# EXHIBIT C

## Part 4

TAB 66

*Rubin v Eurofinance SA* [2013] 1 AC 236, UK Supreme Court

Supreme Court                                                    A

# Rubin and another *v* Eurofinance SA and others
## (Picard and others intervening)

## *In re* New Cap Reinsurance Corpn Ltd (in liquidation)

## New Cap Reinsurance Corpn Ltd and another *v* Grant
and others

B

### [2012] UKSC 46

2012  May 21, 22, 23, 24;           Lord Walker of Gestingthorpe, Lord Mance,
       Oct 24                        Lord Clarke of Stone-cum-Ebony, Lord Sumption JJSC,    C
                                     Lord Collins of Mapesbury

*Insolvency — Liquidation — Foreign company — Liquidators of foreign companies
seeking to enforce in England judgments of United States and Australian courts
to recover moneys transferred to defendants before liquidation — Defendants
claiming not to have been present in or submitted to jurisdiction of foreign courts
— Whether judgments in personam — Whether ordinary rules for enforcing*   D
*judgments in personam inapplicable to bankruptcy proceedings — Whether
judgments enforceable at common law — Whether alternative method of
enforcement through international assistance provisions of Model Law on Cross-
Border Insolvency — Statutory provisions allowing English court to "assist"
Australian court in insolvency matter and for registration and enforcement of
Australian judgment in "civil or commercial" matter — Whether either provision
allowing English court to enforce Australian judgment against defendants —*   E
*Foreign Judgments (Reciprocal Enforcement) Act 1933 (23 & 24 Geo 5, c 13), s 6
— Insolvency Act 1986 (c 45), s 426(4) — Reciprocal Enforcement of Foreign
Judgments (Australia) Order 1994 (SI 1994/1901), art 4(a) — Cross-Border
Insolvency Regulations 2006 (SI 2006/1030), Sch 1, art 21*

In the first case the company settled a trust under English law to hold funds for
consumers who successfully participated in sales promotions organised by it in the   F
United States of America. Following a successful challenge to the promotion under
United States consumer protection legislation, resulting in the trust having to pay a
substantial sum by way of settlement, it obtained an order from the English High Court
appointing the applicants as receivers of the trust's property and the applicants then
filed for protection before the bankruptcy court in New York under Chapter 11 of the
United States Bankruptcy Code.  The applicants were appointed as legal
representatives of the trust, as debtor, with authority to prosecute all causes of action   G
against potential defendants, and they commenced adversary proceedings in New
York, being the equivalent of undervalue transaction and preference claims under
sections 238 and 239 of the Insolvency Act 1986[1], against the defendants, the company
and its founder and his sons. The defendants, who were not present in New York at the
relevant time, did not submit to the court's jurisdiction and did not defend
the proceedings.  Default and summary judgment was entered against them.  The
applicants applied to the High Court for enforcement of the orders in England against   H
the defendants under CPR Pts 70 and 73 on the ground that the English court had power
to do so both at common law and under article 21 of the United Nations Commission
on International Trade Law Model Law on Cross-Border Insolvency, scheduled to the

[1] Insolvency Act 1986, s 426(4)(5): see post, para 146.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A  Cross-Border Insolvency Regulations 2006[2]. The judge held that the Chapter 11 proceedings fell within the ambit of the Model Law but that its provisions for co-operation did not extend to the enforcement of judgments. He refused to recognise the New York court's judgment at common law on the ground that it was an in personam judgment which could not be enforced where the defendants had neither been present in nor submitted to the New York court's jurisdiction. On the applicants' appeal, the Court of Appeal held that the New York court's judgments made in the

B  adversary proceedings, despite having the indicia of judgments in personam, were none the less judgments in and for the purposes of the collective enforcement regime of the bankruptcy proceedings, that the ordinary rule precluding the enforcement of a foreign judgment in personam where the judgment debtor had neither been present in, nor submitted to the jurisdiction of the courts of, the country where judgment had been given did not apply to such proceedings, and that since there should be an unitary bankruptcy proceeding in the court of the bankrupt's domicile which received

C  worldwide recognition, the judgment of the New York court could be enforced against the defendants at common law. Given that decision, the Court of Appeal deemed it unnecessary to decide whether the judgments could have been enforced under the 2006 Regulations.

In the second case the defendants were members of a Lloyd's syndicate which placed reinsurance with an Australian reinsurance company and had received payments from it shortly before it went into liquidation. The liquidator brought

D  proceedings in New South Wales to recover the payments made to the syndicate, on the basis that the company had been insolvent when they were made. The defendants did not accept service of the proceedings or submit to the jurisdiction of the New South Wales court in that matter but did participate in creditors' meetings in Australia in relation to some unsettled claims which they had against the company. The New South Wales court held that the payments had been a preference and therefore liable to be set aside, and issued a letter of request asking, inter alia, that the

E  English court exercise its jurisdiction under section 426(4) of the Insolvency Act 1986 to order the defendants to pay the sum specified in the order. The liquidator and the company issued proceedings in England for relief as sought in the letter of request. The judge held that the English court was entitled to enforce the Australian judgment either at common law, given the decision of the Court of Appeal in the first case, or under section 426(4). Dismissing the defendants' appeal the Court of Appeal, having decided that the Foreign Judgments (Reciprocal Enforcement) Act 1933[3] was

F  applicable because the insolvency proceedings fell within the ambit of "civil or commercial matter" in article 4(a) of the Reciprocal Enforcement of Foreign Judgments (Australia) Order 1994[4], held that, by reason of section 6 of that Act, the judgment was enforceable under section 426 but not at common law.

On appeal by the defendants in both cases—

*Held*, (1) allowing the appeal in the first case (Lord Clarke of Stone-cum-Ebony JSC dissenting), that the common law would only enforce a foreign judgment

G  in personam if the judgment debtors had been present or, where the 1933 Act was applicable, resident in the foreign country when the proceedings had been commenced, or if they had submitted to its jurisdiction; that, as a matter of policy, the court would not adopt a more liberal rule in respect of enforcement judgments in the interests of the universality of bankruptcy; that any change in the settled law of the recognition and enforcement of judgments was a matter for the legislature; that,

H  [2] Cross-Border Insolvency Regulations 2006, Sch 1, art 21: see post, para 136.
   [3] Foreign Judgments (Reciprocal Enforcement) Act 1933, s 6: see post, para 149.
   [4] Reciprocal Enforcement of Foreign Judgments (Australia) Order 1994, art 4: "The following judgments shall be judgments to which Part I of the Foreign Judgments (Reciprocal Enforcement) Act 1933 applies, that is to say— (a) any judgment, decree, rule, order or other final decree for the payment of money (other than in respect of taxes or other charges of a like nature or an order requiring the payment of maintenance) given by a recognised court in respect of a civil or commercial matter . . ."

© 2013 The Incorporated Council of Law Reporting for England and Wales

moreover, the Model Law was not designed to provide for the reciprocal   **A**
enforcement of judgments and so the 2006 Regulations could not be used to enforce a
foreign judgment against a third party; and that, accordingly, applying the common
law, since the proceedings against the defendants in the first case had been in
personam and they had not submitted to the jurisdiction of the United States
bankruptcy court, the orders which it had made against them could not be enforced
by the English court (post, paras 10, 115, 128–129, 142–144, 169, 177, 178, 179).

   *In re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852, HL(E)   **B**
considered.

   *Cambridge Gas Transportation Corpn v Official Committee of Unsecured
Creditors of Navigator Holdings plc* [2007] 1 AC 508, PC disapproved.

   (2) Dismissing the appeal in the second case, that although the English court
could give assistance to the Australian court under section 426 of the Insolvency Act
1986, such assistance did not extend to the enforcement of judgments; that the
defendants' participation in the Australian insolvency proceeding, albeit not the   **C**
actual recovery proceedings, was sufficient for them to be taken to have submitted to
the jurisdiction of the Australian court responsible for the supervision of that
proceeding; that it followed that there could be enforcement in the English court; that
since the 1994 Order applied Part I of the 1933 Act to Australian judgments in
respect of "civil and commercial matters" and since insolvency proceedings were not
to be excluded from that term, enforcement in such cases would be under the
1933 Act rather than at common law; and that, accordingly, the Australian judgment   **D**
in the second case would be enforced by the English court on that basis (post,
paras 152, 167, 175–177, 178, 203, 205).

   *England v Smith* [2001] Ch 419, CA distinguished.

   *Per* Lord Walker of Gestingthorpe, Lord Mance, Lord Sumption JJSC and Lord
Collins of Mapesbury. Declining to sanction a departure from the traditional rules is
unlikely to cause serious injustice. Several of the ways in which the claims were put in
the United States proceedings in the first case might have founded proceedings by   **E**
trustees in England for the benefit of the creditors (as beneficiaries of the express
trust). There are several other avenues available to office-holders. Avoidance claims
by a liquidator of an Australian company may be the subject of a request by the
Australian court pursuant to section 426(4) of the Insolvency Act 1986, applying
Australian law under section 426(5). In appropriate cases, article 23 of the Model
Law will allow avoidance claims to be made by foreign representatives under the
Insolvency Act 1986. In the cases where the insolvent estate has its centre of main   **F**
interests in the European Union, judgments will be enforceable under article 25 of
Council Regulation (EC) No 1346/2000 (post, paras 131, 178).

   Decision of the Court of Appeal in *Rubin v Eurofinance SA* [2010] EWCA Civ
895; [2011] Ch 133; [2011] 2 WLR 121; [2011] Bus LR 84; [2011] 1 All ER (Comm)
287 reversed.

   Decision of the Court of Appeal in *In re New Cap Reinsurance Corpn Ltd* [2011]
EWCA Civ 971; [2012] Ch 538; [2012] 2 WLR 1095; [2012] Bus LR 772; [2012]   **G**
1 All ER 755; [2012] 1 All ER (Comm) 1207 affirmed on different grounds.

The following cases are referred to in the judgments:

*Adams v Cape Industries plc* [1990] Ch 433; [1990] 2 WLR 657; [1991] 1 All ER
   929, Scott J and CA
*African Farms Ltd, In re* [1906] TS 373
*Akai Pty Ltd v People's Insurance Co Ltd* [1998] 1 Lloyd's Rep 90   **H**
*Akande v Balfour Beatty Construction Ltd* [1998] IL Pr 110
*Al Sabah v Grupo Torras SA* [2005] UKPC 1; [2005] 2 AC 333; [2005] 2 WLR 904;
   [2005] 1 All ER 871, PC
*Amin Rasheed Shipping Corpn v Kuwait Insurance Co* [1984] AC 50; [1983] 3 WLR
   241; [1983] 2 All ER 884; [1983] 2 Lloyd's Rep 365, HL(E)

A  *Bank of Credit and Commerce International SA, In re (No 10)* [1997] Ch 213; [1997]
      2 WLR 172; [1996] 4 All ER 796
   *Banque Indosuez SA v Ferromet Rescources Inc* [1993] BCLC 112
   *Barcelona Traction, Light and Power Co Ltd (Second Phase), Case concerning
      (Belgium v Spain)* [1970] ICJ Rep 3
   *Beals v Saldanha* 2003 SCC 72; [2003] 3 SCR 416
   *Bergerem v Marsh* (1921) 6 B & CR 195; 91 LJKB 80
B  *Berliner Industriebank AG v Jost* [1971] 2 QB 463; [1971] 3 WLR 61; [1971] 2 All
      ER 1513, CA
   *Byers v Yacht Bull Corpn* [2010] EWHC 133 (Ch); [2010] BCC 368
   *CCIC Finance Ltd v Guangdong International Trust & Investment Corpn* [2005]
      2 HKC 589
   *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors
      of Navigator Holdings plc* [2006] UKPC 26; [2007] 1 AC 508; [2006] 3 WLR
C     689; [2006] 3 All ER 829; [2006] 2 All ER (Comm) 695, PC
   *Cavell Insurance Co, In re* (2006) 269 DLR (4th) 679
   *Condor Insurance Ltd, In re* (2010) 601 F 3d 319
   *Credit Suisse Fides Trust SA v Cuoghi* [1998] QB 818; [1997] 3 WLR 871; [1997]
      3 All ER 673, CA
   *Desert Sun Loan Corpn v Hill* [1996] 2 All ER 847, CA
   *England v Smith* [2001] Ch 419; [2000] 2 WLR 1141, CA
D  *F-Tex SIA v Lietuvos-Anglijos UAB-Jadecloud-Vilma* (Case C-213/10) (unreported)
      19 April 2012, ECJ
   *Flightlease (Ireland) Ltd, In re* [2006] IEHC 193; [2012] IESC 12
   *Galbraith v Grimshaw* [1910] AC 508, HL(E)
   *German Graphics Graphicsche Maschinen GmbH v van der Schee* (Case C-292/08)
      [2009] ECR I-8421, ECJ
   *Gibson (Gavin) & Co Ltd v Gibson* [1913] 3 KB 379
E  *Godard v Gray* (1870) LR 6 QB 139
   *Gourdain v Nadler* (Case 133/78) [1979] ECR 733, ECJ
   *Gourmet Resources International Inc Estate v Paramount Capital Corpn* (1991)
      3 OR (3d) 286, [1993] IL Pr 583; 14 OR (3d) 319 (Note)
   *HIH Casualty and General Insurance Ltd, In re* [2008] UKHL 21; [2008] 1 WLR
      852; [2008] Bus LR 905; [2008] 3 All ER 869, HL(E)
F  *Hughes v Hannover Ruckversicherungs-Aktiengesellschaft* [1997] 1 BCLC 497, CA
   *Impex Services Worldwide Ltd, In re* [2004] BPIR 564
   *Industrial Maritime Carriers (Bahamas) Inc v Sinoca International Inc (The Eastern
      Trader)* [1996] 2 Lloyd's Rep 585
   *Indyka v Indyka* [1969] 1 AC 33; [1967] 3 WLR 510; [1967] 2 All ER 689, HL(E)
   *Maxwell Communication Corpn, In re* (1994) 170 BR 800
   *Metcalfe & Mansfield Alternative Investments, In re* (2010) 421 BR 685
G  *Modern Terminals (Berth 5) Ltd v States Steamship Co* [1979] HKLR 512
   *Morguard Investments Ltd v De Savoye* [1990] 3 SCR 1077
   *New Cap Reinsurance Corpn v Grant* [2009] NSWSC 662; 257 ALR 740
   *New Cap Reinsurance Corpn v Renaissance Reinsurance Ltd* [2002] NSWSC 856
   *Nouvion v Freeman* (1889) 15 App Cas 1, HL(E)
   *Oakley v Ultra Vehicle Design Ltd* [2005] EWHC 872 (Ch); [2006] BCC 57; [2006]
      BPIR 115
H  *Owens Bank Ltd v Bracco* [1992] 2 AC 443; [1992] 2 WLR 621; [1992] 2 All ER
      193, HL(E)
   *Paramount Airways Ltd, In re* [1993] Ch 223; [1992] 3 WLR 690; [1992] 3 All ER 1,
      CA
   *Pattni v Ali* [2006] UKPC 51; [2007] 2 AC 85; [2006] 2 WLR 102; [2007] 2 All
      ER (Comm) 427, PC

© 2013 The Incorporated Council of Law Reporting for England and Wales

240
**Rubin v Eurofinance SA (SC(E))**                                    [2013] 1 AC

*Picard v Harley International (Cayman) Ltd* (unreported) 10 November 2010,    A
    US Bankruptcy Ct, Southern District of New York
*Rein v Stein* (1892) 66 LT 469, DC
*Robertson, Ex p; In re Morton* (1875) LR 20 Eq 733
*Seagon v Deko Marty Belgium NV* (Case C-339/07) [2009] 1 WLR 2168; [2009]
    Bus LR 1151; [2009] ECR I-767, ECJ
*Siskina (Owners of cargo lately laden on board) v Distos Cia Naviera SA* [1979] AC
    210; [1977] 3 WLR 818; [1977] 3 All ER 803, HL(E)                        B
*Société Eram Shipping Co Ltd v Cie Internationale de Navigation* [2003] UKHL 30;
    [2004] 1 AC 260; [2003] 3 WLR 21; [2003] 3 All ER 465, HL(E)
*Solomons v Ross* (1764) 1 H Bl 131n
*Spiliada Maritime Corpn v Cansulex Ltd* [1987] AC 460; [1986] 3 WLR 972; [1986]
    3 All ER 843, HL(E)
*Starlight International Inc v Bruce* [2002] EWHC 374 (Ch), [2002] IL Pr 617
*Stone & Rolls Ltd v Moore Stephens* [2009] UKHL 39; [2009] AC 1391; [2009]    C
    3 WLR 455; [2009] Bus LR 1356; [2009] 4 All ER 431; [2010] 1 All ER (Comm)
    125, HL(E)
*SwissAir Schweizerische Luftverkehr-Aktiengesellschaft, In re* [2009] EWHC 2099
    (Ch); [2010] BCC 667
*Television Trade Rentals Ltd, In re* [2002] EWHC 211 (Ch); [2002] BCC 807; [2002]
    BPIR 859
*Travers v Holley* [1953] P 246; [1953] 3 WLR 507; [1953] 2 All ER 794, CA    D
*Trepca Mines Ltd, In re* [1960] 1 WLR 1273; [1960] 3 All ER 304, CA
*Turners & Growers Exporters Ltd v The ship Cornelis Verolme* [1997] 2 NZLR 110
*Williams v Jones* (1845) 13 M & W 628
*Williams & Glyn's Bank plc v Astro Dinamico Cia Naviera SA* [1984] 1 WLR 438;
    [1984] 1 All ER 760; [1984] 1 Lloyd's Rep 453, HL(E)

The following additional cases were cited in argument:                        E

*AWB (Geneva) SA v North American Steamships Ltd* [2007] EWCA Civ 739; [2007]
    2 Lloyd's Rep 315; [2007] 2 CLC 117, CA
*Atlas Shipping A/S, In re* (2009) 404 BR 726
*Barlow Clowes Gilt Managers Ltd, In re* [1992] Ch 208; [1992] 2 WLR 36; [1991]
    4 All ER 385
*Drumm (A Bankrupt), In re* (unreported) 13 December 2010, High Ct of Ireland
*Fairfield Sentry Ltd v Citco Bank Nederland NV* [2012] IEHC 81                F
*International Tin Council, In re* [1987] Ch 419; [1987] 2 WLR 1229; [1987] 1 All ER
    890
*Pantmaenog Timber Co Ltd, In re* [2003] UKHL 49; [2004] 1 AC 158; [2003] 3 WLR
    767; [2003] 4 All ER 18, HL(E)
*Stegmann, Ex p* [1902] TS 40
*UBS AG v Omni Holding AG* [2000] 1 WLR 916; [2000] 1 All ER (Comm) 42

                                                                             G

**APPEALS** from the Court of Appeal

### Rubin v Eurofinance SA

    On 31 July 2009 Nicholas Strauss QC sitting as a deputy judge of the
Chancery Division [2010] 1 All ER (Comm) 81 granted an application by
the applicants, David Rubin and Henry Lan, being the foreign
representatives of the Consumer Trust, for (1) recognition of proceedings    H
brought under Chapter 11 of the United States Bankruptcy Code, including
adversary proceedings, in relation to the trust and taking place in the United
States Bankruptcy Court for the Southern District of New York, as a foreign
proceeding under article 2(i) of the United Nations Commission on

© 2013 The Incorporated Council of Law Reporting for England and Wales

241

A  International Trade Law Model Law on Cross-Border Insolvency and
   (2) recognition of themselves as foreign representatives of the trust under
   article 2(j), but refused to grant an order that the United States Bankruptcy
   Court's order of 23 July 2008 be enforced as a judgment of the English
   courts in accordance with CPR Pts 70 and 73 against the defendants to the
   New York proceedings, Adrian Roman, Justin Roman, Nicholas Roman and
   Eurofinance SA.

B      On 30 July 2010, the Court of Appeal (Ward, Wilson LJJ and Henderson
   J) [2011] Ch 133 allowed the applicants' appeal against the dismissal of their
   claim for enforcement and dismissed the defendants' cross-appeal against
   the orders for recognition of the adversary proceedings as part of the
   Chapter 11 proceedings.

       On 27 October 2010 the Supreme Court (Lord Walker of Gestingthorpe,
C  Lord Mance and Lord Collins of Mapesbury JJSC) allowed an application
   by the defendants for permission to appeal, pursuant to which they
   appealed.  On 29 November 2011, 3 April 2012 and 24 April 2012
   respectively the Supreme Court gave leave to intervene in the appeal to
   (1) Irving H Picard, as trustee for the substantively consolidated "SIPA"
   liquidation (under the (United States) Securities Investor Protection Act
   1970) of the business of Bernard L Madoff Investment Securities LLC and
D  Bernard L Madoff, (2) Asphalia Fund Ltd, and (3) Vizcaya Partners Ltd. The
   issues for the Supreme Court, as set out in the parties' statement of agreed
   facts and issues, were whether (1) the relevant proceedings should be
   recognised as a "foreign main proceeding" in accordance with the United
   Nations Commission on International Trade Law Model Law on Cross-
   Border Insolvency, scheduled to the Cross-Border Insolvency
E  Regulations 2006; (2) the applicants should be recognised as "foreign
   representatives" within the meaning of article 2(j) of the Model Law in
   relation to those proceedings; and (3) that part of the United States
   Bankruptcy Court's order of 23 July 2008 relating to the avoidance
   proceedings be enforced against the defendants as a judgment of the English
   courts in accordance with CPR Pts 70 and 73.

       The facts are stated in the judgment of Lord Collins of Mapesbury.
F

                    *In re New Cap Reinsurance Corpn Ltd*

       On 15 March 2011 Lewison J [2011] EWHC 677 (Ch) granted an
   application by the first applicant, New Cap Reinsurance Corpn Ltd (in
   liquidation), and the second applicant, John Raymond Gibbons (the first
   applicant's liquidator) for an order enforcing in England an order made on
G  11 September 2009 by the Supreme Court of New South Wales that the
   defendants, AE Grant and others, as members of Lloyd's Syndicate 991 for
   the 1997 and 1998 year accounts, pay the applicants certain commutation
   payments made by the first applicant to the defendants, and in respect of
   which order the court had issued a letter of request to the English High Court
   requesting assistance in enforcing that order.  The judge held that the order
   of the New South Wales court could not be registered and enforced under the
H  Foreign Judgments (Reciprocal Enforcement) Act 1933 (as applied to
   Australia by the Reciprocal Enforcement of Foreign Judgments (Australia)
   Order 1994), that the High Court therefore had power to assist the New
   South Wales court either at common law or under section 426 of the
   Insolvency Act 1986 and that, in the exercise of his discretion, he would

© 2013 The Incorporated Council of Law Reporting for England and Wales

assist the New South Wales court by ordering payment of the Australian    A
judgment debt under section 426.

On 9 August 2011, the Court of Appeal (Mummery, Lloyd and
McFarlane LJJ) [2012] Ch 538 dismissed an appeal by the defendants
against the judge's order.

On 30 November 2011 the Supreme Court (Lord Walker of
Gestingthorpe, Lord Mance, Lord Dyson JJSC) allowed an application by
the defendants for leave to appeal, pursuant to which they appealed. On    B
18 January 2012 the Supreme Court (Lord Walker of Gestingthorpe, Lord
Mance and Lord Dyson JJSC) allowed an application by the applicants to
cross-appeal, pusuant to which they cross-appealed.

The issues for the Supreme Court, as set out in the parties' statement of
agreed facts and issues, were (1) whether the court was being asked to apply
section 426(4) of the Insolvency Act 1986 to the enforcement of foreign    C
judgments or (2) whether instead the court was being asked to apply that
part of section 588FF(1) of the (Australian) Corporations Act 2001 which
empowered the court to make an order directing the defendants to pay
money to the claimants and/or (ii) to direct the defendants to pay money to
the claimants under the court's general jurisdiction and powers; (3) whether,
if the court was being asked to apply section 426(4) to the enforcement of    D
foreign judgments, that section extended to the enforcement of foreign
judgments; (4) whether section 6 of the Foreign Judgments (Reciprocal
Enforcement) Act 1933 had application to judgments for the payment of
money in foreign insolvency proceedings; (5) (on the cross-appeal) whether
the Australian judgment was a judgment to which Part I of the 1933 Act (as
applied by the Reciprocal Enforcement of Foreign Judgments (Australia)
Order 1994) applied; (6) (on the cross-appeal) whether, if the Australian    E
judgment was a judgment to which Part 1 of the 1933 Act applied, the
declarations in the Australian judgment (a) were binding under section 8 of
the 1933 Act and/or at common law, and/or (b) could form the subject of
judicial assistance; (7) whether *Rubin v Eurofinance SA* [2011] Ch 133 was
rightly decided; (8) whether, if *Rubin's* case was wrong, registration of the
Australian judgment under the 1933 Act would be set aside by the English    F
court, and whether the courts below were right to assist the Australian court
under section 426(4) of the 1986 Act; (9) whether, if section 426(4) was
available but registration of the Australian judgment under the 1933 Act
would be set aside, it was appropriate to assist the Australian court under
section 426(4); (10) whether the defendants had submitted to the insolvency
jurisdiction of the Australian court and, if so, with what consequence; and
(11) whether the English court should in any event assist the Australian    G
court at common law.

The facts are stated in the judgment of Lord Collins of Mapesbury.

*Robin Knowles QC* and *Blair Leahy* (instructed by *Edwards Wildman
Palmer UK LLP*) for the defendants in the second case.

Section 426(4) of the Insolvency Act 1986 does not provide a procedure
by which a judgment of a court having jurisdiction in relation to insolvency    H
law in a "relevant country or territory" may be enforced in the United
Kingdom. It is not concerned with "assistance", not "enforcement" of
judgments. Enforcement is dealt with by section 426(1)(2), where it is
confined to orders made by courts in other parts of the United Kingdom.

© 2013 The Incorporated Council of Law Reporting for England and Wales

243

**[2013] 1 AC**                                                    Rubin v Eurofinance SA (SC(E))
                                                                                    Argument

A   Although Lloyd LJ [2012] Ch 538, paras 58, 61, 72 refers to "assistance by
    way of enforcement", enforcement is not to be treated as a form of
    assistance. Since section 426(4) also applies to courts having jurisdiction in
    other parts of the United Kingdom, if "assistance" in section 426(4) meant
    enforcement, section 426(1)(2) would be redundant. Enforcement of
    judgments, a subject which goes to jurisdiction, has always been a matter for
    distinct provision and rules. In the context of insolvency law, section 426(4)
B   is about assisting with information provision, evidence gathering, the
    conduct of an insolvency administration and the undertaking of
    proceedings.
        Where the judgment is one to which Part I of the Foreign Judgments
    (Reciprocal Enforcement) Act 1933 applies, the procedure provided for by
    that Act—registration, subject to an application to set aside the
C   registration—must be used. Where a "relevant country or territory" under
    section 426 of the 1986 Act is also the country of a "recognised court" under
    the 1933 Act, section 6 of the 1933 Act requires proceedings for the recovery
    of a sum payable under a foreign judgment to be by way of registration. The
    availability of the 1933 Act procedure (albeit not used) precludes reliance on
    enforcement at common law in respect of the Australian judgment.
D       At common law the United Kingdom courts will not enforce a foreign
    money judgment obtained against a defendant not subject to the jurisdiction
    of the foreign court: see rule 43 of *Dicey, Morris & Collins, The Conflict of
    Laws*, 15th ed (2012). That position has not been changed by the 1933 and
    1986 Acts. [Reference was made to section 426(4) of the 1986 Act and
    section 4(1)(a)(ii) of the 1933 Act.] The decision of the Court of Appeal in
    the *Rubin* case [2011] Ch 133 that a foreign insolvency judgment could be
E   enforced in England and Wales at common law against a defendant not
    subject to the jurisdiction of the foreign court is a radical departure from the
    existing law rather than an incremental development recognisable to the
    common law and is wrong. Concepts of co-operation and universalism do
    not justify rewriting the private international law position. Universalism
    may be accorded to matters of distribution of the insolvent estate (see
F   *Cambridge Gas Transportation Corpn v Official Committee of Unsecured
    Creditors of Navigator Holdings plc* [2007] 1 AC 508, paras 16, 22, 25 and
    *In re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852, paras 6,
    9) but not to the collection of assets for the estate. Co-operation enables
    assistance to be given but enforcement is available only when private
    international law allows. Private international law is best developed
    uniformly by comprehensive legislation and international agreement, not by
G   uncertain development of the common law. In insolvency law certainty is of
    crucial importance: see *In re Flightlease (Ireland) Ltd* [2006] IEHC 193;
    [2012] IESC 12. To leave this area of law subject to the incidence of
    discretion (at common law, or under section 426) is unsatisfactory. Parties,
    the courts and other litigants need to know where they stand when litigation
    begins, not when it comes to an attempt to enforce a judgment.

H   *Marcus Staff* (instructed by *Brown Rudnick LLP*) for the defendants in
    the first case.
        Whether the judgment of a foreign court may be enforced at common law
    depends on its classification as a judgment in personam, a judgment in rem,
    or an order of the type recognised in *Cambridge Gas Transportation Corpn v*

© 2013 The Incorporated Council of Law Reporting for England and Wales

*Official Committee of Unsecured Creditors of Navigator Holdings plc*    A
[2007] 1 AC 508.

The order in the present case does not fall within the latter classification. The purpose of the order in the *Cambridge Gas* case was simply to establish a mechanism of collective execution against the property of the debtor by creditors whose rights were admitted or established. The claims that gave rise to the foreign judgment in the present case were in adversary proceedings to determine or establish the existence of rights. As an in    B personam judgment that judgment did not meet the requirements of rule 43 of *Dicey, Morris & Collins, The Conflict of Laws*, 15th ed (2012). The defendants were not resident in New York when the proceedings were instituted and they did not submit to the jurisdiction of the New York courts by voluntarily appearing there. A decree pronounced in absentia by a foreign court, to the jurisdiction of which the defendant has not in any way    C submitted, is by international law a nullity.

The decision in the *Rubin* case [2011] Ch 133 drives a coach and horses through well established principles of English law in relation to the recognition and enforcement of foreign in personam judgments. The decision means that defendants cannot predict where they might be sued. Such a lack of predictability is contrary to the guiding principles of European law and undermines the principle of commercial certainty which is a    D constant and important objective of English commercial law. If the law on recognition of foreign judgments is to be changed, that should be done only in respect of countries or territories selected by the legislature so that the consequences of the change can be mapped out in a way which is predictable and therefore fair for all parties. The decision extends relief well beyond the provisions of the UNCITRAL Model Law.    E

*Robin Dicker QC* and *Tom Smith* (instructed by *Chadbourne & Parke LLP*) for the applicants in the first case.

The primary purpose of insolvency law is to provide a regime where the liquidator acts in the public interest and not merely in the interests of the creditors and contributories. The community itself has always been recognised as having an interest in such proceedings: see *In re Pantmaenog*    F *Timber Co Ltd* [2004] 1 AC 158, para 52; *In re Barlow Clowes Gilt Managers Ltd* [1992] Ch 208, 221 and *Ex p Stegmann* [1902] TS 40, 47.

English law takes the view that fairness between creditors requires that bankruptcy proceedings should have universal application. There should be a single bankruptcy in which all creditors are entitled and required to prove. No one should have an advantage because he happens to live in a jurisdiction where more of the assets or fewer of the creditors are situated: see    G *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC 508, para 16; *In re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852, para 30; *Bergerem v Marsh* (1921) 6 B & CR 195 and *In re Impex Services Worldwide Ltd* [2004] BPIR 564. Common law courts in England and elsewhere refuse to allow execution to issue on a debtor's local assets when the debtor is subject to insolvency proceedings in another jurisdiction in    H which the creditors can participate: see *Solomons v Ross* (1764) 1 H Bl 131n; *Modern Terminals (Berth 5) Ltd v States Steamship Co* [1979] HKLR 512 and *CCIC Finance Ltd v Guangdong International Trust & Investment Corpn* [2005] 2 HKC 589.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    At an early stage of the development of the law of corporate insolvency the potential conflict between the locally effective winding up of an overseas company in England and an universal winding up in the country of the debtor's incorporation was resolved by a judge-made principle which treated the English proceedings as ancillary to the principal winding up: see *In re International Tin Council* [1987] Ch 419, 446–447. [Reference was also made to the UNCITRAL Legislative Guide on Insolvency Law (2004),
B    paras 150–152 and *Fletcher, The Law of Insolvency*, 4th ed (2009), paras 26-001–26-003.]

The guiding principles to be applied in relation to foreign insolvency proceedings are, first, that the court should seek so far as possible to give effect to the principle of there being a single insolvency proceeding in relation to an insolvent debtor which has universal effect and, secondly, that
C    active assistance should be given to that insolvency proceeding. The application of these principles may require the court to recognise and enforce an order made in the course of the foreign insolvency proceedings. The rules governing the recognition of such orders are separate and distinct from the rules governing the recognition and enforcement of judgments in rem and judgments in personam. The *Cambridge Gas* case establishes that
D    there is a third category of judgment independent of judgments in rem and judgments in personam, namely, orders which form part of insolvency proceedings. A different approach is taken for each. A similar distinction is recognised under EU law: see *Seagon v Deko Marty Belgium NV* (Case C-339/07) [2009] 1 WLR 2168; *F-Tex SIA v Lietuvos-Anglijos UAB-Jadecloud-Vilma* (Case C-213/10) (unreported) 19 April 2012 and *German Graphics Graphicsche Maschinen GmbH v van der Schee* (Case C-292/08)
E    [2009] ECR I-8421.

Avoidance provisions by which prior transactions can be adjusted and assets recovered to supplement the estate available for distribution to creditors are an integral part of the process of collective enforcement represented by an insolvency proceeding. They are central to the purpose of insolvency proceedings because they are a necessary means of constituting the estate of the debtor against which collective enforcement then takes
F    place.

The assistance sought in the present case is well within the limits of what the courts can properly provide: see *Byers v Yacht Bull Corpn* [2010] BCC 368; *Oakley v Ultra Vehicle Design Ltd* [2006] BCC 57 and *UBS AG v Omni Holding AG* [2000] 1 WLR 916.

The relevant parts of the judgment can also be recognised and enforced
G    under the Model Law as implemented by the Cross-Border Insolvency Regulations 2006 (SI 2006/1030). The approach under the Model Law, as enacted by the Regulations, is consistent with that at common law. The court is empowered to grant appropriate relief including any type of relief which is available under the law of the enacting state. In the present case the relief sought reflects relief which would have been available under the English statutory scheme if the trust had been in an insolvency procedure in
H    England. It is therefore a type of relief which is available under English law. Furthermore, the relief sought is in the interests of creditors because it will facilitate the recovery of assets for distribution in accordance with the applicable statutory scheme to the creditors of the trust. [Reference was made to *In re Atlas Shipping A/S* (2009) 404 BR 726; *In re Metcalfe &*

© 2013 The Incorporated Council of Law Reporting for England and Wales

*Mansfield Alternative Investments* (2010) 421 BR 685 and *In re Condor*    A
*Insurance Ltd* (2010) 601 F 3d 319.]

Whether at common law or under the Model Law there is no reason why
the court should not exercise its jurisdiction to provide assistance to the
Chapter 11 proceeding by recognising and enforcing the relevant parts of the
judgment.

*Gabriel Moss QC* and *Barry Isaacs QC* (instructed by *Mayer Brown*    B
*International LLP*) for the applicants in the second case.

The judge was right to grant the relief sought in the letter of request under
section 426 of the Insolvency Act 1986 and/or the common law. The nature
of cross-border insolvency is such that a court in one jurisdiction should
render whatever assistance it properly can to a court in another in respect of
assets located or persons resident within the territory of the former: see
*Credit Suisse Fides Trust SA v Cuoghi* [1998] QB 818, 827.    C

Section 426 is not merely concerned with procedure but is part of the
substantive insolvency scheme. It imposes a duty on English courts to
provide assistance to insolvency courts in relevant countries and territories:
see section 426(4)(5)(10). The Australian proceedings were based on section
588FF(1) of the Australian Corporations Act 2001, which corresponds to
section 239 of the 1986 Act. The English court was asked to apply that part    D
of section 588FF(1) which empowers the court to make an order directing a
person to pay money to a company. In granting this form of assistance the
English court was applying Australian insolvency law; it was not applying
section 426 to the enforcement of a foreign judgment. The court was also
asked to make an order directing a person to pay money under its general
jurisdiction and powers. The English court has the power under section 426
to apply its own general jurisdiction and powers by way of assistance to the    E
Australian court: see *Hughes v Hannover Ruckversicherungs-*
*Aktiengesellschaft* [1997] 1 BCLC 497, 517. The *Report of the Review*
*Committee on Insolvency Law and Practice* (1982) (Cmnd 8558) refers to
the "enforcement" of foreign insolvency judgments: see para 1902.

Section 6 of the Foreign Judgments (Reciprocal Enforcement) Act 1933 has
no application to judgments for the payment of money in foreign insolvency
proceedings. The intention of the 1933 Act was to provide a simpler and    F
more convenient mode of enforcement than the common law provided. The
Act applies only to cases where foreign judgments used to be enforced by
bringing an action at common law based on the foreign judgment. The
position in relation to foreign insolvency judgments before the 1933 Act was
governed by section 122 of the Bankruptcy Act 1914. There is no indication
that the 1933 Act was intended to affect this pre-existing jurisdiction. The    G
Bankruptcy Act 1914 did not feature in the Greer Report, which led to the
passing of the 1933 Act: see the *Report of the Foreign Judgments (Reciprocal*
*Enforcement) Committee* (1932) (Cmd 4213).

The rules governing insolvency proceedings have diverged significantly
from the general provisions of civil law: see *Seagon v Deko Marty Belgium*
*NV* (Case C-339/07) [2009] 1 WLR 2168, 2175, 2176–2178, paras 27, 33,
35, 39. The decision of the Court of Appeal [2011] Ch 133 was correct. All    H
that was new in the decision was the application of the principles in
*Cambridge Gas Transportation Corpn v Official Committee of Unsecured*
*Creditors of Navigator Holdings plc* [2007] 1 AC 508 and *In re*
*HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852 to a foreign

© 2013 The Incorporated Council of Law Reporting for England and Wales

A  insolvency judgment which required payment of a sum of money. As to *In re Flightlease (Ireland) Ltd* [2006] IEHC 193; [2012] IESC 12, which declined to follow the reasoning in *Cambridge Gas*, see *In re Drumm (A Bankrupt)* (unreported) 13 December 2010 (High Court of Ireland) and *Fairfield Sentry Ltd v Citco Bank Nederland NV* [2012] IEHC 81.

B  In any event the defendants in the present case submitted to the jurisdiction of the Australian court by participating in meetings of creditors of, and submitting proofs of debt in the administration, liquidation and scheme of arrangement relating to, the liquidated company. Having chosen to submit to that Australian insolvency proceeding, they should not be allowed to benefit from it without the burden of complying with the orders made in that proceeding.

C  *Pushpinder Saini QC, Adrian Briggs, Shaheed Fatima, Ian Fletcher* and *Stephen Robins* (instructed by *Taylor Wessing LLP*) for the first intervener in the first case, by written submissions.

As a matter of English private international law it is necessary to distinguish between (a) judgments in rem and in personam and (b) foreign orders which form integral parts of foreign insolvency proceedings: see *Cambridge Gas Transportation Corp v Official Committee of Unsecured* D  *Creditors of Navigator Holdings plc* [2007] 1 AC 508, paras 13–15 and *Pattni v Ali* [2007] 2 AC 85, para 23. The effect of this distinction is that where the foreign court seeks assistance in England in respect of the implementation of a foreign insolvency order such assistance (which is discretionary) will not be subject to the English private international law rules regarding the enforcement of foreign judgments in rem or in personam as set out in rule 43 of *Dicey, Morris & Collins, The Conflict of Laws*, 15th E  ed (2012). The distinction arises because the enforcement of judgments in rem and in personam is rooted in the doctrine of obligation whereby the successful party to the foreign proceedings is able, when seeking recognition and enforcement in England, to show that the other owes him an obligation by virtue of that other's being bound by the foreign judgment as res judicata. By contrast, cross-border judicial assistance and co-operation in insolvency F  does not relate to the court's function of resolving disputes between private litigants but to the separate function of administering insolvent estates in a collective process which is performed with regard to the wider public interest: see *Ex p Stegmann* [1902] TS 40 and *In re Barlow Clowes Gilt Managers Ltd* [1992] Ch 208, 220–221. English common law takes the view that insolvency proceedings should have universal application. This requires that the estate which the insolvency court administers should be the G  worldwide estate of the insolvent debtor. In order for the court which is seised of the administration of the worldwide estate to administer it effectively, it will frequently be necessary for courts in other jurisdictions to provide assistance to further that objective, acting under the principle of modified universalism: see *In re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852, para 30 and *Credit Suisse Fides Trust SA v Cuoghi* H  [1998] QB 818, 827. To be effective, insolvency proceedings must be able to thwart the underhand conduct of debtors and connected creditors.

The proper approach, when determining whether a foreign order is an insolvency order, is to consider whether it is part of foreign insolvency proceedings. It is not correct to consider, in isolation from the context, whether the effect of the order is akin to a judgment in rem or in personam,

© 2013 The Incorporated Council of Law Reporting for England and Wales

nor therefore whether the order "establishes" rights rather than seeking to    A
enforce them.   Judgments in rem and in personam will, by definition,
"establish" rights.  In broad terms a foreign order will be part of foreign
insolvency proceedings if it is integral to the foreign insolvency law's scheme
for the collection and distribution of the assets of the insolvent estate to
creditors.  In particular, avoidance orders (which are not unique to English
or United States insolvency proceedings but are a feature of every developed
system of insolvency law) form an integral part of the insolvency    B
proceedings: see *Oakley v Ultra Vehicle Design Ltd* [2006] BCC 57, para 42;
*AWB (Geneva) SA v North American Steamships Ltd* [2007] 2 Lloyd's Rep
315, para 27 and the *HIH* case [2008] 1 WLR 852, para 19.  Where the
English court is considering whether to exercise its discretion to assist the
foreign court, there is a presumption in favour of assistance, which should
therefore be provided unless there is a good reason for it to be refused.  It is    C
irrelevant that the person against whom the insolvency order takes effect
was not present in the foreign country at the time of the issue of the writ.

  *Michael Driscoll QC* and *Rosanna Foskett* (instructed by *Wilsons
Solicitors LLP*) for the second intervener in the first case (and instructed by
*Wedlake Bell LLP*) for the third intervener in the first case, by written
submissions.    D
  The English court's inherent jurisdiction to assist a foreign representative
(as that expression is used in article 2 of the UNCITRAL Model Law) should
not extend to enforcement of any money judgment against a third party
defendant obtained by a foreign representative in a foreign court on the
application of principles of a foreign law where the foreign court does not
have competent jurisdiction over the defendant according to English private
international law, and the inherent jurisdiction should not extend, therefore,    E
to the enforcement of money judgments against defendants.  The assistance
to be given by the English court should be limited to recognition of the
foreign representative and of the rights and powers over the debtor's
property which his appointment gives him.  It should extend to authorising
the foreign representative to bring proceedings in England equivalent to
those which an English representative could bring based upon principles of    F
English law and not foreign law.
  Whilst many national insolvency laws include provisions to avoid certain
preferences and fraudulent transfers made by the debtor before the
commencement of the insolvency proceedings, those laws operate in
materially different ways and have materially different consequences.  In
particular, an United States Securities Investor Protection Act ("SIPA")
liquidation enables an United States SIPA trustee to bring avoidance claims    G
which an English liquidator or trustee in bankruptcy cannot bring.
Moreover, the consequences of a successful avoidance claim in the United
States by a SIPA trustee defeats rather than gives effect to the fundamental
principle of equitable pro rata distribution among all unsecured creditors of
the debtor.  The English court should not develop new law by assuming to
itself a jurisdiction which Parliament has not conferred on it to enforce a    H
money judgment obtained by a foreign representative against a third party in
insolvency proceedings before a foreign court where the third party is not, as
a matter of English law, subject to the jurisdiction of the foreign court.
  The default judgments were judgments in personam given by a foreign
court which did not have competent jurisdiction over the defendants so as to

© 2013 The Incorporated Council of Law Reporting for England and Wales

A make the default judgments enforceable as of right in an English court: see *Adams v Cape Industries plc* [1990] Ch 433, 513, 528, 530–544, 549–550, 557–572. They are therefore a nullity as far as the English court is concerned. Until the Court of Appeal decision in the *Rubin* case [2011] Ch 133 no English court has gone so far as to enforce as a matter of discretion money judgments obtained in such circumstances. The legislature and the executive through its treaty-making powers are in a better position

B than the judiciary to develop and extend the laws of co-operation between English courts and others in the field of cross-border insolvency. A principle of universalism can only properly come about through international treaty.

*Knowles QC* replied.

*Staff* also replied.

C
The court took time for consideration.

24 October 2012. The following judgments were handed down.

**LORD COLLINS OF MAPESBURY** (with whom **LORD WALKER OF GESTINGTHORPE** and **LORD SUMPTION JJSC** agreed)

D
*I Introduction*

*The appeals*

1 There are two appeals before the court: *Rubin v Eurofinance SA* ("*Rubin*") and *New Cap Reinsurance Corpn Ltd v Grant* ("*New Cap*"). These appeals raise an important and novel issue in international insolvency

E law. The issue is whether, and if so, in what circumstances, an order or judgment of a foreign court (on these appeals the United States Bankruptcy Court for the Southern District of New York, and the New South Wales Supreme Court) in proceedings to adjust or set aside prior transactions, e g preferences or transactions at an undervalue ("avoidance proceedings"), will be recognised and enforced in England. The appeals also raise the question whether enforcement may be effected through the international

F assistance provisions of the UNCITRAL Model Law (implemented by the Cross-Border Insolvency Regulations 2006 ("CBIR")), which applies generally, or the assistance provisions of section 426 of the Insolvency Act 1986, which applies to a limited number of countries, including Australia.

2 In *Rubin* a judgment of the US Federal Bankruptcy Court for the Southern District of New York ("the US Bankruptcy Court") in default of

G appearance for about US$10m under State and Federal law in respect of fraudulent conveyances and transfers was enforced in England at common law. In *New Cap* (in which the Court of Appeal was bound by the prior decision in *Rubin*) a default judgment of the New South Wales Supreme Court, Equity Division, for about US$8m in respect of unfair preferences under Australian law was enforced under the Foreign Judgments (Reciprocal Enforcement) Act 1933, and, alternatively, pursuant to powers under

H section 426 of the Insolvency Act 1986.

3 In each of the appeals it was accepted or found that the party against whom they were given was neither present (nor, for the purposes of the 1933 Act, resident) in the foreign country nor submitted to its jurisdiction (which are the relevant conditions for enforceability at common law and

250
Rubin v Eurofinance SA (SC(E))                                     [2013] 1 AC
Lord Collins of Mapesbury

under the 1933 Act), but that those conditions did not apply to judgments or   A
orders in foreign insolvency proceedings.

4   In addition to the arguments on these two appeals, the court has had
the great benefit of written submissions on behalf of parties to proceedings
pending in Gibraltar.  Those proceedings are to enforce default judgments
entered by the United States Bankruptcy Court for some $247m in respect of
alleged preferential payments to companies in the British Virgin Islands and   B
Cayman Islands arising out of the notorious Ponzi scheme operated by
Mr Bernard Madoff.

5   It has been necessary to emphasise that the judgments in all three
matters were in default of appearance, because if the judgment debtors had
appeared and defended the proceedings in the foreign courts, the issues on
these appeals would not have arisen.  The reason is that the judgments would
have been enforceable on the basis of the defendants' submission to the   C
jurisdiction of the foreign court.  Enforcement would have been at common
law, or, in the *New Cap* case either under the common law, or under the
1933 Act which substantially reproduces the common law principles—there
is a subsidiary issue on this appeal as to whether the 1933 Act applies to
judgments in insolvency proceedings, dealt with in section IX below.

6   Under the common law a court of a foreign country has jurisdiction to   D
give a judgment in personam where (among other cases) the judgment debtor
was present in the foreign country when the proceedings were instituted, or
submitted to the jurisdiction of the foreign court by voluntarily appearing in
the proceedings.  In the case of the 1933 Act the foreign court is deemed to
have jurisdiction where the judgment debtor submitted to the jurisdiction by
voluntarily appearing in the proceedings otherwise than for the purpose   E
(inter alia) of contesting the jurisdiction; or where the judgment debtor was
resident at the time when the proceedings were instituted, or being a body
corporate had an office or place of business there: section 4(2)(a)(i)(iv).

*The Dicey rule*

7   The general principle has been referred to on these appeals, by   F
reference to the common law rule set out in *Dicey, Morris & Collins, The
Conflict of Laws*, 14th ed (2006), as "*Dicey's* rule 36."  This was only by
way of shorthand, because the rules in the 1933 Act are not quite identical,
and in any event has been purely for convenience, because the rule has no
standing beyond the case law at common law which it seeks to re-state.
What was rule 36 now appears (incorporating some changes which are not
material on this appeal) as rule 43 in the new 15th edition, and I shall refer to   G
it as "the *Dicey* rule".  So far as relevant, rule 43 (*Dicey, Morris & Collins,
The Conflict of Laws*, 15th ed (2012), vol 1, para 14R-054) states:

"a court of a foreign country outside the United Kingdom has
jurisdiction to give a judgment in personam capable of enforcement or
recognition as against the person against whom it was given in the
following cases:   H
"*First Case*—If the person against whom the judgment was given was,
at the time the proceedings were instituted, present in the foreign country.
"*Second Case*—If the person against whom the judgment was given
was claimant, or counterclaimed, in the proceedings in the foreign court.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A        "*Third Case*—If the person against whom the judgment was given
         submitted to the jurisdiction of that court by voluntarily appearing in the
         proceedings.
             "*Fourth Case*—If the person against whom the judgment was given
         had before the commencement of the proceedings agreed, in respect of the
         subject matter of the proceedings, to submit to the jurisdiction of that
         court or of the courts of that country."

B
         8   The first edition of *Dicey* in 1896 stated (rule 80) that the foreign
     court would have jurisdiction if "the defendant was resident [or present?]" in
     the foreign country "so as to have the benefit, and be under the protection, of
     the laws thereof". By the 6th edition in 1949 the formula was repeated by
     Professor Wortley (rule 68) but without the doubt about presence as a basis
C    of jurisdiction. In the 8th edition in 1967 Dr (later Professor) Clive Parry
     removed the phrase (then rule 189) about the benefit and protection of the
     foreign country's laws. The rule, subsequently edited by Dr Morris and then
     by Professor Kahn-Freund, remained in that form until the decision in
     *Adams v Cape Industries plc* [1990] Ch 433 (CA), which established that
     presence in the foreign jurisdiction, as opposed to residence, was a sufficient
     basis for the recognition of foreign judgments. Then, edited by myself and
D    later by Professor Briggs, the rule took substantially its present form in the
     12th edition in 1993.
         9   The theoretical basis for the enforcement of foreign judgments at
     common law is that they are enforced on the basis of a principle that where a
     court of competent jurisdiction has adjudicated a certain sum to be due from
     one person to another, a legal obligation arises to pay that sum, on which an
E    action of debt to enforce the judgment may be maintained: *Williams v Jones*
     (1845) 13 M & W 628, 633, per Parke B; *Godard v Gray* (1870) LR 6
     QB 139, 147, per Blackburn J; *Adams v Cape Industries plc* [1990] Ch 433,
     513 and *Owens Bank Ltd v Bracco* [1992] 2 AC 443, 484, per Lord Bridge
     of Harwich. As Blackburn J said in *Godard v Gray*, this was based on the
     mode of pleading an action on a foreign judgment in debt, and not merely as
     evidence of the obligation to pay the underlying liability: LR 6 QB 139, 150.
F    But this is a purely theoretical and historical basis for the enforcement of
     foreign judgments at common law. It does not apply to enforcement under
     statute, and makes no practical difference to the analysis, nor, in my
     judgment, to the issues on these appeals.
         10   Consequently, if the judgments in issue on the appeals are regarded
     as judgments in personam within the *Dicey* rule, then they will only be
G    enforced in England at common law if the judgment debtors were present
     (or, if the 1933 Act applies, resident) in the foreign country when the
     proceedings were commenced, or if they submitted to its jurisdiction. It is
     common ground that the judgment debtors were not present or resident,
     respectively, in the United States or in Australia, although there is an issue as
     to whether the New Cap defendants submitted to the jurisdiction of the
     Australian court, which is dealt with in section VIII below.

H
         *Insolvency proceedings and the international dimension*

         11   There are some general remarks to be made. First, from as early as
     the mid-18th century the English courts have recognised the effect of foreign
     personal bankruptcies declared under the law of the domicile: *Solomons v*

© 2013 The Incorporated Council of Law Reporting for England and Wales

*Ross* (1764) 1 H Bl 131n, where Dutch merchants were declared bankrupt in    A
Amsterdam, and the Dutch curator was held entitled to recover an English
debt in priority to an English creditor of the merchants who had attached the
debt after the bankruptcy: see *Nadelmann, Conflict of Laws: International
and Interstate* (1972), p 273 and *Blom-Cooper, Bankruptcy in Private
International Law* (1954), pp 107–108.

12    In *Galbraith v Grimshaw* [1910] AC 508 Lord Dunedin said that    B
there should be only one universal process of the distribution of a bankrupt's
property and that, where such a process was pending elsewhere, the English
courts should not allow steps to be taken in its jurisdiction which would
interfere with that process:

> "Now so far as the general principle is concerned it is quite consistent
> with the comity of nations that it should be a rule of international law    C
> that if the court finds that there is already pending a process of universal
> distribution of a bankrupt's effects it should not allow steps to be taken in
> its territory which would interfere with that process of universal
> distribution . . .": p 513.

13    Second, in the case of corporations the English courts have exercised
a winding up jurisdiction which is wider than that which at common law    D
they have accorded to foreign courts. The court exercises jurisdiction to
wind up a foreign company if there is a sufficient connection between the
company and England, there are persons who would benefit from
the making of a winding up order, and there are persons interested in the
distribution of assets of the company who are persons over whom the court
can exercise jurisdiction: see *Dicey*, 15th ed, para 30R-036. But as regards
foreign liquidations, the general rule is that the English court recognises at    E
common law only the authority of a liquidator appointed under the law of
the place of incorporation: *Dicey*, 15th ed, para 30R-100. That is in contrast
to the modern approach in the primary international and regional
instruments, the EC Insolvency Regulation on Insolvency Proceedings
(Council Regulation (EC) No 1346/2000) ("the EC Insolvency Regulation")
and the Model Law, which is that the jurisdiction with international
competence is that of the country of the centre of main interests of the debtor    F
(an expression not without its own difficulties). It is ultimately derived from
the civil law concept of a trader's domicile, and was adopted in substance in
the draft EEC Convention of 1980 as a definition of the debtor's centre of
administration: see Report by M Lemontey on the draft EEC Bankruptcy
Convention, Bulletin of the European Communities, Supp 2/82, p 58;
American Law Institute, *Transnational Insolvency: Global Principles for*    G
*Co-operation in International Insolvency Cases* (2012), Principle 13, pp 83
et seq.

14    Third, it is not only in recent times that there have been large
insolvency proceedings with significant cross-border implications. Even
before then there were the Russian bank cases in the 1930s (arising out of the
nationalisation and dissolution of the banks by the Soviet Government) and
the *Barcelona Traction* case in the 1940s and 1950s (see *Case concerning*    H
*Barcelona Traction, Light and Power Co Ltd (Second Phase) (Belgium v
Spain)* [1970] ICJ Rep 3), but there is no doubt that today international
co-operation in cross-border insolvencies has become a pressing need. It is
only necessary to recall the bankruptcies or liquidations of Bank of Credit

© 2013 The Incorporated Council of Law Reporting for England and Wales

A  and Commerce International, Maxwell Communications, or Lehman
Brothers, each with international businesses, assets in many countries, and
potentially competing creditors in different countries with different laws.
There is not only a need to balance all these interests but also to provide
swift and effective remedies to combat the use of cross-border transfers of
assets to evade and to defraud creditors.

B      15  Fourth, there is no international unanimity or significant
harmonisation on the details of insolvency law, because to a large extent
insolvency law reflects national public policy, for example as regards
priorities or as regards the conditions for the application of avoidance
provisions: "the process of collection of assets will include, for example, the
use of powers to set aside voidable dispositions, which may differ very
considerably from those in the English statutory scheme": *In re*
C  *HIH Casualty and General Insurance Ltd* ("*HIH*") [2008] 1 WLR 852,
para 19, per Lord Hoffmann.

    16  Fifth, there has been a trend, but only a trend, to what is called
universalism, that is, the "administration of multinational insolvencies by a
leading court applying a single bankruptcy law": Jay Westbrook, "A Global
Solution to Multinational Default" (2000) 98 Mich L Rev 2276, 2277.
What has emerged is what is called by specialists "modified universalism."

D      17  The meaning of the expression "universalism" has undergone a
change since the time it was first used in the 19th century, and it later came to
be contrasted with the "doctrine of unity." In 1834 Story referred to the
theory that assignments under bankrupt or insolvent laws were, and ought
to be, of universal operation to transfer movable property, in whatever
country it might be situate, and concluded that there was great wisdom in
E  adopting the rule that an assignment in bankruptcy should operate as a
complete and valid transfer of all his movable property abroad, as well as at
home, and for a country to prefer an attaching domestic creditor to a foreign
assignee or to foreign creditors could

    "hardly be deemed consistent with the general comity of nations . . .
the true rule is, to follow out the lead of the general principle that makes
F      the law of the owner's domicil conclusive upon the disposition of his
personal property,"

citing *Solomons v Ross* 1 H Bl 131n as supporting that doctrine: *Story,
Commentaries on the Conflict of Laws*, 1st ed (1834), pp 340–341,
para 406.

    18  Professor Cheshire, in his first edition (*Cheshire, Private
G  International Law* (1935), pp 375–376), said that although English law
"neglects the doctrine of unity it recognizes the doctrine of universality".
What he meant was that English law was committed to separate
independent bankruptcies in countries where the assets were situate, rather
than one bankruptcy in the country of the domicile (the doctrine of unity),
but also accepted the title of the foreign trustee to English movables
provided that no bankruptcy proceedings had begun within England
H  (universality). He cited *Solomons v Ross* for this proposition:

    "The English courts . . . have consistently applied the doctrine of
universality, according to which they hold that all *movable* property, no
matter where it may be situated at the time of the assignment by the
foreign law, passes to the trustee."

© 2013 The Incorporated Council of Law Reporting for England and Wales

254

Rubin v Eurofinance SA (SC(E))                                    [2013] 1 AC
Lord Collins of Mapesbury

19   In *HIH* [2008] 1 WLR 852, para 30, Lord Hoffmann said:    A

"The primary rule of private international law which seems to me
applicable to this case is the principle of (modified) universalism, which
has been the golden thread running through English cross-border
insolvency law since the 18th century.  That principle requires that
English courts should, so far as is consistent with justice and UK public
policy, co-operate with the courts in the country of the principal    B
liquidation to ensure that all the company's assets are distributed to its
creditors under a single system of distribution."

And in *Cambridge Gas Transportation Corporation v Official Committee of
Unsecured Creditors of Navigator Holdings plc* ("*Cambridge Gas*") [2007]
1 AC 508, para 16 he said, speaking for the Privy Council:

"The English common law has traditionally taken the view that    C
fairness between creditors requires that, ideally, bankruptcy proceedings
should have universal application.  There should be a single bankruptcy
in which all creditors are entitled and required to prove.  No one should
have an advantage because he happens to live in a jurisdiction where
more of the assets or fewer of the creditors are situated."

20   The US Bankruptcy Court accepted in *In re Maxwell*    D
*Communication Corpn* (1994) 170 BR 800 (Bankr SDNY) that the United
States courts have adopted modified universalism as the approach to
international insolvency:

"the United States in ancillary bankruptcy cases has embraced an
approach to international insolvency which is a modified form of
universalism accepting the central premise of universalism, that is, that    E
assets should be collected and distributed on a worldwide basis, but
reserving to local courts discretion to evaluate the fairness of home
country procedures and to protect the interests of local creditors."

*II International co-operation and assistance*

21   Jurisdiction in international bankruptcy has been the subject of    F
multilateral international instruments at least since the Montevideo Treaty
on International Commercial Law of 1889, Title X, although bilateral
treaties go back much further, and the subject of international recognition
and co-operation in insolvency was the subject of early discussion by the
International Law Association (1879), the Institut de droit international
(1888–1912) and the Hague Conference on Private International Law    G
(1904): see Nadelmann, pp 299 et seq.

22   In more modern times, the European Convention on Certain
International Aspects of Bankruptcy (the Istanbul Convention) was
concluded under the auspices of the Council of Europe in 1990, but never
came into force.  The European Community/Union initiative took 40 years
to come to fruition.  In 1960 the European Community embarked on a
project for a Bankruptcy Convention, which resulted in a draft Convention    H
in 1980, to which there was significant opposition.  But the project was
renewed in 1989, and this led to the tabling of a draft Convention in 1995,
which provided that it would only come into force when signed by all 15 of
the then member states.  The United Kingdom, however, alone of the states,

© 2013 The Incorporated Council of Law Reporting for England and Wales

255

[2013] 1 AC
Rubin v Eurofinance SA (SC(E))
Lord Collins of Mapesbury

A    did not sign the Convention (for political reasons), and it never came into force. In 1999 the project was re-launched as a Council Regulation, which resulted in the EC Insolvency Regulation in 2000 (Council Regulation No 1346/2000).

    23    The United Nations Commission on International Trade Law ("UNCITRAL") adopted a Model Law on cross-border insolvency in 1997.
B    The Model Law was adopted following initiatives in the 1980s by the International Bar Association and later by INSOL International (the International Association of Restructuring, Insolvency and Bankruptcy Professionals). In 1993 UNCITRAL adopted a resolution to investigate the feasibility of harmonised rules of cross-border insolvencies. In 1994 an expert committee was assembled consisting of members of INSOL and representatives of the UNCITRAL Secretariat, and following a series of
C    reports and drafts, UNCITRAL adopted the Model Law in May 1997. The Model Law provides for a wide range of assistance to foreign courts and office-holders. It has been implemented by 19 countries and territories, including the United States and Great Britain (although by some states only on the basis of reciprocity). It was not enacted into law in Great Britain until 2006, by the CBIR.

D    24    Apart from the EC Insolvency Regulation, none of these instruments deals expressly with the enforcement of judgments in insolvency proceedings. The question whether the Model Law does so by implication will be considered below in section IV.

    25    Consequently, there are four main methods under English law for assisting insolvency proceedings in other jurisdictions, two of which are part of regionally or internationally agreed schemes. First, section 426 of the
E    Insolvency Act 1986 provides a statutory power to assist corporate as well as personal insolvency proceedings in countries specified in the Act or designated for that purpose by the Secretary of State. All the countries to which it currently applies are common law countries or countries sharing a common legal tradition with England. They include Australia: the Co-operation of Insolvency Courts (Designation of Relevant Countries and
F    Territories) Order 1986 (SI 1986/2123).

    26    Second, the EC Insolvency Regulation applies to insolvency proceedings in respect of debtors with their centres of main interests (COMI) within the European Union (excluding Denmark). The EC Insolvency Regulation has no role in the present appeal because none of the debtors has its centre of main interests in the European Union.

G    27    Third, the CBIR came into force on 4 April 2006, implementing the Model Law. The CBIR supplement the common law, but do not supersede it. Article 7 of the Model Law provides: "Nothing in this Law limits the power of a court or British insolvency office-holder to provide additional assistance to a foreign representative under other laws of Great Britain."

    28    Article 23 of the Model Law allows avoidance claims to be made by foreign representatives under the Insolvency Act 1986, and the CBIR apply
H    to preferences after they came into force on 4 April 2006. The UNCITRAL Guide to Enactment (to which resort may be had for the purposes of interpretation of the CBIR) also emphasises that the Model Law enables enacting states to make available to foreign insolvency proceedings the type of relief which would be available in the case of a domestic

© 2013 The Incorporated Council of Law Reporting for England and Wales

insolvency (*UNCITRAL Legislative Guide on Insolvency Law* (2005),    A
Ann III, Ch IV, p 311, para 20(b)):

> "The Model Law presents to enacting states the possibility of aligning
> the relief resulting from recognition of a foreign proceeding with the relief
> available in a comparable proceeding in the national law . . ."

29   Fourth, at common law the court has power to recognise and grant    B
assistance to foreign insolvency proceedings.  The common law principle is
that assistance may be given to foreign office-holders in insolvencies with an
international element.  The underlying principle has been stated in different
ways: "recognition . . . carries with it the active assistance of the court": *In
re African Farms Ltd* [1906] TS 373, 377; "This court . . . will do its utmost
to co-operate with the US Bankruptcy Court and avoid any action which
might disturb the orderly administration of [the company] in Texas under ch    C
11": *Banque Indosuez SA v Ferromet Resources Inc* [1993] BCLC 112, 117.

30   In *Credit Suisse Fides Trust v Cuoghi* [1998] QB 818, 827, Millett LJ
said:

> "In other areas of law, such as cross-border insolvency, commercial
> necessity has encouraged national courts to provide assistance to each
> other without waiting for such co-operation to be sanctioned by    D
> international convention . . . It is becoming widely accepted that comity
> between the courts of different countries requires mutual respect for the
> territorial integrity of each other's jurisdiction, but that this should not
> inhibit a court in one jurisdiction from rendering whatever assistance it
> properly can to a court in another in respect of assets located or persons
> resident within the territory of the former."    E

31   The common law assistance cases have been concerned with such
matters as the vesting of English assets in a foreign office-holder, or the
staying of local proceedings, or orders for examination in support of the
foreign proceedings, or orders for the remittal of assets to a foreign
liquidation, and have involved cases in which the foreign court was a court
of competent jurisdiction in the sense that the bankrupt was domiciled in the
foreign country or, if a company, was incorporated there.    F

32   An early case of recognition was *Solomons v Ross* 1 H Bl 131n,
where, as I have said, the bankruptcy was in Holland, and the bankrupts
were Dutch merchants declared bankrupt in Amsterdam, and the Dutch
curator was held entitled to recover an English debt: see also *Bergerem v
Marsh* (1921) 6 B & CR 195 (English member of Belgian firm submitted to
Belgian bankruptcy proceedings: movable property in England vested in    G
Belgian trustee).

33   One group of cases involved local proceedings which were stayed or
orders which were discharged because of foreign insolvency proceedings.
Thus in *Banque Indosuez SA v Ferromet Resources Inc* [1993] BCLC 112 an
English injunction against a Texas corporation in Chapter 11 proceedings
was discharged; cf *In re African Farms Ltd* [1906] TS 373 (execution in
Transvaal by creditor in proceedings against English company in liquidation    H
in England stayed by Transvaal court), applied in *Turners & Growers
Exporters Ltd v The Ship Cornelis Verolme* [1997] 2 NZLR 110 (Belgian
shipowner in Belgian bankruptcy: ship released from arrest); *Modern
Terminals (Berth 5) Ltd v States Steamship Co* [1979] HKLR 512 (stay in

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   Hong Kong of execution against Nevada corporation in Chapter 11
    proceedings in United States federal court in California), followed in *CCIC
    Finance Ltd v Guangdong International Trust & Investment Corpn* [2005]
    2 HKC 589 (stay of Hong Kong proceedings against Chinese state-owned
    enterprise in Mainland insolvency). Cases of judicial assistance in the
    traditional sense include *In re Impex Services Worldwide Ltd* [2004]
    BPIR 564, where a Manx order for examination and production of
B   documents was made in aid of the provisional liquidation in England of an
    English company.

       34   Cases involving remittal of assets from England to a foreign office-
    holder include *In re Bank of Credit and Commerce International SA (No 10)*
    [1997] Ch 213 (Luxembourg liquidation of Luxembourg company); and
    *HIH* [2008] 1 WLR 852 (the view of Lord Hoffmann and Lord Walker of
C   Gestingthorpe) (Australian liquidation of Australian insurance company);
    and *In re SwissAir Schweizerische Luftverkehr-Aktiengesellschaft* [2010]
    BCC 667 (Swiss liquidation of Swiss company).

### III The Cambridge Gas and HIH decisions

       35   The opinion of Lord Hoffmann, speaking for the Privy Council, in
D   *Cambridge Gas* [2007] 1 AC 508 and his speech in the House of Lords in
    *HIH* [2008] 1 WLR 852 have played such a major role in the decisions of the
    Court of Appeal and in the arguments of the parties on these appeals that it is
    appropriate to put them in context at this point.

#### Cambridge Gas

       36   The broad facts of *Cambridge Gas* [2007] 1 AC 508 were these. In
E   1997 a shipping business was initiated by a Swiss businessman, Mr Giovanni
    Mahler. The investors borrowed $300m on the New York bond market and
    the business bought five gas transport vessels. The venture was a failure, and
    ended with a Chapter 11 proceeding in the US Bankruptcy Court in New
    York. The question for the Privy Council on appeal from the Isle of Man
    was whether an order of the New York court was entitled to implementation
F   in the Isle of Man.

       37   The corporate structure of the business was that the investors
    owned, directly or indirectly, a Bahamian company called Vela Energy
    Holdings Ltd ("Vela"). Vela owned (through an intermediate Bahamian
    holding company) Cambridge Gas, a Cayman Islands company.

       38   Cambridge Gas owned directly or indirectly about 70% of the shares
    of Navigator Holdings plc ("Navigator"), an Isle of Man company.
G   Navigator owned all the shares of an Isle of Man company which in turn
    owned companies which each owned one ship.

       39   In 2003 Navigator petitioned the US Bankruptcy Court for relief
    under Chapter 11 of the US Bankruptcy Code, which allows insolvent
    companies, under supervision of the court and under cover of a moratorium,
    to negotiate a plan of reorganisation with their creditors. The petition was
    initiated by the investor interests, who proposed a plan to sell the ships
H   nominally by auction but in fact to the previous investors, but the
    bondholders did not accept this and proposed their own plan under which
    the assets of Navigator would be vested in the creditors and the equity
    interests of the previous investors would be extinguished. The judge rejected
    the investors' plan and approved the creditors' plan.

© 2013 The Incorporated Council of Law Reporting for England and Wales

258
Rubin v Eurofinance SA (SC(E))                                           [2013] 1 AC
Lord Collins of Mapesbury

40    The mechanism which the plan used to vest the assets in the creditors    A
was to vest the shares in Navigator in their representatives, i e, the creditors'
committee.  That would enable them to control the shipping companies and
implement the plan.  The plan provided that upon entry of the confirmation
order title to all the common stock of Navigator would vest in the creditors'
committee to enable it to implement the plan.  The order of the New York
court confirming the plan recorded the intention of the court to send a letter
of request to the Manx court asking for assistance in giving effect to "the    B
plan and confirmation order" and such a letter was sent.  The committee of
creditors then petitioned the Manx court for an order vesting the shares in
their representatives.

41    At this point it is necessary to emphasise two features of the case.
The first feature is that Navigator was an Isle of Man company and 70% of
its common stock was owned directly or indirectly by Cambridge Gas.    C
Under the normal principles of the conflict of laws the shares would have
been situate in the Isle of Man: *Dicey*, 15th ed, para 22-045.  That is why
Lord Hoffmann said, at para 6, that the New York court was aware that the
order vesting title to the common stock of Navigator in the creditors'
committee could not automatically have effect under the law of the Isle of
Man; and also why he accepted (paras 12–13) that if the judgment were a
judgment in rem it could not affect title to shares in the Isle of Man.    D

42    The second feature which it is necessary to emphasise is that
Cambridge Gas was a Cayman Islands company which (as held by the Manx
courts) had not submitted to the jurisdiction of the US Bankruptcy Court.
Lord Hoffmann said, at para 8, that the position that Cambridge Gas had
not submitted to the jurisdiction of the US Bankruptcy Court bore little
relation to economic reality since the New York proceedings had been    E
conducted on the basis that the contest was between rival plans put forward
by the shareholders and the creditors; Vela, the parent company of
Cambridge Gas, participated in the Chapter 11 proceedings; and they had
been instituted by Navigator.  Consequently the claim by Cambridge Gas
that it had not submitted was highly technical, but there was no appeal from
the decisions of the Manx courts that it had not submitted.  But Lord
Hoffmann also accepted that if the order of the US Bankruptcy Court were to    F
be regarded as a judgment in personam it would not be entitled to
recognition or enforcement in the Isle of Man because "the New York court
had no personal jurisdiction over Cambridge [Gas]": para 10.

43    Nevertheless the Privy Council held that the plan could be carried
into effect in the Isle of Man.  The reasoning was as follows: first, if the
judgment had to be classified as in personam or in rem the appeal would
have to be allowed, but bankruptcy proceedings did not fall into either    G
category:

"13. . . . Judgments in rem and in personam are judicial
determinations of the existence of rights: in the one case, rights over
property and in the other, rights against a person.  When a judgment in
rem or in personam is recognised by a foreign court, it is accepted as
establishing the right which it purports to have determined, without    H
further inquiry into the grounds upon which it did so.  The judgment itself
is treated as the source of the right.

"14. The purpose of bankruptcy proceedings, on the other hand, is not
to determine or establish the existence of rights, but to provide a

© 2013 The Incorporated Council of Law Reporting for England and Wales

A  mechanism of collective execution against the property of the debtor by
creditors whose rights are admitted or established . . .

"15. . . . bankruptcy, whether personal or corporate, is a collective
proceeding to enforce rights and not to establish them. Of course, as
Brightman LJ pointed out in *In re Lines Bros Ltd* [1983] Ch 1, 20, it may
incidentally be necessary in the course of bankruptcy proceedings to
establish rights which are challenged: proofs of debt may be rejected; or
B  there may be a dispute over whether or not a particular item of property
belonged to the debtor and is available for distribution. There are
procedures by which these questions may be tried summarily within the
bankruptcy proceedings or directed to be determined by ordinary action.
But these again are incidental procedural matters and not central to the
purpose of the proceedings."

C
44  Second, the principle of universality underlay the common law
principles of judicial assistance in international insolvency, and those
principles were sufficient to confer jurisdiction on the Manx court to assist,
by doing whatever it could have done in the case of a domestic insolvency:
paras 21–22. Third, exactly the same result could have been achieved by a
scheme under the Isle of Man Companies Act 1931. Fourth, it was no
D  objection to implementation of the plan in the Isle of Man that the shares in
Navigator belonged to a person (Cambridge Gas) which was not a party to
the bankruptcy proceedings for these reasons, at para 26:

"a share is the measure of the shareholder's interest in the company: a
bundle of rights against the company and the other shareholders. As
against the outside world, that bundle of rights is an item of property, a
E  chose in action. But as between the shareholder and the company itself,
the shareholder's rights may be varied or extinguished by the mechanisms
provided by the articles of association or the Companies Act. One of
those mechanisms is the scheme of arrangement under section 152 [of the
Isle of Man Companies Act 1931]. As a shareholder Cambridge is bound
by the transactions into which the company has entered, including a plan
F  under Chapter 11 or a scheme under section 152."

45  At this point it is necessary to point out that the opinion in
*Cambridge Gas* does not articulate any reason for holding that, in the eyes of
the Manx court, the US Bankruptcy Court had international jurisdiction
in either of two relevant senses.
46  The first sense is the jurisdiction of the US Bankruptcy Court in
G  relation to the Chapter 11 proceedings themselves. The entity which was in
Chapter 11 was Navigator. The English courts exercise a wider jurisdiction
in bankruptcy and (especially) in winding up than they recognise in foreign
courts. At common law, the foreign court which is recognised as having
jurisdiction in personal bankruptcy is the court of the bankrupt's domicile or
the court to which the bankrupt submitted (*Dicey*, 15th ed, vol 2, para 31R-
059) and the foreign court with corresponding jurisdiction over
H  corporations is the court of the place of incorporation: *Dicey*, 15th ed, vol 2,
para 30R-100. Under United States law the US Bankruptcy Court has
jurisdiction over a "debtor", and such a debtor must reside or have a
domicile or place of business, or property in the United States. From the
standpoint of English law, the US Bankruptcy Court had international

© 2013 The Incorporated Council of Law Reporting for England and Wales

jurisdiction because although Navigator was not incorporated in the United
States, it had submitted to the jurisdiction by initiating the proceedings.

47    The second sense in which international jurisdiction is relevant is the
jurisdiction over the third party, Cambridge Gas, and its shares in
Navigator. Cambridge Gas was not incorporated in the United States, and it
was held by the Isle of Man courts that it had not submitted to the
jurisdiction of the US Bankruptcy Court (and this was, as I have said,
accepted with evident reluctance by the Privy Council). The property which
was the subject of the order of the US Bankruptcy Court was shares in an Isle
of Man company.    Consequently the property dealt with by the
US Bankruptcy Court was situate, by Manx rules of the conflict of laws, in
the Isle of Man, and the shareholder relationship was governed by Manx
law.

48    *Cambridge Gas* [2007] 1 AC 508 was the subject of brief comment a
few months later by the Privy Council in *Pattni v Ali* [2007] 2 AC 85. The
decision in that case was simply that a Kenyan judgment deciding that A was
bound to sell shares in a Manx company to B was entitled to recognition in
the Isle of Man. It resulted in an order in personam against a person subject
to the jurisdiction of the Kenyan court, and was not a judgment in rem
against property in the Isle of Man and outside the jurisdiction of the Kenyan
court, because the fact that a judicial determination determines or relates to
the existence of property rights between parties does not in itself mean that it
is in rem. Lord Mance, speaking for the Board, said, at para 23:

"In *Cambridge Gas* . . . the Board touched on the concepts of in
personam and in rem proceedings, but held that the bankruptcy order
with which it was concerned fell into neither category. Its purpose was
simply to establish a mechanism of collective execution against the
property of the debtor by creditors whose rights were admitted or
established."

*HIH*

49    The decision in *HIH* does not deal with foreign judgments. *HIH*
concerned four Australian insurance companies which were being wound up
in Australia and in respect of which provisional liquidators had been
appointed in England. The question was whether the English court had
power to direct remission of assets collected in England to Australia,
notwithstanding that there were differences between the English and
Australian statutory regimes for distribution which meant that some
creditors would benefit from remission whilst some creditors would be
worse off. The House of Lords unanimously directed that remission should
take place, but the reasons differed.

50    The reasoning of the majority (Lord Scott of Foscote and Lord
Neuberger of Abbotsbury, with Lord Phillips of Worth Matravers agreeing)
was based exclusively on the statutory power to assist foreign insolvency
proceedings under section 426 of the Insolvency Act 1986, but Lord
Hoffmann (with whom Lord Walker of Gestingthorpe agreed) also
considered that such a power existed at common law.

51    Lord Hoffmann characterised the principle of universality as a
principle of English private international law that, where possible, there
should be a unitary insolvency proceeding in the courts of the insolvent's

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   domicile which receives worldwide recognition and which should apply universally to all the bankrupt's assets, at para 6:

> "Despite the absence of statutory provision, some degree of international co-operation in corporate insolvency had been achieved by judicial practice. This was based upon what English judges have for many years regarded as a general principle of private international law,
B   namely that bankruptcy (whether personal or corporate) should be unitary and universal. There should be a unitary bankruptcy proceeding in the court of the bankrupt's domicile which receives worldwide recognition and it should apply universally to all the bankrupt's assets."

52   Other parts of Lord Hoffmann's speech have already been quoted above, and it is only necessary for present purposes to recall that he said that
C   (a) "the process of collection of assets will include, for example, the use of powers to set aside voidable dispositions, which may differ very considerably from those in the English statutory scheme" (para 19) and (b) that the purpose of the principle of universality was to ensure that the debtor's assets were distributed under one scheme of distribution, and that the principle required that English courts should co-operate with the courts in the country of the principal liquidation to ensure that all the company's
D   assets are distributed to its creditors under a single system of distribution: para 30.

### Subsequent treatment of Cambridge Gas

53   The decision in *Cambridge Gas* was not applied by the Supreme Court of Ireland in *In re Flightlease (Ireland) Ltd* [2012] IESC 12 (to which
E   I shall revert) and has been subject to academic criticism. Professor Briggs has expressed the view (2006) 77 BYIL 575, 581 that

> "the decision in [*Cambridge Gas*] is wrong, for it requires a Manx court to give effect to a confiscation order made by a foreign court of property belonging to a person who was not subject to the personal jurisdiction of the foreign court. That a Manx court could have done so
F   itself is nothing to the point."

I shall return to the question whether it was correctly decided.

### IV The cases before the court and the issues
#### Rubin

G   54   Eurofinance SA is a company incorporated in the British Virgin Islands. It was established by Adrian Roman, the second appellant on the *Rubin* appeal. Eurofinance SA settled "The Consumers Trust" ("TCT") under a deed of trust made in 2002 under English law, with trustees resident in England, of whom two were accountants and two were solicitors.

55   TCT was established to carry on a sales promotion scheme in the USA and Canada. The class of beneficiaries was made up of persons who
H   had successfully participated in the scheme by claiming validly in certain sales promotions owned and operated by Eurofinance SA. The trustees were to hold the capital and income of TCT for the beneficiaries and subject thereto for Eurofinance SA as beneficiary in default. The promotion, known as the cashable voucher programme, was entered into with participating

© 2013 The Incorporated Council of Law Reporting for England and Wales

merchants in the United States and Canada who, when they sold products or    A
services to their customers, offered those customers a cashable voucher
comprising a rebate of up to 100% of the purchase price for the product or
service.  Under the terms of the voucher the rebate was to be paid to
customers in three years' time provided that certain conditions were
followed by the customer involving the completion by the customer of both
memory and comprehension tests.                                              B

56  The participating merchants paid TCT 15% of the face value of each
cashable voucher issued by the merchant during a week.  TCT retained 40%
of the payments received (i e 6% of the face value of each cashable voucher).
About one half of the 60% balance received from merchants was paid to
Eurofinance SA (and so effectively to Adrian Roman) and the remainder was
paid to others involved in the operation of the programme, such as solicitors,
accountants and US lawyers.  From about 2002 Adrian Roman's sons,          C
Nicholas Roman and Justin Roman, each began to receive about 2%.  The
trustees maintained bank accounts in the USA and Canada where the
payments they had received from merchants were kept.

57  Since the trustees only retained 6% of the face value of the issued
vouchers, the success of the scheme necessarily involved the consumers
either forgetting to redeem the vouchers or being unsuccessful in navigating   D
the process required to be followed in order to obtain payment.  When the
scheme folded in 2005 the trustees held nearly US$10m in bank accounts in
the United States and Canada.

58  By about 2005 TCT's business ceased after the Attorney General of
Missouri brought proceedings under Missouri's consumer protection
legislation which resulted in a settlement involving a payment by the trustees
of US$1,650,000 and US$200,000 in costs.                                    E

59  When it became clear that further proceedings were likely to be
brought by Attorneys General in other states, that the number of consumer
claims would increase, and that TCT would not have sufficient funds to meet
all the valid claims of its beneficiaries, in November 2005 Adrian Roman
caused Eurofinance to apply for the appointment by the High Court of the
respondents on the *Rubin* appeal, David Rubin and Henry Lan, as receivers   F
of TCT for the purposes of causing TCT then to obtain protection under
Chapter 11 of Title 11 of the United States Code ("Chapter 11").  The
English court was told that Chapter 11 reorganisation proceedings would
result in an automatic stay of proceedings against TCT, would enable the
receivers to reject unprofitable or burdensome executory contracts, and
might result in the recovery as preferential payments of sums paid to         G
consumers and to the Missouri Attorney General.

60  In November 2005 the respondents were appointed as receivers by
order of Lewison J, and in the following month, the respondents and the
trustees then caused TCT to present a voluntary petition to the
US Bankruptcy Court for relief under Chapter 11.  TCT was placed into
Chapter 11 proceedings in New York as virtually all of its 60,000 creditors
were located in the United States or Canada as were its assets.  As a matter of   H
United States bankruptcy law, TCT could be the subject matter of a petition
for relief under Chapter 11 as a debtor.  This is because a trust such as TCT is
treated under Chapter 11 as a separate legal entity under the classification of
a "business trust".

© 2013 The Incorporated Council of Law Reporting for England and Wales

**[2013] 1 AC**                                    Rubin v Eurofinance SA (SC(E))
                                                  Lord Collins of Mapesbury

A      61   A joint plan of liquidation for TCT was prepared, and in September
2007 Lewison J ordered that the respondents (as receivers) be at liberty to
seek approval of the plan from the US Bankruptcy Court. Under the terms of
the plan the respondents were appointed legal representatives of TCT and
given the power to commence, prosecute and resolve all causes of action
against potential defendants including the appellants. The US Bankruptcy
Court approved the plan in October 2007, and appointed the respondents as
B   "foreign representatives" of the debtor to make application to the Chancery
Division in London for recognition of the Chapter 11 proceedings as a
foreign main proceeding under the CBIR; and to seek aid, assistance and
co-operation from the High Court in connection with the Chapter 11
proceedings, and, in particular to seek the High Court's assistance and
co-operation in the prosecution of litigation which might be commenced in
C   the US Bankruptcy Court including "the enforcement of judgments of this
court that may be obtained against persons and entities residing or owning
property in Great Britain . . ."
       62   In December 2007 proceedings were commenced in the
US Bankruptcy Court by the issue of a complaint against a number of
defendants including the appellants. These claims fall within the category of
D   "adversary proceedings" under the US bankruptcy legislation, and I will use
this term to refer to them. The adversary proceedings comprised a number
of claims including causes of action arising under the US Bankruptcy Code,
which related to funds received by TCT from merchants which were paid out
to the defendants (including the appellants), or to amounts transferred to the
defendants within one year prior to the commencement of the
TCT bankruptcy case including the appellants.
E      63   The defendants were the appellants and other parties involved with
the programme. The appellants were served personally with the complaint
commencing the adversary proceedings but did not defend, or participate, in
the adversary proceedings, although it appears from a judgment of the
US Bankruptcy Court that Eurofinance SA had filed a notice of appearance
in the main Chapter 11 proceedings: order of 22 July 2008, paras 42–43.
F      64   On 22 July 2008 default and summary judgment was entered against
the appellants in the adversary proceedings by the US Bankruptcy Court.
The US Bankruptcy Court entered a judgment against the appellants on the
ten counts of the complaint.
       65   In November 2008 the respondents applied as foreign
representatives to the Chancery Division for, inter alia, (a) an order that the
Chapter 11 proceedings be recognised as a "foreign main proceeding" (b) an
G   order that the respondents be recognised as "foreign representatives" within
the meaning of article 2(j) of the Model Law in relation to those
proceedings; and (c) an order that the US Bankruptcy Court's judgment be
enforced as a judgment of the English court in accordance with CPR Pts 70
and 73.
       66   Nicholas Strauss QC, sitting as a deputy judge of the Chancery
Division, [2010] 1 All ER (Comm) 81 recognised the Chapter 11
H   proceedings (including the adversary proceedings) as foreign main
proceedings, and the respondents as foreign representatives, but refused to
enforce the judgments in the adversary proceedings because (a) at common
law the English court will not enforce a judgment in personam contrary to
the normal jurisdictional rules for foreign judgments; and (b) there was

© 2013 The Incorporated Council of Law Reporting for England and Wales

nothing in CBIR, articles 21(e) (realisation of assets) and 25 (judicial    A
co-operation), which justified the enforcement of judgments in insolvency
proceedings.

67   At first instance the respondents sought to enforce the entirety of the
US Bankruptcy Court's judgment, but before the Court of Appeal they
sought an order for the enforcement of those parts of the judgment which
were based on state or federal avoidance laws, including fraudulent
conveyance under State Fraudulent Conveyance Laws, and under federal    B
law, namely fraudulent transfers under section 548(a) of 11 USC; liability of
transferees of avoided transfers under section 550; fraudulent transfers
under section 548(b) and liability of transferees of avoided transfers under
section 550.

68   The Court of Appeal (Ward, Wilson LJJ and Henderson J) [2011] Ch
133 allowed an appeal, and held that the judgment was enforceable.    C

### New Cap

69   In the *New Cap* appeal the appellants are members of Lloyd's
Syndicate Number 991 ("the syndicate") for the 1997 and 1998 years of
account. The respondents are a reinsurance company ("New Cap") and its
liquidator, a partner in Ernst & Young in Sydney.    D

70   New Cap is an Australian company, which was licensed as an
insurance company in Australia under the (Australian) Corporations Act
2001 ("the Australian Act"). New Cap did not conduct insurance business
in any country other than Australia, and the majority of New Cap's business
was generated through reinsurance brokers conducting business in Australia
and the balance was generated from overseas insurance brokers.

71   New Cap reinsured the syndicate in relation to losses occurring on    E
risks attaching during the 1997 and 1998 years of account under reinsurance
contracts which were subject to English law, and contained London
arbitration clauses and also (oddly) English jurisdiction clauses. The
reinsurance contracts were placed with New Cap by the syndicate's
Australian broker, which was the sub-broker for the syndicate's London
broker.    F

72   Each reinsurance contract contained a commutation clause. The
syndicate and New Cap entered into a commutation agreement to commute
the reinsurances with effect from 11 December 1998. Under the
commutation agreement, New Cap agreed to make a lump sum payment to
the syndicate by 31 December 1998 in consideration for its release from
liability under the reinsurance contracts. The payments were calculated on
the basis of a 7·5% discount and a deduction from premium. New Cap made    G
payment pursuant to the commutation agreements in two instalments of
US$2,000,000 and US$3,980,600 in January 1999. The commutation
payments were made from a bank account held by New Cap at the Sydney
branch of the Commonwealth Bank of Australia to a bank account in
London.

73   The second respondent was appointed the administrator of New
Cap by a resolution of its directors in April 1999. In September 1999 the    H
creditors of New Cap resolved that New Cap be wound up and the second
respondent ("the liquidator") was appointed its liquidator. Under the
Australian legislation, the winding up is deemed to have commenced on the
day on which the administration began.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A     74   In April 2002 the liquidator caused proceedings to be commenced against the syndicate in the Supreme Court of New South Wales alleging that because New Cap was insolvent when the commutation payments were made in January 1999, and because those payments were made within the period of six months ending on the date when the administrator was appointed, they constituted unfair preferences and were thus "voidable transactions" under Part 5.7B of the Australian Act.

B     75   The syndicate (which does not accept that the payments were preferences) refused to accept service of the Australian proceedings. The liquidator obtained leave from the Australian court to serve the Australian proceedings on the syndicate's English solicitors in London. The syndicate did not enter an appearance to the proceedings, but corresponded with the liquidator's solicitors, including commenting on an independent expert's

C   report to be used by the respondents as evidence of New Cap's insolvency in all of the avoidance proceedings including the proceedings against the syndicate.

    76   The Australian court (White J in a judgment in September 2008, and Barrett J in a judgment in July 2009) recognised that there had been no submission by the syndicate to the jurisdiction of the Australian court in that

D   it did not enter an appearance, but White J held that the Australian court had jurisdiction over the syndicate because a cause of action available under the Australian Act for the recovery of a preferential payment to an overseas party made when the company is insolvent was a cause of action which arose in New South Wales for the purposes of the New South Wales provisions for service out of the jurisdiction.

E     77   Barrett J gave a reasoned judgment in July 2009 holding the syndicate liable. After the respondents had been given leave to re-open their case so that the orders made by the Australian court would more accurately reflect the differences between those appellants who were members of the syndicate for the 1997 year of account and those appellants who were members for the 1998 year of account, the Australian court entered final judgment against the syndicate in its absence on 11 September 2009. The

F   Australian judgment declared that the commutation payments were voidable transactions within the meaning of part 5.7B of the Australian Act and ordered the syndicate to repay the amount of the commutation payments to the liquidator together with interest.

    78   On the liquidator's application the Australian court issued, in October 2009, a letter of request to the High Court in England and Wales requesting that the court "act in aid of and assist" the Australian court and

G   exercise jurisdiction under section 426 of the Insolvency Act 1986 by: (1) ordering the syndicate to pay the sums specified in the Australian judgment; alternatively (2) allowing the liquidator to commence fresh proceedings under the Australian Act in the English court; (3) granting such further and other relief as the High Court may consider just; and (4) making such further or other orders as may, in the opinion of the High Court, be

H   necessary or appropriate to give effect to the foregoing orders.

    79   On 30 July 2010, the Court of Appeal handed down judgment in *Rubin* [2011] Ch 133. As a result, the respondents' alternative application for permission to commence fresh proceedings against the syndicate under the Australian Act in England pursuant to section 426 of the Insolvency Act

© 2013 The Incorporated Council of Law Reporting for England and Wales

266
Rubin v Eurofinance SA (SC(E))                                    [2013] 1 AC
Lord Collins of Mapesbury

1986 was adjourned generally, and the respondents were granted permission    A
to seek relief at common law as an alternative to relief under section 426.

80    In *New Cap* Lewison J and the Court of Appeal were bound by the
decision of the Court of Appeal in *Rubin*. Lewison J held [2011] EWHC 677
(Ch): (a) the judgment was not enforceable under the Foreign Judgments
(Reciprocal Enforcement) Act 1933 because, although it applied to
Australian judgments, it did not apply to orders made in insolvency
proceedings; but (b) the judgment was enforceable under the assistance    B
provision of section 426 of the Insolvency Act 1986 and also at common
law.

81    The Court of Appeal (Mummery, Lloyd and McFarlane LJJ) [2012]
Ch 538 affirmed Lewison J's judgment on these grounds: (a) the 1933 Act
applied, and registration would not be set aside for lack of jurisdiction in the
foreign court, because of the *Rubin* decision; (b) section 426 could also be    C
used and was not excluded by section 6 of the 1933 Act; (c) but section 6
would preclude an action at common law; (d) it was not necessary to decide
whether the court's power of assistance at common law was exercisable
where the statutory power was available.

### *Picard v Vizcaya Partners Ltd*                                         D

82    This court gave permission for intervention by a written submission
on behalf of Mr Irving Picard ("the trustee"), the trustee for the liquidation
in the United States under the Securities Investor Protection Act of 1970
("SIPA") of Bernard L Madoff Investment Securities LLC ("Madoff"), which
was Bernard Madoff's broking company. The trustee is seeking to enforce at
common law in Gibraltar judgments of the US Bankruptcy Court against
Vizcaya Partners Ltd ("Vizcaya"), a British Virgin Islands company, for    E
$180m, and against Asphalia Fund Ltd ("Asphalia"), a Cayman Islands
company, for $67m, representing alleged preferential payments. He is also
seeking to enforce a US Bankruptcy Court default judgment in excess of $1
billion in the Cayman Islands in *Picard v Harley International (Cayman) Ltd*
(unreported) 10 November 2010. The Gibraltar and Cayman Islands
proceedings have been adjourned to await the outcome of the present    F
appeals.

83    In *Picard v Vizcaya Partners Ltd* proceedings have been brought in
Gibraltar to enforce the default judgments against Vizcaya and Asphalia
because $73m is held there on behalf of Vizcaya which the trustee maintains
is available to satisfy the judgments. Vizcaya and Asphalia have also, with
the permission of the court, intervened by written submission.

84    There is no agreed statement of facts relating to this aspect of the    G
case, and nothing which is said here about the facts should be taken as
representing or reflecting any finding. According to Vizcaya and Asphalia
the position is as follows. Between 2002 and 2007, a bank in Europe, acting
as a custodian trustee for Vizcaya, sent $327m to Madoff for investment in
securities. Unknown to the bank, or to Vizcaya, or its shareholder Asphalia,
Madoff had been engaged in a Ponzi scheme for some 30 years, and their
money was never invested in securities. In 2008, at the time of the credit    H
crunch and the banking crisis, the custodian trustee withdrew $180m
(leaving $147m with Madoff) and $67m of the $180m was paid to Asphalia.

85    In late 2008, the Madoff fraud came to light, and the trustee was
appointed. The trustee targeted investors who had withdrawn investments

© 2013 The Incorporated Council of Law Reporting for England and Wales

A  from Madoff in the two years before its collapse in December 2008 as a source for recovery of "customer property" for the benefit of other investors who had not withdrawn their investments.    The trustee commenced adversary proceedings in the US Bankruptcy Court alleging preference and fraudulent conveyance against Vizcaya and Asphalia under SIPA and under the Bankruptcy Code, the effect of which, they say, is that (a) as the trustee

B  argues, a person who, on the basis that he has received "customer money" has been required to repay a preference, does not necessarily become a "customer" and thereby entitled to share with other customers in the bankruptcy; and (b) the trustee may avoid a payment made by the bankrupt to a creditor 90 days before the commencement of the bankruptcy, irrespective of the intention with which the payment is made or received.

C  86    The trustee obtained judgments in default, and Vizcaya and Asphalia say that they took no part in the New York proceedings because they had no connection with New York, and in particular (a) Asphalia was not a customer of Madoff but a shareholder of Vizcaya; (b) arguably Vizcaya was not a customer since it had appointed the bank to act as custodian trustee and it was the bank which entered into contracts with Madoff.

*The issues*

D  87    The principal issue on these appeals is whether the rules at common law or under the 1933 Act regulating those foreign courts which are to be regarded as being competent for the purposes of enforcement of judgments apply to judgments in avoidance proceedings in insolvency, and, if not, what rules do apply: section V below.    The other issues are whether, in the *Rubin* appeal, enforcement may be effected through the assistance provisions of the

E  Cross-Border Insolvency Regulations 2006 (section VI) or, in the *New Cap* appeal, section 426 of the Insolvency Act 1986 (section VII); whether the judgments are enforceable as a result of the submission by the judgment debtors to the jurisdiction of the foreign courts (section VIII); and, in the *New Cap* appeal, if the judgment is enforceable, whether enforcement is at common law or under the 1933 Act: section IX.

F  *V The first issue: recognition and enforcement of foreign judgments in insolvency proceedings*

*Reasoning of the Court of Appeal in Rubin and the issue on the appeal*

88    The Court of Appeal in the *Rubin* appeal decided that a foreign insolvency judgment could be enforced in England and Wales at common law against a defendant not subject to the jurisdiction of the foreign court

G  under the traditional rule as formulated in the *Dicey* rule.

89    As I have already said, on the *Rubin* appeal in the Court of Appeal the receivers sought only to enforce those parts of the judgment which in effect related to the avoidance causes of action. The Court of Appeal held that the judgment (as narrowed) was enforceable at common law. The reasoning [2011] Ch 133, paras 38, 41, 43, 45, 48, 50, 61–62, 64 was as follows: (a) the judgment was final and conclusive, and for definite sums of

H  money, and on the face of the orders was a judgment in personam; (b) it was common ground that the judgment debtors were not resident (this was a slip for "present" since the action was at common law and not under the 1933 Act) when the proceedings were instituted, and did not submit to the jurisdiction, and so at first blush had an impregnable defence; (c) *Cambridge*

© 2013 The Incorporated Council of Law Reporting for England and Wales

268
Rubin v Eurofinance SA (SC(E))                                    [2013] 1 AC
Lord Collins of Mapesbury

*Gas* decided that the bankruptcy order with which it was concerned was    A
neither in personam nor in rem, and its purpose was simply to establish a
mechanism of collective execution against the property of the debtor by
creditors whose rights were admitted or established: *Pattni v Ali* [2007]
2 AC 85, para 23; (d) bankruptcy was a collective proceeding to enforce
rights and not to establish them: *Cambridge Gas* [2007] 1 AC 508, para 15;
(e) the issue was whether avoidance proceedings which could only be         B
brought by the representative of the bankrupt were to be characterised as
part of the bankruptcy proceedings, i e part of the collective proceeding to
enforce rights and not to establish them; (f) the adversary proceedings were
part and parcel of the Chapter 11 proceedings; (g) the ordinary rules for
enforcing foreign judgments in personam did not apply to bankruptcy
proceedings; (h) avoidance mechanisms were integral to and central to the   C
collective nature of bankruptcy and were not merely incidental procedural
matters; (i) the process of collection of assets will include the use of powers
to set aside voidable dispositions, which may differ very considerably from
those in the English statutory scheme: *HIH* [2008] 1 WLR 852, para 19;
(j) the judgment of the US Bankruptcy Court was a judgment in, and for the
purposes of, the collective enforcement regime of the insolvency
proceedings, and was governed by the sui generis private international law    D
rules relating to insolvency; (k) that was a desirable development of the
common law founded on the principles of modified universalism, and did
not require the court to enforce anything that it could not do, mutatis
mutandis, in a domestic context; (l) there was a principle of private
international law that bankruptcy should be unitary and universal, and there
should be a unitary insolvency proceeding in the court of the bankrupt's
domicile which receives worldwide recognition and should apply universally   E
to all the bankrupt's assets; (m) there was a further principle that recognition
carried with it the active assistance of the court which included assistance by
doing whatever the English court could do in the case of a domestic
insolvency; (n) there was no unfairness to the appellants in upholding the
judgment because they were fully aware of the proceedings, and after taking
advice chose not to participate. It was unnecessary to decide whether the
judgment was enforceable under the CBIR: para 63.                            F

90    In short, Ward LJ accepted that the judgment was an in personam
judgment, but he decided that the *Dicey* rule did not apply to foreign
judgments in avoidance proceedings because they were central to the
collective enforcement regime in insolvency and were governed by special
rules.

91    The essential questions on this aspect of the appeals are these. Is the   G
judgment in each case to be regarded as a judgment in personam within the
scope of the traditional rules embodied in the *Dicey* rule, or is it to be
characterised as an insolvency order which is part of the bankruptcy
proceedings, i e part of the collective proceeding to enforce rights and not to
establish them? Is that a distinction which has a role to play? Is there a
distinction between claims which are central to the purpose of the
proceedings and claims which are incidental procedural matters? As a          H
matter of policy, should the court, in the interests of universality of
insolvency proceedings, devise a rule for the recognition and enforcement of
judgments in foreign insolvency proceedings which is more expansive, and
more favourable to liquidators, trustees in bankruptcy, receivers and other

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    office-holders, than the traditional common law rule embodied in the *Dicey* rule, or should it be left to legislation preceded by any necessary consultation?

92    Ward LJ's conclusion derives from a careful synthesis of dicta in Lord Hoffmann's brilliantly expressed opinion in *Cambridge Gas* and his equally brilliant speech in *HIH*, each of which has on these appeals been subjected to an exceptionally detailed analysis. For reasons which will be

B    developed, I do not agree with the conclusions which Ward LJ draws.

93    But I begin with two matters on which I accept the respondents' analysis. The first is that avoidance proceedings have characteristics which distinguish them from ordinary claims such as claims in contract or tort. The second is that, if it were necessary to draw a distinction between insolvency orders and other orders, it would not be difficult to formulate

C    criteria for the distinction, along similar lines to that drawn by the European Court in relation to the Brussels Convention, the Brussels I Regulation (Council Regulation (EC) 44/2001) and the EC Insolvency Regulation.

### Nature of avoidance proceedings

94    In order to achieve a proper and fair distribution of assets between

D    creditors, it will often be necessary to adjust prior transactions and to recover previous dispositions of property so as to constitute the estate which is available for distribution. The principle of equality among creditors which underlies the pari passu principle may require the adjustment of concluded transactions which but for the winding up of the company would have remained binding on the company, and the return to the company of payments made or property transferred under the transactions or the

E    reversal of their effect. Systems of insolvency law use avoidance proceedings as mechanisms for adjusting prior transactions by the debtor and for recovering property disposed of by the debtor prior to the insolvency. Thus under the Insolvency Act 1986 an administrator, or liquidator, or trustee in bankruptcy may, where there has been a transaction at an undervalue, or amounting to an unlawful preference, apply for an order restoring the

F    position to what it would have been had the transaction not taken place: sections 238 et seq and 339 et seq. Other systems of law have similar mechanisms, but they will differ in matters such as the period during which such transactions are at risk of reversal and the role of good faith of the parties to the transaction.

95    The underlying policy is to protect the general body of creditors against a diminution of the assets by a transaction which confers an unfair or

G    improper advantage on the other party, and it is therefore an essential aspect of the process of liquidation that antecedent transactions whose consequences have been detrimental to the collective interest of the creditors should be amenable to adjustment or avoidance: *Fletcher, The Law of Insolvency*, 4th ed (2009), para 26-002; *Goode, Principles of Corporate Insolvency Law*, 4th ed (2011), para 13-03.

H    96    Thus the UNCITRAL Legislative Guide on Insolvency Law (2005) says:

"150. Many insolvency laws include provisions that apply retroactively from a particular date (such as the date of application for, or commencement of, insolvency proceedings) for a specified period of time

© 2013 The Incorporated Council of Law Reporting for England and Wales

(often referred to as the 'suspect' period) and are designed to overturn    A
those past transactions to which the insolvent debtor was a party or
which involved the debtor's assets where they have certain effects . . .

"151. It is a generally accepted principle of insolvency law that
collective action is more efficient in maximizing the assets available to
creditors than a system that leaves creditors free to pursue their individual
remedies and that it requires all like creditors to receive the same
treatment. Provisions dealing with avoidance powers are designed to    B
support these collective goals, ensuring that creditors receive a fair
allocation of an insolvent debtor's assets consistent with established
priorities and preserving the integrity of the insolvency estate."

97    In *In re Condor Insurance Ltd* (2010) 601 F 3d 319, 326, the Court
of Appeals for the Fifth Circuit said that:                                  C

"Avoidance laws have the purpose and effect of re-ordering the
distribution of a debtor's assets . . . in favor of the collective priorities
established by the distribution statute . . . [and] must be treated as an
integral part of the entire bankruptcy system."

98    In different phases of the Australian proceedings in *New Cap*
*Barrett* J made similar points. He said that in an action for unfair preference    D
under the Australian legislation the liquidator might obtain an order for the
payment of money, but the action did not contemplate recovery in the sense
applicable to damages and debts; and the proceedings sought to remedy or
counter the effects of that depletion caused by the payment by New Cap:
*New Cap Reinsurance Corpn v Renaissance Reinsurance Ltd* [2002]
NSWSC 856, paras 23, 27. The order does not vindicate property rights    E
which the company itself would have had prior to liquidation, but statutory
rights which the liquidator has under the statutory scheme in consequence of
winding up. The purpose of the order for the payment of money to a
company in liquidation is not to compensate the company, but to adjust the
rights of creditors among themselves in such a way as to eliminate the effects
of favourable treatment afforded to one or more creditors, to the exclusion
of others, in the period immediately before an insolvent administration    F
commences: *New Cap Reinsurance Corpn v Grant* (2009) 257 ALR 740,
paras 20–21.

*Difference between insolvency claims and others*

99    I also accept that, if there were to be a separate rule for the
recognition and enforcement of insolvency orders, it would not normally be    G
difficult to distinguish between judgments in insolvency proceedings which
are peculiarly the subject of insolvency law such as avoidance proceedings,
and other judgments of the kind which are covered by the *Dicey* rule.

100    In the context of the Brussels Convention, the Brussels I Regulation
and the EC Insolvency Regulation, the Court of Justice of the European
Union has developed a distinction between claims which derive directly from
the bankruptcy or winding up, and which are closely connected with them,    H
on the one hand, and those which do not, on the other hand, and the
distinction has been applied by the English court. In my judgment, the
distinction is a workable one which could be adapted to other contexts
should it be useful or necessary to do so.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A       101   Claims which were regarded as bankruptcy claims have been held
to include a claim under French law by a liquidator against a director to
make good a deficiency in the assets of a company (*Gourdain v Nadler* (Case
133/78) [1979] ECR 733); or a claim under German law to set aside a
transaction detrimental to creditors: *Seagon v Deko Marty Belgium NV*
(Case C-339/07) [2009] 1 WLR 2168.   Claims outside the category of
bankruptcy claims have been held to include an action brought by a seller
B  based on a reservation of title against a purchaser who was insolvent
(*German Graphics Graphische Maschinen GmbH v van der Schee* (Case
C-292/08) [2009] ECR I-8421) or a claim by a liquidator as to beneficial
ownership of an asset: *Byers v Yacht Bull Corpn* [2010] BCC 368. In *Oakley
v Ultra Vehicle Design Ltd* [2006] BCC 57, para 42 Lloyd LJ (sitting as an
additional judge of the Chancery Division) said:

C           "it has been held that a claim by a liquidator to recover pre-liquidation
         debts, although made in the course of the winding up and so, in a sense,
         relating to it, does not derive directly from it and is therefore not excluded
         from the Brussels Convention (and therefore now not from the [Brussels I]
         Regulation) by article 1.2(b): see *In re Hayward decd* [1997] Ch 45, and
         *UBS AG v Omni Holding AG* [2000] 1 WLR 916.   By contrast,
D        proceedings by a liquidator against a director or a third party to set aside
         a transaction as having been effected at an undervalue or on the basis of
         wrongful or fraudulent trading would be claims deriving directly from the
         winding up and therefore excluded from the Brussels Convention and
         now from the [Brussels I] Regulation."

E   *In personam or sui generis?*

       102   I have already quoted the passage in *Cambridge Gas* [2007]
1 AC 508 in which Lord Hoffmann distinguished between judgments in rem
and in personam, on the one hand, and judgments in bankruptcy
proceedings, on the other, but it is necessary to repeat it at this point. He
said, at paras 13–14:

F           "13. . . .   Judgments in rem and in personam are judicial
         determinations of the existence of rights: in the one case, rights over
         property and in the other, rights against a person.   When a judgment in
         rem or in personam is recognised by a foreign court, it is accepted as
         establishing the right which it purports to have determined, without
         further inquiry into the grounds upon which it did so.   The judgment itself
         is treated as the source of the right.
G           "14. The purpose of bankruptcy proceedings, on the other hand, is not
         to determine or establish the existence of rights, but to provide a
         mechanism of collective execution against the property of the debtor by
         creditors whose rights are admitted or established."

       103   There is no doubt that the order of the US Bankruptcy Court in
*Cambridge Gas* did not fall into the category of an in personam order. Even
H  though the question whether a foreign judgment is in personam or in rem is
sometimes a difficult one (*Dicey*, 15th ed, para 14-109), that was not a
personal order against its shareholders, including Cambridge Gas.   The
order vested the shares in Navigator in the creditors' committee.   It did not
declare existing property rights.   Indeed the whole purpose of what was the

© 2013 The Incorporated Council of Law Reporting for England and Wales

functional equivalent of a scheme of arrangement was to alter property   A
rights. But it is not easy to see why it was not an in rem order in relation to
property in the Isle of Man in the sense of deciding the status of a thing and
purporting to bind the world: see *Jowitt's Dictionary of English Law*, 3rd ed
(2010) (ed Greenberg), p 1249.

104   The judgments in the *Rubin* and *New Cap* appeals were based on
avoidance legislation which, with some differences of substance, performs
the same function as the equivalent provisions in the Insolvency Act 1986   B
and its predecessors. But Ward LJ in *Rubin* accepted that the judgment was
in personam and the *Rubin* respondents have not sought to argue that it was
not an in personam judgment. What they say is that, even if it is in
personam, it is within a sui generis category of insolvency orders or
judgments subject to special rules.

105   There can be no doubt that the avoidance orders in the present   C
appeals are in personam. In *In re Paramount Airways Ltd* [1993] Ch 223,
238 Nicholls LJ said that the remedies under section 238 of the Insolvency
Act 1986 (transactions at an undervalue) were "primarily of an in personam
character", and that accords with the nature of the orders in these appeals.
The form of judgment of the US Bankruptcy Court in the *Rubin* case was
that "plaintiffs have judgment . . . against the defendants" in the sums
awarded, and the orders of the New South Wales Supreme Court in the *New*   D
*Cap* case included orders that "the defendants . . . pay to the first plaintiff"
the sums due under section 588FF(1) of the Australian Corporations Act.

### The question of principle and policy

106   Since the judgments are in personam the principles in the *Dicey* rule
are applicable unless the court holds that there is, or should be, a separate   E
rule for judgments in personam in insolvency proceedings, at any rate where
those judgments are not designed to establish the existence of rights, but are
central to the purpose of the insolvency proceedings or part of the
mechanism of collective execution.

107   Prior to *Cambridge Gas* [2007] 1 AC 508 and the present cases,
there had been no suggestion that there might be a different rule for
judgments in personam in insolvency proceedings and other proceedings.   F
There are no cases in England which are helpful. The normal rules for
enforcement of foreign judgments were applied to a claim by a liquidator for
moneys due to the company (*Gavin Gibson & Co Ltd v Gibson* [1913]
3 KB 379) and to a claim on a debt ascertained in bankruptcy under German
law: *Berliner Industriebank AG v Jost* [1971] 2 QB 463. A judgment of the
US Bankruptcy Court in Chapter 11 proceedings for repayment of a   G
preferential transfer was enforced in Ontario on the basis of the judgment
debtor's submission to the New York court, without any suggestion that the
normal rules did not apply: *Gourmet Resources International Inc Estate v
Paramount Capital Corpn* (1991) 3 OR (3d) 286, [1993] IL Pr 583, appeal
dismissed (1993) 14 OR (3d) 319(Note) (Ont CA).

108   The principles in the *Dicey* rule have never received the express
approval of the House of Lords or the UK Supreme Court and the leading   H
decisions remain *Adams v Cape Industries plc* [1990] Ch 433 and the older
Court of Appeal authorities which it re-states or re-interprets. But there can
be no doubt that the references by the House of Lords in the context of
foreign judgments to the foreign court of "competent jurisdiction" are

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   implicit references to the common law rule: e g *Nouvion v Freeman* (1889)
    15 App Cas 1, 8 and *Owens Bank Ltd v Bracco* [1992] 2 AC 443, 484.

    109   The *Rubin* respondents question whether the rules remain sound in
    the modern world.  It is true that the common law rule was rejected in
    Canada, at first in the context of the inter-provincial recognition of
    judgments.  The Supreme Court of Canada held that the English rules
    developed in the 19th century for the recognition and enforcement of
B   judgments of foreign countries could not be transposed to the enforcement
    of judgments from sister provinces in a single country with a common
    market and a single citizenship.  Instead a judgment given against a person
    outside the jurisdiction should be recognised and enforced if the subject
    matter of the action had a real and substantial connection with the province
    in which the judgment was given: *Morguard Investments Ltd v De Savoye*
C   [1990] 3 SCR 1077, para 45.  This approach was applied, by a majority, to
    foreign country judgments in *Beals v Saldanha* [2003] 3 SCR 416 (applied to
    the recognition of an English order convening meetings in a scheme of
    arrangement in *In re Cavell Insurance Co* (2006) 269 DLR (4th) 679 (Ont
    CA)).

    110   There is no support in England for such an approach except in the
    field of family law.  In *Indyka v Indyka* [1969] 1 AC 33 it was held that a
D   foreign decree of divorce would be recognised at common law if there was a
    "real and substantial connection" between the petitioner (or the respondent)
    and the country where the divorce was obtained.  This rule (now superseded
    by the Family Law Act 1986) was in part devised to avoid "limping
    marriages", i e cases where the parties were regarded as divorced in one
    country but regarded as married in another country.  It has never been
E   adopted outside the family law sphere in the context of foreign judgments.

    111   The Supreme Court of Ireland in *In re Flightlease (Ireland) Ltd*
    [2012] IESC 12 declined to follow *Cambridge Gas* (and also the decision of
    the Court of Appeal in *Rubin*) and also held that the *Dicey* rule should not be
    rejected in favour of a real and substantial connection test.  In *Flightlease*
    the airline Swissair was in a form of debt restructuring proceeding in
F   Switzerland, where it was incorporated.  Flightlease is an Irish company in
    the same group as Swissair.  An application was before the Swiss courts
    under the Swiss federal statute on debt enforcement and bankruptcy seeking
    the return of money paid by Swissair to Flightlease.  The proceedings had
    reached the stage of judgment, but the liquidators of Flightlease were
    concerned to know whether a Swiss judgment would be enforceable in
    Ireland so that they could decide whether to appear in the Swiss proceedings.

G   112   The Irish Supreme Court held that the judgment would not be
    enforceable if Flightlease did not appear in the Swiss proceedings for these
    reasons: (1) the effect of the Swiss order would be to establish a liability on
    Flightlease to repay moneys and would therefore result in a judgment in
    personam; (2) it would be preferable for any change in the rules relating to
    the enforcement of foreign judgments to take place in the context of
    international consensus by way of treaty or convention given effect by
H   legislation.  In particular, the Irish Supreme Court said that it would not
    adopt the approach in *Cambridge Gas* because it had resulted from
    legislative changes in the United Kingdom (this appears to have been based
    on a misapprehension), and should not be adopted in Ireland in the absence
    of consensus among common law jurisdictions.

© 2013 The Incorporated Council of Law Reporting for England and Wales

274
Rubin v Eurofinance SA (SC(E))                                    [2013] 1 AC
Lord Collins of Mapesbury

113   But there is no suggestion on this appeal that the principles   A
embodied in the *Dicey* rule should be abandoned.   Instead the *Rubin*
respondents suggest that the principles should not apply to foreign
insolvency orders.

114   The respondents accept that the *Dicey* rule applies to claims which
may be of considerable significance by an office-holder in a foreign
insolvency, such as a claim for breach of contract, or a tort claim, or a claim
to recover debts.   It is clear that such claims may affect the size of the   B
insolvent estate just as much, and often more, than avoidance claims.   Like
claims to recover money due to the insolvent estate such as restitutionary
claims not involving avoidance, avoidance claims may establish a liability to
pay or repay money to the bankrupt estate (as in the present cases).   There is
no difference of principle.

115   The question, therefore, is one of policy.   Should there be a more   C
liberal rule for avoidance judgments in the interests of the universality of
bankruptcy and similar procedures?   In my judgment the answer is in the
negative for the following reasons.

116   First, although I accept that it is possible to distinguish between
avoidance claims and normal claims, for example in contract or tort, it is
difficult to see in the present context a difference of principle between a
foreign judgment against a debtor on a substantial debt due to a company in   D
liquidation and a foreign judgment against a creditor for repayment of a
preferential payment.   The respondents suggest that a person who sells
goods to a foreign company accepts the risk of the insolvency legislation of
the place of incorporation.   Quite apart from the fact that the suggestion is
wholly unrealistic, why should the seller/creditor be in a worse position than
a buyer/debtor?   E

117   The second reason is that if there is to be a different rule for foreign
judgments in such proceedings as avoidance proceedings, the court will have
to ascertain (or, more accurately, develop) two jurisdictional rules.   There
are two aspects of jurisdiction which would have to be satisfied if a foreign
insolvency judgment or order is to be outside the scope of the *Dicey* rule: the
first is the requisite nexus between the insolvency and the foreign court, and   F
the second is the requisite nexus between the judgment debtor and the
foreign court.

118   In *Cambridge Gas* Navigator was an Isle of Man company, and the
jurisdiction of the United States Bankruptcy Court depends on whether
the "debtor" resides or has a domicile or place of business, or property, in the
United States.   The shares in Navigator owned by Cambridge Gas (a
Cayman Islands company) were, on ordinary principles of the conflict of   G
laws, situated in the Isle of Man, and the shareholder relationship between
Navigator and Cambridge Gas was governed by Manx law.   The Privy
Council, as noted above, did not articulate any rule for the jurisdiction of the
US Bankruptcy Court over Navigator (although it had plainly submitted to
its jurisdiction) or over Cambridge Gas (which, the Manx courts had held
and the Privy Council accepted, had not submitted) or over Cambridge Gas'   H
Manx assets.

119   Nor did the Court of Appeal in *Rubin* articulate the reasons why
the English court recognised the jurisdiction of the US Bankruptcy Court
over TCT, or over the appellants.   The receivers appear to have proceeded
originally on the basis that the US Bankruptcy Court had jurisdiction under

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   United States bankruptcy law because of TCT's residence and principal place of business in New York (petition, 5 December 2005), but the US Bankruptcy Court, in deciding to appoint the receivers as foreign representatives also noted that TCT's business operations were conducted primarily in the United States, the majority of its creditors, substantially all of its assets, and its centre of main interests, were all in the United States.

B   The basis of jurisdiction of the US Bankruptcy Court under United States law over the individual defendants in *Rubin* was that they were subject both to the general jurisdiction of the court (i e connection of the defendant with the jurisdiction) and also to the specific jurisdiction of the court (i e connection of the cause of action with the jurisdiction) because they specifically sought out the United States as a place to do business and specifically sought out United States merchants and consumers with whom to do business.

C   Accordingly, the exercise of jurisdiction satisfied the due process requirements of the Fifth Amendment.

120   The basis of jurisdiction in *New Cap* over New Cap itself was of course that it was incorporated in Australia. The basis of jurisdiction over the syndicate under New South Wales law was that the cause of action against the syndicate arose in New South Wales.

D   121   The respondents do not put forward any principled suggestion for rules which will deal with the two aspects of jurisdiction. They accept, as regards the jurisdictional link between the foreign country and the insolvent estate, that English law has traditionally recognised insolvency proceedings taking place in an individual bankrupt's place of domicile, or, in the case of corporations, the place of incorporation, but (because the connection which the trustees of the TCT, or the TCT itself, had with the United States was that

E   the trust's main business was there) they rely on what Lord Hoffmann said in *HIH* [2008] 1 WLR 852, para 31:

"I have spoken in a rather old-fashioned way of the company's domicile because that is the term used in the old cases, but I do not claim it is necessarily the best one. Usually it means the place where the company is incorporated but that may be some offshore island with which the

F   company's business has no real connection. The Council Regulation on insolvency proceedings (Council Regulation (EC) No 1346/2000 of 29 May 2000) uses the concept of the 'centre of a debtor's main interests' as a test, with a presumption that it is the place where the registered office is situated: see article 3.1. That may be more appropriate."

122   They propose that each of these issues be resolved, not by a black

G   letter rule like the common law rule for enforcement of judgments, but instead by an appeal to what was said in oral argument to be the discretion of the English court to assist the foreign court.

123   On the second aspect, the jurisdictional link between the foreign country and the judgment debtor, they accept that it is necessary for there to be an appropriate connection between the foreign insolvency proceeding and the insolvency order in respect of which recognition and enforcement is

H   sought. They propose that, in the exercise of the discretion, the court should adopt an approach similar to that taken by the English court in deciding whether to apply provisions of the Insolvency Act 1986, such as section 238 (transactions at an undervalue), to persons abroad, relying on *In re Paramount Airways Ltd* [1993] Ch 223.

© 2013 The Incorporated Council of Law Reporting for England and Wales

124  That case decided that there is no implied territorial limitation to    A
the exercise of jurisdiction over "any person". The Court of Appeal rejected
the argument that the section applied only to British subjects and to persons
present in England at the time of the impugned transaction. In particular the
physical absence or presence of the party at the time of the transaction bore
no necessary relationship to the appropriateness of the remedy. Nor was the
test of "sufficient connection" with England satisfactory because it would
hardly be distinguishable from the ambit of the sections being unlimited    B
territorially: p 237. Instead, the approach was to be found in the discretion
of the court, first to grant permission to serve the proceedings out of the
jurisdiction, and secondly, to make an order under the section. On both
aspects the court would take into account whether the defendant was
sufficiently connected with England for it to be just and proper to make the
order against him despite the foreign element.                              C

125  The *Rubin* respondents say that *In re Paramount Airways Ltd* is
instructive because, if the facts of the present case were reversed such that
TCT had carried on the scheme in England and had been placed into
insolvency proceedings here and the appellants were resident in New York,
then it can be expected that the English court would have considered that
England was the correct forum in which to bring section 238 proceedings to    D
recover payments made to the appellants and would have given permission
to serve out of the jurisdiction accordingly. They go on to say that it is
implicit in this that the English court would have expected the New York
court then to recognise and enforce any judgment of the English court even if
the appellants had remained in New York and had not contested the
proceedings; and that by the same token that the court seeks and expects the
recognition and enforcement abroad of its own insolvency orders, the court    E
should recognise and enforce in England insolvency orders made in
insolvency proceedings in other jurisdictions.

126  There is no basis for this line of reasoning. There is no necessary
connection between the exercise of jurisdiction by the English court and its
recognition of the jurisdiction of foreign courts, or its expectation of the
recognition of its judgments abroad. It has frequently been said that the
jurisdiction exercised under what used to be RSC Ord 11, r 1 (and is now    F
CPR Practice Direction 6B, paragraph 3.1) is an exorbitant one, in that it
was a wider jurisdiction than was recognised in English law as being
possessed by courts of foreign countries in the absence of a treaty providing
for recognition: see *Siskina (Owners of cargo lately laden on board) v Distos
Cia Naviera SA* [1979] AC 210, 254, per Lord Diplock; *Amin Rasheed
Shipping Corpn v Kuwait Insurance Co* [1984] AC 50, 65, per Lord Diplock    G
and *Spiliada Maritime Corpn v Cansulex Ltd* [1987] AC 460, 481, per Lord
Goff of Chieveley.

127  Outside the sphere of matrimonial proceedings (see *Travers v
Holley* [1953] P 246, disapproved on this aspect in *Indyka v Indyka* [1969]
1 AC 33) reciprocity has not played a part in the recognition and
enforcement of foreign judgments at common law. The English court does
not concede jurisdiction in personam to a foreign court merely because the    H
English court would, in corresponding circumstances, have power to order
service out of the jurisdiction: *In re Trepca Mines Ltd* [1960] 1 WLR 1273.

128  In my judgment, the dicta in *Cambridge Gas* and *HIH* do not
justify the result which the Court of Appeal reached. This would not be an

© 2013 The Incorporated Council of Law Reporting for England and Wales

A  incremental development of existing principles, but a radical departure from substantially settled law. There is a reason for the limited scope of the *Dicey* rule and that is that there is no expectation of reciprocity on the part of foreign countries. Typically today the introduction of new rules for enforcement of judgments depends on a degree of reciprocity. The EC Insolvency Regulation and the Model Law were the product of lengthy negotiation and consultation.

B  129  A change in the settled law of the recognition and enforcement of judgments, and in particular the formulation of a rule for the identification of those courts which are to be regarded as courts of competent jurisdiction (such as the country where the insolvent entity has its centre of interests and the country with which the judgment debtor has a sufficient or substantial connection), has all the hallmarks of legislation, and is a matter for the

C  legislature and not for judicial innovation. The law relating to the enforcement of foreign judgments and the law relating to international insolvency are not areas of law which have in recent times been left to be developed by judge-made law. As Lord Bridge of Harwich put it in relation to a proposed change in the common law rule relating to fraud as a defence to the enforcement of a foreign judgment, "if the law is now in need of reform, it is for the legislature, not the judiciary, to effect it": *Owens Bank*

D  *Ltd v Bracco* [1992] 2 AC 443, 489.

130  Furthermore, the introduction of judge-made law extending the recognition and enforcement of foreign judgments would be only to the detriment of United Kingdom businesses without any corresponding benefit. I accept the appellants' point that if recognition and enforcement were simply left to the discretion of the court, based on a factor like "sufficient

E  connection", a person in England who might have connections with a foreign territory which were only arguably "sufficient" would have to actively defend foreign proceedings which could result in an in personam judgment against him, only because the proceedings are incidental to bankruptcy proceedings in the courts of that territory. Although I say nothing about the facts of the Madoff case, it might suggest that foreigners who have bona fide dealings with the United States might have to face the

F  dilemma of the expense of defending enormous claims in the United States or not defending them and being at risk of having a default judgment enforced abroad.

131  Nor is there likely to be any serious injustice if this court declines to sanction a departure from the traditional rule. It would not be appropriate to express a view on whether the office-holders in the present cases would

G  have, or would have had, a direct remedy in England, because there might be, or might have been, issues as to the governing law, or issues as to time-limits or as to good faith. Subject to those reservations, several of the ways in which the claims were put (especially those parts of the judgment which were not the subject of these proceedings) in the United States proceedings in *Rubin* could have founded proceedings by trustees in England for the benefit of the creditors (as beneficiaries of the express trust). In addition there are

H  several other avenues available to office-holders. Avoidance claims by a liquidator of an Australian company may be the subject of a request by the Australian court pursuant to section 426(4) of the Insolvency Act 1986, applying Australian law under section 426(5). In appropriate cases, article 23 of the Model Law will allow avoidance claims to be made by

© 2013 The Incorporated Council of Law Reporting for England and Wales

278

Rubin v Eurofinance SA (SC(E))                                    [2013] 1 AC
Lord Collins of Mapesbury

foreign representatives under the Insolvency Act 1986. In the cases where    A
the insolvent estate has its centre of main interests in the European Union,
judgments will be enforceable under article 25 of the EC Insolvency
Regulation.

132  It follows that, in my judgment, *Cambridge Gas* [2007] 1 AC 508
was wrongly decided. The Privy Council accepted (in view of the conclusion
that there had been no submission to the jurisdiction of the court in New
York) that Cambridge Gas was not subject to the personal jurisdiction of the    B
US Bankruptcy Court. The property in question, namely the shares in
Navigator, was situate in the Isle of Man, and therefore also not subject to
the in rem jurisdiction of the US Bankruptcy Court. There was therefore no
basis for the recognition of the order of the US Bankruptcy Court in the Isle
of Man.

C

### VI Issue 2: Rubin: Enforcement under the Cross-Border Insolvency Regulations

133  In the *Rubin* appeal it was argued by the respondents that the
judgment should also be enforced through the CBIR, implementing the
UNCITRAL Model Law.

134  The order made by the deputy judge [2010] 1 All ER (Comm) 81,    D
paras 46, 47 recognised the Chapter 11 proceeding "including the adversary
proceedings," because "bringing adversary proceedings against debtors of
the bankrupt is clearly part of collecting the bankrupt's assets with a view to
distributing them to creditors" and "the adversary proceedings are part and
parcel of the Chapter 11 insolvency proceedings". The Court of Appeal was
of the same view [2011] Ch 133, para 61(2)–(3). The appellants no longer
maintain that the adversary proceedings should not be recognised under the    E
Model Law.

135  The issue which still arises in relation to the Model Law as
implemented by the CBIR is whether the court has power to grant relief
recognising and enforcing the relevant parts of the judgment.

136  Article 21 provides:

> "1. Upon recognition of a foreign proceeding, whether main or    F
> non-main, where necessary to protect the assets of the debtor or the
> interests of the creditors, the court may, at the request of the foreign
> representative, grant any appropriate relief, including— (a) staying the
> commencement or continuation of individual actions or individual
> proceedings concerning the debtor's assets, rights, obligations or
> liabilities, to the extent they have not been stayed under paragraph l(a) of    G
> article 20; (b) staying execution against the debtor's assets to the extent it
> has not been stayed under paragraph l(b) of article 20; (c) suspending the
> right to transfer, encumber or otherwise dispose of any assets of the
> debtor to the extent this right has not been suspended under
> paragraph 1(c) of article 20; (d) providing for the examination of
> witnesses, the taking of evidence or the delivery of information
> concerning the debtor's assets, affairs, rights, obligations or liabilities;    H
> (e) entrusting the administration or realisation of all or part of the
> debtor's assets located in Great Britain to the foreign representative or
> another person designated by the court; (f) extending relief granted under
> paragraph 1 of article 19; and (g) granting any additional relief that may

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    be available to a British insolvency office-holder under the law of Great
Britain, including any relief provided under paragraph 43 of Schedule B1
to the Insolvency Act 1986."

137   The reference to relief under paragragh 43 of Schedule B1 to the
Insolvency Act 1986 (as inserted by section 248 of and Schedule 16 to the
Enterprise Act 2002) is a reference to a moratorium on claims in an
B    administration.

138   The Guide to Enactment states, at paras 154, 156:

"154. . . . The types of relief listed in article 21, paragraph 1, are
typical or most frequent in insolvency proceedings; however, the list is not
exhaustive and the court is not restricted unnecessarily in its ability to
grant any type of relief that is available under the law of the enacting state
C    and needed in the circumstances of the case . . .
"156. It is in the nature of discretionary relief that the court may tailor
it to the case at hand. This idea is reinforced by article 22, paragraph 2,
according to which the court may subject the relief granted to conditions
that it considers appropriate."

139   Article 25 provides (under the heading "Co-operation and direct
D    communication between a court of Great Britain and foreign courts or
foreign representatives") that:

"1. . . . the court may co-operate to the maximum extent possible with
foreign courts or foreign representatives, either directly or through a
British insolvency office-holder.
"2. The court is entitled to communicate directly with, or to request
E    information or assistance directly from, foreign courts or foreign
representatives."

140   Article 27 provides that the co-operation referred to in article 25
may be implemented "by any appropriate means", including

"(a) appointment of a person to act at the direction of the court;
(b) communication of information by any means considered appropriate
F    by the court; (c) coordination of the administration and supervision of the
debtor's assets and affairs; (d) approval or implementation by courts of
agreements concerning the coordination of proceedings; (e) coordination
of concurrent proceedings regarding the same debtor."

141   The respondents say that (a) the power under article 21 is to grant
any type of relief that is available under the law of the relevant state, and that
G    the fact that recognition and enforcement of foreign judgments is not
specifically mentioned in article 21 as one of the forms of relief available,
does not mean that such relief cannot be granted; (b) the recognition and
enforcement of the judgments of a foreign court is the paradigm means of
co-operation with that court; and (c) the examples of co-operation in
article 27 are merely examples and are not exhaustive.

H    142   But the CBIR (and the Model Law) say nothing about the
enforcement of foreign judgments against third parties. As Lord Mance JSC
pointed out in argument, recognition and enforcement are fundamental in
international cases. Recognition and enforcement of judgments in civil and
commercial matters (but not in insolvency matters) have been the subject of
intense international negotiations at the Hague Conference on Private

© 2013 The Incorporated Council of Law Reporting for England and Wales

280
Rubin v Eurofinance SA (SC(E))                                    [2013] 1 AC
Lord Collins of Mapesbury

International Law, which ultimately failed because of inability to agree on      A
recognised international bases of jurisdiction.

143    It would be surprising if the Model Law was intended to deal with
judgments in insolvency matters by implication.  Articles 21, 25 and 27 are
concerned with procedural matters.  No doubt they should be given a
purposive interpretation and should be widely construed in the light of the
objects of the Model Law, but there is nothing to suggest that they apply to
the recognition and enforcement of foreign judgments against third parties.    B

144    The respondents rely on United States decisions but the only case
involving enforcement of a foreign judgment in fact supports the appellants'
argument.  The Model Law has been implemented into United States law
through Chapter 15 of Title 11 of the United States Code, which has in
sections 1521, 1525 and 1527 provisions which are, with modifications not
relevant for present purposes, equivalent to articles 21, 25 and 27 of the     C
CBIR.  In *In re Metcalfe & Mansfield Alternative Investments* (2010)
421 BR 685 (Bankr SDNY) the US Bankruptcy Court ordered that orders
made by a Canadian court in relation to a plan of compromise and
arrangement under the (Canadian) Companies' Creditors Arrangement Act
1985 be enforced.  That decision does not assist the respondents because the
US Bankruptcy Court applied the normal rules in non-bankruptcy cases for
enforcement of foreign judgments in the United States: pp 698–700. In my     D
judgment the Model Law is not designed to provide for the reciprocal
enforcement of judgments.

*VII Issue 3: New Cap: Enforcement through assistance under section 426 of
the Insolvency Act 1986*

145    In view of my conclusion in the next section (section VIII) that the     E
syndicate submitted to the jurisdiction of the Australian court, the issues on
section 426(4)(5) of the Insolvency Act 1986, and their relationship with
section 6 of the Foreign Judgments (Reciprocal Enforcement) Act 1933 do
not arise, but since the matter was fully argued I will express a view on the
applicability of section 426(4) to a case such as this.

146    Section 426(4)(5) of the Insolvency Act 1986 provides:                   F

"(4) The courts having jurisdiction in relation to insolvency law in any
part of the United Kingdom shall assist the courts having the
corresponding jurisdiction in any other part of the United Kingdom or
any relevant country or territory.

"(5) For the purposes of subsection (4) a request made to a court in any
part of the United Kingdom by a court in any other part of the United
Kingdom, or in a relevant country or territory is authority for the court to   G
which the request is made to apply, in relation to any matter specified in
the request, the insolvency law which is applicable by either court in
relation to comparable matters falling within its jurisdiction.
In exercising its discretion under this subsection, a court shall have regard
in particular to the rules of private international law."

147    The reference to the application of rules of private international        H
law in section 426(5) is difficult and obscure: see *Dicey*, 15th ed, para 30-
119; my discussion in *In re Television Trade Rentals* [2002] BCC 807,
para 17, and the cases there cited; and *Al-Sabah v Grupo Torras SA* [2005]
2 AC 333, para 47.  But nothing turns on it on these appeals.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    148    The question is whether section 426(4) of the 1986 Act provides a procedure by which a judgment of a court having jurisdiction in relation to insolvency law in a "relevant country or territory" may be enforced in the United Kingdom. As I have said, Australia is a relevant country.

149    A further question arises if section 426(4) applies to the enforcement of foreign judgments and that is whether section 426 is ousted
B  by section 6 of the Foreign Judgments (Reciprocal Enforcement) Act 1933, which provides:

> "No proceedings for the recovery of a sum payable under a foreign judgment, being a judgment to which this Part of the Act applies, other than proceedings by way of registration of the judgment, shall be entertained by any court in the United Kingdom."

C    150    Both Lewison J and the Court of Appeal [2012] Ch 538 held that section 426(4) was available as a tool for the enforcement of the judgment.

151    Section 426(4) has been given a broad interpretation: see *Hughes v Hannover Rückversicherungs-Aktiengesellschaft* [1997] 1 BCLC 497 (CA); *England v Smith* [2001] Ch 419 (CA) and *HIH* [2008] 1 WLR 852. It has been held that the fact that a letter of request has been made is a weighty
D  factor, and public policy and comity favour the giving of assistance: *Hughes v Hannover*, at pp 517–518 and *England v Smith*, at p 433. Thus in *England v Smith* the Australian court overseeing the liquidation of the Bond Corporation made an order for the examination of a London partner in Arthur Andersen. It issued a letter of request asking the English court to assist it by making its own order for the examination. The Court of Appeal decided that the order should be made.

E    152    But, despite the respondents' argument to the contrary, *England v Smith* was not a case of the enforcement of the Australian order, but rather the making of the court's own order in aid of the Australian liquidation. In my judgment, subsections 426(4) and 426(5) of the 1986 Act are not concerned with enforcement of judgments. Section 426(1)(2), by contrast, deals with enforcement of orders in one part of the United Kingdom in another part, and refer expressly to the enforcement of such orders ("shall be
F  enforced" in section 426(1)). Section 426(4) deals with assistance not only for foreign designated countries such as Australia but also to intra-United Kingdom assistance. If section 426(4) applied to intra-United Kingdom enforcement of orders, then section 426(1) would be largely redundant, going beyond what the Court of Appeal [2012] Ch 538, para 57 described as "a degree of overlap".

G    153    Section 426(1)(4) has its origin in sections 121 and 123 of the Bankruptcy Act 1914. Section 121 of the 1914 Act provided that orders of bankruptcy courts in one part of the United Kingdom were to be enforced in other parts. Section 122 provided that the courts exercising bankruptcy and insolvency jurisdiction in the United Kingdom and "every British court elsewhere" were to act in aid of, and be auxiliary to, each other; and, upon a request by the non-English court, could exercise the jurisdiction of either
H  court.

154    The *Report of the Review Committee on the Insolvency Law and Practice* (1982) (Cmnd 8558) (the "Cork Report") said, at paras 1909–1913, that section 122 was the "vital section in this context", and recommended that the section should be extended to winding up. But, despite the

© 2013 The Incorporated Council of Law Reporting for England and Wales

respondents' arguments, I do not discern any recommendation which would     A
suggest that section 426(4) applies to the enforcement of foreign judgments.

155   Consequently the applicability of section 6 of the 1933 Act does not
arise for decision, except in a context which makes little practical difference,
and to which I will revert.

### VIII Submission
                                                                            B
156   If the *Dicey* rule applies the judgments in issue will be enforceable
in England if the judgment debtors submitted to the jurisdiction of the
foreign court.

#### New Cap

157   The Australian court granted leave to serve these proceedings out      C
of the jurisdiction on the syndicate: section IV, above. The syndicate did not
enter an appearance, but its solicitors commented in writing on evidence
presented to the Australian court about New Cap's insolvency and their
comments were placed before the Australian judge.

158   More relevant is the fact that from August 1999 the syndicate
submitted proofs of debt (in relation to unsettled claims and outstanding
premiums for the 1997, 1998, and 1999 years of account, and not to the      D
reinsurance contracts which are the subject of these proceedings) and
attended and participated in creditors' meetings. In particular at an
adjourned meeting of creditors on 16 September 2009 the syndicate had
given a proxy for that meeting to the chairman, and submitted a proof of
debt and proxy form for that meeting. The syndicate voted at a meeting of
creditors in favour of a scheme of arrangement. The liquidator has admitted  E
claims by the syndicate for the sterling equivalent of more than £650,000,
although the liquidator is retaining the dividend in partial settlement of the
costs incurred in these proceedings.

159   The general rule in the ordinary case in England is that the party
alleged to have submitted to the jurisdiction of the English court must have
"taken some step which is only necessary or only useful if" an objection to
jurisdiction "has been actually waived, or if the objection has never been   F
entertained at all": *Williams & Glyn's Bank plc v Astro Dinamico Cia
Naviera SA* [1984] 1 WLR 438, 444 (HL) approving *Rein v Stein* (1892)
66 LT 469, 471 (Cave J).

160   The same general rule has been adopted to determine whether there
has been a submission to the jurisdiction of a foreign court for the purposes
of the rule that a foreign judgment will be enforced on the basis that the   G
judgment debtor has submitted to the jurisdiction of the foreign court:
*Adams v Cape Industries plc* [1990] Ch 433, 459 (Scott J) and *Akai Pty Ltd
v People's Insurance Co Ltd* [1998] 1 Lloyd's Rep 90, 96–97 (Thomas J); see
also *Desert Sun Loan Corpn v Hill* [1996] 2 All ER 847, 856 (CA); *Akande v
Balfour Beatty Construction Ltd* [1998] IL Pr 110; *Starlight International
Inc v Bruce* [2002] IL Pr 617, para 14 (cases of foreign judgments) and
*Industrial Maritime Carriers (Bahamas) Inc v Sinoca International Inc (The   H
Eastern Trader)* [1996] 2 Lloyd's Rep 585, 601 (a case involving the
question whether the party seeking an anti-suit injunction in support of an
English arbitration clause had waived the agreement by submitting to the
jurisdiction of the foreign court).

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    161  The characterisation of whether there has been a submission for the purposes of the enforcement of foreign judgments in England depends on English law.  The court will not simply consider whether the steps taken abroad would have amounted to a submission in English proceedings.  The international context requires a broader approach.  Nor does it follow from the fact that the foreign court would have regarded steps taken in the foreign proceedings as a submission that the English court will so regard them.

B    Conversely, it does not necessarily follow that because the foreign court would not regard the steps as a submission that they will not be so regarded by the English court as a submission for the purposes of the enforcement of a judgment of the foreign court.  The question whether there has been a submission is to be inferred from all the facts.

162  It is in that context that Scott J said at first instance in *Adams v*
C    *Cape Industries plc* [1990] Ch 433, 461 (a case in which the submission issue was not before the Court of Appeal):

"If the steps would not have been regarded by the domestic law of the foreign court as a submission to the jurisdiction, they ought not . . . to be so regarded here, notwithstanding that if they had been steps taken in an English court they might have constituted a submission.  The implication
D    of procedural steps taken in foreign proceedings must . . . be assessed in the context of the foreign proceedings."

163  I agree with the way it was put by Thomas J in *Akai Pty Ltd v People's Insurance Co Ltd* [1998] 1 Lloyd's Rep 90, 97:

"The court must consider the matter objectively; it must have regard to
E    the general framework of its own procedural rules, but also to the domestic law of the court where the steps were taken.  This is because the significance of those steps can only be understood by reference to that law.  If a step taken by a person in a foreign jurisdiction, such as making a counterclaim, might well be regarded by English law as amounting to a submission to the jurisdiction, but would not be regarded by that foreign
F    court as a submission to its jurisdiction, an English court will take into account the position under foreign law."

164  The syndicate did not take any steps in the avoidance proceedings as such which would be regarded either by the Australian court or by the English court as a submission.  Were the steps taken by the syndicate in the liquidation a submission for the purposes of the rules relating to foreign
G    judgments?

165  In English law there is no doubt that orders may be made against a foreign creditor who proves in an English liquidation or bankruptcy on the footing that by proving the foreign creditor submits to the jurisdiction of the English court.  In *Ex p Robertson; In re Morton* (1875) LR 20 Eq 733 trustees were appointed over the property of bankrupt potato merchants in a liquidation by arrangement.  A Scots merchant received payment of £120
H    after the liquidation petition was presented, and proved for a balance of £247 and received a dividend of what is now 20p in the pound.  The trustees served a notice of motion, seeking repayment of the £120 paid out of the insolvent estate, out of the jurisdiction.  The respondent objected to the jurisdiction of the English court on the ground that he was a domiciled

© 2013 The Incorporated Council of Law Reporting for England and Wales

Scotsman.  On appeal from the county court, Bacon CJ held that the court    A
had jurisdiction.  He said, at pp 737–738:

> "what is the consequence of creditors coming in under a liquidation or
> bankruptcy?  They come in under what is as much a compact as if each of
> them had signed and sealed and sworn to the terms of it—that the
> bankrupt's estate shall be duly administered among the creditors.  That
> being so, the administration of the estate is cast upon the court, and the    B
> court has jurisdiction to decide all questions of whatever kind, whether of
> law, fact, or whatever else the court may think necessary in order to effect
> complete distribution of the bankrupt's estate . . . can there be any doubt
> that the appellant in this case has agreed that, as far as he is concerned . . .
> the law of bankruptcy shall take effect as to him, and under this
> jurisdiction, to which he is not only subjected, but under which he has
> become an active party, and of which he has taken the benefit . . . [The    C
> appellant] is as much bound to perform the conditions of the compact,
> and to submit to the jurisdiction of the court, as if he had never been out
> of the limits of England."

166    The syndicate objected to the jurisdiction of the Australian court.
Barrett J in his judgment of 14 July 2009 accepted that it had made it clear
that it was not submitting to its jurisdiction, and he also accepted that as a    D
result the judgment of the Australian court would not be enforceable in
England.  His judgment is concerned exclusively with the preference claims,
and he did not deal with the question of submission by reference to the
syndicate's participation in the liquidation by way of proof and receipt of
dividends.  He decided that the court had jurisdiction because the New
South Wales rules justified service out of the jurisdiction on the basis that the    E
cause of action arose in New South Wales.

167    I would therefore accept the liquidators' submission that, having
chosen to submit to New Cap's Australian insolvency proceeding, the
syndicate should be taken to have submitted to the jurisdiction of the
Australian court responsible for the supervision of that proceeding.  It
should not be allowed to benefit from the insolvency proceeding without the
burden of complying with the orders made in that proceeding.    F

### Rubin

168    The position is different in the *Rubin* appeal.  It would certainly
have been arguable that Eurofinance SA had submitted to the jurisdiction of
the United States District Court, for these reasons: first, it was Eurofinance
SA which applied for the appointment by the High Court of Mr Rubin and    G
Mr Lan as receivers of TCT specifically for the purpose of causing TCT then
to obtain protection under Chapter 11; second, it was Eurofinance SA which
represented to the English court that office-holders appointed by the United
States court would be able to pursue claims against third parties; third, the
judgment of the US Bankruptcy Court states that the court had personal
jurisdiction over Eurofinance SA not only because it did business in the
United States but also (as I have mentioned above) because it had filed a    H
notice of appearance in the Chapter 11 proceedings: order 22 of July 2008,
paras 42–43.

169    But the *Rubin* appellants did not appear in the adversary
proceedings, and it was not argued in these proceedings that Eurofinance

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   SA (or Mr Adrian Roman, who caused Eurofinance SA to make the
application) had submitted to the jurisdiction of the US Bankruptcy Court in
any other way and it is not necessary therefore to explore the matter further.

*IX New Cap: enforcement at common law or under the 1933 Act*

170   In view of my conclusion that the Australian judgment in *New Cap*
B   is enforceable by reason of the syndicate's submission, a purely technical
point arises on the method of enforcement. The point is whether the
enforcement is to be under the 1933 Act or at common law. If insolvency
proceedings are excluded from the 1933 Act, then enforcement would be at
common law. If they are not excluded, then (as I have said) section 6 has the
effect of excluding an action at common law on the judgment and making
registration under the 1933 Act the only method of enforcement of
C   judgments within Part I of the Act.

171   Section 11(2) of the 1933 Act provides that the expression "action
in personam" shall not be deemed to include (inter alia) proceedings in
connection with bankruptcy and winding up of companies. But the effect of
section 4(2)(c) is that in the case of a judgment given in an action other than
an action in personam or an action in rem, the foreign court shall be deemed
D   to have jurisdiction if its jurisdiction is recognised by the English court, i e at
common law. Accordingly, the question whether insolvency proceedings are
wholly excluded from the operation of the 1933 Act still arises. There is no
other provision in the 1933 Act which throws any light on the point.

172   The main object of the 1933 Act was to facilitate the enforcement
of commercial judgments abroad by making reciprocity easier. The only
reference to insolvency proceedings in the *Report of the Foreign Judgments
E   (Reciprocal Enforcement) Committee* (1932) (Cmd 4213) ("the Greer
Report"), which recommended the legislation, is the statement (para 4):
"It is not necessary for our present purposes to consider the effect in England
of foreign judgments in bankruptcy proceedings . . ." The report annexed
draft Conventions which had been drawn up in consultation with experts
from Belgium, France and Germany. The draft Conventions with Belgium
F   (article 4(3)(4)) and Germany (article 4(4)) provided that the jurisdictional
rules in the Convention did not apply to judgments in bankruptcy
proceedings or proceedings relating to the winding up of companies or other
bodies corporate, but that the jurisdiction of the original court would be
recognised where such recognition was in accordance with the rules of
private international law observed by the court applied to. That provision
paralleled what became sections 4(2)(c) and 11(2) of the 1933 Act. The
G   draft Convention with France did not apply to judgments in bankruptcy
proceedings etc (article 2(3)), but provided that nothing was deemed to
preclude the recognition and enforcement of judgments to which the
Convention did not apply: article 2(4).

173   The Conventions concluded with countries to which the 1933 Act
applied adopted similar techniques. It is unnecessary to set them out in
detail. But there is no reason to suppose that bankruptcy proceedings were
H   not regarded as being "civil and commercial matters". Thus the
1961 Convention with the Federal Republic of Germany of 1961 (set out in
the Schedule to the Reciprocal Enforcement of Foreign Judgments
(Germany) Order (SI 1961/1199)) provided in article I(6) that the
expression "judgments in civil and commercial matters" did not include

© 2013 The Incorporated Council of Law Reporting for England and Wales

judgments for fines or penalties, and had a separate provision in article   A
II(2) that the Convention did not apply to judgments in bankruptcy
proceedings or proceedings relating to the winding up of companies or
other bodies corporate (although, in accordance with the usual technique,
it did not rule out recognition and enforcement: article II(3)).   Other
Conventions simply excluded bankruptcy proceedings from the specific
jurisdictional provisions of the Convention, like the draft Conventions
annexed to the Greer Report: article IV(5) of the Schedule to the Reciprocal   B
Enforcement of Foreign Judgments (Austria) Order 1962 (SI 1962/1339),
article IV(3) of the Schedule to the Reciprocal Enforcement of Foreign
Judgments (Norway) Order 1962 (SI 1962/636), and article IV(3) of
Schedule 1 to the Reciprocal Enforcement of Foreign Judgments (Italy)
Order 1973 (SI 1973/1894).

174   The Reciprocal Enforcement of Judgments (Australia) Order 1994   C
(SI 1994/1901) extended the 1933 Act to Australia, implementing the UK-
Australia Agreement for the reciprocal enforcement of judgments in civil
and commercial matters.   The Agreement (set out in the Schedule to the
Order) is expressed in article 1(c)(i) to apply to judgments in civil and
commercial matters.   The Order applies Part I of the Act to judgments in
respect of a "civil or commercial matter": article 4(a).   D

175   There is no reason to conclude that the phrase "civil and
commercial matters" does not include insolvency proceedings, and the
history of the 1933 Act and the Conventions shows that it does.   The fact
that insolvency was expressly excluded from the operation of the Brussels
Convention, the original and revised Lugano Conventions and the Brussels
I Regulation in fact suggests that otherwise they would have been within
their scope.   The respondents relied on a passage in the ruling of the   E
Court of Justice of the European Union in *Gourdain v Nadler* (Case
133/78) [1979] ECR 733, paras 3–4, as suggesting that the exclusion of
bankruptcy in article 1 of the Brussels Convention was an example of a
matter excluded from the concept of civil and commercial matters.   But it
is clear from the context (and from the opinion of Advocate General
Reischl) that the court was simply saying that because the expression   F
"civil and commercial matters" in article 1 had to be given an
autonomous meaning, so also was the case with the expression
"bankruptcy".   That the exclusion of bankruptcy proceedings does not
affect their character as civil or commercial matters is confirmed by the
recent ruling in *F-Tex SIA v Lietuvos-Anglijos UAB-Jadecloud-Vilma*
(Case C-213/10) 19 April 2012, where the court said that the Brussels
I Regulation was "intended to apply to all civil and commercial matters   G
apart from certain well-defined matters" and as a result actions directly
deriving from insolvency proceedings and closely connected with them
were excluded: para 29.

176   It follows that the 1933 Act applies to the Australian judgment and
that enforcement should be by way of registration under the 1933 Act.

H

### X Disposition

177   I would therefore allow the appeal in *Rubin*, but dismiss the appeal
in *New Cap* on the ground that the syndicate submitted to the jurisdiction of
the Australian court.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    LORD MANCE JSC

178  I agree with Lord Collins of Mapesbury's reasoning and conclusions in his judgment on these appeals, essentially for the reasons he gives, though without subscribing to his incidental observation (para 132) that the Privy Council decision in *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc*

B    [2007] 1 AC 508 was necessarily wrongly decided. This was not argued before the Supreme Court, and I would wish to reserve my opinion upon it. *Cambridge Gas* is, on any view, distinguishable.

179  The common law question central to these appeals is whether the Supreme Court should endorse or introduce a special rule of recognition and enforcement, one falling outside the scope of the *Dicey* rule which Lord Collins has identified (rule 36 in the 14th and rule 43 in the 15th edition) and

C    applicable to judgments in foreign insolvency proceedings setting aside voidable pre-insolvency transactions. For the principal reasons which Lord Collins gives in paras 95–131, I agree that we should not do so.

180  Since much weight was placed by the respondents and the Court of Appeal upon the Board's reasoning and decision in *Cambridge Gas*, I add some observations to indicate why, as the present appellants submitted, it concerned circumstances and proceeded upon factual assumptions and a

D    legal analysis which have no parallel in the present case.

181  *Cambridge Gas* has attracted both Irish judicial dissent and English academic criticism, to which Lord Collins refers in paras 53 and 111–112. Giving the judgment of the Board in *Pattni v Ali* [2007] 2 AC 85, I said that the purpose of the bankruptcy order with which the Board was concerned in *Cambridge Gas* "was simply to establish a mechanism of collective

E    execution against the property of the debtor [Navigator] by creditors whose rights were admitted or established": para 23.

182  This analysis, admittedly, involved treating the vesting in creditors of shares *in* Navigator as no different in substance from the vesting in creditors of Navigator's shares in its ship-owning subsidiaries. But it is clear from paras 8 and 9 and again 24–26 of the Board's advice in *Cambridge Gas* that the Board saw no difference. It did not regard Cambridge Gas as having

F    any interest of value to advance or protect in the shares still held nominally in its name. Their vesting in Navigator's creditors was no more than a mechanism for disposing of Navigator's assets, which did not affect or concern Cambridge Gas. The Board was therefore, in its view (and rightly or wrongly), concerned with distribution of the insolvent company's assets in a narrow and traditional sense.

G    183  Amplifying this, the Board approached the situation in *Cambridge Gas* as follows. The New York court had jurisdiction over Navigator's assets, since Navigator had submitted to the New York proceedings. Cambridge Gas's shares in Navigator (located in the Isle of Man, Navigator's place of incorporation) were "completely and utterly worthless" [2007] 1 AC 508, para 9. The transfer to Navigator's creditors of Cambridge Gas's shares in Navigator had the like effect to a transfer of

H    Navigator's assets, since Navigator was "an insolvent company, in which the shareholders ha[d] no interest of any value": para 26. Cambridge Gas's shares in Navigator were vulnerable in the Isle of Man, under section 152 of the Companies Act 1931, to a similar scheme of arrangement to that which the New York Court intended by its Chapter 11 order. More generally, as

© 2013 The Incorporated Council of Law Reporting for England and Wales

I noted in *Stone & Rolls Ltd v Moore Stephens* [2009] AC 1391,    A
paras 236–238, in insolvency shareholders' interests yield to those of
creditors.

184   It was in this limited context that the Board concluded that the
New York and Manx courts' orders could be regarded as doing no more
than facilitating or enabling collective execution against Navigator's
property.
                                                                            B
185   The Court of Appeal believed on the contrary that the answer to the
present cases lay in the Board's general statements in *Cambridge Gas* [2007]
1 AC 508, paras 19–21 regarding the nature of insolvency proceedings. It is
true that proceedings to avoid pre-insolvency transactions can be related to
the process of collection of assets. That is, their general purpose and effect is
to ensure a fair allocation of assets between all who are and were within
some specified pre-insolvency period creditors. A dictum of Lord Hoffmann    C
in *In re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852,
para 19, quoted by Lord Collins in paras 15 and 52, is to that effect, though
again uttered in a different context to the present.

186   However, the Board did not see these considerations as answering
or eliminating all questions regarding the existence of jurisdiction or at least
its exercise in *Cambridge Gas*. On the contrary, it went on to examine in    D
close detail in paras 22–26 the limits of the assistance that a court could
properly give. In rejecting the argument that the interference with the
shareholding held in Cambridge Gas's name was beyond the Manx court's
jurisdiction (para 26), the only reason it gave related to the nature of shares
in an insolvent company. This meant, according to its advice, that
Cambridge Gas had no interest of any value to protect and that registration    E
of the shares in Navigator's creditors' name was no more than a mechanism
for giving creditors access to Navigator's assets.

187   On this basis, the decision in *Cambridge Gas* is, as Professor Adrian
Briggs noted in a penetrating case-note in *The British Year Book of
International Law* 2006, pp 575–581, less remarkable (although, as
Professor Briggs also notes, it perhaps still poses problems of reconciliation
with the House's decision in *Société Eram Shipping Co Ltd v Cie*    F
*Internationale de Navigation* [2004] AC 260). But, because the actual
decision in *Cambridge Gas* was so narrowly focused on the nature of a
shareholder's rights in an insolvent company and was not directly
challenged, I prefer to leave open its correctness.

188   Whatever view may be taken as to the validity of the Board's
reasoning in *Cambridge Gas*, it is clear that it does not cover or control the    G
present appeal. The present cases are not concerned with shares, with
situations in which shares are, or are treated by the court as, no more than a
key to the insolvent company's assets or even with situations in which it is
clear that those objecting to recognition and enforcement of the foreign
courts' orders have no interests to protect. There are, on the contrary,
substantial issues as to whether there were fraudulent preferences giving rise
to in personam liability in large amounts. The persons allegedly benefitting    H
by fraudulent preferences did not appear in the relevant foreign insolvency
proceedings in which judgment was given against them. They were (leaving
aside any question of submission) outside the international jurisdiction of
the relevant foreign courts.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    189   Lord Clarke of Stone-cum-Ebony JSC takes a different view from Lord Collins, but does not define either the circumstances in which a foreign court should, under English private international law rules, be recognised as having "jurisdiction to entertain" bankruptcy proceedings or, if one were (wrongly in my view) to treat the whole area as one of discretion, the factors which might make it either unjust or contrary to public policy to recognise an avoidance order made in such foreign proceedings: see paras 193, 200

B    and 201 of Lord Clarke JSC's judgment. The scope of the jurisdiction to entertain bankruptcy proceedings which English private international law will recognise a foreign court as having is described in *Dicey* (in para 31-064 in the 14th and 15th editions) as a "vexed and controversial" question. But it would include situations in which the bankrupt or insolvent company had simply submitted to the foreign bankruptcy jurisdiction.   On Lord

C    Clarke JSC's analysis, in such a case (of which *Rubin v Eurofinance* is an example), it would be irrelevant that the debtor under the avoidance order had not submitted, and was not on any other basis subject, to the foreign jurisdiction. It would be enough that the judgment debtor had had the chance of appearing and defending before the foreign court. For the reasons given by Lord Collins, I do not accept that this is the common law.

D    190   In the light of the above, the Court of Appeal was, in my view, in error in seeing the solution to the present appeals as lying in the advice given by the Board in *Cambridge Gas*. Even on an assumption that the actual decision in *Cambridge Gas* can be supported, it cannot and should not be treated as supporting the respondents' case that fraudulent preference claims and avoidance orders in insolvency proceedings generally escape the common law rules requiring personal or in rem jurisdiction.

E
### LORD CLARKE OF STONE-CUM-EBONY JSC
191   I would like to pay tribute to the learning in Lord Collins of Mapesbury's comprehensive judgment. However, left to myself, I would dismiss the appeal in the *Rubin* case. Since I am in a minority of one, little is to be gained by my writing a long dissent. I will therefore try to explain my reasons shortly. In doing so, I adopt the terminology and abbreviations used

F    by Lord Collins.
192   I agree with Lord Collins and Lord Mance JSC that the decision of the Privy Council in *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC 508 is distinguishable. The facts there were quite different from those here. However, in so far as it is suggested that *Cambridge Gas* was wrongly

G    decided, I do not agree.   Moreover, I do not think that it would be appropriate so to hold because it was not submitted to be wrong in the course of the argument. To my mind the approach which should be adopted is presaged in the speech of Lord Hoffmann in *In re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852 and in his judgment in *Cambridge Gas*.

H    193   As I see it, the issue is simply whether an avoidance order made by a foreign bankruptcy court made in the course of the bankruptcy proceedings, whether personal or corporate, which the court has jurisdiction to entertain, is unenforceable if it can fairly be said to be an order made either in personam or in rem. I would answer that question in the negative. Put another way, the question is whether the English court has jurisdiction under

© 2013 The Incorporated Council of Law Reporting for England and Wales

English rules of private international law to enforce an avoidance order   A
made in foreign bankruptcy proceedings in circumstances where, under
those rules, the foreign court has jurisdiction to entertain the bankruptcy
proceedings themselves. I would answer that question in the affirmative. It
is not, as I understand it, suggested here that the US court did not have
jurisdiction to entertain the bankruptcy proceedings themselves.

194   The relevant paragraphs of Lord Hoffmann's judgment in   B
*Cambridge Gas* are in these terms (as quoted by Lord Collins at para 43
above):

"13. . . . Judgments in rem and in personam are judicial
determinations of the existence of rights: in the one case, rights over
property and in the other, rights against a person. When a judgment in
rem or in personam is recognised by a foreign court, it is accepted as   C
establishing the right which it purports to have determined, without
further inquiry into the grounds upon which it did so. The judgment itself
is treated as the source of the right.

"14. The purpose of bankruptcy proceedings, on the other hand, is not
to determine or establish the existence of rights, but to provide a
mechanism of collective execution against the property of the debtor by
creditors whose rights are admitted or established . . .   D

"15. . . . bankruptcy, whether personal or corporate, is a collective
proceeding to enforce rights and not to establish them. Of course, as
Brightman LJ pointed out in *In re Lines Bros Ltd* [1983] Ch 1, 20, it may
incidentally be necessary in the course of bankruptcy proceedings to
establish rights which are challenged: proofs of debt may be rejected; or
there may be a dispute over whether or not a particular item of property
belonged to the debtor and is available for distribution. There are   E
procedures by which these questions may be tried summarily within the
bankruptcy proceedings or directed to be determined by ordinary action.
But these again are incidental procedural matters and not central to the
purpose of the proceedings."

195   The critical paragraph is para 15, which seems to me to make it   F
clear that it is possible to have an order which is both in personam or in rem
and an order of the kind referred to by Lord Hoffmann in para 14. Thus it
may be incidentally necessary to establish substantive rights in the course of
the bankruptcy proceedings as part of a collective proceeding to enforce
rights. In such a case the order will be doing two things. It will be both
establishing the right and enforcing it. This can be seen from the examples
given in para 15. Proofs of debt may be rejected, which is a process which   G
may involve determining, for example, the substantive rights of the creditor
against the debtor. Or it may be necessary to determine whether or not a
particular item of property belongs to the debtor and is available for
distribution. As para 15 contemplates, such procedures may be tried either
summarily within the bankruptcy proceedings or by ordinary action. In
either such case Lord Hoffmann describes them as incidental procedures
which are not central to the purpose of the bankruptcy proceedings. As I see   H
it, in such a case, an avoidance order may be both an order in personam or in
rem and an order in the bankruptcy proceedings.

196   I agree with Lord Collins at para 103 that it is not easy to see why
the order of the US Bankruptcy Court in *Cambridge Gas* was not an order in

© 2013 The Incorporated Council of Law Reporting for England and Wales

A  rem. However, that does not to my mind show that *Cambridge Gas* was wrongly decided but demonstrates that it is possible to have an in rem order which is made as incidental to bankruptcy proceedings but which is enforceable at common law, provided that the bankruptcy court has jurisdiction in the bankruptcy.

B  197  The approach is explained by Lord Hoffmann in *HIH* [2008] 1 WLR 852, para 30 and in *Cambridge Gas* [2007] 1 AC 508, para 16, both of which are quoted by Lord Collins at para 19 above. In *HIH* he said:

"The primary rule of private international law which seems to me applicable to this case is the principle of (modified) universalism, which has been the golden thread running through English cross-border insolvency law since the 18th century. That principle requires that
C  English courts should, so far as is consistent with justice and UK public policy, co-operate with the courts in the country of the principal liquidation to ensure that all the company's assets are distributed to its creditors under a single system of distribution."

In *Cambridge Gas* he said:

"The English common law has traditionally taken the view that
D  fairness between creditors requires that, ideally, bankruptcy proceedings should have universal application. There should be a single bankruptcy in which all creditors are entitled and required to prove. No one should have an advantage because he happens to live in a jurisdiction where more of the assets or fewer of the creditors are situated."

E  198  At paras 94–98 above Lord Collins discusses the nature of avoidance proceedings. I entirely agree with his analysis. Avoidance provisions requiring the adjustment of prior transactions and the recovery of previous dispositions of property so as to constitute the estate available for distribution are necessary in order to maintain the principle of equality among creditors. At para 15 Lord Collins notes that Lord Hoffmann said at para 19 of *HIH* that "the process of collection of assets will include, for example, the use of powers to set aside voidable dispositions, which may
F  differ very considerably from those in the English statutory scheme". In short, avoidance proceedings, and therefore avoidance orders, are central to the bankruptcy proceedings. As Lord Collins puts it at para 99, avoidance proceedings are peculiarly the subject of insolvency law.

199  I accept that to permit the enforcement of an avoidance order in circumstances of this kind would be a development of the common law.
G  However, it seems to me that it would be a principled development. It would in essence be an application of the principle identified by Lord Hoffmann in the passage quoted above from para 30 of *HIH* that the principle of modified universalism requires that English courts should, so far as is consistent with justice and United Kingdom public policy, co-operate with the courts in the country of the principal liquidation to ensure that all the company's assets are distributed to its creditors under a single system of
H  distribution.

200  The position of the judgment debtor in such a case would be protected by the principle that the English court would only enforce a judgment in a case like this where to do so was consistent with justice and United Kingdom public policy. All would depend upon the facts of the

© 2013 The Incorporated Council of Law Reporting for England and Wales

292
Rubin v Eurofinance SA (SC(E))                                    [2013] 1 AC
Lord Clarke of Stone-cum-Ebony JSC

particular case. In the case of *Rubin*, there would be no injustice in enforcing     A
the judgment against the appellants.

201   Lord Mance JSC notes at para 189 that I do not define either the
circumstances in which a foreign court should be recognised as having
jurisdiction to entertain bankruptcy proceedings or the factors which would
make it unjust or contrary to public policy to recognise an avoidance order
made in such foreign proceedings. As I see it, these are matters which would
be worked out on a case by case basis in (as Lord Hoffmann put it in *HIH*      B
[2008] 1 WLR 852, para 30) co-operating with the courts in the country of
the principal liquidation to ensure that all the company's assets are
distributed to its creditors under a single system of distribution. It would not
be irrelevant that the debtor under the avoidance order had not submitted.
All would depend upon the particular circumstances of the case, including
the reasons why the debtor had not submitted.                                    C

202   In essence, on the critical question, I prefer the reasoning of the
Court of Appeal, which is contained in the judgment of Ward LJ [2011] Ch
133, paras 38, 41, 43, 45, 48, 50, 61–62, 64, with whom Wilson LJ and
Henderson J agreed. Lord Collins has concisely summarised their reasoning
in paras 88–90, substantially as follows: (a) the judgment was final and
conclusive, and for definite sums of money, and on the face of the orders was
a judgment in personam; (b) it was common ground that the judgment         D
debtors were not present when the proceedings were instituted, and did not
submit to the jurisdiction, and so at first blush had an impregnable defence;
(c) *Cambridge Gas* decided that the bankruptcy order with which it was
concerned was neither in personam nor in rem, and its purpose was simply to
establish a mechanism of collective execution against the property of the
debtor by creditors whose rights were admitted or established: *Pattni v Ali*     E
[2007] 2 AC 85, para 23; (d) bankruptcy was a collective proceeding to
enforce rights and not to establish them: *Cambridge Gas* [2007] 1 AC 508,
para 15; (e) the issue was whether avoidance proceedings which could only
be brought by the representative of the bankrupt were to be characterised as
part of the bankruptcy proceedings, i e part of the collective proceeding to
enforce rights and not to establish them; (f) the adversary proceedings were
part and parcel of the Chapter 11 proceedings; (g) the ordinary rules for      F
enforcing foreign judgments in personam did not apply to bankruptcy
proceedings; (h) avoidance mechanisms were integral to and central to the
collective nature of bankruptcy and were not merely incidental procedural
matters; (i) the process of collection of assets will include the use of powers to
set aside voidable dispositions, which may differ very considerably from
those in the English statutory scheme: *HIH* [2008] 1 WLR 852, para 19;    G
(j) the judgment of the US Bankruptcy Court was a judgment in, and for the
purposes of, the collective enforcement regime of the insolvency proceedings,
and was governed by the sui generis private international law rules relating to
insolvency; (k) that was a desirable development of the common law founded
on the principles of modified universalism, and did not require the court to
enforce anything that it could not do, mutatis mutandis, in a domestic
context; (l) there was a principle of private international law that bankruptcy     H
should be unitary and universal, and there should be a unitary insolvency
proceeding in the court of the bankrupt's domicile which receives worldwide
recognition and should apply universally to all the bankrupt's assets;
(m) there was a further principle that recognition carried with it the active

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    assistance of the court which included assistance by doing whatever the
     English court could do in the case of a domestic insolvency; (n) there was no
     unfairness to the appellants in upholding the judgment because they were
     fully aware of the proceedings, and after taking advice chose not to
     participate [2011] Ch 133, paras 38, 41, 43, 45, 48, 50, 61–62, 64.

         203    That seems to me to be a correct summary of the views of the Court of
B    Appeal. I agree with those views subject to this comment on point (c). I am not
     sure that in *Cambridge Gas* the Privy Council decided that the bankruptcy
     order with which it was concerned was neither in personam nor in rem. It held
     that the purpose of the order was simply to establish a mechanism of collective
     execution against the property of the debtor by creditors whose rights were
     admitted or established. As discussed above, it may well have appreciated that
     it was also an order in rem. However that may be, I agree with Lord Collins at
C    para 90 that, in short, the Court of Appeal accepted that the judgment sought
     to be enforced in the instant cases was an in personam judgment, but decided
     that the *Dicey* rule did not apply to foreign judgments in avoidance
     proceedings because they were central to the collective enforcement regime in
     insolvency and were governed by special rules. I agree with the reasoning of
     the Court of Appeal. Put another way, the *Dicey* rule should in my opinion be
     modified to include a fifth case in which a foreign court has jurisdiction to give
D    a judgment in personam capable of enforcement or recognition as against the
     person against whom it is given. That fifth case would be if the judgment was
     given in avoidance proceedings as part of foreign bankruptcy proceedings
     which the foreign court had jurisdiction to entertain.

         204    I recognise that there are other ways of achieving such a result, as
     for example by an equivalent provision to the EC Insolvency Regulation: per
E    Lord Collins at paras 99–101. I also recognise that it would be possible to
     adopt a more radical approach not limited to avoidance proceedings.
     However, so limited, I respectfully disagree with the view expressed by Lord
     Collins at para 128 that this development would not be an incremental
     development of existing principles but a radical departure from substantially
     settled law. For the reasons given in para 199, it would in essence be an
     application of the principle of modified universalism. It seems to me that in
F    these days of global commerce, the step taken by the Court of Appeal was
     but a small step forward. Judgment debtors are protected by the principle
     that no order would be made if it were contrary to justice or United
     Kingdom public policy. Moreover, on the facts here, I can see no basis upon
     which the order made by the Court of Appeal would be either unjust or
     contrary to public policy. Finally, I do not think that that conclusion is
     undermined by any absence of reciprocity.
G
         205    For these reasons, I would dismiss the appeal in the *Rubin* case on
     the common law point. On all other issues I agree with the judgment of Lord
     Collins.

                                        *Appeal in first case allowed.*
                                        *Appeal in second case dismissed.*

H
                                        COLIN BERESFORD, Barrister

© 2013 The Incorporated Council of Law Reporting for England and Wales

TAB 67

*Sandhu v Jet Star Retail Ltd* [2011] EWCA Civ 459,
English Court of Appeal

Neutral Citation Number: [2011] EWCA Civ 459

Case No: A3/2010/1973

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**BIRMINGHAM MERCANTILE COURT**
**His Honour Judge Simon Brown Q.C.**
**9BM40023**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 19 April 2011

Before :

**LORD JUSTICE MAURICE KAY**
**Vice-President of the Court of Appeal, Civil Division**
**LADY JUSTICE SMITH**
and
**LORD JUSTICE MOORE-BICK**

- - - - - - - - - - - - - - - - - - - -

Between :

|  |  |
|---|---|
| **BULBINDER SINGH SANDHU** **(trading as Isher Fashions UK)** | **Claimant/** **Appellant** |
| **- and -** | |
| **(1) JET STAR RETAIL LIMITED** **(in administration)** **(2) MICHAEL HEALY** **(3) NEIL BENNETT** | **Defendants/** **Respondents** |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Mr. Peter Arden Q.C.** (instructed by **Billy Hughes & Co**) for the **appellant**
**Mr. Adam Goodison** (instructed by **SGH Solicitors**) for the **respondents**

Hearing date : 22nd March 2011
- - - - - - - - - - - - - - - - - - - -

# Judgment

Bulbinder Singh Sandhu -v- Jet Star Retail Ltd

**Lord Justice Moore-Bick :**

1.  The appellant, Mr. Bulbinder Singh, carries on business as a manufacturer of clothing under the name Isher Fashions UK ("Isher Fashions"). At the time with which the appeal is concerned the first respondent, Jet Star Retail Ltd ("Jet Star"), carried on business as a retailer of women's fashion garments through a chain of shops around the United Kingdom.

2.  During the summer and autumn of 2008 Isher Fashions supplied a substantial quantity of garments to Jet Star under contracts which included a retention of title clause. By the middle of October 2008 Jet Star was in serious financial difficulties. On 27th October three other suppliers presented a winding up petition against it and on 19th November an administration order was made in respect of it. The second and third respondents, Mr. Healy and Mr. Bennett, were appointed as administrators. Between 20th and 24th November 2008 Jet Star continued to trade and stock held in its various shops was sold to the public, as before. On 25th November 2008 Jet Star acting through the administrators sold the entirety of its business as a going concern to Internazionale Retail Ltd ("Internazionale") and delivered to it the stock remaining in the shops.

3.  In March 2009 Isher Fashions brought proceedings against Jet Star and the administrators in the Birmingham Mercantile Court relying on the retention of title clause to claim damages for conversion of the garments delivered to Internazionale under the sale agreement and an order that the damages be treated as an expense of the administration. On 5th June 2009 His Honour Judge Simon Brown Q.C. directed that there be a trial of certain preliminary issues, the third of which was framed in the following terms:

    "whether the claimant has any claim as pleaded in the particulars of claim in respect of any goods:

    (i)   held in stock by the first defendant upon its entering into administration on 19th November 2009 but sold before the sale of the business to Internazionale Retail Limited on 25th November 2008; or

    (ii)  held in stock by the first defendant at the time of the administration and delivered to Internazionale Retail Limited pursuant to the 25th November 2008 agreement."

4.  The terms on which the goods were sold by Isher Fashions to Jet Star included the following:

    "6.   PROPERTY AND RISK

    . . .

    6.2 Isher Fashions shall retain property, title and ownership of the Products until it has received payment in full in cash or cleared funds of all sums due and/or owing for all Products supplied to the Customer by Isher Fashions under this

Contract and any other agreement between Isher Fashions and the Customer.

7.   DEFAULT

If the Customer

. . .

7.1.4   . . . has a bankruptcy petition presented against it, has appointed in respect of it or any of its assets a liquidator, . . . receiver, administrative receiver, administrator or similar officer . . .

then Isher Fashions shall have the right, without prejudice to any other remedies, to exercise any or all of the following rights:

. . .

7.1.9   Isher Fashions may require the customer not to re-sell or part with the possession of any Products owned by Isher Fashions until the Customer has paid in full all sums due to Isher Fashions under this Contract or any other agreement with the Customer;"

5.    The judge held that although the terms on which the goods had been sold included a retention of title clause, Jet Star had implied authority to sell or otherwise dispose of them unless and until Isher Fashions exercised its right under clause 7.1.9 to withdraw it. Since no steps had been taken to withdraw its authority, Jet Star was entitled to dispose of the goods, both by selling them through its retail outlets during the period of the administration and by disposing of them to Internacionale in connection with the sale of its business. Accordingly, he held that each of the questions should be answered 'No' and entered judgment for the respondents.

6.    Isher Fashions now appeals against the judge's order. It accepts that Jet Star  had authority to sell and dispose of the goods in the ordinary course of business, notwithstanding the retention of title clause, but says that it ceased to have such authority once it became insolvent and entered into administration. Accordingly, any sale and disposal of the goods that took place on or after 20th November 2008 amounted to wrongful interference with its goods.

7.    The scope of Jet Star's authority to dispose of the goods lies at the heart of the appeal. On behalf of Isher Fashions Mr. Peter Arden Q.C. submitted that the retention of title clause was intended to provide security for the payment of the price and that the implied authority to dispose of the goods before they had been paid for was limited, as would be the case under an agreement for a floating charge, to selling goods in the ordinary course of business, that is, while the company remained solvent. In support of that submission he drew our attention to the decisions in *Re Bond Worth* [1980] Ch. 228 and *Four Point Garage v Carter* [1985] 3 All E.R. 12, each of which provides an

example of circumstances in which a purchaser was given limited authority to sell or otherwise dispose of goods subject to a retention of title clause in the ordinary course of business.

8.   Mr. Adam Goodison for Jet Star submitted that in the present case the terms of clause 7.1.9 made it clear not only that the parties had contemplated that the buyer might go into administration (or worse), but that even under those circumstances it should continue to have authority to dispose of the goods unless Isher Fashions took steps to withdraw it. In those circumstances they must have contemplated not only the disposal of the goods through shops during the currency of the administration but also their disposal in bulk to a purchaser of the business, since that is a well-recognised way of carrying out the administrators' duty to achieve a better result for the company's creditors than would be likely if it were to be wound up.

9.   Mr. Arden's case rests on two main propositions: that in relation to the buyer's authority to dispose of the goods before it has paid for them, the effect of the retention of title clause is broadly the same as that of an agreement for a floating charge; and that in the case of a floating charge the company's authority to dispose of its assets is limited to disposals made in the ordinary course of business and ceases on insolvency.

10.   The second of those propositions was not seriously in dispute. Nowadays a debenture which creates a floating charge normally expressly permits the borrower to dispose of assets "in the ordinary course of business", but from time to time disputes have arisen over the precise meaning of that expression. In *Ashborder BV v Green Gas Power Ltd* [2004] EWHC 1517 (Ch), [2005] 1 BCLC 623 Etherton J. reviewed a number of authorities in which the question has been considered and in doing so drew attention to the case of *Driver v Broad* [1893] 1 Q.B. 744, in which Kay L.J. expressed the view that there is no distinction between a debenture which expressly gives the company liberty to dispose of the charged property "in the ordinary course of its business" and one that does not, the concept being, in his view, inherent in the term "floating security" or "floating charge." The case therefore supports the proposition that a debenture creating a floating charge limits the company's ability to dispose of its assets to disposals under transactions made in the ordinary course of its business. In paragraph 227 of his judgment Etherton J. set out certain conclusions that he thought could be drawn from the decided cases about what is meant by the ordinary course of a company's business in this context. The last of these conclusions, on which Mr. Arden placed particular reliance, was that transactions which are intended to bring to an end, or have the effect of bringing to an end, the company's business are not transactions in the ordinary course of its business. For my part I would accept that as a correct statement of the law.

11.   The first of Mr. Arden's propositions is, however, more controversial, since the existence and scope of any authority that Jet Star may have had to dispose of the goods before they had been paid for is to be gleaned from the terms of the contract and its commercial object. It is for this reason that I have not derived a great deal of assistance from either of the authorities on which he relied, since each case depends on its own facts and the particular terms of the contract. In *Re Bond Worth*, for example, the court held that title passed to the buyer on delivery of the goods, but that the effect of the retention of title clause was to create a floating charge over the products in favour of the seller. No one has suggested that that was the effect of the contract in this case. In *Four Point Garage v Carter* one question for decision was

whether a retention of title clause in a contract between two motor dealers for the sale of a car was sufficient to exclude any implied authority on the part of the buyer to resell in the ordinary course of business. The court held that it did not, but again, the question clearly turned on the nature of the business and the express terms of the contract.

12.     In the present case the purpose of the contract, as both parties recognised, was to supply fashion goods for sale in the retail market. The very fact that Jet Star sold garments through more than a hundred outlets is sufficient to show that it was engaged in a trade dealing with large quantities of goods with a high turnover, in which it is necessary for stock to be capable of moving from manufacturer to stores at speed in order to satisfy customer demand. The terms of payment were generous - 5% of the price was to be paid within 60 days of invoice -  which reinforces the conclusion that the parties intended that the goods could be sold before they had been paid for. Moreover, it is not unknown in the clothing trade for stock clearances to be made from time to time in order to create space for new lines. These are all aspects of the trade which tend to suggest that one matter the parties must have had in mind was that Jet Star might wish to dispose of substantial quantities of stock to wholesalers rather than disposing of them through its own retail outlets.

13.     All this forms part of the context in which the contract as a whole, and clause 7.1.9 in particular, falls to be construed. The clause proceeds on the assumption that the buyer is entitled to sell and dispose of the goods even though property has not passed and that its right to do so continues after the occurrence of any of the events described in clause 7.1.4, unless terminated by a requirement on the part of Isher Fashions to refrain from doing so. The parties clearly had in mind, therefore, that the buyer might be permitted to continue to deal with the goods even after it had become insolvent or (as here) had gone into administration. In my view that is an important distinction between this contract and a debenture creating a simple floating charge and one which has significant implications for the scope of the buyer's authority to dispose of the goods. It is an important feature of a floating charge that it crystallises on the insolvency of the debtor and thereby provides the creditor with the protection he seeks. Under this contract, by contrast, the protection provided by the retention of title clause is contingent on the decision of Isher Fashions to withdraw the buyer's authority to deal with the goods. I do not think, therefore, that one can draw a direct analogy between the two.

14.     Having regard to the commercial considerations mentioned earlier and to the language of clause 7, I am unable to accept that Jet Star's authority to sell and dispose of goods subject to the retention of title clause was limited to disposals in what, in the context of a floating charge, could be described as the ordinary course of business. While the buyer's business was flourishing it did not matter to Isher Fashions whether goods were disposed of through retail outlets, by means of wholesale contracts or in any other manner. Its chosen method of securing protection when the buyer encountered financial difficulties was to reserve the right to decide whether, and if so when, to intervene in order to preserve its interest in any goods for which payment had not been made. In those circumstances I do not think that it is possible to construe the contract as restricting the buyer's authority to dispose of the goods otherwise than as provided for by clause 7.1.9. The fact that the seller's rights under clause 7 are expressed to be without prejudice to any other remedies it may have does not carry

the matter any farther. Isher Fashions did not seek to exercise any right or remedy that might have been available to it under the general law and it was not suggested that Jet Star's right to dispose of the goods was otherwise affected by the events that had occurred.

15.    Despite the fact that Mr. Singh was by then the sole shareholder in Jet Star and, although not formally a director, effectively responsible for the management of the company, he took no steps in his capacity as Isher Fashions to withdraw its authority to dispose of the goods at any time before the sale of the business to Internacionale was completed, although he was well aware of its financial difficulties and of the appointment of the administrators. It follows that Jet Star did not wrongfully interfere with the goods, either by disposing of them during the currency of the administration or by disposing of them under the agreement with Internacionale. Jet Star no doubt remained liable to Isher Fashions in respect of the price of the goods, as it had been throughout, but the disposal, having been made with its authority, did not give Isher Fashions any other cause of action against it.

16.    For these reasons, which are essentially the same as those of the learned judge, I would dismiss the appeal.

**Lady Justice Smith:**

17.    I agree

**Lord Justice Maurice Kay:**

18.    I also agree.

TAB 68

*Singla v Brown* [2008] Ch 357, English High Court

*A*

## Singla *v* Brown and another

### [2007] EWHC 405 (Ch)

2007 Feb 6, 7;          Thomas Ivory QC sitting as a deputy High Court judge
March 2

*B*  *Bankruptcy — Transaction at undervalue — Application to set aside — Property*
*purchased by second defendant but held by her and first defendant as joint*
*tenants — Intention that first defendant have only nominal interest in property —*
*First defendant making no contribution to purchase — First defendant signing*
*receipt of notice of severance served by second defendant accepting he held 1%*
*of beneficial interest in property as tenant in common — First defendant made*
*bankrupt — Trustee in bankruptcy applying for order to set aside transfer as*
*C  transaction at undervalue — Whether service of notice of severance and*
*execution of receipt constituting transaction at undervalue — Whether court*
*having discretion to make no order notwithstanding fact that transaction at*
*undervalue — Insolvency Act 1986 (c 45), s 339*

The second defendant purchased the freehold of the house which she had
occupied for some years as a secure tenant. She intended to purchase it in her sole
*D*  name but, on the insistence of the mortgage company, the property was initially
held by herself and her partner, the first defendant, as joint tenants. When the
second defendant learned of the effect of the joint tenancy, she signed and gave to
the first defendant a notice of severance of the joint tenancy which stated that the
property would thereafter be held by them as tenants in common in unequal shares
as to 99% for her and 1% for the first defendant. The first defendant signed a
document acknowledging receipt of the notice of severance and accepting the
*E*  apportionment of the beneficial ownership contained in it. Subsequently, the first
defendant was made bankrupt and the relationship between the defendants ended.
The claimant was appointed trustee in bankruptcy and applied for an order under
section 339(2) of the Insolvency Act 1986[1] to set aside the transfer of 49% of the
beneficial interest to the second defendant as a transaction "at an undervalue"
pursuant to section 339(1).

On the trustee's application—

*F*  *Held*, dismissing the application, that the court had an overall discretion to
make no order under section 339(2) of the 1986 Act where, exceptionally, justice so
required, notwithstanding that the relevant transaction was at an undervalue within
the meaning of section 339(1); that the power to make no order was not limited to
cases in which the transaction involved an extraterritorial element; that the notice of
severance and receipt had the effect of transferring 49% of the beneficial interest in
the property from the first to the second defendant and, since there had been no
*G*  consideration for that transfer, it was a transaction at an undervalue for the
purposes of section 339(1); but that the case was exceptional, since the severance
notice and receipt had been executed to give effect to the intention that the first
defendant should have only a nominal interest in the property, and, in those
circumstances, justice required that no order be made notwithstanding that the
conditions for the application of section 339(1) were satisfied (post, paras 26, 50,
52, 54–55, 58–62).

*In re Paramount Airways Ltd* [1993] Ch 223, CA applied.
*H*  *Ramlort Ltd v Reid* [2004] BPIR 985, CA considered.

---

[1] Insolvency Act 1986, s 339(1): ". . . where an individual is adjudged bankrupt and he has
at a relevant time . . . entered into a transaction with any person at an undervalue, the trustee of
the bankrupt's estate may apply to the court for an order under this section."
S 339(2): see post, para 51.

358
**Singla v Brown**                                                                     **[2008] Ch**

The following cases are referred to in the judgment:                                        *A*

*Goodman v Gallant* [1986] Fam 106; [1986] 2 WLR 236; [1986] 1 All ER 311, CA
*Moscow v Brown* [2005] EWHC 2243 (Ch)
*Paramount Airways Ltd, In re* [1993] Ch 223; [1992] 3 WLR 690; [1992] 3 All ER 1,
      CA
*Ramlort Ltd v Reid* [2004] EWCA Civ 800; [2004] BPIR 985; [2005] 1 BCLC 331,
      CA
                                                                                            *B*

The following additional cases were cited in argument:

*Crossley v Crossley* [2005] EWCA Civ 1581; [2006] 2 FLR 813, CA
*Roy v Roy* [1996] 1 FLR 541; CA

**APPLICATION**

By an application dated 2 September 2005 the claimant, Surjit K Singla,       *C*
the trustee in bankruptcy of the first defendant, Rodney Thomas Lambton
Brown, applied for declarations (i) that a notice of severance of a joint
tenancy in equity of a house situated at 74, Chester Road, Wanstead,
London E11 2JR and a receipt of notice made between the first defendant
and the second defendant, Amanda Jane Malden-Browne, were transactions
at an undervalue within the meaning of section 339(1) of the Insolvency Act
1986 and were void against the trustee; and (ii) that the trustee and the        *D*
second defendant were beneficially entitled to the property or the net
proceeds of sale thereof as tenants in common in equal shares.

The facts are stated in the judgment.

*Adrian Davies* for the trustee in bankruptcy.   An express declaration
that the first and second defendants held the property as joint tenants is       *E*
conclusive with regard to their beneficial interests, subject to any
application to rectify the transfer: see *Roy v Roy* [1996] 1 FLR 541. Upon
severance of a beneficial joint tenancy, the parties hold as beneficial
tenants in common in equal shares, absent an application for rectification:
see *Goodman v Gallant* [1986] Fam 106. The notice of severance of the
joint tenancy and acknowledgment of receipt, under which the first
defendant accepted the apportionment of the shares, had the effect of        *F*
transferring 49% of the beneficial interest from the first defendant to the
second defendant and, since there was no consideration for that transfer,
it falls within section 339(3)(a) of the Insolvency Act 1986 as a gift or
otherwise a transaction for no consideration. The question of whether the
notice and receipt effected a transaction at an undervalue or whether they
merely reflect the fact that the first defendant was only a nominal             *G*
purchaser of the property to satisfy the mortgage, has to be addressed in
the light of (i) the presumption that a transfer of beneficial interest should
take effect according to its language (see *Roy v Roy* [1996] 1 FLR 541,
546); (ii) the first defendant's continuing obligations in respect of the joint
mortgage (see *Crossley v Crossley* [2006] 2 FLR 813); (iii) the first
defendant's claim made in the earlier proceedings (see *Moscow v Brown*
[2005] EWHC 2243 (Ch)) that he was the 50% beneficial owner of the          *H*
property made 17 months after the notice of severance and receipt; and
(iv) the credibility or otherwise of the second defendant's contentions that
the first defendant did not and could not have contributed to the purchase
of the property.

A    The facts found by Lloyd J in the earlier proceedings are not binding upon
the first defendant or the trustee in the instant proceedings and it is open to
the trustee to challenge those findings. The first defendant and the trustee in
bankruptcy are not privies for this purpose. The statutory burden of proof is
on the second defendant to uphold a transaction which, on its face, disposed
of a valuable interest in land for no consideration: see section 342(2A)(b) of
B    the 1986 Act, as inserted by section 2(2) of the Insolvency (No 2) Act 1994.
Alternatively, the second defendant is counterclaiming for rectification,
however informally, and should not be in a better position than had she
delivered a pleading seeking rectification of the transfer, on which she would
bear the burden of proof: see *Goodman v Gallant* [1986] Fam 106 and *Roy v
Roy* [1996] 1 FLR 541.

C    In the event that the transaction is held to be at an undervalue within the
meaning of section 339(1), any discretion the court has to make no order at
all under section 339(2) is limited: see *In re Paramount Airways Ltd* [1993]
Ch 223. The issue before the court in *In re Paramount Airways Ltd* was the
territorial limitations on section 339 and the court's observations about an
overall discretion wide enough to enable it not to make an order relate only
to territorial considerations and the need to avoid an extravagant exercise of
D    extraterritorial jurisdiction. The court has no discretion in the instant case
since such considerations do not apply. If the transaction concerned land in
this country the foreign nationality or residence of the defendant would not
by itself normally be a factor against the court exercising its discretion: see
*In re Paramount Airways Ltd* [1993] Ch 223, 240B. The discretion of the
court is to do what seems just in order to put the parties back in their original
position, and the question is to how the court should do so, not whether it
E    should do so at all: see *Ramlort Ltd v Reid* [2004] BPIR 985, para 125.

*Joshua Winfield* for the second defendant. The transfer by the first
defendant to the second defendant of his 49% beneficial interest in the
property was not a transaction at an undervalue under section 339 of the
1986 Act for the following reasons. (i) It was the intention of the first and
second defendants that the first defendant was to have only a nominal
F    interest in the property and the notice of severance of that tenancy and
receipt were simply to give effect to that intention—they were effectively an
informal rectification of the error in the original transfer. (ii) The property
was transferred into the joint names when purchased only because the
mortgage company required it. (iii) The second defendant's conveyancing
solicitors did not advise her about the effect of a declaration of joint tenancy
or the possibility of declaring a tenancy in common in unequal shares as was
G    the parties' intention. (iv) The first and second defendants entered into the
transfer after the second defendant had been given informal advice about the
effect of the declaration of joint tenancy in order to reflect the agreement
between them.

The matters relating to the first and second defendant's intentions had
already been decided in the earlier proceedings (see *Moscow v Brown* [2005]
H    EWHC 2243 (Ch)) and the findings of fact are binding on the trustee in
bankruptcy as a privy of the first defendant in the instant proceedings. It is
therefore not open to the trustee to challenge those findings in the instant
proceedings. On that basis, the transaction comprising the notice of
severance and receipt was not a gift or otherwise a transaction for no

consideration within section 339(3)(a) of the 1986 Act. Nor was it a     *A*
transaction for a consideration the value of which in money or money's
worth was significantly less that the value of the property transferred
within section 339(3)(c) because the first defendant held his interest subject
to the second defendant's potential claim for rectification. By the notice
of severance and receipt, the second defendant effectively gave up her
potential rectification claim which was consideration for the transfer of     *B*
the first defendant's 49% beneficial interest, which consideration was not
significantly less than the value of the beneficial interest transferred, so that
section 339(3)(c) was not satisfied.

Alternatively, if the transfer was technically at an undervalue so as to
allow the court to exercise its discretion under sections 339(2) and 342(1)
of the 1986 Act, the court should not interfere with the transaction for the
following reasons. (i) The court has discretion under section 339, if justice     *C*
so requires, to make no order against the second defendant: see *In re
Paramount Airways Ltd* [1993] Ch 223, 239G; *Ramlort Ltd v Reid* [2004]
BPIR 985, paras 125, 126 and *Parry, Transaction Avoidance in Insolvencies*
(2001), paras 4.168–4.169. (ii) In addition to the four reasons previously
listed, the first defendant made no contribution to the acquisition costs of
the property and the second defendant had paid the vast majority of the     *D*
mortgage payments and other outgoings since the purchase. (iii) An order
setting aside the transfer would cause further hardship to the second
defendant.

The first defendant did not appear and was not represented.

*Cur adv vult*     *E*

2 March. **THOMAS IVORY QC** handed down the following judgment.

*Introduction*

1   This is an application under section 339 of the Insolvency Act 1986
(transactions at an undervalue) by the trustee in bankruptcy of Rodney     *F*
Lambton Brown in respect of a transfer of 49% of the beneficial interest in a
house at 74, Chester Road, Wanstead, London E11 to the second defendant,
Mrs Malden-Browne. The background to this matter is as follows.

2   Mrs Malden-Browne occupied the house in question from 1981 as a
secure tenant. She was married, but the marriage broke down in 1987. She
continued to live in the house with the child she then had. From the
early 1990s until June 2005 she had a relationship with Mr Brown with     *G*
whom she has had two further children, one born in 1993 and the other in
2001. Despite the similarity in names, she was not married to Mr Brown.
Mr Brown did not actually live in the house before 1998. He moved into
the house around May 1998 after he was badly injured in a motor cycle
accident.

3   In September 1998, following the death of the owner of the freehold,
Mrs Malden-Browne was offered the chance to purchase the freehold, at a     *H*
substantial discount to the value of the house with vacant possession because
of her secure tenancy.

4   Eventually the purchase price was agreed at £130,000, which was
some £70,000 less than the value of the property with vacant possession.

A  The purchase was financed by a mortgage of £129,780 after deduction of
   some expenses from Mortgages 2 Ltd. Mrs Malden-Browne says she paid
   an additional £2,776·68 for legal and other expenses. She had borrowed
   £6,000 from her parents to pay the deposit.

       5  Completion took place on 23 November 1999. The property was
   conveyed into the joint names of Mrs Malden-Browne and Mr Brown
B  expressly on trust for themselves as joint tenants. Mrs Malden-Browne says
   her original intention had been to purchase the property in her sole name.
   The reason the house was put into their joint names was because the
   mortgage company insisted that the mortgage be in their joint names. But
   she says there was an agreement or understanding between her and
   Mr Brown that he was only to have a nominal interest in it. She also
   says he made no capital contribution to the purchase of the house, nor
C  has he contributed to the mortgage payments, the life policy premiums or
   household expenses since the purchase.

       6  The express trust as joint tenants in the conveyance does not accord
   with what Mrs Malden-Browne says was their understanding at the time of
   the purchase. She says she was not given any explanation by her solicitors as
   to what the legal effect of buying as joint tenant would be, or the possibility
D  of declaring a tenancy in common in unequal shares. She discovered
   Mr Brown had acquired more than a nominal interest in the property a
   month after the purchase, when she met Sheila Conroy, a legal executive to
   whom she was introduced by a mutual friend. Following informal advice
   from Ms Conroy about the effect of the declaration of a joint tenancy, and
   how this could be changed to reflect her and Mr Brown's intentions, on
E  6 February 2000 she signed and gave to Mr Brown a notice of severance of
   the joint tenancy which stated that the property would thereafter be held by
   them as tenants in common in unequal shares, 99% for her and 1% for him,
   and he signed a document acknowledging receipt of the notice and accepting
   the apportionment of the shares stated in it. This is the transaction which
   the trustee seeks to set aside under section 339 of the Insolvency Act 1986
   in this application before me. Before dealing with that, I shall summarise
F  briefly the subsequent history of this matter.

       7  Mr Brown, together with a Mr Paul Moscow, had been concerned in
   business, through a company called Cigar Vending Co Ltd. There was a
   dispute between that company and a company called Swedish Match Ltd,
   which resulted in proceedings being commenced in November 1999. Cigar
   Vending Co was represented in those proceedings by Kay & Co (the same
G  solicitors who acted for Mrs Malden-Browne in the purchase of the house).
   At Mr Kay's insistence, Mr Moscow and Mr Brown agreed to accept
   personal responsibility to Mr Kay for the company's legal costs. In July
   2001 Cigar Vending lost the proceedings against Swedish Match. Swedish
   Match obtained orders for costs against Mr Moscow and Mr Brown
   personally, and a freezing injunction against Mr Brown.

       8  On 12 July 2001 Mr Kay obtained a legal charge from Mrs Malden-
H  Browne and Mr Brown over the house, as security for Kay & Co's costs.
   Those costs were ultimately assessed at just over £71,000, of which
   Mr Brown paid approximately £1,300 and Mr Moscow paid the rest.
   Mr Moscow then claimed a contribution from Mr Brown. He duly
   obtained judgment against Mr Brown for some £40,000, and in October

362
**Singla v Brown**                                                                   **[2008] Ch**
**Thomas Ivory QC**

2003 he obtained a charging order over Mr Brown's beneficial interest in    *A*
the house.

9   Mr Moscow then commenced proceedings seeking to enforce his
judgment against the house, in which he claimed to be entitled to an
assignment of the benefit of the charge in favour of Kay & Co, and made an
alternative claim under section 14 of the Trusts of Land and Appointment of
Trustees Act 1996 for a declaration that Mr Brown was entitled to 50%        *B*
of the beneficial interest in the house. Mr Moscow died shortly after
commencement of those proceedings, and they were continued by his son,
Simon, as his personal representative.

10   Those proceedings came on for trial before Lloyd J in January 2005:
*Moscow v Brown* [2005] EWHC 2243 (Ch). The principal issues in those
proceedings were: (i) whether the charge over the house was voidable; and
(ii) whether the notice of severance and receipt were fabricated in the sense   *C*
of being back dated, having really been signed some date after Mr Moscow
obtained the charging order in October 2003.

11   Lloyd J found for Mrs Malden-Browne on both issues. As to the first
issue, the charge signed by Mrs Malden-Browne in favour of Kay & Co was
a security by her over her interest in the property for an existing liability
of Mr Brown to Kay & Co (who was also Mrs Malden-Browne's former            *D*
solicitor), where there was no further credit to be gained on the security and
no particular incentive for Mrs Malden-Browne to sign the document.
Clause 7 of the charge stated that both she and Mr Brown had taken
independent legal advice in respect of the charge and confirmed that the
charge was executed voluntarily without any undue influence, coercion or
preference. But that was untrue, at least as regards Mrs Malden-Browne.
The judge found, at para 45:                                                 *E*

"Mr Kay plainly should have advised Mrs Browne to get separate
advice and knew it, as clause 7 of the mortgage shows, but failed to do
so . . . I am satisfied that her signature on this mortgage was procured in
breach of duty by Mr Kay, and probably, also, by a collateral contract,
and that Mr Kay could not enforce it against her."

Accordingly, the charge was voidable and there would be no benefit to the    *F*
trustee in having the mortgage assigned to him.

12   As to the second issue, the judge, at para 52,

"conclude[d] on the balance of probability that [Mrs Malden-Browne]
was telling me the truth about the circumstances in which the notice of
severance and receipt came to be prepared and signed and, in particular,
that the date they bear is accurate"                                         *G*

and, at para 53, "reject[ed] the contrary submission that this part of her
evidence is perjured, and that the documents were thought up and created
after October 2003 by the first defendant".

13   Accordingly, Lloyd J dismissed both claims and held that Mr Brown
had only a 1% share of the property. In the course of his judgment, he
recorded that counsel for the claimant had mentioned section 339 of the     *H*
1986 Act, and observed, at para 47, "but that is only open to a trustee in
bankruptcy. So that is a future question not arising in these proceedings."

14   Following the trial before Lloyd J, a bankruptcy petition was
presented, I understand, three days before the expiry of the "relevant

363

A   period" for the purposes of the section 339 application now before me.
    The bankruptcy order was made on 23 March 2005. On 27 April 2005
    Mrs Malden-Browne paid Mr Moscow's estate the sum of £1,409·76,
    representing 1% of the agreed value of the equity in the house, being
    Mr Brown's beneficial interest as determined by Lloyd J, so that she became
    the sole beneficial owner. Mr Singla was appointed Mr Brown's trustee in
B   bankruptcy on 20 May 2005, and issued this application in early September
    2005.

    15 Mrs Malden-Browne's relationship with Mr Brown ended in June
    2005, and in October 2005 she emigrated to Australia where she now lives
    with her two younger children in rented accommodation. She intended
    to sell the property before emigrating, and use the net proceeds to buy a
    property in Australia where property prices are cheaper. She instructed
C   estate agents to market the property, but has been unable to sell it because of
    the present application and a notice placed by the trustee on the registered
    title. The property was eventually let on 5 December 2005. It is currently let
    on a year's tenancy from December of last year.

    *The application under section 339*

D   16 The principal issues for decision are: (i) whether the notice of
    severance and receipt fall within section 339 of the Insolvency Act 1986;
    and, if so, (ii) what order the court should make, and in particular whether
    the court can and should decline to make any order in the exercise of its
    discretion, notwithstanding that the transaction falls within section 339.

    17 The principal witness was Mrs Malden-Browne who has made three
E   witness statements in this action (one of which also refers to and exhibits
    one of her witness statements in the earlier action tried by Lloyd J). She was
    cross-examined by video link from Australia. Mr Singla, the trustee, has
    made a witness statement and was tendered for cross-examination, but the
    cross-examination was very limited. He has no direct knowledge of any
    relevant matter. Mr Brown is also a party to the proceedings but he did
    not appear before me. In reality, the only substantive evidence was from
F   Mrs Malden-Browne.

    18 The trustee's case under section 339 is simple. Mr Davies, counsel
    for the trustee, says that the notice of severance and receipt (really, he says,
    the receipt under which Mr Brown accepted the apportionment of the
    shares stated in the notice of severance) had the effect of transferring 49%
    of the beneficial interest from Mr Brown to Mrs Malden-Browne; there
G   was no consideration for that transfer; and, accordingly, it falls within
    section 339(3)(a) as a gift or otherwise a transaction for no consideration.

    19 Mr Winfield, counsel for Mrs Malden-Browne, says that it always
    was the intention of Mrs Malden-Browne and Mr Brown that he was only to
    have a nominal interest in the house, and the notice of severance and receipt
    were simply to give effect to that intention. They were, he says, effectively
    an informal rectification of the error in the original transfer. He says
H   those matters have already been decided by Lloyd J in the earlier trial,
    which findings of fact are binding on Mr Brown's trustee in bankruptcy,
    alternatively the evidence of Mrs Malden-Browne bears them out.

    20 On that basis, Mr Winfield says the transaction comprising the
    notice of severance and receipt was not a gift or otherwise a transaction for

no consideration within section 339(3)(a). Nor was it a transaction for    *A*
a consideration the value of which in money or money's worth was
significantly less than the value of the property transferred within
section 339(3)(c) because Mr Brown held his interest subject to Mrs Malden-
Browne's potential claim for rectification. The value of that potential
rectification claim to Mrs Malden-Browne was very high if I accept (either
on the basis of Lloyd J's findings in the earlier proceedings or on the basis of    *B*
Mrs Malden-Browne's evidence in these proceedings before me) that the
common intention at the time of the transfer was that Mr Brown was only to have a
nominal interest in the property. It would inevitably be subject to the
uncertainties inherent in any litigation, but on the face of it the value of the
potential rectification claim would be very high, so that the actual value
transferred (49% of the beneficial interest subject to the potential claim
for rectification) would be very small. Alternatively, by the notice of    *C*
severance and receipt Mrs Malden-Browne effectively gave up her potential
rectification claim which was consideration for the transfer of Mr Brown's
49% beneficial interest, which consideration was not significantly less than
the value of the beneficial interest transferred, so that section 339(3)(c) was
not satisfied.

21    Assuming for the purposes of these arguments that the common    *D*
intention at the time of the transfer was that Mr Brown was only to have a
nominal interest in the property and that the transaction was to give effect
to that common intention (to which I will return later in this judgment), I am
nevertheless unable to accept the submission that the transaction would fall
outside the conditions of section 339.

22    If Mrs Malden-Browne had claimed or counterclaimed rectification    *E*
of the original transfer in these proceedings, and if that claim had been
successful, the decree of rectification would have been retrospective in effect,
so that the original transfer would be treated as having conferred only 1% of
the beneficial interest on Mr Brown from the outset. The notice of severance
and receipt two months later would not then have transferred any of the
beneficial interest to Mrs Malden-Browne because she would already have
had 99% of the beneficial interest vested in her under the original transfer as    *F*
rectified by the court.

23    However, it is trite law that unless and until a document is rectified
by an order of the court, the document takes effect as it stands: see, for
example, *Goodman v Gallant* [1986] Fam 106. No claim for rectification
has been made by Mrs Malden-Browne in these proceedings. I gave
Mr Winfield the opportunity on behalf of his client to consider whether he
wished to plead a rectification claim (Mr Davies fairly taking no objection    *G*
to such a claim being pleaded in the course of the trial). Having been given
the opportunity to consider it, Mr Winfield later confirmed no claim for
rectification would be made in these proceedings. I was not told the reason.
It may be, as suggested by Mr Davies, because of concern about the high
evidential burden of proving a common mistake for a rectification claim to
succeed, particularly in the absence of evidence from Mr Brown. Be that as
it may, for whatever reason, no claim for rectification has been made. In the    *H*
absence of such a claim being made and succeeding, the express declaration
of trust in the conveyance takes effect as it stands, so that Mrs Malden-
Browne and Mr Brown held the property upon trust for themselves as joint
tenants, and the notice of severance and receipt also take effect as they stand,

A   transferring 49% of the beneficial interest from Mr Brown to Mrs Malden-
Browne.

24   Moreover, even on Mr Winfield's analysis that Mr Brown held his
beneficial interest subject to the potential rectification claim which had
a very high value, the transfer (however small its value) would still be a
transfer for no consideration within section 339(3)(a).

B   25   Mr Winfield's alternative analysis—that it was a transfer of the
beneficial interest in consideration of Mrs Malden-Browne giving up her
potential rectification claim—is not, in my judgment, correct either.
Mr Winfield rightly accepted that "consideration" in section 339 means
consideration in the contractual sense. Entering into the transaction would,
of course, preclude, indeed make redundant, the potential rectification
claim, but that is not the same thing as saying that the transaction was

C   entered into *in consideration of* Mrs Malden-Browne giving up her potential
rectification claim. The "consideration" analysis is that she promised to give
up her potential claim for rectification in return for him entering into the
transaction. That is an attempted ex post facto rationalisation by lawyers.
There is no evidence that Mrs Malden-Browne was even aware of a potential
claim for rectification, still less that there was any discussion of it between

D   her and Mr Brown, let alone a promise by her to give it up in return for him
agreeing to enter into the transaction. In my judgment, there is no warrant
for treating her as having made a promise (to give up a potential claim for
rectification) which she never in fact made.

26   Accordingly, in the absence of any claim for rectification, I am driven
to the conclusion that the requirements of section 339 are indeed made out.

E   27   That is not, however, an end of the matter. Granted that the
transaction is a transaction at an undervalue under section 339, the next
issue is what order should I make, and in particular whether, on the
particular facts of this case, I have a discretion not to make any order and,
if so, whether I should exercise it. Although I have rejected Mr Winfield's
submissions that there was no transfer at an undervalue, the factual
premises for his submissions (that there was an agreement or understanding

F   between Mrs Malden-Browne and Mr Brown at the time of the transfer
that he should have only a nominal interest in the property, and that the
severance notice and receipt were implemented in order to reflect that
agreement or understanding) may be relevant to the exercise of my
discretion (if I have one) to make no order, and accordingly I shall consider
that first.

G   *Was there an agreement or understanding that Mr Brown was only to
have a nominal interest?*

28   Mr Winfield argued that these are facts which have already been
found by Lloyd J in the earlier proceedings to which I have referred; that they
are binding upon Mr Brown and also upon the trustee in these proceedings
as his trustee in bankruptcy; and that it is not open to the trustee to challenge

H   those findings in these proceedings.

29   Notwithstanding the submissions of Mr Davies to the contrary, in
my judgment it is quite clear that Mr Brown and his trustee in bankruptcy
are privies for this purpose, trustee in bankruptcy being one of the
most common examples given of the privy principle: see for example

366
**Singla v Brown**                                                                  **[2008] Ch**
Thomas Ivory QC

*Spencer Bower, Turner & Handley, The Doctrine of Res Judicata*, 3rd ed   *A*
(1996), para 231. Accordingly, any findings made by Lloyd J in the earlier
proceedings binding upon Mr Brown would also, in my judgment, be
binding on the claimant in these proceedings as his trustee in bankruptcy.

30  The real difficulty with the estoppel argument, as I see it, is rather the
true extent of the findings made by Lloyd J in *Moscow v Brown* [2005]
EWHC 2243, and how far they were necessary for the purposes of his     *B*
decision. At the trial of those proceedings, Mr Davies, who was on that
occasion appearing for Mr Moscow, accepted that if the notice of severance
and receipt were signed as they purported to be on 6 February 2000,
Mr Brown effectively gave up 49% of the beneficial interest in favour of
Mrs Malden-Browne: para 47 of the judgment of Lloyd J. The issue was
whether that was true (as was Mrs Malden-Browne's evidence) or whether
on the contrary she was lying and the documents were fabricated in the sense   *C*
of being backdated, thought up and created by Mr Brown in October 2003
after the charging order had been made: see paras 51 and 53. The judge
concluded, at para 52, on balance of probabilities that Mrs Malden-Browne
was "telling me the truth about the circumstances in which the notice of
severance and receipt came to be prepared and signed and, in particular, that
the date they bear is accurate."

31  In support of a wider interpretation of the judge's findings,     *D*
Mr Winfield emphasised that in the passage from the judgment just quoted,
the judge's acceptance of her evidence was not limited to the date of the
documents but also to "the circumstances in which . . . [they] came to be
prepared and signed". He also relies upon the judge's formulation of the
question at the beginning of para 51: whether he believed Mrs Malden-
Browne's oral evidence as to "how" as well as "when" the documents came    *E*
to be written and signed.

32  These points are not without force. However, these passages must
be read in the context of the rather stark issue before the judge which, as
already indicated, was whether the documents were signed as they
purported to have been on 6 February 2000 as was Mrs Malden-Browne's
evidence, or whether she was lying and they were fabricated in the sense of
being backdated, only thought up and created by Mr Brown in October     *F*
2003. Moreover, as Mr Winfield accepted, there is no specific reference
in the judgment to the parties having had a *common intention* that
Mrs Malden-Browne should only have a nominal interest at the time of the
transfer. The summary of Mrs Malden-Browne's evidence in para 18 of the
judgment refers to Mrs Malden-Browne "realis[ing] that a joint tenancy was
what she had, but not what *she* wanted or intended" (emphasis added), but    *G*
that is not the same thing as common intention. Mr Winfield argued that the
judge's acceptance of Mrs Malden-Browne's evidence on this issue should be
read as embracing all the evidence in her witness statements which did refer
to the common intention and understanding of the parties. But that is not
obvious on the face of the judgment. Moreover, the judge regarded the
question as "turn[ing] on whether I believe Mrs Malden-Browne's *oral*
evidence as to how and when the notice of severance and receipt came to be    *H*
written and signed": see para 51, emphasis added.

33  At all events, there is in my judgment no clear unequivocal finding by
the judge of an agreement or common intention of the parties at the time
of the transfer that Mr Brown should only have a nominal interest in the

A  property, to which the notice of severance and receipt would give effect, or
that such a finding (if made) was necessary for the purposes of his decision.
There is a clear unequivocal finding as to the date when the document was
prepared and signed which was necessary for the purposes of his decision,
which in my judgment would be binding, but that is a different matter.

B  34  I, therefore, approach the matter on the basis that Mr Davies was
entitled to challenge Mrs Malden-Browne's evidence on these matters.
Mrs Malden-Browne consistently gave evidence throughout these
proceedings that there was an agreement or understanding on the part of her
and Mr Brown at the time of the transfer that he was only to have a nominal
interest in the property, and that on the informal advice of one Sheila
Conroy, a legal executive, the notice of severance and receipt were prepared
and signed some two months later to reflect that.  She maintained that
C  evidence consistently in cross-examination.  She was quite clear that she did
not buy the house as a home for herself and Mr Brown, saying that he was
"purely a name" and that they "needed his name on the mortgage, that was
all it was".

35  Having seen and heard Mrs Malden-Browne give her evidence
orally, I believe her.  (I should add the fact her evidence was given by video
link rather than physically in court made no difference whatsoever to my
D  ability to assess her as a witness, the quality of the video link being
excellent.)  In my judgment, she was an honest witness.

36  Mrs Malden-Browne's evidence as to the agreement or understanding
at the time of the purchase that Mr Brown was only to have a nominal
interest in the property, and that she was not buying it for both of them,
is also consistent with the circumstances and history leading up to the
E  purchase.  As Mrs Malden-Browne emphasised in oral evidence, at the time
of the purchase she had been living in the house for some 16 years as a secure
tenant, and for all or almost all of that period Mr Brown had not been living
there.  She had a relationship with him but she was not married to him.  He
only came to live in the house after he had his accident.  It was she who was
offered the opportunity to purchase the freehold at a substantial discount by
F  virtue of her position as a secure tenant.  That had nothing to do with him.
Her evidence that she was buying the house as a home for herself and her
children makes sense.

37  Moreover, Mr Brown made no capital contribution to the purchase
of the house and because of his injuries, at least at the time of the purchase,
there was no prospect of him contributing to the mortgage, life policy
premiums or other household expenses for the foreseeable future.  Whatever
G  the position may have been in later years (a subject to which I shall return)
I understood Mr Davies to accept that Mr Brown did not contribute
anything in the years immediately following the purchase, or that he was in
any position to do so.

38  The very fact that the notice of severance and receipt were executed
only just over two months later also tends to support Mrs Malden-Browne's
evidence, suggesting that the beneficial joint tenancy in the conveyance was
H  not what the parties wanted or intended.  Her evidence as to how these
documents came to be produced was that the difference between joint
tenancy and tenancy in common was not explained to her at the time of
the purchase, and she only discovered the legal effect of buying as joint
tenants the following month when she met Sheila Conroy to whom she was

introduced by a mutual friend. It was on the informal advice of Ms Conroy    *A*
that she came to effect the severance to reflect what she says was the
understanding between her and Mr Brown at the time of the purchase.

39  The trustee has put in evidence under the Civil Evidence Act 1995 a
short statement from Ms Conroy, who apparently now lives in Egypt, saying
that she has never met Mrs Malden-Browne and denying that she gave
Mrs Malden-Browne any such advice as she claims. The trustee's solicitors    *B*
have apparently been unable to contact Ms Conroy for some considerable
time now, despite repeated efforts to do so, and Mr Davies for the trustee
understandably placed little reliance on her statement. He did put to
Mrs Malden-Browne in cross-examination that Ms Conroy had signed a
witness statement saying she had never heard of Mrs Malden-Browne.
Mrs Malden-Browne was quite clear that Ms Conroy was wrong, that she
had met Ms Conroy and that Ms Conroy had given her informal advice upon    *C*
which she acted. Again, having heard and seen Mrs Malden-Browne give
her evidence, I believe she was telling the truth. If Ms Conroy was right that
she had never heard of Mrs Malden-Browne, it would follow Mrs Malden-
Browne was making this up. I am quite sure she was not.

40  Apart from the short statement of Ms Conroy, there was no evidence
to contradict Mrs Malden-Browne's evidence, and I accept it as the evidence    *D*
of a truthful witness.

41  The main thrust of the cross-examination of Mrs Malden-Browne
related to her evidence that Mr Brown made no substantial contributions to
the mortgage, life policy, premiums, council tax and other household
expenses since the purchase. Mr Davies accepted that Mr Brown was
seriously injured, which incapacity prevented him from contributing
anything for several years after the purchase, but he pointed to Mrs Malden-    *E*
Browne's bank statements which do show not insignificant payments being
made into her account in addition to her salary from 2002 onwards,
including a number of payments from two companies called PPS plc and
Fordham Research Ltd for which Mr Brown was apparently doing some
work, and in 2002 approximately £15,000 received by him as damages for
personal injury. Mr Davies took Mrs Malden-Browne through a number of
these payments in cross-examination, and suggested that contrary to her    *F*
evidence Mr Brown was in fact contributing substantially to the household
expenses on an increasing scale from 2002 onwards by payments into her
bank account.

42  Even if Mr Brown had been contributing to the household expenses
from 2002 onwards, that is not of itself inconsistent with the existence of an
agreement or understanding at the time of the purchase that Mr Brown    *G*
should only have a nominal interest in the property. Indeed, on any view
that is what he did have following the notice of severance and receipt in
February 2000.

43  In any event, Mrs Malden-Browne consistently denied that
Mr Brown was contributing substantially to the household expenses from
2002 onwards. As regards the payments from PPS and Fordham Research,    *H*
she explained that Mr Brown did surveying work for these two companies
which involved a lot of travelling in the course of which he incurred very
substantial travelling and accommodation expenses which she would pay,
and he would return when he was paid. She also provided him with his
living expenses and drew cash out of her account for him, all of which used

A  up the money paid in and more, leaving him still owing her money. That was
   in addition to other loans for legal, medical and other expenses which she
   had made to him.

   44  Moreover, as she pointed out in cross-examination, there is a
   pattern apparent in the bank statements of many of these payments in
   being followed within a short period by substantial payments out, which
B  she was clear related to him and not her. She also said that cash was
   being withdrawn on her credit card and she referred to her credit card
   statements in that connection. Mr Davies expressed scepticism as to how
   she could remember what these payments related to now up to five years
   later, giving as an example a payment of £40 from a cashpoint. But
   Mrs Malden-Browne explained that she herself did not generally withdraw
   cash from a cashpoint. If she needed cash, she would have it added to her
C  shopping bill at Tescos. Whenever she did withdraw money from a
   cashpoint, it would be no more than £10 to £15. Moreover, she did not
   claim to recall what every receipt or payment in her bank statements
   related to. In relation to quite a number, she frankly admitted she could
   not now recall.

   45  In effect, Mr Brown was using Mrs Malden-Browne's bank account
   to pay in money and then pay it out again. At the time, he told her it was
D  because his own account was overdrawn. She did not know at the time
   about the freezing injunction over his assets. It was probably because of
   the freezing injunction that he was using her account in this way. (Whether
   he should have been doing so is another matter, but, as I have said,
   Mrs Malden-Browne was not aware of the freezing injunction.)

   46  Mr Davies submits that Mrs Malden-Browne's salary was not
E  sufficient to pay the mortgage, life assurance premiums, council tax, utility
   bills and other household expenses, and expenses of looking after her
   children, and therefore must have had contributions from Mr Brown in
   order to make ends meet. Mrs Malden-Browne did have other income apart
   from her salary, namely income from part-time work from hairdressing and
   beauty treatments. She explained in cross-examination how the amount of
   this other income varied. She did more work in summer outside the
F  academic terms, when she had more time for other work. Mr Davies
   submitted that the amount of income from this part-time work could not be
   sufficient to make ends meet.

   47  A difficulty with these submissions is that Mrs Malden-Browne
   undoubtedly was paying the mortgage and all the other expenses without
   assistance from Mr Brown in the years immediately following the purchase.
G  If she was able to manage on her own in those years (2000 and 2001), why
   not in subsequent years—particularly when the mortgage payments in 2001
   at £14,557 were substantially higher than in any subsequent year.

   48  I accept Mrs Malden-Browne's evidence overall that Mr Brown did
   not make any significant contribution towards the mortgage payments, life
   assurance premiums and other household expenses, and that she was
   supporting him during his lengthy recovery period.
H  49  Mr Davies also submitted that on Mrs Malden-Browne's evidence
   as to the understanding between her and Mr Brown at the time of the
   transfer, it would appear to follow that her solicitors had been negligent in
   completing the transfer form, and the court should be slow to make such a
   finding or assumption without seeing the solicitors' files or hearing evidence

from the solicitors. For the avoidance of doubt, I make no findings against    *A*
the solicitors who are not a party to these proceedings. The fact that they
completed the form ticking the joint tenants box is a relevant factor to be
taken into account. But that fact carries rather less weight than it might have
otherwise done when it is recalled that on another occasion in the history of
this matter, the same solicitors drafted and caused Mrs Malden-Browne to
sign a charge in their favour containing an express statement that she had     *B*
received independent advice, which was untrue and the solicitors were found
by Lloyd J to have had acted in breach of duty to Mrs Malden-Browne.
(Those findings of Lloyd J were unequivocal and necessary for the purposes
of his decision on that issue.)

50    Accordingly, I accept Mrs Malden-Browne's evidence as to the
agreement or understanding on the part of herself and Mr Brown at the time
of the purchase that he should only have a nominal interest in the property,    *C*
and that the severance notice and receipt were executed on the informal
advice of Ms Conroy to reflect that. I approach the question of discretion on
that basis.

*Discretion*

51    The first issue here is whether I have a discretion not to make any       *D*
order at all in this case. Section 339(2) provides that if the conditions of
section 339(1) are satisfied: "The court shall, on such an application, make
such order as it thinks fit for restoring the position to what it would have
been if that individual had not entered into that transaction." That wording
may be contrasted with the wording found in section 423(2) (transactions
defrauding creditors): "the court *may* . . . make such order as it thinks fit"
(emphasis added). The use of the word "shall" rather than "may" in            *E*
section 339(2) might suggest that the court must make an order under
section 339(2) if the relevant conditions are satisfied. However, the Court of
Appeal in *In re Paramount Airways Ltd* [1993] Ch 223 rejected that
interpretation.

52    In *In re Paramount Airways Ltd* the issue was whether section 238
(the equivalent provision to section 339 for companies) could apply to a        *F*
transaction with a non-resident (in that case a Jersey bank). The Court of
Appeal held that it could, and the section was not limited to domestic
persons or territory. However, the Court of Appeal went on to emphasise
that ([1993] Ch 223, 239–240, per Sir Donald Nicholls V-C, with whom
Russell and Farquharson LJJ agreed):

"This conclusion is not so unsatisfactory as it might appear at first       *G*
sight. The matter does not rest there. Parliament is to be taken to have
intended that the difficulties such a wide ambit may create will be
sufficiently overcome by two safeguards built into the statutory scheme.
The first lies in the discretion the court has under the sections as to the
order it will make. Section 423(2) provides that the court 'may' make
such order as it thinks fit for restoring the position and protecting victims
of transactions intended to defraud creditors. Sections 238, 239, 339 and    *H*
340 provide that the court 'shall', on an application under those sections,
make such order as it thinks fit for restoring the position. Despite the use
of the verb 'shall', the phrase 'such order as it thinks fit' is apt to confer on
the court an overall discretion. The discretion is wide enough to enable

A the court, if justice so requires, to make no order against the other party to the transaction or the person to whom the preference was given. In particular, if a foreign element is involved the court will need to be satisfied that, in respect of the relief sought against him, the defendant is sufficiently connected with England for it to be just and proper to make the order against him despite the foreign element."

B So the court does have an overall discretion which is wide enough to enable the court to make no order at all "if justice so requires".

 53 In the light of *In re Paramount Airways Ltd*, I understood Mr Davies to accept (as he had to) that the court does retain a measure of discretion not to make any order at all. However, he says that it is very limited discretion and that I have no such discretion in this case. He emphasises that the issue

C before the Court of Appeal was the territorial limitations on section 339 (as it was). He submits that the Court of Appeal's observations about an overall discretion wide enough to enable the court not to make any order at all relate only to territorial considerations and the need to avoid an extravagant exercise of extraterritorial jurisdiction. He further relies upon a subsequent passage in the judgment of Sir Donald Nicholls V-C, at p 240B, to the effect that if the transaction concerned land in this country, "the foreign

D nationality or residence of the defendant would not *by itself* normally be a weighty factor against the court exercising its discretion under the sections." (Original emphasis.)

 54 In my judgment, the court's power to make no order at all, which was recognised by the Court of Appeal as falling within the court's overall discretion under the relevant sections, is not confined to territorial

E considerations. It is quite true that the issue before the Court of Appeal was the territorial limitation of section 238, and that the Court of Appeal were concerned to make clear that their conclusion (that section 238 was not confined to domestic persons or property) would not lead to an extravagant or unjust exercise of extraterritorial jurisdiction. However, I do not read the Court of Appeal as saying that the overall discretion which is wide enough not to make any order where justice so requires is confined to extraterritorial

F considerations. On the contrary, it is the fact the court has an overall discretion which is wide enough to enable the court to make no order "where justice so requires" which is one of two answers or safeguards against what might otherwise be an unsatisfactory position of the court having to make an order with extraterritorial effect irrespective of the justice of the matter (the other safeguard being the requirement to obtain the leave of the court for

G service of proceedings abroad). The existence of the overall discretion is one of the safeguards against unjust or extravagant extraterritorial effect, but it is not confined to it.

 55 That that is the correct reading of the Court of Appeal's judgment is confirmed by the next sentence in the passage quoted above:

  "In particular, if a foreign element is involved the court will need to be
H satisfied that . . . the defendant is sufficiently connected with England for it to be just and proper to make the order against him despite the foreign element."

The words "in particular" make it clear that that is one consequence of the overall discretion wide enough to enable the court to make no order if justice

*A*

so requires, but it is not the only consequence or circumstance in which it could apply.

56   Mr Davies also relied upon the more recent decision of the Court of Appeal in *Ramlort Ltd v Reid* [2004] BPIR 985 and in particular para 125 in the judgment of Jonathan Parker LJ, with whom Judge and Waller LJJ agreed:

*B*

"I respectfully agree with the observation of Judge Havelock-Allan QC in *Walker v WA Personnel Ltd* [2002] BPIR 621 . . . to the effect that, as a matter of general approach, in deciding what is the appropriate remedy where there has been transaction at an undervalue the court does not start with a presumption in favour of monetary compensation as opposed to setting the transaction aside and revesting the asset transferred. Indeed, in my judgment, in considering what is the appropriate remedy on the facts of any particular case the court should not start from any priori position. Each case will turn on its particular facts, and the task of the court in every case is to fashion the most appropriate remedy with a view to restoring, so far as it is practicable and just to do so, the position as it 'would have been if [the debtor] had not entered into the transaction'. In some cases that remedy may take the form of reversing the transaction; in others it may not. In some cases it may take the form of an order for monetary compensation; in others it may not."

*C*

*D*

57   Mr Davies says this passage makes clear that the discretion is to do what seems just in order to put the parties back in their original position. The discretion is as to *how* the court should restore the parties to their original position, not *whether* it should restore them to their original position at all.

*E*

58   In my judgment, the views expressed by the Court of Appeal in *Ramlort Ltd v Reid* are consistent with the views they expressed *In re Paramount Airways Ltd* [1993] Ch 223 as I understand them. In *Ramlort Ltd v Reid* it was not in dispute that if there was a transaction at an undervalue (as the Court of Appeal held), the Court of Appeal should make an order restoring the parties' original position. The issue was how it should do so, not whether it should do so. The remarks of Jonathan Parker LJ [2004] BPIR 985, para 125 should be read and understood in that context. Moreover, even within that context, Jonathan Parker LJ said

*F*

"each case will turn on its particular facts, and the task of the court in every case is to fashion the most appropriate remedy with a view to restoring, *so far as it is practicable and just to do so*, the position" (emphasis added).

*G*

Thus, he too recognised that the court will only act with a view to restoring the parties' position "so far as it is . . . just to do so", echoing the Sir Donald Nicholls V-C's phrase "if justice so requires" in *In re Paramount Airways Ltd* [1993] Ch 223, 239 and reflecting the same approach.

59   Of course in the vast majority of cases where the conditions for the application of the section are satisfied, the court will make an order. Nevertheless, the court retains an overall discretion which is wide enough to enable it to make no order where, exceptionally, justice so requires, and in my judgment that is not limited to extraterritorial considerations.

*H*

A      60  I consider that this is an exceptional case in which justice requires
that I make no order notwithstanding that the conditions for the application
of the section are otherwise satisfied.

       61  In my judgment, when it comes to discretion, it is not right to view
the severance notice and receipt in isolation, without regard to the purchase
and transfer only two months previously with which they are obviously
intimately connected. The freehold was only purchased in the first place
B  because Mrs Malden-Browne had the opportunity to acquire it on the death
of the freeholder at a very substantial discount of £70,000 or over one third
of the vacant possession value, because of her protected tenancy. That was
hers and hers alone, nothing to do with Mr Brown. The purchase of the
property as joint tenants in effect conferred a windfall on Mr Brown of half
the value of the discount. True, he was jointly liable with Mrs Malden-
C  Browne for the mortgage repayments, but they were always going to be
made by Mrs Malden-Browne (as they were by direct debit from her bank
account). If she defaulted in the mortgage payments, the mortgage company
would enforce the security and sell the house to repay the loan. The equity
of redemption belonged to both Mrs Malden-Browne and Mr Brown and
was worth over 50% of the amount of the loan, on valuations pertaining at
the time of the purchase, and even more with the increase in the value of the
D  property which has occurred since the purchase.

       62  The effect of the severance notice and receipt entered into two
months later was simply to remove that windfall and reduce Mr Brown's
interest to a nominal interest. Moreover, on Mrs Malden-Browne's evidence
(which, as already indicated, I accept), it was never intended that Mr Brown
should have such a windfall in the first place, and the execution of the
E  severance notice and receipt just over two months later to give effect to
what was intended, namely that he should have only a nominal interest in
the property. If there had been a declaration of trust at the time of the
purchase to reflect that intention, there would have been no basis for an
application under section 339 at all.

       63  Moreover, since the severance notice and receipt were signed on
6 February 2000, Mrs Malden-Browne has (as I have found) made all
F  the mortgage payments and associated life assurance premium payments
and all, or almost all, the council tax payments, utility bills and other
household expenses. Those by themselves would not justify my declining
to make an order, since they can and would be taken into account by way
of equitable accounting if I were to make an order as referred to below.
However, in all the circumstances, and in particular the matters referred
G  to in paras 61 and 62 above, I consider that justice requires I should make
no order.

       64  I should add that if I had otherwise been minded to make an order
with a view to restoring the parties to the position they would have been in if
the severance notice and receipt had not been executed, it is by no means
obvious to me that such an order would in fact yield a substantial net gain to
the trustee at the end of the day. It was common ground that under any
H  order that I might make such as a declaration of trust restoring Mr Brown's
49% interest, or monetary equivalent, there would have to be an equitable
accounting to reflect the parties' contributions to the mortgage payments,
life assurance premiums, and other household expenses and household
improvements paid by her. There is no evidence before the court as to what

*A*

the property is worth now. But the value of the property was agreed by the parties in March 2005 (for the purposes of Mrs Malden-Browne buying out Mr Brown's 1% interest following the trial before Lloyd J) at £270,000, or approximately £140,000 after deduction of the mortgage of £130,000. Even allowing for some increase in value since then, it is by no means clear that much would remain once all the mortgage payments, life assurance premiums and household expenses and household improvements paid for by Mrs Malden-Browne are deducted.

*B*

65   Mr Davies rightly expressed concern about the need for yet more proceedings to determine valuation and the equitable accounting if I were to make an order, but in the end concluded that was unavoidable if I were to make an order. The result of those further proceedings might well be to produce little, if anything, for the trustee after the equitable accounting. I would have been reluctant to subject Mrs Malden-Browne to yet further proceedings over the property. Happily, in view of my decision, that will not now happen.

*C*

*Application refused.*

*Solicitors: Osmond & Osmond; Travers Smith.*

S E R

*D*

_____

*E*

*F*

*G*

*H*

TAB 69

*Skandinaviska Enskilda Banken AB (PUBL) v Conway*,
CICA No 2 of 2016, 18 November 2016 ("*Weavering* Case")

IN THE CAYMAN ISLANDS COURT OF APPEAL                    CICA NO 2 OF 2016

ON APPEAL FROM THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

FSD 98 OF 2014 (NRLC)

IN THE MATTER OF THE COMPANIES LAW (2013 Revision)

AND IN THE MATTER OF WEAVERING MACRO FIXED INCOME FUND LIMITED (IN LIQUIDATION)

BETWEEN:

SKANDINAVISKA ENSKILDA BANKEN AB (PUBL)

Appellant

- and-

(1)  SIMON CONWAY
(2)  DAVID WALKER
(as Joint Official Liquidators of Weavering Macro Fixed Income Fund Limited)

Respondents

BEFORE:

THE HON JOHN MARTIN QC, JA
THE HON DENNIS MORRISON, JA
THE HON SIR RICHARD FIELD, JA

Appearances: David Chivers QC instructed by  Sam Dawson and Kai McGriele of Solomon Harris appeared for the Appellant.  Jeremy Goldring QC and Shaun Folpp instructed by Mourant Ozannes appeared for the Respondents.

Hearing: 20 April 2016
Judgment: 18 November 2016



**JUDGMENT**

**MARTIN JA:**

*Introduction*

1.  This is an appeal against an order dated 5 January 2016 of Clifford J. By that order, he declared that certain payments (amounting in total to US $8,217,761.54) made by Weavering Macro Fixed Income Fund Ltd ("the Company") to the appellant Skandinaviska Enskilda Banken AB (Publ) ("SEB") were invalid as preferences over the other creditors of the Company; and he ordered SEB to pay an equivalent amount to the respondents (who are the joint official liquidators of the Company – "the JOLs"), together with interest and costs.

2.  The order was made pursuant to section 145 (1) of the Companies Law (2013 Revision) ("the Law"). That subsection is in the following terms:

    "Every conveyance or transfer of property, or charge thereon, and every payment obligation and judicial proceeding, made, incurred, taken or suffered by any company in favour of any creditor at a time when the company is unable to pay its debts within the meaning of section 93 with a view to giving such creditor a preference over the other creditors shall be invalid if made, incurred, taken or suffered within six months immediately preceding the commencement of a liquidation".

3.  The Company went into liquidation (initially voluntary liquidation, but subsequently subject to the supervision of the Court) on 19 March 2009.  The payments were made on 19 December 2008, 2 January 2009 and 11 February 2009, and so were made within six months of the commencement of the liquidation.  The judge found that the Company was unable to pay its debts when the payments were made, and that they were made with a view to giving SEB preference over the other creditors.  He held that the appropriate remedy was repayment to the Company, and rejected defences raised by SEB based on unjust enrichment, change of position, illegality and public policy.

4.  SEB challenges the judge's conclusion that the Company was insolvent when the redemption payments were made.  It asserts that he calculated the Company's liabilities by reference to valuations that were the product of fraud and so did not accurately state the amount of the liabilities; that he failed to recognise that the Company had a 30 day period, or a reasonable time, in which to make redemption payments, and accordingly took into account liabilities that were not yet due; and that he wrongly took into account future debts without considering future assets.  It challenges the judge's conclusion that the Company intended to

prefer SEB on the basis that the judge misinterpreted the law; that he failed to have proper regard to uncontradicted evidence and drew impermissible inferences of fact; and that he wrongly included future creditors in the class of those he held the Company intended to prefer. Finally, SEB challenges the judge's rejection of its defences.

*Background*

5.  The Company was incorporated in the Cayman Islands on 2 April 2003. It carried on business as an open-ended investment company trading mainly in interest rate derivatives. It had two directors, Stefan Peterson and Hans Ekstrom.  It was part of a group of companies that included Weavering Capital (UK) Limited ("WCUK"), an English company that was the Company's investment manager and undertook its trading activities; and Weavering Capital Fund Limited ("WCF"), a BVI company that was counterparty to interest rate swaps entered into by the Company. There were other corporate entities within the Weavering group, including a Swedish investment vehicle into which investors could invest.

6.  The chief executive officer and principal investment manager, and a director, of WCUK was Magnus Peterson, the brother of Stefan Peterson and the stepson of Hans Ekstrom. The judge found that it was Magnus Peterson who was the controlling mind of the Company, both generally and specifically in relation to the payments made to SEB, and there is no appeal against that conclusion.

7.  The judge also found that the interest rate swaps conducted between the Company and WCF were, to the knowledge of Magnus Peterson, worthless. He said this (judgment paragraph [35]):

> "i. The Swaps were worthless paper transactions entered into with WCF, which was never in a position to honour its obligations pursuant to them. WCF ... had no realisable assets and did not trade other than as counterparty to the Swaps.
>
> ii. Magnus Peterson used the existence of the Swaps to show a sustained growth over the life of the Company. Large monthly adjustments were made to Swaps exposures through the full or partial closing out of existing Swaps and the opening of new Swaps so as to avoid generating the impression of too large profits that the Swaps would otherwise have showed on paper, but not in reality, and to avoid defeating the impression of the Company as relatively low risk. The result was that the Company was able to show the relatively modest but positive month on month

performance expected by its investors.

iii. No gains were ever realised by the Company in relation to the Swaps (even when some of the Swaps were closed out). They were simply used to present a picture of a fund showing sustained growth when in fact the unrealised gains represented by the Swaps were fictitious.

iv. The reality was that the Company was suffering large losses through its options trading (that were masked by the Swaps) and expending considerable sums on management and performance fees and brokerage fees largely to WCUK."

8.  Persons wishing to invest in the Company acquired redeemable Participating Shares in it. SEB, a Swedish financial institution, acquired such shares.  It did so as custodian for, among others, two Swedish mutual funds: HQ Solid ("HQ Solid") and Catella Stiftelsefond ("Catella"). Between April 2006 and November 2007, SEB subscribed for US$8.5 million Participating Shares on behalf of HQ Solid, and the Company issued 56,836.96 Participating Shares to "SEB Merchant Banking as nominee for HQ Solid". In March 2008, SEB subscribed for US$1 million Participating Shares on behalf of Catella; and the Company issued 5,926.98 Participating shares to "SEB Merchant Banking as nominee for Catella Stiftelsefond". The Company subsequently issued equalisation shares to SEB, again as nominee, so that SEB's total holding on behalf of Catella increased to 5,953.99 Participating Shares. Despite the reference to nomineeship, SEB was registered as the holder of all the shares in the Company's register of members.

9.  Under the terms of the Company's offering memoranda (the latest of which was published on 24 September 2008), Participating Shares could be redeemed as follows:

"Redemption of Company Shares

Shareholders can redeem their Shares, in whole or in part, in a minimum amount of US$50,000 (subject to the discretion of the Board of Directors to redeem lesser amounts), on one calendar month's prior written notice (subject to the discretion of the Board of Directors to waive such notice), on each Redemption Day. To effect a redemption, a Request for Redemption of Shares, obtained from the Company must be received by the Company by 5pm Dublin time one calendar month before any Redemption Day, accompanied by the share certificates, if any, duly endorsed and in a form for redemption acceptable to the Board of Directors.

Redemptions are made at a price per Share equal to the NAV per Share of the Company, as of the close of business on the relevant Valuation Date, to the nearest whole US cent (the "Redemption Price").

Payment of Redemptions

Redemption payments are generally made within 30 calendar days after the Redemption Day. No interest is paid from the Redemption Day to the payment date. Payment is made by telegraphic transfer (with transfer charges to the account of the recipient) to the Remitting Bank/Financial Institution or to another account in the name of the shareholder."

"Redemption Day" meant the first business day of each calendar month, and "Valuation Day" meant the business day immediately preceding each Redemption Day.

10. On 9 October 2008 SEB gave notice of redemption in accordance with these provisions of all the shares it held as nominee for Catella, and on 28 October 2008 it gave notice of redemption of all its unredeemed shares held as nominee for HQ Solid. The Redemption Day first occurring one month after these notices was 1 December 2008, and the relevant Valuation Day was 30 November 2008. On 19 December 2008 the Company paid SEB US$1,096,903.58 in respect of the first notice ("the First SEB Redemption Payment"); on 2 January 2009 it paid SEB 25% of the amount due in respect of the second notice, US$1,780,214.29 ("the Second SEB Redemption Payment"); and on 11 February 2009 the Company paid SEB the remaining 75% due in respect of the second notice, US$5,340,643.47 ("the Third SEB Redemption Payment").

11. The redemption notices given by SEB were far from being the only notices of redemption received by the Company in October 2008 and subsequent months. This was a time of turmoil in the financial markets following the collapse of Lehman Brothers in September 2008.  Notice was given for 1 December 2008 in respect of shares totalling (at the 30 November 2008 NAV) US$138.4 million (of which the SEB shares amounted to some US$8.22million). Persons giving notice for 1 December 2008 are referred to as "December redeemers". For the 2 January 2009 and 2 February 2009 redemption dates, the equivalent figures were US$54.7 million and US$30 million.

12. On 19 December 2008 a total of about US$7.6 million was paid to the December redeemers. The First SEB Redemption Payment was part of that total. No further payments were made

in December 2008 to the December redeemers. Towards the end of the month, Magnus Peterson decided that the Company should initially pay only 25% of the amount due to the December redeemers, the remainder being paid by the end of January 2009. A letter to that effect, dated 31 December 2008 but not in fact sent until 7 January 2009, was sent to shareholders. The judge found that Magnus Peterson must have known by the end of December 2008 that the Company would not be in a position to pay all the December redeemers, by instalments or otherwise, let alone the amounts about to fall due at the beginning of January 2009.

13.  Those amounts, totalling US$54.7 million, fell due on 2 January 2009. On that day, the Second SEB Redemption Payment was made, and partial payments were made to other December redeemers (seemingly on an ad hoc basis, according to the judge). Additional partial payments were made on 5 and 13 January 2009; and later in January 2009 most of the December redeemers (but not SEB and six others) were paid the outstanding amounts due to them.

14.  On 2 February 2009 further redemption payments totalling US $30 million fell due. The Third SEB Redemption Payment was made on 11 February 2009, and three of the remaining December redeemers received the outstanding amounts due to them on 4, 11 and 26 February 2009 respectively. The other three December redeemers received no further payments.  By the end of February 2009, the overall position was that, of the approximately US$138.36 million due in respect of the December, January and February redemption dates, about US$90.16 million had been paid (US$7.6 million in December 2008, US$72.33 million in January 2009 and US$10.23 million in February 2009), leaving a shortfall of some US$48.2 million.

15.  Finally, on about 5 March 2009, the directors became aware of the true nature of the swaps and the likely effect on the solvency of the company. They resolved to suspend determination of the NAV and the issue and redemption of shares with immediate effect. On 19 March 2009, the Company was put into liquidation. In January 2015 Magnus Peterson was convicted in England of fraud and sentenced to 13 years' imprisonment.

*Issues*

16. There are two main issues as to the application of section 145(1) of the Law. First, at the times that the Company made the three redemption payments to SEB, was the Company unable to pay its debts within the meaning of section 93 of the Law? This issue, which contains three sub-issues, is known as the Solvency Issue. Secondly, were the three SEB redemption payments made with a view to giving SEB a preference over the other creditors? This is known as the Preference Issue.

17. If the Solvency Issue and the Preference Issue are resolved against SEB, there are further issues about the obligation of SEB to make repayment to the Company. I refer to these issues as the Repayment Issues.

*The Solvency Issue*

18. It is a condition of the application of section 145 (1) of the Law that at the date of a relevant payment the Company should have been unable to pay its debts within the meaning of section 93. In the circumstances of this case, the only part of section 93 that is relevant is paragraph (c), by which a company is deemed to be unable to pay its debts if "it is proved to the satisfaction of the Court that the company is unable to pay its debts". It was common ground that inability to pay debts was to be judged by reference to commercial or cash flow insolvency, not balance sheet insolvency. Applying that test, the judge held on the evidence that the JOLs had discharged the burden of proving that on each of the dates when redemption payments were made to SEB the Company was unable to pay its debts. SEB does not challenge the judge's assessment of the evidence; but it asserts that he failed to take into account the fact that the relevant NAVs were the product of fraud ("the fraud point"), wrongly disregarded a 30 day period of grace available to the Company for payment of redemptions ("the 30 day point"), and wrongly took into account future debts ("the future debts point").

<u>The fraud point</u>

19. SEB contends that the published NAVs, which assumed that the swaps had the value fraudulently attributed to them by Magnus Peterson, were not valuations within the meaning of the Company's articles; that in consequence none of the shareholders redeeming on the December 2008, January 2009 and February 2009 redemption dates was entitled to be paid by reference to the relevant published NAV; that the figures put forward by the JOLs to establish the Company's insolvency wrongly assumed that the redeemers

were entitled to be paid by reference to the published NAVs; and that in the absence of any alternative figures stating the Company's true asset value there was no material on which the court could be satisfied that the Company was unable to pay its debts on any of the SEB Redemption Dates.

20.  SEB accepts that, if this argument is correct, it means that it should not have received any of the SEB Redemption Payments.  It suggests that the JOLs might once have been in a position to recover the payments as made by mistake, but any such claim is now statute-barred; and it says that, since the JOLs have chosen to attack the payments as preferences, SEB is entitled to assert that an essential condition of a preference claim, namely that the company was unable to pay its debts, has not been established.

21.  In dealing with these arguments, the judge started by referring to article 34 of the Company's articles of association, which is in the following terms:

"The assets of the Company shall be valued in accordance with such policies as the Directors may determine. Any valuations made pursuant to these Articles shall be binding on all persons".

He noted SEB's argument that a fraudulent valuation could not be a valuation made pursuant to the articles, particularly in the light of article 32, which requires the directors in calculating the NAV to "apply such generally accepted accounting principles as they may determine".  He recorded SEB's reference to cases such as *Socimer International Ltd v Standard Bank London Ltd* [2008] 1 Lloyd's Rep 558 as supporting the proposition that a valuation to be carried out by a contracting party must be carried out rationally and in good faith, and to the Cayman case of *Primeo Fund v Pearson* [2015(1)CILR 482], in which Jones J had suggested that an NAV would not be binding if some conduct of an agent that could properly be imputed to a company had the effect of vitiating the contract between the company and its members.  He noted SEB's submission that since Magnus Peterson was the controlling mind of the Company his fraud must be treated as that of the Company and that, in the light of these authorities, the published NAVs must be regarded as invalid.  The judge then recorded the submissions of the JOLs, in particular that SEB's argument was inconsistent with the decision of the Privy Council in *Fairfield Sentry v Migani* [2014] UKPC 9, [2014] 1 CLC 611 ("*Fairfield Sentry*") to the effect that a published NAV is binding, and that it was wrong to attribute Magnus Peterson's state of mind to the Company, whether generally or in relation to implementation of the redemption procedure. The judge stated that he preferred the arguments made by the JOLs, and in conclusion said this [133-4]:

"However, I think that it is necessary to guard against the issue in relation to the NAV being weighed down by too much analysis. What it all comes down to in the end can be summarised quite simply. In my view, certainly for the purpose of this case, the NAV is binding in accordance with article 34 of the articles of association. The fact that it has emerged that the NAV is affected by fraud is not by itself sufficient to vitiate the NAV for the reasons explained by Lord Sumption in *Fairfield Sentry* and referred to by Jones J in *Primeo*. It seems to me that the claims in relation to the redemptions in this case have to be resolved by reference to the NAV which gave rise to their payment. The NAV remains binding (in accordance with article 34) for this specific, and perhaps limited, purpose, even though it has subsequently, after payment of the redemptions, proved to be affected by fraud. This I believe is the sensible and rational approach which avoids an unacceptable outcome".

22. On appeal, SEB largely repeated the submissions it had made to the judge, whilst complaining that the judge had not given any, or any adequate, reasons for rejecting them below. It complained that the judge had allowed himself to be influenced by his view that SEB's submissions were "unattractive" and resulted in "SEB benefiting from Magnus Peterson's fraud to the detriment of other redeemers". It pointed out that SEB was an unconnected shareholder with no knowledge of the fraud, and that if there were any detriment to other redeemers it was a consequence of the JOLs having elected to pursue the wrong cause of action against SEB. It reasserted its construction points on articles 34 and 32, in particular that a valuation based on fraud could not be a valuation "pursuant to the articles", which was the only sort of valuation stated by article 34 to be binding.  It again referred to cases such as *Socimer International Ltd v Standard Bank London Ltd* for the proposition that a valuation to be carried out by a contracting party must be carried out rationally and in good faith, and cited the following statement of Teare J in *WestLB AG v Nomura Bank International plc* [2010] EWHC 2863 (Comm) (upheld on appeal: [2012] EWCA (Civ) 495):

"There is no dispute that in determining the NAV of the Reference Fund and the Redemption Amount the Second Defendant as the Calculation Agent was bound to act in good faith and not to exercise its discretion in a manner which was irrational, that is, capricious, arbitrary, unreasonable (in the public law sense) or perverse. It was further common ground that its determination would not be binding in the

event of manifest error which meant an oversight or blunder so obvious as to admit of no difference of opinion."

SEB submitted that these and similar cases suggested that the contract between the Company and the redeemers should not be construed as containing an agreement that the parties would be bound by a NAV notwithstanding that it was tainted by fraud. It required clear and unmistakable terms for a party to a contract to exclude the ordinary consequences of fraud. The judge had wrongly rejected SEB's submission, based on the statement of Jones J in *Primeo Fund v Pearson* that for a NAV not to be binding there must be "some conduct on the part of the company itself or conduct on the part of an agent which can properly be imputed to the company that has the effect of vitiating the contract with its members", that there was a distinction between internal fraud, which would vitiate a valuation, and external fraud, which would not. In the present case, the NAV had been calculated by the administrator but had been based on false information supplied by Magnus Peterson through WCUK, and it was right to impute Magnus Peterson's knowledge of the falsity of the information to the Company. This was accordingly a case of internal fraud.   The judge had also wrongly dismissed the significance of Order 12, rule 2 of the Companies Winding Up Rules which, by requiring an official liquidator to rectify the register of members if "the company has from time to time issued redeemable shares at prices based on misstated net asset value which is not binding upon the company by reason of fraud", recognised that a fraudulent NAV would not be valid. If the JOLs had adopted the Order 12, rule 2 procedure, there could have been a general adjustment of the rights and obligations of the shareholders (although SEB again conceded that its own position would have been unaffected). The judge was wrong to take the view that *Fairfield Sentry* provided an answer to these points; that case did not concern a NAV that was the product of fraud, and said nothing about whether such a valuation was binding.

23. The JOLs' position on the appeal was that the judge was right to apply *Fairfield Sentry* and hold that the NAVs were binding in favour of redeemers and conclusive at the time of the SEB Redemption Payments, notwithstanding that because of Magnus Peterson's fraud they proceeded on the false basis that the swaps were valuable. The argument advanced by SEB was equivalent to an argument rejected in *Fairfield Sentry* as "impossible". Properly construed, the articles required the published NAV to be binding in respect of both acquisition and redemption of shares: they could not be construed as conferring on the Company an ability to adjust the NAV from time to time in the light of new information. Such

an approach to the articles would render the rights of shareholders entirely uncertain. Cases like *Socimer International Ltd v Standard Bank London Ltd* were concerned with implied terms prohibiting a party that abused a contractual discretion from binding the innocent party; whereas SEB's contention that the Company's wrongful conduct prevented it from becoming liable to innocent redeemers was in effect the reverse. A construction of the articles that meant that the innocent party suffered and the Company benefited from its own wrong was commercially unsustainable. The statement in *Primeo Fund v Pearson* was unclear: it spoke of vitiating the contract between a company and its members, but such language was more appropriate to the inception of the contract than to the consequence of a step taken in the course of its performance. Moreover, it was in any event wrong to attribute Magnus Peterson's fraud to the Company: it was not he, but the administrator, that was the relevant agent for the purpose of calculation of the NAV. As to Order 12, rule 2, it was not concerned with the position prior to rectification and had no impact on the question of whether the NAV was at that time binding.

24. In common with the judge, it seems to me that the appropriate place to start is article 34. It provides that any valuation of the Company's assets made in accordance with the articles is to be binding on all persons. Such a provision is fundamental to the mechanism by which investors in the Company acquire and redeem shares.

25. A similar provision was in issue in *Fairfield Sentry*. In that case, Fairfield Sentry Limited ("the Fund") was a BVI mutual fund that invested almost exclusively in Bernard L Madoff Investment Securities LLC ("BLMIS"). BLMIS operated a notorious Ponzi scheme. Investors in the Fund participated indirectly in the investments with BLMIS by subscribing for shares in the Fund at a price dependent on the Fund's NAV, and were entitled to withdraw funds by redeeming their shares under the provisions of the Fund's articles of association. In December 2008, when Madoff's frauds were discovered, the Fund's directors suspended determination of the Fund's NAV, thereby terminating redemption of shares. The proceedings were brought by the Fund at the instance of its liquidators against a number of financial institutions that were shareholders in the Fund but redeemed some or all of their shares before December 2008. The purpose of the proceedings was to recover from the defendants the amounts paid out to them on redemption, on the basis that they were paid out in the mistaken belief that the underlying assets were as stated by BLMIS when in fact

there were no assets. Any amounts recovered were intended to be distributed rateably between all members, irrespective of when or whether they had redeemed.

26. Two main issues fell to be decided: whether documents issued to members of the Fund recording the NAV or redemption price were binding on the Fund under article 11 of its articles of association, which provided that any certificate as to the NAV or redemption price given in good faith by or behalf of the directors should be binding on all parties ("the article 11 question"); and whether the defendants had a defence on the ground that by surrendering their shares they gave good consideration for the money that they received on redemption ("the good consideration question"). At first instance, the article 11 question was decided in favour of the Fund on the basis that no formal certificate had ever been issued, but the good consideration question was decided in favour of the defendants. Both elements of the decision were upheld on appeal to the Eastern Caribbean Court of Appeal. In the Privy Council, however, both the article 11 question and the good consideration question were determined in favour of the defendants.

27. The judgment of the Judicial Committee of the Privy Council was delivered by Lord Sumption. At [19], he said the following:

> "[T]he Fund's claim to recover the redemption payments depends on whether it was bound by the redemption terms to make the payments which it did make. That in turn depends on whether the effect of those terms is that the Fund was obliged upon a redemption to pay (i) the true NAV per share, ascertained in the light of information which subsequently became available about Madoff's frauds, or (ii) the NAV per share which was determined by the directors of the time and redemption. If (ii) is correct then, the shares having been surrendered in exchange for the amount properly due under the articles, the redemption payments are irrecoverable."

At [21], Lord Sumption set out the scheme of the Fund's articles. They included provision for the subscription price and the redemption price to be set at the NAV per share "determined in accordance with article 11", with the redemption price being paid as soon as practicable, normally within 30 days. The summarised provisions are different in form from, but in substance the same as, those contained in the Company's articles. Lord Sumption concluded his summary by saying: "It will be apparent from this summary that the whole of this scheme

depends upon the price being definitively ascertained by the dealing day and known to the
parties shortly thereafter. It is unworkable on any other basis."

28. The substance of the Privy Council's decision is contained in paragraphs [22] to [24]. They
are in the following terms.

"[22] The Fund's case is that when article 10(2) defines the redemption price as the
NAV per share "determined in accordance with Article 11", it means the NAV
correctly determined by dividing the NAV of the Fund by the number of shares in
issue in accordance with articles 11(1)[b], 11(2) and 11(3). If this is right, the same
must be true of article 9(1)(c), which fixes the subscription price by reference to the
same provisions of article 11. The directors' determination of the NAV per share as
at the valuation day, under article 11, was not definitive according to this analysis
unless a certificate was issued pursuant to article 11(1)[c], and that would happen
only if the directors chose to issue one.

[23] In the Board's opinion, this is an impossible construction. If it were correct, an
essential term of both the subscription for shares and their redemption, namely the
price, would not be definitively ascertained at the time when the transaction took
effect, nor at the time when the price fell to be paid. Indeed, it would not be
definitively ascertained for an indefinite period after the transaction had ostensibly
been completed, because unless a certificate was issued it would always be possible
to vary the determination of the NAV per share made by the directors at the time
and substitute a different one based on information acquired long afterwards about
the existence or value of the assets. This would not only expose members who had
redeemed their shares to an open-ended liability to repay part of the price received
if it subsequently appeared that the assets were worth less than was thought at the
time. It would confer on them an open-ended right to recover more (at the expense
of other members) if it later appeared that they were worth more. Corresponding
problems would arise out of a retrospective variation of the subscription price long
after the shares had been allotted. Indeed, it is difficult to see how the directors
could perform their duty under article 9(1)(b) not to allot or issue a share at less
than the subscription price if the latter might depend on information coming to light
after the allotment had been made.

[24] *If, as the articles clearly envisage, the subscription price and the redemption
price are to be definitively ascertained at the time of the subscription or redemption,*

> *then the NAV per share on which those prices are based must be the one determined*
> *by the directors at the time, whether or not the determination was correctly carried*
> *out* in accordance with articles 11(2) and (3). That means either (i) that the directors'
> determination at the time must be treated as conclusive whether or not there is a
> certificate under article 11(1)[c]; or else (ii) that article 11(1)[c] must be read as
> referring to the ordinary transaction documents recording the NAV per share or the
> subscription or redemption price which will necessarily be generated and
> communicated to the member at the time, and not some special document issued at
> the discretion of the directors. The Board considers, for the reasons given below,
> that in a case where a provision for certification such as article 11(1)[c] has been
> included as part of the mechanics of subscription and redemption, the correct
> approach is the second one" (emphasis added).

29.  In my view, the judge was right to regard this reasoning as applicable to the present case. It
is true that in *Fairfield Sentry* neither the Fund nor any of its agents was complicit in
Madoff's fraud, and to that extent SEB is right to say that the reasoning is not directly
applicable. Nevertheless, the practical reasons that underlie the decision in *Fairfield Sentry*
apply equally to a situation in which the NAV is affected by fraud. It is essential to the
operation of an investment vehicle such as the Company that permits investment through
the acquisition and redemption of shares that there should be certainty on a day-to day
basis as to the price at which shares are to be purchased or redeemed. It may be that, as in
the present case, the subscription price and the redemption price are largely or entirely
artificial, but it is nevertheless important that they are calculated on a consistent basis. That
is the purpose of article 34, which is to be construed as referring to a valuation purportedly
made in compliance with the articles. Otherwise, the problems identified in paragraph (23)
of the judgment in *Fairfield Sentry* will arise. It is important to note that many investors are
likely to have acquired and redeemed shares before any fraud and resulting insolvency
becomes apparent. Although those transactions will with hindsight be seen to have been
conducted on an artificial basis, the position of the investors is similar to that of investors in
a Ponzi scheme, about which Lord Sumption said in *Fairfield Sentry* (at [3]):

> "It is inherent in a Ponzi scheme that those who withdraw their funds before the
> scheme collapses escape without loss, and quite possibly with substantial fictitious
> profits. The loss falls entirely on those investors whose funds are still invested when
> the money runs out and the scheme fails".

This is not to say that fraud has no relevance. If the company is complicit in the fraud, it may entitle an investor to claim that he became a shareholder only as a result of a fraudulent misrepresentation, and claim damages in the liquidation for the difference between the price he paid and the true value of the shares he obtained. It may found a claim in conspiracy against the directors. If the company is innocent of the fraud, it may have a claim against the fraudster; and investors may have a provable claim for damages for negligence or innocent misrepresentation inducing them to acquire shares.   Whether or not the company is complicit in it, the existence of a fraud may give rise to additional remedies in a winding-up, such as that afforded by Order 12, rule 2 (which by section 112 of the Law applies only in the case of a solvent winding-up, something that the judge accepted was at least a possibility in the present case).   Apart from any remedies specific to a winding-up, such as the avoidance of preferences, however, it is not in my view permissible to reopen a NAV retrospectively on the ground of fraud, whether or not the company was complicit in it. It follows that I do not accept the suggestion in *Primeo Fund v Pearson* that conduct by the company or its agent "that has the effect of vitiating the contract with its members" will invalidate a NAV. A contract is capable of being vitiated at its inception, for example by misrepresentation; and in the sense that, whether the company was a participant in the fraud or not, an investor is likely to have a claim based on misrepresentation, the existence of a fraud may be said to be capable of vitiating the contract between the company and the investor consequent on the acquisition of shares. Redemption of shares once acquired, however, is an incident of the existing contract and brings it to an end according to its terms. It is not possible to regard it as giving rise to a new contract capable of being vitiated.  Nor is vitiation an appropriate description for a breach of contract, however severe; and it is in any event not on the face of it permissible for the company to rely on its own misconduct to terminate a contract.  There is in my view no difference between an internal and an external fraud in terms of the binding nature of a NAV: the whole scheme of the Company's articles requires its business to be conducted on the basis that the NAV is binding, whether it is accurate or not.

30. Accordingly, I would hold that the fraud point fails.

The 30 day point

31. Article 55 of the Company's articles of association provided that the Company should remit redemption proceeds "within such period as the Directors shall determine". The Company's

offering memoranda stated that "Redemption payments are generally made within 30 calendar days after the Redemption Day". SEB contended that this meant that, as part of an investor's contract with the Company, the Company was allowed at least 30 days in which to make payment, and would not be in breach of contract until that period expired without payment. On that basis, the First SEB Redemption Payment could not be a preference, since the Company had at least until 30 December 2008 to make redemption payments to the December redeemers, there was no evidence that it owed money to anybody else on 19 December 2008 when the First SEB Redemption Payment was made, and accordingly there was no basis on which the court could be satisfied that the Company was unable to pay its debts on that date. [It is to be noted that this argument is not available in respect of the Second SEB Redemption Payment or the Third SEB Redemption Payment, since by the time they were made there were on any basis substantial amounts owed to the December redeemers.]

32.  The judge dealt with this point primarily by reference to article 36 of the Company's articles of association, which is in the following terms:

> "The price to be paid for Participating Shares which are to be redeemed shall be deemed to be a liability of the Company from the Valuation Point on the Redemption Day until the price is paid".

He pointed out that in *Culross Global SPC Ltd v Strategic Turnaround Master Partnership Ltd* 2008 CILR 447  ("*Strategic Turnaround*") this Court held that an article containing similar wording created a provable debt owed to the redeeming investor from the redemption day. In relation to the statement in the Company's offering memoranda that redemption payments would generally be made within 30 calendar days, and an alternative submission from SEB that in the absence in articles 36 and 55 of a specified time for payment a reasonable time would as a matter of general law be implied, he referred to *Strategic Turnaround* in the Privy Council (2010 (2) CILR 364. In *Strategic Turnaround*, the relevant provisions were that the price payable for redeemed shares should be deemed to be a liability of the company from close of business on the redemption day until the price was paid, and that redemption proceeds would be remitted within such period as the directors should determine. Lord Mance, delivering the opinion of the Board, said this (at [20]):

> "The focus of these provisions is on the redemption date, by reference to which the redemption price payable is crystallised and from which the price is deemed to be a liability of the respondent. The remittance of the "redemption proceeds" is treated

as a matter of supplementary procedure, although it may be refused on particular money-laundering grounds. Both stages may be said to be part of a continuing process, but it does not follow that "redemption" within the meaning of arts. 55 and 32 only occurs at the conclusion of that whole process".

The judge then said this (at [110]):

"In my view much the same can be said here. The allowance of a grace period of 30 days for redemption payments was a purely practical measure to allow the orderly payment of sums which had become due on the redemption date. It had no legal bearing on the liability which arose at that date. Subsequent payment in accordance with the grace period was, mirroring the words of Lord Mance, no more than a matter of supplementary procedure. Nor is there any need, as suggested by Mr Chivers [for SEB], to consider implying terms as to payment."

33. On appeal, SEB's primary contention was that the judge had misinterpreted *Strategic Turnaround*: that case did not decide when redemption proceeds became due and payable but merely whether the company had the power to suspend redemptions after the relevant redemption date had passed. In particular, the passages from Lord Mance's judgment on which the judge relied were not intended to identify when the redemption proceeds became due and payable but rather the point at which redemption occurred, after which point it would be impossible to suspend the redemption process. By treating the 30 day grace period as purely a practical measure, the judge had deprived the Company of any benefit of that period. To hold that the redemption proceeds became due on the Redemption Day meant that the Company would be in breach of contract if it did not pay them then, despite the intention that it should have a further period to allow for orderly payment. The judge should have construed the articles and the offering memoranda together or, if he was not prepared to do so, should have recognised that on ordinary principles a reasonable time for payment was to be implied into articles 36 and 55. If the grace period was available to the Company, nothing was due to the December redeemers at the date of the First SEB Redemption Payment, and the Company was not insolvent. That SEB had received the First SEB Redemption Payment before it could legally have insisted upon its payment did not alter that fact.

34. In my view, the judge was right to regard this issue as concluded by *Strategic Turnaround*.  In that case, a redeeming shareholder petitioned to wind up the company on the ground of

non-payment of the redemption price. The company applied to strike out the petition, asserting that between the redemption date and payment the company had validly suspended redemptions, with the result that there was no present debt due to the petitioner capable of founding the petition. The Grand Court refused to strike out the petition, holding that the petitioner had become a creditor on the redemption date and the purported suspension had been beyond the company's powers. This Court allowed an appeal on the basis that the suspension had been valid, but upheld the Grand Court's decision that the petitioner had become a creditor on the redemption date. The Privy Council restored the Grand Court's decision. Thus all three courts held that the petitioner became a creditor on the redemption date, with an immediate right to present a petition, the difference in outcome depending on the effect of the purported suspension. It is in that light that paragraph [42] of this Court's decision, relied on by SEB in relation to the future debts point, is to be viewed. That paragraph is in the following terms:

> "For these reasons, therefore, it seems to me that the respondent did not have the locus standi to petition on the "unable to pay its debts" ground as a creditor with a future debt. The respondent's debt was one that was not presently due and payable. It had been suspended under the articles and the CEM for an indeterminate period. Plainly, Mr McDonough is right in saying that the debt still exists, even if it has been validly suspended. But it is not presently due and payable in the sense that it is a debt "for which a creditor may go at once to the company's office and demand payment." Mr McDonough can also validly say that, under the Insolvency Rules, r. 12.3, a future debt is provable in the liquidation. That does not, however, make the debt automatically capable of founding a valid creditor's petition."

This paragraph is to be contrasted with paragraphs [23] to [25] of this Court's judgment, dealing in terms with the date on which the petitioner became a creditor. The conclusion on that issue, expressed at [25], was as follows:

> "I am, therefore, entirely satisfied that Smellie, C.J. was right to hold (as I believe he did) that the respondent became a creditor of the company on March 31, 2008 in the amount of the redemption value of the redemption shares that was yet to be quantified. It is wrong, in my judgment, to suggest that there was no debt until April 30, 2008, relying on the terms of the CEM that make 90% of the debt payable on that date. The respondent was, as Smellie, C.J. held, a creditor on March 31 by virtue of the clear provision of art. 53" [deeming the redemption price to be a liability of the company from the redemption date until payment].

35. In paragraph [1] of the opinion of the Privy Council, Lord Mance identified the issue as follows:

> "Whether the petition was an abuse of process depends upon whether, at the date of its issue, the appellant was a current creditor, with standing to issue it, or at best only a prospective creditor, in which case it would have no such standing".

Accordingly, paragraph [20] of Lord Mance's judgment, quoted by the judge and set out in paragraph 32 above, involves a clear rejection of the proposition that a statement in an offering memorandum or similar document indicating when payment of a redemption price would be made does not prevent an immediate liability arising – as, indeed, article 36 expressly provides. The judge was in my view correct to treat what SEB described as the period of grace as merely a practical matter, and correct to hold that the redemption prices due to the December redeemers fell due on 1 December 2008. Those amounts were accordingly properly taken into account by him for the purpose of determining whether the Company was insolvent at the date of the First SEB Redemption Payment. I would hold that the 30 day point fails.

<u>The future debts point</u>

36. The future debts point arises out of paragraph [113] of the judgment under appeal, in which the judge said this:

> "In point of fact, however, Mr Lord [for the JOLs] contends that it does not matter whether or not those debts are regarded as payable on 31 December 2008 or on 1 December 2008, as long as the Court is satisfied that on 19 December 2008, on the balance of probabilities, the Company would not have been able to pay all of the 1 December 2008 redemptions on 31 December 2008. It is submitted that the evidence amply demonstrates that the Company on 19 December 2008 had no prospect of being able to pay all the 1 December 2008 redemption payments on 31 December 2008. I have no hesitation in accepting this to be the position."

SEB contends that the judge was wrong to treat the Company as having been insolvent at the date of the First SEB Redemption Payment because it had no prospect of paying debts that did not become due until the end of the same month.

37. Because this was merely an alternative basis for rejection of the 30 day point, and I have indicated that I consider that the judge's primary basis for rejection of that point, namely

that the amounts due to the December redeemers fell due on 1 December 2008, was correct, I can deal with the future debts point shortly.

38. SEB contended, rightly, that *Strategic Turnaround* in this Court had established that the test of solvency in the Cayman Islands was the cash flow test, approving *In re European Life Assurance Society* (1869) L R 9 Eq 122 and quoting the headnote in the Law Reports as follows:

> "The Court will not order a company to be wound up under the just and equitable clause by reason of any liabilities not immediately payable unless it is reasonably certain that the existing and probable assets will be insufficient to meet the existing liabilities, and will not in any case take into account the possible liabilities or profits which may accrue in respect of future business".

SEB asserted that this was to be contrasted with the position in England and Wales, where insolvency could be proved by reference to the balance sheet test. Further, in England and Wales the cash flow test was differently expressed, requiring proof to the satisfaction of the court "that the company is unable to pay its debts as they fall due". The words "as they fall due", which do not appear in the Cayman legislation, introduced an element of futurity; without them, insolvency had to be assessed by reference to debts that were immediately due and payable. However, if it was right to take into account future debts, it was also necessary to take into account future assets; and there was no evidence as to the Company's ability to raise finance to meet the December redemptions.

39. The JOLs contended that the additional words "as they fall due" merely made express what was inherent in any cash flow test, including that applicable in the Cayman Islands. Any such test required a flexible and fact-sensitive approach to the question of a company's ability to pay its debts. They referred to the statement of Lord Walker in the UK Supreme Court decision *BNY Corporate Trustee Services Ltd v Eurosail-UK 2007-3BL plc* [2013] 1 WLR 1408 ("*Eurosail*") at [37] that "the cash-flow test is concerned, not simply with the petitioner's own presently-due date, nor only with other presently-due date owed by the company, but also with debts falling due from time to time in the reasonably near future. What is the reasonably near future, for this purpose, will depend on all the circumstances, but especially on the nature of the company's business"; and they pointed out that in that case the decision in *In re European Life Assurance Society* had been criticised.

40. In my view, the cash flow test in the Cayman Islands is not confined to consideration of debts that are immediately due and payable. It permits consideration also of debts that will become due in the reasonably near future. The approval of *In re European Life Assur. Socy.* by this Court in *Strategic Turnaround* does not prevent that conclusion: that case was primarily concerned with winding up on the just and equitable basis, not on the basis of inability to pay debts; and the headnote quoted by this Court refers to debts resulting from future business, not to future debts resulting from existing business.  Nor does paragraph [42] of this Court's judgment in *Strategic Turnaround* (quoted in paragraph 34 above) suggest otherwise. If, as this Court erroneously thought, the suspension of redemptions was valid, the petitioner's debt would not be payable for an indeterminate period; and if the period could not be determined it was impossible to say that the debt would fall due in the reasonably near future. I do not regard the words "as they fall due" as adding anything of substance. In *Eurosail*, Lord Walker, after noting that the words "as they fall due" were introduced for the first time in the Insolvency Act 1985, said (again at [37]) that despite the difference in form they made little significant change in the law and served to underline that the cash flow test was concerned both with presently-due debts and with debts falling due in the reasonably near future. Any other conclusion leads to artificiality: if a company is able to pay a small debt due on a particular day, but will inevitably be unable to pay a much larger debt due on the following day, it is artificial to say that on the first day it is not unable to pay its debts. As to SEB's suggestion that there was no evidence about the Company's ability to finance the December redemptions, the fact is that no such finance was obtained, and it is a proper inference that none was available.  I would hold that the future debts point fails.

*The Preference Issue*

41. A further condition of the application of section 145 (1) of the Law is that the payment said to be a preference is made to a creditor "with a view to giving such creditor a preference over the other creditors".

42. The judge approached this part of the case by first identifying the relevant legal principles. He referred extensively to English authority, much of which had been summarised in this jurisdiction by Smellie CJ in *RMF Market Neutral Strategies (Master) Ltd v DD Growth Premium2X Fund* [2013] 2 CILR 361; and at the end of that summary he said this (at [170]):

"In the end all this analysis leads back to *DD Growth*. Applying those principles, it is plainly necessary, in my view, for the JOLs to prove to the satisfaction of the Court that the redemption payments were made with the intention of preferring SEB over other creditors. It is competent for the Court to draw the inference of an intention to prefer from all the facts of the case. However, the intention to prefer, which must be proved, must be the principal or dominant intention. There is no mention, in the final analysis by the Chief Justice, of there being a need for evidence of dishonesty, which is understandable in that the relevant statutory provision has moved away from fraudulent preference to voidable preference. But in reaching his conclusions the Chief Justice did appear to accept that the dominant intention must be to prefer a particular creditor, although I see no reason why that could not be a class of particular creditors."

SEB takes issue with only one element of this analysis, namely the implicit rejection of the need to find some evidence of dishonesty. I refer to this as the Dishonesty Point.

43. At [117] of the judgment, the judge identified what he described as the critical point of difference between the parties, namely "whether payment of the redeemers in the knowledge that the Company was unable to pay its debts is of itself sufficient (in the absence of any other explanation such as pressure) to infer objectively the necessary intention of preference or whether there must be proof of something more, specifically a subjective dominant intention to prefer particular creditors over others". In the end, having decided that the Company had a specific intention to prefer SEB, the judge came to the conclusion (at [188]) that it was not necessary for him "to decide whether, absent such specific intention, the required intention of preference can be inferred objectively from the fact of such payments being made when the Company was commercially insolvent". This conclusion is challenged in a Respondents' Notice filed by the JOLs. I should record that, in the course of the hearing of this appeal, we received a letter from Maples and Calder dated 18 April 2016 referring to the fact that the issue raised in the Respondents' Notice was due to be litigated against other redeemers in the Grand Court at the instance of the JOLs, and suggesting that we should defer consideration of it.

44. The judge then considered whether there was evidence of a specific intention to prefer SEB in relation to the First SEB Redemption Payment. He referred to an e-mail sent by Magnus

Peterson to the Company's administrators (PNC) on 17 December 2008, which was in the following terms:

> "Hi Gillian,
>
> We have a few Swedish investors that have switched into our SEK based Fund as at 1st December.
>
> We need to pay them value tomorrow please.
>
> On the attached spreadsheet I have highlighted those investors in yellow. It is approximately US$7.6 million that needs to be paid.
>
> SEB are sending funds today to PNC so there should be no problem executing it.
>
> Best regards
>
> Magnus".

The reference in that e-mail to SEB sending funds is explained by the fact that, quite separately from its capacity as shareholder, SEB provided clearing and brokerage services to the Company. However, one of the investors highlighted in yellow on the spreadsheet was "SEB Merchant Banking as nominee for Catella Stiftelsefond"; although it appears that in fact SEB never subscribed for, or expressed an interest in subscribing for, shares in the Swedish fund on behalf of Catella, HQ Solid or anyone else. At [179], the judge expressed his conclusion on this topic as follows:

> "I find on the evidence that there was an intention to pay the Swedish Redeemers on the basis that they were investors, or potential investors, in the Swedish fund. The fact that there may have been a mistake about this matters not. What does matter is the subjective intention of Magnus Peterson in acting, as I have found, as the Company's controlling mind. The intention appears to have been a principal or dominant intention to prefer a particular class of creditors. This resulted in a preference in fact of a particular creditor".

SEB challenges this conclusion on the basis that, in the absence of any direct evidence from Magnus Peterson as to how the mistake had occurred, it was equally plausible that he had simply highlighted the wrong investor and had never had any intention to prefer SEB. I refer to this as the Mistake Point.

45. In relation to the Second SEB Redemption Payment, the judge said this (at [181-182]):

> "The question which has occurred to me is whether the intention in relation to the first payment continued beyond then. There is evidence that it did because of the email of 20th January 2009, when Magnus Peterson selected for payment three

more Swedish investors who were said to have switched into the Swedish fund. This was actually after the Second SEB Redemption Payment. It is also right to note that after the First SEB Redemption Payment (which resulted in payment in full to SEB as nominee for Catella) there was no specific mention of paying SEB as nominee for HQ Solid.  However, nor is there anything to suggest that any distinction was made in the mind of Magnus Peterson as to the different capacities in which SEB was acting. The evidence rather indicates that there was a continuing general intention on his part to make preferential payments to the various Swedish Redeemers (SEB included) as a class thought, rightly or wrongly, to be re-investors in the Swedish fund.

The matter does not rest there. There is also the point that the Second SEB Redemption Payment appears to have been made with the intention of complying with the policy set out in the 31st December 2008 letter. That policy arguably had the effect of reinforcing the decision which had been made to pay SEB, resulting in a preference over other creditors. Thus it appears that in the absence of any other explanation for the Second SEB Redemption Payment (and there is none) that it was made with a view to prefer SEB."

The e-mail of 20 January 2009 was a further request from Magnus Peterson to the Company's administrator, saying: "Just like last month we have 3 Swedish investors who have switched into our SEK based Fund. We need to pay them tomorrow please". SEB was not one of the investors referred to. The letter of 31 December 2008, which was not in fact sent until 7 January 2009 but represented a decision made by Magnus Peterson at the end of December 2008, notified investors that "in order to effect an orderly liquidation of the Fund's assets to meet the requested redemptions, the directors have decided to pay at the end of this month 25% of all redemptions requested at the end of November on a pro-rata basis. The remaining redemption amounts will be paid out in one or more instalments as market conditions improve as the directors in their absolute discretion determine, and the directors envisage this improvement will take place by the end of January".

46. In relation to the Third SEB Redemption Payment, the judge said this (at [184]-[186]):

"Nor is it right that the Third SEB Redemption Payment rests solely upon the effect of preference. It can be taken to have been paid pursuant to what I have found to be a continuing general intention to make preferential payments to the particular Swedish Redeemers as a class.

It may well be, as pointed out by Mr. Chivers, by reference to the relevant schedule previously referred to, that in the meantime various other redeemers had in fact been paid ahead of SEB. The reasons for this are not presently apparent and may well have to be investigated in the context of any claims pursued in relation to other preferences of these particular redeemers. But none of this detracts from the intention which there appears to have been to make the preferential payment to SEB.

Moreover, if an inference is to be drawn, there appears to be nothing here to displace the "inference of intention" in the analysis of Lord Evershed MR in *Re Cutts*. The same can be said of the Second SEB Redemption Payment. Additionally, it appears from the Board Minutes of the 22nd February 2009 that the payment may have been made pursuant to an intentional policy to prefer smaller investors over larger investors. Again this may have had the effect of reinforcing the decision which had been taken to pay SEB. The policy was one which could lead to the recipients being preferred over the other investors who had redeemed but were not paid in full or were not paid at all."

The schedule there referred to demonstrated that other redeemers had received their payments in full before SEB. The Board Minutes included the statement that "where one redemption request is of such a size that it can only be satisfied in a number of payments or in one deferred payment (a "Large Redemption"), the Directors may satisfy all other contemporaneous or prior redemption requests in full before paying the redemption proceeds for the Large Redemption in order best to protect the Net Asset Value of the Fund and the interests of the remaining Shareholders".

47. The reference to *Re Cutts* [1956] 1 WLR 728  is to the following passage:

"For if a debtor deliberately selects for payment A in preference to all his other creditors, it cannot, to my mind, matter, in the absence of other relevant circumstances, whether A is the debtor's oldest friend, closest relative or best client. On the other hand, where a debtor, owing money in all directions, has also robbed his employer's till, he may, knowing himself to be insolvent, elect to reimburse the till in order that, when the crash comes, the damaging fact of his robbery may not be discovered. Or a debtor may elect to make a particular payment under pressure of some threat, or to obtain for himself some immediate and material benefit or to fulfil some particular obligation. In these cases the reason for the payment affects,

essentially, the intention in making it. In the instances given the intention, that is the real dominant intention, will no longer be to "prefer" (that is to pay, as it were, out of turn) but will be to avoid the detection of a criminal act; to relieve the threat; to get the benefit and postpone the evil day; or to satisfy the particular obligation. Though the question of pressure in some form or another has, in the reported cases, often been the crux of the matter, it is plain that an inference of intention to prefer may be displaced in many other ways than by showing that the debtor acted under pressure. Examples are indeed legion. But in the present case the examples that I have given provide the closest analogies to the suggestions on the society's side; and the real question before us is whether, upon the evidence and the findings of the county court judge, the true inference is intention to prefer or whether an inference of some other kind similar to those in the examples given is, at the least, not equally legitimate."

48. Finally, at [187], the Judge summarised his views as follows:

"I am satisfied that each of the SEB redemption payments was made with the principal or dominant intention of preferring SEB as a member of a particular class of creditors, the Swedish Redeemers. Here there was not mere selection, but the added dimension of conscious decision making resulting in particular selection for payment. This was clearly the case, in my view, in relation to the First SEB Redemption Payment. It is less clear in relation to the Second and Third SEB Redemption Payments, although, on balance, I think that it is reasonable to draw the inference that these further payments were made as part of a continuing general intention to make preferential payments to the Swedish Redeemers. Furthermore, the intention in this regard appears to have been reinforced by particular decision making in relation to the payments."

49. SEB challenges these conclusions on the ground that there was no evidence to support the judge's inference of a "continuing general intention" to prefer SEB. The First SEB Redemption Payment related to shares held by SEB as nominee for Catella, whereas the Second SEB Redemption Payment and the Third SEB Redemption Payment were in respect of shares held as nominee for HQ Solid, and there was nothing to suggest that Magnus Peterson thought that SEB in its capacity as nominee for HQ Solid would reinvest in the Swedish fund. There was uncontested evidence that SEB was obliged to act on the

instructions of its nominee, so that the judge could not properly have concluded that an intention to prefer SEB as nominee for Catella had any relevance to an intention to prefer SEB as nominee for HQ Solid. Moreover, the Second SEB Redemption Payment and the Third SEB Redemption Payment were made after substantial payments had been made to other investors, and there was no evidence of intention to prefer in relation to those investors; and SEB was not preferred in the application of the Company's policy to pay 25% of liabilities immediately and the balance later. I refer to these contentions as the Continuing Intention Point.

50. SEB also contends that the judge, when deciding whether SEB was preferred over other creditors, ought to have concluded that the only relevant creditors were current creditors with debts that were already due and payable, not future creditors. There is nothing in this point. At [196], the judge stated that he did not need to decide whether he could take future creditors into account. That was because he had already concluded that the amounts due to redeeming shareholders were liabilities of the Company from the redemption date; and, as I have said, in my view he was right to do so. On that basis, he identified at [197] the creditors over whom SEB was preferred by the First SEB Redemption Payment as being the other December redeemers who received no payment on 19 December 2008; those over whom SEB was preferred by the Second SEB Redemption Payment as being the unpaid December redeemers and all the January 2009 redeemers; and those over whom SEB was preferred by the Third SEB Redemption Payment as being the unpaid December redeemers and all the January 2009 and February 2009 redeemers. Those creditors were all current creditors at the date of the relevant SEB Redemption Payment.

51. By amendment to the Grounds of Appeal SEB also contended that, if it succeeded in relation to the Second SEB Redemption Payment and the Third SEB Redemption Payment but would otherwise fail in relation to the First SEB Redemption Payment, the First SEB Redemption Payment was nevertheless not liable to be set aside. That was because if the payment had not been made on 19 December 2008 it would have been paid in the ordinary course of payments made to the December redeemers during January 2009, and consequently would not have been a preference. The point is based on *Lewis v Hyde* [1997] BCC 976. I refer to it as the Amendment Point.

The Dishonesty Point

52. It is SEB's contention that it is necessary that an intention to prefer within section 145 (1) of the Law should carry with it a "taint of dishonesty". That contention is based upon the decision of the English Court of Appeal in *Re Kushler Ltd* [1943] 1 Ch 248, in which Lord Greene MR said the following (at p252):

> "The statute is directing the court to ascertain the state of mind of the payer in relation to a particular transaction. A state of mind is as much a fact as a state of digestion and the method of ascertaining it is by evidence and inference, and I can see nothing in the language of the section which justifies the view that the problem which the legislature sets the court is to be dealt with on any principles different from those commonly employed in drawing inferences of fact. It must, however, be remembered that the inference to be drawn is of something which has about it, at the least, a taint of dishonesty, and, in extreme cases, much more than a mere taint of dishonesty. The court is not in the habit of drawing inferences which involve dishonesty or something approaching dishonesty unless there are solid grounds for drawing them."

This passage does not bear the weight SEB seeks to place on it. It does not say that a payment can be a preference only if it is made dishonestly; and neither section 145 (1) of the Law nor the equivalent English legislation contains any requirement of dishonesty. What the passage appears to me to be doing is to make explicit the element of legislative disapproval that is implicit in a provision intended to avoid preferences. The idea underpinning insolvency legislation is that limited assets should be shared pari passu among the creditors, so that each bears a share of the loss that corresponds to the proportion that his debt bears to the total indebtedness. Preferring one creditor over the others means on the face of it that the preferred creditor suffers no loss, and the other creditors suffer more than their proportionate share. That subverts the principle of pari passu distribution; and intentionally giving an advantage to one creditor is something that is to be frowned on. It is perhaps not surprising that in 1943, when the relevant legislation still spoke of a "fraudulent" preference, this disapproval was regarded as akin to dishonesty (although it was well-established by then that fraud in its ordinary meaning was not necessary to bring a preference within the legislation: see for example *Re Patrick and Lyon Ltd* [1933] 1 Ch 786, 790); but in my view it is a misdescription of the disapproval implicit in section 145 (1) of the Law. I would hold that the Dishonesty Point fails.

<u>The Mistake Point</u>

53. The Mistake Point arises out of the fact that Magnus Peterson appears to have been mistaken in identifying SEB (in its capacity as nominee of Catella) as an intending investor in the Swedish fund. To my mind, this is irrelevant. The e-mail of 17 December 2008 and the accompanying highlighted spreadsheet show precisely why the First SEB Redemption Payment was made. It was because Magnus Peterson wanted early payment to be made to a particular class of redeemers, and he identified SEB as a member of that class.  His direction to PNC was the cause of the payment to SEB. It is merely speculation that he might have intended some other investor to benefit; the fact of the matter is that he identified SEB as a person to whom payment should be made in priority to other creditors. It is impossible to suggest that his expressed intention was not the operative one. I would hold that the Mistake Point fails.

The Continuing Intention Point

54. The judge found in terms (at [187]) that "each of the SEB redemption payments was made with the principal or dominant intention of preferring SEB as a member of a particular class of creditors, the Swedish Redeemers". That conclusion is not challenged by SEB in relation to the First SEB Redemption Payment (except by reference to the Mistake Point, which I have already said should be rejected); but it is challenged in relation to the Second SEB Redemption Payment and the Third SEB Redemption Payment. As I have indicated, SEB contends that there was nothing to suggest that Magnus Peterson regarded SEB, in its capacity as nominee for HQ Solid, as a Swedish Redeemer; the Second SEB Redemption Payment and the Third SEB Redemption Payment were made after substantial payments had been made to other investors; and SEB was not preferred in the application of the Company's policy to pay 25% of liabilities immediately and the balance later.

55. In my view, there was insufficient material to enable the judge to infer a dominant intention throughout to prefer SEB on the grounds that it intended, as Magnus Peterson appears to have believed, to invest in the Swedish fund. Whilst that plainly was, as I have said, the reason for the First SEB Redemption Payment, it cannot be said to be the case in respect of either of the Second SEB Redemption Payment or the Third SEB Redemption Payment. That is partly because, although SEB was the registered shareholder in respect of all the shares it held, the company and Magnus Peterson understood that it held some of those shares as nominee for Catella and some of them as nominee for HQ Solid. That understanding is particularly evident in the highlighted spreadsheet that, with the e-mail of 17 December

2008, provided the instruction for the First SEB Redemption Payment, where SEB was specifically referred to as nominee for Catella. As SEB contends, there is no reason to suppose on the evidence that Magnus Peterson can have thought that SEB in its capacity as nominee for HQ Solid intended to invest in the Swedish fund. Indeed, the e-mail of 20 January 2009 suggests the contrary: on the face of it, there was an intention to prefer the investors named in that e-mail, but SEB was not one of them. The judge pointed out that by the time of that e-mail the Second SEB Redemption Payment had been made; but, whilst that is true as a matter of fact, it is at best neutral for the purpose of establishing a continuing intention to prefer SEB as a Swedish Redeemer. Moreover, there was no evidence to indicate that the redeemers who had received payment in full before SEB did so because they were understood to be intending to invest in the Swedish fund; indeed, the judge described the payments to them as having been made seemingly on an ad hoc basis. But the absence of that evidence, or evidence of some reason for those payments which did not conflict with the idea of an intention to prefer Swedish investors, calls into question the hypothesis of such a continuing intention. In truth, all the evidence establishes is that Magnus Peterson intended to give preference to redeemers intending to transfer to the Swedish fund; but, except in relation to the First SEB Redemption Payment, there is nothing to indicate that he regarded SEB as such a redeemer.

56. The matter does not, however, end there. The judge did not rely only on an intention to prefer Swedish Redeemers: he said (again at [187]) that "the intention in this regard appears to have been reinforced by particular decision making in relation to the payments". He was referring to the policy set out in the letter dated 31 December 2008 of paying the December Redeemers 25% initially and the balance later, and that set out in the board minutes dated 22 February 2009 of giving priority to redemptions that were not "Large Redemptions". Although the judge regarded these merely as reinforcing his view that the payments to SEB were made pursuant to a policy of giving preference to investors in the Swedish fund, it seems to me that the letter dated 31 December 2008 at least has a significance of its own. By the time the Second SEB Redemption Payment, representing 25% of the amount outstanding, was made on 2 January 2009, the sums due to the January Redeemers had already fallen due and notice of redemption had been given by the February Redeemers. The judge found that Magnus Peterson knew that the Company had no prospect of paying the January Redeemers and the February Redeemers in full. The proper course would have been to suspend redemptions (if that were by then possible) or liquidate the Company.  He

nevertheless caused the Company to adopt a policy designed to allow the December redeemers to be paid before other redeemers. The Second SEB Redemption Payment and the Third SEB Redemption Payment were made pursuant to this policy, and had the intended effect of preferring SEB (as one of the class of December redeemers) over the body of January redeemers. SEB says that it was not preferred in the application of the policy, but that does not answer the point. Although the policy may have been applied consistently in relation to the December redeemers, so that SEB gained no advantage over them, it did give SEB an advantage over the January redeemers and (in the case of the Third SEB Redemption Payment) over the February redeemers, all of whom were to the knowledge of Magnus Peterson unlikely to be paid. That is in my opinion sufficient to justify the judge's conclusion of a specific intention to prefer. As the judge recorded at [78], SEB did not put pressure on the Company to pay, or even request payment after giving notice of redemption, so there was nothing to displace the inference that SEB was paid pursuant to that intention. Accordingly, although for slightly different reasons from those expressed by the judge, I would hold that the Continuing Intention Point fails.

57. That conclusion deals to some extent with the Respondents' Notice, which made specific reference to the letter dated 31 December 2008 and the February 2009 board minutes. I do not, however, find it necessary to address the more general question raised by the Respondents' Notice, namely whether the fact of payment in knowledge of insolvency is sufficient without more to found an inference of intention to prefer. In light of the letter from Maples and Calder to which I have referred, I also think it would be undesirable to do so.

### The Amendment Point

58. The Amendment Point is expressly contingent on SEB having succeeded in relation to the Second SEB Redemption Payment and the Third SEB Redemption Payment. Since it has not, it is not necessary to consider the point further.

*The Repayment Issues*

59. The Repayment Issues related to the judge's rejection of SEB's analysis that the remedies available in a case to which section 145 (1) of the Law applied were common law remedies, to which common law defences such as the absence of unjust enrichment, and change of

position, applied; and his rejection of SEB's contention that the JOLs' claim was founded on illegality and was contrary to public policy.

60. The judge dealt with these matters at [200] to [245] of his judgment. At [211], and again at [218], he held that common law defences were not available to a statutory claim under section 145 (1) of the Law, and at [212] he said this:

> "Mr Lord [for the JOLs] submits, and I accept, the absence of any discretion built into the section reflects the policy behind it of restoring value to the company for the benefit of its creditors which overrides the common law rules on unjust enrichment and change of position as between parties to a private transaction. The cause of action derives from the section itself: pursuant to statute the payment is invalid, therefore, the recipient is obliged to repay what he received. There is no question of having to consider unjust enrichment, rather the recipient has received something he should not have received and is obliged to pay it back."

At [219] and [229], he held that SEB had not in any event made out a defence of change of position on the facts: SEB was always a nominee, and passing the redemption payments to Catella and HQ Solid did not amount to a change of position; and such indemnity as SEB had was, on the evidence, unaffected by that payment or by events that occurred subsequently. As to illegality and public policy, the judge said (at [244]):

> "There is a compelling reason why the NAV must stand to allow recovery of redemption payments made in accordance with it which are found to be invalid. The public policy, in my view, is very much in support of such recovery, rather than against it."

61. SEB challenged these conclusions on the ground that section 145 (1) said nothing about the legal basis for recovering a preference, and the judge should have held that the appropriate remedy was a common law claim in unjust enrichment; that he should have recognised the existence of a change of position defence to a preference claim; that he was wrong as a matter of fact to reject the change of position defence; and, in relation to illegality and public policy, on the ground that –

> "Contrary to the Judge's view, the JOLs' claims were based on fraud: those claims were founded on an allegation that other creditors were themselves entitled to a pari passu share of funds which were, by reason of Magnus Peterson's fraud,

> extracted from the Company. The judge ought to have held that it was repugnant to
> public policy to allow those claims."

62. In oral argument, SEB pointed out that section 145 (1) of the Law merely avoids a
preference, whilst saying nothing about the consequence of avoidance. Since the statute did
not provide an explicit remedy, the only way in which the JOLs could recover the payments
was by asserting a restitutionary remedy. The policy behind the section, namely to restore
value to a company for the benefit of its creditors, was the same as the policy behind
provisions avoiding transactions designed to defraud creditors; but in the latter case the
possibility of a change of position defence was recognised: see the English High Court
decision of *Rose v AIB Group (UK) plc* [2003] 1 WLR 2791. Moreover, in a further English High
Court decision, *Charles Terence Estates Ltd v The Cornwall Council* [2011] EWHC 2542 (QB)
local councils failed to recover payment of rent made under leases that were void against
them (because they had been entered into in breach of fiduciary duties to council taxpayers)
on the grounds that the landlords had a common law defence of change of position. This
demonstrated that the fact that there were public policy reasons for invalidating a payment
did not prevent an innocent recipient from relying on a change of position defence.

63. In response, the JOLs contended that a claim under section 145 (1) of the Law was not part
of the common law of restitution or unjust enrichment, but was a long-standing part of the
statutory law of insolvency aimed at protecting the interests of all creditors. It followed that
the claim was not based on a creditor's unjust enrichment, but on vindicating the statutory
regime for the benefit of all creditors. They referred to the following statement of Lord
Browne-Wilkinson in *Lewis v Hyde* [1997] BCC at 979:

> "The effect of the section, if applied, is to require the preferred creditor to repay
> what he has received, the monies recovered being applicable pari passu between
> the creditors in the liquidation. The underlying purpose is to ensure compliance with
> the basic principle of insolvency law, viz. pari passu distribution of the insolvent
> estate."

They also made reference to the decision of the Court of Appeal of Alberta on provisions
(which, unsurprisingly but unfortunately, were not set out in the report) of the Canadian
Bankruptcy and Insolvency Act, *Principal Group v Anderson* (1997) 147 DLR 4th 228, 231-4,
the effect of which (as summarised in the headnote) is as follows:

"The defence of change of position does not apply to statutory proceedings such as those set out in the Act, which impose a duty on the trustee to treat all creditors equally and to collect the property of the bankrupt. These duties are incompatible with the defence of change of position."

64. In my view, it is implicit in section 145 (1) of the Law that, where the conditions of that section are satisfied, a preferential payment is automatically avoided and it (or its equivalent) is to be returned. The section makes the payment invalid without more, leaving no room for the possibility that a change of position defence might cause it not to be invalidated at all. Any other conclusion would be at odds with the underlying purpose of the section identified in *Lewis v Hyde*.  Although it is not necessary to decide the point, I would expect the same principle to apply to a case of a transaction in fraud of creditors, and accordingly I do not regard *Rose v AIB Group (UK) plc* as a reliable guide to the construction of section 145 (1). In my view, the judge was right to reject the possibility of common law defences.

65. I also consider that he was entitled to conclude that, as a matter of fact, the claimed defences were not available to SEB. SEB was the Company's shareholder, regardless of the capacity in which it held shares. By receiving the SEB Redemption Payments when it should not have done, it was – as between itself and the Company – unjustly enriched. It claims to have changed its position by paying the proceeds to Catella and HQ Solid in circumstances where it now has no ability to recover them; but the position in fact was that it paid them over on terms that included contractual indemnities.  The deterioration in SEB's position stems not from its payment of the proceeds but from the fact that the indemnities have, according to the evidence, always been worthless. SEB's failure to procure a valuable indemnity or otherwise protect its position cannot be said to amount to a change of position sufficient to afford a defence to the preference claim.

66. So far as questions of illegality and public policy are concerned, it appears to me that the policy underlying section 145 (1) again prevents them arising. The relevant public policy is that underpinning the whole insolvency regime, namely the necessity to procure pari passu distribution of available assets; and it is difficult to see what type of illegality would prevent a liquidator taking advantage of the preference avoidance provisions. In any event, however, I consider that SEB mischaracterises the position. As explained in paragraph 86 of its skeleton argument, SEB's contention was as follows:

"Contrary to the judge's view, the JOLs' claims to recover the three SEB Redemption Payments were founded on Magnus Peterson's fraud. This was because the JOLs' claims were to recover the proceeds of that fraud not for the benefit of the company (the victim of the fraud) but, rather, for the benefit of unpaid redeeming shareholders. Put shortly, the JOLs' claim was to deprive one beneficiary of the fraud (SEB) of the proceeds of the fraud for the purpose of distributing such proceeds among other beneficiaries (the unpaid redeemers)".

Whoever the beneficiaries of the fraud were (and they will have included Magnus Peterson, at least until his imprisonment, and shareholders who managed to redeem at inflated NAVs more than six months before the commencement of the liquidation), they do not include unpaid redeemers. They will have suffered from the fraud by acquiring their shares at inflated prices, and will not have been able to extricate themselves. What available assets there are will have to be distributed pari passu amongst them, and for that purpose it is immaterial whether they prove by reference to the inflated redemption values which they expected to receive but did not, or by reference to some revised NAV – at least so long as there is consistency among them. By contrast, however, SEB is (as it acknowledges) currently a beneficiary of the fraud, having received redemption payments by reference to the inflated NAV; and, to the extent that anyone is relying on illegality, it is SEB by asserting its entitlement to retain the inflated redemption values. I would hold that the Repayment Issues are to be resolved against SEB.

67. For the sake of completeness, I should record that the illegality point was argued on the basis of the law as it was understood prior to the United Kingdom Supreme Court decision in *Patel v Mirza* [2016] UKSC 42; [2016] 3 WLR 399. Having regard to the way in which I consider the point is to be resolved, nothing turns on this.

*Conclusion*

68. For the reasons I have given, which largely coincide with those set out by the judge in his commendably clear and comprehensive judgment, I would dismiss this appeal.

**MORRISON JA**:

69. I agree.

**FIELD JA:**

70. I also agree.



TAB 70

*Somers Dublin Ltd A/C KBCS v Monarch Pointe Fund Ltd*
HCVAP 2011/040, 11 March 2013, the EC Court of Appeal

EASTERN CARIBBEAN SUPREME COURT
IN THE COURT OF APPEAL

TERRITORY OF THE VIRGIN ISLANDS

HCVAP 2011/040

(On appeal from the Commercial Division)

BETWEEN:

[1] SOMERS DUBLIN LTD. A/C KBCS
[2] CITCO GLOBAL CUSTODY NV- REF 209974/ARM
[3] FIDULEX MANAGEMENT INC.
[4] DAIWA SECURITIES TRUST & BANKING

Appellants

and

MONARCH POINTE FUND LIMITED

Respondent

**Before**:

| | |
|---|---|
| The Hon. Mde. Janice M. Pereira | Chief Justice |
| The Hon. Mde. Louise E. Blenman | Justice of Appeal |
| The Hon. Mr. Don Mitchell | Justice of Appeal [Ag.] |

**Appearances**:

Mr. Gabriel Moss, QC with him Mr. Andrew Thorp, and Claire Robey
for the Appellants
Mr. Barry Isaacs, QC with him Mr. Oliver Clifton for the Respondent

_____

2013:    February 13;
March 11.

_____

*Civil appeal – BVI company – Mutual fund – Redeemed members of fund in liquidation claiming redemption proceeds in priority to claims of continuing members – Whether judge right to order liquidator to distribute pro rata between continuing members and redeemed members*

The appellants are four redeemed shareholders in the respondent mutual fund company incorporated in The Virgin Islands. The fund has been put in liquidation and the external creditors have been paid. There are not sufficient funds remaining to pay the redeemed shareholders, far less the continuing shareholders. The liquidator wished to pay the

1

remaining assets to the redeemed shareholders pro rata, and made an application to the High Court for directions to do so.  The trial judge held as a matter of law that the claims of the redeemed members and of the continuing members should rank equally.  This being an interlocutory order in the winding up petition, the redeemed members appealed to the Court of Appeal with leave of the court below.

**Held**: allowing the appeal, that:

1.  A redeemed member is a creditor in respect of his unpaid redemption payment.

    **Westford Special Situations Fund Ltd. v Barfield Nominees Limited et al** Territory of the Virgin Islands High Court Civil Appeal No. 14 of 2010 (delivered 28th March 2011, unreported) followed; **Kenneth M. Krys et al v Stichting Shell Pensioenfonds** Territory of the Virgin Islands High Court Civil Appeal No. 36 of 2011 (delivered 17th September 2012, unreported) followed.

2.  The purpose of section 197 of the **Insolvency Act, 2003** is merely to subordinate the former members' claims (along with other claims arising out of membership) as creditor to that of ordinary unsecured (and usually external) creditors.  When section 197 says that a past member "may not claim in the liquidation" it must be read as referring to and barring claims as an ordinary unsecured creditor, and not as barring claims as a deferred creditor as part of the "final adjustment of the rights of members and ... past members between themselves".

    Section 197 of the **Insolvency Act, 2003** applied.

3.  It was therefore wrong for the learned trial judge to have held that the redeemed members in their character as such should rank equally with the continuing members claiming a return on their capital.  It was wrong to have held that redeemed members were not deferred creditors and as such entitled to have their claims against the Company satisfied in priority to any claim by the continuing members.    The redeemed members must be paid before any surplus is ascertained out of which the continuing members may be paid.

    **Westford Special Situations Fund Ltd. v Barfield Nominees Limited et al** Territory of the Virgin Islands High Court Civil Appeal No. 14 of 2010 (delivered 28th March 2011, unreported) followed; **Kenneth M. Krys et al v Stichting Shell Pensioenfonds** Territory of the Virgin Islands High Court Civil Appeal No. 36 of 2011 (delivered 17th September 2012, unreported) followed.

4.  Share capital is now an obsolete concept for BVI companies.  The BVI **Business Companies Act, 2004** removes the concept altogether, even with respect to par value shares.    The mode of distribution of surplus among members on a liquidation depends ultimately on the Memorandum and Articles of a company, but section 34(1)(c) of the BVI **Business Companies Act, 2004** provides a default

2

position.   It provides that in the absence of anything to the contrary, a share confers "the right to an equal share in the distribution of the surplus assets of the company".   There being nothing to the contrary in the Memorandum and Articles in the present case, each share carries an equal right to share in any surplus.

BVI **Business Companies Act, 2004** applied.

## JUDGMENT

[1]    **MITCHELL JA [AG.]:** Monarch Pointe Fund Limited ("the Company") was incorporated in the Virgin Islands on 29th December 2003.[1]  It carried on business as a mutual fund and operated under a Memorandum and Articles of Association in a form commonly adopted by institutions of this type.  In particular, its Articles of Association provided for members to be able to redeem their shares in accordance with a set of regulations of the type which are frequently encountered in cases of this sort.

[2]    On 17th August 2007, the Company suspended redemptions and sometime in 2008 the High Court appointed a liquidator.  Material before the learned trial judge showed that when redemptions were suspended, seven redeemed members had yet to receive some $18 million between them of redemption proceeds to which they were entitled.  The subscription price represented by the retained shares of some of the redeemed members, together with the subscription price represented by the retained shares of the other eleven continuing members, is some $47 million in total.  The total nominal value of the unpaid redemption proceeds and retained capital subscriptions together is thus somewhere in the region of $65 million.  After payment of all the Company's external creditors the liquidator has available to satisfy these liabilities a fund of some $3.5 million.  If he distributes this fund *pro rata*, without distinguishing between continuing and redeemed members, each will receive about five cents in the dollar.  If he pays the redeemed members in priority to the continuing members, the redeemed members will

---

[1] I take the facts from the judgment of 16th November 2012 where they are very helpfully set out.

receive about twenty cents in the dollar and the continuing members nothing.  If he pays the fund to the continuing members without distributing anything to the redeemed members, each continuing member will receive just over seven cents in the dollar.

[3]     The liquidator sought directions, *ex parte*, that he be permitted to make an interim distribution of the fund to the redeemed members in priority to any rights of continuing members.  The learned trial judge by an order of 17th May 2012 refused to make such a direction and instead directed that the distribution be made rateably between the redeemed members (for the outstanding balance of their redemption proceeds) and the continuing members (for the subscription price paid for their shares).   At the same time, he directed that notice be given to all redeemed and continuing members and that any redeemed or continuing member wishing to apply to vary the direction should make an application to do so within 56 days of entry of the order.

[4]     Four redeemed members did make such an application.  The learned trial judge made a further direction that any continuing member wishing to be represented on that application must give notice of its intention to do so by a certain date, and that in default the liquidator would represent the interests of the continuing members on the substantive hearing.   That hearing eventually took place when the four redeemed members were represented by counsel and the continuing members' interests were looked after by counsel who appeared on behalf of the liquidator.

[5]     The primary contention of counsel for the interests of the continuing members was that the fund should be distributed to the continuing members in proportion to the number of shares retained by each of them when the company went into liquidation, to the exclusion of the redeemed members.  Alternatively, he submitted that the fund should be distributed between the redeemed and the continuing members rateably in proportion to the number of shares held by each at the commencement of the winding up.  Counsel for the redeemed members submitted

4

that a redeemed member was to be treated as a creditor of the company, but deferred to an ordinary third party creditor. Thus, the liquidator was required, after the external creditors had been paid, to meet the claims of the redeemed members in priority to the continuing members. After considering the submissions and the authorities placed before him, the learned trial judge by a written judgment of 16th November 2012 concluded that section 197 of the **Insolvency Act, 2003** ("the Act")[2] required that the fund is available to satisfy outstanding claims of members, past and present, in their capacity as such, as well as the entitlement of continuing members to a return on their capital. He decided that there was no need or justification for a third class of creditor, the redeemed members, floating uneasily between the external creditors and the continuing members. He therefore declined to vary his order of 17th May 2012. He gave leave to the applicant redeemed members to appeal to the Court of Appeal.

[6]    An argument had been put forward at trial on behalf of the interests of the continuing members in support of the "black hole" solution. This was that section 207, combined with section 197, provided only for distribution to ordinary unsecured creditors sharing *pari passu* and to continuing members, leaving redeemed members as creditors who were no longer members in a void. The learned trial judge's solution to the "black hole" solution was to find that "member" in section 207(3) includes a redeemed member. It would, however, not be correct on the authorities cited to treat deferred creditors *pari passu* with members, as that conflicts with fundamental notions of priority. Section 207 only provides a *prima facie* order of priorities, being subject to other provisions of the Act. As section 207(1) states, the section applies only and to the extent that this Act or any other enactment provides otherwise. Section 197 does indeed provide otherwise. In the case of redeemed but unpaid members it provides for unpaid redeemers to be creditors, not able to compete with ordinary unsecured creditors, but taking part in a "...final adjustment of the rights of members and ... past members." In such an

---

[2] No. 5 of 2003, Laws of the Virgin Islands.

adjustment, past members who are deferred creditors, inevitably come before continuing members.

[7]    Counsel for the redeemed members, Mr. Moss, QC, and for the interests of the continuing members, Mr. Isaacs, QC provided both oral and written submissions which set out the different contentions of the liquidator, on behalf of the continuing members, on the one side, and the redeemed members on the other.   The difference of opinion turns on the interpretation of provisions of the Act.

[8]    Counsel for the redeemed members submitted that the central issue in the appeal was, put simply: does an unpaid redeemed member of a BVI company in liquidation rank as (a) a deferred creditor with higher priority than an ordinary unredeemed member; or (b) have the same priority as an ordinary unredeemed member; or (c) have the same priority as other creditors; or (d) does he fall down a "black hole" and have no claim at all, as argued by counsel for the continuing members at trial?  He submitted that solution (a) was the only one that made sense legally and commercially.   Mr. Isaacs, QC submitted that the central premise of the appellants was that the redeemed members are creditors in respect of their claims for redemption proceeds; the second premise was that creditors are to be paid in priority to members in the fund in liquidation; and the conclusion drawn from these two is that redeemed members' claims are to be paid in priority to the claims of continuing members.   The first premise, he urged, is false, as is the third.   Redeemed members are members, and not creditors of the fund in liquidation.

[9]    The relevant statutory provisions are not long and may be set out here.  Section 9 of the Act defines "creditor" and provides, so far as relevant, as follows:

> "**9.**    (1)    A person is a creditor of another person (the debtor) if he has a claim against the debtor, whether by assignment or otherwise, that is, or would be, an admissible claim in
>> (a)    the liquidation of the debtor, in the case of a debtor that is a company..."

[10]    Section 11(2) deals with admissible claims. It provides that, subject to section 12, a liability at the time of the commencement of the liquidation is admissible in a liquidation of a company as a claim.

[11]    Section 12 of the Act deals with non-admissible claims, and provides, so far as is relevant, as follows:

> "**12.**    The following liabilities are not admissible claims in the liquidation of a company...
>> (b) a liability that, under any enactment or rule of law, is of a type that is not claimable, whether on grounds of public policy or otherwise..."

[12]    Section 197 deals with sums payable to members in their character as a member, and provides as follows:

> "**197.**    A member, and a past member, of a company may not claim in the liquidation of the company for a sum due to him in his character as a member, whether by way of dividend, profits, redemption proceeds or otherwise, but such sum is to be taken into account for the purposes of the final adjustment of the rights of members and, if appropriate, past members between themselves."

Mr. Isaacs, QC, on behalf of the interests of the continuing members, urges four points. First, the section applies to a member and a past member. Second, it applies to a sum due to a past member in his capacity as a member. Third, it expressly includes a sum due by way of redemption proceeds. Fourth, it provides that a member and a past member may not claim in the liquidation of a company for such a sum. Since the provision is that the sum is not claimable, it follows that it is not an admissible claim in the liquidation.

[13]    Section 207 falls under the heading "Claims" and prescribes the priority in which the assets of a company in liquidation shall be applied, paid and distributed. It provides, so far as relevant, as follows:

> "**207.**    (1)    Unless and to the extent that this Act or any other enactment provides otherwise, the assets of a company in liquidation shall be applied

7

(a) in paying, in priority to all other claims, the costs and expenses properly incurred in the liquidation in accordance with the prescribed priority;

(b) after payment of the costs and expenses of the liquidation, in paying the preferential claims admitted by the liquidator in accordance with the provisions for the payment of preferential claims prescribed;

(c) after payment of the preferential claims, in paying all other claims admitted by the liquidator; and

(d) after paying all admitted claims, in paying any interest payable under section 215.

(2) Subject to section 151, the claims referred to in subsection (1)(c) rank equally between themselves if the assets of the company are insufficient to meet the claims in full, they shall be paid rateably.

(3) Any surplus assets remaining after payment of the costs, expenses and claims referred to in subsection (1) shall be distributed to the members in accordance with their rights and interests in the company."

It is the gravamen of the case for the continuing members that the redeemed members are to be paid under section 207(3), and not under section 197.

[14] This Court has recently considered and interpreted these sections in the **Westford Special Situations Fund Ltd. v Barfield Nominees Limited et al** case,[3] and in the **Kenneth M. Krys et al v Stichting Shell Pensioenfonds** case.[4] Counsel for the interests of the continuing members submitted that neither of these decisions supports the premise of the redeemed members' appeal. Counsel for the redeemed members submitted that they do.

---

[3] Territory of the Virgin Islands High Court Civil Appeal No. 14 of 2010 (delivered 28th March 2011, unreported).

[4] Territory of the Virgin Islands High Court Civil Appeal No. 36 of 2011 (delivered 17th September 2012, unreported).

[15]     In the **Westford** case, a member of the company had given notice of redemption
and had been paid part of the redemption price, but the remainder of the payment
had been delayed.  The redeemer issued a statutory demand for the balance of
the redemption price.  The statutory demand not having been complied with, the
redeemer issued an application for the appointment of liquidators over the fund.
One of the issues in the case was whether the redeemers were "creditors" with
standing to seek the appointment of liquidators.

[16]     Mr. Isaacs, QC, counsel for the interests of the continuing members, submitted
that the **Westford** case is authority for the propositions that:  (a) a redeemed
member is a creditor of the fund in the wider sense in respect of any unsatisfied
redemption proceeds in respect of which he may sue the company and obtain
judgment;[5]  (b) a redeemed member is not a creditor of the fund in respect of any
unsatisfied redemption proceeds in the liquidation of the company;[6]  (c) a
redeemed member's claim in respect of any unsatisfied redemption proceeds in
the liquidation is a claim *qua* member;  and (d) a redeemed member's claim in
respect of any unsatisfied redemption proceeds cannot compete with and ranks
behind claims of outside creditors in a winding up.  Section 197 ranks the
redeemed member's claim behind that of the outside creditor.  He placed reliance
on the statement that section 197 makes it clear that a member of a company
(past or present) may not claim redemption proceeds once the liquidation is
underway."[7]   Redeemed members do not claim as creditors, they claim as
members or past members.  Claims for redemption proceeds may not be paid in
priority to members' claims.

[17]     The question of who is a creditor for the purposes of standing to apply for the
appointment of liquidators under section 162 of the Act is dealt with in detail in the
**Westford** judgment.   Standing is considered by reference to the definition of

---

[5] Para. 20 of the judgment of the Court of Appeal.
[6] Para. 31 of the judgment of the Court of Appeal.
[7] Para. 30 of the judgment of the Court of Appeal.

9

creditor in section 9.  Section 9 refers to "admissible claims".  The concept of admissibility is defined in section 11.  A redeemed member's claim is admissible under section 11(2)(a) as a liability of a company at the time of the commencement of the liquidation.  The Court pointed out[8] that redeemers cannot claim in the liquidation of a company other than in the manner permitted by section 197 which, in essence, says that where a sum is due to a member in his character as member, (such as redemption proceeds) "such sum is to be taken into account for the purposes of the final adjustments of the rights of members and, if appropriate, past members between themselves."  In other words, the Court of Appeal regarded the unpaid redeemed member's claim as "claimable" and therefore admissible, but only in the manner allowed by section 197, i.e., on a deferred basis, payable after outside creditors are paid and not claimable as an ordinary unsecured claim.

[18]    The relevant ratio of the Court of Appeal decision is that the redeemed members in that case were not "creditors" for the purpose of appointment of a liquidator. This decision was limited to the meaning of "creditor" for the purpose alone of standing to apply for the appointment of liquidators.  In a number of passages the Court made it clear that they regarded a redeemed member as a "creditor" in a more general sense.  So, at paragraph 21, the Court stated that the redeemed member "is a creditor of the company in the wider sense in respect of any unpaid redemption proceeds."  The paragraph goes on to say nevertheless that being a creditor in this general sense does not give the redeemed member standing to apply for the appointment of liquidators.  Then, at paragraph 25 there is a passage stating that "it is true that the respondents were creditors of the Fund in respect of any outstanding redemption proceeds..."

[19]    In the **Shell Pensioenfonds** case, the claim concerned an application by liquidators for an anti-suit injunction against a redeemed but unpaid member who

---

[8] At para. 21 of the judgment of the Court of Appeal.

was taking legal proceedings in Holland in respect of an account in Ireland with a view to gaining priority over the general body of creditors. The redeemed member had submitted to BVI jurisdiction by proving his claim in the liquidation. The appeal was allowed and an injunction granted. Pereira JA delivered the judgment of the Court and said this:

> "[4]     ... It is not disputed that Sentry's liquidators have so far not ruled on Shell's proof of claim. Counsel for Shell surmises that this may be due to the current state of the law as interpreted by this court in Westford[4] *[Territory of the Virgin Islands High Court Civil Appeal No. 14 of 2010 (delivered 28th March 2011, unreported]* in which it was held that a redeeming shareholder claiming redemption proceeds was not a creditor <u>for the purposes of bringing insolvency proceedings under the **Insolvency Act, 2003**</u> of the Virgin Islands. I underline this portion to make clear that **Westford** did not decide that an unpaid redeeming member is not a creditor of the company. It merely decided that as between outside creditors and redeeming members ... the **Insolvency Act, 2003** subordinated the 'inside' creditor's rights to those of the 'outside' creditor, and that the **Insolvency Act, 2003** restricted the right of an inside creditor, whose claim was derived from the inside creditor's character as a member, to bring insolvency proceedings as a creditor in reliance on such a claim. There is no statement in **Westford** which can or should be taken to mean that an unpaid redeemer is not a creditor of the company at all..."

[20]    It is clear from the dicta in **Shell Pensioenfunds** and **Westford** that a redeemed member is a creditor in respect of his redemption payment (save for the purpose of filing an application to appoint a liquidator). Sections 9, 12 and 197 of the Act cannot be interpreted as overruling this right, either in nature or in form. Section 197 indicates only that redeemed members cannot rank *pari passu* with outside creditors and are therefore deferred to them. The reason why such a creditor is deferred is that his claim as a creditor is for a "... sum due ... in his character as a member ... by way of … redemption proceeds" in section 197. Nowhere in the Act does it provide that redeemed members should rank equally alongside continuing members by virtue of any adjustment or any other provision. Any adjustment must give higher priority to former members who have become creditors as a result of a

redemption than to mere continuing members.  To do otherwise fails to give any weight to their rights as creditors, rather than members.  Any "adjustment" necessarily involves redeemed members making a "claim".

[21]     Section 197 lays out a general rule that deferred creditors may not claim as ordinary unsecured creditors, but with the proviso that their claims will be dealt with in the adjustment between members and former members under the second half of section 197, i.e., after ordinary unsecured creditors have been paid in full.

[22]     The words "may not claim in the liquidation" in section 197 must refer to claiming as an ordinary unsecured creditor.  It reflects the old common law legal principle that redeemed members are deferred creditors, postponed behind ordinary unsecured creditors.  As deferred creditors, their claims are "... to be taken into account for the purposes of the final adjustment of the rights of members and, if appropriate, past members between themselves."

[23]     This interpretation is in keeping with long-standing rules of priority on a liquidation of a company.  There is an analogy with the position of a "depositor" in an English building society.  The word "depositor" is a misnomer, since persons who become members of the building society as a result of making a deposit are, while the deposit lasts, members and not creditors.  However, once they give notice to withdraw their "deposit" and before payment, the withdrawing member's status changes.  His status as a member or past member depends on the terms of membership, so that, if, e.g., termination of membership is subject to a period of notice and is not immediate, he remains a member, but in other cases he becomes a past member.  In either case, he ranks as a deferred creditor, ranking behind outside creditors, but having priority ahead of continuing members.[9]

[24]     The learned trial judge felt that the dictum in **Sibun's** case was of no assistance, but Lindley LJ was a very highly regarded judge, particularly in relation to

---

[9] Sibun v Pearce (1890) 44 Ch D 354, per Lindley LJ at p. 371.

partnership and company law, and his dictum, unchallenged in case law since 1890, is deserving of considerable respect.   The approach in building society cases provides a good analogy.   Redemption in a case such as the present terminates membership and the redeemed member becomes a deferred creditor, who necessarily ranks ahead of members who are not redeemed and therefore not creditors.   It is clear that the purpose of section 197 of the Act is merely to subordinate the former members' claims (along with other claims arising out of membership) as creditor to that of ordinary unsecured (and usually external) creditors.   When section 197 says that a past member "may not claim in the liquidation" it must be read as referring to and barring claims as an ordinary unsecured creditor, and not as barring claims as a deferred creditor as part of the "final adjustment of the rights of members and ... past members between themselves".   This analysis is in accordance with the approach of this Court in **Westford**'s case.

[25]    Mr. Moss, QC submitted that another useful analogy is with declared dividends. When dividends are declared in favour of members, they constitute, prior to payment, a debt of the company, payable in a liquidation in priority to members.[10] Distribution among continuing members will depend on the terms agreed among them.   Mr. Isaacs, QC points out that the New Zealand decision relied on by Mr. Moss, QC deals with dividends declared but not paid, involved the construction of a company's constitution, and in any event, the point went by consent.

[26]    Mr. Moss, QC urged that cases under the English **Companies Act 1948** are instructive in showing the history and rationale of the rule of priority.   So, in the **Electricidad** case,[11] Slade J held:

> "True it is that the terminology of section 259(3),[12] like the terminology of section 302, is not very exact, because it does not make adequate

---

[10] In re Te Kumi Land Company Limited et al v Te Land Company Limited [1944] NZLR 924.
[11] In Re Compania do Electricidad de la Provincia de Buenos Aires Ltd. [1980] Ch 146.
[12] 259(3) provides:

allowance for the fact that, beyond the categories of creditor (simpliciter) and contributory, there exists a third category, namely, the contributory who (i) is also a creditor of the company in his capacity as a member and (ii) while subject to deferment to outside creditors, is entitled to ask for his debt to be taken into account in any adjustment as between himself and his fellow contributories.  The wording of section 259(3), however, does not in my judgment justify the conclusion that a person belonging to this third category is not in general to be treated as a creditor for the purpose of the statutory provisions relating to winding up and of the Winding-up Rules.

"... By necessary implication therefore, the section contemplates that sums due to former members in respect of dividends or otherwise due to them in their character as former members, whether or not they are contributories, will be treated as "liabilities" of the company and dealt with during the process of discharging "liabilities" of the company, rather than during the process of distribution therein referred to.  If sums of this nature due to former members who are contributories are to be dealt with as "liabilities," it would be surprising in principle if sums due to present members were not to be dealt with in the like manner.  Consequently, it would be surprising if all such sums did not fall to be treated as "debts" for the general purposes of the Act and the Winding-up Rules.[13]

His finding was that the present and former shareholders of a company to whom the company owed money by way of dividends or repayment of capital were to be treated in any winding up as creditors for the purposes of the sections of the **Companies Act 1948** dealing with claims, subject only to the provisions for deferment contained in that Act.  Mr. Isaacs, QC seeks to distinguish this case.  Slade J, he urges, was considering the construction of a section of an English statute which is not similar to our section 197.

[27]   In my view, the issue can be determined purely on the construction of the words of the Memorandum and Articles and the statute, with guidance provided by the Court of Appeal decisions from the Virgin Islands previously referred to.  Section 207(3) of the Act deals with the distributable surplus.  It provides that any surplus

---

"In the case of any company, whether limited or unlimited, when all the creditors are paid in full, any money due on any account whatever to a contributory from the company may be allowed to him by way of set-off against any subsequent call."
[13] At p. 172-173.

assets remaining after payment of the costs, expenses and claims shall be distributed to the members in accordance with their rights and interests in the company. The expression "surplus" usually means that which remains after discharging liabilities and costs.[14] Paragraph 7 of the Memorandum provides that each share shall participate in the surplus assets in the event of a distribution. Article 1 of the Articles defines the "surplus" as "the excess, if any, at the time of the determination of the total assets of the Company, over the aggregate of its total liabilities, as shown in its books of account, plus the Company's capital". Thus, liabilities are excluded from the definition of "surplus assets". The "sums due in the character as member" in respect of redeemed members under section 197 are liabilities of the company and are therefore excluded before the surplus distributable to members under section 207(3). It was therefore wrong for the learned trial judge to have held that the redeemed members in their character as such should rank equally with those claims by continuing members to a return on their capital. It was wrong to have held that redeemed members were not deferred creditors and as such entitled to have their claims against the Company satisfied in priority to any claim by the continuing members. The redeemed members must be paid before any surplus is ascertained out of which the continuing members may be paid.

[28]    The learned trial judge, in dealing with distributions to members, fell into error in describing the mode of distribution amongst them. He used the expression "return of their capital contributions". Share capital is now an obsolete concept for BVI companies. The BVI **Business Companies Act, 2004**[15] removes the concept altogether, even with respect to par value shares. The starting point of returning "paid up share capital" to members in a liquidation is therefore flawed. The fact that the Memorandum and Articles of Monarch Pointe refer to "capital" and "surplus" is no more than a hangover due to the fact that the company was first

---

[14] In Re Crichton's Oil Company [1902] 2 Ch 86.
[15] No. 16 of 2004, Laws of the Virgin Islands.

15

incorporated under the **International Business Companies Ordinance**.[16] It was re-registered under the BVI **Business Companies Act, 2004** in July 2006. From that date, it is correct to say that the references to capital and surplus do not reflect the law governing the company. The mode of distribution depends ultimately on the Memorandum and Articles of a company, but section 34(1)(c) of the BVI **Business Companies Act, 2004** provides a default position. It provides that in the absence of anything to the contrary, a share confers "the right to an equal share in the distribution of the surplus assets of the company". There being nothing to the contrary in the Memorandum and Articles in the present case, each share carries an equal right to share in any surplus.

[29]    I would therefore allow the appeal and order that paragraphs 1 and 2 of the order of 17th May 2012 be replaced with an order that the liquidator do pay the redeemed members of the fund *pro rata* their redemption price in priority to the distribution of any surplus assets to the continuing members.

[30]    I would order the costs on the appeal of both of the liquidator (the respondent) and of the redeemed members (the appellants) to be costs in the liquidation of the Company in accordance with the Orders of Bannister J dated 13th December 2012 and 1st February 2013, to be assessed if not agreed.

**Don Mitchell**
Justice of Appeal [Ag.]

**Janice M. Pereira**
Chief Justice

**Louise E. Blenman**
Justice of Appeal

---

[16] Cap. 291, Revised Laws of the Virgin Islands, 1991.

TAB 71

*Stanley v TMK Finance Ltd* [2010] EWHC 3349 (Ch),
English High Court

Neutral Citation Number: [2010] EWHC 3349 (Ch)

Case No: 1942 of 2009

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**MANCHESTER DISTRICT REGISTRY**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 21/12/2010

Before :

**MR JUSTICE DAVID RICHARDS**
- - - - - - - - - - - - - - - - - - - -
**Between :**

| | |
|---|---|
| **(1) PAUL STANLEY** | |
| **(2) PHILIP BARRINGTON WOOD** | **Applicants** |
| **(AS THE JOINT LIQUIDATORS OF NEW** | |
| **GRASS OF MANCHESTER LIMITED)** | |
| - and - | |
| **(1) TMK FINANCE LIMITED** | |
| **(2) TG HOLDCROFT (HOLDINGS) LIMITED** | **Respondents** |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Mr Giles Maynard-Connor** (instructed by **Kennedys LLP**) for the **Applicants**
**Mr David Alexander QC** (instructed by **Bowcock & Pursaill LLP**) for the **Respondents**

Hearing dates: 5,6,7,8,11,12,13,14,15 October, 5 November 2010
- - - - - - - - - - - - - - - - - - - -

# Judgment

Mr Justice David Richards :

*Introduction*

1.    This is a claim by the joint liquidators of New Grass of Manchester Limited, formerly called Holdcroft Properties Limited (the company), for relief under ss.238 and 241 of the Insolvency Act 1986.  The claim arises out of the sale of a freehold property in Hanley, Stoke on Trent on 11 May 2005 by the company to an associated company, TMK Finance Limited (TMK).  The price was £2,279,331 which, the liquidators allege, was about £1m less than its market value at that date.

2.    The relief claimed is against TMK an order for payment of the alleged undervalue, together with interest, and against its holding company TG Holdcroft (Holdings) Limited (Holdings) an order for payment of just over £1.55m, being the amount of a dividend paid to it out of the profits arising on a subsequent sale of the property.

3.    Section 238, so far as relevant, provides as follows:

> *"(1) This section applies in the case of a company where—*
>
> > *(a) the company enters administration,*

> *(b)the company goes into liquidation;*
>
> *and "the office-holder" means the administrator or the liquidator, as the case may be.*
>
> *(2)   Where the company has at a relevant time (defined in section 240) entered into a transaction with any person at an undervalue, the office-holder may apply to the court for an order under this section.*
>
> *(3)   Subject as follows, the court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not entered into that transaction.*
>
> *(4)   For the purposes of this section and section 241, a company enters into a transaction with a person at an undervalue if—*
>
> > *(a) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration, or*
> >
> > *(b) the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company."*

4.   The company went into creditors' voluntary liquidation on 23 February 2007 and it is accepted, as is clear, that the sale took place within the "relevant time" of two years before the date of liquidation.   It has been accepted by Holdings at trial, although it did not do so in its pleaded defence, that if the sale was at a material undervalue, the court can make an order against it under s.238 (3).   Such an order would fall within the very general words of s.238(3) read with s.241(2) although not, I think, within any of the specific examples in s.241(1).   Holdings accepts that it will not be able to rebut the presumption imposed on it by s.241(2A).

5.   The parties agree that the sole issue arising for decision is whether the sale was at a significant undervalue and, if so, the amount of such undervalue.   The respondents, TMK and Holdings, deny that there was any undervalue in the sale price.

6.   In order to determine this issue, I have heard evidence of fact relating to matters relied on by the applicants in support of their case of undervalue and I have also heard extensive expert evidence called by both sides relevant to the market value of the property on 11 May 2005.   Whether the market value exceeded the sale price turns largely on the prospects for planning permission for alternative uses on the property and on the costs of remediation and associated ground works before the property would be fit for development.   There are wide disparities on these issues and I

accordingly heard evidence from experts in property valuation, planning and remediation works.

*The law*

7.    For the most part, there is agreement on the legal principles governing the application of s.238. First, the burden of proving that a transaction was entered into at an undervalue lies upon the applicant: *Stone & Rolls Ltd v Micro Communications Inc* [2005] EWHC 1052 (Ch) at para 93, although the circumstances may be such as to impose an evidential burden on the respondents: *Phillips v Brewin Dolphin* [2001] WLR 143 at para 27. Secondly, the applicant does not have to establish any intention to sell at an undervalue or other subjective element, although if established it may have an impact on the appropriate remedy under s.241. Thirdly, the consideration passing between the parties is to be valued as at the date of the transaction: *Phillips v Brewin* at para 26. Fourthly, the value of an asset is prima facie not less than the amount that a reasonably well informed purchaser is prepared, in arms' length negotiations, to pay for it: ibid at para 30. As noted by HHJ David Cooke in *Ailyan and Fry (Trustees in Bankruptcy of Kevin Foster) v Smith and others* [2010] BPIR 289 at para 69:

> "The Court has to assess as best it can on the evidence what [the asset's] value in money or money's worth would be to a rational and reasonably well-informed purchaser, having knowledge of the actual characteristics of what it is he is buying."

This assumes the existence of a market for the asset: *Re Thoars (decd) (No 2)* [2003] EWHC 1999 (Ch), [2005] IBCLC 331 at para 101 (Judge Norris QC at first instance). Fifthly, it is preferable, but not essential, that the court arrives at precise valuation figures. If that is not possible, the court can decide that the value falls within a range: *Re Thoars (decd) (No 2)* [2004] EWCA Civ 800, [2005] 1 BCLC 331 at paras 103 – 105 (CA).

8.    The only disputed issue of law between the parties was the extent to which the court was entitled to take account of later events in determining value at an earlier date. Specifically, the issue was whether the court could take account of the sale of the property in October 2006 in determining its value as at May 2005.

9.    Mr Alexander for the respondents submitted that, in general, the court should confine itself to matters capable of being known to a hypothetical purchaser at the valuation date. This is the test which applies to valuations carried out by professional valuers in accordance with the rules and guidelines of the Royal Institute of Chartered Surveyors. These are rules and guidelines carefully prepared by the professional body with the relevant expertise with a view to providing the most reliable basis for an open market valuation as at a particular date and they should therefore be applied by the court when carrying out what is in effect the same exercise.

10.  Mr Maynard-Connor for the applicants submitted that the task of the court is to make a finding as to value based on all the evidence available to it, provided of course it is relevant and cogent. Part of that evidence may well be, as it is in this case, expert valuation evidence prepared in accordance with the RICS rules and guidelines. It is

important evidence but the court is not confined by any rule of law to those rules and guidelines nor should it be as a matter of principle.  Provided that a later event genuinely sheds light on open market value at an earlier date, evidence of it is relevant and admissible.

11.  There was consideration of this issue by the House of Lords in *Phillips v Brewin Dolphin Ltd* [2001] 1 WLR 143, also a claim brought under s.238 of the Insolvency Act 1986.  A stockbroking business had been sold in consideration, as the House of Lords held, for (i) a nominal sum of £1 and (ii) a sub-lease of the computer equipment used in the business.  The sub-lease was made in breach of covenant in the leases of the equipment and, before the sub-lease was entered into, the transferee of the business had decided not to use the equipment.  Two months later, and before the first payment under the sub-lease became due, the owner of the equipment terminated the head leases for non-payment of rent and re-possessed the equipment.  The relevant issue was the value to be ascribed in these circumstances to the sub-leases as consideration for the transfer of the business.  Because of the way the case had been decided below, this issue was not considered by the judge at first instance or the Court of Appeal.

12.  Lord Scott of Foscote, giving the only reasoned speech, noted that, because of the breach of the covenants against sub-letting, the head leases were terminable at any time by the head lessors.  What, asked Lord Scott, was "the value, in money or money's worth, of a covenant by [the sub-lessee] that was so precarious?"  In addressing this question, Lord Scott considered that the actual events which took place were relevant.  Within a week of the sub-lease, the head lessors complained about it and threatened proceedings, and within two months there was a default in the payment of rent under the head lease, leading quickly to its termination.  Lord Scott observed that "the sub-lessee's" covenant, which had been precarious at the outset, had become worthless."

13.  At paragraph 26, Lord Scott said:

"*Mr Mitchell submitted that these ex post facto events ought not to be taken into account in valuing PCG's sublease covenant as at 10 November 1989.  I do not agree.  In valuing the covenant as at that date, the critical uncertainty is whether the sublease would survive for the four years necessary to enable all the four £312,500 payments to fall due, or would survive long enough to enable some of them to fall due, or would come to an end before any had fallen due.  Where the events, or some of them, on which the uncertainties depend have actually happened, it seems to me unsatisfactory and unnecessary for the court to wear blinkers and pretend that it does not know what has happened.  Problems of a comparable sort may arise for judicial determination in many different areas of the law.  The answers may not be uniform but may depend upon the particular context in which the problem arises.  For the purposes of section 238(4) however, and the valuation of the consideration for which a company has entered into a transaction, reality should, in my opinion, be given precedence over speculation.  I would hold, taking account of the events*"

> *that took place in the early months of 1990, that the value of PCG's covenant in the sublease of 10 November 1989 was nil. After all, if following the signing of the sublease, AJB had taken the sublease to a bank or finance house and had tried to raise money on the security of the covenant, I do not believe that the bank or finance house, with knowledge about the circumstances surrounding the sublease, would have attributed any value at all to the sublease convenant.*"

14.  The decision of the House of Lords establishes that, in appropriate circumstances, regard may be had to subsequent events, but it was in the context of attributing value to a covenant which was, on the facts known at the date of the transaction, precarious. I would agree with the comments of Professor Goode in *Principles of Corporate Insolvency Law* (3rd ed.) at para 11-31:

> "*Lord Scott's speech has generated much debate on the use of hindsight to determine a value at the time of the transaction. But it seems clear that Lord Scott was not in truth applying a hindsight test; rather he was relying on evidence of subsequent events to show that from the outset the covenant under the sub-lease was so precarious and its value so speculative that even at the time it was entered into a bank or finance house with knowledge of the surrounding circumstances would not have attributed any value to the sub-lease convenant.*"

15.  The purpose for which the applicants seek to rely on the sale of the property in October 2006 is not the same.  It is not to put a value on an existing quality or defect in the asset.  The purpose is to establish that a price agreed for this property between independent third parties in 2006 shows what the open market value was in May 2005, because the evidence establishes that there was no material difference in market conditions between those dates, including the prospects for planning permission.  The only difference was a general rise of about 10% in values for properties of this type in Stoke-on-Trent, and a suitable discount can be applied to reflect this.

16.  In my judgment, as a matter of principle, the court is entitled on this basis to have regard to the price agreed in 2006.  It is not an application of a hindsight principle, which in an insolvency context usually means taking account of later events to value a contingency as at an earlier date (see *Stein v Blake* [1996] AC 243).  It is simply using the later sale to establish by inference the market value at the earlier date.

17.  This depends for its validity crucially on two factors.  The first is to establish that there was no significant change in market conditions between the two dates, apart from those such as a general rise in market values which can be quantified without otherwise affecting market conditions.

18.  The second is that the circumstances of the sale are such that it can truly be regarded as establishing market value at the date of the sale and, hence, be used as a reliable basis for inferring market value at the earlier date.  It is this second factor which is controversial in this case and which I will consider when dealing with the sale in October 2006.

*The property and its location*

19.  The property lies on the southern side of Clough Street, Hanley, Stoke-on-Trent which itself lies about half a mile to the west of the city centre.  The site area is approximately 2.27 hectares (5.6 acres).  In the early to mid part of the 20th century it was used as a greyhound track and before that it had been the site of a marl pit.  There were also some mine-workings under the site.  From the 1960s it was used as a car dealership, showroom and workshop.  Since its acquisition by the Holdcroft group in 1998, it has been used as a car workshop, offices for the group, and vehicle storage.

20.  The buildings on the site are a showroom (about 17,500 sq ft.), offices (about 2,000 sq ft.) and workshops (about 44,000 sq ft.)  The general condition of the buildings is fairly poor.  There are extensive open-air areas used for car storage.

21.  A striking physical feature of the site is that it is on two levels.  The northern part, adjacent to Clough Street for a length of about 150 metres, is on the same level as the road.  It is a relatively narrow strip and covers in total an area of about one acre. Part of the showroom and a forecourt area is on this level.  There is a drop of about 5 metres to the lower level which covers the rest of the site.  Access to the lower level is gained from the upper level by two solid ramps on the eastern and western boundaries, each about the width of a vehicle.  The general setting of the site is accurately described by one of the experts as "urban-commercial".  Clough Street has mainly commercial premises, including another car dealership and trade counter outlets and some of the premises are now empty.  To the north of Clough Street are mainly commercial and industrial premises.  Immediately to the east is a property with an area of about 1.3 hectares (the Steelite site) which was previously a pottery but has been derelict for some years, the buildings on it having been demolished. Immediately to the west are commercial buildings adjoining a minor road, Mount Pleasant, with a residential area to the west of the road.  Immediately to the south are several warehouse buildings bordering on Sun Street, to the south of which is a residential area of terraced housing built in the last 30 or so years.

22.  The property is within an area which for many years before 2005 had been zoned for industrial use and the property itself had planning permission for motor retail uses.

*The Tesco site and link road*

23.  To the east of the Steelite site and to the west of the city centre lies a large site. Tesco applied in 2003 for planning consent to develop it as a superstore.  As was common procedure with important applications of this sort, it was called in by the Secretary of State and a public enquiry was held in October 2004.

24.  Notice was given that the Secretary of State had approved Tesco's planning application on 19 May 2005, eight days after the sale of the property by the company to TMK.  The decision to transfer the property to TMK had been made in March 2005, and it is not suggested that the decision or the transfer were deliberately made in advance of the announcement, so as to justify a lower price.

25.  While the outcome of the Tesco application could not be predicted with certainty, it received strong backing from the local authority and the valuation experts are

agreed that it would be assumed as at 11 May 2005 that planning consent would in all probability be granted.

26.  The significance of a successful application by Tesco is a matter of some dispute between the experts, which I will address later in this judgment.  At this point, I will simply note the two aspects of it which may be of significance.  First, a major development such as a Tesco superstore can attract other developments to the surrounding area.  Secondly, as part of its application, Tesco offered to fund a major link road connecting the ring road to the south with Etruria Road to the north.  Again, the significance of this is in dispute.  On the one hand it would greatly improve road access to the area including the property.  On the other hand, it would act as a physical barrier between the property and the city centre.

### The Holdcroft group and property holdings

27.  The company and TMK were both subsidiaries of Holdings and part of a largely successful group of companies, mainly engaged in dealing in new and used cars and car servicing.  The business has been built up by Terence George Holdcroft who started the business in 1966 and remains the principal shareholder.  The group now has retail franchises with ten car manufacturers and operates on a number of sites in the Stoke on Trent area.

28.  In a re-organisation in 1995, all the companies then owned by Mr Holdcroft were brought under Holdings.  As part of this re-organisation, the company was acquired off the shelf to act as the property holding company for the group.  It was called Holdcroft Properties Limited and its present name was adopted only as a precursor to going into liquidation.  The properties belonging to the various trading companies were transferred to the company.

29.  The property was purchased by the company in 1998 from the receiver of a major car dealer at a price of £2.1m with an additional £150,000 for fixtures, fittings, plant and machinery.  The property was shown in the company's accounts at its total cost of £2,279,033.  It was purchased to be used in the group's car dealership business and has been put to a variety of uses : second-hand car sales, repairs and bodywork, fleet sales and the pre-delivery inspection of new cars.  It became the group's principal car compound and an integral part of the group's operation, as continues to be the case under a lease from the freehold owners to whom it was sold in October 2006.

30. In 2002 and 2003 Mr Holdcroft was advised that as a result of tax changes introduced by the Finance Act 2002 it was disadvantageous for the group's properties to continue to be owned by the company.  In September 2003 all the properties owned by the company, except for the property, were transferred to various trading companies in the group.  The property was excluded because at that time it was subject to a conditional contract of sale to an unconnected third party, as a result of which stamp duty at the full rate would be payable on an intra-group transfer.

31. The property was transferred out of the company by the sale to TMK in May 2005, some time after it had ceased to be subject to any conditional contract of sale. The proceeds of sale were paid to the group's bank which had a legal charge over the property.  It is not alleged that the sale was motivated by a desire to put the property beyond the reach of creditors of the company, at least in these proceedings.  The

company's principal external creditor commenced proceedings in July 2008 for relief under s.423, as well as s.238, of the Insolvency Act 1986 against TMK and others. The proceedings were stayed following the issue of the present claim, to await its outcome.

*The liquidation of the company*

32.  The insolvent liquidation of the company occurred as a result of liabilities to the lessor of a site in Widnes from which a car franchise had been operated. One of the group companies acquired the franchise in October 2003 and the company took an assignment of the lease. This franchise traded at a substantial loss and was terminated in 2006. Trading ceased at the Widnes property and the company was left without funds to meet its liabilities under the lease. It went into creditors' voluntary liquidation, as I have mentioned, on 23 February 2007. Its liabilities to third party creditors, as claimed in the liquidation are £365,000 due to the lessor of the Widnes site and £6,000 due to HMRC. In addition, there is a debt of £498,000 claimed to be due to Holdings. Interest, amounting in total to £257,000, would be payable on these debts in the event of a surplus of assets over proved debts. In addition the costs of the liquidation, excluding the costs of these proceedings, amount to £134,000. The company has no assets.

*Value of the property in May 2005:introduction*

33.  The valuation experts are now agreed that the existing use value of the property in May 2005 was in the range of £2m-2.25m. This was the range at which the respondent's valuation expert placed the existing use value. The applicants' expert put it at just £2m, in a preliminary report prepared in July 2008 and repeated in his report for these proceedings. It accords with the view of Lambert Smith Hampton who prepared two reports in 2005, the first for the Holdcroft group's bank in April 2005 and the second for the group itself in July 2005. The issue is the amount, if any, to be attributed to hope value.

34.  The applicants' case is that the prospects in May 2005 for a successful re-development of the site were sufficiently good that the market value at that time was about £3.3m. They attribute a hope value of between £1m and £1.3m to the property.

35.  In order to arrive at this conclusion, it is of course necessary to identify the type or end-use of such re-development. As will become apparent, there was for four years or so up to mid - 2004, some material prospect that the property could be developed for large-scale retail use. If planning consent could have been obtained for this use, it would have maximised the value of the site. The experts are however largely agreed that there was little chance of such consent by May 2005 and the applicants do not advance a case for hope value based on large-scale retail development.

36.  Until the start of the trial, the applicants' pleaded case was that the most likely suitable use for the property was residential development. The respondents did not oppose an amendment put forward during the course of the trial, that "the most suitable use for the Property, as expanded in the BJB report dated 7 May 2010 [their valuation expert's report], involved some residential development either solely or as part of a mixed use scheme". In fact, there was only the barest discussion in their expert's report of the likely re-development.

37. In the joint report of the valuation experts, which in substance is a summary reiteration of the reasons for their conflicting opinions, the applicants' expert suggests that the mixed use would incorporate residential and retail uses. A further suggestion of the addition of hotel use was not really pursued at trial, and would in my view on the evidence be highly improbable. In his opening skeleton Mr Maynard-Connor, appearing for the applicants, submitted that hope value existed because there was a realistic chance that the property would be granted planning permission for alternative uses, "whether residential use only or mixed use – residential/retail and leisure".

38. It was only in the course of cross-examination that the outline of the applicants' alternative use crystallised to the point of identifying in broad terms the relative sizes and character of the suggested residential and retail development. Ultimately the outline of the scheme on which the applicants based their case involved blocks of apartments on the lower level, with a density of not less than 30 apartments per acre, and retail development on the upper level involving a bulky goods or motor parts store with an area of about 5,000 sq ft and associated car parking.

39. As the bulk of this development, representing about four-fifths of the ground area, would be residential, I am satisfied that the planning and valuation issues are much the same as if the whole site were to be residential. I consider it reasonably likely that consent could have been obtained for bulky goods retail use on the upper level. The real issue relates to the prospects, if any, for consent for residential development, either on the whole site or on the lower level.

40. The expert evidence of both sides in this connection was in large part directed at establishing the chances of a grant of planning permission existed as at May 2005. However, in the course of cross-examination, particularly of the defendants' valuation expert, and in closing, the emphasis of the applicants' case was not so much focussed on immediate prospects as on a perception in May 2005 that in a changing planning environment there was a good prospect that over a longer period, perhaps after about two years, planning permission would be granted. I will consider these aspects when I deal with the expert evidence.

41. There are also important factual matters on which the applicants rely in support of their case that the price agreed for the sale of the property in May 2005 was a significant under-value. There are essentially three matters. First, there were a series of offers and agreements between late 1999 and 2004 for the purchase of the property, in some cases at prices very substantially in excess of £2.2m, but all of these were conditional on the grant of planning consent and in most cases for retail use. Secondly, the property was re-valued in the company's accounts for the year ended 30 September 2000 to £3.2m, on the basis of a director's valuation. Following its transfer at cost to TMK, it was re-valued back to £3.2m in TMK's accounts, again on the basis of a director's valuation. Thirdly, in July 2006 TMK received an unsolicited offer to purchase the property for £3m. This offer was rejected but quickly increased to £4m. It was not conditional on any planning consent and was subject to a lease back of part of the property to Holdings so that the group could continue to use the property in its business. Contracts were exchanged on 12 September 2006 and completed on 24 October 2006. It was from the profit arising on this purchase that TMK declared a dividend of £1.5m in favour of Holdings.

42. I will consider the sale of the property in 2006 later, after dealing with the expert evidence. But I will deal now with the other two factual matters.

*Offers for the property 1999-2004*

43. There was substantial interest in the site between 1999 and 2004, principally for potential large-scale retail use. In November 1999 the company received an offer of £2.5m for the property, conditional on planning consent for retail use, from agents acting for Characin Developments Limited (Characin). The offer was rejected. Characin returned in May 2000 with an offer to take a 3 year option to purchase the property for £4m, conditional on retail planning consent and the acquisition of the adjacent Steelite site. There were discussions with Characin but no agreement was reached.

44. In September 2000 the Holdcroft group instructed GVA Grimley to assist in relation to a possible realisation of the property. This resulted in an approach in January 2001 from Henry Boot Developments Limited (Henry Boot) which was interested in acquiring the property and the Steelite site. An offer was in due course indicated to acquire both sites at a total price of £8.75m, conditional on retail planning consent, but no formal offer was made because the main board of Henry Boot did not give approval.

45. In April 2001, Helical Retail Limited (Helical) proposed a contract, conditional on retail planning consent, for the acquisition of the property and the Steelite site at a combined price of £9.213m. This led Grimley to contact Henry Boot and another property developer, Asda Properties Limited, to invite proposals. Henry Boot and Asda Properties offered respectively £8.75m and "a minimum" of £3.5m (quickly increased to £8.75m) for both sites, conditional on planning consent for large-scale retail use.

46. In July 2001 the company and Helical entered into a contract with a term of 30 months for the purchase of the property at a price of £5.54m, conditional on a number of matters including retail planning consent. A similar conditional contract was made at the same time with the owner of the Steelite site.

47. In November 2001, Helical submitted a planning application for both sites for non-food retail development, a drive-through restaurant, a hotel/leisure unit and a pub/restaurant. It was withdrawn in August 2002. A similar application was lodged again by Helical in November 2002, principally it appears to give Helical standing to object to a large-scale development proposed on a 5.5 hectare site at the edge of Hanley town centre at Waterloo Road by Lear Management Limited (Lear). A public inquiry took place in relation to Lear's application for the Waterloo Road site between 26 November and 6 December 2002.

48. In January and February 2003 it became clear from correspondence and meetings with Stoke City Council officials that the second Helical application was meeting considerable opposition from the Council, with a large number of sites seen as preferable to the property and Steelite site. Helical withdrew its application in August 2003 and lost interest in pursuing the development of the property. The company's agreement with Helical was formally terminated in March 2004.

49. In February 2004 there were discussions with another developer, Morbaine Limited (Morbaine) which put forward proposals for an acquisition of the property and the Steelite site at a combined price of approximately £12m, conditional on, amongst other things, retail planning permission and unconditional agreements with end-users. Heads of terms were agreed in April 2004.

50. The arrangement with Morbaine was, critically, dependent on the retail development proposed by Lear at Waterloo Road not proceeding. A grant of permission for that development made it very unlikely that consent for a large-scale retail development at the property and the Steelite site would be granted. It was for this reason that Helical had ensured it had standing to be represented at the public enquiry which took place in November/December 2002. In December 2003, the Secretary of State indicated that he was minded to agree to the grant of planning permission for the Waterloo Road development. Permission was subsequently granted. In April 2004, Morbaine issued an application for judicial review of the decision to grant permission, but the application was refused in August 2004. Morbaine pursued no further interest in the property or the Steelite site.

51. On 8 March 2004 Anthony Bland, an agent who had acted for Characin in 2000, had written to Mr Holdcroft, confirming an interest on behalf of Broad Street Properties Limited in acquiring the property and suggesting a proposal for an option period of "say, one year, during which we would obtain the necessary consents for the development". If the option were exercised, the price would be "in the order of £500,000 per acre". Mr Bland was not specific as to the use for which he would seek planning consent. This approach was rejected, the group confirming that it fell well short of its requirements and that the group's best interests were in pursuing a retail application with adjoining owners. Against the background of the discussions then taking place with Morbaine, this response is not in the least surprising.

52. An approach, apparently on behalf of Lear, was received in September 2004. The response was a request that Lear contact the group but it never did so. Mr Holdcroft and Mr Shenton, the group's property manager and consultant, were right to treat this approach as not serious or, as Mr Shenton put it, a fishing expedition.

53. In November 2004 King Sturge, property consultants, prepared a report for the owner of the Steelite site, which recommended that it be promoted for the bulky goods retail sector, with units totalling 115,000 sq.ft. Apart from a bulky goods outlet of about 5,000 sq.ft on the upper tier, this type of development is not put forward by the applicants as a basis for hope value for the property in May 2005.

54. There was no further interest shown by developers in a large-scale retail scheme, or indeed any other scheme, for the property. It seems clear that the grant of permission for retail development at Waterloo Road ended any real prospects for such development at the property. As I have earlier mentioned, the experts are agreed that by May 2005 there was little chance of permission being granted for extensive retail development.

55. For this reason, the various offers and proposals in the years 1999 – 2004, all of them conditional on planning permission and all of them except Broad Street Properties' approach conditional on retail planning permission, provide no basis for a conclusion that there was hope value in the property in May 2005. The approach

from Broad Street Properties in March 2004 was in vague terms and offered a total of only £2.8m if permission for an unspecified use were granted.  It provides no basis for any hope value in May 2005.

*Revaluations of the property in the accounts of the company and TMK*

56. The original revaluation in the company's accounts for the year ended 30 September 2000, increasing the book value by £1m over cost, was prompted, and as it seems to me justified, by the interest being shown in the property for retail development.

57. The directors took no valuation advice on the revaluation amount.  It was essentially Mr Holdcroft's decision and his evidence was that the amount was "plucked out of the air really" and was, he thought, a conservative figure in the light of the offers then being put forward.  It is not clear exactly when the revaluation was decided but it could have been at any time until shortly before the accounts were approved in June 2001 by when offers had been received from Helical, Henry Boot and Asda Properties.

58. I have previously referred to the decision taken in August 2003 to transfer properties out of the company to other group companies.  This followed advice from Christopher Kane, the group's principal tax advisor as well as auditor that as a result of changes introduced by the Finance Act 2002 it would be advantageous if the properties were held by the operating companies.  As evidenced by an email to the group's solicitors, all the properties held by the company were to be transferred to operating companies at book value, including the property at its re-valued book value of £3,258,288.  The transferee was to be TG Holdcroft (Motors) Limited, chosen because it was using the property more than any other group company.

59. The transfer of the property did not then proceed, only because the group's solicitors advised that stamp duty relief for intra-group transfers would not be available, because of the conditional contract with Helical.

60. Following the end of any likelihood of a large-scale retail development of the property and the end of any interest from developers, Mr Holdcroft concluded in March 2005 that the process of transferring properties out of the company should be completed with the transfer of the property, which he assumed would be effected at the re-valued book value.

61. Mr Holdcroft briefly discussed the matter with Mr Kane in early March 2005. Three significant points were raised.  First, Mr Kane advised that while the profit over cost realised on the transfer by the company could be distributed by way of dividend to Holdings, it could not be distributed out of Holdings.  He advised that the transfer should be at cost (including the cost of any improvements).  Mr Holdcroft's evidence was that Mr Kane was emphatic about this.

62. Secondly, Mr Holdcroft was concerned at how a transfer at less than re-valued book value would affect the group balance sheet.  His concern was that the reduction would be picked up by car manufacturers and would affect the amount of credit allowed to the group.  Mr Kane advised that in the transferee's accounts it could be

re-valued back to the existing re-valued amount, as long as the accounts made clear that it was a directors' valuation.

63. Thirdly, Mr Kane advised that the transfer should be made to a non-trading company, so that if the property was at any time sold, there would be the option of offering to sell the company, as owner of the property, and thereby reduce the stamp duty charge.

64. Mr Holdcroft accepted Mr Kane's advice on these matters and gave instructions to the group's solicitors to proceed on that basis on 10 March 2005. TMK was chosen as the transferee. It was necessary to obtain the consent of Barclays Bank, the group's bankers, which had a first legal charge on all the group's properties.

65. In February 2005, Barclays Bank had instructed Lambert Smith Hampton (LSH) to prepare a valuation of the group's properties. The valuation was dated 15 April 2005 and placed a market value of £2m on the property. When Mr Holdcroft became aware of this, he asked Mr Kane whether this affected the price at which it should be transferred. Mr Kane advised it should be the higher of cost and market value. The transfer was completed on 11 May 2005 at a price of £2,279,331.

66. Mr Holdcroft requested Mr Shenton to obtain a valuation of the property from LSH addressed to the company. The valuation report for Barclays Bank had also contained two errors, that the property was included in the proposed site of the Tesco superstore and that the company had entered into a contract with Tesco in relation to it. LSH had expressly excluded this incorrect assumption from their market value figure.

67. The valuation report of the property prepared by LSH for the group was dated 4 July 2005. It gave a figure of £2.2m as the market value of the freehold interest in the property. Under the heading "valuation considerations", the report stated:

> *"Our valuation assumes that the existing buildings continue to be utilised for B1 or Motor Trade use and the allocation of the site stays as industrial/B1. If the Retail Study changes the allocation to retail or leisure the value of the land for development could be substantially enhanced. Once the Tesco store is developed we would expect pressure to build for a change of use for this site, as the area generally improves and road communications are enhanced. At present it is too early to tell how quickly the area will change and how this will ultimately affect values. Our valuation does show some enhancement since we last valued the property to reflect hope value."*

68. In March 2006, the accounts for the Holdcroft group and for the individual companies within the group were approved. The re-valuation reserve of £1m in the company's accounts had been released on the transfer of the property at cost to TMK. The property was included in TMK's accounts at £3,292,701, with a note in the following terms:

> "*The freehold land and buildings were transferred at cost from Holdcroft Properties Limited on 1 May 2005. The property was subsequently re-valued on an open market basis by the directors during the period 1 May 2005 to 30 September 2005.*"

69. The group accounts continued to show the property at the slightly different figure of £3,280,513 and continued to contain the following note:

> "*The freehold land and buildings were valued on an open market basis by John E Keenan, an independent chartered surveyor and the directors. All sites were valued in April 2004 with the exception of Clough Street, Hanley which was valued during the period ended 30 September 2000. These valuations were included in the previous years' financial statements*"

The property had not been valued by John E Keenan but only by the directors.

70. Mr Holdcroft's evidence was that he had never read the note in TMK's accounts and that it was factually wrong. He, and the other directors, had not re-valued the property on an open market basis, nor had any decision as to its book value been taken in the period 1 May to 30 September 2005. His concern was only that the book value should remain the same in the group accounts, so as not to affect adversely its credit position with car manufacturers. He was content to accept Mr Kane's advice that it could be included at the re-valued amount, provided that the accounts made clear that it was a directors' valuation (or "only" a directors' valuation, as Mr Holdcroft put it in his oral evidence). Mr Holdcroft gave no thought to whether the re-valued amount, adding £1m to its cost, was still a proper figure. Mr Kane supported this evidence, and said that as auditor he was not concerned because the figure was not material in the context of the group accounts. I doubt that the same could be said of TMK's accounts, which were also audited by Mr Kane's firm.

71. This case is not concerned with whether Mr Holdcroft, or indeed Mr Kane, behaved properly in relation to the issue of re-valuation.

72. I am concerned with whether Mr Holdcroft in fact addressed the question of the market value of the property, and, if he did, whether he had a sound basis for including the property at its re-valued amount in the 2005 accounts.

73. Having heard Mr Holdcroft's evidence, I am satisfied that in its essentials it was truthful. I accept that his only concern was whether the group's standing with the car manufacturers would be damaged and that, acting on Mr Kane's advice as he understood it, he was content to see the re-valued amount in the accounts without giving real thought as to whether that amount could in fact be justified as its market value. The only advice as to its market value was provided by LSH in July 2005, which indicated that the re-valued amount exceeded market value by nearly £1.1m. Mr Holdcroft said that he gave no consideration to LSH's valuation in relation to the book value of the property, evidence which I find it difficult to accept. I think it more likely that he decided to ignore it, and so avoid any difficulties with the car manufacturers.

74. These findings do not reflect well on Mr Holdcroft's conduct in relation to the accounts. Equally, however, I am satisfied that the manoeuvres with the accounting entries in the 2005 accounts provide no basis for a conclusion that the property was transferred to TMK at an under-value in May 2005.

75. Mr Maynard-Connor submitted that the decision to transfer the property to TMK, a non-trading company, so as to facilitate any future sale, showed that a direct or indirect sale of the property was envisaged. It clearly shows that a future sale of the property separate from any business was seen as a possibility, but in my judgment it shows no more than contingency planning and does not assist the applicants in establishing any hope value as at May 2005.

*Expert evidence*

76. The parties called experts in three areas, remediation, planning and valuation. The valuation of the property would very largely depend on remediation costs and the prospects for planning permission for alternative use. Without a sufficient prospect of receiving planning permission, there was no hope value. The amount of any hope value could be significantly affected by the likely remediation costs.

*Remediation*

77. Remediation or abnormal development costs are costs which must be incurred to bring a site to the condition required for development for its intended use. In effect, it is the costs required to bring a brownfield site to a condition equivalent to a greenfield site. Dealing with toxic land and old mine-workings are examples. The costs have a direct impact on the cost of development and therefore on the profit to be made on a development. In turn, these costs therefore affect the market value of a site with development potential. It is in the interests of the applicants to pitch these costs for the property as low as possible and, conversely, in the respondents' interests to pitch them as high as possible.

78. In October 2001, Thornton-Firkin and Partners (Thornton-Firkin), chartered and quantity surveyors, produced for Helical Bar a ground-works estimate for a retail scheme on the combined site of the property and the Steelite site. This estimate was based on a geo-environmental investigation and assessment and drawings produced by Roscoe Capita Limited, consulting civil, structural and geotechnical engineers, and by architects. The estimate was prepared as a feasibility estimate for Helical Bar before it entered into a conditional contract for the purchase of the property, with costs based on Thornton-Firkin's knowledge of similar schemes in the Stoke on Trent area. Essentially, Roscoe Capital devised the scheme and Thornton-Firkin costed it.

79. The total cost was estimated in 2001 by Thornton-Firkin at £1.38m. In response to the prospect of a claim that the property had been sold at an undervalue, Holdcroft Holdings instructed Thornton-Firkin in 2008 to prepare an estimate as at May 2005 for the remediation costs associated with a development of the property on its own without the Steelite site, for residential purposes. To produce this estimate, Thornton-Firkin adjusted their 2001 estimate by excluding the Steelite site, making provision for work required for residential development, and allowing for cost inflation between December 2001 and May 2005.

80. The revised estimate totalled £2.16m.  It included additional works required for residential development costed at £190,841 but the principal reason for the increase from the 2001 estimate was the inclusion of £600,000 as an allowance for imported landfill material which under the scheme for the two sites would have been obtained from the Steelite site.

81. On the instructions of the applicants, Hydrock Special Projects Limited (Hydrock) prepared an estimate in December 2008 of remediation costs as at May 2005, which totalled £1.16m.  This was on the basis of a commercial, rather than residential, development. The business of Hydrock is engineering and environmental consultancy and contracting, specialising in remediation work.

82. The experts called by the applicants and the respondents are from Hydrock and Thornton-Firkin respectively.  The applicants' experts were Eric Cooper and Jonathan Ridgeway, respectively a technical director and a commercial manager with Hydrock. Mr Cooper's expertise lies in devising remediation schemes, while Mr Ridgeway's experience is in costing works for estimates and tenders.  Mr Cooper had prepared the letter in December 2008 identifying remediation solutions for the property and providing a costs estimate.  Mr Ridgeway was not involved in it.  Mr Cooper has 36 years' experience in land remediation and manages Hydrock's Stoke on Trent office in Hanley.  He is familiar with ground conditions in the area from other development projects.  Mr Cooper's methodology was to assess the land quality conditions of the property based on a review of information contained in the reports prepared by Roscoe Capita in 2001, Thornton-Firkin in 2001 and others.  Using that assessment he identified remediation requirements for commercial and residential end uses.  Those works were then costed by Mr Ridgeway on the basis that Hydrock was tendering for the work in 2005.  The total costs are stated in their report as just over £1m for commercial use and £1.2m for residential use.

83. I should mention here that in their report as originally served, these costs were stated in paragraph 6.2 as a little over £1.3m and £1.5m respectively, without any costs schedule to show the constituent elements despite a reference to a costs schedule in paragraph 6.1.  The lower figure of £1.2m for residential use appeared as Hydrock's figure in the joint report of both sides' experts.  The respondents were understandably concerned about these higher figures and both Mr Cooper and Mr Ridgeway were cross-examined about them.  Neither could understand what these figures were or why they appeared in the report as served.  Both said that they did not represent costs estimates made by them for the property, and I accept their evidence.

84. The respondents called Stephen Thomas Holman, a quantity surveyor for over 40 years and a partner in Thornton-Firkin since 1978.  His methodology was to assess the estimates prepared by Thornton-Firkin in 2001 and 2008-9 and  to consider whether they were reasonable.  The elements of the remediation scheme are those identified by Roscoe Capita in 2001, adjusted so as to exclude the Steelite site.  No separate scheme was produced for residential development.  As regards costing, the figures are based on those provided by Thornton-Firkin in 2001, adjusted for building cost inflation, subject to the adoption in some cases of figures as at 11 May 2005 quoted in 2008-09 by Hydrock

85. Mr Holman did not himself devise a remediation scheme, and he readily accepted that he was not qualified to do so. He explained that he is not a remediation expert, and that his field is construction costs and procurement.

86. A very significant difference between the figures produced by Hydrock and Thornton-Firkin depended on whether the ground level of the lower tier of the property would be raised and therefore whether landfill material would be needed. Thornton-Firkin had included a figure of £600,000 for this cost. While raising the ground level of the lower tier had formed part of the proposals for a joint development of the property and the Steelite site as a single retail site, it would not necessarily be essential to a development of the property on its own. The applicants' case is that the property could have been sold in May 2005 with a view to residential development on the lower tier and either residential or, more likely, bulk retail use on the upper tier, without the need to raise the level of the lower tier.

87. Taking account of this point, Mr Holman's report includes figures on alternative bases which totalled, for a residential scheme, £2.4m if the lower tier level were raised and £2.26m if it were not. It might be expected that this latter figure would be significantly lower, but this is not the case largely because Mr Holman adopted, for some items, figures which appeared in Hydrock's estimate prepared in December 2008.

88. The joint report of the experts records a reduction in Mr Holman's estimate to a little over £2m, leaving them some £800,000 apart. The difference between them is largely accounted for by four items.

89. First, Mr Holman allows £231,150 for reconstruction work to the retaining walls which run along three sides of the lower tier of the site. There is no evidence that they are not sound, but Mr Holman's view was that because of its importance, provision for this item would be made at the pre-purchase stage, although all or some of it might not in the event be needed.

90. I am satisfied that without evidence to justify a provision of this size, a developer would not factor it into his assessment of the price to be offered for the site. It seems likely that the vehicle ramp on the eastern side of the property would need widening, therefore requiring a new retaining wall against the side of the ramp, and some provision would be required for it.

91. Secondly, Mr Holman allowed £50,000 for a pumping station and associated works to pump drainage from the lower to the upper tier. He agreed in cross-examination that this was unnecessary, in the light of more detailed plans of the existing drains than he had not previously seen.

92. Thirdly, there were significant differences in the estimates for some of the remediation works. Mr Holman used in his report estimates provided by Hydrock in December 2008. Mr Cooper who was responsible for these estimates explained that they were conservative figures of a type which might be provided at a preliminary stage. A serious prospective purchaser was likely to look closely at remediation costs before finalising a purchase offer, as in fact happened in relation to a number of the prospective retail schemes.

93. The figures provided by Mr Ridgeway for the report produced for these proceedings, which were significantly lower for some items, represented the figures at which, in Mr Ridgeway's opinion, a specialist remediation contractor would be prepared to tender as the basis of a binding commitment. The difference for remediation costs including imported material to fill hot spots (contaminated areas), is just over £202,000.

94. In the joint report, Mr Holman accepted that "based on its experience as a remediation contractor, Hydrock may be able to provide alternative, less expensive ways of meeting the same objectives" as those addressed by his own more expensive estimates. Nonetheless, he considered that Mr Ridgeway's figures were untested in a competitive process and that a prospective purchaser would adopt a conservative approach at the stage of deciding his offer for the property, and hope to make savings as the work progressed.

95. Hydrock are specialist remediation contractors whose business requires them to tender for contracts with prices which, if accepted, are binding on them. I accept that the relevant figures put forward by Mr Cooper and Mr Ridgeway for these particular works represent prices which would have been quoted by Hydrock in 2005, and could have been relied on by a developer deciding whether and at what price to offer for the property. The same goes for the sub-contract quotation for shallow mine workings, where the difference is just over £131,000. Mr Ridgeway was not challenged in cross-examination on any of these figures.

96. Fourthly, Mr Holman proceeds on the basis that a specialist contractor such as Hydrock would be engaged by the main contractor as a sub-contractor. This adds nearly £185,000 to his estimate, representing the main contractor's overheads and profits. Clearly, some developers will wish to deal only with one contractor and may regard that as a price worth paying. However, provided that the works were scheduled to occur before the start of the main contractor's work, I see no reason why a developer should not save himself this not insubstantial sum and engage the remediation contractor directly. It appears from Mr Cooper's evidence this occurs with some regularity.

97. Overall, I accept the figures put forward by Mr Cooper and Mr Ridgeway as a reliable guide to the provision for remediation costs which a prospective purchaser would make when deciding a price to offer for the property. Provision would need to be made for the construction of a new retaining wall along the length of a widened ramp. A figure of, say, £50,000 appears appropriate for this item, which would almost certainly be carried out as part of the main contract along with widening the ramp (the cost of which is not covered in the evidence).

98. It was submitted for the applicants that, as (i) their case involves a mixed residential/commercial scheme, (ii) remediation costs are lower for commercial end-use than for residential end-use and (iii) the Hydrock figures are for an exclusively residential scheme, I should proceed on the basis of a reduced figure. I do not propose to do so, as the commercial element is confined to the upper tier, whereas the bulk of the suggested development is residential. Any saving is insufficiently material to be taken into account, save perhaps as providing an increased contingency provision.

99.  The respondents submitted that it must be reasonably likely that the remediation costs would have been somewhere between Hydrock's figure of £1.2m and a figure of about £2m put forward by Mr Holman and that the prudent buyer would have budgeted for about £1.5m-£1.6m.  Having considered the differences between the experts' respective figures, I do not think that this approach is justified.  The evidence satisfies me that a prospective purchaser, particularly in a competitive situation, would wish to quantify these costs as closely as possible.  If a bidder builds in too much provision for remediation costs in its offer price, it risks bidding too low a price.  It is clear that Helical Bar looked closely at these costs before it made the conditional contract for the purchase of the property and the Steelite site.  I am satisfied that, having examined the elements of the proposed works, a prospective purchaser would feel able to proceed on the basis of the Hydrock figures.  This is particularly so if, as was the evidence of Mr Cooper and Mr Ridgeway, a specialist contractor such as Hydrock would have been willing to bind itself to the tendered figures.

100.    Accordingly, allowing for the retaining wall for the ramp and for some caution, I find that a figure of no more than £1.3m would have been taken by a prospective purchaser as the remediation costs.

*Planning*

101.    Each side called an expert on planning, both members of the Royal Town Planning Institute and both with experience in the Stoke on Trent area.

102.    The applicant's expert was Carl Copestake, who has 17 years planning experience in the private and public sectors.  He was employed for eight years prior to May 2005 by Stoke on Trent City Council, working in the areas of development control and regeneration and is now director of planning with a town planning consultancy.

103.    The respondent's expert was Gerald Willard, who has been in private practice for the last 10 years but before then was employed by local authorities in Staffordshire.  Between 2004 and 2009 he acted for a number of clients seeking to obtain permission or allocations for residential development in North Staffordshire, including companies in the Holdcroft group, and he also issued a written submission on behalf of the Holdcroft group in relation to the property in July 2005.  Having heard his evidence, I am satisfied that Mr Willard's independence and objectivity were not compromised by these connections.

104.    When expert reports were originally exchanged, the applicants did not produce a separate planning report.  They relied on the valuation report of Robert Elliott who had made his own assessment of the prospects of obtaining planning permission for a new development on the property.  It was clear from his oral evidence that he continued to rely principally on his own assessment.  Mr Copestake's report was produced in response to the report of Mr Willard for the respondents.

105.    The explicit terms of reference of each expert's report were the prospects of receiving planning permission for the property on or about 11 May 2005.  It is important to underline this, because much of the way in which the applicants' case was put in closing was that a developer purchasing the property in May 2005 would have waited perhaps two years before making an application.  The planning experts

concentrated on the prospects for planning permission for residential development, as this was the pleaded basis of the applicants' case until amended during the trial. However, as the applicants' case continued on the basis that most of the property would be developed for residential use, the amendment makes no significant difference and the central issue remains the prospects for planning permission for residential development for the majority of the property.  So far as obtaining permission for some retail use, such as bulky goods, on the upper tier, there is no good reason on the evidence for considering that permission would not be granted, but the upper tier is only about one-fifth of the entire site.

106.      Mr Copestake based his opinion primarily on the documents comprising the development plan for the Stoke-on-Trent area in May 2005, as to which s.38(6) of the Planning and Compulsory Purchase Act 2004 provides:

> "*If regard is to be had to the development plan for the purpose of any determination to be made under the Planning Acts the determination must be made in accordance with the plan unless material considerations indicate otherwise.*"

He also had regard, as material considerations, to a number of national planning policies and to the Renew Housing Market Renewal Prospectus (2004) which has a particular importance on the basis of both experts' evidence and to which I will refer later in more detail.  Mr Copestake's opinion is that, as a brownfield site in an urban location close to the city centre in Stoke-on-Trent which itself was identified as a major urban area in the Regional Spatial Strategy for the West Midlands (RSS 11) (June 2004), development of the property for housing, or a mixed use involving a substantial amount of housing, would have conformed to the development plan and other material considerations.  It was, he said in his oral evidence, suitable for housing.

107.      Mr Willard's evidence was that there was little or no prospect of a successful application for residential development on the property, because it did not lie within the city centre or within one of the areas of major interventions (AMIs) identified in the Renew Housing Market Renewal Prospectus.  This prospectus was submitted by Renew North Staffordshire, with the full support of the Stoke on Trent City Council, to central government in March 2004.  The background to this is that in 2002, the government announced the creation of nine market renewal pathfinders, in areas in the North of England and the Midlands with housing market weaknesses. One of the areas was North Staffordshire, including Stoke on Trent, and Renew North Staffordshire (Renew) was established as the "pathfinder" for that area.  It was, and remains, responsible for securing funding, attracting public and private sector investment and co-ordinating efforts with a view to a revival of the housing market in North Staffordshire.  In particular, it worked with the local authorities in the area. The government created the Housing Market Renewal Fund in 2003 with funds of £500m, increased to £1.2 billion in January 2005, to support the work of the pathfinders.

108.      The prospectus identified four first phase AMIs, including Hanley South and a further four second phase AMIs.  The property is close to the Hanley South AMI but not within it, nor is it within any of the other AMIs.

109.    As mentioned above, the prospectus was strongly supported by Stoke on Trent City Council, which was the relevant planning authority. The evidence showed that the planning officials in Stoke on Trent consistently recommended applications for significant residential development for approval only if they were for a site within an AMI. In most cases the recommendation was followed. In Mr Willard's opinion, consistently with this evidence, an application in May 2005 for planning consent for significant residential development on the property would have been refused, whether alone or as part of a mixed use scheme.

110.    Mr Copestake accepted that officials consistently recommended against consent for significant residential developments outside an AMI and he also accepted that the likelihood was that an application for housing development on the property would not get planning officer approval. However, "while the LPA officers largely supported Renew's objections", he explained in his oral evidence:

> "*A. I am of the opinion that had a well-crafted planning application been submitted around that time, it had worked with Renew and not against them and you worked with the officers, then a planning application would have every chance of having support from the officers.*
>
> *Q. But you accept, do you not, in your report (and you make some criticism of it) that Renew were not going to agree to a residential planning application outside an AMI?*
>
> *A. No. Renew were objecting to planning applications at the time, but that was where those applications fell primarily in suburban areas. This is different, Clough Street is different. It is because it is on the fringes, if you like, on the doorstep of the sub-regional centre. It had a lot of positives going for it, it was previously developed land, arguably one of the most sustainable locations in the North Staffordshire. The site was large enough to accommodate a planning application of mixed uses. I feel that it would have been an attractive proposition for Renew to have supported, and you could have shown that it aligned with the Housing Market Renewal objectives.*
>
> *Q. Is there any evidence of a planning officer supporting an application in early 2005 in circumstances when a site was outside an AMI and contrary to the Renew policy?*
>
> *A. No, but I haven't seen any evidence that demonstrates that a local planning authority were in a position to have had an application presented to them that fell within such a sustainable location as this.*
>
> *Q. Well.....*
>
> *A. Because the Renew Prospectus was very much about City Centre living as well. And what Hanley, which was the City Centre of Stoke, was not doing at the time, it didn't have any*

*City Centre apartments, there was no City Centre living and the Renew Prospectus was about that. And this site could very much have supported that type of residential accommodation. So that type of application was not before the officers around that time.*

*Q. But any purchaser would only have evidence of the, and I think you used the phrase, somewhat "blanket" policy being adopted by Renew of saying no, would they not?*

*A. Well, that was the evidence, but what they hopefully – my job is also to give them a professional opinion, that it would be worthwhile talking and working with Renew, with the local planning authority to demonstrate how a planning application could align with the prospectus.*

*What I would say to a prospective purchaser is that the evidence so far, it's poor examples really. There is no example where you have got a planning application that would have a very good chance of being successful on a site like this.*

*Q. But there was not one illustration you could draw to the attention of that purchaser to say that Renew had been shifted from that policy, was there?*

*A. That's correct at that time, yes.*"

111.    If an application was not supported by the planning officials, Mr Copestake said that an application could nonetheless have been approved "had councillors been convinced that the proposal was in accordance with the development plan", and he instanced two applications in April/May 2005 for 34 apartments and 24 apartments. As they were in suburban areas, they were in his view less likely to be approved than a scheme close to the city centre. However, as he accepted in oral evidence, both were much smaller sites and both were disused pubs in residential areas.

112.    Mr Copestake referred in particular to the planning official's report on one of those applications, in which they pointed out that the site of the proposed development lay outside any AMI and also outside the boundaries of proposed area action plans in the "embryonic" local development plan. Mr Copestake relied on the fact that not only was the property in an inner city, as opposed to a suburban, area but also that it lay within a proposed area action plan. Since the committee members had overturned the officials' recommendation in that case, there were therefore real prospects that they would do so in the case of the property. It does not seem to me to be possible to argue from that application, which was for a smaller development in the middle of existing residential area, that there was a good chance of a grant of planning permission for the property against the advice of the officials.

113.    It is worth quoting from the officials' report prepared in February 2005 because it clearly illustrates the approach adopted by the officials:

"…*The current Housing Market Renewal (HMR) programme is the latest incarnation of area based housing market renewal and integrates fully with the City Plan's stated aims referred to above.  As well as the weight given to it by the City Plan, Housing Market Renewal is also supported by Policy CF1 of RSS 11 and is in its own right endorsed as government policy, the prospectus having been agreed by the Government office for the West Midlands.  Policy H5 of the Structure Plan also supports an area based approach to housing renewal."*

*Housing Market Renewal is therefore at the forefront of Development Plan Policy for housing development and provides clear guidance on where such development should be prioritised."*

It referred to the proposed Local Development Framework which was being prepared and would be subject to public consultation and stated:

"*PPG3 advocates a plan, monitor and manage approach to the delivery of new housing sites.  This would normally be done through the allocation of sites in the Development Plan but the LDF is at present too early in its production to be helpful and the existing City Plan is out of date in terms of allocations.  In the absence of specific allocations, the prioritisation of renewal areas does however provide a legitimate means of managing the City's housing delivery in the interim.*

*The need to prioritise housing development in a controlled way is heightened by the current housing supply situation.  The City has already exceeded its 2011 Structure Plan target and is well ahead of the building rates set out in RSS 11 and as such, it is currently unnecessary to provide additional housing land to meet general market needs.  Moreover, to do so would exacerbate the low market demand situation that HMR is intended to address and would divert attention and investment away from the priority sites (that are most difficult to re-develop).  To divert attention away from priority areas in an already weak market could have serious consequences for the success of the HMR programme and the key Development Plan objectives that it delivers.*

*In light of the above, priority for housing development at the current time must be given to those areas of greatest need that lie within the first phase Areas of Major Intervention (AMI) identified by HMR.  Proposed development within the second phase AMI's or the first tranche of Area Action Plans may also be considered where it contributes to HMR delivery within these or adjoining areas.*"

114.	Mr Copestake described it as "a challenge" to persuade a planning committee to grant consent against the advice of officials, but not impossible.  He

thought that there was a case to be put to the members of the planning committee. It was a question of "could" not "would", and while he did not say that it was likely that the committee would reject the officials' recommendation against permission, he thought "there was every possibility that it could have happened."

115.      If the local authority planning committee refused consent, the applicant could appeal and, as Mr Copestake states, "an Inspector may have given a favourable decision". In this connection, Mr Copestake cited four successful appeals in 2005-2006 in respect of applications for residential development which had been opposed by Renew on the grounds that the sites fell outside an AMI. Two were very small-scale, for one and four dwellings respectively. Of the other two, one in September 2006, related to an application for flats and town houses on a site with an area of 0.38 hectares. The other appeal, in December 2005, related to an application for permission to build 53 dwellings on a previously developed site near the town centre. These last two appeals related to sites with some characteristics which were similar to the property. One was in the city centre and the other was on the edge of a town centre. Both were however significantly smaller than the property and both appeal decisions were after May 2005, and so would not be known at that time.

116.      As to the overall prospects for a successful appeal, Mr Copestake considered that there was "every chance that the appeal could [or would, as per his oral evidence] have been successful". However, he agreed that it was always uncertain as to what would happen on an appeal. Mr Copestake mentions also that on a national level, 34% of all appeals across the board were successful in 2004-2005.

117.      Mr Copestake accepted that there would have been considerable uncertainty in May 2005 and he was careful not to say that it was likely that an application would succeed. I am satisfied on the basis of the evidence of both the planning experts that a prospective purchaser in May 2005 would have no confidence that planning consent would be likely to be forthcoming for significant residential development on the property.

118.      The prospects were against a recommendation by officials in favour of consent and the prospects for a contrary decision by the planning committee or a successful appeal were highly uncertain.

119.      This conclusion is not affected by the shared position of the valuation experts that as 11 May 2005 the market would have assumed that planning consent would be given (as, in fact, it was on 18 May 2005) for the Tesco superstore and associated link road. There was no evidence from either expert that this would materially improve the chances of consent for substantial residential development on the property. The furthest that Mr Copestake would go was to say that the new link would improve access, but he develops that in connection with retail, rather than residential, use. Mr Willard considered that, if anything, it was a disadvantage because the link road would sever the property from the city centre for pedestrian movement, and so make it harder to rely on proximity to the city centre. Whatever may be made of the inconsistency between that and Mr Willard's representations on behalf of Holdcroft Holdings to the city council in July 2005 in relation to the LDF, it does not help to show that the grant of consent to Tesco improved the prospects for consent to a substantial residential development.

120.    Both experts sought in their reports to gain support for their views from conversations each had with Joanne Mayne, a senior planning officer with Stoke-on-Trent City Council.  Mr Willard referred in his report to his conversation with her on 16 March 2010 and, in preparing his report, Mr Copestake spoke to her on 20 July 2010.

121.    On 5 August 2010 Ms Mayne provided a written memorandum to Mr Copestake.  On 29 September 2010 the applicants' solicitors served what purported to be a hearsay notice under s.2 (1) of the Civil Evidence Act 1995 in respect of this statement.  The memorandum is expressed in the cautious and non-committal terms that one would expect.  She writes:

> " *The City Council are not in a position to be able to provide a written statement of what the Council would have decided in 2005 had different planning applications been submitted on this site because the very nature of the planning decisions are taken on a scheme by scheme and site by site basis.  Decisions not only involve information from applicants but from public consultation comments; stakeholders; councillors and anyone with an interest in the development.  Planning applications which go through Planning Committee are decided through a democratic process.  There are therefore many varying determining factors in making such decisions that you cannot accurately speculate what may or may not be given permission.*"

She comments very briefly on seven planning applications made for other sites in 2005 and their possible relevance, but in a way which is careful not to draw conclusions as regards a hypothetical application in May 2005 for the property.  She concludes under the heading "What 'In principle' would have been acceptable on the Clough Street Site" as follows:

> "*As set out above there are both positives and negatives in this case.  The timing of any housing application at this time would also have also been a determining factor and one which cannot be answered now over five years later.  It is certainly not a case which is clear cut and by using one example which was recommended for refusal at Crane Street Cobridge at the same time, has now been given permission.  A certain level of information e.g. the nature of the proposal, would have been required and would have influenced opinion in order to determine whether the site 'in principle' would have been acceptable for housing.  The absence of a specific scheme/proposal to relate the advice to makes it all the more difficult to do anything than to provide general contextual comments as set out above.*"

122.    Ms Mayne's comments underline the uncertainty of outcome for any application for residential development on the property in May 2005.  I should, however, make clear that I regard these attempts to introduce the views, and reports of the views, of Ms Mayne as unacceptable.  Her views are necessarily expressions of

opinion on what might have happened five years ago. They are admissible therefore only as expert evidence. Expert evidence is admissible only with the permission of the court (CPR 35.4) and no directions or permission was given for her evidence.

123.    Reports by Mr Willard and Mr Copestake of what Ms Mayne has told them are inadmissible without the permission of the court and are in a wholly unsatisfactory form. At least the memorandum was in her own words, but on a contentious topic I would not have given permission for it to be admitted unless she was going to give oral evidence. This is however somewhat academic in this case because, as a serving official, it is difficult to see that it would be appropriate for her to express a personal view on the issue and she has been careful not to do so.

*Valuation*

124.    The expert valuers agreed that for the purposes of their evidence the correct approach to an assessment of the value of the property as at 11 May 2005 is as set out in the RICS Appraisals and Valuation Standards, and associated practice statements and guidance notes. Market value is defined as:

> "*The estimated amount for which a property should exchange on the date of valuation between a willing buyer and a willing seller in an arm's-length transaction after proper marketing wherein the parties had each acted knowledgeably, prudently and without compulsion.*"

Existing use value is defined as:

> "*The estimated amount for which a property should exchange on the date of valuation between a willing buyer and a willing seller in an arms-length transaction after proper marketing wherein the parties had acted knowledgeably, prudently and without compulsion, assuming that the buyer is granted vacant possession of all parts of the property required by the business and disregarding potential alternative uses and any other characteristics of the property that would cause its market value to be different from that needed to replace the remaining service potential at least cost.*"

The guidance as to hope value is as follows:

> "*Market Value will include elements of value, usually known as hope value arising from any expectation that circumstances affecting the property may change in the future. A few examples include:*
>
> •    *The prospect of development where there is no current permission for that development;*
>
> •    *The realisation of marriage value arising from merger with another property or interests within the same property.*

> *However the amount of hope value must be limited to the extent that it would be reflected in offers made by prospective purchasers in the general market.*"

The experts were agreed that if there were any hope value in the property, it lay in the prospect of permission being granted for development for alternative use. While a prospect of permission for large-scale retail use would add the most value, the experts were agreed that there was no real prospect of this by May 2005. Mr Chittenden, the respondents' expert, directed his report to the value of the property for residential development, as this was the applicants' pleaded case. The applicants' expert, Mr Elliott, was rather unspecific in his report, but his oral evidence was concerned principally with residential development. Both experts dealt with mixed use largely in their oral evidence. Even in a mixed use scheme, as put forward on behalf of the applicants, the predominant element would be residential development on the lower tier. I am satisfied that the prospects for the grant of permission would be much the same on either basis.

125.    The applicants' valuation expert, Robert Elliott, is a partner in a firm of chartered surveyors, specialising in particular in the North Staffordshire and South Cheshire region. He has a detailed knowledge of Stoke on Trent, having previously worked for over 17 years in its property services and regeneration departments.

126.    In arriving at his valuation of £3.3m for the property as at 11 May 2005, Mr Elliott assumed a 50 per cent prospect for consent for residential development with a density of 30 units per acre. He regarded this assumption as conservative. He thought the chances were much better than 50 per cent. In re-examination he put them at 75-85 per cent.

127.    There is little or no support for this view in Mr Elliott's own report. He states in paragraph 9.1 his belief that there was significant hope value attached to the property on 11 May 2005 due to four factors:

> "*The likelihood that the Tesco scheme would secure a planning consent.*
>
> *The potential strategic significance the Chatfield site had in relation to the Steelite site.*
>
> *The level of interest shown in the site by various developers*
>
> *The uncertainty prevailing in 2005 in the Council's planning policy framework which indicated, at that stage, retail consent or mixed use consent containing some retail uses could not be ruled out on the Chatfield site.*"

None of these factors relates to residential development. As already noted, consent for the Tesco superstore is not particularly significant to a principally residential development of the property. The suggested strategic significance of the property to the Steelite site rests on the view that access for any major development of the latter could only be provided over the property. However, Mr Elliott made clear in his oral evidence that he had not ascribed any value to this ransom strip possibility. None of

the interest shown in the site had been for residential development, and almost all of it had been for retail development.

128.     Mr Elliott sought to support his view in his oral evidence by reference to the location of the property and by his assessment, based on his experience of dealing with Renew and planning policy officers at the city council, that Renew would not try to prevent residential schemes in or close to the city centre and that the officials were concerned to increase the number of sites available for housing.  He relied also on draft planning documents produced in 2006 and 2007.

129.     I have concluded that Mr Elliott's personal view of the prospects for residential planning consent in May 2005 is unrealistically optimistic.  There is nothing in his evidence which causes me to change my assessment of the evidence of the planning experts, that a prospective purchaser would have viewed the prospects for a successful planning application lodged as soon as reasonably practicable after a purchase in May 2005 as highly uncertain.

130.     Mr Elliott gave evidence as to how good the prospect for the grant of planning consent needs to be in order to create any material hope value.  He said that a 50 per cent chance was a reasonable percentage to consider.  A ten or twenty per cent chance would not add hope value.  A thirty per cent chance was not appealing.  When asked what value he would put on the property if there was a 30 per cent chance of planning permission, he replied:

> "*Well, I think you would have to take a view on that, if the feedback is 30 per cent, whether that is an avenue that you would realistically want to go down.*"

131.     I am satisfied on the expert planning evidence that prospective purchasers would view the prospects for planning permission for residential development or mixed-use development with a substantial residential element as well below 50 per cent.  In my judgment, the prospects were not at a level which would lead to an attribution of any significant hope value to the property, judged by reference to a proposed application made in or reasonably soon after May 2005.

132.     In his report, Mr Chittenden concluded that no hope value would attach to the property in May 2005, in the light of a number of factors, in particular the planning situation but also other factors including the location of the property and strong doubts that it would have been attractive to residential developers.  While he valued the property on an existing use basis at £2 - 2.5m, he put its value as a purely development property at less than that:

> "*..I am of the opinion, given the risks associated with obtaining planning permission, the likely timeframes involved and most significantly the fact that the majority of the property would have been vacant at the date of transfer unless a leaseback was entered into, that a notional purchaser, on an unconditional basis would have only been prepared to proceed at below Existing Use Value and at probably less than £2,000,000 (Two million).*"

133.    This conclusion was derided by Mr Maynard-Connor, but it is not in my judgment self-evidently wrong.  If existing use is removed from the equation, its value rests on holding it for rental income or on redeveloping it for existing permitted use or on the prospects for permission for alternative use.  I do not regard as fanciful Mr Chittenden's view that these purposes, excluding existing use, would be insufficient to support a value of £2.25m.  So I do not regard Mr Chittenden's credibility as an expert as damaged by his view on this.  It is not however necessary to go further than this, because it is accepted that without a sufficient prospect of planning permission for alternative use, the property had no hope value and was not worth more than was paid by TMK.

134.    The focus of the expert planning and valuation evidence was on the prospects for a planning application if made at about the time of purchase in May 2005 and the value of the property in the light of those prospects.  This was as true of the applicants' experts as it was of the respondents'.  So at para. 3.02 of his report, Mr Copestake, the applicants' planning expert, wrote that his research had enabled him:

> "*to advise the reader of this report what types of development may, or may not have, received planning permission on the Clough Street site on or around 11 May 2005, based upon the development plan and other material considerations.*"

It was apparent too from the experts' oral evidence that they were considering the prospects for a planning application made in about May 2005, or as soon after that as was reasonably practicable.

135.    In his closing speech, Mr Maynard-Connor presented his case on a broader, somewhat different, basis.  He had sought to lay the ground for this in his cross-examination of Mr Chittenden, and his case in closing was based to a significant extent on Mr Chittenden's evidence.  By contrast, he made little of Mr Elliott's evidence.  Paragraphs 9-13 of his written closing submissions read:

> "*9. Despite the other classifications noted by Mr Chittenden in his report, it is self evident that the most likely purchaser would have been a property developer. This is significant as is sets the context for the Court's determination of the Property's true value in 5/05.*
>
> *10. To that end, it is important to note that the mindset of such a purchaser, and thus the amount which he is willing to pay, is not constrained by existing factors, such as the physical layout of the property in question, existing planning policies, or current market conditions. Although such factors will undoubtedly be considered by a developer, as accepted by Mr Chittenden such a purchaser buys with one eye on the future and he will delay the submission of a planning application and the commencement of his envisaged development until conditions are most favourable to maximise his profit the acquisition of land banks being common place amongst developers.*

> *11. Such a purchaser is familiar with the vagaries of the planning process and is experienced with negotiating and working with planning authorities and other interested third parties, including on matters such as affordable housing, to ensure that a successful and commercially viable development is delivered.*

> *12. In that regard, and as was further accepted by Mr Chittenden, a developer considering the purchase of the Property in 5/05 would have had regard to the fact that the Local Development Framework ('the LDF') was emerging because it was actually 'changing the landscape'. As confirmed by the relevant City Council report dated 29/3/05, it was projected that the LDF would be adopted during Spring 2007.*

> *13. It was also accepted that developers do not apply a formulaic and scientific approach to valuation; they 'look at everything' including 'the opportunity.'*

136.   The theme of the 'changing landscape' in terms of planning policy and its effect on value is developed at paragraphs 42-50:

> *"42. That said, whether or not a planning application would have been approved during 5/05 is not the issue in this case; for it cannot be sensibly argued that the hypothetical purchaser would have purchased with a view to submitting a planning application at that time; quite the opposite, as was accepted by Mr Chittenden who acknowledged that he would have advised a purchaser to wait.*

> *43. Indeed, it is evident that the purchaser would have waited for the emerging LDF and the proposed designation of the Property within the Euturia Corridor AAP and that he would have recognised that the same were 'changing the landscape'. Mr Chittenden admitted that in 2005 there was a drive to regenerate the area and he accepted that there was evidence to suggest that looking forward from 5/05 residential would be considered as part of mixed use scheme.*

> *44. In fact, as explained in detail by Mr Copestake and recognised by Mr Elliott when making his valuation with the benefit of his local knowledge having worked within Stoke CC and with RENEW, the new LDF and AAP were emerging to achieve the urban regeneration desired by the Local Authorities and the 29/3/05 report confirms that RENEW were working with Stoke CC in that regards.*

*45. The truth is that the only logical and reasonable assessment of these emerging policies in 5/05 was that they could only improve the prospects of obtaining a suitable planning permission and importantly, this fact was actually recognised some two months later by Mr Willard in the context of a mixed use scheme. In this respect his 7/05 submissions speak volumes:*

*46. The expected time delay also fitted well with the likely timetable for the construction of the Tesco store and the new link road; 2007 according to Savills.*

*47. In addition, Yes Car Credit's lease had another 3 years or so to run and although a break clause existed, that required 12 months notice [cl.10.1]. This lease therefore provided a valuable income of £85,000 pa and visible occupation of part of the Property (on the upper tier fronting Clough Street) 14 while the developer waited for the more favourable planning conditions to be brought into force.*

*48. Pausing there, and as hypothesised with Mr Chittenden on Day 9, the Court is invited to assume that on any sale in 5/05 the Group would have sought to lease back the remainder of the Property. This is supported by the evidence of Messrs Holdcroft and Shenton about its importance to the Group. Similarly, it is a reasonable assumption that in such circumstances the hypothetical purchaser would have been agreeable to such a lease, provided the terms of the relevant demise enabled vacant possession to be delivered up at the same time or before Yes Car Credit vacated.*

*49. Quite simply there was no incentive for a purchaser to seek a planning approval in 5/05 and, consistent with his general mindset, in planning terms the purchaser would have been looking to the future.*

*50. That fact fundamentally undermines the Rs' planning evidence which, as Mr Willard confirmed to the Court, was directed at a hypothetical planning application submitted in 5/05."*

137.    As I have earlier mentioned, the point made in paragraph 50 as regards the focus of the respondents' expert evidence is true equally of the applicants' evidence.

138.    In considering these submissions, it is necessary to look at the features of the 'changing landscape' in May 2005.  Existing planning policies and factors such as the approach of Renew and the attitude of planning officials to residential developments outside AMIs represented material considerations for any planning application in May 2005.  By contrast, this part of the applicants' case is directed rather to policies which were in the course of formulation and could, once developed and adopted, be expected to have a significant effect on planning decisions.

139.     The property lies in or close to an area known as Etruria Valley.  The Renew market renewal prospectus published in March 2004, had identified four present AMIs and a further four proposed AMIs, none of which included the property.  Six smaller general renewal areas were proposed, again none containing the property.  Looking even further forward, the prospectus stated:

> "*The Etruria Valley, on the site of the former Shelton steel works, combined with other sites in Burslem and Hanley City Centre, presents the opportunity to create up to 9,000 new homes and to support up to 25,000 new jobs, but a successful plan will depend on co-ordinated investment by all of Renew North Staffordshire's partners.*"

140.     The Planning and Compensation Act 2004 required the production by Stoke-on-Trent city council, in common with other local planning authorities, of a local development framework (LDF).  In April 2005, the city council published its local development scheme (LDS) which was, quoting from an internal but published report dated 29 March 2005, "a three year management programme outlining the preparation and adoption of the City of Stoke-on-Trent Local Development Framework (LDF) which will guide sustainable development in the City".  The LDS set out the timetable for developing the LDF.  It involved the preparation of draft plans, periods of public consultation and final adoption over a period of two to three years, although adoption did not occur until 2009.  The timetable set out in the report dated 29 March 2005 included the following items and dates which are of some significance.  The strategic planning documents, comprising or including a joint core strategy and a development portfolio, would be submitted to the planning inspectorate in December 2005 with a projected adoption date of spring 2007.  Of more direct and local significance for the property, the preparation of area action plan documents had commenced in November 2004 and again would be submitted in December 2005 with adoption projected for spring 2007.  Four area action plans were identified, including one for "City Centre and Etruria Road", an area which included the property.  The policies for these areas would be developed in the course of and following extensive public consultation.

141.     According to Mr Copestake's report, as amplified by his oral evidence, the LDS or other document published by the city council in May 2005 stated that the purpose of the proposed area action plan was to "provide detailed guidance for the regeneration of the City Centre and Etruria Road Corridor area.  The purpose of the plan is to create a vibrant City Centre that builds on its core assets for business and increasingly becomes the focus for City Living".  This document was not in evidence, nor was any other document which evidenced the city council's thinking at that time for this area.

142.     There was a lengthy public consultation process.  It was in response to the invitation for submissions that Mr Willard contacted clients with properties in the relevant areas.  They included the Holdcroft group and I refer below to the submission made on its behalf.

143.     A clear indication of the length of time taken by this process is that in September 2007 the planning officials were taking steps with a view to the release of

"the draft City Centre and Etruria Road Corridor Area Action Plan – Draft Spatial Options" *for consultation purposes.*

144.    The internal but published report dated 20 September 2007 stated that "we are at the second stage of plan making where we set out choices for public comment". The draft plan would or might be amended before submission to central government for independent scrutiny.   The purpose of the exercise was "to give interested individuals and organisations the opportunity to have their say on the choices in front of us".  The plan itself was "intended to set out where we want to be in 2026 and how we might get there".

145.    There are extracts from the draft area action plan in evidence, and they include on page 93 of the document details of the 5.9 hectare site on the south side of Clough Street, including the Steelite site and the property.  Appropriate land uses are stated to be employment/residential mixed use including shops, business, general industry and dwellings.  Development would be subject to sequential assessment (i.e. assessing the order in which sites in the area covered by the action plan should be developed) and projected impact on city centre regeneration prospects.   "Key development requirements" included "High density town housing.  This land could provide about 140 residential units".

146.    An earlier and separate development was that in November 2005, Renew issued a lengthy Scheme Update, of which a few pages were put in evidence.  At page 5, it is stated that a clear set of geographical priorities had been established for investment, and "at the top of this list is the 'Urban Core' – made up of the City Centre and the surrounding neighbourhoods".  The Urban Core Study included proposals for the Etruria Valley area.   Further detail at pages 45-46 includes residential development in the City Centre and a plan which showed a large area, including the property, zoned for "employment".

147.    Most of these documents post-date May 2005 and, in the case of the draft area action plan, it does so by over two years.  As Mr Maynard-Connor stressed in his cross-examination of Mr Chittenden, the hypothetical developer would not have known of these documents, or, I would add, their likely contents, in May 2005.  The most that can be said as at May 2005 is that the property fell within a large area for which an area action plan was to be developed with a lengthy process of public consultation, and adoption anticipated in spring 2007.

148.    There is no evidence of what, if anything, the City planners had in mind for the area in which the property lay.  There is certainly no evidence that it was being considered for residential development or for mixed-use development with a large residential element.

149.        In support of their case that the property would have been seen at that time as an attractive prospect for development, much was made of a submission sent to the planning authority in July 2005 by Mr Willard on behalf of the Holdcroft group. It was made in response to the call for suggestions in the initial round of public consultation on the proposed LDF.  Paragraph 1.3 stated:

> "*It is considered that the site is suitable and appropriate for a variety of retail uses and/or other suitably viable land-uses*

> *such as leisure or office uses or a mixed use that is commercially viable. Any such uses must demonstrate that they have no adverse impact on the vitality or viability of the town centre and demonstrate both a quantitative need and lack of sequentially better and available sites.*"

This was developed in greater detail at paragraph 3:

> "*3.1    The site at Clough Street, Hanley, is currently used for the sale of vehicles.*
>
> *3.2    It is suggested that the site be considered for, and allocated in the City Centre Area Action Plan, as retail and any other commercially viable uses, for the reasons set out below.*
>
> <u>*Contribution to the City Centre Regeneration*</u>
>
> *3.3    The regeneration of the City Centre is identified by the Council as a strategic priority, and the focus for major retail, leisure and office development. The allocation of this site for the uses suggested will assist with the delivery of City Centre regeneration, in particular the provision of a wider range of shopping offer, either for an appropriate retail offer or for bulky goods retail.*
>
> *3.4    Additional alternative retail provision will complement other retail offer in the vicinity of the site, and in particular the recently approved Tesco store on the adjoining site, off Clough Street (this site is edged in green).*
>
> <u>*Sustainability*</u>
>
> *3.5    Given the sites location adjoining the City Centre, the     site performs well when judged against a range of sustainability criteria. The site is brownfield in character; urban in location; highly accessible by public transport, walking and cycling; and presents opportunities for a high quality mixed use development, to complement existing city centre uses, either existing or proposed.*
>
> *3.6    Overall the site and suggested development options for the site will support a number of planning policy and regeneration-related aspirations for the City Centre, as well as the underlying principle of sustainability.*"

150.     There are a number of points to be made about this document.  First, it is not an independent assessment by Mr Willard of the suitability of the property for development, nor in particular does it assess its suitability as against other sites in the same broad area.  It is a submission made on behalf of a client.  Secondly, it does not suggest that it is suitable for residential development either alone or as a substantial part of a mixed scheme.  Thirdly, it specifically promotes the property for retail development, but as I have earlier found there was little prospect at that time of large-scale retail development on the property.  I accept Mr Willard's explanation of this document when he said in evidence:

> "*The point of these submissions was to demonstrate that a site was available and that there was interest in some of those uses that you were putting forward.  And it ended at that.  It was a very simple, brief submission and not a great deal of time or cost got into preparing the submission and it was just simply putting on the table a range of uses which in a marketplace were potentially viable.  It would be then for the Local Authority to determine, in considering their draft whether they wanted to evolve policy to move forward.*"

151.     The planning experts were unanimous in their view that the steps being taken to develop the LDF and an area action plan for the City Centre and Etruria Road Corridor were "embryonic" in May 2005.  It could be afforded little, if any, weight in relation to any planning application.  Mr Copestake said that the situation in May 2005 was that the area action plan was a line on a plan.  The purpose of the consultation exercise was to assist in creating a development strategy for the area.  I appreciate, of course, that the applicants seek to rely on this material for the different point that the property would in general terms have been perceived as having development potential in the longer term.  But there is in truth no evidence to support this thesis.  I except for the moment from that the purchase of the property in September 2006 which I will address later, but it is worth noting now that there is no evidence that the purchasers had read any of the Renew or LDF documents or knew anything about them, and their agent Mr Sanders gave evidence that he made no inquiries about the planning position or prospects.

152.     The applicants adduced no evidence from any developers or agents either that they had any interest in the property in 2005 or would have had interest in it if it had been marketed.  No developer or agent in fact made any inquiries or showed any interest in the property between Morbaine losing interest in about August 2004 and Mr Sanders' approach in July 2006.

153.     The applicants' own expert evidence does not support this case.  Their valuation expert, Mr Elliott, tied any hope value to the prospects of obtaining planning consent on an application made in or about May 2005.  In other words, hope value for the property was attributable to planning prospects as they then existed, not on how they might develop in the future.  There is no support in Mr Elliott's evidence for any significant hope value to be derived from the embryonic LDF.

154.     In view of the applicants' reliance on parts of Mr Chittenden's oral evidence, it is important to consider his evidence in a little detail.  He accepted that developers will buy property with an eye to the future.  He agreed that developers will

work with planners to devise a scheme that is most suitable both to the site and also to the prevailing planning conditions "either at the time or that are *about to come into force*". He agreed that they know that the planning process is uncertain and that developers have land banks. He accepted that a developer buying in 2005 would factor in building costs and sales price inflation over the following 12 to 18 months, and would know that the housing market was buoyant with an expectation of further price increases and strong demand for city centre flats.

155.     He agreed that "if I [a developer] buy on a Thursday and the circumstances are not right for me to maximise my profit on a Thursday, then I will wait until such time as I feel I can maximise my profit". It is a proposition that really answers itself, but it presupposes that the developer had already purchased the site unconditionally, as was made very clear when Mr Maynard-Connor returned to the point at the end of day 8. He was not agreeing, or being asked to agree, that the developer would in such circumstances have purchased the site. In particular he was asked to assume that the developer had purchased the site under an unconditional contract. He added that a diligent, prudent purchaser would have undertaken all their investigations before purchasing.

156.     In his report Mr Chittenden referred to planning policies and considerations current in May 2005, including in particular the Renew prospectus. He referred also to the LDF but commented that it would not have been "particularly relevant at the date of valuation as it was still in an embryonic stage". He went on to refer to the contents of the consultation documents produced in September 2007, but only because Mr Elliott had done so in his earlier report prepared in 2008.

157.     Mr Chittenden accepted that a developer considering whether to purchase the property in May 2005 would have regard to the LDF process and the fact that the property fell within an area to be covered by an area action plan. In his report, he said as regards the draft plan produced for consultation in September 2007:

> "*The date of these reports is at least two years past the date of valuation but in my view the proposals therein will have probably formed the mindset of any national purchaser in terms of type of user.*"

I should say I find that difficult to follow, unless the types of user emerged from the documents available in May 2005. As regards the LDF documents available in May 2005, there was the following exchange in cross-examination:

> "*Q. But it is relevant to a developer who is looking forward to developing, say, in 2007, is it not?*
>
> *A. He would certainly have regard to it.*
>
> *Q. Because that is changing the landscape, is it not?*
>
> *A. It is changing the landscape, yes.*"

158.     But Mr Chittenden was clear that, while there was a push for regeneration in Stoke-on-Trent and developers would have regard to the early LDF documents

which were initiating the first stage in the consultation process, this did not translate into significant hope value for the property in 2005.

159.    The fundamental difficulty faced by the applicants in this part of their case is to translate the general policy of regeneration and the very preliminary stage of the development of the LDF into sufficiently good prospects for this particular property for it to attract hope value.

160.    Mr Chittenden's evidence does not provide the basis for this conclusion, nor can the applicants rely on their own valuation expert, Mr Elliott. Mr Elliott's evidence was firmly grounded in the prospects for a successful planning application made in about May 2005 and he was clear that any hope value was directly linked to those prospects. He gave no evidence to support a hope value as at May 2005 based on the prospects for a planning application submitted in 2007.

161.    The fact that developers will often look to the future, will have regard to emerging planning policies and may build up land banks does not mean that there would have been demand from developers for this property in May 2005, sufficient to create hope value.

162.    A factor requiring consideration which is particular to the property is the impact of Tesco's application and the grant of consent on 18 May 2005. Mr Elliott and Mr Chittenden are agreed that as at 11 May 2005 it would be assumed that consent would in all probability be granted. Although Mr Chittenden drew attention to the factors which could delay completion of the development by Tesco, and in fact in the event there has been considerable delay, I find that as at May 2005 the general view would be that it was likely to be completed within about two years.

163.    In his report, Mr Elliott stated that the Tesco scheme was relevant because it provided for the building of the link road, extending the city ring road, which would improve access to Clough Street and the property. The link road would result in a significant impact on the development potential of the sites on Clough Street. Mr Elliott does sound a warning note:

> "*However, it should be borne in mind that the securing of the planning consent for the Tesco scheme would not of course guarantee the subject site would automatically secure a viable planning consent. Furthermore, although the delivery of the next section of the Ring Road would undoubtedly increase the prominence of the subject site, the site itself does not immediately adjoin the line of the proposed new highway.*"

In his oral evidence, Mr Elliott said that the grant of planning consent to Tesco was "key to the hope value" of the property.

164.    Mr Chittenden stated in his report:

> "*Of particular significance in the mind set of a notional purchaser would have been the potential impact the Tesco's proposal would have had on the immediate surrounding area at the date of valuation.*

> *In establishing whether a purchaser would have paid hope value on the back of this planning permission it is important to have regard to a number of factual issues which were pertinent at that time."*

165.    He concludes that it would not have assisted in the development of the property for large-scale retail purposes, because as the planning experts agree, there was little chance of permission being granted for it.

166.    So far as adding value to the property for other purposes, Mr Chittenden, like Mr Willard, noted that the effect of the link road would clearly be to take Clough Street outside the city centre.  The link road and Tesco development would create a barrier between the property and the city centre.  At the same time, he accepted that there would be regeneration benefits in the surrounding area generally, including Clough Street.  When asked whether it was a game-changer, he replied:

> *"Well, it was one of the reasons why there was attraction – why developers were attracted by the site potentially, because it was going to be the next sort of step away from the town centre."*

This refers to the interest in retail development shown in 2000-2004 by developers, as does this later exchange:

> *"Q. ...So, on Tesco's, I am putting it that the decision itself was a significant consideration in the mind of the notional purchaser; do you agree?*
>
> *A.  Indeed.  The fact that it was there is what generated all the interest in the site previously for retail development."*

167.    Mr Chittenden also accepted as a general proposition that the effect of a Tesco development is to increase land values around it.

168.    It is straightforward on this evidence to find that the effect of a successful application for the Tesco superstore was to increase very significantly the value of the property for large-scale retail development.  But the planning experts are agreed that there was little chance of obtaining planning consent for such retail development on the property.  The applicants' case is that, while the upper tier would have bulky goods retail development, the lower tier which is most of the site would be residential development.  As Mr Maynard-Connor accepted, there is no evidence that the presence of the Tesco superstore would increase the value of the property for residential purposes, or that the link road would have a significant effect on its value for those purposes.

169.    I am not persuaded that, given that the property would very probably not get planning consent for large-scale retail development, the Tesco development had a significant effect on the value of the property.

170.    In my judgment, there is no substantial basis in the evidence for concluding that there was hope value to be attributed to the property by reference to the prospects

for a purchase by a developer with a view to applying for planning permission two years or so later.

171.     Overall, my conclusion on the totality of the expert planning and valuation evidence is that there was no hope value in the property as at May 2005 which would increase its value significantly above the price of nearly £2.28m paid for it by TMK in May 2005.

*Sale to Cannon and Kirk*

172.     On 12 September 2006, contracts were exchanged for the sale of the property by TMK to Michael Cannon and Owen Kirk at a price of £4m.  The sale was completed on 24 October 2006.  The sale was subject to a lease back to the Holdcroft group of those parts of the property used by it for a fixed term of  two years, and thereafter terminable by either party on 6 months' notice, at an annual rent of £100,000.

173.     The terms of the sale had been agreed in the course of July 2006 between Darren Holdcroft, Mr Holdcroft's son and a director of the group companies, and one John Sanders, acting for the purchasers.

174.     Apart from a rise in property prices of the order of 10% in the Stoke-on-Trent area between May 2005 and September 2006, there was no significant change either in market conditions or planning expectations either generally in the area or specifically as regards the property.

175.     On the face of it, therefore, this sale negotiated at arms length with an independent third party would appear to provide a strong indication of the property's market value in September 2006 and, by inference, in May 2005.

176.     It is, however, necessary to examine the circumstances of this sale with some care, notwithstanding that it was an arms length deal between independent parties.  The sole source of evidence about the sale of the property from the point of view of the purchasers was provided by Mr Sanders.  He was initially contacted for the purposes of this case in December 2008 by Mr Elliott, who was then providing valuation advice to the applicants and who was subsequently instructed as their valuation expert.  Following a meeting Mr Elliott sent him a letter dated 10 December 2008, summarising what he had told Mr Elliott, which Mr Sanders signed as correct on 21 January 2009.  There is an unfortunate difference of recollection between Mr Elliott and Mr Sanders as to whether he was willing to give evidence.  In any event, when the applicants' solicitors sent him a draft witness statement, Mr Sanders refused to sign it.  The applicants served a hearsay notice in respect of the draft statement. The defendants required his attendance to give evidence but also shortly before the trial obtained a signed witness statement from him in respect of which they too served a hearsay notice.  It transpired that Mr Sanders was willing to attend to give evidence and I ruled that, as the defendants had served a witness statement signed by him, they should call him as their witness.

177.     It was, I think, regrettable that Mr Elliott, not a lawyer but a potential expert witness, should have been involved in this evidence-gathering process.  It identifies him too closely with one of the parties and, as here, leaves him open to differences of

recollection on matters which should not be the concern of an expert. I accept that Mr Elliott had not then been instructed as the applicants' valuation expert but, having given full advice on the subject, it must have been a real possibility that he would be instructed. I accept too that Mr Elliott was acting in complete good faith and that in the event no real harm was done.

178.   There is very little evidence before the court about Cannon and Kirk themselves. The evidence such as it is comes from Mr Sanders. They are established developers and house-builders who have been in business for a long time, undertaking developments mainly in the Republic of Ireland but also in Scotland and, more recently, in England. They had developed a site in Coventry and were developing a site in the Stoke-on-Trent area.

179.   Mr Sanders introduced the opportunity to purchase the property to Cannon and Kirk. He has been in the building trade in the Stoke-on-Trent area for most of his working life, operating as he said as "a one-man band", doing relatively small jobs such as house extensions and occasionally buying a plot of land and building a house on it. He knows the area well.

180.   He first met Cannon & Kirk in 2000. He put to them the opportunity to buy a site in the Stoke-on-Trent area. They bought it and are still developing it. It has been a success for them and gave Mr Sanders credibility in their eyes. Mr Sanders used his local knowledge to keep his eyes open for sites which he thought might have potential. He was aware of the projected development by Tesco and thought there was potential for other sites in the area. Tesco was important because "it acts like a honey-pot" and the proposed link road was, he agreed, a big plus point. Without them he would not have bothered with the property.

181.   In about January 2006 he became aware of the property, which he saw as the best in the area for his purposes of introducing it to a developer. It was close to the proposed link road and bigger than the Steelite area. He appreciated that the property must have permission for its current use as a car showroom and a repair shop. He made no enquiries of the local authority or, it would seem, anyone else as to the type of any other development which might be permitted on the property. As he said in his witness statement, "I simply relied on my own local knowledge and interest". In his oral evidence, he referred to the existing use and continued:

> "That was good enough for me. I could take a view on that. That was good enough for me. I didn't need any more than that because I thought that the road being so close and one thing and another if I eventually got say an end user, substantial end user, that was not already in the city so to speak, then the council might be you know helpful in getting a permission on that."

182.   Mr Sanders decided at some time in 2006 that he would try to negotiate the terms of a purchase of the property on the basis that he was acting as agent and, once terms were agreed, take it to Cannon and Kirk. Through a contact he met Darren Holdcroft in July 2006 and offered £3m for the property. The offer was refused because, as Darren Holdcroft made clear, Holdcrofts did not wish to sell as they were still using the site.

183.    Mr Sanders formed the view that if he was to persuade Darren Holdcroft to agree a sale, he would have to go back with a much higher price. He decided to offer £4m which Darren Holdcroft agreed, subject to a lease-back arrangement.

184.    Mr Sanders' evidence was that he "valued the site at £3m but then emotions took over". "If I had got it at £3m I would have been happy with it". He also knew that Cannon & Kirk were buying land elsewhere, so time was not on his side if he wanted to introduce the purchase to them. His evidence was that he did not think that at £4m Cannon and Kirk would make a loss on the site. He said that he knew in his own mind that he was paying £1m more than his valuation but he thought they would get it back in the long run. He was also content to go to £4m because Cannon and Kirk were going to make a great deal of money from the development site that he had earlier introduced to them, and if they only broke even, or lost money, on the property they "wouldn't bat an eyelid". In these circumstances, Mr Sanders did not feel it necessary to inform Cannon and Kirk that he had offered £3m and that this represented his own view of the value of the property. It was a matter for Cannon and Kirk whether they chose to purchase at £4m.

185.    The consideration given by Cannon and Kirk to the merits of the property appears to have amounted to the following. Mr Sanders told them the property had potential, because it was close to the Tesco site and the link road and based on "my experience of the area". No inquiries were made with the local planning authorities and no professional advice was taken as to the prospects for planning permission or the uses for which permission might be given. Mr Sanders, and Cannon and Kirk, relied entirely on his own local knowledge. Mr Kirk walked round Hanley with Mr Sanders who pointed out the Tesco site and the route of the proposed link road. They walked to the property and had a look at it without, it appears, going on to it. Mr Kirk was positive about its potential, because in Mr Sanders' words "he knows that I know my area". There were no ground-works investigations, because any developer in the Stoke-on-Trent area knows that allowance must be made for remedial work. However, with costs of £1m or more, he would have negotiated the price back down to £3m. In broad terms, with remediation costs of £1m, he would be content with a purchase price of £3m. If he was advised that the remediation work would cost up to £1.7m, he would proceed on the basis that he could get the costs down to about £1m.

186.    As to the use of the property, Mr Sanders' evidence is that when they acquired it Cannon and Kirk had no particular use in mind. In a subsequent discussion, they envisaged a mixed residential/commercial or retail development. Mr Sanders told them that he did not think it should be a purely residential development. The reason appears to have been that a commercial or retail element would make more money. He gave no oral evidence as to the likely proportions of commercial/retail and residential use, although following a meeting with Mr Sanders in December 2008 Mr Elliott wrote to one of the applicants saying that it was to be "predominantly commercial". I conclude on the evidence that Cannon and Kirk did not give much consideration, and certainly no detailed consideration, to uses for the property.

187.    As already noted, the property has not to date been developed and there is no evidence that Cannon and Kirk have submitted any planning applications.

188.    It would, of course, have been easier to understand more fully the reasons for the purchase by Cannon and Kirk if there had been evidence from them, but no written or oral evidence was provided by them.  As it is the applicants who seek to rely on the sale, it was most obviously for them to call such evidence.

189.    I have concluded that it is impossible to place significant weight on this purchase in determining the market value of the property in May 2005.  There is no evidence that Cannon and Kirk would themselves have been in the market for it in May 2005.  That would depend on the state of their other developments and other factors personal to them and their business at that time.  Mr Maynard-Connor accepted that I could not assume that they would have been potential purchasers at that time.

190.    The purchase could nonetheless be a very telling indication, by inference, of market value in May 2005, if Cannon and Kirk had approached the purchase in a way which, on the expert valuation evidence, a hypothetical reasonable developer would approach it.  Such a person would have investigated with some care the planning position and the prospects for the grant of permission.

191.    The valuation experts are agreed that without an assessment of those prospects it is impossible to attribute a hope value to the property.  Cannon and Kirk relied solely on Mr Sanders and his local knowledge, but he had no expertise in the subject and he made no inquiries or investigations which might have enabled him to give an informed view.  Likewise, there was no investigation of the likely level of remediation works, nor even any form of survey of the property, apart from a simple mining report which did not require any inspection of the property.

192.    In my judgment, Cannon and Kirk cannot be categorised as knowledgeable and prudent purchasers.  Without evidence that they or buyers with a similar approach would have been in the market for the property in May 2005, I must proceed on the basis that buyers would act knowledgeably and prudently.  This is not altered by the fact, as the evidence demonstrated, that this was in a period when there was a great deal of investment by Irish developers in the UK property market.  I do not agree with Mr Chittenden that the presence of a well-funded group of investors looking for buying opportunities is to be ignored when considering market value.  However, there is no evidence that Cannon and Kirk were in their approach typical of Irish buyers.  I must assume that a hypothetical buyer, whether from the Republic of Ireland or elsewhere, would take reasonable steps to be well-informed on planning and remediation issues.

*Transaction at an undervalue: an alternative basis*

193.    The applicants pleaded, by way of amendment during the trial, an alternative basis on which it was said that the sale to TMK was at an undervalue.  It was said that the sale at a price of £2.279m enabled TMK to revalue the property by £1m, thereby conferring a collateral benefit on TMK for which it gave no consideration.  It was submitted that the revaluation was worth £1m to TMK and to the group.

194.    In my judgment, this submission cannot succeed.  The short answer is that, on my findings as to the value of the property, there was no proper basis in 2005/06

for the revaluation.  There is no value in the opportunity to make an unjustified increase in the book value of an asset.  If by contrast, the increase, or a significant part of it, had been justified, then the sale would have been a transaction at an undervalue not because it would have provided an opportunity for a revaluation but because TMK would have paid too low a price.

*Conclusion*

195.    In the result, therefore, I find that the property was not sold at a significant undervalue in May 2005.  I can well see why the particular facts and circumstances of this case, especially the revaluation of the property in TMK's accounts following the sale, caused the applicants to consider that a claim lay against the respondents.  Those facts and circumstances undoubtedly created a strong prima facie case.  But following the close scrutiny which is the purpose of a trial, I am satisfied that the claim is not made out.  Accordingly, I dismiss the application.

TAB 72

*Taylor v White* (1964) 110 CLR 129, High Court of Australia

r            [1962-1963.

a. The consequential pro-
ecember 1959 which made
ouncil immediately before
'rospect Council and made
enrith Council immediately
t the suit of the Prospect
ffect to moneys recoverable
to such works ". And, by
f the proclamation, " such
ctricity ".

in the Act itself and in the
es " in relation to works "
upply of electricity " seems
ie words " such works " in
ling the " supply " of elec-

'enrith Council is entitled to
action. The moneys sought
: Penrith Council in relation
· " and par. (3) of the 1959
to transfer from the Penrith
ght to recover the moneys.
f the Penrith Council were
atter or claim in relation to
affected by par. (4) of the
gree with *Brereton J.* who
he Full Court that the result
nrith Council is seeking to
ed by it to a consumer. I
xpended money in providing
to recover whatever became
: supply were divested from
. The appeal should be dis-

*Court varied by deleting so*
*nurports to direct that para-*
*er of Walsh J. be struck out.*
*lismissed with costs.*

, *Hughes & Garvin.*
*Jones.*

C. S. C. S.

---

[HIGH COURT OF AUSTRALIA.]

TAYLOR AND ANOTHER . . . . APPELLANTS ;
RESPONDENTS,

AND

WHITE AND ANOTHER . . . . RESPONDENTS.
APPLICANTS,

### ON APPEAL FROM THE SUPREME COURT OF QUEENSLAND.

*Companies—Liquidation—Preference, priority or advantage—Avoidance—Protection of payments made in good faith and in the ordinary course of business—" In the ordinary course of business "—Repayment of loan made to family company by mother of one of two shareholders—Company insolvent—The Companies Acts, 1931 to 1960 (Q.), s. 275—Bankruptcy Act 1924-1960 (Cth), s. 95.*

H. C. OF A.
1963-1964.
⌣
BRISBANE,
1963,
*Sept.* 3;

MELBOURNE,
1964,
*Feb. 25.*

Dixon C.J.,
Kitto,
Taylor,
Menzies and
Windeyer JJ.

A husband and wife were the sole shareholders in and the sole directors of a proprietary company. In 1957 the wife, acting as the attorney under power of her mother, lent the sum of £4,000 to the company, which undertook to pay interest thereon and to repay the principal in full within six months after written demand therefor made. Early in 1959 the wife spoke to her husband about replenishing her mother's bank account and at his suggestion made written demand on 30th January 1959 of the company for repayment of the loan. The sum of £160 for interest was paid by the company on 10th March 1959 and thereafter it made three repayments each of £500 on 8th April, 17th June and 20th June 1959 and on 30th July 1959 it repaid the balance of the loan, £2,500. The first two sums were paid by the company at the request of the wife, the last three without any such request. The actual management of the company was at all times in the hands of the husband. On 17th August 1959 the creditors of the company resolved that it should go into liquidation. In proceedings by the liquidators in the Supreme Court of Queensland for declarations that the last few payments were void as preferences the primary judge found that on 20th July 1959 the husband knew that the company was insolvent and that it was not until 3rd August 1959 that the wife became aware of this, though she had previously known that it was experiencing difficulties. He held the payments to be preferences within s. 95 (1) of the *Bankruptcy Act* 1924-1960 (Cth) (imported into *The Companies Acts*, 1931 *to* 1960 (Q.) by s. 275 thereof) but further held that the payments had been received by the mother in good faith for valuable consideration and in the ordinary course of business. The Full Court reversed this decision as to the last three payments, being of opinion that they were not made in the ordinary course of business.

*Held*, by *Dixon C.J., Taylor, Menzies* and *Windeyer JJ., Kitto J.* dissenting, that the payments in question were not made in the ordinary course of business.

H. C. OF A.
1963-1964.

TAYLOR
*v.*
WHITE.

Meaning of the expression " in the ordinary course of business " in s. 95 (2) of the *Bankruptcy Act* 1924-1960 (Cth), considered.

Decision of the Supreme Court of Queensland (Full Court): *Re E. J. Taylor & Son Pty. Ltd.,* [1963] Qd. R. 284, affirmed.

APPEAL from the Supreme Court of Queensland.

Eaglie White and David John Kerr, the liquidators of E. J. Taylor & Son Pty. Ltd. (in voluntary liquidation), applied to the Supreme Court of Queensland by originating summons, to which Christabel Janet Taylor and Vincent Patrick Quinn as executors of the will of Florence Catherine Quinn deceased were respondents, for a declaration that three payments each of £500 made on 8th April 1959, 17th June 1959 and 20th July 1959 respectively and one payment of £2,500 made on 30th July 1959 amounted to preferences of Florence Catherine Quinn deceased within s. 275 of *The Companies Acts,* 1931 *to* 1960 (Q.) and were invalid accordingly and for an order that the respondents as such executors as aforesaid do pay to the applicants the sum of £4,000.

The originating summons was heard by *Gibbs* J., who dismissed it upon the ground that, whilst the payments in question were preferences, the respondents had established that they had been received by their testatrix in good faith, for valuable consideration and in the ordinary course of business.

The applicants then appealed to the Full Court of the Supreme Court (*Mansfield* C.J., *Jeffriess* and *Hart* JJ.), which held that as to the last three payments made the finding of *Gibbs* J. that they were made in the ordinary course of business was against the evidence and weight of evidence. The Full Court accordingly set aside the order of *Gibbs* J. and in lieu thereof declared that the said three payments were void as against the applicants as preferences and ordered that the applicants do recover the sum of £3,500 from the respondents: *Re E. J. Taylor & Son Pty. Ltd.* (1).

From this decision the respondents appealed to the High Court.

The relevant facts are fully set out in the judgments of the Court hereunder.

*V. M. Mylne,* for the appellants. The payments in question were made in the ordinary course of business because (1) they were received by the creditor without any belief that the debtor might be insolvent; (2) no unusual means was adopted by the creditor to secure the payments; and (3) the transactions relating to the payments were not of an unusual kind. The test under s. 95 of the *Bankruptcy Act* is whether the payee received them in the ordinary

(1) [1963] Qd.R. 284.

· course of business " in s. 95 (2)
lered.

ısland (Full Court): *Re E. J.*
ffirmed.

ınsland.

the liquidators of E. J.
quidation), applied to the
ıating summons, to which
atrick Quinn as executors
leceased were respondents,
ɛach of £500 made on 8th
ʻuly 1959 respectively and
July 1959 amounted to
deceased within s. 275 of
ıd were invalid accordingly
ıs such executors as afore-
ɔf £4,000.

ɔy *Gibbs* J., who dismissed
ayments in question were
tished that they had been
. for valuable consideration

Full Court of the Supreme
rt JJ.), which held that as
ıding of *Gibbs* J. that they
business was against the
ıe Full Court accordingly
ıu thereof declared that the
nst the applicants as pref-
ts do recover the sum of
*Taylor & Son Pty. Ltd.* (1).
ppealed to the High Court.
; in the judgments of the

The payments in question
ɔiness because (1) they were
elief that the debtor might
ʻas adopted by the creditor
transactions relating to the
The test under s. 95 of the
ceived them in the ordinary
284.

course of business. If it be material that the debtor knew of his
insolvency and intending to seek out and pay a particular creditor,
made a payment, one that was not in the ordinary course of business,
no creditor, even though he did not advert to the possibility of bank-
ruptcy, in a case like this, could receive a payment in the ordinary
course of business. Under s. 95 (2) the onus is on the creditor to
prove that the payment was made in the ordinary course of business,
hence it should not be incumbent on him to show the intention or
motive of the debtor because he would not have cognizance of
them. If the payment is an ordinary, everyday transaction and
is received without the payee having bankruptcy in contemplation,
the payment is received in the ordinary course of business. The
payments here being the repayment of a loan were ordinary every-
day transactions. They were made in response to a demand for
payment of a debt in circumstances in which the creditor had a
pressing need for the money and without her having bankruptcy
in contemplation. If the fact that payments were made without
further request is a relevant consideration in determining whether
they were received in the ordinary course of business, that could
not apply to the final payment of £2,500 which as made on the last
day of the six months period from the service of the formal written
notice on the company requiring its payment. After that day it
would have been legally recoverable. The two tests applied by the
Chief Justice in the Full Court, namely, that no request was made
and that the debtor knew the company was insolvent, are irrelevant.
[He referred to *Robertson* v. *Grigg* (1); *Downs Distributing Co. Pty.
Ltd.* v. *Associated Blue Stores Pty. Ltd.* (2).]

*J. D. McGill* Q.C. (with him *C. E. K. Hampson*), for the respon-
dents. The appellants have failed to prove that the payments were
made in the ordinary course of business and they have also failed
to prove that they were made in good faith. The only logical
approach to sub-s. (2) of s. 95 of the *Bankruptcy Act* is to regard it
from the point of view of the payer so far as the ordinary course
of business is concerned. When one has in mind the forerunners
of s. 95, if there was an intention to prefer, one would hardly think
the payment was in the ordinary course of business. The *Bank-
ruptcy Act* now simply substitutes a de facto preference. It would
be a curious result if a de facto preference, made with an intention
to prefer, was a payment in the ordinary course of business. It
would mean that having departed from the question of fraudulent
preference and substituted a de facto preference, the intention of

(1) (1932) 47 C.L.R. 257, at pp. 267,
268, 273.

(2) (1948) 76 C.L.R. 463, at pp. 474-
477, 479, 480.

132                    HIGH COURT                    [1963-1964.

H. C. OF A.  the debtor to make a preference would be irrelevant in considering
1963-1964.  whether a payment was made in the ordinary course of business.
           In the light of sub-s. (2) of s. 95 the question of good faith is referable
TAYLOR     to the payee ; the question of " the ordinary course of business "
  v.       relates to the whole of the transaction so far as the intention of
WHITE.     the payer is concerned. [He referred to
           Robertson v. Grigg (1).] One should not consider only the position
           of the creditor. If the debtor had bankruptcy in view, the pay-
           ment could not be made in the ordinary course of business. If
           upon considering the whole transaction it appears that there was
           a payment made on the eve of bankruptcy that would be something
           different from the ordinary transaction of a payment of a debt
           and one looks to see if it could be said that it was a fair trans-
           action, one which might be transacted without adverting to the
           possibility of bankruptcy. [He referred to Burns v. McFarlane
           (2) ; Robertson v. Grigg (3).] If the payee knew of the possibility
           of impending bankruptcy the question of good faith would be
           resolved against him. On that issue the state of mind of the payee
           is the important matter. It is not merely the circumstances of the
           payment which have to be considered ; the whole transaction in
           the light of all the circumstances must be examined. On the true
           construction of s. 95 (2) (a) the question of good faith is at large.
           Sub-section (4) does not in any way lay down an exhaustive test.
           [He referred to S. Richards & Co. Ltd. v. Lloyd (4).] When one
           looks at the relationship between the parties and at the whole
           nature of the transaction and finds a payment to a relative just
           before bankruptcy, it is impossible to find good faith.

           V. M. Mylne, in reply.

                                                      Cur. adv. vult.

Feb. 25.      The following written judgments were delivered :—

              DIXON C.J. This is an appeal from an order of the Full Court
           of the Supreme Court of Queensland setting aside an order of
           Gibbs J. and declaring that certain payments made in the voluntary
           liquidation of E. J. Taylor & Son Pty. Ltd. were preferences, viz.
           £500 paid on 17th June 1959, £500 paid on 20th July 1959 and
           £2,500 paid on 30th July 1959, and ordering that the now respon-
           dents, viz. the liquidators of E. J. Taylor & Son Pty. Ltd. (in
           liquidation) do recover against the now appellants the sum of
           £3,500 : Re E. J. Taylor & Son Pty. Ltd. (5).

(1) (1932) 47 C.L.R., at p. 267.        (4) (1933) 49 C.L.R. 49.
(2) (1940) 64 C.L.R. 108, at p. 128.    (5) [1963] Qd.R. 284.
(3) (1932) 47 C.L.R., at p. 273.

irrelevant in considering
inary course of business.
n of good faith is referable
nary course of business "
o far as the intention of
mentary. [He referred to
consider only the position
ruptcy in view, the pay-
y course of business. If
t appears that there was
r that would be something
of a payment of a debt
that it was a fair trans-
without adverting to the

to *Burns* v. *McFarlane*
ee knew of the possibility
of good faith would be
state of mind of the payee
y the circumstances of the
the whole transaction in
ce examined. On the true
a of good faith is at large.
down an exhaustive test.
v. *Lloyd* (4).] When one
parties and at the whole
payment to a relative just
d good faith.

*Cur. adv. vult.*

e delivered :—
an order of the Full Court
setting aside an order of
rents made in the voluntary
Ltd. were preferences, viz.
aid on 20th July 1959 and
lering that the now respon-
'aylor & Son Pty. Ltd. (in
ow appellants the sum of
*Ltd.* (5).

1933) 49 C.L.R. 49.
1963] Qd.R. 284.

The chief ground of appeal to this Court is that the payments
of £500 on 17th June and £500 on 20th July and £2,500 on 30th
July 1959 were made in the ordinary course of business, and that
the Full Court were wrong in holding the contrary and setting aside
the affirmative findings of *Gibbs* J.

By s. 275 of *The Companies Acts* 1931 *to* 1960 of the State of
Queensland it is provided that any payment which would, if made
by an individual, be deemed in his bankruptcy a preference, shall
if made by a company, be deemed, in the event of its being wound
up, a preference of its creditors, and be invalid accordingly. For
the purpose of the provision the commencement of the winding
up is deemed to correspond with presentation of the bankruptcy
petition in the case of an individual. By s. 95 of the federal *Bank-
ruptcy Act* 1924-1960 which is thus so to speak incorporated, a
payment made . . . by any person unable to pay his debts as they
become due from his own money, in favour of any creditor . . . having
the effect of giving that creditor . . . a preference, a priority or an
advantage over the other creditors, shall, if the debtor becomes
bankrupt on a bankruptcy petition presented within six months
thereafter be void as against the trustee in bankruptcy. This
provision is qualified by sub-s. (2) of s. 95 which includes the pro-
vision that the rights of a purchaser, payee or encumbrancer in
good faith and for valuable consideration and in the ordinary course
of business shall not be affected. Sub-section (3) casts the burden
of proving compliance with this qualification upon the person who
relies upon it. Sub-section (4) qualifies the provision by denying
good faith to a creditor who knew or had reason to suspect that the
debtor was unable to pay his debts as they became due and that
the effect of the payment would be to give him a preference, a
priority or an advantage over the other creditors.

E. J. Taylor & Son Pty. Ltd., the company in liquidation, con-
ducted the business of building contractors. It had been formed
in September 1954 as a family company. Indeed there were only
two shareholders, E. J. Taylor and his wife, and both were directors.
As might be expected, Mrs. Taylor took no part in the actual
management of the company which was left in the hands of her
husband, Edwin Joseph Taylor. Mrs. Taylor had a mother, Florence
Catherine Quinn, who was an invalid. Indeed she died at the age
of eighty-two on 1st September 1960. For two years before her
death she was senile and confined to her bed and understood little
that was going on around her. Her daughter held a wide power of
attorney, dated 17th October 1955, for the management of her
affairs. The not inconsiderable expense of nursing Mrs. Quinn and

H. C. OF A.
1963-1964.

TAYLOR
*v.*
WHITE.

Dixon C.J.

134                    HIGH COURT                    [1963-1964.

looking after her was paid from her banking account on which, of course, Mrs. Taylor was able to draw. Mrs. Quinn had a house which was sold in 1957. Of the purchase money £4,000 became available for investment. E. J. Taylor suggested to his wife that the sum might be lent to his company at eight per cent per annum interest, and this was done. The loan was the subject of an acknowledgment dated 26th July 1957 and signed by Mr. and Mrs. Taylor as directors. It acknowledged that the company was indebted to Mrs. Quinn in the sum of £4,000 and that the company agreed to repay the sum in full within six months from the date of a notice in writing to the company delivered at its registered office advising that repayment of the sum of £4,000 was to be made. The company agreed to pay interest in the meantime at eight per cent per annum payable monthly. The evidence is that Mrs. Taylor spoke to her husband about replenishing her mother's bank account somewhere early in 1959 and that he suggested that she, as attorney under power, make a written demand on the company. There was a letter dated 30th January 1959 to the secretary of the company in which her mother is made to say : " I wish to advise that I would like the repayment of £4,000 which I lent your company on 26th July 1957 ". Early in 1959 the bank account was overdrawn and according to the evidence Mrs. Taylor requested her husband to make arrangements for some payment into the account. On 10th March 1959 a payment of £160 as interest was made by the company. Early in April Mrs. Taylor again asked her husband to repay some of the indebtedness and on 8th April a sum of £500 was paid in by cheque signed by E. J. Taylor. A cheque signed by Mrs. Taylor made a further payment of £500 into the account on 17th June 1959, and on 20th July £500 was likewise paid in and the balance of the debt, viz. £2,500, was paid on 30th July. These two cheques were signed by E. J. Taylor, her husband. According to Taylor's evidence the payments of 17th June, 20th July and 30th July were made without any request from his wife, and the learned judge (*Gibbs* J.) so found. According to the evidence of Taylor business in the building trade is always in difficulties—" in one day and out the next ". Be this as it may, the learned judge said that he had " no hesitation in finding that on 20th July Taylor knew that the company was insolvent ". On that day he drew in his own favour a cheque for £1,250 on account of moneys that he had lent the company. An estimate of the position prepared on 4th August 1959 showed a deficiency of £23,475. A meeting of creditors was called and on 17th August 1959 a formal meeting of the company's shareholders resolved that the

H. C. OF A.
1963-1964.

TAYLOR
v.
WHITE.

Dixon C.J.

g account on which,
s. Quinn had a house
money £4,000 became
ested to his wife that
at per cent per annum
subject of an acknow-
y Mr. and Mrs. Taylor
mpany was indebted
t the company agreed
s from the date of a
at its registered office
000 was to be made.
e meantime at eight
evidence is that Mrs.
nishing her mother's
hat he suggested that
itten demand on the
January 1959 to the
ther is made to say :
yment of £4,000 which
arly in 1959 the bank
e evidence Mrs. Taylor
ts for some payment
ent of £160 as interest
rs. Taylor again asked
ness and on 8th April
d by E. J. Taylor. A
her payment of £500
n 20th July £500 was
, viz. £2,500, was paid
ned by E. J. Taylor,
nce the payments or
le without any request
.) so found. According
uilding trade is always
t ". Be this as it may,
itation in finding that
y was insolvent ". On
e for £1,250 on account
. An estimate of the
owed a deficiency of
d on 17th August 1959
ders resolved that the

company should go into voluntary liquidation. The judge found " that it was not until 3rd August 1959 that Mrs. Taylor knew that the company was insolvent. However, said his Honour, " I also find that before that date Mrs. Taylor knew that the company was experiencing difficulties although she hoped that it would be able to surmount them." *Gibbs* J. concluded " on the balance of probabilities, that from April onwards the company was unable to pay its debts as they became due out of its own money, within the meaning of the section. I find therefore ", said his Honour, " that the liquidators have established that the payments were preferences within s. 95 (1) of the *Bankruptcy Act*. The question that then arises is whether the respondents have satisfied the onus of showing that Mrs. Quinn received the payments in good faith and for valuable consideration and in the ordinary course of business (s. 95 (2) and (3)). It is clear that Mrs. Quinn herself had no knowledge of any of these transactions. However, in the circumstances of the case, since Mrs. Taylor had the widest authority to manage Mrs. Quinn's affairs, her knowledge and state of mind should be imputed to Mrs. Quinn (see *In re Drabble Brothers* (1)). The crucial question in the case is whether there was any lack of good faith on the part of Mrs. Taylor."

His Honour proceeded to discuss Mrs. Taylor's position and came to the conclusion that she neither knew nor ought reasonably to have suspected that the company could not pay its debts as they became due from its own money. His Honour further held that the payments were made in the ordinary course of business. *Gibbs* J. ended his judgment as follows : " I accordingly find that the respondents have satisfied the onus that lies upon them of showing that Mrs. Quinn was a payee in good faith and for valuable consideration and in the ordinary course of business. The application by the liquidators therefore fails as to all the payments and should be dismissed with costs."

On appeal to the Full Court of the Supreme Court (the Chief Justice, *Jeffriess* J. and *Hart* J.) this decision was reversed as to the last three payments, viz. the £500 paid on 17th June, the £500 paid on 20th July and the £2,500 paid on 30th July 1959, on the ground that the finding that these payments were made in the ordinary course of business was against the evidence and the weight of evidence. I agree in this conclusion. In addition, I have great difficulty in sustaining the finding that the payments were made in good faith. I am inclined to think that on the facts Mrs. Taylor had reason to suspect that the company was unable to pay its debts as they became due and that the effect of the payments

(1) [1930] 2 Ch. 211, at pp. 234, 235.

H. C. OF A.
1963-1964.

TAYLOR
*v.*
WHITE.

Dixon C.J.

to her mother would be to give a preference, a priority or advantage over other creditors. As to the question whether the rights of Mrs. Quinn could be considered the rights of a payee in good faith and for valuable consideration and in the ordinary course of business, I have even more difficulty. Mrs. Quinn's daughter must be taken to represent her and the question applies to the daughter. She may be considered a payee for valuable consideration but I cannot see how the expression " in the ordinary course of business " applies to this transaction at all. I do not doubt that " in the ordinary course of business " refers to " business " as a general conception and is not restricted to the conduct of any particular business such as the business carried on in a shop or merchant's office or the like, but is referring to the transaction of business as a known and recognized activity pursued by anybody engaged in an attempt to win or earn or " make " money or a living in a systematic or regular way. But this seems to me to have been a family transaction in which a son-in-law, with the help of his wife, decided to borrow money from his mother-in-law for his company and then attempted to effect its repayment in the face of approaching disaster. The time-honoured phrase " in the ordinary course of business " is meant to refer to transactions regularly taking place in a sustained course of activity or some usual process naturally passing without examination. It must be remembered that the provisions relating to preference have a course of history which substantially begins with an attempt to invalidate transactions made in contemplation of bankruptcy or insolvency and calculated to disturb the ratable distribution of the debtor's assets or their proceeds which the law designed. There is attributed to the Court of Common Pleas of 1770 a statement of principle which perhaps explains this. " There is no case where ever such a preference as this was allowed. The same spirit of equality ought to warm the Courts of Justice, which warmed the Legislature when they made the bankrupt-laws ; and if we should let this deed stand, we should tear up the whole bankrupt-laws by the roots " : *Linton* v. *Bartlet* (1). In *Rust* v. *Cooper* (2), Lord *Mansfield* after restating the general principle to be " that a fraudulent contrivance, with a view to defeat the bankrupt laws, is void, and annuls the act " (3) refers to the " common course of business." He says : " There is a fundamental distinction between an act like this, and one done in the common course of business. The statutes have relation back only to the act of bankruptcy ... If, in a fair course of business, a man pays a creditor

(1) (1770) 3 Wils. K.B. 47 [95 E.R. 926].
(2) (1777) 2 Cowp. 629 [98 E.R. 1277].
(3) (1777) 2 Cowp., at p. 632 [98 E.R., at p. 1279].

e, a priority or advantage
n whether the rights of
of a payee in good faith
:dinary course of business,
s daughter must be taken
o the daughter. She may
leration but I cannot see
urse of business" applies
ot that "in the ordinary
' as a general conception
y particular business such
rchant's office or the like,
usiness as a known and
engaged in an attempt to
in a systematic or regular
n a family transaction in
wife, decided to borrow
:pany and then attempted
pproaching disaster. The
r course of business" is
aking place in a sustained
naturally passing without
:at the provisions relating
rhich substantially begins
as made in contemplation
ed to disturb the ratable
ir proceeds which the law
ourt of Common Pleas of
aps explains this. "There
as this was allowed. The
e Courts of Justice, which
: the bankrupt-laws; and
d tear up the whole bank-
*let* (1). In *Rust* v. *Cooper*
e general principle to be
ew to defeat the bankrupt
:rs to the "common course

fundamental distinction
in the common course of
k only to the act of bank-
:ss, a man pays a creditor

77) 2 Cowp., at p. 632 [98 E.R.,
p. 1279].

who comes to be paid, notwithstanding the debtor's knowledge of
his own affairs, or his intention to break; yet, being a fair trans-
action in the course of business, the payment is good; for the
preference is there got consequentially, not by design: it is not
the object; but the preference is obtained, in consequence of the
payment being made at that time" (1).

In the present bankruptcy law good faith apparently seems to
have been considered not enough by itself to protect payments
unless they took place in the ordinary course of affairs. Here it is
plain that Mrs. Taylor thought her husband ought to secure enough
money out of that lent by her mother to carry on the fragile life
of the old lady, and the husband apparently took the additional
view that she should not share in the disaster which overshadowed
him. I can see no ordinary course of business in all this.

I think the appeal should be dismissed.

KITTO J. Before *Gibbs* J. in the Supreme Court of Queensland
the respondents as liquidators of a company in voluntary liquidation
sought a declaration that four payments made by the company
within six months before the commencement of the winding up
to a Mrs. Quinn (now deceased) were void as against the liquidators,
and an order that the appellants, the executors of the will of the
deceased, pay to the liquidators the total amount of the payments.

The application was made under s. 275 of *The Companies Acts*,
1931 *to* 1960 (Q.) which provides (*inter alia*) that any payment which
would, if made by an individual, be deemed in his bankruptcy a
preference, a priority or an advantage over the other creditors
shall, if made by a company, be deemed, in the event of its being
wound up, a preference, priority or advantage of its creditors
[*sic*], and be void accordingly. For the purposes of the section the
commencement of the winding up is to be deemed to correspond
with the presentation of the bankruptcy petition in the case of an
individual. By virtue of s. 95 (1) of the *Bankruptcy Act* 1924-1960
(Cth.), so far as here material, a payment by a debtor in favour of
a creditor within six months before the presentation of a bank-
ruptcy petition on which he becomes bankrupt is void as against
the trustee in bankruptcy if certain conditions are fulfilled. The
conditions are that at the time of the payment the debtor was
unable to pay his debts as they became due from his own money,
and that the payment had the effect of giving that creditor a
preference, a priority or an advantage over the other creditors.
But sub-s. (2) of s. 95 provides that nothing in the section shall

(1) (1777) 2 Cowp., at p. 634 [98 E.R., at p. 1280].

H. C. of A.
1963-1964.

TAYLOR
v.
WHITE.

Kitto J.

affect the rights of a "payee in good faith and for valuable con-
sideration and in the ordinary course of business". Sub-section (3)
places the burden of proving that the provisions of sub-s. (2) have
been complied with upon the person who relies upon their having
been complied with; and sub-s. (4), so far as material, provides
that a creditor shall not be deemed a payee in good faith if the
payment was made under such circumstances as to lead to the
inference that the creditor knew or had reason to suspect that the
debtor was unable to pay his debts as they became due and that
the effect of the payment would be to give him a preference, a
priority or an advantage over the other creditors.

The learned Judge, after a full review of evidence, made findings
of fact which reduce the problem for our consideration to a small
compass. The company was a family affair, its only shareholders
and only directors being a Mr. and Mrs. Taylor. Mrs. Quinn was
Mrs. Taylor's mother. Being an invalid she gave Mrs. Taylor a power
of attorney to manage her affairs. In exercise of her powers as
attorney Mrs. Taylor in July 1957 lent £4,000 of Mrs. Quinn's
money to the company, the company agreeing by a document
dated 26th July 1957 to repay the amount in full, with interest
at 8% per annum payable monthly, within six months from the
date of notice in writing to repay. On 30th January 1959 Mrs.
Taylor gave the company notice in writing to repay the £4,000.
In February 1959 Mrs. Taylor orally asked her husband to arrange
for a payment into Mrs. Quinn's bank account because it was then
in debit. He did so, a payment of £160 for interest being paid into
the account on 10th March 1959. This was apparently by no means
the first payment of interest. The evidence was that several earlier
payments had been made, and although they do not seem to have
been made with strict regularity each month there is nothing to
suggest that there was anything in relation to interest which
either aroused any suspicion in Mrs. Taylor's mind that the com-
pany might be insolvent or ought reasonably to have done so.
The giving of the notice to repay the loan had the effect that the
last day for repayment was 30th July 1959. Three instalments
were in fact paid at earlier dates: £500 on 8th April 1959, £500
on 17th June 1959 and £500 on 20th July 1959. The balance,
£2,500, was paid on the last day of the six months, 30th July 1959.
The first £500 was repaid in response to a specific request by Mrs.
Taylor which she made because Mrs. Quinn's bank account was
nearly depleted and money was needed for her current expenses.
The other three payments were made without any further request.

All four payments were made when the company was unable to
pay its debts from its own moneys, and each of them had the effect

[1963-1964.    110 C.L.R.]    OF AUSTRALIA.    139

H. C. OF A.
1963-1964.
TAYLOR
v.
WHITE.
Kitto J.

. and for valuable con-
iness ".  Sub-section (3)
sions of sub-s. (2) have
elies upon their having
r as material, provides
ee in good faith if the
nces as to lead to the
.son to suspect that the
y became due and that
ve him a preference, a
ditors.

evidence, made findings
consideration to a small
ir, its only shareholders
Taylor.  Mrs. Quinn was
gave Mrs. Taylor a power
ercise of her powers as
£4,000 of Mrs. Quinn's
greeing by a document
nt in full, with interest
in six months from the
30th January 1959 Mrs.
ng to repay the £4,000.
l her husband to arrange
ount because it was then
r interest being paid into
apparently by no means
e was that several earlier
hey do not seem to have
onth there is nothing to
ation to interest which
lor's mind that the com-
mably to have done so.
n had the effect that the
1959.  Three instalments
on 8th April 1959, £500
July 1959.  The balance,
months, 30th July 1959.
a specific request by Mrs.
uinn's bank account was
for her current expenses.
hout any further request.
e company was unable to
ach of them had the effect

of giving Mrs. Quinn a preference, priority or advantage over the
other creditors.  The winding up of the company commenced on
17th August 1959, so that all the payments were within the statutory
six months period.  The liquidators were therefore entitled to the
relief they sought in respect of each of the four payments in respect
of which it was not proved by Mrs. Quinn's executors that in
the sense of s. 95 (2) of the *Bankruptcy Act* she was a payee in
good faith, a payee for valuable consideration, and a payee in the
ordinary course of business.  As Mrs. Quinn herself by reason of
her state of health had known nothing of the relevant event, and
Mrs. Taylor had acted as her attorney throughout, *Gibbs* J. con-
sidered, and rightly, that the proofs necessary to satisfy s. 95 (2)
had to be furnished as if Mrs. Taylor had been the payee in her
own right.  *Gibbs* J. was in fact satisfied of them all.  That the four
payments were for valuable consideration in the relevant sense
there could be no doubt ; for the past consideration consisting of
the making of the loan was enough for the purposes of s. 95 (2) :
*Ex parte Butcher ; In re Meldrum* (1), affirmed *sub. nom Butcher
v. Stead* (2).  Whether Mrs. Quinn was a payee in good faith on
each of the four occasions was a question requiring careful con-
sideration of what Mrs. Taylor knew and had reason to suspect
as to the company's affairs.  The earliest period as at which it was
found that the company was in serious financial difficulties was
April 1959 ; and it was not until 20th July 1959 that even Mr.
Taylor, although he all along was in de facto charge of the com-
pany's affairs, became aware that the company was actually
insolvent.  Of course he knew from April onwards that the company
was in difficulties, and his wife seems to have understood in a
vague way that that was so.  But although she was a director
and in fact signed some of the relevant documents, her husband
never discussed the business of the company with her ; and the
learned Judge, after both of them had given evidence and been
fully cross-examined, was satisfied that she did not know that the
company was insolvent until 3rd August 1959, i.e. after all the
payments had been made.  His Honour found that Taylor caused
the last two payments to be made knowing that the company was
insolvent and with the intention of preferring Mrs. Quinn over the
other creditors, but that Mrs. Taylor neither knew nor had reason
to suspect at any material time that the company was unable to
pay its debts as they became due.  He accordingly found that in
respect of all the payments Mrs. Quinn was a payee in good faith.

(1) (1874) L.R. 9 Ch. App. 595, at
p. 601.

(2) (1875) E.R. 7 H.L. 839, at
pp. 847, 849, 852.

140                        HIGH COURT                    [1963-1964.

H. C. OF A.    This finding the liquidator accepted. He could do no other, for the
1963-1964.    finding depended very much upon evaluation of the oral testimony,
            and was reached after careful consideration of the whole case.
TAYLOR
v.            There remained only the one question : had the executors proved
WHITE.     that on each occasion Mrs. Quinn was a payee in the ordinary
            course of business ? *Gibbs* J. held that she was. Upon this point,
Kitto J.    and upon this point alone, the Full Court of the Supreme Court
            reversed his decision as regards the last three payments, though
            not in regard to the first. From the Full Court's judgment the appeal
            to this Court is made.

            The learned members of the Full Court accepted the findings
            of fact which *Gibbs* J. had made. Their reversal of his decision really
            resulted from their taking a different view of the meaning of the
            expression " a payee in the ordinary course of business " in s. 95 (2)
            of the *Bankruptcy Act*. The primary Judge had fully recognized,
            on the authority of what had been said in three cases in this Court,
            *Robertson* v. *Grigg* (1) ; *Burns* v. *McFarlane* (2), and *Downs Dis-
            tributing Co. Pty. Ltd.* v. *Associated Blue Star Stores Pty. Ltd.* (3),
            that the expression does not refer to any particular business, either
            of the debtor or of the creditor, but refers to what *Rich* J. had
            called in the lastmentioned case " the everyday usual or normal
            character of the transaction ". His Honour took the view that a
            payee is a payee in the ordinary course of business in this sense,
            even though the payment to him is unfair in that it pays off one
            creditor at the expense of the others, if " in itself " it calls for no
            special remark and is a transaction (in the words of *Williams* J.
            in the *Downs Distributing Company's Case* (4)) " into which it
            would be usual for a creditor and debtor to enter as a matter of
            business in the circumstances of the particular case uninfluenced
            by any belief *on the part of the creditor* (the emphasis is mine)
            that the debtor might be insolvent ". But *Gibbs* J. did not con-
            sider that " the circumstances of the particular case " to be taken
            into account in deciding whether a payee is a payee in the ordinary
            course of business include the state of mind of the payer where the
            payee knows nothing of it. If this view of the law be wrong, it seems
            clear enough that his Honour's conclusion was wrong, at least in
            regard to the final payment ; for Mr. Taylor, who was the com-
            pany's agent in relation to the payments, knew when making the
            second and third payments that the company was having its
            difficulties ; and at the time of the last payment he not only knew

        (1) (1932) 47 C.L.R. 257, at pp. 267,      (3) (1948) 76 C.L.R. 463, at pp. 476,
            268.                                        477, 480.
        (2) (1940) 64 C.L.R. 108, at pp. 125,       (4) (1948) 76 C.L.R. 463, at p. 480.
            128.

:e could do no other, for the
:ation of the oral testimony,
: of the whole case.
:: had the executors proved
:s a payee in the ordinary
:t she was. Upon this point,
:ourt of the Supreme Court
:ast three payments, though
:Court's judgment the appeal

:Court accepted the findings
:reversal of his decision really
:view of the meaning of the
:urse of business " in s. 95 (2)
:Judge had fully recognized,
:d in three cases in this Court,
:Farlane (2), and Downs Dis-
:Blue Star Stores Pty. Ltd. (3),
:refers to what Rich J. had
:e everyday usual or normal
:Honour took the view that a
:urse of business in this sense,
:unfair in that it pays off one
:, if " in itself " it calls for no
:(in the words of Williams J.
:'s Case (4)) " into which it
:ebtor to enter as a matter of
:particular case uninfluenced
:editor (the emphasis is mine)
:". But Gibbs J. did not con-
:particular case " to be taken
:ayee is a payee in the ordinary
:f mind of the payer where the
:w of the law be wrong, it seems
:clusion was wrong, at least in
:Mr. Taylor, who was the com-
:ments, knew when making the
:the company was having its
:last payment he not only knew

3) (1948) 76 C.L.R. 463, at pp. 476,
    477, 480.
4) (1948) 76 C.L.R. 463, at p. 480.

that it was insolvent but intended a preference in favour of his
mother-in-law Mrs. Quinn. As I have said, however, it was found
and must be accepted that Mrs. Taylor in fact knew nothing of
all this; and the conclusion reached by *Gibbs* J. must, I think,
stand unless the question whether a payee is a payee in the ordinary
course of business is a question to which the knowledge and inten-
tion of the payer, though unknown to the payee, is relevant.

In the Full Court, *Mansfield* C.J. held that the first of the four
payments was made to a payee in the ordinary course of business.
His Honour gave as his reason that the payment was the outcome
of a request to a debtor, made by a creditor who was in low financial
circumstances, to pay portion of a debt which was due although
payment could not have been legally enforced until 30th July.
" As such ", his Honour said, " it fell into place as part of the
undisturbed common flow of business, and is not excluded from that
category by the existing relationship between Mr. Taylor as the
company's agent and Mrs. Quinn and her daughter, or by the fact,
known to Mr. Taylor but not to Mrs. Taylor, that the company
was in financial difficulties ". Up to this point his Honour seems to
have interpreted s. 95 (2) in the same sense as *Gibbs* J. But his
Honour went on to hold that the other three payments were not
payments to a payee in the ordinary course of business, because
they were unsolicited payments to one of a number of creditors
at a time when the payer knew that he was in serious difficulties,
and his Honour thought that in those circumstances the family
relationship involved assumed a significance which it lacked in
the case of the first payment. The only new element, however,
was the fact that the payments had not been specifically solicited,
though in fact they were made in response to the notice of 30th
January 1959. It is not altogether clear why his Honour thought
that that was a sufficient point of distinction; but this may be
left on one side, for his Honour does seem to have regarded as
material the payer's knowledge of his own financial difficulties,
and it is to that that I propose to address myself.

*Jeffriess* J. did not deliver separate reasons for judgment. *Hart* J.,
the other member of the Full Court, agreed with *Gibbs* J. that
Mrs. Taylor took the payments (i.e. for Mrs. Quinn) " in all good
faith ", but considered that as the last payment was " designed by
the debtor (meaning by Mr. Taylor) to save what he could from
the wreck of the family company for his family at the expense
of the other creditors ", it was not a payment " made " in the
ordinary course of business. His Honour referred to several well-
known cases, and it will be necessary to examine them; but I

H. C. OF A.
1963-1964.

TAYLOR
v.
WHITE.

Kitto J.

142                          HIGH COURT                    [1963-1964.

H. C. of A.    pause to say at once what it seems to me has happened to s. 95 (2)
1963-1964.    if his Honour's approach to the problem be accepted. The language
Taylor      of the sub-section has been deserted, and its apparent purpose has
   v.       been defeated ; for the burden on the payee of proving that he was
White.      a payee in the ordinary course of business has become a burden of
Kitto J.    proving that the debtor was a payer in the ordinary course of
            business, and a protection intended for a creditor by reason of his
            merits has been made to depend on an absence of demerit in the
            debtor.

            The authorities in this Court upon which the Full Court relied
            begin with *Robertson* v. *Grigg* (1), where the meaning of the expres-
            sion " payee in the ordinary course of business " is discussed in
            the joint judgment of *Gavan Duffy* C.J. and *Starke* J. and in the
            judgment of *Evatt* J. Their Honours interpreted the expression not
            as referring to any particular business in which either the payer
            or the payee was engaged but as concerned with the character of
            the payment—" whether it is a fair transaction and what a man
            might do without having any bankruptcy in view ". It is, I think,
            a misreading of the judgments to gather from these words, or
            from the judgments generally, that the expression looks at the
            payment from the debtor's point of view. The words quoted surely
            mean that if the payee is to be protected by s. 95 (2), the payment
            must have presented itself to him as a fair payment to accept,
            and what a debtor might offer who was uninfluenced by any pros-
            pect of bankruptcy.    What is required, in my opinion, is the
            quality of ordinariness from a business point of view in the accep-
            tance of the payment.    After all, s. 95 (2) does not describe the
            payment.    It describes the payee.    He is required to be a person
            receiving the payment in good faith ; receiving it for valuable
            consideration ; receiving it in the ordinary course of business.

            The next case in this Court is *Burns* v. *McFarlane* (2).    There,
            as in *Robertson* v. *Grigg* (1), the question did not arise from whose
            standpoint the payment has to be considered, for on the facts as
            found the payment in that case wore the same appearance from
            either point of view.

            The third case is *Downs Distributing Co. Pty. Ltd.* v. *Associated
            Blue Star Stores Pty. Ltd.* (3).    That was a case in which the payee
            was found to be not a payee in good faith, and therefore, as
            *Latham* C.J. said (4), it was unnecessary to determine the precise
            meaning of the words " in the ordinary course of business ".    *Rich* J.,
            however, amplified what had been said concerning those words

            (1) (1932) 47 C.L.R. 257.        (3) (1948) 76 C.L.R. 463.
            (2) (1940) 64 C.L.R. 108.        (4) (1948) 76 C.L.R., at p. 474.

ne has happened to s. 95 (2)
a be accepted. The language
nd its apparent purpose has
payee of proving that he was
ness has become a burden of
r in the ordinary course of
r a creditor by reason of his
n absence of demerit in the

which the Full Court relied
e the meaning of the expres-
of business " is discussed in
.J. and *Starke* J. and in the
nterpreted the expression not
s in which either the payer
cerned with the character of
transaction and what a man
tcy in view ". It is, I think,
ather from these words, or
the expression looks at the
ew. The words quoted surely
ted by s. 95 (2), the payment
s a fair payment to accept,
as uninfluenced by any pros-
uired, in my opinion, is the
s point of view in the accep-
95 (2) does not describe the
e is required to be a person
a ; receiving it for valuable
nary course of business.

*ns* v. *McFarlane* (2). There,
tion did not arise from whose
onsidered, for on the facts as
e the same appearance from

*ng Co. Pty. Ltd.* v. *Associated*
was a case in which the payee
;ood faith, and therefore, as
sary to determine the precise
y course of business ". *Rich* J.,
said concerning those words

) (1948) 76 C.L.R. 463.
) (1948) 76 C.L.R., at p. 474.

in *Burns* v. *McFarlane* (1), observing that s. 95 (2) supposes
that " according to the ordinary and common flow of transactions
in affairs of business, there is a course, an ordinary course. It
means ", he said, " that the transaction must fall into place as
part of the undistinguished common flow of business done, that
it should form part of the ordinary course of business as carried
on, calling for no remark and arising out of no special or particular
situation " (2). I do not read these words as meaning that in
applying the concept they describe a court is to inquire into the
state of the payer's mind at the time of the payment, and treat
his knowledge and his intentions, though unknown to the payee,
as part of the " situation ". *Williams* J. (3) in the passage already
quoted, made it clear that he for one was not unmindful of the
fact that the expression he was explaining was used in the Act as
descriptive of the payee. His Honour's words show plainly that
he did not consider that in judging of the usualness of the trans-
action of payment it would be material to inquire whether there
was a belief on the part of the *debtor* that he might be insolvent.

I turn to the English authorities. The law as to the avoidance
of fraudulent preferences was developed by the Judges as a branch
of the law of public policy (4) upon the basis that where a trans-
action " is fraudulent, and done with no other view whatsoever
but to defeat the equality of the bankrupt laws, it is void on account
of such intended fraud " : *Rust* v. *Cooper* (5). The question to be
decided was therefore in ultimate theory a question as to the
intent with which the debtor made the payment ; but it was
reduced by the decisions to a more concrete form. It was made
to depend upon two inquiries : (i) was the transaction voluntary
(in the sense of spontaneous or gratuitous) on the part of the debtor,
(ii) and did he carry it out in contemplation of bankruptcy ? If
Yes to both, no more need be shown in order to make the trans-
action void. The first inquiry was purely objective in relation to
the debtor. A payment made by reason of pressure from the
creditor was not voluntary. A payment which, considered without
regard to the debtor's mental processes, was sufficiently explained
as an occurrence in the ordinary course of trade, or of business,
or (in one case) in the ordinary course of the debtor's mode of
maintaining his family : *Abell* v. *Daniell* (6) was likewise not in the
voluntary class. A good illustration may be seen in *Cosser* v.

(1) (1940) 64 C.L.R. 108.
(2) (1948) 76 C.L.R., at p. 477.
(3) (1948) 76 C.L.R., at p. 480.
(4) (1768) 4 Burr., at p. 2239 [98
    E.R., at p. 168].
(5) (1777) 2 Cowp. 629, at p. 633 [98
    E.R. 1277, at p. 1279].
(6) (1829) M. & M. 370 [173 E.R.
    1192].

144                         HIGH COURT                    [1963-1964.

*Gough* (1) where Lord *Kenyon* placed in direct contrast a payment made by a debtor " officiously " on the eve of his bankruptcy and a payment in the ordinary course of trade. An early use of the expression " in the ordinary course of business " as the opposite of " voluntarily " occurs in *Alderson* v. *Temple* (2) where Lord *Mansfield* recalled a case in which a conveyance by a trader of all his effects for the payment of one or more bona fide creditors " of the most meritorious kind " had been held void, and stated as the reason : " because it was not an act in the ordinary course of business ". Then a little later in the judgment in *Alderson* v. *Temple* (3) comes the passage which *Gavan Duffy* C.J. and *Starke* J. set out in their joint judgment. I shall not repeat it, but I must observe that to read it in its original setting is to see that Lord *Mansfield* was merely contrasting a payment which cannot be accounted for as other than the debtor's own idea with a payment which is explained by its consonance with the ordinary course of trade. A passage from *Rust* v. *Cooper* (4) was also quoted by *Gavan Duffy* C.J. and *Starke* J. For present purposes it is desirable to make a fuller quotation. His Lordship said : " If, in a fair course of business, a man pays a creditor who comes to be paid, *notwithstanding the debtor's knowledge of his own affairs, or his intention to break* ; yet, being a fair transaction in the course of business, the payment is good : for the preference is there got consequentially, not by design : it is not the object ; but the preference is obtained, in consequence of the payment being made at that time. Suppose a creditor presses his debtor for payment, and the debtor makes a mortgage of his goods, and delivers possession ; that is, and, at any time, may be, a transaction in the common course of business, without the creditor's knowing there is any act of bankruptcy in contemplation ; and, therefore, good. *It is not to be affected by what passes in the mind of the bankrupt* " (5). (The italics are mine).

What is important to notice is that an intent on the part of a debtor who knew he was insolvent to give a preference to one creditor over the others was not one of the circumstances to be considered for the purpose of deciding whether the transaction was in the ordinary course of business and therefore not voluntary. The position thus reached was described by *Bacon* C.J. in *Ex parte Blackburn* ; *In re Cheesebrough* (6) : " It has, however, never, that I know of, been suggested that a payment in the ordinary course

(1) (1789) 1 T.R. 156 (n) [99 E.R. 1027(n)].
(2) (1768) 4 Burr. 2235, at p. 2240 [98 E.R. 165, at p. 168].
(3) (1768) 4 Burr. 2235 [98 E.R. 165].
(4) (1777) 2 Cowp. 629, at p. 634 [98 E.R. 1277, at p. 1280].
(5) (1777) 2 Cowp., at pp. 634, 635 [98 E.R., at p. 1280].
(6) (1871) L.R. 12 Eq. 358.

n direct contrast a payment
e eve of his bankruptcy and
trade. An early use of the
: business " as the opposite
v. *Temple* (2) where Lord
nveyance by a trader of all
ore bona fide creditors " of
held void, and stated as the
, in the ordinary course of
e judgment in *Alderson* v.
*van Duffy* C.J. and *Starke* J.
ll not repeat it, but I must
setting is to see that Lord
payment which cannot be
's own idea with a payment
with the ordinary course of
4) was also quoted by *Gavan*
; purposes it is desirable to
) said : " If, in a fair course
o comes to be paid, *notwith-*
*vn affairs, or his intention to*
ı the course of business, the
is there got consequentially,
ıt the preference is obtained,
made at that time. Suppose
nent, and the debtor makes
possession ; that is, and, at
, common course of business,
is any act of bankruptcy in
. *It is not to be affected by*
" (5). (The italics are mine).
t an intent on the part of a
to give a preference to one
of the circumstances to be
ng whether the transaction
and therefore not voluntary.
ed by *Bacon* C.J. in *Ex parte*
It has, however, never, that
ment in the ordinary course

(1777) 2 Cowp. 629, at p. 634 [98
   E.R. 1277, at p. 1280].
(1777) 2 Cowp., at pp. 634, 635 [98
   E.R., at p. 1280].
(1871) L.R. 12 Eq. 358.

---

of trade, the honouring bills of exchange presented at their maturity, or the payment of debts which had become due in the usual and customary manner, or payments made in fulfilment of a contract or engagement to pay in a particular manner or at a particular time, were open to any objection on the ground of their being voluntary, even although they were made without any express demand by the creditor, unless, indeed, the creditor had at the time notice of an act of bankruptcy committed by the debtor. To hold otherwise would be to embarrass and impede the most ordinary every-day transactions of commerce, and to make it impossible for creditors to know when the payments received by them in good faith and in common course could be maintained by them or not " (1).

That was the point. And accordingly when s. 92 of the *Bankruptcy Act*, 1869, made the old objective tests, the spontaneity of the payment and contemplation of bankruptcy, no longer decisive of validity, and adopted as the test for the future whether the payment (etc.) had been made " with a view of giving such creditor a preference over the other creditors ", a proviso was added to obviate the inconvenience and injustice that would result in some cases if nothing mattered but the debtor's state of mind. The proviso was that the section should not affect the rights of a purchaser, payee, or incumbrancer in good faith and for valuable consideration. Henceforth " in the ordinary course of business " as a test of whether a payment satisfied the old objective criteria was irrelevant. Of course there was a use that could still be made of the expression, for to say that the act of a debtor in making a payment was an act done by him in the ordinary course of business would amount to denying that he did it with a view of preferring the payee over the other creditors : cf. per Lord *Blackburn* in *Tomkins* v. *Saffery* (2). " The mere fact " said *Vaughan Williams* J. in *In re Eaton & Co. ; Ex parte Viney* (3), " a man in business, when insolvent, meets a bill of exchange raises no inference of an intention or view to prefer the holder of the bill, because in the ordinary course of business a man must either meet his bills or put up his shutters ". The expression thus came to be used in a context which treated it as explanatory of the debtor's state of mind.

When the Commonwealth *Bankruptcy Act* 1924, took up the expression it placed it in a different context. The course adopted was to make the debtor's state of mind completely immaterial to the validity of a preference, priority or advantage given to one creditor over the others. Whether the debtor has acted with a view

H. C. OF A.
1963-1964.

TAYLOR
v.
WHITE.

Kitto J.

(1) (1871) L.R. 12 Eq., at pp. 363, 364.
(2) (1877) 3 App. Cas. 213, at p. 233.
(3) [1897] 2 Q.B. 16, at p. 18.

146                        HIGH COURT                [1963-1964.

H. C. OF A.
1963-1964.

TAYLOR
v.
WHITE.

Kitto J.

of giving a preference or, on the contrary, has acted in the ordinary course of business matters no longer. A payment which has in fact given a creditor an advantage over the others within the statutory period is void, subject only to a provision enacted for the protection of a payee of a particular kind. It is in the definition of that particular kind of payee that the legislature has laid hold of the phrase " in the ordinary course of business ", in order to express, as it had expressed in such contexts as that of the passage I have set out from *Rust* v. *Cooper* (1) an idea, in relation to the creditor's acceptance of the payment, which goes beyond his good faith but has nothing to do with the debtor's knowledge of his own financial position or any intention he may have of giving a preference. The payee must have taken the money not only in good faith—at the least without knowing, and without having reason to suspect, that the payer was unable to pay his debts as they became due and that the effect of the payment would be to give him an advantage over the other creditors—but also without there being, in his taking it, anything unusual or remarkable to make it other than an ordinary business transaction. That is how I would understand s. 95 (2). In s. 96 (1) a similar addition was made to the general provision for protecting a payment (etc.) made before sequestration : the person (other than the debtor) with whom the transaction took place must not have had notice of any available act of bankruptcy committed by the debtor or the presentation of a petition, and the transaction must have been in good faith and in the ordinary course of business. It seems inconceivable that under that section the debtor's knowledge or intention should enter into a question as to whether a transaction was in the ordinary course of business.

I would therefore regard as irrelevant in the present case, on the question whether the appellant was a payee in the ordinary course of business, the financial condition of the company at the times when the payments were made, the state of Taylor's knowledge at those times, and the intention with which Taylor caused the payments to be made ; for these things were all unknown both to Mrs. Quinn and to Mrs. Taylor. I would also regard as irrelevant the fact that Mrs. Taylor knew that the company was having financial difficulties, for the finding has been made that she did not know it was insolvent. There is many a company in the community known to be having financial difficulties. To hold that a creditor of such a company who knows that fact but knows nothing more cannot be a payee of his debt in the ordinary course of business

(1) (1777) 2 Cowp. 629, at pp. 634, 635 [98 E.R. 1277, at p. 1280].

has acted in the ordinary
A payment which has in
or the others within the
a provision enacted for
ind. It is in the definition
legislature has laid hold
of business ", in order to
xts as that of the passage
an idea, in relation to the
uich goes beyond his good
or's knowledge of his own
tay have of giving a pre-
money not only in good
id without having reason
to pay his debts as they
ayment would be to give
ditors—but also without
unusual or remarkable to
transaction. That is how
(1) a similar addition was
tecting a payment (etc.)
(other than the debtor)
must not have had notice
nmitted by the debtor or
ransaction must have been
rse of business. It seems
the debtor's knowledge or
s to whether a transaction

it in the present case, on
s a payee in the ordinary
on of the company at the
he state of Taylor's know-
with which Taylor caused
ngs were all unknown both
uld also regard as irrelevant
the company was having
s been made that she did
uny a company in the com-
lifficulties. To hold that a
hat fact but knows nothing
ordinary course of business

8 E.R. 1277, at p. 1280].

would surely be out of the question. Moreover I would regard as of no significance the fact that the first three payments of £500 each were made during the six months instead of being kept, like the balance, until the last day. The payment of the debt by such instalments does not seem to me to be out of the ordinary for a transaction of the kind. Finally, in my opinion, the family relationship has nothing to do with the question whether Mrs. Quinn was a payee in the ordinary course of business. In brief, I think, with all respect to those who differ, that the question in such a case as the present becomes blurred, so that immaterial considerations are allowed to affect the answer, if it is put in the form whether the payment was in the ordinary course of business. The question the section asks is whether the payee was a payee in the ordinary course of business.

In my opinion the appeal should be allowed and the judgment of *Gibbs* J. should be restored.

TAYLOR J. The question in this appeal is whether certain payments made by E. J. Taylor & Son Pty. Limited to Florence Catherine Quinn, now deceased, constituted preferences within the meaning of s. 275 of *The Companies Acts* 1931 *to* 1960 (Q.). The payments in question are three in number, £500 paid on 17th June 1959, £500 paid on 20th July 1959 and £2,500 paid on 30th July 1959, and it was held by *Gibbs* J. that, in relation to these payments, and an earlier payment of £500 made on 8th April 1959 and within six months preceding the commencement of the company's winding up, Mrs. Quinn was, in the language of s. 95 of the *Bankruptcy Act* 1924-1960 (Cth), a " payee in good faith and for valuable consideration and in the ordinary course of business ". Accordingly he dismissed the application of the liquidator for a declaration that the payments constituted preferences but on appeal the Full Court reversed his decision except as to the payment on 8th April 1959 and this payment is not now in question.

The business of the company was that of building contractors and at all material times Edwin Joseph Taylor and the respondent Christabel Janet Taylor were its only directors. Mrs. Quinn, to whom the payments were made and who died on 1st September 1960 at the age of eighty-two, was Mrs. Taylor's mother and Mrs. Taylor and the other respondent, Vincent Patrick Quinn, are the executors of Mrs. Quinn's will. It appears that Mrs. Taylor was not an active director of the company and, according to the learned trial judge, she had little, if any, knowledge of the company's affairs. " Although she was a director ", his Honour said, " Mrs.

148                                HIGH COURT                        [1963-1964.

Taylor took little part in the management of the affairs of the company. Meetings of directors were not held and Mrs. Taylor was not consulted about the company's affairs. She took telephone messages and occasionally signed cheques when her husband was not available but those were practically the only duties she performed for the company, although she received not inconsiderable fees as a director ".

The four payments originally challenged, which aggregated £4,000, were made in repayment to Mrs. Quinn of an amount lent by her to the company in 1957. But at this time Mrs. Taylor held a power of attorney from her mother and under its authority managed her affairs. *Gibbs* J. found that Mrs. Quinn was bedridden and senile for some few years before her death and that she could comprehend only very little of what was going on about her. She required nursing attention both by day and by night and the expense of caring for her was heavy. It was in these circumstances that Mrs. Taylor, acting under her power of attorney, advanced the sum of £4,000 to the company in 1957. What happened was that Mrs. Quinn's house was sold in that year and the sum of £4,000 became available for investment. She discussed the matter with her husband and at his suggestion that sum was lent to the company on 26th July 1957. In return for a cheque drawn on her mother's account Mrs. Taylor received from the company a written document which acknowledged receipt of the sum of £4,000 and evidenced an agreement by the company to repay the amount of the loan in full " within six months from date of notice in writing delivered to the registered office of the company ". In the meantime the company agreed to pay interest at the rate of £8 per cent per annum monthly.

By January 1959 Mrs. Quinn's resources had been almost depleted and Mrs. Taylor spoke to her husband with a view to obtaining repayment of some part of the loan. His reply was that she should write to the company about it and, accordingly, on 30th January 1959, she made a demand in writing upon the company for the repayment of the sum of £4,000 in accordance with the company's undertaking. Nothing was paid by the company until 10th March 1959 when a cheque for interest in the sum of £160 was paid into Mrs. Quinn's account. After a further conversation with her husband towards the end of March or early in April 1959 when Mrs. Taylor again asked for repayment of some part of the debt a payment of £500 was made on account of the principal sum. This amount was also paid by the company into Mrs. Quinn's account. The next payment on 17th June 1959 was effected by a

[1963-1964.

t of the affairs of the
held and Mrs. Taylor
irs. She took telephone
when her husband was
ne only duties she per-
ived not inconsiderable

ged, which aggregated
quinn of an amount lent
s time Mrs. Taylor held
nd under its authority
rs. Quinn was bedridden
eath and that she could
going on about her. She
and by night and the
s in these circumstances
of attorney, advanced
7. What happened was
t year and the sum of
She discussed the matter
hat sum was lent to the
for a cheque drawn on
ed from the company a
eipt of the sum of £4,000
ny to repay the amount
date of notice in writing
mpany ". In the mean-
at the rate of £8 per cent

urces had been almost
husband with a view to
loan. His reply was that
it and, accordingly, on
in writing upon the com-
00 in accordance with the
id by the company until
st in the sum of £160 was
: a further conversation
rch or early in April 1959
ment of some part of the
ount of the principal sum.
npany into Mrs. Quinn's
ne 1959 was effected by a

---

110 C.L.R.]       OF AUSTRALIA.                149

cheque which was actually signed by Mrs. Taylor but she says that she has no recollection of having signed it. Then followed a further payment of £500 by the company to Mrs. Quinn's account on 20th July 1959 and the balance of £2,500 was paid on 30th July 1959. According to Mrs. Taylor's evidence she made no request to her husband in respect of any of the last three payments and she did not know whether she had been notified that some of the payments had been made. It was found as a fact by the learned trial judge that the payments on 17th June, 20th July and 30th July were made by the company without any request from Mrs. Taylor.

It is obvious that some months before the payment of 17th June was made the company was in serious financial difficulties, and it was found as a fact by the learned trial judge that from April onwards it was unable to pay its debts as they became due out of its own money and that when the company made the last two payments Taylor knew that the company was insolvent. Further his Honour expressly found that the last two payments were made by Taylor with the intention of preferring Mrs. Quinn over the other creditors. Indeed, by 4th August 1959 an accountant employed by the company had prepared an estimated statement of the company's assets and liabilities and three days later, on 7th August 1959, he arranged to call a meeting of the company's creditors. Ten days later, on 17th August, a meeting of the company was held and it was resolved that it should go into voluntary liquidation.

The extent of Mrs. Taylor's knowledge of the financial position of the company was investigated in the original proceedings. It is unnecessary to review this evidence in detail but it is clear that Mrs. Taylor did know that the company was experiencing difficulties although she hoped, as the trial judge found, that it would be able to surmount them. However, it was found in her favour that the payments were not made under such circumstances as to lead to the inference that she knew or had reason to suspect that the company was unable to pay its debts as they became due or that the effect of the payment would be to give Mrs. Quinn a preference, a priority or an advantage over the other creditors. This finding was not seriously challenged and the only question for us is whether the learned trial judge's finding that Mrs. Quinn was a payee in the ordinary course of business should be restored.

Under the English bankruptcy law and the earlier bankruptcy law of a number of the States of the Commonwealth provision was made for the avoidance of what were called " fraudulent pre-ferences " and a payment by a debtor unable to pay his debts

H. C. of A.
1963-1964.

TAYLOR
v.
WHITE.

Taylor J.

from his own money made in favour of a creditor and having the effect of giving the creditor a preference over other creditors fell within this category if made " with a view " of giving such creditors such a preference. Under these provisions lack of knowledge of the debtor's affairs on the part of the creditor was of no consequence ; it was sufficient if it appeared that the " substantial, effective or dominant" intention of the debtor in making the payment was to prefer the creditor to whom the payment was made (*Ex parte Hill* ; *In re Bird* (1) and *Muntz* v. *Smail* (2)). There are decisions to the effect that once a trustee in bankruptcy proved that the debtor was insolvent at the time when the payment was made and that the payment had the effect of giving the creditor a preference the onus lay upon the latter, if he wished to support the payment, to establish that it was not made with the intention of preferring him (*In re Eaton & Co.* ; *Ex parte Viney* (3) ; and *In re Lake* ; *Ex parte Dyer* (4). But these decisions are in conflict with *Ex parte Lancaster* ; *In re Marsden* (5) and *Sharp* v. *Jackson* (6) and with later cases, including *Peat* v. *Gresham Trust Ltd.* (7)). Whether any particular payment is made with a view to prefer one creditor to another or others almost invariably falls to be established under the English legislation upon consideration of evidence of the circumstances in which it was made and the intent may be inferred from a great variety of circumstances. But, perhaps, the most potent circumstance for consideration is whether the payment was made in the ordinary course of business. This expression was not intended or taken to require an examination of the character of the business of the debtor and, thereupon, a conclusion reached as to whether the impugned transaction fell within the scope of the activities usually or commonly carried on in such a business ; the test was whether the transaction had found its origin in and was accounted for by ordinary business considerations. If and when this was found to be so and no other special circumstances appeared, that fact was constantly regarded for all practical purposes as being inconsistent with the contemporaneous existence of any intent " or view " to prefer the payee. The " ordinary course of business " and an " intent to prefer " were, it seems to me, treated as quite inconsistent notions so that once it was proved that a payment had in fact been made with the sole or dominant " view " of preferring a creditor it was impossible to say that it had been made in the ordinary course of business.

(1) (1883) 23 Ch.D. 695.
(2) (1909) 8 C.L.R. 262.
(3) [1897] 2 Q.B. 16.
(4) [1901] 1 K.B. 710.

(5) (1884) 25 Ch. D. 311.
(6) [1899] A.C. 419.
(7) [1934] A.C. 252.

[1963-1964.

creditor and having the
over other creditors fell
" of giving such creditors
is lack of knowledge of
editor was of no conse-
that the " substantial,
debtor in making the
n the payment was made
v. *Smail* (2)).   There are
e in bankruptcy proved
when the payment was
ct of giving the creditor
, if he wished to support
made with the intention
*Ex parte Viney* (3) ;  and
e decisions are in conflict
(5) and *Sharp* v. *Jackson*
*Gresham Trust Ltd.* (7)).
le with a view to prefer
st invariably falls to be
n upon consideration of
was made and the intent
circumstances.  But, per-
consideration is whether
course of business.  This
require an examination
debtor and, thereupon, a
mpugned transaction fell
or commonly carried on in
transaction had found its
y business considerations.
l no other special circum-
regarded for all practical
ontemporaneous existence
e payee.  The " ordinary
prefer " were, it seems to
so that once it was proved
with the sole or dominant
impossible to say that it
f business."

84] 25 Ch. D. 311.
99] A.C. 419.
34] A.C. 252.

---




H. C. OF A.
1963-1964.

TAYLOR
*v.*
WHITE.

Taylor J.

Section 95 of the Commonwealth Act initially, at least, casts the net a little wider than the English legislation.  If upon the evidence all that appears is that a payment has been made to a creditor by a person unable to pay his debts as they become due from his own money and that the payment has the effect of giving that creditor a preference, a priority or an advantage over the other creditors, the section operates to avoid the payment as against the trustee if the debtor becomes bankrupt on a bankruptcy petition presented within six months after the making of the payment (*S. Richards & Co. Ltd.* v. *Lloyd* (1)).  But the operation of s. 95 (1) will be defeated if the payee establishes that he was a payee in good faith and for valuable consideration and in the ordinary course of business (sub-s. (2) and (3)).  It is clear, therefore, that as far as s. 95 (1) is concerned the intention of the debtor, and for that matter, that of the creditor, is an irrelevant consideration though the extent of the latter's knowledge will be most material in relation to the issue of good faith.  How far the debtor's intention in making the payment is relevant to the question whether the payment was made in the ordinary course of business has, perhaps, not been directly decided in relation to s. 95 but if it has no bearing on that issue the surprising result will follow that a payment which constituted a fraudulent preference under the English bankruptcy law and that of a number of the States of the Commonwealth may well escape the operation of s. 95 though it was designed, as I have already said, to cast a somewhat wider net.

In considering this question it is desirable to repeat that under the old law the fact that a payment was made to a creditor in the ordinary course of business for all practical purposes negatived any suggestion that it had been made with a view to preferring the creditor.  I quote from the joint judgment of *Gavan Duffy* C.J. and *Starke* J. in *Robertson* v. *Grigg* (2) : " But was he (i.e. the respondent) a purchaser ' in the ordinary course of business ' ?  These words may be traced a long way back in bankruptcy law.  Thus in *Alderson* v. *Temple* (3) and *Rust* v. *Cooper* (4), we find Lord *Mansfield* denying that acts in the ordinary course of business amount to fraudulent preferences.  ' If a bankrupt, in course of payment pays a creditor ; this is a fair advantage, in the course of trade : or, if a creditor threatens legal diligence, and there is no collusion ;  or begins to sue a debtor ;  and he makes an assignment of part of his goods ; it is a fair transaction, and what a man might do, without having

(1) (1933) 49 C.L.R. 49.
(2) (1932) 47 C.L.R. 257.
(3) (1768) 4 Burr. 2235, at p. 2240
      [98. E.R. 165; at p. 168].
(4) (1777) 2 Cowp. 629, at p. 634 [98
      E.R. 1277, at p. 1280].

152         HIGH COURT         [1963-1964.

H. C. OF A.
1963-1964.

TAYLOR
*v.*
WHITE.

Taylor J.

any bankruptcy in view.' 'If, in a fair course of business, a man pays a creditor who comes to be paid, notwithstanding the debtor's knowledge of his own affairs, or his intention to break ; yet, being a fair transaction in the course of business, the payment is good ; for the preference is there got consequentially, not by design.' Again, Lord *Blackburn*, in *Tomkins* v. *Saffery* (1) says : ' Now I think you must say that it is not with a view to give an undue preference, if a man makes a payment to a creditor in the ordinary course of business.' And he instances the case of a man struggling on and making payments to keep his business going " (2). This case, together with *Burns* v. *McFarlane* (3) and *Downs Distributing Co. Pty. Ltd.* v. *Associated Blue Star Stores Pty. Ltd.* (*In Liquidation*) (4), are clear authorities for the proposition that the conclusion whether a payment has, within the meaning of s. 95 (2), been made in the ordinary course of business does, as was the position under the English law, not require an examination of the character of the debtor's business. In the first-mentioned case the test was stated by *Gavan Duffy* C.J. and *Starke* J. in the following words : " The test under s. 95 of the ordinary course of business is not whether the act is usual or common in the business of the debtor or of the creditor, but whether it is ' a fair transaction, and what a man might do without having any bankruptcy in view ' " (2). Much the same view was expressed by *Evatt* J. in the same case when he said that " the ' ordinary course of business ' is not, I think, to be related to any special business carried on by either debtor or creditor but is concerned with the character of the impeached transaction itself " (5). Likewise in the joint judgment of *Rich, Dixon* and *McTiernan* JJ. in *Burns* v. *McFarlane* (3), it was said : " Unlike the expression found in the bills-of-sale legislation, viz., ' transfers of goods in the ordinary course of business of any trade or calling ', it does not require an investigation of the course pursued in any particular trade or vocation and it does not refer to what is normal or usual in the business of the debtor or that of the creditor " (6), whilst *Starke* J. in the same case briefly recapitulated the test propounded in *Robertson* v. *Grigg* (7) " that the test under s. 95 of the ordinary course of business was not related to any special business carried on by the debtor or creditor but was whether the transaction was fair and what a man might do without having any bankruptcy in view " (8). In the latest of these cases *Rich* J. carried the matter a little further when,

(1) (1877) 3 App. Cas. 213, at p. 235.      (5) (1932) 47 C.L.R., at p. 273.
(2) (1932) 47 C.L.R., at p. 267.          (6) (1940) 64 C.L.R., at p. 125.
(3) (1940) 64 C.L.R. 108.              (7) (1932) 47 C.L.R. 257.
(4) (1948) 76 C.L.R. 463.              (8) (1940) 64 C.L.R., at p. 128.

[1963-1964.

110 C.L.R.]    OF AUSTRALIA.    153

H. C. OF A.
1963-1964.

TAYLOR
*v.*
WHITE.

Taylor J.

course of business, a man
withstanding the debtor's
tion to break ; yet, being
ass, the payment is good ;
ully, not by design.' Again,
(1) says : ' Now I think
give an undue preference,
in the ordinary course of
a man struggling on and
s going " (2). This case,
nd *Downs Distributing Co.
y. Ltd. (In Liquidation)* (4),
hat the conclusion whether
. 95 (2), been made in the
as the position under the
n of the character of the
d case the test was stated
e following words : " The
of business is not whether
siness of the debtor or of
: transaction, and what a
ankruptcy in view ' " (2).

*Evatt* J. in the same case
urse of business ' is not, I
siness carried on by either
with the character of the
ewise in the joint judgment
*Burns* v. *McFarlane* (3), it
d in the bills-of-sale legisla-
dinary course of business of
uire an investigation of the
or vocation and it does not
e business of the debtor or
: J. in the same case briefly
*Robertson* v. *Grigg* (7) " that
course of business was not
on by the debtor or creditor
fair and what a man might
a view " (8). In the latest
atter a little further,

1932) 47 C.L.R., at p. 273.
1940) 64 C.L.R., at p. 125.
1932) 47 C.L.R. 257.
1940) 64 C.L.R., at p. 128.

after quoting from the earlier cases to show that the expression " does not require an investigation of the course pursued in any particular trade or vocation and it does not refer to what is normal or usual in the business of the debtor or that of the creditor " (1), went on to emphasize that " it is an additional requirement and is cumulative upon good faith and valuable consideration " (2). " It is, therefore ", he said, " not so much a question of fairness and absence of symptoms of bankruptcy as of the everyday usual or normal character of the transaction. The provision does not require that the transaction shall be in the course of any particular trade, vocation or business. It speaks of the course of business in general. But it does suppose that according to the ordinary and common flow of transactions in affairs of business there is a course, an ordinary course. It means that the transaction must fall into place as part of the undistinguished common flow of business done, that it should form part of the ordinary course of business as carried on, calling for no remark and arising out of no special or particular situation " (3).

With these observations in mind it is important to emphasize once again that the section contemplates that a payee may be a payee in good faith and yet not in the ordinary course of business (cf. sub-ss. 2 (*a*) and 2 (*b*) of s. 95). In other words it may clearly appear that the payment was not made or incurred under such circumstances as to lead to the inference that the creditor knew or had reason to suspect that the debtor was unable to pay his debts as they became due or that the effect of the payment would be to give him a preference, a priority or advantage over other creditors and yet he may not be a payee in the ordinary course of business. Indeed he may not know that he has received the payment and there is evidence in the present case which shows that all or some of the payments now in question were paid into Mrs. Quinn's bank account without her knowledge and, possibly, without the knowledge of her attorney, Mrs. Taylor. To my mind, s. 95 appears as an attempt to rationalize the old law and to accept the view that a payment made by a debtor in the ordinary course of business negatives any design or intent to prefer the creditor and to afford a complete answer where the payment is so made, provided also that he is also a payee in good faith within the meaning of the section.

However, upon consideration of the local cases to which I have referred, the learned trial judge seems to have thought that a payment must be taken to have been made in the ordinary course of business unless the payment, considered entirely apart from the

(1) (1948) 76 C.L.R., at p. 476.    (3) (1948) 76 C.L.R., at p. 477.
(2) (1948) 76 C.L.R., at pp. 476, 477.

154                        HIGH COURT                  [1963-1964.

H. C. of A.    circumstances which have induced it, exhibits at the time some
1963-1964.    unusual feature. He said: "Here all that occurred was that a
TAYLOR       debtor chose to pay off its debt although it could lawfully have
  v.         delayed payment if it had wished, and the creditor accepted the
WHITE.       payment. A man may pay his debts before he is obliged to do so,
Taylor J.    even though he has not bankruptcy in view. Such a payment, in
             itself, calls for no special remark, and it would be usual for a debtor
             to make and a creditor to receive such a payment uninfluenced by
             any belief on the part of the creditor that the debtor was insolvent."
             In this passage there is some adaptation of a quotation already
             made from the judgment of *Rich* J. in *Downs Distributing Co. Pty.
             Ltd.* v. *Associated Blue Star Stores Pty. Ltd.* (*In Liquidation*) (1)
             when he said " it means that the transaction must fall into place
             as part of the undistinguished common flow of business done,
             that it should form part of the ordinary course of business as car-
             ried on, calling for no remark and arising out of no special or particu-
             lar situation " (2). But this means no more and no less than that
             the transaction will be taken to have been in the ordinary course
             of business if after examination of the circumstances in which it
             took place it is found to possess these characteristics. When the
             circumstances in which these payments were made are examined
             it is seen that they were made at a time when the company owed
             large sums to unsecured creditors, a great deal of which had been
             outstanding for more than three months, that some of the pay-
             ments in question were made before the company was obliged
             to make them, that at least from April onwards the company was
             unable to pay its debts as they became due out of its own money,
             that the payments were made to Taylor's wife's mother almost
             immediately before liquidation and that the last two payments
             at least were made with the intention of preferring Mrs. Quinn
             over the other creditors. In these circumstances it is, I think,
             impossible to say that they " fall into place as part of the undis-
             tinguished common flow of business done " (2). Nor do they
             appear, in the language of *Gavan Duffy* C.J. and *Starke* J. in
             *Robertson* v. *Grigg* (3), as " what a man might do without having
             any bankruptcy in view " (4). To my mind the express finding
             that the last two payments were made with the intention of pre-
             ferring Mrs. Quinn alone precludes the conclusion that they were
             made in the ordinary course of business and consideration of the
             circumstances in which the payment of 17th June 1959 was made
             leads me to the conclusion that it must share the same fate.

                 In my opinion the appeal should be dismissed.

             (1) (1948) 76 C.L.R. 463.          (3) (1932) 47 C.L.R. 257.
             (2) (1948) 76 C.L.R., at p. 477.   (4) (1932) 47 C.L.R., at p. 267.

exhibits at the time some
that occurred was that a
gh it could lawfully have
the creditor accepted the
fore he is obliged to do so,
view. Such a payment, in
would be usual for a debtor
a payment uninfluenced by
t the debtor was insolvent."
ion of a quotation already
*Downs Distributing Co. Pty.*
*t. Ltd. (In Liquidation)* (1)
saction must fall into place
on flow of business done,
y course of business as car-
out of no special or particu-
more and no less than that
been in the ordinary course
e circumstances in which it
e characteristics. When the
s were made are examined
ne when the company owed
reat deal of which had been
ths, that some of the pay-
the company was obliged
l onwards the company was
e due out of its own money,
ylor's wife's mother almost
hat the last two payments
n of preferring Mrs. Quinn
ircumstances it is, I think,
place as part of the undis-
done" (2). Nor do they
*Duffy* C.J. and *Starke* J. in
an might do without having
y mind the express finding
le with the intention of pre-
e conclusion that they were
ess and consideration of the
of 17th June 1959 was made
st share the same fate.
dismissed.

(1932) 47 C.L.R. 257.
(1932) 47 C.L.R., at p. 267.

MENZIES J. The respondents, the liquidators of E. J. Taylor & Son Pty. Ltd., commenced proceedings to have it declared that payments totalling £4,000 made by the company to Mrs. Florence Catherine Quinn (who died and whose estate is represented by the appellants) amounted to a preference within the meaning of s. 275 of *The Companies Acts* 1931 *to* 1960 (Q.) and were invalid accordingly. The application was heard by *Gibbs* J. who found that the payments in question (1) were for valuable consideration because they were in satisfaction of a debt owing by the company to Mrs. Quinn and (2) were in good faith because she did not know, and had no reason to suspect, the facts that the company was unable to pay its debts as they became due and that the effect of the payments would be to give her an advantage over other creditors. Accepting these findings which were unchallenged, the only question with which we are now concerned is whether the payments in issue were made in the ordinary course of business. *Gibbs* J. held that they were but his decision on this point was reversed by the Full Court as to payments totalling £3,500. The finding of *Gibbs* J. on the point now at issue was expressed shortly as follows :—" Here all that occurred was that a debtor chose to pay off its debt although it could lawfully have delayed payment if it had wished, and the creditor accepted the payment. A man may pay his debts before he is obliged to do so, even though he has not bankruptcy in view. Such a payment, in itself, calls for no special remark, and it would be usual for a debtor to make and a creditor to receive such a payment uninfluenced by any belief on the part of the creditor that the debtor was insolvent." His Honour's reference to the company having paid the debt before it was obliged to do so is explained by the facts.

On 26th July 1957 Mrs. Quinn lent the company £4,000 to be repaid in full " within six months from the date of notice in writing delivered to the registered office of the Company advising that repayments of the sum . . . is to be made." Interest at 8 per cent was payable monthly—that is £26.13.4 per month. Interest, it would seem, was paid for some time but must have fallen into arrears not later than October 1958, for on 10th March 1959 a sum of £160 was paid by way of interest. In the meantime, on 30th January 1959 Mrs. Quinn's attorney, her daughter Mrs. Taylor who was also a director of the company, wrote to the secretary of the company as follows : " I wish to advise that I would like repayment of £4,000 which I lent your Company on 26th July 1957." Then followed these payments on account of the money lent: 8th April 1959, £500 ; 17th June 1959, £500 ; 20th July

156                            HIGH COURT                    [1963-1964.

1959, £500 ; 30th July 1959, £2,500. These dates show that £1,500 was paid on dates earlier than that by which the company was bound to pay (i.e. 30th July 1959). What happened about interest after 10th March 1959 was not disclosed.

The reason for the notice to repay was that money was needed to pay the nursing and medical expenses necessary for Mrs. Quinn's care. Before April 1959 these expenses were about £18 per week and thereafter they were about £30 per week. They were paid out of Mrs. Quinn's banking account which, on 27th January 1959, was in credit to the extent of £117.

From its incorporation in 1954 there were but two directors of the company, E. J. Taylor and his wife, Mrs. Quinn's daughter and attorney. Mrs. Taylor's evidence was that she did not remember ever seeing a balance sheet or a bank statement of the company. Her husband and the company's secretary and the company's accountant each swore that he did not show Mrs. Taylor any balance sheet or bank statement. How the provisions of s. 139 of *The Companies Acts* 1931 *to* 1960 (Q.) requiring every balance sheet of a company to be signed by two directors were complied with was a matter not explained.

The financial position of the company during the period in which the payments in question were made is sufficiently indicated by stating that in August 1959, at the end of the period, the company owed about £90,000 to unsecured creditors who will not receive more than two shillings in the pound ; on 31st March 1959, at the beginning of the period, it owed unsecured creditors £107,354, of which £31,342 had then been owing for more than three months.

*Gibbs* J. made the following findings that seem to me of importance in deciding this appeal :—

(1) " It is not in dispute that the four payments totalling £4,000 were made, that they were in favour of a creditor, that they had the effect of giving the creditor a preference over the other creditors or that the payments were made within six months of the commencement of the winding up, which commenced when the resolution was passed on the 17th August, 1959 (Section 233 of *The Companies Acts*) ".

(2) " I think that I should conclude, on the balance of probabilities, that from April onwards the company was unable to pay its debts as they became due out of its own money, within the meaning of the section ".

(3) " I am not prepared to find that Taylor was aware before the 20th July that the company was insolvent ".

[1963-1964.

ese dates show that £1,500
y which the company was
at happened about interest
d.

as that money was needed
necessary for Mrs. Quinn's
were about £18 per week
week. They were paid out
h, on 27th January 1959,

were but two directors of
ife, Mrs. Quinn's daughter
as that she did not remem-
c statement of the company.
retary and the company's
ow Mrs. Taylor any balance
rovisions of s. 139 of *The*
ring every balance sheet of
rs were complied with was a

y during the period in which
is sufficiently indicated by
of the period, the company
ditors who will not receive
on 31st March 1959, at the
cured creditors £107,354, of
or more than three months.
hat seem to me of importance

ur payments totalling £4,000
of a creditor, that they had
rence over the other creditors
six months of the commence-
nced when the resolution was
ction 233 of *The Companies*

, on the balance of probabili-
npany was unable to pay its
n money, within the meaning

iat Taylor was aware before
insolvent ".

---

(4) " I have no hesitation in finding that on the 20th July Taylor knew that the company was insolvent ".

(5) " Mrs. Quinn died on the 1st September 1960, aged 82. For the last two years of her life at least she was bedridden and senile and her sight was bad. She could comprehend only very little of what was going on about her. Her daughter managed her affairs ... It is clear that Mrs. Quinn herself had no knowledge of any of these transactions. However, in the circumstances of the case, since Mrs. Taylor had the widest authority to manage Mrs. Quinn's affairs, her knowledge and state of mind should be imputed to Mrs. Quinn ".

(6) " I find that the payments on the 17th June, 20th July and the 30th July were made by the company without any request having been made by Mrs. Taylor. After the payment was made on the 17th June Mrs. Quinn's account was £604. 3. 0 in credit ; the third payment on the 20th July brought the credit balance up to at least £914 ".

(7) " I do accept that it was not until the 3rd August 1959, that Mrs. Taylor knew that the company was insolvent. However, I also find that before that date Mrs. Taylor knew that the company was experiencing difficulties although she hoped that it would be able to surmount them ".

(8) " On 20th July, Taylor, besides drawing the company's cheque for £500 in favour of Mrs. Quinn, also drew, on behalf of the company, in his own favour, a cheque for £1,250 in repayment of moneys that he had lent to the company ".

The onus of proof that the payments were made in the ordinary course of business was, of course, upon the appellants and accordingly I am not sure that his Honour's carefully expressed negative statement (3) above helps the appellants very much.

At this point it is, I think, necessary to examine the relevant portion of the text of s. 95 of the Commonwealth *Bankruptcy Act*, for what s. 275 of *The Companies Acts*, 1931 *to* 1960 (Q.) does is to invalidate any payment made by a company before its winding up which, if it had been made by an individual, would, in a bankruptcy upon a petition presented upon the date of the commencement of the company's winding up, be deemed in that bankruptcy to be a fraudulent preference—that is a payment avoided as against the trustee in bankruptcy by s. 95 of the *Bankruptcy Act*.

What s. 95 avoids *inter alia* are payments made in particular circumstances " in favour of any creditor or of any person in trust for any creditor " having a particular effect. The word " creditor " is not defined, so it bears its ordinary meaning, and it is important

158                      HIGH COURT                    [1963-1964.

H. C. OF A.
1963-1964.

TAYLOR
v.
WHITE.

Menzies J.

to keep in mind that what are avoided are certain transactions between the person who becomes bankrupt and a creditor or a trustee for a creditor : see *Robertson* v. *Grigg* (1), per *Dixon* J. (2). There is no doubt that the payments which the company made here to Mrs. Quinn would, if made by an individual who became bankrupt when the liquidation of the company commenced, fall within s. 95 (1) unless excluded therefrom by s. 95 (2). It is this latter sub-section that is therefore particularly important for present purposes and it is desirable to set it out together with s. 95 (3) :—" (2) Nothing in this section shall affect—(*a*) the rights of any person making title in good faith and for valuable consideration through or under a creditor of the bankrupt ; or (*b*) the rights of a purchaser, payee or encumbrancer in good faith and for valuable consideration and in the ordinary course of business. (3) The burden of proving that the provisions of the last preceding sub-section have been complied with shall lie upon the person who relies upon their having been complied with ".

What s. 95, sub-s. (2) (*a*), protects is the rights of a person making title in the circumstances there stated through or under a creditor to whom sub-s. (1) applies. On its face it does not relate to a person who obtains title from a person making title through or under a creditor nor does it relate to a person who is himself a creditor. Section 95 (2) (*b*) protects the rights of " a purchaser, payee or encumbrancer " and, in conformity with s. 95 (2) (*a*), one might have expected this provision to refer not to a creditor but to a purchaser, payee or encumbrancer from a creditor. Section 95, sub-s. (4), however, makes it clear that if sub-s. (2) (*b*) is not exclusively concerned with the rights of creditors, it does comprehend the rights of creditors, for the words in sub-s. (4) " a creditor shall not be deemed to be a purchaser, payee or encumbrancer in good faith " clearly enough, in referring back to sub-s. (2) (*b*), indicate that the earlier sub-section is dealing with the rights of creditors. It follows from this and from what has already been said that s. 275 of *The Companies Acts*, 1931 *to* 1960 (Q.), incorporating as it were s. 95 of the *Bankruptcy Act* 1924-1960 (Cth), would protect the rights of Mrs. Quinn and her estate in receiving the payments in question if she is to be regarded as a payee " in the ordinary course of business ".

The conception of a creditor receiving from his debtor payment of a debt due and payable otherwise than in the ordinary course of the payee's business is somewhat odd. A payee who has no business might be so described so that such a creditor could never

(1) (1932) 47 C.L.R. 257.          (2) (1932) 47 C.L.R., at p. 271.

110 C.L.R.]   OF AUSTRALIA.   159

l are certain transactions
rupt and a creditor or a
*'rigg* (1), per *Dixon* J. (2).
vhich the company made
in individual who became
:ompany commenced, fall
m by s. 95 (2). It is this
articularly important for
set it out together with
shall affect—(*a*) the rights
ind for valuable considera-
ankrupt ; or (*b*) the rights
good faith and for valuable
of business. (3) The burden
preceding sub-section have
irson who relies upon their

e rights of a person making
hrough or under a creditor
does not relate to a person
g title through or under a
who is himself a creditor.
of " a purchaser, payee or
h s. 95 (2) (*a*), one might
iot to a creditor but to a
n a creditor. Section 95,
f sub-s. (2) (*b*) is not exclu-
ditors, it does comprehend
sub-s. (4) " a creditor shall
e or encumbrancer in good
к to sub-s. (2) (*b*), indicate
rith the rights of creditors.
as already been said that
1960 (Q.), incorporating as
4-1960 (Cth), would protect
in receiving the payments
a payee " in the ordinary

g from his debtor payment
ihan in the ordinary course
odd. A payee who has no
such a creditor could never

1932) 47 C.L.R., at p. 271.

have his rights protected by sub-s. (2) (*b*), but that seems highly
unlikely. The oddness is quite as apparent if attention is given to
the word " purchaser " in sub-s. (2) (*b*). Is a purchase of a house
for a home by a private creditor necessarily outside the protection
of sub-s. (2) (*b*) while a finance company, being a creditor, which
buys a house in the course of its business, is capable of bringing
itself within the protection of the sub-section ?   The same difficulty
arises with the third class of creditor referred to in sub-s. (2) (*b*)—
that is an encumbrancer. It seems most unlikely that the business
actually carried on by the creditor should be examined to see
whether the payment was in the ordinary course of business.
Similar considerations make it unlikely that all that should be
looked at to determine whether a transaction is " in the ordinary
course of business " is the business of the person making the pay-
ment. It is not surprising, therefore, that the courts have rejected
out of hand the notion that to determine what is in the ordinary
course of business requires an investigation into what is normal
or usual in the business of the debtor or the creditor: see *Robertson* v.
*Grigg* (1) per *Gavan Duffy* C.J. and *Starke* J. (2) and per *Evatt* J. (3) ;
*Burns* v. *McFarlane* (4) per *Rich, Dixon* and *McTiernan* JJ. where
their Honours, speaking of the expression " in the ordinary course
of business ", said :  " It does not require an investigation of the
course pursued in any particular trade or vocation and it does not
refer to what is normal or usual in the business of the debtor or
that of the creditor " (5) : see also per *Starke* J. (6) ; *Downs Distri-
buting Co. Pty. Ltd.* v. *Associated Blue Star Stores Pty. Ltd.* (*In
Liquidation*) (7), per *Latham* C.J. (8), per *Rich* J. (9) and per
*Williams* J. (10).   It is therefore clearly established that the deter-
mination of what is meant by " in the ordinary course of business "
must take into account considerations other than the businesses
carried on by the creditor and the debtor.

The authorities, it seems to me, show that the payments here in
question occurred in the ordinary course of business if there were
nothing about them that was unusual according to ordinary business
standards. In other words, the payments were in the ordinary
course of business if the company and Mrs. Quinn, as represented
by Mrs. Taylor, were, with regard to them, acting in accordance
with the standards of honesty and fairness which are ordinarily
accepted by the business community. In *Robertson* v. *Grigg* (1)

(1) (1932) 47 C.L.R. 257.
(2) (1932) 47 C.L.R., at p. 267.
(3) (1932) 47 C.L.R., at p. 273.
(4) (1940) 64 C.L.R. 108.
(5) (1940) 64 C.L.R., at p. 125.
(6) (1940) 64 C.L.R., at p. 128.
(7) (1948) 76 C.L.R. 463.
(8) (1948) 76 C.L.R., at p. 474.
(9) (1948) 76 C.L.R., at p. 477.
(10) (1948) 76 C.L.R., at p. 480.

H. C. OF A.
1963-1964.

TAYLOR
v.
WHITE.

Menzies J.

*Gavan Duffy* C.J. and *Starke* J. said : " .. the test under s. 95 of the ordinary course of business is not whether the act is usual or common in the business of the debtor or of the creditor, but whether it is ' a fair transaction, and what a man might do without having any bankruptcy in view ' " (1). In *Burns* v. *McFarlane* (2) *Rich, Dixon* and *McTiernan* JJ. said, supporting the finding that what was done was in the ordinary course of business : " The transaction considered as a whole presented the appearance of a perfectly fair and honest attempt to place the finances of Woon's business on a sound basis " (3) and *Starke* J. said that in *Robertson* v. *Grigg* (4) it was held " that the test under s. 95 of the ordinary course of business was not related to any special business carried on by the debtor or creditor but was whether the transaction was fair and what a man might do without having any bankruptcy in view " (5). In *Downs Distributing Co. Pty. Ltd.* v. *Associated Blue Star Stores Pty. Ltd. (In Liquidation)* (6) *Rich* J. said :—" It is, therefore, not so much a question of fairness and absence of symptoms of bankruptcy as of the everyday usual or normal character of the transaction. The provision does not require that the transaction shall be in the course of any particular trade, vocation or business. It speaks of the course of business in general. But it does suppose that according to the ordinary and common flow of transactions in affairs of business there is a course, an ordinary course. It means that the transaction must fall into place as part of the undistinguished common flow of business done, that it should form part of the ordinary course of business as carried on, calling for no remark and arising out of no special or particular situation " (7). It is true that all the statements I have quoted are not exactly to the same effect but my reading of them as a whole leads me to the conclusion which I have already stated. I should perhaps add that because the section under consideration treats a payment " in good faith " as different from a payment " in the ordinary course of business " and so requires a construction of each phrase which leaves some room for the other, I have not found much help from decisions in cases where this distinction did not have to be observed.

Applying the standard which I think s. 95 lays down, I agree with the Full Court that the payments here in question were not in the ordinary course of business. The company was insolvent when they were made, owing unsecured creditors about £90,000,

(1) (1932) 47 C.L.R., at p. 267.        (5) (1940) 64 C.L.R., at p. 128.
(2) (1940) 64 C.L.R. 108.               (6) (1948) 76 C.L.R. 463.
(3) (1940) 64 C.L.R., at p. 125.        (7) (1948) 76 C.L.R., at p. 477.
(4) (1932) 47 C.L.R. 257.

e test under s. 95
er the act is usual
of the creditor, but
n might do without
*ns* v. *McFarlane* (2)
ng the finding that
of business : " The
he appearance of a
finances of Woon's
id that in *Robertson*
. 95 of the ordinary
cial business carried
the transaction was
ng any bankruptcy
. *Ltd.* v. *Associated*
*ich* J. said :—" It is,
nd absence of symp-
or normal character
quire that the trans-
r trade, vocation or
in general. But it
nd common flow of
course, an ordinary
ll into place as part
s done, that it should
is carried on, calling
particular situation "
noted are not exactly
a whole leads me to
. I should perhaps
on treats a payment
nt " in the ordinary
ction of each phrase
not found much help
did not have to be

s lays down, I agree
in question were not
apany was insolvent
litors about £90,000,

C.L.R., at p. 128.
C.L.R. 463.
C.L.R., at p. 477.

---

H. C. OF A.
1963-1964.

TAYLOR
*v.*
WHITE.

Menzies J.

of which little would be paid. The company was completely con-
trolled by Mr. and Mrs. Taylor, a son-in-law and daughter of
Mrs. Quinn, who was represented by Mrs. Taylor who, if she knew
no more, knew that, when the payments were made, the company
was in financial difficulty. The last two payments, made on the
20th and the 30th July respectively and totalling £3,000, were
made and were made to prefer Mrs. Quinn when Taylor knew that
the company was hopelessly insolvent. In these circumstances,
for the favoured unsecured creditor owed £3,500 to be paid twenty
shillings in the pound because of her special position leaving the
others owed £90,000 or thereabouts to receive two shillings in the
pound if they are lucky, seems to me something that was entirely
outside the ordinary course of business.

In my opinion this appeal should be dismissed.

WINDEYER J. I concur in the view that this appeal should be
dismissed. The question whether a payment was " in the ordinary
course of business " must be determined having regard to the
effect that old phrase now has in its context in the *Bankruptcy Act.*
But in determining that, the meaning and consequences that it
had in bankruptcy law in the past ought not to be overlooked. It
goes back to the days when bankruptcy law concerned only traders.
It postulates, it seems to me, the carrying on of a business of some
kind by someone, in the course of which payments are made or
received. In its context in s. 95 it attracts attention, I think,
both to the business of the payer, if he be in business, and to the
business of the payee, if he be in business, so that one asks was the
questioned payment one that would be made by the payer and
received by the payee in the ordinary course of a business trans-
action between them. A transaction that amounts to a preference
in fact is not to be seen only from one aspect when the application
of s. 95 is under consideration. It must be seen in the light of all
the circumstances. So regarded, the payments in question in this
case cannot, I think, be supported and are void as against the
liquidator.

*Appeal dismissed with costs.*

Solicitors for the appellants, *Thomas McCormack & Byrne.*
Solicitors for the respondents, *Comino and MacGillivray.*

T. J. L.

TAB 73

*Taylors Industrial Flooring Ltd v M&H Plant Hire (Manchester) Ltd*
[1990] BCLC 216, English Court of Appeal

# Taylors Industrial Flooring Ltd v M & H Plant Hire (Manchester) Ltd

COURT OF APPEAL, CIVIL DIVISION
DILLON, STAUGHTON AND MANN LJJ
27 OCTOBER 1989

*Petition to wind up company on the grounds of non-payment of a debt – Debt disputed – Whether creditor can present winding-up petition without first making statutory demand – Insolvency Act 1986, s 123.*

If a debt is due from a company and it is not disputed, the failure of the debtor company to pay is evidence of an inability on the part of the company to pay its debts. This constitutes grounds for presenting a petition under s 123(1)(e) of the Insolvency Act 1986 and there is no requirement for a creditor to present a statutory demand before presenting a winding-up petition. Where a company disputes a debt then it must establish a substantial ground for doing so in order to have the winding-up petition dismissed.

### Cases referred to in judgments

*Cornhill Insurance plc v Improvement Services Ltd* [1986] BCLC 26, [1986] 1 WLR 114.
*Tweeds Garages Ltd, Re* [1962] 1 All ER 121, [1962] Ch 406, [1962] 2 WLR 38.
*Welsh Brick Industries Ltd, Re* [1946] 2 All ER 197, CA.

### Appeal

The petitioning creditor, M & H Plant Hire (Manchester) Ltd, appealed from the decision of Scott J made on 8 May 1989 whereby he ordered that a winding-up petition presented by the petitioning creditor against the respondent, Taylors Industrial Flooring Ltd, be struck out as an abuse of the process of the court. The facts are set out in the judgment of Dillon LJ.

*Guy Vickers* for the petitioning creditor.
*Robert Sterling* for the respondent.

DILLON LJ. This is an appeal by the petitioning creditor, M & H Plant Hire (Manchester) Ltd, against an order made by Scott J in Manchester on 8 May 1989 whereby he ordered that a winding-up petition presented by the petitioning creditor against a company, the respondent to this appeal called Taylors Industrial Flooring Ltd, be struck out and that the costs of and incidental to the petition be paid by the petitioning creditor. The order made by the judge was not on the effective hearing of the petition but on an interlocutory hearing and it could only be justified on the ground that the petition was demurrable and its presentation an abuse of the process of the court.

The petition had been presented on 14 April 1989. It is in common form. Paragraphs 5 and 6 read as follows:

'5. The company is indebted to your Petitioner in the aggregate sum
of £9,875.28, being the aggregate amount of various invoices delivered
by your Petitioner to the Company on various dates between the 30th
December 1988 and the 31st March 1989. The invoices were delivered to
the company's principal trading address aforesaid. The company has had
full notice of the debt. The company has not given any notification of
any dispute in connection with the said invoices. None of the aforesaid
invoices have been returned by the Post Office through the Dead Letter
Service. The Company is unable to pay its debts.

6. In the circumstances, it is just and equitable that the Company
should be wound up.'

The petitioner therefore prays that the company may be wound up by the court
under the provisions of the Insolvency Act 1986.

The petition was duly verified by the statutory form of affidavit, which is all
the evidence in support of the petition that is required at the outset. The
company obtained from Judge O'Donoghue an injunction restraining adver-
tisement of the petition on the ground that the debt claimed was disputed and
the company was solvent. The judge's order striking out the petition was on
the inter partes hearing following that ex parte injunction, but because
the petition (because of the injunction) had not been advertised, it was
not fully before the court for hearing as the other creditors had not had the
opportunity, which the rules require, to put forward their views on whether
they supported or opposed the petition. The judge decided the case on a
ground to which I shall come, but he dealt first with the grounds on which
the petition was said to be disputed and, without forming a conclusion as to
that, he said:

'If the company's case had been based solely on the ground that if the
credit terms claimed by the company had been agreed, nothing was yet
due, I am not sure that I would have been persuaded by it.'

I propose first to look at the factual position before turning to the judge's
main ground of decision. The company hired plant from the petitioners. The
company's business was as building contractors. The trading began in
December 1988. An invoice for the December supply was served on the company
in the middle of January, but the amount due in respect of the December supply
had not been paid by the time the petition was presented. It was in fact paid
by a cheque of the company which is dated 2 May. There was a further supply
in January, for which an invoice was rendered in February. The amount of the
December supply was £1,743.28 and thus, under the statutory provisions,
enough to found a winding-up petition.

The case put forward by the company was that there had been oral agreement
in November 1988, before the two companies began dealing with each other,
that the company could have sixty days' credit following the month's end of
supply. That sixty days equates to two months and sixty days' credit following
the month's end of supply, to my mind, in the case of the December supply
means the end of February and in the case of the January supply the end of
March. What the company sought to spell out of that term was much more
complicated. It said that if an invoice is received it is the practice of the

company, of which it gives notice in its order forms, that the invoice will not
be carried to the ledger until the beginning of the following month unless the
invoice has been received within seven days of the commencement of the  *a*
calendar month. Sixty days' credit following the month's end of supply is thus
to be construed as sixty days' credit following the end of the month in which
the invoice has been carried to the ledger. Therefore in respect of December,
with an invoice in mid-January, it is not carried to the ledger until the beginning
of February and the two months' credit does not begin to run until the end of  *b*
February and payment for the December supply is not due until the end of
April. Therefore, so it was argued in the documents, nothing was due at the
time the petition was presented. It seems to me that that is absolutely untenable
as an interpretation of sixty days' credit following the month's end of supply.
It was accepted that it was a normal practice in the trade not to carry invoices
to ledger until the following month, unless they were received within seven  *c*
days of the commencement of the calendar month, but, even so, the company
had received the invoices for the December and January supply in ample time
before the petition was presented and had raised no query on those invoices.
In point of fact, on the hearing before the judge there was evidence in reply
indicating telephone conversations between a member of the petitioning cre-  *d*
ditor's staff and the company in respect of the December payment, firstly on 9
March 1989 when the company promised a cheque within two weeks, then on
22 March when the company promised a cheque next week, and then on 23
March when the company promised a cheque by Friday 31 March but, as I
have said, the cheque did not come until the beginning of May. So far as the
facts are concerned, therefore, I take the view that there is no substantial  *e*
ground for disputing the debts claimed in respect of the January and February
instalments.

If there is a debt which to an extent above the statutory minimum is
indisputable, then a petition can validly be presented even if the debt as claimed
in the petition is for a larger sum, part of which is bona fide disputed. That
was decided in *Re Tweeds Garages Ltd* [1962] 1 All ER 121, [1962] Ch 406,  *f*
and therefore since there is no substantial dispute in respect of the December
and January supplies, it is unnecessary to consider the subsequent supplies
included in the invoices delivered after the end of March (that is to say, the
next month's supply).

The judge decided the case on a different ground and it is necessary to  *g*
consider some of the statutory provisions. Section 122 of the Insolvency Act
1986 sets out the grounds on which a company may be wound up by the court.
They are in paras (*a*) to (*g*). Paragraph (*f*) is that 'the company is unable to
pay its debts'. Paragraph (*g*) is that 'the court is of the opinion that it is just
and equitable that the company should be wound up'. Those are the two
grounds which are relied on in the paragraphs of the petition in the present  *h*
case, which I have read. The form of s 122 has been consistent in successive
Companies Acts since the 1908 Act (I have not looked earlier) through the 1929
and 1948 Acts and under the present Act. The lettering of the subheads has
changed, but the wording has not.

Section 123 then provides by sub-s (1) the circumstances in which a company  *i*
is deemed unable to pay its debts. Paragraph (*a*) is 'if a creditor ... to whom
the company is indebted in a sum exceeding £750 then due has served [a
statutory demand on the company requiring payment in three weeks]'.

The statutory demand now has to be in a prescribed form. Paragraph (b) provides:

*a*

> 'if, in England and Wales, execution or other process issued on a judgment, decree or order of any court in favour of a creditor of the company is returned unsatisfied in whole or in part . . .'

*b*    Paragraphs (c) and (d) apply respectively in Scotland and Northern Ireland and are not relevant to the present case. Paragraph (e) provides:

> 'if it is proved to the satisfaction of the court that the company is unable to pay its debts as they fall due.'

*c*    Those three grounds, (a), (b) and (e) have again appeared as alternative grounds for establishing that a company is unable to pay its debts in the successive Companies Acts from the 1908 Act.

The judge, after he had referred to those statutory provisions, said:

*d*

> 'In my judgment, something more must be proved than simply that the company has not paid a debt. In some cases the circumstances surrounding the non-payment may justify the inference that the debtor is unable to pay its debts as they fall due. A series of dishonoured cheques might justify that inference. But in the present case a reason for non-payment has been put forward. The reason may not be a very good one, but unless

*e*

> it is not being put forward honestly, I do not see why an inference of inability to pay should be drawn from the fact of non-payment. These difficulties could have been avoided if the petitioner had served a statutory demand, the extra costs of which would have been trivial.'

*f*    There is no requirement that a creditor must serve a statutory demand. The practice for a long time has been that the vast majority of creditors who seek to petition for the winding up of companies do not serve statutory demands. The practical reason for that is that if a statutory demand is served, three weeks have to pass until a winding-up petition can be presented. If, after the petition has been presented, a winding-up order is made, the winding up is only treated

*g*    as commencing at the date of the presentation of the petition; thus, if the creditor takes the course of serving a statutory demand, it would be giving the company an extra three weeks' grace in which such assets as the company may have may be dissipated in attempting to keep an insolvent business afloat, or may be absorbed into the security of a debenture holder bank. So there are practical reasons for not allowing extra time, particularly where commercial

*h*    conditions and competition require promptness in the payment of companies' debts so that the creditor companies can manage their own cash flow and keep their own costs down.

The short answer to the judge's view is two fold. They run together. The first limb is that if a debt is due and an invoice sent and the debt is not disputed, then the failure of the debtor company to pay the debt is itself evidence of

*i*    inability to pay. That appears from the judgment of Harman J in *Cornhill Insurance plc v Improvement Services Ltd* [1986] BCLC 26, [1986] 1 WLR 114. The headnote correctly states that ([1986] 1 WLR 114):

'Where a company was under an undisputed obligation to pay a specific
sum and failed to do so, it could be inferred that it was unable to do so;
that accordingly, the defendants could properly swear to their belief in    *a*
the plaintiff company's insolvency and present a petition for its winding
up.'

The judge refers in passing to a statement by Vaisey J in an earlier case:
'Rich men and rich companies who did not pay their debts had only themselves    *b*
to blame if it were thought that they could not pay them'. It is not right to say,
as was submitted to us by counsel for the respondent (Mr Sterling) 'Well, it
may be just that they do not want to pay and so you cannot from non-payment
of an undisputed debt deduce inability to pay'.

The second point is that the reason for non-payment has to be substantial.
It is not enough if a thoroughly bad reason is put forward honestly.             *c*

I refer to the decision of this court in *Re Welsh Brick Industries Ltd* [1946]
2 All ER 197. In that case the creditor had issued a writ in the King's Bench
Division for recovery of a debt. There was an application for summary judgment
under RSC Ord 14. The district registrar had given the company unconditional
leave to defend on the basis of a contention that the debt was bona fide disputed,   *d*
because it had been agreed that the money was not repayable until the company
was in a financial position to pay it. Faced with that, the creditor had simply
presented a winding-up petition in the county court. The county court judge
found that the debt was owing and consequently that the company could not
pay its debts and made the winding-up order. His decision was affirmed by this
court. In giving the leading judgment Lord Greene MR said ([1946] 2 All ER    *e*
197 at 198):

'The law and practice on those matters is for present purposes stated
with sufficient accuracy in BUCKLEY ON THE COMPANIES ACTS, 11th Edn.,
pp. 356, 357, as follows: "A winding-up petition is not a legitimate means
of seeking to enforce payment of a debt which is *bona fide* disputed by    *f*
the company. A petition presented ostensibly for a winding-up order but
really to exercise pressure will be dismissed and under circumstances may
be stigmatised as a scandalous abuse of the process of the court. Some
years ago petitions founded on disputed debt were directed to stand over
till the debt was established by action. If, however, there was no reason
to believe that the debt, if established, would not be paid, the petition    *g*
was dismissed. The modern practice has been to dismiss such petitions.
But, of course, if the debt is not disputed on some substantial ground,
the court may decide it on the petition and make the order." I do not
think that there is any difference between the words "*bona fide* disputed"
and the words "disputed on some substantial ground". I cannot accept    *h*
the proposition that, merely because unconditional leave to defend is
given, that of itself must be taken as establishing that there is a *bona fide*
dispute or that there is some substantial ground of defence.'

Therefore it was necessary to consider whether there was indeed a substantial    *i*
ground of defence and the judge had found that there was not. Therefore the
position was that the company had not paid a debt as it fell due and had no
substantial ground for opposing it. Therefore there was evidence of insolvency.

*a*   In the present case it is now conceded that the amounts of the invoices for the services supplied in December and January were, on any view, properly payable before the petition was presented. The presentation of the petition was thus in my judgment amply warranted.

The judge has, in my view, misdirected himself in law in the passage to which I have referred. On the facts of this case, that were before him, he should not have treated this petition as demurrable, or an abuse of the process of the court.

*b*   Accordingly I would allow this appeal, set aside the order of the judge and restore the petition. I would refer the case back to the Chancery Division in Manchester to fix a new date for the hearing of the petition so that, unless the matter is disposed of by consent in the meantime, the petition may be properly advertised by the petitioning creditor.

*c*   **STAUGHTON LJ.** I entirely agree with everything that has been said by Dillon LJ. Many people today seem to think that they are lawfully entitled to delay paying their debts when they fall due or beyond the agreed period of credit, if there is one. Alternatively they may think that no remedy is in practice available to the creditor if they do delay payment. There is a greater degree of truth in the second belief than the first. Legal remedies are in themselves slow and

*d*   expensive. A creditor will often tolerate late payment, rather than incur further expense. But this can cause great hardship to honest traders, particularly those engaged in small businesses recently started. Anything which the law can do to discourage such behaviour in my view should be done.

In my judgment M & H Plant Hire (Manchester) Ltd had allowed quite enough

*e*   gratuitous time for payment to the company when they presented their petition. Indeed, they would have been justified, like Lord Clive, in being astonished at their own moderation. I agree with the orders proposed by Dillon LJ.

**MANN LJ.** I also agree with the orders proposed by Dillon LJ. As Staughton LJ has just said, this is an example of the popular fact that one may prevaricate

*f*   over the payment of debts. It is a fallacy and the law must not be allowed to be exploited.

*Appeal allowed.*

*g*   Solicitors: *Alsop Wilkinson*, agents for *Alsop Wilkinson*, Manchester (for the appellant); *Berrymans*, agents for *Shakespeare Duggan Lea & Co*, Manchester (for the respondent).

Carolyn Toulmin   Barrister.