# EXHIBIT C

## Part 5

TAB 74

*Thanakharn Kasikorn Thai Chamkat v Akai Holdings Ltd*
(2010) 13 HKCFAR 479

**Thanakharn Kasikorn Thai Chamkat (Mahachon)**

**and**

**Akai Holdings Ltd (No 2)**

Ma CJ, Bokhary, Chan and Ribeiro PJJ and Lord Neuberger of
Abbotsbury NPJ
Final Appeal No 16 of 2009 (Civil)
11–15 October, 8 November 2010

*Agency — apparent authority — agent could not clothe himself with apparent
authority — test for whether third party justifiably relied on apparent authority
was "irrationality": open to third party to rely on apparent authority, unless
belief in that connection was dishonest or irrational — whether circumstances
of transaction in question so peculiar that third party's reliance irrational*

*Damages — equitable compensation — party's case was that claim for
knowing receipt entitling it to equitable compensation for higher sum than
common law damages for conversion — could elect between claims for such
purpose*

*Trusts — constructive trusts — knowing receipt — requisite state of mind*

C was a Bermudan company which was listed on the Hong Kong
Stock Exchange (the HKSE). C and another company, S, shared the
same parent company (PC) which was the largest shareholder in both
companies, but S and C were neither subsidiaries nor affiliates. T was
the executive chairman and chief executive officer of C; the chairman
and a director of S; and the chairman, president and chief executive
officer of PC, in respect of which he owned a very substantial stake.
As a result of the Asian financial crisis, B, a Thai bank, had severe
liquidity problems due to substantial non-performing loans including
a loan from it to S. In December 1998, T, purportedly acting on
behalf of C, executed a number of documents and borrowed US$30
million from B (the Loan), authorised it to be used to pay off S's loan
liability to B and lodged with B certificates of shares (the Shares) in
C's subsidiary (CS) worth some US$50 million as security. S's liability
for its loan was thereby switched to C (the Switch Transaction).
B had previously often dealt with S through T and B's Chairman
had a fairly close relationship with T, but B had never dealt with C
before the Switch Transaction. B had required evidence confirming
that T had the relevant authority on behalf of C and in response
T provided, *inter alia*, minutes of a purported executive committee
meeting of C (the Minutes), signed by himself, conferring authority
on him to execute the Loan agreement and to pledge the Shares. In
fact, the Minutes were false; and no such meeting had taken place.

C failed to repay the Loan when due in December 1999, at which point the Shares were worth some US$32.9 million, and shortly thereafter it went into liquidation. In April and May 2000, B enforced its security by selling the Shares, which had fallen greatly in value, for some US$20.5 million which it used to pay off part of the Loan, and proved in C's liquidation for the balance. Subsequently, C's liquidators brought the present proceedings against B on the basis that B realised, or must or ought to have realised that T had no power to commit C to the Switch Transaction, thus B was liable to pay compensation to C. The Court of Appeal found in favour of C and awarded compensation. B appealed to the Court of Final Appeal, and C cross-appealed on the question of compensation. At issue was whether T had apparent authority to commit C to the Switch Transaction (it being accepted that T did not have actual authority); and if he did not, the compensation payable to C.

**Held**, dismissing both B's appeal and C's cross-appeal, that:

*Apparent authority*

(1)     Determining whether T had apparent authority to commit C to the Switch Transaction depended on: (a) the state of mind required in order to establish that B had "justifiably relied" on T's authority; (b) the extent, if any, to which a third party (here, B) who claimed to have dealt with an alleged apparent agent (here, T) could rely on unauthorised statements made by the agent as to his authority to commit the principal (here, C); and (c) the evidence required from B to show that it relied on T's apparent authority. (See para.47.)

(2)     As to issue (a), the test was one of "irrationality", which set a higher hurdle for a party like C, rather than "unreasonableness" in that, in a commercial context, absent dishonesty or irrationality (which included turning a blind eye and being reckless), a person should be entitled to rely on what he was told: this might occasionally produce harsh results, but it enabled people engaged in business to know where they stood. C's argument that the concept of constructive notice applied in this respect was rejected. Thus it was open to B to rely on T's apparent authority (if he had such authority) unless B's belief in that connection was dishonest or irrational (*Jones v Gordon* (1876–77) 2 App Cas 616, *Greer v Downs Supply Company* [1927] 2 KB 28, *Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd* [1964] 2 QB 480, *Northside Developments Pty Ltd v Registrar-General* (1989–1990) 170 CLR 146, *Macmillan Inc v Bishopsgate Investment Trust Plc (No 3)* [1995] 1 WLR 978, *By Appointment (Sales) Ltd v Harrods Ltd* (unrep., Court of Appeal, 1 December 1997) applied; *AL Underwood Ltd v Bank of Liverpool and Martins* [1924] 1 KB 775, *Houghton and Co v Nothard, Lowe and Wills Ltd* [1927] 1 KB 246 distinguished.) (See paras.49–62.)

(3)     Concerning issue (b), it was very unlikely that an agent's own unauthorised statement could clothe him with apparent authority. Apparent authority was based on a representation (normally implied) as between the alleged principal and third party as to the authority of the alleged agent, and if the third party could rely on some statement by the alleged agent, made without the authority of the principal, it would be close to pulling oneself up by one's own bootstraps. While, the law in this field struggled to reconcile principle and predictability with commercial reality and fairness, and it was inadvisable to lay down rigid principles, it was very hard to conceive of any circumstances in which an alleged agent, who did not have actual or apparent authority to bind the principal, could nevertheless acquire apparent authority to do so, simply by representing to the third party that he had such authority (*Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd* [1964] 2 QB 480, *Armagas Ltd v Mundogas SA* [1986] AC 717 applied). (See paras.63–70.)

(4)     Issue (c) was inevitably fact-sensitive. However, once the third party had established that the alleged agent had apparent authority, then, in the absence of any evidence or indication to the contrary, it would be an unusual case where reliance was not presumed (*Silver v Ocean Steamship Co Ltd* [1930] 1 KB 416 applied; *Nationwide Building Society v Lewis* [1998] Ch 482 considered). (See paras.72–75.)

*Application of principles*

(5)     Here, T did not have apparent authority to commit C to the Switch Transaction. First ignoring the Minutes, the only basis upon which B had and could have put its case that C represented that T had authority to commit it to the Switch Transaction was that he was authorised by C to manage its affairs, by virtue of being its executive chairman and chief executive officer. It was clear that in such capacity, T would have had a large measure of apparent authority — indeed also of actual authority. However, while that authority would extend to entering into many types of contract including those which might involve C incurring a US$30 million liability, the nature and circumstances of the Switch Transaction were so peculiar that T did not have apparent authority to commit C to the Switch Transaction, in the sense that he was not clothed with the authority to commit C to it. And even if he had otherwise been clothed with such authority, B was simply irrational in its belief when it relied on that authority. B appeared to be in dire financial straits at the relevant time and the enormous attraction of the transaction to it could easily have caused a normally responsible banker to depart from his or her rational approach. (See paras.78–81, 87, 94–95, 111, 162.)

(6)     Those circumstances included that:

    (a)  While the Switch Transaction was of obvious and very substantial benefit to S and to B, C appeared to get nothing in return;

    (b)  Although PC was the largest shareholder in C and S, the majority of shareholders in C were members of the public who had no apparent interest in using a substantial amount of C's money to prop up S;

    (c)  C was required to disclose the Switch Transaction to the HKSE, and it probably would have required shareholder approval as an arrangement between connected persons;

    (d)  T was in a position of conflict, given his very substantial interest in PC and his management responsibilities for both S and C;

    (e)  T's conflict must have been obvious to any banker reviewing C's Loan application and moreover, C's bye-laws which B had obtained made it clear that he should not have been involved with the Switch Transaction due to such conflict;

    (f)  B's normal course in the case of a large transaction would be to obtain a board resolution from the corporate borrower (here, C) authorising it and stating that it was in the best interests of the company;

    (g)  When dealing with a new foreign borrower (here, C), B would normally obtain legal advice from a lawyer qualified in the borrower's country of incorporation, to ensure that the borrower was bound by the arrangement (*Gray v Johnston* (1868) LR 3 HL 1, *Northside Developments Pty Ltd v Registrar-General* (1989–1990) 170 CLR 146 applied). (See paras.83–92, 95.)

(7)  Second, even if the effect of the Minutes was taken into account, they provided significant reinforcement for such conclusion. They: (a) were not, and did not purport to be, minutes of a meeting of C's board of directors as was to be expected even in a "normal" transaction; (b) contained no disclosure of T's interests; (c) did not describe the nature or purpose of the Switch Transaction, let alone its true purpose to cause C to assume S's liability to B; (d) did not identify any benefit to C from it or any purpose for the Loan; (e) were only signed by T, who was in the most obvious position of conflict; (f) disclosed no involvement in the purported approval process by any of the independent, non-conflicted directors of C; and (g) made no reference to C's public shareholders, much less to any consideration of regulatory requirements. B did not check the Minutes against C's bye-laws, as was its normal practice and that of a reasonable Thai bank, and did not obtain any legal advice to assess whether the Minutes were in fact proper evidence of T's authority. The fact that there was no mention of the extraordinary "switch" aspect of the transaction destroyed B's case that the Minutes supported the rationality of its belief

that T was authorised to commit C to that course and indeed rendered B's case on rationality even weaker. (See paras.116–121.)

*Compensation and knowing receipt*

(8) As T had no authority to enter into the Switch Transaction on behalf of C, then, as between B and C, that transaction was void, and B had no right to retain the share certificates or to sell the Shares. Accordingly, C had a claim for conversion of the Shares and on that basis, it was clear that it was entitled to common law damages measured by their value of some US$22.5m when sold, which included interest and fees, as awarded by the CA (*BBMB Finance (Hong Kong) Ltd v Eda Holdings Ltd* [1990] 1 WLR 409 applied). (See paras.122–123.)

(9) As for C's case that it was entitled to a greater sum based on knowing receipt, C could make such election on the basis of which was more beneficial to it. Further, the notion that equitable compensation was assessed on a somewhat different basis from common law damages was clearly right (*Henderson v Merrett Syndicates Ltd* [1995] 2 AC 145, *Target Holdings Ltd v Redferns* [1996] 1 AC 421 applied). (See paras.124, 129–131.)

(10) Without deciding the point, the Court would also proceed on the basis that the requisite state of mind for knowing receipt was whether the trust property was received in circumstances where there was unconscionability on the part of the recipient, in this case B when it accepted the share certificates (*Bank of Credit and Commerce International (Overseas) Ltd v Akindele* [2001] Ch 437, *Criterion Properties Plc v Stratford UK Properties LLC* [2003] 1 WLR 2108, *Charter Plc v City Index Ltd* [2008] Ch 313 considered). (See paras.125–128, 134.)

(11) The facts of this case illustrated how it could be unconscionable for a party to retain property in circumstances which did not involve dishonesty, but which did involve irrationality. Indeed, particularly in a commercial context, the test which equity applied to a claim of knowing receipt of an asset was effectively identical to the test for reliance on the apparent authority of an alleged agent: if the recipient's reliance on the alleged agent's authority, when accepting the asset from the alleged agent on behalf of the principal, was dishonest or irrational, it would be unconscionable for the recipient to retain the asset against the wishes of the principal. On the other hand, if the reliance was merely negligent, then the unconscionability test would, at least normally, not be satisfied (*Re Montagu's Settlement Trusts* [1987] 1 Ch 264 applied). (See paras.134–137.)

(12) However, here, there was no need for this Court to reach a firm conclusion on whether C in fact had a claim for knowing receipt as the equitable compensation should be assessed on the same basis as common law damages. A basic principal of equitable compensation was that there had to be some causal

**connection between the breach of trust and the loss to the trust estate for which the compensation was recoverable. On the evidence, it was clear that if B had returned the share certificates to C, far from being sold earlier than the date upon which B sold them, C would have kept the Shares until they became worthless. Of course that did not mean that C had no right to equitable compensation, and that B was entitled to keep the proceeds of sale of the Shares: normal equitable principals entitled C to elect between receiving a sum equal to the proceeds of sale of the Shares, or unless it was impossible to obtain them, an equivalent number of shares in S (*Target Holdings Ltd v Redferns* [1996] 1 AC 421, *Bristol and West Building Society v Mothew* [1998] 1 Ch 1 applied). (See paras.140, 151–155.)**

***代理——表面權限——代理人不能向自己賦予表面權限——用以決定第三方可否有理由地倚賴表面權限的驗證標準是「是否有違常理」：除非第三方所持的相關信念屬不誠實或有違常理，否則該方可倚賴表面權限——有關交易的情況是否非常特殊，以致第三方倚賴表面權限乃屬有違常理***

***損害賠償——衡平補償——申索方的案情是根據對方在知情下接收信託財產而追討補償，而申索方因而有權獲得的衡平補償金額較根據侵佔財產而獲得的普通法損害賠償額為大——就此而言，申索方可在兩者之間作出選擇***

***信託——法律構定信託——在知情下接收信託財產——所需的思想狀態***

C是一家在香港交易所上市的百慕達公司。它與另一家公司（下稱S）棣屬同一家母公司（下稱PC），PC亦是該兩家公司的最大股東，但該兩家公司並非附屬公司或關聯公司。T是C的行政主席兼行政總裁；S的主席兼董事；以及PC的主席、董事長兼行政總裁。T在PC亦擁有龐大權益。亞洲金融風暴過後，一家泰國銀行（下稱B）因面對大批不履約貸款（包括一筆向S所作的貸款）而面臨嚴重的資金周轉問題。1998年12月，T在看來是代表C行事的情況下簽署多份文件及向B借取三千萬美元（下稱「涉案貸款」）、授權將該筆款項用作清償S對B的欠債，以及將一批面值約為五千萬美元、由C的附屬公司（下稱CS）發出的股票證書（下稱「CS股票」）交給B存放，作為涉案貸款的還款保證。換言之，S的償債責任轉移至C身上（下稱「轉責交易」）。在此之前，B曾經常透過T而與S進行業務往來而B的主席與T亦有頗為密切的關係；但在轉責交易之前，B從未曾與C進行業務往來。B曾要求T出示證據證明他擁有相關權限代表C行事，T亦因而提供各項證據，包括一份看來是C的執行委員會的會議紀錄，該份經由T簽署的紀錄提述C授權T簽立涉案貸款協議和將CS股票質押（下稱「涉案紀錄」）。事實上，被指的會議從沒有進行，涉案紀錄亦屬偽造。1999年12月，涉案貸款到期償還，但C未有還款。當時CS股票的面值約為3,290萬美元。C於隨後不久進行清盤。2000年4至5月，B強制執行還款保證，將當時面值已大跌的CS股票出售，並將所得的大約2,050萬美元收益用作抵償部份涉案貸款，然後藉著在C的清盤程序中提交債權證明而追討其餘欠款。隨後，C的清

盤人提起本案的原訟法律程序，向B追討賠償，理由為B確實、必然或理應知道T無權致使C進行轉責交易，因此B須向C支付賠償。上訴法庭裁定C勝訴，下令B向C支付賠償。B現上訴至終審法院，C亦就賠償問題提出交相上訴，所涉爭議點包括：(a)T是否擁有表面權限致使C進行轉責交易（與訟雙方已接納T並不擁有相關的實際權限）；及(b)假如T並不擁有該表面權限，C應獲得的賠償額。

**裁決**——同時駁回B的上訴及C的交相上訴：

*表面權限*

(1) T是否擁有表面權限致使C進行轉責交易，須取決於：(a)用以證明B「有理由地倚賴」T的權限所需的思想狀態；(b)聲稱曾與被指是表面代理人（即本案中的T）的人進行交易的第三方（即本案中的B）可否及在何等程序上可倚賴該代理人在未獲授權下所作的陳述，以作為該代理人致使主事人（即本案中的C）進行有關交易的權限；及(c)B須提交何等證據以證明它曾倚賴T的表面權限。（見第47段）

(2) 就(a)項而言，相關的驗證標準並非「是否合理」，而是舉證標準較高的「是否有違常理」，其意思是，在商業世界內，除非有不誠實或有違常理（包括視而不見和罔顧實情）的情況，否則某人應有權倚賴其所獲告知的事情。這標準偶爾或會產生苛刻的結果，但它讓從商者能清楚知道本身的處境。本院拒納C指「法律構定知悉」概念適用於這範疇的辯據。因此，除非B所持的相關信念屬不誠實或有違常理，否則B可倚賴T的表面權限（如該權限存在的話）（引用 *Jones v Gordon* (1876–77) 2 App Cas 616，*Greer v Downs Supply Company* [1927] 2 KB 28，*Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd* [1964] 2 QB 480，*Northside Developments Pty Ltd v Registrar-General* (1989–1990) 170 CLR 146，*Macmillan Inc v Bishopsgate Investment Trust Plc (No 3)* [1995] 1 WLR 978，*By Appointment (Sales) Ltd v Harrods Ltd* (unrep., Court of Appeal, 1 December 1997)；*AL Underwood Ltd v Bank of Liverpool and Martins* [1924] 1 KB 775，*Houghton and Co v Nothard, Lowe and Wills Ltd* [1927] 1 KB 246予以區別）。（見第49至62段）

(3) 至於(b)項，一名代理人藉著在未獲授權下作出陳述而獲賦予表面權限的可能性是微乎其微的。表面權限乃建基於被指是主事人者與第三方之間關乎被指是代理人者的權限的申述（通常為隱含申述）；假如第三方可倚賴被指是代理人者在未獲主事人授權下所作的陳述，則這幾乎是等同容許代理人自行提升自己的地位。誠然，這方面的法律一直致力在原則和肯定性與商業現實和公平性之間尋求平衡，而法庭亦不宜訂立一成不變的法則。不過，對於一名既無實際權限亦無表面權限進行對主事人具約束力的交易的被指是代理人者，實難想像該人在任何情況下可單憑向第三方表示自己擁有表面權限而獲賦予該等權限（引用 *Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd* [1964] 2 QB 480，*Armagas Ltd v Mundogas SA* [1986] AC 717）。（見第63至70段）

(4) 無可否認，(c)項屬於事實問題。然而，一旦第三方證實被指是代理人者擁有表面權限，則除非有相反證據或跡象，否則第三方在特殊情況下才不會被推定曾倚賴該等權限（引用 *Silver v Ocean Steamship Co Ltd* [1930] 1 KB 416；*Nationwide Building Society v Lewis* [1998] Ch 482予以考慮）。（見第72至75段）

*把上述原則引用到本案*

(5) T並不擁有表面權限致使C進行轉責交易。首先，撇開涉案紀錄不談，B能夠用作支持「C曾表示T擁有權限致使C進行轉責交易」的說法的唯一基礎，是T身為C的行政主席兼行政總裁，已獲C授權管理其事務。T既持有該身份，亦顯然擁有廣泛的表面權限以至實際權限。不過，儘管該等權限可涵蓋訂立多種合約，包括可能令C要承擔三千萬美元債務的合約，但轉責交易的性質和情況非常特殊，以致T並不擁有表面權限致使C進行該項交易，意思是他不獲賦予權限如此行。再者，即使他確獲賦予該等權限，B在倚賴該等權限時所持的相關信念亦屬有違常理。B在相關時段看來正身陷財政窘境，而涉案交易對於B的強大吸引力，實不難導致一名在正常情況下負責任的銀行家偏離常理行事。(見第78至81、87、94至95、111、162段)

(6) 該等情況包括：

(a) 轉責交易對S和B帶來明顯和非常龐大的利益，但C看來未有從中得到任何回報；

(b) 雖然PC是C和S的最大股東，但C的股東大多是公眾人士，而利用C的大部份資產來支撐S，並不是大多數股東的利益所在；

(c) C須向香港交易所披露轉責交易，而該交易作為關聯人士之間的安排，大概需要得到股東的贊成；

(d) T在PC擁有龐大權益，同時在S和C負有管理責任，兩者的角色存在著衝突；

(e) 對於任何負責審批涉案貸款申請的銀行家來說，T的角色衝突理必顯然易見。此外，B曾成功索取C的公司章程，當中已訂明，身處角色衝突境況的T不應牽涉在轉責交易之中；

(f) B處理大額交易申請的常規做法是索取公司借款人(即本案中的C)的董事局決議以證明該交易已獲該公司授權進行以及符合該公司的最佳利益；

(g) B與一名海外借款人(即本案中的C)進行首次交易時，通常會尋求一名在該借款人成立的國家具備執業資格的律師的法律意見，以確保貸款安排對該借款人具有約束力(引用 *Gray v Johnston* (1868) LR 3 HL 1，*Northside Developments Pty Ltd v Registrar-General* (1989–1990) 170 CLR 146)。(見第83至92、95段)

(7) 第二，即使顧及涉案紀錄的影響，它亦對上述結論提供有力的支持。涉案紀錄：(a)既不是也不表明為C的董事局會議紀錄。即使是「正常」交易，也應備有董事局會議紀錄；(b)並無披露T的利益；(c)並無述明轉責交易的性質和目的，更沒有述明其目的是致使C承擔S對B的責任；(d)並無表明該交易對C有何益處或涉案貸款的目的何在；(e)只經由T簽署，而他顯然身處角色衝突的境況；(f)並無披露C公司曾有任何獨立和不身處角色衝突境況的董事參與所指的議決過程；及(g)全無提及C的公眾股東，更無提及曾考慮相關的監管規定。B既沒有按照其常規或任何合理的泰國銀行的常規，把涉案紀錄與C的公司章程進行核對，亦沒有尋求任何法律意見，以評估涉案紀錄事實上能否妥為證明T的權限。B聲稱涉案紀錄足以支持B認為T獲授權致使C進行轉責交易的信念合乎常理，但涉案紀錄對該交易的不尋常「轉責」性質隻字不提，這不但

令B的聲稱無法成立，而且進一步削弱B在其信念是否合乎常理一事上的案情。(見第116至121段)

*賠償與知情接收*

(8) 由於T並無權限代表C訂立轉責交易，因此該交易在B與C之間屬無效，B亦無權管存涉案股票證書或將CS股票出售。據此，C因B侵佔CS股票而提出的申索成立，C亦從而有權獲得普通法損害賠償，賠償額為CS股票的售後價值，即大約2,050萬美元，以及利息和費用，一如上訴法庭所判(引用 *BBMB Finance (Hong Kong) Ltd v Eda Holdings Ltd* [1990] 1 WLR 409)。(見第122至123段)

(9) 至於C聲稱可因B在知情下接收信託財產而有權獲得更多賠償，C有權選擇在對其較為有利的基礎上索償。此外，指衡平補償金額評估基礎有別於普通法損害賠償評估基礎的說法，顯然正確(引用 *Henderson v Merrett Syndicates Ltd* [1995] 2 AC 145，*Target Holdings Ltd v Redferns* [1996] 1 AC 421)。(見第124、129至131段)

(10) 在不作出裁決的情況下，本院亦會以以下一點為基礎：「在知情下接收信託財產」所需的思想狀態是信託財產是否在接收者作出不合情理的行為的情況下被接收，即本案B在接收涉案股票證書時的行為是否不合情理(*Bank of Credit and Commerce International (Overseas) Ltd v Akindele* [2001] Ch 437，*Criterion Properties Plc v Stratford UK Properties LLC* [2003] 1 WLR 2108，*Charter Plc v City Index Ltd* [2008] Ch 313予以考慮)。(見第125至128、134段)

(11) 本案案情闡明，某方在不涉及不誠實但涉及有違常理的情況下管存財物，可屬於不合情理。事實上，在商業範疇內，衡平法用以證明在知情下接收信託財產的驗證標準，無異於用以證明倚賴被指是代理人者的表面權限的驗證標準：接收者從代表主事人的被指是代理人者接收資產時，假如接收者對該代理人的權限的倚賴屬於不誠實或有違常理，則接收者違背主事人意願而管存財物便屬不合情理。另一方面，假如該種倚賴純屬疏忽，則至少在正常情況下，接收者的行為並不構成不合情理(引用 *Re Montagu's Settlement Trusts* [1987] 1 Ch 264)。(見第134至137段)

(12) 然而，在本案中，本院毋須判斷C根據「知情接收」而提出的申索實際上是否成立，因為衡平補償金額的評估基礎應與普通法損害賠償的相同。衡平補償的基本原則是：違反信託行為與補償所涉及的信託財產損失必須存在著某些因果關係。本案呈堂證據清楚顯示，假如B將涉案股票證書歸還給C，C不會在較B出售該批證書之日更早的時間出售該批證書，而是會繼續保存CS股票，直至它們變成毫無價值為此。這當然並不表示C無權獲得衡平補償或B有權保管出售CS股票的收益：根據正常衡平法則，C有權選擇收取相等於出售CS股票的收益的款項，或(不可能收取的情況除外)收取同等數量的S的股票(引用 *Target Holdings Ltd v Redferns* [1996] 1 AC 421，*Bristol and West Building Society v Mothew* [1998] 1 Ch 1)。(見第140、151至155段)

**Mr Jonathan Sumption QC and Mr Eugene Fung, instructed by Baker & McKenzie for the appellant in FACV 16/2009 and respondent in FACV 9/2010.**

Mr Leslie Kosmin QC and Ms Linda Chan, instructed by Hogan Lovells, for the respondent in FACV 16/2009 and appellant in FACV 9/2010.

**Legislation mentioned in the judgment**
Bills of Exchange Act 1882 [England] s.82

**Cases cited in the judgment**
AL Underwood Ltd v Bank of Liverpool and Martins [1924] 1 KB 775

Armagas Ltd v Mundogas SA (The Ocean Frost) [1986] AC 717, [1986] 2 WLR 1063, [1986] 2 All ER 385

Auxil Pty Ltd v Terranova (2009) 260 ALR 164

Bank of Credit and Commerce International (Overseas) Ltd v Akindele [2001] Ch 437, [2000] 3 WLR 1423, [2000] 4 All ER 221

BBMB Finance (Hong Kong) Ltd v Eda Holdings Ltd [1990] 1 WLR 409, [1991] 2 All ER 129, (1990) 87(9) LSG 43

Bloomenthal v Ford [1897] AC 156

Bristol and West Building Society v Mothew [1998] 1 Ch 1, [1997] 2 WLR 436, [1996] 4 All ER 698

By Appointment (Sales) Ltd v Harrods Ltd (unrep., Court of Appeal, 1 December 1977)

Canson Enterprises Ltd v Boughton & Co (1991) 85 DLR (4th) 129

Charter Plc v City Index Ltd [2007] EWCA Civ 1382, [2008] Ch 313, [2008] 2 WLR 950, [2008] 3 All ER 126

Criterion Properties Plc v Stratford UK Properties LLC [2003] 1 WLR 2108, [2003] 1 WLR 2108, [2003] BCC 50

Criterion Properties Plc v Stratford UK Properties LLC [2004] UKHL 28, [2004] 1 WLR 1846, [2004] BCC 570

Deutsche Morgan Grenfell Group Plc v Inland Revenue Commissioners [2006] UKHL 49, [2007] 1 AC 558, [2006] 3 WLR 781

Dubai Aluminium Co Ltd v Salaam [2002] UKHL 48, [2003] 2 AC 366, [2002] 3 WLR 1913

Duckwari Plc, Re [1999] Ch 253, [1998] 3 WLR 913, [1999] BCC 11

Egyptian International Foreign Trade Co v Soplex Wholesale Supplies Ltd (The Raffaella) [1985] 2 Lloyd's Rep 36

El Ajou v Dollar Land Holdings Plc (No 1) [1994] 2 All ER 685, [1994] BCC 143, [1994] 1 BCLC 464

First Energy (UK) Ltd v Hungarian International Bank Ltd [1993] 2 Lloyd's Rep 194, [1993] BCC 533, [1993] BCLC 1409

Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd [1964] 2 QB 480, [1964] 2 WLR 618, [1964] 1 All ER 630

Fry v Fry (1859) 27 Beav 144, 54 ER 56

Gray v Johnston (1868) LR 3 HL 1

Greer v Downs Supply Co [1927] 2 KB 28

Henderson v Merrett Syndicates Ltd [1995] 2 AC 145, [1994] 3 WLR 761, [1994] 3 All ER 506

Houghton and Co v Nothard Lowe and Wills Ltd [1927] 1 KB 246, (1926) 25 Ll L Rep 469

Jones v Gordon (1876–77) 2 App Cas 616

Kleinwort Benson Ltd v Lincoln City Council [1999] 2 AC 349, [1998] 3 WLR 1095, [1998] 4 All ER 513

Knott v Cottee (1852) 16 Beav 77, 51 ER 705

Macmillan Inc v Bishopsgate Investment Trust Plc (No 3) [1995] 1 WLR 978, [1995] 3 All ER 747

Maguire v Makaronis (1997) 188 CLR 449

Montagu's Settlement Trusts, Re [1987] 1 Ch 264, [1987] 2 WLR 1192, [1992] 4 All ER 308

Morris v Kanssen [1946] AC 459

Nationwide Building Society v Lewis [1998] Ch 482, [1998] 2 WLR 915, [1998] 3 All ER 143

Northside Developments Pty Ltd v Registrar-General (1989–1990) 170 CLR 146

Paragon Finance Ltd v DB Thakerar & Co [1999] 1 All ER 400

Rolled Steel Products (Holdings) Ltd v British Steel Corp [1986] Ch 246, [1985] 2 WLR 908, [1985] 3 All ER 52

Royal British Bank v Turquand (1856) 6 El & Bl 327, 119 ER 886, [1843–60] All ER Rep 435

Silver v Ocean Steamship Co Ltd [1930] 1 KB 416, (1929) 35 Ll L Rep 49

Target Holdings Ltd v Redferns [1996] 1 AC 421, [1995] 3 WLR 352, [1995] 3 All ER 785

Thorner v Major [2009] UKHL 18, [2009] 1 WLR 776, [2009] 3 All ER 945

Walker v Wimborne (1975–76) 137 CLR 1

Westdeutsche Landesbank Girozentrale v Islington London Borough Council [1996] AC 669, [1996] 2 WLR 802, [1996] 2 All ER 961

**Cases in the List of Authorities not cited in the judgment**

A-G of Hong Kong v Reid [1994] 1 AC 324, [1993] 3 WLR 1143, [1994] 1 All ER 1

Agip (Africa) Ltd v Jackson [1990] Ch 265, [1989] 3 WLR 1367, [1992] 4 All ER 385

Application of The News Corp Ltd, Re (1987) 70 ALR 419

Arctic Shipping Co Ltd v Mobilia AB (The Tatra) [1990] Lloyd's Rep 51

B Liggett (Liverpool) Ltd v Barclays Bank Ltd [1928] 1 KB 48

Baden v Societe Generale [1993] 1 WLR 509, [1992] 4 All ER 161

Bairstow v Queens Moat Houses Plc [2001] EWCA Civ 712, [2002] BCC 91, [2001] 2 BCLC 531

Bank of China (Hong Kong) Ltd v Kanishi (Far East) Ltd [2002] 2 HKLRD 52

Bank of New Zealand v Fiberi Pty Ltd (1994) 12 ACLC 48

Barclays Bank Plc v O'Brien [1994] 1 AC 180, [1993] 3 WLR 786, [1993] 4 All ER 417

Barclays Bank Plc v Quincecare Ltd [1992] 4 All ER 363

Barclays Mercantile Business Finance Ltd v Sibec Developments Ltd [1992] 1 WLR 1253, [1993] 2 All ER 195, [1993] BCC 148

Barlow Clowes International Ltd v Eurotrust International Ltd [2005] UKPC 37, [2006] 1 WLR 1476, [2006] 1 All ER 333

Barnes v Addy (1873–74) LR 9 Ch App 244

BBMM Finance (Hong Kong) Ltd v Eda Holdings Ltd [1990] 1 WLR 409, [1991] 2 All ER 129

Bell Group Ltd v Westpac Banking Corp (No 9) (2008) 225 FLR 1, [2008] WASC 239

Belmont Finance Corp v Williams Furniture Ltd (No 2) [1980] 1 All ER 393

Biggerstaff v Rowatt's Wharf Ltd [1896] 2 Ch 93

British Bank of the Middle East v Sun Life Assurance Co of Canada (UK) [1983] 2 Lloyd's Rep 9

British Thomson Houston Co Ltd v Federated European Bank Ltd [1932] 2 KB 176

Broadcasting Station 2GB Pty Ltd, Re [1964–5] NSWR 1648

BSB Holdings Ltd, Re [1996] 1 BCLC 155

Cadbury Schweppes Plc v Halifax Share Dealing Ltd [2006] EWHC 1184 (Ch), [2006] BCC 707, [2007] 1 BCLC 497

Caerphilly Colliery Co, Re (1877) LR 5 Ch D 336

Canwest Global Communications Corp v Australian Broadcasting Authority (1997) 24 ACSR 405

Carl Zeiss Stiftung v Herbert Smith & Co (No 2) [1969] 2 Ch 276, [1969] 2 WLR 427, [1969] 2 All ER 367

Caxton Publishing Co Ltd v Sutherland Publishing Co Ltd [1939] AC 178, [1938] 4 All ER 389

Charterbridge Corp Ltd v Lloyds Bank Ltd [1970] Ch 62, [1969] 3 WLR 122, [1969] 2 All ER 1185

China and South Seas Bank Ltd v Tan [1990] 1 AC 536, [1990] 2 WLR 56, [1989] 3 All ER 839

Citadel General Assurance Co v Lloyds Bank Canada [1997] 3 SCR 805

Clark v Cutland [2003] EWCA Civ 810, [2004] 1 WLR 783, [2003] 4 All ER 733

Clough v Bond (1838) 3 My & C 490, 40 ER 1016

Cobbe v Yeoman's Row Management Ltd [2008] UKHL 55, [2008] 1 WLR 1752, [2008] 4 All ER 713

Colin Gwyer & Associates Ltd v London Wharf (Limehouse) Ltd [2002] EWHC 2748 (Ch), [2003] BCC 885, [2003] 2 BCLC 153

Comboni Vincenzo v Shakar's Emporium (Pte) Ltd [2007] 2 SLR 1020

Combulk Pty Ltd v TNT Management Pty Ltd (1993) 113 ALR 214
Consul Development Pty Ltd v DPC Estates Pty Ltd (1975) 132 CLR 373
Coulthard v Disco Mix Club Ltd [2000] 1 WLR 707, [1999] 2 All ER 457
Cowan de Groot Properties v Eagle Trust [1992] 4 All ER 700, [1991] BCLC 1045
Crabtree-Vickers Pty Ltd v Australian Direct Mail Advertising & Addressing Co Pty Ltd (1975) 133 CLR 72
Criterion Properties Plc v Stratford UK Properties LLC [2002] EWHC 496 (Ch), [2002] 2 BCLC 151
Dawson's Settlement, Re [1966] 2 NSWR 211
Devi v Roy [1946] AC 508, 62 TLR 549
Docker v Somes (1834) 2 Mylne & Keen 655
Doneley v Doneley [1998] 1 Qd R 602
Duckwari Plc (No 2), Re [1999] Ch 268, [1999] 2 WLR 1059, [1999] 1 BCLC 168
Duckwari Plc, Re [1999] Ch 253, [1998] 3 WLR 913, [1999] BCC 11
Eagle Trust Plc v SBC Securities Ltd [1993] 1 WLR 484, [1992] 4 All ER 488, [1991] BCLC 438
Edgington v Fitzmaurice (1885) LR 29 Ch D 459
Environment Agency v Empress Car Co (Abertillery) Ltd [1999] 2 AC 22, [1998] 2 WLR 350, [1998] 1 All ER 481
Equiticorp Finance Ltd v Bank of New Zealand (1993) 32 NSWLR 50
Extrasure Travel Insurances Ltd v Scattergood [2003] 1 BCLC 598
Farah Constructions Pty Ltd v Say-Dee Pty Ltd (2007) 230 CLR 89
Feuer Leather Corp v Johnstone & Sons [1981] Com LR 251
Fitzherbert v Mather (1785) 1 Term Reports 12
Ford v Polymer Vision Ltd [2009] EWHC 945 (Ch), [2009] 2 BCLC 160
General and Finance Facilities v Cooks Cars (Romford) [1963] 1 WLR 644, [1963] 2 All ER 314
George Raymond Zage III v Ho Chi Kwong [2010] SGCA 4
Gillman v Robinson (1825) 1 Carrington & Payne 642
GM & AM Pearce & Co Pty Ltd v Australian Tallow Producers [2005] VSCA 113
Gold v Rosenberg [1997] 3 SCR 767
Gray v Lewis (1869) LR 8 Eq 526
Gresham Life Assurance Society v Crowther [1914] 2 Ch 219
Hambro v Burnand [1904] 2 KB 10
Hampshire Land Co (No 2), Re [1896] 2 Ch 743
Hancom v Allen (1774) Dick 498, 21 ER 363
Harris v Digital Pulse (2003) 56 NSWLR 298, [2003] NSWCA 10

Hawkes v Cuddy [2007] EWHC 1789 (Ch), [2007] BCC 671, [2008] 1 BCLC 527

Hely-Hutchinson v Brayhead Ltd [1968] 1 QB 549, [1967] 3 WLR 1408, [1967] 3 All ER 98

High Fashion Garments Co Ltd v Ng Siu Tong [2004] 1 HKLRD 928, [2005] 4 HKC 8

Hindle v John Cotton Ltd (1919) 56 SLR 625

Hong Kong and Shanghai Banking Corp Ltd v Jurong Engineering Ltd [2000] 2 SLR 54

Hopkins v TL Dallas Group Ltd [2004] EWHC 1379 (Ch), [2005] 1 BCLC 543

Hospital Products Ltd v United States Surgical Corp (1984) 156 CLR 41

Howard Smith Ltd v Ampol Petroleum Ltd [1974] AC 821, [1974] 2 WLR 689, [1974] 1 All ER

IVI Pty Ltd v Baycrown Pty Ltd [2005] QCA 205

Joint and Several Liquidators of Akai Holdings Ltd v Grande Holdings Ltd (2006) 9 HKCFAR 766, [2007] 1 HKLRD 116

K & S Corp Ltd v Sportingbet Australia (2003) 86 SASR 312

Karak Rubber Co Ltd v Burden (No 2) [1972] 1 WLR 602, [1972] 1 All ER 1210, [1972] 1 Lloyd's Rep 73

Kelly v Cooper [1993] AC 205, [1992] 3 WLR 936, [1994] 1 BCLC 395

Kuwait Airways Corp v Iraqi Airways Co (No 6) [2002] UKHL 19, [2002] 2 AC 883, [2002] 2 WLR 1353

Lands Allotment Co, Re [1894] 1 Ch 616

Lankshear v ANZ Banking Group (NZ) Ltd [1993] 1 NZLR 481

Linter Group Ltd v Goldberg (1992) 7 ACSR 580

Lombard North Central Plc v Vincent Stobart (1990) 9 Tr LR 105

London Joint Stock Bank v Simmons [1892] AC 201

Lysaght Bros & Co Ltd v Falk (1905) 2 CLR 421

Mahony v East Holyford Mining Co Ltd (1874–75) LR 7 HL 869

Manchester Trust v Furness [1895] 2 QB 539

Maronis Holdings Ltd v Nippon Credit Australia (2001) 38 ACSR 404

Marquess of Bute v Barclays Bank Ltd [1955] 1 QB 202, [1954] 3 WLR 741, [1954] 3 All ER 365

Massingberd's Settlement, Re (1890) 59 LJ Ch 108

MC Bacon, Re [1990] BCC 78, [1990] BCLC 324

Meridian Global Funds Management Asia Ltd v Securities Commission [1995] 2 AC 500, [1995] 3 WLR 413, [1995] 3 All ER 918

Miller v Dell [1891] 1 QB 468

Ministry of Health v Simpson [1948] Ch 465, [1948] 2 All ER 318

Moulin Global Eyecare Holdings Ltd, Re (2009) 12 HKCFAR 621, [2010] 1 HKC 90

Moulin Global Eyecare Holdings Ltd, Re (unrep., HCCW 470/2005, [2008] HKEC 1756)

Moulin Global Eyecare Holdings Ltd, Re [2009] 4 HKLRD 203

Nant-y-glo and Blaina Ironworks Co v Grave (1879) LR 12 Ch D 738

Nocton v Lord Ashburton [1914] AC 932, [1914–15] All ER Rep 45

O'Halloran v RT Thomas & Family Pty Ltd (1998) 45 NSWLR 262

Pacific Carriers Ltd v BNP Paribas (2004) 218 CLR 451

Papamichael v National Westminster Bank Plc (No 2) [2003] EWHC 164 (Comm), [2003] 1 Lloyd's Rep 341

Peconic Industrial Development Ltd v Chio Ho Cheong (unrep., HCA 16255/1999, [2005] HKEC 1745)

Permanent Building Society v Wheeler (1994) 14 ACSR 109

Port Line v Ben Line Steamers [1958] 2 QB 146, [1958] 2 WLR 551, [1958] 1 All ER 787

Powercor Australia Ltd v Pacific Power [1999] VSC 110

Quintex Australia Finance Ltd v Schroders Australia Ltd (1990) 3 ACSR 267

R v Byrnes (1995) 183 CLR 501

Relfo Ltd v Bhimji Veiji Jadva Varsani [2008] 4 SLR 657

Royal Brunei Airlines Sdn Bhd v Tan [1995] 2 AC 378, [1995] 3 WLR 64, [1995] 3 All ER 97

Sanders Bros v Maclean & Co (1882–83) LR 11 QBD 327

Selangor United Rubber Estates Ltd v Cradock (No 3) [1968] 1 WLR 1555, [1968] 2 All ER 1073, [1968] 2 Lloyd's Rep 289

Shalson v Russo [2003] EWHC 1637 (Ch), [2005] Ch 281, [2005] 2 WLR 1213

Shepherd v Mouls (1851) 1 De GM & G 247, 42 ER 547

Shields v Bank of Ireland [1901] 1 IR 228

Sky Heart Ltd v Lee Hysan Estate Co Ltd (1998) 1 HKCFAR 318, [1999] 1 HKLRD 100, [1999] 1 HKC 18

Smith v Peter & Diana Hubbard Pty Ltd [2006] NSWCA 109

Solloway v McLaughlin [1938] AC 247

Spackman v Foster (1882–83) LR 11 QBD 99

Stone & Rolls Ltd v Moore Stephens [2009] UKHL 39, [2009] 1 AC 1391, [2009] 3 WLR 455

Ting Kwok Keung v Tam Dick Yuen (2002) 5 HKCFAR 336, [2002] 3 HKLRD 1, [2002] 1 HKC 601

Tipperary Developments Pty Ltd v Western Australia (2009) 258 ALR 124

Twinsectra Ltd v Yardley [2002] UKHL 12, [2002] 2 AC 164, [2002] 2 WLR 802

Ultraframe (UK) Ltd v Fielding [2005] EWHC 1638 (Ch), [2006] FSR 17, [2007] WTLR 835

Uzinterimpex JSC v Standard Bank Plc [2008] EWCA Civ 819, [2008] Bus LR 1762, [2008] 2 Lloyd's Rep 456

Westpac Banking Corp v Savin [1985] 2 NZLR 41

Wrexham Associated Football Club Ltd v Crucialmove Ltd [2006] EWCA Civ 237, [2007] BCC 139, [2008] 1 BCLC 508

Yeshiva Properties No 1 Pty Ltd v Marshall (2005) 219 ALR 112

Youyang Pty Ltd v Minter Ellison Morris Fletcher (2003) 212 CLR 484

**Other materials mentioned in the judgment**
*Chitty on Contracts* (30th ed., 2008) Vol.1, p.527 para.6-039
*Halsbury's Laws of England* (4th ed., Reissue) Vol.16(2), para.1072

**Ma CJ**
1. I agree with the judgment of Lord Neuberger of Abbotsbury NPJ.

**Bokhary PJ**
2. I agree with the judgment of Lord Neuberger of Abbotsbury NPJ.

**Chan PJ**
3. I agree with the judgment of Lord Neuberger of Abbotsbury NPJ.

**Ribeiro PJ**
4. I agree with the judgment of Lord Neuberger of Abbotsbury NPJ.

**Lord Neuberger of Abbotsbury NPJ**

***Introduction***

5. On 4 December 1998, Mr James Ting (Mr Ting), the Chief Executive Officer of a company then called Semi-Tech Global Co Ltd, and subsequently renamed Akai Holdings Ltd (and to which I shall refer as Akai), purportedly acting on behalf of Akai, executed a number of documents giving rise to obligations on the part of Akai in favour of Thai Farmers Bank (the Bank). On 7 December 1998, in accordance with the documents executed three days earlier, Mr Ting, again purportedly acting for Akai, borrowed US$30 million from the Bank, authorised it being used to pay off the liability to the Bank of The Singer Co NV (Singer NV), and lodged certificates in respect of the 56 million shares (the pledged shares) in a subsidiary of Akai called Akai Electric Co Ltd (Akai Electric) with the Bank, as security for the loan.

6. This transaction was referred to in argument as "the Switch Transaction", an expression which I will adopt. The effect of the transaction was to create a liability on Akai to repay the Bank within a year the sum of US$30 million plus interest, which had previously been the liability of Singer NV and to give the Bank security in the form of 56 million shares owned by Akai in Akai Electric.

7. A few months thereafter, pursuant to a request from Akai, made on the ground that the market value of the pledged shares

had increased, the Bank released some 5.5 million of the shares (the 5.5 million shares), retaining the balance of the pledged shares (the Shares). Akai failed to repay the loan when it fell due, and, a short time thereafter, Akai went into liquidation. Thereafter, the Bank sold the Shares for some US$20 million, retained that sum to pay off part of the loan, and proved in Akai's liquidation for the balance.

8.   At the end of 2004, the liquidators of Akai brought the present proceedings against the Bank, essentially based on the proposition that the Bank realised, must have realised, or ought to have realised, that Mr Ting had no power to commit Akai to the Switch Transaction, and that the Bank was accordingly liable to pay compensation to Akai. Stone J dismissed the claim, but the Court of Appeal overturned his decision, and awarded Akai compensation in the sum of some $22 million plus interest. The Bank now appeals, contending that Stone J's order dismissing Akai's claim should be restored; Akai cross-appeals contending that it is entitled to substantially more compensation than that awarded by the Court of Appeal.

9.   The issues on this appeal, pared to the bone, are two-fold:

(a)  Did Mr Ting have apparent authority to commit Akai to the Switch Transaction?
(b)  If he did not, then, in the light of Akai's alternative claim based on knowing receipt, is the compensation payable to Akai limited to the common law measure of damages?

10.   The Bank contends that the answer to both questions is in the affirmative. On the first question, the Bank has realistically abandoned its contention, unsuccessfully maintained below, that Mr Ting had actual authority to enter into the Switch Transaction: hence the issue in this court is limited to apparent authority. On the second question, it is agreed that, in common law, the measure of damages would be based on the value of the Shares at the date they were sold by the Bank, but Akai contends that it has a claim against the Bank for knowing receipt of the pledged shares, which entitles it to claim equitable compensation, which would result in a substantially higher sum.

11.   I turn first to set out the undisputed facts in a little more detail, and will then deal with the two questions identified above, and a small point on interest.

## *The facts giving rise to this claim*

### *The companies involved in this case*

12.   During late 1997, many countries in South-East Asia were adversely affected by the so-called Asian Financial Crisis. As the third largest financial institution in Thailand, the Bank was hit by what

Stone J referred to as "severe liquidity problems" owing to the Crisis and consequent substantial non-performing loans. The Bank's entire profit for the year ended 31 December 1997 was only US$17 million, and, in order to survive, it undertook a share issue of US$857 million during April and May of 1998.

13. One of the Bank's many non-performing loans had been made to Singer NV, with whom the Bank had often had dealings through Mr Ting. Although it subsequently transpired that he had been dishonest, as at 1998 Mr Ting was a much respected, and apparently very successful, businessman, with substantial interests in, *de facto* control over, and effective management of, a number of what were then at least substantial companies.

14. One of those companies was Akai, at that time a public company incorporated in Bermuda and carrying on business from Hong Kong. Akai owned just over 70% of the shares in Akai Electric, a Japanese company, which was Akai's main operating subsidiary. Mr Ting was its executive chairman and chief executive officer. Its shares were listed on the main board of the Hong Kong Stock Exchange, with the majority of the issued shares being held by members of the public, while 43% were owned by Semi-Tech Corp (STC Canada).

15. STC Canada was a company listed on the Toronto Stock Exchange, and owned as to 45% by Mr Ting and 55% by the public; Mr Ting was its chairman, president and chief executive officer. He owned a very substantial stake in STC Canada, as did (albeit to a lesser extent) his former University teacher, Dr Holmes, who was also a director of STC Canada and of Akai. Unlike Mr Ting, Dr Holmes gave evidence at the trial.

16. STC Canada owned 50% of the shares in Singer NV, a company incorporated in the Netherlands Antilles and listed on the New York Stock Exchange. The remaining 50% of Singer NV shares were held by members of the public. Mr Ting was also the chairman and a director of Singer NV.

17. Singer NV indirectly owned 48% of Singer Thailand Public Co Ltd (Singer Thailand), a company listed on the Stock Exchange of Thailand. The Bank owned 8.5% of Singer Thailand's issued shares, and the Bank's chairman, Mr Banyong Lamsam was on the board of Singer Thailand (as its chairman), together with Mr Ting.

## *The background to the Switch Transaction*

18. Since about 1992, Singer NV had enjoyed a revolving credit facility (the Singer Facility), with a limit of US$30 million, from the Bank. The Singer Facility was secured by a pledge of 6 million shares in Singer Thailand owned by Singer NV.

19. By the second half of 1997, the value of shares in Singer Thailand had dropped very substantially, and, as a result, the security

provided by Singer NV was no longer anywhere near sufficient to meet the collateral requirements of its facility. On 24 November 1997 Singer NV repaid the Singer Facility in full. Notwithstanding the deficient security, it was allowed to redraw the full US$30 million on 5 January 1998. Stone J held that this was clearly a "mistake" and an embarrassing "error of judgment" on the part of employees of the Bank.

20. In April 1998, having realised its mistake in permitting the re-drawing of the Singer Facility, the Bank initiated discussions to prompt proposals from Singer NV to address the problem of its severely defective security. The Singer Facility was rolled over for a further six months on 2 April 1998, pending the outcome of those discussions.

21. During the course of those discussions, one possibility which was mooted was that the loan to Singer NV be redeemed by Akai, an arrangement which would be facilitated by the money for this being provided by the Bank in the form of a loan to Akai. In the context of this possibility, Akai's memorandum and articles of association (or bye-laws) were provided to the Bank on 25 May 1998.

22. The discussions eventually resulted in the Bank preparing an internal credit application dated 19 August 1998 in the name of Singer NV (the Singer Credit Application). This application included a proposal for a change of borrower from Singer NV to Akai, with Akai providing fresh security, which would fully cover the advance, in the form of Akai Electric shares. The Singer Credit Application was prepared by the Bank's account officer responsible for the Singer Facility, Ms Tattaya Wattanakul (Ms Wattanakul), and approved by her supervisor, Mrs Jutathip Tasma.

23. After stating that Singer NV needed to renew the US$30 million loan facility for three years, the Singer Credit Application continued:

> [The Singer Thailand] shares … cover only 4.2% of the outstanding. To comply with terms and conditions of the [loan facility] and to reduce the Bank's risk, we proposed 2 alternatives to [Singer NV] …:
>
> – 1st alternative, the Company shall renew the [US$30 million credit facility] … for another 3 years by pledging of the remaining [Singer Thailand] shares … to cover the loan from 4.2% to 9.07%.
> – 2nd alternative, … changing of the borrower from [Singer NV] to [Akai] and changing of collateral from … [Singer Thailand] shares to … [Akai Electric shares] to reduce the Bank's risk. … The 2nd alternative would be beneficial to the Bank namely (1) collateral would cover the credit at 100% (2) [Akai's] sales volume has increased every year and

> sustained profit. The Company has stable financial condition … (3) [Akai Electric] has good operating result …

For the above 2 alternatives, we have negotiated with the Company and are of the view that the interest rate should be adjusted from LIBOR + 2.25% to LIBOR + 4.50%.

24. The Singer Credit Application attached a detailed corporate structure chart for Akai, STC Canada and Singer NV, which is a useful aide-memoire (although it refers to Akai Electric as Akai Electronic):

25. On 24 September 1998, the Singer Credit Application was considered by the Bank's Credit Committee. Of those attending the Credit Committee meeting of 24 September 1998, only Mr Siripongs Kalayanarooj (Mr Siripongs) gave evidence. He could not think of another example of a transaction similar to the Switch Transaction during his thirty years in banking.

26. The Credit Committee did not accept either of the two options proposed in the application, but instead put forward an alternative proposal, which involved a reduction in the Singer Facility and pledge of additional Singer Thailand shares as security. This proposal was rejected by Singer NV, which was experiencing significant cash-flow problems and was not in a position to repay the US$30 million.

27. By this stage, as Mr Siripongs explained, the Bank was faced with the choice of continuing to lend to Singer NV, an under-collateralised borrower that would inevitably default in a short time,

or proceeding with the Switch Transaction. He also said that, in the event of default by Singer NV under the Singer Facility, which was inevitable without the Switch Transaction, the Bank would have to report such default to the Bank of Thailand and Bank of England, which at the time "would have caused problems for [the Bank]".

28. On 2 October 1998, the Bank prepared a second internal credit application, in the name of Akai instead of Singer NV (the Akai Credit Application), which was submitted directly to the Bank's Executive Board. The Board's members were the Bank's chairman, Mr Banyong Lamsam, its chief executive officer, Mr Banthoon Lamsam, and two of its senior executives. Of these four people, only Mr Banthoon Lamsam gave evidence.

29. The Akai Credit Application recommended, and sought approval for, the Switch Transaction. It proposed a short term credit line of US$30 million in favour of Akai secured by the pledge by Akai of Akai Electric Shares, to the value of 143% of the loan. The Akai Credit Application attached the same corporate chart as was attached to the Singer Credit Application, and it stated:

> 4. [Singer NV] was granted 3 years Short Term Revolving Line in the amount of USD30M by the Bank by pledging [Singer Thailand], shares … as collateral. Due to the declining of the shares value, the collateral value could cover only 4.2% of the outstanding debt.
>
> To minimize the Bank's risk, it is proposed to change the Borrower from the [Singer NV] to [Akai], which is in the same group having stronger financial status, and change collateral from … Singer Thailand shares to … shares of [Akai Electric], which can fully cover the total credit line provided that [Akai] shall apply the amount of money to repay the [Singer Facility] … and the interest rate would be adjusted from LIBOR + 2.25% to LIBOR + 4.5%.
>
> [T]he operating result of [Akai show] … that the company has continuous growth of sale volume every year and has sustained profit continuously.
>
> The financial status is also stable… Also, the value of [Akai Electric] shares to be pledged with the Bank replacing [Singer Thailand], shares can cover 100% of the credit line. As a result, the proposal should be approved as per request.

The Akai Credit Application also stated that Akai was listed on the Stock Exchange of Hong Kong.

30. On 6 October 1998, the Switch Transaction, as commended in the Akai Credit Application was considered and approved by the Bank's Executive Board. The formal record of the meeting largely reflects the wording of the Akai Credit Application. The justification for the Switch Transaction, as recorded in the minutes of the meeting, was "to reduce the Bank's risk" by effecting a change of borrower

from Singer NV to Akai "a company in the same group with more stable financial status ... together with changing collateral ... to [Akai Electric] shares, which could cover the entire credit line".

31. Mr Banthoon Lamsam, who had never previously dealt with Mr Ting, asserted in cross-examination that his sole knowledge of the Switch Transaction had been derived from the Akai Credit Application. Stone J rejected that evidence. He found that the Switch Transaction had already been discussed between Mr Banyong Lamsam and Mr Ting, with a view to Akai taking over the Singer Facility and that it would "beggar belief" if Mr Banthoon Lamsam had not discussed the Switch Transaction with Mr Banyong Lamsam, who was his uncle.

### *The Switch Transaction*

32. Following approval of the Switch Transaction, in early December 1998 Ms Wattanakul was, according to the Judge, "instructed by her superior to obtain evidence of the authority of the person who was to sign the agreements on behalf of Akai". She liaised with Mr Domine Ko (Mr Ko) of Akai to fix a time for Akai to execute the Loan Agreement and Share Pledge Agreement. Mr Ko told Ms Wattanakul that Mr Ting would be signing on behalf of Akai, and she asked him to provide evidence at the meeting confirming Mr Ting's authority. As the signing was to take place in Hong Kong, Ms Wattanakul told Mr Bhadranavik of the Bank's Hong Kong office that evidence of the authority of the person signing the documentation on behalf of Akai should be provided.

33. On 4 December 1998, Mr Bhadranavik attended Akai's office in Hong Kong to collect the documentation for the Switch Transaction, and was met by Mr Ting, Ms Clara Loh and Mr Ko of Akai. Mr Bhadranavik was handed the following documents:

(a) "Minutes of an Executive Committee" meeting of Akai of 4 December 1998 (the ExCo minutes), signed by Mr Ting, with Mr Ko as witness;
(b) The Loan Agreement under which Akai agreed to repay the Bank US$30 million within 12 months of drawdown, signed by Mr Ting;
(c) A Drawing Notice, whereby Akai applied to draw down the whole of the US$30m immediately, signed by Mr Ting;
(d) A payment direction, which requested the London Branch of the Bank to "disburse the [US$30 million] to yourself for the repayment of the loan in the same amount due by [Singer NV] to yourself ...", signed by Mr Ting;
(e) A Share Pledge Agreement recording the terms of the pledge of 56 million Akai Electric shares as security for the Loan Agreement, signed by Mr Ting; and

(f)   The share certificates, for the pledged 56 million shares in Akai Electric, worth at that time US$56.3 million, to be held as security for the loan.

34.   Mr Bhadranavik took these documents back to his office, and informed his Branch supervisor, Mr Niasinn Lamsam, that the signing of the agreements had been completed and that he had obtained the ExCo minutes. Mr Niasinn Lamsam read the minutes and signed the Loan Agreement as a witness (even though he had not been present at the meeting). The documents were then sent to Ms Wattanakul in Thailand. The loan was thereafter formally drawn down on 7 December 1998, and the pledged shares were lodged with the Bank on the same date. By a promissory note dated 7 December 1998, signed by Mr Ting on behalf of Akai, Akai promised to pay to the Bank on 7 January 1999 the sum of US$30 million plus interest.

35.   It is appropriate to set out the ExCo minutes in full:

SEMI-TECH (GLOBAL) CO LTD

Minutes of a Meeting of the Executive Committee of the Company held at 3001 Two Exchange Square, 8 Connaught Place, Hong Kong on 4 December 1998

Present:      Mr James H Ting
              Ms Clara Loh
              Dr Frank Edward Holmes (by phone)
              Mr Chuck Tam (by phone)

1.   CHAIRMAN

Mr James H Ting was elected as Chairman of the Meeting.

2.   QUORUM

The Chairman declared that a quorum of the Meeting was present and that the Meeting was duly constituted.

3.   US$30,000,000 LOAN AGREEMENT BETWEEN THE THAI FARMERS BANK PUBLIC COMPANY LIMITED, LONDON BRANCH (THE BANK) AND THE COMPANY

There was tabled at the Meeting a draft Loan Agreement (the Loan Agreement) to be entered between the Bank and the Company in relation to the granting of a loan facility of US$30,000,000 (the Loan) by the Bank to the Company. It was noted that it is one of

the terms of the Loan Agreement that the Company shall pledge 56,000,000 shares of Akai Electric Co., Ltd, a subsidiary of the Company, to the Bank pursuant to a draft Share Pledge Agreement (the Pledge), as tabled, to be entered between the Bank and the company.

It was resolved that the Loan Agreement and the Pledge (the Agreement) be accepted and approved and that any one of the Directors be authorised to approve any changes made to the Agreements prior to their execution and to execute, under hand or seal, and deliver the Agreement, and any other documents which may, from time to time, be necessary for the Loan on behalf of the Company.

It was also resolved that the Loan be operated as follows:

| | | |
|---|---|---|
| Mr James H Ting | | signing singly |
| Ms Clara Loh | ) | two out of |
| Dr Frank Edward Holmes | ) | any three |
| Mr Chuck Tam | ) | signing jointly |

4.    TERMINATION

There being no other business, the Chairman declared the Meeting terminated.

[Signature of Mr Ting]
Chairman of the Meeting

**36.   In fact, as the Judge found, the ExCo minutes was a false document, which had been dishonestly prepared by Mr Ting, or at least on his instructions. No meeting of Akai's Executive Committee was held on that day.**

*Events subsequent to the Switch Transaction*

**37.   A few months later, Akai asked the Bank to release a number of the pledged shares, as the market value of Akai Electric had increased significantly. The Bank initially refused, but it then released 5.5 million of the pledged shares to Akai, leaving the Bank holding certificates for 50.5 million Akai Electric shares, "the Shares".**

**38.   In September 1999, Singer NV filed for bankruptcy protection in the USA under Chapter 11. On 6 December 1999, Akai failed to pay US$31,298,906, which had become owing to the Bank under the Loan Agreement. On that date, the Shares were worth US$32,904,372. An event of default was declared by the**

Bank on 23 December 1999. However, it was not until April and May 2000 that the Bank enforced its security over the Shares, by selling them in the market. In so doing the Bank realised proceeds of US$20,504,295, which was applied in full to discharge partially Akai's then outstanding debt, and the Bank proved in the winding-up of Akai for the shortfall of over US$13 million. Meanwhile, Akai was being wound up in Hong Kong and Bermuda.

39. On 16 August 2002, Akai's Hong Kong Liquidators notified the Bank that its claim against Akai had been adjudicated to be some US$13 million in the Hong Kong liquidation of Akai. On the same day, the Bermudian Liquidators of Akai notified the Bank that its claim against Akai in the Bermudian liquidation had also been adjudicated to be some US$13 million.

40. These proceedings were issued on 3 December 2004. The trial was held before Stone J over 20 sitting days between 12 February and 18 March 2008, and he gave judgment in favour of the Bank on 26 May 2008. Akai's appeal was heard from 8 to 12 June 2009 and the Court of Appeal's unanimous judgment in favour of Akai was delivered on 10 August 2009, and judgment was entered for Akai in the sum of US$22,451,332 plus compound interest at 1% over LIBOR (from time to time prevailing) from 6 December 1999, with quarterly rests.

## *Did Mr Ting have authority to bind Akai to the Switch Transaction?*

41. The first of the two main questions to be considered is whether Mr Ting had authority to commit Akai to the Switch Transaction in December 1998. If he did, then the transaction is and was binding on Akai, and, subject to Akai's claim in knowing receipt (which, for reasons which will be explained below, I consider stands or falls with the authority issue), Stone J would have been right in dismissing Akai's claim. If, on the other hand, Mr Ting did not have such authority, then Akai was never committed to the Switch Transaction, indeed the whole transaction was void, the Bank never had any rights over the Shares, and it must therefore pay damages, as the Court of Appeal held.

### *Introductory*

42. The law relating to apparent authority has been considered in a number of cases, not all of which are easy to reconcile in every respect. There are three issues of principle between the parties, and a number of other disputes as to the consequence of the application of the principles to the facts of the present case.

43. In an often cited passage in *Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd* [1964] 2 QB 480, 506, Diplock LJ

**identified four conditions which have to be satisfied before a third party, whom he described as a "contractor", can enforce a contract against a company entered into by a purported agent with no actual authority. Those conditions are:**

> (1) that a representation that the agent had authority to enter on behalf of the company into a contract of the kind sought to be enforced was made to the contractor;
> (2) that such representation was made by a person or persons who had "actual" authority to manage the business of the company either generally or in respect of those matters to which the contract relates;
> (3) that he (the contractor) was induced by such representation to enter into the contract, that is, that he in fact relied upon it; and
> (4) that under its memorandum or articles of association the company was not deprived of the capacity either to enter into a contract of the kind sought to be enforced or to delegate authority to enter into a contract of that kind to the agent.

**44. As Diplock LJ explained at p.503, apparent authority:**

> … is a legal relationship between the principal and the contractor created by a representation, made by the principal to the contractor, intended to be and in fact acted upon by the contractor, that the agent has authority to enter on behalf of the principal into a contract of a kind within the scope of the "apparent" authority, so as to render the principal liable [thereunder].

**45. In a decision of the Supreme Court of Western Australia Court of Appeal, *Auxil Pty Ltd v Terranova* (2009) 260 ALR 164, para.176, Newnes JA said this about representations capable of creating an apparent authority:**

> A representation creating an apparent authority of an agent may be made in a number of ways but the most common form of representation by a principal is by conduct, that is, by permitting the agent to act in the management or conduct of the principal's business. By permitting the agent to act in the management or conduct of the business, the principal thereby represents to anyone dealing with the agent that he or she has authority to do those acts on behalf of the company which an agent authorised to do acts of the kind which he or she is in fact permitted to do normally does in the ordinary course of such business.

**This passage reflects what was said by Diplock LJ in *Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd* at pp.503, 505.**

46. In this case, the Bank's argument in a nutshell is (a) that, by holding him out as its executive chairman and chief executive officer, Akai clothed Mr Ting with apparent authority to commit it to the Switch Transaction, and (b) that, when the Bank entered into the transaction, it justifiably relied on his authority to enter into the transaction on Akai's behalf. Stone J accepted both those propositions, but they were both rejected by the Court of Appeal. In this court, Akai challenges both of those propositions.

47. Probably the main point of principle which divides the parties centres on what state of mind is required in order to establish that the Bank "justifiably relied" on Mr Ting's authority. Another issue of principle is the extent, if any, to which a third party who claims to have dealt with an alleged apparent agent can rely on unauthorised statements made by the agent as to his authority to justify the contention that he had authority to commit the principal. The third issue of principle concerns the evidence required from the Bank to show that it relied on the apparent authority of Mr Ting.

48. I propose to consider those three issues of principle first, and will then turn to the question of how they are to be applied in the present case. In that latter connection, I will first consider whether the Bank can justifiably have believed that Mr Ting had authority to commit Akai to the Switch Transaction, irrespective of the ExCo minutes, and I will then turn to the effect of those minutes.

### *The state of mind of the person alleging apparent authority*

49. For the Bank, Mr Jonathan Sumption QC (Mr Sumption) (who appeared with Mr Eugene Fung) contended that, unless the Bank had actual knowledge of Mr Ting's lack of authority or its belief that Mr Ting had authority was dishonest or irrational, then the Bank's state of mind will suffice for the purpose of establishing apparent authority. Mr Sumption also accepted that, if the Bank was reckless in its belief, or if it was guilty of turning a blind eye, that would not do either, on the basis that recklessness and blind-eye ignorance amount to irrationality or dishonesty in this context. Mr Leslie Kosmin QC (Mr Kosmin) (who appeared for Akai with Ms Linda Chan) argued that this set too low a standard on the Bank as a third party seeking to establish apparent authority, and that apparent authority could not be relied on if the Bank had failed to make the inquiries that a reasonable person would have made in the circumstances to verify the authority of Mr Ting.

50. I have some doubts as to the extent to which there would, in practice, be much difference in outcome between the application of the rival tests. The distinction between Mr Sumption's "irrationality" and Mr Kosmin's "unreasonableness" may puzzle anyone who has recourse to the dictionary, although I would accept that the former word tends to carry more pejorative overtones, and therefore would

set a higher hurdle for a party in the position of Akai in the present case. Similarly, the distinction between turning a blind eye and being put on enquiry seems fairly slender, but I accept that the former involves a more subjective exercise than the latter, although irrationality ultimately involves an objective assessment.

51.   Approaching the issue by reference to both practicality and principle, I would prefer the Bank's submission. In terms of practicality, at least when it comes to normal commercial transactions, the application of the concept of constructive notice, which is what Akai's approach effectively involves, has been deprecated (see for instance *per* Scrutton LJ in *Greer v Downs Supply Co* [1927] 2 KB 28, 36). And one can understand why.

52.   In a commercial context, absent dishonesty or irrationality, a person should be entitled to rely on what he is told: this may occasionally produce harsh results, but it enables people engaged in business to know where they stand. As to principle, apparent authority is essentially a species of estoppel by representation (see *per* Diplock LJ in *Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd*, p.503 and *per* Brennan J in the High Court of Australia in *Northside Developments Pty Ltd v Registrar-General* (1989–1990) 170 CLR 146, 173–174). In the field of misrepresentation, it is clear that "it is no defence to an action for rescission that the representee might have discovered its falsity by the exercise of reasonable care" — *per Chitty on Contracts* (30th ed., 2008) Vol.1, p.527 para.6-039 and the cases cited in footnote 190. Even more in point, there is this passage in *Halsbury's Laws of England* (4th ed., Reissue) Vol.16(2), para.1072, dealing with estoppel by representation:

> If … [the party contending that he relied on the representation] really has relied upon its truth, it is no answer to say that, if he had thought about it, he must have known that it was untrue; the representation itself was what put him off his guard. If the representation is clear and unequivocal … he is under no obligation to make investigation or inquiry to ascertain whether it is true.

53.   That proposition is supported (albeit in slightly different commercial contexts) by a number of judicial *dicta* of high authority, including from Lord Halsbury LC and Lord Herschell in *Bloomenthal v Ford* [1897] AC 156, 161–162 and 166–167 respectively, and Lord Blackburn in *Jones v Gordon* (1876–77) 2 App Cas 616, 628–629. At the end of that last-cited passage, Lord Blackburn provided a characteristically clear explanation of what constitutes blind eye knowledge, or turning a blind eye when he said this:

> [I]f the facts and circumstances are such that the [judge comes] to the conclusion that he was not honestly blundering and careless, but that he must have had a suspicion that there was something

> wrong, and that he refrained from asking questions, not because he was an honest blunderer or a stupid man, but because he thought in his own secret mind — I suspect there is something wrong, and if I ask questions and make farther inquiry, it will no longer be my suspecting it, but my knowing it, and then I shall not be able to recover — I think that is dishonesty.

54. In the context of an agency case, where the issue was whether the defendants should have appreciated that the party with whom they had contracted was an agent for the plaintiff, rather than a principal, Lord Edmund Davies (sitting in the English Court of Appeal with Viscount Dilhorne and Lord Scarman) in *By Appointment (Sales) Ltd v Harrods Ltd* (unrep., Court of Appeal, 1 December 1977) said at the end of his judgment that "there was possibly constructive notice but not actual notice, and actual notice is required".

55. Millett J took the clear view that constructive notice did not involve "the proper approach" in a normal commercial case, on the basis that "[u]nless and until they are alerted to the possibility of wrongdoing, [account officers] proceed, and are entitled to proceed, on the assumption that they are dealing with honest men". He continued by saying that they were entitled to do so until "the facts ... [make] it imperative for [them] to seek an explanation, because in the absence of an explanation it was obvious that the transaction was probably improper"— *Macmillan Inc v Bishopsgate Investment Trust Plc (No 3)* [1995] 1 WLR 978, 1014G–H.

56. It is true that there are judicial *dicta* which appear at first sight to provide some support for Akai's case on this issue, but, on closer analysis, I do not consider that they are in point.

57. Two of the three judgments in the English Court of Appeal decision of *AL Underwood Ltd v Bank of Liverpool and Martins* [1924] 1 KB 775 contain reference to "negligence" and being put on inquiry — see pp.785, 788–789 (*per* Bankes LJ) and 793 (*per* Scrutton LJ). However, that was because the defendant had to rebut an allegation of negligence in order to rely on s.82 of the Bills of Exchange Act 1882. It is fair to say that Atkin LJ's judgment contains a sentence which, read on its own supports Akai's argument (see pp.797–798), but, if considered in the context of s.82 of the 1882 Act, I do not think it can fairly be regarded as a general statement of the law of apparent authority.

58. Another English Court of Appeal decision relied on by Akai is *Houghton and Co v Nothard Lowe and Wills Ltd* [1927] 1 KB 246. There is no doubt but that, in that case, the test propounded by the Court was that proposed by Mr Kosmin. However, it was a case involving the so-called indoor management rule (also known as the rule in *Turquand*'s case — see *Royal British Bank v Turquand* (1856) 6 El & Bl 327, 119 ER 886), decided at a time when a person dealing with a company was deemed to know of the terms of its memorandum and

articles of association which is, of course, no longer the law in Hong Kong, or indeed, England. A passage in *Houghton and Co v Nothard Lowe and Wills Ltd*, p.267, in the judgment of Sargant LJ indicates an acceptance of a difference between the indoor management rule and apparent authority.

59.    That difference was, in my opinion, well explained by Dawson J in *Northside Developments Pty Ltd v Registrar-General* (1989–1990) 170 CLR 146, 198 in a passage which neatly distinguishes between the rule and apparent (or, as he called it, ostensible) authority:

> The correct view is that the indoor management rule cannot be used to create authority where none otherwise exists; it merely entitles an outsider, in the absence of anything putting him upon inquiry, to presume regularity in the internal affairs of a company when confronted by a person apparently acting with the authority of the company. The existence of an article under which authority might be conferred, if it is known to the outsider, is a circumstance to be taken into account in determining whether that person is being held out as possessing that authority. … In other words, the indoor management rule only has scope for operation if it can be established independently that the person purporting to represent the company had actual or ostensible authority to enter into the transaction. The rule is thus dependent upon the operation of normal agency principles; it operates only where on ordinary principles the person purporting to act on behalf of the company is acting within the scope of his actual or ostensible authority.

It is also worth referring to what Brennan J (as he then was) said in this connection at pp.177–179.

60.    Other cases relied on by the Bank, which similarly concerned the indoor management rule, included *Morris v Kanssen* [1946] AC 459, 475, and *Rolled Steel Products (Holdings) Ltd v British Steel Corp* [1986] Ch 246, 295 and 304 (*per* Slade LJ and Browne-Wilkinson LJ respectively). It is fair to say that some of the observations in *Rolled Steel Products (Holdings) Ltd v British Steel Corp*, especially at p.296, proposition (6), can be read as supporting Akai's case. However, it seems to me that the precise nature of the state of mind or knowledge of the person alleging apparent authority was not in issue in that case, and, with all respect to Slade LJ, the cases he had cited did not support the proposition, if it was intended to refer to constructive notice and to apply to apparent authority generally.

61.    Whether or not the indoor management rule is part of the law of agency or companies is a category issue which is of no consequence at least for present purposes. The essential point, to my mind, is that it was developed for good practical reasons to mitigate the harsh consequences of the principle (now thankfully historic) that a person dealing with a company was deemed to know the

contents of its memorandum and articles. It is therefore unsurprising that the courts developed the principle that one could only rely on the rule if one took reasonable steps to ascertain the relevant facts. There is no obvious reason why the same principle should apply to cases of apparent authority.

62. I conclude that it is open to the Bank to rely on Mr Ting's apparent authority (if he had such authority) unless the Bank's belief in that connection was dishonest or irrational (which includes turning a blind eye and being reckless).

*Can an agent clothe himself with apparent authority?*

63. A point which was hotly debated was whether a third party, seeking to establish that an alleged agent had apparent authority, can rely on what the apparent agent represented (without the sanction of the principal) about his authority, so as to clothe him with the authority which he would not otherwise have. The point arose out of Mr Sumption's contention that the argument that Mr Ting had apparent authority to commit Akai to the Switch Transaction was reinforced by the ExCo minutes, which of course had been prepared, signed and handed over by Mr Ting himself. As I am of the view (for reasons explained below) that, properly analysed, those minutes actually harm, rather than assist, the Bank's case on apparent authority, the point is academic in this case, but, as it has been fully argued, I shall deal with it.

64. At any rate at first sight, it would appear to require exceptional facts before such an argument could have any chance of success. After all, apparent authority is based on a representation (normally implied) as between the alleged principal and the third party as to the authority of the alleged agent, and if the third party could rely on some statement by the alleged agent, made without the authority of the principal, it would seem precious close to pulling up oneself by one's own bootstraps.

65. Support for the notion that an agent who has no apparent authority cannot clothe himself with such authority by his own unauthorised words may be found in *Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd*, p.504, where Diplock LJ summarised the position as follows:

> The second characteristic of a corporation, namely, that unlike a natural person it can only make a representation through an agent, has the consequence that in order to create an estoppel between the corporation and the contractor, the representation as to the authority of the agent which creates his "apparent" authority must be made by some person or persons who have 'actual' authority from the corporation to make the representation.

66. By reference to individuals in the present case, Mr Sumption rhetorically asked why, if Mr Ting could have given apparent authority to Miss Loh to sign on behalf of Akai, should he not be able to give himself apparent authority to sign? Attractive though that argument seems at first sight, it seems to me, on analysis, to take matters little further. If Mr Ting had purported to give Miss Loh authority, the question would still arise as to whether he had Akai's authority to give her authority to bind Akai. So, by the same token, if he purports to clothe himself with authority, the question would still arise as to whether he had authority to authorise himself to bind Akai, which is, at least normally, the same as asking whether he has apparent authority to bind Akai.

67. We have been referred to three English cases on this topic. The first is *Armagas Ltd v Mundogas SA (The Ocean Frost)* [1986] AC 717, in the Court of Appeal and House of Lords. The second and third are decisions of the Court of Appeal, *Egyptian International Foreign Trade Co v Soplex Wholesale Supplies Ltd (The Raffaella)* [1985] 2 Lloyd's Rep 36 (decided after the Court of Appeal's decision, but before that of the House of Lords in *The Ocean Frost*) and *First Energy (UK) Ltd v Hungarian International Bank Ltd* [1993] 2 Lloyd's Rep 194.

68. The effect of those decisions appears to be that, at least in the Courts of England and Wales, it is very unlikely that a third party could establish apparent authority on the part of an alleged agent by relying on the agent's own unauthorised statement to clothe the agent with authority. The judgment of Goff LJ and the speech of Lord Keith of Kinkel in *The Ocean Frost*, pp.730H–732F and 777C–778D indicate great scepticism as to the notion that an agent could clothe himself with authority in this way. Having said at p.777D that there might be "very rare and unusual" circumstances in which this might happen, Lord Keith continued at 779D–G:

> Robert Goff LJ said of the trial judge's view in this case, *ante*, at pp.730H–731C:
>
> > the effect of the judge's conclusion was that, although [the alleged agent] did not have ostensible authority to enter into the contract, he did have ostensible authority to tell [the third party] that he had obtained actual authority to do so. This is, on its face, a most surprising conclusion. It results in an extraordinary distinction between (1) a case where an agent, having no ostensible authority to enter into the relevant contract, wrongly asserts that he is invested with actual authority to do so, in which event the principal is not bound; and (2) a case where an agent, having no ostensible authority, wrongly asserts after negotiations that he has gone back to his principal and obtained actual authority, in which

> event the principal is bound. As a matter of common sense, this is most unlikely to be the law.

I respectfully agree. It must be a most unusual and peculiar case where an agent who is known to have no general authority to enter into transactions of a certain type can by reason of circumstances created by the principal reasonably be believed to have specific authority to enter into a particular transaction of that type.

69.   The facts of *The Raffaella* and *First Energy (UK) Ltd v Hungarian International Bank Ltd* were both rather unusual. In the former case, the observations of Browne-Wilkinson LJ on the topic at p.43 were plainly *obiter*, and not supported in the other two judgments (in particular, Kerr LJ seems to have taken a different view — see pp.46–47). In any event, the agent's representation in that case was that one signature would suffice in the London market — not a simple statement that the alleged agent was authorised, more of a simple statement of alleged fact. In *First Energy (UK) Ltd v Hungarian International Bank Ltd*, the communication was that the principal had agreed, not that the alleged agent had authority to agree on the principal's behalf.

70.   It seems to me that the reasoning in the judgments of Steyn and Nourse LJJ in *First Energy (UK) Ltd v Hungarian International Bank Ltd* illustrate how the law in this field struggles to reconcile principle and predictability with commercial reality and fairness, and this difficulty underlines the inadvisability of seeking to lay down any rigid principles in this area, especially as the point does not arise in this case. In my view, the law is as stated by Lord Keith in the passages I have quoted from his speech in *The Ocean Frost*, but it is right to add that I find it very hard indeed to conceive of any circumstances in which an alleged agent, who does not have actual or apparent authority to bind the principal, can nevertheless acquire apparent authority to do so, simply by representing to the third party that he has such authority.

71.   It is worth adding that, as was explained in the two cases just referred to, before any representation by the agent could be relied on to assist the contention that he had apparent authority, the court would have to be satisfied that the principal had given the alleged agent apparent authority to make the representation in question. Furthermore, any such representation would have to be "clear and unequivocal", as in any case of estoppel by representation (unlike, arguably, proprietary estoppel — see *per* Lord Walker of Gestingthorpe in *Thorner v Major* [2009] 1 WLR 776, paras.54–56), and what is clear and unequivocal must be judged by reference to the practical realities of the particular case (as I suggested in *Thorner v Major*, paras.84–86). Otherwise, apparent authority could not be established on the back of the statement as a matter of principle.

*Evidence of reliance*

**72. Given that apparent authority is a species of estoppel by representation, it follows that, as Diplock LJ said in his third proposition in *Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd*, p.506, the third party must establish that it relied on the apparent authority of the alleged agent before it can succeed in establishing its case. The issue which divides the parties is the quality of the evidence which the third party has to lead to establish reliance. Inevitably, that is a fact-sensitive issue, but I detected a suggestion in Akai's case that it is positively necessary for a third party to establish that he positively relied on the apparent authority in every case.**

**73. In *Nationwide Building Society v Lewis* [1998] Ch 482, a case concerning the alleged holding out of a person as a partner in a firm, Peter Gibson LJ said at p.491:**

> It does not seem to me to be impractical or unjust for the law to require a person claiming an estoppel to have to prove in a partnership context what he would have to prove in other contexts. Given that reliance is a necessary requirement, it is not obvious that there should be a presumption in favour of the person who claims reliance and is in a better position to know whether he did rely on the holding-out and who should thereby be able to prove it. … Of course, there may be circumstances from which it would be appropriate for the court to infer that there was reliance on a holding-out. As is stated in *Spencer Bower and Turner on Estoppel by Representation* (3rd ed., 1977) pp.114–115:
>
>> Though on questions of fact the onus will be upon the representee, it may happen that the probability of inducement from a given set of facts is so great, or in other words the materiality is so plain and palpable, as to justify a finding of the inducement itself merely from the circumstantial context … but it must be remembered that the inference so made is one of fact and not of law.

**74. While there is nothing with which I would fundamentally disagree in those observations, I consider that their thrust could risk placing too high a hurdle for third parties seeking to establish a claim in apparent authority. In *Silver v Ocean Steamship Co Ltd* [1930] 1 KB 416, it was held that the taking up of a bill of lading was sufficient evidence of reliance on it to raise an estoppel. The point was dealt with very shortly in the judgments of Scrutton, Greer and Slesser LJJ at pp.428, 434, and 441 effectively on the basis that it was obvious. Thus, Slesser LJ said that "[t]he appellant took the bill and may be assumed to have relied upon it to his detriment in the absence of any evidence to the contrary".**

75. In my view, once a third party has established that the alleged agent had apparent authority, ie that the principal held out the alleged agent as having authority to bind the principal, and that the third party has entered into a contract with the alleged agent on behalf of the principal, then, in the absence of any evidence or indication to the contrary, it would be an unusual case where reliance was not presumed.

*Did Mr Ting have apparent authority (disregarding the ExCo minutes)?*

76. Having resolved the issues of principle between the parties, I now turn to consider whether in this case, the Bank has established that Mr Ting had apparent authority to commit Akai to the Switch Transaction. In considering that issue, it is important to bear in mind that the primary fact-finder in this case is Stone J, who had the advantage of seeing live witnesses, although a number of the centrally important figures (notably Mr Ting and Mr Banyong Lamsam) were either unable or unwilling to give evidence, a feature from which he seems to have drawn no adverse inferences.

77. As I have explained, it is no longer contended by the Bank that Mr Ting had actual authority to commit Akai to the Switch Transaction: the Bank relies solely on the contention that he had apparent authority. However, it is important to emphasise that the effect of the Bank's concession that Mr Ting had no actual authority is that, when purporting to commit Akai to the Switch Transaction, he was acting outside the scope of what he was actually authorised to do. That concession, which was plainly rightly made, must carry with it the implication that Mr Ting was acting dishonestly, especially in the light of the forged ExCo minutes. The Court of Appeal plainly concluded that Mr Ting acted dishonestly in connection with the transaction, and Stone J appears to have thought so too, albeit that he expressed himself rather elliptically: at para.331 of his judgment, having said that he was not "disposed to assume the honesty of Mr Ting", he added "the overwhelming probability, I should have thought, is to the contrary".

78. As already indicated, I propose to consider the issue in two stages, first ignoring the ExCo minutes, and then considering its effect. I appreciate that this may seem a slightly surprising approach, but I believe that it is helpful in the light of the unusual facts of this case.

79. Absent the ExCo minutes, the only basis upon which Mr Sumption put his case that Akai represented that Mr Ting had authority to commit it to the Switch Transaction was that he was authorised by Akai to manage its affairs, by virtue of being its executive chairman and chief executive officer.

80.   As far as I can see, that was indeed the only basis upon which the Bank could put its case. It is clear that, by December 1998, the Bank had had dealings with Mr Ting, and with some companies in which he had a substantial interest and which he managed (most obviously, Singer NV), for many years, and that at least one senior member of the Bank, Mr Banyong Lamsam, the chairman, must have had a fairly close relationship with Mr Ting. However, it is also apparent that there had been no history of any dealings whatever between the Bank and Akai until the Switch Transaction.

81.   It is clear that, as executive chairman and chief executive officer of Akai, Mr Ting would have had a large measure of apparent authority — indeed, no doubt he would have had a large measure of actual authority. That authority would, no doubt, extend to entering into many types of contract, including, I would have thought, contracts which might involve Akai incurring a US$30 million liability. However, the question which has to be faced is whether the nature and circumstances of the Switch Transaction were so peculiar as to preclude the Bank contending that his apparent authority extended as far as committing Akai to it.

82.   In that connection, in support of his contention that the Switch Transaction was so extraordinary as to take outside the ambit of Mr Ting's apparent authority, Mr Kosmin essentially relied on the fact that the transaction was not merely very unusual in nature and very substantial in the sum involved, but, above all, that it was, quite plainly, for the benefit of Singer NV and the Bank, but not in any way for the benefit of the party allegedly represented by Mr Ting, Akai.

83.   The effect of the Switch Transaction was, at least on the face of it, as follows. Akai took on a liability to the Bank for US$30 million, which it had to repay with interest in a year's time, which liability was secured by the pledging of a large proportion of the shares in Akai's chief operating subsidiary. In return, Akai got nothing: the US$30 million was immediately used to pay off the liabilities of another company, Singer NV, which (whether directly or indirectly) neither owned nor was owned by Akai, albeit that they shared the same parent: the two companies were neither subsidiaries nor affiliates. The transaction was of obvious and very substantial benefit to Singer NV (even on the assumption that Akai became subrogated to Singer NV's liability to the Bank). It was also of obvious and very substantial benefit to the Bank: for no cost to itself, it gained an apparently financially strong borrower and excellent security in place of a weak borrower, already in default, with security of almost negligible value.

84.   This in turn gives rise to a number of other points of concern. Although the largest shareholder in both Akai and Singer NV was STC Canada, the majority of the shareholders in Akai (and, if it is relevant, which I doubt, half of the shareholders in Singer

NV) were members of the public, who had no apparent interest in using a substantial amount of Akai's money to prop up the ailing Singer NV. That is not only significant in itself, but (as was stated in the Akai Credit Application) Akai was listed on the Hong Kong Stock Exchange, and its Rules required the Switch Transaction to be disclosed to the Stock Exchange authorities, as it was an arrangement between connected persons, and the Stock Exchange would probably have required shareholder approval, as well as main Board approval, so far as Akai was concerned.

85.   In addition, the very person who was purporting to represent Akai, Mr Ting, was in an obvious position of conflict, given his very substantial interest in STC Canada and his management responsibilities for both Singer NV and Akai. To appreciate this conflict did not require any nuanced understanding of Akai's bye-laws or of company law — Mr Ting's conflict must have been obvious to any banker reviewing the Akai Credit Application. But, over and above this, arts.103 and 104 of Akai's bye-laws, which the Bank had obtained in connection with the transaction, made it clear that he should not have been involved with the decision to enter into the Switch Transaction, owing to his conflicted position.

86.   All these facts were well known to the Bank as was clear from the evidence, and indeed as is clear from the contents of the Singer and Akai Credit Applications. It does not appear that the Bank at any time asked for, or was given, any commercial justification for Akai entering into the Switch Transaction. The two Credit Applications (in particular the Akai Credit Application) made much of the benefit to the Bank, but nothing was said about Akai's reasons for entering into the transaction. Because neither Mr Banyong Lamsam (who produced a medical certificate to explain his absence) nor Mr Ting (whose absence is unsurprising) gave evidence, and because Mr Banthoon Lamsam gave unreliable evidence about it (and even if accurate, his evidence would have been second-hand), one simply does not know what passed between the two most senior representatives of the principal participants at their meeting before the crucial Bank executive committee meeting which approved the Switch Transaction.

87.   It appears to me that the various features of the Switch Transaction that I have described, especially when taken together, render it, at least in the absence of significant factors pointing the other way, very difficult for the Bank to contend that, merely because he was the executive chairman and chief executive officer of Akai, Mr Ting was, without more, held out as having authority to commit Akai to the transaction. As Brennan J said in *Northside Developments Pty Ltd v Registrar-General*, p.183, "the execution of guarantees and supporting securities for another's liabilities, not being for the purposes of a company's business nor otherwise for its benefit, is not ordinarily within the authority of the officers or agents of a

company" (and see to similar effect, the observations of Mason CJ at pp.160–161). In such a case, one must scrutinise with particular care any allegation of apparent authority.

88.   All the more so, where, as here, the transaction is one from which the third party seeking to assert the apparent agency benefits very substantially. Indeed, in that sort of case, the court's state of mind may almost verge on the sceptical. As Lord Cairns LC said in *Gray v Johnston* (1868) LR 3 HL 1, 11 "if it be shewn that any personal benefit to the bankers themselves is designed or stipulated for, that circumstance, above all others, will most readily establish the fact that the bankers are in privity with the breach of trust which is about to be committed.".

89.   When one examines the Bank's conduct against the standards which, on the basis of the evidence (which included testimony as to the Bank's own practice and that of Thai banks generally) and commercial common sense, one would have expected, its case on apparent authority gets worse. So far as standards are concerned, the only witness to whose evidence I need to refer is Mr Banthoon Lamsam, the sole person present at the Executive Board meeting to give evidence, and who was described by Stone J as "an experienced and highly intelligent international banker".

90.   Mr Banthoon Lamsam's evidence displayed extensive knowledge of proper practices of corporate governance and banking practice. His evidence was that:

- The "normal course" in the case of "a large transaction" would be for the Bank to obtain a Board resolution from the corporate borrower authorising the arrangement, and this was "standard practice" for a Thai bank, and the resolution normally would state that the arrangement was in the best interests of the company; and
- When dealing with a new foreign borrower, the Bank would normally obtain legal advice from a lawyer qualified in the borrower's country of incorporation, to ensure that the borrower was bound by the arrangement.

91.   Mr Banthoon Lamsam accepted that the Switch Transaction was "important" and a "major shift in the structure of the relationship", and that the descriptions "routine" and "unremarkable", contained in his witness statement to describe the transaction, were not appropriate. He accepted that Mr Banyong Lamsam (as chairman and a director of the Bank and of Singer Thailand) and Mr Ting (as chief executive and a director of both Akai and Singer NV) were each in positions of conflict in respect of the transaction. He also knew that Akai was quoted on the Hong Kong Stock Exchange and that over half of its shares were in the hands of the public. He was unaware of any benefit to Akai from the Switch Transaction, but appreciated the

benefit to the Bank; he said that the only information which the Executive Board had was in the Akai Credit Application.

92. Mr Banthoon Lamsam's evidence was to the effect that none of this was his concern, and he was not required to pay any regard to Akai's interests. In a sense, of course, that is true. However, given that the Bank's normal practice was to obtain a Board Resolution, and to get appropriate legal advice, it appears to me to have been quite extraordinary for the Bank to have proceeded with the Switch Transaction, with all its remarkable and questionable features, simply on the basis of Mr Ting's say-so. All the more so given that there was plenty of time, nearly two months, to do this between the Executive Board's approval of the Akai Credit Application and the completion of the transaction.

93. There is some support for the notion that a formal resolution by the board of directors is appropriate for a large transaction, and that such a resolution should fully describe the transaction, state that it is in the interests of the company, and record any conflicts of interests. That evidence is in the form of a full and detailed board resolution of Akai in December 1997 relating to the so-called "Pfaff transaction", involving the sale of just over 80% of the shares in GM Pfaff AG by Akai to Singer NV. The nature of the transaction, its benefit for Akai, the conflicted position of Mr Ting and Dr Holmes, and the need to comply with the regulatory requirements in the light of the existence of public shareholders are all recorded in the board resolution approving the transaction, signed by all the directors. This was not a document seen by the Bank (as far as one can tell), but its existence and terms rather underline the oddity of the absence of any such document in relation to the Switch Transaction, which cried out for justification.

94. Subject to any good reason to the contrary, for the reasons I have attempted to give, I would accordingly conclude that:

(a) Despite his wide powers of management, Mr Ting did not have apparent authority to commit Akai to the Switch Transaction, in the sense that he was not clothed with the authority to commit Akai to the transaction; and
(b) Even if he had otherwise been clothed with such authority, the Bank was simply irrational in its belief that it relied on that authority.

95. I am aware that there is a significant degree of overlap between these two preliminary conclusions, but they do involve separate questions, namely (a) whether Mr Ting was held out as having authority at all, and, if he was, (b) whether the Bank could rely on such holding out. I am also aware that in holding (b), I would be making a serious finding against the Bank. However, subject again to any arguments to the contrary, the facts speak for themselves.

Furthermore, it is worth remembering that the Executive Board's approval of the Switch Transaction was at a time when the Bank appears to have been in dire financial straits, and the enormous attraction of the transaction to the Bank (the loan represented nearly twice its annual profits for the previous year) could easily have caused a normally responsible banker to depart from his or her normally rational approach.

96.  Although there may well have been evidence on which a judge could have concluded that the Bank had turned a blind eye to the question of whether Mr Ting had authority to commit Akai to the Switch Transaction, Stone J expressly rejected such a contention, and the Court of Appeal upheld him on that point. In those circumstances, I accept Mr Sumption's submission that this Court should not revisit that conclusion. First, there are concurrent findings in the lower courts; secondly, it is a very strong thing for an appeal court to reverse a first instance rejection of an allegation of dishonesty (which is what blind eye ignorance probably involves — see *per* Lord Blackburn in *Jones v Gordon*, at p.629). These reasons, even taken together, do not constitute an absolute bar to reconsidering the issue, but in this case I am satisfied that such reconsideration would be inappropriate.

97.  As I have emphasised, the views I have expressed in para.95 above are provisional, albeit that they coincide with the views of the Court of Appeal. Before adopting them, it is necessary to consider the factors relied on by Mr Sumption on behalf of the Bank. They are really two-fold. First, he said that a reasonable banker could have concluded that the Switch Transaction was in the interest of Akai, or at least that the directors of Akai, and in particular Mr Ting, could have taken that view. Secondly, he relied on the fact, which is very telling, at least in principle, that Stone J had concluded that Mr Ting had apparent authority, which was properly relied on by the Bank.

98.  As to the first argument, Mr Sumption relied on the contention that Akai had a strong commercial interest in the continuing survival and success of Singer NV and indeed of what may be called the whole STC group: he invoked the following points in that connection:

(a)  The companies in which STC Canada had a substantial interest were operated "very much as a commercial group";
(b)  Singer NV's business operation represented a very important distribution network for Akai's products; and
(c)  Akai had a substantial financial interest in Singer NV's survival, holding US$75 million convertible loan stock, being a guarantor of its subsidiary, Pfaff, to the tune of just under US$15 million, and because there was intra-group liability, which would have resulted in Akai having to pay up a substantial sum if Singer NV became insolvent.

99. So far as the first instance judgment is concerned, Stone J set out his conclusions on apparent authority in some detail in paras.392–426 of his judgment. He made the point that the liquidators had accepted the Bank's proof of debt, and warned himself against using hindsight. He then said that he was "unable to discern anything of substance occurring *at the time* which should have placed the Bank 'on inquiry', far less is there any evidence of *actual* knowledge on the part of the Bank either as to any breach of fiduciary duty on the part of Mr Ting, or in terms of any want of authority on his part" (para.401). He went on in para.413 to describe the Switch Transaction as "a hard-nosed commercial transaction", even though it may "have been ... regarded by some within the Bank ... as a 'small miracle'". In para.417, he said that he found "neither dishonesty nor disingenuousness on the part of the Bank", and in the next paragraph, he made the points that Akai "relied upon Singer[ NV]'s distribution network" and "had a major financial investment in Singer[ NV]".

100. These findings, made by the trial judge, who is the primary fact-finder and who heard relevant oral testimony, give one considerable pause for thought, particularly when taken with Mr Sumption's identification of the factors supporting the view that Akai had an interest in the survival of Singer NV. However, like the Court of Appeal, I have come to the clear conclusion that the Judge's conclusion, carefully considered as it was, simply cannot stand.

101. The best starting point for the explanation for this conclusion is to be found in paras.329–343 of Stone J's judgment, when he was dealing with the argument that Mr Ting had actual authority to commit Akai to the Switch Transaction (which was then in issue, as it was in the Court of Appeal). Having said in para.329 that "it is unarguable but that at face value Mr Ting's actions ... can only be reflective of a failure to consider the interests of Akai", the Judge said at para.334 that the Switch Transaction was "[p]lainly to the financial detriment of Akai; this can permit of no contrary argument". He then stated that "it was not in the ordinary course of business for Akai to assume the liability of another company". In the same paragraph, he emphasised the oddity of the Switch Transaction in the light of the fact that Akai "had no equity interest" in Singer NV, and then remarked on the unusualness of the Switch Transaction, contrasting it with "the more usual commercial approach of a guarantee of Singer [NV]'s indebtedness".

102. In para.335, the Judge made the points that "no account apparently was taken ... of the remaining 57% of the shareholders of Akai", and that the Hong Kong Stock Exchange had not been informed, as it should have been, of the transaction, and, had that been done, "at the very least a public announcement would have been required". Paragraph 336 contains a rejection of the Bank's reliance on the alleged financial and commercial interest which Akai had in Singer NV's survival. There was no evidence that

Mr Ting had considered these features when entering into the Switch Transaction, and in any event "the matters now relied on as *post-facto* rationalisation ... did not on any view amount to justification for the assumption, for no consideration, of [Akai's obligations under the Switch Transaction]".

103.   At para.339 of his judgment, the Judge described it as "objectively ... 'absurd'" to suggest that "it was in the interests of Akai to take up *another* debt of [$30 miilion]" because of the debt already owing from Singer NV to Akai. In conclusion on the issue of actual authority, in para.342, the Judge concluded that it was "difficult to avoid the conclusion that this was a transaction adopted by Mr Ting ... in blatant disregard for the interests of Akai". Drawing on a judgment of Mason J in *Walker v Wimborne* (1975–76) 137 CLR 1, he described the Switch Transaction as "offering no prospect of advantage" to Akai, "seriously prejudice[ing its] unsecured creditors", "more than improvident", and "adopted ... in total disregard of the interests of the company and its creditors".

104.   It is not realistically possible to reconcile the Judge's analysis and assessment of the justifiability of the Switch Transaction in paras.329–343 of his judgment with his analysis and assessment in the subsequent paras.392–426. It is not enough to say that the earlier passages were concerned with what Mr Ting must have appreciated, whereas the latter passages were directed to the perception of the Bank's employees. Reading the two passages together, such an explanation plainly will not do, and closer analysis confirms that conclusion.

105.   First, in the earlier passages, the Judge relied on facts which were known to the Bank to justify his strongly expressed view that the transaction was plainly not to Akai's advantage, and then seems to have ignored those facts in the later passages. Examples include the public shareholding in Akai, the requirement of Stock Exchange involvement, the very unusual nature of the transaction, and the "objective ... absurdity" of, in effect, pouring good money after bad. Secondly, if, as the Judge said, "at face value Mr Ting's actions" could "only be reflective of a failure to consider the interests of Akai" and it was "difficult to avoid the conclusion that this was a transaction adopted by Mr Ting ... in blatant disregard for the interests of Akai", then it is hard to see why that should not have been appreciated by the Bank, unless it was shutting its eyes to the point. Thirdly, if the transaction "was not in the ordinary course of business for Akai", that should, at the very least, give rise to serious concerns about the conclusion that Mr Ting had apparent authority to commit Akai to it. Fourthly, if the Judge was right in rejecting so robustly what he called "the *post-facto* rationalisation" of the transaction in relation to the actual authority issue, it is hard to understand why he did not take the same line when it came to the issue of apparent authority.

106.   Over and above these points, when considering the issue of apparent authority, I consider that there are a number of questionable

aspects in the Judge's analysis. He appears to have overlooked the fact that the Bank had never had dealings with Akai before the Switch Transaction was proposed. Thus, in para.384, he said that Mr Ting's apparent authority to commit Akai to the Switch "was confirmed by the fact that Akai invariably had permitted Mr Ting to enter into all manner of financing agreements on its behalf". Yet the Bank had no knowledge or experience of this. Anyway, this observation wholly overlooks the extraordinary nature of the transaction.

107.   The Judge also gave quite insufficient weight in para.413 of his judgment to the effective windfall the Bank was enjoying as a result of the Switch Transaction — see the remarks of Lord Cairns in *Gray v Johnston*, p.11. It was also inappropriate to give weight to the Akai liquidators' acceptance of the Bank's proof of debt: at the relevant time, they had limited resources, considerable burdens, incomplete records and little assistance from Akai, they had no evidence of Mr Ting's misdeeds, and they did not have the Bank's relevant internal documents which formed an important part of Akai's case.

108.   Mr Sumption contended that the Bank was entitled to rely on the more favourable findings in paras.392–426 of the judgment, presumably because they related to the point at issue, namely apparent authority. I do not agree. Where a Judge makes inconsistent findings, an appellate court must either choose between the two findings on some principled basis, or try and make its own findings, or, if neither of these alternatives is possible, send the case back for further findings or a retrial. The Court of Appeal rightly did not send the case back, but effectively concluded that the Judge's reasoning and conclusion in paras.392–426 could not stand. For the reasons I have given, which are much the same as their reasons, I agree.

109.   I have not so far dealt specifically with the points made by Mr Sumption as to why the Bank could have believed that the Switch Transaction was for the benefit of Akai. The argument that the companies in which STC Canada had a substantial interest were run as a single entity is scarcely helpful to the Bank: the whole point of Akai's case is that that patently should not have happened. In any event, it must be irrelevant to the question of apparent authority, as the Bank had had no prior dealings with Akai. The points based on Akai's financial interest in saving Singer NV carried no weight with the Judge when considering actual authority: as I have mentioned, he clearly thought that this involved saying that Akai was justified in pouring in good money after bad.

110.   As the Judge said, these points are in any event speculative: there is no reason to think that they would have been advanced by Mr Ting if he had been challenged about the transaction. He was not so challenged, because, as stated above, the Bank was only concerned about its own position, and did not at any stage consider the question of whether there could have been any commercial benefit to Akai in entering into the Switch Transaction. In any event, these points

do not begin to meet many of the arguments which justify the conclusion that the Bank was irrational in relying on Mr Ting's alleged authority (eg the unusual and large nature of the transaction, the 57% public shareholders, the Hong Kong Stock Exchange factor, and Mr Ting's patently conflicted position).

111. In these circumstances, subject to any point which can be made by the Bank in relation to the ExCo minutes, to which I now turn, I would reject the contention that it was open to the Bank to hold Akai to the Switch Transaction on the ground that Mr Ting had apparent authority to commit Akai to it.

*The effect of the ExCo minutes*

112. Both Akai and the Bank contended that their respective cases on apparent authority was reinforced by the production of the ExCo minutes at the meeting on 4 December 1998, when almost all the documents relating to the Switch Transaction were signed and handed over to the Bank's representatives by Mr Ting.

113. The Judge effectively decided that the minutes were of little, if any, relevance to the question of apparent authority, because they were merely required by the Bank for formal reasons. In effect, he said, the ExCo minutes did not detract from the Bank's contention that it relied on Mr Ting's apparent authority to commit Akai to the Switch Transaction, by virtue of his role as executive chairman and chief executive offcier of Akai. The Court of Appeal took a very different view. They held that the Bank's requirement for a document such as the ExCo minutes was fatal to the Bank's case on apparent authority: the Bank could not say that it relied on his position in Akai to clothe him with authority to commit Akai if, at the same time, it had required documentary evidence of his authority to do so.

114. Subject to my views as to the effect of the contents of those minutes, I am in agreement with Stone J, rather than the Court of Appeal, albeit for slightly different reasons. I do not think the Court of Appeal would have been entitled to interfere with the Judge's conclusion that the Bank regarded the provision of the ExCo minutes as effectively only a formality.

115. It does not seem to me that the provision of the minutes undermined the Judge's conclusion on reliance. It was Mr Ting who produced those minutes, Mr Ting who signed the minutes, Mr Ting who was recorded as presiding at the meeting referred to in the minutes, and Mr Ting whose authority and reputation founded the whole of the Bank's case on apparent authority. In those circumstances, the production of the minutes at the 4 December 1998 meeting to satisfy the Bank's formal requirements seems to me to have been simply part and parcel of Mr Ting's alleged authority: it was because he produced them and was clearly so closely involved in the alleged decision that the minutes were accepted as effective.

116.   The Bank sought to rely on the minutes to bolster its case on apparent authority. As just mentioned, the minutes were produced and signed by Mr Ting, and to invoke them to support the contention that he had apparent authority might well fall foul of the general rule laid down in *The Ocean Frost*, pp.777C–778D. It is unnecessary to decide that point, however, because examination of the ExCo minutes appears to me to justify the contention that, rather than reinforcing Mr Ting's apparent authority, they actually weaken the Bank's case on reliance, as they should have added to the Bank's concerns as to whether Mr Ting really could have had authority to bind Akai to the Switch Transaction.

117.   Before summarising the features of the minutes which I consider justify this conclusion, it is right to refer to Akai's bye-laws, which were in the possession of the Bank in anticipation of the Switch Transaction. Although one must be careful of attributing knowledge of such bye-laws to a third party, it appears to me right to do so in this case, given that the Bank had been specifically provided, at its request, for the very purpose of the transaction. The bye-laws prohibited Mr Ting from any involvement in the approval of the Switch Transaction. In particular, given his interest in Singer NV, arts.103 and 104 required him both to disclose his interest and to refrain from voting on the transaction. Not only do these bye-laws thus cast a shadow over the Bank's primary case on Mr Ting's authority to commit Akai to the Switch Transaction, as already mentioned: they impinge on anybody reading the ExCo minutes in the context of the transaction.

118.   In particular, the minutes:

- Are not, and do not purport to be, minutes of a meeting of Akai's board of directors, which according to the Bank's own evidence, is what one would expect even in a "normal" transaction — a view supported by the documents relating to the Pfaff transaction;
- Contain no disclosure of interests, notwithstanding the position of patent conflict of Mr Ting and, indeed, Dr Holmes;
- Contain no suggestion that Mr Ting or Dr Holmes did not vote at the alleged meeting;
- Do not describe the nature or purpose of the Switch Transaction let alone its true purpose, which was to cause Akai to assume Singer NV's liability to the Bank;
- Do not identify any benefit to Akai from the Switch Transaction or, indeed, any purpose for the loan;
- Were signed only by Mr Ting, who was in the most obvious position of conflict;
- Disclose no involvement in the purported approval process by any of the independent, non-conflicted directors of Akai; and
- Make no reference to the public shareholders of Akai, much less to any consideration of any regulatory requirements.

119. These features were either not noted or ignored by the Bank. Although the Bank had Akai's bye-laws in its possession, there is no suggestion that the minutes were checked against the bye-laws, as was the Bank's normal practice, and the practice of a reasonable Thai bank. Moreover, also contrary to its usual practice the Bank did not obtain any legal advice from a lawyer qualified to assess whether the minute was in fact proper evidence of Mr Ting's authority.

120. It is worth emphasizing that the ExCo minutes did not purport to authorize Mr Ting to commit Akai to the very aspect of the Switch Transaction which was so extraordinary, namely using the US$30 million facility to pay off the liability of Singer NV to the Bank. What the minutes purported to authorize Mr Ting to do was agree the loan facility, and to draw on it, as well as to pledge Akai Electric shares as security. All those aspects of the Switch Transaction were unexceptionable. The fact that there was no mention of the extraordinary aspect of the transaction both undermines the Bank's argument that it reasonably relied on the minutes and strengthens Akai's case that the Bank's belief in Mr Ting's authority was irrational. Particularly as a representation has to be "clear and unequivocal", the absence of any mention of discussion, let alone approval, of the US$30 million being used to pay off Singer NV's liability must destroy the Bank's case that the minutes support the rationality of its belief that Mr Ting was authorized to commit Akai to that course. Indeed, given my view of the position in the absence of the ExCo minutes, I consider that the absence in the minutes of any reference to the use to which the US$30 million was to be put actually renders the Bank's case on rationality even weaker.

121. In my opinion, these failings on the part of the Bank in relation to the ExCo minutes provide significant reinforcement for the view that the Bank was irrational in its belief that Mr Ting had authority to commit Akai to the Switch Transaction, with all its remarkable features as discussed above. I am therefore of the opinion that the ExCo minutes assist the conclusion that the Bank's case on apparent authority must fail.

## *What is the correct amount to be awarded to Akai?*

### *Introductory*

122. On the basis that Akai is entitled to succeed in its claim that Mr Ting had no authority to enter into the Switch Transaction on its behalf, the Court of Appeal awarded Akai the sum of US$22,541,332 plus compound interest, which was also the sum which the Judge would have awarded if he had found for Akai on that issue. This sum is calculated on the basis that the Bank received a total of US$20,504,295 for the Shares when it sold them, with the balance being accounted for by interest and fees.

123.   This is clearly the correct sum to have awarded Akai by way of common law damages. As Mr Ting had no authority to enter into the Switch Transaction on behalf of Akai, then, as between the Bank and Akai, the Switch Transaction was void, and the Bank had no right to retain the share certificates or to sell the Shares. Accordingly, Akai had a claim for conversion of the Shares. On that basis, it is clear that Akai's damages should be measured by the value of those shares at the date they were sold: see *BBMB Finance (Hong Kong) Ltd v Eda Holdings Ltd* [1990] 1 WLR 409. The Privy Council's decision in that case is accurately summarised in the headnote, at pp.409H–410A:

> [T]he general rule [is] that where property [is] irreversibly converted the measure of damages for conversion [is] the value of the property at the date of conversion, and that, … since the plaintiffs' shares had been irrevocably sold by the defendant, the plaintiffs were entitled to damages for that conversion … at the date of conversion ….

As the Shares were sold on the open market by the Bank, the value of those shares must be measured by reference to what the Bank obtained for them.

124.   However, by its cross-appeal, Akai contends that it is entitled to a greater sum than $22,541,332, because, over and above its claim based on want of authority and conversion, it has a claim against the Bank based on the proposition that, when they accepted the Electric shares in December 1998, or in the alternative in December 1999, the Bank at once became liable to Akai for knowing receipt. Hence Akai's cross-appeal.

125.   Akai's case in this connection may be summarised as follows:

(a)   The classic test for a claim in knowing receipt is whether trust property was received in circumstances where there is unconscionability on the part of the recipient;

(b)   The facts which justify Akai's case against the Bank on apparent agency also justify its case on unconscionability;

(c)   Accordingly, Akai has a claim against the Bank for knowing receipt in respect of the Shares;

(d)   Given that Akai has claims based on conversion and knowing receipt, it can elect between the two claims when it comes to assessing compensation;

(e)   While damages based on the conversion claim are assessed according to common law principles, equitable compensation for knowing receipt are assessed on a different basis;

(f)   In this case, equitable compensation should be assessed by the value of the Shares, as at either (i) when they were wrongly received by the Bank, or (ii) when the Bank wrongly refused

to hand them back, namely by reference to their value in (i) December 1998 or (ii) December 1999, as either basis would produce a higher level of compensation than assessment by reference to the proceeds of sale; and

(g) Accordingly, Akai is entitled to (i) US$50,775,000 being the value of the retained shares at the time they were wrongly received by the Bank, or (ii) US$32,904,372, the value of the shares on 6 December 1999, rather than the US$20,504,295, which the Bank received for those shares when it sold them (plus, in all cases, plus interest and fees).

126. Proposition (a) is not in contention, and, provided Akai establish propositions (b) and (c), propositions (d) and (e) are not in contention either. However, propositions (b), (c) and (f) are challenged by the Bank. Proposition (g) is not precisely agreed, but it raises no issue of significance, if propositions (a) to (f) are made out.

*Akai's propositions which are not in dispute*

127. So far as Akai's proposition (a) is concerned, the characterisation of the precise state of mind on the part of a defendant needed to render him liable for knowing receipt has been the subject of much debate in judgments and academic articles. In *Bank of Credit and Commerce International (Overseas) Ltd v Akindele* [2001] Ch 437, the law on the topic was reviewed by Nourse LJ in a full and careful judgment (with which Ward and Sedley LJJ agreed). At p.455, Nourse LJ concluded that:

> [J]ust as there is now a single test of dishonesty for knowing assistance, so ought there to be a single test of knowledge for knowing receipt. The recipient's state of knowledge must be such as to make it unconscionable for him to retain the benefit of the receipt. A test in that form, though it cannot, any more than any other, avoid difficulties of application, ought to avoid those of definition and allocation to which the previous categorisations have led. Moreover, it should better enable the courts to give commonsense decisions in the commercial context in which claims in knowing receipt are now frequently made …

128. This approach was subsequently followed by the English Court of Appeal in *Criterion Properties Plc v Stratford UK Properties LLC* [2003] 1 WLR 2108, although a little doubt may be cast on it by an uncharacteristically obscure remark of Lord Nicholls of Birkenhead in *Criterion Properties Plc v Stratford UK Properties LLC* in the House of Lords at [2004] 1 WLR 1846, para.4, first sentence. Nonetheless, in *Charter Plc v City Index Ltd* [2008] Ch 313, para.8, the English Court

of Appeal reaffirmed that the conclusion reached in *Bank of Credit and Commerce International (Overseas) Ltd v Akindele* represented the law. In the light of this, without deciding the point, I am prepared to proceed on the basis of Mr Sumption's realistic concession, and to assume that proposition (a) is correct.

129.   Before turning to the contentious propositions, it is right briefly to explain why I am also prepared to proceed on the basis that propositions (d) and (e) are correct, and what is at stake in relation to proposition (g).

130.   Proposition (d) rests on the general principle that, where a person can bring a claim on two alternative bases, he can elect to proceed on the basis which is more beneficial to him. This proposition is not challenged — unsurprisingly, as it receives support from three decisions of the House of Lords, *Henderson v Merrett Syndicates Ltd* [1995] 2 AC 145, 193, *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349, 387 (in each case *per* Lord Goff of Chieveley), and *Deutsche Morgan Grenfell Group Plc v Inland Revenue Commissioners* [2007] 1 AC 558, para.51 (*per* Lord Hope of Craighead).

131.   As for proposition (e), the notion that equitable compensation is assessed on a somewhat different basis from common law damages is clearly right (albeit that the difference can be overstated). That is clear from another decision of the House of Lords (to which it will be necessary to return). In *Target Holdings Ltd v Redferns*, p.434D–G, Lord Browne-Wilkinson said this:

> … If specific restitution of the trust property is not possible, then the liability of the trustee is to pay sufficient compensation to the trust estate to put it back to what it would have been had the breach not been committed … Even if the immediate cause of the loss is the dishonesty or failure of a third party, the trustee is liable to make good that loss to the trust estate if, but for the breach, such loss would not have occurred … Thus the common law rules of remoteness of damage and causation do not apply. However there does have to be some causal connection between the breach of trust and the loss to the trust estate for which compensation is recoverable, viz. the fact that the loss would not have occurred but for the breach …

The same view was taken by the High Court of Australia in *Maguire v Makaronis* (1997) 188 CLR 449 — see especially at pp.469–470 *per* Brennan CJ, citing *Target Holdings Ltd v Redferns* with approval.

132.   Proposition (g) concerns the precise valuation of the Shares in December 1998 or December 1999, and is only relevant if Akai succeeds in establishing its claim for more compensation than the Judge would have awarded, and the Court of Appeal did award. Although I have little hesitation in rejecting the argument (for reasons given below) I can see some logical basis for arguing that

compensation for knowing receipt should be assessed by reference to the value of the Shares in December 1998, ie by reference to what might be said to be the date of receipt. However, I cannot see any basis for the December 1999 date: that was the date on which the US$30 million became repayable under the Loan Agreement. If that agreement was valid, then the share certificates were lawfully retained, as they were security for repayment of the loan, and it was not repaid. If, on the other hand, that agreement was void (as was the case for reasons already given), then *ex hypothesi* the date has no relevance.

133. At the hearing, we were told that there were small disagreements between the parties as to the valuations of the Shares as at those dates. If any of those disagreements had been relevant to the assessment compensation, I would have thought it right to refer them to the High Court, in the event of Akai succeeding on its propositions (b), (c) and (e), the three propositions which I now turn to consider.

*Proposition (b): the requisite state of mind of a recipient in knowing receipt*

134. Proposition (b) raises the issue of the Bank's state of mind when it received the share certificates in December 1998. Applying the test laid down in *Bank of Credit and Commerce International (Overseas) Ltd v Akindele*, at p.455, the question is whether its state of mind when it accepted the share certificates was such that it would be unconscionable for it to have retained the Shares. I have already explained that the Bank was irrational, but not dishonest, in believing, or more accurately in assuming, that Mr Ting had authority to commit Akai to the Switch Transaction. In my view, subject to considering proposition (c), the facts of this case provide a good illustration of how it can be unconscionable for a party to retain property in circumstances which do not involve dishonesty, but which do involve irrationality.

135. Indeed, particularly in a commercial context, the test which equity applies to a claim in knowing receipt of an asset is effectively identical to the test which the common law would apply to determine whether there was what I have called reasonable reliance on the apparent authority of an alleged agent to commit the principal to handing over the asset. It makes little commercial sense, and would provide a fertile source of confusion and inconsistency, if the tests were different. It is true that common law talks about actual knowledge and presumed knowledge whereas equity sometimes refers to actual notice and constructive notice. But, above all in a case involving knowing receipt in an arm's length commercial context, I consider that, at any rate absent very special facts, equity would follow the law.

136. This conclusion receives support from the penetrating analysis in the judgment of Sir Robert Megarry V-C in *Re Montagu's Settlement Trusts* [1987] 1 Ch 264, 277D–F, 278B–D, and 285B–F (especially propositions (4) and (5)). This judgment was described as "seminal" in *Bank of Credit and Commerce International (Overseas) Ltd v Akindele*, p.452C, by Nourse LJ, who summarised its effect at p.453D as being "that, in order to establish liability in knowing receipt, the recipient must have actual knowledge (or the equivalent) ... and that constructive knowledge is not enough".

137. If the recipient's reliance on the alleged agent's apparent authority, when accepting the asset from the alleged agent on behalf of the principal, was dishonest or irrational, it seems to me that it would be unconscionable for the recipient to retain the asset against the wishes of the principal, or, to put it another way, the recipient would have the relevant "actual knowledge (or the equivalent)". On the other hand, if the reliance was merely negligent, then I doubt that the unconscionability test would, at least normally, be satisfied — at best it would amount to "constructive knowledge".

*Proposition (c): is there a claim for knowing receipt in this case?*

138. That brings me to Akai's proposition (c), which raises the question of whether there is in fact a claim for knowing receipt. Mr Sumption's argument that there is no such claim, is based essentially on two reasons. The first is that no legal or equitable title passed in the share certificates or the Shares, when the certificates were received by the Bank, because the Switch Transaction was void: accordingly, there is no "receipt" in respect of which a knowing receipt claim can be mounted. The second reason is that, especially in the commercial context, where the claimant has a perfectly good common law claim, it is both unnecessary and undesirable to permit him to invoke equity: his claim should be satisfied by his common law claim, and an equitable claim would create a proprietary interest which would rank ahead of subsequent equitable interests, or legal interests acquired with notice of the proprietary interest. Both these reasons are said to be supported by the reasoning of Lord Browne-Wilkinson in *Westdeutsche Landesbank Girozentrale v Islington London Borough Council* [1996] AC 669.

139. So far as the first reason is concerned, at p.706E–F, Lord Browne-Wilkinson explained that "[u]nless and until there is a separation of the legal and equitable estates, there is no separate equitable title". In this case, says Mr Sumption, legal and equitable title in the Shares remained with Akai until the shares were sold, and therefore there can be no claim against the Bank for knowing receipt of the Shares.

140. The arguments on this point were not developed in any detail by either party, and, in the light of my conclusion on Akai's

proposition (f), it is unnecessary to resolve it. Because it may give rise to a rather controversial and difficult issue of some significance in other cases, I am, in these circumstances, rather reluctant to express a firm conclusion on the point.

141.   It may well be that the correctness of Mr Sumption's contention stands or falls on determining whether the Bank had an equitable interest in the Shares at the moment that the share certificates were pledged. That in turn may be resolved by construing the pledge agreement (and possibly other documents signed on 4 December 1998). If the Bank merely had a contractual right to sell the Shares, which right was protected by the pledging of the certificates, then, at least until the Shares were sold and the proceeds of sale retained by the Bank, there may have been no asset or money in the possession of the Bank on which a claim for knowing receipt could bite. However, even if that is right, when the Shares were sold, the proceeds of sale were retained by the Bank as its own money, so there would, I think, be a claim for knowing receipt of the proceeds of sale of the Shares.

142.   This is not quite the point which Lord Browne-Wilkinson had in mind in *Westdeutsche Landesbank Girozentrale v Islington London Borough Council*, p.706E–F, as he was addressing an issue relating to an alleged resulting trust. More in point is another passage relied on by Mr Sumption, in the opening two sentences of the judgment of Hoffmann LJ in *El Ajou v Dollar Land Holdings Plc (No 1)* [1994] 2 All ER 685, 700:

> This is a claim to enforce a constructive trust on the basis of knowing receipt. For this purpose the plaintiff must show, first, a disposal of his assets in breach of fiduciary duty; secondly, the beneficial receipt by the defendant of assets which are traceable as representing the assets of the plaintiff; and thirdly, knowledge on the part of the defendant that the assets he received are traceable to a breach of fiduciary duty.

Even though it emanates from Lord Hoffmann, this should not, I acknowledge, be treated as a comprehensive definition of the essential ingredients of a knowing receipt claim in every case.

143.   Nonetheless, it may usefully highlight the need for "beneficial receipt" of an asset or money by a defendant in a knowing receipt claim. It is true that, by holding the certificates, the Bank did receive a benefit, but it was merely a protection of its alleged right to sell the Shares, and Akai's claim relates to the Shares. (There is, I suppose, an argument, which, even for the purpose of this hypothesis, need not be considered, that when the Bank actually purported to exercise its right of sale of the Shares, there was a *scintilla temporis* before sale when it was exercising sufficient degree of control over the Shares to have beneficial ownership of them.)

144.    I propose to take this point no further. Even if it is correct to say that no claim in knowing receipt could be made in respect of any time before the Bank acquired an equitable interest in the Shares or proceeds of sale, it would be necessary to construe the pledge agreement (and, possibly, other documentation) in order to be able to identify and characterise the Bank's rights in the Shares, and we heard no submissions on that issue.

145.    I would, however, reject the Bank's alternative contention that, as a matter of principle, there should be no equitable claim in this area. It is true that in *Westdeutsche Landesbank Girozentrale v Islington London Borough Council*, pp.704G–705B, Lord Browne-Wilkinson warned against "the wholesale importation into commercial law of equitable principles inconsistent with the certainty and speed which are essential requirements for the orderly conduct of business affairs". The question when it is right to invoke an equitable right in a commercial context is not always easy to resolve. There are *dicta* which, if read in isolation, appear to provide some support for the Bank's case on the point — see eg *per* Millett LJ in *Paragon Finance Ltd v DB Thakerar & Co* [1999] 1 All ER 400, 409E–G, and, as Lord Millett, in *Dubai Aluminium Co Ltd v Salaam* [2003] 2 AC 366, 404D–H.

146.    However, in *Bristol and West Building Society v Mothew* [1998] 1 Ch 1, 18A–F, Millett LJ, after pointing out that the mere fact that a person with fiduciary duties to another had been negligent would not of itself give rise to an equitable remedy, referred to:

> … those duties which are special to fiduciaries and which attract those remedies which are peculiar to the equitable jurisdiction and are primarily restitutionary or restorative rather than compensatory. A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. … A fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal.
>
> …
>
> … Breach of fiduciary obligation, therefore, connotes disloyalty or infidelity. Mere incompetence is not enough.

This seems to me to apply here: Mr Ting clearly owed a fiduciary duty to Akai, which he equally plainly breached when he intentionally, indeed dishonestly, purported to commit Akai to the Switch Transaction, without its authority or knowledge, for the benefit of Singer NV.

147.    Mr Sumption also relied on *Criterion Properties Plc v Stratford UK Properties LLC*, where the House of Lords held that a claim

for knowing receipt was effectively irrelevant in a case where the claimant's case was based on want of authority of an alleged agent. I do not consider that that case assists. It involved an executory contract, so a claim for knowing receipt could not arise as the contract had not been completed, and no property had changed hands. If the claim based on want of authority succeeded, the contract would have been void and unenforceable, so there could be no receipt. If, on the other hand, the claim based on want of authority failed, the House of Lords took the view that the claim for knowing receipt would also fail. (This appears to me to imply fairly strong support for my view that what is required of the recipient's state of mind in a knowing recipient claim in a case such as this is the same as the test of want of honest and rational belief for the purpose of defeating apparent authority.) Mr Kosmin suggested that a different result might obtain if the potential recipient acquired knowledge between contracting with the agent and receiving the property; that could be right, but that takes matters no further here.

*Proposition (f): the measure of equitable compensation*

148. I turn to Akai's proposition (f), namely that the measure of equitable compensation should be the value of the Shares at the date they were first received by the Bank, in December 1998, or the date the Bank refused to hand them back, in December 1999. In a nutshell, assuming in Akai's favour that a claim for knowing receipt arose in December 1998, its primary case is that it is entitled, as a matter of principle, to be compensated, if it so elects, by reference to the value of those shares as at that date. (Alternatively, the Bank should have handed the share certificates back in December 1999, which is the alternative valuation date alleged by Akai.)

149. In support of the contention that, if the claim for knowing receipt arose in December 1998, equitable compensation should be assessed by reference to the value of the Shares as at that date, Mr Kosmin relied on *dicta* in a number of cases. Some of those cases were concerned with the duty of a person in a fiduciary position to account for a profit or a bribe; others arose out of a trustee's duty to make good a loss made on an unauthorised investment. In my view, none of those circumstances are in point here, even as useful analogies.

150. Thus, I do not see how Akai gets help from the proposition which was expressed by Nourse LJ in these terms in *Re Duckwari Plc* [1999] Ch 253, 262H:

> If a trustee applies trust moneys in the acquisition of an unauthorised investment, he is liable to restore to the trust the amount of the loss incurred on its realisation: see *Knott v Cottee* (1852) 16 Beav 77.

In a case where a trustee acquires an unauthorised investment or wrongly retains an investment (as in *Fry v Fry* (1859) 27 Beav 144, 54 ER 56), one can well see the logic of holding that the beneficiaries should have the option of keeping the investment or requiring the trustee to reimburse the trust the cost of the investment: if the investment has gone down in value, the trust will have suffered a loss through the wrongful act of the trustee, which he ought to be required to make good.

151. However, it is important to recall that a basic principle applicable to equitable compensation is that, as already quoted, "there does have to be some causal connection between the breach of trust and the loss to the trust estate for which compensation is recoverable viz. the fact that the loss would not have occurred but for the breach" — *per* Lord Browne-Wilkinson in *Target Holdings Ltd v Redferns*, p.434G. That chimes with what he said at pp.432E–G, 437C–E, 439A–B and 440E–F. In the third of those passages, after referring with approval to certain passages in the judgment of McLachlin J in the Canadian case of *Canson Enterprises Ltd v Boughton & Co* (1991) 85 DLR (4th) 129, 160–163, he said this:

> Equitable compensation for breach of trust is designed to achieve exactly what the word compensation suggests: to make good a loss in fact suffered by the beneficiaries and which, using hindsight and common sense, can be seen to have been caused by the breach.

152. The same point underlies the decision of the Court of Appeal in *Bristol and West Building Society v Mothew*. The same approach, as I have indicated, has been adopted in Australia and Canada. As McLachlin J expressed it in *Canson Enterprises Ltd v Boughton & Co*, p.163, "the losses made good are only those which, on a common sense view of causation, were caused by the breach". Kirby J put it this way in *Maguire v Makaronis*, p.496:

> [Equitable] remedies will be fashioned according to the exigencies of the particular case so as to do what is "practically just" as between the parties. The fiduciary must not be "robbed"; nor must the beneficiary be unjustly enriched.

153. In this case, it appears to me clear that equitable compensation should be assessed by reference to the value of the Shares at the date when they were sold by the Bank, even if the claim for knowing receipt arose some 18 months earlier. As Mr Sumption pointed out, until the Shares were actually sold, it was always open to Akai to recover them from the Bank. Even more significantly, it seems to me clear that, if the Bank had not accepted the share certificates and retained them until selling the shares, Akai would have retained those shares until Akai Electric was placed into [administration] by

the Japanese courts. The uncontested evidence very strongly suggests that this is so: Akai Electric was Akai's effective operating subsidiary; there was no history of the STC group transferring its assets, let alone its shareholdings in subsidiaries, out of its ultimate control; after the Bank returned the 5.5 million Akai Electric shares to Akai, they were retained by Akai until they became valueless.

154. In those circumstances, it is clear on the balance of probabilities, indeed it is, in truth, clear beyond any real doubt, that, if the Bank had returned the share certificates to Akai, far from being sold earlier than the date upon which the Bank sold them, Akai would have kept the Shares until they had become worthless. The ironic fact is that Akai is substantially better off as a result of the Bank having received and sold the Shares. Of course, that does not mean that Akai has no right to equitable compensation, and the Bank is entitled to keep the proceeds of sale of the Shares: normal equitable principles entitle Akai to elect between receiving a sum equal to the proceeds of sale of the Shares or, unless it is impossible to obtain them, an equivalent number of Akai Electric shares.

155. Accordingly, even though I consider that, although Akai may well have a claim in knowing receipt, it takes matters no further. I should add that, even if the principles so far discussed had suggested that Akai was entitled to equitable compensation in an amount greater than it should recover by way of common law damages, I would have been very sympathetic to the notion that the equitable remedy would have to be refashioned so as to equate the amount of such compensation with the common law damages. In that connection, I draw support from what was said by Lord Browne-Wilkinson in *Target Holdings Ltd v Redferns*, 432F–433A and 435F–G, and by Millett LJ in *Bristol and West Building Society v Mothew*, p.17G–H.

## *Issues on interest*

156. Towards the very end of the oral argument, the question was raised as to whether the Judge was right (a) to have awarded Akai compound interest on the damages or compensation, and (b) to have ordered that such interest should start to run from 6 December 1999. Neither point had been raised before the Court of Appeal or in the Bank's notice of appeal or written case, but Mr Sumption indicated that he wanted leave to amend the bank's notice of appeal, at least in relation to issue (b).

157. I would not allow the Bank to raise the issue of compound interest. The circumstances in which interest should be awarded on a compound basis are not always entirely clear and it seems to me that it would be unfair on Akai to allow it to be raised at the last minute, and determined without full argument. Further, there is no commercial injustice in requiring a bank to pay compound interest

on money it has wrongly been holding for a few years, at least in circumstances such as the present.

158.   The issue of the date from which interest is to run stands on a different footing. If, as the Court of Appeal rightly held, damages or compensation should be based on the proceeds of sale received by the Bank for the Shares, then I can see no possible justification for ordering that interest should run from any date earlier (or indeed later) than the date (or dates) on which the proceeds of sale were received by the Bank (unless there was some unjustifiable delay in getting in the proceeds). In particular, there is no possible justification for choosing the date on which the US$30m became repayable under the Loan Agreement, not least because the reason the claim has succeeded is that that agreement was void. The point is really the same as that already discussed in relation to Akai's proposition (g) on the measure of the compensation payable.

159.   There was an argument that the Bank delayed unnecessarily in selling the Shares. In my view, in agreement with the Court of Appeal, that argument plainly fails on the facts: the Bank understandably considered that it should get certain regulatory clearances before it sold the Shares, which delayed the sale for a few months. Although it is unnecessary to decide the point, I strongly suspect that that argument fails on the law as well: the Bank was not under a duty to sell the Shares with any particular despatch, or at all, so far as I can see.

160.   In order to avoid the risk of any argument that the Bank took an unreasonable time to get in the proceeds of sale, and in order to ensure that Akai is not prejudiced in that connection, I think it would be fair if interest ran from the date (or, more accurately, the dates) of sale of the Shares. After all, the Bank is very much in mercy by having raised this point so very late.

## *Conclusion*

161.   It would be wrong to end this judgment without referring to the quality of the judgments below, from all of which I have derived considerable assistance. I have inevitably referred to aspects of the judgments in the courts below which appear questionable. However, this should not detract from the fact that Stone J delivered an admirably full and carefully considered judgment, and, although I have not made much specific mention of the judgments in the Court of Appeal, perusal of those judgments will reveal that I have applied and followed most of the points made in the incisive and well reasoned judgments of Tang V-P, Le Pichon and Cheung JJA.

162.   In the event, for the reasons given above, my conclusions are that (a) Mr Ting did not have authority to commit Akai to the Switch Transaction, and (b) the Bank is limited to the common law measure of damages. Although I do not agree with all their reasoning

Pg 60 of 686

on issue (a), I consider that the Court of Appeal reached the right conclusion on both those two issues. Accordingly, I would dismiss both the Bank's appeal and Akai's cross-appeal, but I would vary the award of interest so that it runs from the dates on which the Bank sold the Shares.

163. So far as costs are concerned, I would order that they be dealt with on written submissions as to which the parties should seek written directions from the Registrar.

**Ma CJ**

164. For the above reasons, the Bank's appeal and Akai's cross-appeal are dismissed. The Order of the Court of Appeal dated 10 August 2009 is varied only to the extent that the award of compound interest (on the damages totalling US$22,541,332) will begin to run as from the dates on which the Bank sold the Shares. Costs will be dealt with as indicated in para.163 above.

TAB 75

*The Bell Group Ltd v Westpac Banking Corp* [2008] WASC 239,
§§1065-1122 Western Australia Supreme Court (excerpt)

**[2008] WASC 239**

| | | |
|---|---|---|
| **JURISDICTION** | **:** | SUPREME COURT OF WESTERN AUSTRALIA IN CIVIL |
| **CITATION** | **:** | THE BELL GROUP LTD (IN LIQ) -v- WESTPAC BANKING CORPORATION [No 9]<br>[2008] WASC 239 |
| **CORAM** | **:** | OWEN J |
| **HEARD** | **:** | 404 DAYS BETWEEN 22 JULY 2003 AND 22 SEPTEMBER 2006 |
| **DELIVERED** | **:** | 28 OCTOBER 2008 |
| **FILE NO/S** | **:** | CIV 1464 of 2000 |
| **BETWEEN** | **:** | THE BELL GROUP LTD ACN 008 666 993 (IN LIQ)<br>First Plaintiff<br><br>THE BELL GROUP LTD ACN 008 666 993 (IN LIQ) as trustee separately for each of<br>DOLFINNE PTY LTD ACN 009 134 516 (IN LIQ)<br>INDUSTRIAL SECURITIES PTY LTD<br>ACN 008 728 792 (IN LIQ)<br>MARANOA TRANSPORT PTY LTD<br>ACN 009 668 393 (IN LIQ)<br>NEOMA INVESTMENTS PTY LTD<br>ACN 009 234 842 (IN LIQ)<br>Second Plaintiff<br><br>BELL GROUP FINANCE PTY LTD<br>ACN 009 165 182 (IN LIQ) (RECEIVER AND MANAGER APPOINTED)<br>Third Plaintiff<br><br>BELL GROUP (UK) HOLDINGS LTD (IN LIQ) (IN ADMINISTRATIVE RECEIVERSHIP)<br>Fourth Plaintiff |

would inevitably become insolvent'. Secondly, I will examine some other aspects of the test of insolvency; in particular, whether it is permissible to use hindsight and the degree of satisfaction that must be enjoyed before a receipt or expense can be taken into account. Thirdly, I will consider the factual arguments about various disputed cash inflow items. Fourthly, I will deal with the impact on solvency of trading losses made in the period from 1 July 1989 to 26 January 1990. Fifthly, I will cover the arguments relating to the cl 17.12 issue. Sixthly, I will consider the ability of the Bell group to raise funds from its two main assets, namely, the publishing assets and the BRL shares. Seventhly, I will review the plaintiffs' arguments about cascading demands. And finally, I will look at various liabilities that the companies were obliged to meet in the relevant period.

## 9.2. Meaning and assessment of insolvency

1064 The central feature of the insolvency concept is clear: a person is insolvent if he or she is unable to pay debts as they become due. But thereafter, the fog descends. An examination of previous cases reveals the nuances surrounding the concept of insolvency. The application of the concept in individual cases can be both vexed and difficult.

### 9.2.1. The balance sheet and cash flow tests

1065 At common law, the solvency of a company is assessed by one or other (or a combination) of two measures: the 'cash flow' test and the 'balance sheet' test. Both tests are advanced by the plaintiffs in this case. The former focuses on income sources that were available to the entity and expenditure obligations it had to meet. The latter concentrates on the value of the assets and liabilities reflected in the company's books.

1066 The 'cash flow' or 'commercial insolvency' test is an assessment of solvency based on a company's ability to meet its debts (current liabilities), as and when they fall due. This test assesses the financial health of a company by reference to its capacity to finance its current operations. In other words, it looks at whether the company's business is viable and can continue to operate by meeting the present demands upon it. As the authors of Ford, Austin and Ramsay, *Ford's Principles of Corporations Law* (12th ed, 2005) point out, the essential features of the cash flow test include an assessment of the company's existing debts and debts that will arise in the near future, the date each debt is due for payment, the company's present and expected cash resources and the date each inflow item will be received (at [25.050]).

1067 The 'balance sheet' test is different. It considers whether a company's total external liabilities are greater than the value of its assets. If they are, and therefore there are insufficient assets to satisfy all claims on the company, the company is insolvent.

1068 Neither test is invariably accurate in ascertaining the true financial position of a company. Both have defects. One of the major problems with the balance sheet test is that not all of the company's book value assets are severable or can readily be exchanged for money. Consider, for example, the goodwill of a company or other accounting constructs such as 'deferred IT costs'. Disciples of the 'if you can't kick it, you shouldn't count it' school of accounting have strong views about the valuation of items of this type. There are other problems with ascertaining the real or realisable value of a company's assets at any particular time. For example, are asset values to be assessed in a liquidation scenario under 'fire sale' conditions or should they be calculated on the assumption that the company will continue as a going concern?

1069 The cash flow test on the other hand has been criticised as being vague and uncertain and as posing difficult questions with regard to timing: see, for example, Keay AR, 'The Insolvency Factor in the Avoidance of Antecedent Transactions in Corporate Liquidations' (1995) 21(2) *Monash University Law Review* 306. In an article, Margret JE, 'Insolvency and Tests of Insolvency: An Analysis of the 'Balance Sheet' and 'Cash Flow' Tests' (2002) 12 *Australian Accounting Review* 59, the author says:

> [T]he emphasis in this test is on an entity's ability to pay its debts *as they fall due.* This idea suggests a focus on an entity's level of liquidity or short-term financial state … On the other hand, in a purely financial sense, solvency focuses on long term calculations of an entity's ability to pay. This is because the concept of solvency includes identifying whether the entity has a short term financial problem. It is evident that difficulties have arisen for the courts when using the cash flow test of insolvency, particularly in deciding what debt to recognise at a particular time.

1070 To add to the confusion, it is possible that a company might be cash flow insolvent but show a positive balance sheet where assets exceed liabilities. A company may be, at the same time, insolvent and wealthy. It may have wealth locked up in investments that are not easy to realise. Regardless of its wealth (in this sense), unless it has assets available to meet its current liabilities, it is commercially insolvent and therefore liable to be wound up: ***Re Tweeds Garages Ltd*** [1962] Ch 406, 460 (Plowman J, referring to an extract from the *Buckley's Companies Acts*, 13th ed, 1957).

1071 There are comments to similar effect in ***Re Bond Corp Holdings Ltd*** [1990] 1 WAR 465, 473 - 474. Ipp J commented that the task of the court is to determine whether the company is then able to meet its current liabilities as they fall due. The court is not required to determine the probabilities of circumstances arising 'at some future time which will then cause [the company] to be in a position whereby it will not be able to meet the liabilities which will then exist'.

1072 There is no unanimity of approach across common law jurisdictions. In Australia, however, the cash flow test is generally viewed as the more appropriate mechanism for assessing solvency, both for individuals and companies. For example, in ***Bank of Australasia v Hall*** (1907) 4 CLR 1514, 1521, Isaacs J said: 'The debtor's position depends on whether he can pay his debts, not on whether a balance sheet will show a surplus of assets over liabilities'. The cash flow test is more in keeping with the definitions of solvency in the *Bankruptcy Act* and the *Corporations Law*.

1073 That having been said, it would be wrong to dismiss the balance sheet test as irrelevant. It can be useful, for example, in providing contextual evidence for the proper application of the cash flow test. In Coburn N, *Coburn's Insolvent Trading* (2nd ed, 2003) 66, the author says that:

> The courts have moved to a far wider consideration of solvency, rather than just applying a cash flow test, which is viewed as a basic starting point in the consideration of solvency. This is because the statutory emphasis is on 'solvency' rather than 'liquidity'. The consideration will be as a question of fact: in the light of commercial reality, all things considered, could the company pay its debts as and when they became due? Such an approach includes the balance sheet test, and other commercial realities such as access to money from third parties, raising capital or credit and financial support are all relevant considerations in determining a company's ability to pay debts.

1074 The proposition that a balance sheet assessment continues to have some relevance is supported by other authorities: see, for example, ***Australian Securities and Investments Commission v Edwards*** [2005] NSWSC 831; (2005) 220 ALR 148, [96] (Barrett J); ***Ace Contractors & Staff Pty Ltd v Westgarth Development Pty Ltd*** [1999] FCA 728 [44] (Weinberg J).

1075 In this litigation, my primary focus is on the cash flow test. But, as will become apparent, it is necessary to look at the balance sheets to resolve some particularly contentious issues.

### 9.2.2. The importance of context

1076 There are difficulties in ascribing a definitive meaning to the phrase 'ability to pay debts as they fall due'. These difficulties are compounded by the fact that the concept of solvency can, and does, differ according to the context in which it is used. On occasion, the principles which have evolved through the cases do not seem to reflect differences in context: ***Southern Cross Interiors Pty Ltd (in liq) v Deputy Commissioner of Taxation*** [2001] NSWSC 621; (2001) 53 NSWLR 213, [35].

1077 In ***London and Counties Assets Company Ltd v Brighton Grand Concert Hall and Picture Palace Ltd*** [1915] 2 KB 493, Pickford LJ noted that the principles of solvency may vary according to the statute under which solvency was being assessed. In ***Southern Cross Interiors***, Palmer J referred to the different 'categories' of solvency that might come before the courts for analysis. His Honour recognised that when assessing the 'actual' solvency of a company, a court will apply different criteria from those it will use when considering whether an individual had 'reasonable grounds to expect' solvency. At [35], Palmer J pointed out that the test of solvency arises (relevantly) in three types of case: applications to wind up a company on the ground of insolvency; claims to recover preferences; and claims to recover particular debts from directors on the ground of insolvent trading. Under previous statutory regimes, a plaintiff in an insolvent trading case had to prove only that there were 'reasonable grounds to expect' insolvency at the time that the relevant debt was contracted. The necessity to prove actual insolvency was common to winding up and preference cases. It follows that winding up and preference cases may be treated as one category, while insolvent trading cases can be regarded as a different category. Statements of principle as to insolvency in one category of case have often been cited in the other category of case without necessarily appreciating the contextual differences.

1078 'Prospective' and 'retrospective' assessments of solvency present another contextual difference. A prospective assessment is required when, for example, the court is entertaining a winding up application. The company's ability to pay its debts has to be determined not only by reference to debts payable as at the date of the hearing, but also by reference to its ability to pay debts which will fall for payment sometime in the near future. The question of a company's solvency can arise retrospectively where, for example, a liquidator is seeking to recover an unfair preference or to set aside an insolvent transaction. In those cases, the issue concerns the solvency of the company at a date prior to the

winding up: ***Lewis v Doran*** [2004] NSWSC 608; (2004) 208 ALR 385, [107] (Palmer J).

1079 Care needs to be taken when reading the authorities because the meaning and application of the phrase 'unable to pay debts as they fall due' can differ depending on the context in which the issue arises. In this case I am confronted by a mix of concepts and contexts. I have to decide as a question of fact whether the companies were insolvent as at 26 January 1990; this is the issue I have previously described as 'objective insolvency'. It equates (broadly) with what was called 'actual' insolvency in ***Southern Cross Interiors***. I also have to decide the directors' state of mind on that question as at the same date. This is what I have termed 'subjective insolvency' and it equates (again broadly) with the reasonable expectation test referred to in ***Southern Cross Interiors***. In determining objective or actual insolvency, I will be engaging in a retrospective assessment. But when I come to look at the state of mind of the directors, the distinction between retrospective and prospective becomes more difficult to apply. The juridical task may combine elements of both approaches.

### 9.2.3. The phrase 'from its own moneys'

1080 The starting point for the assessment of solvency is the broad definition that a company is insolvent if it is unable to pay its debts as they become (or fall) due, out of its own moneys. Those last words, 'out of its own moneys', have created controversy over the years. The plaintiffs see them as words of limitation: the available sources are only those that can be garnered from the company's assets. The banks contend that the words are not essential to the definition. They say that none of the plaintiffs' causes of action involves the application of a statute incorporating, as a statutory integer, the requirement of insolvency. Accordingly, the general law meaning of 'insolvency' is relevant for present purposes. At law, the focus of attention is on the company's ability to pay debts when they fall due, not on the source of funds.

1081 There is some support in the authorities for the approach advocated by the banks. In ***London and Counties Assets Company,*** Buckley LJ (at 501) defined the word 'insolvent' as meaning commercial insolvency, that is to say, 'inability to pay debts as they become due'. That case concerned a provision in the articles of association disqualifying a person from holding office as a director if 'insolvent'. A similar approach is to be found in ***Registrar-General v Harris*** (1998) 45 NSWLR 404, 414 (claims against the assurance fund under land titles legislation) and in ***Minion v***

***Graystone Pty Ltd*** [1990] 1 Qd R 157, 161 (a provision in a contract for excavation works). But none of those decisions included a discussion of the sources of funds that could be taken into account in deciding whether the debtor was able to pay its debts as they fell due.

1082 Prior to 1992, neither the *Bankruptcy Act* nor the relevant corporations legislation contained a definition of 'insolvency'. In applying the legislative provisions concerning preferences, the courts treated the statutory formulation 'unable to pay his debts as they become due from his moneys' as meaning the same as 'insolvency'. And they afforded to the words 'from his own moneys' a particular meaning or content: see, for example ***Bank of Australasia v Hall*** at 1528; ***Rees v Bank of New South Wales*** (1964) 111 CLR 210 at 229 - 230. The most oft-cited authority is ***Sandell v Porter***, a preference recovery action under s 95 of the *Bankruptcy Act 1924* (Cth). Barwick CJ said, at 670:

> An essential step in making out that a payment is a preference under s.95 is to establish by evidence to the satisfaction of the court that the payer was at the time of the payment insolvent. Insolvency is expressed in s.95 as an inability to pay debts as they fall due out of the debtor's own money. But the debtor's own moneys are not limited to his cash resources immediately available. They extend to moneys which he can procure by realization by sale or by mortgage or pledge of his assets within a relatively short time - relative to the nature and amount of the debts and to the circumstances, including the nature of the business, of the debtor. The conclusion of insolvency ought to be clear from a consideration of the debtor's financial position in its entirety and generally speaking ought not to be drawn simply from evidence of a temporary lack of liquidity. It is the debtor's inability, utilizing such cash resources as he has or can command through the use of his assets, to meet his debts as they fall due which indicates insolvency.

1083 Another provision of the *Corporations (Western Australia) Code* (as it existed in 1990) is relevant to this argument. Under s 364(1)(e), a company could be wound up on the ground that it 'is unable to pay its debts'. Under s 364(2)(c), a company was deemed to be unable to pay its debts if 'the court… is satisfied that the company is unable to pay its debts'. Ignoring the deeming aspect, this section enabled a court to order a winding up if satisfied, on evidence, that the company was unable to pay its debts. This has been interpreted as referring to insolvency in the commercial sense, namely, an inability to meet current demands: ***Re Premier Permanent Building Association*** (1890) 16 VR 20, 22 - 23.

1084 I raise this because the context in which the insolvency question arises involves the proposition that the companies might become subject

to a winding up. This is the tenor of the plaintiffs' case in a number of areas. For example, given (among other things) the allegation of insolvency, unless there was a valid and effective restructuring, the companies would have been wound up: 8ASC par 33B. Further, TBGL was insolvent and had any of its creditors made a demand, it would have been wound up: PP par 26A(b)(ix). It is also alleged that the banks knew that the companies were insolvent and may be wound up: 8ASC par 58G and par 58I. That having been said, there are, of course, the statutory claims. But they do not proceed under the provisions that correspond to s 95 of the *Bankruptcy Act 1924* (Cth). And insolvency (at the time the Transactions were entered into) is not a necessary element of the statutory claims that are pleaded in this litigation, although it has practical significance: see Sect 7.2.6.3.

1085 I wish now to return to the subject of statutory definitions of insolvency. The *Corporate Law Reform Act 1992* introduced, for the first time, a definition of insolvency. The *Corporations Law* was amended to include s 95A:

> (1) A person is solvent if, and only if, the person is able to pay all the persons debts, as and when they become due and payable.
>
> (2) A person who is not solvent is insolvent.

1086 In 1996, the *Bankruptcy Act* s 122 (the successor to s 95) was substantially redrafted. Among the changes were the removal of the words 'unable to pay his debts as they become due from his own moneys' and the insertion of the word 'insolvent'. At the same time, definitions in identical terms to the *Corporations Law* s 95A were introduced by the enactment of s 5(2) and s 5(3). So far as I can see, neither the explanatory memoranda to the amending Bills nor the second reading speeches indicate why the words 'from his own moneys' were omitted from the definition. Nor is there any indication that the legislature intended to bring about any particular change in the law in this respect. Those definitions have remained unchanged in the *Bankruptcy Act* and in successive versions of the legislation governing corporations.

1087 The change in wording has been the subject of judicial comment. In ***Lewis v Doran,*** Palmer J considered the difference in the two formulations when deliberating on solvency under the *Corporations Act 2001* (Cth). In that case, insolvency was an element of various claims bought by the liquidator against the directors. His Honour noted that in many of the authorities decided since 1993 the ***Sandell v Porter*** definition had been followed notwithstanding the legislative change. Palmer J

proffered the view that the purpose behind the statutory inclusion of the words 'from its own moneys' was to preclude unreliable or speculative claims to funds from the determination of insolvency in a winding up. His Honour said, at [109] - [111]:

> Where the question is prospective insolvency … [one] can appreciate the Court's reluctance to conclude that a company will be able to pay those debts which must be taken into account as a matter of commercial reality as at the relevant date only because it claims to have access to funds which a third party is said to be willing to lend without security.
>
> In such a case there is a considerable measure of trust, if not speculation, that 'things will turn out all right in the end'. If the third party is free to change its mind after the winding-up application is dismissed, the company's creditors are left with their hopes disappointed and their debts unpaid. Doubtless, it is this consideration which brought about the requirement in the predecessors of s 95A [of the *Corporations Act*] that a company's solvency must depend on its ability to pay by recourse to its own assets rather than by recourse to the benevolence or to the whim of others.
>
> In my opinion, the omission of the words 'from its own monies' from the definition of insolvency in s 95A now leaves the Court free to determine the question of retrospective insolvency free of a qualification which might well be appropriate to determine only prospective insolvency. The omission leaves the Court free to determine insolvency, whether retrospective or prospective, as a question of commercial reality having regard to the particular facts of the case.

1088 Palmer J's conclusion as to the effect of the omission of the words 'from the debtor's own moneys' was approved by the Court of Appeal in ***Lewis (as liquidator of Doran Constructions Pty Ltd) v Doran*** [2005] NSWCA 243; (2005) 219 ALR 555**,** [106] - [109].

1089 While ***Lewis v Doran*** is distinguishable on the facts (the external sources there were borrowings available from third parties, which is not the case here), I find Palmer J's analysis of the effect of s 95A compelling and will adopt it. See also ***Fryer v Powell*** [2001] SASC 59; (2001) 159 FLR 433, [75].

1090 But this does not mean that it is 'open slather'. Insolvency is to be judged by a proper consideration of the company's financial position, in its entirety, based on commercial reality. It is not to be found or inferred simply from evidence of a temporary lack of liquidity. Nor should it be assessed as if the company had to keep cash reserves sufficient to meet all outstanding indebtedness, however distant the date of payment might be in the fullness of time. But nor can directors rely on some faint hope that

help is at hand and that all will be well. The word 'reality' in the phrase 'commercial reality' has a bite. Commercial reality dictates that the assessment of available funds is not confined to the company's cash resources. It is legitimate to take into account funds the company can, on a real and reasoned view, realise by sale of assets, borrowing against the security of its assets, or by other reasonable means. It is a question of fact to be determined in accordance with the evidence. In this respect, I affirm (without repeating) what I said about the concept of 'commercial reality' in ***The Bell Group Ltd (In Liq) v Westpac Banking Corporation (No 6)*** [2006] WASC 54, [101] - [107].

1091 Raising funds by sale or mortgage of assets can be a two-edged sword. In ***Re United Medical Protection Ltd*** [2003] NSWSC 1031; (2003) 47 ACSR 705, [57], Austin J noted that despite a present ability to pay debts, problems can arise if the company 'would be unable to pay [its] debts as and when they fell due at some future time, because of an unidentified future reduction or absorption of cash flow'. Take, for example, the sale of the company's major income generating asset. The sale might provide sufficient funds to meet liabilities that are due immediately, yet at the same time rob the company of the ability to meet other liabilities due later but nonetheless in the foreseeable future. If that were to be the case, it could lead to a conclusion of insolvency, notwithstanding the present ability to meet commitments.

1092 In my view, none of the disputed cash inflow items should be ruled out on the grounds that they could not be considered as 'the company's own moneys' and that it would therefore be legally inapposite to take them into account. It does not follow that they must necessarily, as a matter of commercial reality, be regarded as reasonably available to the company in the sense that I have explained. That will depend on an item-by-item assessment.

### 9.2.4. Likelihoods, prospects and possibilities

1093 This brings me to a related question. In the cash flows that were prepared by the Bell Treasury officers in January and February 1990, various cash inflow items were included. When the expert witnesses came to examine the financial affairs of the companies and to prepare their own cash flows, they took differing views as to whether individual items should or should not be included. This is at the very heart of the factual dispute about the solvency of the companies at the relevant time.

1094 The plaintiffs argue that the legal test for inclusion or exclusion of a cash inflow item is whether there was a 'likelihood' of receipt of the

relevant item. They contend that this is in line with the authorities and that it is consistent with the base question that falls to be answered: is the company able to meet its debts? The banks say that there is no legal test. They say that the court must find the facts by reference to the level of satisfaction the particular finding requires, bearing in mind the gravity of the allegation in the context of these proceedings. The banks introduce their cash flow defence by saying that, as at 26 January 1990, the companies 'did have a prospect, which was reasonable, of paying their liabilities as they fell due'.

1095 At the same time, the banks say that Honey developed his predictive cash flow according to what he considered 'reasonable' in light of the uncertainties relating to each disputed item. They say that Honey assessed the prospect or likelihood of each item by looking for a 'sufficient likelihood'. He only included a particular item in his predictive cash flow if he had formed a view that there was sufficient likelihood that it would be received. If there was, it warranted inclusion. In their closing submissions, the banks put it this way:

> Mr Honey approached each of the disputed items by assessing the uncertainties relating to them, and in that context, came to a view as to whether the degree of uncertainty was such as to warrant exclusion or enable inclusion in his cash flow. In that sense, he considered the 'likelihoods' … He took a view as to whether, in that sense, it was reasonable in light of the uncertainties to include the relevant item in his cash flow.

1096 The plaintiffs contend that in substance there is no real difference between the tests enunciated by the three corporate recovery practitioners who gave evidence. Honey proffered the view that the directors of a financially distressed company need to 'be sure' or 'be confident' of their company's solvency. Love considered that the directors would have to make a decision as to 'the likelihood of assets of the Bell group yielding ready cash in sufficient time for the purposes of meeting its debts as and when they fall due'. Woodings considered the directors would have to make a decision as to what was 'probable or likely to materialise'.

1097 I doubt that there is a 'legal test' that can be applied rigidly on each and every occasion that a court is called upon (in effect) to reconstruct a cash flow in order to assess the solvency of a company at a particular time. What I have to do is decide whether or not, as at 26 January 1990, the relevant Bell group companies were able to pay their debts as the debts became due. I have to be satisfied of that on the balance of probabilities. To get to that point, I am obliged to look at the cash flows

and decide whether each disputed item should be included or excluded. But does it mean that I have to be satisfied on the balance of probabilities as to each disputed item? I think not. The question is the weight to be given to the united force of all of the circumstances put together: ***Chamberlain v R (No 2)*** (1984) 153 CLR 521, 535.

1098 In a sense, the juridical task is not unlike that explained by the Court in ***Shepherd v R (No 5)*** (1990) 170 CLR 573. A jury can draw an inference of guilt even though not each and every fact is proved beyond reasonable doubt. But if a conclusion on a particular fact is an indispensable intermediate step in the reasoning process leading to the inference of guilt, then the jury must be satisfied of that fact beyond reasonable doubt. Take as an example, a trier of fact having to determine solvency based on six disputed cash flow items. He or she might conclude that it is almost certain item 'A' would have materialised and that 'B' would not; that it is probable (in the balance of probabilities sense) that 'C' would have materialised and that 'D' would not; and that it was possible (but not probable) that 'E' might have been received, but that there was no possibility of 'F' arriving in time. The question is whether the combined effect of 'A', 'C' and 'E' (ascribing to each the weight that the circumstances require) leaves the trier of fact with a degree of satisfaction necessary to justify a conclusion that it is more probable than not the company was (at the relevant date) able to pay its debts as they became due.

1099 I acknowledge that ***Chamberlain*** and ***Shepherd*** are criminal cases and that the consequences of a finding of guilt are more serious than findings made in civil litigation of the type with which I am dealing. Criminal cases involve the liberty of the subject. This case is only about money, albeit a lot of money, with some reputational aspects thrown in. Nonetheless, I can see no reason why the general approach to fact finding where there are individual strands or fibres going to make up a rope (an analogy sometimes used) should not be applied in a case such as this.

1100 Generally speaking, I am comfortable with the formulation that it is appropriate to take an item into account if it is likely to materialise. But I am less comfortable with a position that equates likelihood with the balance of probabilities. Certainly, the dictionary definitions of 'likely' all include, as one integer, 'probable'. But there are other meanings, such as 'having an appearance of truth or fact; that looks as if it would happen, be realised or prove to be what is alleged or suggested': the Oxford Dictionary. To my mind, a likelihood test does not mean that each and every disputed item has to be established on the balance of probabilities.

But nor do I accept the 'reasonable prospect' formulation if that is understood as sanctioning an overall conclusion in which none of the constituent parts are established to that level. I think the word 'likelihood' is an apt description if it is understood in the sense suggested by Woodings as 'likely to materialise', and by Honey as a view arrived at after assessing the degrees of certainty and uncertainty. In the end, it probably (there is that word again) comes back to commercial reality. In the discussion that follows, I am going to use the words 'likely' and 'likelihood' in relation to the disputed cash flow items. When I do, the words have to be understood in the light of the discussion in this section.

1101 The level of satisfaction must rise well above a mere hope or vague expectation. The reasoning process must be assiduous and disciplined. It is fitting to bear in mind the words of the Roman philosopher Lucius Seneca:

> If you are wise, you will mingle one thing with the other: not hoping without doubt, not doubting without hope.

1102 Of course, 'hope' must translate into the requisite level of satisfaction and 'doubt' demands sceptical questioning and analysis where and when it matters.

### 9.2.5. The use of hindsight

#### *9.2.5.1. The problem and the respective positions*

1103 The Macquarie Dictionary defines 'hindsight' as the perception of the nature and exigencies of a case after the event. The Oxford Dictionary defines it as seeing what has happened and what ought to have been done after the event. The latter also calls it 'wisdom after the event'.

1104 The way in which hindsight arises in this case can be illustrated by reference to a factual example. One of the disputed cash flow items is the ITC contract payment. A cash flow prepared in February 1990 made provision for the receipt in June 1990 of the ITC contract payment, in an amount of $17 million. Early in July 1990 the ITC contract payment was received, but in an amount of £4.6 million. The question is, is evidence that £4.6 million was received in July 1990 admissible as going to the question of solvency as 26 January 1990 and (or) the state of mind of the directors concerning the likelihood of receipt of funds from the ITC contract payment and, if so, to what extent?

1105 The banks contend that events occurring after 26 January 1990 are relevant and admissible to determine solvency to the extent that they

throw light on the ability, as at 26 January 1990, of the relevant assets to produce sufficient funds to enable debts to be paid as and when they fall due. Admissible and relevant evidence is confined to that which concerns the inherent, intrinsic quality of the asset or matters arising from the asset and does not include evidence of independent or supervening events. The banks also say that it is the quantitative (rather than qualitative) aspect of the financial position that is relevant.

1106 The plaintiffs, on the other hand, argue that the banks' approach to hindsight is based on valuation and damages cases and as such ought not be used for determining insolvency. For example, they say that in determining the appropriate measure of loss in a damages case, the court can, and does, enquire whether what occurred in hindsight was 'intrinsic in the thing itself or was something supervening or independent or accidental, for which it would not be appropriate to award compensation'. The plaintiffs contend that the rule regarding hindsight is designed to ensure that a plaintiff in a successful action for damages obtains a true measure of his loss, but no more, whereas (according to the plaintiffs) insolvency is a very different enquiry from the assessment of appropriate compensation. In support of their argument, the plaintiffs quote Hodgson J in ***Standard Chartered Bank of Australia Ltd v Antico (No 1 and 2)*** (1995) 38 NSWLR 290, 329: 'The question is one of ability to pay, not the fact of payment'.

1107 Furthermore, the plaintiffs contend that, in the application of the test, the banks have been selective and partisan by 'cherry picking' certain events in hindsight while omitting others as and when it suited their argument. The plaintiffs say that, properly analysed, the banks have not applied the hindsight test which they propound.

### *9.2.5.2. Hindsight and the reasoning in Lewis v Doran*

1108 Looked at in one way, hindsight is a relatively straightforward concept: it is essentially a question of relevance. Put simply, facts occurring after the event that were not known or knowable at the determinative date cannot be applied in a later assessment of ability to pay as at that date, because they are not relevant. But that simple proposition belies the complexity that has arisen in this area.

1109 In ***Lewis v Doran***, at [108], Palmer J opined that when assessing retrospective solvency, the court has available to it 'the inestimable benefit of the wisdom of hindsight' aided by the whole picture, both before, as at and after the alleged date of insolvency. His Honour went on, at [112], to explain why it was 'an inestimable benefit':

> Where retrospective insolvency is in issue, the Court can take into account that as at and after the alleged date of insolvency the company actually paid all its debts as they fell due … The Court can look at the arrangements which were actually made rather than artificially excluding them from consideration … To look at what actually happened avoids the possibility that the Court is forced to conclude that, as a matter of law, a company could not pay all its relevant debts when, as a matter of fact, the company clearly did pay those debts. (emphasis in original)

1110 Palmer J concluded that the company was in fact solvent at the relevant date, and the decision was affirmed in the Court of Appeal. But in his reasons in the Court of Appeal, Giles JA (with whom Hodgson and McColl JJA agreed), said, at [103]:

> Solvency or insolvency is a state on which directors or others act in current conduct … [the definition of solvency] speaks of objective ability to pay debts as and when they become due and payable, but ability must be determined *in the circumstances as they were known or ought to have been known at the relevant time, without intrusion of hindsight.* There must of course be 'consideration ... given to the immediate future' … and how far into the future will depend on the circumstances including the nature of the company's business and, if it is known, of the future liabilities. Unexpected later discovery of a liability, or later quantification of a liability at an unexpected level, may be excluded from consideration if the liability was properly unknown or seen in lesser amount at the relevant time. (emphasis added, authorities omitted)

1111 This passage indicates that hindsight can apply equally to the outflow as well as to the inflow side of the cash flow equation, although in this case I am primarily concerned with inflows. The plaintiffs contend that the Court of Appeal 'expressly disapproved' the reasons espoused at first instance, at least insofar as those reasons sanctioned the use of hindsight. I am not sure that this is so: see, for example, Giles JA at [118]. I do not think that Palmer J intended to make a sweeping and all-embracing statement about the use of hindsight as a principle in an assessment of solvency. As Giles JA pointed out at [95], Palmer J's conclusion that the company was solvent was based on more than the simple fact that the company had paid its debts for a period after the relevant date. Palmer J was discussing the availability or otherwise of unsecured borrowings and the effect, if any, that the new definition of solvency in the *Corporations Act* has had on that question. In saying that, when assessing retrospective insolvency, the court has 'the inestimable benefit of hindsight', his Honour was merely confirming the position from previous authorities that have recognised that unsecured borrowings can, in certain circumstances, be included in an assessment of solvency. Those circumstances include a situation where there is sufficient evidence that they were in fact available

(in the case of retrospective solvency) or would be available as a matter of commercial reality (in the case of prospective and retrospective solvency).

1112 I do not think it is controversial that the issue of solvency is a question of fact that has to be determined in light of all the circumstances as they were known or ought to have been known at the time. Consequently, there are two issues to be determined.

1113 The first issue that the court must determine is the prevailing circumstances at the relevant time (often referred to as 'the commercial realities' or 'state of affairs') upon which the directors acted. In other words, the trier of fact has to determine the actual state of affairs and in doing this she or he can consider any relevant event or fact (both before and after the relevant date) if it helps 'throw a reflected light as to the actual state of affairs': ***Bank of Australasia v Hall*** (1529) (Griffiths CJ).

1114 Having determined the circumstances (or commercial realities) of the past the trier of fact must then move to consider whether or not, at the relevant date and under the circumstances referred to above, the company had the ability to pay its debts. This involves balancing existing debts with available assets and resources over a period of time.

1115 In my opinion, Giles JA's reference in ***Lewis v Doran*** to an assessment made 'without the intrusion of hindsight' means that, when determining the company's ability to pay, it must be done according to the circumstances or state of affairs which were known or 'knowable' at the time. In other words, if an event or fact was either not in existence or was not properly knowable, it is impossible that anyone would have or should have considered it. That fact, therefore, cannot be relevant to an assessment of a company's ability to pay. Giles JA at [95] gives an example (on the inflow side) of 'a hopelessly insolvent person who wins the lottery', and at [103] (on the liabilities side) of an 'unexpected later discovery of a liability'.

1116 In my view, a court can take into account facts available in hindsight (that is, after the determinative date of solvency) if the facts help determine which version of conflicting accounts as to the state of affairs is the more likely. The fact that an event actually took place might weigh in favour of the alleged expectation as being a commercial reality. But that fact alone is not determinative. It is one only of a host of matters that may intrude into the decision-making process.

1117 Consequently, the court can apply its knowledge of post-event facts to determine whether the proffered expectations of the parties (the

commercial realities with regard to cash flow) were or were not realistic. From there, the court can make an assessment of the company's ability to pay. But the trier of fact cannot simply look at the facts in hindsight, determine the value of a particular asset or liability which could not have been anticipated at the time, and, without more, include that amount in a cash flow analysis.

1118 I should not be taken as endorsing the entirety of the approach for which the banks are contending. The banks submit that the phrase 'without the intrusion of hindsight' (as used by Giles JA) is to be understood as a reference to the exclusion of matters that are supervening, unrelated or accidental (as discussed in the valuation cases) or that are events having no connection with the state of affairs as at the relevant date. This would include the example of the hopelessly insolvent person who wins the lottery. I think that the analysis places too narrow a construction on those words. It does not give sufficient ambit to the overriding question of relevance. To be admissible, the evidence must shed light on the state of affairs at the time and on what was, or ought then to have been, known about that state of affairs. For example, the reason why a later windfall from a lottery cannot be considered is not just because it is a supervening event, but because the event was properly unknown at the time and therefore can shed no light on the state of affairs.

1119 Applying this conclusion to the situation with which I am confronted in this litigation, the phrase 'circumstances as they were known or ought to have been known at the relevant time, without intrusion of hindsight' used by Giles JA would seem to encompass (in relation to the objective solvency):

(a) documents which came into existence after 26 January 1990, but which record a state of affairs as at 26 January 1990 and which a reasonable observer looking at all of the circumstances would have appreciated; and

(b) events occurring post 26 January 1990 that a reasonable observer at the relevant date, looking at all of the circumstances in which the company then found itself, would have considered likely to occur.

1120 Because of the vagaries that inevitably attend such prognostications, I will approach evidence of events occurring after the relevant date with appropriate caution to ensure that it is not accepted simply because it happened.

1121 In relation to subjective solvency, the trier of fact must make an assessment of the actual state of mind of the directors and, to the extent that the banks are said to have been aware of the insolvency of the companies, of the relevant bank officers. Ultimately, this state of mind is a question of fact which may or may not accord with the actual solvency of the company. To determine state of mind, the trier of fact can use facts available with the benefit of hindsight if those facts are relevant and 'throw a reflected light' onto the issue. But looking at what occurred with regard to payments is not, of itself, determinative.

1122 In the preceding discussion, I have concentrated on ***Lewis v Doran***, building, as I believe it did, on ***Bank of Australasia v Hall***. There are other decisions that lend some support for the conclusion to which I have come. ***3M Australia Pty Ltd v Kemish*** (1986) 190 ACLR 371; (1986) 4 ACLC 185, 191 - 192 (Foster J) and ***Re Australian Co-operative Development Society Ltd*** [1977] Qd R 66, 75 - 76 (Dunn J) are two such cases. Both stress the limited nature of permissible hindsight evidence and both express the need to approach such evidence with caution, as I have indicated I will do.

## 9.2.6. The period over which the assessment extends

### *9.2.6.1. An assessment period: the principles*

1123 A further question that arises is the period of time over which the assessment of solvency extends. Put another way, the question is whether, as at 26 January 1990, the company could have paid its debts as those debts fell due. This answer inevitably involves prognostication or a 'degree of forward analysis' (as Austin J called it in ***Re United Medical Protection Ltd*** at 719) to identify the debts that will become due and the resources that will be available at the time when each debt must be paid. But for how long into the future do you look? Is it one day, or one week, or one month, or one year? What is it that determines the length of the assessment period?

1124 I will commence by referring, once again, to the reasons of Giles JA in ***Lewis v Doran*** and in particular to a passage from [103] that I have already quoted: 'There must of course be "consideration ... given to the immediate future" … and how far into the future will depend on the circumstances including the nature of the company's business and, if it is known, of the future liabilities'. The words in double quotation marks are taken from passage from ***Bank of Australasia v Hall***, where Griffiths CJ said, at 1528:

TAB 76

*Three Rivers District Council v Bank of England (No 3)*
[2003] 2 AC 1, House of Lords

**[2003]** **1**
**2 AC**

Original Printed Version (PDF)

House of Lords

**Three Rivers District Council and Others v Governor and Company of the Bank of England (No 3)**

1998 July 9, 10; 14, 15, 16, 17; 21, 22, 23, 24; 28, 29; 31; Dec 4 — Hirst, Auld and Robert Walker LJJ

2000 Jan 24, 25, 26, 27; May 18 — Lord Steyn, Lord Hope of Craighead, Lord Hutton, Lord Hobhouse of Woodborough and Lord Millett

2001 Jan 15, 16, 17, 18; March 22 — Lord Steyn, Lord Hope of Craighead, Lord Hutton, Lord Hobhouse of Woodborough and Lord Millett

*Tort - Cause of action - Misfeasance in public office - Bank of England's regulatory functions - Licensed deposit-taker collapsing as result of fraud - Whether recklessness sufficient to establish liability - Whether necessary to establish foresight of actual consequences of particular failure in supervision*
*Banking - Deposits - Deposit-taking business - Whether depositors or potential depositors acquiring rights against regulatory body under Community law - First Council Banking Co-ordination Directive (77/780/EEC)*

Following the collapse of BCCI, a licensed deposit-taker, and its associated companies in July 1991 with huge deficiencies, much of which resulted from fraud on a very large scale, its affairs were the subject of an official report which showed that until April 1990 the Bank of England, which had principal responsibility for supervising banking activities in the United Kingdom, had been unaware that BCCI was heading for collapse. The plaintiffs, some 6,000 former depositors with BCCI's UK branch, brought an action against the Bank. Although by section 1(4) of the Banking Act 1987[1] the Bank was not liable in damages for acts or omissions in the discharge of its regulatory functions in the absence of bad faith, the plaintiffs alleged that the Bank was liable to them for misfeasance in public office in that it had either wrongly granted a licence to BCCI or had failed to revoke BCCI's licence when it knew, believed or suspected that it would probably collapse without being rescued. The Bank denied the claim. The judge decided as a preliminary issue that the Bank was not capable of being liable to the plaintiffs for misfeasance in public office since the plaintiffs' alleged losses were not in law capable of being caused by the Bank's acts or omissions. He also held that the plaintiffs were not entitled to rely upon any rights given to them by Community law since they had no right to recover damages against the Bank for breach of duty either under the Banking Act 1979 or the Banking Act 1987 or under the First Council Banking Co-ordination Directive (77/780/EEC)[2]. The judge accordingly refused leave to re-re-amend the statement of claim and struck out the plaintiffs' re-amended statement of claim. The Court of Appeal upheld the judge's definition of the tort of misfeasance in public office and his decision on Community law, but went on to hold that, until the facts were established, it would be premature to rule against the plaintiffs on causation or to decide that they were unable to sue in the capacity of potential depositors. However, the court struck out the statement of claim on the grounds that, even if it were amended, there was no realistic possibility of it becoming arguable. The plaintiffs appealed against the decisions on the scope of the tort of misfeasance in public office and Community law

[1] Banking Act 1987, s. 1(4): see post, pp 198D-E.
[2] First Council Banking Co-ordination Directive (77/780/EEC), art 3: see post, p 211E-G.
Art 6(1): see post, p 214B-D.
Art 7(1): see post, p 215C-D.
Art 8(1)(2): see post, p 217A-C.

Art 10(1)(3)(4): see post, p 212C-F.

and the refusal of leave to re-re-amend the statement of claim. The Bank cross-appealed against the decisions on causation and potential depositors. The House first heard argument on the legal issues with the appeal on the factual issues to follow if necessary.

On hearing the appeal on the legal issues and determining the scope of the tort of misfeasance in public office and the obligations imposed by the Directive--

*Held*, referring the appeal and cross-appeal back to the House for further argument, (1) that the tort of misfeasance in public office involved an element of bad faith and arose when a public officer exercised his power specifically intending to injure the plaintiff, or when he acted in the knowledge of, or with reckless indifference to, the illegality of his act and in the knowledge of, or with reckless indifference to, the probability of causing injury to the plaintiff or persons of a class of which the plaintiff was a member; that subjective recklessness in the sense of not caring whether the act was illegal or whether the consequences happened was sufficient; that a deliberate omission involving an actual decision not to act might also give rise to liability; that only losses which had been foreseen by the public officer as a probable consequence of his act were recoverable; and that such a formulation of the tort struck the appropriate balance between providing adequate protection for the public and protecting public officers from unmeritorious claims (post, pp 192B-C, 195H-196C, 197B-C, 222G-223C, 224H,226F-227B, 230B-231D, 235A, 236C-F).

*Bourgoin SA v Ministry of Agriculture, Fisheries and Food* [1986] QB 716, Mann J and CA considered.

(2) Dismissing the appeal in so far as it related to European Community law, that whether the Directive of 1977 gave rights to individual depositors and potential depositors had to be determined by examining the terms of the Directive itself; that the recitals showed that it was intended to be the first step in a continuing process to co-ordinate the supervision of credit institutions; that the protection of savings was merely a matter to which regard had to be had, along with the creation of equal conditions of competition, in the process of co-ordination; that since BCCI had already been legitimately carrying on business in the United Kingdom before the Directive came into force the Bank had not been obliged by article 3(1) to require it to obtain authorisation as a condition of continuing to carry on business in the United Kingdom; that, although articles 6 and 7 were concerned with supervision, their purpose was to ensure co-ordination between the supervisory authorities of the member states and the only duty which they imposed was a duty to co-operate; that article 8(1) allowed the withdrawal of authorisation in limited circumstances but its terms were restrictive rather than obligatory; that, read as a whole, the Directive placed duties of co-operation on the supervisory authorities of member states but stopped short of prescribing any duties of supervision; that, consequently, it was not possible to discover provisions entailing the granting of rights to individuals as such rights were not necessary to achieve the results which were intended to be achieved by the Directive; and that, accordingly, the interpretation of the Directive was acte clair and it would not be appropriate to make a reference to the European Court of Justice (post, pp 196F, 207F-G, 209B-C, 213G-214B, 216F-H, 219B-C,228D-F, 232A-F, 233B-F).

Decision of the Court of Appeal post, p 17G et seq; [2000] 2 WLR 15 affirmed in part.

At a further hearing on 15, 16, 17 and 18 January 2001 the House heard argument on the factual aspects of the appeal and on 22 March 2001 (Lord Hobhouse of Woodborough and Lord Millett dissenting) allowed the appeal of the plaintiffs, granted them leave to amend their particulars of claim and dismissed the defendants' cross appeal (post, 237G et seq).

Decision of the Court of Appeal reversed.

The following cases are referred to in their Lordships' opinions:

*Ackerley v Parkinson* (1815) 3 M & S 411

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 3 of 260
Pg 83 of 686

*Algemene Transport- en Expeditie Onderneming van Gend & Loos (NV) v Nederlandse administratie der belastingen* (Case 26/62) [1963] ECR 1, ECJ
*Allen v Flood* [1898] AC 1, HL(E)
*Ashby v White* (1703) 14 StTr 695; 2 LdRaym 938; 3 LdRaym 320; 1 Smith's LC (13th ed) 253
*Barnard v Restormel Borough Council* [1998] 3 PLR27, CA
*Beaudesert Shire Council v Smith* (1966) 120 CLR 145
*Becker v Finanzamt MŸnster-Innenstadt* (Case 8/81) [1982] ECR 53, ECJ
*Bourgoin SA v Ministry of Agriculture, Fisheries and Food* [1986] QB 716; [1985] 3 WLR 1027; [1985] 3 All ER 585, Mann J and CA
*Bradford Corpn v Pickles* [1895] AC 587, HL(E)
*Brasserie du Pcheur SA v Federal Republic of Germany; R v Secretary of State for Transport, Ex p Factortame Ltd (No 4)*(Joined Cases C-46/93 and C-48/93) [1996] QB 404; [1996] 2 WLR 506; [1996] All ER (EC) 301; [1996] ECR I-1029, ECJ
*Calveley v Chief Constable of the Merseyside Police* [1989] AC 1228; [1989] 2 WLR 624; [1989] 1 All ER 1025, HL(E)
*Carbonari v Universitˆ degli studi di Bologna* (Case C-131/97) [1999] ECR I-1103, ECJ
*Commission of the European Communities v Council of the European Communties* (Case 45/86) [1987] ECR 1493, ECJ
*Commission of the European Communities v Federal Republic of Germany* (Case C-131/88) [1991] ECR I-825, ECJ
*Commission of the European Communities v Federal Republic of Germany* (Case C-298/95) [1996] ECR I-6747, ECJ
*Cullen v Morris* (1819) 2 Stark 577
*Davis v Bromley Corpn* [1908] 1 KB 170, CA
*Davis v Radcliffe* [1990] 1 WLR 821; [1990] 2 All ER 536, PC
*Dillenkofer v Federal Republic of Germany* (Joined Cases C-178, 179 and 188-190/94) [1997] QB 259; [1997] 2 WLR 253; [1996] All ER (EC) 917; [1996] ECR 4845, ECJ
*Drewe v Coulton* (1787) 1 East 563n
*Dunlop v Woollahra Municipal Council* [1982] AC 158; [1981] 2 WLR 693; [1981] 1 All ER 1202, PC
*Ferguson v Earl of Kinnoull* (1842) 9 Cl & Fin 251, HL(E)
*Francovich v Italian Republic* (Joined Cases C-6/90 and 9/90) [1995] ICR 722; [1991] ECR I-5357, ECJ
*Garrett v Attorney General* [1997] 2 NZLR 332
*Germany (Federal Republic of) v European Parliament* (Case C-233/94) [1997] ECR I-2405, ECJ
*Harman v Tappenden* (1801) 1 East 555
*Henly v Lyme Corpn* (1828) 5 Bing 91
*Hillegom (Municipality of) v Hillenius* (Case 110/84) [1985] ECR 3947, ECJ
*Jones v Swansea City Council* [1990] 1 WLR 54; [1989] 3 All ER 162, CA; [1990] 1 WLR 1453; [1990] 3 All ER 737, HL(E)
*Lam v Brennan and Torbay Borough Council* [1997] PIQR P488, CA
*Leur-Bloem v Inspecteur der Belastingdienst/Ondernemingen Amsterdam 2* (Case C-28/95) [1998] QB 182; [1998] 2 WLR 27; [1997] ECR I-4161, ECJ
*Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* (unreported) 6 March 1981, Parker J; Court of Appeal (Civil Division) Transcript No 51 of 1981; [1982] AC 173; [1981] 3 WLR 33; [1981] 2 All ER 456, HL(E)
*Norbrook Laboratories Ltd v Ministry of Agriculture, Fisheries and Food* (Case C-127/95) [1998] ECR I-1531, ECJ
*Northern Territory v Mengel* (1995) 185 CLR 307; 69 ALJR 527
*Racz v Home Office* [1994] 2 AC 45; [1994] 2 WLR 23; [1994] 1 All ER 97, HL(E)
*Rawlinson v Rice* [1997] 2 NZLR 651

---

**[2003]** **4**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA and HL(E))**

*Rechberger v Austrian Republic* (Case C-140/97) [1999] ECR I-3499, ECJ
*R v Bowden* [1996] 1 WLR 98; [1995] 4 All ER 505, CA
*R v Caldwell* [1982] AC 341; [1981] 2 WLR 509; [1981] 1 All ER 961, HL(E)

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 4 of 260
Pg 84 of 686

*R v Chief Constable of the North Wales Police, Ex p AB* [1999] QB 396; [1997] 3 WLR 724; [1997] 4 All ER 691, DC
*R v Cunningham* [1957] 2 QB 396; [1957] 3 WLR 76; [1957] 2 All ER 412, CCA
*R v Dytham* [1979] QB 722; [1979] 3 WLR 467; [1979] 3 All ER 641, CA
*R v Lawrence (Stephen)* [1982] AC 510; [1981] 2 WLR 524; [1981] 1 All ER 974, HL(E)
*R v Secretary of State for Transport, Ex p Factortame Ltd (No 5)* [2000] 1 AC 524; [1999] 3 WLR 1062; [1999] 4 All ER 906, HL(E)
*Romanelli, Criminal proceedings against* (Case C-366/97) [1999] ECR I-855; [1999] All ER (EC) 473, ECJ
*SociŽtŽ Civile Immobilire Parodi v Banque H Albert de Bary et Cie* (Case C-222/95) [1997] ECR I-3899; [1997] All ER (EC) 946, ECJ
*Taylor v Nesfield* (1854) 3 E & B 724
*Tozer v Child* (1857) 7 E & B 377
*Turner v Sterling* (1671) 2 Vent 25
*Verein fŸr Konsumenteninformation v …sterreichische Kreditversicherungs AG* (Case C-364/96) [1998] ECR I-2949; [1999] All ER (EC) 183, ECJ
*W v Essex County Council* [1999] Fam 90; [1998] 3 WLR 534; [1998] 3 All ER 111, CA
*Wagner Miret v Fondo de Garant'a Salarial* (Case C-334/92) [1993] ECR I-6911, ECJ
*X (Minors) v Bedfordshire County Council* [1995] 2 AC 633; [1995] 3 WLR 152; [1995] 3 All ER 353, HL(E)
*Yuen Kun Yeu v Attorney General of Hong Kong* [1988] AC 175; [1987] 3 WLR 776; [1987] 2 All ER 705, PC

The following additional cases were cited in argument in the House of Lords:

*Agip (Africa) Ltd v Jackson* [1990] Ch 265; [1989] 3 WLR 1367; [1992] 4 All ER 385
*Alberta (Minister of Public Works, Supply and Services) v Nilsson* 70 Alta LR (3d) 267
*Alford v Canada* (1997) 31 BCLR (3d) 228
*Amministrazione delle Finanze dello Stato v Simmenthal SpA* (Case 106/77) [1978] ECR 629, ECJ
*Amministrazione delle Finanze dello Stato v SpA San Giorgio* (Case 199/82) [1983] ECR 3595, ECJ
*Armitage v Nurse* [1998] Ch 241; [1997] 3 WLR 1046; [1997] 2 All ER 705, CA
*Atkinson v Newcastle and Gateshead Waterworks Co* (1877) 2 ExD 441, CA
*Attorney General v Newspaper Publishing plc* [1988] Ch 333; [1987] 3 WLR 942; [1987] 3 All ER 276, Sir Nicolas Browne-Wilkinson V-C and CA
*Baker, In re* (1890) 44 Ch D 262, CA
*Bassett v Godschall* (1770) 3 Wils KB 121
*Bennett v Comr of Police of the Metropolis* The Times, 24 October 1997; (1998) 10 Admin LR 245
*Berkovitz v United States* (1988) 486 US 531
*Brasyer v Maclean* (1875) LR 6 PC 398, PC
*Bromage v Prosser* (1825) 4 B & C 247
*Bullo and Bonivento, Criminal proceedings against* (Case 166/85) [1987] ECR 1583, ECJ
*Burgoyne v Moss* (1768) 1 East 563n
*Burdett v Abbott* (1811) 14 East 1
*Candlewood Navigation Corpn Ltd v Mitsui OSKLines Ltd* [1986] AC 1; [1985] 3 WLR 381; [1985] 2 All ER 935, PC
*Cannock Chase District Council v Kelly* [1978] 1 WLR 1; [1978] 1 All ER 152, CA

---

**[2003]** **5**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA and HL(E))**

*Comitato di Coordinamento per la Difesa della Cava v Regione Lombardia* (Case C-236/92) [1994] ECR I-483, ECJ
*Commission of the European Communities v Federal Republic of Germany* (Case 29/84) [1985] ECR 1661, ECJ
*Commission of the European Communities v Federal Republic of Germany* (Case 205/84) [1986] ECR 3755, ECJ
*Commission of the European Communities v Federal Republic of Germany* (Case C-361/88) [1991] ECR I-2567, ECJ
*Commission of the European Communities v Federal Republic of Germany* (Case C-237/90) [1992] ECR I-5973, ECJ
*Commission of the European Communities v Italian Republic*(Case 300/81) [1983] ECR 449, ECJ

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 5 of 260
Pg 85 of 686

*Commission of the European Communities v Italian Republic*(Case C-287/91) [1992] ECR I-3515, ECJ
*Commission of the European Communities v Italian Republic*(Case C-365/97) [1999] ECR I-7773, ECJ
*Commission of the European Communities v Kingdom of Belgium* (Case 42/89) [1990] ECR I-2821, ECJ
*Compania Maritima San Basilio SA v Oceanus Mutual Underwriting Association (Bermuda) Ltd* [1977] QB 49; [1976] 3 WLR 265; [1976] 3 All ER 243, CA
*Dorset Yacht Co Ltd v Home Office* [1970] AC 1004; [1970] 2 WLR 1140; [1970] 2 All ER 294, HL(E)
*Ealing London Borough Council v Metha* (unreported) 24 April 1997; Court of Appeal (Civil Division) Transcript No 1449 of 1997, CA
*Elguzouli-Daf v Comr of Police of the Metropolis* [1995] QB 335; [1995] 2 WLR 173; [1995] 1 All ER 833, CA
*Elliott v Chief Constable of Wiltshire* The Times, 5 December 1996
*Emmott v Minister for Social Welfare* (Case C-208/90) [1993] ICR 8; [1991] ECR I-4269, ECJ
*Everett v Griffiths* [1920] 3 KB 163, CA; [1921] 1 AC 631, HL(E)
*Farrington v Thomson and Bridgland* [1959] VR 286
*Flanagan v Comr of the Australian Federal Police* (1996) 60 FCR 149
*Germany (Federal Republic of) v European Parliament* (Case C-233/94) [1997] ECR I-2405, ECJ
*Gerrard v Manitoba* (1992) 98 DLR (4th) 167
*Gibbs v Rea* [1998] AC 786; [1998] 3 WLR 72, PC
*Gizzonio v Chief Constable of Derbyshire* The Times, 29 April 1998; Court of Appeal (Civil Division) Transcript No 559 of 1998, CA
*Gollins v Gollins* [1964] AC 644; [1963] 3 WLR 176; [1963] 2 All ER 966, HL(E)
*Horrocks v Lowe* [1975] AC 135; [1974] 2 WLR 282; [1974] 1 All ER 662, HL(E)
*Institute of Chartered Accountants in England and Wales v Customs and Excise Comrs* [1999] 1 WLR 701; [1999] 2 All ER 449, HL(E)
*Irish Aerospace (Belgium) NV v European Organisation for the Safety of Air Navigation* [1992] 1 Lloyd's Rep 383
*J L Holdings Pty Ltd v Queensland* (unreported) 26 May 1995, Federal Court of Australia
*Jones v Gordon* (1877) 2 App Cas 616, HL(E)
*Julius v Oxford (Bishop of)* (1880) 5 App Cas 214, HL(E)
*Kolpinghuis Nijmegen BV, Criminal proceedings against*(Case 80/86) [1987] ECR 3969, ECJ
*Lithgow v United Kingdom* (1986) 8 EHRR 329
*Lloyd v McMahon* [1987] AC 625; [1987] 2 WLR 821; [1987] 1 All ER 1118, CA and HL(E)
*Lonrho plc v Fayed* [1992] 1 AC 448; [1991] 3 WLR 188; [1991] 3 All ER 303, HL(E)

---

**[2003]** **6**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA and HL(E))**

*McC (A Minor), In re* [1985] AC 528; [1984] 3 WLR 1227; [1984] 3 All ER 908, HL(NI)
*McGillivray v Kimber* (1915) 26 DLR 164
*McLoughlin v O'Brian* [1983] 1 AC 410; [1982] 2 WLR 982; [1982] 2 All ER 298, HL(E)
*McMahon v Ireland* [1988] ILRM 610
*Madden v Madden* (1996) 65 FCR 354
*Marks & Spencer plc v Customs and Excise Comrs* (unreported) 14 December 1999; Court of Appeal (Civil Division) Transcript No 2126 of 1999, CA
*Mattiazzo, Criminal proceedings against* (Case 422/85) [1987] ECR 5413, ECJ
*Micosta SA v Shetland Islands Council* [1984] 2 Lloyd's Rep 525
*Mighell v Reading* [1999] 1 CMLR 1251, CA
*Milward v Sargeant* (1786) 1 East 567
*Minories Finance Ltd v Arthur Young* [1989] 2 All ER 105
*Mogul Steamship Co Ltd v McGregor, Gow & Co* [1892] AC 25, HL(E)
*Odhavji v Woodhouse* (unreported) 30 December 1998, Ontario Court of Justice (General Division)
*Owen and Gutch v Homan* (1853) 4 HLC 997, HL(E)
*Padfield v Minister of Agriculture, Fisheries and Food* [1968] AC 997; [1968] 2 WLR 924; [1968] 1 All ER 694, CA and HL(E)
*Peek v Gurney* (1873) LR 6 HL 377, HL(E)
*R v Allsop* (1976) 64 Cr App R 29, CA
*R v Bembridge* (1783) 3 Doug 327

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

*R v Borron* (1820) 3 B & Ald 432
*R v HM Treasury, Ex p British Telecommunications plc*(Case C-392/93) [1996] QB 615; [1996] 3 WLR 203; [1996] All ER (EC) 411; [1996] ECR I-1631, ECJ
*R v Hyam* [1975] AC 55; [1974] 2 WLR 607; [1974] 2 All ER 41, HL(E)
*R v International Stock Exchange of the United Kingdom and the Republic of Ireland Ltd, Ex p Else (1982) Ltd* [1993] QB 534; [1993] 2 WLR 70; [1993] 1 All ER 420, CA
*R v Grantham* [1984] QB 675; [1984] 2 WLR 815; [1984] 3 All ER 166, CA
*R v Llewellyn-Jones* [1968] 1 QB 429; [1967] 3 WLR 1298; [1967] 3 All ER 225, CA
*R v Medicines Control Agency, Ex p Smith & Nephew Pharmaceuticals Ltd; Primecrown Ltd v Medicines Control Agency*(Case C-201/94) [1996] ECR I-5819, ECJ
*R v Ministry of Agriculture, Fisheries and Food, Ex p Hedley Lomas (Ireland) Ltd* (Case C-5/94) [1997] QB 139; [1996] 3 WLR 787; [1996] All ER (EC) 493; [1996] ECR I-2553, ECJ
*R v Moloney* [1985] AC 905; [1985] 2 WLR 648; [1985] 1 All ER 1025, HL(E)
*R v Nedrick* [1986] 1 WLR 1025; [1986] 3 All ER 1, CA
*R v Parmenter; R v Savage* [1992] 1 AC 699; [1991] 3 WLR 914; [1991] 4 All ER 698, HL(E)
*R v Scott* [1975] AC 819; [1974] 3 WLR 741; [1974] 3 All ER 1032, HL(E)
*R v Secretary of State for Social Security, Ex p Sutton*(Case C-66/95) [1997] ICR 961; [1997] All ER(EC) 497; [1997] ECR I-2163, ECJ
*R v Secretary of State for the Environment, Ex p Hackney London Borough Council* [1983] 1 WLR 524; [1983] 3 All ER 358, DC
*R v Secretary of State for the Home Department, Ex p Ruddock* [1987] 1 WLR 1482; [1987] 2 All ER 518
*R v Sinclair* [1968] 1 WLR 1246; [1968] 3 All ER 241, CA
*R v Terry* [1984] AC 374; [1984] 2 WLR 23; [1984] 1 All ER 65, HL(E)
*Roncarelli v Duplessis* (1959) 16 DLR(2d) 689
*Rookes v Barnard* [1964] AC 1129; [1964] 2 WLR 269; [1964] 1 All ER 367, HL(E)
*Rowling v Takaro Properties Ltd* [1988] AC 473; [1988] 2 WLR 418; [1988] 1 All ER 163, PC
*Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378; [1995] 3 WLR 64; [1995] 3 All ER 97, PC

---

*Sanders v Snell* (1998) 157 ALR 491
*Simpson v Attorney General (Baigent's Case)* [1994] 3 NZLR 667
*Smith v East Elloe Rural District Council* [1956] AC 736; [1956] 2 WLR 888; [1956] 1 All ER 855, HL(E)
*Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd* [1997] AC 254; [1996] 3 WLR 1051; [1996] 4 All ER 769, HL(E)
*Stovin v Wise* [1996] AC 923; [1996] 3 WLR 388; [1996] 3 All ER 801, HL(E)
*Sutton v Johnstone* (1786) 1 Durn & E 493
*Tee v Lautro Ltd* (unreported) 16 July 1996, Ferris J
*Thomson (D C) & Co Ltd v Deakin* [1952] Ch 646; [1952] 2 All ER 361, CA
*United States v Gaubert* (1991) 499 US 315
*Van Duyn v Home Office* (Case 41/74) [1975] Ch 358; [1975] 2 WLR 760; [1975] 3 All ER 190; [1974] ECR 1337, ECJ
*von Colson v Land Nordrhein-Westfalen* (Case 14/83) [1984] ECR 1891, ECJ
*Welham v Director of Public Prosecutions* [1961] AC 103; [1960] 2 WLR 669; [1960] 1 All ER 805, HL(E)
*Westminster City Council v Croyalgrange Ltd* [1985] 1 All ER 740, DC
*Whitelegg v Richards* (1823) 2 B & C 45
*Wilkinson v Downton* [1897] 2 QB 57
*Williams v Lewis* (1797) Peake Add Cas 157
*Williams v Solicitor to the Department of Social Security* (unreported) 11 June 1997; Court of Appeal (Civil Division) Transcript No 1183 of 1997, CA
*Woolwich Equitable Building Society v Inland Revenue Comrs* [1993] AC 70; [1992] 3 WLR 366; [1992] 3 All ER 737, HL(E)

The following cases are referred to in the judgments in the Court of Appeal:

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 7 of 260
Pg 87 of 686

*AGS Assedic Pas de Calais v Dumon* (Case C-235/95) [1998] ECR I-4531, ECJ
*Agip (Africa) Ltd v Jackson* [1990] Ch 265; [1989] 3 WLR 1367; [1992] 4 All ER 385
*Algemene Transport- en Expeditie Onderneming van Gend & Loos (NV) v Nederlandse administratie der belastingen* (Case 26/62) [1963] ECR 1, ECJ
*Allen v Gulf Oil Refining Ltd* [1981] AC 1001; [1981] 2 WLR 188; [1981] 1 All ER 353, HL(E)
*Amministrazione delle Finanze dello Stato v Simmenthal SpA* (Case 106/77) [1978] ECR 629, ECJ
*Anns v Merton London Borough Council* [1978] AC 728; [1977] 2 WLR 1024; [1977] 2 All ER 492, HL(E)
*Ashby v White* (1704) 14 St Tr 695; 2 LdRaym 938; 3 LdRaym 320; 1 Smith's LC (13th ed) 253
*Baden v SociŽtŽ GŽnŽrale pour Favoriser le DŽveloppement du Commerce et de l'Industrie en France SA (Note)* [1993] 1 WLR 509; [1992] 4 All ER 161
*Baird v The Queen* (1983) 148 DLR (3d) 1
*Banque Bruxelles Lambert SA v Eagle Star Insurance Co Ltd* [1995] QB 375; [1995] 2 WLR 607; [1995] 2 All ER 769, CA
*Barnard v Restormel Borough Council* [1998] 3 PLR 27, CA
*Bassett v Godschall* (1770) 3 Wils KB 121
*Beaudesert Shire Council v Smith* (1966) 120 CLR 145
*Becker v Finanzamt MŸnster-Innenstadt* (Case 8/81) [1982] ECR 53, ECJ
*Bennett v Comr of Police of the Metropolis* [1998] 10 Admin LR 245
*Bourgoin SA v Ministry of Agriculture, Fisheries and Food* [1986] QB 716; [1985] 3 WLR 1027; [1985] 3 All ER 585, Mann J and CA
*Bradford Third Equitable Benefit Building Society v Borders* [1941] 2 All ER 205, HL(E)
*Brasserie du Pcheur SA v Federal Republic of Germany; Reg v Secretary of State for Transport, Ex p Factortame Ltd (No 4)*(Joined Cases C-46/93 and C-48/93) [1996] QB 404; [1996] 2 WLR 506; [1996] All ER(EC) 301; [1996] ECR I-1029, ECJ

---

**[2003]** **8**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)**

*Brasserie du Pcheur SA v Germany* [1997] 1 CMLR 971
*Brasyer v Maclean* (1875) LR 6 PC 398, PC
*Bullo and Bonivento, Criminal proceedings against* (Case 166/85) [1987] ECR 1583, ECJ
*Burgoyne v Moss* (1768) 1 East 563n
*CIA Security International v Signalson SA* (Case C-194/94) [1996] ECR I-2201; [1996] All ER(EC) 557, ECJ
*Calveley v Chief Constable of the Merseyside Police* [1989] AC 1228; [1989] 2 WLR 624; [1989] 1 All ER 1025, HL(E)
*Candlewood Navigation Corpn Ltd v Mitsui OSK Lines Ltd* [1986] AC 1; [1985] 3 WLR 381; [1985] 2 All ER 935, PC
*Carbonari v Universitˆ degli Studi di Bologna* (Case C-131/97) [1999] ECR I-1103, ECJ
*Comitato di Coordinamento per la Difesa della Cava v Regione Lombardia* (Case C-236/92) [1994] ECR I-483, ECJ
*Commission of the European Communities v Federal Republic of Germany* (Case 205/84) [1986] ECR 3755, ECJ
*Commission of the European Communities v Federal Republic of Germany* (Case C-131/88) [1991] ECR I-825, ECJ
*Commission of the European Communities v Federal Republic of Germany* (Case C-361/88) [1991] ECR I-2567, ECJ
*Commission of the European Communities v Federal Republic of Germany* (Case C-58/89) [1991] ECR I-4983, ECJ
*Commission of the European Communities v Federal Republic of Germany* (Case C-59/89) [1991] ECR I-2607, ECJ
*Commission of the European Communities v Federal Republic of Germany* (Case C-237/90) [1992] ECR I-5973, ECJ
*Commission of the European Communities v Federal Republic of Germany* (Case C-431/92) [1995] ECR I-2189, ECJ
*Commission of the European Communities v Federal Republic of Germany* (Case C-298/95) [1996] ECR I-6747, ECJ
*Commission of the European Communities v French Republic*(Case 220/83) [1986] ECR 3663, ECJ

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 8 of 260
Pg 88 of 686

*Commission of the European Communities v Italian Republic*(Case 300/81) [1983] ECR 449, ECJ
*Commission of the European Communities v Kingdom of Belgium* (Case 301/81) [1983] ECR 467, ECJ
*Commission of the European Communities v Kingdom of Belgium* (Joined Cases 227-230/85) [1988] ECR 1, ECJ
*Commission of the European Communities v Kingdom of Denmark* (Case 252/83) [1986] ECR 3713, ECJ
*Commission of the European Communities v Republic of Ireland* (Case 206/84) [1986] ECR 3817, ECJ
*Compania Maritima San Basilio SA v Oceanus Mutual Underwriting Association (Bermuda) Ltd* [1977] QB 49; [1976] 3 WLR 265; [1976] 3 All ER 243, CA
*Costa v Ente Nazionale Energia Elettrica (Case 6/64)* [1964] ECR 585, ECJ
*Cullen v Morris* (1819) 2 Stark 577
*David v Abdul Cader* [1963] 1 WLR 834; [1963] 3 All ER 579, PC
*Davies v Liverpool Corpn* [1949] 2 All ER 175, CA
*Davis v Radcliffe* [1990] 1 WLR 821; [1990] 2 All ER 536, PC
*De la Bere v Pearson Ltd* [1908] 1 KB 280, CA
*Dillenkofer v Federal Republic of Germany* (Joined Cases C-178, 179 and 188-190/94) [1997] QB 259; [1997] 2 WLR 253; [1996] All ER(EC) 917; [1996] ECR 4845, ECJ
*Dorset Yacht Co Ltd v Home Office* [1970] AC 1004; [1970] 2 WLR 1140; [1970] 2 All ER 294, HL(E)

---

**[2003]** **9**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)**

*Drewe v Coulton* (1787) 1 East 563n
*Duke v Reliance Systems Ltd* [1988] AC 618; [1988] 2 WLR 359; [1988] 1 All ER 626, HL(E)
*Dunlop v Woollahra Municipal Council* [1982] AC 158; [1981] 2 WLR 693; [1981] 1 All ER 1202, PC
*Eagle Trust plc v SBC Securities Ltd* [1993] 1 WLR 484; [1992] 4 All ER 488
*Ealing London Borough Council v Metha* (unreported) 24 April 1997; Court of Appeal (Civil Division) Transcript No 1449 of 1997, CA
*Elguzouli-Daf v Comr of Police of the Metropolis* [1995] QB 335; [1995] 2 WLR 173; [1995] 1 All ER 833, CA
*Elliott v Chief Constable of Wiltshire* The Times, 5 December 1996
*Farrington v Thomson and Bridgland* [1959] VR 286
*Felicitas Rickmers-Linie KG & Co v Finanzamt fŸr Verkehrsteuern, Hamburg* (Case 270/81) [1982] ECR 2771, ECJ
*Ferguson v Earl of Kinnoull* (1842) 9 Cl & Fin 251, HL(E)
*Flanagan v Comr of the Australian Federal Police* (1996) 60 FCR 149
*Foster v British Gas plc* (Case C-188/89) [1991] 1 QB 405; [1991] 2 WLR 258; [1990] 3 All ER 897; [1990] ECR I-3313, ECJ
*Francovich v Italian Republic* (Case C-6/90) [1995] ICR 722; [1991] ECR I-5357, ECJ
*Galoo Ltd v Bright Grahame Murray* [1994] 1 WLR 1360; [1995] 1 All ER 16, CA
*Garland v British Rail Engineering Ltd* [1983] 2 AC 751; [1982] 2 WLR 918; [1982] 2 All ER 402, ECJ and HL (E)
*Garrett v Attorney General* [1997] 2 NZLR 332
*Germany (Federal Republic of) v Commission of the European Communities (Case 8/88)* [1990] ECR 2321, ECJ
*Germany (Federal Republic of) v European Parliament* (Case C-233/94) [1997] ECR I-2405, ECJ
*Griffin v South West Water Services Ltd* [1995] IRLR 15
*Harman v Tappenden* (1801) 1 East 555
*Haynes v Harwood* [1935] 1 KB 146, CA
*Hedley Byrne & Co Ltd v Heller & Partners Ltd* [1964] AC 465; [1963] 3 WLR 101; [1963] 2 All ER 575, HL(E)
*Henly v Lyme Corpn* (1828) 5 Bing 91
*Hill v Chief Constable of West Yorkshire* [1988] QB 60; [1987] 2 WLR 1126; [1987] 1 All ER 1173, CA; [1989] AC 53; [1988] 2 WLR 1049; [1988] 2 All ER 238, HL(E)
*Hillegom (Municipality of) v Hillenius* (Case 110/84) [1985] ECR 3947, ECJ
*Horrocks v Lowe* [1975] AC 135; [1974] 2 WLR 282; [1974] 1 All ER 662, HL(E)
*Hurd v Jones* (Case 44/84) [1986] QB 892; [1986] 3 WLR 189; [1986] ECR 29, ECJ
*Irish Aerospace (Belgium) NV v European Organisation for the Safety of Air Navigation* [1992] 1 Lloyd's Rep 383
*JL Holdings Pty Ltd v Queensland* (unreported) 26 May 1995, Federal Court of Australia
*Jones v Gordon* (1877) 2 App Cas 616, HL(E)

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 9 of 260
Pg 89 of 686

*Jones v Swansea City Council* [1990] 1 WLR 54; [1989] 3 All ER 162, CA; [1990] 1 WLR 1453; [1990] 3 All ER 737, HL(E)
*Kampelmann v Landschaftsverband Westfalen-Lippe* (Joined Cases C-253/96 to C-258/96) [1997] ECR I-6907, ECJ
*Kirklees Metropolitan Borough Council v Wickes Building Supplies Ltd* [1993] AC 227; [1992] 3 WLR 170; [1992] 3 All ER 717, HL(E)
*Kolpinghuis Nijmegen BV, Criminal proceedings against*(Case 80/86) [1987] ECR 3969, ECJ
*Lam v Brennan and Torbay Borough Council* [1997] PIQR P488, CA
*Lamb v Camden London Borough Council* [1981] QB 625; [1981] 2 WLR 1038; [1981] 2 All ER 408, CA

---

**[2003]** **10**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)**

*Lawrance v Lord Norreys* (1890) 15 App Cas 210, HL(E)
*Litster v Forth Dry Dock & Engineering Co Ltd* [1990] 1 AC 546; [1989] 2 WLR 634; [1989] 1 All ER 1134, HL (Sc)
*Little v Law Institute of Victoria (No 3)* [1990] VR 257
*London Joint Stock Bank Ltd v Macmillan and Arthur* [1918] AC 777, HL(E)
*Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* (unreported) 6 March 1981, Parker J; Court of Appeal (Civil Division) Transcript No 51 of 1981, CA; [1982] AC 173; [1981] 3 WLR 33; [1981] 2 All ER 456, HL(E)
*Lonrho plc v Fayed* [1992] 1 AC 448; [1991] 3 WLR 188; [1991] 3 All ER 303, HL(E)
*McDonald's Corpn v Steel* [1995] 3 All ER 615, CA
*McGillivray v Kimber* (1915) 26 DLR 164
*Madden v Madden* (1996) 65 FCR 354
*Marshall v Southampton and South West Hampshire Area Health Authority (Teaching)* (Case 152/84) [1986] QB 401; [1986] 2 WLR 780; [1986] 2 All ER 584; [1986] ECR 723, ECJ
*Marshall v Southampton and South West Hampshire Health Authority (Teaching) (No 2)* (Case C-271/91) [1994] QB 126; [1993] 3 WLR 1054; [1993] 4 All ER 586; [1993] ECR I-4367, ECJ
*Mattiazzo, Criminal proceedings against* (Case 422/85) [1987] ECR 5413, ECJ
*Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 2 AC 500; [1995] 3 WLR 413; [1995] 3 All ER 918, PC
*Micosta SA v Shetland Islands Council* [1984] 2 Lloyd's Rep 525
*Mighell v Reading* The Times, 12 October 1998; Court of Appeal (Civil Division) Transcript No 1378 of 1998, CA
*Milward v Sargeant* (1786) 1 East 567
*Minories Finance Ltd v Arthur Young* [1989] 2 All ER 105
*National Union of Teachers v Governing Body of St Mary's Church of England (Aided) Junior School* [1997] ICR 334, CA
*Norbrook Laboratories Ltd v Ministry of Agriculture, Fisheries and Food* (Case C-127/95) [1998] ECR I-1531, ECJ
*Northern Territory v Mengel* (1995) 185 CLR 307; 69 ALJR 527
*Osman v United Kingdom* (1998) 29 EHRR 245
*Peek v Gurney* (1873) LR 6 HL 377, HL(E)
*Pickstone v Freemans plc* [1989] AC 66; [1988] 3 WLR 265; [1988] 2 All ER 803, HL(E)
*Price Waterhouse v BCCI Holdings (Luxembourg) SA* [1992] BCLC 583
*Racz v Home Office* [1994] 2 AC 45; [1994] 2 WLR 23; [1994] 1 All ER 97, HL(E)
*Rawlinson v Rice* [1997] 2 NZLR 651
*R v Caldwell* [1982] AC 341; [1981] 2 WLR 509; [1981] 1 All ER 961, HL(E)
*R v Chief Constable of the North Wales Police, Ex p AB* [1999] QB 396; [1997] 3 WLR 724; [1997] 4 All ER 691, DC
*R v Cunningham* [1957] 2 QB 396; [1957] 3 WLR 76; [1957] 2 All ER 412, CCA
*R v HM Treasury, Ex p British Telecommunications plc*(Case C-392/93) [1996] QB 615; [1996] 3 WLR 203; [1996] All ER(EC) 411; [1996] ECR I-1631, ECJ
*R v International Stock Exchange of the United Kingdom and the Republic of Ireland Ltd, Ex p Else (1982) Ltd* [1993] QB 534; [1993] 2 WLR 70; [1993] 1 All ER 420, CA
*R v Lawrence (Stephen)* [1982] AC 510; [1981] 2 WLR 524; [1981] 1 All ER 974, HL(E)

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 10 of 260
Pg 90 of 686

*R v Medicines Control Agency, Ex p Smith & Nephew Pharmaceuticals Ltd; Primecrown Ltd v Medicines Control Agency*(Case C-201/94) [1996] ECR I-5819, ECJ
*R v Ministry of Agriculture, Fisheries and Food, Ex p Hedley Lomas (Ireland) Ltd* (Case C-5/94) [1997] QB 139; [1996] 3 WLR 787; [1996] All ER(EC) 493; [1996] ECR I-2553, ECJ

---

**[2003]** **11**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)**

*R v Newham London Borough Council, Ex p Watkins* (1994) 26 HLR 434
*R v Parmenter; Reg v Savage* [1992] 1 AC 699; [1991] 3 WLR 914; [1991] 4 All ER 698, HL(E)
*R v Secretary of State for Employment, Ex p Equal Opportunities Commission* [1995] 1 AC 1; [1994] 2 WLR 409; [1994] 1 All ER 910, HL(E)
*R v Secretary of State for Social Security, Ex p Sutton*(Case C-66/95) [1997] ICR 961; [1997] All ER(EC) 497; [1997] ECR I-2163, ECJ
*R v Secretary of State for the Environment, Ex p Hackney London Borough Council* [1983] 1 WLR 524; [1983] 3 All ER 358, DC
*R v Secretary of State for the Home Department, Ex p Ruddock* [1987] 1 WLR 1482; [1987] 2 All ER 518
*R v Secretary of State for Transport, Ex p Factortame Ltd (No 2)* (Case C-213/89) [1991] 1 AC 603; [1990] 3 WLR 818; [1991] 1 All ER 70; [1990] ECR I-2433, ECJ and HL(E)
*R v Secretary of State for Transport, Ex p Factortame Ltd (No 5)* The Times, 28 April 1998; Court of Appeal (Civil Division) Transcript No 1585 of 1998, CA
*Roncarelli v Duplessis* (1959) 16 DLR (2d) 689
*Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378; [1995] 3 WLR 64; [1995] 3 All ER 97, PC
*Slipper v British Broadcasting Corpn* [1991] 1 QB 283; [1990] 3 WLR 967; [1991] 1 All ER 165, CA
*Smith v East Elloe Rural District Council* [1956] AC 736; [1956] 2 WLR 888; [1956] 1 All ER 855, HL(E)
*Smith v Littlewoods Organisation Ltd* [1987] AC 241; [1987] 2 WLR 480; [1987] 1 All ER 710, HL(Sc)
*Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd* [1997] AC 254; [1996] 3 WLR 1051; [1996] 4 All ER 769, HL(E)
*SociŽtŽ Civile Immobilire Parodi v Banque H Albert de Bary et Cie* (Case C-222/95) [1997] ECR I-3899; [1997] All ER(EC) 946, ECJ
*Society of Lloyd's v Clementson* [1995] CLC 117, CA
*Stansbie v Troman* [1948] 2 KB 48; [1948] 1 All ER 599, CA
*States of Guernsey v Firth* (unreported) 14 May 1981; Court of Appeal of Guernsey (Civil Division) (Appeal No 10 Civil)
*Tampion v Anderson* [1973] VR 715
*Tee v Lautro Ltd* (unreported) 16 July 1996, Ferris J
*Tozer v Child* (1857) 7 E & B 377
*Turner v Sterling* (1671) 2 Vent 25
*Ultramares Corpn v Touche* (1931) 255 NY 170
*Van Duyn v Home Office* (Case 41/74) [1975] Ch 358; [1975] 2 WLR 760; [1975] 3 All ER 190; [1974] ECR 1337, ECJ
*Verein fŸr Konsumenteninformation v …sterreichische Kreditversicherungs AG* (Case C-364/96) [1998] ECR I-2949; [1999] All ER(EC) 183, ECJ
*von Colson v Land Nordrhein-Westfalen* (Case 14/83) [1984] ECR 1891, ECJ
*W v Essex County Council* [1999] Fam 90; [1998] 3 WLR 534; [1998] 3 All ER 111, CA
*Ward v Cannock Chase District Council* [1986] Ch 546; [1986] 2 WLR 660; [1985] 3 All ER 537
*Weld-Blundell v Stephens* [1920] AC 956, HL(E)
*Wenlock v Moloney* [1965] 1 WLR 1238; [1965] 2 All ER 871, CA
*Whitelegg v Richards* (1823) 2 B & C 45
*Wilkinson v Downton* [1897] 2 QB 57
*Williams v Lewis* (1797) Peake Add Cas 157
*Williams v Solicitor to the Department of Social Security* (unreported) 11 June 1997; Court of Appeal (Civil Division) Transcript No 1183 of 1997, CA

---

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 11 of 260
Pg 91 of 686

[2003] 12
2 AC Three Rivers DC v Bank of England (No 3) (CA)

*Williams and Humbert Ltd v W & H Trade Marks (Jersey) Ltd* [1986] AC 368; [1985] 3 WLR 501; [1985] 2 All ER 208; [1985] 2 All ER 619, Nourse J and CA; [1986] AC 368; [1986] 2 WLR 24; [1986] 1 All ER 129, HL(E)
*X (Minors) v Bedfordshire County Council* [1995] 2 AC 633; [1995] 3 WLR 152; [1995] 3 All ER 353, HL(E)
*Yuen Kun Yeu v Attorney General of Hong Kong* [1988] AC 175; [1987] 3 WLR 776; [1987] 2 All ER 705, PC

The following additional cases were cited in argument in the Court of Appeal:

*Admiralty Comrs v SS Volute* [1922] 1 AC 129, HL(E)
*Al-Kandari v J R Brown & Co* [1987] QB 514; [1987] 2 WLR 469; [1987] 2 All ER 302; [1988] QB 665; [1988] 2 WLR 671; [1988] 1 All ER 833, CA
*Alexander v Cambridge Credit Corpn Ltd* (1987) 9 NSWLR 310
*Alexandrou v Oxford* [1993] 4 All ER 328, CA
*Alford v Canada* (1997) 31 BCLR (3d) 228
*Allen v Flood* [1898] AC 1, HL(E)
*Alliance & Leicester Building Society v Zandi* (unreported) 21 August 1992
*Anderson v Gorrie* [1895] 1 QB 668, CA
*Armstrong v Strain* [1952] 1 KB 232; [1952] 1 All ER 139, CA
*Associated British Ports v Transport and General Workers' Union* [1989] 1 WLR 939; [1989] 3 All ER 796, CA; [1989] 1 WLR 939; [1989] 3 All ER 822, CA and HL(E)
*Atkinson v Newcastle and Gateshead Waterworks Co* (1877) 2 ExD 441, CA
*Attorney General v Newspaper Publishing plc* [1988] Ch 333; [1987] 3 WLR 942; [1987] 3 All ER 276, Sir Nicolas Browne-Wilkinson V-C and CA
*Bromage v Prosser* (1825) 4 B & C 247
*Burdett v Abbott* (1811) 14 East 1
*CBS Songs Ltd v Amstrad Consumer Electronics plc* [1988] Ch 61; [1987] 3 WLR 144; [1987] 3 All ER 151, CA
*Cannock Chase District Council v Kelly* [1978] 1 WLR 1; [1978] 1 All ER 152, CA
*Caparo Industries plc v Dickman* [1990] 2 AC 605; [1990] 2 WLR 358; [1990] 1 All ER 568, HL(E)
*Century Impact Pty Ltd v Chief Comr of Business Franchise Licences (Tobacco)* (1992) 29 ALD 531
*Chan Yee Kin v Minister for Immigration, Local Government and Ethnic Affairs* (1991) 103 ALR 499
*Clin-Midy SA v Belgium* (Case 301/82) [1984] ECR 251, ECJ
*Cork v Kirby Maclean Ltd* [1952] 2 All ER 402, CA
*Cornfoot v Fowke* (1870) 6 M & W 358
*Davy v Garrett* (1878) 7 Ch D 473, CA
*Doyle v Olby (Ironmongers) Ltd* [1969] 2 QB 158; [1969] 2 WLR 673; [1969] 2 All ER 119, CA
*Elliott v C* [1983] 1 WLR 939; [1983] 2 All ER 1005, DC
*Frogmore Estates plc v Berger* (1989) 139 NLJ 1560
*Fulton v Norton* [1908] AC 451, PC
*Gibbs v Rea* [1998] AC 786; [1998] 3 WLR 72, PC
*Gibson v Parkes District Hospital* (1991) 26 NSWLR 9
*Gimson v Victorian Workcover Authority* [1995] 1 VR 209
*Gollins v Gollins* [1964] AC 644; [1963] 3 WLR 176; [1963] 2 All ER 966, HL(E)
*Grant v Australian Knitting Mills Ltd* [1936] AC 85, PC
*Ichi Canada Ltd v Palmquist* (unreported) 11 February 1997, British Columbia SC
*Jones v Livox Quarries Ltd* [1952] 2 QB 608, CA
*Leroux v City of Lachine* [1942] CS 352
*Liesbosch Dredger v SS Edison* [1933] AC 449, HL(E)
*M v Home Office* [1994] 1 AC 377; [1993] 3 WLR 433; [1993] 3 All ER 537, HL(E)

---

[2003] 13
2 AC Three Rivers DC v Bank of England (No 3) (CA)

*McKay v Essex Area Health Authority* [1982] QB 1166; [1982] 2 WLR 890; [1982] 2 All ER 771, CA

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

*MacKenzie v MacLachlan* [1979] 1 NZLR 670
*Macksville & District General Hospital v Mayze* (1987) 10 NSWLR 708
*Metall und Rohstoff AG v Donaldson Lufkin & Jenrette Inc* [1990] 1 QB 391; [1989] 3 WLR 563; [1989] 3 All ER 14, CA
*Millar v Bassey* [1994] EMLR 44, CA
*Minister of Pensions v Chennell* [1947] KB 250; [1946] 2 All ER 719
*Mogul Steamship Co Ltd v McGregor, Gow & Co* [1892] AC 25, HL(E)
*Monarch Steamship Co Ltd v Karlshamns Oljefabriker (A/B)* [1949] AC 196; [1949] 1 All ER 1, HL(Sc)
*Morgan Crucible Co plc v Hill Samuel & Co Ltd* [1991] Ch 295; [1991] 2 WLR 655; [1991] 1 All ER 148, CA
*Morris v Director of the Serious Fraud Office* [1993] Ch 372; [1993] 3 WLR 1; [1993] 1 All ER 788
*Murphy v Brentwood District Council* [1991] 1 AC 398; [1990] 3 WLR 414; [1990] 2 All ER 908, HL(E)
*Owen and Gutch v Homan* (1853) 4 HL Cas 997, HL(E)
*Parsons (H) (Livestock) Ltd v Uttley Ingham & Co Ltd* [1978] QB 791; [1977] 3 WLR 990; [1978] 1 All ER 525, CA
*Percy v Hall* [1997] QB 924; [1997] 3 WLR 573; [1996] 4 All ER 523, CA
*Perl (P) (Exporters) Ltd v Camden London Borough Council* [1984] QB 342; [1983] 3 WLR 769; [1983] 3 All ER 161, CA
*Petrovich v Callinghams Ltd* [1969] 2 Lloyd's Rep 386
*Quinn v Burch Bros (Builders) Ltd* [1966] 2 QB 370; [1966] 2 WLR 1017; [1966] 2 All ER 283, CA
*Rayner (J H) (Mincing Lane) Ltd v Department of Trade and Industry* [1990] 2 AC 418; [1989] 3 WLR 969; [1989] 3 All ER 523, HL(E)
*R v Adomako* [1995] 1 AC 171; [1994] 3 WLR 288; [1994] 3 All ER 79, HL(E)
*R v Allsop* (1976) 64 Cr App R 29, CA
*R v Bembridge* (1783) 22 St Tr 1; 3 Doug 327
*R v Brooke* (1788) 2 TR 190
*R v Cozens* (1780) 2 Doug 426
*R v Deputy Governor of Parkhurst Prison, Ex p Hague* [1992] 1 AC 58; [1991] 3 WLR 340; [1991] 3 All ER 733, HL(E)
*R v Grantham* [1984] QB 675; [1984] 2 WLR 815; [1984] 3 All ER 166, CA
*R v Ministry of Agriculture, Fisheries and Food, Ex p First City Trading Ltd* [1997] 1 CMLR 250
*R v Ministry of Defence, Ex p Smith* [1996] QB 517; [1996] 2 WLR 305; [1996] 1 All ER 257, CA
*R v Moloney* [1985] AC 905; [1985] 2 WLR 648; [1985] 1 All ER 1025, HL(E)
*R v Nedrick* [1986] 1 WLR 1025; [1986] 3 All ER 1, CA
*R v Phelps* (1757) 2 Keny 570
*R v Port Talbot Borough Council, Ex p Jones* [1988] 2 All ER 207
*R v Sinclair* [1968] 1 WLR 1246; [1968] 3 All ER 241, CA
*R v West London Coroner, Ex p Gray* [1988] QB 467; [1987] 2 WLR 1020; [1987] 2 All ER 129, DC
*Rewe-Handelsgesellschaft Nord mbH v Hauptzollamt Kiel*(Case 158/80) [1981] ECR 1805, ECJ
*Roman Corpn v Hudson's Bay Oil & Gas Co Ltd* (1973) 36 DLR (3d) 413
*Rowling v Takaro Properties Ltd* [1988] AC 473; [1988] 2 WLR 418; [1988] 1 All ER 163, PC
*Scott's Trustees v Moss* (1889) 17 R 32
*Simaan General Contracting Co v Pilkington Glass Ltd (No 2)* [1988] QB 758; [1988] 2 WLR 761; [1988] 1 All ER 791, CA

---

*Simpson v Attorney General (Baigent's Case)* [1994] 3 NZLR 667
*Smith v Eric S Bush* [1990] 1 AC 831; [1989] 2 WLR 790; [1989] 2 All ER 514, HL(E)
*Smith v Morrison* [1974] 1 WLR 659; [1974] 1 All ER 957
*Stapley v Gypsum Mines Ltd* [1953] AC 663; [1953] 3 WLR 279; [1953] 2 All ER 478, HL(E)
*Steamship Mutual Underwriting Association Ltd v Trollope & Colls (City) Ltd* (1986) 33 BLR 77, CA
*Swanson Estate v Canada* (1991) 80 DLR (4th) 741
*T (A Minor) v Surrey County Council* [1994] 4 All ER 577
*Thacker v Crown Prosecution Service* The Times, 29 December 1997; Court of Appeal (Civil Division) Transcript No 2149 of 1997, CA

*Thomson (D C) & Co Ltd v Deakin* [1952] Ch 646; [1952] 2 All ER 361, CA
*Trust Securities Holdings Ltd v Sir Robert McAlpine and Sons Ltd* The Times, 21 December 1994; Court of Appeal (Civil Division) Transcript No 1608 of 1994, CA
*Van Camp Chocolates Ltd v Aulsebrooks Ltd* [1984] 1 NZLR 354
*Wallingford v Mutual Society* (1880) 5 App Cas 685, HL(E)
*Western Fish Products Ltd v Penwith District Council* [1981] 2 All ER 204, CA
*Westminster City Council v Croyalgrange Ltd* [1985] 1 All ER 740, DC
*Wood v Blair* The Times, 5 July 1957; Court of Appeal Transcript No 209 of 1957, CA

The following additional cases, although not cited, were referred to in the skeleton arguments before the Court of Appeal:

*Couch v Steel* (1854) 3 E & B 402
*Crofter Hand Woven Harris Tweed Co Ltd v Veitch* [1942] AC 435; [1942] 1 All ER 142, HL(Sc)
*Davis v Bromley Corpn* [1908] 1 KB 170, CA
*Drummond-Jackson v British Medical Association* [1970] 1 WLR 688; [1970] 1 All ER 1094, CA
*Gerrard v Manitoba* (1992) 98 DLR (4th) 167
*Gershman v Manitoba Vegetable Producers' Marketing Board* (1976) 69 DLR (3d) 114
*Pemberton v Attorney General* [1978] Tas SR 1
*Rookes v Barnard* [1964] AC 1129; [1964] 2 WLR 269; [1964] 1 All ER 367, HL(E)
*Yorkshire Dale Steamship Co Ltd v Minister of War Transport* [1942] AC 691; [1942] 2 All ER 6, HL(E)

**APPEAL** from Clarke J

By a notice of appeal dated 20 October 1997 the plaintiffs, Three Rivers District Council and some 400 other creditors of the Bank of Credit and Commerce International SA ("BCCI") together with the Bank of Credit and Commerce International SA (in liquidation), appealed from those parts of an order made on 2 October 1997 by Clarke J in the Commercial Court of the Queen's Bench Division whereby he (i) declared that on the facts pleaded in the plaintiffs' re-amended statement of claim dated 21 August 1995 the defendant, the Governor and Company of the Bank of England, was not capable of being liable to the plaintiffs for the tort of misfeasance in public office and that the plaintiffs' alleged losses were not capable in law of being caused by the defendant's acts or omissions, (ii) struck out the re-amended statement of claim as disclosing no reasonable cause of action and refused leave to re-re-amend the statement of claim on the grounds that the draft

---

was frivolous and vexatious and (iii) dismissed the plaintiffs' action with costs.

The grounds of the appeal were (i) that the judge was wrong in law and should have held that on the pleaded facts the defendant was capable of being liable to the plaintiffs for the tort of misfeasance in public office for its failure to carry out duties placed upon it by the Banking Acts 1979 and 1987; (ii) that the judge ought to have held that liability for misfeasance in public office would arise where a public officer acted or omitted to act otherwise than in an honest attempt to perform his duty and such act or omission caused loss to the plaintiff; (iii) that the judge was wrong to hold that it was necessary for the plaintiffs to show that the public officer knew, suspected or believed that his act or omission was unlawful and ought to have held that it was sufficient for the plaintiff to show that the public officer was reckless or indifferent as to whether his act or omission was lawful, such recklessness or indifference being inconsistent with an honest attempt to perform his duty; (iv) that the judge ought to have held that the defendant was, on the pleaded facts, capable of being liable to the plaintiffs for misfeasance in public office; (v) that the judge was wrong to hold that it was also necessary for the plaintiff to show that the officer had actual knowledge that his act or omission would probably damage the plaintiff or a person in a class to which the plaintiff belonged or, where the defendant believed or suspected that his act or omission would probably damage the plaintiff, that he did not ascertain whether or not that was so, or failed to make such inquiries as an

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 14 of 260
Pg 94 of 686

honest and reasonable man would have made, and that the judge ought to have held either that questions of foreseeability of loss or damage to the plaintiff were irrelevant or that it was sufficient for a plaintiff to show that loss or damage to him was a foreseeable result of the defendant's acts or omissions or that it was sufficient for the plaintiff to show that the public officer was reckless or indifferent as to whether his acts or omissions would cause loss; (vi) the judge was wrong to hold that it was necessary for the plaintiffs to show that the defendant knew the managers or operators of BCCI would probably act fraudulently; (vii) the judge ought to have held that on any test the defendant was on the pleaded facts capable of being liable to the plaintiffs; (viii) the judge ought to have found that the plaintiffs' losses were capable of being caused by the acts or, omissions of the defendant; (ix) that the judge was wrong to hold that the plaintiffs enjoyed no relevant rights under Council Directive (77/780/EEC) ("the Directive of 1977") or were not entitled to rely on any rights given to them by EC law, that the directive did not intend that member states should be bound to confer legally enforceable rights on savers or potential savers if the supervisory authority should fail to comply with its duties; (x) that the judge was wrong in holding that the plaintiffs could not obtain damages for the damage caused to them by the failure of the United Kingdom, through the defendant as an emanation of the state, to implement effectively in practice the provisions of the Directive of 1977; (xi) that the judge was wrong in failing to hold that the pleaded facts were sufficient to render the defendant capable of being liable in damages to the plaintiffs for breach of duties imposed by or resulting from EC law; (xii) that the judge ought to have held there was a direct causal link between the defendant's pleaded breaches of duties imposed by EC law and the plaintiffs' rights under the Directive of 1977 on the one hand and the loss and damage suffered by the plaintiffs on

---

**[2003]** **16**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)**

the other; (xiii) the judge should have held that, if the defendant was capable of being liable for breach of rights enjoyed by the plaintiffs by virtue of EC law, plaintiffs who were either existing or potential depositors at the time of such breaches would be entitled to recover in respect of losses caused by such breaches; (xiv) the judge was wrong to hold that there was nothing in EC law which should affect the common law approach to the question of the ingredients of the tort of misfeasance in public office; (xv) the judge was wrong to strike out the re-amended statement of claim as frivolous and vexatious in a case which was not plain and obvious; (xvi) the judge ought not to have struck out the statement of claim since his decision was premised on wrong conclusions as to the law; (xvii) the judge was wrong to conclude that on the pleaded facts the defendant was incapable of being liable to the plaintiffs for misfeasance in public office; (xviii) the judge, having found that the EC law issues merited a reference to the European Court of Justice, was wrong in law to strike out the plaintiffs' pleadings in so far as they raised EC law issues; (xix) the fact-finding exercise which the judge performed by reference to the Bingham report (Inquiry into the Supervision of the Bank of Credit and Commerce International (HC Paper (1992-1993) No 198) was one that was not open to him and he was wrong to treat the Bingham report as constituting conclusive proof of matters recorded therein; (xx) the judge's conclusion that there was no realistic possibility that Bingham LJ had not correctly set out the state of mind of the Bank at each stage and that there was no realistic possibility of more evidence coming to light of the Bank's state of mind was wrong and irrational.

By a respondent's notice dated 10 November 1997 the defendant contended that the judge's decision should be affirmed on the following additional or alternative grounds: (i) misfeasance in public office required an actual purpose or intention on the part of the defendant to injure the plaintiff; (ii) misfeasance in public office required an act aimed at or targeted at the plaintiff; (iii) the tort required actual knowledge by the defendant that its acts or omissions would inevitably or necessarily injure the plaintiff; (iv) whether the tort required knowledge by the defendant that its acts or omissions would inevitably and necessarily injure the plaintiff, or, as the judge found, knowledge that they would probably injure the plaintiff or a person in a class of which the plaintiff was a member, nothing less than actual knowledge would suffice; (v) misfeasance in public office required knowledge by the defendant that it had no power to do the act complained of and nothing less than actual knowledge would suffice; (vi) in order to maintain an action in

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 15 of 260
Pg 95 of 686

misfeasance in public office the plaintiff had to have had a pre-existing legal right or interest which had been interfered with by the defendant; (vii) the Directive of 1977 imposed no liability on national competent authorities sounding in damages and granted no rights to any class of which the plaintiffs had been or were members; (viii) the Directive of 1977 imposed no duty on the bank, breach of which would sound in damages; (ix) the material before the judge clearly revealed that there was no common view among the member states to the effect that the banking supervisory authority owed any duty to persons in the position of the plaintiffs; (x) article 8 of the Directive of 1977 imposed a duty on the Bank only as to the grounds on which authorisation issued to a credit institution could be withdrawn; (xi) the plaintiffs could not claim under or as a result of EC law to the extent that they were merely potential depositors at the time

---

**[2003]** **17**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Hirst LJ**

when the defendant's alleged acts or omissions took place; (xii) if, contrary to the judge's findings, the Directive of 1977 intended to confer rights on the plaintiffs, any cause of action would lie against the United Kingdom as having failed to implement the directive, and not on the Bank: see *R v HM Treasury, Ex p British Telecommunications plc* (Case C-392/93) [1996] QB 615; (xiii) there had been no actionable failure to implement on the part either of the UK or the Bank; (xiv) the plaintiffs' case on causation amounted to no more than an allegation that but for the Bank's alleged acts or omissions they could not have had deposits with BCCI when it collapsed: the alleged acts or omissions did no more than provide the occasion for the plaintiffs to suffer loss; (xv) the plaintiffs' alleged loss was caused by the deliberate acts or omissions of third parties; (xvi) the immediate cause of the plaintiffs' loss was the fraud of BCCI SA's managers; (xvii) the plaintiffs' alleged losses were not capable under EC law of having been caused by the defendant; (xviii) the defendant was incapable of being liable to the plaintiffs for misfeasance in public office to the extent that they were merely potential depositors with the second plaintiff at the dates of the acts or omissions of the defendant which were alleged to constitute the tort of misfeasance in public office; (xix) liability to potential depositor plaintiffs would expose the defendant to potential liability in an indeterminate amount for an indeterminate time to an indeterminate class and would therefore be contrary to public policy; (xx) the defendant was incapable of being liable to the plaintiffs under or as a result of EC law to the extent that they were merely potential depositors with the second plaintiff at the date of the acts or omissions of the defendant which were alleged to give rise to that liability because, if as was denied any relevant right was conferred on any class of persons by EC law, it was conferred on the class comprising persons who were depositors at the time when the alleged acts or omissions took place. The defendant also sought to affirm the judge's decisions to strike out the re-amended statement of claim and to refuse to give leave to re-re-amend the statement of claim on additional grounds.

The facts are stated in the judgment of Hirst and Robert Walker LJJ.

*Lord Neill of Bladen QC, David Vaughan QC, Richard Sheldon QC, Robin Dicker* and *Dominic Dowley* for the plaintiffs.

*Nicholas Stadlen QC, Paul Lasok QC, Mark Phillips, Bankim Thanki, Rhodri Thompson* and *Ben Valentin* for the defendant.

*Cur adv vult*

4 December 1998. The following judgments were handed down.

**HIRST LJ**

INTRODUCTORY

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 16 of 260
Pg 96 of 686

| | | |
|---|---|---|
| I | Introductory sketch | 18 |
| II | Banking regulation | 20 |
| III | The rise and fall of BCCI | 23 |
| IV | The proceedings before Clarke J | 24 |
| V | Issues on the appeal | 25 |

---

**[2003]** **18**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Hirst LJ**

MISFEASANCE IN PUBLIC OFFICE

| | | |
|---|---|---|
| VI | The issues and arguments in broad outline | 26 |
| VII | The authorities in broad outline | 29 |
| VIII | The old cases | 34 |
| IX | *Bourgoin SA v Ministry of Agriculture, Fisheries and Food* | 38 |
| X | The Commonwealth cases | 39 |
| XI | The English cases subsequent to Clarke J's decision | 43 |
| XII | No duty of care--the two Privy Council cases | 45 |
| XIII | Dishonesty, knowledge and recklessness | 50 |
| XIV | Proximity | 55 |
| XV | Conclusions | 57 |

THE OTHER TWO PRELIMINARY ISSUES

| | | |
|---|---|---|
| XVI | Causation of loss | 59 |
| XVII | Potential depositors | 61 |

EUROPEAN UNION LAW

| | | |
|---|---|---|
| XVIII | Introduction | 61 |
| XIX | Did the Directive of 1977 confer rights on depositors? | 72 |
| XX | Conclusions on EU law | 77 |

STRIKING OUT

| | | |
|---|---|---|
| XXI | Principles | 77 |
| XXII | The plaintiffs' pleaded case | 80 |
| XXIII | The Bingham report | 82 |
| XXIV | The original authorisation | 83 |
| XXV | June 1980 to December 1986 | 84 |
| XXVI | December 1986 to April 1990 | 87 |
| XXVII | April 1990 to July 1991 | 91 |
| XXVIII | Conclusions | 94 |

INTRODUCTORY

I

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 17 of 260
Pg 97 of 686

*Introductory sketch*

This is the joint judgment of myself and Robert Walker LJ, to which we have both contributed.

This is an appeal (with the leave of the judge) from an order of Clarke J made on 2 October 1997. The order struck out the plaintiffs' re-amended statement of claim and dismissed the action. It also made declarations which reflected the judge's three successive judgments (delivered on 1 April 1996, 10 May 1996 and 30 July 1997). The first two of those judgments (reported at [1996] 3 All ER 558 and 634) dealt with three preliminary issues of law which had been directed by the judge's order of 19 July 1995. The third judgment considered various further amendments to the plaintiffs' statement of claim which had been proposed, and concluded (on the assumption that

---

[2003] 19
2 AC Three Rivers DC v Bank of England (No 3) (CA) Hirst LJ

the earlier judgments were correct) that the plaintiffs' claim was bound to fail, and should be struck out.

The plaintiffs (the appellants in this court) consist of over 6,000 persons from all over the world who were depositors with United Kingdom branches of Bank of Credit and Commerce International SA ("BCCI SA") together with BCCI SA (in liquidation) as equitable assignee of the depositors' claims. The defendant (the respondent in this court) is the Governor and Company of the Bank of England ("the Bank"). As is notorious, BCCI SA and its associated companies collapsed in July 1991 with huge deficiencies, much of which resulted from fraud on a very large scale. As Bingham LJ said in the published summary of the report of his Inquiry into the Supervision of the Bank of Credit and Commerce International (HC Paper (1992-93) No 198 ("the Bingham report"), p 29, para 2.3: "the systematic frauds now thought to have been practised in BCCI were on a scale which had never been known before ..."

BCCI SA was incorporated in Luxembourg, as was its holding company. The other principal company in the group, Bank of Credit and Commerce Overseas Ltd ("Overseas") was incorporated in the Cayman Islands. In this judgment we will use "BCCI" to refer to the group or its managers generally, in contexts where it is unnecessary or inappropriate to refer to any particular group company. No group company was incorporated in any part of the United Kingdom. Nevertheless BCCI SA carried on a large-scale business as a deposit-taker in this country, and after a few years it became clear that its principal place of business was in London. Responsibility for supervision of its activities in this country was borne by the Bank (concurrently in some respects with the regulatory authorities in Luxembourg) under the Banking Acts of 1979 and 1987, which are referred to further in section II below.)

The first plaintiff, Three Rivers District Council (a local authority which made deposit with BCCI SA), and its co-plaintiffs other than BCCI SA itself commenced proceedings by a writ issued on 24 May 1993. BCCI SA was not joined as a claiming plaintiff until 30 November 1994, and then only after interlocutory skirmishing which reached this court [1995] 4 All ER 312. The plaintiffs' essential claim was for damages for the tort of misfeasance in public office.

On 19 July 1995 the judge directed that the following questions as later reformulated should be tried as preliminary issues, on the assumption of the truth of the facts pleaded in the re-amended statement of claim. (1) Is the defendant capable of being liable to the plaintiffs for the tort of misfeasance in public office? (2) Were the plaintiffs' alleged losses capable of being caused in law by the acts or omissions of the defendant? (3) Are the plaintiffs entitled to recover for the tort of misfeasance in public office as existing depositors or potential depositors?

These are the first, second and third preliminary issues referred to in the three judgments which resulted in the order under appeal. The judge's conclusions on these preliminary issues, and the further hearings leading up to the judgment of 30 July 1997, are summarised in section IV below. The issues on the appeal (as they appear from the plaintiffs' lengthy notice of appeal and the Bank's even lengthier respondent's notice) are summarised in section V below.

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 18 of 260
Pg 98 of 686

Before coming to those matters, however, it is necessary to give a brief outline of domestic and European legislation relating to banking supervision

[2003] 20
2 AC Three Rivers DC v Bank of England (No 3) (CA) Hirst LJ

(section II) and the rise and fall, between 1972 and 1991, of BCCI SA and its associated companies (section III). This outline of the history will have to be filled in with more detail at a later stage. It is heavily indebted to the Bingham report, although the extent to which either party can rely on what that report says about controversial issues is a point to which it will be necessary to return.

II

*Banking regulation*

Until the enactment of the Banking Act 1979 there was no formal and systematic regulation of banking in the United Kingdom. Regulation and supervision depended on the Bank's informal influence and on a disparate collection of statutory provisions, including schedule 8 to the Companies Act 1948, under which banks recognised by the Board of Trade and the Bank obtained certain accounting privileges. The secondary banking crisis of 1973-74 was one matter prompting legislative activity in this area; another was the impact of what is now the European Union ("EU", which we use to include the EEC and the EC).

The 1979 Act was preceded by a White Paper in 1976 and also by the First Council Banking Co-ordination Directive of 12 December 1977, Council Directive (77/780/EEC). The Directive of 1977 was the first important step taken by the EU on the road to creating a common market in banks and other credit institutions. That is common ground between the parties, but there is acute controversy as to whether the Directive of 1977 conferred any (and if so what) directly enforceable rights on depositors. The plaintiffs rely particularly on articles 3, 7 and 8, which are in Title II (Credit institutions having their head office in a member state and their branches in other member states). Article 3 begins:

> "(1) Member states shall require credit institutions subject to this Directive to obtain authorisation before commencing their activities. They shall lay down the requirements for such authorisation subject to paragraphs (2), (3) and (4) and notify them to both the Commission and the Advisory Committee. (2) Without prejudice to other conditions of general application laid down by national laws, the competent authorities shall grant authorisation only when the following conditions are complied with: the credit institution must possess separate own funds, the credit institution must possess adequate minimum own funds, there shall be at least two persons who effectively direct the business of the credit institution. Moreover, the authorities concerned shall not grant authorisation if the persons referred to in the third indent of the first sub-paragraph are not of sufficiently good repute or lack sufficient experience to perform such duties."

Paragraphs (3) and (4) of article 3 contain further provisions relating to authorisation, including (article 3 (3)(d), first indent) the security of savings as one of the aims of the general criteria for authorisation. Article 6 also refers to the protection of savings. Article 7 requires the competent authorities of the member states concerned to collaborate closely in the supervision of credit institutions with their head offices in one member state and their branches in another. They are to supply one another with

[2003] 21
2 AC Three Rivers DC v Bank of England (No 3) (CA) Hirst LJ

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 19 of 260
Pg 99 of 686

information needed to facilitate supervision and monitoring of liquidity and solvency. Article 8 deals with the circumstances in which the competent authorities may withdraw an authorisation already granted. These include article 8(1)(c) and circumstances in which the institution no longer fulfils the conditions for authorisation, or no longer possesses sufficient own funds or can no longer be relied on to fulfil its obligations to its creditors.

The 1979 Act gave effect to the Directive of 1977, but went further than the Directive of 1977 required in establishing a new statutory system of banking supervision in the United Kingdom. The 1979 Act drew a distinction between banks (which might be recognised under section 3(1) if satisfying the criteria in Schedule 2, Part I) and deposit-taking institutions (which might be licensed under section 3(2) if satisfying the criteria in Schedule 2, Part II). In order to be recognised as a bank an institution had to provide either a wide range of banking services or a highly specialised banking service. It had to enjoy a high reputation and standing (Schedule 2, Part I, paragraph 1); its business had to be carried on with integrity, prudence and professional skill (paragraph 3); the business had to be effectively directed by at least two individuals (paragraph 4--the "four eyes" criterion); and it had to have and maintain net assets to a specified minimum value (paragraph 5). The criteria for licensing a deposit-taking institution were comparable but in some respects less stringent, including (Schedule 2, Part II, paragraphs 7 and 10) the requirement that every director, controller and manager should be a fit and proper person and that the business should be conducted prudently. "Controller" was widely defined so as to include anyone who (alone or with associates) had 15% of the voting power over an institution. Section 3(5) provided:

> "In the case of an institution whose principal place of business is in a country or territory outside the United Kingdom, the Bank may regard itself as satisfied that the criteria in paragraphs 3 and 6 of Schedule 2 to this Act or, as the case may be, paragraphs 7 and 10 of that Schedule are fulfilled if--(a) the relevant supervisory authorities inform the Bank that they are satisfied with respect to the management of the institution and its overall financial soundness; and (b) the Bank is satisfied as to the nature and scope of the supervision exercised by those authorities."

Section 4 required the Bank to make an annual report listing recognised and licensed institutions and stating the principles on which the Bank was acting. Section 36 prohibited any person who was not a recognised bank (or within other limited exceptions) from using banking names, but section 36(8) largely lifted that prohibition for a licensed institution with its principal place of business outside the United Kingdom. The 1979 Act gave the Bank powers to revoke recognition or a licence (subsections (6) to (8)); various investigative powers (subsections (16) to (17)); and the ultimate sanction of a winding up petition (section 18). Part II (subsection (21) ff) established a funded deposit protection scheme. In order to perform its functions under the 1979 Act the Bank formed, in March 1980, a new Banking Supervision Division ("BSD"). Mr W P Cooke became its first head, with Mr Brian Gent as his deputy.

The system of banking supervision introduced by the 1979 Act was within five years tested and shaken by the failure of Johnson Matthey Bankers Ltd. The Bank mounted a rescue operation which was in part

---

[2003] 22
2 AC Three Rivers DC v Bank of England (No 3) (CA) Hirst LJ

financed by the Bank itself. This serious failure led to various committees, a new White Paper and a new statute, the Banking Act 1987. Meanwhile in 1983 the Basle Committee of central bank governors, following the failure of the Banco Ambrosiano, reached the so-called Basle Concordat of 1983 as to the supervision of foreign establishments of international banks. It is not necessary to go into the details of the Concordat but it is another element in the history of the matter.

The 1987 Act repealed and replaced the 1979 Act almost in its entirety. In place of the previous dual system of recognised banks and licensed deposit-takers it established a single system of authorisation of deposit-taking institutions (Part I) but reinforced by restrictions on the use of banking names which in practice preserved at least some trace of the dual system (Part III). The deposit protection scheme was

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 20 of 260
Pg 100 of 686

enlarged and continued (Part II). The Bank was (section 1(1)) to "have the powers conferred on it by this Act and the duty generally to supervise the institutions authorised by it in the exercise of those powers," and also (section 1(2)) to have the duty "to keep under review the operation of this Act and developments in the field of banking which appear to it to be relevant to the exercise of its powers and the discharge of its duties". Section 1(4) contained an immunity which is of importance to this case and goes a long way to explaining why the plaintiffs have undertaken the arduous burden of seeking to prove misfeasance in public office:

> "Neither the Bank nor any person who is a member of its Court of Directors or who is, or is acting as, an officer or servant of the Bank shall be liable in damages for anything done or omitted in the discharge or purported discharge of the functions of the Bank under this Act unless it is shown that the act or omission was in bad faith."

The Bank was required (section 2) to establish a committee to be known as the Board of Banking Supervision, with three ex officio members and six independent members. The immunity in section 1(4) extended to each member of the Board.

The minimum criteria for authorisation were set out in Schedule 3 to the 1987 Act. For an institution not incorporated in the United Kingdom there were five basic requirements: (i) every director, controller and manager was to be a fit and proper person; (ii) the "four eyes" requirement; (iii) the institution's business was to be conducted in a prudent manner; (iv) it was to be carried on with integrity and professional skill; and (v) the institution had to have net assets of at least £1m. Section 9 provided for the grant or refusal of authorisation and section 9(3) was in the following terms, reproducing section 3(5) of the 1979 Act:

> "In the case of an application by an applicant whose principal place of business is in a country or territory outside the United Kingdom the Bank may regard itself as satisfied that the criteria specified in paragraphs 1, 4 and 5 of [Schedule 3--points (i), (iii) and (iv) above] are fulfilled if--(a) the relevant supervisory authority in that country or territory informs the Bank that it is satisfied with respect to the prudent management and overall financial soundness of the applicant; and (b) the Bank is satisfied as to the nature and scope of the supervision exercised by that authority."

---

**[2003]** **23**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Hirst LJ**

In Part III (Banking names and descriptions) section 68(5) corresponded to section 36(8) of the 1979 Act, but the effect of section 68(3) was to permit BCCI SA (as an institution incorporated and carrying on business, albeit on a small scale, in Luxembourg) to call itself a bank when carrying on business in the United Kingdom.

It is to be noted that several years before the coming into force of the 1987 Act the Bank (in the person of Mr Gent) had become satisfied that BCCI SA's head office was at its London premises, 100, Leadenhall Street (see his memorandum of 15 July 1983). It seems likely (although it is not common ground) that Mr Gent was right in his view, and that a banks head office (as the effective centre of management control of its business) was to be equated with its principal place of business. The implication is that section 3(5) or section 36(8) of the 1979 Act did not apply if (as seems likely) the office at 100, Leadenhall Street was the head office when BCCI SA was first licensed. However the transitional provisions of the 1987 Act made it unnecessary for BCCI SA to make a fresh application under the 1987 Act.

Section 11 of the 1987 Act dealt with the revocation of authorisation. The Bank had power to revoke the authorisation of an institution in any of the five sets of circumstances set out in section 11(1), of which the first (in paragraph (a)) was that it appeared to the Bank that "any of the criteria specified in Schedule 3 to this Act is not or has not been fulfilled, or may not be or may not have been fulfilled, in respect of the institution". Section 11(1)(e) referred to the interest of depositors or potential depositors being threatened in any other way. Sections 16 and 17 (statement of principles and annual list), 40 (information), 41

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 21 of 260
Pg 101 of 686

(investigation) and 92 (winding up) corresponded to sections 4 and 16 to 18 of the 1979 Act. Section 47 was a new provision enabling a bank auditor to act as a "whistle-blower" to the Bank despite any duty of confidentiality. Section 107 and Schedule 5 contained transitional provisions.

When BCCI SA was first incorporated in 1972 the regulatory authority in Luxembourg was the Commissariat au Contr™le des Banques or Luxembourg Banking Commission ("LBC"), which in May 1983 became the Institut Montaire Luxembourgeois ("IML"). As the business of the BCCI group grew in volume and geographical extent the LBC/IML made no secret of its inability to exercise effective supervision over a worldwide group whose presence within Luxembourg was little more than nominal.

The Directive of 1977 was followed by other directives, the most important of which are listed in paragraph 436 of the Bank's written submissions. In particular, the Second Banking Co-ordination Directive, Council Directive (89/646/EEC) aimed at a "passport" approach under which a bank authorised in one member state could open a branch or carry on banking business in another member state without further authorisation. However the period for compliance by member states with the Directive of 1989 expired only on 1 January 1993.

[Section III of their Lordships' judgment dealt with "The Rise and Fall of BCCI" and has been omitted from this report.]

---

**[2003] 24**
**2 AC Three Rivers DC v Bank of England (No 3) (CA) Hirst LJ**

IV

*The proceedings before Clarke J*

The first judgment of Clarke J, handed down on 1 April 1996, addressed the three preliminary issues set out in section I above. The judge's conclusions are summarised [1996] 3 All ER 558, 632-633 and were (with a little further abbreviation) as follows.

1. The first issue (misfeasance in public office) (1) The tort is concerned with deliberate and dishonest abuse of power by a public officer. (2) Malice (in the sense of an intention to injure) and relevant knowledge on the part of the officer are alternative (not cumulative) requirements, since to act with such knowledge is to act maliciously. Relevant knowledge is knowledge (i) that the officer has no power to act in that way and (ii) that the act will probably injure the plaintiff. (3) For the first element of relevant knowledge (unlawfulness) it is sufficient if the officer has actual knowledge that that act was unlawful or if, suspecting that he has no power to do it, he does not ascertain, or fails to take such steps as an honest and reasonable man would take to ascertain, the true position. (4) The test for the second element of relevant knowledge (probable injury) is the same. (5) If the states of mind at (3) and (4) above do not amount to actual knowledge, they amount to recklessness. (6) If the plaintiff establishes that the defendant was a public officer or entity and (i) intended to injure the plaintiff or a class including the plaintiff (limb one) or (ii) had relevant knowledge of the unlawfulness of his act and of probable injury to the plaintiff or a class including the plaintiff (limb two), and the plaintiff had suffered loss caused by the wrongful act, he can recover damages.

The judge also held that the plaintiffs had no relevant rights under EU law, and that there is nothing in the principles of EU law which alters the ingredients of the tort of misfeasance in public office. He recorded, at p 625, that one of the few points on which the parties were agreed was that he should not refer the meaning and effect of the Directive of 1977 to the Court of Justice under article 177 of the Treaty. The judge therefore saw his answer to the question posed by the first issue as depending on and coinciding with his answer on the second issue, and he provisionally answered both questions in the negative, but he gave the parties the opportunity of making further submissions.

2. The second issue (causation). Subject to further submissions the judge answered this question in the negative: the plaintiff's alleged losses were not in law caused by the Bank's acts or omissions.

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 22 of 260
Pg 102 of 686

3. The third issue (claim as depositors or potential depositors). In principle, the judge would have decided this question in favour of the plaintiffs.

The second judgment was given on 10 May 1996 after the judge had heard further submissions. It was largely concerned with the contents of the statement of claim as it then stood. Because further amendments have since been formulated and debated it is unnecessary to go further into the details of the second judgment. The judge concluded, at pp 639-640, that the statement of claim as it then stood did not allege the necessary knowledge of or recklessness as to probable loss, and he confirmed his provisional negative answers on the first and second issues. He added that it did not follow that

---

**[2003]** **25**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Hirst LJ**

the plaintiffs' claim must be dismissed; he contemplated that it might be kept alive by further amendment of the statement of claim.

There were then further hearings of an application by the plaintiffs for leave to make further amendments, and an application by the Bank to strike out the whole of the statement of claim. On 30 July 1997 the judge handed down a long judgment (it runs to 172 pages of transcript) concluding that the plaintiffs' claim was bound to fail, and that the statement of claim should be struck out and the action dismissed. The general structure of the third judgment is a summary of the procedural history, the judge's legal conclusions and the evolution of the proposed amendments. Then there is a discussion of the material (including the Bingham report) available or likely to become available to the plaintiffs in order to make good their claim, and general observations as to the court's task in deciding whether a claim is bound to fail. There is a summary of the crucial paragraphs of the statement of claim. Then comes a detailed consideration of the pleaded allegations (and proposed amendments of them) arranged in chronological order in four main sections (which are themselves subdivided): (1) the grant of a licence under the 1979 Act; (2) June 1980 to December 1986; (3) December 1986 to April 1990; and (4) April 1990 to July 1991. Then came the judge's conclusions and a summary.

V

*Issues on the appeal*

By their notice of appeal the plaintiffs seek to have the judge's order of 2 October 1997 set aside. Instead they seek declarations that on the basis of what is pleaded in the existing statement of claim, or alternatively on the basis of draft amendments dated 6 January 1997 (which they seek leave to make): (1) the Bank is capable of being liable to the plaintiffs for misfeasance in public office; (2) the Bank is capable of being liable to the plaintiffs for breaches of EU law; and (3) the plaintiffs' alleged losses are capable of being caused in law by the Bank's acts or omissions.

There are 21 numbered paragraphs of the grounds of appeal. Some are by way of introduction or summary, and some raise detailed points as to the adequacy of particular passages in the existing or draft pleadings. The main points of principle which arise are, in relation to the tort of misfeasance in public office, in paragraphs 2, 3 and 5 (which put forward a wide formulation of the essentials of the tort, and criticise the judge's view of recklessness and his requirement of knowledge of or recklessness as to probable loss). In relation to EU law the main point of principle, elaborated in paragraph 9, is that the judge was wrong to hold that the Directive of 1977 did not confer enforceable rights on depositors. Paragraphs 12 and 13 are concerned mainly with causation in the context of EU law, and paragraph 14 contends that EU jurisprudence should in any event influence (and reduce the burden of establishing) the tort of misfeasance in public office. In relation to the striking-out order paragraphs 15, 16 and 18 criticise it as inappropriate because this was not a clear case, because it is said to have been based on mistaken premises (viz as to the ingredients of the tort) and because of the possibility of an article 177 reference

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 23 of 260
Pg 103 of 686

(although neither side favoured a reference). Paragraphs 19 and 20 criticise the judge for the way in which he used and relied on the Bingham report, and for his conclusion

[2003] 26
2 AC Three Rivers DC v Bank of England (No 3) (CA) Hirst LJ

that there was no realistic possibility of more evidence becoming available, by any means, to cast light on the state of mind of the Bank or any of its officials.

The respondent's notice (partly to affirm the judge's order on other grounds and partly to vary it) contains no fewer than 40 numbered paragraphs. Its general effect can be summarised: (1) as to misfeasance in public office, the notice seeks to uphold the judge's conclusion on the first preliminary issue on the additional grounds that the tort requires a more stringent test of the defendant's mental state, being limited (on one formulation) to "targeted malice" (paragraphs 1 to 5) and that the plaintiff must have had a pre-existing legal right or interest (paragraph 6); (2) as to EU law, the notice seeks to uphold the judge's conclusion on the additional grounds, elaborated in various ways, that the Directive of 1977 did not impose enforceable duties on national regulators (paragraphs 7 to 11); and that if there were an actionable breach the proper defendant would be the Attorney General (paragraphs 12 to 13); (3) as to causation, the notice seeks to uphold the judge's conclusion on the second preliminary issue on additional grounds negativing causation either under English law or under EU law (paragraphs 14 to 17); (4) as to the third preliminary issue the notice seeks to vary the judge's order on the grounds (paragraphs 18 to 20) that the plaintiffs were not an existing or ascertainable class and had no existing rights or interests; paragraph 19 echoes the well known saying of Cardozo CJ in *Ultramares Corpn v Touche* (1931) 255 NY 170, 179; (5) as to the judge's decision to strike out the whole statement of claim, the notice seeks to uphold the judge's order on all the additional grounds in paragraphs 1 to 20, and also on nine further grounds (paragraphs 21 to 29) of which the first and the last assert a failure to plead dishonesty and bad faith with sufficient particularity; (6) as to the judge's refusal of leave for further amendment of the statement of claim, the notice seeks both to uphold and to vary the judge's order on the ground (paragraph 30) that the proposed amendments were an abuse of process, and (paragraph 31 and paragraphs 32 to 40) on the same grounds as those relied on (in relation to the strike-out) in paragraphs 21 to 29 of the notice.

The appeal as a whole does therefore raise important issues of principle as to the tort of misfeasance in public office, as to causation and the rights of an indeterminate body of depositors and as to EU law. It also raises issues as to striking out and amending pleadings. Those issues are addressed below in that order.

## MISFEASANCE IN PUBLIC OFFICE

## VI

*The issues and arguments in broad outline*

We have already summarised Clarke J's conclusions in his first judgment [1996] 3 All ER 558, 632-633, which were based on a very painstaking and thorough consideration of the authorities, at pp 564-594: see section IV above.

Proposition (1) ("the tort is concerned with deliberate and dishonest abuse of power by a public officer") is uncontroversial, and indeed Lord Neill was at pains to emphasise that the hallmark of the tort is dishonesty. However there was a wide gulf between the parties as to the meaning in this

[2003] 27
2 AC Three Rivers DC v Bank of England (No 3) (CA) Hirst LJ

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

context of dishonesty, which Lord Neill categorised as no more than a failure on the part of the bank to make an honest attempt to fulfil its statutory duty, whereas Mr Stadlen interpreted it in a more traditional manner, applying what he described as an ordinary jury test.

On proposition (2) there was no dispute as to the first limb of the tort which is that the defendant intended to injure the plaintiff and that the plaintiff had suffered loss as a result. (i e targeted malice). The dispute centred on the second and alternative limb of the tort as identified by Clarke J, viz: that the defendant had actual knowledge not only of the unlawfulness of his act, but also (critically) of probable injury to the plaintiff, and that the plaintiff had suffered loss as a result.

Lord Neill's primary submission was that there was no need for the plaintiff to prove any mental state at all as to ensuing loss, on the footing that the tort of misfeasance is an action on the case which is actionable upon proof of special damage. That he submitted is the approach adopted in all the long catalogue of misfeasance cases up until *Bourgoin SA v Ministry of Agriculture, Fisheries and Food* [1986] QB 716. Alternatively, basing himself on the ipsissima verba of the *Bourgoin* case, he submitted that in the second limb the correct test is not that the defendant had actual knowledge of probable injury, but rather an objective test that such injury was reasonably foreseeable.

He epitomised his submissions:

> "The plaintiffs' case in relation to the nature and requirements of the tort of misfeasance in public office in English law (ignoring at this stage, the impact of the Directive of 1977) can be summarised as follows. (1) The tort of misfeasance in public office is concerned with an abuse, or deliberately wrongful use, of the powers given to a public officer. The tort provides a remedy against dishonest administration by public officers. (2) There are two well established and alternative limbs of the tort, viz malice, in the sense of an intention to injure (the first limb), and knowledge by the defendant that he has no power to do the act complained of (the second limb). (3) However, liability will arise in any case where there has been an abuse, or a deliberately or recklessly wrongful use, of the powers given to a public officer. (4) The boundaries of the tort are not tightly drawn and there is scope for further development. (5) The tort involves deliberate conduct. It requires the plaintiff to establish that the defendant knowingly acted unlawfully in the sense indicated above. To this extent it is also an intentional tort. A defendant can always avoid liability by choosing not to act in a way that he knows is unlawful. In this sense the tort is sharply different from the torts of negligence or breach of statutory duty. (6) For the purpose of the requirement of the second limb, that the public officer knows that he has no power to do the act complained of, it is sufficient that the officer had actual knowledge that the act was unlawful or deliberately shut his eyes or recklessly failed to make the type of inquiries that a public officer honestly intending to carry out his statutory duties would have made. (7) There is no justification, either in principle or on the authorities, for holding (as Clarke J held in this case) that, in addition to knowing that he was acting unlawfully, an officer must also have known that his actions *would probably* injure the plaintiff or a person in a class of which the

---

> plaintiff is a member. (8) Questions of the foreseeability of, or the public officer's knowledge, belief or suspicion as to, loss or damage to the plaintiff or to persons in a class of which the plaintiff was a member are irrelevant. (9) Alternatively, it is sufficient for a plaintiff to show that loss or damage to him or to a person in a class of which he was a member were a foreseeable result of the public officer's acts or omissions or that the public officer's acts or omissions created a foreseeable risk of such loss or damage. (10) Alternatively it is sufficient for the plaintiff to show that the public officer was reckless or indifferent as to whether his acts or omissions would or might result in loss or damage to the plaintiff or to a person or persons in a class of which the plaintiff was a member. There is no public policy in protecting a public officer who acted in a manner that he knew to be unlawful. The concern is, and should only be, to ensure that a public officer who makes an honest attempt to exercise his powers but

who, as a result of some mistake, acts unlawfully, is protected from liability. Imposing liability on a public officer who knowingly acts unlawfully will not have a chilling effect on the actions of public officers. Nor will it open any floodgates."

Mr Stadlen sought to uphold Clarke J's formulation of the tort, which was based on the judge's interpretation of the *Bourgoin* case, and was content to present his case on that foundation. However, he did not abandon the argument which he presented before Clarke J, that the formulation should be considerably narrower, i e restricted to cases where the public officer has the purpose of injuring the plaintiff (targeted malice) or actually knows that his act will necessarily injure the plaintiff, and in either case only when the plaintiff enjoyed an antecedent legal right or interest which was interfered with by the defendant.

He epitomised his submissions:

"Clarke J was correct to reject the plaintiffs' submissions for the reasons given in his judgment and the reasons set out below. (1) On several occasions, the English Court of Appeal, Divisional Court and High Court have expressly or implicitly approved Clarke J's analysis of the tort. (2) The ratios and dicta of the older English cases show that intention to injure and/or wilfully injuring the plaintiff are essential elements of the tort. The older cases are inconsistent with the plaintiffs' proposition that foreseeability of loss (reasonable or otherwise) or objective recklessness as to loss is sufficient to found liability. (3) At the very lowest, there is no support for that proposition in any of the older English cases: (a) there is no case in which the ratio was that foreseeability/objective recklessness is sufficient; (b) there is no case in which there are even obiter dicta to that effect; (c) there is no case in which a claim in misfeasance succeeded without proof of actual intention to injure the plaintiff and actual knowledge that he would necessarily suffer loss. (4) There is no support for the proposition in the *Bourgoin* case. The ratio in the *Bourgoin* case was very narrow: actual foresight that the plaintiff will necessarily suffer loss is sufficient to make good a claim in misfeasance even if it is not pleaded that the public officer acted with the purpose of inflicting such loss on the plaintiff. If that represented an extension in the ambit of the tort from that to be deduced from the older English cases, which the Bank does not accept, it was minimal."

---

There was also a significant divergence between Lord Neill and Mr Stadlen as to the meaning of recklessness in this context, which led to a consideration of a number of criminal cases where recklessness was in issue.

Both sides, albeit from different standpoints, emphasised sharply the contrast between this tort and negligence, it being well established by two recent Privy Council cases cited in detail below that, in comparable circumstances, a regulator owes no duty of care to depositors or potential depositors. This is of course of crucial significance in the present case, since (as the Bingham report shows, and as Mr Stadlen concedes) there would otherwise be a very powerful case in negligence against the Bank. Indeed one of Mr Stadlen's principal objections to Lord Neill's primary submission (that the tort constitutes an action on the case on proof of special damage) was that it would result in a liability being imposed on a regulator in circumstances substantially, if not entirely, similar to those in which a bank regulator's liability in negligence has been so firmly rejected by the Privy Council.

A further key element in Mr Stadlen's argument is the stress which he lays on the need to prove actual dishonesty under both limbs of the tort, and he submits that Lord Neill, while paying lip service to the requirement of dishonesty, waters it down impermissibly. Lord Neill for his part also proposed a far more fundamental development in the law as it affects state liability, obviating the need to prove misfeasance. We shall of course be returning in greater detail to these various themes, and to the range of authorities relied upon by both sides in support of their respective contentions.

VII

*The authorities in broad outline*

The tort of misfeasance in public office has a very long history in English law, dating back to the end of the 17th century. During the 18th century and the first part of the 19th, there were several important cases, the majority of which were claims by eligible electors that they had been maliciously denied the right to vote by returning officers or similar authorities. Both sides seek comfort from this line of cases in support of their respective arguments.

There is then a long gap of over 100 years until the second half of the present century. During the last 40 years, and especially in the last two decades, there have been several important cases both here and in the Commonwealth. *Bourgoin SA v Ministry of Agriculture, Fisheries and Food* [1986] QB 716 is a landmark decision and it has been discussed at length in some of the Commonwealth cases. The judgment of Clarke J now under appeal has already been referred to in several reported cases, some in this court.

The most notable cases during the second half of the 20th century are as follows (in chronological order). It will be necessary to return to several of them in more detail.

(1) In *Smith v East Elloe Rural District Council* [1956] AC 736 the House of Lords considered the plaintiff's complaint that a compulsory purchase order for her house (made by the local authority and confirmed by the minister) had been made in bad faith. In rejecting a strike-out application in

---

relation to the claim against the clerk to the local authority Viscount Simonds said, at p 752:

> "Here the appellant by her writ claims against the personal defendant a declaration that he knowingly acted wrongfully and in bad faith in procuring the order and its confirmation, and damages, and that is a claim which the court clearly has jurisdiction to entertain."

(2) In *Roncarelli v Duplessis* (1959) 16 DLR (2d) 689 the defendant was the Premier and Attorney General of Quebec. The plaintiff was a restaurateur who had held a liquor licence for 30 years. He was also a Jehovah's Witness and he antagonised the provincial government by repeatedly standing bail for Jehovah's Witnesses accused of public order offences; but he was not personally involved in any questionable activities. The defendant put pressure on a supposedly independent licensing commission to cancel the plaintiff's liquor licence. The Supreme Court of Canada held him liable in damages. Rand J said, at p 706:

> "it was a gross abuse of legal power expressly intended to punish him for an act wholly irrelevant to the [licensing] statute, a punishment which inflicted on him, as it was intended to do, the destruction of his economic life as a restaurant keeper within the province."

(3) *Farrington v Thomson and Bridgland* [1959] VR 286 is the first important Australian case. The police had purported to use statutory powers to close a hotel when (as it was found, to their knowledge) they had no power to do so. Smith J discussed the authorities and said, at p 293:

> "the rule should be taken to go this far at least, that if a public officer does an act which, to his knowledge, amounts to an abuse of his office, and he thereby causes damage to another person, then an action in tort for misfeasance in a public office will lie against him at the suit of that person."

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 27 of 260
Pg 107 of 686

(4) In *Tampion v Anderson* [1973] VR 715 the Supreme Court of Victoria was concerned with claims by a teacher of Scientology against persons who had been involved in different ways in an official inquiry into Scientology. The judgment of the Full Court referred to *Farrington v Thomson and Bridgland* [1959] VR 286 and added, at p 720:

> "But to be able to sustain an action upon this basis a plaintiff must not only show damage from the abuse; he must also show that he was a member of the public, or one of the members of the public, to whom the holder of the office owed a duty not to commit the particular abuse complained of."

This reference to a particular duty has been commented on, but not perhaps fully explained, in later cases. If there is a need for a particular duty it might be the correlative of the antecedent right for which Mr Stadlen contends.

(5) *Dunlop v Woollahra Municipal Council* [1982] AC 158 was an appeal to the Privy Council from New South Wales. The appellant plaintiff complained of economic loss caused by the local authority's imposition of building controls. The local authority's actions had been invalid but not in bad faith. Lord Diplock said, at p 172:

---

**[2003]** **31**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Hirst LJ**

> "in the absence of malice, passing without knowledge of its invalidity a resolution which is devoid of any legal effect is not conduct that of itself is capable of amounting to such 'misfeasance' as is a necessary element in this tort."

(6) In *Bourgoin SA v Ministry of Agriculture, Fisheries and Food* [1986] QB 716 the Court of Appeal, upholding Mann J at first instance, held on the trial of a preliminary issue that the plaintiffs, most of whom were French turkey producers, had by their claim disclosed a cause of action in misfeasance against the minister, based on the withdrawal of a general licence for the import of turkeys from France. It is important to note that it was accepted by the minister, for the purpose of the preliminary issue, that he knew at the time of the revocation that his act infringed article 30 of the EEC Treaty and would and was calculated to injure the plaintiffs in their businesses. The case also raised an important question of Community law, on which the court was divided, with Oliver LJ dissenting from the majority view expressed by Parker and Nourse LJJ; however the court was unanimous on the point presently in issue, on which Oliver LJ gave the leading judgment.

Mann J, having cited several of the old cases, stated in his reserved judgment, at p 740:

> "I do not read any of the decisions to which I have been referred as precluding the commission of the tort of misfeasance in public office where the officer actually knew that he had no power to do that which he did, and that his act would injure the plaintiff as subsequently it does. I read the judgment in *Dunlop v Woollahra Municipal Council* [1982] AC 158 in the sense that malice and knowledge are alternatives. There is no sensible reason why the common law should not afford a remedy to the injured party in circumstances such as are before me. There is no sensible distinction between the case where an officer performs an act which he has no power to perform with the object of injuring A (which the defendant accepts is actionable at the instance of A) and the case where an officer performs an act which he knows he has no power to perform with the object of conferring a benefit on B but which has the *foreseeable and actual consequence* of injury to A (which the defendant denies is actionable at the instance of A). In my judgment each case is actionable at the instance of A ..." (Emphasis added.)

In the Court of Appeal, Oliver LJ having quoted the above passage from Mann J's judgment, stated, at p 777:

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 28 of 260
Pg 108 of 686

> "For my part, I too can see no sensible distinction between the two cases which the judge mentions. If it be shown that the minister's motive was to further the interests of English turkey producers by keeping out the produce of French turkey producers--an act which must necessarily injure them--it seems to me entirely immaterial that the one purpose was dominant and the second merely a subsidiary purpose for giving effect to the dominant purpose. If an act is done deliberately and with knowledge of its consequences, I do not think that the actor can sensibly say that he did not 'intend' the consequences or that the act was not 'aimed' at the person who, it is known, will suffer them. In my judgment the judge was right in his conclusion also on this point."

---

**[2003]** **32**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Hirst LJ**

The proper interpretation of the *Bourgoin* case [1986] QB 716 has been one of the main points of controversy, in particular as to whether Mann J, when he said "*foreseeable*", really meant what he said, or whether, as Clarke J held and Mr Stadlen submitted, this was a slip of the tongue for "*foreseen*". Thus the crux of the dispute in relation to the *Bourgoin* test is whether the probability of damage must be *actually foreseen*, or whether it is enough to show that it was *reasonably foreseeable*.

(7) and (8) The next important cases are two decisions of the Privy Council ruling against any possible liability in negligence of a public authority discharging statutory functions as a bank regulator. Those decisions, *Yuen Kun Yeu v Attorney General of Hong Kong* [1988] AC 175 (an appeal from Hong Kong) and *Davis v Radcliffe* [1990] 1 WLR 821 (an appeal from the Isle of Man) are not directly concerned with misfeasance and are considered in section XII below.

(9) In *Northern Territory v Mengel* (1995) 69 ALJR 527 the High Court of Australia considered a claim by cattle station owners whose stock had been placed in quarantine by stock inspectors who had imposed the restrictions without power to do so, but in good faith. The judgment of the plurality said, at p 540:

> "The cases do not establish that misfeasance in public office is constituted simply by an act of a public officer which he or she knows is beyond power and which results in damage. Nor is that required by policy or by principle. Policy and principle both suggest that liability should be more closely confined ... it is sufficient for present purposes to proceed on the basis accepted as sufficient in *Bourgoin*, namely, that liability requires an act which the public officer knows is beyond power and which involves a foreseeable risk of harm."

It should however be noted that it had been found as a fact at trial (see p 544) that the inspectors caused the plaintiff's financial loss and that they knew that the imposition of quarantine directions would cause such a loss. Brennan and Deane JJ concurred in the result and gave separate judgments which also call for careful attention.

(10) In *Garrett v Attorney General* [1997] 2 NZLR 332 the plaintiff's claim was that she had been raped in a police station by a police officer and that the matter had not been properly dealt with by the police, either by the sergeant who originally investigated the matter or by more senior officers when the plaintiff made a formal complaint three months later. She claimed damages for loss of reputation and also for loss of her job (as a result of being supposed to have made a false allegation of rape). At trial the jury found that the sergeant had failed in his duty but had not been actuated by malice, and that the formal complaint had been properly dealt with.

The plaintiff's appeal (seeking a new trial) was heard by the New Zealand Court of Appeal (specially constituted with five members). The judgment of the court contains a very full discussion of the *Bourgoin* case [1986] QB 716, *Mengel's* case, 69 ALJR 527 and the judgment of Clarke J now under appeal. The Court of Appeal of New Zealand agreed with Clarke J that when Mann J used the word "foreseeable" in *Bourgoin* he must have meant "foreseen". The court said, at p 348:

---

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

"Clarke J pointed out that Mann J had three times earlier in his judgment referred to 'foreseen' or to knowledge of the consequences. It was also an agreed fact that the minister knew his act would injure the plaintiffs and it was not therefore being suggested that foreseeability was enough. We agree with Clarke J also that Oliver LJ's remarks are limited to a situation in which the defendant must have appreciated the obvious consequence of a deliberate unlawful act."

And, at p 350:

"The purpose behind the imposition of this form of tortious liability is to prevent the deliberate injuring of members of the public by deliberate disregard of official duty. It is unnecessary, to attain this objective, to extend the tort to catch an act which, though known to be wrongful, is done without a realisation of the consequences for the plaintiff."

And, at p 351:

"The common law has long set its face against any general principle that invalid administrative action by itself gives rise to a cause of action in damages by those who have suffered loss as a consequence of that action. There must be something more. And in the case of misfeasance of public office that something more, it seems to us, must be related to the individual who is bringing the action. While the cases have made it clear that the malice need not be targeted there must, as we have said, be a conscious disregard for the interests of those who will be affected by the making of the particular decision."

(11) In *Rawlinson v Rice* [1997] 2 NZLR 651 the Court of Appeal of New Zealand considered the striking-out of a claim for misfeasance against a district judge in the conduct of family litigation. Following *Garrett's* case [1997] 2 NZLR 332, the majority took the view that the pleadings (prepared by a litigant in person) sufficiently alleged reckless indifference on the part of the district judge. The appeal was adjourned for hearing by a five-judge court on the issue of judicial responsibility.

That is a bird's eye view of the most important modern authorities. In addition there are some recent cases in which the House of Lords or this court has made general observations about the tort of misfeasance in public office. In *Calveley v Chief Constable of the Merseyside Police* [1989] AC 1228, 1240 Lord Bridge of Harwich said:

"I do not regard this as an occasion where it is necessary to explore, still less to attempt to define, the precise limits of the tort of misfeasance in public office. It suffices for present purposes to say that it must at least involve an act done in the exercise or purported exercise by the public officer of some power or authority with which he is clothed by virtue of the office he holds and which is done in bad faith or (possibly) without reasonable cause."

In *Racz v Home Office* [1994] 2 AC 45, 55 Lord Jauncey of Tullichettle referred to the "apparent uncertainty as to the precise ambit of the tort of misfeasance in public office". In *Elguzouli-Daf v Comr of Police of the Metropolis* [1995] QB 335, 347 Steyn LJ referred to the possibility of further

---

development in this corner of the law, under the direct or indirect influence of the jurisprudence of the European Court of Justice.

These dicta by judges of high authority (all concurred in by the other members of the House or the court) tend in our judgment to suggest that the law on misfeasance in public office is not set in stone, and that it is susceptible of judicial development in the time-honoured tradition of the common law, particularly as the tort has a potential application in such a wide variety of circumstances affecting an extensive range of authorities. It follows that in our judgment we should not be unduly prescriptive in defining the ingredients of the tort.

VIII

*The old cases*

As already stated, both sides relied on these old cases from their different standpoints, particularly with reference to the meaning of malice in this context, and to the existence and scope (if any) of the second limb. Mr Stadlen submitted that these cases demonstrate that malice means an actual intention to injure, or, at least, the deliberate and wilful doing of an act which will necessarily injure the plaintiff, thus confining the concept of malice within very narrow boundaries, and in effect restricting the tort to the first limb. Lord Neill on the other hand submitted that on a proper reading of the cases malice has a much wider connotation, namely a wrongful act done intentionally without just cause or excuse, which would thus include acts done with any improper or indirect motive; he also submitted that none of the old cases at any stage disclosed any recognition of the need to prove that damage was either foreseen or foreseeable.

The earliest case identified was *Turner v Sterling* (1671) 2 Vent 25, when the plaintiff alleged irregularity in an election for the post of bridgemaster in the City of London, and the majority of the judges in the Court of Common Bench held that where an officer does anything against the duty of his place and office, and damage thereby accrues to the plaintiff, an action lies.

The next authority in point of time is the famous case of *Ashby v White* (1704) 14 St Tr 695, 799, culminating in a resolution of the House of Lords, which was apparently based on the advice of Holt CJ:

> "It is resolved by the Lords spiritual and temporal in Parliament assembled, that by the known laws of this kingdom, every freeholder, or other person, having a right to give his vote at the election of members to serve in Parliament, and being wilfully denied or hindered so to do by the officer who ought to receive the same, may maintain an action in the Queen's courts against such officer, to assert his right, and recover damages for the injury."

In a sequence of other cases towards the turn of the 18th century similar claims were rejected on the ground that there was no proof of malice. Thus in *Harman v Tappenden* (1801) 1 East 555, 562-563 Lawrence J held:

> "There is no instance of an action of this sort maintained for an act arising merely from error of judgment. Perhaps the action might have been maintained, if it had been proved that the defendants contriving and intending to injure and prejudice the plaintiff, and to deprive him of the benefit of his profits from the fishery, which as a member of this body he

---

> was entitled to according to the custom, had *wilfully and maliciously* procured him to be disfranchised, in consequence of which he was deprived of such profits. But here there was no evidence of any wilful and malicious intention to deprive the plaintiff of his profits, or that they had disfranchised him with that intent, which is necessary to maintain the action."

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 31 of 260
Pg 111 of 686

Kenyon CJ's judgment, at pp 561-562, was to the same effect, and in the course of their judgments the judges cited two earlier unreported cases, namely *Burgoyne v Moss* (1768) and *Drewe v Coulton* (1787), both of which are reported as footnotes to *Harman v Tappenden* 1 East 555, 563. In the latter case Wilson J, having cited *Turner v Sterling* 2 Vent 25, said, at pp 564-565:

> "In all the cases put the misbehaviour must be wilful, and by wilful I understand, contrary to a man's own conviction ... I do not mean to say that in this kind of action it is necessary to prove *express* malice. It is sufficient if malice may be implied from the conduct of the officer; as if he had decided contrary to a last resolution of the House of Commons; there I should leave it to the jury to imply malice."

A similar test was propounded by Lord Kenyon CJ in *Williams v Lewis* (1797) Peake Add Cas 157, 164, where he held that the returning officers were not liable "unless they acted against the clear conviction of their own minds ..."

In *Cullen v Morris* (1819) 2 Stark 577 Abbott CJ, having upheld the submission on behalf of the returning officers that the action would only lie if it appeared that the refusal of a right to vote resulted from a malicious and improper motive, directed the jury, at p 589:

> "The question for your consideration is, whether the refusal of the vote in this instance, was founded on an improper motive on the part of the defendant, it is for you to pronounce your opinion, whether the defendant's conduct proceeded from an improper motive, or from an honest intention to discharge his duty acting under professional advice. If he intended to do prejudice either to the plaintiff or to the candidate for whom he meant to vote, the plaintiff is entitled to your verdict; if on the other hand he acted in the best way he could according to his judgment, your verdict ought to be for the defendant."

In the final election case, *Tozer v Child* (1857) 7 E & B 377, Lord Campbell CJ's direction to the jury as summarised in the bill of exceptions was, at p 379:

> "And thereupon the said Lord Chief Justice directed the said jury that the defendants were not necessarily liable in this action, although the plaintiff, notwithstanding his non-payment of the said church rate, was qualified and entitled to vote, and to be a candidate at the said election, as he alleged: and that it was incumbent on the plaintiff to make out that the acts of the defendants complained of were malicious; and that malice might be proved, not only by evidence of personal hostility or spite, but by evidence of any other corrupt or improper motive: and that, if the defendants committed the acts and grievances in either counts of the declaration complained of bona fide, and acting upon advice which they

---

**[2003]** **36**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Hirst LJ**

> believed sound, the defendants were not guilty as alleged, and that they the said jury ought, as to each of the counts of the declaration, to find and give their verdict for the defendants upon the first issue within joined between the said parties, unless, upon the evidence, they were of opinion that the defendants, in committing and occasioning the acts, grievances and omissions in such count of the declaration alleged, had acted mala fide and dishonestly."

This direction was upheld by a very powerfully constituted Court of Exchequer Chamber (Cresswell J and Martin, Bramwell and Watson BB), at pp 382-383.

*Whitelegg v Richards* (1823) 2 B & C 45 was a case alleging abuse of power by the clerk to the Court of Relief of Insolvent Debtors in wrongfully and maliciously releasing a debtor from custody despite non-

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

payment to the plaintiff of his damages and costs. The plea alleged that the defendant "wrongfully and maliciously intending to injure the plaintiff" caused the debtor to be discharged out of custody without payment. In his judgment Abbott CJ stated, at p 52:

> "On the argument before us, some authorities were quoted to show, that an action upon the case may be maintained against an officer of a court for a falsity or misconduct in his office, whereby a party sustains a special damage; and that, in this case, a damage was plainly shown by the loss of the means of enforcing payment from the debtor, as in actions against sheriffs or gaolers for an escape."

In *Henly v Lyme Corpn* (1828) 5 Bing 91 the plaintiff, who owned property in Lyme Regis, claimed that he had suffered loss in consequence of the decay of the sea wall in the vicinity of the Cob at Lyme Regis, which the corporation had been directed to repair under the. terms of a grant from the Crown, conveying the sea walls etc. to the corporation with tolls. The plaintiff was successful before Littledale J and a jury at the Dorchester Spring Assizes in 1828, the plea being that the defendants

> "well knowing the premises, and not regarding the said letters patent, or their duty in that behalf, but contriving and wrongfully and unjustly intending to injure, prejudice, and aggrieve the plaintiff, and to deprive him of the use of [his property], permitted [the sea wall] to be and continue ... ruinous, prostrate, fallen down, washed down, out of repair, and in great decay ..."

On appeal, Best CJ stated, at pp 107-108:

> "Now I take it to be perfectly clear, that if a public officer abuses his office, either by an act of omission or commission, and the consequences of that, is an injury to an individual, an action may be maintained against such public officer. The instances of this are so numerous, that it would be a waste of time to refer to them. Then, what constitutes a public officer? In my opinion, every one who is appointed to discharge a public duty, and receives a compensation in whatever shape, whether from the Crown or otherwise, is constituted a public officer. Bishops, certainly, are paid by the Crown, not in money, but by estates which have been granted to them; and in consequence of the grant of such estates certain duties have been imposed on the bishops; such, for instance, as holding

---

> ecclesiastical courts. Does any man doubt, if a bishop, by neglect to hold an ecclesiastical court, prevents an individual from obtaining probate of a will, by which he sustains an injury, an action might be maintained against such bishop for the consequence of that neglect? Clergymen are public servants to a certain extent, although undoubtedly they are not paid by the public. The emoluments which they receive have not been derived from the public; they have been derived from the owners of particular lands, who have endowed them with the glebe or tithes which they possess; yet they have duties cast on them as the consequence of the tenure of those lands and tithes, such as, for instance, to administer the sacrament; and it has been decided, that if a clergyman refuse to administer the sacrament to a man who is thereby prejudiced in his civil rights, an action is maintainable against the clergyman. So if a clergyman were to neglect to register a person brought to be baptised, and in consequence of that, such person should lose an estate, does any man doubt an action could be maintained against him? If the Bank of England, refuse to transfer stock, an action may be maintained against them. Lords of manors hold courts, which courts they are obliged to hold, as one of the considerations on which the lands have been granted to them. If a lord of the manor were to refuse or neglect to hold a court, by which a copyholder should be prevented from having admission to his copyhold, does any man doubt an action could be maintained against such lord? It seems to me that all these cases establish the principle, that if a man takes a reward--whatever be the nature of that reward, whether it be in money from the Crown,

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 33 of 260
Pg 113 of 686

whether it be in land from the Crown, whether it be in lands or money from any individual--for the discharge of a public duty, that instant he becomes a public officer; and if by any act of negligence or any act of abuse in his office, any individual sustains an injury, that individual is entitled to redress in a civil action. If that be so, then it is quite clear that the plaintiff in this case is entitled to maintain this action. The plaintiff may say to the corporation, 'you have a compensation from the Crown for discharging the duty which you have neglected to discharge; and in consequence of that neglect have I sustained an injury; I am, therefore, entitled to have a compensation from you'."

Gaselee J concurred.

Reviewing these cases in the round, we consider that there is plainly substance in Lord Neill's submission that none of them mentions expressly the need to prove that loss was foreseen or foreseeable. However we do not attach great significance to this, since it is obvious that the denial to an elector of his right to vote would be foreseen, or at least foreseeable, to be likely to cause him loss of his constitutional right. Indeed, it deprived him of that right without any room for further discussion of cause and effect. That was in an era where the suffrage was very narrowly based, all the election cases we have cited other than *Tozer v Child* 7 E & B 377 having preceded the Reform Bill of 1832 (the Representation of the People Act 1832 (2 & 3 Will 4, c 45)).

*Whitelegg v Richards* 2 B & C 45 and *Henly v Lyme Corpn* 5 Bing 91 undoubtedly lend support to Lord Neill's submission that this tort comprises an action on the case upon proof of special damage; but it seems unlikely

---

**[2003]** **38**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Hirst LJ**

that Abbott and Best CJJ can have intended, sub silentio, to overturn the requirement of malice so clearly laid down in all the earlier cases, and it may well be, in the light of the pleas in those two cases which we have quoted, that this requirement was taken for granted. Thus we accept Mr Stadlen's submission that these cases do not carry the day in favour of Lord Neill so far as the second limb of the tort is concerned. However, so far as the ingredients of malice are concerned, we are unable to accept that these cases restrict them as narrowly as Mr Stadlen submits.

On the contrary, a number of them recognised a wider connotation for malice, in particular the description of the defendant acting "contrary to his own conviction" in *Drewe v Coulton* 1 East 563n and in *Williams v Lewis* Peake Add Cas 157, the references in Abbott CJ's judgment in *Cullen v Morris* 2 Stark 577 to an "improper motive", and Lord Campbell CJ's mention in *Tozer v Child* 7 E & B 377 of "any other corrupt or improper motive." Consequently we consider that Lord Neill was correct in his submission that the concept of malice here is similar to that which figures in the law of defamation, namely where the defendant either did not honestly believe that what he said was true (in the sense that he was either aware that it was not true or indifferent to its truth or falsity) or (even when he positively believes in the truth of what he published) was actuated by some improper or indirect motive: see Lord Diplock's classic judgment in *Horrocks v Lowe* [1975] AC 135, especially at pp 150 and 152.

IX

*Bourgoin SA v Ministry of Agriculture, Fisheries and Food* [1986] QB 716

We have already quoted the salient parts of the judgments of Mann J at first instance and of Oliver LJ in the Court of Appeal. Both sides have subjected the decision to the most minute textual analysis in support of their respective contentions.

Lord Neill rightly stressed that Mann J was most meticulous in his choice of language throughout his judicial career both at first instance and in the Court of Appeal. He was thus unlikely to have made such an elementary slip as to use "foreseeable" if he meant "foreseen", and it was equally improbable that Oliver

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 34 of 260
Pg 114 of 686

LJ would have specifically quoted and approved what Mann J said, without making the correction, when he came to consider the crucial part of Mann J's judgment.

Mr Stadlen on the other hand submitted that this was an isolated and discordant reference to "foreseeable" in a judgment which elsewhere makes it abundantly clear that the only point in issue was whether actual foresight of loss was sufficient. In support of that argument he cited six references from Mann J's judgment which, he contended, show that the only proposition he was approving was the limited one that actual foresight of loss coupled with actual knowledge of illegality is sufficient to establish liability. These comprise references from which we shall quote two which are illustrative of the rest:

> "For the purpose of the preliminary issue the defendant accepted the plaintiffs' allegations that ... the minister knew at the time of revocation that his act would and was calculated to injure the plaintiffs in their businesses": see pp 734-735.

---

[2003] 39
2 AC Three Rivers DC v Bank of England (No 3) (CA) Hirst LJ

> "The wrong described before me is that of an act performed by a public officer with actual knowledge that it is performed without power and is so performed with the known consequence that it would injure the plaintiffs": see p 740.

So far as the Court of Appeal is concerned, Mr Stadlen directed attention to the second paragraph quoted above from Oliver LJ's judgment, and in particular to the words "with knowledge of its consequences."

In our judgment it is very important to bear in mind that no issue arose in *Bourgoin SA v Ministry of Agriculture, Fisheries and Food* as between the two rival concepts, seeing that actual knowledge of the consequences was conceded by the minister. There was no need either for Mann J or for the Court of Appeal to focus any attention on the resolution of the dilemma. Thus in the particular circumstances of the case Mann J's choice of the adjective "foreseeable" was not critical, and indeed there appears to be no reference in the argument to this aspect.

Furthermore, we agree with Mr Stadlen that this was an isolated and discordant reference in a judgment otherwise abounding with references to actual knowledge, as was to be expected in view of the minister's concession. These considerations tend seriously to weaken the force of Lord Neill's argument, which at first sight seemed very powerful.

X

*The Commonwealth cases*

*Northern Territory v Mengel* 69 ALJR 527 was a claim by the owners of two cattle stations whose plans to sell cattle worth approximately $A1m. were frustrated by the action of two inspectors of the Northern Territory Department of Primary Industries and Fisheries, who quarantined the stock notwithstanding the absence of any statutory or other authority. One of several causes of action relied upon by the plaintiff was misfeasance in public office, and the question arose whether, as the plaintiff submitted, it was sufficient to show that the inspectors knew that their actions were beyond their powers, or whether there was an additional requirement.

One central issue in the case was whether the inspectors had actual knowledge of the consequences of their actions, and it was held that they did. Another was whether they had knowledge of the illegality of their actions.

Having cited the *Bourgoin* case [1986] QB 716, the judgment of the plurality (Mason CJ, Dawson, Toohey, Gaudron and McHugh JJ) proceeded, at p 540:

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 35 of 260
Pg 115 of 686

"The cases do not establish that misfeasance in public office is constituted simply by an act of a public officer which he or she knows is beyond power and which results in damage. Nor is that required by policy or by principle. Policy and principle both suggest that liability should be more closely confined. So far as policy is concerned, it is to be borne in mind that, although the tort is the tort of a public officer, he or she is liable personally and, unless there is de facto authority, there will ordinarily only be personal liability. And principle suggests that misfeasance in public office is a counterpart to, and should be confined in the same way as, those torts which impose liability on private individuals

---

**[2003]** **40**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Hirst LJ**

for the intentional infliction of harm. For present purposes, we include in that concept acts which are calculated in the ordinary course to cause harm, as in *Wilkinson v Downton* [1897] 2 QB 57, or which are done with reckless indifference to the harm that is likely to ensue, as is the case where a person, having recklessly ignored the means of ascertaining the existence of a contract, acts in a way that procures its breach. It may be that analogy with the torts which impose liability on private individuals for the intentional infliction of harm would dictate the conclusion that, provided there is damage, liability for misfeasance in public office should rest on intentional infliction of harm, in the sense that that is the actuating motive, or on an act which the public officer knows is beyond power and which is calculated in the ordinary course to cause harm. However, it is sufficient for present purposes to proceed on the basis accepted as sufficient in *Bourgoin*, namely, that liability requires an act which the public officer knows is beyond power and which involves a foreseeable risk of harm."

In a separate judgment Brennan J stated, at p 546:

"I respectfully agree that the mental element is satisfied either by malice (in the sense stated) or by knowledge. That is to say, the mental element is satisfied when the public officer engages in the impugned conduct with the intention of inflicting injury or with knowledge that there is no power to engage in that conduct and that that conduct is calculated to produce injury. These are states of mind which are inconsistent with an honest attempt by a public officer to perform the functions of the office. Another state of mind which is inconsistent with an honest attempt to perform the functions of a public office is reckless indifference as to the availability of power to support the impugned conduct and as to the injury which the impugned conduct is calculated to produce. The state of mind relates to the character of the conduct in which the public officer is engaged--whether it is within power and whether it is calculated (that is, naturally adapted in the circumstances) to produce injury."

This passage is in line with the view of the plurality, and when, later in his judgment Brennan J stated, at p 547, that "causation of damage is relevant; foreseeability of damage is not", he was clearly speaking in the context of negligence rather than misfeasance.

Finally, in another separate judgment, Deane J stated, at p 554:

"In the context of misfeasance in public office, the focus of the requisite element of malice is injury to the plaintiff or injury to some other person through an act which injuriously affects the plaintiff. Such malice will exist if the act was done with an actual intention to cause such injury. The requirement of malice will also be satisfied if the act was done with knowledge of invalidity or lack of power and with knowledge that it would cause or be likely to cause such injury. Finally, malice will exist if the act is done with reckless indifference or deliberate blindness to that invalidity or lack of power and that likely injury. Absent such an intention, such knowledge and such reckless indifference or deliberate blindness, the requirement of malice will not be satisfied."

---

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

This case undoubtedly lends some support to Lord Neill's interpretation, but only to a very limited extent seeing that (as in the *Bourgoin* case [1986] QB 716 itself) there was no debate between the two concepts, which would in any event have been otiose since (as already noted) it was held that the inspectors had actual knowledge of the loss that would be suffered by the plaintiffs.

In *Garrett v Attorney General* [1997] 2 NZLR 332 the New Zealand Court of Appeal (Richardson P, Gault, Henry, Keith and Blanchard JJ) considered a case where the plaintiff's claim was for misfeasance in public office against a police sergeant who was in charge of a police station, on the ground that he had failed to investigate and properly deal with her complaint that she had been raped by a police constable attached to that police station. The court held that the case was bound to fail because there was no evidence whether the sergeant had actual appreciation that his breaches of duty (such as they might have been) were going to lead to the plaintiff suffering harm.

The judgment of the court was delivered by Blanchard J and at the outset of the discussion of the ingredients of the tort he stated, at p 344:

> "Proceedings for the tort of misfeasance in public office, also known as abuse of public office, have never been common. Early in its development an essential ingredient was malice on the part of the defendant: a deliberate and vindictive act by a public official involving a breach of duty and directed towards the plaintiff. This has come to be known as 'targeted malice.' But the tort is no longer so confined. It can also be committed by an official who acts or omits to act in breach of duty knowing about the breach and also knowing harm or loss is thereby likely to be occasioned to the plaintiff. As will appear from the following discussion, 'knowing' in relation to both the breach and its effect on the plaintiff includes acting recklessly, in the sense of believing or suspecting the position and going ahead anyway without ascertaining the position as a reasonable and honest person would do."

There followed extensive discussion of and citation from the judgments in the *Bourgoin* case [1986] QB 716 and *Northern Territory v Mengel* 69 ALJR 527, and of Clarke J's judgment in the present case. He then concluded [1997] 2 NZLR 332, 349-351:

> "We are in respectful agreement with Clarke J that it is insufficient to show foreseeability of damage caused by a knowing breach of duty by a public officer. The plaintiff, in our view, must prove that the official had an actual appreciation of the consequences for the plaintiff, or people in the general position of the plaintiff, of the disregard of duty or that the official was recklessly indifferent to the consequences and can thus be taken to have been content for them to happen as they would. The tort has at is base conscious disregard for the interests of those who will be affected by official decision making. There must be an actual or, in the case of recklessness, presumed intent to transgress the limits of power even though it will follow that a person or persons will be likely to be harmed. The tort is not restricted to a case of deliberately wanting to cause harm to anyone; it also covers a situation in which the official's act or failure to act is not directed at the injured party but the official sees the consequences as

---

> naturally flowing for that person when exercising power. In effect this is no more than saying the tort is an intentional tort. In this context, a person intends to bring about the known consequences of his or her actions or omissions, even if other consequences from the primary motive. *Bourgoin* is an example. The concept of attributing intention by necessary inference in this way is well established. The purpose

behind the imposition of this form of tortious liability is to prevent the deliberate injuring of members of the public by deliberate disregard of official duty. It is unnecessary, to attain this objective, to extend the tort to catch an act which, though known to be wrongful, is done without a realisation of the consequences for the plaintiff ... In our view this intentional tort should not be allowed to overflow its banks and cover the unintentional infliction of damage. In many cases the consequences of breaking the law will be obvious enough to officials, who can then be taken to have intended the damage they caused. But where at the time they do not realise the consequences they will probably not be deterred from exceeding their powers by any enlargement of the tort. As Clarke J observes, they may well think that they are acting in the best interests of those persons whom they actually have in mind. In any modern society administration of central or local government is complex. Overly punitive civil laws may oftentimes deter a commonsense approach by officials to the use of enforcement of rules and regulations. We prefer to err on the side of caution and not to extend the potential liability of officials for causing unforeseen damage. To do so may have a stultifying effect on governance without commensurate benefit to the public ... The common law has long set its face against any general principle that invalid administrative action by itself gives rise to a cause of action in damages by those who have suffered loss as a consequence of that action. There must be something more. And in the case of misfeasance of public office that something more, it seems to us, must be related to the individual who is bringing the action. While the cases have made it clear that the malice need not be targeted there must, as we have said, be a conscious disregard for the interests of those who will be affected by the making of the particular decision."

The tort was again considered in New Zealand by the Court of Appeal (McKay, Barker and Tipping JJ) in *Rawlinson v Rice* [1997] 2 NZLR 651. McKay J stated, at p 658:

"A deliberate act knowingly or recklessly in excess of one's powers is sufficient. As has now been decided in *Garrett v Attorney General* [1997] 2 NZLR 332, it must also be shown that the defendant knew that the conduct would cause damage to the plaintiff, or was recklessly indifferent to the consequences."

Later he stated, at p 661: "What must be established, however, is that this was actually foreseen, or that the defendant was reckless as to possible damage."

Barker J in a judgment which dissented on the result but not on the ingredients of the tort, stated, at p 663:

"*Garrett v Attorney General* [1997] 2 NZLR 332 discusses the ingredients of the tort of misfeasance in public office. The official must exhibit 'malice' in the sense of being recklessly indifferent, both as to the

---

exercise of his jurisdiction and as to the consequences for the person harmed. There must be a *presumed intent* to transgress the limits of power, even though it will follow that the person is likely to be harmed. Mere foreseeability of deleterious consequences is insufficient; the defendant must be reckless as to possible damage."

Tipping J stated, at p 665:

"In the present case the cause of action is misfeasance in public office. That tort has a variety of manifestations. Sometimes actual malice in the form of spite or ill will is alleged but not in this case. It is sufficient for the plaintiff to show that the defendant knew he/she was acting outside the limits of

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 38 of 260
Pg 118 of 686

power or was recklessly indifferent to whether that was the case. The same concepts of knowledge or reckless indifference must be shown in relation to the harm likely to be caused by the defendant's conduct: *Garrett v Attorney General* [1997] 2 NZLR 332. To sustain the tort in the form alleged Mr Rawlinson has to satisfy the following criteria: (1) That he has standing to sue. (2) That the respondent held and was acting in the course of a public office. (3) That the respondent knew, or is presumed to have known (showed reckless indifference to whether) he was acting outside the limits of his power. (4) That the respondent knew, or is presumed to have known (in the same sense as above) that his conduct was likely to harm the plaintiff as an individual or as a member of a class. (5) That the respondents conduct did in fact cause the plaintiff qualifying harm."

Later in his judgment he proceeded, at p 667:

"On the premise that the facts alleged in the pleadings and described in the briefs of evidence are capable of demonstrating the necessary knowledge or reckless indifference in relation to criterion (3), it is for completeness necessary to consider whether the same applies in relation to criterion (4), i e likelihood of harm being suffered by Mr Rawlinson. If the respondent was recklessly indifferent as to his powers it seems to me to be a short step to infer that he was recklessly indifferent to the harm that he might cause Mr Rawlinson by acting outside those powers."

Lord Neill at one stage in his argument tended to suggest that the clear statements in *Garrett v Attorney General* [1997] 2 NZLR 332 were somehow limited or obscured by *Rawlinson v Rice* [1997] 2 NZLR 651, but in our judgment the above quotations show that there was no disharmony, and in any event the court in the latter case was bound by the former.

It is thus apparent that, from the point of view of comity, there is no consistent Commonwealth line of authority to guide us. However, we do find it helpful to bear in mind that in *Garrett's* case, unlike *Northern Territory v Mengel* 69 ALJR 527, the dilemma was the subject of careful (and to our mind very cogent) consideration, which leads us to draw more assistance from the New Zealand case.

XI

*The English cases subsequent to Clarke J's decision*

These cases were strongly relied upon by Mr Stadlen as authoritative endorsements of Clarke J's decision. Lord Neill on the other hand submitted

---

**[2003]** **44**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Hirst LJ**

that in none of them was Clarke J's judgment subjected to any detailed analysis, and that in particular there was no specific consideration of the foreseeable/foreseen issue.

At the appellate level the cases are as follows.

(i) In *Lam v Brennan and Torbay Borough Council* [1997] PIQR P488 the Court of Appeal (Potter and Brooke LJJ) struck out a claim in negligence against a planning authority on the footing that the authority owed the plaintiff no duty of care. In the judgment of the court they also refused an application by the plaintiff for leave to amend to add a plea of misfeasance in public office (which was described as "an ill-considered attempt to create a long-stop"), on the footing that the pleadings disclosed no material to support "what is essentially a tort of malice (albeit malice in the extended sense contemplated in the *Bourgoin* case [1986] QB 716, and further expanded by Clarke J in *Three Rivers District Council v Bank of England* [1996] 3 All ER 558)".

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

(ii) In *R v Chief Constable of the North Wales Police, Ex p AB* [1999] QB 396 the Divisional Court (Lord Bingham of Cornhill CJ and Buxton J) cited Clarke J's judgment as "a most helpful summary" and quoted his first two propositions. Lord Bingham CJ then proceeded, at p 413:

> doq;It is unnecessary to list the other ingredients of this tort, since it cannot be suggested that in the present case the NWP. acted with a deliberate and dishonest intention to abuse their powers and with an intention to injure the applicants or with knowledge that they had no power to disclose information to the site owner. All the evidence shows that they acted in a bona fide belief that disclosure was necessary, to the extent made, in the public interest."

(iii) In *Barnard v Restormel Borough Council* [1998] 3 PLR 27 the Court of Appeal (Buxton LJ and Sir John Knox) struck out, inter alia, a claim for misfeasance against the defendant borough council; Buxton LJ, giving the leading judgment with which Sir John Knox agreed, referred to the "detailed and thorough judgment" of Clarke J, which, he held, accurately summarised the elements of the tort as laid down in the *Bourgoin* case [1986] QB 716. Buxton LJ then quoted with approval Clarke J's first two propositions. Later, he described bad faith or dishonesty as the "operative requirement" as laid down both by Clarke J and by the *Bourgoin* case.

(iv) In *Ealing London Borough Council v Metha* (unreported) 24 April 1997; Court of Appeal (Civil Division) Transcript No 1449 of 1997 (Beldam LJ and Bennett J) there is a reference to the present case as being "distinguished by an erudite judgment by Clarke J."

There are also two decisions at first instance, both of Sir Richard Scott V-C, where Clarke J's judgment was considered. In *Elliott v Chief Constable of Wiltshire* The Times, 5 December 1996 the Vice-Chancellor refused to strike out a claim for misfeasance in public office and, having cited *Calveley v Chief Constable of the Merseyside Police* [1989] AC 1228, he commented that "the boundaries of this tort have not been and perhaps should not be precisely defined". He then proceeded to cite in detail both *Northern Territory v Mengel* 69 ALJR 527 and Clarke J's judgment, which he said provided the measure of the ingredients of the tort against which the plaintiff's pleading should be assessed. In *Bennett v Comr of Police of the*

---

*Metropolis* 1998 10 Admin LR 245; The Times, 24 October 1997 Sir Richard Scott V-C upheld a striking-out application, again applying *Mengel's* case and Clarke J's judgment as "two ... recent cases which have illuminated the ingredients of the tort".

We should add that we have left out of account two other misfeasance cases cited by Mr Stadlen, where the Court of Appeal refused leave to appeal, since they do not in our judgment carry the matter any further.

We accept Lord Neill's submission that none of these subsequent cases is conclusive in Mr Stadlen's favour; none the less we do consider that they, like *Garrett v Attorney General* [1997] 2 NZLR 332, lend very significant support to Mr Stadlen's interpretation which, for the reasons we have already given, does not subject the judgments in the *Bourgoin* case [1986] QB 716 to undue strain.

In the final analysis, we find it helpful to go back to the fundamental concepts of the tort of misfeasance, and to bear in mind that the second limb is an alternative to the targeted malice comprised in the first limb. The two limbs should be broadly in harmony, as they will be if the test is actual foresight; a test of mere foreseeability, on the other hand, would be a somewhat jejune alternative, introducing considerations more appropriate to negligence.

For all these reasons we would uphold Clarke J's decision that actual foresight is the correct test.

XII

*No duty of care--the two Privy Council cases*

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 40 of 260
Pg 120 of 686

Before proceeding to the remaining issues which arise under the general heading of misfeasance in public office, it is convenient to consider these two Privy Council cases, which have some bearing on those issues.

In *Yuen Kun Yeu v Attorney General of Hong Kong* [1988] AC 175 the plaintiffs, who had lost money they had deposited with a deposit-taking company registered by the Comr of Deposit-Taking Companies in Hong Kong, claimed damages for negligence alleging that they had made deposits in reliance upon the company's registration and that the commissioner knew or ought to have known, had he taken reasonable care, that the company's affairs were being conducted fraudulently, speculatively and to the detriment of its depositors. One of the allegations in the statement of claim, which of course was assumed to be true for the purpose of the striking-out application, was that information about the company giving rise to the suspicion that its business was being conducted fraudulently was available to the commissioner but not to members of the public.

Giving the judgment of the Board (Lord Keith of Kinkel, Lord Templeman, Lord Griffiths, Lord Oliver of Aylmerton and Sir Robert Megarry) Lord Keith stated, at p 190:

> "The issues in the appeal raise important issues of principle, having far-reaching implications as regards the potential liability in negligence of a wide variety of regulatory agencies carried on under the aegis of central or local government and also to some extent by non-governmental bodies. Such agencies are in modern times becoming an increasingly familiar feature of the financial, commercial, industrial and social scene. The

---

**[2003]** **46**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Hirst LJ**

> foremost question of principle is whether in the present case the commissioner owed to members of the public who might be minded to deposit their money with deposit-taking companies in Hong Kong a duty, in the discharge of his supervisory powers under the Ordinance, to exercise reasonable care to see that such members of the public did not suffer loss through the affairs of such companies being carried on by their managers in fraudulent or improvident fashion. That question is one of law, which is capable of being answered upon the averments assumed to be true, contained in the plaintiffs' pleadings. If it is answered in the negative, the plaintiffs have no reasonable cause of action, and their statement of claim was rightly struck out."

Lord Keith went on to consider the leading authorities, including *Anns v Merton London Borough Council* [1978] AC 728, *Hedley Byrne & Co Ltd v Heller & Partners Ltd* [1964] AC 465, *Dorset Yacht Co Ltd v Home Office* [1970] AC 1004 and *Hill v Chief Constable of West Yorkshire* [1988] QB 60 (the Court of Appeal decision subsequently upheld in the House of Lords [1989] AC 53). Lord Keith then proceeded, at pp 194-196:

> "The primary and all-important matter for consideration, then, is whether in all the circumstances of this case there existed between the commissioner and would-be depositors with the company such close and direct relations as to place the commissioner in the exercise of his functions under the Ordinance, under a duty of care towards would-be depositors. Among the circumstances of the case to be taken into account is that one of the purposes of the Ordinance (though not the only one) was to make provision for the protection of persons who deposit money. The restrictions and obligations placed on registered deposit-taking companies, fenced by criminal sanctions, in themselves went a long way to secure that object. But the discretion given to the commissioner to register or deregister such companies, so as effectively to confer or remove the right to do business, was also an important part of the protection afforded. No doubt it was reasonably foreseeable by the commissioner that if an uncreditworthy company were placed on or allowed to remain on the register, persons who might in the

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 41 of 260
Pg 121 of 686

future deposit money with it would be at risk of losing that money. But mere foreseeability of harm does not create a duty, and future would-be depositors cannot be regarded as the only persons whom the commissioner should properly have in contemplation. In considering the question of removal from the register, the immediate and probably disastrous effect on existing depositors would be a very relevant factor. It might be a very delicate choice whether the best course was to deregister a company forthwith or to allow it to continue in business with some hope that, after appropriate measures by the management, its financial position would improve. It must not be overlooked that the power to refuse registration, and to revoke or suspend it, is quasi-judicial in character, as is demonstrated by the right of appeal to the Governor in Council conferred upon companies by section 34 of the Ordinance, and the right to be heard by the commissioner conferred by section 47. The commissioner did not have any power to control the day-to-day management of any company, and such a task would require immense resources. His power was limited to putting it out of business or allowing it to continue. No doubt

---

**[2003]** **47**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Hirst LJ**

recognition by the company that the commissioner had power to put it out of business would be a powerful incentive impelling the company to carry on its affairs in a responsible manner, but if those in charge were determined upon fraud it is doubtful if any supervision could be close enough to prevent it in time to forestall loss to depositors. In these circumstances their Lordships are unable to discern any intention on the part of the legislature that in considering whether to register or deregister a company the commissioner should owe any statutory duty to potential depositors. It would be strange that a common law duty of care should be superimposed upon such a statutory framework.

"On the plaintiffs' case as pleaded the immediate cause of the loss suffered by the plaintiffs in this case was the conduct of the managers of the company in carrying on its business fraudulently, improvidently and in breach of many of the provisions of the Ordinance. Another cause was the action of the plaintiffs in depositing their money with a company which in the event turned out to be uncreditworthy. Considerable information about the company was available from the documents required by the Ordinance to be open to public inspection, and no doubt advice could have been readily obtained from investment advisers in Hong Kong. Before the plaintiffs deposited their money with the company there was no relationship of any kind between them and the commissioner. They were simply a few among the many inhabitants of Hong Kong who might choose to deposit their money with that or any other deposit-taking company. The class to whom the commissioner's duty is alleged to have been owed must include all such inhabitants. It is true, however, that according to the plaintiffs' averments there had been available to him information about the company's affairs which was not available to the public and which raised serious doubts, to say the least of it, about the company's stability. That raises the question whether there existed between the commissioner and the company and its managers a special relationship of the nature described by Dixon J in *Smith v Leurs* (1945) 70 CLR 256, 261-262, and such as was held to exist between the prison officers and the Borstal boys in *Dorset Yacht Co Ltd v Home Office* [1970] AC 1004, so as to give rise to a duty on the commissioner to take reasonable care to prevent the company and its managers from causing financial loss to persons who might subsequently deposit money with it.

"In contradistinction to the position in the *Dorset Yacht* case, the commissioner had no power to control the day-to-day activities of those who caused the loss and damage. As has been mentioned, the commissioner had power only to stop the company carrying on business, and the decision whether or not to do so was clearly well within the discretionary sphere of his functions. In their Lordships' opinion the circumstance that the commissioner had, on the plaintiffs' averments, cogent reason to suspect that the company's business was being carried on fraudulently and improvidently did not create a special relationship between the commissioner and the company of the nature described in the authorities. They are also of opinion that no special relationship existed between the commissioner and those unascertained members of the public who might in future become exposed to risk of financial

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

> loss through depositing money with the company. Accordingly their Lordships do not consider that the commissioner owed to the plaintiffs

---

> any duty of care on the principle which formed the ratio of the *Dorset Yacht* case. To hark back to Lord Atkin's words in *Donoghue v Stevenson* [1932] AC 562, 581, there were not such close and direct relations between the commissioner and the plaintiffs as to give rise to the duty of care desiderated."

Lord Keith concluded his judgment, at p 198:

> "The final matter for consideration is the argument for the Attorney General of Hong Kong that it would be contrary to public policy to admit the plaintiffs' claim, upon grounds similar to those indicated in relation to police forces by Glidewell LJ in *Hill v Chief Constable of West Yorkshire* [1988] QB 60, 75. It was maintained that if the commissioner were to be held to owe actual or potential depositors a duty of care in negligence, there would be reason to apprehend that the prospect of claims would have a seriously inhibiting effect on the work of his department. A sound judgment would be less likely to be exercised if the commissioner were to be constantly looking over his shoulder at the prospect of claims against him, and his activities would be likely to be conducted in a detrimentally defensive frame of mind. In the result, the effectiveness of his functions would be at risk of diminution. Consciousness of potential liability could lead to distortions of judgment. In addition, the principles leading to his liability would surely be equally applicable to a wide range of regulatory agencies, not only in the financial field, but also, for example, to the factory inspectorate and social workers, to name only a few. If such liability were to be desirable upon any policy grounds, it would be much better that the liability were to be introduced by the legislature, which is better suited than the judiciary to weigh up competing policy considerations. Their Lordships are of opinion that there is much force in these arguments, but as they are satisfied that the plaintiffs' statement of claim does not disclose a cause of action against the commissioner in negligence they prefer to rest their decision upon that rather than upon the public policy argument."

In *Davis v Radcliffe* [1990] 1 WLR 821 a similar claim was brought against the Treasurer of the Isle of Man and members of the Finance Board who were the regulatory authority in the Isle of Man. The judgment of the Board (Lord Keith of Kinkel, Lord Brandon of Oakbrook, Lord Templeman, Lord Goff of Chieveley and Lord Lowry) was delivered by Lord Goff, who stated, at p 826, that the case was for all practical purposes indistinguishable from the *Yuen* case. Lord Goff then proceeded, at pp 826-827:

> "It is against this background of authority that their Lordships approach the present case, in which it is submitted that, on the facts pleaded, the Treasurer and the members of the Finance Board owed a duty of care to persons in the position of the plaintiffs, breach of which may render them liable in damages to such persons in respect of loss suffered by them through having deposited money with a bank such as SIB which has become insolvent. There are, in the opinion of their Lordships, certain considerations, each of which militates against the imposition of any such duty, and which taken together point to the inevitable conclusion that no such duty should be imposed.

---

"First, it is evident that the functions of the Finance Board, and indeed of the Treasurer, as established by the Finance Board Act 1961, are typical functions of modern government, to be exercised in the general public interest. These functions are, as already indicated, of the broadest kind, for which parallels can doubtless be drawn from other jurisdictions. The functions vested in the Treasurer, and in the Finance Board, by the Banking Act 1975 must be seen as forming part of those broader functions. No doubt, in establishing a system of licensing for banks, regard was being had (though this is not expressly stated in the long title of the Act) to the fact that the existence of such a licensing system should provide an added degree of security for those dealing with banks carrying on business in the Isle of Man, including in particular those who deposit money with such banks. But it must have been the statutory intention that the licensing system should be operated in the interests of the public as a whole; and when those charged with its operation are faced with making decisions with regard, for example, to refusing to renew licences or to revoking licences, such decisions can well involve the exercise of judgment of a delicate nature affecting the whole future of the relevant bank in the Isle of Man, and the impact of any consequent cessation of the bank's business in the Isle of Man, not merely upon the customers and creditors of the bank, but indeed upon the future of financial services in the island. In circumstances such as these, competing considerations have to be carefully weighed and balanced in the public interest, and, in some circumstances, as Mr Kentridge observed, it may for example be more in the public interest to attempt to nurse an ailing bank back to health than to hasten its collapse. The making of decisions such as these is a characteristic task of modern regulatory agencies; and the very nature of the task, with its emphasis on the broader public interest, is one which militates strongly against the imposition of a duty of care being imposed upon such an agency in favour of any particular section of the public.

"A further consideration which militates against the imposition of a duty of care upon persons in the position of the defendants in the present case is that it is being sought to make them liable in negligence for damage caused to the plaintiffs by the default of a third party, SIB. In the case of physical damage caused by the deliberate wrongdoing of a third party, such liability will only be imposed in limited classes of case, a matter which was recently explored in the speeches of the House of Lords in *Smith v Littlewoods Organisation Ltd* [1987] AC 241. Here it is suggested that such liability should be imposed for purely financial loss flowing from the negligence of a third party. It must be rare that any such liability will be imposed; but in any event it is difficult to see that, in the present case, the defendants possessed sufficient control over the management of SIB to warrant the imposition of any such liability: cf *Smith v Leurs* (1945) 70 CLR 256, 261-262, per Dixon J. Certainly, *Anns v Merton London Borough Council* [1978] AC 728 does not provide an instance of the imposition of such liability, since the damage in that case was treated as falling within the description of physical damage. Yet another consideration militating against the existence of the alleged duty of care in the present case is that it is said to be owed to an unlimited class of persons including not only the depositors of money with SIB but also those considering whether to deposit their money with SIB. Their

---

Lordships wish to add that, in the case of the members of the board, it would be most remarkable if they should be under any such duty of care, bearing in mind that not only do they constitute a Board of Tynwald, responsible to Tynwald, but also that the membership of the board changes from time to time (as indeed it did during the relevant period in the present case) and that different views may be expressed by different members of the board present at any particular meeting."

These considerations, which also underlay the decision in *Yuen Kun Yeu v Attorney General of Hong Kong* [1988] AC 175, have a significant bearing on the remaining matters which we are about to consider.

XIII

*Dishonesty, knowledge and recklessness*

It is common ground that dishonesty is an essential ingredient of the tort of misfeasance in public office. We need not repeat or multiply citations to that effect. The requirement for knowledge (of some sort) of illegality and for knowledge (or foresight) of consequent injury is a theme of all the main authorities from and after *Bourgoin SA v Ministry of Agriculture, Fisheries and Food* [1986] QB 716 (see Mann J, at p 740, and Oliver LJ, at p 777). Recklessness was not referred to in the *Bourgoin* case (which is not surprising, in view of the minister's concessions of actual knowledge) but it is referred to in the recent Commonwealth cases.

It may be helpful to give a brief summary of those references.

(1) In *Northern Territory v Mengel*, 69 ALJR 527 (in which actual foresight of loss was found as a fact, and awareness of illegality was the crucial issue) all the members of the High Court favoured reckless indifference on the part of the defendant to the illegality of his conduct as meeting the requirement (the plurality, at pp 540-541, Brennan J, at pp 546-548, and Deane J, at p 554) while rejecting mere "constructive knowledge".

(2) In *Garrett v Attorney General* [1997] 2 NZLR 332 (in which the main concern was with foresight of loss) the Court of Appeal of New Zealand discussed *Mengel's* case (without giving unqualified support to it) but, at p 349, approved actual foresight or reckless indifference to consequences as the appropriate test.

(3) In *Rawlinson v Rice* [1997] 2 NZLR 651 the Court of Appeal of New Zealand expressly and unanimously (though in three separate judgments) approved reckless indifference as an appropriate test both as to illegality and as to consequences (McKay J, at pp 658 and 661, Barber J, at p 663, and Tipping J, at p 665).

The interrelationship between dishonesty, knowledge (or foresight) and recklessness was carefully considered by the judge in his first judgment [1996] 3 All ER 558, 579-583. Both sides have criticised different aspects of his reasoning and conclusions. We shall approach this part of his judgment by referring to some well known cases in two quite different areas of the law (constructive trusteeship and the criminal law relating to offences against the person and against property) which counsel's indefatigable industry placed before Clarke J and again before this court.

We begin with the constructive trust cases. A defendant may be fixed with liability as a constructive trustee under two heads, often labelled as

---

"knowing receipt" and "knowing assistance". However the implicit reference in these labels to knowledge immediately leads into difficulties. Whatever may be the position on knowing receipt (the state of authority was reviewed by Vinelott J in *Eagle Trust plc v SBC Securities Ltd* [1993] 1 WLR 484, 489 et seq), a defendant cannot be made liable under the head of knowing assistance unless he has acted dishonestly.

In *Baden v SociŽtŽ GŽnŽrale pour Favoriser le DŽveloppement du Commerce et de l'Industrie en France SA (Note)* [1993] 1 WLR 509 Peter Gibson J was concerned with a very complicated sequence of events arising out of the OIS investment scandal in the 1970s. Those events might have produced claims under either head of constructive trusteeship but in the event only knowing assistance was pursued. Peter Gibson J mentioned, at pp 575-576, five different mental states (formulated not by himself but by counsel) which might be relevant in establishing constructive trusteeship under the knowing assistance head. That formulation was partly based on authority, and indeed the same sort of language was used over a century ago by Lord Blackburn in *Jones v Gordon* (1877) 2 App Cas 616, 629 in his well known comments on the difference between good faith and bad faith in the holder of a bill.

However this fivefold classification has attracted criticism, largely for its over-elaboration. In *Agip (Africa) Ltd v Jackson* [1990] Ch 265, another knowing assistance case, Millett J referred to the

classification and adopted it, but at the same time warned against over-refinement. He said, at p 293: "The true distinction is between honesty and dishonesty. It is essentially a jury question."

In a recent knowing assistance case heard by the Privy Council, *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378, Lord Nicholls of Birkenhead, delivering the opinion of the Board, went further and in defining the essentials of liability stated, at p 392: "Knowingly is better avoided as a defining ingredient of the principle, and in the context of this principle the *Baden* [1993] 1 WLR 509 scale of knowledge is best forgotten." The reason for this admonition appears a little earlier in the opinion. At the end of important sections on "Dishonesty" and "Taking risks" (to which we will refer again) Lord Nicholls stated, at p 391, that to ask whether a defendant had dishonestly assisted in what was later held to be a breach of trust was a meaningful question:

> "This is not always so if the question is posed in terms of 'knowingly' assisted. Framing the question in the latter form all too often leads one into tortuous convolutions about the 'sort' of knowledge required, when the truth is that 'knowingly' is inapt as a criterion when applied to the gradually darkening spectrum where the differences are of degree and not kind."

These were all cases dealing with the law of fiduciary obligations. But it has not been suggested to us that their discussion of dishonesty, and of the states of mind that amount to dishonesty, are not relevant to the determination of this appeal. The concept of dishonesty is indeed so basic that it must have the same meaning in every branch of the law.

We were also referred, as Clarke J was, to a number of criminal cases in which recklessness was discussed, either as an express ingredient of a statutory offence or as imported by the word "maliciously" used in a statute.

---

In chronological order the principal cases were the following: (1) *R v Cunningham* [1957] 2 QB 396, the case of the man who stole a gas meter from an empty house, with the result that the occupant of the neighbouring house inhaled escaping gas; the thief was charged with maliciously administering a noxious substance contrary to section 23 of the Offences against the Person Act 1861 (24 & 25 Vict c 100); (2) *R v Lawrence (Stephen)* [1982] AC 510, a prosecution for the now-repealed offence of causing death by reckless driving; (3) *R v Caldwell* [1982] AC 341, the case of the resentful ex-employee who, while drunk, set fire to a hotel where residents were sleeping and was prosecuted under section 1(2) of the Criminal Damage Act 1971, an offence which includes "being reckless as to whether the life of another would be thereby endangered"; and (4) *R v Parmenter; R v Savage* [1992] 1 AC 699, the case of the woman who deliberately threw beer in her rival's face, but let go of the glass as well and caused her injury.

The judge did not find it necessary to discuss the criminal cases at length. Nor do we. They were all concerned with statutory offences of differing antiquity and provenance. The general conclusion which we derive from them is that to draw any sharp distinction between "subjective" and "objective" tests may not be helpful; that the more obviously dangerous the defendant's activity is (such as driving at not less than 60 m p h in a built-up area) the more difficult it will be for him to avoid the jury finding that he was at least reckless as to the consequences; and that, by contrast, the greater the gap (in space or time, or both) between the defendant's act or omission and the injurious consequences, the more evidence will be required to establish that the defendant actually foresaw the consequences or was recklessly indifferent to them to a degree that amounts to dishonesty.

The judge [1996] 3 All ER 558, 579, after a very full discussion of the *Bourgoin* case [1986] QB 716 and *Northern Territory v Mengel*, 69 ALJR 527 turned to consider the difference between knowledge, turning a blind eye and recklessness. He found helpful, as we do, some observations on the meaning of "privity of the assured" (in section 39(5) of the Marine Insurance Act 1906) made by Lord Denning MR and Geoffrey Lane LJ in *Compania Maritima San Basilio SA v Oceanus Mutual Underwriting Association*

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 46 of 260
Pg 126 of 686

*(Bermuda) Ltd* [1977] QB 49, 68, 76-77 in which "privity" was held to connote knowledge, belief or deliberately turning a blind eye, but not mere negligence.

The judge then turned to the constructive trust cases. He cited the fivefold classification in *Baden's* case [1993] 1 WLR 509 and noted the observations on it made by Millett J in the *Agip* case [1990] Ch 265 and Lord Nicholls in the *Royal Brunei* case [1995] 2 AC 378. Nevertheless he found the classification of considerable value in relation to misfeasance because (as he stated [1996] 3 All ER 558, 581) "the cases show that knowledge is material". He then went to refer briefly to the criminal cases and concluded that recklessness (in the "subjective" sense), as well as actual knowledge, was a sufficient basis for establishing misfeasance. He said, at pp 581-582:

> "The reason why recklessness was regarded as sufficient by all members of the High Court in *Mengel*, 69 ALJR 527 is perhaps most clearly seen in the judgment of Brennan J It is that misfeasance consists in the purported exercise of a power otherwise than in an honest attempt to

[2003]
2 AC Three Rivers DC v Bank of England (No 3) (CA) 53
Hirst LJ

> perform the relevant duty. It is that lack of honesty which makes the act an abuse of power. In my judgment a public officer who falls within any of the categories (i) [actual knowledge], (ii) [wilfully shutting one's eyes to the obvious]) and (iii) [wilfully and recklessly failing to make such inquiries as an honest and reasonable man would make] is guilty of an abuse of power of the kind that the court had in mind in *Mengel*. Anything less than knowledge or recklessness of that kind would not in my judgment be consistent with the essence of the tort, namely the deliberate and dishonest abuse of power."

That statement of principle has been very largely approved by the Court of Appeal of New Zealand in *Garrett v Attorney General* [1997] 2 NZLR 332 and *Rawlinson v Rice* [1997] 2 NZLR 651, and we too think that it is a correct statement of law. We would however add some comments and qualifications.

First, in the passage just cited from the judgment of Clarke J he was right to emphasise the central importance of dishonesty in the ingredients of the tort. The same emphasis appears in the first point of the judge's five-point summary [1996] 3 All ER 558, 582, and in the first point of his very similar six-point summary, at pp 632-633. It is important to bear in mind that this first point informs and permeates the other points.

Secondly (and following on from the first point), we think that the judge might have paid rather more attention to the observations in the *Royal Brunei* case [1995] 2 AC 378 about moving on from the *Baden* [1993] 1 WLR 509 test. The classification is over-elaborate (and its point (iii) in effect defines recklessness in a circular manner). Dishonesty and knowledge (of some sort) are rather like the chicken and the egg, but Lord Nicholls's reference to a "gradually darkening spectrum" explains the difficulties inherent in the "sort" of knowledge required.

Thirdly, whether a defendant has acted honestly or dishonestly is, as Millett J said, a jury question. Nevertheless some guidance may be needed, and such guidance has been given by Lord Nicholls in the *Royal Brunei* case [1995] 2 AC 378. All the observations in the opinion, at pp 389-391, merit careful study. We call attention in particular to Lord Nicholls's emphasis, at p 391, on assessing a person's conduct in the context of the surrounding circumstances:

> "when called upon to decide whether a person was acting honestly, a court will look at all the circumstances known to the third party at the time. The court will also have regard to personal attributes of the third party, such as his experience and intelligence, and the reason why he acted as he did."

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 47 of 260
Pg 127 of 686

Fourthly (and following on from the third point), we note that the test of state of mind which the judge prescribed for awareness of illegality (point (3) in each summary) is for practical purposes identical with that which he prescribed for awareness of consequences (point (4) in each summary). We agree that the authorities establish that actual knowledge or reckless indifference is (in shorthand) the test for the dishonest state of mind on each point. But in every case it will be necessary to look carefully at the facts in order to apply the test. Suppose that A, a civil servant, accepts a bribe from B for causing either his (B's) or some other person's (C's) name and address

---

[2003] 54
2 AC Three Rivers DC v Bank of England (No 3) (CA) Hirst LJ

to be improperly deleted from, or added to, an official database. The consequences of such improper action might range from B obtaining some grant or subsidy to which he was not entitled, to some third party, C, being harassed by official demands which ought not to have been made. A may be either a young and inexperienced clerk, or an experienced officer in a responsible managerial position. In either case A would be hard put to contend that taking a bribe was not dishonest (and that would, of course, give rise to criminal liability). But whether A knew of, or was recklessly indifferent to, injury to C so as to incur civil liability to C would depend on all circumstances. That would be so whether the claim was against A personally or was against the government department where A worked.

Lord Neill submitted, basing himself on what Lord Nicholls said in the *Royal Brunei* case, at p 389 ("acting dishonestly ... means simply not acting as an honest person would in the circumstances"), that any knowing departure from the Bank's statutory obligations as a regulator is in the circumstances sufficient to constitute dishonesty. In the context of supervision of banks and deposit-takers it is very likely--indeed almost inevitable--that, if there is a question mark over an institution which had already been authorised, the Bank will find itself in a dilemma as between the interests of current and future depositors, as was pointed out in the clearest terms by Lord Keith in *Yuen Kun Yeu v Attorney General of Hong Kong* [1988] AC 175, 195 and by Lord Goff in *Davis v Radcliffe* [1990] 1 WLR 821, 827. It must have been the statutory intention that the regulatory system should be operated in the interests of the public as a whole, and regulatory decisions will generally involve the exercise of delicate judgments. Lord Neill faced up squarely to this, and submitted that any knowing departure from statutory obligations imports dishonesty, regardless of any particular circumstances which give rise to a dilemma.

We cannot accept that submission. We would agree that the Bank's statutory obligations as regulator were obligations of a grave nature. Moreover they were not (except perhaps as to "principal place of business") obligations that were expressed in obscure or complicated language, or hedged about with very lengthy rules and regulations. Nevertheless we consider that the honesty or dishonesty of any breach of a statutory obligation (where the person in breach is conscious of the breach, or suspects it, or chooses not to inquire into it) must depend on all the circumstances. We agree with what was said by Sir Louis Blom-Cooper QC in *R v Newham London Borough Council, Ex p Watkins* (1994) 26 HLR 434, 451:

> "There is always a spectrum of possibilities in which to the place the particular non-compliance, along a continuum from the trivial default, which can properly be overlooked, to the flagrant defiance of a statutory obligation, which cannot be condoned or even countenanced. The latter end of the continuum is tantamount to bad faith."

That is especially so in a case in which the plaintiffs seek to make the Bank liable, not vicariously but as a principal tortfeasor, for acts and omissions on the part of a number of individual officials who held different posts for different parts of the relevant period. Those officials are to be identified (as Lord Neill submitted and Mr Stadlen did not seriously dispute) in accordance with the principles laid down by the Privy Council in *Meridian*

---

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

*Global Funds Management Asia Ltd v Securities Commission* [1995] 2 AC 500.

XIV

*Proximity*

This issue was dealt with largely by written submissions but is nevertheless an issue of considerable importance. This is on any view an exceptional action. The fact that there are more than 6,000 plaintiffs from all over the world is not merely an interesting statistic; it demonstrates the extraordinary range of the duty which the plaintiffs assert, and for breach of which (over a long period) they seek to recover damages. It makes the plaintiffs' claim different from almost every successful (or potentially successful) claim for misfeasance in public office to which we have been referred. The only cases which are even remotely comparable are *Henly v Lyme Corpn* 5 Bing 91 and the *Bourgoin* case [1986] QB 716, to which we will again return.

With the possible exception of those cases, all the successful claims for misfeasance in public office--and indeed most of the unsuccessful claims--were concerned with a direct and proximate relationship between the plaintiff and the public officer responsible for the acts or omissions complained of. The directness and proximity of the relationship was mirrored in the directness and inevitability, or near-inevitability, of the loss suffered. In the old election cases there was often (as appears from the pleadings) a physical confrontation at the hustings, and when the returning officer (or similar officer) prevailed the plaintiff's loss of his vote was the immediate and inevitable consequence. Similarly the court clerk who wrongfully discharged the debtor from custody in *Whitelegg v Richards*, 2 B & C 45 thereby caused immediate economic loss to the plaintiff, the disappointed creditor.

The 20th century authorities include a preponderance of licence cases, reflecting increasing official regulation of economic activity in the interests of health, safety and public order (the earliest licence case seems to be *Bassett v Godschall* (1770) 3 WilsKB 121, which would not be decided in the same way today: see *David v Abdul Cader* [1963] 1 WLR 834). The licensee of a restaurant (*Roncarelli v Duplessis* 16 DLR (2d) 689), an hotel (*Farrington v Thomson and Bridgland* [1959] VR 286) or a cinema (*David v Abdul Cader* [1963] 1 WLR 834) who loses his livelihood through the wrongful withdrawal of his licence would naturally and almost inevitably suffer economic loss. So would the widow whose house was compulsorily purchased for £3,000 in *Smith v East Elloe Rural District Council* [1956] AC 736. So would the cattle station owners in *Northern Territory v Mengel* 69 ALJR 527 who were prevented from selling their cattle by the quarantine invalidly imposed by inspectors who knew that their actions would cause the plaintiffs financial loss. In none of these cases can the public officer have been in any doubt about who would be injured by his act or omission, nor can there have been much room for uncertainty about the consequence of financial loss. In all the cases in which liability was established (or potentially established) there was (as it was put in *Garrett v Attorney General* [1997] 2 NZLR 332, 349) "a conscious disregard for the interests of those who will be affected by official decision making".

---

In *Henly v Lyme Corpn* 5 Bing 91 the class of persons capable of suffering injury to property in consequence of non-repair of the sea defences must have been quite numerous. It appears that the plaintiff owned premises which were "abutting on or near the sea shore". The pleadings contain a more or less ritual averment of the defendants' "contriving and wrongfully and unjustly intending to injure, prejudice

and aggrieve the plaintiff". There seems to have been no discussion of this point either in the course of argument or in the judgments.

In *Bourgoin SA v Ministry of Agriculture, Fisheries and Food* [1986] QB 716 there were seven plaintiffs, one of whom was a trade association of French turkey producers. The licence granted under the Diseases of Animals Act 1950 (and withdrawn by the minister with effect from 1 September 1981) was a general licence. It is likely that it affected, directly or potentially, a large number of French turkey producers, some of them persons of whose identities the minister was unaware. But the scope of the issues to be decided in the *Bourgoin* case was drastically restricted because (as already noted) the minister accepted, for the purpose of the preliminary issue, that he knew that his revocation of the general licence infringed article 30 of the EEC Treaty, and knew that revocation would and was calculated to injure the plaintiffs in their businesses. In making those concessions of actual knowledge the minister was adopting the high-risk strategy of contending that the purpose of inflicting injury (targeted malice) was a necessary ingredient of the tort, so that the preliminary issue (so far as it related to misfeasance) turned on that single point. It seems unlikely that the minister intended to concede, even for the purpose of the preliminary issue, that his revocation of the general licence had been dishonest or in bad faith.

While recognising that there may have been potentially several plaintiffs in *Henly v Lyme Corpn* 5 Bing 91 and the *Bourgoin* case [1986] QB 716, we remain of the view that this case is unprecedented in the breadth of the duty, and the range of possible plaintiffs, asserted against the Bank. The injury of which the plaintiffs complain is grievous, but it arises from a situation utterly different from the proximate relationship between the voter and the returning officer face to face at the hustings, the hotelier ordered to close his business premises, or the cattle station owners forbidden to move their cattle. The claim is more like that which might have been made (on a variation of the facts in *Northern Territory v Mengel* 69 ALJR 527) if inspectors had taken a bribe *not* to exercise their power to halt the movement of cattle which *were* infected with brucellosis, and consumers somewhere in the world had suffered harm as a result of eating meat which ought never to have reached the market.

Counsel on both sides reminded us, more than once, that a claim for misfeasance in public office is concerned with a tort fundamentally different from negligence; therefore, they urged--although with opposite aims in view--the notion of foreseeability has no part to play in misfeasance (except for Lord Neill's fallback position as set out in paragraph (9) of his summarised submissions). We have well in mind that the plaintiffs' claim is not a claim for negligence, and that there may be policy reasons for adopting a different and sterner attitude to deliberate wrongdoing. As Lord Steyn said in *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd* [1997] AC 254, 279:

---

> "It may be said that logical symmetry and a policy of not punishing intentional wrongdoers by civil remedies favour a uniform code. On the other hand, it is a rational and defensible strategy to impose wider liability on an intentional wrongdoer."

That was said in relation to the measure of damages for deceit, liability to the plaintiff having been established. It seems to us much more questionable whether the court should act on the same principle in extending the classes of persons to whom a public officer may be liable for misfeasance.

Furthermore there is at least a narrow line of authority suggesting that the court should identify a duty owed to a particular plaintiff. That was the view taken in *Tampion v Anderson* [1973] VR 715, although in *Northern Territory v Mengel* 69 ALJR 527, 546 Brennan J expressly disagreed. The plurality of the High Court of Australia in *Mengels* case thought that there was "some additional requirement" which might be found in the duty posited in *Tampions* case. The Court of Appeal of New Zealand in *Garrett v Attorney General* [1997] 2 NZLR 332, 346 disapproved *Tampion's* case if it was importing a duty *of care*, but nevertheless observed, at p 351, that "that something more, it seems to us, must be related to the individual who is bringing the action".

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 50 of 260
Pg 130 of 686

These passages suggest to us that the notion of proximity should have a significant part to play in the tort of misfeasance, as it undoubtedly has in the tort of negligence.

XV

*Conclusions*

Trying to stand back and assess the large volume of authorities and submissions placed before us, we see the tort as having developed, like the tort of negligence, by a process which has been partly incremental and partly marked by more abrupt (and often not fully explained) extensions.

In the days when the tort was virtually confined to disputes over voting rights, the simple formula of a dishonest abuse of official power damaging the plaintiff (the would-be voter) was adequate. The dishonesty of the defendant (if proved) lay in his deliberately making an improper exercise of his power, and it did not matter whether the defendant's purpose was to harm the plaintiff, or to favour the plaintiff's rival, or simply to line his own pocket. The requirement to plead malice was more than a ritual incantation, but it covered all these states of mind. The injury to the plaintiff was not physical. In some cases (such as that of the bridgemaster who was entitled to valuable perquisites) the plaintiff suffered economic loss. In other cases he was deprived of a constitutional right (in times before there was universal suffrage).

In the second half of this century (paradoxically, soon after civil actions for misfeasance in public office in connection with elections had been ended by the Representation of the People Act 1949) the tort came to life again in connection with other official powers, especially in areas of official regulation of private economic activity through systems of licensing or similar controls. The simple formula used in the old cases was still apposite in cases where the plaintiff had been deprived of a licence (*David v Abdul Cader* [1963] 1 WLR 834, *Farrington v Thomson and Bridgland* [1959] VR 286, *Roncarelli v Duplessis* 16 DLR (2d) 689, the *Bourgoin* case [1986]

---

**[2003] 58**
**2 AC Three Rivers DC v Bank of England (No 3) (CA) Hirst LJ**

QB 716) or otherwise subjected to official power (*Smith v East Elloe Rural District Council* [1956] AC 736, *Dunlop v Woollahra Municipal Council* [1982] AC 158, *Northern Territory v Mengel* 69 ALJR 527) in circumstances in which consequent economic loss to the plaintiff was for practical purposes both immediate and inevitable.

Lord Diplock's statement in *Dunlop v Woollahra Municipal Council* [1982] AC 158 has been frequently cited in later cases as establishing "malice" and "knowledge" as alternative ingredients of the tort. It should however be noted that it occurs in a short section at the end of the opinion of the Privy Council in an appeal in which the respondents were not called on. The opinion was concerned mainly with the so-called *Beaudesert* principle (see *Beaudesert Shire Council v Smith* (1966) 120 CLR 145) which is no longer regarded as good law. Lord Diplock did not explain exactly what he meant by "malice" or "knowledge".

The *Bourgoin* case [1986] QB 716 stands out as a case of particular importance, as Clarke J recognised. With hindsight it is possible to feel surprise that the defendant minister was ready to make such wide concessions as he did, especially since (i) the revoked licence was a general licence and (ii) the plaintiffs included a French turkey producers' trade association (which presumably represented not only current but also potential future exporters of turkeys from France to the United Kingdom). Moreover it is very questionable whether the minister intended by his concessions to accept (even for the purpose of the preliminary issue) that he had acted dishonestly and in bad faith. None of these points seems to have been explored in the *Bourgoin* case, in which counsel's submissions concentrated, understandably, on the important points of European Community law which arose. So far as the tort of misfeasance was concerned the minister adopted the high-risk strategy of relying solely on the point that injury to French producers was not the *purpose* of revocation of the licence. We consider that Clarke J was right in his

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 51 of 260
Pg 131 of 686

conclusion, after a careful analysis of the *Bourgoin* case, that it is binding authority only for a very limited proposition, that is that the minister's high-risk strategy had failed.

However the *Bourgoin* case has had a profound influence which is reflected in the later cases. *Dunlop v Woollahra Municipal Council* [1982] AC 158 and the *Bourgoin* case together seem to have led to what we regard as a rather rigid distinction between two supposed limbs of the tort (targeted malice and other cases). That is surprising, since neither Mann J nor Oliver LJ could see any sensible distinction between the two cases: see [1986] QB 716, 740, 777. The supposed distinction between the two limbs may have tended to blur the need to establish deliberate and dishonest abuse of power in every case. It may also have led Clarke J into an analysis of the requirements for the second limb which may be (in our respectful view) rather too elaborate as regards the defendant's state of mind, and insufficiently responsive to the relationship between the parties, to be acceptable as a completely general test. But in any event we do not consider that the judge stated the principles in a way that was too favourable to the Bank.

We are indeed in broad agreement with the judge's conclusions on the tort, as set out in the first judgment [1996] 3 All ER 558, 632-633, subject

---

**[2003]** **59**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Hirst LJ**

only to the qualifications and doubts tentatively expressed in the last three sections of this judgment.

It necessarily follows from this conclusion, and from our conclusions (which follow) as to the effect of the Directive of 1977, that we cannot accept Lord Neill's very far-reaching submission that the need to prove a guilty state of mind on the part of an official body is now out of date and unjustifiable, particularly in the light of the jurisprudence of the European Court of Justice. The correctness of the *Bourgoin* case [1986] QB 716 on the issue of European Community law argued in that case was questioned by Lord Goff (without his Lordship expressing a concluded view) in *Kirklees Metropolitan Borough Council v Wickes Building Supplies Ltd* [1993] AC 227, 281-282 and Steyn LJ in *Elguzouli-Daf v Comr of Police of the Metropolis* [1995] QB 335, 347 referred to the English legal system possibly having the capacity for further development under the direct or indirect influence of the European Court of Justice.

But in our view (for reasons which follow) European Union law does not assist the plaintiffs in this case. The development which Lord Neill urges would be a very radical change in the law going far beyond incremental development of the existing tort. It would be inconsistent with section 1(4) of the 1987 Act. It would also be inconsistent with the decisions of this court and with clear expressions of view in the House of Lords. If such a change were to be made otherwise than through the superior authority of EU law, it should be enacted by Parliament and not effected by judicial extension of the common law.

## THE OTHER TWO PRELIMINARY ISSUES

Since the outcome of the two issues would turn significantly on the ultimate findings of fact, we strongly question whether either was appropriate to be decided as a preliminary issue. We shall therefore deal with them very briefly.

## XVI

*Causation of loss*

Clarke J's conclusion was [1996] 3 All ER 558, 629:

> "There is, so far as I know, no authority which has considered this question, but I can see no reason why, if the plaintiffs prove that the Bank knew that any particular act or omission would probably cause loss to a depositor or potential depositor (as a member of the class of depositors or potential depositors), it should not follow that the loss was caused by the act or omission complained of.

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Common sense suggests that in those circumstances there would be a direct and effective causal link between the act or omission and the loss. That would in my opinion be even on the basis (as is the case on the facts) that another cause of the loss was fraud on the part of the managers ... it is not sufficient to say that no duty of care was owed to the plaintiffs or that it makes no difference to the question of causation whether the Bank acted honestly or dishonestly."

However, since he concluded that the plaintiffs' statement of claim as it then stood had not put forward the necessary allegation as to knowledge of loss, he answered this question in the Bank's favour, adding that, had the

---

ingredients of the tort been as the plaintiffs submitted (i e, reasonably foreseeable loss), there would have been considerable force in the Bank's submission.

The Bank's submission was that it was well established that a defendant should not be responsible in law for the deliberate wrongdoing of others, and that this applied particularly in the present case because: (i) the Bank did not have control over the operations of BCCI; (ii) the Bank owed no duty to the plaintiffs to guard against the fraud of the operators of BCCI SA and so had not assumed any responsibility for its acts; and (iii) the cause of any loss to the plaintiffs was BCCI SA's fraud, not any breach of duty on the part of the Bank.

The locus classicus on causation in the present context is to be found in the well known judgment of Lord Sumner in *Weld-Blundell v Stephens* [1920] AC 956, 986:

"In general ... even though A is in fault, he is not responsible for injury to C which B, as a stranger to him, deliberately chooses to do. Though A may have given the occasion for B's mischievous activity, B then becomes a new and independent cause ... he insulates A from C."

This was explained by Lord Goff of Chieveley in *Smith v Littlewoods Organisation Ltd* [1987] AC 241, 272:

"This dictum may be read as expressing the general idea that the voluntary act of another independent of the defender's fault, is regarded as a novus actus interveniens which, to use the old metaphor, 'breaks the chain of causation'. But it also expresses a general perception that we ought not to be held responsible in law for the deliberate wrongdoing of others. Of course, if a duty of care is imposed to guard against deliberate wrongdoing by others, it can hardly be said that the harmful effects of such wrongdoing are not caused by such breach of duty. We are therefore thrown back to the duty of care."

There are of course exceptions to this general rule, namely where the defendant has assumed the responsibility for the act of a third party (e g *Haynes v Harwood* [1935] 1 KB 146), or where the defendant is deemed to have assumed responsibility for such acts, for example where he has control over the third party whose acts directly caused the plaintiff's loss (e g *Dorset Yacht Co Ltd v Home Office* [1970] AC 1004).

The nub of Mr Stadlen's submission was that the case falls within the general category laid down in *Weld-Blundell v Stephens* [1920] AC 956 and that neither of the exceptions applies. He also points strongly to the passages in *Yuen Kun Yeu v Attorney General of Hong Kong* [1988] AC 175 and *Davis v Radcliffe* [1990] 1 WLR 821, quoted above, where the Privy Council dealt with causation in the regulatory context. These in our judgment are all very powerful submissions, but it must be borne in mind that all the authorities just referred to were negligence cases in which the crucial question was whether the defendant owed to the plaintiff a duty of care.

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 53 of 260
Pg 133 of 686

Here the cause of action is quite different, and, on the hypothesis that the plaintiffs were able to prove facts to satisfy the very heavy burden resting upon them to make good a claim for misfeasance in public office, it does not seem to us beyond the bounds of possibility that the establishment of such

---

[2003] 61
2 AC Three Rivers DC v Bank of England (No 3) (CA) Hirst LJ

facts would also make good the plaintiffs' case on causation. All depends on these findings of fact, and, until they are established, it would in our view be premature to give a preliminary ruling on causation adverse to the plaintiffs.

XVII

*Potential depositors*

The question here is whether the plaintiffs are entitled to sue in the capacity of potential depositors, even though they were unidentifiable at the time of the alleged misfeasance. The judge answered this question in the affirmative, and this is challenged by the Bank.

In support of his argument, Mr Stadlen stressed that this is a claim for economic not physical loss, and he pointed to a number of instances where the courts have emphasised the need for a control mechanism to limit liability in respect of economic loss: e g per Lord Fraser in *Candlewood Navigation Corpn Ltd v Mitsui OSK Lines Ltd* [1986] AC 1, 17.

He then went on to submit that an affirmative answer to the third preliminary issue would come close to exposing regulators to precisely the kind of indeterminate liability which the Privy Council in *Yuen Kun Yeu v Attorney General of Hong Kong* [1988] AC 175 and *Davis v Radcliffe* [1990] 1 WLR 821 considered to be against public policy: the less protection afforded by the inherent requirements of the tort, the greater the need for such protection to be provided by a control mechanism which confines liability at most to members of a class identifiable at the date of the misfeasance.

We consider this also to be a very powerful argument, reflecting as it does some of the points we have already touched on in connection with proximity. But, at the preliminary issue stage, it founders for the same reason as causation, namely that until the facts are found, it would be premature to decide the point conclusively in the Bank's favour.

In reaching our conclusions on these last two preliminary issues, we have very much in mind Lord Wilberforce's words of caution in *Allen v Gulf Oil Refining Ltd* [1981] AC 1001, 1010-1011 quoted by Lord Bridge of Harwich in *Lonrho plc v Fayed* [1992] 1 AC 448, 470:

> "My Lords, I and other of your Lordships have often protested against the procedure of bringing, except in clear and simple cases, points of law for preliminary decision. The procedure indeed exists and is sometimes useful. In other cases, and this is frequently so where they reach this House, they do not serve the cause of justice ... The present is such an example. The fact is that the result of the case must depend upon the impact of detailed and complex findings of fact upon principles of law which are themselves flexible. There are too many variables to admit of a clear-cut solution in advance."

EUROPEAN UNION LAW

XVIII

*Introduction*

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

The parties' written and oral submissions on EU law reveal that there is no agreement even as to what the essential issues are. The Bank says that the plaintiffs' submissions are fundamentally flawed, especially as it is not part

---

of the plaintiffs' case that the Directive of 1977 has been incorrectly transposed into the law of the United Kingdom. The plaintiffs reply that EU law has been developing fast, even since the judge's first judgment delivered on 1 April 1996, and that the Bank is aiming at a target which has moved. In the face of this extensive disagreement it is appropriate to restate some elementary principles of EU law. Elementary though these principles are, their implications are still not fully developed, and it will be necessary to refer to a number of recent decisions of the European Court of Justice ("ECJ") and opinions of Advocates General given since the first judgment.

The primacy of EU law over the national legal systems of member states, amounting to a "new legal order", has been clear at least since the seminal decision of the ECJ in *NV Algemene Transport- en Expeditie Onderneming van Gend & Loos v Nederlandse administratie der belastingen* (Case 26/62) [1963] ECR 1 recognising that an individual may have rights under Community law which he can enforce directly in his national court. However (as Mr Paul Lasok for the Bank has demonstrated in his clear and helpful submissions) that general proposition needs a good deal of qualification and explanation, especially in relation to (i) the source of those rights, (ii) the quality (or content) of the rights and (iii) the type of recognition and enforcement sought in the national court. These points are considered in turn.

The primary sources of obligations and rights under EU law are the EC Treaty and its associated treaties; regulations (of the Council or the Commission); directives (normally issued by the Council to all member states); and decisions. Article 189 of the Treaty provides:

> "In order to carry out their task and in accordance with the provisions of this Treaty, the European Parliament acting jointly with the Council, the Council and the Commission shall make regulations and issue directives, take decisions, make recommendations or deliver opinions. A regulation shall have general application. It shall be binding in its entirety and directly applicable in all member states. A directive shall be binding, as to the result to be achieved, upon each member state to which it is addressed, but shall leave to the national authorities the choice of form and methods. A decision shall be binding in its entirety upon those to whom it is addressed. Recommendations and opinions shall have no binding force."

A directive is typically the means by which the Council requires member states to introduce, within a set period of time, any legislation necessary to give effect to the social or economic policies embodied in the directive. In the United Kingdom primary or secondary legislation (sometimes under section 2 of the European Communities Act 1972) may be required in the fields of (among others) agriculture, consumer protection, customs duties, employment, fisheries and food, health and safety at work, medicine and pharmacy, public health, and trade and industry.

Article 189 states expressly that regulations are directly applicable in all member states. A national law which is in conflict with an EU regulation must therefore be disregarded by the national court: *Amministrazione delle Finanze dello Stato v Simmenthal SpA* (Case 106/77) [1978] ECR 629. The position is the same with obligations created by the Treaty itself, but only if the Treaty provision has direct effect. Familiar provisions of the Treaty

---

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 55 of 260
Pg 135 of 686

which do have direct effect include article 52 (forbidding restrictions on rights of establishment, as in *R v Secretary of State for Transport, Ex p Factortame Ltd (No 4)* (Case C-48/93) [1996] QB 404), article 12 (forbidding any increase in customs duties between member states, as in *NV Algemene Transport- en Expeditie Onderneming van Gend & Loos v Nederlandse administratie der belastingen* (Case 26/62) [1963] ECR 1) and article 30 (forbidding restrictions on imports from other member states, as in *Brasserie du Pcheur SA v Federal Republic of Germany* (Case C-46/93) [1996] QB 404). An example of a provision of the Treaty which does not have direct effect is article 5 (requiring member states to take all appropriate measures to fulfil their obligations under EU law); it does not meet the test of being "clear and unconditional and not contingent on any discretionary implementing measure": see *Hurd v Jones* (Case 44/84) [1986] QB 892, 946, para 47.

The position in relation to the effect of directives was very clearly explained by the ECJ in *Becker v Finanzamt MŸnster-Innenstadt* (Case 8/81) [1982] ECR 53. Mrs Becker was a self-employed credit negotiator. The sixth directive on the harmonisation of value added tax (77/388/EEC) provided for the exemption of credit transactions. The period for the Federal Republic of Germany to comply with the directive (as extended) terminated on 1 January 1979 but it was not implemented in Germany until a year later. Mrs Becker brought proceedings against the MŸnster tax authorities and sought to rely on the directive. On a reference under article 177 of the Treaty the ECJ referred to the third paragraph of article 189 and continued in a passage which is very frequently cited and referred to, at pp 70-71:

> "18. It is clear from that provision that states to which a directive is addressed are under an obligation to achieve a result, which must be fulfilled before the expiry of the period laid down by the directive itself.
>
> "19. It follows that wherever a directive is correctly implemented, its effects extend to individuals through the medium of the implementing measures adopted by the member state concerned (judgment of 6 May 1980 in *Commission of the European Communities v Kingdom of Belgium* (Case 102/79) [1980] ECR 1473).
>
> "20. However, special problems arise where a member state has failed to implement a directive correctly and, more particularly, where the provisions of the directive have not been implemented by the end of the period prescribed for that purpose.
>
> "21. It follows from well-established case law of the court and, most recently, from the judgment of 5 April 1979 in *Pubblico Ministero v Ratti* (Case 148/78) [1979] ECR 1629, that whilst under article 189 regulations are directly applicable and, consequently, by their nature capable of producing direct effects, that does not mean that other categories of measures covered by that article can never produce similar effects.
>
> "22. It would be incompatible with the binding effect which article 189 ascribes to directives to exclude in principle the possibility of the obligations imposed by them being relied on by persons concerned.
>
> "23. Particularly in cases in which the Community authorities have, by means of a directive, placed member states under a duty to adopt a certain course of action, the effectiveness of such a measure would be diminished

---

**[2003]** **64**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Hirst LJ**

> if persons were prevented from relying upon it in proceedings before a court and national courts were prevented from taking it into consideration as an element of Community law.
>
> "24. Consequently, a member state which has not adopted the implementing measures required by the directive within the prescribed period may not plead, as against individuals, its own failure to perform the obligations which the directive entails.

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 56 of 260
Pg 136 of 686

"25. Thus, wherever the provisions of a directive appear, as far as their subject matter is concerned, to be unconditional and sufficiently precise, those provisions may, in the absence of implementing measures adopted within the prescribed period, be relied upon as against any national provision which is incompatible with the directive or in so far as the provisions define rights which individuals are able to assert against the state."

Some further explanation of this principle (and especially its basis in a sort of estoppel) was given by Advocate General Mischo in *Criminal proceedings against Kolpinghuis Nijmegen BV*(Case 80/86) [1987] ECR 3969, 3976-3977, paras 1-9.

Because the principle arises in that way, it permits an individual to obtain a remedy in his national court if (and only if) the person responsible for the breach is an entity which is an emanation of the state, and the other conditions in paragraph 25 of the judgment in *Becker v Finanzamt MŸnster-Innenstadt* (Case 8/81) [1982] ECR 53, 71 ("the *Becker* conditions") are satisfied. EU directives are addressed to member states and it is upon member states that they impose obligations: see the opinion of Advocate General Slynn in *Marshall v Southampton and South West Hampshire Area Health Authority (Teaching)* (Case 152/84) [1986] QB 401, 412-413, followed by the ECJ, at pp 421-422, paras 46-50. That case, and later cases on other English entities, show how widely the concept of emanation of the state has been interpreted, and that no distinction is to be drawn between a state body as employer and the same body in another capacity; see also *Foster v British Gas plc* (Case C-188/89) [1991] 1 QB 405 and *National Union of Teachers v Governing Body of St Mary's Church of England (Aided) Junior School* [1997] ICR 334. In this case it is not in dispute that the Bank of England is an emanation of the state.

Cases in which a directive is enforced in the national court against a state body are commonly referred to as cases of "vertical direct effect," as opposed to the horizontal effect mentioned by Sir Gordon Slynn in the opinion already cited. In *Marshall's* case [1986] QB 401 a female senior dietician was dismissed on attaining the age of 62 in circumstances where a male employee would not have been dismissed. The ECJ (on a reference by the Court of Appeal under article 177) held that her dismissal breached EU law (as embodied in Council Directive (76/207/EEC), the Equal Treatment Directive) and that section 6(4) of the Sex Discrimination Act 1975 (which permitted discrimination in relation to retirement) was inconsistent with the directive and provided no defence in the national court. Where the employer was not a state body, the result was different, as in the case of the female plaintiff who lost her job in similar circumstances in *Duke v Reliance Systems Ltd* [1988] AC 618. The United Kingdom Government had not amended the Sex Discrimination Act 1975 so as to comply with the Equal

---

**[2003]** **65**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Hirst LJ**

Treatment Directive because that directive was not perceived as prohibiting different normal ages of retirement for men and women, and there was no horizontal direct effect between the individual employee and the non-state employer.

The other two qualifications can be noted more briefly, since they have been mentioned in the passage from *Becker's* case [1982] ECR 53, 71, para 25 already cited. The rights must be "unconditional and sufficiently precise". That does not mean that they must be spelt out in exact detail, since a directive does almost by definition leave the choice of form and methods to member states. Mrs Becker succeeded even though the Federal Republic had a measure of discretion over such matters as provisions against abusive tax avoidance. But there must be a basic minimum of clarity and certainty.

As to the type of recognition or enforcement sought in the national court, there is a distinction between relying on a Treaty provision with direct effect, or a regulation, to nullify some incompatible provision of national law (on the one hand) and relying on EU law as giving a right to reparation (in terms of English law, damages) for breach of an obligation under EU law. The distinction is reflected in the alternative formula in *Becker's* case, at p 71, para 25, of a provision of a directive being relied on "as against any

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

national provision which is incompatible with the directive or in so far as the provisions define rights which individuals are able to assert against the state".

In the context of a member state's failure to implement a directive correctly (or at all) state liability may take the form of the estoppel-based liability of an emanation of the state (such as the health authority's liability to Miss Marshall for sex discrimination) or may be the liability of the state itself under the principle in *Francovich v Italian Republic* (Case C-6/90) [1995] ICR 722. *Francovich's* case has recently been followed and applied in *Dillenkofer v Federal Republic of Germany* (Joined Cases C-178, 179 and 188-190/94) [1997] QB 259. *Francovich's* case concerned Italy's failure to implement a directive protecting workers' rights in the event of their employer's insolvency. *Dillenkofer's* case concerned Germany's failure to implement a directive for consumer protection in the field of package holidays. The judgment of the ECJ in *Dillenkofer's* case (given on 11 July 1996, after the judge's first judgment dealing with issues of EU law) set out the principles [1997] QB 259, 291-292:

> "20. The court has held that the principle of state liability for loss and damage caused to individuals as a result of breaches of Community law for which the state can be held responsible is inherent in the system of the Treaty: *Francovich v Italian Republic* (Case C-6/90) [1995] ICR 722, 772, para 35; *Brasserie du Pcheur SA v Federal Republic of Germany; R v Secretary of State for Transport, Ex p Factortame Ltd (No 4)* (Joined Cases C-46/93 and C-48/93) [1996] QB 404, 496, para 31; *R v HM Treasury, Ex p British Telecommunications plc* (Case C-392/93) [1996] QB 615, 654, para 38 and *R v Ministry of Agriculture, Fisheries and Food, Ex p Hedley Lomas (Ireland) Ltd* (Case C-5/94) [1997] QB 139, 160, para 24. Furthermore, the court has held that the conditions under which state liability gives rise to a right to reparation depend on the nature of the breach of Community law giving rise to the loss and

---

> damage: *Francovich* [1995] ICR 722, 772, para 38; *Brasserie du Pcheur* [1996] QB 404, 497, para 38, and *Hedley Lomas* [1997] QB 139, 160, para 24.
>
> "21. In *Brasserie du Pcheur*, at p 499, paras 50 and 51; *British Telecommunications* [1996] QB 615, 655, paras 39 and 40, and *Hedley Lomas*, at p 160, paras 25 and 26, the court, having regard to the circumstances of the case, held that individuals who have suffered damage have a right to reparation where three conditions are met: the rule of law infringed must have been intended to confer rights on individuals, the breach must be sufficiently serious, and there must be a direct causal link between the breach of the obligation resting on the state and the damage sustained by the injured parties.
>
> "22. Moreover, it is clear from the *Francovich* case which, like the present cases, concerned non-transposition of a Directive within the prescribed period, that the full effectiveness of the third paragraph of article 189 of the Treaty requires that there should be a right to reparation where the result prescribed by the Directive entails the grant of rights to individuals, the content of those rights is identifiable on the basis of the provisions of the Directive and a causal link exists between the breach of the states obligation and the loss and damage suffered by the injured parties.
>
> "23. In substance, the conditions laid down in that group of judgments are the same, since the condition that there should be a sufficiently serious breach, although not expressly mentioned in *Francovich*, was nevertheless evident from the circumstances of that case."

The total failure by a member state to implement a directive addressed to it will almost invariably, it seems, be regarded as seriously (that is, manifestly and gravely) in breach. Conversely there may be no actionable breach if a member state has made a venial error in transposing an ambiguous directive (*R v HM Treasury, Ex p British Telecommunications plc* (Case C-392/93) [1996] QB 615) or where the transposition of the directive requires legislative activity in which the member state has a comparatively wide margin of appreciation. But in any case intentional fault or negligence is not an essential precondition

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 58 of 260
Pg 138 of 686

of liability: see the judgment of the ECJ in *R v Secretary of State for Transport, Ex p Factortame Ltd (No 4)* (Case C-48/93) [1996] QB 404, 502-503, paras 75-80. *Brasserie du Pcheur SA v Federal Republic of Germany*; *R v Secretary of State for Transport, Ex p Factortame Ltd (No 4)* (Joined Cases C-46/93 and C-48/93) [1996] QB 404 were concerned, not with failure to implement a directive, but with breaches by national legislative action of member states' obligations under articles 52 and 30 respectively of the Treaty, articles which have long been recognised as having direct effect. They are therefore more readily classified as direct effect cases than true *Francovich*-type cases of state responsibility for failure to implement a directive (though to refer to "true" *Francovich*-type liability begs some questions, and the ECJ's judgment in *Dillenkofer v Federal Republic of Germany* (Joined Cases C-178, 179 and 188-190/94) [1997] QB 259 in the passage already quoted, shows some inclination to assimilate the two heads of the liability; and the breadth of the principles stated in *Francovich's* case [1995] ICR 722 was also emphasised by Lord Goff in *Kirklees Metropolitan Borough Council v*

---

[2003] 67
2 AC Three Rivers DC v Bank of England (No 3) (CA) Hirst LJ

*Wickes Building Supplies Ltd* [1993] AC 227, 281-282, expressing doubt as to whether the *Bourgoin* case [1986] QB 716 was correctly decided on the point of EU law).

Indeed the plaintiffs go so far as to submit that the doctrine of direct effect in the traditional sense is now of limited importance to the question of state liability. They rely on *Dillenkofer's* case [1997] QB 259 and on some general observations of the ECJ in the *Factortame* and *Brasserie du Pcheur* cases [1996] QB 404, 495, paras 20-22, in the context of the right to reparation. They also rely on the decisions of the ECJ in *CIA Security International v Signalson SA* (Case C-194/94) [1996] ECR I-2201 and *Verein fŸr Konsumenteninformation v …sterreichische Kreditversicherungs AG* (Case C-364/96) [1998] ECR I-2949.

Since *Francovich's* case [1995] ICR 722, it has been recognised that an individual may have the right to reparation (in this country, damages) for non-implementation of a directive, even though the *Becker* conditions are not satisfied. State liability to make reparation to an individual for non-implementation of a directive can be seen as subdivided into *Becker*-type liability and *Francovich*-type liability, the practical requirements for which are (as *Dillenkofer's* case [1997] QB 259 shows) closely analogous. In that sense the doctrine of direct effect does not, in this context, have the same paramount importance as it had before *Francovich's* case.

Nevertheless there still appears to be an important distinction (recognised by Schiemann LJ in *National Union of Teachers v Governing Body of St Mary's Church of England (Aided) Junior School* [1997] ICR 334, 338) between cases in which an emanation of the state may be directly liable (or may be deprived of a defence) because of a breach of a directly effective provision of Community law (as in *Marshall's* case [1986] QB 401) and cases in which the state itself is liable (as in *Francovich's* case [1995] ICR 722) for failure to transpose a directive (and so, in effect, to give the wronged individual a right of action and a remedy against some other defendant). The point is well illustrated by the facts of *Francovich's* case. Employees of two insolvent Italian companies were unable to obtain arrears of wages from guarantee institutions because Italy had failed to implement Council Directive (80/987/EEC). The first issue raised by the first question was simple direct effect, on which the ECJ said, at pp 767-768:

> "11. As the court has consistently held, a member state which has not adopted the implementing measures required by a directive within the prescribed period may not, against individuals, plead its own failure to perform the obligations which the directive entails. Thus wherever the provisions of a directive appear, as far as their subject matter is concerned, to be unconditional and sufficiently precise, those provisions may, in the absence of implementing measures adopted within the prescribed period, be relied upon as against any national provision which is incompatible with the directive or in so far as the provisions of the directive define rights which individuals are able to assert against the state: see *Becker v Finanzamt MŸnster-Innenstadt* (Case 8/81) [1982] ECR 53.

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 59 of 260
Pg 139 of 686

"12. It is therefore necessary to see whether the provisions of Directive 80/987 which determine the rights of employees are unconditional and sufficiently precise. There are three points to be considered: the identity

---

**[2003]** **68**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Hirst LJ**

of the persons entitled to the guarantee provided, the content of that guarantee and the identity of the person liable to provide the guarantee. In that regard, the question arises in particular whether a state can be held liable to provide the guarantee on the ground that it did not take the necessary implementing measures within the prescribed period."

The ECJ held that the identity of the persons entitled to the guarantee (in the event of their employer's insolvency) and the content of the guarantee were sufficiently precise and unconditional, but that the identity of the person liable to give the guarantee was not. The guarantor might have been an emanation of the state, but that could not be assumed. The ECJ then went on to the second issue raised by the first question, in an important and much cited passage part of which is set out in the speech of Lord Goff in *Kirklees Metropolitan Borough Council v Wickes Building Supplies Ltd* [1993] AC 227, 281-282. The ECJ's judgment summarises the conditions for state liability for failure to transpose a directive [1995] ICR 722, 772:

"39. Where, as in this case, a member state fails to fulfil its obligation under the third paragraph of article 189 of the Treaty to take all the measures necessary to achieve the result prescribed by a directive, the full effectiveness of that rule of Community law requires that there should be a right to reparation provided that three conditions are fulfilled.

"40. The first of those conditions is that the result prescribed by the directive should entail the grant of rights to individuals. The second condition is that it should be possible to identify the content of those rights on the basis of the provisions of the directive. Finally, the third condition is the existence of a causal link between the breach of the state's obligation and the loss and damage suffered by the injured parties.

"41. Those conditions are sufficient to give rise to a right on the part of individuals to obtain reparation, a right founded directly on Community law."

As already noted, in *Dillenkofer's* case [1997] QB 259, 292, para 23 the ECJ added that the seriousness of the breach, although not expressly mentioned in *Francovich*, was evident from the facts of the case.

One practical implication of the distinction between *Becker*-type liability and *Francovich*-type liability is in the identity of the defendant. The member state and the particular emanation of the member state, although assimilated in the eyes of EU law, are likely to be quite different persons so far as concerns procedure in the national court: see on this point the observations of Lord Goff in *Kirklees Metropolitan Borough Council v Wickes Building Supplies Ltd* [1993] AC 227, 282, and of Lord Keith in *R v Secretary of State for Employment, Ex p Equal Opportunities Commission* [1995] 1 AC 1, 32, identifying the Attorney General as the proper defendant to a *Francovich*-type claim.

The main difference between the parties, as to the basic principles to be applied, is as to whether a directive, once transposed into national law, ceases to be the immediate source of rights enforceable by an individual claimant in his national court (and is supplanted by rights under the national law). Mr Lasok submits that that is a clear and well-established principle relying on *Becker's* case [1982] ECR 53 itself (see p 70, para 19 of the ECJ judgment), *Felicitas Rickmers-Linie KG & Co v*

---

**[2003]** **69**

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

*Finanzamt fŸr Verkehrsteuern, Hamburg* (Case 270/81) [1982] ECR 2771, 2786, para 24, and *Kampelmann v Landschaftsverband Westfalen-Lippe* (Joined Cases C-253/96 to C-258/96) [1997] ECR I-6907, 6939, para 42, which states:

> "Since the date on which [Council Directive (91/533/EEC) on an employer's obligation to inform employees of the conditions applicable to the contract or employment relationship] was transposed, individuals can no longer rely on those provisions unless the national implementing measures are incorrect or inadequate in the light of the Directive."

Against that Lord Neill submits that EU law has been developing in this area, and that a directive can be the immediate source of enforceable rights even if it has been transposed (and correctly transposed) into national law. He relies on *Verein fŸr Konsumenteninformation v ...sterreichische Kreditversicherungs AG* (Case C-364/96) [1998] ECR I-2949 and on *Norbrook Laboratories Ltd v Ministry of Agriculture, Fisheries and Food*(Case C-127/95) [1998] ECR I-1531. He also relies on *Commission of the European Communities v Federal Republic of Germany* (Case C-237/90) [1992] ECR I-5973, 6005 where Advocate General Jacobs said:

> "The Commission is of course right when it says that it is not sufficient simply to incorporate the terms of a directive into national legislation; in addition, member states must ensure that the legislation is applied in practice."

This point is also touched on in the opinion of Advocate General LŽger in *R v Ministry of Agriculture, Fisheries and Food, Ex p Hedley Lomas (Ireland) Ltd* (Case C-5/94) [1997] QB 139 180, paras 112 et seq; note also the references to the *Bourgoin* case [1986] QB 716 and misfeasance in public office, at pp 185-186, paras 138-141.

*Verein fŸr Konsumenteninformation v ...sterreichische Kreditversicherungs AG* (Case C-364/96) [1998] ECR I-2949 does not assist the plaintiffs. It is simply an illustration (on the interpretation of Council Directive (90/314/EEC) on package holidays) of the familiar principle that, because the national court will always try to construe implementing legislation in conformity to the directive which it is intended to implement, it may still be necessary to obtain a ruling from the ECJ as to the meaning of an implemented directive. Nor does *CIA Security International v Signalson SA* (Case C-194/94) [1996] ECR I-2201 significantly assist the plaintiffs. But the *Hedley Lomas* case [1997] QB 139 and the *Norbrook* case [1998] ECR I-1531 call for more extended discussion.

With two exceptions, all the cases mentioned in this part of the judgment were concerned with breaches of EU law occasioned by acts of omission or commission in the enactment of primary or secondary legislation by a member state. The exceptions are the *Hedley Lomas* and *Norbrook* cases, which were concerned with administrative acts.

The *Hedley Lomas* case [1997] QB 139 was decided by the ECJ on 23 May 1996 (that is, after delivery of the judge's first judgment). The facts were that the Ministry of Agriculture, Fisheries and Food ("MAFF") refused (between April 1990 and January 1993) to issue licences for the export to Spain of live animals for slaughter. The reason for this policy was the belief or suspicion (which was not substantiated) that a number of Spanish

---

slaughterhouses were not complying with the requirements of Council Directive (74/577/EEC) which had been implemented in Spain in 1987. MAFF's refusal was at first sight an infringement of article 34 of the

Treaty; in the ensuing proceedings by an exporter MAFF relied on article 36 (which qualified article 34 by reference to, among other things, the protection of animal health and life).

The case is notable for the length of the opinion of Advocate General LŽger and the brevity of the judgment of the ECJ The judgment decided that the United Kingdom could not rely on article 36 in a situation where harmonisation was already provided for by a directive, and that on the three-stage test laid down by the ECJ in the earlier cases (rights conferred on individuals; sufficiently serious breach; and direct causal link) the United Kingdom could not avoid liability to pay damages. In its judgment the ECJ said, at p 204, para 28:

> "As regards the second condition, where, at the time when it committed the infringement, the member state in question was not called on to make any legislative choices and had only considerably reduced, or even no, discretion, the mere infringement of Community law may be sufficient to establish the existence of a sufficiently serious breach."

The *Norbrook* case [1998] ECR I-1531 was concerned with the Medicines Act 1968 (which relates to veterinary as well as human medicinal products), with statutory instruments which not only supplemented but also amended the primary legislation, and with Council Directives (81/851 and 852/EEC) on the approximation of laws of member states relating to veterinary medicinal products. Norbrook Laboratories manufactured in Northern Ireland a product popularly known as "Pen & Strep" (after its two active ingredients). "Strep" was dihydrostreptomycin ("DHS") which was itself manufactured from streptomycin sulphate ("SS"). Norbrook manufactured its own DHS. MAFF, the competent authority for the grants of a marketing authorisation, sought information about the manufacturer of the SS from which Norbrook made its DHS. A dispute arose early in 1991 and judicial review proceedings ensued. The issue (elaborated in seven separate questions on a reference under article 177) was whether MAFF's requirement for that information infringed EU law.

The case is rather confusing because at first instance in Northern Ireland the judge, by consent of the parties, referred directly to Council Directives (81/851 and 852/EEC) rather than looking at the primary and secondary legislation then in force in Northern Ireland. Moreover that legislation was amended (in such a way as to refer explicitly to the directives) by a statutory instrument which came into force on 19 October 1993, before the article 177 reference by the Court of Appeal in Northern Ireland in March 1995. Those points are made clear by the terms of the reference, paragraphs 20 and 21. Paragraph 33(k) shows that Norbrook was contending that MAFF's imposition of the requirement (and consequent failure to grant a marketing authorisation) was a breach of the directives, and in particular article 41 of Directive 81/851. Article 41 (set out at p 1541, para 26 of the opinion of Advocate General LŽger) provided that no decision to withhold, withdraw or suspend marketing authorisation might be taken on grounds other than those in the directive. The Advocate General's opinion stated, at p 1563, para 134:

---

> "Therefore, where, in breach of the third paragraph of article 189 of the Treaty, a member state incorrectly transposes *or misapplies* sufficiently clear and precise provisions of the aforementioned directives, that member state manifestly and gravely disregards the limits on the exercise of its powers." (Emphasis supplied.)

The words emphasised express the Advocate General's view that article 189 may require a directive not only to be transposed by a legislative process, but also to be given continuing practical application by administrative processes. Submissions to the same effect are also recorded in the report for the hearing, at pp 1553-1554, paras 86, 87 and 89. Paragraph 89 speaks of no distinction being drawn between non-implementation and misimplementation in a context which suggests that "misimplementation" is not limited to a legislative process.

The judgment itself casts little light on these points. Paragraph 20, at p 1575, refers to the directives having "been deemed to have been implemented by the Medicines Act 1968, as amended, and subordinate legislation", a choice of words which is explained by the parties agreement as to how the case should be dealt with. The general effect of the ECJ's answers to) the first six questions was that the directives prescribed in a complete and comprehensive way, what information was to accompany an application for a marketing authorisation, and that the competent authority could not, consistently with the directives, ask for more information about the provenance of the SS. In relation to the seventh question the ECJ, at pp 1598-1600, paras 105-112, restated the principles in *Dillenkofer's* case [1997] QB 259 in very much the same terms, but with an added reference to the requirement for equivalence and effectiveness of remedies in the national court.

It has been necessary to refer to the *Norbrook* case [1998] ECR I-1531 at some length because very different submissions were made as to its significance. It is an unusual and inconclusive case, partly because of the odd basis on which it was argued in the national court. The outcome on the issues of interpretation (that the directives were a comprehensive code) suggests some deviation from the spirit of article 189 ("shall leave to the national authorities the choice of form and methods"). The *Norbrook* case [1998] ECR I-1531 does not in our judgment displace the general principle (in *Becker's* case [1982] ECR 53, *Felicitas Rickmers-Linie KG & Co v Finanzamt fŸr Verkehrsteuern, Hamburg* (Case 270/81) [1982] ECR 2771 and *Kampelmann v Landschaftsverband Westfalen-Lippe* (Joined Cases C-253/96 to C-258/96) [1997] ECR I-6907) that a correctly transposed directive gives rise to rights under national law, enforceable in the national court. But it does suggest that there may be a category of directives in relation to which a member state's obligation of proper implementation is not restricted to a once-for-all legislative process, but also requires a continuing administrative process.

In such a case, it may not always be right to assume that the range of choice (or margin of appreciation) for administrative action is necessarily much more restricted than for legislative action. That was the case in the *Hedley Lomas* case [1997] QB 139 (see p 204, para 28 of the judgment already quoted), and in the *Norbrook* case [1998] ECR I-1531 the detailed and comprehensive prescription in the directives left the member states and

---

the competent authorities with virtually no discretion, legislative or administrative. But not every administrative act of government requires the exercise of little or no discretion; the Bank stresses the sensitive and difficult judgments which any national bank regulator is called upon to make from time to time. That leads on to the central issue of whether the Directive of 1977 did in the relevant sense confer rights on individuals.

XIX

*Did the Directive of 1977 confer rights on depositors?*

The judge identified this central issue as depending on the meaning and effect of the Directive of 1977. He was influenced in his approach to the issue by the two decisions of the Privy Council in *Yuen Kun Yeu v Attorney General of Hong Kong* [1988] AC 175 and *Davis v Radcliffe* [1990] 1 WLR 821, to which we have already extensively referred. He noted [1996] 3 All ER 558, 600-601 three salient points discussed by the judge. First, in the Privy Council cases (as in this case) the regulator had no day-to-day control of the deposit-taker. Second, the real cause of the depositors' loss was fraud on the part of the deposit-taker's manager. Third, the performance by a regulator of its statutory supervisory function requires the regulator to make delicate judgments balancing the interests of existing and potential depositors, as well as the general public interest in a sound financial system. The making of those judgments might be inhibited if the regulator (in Lord Keith's words) "were to be constantly looking over his shoulder at the prospect of

claims against him, and his activities would be likely to be conducted in a detrimentally defensive frame of mind": [1998] AC 175, 198. Those considerations argued strongly against the imposition on a regulator of a duty of care in favour of any particular section of the public.

These three points helped to lead the judge to his conclusion [1996] 3 All ER 558, 615 that the Directive of 1977 did not create enforceable rights for depositors or potential depositors. The plaintiffs criticise that as the wrong approach. It is an approach rooted in the need to find (before recognising that individuals have enforceable rights) a duty of care in favour of a limited and ascertainable class of prospective plaintiffs who stand in a proximate relationship to the prospective defendant, and whose claims ought as a matter of policy to be recognised by the law. It is an approach which readily accepts that the prospective defendant should not be exposed to "liability in an indeterminate amount for an indeterminate time to an indeterminate class": see *Ultramares Corpn v Touche* 255 NY 170, 179. It is an approach which has a natural appeal to most lawyers brought up in the common law tradition.

Nevertheless there is much force in the plaintiffs' submission that decisions of the ECJ (going back over 30 years and more to *NV Algemene Transport- en Expeditie Onderneming van Gend & Loos v Nederlandse administratie der belastingen* (Case 26/62) [1963] ECR 1) take a markedly different approach. The jurisprudence of the ECJ shows no reluctance to find rights enforceable by very large and ill-defined groups of individuals, if a provision of the Treaty (such as article 12 in the *van Gend & Loos* case) or a directive is found, on a purposive construction, to impose an obligation capable of giving rise to correlative rights. The interest of the group of individuals may be as employees (as in *Marshall's* case [1986] QB 401 and

*Francovich's* case [1995] ICR 722), as consumers (as in *Dillenkofer's* case [1997] QB 259), as traders (as in the *van Gend & Loos* case [1963] ECR 1, *Amministrazione delle Finanze dello Stato v Simmenthal SpA* (Case 106/77) [1978] ECR 629, the *Factortame* case (Case C-48/93) [1996] QB 404, the *Brasserie du Pcheur* case (Case C-46/93) [1996] QB 404 and the *Hedley Lomas* case [1997] QB 139) or simply as inhabitants with an interest in a clean and healthy environment.

The last point is strikingly illustrated by a series of actions brought by the Commission against Germany for failing to transpose directives concerning air quality and water quality. The fact that these proceedings were commenced by the Commission, and not by individuals, might seem an important point of distinction, but the ECJ appears to have taken the view that the directives did confer rights on individuals. The point appears most clearly from the opinion of Advocate General Jacobs in *Commission of the European Communities v Federal Republic of Germany* (Case C-237/90) [1992] ECR I-5973, 6005:

> "As regards liability towards individuals, the circumstances in which an action for damages may be brought by an individual in respect of a member state's failure to implement a directive were defined in paragraph 40 of the judgment in *Francovich v Italian Republic* (Case C-6/90) [1995] ICR 722, 772. In particular, the directive must be such as to confer rights on individuals. It may be inferred from paragraph 14 of the judgment in *Commission of the European Communities v Federal Republic of Germany* (Case C-58/89) [1991] ECR I-4983, 5023 that the directive in issue in the present proceedings does indeed confer rights on individuals, in so far as its purpose is to protect public health and a failure to comply with it might endanger public health."

Both Directive 75/440 and Directive 80/778 (considered in *Commission of the European Communities v Federal Republic of Germany* (Case C-58/89) [1991] ECR I-4983 and *Commission of the European Communities v Federal Republic of Germany* (Case C-237/90) [1992] ECR I-5973 respectively) laid down detailed requirements as to water quality, non-compliance with which could endanger public health, and those concerned (Case C-58/89, at p 5023, para 14) "should be able to rely on mandatory rules in order to enforce their rights".

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 64 of 260
Pg 144 of 686

However in another environmental case, *Comitato di Coordinamento per la Difesa della Cava v Regione Lombardia* (Case C-236/92) [1994] ECR I-483, the ECJ reached the opposite conclusion on Council Directive (75/442/EEC) (relating to waste disposal). The claimants objected to the creation of landfill sites in Lombardy, and contended that the Italian Government was at fault in not having required facilities for recycling waste to be provided. The relevant provisions of the directive are set out or summarised in the opinion of the Advocate General Darmon. The recitals showed that the directive had twin objectives: the economic objective of harmonising national legislation so as to avoid obstruction of trade and the social objective of protecting health and the environment: see p 488, para 21 of the opinion. Article 3 required member states to take appropriate steps to encourage the prevention, recycling and processing of waste, but it did not impose any particular obligation. Article 4 was mandatory but unspecific, requiring member states to take the necessary measures to ensure that waste

---

**[2003]** **74**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Hirst LJ**

was disposed of without endangering human health and without harming the environment. Articles 5 to 11 imposed a number of particular requirements, none of which referred to recycling. The Advocate General observed, at p 489, para 24, that the sole purpose of article 4 was "to define the objectives of the more specific measures contained in articles 5 to 11, but it cannot, in isolation, constitute a measure of that kind", i e impose a specific obligation.

The judgment of the ECJ proceeded on the same lines. It concluded, at p 503, para 14:

> "Thus, the provision at issue must be regarded as defining the framework for the action to be taken by the member states regarding the treatment of waste and not as requiring, in itself, the adoption of specific measures or a particular method of waste disposal. It is therefore neither unconditional nor sufficiently precise and thus is not capable of conferring rights on which individuals may rely as against the state."

If the obligation had been sufficiently clear and certain the width and open-endedness of the class benefited would not, it seems, have been an obstacle.

The plaintiffs' submissions on this issue start with the proposition that a purpose, and an important purpose, of the Directive of 1977 was the protection of depositors and their savings. This submission is supported by various points both on the actual text of the Directive of 1977 and on associated material. It is not necessary to set them out in detail since the Bank does not dispute that one of the directive's purposes was the protection of depositors. The ECJ said in *SociŽtŽ Civile Immobilire Parodi v Banque H Albert de Bary et Cie* (Case C-222/95) [1997] ECR I-3899, 3922-3923, para 22, a decision on the Directive of 1977 which postdates the judge's first judgment:

> "It must be recognised in this regard that the banking sector is a particularly sensitive area from the point of view of consumer protection. It is, in particular, necessary to protect the latter against the harm which they could suffer through banking transactions effected by institutions not complying with the requirements relating to solvency and whose managers do not have the necessary professional qualifications or integrity."

In the *Parodi* case, at p 3923, para 24 the ECJ described the Directive of 1977 as "no more than a first step" towards mutual recognition by member states of each other's authorisation of credit institutions.

The plaintiffs submit that the fact that the Directive of 1977 has another important aim--that is, the eventual establishment of a common banking market with full mutual recognition of authorisations--is in no way inconsistent with the conferment of enforceable rights on individuals. They rely on *Dillenkofer's* case [1997] QB 259, in which the ECJ said, at p 294, para 39, in rejecting the arguments of the German

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 65 of 260
Pg 145 of 686

and United Kingdom Governments: "The fact that [Directive 90/314/EEC] is intended to assure other objectives cannot preclude its provisions from also having the aim of protecting consumers."

The provisions of Directive 90/314 were clear and certain in requiring a travel organiser to "provide sufficient evidence of security for the refund of

---

**[2003]** **75**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Hirst LJ**

money paid over and for the repatriation of the consumer in the event of insolvency". Mr Dillenkofer and his fellow claimants had lost the prepaid cost of holidays when a tour operator became insolvent, and the directive had not been transposed into German law within the permitted period. The ECJ, taking a purposive approach to the directive, had little difficulty in rejecting the argument (put forward by Germany and the United Kingdom) that the production of evidence of security did not imply that it had to be actually available for disappointed customers.

The sort of dual purpose described in *Comitato di Coordinamento per la Difesa della Cava v Regione Lombardia* (Case C-236/92) [1994] ECR I-483 and *Dillenkofer's* case [1997] QB 259 is in fact central to, and characteristic of, most of the directives considered in the authorities. The directives are aimed at a social purpose (typically, the protection of employees, consumers or inhabitants generally) and they are also aimed at the economic purpose of free and fair competition by ensuring that all employers and all traders throughout the EU have to bear the cost of meeting the minimum social standards which the directives require. That is the context in which the ECJ in the *Parodi* case [1997] ECR I-3899, 3922, para 21 spoke of requirements being "objectively necessary in order ... to guarantee the protection of the recipient of services". There are similar references in cases on the insurance directive (Council Directive (78/473/EEC) on the co-ordination of laws etc. relating to Community co-insurance) on which the plaintiffs rely: *Commission of the European Communities v France* (Case 220/83) [1986] ECR 3663, 3709, para 20; *Commission of the European Communities v Federal Republic of Germany* (Case 205/84) [1986] ECR 3755, 3809, para 49 and in the *Norbrook* case [1998] ECR I-1531, 1568, para 3 of the ECJ judgment, illustrating the duality in the recitals to Directive 81/851.

The judge did not obtain much assistance from the insurance cases: see [1996] 3 All ER 558, 621 et seq. But they are of some interest since they were concerned with the same sort of triangular relationship (competent regulatory authority, regulated service provider and customer as under the Directive of 1977. In *Commission of the European Communities v Federal Republic of Germany* (Case 205/84) [1986] ECR 3755, 3809, para 49 the ECJ said:

> "It follows from the foregoing that the requirement of authorisation may be maintained only in so far as it is justified on the grounds relating to the protection of policy-holders and insured persons relied upon by the German Government. It must also be recognised that those grounds are not equally important in every sector of insurance and that there may be cases where, because of the nature of the risk insured and of the party seeking insurance, there is no need to protect the latter by the application of the mandatory rules of his national law."

The passage as a whole implies that in some sectors of insurance policy-holders would have enforceable rights in respect of the requirement of authorisation. But the point is by no means clear.

Another case concerned with a triangular relationship, on which the Bank strongly relies, is *R v International Stock Exchange of the United Kingdom and the Republic of Ireland Ltd, Ex p Else (1982) Ltd* [1993] QB 534. In that case the triangle consisted of the Stock Exchange Committee on Quotations, Titaghur plc (a company which had lost its official listing) and

---

**[2003]** **76**

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 66 of 260
Pg 146 of 686

2 AC Three Rivers DC v Bank of England (No 3) (CA) Hirst LJ

investors (that is the applicants, who were shareholders in Titaghur). The applicants sought to rely on Council Directive (79/279/EEC), which was concerned with co-ordinating rules for the listing of securities. Article 15 required member states to ensure that decisions of the competent authorities refusing or terminating a listing should be subject to the right to apply to the national court. When Titaghur's listing was terminated that company did not challenge the decision but two of its shareholders sought to do so by way of judicial review, arguing that the directive was intended to protect investors, that delisting was damaging to investors, and that article 15 therefore conferred on the shareholders (as well as on the company) the right to seek judicial review of the decision.

This court (Sir Thomas Bingham MR, McCowan and Leggatt LJJ) partially accepted some of the steps in the argument but rejected its conclusion. For present purposes it is most relevant to note that Sir Thomas Bingham MR relied on (among other points) the fact that the directive was concerned with relations between competent authorities and companies or issuers; that to extend rights to investors would gravely restrict the discretion of the competent authorities; and that the class of investors was not defined, especially in point of excluding or including potential investors: see pp 550-551. Leggatt LJ said, at p 554:

> "[Counsel for the shareholders] argues that because the directive is for the protection of investors it is they who must have a right to apply to the court. That is a non sequitur. Nothing in the language of the directive accords such a right to investors ..."

The relationship to which a directive (or part of a directive) is addressed has also been treated as significant in other recent cases, notably *R v Medicines Control Agency, Ex p Smith & Nephew Pharmaceuticals Ltd; Primecrown Ltd v Medicines Control Agency*(Case C-201/94) [1996] ECR I-5819, 5835, per Advocate General LŽger, and the very recent case of *AGS Assedic Pas de Calais v Dumon* (Case C-235/95) [1998] ECR I-4531, 4567, para 32 of the judgment of the ECJ.

In our judgment it is reasonably clear that the Directive of 1977 does confer enforceable rights on credit institutions which are to be supervised under its provisions. In particular, a credit institution which was refused authorisation for reasons incompatible with article 3, or which had its authorisation withdrawn for reasons incompatible with article 8, would (in the event of non-transposition of the Directive of 1977) most probably have had a right to challenge the Bank's decision on the basis that the *Becker* conditions [1982] ECR 53 were satisfied. But there is not in our judgment any sufficient clarity or certainty in the position of depositors (or other customers of credit institutions). The fact that the directive is in general terms for the benefit of depositors cannot be conclusive: cf Leggatt LJ in *Ex p Else (1982) Ltd* [1993] QB 534, 554. Had intended rights been precisely and unconditionally defined, the large size and indefinite character of the class benefited would not have been conclusive against the conferment of enforceable rights. But we accept the Bank's submission that this is a case like *Comitato di Coordinamento per la Difesa della Cava v Regione Lombardia* (Case C-236/92) [1994] ECR I-483 or *Ex p Else (1982) Ltd* [1993] QB 534 in which the *Becker* conditions would not be satisfied even if there were a clear case of non-transposition.

---

[2003] 77
2 AC Three Rivers DC v Bank of England (No 3) (CA) Hirst LJ

XX

*Conclusions on EU law*

For these reasons we do not consider that the plaintiffs are assisted by reliance on the Directive of 1977 or on principles of EU law. Because the *Becker* conditions are not satisfied, we need not consider the plaintiffs' argument based on the Bank's alleged failure to achieve continuing administrative

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 67 of 260
Pg 147 of 686

implementation of the transposed directive. We do perceive some traces of such a principle developing in the jurisprudence of the ECJ, but it is by no means fully developed.

If administrative non-implementation were of critical importance we would most probably think it right to refer that issue to the ECJ under article 177 of the Treaty. As regards *Becker*-type liability we do not regard the point as acte clair, but as a matter of discretion this court decided not to make a reference under article 177. The parties' rare unanimity in asking this court not to make a reference has been a significant factor (but not the only factor) in that decision.

STRIKING OUT

XXI

*Principles*

By the time the judge came to adjudicate on the merits of the striking-out application, he had before him the plaintiffs' proposed re-re-amendments to the statement of claim, and rightly considered that it was proper to consider whether their case was indeed doomed to failure even if leave was granted to make those proposed amendments.

He ruled, correctly, that the court's power to strike out an action both under its inherent jurisdiction to prevent abuse of its process, and under RSC Ord 18, r 19, should only be exercised in very exceptional circumstances and in plain and obvious cases: *Lawrance v Lord Norreys* (1890) 15 App Cas 210.

He then considered a number of the leading authorities cited below, and concluded:

> "In my judgment the question in the instant case is whether the Bank has persuaded the court that the plaintiffs' case is bound to fail on the material at present available and that there is no reasonable possibility of evidence becoming available to the plaintiff, whether by further investigation, discovery, cross-examination or otherwise sufficiently to support their case and to give it some prospect of success. If the Bank discharges that burden, it will follow that the plaintiffs' claim is bound to fail. In that event to allow the action to proceed would serve no useful purpose. It would only involve the expenditure of time and money--in this case a very great deal of both. Neither party would have any legitimate interest in such expenditure because it could not benefit either. As the necessity for Lord Woolf's reforms shows, the time of the courts is not unlimited and should not be used in the consideration of what can be seen to be obviously hopeless cases. To allow such an action to proceed would be to permit an abuse of process. It follows that the question is whether the Bank has shown that the plaintiffs' claim is doomed to failure. As already stated, it will only be able to do so if it shows that the

---

**[2003]** **78**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Hirst LJ**

> court has available to it all the evidence which is at present available to the plaintiffs, that the plaintiffs' case is bound to fail on the basis of that evidence and that there is no realistic possibility of the plaintiffs obtaining further evidence to support their case in the future, whether by further investigation, discovery, cross-examination or otherwise. I turn therefore to the circumstances of the plaintiffs' claim, which will of course involve a consideration both of the relevant legal principles and of the facts."

In *Wenlock v Moloney* [1965] 1 WLR 1238, a case on which the plaintiffs strongly relied, the Court of Appeal considered a case where an action had been struck out after consideration of a large number of affidavits with no oral evidence or cross-examination. Danckwerts LJ stated, at p 1244:

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 68 of 260
Pg 148 of 686

"There is no doubt that the inherent power of the court remains. But this summary jurisdiction of the court was never intended to be exercised by a minute and protracted examination of the documents and facts of the case, in order to see whether the plaintiff really has a cause of action. To do that is to usurp the position of the trial judge, and to produce a trial of the case in chambers, on affidavits only, without discovery and without oral evidence tested by cross-examination in the ordinary way. This seems to me to be an abuse of the inherent power of the court and not a proper exercise of that power. The master stated the relevant principles and practice correctly enough and then, I am afraid, failed to apply them to the present case. In my view, the way in which this case has been dealt with is quite contrary to the practice of the court, and is thoroughly undesirable."

Sellers LJ delivered a concurring judgment, and Diplock LJ agreed.

This somewhat rigid position was however modified by the House of Lords in *Williams and Humbert Ltd v W & H Trade Marks (Jersey) Ltd* [1986] AC 368, which was a very heavy trade marks case involving difficult questions of domestic and international law. After a six-day hearing Nourse J in a reserved judgment struck out the defences, and his decision was upheld both by the Court of Appeal and by the House of Lords. Lord Templeman stated, at pp 435-436:

"My Lords, if an application to strike out involves a prolonged and serious argument the judge should, as a general rule, decline to proceed with the argument unless he not only harbours doubts about the soundness of the pleading but, in addition, is satisfied that striking out will obviate the necessity for a trial or will substantially reduce the burden of preparing for trial or the burden of the trial itself. In the present case, the general rule would seem to require a refusal by the judge to embark on the problems of international law involved in the present appeal, leaving those problems to be solved at the trial if they became material. If at the trial the appellants were cleared of any impropriety in their management of the affairs of the Rumasa group, then the problems of international law would not arise. Moreover, even if those problems did arise I do not believe that the length of time, namely seven days, occupied by the judge in deciding to strike out the pleadings would have been added to the time required to decide other issues. But there are special circumstances

---

**[2003]** **79**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Hirst LJ**

which, in my view, made it right for the judge to proceed and to make the order which he made. If the appellants' pleadings and particulars had not been struck out the appellants would have proceeded to demand discovery before trial and to lead evidence at the trial, harassing to the plaintiffs and embarrassing to the court and designed to support the allegations and insinuations of oppression and bad faith on the part of the Spanish authorities which appear in the amended defences and particulars. These allegations are irrelevant to the trade marks action and the banks' action and are inadmissible as a matter of law and comity and were rightly disposed of at the first opportunity."

Lord Mackay of Clashfern stated, at p 441:

"If on an application to strike out it appears that a prolonged and serious argument will be necessary there must at the least, be a serious risk that the court time, effort and expense devoted to it will be lost since the pleading in question may not be struck out and the whole matter will require to be considered anew at the trial. This consideration, as well as the context in which Ord 18, r 19 occurs and the authorities upon it, justifies a general rule that the judge should decline to proceed with the argument unless he not only considers it likely that he may reach the conclusion that the pleading should be struck out, but also is satisfied that striking out will obviate the necessity for a trial or will so substantially cut down or simplify the trial as to make the risk of proceeding with the hearing sufficiently worth while. I agree with the view that the course taken by the judge in the present case

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 69 of 260
Pg 149 of 686

was justified by the very special circumstances to which [Lord Templeman] has referred. The fact that at the end of a sustained argument in which other questions were discussed than those which have occupied you Lordships in the four days of the hearing of this appeal in this House he reached a conclusion that the impugned pleading should be struck out in the trade marks action and should not be allowed as an amendment in the banks' action, a decision in which the majority of the Court of Appeal and all your Lordships agree, shows that the judge's exercise of his discretion early in the argument has been shown to be right."

The other three members of the Appellate Committee agreed.

In *McDonald's Corpn v Steel* [1995] 3 All ER 615, which was a libel action, Neill LJ with whom Steyn and Peter Gibson LJJ agreed, held, at p 623, that the power to strike out was a draconian remedy which was to be employed only in clear and obvious cases where it was possible to say at the interlocutory stage and before full discovery that a particular allegation was incapable of being proved. Thus, in the case of a plea of justification, the defendant should not only intend to support that defence at the trial but should also have reasonable evidence to support the plea or reasonable grounds for supposing that sufficient evidence to prove the allegations will be available at the trial. He went on to point out that the evidence on which the defendant may rely may include many forms in addition to his own evidence, including evidence produced by third parties on subpoena, evidence elicited from the plaintiff or the plaintiff's witnesses in cross-examination, and evidence contained in documents disclosed by the plaintiff

---

**[2003]** **80**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Hirst LJ**

on discovery. The correct approach, Neill LJ said, at p 623, was to consider whether or not the defendant's case was incurably bad.

Lord Neill strongly urged that the judge erred in principle in embarking on the striking out exercise at all. We unhesitatingly accept that for him to do so in a very complex case of this kind must be the exception rather than the rule, as was stated so clearly in the two speeches quoted above from *Williams and Humbert Ltd v W & H Trade Marks (Jersey) Ltd* [1986] AC 368.

However, we are satisfied that this case, like the *Williams and Humbert* case, falls within the exceptional class for similar reasons as those explained in the *Williams and Humbert* case. The pleadings involve imputations against a considerable number of Bank officials who held various posts of responsibility at different times during a period of over 10 years. The trial, if it took place, would be extremely long and expensive. An estimated duration of a year was mentioned, and that does not seem to us likely to be an overestimate. Justice may of course require a full trial, however great the trouble and expense involved; but the burden on the parties and their witnesses is one of the factors to be taken into account in discerning what course, in exceptional circumstances, best meets the requirements of justice. We would therefore uphold the course taken by the judge, and would also note that the approach he adopted in the second paragraph quoted above is fully in line with principles enunciated by Neill LJ in *McDonald's Corpn v Steel* [1995] 3 All ER 615.

XXII

*The plaintiffs' pleaded case*

The statement of claim was first served on 21 June 1993. It was amended on 30 November 1994 (with leave of this court) to add BCCI SA (in liquidation) as a plaintiff. It was re-amended on 21 August 1995 (with leave of Clarke J) after the order for preliminary issues and with a view to making the plaintiffs' case battle-ready, as it were, for the hearing of the preliminary issues. We will summarise the statement of claim as it stood after that re-amendment, deferring for the present reference to the draft pleading (with

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 70 of 260
Pg 150 of 686

further proposed amendments) finally formulated (after other drafts had been put forward) in January 1997 (and rejected by the judge in his third judgment as incapable of salvaging the plaintiffs' claim).

The general form of the re-amended statement of claim appears from the index at the end of the pleading. The index has 11 headings:

| | | |
|---|---|---|
| 1. | BCCI | paragraphs 1-10 |
| 2. | The plaintiffs? | 10A-12A |
| 3. | The defendant | 13 |
| 4. | The LBC and IMC | 14 |
| 5. | The supervisory regime | 15-31 |
| 6. | BCCI SA and BCCI Overseas in the UK | 32-38 |
| 7. | Misfeasance by the Bank | 39-44 |
| 8. | The Bank's motives for breaching its statutory duties | 45-4 |
| 9. | Damages | 47 |
| 10. | Interest | 48 |
| [11] | Prayer | 49 |

---

[2003] 81
2 AC Three Rivers DC v Bank of England (No 3) (CA) Hirst LJ

That summary might give the impression that the pleading of the acts or omissions said to amount to misfeasance is fairly short. Any such impression would be wholly mistaken. Paragraphs 39, 40 and 41 of the pleading are copiously divided and subdivided (to an extent which sometimes makes it difficult to identify passages in the pleading) and these three paragraphs together occupy 90 pages of the pleading.

The final draft proposed further extensive additions, including lengthy additions in paragraphs 40 and 45, an important addition to paragraph 47, and entirely new paragraphs 48 to 52 inclusive (those new paragraphs particularising the averment in the proposed paragraph 47.3A(b)(i) of the Bank's knowledge, belief or suspicion at various times).

The task of reviewing these exceedingly complex pleadings is made a little less burdensome--although it is still far from an easy task--because as the judge said, with one exception

> "the Bank has conceded that it cannot show that the plaintiffs' case that it knew, believed or suspected that its acts or omissions were unlawful is doomed to failure. That exception is the way that section 3(5) of the Banking Act 1979 was applied. I shall return to this point below. However, with that exception, the only question which I shall consider under this head is whether the plaintiffs are bound to fail to establish the second stage of the second limb of the tort. The question for decision at each stage is whether the Bank has shown that there is no realistic possibility of the plaintiffs establishing that the Bank knew, believed or suspected that the depositors or potential depositors would probably suffer loss if it did the act complained of or if it failed to do what the plaintiffs say that it ought to have done."

The judge went on to analyse the statement of claim. His conclusions can be summarised (omitting some inessential detail) as follows. (1) The essential acts and omissions alleged to amount to misfeasance on the part of the Bank were its authorising BCCI SA as a deposit-taker in March or June 1980 and its failure to revoke BCCI SA's authorisation under the 1979 Act or (after it came into force) the 1987 Act (paragraph 39 of the statement of claim, as expanded by paragraphs 39A, B and C). (2) Paragraphs 40 to 46 of the statement of claim, although highly relevant to the issue of the Bank's awareness of illegality, were not relevant to the issue of the Bank's foresight of loss, with the (very important) exception that paragraph 48 referred to, and incorporated into itself, a large number of sub-paragraphs of paragraph 40. (3) Paragraphs

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 71 of 260
Pg 151 of 686

47 to 51 contained the key allegations, paragraph 48 to 52 being wholly new since the judge's second judgment. Paragraphs 48 to 52 were intended to make good the crucial allegations contained in sub-paragraphs 47.3A and 47.3B in the form in which the plaintiffs sought to re-amend them. In recognition of their importance the judge set out those two complex sub-paragraphs in an appendix to his third judgment. He commented that it was a historical accident that they occurred in a part of the pleading headed "Damages."

The judge then proceeded to consider, by reference to the plaintiffs' pleaded case including the proposed further amendments, whether the plaintiffs' case was bound to fail in relation to different periods of time, beginning with the authorisation of BCCI SA in 1980 and going on to the

---

[2003] 82
2 AC Three Rivers DC v Bank of England (No 3) (CA) Hirst LJ

final period after Price Waterhouse's* ("PW") stark warning to Mr Barnes, on 11 April 1990, that the survival of BCCI was at stake. We have in an earlier section of this judgment considered whether the judge was right to embark on that vastly difficult undertaking and we have concluded that in doing so he did not err in the exercise of his discretion. Having by then devoted many weeks to the case, both in court and out of court, he may have felt that there would be some element of abdication of responsibility not to reach a definite conclusion on the strike-out application. On that basis, we have to review the judge's conclusion that the plaintiffs' case was bound to fail.

In our review we shall follow the same chronological pattern as the judge, who divided the sequence of events into four periods: (i) original authorisation; (ii) June 1980 to December 1986; (iii) December 1986 to April 1990; (iv) April 1990 to July 1991. Our review will involve some repetition of material in section III above but that seems preferable to continual references back to the beginning of the judgment. But before undertaking that review we must make some general observations about the Bingham report. The judge made copious references to that report in his third judgment, and it is entirely understandable that he did so, since it is a conspicuously clear guide to an exceptionally complex history. But it is necessary to have in mind the status of the report and the purposes for which it could properly be relied on.

XXIII

*The Bingham report*

The Bingham report has, predictably, been extensively cited and relied on by both sides in the course of the appeal. The submissions based on it have not always been wholly consistent. There is some force in the Bank's comment that the information and conclusions in the report are vital to the plaintiffs' case, but that the plaintiffs distance themselves from the report when it suits them to do so. It is therefore appropriate for us to clarify the significance of the Bingham report to the issues which we have to decide.

The report (which runs to nearly 200 pages, without the further eight appendices which are not published) represents the outcome of an inquiry which, momentous though it was, was essentially a private inquiry instituted by the Bank of England and the Treasury, the Bank having "chosen to delegate to an independent inquiry the review of the adequacy of its supervision of BCCI," as it was put by Millett J in *Price Waterhouse v BCCI Holdings (Luxembourg) SA* [1992] BCLC 583, 599. It was not a statutory inquiry under the Tribunals of Inquiry Act 1921. Bingham LJ had no power to compel the attendance of witnesses or the production of documents and there was no counsel to the inquiry (although witnesses were permitted to have their own legal advisers present). The Bank and the United Kingdom firm of Price Waterhouse did (as Bingham LJ gratefully recorded in his letter presenting the report) show a very high level of co-operation. The position of the liquidators of BCCI SA (as recorded in the same letter) was that for a

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 72 of 260
Pg 152 of 686

[*] *Reporter's note*. Price Waterhouse were, in the mid-1980s, the auditors of Overseas (but not of BCCI SA) and were commissioned by BCCI SA at the instance of the IML in October 1985 to review the treasury operations.

---

**[2003]** **83**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Hirst LJ**

variety of reasons they did not feel able to take the opportunity to comment on factual passages and opinions in the report. Several individuals who were deeply involved in the matter did not give oral evidence to the inquiry, the most conspicuous absentee being Mr Abedi (see paragraph 2.101 of the Bingham report).

The scope of Bingham LJ's inquiry was therefore limited by the extent of his powers as well as by his terms of reference. His report has undoubtedly been a most fruitful source of information and lines of inquiry for the plaintiffs (as they acknowledge). But to suggest that Clarke J was trying a case which had already been tried by Bingham LJ would be totally misconceived. The judge had that well in mind (see his third judgment). If any analogy is to be proposed a closer one would be an investigation of the affairs of a company by inspectors appointed by the Secretary of State under section 432 of the Companies Act 1985 (though inspectors do have powers of compulsion under sections 434 and 436 of that Act). Such an investigation might or might not be followed by civil proceedings against directors of the company for misfeasance or breach of fiduciary duty. The inspectors' report, when published, might give the liquidators useful information and suggest lines of inquiry for any subsequent litigation. But the report would be admissible in evidence only because of the special provisions in section 441 of the Companies Act 1985 (as amended), and only for the limited purposes there mentioned. No comparable statutory provision applies to the Bingham report.

Having correctly recognised the limited scope of Bingham LJ's inquiry Clarke J said in his third judgment:

> "On the other hand, it is plain that in addition to questioning witnesses Bingham LJ considered in detail all the relevant internal documents in the possession of the Bank, which involved a perusal of a mass of documentation. As I have already said, it is clear from the terms of Bingham LJ's covering letter to the Chancellor of the Exchequer, and indeed from many passages in the report itself, that he was applying his mind to the question what was the state of mind of the Bank at each stage. In these circumstances I accept Mr Stadlen's submission that it is inconceivable that Bingham LJ was aware of material which was materially at odds with his conclusions as to the state of mind of the Bank. There is, in my judgment, no realistic possibility that he has not correctly set out the state of mind of the Bank at each stage."

That, with great respect both to the judge and to Bingham LJ, seems to be putting the matter too high. Were officials of the Bank to give evidence which was fully tested by cross-examination in the adversarial process of a trial, it is not merely possible, but even likely, that a clearer and somewhat different picture would emerge as to the Bank's corporate state of mind from time to time, as constituted by the states of mind of a small number of its responsible officials. But we would agree that there is no realistic possibility that the picture which emerged would be fundamentally different. In that respect the Bingham report is, despite its relatively informal status, an invaluable aid to distinguishing between what is a practical possibility and what is fanciful or inconceivable.

---

**[2003]** **84**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Hirst LJ**

XXIV

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

*The original authorisation*

The judge decided that the plaintiffs' case as to the Bank's foresight of loss was bound to fail in relation to the original authorisation granted to BCCI SA under the 1979 Act. He expressed his conclusion roundly:

> "I must say that, however critical one is of the Bank (and there is plenty of scope for criticism), it seems to me to offend common sense to conclude that before it licensed BCCI SA in 1980 it actually knew, believed or suspected that if it licensed BCCI SA, BCCI SA would (or even might) subsequently collapse."

The judge elaborated on that. We are in full agreement with the judge's analysis and conclusions on this point, including his comment that the case made is really one of fault or negligence, and not of the necessary knowledge or suspicion. We also agree with the judge when he said (in relation to the original authorisation) that there was material from which it was at least arguable that the Bank must have known that the LBC and IML, the Luxembourg regulators, were not regulating BCCI SA properly and did not have the resources to do so. We are therefore against the Bank's submission that the plaintiffs have no arguable case on the section 3(5) point (the only point on which the Bank did not concede that the plaintiffs had an arguable case on awareness of illegality). But as we agree with the judge that there is no arguable case on foresight of loss during this period we need not go further into the section 3(5) point.

XXV

*June 1980 to December 1986*

This part of the history of the Bank's supervision of BCCI SA is marked by a number of important documents, copies of which have been produced by the Bank in the course of the litigation. Almost all of them are referred to and discussed in the Bingham report. Some are memoranda addressed to the Bank's Head of Banking Supervision by his deputy or by subordinate officials in that department (during the period under consideration the Head was Mr Cooke, succeeded by Mr Quinn, and the deputy who dealt with BCCI was Mr Gent). Others are notes which were made to record meetings, and then circulated. A few of these documents were circulated to the Bank's governor or deputy governor and one (a memorandum dated 11 January 1984 prepared by Mr Cooke) was endorsed with the governor's initials. It is at least arguable that all these documents are material evidence as to the Bank's corporate state of knowledge on the test in *Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 2 AC 500.

These documents were extensively referred to by Clarke J and some have already been referred to in section III of this judgment. They are in our view candid, and not self-serving documents. They do not attempt to disguise anxiety which officials of the Bank felt about the shortcomings of supervision by the Luxembourg authorities or dissatisfaction which they felt about the lack of frankness of Mr Abedi and his top managers. They clearly spell out the Banks growing awareness that BCCI SA's principal place of business was in the United Kingdom (see especially Mr Gent's memorandum of 15 July 1983 and Mr Walton's of 16 December 1985) and of the

---

consequences of that (see especially Mr Lynas's memorandum of 19 October 1983, which actually speaks of the Bank turning a blind eye). It is no doubt because of these documents that Mr Stadlen has conceded that there is an arguable case that the Bank was aware of illegality in its supervision of BCCI SA.

But there is in our view a striking contrast between the Bank's ready acknowledgement of problems in performing its supervisory duties, and the almost complete absence of any acknowledgement of dire financial consequences which might follow. On the contrary, BCCI SA's business appeared to the Bank to be going from strength to strength. In Mr Gent's memorandum of 9 June 1982 he wrote of audited figures "which show a large international bank well capitalised, profitable and maintaining conservative ratios". Mr Gent wrote (referring to BCCI SA's wish to be upgraded from a licensed deposit-taker to a recognised bank) that the Bank "could probably fend them off for another year". Mr Cooke wrote to the governor on 11 June 1984 that

> "the bank's initial rapid growth has been consolidated without serious problems coming to light, the balance sheet appears strong, adverse publicity has subsided, and the group now enjoys lines with all the clearers, Standard Chartered, and many foreign banks."

He also wrote: "as BCCI's strength and standing in markets grow, our bargaining position will weaken." That last remark reflects a certain defensiveness (or even lack of self-esteem) which runs through many of the Bank's internal documents, and it may well suggest that the Bank ought to have had a much livelier awareness of the interests of depositors, and of the Banks powers to act in their interests; but again that would go to negligence, not actual foresight or reckless indifference.

The only direct reference to the interests of depositors made in the Bank's disclosed documents during this period appears to be in an annex accompanying Mr Gent's memorandum of 15 July 1983. Under the headings "How to deal with the problem--options" and "Closure" he wrote:

> "This course seems neither practicable or justifiable on the basis of our present knowledge of the group. It is not so much that BCCI is an undesirable force in banking as such but rather that no one can be certain that it is properly controlled and prudently run. The closure route could only be pursued if it could be shown, with reasonable certainty, that the group's operations were fundamentally unsound; and that continued existence posed a greater threat to depositors' money than a winding up. Without a very wide ranging investigation and the fullest co-operation of other supervisory authorities it would not be possible to state, categorically, that the group's operations are unsound to the extent of endangering depositors. We should have to be very sure of our facts before approaching other supervisory authorities or launching a separate assault under the Banking Act. This would probably necessitate the employing of independent investigating accountants whose appointment could well be misunderstood and trigger off a crisis of confidence. So far as the co-operation of other supervisors was needed there could be the further problem of political pressure. Such pressure has already made its

---

> presence felt in the case of the UAE (inspection) and Zimbabwe and Jamaica (entry)."

The judge quoted most of this passage, together with two further paragraphs. He commented (and we agree) that there was no evidence that the memorandum did not represent the genuine views of Mr Gent and his department. He concluded that in the light of the memorandum it was not arguable that the Bank knew or suspected, at that time, that if BCCI SA was not closed down it would probably collapse and cause loss to depositors.

We have carefully reviewed that conclusion. It might be said that, although Mr Gent (who is now dead) thought that danger to depositors could not be asserted "categorically", he must have regarded danger as a possibility, and if available to be cross-examined he might have agreed that he thought at the time that it was a probability. But it is clear from the memorandum that Mr Gent was also well aware, at the time, of the risk to depositors involved in closure (or even independent investigation) of BCCI SA Bearing in mind that misfeasance in public office is a tort involving dishonesty, we--like the judge--find it inconceivable

that Mr Gent could be proved to have shown the "conscious disregard" (*Garrett v Attorney General* [1997] 2 NZLR 332) for the interests of depositors which is an essential ingredient of the tort.

This period ended with the belated disclosure to the Bank of BCCI SA's treasury losses, and the company's failure to discuss with the Bank, or even inform the Bank in advance, of the move of its treasury operations to Abu Dhabi. The Bank was rightly indignant; in a memorandum dated 22 October 1986 Mr Mallett called the move "another quite appalling example of BCCI failing to be straightforward with us". These episodes are discussed by the judge. As he indicates there is no suggestion in the papers relating to the treasury losses that the Bank saw the interests of depositors as threatened. PW reported that the losses were the result of lack of experience and the exceptional loss was to be made good by a shareholders subvention. The Bank was assured that new systems were being put in place to ensure that there would be no recurrence.

Nor is there any sustained suggestion in the papers that during this period anyone in the Bank suspected (still less knew of) fraud on the part of Mr Abedi and his associates. It is arguable that officers of the Bank had material on which they should have suspected fraud, but that is a different matter. They saw the men behind BCCI as undisciplined, secretive and coming from a different banking culture, but not as criminals. The first hint of suspicion of something worse appears in a manuscript note which Mr Quinn added to Mr Butt's memorandum of 27 May 1986, that the group's recourse to the staff trust fund of ICIC* "raises questions of legality and probity". At about the same time a Member of Parliament raised with the Bank concerns about the BCCI group being involved in fraudulent transactions affecting West Africa.

* *Reporter's note*. "ICIC" is a reference to International Credit and Investment Co Ltd, a Liechtenstein company which was initially the largest shareholder in BCCI, and to its later replacement, two Cayman companies, International Credit and Investment Co (Overseas) Ltd and its holding company, ICIC Holdings Ltd.

---

XXVI

*December 1986 to April 1990*

This very important period was considered by the judge. The salient events of this period included (i) a continuing dialogue during 1987 between the Luxembourg regulators and the Bank leading to the decision (at the end of 1987) to establish the small international group of supervisors which became known as the college; (ii) the appointment of PW as group auditors, replacing the previous split of responsibility between Ernst& Whinney and PW; (iii) the coming into force of the 1987 Act which established the Board of Banking Supervision ("BBS") (consisting of the governor, the deputy governor and an executive director of the Bank and six independent members; the BBS began operating on a "shadow basis" before the 1987 Act was actually in force); (iv) Mr Abedi's disabling heart attack in February 1988; (v) meetings of the college at regular intervals from June 1988; (vi) the Tampa arrests and indictments in October and November 1988; (vii) an important paper presented to the BBS by the Bank in November 1989; and (viii) formal consideration by the Bank's review committee, in January 1990, whether BCCI SA should continue to be authorised despite the Tampa incident.

During this period of a little over three years officials of the Bank were confronted with an increasing number of indications of serious lack of probity in the operations of BCCI Some of these indications were vague and unsubstantiated, but others (such as those mentioned at paragraphs 2.94-2.98 of the Bingham report) were specific and serious. Officials of the Bank were aware that they could not perceive or assess the whole picture of the group's worldwide operations. Hindsight reveals that the true picture was far worse than even the most sceptical critic could have suspected. It is impossible to avoid the question (posed more than once, explicitly or implicitly, in Lord Neill's submissions): if the Bank, through its

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 76 of 260
Pg 156 of 686

responsible officers, did not foresee the risk of the group collapsing and the probability of loss to depositors, why not?

The documentary evidence shown to the court as bearing on that issue was not as plentiful, in relation to the period now under consideration, as that relating to the previous period. Nor does it strike us as being so transparently candid; most of the important documents are not purely internal notes and memoranda, but documents prepared for submission to the BBS or the college, both bodies which had a majority of members from outside the Bank. That is not to say, however, that the documents are not very important contemporaneous evidence of the state of mind of the Bank's responsible officials.

On 8 April 1987 Mr Galpind wrote to Mr Jaans (of IML) an important letter from which we have already (in section III above) quoted an extract. It stated plainly that the Bank would have difficulty in licensing BCCI SA under the criteria in the 1987 Act, especially as regards the statutory requirement for integrity in the running of a licensed institution.

On 6 August 1987 the Bank's BSD presented a paper on the BCCI group (and, in particular, its United Kingdom operations) for consideration by the BBS. It had a diagram of group structure and fairly detailed information as to branches of BCCI SA in the United Kingdom. It summarised group

---

[2003] 88
2 AC Three Rivers DC v Bank of England (No 3) (CA) Hirst LJ

footings in 1986 (£17.5 billion, of which £6.3 billion were those of BCCI SA). In relation to shareholders it stated:

> "The shareholding structure of the group has always been somewhat opaque but the majority shareholders are the Crown Prince of Abu Dhabi, the Bin Mahfouz brothers, the Pharaon family and the Abu Dhabi Investment Authority."

The memorandum clearly acknowledged the shortcomings of supervision in and from Luxembourg.

Under the heading "Market perceptions of the BCCI group" the memorandum referred to the market as being very wary about the group. It also referred to a widespread view that the group was a United Kingdom bank for which the Bank had primary responsibility. It stated:

> "Other supervisors with major BCCI group operations are nervous and are looking for comfort and they often tend to look to the Bank. We judge that, given the nature of the group, the market may not see the Bank as providing any lender of last resort underpinning. We believe, however, that some blame would be attached to the Bank in the event of serious problems emerging."

So the likely consequences of "serious problems" (of an unspecified nature) were viewed in terms of blame for the Bank rather than loss to depositors. It reveals an unattractively introverted and defensive attitude, but it is consistent with Mr Stadlen's submission that at that stage the Bank's officers simply did not foresee the prospect of such loss, and that there is no arguable case that they did.

The BSD was asked to prepare a further paper for the next meeting of the BBS in September 1987. A further paper was prepared, dated 3 September, annexing an additional memorandum signed by Mr Gent. It is of particular importance because it addressed concerns expressed by the BBS as to the protection of United Kingdom depositors. The BBS had inquired whether such depositors might not be better protected by the formation of an United Kingdom subsidiary as the only licensed deposit-taker.

Both the main paper and Mr Gent's annexure argued against local incorporation. Again, both papers seem to have concentrated (despite the expressed concerns of the BBS) on the risk of the Bank being exposed to criticism rather than on the risk of depositors being exposed to loss. The main paper contained a statement (already quoted in section III above) as to the Bank's limited power to continue authorisation of BCCI SA Lord Neill criticised that statement, in our view with justification, as a travesty of both the legal and the factual position. Mr Gent's annexure referred, revealingly, to local incorporation having

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 77 of 260
Pg 157 of 686

> "very considerable disadvantages. First, we would be required to make a conscious decision that BCCI (UK) Ltd would, on the evidence before us, be run prudently. I find that a very difficult conclusion to come to at the moment and though we would no doubt ask for a great deal of information ... I suspect we would in the end be forced into reaching a conclusion *against our better judgment*."

The last words (to which emphasis has been supplied) are a remarkable echo of "contrary to a man's own conviction" in the old case of *Drewe v Coulton*,

---

**[2003]** **89**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Hirst LJ**

1 East 563n; but they go to awareness of illegality (in a hypothetical situation), not to foresight of loss.

The Bingham report, at paragraph 2.90, records that at the September meeting of the BBS:

> "There was again a lively discussion, during which the deputy governor expressed his disagreement with the main paper which, he felt, was too heavily influenced by concern for the Bank's position and too little by concern for that of UK depositors."

Hindsight confirms that the deputy governor's concerns were only too apposite.

The apparent lack of anxiety in the BSD about depositors' interests seems to have depended partly on financial statements audited by PW in their new capacity as group auditors, and on information provided by that firm. The 1987 accounts showed a small group profit of $37m, but after a reappraisal an additional provision of $100m was made. In May 1988 PW produced a substantial report for the college. This is dealt with in paragraphs 2.108-2.110 of the Bingham report. The PW report drew attention to some questionable points relating to ICIC, but (in the words of the Bingham report) the reasons for PW's concern "were not spelt out in the report, or even flagged". The report as a whole did not sound a note of warning.

In April 1989 PW gave their audit opinion on the 1989 group accounts, which showed a loss of $49m after loan loss provisions of $145m. The accounts were qualified because of the uncertainty caused by the Tampa incident. PW also prepared another substantial report for the third meeting of the college held in July 1989. The PW report drew attention to various matters of concern, some of which were long-standing problems (such as the high concentration of lending to a small number of borrowers including the Gokal group) and other relatively new (such as Tampa and the questionable transaction involving ICIC). They also reported that a capital injection in April 1989 had raised the risk-asset ratio (on adjusted end-1988 figures) to 1% above the Basle minimum.

The third meeting of the college is described in paragraphs 2.127-2.129 of the Bingham report. The meeting was chaired by Mr Barnes and Mr Naqvi (who had succeeded Mr Abedi) gave long and discursive answers to questions. PW thought that college meetings had become too large and formal to be effective. The Bank (principally in the person of Mr Barnes) was, as paragraph 2.131 of the Bingham report states, more sanguine.

That was the background to the report dated 1 November 1989 which the BSD prepared for the BBS. It contained up-to-date facts and figures and by now familiar complaints that (despite the establishment and operations of the college) there was not full transparency:

> "In summary the present position is unsatisfactory. The action we have taken to date ... has brought some improvement. But there is still no effective consolidated supervision, and much of the group's activity remains opaque."

As the Bingham report states, at paragraph 2.154, the fundamentals of the problem had not changed over the preceding decade.

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Under the heading "The way forward" the paper of 1 November 1989 identified three options: inaction, revocation of authorisation under the 1987 Act and full consolidated supervision of the group by the Bank. The report recommended the third as the long-term aim (which was by itself an indication, Mr Stadlen submitted, that the Bank cannot have foreseen any early collapse) while recommending formation of a local subsidiary as an interim solution. As to the revocation option the report stated: "Given our knowledge of the UK region, there are no grounds for revocation which we can determine. A section 11(1)(e) case alleging a general threat to depositors' interests"--i e that the interests of depositors or potential depositors of the institution are in any other way threatened, whether by the manner in which the institution is conducting or proposes to conduct its affairs or for any other reason--"would be tenuous in the extreme." In this passage the Bank's officials were looking to the possibility of a decision to withdraw authorisation being challenged through the statutory appeal procedure, and they no doubt had in mind that they would have to produce solid reasons to justify their action. In relation to the decision actually taken soon afterwards in relation to section 11(1)(a) of the 1987 Act, and in relation to the Tampa incident, the Bingham report, at paragraph 2.160, rightly criticised the Bank for being too much influenced by the fear that an appellate body might disagree with its decision. But even allowing for that, we see the passage which we have quoted as significant evidence of the state of mind of the Bank's officials at the end of 1989. Despite all the warning signs, they appear not to have considered the collapse of the BCCI group and the infliction of heavy losses on depositors as a real risk, rather than a theoretical or hypothetical possibility.

The last event calling for detailed discussion, during this period, was the fourth meeting of the college held in London on 1 December 1989. This meeting, and events following from it, are discussed in some detail both in the Bingham report, at paragraphs 2.148-2.154, and in the judge's third judgment. Part of the meeting was taken up with a presentation by American lawyers instructed on behalf of the BCCI group in connection with the Tampa incident. They explained that corporate criminal liability was easily established in the USA and that a plea bargain was advisable despite (as they asserted, and as the Bank and the rest of the college seem to have accepted) the absence of complicity on the part of any of the top management of BCCI The rest of the meeting was taken up with discussion of the lack of organic growth of profits within the group, the continuing problem of concentrations of loans and non-performing loans, and the Bank's latest proposal for the incorporation of two United Kingdom subsidiaries, one to house the central treasury and the other to house the United Kingdom branches.

After the meeting Mr Beverly of the BSD telephoned PW to make sure that the auditors were well aware of the supervisors' concerns. The Bank wished to know in advance if the next accounts were liable to be qualified. When the BBS received a report on the fourth college meeting the governor (in the words of the Bingham report, paragraph 2.153) "pointed to the need for greater urgency in pressing forward the separate incorporation of the UK business in order to build a firewall around the UK depositors".

Mr Barnes, in his evidence at the Gokal trial, said that ring fences did not really work, because in the event of liquidation they got "blown apart" by

international insolvency legislation. This matter is covered in proposed amendments to paragraphs 40.34 and 40.69 of the statement of claim, both of which refer to "the imminent peril of financial ruin envisaged by the governor".

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 79 of 260
Pg 159 of 686

The judge accepted the submission on behalf of the Bank that that there was no evidential basis on which the governor's foresight of "imminent peril of financial ruin" could be alleged. We have reviewed the evidential material again and we have reached the same conclusion. The governor rightly wanted to see a firewall put in place as a matter of urgency, as a protection for United Kingdom depositors against the possibility of a dangerous conflagration elsewhere in the BCCI group. Whether such a firewall would have protected them is, for present purposes, immaterial. The essential point, to our minds, is that the governor's urgently expressed wish is not evidence that he knew or believed or suspected that a huge conflagration was already blazing, and that loss to United Kingdom depositors would follow in the absence of rescue. On the contrary, it is inconsistent with such a conclusion. It is consistent with a belief that the situation was unsatisfactory but manageable, and that the plan for local incorporation was feasible and would improve the situation.

At this point, as so often in the course of this appeal, we have to remind ourselves that the Bank is charged, not with negligence, but with misfeasance in public office, which is a tort requiring dishonesty, and either actual foresight of, or reckless indifference to, the infliction of damage on the plaintiff. Where such a state of mind is alleged against a corporation, the case must be pleaded with some particularity. The plaintiffs' statement of claim (with its extensive past and proposed amendments) puts their case in great detail, and no doubt as clearly and as convincingly as it can be put. But in relation to the period down to April 1990 we agree with the judge that the case is not arguable on the basis of the material now available, and that there is no realistic prospect of the position being significantly changed by new material.

XXVII

*April 1990 to July 1991*

The final period is dealt with in detail in paragraphs 2.174-2.484 of the Bingham report and in the third judgment. The period opens with the PW's report dated 18 April 1990 to the board of BCCI Holdings and it ends, for practical purposes, with PW's draft section 41 report (delivered to the Bank on the night of Saturday, 22 June 1991) and its immediate aftermath.

The Bingham report says of the PW report of 18 April 1990, at paragraph 2.174:

> "The most striking point in the report was PW's indication that the group required financial support estimated at a minimum of $1.8 billion, with unfunded support for unsecured loans of about $400m. PW said that they could not sign the accounts as they stood. This point therefore went to the survival of the group."

The report also referred to false or deceitful accounting transactions and to PW's belief that loan transactions involving ICIC were improper. The Bingham report, at paragraphs 2.180-2.187, indicates that the financial

---

**[2003]** **92**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Hirst LJ**

crisis facing the BCCI group made more impact on the Banks officers than the questions raised as to the integrity of Mr Naqvi and Mr Abedi. Paragraph 2.181 comments:

> "It is eminently understandable that a financial crisis which threatened the survival of the group was the major preoccupation of PW and the Bank. But I do not think any informed reader of the report, which was relatively brief, could have failed to read it as seriously impugning the honesty with which the group had been run."

Yet the report was not at that stage shown or even mentioned to the BBS or any of the Banks governors.

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

The report cannot have come as a total surprise to the senior officials of the BSD, since Mr Hoult and Mr Cowan of PW had during February and March taken the exceptional course of coming to the Bank for private discussions with Mr Barnes and Mr Beverly. At a meeting on 2 March the Bank had learnt for the first time of PW's unnamed informant within BCCI SA. On 11 April Mr Hoult and Mr Charged had indicated to Mr Barnes and Miss Jones the very high level of shareholder support that would be required in order to rescue the group.

The report of 18 April 1990 was not therefore a totally unheralded shock for the Bank. Nevertheless it is highly significant as marking a date after which it would be impossible, in our judgment, to contend that there was no arguable case that the Bank was aware of a very serious and very immediate threat to depositors of BCCI SA. At this point, therefore, the prospect of a rescue operation being promoted by the Abu Dhabi ruling house, and the Bank's perception of the various possible outcomes, assumes central importance.

We think it is helpful to pause in the narrative at this point and take stock again of the plaintiffs' pleaded case. An enormous amount of skilled labour has gone into that pleading, but its complexity makes it very difficult, at times, to see the wood for the trees. However the general effect of paragraph 47.3A(a)(i)(1) and (2), taken with (b)(i)(1) and (2) and the copious particulars which are incorporated, is that from November 1989 (or an earlier date which we have already ruled out) the Bank knew, believed or suspected (or was recklessly indifferent to the prospect) that depositors and potential depositors would (in the absence of adequate and speedy remedial steps) suffer loss as the inevitable or probable consequence of the Bank's conduct, and also knew, etc, that such steps would probably not be taken.

The conduct of the Bank which is impugned by this pleading must be its conduct at the time when it had (through its responsible officers) the requisite state of mind. The Bank's failure to withdraw authorisation in (say) 1988 immediately after the Tampa incident cannot become tortious as the result of knowledge which the Bank obtained 18 months later.

That point (which is obvious, but still worth making) leads potentially to some very difficult issues of causation. Those issues were discussed in the judge's first judgment [1996] 3 All ER 558, 626-631, which was of course handed down long before the last set of proposed amendments was formulated. We have already considered issues of causation briefly in section XVI above. We see serious difficulties on causation in the path of very many of the plaintiffs, whose losses would appear to have been caused by fraud on an unprecedented scale which had been on foot long before

---

1990. Nevertheless it seems very probable that there must be a class of depositors (that is, those who first became depositors in the last year before the eventual collapse, whose claims would not founder on causation if it could be shown that, during the final year, the Bank knowingly stood by and failed in its duty to close down a doomed business. That is reflected in our observations in section XVI. The judge's decision to strike out the plaintiffs action in its entirety, even in respect of the latest depositors, must therefore stand, if it is to stand, not on causation, but on the Bank's perception, during this final period, of the relative probabilities of a successful rescue operation or a ruinous collapse.

The complicated pattern of events during the final period is clearly summarised in the Bingham report. The judge's third judgment adds some comment on material not available to be considered in the Bingham report, notably the evidence of Mr Barnes, who said at the Gokal trial:

> "The most difficult balance that you have to strike as a regulator is striking the balance between the existing depositors and potential depositors. It is almost always in the interests of existing depositors that a solution which does not involve liquidation is more in their interests. The very difficult balance one has to strike is the interest of the potential depositors, the people who may in the future decide to deposit in that bank."

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 81 of 260
Pg 161 of 686

We do not find it necessary to discuss in detail the events between April 1990 and July 1991. The principal landmarks during 1990 were as follows. (i) There were 10 days of intense activity immediately after the PW report of 18 April, ending with the decision of the Abu Dhabi Government, in principle, to promote a rescue operation. (ii) The fifth meeting of the college was held on 19 June, at which the IML delivered the ultimatum that BCCI SA must leave Luxembourg. (iii) PW made three visits to Abu Dhabi between then and October. (iv) PW reported to the BCCI audit committee on 30 October (and copied the report to the Bank) identifying the need for further support of the order of $1.5 billion. (v) The BBS met on 4 October and the sixth meeting of the college took place on the following day. (vi) There was sporadic contact between the Bank, PW and the US Federal Reserve Board, but their communications had by November and December reached a position satisfactory to neither side. The principal landmarks during 1991 were: (i) delays caused by questions over the $600m loan portfolio in January; (ii) doubts about the attitude of the majority shareholders in February, and PW's so-called "Doomsday Report" of 25 February, quantifying the total support required at between $4.4 billion and $5.6 billion; (iii) PW's contentious meeting with the board of BCCI SA on 1 March; (iv) the Bank's commissioning from PW of the section 41 report on 4 March; (v) the seventh meeting of the college on 4 April; and (vi) the signature of the majority shareholders' support package on 22 May.

There is a bitter irony in the fact that the majority shareholders' support, so arduously obtained over a period of about 13 months during which one unpleasant shock followed another, failed to achieve the rescue of BCCI. But the fact that it was obtained, just a month before PW's section 41 report finally led the Bank to take drastic action and close BCCI SA, seems to us striking confirmation of what emerges from the totality of the documentary evidence, that is that the Bank hoped and expected, on

---

**[2003]** **94**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Hirst LJ**

reasonable grounds, that a rescue operation would succeed. Further confirmation is also provided by the criticism which was subsequently aimed at the Bank for its eventual decision to close BCCI SA. The Bingham report discusses the decision and concludes, at paragraph 2.478: "It cannot be plausibly argued, in my opinion, that the course which the Bank took was not an appropriate one, even though it was not the only possible course." The following six paragraphs contain some trenchant comments on the events of the final period, which is described, at paragraph 2.480, as "a tragedy of errors, misunderstandings and failures of communication". The Bingham report plainly considers that rescue was feasible and collapse not inevitable.

The judge reached the firm conclusion, in his third judgment, that, on the material then available, the plaintiffs had no arguable case that the Bank dishonestly licensed BCCI SA or dishonestly failed to revoke the licence or authorisation in circumstances when it knew, believed or suspected that the company would probably collapse without being rescued. We agree with that conclusion. We also agree that, in all the circumstances of this extraordinary case, it is now for practical purposes inconceivable that new material would emerge of such significance as to alter that conclusion. The tort alleged is a tort of dishonesty, and the plaintiffs' claim must be rigorously assessed on their pleaded case and the evidential material shown to be available to support it.

XXVIII

*Conclusions*

Throughout the preceding four sections we have adopted the same approach as that taken by the judge, and asked ourselves whether the plaintiffs have an arguable case that the Bank actually foresaw BCCI's imminent collapse at each relevant stage. We have agreed with the judge's conclusion that all the evidence indicates that up to April 1990 it did not, and that thereafter it did, but properly relied on the prospect of a rescue. That is sufficient to dispose of the case in the Bank's favour.

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

That formulation, however, may have been too favourable to the plaintiffs. In view of the stringent requirements of the tort of misfeasance in public office, the more appropriate question may be: "Is it reasonably arguable that the Bank at any stage made an unlawful and dishonest decision knowing at the time that it would cause loss to the plaintiffs?" To that question, in the light of our analysis of the evidence, the answer is plainly "No."

We would therefore dismiss the appeal.

**AULD LJ**

CONTENTS

Summary of judgment 95
The issues 96
The Directive of 1977 and the Banking Acts 1979 and 1987 97
The Community law claim 99
Introduction and summary 99

---

The purpose and terms of the Directive of 1977 103
*Yuen Kun Yeu v Attorney General of Hong Kong* and *Davis v Radcliffe* 109
The legislative basis of the Directive of 1977 113
*Francovich* liability 117
*Francovich* liability of a regulatory body 128
Direct effect--implementation 133
Sufficiently serious breach 136
Causal link 137
Conclusion 137
Common law claim for misfeasance in public office 137
The two forms of the tort 137
"Policy" and "principle" 139
The old authorities 143
*Bourgoin SA v Ministry of Agriculture, Fisheries and Food* 147
The Commonwealth authorities 150
English authorities since Clarke J's judgment 157
Conclusion 157
"The third way"--reformulation of the tort of misfeasance in public office 163
Causation 166
Potential deposito 169
The July 1997 judgment striking out the claim 170

*Summary of judgment*

For the reasons summarised below, I would allow the plaintiffs' appeal and dismiss the Bank of England's cross-appeal on the matters in issue, save as set out in paragraph 9.

1. A right to a remedy in damages enforceable in the courts of member states may arise from a clearly defined obligation imposed by an EEC Directive, even though the right is not expressly identified in it, and

does so where failure to acknowledge the right would deprive those for whose protection the obligation is imposed of a full remedy for its breach (post, pp 117A-128E).

2. The First Council Banking Co-operation Directive of 12 December 1977 (77/780/EEC) imposed clearly defined obligations on member states and on their regulatory bodies. In doing so, it gave rise to corresponding Community law rights in depositors to enforce those obligations by an action for damages in a United Kingdom court (post, pp 128F-136C).

3. Such Community law rights prevail over United Kingdom law, in particular section 1(4) of the Banking Act 1987 and the common law action for misfeasance in public office, to the extent that United Kingdom law conflicts with or purports to impede the effective enforcement by depositors of their Community law rights (post, pp 100F-H and 135H-136C).

4. In the context of this case, the Directive, with a view to protecting the customers of banks trading in this country, imposed obligations on the Bank of England to prevent such banks from trading if they failed to meet the criteria laid down by the Directive and/or effectively to supervise them with a view to ensuring their compliance with such criteria (post, pp 132F-133B).

5. The plaintiffs, as depositors of BCCI at the material time, have an arguable Community law claim in damages against the Bank of England for

---

losses caused by a "sufficiently serious breach" by it of its regulatory and supervisory obligations under the Directive (post, pp 136C-137C).

6. The essence of the common law tort of misfeasance in public office is dishonesty in the form of abuse of public office. Such dishonesty may, but does not necessarily, include as an essential ingredient some appreciation by the public officer of the injurious consequence of his act. The tort may be committed in two distinct ways: by an act of "targeted malice", that is, one intended to harm the plaintiff; or by an intentional and knowingly unlawful act which does harm him. As to the latter, it is enough if the officer dishonestly disregards his plain duty or does not honestly attempt to do it (post, pp 137E-139F and 157C-163G).

7. If, in the second form of the tort, it is necessary to prove some appreciation by a public officer of the injurious consequences of his act, reasonable foreseeability of injury, not foresight in the form of knowledge, belief or suspicion of probable injury, is the most that is required (post, p 163D-G).

8. The plaintiffs, as depositors of BCCI at the material time, have an arguable case, subject to proving the matters of fact on which they rely and seek to rely, against the Bank of England for damages for misfeasance in public office by reason of its alleged intentional and knowingly unlawful conduct in failing to regulate and supervise BCCI as required by the Banking Acts 1979 and 1987 (post, p 163G).

9. Matters of causation of the plaintiffs' damage and whether all the plaintiffs come within the class of persons entitled to claim against the Bank of England for misfeasance in public office should be determined after a trial on the facts (post, pp 166B-170B).

10. The judge should not have struck out the plaintiffs' claim on the basis that, on the evidence which he considered would be available at trial if there were one, the claim would be bound to fail. This legally and factually complex case is particularly unsuitable for such a ruling and is not of the very exceptional kind required to justify such a course (post, pp 170B-176A).

*The issues*

Hirst and Robert Walker LJJ have summarised the factual history giving rise to the plaintiffs' claim, and of its progress, against the Bank of England ("the Bank") in respect of their losses resulting from the failure of BCCI. Their appeal and the Bank's cross-appeal from the several judgments of Clarke J culminating in his striking out of their claim raise the following issues: (1) whether, on the assumption that the facts the plaintiffs plead and propose to plead are, true, they have an arguable (i) Community law claim

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 84 of 260
Pg 164 of 686

under or derived from the Directive of 1977, (ii) common law claim for misfeasance in public office, (iii) common law claim for administrative failure regardless of abuse of power, (iv) case under any of the first three heads that the Bank caused such damage as they suffered from the incompetence or dishonesty of BCCI and (v) claim to be an existing or ascertainable body of persons so as to entitle them to recover under any of the first three heads; and (2) whether the judge was entitled to strike out their claim for misfeasance in public office as one bound to fail.

I shall deal first with the Community law claim, because if the plaintiffs were to succeed under that head the only possible surviving impediments to

---

[2003] 97
2 AC Three Rivers DC v Bank of England (No 3) (CA) Auld LJ

the matter proceeding to trial would be issues (1)(iv) and (v). Before doing so, and for convenience of reference, I shall briefly introduce the Directive of 1977 and the Banking Acts 1979 and 1987, returning to them in more detail where appropriate later in the judgment.

*The Directive of 1977 and the Banking Acts 1979 and 1987*

Before the 1979 Act there was no formal system in this country for the regulation and supervision of banks. It had been left to the Bank of England and the "twitch of its governors' eyebrows" to encourage prudential practices by those bodies holding themselves out as banks. The European Community's First Council Banking Co-ordination Directive of 12 December 1977 (77/780/EEC) changed all that. Its full title described it as for "the co-ordination of laws, regulations and administrative provisions relating to the taking up and pursuit of the business of credit institutions".

In outline the directive obliged member states to require banks to obtain authorisation before commencing their activities (article 3) and, through their "competent authorities", only to grant such authorisation if: the bank had separate and adequate minimum capital; its business was effectively directed by at least two persons (the "four eyes requirement"); and the two persons were of sufficiently good repute and had sufficient experience for the purpose.

It also required the competent authorities of member states to establish certain financial operating criteria for banks with a view to monitoring their solvency and liquidity (article 6) and member states to collaborate closely in the supervision of banks with branches in more than one member state (article 7). Finally, for the purpose of this brief summary, it provided for the withdrawal of authorisation on a number of grounds, including failure by a bank to continue to fulfil the conditions under which it was granted and/or lack of sufficient own funds or because it could no longer be relied upon to fulfil its obligations (article 8).

The directive, by article 189 of the EEC Treaty, was not directly applicable, but it was "binding" on each member state "as to the result to be achieved", leaving to each "the choice of form and methods". The United Kingdom's form and methods were the Banking Act 1979, the material parts of which came into force on 1 October 1979. I have summarised the material provisions of the Act in an appendix to this judgment [not set out in this report]. In even briefer summary here, it prohibited the carrying on of a banking business, referred to in the Act as "a deposit-taking business" (section 1), save for a two-tier system of exemption to be granted by the Bank, namely "recognition as a bank" or by the grant of "a full licence to carry on a deposit-taking business" (sections 1-3). The Act set out various criteria of probity and financial prudence and standing for each form of exemption. The main difference between the criteria was that, to obtain recognition as a bank, the applicant had to satisfy the Bank, inter alia, that it enjoyed, and had done so for a reasonable period of time, "a high reputation and standing in the financial community" and that it provided or would provide a wide range of banking services or a highly specialised banking service (section 3(3) and Schedule 2).

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 85 of 260
Pg 165 of 686

In addition, the Act provided that in the case of an institution whose "principal place of business" was out of the country the Bank, instead of satisfying itself of the institution's compliance with the statutory criteria,

[2003] 98
2 AC Three Rivers DC v Bank of England (No 3) (CA) Auld LJ

could rely on assurances of the supervisory authority in the country of its principal place of business as to its management and overall financial soundness, providing that it, the Bank, was satisfied about the supervision exercised by that authority (section 3(5)).

The Bank's control of banks under the Act consisted in the powers of grant and revocation of recognition or of a full licence as the case may be. It also had extensive powers of supervision through the media: first, of the grant of a conditional licence, that is, one subject to such conditions as it considered necessary to protect depositors (sections 7(1)(b) and 10), and/or, second, of a requirement of the bank to furnish it with information and documents about its affairs (section 16) and/or, third, by ordering an investigation of the conduct of its business (section 17).

As BCCI SA and BCCI Overseas were already carrying on deposit-taking businesses in this country when the main provisions of the 1979 Act came into force on 1 October 1979, they required recognition as banks or licensing as deposit-taking institutions to enable them to continue in business. SA applied for recognition. The Bank rejected the application, but on 19 June 1980 granted it a full licence, which it retained until the licence was automatically converted into an authorisation under the 1987 Act. Overseas did not apply for recognition or licensing at any time and was never granted either.

The plaintiffs maintain and the Bank accepts as arguable that SA's principal place of business was always in the United Kingdom. However, the Bank relied, purportedly under section 3(5) and later under section 9(3) of the 1987 Act, on assurances as to its soundness from the LBC/IML, the supervisory authority in Luxembourg, as a proxy for satisfying itself, that SA met the statutory criteria for a full licence/authorisation. Overseas, notwithstanding its lack of recognition or licence, traded in London as a bank and a deposit-taking business until the removal of the BCCI group's central treasury from London to Abu Dhabi in October 1986.

The Banking Act 1987, the material parts of which came into force on 1 October 1987, begins by defining the functions and duties of the Bank. It expressly identified its supervisory role (section 1(1)) and required it to establish a committee to be known as the Board of Banking Supervision (section 2). It also introduced a statutory exemption from liability for the Bank and its officers and employees in respect of that supervisory role in the absence of proof of bad faith. Section 1 provides:

> "(1) The Bank of England ... shall have the powers conferred on it by this Act and the duty generally to supervise the institutions authorised by it in the exercise of those powers ... (4) Neither the Bank nor any person who is a member of its Court of Directors or who is, or is acting as, an officer or servant of the Bank shall be liable in damages for anything done or omitted in the discharge or purported discharge of the functions of the Bank under this Act unless it is shown that the act or omission was in bad faith."

The system of control under the new Act was much the same as that under the 1979 Act. However, it dispensed with the two-tier system of recognition and licensing, substituting for it a single authorisation as a bank. Recognised and licensed institutions under the former regime became authorised banks.

[2003] 99
2 AC Three Rivers DC v Bank of England (No 3) (CA) Auld LJ

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 86 of 260
Pg 166 of 686

The minimum criteria of probity and financial prudence and standing for authorisation were similar to those in the 1979 Act, though more specific (section 9 and Schedule 3). The, new Act also contained, in section 9(3), a continuation of the section 3(5) power under the old Act, in the case of institutions whose principal place of business was in a country outside the United Kingdom, for the Bank to rely on information of the relevant supervisory body in that country as to prudent management and overall financial soundness if it was satisfied as to the supervision exercised by that authority.

The new Act contained similar but broader powers of revocation. Section 11(1) provided that the Bank "may" revoke an authorisation "if it appears to" it that:

> "(a) any of the [relevant] criteria ... is not or has not been fulfilled, or may not be or may not have been fulfilled ... (b) the institution has failed to comply with any obligation imposed on it by or under [the] Act ... (e) the interests of depositors or potential depositors of the institution are in any other way threatened, whether by the manner in which the institution is conducting or proposes to conduct its affairs or for any other reason."

It also continued the possibility of conditional or, as it calls it, "restricted", authorisation (section 12).

*The Community law claim*

The plaintiffs' claim in Community law is derived from the Directive of 1977.

*Introduction and summary*

Article 189 of the EC Treaty binds each member state to achieve the result stipulated in a directive but leaves to the authorities of the member state how it is to do that. The overlapping but more general article 5 of the Treaty requires each member state "to take all appropriate measures ... to ensure fulfilment" of obligations arising out of the Treaty and, inter alia, of directives.

The European Court has developed a principle of "direct effect" for directives similar to that of direct applicability expressly provided by article 189 for regulations. The principle, which is a right to invoke Community law against a member state or its emanation to protect interests for which a directive makes provision, owes its origin to the court's concern to ensure that member states should not be able to deprive individuals of Community law rights derived from a directive, simply by failing to implement or by mis-implementing it: *Felicitas Rickmers-Linie KG & Co v Finanzamt fŸr Verkehrsteuern, Hamburg* (Case 270/81) [1982] ECR 2771; *Marshall v Southampton and South West Hampshire Area Health Authority (Teaching)* (Case 152/84) [1986] QB 401.

The court has held that a member state may not plead, as against an individual, its own failure properly to implement the directive: *Becker v Finanzamt MŸnster-Innenstadt* (Case 8/81) [1982] ECR 53, 71, para 24. In that case the court, at para 25, specified two, not necessarily mutually exclusive, purposes for which he could rely upon it: first, "as against any national provision which is incompatible with" it; and second, "in so far as

---

**[2003]** **100**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

[its] provisions define rights which individuals are able to assert against the state".

Whichever of the two purposes for which an individual may rely on a directive--defensive or aggressive--the court, in *Becker's* case, at p 71, para 25, has stipulated that the provisions upon which he relies must be "unconditional and sufficiently precise" as to three matters: first, the identity of the persons entitled to the right ("the eligible plaintiff point"); second, the content of the right ("the contents point"); and, third, the identity of the person against whom the right may be asserted ("the damages point"). See also *Francovich v Italian Republic* (Case C-6/90) [1995] ICR 722, 738, paras 11 and 12; and *Brasserie du*

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 87 of 260
Pg 167 of 686

*Pcheur SA v Federal Republic of Germany*(Joined Cases C-46/93 and C-48/93) [1996] QB 404. Blackburne J observed in *Griffin v South West Water Services Ltd* [1995] IRLR 15, 30 that the concept of the test "unconditional and sufficiently precise" is "somewhat elusive"; he went on nevertheless to venture a simple test which I find as good as any: "One at least of the elements of unconditionality and precision which the provisions of a directive must exhibit ... is that it should be clear what it is that the body is required to do."

The European Court from its earliest days has also developed, albeit more slowly, a broader principle of liability in damages to individuals of which, it seems to me, the *Becker* direct effect rule may now be regarded a part. It is a fundamental principle of Community law inherent in the system of the Treaty, including articles 5 and 189, that national courts must provide remedies to individuals to protect their Community law rights, if necessary by removing national procedural or substantive rules which prevent or impede such remedies: see *Francovich's* case [1995] ICR 722, 771-773, paras 28-46; see also *NV Algemene Transport- en Expeditie Onderneming van Gend & Loos v Nederlandse administratie der belastingen* (Case 26/62) [1963] ECR 1; *Costa v Ente Nazionale Energia Elettrica*(Case 6/64) [1964] ECR 585; *Amministrazione delle Finanze dello Stato v Simmenthal SpA* (Case 106/77) [1978] ECR 629, 643, 644, paras 16 and 21; *R v Secretary of State for Transport, Ex p Factortame Ltd (No 2)* (Case C-213/89) [1991] 1 AC 603, 643-644, para 19.

A right to damages under the *Francovich* head only exists where: first, the obligation giving rise to it is clearly defined on a similar basis to that required to give a directive direct effect, namely so as to confer clearly identifiable rights in the event of its breach; second, the breach is "sufficiently serious" in the sense that the member state "manifestly and gravely disregarded the limits on its discretion"; and third, there is a direct causal link between the breach of the obligation and the claimed loss: see *Francovich's* case [1995] ICR 722, 772, para 40; and the *Brasserie du Pcheur* case [1996] QB 404, 499, paras 51 and 55. As Clarke J observed [1996] 3 All ER 558, 622, the *Becker* and *Francovich* requirements as to conferral of rights under a directive are much the same.

If the plaintiffs can establish their claimed right in Community law to damages against the Bank, section 2(1) of the European Communities Act 1972 entitles them to enforce it in the courts of the United Kingdom. However, in doing so the courts must set aside, if necessary, any conflicting provisions of our domestic statutory or common law, in particular, in this context, the requirement of proof of bad faith in section 1(4) of the 1987 Act and in the tort of misfeasancer in public office.

---

**[2003] 101**
**2 AC Three Rivers DC v Bank of England (No 3) (CA) Auld LJ**

The plaintiffs' claim against the Bank is for damages for loss caused to them by its failure to comply with obligations to them derived from the Directive of 1977. It is not a claim against the United Kingdom based on failure to implement the directive in the sense of not transposing it into national legislation, but against the Bank as its emanation for failing to apply it.

The plaintiffs maintain that their claim does not depend on whether the directive itself expressly confers on them a right and remedy arising from the Bank's breach of its obligations. They say that it is sufficient to derive from its terms firm and precise obligations to protect depositors from which, if it is to achieve its purpose, a corresponding right in them to damages for breach of such obligations must follow. That, they say, is a right founded directly in Community law. As to the obligations, and corresponding rights, they maintain that they are sufficiently firm and precise to meet the broadly corresponding formulations in *Becker's* case: [1982] ECR 53 and *Francovich's* case [1995] ICR 722, that the breaches are "sufficiently serious" to give them a remedy in damages and that they have caused them direct loss.

Under both heads of claim the plaintiffs rely on recent jurisprudence of the European Court which, they contend, shows that a directive does not cease to be a source of Community law obligations giving rise to corresponding rights, or to have direct effect, in a member state once that state has implemented it. They say that, whether implemented or not, it may impose obligations on a member state, or an emanation of it

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

as appropriate, giving rise to corresponding rights under Community law. Thus, Community law provides a remedy for failure to apply an implemented directive as well as for failure to implement it.

As to breach by the Bank of its obligations under the directive, the plaintiffs maintain that the Bank, knowing at all material times that BCCI did not meet the minimum legal criteria for licensing or authorisation, failed to meet its obligations in one or more or all of three respects, namely: in licensing or authorising it to trade as a bank; in failing to supervise it to ensure that it met the criteria for licensing or authorisation; and in failing to revoke or withdraw its licence or authorisation, as the case may be, or to take steps short of such revocation or withdrawal to protect depositors.

The plaintiffs maintain that the facts and matters that they plead and seek to plead, including that the Bank knew it was acting unlawfully, more than satisfy the requirements that I have just summarised as necessary to entitle them to recover damages from it for breaches of Community law. They add that, to the extent that section 1(4) of the 1987 Act or the English law of misfeasance in public office calls for proof of more, in particular, of bad faith or, as Clarke J added, of knowledge, belief or suspicion that the acts or omissions complained of would probably cause them damage, it is incompatible with Community law. That is because it is "tantamount to calling in question the right to reparation founded on the Community legal order": see the *Brasserie du Pcheur* case [1996] QB 404, 502-503, para 79.

The Bank's case is, first, that the plaintiffs cannot succeed, however they put their claim, because the directive neither expressly confers upon them any right or remedy in damages against banking regulators for breach of it nor provides any basis for an obligation to them from which any such rights could be derived. In the *Becker* formula, it did not "define" any such rights,

---

nor were its terms unconditional or sufficiently precise to give it direct effect. In *Francovich* terms it did not confer identifiable rights on individuals in the category of the plaintiffs. It was nothing more than the first of a series of Community directives providing for the gradual harmonisation of national laws so as to eliminate discrimination in competition in the provision of banking services. The Bank maintains that such Community legislation did not expressly confer any rights to compensation until 1995, when the Community, by directive, provided for a harmonised system of minimum and maximum levels of compensation in the form of deposit guarantee schemes: Council Directive (94/19/EC) of 30 May 1994.

Second, the Bank says that there is no authority for the *Francovich* type claim based on state liability against an emanation of the state, still less against a regulatory authority for failure properly to carry out its duties.

Third, the Bank says that the United Kingdom has fully and properly implemented the Directive of 1977 and it is, therefore, no longer a source of or a means of identifying rights in Community law; the plaintiffs cannot, therefore, pray in aid the *Becker* principle of direct effect, and their sole remedy if any, is under English common law.

Fourth, the Bank says that the only basis on which Community law might be of value would be as an aid to interpretation of the United Kingdom's implementing legislation, or as comparative material for consideration of future legislation, but that Community law provides no such interpretative or comparative material.

Fifth, the Bank says that, even if it is in breach of an obligation capable of giving rise to rights of action by the plaintiffs for damages, its breach is not "sufficiently serious" to confer such rights in the circumstances of the case.

Sixth, the Bank maintains that it has not, by its conduct as regulator, caused any direct loss to the plaintiffs.

Clarke J [1996] 3 All ER 558, 603 held that the plaintiffs could not show that the Directive of 1977 was intended to confer upon them rights enforceable by an action for damages against a banking supervisory body. He agreed with the Bank's case that the directive imposed no duty on it to supervise and that its immediate purpose was a first step towards harmonisation. He acknowledged that an important underlying

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 89 of 260
Pg 169 of 686

purpose of the directive was to protect existing and future depositors. However, he ruled, at p 602, that that was not enough to impose on the Bank any obligation which gave rise to rights on the part of the plaintiffs to claim damages for breach of it. He said, at pp 614-615:

> "In my judgment the Directive of 1977 was not intended to confer rights upon savers, even though the underlying purpose of supervision of credit institutions was to be for their benefit. It is true that articles 3 and 7, and probably also article 8, impose duties upon the supervising authority, but it does not seem to me to follow from that that it was intended that savers or any particular class of person were to have rights of action in damages against that authority."

His reasoning was the same under both heads of the Community law claim, namely that the provisions of the directive were not sufficiently precise as to the identity of the persons entitled to the right claimed, or as to the content of the right, or as to the identity of the person obliged. He was influenced, in particular, by the absence from the directive of any "remedies

---

**[2003]** **103**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

provision" of the sort found in *von Colson v Land Nordrhein-Westfalen* (Case 14/83) [1984] ECR 1891 and *Marshall v Southampton and South West Hampshire Area Health Authority (Teaching)* (Case 152/84) [1986] QB 401; see [1996] 3 All ER 558, 616-618. As to *Francovich* liability, as distinct from that giving rise to direct effect, he said, at p 622:

> "if the plaintiffs cannot establish a sufficient right or interest to enable them to rely upon the directive as having direct effect, they equally cannot succeed by relying upon the principle in *Francovich* because here too it is necessary to establish the same right or interest."

In so ruling, the judge applied to the Directive of 1977 the reasoning of the Privy Council in relation to domestic legislation in the negligence cases of *Yuen Kun Yeu v Attorney General of Hong Kong* [1988] AC 175 and *Davis v Radcliffe* [1990] 1 WLR 821, that public regulators who had discretionary powers to stop deposit-taking institutions from carrying on business, but no day-to-day control or supervision of them, had no legal responsibility to depositors or potential depositors for default of those institutions made possible as a result of their regulatory decisions, even though one of their functions was to protect depositors. In so reasoning the Judicial Committee relied on three matters which Clarke J considered, at pp 600-602 and 615, applied to the Directive of 1977: the regulator had no day-to-day control or supervisory responsibility over the institutions; the immediate cause of the loss was the default of third parties, namely fraud by the managers of the institutions; and the regulator's role was a discretionary one, namely to balance a number of different factors in the interest of the public: generally as well as that of existing and future depositors. As to the last, the judge considered [1996] 3 All ER 558, 601 that it might be that depositors would be sufficiently protected by, criminal sanctions against the fraudsters themselves or by the establishment of a supervisory system such as the Board of Banking Supervision introduced by section 2 of the 1987 Act.

*The purpose and terms of the Directive of 1977*

It is a fundamental and general principle of Community law inherent in the Treaties that national courts must protect the rights which individuals derive from Community law. The first question for decision, at its broadest, is whether the directive, purposively construed, imposed obligations on the Bank to protect depositors, the breach of which conferred on them a right to claim damages against it.

It is plain that one of the purposes of the directive was the protection of depositors. The plaintiffs say it was the main purpose. The Bank, to the extent that it recognises it as a purpose of the directive at all, says

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 90 of 260
Pg 170 of 686

it was subsidiary to that of beginning the process of harmonisation. As I have mentioned, the judge regarded it as an important underlying purpose.

Purposive construction of the directive requires consideration of the relative importance it gives to the protection of depositors as well as to the content and precise formulation of the articles in it upon which the plaintiffs rely. As always in Community instruments, the title and recitals are important. Also of importance when considering the precision, or lack of it, in the articles themselves, is the extent to which their criteria for authorisation and withdrawal of authorisation allowed the Bank a discretion in determining whether such criteria were met or as to what it

---

**[2003]** **104**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

could do if it was of the view they were not. In particular, it is of value to look for what, if any, scope it allowed in that exercise for consideration of other factors of the sort mentioned by Lord Goff in *Davis v Radcliffe* [1990] 1 WLR 821, 827B-C, to which I shall return, namely the effect of a decision one way or the other on other depositors, creditors and other customers of the bank and possibly on the wider provision of financial services in the community.

The title of the directive is "the co-ordination of laws, regulations and administrative, provisions relating to the taking up and pursuit of the business of credit institutions", which, the Bank contends, summarises its main purpose--harmonisation. However, the plaintiffs say that looking at the directive as a whole, and in the light of its legislative basis as the court should, its purposes were the immediate protection of depositors and the progressive co-ordination of the laws of member states to achieve the same minimum level of protection throughout the Community.

Reference to the legislative basis for the directive mentioned in the preamble to it, in particular article 57 (2) of the Treaty and the opinion of the Economic and Social Committee ("ECOSOC"), indicates that harmonisation without regard to content was not and could not sensibly have been an end in itself. Article 57(2) required the Council before the end of a transitional period to issue directives for the co-ordination of the laws of member states as to the taking up and conduct of professions and businesses, including that of banking. And ECOSOC, in drawing up its opinion on the proposal for the directive, included a number of passages clearly relevant to the degree of protection to be provided for depositors as well as to its uniformity in the specific provisions proposed: see the report of ECOSOC (OJ 1975 C263, p 25). The opinion, which gave rise to an amendment to the directive, included the following passage:

> "1.1.3 ... the lack of harmonisation of member states' legislation, whose main purpose in each country is to provide security for depositors and to protect savings, is liable to create serious disparities with regard to that objective, indeed even certain dangers."

As to the recitals, Clarke J has helpfully rehearsed all of them, at pp 607-608. Recitals 1, 2 and 9 refer to the need to remove discrimination between member states in the establishment and provision of banking services. Recital 3 refers to the need for the introduction by "successive stages" of a system which, when read with the other provisions in the directive, would plainly provide both immediate supervision within each member state and, in the long term, consolidated supervision by home member states in consultation with host member states, that is

> "overall supervision of a credit institution operating in several member states by the competent authorities in the member state where it has its head office, in consultation, as appropriate, with the competent authorities of the other member states concerned."

Among the other recitals, no. 4 refers to the need for measures "to co-ordinate credit institutions ... both in order to protect savings and to create equal conditions of competition between" them. No 8 contains the same duality in providing:

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

> "Whereas the *eventual* aim is to introduce uniform authorisation requirements throughout the Community for comparable types of credit institution; *whereas at the initial stage* it is necessary, however, to specify only certain minimum requirements to be imposed by all member states." (My emphasis.)

See also recitals 5 and 12.

A directive may have two or more purposes and, regardless of their relative importance, may impose obligations advancing both or all of them. In my view, it is an arid exercise to seek to attribute greater importance to one or other of the two purposes of immediate protection of depositors and progressive harmonisation. It is clear from the directive, looked at as a whole and in its legislative context, that there were two such purposes here and that they were interdependent, each serving the other and as a start specifying certain minimum requirements for the protection of depositors. I am content to adopt Clarke J's conclusion, at p 609, that while "the immediate purpose of the directive was a first step towards ... harmonisation ... a key purpose of controlling and supervising credit institutions was to protect ... savers by the protection of their savings".

The articles of the directive, particularly articles 3, 6, 7 and 8 upon which the plaintiffs rely, must be read in the light of its recitals and the legislative background. By way of preliminary, it should be noted that, although the directive, in its title and in article 2, applies it to "the taking up and pursuit of business of credit institutions", it is plainly also, and perhaps primarily, concerned with institutions that receive deposits. Article 1 defines "credit institution" as "an undertaking whose business is to receive deposits or other repayable funds from the public and to grant credits for its own account".

As I have mentioned, article 3 set out certain conditions of authorisation of credit institutions to trade as such. It imposed duties variously on member states and on their competent authorities. It obliged member states to require credit institutions to obtain authorisation before trading and their competent authorities to grant authorisation only on certain minimum conditions. It provided, so far as material:

> "(1) Member states shall require credit institutions subject to this directive to obtain authorisation before commencing their activities. They shall lay down the requirements for such authorisation subject to paragraphs (2), (3) and (4) ... (2) Without prejudice to other conditions of general application laid down by national laws, *the competent authorities shall grant authorisation only when the following conditions are complied with*: the credit institution must possess separate own funds, the credit institution must possess adequate minimum own funds, there shall be at least two persons who effectively direct the business of the credit institution ... *the authorities* concerned shall not grant authorisation if the [two] persons ... are not of sufficiently good repute or lack sufficient experience to perform such duties ... (4) Member states shall also require applications for authorisation to be accompanied by a programme of operations setting out inter alia the types of business envisaged and the structural organisation of the institution." (My emphasis.)

Article 3, in paragraph (3), also prohibited competent authorities when considering authorisation under those provisions from having regard to the economic needs of the market, subject where appropriate to a transitional period of 7 to 12 years before the prohibition took effect. However, it is interesting to note that

within that transitional period paragraph (3)(d) provided that the criterion of economic need must be aimed at promoting, amongst other things, "security of savings".

Article 6 deals with supervision. In my view, and contrary to that of Clarke J, at p 616, it imposed on regulators immediate duties of a technical banking nature to "ensure that savings are protected", and it did so in advance of the process and achievement of co-ordination. It is clear from the wording of the article and the context of the directive as a whole, concerned as it is with "the taking up *and pursuit* of the business of credit institutions" (my emphasis), that the intended purpose of the supervision was to ensure, as a minimum, continuing compliance with the requirements of authorisation under article 3. It provided:

> "(1) Pending subsequent co-ordination, *the competent authorities* shall for the purposes of observation and, if necessary, in addition to such coefficients as may be applied by them, establish ratios between the various assets and/or liabilities of credit institutions with a view to monitoring their solvency and liquidity and the other measures which may serve to ensure that savings are protected. To this end, the Advisory Committee"--established under article 11--"shall decide on the content of the various factors of the observation ratios referred to in the first sub-paragraph and lay down the method to be applied in calculating them. Where appropriate, the Advisory Committee shall be guided by technical consultations between the supervisory authorities of the categories of institutions concerned. (2) The observation ratios established in pursuance of paragraph (1) shall be calculated at least every six months. (3) The Advisory Committee shall examine the results of the analyses carried out by the supervisory authorities referred to in the third sub-paragraph of paragraph (1) on the basis of the calculations referred to in paragraph (2). (4) The Advisory Committee may make suggestions to the Commission with a view to co-ordinating the coefficients applicable in the member states." (My emphasis.)

An associated provision, article 7, was also directed at the mechanics of supervision, obliging banking regulators to have regard to such matters in their supervisory role. I do not agree with Clarke J, at p 614, where he said that this article requires competent authorities merely to "collaborate closely in order to supervise" but does not of itself "impose a duty to supervise". It provided:

> "(1) The *competent authorities* of the member states concerned shall collaborate closely in order to supervise the activities of credit institutions operating, in particular by having established branches there, in one or more member states other than that in which their head offices are situated. They shall supply one another with all information concerning the management and ownership of such credit institutions that is likely to facilitate their supervision of and the examination of the conditions for their authorisation and all information likely to facilitate the monitoring

---

> of their liquidity and solvency. (2) *The competent authorities* may also, for the purposes and within the meaning of article 6, lay down ratios applicable to the branches referred to in this article by reference to the factors laid down in article 6. (3) The Advisory Committee shall take account of the adjustments necessitated by the specific situation of the branches in relation to national regulations." (My emphasis.)

See also article 12(3), which acknowledges as one of the purposes for which banking regulators may use information provided as a result of collaboration required by the directive, the examination of: "the conditions for the taking up *and pursuit* of the business of credit institutions, to facilitate monitoring of the liquidity and solvency of those institutions ..." (My emphasis.)

I should add that, in my view, it follows from the obligations to supervise and collaborate over supervision that regulators were also bound to take steps where necessary to obtain information and to take

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 93 of 260
Pg 173 of 686

appropriate action if, as a result of their attempts to supervise, they were not satisfied that the criteria for authorisation and as required under article 6 were still met. As Lord Neill submitted, without such an obligation, those of supervision, monitoring and collaboration would be otiose.

Article 8(1) provided for withdrawal by banking regulators of authorisation in a number of circumstances, including failure by a bank to continue to fulfil the conditions under which authorisation was granted. The article reads:

> "(1) *The competent authorities may* withdraw the authorisation issued to a credit institution subject to this directive or to a branch authorised under article 4 only where such an institution or branch: (a) does not make use of the authorisation within 12 months, expressly renounces the authorisation or has ceased to engage in business for more than six months, if the member state concerned has made no provision for the authorisation to lapse in such cases; (b) has obtained the authorisation through false statements or any other irregular means; (c) *no longer fulfils the conditions under which authorisation was granted, with the exception of those in respect of own funds*; (d) *no longer possesses sufficient own funds*or can no longer be relied upon to fulfil its obligations towards its creditors, and in particular no longer provides security for the assets entrusted to it; (e) falls within one of the other cases where national law provides for withdrawal of authorisation." (My emphasis.)

The provision is in general terms permissive in the various circumstances specified. One can see why that should be so for some of them, but not for those in paragraph (c) or (d)--failure to comply with conditions of authorisation or other financial malaise fatal to its continued handling of other people's money. In my view, in those respects the article should be read as imposing a duty on competent authorities to withdraw authorisation. Clarke J acknowledged, at p 614, the force of Lord Neill's argument to that effect. It is inconceivable that the directive, should be read so as to require banking regulators to insist on certain minimum requirements of authorisation and to supervise to ensure continued satisfaction of them, yet leave them with a discretion, unspecified as to

---

**[2003]** **108**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

criteria, to permit continuance of trading without check or condition when those requirements are no longer met. I am not deterred from that conclusion by the mandatory terms of paragraph 8(2), relating to branch authorisations:

> "In addition, the authorisation issued to a branch under article 4 *shall* be withdrawn if the competent authority of the country in which the credit institution which established the branch has its head office has withdrawn authorisation from that institution." (My emphasis.)

One of five decisions of the European Court on the Directive of 1977, *Municipality of Hillegom v Hillenius* (Case 110/84) [1985] ECR 3947, is of some interest on the question whether articles 6, 7 and 8 of the directive impose a duty to supervise, as distinct from just a duty to collaborate over supervision. It concerned the obligation imposed by article 12 on member states to ensure that members of their regulatory authorities complied with their obligation of professional secrecy. An investor, seeking to claim in the Dutch courts against the Dutch banking regulator for losses incurred as a result of its failure to supervise, sought to examine a number of its staff. They resisted examination, relying on article 12. The Advocate General, Sir Gordon Slynn, and the court, in considering that narrow issue, made some general observations on the matter of supervision. In doing so they made plain that they regarded the directive as imposing on regulators a supervisory role. Thus, Sir Gordon Slynn said, at p 3948: "credit institutions are subject to continuing supervision and under article 8 the supervisory authority may withdraw the authorisation issued to a credit institution in certain circumstances." Later, at p 3950, he spoke of the necessity of the relaxation of the obligation of secrecy as between regulators provided by article 12(2) of

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 94 of 260
Pg 174 of 686

the directive, since it was "obviously necessary if the supervision and collaboration intended by the directive [were] to be effective". The court made similar observations in its judgment, at p 3963:

> "26. An analysis of the general aims of the directive and the context of article 12(1) shows that, in order to create the legislative conditions required for a common market for credit institutions, the directive is designed to facilitate the overall monitoring of credit institutions operating in more than one member state by the competent authorities of the member state in which the credit institution has its head office ...
>
> "27. If the monitoring of banks through supervision within a member state and exchanging of information by the competent authorities is to function properly, it is necessary to protect professional secrecy ..."

There is also an interesting observation of the court to like effect in *Criminal proceedings against Bullo and Bonivento* (Case 166/85) [1987] ECR 1583, 1595, para 9, though this time in relation to conditions of authorisation imposed by article 3(4) in particular: "article 3(4) ... is formal in nature and is designed to *secure* effective *supervision* of the activities of those institutions with a view to the protection of their customers ..." (My emphasis.)

The first and principal issue between the parties, whether the matter is considered as one of *Becker* or *Francovich* liability, is whether, as a result of the directive imposing obligations on the Bank for the protection of depositors, it conferred corresponding enforceable rights on them against

---

[2003] 109
2 AC Three Rivers DC v Bank of England (No 3) (CA) Auld LJ

the Bank. The plaintiffs say that, regardless of the absence of any express conferral in the directive, such rights result logically and necessarily from the obligations if the latter are to have any practical effect. They say, with particular reference to the direct effect route to liability, that the second limb of the *Becker* test, requiring definition of such rights does not require them to be spelt out in the directive. The Bank says that the test means just that, that *Francovich* type of liability, if it exists at all against an emanation of the state exercising a regulatory function, is no less specific and that, as this directive says nothing about depositors' rights, the plaintiffs' claim for damages must fail. They add that there are other means of securing the benefit of such obligation as the Bank has to protect them.

Before examining the jurisprudence of the European Court bearing on this central issue there is some ground clearing to be done.

*Yuen Kun Yeu v Attorney General of Hong Kong* and *Davis v Radcliffe*

First, there is Clarke J's and the Bank's heavy reliance on the reasoning of the Judicial Committee of the Privy Council in *Yuen Kun Yeu v Attorney General of Hong Kong* [1988] AC 175 and *Davis v Radcliffe* [1990] 1 WLR 821. In my view, those authorities are distinguishable in a number of important respects and provide little or no guidance on the question whether Community law duties of the Bank derived from the directive confer on depositors Community law rights of action against the Bank.

It does not seem to me appropriate to pray in aid common law principles and public policy considerations going to the existence of a duty of care when determining as a matter of construction what, if any, obligations and corresponding enforceable Community law rights are to be derived from Community legislation. The primary question in both Privy Council cases was whether there was a duty of care: the *Yuen* case, per Lord Keith, at p 190C-D; *Davis v Radcliffe*, per Lord Goff, at pp 825-826, 826-827. In both the Judicial Committee determined it according to common law criteria as to the presence or absence of "a close and direct relationship" between regulator and depositors and of "a special relationship" between the regulator and the deposit-taking institutions concerned, and by reference to public policy considerations governing the exercise by a public body of a discretion. Here, the directive

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 95 of 260
Pg 175 of 686

imposed a number of clearly defined obligations--duties--on the Bank to ensure the compliance with certain minimum requirements by banks seeking the grant and retention of authorisation. The critical question is whether, as a matter of construction of the directive and Community law principles, those undoubted duties conferred enforceable rights of action on the plaintiffs.

Second, it was an important consideration in *Yuen* and in *Davis v Radcliffe* that the domestic legislation in question gave the regulators little or no supervisory powers, still less any day-to-day control. In *Yuen*, at p 195C, Lord Keith described the regulator's powers, under the Hong Kong Deposit-taking Companies Ordinance, as being limited to putting the institution in question "out of business or allowing it to continue". In *Davis v Radcliffe* the regulator's powers under the Isle of Man banking legislation were, as Lord Goff said, at p 830C, "somewhat wider", but not materially so. Whether a supervisory role is of such a nature as to impose in common law or Community law a duty to depositors must be a matter of fact and degree turning on the precise form and level of supervision prescribed in each case.

---

**[2003]** **110**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

Lord Keith acknowledged as much in *Yuen* when distinguishing the Court of Appeal's decision in *States of Guernsey v Firth* (unreported) 14 May 1981; Court of Appeal of Guernsey (Civil Division) (Appeal No 10 Civil), that a depositor had a cause of action against a public authority statutorily responsible for publishing lists of bodies registered to accept deposits, by reason of his loss resulting from its failure to publish a list. Lord Keith said, at p 197:

> "The decision was concerned with the construction of an enactment imposing a specific statutory duty which was alleged to have been breached. Their Lordships therefore do not, consider it to be in point for the purposes of the present appeal, which is concerned with the existence of a common law duty of care, and I do not think it appropriate to express any opinion as to its correctness."

He took a similar stance in relation to a decision of the Canadian Federal Court of Appeal in *Baird v The Queen* (1983) 148 DLR (3d) 1, that a depositor had a cause of action against the Canadian Government in respect of alleged breaches by it of various supervisory duties imposed upon it by statute.

Lord Keith's acknowledgement that the decision in *Yuen* depended as much on its own facts as on broad principle was underlined by Saville J in the following passage from his judgment in *Minories Finance Ltd v Arthur Young* [1989] 2 All ER 105, 111:

> "Counsel submitted that this case was conclusive authority against the proposition that the Bank of England owed a duty of care to depositors in this country. Although this submission is formidable, I am not persuaded that it is so strong that the contrary argument can simply be dismissed as unsustainable. The Privy Council were concerned with a Hong Kong ordinance; the present case concerns a different supervisory banking authority in a different country exercising, according to the third party notices, powers and functions over and above those to be found in the Banking Act 1979, the then equivalent in this country of the Deposit-taking Companies Ordinance. It is noteworthy that the Privy Council itself distinguished the Canadian case of *Baird v The Queen*, 148 DLR (3d) 1, where the Federal Court of Appeal concluded that a similar claim should not be struck out as disclosing no reasonable cause of action, on the ground that the legislation and the circumstances under consideration in Canada were different from those in the Hong Kong case."

Here, whilst it cannot be said that the directive imposed a duty of "day-to-day control" by the Bank, articles 6 and 7, when read with article 8, clearly imposed supervisory duties on it which go beyond those considered in the *Yuen* case and *Davis v Radcliffe*. "Day-to-day control" cannot, in my view, be the touchstone or the necessary minimum for a common law duty of care by a regulator, still less for a right of action against a regulator for breach of a Community law obligation to supervise. It is a notion taken from

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 96 of 260
Pg 176 of 686

the wholly different circumstances under consideration in *Dorset Yacht Co Ltd v Home Office* [1970] AC 1004, and should not be given general application regardless of context.

Third, similar considerations govern the second concern in *Yuen* and *Davis v Radcliffe* that a court should be slow to impose upon a regulator a

---

[2003] 111
2 AC Three Rivers DC v Bank of England (No 3) (CA) Auld LJ

duty to depositors to protect them against default of third parties, in particular, against fraud by banks or their staff. Again, as Lord Keith made clear in the *Yuen* case, at p 195-196, this goes to the issue whether there was a duty of care to depositors to protect them against such default, including whether there was "a special relationship" between the regulator and the institution concerned to give rise to such a duty. It all depends upon the form and level of supervision a regulator is required to provide in the circumstances of each case. If a banking regulator is required to supervise banks then, depending on its precise statutory powers and duties, I can see no reason in principle why it should not be liable to depositors if they lose their funds through fraud or other culpable behaviour of the institutions or their staff made possible by its failure properly to supervise.

Fourth, there are the public policy considerations, referred to by Lord Keith and Lord Goff in *Yuen* and *Davis v Radcliffe* respectively, against allowing public bodies' discretionary decisions to be influenced by fear of litigation resulting from susceptibility to claims in negligence arising out of their decisions: see *Yuen*, per Lord Keith, at pp 194-195, 198; and *Davis v Radcliffe*, per Lord Goff, at pp 826-827.

Whether and the extent to which such considerations come into play, either as a matter of common or Community law, depends on whether and to what extent the duties imposed upon a public body allow it a margin of discretion or judgment in its exercise of them. This type of case is far removed from that of a police officer's exercise of his professional judgment in the investigation of crime which gave rise to *Hill v Chief Constable of West Yorkshire* [1988] QB 60, and the observations of Glidewell LJ, at pp 75-76, so often cited in this context and referred to by Lord Keith in the *Yuen* case, at p 198. Moreover, the force of that exclusionary principle may require some re-examination in the light of the European Court of Human Rights' recent decision in *Osman v United Kingdom* (1998) 29 EHRR 245. The directive's provisions as to authorisation, supervision and withdrawal of authorisation are specific and focused entirely on each individual institution's state of compliance with the prescribed criteria. Whatever may have been the effect of the Hong Kong ordinance in the *Yuen* case, there is less scope in the Directive of 1977 for balancing interests of the sort mentioned by Lord Keith, at pp 194-195:

> "future would-be depositors cannot be regarded as the only persons whom the commissioner should properly have in contemplation. In considering the question of removal from the register, the immediate and probably disastrous effect on existing' depositors would be a very relevant factor. It might be a very delicate choice whether the best course was to deregister a company forthwith or to allow it to continue in business with some hope that, after appropriate measures by the management, its financial position would improve."

Similarly, there does not appear to be much scope here for consideration of wider interests, including the general well-being of the financial community of the sort that Lord Goff spoke of in *Davis v Radcliffe*, at pp 826-827. In that case the regulators' statutory powers and duties were broadly described, far more broadly than those of regulators governed by the Directive of 1977. This is how Lord Goff summarised them, at p 825:

---

[2003] 112
2 AC Three Rivers DC v Bank of England (No 3) (CA) Auld LJ

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 97 of 260
Pg 177 of 686

"Under the Banking Act 1975, it became an offence to carry on a banking business in the Isle of Man without a licence, or otherwise than in accordance with ther terms of a licence. Detailed provision is made in the 1975 Act for the licensing of banks and other related matters. Applications for a licence to carry on a bank have to be made to the Treasurer, in whom is vested the power to issue such a licence, with or without conditions; to refuse a licence; or to revoke a licence previously granted. *However the Finance Board is given the power to give to the Treasurer such directions as it thinks fit with regard to the exercise of such powers*. The Treasurer is vested with other powers under the Banking Act 1975, including power (with the authority of the Finance Board) to suspend or discontinue the business of the bank; and power to inspect books and other documents of a bank (with power of entry for that purpose) and to take copies of such documents, *as to the exercise of which powers the Finance Board may again give such directions to the Treasurer as it thinks fit*." (My emphasis.)

It was on those facts that Lord Goff went on, at p 826, to make his observation about the relevance and importance of the interests of the financial services community as a whole:

"There are, in the opinion of their Lordships, certain considerations, each of which militates against the imposition of any such duty, and which taken together point to the inevitable conclusion that no such duty should be imposed. First, it is evident that the functions of the Finance Board, and indeed of the Treasurer, as established by the Finance Board Act 1961, are typical functions of modern government, to be exercised in the general public interest. These functions are ... of the broadest kind, for which parallels can doubtless be drawn from other jurisdictions. The functions vested in the Treasurer, and in the Finance Board, by the Banking Act 1975 must be seen as forming part of those broader functions. No doubt, in establishing a system of licensing for banks, regard was being had (though this is not expressly stated in the long title of the Act) to the fact that the existence of such a licensing system should provide an added degree of security for those dealing with banks carrying on business in the Isle of Man, including in particular those who deposit money with such banks. But it must have been the statutory intention that the licensing system should be operated in the interests of the public as a whole; and when those charged with its operation are faced with making decisions with regard, for example, to refusing to renew licences or to revoking licences, such decisions can well involve the exercise of judgment of a delicate nature affecting the whole future of the relevant bank in the Isle of Man, and the impact of any consequent cessation of the bank's business in the Isle of Man, not merely upon the customers and creditors of the bank, but indeed upon the future financial services in the island. In circumstances such as these, competing considerations have to be carefully weighed and balanced in the public interest, and, in some circumstances, as Mr Kentridge observed, it may for example be more in the public interest to attempt to nurse an ailing bank back to health than to hasten its collapse. The making of decisions such as these is a characteristic task of modern regulatory agencies; and the very nature of the, task, with its emphasis on the broader public interest, is one which

---

**[2003]** **113**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

militates strongly against the imposition of a duty of care being imposed upon such an agency in favour of any particular section of the public."

Fifth, the *Brasserie du Pcheur* [1996] QB 404 requirement of a "sufficiently serious" breach for recovery of damages by an individual against a state or its emanation for breach of a Community law obligation, indicates that that legal regime provides its own distinct threshold or brake of a public policy nature on the award of damages in such cases.

For those reasons, I consider it unhelpful, indeed positively misleading, to take as a starting point the decisions on the facts and the reasoning of the Privy Council in the *Yuen* case and *Davis v Radcliffe* as to

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

the absence of a duty of care for the wholly different question here, whether as a matter of Community law depositors have a right of action against a banking regulator for breach of its obligations under a directive. In short, as the plaintiffs maintained, adoption of the *Yuen* case and *Davis v Radcliffe* reasoning in this context could negate the protection that the Directive of 1977 was intended to provide.

*The legislative basis of the Directive of 1977*

The second piece of ground clearing is as to the legislative basis of the Directive of 1977 as indicated by subsequent Community legislation, on which the Bank places much reliance. It points to the whole legislative programme of which the directive was part, and characterises it as no more than a modest first step towards harmonisation imposing no obligations on member states' regulators and conferring no rights on individuals against them. It says that the programme demonstrates that protection of depositors was not the directive's sole or even its main object. It refers to the following general description of it by the European Court in its judgment in *Commission of the European Communities v Italian Republic*(Case 300/81) [1983] ECR 449, 455, para 3:

> "Council Directive 77/80 constitutes the first step in the harmonisation of banking structures and the supervision thereof. The purpose of such harmonisation is to permit the gradual attainment of freedom of establishment for credit institutions and the liberalisation of banking services. In that respect the directive introduces minimum conditions for the authorisation of credit institutions which all member states must observe. In order to facilitate the taking up and pursuit of business as a credit institution the directive aims in particular to reduce the discretion enjoyed by certain supervisory authorities in authorising credit institutions."

As the third sentence in that passage and the terms of article 3 of the directive plainly indicate, it did at least make some immediate provision of a protective nature concerning the authorisation of credit institutions. However, the Bank's case is that nearly another 20 years were to elapse and many more directives were to follow before supervisory obligations and some limited rights for depositors began to emerge. After a detailed examination of some 11 directives on the supervision of credit institutions between 1977 and 1995, the Bank summarises its contentions on this legislative development as follows.

---

It has taken the Community some 20 years to develop an increasingly sophisticated harmonised system of banking regulation and supervision. It was not until Directive 94/19 that the Community provided (from 1 July 1995) any specific remedy to depositors. And then it was in the form of a minimum financial guarantee provided through a harmonised system of deposit-guarantee schemes, not through a harmonised system of rights of action again member states or their competent authorities. The recitals to the Directive of 1994 "expressly disavow" any intention to impose additional liability on member states or on their competent authorities where their respective deposit protection schemes comply with the requirements of the directive. It is, therefore, impossible to read any such additional liability into the Directive of 1977, which made no express provision for consumer protection at all.

The Bank referred to the ruling of the European Court and the opinion of Advocate General LŽger in *Federal Republic of Germany v European Parliament* (Case C-233/94) [1997] ECR I-2405, indicating that, though consumer protection was one of the objects of the Directive of 1994, it did not enable member states to invoke it in order to impede the activities of credit institutions authorised in other member states. It also relied on certain observations of the court in *SociŽtŽ Civile Immobilire Parodi v Banque H Albert de Bary et Cie* (Case C-222/95) [1997] ECR I-3899, 3922-3924, paras 22-26, to which I shall return, which, it maintains, indicate the limited role of the Directive of 1977.

The plaintiffs agree that the Directive of 1977 was a first step towards the harmonisation of authorisation procedures. However, they say that as a first step it was directed at both protection of depositors and elimination of restrictions on competition; as to protection of depositors it established minimum requirements of authorisation, supervision and withdrawal of authorisation, the last of which goes also to effective supervision; the system has remained essentially unchanged since the Directive of 1977 and the developments made by subsequent: directives are not great.

As to the following directives on which the Bank placed much reliance, the plaintiffs, maintain: the Second Council Directive of 1989 (89/646/EEC) adds to, but does not replace, the minimum requirements going to supervision contained in articles 6, 7 and 8 of the Directive of 1977; the Directive of 1983 (83/350/EEC) and the Directive of 1992 (92/30/EEC) are concerned with consolidation of supervision, not the requirement of supervision already established by the Directive of 1977, as acknowledged by, inter alia, recital 5 to the Directive of 1992, to the terms of which I shall refer shortly; as to the introduction by the Directive of 1994 (94/19/EC) of a harmonised system of consumer protection in the form of deposit guarantee schemes, it was not intended to be the only protection for depositors, but, as recital 25 to the directive states, "an indispensable *supplement* to the system of supervision of credit institutions on account of the solidarity it creates among all the institutions in a given financial market in the event of failure of any of them". (My emphasis.)

The European Court had considered the Directive of 1977 in five cases before Clarke J gave his judgment. As he found, they confirm, or do not contradict, what is evident from the plain words of the directive, that one of its underlying purposes was to protect the interests of savers: see *Commission of the European Communities v Italian Republic* (Case 300/81)

---

[1983] ECR 449; *Commission of the European Communities v Kingdom of Belgium* (Case 301/81) [1983] ECR 467; *Municipality of Hillegom v Hillenius* (Case 110/84) [1985] ECR 3947; *Criminal proceedings against Bullo and Bonivento* (Case 166/85) [1987] ECR 1583 and *Criminal proceedings against Mattiazzo* (Case 422/85) [1987] ECR 5413.

The judge, while acknowledging that protection of depositors was an important underlying purpose of the directive, held that its "immediate purpose" was a first step towards harmonisation and did not impose any obligations on the Bank giving rise to enforceable rights against it by individuals. In so holding, he likened it to the directive for co-ordination of the conditions for the admission of securities to official stock exchange listing (Council Directive 79/279/EEC) considered by the Court of Appeal in *R v International Stock Exchange of the United Kingdom and the Republic of Ireland Ltd, Ex p Else (1982) Ltd* [1993] QB 534. There, the court held that the primary purpose of the directive was to co-ordinate listing practices of competent authorities in member states and not directly to provide additional protection for investors so as to enable them to challenge the Stock Exchange's cancellation of a company listing.

I respectfully disagree with the judge's reliance on that case as an analogy and support for his approach to his decision in this case. First, neither the recitals nor the substantive provisions in the Listing Directive were directed at the protection of investors with the same focus as those in the Directive of 1977 in favour of depositors. The Listing Directive was made under articles 54(3)(g) and 100 of the Treaty requiring co-ordination of "safeguards ... for the protection of the interests of members and others" of companies or firms and was of direct effect. The long title of the directive, like that of the Directive of 1977, indicated that its purpose was one of co-ordination, that is, of "the conditions for the admission of securities to official stock exchange listing". And recital 5 to the directive included within that general purpose the provision of equivalent protection for investors at Community level, and a number of articles referred to the interest of protection of investors.

The Listing Directive made specific and detailed provision for challenges to listing decisions, but did not expressly identify the persons entitled to make those challenges. All three members of the court, Sir Thomas Bingham MR and McCowan and Leggatt LJJ, after a close analysis of its provisions, one article in

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 100 of 260
Pg 180 of 686

particular setting out the machinery of challenge, concluded as a matter of construction that investors had no right of challenge. Sir Thomas Bingham MR concluded, at p 549F, that the primary purpose of the directive was "not, in any direct way, to provide *additional*protection for investors" (my emphasis). That cannot be said about the Directive of 1977; see *SociŽtŽ Civile Immobilire Parodi v Banque H Albert de Bary et Cie* (Case C-222/95) [1997] ECR I-3899. Sir Thomas Bingham MR and Leggatt LJ also spoke of the great difficulties that could arise if companies and their members were in conflict over listing decisions.

The case is thus readily distinguishable from this one, being concerned as it was with the construction of the detailed provisions of a different directive. It is not to be taken as an authority for a general proposition excluding a remedy to an individual for whose protection a directive is intended, simply because its primary or an important purpose is co-ordination. It all depends on the terms of each instrument and the extent to which, if at all, it makes

---

**[2003]** **116**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

detailed and practical provisions for both purposes. As the subsequent jurisprudence of the European Court on the Directive of 1977 (see in particular the *Parodi* case, at pp 3922-3923, paras 22 and 23) and similar directives in other fields illustrate, different considerations apply here.

The mere fact that a directive is a first step in harmonisation or that it has an immediate purpose as such does not mean that it cannot also have an immediate purpose of protecting individuals, such as depositors. Indeed, it does not prevent it from immediately imposing obligations or conferring or giving rise to corresponding rights. As Advocate General LŽger observed in his opinion in *Federal Republic of Germany v European Parliament* (Case C-233/94) [1997] ECR I-2405, 2419, para 39 on the competing demands of protection of depositors and harmonisation under Directive 94/19: "the requirement as regards protection may chronologically precede harmonisation." In that case Germany sought annulment of Directive 94/19, of a deposit guarantee scheme on the ground that it wrongly failed to increase protection for depositors by applying to all member states the highest level of protection required by any one of them. The court, at pp 2448-2451, paras 10, 19 and 20, rejected that contention, observing that consumer protection was one, but not the sole or paramount, objective of the directive. However, it acknowledged that the object of promoting the right of establishment and freedom to provide banking services necessarily carried with it "a high level of consumer protection" and "a considerable improvement in the protection of depositors within the Community". And, as I shall mention again, the important recent authority of *Norbrook Laboratories Ltd v Ministry of Agriculture, Fisheries and Food*(Case C-127/95) [1998] ECR I-1531 is an example of "a first stage" directive which, the European Court held, imposed obligations and conferred rights; see also as to more than one objective *Dillenkofer v Federal Republic of Germany* (Joined Cases C-178, 179 and 188-190/94) [1997] QB 259, 294, para 39.

Accordingly, I prefer the plaintiffs' submissions on the light thrown on the issue as to conferment of rights on individuals by the legislative programme introduced by the Directive of 1977. In my view, it is clear from the directive on its own terms, looked at as a whole and in its legislative context, that it had as *an*immediate purpose the protection of depositors and that such protection extended to supervision as well as to the grant and withdrawal of authorisation. That the framers of the directive and of the subsequent legislation were of that view is plain from recital 5 to the Directive of 1992, which states:

> "Whereas the member states can ... refuse or withdraw banking authorisation in the case of certain group structures considered inappropriate for carrying on banking activities, *in particular because such structures could not be supervised effectively*; whereas in this respect the competent authorities have the powers mentioned in article 8(1)(c) of [the Directive of 1977] and in articles 5 and 11 of the [Second Council: Directive of 1989] in order to ensure the sound and prudent management of credit institutions." (My emphasis.)

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 101 of 260
Pg 181 of 686

The plaintiffs' point about the Directive of 1994, introducing the harmonised system of deposit guarantee schemes, is also telling, namely its clear reference in recital 25 to such scheme being a "supplement" to the existing "system of supervision of credit institutions," in contrast to the

---

**[2003]** **117**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

provision considered by this court in *R v International Stock Exchange of the United Kingdom and the Republic of Ireland Ltd, Ex p Else (1982) Ltd* [1993] QB 534.

*Francovich liability*

The essential question is whether the directive imposes obligations on the Bank from which, as a matter of Community law, rights are conferred on individuals in the position of the plaintiffs. Whether the matter is considered under this head or as one of direct effect, I am content to adopt the broad thrust of Clarke J's approach [1996] 3 All ER 558, 605 that, to establish obligations in a directive giving rights under Community law, it must be possible on a fair reading of it, construed purposively, to conclude that it was intended to give rise to such rights. However, I do not agree with his reasoning, at pp 616-618, that the absence of any expression of such rights in the text of the directive is a "pointer" to the conclusion that they were not intended.

In determining whether, regardless of other hurdles, the Directive of 1977 was sufficiently specific to enable the plaintiffs to rely on *Francovitch* liability, it is necessary to examine two fundamental provisions of the Treaty and the original and, now, rapidly developing jurisprudence under this head to see what it does and does not require.

As to the Treaty, articles 5 and 189 of it are clearly directed at the effectiveness of Community law obligations by securing their "fulfilment". Thus, in *von Colson v Land Nordrhein-Westfalen* (Case 14/83) [1984] ECR 1891, which concerned a directive requiring equal treatment in employment but not specifying a right to compensation in the event of a breach, the court held that, if a member state chose to penalise breach by an award of compensation, such compensation had to be adequate to ensure the effectiveness of the requirement. In so holding, the court said, at pp 1906, 1909:

> "15 ... Although [article 189 of the Treaty] leaves member states to choose the ways and means of ensuring that the directive is implemented, that freedom does not affect the obligation imposed on all the member states to which the directive is addressed, to adopt, in their national legal systems, all the measures necessary to ensure that the directive is fully effective ..."
>
> "26 ... the member states' obligation arising from a directive to achieve the result envisaged by the directive and their duty under article 5 of the Treaty to take all appropriate measures, whether general or particular, to ensure the fulfilment of that obligation, is binding on all the authorities of member states including, for matters within their jurisdiction, the courts. It follows that, in applying the national law and in particular the provisions of a national law specifically introduced in order to implement [the directive], national courts are required to interpret their national law in the light of the wording and the purpose of the directive in order to achieve the result referred to in the third paragraph of article 189."

See also *Francovich's* case [1995] ICR 722, 772, para 36 and *Marshall v Southampton and South West Hampshire Health Authority (Teaching) (No 2)* (Case C-271/91) [1994] QB 126, 164, para 17.

---

**[2003]** **118**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

The European Court has recognised from the earliest days the close connection in Community law between the imposition of obligations on member states and/or their emanations and making those obligations effective by the conferment on individuals of rights corresponding to them. That is so even when such rights are not expressly stated or clearly defined in the particular instrument creating or giving rise to the obligations. The critical question is whether the instrument, be it Treaty provision, regulation or directive, identifies sufficiently clearly an obligation which, if it is to be effective, must have a correlative right of the kind sought to be enforced and by the institution or individual claiming it.

The starting point for that broad proposition is the direct effect case of *NV Algemene Transport- en Expeditie Onderneming van Gend & Loos v Nederlandse administratie der belastingen* (Case 26/62) [1963] ECR 1, an article 177 reference on the question whether article 12 of the Treaty had direct application so as to give rise to Community rights in individuals which national courts must protect. The court in the following well known passage, at p 12, declaring the new Community legal order, held that Community law did confer such rights:

> "In addition, the task assigned to the Court of Justice under article 177, the object of which is to secure uniform interpretation of the Treaty by national courts and tribunals, confirms that the states have acknowledged that Community law has an authority which can be invoked by their nationals before those courts and tribunals. The conclusion to be drawn from this is that the Community constitutes a new legal order of international law for the benefit of which the states have limited their sovereign rights, albeit within limited fields, and the subjects of which comprise not only member states but also their nationals. Independently of the legislation of member states, Community law therefore not only imposes obligations on individuals but is also intended to confer upon them rights which become part of their legal heritage. These rights arise not only where they are expressly granted by the Treaty, but also by reason of obligations which the Treaty imposes in a clearly defined way upon individuals as well as upon the member states and upon the institutions of the Community."

As to article 12, the court said, at p 13:

> "The implementation of article 12 does not require any legislative intervention on the part of the states. The fact that under this article it is the member states who are made the subject of the negative obligation does not imply that their nationals cannot benefit from this obligation ... It follows ... that, according to the spirit, the general scheme and the wording of the Treaty, article 12 must be interpreted as producing direct effects and creating individual rights which national courts must protect."

In *Van Duyn v Home Office* (Case 41/74) [1975] Ch 358, 376-377, para 12, another direct effect case, the European Court applied the same reasoning to a directive:

> "where the Community authorities have, by directive, imposed on member states the obligation to pursue a particular course of conduct, the useful effect of such an act would be weakened if individuals were

---

> prevented from relying on it before their national courts and if the latter were prevented from taking it into consideration as an element of Community law."

The court added, as a precursor to the more specific requirements it was later to express and apply in 1982 in *Becker's* case [1982] ECR 53 and in 1991 in *Francovich's* case [1995] ICR 722: "It is necessary to examine, in every case, whether the nature, general scheme and wording, of the provision in question are capable of having direct effects on the relations between member states and individuals." See also

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 103 of 260
Pg 183 of 686

*Marshall v Southampton and South West Hampshire Health Authority (Teaching) (No 2)* (Case C-271/91) [1994] QB 126.

Before continuing with the jurisprudence of the European Court introducing and developing *Francovich* liability, I should say something of that case itself. It concerned claims for damages by individuals arising from the failure of a member state, Italy, to implement within the prescribed period a directive which the European Court found was intended to confer guarantees on the employees of companies in the event of the companies' insolvency. The court held that the claimants could not recover under the head of direct effect because the directive, though otherwise sufficiently precise, did not identify the person or body responsible for providing the guarantees. The court held, however, that the plaintiffs were entitled to recover against the state because it had failed to comply with its obligations under the directive, and pursuant to articles 5 and 189 of the Treaty, to achieve the result prescribed by the directive, namely the provision of guarantees, and, therefore, the claimants had a right to reparation against it.

There was no difficulty in concluding from the terms of the directive the identity of the persons intended to benefit from the required guarantees or as to the nature and scope of that benefit. In that circumstance Advocate General Mischo was able to assert [1995] ICR 722, 747, para 42 of his opinion:

> "if the payment of compensation is the sole means in the particular circumstances of ensuring effective protection, the member state is under an obligation by virtue of Community law to make available to individuals an appropriate remedy enabling them to claim compensation."

And see the judgment of the court, pp 768-769, paras 14 and 17-20.

As to the broader basis on which the court upheld the claim, it began by reaffirming the principles it had stated in *NV Algemene Transport- en Expeditie Onderneming van Gend & Loos v Nederlandse administratie der belastingen* (Case 26/62) [1963] ECR 1 and *Costa v Ente Nazionale Energia Elettrica* (Case 6/64) [1964] ECR 585, observing [1995] ICR 722, 771, para 31:

> "Just as it imposes burdens on individuals, Community law is also intended to give rise to rights which became part of their legal patrimony. Those rights arise not only where they are expressly granted by the Treaty but also by virtue of obligations which the Treaty imposes in a clearly defined manner both on individuals and on the member states and the Community institutions ..."

---

**[2003]** **120**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

Referring to its judgments in *Amministrazione delle Finanze dello Stato v Simmenthal SpA* (Case 106/77) [1978] ECR 629 and *R v Secretary of State for Transport, Ex p Factortame Ltd (No 2)* (Case C-213/89) [1991] 1 AC 603 as to the primacy of directly applicable Community law over national law where the two conflict, it went on to stress the importance of effective imposition of obligations and the securing of corresponding rights of redress in the event of breach [1995] ICR 722, 771-772:

> "32 ... national courts whose task it is to apply the provisions of Community law in areas within their jurisdiction must ensure that those rules take full effect and must protect the rights which they confer on individuals ...
> "33. The full effectiveness of Community rules would be impaired and the protection of the rights which they grant would be weakened if individuals were unable to obtain redress when their rights are infringed by a breach of Community law for which a member state can be held responsible ...
> "35. It follows that the principle whereby a state must be liable for loss and damage caused to individuals as a result of breaches of Community law for which the state can be held responsible is inherent in the system of the Treaty."

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

In *Kirklees Metropolitan Borough Council v Wickes Building Supplies Ltd* [1993] AC 227, 281-282 Lord Goff, with whom the other members of the Committee agreed, commented on the generality of that reasoning and indicated that a right of such redress would apply to a breach of the Treaty as it would to a directive. In so indicating, he expressed doubt about the correctness of the majority judgment of the Court of Appeal in *Bourgoin SA v Ministry of Agriculture, Fisheries and Food* [1986] QB 716 that a breach of article 30 of the Treaty would not of itself give rise to a claim in damages to the injured party.

Under the heading "The conditions for state liability" the court in *Francovich's* case [1995] ICR 722 then set out the conditions--the degree of particularity in an instrument claimed to impose obligations and give rise to rights--required to establish a case for reparation. I have summarised these conditions at the beginning of this section of my judgment but I had better set them out in the court's own words, at pp 772-773:

> "38. Although state liability is ... required by Community law, the conditions under which that liability gives rise to a right to reparation depend on the nature of the breach of Community law giving rise to the loss and damage.
>
> "39. Where, as in this case, a member state fails to fulfil its obligation under the third paragraph of article 189 of the Treaty to take all the measures necessary to achieve the result prescribed by a directive, the full effectiveness of that rule of Community law requires that there should be a right to reparation provided that three conditions are fulfilled.
>
> "40. The first of those conditions is that the result prescribed by the directive should entail the grant of rights to individuals. The second condition is that it should be possible to identify the content of those rights on the basis of the provisions of the directive. Finally, the third

> condition is the existence of a causal link between the breach of the state's obligation and the loss and damage suffered by the injured parties.
>
> "41. These conditions are sufficient to give rise to a right on the part of individuals to obtain reparation, a right founded directly on Community law.
>
> "42. Subject to that reservation, it is on the basis of the rules of national law on liability that the state must make reparation for the consequences of the loss and damage caused. In the absence of Community legislation, it is for the internal legal order of each member state to designate the competent courts and lay down the detailed procedural rules for legal proceedings intended *fully* to safeguard the rights which individuals derive from Community law ...
>
> "43. Further, the substantive and procedural conditions for reparation of loss and damage laid down by the national law of the member states ... must not be so framed as to make it virtually impossible or excessively difficult to obtain reparation ..." (My emphasis.)

I pause to draw attention to three features of this opening, important and broad statement of principle as to entitlement to reparation for breach of obligation.

First, the court made it in the context of a member state's failure to implement a directive requiring the provision of guarantees to individuals. Thus, its detailed formulation of the principle was in relation to the breach of obligation by the state and the right to recover reparation against it. However, as is plain from paragraph 31 of the court's judgment, at p 771, it contemplated that obligations imposed on others, including individuals, would be capable of giving rise to rights of reparation against them. Given the breadth of the principle stated, there can be no logical reason why that should not be so where, by reason of a conflict between Community law and domestic law, an individual would otherwise lose against another, whoever that other may be, a protection given to him by Community law.

Second, the conditions set out in paragraph 40, though *Becker*-like as to the "eligible plaintiff" and "contents" requirement, have been broadly and flexibly interpreted and applied by the European Court.

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 105 of 260
Pg 185 of 686

Third, the judgment, like those in *von Colson's* case [1984] ECR 1891 and *Marshall's* case [1994] QB 126, emphasises, in paragraphs 42 and 43, the entitlement of an individual to the safeguard of his rights by "full" reparation. Thus, the availability of alternative sanctions, such as criminal proceedings, or limited rights of recovery, such as deposit guarantee schemes subject to limits which may fall short of full recovery (such as that in the deposit protection scheme introduced in the United Kingdom in February 1982 by Part II of the 1979 Act or as introduced into Community law by the Directive of 1994), does not satisfy the *Francovich* principle.

It is true, as Clarke J observed [1996] 3 All ER 558, 617, that the only way in which the directive in *Francovich's* case [1995] ICR 722 could be performed was by providing a guarantee to pay the amounts due and that that all depends upon the terms of the particular instrument in question. If, however, contrary to his view, the Directive of 1977 does impose an obligation on the Bank, breach of which does give to depositors rights of reparation for loss of their deposits, they are rights of full reparation, closely analogous to the guarantee in *Francovich*.

---

**[2003] 2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **122** **Auld LJ**

The European Court affirmed its reasoning in *Francovich* in the *Brasserie du Pcheur* case [1996] QB 404 in 1996, adding what it later described in *Dillenkofer's* case [1997] QB 259, 292, para 23, as "evident from the circumstances" of *Francovich*, the requirement of "a sufficiently serious breach". Each of the joint cases in *Brasserie du Pcheur* involved a direct conflict between a provision of the Treaty and national legislation and the question whether individuals were entitled to reparation from their respective member states for damage resulting from their breach of Community law. The court emphasised [1996] QB 404, 495, para 22, the importance of an individual's ability to seek reparation, even if the provisions on which he relies may not satisfy all the requirements of the *Becker* test, where: "the right to reparation is the necessary corollary of the direct effect of the Community provision whose breach caused the damage sustained."

*Dillenkofer's* case [1997] QB 259, given after Clarke J's judgment, concerned an unimplemented directive (90/314/EEC) or, more precisely, one not implemented within the prescribed period. Article 1 of the directive stated its purpose to be the approximation of the laws of member states governing package holidays, a stated purpose similar, apart from the subject matter, to that described in the title of the Directive of 1977. It also referred in its recitals to the purpose of protecting consumers and, in article 7, required member states to ensure that package tour operators would "provide sufficient evidence of security" for the refund of moneys paid to them by consumers and for their repatriation in the event of the operators becoming insolvent. In article 2 it defined "consumer" generically, and so far as material, as "the person who takes or agrees to take the package ..."

The court rejected the contentions of Germany, Netherlands and the United Kingdom that the directive was aimed only at ensuring freedom of competition. It had regard, not only to article 7, but also to the recitals, and held that the purpose of article 7 was to protect consumers, imposing on the operators an obligation to provide, not just evidence of security, but also the security itself and, in consequence conferring on consumers a right to be reimbursed or repatriated in the event of insolvency of their holiday operator. The court's reasoning, in particular its relaxed application of the *Francovich* requirement of identification of the right in question and of the persons entitled to it, is shown in the following paragraphs of its judgment, at pp 293-295:

> "34. According to the actual wording of article 7, this provision prescribes, as the result of its implementation, an obligation for the organiser to have sufficient security for the refund of money paid over and for the repatriation of the consumer in the event of insolvency.
>
> "35. Since the purpose of such security is to protect consumers against the financial risks arising from the insolvency of package travel organisers, the Community legislature has placed operators

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 106 of 260
Pg 186 of 686

under an obligation to offer sufficient evidence of such security in order to protect consumers against those risks.

"36. The purpose of article 7 is accordingly to protect consumers, who thus have the right to be reimbursed or repatriated in the event of the insolvency of the organiser from whom they purchased the package travel. Any other interpretation would be illogical, since the purpose of

[2003] 123
2 AC Three Rivers DC v Bank of England (No 3) (CA) Auld LJ

the security which organisers must offer under article 7 of the directive is to enable consumers to obtain a refund of money paid over or to be repatriated ...

"40. Similarly, the German and United Kingdom Governments' argument that the actual wording of article 7 shows that this provision simply requires package travel organisers to provide sufficient evidence of security and that its lack of reference to any right of consumers to such security indicates that such a right is only an indirect and derived right must be rejected.

"41. In this regard, it suffices to point out that the obligation to offer sufficient evidence of security necessarily implies that those having that obligation must actually take out such security. Indeed, the obligation laid down in article 7 would be pointless in the absence of security actually enabling money paid over to be refunded or the consumer to be repatriated, should occasion arise.

"42. Consequently, it must be concluded that the result prescribed by article 7 of the directive entails the grant to package travellers of rights guaranteeing the refund of money that they have paid over and their repatriation in the event of the organiser's insolvency ...

"44. The persons having rights under article 7 are sufficiently identified as consumers, as defined by article 2 of the directive. The same holds true of the content of those rights. As explained above, those rights consist in a guarantee that money paid over by purchasers of package travel will be refunded and a guarantee that they will be repatriated in the event of the insolvency of the organiser. In those circumstances, the purpose of article 7 of the directive must be to grant to individuals rights whose content: is determinable with sufficient precision."

As to the obligation on Germany, as distinct from that on the travel operators, the court held, at p 295, paras 49-51, that it was to implement the directive within the required period so as to "guarantee" its object of ensuring the provision of security to consumers in the circumstances prescribed. See to the same effect a subsequent case concerned with the interpretation of the same provision, *Verein fŸr Konsumenteninformation v ...sterreichische Kreditversicherungs AG* (Case C-364/96) [1998] ECR I-2949, 2963, para 18.

Clarke J, although without the advantage of the European Court's judgments in thos cases, was referred to the opinion of Advocate General Tesauro in *Dillenkofer's* case [1997] QB6 259 that the directive granted rights. He said [1996] 3 All ER 558, 621 that he regarded it as of no assistance on the question whether the Directive of 1977 granted rights to individuals, because it turned "upon the wording and purpose of the directive" which he regarded as "very different ... from the Directive of 1977".

With respect to the judge, I do not see what is so very different about the two provisions, apart from their subject matter and the party against whom the claimants respectively sought and seek to enforce them. Both had the dual purpose of protection of consumers and harmonisation. In both the consumers were readily identifiable customers of particular types of trader, in *Dillenkofer's* case [1997] QB 259, a "person who takes or agrees to take" a package holiday, in the case of the Directive of 1977, depositors of banks.

[2003] 124
2 AC Three Rivers DC v Bank of England (No 3) (CA) Auld LJ

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 107 of 260
Pg 187 of 686

As to obligations, the *Dillenkofer* directive was, if anything, less direct and less precise than the Directive of 1977. It referred only to a requirement on operators to provide evidence of security for refund of money paid and/or for repatriation, which the court, in the absence of implementation, saw as an obligation on the state to guarantee protection against their default. As to rights, neither directive expressly conferred any.

The Directive of 1977, on the reasoning of the court in *Dillenkofer's* case, at p 294, paras 35-36, and in *von Colson's* case [1984] ECR 1891, could only serve one of its purposes, that of fully protecting depositors against default by banks with which they had deposited their moneys, if the Bank, as a "competent authority", carried out its responsibilities of authorisation, supervision and withdrawal of authorisation in accordance with the criteria prescribed in the directive to protect depositors against such defaults. In both cases the defaults, the subject of the protection, could result from misfortune and/or mismanagement and/or fraud. The parallels are not exact, but in the context of identifying obligations and corresponding rights, they are close. (I shall deal separately with the issue whether *Francovich* liability may arise against an emanation of the state acting in an administrative capacity as a regulator.)

There are further decisions of the European Court delivered since Clarke J's judgment, which illustrate the readiness of the court to derive a right in favour of an individual from an obligation in a directive, although the directive does not expressly refer to such a right. Thus, in *R v Ministry of Agriculture, Fisheries and Food, Ex p Hedley Lomas (Ireland) Ltd* (Case C-5/94) [1997] QB 139 the court held that the United Kingdom's refusal by way of an administrative decision to issue an export licence contrary to article 34 of the Treaty, which prohibits quantitative restrictions on imports, created rights for individuals which the national courts must protect. See also *R v Secretary of State for Social Security, Ex p Sutton* (Case C-66/95) [1997] ICR 961, 992-994, paras 25, 30, 33 and 34 and *SociŽtŽ Civile Immobilire Parodi v Banque H Albert de Bary et Cie* (Case C-222/95) [1997] ECR I-3899, which is the most recent and most significant of the European Court's judgments on the purpose and effect of the Directive of 1977.

The facts of the *Parodi* case were that a French company sought to escape liability under a mortgage loan granted to it by a Dutch bank authorised only under Dutch law, contending that the loan was unlawful under French law. The question for the court was whether the requirements of French law in relation to the authorisation of banking were compatible with article 59 of the Treaty (free movement of services) if and in so far as they went beyond the Directive of 1977.

The court ruled that article 59 precluded member states from imposing further requirements unless they were "justified on grounds of public interest, such as consumer protection" and were non-discriminatory and proportionate. However, the court was not able to determine whether the French national law was intended to protect borrowers or savers. In the course of its judgment, given on 9 July 1997, it made a number of general observations on the Treaty and on the directive underlining the latter's purpose of consumer protection and making plain that, although it was a "first step" in a process of harmonisation, it imposed certain minimum conditions in the nature of a "guarantee" of protection. It held that

---

**[2003]** **125**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

restrictions on the freedom to provide banking services are permissible if they "are objectively necessary in order to ensure compliance with professional rules and to guarantee the protection of the recipient of the services". (p 3922, para 21); that protection of consumers is particularly important in the banking sector; "... It is, in particular, necessary to protect ... [consumers] against the harm which they could suffer through banking transactions effected by institutions not complying with the requirements relating to solvency and whose managers do not have the necessary professional qualifications or integrity" (pp 3922-3923, para 22); that the importance of such protection gave rise to the Directive of 1977 as a first step towards co-ordination (p 3923, paras 23 and 24); that it imposed minimum conditions on member states obliging them to require authorisation of credit institutions subject to those conditions (p 3923, para 25). Finally, in observing that it did not have information about the purpose of France's legislation on the matter, it again used the word "guarantee":

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 108 of 260
Pg 188 of 686

"the national provisions applicable in the main proceedings do not appear to be specifically designed to protect borrowers but rather to give effect to prudential rules intended to *guarantee* that the banks are solvent in regard to savers": p 3924, para 28 (my emphasis).

In my view the *Parodi* case puts beyond doubt that an important purpose of the Directive of 1977 was to protect depositors from risks associated with the deposits of their funds by imposing obligations on member states and their banking regulators and by conferring corresponding rights on depositors to secure that end. Such risks must, for example, include those of losses from failure to comply with the directive's requirements as to solvency and/or to employ managers with the necessary integrity and experience. It is true, as Mr Stadlen and Mr Lasok, on behalf of the Bank, have emphasised, that the *Parodi* case does not deal with the question whether depositors have a right of action against a banking regulator or, indeed anyone else. However, as Lord Neill submitted, adopting the court's reasoning in the *van Gend & Loos* case [1963] ECR 1, *Francovich's* case [1995] ICR 722 and *Dillenkofer's* case [1997] QB 259, such protection would be illusory if a depositor who has suffered harm as a result of a member state's breach of the obligations in the directive cannot obtain full redress for it.

Where is the full redress where a bank has failed causing loss to its depositors for want of proper supervision by the regulator? Mr Stadlen's answer was that there are others to provide protection and other means of providing it. He suggested that the court's use in the *Parodi* case [1997] ECR I-3899 of the word "guarantee" in this context is inconsistent with the fact that Community legislation now encourages protection of depositors by means of deposit guarantee schemes. But, as I have said, the limited schemes provided by the Acts of 1979 and 1987 and introduced by the Directive of 1994, do not meet the fundamental requirement under the *Francovich* and *von Colson* principles that breach of a Community law obligation carrying with it a right of reparation means full reparation.

The European Court's characterisation in the *Parodi* case of the Directive of 1977 as providing a protection in the form of a "guarantee" for depositors is of a piece with its similar treatment of the insurance directives, most of which, like that directive, were issued pursuant to the provisions for co-

---

**[2003]** **126**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

ordination in article 57(2) of the Treaty: see *Commission of the European Communities v France* (Case 220/83) [1986] ECR 3663; *Commission of the European Communities v Federal Republic of Germany* (Case 205/84) [1986] ECR 3755, 3803-3809, paras 30, 38, 42-46 and 49; *Commission of the European Communities v Kingdom of Denmark* (Case 252/83) [1986] ECR 3713; *Commission of the European Communities v Republic of Ireland* (Case 206/84) [1986] ECR 3817. See also Sir Thomas Bingham MR's summary description of the first insurance directive in *Society of Lloyd's v Clementson* [1995] CLC 117, 123.

These directives were clearly designed to do the same job in the insurance field as the Directive of 1977 in its field, begin the process of co-ordination and in the meantime establish a body of minimum obligations to protect consumers. In so doing they also established a Community obligation on member states to provide effective supervision to achieve that protection. It is noteworthy that the court in the *Parodi* case [1997] ECR I-3899 relied on one of them, *Commission of the European Communities v Federal Republic of Germany* (Case 205/84) [1986] ECR 3755, when referring, at p 3801, paras 21-23 of its judgment, to the Directive of 1977 as ensuring the provision of a "guarantee [of] the protection of the recipient of services".

Further and compelling examples of the same approach are to be found in "the German environmental cases", a number of claims brought by the Commission against Germany for failure to implement directives as to requirements to be observed by member states concerning the quality of water and air: see *Commission of the European Communities v Federal Republic of Germany* (Case C-131/88) [1991] ECR I-825, 867, para 7 ("The purpose of those provisions ... is ... to create rights and obligations for individuals"--repeated in similar form as indicated in the following cases); *Commission of the European*

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 109 of 260
Pg 189 of 686

*Communities v Federal Republic of Germany* (Case C-361/88) [1991] ECR I-2567, 2601-2602, paras 16 and 20; *Commission of the European Communities v Federal Republic of Germany* (Case C-59/89) [1991] ECR I-2607, 2631-2632, paras 18, 19 and 23; *Commission of the European Communities v Federal Republic of Germany* (Case C-58/89) [1991] ECR I-4983, 5023, para 14 (relied upon by the court in *Dillenkofer's* case [1997] QB 259, 295, para 48; *Commission of the European Communities v Federal Republic of Germany* (Case C-237/90) [1992] ECR I-5973, opinion of Advocate General Jacobs, at p 6005; and *Commission of the European Communities v Federal Republic of Germany* (Case C-298/95) [1996] ECR I-6747, p 6760, paras 15 and 16.

Each of the directives required member states to take specific measures to ensure that water or air was of the quality prescribed by the directive, but said nothing about conferment of rights on individuals. The court held, nevertheless, that each directive, in seeking to protect the community's health and/or the quality of its environment by imposing on member states specific and detailed obligations as to water and air, conferred rights on individuals. Lord Neill, in his submissions, commented on the great width of the class of persons potentially granted rights by virtue of those directives; it includes every inhabitant of the European Union. In the most recent of the cases, *Commission of the European Communities v Federal Republic of Germany* (Case C-298/95) [1996] ECR I-6747, 6760 the court said:

---

**[2003]** **127**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

"15 ... one of the purposes of the directives ... is to protect human health ...

"16. In those circumstances, it is particularly important that directives should be transposed by measures which are indisputably binding. In all cases where non-implementation of the measures required by a directive could endanger human health, the persons concerned must be in a position to rely on mandatory rules in order to be able to assert their rights ..."

The plaintiffs have also referred to decisions of the European Court in other fields adopting similar reasoning.

The Bank has attempted to deflect the impact of the reasoning in these cases. It maintains that they were concerned with the degree of particularity with which a directive must be implemented, not with the question whether individuals should have rights in damages agains! a national regulator. It says that in some instances there are suggestions that the directives were insufficient to confer rights without further particularity (such particularity to be derived from national legislation). It refers to another environmental case, *Commission of the European Communities v Federal Republic of Germany* (Case C-431/92) [1995] ECR I-2189, 2220, paras 23-26, in which the court distinguished between the obligation to implement a directive and whether it gave rise to rights in individuals. However, that distinction does not seem to me to dent the European Court's now well established statement of general principle, that clearly defined obligations, where the context plainly intends it, give rise to rights in individuals to reparation for loss caused by breach of those obligations. The Bank also maintains that, in any event, the references are to *Francovich* liability of member states for failure to implement directives, not against their emanations for failing as regulators to apply them, and that remedies are in general a matter for national law. I shall deal with that issue in a moment.

In my judgment, none of the Bank's arguments meets the essential thrust of the reasoning in the German environmental cases. It is that the directives, by the mandatory and specific nature of their requirements, imposed obligations which gave rise to rights to those whose health was endangered by breach of them, regardless of the directives' lack of mention of such rights. Professor Sacha Prechal, writing in 1995 in her study, *Directives in European Community Law*, just after the first flush of these cases, stated, at p 138: "A number of relatively recent judgments suggest that the court is rather easily satisfied that a directive provision also intends to protect individual interests." See also her concluding paragraph, at p 139.

Finally, there is *Norbrook Laboratories Ltd v Ministry of Agriculture, Fisheries and Food* (Case C-127/95) [1998] ECR I-1531. This recent decision of the European Court is important on a number of

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 110 of 260
Pg 190 of 686

issues, including the derivation, from obligations expressed in a directive, of rights that are not so expressed. It concerned Council Directives (81/851/EEC) and (81/852/EEC) on the approximation of laws of the member states relating to veterinary products, directives which the United Kingdom maintained, and Advocate General LŽger seemingly accepted, at p 1542, para 32 of his opinion, had been implemented by virtue of earlier domestic legislation. The primary purpose of the directives was to safeguard public health; they

---

[2003] 128
2 AC Three Rivers DC v Bank of England (No 3) (CA) Auld LJ

imposed detailed obligations on member states' "competent authorities" to that end, but said nothing about corresponding rights.

The issue before the court was whether Norbrook was entitled to a remedy of damages against the United Kingdom's selected "competent authority", the ministry, for its unlawful administration of the provisions of the directives in making an unauthorised demand for information from the company when considering the grant of a licence to it to manufacture and sell a particular product. The court held, at p 1600, para 111, that Norbrook was entitled to such a remedy "on the basis of rules of national law on liability" subject to the condition, inter alia, that such rules must "not be so framed as to make it in practice impossible or excessively difficult to obtain reparation". In so holding, the court said, at p 1599, para 108, with regard to the first *Francovich* condition of a clear intention to confer rights:

> "in providing that an application for marketing authorisation may be refused only for the reasons set out ... [the] directive *gives individuals the right* to obtain authorisation if certain conditions are fulfilled. Those conditions are ... laid down precisely and exhaustively in [the directives]. The scope of the right conferred on applicants for marketing authorisation may therefore be adequately identified on the basis of those directives." (My emphasis.)

It is apparent that the European Court has in the last few years been moving towards a ready application of the *Francovich* principle that where a Community law obligation is imposed with clear intent to protect individuals, Community law will protect them by conferring on them rights of reparation in the event of a sufficiently serious breach of the obligation. In my view, that principle, as developed by the court in its jurisprudence in several contexts, in particular, in the recent authorities to which I have referred, shows that, contrary to Clarke J's reasoning, a right to a remedy in damages, even though not expressly provided for in a directive, may arise from an obligation in it, and does so where failure to acknowledge the right would deprive those for whose protection the obligation is imposed of full reparation for its breach.

*Francovich liability of a regulatory body*

In my view, the Directive of 1977 imposed clearly defined obligations on member states and on their regulatory bodies and, in doing so, gave rise to corresponding Community law rights in individuals in the position of the plaintiffs to enforce those obligations, if necessary by an action for damages. It was designed, amongst other things, to safeguard the savings of depositors whom the European Court clearly regards as a sufficiently identifiable body of persons for the purpose. In particular, the directive imposed express and clear administrative obligations on regulators, "the competent authorities", in relation to the authorisation and supervision of banks.

I have already referred to the Bank's contention that *Francovich* rights of redress, to the extent that they arise at all, do not lie against an emanation of a member state, in its capacity as a banking regulator in respect of its obligation to apply a fully implemented directive. It is well established that a non-implemented directive clearly imposing an obligation on an emanation of a member state can be enforced directly against that emanation under the *Becker* principle of direct effect. However, it does not seem to me, on

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 111 of 260
Pg 191 of 686

[2003] 129
2 AC Three Rivers DC v Bank of England (No 3) (CA) Auld LJ

authority or as a matter of logic, that non-implementation is critical to the issue of liability of an emanation of a state exercising an administrative function. Where there has been implementation of a directive the general principle of Community law is that each member state is primarily responsible for meeting the Community obligations imposed but that how it does so is usually a matter for it. However, once a member state has, by its domestic law devolved or delegated the specific obligations to some organ or emanation, such bodies are directly obligated. That is so whether the obligations are regarded as matters of Community law or as matters of national law construed in accordance with Community law; procedural matters not detracting from those Community obligations are, of course, solely matters of national domestic law. Thus the European Court in *von Colson's* case [1984] ECR 1891, 1909, para 26 said:

> "the member states' obligation arising from a directive to achieve the result envisaged by the directive and their duty under article 5 of the Treaty to take all appropriate measures ... to ensure the fulfilment of that obligation, is binding *on all the authorities of member states* including, for matters within their jurisdiction, the courts. It follows that, in applying the national law and in particular the provisions of a national law specifically introduced in order to implement Directive No 76/207, national courts are required to interpret their national law in the light of the wording and the purpose of the directive in order to achieve the result referred in the third paragraph of article 189." (My emphasis.)

It follows that where there has been implementation coupled with devolvement of the relevant powers and obligations to an emanation of the state, the Community obligations are enforceable against that body. As Professor Prechal has observed in *Directives in European Community Law*, p 70:

> "the answer to the question of which organ or authority of a member state is actually bound by a directive will, depending on the subject matter of the directive at issue, vary from member state to member state, according to the internal distribution of tasks and competences."

See also her citations, at p 70, of *Pescatore, L'Ordre juridique des CommunautŽs EuropŽennes, ƒtude des sources du droit communautaire* (1971), p 91; and the opinion of Advocate General Mancini in *Commission of the European Communities v Kingdom of Belgium* (Joined Cases 227- 230/85) [1988] ECR 1, 6, para 2 and *Federal Republic of Germany v Commission of the European Communities* (Case 8/88) [1990] ECR 2321, 2359, para 13. Cf the different, outcome where a directive imposing an obligation on member states without reference to its fulfilment through any particular body has not been implemented and the plaintiffs rely on direct effect: *Mighell v Reading* The Times, 12 October 1998; Court of Appeal (Civil Division) Transcript No 1378 of 1998.

It is worth remembering the context of *Francovich's* case [1995] ICR 722 itself--non-implementation of a directive on the approximation of the laws of the member states for the provision of a guarantee of protection to employees in the event of insolvency of their employers. The whole problem there was that, although the directive was specific as to the individuals entitled to the protection of the guarantee and as to its content, it did not

[2003] 130
2 AC Three Rivers DC v Bank of England (No 3) (CA) Auld LJ

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

identify who was obliged to provide it. In such circumstance the only candidate for liability--under the eponymous *Francovich* principle--was the Italian state. Thus, the questions put to the court were limited to the liability of "the state itself": [1995] ICR 722, 727, 767; the question of application of the principle to emanations of the state did not arise for consideration. Nevertheless, there are indications in the opinion of Advocate General Mischo and in the general statements of principle in the judgment of the court, which I have set out and which are derived from the *van Gend & Loos* case [1963] ECR 1 and other authorities, that it was not confined to state liability in respect of its legislative function only. Thus, the Advocate General said [1995] ICR 722, 747, 758:

> "42 ... if the payment of compensation is the sole means in the particular circumstances of ensuring effective protection, the member state is under an obligation by virtue of Community law to make available to individuals *an appropriate remedy* enabling them to claim compensation.
>
> "66 ... where the court has held that a member state has failed to fulfil its obligations by failing to implement provisions of a directive in national law, even provisions which do not have direct effect, that member state *is obliged to make available to the individuals on whom the directive was intended to confer rights appropriate judicial remedies to enforce those rights, where necessary by means of an action for damages against the state*." (My emphasis.)

Similar indications are to be found in more recent decisions of the court. As the plaintiffs submit, there is nothing in the *Norbrook* case [1998] ECR I-1531, for instance, to suggest that the fact that the United Kingdom's selected competent authority in that case was the ministry made any difference to the court's decision. See also the *Hedley Lomas* case [1997] QB 139, in which the European Court held that the United Kingdom was liable in damages to a company for an administrative decision by a ministry official in breach of article 34 of the Treaty, refusing it a licence to export sheep to a Spanish slaughterhouse. In my view, it is inconceivable that, if the decision had been made by "an emanation of the state" instead of a "state authority" (see e g *Griffin v South West Water Services Ltd* [1995] IRLR 15, per Blackburne J, a "first limb" *Becker* case), the court would not have held the emanation similarly liable. See also *R v Medicines Control Agency, Ex p Smith & Nephew Pharmaceuticals Ltd; Primecrown Ltd v Medicines Control Agency*(Case C-201/94) [1996] ECR I-5819 (the *Primecrown* case), in which the body whose liability was under consideration was the Medicines Control Agency.

The court in *Dillenkofer's* case [1997] QB 259, 295 adopted the same approach in response to the German Government's plea that, although it might have been able to introduce legislation within the prescribed period transposing the directive's requirements for the provision of the prescribed security to holiday makers, it was dependent for its operation on the collaboration of third parties, namely travel organisers, insurers and banks:

> "49 ... in providing that the member states were to bring into force the measures necessary to comply with the directive before 31 December 1992, article 9 required the member states to adopt all the measures

> necessary to ensure that the provisions of the directive were fully effective and so guarantee achievement of the prescribed result.
>
> "50 ... in order to ensure full implementation of article 7 of the directive, the member states should have adopted, within the prescribed period, all the measures necessary to provide purchasers of package travel with a guarantee that, as from 1 January 1993, they would be refunded money paid over and be repatriated in the event of the organiser's insolvency.

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 113 of 260
Pg 193 of 686

> "51. *It follows that article 7 would not have been fully implemented if, within the prescribed period, the national legislature had done no more than adopt the necessary legal framework for requiring organisers by law to provide sufficient evidence of security.*" (My emphasis.)

See also the *Norbrook* case [1998] ECR I-1531, 1563, para 134 of the opinion of the Advocate General.

It makes sense that, if a Community instrument such as a directive imposes in Community law an obligation on a member state carrying with it a right in an individual to damages if that obligation is breached, the state must not only implement the Community law in a legislative sense, it must also, through a ministry or an appropriate emanation, apply it. Thus Advocate General Jacobs said in *Commission of the European Communities v Federal Republic of Germany* (Case C-237/90) [1992] ECR I-5973, 6005, para 14: "it is not sufficient simply to incorporate the terms of a directive into national legislation; in addition, member states must ensure that the legislation is applied in practice." In my view, the Advocate General's reasoning has even greater force where, as here, all the relevant articles of the directive expressly and directly impose duties on the member states' "competent authorities."

It is true, as the Bank has repeatedly emphasised, that there is no reported authority in Community or common law affirming the derivation from the Directive of 1977 of individuals' rights against a banking regulator. However, that is neither a juridical nor a logical impediment to applying a clear general principle to the instrument if a national court is of the view that its purpose and effect require it. Nor should such a court be deterred by the "floodgates" argument in this age of environmental and product liability. The European Court's own robust disregard of such a consideration in the German environmental cases points the way as does its firm assertion in the *Parodi* case [1997] ECR I-3899 of the right of bank customers to protection--all coupled with the *Brasserie du Pcheur* public policy requirement of a "sufficiently serious" breach as an element of restraint in the Community law context.

It is noteworthy that the court, in the *Parodi* case, spoke in terms of an obligation to provide "a guarantee" of protection. Now that may be putting it a bit high as against a regulator: the directive does not oblige it to guarantee, in the sense in which common lawyers use that word, compliance of banks with the various criteria. However, it clearly obliges the regulator to perform its functions of authorisation, supervision and, if necessary, withdrawal of authorisation in a manner designed to protect depositors from risks associated with their deposit of funds. Such risks include that of a bank failing to comply with the directive's requirements as to solvency and liquidity and/or as to its effective direction by persons of integrity and

---

**[2003]** **132**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

experience. The directive would not achieve its purpose if it did not also confer corresponding rights on depositors to enforce that obligation against the regulator by actions for damages where appropriate. I return briefly to the relevant articles.

As I understand it, the Bank accepts that the article 3 criteria for authorisation may have been unconditional and sufficiently precise to impose on it an obligation to apply them, though it says that it does not follow that depositors have a right of action against it for breach of that obligation. I have expressed the view that the undoubted purpose and effect of the provision were to ensure minimum standards of consumer protection, and that there was clearly an obligation on the Bank to comply with them when considering authorisations.

As to supervision and withdrawal of authorisation, I have already said that I reject the Bank's submissions that articles 6 and 7 did not impose on it an obligation to supervise but merely a general obligation to collaborate and exchange information with regulators of other member states, or that the provisions for withdrawal in article 8 are merely permissive. A duty to collaborate with others over supervision cannot exist without a duty to supervise. Article 6 clearly provided the minimum basis on which regulators could--and without which they could not have been bound under article 7 to--collaborate effectively with each other. Its purpose, when read with articles 3, 7 and 8 and also article 5 of the

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 114 of 260
Pg 194 of 686

Directive of 1992, was to "ensure that savings were protected". The only way in which it could achieve that purpose was by imposing a continuing obligation on regulators to hold authorised banks, as a minimum, to the conditions of their authorisation and to withdraw it or subject it to conditions in the event of their failure to adhere to them.

As to article 8, despite its use of the word "may", I reject, as I have said, the Bank's contention that it merely identified or limited the circumstances in which a regulatory body had power to withdraw authorisation. Such an interpretation would defeat the clear purpose, particularly of paragraph 1(c) of it, as recognised by recital 5 to the Directive of 1992, of ensuring "the sound and prudent management of credit institutions."

There is then the question whether those obligations give rise to corresponding rights in depositors in the form of a remedy in damages against a regulator in the event of its breach of them. The terms of articles 3, 6, 7 and 8 of the Directive of 1977 are similar to, and if anything more precise than, those of article 7 of the directive in *Dillenkofer's* case [1997] QB 259, not least in their direct imposition of obligations on the Bank as a "competent authority"; and both have similar recitals indicating that protection of the consumers to whom they respectively relate is a purpose of the instrument. I can see no reason why they should be given any different effect as to the conferral and enforceability of rights because, here, the body on whom the obligation to regulate is imposed is a regulator as distinct from the state itself. Nor can I see any material distinction between the conferral of rights on individuals derived from obligations on member states, acting through regulatory bodies, to protect their health, as in the German environmental cases, from that of rights of depositors derived from obligations on member states' banking regulators to protect them financially in their dealings with their banks.

---

**[2003]** **133**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

In my view, on the clear wording of the directive and having regard to the jurisprudence of the European Court, the obligations imposed by the directive on the Bank are sufficiently clear and precise to give depositors a right of redress against it in the event of breach of that obligation. I add that, in reaching that conclusion, I have considered and rejected the possibility that such rights as the directive conferred might be limited to banks themselves, whether as applicants or holders of authorisations or their competitors. First, that would not serve one of the two important purposes of the directive or meet the *Francovich* test in this context, the effective protection of depositors against defaulting banks. Second, the case upon which the Bank relied in suggesting that possibility, *R v Medicines Control Agency, Ex p Smith & Nephew Pharmaceuticals Ltd; Primecrown Ltd v Medicines Control Agency* (Case C-201/94) [1996] ECR I-5819, 5853-5854, 5859, paras 17 and 35-38, was one in which the only issue under consideration was the respective entitlements of competing authorised sellers of similar products, not the welfare of those to whom they were selling them.

*Direct effect--implementation*

The arguments of the parties have proceeded largely on the basis that the Acts of 1979 and 1987--legislatively at any rate--have fully implemented the Directive of 1977. The plaintiffs say, as an alternative to their *Francovich* claim, that that does not prevent them from relying on it against the Bank as a matter of direct effect if it satisfies the *Becker* criteria. The Bank says that implementation does deprive the plaintiffs of recourse to the directive under this head and that, for reasons I have already discussed and rejected, they cannot rely on *Francovich* liability. If I am right about the *Francovich* claim, the debate about this is academic. There are two further reasons why, in my view, it does not assist the Bank.

First, it is open to question whether the Bank can, in any event, properly adopt the plaintiffs' seeming stance that the directive has been fully implemented so as to oust their reliance on *Becker* liability. It could reasonably be said that the precondition of liability for damages of bad faith on the part of the Bank or its officers in a common law action for misfeasance in public office and as introduced in section 1(4) of the

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 115 of 260
Pg 195 of 686

1987 Act, to the extent which they derogate from the directive, "misimplement" it. In a common law jurisdiction, judge-made law as well as domestic legislation may be an agent of misimplementation. Such a precondition of liability goes beyond the *Brasserie du Pcheur* criterion of "a sufficiently serious breach" for recovery of damages, certainly in a case like this where, in my view, the directive left the Bank with little discretion in the application of its minimum requirements for permitting banks to trade.

In the *Brasserie du Pcheur* case [1996] QB 404, 502-503, para 79 the court said:

> "The obligation to make reparation for loss or damage caused to individuals cannot ... depend on a condition based on any concept of fault going beyond that of a sufficiently serious breach of Community law. Imposition of such a supplementary condition would be tantamount to calling in question the right to reparation founded on the Community legal order."

---

**[2003]** **134**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

See also *R v Secretary of State for Transport, Ex p Factortame Ltd (No 5)*, The Times, 28 April 1998; Court of Appeal (Civil Division) Transcript No 1585 of 1998, in which the court, in the following passage, indicated that a requirement of proof of intentional or negligent "fault" could, depending on the circumstances, go impermissibly beyond a "sufficiently serious breach". The court said:

> "Pursuant to the national legislation which it applies, *reparation of loss or damage cannot be made conditional upon fault (intentional or negligent)* on the part of the organ of the state responsible for the breach, going beyond that of a sufficiently serious breach of Community law."

Although the Acts of 1979 and 1987 must be interpreted as far as possible to conform to the meaning and purpose of the Directive of 1977, it seems to me that even the most flexible exercise in interpretation could not reconcile section 1(4) of the 1987 Act with the Community remedy of damages for a "sufficiently serious" breach derived from the directive.

Second, the origin of the *Becker* principle of direct effect lay in the European Court's concern to ensure that member states could not escape their obligations under directives by failing to implement them or by mis-implementing them: see *Becker's* case [1982] ECR 53, 71, paras 23 and 24 and *Criminal proceedings against Kolpinghuis Nijmegen BV*(Case 80/86) [1987] ECR 3969, 3977, 3978, paras 8 and 15. As Judge Pescatore, who wrote the court's judgment in *Becker's* case, put it in [1980] Recueil Dalloz Sirey 171-176, its basis was a form of estoppel: see the *Kolpinghuis* case [1987] ECR 3969, 3977, opinion of Advocate General Mischo, para 7. A complementary view of the court's approach to direct effect, as distinct from direct applicability under the second paragraph of article 189, is that expressed by Josephine Steiner in "Direct Applicability in EEC Law--A Chameleon Concept" (1982) 98 LQR 229, 239, namely that it:

> "was developed by the European Court ad hoc, from expediency rather than principle. The reasoning employed to justify the doctrine was pragmatic, based on the 'effet utile' argument. If Community law were to work, it must be applied uniformly. Its useful effect would be weakened if individuals were unable to invoke it before their national courts."

See also Steiner, "Coming to Terms with EEC Directives" (1990) 106 LQR 144.

Accordingly, it does not follow from that starting point that non- or mis-implementation should be regarded as a precondition for direct reliance on a directive. In my view, Clarke J was wrong so to suggest [1996] 3 All ER 558, 603, in reliance on *Felicitas Rickmers-Linie KG & Co v Finanzamt fŸr Verkehrsteuern, Hamburg* (Case 270/81) [1982] ECR 2771: "Once a directive has been correctly implemented there is no question of direct effect because, by: definition, effect has already been given to it ..." The European Court in that case did not put it in quite that way. It said, at p 2787, para 26, that where a directive has been implemented its, effects could reach individuals "through the intermediary of the

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

implementing measures" and that it was, therefore, "unnecessary" to consider whether it meets the criteria for giving it direct effect in the event of non-implementation. It is unnecessary because as a result of full implementation the directive and the national law, *as to Community obligations*, are the

---

same. It follows that, whether a national court approaches those obligations, as distinct from its own procedural means of observing them, via the directive or through its national legislation properly construed in accordance with the directive, the answer should be the same.

In my view, therefore, non- or mis-implementation of a directive is a *reason* for giving a directive direct effect; it should not be a *condition* of giving it effect, either on its own terms or on those of a national measure fully implementing it. The principle of direct effect was devised by the European Court to ensure access to Community law when not implemented, not to hinder access to it when implemented.

Recent decisions of the European Court indicate that in the main it is indifferent to the precise route by which it gives effect to a directive. In *Dillenkofer's* case [1997] QB 259, which concerned a member state's failure to implement a directive within the prescribed period, the court disposed of the matter without reference to direct effect. In the article 177 reference in *Verein fŸr Konsumenteninformation v … sterreichische Kreditversicherungs AG* (Case C-364/96) [1998] ECR I-2949, where there had been implementation of the directive in question, the court interpreted the directive and its requirements without reference to the doctrine; see also the *Primecrown* case [1996] ECR I-5819, 5850, para 7; *CIA Security International v Signalson SA* (Case C-194/94) [1996] ECR I-2201, 2246-2248, paras 44-50 and the *Norbrook* case [1998] ECR I-1531. On the other hand there are still signs the other way: see, for example *Kampelmann v Landschaftsverband Westfalen-Lippe*(Joined Cases C-253/96 to C-258/96) [1997] ECR I-6907, 6938-6940, paras 40-45, 47, where the Fifth Chamber of the court (four of whose members sat in the full court in *Dillenkofer's* case and three in the *Norbrook* case) stressed non- or mis-implementation as conditions of direct effect; and *Carbonari v Universitˆ degli Studi di Bologna* (Case C-131/97) [1999] ECR I-1103 the opinion of Advocate General LŽger, at paras 21-27, the most recent statement on the subject.

Neither the 1979 Act nor the 1987 Act transposed the directive word for word. Thus, for example, article 3(2) imposed as a condition of authorisation that the persons who effectively direct the business of the bank should be of "good repute" and of "sufficient experience", whereas the 1979 Act, in Schedule 2, paragraphs 7 and 1 respectively required all directors, controllers and managers to be "fit and proper" and, in the case of recognised banks that they as institutions, rather than those who directed them should be of "high reputation". And the 1979 Act, unlike the 1987 Act, did not expressly impose on the Bank a duty to supervise; neither Act mentions the obligations in article 6 as to the establishment of regular recalculation and observation of ratios and the monitoring of solvency and liquidity; and neither Act expressly transposes the obligations of collaboration with other regulators provided for by article 7. Those in the main are comparatively trivial differences. More important are the rights of redress derived from the obligations the directive imposes, rights which are wider than those dependent on proof of bad faith as required by section 1(4) of the 1987 Act and the common law action of misfeasance in public office.

Now, one approach to those and other differences is to say that the United Kingdom legislation, if properly construed so as to give effect to the requirements of the directive, in accordance with article 189 of the Treaty and sections 2(1) and (4) and 3(1) of the 1972 Act, effectively implemented

---

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 117 of 260
Pg 197 of 686

it: see, for example, the "generous" interpretative approach of the House of Lords in *Garland v British Rail Engineering Ltd* [1983] 2 AC 751, *Pickstone v Freemans plc* [1989] AC 66 and *Litster v Forth Dry Dock & Engineering Co Ltd* [1990] 1 AC 546. Another approach is to say that the legislation did not fully implement the directive and, therefore, United Kingdom courts should have direct recourse to it. As Josephine Steiner observed in "Coming to Terms with EEC Directives", 106 LQR 144, 146, the question whether a directive has been correctly implemented can only be assessed by reference to the directive itself, with the result that it can rarely be disregarded. Clearly, as a result of the court's ready application of the *Francovich* principle, the two approaches can shade into one another. Whichever route is taken, the answer on matters of *Community law* should be the same, with the result that it should prevail over United Kingdom law, including the common law as to misfeasance in public office and section 1(4) of the 1987 Act, where the latter frustrates it: see *Amministrazione delle Finanze dello Stato v Simmenthal SpA* (Case 106/77) [1978] ECR 629, 643-645, paras 16-26; the *Brasserie du Pcheur* case [1996] QB 404, 502, paras 72-73.

*Sufficiently serious breach*

The question is whether the pleaded or sought to be pleaded breaches of the rights derived from the Directive of 1977 are "sufficiently serious" to confer on the plaintiffs a remedy in damages against the Bank: see the *Factortame* case [1996] QB 404, 499, paras 50, 51, 54-55. The court distinguishes between breaches where, on the one hand, the provision of Community law is imprecise or complex or leaves the member states with some discretion as to how to implement it and, on the other hand, where the provision makes clear what the member states have to do and leaves them with little or no discretion as to how to do it.

In the former case, particularly where a member state has a discretion, the "decisive test" of sufficient seriousness is whether the member state has "manifestly and gravely disregarded the limits on its discretion:" see the *Brasserie du Pcheur* case [1996] QB 404, 499, para 55, and see generally pp 498, 502-504, paras 43 and 77-89. The court said that there should be taken into account, inter alia:

> "the complexity of the situations to be regulated, difficulties in the application or interpretation of the texts and, more particularly, the margin of discretion available to the authors of the act in question": see p 498, para 43.

See e g *R v HM Treasury, Ex p British Telecommunications plc* (Case C-392/93) [1996] QB 615.

In the latter case where the Community provision makes plain what has to be done and leaves the member states with little or no discretion, mere infringement, whether legislative or administrative, may suffice: see *Dillenkofer's* case [1997] QB 259, 292-293, paras 25, 26 and 28 (failure to implement a directive); the *Hedley Lomas* case [1997] QB 139, 204, para 28 (administrative decision in breach of Treaty provision); the *Norbrook* case [1998] ECR I-1531, 1599-1600, para 109 (administrative decision in breach of directive).

Here, although the Bank had judgments to make in the exercise of its duties of authorisation, supervision and withdrawal of authorisation, they

---

**[2003]** **137**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

were administrative decisions governed closely by the detailed criteria for authorising and permitting banks to trade prescribed by the directive (cf the *Norbrook* case). The requirements were not difficult to understand. Nor, in the main, did they require an exercise of discretion--more an assessment of the facts. And, as I have already said, there was little or no scope for a balancing exercise of the sort considered by Lord Goff in *Davis v Radcliffe* [1990] 1 WLR 821. The Bank's role was essentially to determine as a

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 118 of 260
Pg 198 of 686

matter of fact according to the regime laid down by the directive whether BCCI at any stage satisfied the prescribed criteria for authorisation, and/or continuation of its authorisation to trade as a bank.

To the extent, if at all, that the plaintiffs may have to prove more than mere infringement, my view is that they plead and seek to plead matters which, if they prove them, are capable of amounting to manifest and grave disregard of the limits of the Bank's scope for discretion or assessment.

*Causal link*

Whether there was a direct causal link between breach and damage is a matter to be determined by the English court in accordance with English domestic law, whilst safeguarding the full effectiveness of Community law: see the *Brasserie du Pcheur* case [1996] QB 404, 501, para 65; and *Brasserie du Pcheur SA v Germany* [1997] 1 CMLR 971.

*Conclusion*

It follows from my reasoning that the plaintiffs have an arguable Community law claim against the Bank.

*Common law claim for misfeasance in public office*

*The two forms of the tort*

The issue is the nature and ambit of the tort of misfeasance in public office and whether the plaintiffs' case accords with it. Despite its antiquity, or perhaps because of it, the precise boundaries of the tort of misfeasance in public office are unclear. However, English and Commonwealth jurisprudence indicates two main themes.

First, as Steyn LJ put it in *Elguzouli-Daf v Comr of Police of the Metropolis* [1995] QB 335, 347B, "The essence of the tort is the abuse of public office." Abuse in this context necessarily connotes dishonesty or bad faith by a public officer either in the performance of his office or in an absence of an honest attempt at it: see *Jones v Swansea City Council* [1990] 1 WLR 54, 71, per Slade LJ; see also *Northern Territory v Mengel*, 69 ALJR 527, 547, per Brennan J.

The second theme is that abuse of power for this purpose may take one or other or both of two forms. I put it in this way rather than saying that there are two alternative "limbs" to the tort, because the notion of alternative limbs when used as part of a definition of something from which each limb springs seems to me to invite confusion. The first form of the tort is what is now called "targeted malice", that is, use or non-use of a power with the predominant intent of damaging a person, and which causes such damage. The second form is an intentional and knowingly or recklessly unlawful act or omission which causes damage to a person.

---

**[2003]** **138**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

The early English authorities, in their then customary loose use of the word "malice" and on their particular facts, are no basis for seeking, as the Bank does, to confine the tort to acts done with an intention to injure: see *Bourgoin SA v Ministry of Agriculture, Fisheries and Food* [1986] QB 716, 776, per Oliver LJ And there is much recent and highly authoritative judicial support for these alternative forms of the tort: see *Dunlop v Woollahra Municipal Council* [1982] AC 158, 172, per Lord Diplock; *R v Secretary of State for the Environment, Ex p Hackney London Borough Council* [1983] 1 WLR 524, 539, per May LJ; *Micosta SA v Shetland Islands Council* [1984] 2 Lloyd's Rep 525, 543, per Lord Ross; *Bourgoin SA v Ministry of Agriculture, Fisheries and Food* [1986] QB 716, 740, per Mann J: "I read the judgment in *Dunlop v Woollahra Municipal Council* in the sense that malice and knowledge are alternatives." Mann J

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 119 of 260
Pg 199 of 686

was upheld by the Court of Appeal on this part of the case, per Oliver LJ, at p 777, and approved by Slade LJ in *Jones v Swansea City Council* [1990] 1 WLR 54, 69 (a "targeted malice" case) obiter:

> "The recent decision of this court in *Bourgoin* has reaffirmed the existence of the tort and made it clear that malice, in the sense of an intent to injure, and knowledge by the doer that he has no power to do the act complained of are merely alternative, not cumulative, ingredients of the tort."

In *Elguzouli-Daf v Comr of Police of the Metropolis* [1995] QB 335, 347 Steyn LJ said: "as the law stands, the plaintiff has to establish either that the holder of the public office maliciously acted to the plaintiff's detriment or that he acted knowing that he did not possess the relevant power." In *X (Minors) v Bedfordshire County Council* [1995] 2 AC 633, 731 Lord Browne-Wilkinson described the tort as: "the failure to exercise, or the exercise of, statutory powers either with the intention to injure the plaintiff or in the knowledge that the conduct is unlawful."

Taylor J aptly and neatly noted the distinction between the two forms of the tort in *R v Secretary of State for the Home Department, Ex p Ruddock* [1987] 1 WLR 1482, 1500C, as between "an ulterior motive" and a "deliberate flouting of ... criteria". So also did Hirst J in *Irish Aerospace (Belgium) NV v European Organisation for the Safety of Air Navigation* [1992] 1 Lloyd's Rep. 383, 401, when identifying the tort as a "malicious or conscious action beyond [a public body's] powers".

Since dishonesty lies at the heart of both forms of the tort, I do not consider it necessary to complicate consideration of the second form, deliberate and knowing illegality, with elaborate discussion of the role of recklessness, its subjective and objective forms and so on. The basis of this form of the tort, put at its lowest, is that a public officer has not honestly attempted to perform his duty. Dishonesty in that or more direct form, as the Privy Council said in *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378, 389-391, means simply not acting as an honest person would act in the circumstances. It is an objective standard, though it has to be assessed in the light of what the person concerned actually knew at the time; an honest person does not "deliberately close his eyes and ears, or deliberately not ask questions, lest he learn something he would rather not know, and then proceed regardless"; and "Acting in reckless disregard of others' rights or possible rights can be a telltale sign of dishonesty."

---

**[2003]** **139**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

The critical question on this part of the appeal is whether a plaintiff seeking damages for injury caused by a deliberate and knowingly or recklessly unlawful act is required to prove any further, and, if so, what, mental element. It cannot be necessary to prove a predominant intention to injure because that would confine the tort to the single form of "targeted malice."

The plaintiffs' case is that the Bank was guilty of misfeasance in public office by its dishonest breach of the 1979 Act in granting a full licence to BCCI, and under both Acts in failing to supervise its conduct of its business and/or to revoke (withdraw) the full licence (authorisation). They maintain that it is a sufficient plea of the tort of misfeasance in public office to allege dishonest breach of duty in any of those respects causing damage. They say that they do not need to allege any mental ingredient as to damage but that if they do, the most that is required is foreseeability of, or recklessness as to, damage. The Bank maintains that it is necessary for the plaintiffs to prove that it knew at the material times that its conduct would "necessarily" injure them or at the very least that it foresaw that its conduct would probably cause them damage.

Before the *Bourgoin* case [1986] QB 716 the question of foresight or foreseeability of injury did not arise for consideration in any of the reported authorities--it did not require consideration in the *Bourgoin* case. The early commentators' descriptions of the tort contain no references to such mental states as an integral part of the wrong. Smith J in the Australian case of *Farrington v Thomson and Bridgland* [1959] VR 286, 293, helpfully summarised them:

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 120 of 260
Pg 200 of 686

"That an action on the case lay for such a misfeasance was established at a relatively early period. In *Comyns' Digest*, tit 'Action on the Case for Misfeasance (A1)', there is the statement: 'an action on the case lies for misfeasance; as, if an officer misdemean himself by any falsity ... or otherwise misbehave himself in his office' ... In *Bacon's Abridgment*, 'Offices and Officers (N)', it is said that all officers, whether such by the common law or made pursuant to statute, are punishable for oppressive proceedings by an action at the suit of the party injured."

In the early English cases, the injury flowing from the alleged misfeasance was usually so obvious as not to occasion debate.

*"Policy" and "principle"*

Before considering the *Bourgoin* case [1986] QB 716 and other recent English and Commonwealth authorities on the point, it may be helpful to consider the place of the tort of misfeasance in public office in the range of remedies available to an individual for a wrong done to him by a public body. In doing so it is possible to discern what are and are not valid policy conditions affecting its ambit.

First, the civil wrong, which has as its twin the criminal offence of misfeasance in public, office, carries with it two elements which together distinguish it from most other civil wrongs, dishonesty and conduct in public office. Those combined elements attract particular public censure. As Lord Neill submitted, there can be no public policy in protecting a public officer who acts dishonestly in his office as distinct from one who makes an honest but negligently mistaken decision. There is thus no sensible basis for

[2003] 140
2 AC Three Rivers DC v Bank of England (No 3) (CA) Auld LJ

restricting the scope of the tort by reference to public policy considerations restricting the ambit of other civil wrongs with different characteristics.

For example, the concern of the New Zealand Court of Appeal in *Garrett v Attorney General* [1997] 2 NZLR 332, 350 that an overly punitive form of the tort would stultify public administration is an inappropriate application to this tort of the reasoning of the Privy Council in *Yuen Kun Yeu v Attorney General of Hong Kong* [1988] AC 175 and *Davis v Radcliffe* [1990] 1 WLR 821 against imposing a duty of care on banking regulators in the circumstances of those cases. The same would apply to the courts' careful restriction of actions for breach of statutory duty to those breaches where the statute plainly intended there should be such a remedy. My observations on the inapplicability of such reasoning to the question of the existence of a Community law remedy apply a fortiori to the more stringent requirements of the common law remedy of misfeasance. Its distinctive feature is that it is a dishonest abuse by a public officer of his office, in which the dishonesty may take the form of a deliberate failure honestly to perform the duties of that office.

In my view, and contrary to Mr Stadlen's submission, there is no distinction for this purpose between a dishonest performance of a public function and a dishonest failure to attempt to perform it. I also respectfully disagree with his submission and Clarke J's reasoning [1996] 3 All ER 558, 578 that the dishonesty is removed if a public officer knowingly exceeds his powers but does so in what he may regard as the best interests of someone. Would dishonesty for this purpose be measured by his subjective view of the propriety of his deliberate breach of the law or by some objective standard involving a balancing of interests? Either way and apart from anything else, logic would suggest that much would then depend on: the seriousness of the power breached and/or of the breach; and/or the magnitude of the risk of injury and/or of the injury risked; and, in any event, the relative importance to one or more of those factors of the interest prompting the breach. Such an uncertain exercise would be plainly undesirable and unworkable, both for public officers and for the courts, in determining the ambit in any particular case of a civil wrong the purpose of which is to deter abuse of public office and to compensate those who suffer from it.

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 121 of 260
Pg 201 of 686

Moreover, it would run contrary to the very existence of the second and distinct form of the tort, in which the malice lies in a public officer's deliberate breach of the law causing damage, whatever his perceived justification for doing so: see e g the decision of the Supreme Court of Canada in *Roncarelli v Duplessis* 16 DLR (2d) 689, to which I refer again below. For the same reason, I respectfully disagree with the majority of the Australian High Court in *Northern Territory v Mengel* 69 ALJR 527, 541 that where unintended harm is involved the imposition of liability for misfeasance involves no purpose where there is a duty of care to avoid the risk in question and anomalous where there is not; the suggested anomaly is clearly removed by the dishonesty of the public officer in that capacity, whether in the form of intentionally unlawful conduct or conduct recklessly indifferent to its unlawfulness.

There can be no public policy in the interests of sound administration in permitting a public officer knowingly or recklessly to act illegally in his office and in freeing him from liability for the consequences of such dishonest conduct.

---

**[2003]** **141**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

Equally, misfeasance in public office is not to be equated with the tort of conspiracy where there may well be a need to confine its extent when it takes the form of an agreement by anyone, regardless of office, to do an unlawful act where the predominant intention is not to harm; see per Parker J's expression of concern in *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* (unreported) 6 March 1981. Similarly, it is of little value to look at the tort of deceit where it is an integral part of the tort that a statement is "made with the intention that it should be acted on by the plaintiff": see *Bradford Third Equitable Benefit Building Society v Borders* [1941] 2 All ER 205, 211, per Viscount Maugham and *Peek v Gurney* (1873) LR 6 HL 377.

If a plaintiff is required to prove, not only dishonesty of conduct, but also foresight of injury or of probable injury, so that the tort of misfeasance will not "overflow its banks", as the New Zealand Court of Appeal put it in *Garrett v Attorney General* [1997] 2 NZLR 332, 350, it is difficult to see where the tort comes in the spectrum of civil fault. The serious wrong of dishonesty, and by a public officer, would carry with it a penalty for the injured claimant not present in the less heinous wrongs of negligence or simple breach of statutory duty committed by anyone, public officer or no. He would be required to show, in addition to dishonest abuse of public office, not merely foreseeability of injury but its inevitability or, at the lowest, its probability.

What possible public policy could there be in such a penalty, and what purpose could there be in the tort even in cases, such as here under section 1(4) of the 1987 Act, when liability for negligence but not for dishonesty ("bad faith") is expressly excluded? On the Bank's submission, it would only have acted dishonestly ("in bad faith") in knowingly or recklessly acting unlawfully if it knew that its conduct would or would probably, as distinct from knowing that it might, damage BCCI's depositors. When a statutory duty is imposed on a regulator to perform its functions so as, inter alia, to prevent such damage, a public policy protecting it from its failure to discover the inevitability or probability of harm because of its wilful disregard of that duty would be strange indeed.

The recourse to "policy" and "principle" of the Australian High Court in *Northern Territory v Mengel* 69 ALJR 527 and of the New Zealand Court of Appeal in *Garrett v Attorney General* [1997] 2 NZLR 332 was prompted by the lack of authority before the *Bourgoin* case [1986] QB 716 as to what, if any, mental element as to damage is required for the second form of the tort. However, in their identification of what they considered to be the relevant public policy considerations, both courts assumed the mental element for which they were searching--an intention, actual or presumed, to injure. Thus, in *Mengel's* case, the majority said, at p 540:

> "The cases do not establish that misfeasance in public office is constituted simply by an act of a public officer which he or she knows is beyond power and which results in damage. Nor is that required by policy or by principle. Policy and principle both suggest that liability should be more closely confined. So far as policy is concerned, it is to be borne in mind that, although the tort is the tort

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

of a public officer, he or she is liable personally and, unless there is de facto authority, there will ordinarily only be personal liability. And principle suggests that misfeasance in public office is a counterpart to, and should be confined in

---

the same way as, those torts which impose liability on private individuals for the intentional infliction of harm. For present purposes, we include in that concept acts which are calculated in the ordinary course to cause harm, as in *Wilkinson v Downton* [1897] 2 QB 57 or which are done with reckless indifference to the harm that is likely to ensue ..."

As to the only element of policy identified by the court in that passage, concern for the personal liability of the public officer of whose conduct complaint is made, the tort is capable of being committed by a public body as well as an officer of a public body where, as here, those responsible are effectively the directing minds of the body: see *Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 2 AC 500. But in any event, there may be vicarious liability for a public officer's unauthorised, as well as authorised, acts of misfeasance in public office: see *Racz v Home Office* [1994] 2 AC 45, 50-53, per Lord Jauncey of Tullichettle, with whom the other members of the Appellate Committee agreed.

As to the suggestion of "principle," I do not know to what principle the court is referring in suggesting that the tort of misfeasance is a "counterpart to, and should be confined in the same way as, those torts which impose liability on private individuals for the intentional infliction of harm". That is merely an assertion of a proposition, not supported by case law, which the court then proceeded to rely upon to characterise the tort as possibly analogous to one of intentional infliction of harm. As an assertion, it fails to have regard to the distinctive combination of ingredients of the tort of misfeasance, dishonesty in the performance of a public office. And the court, by turning to the aspect of intentional infliction of harm, seemingly concentrated on the first form of the tort, "targeted malice" and paid little regard to the second, "deliberate and knowing illegality".

The New Zealand Court of Appeal in *Garrett v Attorney General* [1997] 2 NZLR 332 appears, with respect, to have adopted a similar circular form of reasoning in the following passage, at pp 349-350, namely an assertion, albeit in reliance on its reading of the *Bourgoin* case [1986] QB 716 and following Clarke J's judgment, that the tort is akin to one of intentional injury in order so to confine it:

"The tort has at its base conscious disregard for the interests of those who will be affected by official decision making. There must be an actual or, in the case of recklessness, presumed intent to transgress the limits of power even though it will follow that a person or persons will be likely to be harmed ... In effect this is no more than saying the tort is an intentional tort ... The purpose behind the imposition of this form of tortious liability is to prevent the deliberate injuring of members of the public by deliberate disregard of official duty. It is unnecessary, to attain this objective, to extend the tort to catch an act which, though known to be wrongful, is done without a realisation of the consequences for the plaintiff. The law may still provide a remedy in negligence if the situation is one of those in which it is appropriate to impose a duty of care or, if the plaintiff is someone intended by statute to have the particular benefit or protection of an Act of Parliament or subordinate legislation, the plaintiff may have a remedy in the form of an action for breach of statutory duty; or the circumstances may give rise to another of the traditional tort actions, for instance, false imprisonment or assault ... In our view this

---

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 123 of 260
Pg 203 of 686

intentional tort should not be allowed to overflow its banks and cover the unintentional infliction of damage ... We prefer to err on the side of caution and not to extend the potential liability of officials for causing unforeseen damage. To do so may have a stultifying effect on governance without commensurate benefit to the public."

The clear public policy behind the tort is to achieve an honest and fair public administration, by encouraging public officers not to abuse their position and to compensate those who suffer if they do. In *Ashby v White* 2 Ld Raym 938, 956 Holt CJ said: "If public officers will infringe mens rights, they ought to pay greater damages than other men, to deter and hinder other officers from like offences." For more modern judicial expression of the same principle, see per Slade LJ in *Jones v Swansea City Council* [1990] 1 WLR 54, 71:

"The essence of the tort, as I understand it, is that someone holding public office has misconducted himself by purporting to exercise powers which were conferred on him not for his personal advantage but for the benefit of the public or a section of the public, either with intent to injure another or in the knowledge that he was acting ultra vires ... It is the abuse of a public office which gives rise to the tort."

A further consideration of policy is that regard must be had to the nature and extent of the public office in respect of which misfeasance is alleged. The tort has many modern applications going well beyond the limited and highly personal form of the conduct of elections in which it had its roots. It may, as here, concern a public body's responsibility to regulate or supervise the conduct of others. The knowledge of such a body of the probable or possible consequences of any failure by it to perform its regulatory or supervisory functions will almost always depend on the fact and extent of that failure. It does not make sense to maintain, as does the Bank, that if its deliberate and knowingly unlawful failure to regulate and/or supervise was such that it only foresaw the possibility, not the probability, of damage to BCCI's depositors it should not and cannot be guilty of misfeasance in public office. If such were the law, the Bank could always escape responsibility by disabling itself from learning sufficient of the facts by deliberately not doing its duty. It is plain that one of the important purposes of regulation and/or supervision by a banking regulator is to enable it, by the proper exercise of such functions, to guard against damage to the depositors of the banks it supervises. It cannot, by hiding behind a self-drawn curtain of ignorance, escape liability when it must have known at least that it was possible that its want of proper regulation or supervision would result in such damage.

*The old authorities*

So much for policy and principle; I now return to the authorities and examine them, against the respective submissions of Mr Stadlen and Lord Neill: namely that the essence of the tort is an intention to injure or foresight of injury; or it is dishonest conduct which may take one of two forms, the first of which is intentional injury and the second of which is deliberate action or inaction knowing it to be unlawful.

As to the old authorities, there is, as one would expect, frequent reference to malice as an ingredient. That is not because they were mainly cases of

---

**[2003]** **144**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

spite, "targeted malice" or "predominant intention" to injure the plaintiff; but rather because pleaders and judges tended to equate the term "maliciously" with "wilfully", that is, wrongfully, intentionally and without just cause or excuse, even when using both words: see e g *Ferguson v Earl of Kinnoull* (1842) 9 Cl & Fin 251, 431, per Lord Brougham.

As I have said, the seed bed of the tort lay in a series of election cases starting in the 18th century. The most commonly cited starting point for the tort is the celebrated case of *Ashby v White* 2 Ld Raym 938; 3

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 124 of 260
Pg 204 of 686

Ld Raym 320; 1 Smith's LC (13th ed) 253, a claim against borough constables for wrongfully preventing the plaintiff from voting. Ashby's claim included an allegation of malice, and Holt CJ's revised version of his judgment and his contribution to the House of Lords' Committee's report on the matter referred to malice as an ingredient of the action. However, it is clear from the facts and the resolution of the House of Lords upholding his dissent that the alleged wrong lay not in the constables' spite or ill will against Ashby but in their concern that he would become a burden on the parish.

Holt CJ's invocation of the principle ubi jus, ibi remedium in his dissenting judgment, 2 Ld Raym 938, 954, was directed at the right of redress for abuse of public powers whatever the motive, and his references to malice were clearly intended in the broad sense of the constables intending not to do their duty. The terms of the House of Lords' resolution was equally broad:

> "every ... person, having a right to give his vote ... and being *wilfully* denied or hindered so to do by the officer who ought to receive the same, may maintain an action ... to assert his right and recover damages for the injury." (My emphasis.)

The same equation of "malice" with "wilfulness" is to be found in a number of election cases in the latter half of the 18th century and continuing into the early part of the 19th century: see *Burgoyne v Moss* (1768) reported in *Harman v Tappenden* (1801) 1 East 555, 563; *Bassett v Godschall* 3 Wils KB 121; *Milward v Sargeant* (1786) 1 East 567; *Drewe v Coulton* 1 East 563n (where, as Clarke J observed [1996] 3 All ER 558, 587, the only possibility canvassed was targeted malice), per Wilson J, at pp 563-564:

> "This is in the nature of it an action for misbehaviour by a public officer in his duty. Now I think that it cannot be called a misbehaviour unless maliciously and wilfully done, and that the action will not lie for a mistake in law ... In all the cases put the misbehaviour must be wilful, and by wilful I understand, contrary to a man's own conviction."

*Harman v Tappenden* 1 East 555; *Cullen v Morris* 2 Stark 577, 587, 589, per Abbott CJ, contrasting "improper motive" with "an honest intention to discharge ... duty":

> "On the part of the defendant it has been contended, that an action is not maintainable for merely refusing the vote of a person who appears afterwards to have really had a right to vote, unless it also appears that the refusal resulted from a malicious and improper motive, and that if the party act honestly and uprightly according to the best of his judgment, he is not amenable in action for damages. I am of the opinion, that the law, as it has been stated by counsel for the defendant, is correct."

---

**[2003]** **145**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

Finally, in *Tozer v Child* 7 E & B 377, 379, the Court of Exchequer Chamber left undisturbed the following direction of Lord Campbell CJ to the jury:

> "it was incumbent on the plaintiff to make out that the acts of the defendants complained of were malicious; and that malice might be proved, not only by evidence of personal hostility or spite, but by evidence of any other corrupt or improper motive ..."

There are two further early 18th century cases which suggest that malice in the sense of an intention to injure or foresight of injury was not a necessary ingredient of the tort.

The first is *Whitelegg v Richards* 2 B & C 45, which concerned a creditor's claim against the clerk of the Court of Relief of Insolvent Debtors for wrongfully and maliciously releasing a debtor, thereby depriving the creditor of the means of recovering his debt. Abbott CJ, giving the judgment of the court, said, at p 52:

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

> "On the argument before us, some authorities were quoted to show, that an action upon the case may be maintained against an officer of a court for a falsity or misconduct in his office, whereby a party sustains a special damage; and that, in this case, a damage was plainly shown by the loss of the means of enforcing payment from the debtor, as in actions against sheriffs or gaolers for an escape."

There, as in his judgment in *Cullen v Morris* 2 Stark 577, Abbott CJ expressed himself in a way which might suggest that all the necessary malice in the action lay in the improper conduct of the officer regardless of any intention to injure the plaintiff or of knowledge of its likelihood. However, as in the election cases, the strong likelihood of injury was plain.

The second case is *Henly v Lyme Corpn* 5 Bing 91, in which the plaintiff, an inhabitant of Lyme, claimed that the corporation had unlawfully and with intent to injure him failed to maintain the Cob at Lyme with the result that nearby land of his was damaged by the sea. On appeal from a jury's verdict in the plaintiff's favour, Best CJ, with whom Gaselee J agreed, described the tort of misfeasance in terms unconstrained by a need for an express allegation of an intention to injure. He said, at p 107:

> "Now I take it to be perfectly clear, that if a public officer abuses his office, either by an act of omission or commission, and the consequence of that is an injury to an individual, an action may be maintained against such public officer."

Then, after mentioning a number of examples of the application of that rule, he continued, at p 108:

> "It seems to me that all these cases establish the principle, that if a man takes a reward ... for the discharge of a public duty, that instant he becomes a public officer; and if by any act of negligence"--by which he clearly meant wilful neglect to act--"or any act of abuse in his office, any individual sustains an injury, that individual is entitled to redress in a civil action."

Mr Stadlen submitted that these older cases do not support the plaintiffs' argument that malice in the sense of some intention to injure is not an

---

essential ingredient of the tort. He suggested that they amounted to no more than this: where malice or wilfulness was mentioned it was in the sense of wrongfully intending to injure; and where it was not, there was no need for a comprehensive judicial definition of the tort because the intention was taken for granted and the sole issue was whether the defendant had acted dishonestly and/or without just cause. Similar arguments were addressed to and rejected by this court in the *Bourgoin* case [1986] QB 716, Oliver LJ observing, at p 776:

> "There are in certain of the older cases phrases in the judgments or pleadings which might be taken to suggest that 'targeted malice' was regarded as essential. I say 'might', because in my judgment they are entirely inconclusive. There are also strong indications in the other direction, particularly in the older election cases."

I respectfully agree with the assessment that the old cases are, at best for the Bank, inconclusive. In none of the election cases in particular was there evidence to suggest that, in preventing the plaintiff from voting, the defendant had a predominant intention to injure him; and in all of them the deprivation of the right to vote necessarily injured the plaintiff. Even in *Whitelegg v Richards* 2 B & C 45 and *Henly v Lyme Corpn* 5 Bing 91, where the allegations, respectively, were of an implied and an express intention to injure, the issue of malice in the sense of such an intention simply did not feature in the judges' formulation of the wrong. There is much in the language of the various judgments to indicate that the notion of malice was

used in a different and much broader sense, that is, doing or omitting to do a public act wilfully, and in bad faith. Mr Stadlen's submission, in any event, ignores the developing nature of the cause of action over the next two centuries; as he himself observed, the old authorities were decided at a time when it had not been analysed as a tort with two forms.

Before moving forward to the *Bourgoin* case [1986] QB 716 in 1986 I should mention two other cases, *Brasyer v Maclean* (1875) LR 6 PC 398 and *Smith v East Elloe Rural District Council* [1956] AC 736, which point away from the need to prove malice in the sense of an intention to injure.

*Brasyer v Maclean* LR 6 PC 398 was an appeal to the Privy Council against the nonsuiting by the Supreme Court of New South Wales of a claimant for damages against a sheriff from the sheriff's false return resulting in his attachment and arrest. One of the issues in the case was whether the claimant was required to prove, in addition to the sheriff's knowing falsity of the return, that he had "acted maliciously and without reasonable cause". Sir Barnes Peacock, giving the judgment of the Board, said, at pp 405-406:

> "This is not a case which falls within the general rule which has been laid down, that no action lies for damage or inconvenience sustained in consequence of process of law, unless it be alleged and proved that the party who occasioned it was actuated by malice. This is a case of a misfeasance by a public ministerial officer in the discharge of his duties. The sheriff was intrusted with the power of making a return to the court which would be considered conclusive by the court as to the truth of the facts stated in the return. He was enabled, therefore, by virtue of his office, to make a return to the court in this particular instance, which was

---

> conclusive in that stage of the proceedings ... and he therefore had the power, and he exercised the power of doing that which rendered the plaintiff liable to an attachment for a contempt of court without being allowed to show that the facts returned were untrue. It appears, therefore, to their Lordships that the sheriff in this case was guilty of a misfeasance in the exercise of the powers which were intrusted to him by law and in the discharge of his duty as a public ministerial officer, and that in respect of that misfeasance he is liable to an action for the damage which resulted from that act, notwithstanding it was not proved against him that he was actuated by malicious motives. The mere fact of the misfeasance and the damage resulting from it by reason of the attachment issuing upon the return as conclusive evidence against the plaintiff was sufficient damage to enable the plaintiff to maintain an action against the sheriff for that misfeasance, and to recover the damage which he has sustained in consequence of it."

In *Smith v East Elloe Rural District Council* [1956] AC 736 the House of Lords held unanimously that an action could proceed against the clerk to a local authority for a declaration and damages in respect of his knowingly, wrongfully and in bad faith procuring the making by the authority of a compulsory purchase of the claimant's land. Viscount Simonds said, at p 752:

> "Here the appellant by her writ claims against the personal defendant a declaration that he knowingly acted wrongfully and in bad faith in procuring the order and its confirmation, and damages, and that is a claim which the court clearly has jurisdiction to entertain. I am far from saying that the claim has any merit. Of that I know nothing. But because the court can entertain it, I think that the Court of Appeal ... were wrong in striking out the whole writ ..."

*Bourgoin SA v Ministry of Agriculture, Fisheries and Food*

None of the English authorities, ancient or modern, before *Bourgoin SA v Ministry of Agriculture, Fisheries and Food* [1986] QB 716 support the proposition that it is a necessary ingredient of the second

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 127 of 260
Pg 207 of 686

form of the tort that the public officer knew or foresaw, or even that he should have foreseen the possibility of, harm from his unlawful act. As to the *Bourgoin* case, I do not regard it as an authority for the proposition that either foresight of probable harm, as held by Clarke J, or foreseeability of harm is a necessary ingredient of the tort.

In the *Bourgoin* case, a decision of Mann J on a preliminary issue, the defendant had conceded that he had known his conduct was unlawful and that it would injure the plaintiffs. The only issue was whether, as he maintained, the plaintiffs had to prove that that was his predominant intention, i e "targeted malice". The case concerned a claim by French turkey producers against a government minister for having knowingly unlawfully prohibited the importation of turkey meat from France with the intention of protecting English turkey producers, and in the knowledge that his prohibition would injure the French producers. The minister maintained that, as his predominant motive was to benefit English producers, he could not be held liable in misfeasance and that his appreciation that it would necessarily harm French producers did not constitute malice for the purpose.

---

**[2003]** **148**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

Mann J, after reviewing the authorities, held that proof of malice and proof of knowledge of unlawfulness were alternative methods of proving the tort. In doing so, he expressed himself by reference to the minister's concession before him that he had foreseen that his act would cause injury to the French turkey producers. This is how he put it, at p 740, referring both to the minister's conceded foresight and to the foreseeability of the injury in question:

> "the words 'aimed at him' ... wholly appropriate in the context of the disgraceful conduct of the respondent in *Roncarelli*'s case 16 DLR (2d) 689 ... do not preclude another path towards liability; that is to say, knowledge that an act is invalid coupled with foresight that, its commission would damage the plaintiff ... The wrong described before me is that of an act performed by a public officer with actual knowledge that it is performed without power and is so performed with the known consequence that it would injure the plaintiffs. I do not read any of the decisions to which I have been referred as precluding the commission of the tort of misfeasance in public office where the officer actually *knew* that he had no power to do that which he did, and *that his act would injure the plaintiff* as subsequently it does. I read the judgment in *Dunlop v Woollahra Municipal Council* [1982] AC 158 in the sense that malice and knowledge are alternatives. There is no sensible reason why the common law should not afford a remedy to an injured party in circumstances such as are before me. There is no sensible distinction between the case where an officer performs an act which he has no power to perform with the object of injuring A (which the defendant accepts is actionable at the instance of A) and the case where the officer performs an act which he knows he has no power to perform with the object of conferring a benefit on B but which has the *foreseeable* and actual consequence of injury to A (which the defendant denies is actionable at the instance of A). In my judgment each case is actionable at the instance of A ..." (My emphasis.)

On appeal to this court, Oliver LJ, with whom Parker and Nourse LJJ agreed on this part of the case, said, at p 777:

> "For my part, I too can see no sensible distinction between the two cases which the judge mentions. If it be shown that the minister's motive was to further the interests of English turkey producers by keeping out the produce of French turkey producers--an act which must necessarily injure them--it seems to me entirely immaterial that the one purpose was dominant and the second merely a subsidiary purpose for giving effect to the dominant purpose. If an act is done deliberately and with knowledge of its consequences, I do not think that the actor can sensibly say that he did not 'intend' the consequences

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 128 of 260
Pg 208 of 686

or that the act was not 'aimed' at the person who, it is known, will suffer them. In my judgment, the judge was right in his conclusion also on this point."

Clarke J held [1996] 3 All ER 558, 578, that foreseeability of damage was not enough to satisfy the second form of the tort. He expressed the view, at p 568, that when Mann J referred in his judgment to the "foreseeable" consequence of injury he must have meant "foreseen", observing that in that case no one had suggested that foreseeability of damage was enough and

---

**[2003]** **149**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

that Mann J had not applied his mind separately to that question. He paraphrased, at p 569, the Court of Appeal's approach:

> "Thus, even if it was not absolutely necessary to do so for the purposes of the actual decision in *Bourgoin* [1986] QB 716, the Court of Appeal was approving the proposition that there are two alternative ways in which the tort can be established, namely (a) where a public officer performs an act with the object of injuring the plaintiff (which may be called targeted malice), and (b) where he performs an act which he knows that he has no power to perform and which he knows will injure the plaintiff."

Mr Stadlen submitted that the ratio of the *Bourgoin* case is that, in the absence of targeted malice, misfeasance can be established on proof of knowledge of illegality coupled with actual foresight of loss to the plaintiff. He adopted Clarke J's view that Mann J must have meant foresight, not foreseeability. He said that there was no previous English authority or even any obiter statement in support of the proposition that foreseeability, reasonable or otherwise, of loss was enough. He suggested that in the *Bourgoin* case the only point in issue between the parties and the only point to which Mann J's judgment, and that of Oliver LJ approving it, were directed was whether foresight of loss was sufficient. He said that it was implicit in both judgments that they considered an intention, though not necessarily a predominant intention, to injure was a necessary ingredient of the tort, provable in the second form of the tort by knowledge of necessary loss. He said that the only logical premise of Oliver LJ's reasoning in the passage quoted was that, as a minimum, proof of a subsidiary intention to injure was necessary. Otherwise the defendant's concession that he knew he was acting unlawfully would have been sufficient to dispose of the preliminary issue in favour of the plaintiff. He said that the ratio of the decision was that, in the absence of a predominant intention to injure, a public officer is liable for misfeasance if he has both knowledge of illegality and knowledge that his conduct will necessarily cause loss.

In support of that understanding of the ratio he prayed in aid *R v Secretary of State for the Home Department, Ex p Ruddock* [1987] 1 WLR 1482, in which Taylor J, at p 1498, set out his understanding of the ingredients of the tort as stated in the *Bourgoin* case [1986] QB 716, namely: "(1) that a public officer knew he had not power to do that which he did; (2) that he knew his act would injure the plaintiff; and (3) that it in fact did so."

Lord Neill submitted that it is clear from Mann J's consideration of the authorities that he was concerned throughout with the question whether knowledge of illegality on its own was sufficient. He said that his use of the word "foreseeable" in the critical passage was more consistent with that consideration than was "foresight"; that it was clearly deliberate, and neither Mann J nor the Court of Appeal in approving this part of the judgment could possibly have overlooked its mistaken significance if "foresight" had been intended and was part of the ratio; and that his use of the word "foresight" elsewhere in the judgment was all in the context of the minister's concession that he had indeed foreseen harm to the plaintiffs as a result of his conduct.

---

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

The courts of Australia and New Zealand have interpreted Mann J's words differently. The majority of the High Court of Australia in *Northern Territory v Mengel*, 69 ALJR 527, 540, and the Federal Court of Australia in three subsequent decisions following *Mengel's* case have read it as "foreseeable": see *J L Holdings Pty Ltd v Queensland* (unreported) 26 May 1995; *Madden v Madden* (1996) 65 FLR 354 and *Flanagan v Comr of the Australian Federal Police* (1996) 60 FCR 149. However, the New Zealand Court of Appeal in *Garrett v Attorney General* [1997] 2 NZLR 332 concluded that he had meant to say "foresight".

I do not regard Mann J's references to "foresight" or "foreseeability" in the passage from his judgment that I have set out, or his earlier references to foresight or its equivalent when rehearsing the rival contentions of the parties, as anything more than a factual setting in the case for the clear and well established proposition of law that he confirmed, namely that targeted malice and knowledge of unlawfulness are two alternative forms of the tort. And, given the concession made by the minister for the purpose of the preliminary issue, I certainly do not regard Mann J's references to foresight or foreseeability of injury as part of the ratio, still less that in using the word "foreseeable" he made a mistake and must have meant "foreseen", as Clarke J concluded. Oliver LJ appears to have been content to approach the case in the same focused way, namely that, given the minister's concession that he knew his unlawful act would injure the French producers, he could not say that he did not intend it because his dominant motive was to benefit the English producers. Either way, Mann J's and Oliver LJ's references to the minister's appreciation of the consequences of his act were obiter, save to the extent that he could not escape liability by denying a predominant intention to injure.

In the result, I do not consider the *Bourgoin* case an authority for the proposition that, where a claimant who has been injured by the deliberate and knowing illegality of a public officer, foresight or foreseeability of damage is an essential ingredient of the second form of the tort. As there was no issue or argument in the case as to the need for either, it is unfortunate that it has been treated as the starting point and basis for subsequent judicial interpretation on the point.

*The Commonwealth authorities*

In Australia there was a line of modern authority suggesting that it is not necessary to show malice in the sense of an intention to injure or foresight or foreseeability of injury, and that proof of knowledge of illegality would do. Its starting point was *Farrington v Thomson and Bridgland* [1959] VR 286, a decision of the Supreme Court of Victoria. The issue in the case was whether two police constables, who knowingly unlawfully, but in what they considered to be the public interest, ordered a hotel keeper to close his hotel and cease supplying liquor, were liable for misfeasance in public office for damage he suffered as a result of obeying their order. Smith J held that they were so liable. He said, at p 293, after reference to some of the early English authorities, including *Brasyer v Maclean* LR 6 PC 398 and *Smith v East Elloe Rural District Council* [1956] AC 736, that:

> "Some of the authorities seem to assume that in order to establish a cause of action for misfeasance in public office it is, or may be, necessary

> to show that the officer acted maliciously, in the sense of having an intention to injure ... It appears to me, however, that this is not so and that it is sufficient to show that he acted with knowledge that what he did was an abuse of his office ... In my view, therefore, the rule should be taken to go this far at

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 130 of 260
Pg 210 of 686

least, that if a public officer does an act which, to his knowledge, amounts to an abuse of his office, and he thereby causes damage to another person, then an action in tort for misfeasance in a public office will lie against him at the suit of that person."

Although that plain statement of rule contains no reference to foresight or foreseeability of injury as a necessary ingredient of the tort in that form, it does not follow that Smith J rejected the need for some such mental element. He was concerned--as was Mann J later in the *Bourgoin* case [1986] QB 716--only with the question whether the plaintiff had to prove an intent to injure; the circumstances of the case made plain that the officers must have foreseen that in ordering the plaintiff to close his hotel they would cause him loss. The same comment can be made about the Supreme Court of Victoria's reliance on that general statement in two other cases of alleged knowing illegality, namely, no allegation of an intention to injure but obvious foresight of damage from the alleged conduct, *Tampion v Anderson* [1973] VR 715, 720 and *Little v Law Institute of Victoria (No 3)* [1990] VR 257.

As I have indicated, the High Court of Australia has recently considered the tort in some detail in *Northern Territory v Mengel* 69 ALJR 527, which concerned a farmer's claim against a public authority in the Northern Territory for loss resulting from its unlawful restriction of the movement of his cattle. The only issue of law on the claim of misfeasance was as to the requisite knowledge of the authority of the unlawfulness of its conduct. However, in considering and ruling on that issue the court bound in with it some observations as to the foreseeability of damage.

On the issue of lawfulness of conduct all seven judges held that recklessness as to the extent of powers would do. On the matter of knowledge of damage, the majority (Mason CJ, Dawson, Toohey, Gaudron and McHugh JJ) were of the view that, on the facts of the case, and as they appear to have understood the *Bourgoin* case [1986] QB 716, liability was established on proof of a foreseeable risk of harm. They added that it might be necessary for a plaintiff to show that the act in question "was calculated in the ordinary course to cause harm", that is, as in *Wilkinson v Downton* [1897] 2 QB 57, "calculated" in an objective sense. Deane J held, 69 ALJR 528, 554, that the plaintiff could only succeed by establishing that the public authority knew that its conduct was an unlawful act and that it would, or was likely to, cause injury or was reckless as to the invalidity "and that likely" injury; Brennan J held that foreseeability of, or recklessness as to, injury were not necessary ingredients of the tort.

The majority took Mann J in the *Bourgoin* case [1986] QB 716 as having suggested foreseeability as an additional or "sufficient" ingredient to the knowledge of unlawfulness form of the tort. They stated, 69 ALJR 527, 540:

> "it is sufficient for present purposes to proceed on the basis accepted as sufficient in the *Bourgoin* case, namely that liability requires an act which the public officer knows is beyond power and which involves a foreseeable risk of harm."

---

**[2003]** **152**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

In a passage that I have already cited, they added recklessness as a further and alternative ingredient (in relation to knowledge of both illegality and damage) to their concept of the tort as one of intentional infliction of harm.

Lord Neill placed great reliance on the minority judgment of Brennan J, in particular, on his focus on the absence of an attempt by a public officer to perform his duty as the heart of the tort. This is how Brennan J put it, at pp 546-547:

> "The history of the tort shows that a public officer whose action has caused loss and who has acted without power is not liable for the loss merely by reason of an error in appreciating the power available. Something further is required to render wrongful an act done in purported exercise of power when the act is ultra vires. The further requirement relates to the state of mind of the public officer when the

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 131 of 260
Pg 211 of 686

relevant act is done or the omission is made ... It has now been accepted that if a public officer engages in conduct in purported exercise of a power but with actual knowledge that there is no power to engage in that conduct, the conduct may amount to an abuse of office ... I respectfully agree that the mental element is satisfied either by malice (in the sense stated) or by knowledge. That is to say, the mental element is satisfied when the public officer engages in the impugned conduct with the intention of inflicting injury or *with knowledge* that there is no power to engage in that conduct and *that that conduct is calculated to produce injury*. These are states of mind which are inconsistent with an honest attempt by a public officer to perform the functions of his office. Another state of mind which is inconsistent with an honest attempt to perform the functions of a public office is reckless indifference as to the availability of power to support the impugned conduct and as to the injury which the impugned conduct is calculated to produce. The state of mind relates to the character of the conduct in which the public officer is engaged--whether it is within power and *whether it is calculated (that is, naturally adapted in the circumstances) to produce injury*. In my opinion, there is no additional element which requires the identification of the plaintiff as a member of a class to whom the public officers owes a particular duty, though the position of the plaintiff may be relevant to the validity of the public officer's conduct ... *It is the absence of an honest attempt to perform the functions of the office that constitutes the abuse of the office. Misfeasance in public office consists of a purported exercise of some power or authority by a public officer otherwise than in an honest attempt to perform the functions of his or her office whereby loss is caused to a plaintiff. Malice, knowledge and reckless indifference are states of mind that stamp on a purported but invalid exercise of power the character of abuse of or misfeasance in public office. If the impugned conduct then causes injury, the cause of action is complete ... Foreseeability of damage to another by one's own conduct is the factor which warrants the imposition of a duty of care to the other when engaging in the conduct. But the tort of misfeasance in public office is not concerned with the imposition of duties of care. It is concerned with conduct which is properly to be characterised as an abuse of office and with the results of that conduct. Causation of damage is relevant; foreseeability of damage is not*." (My emphasis.)

---

**[2003]** **153**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

In assessing the effect of *Mengel's* case on what, if any, role knowledge as to damage plays in the tort of misfeasance in public office, the following aspects of the case are important.

(1) The issue was as to the defendant's knowledge of the unlawfulness of its conduct, not of the damage to the plaintiffs that would or might result from it. It was clear, as the majority observed, at p 534, that, although the defendant had not intended to harm the plaintiffs, it was "aware of the predicament which ... [they] faced if they could not sell their cattle as planned". Therefore, as in the *Bourgoin* case [1986] QB 716, it was unnecessary to consider foresight and foreseeability, still less to decide between them. The court's observations as to foreseeability of, and recklessness as to, damage were obiter.

(2) I have already challenged the considerations of "policy" and "principle" upon which the majority relied in venturing their view that a mental element of some sort as to injury was an ingredient of the tort. But, in any event, their reasoning falls short of a decision that foreseeability of loss was an essential ingredient of the tort, and even further short of Clarke J's view [1996] 3 All ER 558, 576, namely that the tort consists of foresight of, or a reckless indifference to, the damage that would probably ensue.

(3) The majority's view in *Mengel's* case 69 ALJR 527 was not only obiter, but a diffidently expressed and incidental view drawn principally from the equally obiter and incidental reference by Mann J to foresight and foreseeability of injury in his formulation of the second form of the tort in the *Bourgoin* case [1986] QB 716. The majority, after observing, 69 ALJR 527, 539, that the precise limits of misfeasance in public office were still undefined, and before referring to the non-issue of knowledge as to damage, stated their understanding of the core meaning of the tort:

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 132 of 260
Pg 212 of 686

"the weight of authority here and in the United Kingdom is clearly to the effect that it is a deliberate tort in the sense that there is no liability unless either there is an intention to cause harm or the officer concerned knowingly acts in excess of his or her power."

They then went on, at p 540, to identify as unclear what, if any, role in the tort knowledge as to damage played:

"One aspect of misfeasance in public office that lacks precise definition is whether, assuming damage, it is sufficient to establish that the public officer knows that he or she is acting without authority or whether there is some additional requirement."

After stating that it had been "suggested" in the *Bourgoin* case [1986] QB 716 that there was an additional requirement of foreseeability of damage and resorting, in the passages that I have set out, to "policy" and "principle", the majority concluded that it was "sufficient for present purposes to proceed on the basis accepted as sufficient in *Bourgoin*".

In short, *Mengel's* case 69 ALJR 527 is no more an authority than the *Bourgoin* case [1986] QB 716 for the proposition that an essential ingredient of the tort is some mental element as to damage. However, it is of a piece with it in suggesting that foreseeability is, at any rate sufficient. Its additional contribution, that recklessness was also sufficient, was the view of all the judges, and, in my view, it is plain that they were referring to

---

[2003] 154
2 AC Three Rivers DC v Bank of England (No 3) (CA) Auld LJ

recklessness in an objective sense. In addition, Brennan J's powerful judgment, concentrating as it did, on the need to prove conduct "inconsistent with an honest attempt by a public officer to perform the functions of ... [his] office", is an important reminder of the origin and special role of this form of action. As he indicated by way of examples in the passage from his judgment that I have set out, such dishonesty or abuse of office may be established in various ways and without reference to foresight or foreseeability of harm.

The New Zealand case of *Garrett v Attorney General* [1997] 2 NZLR 332, which was decided after Clarke J's judgment, appears to be the first reported case in which the issue of knowledge as to damage in the second form of the tort has been considered. The case concerned a woman's claim for damages against the police for failing properly to investigate her complaint of rape. Blanchard J, giving the judgment of a five-judge Court of Appeal, held that the claim was bad because the claimant had not alleged or proved that the police knew of or were recklessly indifferent to the harmful consequences to her of the conduct of which she complained; foreseeability of such consequences, he said, was not enough. In so holding he said that the court regarded misfeasance in public office as an intentional tort both as to the unlawfulness of the conduct complained of and as to its consequences. He said that reasonable foreseeability of damage is insufficient to found the wrong and that Mann J, in his use of the word "foreseeability" in the *Bourgoin* case [1986] QB 716 must have meant "foresight". He stated [1997] 2 NZLR 332, 344:

"[The tort of misfeasance in public office] can ... be committed by an official who acts or omits to act in breach of duty knowing about the breach *and also knowing harm or loss is thereby likely to be occasioned to the plaintiff*. As will appear from the following discussion, 'knowing' in relation to both the breach and its effect on the plaintiff includes acting recklessly, in the sense of believing or suspecting the position and going ahead anyway without ascertaining the position as a reasonable and honest person would do." (My emphasis.)

Later he said, at pp 349-351:

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 133 of 260
Pg 213 of 686

"We are in respectful agreement with Clarke J that it is insufficient to show foreseeability of damage caused by a knowing breach of duty by a public officer. *The plaintiff, in our view, must prove that the official had an actual appreciation of the consequences for the plaintiff, or people in the general position of the plaintiff, of the disregard of duty or that the official was recklessly indifferent to consequences and thus can be taken to have been content for them to happen as they would*. The tort has at its base conscious disregard for the interests of those who will be affected by official decision making. There must be an actual or, in the case of recklessness, presumed intent to transgress the limits of power even though it will follow that a person or persons will be likely to be harmed. The tort is not restricted to a case of deliberately wanting to cause harm to anyone; it also covers a situation in which the official's act or failure to act is not directed at the injured party but the official sees the consequences as naturally flowing for that person when exercising power. In effect this is no more than saying the tort is an intentional tort. In this context, a

---

**[2003]** **155**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

person intends to bring about the known consequences of his or her actions or omissions, even if other consequences form the primary motive ... *The purpose behind the imposition of this form of tortious liability is to prevent the deliberate injuring of members of the public by deliberate disregard of official duty*. It is unnecessary, to attain this objective, to extend the tort to catch an act which, though known to be wrongful, is done without a realisation of the consequences for the plaintiff ... In our view this intentional tort should not be allowed to overflow its banks and cover the unintentional infliction of damage. In many cases the consequences of breaking the law will be obvious enough to officials, who can then be taken to have intended the damage they have caused. But where at the time they do not realise the consequences they will probably not be deterred from exceeding their powers by any enlargement of the tort ... *The common law has long set its face against any general principle that invalid administrative action by itself gives rise to a cause of action in damages by those who have suffered loss as a consequence of that action. There must be something more*. And in the case of misfeasance of public office that something more, it seems to us, must be related to the individual who is bringing the action. While the cases have made it clear that the malice need not be targeted there must, as we have said, be a conscious disregard for the interests of those who will be affected by the making of the particular decision." (My emphasis.)

Although the case is of significance as the first reported decision on the issue of a requirement of some form of knowledge of potential damage in the second form of the tort, it is, with respect, unsatisfactory in a number of respects. First, it fails to have regard to the core purpose of the tort, the prevention and reparation of harm from abuse of public office. Second, in equating the tort with those of intentional infliction of harm, it ignores the now well established different forms that the tort can take, "targeted malice" and deliberate and knowing unlawfulness, the purpose of the latter plainly being to provide for cases where the injury was not intentional. Third, in its expression of concern about the tort being "allowed to overflow its banks" and of the need for "something more" where the only complaint is of an "invalid administrative action", the court has again disregarded the fundamental and distinguishing features of this civil wrong--the "something more", as Brennan J said in *Mengel's* case 69 ALJR 527, is dishonesty--the abuse of power--by a public official. Fourth, as Lord Neill has pointed out, the court, in its various references to the state of knowledge necessary or sufficient to establish the second form of the tort, left no clear indication of the threshold of knowledge required.

The same court, differently constituted, in *Rawlinson v Rice* [1997] 2 NZLR 6510 broadly followed the same reasoning, though it spelt out more precisely what a plaintiff must prove on the issue of knowledge of damage. In separate judgments all three members of the court plainly treated *Garrett v Attorney General* [1997] 2 NZLR 332 as an authority for the proposition that knowledge of, or reckless indifference to,

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 134 of 260
Pg 214 of 686

damage was an additional requirement of the second form of the tort. McKay J said [1997] 2 NZLR 651, 658:

"A deliberate act knowingly or recklessly in excess of one's powers is sufficient. As has now been decided in *Garrett*, it must also be shown that

---

**[2003]** **156**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

the defendant knew that the conduct would cause damage to the plaintiff, or was recklessly indifferent to the consequences."

Tipping and Barker JJ said much the same, Barker J observing, at p 663: "Mere foreseeability of deleterious consequences is insufficient; the defendant must be reckless as to possible damage." However, Tipping J perceptively added, at p 667: "If the respondent was recklessly indifferent as to his powers it seems to be a short step to infer that he was recklessly indifferent to the harm he might cause ... by acting outside those powers."

In my view, the two New Zealand decisions, though on the point, were essentially concerned with recklessness in the sense of reckless indifference both as to unlawfulness and as to consequences, both of which, as a matter of practicality, were likely to go hand in hand, as Tipping J observed. However, although the court took its line from Clarke J, it did not, in either decision, adopt his qualification of recklessness by reference to the further ingredient that the public officer had to have known, believed or suspected that his unlawful act would probably harm the plaintiff. In my view, and with respect to the New Zealand Court of Appeal, it was wrong in importing into the second form of the tort a requirement to prove foresight or reckless indifference as to damage. As with the High Court of Australia in *Northern Territory v Mengel* 69 ALJR 527, its error lay in its fundamental misconception of the role of the tort, equating it to other torts of intentional injury by private individuals and disregarding its special characteristic of dishonesty in the form of abuse of a public office.

I should also refer to two of the Canadian authorities.

The first was *McGillivray v Kimber* (1915) 26 DLR 164, in which the Supreme Court of Canada held, by a majority, that a pilot could recover damages against a pilotage authority for dismissing him in breach of statutory requirements. The precise legal basis of the award is not entirely clear from the judgments. However, it seems to have been a case in which the defendants knowingly acted without authority and in which they clearly knew that they would injure the pilot by preventing him from earning his living. There was also some evidence that they had acted out of "motives other than zeal for the public welfare": see per Anglin J, at pp 183-184.

The second authority was *Roncarelli v Duplessis* 16 DLR (2d) 689, in which the Supreme Court of Canada awarded damages against the Prime Minister of Quebec for unlawfully directing the cancellation of a restaurant owner's liquor licence because he had provided bail on many occasions for fellow Jehovah's Witnesses who were then unpopular with the Quebec authorities. The case is important because, although the Prime Minister clearly knew that his conduct would injure the restaurant owner, he maintained that he was not liable in misfeasance because he had not acted maliciously, but in the best interests, as he perceived them, of the public; cf the *Bourgoin* case [1986] QB 716. The court held that, whatever his motivation, his deliberate and intentionally unlawful conduct was malicious for the purpose. Rand J said 16 DLR (2d) 689, 706-707:

"what could be more malicious than to punish this licensee for having done what he had an absolute right to do in a matter utterly irrelevant to the Alcoholic Liquor Act? *Malice in the proper sense is simply acting for a reason and purpose knowingly foreign to the administration*, to which was added here the element of intentional punishment by what was

---

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

virtually vocation outlawry ... 'Good faith' in this context ... means carrying out the statute according to its intent and for its purpose; it means good faith in acting with a rational appreciation of that intent and purpose and not with an improper intent and for an alien purpose ..." (My emphasis.)

Abbott J added, importantly, at p 730:

"I have no doubt that in taking the action which he did, the respondent was convinced that he was acting in what he conceived to be the best interests of the people of his province but this, of course, has no relevance to the issue of his responsibility in damages for any acts done in excess of his legal authority."

*English authorities since Clarke J's judgment*

There have been a number of English decisions approving or following Clarke J's analysis of the tort of misfeasance. However, in none of them did an issue arise as to the knowledge of injury required for proof of the second form of the tort; or the nature of the proceedings was such that it was not fully argued. The courts have been content, without further analysis of the issue and often with words of warm approval of Clarke J's judgment, to take from the *Bourgoin* case [1986] QB 716 as interpreted by him the proposition that a plaintiff must prove at least suspicion of probable damage or recklessness as to damage, suspecting its probability. I trust that the authors of those judgments will not regard my mere citation of the references to them without further comment as a mark of disrespect: *Tee v Lautro Ltd* (unreported) 16 July 1996; *Elliott v Chief Constable of Wiltshire* The Times, 5 December 1996; *Ealing London Borough Council v Metha* (unreported) 24 April 1997; Court of Appeal (Civil Division) Transcript No 1449 of 1997; *Williams v Solicitor to the Department of Social Security* (unreported), 11 June 1997; Court of Appeal (Civil Division) Transcript No 1183 of 1997; *Lam v Brennan and Torbay Borough Council* [1997] PIQR P488; *Bennett v Comr of Police of the Metropolis* (1998) 10 Admin LR 245; The Times, 24 October 1997; *R v Chief Constable of the North Wales Police, Ex p AB* [1999] QB 396, DC; *Barnard v Restormel Borough Council* [1998] 3 PLR 27; *W v Essex County Council* [1999] Fam 90.

*Conclusion*

I hope that it is clear from my brief review of the main English and Commonwealth authorities that, until Clarke J's judgment and that of the New Zealand Court of Appeal in *Garrett v Attorney General* [1997] 2 NZLR 332, there was no reported authority the ratio of which was that foresight or even foreseeability of damage was an essential ingredient of the second form of the tort. Equally, as Mr Stadlen emphatically put it, there was no reported authority to the effect that neither was necessary. Such recent judicial pronouncements, including that of Clarke J, as there are now on the point rest largely on the insecure basis of Mann J's judgment in the *Bourgoin* case [1986] QB 716--insecure because his observations on the point were in passing, the matter not being in issue before him. The Australian High Court in *Northern Territory v Mengel* 69 ALJR 527, obiter and somewhat diffidently, gave further impetus to the notion that some

---

such knowledge was required, stating that foreseeability was "sufficient". The New Zealand Court of Appeal in *Garrett's* case, heavily relying on Clarke J's interpretation of the *Bourgoin* case and his own reasoning on the matter, appears to have proceeded on the basis that some knowledge of injury was

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 136 of 260
Pg 216 of 686

necessary, concluding on what I have ventured to suggest was a flawed basis that foresight or recklessness, not foreseeability, is required. Given the lack of binding English authority and the conflict of Commonwealth authority, I take the view that it is for this court to determine the matter as best it can.

To that end I return to the core of misfeasance in public office, abuse of power, and to its bifurcated development, that is, dishonesty in the form of an act of "targeted malice" or by an intentionally unlawful act as in *Roncarelli v Duplessis* 16 DLR (2d) 689. The element of dishonesty in a public office, either in a deliberate disregard of duty or, as Brennan J put it in *Mengel's* case 69 ALJR 527, failure to make an honest attempt to perform the duty, has a special place in the range of civil remedies available to an individual. It is exemplified and recognised by Parliament in a case such as this by section 1(4) of the Act of 1987, reserving as it does a right of action against the Bank in respect of its acts or omissions committed in "bad faith".

If, as I believe, dishonesty is the critical test of misfeasance in public office, there is no need, as Millett J said in *Agip (Africa) Ltd v Jackson* [1990] Ch 265, 293, to complicate what is essentially a jury question with fine analysis of the gradations of knowledge and recklessness. That applies both as to knowledge of illegality and, where appropriate, to knowledge of it consequences. I include the latter because in some cases, such as this, the two may be hard to disentangle. This is not just an application of Tipping J's common sense mention in *Rawlinson v Rice* [1997] 2 NZLR 651 of the often short step between reckless indifference to powers and to their consequences.

A banking regulator's conduct may be unlawful in one or both of two ways. The first is by dishonestly failing to supervise a bank as it should, with the result that it does not know what is going on and what harm may be in store for that bank's depositors. The second is by dishonestly failing to perform its duty to prevent harm when it does know of such potential harm. In short the dishonest unlawful conduct may lie in a failure to supervise and/or it may lie in actual knowledge of potential harm giving rise to a duty to take preventative action. Whether and what conduct is dishonest in such circumstances will not be assisted by elaborate tests of recklessness, objective or subjective and so on, which have disfigured so many other branches of the law. That is especially so in the context of knowledge of injury where, on Clarke J's analysis, following *Garrett v Attorney General* [1997] 2 NZLR 332 and *Rawlinson v Rice* [1997] 2 NZLR 651, the courts would also have to grapple with the overlapping notion of foresight.

I can do no better than cite the now well known words of Millett J in *Agip (Africa) Ltd v Jackson* [1990] Ch 265 and of Lord Nicholls of Birkenhead, giving the opinion of the Board in *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378. Though, in each case they are concerned with dishonesty giving rise to a constructive trust, they are equally applicable in this context.

In the *Agip* case Millett J was concerned with defendant accountants who, he found, at p 294, "must have realised at least that their clients might be involved in a fraud on the plaintiffs". He said, at p 293:

---

**[2003]** **159**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

"Knowledge may be provided affirmatively or inferred from circumstances. The various mental states which may be involved were analysed by Peter Gibson J in [*Badenr v SociŽtŽ GŽnŽrale pour Favoriser le DŽveloppement du Commerce et de l'Industrie en France SA (Note)* [1993] 1 WLR 509] as comprising: (i) actual knowledge; (ii) wilfully shutting one's eyes to the obvious; (iii) wilfully and recklessly failing to make such inquiries as an honest and reasonable man would make; (iv) knowledge of circumstances which would indicate the facts to an honest and reasonable man; and (v) knowledge of circumstances which would put an honest and reasonable man on inquiry. According to Peter Gibson J, a person in category (ii) or (iii) will be taken to have actual knowledge while a person in categories (iv) or (v) has constructive notice only. I gratefully adopt the classification but would warn against over refinement or a too ready assumption that categories (iv) or (v) are necessarily cases of constructive notice only. The true distinctionn is between honesty and dishonesty. It is essentially a jury question. If a man does not draw obvious inferences or make the obvious inquiries, the question is: why not? If it is: because, however foolishly, he did not suspect wrongdoing or, having suspected it, had his

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 137 of 260
Pg 217 of 686

suspicions allayed, however unreasonably, that is one thing. But if he did suspect, wrongdoing yet failed to make inquiries because 'he did not want to know' (category (ii)) or because he regarded it as 'none of his business' (category (iii)), that is quite another. Such conduct is dishonest, and those who are guilty of it cannot complain if, for the purpose of civil liability, they are treated as if they had actual knowledge."

In *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378, 390-391 Lord Nicholls indicated some of the considerations bearing on a person's honesty which, despite the different context, serve as valuable reminders:

"Acting in reckless disregard of others' rights or possible rights can be telltale sign of dishonesty. An honest person would have regard to the circumstances known to him, *including the nature and importance of the proposed transaction, the nature and importance of his role, the ordinary course of business, the degree of doubt ... and the seriousness of the adverse consequences* ... Likewise, when called upon to decide whether a person was acting honestly, a court will look at all the circumstances known to the third party at the time. The court will also have regard to personal attributes of the third party, such as his experience and intelligence, and the reason why he acted as he did." (My emphasis.)

As to recklessness, Clarke J, in following the lead of all the judges in *Mengel's* case 69 ALJR 527, stressed the importance of the element of dishonesty. He said [1996] 3 All ER 558, 581:

"The reason why recklessness was regarded as sufficient by all members of the High Court in *Mengel* is perhaps most clearly seen in the judgment of Brennan J It is that misfeasance consists in the purported exercise of a power otherwise than in an honest attempt to perform the relevant duty. It is that lack of honesty which makes the act an abuse of power."

He held that the plaintiffs' case on the Bank's recklessness as to the lawfulness of its conduct was sufficiently pleaded. But there is an issue as to

---

**[2003] 160**
**2 AC Three Rivers DC v Bank of England (No 3) (CA) Auld LJ**

his formulation of the test of recklessness for this purpose. He defined it, at pp 581 and 632-633, as either a public officer's wilful shutting of eyes to the obvious ("turning a blind eye") or wilfully and recklessly failing to make such inquiries as an honest and reasonable man would make, adding as provisos "that the officer believes or suspects (a) that his act is beyond his powers and (b) that his act will probably cause ... damage". But for these provisos, the judge's approach followed Peter Gibson and Millett JJ's respective analyses of actual knowledge to found liability as a constructive trustee in *Baden v SociŽtŽ GŽnŽrale pour Favoriser le DŽveloppement du Commerce et de l'Industrie en France SA (Note)* [1993] 1 WLR 509 and *Agip (Africa) Ltd v Jackson* [1990] Ch 265.

The plaintiffs say that even if--which they challenge--Clarke J was correct in introducing to the second form of the tort an alternative of recklessness as to consequences, his proviso makes it too narrow a test and is contrary to the normal meaning of the word "reckless" in its various contexts, both civil and criminal. Lord Neill referred in particular to the classic formulations of Lord Diplock in *R v Caldwell* [1982] AC 341, 354 and *R v Lawrence (Stephen)* [1982] AC 510, 526, of a failure to give any thought to the possibility of an obvious risk or, having recognised the risk, nevertheless going on to take it. He submitted that Clarke J's proviso excluded from liability Lord Diplock's first category, failure to give any thought to the possibility of obvious risk, and thus excluded from the tort cases where a public officer recklessly made no honest attempt to perform his duty.

The Bank says that "objective" recklessness is not enough and would blur the boundary between misfeasance and negligence, since the second form of the tort consists in both a deliberate disregard of

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 138 of 260
Pg 218 of 686

public duty and a deliberate injuring of someone. Thus, it contends, adopting Clarke J's test, that, even where a plaintiff alleges that a public officer deliberately shut his eyes or failed to make inquiries, he must also establish that the officer at least suspected that he was acting unlawfully and that, in doing so he would *probably*cause damage to him.

In my view, the judge's test for which the Bank contends is inappropriate because, in focusing on consequences of conduct, it is capable of excluding plainly dishonest conduct. The critical thing about the role of recklessness in misfeasance in public office is that it is a manifestation of a public officer's abuse of his office, that is to say, of his bad faith or dishonesty in not attempting honestly to perform it. If, contrary to my view, some discrete test of recklessness as to consequences is applicable in this case, I prefer Lord Neill's formulation of it, namely whether there was an obvious and serious risk of causing financial loss to depositors by not supervising BCCI properly, and, if so, whether the Bank failed to give any thought to it, or having recognised it, went on to take the risk?

I do not consider that a plaintiff in an action for misfeasance in public office who can establish dishonesty in the sense of a knowing and deliberately or recklessly unlawful act by the defendant need also establish some knowledge on the officer's part of consequential damage, whether in the form of foresight or foreseeability. There is force in the submission of Lord Neill that, as the primary focus of the tort is on whether a public officer made an honest attempt to perform his duty, not on any intention to injure, if he knew that he was not performing his duty he was sufficiently dishonest.

---

**[2003]** **161**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

Echoing the reasoning of Rand J in *Roncarelli v Duplessis* 16 DLR (2d) 689 and Brennan J in *Northern Territory v Mengel* 69 ALJR 527 in the passages that I have cited, he added that if the officer also knew, believed or suspected that his conduct might cause injury to persons whose interests he was required to protect and who otherwise would be unprotected, that could add to the overall dishonesty, but is not a prerequisite of it.

Clarke J approached the matter by drawing from the authorities, particularly the *Bourgoin* case [1986] QB 716 and *Northern Territory v Mengel* 69 ALJR 527 that an essential of the second form of the tort was proof of some mental state of the defendant as to injury consequent on his unlawful act. He said [1996] 3 All ER 558, 578:

> "On the basis of the cases to which I have so far referred I have reached the clear conclusion that foreseeability of damage is not enough to satisfy the second limb. For ther reasons which I have already given, once Mann J's decision is properly understood, there is no support in *Bourgoin* for the suggestion that reasonable foresight [sic] is sufficient at the second stage. There is no other support for it in the recent cases and in my opinion it is not supported by either principle or policy. As Mr Stadlen points out, an officer may do something knowing it to be unlawful and in circumstances where it was reasonably foreseeable that a class of persons might suffer loss, but he might nevertheless do it in the best interests either of another class of persons or indeed of the plaintiff or of the class of persons of whom the plaintiff is one. In my judgment such a person would not be acting in abuse of power, whereas it is abuse of power which is the essence of the tort. It follows that, as was expressly held by the majority in *Mengel*, it is not sufficient to prove simply knowledge of the unlawful nature of the act and that the act caused the plaintiff's loss."

Later, after concluding on the other hand that proof of knowledge of inevitability of damage was not necessary to establish liability, knowledge of probability of injury would do, he, said, at p 583:

> "The purpose of the tort as I see it is to give compensation to those who have suffered loss as a result of improper abuse of power. That being so, knowledge that the relevant person will probably suffer damage is surely sufficient."

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 139 of 260
Pg 219 of 686

Why any knowledge as to the consequences of deliberate and knowingly unlawful conduct by a public officer is necessary to bring home a claim of abuse of power, or why it should be knowledge of probable rather than merely possible damage, is not apparent from the judge's reasoning. It may possibly be found in his suggestion that a public officer may with impunity deliberately and knowingly breach his duty for what he perceives to be a good reason even though in doing so he appreciates that it "might", as distinct from "probably would", cause injury to the plaintiff. There is also his implied acceptance, at p 582, of the applicability to foreseeable, but apparently not to foreseen, injury of the public policy considerations mentioned by the Privy Council in *Yuen Kun Yeu v Attorney General of Hong Kong* [1988] AC 175 and *Davis v Radcliffe* [1990] 1 WLR 821 against unduly fettering the exercise of executive discretion.

Such reasoning is contrary to the clear understanding of "malice" in the modern authorities, perhaps best exemplified in the facts of *Roncarelli v*

---

**[2003]** **162**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

*Duplessis* 16 DLR (2d) 689 and the words of Rand and Abbott JJ in it, at pp 706-707, 730, that I have cited, namely as including acting knowingly and intentionally in excess of power or contrary to legal duty.

Moreover, to permit dispensation by a public officer of his duty on such a distinction is quite unreal, ignoring as it does the essential "jury" issue of dishonesty. Can it reasonably be said that a public officer could ignore his duty in favour of some other perceived proper interest when he knows that in doing so the consequences might, rather than probably would, cause very serious injury to very many people, as, for example, the BCCI depositors in this case? Put another way, and applying the *Agip* [1990] Ch 265 and *Royal Brunei Airlines* [1995] 2 AC 378 test, can it be said, particularly in advance of a trial on the facts, that such conduct is not dishonest? And, as I have already said, if appreciation of consequences is relevant at all to that question, the magnitude of the power breached, of the breach, of the possible injury risked and of the risk itself would also be relevant factors to weigh against the perceived proper interest in assessing dishonesty.

As for the *Yuen Kun Yeu* [1988] AC 175 and *Davis v Radcliffe* [1990] 1 WLR 821 public policy considerations going to the non-existence of a duty of care, for the reasons that I have given in relation to the Community law claim, they are as inapplicable to a public officer's dishonest disregard of duty resulting in foreseeable harm as they are to that resulting in foreseen harm.

It follows that, in my view, the test of abuse of power--dishonesty--by a public officer does not necessarily include as an essential ingredient some appreciation by the officer of an injurious consequence. A public officer who dishonestly disregards his plain duty or who does not honestly attempt to do it, acts at his peril, and if injury results he is liable for it.

But, even if I am wrong about that, I can see no basis, whether as a matter of interpretation of Mann J's judgment in the *Bourgoin* case [1986] QB 716 or otherwise, for requiring a plaintiff in a claim for misfeasance in public office to prove foresight in at least the form of suspicion of probable harm. That would be a much more onerous burden than that imposed on a plaintiff in a negligence claim, where the defendant is not necessarily a public officer and the claimant has not had to go to the lengths of proving dishonesty. Interestingly, it could also be more onerous than that in a tort of intentional injury such as fraudulent misrepresentation. In *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd* [1997] AC 254, 279-280 Lord Steyn drew attention in the following passage from his speech to the well established policy of English law of imposing a more extensive liability on intentional wrongdoers than on careless defendants:

> "On any view it is clear that, if Cockburn CJ [in *Twycross v Grant* (1877) 2 CPD 469, 544-545] is right, the law imposes liability in an action for deceit for some consequences that were unforeseen and unforeseeable when the tortfeasor committed the wrong. And if that is right it may tell us something about the correct disposal of the present case.

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 140 of 260
Pg 220 of 686

"*The justification for distinguishing between deceit and negligence*

"That brings me to the question of policy whether there is a justification for differentiating between the extent of liability for civil wrongs depending on where in the sliding scale from strict liability to

[2003] 163
2 AC Three Rivers DC v Bank of England (No 3) (CA) Auld LJ

intentional wrongdoing the particular civil wrong fits in. It may be said that logical symmetry and a policy of not punishing intentional wrongdoers by civil remedies favour a uniform rule. *On the other hand, it is a rational and defensible strategy to impose wider liability on an intentional wrongdoer.* As *Hart and HonorŽ, Causation in the Law*, 2nd ed (1985), p 304 observed, an innocent plaintiff may, not without reason, call on a morally reprehensible defendant to pay the whole of the loss he caused. The exclusion of heads of loss in the law of negligence, which reflects considerations of legal policy, does not necessarily avail the intentional wrongdoer. Such a policy of imposing more stringent remedies on an intentional wrongdoer serves two purposes. First it serves a deterrent purpose in discouraging fraud ... And in the battle against fraud civil remedies can play a useful and beneficial role. Secondly, as between the fraudster and the innocent party moral considerations militate in favour of requiring the fraudster to bear the risk of misfortunes directly caused by his fraud. I make no apology for referring to moral considerations. The law and morality are inextricably interwoven. To a large extent the law is simply formulated and declared morality ...

"*For more than 100 years at least English law has adopted a policy of imposing more extensive liability on intentional wrongdoers than on merely careless defendants*. This policy was trenchantly spelt out by Lord Blackburn in *Livingstone v Rawyards Coal Co* (1889) 5 App Cas 25." (My emphasis.)

Finally, if there is a requirement of at least foreseeability of damage, the way in which abuse of power or dishonesty may damage an individual or class of individuals, the extent to which it may do so and the effect of the abuse on the public body's appreciation, if any, of its consequences will vary according to the public function abused. It is straightforward enough when an electoral officer unlawfully deprives an elector of his right to vote or a licensing authority unlawfully removes a licensee's right to trade. The certainty or strong likelihood of injury in each case is obvious to the misfeasor and requires no mention as a necessary ingredient of the wrong. Equally, where the function of a public body is to protect individuals from damage from the conduct of others, its exposure of them to such damage by its failure to protect from it is in clear and obvious disregard of their interests. The public body's knowledge of probable or possible damage from the defaults of those whom it should be supervising will depend largely on the assiduity with which it performs its duties. The less it does the less it is likely to know of or suspect any particular defaults capable of resulting in damage; but it cannot be unaware of the increased potential for such damage because of its lack of supervision. In the field of banking: regulation above all, damage to depositors from defaults by unsupervised banks is clearly foreseeable by a regulator knowingly not doing its job.

Accordingly, I am of the view that the plaintiffs have an arguable case, subject to matters of evidence the subject of the final issue on this appeal, against the Bank in misfeasance in public office.

*"The third way"--reformulation of the tort of misfeasance in public office*

The plaintiffs refer to the antiquity of the tort and contend that its principles, having their origin in jurisprudence governing the conduct of

[2003] 164

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 141 of 260
Pg 221 of 686

2 AC Three Rivers DC v Bank of England (No 3) (CA) Auld LJ

public officers in the 18th and 19th centuries, are not apt for the late 20th century. They submit that, while it may be appropriate for individual public officers to be protected from liability unless it can be shown that they acted in bad faith, a requirement that a plaintiff should have to prove such bad faith on the part of an administrative department or organ of a modern state before he can obtain reparation is unjustifiable. It is unjustifiable, they say, because it imposes too high a burden on plaintiffs, as the European Court has held as a matter of Community law, and because it may enable public authorities to hide behind arguments, such as that advanced by the Bank here, that plaintiffs must prove personal bad faith on the part of the ultimate decision maker.

Lord Neill referred the court to Recommendation No R (84) 15 of the Committee of Ministers of the Council of Europe of September 1984, to which the United Kingdom was a signatory, recommending the governments of all member states to be guided by certain principles in their law and practice relating to public liability. Principles I and II, so far as material, were:

> "I. Reparation should be ensured for damage caused by an act due to a failure of a public authority to conduct itself in a way which can reasonably be expected from it in law in relation to the injured person. Such a failure is presumed in case of transgression of an established legal rule.
>
> "II. Even if the conditions stated in Principle I are not met, reparation should be ensured if it would be manifestly unjust to allow the injured person alone to bear the damage, having regard to the following circumstances: the act is in the general interest, only one person or a limited number of persons have suffered the damage and the act was exceptional or the damage was an exceptional result of the act ..."

Lord Neill, in an argument not pleaded in the present or proposed pleading of the plaintiffs and not argued before Clarke J, submitted that the requirement of proof of bad faith in the common law action of misfeasance in public office is inconsistent with those principles, and that the common law touching the liability of the state and its departments to make reparation for losses caused by administrative failures should be adapted so as remove as conditions of reparation proof of a guilty mind, whether as to the lawfulness of the act or omission or as to the likelihood of damage.

Mr Stadlen suggested that this attack on Clarke J's judgment was a mark of desperation, highlighting the limits presently set on the tort of misfeasance in public office by the leading English and Commonwealth authorities and not indicated by such authority as there is for developing or extending the tort. He said that the Council of Europe Recommendation has no status in English law and that Principle I of it appears to contemplate the imposition of liability independently of any breach of the existing law and automatically where a breach of statute is proved. He said that it was reminiscent of the discredited *Beaudesert* principle (*Beaudesert Shire Council v Smith* 120 CLR 145) of an innominate liability for damages for harm caused by an intentional and unlawful act of another (rejected by Lord Diplock in *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173, 187, as part of the law of England and by the Australian High Court in *Mengel's* case 69 ALJR 528, 538). He submitted that this notion, liability without

---

[2003] 165
2 AC Three Rivers DC v Bank of England (No 3) (CA) Auld LJ

proof of knowing unlawfulness or fault, is alien to the common law and its requirement of at least dishonesty. He relied, in particular, on the observation of Blanchard J in the New Zealand Court of Appeal in *Garrett v Attorney General* [1997] 2 NZLR 332, 350 that, as a matter of policy, the tort should not be allowed to overflow its banks and cover the unintentional infliction of damage. In short, he submitted that there is no English or Commonwealth authority or reason of policy for creation of a new tort. He said that such an extreme and novel basis for liability could only become part of English law by legislation.

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 142 of 260
Pg 222 of 686

There is authoritative judicial support for the proposition that the boundaries of the tort are not tightly drawn: see *Racz v Home Office* [1994] 2 AC 45, 55, per Lord Jauncey of Tullichettle; *Northern Territory v Mengel* 69 ALJR 527, 546; *Elliott v Chief Constable of Wiltshire* The Times, 5 December 1996, per Sir Richard Scott V-C, and *Bennett v Comr of Police of the Metropolis* 10 Admin LR 245 per Sir Richard Scott V-C: "The precise boundaries of this tort have not been (and perhaps it would be inadvisable that they should be) precisely defined ..." But even if, as a matter of domestic law, the boundaries were clear, the effect of Community law may be to loosen them. In *Elguzouli-Daf v Comr of Police of the Metropolis* [1995] QB 335, 347 Steyn LJ said:

> "In this corner of the law our legal system possibly has a capacity for further development, notably under the direct or indirect influence of the jurisprudence of the European Court of Justice: see *Francovich v Italian Republic* (Case C-6/90) [1995] ICR 722 and *Kirklees Metropolitan Borough Council v Wickes Building Supplies Ltd* [1993] AC 227, 281-282, per Lord Goff of Chieveley."

However, to rely on such reasoning does not, it seems to me, justify the plaintiffs' argument for a "third way" as a further alternative to their submissions on the first two preliminary issues. Where Community law imposes obligations carrying corresponding rights enforceable in the domestic laws of member states, in the event of a conflict between the two. regimes Community law must prevail save if and to the extent that Community law permits member states a discretion in the matter. If I am right in concluding that the plaintiffs' case as pleaded is capable, if proved, of giving them an enforceable Community law right in damages against the Bank, the English common law of misfeasance, to the extent that it purports to restrict or impede the enforcement of that right, must bend before it: see pages 100G-101G, 133A-C and 135H-136C of this judgment and, e g, the reasoning of Advocate General LŽger in *R v Ministry of Agriculture, Fisheries and Food, Ex p Hedley Lomas (Ireland) Ltd* (Case C-5/94) [1997] QB 139, 185-186, 190, 198, paras 139-141, 162 and 206 and section 2(1) of the Act of 1972. It is noteworthy that Lord Goff's expression of doubt in *Kirklees Metropolitan Borough Council v Wickes Building Supplies Ltd* [1993] AC 227, 281-282 about the correctness of the Court of Appeal's majority decision in the *Bourgoin* case [1986] QB 716 on the Community law point was based on his view that, as a result of *Francovich's* case [1995] ICR 722, there was, in the case before their Lordships, a Community law right enforceable in the English courts.

If I am wrong about the plaintiffs' entitlement to rely on Community law, either because there is no relevant Community obligation on the Bank or

---

[2003] 166
2 AC Three Rivers DC v Bank of England (No 3) (CA) Auld LJ

none matched by a corresponding right in the plaintiffs to damages for its breach, I cannot see on what basis the English courts could properly develop the law of misfeasance by reference to Community law. For the court to purport to sweep away, without a Community law imperative for doing so, the common law's requirements of a guilty mind whether in the form of "targeted malice" or as to the lawfulness of the act or (as the Bank would contend) as to consequent injury, would be to usurp the function of the legislature. Accordingly, I agree with Hirst and Robert Walker LJJ that the plaintiffs' appeal should fail under this head.

*Causation*

This preliminary question is whether, on the assumption of the facts pleaded by the plaintiffs, their claimed losses are capable in law of having been caused by the acts or omissions of the Bank. Put shortly, can the Bank be liable for its failure to protect the plaintiffs from loss caused by the incompetence or dishonesty of BCCI?

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

As I have said, the question of causation, whether under Community law or English law is for the English court to decide. As to Community law, the plaintiffs say that the very purpose of the provisions of the Directive of 1997 as to authorisation and supervision is to secure depositors effective protection against losses of the type suffered by the plaintiffs.

Causation is essentially a question of fact and common sense: see *Galoo Ltd v Bright Grahame Murray* [1994] 1 WLR 1360, 1374-1375, per Glidewell LJ. The question here, as Clarke J said [1996] 3 All ER 558, 626, is whether a jury, properly directed, could conclude that the Bank, by the alleged "sufficiently serious breaches" of its Community law obligations to the plaintiffs and/or by the alleged various repeated acts of misfeasance, caused loss to the plaintiffs. It is sufficient to establish liability if the plaintiffs prove that those acts or omissions were an effective cause; they do not have to prove that they were the only or main cause: see *Banque Bruxelles Lambert SA v Eagle Star Insurance Co Ltd* [1995] QB 375, 406, per Lord Bingham of Cornhill CJ. I question the wisdom of putting this matter to Clarke J as a preliminary issue, since so much must turn on the findings of fact in the case.

The judge held that, as a matter of common sense and notwithstanding that the immediate, cause of losses may have been the dishonesty of BCCI, the alleged misconduct of the Bank was capable of being an effective cause of the plaintiffs' losses. He seems to have tied that conclusion to his ruling that to establish misfeasance the plaintiffs had to prove that the Bank knew or believed or suspected that its misconduct would probably cause loss to them, though why that should make any difference on the issue of causation is not clear. He said, at pp 629-630:

> "... I can see no reason why, if the plaintiffs prove that the Bank knew that any particular act or omission would probably cause loss to a depositor or potential depositor (as a member of the class of depositors or potential depositors), it should not follow that the loss was caused by the act or omission complained of. Common sense suggests that in those circumstances there would be a direct and effective causal link between the act or omission and the loss. That would in my opinion be so even on the basis (as is the case on the facts) that another cause of the loss was

---

> fraud on the part of the managers. In these circumstances I do not think that it is helpful to try to analyse the many cases to which I was referred, but which do not discuss the question for decision. I do not think that in this context the issue of causation can be resolved in the way suggested by Mr Stadlen. Thus it is not sufficient to say that no duty of care was owed to the plaintiffs or that it makes no difference to the question of causation whether the Bank acted honestly or dishonestly. Those points would I think have had force if the ingredients of the tort were as submitted on behalf of the plaintiffs, namely an act or omission which the Bank knew was unlawful and which foreseeably caused the loss. But on the view of the tort which I have expressed, the correct approach to causation in the case of the second limb is more akin to the approach to causation in the case of the first limb ... In the present case, where the immediate cause of the loss was the fraud of the managers, it appears to me that if it can be proved that the Bank knew that the managers would probably be guilty of fraud and, thus would probably cause the loss, the Bank would be liable on the basis that its misfeasance was an effective cause of the loss ... common sense seems to me to lead to that result."

Given that foreseeability may be one, though not a necessarily conclusive, factor in determining causation, in particular whether there has been a novus actus interveniens, it seems to me that it and all the other usual circumstances would fall for consideration on the facts at a full trial: see *Clerk & Lindsell on Torts* 17th ed (1995), p 55, para 2-26.

The plaintiffs' case is that a jury would have no difficulty in concluding that, on the pleaded facts, the Bank's conduct was an effective cause of their losses. They say that the duties imposed on, and powers given to, the Bank by the Directive of 1977 and the Acts of 1979 and 1987 were intended to enable it to

prevent or guard against depositors being put at risk as a result of incompetence or dishonesty by banks. The Bank's failure to comply with its duties resulted in its authorisation of BCCI to trade as a bank in this country and to continue to trade here with the result that BCCI attracted deposits which, by reason of its incompetence and/or dishonesty it became unable to repay. But for the Bank's failures the plaintiffs would not have deposited moneys or would not have maintained their deposits with BCCI and so would not have suffered the claimed losses. Such losses were the likely consequence of the Bank's conduct and precisely the consequence which the duties imposed on the Bank had been intended to prevent.

The Bank's case is that a defendant is not liable for losses caused by the independent acts of a third party unless he has assumed, or is deemed to have assumed, such a responsibility. Mr Stadlen put at the heart of his argument the following well known observation of Lord Sumner in *Weld-Blundell v Stephens* [1920] AC 956, 986:

> "In general (apart from special contracts and relations and the maxim respondeat superior), even though A is in fault, he is not responsible for injury to C which B, a stranger to him, deliberately chooses to do. Though A may have given the occasion for B's mischievous activity, B then becomes a new and independent cause ... in a word, he insulates A from C."

---

However, as Lord Neill pointed out, there are many reported cases since then in which a defendant has been held to have been an effective cause of a loss the immediate and direct cause of which was the voluntary and, even, unlawful act of a third party: see e g *De la Bere v Pearson Ltd* [1908] 1 KB 280; *London Joint Stock Bank Ltd v Macmillan and Arthur* [1918] AC 777; *Stansbie v Troman* [1948] 2 KB 48; *Davies v Liverpool Corpn* [1949] 2 All ER 175; *Dorset Yacht Co Ltd v Home Office* [1970] AC 1004 and *Ward v Cannock Chase District Council* [1986] Ch 546. Bingham LJ in *Slipper v British Broadcasting Corpn* [1991] 1 QB 283, 298 indicated that the proposition of Lord Sumner "must today be treated with some reserve". As Lord Neill also observed, Lord Sumner was one of a bare majority in that case; and leading textbook writers regard it as a possible exception to the general rule "that a defendant is not relieved of liability by a foreseeable intervening act, or, to use which it is submitted is a preferable formulation, by an intervening act which is in accordance with human nature": *McGregor on Damages* 15th ed (1988), pp 101-102, para 165.

In any event, as the issue is whether a defendant's conduct was an effective cause of claimed loss, Lord Sumner's dictum cannot logically apply to a case where the claim is that the defendant is in breach of duty, of supervision or otherwise, to guard against or prevent the act of a third party causing the very loss that the duty was intended to prevent. As Lord Neill put it, common sense could not result in a conclusion that the Bank's failure to perform its duty was not an effective cause of the plaintiffs' losses. In *Smith v Littlewoods Organisation Ltd* [1987] AC, 241, 272 Lord Goff, after referring to the general idea in Lord Sumner's dictum that a person "ought not be held responsible in law for the deliberate wrongdoing of others", said:

> "Of course, if a duty of care is imposed to guard against deliberate wrongdoing by others, it can hardly be said that the harmful effects of such wrongdoing are not caused by such breach of duty. We are therefore thrown back to the duty of care."

Although Lord Goff spoke in terms of a duty of care, because that happened to be the basis for the cause of action in the case, there is no logical reason to limit its application as a matter of causation to cases of negligence; see also *Dorset Yacht Co Ltd v Home Office* [1970] AC 1004, 1030A-D, per Lord Reid and *Lamb v Camden London Borough Council* [1981] QB 625, 642D, per Oliver LJ.

*Yuen Kun Yeu v Attorney General of Hong Kong* [1988] AC 175 and *Davis v Radcliffe* [1990] 1 WLR 821 are not authorities to the contrary because in each the issue was whether the regulator defendant owed

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 145 of 260
Pg 225 of 686

a duty of care to depositors and potential depositors, not whether they had caused their losses. Nor is *Galoo Ltd v Bright Grahame Murray* [1994] 1 WLR 1360, in which an auditor of a company was held not liable in negligence to an investor in the company for alleged losses sustained as a result of relying on the company's audited accounts. The primary issue on the audited accounts in that case was whether the auditor owed the investor a duty of care, and there is an obvious distinction between the role of an auditor facing a claim in negligence and a regulatory body like the Bank facing a claim in Community law and/or of misfeasance. An auditor lacks both the power and duty of the latter to control whether the relevant institution trades or not and, if it does trade, to subject it to restrictions.

---

**[2003]** **169**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

In my judgment, it follows that it is likely that the conduct of the Bank, as pleaded by the plaintiffs, would be capable, if proved, of having caused the plaintiffs' losses. For this purpose it is not necessary for them to prove that Bank had control over BCCI's day-to-day activities. It is sufficient that the Bank had a duty to guard against the occurrence of conduct of BCCI objectively likely to cause such losses, which, the plaintiffs claim, it could have done by its extensive powers of control in the Directive of 1977 and/or under the Acts of 1979 and 1987: see *Lamb v Camden London Borough Council* [1981] QB 625 , 642D, per Oliver LJ However, as I have said, I do not regard this issue of causation as suitable for a preliminary determination.

*Potential depositors*

This preliminary question, on which the Bank cross-appeals, is whether those plaintiffs who were merely potential depositors at the time of the alleged misfeasance causing their losses are entitled to recover damages for them.

The Bank's case is that the tort requires an interference with an antecedent right or interest of the plaintiff. Mr Stadlen submitted that, as a matter of policy, it would be wrong to permit right of recovery in respect of future rights or interests by persons coming within the same class since it would expose the Bank to "liability in an indeterminate amount for an indeterminate time to an indeterminate class".

The plaintiffs' case is that there can be no public policy in protecting a public officer who has acted in a manner that he knew to be unlawful and who, in doing so, has caused widespread damage. The concern should only be to ensure that a public officer who made an honest attempt to do his duty but who, as a result of some mistake, acted unlawfully is protected from liability. Imposing liability for losses to potential members of the class of persons affected by the misfeasance of public officers would not inhibit them in the performance of their duty any more than the imposition of liability to those who are actually members of the class at the time. A defendant can always avoid liability by choosing not to act in a way that he knows is unlawful.

Clarke J [1996] 3 All ER 558, 632 rejected the Bank's policy argument, so far as misfeasance in public office is concerned, in the following words:

> "In the present context the defendant seems to me to be sufficiently protected by the stringent requirements of the tort, but if a public officer is guilty of an abuse of power, in circumstances where he knows that what he is doing is unlawful and where he also knows that persons in the class of which the plaintiff is a member will probably suffer damage, I see no reason of either principle or policy why such a person should not recover his loss if he further proves that that abuse of power was an effective cause of his loss."

He left open the possibility that different considerations might apply to the claim for damages for breach of a Community law obligation.

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 146 of 260
Pg 226 of 686

In view of Clarke J's narrow definition of the second form of the tort of misfeasance, he was probably right in concluding that potential depositors could, if they satisfied its "stringent requirements", recover damages against the Bank. However, his reasoning might well have been different if he had taken the view of the tort that I have taken. I am not saying that it should

[2003] 170
2 AC Three Rivers DC v Bank of England (No 3) (CA) Auld LJ

have been, and I am not impressed with Mr Stadlen's recourse again to the public policy considerations in the negligence cases of *Yuen Kun Yeu v Attorney General of Hong Kong* [1988] AC 175 and *Davis v Radcliffe* [1990] 1 WLR 821. However, I respectfully share the view of Hirst and Robert Walker LJJ that this issue, like that of causation, would be more appropriately determined after a full trial on the facts.

*The July 1997 judgment striking out the claim*

I gratefully adopt, and cannot usefully add to, the helpful summary of the history of the matter by Hirst and Robert Walker LJJ, drawn, like the necessarily longer summary of Clarke J in his July 1997 judgment, from Bingham LJ's report. In that judgment Clarke J considered, on the pleadings, the report and some further documents shown to him, whether it would be impossible for the plaintiffs to establish, after further pleadings, documentary discovery and by way of interrogatories, further investigations and trial, that the Bank knew, suspected or believed that its alleged wrongdoing would probably cause them loss. He concluded that it would be impossible and, in consequence, dismissed the action on the grounds that it would be an abuse of process or vexatious or oppressive to allow it to proceed. He summarised his conclusions:

> "There is before the court all the evidence which is at present available to the plaintiffs. On the basis of that evidence the plaintiffs' claim is bound to fail. Having regard to all the circumstances of the case, but principally because of the work done by Bingham LJ and the contents of his 1992 report, there is no reasonable possibility of the plaintiffs obtaining more evidence in the future, whether by further investigation, discovery, cross-examination of the Bank's witnesses or otherwise which might enable them to succeed."

The issue of the correctness of that ruling only falls to be determined if Clarke J rightly held that the plaintiffs have no cause of action under Community law and that they can only succeed in their claim for misfeasance in public office if they can prove that the Bank at least suspected that its wrongdoing would probably cause them damage. For the reasons I have given, I would hold that he was wrong in both respects and, therefore, that he was not entitled to dismiss the action for that reason. However, I consider and give my view on the issue against the possibility of further appeal, assuming for the purpose that the plaintiff must establish that the Bank knew, believed or suspected that its conduct would probably cause loss.

It is common ground for the purpose of this issue that, with one exception, the plaintiffs have a pleaded and arguable case that the Bank, at all relevant times and in relevant respects, knew, believed or suspected that its conduct or omissions in relation to BCCI were unlawful. That is one step further than Bingham LJ went, or considered it necessary to go, in his inquiry and report.

The exception is the question whether the Bank knowingly acted in breach of section 3(5) of the 1979 Act in granting BCCI a full licence, and thereafter in not revoking it, in reliance on the LBC's or IML's assurances, as a proxy for satisfying itself, that BCCI satisfied the statutory criteria for the grant when BCCI's "principal place of business" was not in Luxembourg,

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

but in the United Kingdom. Clarke J found, in favour of the Bank, that, although BCCI's principal place of business at the material time was "almost certainly" in the United Kingdom, there was no material before him to lead him to disagree with Bingham LJ's conclusion in paragraphs 2.23-2.25 and 2.33 that the Bank made an innocent error in not appreciating that. Clarke J also found that, although there was material from which it was at least arguable that the Bank must have known it could not be satisfied, as required by section 3(5)(b), "as to the nature and scope of the supervision exercised by" the LBC, there was no evidence that, if it had looked at the matter itself, it would have suspected the probability of damage to BCCI depositors.

I respectfully agree with Hirst and Robert Walker LJJ that the plaintiffs have an arguable case on the knowledge of illegality point under section 3(5). There was material before Clarke J that the Bank knew: that BCCI's principal place of business was in London, not Luxembourg; that the LBC/IML could not supervise BCCI effectively; that the LBCs/IML's assurances were inadequate; and that BCCI did not meet the minimum statutory criteria for which those assurances were to stand proxy. However, unlike Hirst and Robert Walker LJJ, I shall consider the effect of this and the other alleged unlawful conduct of the Bank on the question whether it at least suspected the probability of damage to BCCI depositors.

Clarke J [1996] 3 All ER 558, 633 had put the test, at its lowest for the plaintiffs in just that way, "suspects that his act will probably damage the plaintiff" or "a person in a class of which the plaintiff is a member". In his July 1997 judgment on the issue of striking out, he introduced his task in substantially the same terms:

> "The question for decision at each stage is whether the Bank has shown that there is no realistic possibility of the plaintiffs establishing that the Bank knew, believed or suspected that the depositors or potential depositors would probably suffer loss if it did the act complained of or if it failed to do what the plaintiffs say that it ought to have done ... that involves considering whether at each stage it knew, believed or suspected that appropriate remedial steps would probably not be taken by others."

However, when he went on, stage by stage in the history of the matter, to consider whether Bingham LJ's report and the material before him met the test he had set, he asked himself a narrower and, from the plaintiffs' point of view, stricter question, namely, whether the Bank suspected that BCCI "would probably collapse". Later in the story, when remedial steps and rescue packages were being considered, he variously expressed the question as whether the Bank suspected that "BCCI would probably collapse in the absence of ... [such] steps" or that "BCCI would probably not be rescued" or, in relation to the "rescue" by the Abu Dhabi government in April 1990, whether it "must have known that losses to depositors or potential depositors were probable at or indeed from that time". Hirst and Robert Walker LJJ have suggested and adopted as correct a further tightening by Clarke J of his original test, namely whether the Bank "actually foresaw BCCI's *imminent* collapse at each relevant stage" (my emphasis).

Before I consider the respective cases of the parties on the question whether Clarke J was entitled to strike out the plaintiffs' claim, I must again express my unease about his test--in both its original and varied forms.

---

First, I have great difficulty in giving practical application to the double-jointed notion in his original formulation of it [1996] 3 All ER 558, 633, of "suspicion" of "probable" damage as, presumably, something less than "actual knowledge" of "probable" damage, but not "actual knowledge" of "possible" damage. Also, I also do not understand his conjunction of "suspicion" of "probable" damage with the notion of recklessness in the form of failure to ascertain whether there is such probability, as distinct from

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 148 of 260
Pg 228 of 686

an actuality. It is all very complicated, and, as the judge's reasoning in his July 1997 judgment suggests, his thought process, whatever his original formulation of the test, was as to whether the Bank knew of probable, as distinct from possible, damage.

Second, and more fundamentally, I have already expressed my disagreement with the judge's original test of foresight of probable damage, especially in the context of a misfeasance claim against a regulator. Sharpening the test, as he and Hirst and Robert Walker LJJ have done to one of foresight of probable (imminent) collapse of BCCI, simply drives home, in my view its Orwellian illogicality. If such a test is to survive it will enable a banking regulator who deliberately and knowingly does not supervise a bank as it should do (as is conceded to be arguable here), with resulting damage to its depositors, to defeat a misfeasance claim simply by saying "because I did not make the inquiries that I should have done, I did not suspect that the plaintiff would *probably* suffer loss". In short it enables a banking regulator to rely on its own deliberate and knowing illegality as a justification for its lack of foresight that it would cause damage. If "policy" and "principle" are to be invoked, it must be against providing such an incentive to a banking regulator, or any public body exercising a supervisory function over institutions in the interest of persons for whom they provide a service, not to do their duty. And to load a plaintiff/depositor with the further burden of proving that, despite the regulator's self-imposed ignorance, it foresaw damage in the particular form in which it occurred seems to me, with respect, even more illogical and unjust in a common law remedy the purpose of which is to provide a remedy for abuse of public duty.

Third, in my view, even if Clarke J's original formulation in his April 1996 judgment of suspicion of probable "damage" was correct, his approach in his July 1997 judgment of confining "damage" for this purpose to collapse, imminent or not, of BCCI was far too narrow and somewhat unreal. See, for example, his conclusion that the Bank's (possible) appreciation of Bank of America's assessment of its investment in BCCI as "potentially hazardous" because of sub-standard, doubtful or loss producing loans to over 3.5 times BCCI's capital, fell short of a recognition by the Bank that "BCCI ... [would] probably collapse". There are many ways short of collapse of a bank which can result in damage to its depositors: it may not flourish so that it cannot pay the interest on such deposits in a timely way or in the amount undertaken; it may not be able to effect transactions on behalf of its depositors in as prompt or orderly a way as normal banking conventions demand or as customers had reason to expect when making the deposits; there may be delay in obtaining access to deposited funds because of the need to take steps to obtain support for the bank or due to arrangements short of winding up, such as composition with creditors or the appointment of a receiver or the taking possession by a debenture holder. All of those eventualities, damaging in different ways and degrees as they are

---

**[2003]** **173**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

to the integrity of a bank and to its customers, are the sort of damage against which the Acts of 1979 and 1987, in particular, the criteria for revocation in sections 6 and 11 respectively, were designed to provide protection. I draw particular attention to the "sweep-up" provision in each of those provisions. Act of 1979, section 6(1):

> "(h) the institution has failed to comply with any obligation imposed by this Act; or (i) the institution has *in any other way* so conducted its affairs as *to threaten the interests of its depositors*."

Act of 1987, section 11(1):

> "(b) the institution has failed to comply with any obligation imposed on it by or under this Act ... (e) *the interests of depositors or potential depositors* of the institution are *in any other way* threatened, whether by the manner in which the institution is conducting or proposes to conduct its affairs or for any other reason." (My emphasis.)

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 149 of 260
Pg 229 of 686

I could not accept, certainly on an application to strike out the proceedings and without a full trial of the matter on the facts, that unless the Bank suspected the ultimate and most extreme form of damage to depositors of BCCI, namely its collapse as a result of its arguable lack of supervision, it would not be liable for loss resulting from the occurrence of such an event. So to limit the plaintiffs' entitlement to recover would be a further and, in my view, unwarranted imposition on a plaintiff claiming damages for misfeasance in public office.

The plaintiffs' case is that, if necessary, they have arguably sufficient evidence to support the state of mind originally described by Clarke J, or that there are reasonable grounds for supposing that sufficient evidence to prove it will become available for trial. In consequence, they say, their claim is not incurably bad. They maintain that the judge's review of the claim and his heavy reliance on Bingham LJ's report in determining that the claim was incurably bad was without precedent and inappropriate, and that his decision was irrationally wrong.

The Bank's case is that the plaintiffs' submissions on the materials and evidence before the judge are wrong or misleading or speculative and that he was entitled to conclude on all the material before him that the case as pleaded, and as pleadable on such further material as there might be, was doomed to fail.

Clarke J explained his decision to strike out the claim in his July 1997 judgment:

> "in addition to questioning witnesses Bingham LJ considered in detail all the relevant internal documents in the possession of the Bank, which involved a perusal of a mass of documentation ... it is clear from the terms of Bingham LJ's covering letter to the Chancellor of the Exchequer, and indeed from many passages in the report itself, that was applying his mind to the question what was the state of mind of the Bank at each stage. In these circumstances ... it is inconceivable that Bingham LJ was aware of material which was materially at odds with his conclusions as to the state of mind of the Bank. There is, in my judgment, no realistic possibility that he has not correctly set out *the state of mind of the Bank at each stage*. While it is, of course, true that I have seen only the report and

---

**[2003]** **174**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

> not the appendices, the published report is a summary of an even more detailed narrative in the appendices. Since ... Bingham LJ was expressly considering the state of mind of the Bank at each stage, it is in my judgment inconceivable that there is in the appendices material which would or might support the conclusion that the Bank had *the state of mind which the plaintiffs must establish*. If there was, Bingham LJ would have referred to it, even if only to dismiss it. He would certainly not have disregarded it ... there is nothing in the material which I have seen which gives arguable support for the plaintiffs' case. I would, however, go further. There is nothing in that material which gives reasonable grounds for supposing that there might be other evidence which might in the future support the plaintiffs' case. In these circumstances I accept Mr Stadlen's further submission that there is no realistic possibility of more evidence becoming available, whether by further investigation, discovery, cross-examination or otherwise, which might throw light upon the state of mind of the Bank or any of its relevant officials during the period during which BCCI was operating." (My emphasis.)

Given that heavy reliance by Clarke J on Bingham LJ's report as a justification for taking the exceptional course of striking out the claim as doomed to fail, it is important to consider Bingham LJ's terms of reference and the factual content of his report. He stated his understanding of his terms of reference "as calling for consideration of five broad questions":

> "(1) What did the United Kingdom authorities know about BCCI at all relevant times? (2) Should they have known more? (3) What action did the United Kingdom authorities take in relation to BCCI at all relevant times? (4) Should they have acted differently? (5) What should be done to prevent, or minimise the risk of, such an event recurring in the future?"

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Whilst those questions encompassed some of the issues in this litigation, they did not invite, and Bingham LJ did not venture, any focused conclusions as to possible civil responsibility in whatever form in respect of any of his findings of deficient supervision by the Bank. Indeed, it is clear that he would not have regarded such an inquiry as an appropriate medium of reaching or expressing such conclusions, not least because, as he observed in his letter of submission of the report: "It should be made clear ... that most of the criticisms made, and a number of factual conclusions, remain the subject of challenge."

In particular, save as to the applicability of section 3(5) of the 1979 Act (Report, paras 2.22-33), he did not in general comment expressly on the lawfulness of the Bank's conduct of its supervisory role, still less as to its knowledge at the time of any unlawfulness. Such lack of express finding of deliberate and knowing illegality is, in any event, of no assistance to the Bank on this issue, since it is common ground that the plaintiffs have an arguable case on that aspect of the case.

As to knowledge or suspicion of probable damage, it is plain from many comments of Bingham LJ in the report that his view was that, if the Bank, had done its job properly, it would have found out more about BCCI's dangerously unsatisfactory financial position earlier and might thus have averted much loss: see, in particular, his summary on this aspect in paragraph 2.484 of the report. He did not examine, or need to examine, in

---

the same way as Clarke J did subsequently in this case, the gradations, and their legal significance, of the Bank's state of mind, from knowledge of probable damage through suspicion of probable damage to knowledge or suspicion of possible damage, or to probe, as he might have done, the overlapping implications of recklessness. On occasions, after expressing obvious scepticism about the Bank's inaction, he has, like Clarke J in his July 1997 judgment, confined his conclusion to there being no indication: that it foresaw the collapse of the Bank (see e g Report, paras 2.329, 2.333 and 2.426), or he has left the matter by expressing doubt as to whether the Bank, in the light of its knowledge, could have averted such collapse (see e g report, paras 2.362 and 2.484), a matter of causation.

In addition to the different function of Bingham LJ's inquiry from the more focused issues for determination in this litigation, there are several obvious disadvantages of his procedure when compared with the court's process for determining the truth of the matter and its legal significance. His was not a statutory inquiry, so he had no power to compel the attendance of witnesses or require the production of documents; he heard the evidence of some, but not all, relevant and important players in the story; there was no counsel to the inquiry and no opportunity for adversarial discovery, interrogation or cross-examination of witnesses; and, as I have said, he acknowledged that most of his criticisms and a number of his factual conclusions were challenged, the validity of such challenges not capable of being tested on appeal.

In the circumstances, I am of the view that Clarke J was not entitled to treat Bingham LJ's report effectively as conclusive on the questions he, the judge, had to answer in this litigation or to conclude, as he did, that all the available material evidence on those questions had been gathered in. Given the greater generality of the questions in the Bingham inquiry, the limitations of it as a fact-finding exercise when compared with litigation, his acknowledgement of a number of challenges to some of his factual conclusions and the emergence of additional material since the inquiry indicating the Bank's state of knowledge as to the Gokal unrecorded loans, I can see no basis for Clarke J's confidence in this extraordinary and complex case for concluding that Bingham LJ had seen and fully tested all the material evidence available or likely to become available on the issues confronting the court in this case.

As the authorities to which Hirst and Robert Walker LJJ have referred indicate, it is normally only in clear and obvious cases that a court should strike out a claim as incapable of proof at the interlocutory stage and before full discovery. In cases, such as this, of great legal and factual complexity, it requires a justified confidence that the plaintiffs' case is and will remain incapable of proof and most exceptional

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 151 of 260
Pg 231 of 686

circumstances to justify stifling it at an early stage. For the reasons that I have given, I do not consider that the court can be confident that all the evidence material to Clarke J's conclusion about the Bank's state of knowledge has been gathered in or, which is as important, properly tested. In addition, quite separately from my rejection of the judge's requirement of the need for proof of foresight of the probability of harm, I do not consider that he has posed the correct question in expressing it as one of the Bank's foresight of BCCI's probable collapse. In my view, there are no exceptional circumstances of the *Williams and Humbert Ltd v W & H Trade Marks (Jersey) Ltd* [1986] AC 368 sort or

---

**[2003]** **176**
**2 AC** **Three Rivers DC v Bank of England (No 3) (CA)** **Auld LJ**

otherwise to justify departing from the normal rule of leaving it to the trial judge.

Accordingly, I would allow the plaintiffs' appeal and dismiss the Bank's cross-appeal on the matters in issue, save on the issues of causation and potential depositors, which I consider should be determined at trial.

[An appendix summarising the relevant provisions of the Banking Act 1979 is not set out in this report.]

*Appeal dismissed with costs.*

21 January 1999. The court, on the plaintiffs' undertaking to apply to the House of Lords for a direction that the legal issues as to the correct test for misfeasance in public office should be determined before any consideration of whether the facts alleged or capable of being alleged were capable of meeting that test, granted them leave to appeal and the defendant leave to cross-appeal subject to the grant of leave to appeal on the facts being reserved to the House of Lords following their determination of the correct test for misfeasance in public office.

12 May. The Appeal Committee of the House of Lords (Lord Steyn, Lord Hope of Craighead and Lord Millett) granted a petition by the first plaintiff and Bank of Credit and Commerce International SA (in liquidation) for leave to appeal on whether the facts alleged or capable of being alleged met the correct test for misfeasance in public office.

*Solicitors: Lovell White Durrant; Freshfields.*

J R S

The plaintiffs, Three Rivers District Council and some 6,000 other creditors of the Bank of Credit and Commerce International SA ("BCCI") together with the Bank of Credit and Commerce International SA (in liquidation) appealed and the defendant, the Governor and Company of the Bank of England, coss-appealed. Leave to appeal and cross-appeal against its ruling on the preliminary issues was granted by the Court of Appeal on 21 January 1999. The House of Lords (Lord Steyn, Lord Hope of Craighead and Lord Clyde) granted the plaintiffs' petition for leave to appeal against the refusal of leave to re-re-amend the statement of claim on 12 May 1999. This was the hearing of the appeal on the legal issues.

The facts are stated in the opinion of Lord Steyn.

*Lord Neill of Bladen QC, David Vaughan QC, Richard Sheldon QC, Robin Dicker* and *Dominic Dowley* for the plaintiffs.

The First Council Banking Co-ordination Directive (77/780/EEC) required the Bank of England, as the United Kingdom "competent authority" to apply in practice its provisions concerning the authorisation and supervision of banks. Although there were discretionary aspects in many respects the provisions were imperative.

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 152 of 260
Pg 232 of 686

The 1977 Directive was intended and designed to protect the savings of depositors. Indeed the predominant purpose of the Directive was the protection of depositors: see *SociŽtŽ Civile Immobilire Parodi v Banque*

**[2003]** **177**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))**

*H Albert de Bary et Cie* (Case C-222/95) [1997] ECR I-3899; *Criminal proceedings against Romanelli* (Case C-366/97) [1999] All ER (EC) 473; *Commission of the European Communities v Federal Republic of Germany* (Case 205/84) [1986] ECR 3755. In order to achieve this it imposed certain well defined obligations on the competent authorities of member states in relation to the authorisation and supervision of banks. It conferred on depositors and potential depositors corresponding rights to have those obligations fulfilled. The Directive was enacted having regard in particular to article 57(2) of the EEC Treaty (now article 47 EC). The original text of article 57(2) made specific mention of "measures concerned with the protection of savings, in particular the granting of credit and the exercise of the banking profession". There is no warrant for saying that the many Directives adopted "having regard to" article 57(2) which are self evidently concerned with the protection of savings are to be interpreted on the basis that they are incapable of conferring any rights on savers or depositors. The purpose of an authorisation/supervisory regime is not to equalise competition between banks but to ensure that depositors are protected: see *Institute of Chartered Accountants in England and Wales v Customs and Excise Comrs* [1999] 1 WLR 701. The recitals and articles of the Directive itself emphasise the purpose of protecting depositors: see recitals 3, 4, 5 and 12 and articles 1, 2(1), 3, 4, 6, 7, 8, 12 and 14. On the correct interpretation of the word "may" in article 8: see *Julius v Bishop of Oxford* (1880) 5 App Cas 214; *In re Baker* (1890) 44 Ch D 262; *Padfield v Minister of Agriculture, Fisheries and Food* [1968] AC 997. Where a member state voluntarily accepts obligations under Community law it cannot escape its liabilities on the grounds that it need not have assumed them in the first place: see *Wagner Miret v Fondo de garant'a salarial* (Case C-334/92) [1993] ECR I-6911.

One of the purposes of the Banking Act 1979 and the Banking Act 1987 was to transpose into United Kingdom domestic law the provisions of the 1977 Directive. Neither Act literally transposes the wording of the Directive but, the source of the Acts being the Directive and their purpose being to achieve the result intended to be achieved by the Directive, the Acts are to be and may properly be construed so as to give effect to the requirements of the Directive. There is nothing in either Act which prevents it being construed in such a way. The United Kingdom legislation thus provides the legal certainty and results required by the Directive in fact. However, notwithstanding that transposition the Bank failed in practice to apply the 1977 Directive and therefore breached its Community law obligations.

Article 189 EC provides that a Directive shall be binding "as to the results to be achieved". It is not enough for member states simply to pass domestic legislation enacting the terms of a Directive. They are required to ensure that the results prescribed are in fact achieved: see *Commission of the European Communities v Federal Republic of Germany* (Case 29/84) [1985] ECR 1661; *Emmott v Minister for Social Welfare* (Case C-208/90) [1993] ICR 8; R *Commission of the European Communities v Kingdom of Belgium* (Case 42/89) [1990] ECR I-2821; *Commission of the European Communities v Italian Republic* (Case C-287/91) [1992] ECR I-3515; *Commission of the European Communities v Federal Republic of Germany* (Case C-237/90); *Dillenkofer v Federal Republic of Germany* (Joined Cases C-178, 179 and 188-190/94) [1997] QB 259; *Norbrook Laboratories Ltd v Ministry of Agriculture, Fisheries and Food*(Case C-127/95) [1998] ECR

**[2003]** **178**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))**

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 153 of 260
Pg 233 of 686

I-1531; *Carbonari v Universitˆ degli studi di Bologna*(Case C-131/97) [1999] ECR I-1103. See also the opinion of Advocate General Slynn in *Municipality of Hillegom v Hillenius* (Case 110/84) [1985] ECR 3947, 3951.

The long standing jurisprudence of the European Court of Justice recognises a close connection between the imposition of obligations on member states, including emanations or agencies of the states, and making those obligations effective by conferring upon individuals enforceable rights which correspond to them: see *Algemene Transport- en Expeditie Onderneming van Gend & Loos (NV) v Nederlandse administratie der belastingen* (Case 26/62) [1963] ECR 1; *Van Duyn v Home Office* (Case 41/74) [1975] Ch 358; *Becker v Finanzamt MŸnster-Innenstadt*(Case 8/81) [1982] ECR 53; *Francovich v Italian Republic* (Joined Cases C-6/90 and 9/90) [1995] ICR 722; *Brasserie du Pcheur SA v Federal Republic of Germany*; *R v Secretary of State for Transport, Ex p Factortame Ltd (No 4)* (Joined Cases C-46/93 and C-48/93) [1996] QB 404; *Woolwich Equitable Building Society v Inland Revenue Comrs* [1993] AC 70. Community legislation, in particular Directives, can now be assumed to create rights unless there is some compelling reason to the contrary: see *Dillenkofer v Federal Republic of Germany* (Joined Cases C-178, 179 and 188-190/94) [1997] QB 259; *Verein fŸr Konsumenteninformation v ...sterreichische Kreditversicherungs AG* (Case C-364/96) [1998] ECR I-2949; *Rechberger v Republic of Austria* (Case C-140/97) (unreported) 15 June 1999; *R v Secretary of State for Social Security, Ex p Sutton* (Case C-66/95) [1997] ICR 961; *Norbrook Laboratories Ltd v Ministry of Agriculture, Fisheries and Food*(Case C-127/95) [1998] ECR I-1531. A series of Directives dating from the late 1970s required member states to take necessary or appropriate measures to ensure the water or air was of a quality laid down by the Directive which Germany failed to implement. In each case, albeit the Directive in question said nothing in express terms about the conferment of rights, the court stated that the Directive was intended to create rights for individuals: see *Commission of the European Communities v Federal Republic of Germany* (Case C-131/88) [1991] ECR I-825; *Commission of the European Communities v Federal Republic of Germany* (Case C-361/88) [1991] ECR I-2567; *Commission of the European Communities v Federal Republic of Germany* (Case C-298/95) [1996] ECR I-6747.

It is a fundamental principle of Community law that national courts must protect rights which individuals derive from Community law: see *Amministrazione delle Finanze dello Stato v Simmenthal SpA* (Case 106/77) [1978] ECR 629; *Marks & Spencer plc v Comr of Customs and Excise* (unreported) 14 December 1999; Court of Appeal (Civil Division) Transcript No 2126 of 1999. The 1977 Directive gives rights to depositors to ensure that they are safeguarded from loss arising out of a failure to regulate effectively by the regulating authority. Depositors who suffer damage as a result of such failure are entitled to an effective remedy. The only possible effective remedy they have is an action for damages against the Bank. The Court of Appeal was wrong to rely on *R v International Stock Exchange of the United Kingdom and the Republic of Ireland Ltd, Ex p Else (1982) Ltd* [1993] QB 534 in concluding that it was not sufficiently clear that the 1977 Directive conferred rights on investors.

---

**[2003]** **179**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))**

The criteria which are required to be fulfilled for there to be liability to make reparation for harm caused by breaches of Community law are: (1) that the provision of Community law infringed was intended to confer rights on individuals; (2) that the infringement was sufficiently serious: see *R v Secretary of State for Transport, Ex p Factortame Ltd (No 5)* [2000] 1 AC 524; *R v HM Treasury, Ex p British Telecommunications plc*(Case C-392/93) [1996] QB 615; (3) that there was a direct causal link between the infringement and damage sustained by the injured party: see *Francovich v Italian Republic* (Joined Cases C-6/90 and 9/90) [1995] ICR 722; *Brasserie du Pcheur SA v Federal Republic of Germany*; *R v Secretary of State for Transport, Ex p Factortame Ltd (No 4)* (Joined Cases C-46/93 and C-48/93) [1996] QB 404; *R v Ministry of Agriculture, Fisheries and Food, Ex p Hedley Lomas (Ireland) Ltd*(Case C-5/94) [1997] QB 139; *Dillenkofer v Federal Republic of Germany* (Joined Cases C-178, 179 and 188-190/94) [1997] QB 259. Those conditions are all satisfied in the instant case.

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

The only exception in the transposition of the 1977 Directive into English law is contained in section 1 (4) of the 1987 Act which, for the first time in the banking legislation, seeks to prevent any claim by any person harmed as a result of the Bank's failure to carry out its obligations unless bad faith is shown. That provision is plainly inconsistent with Community law and must be disapplied: see *Brasserie du Pcheur SA v Federal Republic of Germany; R v Secretary of State for Transport, Ex p Factortame Ltd (No 4)*(Joined Cases C-46/93 and C-48/93) [1996] QB 404; *Amministrazione delle Finanze dello Stato v SpA San Giorgio* (Case 199/82) [1983] ECR 3595.

The focus of the tort of misfeasance in public office is on the actions of public officers. Powers are conferred on public officers solely in order that they may use them, as intended, for the public good. The tort is concerned with an abuse of those powers: see *Jones v Swansea City Council* [1990] 1 WLR 54; *Elguzouli-Daf v Comr of Police of the Metropolis* [1995] QB 335; *Northern Territory v Mengel* (1995) 69 ALJR 527. Liability will arise in any case where a public officer fails to make an honest attempt to perform his duty or otherwise acts in bad faith, thereby causing loss. The nature of the necessary wrongful conduct has been expressed in a variety of ways in the cases as abuse of office, bad faith, improper motive, knowledge of unlawfulness, malice, misfeasance or as an absence of an honest attempt to perform the functions of the office: see, for example, *Smith v East Elloe Rural District Council* [1956] AC 736; *Dunlop v Woollahra Municipal Council* [1982] AC 158; *Calveley v Chief Constable of the Merseyside Police* [1989] AC 1228. The language used in the cases reflects the underlying basis of the tort. It emphasises that the basis of the liability is the absence of an honest attempt by the public officer to do his duty rather than any intention to injure: see *Northern Territory v Mengel* 69 ALJR 527; *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378; *Cannock Chase District Council v Kelly* [1978] 1 WLR 1. It is well established by the authorities that malice, in the sense of an intention to injure (targeted malice) and knowledge by the defendant that he has no power to do the act complained of are alternative, not cumulative, grounds for liability. Either will be sufficient to ground liability for the tort: see *Dunlop v Woollahra Municipal Council* [1982] AC 158; *Bourgoin SA v Ministry of Agriculture, Fisheries and Food* [1986] QB 716; *R v Secretary of State for the Environment, Ex p Hackney London Borough Council* [1983] 1 WLR 524; *Jones v Swansea City Council* [1990]

---

1 WLR 54; *Elguzouli-Daf v Comr of Police of the Metropolis* [1995] QB 335; *X (Minors) v Bedfordshire County Council* [1995] 2 AC 633. If both forms required an intention to injure it would be illogical for the second form, but not apparently the first form, to require also that the public officer knew that he was acting unlawfully.

"Malice" as used in the early cases covered not merely spite or ill will but also improper motive. It had a precise legal meaning: see *Bromage v Prosser* (1825) 4 B & C 247; *Allen v Flood* [1898] AC 1; *Ferguson v Earl of Kinnoull* (1842) 9 Cl & Fin 251; *Sutton v Johnstone* (1786) 1 Durn & E 493. For a recent discussion of the legal meaning of malice: see *Gibbs v Rea* [1998] AC 786, 80, 87. The development of the tort can be seen from the early authorities: see *Turner v Sterling* (1671) 2 Vent 25; *Ashby v White* (1703) 14 St Tr 695; 2 Ld Raym 938; 3 Ld Raym 320; 1 Smith's LC (13th ed) 253; *Drewe v Coulton* (1787) 1 East 563n; *Williams v Lewis* (1797) Peake Add Cas 157; *Cullen v Morris* (1819) 2 Stark 577; *Whitelegg v Richards* (1823) 2 B & C 45; *Henly v Lyme Corpn* (1828) 5 Bing 91; *Tozer v Child* (1857) 7 E & B 377. There has been a gradual historical change in the usual meaning of malice. The legal meaning has been used less. Malice is now more generally taken to mean targeted malice. Thus when malice is now used in the first of the two forms of the tort it does mean an intention to injure. Three influential Commonwealth cases were: *Brasyer v Maclean* (1875) LR 6 PC 398; *Roncarelli v Duplessis* (1959) 16 DLR(2d) 689; *Farrington v Thomson and Bridgland* [1959] VR 286.

Imposing liability where a public officer fails to make an honest attempt to perform his duty or acts in bad faith is consistent with (1) the intention of Parliament: see section 1(4) of the Banking Act 1987; *In re McC (A Minor)* [1985] AC 528; *Lloyd v McMahon* [1987] AC 625; (2) Community law: see the opinion of

Advocate General LŽger in *R v Ministry of Agriculture, Fisheries and Food, Ex p Hedley Lomas (Ireland) Ltd*(Case C-5/94) [1997] QB 139, paras 141, 162, 206; *Brasserie du Pcheur SA v Federal Republic of Germany; R v Secretary of State for Transport, Ex p Factortame Ltd (No 4)*(Joined Cases C-46/93 and C-48/93) [1996] QB 404; and (3) appropriate as a matter of principle and policy: see *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd* [1997] AC 254; *Everett v Griffiths* [1920] 3 KB 163.

The tort of misfeasance in public office is not to be equated with those torts which impose liability on private individuals for the intentional infliction of harm: see *Sanders v Snell* (1998) 157 ALR 491. There is also a clear distinction between torts based on negligence and those such as misfeasance which are based on deliberate wrongdoing: see *Rowling v Takaro Properties Ltd* [1988] AC 473, 503; *Northern Territory v Mengel* (1995) 69 ALJR 527, 547; *McMahon v Ireland* [1988] ILRM 610. Both *Yuen Kun Yeu v Attorney General of Hong Kong* [1988] AC 175 and *Davis v Radcliffe* [1990] 1 WLR 821 were concerned with whether a supervisor ought to be liable for a negligent breach of duty. They were not concerned with cases of deliberate wrongdoing. See also *Dorset Yacht Co Ltd v Home Office* [1970] AC 1004.

None of the cases prior to *Bourgoin SA v Ministry of Agriculture, Fisheries and Food* [1986] QB 716 described or discussed the tort in a way which suggested that it was necessary for the plaintiff to prove that loss was foreseeable, let alone that the public officer actually foresaw loss: see

---

*Wilkinson v Downton* [1897] 2 QB 57. The only ratio of the case is that targeted malice is not required for the tort. Neither Mann J nor the Court of Appeal suggested that it was necessary, as opposed to sufficient, for the public officer who knew he was acting unlawfully, also to have foreseen that his action would cause loss. In none of the English cases which followed was there any indication that the tort now required targeted malice or knowledge that loss would occur: see *Calveley v Chief Constable of the Merseyside Police* [1989] AC 1228; *Jones v Swansea City Council* [1990] 1 WLR 54; *Elguzouli-Daf v Comr of Police of the Metropolis* [1995] QB 335.

Some of the subsequent Commonwealth authorities, particularly in New Zealand, have wrongly proceeded on the basis that the rationale for the tort is the prevention of intentional injury by public officers and that what was merely held to be sufficient in the *Bourgoin* case [1986] QB 716 was in fact a necessary ingredient of the tort: see *Micosta SA v Shetland Islands Council* [1984] 2 Lloyd's Rep 525; *Garrett v Attorney General* [1997] 2 NZLR 332. In *Rawlinson v Rice* [1997] 2 NZLR 651 the court indicates that liability will arise if loss was known to be likely or if the officer was recklessly indifferent to loss.

The Australian case *Northern Territory v Mengel* 69 ALJR 527 was concerned with knowledge of unlawfulness. Any comments on a need to show knowledge of loss on the part of the public officer were therefore obiter. However, the majority held that it was sufficient to proceed on the basis, accepted in the *Bourgoin* case [1986] QB 716, that liability requires an act which the public officer knows involves a foreseeable risk of harm.

For the American approach: see *Berkovitz v United States* (1988) 486 US 531.

There is no case in any jurisdiction which goes as far as Clarke J so as to hold that to establish liability it is necessary to show not merely that the public officer knew that he was acting unlawfully but also that he knew that his unlawful act would probably cause loss.

The authorities on the common law offence of misfeasance in public office show that criminal liability is established when it is established that a public officer failed to make an honest attempt to perform his duty and there is no requirement to prove that he knew that loss to any individual was probable: see *R v Bembridge* (1783) 3 Doug 327; *R v Borron* (1820) 3 B & Ald 432; *R v Llewellyn-Jones* [1968] 1 QB 429; *R v Dytham* [1979] QB 722; *R v Bowden* [1996] 1 WLR 98. The crime and the tort should move hand in hand.

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 156 of 260
Pg 236 of 686

The "probable loss" requirement introduced into the tort by Clarke J would confer an unwarranted protection and, in effect, an immunity upon public officers who have exercised public powers in the full knowledge that they were acting unlawfully. Under section 1(4) of the Banking Act 1987 there is no added requirement that knowledge, belief or suspicion of probable loss to the plaintiff must be shown in addition to bad faith. For the courts to introduce this further requirement would be to gloss the statute and to proceed in a manner contrary to the European Convention for the Protection of Human Rights and Fundamental Freedoms. For the relevant principles: see *Lithgow v United Kingdom* (1986) 8 EHRR 329.

It is not necessary to show knowledge on the part of the officer as to the consequences of his actions, let alone knowledge that his actions would probably injure the plaintiff. Alternatively, if the ingredients of the tort do require a reference to loss it is sufficient for a plaintiff to show either (1) that

---

**[2003]** **182**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))**

loss to him or to a person in a class of which he was a member was a foreseeable result of the public officer's acts or omissions or (2) that the public officer was reckless or recklessly indifferent as to whether his acts or omissions would or might result in loss to the plaintiff or a person in a class of which the plaintiff was a member. For the definition of recklessness: see *R v Caldwell* [1982] AC 341; *R v Lawrence (Stephen)* [1982] AC 510. See also: *R v Sinclair* [1968] 1 WLR 1246; *R v Grantham* [1984] QB 675; *R v Allsop* (1976) 64 Cr App R 29, *Welham v Director of Public Prosecutions* [1961] AC 103.

If the Bank was guilty of misfeasance in public office its conduct was an effective cause of loss to potential depositors, but the issue is unsuitable for determination at this stage.

*Nicholas Stadlen QC, Paul Lasok QC, Mark Phillips QC, David Anderson QC, Bankim Thanki, Rhodri Thompson* and *Ben Valentin* for the defendant. From the early cases taken as a whole misfeasance in public office emerged as a tort with three essential ingredients or defining characteristics: (1) An unlawful act intended to injure the plaintiff: see *Milward v Sargeant* (1786) 1 East 567; *Drewe v Coulton* (1787)1 East 563n; *Harman v Tappenden* (1801) 1 East 555. Alternatively the deliberate and wilful doing of an act which will to the defendant's knowledge necessarily injure the plaintiff: see *Ashby v White* (1703) 14 St Tr 695; 2 Ld Raym 938; 3 Ld Raym 320; 1 Smith's LC (13th ed) 253; *Bassett v Godschall* (1770) 3 WilsKB 121; *Drewe v Coulton* 1 East 563n. Even in the cases where intention to injure or wilful injury to the plaintiff was not expressly referred to those elements were implicit in the facts: see *Cullen v Morris* (1819) 2 Stark 577; *Tozer v Child* (1857) 7 E & B 377; *Whitelegg v Richards* (1823) 2 B & C 45. (2) A dishonest abuse of power by a public officer: see *Ashby v White* (1703) 14 St Tr 695; 2 Ld Raym 938; 3 Ld Raym 320; 1 Smith's LC (13th ed) 253; *Burgoyne v Moss* (1768) 1 East 563n; *Williams v Lewis* (1797) Peake AddCas 157; *Harman v Tappenden* 1 East 555; *Drewe v Coulton* 1 East 563n; *Cullen v Morris* 2 Stark 577; *Whitelegg v Richards* 2 B & C 45; *Tozer v Child* (1857) 7 E & B 377. (3) Interference with the plaintiff's enjoyment of an antecedent legal right: see *Ashby v White* 14 St Tr 695; 2 Ld Raym 938; 3 Ld Raym 320; 1 Smith's LC (13th ed) 253; *Bassett v Godschall* 3 Wils KB 121; *Drewe v Coulton* 1 East 563n; *Burdett v Abbott* (1811) 14 East 1; *Cullen v Morris* (1819) 2 Stark 577.

It is clear from the early cases that the requirement of malice was understood as requiring a positive mental element which had to be proved rather than the mere absence of just cause or excuse. It is also clear that the requirement was of a specifically dishonest mental element referable to the defendant's motive. Neither *Bromage v Prosser* (1825) 4 B & C 247 nor *Ferguson v Earl of Kinnoull* (1842) 9 Cl & Fin 251 was a misfeasance case. The approach in those cases has been expressly rejected: see *Atkinson v Newcastle and Gateshead Waterworks Co* (1877) 2 Ex D 441.

The ratio of *Bourgoin SA v Ministry of Agriculture, Fisheries and Food* [1986] QB 716 goes no further than that in the absence of a predominant intention to injure (targeted malice) a public officer can be liable for misfeasance if he has both knowledge of illegality and knowledge of loss that will necessarily be caused to the plaintiff by his actions. Thus if it is helpful to talk of the tort having two limbs, the second limb recognised by English

---

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 157 of 260
Pg 237 of 686

**[2003]** **183**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))**

law represents only a very narrow extension of the first. In fact the case does not justify a rigid distinction between two supposed limbs, targeted malice and other cases, as there is no sensible distinction between the two. It is implicit in the judgments of both Mann J and Oliver LJ that they considered an intention to injure the plaintiff to be a necessary ingredient in the tort and one which therefore has to be established in the second no less than the first limb, albeit that in the second limb it can be established by an oblique or subsidiary intention to injure in contrast to targeted malice. Clarke J, the Court of Appeal and the Court of Appeal of New Zealand in *Garrett v Attorney General* [1997] 2 NZLR 332 were correct to conclude that seen in the context of other references in his judgment, when Mann J referred to the "foreseeable" consequence of injury, he must have meant "foreseen". It was an isolated discordant reference in a judgment otherwise abounding with references to actual knowledge. The ratio, the dicta and the reasoning in the case provide no support for the proposition that there can be liability based on knowledge of illegality coupled with reasonable foreseeability or objective recklessness as to loss without the need to prove foresight of loss. There is no support for the proposition that earlier cases had already established that there could be such liability: see *Dunlop v Woollahra Municipal Council* [1982] AC 158; *R v Secretary of State for the Environment, Ex p Hackney London Borough Council* [1983] 1 WLR 524; *Micosta SA v Shetland Islands Council* [1984] 2 Lloyd's Rep 525. Later cases do not contradict such an interpretation of the *Bourgoin* case: see *R v Secretary of State for the Home Department, Ex p Ruddock* [1987] 1 WLR 1482; *Jones v Swansea City Council* [1990] 1 WLR 54; *Irish Aerospace (Belgium) NV v European Organisation for the Safety of Air Navigation* [1992] 1 Lloyd's Rep 383; *Elguzouli-Daf v Comr of Police of the Metropolis* [1995] QB 335; *X (Minors) v Bedfordshire County Council* [1995] 2 AC 633.

On several occasions since Clarke J's judgment his analysis of the tort has been approved by the Court of Appeal, Divisional Court and High Court: see *Tee v Lautro Ltd* (unreported) 16 July 1996; *Bennett v Comr of Police of the Metropolis* The Times, 24 October 1997; [1998] 10 Admin LR 245; *Elliott v Chief Constable of Wiltshire* The Times, 5 December 1996; *Lam v Brennan* [1997] 3 PLR 22; *Ealing London Borough Council v Metha* (unreported) 24 April 1997; Court of Appeal (Civil Division) Transcript No 1449 of 1997; *R v Chief Constable of the North Wales Police, Ex p AB* [1999] QB 396; *Williams v Solicitor to the Department of Social Security* (unreported) 11 June 1997; Court of Appeal (Civil Division) Transcript No 1183 of 1997; *Barnard v Restormel Borough Council* [1998] 3 PLR 27; *W v Essex County Council* [1999] Fam 90; *Gizzonio v Chief Constable of Derbyshire* (unreported) 26 March 1998; Court of Appeal (Civil Division) Transcript No 559 of 1998. The most recent case in which the House has made reference to the tort are *Calveley v Chief Constable of the Merseyside Police* [1989] AC 1228 and *Racz v Home Office* [1994] 2 AC 45. In neither case was the tort analysed or the authorities reviewed.

The judgment in *Garrett v Attorney General* [1997] 2 NZLR 332 unequivocally rejected the proposition that reasonable foreseeability of loss is sufficient to found misfeasance and was expressly followed in *Rawlinson v Rice* [1997] 2 NZLR 651. See also: *Rowling v Takaro Properties Ltd* [1988] AC 473; *Simpson v Attorney General (Baigent's Case)* [1994] 3 NZLR 667.

---

**[2003]** **184**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))**

The High Court of Australia in *Northern Territory v Mengel* (1995) 69 ALJR 527 in referring to acts done with "reckless indifference" to the harm which was likely to ensue had in mind recklessness in the subjective sense i e based on actual belief or suspicion as to loss. For clarification of Deane J's minority judgment see his reliance on *Owen and Gutch v Homan* (1853) 4 HL Cas 997. The majority expressly disapproved Smith J's dictum in *Farrington v Thomson and Bridgland* [1959] VR 286, 293 and *Brasyer v Maclean* (1875) LR 6 PC 398. See also the approach in *Sanders v Snell* (1998) 157 ALR 491; *Flanagan v*

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 158 of 260
Pg 238 of 686

*Comr of the Australian Federal Police* (1996) 60 FCR 149; *Madden v Madden* (1996) 65 FLR 354, *J L Holdings Pty Ltd v Queensland* (unreported) 26 May 1995.

The Canadian authorities show that until recently a heavy emphasis was placed on acts aimed at the plaintiff. They do not provide support for the plaintiffs' definition of the tort: see *Gerrard v Manitoba* (1992) 98 DLR (4th) 167; *Alford v Canada* (1997) 31 BCLR(3d) 228; *Alberta (Minister of Public Works, Supply and Services) v Nilsson* (unreported) 3 June 1999; *Odhavji v Woodhouse* (unreported) 30 December 1998; *McGillivray v Kimber* (1915) 26 DLR 164; *Roncarelli v Duplessis* (1959) 16 DLR(2d) 689.

The central role of dishonesty both as a free standing ingredient of the tort and as underlying the requirement of knowledge of loss is fatal to the plaintiffs' claim. The material available does not support and is inconsistent with an arguable claim either that the Bank acted dishonestly or that it foresaw the plaintiffs' losses as a consequence of any unlawful acts or omissions on its part. There is overwhelming support in all the misfeasance authorities that dishonesty is an essential ingredient of the tort: see *Lam v Brennan* [1997] 3 PLR 22; *R v Chief Constable of the North Wales Police, Ex p AB* [1999] QB 396; *Barnard v Restormel Borough Council* [1998] 3 PLR 27.

Auld LJ concluded that policy does not require foresight of loss as a control mechanism and justified that by emphasising the need to prove dishonesty as a control mechanism in itself. However, Auld LJ regarded objective recklessness as necessarily dishonest. That reasoning is inconsistent with the decision in *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378, the early misfeasance cases in which subjective bad faith is required and the long established principle that gross negligence may be evidence of bad faith but does not in itself amount to bad faith: see *Armitage v Nurse* [1998] Ch 241. If nothing more is required than mere knowledge or objective recklessness as to illegality, the absence of foresight of loss as a requirement would mean that there was no effective control mechanism: see *Candlewood Navigation Corpn Ltd v Mitsui OSK Lines Ltd* [1986] AC 1. Liability on the sparse foundation of mere knowledge of illegality would render the second limb of the tort unrecognisable as an alternative form of the first limb of targeted malice.

The Bank's primary case is that an intention to injure the plaintiff is a necessary ingredient of the tort. Where it is sought to prove oblique intention by reference to knowledge of consequences, nothing short of knowledge of necessary or inevitable loss, as distinct from probable loss, will suffice: see *R v Moloney* [1985] AC 905; *R v Nedrick* [1986] 1 WLR 1025; *Gollins v Gollins* [1964] AC 644; *Lonrho plc v Fayed* [1992] 1 AC 448; *Gerrard v Manitoba* (1992) 98 DLR (4th) 167; *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* (unreported) 1 December 1980, Parker J: 6 March

---

**[2003]** **185**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))**

1981, Court of Appeal (Civil Division) Transcript No 51 of 1981; *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173; *DC Thomson & Co Ltd v Deakin* [1952] Ch 646; *Rookes v Barnard* [1964] AC 1129; *Horrocks v Lowe* [1975] AC 135; *Westminster City Council v Croyalgrange Ltd* [1985] 1 All ER 740.

Subjective recklessness as to loss is not sufficient to give rise to liability for misfeasance: see *Attorney General v Newspaper Publishing plc* [1988] Ch 333. However, if some form of recklessness is sufficient to satisfy the requirements of the tort, i e dishonesty, only subjective, not objective, recklessness is sufficient. What converts failure to inquire or reckless indifference into dishonesty is actual anticipation of what such an inquiry would reveal if it were to be made: see *Owen and Gutch v Homan* (1853) 4 HL Cas 997; *Jones v Gordon* (1877) 2 App Cas 616; *Agip (Africa) Ltd v Jackson* [1990] Ch 265; *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378; *Compania Maritima San Basilio SA v Oceanus Mutual Underwriting Association (Bermuda) Ltd* [1977] QB 49. In *Northern Territory v Mengel* 69 ALJR 527 and *Garrett v Attorney General* [1997] 2 NZLR 332, where the question of recklessness was addressed, the line was drawn above objective recklessness or reckless indifference. For the meaning of recklessness in the context of criminal proceedings: see *R v Cunningham* [1957] 2 QB 396; *R v Hyam* [1975] AC 55; *R v Scott* [1975] AC 819; *R v Terry* [1984] AC 374; *R v Parmenter; R v Savage* [1992] 1 AC 699.

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

It has always been a fundamental requirement of the tort of misfeasance that the public officer should interfere with the enjoyment by the plaintiff of an antecedent legal right or interest: see *Mogul Steamship Co Ltd v McGregor, Gow & Co* [1892] AC 25. A person who was only a potential depositor with BCCI at the date of any alleged act of misfeasance does not have a cause of action in misfeasance.

The conclusions of the majority in the Court of Appeal in Chapter XIV of their judgment on the question of proximity are adopted. Proximity has a dual role in the tort. It is a free standing requirement for establishing liability. It also explains why there is a requirement for (a) intention to injure the plaintiff or knowledge that the plaintiff will suffer loss and (b) interference with the plaintiff's antecedent legal right or interest. The plaintiffs' reliance on *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd* [1997] AC 254 is misplaced. See also: *Peek v Gurney* (1873) LR 6 HL 377.

The change in the law advocated for by the plaintiffs would have an unquantifiable adverse impact on the public purse. First, the losses suffered by the victims of fraudulent acts of third parties would be transferred through the public purse to the innocent taxpayer. Second, there is an inevitable financial cost to the kind of defensive administration which would be likely to result from a wide ranging extension of liability for public officers across the spectrum of public bodies: *Stovin v Wise* [1996] AC 923; *Yuen Kun Yeu v Attorney General of Hong Kong* [1988] AC 175. Judicial development of tortious liability should proceed incrementally: see *McLoughlin v O'Brian* [1983] 1 AC 410; *Minories Finance Ltd v Arthur Young* [1989] 2 All ER 105. For the approach in the United States: see *United States v Gaubert* (1991) 499 US 315.

---

*Lasok QC,* following. There is no relevant Community law obligation which was imposed on the Bank in the 1977 Directive. When properly construed the articles relied on by the plaintiffs do not impose obligations on the Bank not to licence BCCI, to supervise BCCI or to revoke BCCI's licence. Although there have been obiter remarks in which the European Court of Justice has noted that certain provisions in the 1977 Directive operate within a supervisory framework there has been no decision that the Directive actually imposed an obligation to supervise on the competent domestic authorities: see *Municipality of Hillegom v Hillenius*(Case 110/84) [1985] ECR 3947; *Criminal proceedings against Bullo and Bonivento* (Case 166/85) [1987] ECR 1583; *Criminal proceedings against Mattiazzo* (Case 422/85) [1987] ECR 5413. Voluntary incorporation of European Union provisions does not create obligations on member states: see *Wagner Miret v Fondo de garant'a salarial* (Case C-334/92) [1993] ECR I-6911; *Leur-Bloem v Inspecteur der Belastingdienst/Ondernemingen Amsterdam 2* (Case C-28/95) [1998] QB 182.

The problem addressed by the Directive was not any inadequacy in the protection of depositors by national law but problems arising from the fact that member states had their own differing protective systems for application in the banking sector. These could be used for protectionist purposes. Credit institutions which were subject to less stringent requirements enjoyed a competitive advantage over those subject to more stringent requirements. Also there was no assurance that a credit institution which was authorised in one member state could lawfully operate in another member state. The purpose of the Directive was to take a first step towards solving those problems: see the recitals to the Directive and *Commission of the European Communities v Italian Republic* (Case 300/81) [1983] ECR 449. The interests of investors were not paramount. The most that can be said is that the protection of savings was one of the objectives: see *Criminal proceedings against Romanelli* (Case C-366/97) [1999] All ER (EC) 473. The situation has not changed under subsequent legislation: see *Federal Republic of Germany v European Parliament* (Case C-233/94) [1997] ECR I-2405. The existence or otherwise of some obligation requiring the competent domestic authorities always to act in the interests of depositors was entirely a matter for domestic law and was not governed by European Community law.

In any event, the purpose of a Directive may be of assistance in construing the various obligations which it contains but it cannot be invoked for the purpose of inserting into the Directive obligations that find no reflection in the effective part of the Directive itself.

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 160 of 260
Pg 240 of 686

A Directive can only be relied upon before a national court as a source of individual rights where its provisions are unconditional and sufficiently precise as regards: (a) the content of the rights; (b) the identity of the persons entitled to those rights and (c) the identity of the state body against which the rights are claimed. That is so regardless of the route pursuant to which liability is asserted: see *Van Duyn v Home Office* (Case 41/74) [1975] Ch 358; *von Colson v Land Nordrhein-Westfalen* (Case 14/83) [1984] ECR 1891; *Becker v Finanzamt MŸnster-Innenstadt* (Case 8/81) [1982] ECR 53; *Francovich v Italian Republic* (Joined Cases C-6/90 and 9/90) [1995] ICR 722; *Brasserie du Pcheur SA v Federal Republic of Germany; R v Secretary of State for Transport, Ex p Factortame Ltd (No 4)* (Joined

---

[2003] 187
2 AC Three Rivers DC v Bank of England (No 3) (HL(E)) Lord Steyn

Cases C-46/93 and C-48/93) [1996] QB 404; *R v Ministry of Agriculture, Fisheries and Food, Ex p Hedley Lomas (Ireland) Ltd*(Case C-5/94) [1997] QB 139; *R v HM Treasury, Ex p British Telecommunications plc* (Case C-392/93) [1996] QB 615; *Dillenkofer v Federal Republic of Germany* (Joined Cases C-178, 179 and 188-190/94) [1997] QB 259; *Comitato di Coordinamento per la Difesa della Cava v Regione Lombardia*(Case C-236/92) [1994] ECR I-483; *Carbonari v Universitˆ degli studi di Bologna* (Case C-131/97) [1999] ECR I-1103; *Mighell v Reading* [1999] 1 CMLR 1251; *R v International Stock Exchange of the United Kingdom and the Republic of Ireland Ltd, Ex p Else (1982) Ltd* [1993] QB 534; *R v Medicines Control Agency, Ex p Smith & Nephew Pharmaceuticals Ltd; Primecrown Ltd v Medicines Control Agency* (Case C-201/94) [1996] ECR I-5819; *Criminal proceedings against Kolpinghuis Nijmegen BV* (Case 80/86) [1987] ECR 3969. None of those conditions is satisfied with regard to the 1977 Directive.

Reference to other Directives are of no assistance, particularly the environmental directives, under which the Commission can bring an action but there is no right of individual action. The distinction between individual and Commission actions is vital: see *Commission of the European Communities v Italian Republic*(Case C-365/97) [1999] ECR I-7773. More precise terms are required if there is to be a right of individual action.

Of particular importance, given that the plaintiffs seek to assert a directly effective right to reparation, is the absence from the 1977 Directive and all subsequent European Union legislation, of any reference to any right for anybody to be compensated for failure of supervision.

*Lord Neill of Bladen QC* replied.

Their Lordships took time for consideration.

18 May 2000. **LORD STEYN**

My Lords, before 1979, with limited exceptions, a deposit-taking institution in the United Kingdom required no licence or other authorisation before it commenced business. There was no statutory regulation of its subsequent performance. But the Bank of England operated an informal system of supervision. The Banking Act 1979, enacted to give effect in domestic law to the First Council Banking Co-ordination Directive of 12 December 1977 (77/780/EEC), introduced a statutorily based licensing system. Subsequently, the Banking Act 1987 replaced that system. For the purposes of the First Council Banking Co-ordination Directive of 12 December 1977 (77/780/EEC), the Banking Act 1979 and the Banking Act 1987 the Bank of England was the supervisory authority in the United Kingdom. On 1 June 1998, pursuant to the Bank of England Act 1998, the Financial Services Authority assumed the Bank's powers and responsibilities under the Banking Act 1987, for the supervision of deposit-taking institutions.

The Bank of Credit and Commerce International SA ("BCCI"), a Luxembourg corporation, had carried on business in the United Kingdom as a deposit taking institution before the 1979 Act came into force. When the 1979 Act came into force BCCI came under the aegis of the new system. In June 1980 the Bank of England granted a licence to carry on business as a

---

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 161 of 260
Pg 241 of 686

**[2003]** **188**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Steyn**

deposit-taking institution to BCCI. Until 5 July 1991 BCCI carried on business at its principal place of business in the City of London, and at many branches elsewhere in the United Kingdom. On this date, the Bank petitioned the High Court to appoint joint provisional liquidators to BCCI. The order was duly made. This resulted in the closure of BCCI in the United Kingdom, and led to the collapse of associated companies of BCCI in many jurisdictions. Thousands of depositors in the United Kingdom and elsewhere suffered substantial losses. The principal cause of the collapse of BCCI was fraud on a vast scale perperated at a senior level in BCCI.

The plaintiffs are more than 6,000 persons who claim to have been depositors with United Kingdom branches of BCCI. The action was started in May 1993. It is unnecessary to trace the earlier procedural history of this litigation. By August 1995 the claim was formulated in a re-amended statement of claim. This is a detailed and complicated pleading. It runs to 133 pages. In outline there are two alleged causes of action. The first is based on the tort of misfeasance in public office. The plaintiffs allege that named senior officials of the Banking Supervision Department of the Bank, but not two successive Governors of the Bank, acted in bad faith (a) in licensing BCCI in 1979, when they knew that it was unlawful to do so; (b) in shutting their eyes to what was happening at BCCI after the licence was granted; and (c) in failing to take steps to close BCCI when the known facts cried out for action at least by the mid 80s. The second cause of action is based on alleged breaches of Community law, and in particular breaches of the requirements of the Directive of 1977. The alleged breaches cover the initial licensing of BCCI, failure to supervise BCCI and failure to revoke the licence of BCCI. The total damages claimed are apparently of the order of £550m, plus interest. In a defence the Bank comprehensively denied the material allegations under both heads of claim.

On an application by the Bank, which was opposed by the plaintiffs, Clarke J ordered preliminary questions to be tried. This order was made on 19 July 1995 at a stage when discovery had not yet taken place. The judge directed that the questions should be tried on the assumption that the facts pleaded in the re-amended statement of claim were true. The preliminary issues were designed to test whether, if the pleaded facts are true, the causes of action based on the tort of misfeasance in public office and on breaches of community law are sustainable in law. The principal legal issues for decision were the precise ingredients of the tort of misfeasance in public office and whether the Directive of 1977 conferred rights of compensation on depositors.

The judge tried the preliminary issues as subsequently reformulated in stages. He delivered judgments on 1 April 1996, 10 May 1996 and 30 July 1997. The first two judgments are reported: [1996] 3 All ER 558 and 634. These impressive and careful judgments dealt with the preliminary issues. The judge ruled that both causes of action were unsustainable. The third is an unreported judgment which considered further proposed amendments to the plaintiff's statement of claim. The judge concluded (on the assumption that his earlier rulings were correct) that the plaintiff's claim was bound to fail and that it should be struck out. On 2 October 1997 Clarke J struck out the re-amended statement of claim and dismissed the action. He gave leave to appeal.

---

**[2003]** **189**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Steyn**

By a majority (Hirst and Robert Walker LJJ) the Court of Appeal, ante, p 17 dismissed an appeal and for broadly similar reasons affirmed the decisions of Clarke J Auld LJ dissented. These judgments are lengthy and carefully reasoned.

The present appeal to the House, described as the plaintiffs' legal appeal, is brought by the plaintiffs with the leave of the Court of Appeal given on 21 January 1999. The order of the Court of Appeal contemplated that the House would determine "the legal issues as to the correct test for misfeasance in public office ...

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 162 of 260
Pg 242 of 686

before any consideration of whether the facts alleged or capable of being alleged are capable of meeting that test". At the same time the legal appeal requires the House to consider whether properly construed the Directive of 1977 confers rights on depositors. Being the court of last resort in the United Kingdom the House may only determine the Community law issue if the matter is truly acte clair.

In a disappointingly uninformative joint statement of facts and issues the issues arising on the appeal are formulated as follows. (1) Whether on the assumption that the facts pleaded in the re-amended statement of claim are true the Bank is capable of being liable to the plaintiffs for the tort of misfeasance in public office. (2) Whether on the assumption that the facts pleaded in the re-amended statement of claim are true, the Bank is capable of being liable to the plaintiffs in damages for violation of the requirements of the First Council Banking Co-ordination Directive of 12 December 1977 (77/780/EEC). (3) Whether on the assumption that the facts pleaded in the re-amended statement of claim are true, the plaintiffs' losses are capable of having been caused in law by the acts or omissions of the Bank. (4) Whether on the assumption that the facts pleaded in the re-amended statement of claim are true, the Bank is capable of being liable for the tort of misfeasance in public office to plaintiffs who were potential depositors at the time of any relevant act or omission of misfeasance by the Bank.

A strategy which differentiates between the issues affecting the tort of misfeasance in public office and the Community law issues is necessary. It is certainly possible to state, so far as is relevant, the ingredients of the tort of misfeasance in public office. What will not be possible at this stage is to embark on the exercise contemplated by the agreed issues viz to test at this stage the sustainability of the case pleaded in the re-amended statement of claim against the requirements of the tort as stated by the House. In granting leave to appeal the Court of Appeal realistically foreshadowed that it would be necessary to postpone the question "whether the facts alleged or capable of being alleged are capable of meeting that test" i e the tort enunciated by the House. That exercise will indeed require exploration at a further hearing. On the other hand, the Community law issue raises the question of interpretation whether the Directive of 1977 conferred rights of reparation on depositors. If the matter is acte clair, the House can rule dispositively on this part of the case.

*Misfeasance in public office*

*The early history*

The history of the development of the tort has been described by Clarke J and in the judgments in the Court of Appeal: see also *Arrowsmith, Civil Liability and Public Authorities* (1992), pp 226-234. It is traceable to

---

**[2003]** **190**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Steyn**

the 17th century: *Turner v Sterling* (1671) 2 Vent 25. But the first solid basis for this new head of tort liability, based on an action on the case, is to be found in *Ashby v White* (1703), best reported in 1 Smith's LC (13th ed) 253. The view ultimately prevailed that an action would lie by an elector who was wilfully denied a right to vote by a returning officer. Despite the recognition of the tort in a number of cases in the 18th and 19th centuries, the Court of Appeal in 1907 denied the existence of the tort in *Davis v Bromley Corpn* [1908] 1 KB 170. But by 1981 the Privy Council described the tort as "well established": *Dunlop v Woollahra Municipal Council* [1982] AC 158, 172F. An examination of the ingredients of the tort was still required. The first step towards that goal was the judgments in the Court of Appeal in *Bourgoin SA v Ministry of Agriculture, Fisheries and Food* [1986] QB 716. The present case is the first occasion on which the House has been called on to review the requirements of the tort in a comprehensive manner. Your Lordships are however not asked to prepare an essay on the tort of misfeasance in public office but to state the ingredients of the tort so far as it may be material to the concrete disposal of the issues arising on the pleadings in this case.

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 163 of 260
Pg 243 of 686

*The matrix of the tort*

The coherent development of the law requires the House to consider the place of the tort of misfeasance in public office against the general scheme of the law of tort. It is well established that individuals in the position of the depositors cannot maintain an action for compensation for losses they suffered as a result of the Bank's breach of statutory duties: *Yuen Kun-Yeu v Attorney General of Hong Kong* [1988] AC 175; *Davis v Radcliffe* [1990] 1 WLR 821. Judicial review is regarded as an adequate remedy. Similarly, persons in the position of the depositors cannot sue the Bank for losses resulting from the negligent licensing, supervision or failure to withdraw a licence: *Yuen Kun-Yeu v Attorney General of Hong Kong*; *Davis v Radcliffe*. The availability of the tort of misfeasance in public office has been said to be one of the reasons justifying the non-actionability of a claim in negligence where there is an act of maladministration: *Calveley v Chief Constable of the Merseyside Police* [1989] AC 1228, 1238F. It is also established that an *ultra vires* act will not per se give rise to liability in tort: *X (Minors) v Bedfordshire County Council* [1995] 2 AC 633. And there is no overarching principle in English law of liability in tort for "unlawful, intentional and positive acts": see *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173, 187G in which the House refused to follow *Beaudesert Shire Council v Smith* (1966) 120 CLR 145, which was subsequently overruled by the Australian High Court in *Northern Territory v Mengel* (1995) 69 ALJR 527. The tort of misfeasance in public office is an exception to "the general rule that, if conduct is presumptively unlawful, a good motive will not exonerate the defendant, and that, if conduct is lawful apart from motive, a bad motive will not make him liable": *Winfield & Jolowicz on Tort,* 15th ed (1998), p 55; *Bradford Corpn v Pickles* [1895] AC 587; *Allen v Flood* [1898] AC 1. The rationale of the tort is that in a legal system based on the rule of law executive or administrative power "may be exercised only for the public good" and not for ulterior and improper purposes: *Jones v Swansea City Council* [1990] 1 WLR 54, 85F, per Nourse LJ; a decision reversed on the facts but not on the law by the House of Lords [1990] 1 WLR 1453, 1458.

---

**[2003]** **191**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Steyn**

The tort bears some resemblance to the crime of misconduct in public office: *R v Bowden* [1996] 1 WLR 98.

*The ingredients of the tort*

It is now possible to consider the ingredients of the tort. That can conveniently be done by stating the requirements of the tort in a logical sequence of numbered paragraphs.

*(1) The defendant must be a public officer*

It is the office in a relatively wide sense on which everything depends. Thus a local authority exercising private-law functions as a landlord is potentially capable of being sued: *Jones v Swansea City Council* [1990] 1 WLR 54. In the present case it is common ground that the Bank satisfies this requirement.

*(2) The second requirement is the exercise of power as a public officer*

This ingredient is also not in issue. The conduct of the named senior officials of the Banking Supervision Department of the Bank was in the exercise of public functions. Moreover, it is not disputed that the principles of vicarious liability apply as much to misfeasance in public office as to other torts involving malice, knowledge or intention: *Racz v Home Office* [1994] 2 AC 45.

*(3) The third requirement concerns the state of mind of the defendant*

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 164 of 260
Pg 244 of 686

The case law reveals two different forms of liability for misfeasance in public office. First there is the case of targeted malice by a public officer, i e conduct specifically intended to injure a person or persons. This type of case involves bad faith in the sense of the exercise of public power for an improper or ulterior motive. The second form is where a public officer acts knowing that he has no power to do the act complained of and that the act will probably injure the plaintiff. It involves bad faith inasmuch as the public officer does not have an honest belief that his act is lawful.

The distinction, and the availability of an action of the second type, was inherent in the early development of tort. A group of cases which began with *Ashby v White* (1703) 1 Smith's LC (13th ed) 253, concerned the discretionary refusal of voting rights: see also *Drewe v Coulton* (1787) 1 East 563n; *Tozer v Child* (1857) 7 E & B 377; *Cullen v Morris* (1819) 2 Stark 577. In the second group of cases the defendants were judges of inferior courts, and the cases concerned liability of the judges for malicious acts within their jurisdiction: *Ackerley v Parkinson* (1815) 3 M & S 411; *Harman v Tappenden* (1801) 1 East 555; *Taylor v Nesfield* (1854) 3 E & B 724. These decisions laid the foundation of the modern tort; they established the two different forms of liability; and revealed the unifying element of conduct amounting to an abuse of power accompanied by subjective bad faith. In the most important modern case in England the existence of the two forms of the tort was analysed and affirmed: *Bourgoin SA v Ministry of Agriculture, Fisheries and Food* [1986] QB 716. Clarke J followed this traditional twofold classification. He expressly held that the two forms are alternative ways in which the tort can be committed. The majority in the Court of Appeal commented on "a rather rigid

---

**[2003] 192**
**2 AC Three Rivers DC v Bank of England (No 3) (HL(E)) Lord Steyn**

distinction between the two supposed limbs of the tort" and observed that there was "the need to establish deliberate and dishonest abuse of power in every case": ante, p 58F-G. As a matter of classification it is certainly right to say that there are not two separate torts. On the other hand, the ingredients of the two forms of the tort cannot be exactly the same because if that were so there would be no sense in the twofold classification. Undoubtedly there are unifying features, namely the special nature of the tort, as directed against the conduct of public officers only, and the element of an abuse of public power in bad faith. But there are differences between the alternative forms of the tort and it is conducive to clarity to recognise this.

The present case is not one of targeted malice. If the action in tort is maintainable it must be in the second form of the tort. It is therefore necessary to consider the distinctive features of this form of the tort. The remainder of my judgment will be directed to this form of the tort.

The basis for the action lies in the defendant taking a decision in the knowledge that it is an excess of the powers granted to him and that it is likely to cause damage to an individual or individuals. It is not every act beyond the powers vesting in a public officer which will ground the tort. The alternative form of liability requires an element of bad faith. This leads to what was a disputed issue. Counsel for the Bank pointed out that there was no precedent in England before the present case which held recklessness to be a sufficient state of mind to ground the tort. Counsel argued that recklessness was insufficient. The Australian High Court and the Court of Appeal of New Zealand have ruled that recklessness is sufficient: *Northern Territory v Mengel*, 69 ALJR 527; *Garrett v Attorney General* [1997] 2 NZLR 332; *Rawlinson v Rice* [1997] 2 NZLR 651. Clarke J lucidly explained the reason for the inclusion of recklessness [1996] 3 All ER 558, 581:

> "The reason why recklessness was regarded as sufficient by all members of the High Court in *Mengel* is perhaps most clearly seen in the judgment of Brennan J. It is that misfeasance consists in the purported exercise of a power otherwise than in an honest attempt to perform the relevant duty. It is that lack of honesty which makes the act an abuse of power."

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 165 of 260
Pg 245 of 686

The Court of Appeal accepted the correctness of this statement of principle, ante, pp 52-53. This is an organic development, which fits into the structure of our law governing intentional torts. The policy underlying it is sound: reckless indifference to consequences is as blameworthy as deliberately seeking such consequences. It can therefore now be regarded as settled law that an act performed in reckless indifference as to the outcome is sufficient to ground the tort in its second form.

Initially, counsel for the plaintiffs argued that in this context recklessness is used in an objective sense. Counsel said that the distinction was between subjective or advertent recklessness in the sense used in *R v Cunningham* [1957] 2 QB 396 and objective recklessness as explained in *R v Caldwell* [1982] AC 341 and *R v Lawrence (Stephen)* [1982] AC 510. The latter ingredient is present where in a case of an obvious risk the defendant failed to give any thought to the possibility of its existence: see *Smith & Hogan, Criminal Law*, 9th ed (1999), pp 60-69. *Smith & Hogan* trenchantly observed, at p 67:

---

**[2003]** **193**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Steyn**

> "The *Caldwell* test fails to make a distinction which should be made between the person who knowingly takes a risk and the person who gives no thought to whether there is a risk or not. And, on the other hand, it makes a distinction which has no moral basis. The person who, with gross negligence, fails to consider whether there is a risk is liable; but the person who considers whether there is a risk and, with gross negligence, decides there is none, is not liable. The right solution, it is submitted, is to go back to the *Cunningham* test which appears to have been entirely trouble-free in practice."

Counsel argued for the adoption of the *Caldwell* test in the context of the tort of misfeasance in public office. The difficulty with this argument was that it could not be squared with a meaningful requirement of bad faith in the exercise of public powers which is the raison d'tre of the tort. But, understandably, the argument became more refined during the oral hearing and counsel for the plaintiffs accepted that only reckless indifference in a subjective sense will be sufficient. This concession was rightly made. The plaintiff must prove that the public officer acted with a state of mind of reckless indifference to the illegality of his act: *Rawlinson v Rice* [1997] 2 NZLR 651. Later in this judgment I will discuss the requirement of reckless indifference in relation to the consequences of the act.

*(4) Duty to the plaintiff*

The question is who can sue in respect of an abuse of power by a public officer. Counsel for the Bank argued that in order to be able to claim in respect of the second form of misfeasance, there must be established "an antecedent legal right or interest" and an element of "proximity". Clarke J did not enunciate a requirement of proximity. He observed [1996] 3 All ER 558, 584:

> "If an officer deliberately does an act which he knows is unlawful and will cause economic loss to the plaintiff, I can see no reason in principle why the plaintiff should identify a legal right which is being infringed or a particular duty owed to him, beyond the right not to be damaged or injured by a deliberate abuse of power by a public officer."

The majority in the Court of Appeal held that "the notion of proximity should have a significant part to play in the tort misfeasance, as it undoubtedly has in the tort of negligence": ante, p 57D. Counsel for the Bank argued that both requirements are essential in order to prevent the tort from becoming an uncontrollable one. It would be unwise to make general statements on a subject which may involve many diverse situations. What can be said is that, of course, any plaintiff must have a sufficient interest to found a legal standing to sue. Subject to this qualification, principle does not require the introduction of proximity as a controlling mechanism in this corner of the law. The state of mind required to establish the tort, as already explained, as well as the special rule of remoteness hereafter discussed, keeps the tort

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

within reasonable bounds. There is no reason why such an action cannot be brought by a particular class of persons, such as depositors at a bank, even if their precise identities were not known to the bank. The observations of Clarke J are correct.

---

In agreed issue 4 the question is raised whether the Bank is capable of being liable for the tort of misfeasance in public office to plaintiffs who were potentially depositors at the time of any relevant act or omission of misfeasance by the Bank. The majority in the Court of Appeal and Auld LJ held that this issue is unsuitable for summary determination. In my view this ruling was correct.

*(5) Causation*

Causation is an essential element of the plaintiffs cause of action. It is a question of fact. The majority in the Court of Appeal and Auld LJ held that it is unsuitable for summary determination. That is plainly correct. This conclusion disposes of agreed issue 3 so far as it relates to the tort of misfeasance.

*(6) Damage and remoteness*

The claims by the plaintiffs are in respect of financial losses they suffered. These are, of course, claims for recovery of consequential economic losses. The question is when such losses are recoverable. It would have been possible, as a matter of classification, to discuss this question under paragraph 3 in which the required state of mind for this tort was examined. It is, however, convenient to consider it under the traditional heading of remoteness.

On the assumption that the other requirements can be established, counsel for the plaintiffs argued that the plaintiffs should be able to recover all reasonably foreseeable losses suffered by them. In support of this argument he had the advantage of a powerfully reasoned dissenting judgment by Auld LJ Counsel for the Bank argued that the rule is more restrictive. He supported the conclusion of the majority in the Court of Appeal. The judge had held that the plaintiffs must prove that the Bank actually foresaw the losses to the plaintiff as a probable consequence. This part of the judgment at first instance provided the reason for the judge refusing to allow the proposed amendments and striking out the claims. The majority observed, ante, p 94F-G:

> "[The] formulation, however, may have been too favourable to the plaintiffs. In view of the stringent requirements of the tort of misfeasance in public office, the more appropriate question may be: 'Is it reasonably arguable that the Bank at any stage made an unlawful and dishonest decision knowing at the time that it would cause loss to the plaintiffs?' To that question, in the light of our analysis of the evidence, the answer is plainly 'No.' "

Counsel adopted this formulation as his primary submission. In the alternative he submitted that the test stated by Clarke J should be adopted.

It will be necessary to give a brief account of the decisions in which this issue was considered. It was first touched on in *Bourgoin SA v Ministry of Agriculture* [1986] QB 716. At first instance Mann J had spoken of foreseeable losses. Oliver LJ quoted and endorsed the relevant passage. In *Northern Territory v Mengel*, 69 ALJR 527, 540 the majority in the Australian High Court adopted a test of "a foreseeable risk of harm" for which it relied on the *Bourgoin* case. In the present case Clarke J concluded

---

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 167 of 260
Pg 247 of 686

2 AC Three Rivers DC v Bank of England (No 3) (HL(E)) Lord Steyn

that in using the word "foreseeable" in the *Bourgoin* case Mann J must have meant "foreseen" and that the same applies to the adoption of the relevant passage by Oliver LJ. Before the judgments in the Court of Appeal in the present case the Court of Appeal of New Zealand adopted the conclusions of Clarke J as well as his explanation of the *Bourgoin* case: *Garrett v Attorney General* [1997] 2 NZLR 332; *Rawlinson v Rice* [1997] 2 NZLR 651. In England the Court of Appeal and Divisional Court have on a number of occasions approved the reasoning of Clarke J. These decisions include the following: *Lam v Brennan and Torbay Borough Council* [1997] PIQR P488; *R v Chief Constable of the North Wales Police, Ex p AB* [1999] QB 396; *Barnard v Restormel Borough Council* [1998] 3 PLR 27; *W v Essex County Council* [1999] Fam 90. While it is unnecessary to discuss these decisions it is relevant to point out that in the *North Wales Police* case Lord Bingham of Cornhill CJ expressed agreement with the view that the tort is only established if the officer had knowledge that he had no power to do the act complained of and that the act would probably injure the plaintiff. He paid tribute to the "extended consideration and most helpful summary" by Clarke J at [1999] QB 396, 413B.

The issues have been canvassed in great depth in written and oral argument. Taking into account all the matters advanced the choice before the House can be narrowed down. So far as the majority was minded to adopt a stricter test that Clarke J, encapsulated in the words "knowing at the time that [the decision] *would* cause damage to the plaintiffs", they went too far. A test of knowledge or foresight that a decision *would* cause damage does not readily fit into the standard of proof generally required in the law of tort, and specifically in the case of intentional torts. Moreover, this test unnecessarily emasculates the effectiveness of the tort. The real choice is therefore between the test of knowledge that the decision would probably damage the plaintiff (as enunciated by Clarke J) and the test of reasonable foreseeability (as contended for by counsel for the plaintiffs).

It is now necessary to return to the *Bourgoin* case. While all judges are prone to error and imprecise language from time to time, it is difficult to say that Mann J and Oliver LJ used the word "foreseeable" when they meant "foreseen". It is sufficient to point out, as the majority of the Court of Appeal did [2000] 2 WLR 15, 48D, that there was no focus in the *Bourgoin* case on the choice which is now before the House. In these circumstances the observations in the *Bourgoin* case on this particular issue do not greatly assist.

It is true that Clarke J made new law. He relied on the special nature of the tort. He reasoned from legal principle. It is true that the earlier decision of the majority in the *Mengel* case runs counter to the conclusion of Clarke J. But apart from the *Mengel* case there has however been no judicial support for a foreseeability test. And there has been no academic criticism of the view of Clarke J that a test of foreseeability is not enough in this tort. Given that his ground-breaking first instance judgment has been pored over by many judicial and academic eyes, this is a factor of some significance. Nevertheless, it is necessary to consider the merits of the competing solutions from the point of view of principle and legal policy.

Enough has been said to demonstrate the special nature of the tort, and the strict requirements governing it. This is a legally sound justification for adopting as a starting point that in both forms of the tort the intent required

---

[2003] 196
2 AC Three Rivers DC v Bank of England (No 3) (HL(E)) Lord Steyn

must be directed at the harm complained of, or at least to harm of the type suffered by the plaintiffs. This results in the rule that a plaintiff must establish not only that the defendant acted in the knowledge that the act was beyond his powers but also in the knowledge that his act would probably injure the plaintiff or person of a class of which the plaintiff was a member. In presenting a sustained argument for a rule allowing recovery of all foreseeable losses counsel for the plaintiffs argued that such a more liberal rule is necessary in a democracy as a constraint upon abuse of executive and administrative power. The force of

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 168 of 260
Pg 248 of 686

this argument is, however, substantially reduced by the recognition that subjective recklessness on the part of a public officer in acting in excess of his powers is sufficient. Recklessness about the consequences of his act, in the sense of not caring whether the consequences happen or not, is therefore sufficient in law. This justifies the conclusion that the test adopted by Clarke J represents a satisfactory balance between the two competing policy considerations, namely enlisting tort law to combat executive and administrative abuse of power and not allowing public officers, who must always act for the public good, to be assailed by unmeritorious actions.

It is undoubtedly right, as counsel for the plaintiffs pointed out, that the mental element required for the tort of misfeasance in public office means that it is not an effective remedy to deal with state liability for breaches of Community law: *Brasserie du Pcheur SA v Federal Republic of Germany; R v Secretary of State for Transport, Ex p Factortame Ltd (No 4)* (Joined Cases C-46/93 and C-48/93) [1996] QB 404. This consideration cannot, however, affect the decision of the House on the tort. If there is a gap it must be for Community law to fill it. And our courts will loyally apply Community law.

*Conclusion on misfeasance in public office*

For the reasons given the requirements of the tort are as set out.

*Community law*

My Lords, I have had the advantage of reading in draft the speech of Lord Hope of Craighead. He has demonstrated with compelling logic that the Directive of 1977 was not intended to confer rights on individual depositors. I am persuaded that the matter is truly acte clair.

*Future course of the proceedings*

It will be necessary to take account of the following matters. (1) The question whether the existing re-amended statement of claim reveals a sustainable cause of action based on the tort of misfeasance in public office will have to be considered at a further hearing of the Appellate Committee. (2) The next hearing will include the questions whether the Court of Appeal was right to affirm the decisions of Clarke J who refused to allow proposed amendments and struck out the action. (3) The shape of the case has been altered. The requirements of the tort, so far as relevant to the present case, have today been authoritatively stated. The allegations of breaches of Community law can no longer found a cause of action. (4) In these circumstances I take the view that at a further hearing there should be available a new draft pleading by the plaintiffs reflecting the altered position.

---

**[2003]** **197**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Steyn**

And I draw attention to the fact that the Court of Appeal referred to "the facts alleged or capable of being alleged", that being a reference to the circumstances in which it is proper to strike out all action.

Given this untidy procedural position, it may be necessary when the parties are ready for an Appeal Committee to consider the future progress of the matter.

*Disposal*

For the reasons given by Lord Hope of Craighead, I would dismiss the appeal on Community law issues. In the light of my statement of the requirements of the tort of misfeasance in public office I would adjourn this part of the appeal for further argument.

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

**LORD HOPE OF CRAIGHEAD** My Lords, I have had the advantage of reading in draft the speeches prepared by my noble and learned friends, Lord Steyn and Lord Hutton. As regards the tort of misfeasance in public office, I am in full agreement with what they have said as to the essential elements of the tort and the requirements which must be satisfied. The question with which I wish to deal is whether the plaintiffs have a basis for an action of damages against the Bank in Community law.

*Community law*

The appellants' claim that they are entitled to damages for losses caused by breaches of Community law is based upon the following allegations. First, it is alleged that in June 1980 the Bank granted to BCCI SA a full licence to carry on business as a deposit-taker deliberately contrary to the scheme laid down by the First Council Banking Co-ordination Directive (77/780/EEC) of 12 December 1977 on the co-ordination of laws, regulations and administrative provisions relating to the taking up and pursuit of the business of credit institutions ("the Directive of 1977") and the Banking Act 1979 when it knew that the relevant criteria in Schedule 2 to the 1979 Act were not fulfilled. Then it is alleged that, at all times after the grant of the licence in June 1980 until the eventual closure of BCCI SA, the Bank continued to act contrary to the scheme laid down by the Directive of 1977, the 1979 Act and the Banking Act 1987 in the respects described in paragraphs 40-44 of the re-amended statement of claim. The essence of this further allegation is that, contrary to the scheme laid down by the Directive of 1977, the 1979 Act and the 1987 Act, the Bank concluded that it had no discretion or power to revoke the licence to carry on business as a deposit-taker when it knew that BCCI SA had conducted and was conducting its affairs in a way which threatened the interests of its depositors. Furthermore, it permitted BCCI. Overseas to carry on a deposit-taking business when it knew that the business of that company was carried on in a manner which might affect the soundness of BCCI SA and place its depositors at risk. It is also alleged that throughout this period the Bank failed to supervise both BCCI SA and BCCI Overseas to the detriment of the depositors.

Shortly put, and based upon these allegations, the plaintiffs' Community law argument proceeds along these lines. Under the EEC Treaty the Directive of 1977 has direct effect in the United Kingdom. The United

---

Kingdom discharged its obligations under the Directive by enacting the Banking Acts of 1979 and 1987. The Bank was at all material times the supervisory authority in the United Kingdom for the purposes of both the Directive of 1977 and the 1979 Act and the 1987 Act. The Bank as an emanation of the state is liable to the depositors for failing in its functions as supervisory authority to give full effect to the Directive of 1977. National courts are required by Community law to protect the rights which individuals derive from Community law, including those which are derived from a Directive. Accordingly the plaintiffs are entitled, as parties who were intended to benefit from the Directive of 1977, to rely upon its terms against the Bank in order to obtain damages.

The plaintiffs maintain that the Directive of 1977 was intended and designed to protect the savings of depositors. They say that, in order to achieve this purpose, it imposed certain well-defined Community law obligations on the competent authorities of member states in relation to the authorisation and supervision of banks, and that it conferred on depositors and potential depositors corresponding Community law rights against the competent authorities to have these obligations fulfilled. That being so, their Community law rights under the Directive of 1977 must prevail over the requirement in national law to prove bad faith or dishonesty as a prerequisite of the tort of misfeasance in public office under the common law. And they must prevail over the Bank's right to seek exemption from liability under section 1(4) of the Banking Act 1987, which provides:

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 170 of 260
Pg 250 of 686

> "Neither the Bank nor any person who is a member of its Court of Directors or who is, or is acting as, an officer or servant of the Bank shall be liable in damages for anything done or omitted in the discharge or purported discharge of the functions of the Bank under this Act unless it is shown that the act or omission was in bad faith."

The main issue of Community law which arises in this appeal from these allegations is whether the Bank is capable of being liable to the plaintiffs in damages for violations of the Directive of 1977, on the assumption that the facts pleaded in the re-amended statement of claim are true.

*The conditions of liability*

There appeared to be no real dispute between the parties on this point in the course of the argument which was presented to your Lordships, and both the majority judgment in the Court of Appeal, ante, pp 61-72 and the judgment of Auld LJ, ante, pp 99-103have dealt with the whole matter in great detail and with admirable clarity. Nevertheless I think that it is necessary for me to explain at the outset of this chapter the criteria which must be fulfilled before a Directive can be relied upon as a source of rights before a national court.

Community law, as it has been developed by the European Court of Justice, is capable of conferring upon individuals the right to claim damages from a national authority by one or other or both of two distinct routes. The purpose of the right to claim damages is to ensure that provisions of Community law prevail over national provisions. This is because the full effectiveness of Community law would be impaired if individuals were unable to obtain redress in the national courts of the relevant member state when their rights were infringed by a breach of Community law:

---

**[2003]** **199**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hope of Craighead**

*Brasserie du Pcheur SA v Federal Republic of Germany*; *R v Secretary of State for Transport, Ex p Factortame Ltd (No 4)* (Joined Cases C-46/93 and C-48/93) [1996] QB 404, 495, para 20. The first route by which the right to claim damages against the state or an emanation of the state for the non-implementation or misimplementation of a Directive may be asserted is based upon the principle of direct effect. This is the principle which was established in Community law by *NV Algemene Transport- en Expeditie Onderneming van Gend & Loos v Nederlandse administratie der belastingen* (Case 26/62) [1963] ECR 1. The second route is based upon the principle of state liability.

In the *van Gend & Loos* case it was held that article 12 of the EEC Treaty (now article 25 EC) prohibiting customs duties on imports and exports had to be interpreted as producing direct effects and creating individual rights which national courts must protect. The decision in that case has been applied by the European Court in a large number of cases to other articles of the Treaty which the court has construed as having direct effect in member states. Later decisions of the European Court have made it clear, in the light of the provisions of the third paragraph of article 189 of the EEC Treaty (now article 249 EC) which provides that a Directive shall be binding as to the result to be achieved upon each member state, that Directives as well as articles of the Treaty are capable of conferring directly effective rights upon individuals provided certain conditions are satisfied. In *Becker v Finanzamt MŸnster-Innenstadt* (Case 8/81) [1982] ECR 53, 70-71 the court made the following observations as to the conditions for the application of the direct effect principle to a Directive:

> "22. It would be incompatible with the binding effect which article 189 ascribes to Directives to exclude in principle the possibility of the obligations imposed by them being relied on by persons concerned.

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 171 of 260
Pg 251 of 686

"23. Particularly in cases in which the Community authorities have, by means of a Directive, placed member states under a duty to adopt a certain course of action, the effectiveness of such a measure would be diminished if persons were prevented from relying upon it in proceedings before a court and national courts were prevented from taking it into consideration as an element of Community law.

"24. Consequently, a member state which has not adopted the implementing measures required by the Directive within the prescribed period, may not plead, as against individuals, its own failure to perform the obligations which the Directive entails.

"25. Thus, wherever the provisions of a Directive appear, as far as their subject matter is concerned, to be unconditional and sufficiently precise, those provisions may, in the absence of implementing measures adopted within the prescribed period, be relied upon as against any national provision which is incompatible with the Directive or in so far as the provisions define rights which individuals are able to assert against the state."

Two things should be noted about the observations which the European Court made in paragraph 25 of its judgment. The first is that in order for there to be liability under this principle, which the Court of Appeal in the judgments in this case has described as *Becker*-type liability, the rights said to have been conferred by the Directive must be "unconditional and

---

**[2003]** **200**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hope of Craighead**

sufficiently precise". The second is that a distinction is made between relying upon a Directive to nullify some provision in national law which is incompatible with the Directive in order to give effect to rights under Community law, and relying upon Community law itself to give a right to claim damages in the national courts for breach of an obligation of Community law. The plaintiffs seek to rely on each of these two branches in this case.

In *Francovich v Italian Republic* (Joined Cases C-6/90 and C-9/90) [1995] ICR 722 the European Court established the conditions for state liability, which is described in the judgments in the Court of Appeal as *Francovich*-type liability. The European Court had to deal with two issues in that case. The first concerned the direct effect of the provisions of Council Directive (80/987/EEC) which determined the rights of employees in the event of their employers' insolvency and which Italy had failed to implement: this was *Becker*-type liability. The second concerned the existence and scope of the liability of the state for damage resulting from Italy's breach of its obligations under Community law: this was *Francovich*-type liability. In regard to the direct effect route the court said, at p 768, para 12, that there were three points to be considered, in order to see whether the provisions of the Directive which determined whether the rights of employees were, in *Becker*-type liability terms, "unconditional and sufficiently precise" to enable them to recover under this route. These were: "the identity of the persons entitled to the guarantee provided [by the Directive] the content of that guarantee and the identity of the person liable to provide the guarantee."

In regard to the conditions for state liability for failure to implement a Directive, the European Court made these observations, at p 772:

"39. Where, as in this case, a member state fails to fulfil its obligation under the third paragraph of article 189 of the Treaty to take all the measures necessary to achieve the result prescribed by a Directive, the full effectiveness of that rule of Community law requires that that there should be a right to reparation provided that three conditions are fulfilled.

"40. The first of these conditions is that the result prescribed by the Directive should entail the grant of rights to individuals. The second condition is that it should be possible to identify the content of those rights on the basis of the provisions of the Directive. Finally, the third condition is the existence of a causal link between the breach of the state's obligation and the loss and damage suffered by the injured parties.

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 172 of 260
Pg 252 of 686

"41. Those conditions are sufficient to give rise to a right on the part of individuals to obtain reparation, a right founded directly on Community law."

As Lord Slynn of Hadley said in *R v Secretary of State for Transport, Ex p Factortame Ltd (No 5)* [2000] 1 AC 524, 538, state liability is conditional on there being a grant of rights to individuals by the Directive, that the contents of these rights is clear and that the loss suffered is shown to be caused by the state's breach.

In *Dillenkofer v Federal Republic of Germany* (Joined Cases C-178, 179 and 188-190/94) [1997] QB 259 the court restated the conditions for state liability in the light of a number of cases with which it had dealt subsequently to the *Francovich* case. It did so in a manner which, in

---

**[2003]** **201**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hope of Craighead**

paragraph 22 of the judgment, applied the tests which *Francovich* had laid down for the direct effect, or *Becker*-type, route to the state liability, or *Francovich*-type, route. The relevant paragraphs are set out in the judgment, at pp 291-292:

"20. The court has held that the principle of state liability for loss and damage caused to individuals as a result of breaches of Community law for which the state can be held responsible is inherent in the system of the Treaty: *Francovich v Italian Republic*(Joined Cases C-6/90 and C-9/90) [1995] ICR 722, 772, para 35; *Brasserie du Pcheur SA v Federal Republic of Germany*; *R v Secretary of State for Transport, Ex p Factortame Ltd (No 4)* (Joined Cases C-46/93 and C-48/93) [1996] QB 404, 496, para 31; *R v HM Treasury, Ex p British Telecommunications plc* (Case C-392/93) [1996] QB 615, 654, para 38 and *R v Ministry of Agriculture, Fisheries and Food, Ex p Hedley Lomas (Ireland) Ltd* (Case C-5/94) [1997] QB 139, 160, para 24. Furthermore, the court has held that the conditions under which state liability gives rise to a right to reparation depend on the nature of the breach of Community law giving rise to the loss and damage: *Francovich* [1995] ICR 722, 772, para 38; *Brasserie du Pcheur* [1996] QB 404, 497, para 38, and *Hedley Lomas* [1997] QB 139, 160, para 24.

"21. In *Brasserie du Pcheur*, at p 499, paras 50 and 51; *British Telecommunications* [1996] QB 615, 655, paras 39 and 40, and *Hedley Lomas*, at p 160, paras 25 and 26, the court, having regard to the circumstances of the case, held that individuals who have suffered damage have a right to reparation where three conditions are met: the rule of law infringed must have been intended to confer rights on individuals, the breach must have been sufficiently serious, and there must be a direct causal link between the breach of the obligation resting on the state and the damage sustained by the injured parties.

"22. Moreover, it is clear from the *Francovich* case which, like the present cases, concerned non-transposition of a Directive within the prescribed period, that the full effectiveness of the third paragraph of article 189 of the Treaty requires that there should be a right to reparation where the result prescribed by the Directive entails the grant of rights to individuals, the content of those rights is identifiable on the basis of the provisions of the Directive and a causal link exists between the breach of the state's obligation and the loss and damage suffered by the injured parties.

"23. In substance, the conditions laid down in that group of judgments are the same, since the condition that there should be a sufficiently serious breach, although not expressly mentioned in *Francovich*, was nevertheless evident from the circumstances of that case."

In the Court of Appeal it was observed in the majority judgment, ante, p 68G-H that the main difference between the parties, as to the basic principles to be applied, was as to whether a Directive, once it has been transposed into national law, ceases to be the immediate source of rights enforceable by an individual claimant in his national court. For the Bank it was submitted that there is a clear and well-established

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 173 of 260
Pg 253 of 686

principle that the Directive is supplanted at that stage by rights under the national law. For the plaintiffs it was submitted that, as the obligation on member states is to

[2003] 202
2 AC Three Rivers DC v Bank of England (No 3) (HL(E)) Lord Hope of Craighead

ensure that the Directive is applied in practice, a Directive can be the immediate source of enforceable rights under the *Becker*-type principle even if it has been transposed, and correctly transposed, into national law. This is in order to ensure its effectiveness as to the result to be achieved in conformity with the third paragraph of article 249 (ex 189) EC.

The majority in the Court of Appeal, ante, p 71G found some support in *Norbrook Laboratories Ltd v Ministry of Agriculture, Fisheries and Food* (Case C-127/95) [1998] ECR I-1531 for the view that there may be a category of Directives in relation to which a member state's obligation of proper implementation is not restricted to a once-for-all legislative process, but also requires a continuing administrative process. Auld LJ, who was of the opinion that the plaintiffs were entitled to rely on *Francovich*-type liability, regarded the debate on this point as academic: ante, p 133E. But, in the course of his development of this point, ante, pp 133C-136C, he gave two further reasons for rejecting the Bank's argument that implementation of the Directive deprived the plaintiffs of recourse to the Directive under the *Becker*-type principle of liability to which, in my view, great weight should be attached. Although the debate on this issue did not receive the same prominence in the arguments which were presented to your Lordships, as Mr Lasok for the Bank addressed the main part of his submissions to the terms of the Directive, I think that Auld LJ's observations are worth recording here in order to set the scene for an examination of the Directive.

The first point which Auld LJ made was that it could be said that the precondition of liability for damages of bad faith on the part of the Bank or its officers in a common law action for misfeasance in public office and as introduced in section 1(4) of the Banking Act 1987, to the extent that they derogate from the Directive, "misimplement" the Directive: p 133E-F. His second point was that recent decisions of the European Court, including the *Norbrook* case, indicate that in the main the court is indifferent to the precise route by which it gives effect to a Directive. As he pointed out, at p 135E-H, neither the 1979 Act nor the 1987 Act transposed the Directive of 1977 word for word, and the rights of redress which he found in the Directive were wider than those dependent on proof of bad faith as required by section 1(4) of the 1987 Act and the common law action of misfeasance in public office. Having noted the differences between the two approaches--one that the United Kingdom legislation properly construed effectively implemented the Directive, the other that it did not fully implement the Directive with the consequence that the United Kingdom courts must have direct recourse to it--he concluded, at p 136A-C:

> "As Josephine Steiner observed in 'Coming to Terms with EEC Directives' (1990) 106 LQR 144, 146, the question whether a Directive has been correctly implemented can only be assessed by reference to the Directive itself, with the result that it can rarely be disregarded. Clearly, as a result of the court's ready application of the *Francovich* principle, the two approaches can shade into one another. Whichever route is taken, the answer on matters of *Community law* should be the same, with the result that it should prevail over United Kingdom law, including the common law as to misfeasance in public office and section 1(4) of the 1987 Act, where the latter frustrates it: see *Amministrazione delle Finanze dello Stato v Simmenthal SpA* (Case

[2003] 203
2 AC Three Rivers DC v Bank of England (No 3) (HL(E)) Lord Hope of Craighead

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 174 of 260
Pg 254 of 686

106/77) [1978] ECR 629, 643-645, paras 16-26; the *Brasserie du Pcheur* case [1996] QB 404, 502, paras 72-73."

In the result, although the appellants' case under Community law is put in different ways and is based upon both types of liability, the conditions which the plaintiffs must satisfy in order to establish a right to damages against the Bank under each route are so closely analogous that they can be taken to be, at this stage of case, the same. The critical questions in this appeal, following the language of paragraph 22 of the judgment in the *Dillenkofer* case, are whether the Directive of 1977 entails the grant of rights to individual depositors and potential depositors and whether the content of those rights is identifiable on the basis of the provisions of the Directive.

*The legislative basis and purpose of the Directive of 1977*

Clarke J [1996] 3 All ER 558, 602A held, contrary to the submissions which Mr Stadlen for the Bank had made to him, that an important underlying purpose of the Banking Acts 1979 and 1987 was to protect savers, including both existing savers and future savers, and that the same was true of the Directive of 1977. But he went on to say, at p 602B, that this was not enough to impose any obligation on the Bank which gave rise to a right in the savers to claim damages for a breach of it. Having examined the terms of the Directive, he held at p 614J, that it was not intended to confer rights upon savers, even although the underlying purpose of supervision of credit institutions was to be for their benefit. In the Court of Appeal, ante, p 74D the majority understood the Bank's position to be that it did not dispute that one of the Directive's purposes was the protection of depositors. Auld LJ, at p 103F-G, put the matter in this way:

"It is plain that one of the purposes of the Directive was the protection of depositors. The plaintiffs say it was the main purpose. The Bank, to the extent that it recognises it as a purpose of the Directive at all, says it was subsidiary to that of beginning the process of harmonisation. As I have mentioned, the judge regarded it as an important underlying purpose."

It was suggested by the plaintiffs in the course of the hearing before your Lordships that the Bank had changed its position on this point having realised, as Lord Neill put it, that once the concession was made that one of the purposes of the Directive was the protection of depositors it was on a slippery slope from which it now wished to extricate itself. In my view however the position which the Bank has adopted both in its written case and in the oral argument advanced on its behalf by Mr Lasok is based upon a more substantial argument than that which might be thought to have been suggested by that criticism. I am not convinced that there has been, in substance, any change of position on the part of the Bank from its position as Auld LJ understood it to be. There is however a more important point. The plaintiffs still rely, and take as their starting point on this whole issue, on the proposition that one of the purposes of the Directive was to protect depositors. This is a significant step in the argument which they then advance that the Directive also imposed obligations on the Bank which conferred corresponding rights upon which they are entitled to base their claim of damages. The question which the Bank has raised is not only as to

---

**[2003]** **204**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hope of Craighead**

the accuracy of the plaintiffs' description of the purpose of the Directive but also as to its relevance as a starting point to an examination of the articles of the Directive in order to discover what rights, if any, they conferred on depositors.

The plaintiffs' submission is that it is evident from the legislative background to the Directive, its terms and cases decided by the European Court that a principal purpose of the Directive of 1977 was the

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 175 of 260
Pg 255 of 686

protection of depositors. They rely on article 57(2) of the EEC Treaty with reference to which the Directive of 1977 was enacted, on observations in the opinion of the Economic and Social Committee ("ECOSOC") mentioned in the preamble to the Directive, on recitals and articles set out in the Directive and on several decisions of the European Court of which the most important is *SociŽtŽ Civile Immobilire Parodi v Banque H Albert de Bary et Cie* (Case C-222/95) [1997] ECR I-3899.

I do not think that the plaintiffs derive any assistance from article 57(2) of the EEC Treaty (now, in a revised form, article 47(2) EC). Its relevance is not in doubt. Article 253 EC (formerly article 190) requires Community instruments such as Directives to state the reasons on which they are based and to refer to any proposals or opinions which were required to be obtained pursuant to the Treaty. The duty to give reasons will normally require specification of the Treaty article on which the measure was based: *Craig and de Bœrca, EU Law, text, cases and materials*, 2nd ed (1998), p 120. In *Commission of the European Communities v Council of the European Communities* (Case 45/86) [1987] ECR 1493 (the Tariff Preferences case) a Council measure was annulled in part by the European Court because the legal basis of the measure had not been specified. In this case the only article of the Treaty which is referred to by the Directive of 1977 is article 57. This is one of a group of articles which appear in Title III (free movement of persons, services and capital), Chapter 2 (Right of Establishment) of the Treaty. Paragraphs (1) and (2) of article 57, in the terms which were in force in 1977, provided:

> "1. In order to make it easier for persons to take up and pursue activities as self-employed persons, the Council shall, on a proposal from the Commission and after consulting the Assembly, acting unanimously during the first stage and by a qualified majority thereafter, issue Directives for the mutual recognition of diplomas, certificates and other evidence of formal qualifications. 2. For the same purpose, the Council shall, before the end of the transitional period, acting on a proposal from the Commission and after consulting the Assembly, issue Directives for the co-ordination of the provisions laid down by law, regulation or administrative action in member states concerning the taking up and pursuit of activities as self-employed persons. Unanimity shall be required on matters which are the subject of legislation in at least one member state and measures concerned with the protection of savings, in particular the granting of credit and the exercise of the banking profession, and with the conditions governing the exercise of the medical and allied, and pharmaceutical professions in the various member states. In other cases, the Council shall act unanimously during the first stage and by a qualified majority thereafter."

---

**[2003]** **205**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hope of Craighead**

The purpose to which reference is made in the first line of article 57(2) is that of the mutual recognition of qualifications which is the subject of article 57(1). The plaintiffs base their argument that a purpose of the Directive was to protect "savers" on the reference to the protection of "savings" in the second sentence of article 57(2). But this reference appears in provisions which laid down those matters in regard to which proposals were to be dealt with unanimously and those which could be dealt with by qualified majority. The granting of credit and the exercise of the banking profession are taken as two examples of "measures concerned with savings." This seems to me to be no more than a recognition that an ability to protect savings is one of the qualifications which member states will normally require those who wish to grant credit or exercise the banking profession to satisfy. Recognition that this was so, that such measures would need to be co-ordinated throughout member states and the making of provision for the voting formula to be adopted in regard to such matters is one thing. A purpose to direct that provision must be made for the protection of savers and depositors under Community law over and above the protections available under the national law of each member state is quite another. I do not find anything in the wording of the article as a whole to suggest that the protection of individual depositors and potential depositors against loss could be regarded as a purpose for which Directives were to be issued under it.

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 176 of 260
Pg 256 of 686

In *Federal Republic of Germany v European Parliament*(Case C-233/94) [1997] ECR I-2405 the European Court made certain observations about article 57(2) of the Treaty. This was in the context of a challenge to the Deposit Guarantee Scheme Directive (94/19/EEC) by Germany on the ground that, contrary to its preamble, article 57 could not constitute the sole legal basis for the Directive as it did not merely regulate banking operations but was aimed at increasing protection for consumers. The fact that the court rejected this challenge might seem at first sight to provide support for the view that the protection of consumers was a purpose for which Directives could be issued under article 57. But the background to the Directive is important to a proper understanding of the reason why the challenge to its legal base did not succeed. The court had held in earlier cases that member states were entitled in certain circumstances to adopt or maintain measures which were justified on public interest grounds, such as the protection of consumers, which constituted an obstacle to free movement within the Community: p 2450, paras 16 and 17. The court said, at p 2456, para 41, that article 57(2) of the Treaty authorised the Parliament and the Council to issue Directives with a view to abolishing obstacles of this kind. It was apparent that such an obstacle was to be found in the fundamental differences between the deposit-guarantee systems existing in the various member states, so the laws on those systems were to be harmonised in order to facilitate the activity of credit institutions at Community level. The court held, at p 2459, para 48, that there had to be a high level of consumer protection concomitantly with the right of establishment and the freedom to provide services which the Directive aimed to promote. It referred to "the general result" which the Directive sought to achieve, which was a considerable improvement in the protection of depositors within the Community. In that particular context it was legitimate for the Directive to adopt measures which would render the

---

**[2003]** **206**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hope of Craighead**

domestic measures for the protection of consumers otiose. The special circumstances which led to that decision are absent in this case.

Consultation with ECOSOC was required by the second paragraph of article 100 of the EEC Treaty (now article 94 EC) prior to the issuing of the Directive. But the observations in its opinion on which the plaintiffs rely do not seem to me to advance their argument. In paragraph 1.1.3 the point was made that

> "the lack of harmonisation of member states' legislation, whose main purpose in each country is to provide security for depositors and to protect savings, is liable to create serious disparities with regard to that objective, indeed even certain dangers."

In paragraph 1.4.1 it was stated that the ultimate aim was to harmonise the authorisation requirements for financial institutions in all the member states. The plaintiffs say, under reference to these and other passages in the opinion that the committee recognised that the main purpose of legislation concerning banking regulation was to provide security for depositors and to protect savings. I am willing to accept that this is so. No doubt the committee recognised that the protection of savings is a necessary part of every system at national level for the regulation of credit institutions whose business it is to receive from the public deposits and other forms of repayable funds. But the point to which it was drawing attention in its opinion was the need for the harmonisation of authorisation requirements, without which there would be likely to be serious disparities between the member states. The Community law purpose which was indicated by its observations was that of the harmonisation of regulatory measures affecting the right of establishment with a view to eliminating these disparities. I do not find any indication here that the committee saw the purpose of the Directive as being to confer Community law rights on individual depositors.

In the *Parodi* case [1997] ECR I-3899, 3923, paras 24-25 the European Court said that the Directive of 1977 was no more than a first step towards the mutual recognition by member states of authorisations

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 177 of 260
Pg 257 of 686

issued by each of them to credit institutions, and that it confined itself to imposing a number of minimum conditions on member states. Member states were to be obliged to require authorisation of all credit institutions wishing to commence banking activity within their territory of origin, but this was to be subject to minimum requirements and without prejudice to other conditions of general application laid down by national laws. The question which was raised in that case was whether national legislation requiring authorisation in order to supply banking services was precluded by the Treaty where the bank concerned was already established and authorised in another member state. The court said, at p 3922, paras 20-22 that, in view of the special nature of certain provisions of services, specific requirements imposed on the provider that were attributable to the application of rules governing that type of activity could not be regarded as incompatible with the Treaty, and that the banking sector was a particularly sensitive area from the point of view of consumer protection. The following observation was made, at p 3924, para 26:

"It must therefore be accepted that, as Community law stood at the time of the facts in the main proceedings, there were within the banking

---

**[2003]** **207**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hope of Craighead**

sector imperative reasons relating to the public interest capable of justifying the imposition by the member state of destination of conditions regarding access to the activity of credit institutions and their supervision which could go beyond the minimum conditions required by the first banking Directive and already implemented in the member state of origin."

The conclusion in the *Parodi* case was that member states were entitled to apply their own consumer protection measures in the banking sector, pending the entry into force of the measures in the Second Council Directive 89/646/EEC on the co-ordination of laws, regulations and administrative provisions relating to the taking up and pursuit of the business of credit institutions and amending the Directive of 1977 which rendered the national measures otiose. The plaintiffs rely on the observations in the judgment about the need to protect consumers in the banking sector in support of their argument as to the purpose of the Directive of 1977. But, as I read these observations, they were made, not with reference to the purpose of the Directive of 1977, but in order to justify the application of national measures by a member state during the period prior to the entry into force of the Directive of 1989. The purpose of the Directive of 1977 was to begin the process of harmonisation of national laws so as to remove barriers to the provision of banking services throughout the single market, but without weakening or impairing the protection of depositors. The protection of depositors was seen therefore not as a purpose of the Directive but as a constraint on the provision of banking services to the public which had to be recognised.

In *Criminal Proceedings against Romanelli* (Case C-366/97) [1999] ECR I-855, 861, para 12, the court said that it was clear from the Directive of 1977 and the Directive of 1989 that the protection of savings constituted one of the objectives of the measures taken to co-ordinate credit institutions. Here again, taken in its context, this observation seems to me to do no more than recognise the point already made in the *Parodi* case [1997] ECR I-3899, 3922, para 21 that, as a matter of fundamental principle, restrictions on the freedom to provide services under the Treaty must be justified by imperative reasons in the public interest which are objectively necessary to guarantee the protection of the recipient of services and which do not exceed what is necessary to attain these objectives. I do not find in these observations support for the argument that a purpose of the Directive of 1977 was to promote or protect the interests of individual depositors.

In my opinion the question whether the Directive of 1977 granted rights to individual depositors and potential depositors must be answered by examining the recitals and the articles of the Directive itself without any preconception as to its purpose based upon these extrinsic materials.

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 178 of 260
Pg 258 of 686

*The recitals and articles of the Directive of 1977*

The Directive of 1977 contains fifteen recitals and fifteen articles. The plaintiffs rely in particular on the third, fourth, fifth and twelfth recitals and on articles 3, 6, 7 and 8. Article 3 is relevant to their allegation that the Bank acted contrary to the Directive when it granted a full licence to BCCI SA to carry on business as a deposit-taker. Articles 6 and 7 are relevant to their allegation that it failed in its duty under the Directive to supervise

**[2003]** **208**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hope of Craighead**

BCCI SA and BCCI Overseas. Article 8 is relevant to their allegation that it had a duty under the Directive to revoke the licence which it had granted to BCCI SA. But it is necessary to have regard to some of the other recitals and articles in order to understand the overall effect of the Directive. The question in the case of each of the allegations against the Bank is whether, in terms of the conditions for *Becker*-type liability which were applied to *Francovich*-type liability in paragraph 22 of the *Dillenkofer* case [1997] QB 259, 292:

> "the result prescribed by the Directive entails the grant of rights to individuals, the content of those rights is identifiable on the basis of the provisions of the Directive and a causal link exists between the breach of the state's obligation and the loss and damage suffered by the injured parties."

As Lord Neill pointed out, the plaintiffs do not need to show that depositors were the only persons in whose favour obligations were imposed or on whom rights were conferred by the Directive. But in order to satisfy the *Dillenkofer* conditions they must be able to demonstrate that the result to be achieved by the Directive entailed the grant of rights to depositors and potential depositors as well as to the credit institutions operating in several member states whose activities were to be authorised and supervised by the competent authorities. A triangular or tripartite relationship is implied by this argument, between the competent authorities and the credit institutions on the one hand and the competent authorities and the depositors on the other. It is not too difficult to see, as the majority in the Court of Appeal observed, ante, p 76E-F that the Directive conferred rights on the credit institutions which were affected by it. What the plaintiffs have to do is to show that third parties to these arrangements, depositors and potential depositors, were also granted rights by the Directive on the application to its terms of the *Dillenkofer* test.

The first two recitals record the fact that the Treaty prohibited any discriminatory treatment from the end of the transitional period and that, in order to make it easier to take up and pursue the business of credit institutions, it was necessary to eliminate the most obstructive differences between the laws of the member states as to the rules to which these institutions were subject. The third, fourth and fifth recitals are in these terms:

> "Whereas, however, given the extent of these difference, the conditions required for a common market for credit institutions cannot be created by means of a single Directive; whereas it is therefore necessary to proceed by successive stages; whereas the result of this process should be to provide for overall supervision of a credit institution operating in several member states by the competent authorities in the member state where it has its head office, in consultation, as appropriate, with the competent authorities of the other member states concerned; Whereas measures to co-ordinate credit institutions must, both in order to protect savings and to create equal conditions of competition between these institutions, apply to all of them; whereas due regard must be had, where applicable, to the objective differences in their statutes and their proper aims as laid down by national law; Whereas the scope of these measures should

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

therefore be as broad as possible, covering all institutions whose business is to receive repayable funds from the public whether in the form of deposits or in other forms such as the continuing issue of bonds and other comparable securities and to grant credits for their own account; whereas exceptions must be provided for in the case of certain credit institutions to which this Directive cannot apply."

The plaintiffs rely upon the reference to the overall supervision of credit institutions in the third recital, upon the phrase "in order to protect savings" in the fourth recital and the reference in the fifth recital to the receipt of repayable funds from the public as indications that it was a purpose of the Directive to protect depositors. Taken in their context however these recitals seem to me to show that the Directive had a quite different purpose. This was, as the first step in a process which would have to proceed by successive stages, to co-ordinate the conditions for the supervision of all institutions of the kind mentioned in the fifth recital operating in several member states, bearing in mind the need for the co-ordinating measures to protect savings on the one hand and for them to create equal conditions of competition on the other.

The sixth to ninth recitals declare that the eventual aim of the harmonisation process was to introduce uniform authorisation requirements throughout the Community for comparable types of credit institution and that, while at the initial stage it was necessary to specify only certain minimum requirements to be imposed by all member states, the eventual aim could be achieved only if the particularly wide discretionary powers which certain supervisory authorities had for authorising credit establishments were progressively reduced. The tenth and eleventh recitals state that the purpose of co-ordination was to achieve a system whereby credit institutions having their head office in one of the member states were exempt from any national authorisation requirement when setting up branches in other member states, but that a measure of flexibility might nonetheless be possible in the initial stage. The twelfth recital, which explains the means by which the gradual approximation of the systems for the monitoring of solvency and liquidity of credit institutions established by the member states was to be brought about, begins with this proposition on which the plaintiffs rely: "Whereas equivalent financial requirements for credit institutions will be necessary to ensure similar safeguards for savers and fair conditions of competition between comparable groups of credit institutions ..." Here again however the point being made with regard to safeguards for savers and fair conditions of competition between institutions seems to me to be directed to the two requirements which the measures of co-ordination which the Directive was to lay down would have to satisfy, bearing in mind the fact that these measures would to some degree restrict the fundamental principle of freedom of establishment. Nothing turns on the wording of the remaining three recitals.

The first two articles of the Directive are comprised in Title I which deals with definitions and the scope of the Directive. Article 1 contains a number of definitions, including those of the expressions "credit institution" and "branch." It is worth noting that there is no definition of any expression referring to individuals in whose favour rights might be said to have been intended to be created by the Directive. If the result to be achieved was to

---

entail the granting of rights to individuals such as savers or depositors, I would have expected a definition such as that included in article 2 of the Directive (90/314/EEC) concerning package travel, package holidays and package tours which defines the expression "consumer". The meaning and effect of this Directive was considered in the *Dillenkofer* case [1997] QB 259, in *Verein fŸr Konsumenteninformation v …sterreichische Kreditversicherungs AG* (Case C-364/96) [1998] ECR I-2949 and in *Rechberger v*

*Austrian Republic* (Case C-140/97) [1999] ECR I-3499. In each of these cases the European Court held that article 7 of the Directive gave "consumers" a right to be reimbursed or repatriated in the event of the insolvency of the tour operator. The absence of a definition of that kind from the Directive of 1977 suggests that it was not the intention when the Directive was being drafted to grant rights under the Directive in favour of individuals or any group or class of individuals.

In a series of cases, referred to as "the German environmental cases", claims were brought by the Commission against Germany for its failure to implement Directives which laid down various requirements to be observed by member states in relation to water and air quality: e g *Commission of the European Communities v Federal Republic of Germany* (Case C-131/88) [1991] ECR I-825; *Commission of the European Communities v Federal Republic of Germany* (Case C-298/95) [1996] ECR I-6747. As Auld LJ noted, ante, p 126G, each of these Directives required member states to take specific measures to ensure that water or air was of the quality prescribed by the Directive, but they said nothing about the conferment of rights on individuals. Nevertheless the European Court held that the purpose of certain of the provision of these Directives was to create rights and obligations for individuals. In Case C-131/88 [1991] ECR I-825, 867 in para 7 the court said:

> "The Directive at issue in the present case seeks to protect the Community's groundwater in an effective manner by laying down specific and detailed provisions requiring the member states to adopt a series of prohibitions, authorisation schemes and monitoring procedures in order to prevent or limit discharges of certain substances. The purpose of those provisions of the Directive is thus to create rights and obligations for individuals."

I agree with the plaintiffs that these cases demonstrate that the potential width of the class of persons granted rights does not militate against the conclusion that the relevant provisions of these Directives were intended to create rights. This does not in itself mean that the persons intended to be granted rights are not sufficiently identifiable. But the cases also demonstrate that the question whether provisions in a Directive create rights and obligations for individuals depends in each case on the subject matter of the Directive, on the context and on the nature and purpose of the provisions which are in issue. The environmental cases were concerned with the protection of human health. This is a matter of concern to everybody, as we all share the environment in which we live. So the absence of a definition of the individuals who were granted rights by the Directives was of no importance. As the court said in Case C-298/95 [1996] ECR. I-6747, 6760:

---

> "15. As the Commission points out, one of the purposes of the Directives at issue is to protect human health through the monitoring of the quality of waters which support, or could support, fish suitable for human consumption ...
>
> "16. In those circumstances, it is particularly important that Directives should be transposed by measures which are indisputably binding. In all cases where non-implementation of the measures required by a Directive could endanger human health, the persons concerned must be in a position to rely on mandatory rules in order to assert their rights ..."

Article 2 of the Directive of 1977 begins with the proposition that the Directive "shall apply to the taking up and pursuit of the business of credit institutions". It then sets out a number of exceptions and qualifications, but these are not significant for present purposes.

The articles on which the plaintiffs mainly rely are in Title II of the Directive, which bears the headnote "Credit institutions having their head office in a member state and their branches in other member states" and comprises articles 3 to 8. But it is necessary to have regard also to article 10 which is included among

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 181 of 260
Pg 261 of 686

the general and transitional provisions in Title IV, as the Bank's contention is that when article 3 is read together with article 10 it is clear that it did not apply to BCCI SA which had already taken up business as a credit institution before the coming into force of the Banking Act 1979. Title III deals with the situation where credit institutions which have their head offices outside the Community have branches in a member state. There is nothing in article 9, which is the only article in Title III, which is relevant to this case.

The first two paragraphs of article 3 provide:

> "1. Member states shall require credit institutions subject to this Directive to obtain authorisation before commencing their activities. They shall lay down the requirements for such authorisation subject to paragraphs 2, 3 and 4 and notify them to both the Commission and the Advisory Committee. 2. Without prejudice to other conditions of general application laid down by national laws, the competent authorities shall grant authorisation only when the following conditions are complied with--the credit institutions must possess separate own funds--the credit institutions must possess adequate minimum own funds--there shall be at least two persons who effectively direct the business of the credit institution. Moreover, the authorities concerned shall not grant authorisation if the persons referred to in the third indent of the first sub-paragraph are not of sufficiently good repute or lack sufficient experience to perform such duties."

The words "before commencing their activities" in paragraph 1 of article 3 indicate that its function was to deal with the authorisation of credit institutions with their head offices in one member state which were seeking to carry on business in another member state after that member state had implemented the Directive. The plaintiffs claim in their re-amended statement of claim that BCCI SA was incorporated in Luxembourg in 1972, that it carried on business there as a bank under an authorisation issued by the Luxembourg authorities and that it established an office in London in the

---

**[2003]** **212**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hope of Craighead**

same year through which it had been carrying on business as a banker and deposit-taker for several years before it was granted a licence under the Banking Act 1979 by the Bank. On these facts it is plain that, as BCCI SA had already commenced its activities as a credit institution in the United Kingdom prior to the implementation of the Directive in domestic legislation by the Banking Act 1979, article 3 did not apply to it. The Bank says that no authorisation procedure was required by the Directive to enable it to continue with its activities. The fact that BCCI SA was granted a licence under the Banking Act 1979 which required all credit institutions to submit to the licensing procedure was a matter of domestic law only, not of Community law.

The Bank submits that this conclusion is confirmed by the first sub-paragraph of paragraph 1 and paragraphs 3 and 4 of article 10, which provide:

> "1. Credit institutions subject to this Directive, which took up their business in accordance with the provisions of the member states in which they have their head offices before the entry into force of the provisions implementing this Directive shall be deemed to be authorised. They shall be subject to the provisions of this Directive concerning the carrying on of the business of credit institutions and to the requirements set out in the first and third indents of the first sub-paragraph and in the second sub-paragraph of article 3(2) ... 3. If a credit institution deemed to be authorised under paragraph 1 has not undergone any authorisation procedure prior to commencing business, a prohibition on the carrying on of its business shall take the place of withdrawal of authorisation. Subject to the first sub-paragraph, article 8 shall apply by analogy. 4. By way of derogation from paragraph 1, credit institutions established in a member state without having undergone an authorisation procedure in that member

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 182 of 260
Pg 262 of 686

> state prior to commencing business may be required to obtain authorisation from the competent authorities of the member state, concerned in accordance with the provisions implementing this Directive. Such institutions may be required to comply with the requirement in the second indent of article 3(2) and with such other conditions of general application as may be laid down by the member state concerned."

The plaintiffs claim in their reply to this submission that the head office of BCCI SA was in London, not Luxembourg. They point out that there were no authorisation procedures for credit institutions in the United Kingdom prior to the coming into force of the Banking Act 1979. Furthermore all credit institutions were required to undergo the licensing procedure under that Act, irrespective of whether they had previously taken up business in the United Kingdom. The plaintiffs also say that, even if in making that requirement the United Kingdom was exercising its right of derogation under article 10(4), this would not affect the Bank's obligation to grant authorisation only on the conditions permitted by the Directive.

On the assumption that the facts stated in the re-amended statement of claim are true, there may be some force in the plaintiffs' argument that deemed authorisation under article 10(1) does not apply to BCCI SA as there were no "provisions" regulating the business of credit institutions when it commenced its activities in this country. But on balance it seems to me that this is to construe the word "provisions" too narrowly. An institution which

---

**[2003]** **213**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hope of Craighead**

was legitimately carrying on business here under the system of law in force at the time, as BCCI SA was doing because there was no prohibition to the contrary, could be said to be doing so "in accordance with the provisions" of the member state within the meaning of article 10(1). That provision does not stipulate any particular requirements which those provisions had to satisfy. In any event, this still leaves article 10 (4), which clearly does apply to BCCI SA as it had not undergone an authorisation procedure in the United Kingdom before commencing business here. The derogation provided by this paragraph, which permits a member state to require credit institutions which are legitimately carrying on business in that state to obtain authorisation on such conditions as may be laid down by that member state, is inconsistent with the view that BCCI SA, which was already legitimately carrying on its activities as a credit institution in the United Kingdom, required to be authorised under article 3(1).

The plaintiffs submit as a general principle that, where a member state voluntarily accepts obligations under Community law, it cannot escape its liabilities by saying that it need not have assumed these obligations in the first place. In support of this proposition they rely on *Wagner Miret v Fondo de Garant'a Salarial* (Case C-334/92) [1993] ECR I-6911, which concerned Directive 80/987 relating to the protection of employees in the event of the employer's insolvency. The Directive permitted member states to exclude certain categories of employee from the scope of the protection, and a list of the excluded categories of employee was set out in an annex to the Directive. Spain requested the exclusion of one category of employee only, and the exclusion of that category was entered in the list. It did not request the exclusion of the category of employee to which Mr Wagner Miret belonged. The European Court held that he was entitled to the protection of the Directive, and that it was no answer to say that Spain could have excluded that category from that protection if it had chosen to exercise the option to do so. It seems to me that that case provides no support for the argument that, in the reverse situation which arises under the Directive of 1977, the United Kingdom was obliged to require an institution which was already legitimately carrying on business here to be authorised. A requirement made under article 10(4) is voluntary, not obligatory. The exercise of the option to make that requirement cannot affect the scope of the obligation under article 3. I think that it is clear, as a matter of principle, that the voluntary incorporation by a member state of a provision in a Directive into national law which it is not obliged to incorporate under Community law does not give rise to a Community law obligation. The scope of that

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 183 of 260
Pg 263 of 686

provision is a matter for determination by the national courts as a part of the domestic law of the member state. The European Court may assist the national court in construing the Directive, but it does not follow that the obligation in question is a Community law obligation: see *Leur-Bloem v Inspecteur der Belastingdienst/Ondernemingen Amsterdam 2* (Case C-28/95) [1998] QB 182, 209, paras 33-34.

For these reasons I would hold that the Bank was not obliged by article 3(1) of the Directive to require BCCI SA to obtain authorisation as a condition of continuing to carry on its business in the United Kingdom. But even if it was obliged to do so as a matter of Community law, I do not find a sufficient indication, in the conditions for authorisation of credit institutions which are set out in article 3(2), that the result to be achieved by the

---

**[2003]** **214**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hope of Craighead**

Directive entailed the granting of rights to individuals or groups of individuals affected by their activities. The purpose of article 3(1), as indicated by the first, second and eighth recitals, was to take the first step towards the introduction of uniform authorisation requirements for comparable types of credit institution having their head office in one member state and their branches in other member states. The obligations which it imposed were designed to bring to an end, in a manner which was consistent with the nature of the business carried on by credit institutions, any discriminatory treatment as between the laws of member states with regard to establishment and the provision of these services.

Article 6(1) provides:

> "1. Pending subsequent co-ordination, the competent authorities shall, for the purposes of observation and, if necessary, in addition to such coefficients as may be applied by them, establish ratios between the various assets and/or liabilities of credit institutions with a view to monitoring their solvency and liquidity and the other measures which may serve to ensure that savings are protected. To this end, the Advisory Committee shall decide on the content of the various factors of the observation ratios referred to in the first sub-paragraph and lay down the method to be applied in calculating them. Where appropriate, the Advisory Committee shall be guided by technical consultations between the supervisory authorities of the categories of institutions concerned."

The plaintiffs rely on this article as the basis for their claim that the Bank were under on obligation owed to the depositors to supervise the activities of BCCI SA and BCCI Overseas at all times during the relevant period. Auld LJ said ante, p 106B-C:

> "Article 6 deals with supervision. In my view, and contrary to that of Clarke J [1996] 3 All ER 558, 616, it imposed on regulators immediate duties of a technical banking nature to 'ensure that savings are protected', and it did so in advance of the process and achievement of co-ordination. It is clear from the wording of the article and the context of the Directive as a whole, concerned as it is with 'the taking up *and pursuit* of the business of credit institutions' (my emphasis), that the intended purpose of the supervision was to ensure, as a minimum, continuing compliance with the requirements of authorisation under article 3."

In my opinion however article 6, although concerned with supervision, had a more limited purpose in view. As the twelfth recital indicates, it imposed a duty on the supervisory authorities, pending subsequent co-ordination, to formulate structural ratios which would make it possible for the national authorities to co-operate with each other in the setting of standards, or coefficients, to ensure the sound management of credit institutions which in due course would be co-ordinated between member states. The ultimate aim was to set equivalent financial standards which would, in terms of the recital, achieve the twin requirements noted by ECOSOC of ensuring "similar safeguards for savers and fair conditions of

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 184 of 260
Pg 264 of 686

competition between comparable groups of credit institutions". It did not impose a duty of supervision. The assumption on which it proceeds is that the competent authorities in each member state would be performing that function under the national law of that member state. No minimum

[2003] 215
2 AC Three Rivers DC v Bank of England (No 3) (HL(E)) Lord Hope of Craighead

standards of supervision or other criteria are laid down in the article. The whole emphasis is on co-operation between the supervisory authorities, with a view to harmonisation in due course of the means by which the performance of credit institutions carrying on business in more than one member state could be monitored. The protection of savings was assumed to be the purpose of the monitoring system. But it was not necessary in order to establish observation ratios and their co-ordination between member states to impose a Community law duty of supervision or to grant rights in that regard to individuals or groups of individuals.

Article 7 is also concerned with supervision. Here again Auld LJ was of the view that it imposed a duty to supervise: ante, p 106F-G. But I think that the duty which it imposed was one of co-operation between the supervisory authorities. Paragraph 1 of the article provides:

> "The competent authorities of the member states concerned shall collaborate closely in order to supervise the activities of credit institutions operating, in particular by having established branches there, in one or more member states other than that in which their head offices are situated. They shall supply one another with all information concerning the management and ownership of such credit institutions that is likely to facilitate their supervision and the examination of the conditions for their authorisation and all information likely to facilitate the monitoring of their liquidity and solvency."

As in the case of article 6, article 7 assumed the existence in each member state of a competent authority or competent authorities whose function it was to supervise the activities of credit institutions in that member state.

Prior to the implementation of the Directive of 1977 there were no supervisory authorities in either the United Kingdom or Denmark. So it was necessary, to give effect to the Directive, for authorities to be set up with the function of supervising credit institutions operating in those member states. An obligation to do so is not expressed in article 7. It is to be found in the third paragraph of article 189 of the EEC Treaty (now article 249 EC), which provides that a Directive is to be binding as to the result to be achieved but leaves the choice of form and methods to each member state. Here again however it is necessary to distinguish between the duty under Community law for an authority to be set up under the national law of each member state whose function it was to supervise and the duty under article 7 of the supervisory authorities of each member state to co-operate. I do not think that article 7, which refers to the sharing of information "likely to facilitate" supervision, examination and monitoring, imposed a duty under Community law to supervise. The absence from the article of any prescribed system of supervision, and of any criteria or standards to be applied by the supervisory authority, is an indication to the contrary. It is noteworthy that, although the plaintiffs claim that there was a general duty to supervise, they do not point to the breach by the Bank of any particular duties of supervision imposed by either article 6 or article 7.

The plaintiffs rely upon the observations of Advocate General Sir Gordon Slynn in *Municipality of Hillegom v Hillenius*(Case 110/84) [1985] ECR 3947, 3948, where he said that article 7 of the Directive of 1977 "provides that the supervisory authorities of the various member states shall collaborate closely in order to supervise credit institutions operating in more

[2003] 216

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 185 of 260
Pg 265 of 686

**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hope of Craighead**

than one member state". I do not think that this comment, which simply repeats the wording of paragraph 1 of the article, is in any way inconsistent with the view which I have formed, that the duty under article 7 is a duty to collaborate in order to assist the competent authorities in the performance of their supervisory functions under national law. The observations which the European Court made in its judgment, at p 3963, paras 26 and 27, to the effect that the Directive was designed to facilitate the overall monitoring of credit institutions operating in more than one member state by the competent authorities of the member state in which the credit institution has its head office and about the need for the monitoring of banks through supervision within a member state and the exchange of information by the competent authorities to function properly, do not go to the length of suggesting that the court saw the Directive as entailing the grant of rights to individual depositors.

The plaintiffs also rely on *Carbonari v Universitˆ degli studi di Bologna* (Case C-131/97) [1999] ECR I-1103. That was a case which was concerned with the direct effect of provisions in two Directives (82/76/EEC amending 75/362/EEC and 75/363/EEC). The first of which related to training periods and remuneration of doctors. Detailed provisions were included about the training requirements, and there was a provision in the Annex to the Directive of 1975 that the posts which specialists were to hold while in full-time training were to be "subject to appropriate remuneration". The European Court, at pp 1133-1134, paras 44-47 of its judgment applied the first limb of the *Becker* test. The right of the medical students to appropriate remuneration during their training period was in itself unconditional and sufficiently precise. But the Directives were not unconditional as to which institution was to bear the obligation to pay the remuneration. They did not include any Community definition of the remuneration which was to be regarded as appropriate or the methods by which it was to be fixed to enable the national court to determine the body liable to pay it or the level at which it was to be paid. Such definitions were to be a matter for the member states when they were implementing the Directive. In other words, as the Directive did not itself define as a matter of Community law what was appropriate remuneration or lay down a Community law method to fix that amount, the medical students had no Community right which they could enforce to obtain payment.

The plaintiffs say that the *Carbonari* case supports their claim that articles 6 and 7 imposed a duty of supervision notwithstanding that the precise methods or forms of supervision are not specified in the Directive. In my opinion however the case tends to support the Bank's argument. None of the provisions in articles 6 and 7 of the Directive of 1977 define any categories of individual on whom rights were being conferred, nor do they state in obligatory terms that the credit institutions "shall be subject to appropriate supervision" by the competent authorities. Even if such an obligation in general terms could be said to be implied, the absence of even the slightest amount of detail as to the system of supervision required by Community law which was to be adopted and enforced by the national courts would make it impossible to say that, as matter of Community law, the obligation to supervise was unconditional and sufficiently precise to satisfy the *Becker*-type liability test.

---

**[2003]** **217**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hope of Craighead**

The plaintiffs also rely on article 8 which deals with the withdrawal of authorisation. Paragraphs 1 and 2 of this article provide:

> "1. The competent authorities may withdraw the authorisation issued to a credit institution subject to this Directive or to a branch authorised under article 4 only where such an institution or branch: (a) does not make use of the authorisation within 12 months, expressly renounces the authorisation or has ceased to engage in business for more than six months, if the member state concerned has made no provision for the authorisation to lapse in such cases; (b) has obtained the authorisation through false

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

statements or any other irregular means; (c) no longer fulfils the conditions under which authorisation was granted, with the exception of those in respect of own funds; (d) no longer possess sufficient own funds or can no longer be relied upon to fulfil its obligations towards its creditors, and in particular no longer provides security for the assets entrusted to it; (e) falls within one of the other cases where national law provides for withdrawal of authorisation. 2. In addition, the authorisation issued to a branch under article 4 shall be withdrawn if the competent authority of the country in which the credit institution which established the branch has its head office has withdrawn authorisation from that institution."

In my opinion the key word in paragraph 1 is the word "only" which precedes the list of the various situations in which authorisation may be withdrawn. It seems to me that this is a limiting provision, as indicated by the second recital, with a view to eliminating differences between the laws of member states. The reference in sub-paragraph (e) to cases where "national law provides for withdrawal of authorisation" ensures that the matter is not left to the administrative discretion of the competent authority in that member state.

Auld LJ said, ante, p 107G-H, that he recognised the fact that, while paragraph 2 was obligatory, paragraph 1 was in general terms permissive in the various circumstances specified. But his view was that the article should be read as imposing a duty on competent authorities to withdraw authorisation in the circumstances referred to in sub-paragraphs (c) and (d). He added this explanation, at pp 107H-108A:

"It is inconceivable that the Directive should be read so as to require banking regulators to insist on certain minimum requirements of authorisation and to supervise to ensure continued satisfaction of them, yet leave them with a discretion, unspecified as to criteria, to permit continuance of trading without check or condition when those requirements are no longer met."

On my reading of the Directive as a whole however, it is to be regarded as laying down a series of provisions with a view to the harmonisation of the criteria to be applied to credit institutions having their head office in a member state and their branches in other member states. That being so, there is nothing surprising in an approach to the withdrawal of authorisation in the circumstances referred to in paragraph 1 which permits withdrawal in these, and only these, circumstances but provides that withdrawal in the situation mentioned in paragraph 2 is to be obligatory. I do not think that there is anything here which entails the grant of rights to

---

individuals to insist upon the withdrawal of authorisation in the circumstances mentioned in paragraph 1. For their part, the credit institutions could hardly object to a decision to withdraw authorisation in the circumstances mentioned in sub-paragraphs (c) and (d) of paragraph 1 which, in order to protect savings, it was obviously necessary to include in the list of circumstances in which the withdrawal of authorisation was to be permissible.

*Conclusion*

Looking back at the Directive as a whole, the key to a proper understanding of its purpose and effect seems to me to lie in the fact that it was the first step in a process of harmonisation of provisions for the regulation of credit institutions carrying on business within the Community. It was about the removal of barriers to the right of establishment under article 52 of the EEC Treaty (now article 43 EC). It confined itself to imposing a number of minimum conditions and prohibitions on member states as to the authorisation and supervision of credit institutions having their head offices in another member state or

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 187 of 260
Pg 267 of 686

having their head offices outside the Community. It was based upon an appreciation of the fact that credit institutions require regulation in order to protect savings. So any measures of harmonisation had to meet the twin requirements of protecting savings on the one hand and creating conditions of equal competition between credit institutions operating in more than one member state on the other. It placed duties of co-operation on the competent authorities where a credit institution was operating in one or more member state other than that in which its head office was situated. But it stopped short of prescribing any duties of supervision to be performed by the competent authority within each member state. It is not possible to discover provisions which entail the granting of rights to individuals, as the granting of rights to individuals was not necessary to achieve the results which were intended to be achieved by the Directive.

For these reasons I am unable, with great respect, to agree with Auld LJ's conclusions, ante, pp 95E-96A, that the Directive of 1977 imposed clearly defined obligations on member states and on their regulatory bodies and that in doing so it gave rise to corresponding Community law rights in depositors to enforce those obligations by an action of damages. I prefer the views of Clarke J [1996] 3 All ER 558, 616, where he said:

> "The true position, as it seems to me, is that the Directive was not intended to require the imposition of a duty to supervise upon the supervisory authority because, whatever the underlying purpose of the system of supervision, the immediate purpose of the Directive, rather like that in *R v International Stock Exchange of the UK and the Republic of Ireland Ltd, Ex p Else (1982) Ltd, R v International Stock Exchange of the UK and the Republic of Ireland Ltd, Ex p Roberts* [1993] QB 534, was a first step towards harmonisation of the systems in the member states, which were assumed to and no doubt did exist. Its purpose was not to lay down the duty to supervise or radically to alter existing systems, but, even if was, it was not (as I see it) to confer rights upon either savers or other creditors."

The majority in the Court of Appeal did not examine the provisions of the Directive in detail. But they said, ante, p 76E-G:

---

**[2003]** **219**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hope of Craighead**

> "In our judgment it is reasonably clear that the Directive of 1977 does confer enforceable rights on credit institutions which are to be supervised under its provisions. In particular, a credit institution which was refused authorisation for reasons incompatible with article 3, or which had its authorisation withdrawn which for reasons incompatible with article 8, would (in the event of non-transposition of the Directive of 1977) most probably have had a right to challenge the Bank's decision on the basis that the *Becker* conditions [1982] ECR 53 were satisfied. But there is not in our judgment any sufficient clarity or certainty in the position of depositors (or other customers of credit institutions)."

Subject to the qualifications that I have substituted the *Francovich* test as applied in *Dillenkofer* for the *Becker* test, on the view that it is more precise and covers both types of liability, and that I do not accept that credit institutions were to be "supervised under" the provisions of the Directive, I agree with the conclusions of the majority on this issue. I would therefore dismiss the appeal on the Community law claim.

In the courts below neither party asked for a preliminary reference under article 234 EC (ex article 177 EEC) on the issues relating to the plaintiffs' claim under Community law. Clarke J said [1996] 3 All ER 558, 625E-F, that he would have referred the matter as to the meaning and effect of the Directive of 1977 had the parties not requested him to give a judgment on the Community law issue without doing so. In the Court of Appeal the majority said, at p 77B-C, that they did not regard the question of *Becker*-type liability as acte clair, but that as a matter of discretion the court had decided not to make a reference. The parties' unanimity in asking the court not to make a reference had been a significant factor in that decision. That

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 188 of 260
Pg 268 of 686

unanimity was departed from in your Lordships' House. The plaintiffs, having regard to the observations in the courts below, to the fact that there was dissenting judgment in the Court of Appeal and to what they saw as a change of position by the Bank as regards the purpose and intent of the Directive of 1977, have asked for a reference under article 234 EC (ex article 177 EEC) on the question whether the Directive conferred rights, and if so what rights, on depositors which they can exercise against the competent authority designated by the member state for the purpose of carrying out that member state's obligations under the Directive.

I am of the opinion that it would not be appropriate for a reference to be made to the European Court on the critical question in this case, which is whether the Directive of 1977 entailed the granting of rights to individual depositors and potential depositors. I consider that this matter, on which I understand your Lordships to be unanimous and on which we have had the benefit of very full and helpful submissions both orally and in writing from both sides, is acte clair. So I would decline the plaintiffs' request that we should make a reference in this case.

I would make the same order as that proposed by my noble and learned friend, Lord Steyn.

**LORD HUTTON** My Lords, the action for misfeasance in public office has long been recognised by English law. In some of the cases in the 18th and 19th centuries there are statements that the plaintiff must establish that the defendant was actuated by malice towards him and intended to injure him in

---

**[2003]** **220**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hutton**

the way in which he discharged his public duty; in modern cases this is referred to as "targeted malice". In *Harman v Tappenden* (1801) 1 East 555, Lawrence J said, at pp 562-563:

> "There is no instance of an action of this sort maintained for an act arising merely from error of judgment. Perhaps the action might have been maintained, if it had been proved that the defendants contriving and intending to injure and prejudice the plaintiff, and to deprive him of the benefit of his profits from the fishery, which as a member of this body he was entitled to according to the custom, had *wilfully and maliciously* procured him to be disfranchised, in consequence of which he was deprived of such profits. But here there was no evidence of any wilful and malicious intention to deprive the plaintiff of his profits, or that they had disfranchised him with that intent, which is necessary to maintain the action."

But other cases suggest that an unlawful act done with an improper motive is sufficient to constitute the tort.

In *Tozer v Child* (1857) 7 E & B 377, 379 Lord Campbell CJ directed the jury that:

> "the defendants were not necessarily liable in this action, although the plaintiff, notwithstanding his non-payment of the said church rate, was qualified and entitled to vote, and to be a candidate at the said election, as he alleged: and that it was incumbent on the plaintiff to make out that the acts of the defendants complained of were malicious; and that malice might be proved, not only by evidence of personal hostility or spite, but by evidence of any other corrupt or improper motive ..."

In *Bourgoin SA v Ministry of Agriculture, Fisheries and Food* [1986] QB 716 the issue was debated whether the defendant must intend to injure the plaintiff and it was held that damages could be recovered for misfeasance in public office where the defendant acted deliberately, not with the intent to harm the plaintiff, but with knowledge that he had no power to act as he did and that his action would injure the plaintiff. In that case the Minister of Agriculture, knowing that he had no power to do so, prohibited the importation of French turkeys into the United Kingdom knowing that the prohibition must necessarily

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

injure French turkey producers but acting with the motive, not of injuring them, but of benefiting English producers. French producers claimed damages for misfeasance in public office.

Mann J rejected the argument that an intent to injure the plaintiff was an essential ingredient of the tort and stated, at p 740:

> "I do not read any of the decisions to which I have been referred as precluding the commission of the tort of misfeasance in public office where the officer actually knew that he had no power to do that which he did, and that his act would injure the plaintiff as subsequently it does. I read the judgment in *Dunlop v Woollahra Municipal Council* [1982] AC 158 in the sense that malice and knowledge are alternatives. There is no sensible reason why the common law should not afford a remedy to the injured party in circumstances such as are before me. There is no sensible distinction between the case where an officer performs an act which he has no power to perform with the object of injuring A (which

---

> the defendant accepts is actionable at the instance of A) and the case where an officer performs an act which he knows he has no power to perform with the object of conferring a benefit on B but which has the foreseeable and actual consequence of injury to A (which the defendant denies is actionable at the instance of A). In my judgment each case is actionable at the instance of A ..."

His judgment on this point was upheld by the Court of Appeal and Oliver LJ stated, at p 777:

> "For my part, I too can see no sensible distinction between the two cases which the judge mentions. If it be shown that the minister's motive was to further the interests of English turkey producers by keeping out the produce of French turkey producers--an act which must necessarily injure them--it seems to me entirely immaterial that the one purpose was dominant and the second merely a subsidiary purpose for giving effect to the dominant purpose. If an act is done deliberately and with knowledge of its consequences, I do not think that the actor can sensibly say that he did not 'intend' the consequences or that the act was not 'aimed' at the person who, it is known, will suffer them."

The principal issue which arises for determination on the present appeal is whether in order to succeed the plaintiffs must prove that the public officers of the Bank of England knew that their unlawful acts or omissions would probably injure them or persons in a class of which they were members or that the officers were subjectively reckless as to such likely injury.

In a learned judgment [1996] 3 All ER 558, 632-633, after a full and detailed consideration of the authorities, Clarke J summarised his conclusions as to the ingredients of the tort:

> "1. Misfeasance in public office. (1) The tort of misfeasance in public office is concerned with a deliberate and dishonest wrongful abuse of the powers given to a public officer. It is not to be equated with torts based on an intention to injure, although, as suggested by the majority in *Northern Territory v Mengel* 69 ALJR 527, it has some similarities to them. (2) Malice, in the sense of an intention to injure the plaintiff or a person in a class of which the plaintiff is a member, and knowledge by the officer both that he has no power to do the act complained of and that the act will probably injure the plaintiff or a person in a class of which the plaintiff is a member are alternative, not cumulative, ingredients of the tort. To act with such knowledge is to act in a sufficient sense maliciously: see the *Mengel* case 69 ALJR 527, 554, per Deane J. (3) For the purposes of the requirement that the officer knows that he has no power to do the act complained of, it is sufficient that the officer has actual knowledge that the act was unlawful or, in circumstances in which he believes or suspects that the act is beyond his powers, that he does not ascertain whether or not that is so or fails to take such steps as would be taken by an honest and reasonable man to ascertain the true position. (4) For the purposes of

the requirement that the officer knows that his act will probably injure the plaintiff or a person in a class of which the plaintiff is a member it is sufficient if the officer has actual knowledge that his act will probably damage the plaintiff or such a person or, in circumstance in which he believes or suspects that his act will probably damage the

---

plaintiff or such a person, if he does not ascertain whether that is so or not or if he fails to make such inquiries as an honest and reasonable man would make as to the probability of such damage. (5) If the states of mind in (3) and (4) do not amount to actual knowledge, they amount to recklessness which is sufficient to support liability under the second limb of the tort. (6) Where a plaintiff establishes (i) that the defendant intended to injure the plaintiff or a person in a class of which the plaintiff is a member (limb one) or that the defendant knew that he had no power to do what he did and that the plaintiff or a person in a class of which the plaintiff is a member would probably suffer loss or damage (limb two) and (ii) that the plaintiff has suffered loss as a result, the plaintiff has a sufficient right or interest to maintain an action for misfeasance in public office at common law. The plaintiff must of course also show that the defendant was a public officer or entity and that his loss was caused by the wrongful act."

In the judgments of the Court of Appeal on appeal by the plaintiffs there was again a learned and comprehensive review of the authorities. The majority of the court, Hirst and Robert Walker LJJ, expressed broad agreement with the conclusions of Clarke J and dismissed the appeal. In his dissenting judgment Auld LJ held that as the core of misfeasance in public office is abuse of power it is sufficient for a plaintiff to prove that the abuse of power was an effective cause of his loss and that there is no requirement for the plaintiff to prove foresight of probable harm on the part of the public officer. Auld LJ stated, ante, p 162D-F:

"It follows that, in my view, the test of abuse of power--dishonesty--by a public officer does not necessarily include as an essential ingredient some appreciation by the officer of an injurious consequence. A public officer who dishonestly disregards his plain duty or who does not honestly attempt to do it, acts at his peril, and if injury results he is liable for it. But, even if I am wrong about that, I can see no basis, whether as a matter of interpretation of Mann J's judgment in the *Bourgoin* case [1986] QB 716 or otherwise, for requiring a plaintiff in a claim for misfeasance in public office to prove foresight in at least the form of suspicion of probable harm. That would be a much more onerous burden than that imposed on a plaintiff in a negligence claim, where the defendant is not necessarily a public officer and the claimant has not had to go to the lengths of proving dishonesty. Interestingly, it could also be more onerous than that in a tort of intentional injury such as fraudulent misrepresentation."

Before this House the principal submission of Lord Neill, on behalf of the plaintiffs, was that the *Bourgoin* case established that there was a second limb of the tort, separate and distinct from the limb constituted by abuse of power with the intent to injure, and that the second limb was constituted by a public officer abusing his power by knowingly acting unlawfully. When such an abuse of power is established and where it is also proved that the abuse has caused loss to the plaintiff the law does not require, and there is no reason why it should require, that for liability to arise there should be foresight by the public officer that loss will probably occur to the plaintiff or

---

to a class of persons to whom the plaintiff belongs, or that there should be subjective recklessness as to such likely loss.

My Lords, I am unable to accept this argument for two principal reasons. The first reason is that I consider that the second limb of the tort cannot be viewed in isolation from the first limb and that the concept of targeted malice which is the underlying principle of the first limb exercises a restrictive effect on the ambit of the second limb. This is implicit in the passage of the judgment of Oliver LJ in the *Bourgoin* case [1986] QB 716, 777 which I have quoted above because Oliver LJ said:

> "If an act is done deliberately and with knowledge of its consequences, I do not think that the actor can sensibly say that he did not 'intend' the consequences or that the act was not 'aimed' at the person who, it is known, will suffer them."

Therefore it was his opinion that if a person acts deliberately, knowing that his action will injure another person, he must be taken to intend the consequences and is equated with the person who acts with the intent to cause injury. This is a view which is inconsistent with a liability which arises where there is an abuse of power without knowledge that it will probably injure the plaintiff but where the abuse is an effective cause of such injury.

The judgments of the High Court of Australia in *Northern Territory of Australia v Mengel*, 69 ALJR 527 and the judgment of the Court of Appeal of New Zealand in *Garrett v Attorney General* [1997] 2 NZLR 332 are the second factor which leads me to reject the wider ambit of the second limb of the tort contended for by the plaintiffs. In those two cases there was a full discussion of the issue now before this House (save that in the *Mengel* case the distinction between foresight by the public officer and objective foreseeability was not directly considered) and in both cases it was held that it was insufficient for the plaintiff to show a knowing breach of duty by a public officer coupled with resultant injury.

In the *Mengel* case stock inspectors employed by the defendant, without statutory or other authority, wrongly quarantined the plaintiffs' cattle whereby the plaintiffs suffered loss. Before the High Court of Australia the plaintiffs contended that they were entitled to succeed on a claim for misfeasance in public office, and they argued that the mental element of that tort is made out if the public officer either knows or ought to know that he is acting without authority and the unlawful exercise of the power results in damage. This argument was rejected by the High Court. In their joint judgment Mason CJ, Dawson, Toohey, Gaudron and McHugh JJ stated, at p 540:

> "The cases do not establish that misfeasance in public office is constituted simply by an act of a public officer which he or she knows is beyond power and which results in damage. Nor is that required by policy or by principle. Policy and principle both suggest that liability should be more closely confined. So far as policy is concerned, it is to be borne in mind that, although the tort is the tort of a public officer, he or she is liable personally and, unless there is de facto authority, there will ordinarily only be personal liability. And principle suggests that misfeasance in public office is a counterpart to, and should be confined in the same way as, those torts which impose liability on private individuals

---

> for the intentional infliction of harm. For present purposes, we include in that concept acts which are calculated in the ordinary course to cause harm, as in *Wilkinson v Downton* [1897] 2 QB 57, or which are done with reckless indifference to the harm that is likely to ensue, as is the case where a person, having recklessly ignored the means of ascertaining the existence of a contract, acts in a way that procures its breach. It may be that analogy with the torts which impose liability on private individuals for the intentional infliction of harm would dictate the conclusion that, provided there is damage,

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 192 of 260
Pg 272 of 686

liability for misfeasance in public office should rest on intentional infliction of harm, in the sense that that is the actuating motive, or on an act which the public officer knows is beyond power and which is calculated in the ordinary course to cause harm. However, it is sufficient for present purposes to proceed on the basis accepted as sufficient in the *Bourgoin* case, namely, that liability requires an act which the public officer knows is beyond power and which involves a foreseeable risk of harm."

Brennan J stated, at p 546:

"I respectfully agree that the mental element is satisfied either by malice (in the sense stated) or by knowledge. That is to say, the mental element is satisfied when the public officer engages in the impugned conduct with the intention of inflicting injury or with knowledge that there is no power to engage in that conduct and that that conduct is calculated to produce injury. These are states of mind which are inconsistent with an honest attempt by a public officer to perform the functions of the office. Another state of mind which is inconsistent with an honest attempt to perform the functions of a public office is reckless indifference as to the availability of power to support the impugned conduct and as to the injury which the impugned conduct is calculated to produce. The state of mind relates to the character of the conduct in which the public officer is engaged--whether it is within power and whether it is calculated (that is, naturally adapted in the circumstances) to produce injury."

Deane J stated, at p 554:

"In the context of misfeasance in public office, the focus of the requisite element of malice is injury to the plaintiff or injury to some other person through an act which injuriously affects the plaintiff. Such malice will exist if the act was done with an actual intention to cause such injury. The requirement of malice will also be satisfied if the act was done with knowledge of invalidity or lack of power and with knowledge that it would cause or be likely to cause such injury. Finally, malice will exist if the act is done with reckless indifference or deliberate blindness to that invalidity or lack of power and that likely injury. Absent such an intention, such knowledge and such reckless indifference or deliberate blindness, the requirement of malice will not be satisfied."

The judgment of Deane J is important because, as in the judgment of Oliver LJ in the *Bourgoin* case [1986] QB 716, it emphasises that the second limb of the tort is a species of malice, and that the requirement for malice is satisfied where the public officer knows that the abuse of power will cause injury, or is recklessly indifferent or deliberately blind to the likely injury.

---

**[2003]** **225**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hutton**

Lord Neill relied on a passage in the judgment of Brennan J where he said, at p 547:

"It is the absence of an honest attempt to perform the functions of the office that constitutes the abuse of the office. Misfeasance in public office consists of a purported exercise of some power or authority by a public officer otherwise than in an honest attempt to perform the functions of his or her office whereby loss is caused to a plaintiff. Malice, knowledge and reckless indifference are states of mind that stamp on a purported but invalid exercise of power the character of abuse of or misfeasance in public office. If the impugned conduct then causes injury, the cause of action is complete."

But in my opinion this passage cannot be read in isolation and must be read together with the earlier passage, at p 546, which I have quoted.

In *Garrett v Attorney General* [1997] 2 NZLR 332 the plaintiff claimed that there had been an abuse of power by a police sergeant who had failed to investigate properly her complaint that she had been raped by

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

a police constable in a police station. The Court of Appeal held that to succeed in a claim for misfeasance in public office the plaintiff had to prove that the public officer knew that his disregard of his duty would injure the plaintiff or that the officer was recklessly indifferent to the consequences for the plaintiff.

In its judgment the Court of Appeal set out Clarke J's summary of his conclusions which I have set out earlier in this judgment and stated their agreement with them, at pp 349-350:

> "We are in respectful agreement with Clarke J that it is insufficient to show foreseeability of damage caused by a knowing breach of duty by a public officer. The plaintiff, in our view, must prove that the official had an actual appreciation of the consequences for the plaintiff, or people in the general position of the plaintiff, of the disregard of duty or that the official was recklessly indifferent to the consequences and can thus be taken to have been content for them to happen as they would. The tort has at its base conscious disregard for the interests of those who will be affected by official decision making. There must be an actual or, in the case of recklessness, presumed intent to transgress the limits of power even though it will follow that a person or persons will be likely to be harmed. The tort is not restricted to a case of deliberately wanting to cause harm to anyone; it also covers a situation in which the official's act or failure to act is not directed at the injured party but the official sees the consequences as naturally flowing for that person when exercising power. In effect this is no more than saying the tort is an intentional tort. In this context, a person intends to bring about the known consequences of his or her actions or omissions, even if other consequences form the primary motive. *Bourgoin* is an example. The concept of attributing intention by necessary inference in this way is well established."

The court also stated the reasons why it considered that the tort should not be extended to cover a wrongful act done without a realisation of the consequences for the plaintiff and stated, at pp 350-351:

> "The purpose behind the imposition of this form of tortious liability is to prevent the deliberate injuring of members of the public by deliberate

---

> disregard of official duty. It is unnecessary, to attain this objective, to extend the tort to catch an act which, though known to be wrongful, is done without a realisation of the consequences for the plaintiff. The law may still provide a remedy in negligence if the situation is one of those in which it is appropriate to impose a duty of care or, if the plaintiff is someone intended by statute to have the particular benefit or protection of an Parl Actiament or subordinate legislation, the plaintiff may have a remedy in the form of an action for breach of statutory duty; or the circumstances may give rise to another of the traditional tort actions, for instance, for false imprisonment or assault ... In our view this intentional tort should not be allowed to overflow its banks and cover the unintentional infliction of damage. In many cases the consequences of breaking the law will be obvious enough to officials, who can then be taken to have intended the damage they caused. But where at the time they do not realise the consequences they will probably not be deterred from exceeding their powers by any enlargement of the tort. As Clarke J observes, they may well think that they are acting in the best interests of those persons whom they actually have in mind. In any modern society administration of central or local government is complex. Overly punitive civil laws may oftentimes deter a commonsense approach by officials to the use or enforcement of rules and regulations. We prefer to err on the side of caution and not to extend the potential liability of officials for causing unforeseen damage. To do so may have a stultifying effect on governance without commensurate benefit to the public ... The common law has long set its face against any general principle that invalid administrative action by itself gives rise to a cause of action in damages by those who have suffered loss as a consequence of that action. There must be something more. And in the case of misfeasance of public office that something more, it seems to

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 194 of 260
Pg 274 of 686

us, must be related to the individual who is bringing the action. While the cases have made it clear that the malice need not be targeted there must, as we have said, be a conscious disregard for the interests of those who will be affected by the making of the particular decision."

The opinion of the New Zealand Court of Appeal, in agreement with Clarke J, that it is insufficient for the plaintiff to show objective foreseeability that the breach of duty will probably cause damage and that it must be proved that the public officer himself foresaw the probability of damage, or was reckless as to the harm which is likely to ensue, is the same as the view taken by Deane J in the *Mengel* case 69 ALJR 527. I also consider that the opinion of Brennan J is not inconsistent with it as, at p 546, he referred to "conduct ... calculated to produce injury". In the *Bourgoin* case [1986] QB 716 the minister knew that the prohibition would harm French turkey producers and therefore the issue as between foresight and foreseeability did not have to be determined by Mann J, but as Clarke J pointed out in his judgment [1996] 3 All ER 558, 568, Mann J had previously referred more than once to the public officer knowing that his act would injure the plaintiff, and I agree with Clarke J that Mann J must have meant "foreseen" [1986] QB 716, 740F in the passage of his judgment which I have quoted above.

I further consider that the judgment in the *Garrett* case provides an answer to the submission that if there is a deliberate or reckless abuse of power which

---

**[2003]** **227**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hutton**

causes harm the injured party is entitled to recover damages whether or not the officer foresaw the harm. This view of the tort separates the abuse of power from the resultant harm and regards the unlawful exercise of the power, viewed in isolation from its consequences, as the essence of the tort, whereas the New Zealand Court of Appeal, rightly in my opinion, does not detach the unlawful conduct from its consequences but regards the abuse of power as consisting in the unlawful exercise of a power by a public officer with knowledge that it is likely to harm another citizen, when the power is given to be exercised for the benefit of other citizens. As the court stated [1997] 2 NZLR 332, 349: "The tort has at its base conscious disregard for the interests of those who will be affected by official decision making."

In the present case Clarke J and the Court of Appeal were of opinion that to constitute the tort of misfeasance there must be a dishonest abuse of power by the public officer. In the course of his submissions that the tort is established under the second limb in the *Bourgoin* case when a public officer knowingly acts unlawfully in the purported exercise of his power and the unlawful exercise of the power causes loss to the plaintiff, Lord Neill accepted that an improper motive is an essential ingredient and said that improper motive was alleged by the plaintiffs. On behalf of the Bank Mr Stadlen submitted that it was a requirement of the tort in every case that the public officer should have acted dishonestly. In considering this point it is necessary to recognise, as Mr Stadlen did in his submissions, that in most cases, as a matter of reality, a finding by the tribunal of fact that a public officer knew that he was acting unlawfully and that his actions would probably injure the plaintiff would lead to a finding that he was acting dishonestly. Mr Stadlen submitted that in most cases the element of dishonesty would permeate a finding of knowledge of unlawfulness and probability of harm, but he contended that dishonesty was an element which was always necessary and that there might be exceptional cases where, notwithstanding knowledge of unlawfulness and probability of harm, the plaintiff would fail in his action because he failed to prove dishonesty.

My Lords, I consider that dishonesty is a necessary ingredient of the tort, and it is clear from the authorities that in this context dishonesty means acting in bad faith. In some cases the term "dishonesty" is not used and the term "in bad faith" or acting from "a corrupt motive" or "an improper motive" is used, or the term "in bad faith" is used together with the term "dishonesty". In *Cullen v Morris* 2 Stark 577, 589 Lord Abbott CJ in directing the jury said:

"The question for your consideration is, whether the refusal of the vote in this instance, was founded on an improper motive on the part of the defendant, it is for you to pronounce your opinion, whether

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 195 of 260
Pg 275 of 686

the defendant's conduct proceeded from an improper motive, or from an honest intention to discharge his duty acting under professional advice."

The judgment of Buxton LJ in *Barnard v Restormel Borough Council* [1998] 3 PLR 27 is a modern example of how the terms "dishonesty" and "bad faith" are used interchangeably. In that case where misfeasance in public office was alleged Buxton LJ in delivering his judgment said, at p 33: "We bear in mind the need to establish dishonesty" and later, at p 37, he referred to the strong emphasis placed "in the tort of misfeasance on the requirement of subjective bad faith". However, as the term "dishonesty" in some

[2003] 228
2 AC Three Rivers DC v Bank of England (No 3) (HL(E)) Lord Hutton

contexts implies a financial motive, I consider that the term "in bad faith" is a preferable term to use and, as I have stated, I consider that it is an essential ingredient in the tort.

I agree with the opinion of Clarke J [1996] 3 All ER 558, 583A, that the tort can be constituted by an omission by a public officer as well as by acts on his part. As Brennan J stated in the *Mengel* case 69 ALJR 527, 545: "Any act or omission done or made by a public official in purported performance of the functions of the office can found an action for misfeasance in public office." But whether the public officer is sued in respect of an act or an omission, it must be a deliberate one involving an actual decision and liability will not arise from injury suffered by mere inadvertence or oversight. I also agree with the opinion of Clarke J [1996] 3 All ER 558, 583B, D that it is sufficient for the plaintiff to prove that the public officer foresaw that his action would probably injure the plaintiff; to require foresight of certainty of harm would be unrealistic and, being very difficult to prove, would give inadequate protection against abuse of power.

I further consider that if the public officer knows that his unlawful conduct will probably injure another person, or is reckless as to that consequence, the plaintiff does not need to show, before liability can arise, some other link or relationship between him and the officer. The requirement of foresight of probable harm to the plaintiff, or recklessness as to such harm, is sufficient to ensure that the tort is confined within reasonable bounds.

I have had the advantage of reading in draft the speeches which have been prepared by my noble and learned friends, Lord Hope of Craighead and Lord Millett, and for the reasons which they give and with which I am in agreement, I would dismiss the appeal on the Community law claim and I would make the same order as that proposed by my noble and learned friend, Lord Steyn

**LORD HOBHOUSE OF WOODBOROUGH** My Lords, this appeal has raised two questions of law. The first is that relating to the alleged breach of the First Council Banking Co-ordination Directive (77/780/EEC) of 1977. I agree that the claim under this head cannot succeed in law for the reasons given by my noble and learned friend, Lord Hope of Craighead, and that the appeal under this head should be dismissed.

The second is that relating to the definition of the tort of misfeasance in public office. On this, subject to what I will say in this speech, I am in substantial agreement with the views expressed by my noble and learned friends, Lord Steyn and Lord Hutton. None of your Lordships are willing to accept the main submissions of the plaintiffs on this aspect but it will be necessary, as your Lordships propose and I agree, to hear further submissions upon the actual pleaded allegations of the plaintiffs before deciding what order to make. On the hearing of the appeal your Lordships have heard full argument upon what are the constituents of the tort. Their correct identification is of an importance which extends beyond the present case. Your Lordships have been greatly assisted by the judgments in this case of Clarke J and the Court of Appeal which contain a careful examination of the authorities as have the written and oral submissions of counsel to which tribute should be paid. I am also indebted to the re-examination of the

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

authorities in the speeches of my noble and learned friends, Lord Steyn and Lord Hutton.

The tort, concerning as it does the acts of those vested with governmental authority and the exercise of executive powers, has developed over the centuries as circumstances have changed. Terminology still tends to be used which is of little assistance to anyone not familiar with the legal history. The use of the word "malice" also causes confusion both as to its meaning in relation to this tort and the role it has in the analysis of the tort. The particular elements emphasised as being of the essence of the tort have varied from time to time. There has been little consistency of language. It is therefore right to take the opportunity to attempt to draw together the threads and assist a more definitive view to be taken. It is not necessary for this purpose to repeat the review of the authorities.

I will start by putting the tort in its legal context. Typically, a tort involves the invasion by the defendant of some legally protected right of the plaintiff, for example, trespass to property or trespass to the person. Conversion is another example. Such conduct on the part of the defendant is actionable as such and the belief of the defendant as to the legality of what he did is irrelevant. It is no defence for the defendant to say that he believed that he had statutory or other legal authority if he did not. The legal justification must actually exist otherwise he is liable in tort: *Northern Territory v Mengel*, 69 ALJR 527, 547.

On the other hand, where the plaintiff is not entitled to complain of the invasion of such a right but bases his claim on some loss which he has suffered consequentially upon some act of the defendant which the defendant mistakenly believed was authorised by the law, the defendant's honest belief provides him with an answer to the plaintiff's claim notwithstanding any actual illegality. Thus the holder of a public office who acts honestly will not be liable to a third party indirectly affected by something which the official has done even if it turns out to have been unlawful. Illegality without more does not give a cause of action: *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173, 189; *Dunlop v Woollahra Municipal Council* [1982] AC 158, 172; the *Mengel* case, 69 ALJR 527, 546. There is no principle in English law that an official is the guarantor of the legality of everything he does; but he is liable if he injures another by an act which is itself tortious if not justified and he is unable to justify it, however honestly he may have acted.

The subject matter of the tort of misfeasance in public office operates in the area left unoccupied by these limits. It does not, and does not need to, apply where the defendant has invaded a legally protected right of the plaintiff. It applies to the holder of public office who does not honestly believe that what he is doing is lawful, hence the statements that bad faith or abuse of power is at the heart of this tort. Similarly, it covers the situation where the plaintiff has suffered some financial or economic loss and therefore raises the question what relationship between the plaintiff's loss and the defendant's bad faith is required: hence the use of such expressions as "targeted malice". It is necessary to locate these words and concepts in the right places in the analysis of the constituents of the tort otherwise confusion can and does occur.

My Lords, features of this tort have to be found both in the origin and in the consequence. The official must have dishonestly exceeded his powers

---

and he must thereby have caused loss to the plaintiff which has the requisite connection with his dishonest state of mind. The correct formulation of this nexus is one of the points of difficulty coupled with the formulation of what state of mind of the official has to be shown.

It is not necessary to discuss further who comes within the description "holder of a public office". It is a broad concept (*Calveley v Chief Constable of the Merseyside Police* [1989] AC 1228, *Henly v Lyme Corpn* 5 Bing 91, 107-108) and has been further extended by recognising that there may be a vicarious liability of

the relevant governmental authority for the acts of the public official (*Racz v Home Office* [1994] 2 AC 45).

The argument before your Lordships has touched upon the question whether omissions as well as acts can give rise to the liability in this tort. I would answer this question by saying that the position is the same as in the law of judicial review. If there is an actual decision to act or not to act, the decision is amenable to judicial review and capable of providing the basis for the commission of the tort. If there is a legal duty to act and the decision not to act amounts to an unlawful breach of that legal duty, the omission can amount to misfeasance for the purpose of the tort: *R v Dytham* [1979] QB 722; the *Henly* case 5 Bing 91, 107. What is not covered is a mere failure, oversight or accident. Neglect, unless there is a relevant duty of care, does not suffice and the applicable tort would then be negligence not misfeasance and different criteria would apply: *X (Minors) v Bedfordshire County Council* [1995] 2 AC 633, the *Mengel* case 69 ALJR 527, 547.

The relevant act (or omission, in the sense described) must be unlawful. This may arise from a straightforward breach of the relevant statutory provisions or from acting in excess of the powers granted or for an improper purpose. Here again the test is the same as or similar to that used in judicial review.

The official concerned must be shown not to have had an honest belief that he was acting lawfully; this is sometimes referred to as not having acted in good faith. In the *Mengel* case, at p 546, the expression honest attempt is used. Another way of putting it is that he must be shown either to have known that he was acting unlawfully or to have wilfully disregarded the risk that his act was unlawful. This requirement is therefore one which applies to the state of mind of the official concerning the lawfulness of his act and covers both a conscious and a subjectively reckless state of mind, either of which could be described as bad faith or dishonest.

The next requirement also relates to the official's state of mind but with regard to the effect of his act upon other people. It has three limbs which are alternatives and any one of which suffices.

First, there is what has been called "targeted malice". Here the official does the act intentionally with the *purpose* of causing loss to the plaintiff, being a person who is at the time identified or identifiable. This limb does not call for explanation. The specific purpose of causing loss to a particular person is extremely likely to be consistent only with the official not having an honest belief that he was exercising the relevant power lawfully. If the loss is inflicted intentionally, there is no problem in allowing a remedy to the person so injured.

Secondly, there is what is sometimes called "untargeted malice". Here the official does the act intentionally being aware that it will in the ordinary course directly cause loss to the plaintiff or an identifiable class to which the

---

plaintiff belongs. The element of knowledge is an actual awareness but is not the knowledge of an existing fact or an inevitable certainty. It relates to a result which has yet to occur. It is the awareness that a certain consequence will follow as a result of the act unless something out of the ordinary intervenes. The act is not done with the intention or purpose of causing such a loss but is an unlawful act which is intentionally done for a different purpose notwithstanding that the official is aware that such injury will, in the ordinary course, be one of the consequences: *Garrett v Attorney General* [1997] 2 NZLR 332, 349-350.

Thirdly there is reckless untargeted malice. The official does the act intentionally being aware that it risks directly causing loss to the plaintiff or an identifiable class to which the plaintiff belongs and the official wilfully disregards that risk. What the official is here aware of is that there is a risk of loss involved in the intended act. His recklessness arises because he choses wilfully to disregard that risk.

It is necessary to add some footnotes. I have used the word "intentionally". This relates to the doing of the act and covers a similar point to that referred to earlier in relation to acts and omissions. It indicates

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 198 of 260
Pg 278 of 686

that the mind must go with the act. It does not require any specific intent (except in so far as having a specific purpose under the first limb imports an intent).

The tort is historically an action on the case. It is not generally actionable by any member of the public. The plaintiff must have suffered special damage in the sense of loss or injury which is specific to him and which is not being suffered in common with the public in general. The three alternative limbs reflect this. The plaintiff has to be complaining of some loss or damage to him which completes the special connection between him and the official's act.

The use of the word "directly" has a similar connotation. The act of the official may have a widespread economic effect, indirectly affecting to some extent a wide range of diverse persons. This does not suffice to give any of them a cause of action. The relevant plaintiff must be able to bring himself within one of the three alternative limbs.

Subjective recklessness comes into the formulation at the first and last stage because it is in law tantamount to knowledge and therefore gives rise to the same liability: see the *Mengel* case 69 ALJR 527, 554. The word "reckless" is not normally used in relation to this tort; other words are used including "blind disregard". At the first stage the phrase "without an honest belief" in the lawfulness of his conduct best conveys the requisite state of mind covering both actual knowledge and dishonest disregard. At the last stage, the phrase "wilful disregard" best describes the element of subjective recklessness in the third limb and the word "risk" is the appropriate word to use in conjunction with it.

The use of the words foreseen or foreseeable is to be avoided. They are concepts borrowed from the law of negligence. This tort concerns deliberate acts. Thus in the first limb the criterion is having a specific purpose, a different concept from foresight. In the second limb the concept is acting intentionally with the knowledge that the act will have a particular consequence in the ordinary course. This is like foresight but represents rather a state of mind which colours the intentional or deliberate act.

---

**[2003]** **232**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Millett**

**LORD MILLETT** My Lords,

*1. The Community law claim*

I have had the advantage of reading in draft the speech of my noble and learned friend Lord Hope of Craighead. I propose to set out my own reasons for agreeing with him that this claim must fail.

*The objects of the Directive*

In my opinion it is plain that the Directive does not have as one of its objects the protection of depositors. That is the function of the various national banking laws of the member states. In order to achieve their purpose these place restrictions on the freedom to provide banking services. Such restrictions are inherently anti-competitive and thus contrary to article 59 of the EEC Treaty (now article 49 EC), but (as the recitals to the Directive itself expressly recognise) some restrictions are necessary if the interests of depositors are to be properly safeguarded. As they are imposed by national legislatures such restrictions vary from one member state to another, and this inevitably has a distorting effect on the operation of the single market. The object of the Directive was to begin the process of co-ordination of the national laws in order to remove anti-competitive barriers to the free provision of banking services throughout the single market so far as this could be achieved without weakening or impairing the protection of depositors. Thus the adequate protection of depositors was not an object of the Directive but rather operated as a constraint upon the extent to which its object could be achieved. That this is the case is in my opinion confirmed by the judgment of the Court of Justice in *SociŽtŽ Civile Immobilire Parodi v Banque H Albert de Bary et Cie* (Case C-222/95) [1997] ECR I-3899.

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 199 of 260
Pg 279 of 686

The identification of the object of the Directive, however, is only of marginal relevance in the present case, where the question is whether the Directive confers rights on individuals. That question must be determined by reference to the particular provisions of the Directive which are relied on. What is decisive is not the interest which a Directive as a whole seeks to protect, but the interest sought to be protected by the provisions which are alleged to have been breached: see *Sacha Prechal*, *Directives in European Community Law* (1995), p 138. Attempting to identify "the underlying object" or "main object" of a Directive and to distinguish it from other subsidiary objects is in my opinion as unprofitable as it is illusory.

There is a further consideration. The question whether a particular provision of a Directive confers rights on individuals is a secondary question. It does not arise until a breach of the provision in question has first been established. In the present case the plaintiffs allege breaches of articles 3, 6, 7 and 8 of the Directive. Unless the plaintiffs can establish a breach of any of these articles, the question whether it confers rights on individuals does not arise.

*Article 3: breach of the alleged obligation to withhold initial authorisation*

As every banking supervisor would recognise, there is a critical difference between (i) withholding authorisation from a credit institution which is about to commence business and (ii) withholding authorisation from or revoking the authorisation of a credit institution which is already carrying

---

**[2003]** **233**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Millett**

on business. The former cannot injure anyone, not even the credit institution itself; it merely deprives it of an opportunity for profit. The latter damages and may destroy an established business and cause irreparable injury to the institution and its existing depositors. In the case of an existing business, there is a perennial conflict between the need to protect potential depositors and the interests of existing depositors, and difficult questions of judgment are inevitably involved.

The Directive is careful to draw this distinction. It lays down precise requirements which must be met by a credit institution before it commences business; but it recognises that it would be inappropriate and potentially harmful to the interests of existing depositors to fetter the discretion necessary to deal with an institution already carrying on business.

Article 3(1) imposes an obligation on member states to require credit institutions to obtain authorisation *before commencing their activities.*The Directive is not retrospective. BCCI had commenced its activities in the United Kingdom before the Directive came into force, and accordingly article 3(1) has no application to it. Article 3(2), which limits the power of the member state to grant authorisation, deals with the same subject-matter, viz the authorisation of credit institutions proposing to carry on business in a member state. It requires the member state to withhold authorisation from a credit institution which does not comply with the relevant criteria. In the context of article 3 this does not include an institution like BCCI which is already carrying on business in the member state concerned. If the article applied to credit institutions already carrying on business in the member state, it would be inconsistent with the provisions of article 10(4).

Credit institutions which commenced business in a member state before the Directive came into force are dealt with by article 10. Such institutions are deemed to be authorised and are subject to modified requirements. Whereas article 3(1) *obliges* member states to require credit institutions to obtain authorisation before commencing their activities, article 10(4) *permits* them to require institutions which are legitimately carrying on business without authorisation to obtain authorisation for the future. The United Kingdom could have exempted BCCI and other credit institutions which had commenced business in the United Kingdom before the Directive came into force from any requirement to obtain authorisation. It did not do so, but went further than the Directive required (though not further than it permitted) by obliging such institutions to obtain authorisation. In these circumstances an unlawful grant of authorisation

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 200 of 260
Pg 280 of 686

in breach of the provisions of the Banking Act 1979 will amount to a breach of United Kingdom law but not of Community law.

The plaintiffs rely on *Wagner Miret v Fondo de garant'a salarial* (Case C-334/92) [1993] ECR I-6911 for the proposition that where a member state voluntarily assumes obligations laid down by a Directive it cannot escape liability by reason of the absence of any Community requirement to assume them. But that case dealt with the converse situation. There the Directive applied, but permitted member states to exclude certain categories of case from its scope. Spain did not exercise this power, and accordingly the Directive applied. The Court of Justice held that the fact that Spain could have excluded the operation of the Directive was no defence to a claim under Community law when it had not done so. The fact that the legal obligation had been voluntarily assumed did not alter its source, which was

---

**[2003] 234**
**2 AC Three Rivers DC v Bank of England (No 3) (HL(E)) Lord Millett**

Community law. But in the present case there is no applicable Community law: article 3(1) of the Directive does not apply. The United Kingdom was not obliged by Community law to require BCCI to obtain authorisation or to withhold authorisation from it. The United Kingdom chose to impose its own requirements. Any obligation to enforce those requirements arises from national law, not Community law.

*Articles 6 and 7: failure to provide continuous and effective supervision*

I cannot see that these articles impose any such obligation. They impose obligations of co-operation and the establishment of appropriate ratios with a view to eventual standardisation. They take the existence of supervisory regimes in the member states for granted.

But it is not necessary to decide this, because it is obvious that an obligation to provide "continuous and effective supervision" is far too imprecise and leaves far too great a margin of appreciation in member states to be capable of conferring rights on individuals in accordance with the jurisprudence of the Court of Justice.

*Article 8: failure to revoke authorisation*

Lastly the plaintiffs allege a breach of an obligation said to be imposed by article 8 of the Directive to revoke an authorisation in certain defined circumstances. But the article imposes no such obligation. It provides that the competent authorities "may withdraw the authorisation ... *only*" in the circumstances prescribed. The word "only" is critical to the meaning. "May" sometimes means "must"; but "may only ... if" means "must not ... unless". The article is not permissive, let alone obligatory. It is prohibitory. It forbids the member state to withdraw authorisation from a credit institution, with the attendant risk of loss to existing depositors, except in the circumstances prescribed. Where those circumstances exist, the article does not interfere with the power of the member state to withdraw authorisation at its discretion. But it does not oblige it to do so without regard to any of the countervailing considerations to which I have referred.

*Conclusion*

When properly understood, the scheme of the Directive makes sound regulatory sense. A member state *must* withhold authorisation from an institution wishing to commence business in the member state unless the criteria prescribed by article 3(2) are met. A member state is, however, free to select its own criteria for allowing an institution to continue to carry on an existing business. A member state may not withdraw authorisation or prohibit an institution from carrying on an existing business except in prescribed circumstances. Where those circumstances exist it is left to the member state to have regard to any

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 201 of 260
Pg 281 of 686

countervailing considerations in exercising its own discretion whether to withdraw authorisation or close down an existing business.

It follows that the plaintiffs are unable to allege any breach of article 3 (which does not apply to BCCI) or article 8 (which does not impose a relevant obligation), while neither article 6 nor 7 confers rights on individuals.

---

**[2003]** **235**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Millett**

*2. Misfeasance in public office*

I have had the advantage of reading in draft the speeches of my noble and learned friends, Lord Steyn and Lord Hutton, with which I am in full agreement. It may, however, be helpful if I set out in my own words what I consider to be the elements of the tort of misfeasance in public office.

The tort is an intentional tort which can be committed only by a public official. From this two things follow. First, the tort cannot be committed negligently or inadvertently. Secondly, the core concept is abuse of power. This in turn involves other concepts, such as dishonesty, bad faith, and improper purpose. These expressions are often used interchangeably; in some contexts one will be more appropriate, in other contexts another. They are all subjective states of mind.

It is important to bear in mind that *excess* of power is not the same as *abuse* of power. Nor is breach of duty the same as abuse of power. The two must be kept distinct if the tort is to be kept separate from breach of statutory duty, which does not necessarily found a cause of action. Even a deliberate excess of power is not necessarily an abuse of power. Just as a deliberate breach of trust is not dishonest if it is committed by the trustee in good faith and in the honest belief that it is for the benefit of those in whose interests he is bound to act, so a conscious excess of official power is not necessarily dishonest. The analogy is closer than may appear because many of the old cases emphasise that the tort is concerned with the abuse of a power granted for the benefit of and therefore held in trust for the general public.

The tort is generally regarded as having two limbs. The first limb, traditionally described as "targeted malice", covers the case where the official acts with intent to harm the plaintiff or a class of which the plaintiff is a member. The second is said to cover the case where the official acts without such intention but in the knowledge that his conduct will harm the plaintiff or such a class. I do not agree with this formulation. In my view the two limbs are merely different ways in which the necessary element of intention is established. In the first limb it is established by evidence; in the second by inference.

The rationale underlying the first limb is straightforward. Every power granted to a public official is granted for a public purpose. For him to exercise it for his own private purposes, whether out of spite, malice, revenge, or merely self-advancement, is an abuse of the power. It is immaterial in such a case whether the official exceeds his powers or acts according to the letter of the power: see *Jones v Swansea City Council* [1990] 1 WLR 1453. His deliberate use of the power of his office to injure the plaintiff takes his conduct outside the power, constitutes an abuse of the power, and satisfies any possible requirements of proximity and causation.

The rationale of the second limb is not so transparent. The element of knowledge which it involves is, in my opinion, a means of establishing the necessary intention, not a substitute for it. But intention does not have to be proved by positive evidence. It can be inferred. Proof that the official concerned knew that he had no power to act as he did and that his conduct would injure the plaintiff is only the first step in establishing the tort. But it may and will usually be enough for the necessary intention, and therefore of the requisite state of mind, to be inferred. The question is: why did the official act as he did if he knew or suspected that he had no power to do so

---

**[2003]** **236**

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 202 of 260
Pg 282 of 686

2 AC Three Rivers DC v Bank of England (No 3) (HL(E)) Lord Millett

and that his conduct would injure the plaintiff? As Oliver LJ said in *Bourgoin SA v Ministry of Agriculture, Fisheries and Food* [1986] QB 716, 777:

> "If an act is done deliberately and with knowledge of its consequences, I do not think that the actor can sensibly say that he did not 'intend' the consequences or that the act was not 'aimed' at the person who, it is known, will suffer loss."

As that case demonstrates, the inference cannot be rebutted by showing that the official acted not for his own personal purposes but for the benefit of other members of the public. An official must not knowingly exceed his powers in order to promote some public benefit at the expense of the plaintiff.

It will be seen from this that the real difference between the two limbs lies in the starting point. If the plaintiff can establish the official's subjective intention to exercise the power of his office in order to cause him injury, he does not need to establish that the official exceeded the terms of the powers conferred upon him. If, on the other hand, the plaintiff can establish that the official appreciated that he was acting in excess of the powers conferred upon him and that his conduct would cause injury to the plaintiff, the inference that he acted dishonestly or for an improper purpose will be exceedingly difficult and usually impossible to rebut. Moreover, as Blanchard J pointed out in *Garrett v Attorney General* [1997] 2 NZLR 332, 350, the consequences of his actions will usually be obvious enough to the official concerned, who can then be taken to have intended the damage he caused. I also agree with him that intention includes subjective recklessness, that is to say (to adopt his words at p 349) a "conscious disregard for the interests of those who will be affected by" the exercise of the power.

It is not, of course, necessary that the official should foresee that his conduct will certainly harm the plaintiff. Nothing in life is certain. Equally, however, I do not think that it is sufficient that he should foresee that it will probably do so. The principle in play is that a man is presumed to intend the natural and probable consequences of his actions. This is the test laid down by Mason CJ writing for the majority of the High Court of Australia and Brennan J in *Northern Territory v Mengel* 69 ALJR 527, viz that it should be calculated (in the sense of likely) in the ordinary course of events to cause injury. But the inference cannot be drawn unless the official did foresee the consequences. It is not enough that he ought to have foreseen them if he did not do so in fact.

In the present case most (and perhaps all) of the complaints made by the plaintiffs are of the Bank's failure to act. Even their complaint that the Bank of England ought not to have granted BCCI initial authorisation is essentially a complaint that officials of the Bank failed to exercise an independent judgment and to apply the relevant criteria.

The parties are agreed that there is no conceptual difference between sins of omission and sins of commission. This may be so; but factually there is a great difference between them. It is no accident that the tort is misfeasance in public office, not nonfeasance in public office. The failure to exercise a power is not in itself wrongful. It cannot be equated with acting in excess of power. The tort is concerned with preventing public officials from acting beyond their powers to the injury of the citizen, not with compelling them to

---

[2003] 237
2 AC Three Rivers DC v Bank of England (No 3) (HL(E)) Lord Millett

exercise the powers they do have, particularly when they have a discretion whether to exercise them or not. There seems to be only one case in the books where a failure to exercise a power gave rise to the tort: *R v Dytham* [1979] QB 722, 727G, where Lord Widgery CJ said in terms that the neglect must be "wilful and not merely inadvertent". *Ferguson v Earl of Kinnoull* (1842) 9 Cl & Fin 251 and the cases there cited were all cases of wilful breach of duty. *Henly v Lyme Corpn* 5 Bing 91 was in my opinion a case of breach of statutory duty, not of misfeasance in public office.

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 203 of 260
Pg 283 of 686

In conformity with the character of the tort, the failure to act must be deliberate, not negligent or inadvertent or arising from a misunderstanding of the legal position. In my opinion, a failure to act can amount to misfeasance in public office only where (i) the circumstances are such that the discretion whether to act can only be exercised in one way so that there is effectively a duty to act; (ii) the official appreciates this but nevertheless makes a conscious decision not to act; and (iii) he does so with intent to injure the plaintiff or in the knowledge that such injury will be the natural and probable consequence of his failure to act.

Although we heard argument directed to the requirement of proximity and in particular the suggested need for the plaintiff to establish "an antecedent legal interest" or, as I would prefer to put it, "a legally protected interest", I cannot see that this presents a problem in the present case. The statutory powers in question were conferred on the Bank of England for the protection of actual and potential depositors, and any member of either class can satisfy the requirement.

*Conclusion*

I agree with the order which your Lordships propose.

*Appeal and cross-appeal referred back for further argument save that appeal dismissed so far as relating to European Community law.*
*No order as to costs.*

*Solicitors: Lovells; Freshfields.*

B L S

*Lord Neill of Bladen QC, Richard Sheldon QC, Robin Dicker QC, Dominic Dowley* and *Barry Isaacs* for the plaintiffs.

*Nicholas Stadlen QC, Mark Phillips QC, Bankim Thanki*, and *Ben Valentin* for the defendant.

22 March 2001. **LORD STEYN**

My Lords,

**1** For the reasons given by my noble and learned friends, Lord Hope of Craighead and Lord Hutton, I would also allow the appeal. While it is unnecessary for me to cover the same ground, I must state in outline the principal factors that proved decisive in my approach to the case.

**2** It is right at the outset to emphasise that in substance one is dealing with a striking out application. The Bank of England submitted that the claims are plainly and obviously unsustainable. In aid of this submission the Bank deployed a written case of no less than 737 pages, amplified by many pages of written aids and lengthy

---

**[2003] 2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **238** **Lord Steyn**

oral argument. It was hardly a simple and obvious case for a striking out. At the end of the argument my views were that the Bank had not succeeded in establishing that it would be right and fair to strike out the claims. Having studied with care the judgments below, as well as the draft speeches on the appeal to the House, I am reinforced in my first view by a combination of the dissenting judgment of Auld LJ in the Court of Appeal, and by the majority speeches of Lord Hope of Craighead and Lord Hutton.

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 204 of 260
Pg 284 of 686

**3** It is necessary to test the question whether the action should be struck out against the new draft particulars of claim drafted and served after the first hearing.

**4** The case fell into two distinct parts. The first question was whether the plaintiffs have pleaded a reasonable cause of action. In essence this was a demurrer point. With due deference to contrary views I have to say that I was unimpressed by the Bank's technical arguments under this heading. The new draft particulars of claim plead the case in misfeasance in public office in clear terms and in sufficient detail to enable the Bank to prepare a defence. The Bank does not need any further particulars. I would reject the Bank's arguments under this heading.

**5** The second question was whether the action is an abuse of the court's process in that it has no realistic prospect of success. This is the more difficult and controversial aspect of the appeal. The Court of Appeal was divided on the issue. The dissenting judgment of Auld LJ is an impressive one. The judgments of Clarke J at first instance and of the majority (Hirst and Walker LJJ) in the Court of Appeal are detailed and careful. Unfortunately, however, the use made by the judge and by the majority in the Court of Appeal of the Bingham Report of October 1992 was not permissible. The report is self-evidently an outstanding one produced by an eminent judge. But in law the judge and the majority erred in relying on positive conclusions and findings, and absence of conclusions and findings, of Bingham LJ. Not only was such use of the report ruled out by settled principles of law but on broader grounds it was also unfair to the claimants. After all, the report was the outcome of a private inquiry, the claimants were not represented before Bingham LJ and the case against the Bank was not put by counsel. And the Appendices to the report, which recount the history in greater detail, were not published and have never been seen by those representing the claimants.

**6** In these circumstances it is necessary for the House to consider the matter entirely afresh. Since I share the views of Lord Hope of Craighead and Lord Hutton I do not propose to revisit the battleground. But I must emphasise that it is indisputably the case that the Bank knew from April 1990 onwards that BCCI was in imminent danger of collapse with inevitable loss to depositors unless there was a real prospect of an effective rescue package. The Bank has failed to persuade me that the claimants have no realistic prospect of establishing that the Bank knew that there would be no effective and comprehensive rescue or was reckless as to whether there would be one. Moreover, I do not share the confidence of the judge and the majority in the Court of Appeal that discovery and cross examination will not produce significant materials assisting the claimants. It is a case that should be examined and tested with the procedural advantages of a fair and public trial.

**7** My conclusion is therefore strongly influenced by the events from April 1990. On the other hand, I also take the view that the earlier part of the history cannot be excised. The interests of justice require that the entire action should be permitted to go to trial. This conclusion involves no judgment about the likely outcome of the case but merely a finding that the threshold requirement for striking out has not been satisfied.

**8** I would, therefore, allow the appeal, dismiss the cross appeal and give leave to the claimants to amend their pleading in terms of the new draft particulars of claim. Like Lord Hope of Craighead I regard the supplementary directions sought by the claimants as entirely reasonable, but on balance I would also leave it to the Commercial Judge to give appropriate directions. I apprehend that he will wish to proceed to trial with due despatch and a minimum of technical interlocutory

---

**[2003]** **239**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Steyn**

hearings. And in proceeding to trial it is axiomatic that the trial judge will have to approach this case in a neutral fashion and without preconceptions. He will have to ignore expressions of opinion *on the facts* in any of the speeches.

**9** At the request of the bank the issue of costs is reserved. Written submission on costs are invited within 21 days.

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

**LORD HOPE OF CRAIGHEAD**

My Lords,

**10** At the previous hearing of this appeal your Lordships were concerned only with two questions of law. The first related to the ingredients of the tort of misfeasance in public office on which the plaintiffs' first ground of action depends. The second was whether the Bank was capable of being liable to the plaintiffs in damages for violation of the requirements of the First Council Banking Co-ordination Directive of 12 December 1977 (77/780/EEC). For the reasons given in your Lordships' judgment of 18 May 2000 the second question was answered in the negative. It is not necessary to give any further consideration to the Community law issues. They no longer form any part of the plaintiffs' case against the Bank. At the further hearing of the appeal with which this judgment deals your Lordships' task has been to consider whether the facts alleged or capable of being alleged by the plaintiffs meet the test for the tort of misfeasance in public office which were identified by your Lordships in answer to the first question. The question, in short, is whether the order of the Court of Appeal upholding the order of Clarke J that the action should be struck out should be upheld on the ground that the plaintiffs have no reasonable prospect of succeeding on the claim at trial.

**11** Your Lordships have been assisted by the oral arguments which were advanced at the further hearing by Lord Neill for the plaintiffs and by Mr Stadlen for the Bank and by the very substantial amount of written material which has been provided by each side. The issues which have had to be resolved are far from easy. Some indication of their complexity can be gathered from the fact that the written cases for the plaintiffs (including their reply) and for the Bank (including a detailed response on the facts but excluding two appendices) run to 385 and 737 pages respectively. There are two bundles of contemporaneous documents extending to 661 pages and a supplementary bundle of documents which extends to about 300 pages. The amount of material that must be read and understood to see whether the claim should be struck out is formidable. It will be necessary for me before I address the competing arguments to set out some of the facts by way of background.

**12** There are a number of preliminary points. (1) At a procedural hearing which was held on 27 June 2000 nine issues were identified for determination at the further hearing of the appeal. But it became clear in the course of the argument that there was a considerable amount of overlap between one issue and another and that it was more likely to be helpful for them to be looked at cumulatively rather than separately. So I do not propose to examine those issues one by one in this judgment. (2) In his judgment after the first hearing of this appeal my noble and learned friend Lord Steyn said that at the further hearing there should be available a new draft pleading by the plaintiffs reflecting the position which was recorded in your Lordships' judgments: ante, p 196H. At the procedural hearing on 27 June 2000 the plaintiffs were required to serve their new draft pleading on the Bank by 17 July 2000, and they duly did so on that date. That new draft pleading is contained in a document entitled "New draft particulars of claim". For reasons which I shall explain later in more detail (see section (4)) it is to that document, which I shall call "the new draft particulars", that I shall for the most part direct my attention when I am discussing the question whether the facts pleaded meet the requirements of the tort. (3) These proceedings were issued before 29 April 1999 under the Rules of the Supreme Court ("RSC"), which were still in force when the case was in the Court of Appeal. On 29 April 1999 the Civil Procedure Rules ("CPR") came into force. This case is therefore subject to the transitional arrangements set out in the Practice Direction--Transitional

---

Arrangements made under CPR rule 51.1. In accordance with the general principles which are set out in that Practice Direction the case is to proceed in the first instance under the previous rules, but any new step taken on or after 26 April 1999 is to be taken under the CPR: 51PD-003, 011.

**13** The parties are agreed that the service of the new draft particulars on the Bank was a new step, and that it follows that the question whether the claim on the ground of misfeasance in public office should be

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 206 of 260
Pg 286 of 686

struck out must now be determined under the CPR. As the CPR require that the word "claimant" be used rather than the word "plaintiff", I propose to adopt the same terminology from now on throughout this judgment. Rule 3.2 provides, so far as relevant to this case, that the court may strike out a statement of case if it appears to the court (a) that it discloses no reasonable cause of action or (b) that it is an abuse of the court's process. There is no exact dividing line between these two grounds: Civil Procedure 2000, 3.4.2. Mr Stadlen did not attempt to maintain an exact separation between them and in the end, as I shall explain below (in section (5)), he invited your Lordships to give summary judgment against the claimants under CPR, rule 24.2.

**14** I propose to deal with the various matters that require to be considered at this stage in this order: (1) introductory narrative, to include (a) outline chronology, (b) the Bingham report and (c) history of the proceedings to date; (2) the requirements of the tort; (3) whether the facts pleaded by the claimants are capable of meeting those requirements; (4) the decision of the courts below to strike out; (5) the test for summary judgment under CPR rule 24.2; (6) whether, applying that test, the claim should be summarily struck out; (7) the Bank's cross-appeal; and (8) conclusion and further procedure.

**15** I should also make it clear at the outset that, although I shall be using the expression "the Bank" throughout this judgment, the claimants' position as explained in their written case is that those who were principally responsible for the regulation and supervision of BCCI SA were the officials of the Banking Supervision Division formed by the Bank in March 1980 for the purpose of implementing the Banking Act 1979 whose names are given in Schedule 1 to the particulars to the new draft particulars.

*(1) Introductory narrative*

*(a) Outline chronology*

**16** The history of the rise and fall of the Bank of Credit and Commerce International SA ("BCCI SA") can conveniently be divided up for the purposes of this action into four periods: (1) the period prior to the grant of a full licence under the Banking Act 1979 on 19 June 1980; (2) the period from the grant of the full licence to December 1986; (3) the period from December 1986 to April 1990; and (4) the period from April 1990 to closure in July 1991. This history was set out in great detail by Clarke J in his third judgment of 31 July 1997 (unreported), in which the history was divided up into the same four periods, and it was reviewed again in Part III of the judgment of the majority in the Court of Appeal of 4 December 1998 (Part III of which is also unreported). I do not propose to set out that history all over again. No significance is to be attached to the fact that I have mentioned some events in the course of this narrative and omitted others. What follows is not intended to be a complete or definitive account of what happened. But for the purposes of this judgment it is necessary to provide an outline of the chronology and to identify some of the more important details in that history.

**17** BCCI SA was incorporated under the laws of Luxembourg on 21 September 1972. In November it established its first office in the United Kingdom and commenced its business in this country as a deposit-taker. Two years later the structure of BCCI was altered by the incorporation on 13 December 1974 of BCCI Holdings SA ("Holdings") in Luxembourg of which BCCI SA became a subsidiary. On 25 November 1975 another subsidiary of Holdings called

---

**[2003]** **241**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hope of Craighead**

BCCI Overseas ("Overseas") was incorporated in the Cayman Islands. Overseas opened its first branch in the United Kingdom in June 1976. At this stage a substantial part of the issued share capital of Holdings was owned by the Bank of America. Although the group was trading through various branches in the United Kingdom it was not subject to any regulatory system in this country. But Holdings was subject to regulation in Luxembourg by the Luxembourg Banking Commission ("LBC") which at that time was that

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 207 of 260
Pg 287 of 686

country's regulatory authority. At the end of 1977 the Bank of America decided to withdraw from its relationship with BCCI. It sold its holding of shares in Holdings to International Credit and Investment Co Ltd ("ICIC") which at that time was BCCI's largest shareholder.

**18** Prior to the enactment of the Banking Act 1979 banking in the United Kingdom was not subject to any formalised system of regulation. Control was exercised in an informal way by the Bank of England and in an indirect manner by means of various statutory provisions which gave privileges to banks which were recognised by the Board of Trade and by the Bank. Following the publication of a White Paper in 1976 and the First Council Banking Co-ordination Directive (77/780/EEC) steps were taken to establish a new statutory system of banking supervision in the United Kingdom. This was contained in the Banking Act 1979, which came into force on 1 October 1979. It provided for the recognition of banks under section 3(1) if they satisfied the criteria in Schedule 2, Part I, and for the licensing of deposit-taking institutions under section 3(2) if they satisfied the less stringent criteria in Schedule 2, Part II. Section 3(5) of the Act provided that, in the case of an institution whose principal place of business was in a country or territory outside the United Kingdom, the Bank might regard itself as satisfied that the criteria in Schedule 2 regarding those responsible for the management of the business and the prudence with which its business was being conducted were fulfilled if the relevant supervisory authorities informed the Bank that they were satisfied with respect to them and the Bank was satisfied as to the nature and scope of the supervision exercised by those authorities.

**19** On 1 October 1979 BCCI SA applied to the Bank for recognition as a bank under the Act. On 19 June 1980 the Bank refused recognition as a bank but granted to BCCI SA a full licence under the Act as a deposit-taker. By that date its principal place of business was in the United Kingdom. Nevertheless the Bank decided to rely under section 3(5) of the 1979 Act on the supervision of its activities by LBC. The claimants' case is that when the Bank granted the licence (a) it did so knowingly deliberately contrary to the statutory scheme or (b) it was recklessly indifferent to whether it was acting in accordance with the scheme or (c) it wilfully disregarded the risk that it was not acting in accordance with that scheme (i) in bad faith and (ii)(a) in the knowledge that the likely consequences were losses to depositors and potential depositors or (b) that it wilfully disregarded the risk of the consequences or (c) that it was recklessly indifferent to those consequences: see paragraph 31 of the new draft particulars.

**20** During the period from June 1980 to December 1986 the activities of the BCCI group expanded dramatically not only in the United Kingdom but throughout the world. Officials of the Bank pointed out that it was unsatisfactory for it as the supervising authority of BCCI SA in the United Kingdom to rely, as it had been doing under section 3(5) of the 1979 Act, on the views of LBC as to the activities of the holding company in Luxembourg. They recognised that, as the activities of BCCI continued to expand, pressure was likely to grow for its recognition as a bank under that Act. Various possible solutions were considered including, on the one hand, a proposal for the Bank to supervise the whole institution and, on the other, the incorporation of Holdings in the United Kingdom to improve the effectiveness of the Bank's supervision of the group's activities in this country. In September 1984 the effectiveness of the existing statutory regime was called into question by the collapse of Johnson Matthey Bankers. In the light of that debacle a further White Paper was produced and the enactment of a new statute, which was to become the Banking Act

---

**[2003]** **242**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hope of Craighead**

1987, was proposed. The system introduced by the 1979 Act was to be both strengthened and simplified. In place of the dual system of recognition and licensing a single system of authorisation was to be introduced with restrictions on the use of banking names. The Bank was to be required to establish a committee to be known as the Board of Banking Supervision which was to include six independent members as well as three members ex officio. Various other changes were to be made to the powers and duties of the Bank as regulatory authority.

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 208 of 260
Pg 288 of 686

**21** Meantime the Bank continued to rely on the views of the Luxembourg regulatory authority. In May 1983 the responsibilities of regulatory authority in that country had passed from the LBC to L'Institute Monetaire Luxembourgeois ("IML"). Further memoranda passed between officials of the Bank drawing attention yet again to the fact that the real place of business of the BCCI SA was in London and that effectively the Bank and not IML was its prime supervisor. Concern was expressed about heavy losses resulting from BCCI SA's central treasury activities which had been identified by BCCI SA's auditors but not been reported to the Bank and BCCI's lack of candour about its decision to relocate its central treasury operation from London to Abu Dhabi.

**22** The claimants' case regarding this period, which follows the same pattern as that set out in paragraph 31 of the new draft particulars which relates to the first period, is that the Bank was continuing to rely on assurances from LBC and IML and, that despite its knowledge of the illegality of this arrangement and the likelihood of losses to depositors, it failed in bad faith to take steps to revoke BCCI SA's licence under section 7 of the 1979 Act.

**23** The next period was marked by a number of changes in the supervisory regime and further expressions of concern about the activities of BCCI. The 1987 Act came into force on 1 October 1987. Section 3(5) of the 1979 Act was replaced by an equivalent provision in section 9(3) of the 1987 Act. BCCI SA was deemed to be authorised under the 1987 Act by section 107 of that Act and Schedule 5, paragraph 2. An international co-operative group, known as "the College", was established to enable the various national supervisors of the operations of the BCCI Group to meet twice-yearly to discuss its financial condition. Concern was expressed at meetings of the College about a large concentration of exposures due to the group's lending and the effect on the group's activities of the arrest of seven of its officials in Tampa, Florida in October 1988 on charges of drug-trafficking, money-laundering and conspiracy. Further consideration was given to proposals for the restructuring of the group's activities with a view to achieving effective consolidated supervision in London by the Bank. On 30 January 1990 the Bank decided to continue BCCI SA's authorisation following a decision of the Tampa prosecutor to enter into a plea-bargain agreement, approved by the court, by which SA and Overseas pleaded guilty to all counts of money-laundering and conspiracy. Concerns were expressed to the Bank by the group's auditors, Price Waterhouse ("PW"), about the probity of BCCI's senior management.

**24** The claimants' case regarding this period contains three specific allegations about decisions by the Bank not to withdraw the authorisation from BCCI SA. These are said to have been taken (1) after the Bank had learned in May 1986 that BCCI, which had been dealing on a massive scale in the financial and commodity markets through its central treasury in London, had incurred losses amounting to some $285 million: new draft particulars, Schedule 5, paragraphs 26 and 27; (2) after a paper prepared by the Bank for the Board of Banking Supervision in November 1989 had revealed serious defects in the group's structure and the existing supervisory regime and the extent to which BCCI's activities in the UK were dependent upon what happened elsewhere in the group which was largely unsupervised: new draft particulars, Schedule 6, paragraph 19; and (3) after the officials of BCCI had pleaded guilty in Tampa, Florida in January 1990 to charges of money-laundering and conspiracy: new draft particulars, Schedule 6, paragraph 24.

---

**[2003]** **243**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hope of Craighead**

**25** The final period from April 1990 to closure in July 1991 began with expressions of concern to the Bank by PW about the group's serious financial problems and reports about efforts which were being made to obtain financial support from the majority shareholders. On 18 April 1990 PW reported to the board of Holdings that they were unable to sign the 1989 accounts. Later that month they felt able to do so in the light of expressions of support for the group by the Abu Dhabi Government. In early June 1990 IML, recognising that they were no longer in a position effectively to supervise their activities, gave notice to Holdings and to BCCI SA that they must leave Luxembourg within the next 12 to 15 months. These

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 209 of 260
Pg 289 of 686

matters were discussed at a meeting of the College on 19 June 1990 when IML repeated its ultimatum and the Cayman supervisor said that, if SA had to leave Luxembourg, Overseas would have to leave Cayman. Further consideration was given to the need for a clear group structure, consolidated supervision of its activities, relocation of the group to Abu Dhabi and the need for a clear and substantial commitment by the Abu Dhabi Government of its support for it.

**26** In October 1990 PW reported to Holdings' audit committee that an urgent investigation was needed to quantify the group's liabilities and its need for financial support. On 5 October 1990 a letter was produced to the College on behalf of the majority shareholders undertaking to provide support to the level indicated by PW. But IML refused to extend its deadline unless certain conditions were met and the supervisors did not regard the shareholders' proposals for support as acceptable. By December 1990 a revised support package had been put together which PW regarded as acceptable, but later that month PW became aware of the extent to which BCCI's financial problems were due to fraudulent activities on the part of management. On 4 March 1991 the Bank commissioned PW to investigate and report to it under section 41 of the Banking Act 1987 on malpractice within BCCI. PW delivered their report to the Bank on 24 June 1991. It contained a comprehensive account of widespread frauds and deceptions which had been perpetrated by BCCI. Four days later the Bank decided that the proposed reconstruction of the group could not be pursued and that to protect depositors BCCI SA had to be closed down. On 5 July 1991 the Bank presented a petition for the appointment of a provisional liquidator.

**27** The claimants' case regarding this period, as explained by Lord Neill in oral argument, is based on general allegations that the Bank failed in bad faith to face up to its responsibilities as a supervisor to take decisions that would protect the interests of depositors and potential depositors when it was aware that there was a serious and immediate threat that unless it was rescued by the Abu Dhabi Government BCCI would collapse.

*(b) The Bingham Report*

**28** The closure of BCCI on 5 July 1991 provoked widespread concern in the financial community on the ground that this action was long overdue, yet the action that was taken was criticised by depositors, employees and shareholders as precipitate. In a prompt response to that concern Bingham LJ was invited to conduct an inquiry into the supervision of BCCI under the Banking Acts, to consider whether the action taken by all the UK authorities was timely and to make recommendations. The establishment of the inquiry was announced on 19 July 1991. Bingham LJ submitted his report to the Chancellor of the Exchequer and the Governor of the Bank in July 1992. Among the questions which he understood to call for consideration by his terms of reference were the following: What did the UK authorities know about BCCI at the relevant times? Should they have known more? And should they have acted differently?

**29** The report (Inquiry into the Supervision of the Bank of Credit and Commerce International (HC Paper (1992-93) No 198) contains a masterly and eminently readable account of the entire sequence of events from the establishment of BCCI in the UK in 1972 to its closure in July 1991. Bingham LJ took evidence both orally and in writing from a large number of witnesses and he had access to many documents. In

---

**[2003] 2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **244** **Lord Hope of Craighead**

his covering letter he paid tribute to the very high level of co-operation which he had received from, among others, the Bank and the UK firm of Price Waterhouse, who acted from June 1987 to July 1991 as the group's auditors. He said that in deciding what was said and done during BCCI's 19 year history he had relied heavily on contemporary notes and minutes of meetings and conversations between the Bank and Price Waterhouse. His report contains numerous findings of fact and expression of opinion relevant to the

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

questions which he understood to have been comprised within his terms of reference. The report was published in October 1992, but eight appendices to the report were not published.

**30** Much of the claimants' pleading has been based upon material taken from that report. This is unsurprising, in view of the fact that the claimants have not yet had the benefit of discovery of documents or the obtaining of answers to interrogatories. The assumption can properly be made at this stage that the narrative which the report contains will in due course be capable of being established by evidence once the claimants have obtained access to the relevant documents. But there are important limitations on the use which can be made of this document. I shall have to deal with this matter in more detail later when I come to the arguments relating to strike out, but I should like to make the following observations at this stage.

**31** The first point that has to be borne in mind is that neither the report itself nor any of its findings or conclusions will be admissible at any trial in this case. At this stage, when the only material that is available for consideration apart from the pleadings is the report and an incomplete bundle of relevant documents, it is tempting to fill in the gaps by reference to Bingham LJ's findings and the conclusions which he was able to draw from his review of the evidence. Nevertheless a sharp dividing line must be observed between, on the one hand, his narrative of the evidence and, on the other hand, his findings and conclusions in the light of that evidence.

**32** It can, as I have said, be assumed that if the claim is not struck out the claimants will in due course have access to the evidence which provides the source material for that narrative, and that that evidence will be capable of being led by them at the trial. But, as Bingham LJ's findings and conclusions based on that narrative are inadmissible, they must be held to be incapable either of being led in evidence at the trial or of being used by either side in any other way in support of the competing arguments. As Hirst LJ observed in the Court of Appeal, no comparable statutory provisions to those which are to be found in section 441 of the Companies Act 1985 apply to the Bingham report: ante, p 83A-D. The investigation which Bingham LJ conducted was a private and not a statutory inquiry. The rigorous attention which must be paid to the distinction between what would and what would not be admissible has not always been observed in the written cases, and I had the impression that it was not always being observed during the oral argument. Nor, for reasons which I shall explain later, do I think that it was always observed either by Clarke J or by the majority in the Court of Appeal in their judgments on the issues relating to the question of strike out. This has an important bearing on the question whether those judgments were soundly based and should be upheld or whether, because they were not soundly based, the question of strike out is now at large for your Lordships' re-consideration.

**33** A further point that should be noted at this stage about the findings and conclusions in the Bingham report is that they were the result of an investigation that lacked the benefit of statutory powers and was conducted behind closed doors. The claimants were not present nor were they represented. In the conduct of his fact-finding exercise Bingham LJ was, as he said in his covering letter, greatly assisted by the co-operation which he received especially from the Bank and Price Waterhouse. But he had no power to compel the attendance of witnesses or to require the production of documents, and there was no counsel to the inquiry. As the appendices have not been published, the claimants have not had access to all the material which

---

Bingham LJ had before him. None of these observations are intended to suggest that the investigation was incomplete or that the report, for the purposes for which it was prepared, is in any way open to criticism. But it is plain that it cannot be suggested that Bingham LJ was in a position to conduct a fair trial of the issues relating to the tort of misfeasance in public office which the claimants are seeking to raise against the Bank in this case. In these circumstances I agree with the views which Auld LJ expressed in the Court of Appeal in his minority judgment when he said that it would not be right to treat the Bingham report as

effectively conclusive on the questions that arise in this litigation or to conclude that all the available evidence on those questions has been gathered in: ante, p 175D-E.

*(c) History of proceedings to date*

**34** The claimants' writ of summons was issued on 24 May 1993. On 19 July 1995 Clarke J made an order for the following questions to be tried as preliminary issues: (1) Is the defendant capable of being liable to the plaintiffs for the tort of misfeasance in public office? (2) Were the plaintiffs' alleged losses caused in law by the acts or omissions of the defendant? (3) Are the plaintiffs entitled to recover for the tort of misfeasance in public office as existing depositors or potential depositors?

**35** On 19 July 1995 Clarke J gave the claimants leave to amend their pleadings for the purposes of these preliminary issues. On 21 August 1995 the claimants lodged a re-amended statement of claim. Following Clarke J's first and second judgments of 1 April 1996 and 10 May 1996 [(1996] 3 All ER 558 and 634) in which he expressed his preliminary conclusions on the three preliminary issues, the claimants applied for leave to re-re-amend their statement of claim and the Bank made an application for the statement of claim to be struck out. Clarke J heard argument on these applications in November and December 1996. The claimants then proposed a series of further amendments to their proposed re-re-amended statement of claim, and an eighth draft was lodged on 6 January 1997.

**36** After a further hearing in April 1997 when he considered the claim as then formulated Clarke J delivered a judgment on 30 July 1997 (unreported) in which he held that, on the basis of the evidence then available, the claim was bound to fail; that, as there was no reasonable possibility that the claimants would obtain evidence in the future which might enable them to succeed, the claim was bound to fail in the future; that in these circumstances it would be an abuse of process or vexatious or oppressive to allow the action to proceed; that the application to re-re-amend the statement of claim should be refused; and the action should be struck out.

**37** When he was expressing his conclusions in his third judgment on the present material Clarke J said:

> "I have reached the firm conclusion that on the material available at present the plaintiffs have no arguable case that the Bank dishonestly granted the licence to BCCI or dishonesty failed to revoke the licence or authorisation in circumstances when it knew, believed or suspected that BCCI would probably collapse. There is nothing in the Bingham report or in the documents which I have seen to support such a conclusion and there is much to contradict it."

**38** In regard to the future, he recognised that Bingham LJ was not conducting a trial but an inquiry, that he did not see a number of Bank officials, that the witnesses whom he did see were not cross-examined in an adversarial process and that there was no right of appeal. But he then went on to say that there was in his judgment no realistic possibility that he had not correctly set out the state of mind of the Bank at each stage. He concluded:

> "In these circumstances I accept Mr Stadlen's further submission that there is no realistic possibility of more evidence becoming available, whether by further investigation, discovery, cross-examination or otherwise, which might throw light

---

> upon the state of mind of the Bank or any of its relevant officials during the period in which BCCI was operating."

**39** In the Court of Appeal the majority (Hirst and Robert Walker LJJ), ante, p 17 et seq, upheld the order pronounced by Clarke J. They asked themselves the question whether the claimants had an arguable case that the Bank actually foresaw BCCI's imminent collapse at each relevant stage. They said that they agreed with the judge's conclusion that, on the material then available, the plaintiffs did not have an arguable case that the Bank actually foresaw BCCI's imminent collapse at each relevant stage. They also agreed with him that, in all the circumstances, it was now for all practical purposes inconceivable that new material would emerge of such significance as to alter that conclusion: ante, p 94B-D. Auld LJ dissented as to the test to be applied. He did not consider that a claimant in an action for misfeasance in public office who could establish dishonesty in the sense of a knowing and deliberately or recklessly unlawful act by the defendant need also establish some knowledge on the officer's part of consequential damage, whether in the form of foresight or foreseeablility, ante, p 160G-H. But he went on to consider and give his view on the question whether the claim should be struck out on the assumption that the claimants had to establish that the Bank knew, believed or suspected that its conduct would probably cause loss: ante, p 170F. He said that there were no exceptional circumstances to justify departing from the normal rule of leaving the matter to the trial judge: ante, pp 175A-176D.

**40** On 21 January 1999, the Court of Appeal gave leave to the claimants to appeal to the House of Lords on the claimants' undertaking to apply to your Lordships for a direction that the correct test for misfeasance in public office should be determined before any consideration of whether the facts alleged or capable of being alleged were capable of meeting that test. On 12 May 1999 your Lordships gave the claimants leave to appeal against the refusal of leave to re-re-amend the statement of claim. On 17 July 2000, as they were directed to do at the procedural hearing on 27 June 2000 which followed the delivery of your Lordships' first judgment, the claimants served the new draft particulars on the Bank.

*(2) The requirements of the tort*

**41** The correct test for misfeasance in public office was established by your Lordships' judgment following the previous hearing of this appeal. I do not wish to repeat or to analyse what your Lordships said in that judgment. But there are two matters with which I must deal. In the first place it is necessary for me to identify my understanding of the various elements in the light of which the question whether the facts pleaded by the claimants in the new draft particulars satisfy its requirements must be tested. In the second place I must examine Mr Stadlen's argument that the claimants' pleadings are based on a misunderstanding of those requirements.

**42** The following are the essential elements of the tort which are relevant to the examination of the new draft particulars. First, there must be an unlawful act or omission done or made in the exercise of power by the public officer. Second, as the essence of the tort is an abuse of power, the act or omission must have been done or made with the required mental element. Third, for the same reason, the act or omission must have been done or made in bad faith. Fourth, as to standing, the claimants must demonstrate that they have a sufficient interest to sue the defendant. Fifth, as causation is an essential element of the cause of action, the act or omission must have caused the claimants' loss.

**43** As to standing, the interest to sue of those who were already depositors with BCCI is not in doubt. A question has been raised about the interest to sue of potential depositors. This is because a widespread economic effect resulting from the misfeasance does not give a cause of action to the public in general. But the Bank, while reserving the right to pursue the issue at trial, accepts that it is capable of being liable for the tort to claimants who were potential depositors with BCCI at the time

---

of any relevant act or omission of misfeasance by the Bank. As to causation, the Bank submits that it is not capable of having caused loss to depositors or potential depositors where the proximate cause of the loss

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 213 of 260
Pg 293 of 686

was the deliberate act of a third party--in this case, fraudulent acts of individuals within BCCI. But questions of fact are raised by this argument which are unsuitable for summary determination at this stage.

**44** The first, second and third requirements lie at the heart of the argument. No further explanation is required as to the test which must be met to satisfy the first requirement. As to the second and third requirements, the claimants do not allege that the Bank did or made the acts or omissions intentionally with the purpose of causing loss to them. The allegation is that this is a case of what is usually called "untargeted malice". Where the tort takes this form the required mental element is satisfied where the act or omission was done or made intentionally by the public officer (a) in the knowledge that it was beyond his powers and that it would probably cause the claimant to suffer injury, or (b) recklessly because, although he was aware that there was a serious risk that the claimant would suffer loss due to an act or omission which he knew to be unlawful, he wilfully chose to disregard that risk. In regard to this form of the tort, the fact that the act or omission is done or made without an honest belief that it is lawful is sufficient to satisfy the requirement of bad faith. In regard to alternative (a), bad faith is demonstrated by knowledge of probable loss on the part of the public officer. In regard to alternative (b), it is demonstrated by recklessness on his part in disregarding the risk. The claimants rely on each of these two alternatives.

**45** At the first hearing Mr Stadlen argued that recklessness was not sufficient to satisfy the required mental element. Your Lordships rejected this submission, with the result that it must be assumed for the purposes of the argument at this stage that the claimants are entitled to include this alternative as part of their case. His argument at the further hearing was that, as one of the essential requirements of the tort was knowledge, belief or suspicion that the act or omission would probably cause loss to depositors or potential depositors, in order to achieve harmony between the two alternatives knowledge, belief or suspicion of "probable loss" was a necessary element in the case of the alternative of recklessness. He submitted that without evidence to support this requirement there could be no liability under the second, or "untargeted malice", limb of the tort.

**46** I would reject these submissions also. The effect of your Lordships' decision following the first hearing is that it is sufficient for the purposes of this limb of the tort to demonstrate a state of mind which amounts to subjective recklessness. That state of mind is demonstrated where it is shown that the public officer was aware of a serious risk of loss due to an act or omission on his part which he knew to be unlawful but chose deliberately to disregard that risk. Various phrases may be used to describe this concept, such as "probable loss", "a serious risk of loss" and "harm which is likely to ensue". Although I have used the phrase "serious risk of loss", I do not think that for present purposes it is necessary to choose between them. Further attempts to define their meaning would raise issues of fact and degree which are best considered at trial. The absence of an honest belief in the lawfulness of the conduct that gives rise to that risk satisfies the element of bad faith or dishonesty.

*(3) Whether the facts pleaded are capable of meeting the requirements of the tort*

**47** The question to which I now turn relates to the adequacy of the pleadings. This is the first of the two broad grounds on which the Bank say the claim should be struck out. The issue here is directed to the sufficiency of the particulars. It is whether, assuming the facts alleged to be true, a case has been made out in the pleadings for alleging misfeasance in public office by the Bank. If it has, then the question whether the pleading is supported by the evidence is normally left until trial. In *McDonald's Corpn v Steel* [1995] 3 All ER 615, 621E-F Neill LJ said:

---

**[2003]** **248**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hope of Craighead**

"It is true that a pleader must not put a plea of justification (or indeed a plea of fraud) on the record lightly or without careful consideration of the evidence available or likely to become available. But, as counsel for the plaintiffs recognised in the course of the argument, there will be cases where, provided

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 214 of 260
Pg 294 of 686

a plea of justification is properly particularised, a defendant will be entitled to seek support for his case from documents revealed in the course of discovery or from answers to interrogatories."

I shall deal later (in section (3)) with the question to which Mr Stadlen directed the main part of his argument. This is whether there are reasonable grounds for thinking that evidence to support the allegations is or is capable of being made available. The question with which I propose to deal at this stage is whether the grounds for the claim have been properly particularised.

**48** The Bank makes much of the fact that the claimants have received numerous warnings of the need for particulars to be given of the facts relied on in support of their allegations and of the many opportunities that they have been given to amend their statement of claim. Your Lordships are invited to infer from the absence of particulars, and in the light of the available evidence, that the claimants are not able to make good their allegations and that on this ground alone Clarke J was right to order that the claim should be struck out. On the other hand the claimants say that the Bank is well aware of the case that they seek to bring and that the Bank's argument is calculated to place an insuperable obstacle in their path.

**49** In my judgment a balance must be struck between the need for fair notice to be given on the one hand and excessive demands for detail on the other. In *British Airways Pension Trustees Ltd v Sir Robert McAlpine & Sons Ltd* (1994) 72 BLR 26, 33-34 Saville LJ said:

> "The basic purpose of pleadings is to enable the opposing party to know what case is being made in sufficient detail to enable that party properly to prepare to answer it. To my mind it seems that in recent years there has been a tendency to forget this basic purpose and to seek particularisation even when it is not really required. This is not only costly in itself, but is calculated to lead to delay and to interlocutory battles in which the parties and the court pore over endless pages of pleadings to see whether or not some particular point has or has not been raised or answered, when in truth each party knows perfectly well what case is made by the other and is able properly to prepare to deal with it."

**50** These observations were made under the old rules. But the same general approach to pleadings under the CPR was indicated by Lord Woolf MR in *McPhilemy v Times Newspapers Ltd* [1999] 3 All ER 775, 792J-793A:

> "The need for extensive pleadings including particulars should be reduced by the requirement that witness statements are now exchanged. In the majority of proceedings identification of the documents upon which a party relies, together with copies of that party's witness statement, will make the detail of the nature of the case the other side has to meet obvious. This reduces the need for particulars in order to avoid being taken by surprise. This does not mean that pleadings are now superfluous. Pleadings are still required to mark out the parameters of the case that is being advanced by each party. In particular they are still critical to identify the issues and the extent of the dispute between the parties. What is important is that the pleadings should make clear the general nature of the case of the pleader. This is true both under the old rules and the new rules."

**51** On the other hand it is clear that as a general rule, the more serious the allegation of misconduct, the greater is the need for particulars to be given which explain the basis for the allegation. This is especially so where the allegation that is being made is of bad faith or dishonesty. The point is well established by authority in the case of fraud.

---

**[2003] 2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **249** **Lord Hope of Craighead**

**52** In *Wallingford v Mutual Society* (1880) 5 App Cas 685, 697 Lord Selborne LC said:

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

"With regard to fraud, if there be any principle which is perfectly well settled, it is that general allegations, however strong may be the words in which they are stated, are insufficient even to amount to an averment of fraud of which any court ought to take notice."

In the same case, at p 709, Lord Watson said:

"My Lords, it is a well-known and a very proper rule that a general allegation of fraud is not sufficient to infer liability on the part of those who are said to have committed it. And even if that were not the rule of the common law, I think the terms of Order XIV would require the parties to state a very explicit case of fraud, or rather of facts suggesting fraud, because I cannot think that a mere statement that fraud had been committed, is any compliance with the words of that rule which require the defendant to state facts entitling him to defend. The rule must require not only a general and vague allegation but some actual fact or circumstance or circumstances which taken together imply, or at least very strongly suggest, that a fraud must have been committed, those facts being assumed to be true."

**53** The Bank says that, as an allegation of misfeasance in public office involves an allegation of dishonesty or bad faith on the part of the public officer, particulars must be given of the facts which, if proved, would justify the allegation. It is also said that it is not enough to aver facts which are consistent either with dishonesty or with negligence. Dishonesty or bad faith must be proved, so the facts relied on must point distinctly to dishonesty. Reference was made to *Davy v Garrett* (1878) 7 Ch D 473, 489 where Thesiger LJ said:

"It may not be necessary in all cases to use the word 'fraud'--indeed in one of the most ordinary cases it is not necessary. An allegation that the defendant made to the plaintiff representations on which he intended the plaintiff to act, which representations were untrue, and known to the defendant to be untrue, is sufficient. The word 'fraud' is not used, but two expressions are used pointing at the state of mind of the defendant--that he intended the representations to be acted upon, and that he knew them to be untrue. It appears to me that a plaintiff is bound to show distinctly that he means to allege fraud. In the present case facts are alleged from which fraud might be inferred, but they are consistent with innocence. They were innocent acts in themselves, and it is not to be presumed that they were done with a fraudulent intention."

**54** It seems to me that it can no longer seriously be maintained by the Bank that they do not have sufficient notice of the case which is being made against them. It is abundantly clear that what the claimants are seeking to prove is misfeasance in public office. As my noble and learned friend Lord Hutton has pointed out, the draft new particulars contain detailed allegations to the effect that the Bank acted in bad faith. It has all along been common ground that the claimants cannot base their claim against the Bank in negligence. As Hirst LJ observed in the Court of Appeal, ante, p 22C-D, the immunity which the Bank enjoys under section 1(4) of the Banking Act 1987 unless it is shown that the act or omission was in bad faith goes a long way to explaining why the claimants have undertaken the burden of seeking to prove misfeasance in public office.

**55** In my view this point alone is a sufficient answer to the criticism based on Thesiger LJ's remarks in *Davy v Garrett*. The principle to which those remarks were directed is a rule of pleading. As the Earl of Halsbury LC said in *Bullivant v Attorney General for Victoria* [1901] AC 196, 202, where it is intended that there be an allegation that a fraud has been committed, you must allege it and you must prove it. We are concerned at this stage with what must be alleged. A party is not entitled to a

---

finding of fraud if the pleader does not allege fraud directly and the facts on which he relies are equivocal. So too with dishonesty. If there is no specific allegation of dishonesty, it is not open to the court to make a finding to that effect if the facts pleaded are consistent with conduct which is not dishonest such as negligence. As Millett LJ said in *Armitage v Nurse* [1998] Ch 241, 256G, it is not necessary to use the word "fraud" or "dishonesty" if the facts which make the conduct fraudulent are pleaded. But this will not do if language used is equivocal: *Belmont Finance Corpn Ltd v Williams Furniture Ltd* [1979] Ch 250, 268 per Buckley LJ. In that case it was unclear from the pleadings whether dishonesty was being alleged. As the facts referred to might have inferred dishonesty but were consistent with innocence, it was not to be presumed that the defendant had been dishonest. Of course, the allegation of fraud, dishonesty or bad faith must be supported by particulars. The other party is entitled to notice of the particulars on which the allegation is based. If they are not capable of supporting the allegation, the allegation itself may be struck out. But it is not a proper ground for striking out the allegation that the particulars may be found, after trial, to amount not to fraud, dishonesty or bad faith but to negligence.

**56** In this case it is clear beyond a peradventure that misfeasance in public office is being alleged. There is an unequivocal plea that the Bank was acting throughout in bad faith. The Bank says that the facts relied on are, at best for the claimants, equally consistent with negligence. But the substance of that argument is directed not to the pleadings as such, which leave no doubt as to the case that is being alleged, and the basis for it in the particulars, but to the state of the evidence. The question whether the evidence points to negligence rather than to misfeasance in public office is a matter which must be judged in this case not on the pleadings but on the evidence. This is a matter for decision by the judge at trial.

**57** The Bank nevertheless submits that the facts pleaded fail to meet the requirements of the tort. Three reasons are advanced in support of this argument. The first is that the claimants have failed to allege the requisite mental element as to loss. Mr Stadlen said that it was not enough for the claimants to show that the Bank knew that depositors and potential depositors were at risk. As he put it, nothing short of a properly particularised allegation of knowledge or recklessness of probable loss, known or suspected, would satisfy the test. The second is that the pleadings do not contain a properly particularised allegation that the Bank in the person of identified officials committed acts or omissions of misfeasance dishonestly in the sense of committing them with subjective bad faith. Mr Stadlen submitted that it was well understood that an allegation of dishonesty had to be supported by particulars from which the inference of dishonesty could be drawn. A failure to satisfy this requirement was in itself a ground for a strike out. The third is that the pleadings do not contain a properly particularised allegation that Bank officials took conscious decisions capable of amounting to acts or omissions of misfeasance. Mr Stadlen directed this part of his argument to what he described as the revocation claim. He accepted that the initial decision to licence BCCI SA was particularised. But he said that only three instances were given of decisions not to revoke, and that in the case of only one of these instances--the Bank's decision in October 1986 not to revoke notwithstanding the scale of the central treasury losses--was there any attempt to suggest that the decision was taken dishonestly.

**58** I would reject the first of these three arguments on the ground that it was based on a misunderstanding of the requirements of the tort. The claimants' case on the pleadings is that at each stage in the history the Bank knew that the likely consequences were that depositors and potential depositors would suffer losses, wilfully disregarded the risk of the consequences or was recklessly indifferent to the consequences: new draft particulars, paragraphs 31-35. Knowledge that the depositors were likely to suffer loss is averred. But the claimants are also offering in the alternative to prove reckless indifference to the risk of loss. As I have already said (in section (2)) I do not think that it is necessary for present purposes to choose between the various phrases that may be used to describe the nature or degree of the

---

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 217 of 260
Pg 297 of 686

risk. This would be to raise issues of fact and degree that are best considered at trial. It was not suggested that, if there was a case to be made on knowledge of probable loss, the pleading as to recklessness should be struck out at this stage. The Bank's position, as explained in its written case, is that it will not be possible to identify with precision which allegations should be struck out until the parties have seen your Lordships' judgment and that for the time being this exercise is premature.

**59** Mr Stadlen said that the essential difference between the parties on this part of the case at this stage is on the question whether knowledge, belief or suspicion of probable loss has to be established where the allegation is that the act or omission was done or made recklessly. He accepted that an allegation of knowledge that loss was "likely" was, in effect, the same as an allegation that it was "probable". He also accepted that the words used in the new draft particulars to describe the tort, although not precisely the same as those used in your Lordships' judgment, were formulated with sufficient accuracy. But he maintained that the material referred to in the particulars did not support an allegation of knowledge, belief or suspicion of likely or probable loss. He said that none of this material came near to meeting that test, and that there was no indication in the Bingham report that material which would do so was available. At best it supported an allegation of knowledge that there was a risk of loss. But this was not enough to satisfy the test of knowledge that loss was probable.

**60** As I have already said more than once, I do not think that it is appropriate at this stage to attempt to define the required state of mind more precisely. This is a matter which is so bound up with the facts that it is best left until trial. It is a question of fact and degree. The greater the risk of loss the easier it is likely to be to say that loss was probable and the easier it will be to find that where that risk was known, believed or suspected there was recklessness. The statutory powers of supervision were conferred on the Bank for the protection of depositors and potential depositors. As the fourth recital of the First Council Banking Co-ordination Directive (77/780/EEC) puts it, supervision of a credit institution is needed "in order to protect savings". The system is based on the assumption that, where that protection is lacking, deposits are likely to be at risk. The question whether at any given point of time that risk is sufficiently serious to justify a finding of recklessness on the part of a supervisor, who knows that the statutory requirements are not fulfilled, is aware of the risk but takes no action to withdraw authorisation or otherwise limit the activities of the deposit-taker, is one of degree. I would hold that it is essentially a question of fact for the trial judge. I do not think that a view on this matter can safely be formed at this stage by a reading of the available documents.

**61** I should add, in order to emphasise the importance which I attach to seeing this as a question of fact and degree, that I see much force in Auld LJ's observation in his dissenting judgment about the Orwellian illogicality of sharpening the test of foresight of probable damage for the purposes of the strike out application to one of foresight of probable (imminent) collapse of BCCI. He said ante, p 172C-E:

> "If such a test is to survive it will enable a banking regulator who deliberately and knowingly does not supervise a bank as it should do (as is conceded to be arguable here), with resulting damage to its depositors, to defeat a misfeasance claim simply by saying 'because I did not make the inquiries that I should have done, I did not suspect that the plaintiff would *probably* suffer loss'. In short it enables a banking regulator to rely on its own deliberate and knowing illegality as a justification for its lack of foresight that it would cause damage. If 'policy' and 'principle' are to be invoked, it must be against providing such an incentive to a banking regulator, or any public body exercising a supervisory function over institutions in the interest of persons for whom they provide a service, not to do their duty. And to load a plaintiff/depositor with the further burden of proving that, despite the regulator's self-imposed ignorance, it foresaw damage in the particular form in which it occurred seems to me, with respect, even more illogical

---

**[2003]** **252**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hope of Craighead**

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

and unjust in a common law remedy the purpose of which is to provide a remedy for abuse of public duty."

**62** The second argument on the pleadings is that the claimants have failed to give particulars of their allegation of dishonesty and to link those allegations with particular officials of the Bank. Here again regard must be paid to the fact that the claimants rely in the alternative on the concept of recklessness. I refer to the comments which I made in the previous section about Mr Stadlen's submission that an allegation of dishonesty in the sense of subjective bad faith is an essential element. The effect of your Lordships' decision following the first hearing is to the contrary. Recklessness is demonstrated where it is shown that the public officer was aware of a serious risk of loss due to an act or omission on his part which was unlawful but chose deliberately to disregard that risk. That is sufficient to establish that he did not have an honest belief in the lawfulness of the conduct which, to his knowledge, gave rise to that risk. Recklessness about the consequences, in the sense of not caring whether the consequences happen or not, will satisfy the test. In this context there is no additional element of dishonesty or bad faith that requires to be satisfied. As for the particular officials against whom the allegation is made, I consider that the Bank has been given sufficient notice of the claimants' case against their officials in the particulars when read with the documents.

**63** It is alleged in paragraph 31 of the new draft particulars that the Bank in bad faith at all times from 1979 onwards purported to rely pursuant to section 3(5) of the 1979 Act, and subsequently section 9(3) of the 1987 Act, upon assurances given by LBC/IML concerning the management and financial soundness of BCCI SA. Particulars are then given in that paragraph of the matters about this arrangement which are said to have been known to the Bank or about which it was recklessly indifferent. These are that the principal place of business of BCCI SA was in the UK, that LBC/IML did not and could not assure the Bank that it was satisfied with the management and overall financial soundness of BCCI SA, and that for various reasons that are specified LBC/IML had declared itself unable to carry out adequate supervision of both BCCI SA and the BCCI group. It is also said that the Bank knew that the consequence of its unlawful reliance upon LBC/IML was that BCCI SA would be and would continue to be unlawfully licensed, and subsequently authorised, and that it was recklessly indifferent to the risk that this presented to depositors and potential depositors. In paragraph 37 of the new draft particulars, under reference at each stage in the history to the facts and matters set out in Schedules 2 to 7 of the particulars, details are given of the respects in which the motives of the Bank for breaching its statutory duties as regulator were in bad faith. It seemed to me at first sight that these particulars give ample notice to the Bank of the case which is being made against it as to the requirement of bad faith. But the point requires further examination in the light of further points in Mr Stadlen's argument.

**64** The claimants are taken some distance down the road they must travel by a concession which the Bank made to Clarke J which the judge recorded in his third judgment in these terms:

"with one exception I shall assume that they can establish that the Bank knew, believed or suspected at each stage that its proposed act or its omission was unlawful. With that one exception, the Bank has conceded that it cannot show that the plaintiffs' case that it knew, believed or suspected that its acts or omissions were unlawful is doomed to failure. That exception is the way that section 3(5) of the Banking Act 1979 was applied."

**65** In the Court of Appeal, as appears both from the majority judgment and that of Auld LJ, it was understood to be common ground that there was an arguable case that the Bank was aware of illegality in its supervision of BCCI SA: ante, pp 85A, 174G. Mr Stadlen objected to these passages on the ground that the extent of the Bank's concession was being misrepresented. He said that the Bank made one very

narrow concession only, which was that for the purposes of the preliminary issue it was arguable that the Bank knew, believed or suspected that it was not entitled to rely, for the purpose of ongoing supervision of BCCI SA, on assurances given by LBC/IML because after, but not before, the licence was granted it knew, believed or suspected that its principal place of business was not in Luxembourg. I am content to accept Mr Stadlen's assurance that the concession was limited to this point. Nevertheless it seems to me to be a significant one. It limits the areas for discussion to the granting of the licence on the one hand, as to which all issues remain in play, and to the Bank's ongoing supervision on the other hand, as to which the issue relates to the question whether the pleadings reveal an arguable case as to recklessness about the consequences.

**66** With regard to the question whether the claimants have sufficiently alleged dishonesty or bad faith when the Bank granted the licence in the first place, the majority in the Court of Appeal agreed with Clarke J's finding in his third judgment that there was material from which it was at least arguable that the Bank must have known at that stage that LBC were not regulating BCCI SA properly and that it did not have the resources to do so in the future: ante, p 84C. I agree, and I also consider that sufficient notice of the facts on which the claimants propose to rely is given in Schedule 2 to the new draft particulars. As for Mr Stadlen's argument that the documents read in the light of the Bingham report do not provide any support for these particulars, I consider that issues of fact are raised here which, subject to further arguments about abuse of process, I would not expect to be answered satisfactorily in advance of a trial. As for the later stages in the history, the issue of dishonesty or bad faith is so bound up with the broad issue of recklessness that here too, subject to further arguments about abuse of process, I would hold that the issue raises questions of fact and degree which are best left for decision by the trial judge in the light of the evidence.

**67** The third argument is that there was a failure to provide particularised allegations in regard to the revocation claim. Mr Stadlen accepted that the initial decision to licence BCCI SA was particularised. But he said that, despite Clarke J's warning that particulars had to be given of the decisions that were said to amount to misfeasance, the claimants' case was still largely based on alleged omissions. He said that only three instances could be identified in the new draft particulars where it was alleged that decisions had been taken by the Bank not to revoke. These were the decision in October 1986 not to revoke the authorisation despite its knowledge of the scale of BCCI SA's central treasury losses, the decision not to revoke in December 1989 in the light of the criticisms expressed in the paper prepared by the Banking Supervision Department for the Board of Banking Supervision in November of that year and the decision not to revoke in January 1990 following the plea bargain which led to the settlement of the Tampa indictment: new draft particulars, Schedule 5, paragraphs 27 and Schedule 6, paragraphs 19 and 24. He maintained that this was a fundamental defect in the revocation claim, as a conscious decision was needed to support a case of misfeasance in public office. It was not open to the claimants to rely on a general reference to the Bank's omission to act day by day over the entire period, as the tort required proof of acts done by the public official intentionally.

**68** In my opinion this argument is based on a misconception of the thrust of the claimants' allegations and on a misunderstanding of the requirements of the tort. The claimants' case, as Lord Neill explained, is that the Bank deliberately ran away from its responsibility as the relevant supervisory authority throughout the history of BCCI SA's activities in this country to safeguard the interests of depositors and potential depositors. He said that a series of events could be identified in the particulars to show that the Bank deliberately failed to take steps which it might have taken to deal with the situation despite its awareness of facts or circumstances which revealed the extent of the risk to those interests. I agree that particulars are given throughout the pleadings of events which are arguably of this character. Examples of

---

such events are given in the new draft particulars, Schedule 5, paragraphs 17 and 34-35, and there are many more.

**69** Furthermore, as Lord Neill pointed out, the tort extends to decisions not to exercise powers as well as decisions to exercise them. In the early days, when the tort was largely confined to disputes over voting rights, it was invoked to deal with the improper exercise of official power. Later, it was invoked in other areas of official regulation through licensing and other controls of that kind. Again the typical complaint was of the improper exercise of the power. That remains true in the majority of the more modern cases. *Bourgoin SA v Ministry of Agriculture, Fisheries and Food* [1986] QB 716 is an example, as that case was concerned with the withdrawal of a licence. But, as Brennan J said in *Northern Territory of Australia v Mengel* (1995) 69 ALJR 527, 545 in a passage which was approved in your Lordships' previous judgment in this case, any act or omission done or made by a public official can found an action for misfeasance in public office. If it were otherwise, a banking regulator would be able to defeat a misfeasance claim simply by resorting to inaction in the face of obvious and immediate risks despite the fact that it knew, believed or suspected that its reckless and deliberate course of inaction was likely to result in damage to depositors and potential depositors. For these reasons I would reject the argument that proof of conscious decisions to act or not to act is required. In my view the tort extends to a deliberate or wilful failure to take those decisions.

**70** For these reasons I would hold that the facts pleaded by the claimants in the new draft particulars are capable, if proved, of meeting the requirements of the tort. I must now turn to the alternative ground for striking out, which was that of abuse of process.

*(4) The decision of the courts below to strike out*

**71** Clarke J said that he understood it to be common ground between the parties that in appropriate circumstances the court had power to strike an action out under its inherent jurisdiction and under RSC Ord 18, r 19. The question which he then asked himself was whether the Bank had shown that the claimants' case was bound to fail on the material presently available and that there was no reasonable possibility of evidence becoming available to them, whether by further investigation, discovery, cross-examination or otherwise sufficiently to support their case and to give it some prospect of success. As he put it, if the Bank were to discharge that burden, it would follow that the claim was bound to fail: third judgment, pp 6-7. He then embarked on a detailed examination of all the material which was available to the claimants to support their claim. I agree with the majority in the Court of Appeal that this was a vastly difficult undertaking: ante, p 82A.

**72** Clarke J's conclusion, after examining the available material over many days, was that the claimants had no arguable case on the material then available that the Bank dishonestly licensed BCCI SA or dishonestly failed to revoke the licence or authorisation in circumstances when it knew, believed or suspected that it would probably collapse without being rescued: third judgment, p 166. The Court of Appeal agreed with the judge that it was right, in the exceptional circumstances of this case, to conduct this exercise: ante, pp 80B-D, 82A. After reviewing the judge's conclusion in great detail, the majority agreed with the judge that all the evidence indicated that up to April 1990 the Bank did not actually foresee BCCI SA's imminent collapse, and thereafter that it did but properly relied on the prospect of a rescue: ante, p 94E.

**73** Concurrent findings of fact are not normally open to review in your Lordships' House. For the like reasons as those on which this rule is based I would not have thought that it was appropriate for your Lordships to interfere with the concurrent findings of the judge and the majority in the Court of Appeal after conducting such a detailed and time-consuming exercise unless some flaw in their

---

reasoning could be demonstrated. There are however two grounds on which it was contended they misdirected themselves. The first relates to the requirements of the tort. The second relates to the use which they made of the Bingham report.

**74** It is not necessary for me to deal in detail with the differences which have emerged between your Lordships and the courts below as to the requirements of the tort. For the most part Clarke J's conclusions as to the legal principles to be applied which he summarised at the end of his first judgment [1996] 3 All ER 558, 632G-633E were approved in the judgment given by your Lordships after the first hearing of this appeal. The majority in the Court of Appeal said that they were in broad agreement with the judge's conclusions on the tort and that they had adopted the same approach as he had taken when they were considering whether the claimants' case was bound to fail: ante, pp 58H, 94E. But there is one point of difference which is of obvious importance, as it lies at the heart of the argument between the parties. This relates to the state of knowledge of the public officer about the prospect of loss that has to be demonstrated where the claim is based on the concept of recklessness.

**75** In his formulation Clarke J said that, for the purposes of the requirement that the officer knows that his act will probably injure the claimant, it is sufficient if he has actual knowledge that his act will probably damage the claimant or, in circumstances in which he believes or suspects that his act "will probably" damage the plaintiff, he does not ascertain whether that is so or fails to make inquires as to "the probability" of such damage: [1996] 3 All ER 558, 633A-B. In the Court of Appeal the majority asked themselves whether the claimants had an arguable case that the Bank "actually foresaw" BCCI's imminent collapse at each relevant stage: ante, p 94E. They went on to say at p 94F-G that that formulation might have been too favourable to the claimants and that, in view of the stringent requirements of the tort of misfeasance in public office, the more appropriate question might be whether the Bank "knew" that its decision would cause loss to the claimants. I would not regard the fact that the latter observation is not supported by your Lordships' judgment as important, as the majority do not say that they based their decision on this view. But it is clear that the theme of knowledge of probable loss informed the approach which was taken throughout these judgments to the question whether the claim should be struck out.

**76** Mr Stadlen sought to support this approach. But, for the reasons which I have already given, I would hold that it is not consistent with the effect of your Lordships' judgment following the first hearing. As I have already said when I was reviewing the requirements of the tort in an earlier section of this judgment (section (2)), the state of mind which amounts to subjective recklessness is demonstrated where it is shown that the public officer was aware of a serious risk of loss due to an act or omission on his part which he knew to be unlawful but chose deliberately to disregard that risk, and the question whether at any given point of time that risk is sufficiently serious to justify a finding of recklessness is one of degree. I consider that this point alone is sufficient to justify taking a fresh look at the question whether the claimants have a seriously arguable case directed to the issue of recklessness.

**77** Then there is the use which was made in their judgments by Clarke J and the majority in the Court of Appeal of the findings and conclusions in the Bingham report. Clarke J said in his third judgment that he recognised that Bingham LJ was not conducting a trial but an inquiry, that he did not see a number of Bank officials, that the witnesses whom he did see were not cross-examined in an adversarial process and that there was no right of appeal. But he went on to say this.

> "On the other hand, it is plain that in addition to questioning witnesses Bingham LJ considered in detail all the relevant internal documents in the possession of the Bank, which involved a perusal of a mass of documentation. As I have already said, it is clear from the terms of Bingham LJ's covering letter to the Chancellor of the Exchequer, and indeed from many passages in the report itself,

---

that he was applying his mind to question what was the state of mind of the Bank at each stage. In these circumstances I accept Mr Stadlen's submission that it is inconceivable that Bingham LJ was aware of material which was materially at odds with his conclusions as to the state of mind of the Bank. There is, in my judgment, no realistic possibility that he has not correctly set out the state of mind of the Bank at each stage. While it is, of course, true that I have seen only the report and not the appendices, the published report is a summary of an even more detailed narrative in the appendices. Since, as just stated, Bingham LJ was expressly considering the state of mind of the Bank at each stage, it is in my judgment inconceivable that there is in the appendices material which would or might support the conclusion that the Bank had the state of mind which the plaintiffs must establish. If there was, Bingham LJ would have referred to it, even if only to dismiss it. He would certainly not have disregarded it. As I have tried to indicate, at no doubt inordinate length, there is nothing in the material which I have seen which gives arguable support for the plaintiffs' case. I would, however, go further. There is nothing in that material which gives reasonable grounds for supposing that there might be other evidence which might in the future support the plaintiffs' case. In these circumstances I accept Mr Stadlen's further submission that there is no realistic possibility of more evidence becoming available, whether by further investigation, discovery, cross-examination or otherwise, which might throw light upon the state of mind of the Bank or any of its relevant officials during the period in which BCCI was operating."

**78** The Court of Appeal said that, while the judge seemed to them to be putting the matter too high in the first of the two paragraphs which I have quoted from his judgment, they agreed with him that there was no realistic possibility that the picture which would emerge if officials of the Bank were to give evidence which was tested by cross-examination would be fundamentally different. In that respect the report was, despite its informal status, an invaluable aid to distinguishing between what was a practical possibility and what was fanciful and inconceivable: ante, p 83H. Auld LJ disagreed with this approach. In his view Clarke J was not entitled to treat the Bingham report effectively as conclusive on the questions that arise in this litigation or to conclude that all the available evidence about the Bank's state of knowledge had been gathered in or properly tested. He said that there were no exceptional circumstances to justify departing from the normal rule of leaving the matter to the trial judge: ante, pp 175D-176A.

**79** As I said in a previous section of this judgment (section (1)(b)), there are important limitations on the use which can be made of the Bingham report in these proceedings. A sharp dividing line must be observed between Bingham LJ's narrative of the evidence, which is a legitimate source to which reference can be made for the purposes of the motion to strike out, and his findings and conclusions in the light of that evidence. It is not just that those findings and conclusions would not be admissible at trial. Fairness to the claimants requires that proper weight is given to the nature of Bingham LJ's inquiry and its limitations. He was not asked to determine the issues relating to the tort of misfeasance in public office which the claimants now seek to raise. These issues were not on trial in those proceedings. There is no doubt that Bingham LJ was chosen to conduct the inquiry because of his outstanding qualities as a judge and the weight of authority which his findings and recommendations would command. But those considerations must not be allowed to affect the rigorous distinction that must be maintained between those parts of the report that are and are not relevant to the Bank's motion to strike out.

**80** As I have already said, Clarke J made it clear that he recognised these limitations. Nevertheless I have formed the clear impression that his view that the claim should be struck out was materially influenced by findings and conclusions and the absence of findings and conclusions in the Bingham report, and that he did not confine himself, as I consider he should have done, strictly to the narrative. I do not

---

leave out of account the fact that he was responding to the way in which the claimants had presented their case. It is clear that they were drawing on those aspects of the report that suited them. It is not surprising that the Bank replied by pointing out those parts of the report that did not, and that the judge in his turn was drawn into this argument. Nevertheless the claimants are, in my view, entitled to say that Bingham LJ's findings and conclusions ought not to be used against them in this way. Bingham LJ's findings and conclusions about the availability of further evidence coming to light were made in proceedings to which they were not parties, and they could not challenge them on appeal. Cogent though these findings and conclusions may appear to be, the claimants are entitled to a fair trial of the claim which they have made against the Bank.

**81** In the following passage in his third judgment Clarke J explained his general approach to the Bingham report before he embarked upon a detailed consideration of the various stages in the history:

> "Mr Stadlen submits that there is no support anywhere in the Bingham report for the conclusion that the Bank acted dishonestly, or that it knew that it was acting unlawfully or that it suspected that its acts or omission would probably cause loss to depositors or potential depositors. For the reasons already stated I shall focus only on the last of these, but I accept the submission that there is no statement in the report which gives any support for the conclusion that at any stage the Bank suspected that depositors and potential depositors would probably suffer loss as a result of the Bank's action or inaction. Yet, as stated on page iii of the covering letter to which I have already referred, it is clear that Bingham LJ was considering the Bank's state of mind at every stage. In my judgment, if Bingham LJ had formed the view that at any stage the Bank suspected that its action or inaction would probably injure depositors or potential depositors he would have said so. Thus, if he had thought that the Bank suspected that BCCI would probably collapse so that new depositors would probably lose their money at any stage of the story from 1979 to 1991 he would have said so. 'Yet, not only did he not say so, but his observations on the evidence are inconsistent with any such conclusion.' "

**82** Thereafter during his examination of the history he made frequent reference to findings or conclusions, or to the absence of conclusions and findings, in the Bingham report. His purpose in doing so was to explain why he was of the opinion that there was nothing in the material he had seen which gave reasonable grounds for supposing that other evidence might become available to throw light on the state of mind of the Bank during the relevant period: see the conclusion, already quoted. The following passage, in which he dealt with the claimants' submission that the Bank must have known when it granted the licence that the principal place of business of BCCI was in the United Kingdom and not in Luxembourg illustrates this point:

> "However, the difficulty with the plaintiffs' submission is that Bingham LJ held in paragraph 2.23 that the Bank never addressed the question what was meant by principal place of business. It assumed wrongly that the principal place of business was in the country of incorporation. Further Bingham LJ says in paragraph 2.24 that the Bank never inquired where the principal place of business was, in the sense of where the mind and management of the company and its central direction resided. The Bank thus treated section 3(5) of the Act as applicable and applied it. In paragraph 2.25 Bingham LJ says that he read nothing sinister in that approach. Moreover, on the footing that the principal place of business was in the United Kingdom, under section 36 BCCI was not entitled to describe itself as a bank, but Bingham LJ says in paragraph 2.33 that it was not until after the licence had been granted that the Bank recognised that fact. There is, in my judgment, no material available to the plaintiffs or to the court to lead to any different conclusion."

---

**83** Among the other passages that might be quoted are those at p 89, where the judge referred to a conclusion in paragraph 2.66 of the report in support of the view that there was no evidence that the Bank suspected in June 1986 following the central treasury losses that BCCI would probably collapse, let alone that it would probably collapse because of an absence of remedial steps; at p 110, where he referred to a conclusion in paragraph 2.154 of the report to the same effect as to the Bank's state of mind in December 1989; and at pp 153 -154, where he referred to paragraphs 2.333 and 2.337 of the report as to the Bank's state of mind in March 1991 when it commissioned PW to investigate and report on malpractice within the group under section 41 of the 1987 Act.

**84** In their written submissions to the Court of Appeal the claimants said that they did not object to the court having regard to the report. But they pointed out that its contents would not be admissible in any trial and that it was odd that the judge considered it permissible or appropriate to determine factual issues by reference to it and to strike out the action in reliance upon it. Nevertheless it is clear that the majority in that court followed Clarke J's approach, and that to a material extent their decision to dismiss the appeal was based on the same view as that which the judge had formed in the light of the findings and conclusions that Bingham LJ expressed.

**85** That there was a fundamental difference of view in the Court of Appeal on this point is clear from Auld LJ's dissenting judgment. He noted the fact that Clarke J relied heavily on the Bingham report as a justification for taking the exceptional course of striking out the claim as doomed to fail: ante, p 174C-D. After pointing out the different functions of that inquiry from those involved in this litigation and the disadvantages that were inherent in that procedure, he said at p 175D-F:

> "In the circumstances, I am of the view that Clarke J was not entitled to treat Bingham LJ's report effectively as conclusive on the questions he, the judge, had to answer in this litigation or to conclude, as he did, that all the available material evidence on those questions had been gathered in. Given the greater generality of the questions in the Bingham inquiry, the limitations of it as a fact-finding exercise when compared with litigation, his acknowledgement of a number of challenges to some of his factual conclusions and the emergence of additional material since the inquiry indicating the Bank's state of knowledge as to the Gokal unrecorded loans, I can see no basis for Clarke J's confidence in this extraordinary and complex case for concluding that Bingham LJ had seen and fully tested all the material evidence available or likely to become available on the issues confronting the court in this case."

**86** I respectfully agree with and would endorse these observations. In my judgment the extent to which the opinions expressed by both Clarke J and the majority in the Court of Appeal were dependent upon passages in the Bingham report which are irrelevant to the issue of strike out provides a further reason for taking a fresh look at this critical issue. For the same reasons I consider that the claimants' motion for leave to re-re-amend the statement of claim is open to re-consideration by your Lordships. The draft re-re-amended statement of claim has now been superseded by the draft new particulars, and it is to that document that I shall direct my remarks on the question whether leave should now be given.

*(5) The test for summary judgment under CPR r 24.2*

**87** Clarke J ordered that the action should be struck out under RSC Ord 18, r 19 on the grounds that the re-amended statement of claim disclosed no reasonable cause of action and that it would be an abuse of process or vexatious or oppressive to give leave to re-re-amend. The parties are agreed that if the question whether the claim should be struck out is to be reconsidered it must now be determined under the

Civil Procedure Rules 1998: see the general principle stated in *Practice Direction--Transitional Arrangements*, 51PD-011. The power which is given to the court to strike out under CPR Pt 3, which is concerned with the court's case management powers, is expressed in rule 3.4(2) in these terms:

> "The court may strike out a statement of case if it appears to the court--(a) that the statement of case discloses no reasonable grounds for bringing or defending the claim; (b) that the statement of case is an abuse of the court's process or is otherwise likely to obstruct the just disposal of the proceedings; or (c) that there has been a failure to comply with a rule, practice direction or court order."

**88** The parties also agree that, if Clarke J were to be held to have applied the wrong test when he ordered the action to be struck out, the relevant rules under the CPR are not confined to the provision for striking out in CPR r 3.4. In *Margulies v Margulies* (unreported) 16 March 2000 the judge's decision to strike out was given pursuant to RSC Ord 18, r 19 before the coming into effect of the Civil Procedure Rules. Nourse LJ said at paragraph 63 that, if the judge wrongly applied the test, the Court of Appeal would have to determine the matter pursuant to CPR Pt 24.2. I would not go so far as to say that your Lordships are obliged to treat the Bank's motion to strike out as an application for summary judgment under rule 24.2. It would, I think, be more accurate to say that your Lordships have power to do so, and that the question is whether your Lordships should exercise that power: see *Taylor v Midland Bank Trust Co Ltd (No 2)* (unreported) 21 July 1999: Court of Appeal (Civil Division) Transcript No 1200 of 1999. *Civil Procedure 2000*, 3.4.6. CPR Pt 24 sets out various procedural requirements which do not apply to rule 3.4 But the claimants do not object to the application of rule 24.2 on procedural grounds. So I would accept Mr Stadlen's submission that it is appropriate for the Bank's application for the claim to be struck out to be treated as if it were an application for summary judgment.

**89** CPR r 24.2 provides:

> "The court may give summary judgment against a claimant or defendant on the whole of a claim or on a particular issue if--(a) it considers that--(i) that claimant has no real prospect of succeeding on the claim or issue; or (ii) that defendant has no real prospect of successfully defending the claim or issue; and (b) there is no other reason why the case or issue should be disposed of at a trial."

**90** The test which Clarke J applied, when he was considering whether the claim should be struck out under RSC Ord 18, r 19, was whether it was bound to fail: see p 171 of the third judgment. Mr Stadlen submitted that the court had a wider power to dispose summarily of issues under CPR Part 24 than it did under RSC Ord 18, r 19, and that critical issue was now whether, in terms of CPR rule 24.2(a)(i), the claimants had a real prospect of succeeding on the claim. As to what these words mean, in *Swain v Hillman* [2001] 1 All ER 91, 92, Lord Woolf MR said:

> "Under r 24.2, the court now has a very salutary power, both to be exercised in a claimant's favour or, where appropriate, in a defendant's favour. It enables the court to dispose summarily of both claims or defences which have no real prospect of being successful. The words 'no real prospect of being successful or succeeding' do not need any amplification, they speak for themselves. The word 'real' distinguishes fanciful prospects of success or, as Mr Bidder QC submits, they direct the court to the need to see whether there is a 'realistic' as opposed to a 'fanciful' prospect of success."

**91** The difference between a test which asks the question "is the claim bound to fail?" and one which asks "does the claim have a real prospect of success?" is not easy to determine. In *Swain v Hillman*, at p 4, Lord Woolf explained that the reason for the contrast in language between rule 3.4 and rule 24.2 is that under rule 3.4, unlike rule 24.2, the court generally is only concerned with the statement of case which it is

alleged discloses no reasonable grounds for bringing or defending the claim. In *Monsanto plc v Tilly* The Times, 30 November 1999; Court of Appeal (Civil Division) Transcript No 1924 of 1999; Stuart Smith LJ said that rule 24.2 gives somewhat wider scope for dismissing an action or defence. In *Taylor v Midland Bank Trust Co Ltd* 21 July 1999 he said that, particularly in the light of the CPR, the court should look to see what will happen at the trial and that, if the case is so weak that it had no reasonable prospect of success, it should be stopped before great expense is incurred.

**92** The overriding objective of the CPR is to enable the court to deal with cases justly: rule 1.1. To adopt the language of article 6(1) of the European Convention for the Protection of Human Rights and Fundamental Freedoms with which this aim is consistent, the court must ensure that there is a fair trial. It must seek to give effect to the overriding objective when it exercises any power given to it by the Rules or interprets any rule: rule 1.2. While the difference between the two tests is elusive, in many cases the practical effect will be the same. In more difficult and complex cases such as this one, attention to the overriding objective of dealing with the case justly is likely to be more important than a search for the precise meaning of the rule. As May LJ said in *Purdy v Cambran* (unreported) 17 December 1999: Court of Appeal (Civil Division) Transcript No 2290 of 1999:

> "The court has to seek to give effect to the overriding objective when it exercises any powers given to it by the rules. This applies to applications to strike out a claim. When the court is considering, in a case to be decided under the Civil Procedure Rules, whether or not it is just in accordance with the overriding objective to strike out a claim, it is not necessary to analyse that question by reference to the rigid and overloaded structure which a large body of decisions under the former rules had constructed."

**93** In *Swain v Hillman* Lord Woolf gave this further guidance, at pp 94 and 95:

> "It is important that a judge in appropriate cases should make use of the powers contained in Part 24. In doing so he or she gives effect to the overriding objectives contained in Part 1. It saves expense; it achieves expedition; it avoids the court's resources being used up on cases where this serves no purpose, and, I would add, generally, that it is in the interests of justice. If a claimant has a case which is bound to fail, then it is in the claimant's interests to know as soon as possible that that is the position. Likewise, if a claim is bound to succeed, a claimant should know this as soon as possible ... Useful though the power is under Part 24, it is important that it is kept to its proper role. It is not meant to dispense with the need for a trial where there are issues which should be investigated at the trial. As Mr Bidder put it in his submissions, the proper disposal of an issue under Part 24 does not involve the judge conducting a mini trial, that is not the object of the provisions; it is to enable cases, where there is no real prospect of success either way, to be disposed of summarily."

*(6) Whether the claim should be summarily struck out*

**94** For the reasons which I have just given, I think that the question is whether the claim has no real prospect of succeeding at trial and that it has to be answered having regard to the overriding objective of dealing with the case justly. But the point which is of crucial importance lies in the answer to the further question that then needs to be asked, which is--what is to be the scope of that inquiry?

**95** I would approach that further question in this way. The method by which issues of fact are tried in our courts is well settled. After the normal processes of discovery and interrogatories have been completed, the parties are allowed to lead their evidence so that the trial judge can determine where the truth lies in the light of that evidence. To that rule there are some well-recognised exceptions. For example, it may be clear as a matter of law at the outset that even if a party were to succeed in

---

proving all the facts that he offers to prove he will not be entitled to the remedy that he seeks. In that event a trial of the facts would be a waste of time and money, and it is proper that the action should be taken out of court as soon as possible. In other cases it may be possible to say with confidence before trial that the factual basis for the claim is fanciful because it is entirely without substance. It may be clear beyond question that the statement of facts is contradicted by all the documents or other material on which it is based. The simpler the case the easier it is likely to be to take that view and resort to what is properly called summary judgment. But more complex cases are unlikely to be capable of being resolved in that way without conducting a mini-trial on the documents without discovery and without oral evidence. As Lord Woolf said in *Swain v Hillman*, at p 95, that is not the object of the rule. It is designed to deal with cases that are not fit for trial at all.

**96** In *Wenlock v Moloney* [1965] 1 WLR 1238 the plaintiff's claim of damages for conspiracy was struck out after a four day hearing on affidavits and documents. Danckwerts LJ said of the inherent power of the court to strike out, at p 1244B-C:

> "this summary jurisdiction of the court was never intended to be exercised by a minute and protracted examination of the documents and facts of the case, in order to see whether the plaintiff really has a cause of action. To do that is to usurp the position of the trial judge, and to produce a trial of the case in chambers, on affidavits only, without discovery and without oral evidence tested by cross-examination in the ordinary way. This seems to me to be an abuse of the inherent power of the court and not a proper exercise of that power."

Sellers LJ said, at p 1243C-D, that he had no doubt that the procedure adopted in that case had been wrong and that the plaintiff's case could not be stifled at that stage, and Diplock LJ agreed.

**97** In the Court of Appeal, ante, p 78E-F the majority said that "this somewhat rigid position" had been modified in *Williams and Humbert Ltd v W & H Trade Marks (Jersey) Ltd* [1986] AC 368, where Lord Templeman said at pp 435H-436A that if an application to strike out involves a prolonged and serious argument the judge should, as a general rule, decline to proceed with the argument unless he not only harbours doubts about the soundness of the pleading but, in addition, is satisfied that striking out will obviate the necessity for a trial or will substantially reduce the burden of preparing for the trial or the burden of the trial itself: see also Lord Mackay of Clashfern, at p 441E-F. But they were satisfied that this case fell within the exceptional class for the same reasons as those explained in the *Williams and Humbert* case, and that Clarke J was right to embark upon the exercise. I too would not criticise the judge for undertaking the exercise. But I would also pay careful regard to what the Court of Appeal in *Wenlock v Moloney* [1965] 1 WLR 1238 regarded as objectionable. In *Morris v Bank of America National Trust* [2000] 1 All ER 954, 966B Morritt LJ said that *Wenlock's* case illustrated a salutary principle. He then said, at p 966B-C:

> "In the Three Rivers DC case the Court of Appeal upheld the decision of Clarke J to strike out a complicated claim for damages for misfeasance in a public office made against the Bank of England for authorising BCCI to carry on the business of banking. In that case all the evidence then available to the plaintiff was before the court because all the facts had been investigated by Bingham LJ as he then was ... Obviously the fact of a recent inquiry is a material distinction."

For reasons already explained (in section (4)), I do not think that the investigation that was conducted by Bingham LJ justifies a departure from the principle. I consider that both Clarke J and the majority in the Court of Appeal were wrong to approach this case on the basis that all the facts that are relevant to the claim that is being made in this case had been investigated.

**98** The present case is, as everyone concerned with it has recognised, one of a quite exceptional character. The issues of fact which the claimants seek to raise are

---

**[2003]** **262**

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 228 of 260
Pg 308 of 686

2 AC Three Rivers DC v Bank of England (No 3) (HL(E)) Lord Hope of Craighead

highly complex. They relate to matters in which they were not directly involved, as they were third parties to the system of regulation which was set up to protect them. They involve meetings and discussions between many parties at which they were not represented and they extend, through no fault of theirs, over a very long period. The issues of law are also complex, as the claim depends on an assessment of the state of mind of the Bank's officials at each of the various stages in the history. Much of what was passing through their minds can be discovered by examining the documents. But the court is normally reluctant to draw inferences of the kind that need to be drawn in this case without seeing and hearing the witnesses. Bingham LJ had that advantage. The court, so far, has not.

**99** My approach to this issue can therefore be summarised against this background as follows. For the reasons which I have already given (in section (3)), I consider that the claimants' pleadings give sufficient notice to the Bank of the case which they wish to present and that the facts pleaded are capable of satisfying the requirements of the tort. That being so, I would be inclined to hold that this highly complex case should not be decided on the documents without hearing oral evidence but should go to trial. This view is reinforced by what I have said about the Bingham report. I would leave out of account the findings and conclusions in that report which the parties are agreed would at any trial be inadmissible. It is not just that, strictly speaking, they are irrelevant to any decision that might be made by the trial judge. I also believe, for the reasons that I have just given, that it would be contrary to the overriding requirement of fairness for them to be taken into account in reaching a decision as to whether this case can be decided without hearing oral evidence.

**100** I would also examine the question whether the claim has no real prospect of succeeding at the outset from a totally neutral standpoint. By that I mean that I would not make any assumptions either one way or the other about the competence or integrity of the Bank or its officials as a prelude to examining the available evidence. I accept that conduct amounting to misfeasance in public office is not to be inferred lightly. That is true as a general proposition, whatever may be the task or status of the impugned public officer. But I think that it would be to risk pre-judging the case to attempt to evaluate the action's prospects of success by considering at this stage, before hearing evidence, whether the claimants' case against the Bank as regulator is inherently implausible or scarcely credible. These factors, taken as a whole, seem to me to point clearly against giving a summary judgment in the Bank's favour under CPR rule 24.

**101** I turn then to the state of the evidence. I shall deal with this matter briefly. It is clear, as my noble and learned friend Lord Steyn has indicated, that the facts must be left to the trial judge if the case is to go to trial. As I said in my introduction (section (1)(a)), the history can conveniently be divided up into four periods: (a) prior to the grant of the licence in June 1980, (b) June 1980 to December 1986, (c) December 1986 to April 1990 and (d) April 1990 to closure in July 1991.

**102** In regard to the period prior to the grant of the licence in June 1980 the majority in the Court of Appeal said that they agreed with Clarke J that there was material from which it could be said to be at least arguable that the Bank must have known that the Luxembourg regulators were not regulating BCCI SA properly and did not have the resources to do so. They were against the claimants on the question whether there was an arguable case on foresight of loss during this period: ante, p 84C-D. Clarke J said in his third judgment, that it seemed to him to offend common sense to conclude that it actually knew, believed or suspected that if it licensed BCCI SA it would, or even might, collapse. By April 1990 however the picture had, in their view, entirely changed. The majority in the Court of Appeal said that the PW report to the board of BCCI Holdings of 18 April 1990 was highly significant, as it marked a date after which it would be impossible in their judgment to contend that there was no arguable case that the Bank was aware of a very serious and very immediate threat to depositors of BCCI SA: ante, p 92D. Clarke J said that it is plain that the Bank appreciated that in the absence of remedial steps BCCI would probably

[2003] 263

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 229 of 260
Pg 309 of 686

2 AC Three Rivers DC v Bank of England (No 3) (HL(E)) Lord Hope of Craighead

collapse. His conclusion however was that at no time between April 1990 and June 1991 did the Bank believe or suspect that the majority shareholders would probably not save the Bank. At this point therefore, as the majority in the Court of Appeal observed, at p 92D, the prospect of a rescue operation being promoted by the Abu Dhabi government, and the Bank's perception of the various possible outcomes, assumes central importance. The majority said, at p 94E, that they agreed with the judge that the claimants had no arguable case that the Bank dishonestly failed to revoke the authorisation of BCCI SA in circumstances when it knew, believed or suspected that the company would probably collapse without being rescued.

**103** These views were, as can be seen from the judgments, heavily influenced by passages in the Bingham report which I consider to be irrelevant to the question whether the claim should be struck out. I have examined the available material from a different standpoint. I have left those passages out of account. I have asked myself whether, in regard to each of the four periods, the available material can be taken to have been fully examined and tested at this stage. The limitations which are inherent in this exercise are obvious. All we can do is read the material and compare it with the case that is being made in the new draft particulars. In a simple case this may be all that needs to be done in order to reach a clear view that the claim has no real prospect of succeeding. If one can reach that view, it follows as night follows day that all the usual fact-finding exercises of discovery, interrogation and cross-examination of witnesses will achieve no purpose and the claim should be struck out. But I am not persuaded this exceptional case falls into that category.

**104** I agree that there is material in the documents that are already available to support the pleading in Schedule 2, of the new draft particulars that the Bank knew that before the grant of the full licence to BCCI SA that it was not entitled to rely on the Luxembourg regulator. Given that starting point, I cannot say that the claimants have no real prospect of proving that the Bank knew that their initial act in licensing BCCI SA was unlawful, that its licence and authorisation remained unlawful throughout the remaining three periods and that all subsequent omissions to revoke the licence and authorisation were affected by the same illegality. I have more difficulty with the question whether there is material to support the pleading in Schedule 3 that at the time of licensing the Bank knew that loss was probable or that it had the state of mind regarding loss to depositors and potential depositors that amounted to recklessness. There is no direct evidence of this in the available documents, and I am not confident that they contain any material which suggests that contemporary documentary evidence to this effect is likely to become available. At best for the claimants, it appears that is a matter which will have to be inferred from other evidence.

**105** But it seems to me that, as events unfold, this part of the case gathers momentum and that the available material makes it clear that the Bank knew by April 1990 at the latest that, unless a rescue could be put in hand in time by the Abu Dhabi government, BCCI would collapse and that serious loss to depositors would then be inevitable. The pattern of events during this final period is complicated, as the majority in the Court of Appeal recognised: ante, p 93B. For reasons already given I would leave out of account the fact, relied on by the majority at p 94B, that the conclusion in the Bingham report was that rescue was feasible and collapse not inevitable. In my opinion the documents alone do not tell the full story, and the question whether the Bank knew that loss to depositors was probable or was reckless in the relevant sense cannot be answered satisfactorily without hearing oral evidence.

**106** I agree with my noble and learned friend Lord Hobhouse that the overriding objective of dealing with cases justly includes dealing with them in a proportionate manner, expeditiously, fairly and without undue expense. As he says, each case is entitled only to an appropriate share of the court's resources. Account has to be taken of the need to allot resources to other cases. But I do not believe that the course which I favour offends against these important principles. The most important principle of all is that which requires that each case be dealt with justly. It

[2003] 264
2 AC Three Rivers DC v Bank of England (No 3) (HL(E))

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 230 of 260
Pg 310 of 686

Lord Hope of
Craighead

may well be that the claimants, on whom the onus lies, will face difficulties in presenting their case. They must face the fact that each and every allegation of bad faith will be examined rigorously. A trial in this case will be lengthy and it will be expensive. There is only so much that astute case management can do to reduce the burdens on the parties and on the court. Nevertheless it would only be right for the claim to be struck out if it has no real prospect of succeeding at trial. I do not think that one should be influenced in the application of this test by the length or expense of the litigation that is in prospect. Justice should be even-handed, whether the case be simple or whether it be complex. It is plain that the situation in which the claimants find themselves was not of their own making, nor are they to be blamed for the volume and complexity of the facts that must be investigated. I would hold that justice requires that the claimants be given an opportunity to present their case at trial so that its merits may be assessed in the light of the evidence.

**107** I have taken one other factor into account. The decision which your Lordships are being asked by the Bank to take is to give summary judgment in its favour on the entire claim. It would only be right to strike out the whole claim if it could be said of every part of it that it has no real prospect of succeeding. That would mean that even the latest depositors who were entrusting their money to BCCI SA up to the very end of the final period would be left without a remedy. I think that that is too big a step to take on the available material. Conversely, I consider that if one part of the claim is to go to trial it would be unreasonable to divide the history up and strike out other parts of it. A great deal of time and money has now been expended in the examination of the preliminary issues, and I think that this exercise must now be brought to an end. I would reject the Bank's application for summary judgment.

*(7) The Bank's cross-appeal*

**108** The cross-appeal by the Bank is directed to the second and third of the three questions which in his order of 19 July 1995 Clarke J said should be tried as preliminary issues. The first question was whether the Bank is capable of being liable to the claimants for the tort of misfeasance in public office. That is the question to which the main part of this judgment has been directed. For the reasons which I have given I consider that it cannot be answered until the facts have been established at trial. The second and third questions were whether the claimants' alleged losses were caused in law by the acts or omissions of the Bank, and whether the claimants are entitled to recover for the tort of misfeasance in public office as existing or potential depositors. The Court of Appeal held that it would be premature to decide these points conclusively in the Bank's favour until the facts have been established; ante pp 59E-61H. I respectfully agree. As I said earlier (see paragraph 34) the Bank, while reserving the right to pursue the issue at trial, accepts that it is capable of being liable for the tort to potential depositors and questions of fact are raised by the issue about causation which are unsuitable for summary determination at this stage.

*(8) Conclusion and further procedure*

**109** For these reasons I would allow the appeal and I would dismiss the cross-appeal. I would set aside the order that the re-amended statement of claim be struck out, and I would give permission to the claimants to amend their particulars of claim in terms of the new draft particulars.

**110** The claimants invited your Lordships to direct the Bank to serve an amended defence within two months of the date of this order and the claimants to serve a reply, if so advised, within six weeks of service of the amended defence, and to direct the parties to arrange a case management conference with the Commercial Court within four weeks of the date for service of the reply with a view to determining further progress of this action and establishing all necessary timetables

---

**[2003]** **265**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))**

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 231 of 260
Pg 311 of 686

**Lord Hope of Craighead**

and directions for bringing the case on for trial at the earliest date the Commercial Court considers feasible. These proposals seem to me to be entirely reasonable. Like Lord Steyn, I anticipate that the court will wish to exercise its powers of case management with a view to bringing the case to trial with due despatch in accordance with the overriding objective and that further delay due to the hearing of interlocutory applications will now be kept to a minimum. But on balance I think that it is preferable to leave it to the Commercial Judge in charge of the case to make the appropriate directions.

**LORD HUTTON**

My Lords,

**111** I have had the advantage of reading in draft the speech of my noble and learned friend Lord Hope of Craighead and I gratefully adopt his account of the factual and statutory background to this appeal and of the course of the proceedings in the High Court and the Court of Appeal. I am in general agreement with his conclusions and with the reasons which he gives for them, but because of the importance of the issues which have arisen for decision I propose to state the reasons which have led me to the conclusion that the plaintiffs' appeal should be allowed and that the action should not be struck out.

**112** In his first judgment dated 1 April 1996 Clarke J stated the ingredients of the tort of misfeasance in public office. In his second judgment dated 10 May 1996 the learned judge held that the amended statement of claim as pleaded at that date did not allege the necessary knowledge of, or recklessness as to, the probability of loss, and that accordingly if that statement of claim were not further amended the plaintiffs' claim would fail and should be dismissed. But the judge gave leave to the plaintiffs to apply to amend further the statement of claim. The plaintiffs then brought an application before the judge for leave to re-amend the statement of claim and by his third judgment dated 30 July 1997 the judge held that even if all the proposed amendments to the statement of claim were permitted the plaintiffs' claim was bound to fail. The judge stated:

> "I have reached the firm conclusion that on the material available at present the plaintiffs have no arguable case that the Bank dishonestly granted the licence to BCCI or dishonestly failed to revoke the licence or authorisation in circumstances when it knew, believed or suspected that BCCI would probably collapse. There is nothing in the Bingham report or in the documents which I have seen to support such a conclusion and there is much to contradict it."

Accordingly the judge ordered that the action be struck out, but the judge made it clear, at p 169, that, but for the conclusion which he had reached that the plaintiffs' action was bound to fail, it is likely that he would have allowed all, or almost all, the proposed amendments to the statement of claim.

**113** The Court of Appeal (Auld LJ dissenting) upheld the decision of Clarke J and delivering the joint judgment of himself and Robert Walker LJ, Hirst LJ stated, ante, p 94B-D:

> "The judge reached the firm conclusion, in his third judgment, that, on the material then available, the plaintiffs had no arguable case that the Bank dishonestly licensed BCCI SA or dishonestly failed to revoke the licence or authorisation in circumstances when it knew, believed or suspected that the company would probably collapse without being rescued. We agree with that conclusion. We also agree that, in all the circumstances of this extraordinary case, it is now for practical purposes inconceivable that new material would emerge of such significance as to alter that conclusion. The tort alleged is a tort of dishonesty, and the plaintiffs' claim must be rigorously assessed on their pleaded case and the evidential material shown to be available to support it."

**[2003] 2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **266** **Lord Hutton**

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

In his dissenting judgment, ante, p 175F-G Auld LJ stated:

> "As the authorities to which Hirst and Robert Walker LJJ have referred indicate, it is normally only in clear and obvious cases that a court should strike out a claim as incapable of proof at the interlocutory stage and before full discovery. In cases, such as this, of great legal and factual complexity, it requires a justified confidence that the plaintiffs' case is and will remain incapable of proof and most exceptional circumstances to justify stifling it at an early stage. For the reasons that I have given, I do not consider that the court can be confident that all the evidence material to Clark J's conclusion about the Bank's state of knowledge has been gathered in or, which is as important, properly tested."

**114** In giving judgment on the legal issues relating to the nature of the tort of misfeasance in public office the House directed that the plaintiffs should prepare a new draft pleading, ante, p 196H and accordingly the plaintiffs have prepared and served a new pleading consisting of particulars of claim which, with a few additions, largely contain the allegations pleaded in the re-amended statement of claim and in the re-re-amendments which the plaintiffs sought leave to make from Clarke J.

**115** Before the House in the present hearing the plaintiffs submitted that the new particulars of claim disclosed a cause of action on which they were entitled to proceed to trial. The Bank advanced two main submissions. The first was that the plaintiffs' claim, whether as formulated in the re-amended statement of claim or in the re-re-amendments which Clarke J considered in his third judgment, or as formulated in the new particulars of claim, disclosed no reasonable cause of action so that the action should remain struck out. The Bank's second submission was that the plaintiffs' claim, in whatever way it was formulated, was frivolous and vexatious and/or an abuse of process and on that ground also the action should remain struck out.

**116** The issues which arose before Clarke J and the Court of Appeal as to whether the pleadings disclosed a reasonable cause of action and/or were frivolous and vexatious and/or an abuse of process were issues which were governed by Ord 18, r 19(1)(a)(b) and (d) of the Rules of the Supreme Court. I think that in applications under the Rules of the Supreme Court a clear distinction was not always drawn between an application under Ord 18, r 19(1)(a) to strike out a statement of claim on the ground that it disclosed no reasonable cause of action and an application under Ord 18, r 19(1)(b) and (d) to strike out a statement of claim on the ground that it was frivolous or vexatious and/or an abuse of the process of the court, and, in practice, there were cases where it was difficult to draw or give effect to this distinction. But in a complex case such as the present one I think it is helpful to recognise the distinction.

**117** The 1999 White Book stated at 18/19/10 with reference to r 19(1)(a)...

> "A reasonable cause of action means a cause of action with some chance of success when only the allegations in the pleading are considered (per Lord Pearson in *Drummond-Jackson v British Medical Association* [1970] 1 WLR 688; [1970] 1 All ER 1094, CA). So long as the statement of claim or the particulars (*Davey v Bentinck* [1893] 1 QB 185) disclose some cause of action, or raise some question fit to be decided by a judge or a jury, the mere fact that the case is weak, and not likely to succeed, is no ground for striking it out (*Moore v Lawson* (1915) 31 TLR 418, CA; *Wenlock v Moloney* [1965] 1 WLR 1238; [1965] 2 All ER 871, CA)..."

Therefore if a plaintiff would be entitled to judgment if he were successful in proving the matters alleged in his pleadings, the statement of claim could not be struck out under rule 19(1)(a) on the ground that he had no prospect of adducing evidence to prove the matters which he alleged. If a defendant wished to strike out a statement of claim and to obtain an order for the dismissal of the action on the ground that the plaintiff had no prospect of proving the case which he alleged in his statement of claim he had to do so under rule 19(1)(b) and/or (d). A case which illustrates this (although the application was to strike out, not a statement of claim, but a plea of

justification in a defence) was the application made in *McDonald's Corpn v Steel* [1995] 3 All ER 615 where the Court of Appeal considered the correct approach to an application under Ord 18, r 19(d) to strike out a pleading for abuse of process and held, at p 623E-F, that the power to strike out was a draconian remedy which was to be employed only in clear and obvious cases where it is possible to say at an interlocutory stage and before full discovery that a particular allegation was incapable of being proved.

**118** In the present case when Clarke J struck out the action he did so on the ground that even with all the proposed re-re-amendments the plaintiffs' claim was bound to fail and that in those circumstances it would be an abuse of the process or vexatious or oppressive to allow the action to proceed (see paragraphs 6 and 7, at p 172, of his third judgment).

**119** The applications before Clarke J and the Court of Appeal were governed by the Rules of the Supreme Court but those Rules have now been replaced by the Civil Procedure Rules. I think that r 3.4 (2)(a) of the new Rules corresponds in a broad way to Ord 18, r 19(1)(a) and r 3.4 (2)(b) and r 24.2 (a)(i) correspond in a broad way to Ord 18, r 19(1)(b) and (d). Rule 3.4(2) provides:

> "The court may strike out a statement of case if it appears to the court--(a) that the statement of case discloses no reasonable grounds for bringing or defending the claim; (b) that the statement of case is an abuse of the court's process or is otherwise likely to obstruct the just disposal of the proceedings ..."

Rule 24.2(a)(i) provides: "The court may give summary judgment against a claimant or defendant on the whole of a claim or on a particular issue if--(a) it considers that--(i) that claimant has no real prospect of succeeding on the claim or issue; ..."

**120** The new particulars of claim, served pursuant to the direction of the House, were served after the new Civil Procedure Rules came into force, and therefore if Clarke J and the majority of the Court of Appeal erred in their approach to the application to strike out the action the question whether the action should remain struck out falls to be determined by the House under the wording of the new Rules. In the present case I think it is desirable, as I have stated, to distinguish between the two grounds on which the Bank submits that the action should remain struck out. Using the terminology of the new Rules one ground is that the statement of case (looking only at the pleadings themselves) discloses no reasonable ground for bringing the claim (which I shall term "the attack on the pleadings point"), and the other ground is that taking into account the evidence available to the plaintiffs to adduce at a trial, they have no real prospect of succeeding on the claim (which I shall term "the no real prospect of success point").

*The attack on the pleadings point*

**121** My Lords, the essential ingredients of the tort of misfeasance in public office were stated in the judgment of the House following the previous hearing and I do not propose again to restate those elements with precision. But it is clear that a plaintiff must prove (1) an abuse of the powers given to a public officer; (2) that the abuse was constituted by a deliberate act or deliberate omission by the public officer with knowledge that the act or omission was wrongful or with recklessness as to whether or not the act or omission was wrongful; (3) that the public officer acted in bad faith; and (4) that the public officer knew that his act or omission would probably injure the plaintiff or was reckless as to the risk of injury to the plaintiff. In addition the plaintiff must prove that the act or omission caused him loss, but issues of causation do not arise at this stage. As to the first and second matters to be proved, I consider that the particulars of claim sufficiently allege that the Bank deliberately abused its statutory powers in licensing BCCI and in failing to revoke the licence after it had been granted. Paragraph 33, for example, alleges:

---

"33. No revocation of the licence under the 1979 Act. The Bank, knowingly, deliberately contrary to the statutory scheme or recklessly indifferent to whether it was acting in accordance with the statutory scheme or wilfully disregarding the risk that it was not acting in accordance with the statutory scheme and in bad faith: 33.1 purported to conclude that it was still entitled to rely upon assurances from the LBC/IML and/or that it had no discretion or power to revoke the full licence when the Bank knew or was recklessly indifferent as to whether or wilfully disregarded the risk that, as was the case: 33.1.1 the criteria under paragraphs 7 (fit and proper), 8 (four eyes) and 10 (prudent manner) of Schedule 2 to the 1979 Act had not been fulfilled at the time of the grant of the full licence and remained unfulfilled at all times thereafter; 33.1.2 BCCI SA was illegally calling itself a bank contrary to subsection 36(1) of the 1979 Act; 33.1.3 BCCI SA had conducted and continued to conduct its affairs in a way which threatened the interests of its depositors; 33.1.4 the Bank's continued reliance upon assurances from the LBC/IML as to BCCI SA's management and financial soundness was unlawful, and the Bank further knew that the likely consequences were that depositors and potential depositors would suffer losses or the Bank wilfully disregarded the risk of the consequences or was recklessly indifferent to the consequences; and/or ..."

**122** Bad faith is an essential element in the tort of misfeasance. In accordance with a well established rule it is necessary that bad faith (or dishonesty--the term used in some authorities) should be clearly pleaded. In *Davy v Garrett* (1878) 7 Ch D 473, 489 Thesiger LJ said:

"There is another still stronger objection to this statement of claim. The plaintiffs say that fraud is intended to be alleged, yet it contains no charge of fraud. In the Common Law Courts no rule was more clearly settled than that fraud must be distinctly alleged and as distinctly proved, and that it was not allowable to leave fraud to be inferred from the facts. It is said that a different rule prevailed in the Court of Chancery. I think that this cannot be correct. It may not be necessary in all cases to use the word 'fraud'--indeed in one of the most ordinary cases it is not necessary. An allegation that the defendant made to the plaintiff representations on which he intended the plaintiff to act, which representations were untrue, and known to the defendant to be untrue, is sufficient. The word 'fraud' is not used, but two expressions are used pointing at the state of mind of the defendant--that he intended the representations to be acted upon, and that he knew them to be untrue. It appears to me that a plaintiff is bound to show distinctly that he means to allege fraud. In the present case facts are alleged from which fraud might be inferred, but they are consistent with innocence. They were innocent acts in themselves, and it is not to be presumed that they were done with a fraudulent intention."

I would observe that the last two sentences in this passage have to be read together with the sentence which immediately precedes them. In *Belmont Finance Corpn Ltd v Williams Furniture Ltd* [1979] Ch D 250, 268 Buckley LJ stated:

"In the present case, do the facts alleged in the statement of claim suffice to bring home to the defendants or any of them a charge that (a) the object of the alleged conspiracy was a dishonest one; and (b) that they actually knew, or must be taken to have known, that it was so? An allegation of dishonesty must be pleaded clearly and with particularity. That is laid down by the rules and it is a well-recognised rule of practice. This does not import that the word 'fraud' or the word 'dishonesty' must necessarily be used: see *Davy v Garrett* 7 Ch D 473, 489, per Thesiger LJ. The facts alleged may sufficiently demonstrate that dishonesty is allegedly involved, but where the facts are complicated this may not be so clear, and in such a case it is incumbent upon the pleader to make it clear when dishonesty is alleged. If he uses language which is equivocal, rendering it doubtful

---

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 235 of 260
Pg 315 of 686

whether he is in fact relying on the alleged dishonesty of the transaction, this will be fatal; the allegation of its dishonest nature will not have been pleaded with sufficient clarity."

**123** In the present case paragraphs 36, 37 and 38 of the particulars of claim allege:

"36. Failure to supervise. The Bank, knowingly, deliberately contrary to the statutory scheme or recklessly indifferent to whether it was acting in accordance with the statutory scheme or wilfully disregarding the risk that it was not acting in accordance with the statutory scheme and in bad faith failed in the respects set out in these particulars of claim to supervise either BCCI SA or BCCI Overseas when: 36.1 the Bank knew that it had a duty to supervise under the 1979 and 1987 Acts; 36.2 the Bank's motives in deliberately failing to supervise were those pleaded in paragraph 37; 36.3 the Bank knew that the consequences of BCCI SA and/or BCCI Overseas being unsupervised was that depositors and potential depositors would suffer losses or was recklessly indifferent to the consequences or wilfully disregarded the risk of the consequences. In support of these contentions the claimants will rely, prior to disclosure, on the facts and matters set out in Schedules 2 to 7.

"THE BANK'S MOTIVES FOR BREACHING ITS STATUTORY DUTIES

"37. The motives of the Bank in acting as pleaded above were improper and unlawful and in the premises the Bank acted in bad faith. The Bank's motives were: 37.1 to avoid having to comply with its duty to make, review and, if necessary revise its own express evaluation of the relevant statutory criteria in relation to BCCI SA, the Bank at all times knowing or suspecting that such criteria were not satisfied (as pleaded above); 37.2 to avoid having to become the lead supervisor in relation to BCCI or the consolidated supervisor of the BCCI Group, even though it knew that it was the only supervisor capable of performing those roles; 37.3 to avoid the risks attaching to the Bank from taking on responsibility for becoming lead supervisor or in undertaking consolidated supervision of the BCCI Group including: 37.3.1 the risk of blame; and 37.3.2 the risk of Her Majesty's Treasury having to act as a lender of last resort; 37.4 to avoid the substantial political and diplomatic problems which would have been generated by the refusal or revocation of BCCI SA's licence or authorisation and the closure of its 45 branches in the United Kingdom; 37.5 as to the use of a bank name by BCCI, to perpetuate a situation, which the Bank had favoured since as early as 1978, that regardless of any statutory requirements, BCCI SA should continue to be permitted to use the word 'bank' as part of its corporate description in the United Kingdom; 37.6 to avoid having to comply with its statutory duty whereby it should have required BCCI Overseas forthwith to apply for and obtain a full licence under the 1979 Act or to cease trading in the United Kingdom. "38. The claimants' case is that in determining the Bank's motives the Bank must be considered in the round as the body made responsible by the 1979 and 1987 Acts for providing the supervisory regime mandated by those Acts for banks. The motives attributed to the Bank pleaded above are a matter of inference from the primary facts pleaded in Schedules 2 to 7. Further particulars will be given following disclosure."

**124** In *Armitage v Nurse* [1998] Ch 241, 256G Millett LJ said: "It is not necessary to use the word 'fraud' or 'dishonesty' if the facts which make the conduct complained of fraudulent are pleaded; but, if the facts pleaded are consistent with innocence, then it is not open to the court to find fraud." Later in his judgment, at p 259G, he said: "I am of opinion that, as at present drawn, the amended statement of claim does not allege dishonesty or any breach of trust for which the trustees are not absolved from liability by clause 15." In *Taylor v Midland Bank Trust Co Ltd*

---

**[2003]** **270**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hutton**

(unreported) 21 July 1999 Buxton LJ referred to the first observation of Millett LJ, at p 256G, and said:

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 236 of 260
Pg 316 of 686

> "That, however, was an observation about pleading, not about substance. If (unlike the pleader in our case) the claim does not expressly allege dishonesty, but stands on facts alone, those facts on their face will meet the requirement of a specific allegation of dishonesty only if they can bear no other meaning."

But in the present case, unlike in *Armitage v Nurse*, the pleader does expressly allege bad faith because paragraph 37 pleads that "the motives of the Bank in acting as pleaded above were improper and unlawful and in the premises the Bank acted in bad faith" and the paragraph sets out particulars in support of that allegation. In my opinion those particulars are not consistent with mere negligence.

**125** I further consider that if a plaintiff clearly alleges dishonesty or bad faith and gives particulars, the statement of claim cannot be struck out under rule 3.4(2)(a) because the facts he pleads as giving rise to an inference of dishonesty or bad faith may at the trial, after a full investigation of the circumstances, be held not to constitute proof of that state of mind. If a defendant applies to strike out an action on the ground that the plaintiff has no prospect of adducing evidence at the trial to establish the case which he pleads the application should be brought under rule 3.4(2)(b) or rule 24.2(a)(1).

**126** Mr Stadlen, for the Bank, submitted that the pleadings were defective because they did not allege that identified or identifiable bank officials took conscious decisions to do acts or to refrain from doing acts with the requisite guilty state of mind. I do not accept that submission. It is clear from the authorities that a plaintiff can allege misfeasance in public office against a body such as a local authority or a government ministry: see *Dunlop v Woollahra Municipal Council* [1982] AC 158 and *Bourgoin SA v Ministry of Agriculture, Fisheries and Food* [1986] QB 716. Therefore I consider that the plaintiffs are entitled in their pleadings to allege in the manner they have done misfeasance in public office against the Bank without having to give particulars of the individual officials whose decisions and actions they claim combined to bring about the misfeasance alleged.

**127** The fourth element which the plaintiff must prove to establish the tort is that the public officer knew that his act or omission would probably injure the plaintiff or was reckless as to the risk of injury to the plaintiff. Mr Stadlen submitted that the judgments of the House after the earlier hearing established that to prove recklessness the plaintiff must not merely establish that the officer was aware that there was a risk of injury to the plaintiff but that he believed or suspected that his act or omission would probably injure the plaintiff and was recklessly indifferent to that probable injury. Mr Stadlen further submitted that in pleading recklessness in a number of places in the particulars of claim the plaintiffs had failed to plead that the Bank believed or suspected that its act or omissions would probably damage the plaintiffs and was recklessly indifferent to that injury and merely pleaded that the Bank "wilfully disregarded the risk of the consequences or was recklessly indifferent to the consequences": see for example the last four lines of paragraph 33.1 which I have set out above.

**128** Having expressly pleaded that "the Bank further knew that the likely consequences were that depositors and potential depositors would suffer losses" the plaintiff then pleaded "or the Bank wilfully disregarded the risk of the consequences or was recklessly indifferent to the consequences", and in my opinion the distinction between so pleading and pleading that the Bank believed or suspected that its acts or omissions would probably damage the plaintiffs and was recklessly indifferent to that probable injury is such a fine one that an argument based on the distinction cannot constitute a ground for a strike-out under rule 3.4(2)(a). In *British Airways Pension Trustees Ltd v Sir Robert McAlpine & Sons Ltd* (1994) 72 BLR 26 the plaintiffs' statement of claim alleged that defects in a development constructed by McAlpine and designed by Project Design Partnership had diminished its value. The defendants

---

**[2003]** **271**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hutton**

applied to strike out the statement of claim on the ground (inter alia) that it failed to identify which of the alleged defects had caused which part of the alleged diminution in value. In the Court of Appeal Saville LJ stated, at pp 33-34:

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 237 of 260
Pg 317 of 686

"The various defects alleged by the plaintiffs might not all be attributable to all the defendants, the cost of remedying the individual defects was not given and no attempt was made to ascribe to each defect the amount by which it contributed to the alleged diminution in value. At the same time I have some difficulty in seeing how the defendants could fairly be said to be seriously prejudiced by these omissions. The pleading alleges that the defects respectively attributable to McAlpine and PDP each caused the alleged diminution in value. The alleged defects themselves were set out in some detail, McAlpine and PDP had been on site for a considerable time after practical completion and so had their own means of knowledge of the alleged defects. Thus it seems to me that it can hardly be said that these defendants were in any real fashion placed in a position where they were unable to know what case they had to meet or were facing an unfair hearing ... The basic purpose of pleadings is to enable the opposing party to know what case is being made in sufficient detail to enable that party properly to prepare to answer it. To my mind it seems that in recent years there has been a tendency to forget this basic purpose and to seek particularisation even when it is not really required. This is not only costly in itself, but is calculated to lead to delay and to interlocutory battles in which the parties and the court pore over endless pages of pleadings to see whether or not some particular point has or has not been raised or answered, when in truth each party knows perfectly well what case is made by the other and is able properly to prepare to deal with it. Pleadings are not a game to be played at the expense of the litigants, nor an end in themselves, but a means to the end, and that end is to give each party a fair hearing."

And in considering the purpose of pleadings under the Civil Procedure Rules in *McPhilemy v Times Newspapers Ltd* [1999] 3 All ER 775, 793B Lord Woolf MR stated: "What is important is that the pleadings should make clear the general nature of the case of the pleader. This is true both under the old rules and the new rules."

**129** In the present case where the plaintiffs plead that the Bank knew that the likely consequences were that depositors and potential depositors would suffer loss and then, in the alternative, plead recklessness, I do not consider that the omission to plead in the context of recklessness that the Bank believed or suspected that injury was likely could prejudice the Bank; and if the ultimate outcome of the trial were to depend on the precise elements necessary to constitute recklessness, I do not consider that the state of the pleadings would prejudice the Bank in advancing any arguments available to it.

*The no real prospect of success point*

**130** The decision by Clarke J, upheld by the majority of the Court of Appeal, that the action was bound to fail and therefore should be struck out was based on two principal conclusions. One was that there was before him all the evidence which was at that time available to the plaintiffs and that there was no reasonable possibility of the plaintiffs obtaining more evidence in the future, whether by further investigation, discovery, cross-examination of the Bank's witnesses or otherwise which might enable them to succeed. The second conclusion was that on the basis of the evidence before him the plaintiff's claim was bound to fail: see Clarke J's third judgment.

**131** It is apparent from the judgments of Clarke J and the majority of the Court of Appeal that in ruling that the plaintiff's claim was bound to fail they took into account the findings and conclusions of Bingham LJ set out in his report. Thus, in his third judgment Clarke J stated:

---

**[2003]** **272**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hutton**

"Mr Stadlen submits that there is no support anywhere in the Bingham report for the conclusion that the Bank acted dishonestly, or that it knew that it was acting unlawfully or that it suspected that its acts or omissions would probably cause loss to depositors or potential depositors. For the reasons already

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

stated I shall focus only on the last of these, but I accept the submission that there is no statement in the report which gives any support for the conclusion that at any stage the Bank suspected that depositors and potential depositors would probably suffer loss as a result of the Bank's action or inaction. Yet, as stated on page iii of the covering letter to which I have already referred, it is clear that Bingham LJ was considering the Bank's state of mind at every stage. In my judgment, if Bingham LJ had formed the view that at any stage the Bank suspected that its action or inaction would probably injure depositors or potential depositors he would have said so. Thus, if he had thought that the Bank suspected that BCCI would probably collapse so that new depositors would probably lose their money at any stage of the story from 1979 to 1991 he would have said so. Yet, not only did he not say so, but his observations on the evidence are inconsistent with any such conclusion."

There are other passages in his judgment where it is clear that Clarke J was influenced by findings or conclusions arrived at by Bingham LJ, and these have been referred to by my noble and learned friend Lord Hope of Craighead in his speech.

**132** Bingham LJ is a judge of the greatest eminence and distinction and his report sets out the entire history of BCCI from its establishment in the United Kingdom until its liquidation and the Bank's relationship to it with the greatest clarity and with much detail. It was therefore inevitable that the plaintiffs would make use of the information contained in the report in drafting their statement of claim. However, notwithstanding the distinction of its author, it is clear that under well established principles the findings and conclusions of Bingham LJ as to the actions and motives of the Bank would be inadmissible on the hearing of the action: it would be the duty and responsibility of the trial judge to decide for himself, on the evidence which he heard, what were the actions and motives of the Bank. And notwithstanding that it appears that both before Clarke J and the Court of Appeal the plaintiffs themselves sought to rely on certain passages of the Bingham report which they thought supported their case, I consider that it was also impermissible for the judge and the majority of the Court of Appeal in deciding at this interlocutory stage whether there was no real prospect of the action succeeding to be influenced by the findings and conclusions of Bingham LJ. Therefore I am in respectful agreement with the observation of Auld LJ in his dissenting judgment, ante, p 175D: "In the circumstances, I am of the view that Clarke J was not entitled to treat Bingham LJ's report effectively as conclusive on the questions he, the judge, had to answer in this litigation ..."

**133** Therefore I am of the opinion that by taking into account the findings and conclusions of Bingham LJ, Clarke J and the majority of the Court of Appeal erred in considering the issue whether the plaintiffs' claim was bound to fail and that accordingly the House must itself address its mind to the issue (using the terminology of rule 24.2(a)(i)) whether the plaintiffs have no real prospect of succeeding in their claim.

**134** In *Swain v Hillman* [2001] 1 All ER 91, 92 Lord Woolf MR said:

"The words 'no real prospect of being successful or succeeding' do not need any amplification, they speak for themselves. The word 'real' distinguishes fanciful prospects of success or, as Mr Bidder QC submits, they direct the court to the need to see whether there is a 'realistic' as opposed to a 'fanciful' prospect of success."

And, at p 95:

"Useful though the power is under Part 24, it is important that it is kept to its proper role. It is not meant to dispense with the need for a trial where there are

---

issues which should be investigated at the trial. As Mr Bidder put it in his submissions, the proper disposal of an issue under Part 24 does not involve the judge conducting a mini trial, that is not the

object of the provisions; it is to enable cases, where there is no real prospect of success either way, to be disposed of summarily."

**135** Mr Stadlen submitted that an action should be struck out if it was apparent that at the trial the plaintiff could adduce no evidence to establish the case which he pleaded and he relied on the judgment of Neill LJ in *McDonald's Corpn v Steel* [1995] 3 All ER 615, 621:

"It is true that a pleader must not put a plea of justification (or indeed a plea of fraud) on the record lightly or without careful consideration of the evidence available or likely to become available. But, as counsel for the plaintiffs recognised in the course of the argument, there will be cases where, provided a plea of justification is properly particularised, a defendant will be entitled to seek support for his case from documents revealed in the course of discovery or from answers to interrogatories. In recent times there has been what I regard as a sensible development whereby pleadings in libel actions are treated in the same way as pleadings in other types of litigation. It is therefore instructive to refer to a short passage in the judgment of May LJ in *Steamship Mutual Underwriting Association Ltd v Trollope & Colls Ltd* (1986) 6 Con LR 11, 27, where, on an application by a firm of structural engineers that the claim against them should be struck out, he said: 'In my opinion, to issue a writ against a party ... when it is not intended to serve a statement of claim, and where one has no reasonable evidence or grounds on which to serve a statement of claim against that particular party, is an abuse of the process of the court.' Actions for defamation take many forms. The allegations complained about may vary from the moderately serious to the very grave. It may therefore be unwise to put forward a formula which will match all occasions. Nevertheless I am satisfied that before a plea of justification is included in a defence the following criteria should normally be satisfied: (a) the defendant should believe the words complained of to be true; (b) the defendant should intend to support the defence of justification at the trial; and (c) the defendant should have reasonable evidence to support the plea or reasonable grounds for supposing that sufficient evidence to prove the allegations will be available at the trial."

**136** Mr Stadlen submitted that in this case the plaintiffs have no reasonable evidence to support their allegations of deliberate abuse of power in bad faith with knowledge of probable loss to the depositors or potential depositors, and he further submitted that the plaintiffs have no reasonable grounds for supposing that sufficient evidence to prove the allegations would be available at the trial. However in considering this submission it is necessary to take into account a later passage in the judgment of Neill LJ, at pp 622H-623A:

"It is to be remembered, however, that the evidence on which a defendant may be entitled to rely at trial may take a number of different forms. It may include: (a) his own evidence and the evidence of witnesses called on his behalf, (b) evidence contained in Civil Evidence Act statements, (c) evidence contained in his own documents or in documents produced by third parties on subpoena, (d) evidence elicited from the plaintiff or the plaintiff's witnesses in the course of cross-examination, (e) answers to interrogatories and (f) evidence contained in documents disclosed by the plaintiff on discovery.

"*At the outset of the trial*

"I understand that it has become the practice in actions for defamation to consider at the outset of the trial whether some parts of the defence should be struck out on the basis that it has become apparent that some of the matters pleaded are not going to be supported by evidence. I can understand that in an

---

appropriate case this is a sensible course which is likely to shorten the trial. On the other hand there may be cases where a defendant pleads some matter which he believes to be true but which he may still be unable to prove by admissible evidence otherwise than by eliciting an answer in cross-examination. Each case will have to be considered on its own facts."

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 240 of 260
Pg 320 of 686

**137** Clarke J and the majority of the Court of Appeal were of the opinion that Bingham LJ had conducted such a thorough examination of the Bank's dealings with BCCI that it was unrealistic to think that any further material of relevance would emerge and that accordingly the question whether there was reasonable evidence to support the plaintiff's case was to be determined on the basis of the evidence referred to in the Bingham report. Mr Stadlen submitted that Clarke J and the majority of the Court for Appeal were right to hold that that evidence provided no support for an allegation that the Bank had acted dishonestly or in bad faith or with knowledge of probable loss to depositors. I am unable to accept that submission. Both Clarke J and the majority of the Court of Appeal found that by April 1990 the Bank knew that BCCI would probably collapse with consequential loss to depositors and potential depositors in the absence of a rescue package. Clarke J, referring to April 1990, said in his third judgment:

> "Bingham LJ concludes that he did not think that any informed reader of the report could have failed to read it as seriously impugning the honesty with which the group had been run. However, according to paragraph 2.186, with the possible exception of Mr Beverly, no-one did. Indeed in paragraph 2.187 Bingham LJ concludes that in April 1990 and for a number of months afterwards the Governors, the Board of Banking Supervision, Mr Quinn and Mr Barnes were unaware of the serious doubts thrown by Price Waterhouse on the integrity of the [b]ank's most senior management. Sir Patrick submits that that conclusion is incredible. He submits that senior representatives of the Bank must have appreciated that that was the position. I see the force of that submission, but, for present purposes, the question is not whether the Bank appreciated that there had been fraud within BCCI but whether it suspected that BCCI would probably not be rescued and nevertheless dishonestly failed to revoke its authorisation. It is plain that the Bank appreciated that in the absence of remedial steps BCCI would indeed probably collapse."

And in the judgment of the majority of the Court of Appeal Hirst LJ said ante, p 92C-D:

> "The report of 18 April 1990 was not therefore a totally unheralded shock for the Bank. Nevertheless it is highly significant as marking a date after which it would be impossible, in our judgment, to contend that there was no arguable case that the Bank was aware of a very serious and very immediate threat to depositors of BCCI SA. At this point, therefore, the prospect of a rescue operation being promoted by the Abu Dhabi ruling house, and the Bank's perception of the various possible outcomes, assumes central importance."

And, at p 94E:

> "Throughout the preceding four sections we have adopted the same approach as that taken by the judge, and asked ourselves whether the plaintiffs have an arguable case that the Bank actually foresaw BCCI's imminent collapse at each relevant stage. We have agreed with the judge's conclusion that all the evidence indicates that up to April 1990 it did not, and that thereafter it did, but properly relied on the prospect of a rescue. That is sufficient to dispose of the case in the Bank's favour."

**138** In my opinion the Bank cannot validly contend that on the documentary evidence available to them the plaintiffs have no real prospect of succeeding in

---

**[2003]** **275**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hutton**

establishing that the Bank knowingly and in a deliberate way abused its statutory powers in failing to revoke BCCI's licence after it had been granted. A memorandum dated 19 October 1983 from an official in the Bank's Banking Supervision Division to a number of senior officials of the Bank states:

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

"This note reviews our approach to the supervision of BCCI, arguing that our present approach fails to satisfy the requirements of the Banking Act and recommending that we should press BCCI for local incorporation of UK operations ... However, these problems are less serious than the present deficiencies in our supervisory approach in the light of the Banking Act's requirements. The problem with regard to the section 36 contraventions is more difficult, particularly with regard to the branches of BCCI SA, to which there seems no practicable alternative to turning a blind eye."

And in a note of a meeting of Bank officials dated 17 December 1985 after a team from the Bank had visited the BCCI offices in Leadenhall Street the following comment by an official is noted:

"There is no doubt in my mind that BCCI has centralised its management, control and operations in the City. This is a UK-based bank, with its White House encompassing two buildings fronting Leadenhall Street and three at the rear. There is absolutely no way that we should continue the pretence that Luxembourg are the prime supervisors. Luxembourg is prehistoric; Grand Cayman is a tax haven; and it is the Bank of England who are the lender of last resort. If UK incorporation of the UK branch network means the movement of the Treasury Support Organisation from London to Abu Dhabi, the Bank must encourage Abedi all the way. This surely is the only route to effective supervision."

**139** I observed in my speech after the earlier hearing, ante, pp 227E-228A that I considered that, in the context of misfeasance, "in bad faith" is a preferable term to "dishonesty". In relation to the element of bad faith the plaintiffs plead in paragraph 37 of the particulars of claim that the Bank's motives set out in that paragraph constitute bad faith. Lord Neill, for the plaintiffs, submitted that an inference can be drawn from a number of the Bank's documents that it was reluctant to face up to the difficulties and responsibilities involved in an adequate supervision of BCCI and that it placed its own interests before the discharge of its duty to protect depositors and that this constituted bad faith on its part. It is relevant to emphasise that this is the case made by the plaintiffs. They do not make the case that the officials of the Bank were dishonest, in the sense that they acted improperly for their own financial gain. Therefore I consider, with respect, that the point that it is inherently improbable that in the absence of some financial incentive bank officials would act dishonestly, does not assist the Bank's case.

**140** Lord Neill referred (inter alia) to a letter dated 8 April 1987 from a senior official of the Bank to a senior official of the Commissariat au Controle des Banques in Luxembourg written after the Bank had been informed that it was no longer possible for Luxembourg to carry out the consolidated supervisory role which it had accepted in the last few years. In the letter the official said:

"The precise formulation set out in your letter poses a particular problem for us. This is that having decided not to take a leading supervisory role, we believe that the incorporation of the 45 UK branches here, combined with the presence in London of a large part of BCCI's overall administration, is likely to draw us in practice into the position of lead supervisor which we seek to avoid. In those circumstances, our ability to do the job effectively would be even more restricted than if we had assumed the role officially from the outset. In any case we are not at all certain that we would feel able to grant a licence by applying the criteria under the UK Banking Act, to any part of the operation at this stage. This is because we have to be satisfied under our new legislation not only that an

---

institution will be prudently run but that it will be run with integrity--and our experience with BCCI in the past make such a judgment difficult."

**141** In respect of the need for the plaintiffs to show material to support their allegation that the Bank knew of probable loss to depositors or was reckless as to whether there would be loss to depositors, Lord Neill referred to certain paragraphs in the affidavit of a senior Bank official sworn in July 1991 in support of the Bank's petition to wind up BCCI. The official stated:

> "20. The Bank is seriously concerned that BCCI has been managed and may still be being managed in a dishonest and fraudulent manner. The Bank is and continues to be concerned that the true financial position of BCCI has been and continues to be concealed by BCCI from the Bank and other regulatory authorities which are part of the 'college'. It appears from the Price Waterhouse report that the accounting records have completely failed and continue to fail to meet the standards required of institutions authorised under the Banking Act. It further appears that there is no proper or adequate system or controls for managing the business of BCCI. The management of BCCI have acted without integrity and with a lack of skill. Notwithstanding the fact that it might be said of some of the senior managers that they were not directly involved in the fraudulent activity described in the Price Waterhouse report, management have as a whole been involved in keeping that activity and its consequences concealed from the Bank and other regulatory authorities. As a result of the information provided to it, the Bank has no trust or confidence in the senior management of BCCI which is essential to the relationship between the regulator and the regulated bank. 21. As a supervisor of BCCI the Bank is concerned that the interest of depositors will be jeopardised if the affairs of BCCI are left in the hands of its managers and it has formed the view that the interest of depositors will be best served by the winding-up of BCCI. In these circumstances the Bank believes that it would be just and equitable to wind up BCCI ... 24. In April 1990 it became apparent that BCCI had a substantial portfolio of US $4 billion of problem loans. In the 1989 year-end accounts substantial provisions were first raised against a US $4 billion portfolio of problem loans in the group, many of which were booked in BCCI. On 22 May 1991 a financial support arrangement was entered into by BCCI whereby these problem loans were transferred to new companies which were either owned directly by the Government of Abu Dhabi, or if not, largely guaranteed by the Government of Abu Dhabi. In return for the loan assets BCCI received promissory notes in US$ and UAE Dhirams equivalent in face value to US $3,061 million. However, from the report it appears that the loan assets can be reassigned to BCCI in the event of any breach of warranty that the loan assets do not involve any activity which is criminal or illegal and which, if revealed might be expected to damage the international reputation of the Abu Dhabi Government. At a meeting held on 5 October 1990 the Abu Dhabi Government said that if fraud was detected there could be a serious problem about the continuation of the support of the Abu Dhabi Government. Whilst the Abu Dhabi Government has said that it has no present intention to reassign the loan assets, there must be a risk that it will do so. If it does, the problem portfolio will revert to BCCI. In July 1991 the Abu Dhabi Government indicated to Price Waterhouse that it was not prepared to commit itself to providing further funds for BCCI to m[e]et all its liabilities on an unqualified basis. Given the present uncertainty surrounding BCCI's liabilities it is fair to conclude that there is no real prospect of sufficient funds being made available within such time as the relevant regulators might require."

**142** Lord Neill submitted that the concerns of the Bank set out in paragraphs 20 and 21 had been known to the Bank for a number of years, as evidenced by the letter dated 8 April 1987 to the official in Luxembourg in which the senior official of the Bank stated that the Bank had to be satisfied that BCCI would be run with

---

integrity, "and our experiences with BCCI in the past make such a judgment difficult". Lord Neill also referred to a memorandum to the Governors of the Bank dated 15 July 1983 from a senior official of the

Bank in which he said that the Bank's officials had become increasingly concerned about the ineffectiveness of the present arrangements for the overall supervision of BCCI and that he attached a note setting out possible ways of dealing with "what has now become, in our view, an unacceptable position". The note, which was headed "WHY HAS BCCI BECOME A PROBLEM? WHY IS ACTION NOW URGENTLY REQUIRED?", stated that it was clear that the principal place of BCCI was not Luxembourg but was, administratively, the United Kingdom and that being so, and in the light of the Luxembourg authorities' admission that their resources were no longer up to the task of supervising BCCI's operations, the Bank was in "a vulnerable position". The note further stated that the Bank's knowledge of the activities of BCCI in the United Kingdom and its limited knowledge of the BCCI group as a whole did not inspire confidence in the soundness of BCCI's worldwide operations. The note went on to state:

> "As noted, the present arrangements are wholly unsatisfactory and it is not therefore considered an option to sit back and do nothing. This leaves two basic choices: (a) to try to have BCCI closed down, either worldwide or just the UK region; (b) to arrange for its supervision on a satisfactory basis."

Lord Neill further referred to a paper of the Board of Banking Supervision dated 3 September 1987 which stated that at their last meeting they had expressed concern about whether the UK depositors with BCCI SA were receiving adequate protection from the supervisory regime in place, or in prospect. The Board asked whether the UK depositors might not be better protected if BCCI were only permitted to take deposits in the UK via a UK subsidiary. They questioned whether the formation of such a subsidiary would increase the "moral hazard" of the UK supervisors in relation to the whole BCCI group and whether, even if it did, the interests of the UK depositors should not be paramount. The paper went on to state that the cause of the concern did not stem from any obvious weakness in the BCCI group. The concern was rather one of scepticism towards a large, shadowy and swift growing bank with no natural geographic base. The paper then stated:

> "The BCCI group is frequently subject to rumours which suggest that it or its clients operate at the margin of legality. Many observers accordingly have developed a gut feeling that the bank might suddenly run into serious difficulties without warning. The fact that so much of the group's business is booked in centres where supervision is less professional, particularly in relation to the type of business which BCCI undertakes, makes the absence of warning all the more likely."

Lord Neill submitted that in July 1983, in September 1987 and in April 1990 the Bank took no steps to arrange for supervision of BCCI on a satisfactory basis but was reckless as to the serious risk of loss to depositors.

**143** There are passages in the documents which support the Bank's case that whilst, prior to April 1990, it had concerns about the soundness of BCCI's operations, nonetheless it recognised that its overriding duty was to protect the interests of depositors and that its decisions and its conduct towards BCCI were intended to discharge that duty, so that the allegation of bad faith on its part cannot be established. Thus in the note sent to the Governors of the Bank dated 15 July 1983 its author states:

> "The closure route could only be pursued if it could be shown, with reasonable certainty, that the group's operations were fundamentally unsound; and that continued existence posed a greater threat to depositors' money than a winding up. Without a very wide ranging investigation and the fullest co-operation of

---

> other supervisory authorities it would not be possible to state, categorically, that the group's operations are unsound to the extent of endangering depositors."

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 244 of 260
Pg 324 of 686

But at this stage in the proceedings a court is not concerned to try to assess which side will probably succeed if there is a trial: the question is whether there is material which shows that there are issues which should be investigated at a trial, and in my opinion the material does show this.

**144** As regards the prospect from April 1990 onwards of a rescue operation by the Abu Dhabi Government I would not take the view that the plaintiffs have no real prospect of establishing that the Bank knew that it was probable, or was reckless as to the probability, that that Government, notwithstanding its stated willingness to rescue BCCI, would not commit itself fully to meet all its liabilities as more information became available as to the extent of its liabilities and as to the dishonesty of its managers. In differing from the opinion of Clarke J and the majority of the Court of Appeal that the plaintiffs have no real prospect of success, I take into account two further considerations. One is that I think that it is reasonably possible that further material may become available to the plaintiffs before trial, and I am in respectful agreement with the view of Auld LJ, ante, p 175B-Fof his judgment:

> "In addition to the different function of Bingham LJ's inquiry from the more focused issues for determination in this litigation, there are several obvious disadvantages of his procedure when compared with the court's process for determining the truth of the matter and its legal significance. His was not a statutory inquiry, so he had no power to compel the attendance of witnesses or require the production of documents; he heard the evidence of some, but not all, relevant and important players in the story; there was no counsel to the inquiry and no opportunity for adversarial discovery, interrogation or cross-examination of witnesses; and, as I have said, he acknowledged that most of his criticisms and a number of his factual conclusions were challenged, the validity of such challenges not capable of being tested on appeal. In the circumstances, I am of the view that Clarke J was not entitled ... to conclude, as he did, that all the available material evidence on those questions had been gathered in. Given the greater generality of the questions in the Bingham inquiry, the limitations of it as a fact-finding exercise when compared with litigation, his acknowledgement of a number of challenges to some of his factual conclusions and the emergence of additional material since the inquiry indicating the Bank's state of knowledge as to the Gokal unrecorded loans, I can see no basis for Clarke J's confidence in this extraordinary and complex case for concluding that Bingham LJ had seen and fully tested all the material evidence available or likely to become available on the issues confronting the court in this case."

**145** Secondly, I consider that the material already available to the plaintiffs provides reasonable grounds for thinking that they may be able to advance their case by the cross-examination of the Bank's officials.

**146** In *McDonald's Corpn v Steel* [1995] 3 All ER 615 Neill LJ recognised that the prospect of evidence emerging on cross-examination was a matter to be taken into consideration. Mr Stadlen relied on the judgment of Chadwick LJ in *Jarvis v Hampshire County Council* The Times, 23 November 1999; Court of Appeal (Civil Division) Transcript No 1908 of 1999 where he said:

> "it is an abuse of the process of the court to make allegations of [dishonesty and deliberate abuse of power] in circumstances in which they cannot be supported by particulars; no less so when they are inconsistent with the substantial documentary material which is available. It is not enough to assert, as counsel for the claimant did assert before us, that--if the matter were allowed to go to trial--something might emerge through cross-examination. That is not a proper basis on which to make allegations of dishonesty. The judge was right to strike out those allegations."

---

**[2003]** **279**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hutton**

**147** But the assessment whether it is reasonable to take the view that evidence may emerge in cross-examination depends on the particular facts of the case. In *Jarvis v Hampshire County Council* it was clear

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

that the allegations were groundless and could not be given any substance by the cross-examination of the defendant's witnesses. But in the present case where there is an arguable case that the Bank had increasing concern about BCCI for a number of years prior to April 1990 and knew from April 1990 onwards of the imminent collapse of BCCI unless there was a rescue, I think that justice requires that the plaintiffs, after discovery and interrogation, should have the opportunity to cross-examine the Bank's witnesses as to their concerns before 1990 and as to their belief from April 1990 onwards that there would be a rescue operation.

**148** The fact that a plaintiff does not have direct evidence as to the belief or foresight or motives of the defendant is not in itself a reason to strike out the action. In *Taylor v Midland Bank Trust Co Ltd* 21 July 1999 the plaintiff alleged dishonest breach of trust and the defendant applied for the dismissal of the claim without trial under rule 24.2(a)(i). Upholding the decision of Carnwath J to dismiss the application Buxton LJ stated:

> "[Counsel for the defendant] appeared at one stage to argue that the case must be made good by direct evidence, and could not rely, as it does, on inference. If that was the submission, I cannot agree with it. Where the motives or knowledge of a party is in issue, it may often be necessary to rely on inference rather than direct statements or admissions by that party. There is nothing objectionable in principle in that, however much an inference may be less cogent than an admission. Nor is it right that, in drawing inferences, a court can only infer this form of dishonesty if the primary evidence admits of no other explanation. That puts the test too high. The process of reasoning should be constrained only by the court's appreciation of the seriousness of the charge and the substantiality of the evidence therefore necessary to make it good."

**149** The Court of Appeal stated, ante, p 83G-H:

> "Were officials of the Bank to give evidence which was fully tested by cross-examination in the adversarial process of a trial, it is not merely possible, but even likely, that a clearer and somewhat different picture would emerge as to the Bank's corporate state of mind from time to time, as constituted by the states of mind of a small number of its responsible officials. But we would agree that there is no realistic possibility that the picture which emerged would be fundamentally different. In that respect the Bingham report is, despite its relatively informal status, an invaluable aid to distinguishing between what is a practical possibility and what is fanciful or inconceivable."

I am in full agreement with the first sentence of that passage, but I am, with respect, unable to agree with the last two sentences and I do not share the majority's confidence that though in cross-examination it is likely that a somewhat different picture would emerge, there is no realistic possibility that a fundamentally different picture would emerge.

**150** The Bank's application has been to strike out the entire action. The Bank's case that the plaintiffs have no reasonable prospect of success can be more strongly advanced in respect of the allegations relating to the earlier part of the history of the Bank's dealings with BCCI. But having regard to the extent to which the allegations in respect of the entire period from 1979 to 1991 are interwoven and interrelated I consider that it would not be appropriate to consider striking out certain parts of the claim and that the entire action should be permitted to proceed to trial.

**151** Because of the large number of documents which were referred to by counsel and the detailed and lengthy submissions which were advanced to the House I have thought it right to state my views at much greater length than is usual when an appellate court considers a strike out application, particularly when the appellate

---

court decides that the action should proceed to trial. But I wish to state my agreement with the observation of my noble and learned friend Lord Steyn as to the duty of the trial judge in paragraph 8 of his speech. The judge will have to decide the case after the examination and cross-examination of witnesses on the evidence which he hears and he should not be influenced by any parts of the speeches of the House in this hearing which may appear to express any opinion on the facts of the case.

**152** Accordingly for the reasons which I have given I would allow this appeal. I would dismiss the Bank's cross-appeal for the reasons given by my noble and learned friend Lord Hope of Craighead and I would make the order proposed by him.

**LORD HOBHOUSE OF WOODBOROUGH**

My Lords,

**153** It has been estimated that the trial of this action will occupy a whole year; I sincerely hope that this is too pessimistic. But, on any view, the continuation of the action will involve the application of very substantial resources both at the trial and in preparation for it by both of the parties and the system of justice. The volume of paper, forensic and evidential, is already formidable and the events which will have to be trawled over extend over some 15 years. The investigation of those events gave rise to a report (the Bingham report: 1992 HC Paper 198) which runs to 218 printed pages together with 8 volumes of (unpublished) appendices recounting the history in greater detail. It was thus understandable that it should have been thought right to examine whether such a trial and such proceedings were really appropriate and necessary in order to determine the just outcome to the parties' dispute. Indeed, under Part 1 of the Civil Procedure Rules now in force it is the overriding objective, and the duty of the courts and the parties, that cases should be dealt with justly and that this includes dealing with cases in a proportionate manner, expeditiously and fairly, without undue expense and by allotting only an appropriate share of the court's resources while taking into account the need to allot resources to other cases. This represents an important shift in judicial philosophy from the traditional philosophy that previously dominated the administration of justice. Unless a party's conduct could be criticised as abusive or vexatious, the party was treated as having a right to his day in court in the sense of proceeding to a full trial after having fully exhausted the interlocutory pretrial procedures.

**154** There were limited exceptions to this traditional approach. One was the RSC Ord 14 procedure for summary judgment. This was not a procedure for an informal trial; it was a procedure for enabling judgment to be entered for the plaintiff where there was no issue to be tried, in the words of the rule, no "issue or question in dispute which ought to be tried" or "other reason" why there ought to be a trial. It was to avoid delaying tactics on the part of a defendant and enable speedy judgment to be given for the plaintiff where that was appropriate and just notwithstanding that the defendant asserted that he had a defence. One of the court's powers under Order 14 was to order the defendant to pay money into court as a condition of being permitted to defend. Order 14 was available to the plaintiff alone; there was no equivalent procedure for summary judgment in favour of the defendant This procedure was not the same as the striking out jurisdiction which had two aspects. One was the striking out of a party's pleading (or part of it) because the conduct of the party was objectionable, i e abusive or vexatious. For this purpose evidence was relevant and admissible. The other was the demurrer procedure which had completely different origins and served a different purpose. It derived from the formal distinction between law and fact. It provided a mechanism for testing the propositions of law upon which the party (plaintiff or defendant) was relying; it was decided upon the pleadings alone and no evidence was admissible. The court could in its discretion deal with the issue of law as a matter of striking out, or by directing the trial of a preliminary point of law, or by directing that the decision of the point of law should be left over to the full trial. In principle, though not always in practice, the striking out procedure should be used only where the point of law was not reasonably

---

arguable. Warnings against the inappropriate use of the striking out procedure to decide arguable points of law were given by Lord Templeman and Lord Mackay of Clashfern in *Williams and Humbert v W & H Trade Marks* [1986] AC 368, 435-436 and 441; but the motive of simplifying procedures and saving costs was applauded and may, in the end, show that the procedure adopted was appropriate.

**155** Another exception in practice was the policy of the Commercial Court to assist the expeditious and efficient determination of disputes of commercial parties by adopting relatively informal procedures, usually at an early stage of the case, to identify the real points at issue and, by deciding them, enable the dispute to be resolved. Often this was an aspiration rather than a reality. Commercial disputes often involve lengthy and costly investigations and trials which defeat these aspirations. At times commercial litigation has been allowed to drift into over elaborate and drawn out procedures which overlook any other priority than investigating every nook and cranny and ensuring that every angle receives the full forensic exposure. In *Ashmore v Corpn of Lloyd's* [1992] 1 WLR 446, 453-454, Lord Templeman objected strenuously to the practice of taking "every point conceivable and inconceivable without judgment and discrimination" and exhorted judges and appellate courts to control the conduct of proceedings. Lord Roskill agreed with him, at p 448, saying:

> "The Court of Appeal appear to have taken the view that the plaintiffs were entitled of right to have their case tried to conclusion in such manner as they thought fit and if necessary after all the evidence on both sides had been adduced. With great respect, like my noble and learned friend, I emphatically disagree. In the Commercial Court and indeed in any trial court it is the trial judge who has control of the proceedings. It is part of his duty to identify the crucial issues and to see they are tried as expeditiously and as inexpensively as possible ... Litigants are not entitled to the uncontrolled use of a trial judge's time. Other litigants await their turn ..."

**156** There is always an exercise of judgment to be undertaken by the judge whether the perceived short-cut will turn out to have been beneficial and, inevitably in a proportion of cases expectations will be confounded. Caution is required. But it is simplistic to suppose that in complex litigation the exercise should never be attempted. The volume of documentation and the complexity of the issues raised on the pleadings should be the subject of critical scrutiny and should not without more deter the judge from considering whether it is really necessary to commit the parties and the court to a lengthy trial and all the preparatory steps which that will involve. Indeed it can be submitted with force that those are just the sorts of case which most strongly cry out for the exclusion of anything that is unnecessary for the achievement of a just outcome for the parties.

**157** The present case illustrates these considerations. The commercial judge was faced with an action dependant upon a cause of action of which the parameters were not wholly certain and a statement of claim which may or may not have disclosed a case sufficient in law to enable the plaintiffs to succeed. He ordered the trial of preliminary questions of law. He was clearly right to do so even though the decision of those questions has led to appeals to your Lordships' House. However difficulties then arose with the plaintiffs' pleadings. At each level the plaintiffs have re-pleaded their case to accommodate the fresh thinking about the elements of the tort of misfeasance in public office. Further, the courts at each level have been called on to adjudicate upon the proposed revised pleading, your Lordships included. This has led to an unsatisfactory state of affairs. Any skilful pleader should be able to draft a pleading which sufficiently makes the minimum allegations to support the legal definition of the tort and I have detected no lack of skill in the lawyers acting for either side in this litigation. The question then becomes whether the particulars given provide realistic support for the primary allegations. This has in turn led to a detailed examination both in the courts below and before your Lordships of these allegations.

---

I will have to comment upon the suitability of that course in your Lordships' House. It was probably inevitable before the judge and may have been so before the Court of Appeal where questions of leave to amend were also debated. It was complicated in the Court of Appeal by the fact that Auld LJ did not agree with the majority on the law. Before the judge and in the Court of Appeal the decision was given on the basis of the Rules of the Supreme Court not the Civil Procedure Rules.

**158** This leads me back to the CPR. As previously noted, Part 1 adopts a philosophy similar to that enunciated in *Ashmore v Corpn of Lloyd's* [1992] 1 WLR 446. It is followed through into the new version of RSC Ord 14. It is Part 24. It authorises the court to decide a claim (or a particular issue) without a trial. Unlike Order 14, it applies to both plaintiffs (claimants) and the defendants. It therefore can be used in cases such as the present where the application for judgment without trial is being made by the defendant. The court may exercise the power where it considers that the "claimant has no real prospect of succeeding on the claim" and "there is no other reason why the case or issue should be disposed of at a trial". The concluding phrase corresponds to the similar phrase used in RSC Ord 14, r 3(1) and has not been relied upon in the present case. The important words are "no real prospect of succeeding". It requires the judge to undertake an exercise of judgment. He must decide whether to exercise the power to decide the case without a trial and give a summary judgment. It is a "discretionary" power, i e one where the choice whether to exercise the power lies within the jurisdiction of the judge. Secondly, he must carry out the necessary exercise of assessing the prospects of success of the relevant party. If he concludes that there is "no real prospect", he may decide the case accordingly. I stress this aspect because in the course of argument counsel referred to the relevant judgment of Clarke J as if he had made "findings" of fact. He did not do so. Under RSC Ord 14 as under CPR Part 24, the judge is making an assessment not conducting a trial or fact-finding exercise. Whilst it must be remembered that the wood is composed of trees some of which may need to be looked at individually, it is the assessment of the whole that is called for. A measure of analysis may be necessary but the "bottom line" is what ultimately matters. Part 24 includes provisions covering various ancillary matters, at what stage the application can be made (24.4), the filing of evidence (24.5) and supplementary powers of the court (24.6). The Practice Direction which was originally appended filled out some of what is in the rules.

> "4.2 Where a defendant applies for judgment in his favour on the claimant's claim, the court will give that judgment if either: (1) the claimant has failed to show a case which, if unanswered, would entitle him to judgment, or (2) the defendant has shown that the claim would be bound to be dismissed at trial. 4.3 Where it appears to the court possible that a claim or defence may succeed but improbable that it will do so, the court may make a conditional order as described below."

The criterion which the judge has to apply under Part 24 is not one of probability; it is absence of reality. The majority in the Court of Appeal used the phrases "no realistic possibility" and distinguished between a practical possibility and "what is fanciful or inconceivable" (ante, p 83H). Although used in a slightly different context these phrases appropriately express the same idea. Part 3 of the CPR contains similar provisions in relation to the court's case management powers. These include explicit powers to strike out claims and defences on the ground, among others, that the statement of case discloses no reasonable ground for bringing or defending the claim.

**159** Before your Lordships it was accepted by counsel that this part of the appeal should be decided under CPR Part 24 applying the criterion "no real prospect of success". An exchange of correspondence has confirmed this. (A similar criterion is also appropriate where there is an application for leave to amend to add a new case.) Recent statements in the Court of Appeal concerning Part 24 bear repetition:

> "The words 'no real prospect of being successful or succeeding' do not need any amplification, they speak for themselves. The word 'real' distinguishes

---

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 249 of 260
Pg 329 of 686

2 AC Three Rivers DC v Bank of England (No 3) (HL(E)) Lord Hobhouse of Woodborough

fanciful prospects of success or, as [counsel] submits, they direct the court to the need to see whether there is a 'realistic' as opposed to a 'fanciful' prospect of success."

"It is important that a judge in appropriate cases should make use of the powers contained in Part 24. In doing so he or she gives effect to the overriding objectives contained in Part 1. It saves expense; it achieves expedition; it avoids the court's resources being used up on cases where this serves no purpose and, I would add, generally, that it is in the interests of justice. If a claimant has a case which is bound to fail, then it is in the claimant's interests to know as soon as possible that that is the position." (*Swain v Hillman* [2000] 1 All ER 91, 92, 94, per Lord Woolf MR)

"The CPR are a procedural code with the overriding objective of enabling the court to deal with cases justly including saving expense and ensuring that it is dealt with expeditiously and fairly. The court must seek to give effect to the overriding objective when it exercises any power given to it or interprets any rule. I take this into account when considering the application under Part 24.2 ... [The language of Part 3.4] is very akin to that in the now extinct RSC Ord 18 and 19 and under which this application was commenced (and as good as succeeded) at the first hearing. This Part includes 'a claim which raises an unwinnable case where continuance of the proceedings is without any possible benefit to the respondent and would waste resources on both sides'." (*Sinclair v Chief Constable of West Yorkshire* Transcript No L189 of 2000, per Otton LJ. See also *Harris v Bolt Burdon* [2000] CPLR 9)

There is no point in allowing claims to proceed which have no real prospect of success, certainly not in proceeding beyond the stage where their hopelessness has clearly become apparent.

**160** The difficulty in the application of the criterion used by Part 24 is that it requires an assessment to be made in advance of a full trial as to what the outcome of such a trial would be. The pre-trial procedures give the claimant an opportunity to obtain additional evidence to support his case. The most obvious of these is discovery of documents but there is also the weapon of requesting particulars or interrogatories and the exchange of witness statements may provide a party with additional important material. Therefore the courts have in the present case recognised that they must have regard not only to the evidence presently available to the plaintiffs but also to any realistic prospect that that evidence would have been strengthened between now and the trial. Indeed, it was the submission of Mr Stadlen for the defendants that Clarke J had applied the right test when he said:

"In my judgment the question in the instant case is whether the Bank has persuaded the court that the plaintiffs' case is bound to fail on the material at present available and that there is no reasonable possibility of evidence becoming available to the plaintiffs, whether by further investigation, discovery, cross-examination or otherwise sufficiently to support their case and to give it some prospect of success. If the Bank discharges that burden, it will follow that the plaintiffs' claim is bound to fail. In that event to allow the action to proceed would serve no useful purpose. It would only involve the expenditure of time and money--in this case a very great deal of both. Neither party would have any legitimate interest in such expenditure because it could not benefit either."

It is possible that this test, in its reference to cross-examination, may be rather too favourable to the plaintiffs. It is derived from what was said in relation to a plea of justification by Neill LJ in *McDonald's Corpn v Steel* [1995] 3 All ER 615, a defamation action. He included cross-examination no doubt because in a defamation action, although the burden of proving justification is upon the defendant, the publisher of the libel, it is normal for the plaintiff to call his evidence first; justification is a defence. Where an allegation of dishonesty is being made as

[2003] 284
2 AC Three Rivers DC v Bank of England (No 3) (HL(E)) Lord Hobhouse of Woodborough

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

part of the cause of action of the plaintiff, there is no reason why the rule should not apply that the plaintiff must have a proper basis for making an allegation of dishonesty in his pleading. The hope that something may turn up during the cross-examination of a witness at the trial does not suffice. It is of course different if the admissible material available discloses a reasonable prima facie case which the other party will have to answer at the trial.

**161** The judge's assessment has to start with the relevant party's pleaded case but the enquiry does not end there. The allegations may be legally adequate but may have no realistic chance of being proved. On the other hand, the limitations in the allegations pleaded and any lack of particularisation may show that the party's case is hopeless. The tort of misfeasance in public office is a tort which involves bad faith and in that sense dishonesty. It follows that to substantiate his claim in this tort, first in his pleading and then at the trial, a plaintiff must be able to allege and then prove this subjectively dishonest state of mind. The law quite rightly requires that questions of dishonesty be approached more rigorously than other questions of fault. The burden of proof remains the civil burden--the balance of probabilities--but the assessment of the evidence has to take account of the seriousness of the allegations and, if that be the case, any unlikelihood that the person accused of dishonesty would have acted in that way. Dishonesty is not to be inferred from evidence which is equally consistent with mere negligence. At the pleading stage the party making the allegation of dishonesty has to be prepared to particularise it and, if he is unable to do so, his allegation will be struck out. The allegation must be made upon the basis of evidence which will be admissible at the trial. This common sense proposition has recently been re-emphasised by the Court of Appeal in *Medcalf v Mardell* [2001] Lloyd's Rep PN 146, in which Peter Gibson LJ said, at paragraph 40: "The material evidence must be evidence which can be put before the court to make good the allegation." Evidence which cannot be used in court cannot be relied upon to justify the making of the allegation of dishonesty. I mention this because it shows the principle to be applied and not because there is any suggestion in the present case that there is any inadmissible material which would support allegations of dishonesty in the present case. It is normally to be assumed that a party's pleaded case is the best case he can make (or wishes to make). Therefore, in the present case, the particulars given provide a true guide to the nature of the case being made by the plaintiffs (claimants).

**162** I agree with my noble and learned friend Lord Hope that in substance Clarke J asked himself the right questions and that, as he expressed it, he directed himself correctly as to the relevance of the Bingham report. My noble and learned friend and those who agree with him are however critical of the actual use made by Clarke J and the majority of the Court of Appeal of the report. I consider that with minor exceptions these criticisms are not fair to Clarke J nor to Hirst and Robert Walker LJJ. The relevant exercise was as I have said earlier not one of making findings of fact or comparable to a trial on admissible evidence. It was to make a predictive assessment. To use the report as an aid was clearly appropriate and proper. Further, as the plaintiffs themselves said, their pleading and its particularisation was substantially taken from the facts set out in the report. They were using the report to plead their case: "With one principal exception, the statement of claim is pleaded on the basis of the Bingham report" (per Clarke J). It was therefore not only permissible but also pertinent to compare their selection from the history recounted in the report with the whole and the conclusions drawn in the report. If the plaintiffs seek to infer bad faith which Bingham LJ declined to infer or even contradicted, is it realistic to suppose that a judge will hereafter be persuaded to do so? The report is in reality at the present stage the context in which the plaintiffs' particulars must be read and their viability assessed. The approach of Clarke J was careful and fair to the plaintiffs. He distinguished between the presently available material and that which might become available in the future. He said:

"I have reached the firm conclusion that on the material available at present the plaintiffs have no arguable case that the bank dishonestly granted the licence to BCCI or dishonestly failed to revoke the licence or authorisation in circumstances when it knew, believed or suspected that BCCI would probably collapse. There is nothing in the Bingham report or in the documents which I have seen to support such a conclusion and there is much to contradict it ... There is nothing in [the report] which gives reasonable grounds for supposing that there might be other evidence which might in the future support the plaintiffs' case. In these circumstances I accept Mr Stadlen's further submission that there is no realistic possibility of more evidence becoming available, whether by further investigation, discovery, cross-examination or otherwise, which might throw light upon the state of mind of the bank or any of its relevant officials during the period in which BCCI was operating."

He therefore concluded that the plaintiff's case would be bound to fail and that he could see no justification for allowing the action to continue: "To do so would be to require an enormous expenditure of time and money to no avail." For myself, I see nothing to criticise in this methodology or chain of reasoning. The critical matter is whether one agrees with his assessment of the inevitability of failure. Were this appeal simply about whether Clarke J had misdirected himself or acted improperly in some way in the exercise of his discretion, I would regard it as improper to allow the appeal. But that is not the manner in which this appeal has been argued. The defendants have accepted that your Lordships' House should reassess the decision to dismiss the plaintiffs' claim using CPR 24 and it is to that that I now turn albeit with the apprehension that your Lordships may have been over influenced by the plaintiffs' submissions about the relevance of the report.

*The cause of action*

**163** This was the subject of the earlier hearing and decision of your Lordships. It is easy to forget that the reason why the plaintiffs have to rely upon the tort of misfeasance in public office is that they cannot allege that the defendants owed them a duty of care. If the plaintiffs were able to rely upon the tort of negligence, their claim would be easy to formulate and, whether or not it would ultimately succeed, would undoubtedly have to go to trial. But, in the present context, to formulate and sustain a claim in the tort of misfeasance in public office is not straightforward, hence a need to have regard to its constituents.

**164** In the speeches of your Lordships, in which I joined, delivered in May 2000, the essential constituents of that tort were explained. The tort is exceptional in that it is necessary to prove the requisite subjective state of mind of the defendant in relation not only to his own conduct but also its effect on others. That state of mind is one equivalent to dishonesty or bad faith and knowledge includes both direct knowledge and what is sometimes called "blind eye" knowledge. ("Blind eye" knowledge has since been discussed in different contexts by your Lordships in *Manifest Shipping Co Ltd v Uni-Polaris Insurance Co Ltd* [2003] 1 AC 469 and *White v White* [2001] 1 WLR 481.) These features are referred to in the speeches.

"It involves bad faith inasmuch as the public officer does not have an honest belief that his act is lawful ... [The 19th century] decisions laid the foundation of the modern tort; they established the two different forms of liability; and revealed the unifying element of conduct amounting to an abuse of power accompanied by subjective bad faith." (Lord Steyn, ante, p 191E-G)

"My Lords, I consider that dishonesty is a necessary ingredient of the tort and it is clear from the authorities that in this context dishonesty means acting in bad faith." (Lord Hutton, ante, p 227E-F)

"The official concerned must be shown not to have had an honest belief that he was acting lawfully;" (Lord Hobhouse, ante, p 230E)

---

Three Rivers DC v Bank of England (No 3) (CA and HL(E)) Page 252 of 260
Pg 332 of 686

"The policy underlying it is sound: reckless indifference to consequences is as blameworthy as deliberately seeking such consequences. It can therefore now be regarded as settled law that an act performed in reckless indifference as to the outcome is sufficient to ground the tort in its second form." (Lord Steyn, ante, p 192F-G)

"The official does the act intentionally being aware that it risks directly causing loss to the plaintiff or an identifiable class to which the plaintiff belongs and the official wilfully disregards that risk. ... His recklessness arises because he chooses wilfully to disregard that risk." "Subjective recklessness comes into the formulation at the first and last stage because it is in law tantamount to knowledge and therefore gives rise to the same liability:" (Lord Hobhouse, ante, p 231B-F)

**165** Having carefully considered the submissions of the parties on both sides, the material which has been placed before us, what further material may reasonably be expected to become available to the plaintiffs before the time of the trial and the judgments of the courts below, I have come to the conclusion that the appeal should be dismissed. Like my noble and learned friend Lord Millett, my assessment is that the plaintiffs' claim does not have a real prospect of success. The majority of your Lordships are however of a different view and would allow the appeal and direct that the case proceed to a full trial on the alleged liability in tort. Under these circumstances, whilst it is my duty to state what my decision would have been and briefly give my reasons, it is inappropriate that I should say anything which will prejudge the conduct or outcome of that trial when it occurs. The outcome will be a matter for the trial judge in the light of the ruling which your Lordships have earlier given on the law, the evidence adduced at the trial and the submissions of the parties. It is the trial judge who will have to decide how the trial should be conducted and what findings of fact to make.

**166** To turn now to the reasons for my assessment of the prospects of the claim, I will structure what I say applying the law as stated last May and applying it to the facts in two periods, first that period ending with the grant of the licence in June 1980, secondly that from July 1980 to the collapse of BCCI in July 1991. The plaintiffs' complaint in these two periods is different. In the first period it is that the defendants wrongly licensed BCCI under section 3 of the Banking Act 1979 when they were forbidden by the statute from doing so. In the second period the complaint is that the defendants failed to supervise BCCI as they were required to do by the 1979 Act and its successor the Banking Act 1987 and failed to perform an obligation under those Acts to revoke the licence. I will take the law as stated in my speech, not because it is materially different from what was said by Lord Steyn, but because its analysis is unifying and therefore easier to apply in the discussion of these two periods and was, indeed, the formulation primarily relied upon by the plaintiffs.

**167** The commission of the tort has two stages. The first is the act done by the defendant. The act must be an unlawful act, not in the sense that it is itself tortious but in the sense that it is contrary to the law for the defendant to have done what he did. In the case of a failure to act it must be a failure to do a specific act which it was the legal obligation of the defendant to do and which was therefore unlawful. In either case there must be unauthorised or forbidden conduct. The conduct must be accompanied by either actual or subjectively reckless, or "blind eye", knowledge that it is unauthorised or forbidden. The second stage is that which relates to the defendants' appreciation of the consequences of his conduct. This may arise from his purpose in doing what he did (my first "limb", Lord Steyn's first form of the tort) or from his appreciation that the plaintiff will in the ordinary course be caused loss or his consciously and wilfully turning a blind eye to the possibility of such loss (my second and third "limbs", Lord Steyn's second form of the tort). Therefore, in making the assessment required by this appeal, one must apply this two stage test to the plaintiffs' case for the two periods.

---

**[2003]** **287**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Hobhouse of Woodborough**

*The First Period*

http://www.uniset.ca/other/cs3/20032AC1.html 1/12/2017

**168** The Act of 1979 introduced a system of licensing for deposit-takers which was new. The task of the defendants was not easy since they were faced with having to decide for the first time and within a relatively short time-scale whether to grant or refuse a licence to a substantial number of institutions which were already established businesses. The refusal of a licence would mean that the institution could no longer accept deposits and would have to go out of business: section 1(1). However the defendants' statutory obligation was clearly stated. In section 3(3)(b) and Part II of the Second Schedule, criteria are laid down which must be met unless subsection (5) applies. In any other case the defendants were forbidden from granting the licence. The defendants purported to grant the licence under subsection (5). For this to apply, the principal place of business of the institution must be in a country outside the United Kingdom and the supervisory authority in that country must have informed the defendants that they are satisfied with respect to the management of the institution and its overall financial soundness and the defendants must be satisfied with the nature and scope of the supervision exercised by those authorities. I consider that the plaintiffs clearly have a fully arguable case that these criteria were not satisfied and that the officials acting for the defendants cannot have believed that these criteria were satisfied. Therefore the plaintiffs have an arguable case on the first stage of the legal test. The courts below were of the same opinion and Mr Stadlen for the defendants only faintly argued the contrary.

**169** The plaintiffs failed in the courts below on the second stage. Clarke J said:

> "Both BCCI SA and the group appeared to be profitable, the shareholders appeared to be supportive and willing to supply more capital when asked, the auditors were giving unqualified opinions on the accounts and the LBC continued to give favourable opinions. [Bingham] also refers to the attitude of the Bank of America, to which I shall return. In these circumstances, it cannot fairly be said that at this stage the Bank suspected that BCCI would probably collapse."
>
> "In all the circumstances I have reached the clear conclusion that on the evidence available at present, either as referred to in the Bingham report or as contained in the documents to which I have been referred, the plaintiffs' case that the Bank knew, believed or suspected that if it gave BCCI a licence it would probably collapse is bound to fail."
>
> "I must say that, however critical one is of the Bank (and there is plenty of scope for criticism), it seems to me to offend common sense to conclude that before it licensed BCCI SA, in 1980 it actually knew, believed or suspected that if it licensed BCCI SA, BCCI SA would (or even might) subsequently collapse."

In the Court of Appeal, the majority agreed that there was no arguable case on foresight of loss: ante, p 84D. Auld LJ based his view on the application of a different view of the constituents of the tort, a view which has been held to be wrong by your Lordships.

**170** It is not suggested that the defendants granted the licence with the purpose of causing loss to any of the plaintiffs. The plaintiffs' case is, rather, that the officials consciously closed their eyes to what might be the consequences to present and future depositors of granting and not refusing the licence. There is no direct evidence to support this improbable allegation. The main evidence which is said to support the allegation is in part the self evident proposition that the officials probably had in mind that one of the main purposes of the regime introduced by the 1979 Act was to protect depositors as is stated in the preamble of the Act plus the proposition that if the safeguards in the Act were not observed before granting a licence there must be a risk that depositors will not be effectively protected; and partly that the officials had already learnt some very disturbing facts about the conduct of the BCCI, for example, from the publicity surrounding the withdrawal of the Bank of America. But there is no evidence to support the appreciation of the officials of the risk they were running nor that, having appreciated it, they wilfully chose to disregard it and hazard the

---

depositors. At the relevant time BCCI appeared to be a flourishing and successful, though to some extent controversial, institution with very many satisfied depositors. The evidence both at the time and subsequently is that the officials thought that they would look silly if they raised difficulties for the approval of BCCI and that if they did they would not have been supported if challenged on an appeal. The objective fact is that no depositor actually lost any money until many years later after much else had happened, including the passing of a new Act in 1987. Problems of proving legal causation will obviously also arise.

**171** There is simply no evidence of any contemplation at this stage that depositors with BCCI would lose their money. There is no evidence whatsoever, nor any allegation, of any corruption of any official of the defendants, either at this time or subsequently. The evidence of the requisite subjective state of mind is not there and there is no reasonable basis for believing that it ever will be. The case of the plaintiffs is in reality one in negligence supported by objective criteria and this does not suffice for the tort upon which they have to rely. This is as I see it an insuperable difficult for them on this part of the case.

*The Second Period*

**172** Here the difficulties which the plaintiffs have to overcome are more fundamental. The foundation of the tort is that the relevant person has done something (in the positive or negative sense) which is contrary to the law. The statutory provisions upon which the plaintiffs rely are ones which give the defendants powers in respect of licenced institutions. Their case is that they constitute a statutory scheme which included a duty to supervise the deposit-taker which the defendants failed to perform adequately. Their more specific case is that the defendants failed to make use of the statutory power given to them under section 11 of the 1987 Act to revoke the authorisation of BCCI, or to exercise one or more of the lesser powers given by sections such as section 12 (restriction of authorisation) or section 19 (directions). The difficulty for the plaintiffs here is that they are unable to sue in the tort of negligence and that the failures of the defendants which they allege do not have the character of unlawfulness. They all involve the exercise of discretions and judgment. There is no allegation which the plaintiffs can make that the statute made it unlawful for the defendants not to take some particular step at any given time.

**173** This ties in with the plaintiffs' next difficulty. There is no evidence that the defendants and their officials were doing anything other than their best to handle the developing situation in a responsible manner in accordance with the Act. The officials may have been out of their depth. They may have been more optimistic than was justified now that all the facts are known. But, particularly in the later stages they were faced with a delicate situation where there were a number of conflicting interests to be taken into account and where any over-reaction would have caused BCCI to collapse without hope of rescue and with far greater losses to its creditors than ultimately occurred. It is easy to overlook the fact that the defendants' forbearance led to the injection in 1990 of substantial additional shareholder funds (how much these were and what happened to them is apparently questioned). The situation developed over the years. In the earlier years, the problem was indiscipline without the anticipation of a threat of default. Later, that situation developed into one which included a growing threat of failure, at first remote, finally grave and imminent. But in all these situations the defendants had to exercise judgment. The wrong step on their part would only make things worse. In 1988 the "College" was constituted and an international approach adopted in which the defendants participated; the defendants would have been irresponsible not to have done so. The plaintiffs have sought to identify some four occasions when they submit that the defendants knew that they had grounds for exercising one or more of their statutory powers and decided not to. Their inaction may be open to criticism. It can be argued that they should have acted differently but that is not the same as arguing that they

acted unlawfully and, naturally, there is no evidence that they knew or even suspected that they might be acting unlawfully. The plaintiffs wish to present a case of dishonesty but they have not got the material to justify the allegation and have no realistic prospect of ever obtaining it. Instead, their case seeks to proceed from the proposition that the defendants were under a statutory duty to supervise BCCI to an allegation that the defendants were aware that they were not exercising effective supervision and thence to the allegation that it was unlawful for the defendants not to have exercised one or more of certain powers given to them under the Act. This is a non sequitur. The powers remain discretionary. It does not follow from the proposition that it would have been lawful to exercise one or more of those powers that not to exercise them was unlawful.

**174** The same applies to the second stage of the test. There is no evidence that the defendants were setting out to cause anyone loss. In the earlier stages they did not foresee the disaster that was to come. In the later stages they were striving to avoid disaster and, if it proved not possible to avoid it, to limit the losses which would in that event inevitably be suffered. The officials had nothing to gain. All the evidence is that they were doing their best. Once they realised the scale of the problem with BCCI, they did not close their eyes to the consequences of a failure; they attempted to avoid precipitating that collapse which would clearly have been the consequence of the wrong kind of intervention. One can illustrate the general point from the plaintiffs' own pleading, schedule 5, paragraph 27(ii): the decision not to revoke the full licence in October 1986 was taken because the officials concluded that "there appeared to be no immediate danger to depositors and it seemed unlikely that there were grounds for revoking BCCI SA's licence outright".

**175** The hearing before your Lordships has been concerned with whether the plaintiffs have a real prospect of success in the action. On any view they face very serious difficulties in presenting and substantiating their case. The burden of proof is upon them. The tort upon which they must rely is one which requires the plaintiffs to prove serious allegations of actual bad faith--dishonesty--against the officials. It is an abuse of process to make the allegations unless the plaintiffs have material to support at least a prima facie case that the allegations are correct. They do not have that material. For the action to be allowed to proceed on the speculation, not backed up by any real expectation, that they may before trial find evidence to support their allegations is vexatious. It is also contrary to the procedural rules now in force. These rules are based upon sound principles of the administration of justice. Doing justice includes bringing to a conclusion highly expensive and long drawn out litigation procedures, inevitably complex, which have no real prospect of success. The real grievance of the actual plaintiffs is that they believe that the law ought to allow actions in negligence against regulators but they accept through their counsel that it does not. I would dismiss the appeal.

**LORD MILLETT**

My Lords,

**176** The Bank of Credit and Commerce International SA ("BCCI") was incorporated under the laws of Luxembourg and obtained a banking licence from the Luxembourg Banking Commission ("the LBC") in 1972. In the years which followed it carried on a world-wide business as a bank and deposit taking institution. Shortly after it received the licence from the LBC it established an office in London which eventually became its principal place of business. By 1979 it had 45 branches in the United Kingdom through which it offered a full range of banking services to members of the public.

**177** The Banking Act 1979 came into force in October 1979. The Act made the Bank of England ("the Bank") formally responsible for supervising banks and other deposit taking institutions in the United Kingdom and conferred wide regulatory powers upon the Bank to enable it to discharge its functions. For the first time authorisation was required for a banking or deposit taking business to be carried on

---

**[2003]** **290**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Millett**

in the United Kingdom. The Act applied to companies like BCCI which was already carrying on an existing business in the United Kingdom as well as to those which wished to commence business here.

**178** In 1980 the Bank granted BCCI a licence to accept deposits. Withholding the licence would have compelled the closure of BCCI's business in the United Kingdom (and in all likelihood elsewhere), with virtually certain loss to depositors. In granting the licence the Bank relied on the judgment of the LBC and made no independent judgment of its own whether the statutory criteria for authorisation were satisfied. It was not entitled to do this because BCCI's principal place of business was in the United Kingdom. Thereafter BCCI continued to carry on business in the United Kingdom and elsewhere for a further 11 years before it was closed down in July 1991 by regulatory action taken by the Bank. Depositors, most of whom must have become depositors or increased their deposits after 1980, have suffered substantial losses. They blame the Bank for its supervisory failures and seek to hold it responsible for their losses. They believe that the Bank was grossly negligent in granting the licence in the first place and in failing to revoke it or take other regulatory action long before it did.

**179** Unfortunately for the depositors, a regulatory authority cannot be held liable in English law for negligence, however gross, in the exercise of its supervisory functions. So the depositors have been forced to base their claim on a very different cause of action. They allege that the Bank has been guilty of misfeasance in public office. This is an intentional tort. It involves deliberate or reckless wrongdoing. It cannot be committed negligently or inadvertently. Accordingly it is not enough for the depositors to establish negligence, or even gross negligence, on the part of the Bank. They must establish some intentional or reckless impropriety. As your Lordships ruled unanimously at an earlier stage of these proceedings, and in the absence of what has been described as "targeted malice" (which is not alleged), the tort has two elements. In the present case the depositors must prove (i) not merely that the Bank acted unlawfully, that is to say in excess of its powers or for an improper purpose, but that it did so knowingly (or recklessly not caring whether it had the necessary power or not); and (ii) that the Bank knew that its actions would probably cause loss to depositors (or was recklessly indifferent to the consequences of its actions). Such conduct in a public official is grossly improper and equates to dishonesty in a private individual.

**180** Seen in this light, the depositors' case is a most implausible one. A bank regulator has a very difficult task and one which may call for an exercise of judgment of some nicety, since it must seek to protect future depositors against the risk of loss without sacrificing the interests of existing depositors. No responsible regulator would contemplate closing down a bank or other deposit taking institution (or taking other action which risked a run on it) with inevitable loss to existing depositors unless there was no alternative, i e unless it considered that collapse was virtually inevitable. A regulator's task has often to be performed on incomplete information and is highly judgmental. Even an action based on negligence would face formidable difficulties. But it is scarcely credible that, unless corrupt, public officials should have been guilty of intentional wrongdoing or have been indifferent to the consequences of their actions to the very people they were supposed to protect. It is not beyond the bounds of possibility, of course, but in the absence of any incentive to act in this way it is in the highest degree unlikely. Certainly such conduct cannot lightly be inferred.

**181** But the present case goes far beyond this. The Bank was formally concerned with the supervision of BCCI for more than 11 years (and informally for a further 8 years) and the supervisory attention which it paid to BCCI during this time was very great. The depositors are alleging deliberate or reckless wrongdoing on the part of a large number of officials at different levels of seniority over a long period. This would involve wholesale wrongdoing on a spectacular scale in the public service. Absent any plausible motive for such conduct it is an extravagant allegation. It will require evidence of the most compelling kind to establish. As Lord Nicholls of

---

Birkenhead observed in *In re H (minors) (Sexual abuse: Standard of proof)* [1996] AC 563, 586:

"The more improbable the event, the stronger must be the evidence that it did occur before, on the balance of probability, its occurrence will be established. Ungoed-Thomas J expressed this neatly in *In re Dellow's Will Trusts* [1964] 1 WLR 451, 455: 'The more serious the allegation the more cogent is the evidence required to overcome the unlikelihood of what is alleged and thus to prove it'."

In the absence of evidence to support the allegation, it would be an abuse of process to make it. It is not at all surprising that the depositors have striven hard to avoid pleading any such case until they were compelled to do so, preferring instead to argue that it was not necessary.

**182** In describing the depositors' case as "implausible" or "scarcely credible", I should not be taken as making any assumptions about the integrity of the Bank and its officials or as departing from the proper judicial stance of neutrality and impartiality. I do not take the view that the Bank can do no wrong or that public officials are incapable of acting in bad faith. But we are called upon to evaluate the action's prospects of success, and that exercise involves an impartial consideration of the inherent plausibility of the allegations and the strength of the evidence needed to establish them. The scales of justice must be evenly balanced at the commencement of such an operation; but they should not be incapable of movement while the operation is being undertaken. It is not unfair to observe that, in the absence of some financial or other incentive, a charge of dishonesty against professional men and public officials is possible but inherently improbable.

*The pleadings: demurrer*

**183** Having read and re-read the pleadings, I remain of opinion that they are demurrable and could be struck out on this ground. The rules which govern both pleading and proving a case of fraud are very strict. In *Jonesco v Beard* [1930] AC 298 Lord Buckmaster, with whom the other members of the House concurred, said, at p 300:

"It has long been the settled practice of the court that the proper method of impeaching a completed judgment on the ground of fraud is by action in which, *as in any other action based on fraud, the particulars of the fraud must be exactly given and the allegation established by the strict proof such a charge requires*" (my emphasis).

**184** It is well established that fraud or dishonesty (and the same must go for the present tort) must be distinctly alleged and as distinctly proved; that it must be sufficiently particularised; and that it is not sufficiently particularised if the facts pleaded are consistent with innocence: see *Kerr on Fraud and Mistake*, 7th ed (1952), p 644; *Davy v Garrett* (1878) 7 Ch D 473, 489; *Bullivant v Attorney General for Victoria* [1901] AC 196; *Armitage v Nurse* [1998] Ch 241, 256. This means that a plaintiff who alleges dishonesty must plead the facts, matters and circumstances relied on to show that the defendant was dishonest and not merely negligent, and that facts, matters and circumstances which are consistent with negligence do not do so.

**185** It is important to appreciate that there are two principles in play. The first is a matter of pleading. The function of pleadings is to give the party opposite sufficient notice of the case which is being made against him. If the pleader means "dishonestly" or "fraudulently", it may not be enough to say "wilfully" or "recklessly". Such language is equivocal. A similar requirement applies, in my opinion, in a case like the present, but the requirement is satisfied by the present pleadings. It is perfectly clear that the depositors are alleging an intentional tort.

**186** The second principle, which is quite distinct, is that an allegation of fraud or dishonesty must be sufficiently particularised, and that particulars of facts which are

---

consistent with honesty are not sufficient. This is only partly a matter of pleading. It is also a matter of substance. As I have said, the defendant is entitled to know the case he has to meet. But since dishonesty is usually a matter of inference from primary facts, this involves knowing not only that he is alleged to have acted dishonestly, but also the primary facts which will be relied upon at trial to justify the inference. At trial the court will not normally allow proof of primary facts which have not been pleaded, and will not do so in a case of fraud. It is not open to the court to infer dishonesty from facts which have not been pleaded, or from facts which have been pleaded but are consistent with honesty. There must be *some* fact which tilts the balance and justifies an inference of dishonesty, and this fact must be both pleaded and proved.

**187** In *Davy v Garrett* 7 Ch D 473, 489 Thesiger LJ in a well known and frequently cited passage stated: "In the present case facts are alleged from which fraud might be inferred, but they are consistent with innocence. They were innocent acts in themselves, and it is not to be presumed that they were done with a fraudulent intent." This is a clear statement of the second of the two principles to which I have referred.

**188** In *Armitage v Nurse* [1998] Ch 241 the plaintiff needed to prove that trustees had been guilty of fraudulent breach of trust. She pleaded that they had acted "in reckless and wilful breach of trust". This was equivocal. It did not make it clear that what was alleged was a dishonest breach of trust. But this was not fatal. If the particulars had not been consistent with honesty, it would not have mattered. Indeed, leave to amend would almost certainly have been given as a matter of course, for such an amendment would have been a technical one; it would merely have clarified the pleading without allowing new material to be introduced. But the Court of Appeal struck out the allegation because the facts pleaded in support were consistent with honest incompetence: if proved, they would have supported a finding of negligence, even of gross negligence, but not of fraud. Amending the pleadings by substituting an unequivocal allegation of dishonesty without giving further particulars would not have cured the defect. The defendants would still not have known why they were charged with dishonesty rather than with honest incompetence.

**189** It is not, therefore, correct to say that *if there is no specific allegation of dishonesty* it is not open to the court to make a finding of dishonesty if the facts pleaded are consistent with honesty. If the particulars of dishonesty are insufficient, the defect cannot be cured by an unequivocal allegation of dishonesty. Such an allegation is effectively an unparticularised allegation of fraud. If the observations of Buxton LJ in *Taylor v Midland Bank Trust Co Ltd* (unreported) 21 July 1999, are to the contrary, I am unable to accept them.

**190** In the present case the depositors (save in one respect with which I shall deal later) make the allegations necessary to establish the tort, but the particulars pleaded in support are consistent with mere negligence. In my opinion, even if the depositors succeeded at the trial in establishing all the facts pleaded, it would not be open to the court to draw the inferences necessary to find that the essential elements of the tort had been proved.

*The evidential material: prospects of success*

**191** But I prefer to decide this appeal on the broader and simpler ground that the action has no real prospects of success. In reaching this conclusion I have not relied upon the Bingham report or its findings. My reasons are as follows:

1. The grant of the licence

(1) It is clear that the Bank was not entitled to grant the licence in reliance on the LBC. So the depositors can prove that the Bank acted unlawfully. However, it was not unlawful for the Bank to grant a licence, but only to do so without first making its own independent inquiries. It must now be a matter of speculation whether the Bank would still have granted the licence if it had made its own inquiries, so there is a difficult (though I am willing to assume not insuperable) question of causation. The burden of proving this lies with the depositors.

(2) It is arguable that the Bank knew the facts which deprived it of the power to grant the licence in reliance upon the LBC and without making its own inquiries. But knowledge of facts which deprive a party of the power to take a particular course of action is not the same as knowledge that it is acting in excess of power. There is no reason to suppose, and not a shred of evidence to suggest, that any official of the Bank appreciated the position, or that any official suspected it but turned a blind eye. If the Bank had realised or suspected that it was not entitled to rely on the LBC, it would obviously have made its own inquiries. It had not the slightest reason not to do so. The facts pleaded, and all the evidence we have seen, are entirely consistent with an honest but (possibly) negligent failure to appreciate the legal consequences of the known facts. This is insufficient to sustain the claim, since the first element of the tort is lacking.

(3) Even if the depositors could establish the first element of the tort, they have no prospect of establishing the second. There is no case for supposing that in 1980 BCCI was in fact already insolvent or likely to collapse; and even if it was the Bank obviously had no knowledge or suspicion that it was. As Clarke J said: it defies common sense to suppose that regulators would licence a bank which they foresaw would probably (or be at all likely to) collapse.

2. The failure to revoke the licence prior to 1990.

(1) The tort is concerned with the *abuse* of power by public officials who act in excess of their powers to the injury of the subject. It is not concerned with their failure to exercise the powers they do have, particularly when they have a discretion whether to exercise them or not.

(2) The Bank had a *power* to revoke the licence in certain circumstances. But it had no *duty* to do so unless the circumstances were such that (objectively) the discretion could only be exercised in favour of revocation. This was never the case, nor is it alleged that it was. Even if the Bank appreciated (after the event) that it had acted in excess of its powers when granting the licence, this did not impose a duty (as distinct from a power) to revoke the licence. It follows that the Bank never acted unlawfully in failing to exercise its power to revoke the licence.

(3) In any case, the Bank's internal documents show that it never believed that it had grounds to revoke the licence, and considered that even if it did revocation would not be justified. There is no reason to suppose (and there is nothing pleaded which would justify a finding) that these views were not honestly (even if erroneously) held. Accordingly, the first element of the tort is lacking.

(4) The real problem was that, as the Bank knew, BCCI was effectively unsupervised. The depositors laid considerable emphasis on this, and rightly so; but they did not face up to the consequences. It meant that the Bank did not know enough to justify either letting BCCI continue or closing it down. It was not unlawful to abstain from revoking the licence in these circumstances. The real charge against the Bank is that it never got to grips with the problem of supervision. This may have been negligent, but it did not amount to deliberate wrongdoing or bad faith.

(5) The right course may have been to impose restrictions. This never entered anyone's head. The failure to take a step which was never even considered may be negligent but cannot possibly amount to deliberate (or reckless) wrongdoing.

3. The failure to revoke the licence: 1990-1991.

(1) By 1990 the Bank knew that BCCI was insolvent and fraudulently run. So it knew (for the first time) that there were grounds for closing it down. But it still had to consider whether this was in the interests of depositors, both present and future.

(2) No regulator would close down a bank in such circumstances while there was any reasonable prospect of a rescue. The first question is whether, objectively and without the benefit of hindsight, there was a reasonable possibility of a rescue (with new funds and new management) until the section 41 report put paid to it. If so, the Bank was not acting unlawfully in exercising its discretion not to revoke the licence, and the first element of the tort would be lacking.

---

**[2003]** **294**
**2 AC** **Three Rivers DC v Bank of England (No 3) (HL(E))** **Lord Millett**

(3) But even if the depositors satisfy the court that there was in fact no reasonable prospect of a rescue, this is not enough. The essential question is whether it was the Bank's honestly held view that there was. There is no reason to suppose and not a shred of evidence from which it could be inferred that the Bank did not honestly believe that a rescue was a reasonable possibility. All the documents we have seen show that this was why the Bank stayed its hand. There is no hint of any other reason. As soon as it received the section 41 report, and realised that there would be no rescue, it moved to close the business down.

(4) The depositors do not even plead the necessary averment. They still plead only that (negatively) the Bank did not believe that there would probably be a rescue. This is remarkable given that Clarke J told them that what they needed to allege and prove was that (positively) the Bank knew or suspected that there would probably *not* be a rescue. There can be only one reason for their failure to plead the necessary averment: it is because they know that they cannot. In the absence of the necessary pleading (supported by proper particulars), it is not open to the court to find that the Bank knew that depositors would probably suffer loss. The second element of the tort is lacking.

(5) The depositors' case is that a regulator has a legal duty to close down an insolvent bank even if it believes that there is a reasonable prospect of a rescue, unless it also believes that a rescue is likely. It is only necessary to formulate the proposition to see that it must be rejected. Nothing could be more inimical to the interests of depositors than to place such a restriction on the regulator's power in their interests to explore every alternative to closure. Not to do so would display the very reckless indifference to their interests of which the depositors in the present case complain.

*Conclusion*

**192** I agree with my noble and learned friend Lord Hope of Craighead that, while cases should in principle be disposed of as expeditiously and cheaply as the circumstances permit, the most important principle of all is that justice should be done. But this does not mean justice to the plaintiff alone. It is not just to a plaintiff to strike out his claim without a trial unless it has no real prospect of success. It is not just to defendants to subject them to a lengthy and expensive trial to defend their integrity when there is no foundation in the evidence for the attack upon it.

**193** In my opinion the depositors cannot establish the requisite elements of the tort in respect of any matter of complaint. They have either failed to make the necessary allegations, or where they have done so they have pleaded insufficient facts in support to entitle the court to draw the necessary inferences. They have produced no document which supports their case, and every document which they have produced and on which they have placed reliance is either neutral or more often contradictory of their case. When in addition regard is had to the seriousness and sheer improbability of their case and the cogency of the evidence required to prove it, the conclusion is inescapable that it has no real prospects of success.

**194** In agreement with my noble and learned friend Lord Hobhouse of Woodborough, I would dismiss the appeal and strike out the action.

*Appeal allowed*
*Cross-appeal dismissed.*

*Solicitors: Lovells; Freshfields*

B L S

01744585

TAB 77

*UBS AG v Kommunale Wasserwerke Leipzig GmbH*
[2014] EWHC 3615, § 762 (Comm) (excerpt)

Neutral Citation Number: [2014] EWHC 3615 (Comm)

Case No: 2010 Folio 50
2010 Folio 1224
2010 Folio 500
2010 Folio 505

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 04/11/2014

**Before** :

**THE HONOURABLE MR JUSTICE MALES**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

Case No: 2010 Folio 50
2010 Folio 1224

| | |
|---|---|
| **(1) UBS AG (LONDON BRANCH)**<br>**(2) UBS GLOBAL ASSET MANAGEMENT (UK) LTD** | **Claimants** |
| **- and -** | |
| **KOMMUNALE WASSERWERKE LEIPZIG GMBH** | **Defendant** |
| **- and -** | |
| **(1) UBS LIMITED**<br>**(2) DEPFA BANK PLC** | **Third Parties** |

**And Between :**

Case No: 2010 Folio 500

| | |
|---|---|
| **UBS LIMITED** | **Claimant** |
| **- and -** | |
| **DEPFA BANK PLC** | **Defendant** |
| **- and -** | |
| **KOMMUNALE WASSERWERKE LEIPZIG GMBH** | **Third Party** |

**And Between :**

Case No: 2010 Folio 505

| | |
|---|---|
| **UBS AG (LONDON BRANCH)** | **Claimant** |
| **- and -** | |
| **LANDESBANK BADEN-WÜRTTEMBERG** | **Defendant** |
| **- and-** | |
| **UBS LIMITED** | **Third Party** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Lord Falconer, Mr Richard Slade QC, Mr Jonathan Dawid and Mr Edward Harrison** (instructed by **Mayer Brown International LLP**) for the **UBS parties**
**Mr Tim Lord QC, Mr Simon Salzedo QC, Mr Stephen Midwinter and Mr Craig Morrison** (instructed by **Addleshaw Goddard LLP**) for **KWL**
**Mr David Railton QC, Mr Edward Levey and Mr Richard Power (**instructed by **Dentons UKMEA LLP)** for **DEPFA**
**Mr Nicholas Peacock QC, Miss Catherine Addy and Miss Fiona Dewar** (instructed by **Baker & McKenzie LLP**) for **LBBW**

Hearing dates: 29th April – 31st July 2014

- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

.............................

THE HONOURABLE MR JUSTICE MALES

> The company's primary rules of attribution will generally be found in its constitution, typically the articles of association, and will say things such as …'the decisions of the board in managing the company's business shall be the decisions of the company.'
>
> These primary rules of attribution are obviously not enough to enable a company to go out into the world and do business. Not every act on behalf of the company could be expected to be the subject of a resolution of the board or a unanimous decision of the shareholders. The company therefore builds upon the primary rules of attribution by using general rules of attribution which are equally available to natural persons, namely, the principles of agency. It will appoint servants and agents whose acts, by a combination of the general principles of agency and the company's primary rules of attribution, count as the acts of the company, and having done so, it will also make itself subject to the general rules by which liability for the acts of others can be attributed to natural persons, such as estoppel or ostensible authority in contract and vicarious liability in tort.
>
> The company's primary rules of attribution together with the general principles of agency, vicarious liability and so forth are usually sufficient to enable one to determine its rights and obligations."

762. In this case the ordinary principles of agency are sufficient to determine whether Mr Bracy's knowledge of the "letter for K" episode is to be attributed to UBS. As stated in *Bowstead and Reynolds on Agency* (20th Edn, 2014) at para 8-207):

> "The law may impute to a principal knowledge relating to the subject matter of the agency which the agent acquires while acting within the scope of his authority."

763. Thus where an agent has authority to receive communications on behalf of a principal, communication to the agent is communication to the principal: *El Ajou v Dollar Land Holdings Plc* [1994] 2 All ER 685, per Hoffmann LJ. As Arden LJ explained in *Real Estate Opportunities Limited v Aberdeen Asset Managers* [2007] EWCA Civ 197 at [49]:

> "The ordinary rules of attribution are well-known. In general, an employer is deemed to have notice of anything of which any of his employees obtains knowledge in the course of his employment. Likewise a company is in general deemed to have notice of anything of which any of its directors obtains knowledge in the course of his duties."

764. Applying these principles in the present case, Mr Bracy was the person within UBS responsible for managing the bank's relationship with Value Partners and liaising with it. He was entrusted with responsibility for the fostering and further development of this relationship by the senior management of UBS following the closure of the

TAB 78

*Virgin Atlantic Airways Ltd v Zodiac Seats UK Ltd*
[2014] AC 160, UK Supreme Court

Supreme Court

# Virgin Atlantic Airways Ltd *v* Zodiac Seats UK Ltd (formerly Contour Aerospace Ltd)

## [2013] UKSC 46

2013 April 29, 30; July 3

Lord Neuberger of Abbotsbury PSC, Baroness Hale of Richmond DPSC, Lord Clarke of Stone-cum-Ebony, Lord Sumption, Lord Carnwath JJSC

*Estoppel — Per rem judicatam — Cause of action estoppel — Court of Appeal finding patent valid and infringed and ordering inquiry as to damages — Patent subsequently amended by technical board of appeal of European Patent Office to remove claims held by Court of Appeal to have been infringed — Amendment having retrospective effect relating back to date of grant of patent — Whether Court of Appeal's decision res judicata — Whether cause of action estoppel preventing any challenge to damages inquiry — Effect of later amendment of patent — Patents Act 1977 (c 37), s 77 (as amended by Copyright, Designs and Patents Act 1988 (c 48), s 295, Sch 5, paras 8(b), 21) — Convention on the Grant of European Patents (1978) (Cmnd 7090), arts 64, 68 (as amended by Act revising the Convention on the Grant of European Patents (2002) (Cm 5615), art 1(24))*

The claimant was the registered proprietor of an European patent, granted in May 2007 out of the European Patent Office ("the EPO"), for a seating system and passenger accommodation unit commonly used in long-haul aircraft. In July 2007 the claimant began proceedings in the High Court against the defendants, the manufacturers and sellers of an allegedly infringing product, seeking, inter alia, damages for infringement. The defendants, denying the claim, counterclaimed for revocation of the patent, in particular, on the ground that it was invalid on account of prior art and in February 2008 they opposed its validity in the EPO. In January 2009 the judge held that the defendants' product did not infringe the patent. In March 2009 the Opposition Division of the EPO upheld the patent subject to minor amendments and the defendants' appealed to a technical board of appeal. The English proceedings were not stayed and, on the claimant's appeal, the Court of Appeal in October 2009 reversed the judge's decision and held that the patent was valid and infringed by the defendants' product. The defendants applied for a stay pending their application for permission to appeal to the Supreme Court and the outcome of their appeal to the board. In December 2009, the Court of Appeal, applying previous authority, refused the application on the ground that, having made a final determination in the claimant's favour, their decision was res judicata, irrespective of whether the board subsequently amended the patent. By its order, made in January 2010, the Court of Appeal declared that the patent was valid and infringed and directed, inter alia, an inquiry as to damages. In September 2010, in advance of any such inquiry, the board, on the claimant's abandoning all claims held by the Court of Appeal to have been infringed, amended the patent with the consequence that, by virtue of section 77 of the Patents Act 1977[1] and articles 64 and 68 of the European Patent Convention[2], the patent was to be treated as limited accordingly with retrospective effect from the date of grant. The Court of Appeal refused the defendants' application for the discharge of the order for an inquiry, on

[1] Patents Act 1977, s 77, as amended: see post, para 4.
[2] Convention on the Grant of European Patents (1978), arts 64, 68, as amended: see post, para 5.

© 2014 The Incorporated Council of Law Reporting for England and Wales

the ground that it was the mechanism for working out the effect of that court's decision that the patent was valid and that the matter was res judicata.

On the defendants' appeal—

*Held*, allowing the appeal, that the purpose of the principle of res judicata was to support the good administration of justice in the interests of the public and the parties by preventing abusive and duplicative litigation; that the principle operated, in the form of cause of action estoppel, to prevent a cause of action being raised in subsequent proceedings which was identical to that raised in earlier proceedings between the same parties so that points which could, with reasonable diligence, have been taken in earlier proceedings but had not been could not be raised subsequently; but that cause of action estoppel was absolute only in relation to points actually decided on the earlier occasion and was sufficiently flexible not to preclude the raising of essential points which had not been decided in the earlier proceedings; that a question of res judicata in a patent case could not be correctly considered without proper regard to the Patents Act 1977 and the European Patent Convention, the effect of which was, in particular, that the revocation or amendment of a patent applied retrospectively, relating back to the date of grant and was an act in rem, not limited to the particular parties but determining the status of the patent as against the world, and entitling everyone to conduct their affairs as though the unamended patent had never existed; that res judicata, although barring an alleged infringer from relying on arguments relating to validity or infringement which had been determined in the English proceedings, did not prevent the assertion that the patent had, as a matter of fact, been revoked or amended; that such a fact had arisen after the determination of the English proceedings, was relevant, centrally important to it and uncontroversial; that the defendants, in relying on it, made no challenge to the conclusions reached by the Court of Appeal and did not seek to relitigate or raise a point which that court had already determined; that the consequence of the retrospective amendment was to remove all claims held by the Court of Appeal to infringe the unamended patent; that it would be wrong to prevent alleged infringers of the patent from invoking in later proceedings a subsequent revocation or amendment so as to avoid liability; and that, accordingly, the defendants were entitled to rely on the amendment in answer to the claim for damages in the inquiry (post, paras 17, 20, 22, 25–26, 27, 32, 34–35, 37, 42, 48–60, 69).

*Arnold v National Westminster Bank plc* [1991] 2 AC 93, HL(E) applied.

*Henderson v Henderson* (1843) 3 Hare 100 and *Johnson v Gore-Wood & Co* [2002] 2 AC 1, HL(E) considered.

*Unilin Beheer BV v Berry Floor NV* [2007] Bus LR 1140, CA disapproved.

*Poulton v Adjustable Cover and Boiler Block Co* [1908] 2 Ch 430, CA and *Coflexip SA v Stolt Offshore MS Ltd (No 2)* [2004] FSR 708, CA overruled.

*Per curiam.* Guidance given by the Court of Appeal, to the effect that the English court should normally refuse to stay its own proceedings if it would be likely to resolve the question of validity significantly earlier that the EPO, should be re-examined by the Patents Court and the Court of Appeal (post, paras 38, 69).

*Glaxo Group Ltd v Genentech Inc (Practice Note)* [2008] Bus LR 888, CA considered.

*Per* Lord Neuberger of Abbotsbury PSC, Baroness Hale of Richmond DPSC, Lord Clarke of Stone-cum-Ebony and Lord Carnwath JJSC. (i) It is inherent in the grant of a patent under the Patents Act 1977 that, however often its validity may be unsuccessfully challenged in earlier litigation, it may none the less be revoked, or amended, and with retrospective effect, at some point by a court or by the EPO. A patentee therefore must appreciate that it can never be sure that a decision of a court that the patent is valid will settle the question for good. An unsuccessful challenge to the validity of a patent by a particular person will normally give rise to a res judicata to prevent that person raising another challenge, but it would not enable the patentee to rely on the patent against that person once the patent had been

© 2014 The Incorporated Council of Law Reporting for England and Wales

revoked, at least in respect of what would be infringements after its revocation (post, para 61).

(ii) Where res judicata has been relied on it is helpful for a court, where it is inclined to accept the proposition that it does not prevent a point being taken, to consider whether that outcome would work justice between the parties. It would be positively unjust, as between the parties, for a former patentee to recover damages for infringement of a patent after it has been irrevocably and retrospectively revoked or amended. There is no public interest in such an outcome (post, para 62).

Decision of the Court of Appeal sub nom *Virgin Atlantic Airways Ltd v Premium Aircraft Interiors UK Ltd* [2009] EWCA Civ 1062; [2010] RPC 192 reversed.

The following cases are referred to in the judgments:

*Arnold v National Westminster Bank plc* [1991] 2 AC 93; [1991] 2 WLR 1177; [1991] 3 All ER 41, HL(E)
*Coflexip SA v Stolt Offshore MS Ltd (No 2)* [2004] EWCA Civ 213; [2004] FSR 708, CA
*Conquer v Boot* [1928] 2 KB 336, DC
*Glaxo Group Ltd v Genentech Inc (Practice Note)* [2008] EWCA Civ 23; [2008] Bus LR 888, CA
*Henderson v Henderson* (1843) 3 Hare 100
*Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1997] AC 70; [1996] 2 WLR 262; [1996] 1 All ER 737, HL(E)
*Hormel Foods Corpn v Antilles Landscape Investments NV* [2005] EWHC 13 (Ch); [2005] RPC 657
*Hoysted v Federal Comr of Taxation* (1921) 29 CLR 537
*Johnson v Gore-Wood & Co* [2002] 2 AC 1; [2001] 2 WLR 72; [2001] 1 All ER 481, HL(E)
*King v Hoare* (1844) 13 M & W 494
*Kingston's (Duchess of ) Case* (1776) 20 State Tr 355
*Poulton v Adjustable Cover and Boiler Block Co* [1908] 2 Ch 430, Parker J and CA
*Thoday v Thoday* [1964] P 181; [1964] 2 WLR 371; [1964] 1 All ER 341, CA
*Thrasyvoulou v Secretary of State for the Environment* [1990] 2 AC 273; [1990] 2 WLR 1; [1990] 1 All ER 65, HL(E)
*Unilin Beheer BV v Berry Floor NV* [2007] EWCA Civ 364; [2007] Bus LR 1140; [2008] 1 All ER 156, CA
*Vervaeke (formerly Messina) v Smith* [1983] 1 AC 145; [1982] 2 WLR 855; [1982] 2 All ER 144, HL(E)
*Virgin Atlantic Airways Ltd v Jet Airways India Ltd* [2012] EWHC 2153 (Pat); [2013] RPC 247
*Waring, In re; Westminster Bank v Burton-Butler* [1948] Ch 221; [1948] 1 All ER 257
*Yat Tung Investment Co Ltd v Dao Heng Bank Ltd* [1975] AC 581; [1975] 2 WLR 690, PC

The following additional cases were cited in argument:

*Al Rawi v Security Service (JUSTICE intervening)* [2011] UKSC 34; [2012] 1 AC 531; [2011] 3 WLR 388; [2012] 1 All ER 1, SC(E)
*Ampthill Peerage, The* [1977] AC 547; [1976] 2 WLR 777; [1976] 2 All ER 411, HL
*Asturcom Telecomunicaciones SL v Rodríguez Nogueira* (Case C-40/08) [2009] ECR I-9579, ECJ
*Barrell Enterprises, In re* [1973] 1 WLR 19; [1972] 3 All ER 631, CA
*Barrow v Bankside Members Agency Ltd* [1996] 1 WLR 257; [1996] 1 All ER 981; [1996] 1 Lloyd's Rep 278, CA
*Boswell v Coaks* (1894) 6 R 167, HL(E)

© 2014 The Incorporated Council of Law Reporting for England and Wales

*Bradford & Bingley Building Society v Seddon (Hancock, Third Party)* [1999] 1 WLR 1482; [1999] 4 All ER 217, CA
*Brisbane City Council v Attorney General for Queensland* [1979] AC 411; [1978] 3 WLR 299; [1978] 3 All ER 30, PC
*Burrell v The Queen* [2008] HCA 34; 238 CLR 218
*Carl Zeiss Stiftung v Rayner & Keeler Ltd (No 2)* [1967] 1 AC 853; [1966] 3 WLR 125; [1966] 2 All ER 536, HL(E)
*Carter v Ahsan* [2007] UKHL 51; [2008] AC 696; [2008] 2 WLR 17; [2008] ICR 82; [2008] 1 All ER 869, HL(E)
*Chiron Corpn v Organon Teknika Ltd (No 6)* [1994] FSR 448; sub nom *Chiron Corpn v Organon Teknika Ltd (No 14)* [1996] FSR 701, CA
*Cinpres Gas Injection Ltd v Melea Ltd* [2008] EWCA Civ 9; [2008] Bus LR 1157, CA
*Crown Estate Comrs v Dorset County Council* [1990] Ch 297; [1990] 2 WLR 89; [1990] 1 All ER 19
*Director General of Fair Trading v First National Bank plc* [2001] UKHL 52; [2002] 1 AC 481; [2001] 3 WLR 1297; [2002] 1 All ER 97; [2001] 2 All ER (Comm) 1000; [2002] 1 Lloyd's Rep 489, HL(E)
*Dudgeon v Thomson* (1877) 3 App Cas 34, HL(Sc)
*Eli Lilly & Co v Human Genome Sciences Inc* [2010] EWCA Civ 33; [2010] RPC 429, CA
*Fidelitas Shipping Co Ltd v V/O Exportchleb* [1966] 1 QB 630; [1965] 2 WLR 1059; [1965] 2 All ER 4, CA
*General Hospital Corpn's European Patent (UK), In re* [2000] FSR 633, Neuberger J and CA
*Gerber Garment Technology Inc v Lectra Systems Ltd* [1995] RPC 383
*Golden Strait Corpn v Nippon Yusen Kubishika Kaisha (The Golden Victory)* [2007] UKHL 12; [2007] 2 AC 353; [2007] 2 WLR 691; [2007] Bus LR 997; [2007] 3 All ER 1; [2007] 2 All ER (Comm) 97; [2007] 2 Lloyd's Rep 164, HL(E)
*Green v Weatherill* [1929] 2 Ch 213
*Greenhalgh v Mallard* [1947] 2 All ER 255, CA
*Harrison v Schipp* [2002] NSWCA 78; 54 NSWLR 612
*Hodgson, In re; Beckett v Ramsdale* (1885) 31 Ch D 177, CA
*Hoystead v Comr of Taxation* [1926] AC 155, PC
*Hunter v Chief Constable of the West Midlands Police* [1982] AC 529; [1981] 3 WLR 906; [1981] 3 All ER 727, HL(E)
*ITP SA v Coflexip Stena Offshore Ltd* 2005 1 SC 116, Ct of Sess
*ITP SA v Technip Offshore UK Ltd (formerly Coflexip Stena Offshore Ltd)* [2005] CSIH 76, Ct of Sess
*India (Republic of) v India Steamship Co Ltd* [1993] AC 410; [1993] 2 WLR 461; [1993] 1 All ER 998; [1993] 1 Lloyd's Rep 387, HL(E)
*Johnson v Agnew* [1980] AC 367; [1979] 2 WLR 487; [1979] 1 All ER 883, HL(E)
*Johnson v Felton* [2006] 3 NZLR 475
*Kimberly-Clark Worldwide Inc v Procter & Gamble Ltd* [2000] RPC 422; [2000] FSR 235, CA
*Lake v Lake* [1955] P 336; [1955] 3 WLR 145; [1955] 2 All ER 538, CA
*Lenzing AG's European Patent (UK), In re* [1997] RPC 245
*Mulkerrins v PricewaterhouseCoopers* [2003] UKHL 41; [2003] 1 WLR 1937; [2003] 4 All ER 1, HL(E)
*PLG Research Ltd v Ardon International Ltd (No 2)* [1993] FSR 698
*Palmaz's European Patents (UK), In re* [2000] RPC 631, CA
*Phosphate Sewage Co Ltd v Molleson* (1879) 4 App Cas 801, HL(Sc)
*Pye (JA) (Oxford) Ltd v United Kingdom* (2007) 46 EHRR 1083, GC
*R v Derby Magistrates' Court, Ex p B* [1996] AC 487; [1995] 3 WLR 681; [1995] 4 All ER 526, HL(E)
*R v Inhabitants of Hartington Middle Quarter* (1855) 4 E & B 780

© 2014 The Incorporated Council of Law Reporting for England and Wales

*R v Secretary of State for the Environment, Transport and the Regions, Ex p Spath Holme Ltd* [2001] 2 AC 349; [2001] 2 WLR 15; [2001] 1 All ER 195, HL(E)
*R (Coke-Wallis) v Institute of Chartered Accountants in England and Wales* [2011] UKSC 1; [2011] 2 AC 146; [2011] 2 WLR 103; [2011] ICR 224; [2011] 2 All ER 1, SC(E)
*Rothwell v Chemical & Insulating Co Ltd* [2007] UKHL 39; [2008] AC 281; [2007] 3 WLR 876; [2007] ICR 1745; [2007] 4 All ER 1047, HL(E)
*St Nazaire Co, In re* (1879) 12 Ch D 88, CA
*Sanguinetti v Stuckey's Banking Co (No 2)* [1896] 1 Ch 502
*Scherrer v Normalu* (Case No 05–14.548) (unreported) 12 June 2007, Cour de Cassation
*Shoe Machinery Co v Cutlan* [1896] 1 Ch 667
*Stran Greek Refineries and Andreadis v Greece* (1994) 19 EHRR 293
*Taylor v Lawrence* [2002] EWCA Civ 90; [2003] QB 528; [2002] 3 WLR 640; [2002] 2 All ER 353, CA
*Three Rivers District Council v Governor and Company of the Bank of England (No 6)* [2004] UKHL 48; [2005] 1 AC 610; [2004] 3 WLR 1274; [2005] 4 All ER 948, HL(E)
*Wehrkamp-Richter v Guitay* (Case No 10–24.282) (unreported) 17 February 2012, Cour de Cassation
*Wiljo NV v Belgian State* (Case C-178/95) [1997] All ER (EC) 226; [1997] ECR I-585, ECJ
*Wright v Bennett* [1948] 1 All ER 227, CA

**APPEAL** from the Court of Appeal

By a claim issued on 30 July 2007 the claimant, Virgin Atlantic Airways Ltd, claimed damages and injunctive relief against the defendant, Zodiac Seats UK Ltd (formerly Contour Aerospace Ltd, formerly Premium Aircraft Interiors UK Ltd) for infringement of European patent (UK) No 1,495,908 granted to the claimant in May 2007. On 21 January 2009 Lewison J [2009] ECDR 127 dismissed the claim.

By an appellant's notice the claimant appealed. On 22 October 2009, the Court of Appeal (Jacob, Patten LJJ and Kitchin J) [2010] RPC 192 allowed the appeal on the basis that the patent was valid and infringed and refused the defendant permission to appeal. The defendant applied for a stay pending the determination of its application to the Supreme Court for permission to appeal. By a further judgment dated 21 December 2009 and an order dated 12 January 2010, the Court of Appeal (Jacob, Patten LJJ and Kitchin J) [2010] FSR 396 refused the application, declared the patent to be valid and infringed and directed, in particular, an inquiry as to damages. Following the decision of a technical board of appeal of the European Patent Office on 9 September 2010 to amend the patent by deleting as invalid all the claims which the Court of Appeal had found to be infringed, the defendant applied to the Court of Appeal to vary its order of 12 January 2010. By an order made on 23 February 2011, the Court of Appeal (Smith, Jacob and Patten LJJ) [2011] FSR 658 refused the application.

The defendants appealed pursuant to permission to appeal granted by the Supreme Court (Lord Walker of Gestingthorpe, Lord Collins of Mapesbury and Lord Kerr of Tonaghmore JJSC) on 31 March 2011, limited to the question whether the decision of the Court of Appeal in *Unilin Beheer BV v Berry Floor NV* [2007] Bus LR 1140 was correct. The issues, as stated in the parties' agreed statement of facts and issues, were whether (1), where an English court had found that a defendant had infringed an European patent

© 2014 The Incorporated Council of Law Reporting for England and Wales

(UK) and had ordered an inquiry as to damages, and where subsequently and before the inquiry had commenced or concluded the patent had been amended or revoked by the European Patent Office so that the claims found by the court to have been infringed were deemed never to have existed in their unamended form, the defendant was none the less liable to pay damages for the said infringement; (2) the decision of the Court of Appeal in the *Unilin* case was correct; and (3), in any event, the Court of Appeal as at 21 December 2009 should have stayed the making of any order that there be an inquiry as to damages in the United Kingdom claim, while the appeal before the technical board of appeal was pending.

The facts are stated in the judgments of Lord Neuberger of Abbotsbury PSC and Lord Sumption JSC.

*Henry Carr QC, Iain Purvis QC* and *Brian Nicholson* (instructed by *Wragge & Co LLP*) for the defendant.

The retrospective revocation of the relevant claims of a patent which occurs after the conclusion of infringement proceedings is not part of the res judicata of those proceedings, and therefore cause of action estoppel cannot apply to any argument based on that revocation. *Poulton v Adjustable Cover and Boiler Block Co* [1908] 2 Ch 430; *Unilin Beheer BV v Berry Floor NV* [2007] Bus LR 1140 and *Coflexip SA v Stolt Offshore MS Ltd (No 2)* [2004] FSR 708 are wrongly decided.

The term "cause of action estoppel" can be used in both a wider and a narrower sense. It arises in the narrow sense where the cause of action in the later proceedings is identical to that in the earlier proceedings, between the same parties or their privies and involving the same subject matter. In such a case, all points decided in the earlier case are absolutely barred, save where fraud or collusion is alleged such as to justify setting aside the first decision. Similarly points which might have been, but were not, raised in the earlier proceedings to establish or negative the cause of action cannot be raised in the later proceedings. In its wider form cause of action estoppel may not apply in its full rigour where the earlier decision did not in terms decide, because they were not raised, points which might have been vital to the existence or otherwise of a cause of action. The wider rule has been considered not to be true cause of action estoppel, but an abuse of process, which, though having much in common with it, is based on the rule of public policy that there should be finality in litigation and that a party should not be twice vexed with the same matter; whether it is correct to characterise the wider doctrine as cause of action estoppel is ultimately a matter of semantics. All courts have recognised that it will only apply where the failure to raise the subject matter in the earlier proceedings means that it is abusive to raise it in the later: see *Henderson v Henderson* (1843) 3 Hare 100; *Yat Tung Investment Co Ltd v Dao Heng Bank Ltd* [1975] AC 581; *Arnold v National Westminster Bank plc* [1991] 2 AC 93; *Johnson v Gore-Wood & Co* [2002] 2 AC 1; *Bradford & Bingley Building Society v Seddon (Hancock, Third Party)* [1999] 1 WLR 1482 and *Barrow v Bankside Members Agency Ltd* [1996] 1 WLR 257.

The only judgment in which the question of the species of cause of action estoppel was specifically considered is the dissent of Neuberger LJ in the *Coflexip* case. His conclusion was that it was the wider form, which was an

© 2014 The Incorporated Council of Law Reporting for England and Wales

aspect of abuse of process. He was correct for the following reasons: (a) the relevant test for determining whether a particular point is subject to strict cause of action estoppel is that applied in the *Yat Tung* case [1975] AC 581, 589–590: namely, whether there was, in the earlier decision, any formal repudiation of the pleas sought to be made in the later proceedings. That view is consistent with the *Henderson* and *Arnold* cases; and (b) a judgment in an infringement action cannot have repudiated a plea that the claims in issue have been revoked ab initio unless the point was before the court. However, in a situation such as the present, it was by definition not before the court since the act of revocation had not taken place by the date of judgment: see, by contrast, *Poulton v Adjustable Cover and Boiler Block Co* [1908] 2 Ch 430 and the majority decision in *Coflexip SA v Stolt Offshore MS Ltd (No 2)* [2004] FSR 708. [Reference was made to *Chiron Corpn v Organon Teknika Ltd (No 6)* [1994] FSR 448; sub nom *Chiron Corpn v Organon Teknika Ltd (No 14)* [2006] FSR 701.]

The effect of identifying the correct species of estoppel is that, if, on that basis, strict cause of action estoppel does not arise, the application of the abuse of process principle (see the *Henderson* and *Johnson v Gore-Wood* cases) requires a broad merits-based judgment, the crucial question being whether, in all the circumstances, a party is misusing or abusing the court's process by seeking to raise the issue which could have been raised before. But the issue of subsequent revocation could not have been raised before because the factual basis for the point did not exist at the time of the original action. Accordingly to raise it now cannot be abusive. In any event there is no basis for precluding reliance on the revocation of the claims in the present case: see the dissenting judgment of Neuberger LJ in the *Coflexip* case, at pp 728–735. In particular, to enforce the estoppel would be unjust and discriminatory, and would be contrary to the public policy of finality and that a party should not be vexed twice in the same matter: see *Johnson v Gore-Wood & Co* [2002] 2 AC 1, 31. The *Chiron* litigation and *Shoe Machinery Co v Cutlan* [1896] 1 Ch 667 are to be distinguished on their facts. Since the unamended patent has already been revoked, the claimant will not be vexed by the need to make further investigations, the court will not be troubled by lack of finality and permitting revocation to be relied on will remove the need for an inquiry.

There is a special public interest in whether the grantee of a patent, which turns out to be invalid, is entitled to enforce it. The enforcement of claims known to be invalid would be the abuse of process, not the ability to oppose such enforcement. The position of a patentee is different from that of the normal run of litigants: since a patent is always vulnerable to an attack however many times it has been upheld in the past, the policy of finality does not apply in the patentee's favour to the same extent as other litigants.

Revocation by the European Patent Office of the infringed claims has some impact on the order made by the Court of Appeal. Since the final injunction was discharged as a result of the revocation, the claimant has to take the position that it is mandatory (see *Dudgeon v Thomson* (1877) 3 App Cas 34) to rely on the revocation to discharge some parts of the final order in the first action, but it is an abuse to rely on the revocation as a defence to enforcement of another part. The argument in support of that distinction, that the injunction is about future conduct while the inquiry as

© 2014 The Incorporated Council of Law Reporting for England and Wales

to damages deals with the past, cannot be made here. Since the revocation is retrospective, no such distinction arises.

The policy reasons asserted in the *Unilin* case [2007] Bus LR 1140, para 88, to the effect that the domestic court system would deliver a conclusion "without having to wait to find out who has won until the slowest horse in the race gets there", does not promote certainty among businessmen or make commercial sense. Where, as here, there are parallel proceedings for invalidity in the United Kingdom and the European Patent Office, the idea that justice and certainty can be achieved by awarding the prize to the winner of a race between two tribunals is misconceived. It creates a random result dependent not on justice but on the availability of lawyers and judges and the volume of litigation. The idea underlying those reasons, that the European Patent Office opposition process is necessarily slow and unwieldy, compared with the domestic court system, is not correct: see *Eli Lilly & Co v Human Genome Sciences Inc* [2010] RPC 429, paras 6–10.

Where an inquiry as to damages is still pending in an action for infringement, the necessary finality for cause of action estoppel is lacking. In most patent actions such an inquiry is more than a mere accounting exercise: see the *Unilin* case [2007] Bus LR 1140. Other aspects of infringement may also arise and issues may arise as to whether particular acts complained of fulfil the requirements of the Patents Act 1977. [Reference was made to *Gerber Garment Technology Inc v Lectra Systems Ltd* [1995] RPC 383.] The distinction between a trial which deals with issues of infringement and an inquiry which deals with issues of money is extremely blurred. Infringement is far from completely resolved after trial and clear difficulties therefore arise in trying to impose cause of action estoppel before the inquiry. The attempts in *Poulton v Adjustable Cover and Boiler Block Co* [1908] 2 Ch 430; *Unilin Beheer BV v Berry Floor NV* [2007] Bus LR 1140 and *Coflexip SA v Stolt Offshore MS Ltd (No 2)* [2004] FSR 708 to justify doing so are intellectually unsatisfactory. The correct approach is that the necessary finality does not exist until the whole question of infringement has been finally worked out. Because of the practice in patent actions that means, if an inquiry is sought, there is no cause of action estoppel until after it is finished. Therefore while the inquiry remains incomplete, there is no estoppel and the retrospective revocation of the relevant claims can be relied on to prevent enforcement.

Even if the decisions in *Poulton v Adjustable Cover and Boiler Block Co* [1908] 2 Ch 430 and *Coflexip SA v Stolt Offshore MS Ltd (No 2)* [2004] FSR 708 are still good law in respect of national patents, the decision in *Unilin Beheer BV v Berry Floor NV* [2007] Bus LR 1140 wrongly applied that law to an European patent (UK). The statutory scheme applying to such a patent is inconsistent with the application of strict cause of action estoppel in the event of subsequent revocation in opposition proceedings; the effect of the statutory code is that, in the event of revocation of claims of an European patent (UK) in opposition proceedings, the proprietor of the patent is deemed never to have had the right to enforce, and the domestic courts are deemed never to have had the power to grant any relief, including damages, for infringement of such claims: see Convention on the Grant of European

© 2014 The Incorporated Council of Law Reporting for England and Wales

Patents (1978) (Cmnd 7090), articles 2(2), 64, 68, 101, 123 and 138; Patents Act 1977, sections 61 and 77.

If the decision in the *Unilin* case [2007] Bus LR 1140 is correct, the court must simultaneously proceed as if there was never any power to award damages for infringement of the patent, as required by article 68, and carry out an inquiry for the purposes of awarding damages for infringement of the patent (applying the decision in the *Poulton* case). Self-evidently the former is inconsistent with the latter. If therefore the *Poulton* case is good law in the case of a national patent, it would be inconsistent with the statutory code provided by the combination of the 1977 Act and the Convention to apply that law in the case of an European patent (UK) revoked or amended in the course of opposition proceedings: see *Thrasyvoulou v Secretary of State for the Environment* [1990] 2 AC 273; *ITP SA v Coflexip Stena Offshore Ltd* 2005 1 SC 116 and *ITP SA v Technip Offshore UK Ltd (formerly Coflexip Stena Offshore Ltd)* [2005] CSIH 76. [Reference was made to *In re Lenzing AG's European Patent (UK)* [1997] RPC 245.]

Alternatively, the court should recognise the possibility of exceptions even in the case of strict cause of action estoppel in special cases where it is in the interests of justice to do so. Subsequent retrospective revocation of a patent by a decision which itself creates an estoppel in rem is a special case and an exception should be made: see the *Arnold* case [1991] 2 AC 93; *Carl Zeiss Stiftung v Rayner & Keeler Ltd (No 2)* [1967] 1 AC 853 and *Johnson v Gore-Wood & Co* [2002] 2 AC 1. The policy that estoppels must be applied so as to work justice not injustice, which is applied to the wider form of cause of action estoppel and to issue estoppel, should be applied also to strict cause of action estoppel. There is no justification for treating the narrower form differently. Exceptions to any form of estoppel are necessary to give the court the flexibility to resolve the tension between the requirements for finality and for justice to be done. The reference by Lord Keith of Kinkel to an "absolute bar" (see the *Arnold* case [1991] 2 AC 93, 104) was obiter. In any event cause of action estoppel could be defeated by the discovery of new material, and Scottish law has always recognised such an exception: see *Boswell v Coaks* (1894) 6 R 167; *Cinpres Gas Injection Ltd v Melea Ltd* [2008] Bus LR 1157 and *Phosphate Sewage Co Ltd v Molleson* (1879) 4 App Cas 801. Contrast *In re Barrell Enterprises Ltd* [1973] 1 WLR 19. Accordingly the court should recognise the existence of a power to override strict cause of action estoppel in exceptional cases of res noviter which entirely changes the aspect of the case. The retrospective revocation of the relevant claims of a patent by the European Patent Office after a finding of infringement by the domestic court is such a matter which could not have been raised by the defendant at the date of trial and gives rise to an entirely exceptional situation. That is conclusive and binding on the patentee as an estoppel in rem. It is a complete answer to the claim for damages, without the need of further investigation. The public policy behind res judicata is not therefore engaged. The estoppel should therefore be overridden.

To avoid injustice a more flexible approach is required than that of the Court of Appeal in holding that strict cause of action applies without exception in a case where a subsequent successful European Patent Office opposition or an amendment in the course of opposition proceedings. It is incumbent on the court to use procedural safeguards to ensure that injustice

© 2014 The Incorporated Council of Law Reporting for England and Wales

is not done. The Court of Appeal was plainly wrong to refuse to stay the making of the order for an inquiry; their refusal did not comply with Parliament and Council Directive 2004/48/EC of 29 April 2004 on the enforcement of intellectual property rights, and their order should be set aside.

*Purvis QC* following.

The issue in the present case is not unique. Most other European countries subscribe to the Convention on the Grant of European Patents (1978) (Cmnd 7090). The approach taken by the courts in the three other main jurisdictions for patent litigation, France, Germany and the Netherlands, would not have permitted the continuation of proceedings for assessment of damages following subsequent revocation: see *Scherrer v Normalu* (Case No 05–14.548) 12 June 2007, Cour de Cassation; *Wehrkamp-Richter v Guitay* (Case No 10–24.282) 17 February 2012, Cour de Cassation, which is to be distinguished on its facts; section 81(2) of the German Patentgesetz and section 580(6) of the Code of Civil Procedure; *Restituionasklage II* (2 U 86/05), 11 May 2006 and article 50 of the Dutch Patents Act.

*Jonathan Crow QC; Richard Meade QC* and *Henry Ward* (instructed by *DLA Piper UK LLP*) for the claimant.

It is inherent in the regime established by the Convention on the Grant of European Patents (1978) (Cmnd 7090) that there may, in a given case, be concurrent infringement proceedings in the national courts and opposition proceedings in the European Patent Office: where that occurs either party may apply to the national court to stay its own proceedings pending a determination by the European Patent Office: see *In re General Hospital Corpn's European Patent (UK)* [2000] FSR 633. Such a stay has been regarded as the preferred option: see *Kimberly-Clark Worldwide Inc v Procter & Gamble Ltd* [2000] RPC 422. The defendant did not take that course in the knowledge that the court would apply national law as established in *Poulton v Adjustable Cover and Boiler Block Co* [1908] 2 Ch 430.

The Court of Appeal's decision is correct; any other solution would result in a final judgment being rendered nugatory otherwise than by means of a successful appeal. Any person in whose favour a final judgment has been entered by a court of competent jurisdiction is precluded from recovering a second judgment on the same cause of action: see *Republic of India v India Steamship Co Ltd* [1993] AC 410, 417 and *Spencer Bower & Handley, Res Judicata*, 4th ed (2009), p 267. That is because the claimant's cause of action merges with the judgment and there is nothing left on which he can sue: *Director General of Fair Trading v First National Bank plc* [2002] 1 AC 481, 487–488; *King v Hoare* (1844) 13 M & W 494; *In re Hodgson; Beckett v Ramsdale* (1885) 31 Ch D 177 and *Halsbury's Laws of England*, 5th ed, vol 12 (2009), para 1157. The doctrine of merger is clearly related to res judicata but is conceptually distinct from it. The effect of the doctrine in the present case is that when a final judgment is entered, a new form of property comes into existence: the successful claimant no longer has a cause of action, he has a judgment which is a property right and any legal deprivation of that right will amount to an interference with it: see *Stran Greek Refineries and*

© 2014 The Incorporated Council of Law Reporting for England and Wales

*Andreadis v Greece* (1994) 19 EHRR 293. If a litigant wishes to contest a judgment, his only legitimate remedy, in the absence of evidence of its having been obtained by fraud, is to appeal. If he fails to appeal, or his appeal fails, the judgment is final, unassailable and enforceable: see *Burrell v The Queen* (2008) 238 CLR 218, 223, para 15.

There is a risk that courts would be straying into the field of legislation if they were to allow unsuccessful defendants to avoid the consequences of losing at trial by disapplying the doctrine of estoppel. The jurisdiction of the Court of Appeal and the Supreme Court is statutory; but the circumstances in which a successful claimant can be deprived of his property, namely by a final judgment, are substantially matters of legislative choice and thus a matter for Parliament not the courts. It is not therefore for the courts to develop a parallel regime for overturning the effect of a final judgment other than by appeal. [Reference was made to *Harrison v Schipp* (2002) 54 NSWLR 612; *In re St Nazaire Co* (1879) 12 Ch D 88, 97–98, 100–101 and *Cinpres Gas Injection Ltd v Melea Ltd* [2008] Bus LR 1157.]

There are two public policy reasons for the doctrine of res judicata. The wider is finality; the narrower, that an individual litigant should not be vexed twice with the same dispute. The court should not be timid about maintaining a bright line based on long-established policy considerations; they are not matters of passing fashion but are rooted in timeless factors which are present in all litigation and are not therefore susceptible to alteration with the passage of time: see *Thrasyvoulou v Secretary of State for the Environment* [1990] 2 AC 273; *Green v Weatherill* [1929] 2 Ch 213 and, by analogy, *Three Rivers District Council v Governor and Company of the Bank of England (No 6)* [2005] 1 AC 610 and *R v Derby Magistrates' Court, Ex p B* [1996] AC 487. The doctrine of res judicata has been subjected to periodic review and approval in recent times; it is not an area of the law which has remained untouched through lack of judicial attention: see *Thoday v Thoday* [1964] P 181; *The Ampthill Peerage* [1977] AC 547; *Arnold v National Westminster Bank plc* [1991] 2 AC 93; *Mulkerrins v PricewaterhouseCoopers* [2003] 1 WLR 1937; *Carter v Ahsan* [2008] AC 696 and *Unilin Beheer BV v Berry Floor NV* [2007] Bus LR 1140.

There are two aspects to the wider public interest: to prevent the legal uncertainty which might result from relitigation and to prevent the waste of time and resources which that would involve. The doctrine applies across the board, including public law proceedings: see *R (Coke-Wallis) v Institute of Chartered Accountants in England and Wales* [2011] 2 AC 146. One purpose of such proceedings is to clarify the law in the general public interest and thereby achieve finality (see *Al-Rawi v Security Service (JUSTICE intervening)* [2012] 1 AC 531) rather than doing justice between particular litigants.

The narrower public interest exists to avoid uncertainty as to mutual rights and obligations and to prevent erosion of private resources and abuse by wealthier litigants who might grind down opponents through a process of forensic attrition: see *Fidelitas Shipping Co Ltd v V/O Exportchleb* [1996] 1 QB 630. The combined effect of the doctrine operates for the benefit of both parties: see *Greenhalgh v Mallard* [1947] 2 All ER 255; *Wright v Bennett* [1948] 1 All ER 227 and *Rothwell v Chemical & Insulating Co Ltd* [2008] AC 281.

© 2014 The Incorporated Council of Law Reporting for England and Wales

Cause of action estoppel, absent fraud or collusion, has always been regarded as absolute: see *Thoday v Thoday* [1964] P 181; *Arnold v National Westminster Bank plc* [1991] 2 AC 93; *R v Inhabitants of Hartington Middle Quarter* (1855) 4 E & B 780; *In re Waring; Westminster Bank v Burton-Butler* [1948] Ch 221; *Coflexip SA v Stolt Offshore MS Ltd (No 2)* [2004] FSR 708, para 49; *Cinpres Gas Injection Ltd v Melea Ltd* [2008] Bus LR 1157, paras 68–69 and *R (Coke-Wallis) v Institute of Chartered Accountants in England and Wales* [2011] 2 AC 146, paras 26, 47.

The principled basis for the rule in *Henderson v Henderson* (1843) 3 Hare 100, despite the court using the language of res judicata, is the concept of abuse of process: see *Greenhalgh v Mallard* [1947] 2 All ER 255; *Yat Tung Investment Co Ltd v Dao Heng Bank Ltd* [1975] AC 581; *Brisbane City Council v Attorney General for Queensland* [1979] AC 411; *Barrow v Bankside Members Agency Ltd* [1996] 1 WLR 257 and *Johnson v Gore-Wood & Co* [2002] 2 AC 1.

Based on that line of authority, the better view is that cause of action estoppel, properly so-called, arises where a party seeks to relitigate a cause of action which has already been determined. By contrast, *Henderson*-type abuse is a separate and distinct concept arising where a party seeks to raise an issue which has not been, but could and should have been determined in earlier proceedings. That distinction is important in terms of the different effect of the two doctrines. Cause of action estoppel is a hard-edged legal doctrine; its operation is absolute, subject always to fraud and collusion, not least because an appeal is available as a remedy for correcting alleged error. Abuse of process is a protean concept which arises where the court has not ruled on the point in issue and an appeal will not, necessarily, be an available route of remedy. As a result the court has a wide discretion: see *Hunter v Chief Constable of the West Midlands Police* [1982] AC 529. It is, therefore, incorrect to refer to a hybrid concept of "abuse of process cause of action estoppel": see *Coflexip SA v Stolt Offshore MS Ltd (No 2)* [2004] FSR 708, paras 39–44, per Neuberger LJ and *Chiron Corpn v Organon Teknika Ltd (No 6)* [1994] FSR 448, 454, per Aldous J. It is not, therefore, a matter of semantics.

Issue estoppel arises where a particular issue forming a necessary ingredient in a cause of action has been litigated and in subsequent proceedings between the same parties involving a different cause of action to which the same issue is relevant, one of the parties seeks to reopen the issue. Issue estoppel is not absolute and in exceptional circumstances can be disapplied: see *Thoday v Thoday* [1964] P 181; the *Arnold* case [1991] 2 AC 93, 105; *Fidelitas Shipping Co Ltd v V/O Exportchleb* [1996] 1 QB 630 and *Hoystead v Comr of Taxation* [1926] AC 155. However the authorities draw a distinction between the two types of estoppel. In particular, the policy reasons underpinning res judicata apply with greater force in relation to cause of action estoppel; in any case where there is a final judgment, the cause of action will have merged in the judgment such that a new form of property will have come into existence. The legal rights and liabilities of the parties will have been definitively determined. But no such concerns arise in the case of issue estoppel, where the mutual rights and responsibilities of the parties have not been determined because the court, in the later proceedings, is dealing with a different cause of action. In seeking, in those circumstances,

© 2014 The Incorporated Council of Law Reporting for England and Wales

to reach a final determination the court can take a more flexible approach even though it will nevertheless recognise the twin policy considerations underpinning both branches of res judicata.

The availability of an appeal where a party has lost gives rise to a further distinction: where an issue, but not a cause of action, has been determined adversely to a litigant, he cannot appeal that issue per se; appeals can only be brought in respect of outcomes, not individual issues: see *Lake v Lake* [1955] P 336 and the *Arnold* case. [Reference was made to *Carl Zeiss Stiftung v Rayner & Keeler Ltd (No 2)* [1967] 1 AC 853.]

Whenever there is a split trial, estoppels always apply in the later stages of the same action: see *Fidelitas Shipping Co Ltd v V/O Exportchleb* [1996] 1 QB 630 and *Johnson v Felton* [2006] 3 NZLR 475. Thus a final judgment on liability is final between the parties; it does not remain contingent or incomplete merely because the amount of the liability has yet to be quantified since the taking of an account is a mechanical operation: see *Sanguinetti v Stuckey's Banking Co (No 2)* [1896] 1 Ch 502. The defendant cannot therefore assert that while the inquiry as to damages remains incomplete there is no estoppel because the necessary finality does not exist.

Although a plea of res judicata in the context of a patent action may give rise to factual complications it does not require the application of any different legal principles from those applicable in any other case. In *Poulton v Adjustable Cover and Boiler Block Co* [1908] 2 Ch 430; *Unilin Beheer BV v Berry Floor NV* [2007] Bus LR 1140 and *Coflexip SA v Stolt Offshore MS Ltd (No 2)* [2004] FSR 708 essentially the same question arose in slightly different circumstances, namely, could an inquiry as to damages be resisted on grounds that the patent was under challenge, or had even been revoked? The answer in each case was the same: that the defendant was estopped by the judgment on liability from raising in the inquiry the subject matter of the action which had already been fully determined, namely that the patent was valid and infringed as at the date of judgment on liability. The dissent of Neuberger LJ in the *Coflexip* case is misplaced and erroneous. The decision in the *Poulton* case has stood the test of time in the courts, it enjoys the approval of leading textbooks and has withstood the scrutiny of academic commentators: see *Spencer Bower & Handley, Res Judicata*, 4th ed, paras 5.27, 8.33, 10.19; *Terrell on the Law of Patents*, 17th ed (2010), paras 18.98, 19.68; *Cornish, Llewelyn & Aplin, Intellectual Property: Patents, Copyright, Trade Marks and Allied Rights*, 7th ed (2010), para 2.67 and *Fawcett & Torremans, Intellectual Property and Private International Law*, 2nd ed (2011), paras 1.141–1.143. Reliance on *Dudgeon v Thomson* (1877) 3 App Cas 34 is misplaced. Neither *PLG Research Ltd v Ardon International Ltd (No 2)* [1993] FSR 698 nor *In re Palmaz's European Patents (UK)* [2000] RPC 631 assists the defendant's case and *ITP SA v Coflexip Stena Offshore Ltd* 2005 1 SC 116 is irrelevant.

The position is no different because the patent is an European patent (UK), subsequently revoked by the European Patent Office. The correct test, set out in *Thrasyvoulou v Secretary of State for the Environment* [1990] 2 AC 273, is that where a decision is taken under a comprehensive, self-contained statutory code, it is presumed that the principle of res judicata applies to give finality to the decision, unless an intention to exclude the principle can properly be inferred as a matter of construction from the code: no such

© 2014 The Incorporated Council of Law Reporting for England and Wales

contrary intention can be established here. Furthermore, Parliament is presumed not to intend to take away or prevent the exercise of any property rights without compensation unless clear and unambiguous wording is used. No such wording is to be found here: see *R v Secretary of State for the Environment, Transport and the Regions, Ex p Spath Holme Ltd* [2001] 2 AC 349. The defendant misinterprets the meaning of section 77(2) of the Patents Act 1977. On its proper interpretation that provision only preserves, in relation to European patents (UK), the jurisdiction of the European Patent Office to amend and revoke them. It is not in any sense providing that any part of the 1977 Act is overridden by the European Patent Convention. The defendant's argument relating to articles 61, 64 and 68 of the Convention, misses the point: the question posed by the *Thrasyvoulou* case is one of domestic statutory interpretation, namely, whether there is anything in the 1977 Act to suggest Parliament intended the res judicata doctrine to be excluded. That is not answered by reference to the terms of the Convention, but only by reference to the Act.

In any event, even if the defendant could rely on the provisions of the Convention, it misinterprets the effect of those articles and would still fail. There is nothing in the Convention to suggest that the decision of a national court in upholding the validity of an European patent in that contracting state is to be regarded as being in any sense provisional or contingent until the European opposition proceedings have been concluded.

The defendant's attempts to undermine the decision in *Unilin Beheer BV v Berry Floor NV* [2007] Bus LR 1140 are themselves undermined by consideration of other jurisdictions. All jurisdictions where the problem could arise have adopted measures through case law or legislation to achieve the finality in infringement actions where a patent is subsequently revoked, and all accept the principle that there is a cut-off point beyond which no repayment or reopening of issues is possible. The position in France shows that *Scherrer v Normalu* (Case No 05–14.548) (unreported) 12 June 2007, Cour de Cassation, is not good law and that the position was restored in *Wehrkamp-Richter v Guitay* (Case No 10–24.282) (unreported) 17 February 2012, Cour de Cassation. Under the German position the legislative choices made there are such that the problem of inconsistent outcomes as to invalidity is incapable of arising. Accordingly no assistance is to be derived from it in the present case. The position in the Netherlands is governed by legislation: see article 50(2)(a) of the Dutch Patent Act 1995 and an equivalent situation applies to that in England.

Parliament and Council Directive 2004/48/EC of 29 April 2004 on the enforcement of intellectual property rights does not prevent contracting states from adhering to rules of domestic law which are intended to achieve finality and the other European jurisdictions referred to illustrate the varying solutions adopted in that context. The public policy objectives of finality and certainty are as much part of European law as they are of domestic law: see *Wiljo NV v Belgian State* (Case C-178/95) [1997] ECR I-585, para 19. In particular European law recognises the importance of res judicata which, in the absence of specific European Union legislation, is a matter for the national legal order, and that European legislation does not require national law to disapply such rules conferring finality on a decision, even if to do so would make it possible to remedy an infringement of a provision of

© 2014 The Incorporated Council of Law Reporting for England and Wales

European law on the part of that decision. [Reference was made to *Asturcom Telecomunicaciones SL v Rodriguez Noguiera* (Case C-40/08) [2009] ECR I-9579, paras 35–38 and *JA Pye (Oxford) Ltd v United Kingdom* (2007) 46 EHRR 1083.] Since domestic courts have consistently and correctly applied the general principles of res judicata to patent cases the law in that context should not be disturbed.

On the question whether new material might make all the difference to the result, considerations of public policy retain all their vigour even though there may be well-founded concerns over the correctness of the original decision: see *Crown Estate Comrs v Dorset County Council* [1990] Ch 297, 305; the *Mulkerrins* case [2003] 1 WLR 1937, 1941 and *Carter v Ahsan* [2008] AC 696, 708.

While judicial decisions might be questionable or wrong, they remain binding unless and until set aside: see *Taylor v Lawrence* [2003] QB 528. But the clarity of the doctrine of res judicata produces at least two significant practical benefits: (i) it avoids all the uncertainty, delay and expense which would be caused by allowing parties to reopen final judgments by arguing that an earlier decision was "wrong"; and (ii) it creates a bright line rule which avoids problems of seeking to define the circumstances in which a court could safely treat an earlier decision as "wrong". Allowing exceptions based on special circumstances would provide an open door to litigants to test boundaries and would be inimical to the overriding objective of the doctrine: see, by analogy, *Al Rawi v Security Service (JUSTICE intervening)* [2012] 1 AC 531, para 44.

The Patents Court and the Court of Appeal provide an efficient forum for testing litigation over the validity and infringement of patents. By contrast the European Patent Office procedures are slower and less searching: see *Unilin Beheer BV v Berry Floor NV* [2007] Bus LR 1140 and *Glaxo Group Ltd v Genetech Inc (Practice Note)* [2008] Bus LR 888. Any departure from the *Unilin* approach would cause great uncertainty for patentees and investors and would deprive judgments in the national court of their finality.

It would be wrong to deprive the claimant of its entitlement to enforce its damages claim, the size of which is irrelevant to the present issues: see *Golden Strait Corpn v Nippon Yusen Kubishika Kaisha (The Golden Victory)* [2007] 2 AC 353; *Johnson v Agnew* [1980] AC 367 and *Arnold v National Westminster Bank plc* [1991] 2 AC 93 are to be distinguished.

*Carr QC* replied.

The court took time for consideration.

3 July 2013. The following judgments were handed down.

**LORD SUMPTION JSC** (with whom **BARONESS HALE OF RICHMOND DPSC, LORD CLARKE OF STONE-CUM-EBONY** and **LORD CARNWATH JJSC** agreed)

1 In this case, Virgin Atlantic Airways Ltd wishes to recover damages exceeding £49m for the infringement of a European patent which does not exist in the form said to have been infringed. The technical board of appeal ("TBA") of the European Patent Office ("EPO") has retrospectively amended

© 2014 The Incorporated Council of Law Reporting for England and Wales

it so as to remove with effect from the date of grant all the claims said to have been infringed.

2 The TBA found that in the form in which the patent was originally granted the relevant claims were invalid because they had been anticipated by prior art. Virgin says that it is nevertheless entitled to recover damages for infringement because before the TBA had issued its decision, the English courts had held the patent to be valid and specifically rejected the objection based on prior art. Their case is that this conclusion and the finding of validity on which it is based are res judicata notwithstanding the later but retrospective decision of the TBA. A similar argument had succeeded before the Court of Appeal in very similar circumstances in *Coflexip SA v Stolt Offshore MS Ltd (No 2)* [2004] FSR 708 and *Unilin Beheer BV v Berry Floor NV* [2007] Bus LR 1140. The Court of Appeal, conceiving itself to be bound by these decisions and regarding them as correct in principle, arrived at the same conclusion.

*The statutory framework*

3 The appeal perfectly illustrates the problems arising from the system of parallel jurisdiction for determining the validity of European patents.

4 Part II of the Patents Act 1977 gives effect to the principal provisions of the European Patent Convention. Section 77(1) of the Act provides that a European patent (UK), i e one which is granted for the United Kingdom or for states including the United Kingdom, is to be treated as if it were a patent granted under the Act, and that

> "(a) the proprietor of a European patent (UK) shall accordingly as respects the United Kingdom have the same rights and remedies, subject to the same conditions, as the proprietor of a patent under this Act . . ."

Section 77(2) to (4A) deals with the revocation or amendment of a European patent by the EPO:

> "*Effect of European patent (UK)*
>
> ". . . (2) Subsection (1) above shall not affect the operation in relation to a European patent (UK) of any provisions of the European Patent Convention relating to the amendment or revocation of such a patent in proceedings before the [EPO].
>
> "(3) Where in the case of a European patent (UK)— (a) proceedings for infringement, or proceedings under section 58 above, have been commenced before the court or the comptroller and have not been finally disposed of, and (b) it is established in proceedings before the [EPO] that the patent is only partially valid, the provisions of section 63 . . . apply as they apply to proceedings in which the validity of a patent is put in issue and in which it is found that the patent is only partially valid.
>
> "(4) Where a European patent (UK) is amended in accordance with the European Patent Convention, the amendment shall have effect for the purposes of Parts I and III of this Act as if the specification of the patent had been amended under this Act; but subject to subsection (6)(b) below.
>
> "(4A) Where a European patent (UK) is revoked in accordance with the European Patent Convention, the patent shall be treated for the purposes of Parts I and III of this Act as having been revoked under this Act."

© 2014 The Incorporated Council of Law Reporting for England and Wales

The provisions of section 63 to which section 77(3) refers deal with the power of the comptroller in a case where a patent is found to be only partially valid to grant relief in respect of that part which is found to be valid and infringed.

5 Section 77(2) of the Act refers to the "provisions of the European Patent Convention relating to the amendment or revocation". This is a reference to article 68 of the Convention, and indirectly to article 64. They provide:

"*Article 64*

"*Rights conferred by a European patent*

"(1) A European patent shall, subject to the provisions of paragraph 2, confer on its proprietor from the date [of publication of the mention of its grant], in each contracting state in respect of which it is granted, the same rights as would be conferred by a national patent granted in that state.

"(2) If the subject matter of the European patent is a process, the protection conferred by the patent shall extend to the products directly obtained by such process.

"(3) Any infringement of a European patent shall be dealt with by national law."

"*Article 68*

"*Effect of revocation or limitation of the European patent*

"The European patent application and the resulting patent shall be deemed not to have had, from the outset, the effects specified in articles 64 and 67, to the extent that the patent has been revoked or limited in opposition, limitation or revocation proceedings."

**6** Part V of the Convention provides for opposition procedure before the Opposition Division of the EPO and on appeal from them to the TBA. A European patent may be opposed on the ground (among others) that the invention is not patentable by reason of lack of novelty. The procedure is available to any one affected, provided that it is initiated within nine months of the grant. Under articles 101 and 111 of the Convention, the Opposition Division and the TBA are empowered to revoke a patent found to be invalid or to accept an amendment proposed by the patentee which will cause the patent to satisfy the requirements of the Convention.

7 The effect of these provisions is that the English courts have the same jurisdiction to determine questions of validity and infringement in the case of a European patent as they have for domestic patents, but that concurrent jurisdiction over questions of validity is exercisable by the EPO. There is, however, an important difference between the legal effect of a decision in the two jurisdictions. Both are decisions in rem. They determine the validity of the patent not only as between the parties to the proceedings, but generally. But the English court's jurisdiction over the question of validity is purely national. A decision of an English court declaring a patent invalid, or (which will normally follow) revoking it, will have effect in the United Kingdom only, whereas a corresponding decision of the EPO, which was the authority by which the patent was granted, will have effect in all the states for which the patent was granted. These considerations make it highly desirable to avoid inconsistent decisions if it can be done. National procedures for achieving this differ from one contracting state to another. In England, there

© 2014 The Incorporated Council of Law Reporting for England and Wales

are established procedures for staying English proceedings in which the validity of a European patent is in issue, if there are concurrent opposition procedures in the EPO. However the value of these procedures is somewhat diminished by the current practice of the High Court, which is based on dicta of Jacob LJ in *Unilin Beheer BV v Berry Floor NV* [2007] Bus LR 1140, para 25 and on the subsequent decision of the Court of Appeal in *Glaxo Group Ltd v Genentech Inc (Practice Note)* [2008] Bus LR 888. Their effect is that the primary consideration on an application for a stay is the probable duration of the proceedings before the two tribunals. If the question of validity would be likely to be resolved quicker in the English court than in the EPO, it would normally be appropriate not to stay the English proceedings. The consequences of this practice are particularly serious in a case where the English courts "win" the race to judgment if, as the Court of Appeal decided in *Unilin*, the effect is to bind the parties to a decision of the English court that the patent is valid notwithstanding that the EPO which granted it subsequently decides that it should be revoked or amended ab initio. In *Glaxo Group Ltd v Genentech Inc*, at para 83 Mummery LJ, delivering the judgment of the court thought that this consequence was inherent in the existence of concurrent systems of adjudication:

> "the possibility of the duplication of proceedings contesting the validity of a patent granted by the EPO is inherent in the system established by the Convention. In practice national courts exercise exclusive jurisdiction on infringement issues and they have concurrent jurisdiction with the EPO on validity issues. As Mr Daniel Alexander appearing for the claimant said, the contracting states and the UK Parliament contemplated that the national patents courts should be able to determine the same issues of patentability as the EPO. The resultant legislation allowed the determination by the national court and the EPO at the same time. Indeed, there is nothing in the Convention or the 1977 Act to prevent the commencement of revocation proceedings in the Patents Court on the very date of the grant of the patent by the EPO."

It is undoubtedly right that the draftsmen of both the Convention and the Patents Act 1977 envisaged concurrent jurisdiction over questions of validity, but it may be doubted whether they envisaged anything like the consequence which has come about in this case.

*The facts*

8 The patent in suit is a European patent for a "seating system and passenger accommodation unit for a vehicle", granted to Virgin and published on 30 May 2007. The seat, which was designed in about 2005, reclines to provide a flat bed. It is commonly used in long-haul aircraft. Zodiac Seats UK Ltd (as it is now called) manufactures a seating unit called the "Solar Eclipse" in the United Kingdom. It has been supplied to a number of international airlines. On 30 July 2007, two months after the grant of the patent, Virgin began proceedings against Zodiac in the High Court claiming an injunction and damages on the footing that its seats infringed the patent. Zodiac defended the action on the ground that its seats did not fall within the claims of the patent. But, they said, if the claims were wide enough to cover their seats, then the patent was invalid on account of prior art and for added matter. They

© 2014 The Incorporated Council of Law Reporting for England and Wales

also, on 29 February 2008, opposed the validity of the patent in the EPO, along with a number of airlines who had bought their seats and were at risk of infringement proceedings if the patent was valid. Initially, no application was made for a stay of the English proceedings. There was a certain amount of argument before us about the significance of this fact, if any. For present purposes, however, it is enough to say that under the *Glaxo v Genentech* guidelines, an application for a stay would not necessarily have succeeded.

9 The English action was heard by Lewison J. He gave judgment [2009] EWHC 26 (Pat); [2009] ECDR 127 in January 2009, holding that Zodiac's "Solar Eclipse" seats did not infringe the patent. He recorded that if the claims of the patent had been wide enough to cover Zodiac's seating system, he would have held it to be invalid for added matter. But he rejected every other ground of invalidity advanced. Virgin appealed against the decision on infringement, and Zodiac cross-appealed on validity.

10 On 31 March 2009, some two months after Lewison J's judgment, the Opposition Division of the EPO upheld the patent subject to minor amendments which are agreed to be immaterial to the present dispute. Zodiac and other opponents of the patent immediately indicated their intention to appeal to the TBA. This gave rise to a brief correspondence between the parties' solicitors about what would happen if the English Court of Appeal held the patent to be valid but the TBA later held it to be invalid in some relevant respect. Zodiac's solicitors proposed that if the appeal on validity succeeded in England, the "making of any final order" by the Court of Appeal should be stayed until the final determination of the opposition proceedings in the EPO. Virgin's solicitors refused, on their client's behalf, to agree. They then wrote on the same day to the Court of Appeal informing them of the progress and likely course of the opposition proceedings, and summarising their correspondence with Zodiac's solicitors. On 12 May 2009, the Civil Appeals Office replied that

> "Jacob LJ has directed that he will not grant a stay of proceedings at present, however, parties can apply for a stay following judgment in the Court of Appeal if it is still possibly relevant."

That direction was given without prior notice to either party and without inviting any observations from those acting for Zodiac.

11 The appeal was heard in October 2009 by Jacob and Patten LJJ and Kitchin J. On 22 October they gave judgment [2009] EWCA Civ 1062; [2010] RPC 192 reversing Lewison J's decision on validity and holding the patent to have been valid and infringed. They specifically rejected the argument based on prior art. Zodiac then made the application for a stay of the order apparently envisaged in Jacob LJ's direction of 12 May 2009, pending an application for permission to appeal to the Supreme Court and the conclusion of the opposition proceedings in the EPO. In a further judgment [2009] EWCA Civ 1513; [2010] FSR 396 handed down on 21 December 2009, the Court of Appeal refused the application. The main ground on which they refused it was that it was pointless to stay the order on the appeal, because the effect of the decision in the *Unilin* case [2007] Bus LR 1140 was that any later decision of the TBA revoking the patent would make no difference. This was because the decision of the Court of Appeal would bind the parties per rem judicatam. On 12 January 2010, the Court of Appeal

© 2014 The Incorporated Council of Law Reporting for England and Wales

sealed an order making a declaration that the patent was valid and infringed, together with an injunction and an inquiry as to damages. The injunction was qualified so as to allow the delivery of seats to Delta under an existing contract, on Zodiac undertaking to pay £10,000 to Virgin for each seat delivered, but otherwise covered all future infringements.

12 At this stage, the decision of the TBA on the opposition proceedings was due to be given on 20 April 2010. In the event, however, this was postponed to 9 September 2010 as a result of the disruption of flights following the eruption of the Eyjafjalajökull volcano in Iceland. When the adjourned date came, the TBA varied the decision of the Opposition Division. They held that all the claims found in England to have been infringed were invalid by reason of prior art, and accepted amendments proposed by Virgin removing them from the patent. By that time, however, the appeal proceedings had been completed and permission to appeal on the merits of the Court of Appeal's findings had been refused by the Supreme Court.

13 As a result of this decision, further applications were made by Zodiac to the Court of Appeal to vary the Court of Appeal's order and to discharge the injunction. The injunction was discharged by consent on 1 December 2010. The application to vary the court's order was heard by the Court of Appeal (Smith, Jacob and Patten LJJ) in February 2011. So far as relevant to this appeal, the variations actually sought were (i) the replacement of the declarations made by new declarations making it clear that the patent held to be valid was the unamended patent; (ii) the discharge of the order for delivery up of the allegedly infringing articles; (iii) the discharge of the order for an inquiry as to damages; and (iv) the release of Zodiac from its undertaking to pay £10,000 per seat delivered to Delta and the repayment of the £3,600,000 already paid under it.

14 Judgment was given on 23 February 2011 [2011] EWCA Civ 163; [2011] FSR 658. The Court of Appeal held (following the same numbering) (i) that the declaration would not be varied; (ii) that the order for delivery up would be discharged because it was redundant in the light of the amendment of the patent; (iii) that the order for an inquiry as to damages would stand, because it was no more than the mechanism for working out the effect of the Court of Appeal's decision that the patent was valid, and that decision was res judicata; and (iv) that the £3,600,000 was not repayable because it was an advance referable to (among other things) the damages to be assessed in the inquiry.

15 To complete the story, on 27 July 2012 Floyd J gave judgment in three actions against customers who had bought and were using Zodiac's seating units; actions to which Zodiac were also joined. They had been sued by Virgin on the footing that the "Solar Eclipse" seating units infringed the amended patent. Floyd J held that they did not: *Virgin Atlantic Airways Ltd v Jet Airways Ltd* [2013] RPC 247. His judgment confirms that Zodiac's seating units do not infringe the patent in the form which it is now deemed to have taken from the moment it was granted.

*The issue*

16 The order of the Court of Appeal of 12 January 2010 upholding the validity of the patent and directing an inquiry as to damages can now be varied only by way of appeal, and no further avenues of appeal are open. It

© 2014 The Incorporated Council of Law Reporting for England and Wales

is therefore right to start by pointing out that this is not an appeal against that order. The fundamental question is whether Zodiac is entitled to contend on the inquiry as to damages that there have been no damages because the patent has been retrospectively amended so as to remove the claims held to have been infringed. This depends on whether the Court of Appeal was right to say that its order declaring the patent to be valid continued to bind the parties per rem judicatam notwithstanding that the patent was later amended on the footing that it was not valid in the relevant respects.

*Res judicata: general principles*

17 Res judicata is a portmanteau term which is used to describe a number of different legal principles with different juridical origins. As with other such expressions, the label tends to distract attention from the contents of the bottle. The first principle is that once a cause of action has been held to exist or not to exist, that outcome may not be challenged by either party in subsequent proceedings. This is "cause of action estoppel". It is properly described as a form of estoppel precluding a party from challenging the same cause of action in subsequent proceedings. Secondly, there is the principle, which is not easily described as a species of estoppel, that where the claimant succeeded in the first action and does not challenge the outcome, he may not bring a second action on the same cause of action, for example to recover further damages: see *Conquer v Boot* [1928] 2 KB 336. Third, there is the doctrine of merger, which treats a cause of action as extinguished once judgment has been given on it, and the claimant's sole right as being a right on the judgment. Although this produces the same effect as the second principle, it is in reality a substantive rule about the legal effect of an English judgment, which is regarded as "of a higher nature" and therefore as superseding the underlying cause of action: see *King v Hoare* (1844) 13 M & W 494, 504 (Parke B). At common law, it did not apply to foreign judgments, although every other principle of res judicata does. However, a corresponding rule has applied by statute to foreign judgments since 1982: see section 34 of the Civil Jurisdiction and Judgments Act 1982. Fourth, there is the principle that even where the cause of action is not the same in the later action as it was in the earlier one, some issue which is necessarily common to both was decided on the earlier occasion and is binding on the parties: *Duchess of Kingston's Case* (1776) 20 State Tr 355. "Issue estoppel" was the expression devised to describe this principle by Higgins J in *Hoysted v Federal Commissioner of Taxation* (1921) 29 CLR 537, 561 and adopted by Diplock LJ in *Thoday v Thoday* [1964] P 181, 197–198. Fifth, there is the principle first formulated by Wigram V-C in *Henderson v Henderson* (1843) 3 Hare 100, 115, which precludes a party from raising in subsequent proceedings matters which were not, but could and should have been raised in the earlier ones. Finally, there is the more general procedural rule against abusive proceedings, which may be regarded as the policy underlying all of the above principles with the possible exception of the doctrine of merger.

18 It is only in relatively recent times that the courts have endeavoured to impose some coherent scheme on these disparate areas of law. The starting point is the statement of principle of Wigram V-C in *Henderson v Henderson* 3 Hare 100, 115. This was an action by the former business

© 2014 The Incorporated Council of Law Reporting for England and Wales

partner of a deceased for an account of sums due to him by the estate. There had previously been similar proceedings between the same parties in Newfoundland in which an account had been ordered and taken, and judgment given for sums found due to the estate. The personal representative and the next of kin applied for an injunction to restrain the proceedings, raising what would now be called cause of action estoppel. The issue was whether the partner could reopen the matter in England by proving transactions not before the Newfoundland court when it took its own account. Wigram V-C said, at pp 114–116:

> "In trying this question, I believe I state the rule of the court correctly, when I say, that where a given matter becomes the subject of litigation in, and of adjudication by, a court of competent jurisdiction, the court requires the parties to that litigation to bring forward their whole case, and will not (except under special circumstances) permit the same parties to open the same subject of litigation in respect of matter which might have been brought forward as part of the subject in contest, but which was not brought forward, only because they have, from negligence, inadvertence, or even accident, omitted part of their case. The plea of res judicata applies, except in special cases, not only to points on which the court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time . . . Now, undoubtedly the whole of the case made by this bill might have been adjudicated upon in the suit in Newfoundland, for it was of the very substance of the case there, and prima facie, therefore, the whole is settled. The question then is, whether the special circumstances appearing upon the face of this bill are sufficient to take the case out of the operation of the general rule."

19 Wigram V-C's statement of the law is now justly celebrated. The principle which he articulated is probably the commonest form of res judicata to come before the English courts. For many years, however, it was rarely invoked. The modern law on the subject really begins with the adoption of Wigram V-C's statement of principle by the Privy Council in *Yat Tung Investment Co Ltd v Dao Heng Bank Ltd* [1975] AC 581. *Yat Tung* was an appeal from Hong Kong, in which the appellant sought to unsuccessfully avoid the exercise by a mortgagee of a power of sale in two successive actions, contending on the first occasion that the sale was a sham and that there was no real sale, and on the second that the sale was fraudulent. Lord Kilbrandon, giving the advice of the Board, distinguished at pp 589–590 between res judicata and abuse of process:

> "The second question depends on the application of a doctrine of estoppel, namely res judicata. Their Lordships agree with the view expressed by McMullin J that the true doctrine in its narrower sense cannot be discerned in the present series of actions, since there has not been, in the decision in no 969, any formal repudiation of the pleas raised by the appellant in no 534. Nor was Choi Kee, a party to no 534, a party to no 969. But there is a wider sense in which the doctrine may be appealed to, so that it becomes an abuse of process to raise in subsequent

© 2014 The Incorporated Council of Law Reporting for England and Wales

proceedings matters which could and therefore should have been litigated in earlier proceedings."

Lord Kilbrandon referred to the statement of Wigram V-C in *Henderson v Henderson* as the authority for the "wider sense" of res judicata, classifying it as part of the law relating to abuse of process.

20 The implications of the principle stated in *Henderson v Henderson* were more fully examined by the House of Lords in *Arnold v National Westminster Bank plc* [1991] 2 AC 93. The question at issue in that case was whether in operating a rent review clause under a lease, the tenants were bound by the construction given to the very same clause by Walton J in earlier litigation between the same parties over the previous rent review. The Court of Appeal had subsequently, in other cases, cast doubt on Walton J's construction, and the House approached the matter on the footing that the law (or perhaps, strictly speaking, the perception of the law) had changed since the earlier litigation. Lord Keith of Kinkel began his analysis by restating the classic distinction between cause of action estoppel (p 104D–E), and issue estoppel (p 105D–E):

> "Cause of action estoppel arises where the cause of action in the later proceedings is identical to that in the earlier proceedings, the latter having been between the same parties or their privies and having involved the same subject matter. In such a case the bar is absolute in relation to all points decided unless fraud or collusion is alleged, such as to justify setting aside the earlier judgment. The discovery of new factual matter which could not have been found out by reasonable diligence for use in the earlier proceedings does not, according to the law of England, permit the latter to be reopened . . ."
>
> "Issue estoppel may arise where a particular issue forming a necessary ingredient in a cause of action has been litigated and decided and in subsequent proceedings between the same parties involving a different cause of action to which the same issue is relevant one of the parties seeks to reopen that issue."

The case before the committee was treated as one of issue estoppel, because the cause of action was concerned with a different rent review from the one considered by Walton J. But it is important to appreciate that the critical distinction in *Arnold* was not between issue estoppel and cause of action estoppel, but between a case where the relevant point had been considered and decided in the earlier occasion and a case where it had not been considered and decided but arguably should have been. The tenant in *Arnold* had not failed to bring his whole case forward before Walton J. On the contrary, he had argued the very point which he now wished to reopen and had lost. It was not therefore a *Henderson v Henderson* case. The real issue was whether the flexibility in the doctrine of res judicata which was implicit in Wigram V-C's statement extended to an attempt to reopen the very same point in materially altered circumstances. Lord Keith of Kinkel, with whom the rest of the committee agreed, held that it did.

21 Lord Keith first considered the principle stated by Wigram V-C that res judicata extended to "every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time." He regarded this principle as applying to

© 2014 The Incorporated Council of Law Reporting for England and Wales

both cause of action estoppel and issue estoppel. Cause of action estoppel, as he had pointed out, was "absolute in relation to all points decided unless fraud or collusion is alleged": p 104D–E. But in relation to points not decided in the earlier litigation, *Henderson v Henderson* opened up

> "the possibility that cause of action estoppel may not apply in its full rigour where the earlier decision did not in terms decide, because they were not raised, points which might have been vital to the existence or non-existence of a cause of action": p 105B.

He considered that in a case where the earlier decision had decided the relevant point, the result differed as between cause of action estoppel and issue estoppel

> "there is room for the view that the underlying principles on which estoppel is based, public policy and justice, have greater force in cause of action estoppel, the subject matter of the two proceedings being identical, than they do in issue estoppel, where the subject matter is different": pp 108G–H.

The relevant difference between the two was that in the case of cause of action estoppel it was in principle possible to challenge the previous decision as to the existence or non-existence of the cause of action by taking a new point which could not reasonably have been taken on the earlier occasion; whereas in the case of issue estoppel it was in principle possible to challenge the previous decision on the relevant issue not just by taking a new point which could not reasonably have been taken on the earlier occasion but to reargue in materially altered circumstances an old point which had previously been rejected. He formulated the latter exception at p 109 as follows:

> "In my opinion your Lordships should affirm it to be the law that there may be an exception to issue estoppel in the special circumstance that there has become available to a party further material relevant to the correct determination of a point involved in the earlier proceedings, whether or not that point was specifically raised and decided, being material which could not by reasonable diligence have been adduced in those proceedings. One of the purposes of estoppel being to work justice between the parties, it is open to courts to recognise that in special circumstances inflexible application of it may have the opposite result."

This enabled the House to conclude that the rejection of Walton J's construction of the rent review clause in the subsequent case law was a materially altered circumstance which warranted rearguing the very point that he had rejected.

22 *Arnold v National Westminster Bank plc* [1991] 2 AC 93 is accordingly authority for the following propositions. (1) Cause of action estoppel is absolute in relation to all points which had to be and were decided in order to establish the existence or non-existence of a cause of action. (2) Cause of action estoppel also bars the raising in subsequent proceedings of points essential to the existence or non-existence of a cause of action which were not decided because they were not raised in the earlier proceedings, if they could with reasonable diligence and should in all the

© 2014 The Incorporated Council of Law Reporting for England and Wales

circumstances have been raised. (3) Except in special circumstances where this would cause injustice, issue estoppel bars the raising in subsequent proceedings of points which (i) were not raised in the earlier proceedings or (ii) were raised but unsuccessfully. If the relevant point was not raised, the bar will usually be absolute if it could with reasonable diligence and should in all the circumstances have been raised.

**23** It was submitted to us on behalf of Virgin that recent case law has re-categorised the principle in *Henderson v Henderson* 3 Hare 100 so as to treat it as being concerned with abuse of process and to take it out of the domain of res judicata altogether. In these circumstances, it is said, the basis on which Lord Keith qualified the absolute character of res judicata in *Arnold v National Westminster Bank* by reference to that principle is no longer available, and his conclusions can no longer be said to represent the law.

**24** I do not accept this. The principle in *Henderson v Henderson* has always been thought to be directed against the abuse of process involved in seeking to raise in subsequent litigation points which could and should have been raised before. There was nothing controversial or new about this notion when it was expressed by Lord Kilbrandon in the *Yat Tung* case [1975] AC 581. The point has been taken up in a large number of subsequent decisions, but for present purposes it is enough to refer to the most important of them, *Johnson v Gore-Wood & Co* [2002] 2 AC 1, in which the House of Lords considered their effect. This appeal arose out of an application to strike out proceedings on the ground that the plaintiff's claim should have been made in an earlier action on the same subject matter brought by a company under his control. Lord Bingham of Cornhill took up the earlier suggestion of Lord Hailsham of St Marylebone LC in *Vervaeke (formerly Messina) v Smith* [1983] 1 AC 145, 157 that that the principle in *Henderson v Henderson* was "both a rule of public policy and an application of the law of res judicata". He expressed his own view of the relationship between the two at p 31 as follows:

> "*Henderson v Henderson* abuse of process, as now understood, although separate and distinct from cause of action estoppel and issue estoppel, has much in common with them. The underlying public interest is the same: that there should be finality in litigation and that a party should not be twice vexed in the same matter. This public interest is reinforced by the current emphasis on efficiency and economy in the conduct of litigation, in the interests of the parties and the public as a whole. The bringing of a claim or the raising of a defence in later proceedings may, without more, amount to abuse if the court is satisfied (the onus being on the party alleging abuse) that the claim or defence should have been raised in the earlier proceedings if it was to be raised at all. I would not accept that it is necessary, before abuse may be found, to identify any additional element such as a collateral attack on a previous decision or some dishonesty, but where those elements are present the later proceedings will be much more obviously abusive, and there will rarely be a finding of abuse unless the later proceeding involves what the court regards as unjust harassment of a party. It is, however, wrong to hold that because a matter could have been raised in earlier proceedings it should have been, so as to render the raising of it in later proceedings

© 2014 The Incorporated Council of Law Reporting for England and Wales

necessarily abusive. That is to adopt too dogmatic an approach to what should in my opinion be a broad, merits-based judgment which takes account of the public and private interests involved and also takes account of all the facts of the case, focusing attention on the crucial question whether, in all the circumstances, a party is misusing or abusing the process of the court by seeking to raise before it the issue which could have been raised before."

The rest of the committee, apart from Lord Millett, agreed in terms with Lord Bingham's speech on this issue. Lord Millett agreed in substance in a concurring speech. He dealt with the relationship between res judicata and the *Henderson v Henderson* principle at pp 58–59 as follows:

"Later decisions have doubted the correctness of treating the principle as an application of the doctrine of res judicata, while describing it as an extension of the doctrine or analogous to it. In *Barrow v Bankside Members Agency Ltd* [1996] 1 WLR 257, Sir Thomas Bingham MR explained that it is not based on the doctrine in a narrow sense, nor on the strict doctrines of issue or cause of action estoppel. As May LJ observed in *Manson v Vooght* [1999] BPIR 376, 387, it is not concerned with cases where a court has decided the matter, but rather cases where the court has not decided the matter. But these various defences are all designed to serve the same purpose: to bring finality to litigation and avoid the oppression of subjecting a defendant unnecessarily to successive actions. While the exact relationship between the principle expounded by Sir James Wigram V-C and the defences of res judicata and cause of action and issue estoppel may be obscure, I am inclined to regard it as primarily an ancillary and salutary principle necessary to protect the integrity of those defences and prevent them from being deliberately or inadvertently circumvented."

**25** It was clearly not the view of Lord Millett in *Johnson v Gore-Wood* that because the principle in *Henderson v Henderson* was concerned with abuse of process it could not also be part of the law of res judicata. Nor is there anything to support that idea in the speech of Lord Bingham. The focus in *Johnson v Gore-Wood* was inevitably on abuse of process because the parties to the two actions were different, and neither issue estoppel nor cause of action estoppel could therefore run (Mr Johnson's counsel conceded that he and his company were privies, but Lord Millett seems to have doubted the correctness of the concession at p 60D–E, and so do I). Res judicata and abuse of process are juridically very different. Res judicata is a rule of substantive law, while abuse of process is a concept which informs the exercise of the court's procedural powers. In my view, they are distinct although overlapping legal principles with the common underlying purpose of limiting abusive and duplicative litigation. That purpose makes it necessary to qualify the absolute character of both cause of action estoppel and issue estoppel where the conduct is not abusive. As Lord Keith put it in *Arnold v National Westminster Bank plc* [1991] 2 AC 93, 110G, "estoppel per rem judicatam, whether cause of action estoppel or issue estoppel, is essentially concerned with preventing abuse of process".

**26** It may be said that if this is the principle it should apply equally to the one area hitherto regarded as absolute, namely cases of cause of action

© 2014 The Incorporated Council of Law Reporting for England and Wales

estoppel where it is sought to reargue a point which was raised and rejected on the earlier occasion. But this point was addressed in *Arnold*, and to my mind the distinction made by Lord Keith remains a compelling one. Where the existence or non-existence of a cause of action has been decided in earlier proceedings, to allow a direct challenge to the outcome, even in changed circumstances and with material not available before, offends the core policy against the re-litigation of identical claims.

*Application to the present case*

**27** If this case is to be determined according to these general principles of the modern law, there can, I think, be little doubt about the answer. The Court of Appeal decided, before the result of the opposition proceedings in the EPO, that in its unamended form the patent was valid and infringed. It follows that Zodiac are estopped from asserting on the inquiry as to damages that in its unamended form the patent was invalid or was not infringed. This estoppel is a true cause of action estoppel. The Court of Appeal has determined in favour of Virgin issues essential to the existence of the cause of action for infringement of the unamended patent, which are the basis of the claim for damages. However, the point which Zodiac seek to make on the inquiry is that the unamended patent has been retrospectively amended. It no longer exists, and is deemed never to have existed, in the form on which these issues were adjudicated by the Court of Appeal. Zodiac's reliance on the retrospective amendment is a new point which was not raised before. It could not have been raised before, because the decision of the TBA retrospectively amending the patent was made after the order giving effect to the judgment of the Court of Appeal. There are two related reasons why Zodiac cannot be precluded from relying on the decision of the TBA on the inquiry as to damages. One is that they are relying on the more limited terms of a different patent which, by virtue of the decision of the TBA, must at the time of the inquiry be treated as the only one that has ever existed. The other is that Zodiac are not seeking to reopen the question of validity determined by the Court of Appeal. The invalidity of the patent may be the reason why the TBA amended the patent, but the defendant is relying on the mere fact of amendment, not on the reasons why it happened.

*The patent cases*

**28** How then did the Court of Appeal come to a different conclusion? The answer is that they followed a line of cases culminating in the decision of the Court of Appeal in *Unilin Beheer BV v Berry Floor NV* [2007] Bus LR 1140, which had held that a patentee whose patent has been held to be valid is entitled to claim damages for its infringement without regard to a subsequent revocation of the patent. This has been held to be so, even though it has always been the law in England (as it is under the European Patent Convention) that the revocation of a patent for invalidity relates back to the date of grant: see, currently, section 75(3) of the Patents Act 1977.

**29** The decisions which support the Court of Appeal's conclusion are *Poulton v Adjustable Cover and Boiler Block Co* [1908] 2 Ch 430, *Coflexip SA v Stolt Offshore MS Ltd (No 2)* [2004] FSR 708 and *Unilin* itself.

**30** The facts in *Poulton* were that the court had held the patent to be valid and infringed and had ordered an inquiry as to damages. An attempt

© 2014 The Incorporated Council of Law Reporting for England and Wales

to have the patent declared invalid for prior use had been rejected. After the judgment, the defendant found a further and better instance of prior use on the basis of which he successfully petitioned for the revocation of the patent. He then sought to rely on the revocation on the inquiry as to damages. The question presently before this court was not argued. The defendant's case was that the revocation of the patent was a decision in rem which itself gave rise to an estoppel against the world. There was therefore, it was said, "an estoppel against an estoppel". Parker J rejected this argument. The Court of Appeal (Vaughan Williams, Fletcher Moulton and Buckley LJJ) also rejected it in an extempore judgment delivered on a Friday afternoon after an argument in which no authority was cited on the ambit of the law of res judicata other than the *Duchess of Kingston's Case* 20 State Tr 355. Vaughan Williams LJ appears to have thought that the revocation of the patent operated only from the date it occurred, but he held that it did not matter whether the patent was valid or not, nor whether the revocation was retrospective. This was because the court having declared it to be valid, it must be treated as valid as between the same parties notwithstanding its subsequent revocation. Fletcher Moulton LJ considered that it was enough that the patent had been declared to be a valid patent at the time of the judgment. That was determinative on an inquiry as to damages in the same proceedings. Buckley LJ did not "feel so clear on this point as my learned brothers", but considered that their view could be justified on the footing that the inquiry as to damages was no more than the working out of the effect of the judgment on liability: pp 440–441. The decision may have been in accord with the law of res judicata as it was then thought to be, before the implications of *Henderson v Henderson* were appreciated or the doctrine had acquired its modern flexibility. What is clear is that without special facts the grounds on which *Poulton* was decided cannot be reconciled with the modern law on the subject.

31 The real origin of the principle applied by the Court of Appeal in the present case was a much more recent case, namely the decision of the Court of Appeal in *Coflexip SA v Stolt Offshore MS Ltd (No 2)* [2004] FSR 708. The patent in this case related to a system for laying flexible flowlines in the seabed in subsea oil installations. The facts were substantially the same as in *Poulton*. The court had rejected a challenge to the validity of the patent based on prior art, and had held that the only infringement alleged in the pleadings (relating to the performance of a contract for the Magnus Swift field) was made out. The court gave judgment for the patentee, ordering an inquiry as to damages. In accordance with the ordinary practice, the inquiry as to damages extended not just to the Magnus Swift field infringement but to 14 other similar infringements. While it was in progress a third party, relying on different prior art in parallel proceedings, succeeded in having the patent revoked. The majority of the Court of Appeal (Peter Gibson LJ and Sir Martin Nourse) held that they were bound by *Poulton* and that the defendant was estopped. They rejected the submission that it was no longer good law, for two reasons. The first was based on Lord Keith's distinction in *Arnold* between cause of action estoppel and issue estoppel. The second was that unless the defendant was estopped, the patentee would be harassed by two successive proceedings in which he would be required to defend the validity of the patent. Neuberger LJ dissented. He distinguished between

© 2014 The Incorporated Council of Law Reporting for England and Wales

"strict cause of action estoppel" (i e where the same issue had been decided in the earlier proceedings) and "abuse of process cause of action estoppel" (where the unsuccessful party wishes to reargue the point by reference to new material or a new argument not put before the court before). Neuberger LJ assigned the Magnus Swift field infringement to the second category of cause of action estoppel, because the defendant was seeking to rely not on the prior art which had led to the revocation of the patent in the parallel proceedings, but on the mere fact of revocation, which was a decision in rem, and decisive irrespective of the ground for it. He regarded the 14 other alleged infringements raised only on the inquiry as being governed by the principles relating to issue estoppel. He considered that the estoppel was not absolute in either case.

32 In my opinion the majority in *Coflexip* were mistaken on both of the points which they made, for substantially the reasons given by Neuberger LJ in his dissenting judgment. The point can best be tested by reference to the Magnus Swift field infringement, which unquestionably turned on cause of action estoppel. I would for my part leave open the question whether the same applied to the other 14 infringements, which has given rise to a certain amount of controversy since: see *Hormel Foods Corpn v Antilles Landscape Investments NV* [2005] RPC 657 and *Unilin Beheer BV v Berry Floor NV* [2007] Bus LR 1140, paras 47–48. The essential fallacy in the majority's reasoning in *Coflexip* lay in their view that Lord Keith in *Arnold* had held that cause of action estoppel was always absolute. He did not. He held that it was absolute only in relation to points actually decided on the earlier occasion. Because of this mistake, the majority had no regard to the fact that the consequences of the patent's revocation had not been decided on the earlier occasion, and could not have been because it had not happened. As for the policy considerations, they were also wrong, as it seems to me, to suppose that the court would be rehearing on the inquiry the question of validity decided by the judgment on liability. The revocation of the patent was an act in rem which determined the status of the patent as against the world. It had been revoked by the authority which had granted it and must be treated as never having existed. Although the patent had been revoked on the ground of invalidity, the issue which the defendant wished to raise on the inquiry was not invalidity but revocation. The revocation would be decisive regardless of the ground on which it was ordered.

33 In *Unilin Beheer BV v Berry Floor NV* [2007] Bus LR 1140, the Court of Appeal reached the same conclusion. The facts were in some ways an even more exacting test of the principle, because the policy considerations invoked in *Coflexip* could not possibly have justified the outcome in *Unilin*. This was because, as in the present case, the patent was retrospectively amended by the EPO to limit its scope to valid claims, after the English court had given judgment in favour of the patentee. The "vexation" associated with the pursuit of two proceedings challenging the validity of the patent was an inescapable feature of the statutory scheme which conferred concurrent jurisdiction on questions of validity on both the English court and the EPO. It can hardly be said that the vexation inherent in there being two perfectly proper proceedings concurrently is made more tolerable by ignoring the outcome of one of them. It was common ground in *Unilin* that the court was bound by *Coflexip*, and there was therefore only limited

© 2014 The Incorporated Council of Law Reporting for England and Wales

consideration of the merits of the principle decided in that case. The argument was directed to a different issue, namely whether the law stated in *Coflexip* was inconsistent with the scheme of the legislation relating to European patents, and therefore impliedly excluded where such a patent was revoked or amended by the EPO.

**34** In his judgment in the *Unilin* case, para 88, Jacob LJ said that he was "not sorry" to reach the conclusion that he did: (i) it was conducive to certainty because it enabled the parties to get a final decision on validity from an English court without waiting "to find out who has won until the slowest horse in the race gets there"; and (ii) any injunction against future infringements will be discharged if the EPO subsequently revokes or amends the patent. I have to say that I do not find either of these considerations convincing. Jacob LJ plainly assumed that the "slowest horse" would usually be the EPO. That assumption was not necessarily correct, especially in the light of the availability of at least one and potentially two tiers of appeal in England. The truth is that the effect of the decision in the *Coflexip* case [2004] FSR 708 is not to introduce certainty in this field but to make the outcome dependent on the wholly adventitious question which of two concurrently competent jurisdictions completes its procedures first. In the present case, the Court of Appeal may have reached a different conclusion if the Opposition Division of the EPO had reached the conclusion subsequently reached by the TBA. Permission to appeal the decision on validity to this court might well have been granted if the eruption of the Icelandic volcano had not deferred the decision of the TBA to a date after the application for permission had been resolved. The fate of £49m must surely depend on more substantial and predictable considerations than these. As for the discharge of any injunction restraining future infringements, this was a point also made by the majority in the *Coflexip* case (see para 137), but to my mind it simply underlines the irrationality of their conclusion. Logically, if the defendant is bound by the court's declaration that the patent is valid although it has been revoked or amended, he should be equally bound whether the remedy sought is damages or an injunction. The distinction between past and future infringements makes no sense in a case where a single cause of action embraces both and the revocation or amendment is by statute effective ab initio.

**35** In my opinion *Poulton* [1908] 2 Ch 430 is no longer good law, and *Coflexip* [2004] FSR 708 was wrongly decided. It follows that *Unilin* [2007] Bus LR 1140 was also wrongly decided because it proceeded on the premise of the law stated in *Coflexip*. The point with which *Unilin* was actually concerned, namely whether there is a different rule for European patents arising from the scheme of the relevant legislation, has been argued before us but it does not arise, because the anomaly in English law to which that point is directed does not exist. Accordingly, where judgment is given in an English court that a patent (whether English or European) is valid and infringed, and the patent is subsequently retrospectively revoked or amended (whether in England or at the EPO), the defendant is entitled to rely on the revocation or amendment on the inquiry as to damages.

**36** Once the inquiry is concluded, different considerations will arise. There will then be a final judgment for a liquidated sum. At common law, that judgment could be challenged on the ground that the patent had later

© 2014 The Incorporated Council of Law Reporting for England and Wales

been revoked or amended only by way of appeal, and then only if an appeal is still open. I doubt whether an implied statutory right to reopen it could be derived from the scheme of the Patents Act 1977, but that is a question which will have to await a case in which it arises.

*Disposal*

37 I would allow the appeal and declare that Zodiac are entitled to rely on the amendment of Virgin's patent in answer to their claim for damages on the inquiry.

*The Glaxo v Genentech guidelines*

38 I add a brief observation on the procedural implications. If I had concluded that the defendant was estopped from relying on the revocation or amendment of the patent once the court had adjudged it to be valid, that would have had important implications for the question whether English proceedings should be stayed pending a decision in concurrent opposition proceedings in the EPO. On that footing, it would in my opinion have been essential to stay the English proceedings so that the decision of the EPO would not be rendered nugatory by the operation of the law of res judicata. On that hypothesis, it would have been difficult to defend the guidance given by the Court of Appeal in *Glaxo Group Ltd v Genentech Inc (Practice Note)* [2008] Bus LR 888 to the effect that the English court should normally refuse a stay of its own proceedings if it would be likely to resolve the question of validity significantly earlier. The effect of that guidance is to put more litigants in the impossible situation in which successive decisions of the Court of Appeal placed the parties in this case. As it is, the problem has not gone away, even on the footing that those decisions are overruled. In the first place, a similar problem may well arise if the patent is revoked by the EPO after a judgment has been given for a liquidated sum. Second, that problem is aggravated by the fact that a decision of the English court on validity is directly effective only in the United Kingdom, whereas the EPO's decision, being the decision of the authority which granted the patent, is directly effective in every country for which the patent was granted. Third, even if the EPO opposition proceedings are concluded in time to affect the English proceedings, the uncertainty and waste of costs involved do little credit to our procedures. This is not a suitable occasion, nor is the Supreme Court the appropriate tribunal to review the guidelines, but I think that they should be re-examined by the Patents Court and the Court of Appeal.

**LORD NEUBERGER OF ABBOTSBURY PSC** (with whom **BARONESS HALE OF RICHMOND DPSC, LORD CLARKE OF STONE-CUM-EBONY** and **LORD CARNWATH JJSC** agreed)

*The factual background*

39 The facts of this case are fully set out by Lord Sumption JSC in paras 8–15 of his judgment, but it is worth summarising them. Virgin was the registered proprietor of a European patent (UK) ("the patent") granted out of the European Patent Office ("EPO"). They began infringement proceedings ("the English proceedings") in the High Court against Zodiac, who were manufacturing and selling an allegedly infringing product.

© 2014 The Incorporated Council of Law Reporting for England and Wales

Zodiac denied infringement, and counterclaimed for revocation of the patent on the grounds, inter alia, that it was invalid in the light of prior art. Those proceedings resulted in a hearing in front of the Court of Appeal, which (i) decided that the patent was valid, (ii) declared that Zodiac's product infringed it, and (iii) ordered an assessment of damages ("the assessment") [2009] EWCA Civ 1062; [2010] RPC 192; [2009] EWCA Civ 1513; [2010] FSR 396.

**40** Meanwhile, opposition proceedings in the EPO had been initiated by Zodiac in respect of the patent. Following the decision of the Court of Appeal in the English proceedings, the opposition proceedings came before the technical board of appeal ("TBA"). During the course of the hearing before the TBA, Virgin abandoned the claims which Zodiac had been held to infringe, and the patent was amended accordingly. Virgin then contended that Zodiac's product infringed one or more of the surviving claims of the patent, as amended, but Floyd J [2013] RPC 247 concluded that the amendment limited the scope of the patent so as to render Zodiac's product no longer infringing. It is common ground that the consequence of this is that the patent is to be treated as limited in its scope pursuant to the amendment, with retrospective effect from its priority date.

**41** Virgin contend that, because the English proceedings have been finally determined in their favour on validity and infringement, it is not now open to Zodiac to rely in the assessment on the subsequent amendment of the patent, by virtue of res judicata. In other words, Virgin's contention is that the assessment should proceed on the basis that Zodiac are precluded from contending that they are not liable for any damages for infringement in the light of the amendment of the patent. If that contention is right, then it seems likely that Virgin will recover damages probably running to tens of millions of pounds, whereas if it is wrong, they will presumably recover nothing.

*Res judicata and the authorities on the point in this appeal*

**42** In paras 17–26 of his judgment, Lord Sumption JSC summarises the law in relation to res judicata, and I agree with his exposition.

**43** Virgin's contention is that res judicata compels the conclusion that, where a patent has been held by a court to be valid and infringed as between the patentee and an alleged infringer, but it is subsequently revoked (or amended so that the alleged infringer would no longer be held to infringe), the patentee is none the less entitled to damages from the alleged infringer as if the patent had not been revoked (or relevantly amended). This contention receives support from three previous decisions of the Court of Appeal, which were followed by the Court of Appeal in this case. Those decisions are *Poulton v Adjustable Cover and Boiler Block Co* [1908] 2 Ch 430, *Coflexip SA v Stolt Offshore MS Ltd (No 2)* [2004] FSR 708, and *Unilin Beheer BV v Berry Floor NV* [2007] Bus LR 1140.

**44** *Poulton* and *Coflexip* both involved an assessment of damages following a hearing at which the alleged infringer had unsuccessfully challenged the patentee on the validity and infringement of a purely British patent, in the English courts, but, before the assessment of damages had taken place, the patent had been revoked in other proceedings which were also in the English courts. The present case, like *Unilin*, is concerned with a

© 2014 The Incorporated Council of Law Reporting for England and Wales

European patent, in respect of which issues of validity and infringement have been determined by the English courts, but, before the assessment of damages has taken place, validity is being, or has been, considered by the EPO in opposition proceedings.

**45** In *Poulton* [1908] 2 Ch 430, 437, Vaughan Williams LJ explained that the judgment obtained by the patentee

> "made the question whether there had been an infringement . . . of a patent then valid . . . res judicata as between the parties to the action, and operated as a complete estoppel between them."

On the following page, he said that the subsequent

> "order of revocation . . . could not affect the already existing estoppel, by virtue of which the defendants were prevented from denying that which . . . had been finally determined to be the truth of the matter as between [the] parties . . . involved in [the] action",

and he therefore concluded that the alleged infringer could not rely on the subsequent revocation of the patent on the assessment of damages.

**46** At first sight, one can see the force of that reasoning. It is well established that the fact that an identical issue is determined differently in two different sets of proceedings is irrelevant to the rights of the parties to each set of proceedings inter se. Thus, in the normal run of things, where A has lost against B on an issue in one case, it is simply irrelevant to A's legal obligations and rights as against B if C subsequently defeats B on the very same issue (except it may help A to obtain permission to appeal out of time—see *Arnold v National Westminster Bank plc* [1991] 2 AC 93, 109F–110C—but that is rather a different matter). That is because the determination of most issues in litigation can only bind the parties to the litigation (and their privies).

**47** The point is starkly illustrated by *In re Waring; Westminster Bank v Burton-Butler* [1948] Ch 221. In that case, Jenkins J held that (i) an annuitant under a will was bound by a decision of the Court of Appeal in earlier litigation, where the will trustees and he were parties, as to the effect of tax legislation on his rights, but (ii) another annuitant was entitled to rely on a subsequent, more favourable, decision of the House of Lords on the point in a different case, because he had not been a party to the earlier litigation. Whilst Jenkins J acknowledged that the result may appear to be "anomalous", in reality it was a clear and principled application of the fundamental rule.

*Discussion*

**48** In my view, however, the same cannot be said of the reasoning of the Court of Appeal in *Poulton* [1908] 2 Ch 430, and in the three cases which followed it (including this case). It seems to me that the mistake of the courts in those four decisions was attributable to the fact that they did not have appropriate regard to the statutory provisions relating to patents, which reflect the nature of a patent and the effect of its revocation. They therefore treated the subsequent decision to revoke the patent as no more than a later determination by another court in other proceedings between different parties.

© 2014 The Incorporated Council of Law Reporting for England and Wales

**49** The essential point is that, although the decision to revoke the patent was indeed made in proceedings involving different parties, the effect of the Patents Act 1977 (and its statutory predecessors) ("the Patents Act") and the European Patent Convention ("the EPC") whose relevant provisions are set out in paras 3–7 of Lord Sumption JSC's judgment, was that the revocation did not just have effect between those parties. The revocation of the patent deprived the patentee of the rights which the patent had bestowed on him as against the world; furthermore, it did so retrospectively. In other words, the effect of the revocation was that everyone was entitled to conduct their affairs as if the patent had never existed.

**50** The failure to consider the nature of a patent and the effect of its revocation led the Court of Appeal into error, as it failed to take into account the fact that the issue of res judicata was being raised by the (former) patentee in connection with a particular statutory right. In this connection, it is worth referring to an observation of Lord Bridge of Harwich in *Thrasyvoulou v Secretary of State for the Environment* [1990] 2 AC 273, 289:

> "In relation to adjudications subject to a comprehensive self-contained statutory code, the presumption . . . must be that where the statute has created a specific jurisdiction for the determination of any issue which establishes the existence of a legal right, the principle of res judicata applies to give finality to that determination unless an intention to exclude the principle can properly be inferred as a matter of construction of the relevant statutory provisions."

I do not suggest that the Patents Act or the EPC "created a specific jurisdiction", but the observation emphasises that an issue of res judicata in connection with a patent case cannot be considered correctly without proper regard to the effect of that Act and the EPC.

**51** In *Poulton* [1908] 2 Ch 430 and the cases which followed it, the Court of Appeal failed to focus on the point that the effect of the Patents Act was that the revocation meant that, as against the world, the patentee had never had a valid patent. They wrongly concluded that cause of action estoppel applied so as to preclude the alleged infringer from relying on the revocation of the patent in the assessment, because they failed correctly to formulate the point which the alleged infringer wished to take on the assessment. The alleged infringer was bound by strict cause of action estoppel from running any argument that it had run on validity or infringement, but there was no such strict rule to prevent it from contending that the patent had, as a matter of fact, been revoked. Not merely was that an argument which had not been run in the earlier proceedings: it was an argument which, ex hypothesi, could not have been run in the earlier proceedings. Accordingly, following the reasoning in *Arnold's* case [1991] 2 AC 93, it was a fact which the court could at least have contemplated permitting the alleged infringer to rely on in the assessment.

**52** In my view, however, it goes further than that. Absent special factors, principle, fairness and commercial sense support the view that the fact that the patent in issue had been revoked was a point which the alleged infringer should have been entitled to rely on in the assessment. It was a new, centrally important, uncontroversial fact, and to deny the alleged

© 2014 The Incorporated Council of Law Reporting for England and Wales

infringer the ability to raise it would be to give effect to a monopoly right which the patentee never should have had. Further, while not enough of a point on its own, it can fairly be said that, far from increasing litigation, permitting Zodiac to rely on the amendment of the patent, would serve to put an end to the assessment.

53 On the facts of this case, Zodiac are not seeking to challenge any of the conclusions reached by the Court of Appeal in the English proceedings. They accept that they cannot say that the patent, in its unamended form, is susceptible to attack on the grounds raised in the English proceedings, or that Zodiac's product did not infringe the patent in that form, or that Virgin is not entitled to an assessment of damages. All that Zodiac are seeking to do is to contend that the damages on the assessment should be assessed at nil (or, perhaps, a nominal figure), because, as the patent has been amended in the course of the EPO proceedings, it is now retrospectively to be treated as amended, so that Zodiac's product does not infringe, and so Virgin have suffered no damage.

54 Further, Zodiac are not seeking to relitigate or raise a point which was determined by the Court of Appeal in the English proceedings. Indeed, they could not have raised the point that the patent had been amended during those proceedings, for the very good reason that it had not been revoked. Zodiac are simply seeking to rely on a highly relevant event which occurred after the determination of those proceedings, and which self-evidently would have a very significant effect on the assessment.

55 It is true that the grounds on which the TBA concluded that the patent in its original form had to be amended were grounds on which Zodiac had unsuccessfully relied before the Court of Appeal, namely invalidity over the prior art. However, Zodiac are not seeking to rely on those grounds in the assessment: they are simply seeking to rely on the fact that the patent has been amended. The position would be the same if validity had not been in issue in the English proceedings. The purpose of res judicata is not to punish a party for failing to take a point, or for failing to take a point properly, any more than to punish a party because the court which tried its case may have gone wrong. It is, as explained above, to support the good administration of justice, in the public interest in general and in the parties' interest in particular. Assessed from either perspective, it seems to me wrong to prevent a person who has been held to infringe a patent from invoking in proceedings thereafter a subsequent revocation or amendment of the patent, in order to avoid liability for infringement (at least in the absence of exceptional facts).

56 The inappropriateness of relying, as the Court of Appeal did, on the approach in the normal run of cases is highlighted by the fact that the decision between the will trustees and one annuitant in *In re Waring* [1948] Ch 221 was not binding as between the will trustees and another annuitant. On the other hand, the decision to revoke the patent in a case such as this and *Poulton* [1908] 2 Ch 430 can be relied on by everyone, even though the decision may have been reached in proceedings in which only one person and the patentee (or its privy) was involved.

57 The point may also be made by considering a hypothetical case, instanced in argument by Lord Sumption JSC, where, after the Court of Appeal found for Virgin on validity and infringement, another court decided

© 2014 The Incorporated Council of Law Reporting for England and Wales

that X's product, which was identical to that of Zodiac, did not infringe the patent. That would not have been a decision which would have assisted Zodiac in any way, as the position of Zodiac and X would have been analogous to that of the two annuitants in *Waring*. A decision on infringement is in personam, so it only binds the parties to the action (and their privies), whereas a decision that a patent is invalid (or must be amended) is in rem, so it binds the world, just as the patent, so long as it is in force, can be enforced against the world.

**58** The policy of the Patents Act is that valid patents are enforceable against the world, even if an infringer is honestly and reasonably unaware of the existence of the patent. Equally, if a patent is revoked (or amended), the policy is that the revocation (or amendment) takes effect retrospectively, and that this can be relied on by the world. I find it hard to see why someone who has failed in an attack on the patent should not be entitled, like anyone else, to rely on the points that the patent has been revoked (or amended), and that the revocation (or amendment) is retrospective in its effect, whether in legal proceedings or in another context.

**59** This conclusion is supported by another point. As Virgin accept, any injunction restraining Zodiac from infringing the patent granted at the end of the English proceedings either became ineffective or would have to be discharged, following the amendment of the patent in the EPO proceedings. In my view, there is a logical difficulty with the notion that Zodiac cannot rely on the fact that the patent was retrospectively amended when it comes to the assessment, if they can rely on the amendment in order to discharge or to ignore the injunction. It is true that the injunction is prospective and the assessment retrospective, but the amendment is both prospective and retrospective in its effect.

**60** Fletcher Moulton LJ rightly said in *Poulton's* case [1908] 2 Ch 430, 439, that "The order of revocation is in the nature of a judgment in rem which terminates the res", and he was also right when he added that "It has . . . no further effect so far as estoppel is concerned". However, where he went wrong was to conclude that this meant that the fact and consequences of the revocation could not be relied on by a person who had previously been held to be an infringer, for instance when damages come to be assessed. He acknowledged that "As regards the world at large, every one is bound by the fact that the patent ceased to exist", and, as a matter of legal principle and consistency, as well as a matter of common sense and fairness, I consider that "every one" includes a party who has previously been held to infringe it.

**61** So far as the interests of patentees are concerned, it is inherent in the grant of a patent under the Patents Act that, however often its validity may be unsuccessfully challenged in earlier litigation, it may none the less be revoked (or amended), and with retrospective effect, at some point by a court or by the EPO. A patentee therefore must appreciate that it can never be sure that a decision of a court that the patent is valid will settle the question for good. It is true that an unsuccessful challenge to the validity of a patent by a particular person will normally give rise to a res judicata to prevent that person raising another challenge, but, as is common ground, it would not enable the patentee to rely on the patent against that person once

© 2014 The Incorporated Council of Law Reporting for England and Wales

the patent had been revoked, at least in respect of what would be infringements after its revocation.

*Other matters*

**62** When seeking to justify a conclusion that, though it applies, res judicata does not preclude a point being taken, it can be dangerous to invoke the observation of Lord Keith of Kinkel in *Arnold v National Westminster Bank plc* [1991] 2 AC 93, 109B, that estoppel is intended "to work justice between the parties", because it is only too easy to fall back on it as an excuse for an unprincipled departure from, or an unprincipled exception to, the rule. However, in a case where the rule has been relied on, I consider that it is helpful for a court which is inclined to accept the argument that it does not prevent a point being taken, to consider whether that outcome would work justice between the parties. In this case, as in cases such as *Poulton*, it seems to me that it would be positively unjust, as between the parties, for a (former) patentee to recover damages for infringement of a patent after the patent has been irrevocably and retrospectively revoked (or, as in this case, relevantly amended). And I can see no public interest in such an outcome. There is no question of extra further litigation, as it is undeniable that the patent has been revoked (or amended); indeed, further litigation will be avoided as the assessment need not proceed.

**63** In the course of his submissions on behalf of Virgin, Mr Crow QC relied on the doctrine of merger, viz the principle whereby whatever rights a claimant has against a defendant are treated as merged into the order made in the proceedings. I do not think that that aspect takes the point at issue on this appeal any further.

**64** Mr Crow realistically did not suggest that it would cause any problems if we were to overturn a decision which had stood for over a hundred years and had been followed and applied in the last ten years. We therefore do not have to address the problem which was faced by the House of Lords in *Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1997] AC 70, when they decided to overturn an early twentieth century decision of the Court of Appeal which had stood for around a century.

**65** We were taken to some articles on the attitude of the courts of Germany, France and the Netherlands to the point raised in these proceedings. I am not confident that we have a full and accurate picture of the position in those three jurisdictions, but it seems clear that, to put it at its very lowest, there is not a consistent approach which could be said to reflect Virgin's contention in this case. Indeed, my strong impression is that Zodiac's contention is closer to the practice in those three countries. However, as Mr Crow submits, that is of little weight, as this is the sort of issue which has to be resolved by reference to domestic law, and is not the subject of any attempt to harmonise practices across the EPC territories.

**66** As to the temporal limit of Zodiac's right to rely on the amendment of the patent in the assessment of damages, I have no doubt that they could raise the amendment until judgment for the assessed damages had been drawn up, or passed and entered to use the time-honoured legal expression. While the court would, I think, have power to refuse to do so, I would expect it normally to agree to reopen such a judgment if any revocation or amendment was raised before the assessed damages had been paid.

© 2014 The Incorporated Council of Law Reporting for England and Wales

**67** If the patent had been amended after the order had been formally passed and entered, but before the damages had been paid, I suspect that the only course open to Zodiac would have been to seek to appeal against the award of damages, relying on the amendment as new evidence, as strict cause of action estoppel (indeed merger) would apply. Once the damages had been paid, it seems to me that an alleged infringer would have to try and raise a restitutionary claim if it wished to recover the damages on the ground that the patent had been revoked or varied. I express no view on the strength of such a claim, which may well be highly dependent on the facts of the particular case.

**68** This conclusion renders it unnecessary to consider whether, if *Poulton* was rightly decided, it would none the less be open to Zodiac to rely on the amendment of the patent in the assessment, because the amendment was effected in the EPO rather than in a domestic court. I find it slightly difficult to consider that hypothetical question, not merely because I would be proceeding on an artificial hypothesis, but also because my reasons for concluding that *Poulton* was wrongly decided in relation to a UK patent apply a fortiori to a European patent.

*Conclusion*

**69** Accordingly, for these reasons, which follow those of Lord Sumption JSC, and with whose reasoning I agree, I would allow Zodiac's appeal, and overrule the decisions in *Poulton* [1908] 2 Ch 430 and *Coflexip* [2004] FSR 708. It also follows that I disagree with the reasoning of the Court of Appeal in *Unilin* [2007] Bus LR 1140. I also agree with what Lord Sumption JSC says in para 38 about the guidance given by the Court of Appeal in *Glaxo Group Ltd v Genentech Inc (Practice Note)* [2008] Bus LR 888.

*Appeal allowed.*

Diana Procter, Barrister

---

© 2014 The Incorporated Council of Law Reporting for England and Wales

TAB 79

*Waikato Freight and Storage v Meltzer* [2001] 2 NZLR 541,
New Zealand Court of Appeal

nor's privilege can be watched e which is a further safeguard. , I think that the appropriate

y the service as to the Privacy ;e subject to Court Orders and .al privilege grounds where the derations to be relegated.

discretionary order for costs tors were taken into account. l to the plaintiffs they having le disbursements to be paid by

*Application dismissed.*

*ence* (Wellington). *Law Office* (Wellington). *ndlay* (Wellington).

*y:* Cecily Brick, *Barrister*

# Waikato Freight and Storage (1988) Ltd v Meltzer

Court of Appeal Wellington
21 February; 5 March 2001
Tipping, McGechan and Salmon JJ

*Company law – Voidable preferences – Payment of accrued indebtedness after commercial relationship terminated – Whether "in the ordinary course of business" – Companies Act 1993, s 292.*

Excel Freight Ltd (Excel), a freight forwarder, had terminated its business relationship with a carrier, Waikato Freight and Storage (1988) Ltd (Waikato), on the basis that it was looking to engage another carrier and cut costs. During the parties' commercial relationship of seven months, Excel had made two payments to Waikato in the amounts of some $12,000 and $10,000. In the two months following termination of the relationship Excel made two further payments to Waikato of over $19,000 and $21,000 to clear its indebtedness, and went into liquidation several months later. Excel's cheque for one of the payments was initially dishonoured but was honoured when re-presented. The liquidator sought to have the two payments set aside as voidable preferences under s 292 of the Companies Act 1993, the payments having been made while Excel was insolvent. In the High Court Waikato argued unsuccessfully that the payments were not voidable as they were made in the ordinary course of business. Waikato appealed.

**Held:** 1 The proper approach to the phrase "ordinary course of business" in s 292(4) was an objective one, but against the actual setting in which the payment or other transaction took place. The true inquiry was whether, in its actual setting, the transaction was an objectively ordinary one for the parties to have entered into. Relevant factors for consideration included general business practice, any particular customs or practices within the field of commerce concerned, and the parties' previous commercial relationship (see paras [19], [31]).

*Countrywide Banking Corporation Ltd v Dean* [1998] 1 NZLR 385 (PC) explained.

*Re Modern Terrazzo Ltd (In Liquidation)* [1998] 1 NZLR 160, *Re Anntastic Marketing Ltd (In Liquidation)* [1999] 1 NZLR 615 and *Re Excel Freight Ltd (In Liquidation)* (1999) 8 NZCLC 261,827 considered.

2 The payments had been made in the ordinary course of business. Waikato had applied no pressure to collect the outstanding money and had simply banked money tendered to it by Excel. There was nothing out of the ordinary in a company paying off outstanding indebtedness in a series of payments after a commercial relationship ended and Waikato had not been put on inquiry as to

Excel's solvency because of the dishonour of Excel's cheque, which was a normal commercial event in the industry, nor because Excel had terminated its relationship with Waikato on the basis that it wanted to cut costs (see paras [34], [37], [38], [39]).

*Appeal allowed.*

*Observations:* (i) Parliament intended that a commercially unremarkable payment would not be voidable by a liquidator even if it had preferential effect, as otherwise the ordinary processes of commerce would be unduly undermined (see para [18]).

(ii) A payment which was made in the ordinary course of business cannot cease to have that character because of a subsequent change of circumstances (see para [22]).

(iii) A debtor's intent to prefer is only relevant to the determination of whether a transaction was in the ordinary course of business if the intent was known to the creditor. If known, the intent points towards the payment being outside the ordinary course of business, though this will not automatically follow (see para [32]).

**Other cases mentioned in judgment**

*Downs Distributing Co Pty Ltd v Associated Blue Star Stores Pty Ltd (In Liquidation)* (1948) 76 CLR 463; 22 ALJ 286.

*Meltzer v Attorney-General* (Court of Appeal, CA 216/98, 3 May 1999).

*Vague v Fajner* (1998) 8 NZCLC 261,790 (CA).

**Appeal**

This was an appeal by Waikato Freight and Storage (1988) Ltd from a decision of Master Kennedy-Grant in the High Court (reported at (2000) 8 NZCLC 262,348) in favour of Jeffrey Philip Meltzer, liquidator of Excel Freight Ltd (In Liquidation), holding that payments made before the company went into liquidation were voidable preferences in terms of s 292 of the Companies Act 1993.

*D J Taylor* for the appellant.
*D L Brown* for the respondent.

*Cur adv vult*

The judgment of the Court was delivered by

**TIPPING J. [1]** This appeal from Master Kennedy-Grant (High Court, Auckland, M 1635SD/99, 11 July 2000) concerns the concept of "the ordinary course of business" as it affects transactions which may be voidable under s 292 of the Companies Act 1993. The appellant, Waikato Freight and Storage (1988) Ltd (Waikato), failed in its application in the High Court to have declared not voidable two payments made to it by Excel Freight Ltd (Excel) of which the respondent, Mr Meltzer, is the liquidator. These payments were made about two and three months prior to Excel being placed in liquidation. Waikato appeals from the Master's decision on the basis that he was wrong to hold it had not satisfied the onus of showing that both payments were made by Excel in the ordinary course of business.

*Background circumstances*

[2] As its name implies, Waikato is a company engaged in carrying freight for its customers. Excel was a freight forwarder. It used Waikato's services

Excel's cheque, which was a :cause Excel had terminated its ıat it wanted to cut costs

a commercially unremarkable ıven if it had preferential effect, e would be unduly undermined

nary course of business cannot quent change of circumstances

levant to the determination of :e of business if the intent was nts towards the payment being gh this will not automatically

:d *Blue Star Stores Pty Ltd* .LJ 286.
:A 216/98, 3 May 1999).
).

age (1988) Ltd from a decision reported at (2000) 8 NZCLC iquidator of Excel Freight Ltd before the company went into of s 292 of the Companies Act

*Cur adv vult*

ıy
Kennedy-Grant (High Court, ıs the concept of "the ordinary :h may be voidable under s 292 ato Freight and Storage (1988) igh Court to have declared not :ight Ltd (Excel) of which the ıayments were made about two n liquidation. Waikato appeals was wrong to hold it had not ts were made by Excel in the

ny engaged in carrying freight er. It used Waikato's services

between late October 1996 and mid-April 1997. At that time it terminated its relationship with Waikato on the basis that it was "looking to cut costs" and had therefore engaged another carrier. During the course of the relationship between the parties, Waikato rendered the following accounts to Excel for services rendered as follows:

| | |
|---|---:|
| October 1996 | $2582.50 |
| November 1996 | $9603.42 |
| December 1996 | $13,797.62 |
| January 1997 | $7883.73 |
| February 1997 | $11,766.30 |
| March 1997 | $11,210.39 |
| April 1997 | $7216.84 |

[3] Excel made four payments to Waikato which, together, cleared all its indebtedness. Their amounts and dates were:

| | |
|---|---:|
| 31 January 1997 | $12,146.65 |
| 6 March 1997 | $10,424.91 |
| 28 May 1997 | $19,261.35 |
| 25 June 1997 | $21,623.50 |

We note that the totals of these sums ($64,060.80 and $63,456.41) do not coincide. The figures are those appearing in the Master's judgment as amended in two respects by counsel. Fortunately the lack of an exact match is of no relevance to the disposition of the case.

[4] None of the four payments can be reconciled with any particular invoice or combination of invoices or balance outstanding. It is only the last two payments totalling $40,884.85 which the liquidator of Excel now contends are voidable. There was earlier a suggestion that the second payment, ie that made on 6 March 1997 was also voidable but the liquidator did not pursue that contention in the High Court.

[5] Excel was placed in liquidation on 25 August 1997. Thus the May and June payments were made during the restricted period of six months as defined in s 292(6) of the Act. It is common ground that Excel was, at the time of both payments, unable to pay its debts and that the payments enabled Waikato to receive more than it would have received in the liquidation. Hence, Waikato had the onus of establishing that the payments were made in the ordinary course of business in terms of s 292, the material part of which states:

> **292. Transactions having preferential effect** – (1) In this section, "transaction", in relation to a company, means –
> (a) A conveyance or transfer of property by the company:
> (b) The giving of a security or charge over the property of the company:
> (c) The incurring of an obligation by the company:
> (d) The acceptance by the company of execution under a judicial proceeding:
> (e) The payment of money by the company, including the payment of money under a judgment or order of a court.

(2) A transaction by a company is voidable on the application of the liquidator if the transaction –

(a) Was made –

(i) At a time when the company was unable to pay its due debts; and

(ii) Within the specified period; and

(b) Enabled another person to receive more towards satisfaction of a debt than the person would otherwise have received or be likely to have received in the liquidation –

unless the transaction took place in the ordinary course of business.

(3) Unless the contrary is proved, for the purposes of subsection (2) of this section, a transaction that took place within the restricted period is presumed to have been made –

(a) At a time when the company was unable to pay its debts; and

(b) Otherwise than in the ordinary course of business.

(4) For the purposes of this section, in determining whether a transaction took place in the ordinary course of business, no account is to be taken of any intent or purpose on the part of a company –

(a) To enable another person to receive more towards satisfaction of a debt than the person would otherwise receive or be likely to receive in the liquidation; or

(b) To reduce or cancel the liability, whether in whole or in part, of another person in respect of a debt incurred by the company; or

(c) To contribute towards the satisfaction of the liability, whether in whole or in part, of another person in respect of a debt incurred by the company –

unless that other person knew that that was the intent or purpose of the company.

. . .

*Master's judgment*

**[6]** The Master referred to the decision of the Privy Council in *Countrywide Banking Corporation Ltd v Dean* [1998] 1 NZLR 385 and made the following citation from the judgment of Their Lordships delivered by Gault J at p 394:

> ". . . the test is essentially one of fact . . .
>
> . . . the transaction must be examined in the actual setting in which it took place. That defines the circumstances in which it is to be determined whether it was in the ordinary course of business. The determination then is to be made objectively by reference to the standard of what amounts to the ordinary course of business. As was said by Fisher J in the *Modern Terrazzo Ltd* case, the transaction must be such that it would be viewed by an objective observer as having taken place in the ordinary course of business.
>
> . . .
>
> The section . . . requires examination of the actual transaction in its factual setting (excluding the intent or purpose of the company save as required by subs (4))."

**[7]** After referring to a submission made by counsel for the liquidator, the Master stated that he was approaching his decision on the basis that whether a challenged payment has been made in the ordinary course of business is to be determined:

voidable on the application of the

npany was unable to pay its due

riod; and
ve more towards satisfaction of a
-wise have received or be likely to
—
ordinary course of business.
or the purposes of subsection (2)
ace within the restricted period is

as unable to pay its debts; and
course of business.
ion, in determining whether a
urse of business, no account is to
part of a company –
ive more towards satisfaction of
therwise receive or be likely to

whether in whole or in part, of
ebt incurred by the company; or
ction of the liability, whether in
n in respect of a debt incurred by

vas the intent or purpose of the

ie Privy Council in *Countrywide*
LR 385 and made the following
delivered by Gault J at p 394:

in the actual setting in which it
in which it is to be determined
usiness. The determination then
he standard of what amounts to
said by Fisher J in the *Modern*
such that it would be viewed by
lace in the ordinary course of

of the actual transaction in its
rpose of the company save as

counsel for the liquidator, the
ion on the basis that whether a
ary course of business is to be

(a) By exercising the judgment of an objective observer;
(b) With regard to the activities of the particular company; and
(c) In reliance on those facts which were or ought to have been known to both the creditor and the company (subject only to the requirement of actual knowledge where the fact in question is intent or purpose on the part of the company – see s 292(4) of the Act).

**[8]** When turning to the facts, the Master indicated that he was disregarding certain facts on the basis that they were known only to Excel or that there was no sufficient evidence that they should have been known to Waikato. The facts so disregarded were that Excel was insolvent from at least 31 March 1996; that Excel's aged trial balances for the period 31 March 1996 (sic) showed creditors whose accounts were more than 90 days overdue; that certain cheques listed in the liquidator's affidavit had been dishonoured; and that Excel had received various letters which the Master described as "dunning" letters, as also referred to in the liquidator's affidavit.

**[9]** The Master then indicated that in addition to the facts set out at the beginning of this judgment, he regarded the following further facts as relevant to his decision. Excel had made no payments to Waikato in either November or December 1996. After the January payment of $12,146.65 Excel's outstanding debt to Waikato was made up as follows:

| | |
|---|---|
| Current | $7883.73 |
| 1 month (ie Dec 1996 billings) | $13,797.62 |
| 2 months | $39.27 |
| Total | $21,720.62 |

**[10]** After the March payment of $10424.91 Excel's debt to Waikato was made up as follows:

| | |
|---|---|
| Current | $11,210.39 |
| 1 month (ie Feb 1997 billings) | $11,766.30 |
| 2 months | $7883.73 |
| 3 months and over | $2807.59 |
| Total | $33,668.01 |

**[11]** Excel made no payment to Waikato in April 1997. The May and June 1997 payments cleared Excel's total indebtedness to Waikato. The evidence of Waikato's managing director, Mr D G Taylor, was that only about 1 per cent of Waikato's debtors paid on the 20th of the month following. The Master concluded that this evidence, which was not contradicted or questioned, suggested that late payment was not unusual in the freight industry. He noted that there had never been prompt payment by Excel. Furthermore, Mr Taylor's evidence, again uncontradicted, was to the effect that it was very common in the freight industry for debtors to be unable to pay their accounts until they received payment of a large account due to them. The Master observed that this appeared to have been true of Excel in this case. This was a reference to a dishonoured cheque to be mentioned in a moment.

**[12]** The Master noted that there was no suggestion that during the course of the relationship between the parties Waikato had departed from its usual debt recovery procedures; nor were those procedures in any way out of the ordinary.



Although not specifically noted by the Master, counsel confirmed that there had been no communication between the parties after the cessation of their relationship, not even when the cheque about to be mentioned was dishonoured with the answer "present again". The Master further concluded that it was not unreasonable for Waikato to require prompt payment of the moneys outstanding when Excel brought the business relationship to an end on the basis that it was looking to cut costs and was therefore engaging another carrier.

**[13]** Finally, in his recital of what he saw as the relevant facts, the Master noted that Excel's cheque for the May payment of $19,261.35 was dishonoured on initial presentation. It was, however, met when presented again two days later. We interpolate here that the dishonour was accompanied by the answer "present again" rather than by some other less encouraging answer, such as "insufficient funds". In respect of the dishonour of this cheque, the Master noted that such events were not infrequent in the freight business, happening every two months or so, usually because the drawer of the cheque had written it out expecting to receive a payment to cover it, and there was some delay in actually getting the covering payment. The Master expressed the view that all the features of the case favoured a finding that the challenged payments were made in the ordinary course of business, save for three matters, namely: the pattern of payments; the fact that the challenged payments were made after the business relationship had been terminated because the company wished to cut costs; and the dishonour of the cheque for the first of the disputed payments on its initial presentation.

**[14]** The Master then proceeded to discuss each of these three matters and came to the now challenged conclusion that in combination they meant that Waikato had failed to establish that the payments were made in the ordinary course of business. We will defer examining the Master's discussion of the three points and counsel's competing submissions on them until after we have considered certain legal matters. Counsel indicated that there was no dispute between them on the law but it is still desirable, indeed necessary, to consider certain aspects of the concept of ordinary course of business as used in the voidable preference provisions of the Act.

*Legislative purpose*

**[15]** One of the important points made by Their Lordships in *Countrywide* was the need to approach the proper meaning and scope of the concept of the ordinary course of business in relation to the particular statutory context in which the concept appears. The meaning of the same or similar phrases in other contexts is not likely to be particularly helpful. The present context is of course that of avoiding transactions, here payments, which give the recipient a preference over other creditors of a company which is now in liquidation and was at the date of payment unable to pay its due debts.

**[16]** In 1993 New Zealand company law underwent a fundamental shift of emphasis in this area. The focus moved from intent to effect. Under the earlier law the focus was on whether the dominant intention of the insolvent company was to prefer the creditor concerned. Under the new law the initial focus is on whether the transaction has a preferential effect.

**[17]** But Parliament did not consider it appropriate to make payments having a preferential effect absolutely voidable. The recipient creditor was given two ways of avoiding that consequence; one as of right, and the other discretionary. If a payment is voidable under s 292(2) the creditor may, as of right, prevent recovery if able to show that it was made in the ordinary course of business. Even if the payment is otherwise voidable, the creditor can seek the exercise of

counsel confirmed that there had s after the cessation of their be mentioned was dishonoured urther concluded that it was not npt payment of the moneys lationship to an end on the basis ore engaging another carrier. s the relevant facts, the Master of $19,261.35 was dishonoured when presented again two days as accompanied by the answer s encouraging answer, such as our of this cheque, the Master the freight business, happening awer of the cheque had written it, and there was some delay in ster expressed the view that all the challenged payments were for three matters, namely: the d payments were made after the use the company wished to cut rst of the disputed payments on

each of these three matters and n combination they meant that nts were made in the ordinary the Master's discussion of the ons on them until after we have tated that there was no dispute e, indeed necessary, to consider rse of business as used in the

heir Lordships in *Countrywide* and scope of the concept of the particular statutory context in same or similar phrases in other The present context is of course s, which give the recipient a which is now in liquidation and ue debts.

derwent a fundamental shift of itent to effect. Under the earlier ntion of the insolvent company new law the initial focus is on t.

priate to make payments having cipient creditor was given two ght, and the other discretionary. editor may, as of right, prevent e ordinary course of business. creditor can seek the exercise of

the Court's discretion under s 296(3) to deny recovery, in whole or in part, if able to show receipt in good faith, alteration of position with a qualifying belief, and that it would be inequitable to order recovery or recovery in full.

**[18]** It is thus evident that Parliament thought it would be unduly harsh to make a transaction voidable simply as a result of its preferential effect. What is more, Parliament considered that the competing interests would not be properly balanced by allowing the creditor simply to seek the exercise of the Court's discretion in terms of s 296(3). An additional protection was given to creditors who had received a payment which was preferential in effect. The creditor can keep the payment if able to show, the onus being on it, that the payment was made by the debtor company in the ordinary course of business. Parliament thereby intended a commercially unremarkable payment to stand, even if having preferential effect. It must have been Parliament's view that otherwise the ordinary processes of commerce would be unduly undermined.

**[19]** As the Privy Council noted, the proper approach to the phrase "ordinary course of business" is an objective one but against the actual setting in which the payment or other transaction took place. The difficulties which seem to have emerged are not so much with the phrase itself. Rather they relate to the standpoint from which the Court identifies the "actual setting". To show that a payment or other transaction took place in the ordinary course of business, the recipient creditor has to show that there was nothing abnormal – nothing out of the ordinary – about the payment or transaction in the commercial context in which it took place. As the Privy Council said, there are difficulties in trying to paraphrase statutory tests, or capture them in different words. Hence Their Lordships did not adopt any particular formulation, and it would be inappropriate to seek further to elaborate the phrase itself. But it has become necessary to consider further the proper ambit of the "actual setting" in which the transaction in question took place.

*The "actual setting" issue*

**[20]** The relevant passage in the *Countrywide* judgment at p 394 is:

> "Plainly the transaction must be examined in the actual setting in which it took place. That defines the circumstances in which it is to be determined whether it was in the ordinary course of business. The determination then is to be made objectively by reference to the standard of what amounts to the ordinary course of business. As was said by Fisher J in the *Modern Terrazzo Ltd* case, the transaction must be such that it would be viewed by an objective observer as having taken place in the ordinary course of business. While there is to be reference to business practices in the commercial world in general, the focus must still be the ordinary operational activities of businesses as going concerns, not responses to abnormal financial difficulties."

**[21]** A little later, also at p 394, Their Lordships spoke again of the exercise being undertaken objectively by reference to the standard of the ordinary course of business. At p 395 they observed:

> "It may be that transactions undertaken in the past will, because of changed circumstances, no longer be considered as in the ordinary course of business."

**[22]** In saying this, Their Lordships did not mean that a payment once made can change its character by reason of changed circumstances in the future. A payment which was made in the ordinary course of business at the time of its



making cannot cease to have that character because of a change of circumstances in the future. The point is that a similar payment made in changed circumstances may not bear the same character. We note in passing that, again at p 395, the Privy Council said that payment of accrued indebtedness, as here, may be in the ordinary course of business.

[23] The fundamental issue to be considered is how much the "objective observer" is to be taken as knowing about the circumstances in which the payment was made. Differences have arisen in the High Court as to whether that observer is to be taken as looking at the matter on the basis of the creditor's perception of the transaction, the debtor company's perception or some amalgam of the two. As will be seen, none of these approaches exactly captures the correct position.

[24] In his summary at p 182 of *Re Modern Terrazzo Ltd (In Liquidation)* [1998] 1 NZLR 160, Fisher J observed in his point (f):

> "(f) As the ordinariness of a course of business can not be viewed exclusively from the viewpoint of the creditor or relevant class of creditor, it could not be sufficient that creditors of that class customarily enter into transactions of that type. Of equal importance is whether the business would also have appeared ordinary if objectively viewed by someone standing in the shoes of the subject company."

That formulation tends to suggest an amalgamated approach, albeit the expression "standing in the shoes of the subject company" has the difficulty that it may appear to ascribe to the objective observer more knowledge of the company's affairs and circumstances than would be apparent on a wholly objective assessment.

[25] There have been two decisions of this Court on this topic since the judgment of the Privy Council in *Countrywide*. The first is *Vague v Fajner* (1998) 8 NZCLC 261,790. The Court (Richardson P, Heron and Doogue JJ), per Richardson P, indicated that it saw no difference in substance between the approach of the Privy Council and that of Rich J in *Downs Distributing Co Pty Ltd v Associated Blue Star Stores Pty Ltd (In Liquidation)* (1948) 76 CLR 463 which the Privy Council cited in *Countrywide* at p 393. Rich J had spoken of the "everyday usual or normal character of the transaction", and the "undistinguished common flow of business done". He had also emphasised that the phrase "ordinary course of business" was speaking of the course of business in general and, when applied to a particular transaction or payment, was referring to something which was unremarkable ("calling for no remark") and arose out of "no special or particular situation".

[26] The second case is *Meltzer v Attorney-General* (Court of Appeal, CA 216/98, 3 May 1999) per Doogue J for a Court comprising Henry J, Gallen J and himself. There is nothing of assistance in relation to the present point in that judgment which was essentially concerned only with how the facts of the case should be viewed in the light of the *Countrywide* judgment.

[27] Counsel referred us to several judgments of the High Court delivered after *Countrywide* was decided in the Privy Council. We have considered them all, but will mention only two, both decisions of Baragwanath J, as they appear to have the greatest relevance to the present issue. In *Re Anntastic Marketing Ltd (In Liquidation)* [1999] 1 NZLR 615, Baragwanath J spoke at p 617 of the fine line between:

> ". . . impairing the free flow of trade by undoing transactions that a reasonable New Zealander aware of the facts known to the trader would

icter because of a change of
hat a similar payment made in
ne character. We note in passing
said that payment of accrued
' course of business.
red is how much the "objective
the circumstances in which the
in the High Court as to whether
atter on the basis of the creditor's
company's perception or some
these approaches exactly captures

*rn Terrazzo Ltd (In Liquidation)*
; point (f):

of business can not be viewed
the creditor or relevant class of
nt that creditors of that class
' that type. Of equal importance is
e appeared ordinary if objectively
shoes of the subject company."

algamated approach, albeit the
:t company" has the difficulty that
bserver more knowledge of the
vould be apparent on a wholly

is Court on this topic since the
*ide*. The first is *Vague v Fajner*
.rdson P, Heron and Doogue JJ),
ference in substance between the
ı J in *Downs Distributing Co Pty*
*Liquidation)* (1948) 76 CLR 463
*e* at p 393. Rich J had spoken of
of the transaction", and the
ne". He had also emphasised that
peaking of the course of business
ar transaction or payment, was
ɔle ("calling for no remark") and
ı".

*ney-General* (Court of Appeal,
r a Court comprising Henry J,
istance in relation to the present
oncerned only with how the facts
he *Countrywide* judgment.

nts of the High Court delivered
ɔuncil. We have considered them
of Baragwanath J, as they appear
ssue. In *Re Anntastic Marketing*
agwanath J spoke at p 617 of the

by undoing transactions that a
facts known to the trader would

regard as normal, and allowing favoured creditors to make off with more than their own share of the assets of this insolvent business to which they have extended credit."

**[28]** After a detailed review of a number of cases, His Honour indicated at p 622 that he proposed to adopt as the appropriate test:

> ". . . whether the trader [the creditor] subjectively was, or objectively ought in the particular circumstances to have been, alerted to real risk that the transaction was abnormal *for reasons of financial weakness*." (Baragwanath J's emphasis.)

That approach tends to draw attention away from the true inquiry which is whether, in its actual setting, the transaction was objectively "abnormal", to use the same word as the Judge. It also introduces the causative gloss of financial weakness. While such weakness may explain any motive or purpose there may have been on the part of the debtor company to prefer the creditor, it does not matter why, if it be so, the transaction is not in the ordinary course of business. In any case the statute puts the onus on the creditor to demonstrate that the transaction did in fact take place in the ordinary course of business. The Judge's further gloss of "real risk" is not easy to reconcile with that requirement.

**[29]** In the later case of *Re Excel Freight Ltd (In Liquidation)* (1999) 8 NZCLC 261,827, Baragwanath J stated at pp 261,833 – 261,834:

> "I add that I considered in the course of argument as to s 292 whether, while the twofold test
>
> '(1) subjectively was or
> (2) objectively ought'
>
> suggested in *Anntastic Marketing* appeared to conform with previous High Court decisions, it could be more generous to paid creditors than the 'ordinary course' test and the strict *Downs* formula permit. It is striking that neither in terms says anything about either (1) *the creditor's knowledge* or (2) knowledge *of financial weakness*; the sole topic is *ordinariness*. Apart from s 292(4), which has no application in this case, the topic of the creditor's knowledge does not arise until s 296(3)(a); which has effect *after* a transaction has become voidable for infringing the 'ordinary course' requirement. It requires, to allow the change of position defence, that the plaintiff both received the property 'in good faith' (see *Laws of New Zealand Insolvency* para 329) *and altered his or her position in the reasonably held belief that the transfer was validly made and would not be set aside* (and also that the Court considers it inequitable to order recovery or recovery in full).
>
> After reflection I remain of the view that 'ordinary course' cannot be tested wholly objectively taking account of the actual position *within* the company: that is because every transaction to which the section applies is *ex hypothesi* by a company trading while insolvent. The test of 'ordinary course' can only be that which would so appear to a reasonable person in the position of the creditor. It has been noted that the relevance of that person's knowledge is stated expressly in s 292(4); I am prepared to infer that it has implied relevance in subs (2). Nor am I minded to treat the section as directed at transactions which are or appear extraordinary in respects other than of financial weakness; there is no obvious reason to do so where the measure is directed at preferential payments by an insolvent company. But the result is the application of a similar yet quite differently



expressed test in ss 292(2) and 296(3)(a). (I return to the latter at the end of the judgment). The point may serve as a footnote to the addendum expressing concern as to drafting with which *Fisher J* concluded his judgment in *Re Modern Terrazzo Ltd (in liq); Bowden v Macdonald* (1997) 8 NZCLC 261,478 at p 261,501; [1998] 1 NZLR 160 at p 189." (Emphasis as in original judgment.)

[30] We note that the Judge was of the view that the test of ordinary course of business could only be what "would so appear to a reasonable person in the position of the creditor". There are variations on these themes in other decisions of the High Court and, when one recalls point (f) of Fisher J's summary in *Terrazzo* noted earlier, it is readily apparent that the High Court judgments are by no means consistent.

[31] In our view the judicial approach has become over-complicated and over-refined. The question is whether, at the time it was made, the relevant transaction was made in the ordinary course of business. That is a question of objective fact. General business practices are relevant to that question, as are any particular customs or practices within the field of commerce concerned. So too is the previous commercial relationship between the parties. The observer spoken of in the Privy Council is in reality the Court which must look at the circumstances, as objectively apparent at the time of the transaction. The ultimate question is whether on the evidence before the Court the transaction or payment can be said to have been made in the ordinary course of business. Was it in its objective commercial setting an ordinary or an out of the ordinary transaction for the parties to have entered into?

[32] The mental approach of the parties to the transaction, as objectively apparent, may sometimes be relevant as an aspect of the circumstances in which the ultimate factual assessment must be made. That of course is subject to s 292(4) which, in itself, demonstrates the legislative purpose to keep subjective intent to prefer on the part of a debtor company out of the arena, unless known to the creditor. It should be noted here that Parliament has made the debtor company's intent or purpose to prefer relevant only if it is actually known to the creditor. The statutory words are "unless that other person [the creditor] knew that that was the intent or purpose of the company". Parliament has thereby eschewed constructive knowledge in this context. It has not said "knew or ought to have known". That being the legislative approach to knowledge in relation to intent to prefer, it is unlikely Parliament intended constructive knowledge to be relevant to other aspects of the transaction, save in the unlikely event that such knowledge is capable of influencing whether the transaction, in its actual setting, was objectively in the ordinary course of business. Intent to prefer is irrelevant unless such intent was known to the creditor. If known, such fact must be regarded as relevant but even then, although pointing towards the payment or other transaction being outside the ordinary course of business, such does not automatically follow. This is consistent with the objective assessment which the Court must make.

[33] We will examine the circumstances of the present case on the foregoing basis. It will be recalled that the Master was of the view that all the facts which he found established with the exception of three matters, supported the view that the two payments had been made by Excel in the ordinary course of business. To those three matters we now turn.

(I return to the latter at the end ıs a footnote to the addendum which *Fisher J* concluded his *ז); Bowden v Macdonald* (1997) NZLR 160 at p 189." (Emphasis

that the test of ordinary course ar to a reasonable person in the ı these themes in other decisions ıt (f) of Fisher J's summary in t the High Court judgments are

become over-complicated and .ime it was made, the relevant business. That is a question of elevant to that question, as are field of commerce concerned. hip between the parties. The ılity the Court which must look the time of the transaction. The 'ore the Court the transaction or rdinary course of business. Was ıary or an out of the ordinary

the transaction, as objectively ıspect of the circumstances in nade. That of course is subject ɜ legislative purpose to keep ıtor company out of the arena, here that Parliament has made ɜr relevant only if it is actually are "unless that other person or purpose of the company". nowledge in this context. It has ɜing the legislative approach to unlikely Parliament intended ıspects of the transaction, save able of influencing whether the ɜly in the ordinary course of ;uch intent was known to the :d as relevant but even then, · transaction being outside the automatically follow. This is the Court must make.

: present case on the foregoing ıe view that all the facts which e matters, supported the view ɜel in the ordinary course of

*The pattern of payments*

**[34]** There were only two payments prior to the first disputed payment. There is force in Mr Taylor's submission that it is difficult to see much of a pattern emerging from only two payments, against which the disputed payments can realistically be compared. Nor do we consider much can usefully be derived in the present case from an astute analysis of how long outstanding the moneys comprised in each payment had been, either in themselves or by comparison with the composition of earlier payments. Ms Brown sought to support the Master's view that the pattern of payments after termination of the relationship showed a marked contrast with the pattern during the relationship. She suggested there was significance in the speed with which the outstanding indebtedness was discharged. In objective terms, we can see nothing out of the ordinary in a company paying off its outstanding indebtedness in two payments made about one month and two months after the relationship ended. In short, we regard Waikato's billings and debt collection procedures as being entirely conventional. So too, objectively viewed, were Excel's payments both during and after the relationship. Any other view seems to us to involve either a departure from the required objectivity or the adoption of too narrow a view of the ordinary processes of commerce in a setting such as the present.

**[35]** For these reasons we are unable to view this aspect of the case in the same way as the Master. We note in passing that the Master referred at one point to Excel's "unsatisfactory payment record". Leaving aside the fact that Waikato did not contend Excel's payment record was unsatisfactory, the crucial issue does not turn on an appraisal of whether a payment record is or is not "satisfactory". Neither can we accept the Master's view that Waikato should have been put on inquiry as to Excel's solvency. In any event the Master did not indicate at what point such inquiry should have occurred, nor how this concept affected whether the two payments were made in the ordinary course of business. The Master had earlier found that it was not unreasonable in the circumstances for Waikato, after the relationship was over, to seek prompt payment of the outstanding indebtedness, albeit, as will be mentioned later, Waikato did nothing specific to hasten the payments.

**[36]** Our impression from the evidence is that Waikato regarded the pattern of payments involved here, to the extent that there was any pattern, as par for the course. In short, we do not see anything in connection with the so-called pattern of payments which suggests that the last two were made other than in the ordinary course of business.

*Dishonour of cheque*

**[37]** All the Master said on this issue when expressing his conclusions was that the initial dishonour of the cheque was "a further indication of the company's inability to pay its debts as they fell due". That, however, was not the issue. The company's inability to pay its debts was acknowledged. The issue should have been to what extent the dishonour of the cheque was relevant to whether the payments in issue were made in the ordinary course of business. On the evidence the dishonour of the cheque was no indicator that when it was presented again in two days' time, the payment thereby made was other than in the ordinary course of business. The reason for the initial dishonour was that covering funds were slower than expected in arriving. That, on the evidence, was a perfectly normal commercial event. There was nothing about the dishonour to suggest general insolvency or that a preference was involved in the ultimate payment. Indeed no suggestion was made that Waikato knew that either of the payments in issue had or was likely to have preferential effect. If



anything the relative promptness of the two payments suggested solvency rather than insolvency. Understandably there is no suggestion in the evidence that Waikato had any concerns about Excel's solvency. The evidence was that Waikato simply re-presented the cheque and did not think it necessary to contact Excel about the dishonour. This suggests that in context it was an ordinary rather than an out of the ordinary commercial event.

*Cutting costs*

**[38]** The Master saw significance in the fact that Excel gave as its reason for terminating the relationship the fact that it was looking to cut costs. It is, with respect, drawing a long bow to suggest that when a company terminates a commercial relationship on the basis that it is going to another supplier to get a cheaper price, the first supplier (here Waikato) is put on inquiry as to the company's solvency. In any case what is the first supplier to do? All the services have been performed. Moneys are outstanding. No question of further credit arises. Is the first supplier to be disqualified from the benefit of payments made to discharge the indebtedness on the basis that they were not made in the ordinary course of business?

**[39]** That will of course depend on the circumstances, but here Waikato applied no pressure to collect the moneys outstanding nor did it change its debt collection procedures. It simply received and banked the money when it was tendered by Excel. To hold that in these circumstances, because of some passing reference by Excel to cutting costs, its discharge of the outstanding indebtedness was not in the ordinary course of business, seems to us to be placing much too high a burden on the creditor. Neither singly nor in combination do the points relied on by the Master detract from the conclusion, supported by the rest of the evidence, that the payments took place in the ordinary course of business.

**[40]** We have given careful consideration to Ms Brown's submissions in all areas of the case. She did her best to uphold the Master's judgment. We are, however, satisfied, in the light of Mr Taylor's submissions, which are substantially reflected in what we have already written about the Master's reasons, that the Master erred and Waikato did show that the two payments were made in the ordinary course of business. It must be said that the Master's task was not assisted by the difficult state of the authorities.

*Conclusion/formal orders*

**[41]** For these reasons the appeal is allowed. The orders made in the High Court are set aside. In their place there will be an order granting Waikato's application that the payments in issue be not set aside. Waikato is to have costs in the High Court on the same basis as costs were ordered against it. The respondent liquidator is to pay Waikato its costs in relation to the appeal to this Court in the sum of $5000 plus the reasonable travel and accommodation expenses of counsel together with disbursements as fixed by the Registrar if the parties cannot agree.

*Appeal allowed.*

Solicitors for the appellant: *Swarbrick Dixon* (Hamilton).
Solicitors for the respondent: *Buddle Findlay* (Auckland).

*Reported by:* Cecily Brick, *Barrister*

TAB 80

*Ward & Co v Wallis* [1900] 1 QB 675, English High Court

## WARD & CO. *v.* WALLIS.

1900
*Feb.* 10.

*Mistake—Money paid under Compulsion of Law—Money credited in Claim—Receipt in Full given—Want of bona fides—Action for Recovery of Money.*

The plaintiffs sued the defendant for work and labour done. In the writ they by mistake credited the defendant with the payment of a sum on account and claimed the balance. The defendant knowing that they had made a mistake paid the balance and obtained from them a receipt for the whole sum due from him to them. Subsequently, having discovered their mistake, the plaintiffs brought an action to recover from the defendant the sum wrongfully credited to him, as money had and received to their use:—

*Held*, that, although the receipt had been given under compulsion of legal process, the defendant could not rely upon it as a defence to the action since he had not acted bonâ fide, and that the plaintiffs were therefore entitled to recover the sum claimed.

SHORT CAUSE tried before Kennedy J.

The plaintiffs were cement specialists and the defendant was a builder.

The action was brought to recover 75*l.* for work and labour done and materials supplied by the plaintiffs to the defendant, or in the alternative for money had and received by the defendant to the use of the plaintiffs.

In January, 1898, the defendant entered into a contract with a Miss Barry to erect for her a building. The contract provided that certain pavements in the building should be supplied by the plaintiffs at a cost of 125*l.* 5*s.*, and this sum was included in the bill of quantities on which the defendant tendered. The plaintiffs having done the requisite work obtained from the architect a certificate that 125*l.* 5*s.* was due to them, and applied to the defendant for payment. The defendant wrote that if he did not pay the plaintiffs the architect might do so under the contract, and might deduct the amount from the contract price, and that he had therefore directed the architect to pay the plaintiffs. The architect, however, when applied to, said that it was for the defendant to pay the plaintiffs. Ultimately on April 19, 1899, the plaintiffs

issued a writ against the defendant in which by a mistake they credited the defendant with a payment on account of 75*l.*, and claimed the balance of 50*l.* 5*s.* The mistake arose from the receipt by the plaintiffs of a sum of 75*l.* from another person of the same name as the defendant, which receipt they wrongly credited to the defendant. On being served with the writ the defendant paid to the plaintiffs the balance of 50*l.* 5*s.*, and obtained from them a receipt shewing that the whole of the amount due to them had been paid by him to them. He forwarded the receipt to the architect and obtained from him (acting as agent for Miss Barry) payment of the balance due under the contract, including the sum of 125*l.* 5*s.* Subsequently the plaintiffs discovered their mistake and brought this action. On an application under Order XIV. the defendant in his affidavit swore that he had a good defence, because the work done by the plaintiffs had not been ordered by him or by any one on his behalf. The master gave the plaintiffs liberty to sign judgment. The defendant appealed, and it was ordered that the case should be tried as a short cause. On the case coming on for trial it was adjourned, and an opportunity was given to the defendant of giving evidence if he thought fit; but his counsel subsequently stated that he did not desire to do so.

*Loehnis*, for the plaintiffs.
*Alan Macpherson*, for the defendant.

KENNEDY J. This is a case raising a point of some nicety. The action was brought by the plaintiffs against the defendant to recover a sum of 75*l.* which is claimed for work and labour done, or in the alternative as money had and received by the defendant for the use of the plaintiffs. Application was made for judgment under Order XIV., and the defendant sets up that he has a good defence on both heads of claim for the following reasons. First, the defendant says that, in so far as regards the claim for work and labour done, that work was never ordered by him, but that if the plaintiffs had any claim against him that claim has in effect been settled in a way which precludes the plaintiffs from successfully bringing the present

action; and, secondly, in so far as regards the claim for money had and received, the defendant says that he has a good defence because, in regard to the sum of 75*l.* wrongly credited to him by the plaintiffs, the settlement bars a recovery under this form of claim, as well as the claim for work and labour done; and, as regards the money subsequently received under the architect's certificate, because there was no receipt of any part of this money by him to the use of the plaintiffs. [The learned judge then stated the facts, and continued:—]

It is difficult to understand the justification of the position of the defendant. He has not thought fit to avail himself of the opportunity which I gave him of going into the witness-box, and it is therefore impossible not to draw the conclusion that he knew, when he was served with the writ in the first action and when he settled the claim under it, that he was being wrongly and in error credited with the payment on account of 75*l.* which appeared in the indorsement on the writ.

It cannot, as it seems to me, be denied that if he had acted conscientiously he ought, when he received the sum of 125*l.* 5*s.* from the architect, to have paid over to the plaintiffs the balance now sued for, or to have at once returned 75*l.* of that sum. However, he has not done so; he is entitled to stand on his legal rights, and if he has a legal defence to this action I am bound to give effect to it.

The point seems to me by no means free from difficulty. There has been a settlement under legal process, and in the terms in which, and for the amount of which, payment was demanded in that legal process. It is plain from *Marriot* v. *Hampton* (1) and the cases such as *Hamlet* v. *Richardson* (2) cited in the notes to that case in Smith's Leading Cases, that as a general rule where money has been paid under the compulsion of legal process it cannot afterwards be recovered back, although the defendant finds that he has paid in error what he was not legally bound to pay. No doubt *Marriot* v. *Hampton* (1 and *Hamlet* v. *Richardson* (2) were the converse of the present

(1) (1797) 7 T. R. 269; 2 Sm. L. C. 10th ed. 409; 4 R. R. 439.

(2) (1833) 9 Bing. 644; 35 R. R. 650.

case, for here it is the plaintiffs who are reopening the transaction; but the principle seems to me to apply that after a settlement under the pressure of process of law the proceedings cannot in general be reopened. In *Moore* v. *Vestry of Fulham* (1) an attempt was made to shew that the principle on which *Marriot* v. *Hampton* (2) and the cases following it were decided was that of res judicata; it was held that that was not so, but, as I understand the effect of the judgment, that the principle on which those decisions rest is that it would be against public policy to allow a matter to be reopened after the law had been called in to effect a settlement and a payment had been made under the pressure of the law. It seems to me that, just as a defendant who has by mistake and without legal liability paid a sum of money under the pressure of legal process cannot, as a general rule, recover it back from the plaintiff, so neither in general can a plaintiff who has given the defendant in an action credit for a sum on account and been paid after writ be allowed to reopen the matter either by suing afresh upon the same cause of action, or by suing for the amount for which he wrongly gave credit as money had and received to his use.

I am of opinion, therefore, that the plaintiffs here cannot recover the 75*l.* they claim, either as due for work and labour done or as money had and received to their use, unless there are some special circumstances which would prevent the general principle enunciated in those authorities from applying.

It seems to me to appear from the notes to *Marriot* v. *Hampton* (2) that there must be bona fides on the part of the party who has got the benefit of his opponent's payment in order to bring the principle laid down in that case into force, and that if the person enforcing a payment under legal process has therein taken an unfair advantage or acted unconscientiously, knowing that he had no right to the money, the principle laid down in *Marriot* v. *Hampton* (2) may not prevent the defendant from recovering the money back. A similar limitation, as it seems to me, ought to apply to such a converse case

(1) [1895] 1 Q. B. 399.
(2) 7 T. R. 269; 2 Sm. L. C. 10th ed. 409: 4 R. R. 439.

as this, where the plaintiff in an action has on the face of the writ credited the defendant with the payment of a sum of money on account which the defendant must have known to have been so credited by a mistake on the plaintiffs' part. Now, as I have said, it is perfectly plain to my mind that the defendant in the present action was aware when he received the writ in the former action, and when he settled the claim by payment, that the sum of 75*l.* with which he was credited, as paid by him on account to the plaintiffs, had never been paid by him at all. He has not thought fit to come here and deny that he knew it; and, in my opinion, he did know it, and he was acting unconscientiously in taking the receipt from the plaintiffs in full. I think, therefore, that the settlement under legal process was not bonâ fide on his part, and that the plaintiffs are entitled to reopen it.

But then it is said that the plaintiffs cannot recover this sum as money had and received to their use because it was only credited by them to the defendant, and was never actually paid into his hands. That, I think, is not material. It is well settled that an allowance in account is equivalent to a payment, and I think, therefore, that as there was here an allowance in account made by the plaintiffs to the defendant under a mistake of fact which was known to the defendant, and of which he unfairly took advantage, the plaintiffs are entitled to recover the amount of that account from the defendant as money had and received by him to their use.

It was further argued for the plaintiffs that as soon as the architect had paid on behalf of Miss Barry the whole of the plaintiffs' bill to the defendant the 75*l.* became money had and received by him to the plaintiffs' use. That point is not material in the view I have taken of the case. I do not, however, agree with that contention. The money was not received by the defendant to hand over to the plaintiffs. He claimed it for himself on the ground that he had paid the plaintiffs their account. If he had been sued by Miss Barry for the 75*l.* I think he would have had no defence; but I do not think that the money he received from her, through the architect, was money had and received to the use of the

1900
WARD & Co. v. WALLIS.

plaintiffs, or that his receipt of the money gives the plaintiffs any better right of action.

It seems to me that the ground on which they are entitled to recover is that the settlement under legal process was obtained by the defendant without bona fides, and may, therefore, be set aside.

I, therefore, give judgment for the plaintiffs for 75*l.* and costs.

*Judgment for the plaintiffs.*

Solicitors for plaintiffs: *Crump, Sprott & Co.*
Solicitor for defendant: *Alexander Pope.*

A. P. P. K.

---

1900
*Feb.* 16.

## UPPERTON *v.* RIDLEY AND ANOTHER.

*Police—Pension—Special-duty Allowance—"Annual Pay"—Police Act,* 1890 (53 & 54 *Vict. c.* 45), *Sched. I., Rules* 1, 11.

By the Police Act, 1890, a constable who has completed a certain number of years approved service is entitled to a pension, which is to be calculated on the amount of his "annual pay" at the date of his retirement.

A constable was appointed by the commissioners of police to attend permanently on special duty at the House of Lords. For that special duty, which he discharged for several years up to the time of his retirement, he received the sum of 1*s.* a day in addition to his ordinary pay:—

*Held,* by Channell J. (Bucknill J. dissenting), that the extra remuneration for the special duty formed no part of his "pay" for the purposes of the calculation of his pension:

*Held,* further, by Channell and Bucknill JJ., that for the purposes of calculating pension "annual pay" means three hundred and sixty-five times the amount of the daily pay, not fifty-two times the amount of the weekly pay.

CASE stated by the quarter sessions for the county of London on an appeal by a police constable under s. 11 of the Police Act, 1890. The respondents were Sir Matthew White Ridley, as being the police authority of the metropolitan police district, and Sir Edward Bradford, as being the commissioner of police of the metropolis.

TAB 81

*West Mercia Safetywear Ltd v Dodd* [1988] BCLC 250,
English Court of Appeal

# West Mercia Safetywear Ltd (in liq) v Dodd and another

COURT OF APPEAL, CIVIL DIVISION
DILLON, CROOM-JOHNSON LJJ, AND CAULFIELD J
19 NOVEMBER 1987

*Misfeasance – Director making a transfer by way of fraudulent preference – Company known to be insolvent – Whether director in breach of duty – Companies Act 1948, s 333 (Insolvency Act 1986, s 212(1)).*

West Mercia Safetywear Ltd (West Mercia) was a wholly-owned subsidiary of A J Dodd & Co Ltd (Dodd). D was a director of both companies. Both companies banked with the same bank. Dodd's overdraft at the bank was guaranteed personally by D. In May 1984 West Mercia owed Dodd about £30,000. At this time both companies were in financial difficulties and an accountant told D that the companies' bank accounts were not to be operated. On 21 May D transferred £4,000 from the West Mercia account to the Dodd account. In June both companies went into liquidation. The liquidator of West Mercia applied for a declaration that D was guilty of misfeasance and breach of trust and that he be ordered to repay the £4,000 transferred from West Mercia to Dodd. The judge held that although D had acted improperly he had not breached any duty to West Mercia because the transfer of £4,000 was payment in part of a debt owed by West Mercia to Dodd and was not therefore a misapplication of West Mercia's assets. The liquidator appealed.

**Held** – Once a company was insolvent the interests of the creditors overrode those of the shareholders since the company's assets belonged in a practical sense to the creditors who could displace the power of the shareholders and directors to deal with them. Since West Mercia was known by D to be insolvent when he caused £4,000 to be transferred from its account to Dodd and the transfer was a fraudulent preference made solely to relieve D of personal liability under his guarantee in disregard of the interests of the general creditors of West Mercia, D had breached his duty. Accordingly, the appeal would be allowed and the declaration sought made and D ordered to repay the £4,000 with interest. The order would be made subject to a direction that in the distribution of the assets of West Mercia to unsecured creditors the debt due from West Mercia to Dodd was to be notionally increased by £4,000 as if there had been no fraudulent preference, and any dividend attributable to that sum was to be recouped to D rather than Dodd.

**Cases referred to in judgments**

*Kinsela v Russell Kinsela Pty Ltd (in liq)* (1986) 4 NSWLR 722, NSW CA.
*Leeds and Hanley Theatres of Varieties Ltd, Re* [1904] 2 Ch 45.
*Multinational Gas and Petrochemical Co v Multinational Gas and Petrochemical Services Ltd* [1983] BCLC 461, [1983] 2 All ER 563, [1983] Ch 258, [1983] 3 WLR 492, CA.
*Washington Diamond Mining Co, Re* [1893] 3 Ch 95, CA.

**Appeal**

Nigel Halls, the liquidator of the property of West Mercia Safetywear Ltd, appealed against the judgment of his Honour Judge Roy Ward QC given in the Worcester County Court on 29 April 1987 dismissing an application by the liquidator for (1) a declaration that the first respondent, Albert James Dodd, a director of the company, was guilty of misfeasance and breach of trust in relation to the company in obtaining and transferring the sum of £4,000 to the overdrawn account of a company called A J Dodd & Co Ltd of which he was also a director, and (2) an order for the repayment of that sum and interest. The second respondent, Peter Prescott, a co-director of West Mercia, did not take part in the appeal. The facts are set out in the judgment of Dillon LJ.

*Mark Phillips* for the liquidator.
*Timothy A Jones* for Mr Dodd.

**DILLON LJ.** This is an appeal from a decision of his Honour Judge Roy Ward QC given in the Worcester County Court on 19 April 1987. The question he had to decide was a question concerning fraudulent preference and misfeasance arising in relation to the liquidation of a company called West Mercia Safetywear Ltd. The present appellant is the liquidator of that company. The respondent to the appeal is a Mr Albert James Dodd, who was at the material time a director of that company.

There is another company involved of which Mr Dodd was also a director, called A J Dodd & Co Ltd. The West Mercia company was, on the affidavits, a wholly-owned subsidiary of the Dodd company.

Both companies banked with Lloyds Bank. The account of the West Mercia company was in credit. The account of the Dodd company was very considerably overdrawn. The bank had a charge to secure the account of the Dodd company on the book debts of the Dodd company, and it also had a guarantee of the Dodd company's account from Mr Dodd himself. The book debts of the Dodd company included a debt which in early May 1984, the relevant time, amounted to about £30,000 due to the Dodd company from the West Mercia company.

In May 1984 both the West Mercia company and the Dodd company were in financial difficulties and, as Judge Ward found, insolvent. The directors, including Mr Dodd, called in an accountant, Mr Nigel Halls, to advise them and to take any necessary steps towards the liquidation of the companies. Mr Halls subsequently became liquidator of both companies when they were put into liquidation, and he is indeed the present appellant.

The evidence clearly establishes that Mr Halls explained very clearly to Mr Dodd and his co-director of the West Mercia company, a Mr Prescott, with whom this appeal is not concerned, that the company bank accounts of the West Mercia company were not thereafter to be operated. The judge says, and I entirely agree:

> 'I cannot believe that the directors thought that, whilst cheques were not to be drawn on either account, *transfers* of money between accounts would be permissible.'

The necessary steps were taken to put both companies into creditors' voluntary liquidation, and the requisite meetings to that end were held on 4 June 1984. In the meantime, however, on 21 May 1984 Mr Dodd instructed Lloyds Bank to transfer £4,000, which had just been paid in by a debtor to the West Mercia company's account, to the overdrawn account of the Dodd company. The plain and obvious intention of that was to reduce the overdraft of the Dodd company which Mr Dodd had personally guaranteed.

The liquidations proceeded. The bank refused to repay the £4,000. The Dodd company had no other assets available to repay the £4,000. Accordingly in due course, by a notice of motion issued on 30 January 1985, the liquidator of the West Mercia company applied in the Worcester County Court for a declaration that Mr Dodd was guilty of misfeasance and breach of trust in relation to the West Mercia company in obtaining and transferring the £4,000 to the Dodd company on 21 May 1984. The notice of motion asked also for an order for repayment of that sum with interest at 12% per anuum from 21 May 1984.

To my mind it is quite clear that there was a fraudulent preference of the Dodd company. It follows that there was misfeasance on the part of Mr Dodd as a director who owed a fiduciary duty to the West Mercia company in making that transfer by way of fraudulent preference: see the decision of this court in *Re Washington Diamond Mining Co* [1893] 3 Ch 95 esp at 115 per Kay LJ.

The judge nevertheless felt that, although Mr Dodd had acted improperly, he had not misapplied any assets of the West Mercia company because he had used the assets merely to pay in part a debt owed by the West Mercia company to the Dodd company. He therefore concluded that he could not see that Mr Dodd had been in breach of any duty of care, fiduciary or otherwise, to the West Mercia company or in relation to that company. On that ground he held that the proceedings were misconceived. In reaching that conclusion he relied in particular on some comments I had made in the case of *Multinational Gas and Petrochemical Co v Multinational Gas and Petrochemical Services Ltd* [1983] BCLC 461, [1983] 2 All ER 563, [1983] Ch 258. The *Multinational* case was, however, a wholly different case from the present. In the present case the West Mercia company was at the relevant time insolvent to the knowledge of the directors. They had been expressly told not to deal with the company's bank account, and Mr Dodd had, in fraud of the creditors of the company, made the transfer to the Dodd company's account for his own sole benefit in relieving his own personal liability under his guarantee. In the *Multinational* case, at the time of the transaction which was in question, the company concerned was amply solvent, and what the directors had done at the bidding of the shareholders had merely been to make a business decision in good faith, and act on that decision. It subsequently turned out to be a bad decision, but the position had to be decided on the facts at the earlier stage where the company was amply solvent and the parties were acting in good faith.

We have been referred to quite a number of authorities on this topic. For my part I find helpful, and would approve, the statement of Street CJ in *Kinsela v Russell Kinsela Pty Ltd (in liq)* (1986) 4 NSWLR 722 at 730, where he said:

> 'In a solvent company the proprietary interests of the shareholders entitle them as a general body to be regarded as the company when questions of the duty of directors arise. If, as a general body, they authorise or ratify a particular action of the directors, there can be no

challenge to the validity of what the directors have done. But where a company is insolvent the interests of the creditors intrude. They become prospectively entitled, through the mechanism of liquidation, to displace the power of the shareholders and directors to deal with the company's assets. It is in a practical sense their assets and not the shareholders' assets that, through the medium of the company, are under the management of the directors pending either liquidation, return to solvency, or the imposition of some alternative administration.'

In the present case, therefore, in my judgment Mr Dodd was guilty of breach of duty when, for his own purposes, he caused the £4,000 to be transferred in disregard of the interests of the general creditors of this insolvent company. Therefore the declaration sought in the notice of motion ought to be made as against Mr Dodd.

The question then remains: what financial relief ought to be granted against him? Prima facie the relief to be granted where money of the company has been misapplied by a director for his own ends is an order that he repay that money with interest, as in *Re Washington Diamond Mining Co*. The section in question, however, s 333 of the Companies Act 1948, provides that the court may order the delinquent director to repay or restore the money, with interest at such rate as the court thinks fit, or to contribute such sum to the assets of the company by way of compensation in respect of the misapplication as the court thinks fit. The court has a discretion over the matter of relief, and it is permissible for the delinquent director to submit that the wind should be tempered because, for instance, full repayment would produce a windfall to third parties, or, alternatively, because it would involve money going round in a circle or passing through the hands of someone else whose position is equally tainted.

In the present case counsel for Mr Dodd (Mr Jones) has taken a much bolder course. He has submitted that, on the facts of this case, the misapplication of £4,000 of the company's money for Mr Dodd's own benefit has not caused any loss either to the company or, through the company and its liquidator, to any of the creditors of the company. In the course of the trial in the court below, the liquidator put in evidence various documents, including an estimated statement of affairs of the West Mercia company as at 14 May, 1984, which was just before the transfer of the £4,000, with an accompanying deficiency account and list of preferential and unsecured creditors. These were essentially the statements prepared with a view to the liquidation of the company, probably by the liquidator himself on the information supplied by the directors, and adopted by the directors for placing before the creditors at the statutory creditors' meeting.

These were necessarily and properly put in evidence to show that the West Mercia company was indeed insolvent to the knowledge of the directors at the time Mr Dodd made the transfer of the £4,000. The liquidator did not put in evidence anything as to the actual realisation in the liquidation, and counsel for Mr Dodd accordingly submitted that, on the basis of these estimated figures, an adjustment could be made to exclude the Dodd company from receipt of any dividend until the £4,000 paid to it had been recouped and, if that was done, it would follow that there was nothing needed to be provided for the liquidator by Mr Dodd in respect of the £4,000.

The basis of the calculation is this. The estimated total assets of the West Mercia company are shown at 14 May, 1984 as £8,018, the preferential creditors are then given as £2,696, leaving a balance after payment of the preferential creditors of £5,322. Counsel for Mr Dodd submits that that represents the sum available for payment of the general creditors because, even if £4,000 was in fact then wrongly paid out, that left £1,322 of realisations and, if £4,000 were to be repaid now, albeit without interest, that would bring the fund up to £5,322. It is then said that of that only between one-sixth and one-seventh is attributable to unsecured creditors other than the Dodd company, which makes out of £5,322 a sum somewhere in the region of £650 or £750 which is sufficiently franked by the £1,322 of uncommitted assets.

Of course, an estimated statement of affairs made over three years ago is wholly unreliable as a basis for considering the actual position in the company. Counsel for Mr Dodd did not pursue further inquiry into the actual realisations and payments of the liquidator, but the liquidator did point out in evidence that the statement of affairs made no provision for the costs and expenses of the winding up. Those costs and expenses of course rank ahead of any payment to the unsecured creditors. They would include all the necessary expenses of realisation, including the liquidator's own remuneration, and they would include the costs of litigation. It is not open to Mr Dodd to assert that these proceedings were not properly brought by the liquidator. They plainly were, since there had been a blatant fraudulent preference and misfeasance. Accordingly, all the expenses that the liquidator has incurred in this litigation and does not recover from Mr Dodd himself would have to be met out of the actual cash assets of the company, and it seems therefore in the highest degree unlikely that the £1,322 supposed estimated surplus assets, if indeed realised, would be sufficient to meet the needs for dividends to the unsecured creditors, other than the Dodd company, and payment of the expenses of the liquidation.

I take the view, notwithstanding that the judge accepted the submission of counsel for Mr Dodd that no loss to any creditor had been shown, that counsel, on whose client the onus lay, has failed to establish that there is no loss to be met by his client. Indeed, it would be surprising if there were no loss where there was such a blatant misfeasance.

The calculations of counsel for Mr Dodd follow the line which was adopted by Buckley J in the case of *Re Leeds and Hanley Theatres of Varieties Ltd* [1904] 2 Ch 45. But that was a very much simpler case, because in that case there were only two companies involved and not a further individual. It was a working out of the liabilities between the two companies, both in liquidation, where one was the creditor of the other for a sum due on debentures, and the other was the creditor of the one for the balance of a sum ordered to be paid for misfeasance. The court was concerned with the way round that should be dealt with as a matter of accounting between the two companies, and there was no question of money being sought from a third party to make good the loss from the misfeasance.

What Buckley J was seeking to do, as I follow his judgment, in the *Leeds and Hanley Theatres of Varieties* case was to apply the fair method of administration, what he called 'proper administration', in the circumstances of that particular case; not to lay down a course of administration to be followed through thick and thin in cases where the circumstances are not the same.

In the present case, if the whole amount of the £4,000 and interest is recouped

to the liquidator by Mr Dodd and is distributed by the liquidator after payment of any outstanding expenses pro rata among the unsecured general creditors of the West Mercia company, including the preference of the £4,000, the result would be that the unsecured creditors of the West Mercia company would receive a larger dividend than they would have received if the fraudulent preference exercise had never happened. That would be unfair to Mr Dodd, but it would also be most unfair to the unsecured creditors, other than the Dodd company, if for the exoneration of Mr Dodd an arbitrary figure were to be imposed from the statement of affairs without regard to what the unsecured creditors should actually receive after the payment of the actual expenses of liquidation properly chargeable in the liquidation.

In my judgment the appropriate course of administration in the present case is to order Mr Dodd to repay the £4,000 with interest and to direct that in the distribution of the assets of the West Mercia company to unsecured creditors the debt due from the West Mercia company to the Dodd company is to be taken as notionally increased by £4,000 to what it would have been if there had not been a fraudulent preference, and then any dividend attributable to the extra £4,000 thus added back to the debt of the Dodd company is to be recouped to Mr Dodd rather than being paid to the Dodd company. That, as I see it, is a rough and ready way of achieving justice on both sides.

Accordingly, for my part I would allow the appeal, set aside the order of the judge, make the declaration sought in the notice of motion, and make the order for payment of the £4,000 and interest with the administrative directions which I have indicated.

**CROOM-JOHNSON LJ.** I agree.

**CAULFIELD J.** I agree.

*Appeal allowed.*

Solicitors: *Penningtons Ward Bowie*, agents for *Flint Hand*, Gloucester (for the liquidator); *Alexander & Co*, Worcester (for Mr Dodd).

Azza Abdullah Barrister.

TAB 82

*Westford Special Situations Fund Ltd v Barfield Nominees Ltd*,
HCVAP 2010/014, 28 March 2011, the EC Court of Appeal

TERRITORY OF THE VIRGIN ISLANDS

IN THE COURT OF APPEAL

HCVAP 2010/014

On appeal from the Commercial Division

WESTFORD SPECIAL SITUATIONS FUND LTD.

Appellant

and

[1] BARFIELD NOMINEES LIMITED
[2] VIRGINIA MOLINA AS TRUSTEE FOR THE MCKINSEY
[3] MASTER RETIREMENT TRUST

Respondents

Before:

The Hon. Mde. Janice George Creque — Justice of Appeal
The Hon. Mr. Davidson Kelvin Baptiste — Justice of Appeal
The Hon. Mr. Michael Gordon, QC — Justice of Appeal [Ag.]

Appearances:

Mr. Stephen Moverly Smith and Ms. Claire Robey for the Appellant
Mr. S. Jack Husbands for the Respondents

---

2010: September 22;
2011: March 28.

---

*Civil Appeal – Commercial Law – appointment of liquidators over fund – locus standi – whether the respondents were creditors within the meaning of section 9.1(a) of the Insolvency Act with standing under section 162 of the Insolvency Act – section 197 of the Insolvency Act – Article 62 of the Company's Articles – payment in specie in part satisfaction of redemption price – whether the trial judge was correct in concluding that the interests transferred by the Transfer Agreements were not 'assets' within the meaning of Article 62 – whether an adjournment should have been granted in order that the giving of assets could be further explored – costs*

The Appellant Fund incorporated in the Virgin Islands, is an investment fund regulated by the Financial Services Commission and acts as a feeder fund for a Master Fund which is incorporated in the Cayman Islands as a limited partnership. The assets of the Fund comprise its interest, in the Master Fund and its liability is analogous to the liability of a shareholder in a limited liability company. Articles 58 to 68 of the Fund's Articles of Association made provision for the redemption of a member's shares at the request of that

member whereupon the member would be entitled to payment of the Redemption Price determined in accordance with the formula set out in the Articles. Article 59 states that the redemption price is to be paid as to 90% of the redemption price no later than 30 days following the Redemption Date with the balance within 15 days after receipt by the Fund of its annual financial statements for the fiscal year. Article 62 states that on any redemption the directors shall have power to divide 'in specie' the whole or any part of the assets of the Company and appropriate such assets in satisfaction or part satisfaction of the Redemption Price. The Fund experienced difficulty brought about by the collapse of credit market liquidity in paying redemptions after the latter part of 2007. The respondents made redemption requests in respect of their shareholdings in the Fund. The respondents received partial cash payments pari passu during 2008 and 2009. The Fund however, delayed in making full payment. The respondents issued a statutory demand for the balance of the Redemption Price outstanding. The statutory demand remaining unsatisfied, subsequently issued an application for the appointment of liquidators over the Fund on the basis of the unsatisfied statutory demand. The Fund invoked its powers under Article 62 and sought to make payment 'in specie' by a proportionate transfer of assets of the Fund and sought to execute transfer agreements to effect the 'in specie' payment. The Fund also filed a notice of opposition to the appointment of liquidators contending among other things that the Redemption Price had been fully satisfied by the 'in specie' payment and that the respondents, in any event, were not creditors of the Fund in reliance on section 197 of the Insolvency Act and thus lacked standing to bring the application. The trial judge made an order for the appointment of liquidators over the Fund. The Fund appealed.

Held: allowing the appeal, setting aside the order of the learned trial judge appointing liquidators over the Fund, dis-applying the costs regime in CPR 65.13 and applying CPR 69B and awarding costs to the appellants:

1. The learned trial judge was wrong in proceeding on the basis that the respondents, as redeemers claiming redemption proceeds, were creditors of the Fund with locus to apply for the appointment of liquidators for the purposes of the Insolvency Act. A member relying on a debt due from a company arising in his character as a member is not a creditor of the company for the purposes of winding up the company.

   Dicta in SV Special Situations Fund Limited v Headstart Class F Holdings Limited [1906] 2 KB 119 at pg. 125 and in Western Union International Limited v Reserve International Liquidity Fund Ltd BVI HCV 2009/322 – unreported (26th January 2010) to the contrary effect disapproved.

2. Article 62, to which the respondents agreed, is clear. In essence, it says that the directors are empowered 'to appropriate' such assets in satisfaction (or part satisfaction) of the Redemption Price. It says nothing about requiring the respondents' acceptance to it to make the appropriation effective. Therefore once the appropriation has occurred and has been tendered or the redeeming shareholder so advised, then it becomes effective. The learned trial judge therefore erred in failing to properly apply the test in Sparkasse having failed to

properly or adequately assess all the relevant facts and circumstances guiding its application in the instant case.

Sparkasse Bregenz Bank AG v Associated Capital Corporation BVI 10/2002 (18th June 2003) followed.

3. The exercise of the learned trial judge's discretion in refusing the grant of the limited adjournment was outwith the generous ambit within which reasonable disagreement is possible.

4. With regard to costs, the prescribed costs approach on appeal is dis-applied notwithstanding CPR 65.13 in as much as CPR 69B specifically dis-applies the prescribed costs approach at first instance. Accordingly the following orders are made:

   (a) That the respondents bear the appellant's costs in the court below such amount if not agreed within 30 days, to be remitted to the court below to be assessed;

   (b) That the respondents bear the appellant's costs of the appeal such costs to be two thirds of the assessed costs found to be payable in the court below;

   (c) That the remuneration of the liquidators be remitted to the court below for assessment unless the amount of such remuneration is agreed within 30 days such remuneration to be paid by the appellant, provided that such sum paid by way of remuneration, shall be recoverable by the appellant from the respondents.

JUDGMENT

[1] GEORGE-CREQUE, J.A: On 22nd September 2010, the court heard and allowed an appeal against the order of the commercial judge made on 18th March 2010, appointing liquidators over the appellant ("the Fund") with written reasons to follow. We now so do.

The background

[2] The Fund, incorporated in the Virgin Islands, is an investment fund regulated by the Financial Services Commission and acts as a feeder fund for a master fund namely Westford Special Situations Master Fund LP, ("the Master Fund") incorporated in the Cayman Islands as a limited partnership.

[3]     The assets of the Fund comprise its interest, as a limited partner, in the Master Fund.  The liability of a limited partner in a limited partnership is limited to the amount of his capital contribution, in much the same way that the liability of a shareholder in a limited company is limited to the amount required to be paid up on subscription for his shares. [1]

[4]     Articles 58 to 68 of the Fund's Articles of Association deal with redemption of shares.  The Fund is required at the request of a member to redeem the whole or part of his shareholding on the redemption date at a redemption price, being the Net Asset Value per share on the valuation day immediately preceding the Redemption Date.[2]

[5]     Article 59 of the Fund says in a nutshell that the redemption price is to be paid as to 90 percent of the Redemption Price no later than 30 days following the Redemption Date with the balance within 15 days after receipt by the Fund of its annual financial statements for the fiscal year.

[6]     Article 62 states that on any redemption:

> "the directors shall have the power to divide in specie the whole or any part of the assets of the Company and appropriate such assets in satisfaction or part satisfaction of the Redemption Price."

[7]     The respondents, during 2004 and 2005, subscribed for shares in the Fund pursuant to an offering memorandum dated 1st January 2004.  The Master Fund, which performed well during the credit crisis, nevertheless experienced difficulty brought about by the collapse of credit market liquidity in paying redemptions after the latter part of 2007.

[8]     In September and October 2007, the respondents submitted redemption requests in respect of their shareholdings in the Fund.  The relevant Redemption Date was 31st December 2007, which date was also the Valuation Date.  As at that date, the net asset value ("NAV") of the Fund was US$233.49 per share.

---

[1] See: Article 12.1.1 of the Master Fund Partnership Agreement – Tab 10/471
[2] These terms are all defined in the Articles.

[9] The respondents, among other redeemers received partial payments made pari passu during the course of 2008 and 2009. The respondents however, being unhappy with the delay in the Fund making full redemptions issued a statutory demand for the sums remaining outstanding on their redemption requests.

[10] The Fund did not seek to set aside the statutory demand. Based on the unsatisfied statutory demand the respondents, on 9th February 2010, issued an application for the appointment of liquidators over the Fund. The Fund, in light of the application to appoint liquidators decided to utilise its powers under Article 62 by seeking to pay the amounts outstanding to the respondents by making an 'in specie' distribution of the Fund's assets being its interest in the Master Fund which, in essence, was the appropriate percentage interest calculated by reference to the then NAV of the Fund. To this end the Fund sought to execute transfer agreements to effect this 'in specie' payment.

[11] The Fund filed a Notice of Opposition to the application to wind up and relied on the following points:

(a) That the Fund was entitled to satisfy the upstanding balance of the Redemption Price in specie pursuant to Article 62;

(b) That the interests transferred by the Transfer Agreements satisfied the outstanding balance;

(c) That the debts owing had accordingly been discharged;

(d) That the respondents were not in any event "creditors" within the meaning of section 9(1)(a) of the Insolvency Act (2003) ("IA") with standing under section 162 of the IA to pursue the Application for the appointment of liquidators.

[12] The trial judge in making an order for the appointment of liquidators over the Fund concluded in an ex tempore judgment that:

(a) under the Transfer Agreements the transferees would make themselves liable without limit in time  for all  future and contingent liabilities of the limited partnership;

(b) a bundle of rights which involves currently assessed value but also time unlimited acceptance of liabilities did not fall within the meaning of 'assets' under Article 62; and

(c) no adjournment should be granted so as to consider whether some acceptable assets within the meaning of Article 62 could be provided.

[13]    Conspicuously absent from the trial judge's ruling is any consideration of the fourth limb of the Fund's attack, namely whether the respondents were creditors within the meaning of section 9.1(a) of the IA with standing under section 162 to bring the application.

The Issues on Appeal

[14]    The appeal by the Fund as succinctly put by counsel for the Fund, raised the following issues:

(a) whether the respondents were creditors within the meaning of section 9.1(a) of the IA with standing under section 162 of the IA; ("the Locus issue")

(b) whether the trial judge was correct in concluding that the interests transferred by the Transfer Agreements were not 'assets' within the meaning of Article 62; ('the Article 62 issue')

(c) whether an adjournment should have been granted in order that the giving of assets could be further explored ("the adjournment issue").

I propose to deal with the issues in the same order as raised.

The Locus Issue

[15] Although the issue as to whether the respondents were creditors formed a plank of the Fund's attack in their Notice of Opposition, it does not appear to have been pursued with much vigour at the hearing. The transcript at the hearing reveals the following exchanges between counsel for the respondents and the Court:[3]

| | |
|---|---|
| "The Court: | I go back to their Notice of Opposition then. …"If contrary to the Fund's position, the redemption price remains outstanding the sum due to each Applicant would not represent an admissible claim in any liquidation by reason of section 197." So they would not be creditors. So we are in 197 |
| Ms. Corbett: | It appears so, yes. |
| The Court: | So your next submission?" |

The trial judge however without any further consideration of this aspect proceeded on the basis that the respondents were creditors within the meaning of section 162 of the IA. This approach may no doubt have been adopted in keeping with his approach applied in his earlier decision given in Western Union International Limited v Reserve International Liquidity Fund Ltd[4].

[16] An appropriate starting point in respect of the law on this issue is with a recital of the relevant provisions of the IA. Section 162 states, in essence, and among other things, that a creditor may apply for the appointment of a liquidator. Section 2(1) states that a "creditor" has the meaning specified in section 9. Section 9(1) states:

> "A person is a creditor of another person (the debtor) if he has a claim against the debtor, whether by assignment or otherwise, that is, or would be, an admissible claim in (a) the liquidation of the debtor,... that is a company. …" (my emphasis)

Clearly then, a creditor of a company only has standing to apply for the appointment of liquidators over a company, if he has an admissible claim in the liquidation. In this regard section 197 becomes relevant. Section 197 states as follows:

---

[3] See: pgs. 25-26 transcript of proceedings.

[4] BVI HCV 2009/322 – unreported (26th January 2010).

> "A member, and a past member, of a company **may not claim** in the liquidation of the company for a sum due to him **in his character as a member**, whether by way of dividend, profits, **redemption proceeds** or otherwise, but such sum is to be taken into account for the purposes of the final adjustment of the rights of members and, if appropriate, past members between themselves." (my emphasis)

[17] Section197, construed in isolation, would appear to be unambiguous in saying that a member (past or present) in respect of a debt and thus a claim arising in that capacity (such as a claim arising from the right to redemption proceeds) could not bring an application to appoint liquidators by treating that debt (and thus such claim) as one which constituted them a creditor, for the purposes of section 9(1) and hence with standing to apply under section 162 of the IA. But that is not the end of the matter. The Business Companies Act (2004) ("BCA") subsequently came into effect, and section 197 must be juxtaposed against section 62 of the BCA which, in dealing with share redemption, says this:

> "(1) If a share is redeemable at the option of the shareholder and the shareholder gives the company proper notice of his intention to redeem the share:
>
> (a) The company shall redeem the share on the date specified in the notice, or … on receipt of the notice;
>
> (b) Unless the share is held as a treasury share under section 64, the share is deemed to be cancelled;
>
> (c) From the date of redemption, the former shareholder ranks as an unsecured creditor of the company for the sum payable on redemption.
>
> (2) If a share is redeemable on a specified date:
>
> (a) ….
>
> (b) ….
>
> (c) ….

[18] It bears note that section 250 of the BCA refers to various enactments which have been either repealed, or amended by the BCA and these are specifically identified in schedule 3 of the BCA. Schedule 3 lists twelve sections of the IA which have been amended by the BCA. Section 197 of the IA is not among the sections listed

as having been amended or repealed which must be taken to mean that the framers of BCA having conducted the exercise of specifying in the schedule the specific provisions of the IA which have been amended or repealed, and section 197 of the IA, having not been so specified, that it was intended to remain as a free standing provision which is not to be read down by section 62 of the BCA as counsel for the respondents seek to suggest.

[19] Is section 197 of the IA in conflict with section 62 of the BCA? The Fund contends, in essence, that there are good reasons for a section 197 provision. Counsel for the Fund says firstly, that it is clearly undesirable that members who may have been responsible, through the officers they have elected, for the insolvency of the a company, should be able to compete in a liquidation on a *pari passu* basis with outside creditors in relation to sums due to them *qua* member and that this has led a number of jurisdictions to demote the members' claims behind those of other creditors. This approach, counsel for the Fund says, was achieved by section 197 of the IA. Apart from this counsel contends that a second rationale for the section 197 provision is to ensure that members who have redeemed before liquidation (and possibly have become past members) but have not been paid all of their redemption proceeds, do not gain priority over those members who did not redeem in time, thus preventing an unfair and unseemly scramble in the dying days of the company, and thus ensuring that members inter se are treated *pari passu*.

[20] Counsel for the Fund contends that section 62 of the BCA and section 197 of the IA are reconcilable once it is recognised that section 62(1)(c) and 62(2)(c) do not deal with ranking in a liquidation (which would be in conflict with section 197) but rather with the position of a shareholder once the shareholder has redeemed. In short, section 62 sets out, subject to any contrary provisions in a company's memorandum and articles,[5] the redemption process and makes a shareholder who has redeemed, an unsecured creditor in the wider sense in respect of any unsatisfied redemption proceeds in respect of which he may sue the company and

[5] S.59 of the BCA states that ss. 60, 61 and 62 do not apply to a company to the extent that they are negated, modified or inconsistent with provisions for the purchase, redemption or acquisition of its own shares specified in the company's memorandum and articles.

obtain judgment but not a creditor in the narrower sense for the purposes of section 162 of the IA by virtue of section 197 of the IA.

[21] I agree with this analysis. The redeemed shareholder, notwithstanding that he is a creditor of the company in the wider sense in respect of any unpaid redemption proceeds, encounters a restriction on the steps he can initiate in relation to a liquidation of the company. By virtue of section 197 of the IA the redeemed shareholder, notwithstanding that he may be a creditor of the company in the general or wider sense, simply does not get the right to apply to wind up the company or claim in its liquidation in the same way as an ordinary 'third party' creditor. This is the restriction section 197of the IA places on a member or past member in respect of a claim arising in favour of a member, qua member, in respect of the liquidation of a company, whilst section 62 of the BCA recognises that such a redeemed member in all other respects is a creditor (in the wider sense) of the company. Put succinctly, the redeeming member is a creditor of the company but <u>not a creditor with locus</u> to apply for the appointment of liquidators or to claim in a liquidation of the company other than in the manner permitted by section 197 which, in essence, says that where a sum is due to a member in his character as a member, (such as redemption proceeds) "such sum is to be taken into account for the purposes of the final adjustments of the rights of members and, if appropriate, past members between themselves." Once this distinction is understood the confusion in construing these provisions and confining them to their proper application should be considerably reduced.

[22] On the issue as to whether the claim to redemption proceeds arises in any other capacity save in his character as a member, I am quite satisfied that it is in the redeeming member's character <u>as a member</u> that the liability of the company to pay redemption proceeds and the claim by the redeeming member to receive such proceeds arises, based on the contractual relationship between the member and the company established by its memorandum and articles, in the absence of some other collateral agreement providing otherwise. In Soden v British &

Commonwealth Holdings Plc[6], a decision of the House of Lords in England, Lord Browne Wilkinson at page 323 in speaking of section 74(2)(f) of the Insolvency Act 1986 [UK] had this to say:

> "Section 74(2)(f) requires a distinction to be drawn between, on the one hand, sums due to a member in his character of a member by way of profits, dividends or otherwise and, on the other hand, sums due to a member otherwise than in his character as a member. In the absence of any other indication to the contrary, sums due in the character as a member must be sums falling due under and by virtue of the statutory contract between the members and the company and the members inter se constituted by section 14(1) the Companies Act 1985"

[23] It is worthwhile to recite section 74 of the Insolvency Act 1986 [UK] for the purposes of comparison with section 197 of the IA. So far as material, it says:

> "(1) When a company is wound up, every present and past member is liable to contribute to its assets to any amount sufficient for payment of its debts and liabilities, and the expenses of winding up, and for the adjustment of the rights of the contributories among themselves. (2) This is subject as follow … (f) a sum due to any member of the company (in his character as a member) by way dividends profits or otherwise is not deemed to be a debt of the company payable to that member in a case of competition between himself and any other creditor not a member of the company, but any such sum may be taken into account for the purpose of the final adjustment of the rights of the contributories among themselves."

In my view, although section 197 of the IA is not a verbatim mirror of section 74 of the Insolvency Act 1986 [UK], when sections 196 and197 of the IA are taken together, it is clear that the effect and objective of section 74 of the Insolvency Act 1986 [UK] and sections 196 and 197 of the IA are the same – that is, to subordinate the claims of members (past or present) arising in that character, to the claims of any outside creditor (i.e. a creditor who is not a member of the company). Indeed it may be said that section 197 is more specific than its UK counterpart in that it expressly includes redemption proceeds within the class of sums which may become due to a member qua member. There can be no doubt that the respondent's claim, and thus their cause of action against the Fund, arises from the statutory contract contained in the Fund's Memorandum and Articles by virtue of

[6] [1998] AC 298.

section 11 of the BCA[7] under which the Fund was incorporated. It is the Fund's Articles[8] on which the respondents rely for payment of the redemption proceeds. Accordingly, the Articles which form the statutory contract and its breach, is the cause of action on which the respondents' claims are grounded. The respondents have not sought to suggest otherwise, nor in my view could they. This basis, in my view, makes it pellucid that the claim based on outstanding redemption proceeds is one arising in the respondents' character as member notwithstanding that, having exercised their right to redemption, they are said to be past members. It matters not. They are caught by section 197 of the IA which restricts this type of debt from being treated as an ordinary creditor's debt. In short, a member relying on a debt due from a company arising in his character as a member is not a creditor of the company for the purposes of winding up the company. He is not allowed to compete with outside creditors of the company in a winding up on such a claim. This is what section 197 of the IA seeks to ensure by ranking his claim behind that of the outside creditor.

[24] The respondent, though acknowledging that the Fund raised a challenge to locus in its Notice of Opposition, contends that the Fund acknowledged that the respondents are creditors, in that they did not consider that they could in good faith seek to set aside the statutory demand and accordingly accepted that the respondents were creditors for the purposes of the IA with standing to apply for the winding up of the company. Counsel for the respondents also say that the Fund not having addressed the court on this issue below was now raising this issue on appeal for the first time.

[25] The first point as to whether the Fund accepted that the respondents were creditors, to my mind, adds nothing to the point once the senses in which the term 'creditor' may be used are accepted as I have already addressed in paragraphs 21 to 23 above. It is true that the respondents were creditors of the Fund in respect of any outstanding redemption proceeds, but that fact alone does not as a matter of

[7] This section states that the Memorandum and Articles of a company is binding as between a company and each member and as between member and member.
[8] See: Tab 9 Supplemental Record – Pg. 148-149.

law, make them creditors for the purposes of section 162 of the IA by virtue of section 197. In short, the respondents, although they are creditors of the Fund, are not creditors with standing to apply for the appointment of liquidators or to claim in a liquidation of the Fund.

[26] As to the second point, suffice it to say that the challenge to locus was expressly made in the Notice of Opposition and reference made thereto in the course of the proceedings. Whether or not the challenge was developed further in argument does not absolve the trial judge from addressing it, particularly if it goes to the grounding of the court's jurisdiction to appoint liquidators on the respondents' application. It cannot be doubted that the issue of locus goes to grounding of the court's jurisdiction to entertain the application. I agree with counsel for the Fund that even were the point not raised in the court below, the Fund is not precluded from raising it on appeal, being a challenge to jurisdiction. This is a long established legal principle. In Norwich Corporation v Norwich Tramways[9] Vaughan Williams LJ had this to say:

> "A point as to jurisdiction has been raised on this appeal which was not raised at trial… I have always supposed it to be well established law that the objection that the tribunal has no jurisdiction to entertain the case is one which, at all events in reference to proceedings in the high Court, may be taken at any time. If the court in any case is itself satisfied that it has no jurisdiction to entertain the application made, it is its duty in my opinion, to give effect to that view, taking if necessary, the initiative upon itself."

[27] On the respondents' analysis of section 197 of the IA, they say that section 197 is only relevant **after** the liquidation of a company has commenced and deals exclusively with the admissibility of claims in a liquidation and thus does not affect the fundamental status of a party as a creditor before the commencement of the liquidation. Counsel for the respondents also contends that section 197 only settles the order of priority and does not relate to locus standi. Further he urges that it could not be contemplated that section 197 could take away the right of a "member creditor" in that way. These contentions appear to be in reliance respectively, on

---

[9] [1906] 2KB 119 at pg. 125.

the decisions in **SV Special Situations Fund Limited v Headstart Class F Holdings Limited**[10] and **Reserve**, two first instance decisions.

[28] In **Headstart** both parties were funds. Headstart held redeemable shares in SV. Headstart sought to redeem its shares but did not receive from SV the redemption proceeds. Headstart issued a statutory demand pursuant to section 155 of the IA, for payment of the redemption proceeds. SV applied to set aside the statutory demand. One of the bases of SV's challenge to the statutory demand was that Headstart did not have standing to serve a statutory demand as it was not a creditor of SV under the IA. The trial judge concluded [para.18] that section 12 of the IA 'is an all-encompassing definition of non-admissible claims'. She then opined, in essence, that:

(a) claims due to former members in respect of redemptions were not included in the list of non-admissible claims established under section 12;

(b) section 11 (listing liabilities which form the basis of admissible claims in a liquidation) was subject only to section 12 and was not subject to section 197, and thus section 197 could not be prayed in aid to whittle away section 11 or expand section 12 and therefore has no role in the definition of a creditor for the purposes of section 155 of the IA. In support of this construction she opined further that: "sections 2, 9, 11 and 12 all fall within Part 1 headed "preliminary provisions" and therefore are of general application. Not so section 197 which is contained in Part V entitled "Liquidation" and specifically under the subheading "Members".

(c) section 197 only needs to be adverted to after the liquidation is underway and the liquidator is considering what claims to honour and cannot be considered when determining whether Headstart is a creditor for the purposes of making a statutory demand under section 155 of the IA.

[10] BVI HCV 2008/0239 - unreported - (per Olivetti J 25th November 2008).

[29] Counsel for the Fund in this appeal says that the trial judge's reasoning is flawed in that:

(a) firstly, by suggesting that section 197 becomes relevant only once a liquidation is underway misses the point that it is only when a liquidation is underway that a claim is admitted. As such, a claim cannot be admissible in a liquidation before the liquidation starts but ceases to be so after that point.

(b) secondly, sections 11 and 12 clearly deals with what claims can and cannot be admitted to proof by the liquidator under section 207. If section 197 applies once the liquidation is underway (and thus section 12 is not all - encompassing at that stage), it begs the question why should section 12 be all – encompassing before liquidation commences.

(c) Thirdly, section 9 of the IA says that it is only a person who has a claim which "is, or would be" admissible in a liquidation that may be considered a creditor for the purposes of the IA. The use of the word "is" is a reference to the time after the commencement of a liquidation and the words "would be" is a reference to a time before a liquidation, the requirement being that when liquidation takes place, the claim would then be admissible.

[30] To my mind, the position would be incongruous were the case to be that section 197, which makes it clear that a member of a company (past or present) may not claim redemption proceeds once the liquidation is underway, could nonetheless on reliance on the same claim, be allowed to commence liquidation proceedings. Put simply, it would mean that whilst, a 'redeeming member' has a claim which enables him to take steps or commence a liquidation he would nonetheless be barred from having his claim admitted and treated as an ordinary creditor once the liquidation is underway. What then would be the point of having locus to commence a liquidation only to have your claim barred or not being admissible in the actual liquidation? It is clear to me that the entire scheme of the IA is to tie together the provisions in terms of who is considered a creditor for the purposes of commencing a liquidation, with those provisions which stipulate what claims are and are not admissible to proof once the liquidation commences. This, in my view, makes perfect sense and avoids the incongruous result the trial judge's reasoning in **Headstart** seems to suggest. Accordingly, I agree with counsel for the Fund that the trial judge's reasoning in **Headstart** is flawed and in this respect should

not be followed. I also agree with counsel for the Fund that although whether a person is a creditor for the purpose of serving a statutory demand (or applying for the appointment of a liquidator) is an analysis conducted before liquidation, section 9 requires that the admissibility of that person's claim is assessed by reference to what the position would be post - liquidation. The test as to whether a person has a claim which is or would be admissible in a liquidation so as to constitute that person a creditor for the purposes of the IA is a threshold requirement which must be addressed by reference to all relevant provisions of the IA as may be applicable to the particular facts and circumstances of the case as presented.

[31] In respect of Reserve, suffice it to say that the trial judge concluded that the redeeming shareholder was a creditor for the purposes of the IA, on grounds entirely different from those given by the trial judge in Headstart. He decided in Reserve that a past member (having redeemed) was a creditor for the purposes of the IA on the basis that the redemption proceeds were not due to the past member in his character as a member but rather 'as a seller entitled to the price.' Counsel for the Fund similarly urges that Reserve was wrongly decided and should not be followed. The decision in Reserve was appealed to this court, but interestingly, and in my view rightly, the appeal was, by consent, allowed and the decision of the trial judge set aside.[11]

[32] It is quite clear that the position, on reading sections 2, 9 and 197 of the IA, is that a redeeming shareholder claiming redemption proceeds has no locus to apply for the appointment of liquidators. For the foregoing reasons I consider that the learned trial judge was wrong in proceeding on the basis that the respondents, as redeemers claiming redemption proceeds, were creditors of the Fund with locus to apply for the appointment of liquidators for the purposes of the IA. Accordingly, their application ought to have been dismissed.

---

[11] Subsequent to the hearing of this Appeal, a Consent Order was made in Reserve, on 30th November 2010 allowing the Appeal and discharging the Order of the of the trial judge appointing liquidators.

[33] This conclusion is sufficient for allowing the appeal. However, for completeness, I address the two remaining issues in turn, assuming for those purposes that the respondents had locus to bring the application.

The Article 62 Issue

[34] The principles to be applied where the company asserts that the debt is disputed are well settled and the case of Sparkasse[12] is the watershed authority in this jurisdiction for the principle. Byron CJ [para.14] set it out this way:

> "The Court will order a winding up for failure to pay a due and undisputed debt over the statutory limit, without other evidence of insolvency. If the debt is disputed, the reason given must be substantial and it is not enough for a thoroughly bad reason to be put forward honestly. But if the dispute is simply as to the amount of the debt and there is evidence of insolvency the company could be wound up. To fall within the principle, the dispute must be genuine in both a subjective and objective sense. That means that the reason for not paying the debt must be honestly believed to exist and must be based on substantial or reasonable grounds. Substantial means having substance and not frivolous, which disputes the Court should ignore. There must be so much doubt and question about the liability to pay the debt that the Court sees that there is a question to be decided. The onus is on the company to bring forward a prima facie case which satisfies the Court that there is something which ought to be tried…."

[35] Article 62 of the Fund says this:

> "On any redemption (….) the directors shall have the power to divide in specie the whole or any part of the assets of the Company and <u>appropriate</u> such assets in satisfaction or part satisfaction of the redemption price." (my emphasis)

It is not disputed that the only asset of the Fund is its investment in the Master Fund and that where a redemption request is made which is to be met in cash, the feeder fund makes a corresponding redemption request to the Master Fund and the proceeds passed on from the Master Fund to the feeder fund which then passes it on to the redeemer. Where a redemption request is to be met by an appropriation of a part of the assets of the Fund, the only asset that the Fund could appropriate to satisfy the redemption request in specie would be an

---

[12] Sparkasse Bregenz Bank AG v Associated Capital Corporation [BVI 10/2002] (18th June 2003).

appropriate part of its interest in the Master Fund. This, counsel for the Fund says, must be what was contemplated (and I would add, 'agreed to') under Article 62, or, at the very least would have amounted to a strong prima facie case, satisfying the Sparkasse test (i.e. that the debt was genuinely disputed on substantial grounds) that such was the case. In this event, the application ought to have been dismissed. Instead, argues counsel for the Fund, the trial judge went further than the Sparkasse test by deciding the point when he held that the bundle of assets and liabilities proposed by the Transfer Agreement did not amount to an asset of the Fund within the meaning of Article 62 having considered that the Transfer Agreement was asking the respondents to accept unlimited liabilities. This appears to have ignored the fact that the Master Fund was a limited partnership which limited the liability of a partner in much the same way as a limited liability company. A partner's limitation was expressly so set out in Article 12.1.1 of the Articles of the Master Fund which were exhibited. Accordingly the liabilities could not in effect be unlimited in the sense considered by the trial judge as the respondents, in reality and as contemplated by Article 62 of the Fund, would be holding the interest in the Master Fund on the same terms as the Fund in accordance with Article12.1.1.

[36] On this issue the respondents contend, in essence, that the transfer of a portion of the Fund's interest in the Master Fund comprised in the Transfer Agreement was ineffective as the transfer was not accepted by the respondents and as such no in-specie distribution had occurred to discharge the debt. That being the case there could be no genuine dispute as to whether the debt was due as at 18th March 2010. It must be pointed out that the trial judge did not base his decision on this point (and there is no Counter Notice) but rather on the point that the in-specie distribution as set out in the Transfer Agreement could not be said to be 'an asset' of the Fund within the meaning of Article 62. Be that as it may, it raises the question as to whether a redeeming shareholder is required to accept an in specie distribution of the Fund's asset appropriated and tendered in satisfaction (or part satisfaction) of the Redemption Price. In this regard the language used in Article 62 is important. In essence it says that the directors are empowered 'to

appropriate' such assets in satisfaction (or part satisfaction) of the Redemption Price. As counsel for the Fund points out, this is the provision to which the respondents agreed and it says nothing about requiring the respondents' acceptance to it to make the appropriation effective. I would think that once the appropriation has occurred and has been tendered or the redeeming shareholder so advised then it becomes effective.

[37] I would conclude accordingly that the trial judge erred in failing to properly apply the test in Sparkasse having failed to properly or adequately assess all the relevant facts and circumstances guiding its application in the instant case. For this reason also, the appeal is allowed.

The adjournment Issue

[38] The Fund's primary complaint here is that the trial judge in the exercise of his discretion did so in a manner which fell 'outside the generous ambit within which reasonable disagreement is possible'[13] in that he failed to factor into his consideration the following:

(a) It was the first hearing of the application;

(b) There was uncontested evidence that the Fund was balance sheet solvent with an NAV of at least $97m;

(c) The appointment of liquidators was a draconian remedy;

(d) A limited adjournment was unlikely to prejudice the respondents and appears to based his refusal to grant an adjournment simply on the basis that there was no evidence before him as to the time scale in which it may be possible to realise any of the underlying assets of the Master Fund. The Fund also complained that the trial judge failed to address the alternative basis for the adjournment which was to afford an opportunity to see if suitable assurances or indemnities could be offered to meet the

[13] See: GvG [1985] 1 WLR 647; Dufour v Helen Air Corporation 52 WLR 188.

judge's concern that the respondents were being exposed to open-ended partnership liabilities, despite the fact that these points had been raised by him during the course of argument.

[39] The Fund accordingly contends that even if the learned judge was of the view that the interest offered by the Fund were not "assets" per Article 62 for the reasons he gave, then he ought to have allowed the Fund a reasonable opportunity:

(a) to deal with the points he had raised about the partnership liabilities whether by way of further evidence as to valuation or by way of assurances as to the limited nature of the liabilities; and/or

(b) to provide alternative assets through a redemption in the Master Fund.

The respondents in essence say that an adjournment would have merely been a postponement of the inevitable.

[40] Would further evidence as to valuation and /or assurances as to the limited nature of the liabilities have swayed the judge into accepting that the appropriation of a portion of the Fund's interest in the Master Fund amounted to assets within the meaning of Article 62? Interestingly, counsel for the respondents during the course of oral argument conceded that value would come into play in considering the 'asset' and therefore would have been relevant to the adjournment issue, but then sought to show in their skeletal arguments that the solvency of the Fund and the values placed on it and the Master Fund was viewed by the respondent with much scepticism. This in my view would clearly bring into play a genuine dispute as to the debt, applying the Sparkasse test. When this is factored into the equation along with the other factors mentioned at paragraph 38 above, and having regard to the fact of the manner in which the matters arose during the proceedings more or less at the instance of the trial judge, I am satisfied that the exercise of the learned trial judge's discretion in refusing the grant of the limited adjournment was outwith the generous ambit within which reasonable disagreement is possible. I would say however, that were the adjournment sought on the basis only of allowing an opportunity to explore whether a redemption of

assets from the Master Fund was available, I would be in agreement with the learned trial judge as I do not consider that an adjournment would have assisted.

### Conclusion

[41] For all of the foregoing reasons the appeal was allowed and the order of the learned trial judge appointing liquidators over the Fund set aside.

### Costs

[42] At the conclusion of the hearing of the appeal the court directed the parties to file and serve written submissions on costs by 8th October 2010. I have been ably assisted by the detailed submissions on both sides. I must mention that I was particularly impressed by the analysis of the costs regime in commercial matters conducted in the Virgin Islands which is governed by a new Part 69B which applies to the Virgin Islands only and for pointing out the seeming anomaly between the costs structure in relation to appeals from such matters vis-a-vis the costs structure at first instance which has sought to dis-apply the prescribed costs regime under CPR 65. Having digested them, I am satisfied that it would be illogical to adopt a 'prescribed costs' approach on appeal notwithstanding CPR 65.13 when CPR 69B at first instance specifically dis-applies this approach to commercial matters in the court below and treat the failure to address this in the parts of CPR dealing with appeals as an inadvertent omission. Accordingly, applying the costs regime guiding the commercial division of the Court at first instance, I consider that the following orders accord with the principles to be applied and best suit the ends of justice in this matter:

(a) That the respondents bear the appellant's costs in the court below (such amount if not agreed within thirty (30) days, to be remitted to the court below to be assessed;

(b) That the respondents bear the appellant's costs of the appeal such costs to be two thirds of the assessed costs found to be payable in the court below;

(c)  That the remuneration of the liquidators be remitted to the court below for assessment unless the amount of such remuneration is agreed within thirty (30) days such remuneration to be paid by the appellant, provided that such sum paid by way of remuneration, shall be recoverable by the appellant from the respondents.

Janice George-Creque
Justice of Appeal

I concur.

Davidson Kelvin Baptiste
Justice of Appeal

I concur.

Michael Gordon, QC
Justice of Appeal [Ag.]

TAB 83

*Wills v Corfe Joinery Ltd* [1998] 2 BCLC 75, English High Court

# Wills and another v Corfe Joinery Ltd (in liq)

CHANCERY DIVISION (COMPANIES COURT)
LLOYD J
15 JANUARY 1997

*Insolvency – Fraudulent preference – Payments made to directors for repayment of loan accounts shortly before company ceased trading – Relevant date for determining whether company influenced in giving preference by desire to put directors in preferential position over other creditors – Insolvency Act 1986, s 239.*

The two appellants were the only directors of a company which had been partly funded by the directors' loan account. By the end of 1993, when they had substantial loan accounts outstanding, they confirmed to the company auditors their intention to leave the loans outstanding for at least a year from 23 December 1993. On 14 January 1994 it was agreed at a board meeting that the loans should be repaid in January 1995. On 2 and 6 February 1995 cheques were drawn in favour of the appellants for repayment of their loan accounts. On 7 February the company ceased trading and on 16 February it went into a creditors' voluntary liquidation. The liquidators of the company brought proceedings for repayment of the sums paid to the appellants on the ground that they were fraudulent preferences and therefore voidable under s 239 of the Insolvency Act 1986. The judge held that the payments made by the company constituted a preference to the appellants and ordered their repayment. The appellants appealed. The question arose as to the relevant date for determining whether the payments were preferential payments. The appellants contended that it was when they agreed not to call in their loans until the end of 1994 and a board meeting decided that they should be repaid in January 1995 and not when the cheques were drawn.

**Held** – The relevant date by reference to which it was appropriate to consider whether, in giving a preference, a company was influenced by a desire to put the recipient in a better position that he would otherwise have been in the event of the company going into insolvent liquidation, was the date when the payment was made, namely in the present case when the cheques were drawn, and not the date when it was agreed not to repay the loans until January 1995. Since the appellants were persons connected with the company, not only by reason of being employees, the onus was on them to show that they had a fair prospect of being able to rebut the statutory presumption under s 239(6) that in giving the preference the company was influenced by the desire to place them in a preferential position over the other creditors in the event of the company going into liquidation. The appellants had failed to rebut that presumption in the absence of evidence as to the company's motivation for honouring its obligation to them as opposed to other obligations to other creditors whose debts were also due at the same

time and evidence to show that the payments were made for purely commercial reasons. Accordingly, the appeal would be dismissed.

**Case referred to in judgment**
*MC Bacon Ltd, Re* [1990] BCLC 324.

**Appeal**
John Leslie Wills and John George Jones, directors of Corfe Joinery Ltd, a company in voluntary liquidation, appealed against the order of Deputy District Judge Rogers in the Cambridge County Court dated 9 August 1996 whereby he ordered them to repay sums paid to them by the company shortly before it ceased trading to the liquidators of the company on the ground that they were fraudulent preferences and accordingly voidable under s 239 of the Insolvency Act 1986. The facts are set out in the judgment.

*Claire Staddon* (instructed by *Mills & Reeve*, Cambridge) for the directors.
*Jason Evans-Tovey* (instructed by *Palmer Wheeldon*, Cambridge) for the liquidators.

**LLOYD J.** This is an appeal by the respondents to the proceedings, Mr John Leslie Wills and Mr John George Jones, against an order of Deputy District Judge Rogers in the Cambridge County Court in August 1995 in which it was ordered that a payment of £20,000 made by Corfe Joinery Ltd (the company) to Mr Wills, and a payment of £63,538 made by the company to Mr Jones, constituted a preference of the two respondents and were voidable accordingly under s 239 of the Insolvency Act 1986, and orders that the respondents pay the relevant amounts to the liquidators and the costs of the proceedings. Mr Jones and Mr Wills, appellants before me, challenge the finding, made on affidavit evidence alone, that these two payments made to them in the last days before the company ceased trading were preferences in relation to which orders could and should be made under s 239.

The appellants were the two directors of the company. Two cheques were drawn in favour of Mr Wills on 2 February 1995 and cleared on 7 February and two cheques were drawn in favour of Mr Jones, one of which was cleared that day and the other cleared on 7 February. It was in fact on 7 February that the company ceased to trade and on 16 February it went into a creditors' voluntary liquidation.

Two cheques were in respect of remuneration but the two amounts in respect of which the orders were made were for repayment of the directors' loan accounts. The payments of remuneration are not challenged. It is undoubtedly the case that the payment of these sums had the effect of putting Mr Wills and Mr Jones into a position which, in the event which happened, of the company going into an insolvent liquidation, was better than the position in which they would have been if the sums had not been paid because if they had not been paid, they would be unsecured loan creditors receiving less than 100% dividend.

Accordingly, under s 239(2) and (4), the company gave a preference to the appellants. Under s 239(5), the court may not make an order under the section unless the company was influenced in deciding to give the preference by a desire to produce, in relation to the person preferred, the prescribed

preferential effect. However, since the appellants, as directors, were persons connected with the company, not only by reason of being employees, sub-s (6) presumes that the company was influenced by the relevant desire unless the contrary is shown. It is therefore up to the appellants to show that the company was not so influenced. If, on the evidence, they have a fairly arguable case for saying that at trial they could rebut the presumption, it would not be right for the judgment below to stand.

It is relevant that, as pointed out by Millett J in *Re MC Bacon Ltd* [1990] BCLC 324 at 335–336, it is sufficient to show that the decision was influenced by a desire to produce the preferential effect even if that is not the only factor which led to the decision. The transaction will be proof against the section only if it can be shown that the company was actuated solely by proper commercial considerations.

One question that has been argued is what is the date at which it has to be shown that the company was or was not influenced by the relevant desire. The section shows that the date is when the company decided to give the preference (see s 239(5)). The appellants say that this was not the dates when the relevant cheques were actually drawn, but a date just over a year earlier when the directors agreed that they would not call in their loans until January 1995 and a board meeting decided that the loans should be paid off in January 1995.

The facts in this respect are these. The company had at all times been funded in part by the directors' loan account. By the end of 1993, the loan accounts had grown so fast that Mr Jones had over £70,000 due to him and Mr Wills had almost £20,000 due to him. Towards the end of December 1993, the directors confirmed to the auditor of the company in the usual way that it was their intention to leave these sums outstanding and not to call them in for at least one year from the date when the accounts for the year ended 31 March 1993 were signed, thus enabling the auditor to treat them as long-term debt. Those accounts were signed on 23 December 1993 and, on 14 January 1994, a board meeting was held whose notes include an item headed 'Directors' loans', which says, amongst other things, that John Jones proposed that the company should be given notice that it was the intention of the directors to withdraw their loans in full in January 1995 and not before, as per their undertaking to the auditor in a letter that I referred to. The proposal was unanimously approved.

Miss Staddon, for the appellants, says that that amounts not only to an agreement to leave the loans outstanding until the end of 1994, but an agreement by the company that the loans shall be repaid in January 1995. I mention in this context that in July 1994, Mr Jones lent a further £17,000 to the company and it was recorded that the directors agreed that this short-term loan would be repaid in full with interest on or before the dates as set out in the 14 January 1994 board minutes. However, I do not accept that January 1994 was the date by reference to which it is appropriate to consider whether, in giving the preference that undoubtedly was given, the company was influenced by the relevant desire. It seems to me that all that happened in January 1994 at most was that the loans became repayable in January 1995. A lot of debts were payable by the company in January 1995 and a lot of them were not paid. The fact that the directors' loan accounts were repayable in January 1995 does not lead to the conclusion that there was not

a relevant decision to give the preference by actually paying those debts. It seems to me that the relevant decision to make the payments was and could only have been made at the time, or immediately before the time, when the cheques were drawn, that is to say, on 2 February and 6 February 1995. Even if, as I am prepared to accept for present purposes, what passed in January 1994 meant that there was an obligation on the company to pay the debt in January 1995, it was necessary for the board to review at that time whether to honour that obligation. If the board had known that the company was insolvent or would be made insolvent by honouring that obligation, it could not have made the payment.

In my view, only when the cheques were signed by the authorised signatories – I do not know who they were, but I assume they were one or both of Mr Wills and Mr Jones – did the company decide to make the payments. It is therefore by reference to that process of decision that the statutory provisions have to be applied.

What, then, is the evidence as to the circumstances at the beginning of February 1995 in relation to which the appellants have to rebut the presumption and how do they seek to do so? From the middle of 1991, the appellants were the only directors of the company. By the end of 1993, each of them had substantial loan accounts outstanding, as I have mentioned. I have mentioned their confirmation to the auditors of their intention to leave the loans outstanding for at least a year from 23 December 1993. During 1994, the company was working on several substantial and prestigious contracts, but it was suffering from delays in payment, in particular, on one contract to do with the Iranian Embassy. It asked the bank for additional overdraft facilities. Barclays Bank commissioned Messrs Coopers & Lybrand to review the affairs of the company and it was at this time that Mr Jones made the additional loan of £17,000 that I have mentioned.

On 29 July, Coopers & Lybrand gave their report to the bank which reported, among other things, that the company had a good rate of turnover, that it was well-managed, but because of the problems of sums outstanding, it was insolvent on a cash-flow basis. It also said that there was no evidence of pressure from creditors. The accountants recommended that the bank should allow a further £40,000 to £50,000 by way of additional overdraft facilities and said that the company might need longer term funding. The bank's response to this was favourable and an additional £50,000 overdraft was allowed, bringing the limit from £30,000 to £80,000, subject to a review after three months. In October 1994, that first review took place and the bank required a reduction of the borrowing to take effect on the completion of three of the company's major outstanding contracts.

In January 1995, the company's position was adversely affected because on one of its major contracts which came to a conclusion at that stage, the effect of the sum ultimately allowed (pursuant no doubt to architects' certificates) produced an unforeseen loss of £140,000, that is to say, the amount payable and indeed paid to the company was less by £140,000 than the amount which the company had had to pay, particularly because of added labour costs.

In the light of that adverse indication, the company could not carry that loss to its cash flow and the bank indicated that it would not renew the overdraft facility. Moreover, by January, there was a significant number of

creditors who were pressing the company for payment of substantial amounts, some of which had been outstanding for several months.

On 27 January, Mr Jones told the company's bookkeeper that the company would not be able to continue with the same level of staff and that preparations should be made to pay off all the employees on a redundancy basis. After that date, the company retained, to all intents and purposes, only self-employed contractors, apart from the directors themselves.

The directors say that that decision was at least in part influenced by the fact that by the beginning of February, there was only one currently ongoing major contract and therefore the labour force, as it had previously existed, was far too big for what was needed or could be afforded.

At the beginning of February, it turned out that the company had been underpaid as compared with what it expected and hoped by over £200,000 on five further contracts. It was the combination of these various factors that led the directors to decide, they say at lunch time on 7 February, that the company must cease trading. It did so at that date and laid off the rest of its workforce on that date. The directors say that they had not considered ceasing trading before that day nor had they considered that it would be necessary to put the company into liquidation.

On 16 February, there was the first meeting of creditors at which the company was put into voluntary liquidation. The minutes prepared by the liquidators record Mr Wills as saying that he knew some week or ten days before the company actually stopped trading that it would have to do so. Mr Wills disagrees with this note even though, unlike some other parts of the minutes, he did not annotate it to that effect when it was shown to him. For present purposes, I must accept that the decision to cease trading was only taken on 7 February and I accept as being in dispute whether Mr Wills said what is recorded in the minutes of 16 February meeting, and the truth of that statement if he did make it. Nevertheless, the question is whether Mr Wills and Mr Jones have an arguable case for showing that the company was not, on 2 and 6 February, influenced in any respect by a desire to achieve the preferential effect which was undoubtedly achieved.

It is not necessary, it seems to me, in order to show such a desire, to demonstrate that the directors knew that the company would go into insolvent liquidation, or when it would do so, or therefore that it was necessary that the company should cease trading at some particular time. Thus, it is not to the point that an insolvency was not inevitable or was not seen as inevitable until 7 February.

The appellants say that, up to that time, the bank had not in fact withdrawn its support. They say that the withholding of sums from debtors and delaying payment is normal in the construction industry, which no doubt it is although it is also, of course, a common reason for an insolvency. They say that large sums were due to the company and that the directors believed and hoped that they would be paid. They say that considerable payments were in fact made, but it was only on 7 February that it became clear that they were not enough to allow continued trading.

Mr Jones, in his first affidavit, says that the reason why the company ceased to trade on 7 February was that the bank had indicated to him that it would cease supporting the company in February, although no notice of withdrawal of the company's overdraft facility was received, and that

payments which had been received in the early part of February for the company's ongoing contracts were disappointing. The company had expected much larger payments to have been received. In para 10 of his first affidavit, he describes what sums were received early in February and the shortfall as regards these expected receipts. He says:

> 'When the anticipated sums were clearly not going to materialise the company was put into liquidation.'

He says at para 11 of the affidavit:

> 'I totally refute the suggestion that the company had decided to cease trading on 2 February 1995. At that stage the company only had one major ongoing contract so the staff level needed to be reduced.'

In para 12, he refers to the payments made and says:

> 'However, in so far as these payments related to the repayments of my loans . . . by making payment to me on 6th February 1995 all the company was doing was honouring its obligation made in January 1994 to repay the directors' loans. In December 1993 when the company made the decision to repay the loans in January 1995 the company was solely influenced by commercial considerations.'

He then goes on, in para 13, by way of submission, to say:

> 'In the circumstances set out above, and bearing in mind that the company only decided to cease trading and go into liquidation on 7 February 1995, I do not see how it can be alleged that the company desired to prefer either me or Mr Wills by honouring its obligations to repay the directors' loans which but for the forbearance of the directors were repayable on demand in any event . . .'

Mr Wills, in his first affidavit, at para 8, says: 'The decision to cease trading was made on 7 February 1994 when it became clear to us that Mr Jones would be unable to persuade the debtors to pay the sums due to the Company. Until that time we were hopeful that a very substantial proportion of the debts would be recovered.' He then says in para 10:

> 'I wholly agree with Mr Jones's submission that the payments are pursuant to the Company's existing obligations, an obligation which had arisen more than a year before. I also submit that at the time the decision was made to repay the loans in January 1995 [that time must be January 1994] the Company was not influenced by a desire to put me in a better position than I would have been in had the payment not been made.'

Mr Wills says a little bit more which has some bearing upon the circumstances in his second affidavit where, at para 3.1, he disputes that he told the meeting of 16 February that he knew the company would stop trading a week or ten days before it actually did stop. He says:

'I did not know that at all. I did not even know on 6 February 1995 that the company would shortly be ceasing to trade. It was only on 7 February that it became clear that funds were below what we had expected to receive and decided over lunchtime to stop trading.

3.2 I was aware that the bank were not prepared to renew our overdraft facility although the bank never confirmed this in writing and it is very difficult to say at what precise moment we became aware of this.'

In para 3.3, he says:

'We first discussed putting the company into liquidation at lunchtime on 7 February 1995. Prior to that we had not discussed stopping trading but we had reduced the staffing levels. Some of the staff had been laid off at the end of January 1995 because there was little by way of production work actually going on in the factory at that point. While there were orders on the books there was no work which needed to be done at the end of January and the company could not afford to have staff standing around idle.'

I also get some assistance from what Mr Wills said in the chairman's statement that was prepared for the creditors' meeting. This is going back over the history to some extent. After referring to the increase in the overdraft facilities following the Coopers & Lybrand report, he says:

'In October 1994 the new overdraft facility was due for review. The Bank indicated that they were uncomfortable at the level of exposure and would require the facility to be reduced on completion of the three major existing contracts, those being Observatory Gardens, Emmanuel College and Judges' Institute all of which were due for completion before Christmas 1994. Of these contracts Emmanuel College and Judges' Institute have yet to be completed. The Company's current difficulties relate in particular to Observatory Gardens. This contract ended with a value of £725,000, however the costs exceeded £865,000 resulting in a loss to the Company of £140,000. The main reason for the cost overrun was site labour costs. These were far higher than anticipated due to initial delays to the contract and then a requirement for additional labour to complete the contract to a tight revised completion date. The final account of this contract was agreed in January 1995. The Company was unable to fund the loss from this contract and when the completion moneys were received, Barclays Bank plc indicated that it would not renew the facility. Faced with no bank facilities and the need to fund the residual work of existing contracts and the need to pay existing creditors, the directors concluded that the Company could not continue to trade and therefore ceased to trade with effect from 7 February 1994.'

Thus, it is clear that at the beginning of February 1995, the directors knew that the company was in difficulties, especially because of the pressing creditors and the warning from the bank that the overdraft would not be renewed, and the loss of the £140,000 on the Observatory Gardens contract. Already by the end of January, it had received short payment on some

contracts. It seems to me that it must have been inevitable and apparent to the directors that there was a serious risk that the company would not be able to carry on trading and would be forced into insolvency in the near future.

I accept a criticism which is made in relation to the judge's decision below that, at para 14.5, he appears to reject the assertion by Mr Wills and Mr Jones on their affidavit that it was not until 7 February that they became aware or decided that the company was unable to continue. It seems to me that it was not open to him to come to that conclusion and no court could do so without the respondents' evidence to that effect being tested in cross-examination.

However, that does not determine the question before me. The question is: what was their, and the company's, state of mind on 2 February and on 6 February in deciding that they should be paid back the amount of their loan accounts? It seems to me at that stage that they must have been aware of the real risk of insolvency in the near future. Even if that is a conclusion that I cannot safely come to on the evidence, what I am left with is that the burden is on the appellants to show that they have a fair prospect of being able to rebut the statutory presumption at trial and they have given absolutely no evidence at all of what the company's motivation was for honouring these obligations as opposed to other obligations which were equally incumbent upon the company to other creditors on 2 and 6 February.

In their evidence, as I have cited it, they talk about the position as it was in January 1994 and they say that they did not know that the company would have to stop trading before 7 February 1995. However, the evidence is entirely silent as to what the company's motivation, desire and reasons were for making these particular payments when they were made. Of course, they were paid pursuant to an obligation, but there were other debts incumbent upon the company which were overdue and which were not paid. The company could not pay all of its creditors outstanding on these days and the question is: why did it choose to pay these? In the absence of evidence to show that it was purely for commercial reasons, there is nothing to rebut the statutory presumption and, indeed, everything to support that statutory presumption.

Accordingly, I accept a number of the criticisms of the way in which the judge's reasoning has been formulated, which Miss Staddon has put forward, but, in my view, his conclusion was entirely correct and I propose to dismiss the appeal.

*Appeal dismissed.*

Mary Rose Plummer Barrister.

TAB 84

Australian Corporations Act 2001 §§ 95A, 588FA, 588FC, 588FE



# Corporations Act 2001

**Act No. 50 of 2001 as amended**

**VOLUME 1** includes: Chapters 1–2K (ss. 1 – 282)

This compilation was prepared on 2 March 2005
taking into account amendments up to Act No. 8 of 2005

The text of any of those amendments not in force
on that date is appended in the Notes section

The operation of amendments that have been incorporated may be affected by application provisions that are set out in the Notes section

**VOLUME 2** includes: Chapters 2L–5B (ss. 283AA – 601DJ)

**VOLUME 3** includes: Chapters 5C–6D (ss. 601EA – 742)

**VOLUME 4** includes: Chapter 7 (ss. 760A – 1101J)

**VOLUME 5** includes: Chapters 9 and 10 (ss. 1274 – 1471)
Schedules 3 and 4
Table of Acts
Act Notes
Table of Amendments
Endnotes
Table A

Prepared by the Office of Legislative Drafting and Publishing,
Attorney-General’s Department, Canberra

(d) units of such shares;

but does not include:

(e) a derivative (as defined in Chapter 7), other than an option to acquire by way of transfer a security covered by paragraph (a), (b), (c) or (d); or

(f) an excluded security.

Note: A derivative does not include an option to acquire a security by way of issue (see the note to subsection (1)).

(3) In Chapters 6 to 6CA (inclusive) and Part 1.2A:

***securities*** means:

(a) shares in a body; or

(b) debentures of a body; or

(c) interests in a registered managed investment scheme; or

(d) legal or equitable rights or interests in:

(i) shares; or

(ii) debentures; or

(iii) interests in a registered managed investment scheme;

(e) options to acquire (whether by way of issue or transfer) a security covered by paragraph (a), (b), (c) or (d).

It does not cover:

(f) a derivative (as defined in Chapter 7), other than an option to acquire by way of transfer a security covered by paragraph (a), (b), (c) or (d); or

(g) a market traded option.

Note: A derivative does not include an option to acquire a security by way of issue (see the note to subsection (1)).

Note: Section 9 defines ***body***.

(4) In Chapter 6D ***securities*** has the meaning given by section 700 and in Chapter 7 ***security*** has the meaning given by section 761A.

## 95A Solvency and insolvency

(1) A person is solvent if, and only if, the person is able to pay all the person's debts, as and when they become due and payable.

(2) A person who is not solvent is insolvent.

Pg 446 of 686
**Chapter 5**External administration
**Part 5.7B**Recovering property or compensation for the benefit of creditors of insolvent company
**Division 2**Voidable transactions

Section 588FA

## Division 2—Voidable transactions

### 588FA Unfair preferences

(1) A transaction is an unfair preference given by a company to a creditor of the company if, and only if:

(a) the company and the creditor are parties to the transaction (even if someone else is also a party); and

(b) the transaction results in the creditor receiving from the company, in respect of an unsecured debt that the company owes to the creditor, more than the creditor would receive from the company in respect of the debt if the transaction were set aside and the creditor were to prove for the debt in a winding up of the company;

even if the transaction is entered into, is given effect to, or is required to be given effect to, because of an order of an Australian court or a direction by an agency.

(2) For the purposes of subsection (1), a secured debt is taken to be unsecured to the extent of so much of it (if any) as is not reflected in the value of the security.

(3) Where:

(a) a transaction is, for commercial purposes, an integral part of a continuing business relationship (for example, a running account) between a company and a creditor of the company (including such a relationship to which other persons are parties); and

(b) in the course of the relationship, the level of the company's net indebtedness to the creditor is increased and reduced from time to time as the result of a series of transactions forming part of the relationship;

then:

(c) subsection (1) applies in relation to all the transactions forming part of the relationship as if they together constituted a single transaction; and

*546* *Corporations Act 2001*

Compilation No. 73 Compilation date: 23/9/16 Registered: 10/4/16

External administration**Chapter 5**
Recovering property or compensation for the benefit of creditors of insolvent company**Part 5.7B**
Voidable transactions**Division 2**

Section 588FB

(d) the transaction referred to in paragraph (a) may only be taken to be an unfair preference given by the company to the creditor if, because of subsection (1) as applying because of paragraph (c) of this subsection, the single transaction referred to in the last-mentioned paragraph is taken to be such an unfair preference.

### 588FB Uncommercial transactions

(1) A transaction of a company is an uncommercial transaction of the company if, and only if, it may be expected that a reasonable person in the company's circumstances would not have entered into the transaction, having regard to:

(a) the benefits (if any) to the company of entering into the transaction; and

(b) the detriment to the company of entering into the transaction; and

(c) the respective benefits to other parties to the transaction of entering into it; and

(d) any other relevant matter.

(2) A transaction may be an uncommercial transaction of a company because of subsection (1):

(a) whether or not a creditor of the company is a party to the transaction; and

(b) even if the transaction is given effect to, or is required to be given effect to, because of an order of an Australian court or a direction by an agency.

### 588FC Insolvent transactions

A transaction of a company is an insolvent transaction of the company if, and only if, it is an unfair preference given by the company, or an uncommercial transaction of the company, and:

(a) any of the following happens at a time when the company is insolvent:

(i) the transaction is entered into; or

*Corporations Act 2001* *547*

Compilation No. 73 Compilation date: 23/9/16 Registered: 10/4/16

Pg 448 of 686
**Chapter 5**External administration
**Part 5.7B**Recovering property or compensation for the benefit of creditors of insolvent company
**Division 2**Voidable transactions

Section 588FD

(ii) an act is done, or an omission is made, for the purpose of giving effect to the transaction; or

(b) the company becomes insolvent because of, or because of matters including:

(i) entering into the transaction; or

(ii) a person doing an act, or making an omission, for the purpose of giving effect to the transaction.

## 588FD Unfair loans to a company

(1) A loan to a company is unfair if, and only if:

(a) the interest on the loan was extortionate when the loan was made, or has since become extortionate because of a variation; or

(b) the charges in relation to the loan were extortionate when the loan was made, or have since become extortionate because of a variation;

even if the interest is, or the charges are, no longer extortionate.

(2) In determining:

(a) whether interest on a loan was or became extortionate at a particular time as mentioned in paragraph (1)(a); or

(b) whether charges in relation to a loan were or became extortionate at a particular time as mentioned in paragraph (1)(b);

regard is to be had to the following matters as at that time:

(c) the risk to which the lender was exposed; and

(d) the value of any security in respect of the loan; and

(e) the term of the loan; and

(f) the schedule for payments of interest and charges and for repayments of principal; and

(g) the amount of the loan; and

(h) any other relevant matter.

548 *Corporations Act 2001*

Compilation No. 73 Compilation date: 23/9/16 Registered: 10/4/16

Pg 449 of 686
**Chapter 5**External administration
**Part 5.7B**Recovering property or compensation for the benefit of creditors of insolvent company
**Division 2**Voidable transactions

Section 588FE

the test in paragraph (1)(c) applies to the transaction taking into account the circumstances as they exist at the time when the transaction is entered into (rather than as they existed at the time when the obligation was incurred).

(3) A transaction may be an unreasonable director-related transaction because of subsection (1):

(a) whether or not a creditor of the company is a party to the transaction; and

(b) even if the transaction is given effect to, or is required to be given effect to, because of an order of an Australian court or a direction by an agency.

## 588FE Voidable transactions

(1) If a company is being wound up:

(a) a transaction of the company may be voidable because of any one or more of subsections (2) to (6) if the transaction was entered into on or after 23 June 1993; and

(b) a transaction of the company may be voidable because of subsection (6A) if the transaction was entered into on or after the commencement of the *Corporations Amendment (Repayment of Directors' Bonuses) Act 2003*.

(2) The transaction is voidable if:

(a) it is an insolvent transaction of the company; and

(b) it was entered into, or an act was done for the purpose of giving effect to it:

(i) during the 6 months ending on the relation-back day; or

(ii) after that day but on or before the day when the winding up began.

(2A) The transaction is voidable if:

(a) the transaction is:

(i) an uncommercial transaction of the company; or

(ii) an unfair preference given by the company to a creditor of the company; or

550 *Corporations Act 2001*

Compilation No. 73 Compilation date: 23/9/16 Registered: 10/4/16

Pg 450 of 686
External administration**Chapter 5**
Recovering property or compensation for the benefit of creditors of insolvent company**Part 5.7B**
Voidable transactions**Division 2**

Section 588FE

(iii) an unfair loan to the company; or

(iv) an unreasonable director-related transaction of the company; and

(b) the company was under administration immediately before:

(i) the company resolved by special resolution that it be wound up voluntarily; or

(ii) the Court ordered that the company be wound up; and

(c) the transaction was entered into, or an act was done for the purpose of giving effect to it, during the period beginning at the start of the relation-back day and ending:

(i) when the company made the special resolution that it be wound up voluntarily; or

(ii) when the Court made the order that the company be wound up; and

(d) the transaction, or the act done for the purpose of giving effect to it, was not entered into, or done, on behalf of the company by, or under the authority of, the administrator of the company.

(2B) The transaction is voidable if:

(a) the transaction is:

(i) an uncommercial transaction of the company; or

(ii) an unfair preference given by the company to a creditor of the company; or

(iii) an unfair loan to the company; or

(iv) an unreasonable director-related transaction of the company; and

(b) the company was subject to a deed of company arrangement immediately before:

(i) the company resolved by special resolution that it be wound up voluntarily; or

(ii) the Court ordered that the company be wound up; and

(c) the transaction was entered into, or an act was done for the purpose of giving effect to it, during the period beginning at the start of the relation-back day and ending:

*Corporations Act 2001* *551*

Compilation No. 73 Compilation date: 23/9/16 Registered: 10/4/16

Pg 451 of 686
**Chapter 5**External administration
**Part 5.7B**Recovering property or compensation for the benefit of creditors of insolvent company
**Division 2**Voidable transactions

Section 588FE

(i) when the company made the special resolution that it be wound up voluntarily; or

(ii) when the Court made the order that the company be wound up; and

(d) the transaction, or the act done for the purpose of giving effect to it, was not entered into, or done, on behalf of the company by, or under the authority of:

(i) the administrator of the deed; or

(ii) the administrator of the company.

(3) The transaction is voidable if:

(a) it is an insolvent transaction, and also an uncommercial transaction, of the company; and

(b) it was entered into, or an act was done for the purpose of giving effect to it, during the 2 years ending on the relation-back day.

(4) The transaction is voidable if:

(a) it is an insolvent transaction of the company; and

(b) a related entity of the company is a party to it; and

(c) it was entered into, or an act was done for the purpose of giving effect to it, during the 4 years ending on the relation-back day.

(5) The transaction is voidable if:

(a) it is an insolvent transaction of the company; and

(b) the company became a party to the transaction for the purpose, or for purposes including the purpose, of defeating, delaying, or interfering with, the rights of any or all of its creditors on a winding up of the company; and

(c) the transaction was entered into, or an act done was for the purpose of giving effect to the transaction, during the 10 years ending on the relation-back day.

(6) The transaction is voidable if it is an unfair loan to the company made at any time on or before the day when the winding up began.

*552* *Corporations Act 2001*

Compilation No. 73 Compilation date: 23/9/16 Registered: 10/4/16

External administration**Chapter 5**
Recovering property or compensation for the benefit of creditors of insolvent company**Part 5.7B**
Voidable transactions**Division 2**

Section 588FF

(6A) The transaction is voidable if:

(a) it is an unreasonable director-related transaction of the company; and

(b) it was entered into, or an act was done for the purposes of giving effect to it:

(i) during the 4 years ending on the relation-back day; or

(ii) after that day but on or before the day when the winding up began.

(7) A reference in this section to doing an act includes a reference to making an omission.

## 588FF Courts may make orders about voidable transactions

(1) Where, on the application of a company's liquidator, a court is satisfied that a transaction of the company is voidable because of section 588FE, the court may make one or more of the following orders:

(a) an order directing a person to pay to the company an amount equal to some or all of the money that the company has paid under the transaction;

(b) an order directing a person to transfer to the company property that the company has transferred under the transaction;

(c) an order requiring a person to pay to the company an amount that, in the court's opinion, fairly represents some or all of the benefits that the person has received because of the transaction;

(d) an order requiring a person to transfer to the company property that, in the court's opinion, fairly represents the application of either or both of the following:

(i) money that the company has paid under the transaction;

(ii) proceeds of property that the company has transferred under the transaction;

*Corporations Act 2001* *553*

Compilation No. 73 Compilation date: 23/9/16 Registered: 10/4/16

TAB 85

BVI Business Companies Act ("BCA") 2004
§§ 11, 31, 56-59, 62-64, 250

**VIRGIN ISLANDS**

# THE BVI BUSINESS COMPANIES ACT, 2004

**No. 16 of 2004**

**Amended by**
**26/2005**

**Subsidiary Legislation**

**Segregated Portfolio Companies Regulations, 2005 (S.I. 2005 No. 96)**

**Revised under the Statute Revision Act, 2005 (No. 25 of 2005)**
**as of 1st January, 2006**

      (i)    issue bearer shares,

      (ii)   convert registered shares to bearer shares, or

      (iii)  exchange registered shares for bearer shares.

26/2005

    (3)  *(Repealed)*

26/2005

    (4)  The Regulations may require the memorandum of a company to contain a statement, in the form specified in the Regulations, as to any limitations on the business that the company may carry on.

Additional matters to be stated in memorandum of restricted purposes company.

**10.**    (1)  The memorandum of a company limited by shares may state that the company is a restricted purposes company.

    (2)  The memorandum of a restricted purposes company shall state the purposes of the company.

26/2005

    (3)  Nothing in this section prevents the memorandum or articles of a company that is not a restricted purposes company from limiting the purposes, capacity, rights, powers or privileges of the company.

Effect of memorandum and articles.

**11.**    (1)  The memorandum and articles of a company are binding as between

      (a)  the company and each member of the company; and

      (b)  each member of the company.

    (2)  The company, the board, each director and each member of a company has the rights, powers, duties and obligations set out in this Act except to the extent that they are negated or modified, as permitted by this Act, by the memorandum or the articles.

    (3)  The memorandum and articles of a company have no effect to the extent that they contravene or are inconsistent with this Act.

Amendment of memorandum and articles.

**12.**    (1)  Subject to subsection (2) and section **14**, the members of a company may, by resolution, amend the memorandum or articles of the company.

    (2)  Subject to subsection (3), the memorandum of a company may include one or more of the following provisions:

      (a)  that specified provisions of the memorandum or articles may not be amended;

      (b)  that a resolution passed by a specified majority of members, greater

      (ii) grant options over unissued shares in the company and treasury shares,

(iii) issue securities that are convertible into shares, and

(iv) give financial assistance to any person in connection with the acquisition of its own shares;

(b) issue debt obligations of every kind and grant options, warrants and rights to acquire debt obligations;

(c) guarantee a liability or obligation of any person and secure any of its obligations by mortgage, pledge or other charge, of any of its assets for that purpose; and

(d) protect the assets of the company for the benefit of the company, its creditors and its members and, at the discretion of the directors, for any person having a direct or indirect interest in the company.

(3) For the purposes of subsection (2)(d), the directors may cause the company to transfer any of its assets in trust to one or more trustees, each of which may be an individual, company, association, partnership, foundation or similar entity and, with respect to the transfer, the directors may provide that the company, its creditors, its members or any person having a direct or indirect interest in the company, or any of them, may be the beneficiaries of the trust. 26/2005

(4) The rights or interests of any existing or subsequent creditor of the company in any assets of the company are not affected by any transfer under subsection (3), and those rights or interests may be pleaded against any transferee in any such transfer.

Validity of acts of company.

**29.** (1) No act of a company and no transfer of an asset by or to a company is invalid by reason only of the fact that the company did not have the capacity, right or power to perform the act or to transfer or receive the asset. 26/2005

(2) Subsection (1) does not apply with respect to a restricted purposes company. 26/2005

Personal liability.

**30.** Subject to section **108**, no director, agent or voluntary liquidator of a company is liable for any debt, obligation or default of the company, unless specifically provided in this Act or in any other enactment, and except in so far as he may be liable for his own conduct or acts.

Dealings between company and other persons.

**31.** (1) A company or a guarantor of an obligation of a company may not assert against a person dealing with the company or with a person who has acquired assets, rights or interests from the company that

(a)  this Act or the memorandum or articles of the company has not been complied with;

(b)  a person named as a director in the company's register of directors

   (i)   is not a director of the company,

   (ii)  has not been duly appointed as a director of the company, or

   (iii) does not have authority to exercise a power which a director of a company carrying on business of the kind carried on by the company customarily has authority to exercise;

(c)  a person held out by the company as a director, employee or agent of the company

   (i)   has not been duly appointed, or

   (ii)  does not have authority to exercise a power which a director, employee or agent of a company carrying on business of the kind carried on by the company customarily has authority to exercise;

(d)  a person held out by the company as a director, employee or agent of the company with authority to exercise a power which a director, employee or agent of a company carrying on business of the kind carried on by the company does not customarily have authority to exercise, does not have authority to exercise that power; or

(e)  a document issued on behalf of a company by a director, employee or agent of the company with actual or usual authority to issue the document is not valid or not genuine;

unless the person has, or ought to have, by virtue of his relationship to the company, knowledge of the matters referred to in any of paragraphs (a) to (e).

(2)  Subsection (1) applies even though a person of the kind specified in paragraphs (b) to (e) of that subsection acts fraudulently or forges a document that appears to have been signed on behalf of the company, unless the person dealing with the company or with a person who has acquired assets, rights or interests from the company has actual knowledge of the fraud or forgery.

Constructive notice.

**32.**  (1)  A person is not deemed to have notice or knowledge of any document relating to a company, including the memorandum and articles, or of the provisions or contents of any such document, by reason only of the fact that a document

(8) The transfer of a registered share is effective when the name of the transferee is entered in the register of members.

26/2005

(9) If the directors of a company are satisfied that an instrument of transfer has been signed but that the instrument has been lost or destroyed, they may resolve

(a) to accept such evidence of the transfer of the shares as they consider appropriate; and

(b) that the transferee's name should be entered in the register of members, notwithstanding the absence of the instrument of transfer.

**55.** Subject to Division 5, a bearer share is transferred by delivery of a certificate relating to the share.

Transfer of bearer share.

**Division 4 - Distributions**

**56.** For the purposes of this Division,

Meaning of solvency test and distribution.

(a) a company satisfies the solvency test if

(i) the value of the company's assets exceeds its liabilities, and

(ii) the company is able to pay its debts as they fall due; and

(b) "distribution", in relation to a distribution by a company to a member, means

26/2005

(i) the direct or indirect transfer of an asset, other than the company's own shares, to or for the benefit of the member, or

(ii) the incurring of a debt to or for the benefit of a member,

in relation to shares held by a shareholder, or to the entitlements to distributions of a member who is not a shareholder, and whether by means of the purchase of an asset, the purchase, redemption or other acquisition of shares, a transfer of indebtedness or otherwise, and includes a dividend.

**57**. (1) Subject to this Part and to the memorandum and articles of the company, the directors of a company may, by resolution, authorise a distribution by the company to members at such time and of such an amount, as it thinks fit if they are satisfied, on reasonable grounds, that the company will, immediately after the distribution, satisfy the solvency test.

Distributions.

26/2005

(2) A resolution of directors passed under subsection (1) shall contain a statement that, in the opinion of the directors, the company will, immediately after the distribution, satisfy the solvency test.

(3) If, after a distribution is authorised and before it is made, the directors cease to be satisfied on reasonable grounds that the company will, immediately after the distribution is made, satisfy the solvency test, any distribution made by the company is deemed not to have been authorised.

Recovery of distribution made when company did not satisfy solvency test.

**58.** (1) A distribution made to a member at a time when the company did not, immediately after the distribution, satisfy the solvency test may be recovered by the company from the member unless

(a) the member received the distribution in good faith and without knowledge of the company's failure to satisfy the solvency test;

(b) the member has altered his position in reliance on the validity of the distribution; and

(c) it would be unfair to require repayment in full or at all.

(2) If, by virtue of section **57**(3), a distribution is deemed not to have been authorised, a director who

(a) ceased, after authorisation but before the making of the distribution, to be satisfied on reasonable grounds for believing that the company would satisfy the solvency test immediately after the distribution is made; and

(b) failed to take reasonable steps to prevent the distribution being made;

is personally liable to the company to repay to the company so much of the distribution as is not able to be recovered from members.

(3) If, in an action brought against a director or member under this section, the Court is satisfied that the company could, by making a distribution of a lesser amount, have satisfied the solvency test, the Court may

(a) permit the member to retain; or

(b) relieve the director from liability in respect of;

an amount equal to the value of any distribution that could properly have been made.

**59.** (1) Subject to section 57, a company may purchase, redeem or otherwise acquire its own shares in accordance with either

Company may purchase, redeem or otherwise acquire its own shares.

26/2005

(a) sections 60, 61 and 62; or

(b) such other provisions for the purchase, redemption or acquisition of its own shares as may be specified in its memorandum or articles.

(2) Sections 60, 61 and 62 do not apply to a company to the extent that they are negated, modified or inconsistent with provisions for the purchase, redemption or acquisition of its own shares specified in the company's memorandum or articles.

26/2005

(3) Where a company may purchase, redeem or otherwise acquire its own shares otherwise than in accordance with sections 60,61 and 62, it may not purchase, redeem or otherwise acquire the shares without the consent of the member whose shares are to be purchased, redeemed or otherwise acquired, unless the company is permitted by the memorandum or articles to purchase, redeem or otherwise acquire the shares without that consent.

(4) Unless the shares are held as treasury shares in accordance with section **64**, any shares acquired by a company are deemed to be cancelled immediately on purchase, redemption or other acquisition.

26/2005

**60.** (1) The directors of a company may make an offer to purchase, redeem or otherwise acquire shares issued by the company, if the offer is

Process for purchase, redemption or other acquisition of own shares.

26/2005

(a) an offer to all shareholders to purchase, redeem or otherwise acquire shares issued by the company that

(i) would, if accepted, leave the relative voting and distribution rights of the shareholders unaffected; and

(ii) affords each shareholder a reasonable opportunity to accept the offer; or

(b) an offer to one or more shareholders to purchase, redeem or otherwise acquire shares

(i) to which all shareholders have consented in writing; or

(ii) that is permitted by the memorandum or articles and is made in accordance with section **61**.

(2) Where an offer is made in accordance with subsection (1)(a),

26/2005

    (a)   the offer may also permit the company to purchase, redeem or otherwise acquire additional shares from a shareholder to the extent that another shareholder does not accept the offer or accepts the offer only in part; and

    (b)   if the number of additional shares exceeds the number of shares that the company is entitled to purchase, redeem or otherwise acquire, the number of additional shares shall be reduced rateably.

Offer to one or more shareholders.

26/2005

**61.**    (1)   The directors of a company shall not make an offer to one or more shareholders under section **60**(1)(b) unless they have passed a resolution stating that, in their opinion,

    (a)   the purchase, redemption or other acquisition is to the benefit of the remaining shareholders; and

    (b)   the terms of the offer and the consideration offered for the shares are fair and reasonable to the company and to the remaining shareholders.

    (2)   A resolution passed under subsection (1) shall set out the reasons for the directors' opinion.

    (3)   The directors shall not make an offer to one or more shareholders under section **60**(1)(b) if, after the passing of a resolution under subsection (1) and before the making of the offer, they cease to hold the opinions specified in subsection (1).

26/2005

    (4)   A shareholder may apply to the Court for an order restraining the proposed purchase, redemption or other acquisition of shares under section **60**(1)(b) on the grounds that

    (a)   the purchase, redemption or other acquisition is not in the best interests of the remaining shareholders; or

    (b)   the terms of the offer and the consideration offered for the shares are not fair and reasonable to the company or the remaining shareholders.

Shares redeemed otherwise than at option of company.

**62.**    (1)   If a share is redeemable at the option of the shareholder and the shareholder gives the company proper notice of his intention to redeem the share

    (a)   the company shall redeem the share on the date specified in the notice, or if no date is specified, on the date of the receipt of the notice;

(b) unless the share is held as a treasury share under section **64**, the share is deemed to be cancelled; and

(c) from the date of redemption, the former shareholder ranks as an unsecured creditor of the company for the sum payable on redemption.

(2) If a share is redeemable on a specified date

(a) the company shall redeem the share on that date;

(b) unless the share is held as a treasury share under section **64**, the share is deemed to be cancelled; and

(c) from the date of redemption, the former shareholder ranks as an unsecured creditor of the company for the sum payable on redemption.

(3) Where a company redeems a share under subsections (1) and (2), sections **60** and **61** do not apply.

Purchases, redemptions or other acquisitions deemed not to be a distribution.

26/2005

**63.** The purchase, redemption or other acquisition by a company of one or more of its own shares is deemed not to be a distribution where

(a) the company redeems the share or shares under and in accordance with section 62;

(b) the company redeems the share or shares pursuant to a right of a shareholder to have his shares redeemed or to have his shares exchanged for money or other property of the company; or

(c) the company purchases, redeems or otherwise acquires the share or shares by virtue of the provisions of section 179.

Treasury shares.

26/2005

**64.** (1) A company may hold shares that have been purchased, redeemed or otherwise acquired under section **59** as treasury shares if

(a) the memorandum or articles of the company do not prohibit it from holding treasury shares;

(b) the directors resolve that shares to be purchased, redeemed or otherwise acquired shall be held as treasury shares; and

(c) the number of shares purchased, redeemed or otherwise acquired, when aggregated with shares of the same class already held by the company as treasury shares, does not exceed fifty per cent of the

shares of that class previously issued by the company, excluding shares that have been cancelled.

(2)   All the rights and obligations attaching to a treasury share are suspended and shall not be exercised by or against the company while it holds the share as a treasury share.

Transfer of treasury shares.

26/2005

**65.**   Treasury shares may be transferred by the company and the provisions of this Act and the memorandum and articles that apply to the issue of shares apply to the transfer of treasury shares.

Mortgages and charges of shares.

**66.**   (1)   A mortgage or charge of shares of a company shall be in writing signed by, or with the authority of, the holder of the bearer share or the registered holder of the registered share to which the mortgage or charge relates.

(2)   A mortgage or charge of a bearer share is not valid and enforceable unless the certificate for the share is deposited with a custodian.

(3)   A mortgage or charge of shares of a company need not be in any specific form but it shall clearly indicate

(a)   the intention to create a mortgage or charge; and

(b)   the amount secured by the mortgage or charge or how that amount is to be calculated.

(4)   Where the governing law of a mortgage or charge of shares in a company is not the law of the Virgin Islands

(a)   the mortgage or charge shall be in compliance with the requirements of its governing law in order for the mortgage or charge to be valid and binding on the company; and

(b)   the remedies available to a mortgagee or chargee shall be governed by the governing law and the instrument creating the mortgage or charge save that the rights between the mortgagor or mortgagee as a member of the company and the company shall continue to be governed by the memorandum and the articles of the company and this Act.

(5)   Where the governing law of a mortgage or charge of shares in a company is the law of the Virgin Islands, in the case of a default by the mortgagor or chargor on the terms of the mortgage or charge, the mortgagee or chargee is entitled to the following remedies:

(a)   subject to any limitations or provisions to the contrary in the

**249.**    (1)   The Executive Council may, on the advice of the Commission, by order amend the Schedules to this Act in such manner as it considers necessary.

Amendment of Schedules.

(2)   An order made under subsection (1) shall be subject to a negative resolution of the Legislative Council.

**250.**    The enactments set out in the second column of Schedule 3 to this Act are repealed or amended to the extent specified in the third column with effect from the date specified in the fourth column.

Repeals and amendments.

Schedule 3

**251.**    This Act is binding on the Crown.

Act binding on Crown.

TAB 86

BVI Conveyancing and Law of Property Act 1967 (Cap 220) § 81

**THE LAWS OF THE VIRGIN ISLANDS**

**CAP. 220**

**CONVEYANCING AND LAW OF PROPERTY**

Based on the Revised Laws of 1961 of the Virgin Islands.

**IMPORTANT**

This is an unofficial version of the Conveyancing and Law of Property Ordinance. Whilst every effort has been made to ensure correctness, no responsibility is assumed for any errors which may appear.

**Harney Westwood & Riegels**
**Craigmuir Chambers**
**P O Box 71**
**Road Town**
**Tortola**
**British Virgin Islands**

*(d)* to drain or otherwise improve the land or any part thereof;

*(e)* to insure against loss by fire;

*(f)* to make allowances to and arrangements with tenants and others;

*(g)* to determine tenancies and to accept surrenders of leases and tenancies; and

*(h)* generally to deal with the land in a proper and due course of management,

but so that, where the infant is impeachable for waste, the trustees shall not commit waste, and shall cut timber on the same terms only, and subject to the same restrictions on and subject to which the infant could, if of full age, cut the same.

(3) The trustees may from time to time, out of the income of the land, including the produce of the sale of timber and underwood, pay the expenses incurred in the management, or in the exercise of any power conferred by this section, or otherwise in relation to the land, and all outgoing not payable by any tenant or other person, and shall keep down any annual sum, and the interest of any principal sum, charged on the land.

(4) Where the infant's estate or interest is an undivided share of land, the powers of this section relative to the land may be exercised jointly with persons entitled to possession of, or having power to act in relation to, the other undivided share or shares.

(5) This section has effect subject to an express appointment by the settlement, or the Court, of trustees for the purposes of this section or of any enactment replaced by this section.

(6) Where any person is contingently entitled to land, this section shall, subject to any prior interests or charges affecting that land, apply until his interest vests, or, if his interest vests during his minority, until he attains the age of twenty-one years.

This subsection applies only where a person becomes contingently entitled under an instrument coming into operation after the 31st day of December, 1881.

(7) This section applies only if and as far as a contrary intention is not expressed in the instrument, if any, under which the interest of the infant or person contingently entitled as aforesaid arises, and has effect subject to the terms of that instrument and to the provisions therein contained.

## PART XI.

## VOIDABLE DISPOSITIONS.

Voluntary conveyances to defraud creditors voidable.

**81.** (1) Save as provided in this section, every conveyance of property, made whether before or after the commencement of this Ordinance, with intent to defraud creditors, shall be voidable at the instance of any person thereby prejudiced.

(2) This section does not affect the operation of a disentailing assurance, or the law of bankruptcy for the time being in force.

(3) This section does not extend to any estate or interest in property conveyed for valuable consideration and in good faith or upon good consideration and in good faith to any person not having at the time of conveyance, notice of the intent to defraud creditors.

Voluntary disposition of land how far voidable as against purchasers.

**82.** (1) Every voluntary disposition of land made with intent to defraud a subsequent purchaser is voidable at the instance of that purchaser.

(2) For the purposes of this section, no voluntary disposition, whenever made, shall be deemed to have been made with intent to defraud by reason only that a subsequent disposition for valuable consideration was made, if such subsequent disposition was made after the 28th day of June, 1893.

Cap. 231

(3) In this section, the expression "disposition" includes a transfer under the provisions of the Title by Registration Act and also includes every mode of conveyance or disposition mentioned or referred to in the Act 27, Elizabeth, Chapter 4.

## PART XII.

## NOTICES.

Restriction on constructive notice.

**83.** (1) A purchaser shall not be prejudicially affected by notice of any instrument, fact, or thing unless—

*(a)* it is within his own knowledge, or would have come to his knowledge, if such enquiries and inspections had been made as ought reasonably to have been made by him; or

*(b)* in the same transaction with respect to which a question of notice to the purchaser arises, it has come to the knowledge of his counsel, as such, or of his solicitor or other agent, as such, or would have come to the knowledge of his counsel, solicitor or other agent, as such, if such enquiries and inspections had been made as ought reasonably to have been made by the counsel, solicitor or other agent.

(2) This section shall not exempt a purchaser from any liability under, or any obligation to perform or observe, any covenant, condition, provision, or restriction contained in any instrument under which his title is derived, mediately or immediately; and such liability or obligation may be enforced in the same manner and to the same extent as if this section had not been enacted.

(3) A purchaser shall not, by reason of anything in this section, be affected by notice in any case where he would not have been so affected if this section had not been enacted.

(4) This section applies to purchases made either before or after the commencement of this Ordinance.

TAB 87

BVI Criminal Code § 223

(3) Subsection (1) shall not apply where the supply of the goods or the doing of the service is contrary to law, or where the service is such that payment is not legally enforceable.

False accounting.

**221.** (1) Any person who dishonestly, with a view to gain for himself or another or with intent to cause loss to another,

(a) destroys, defaces, conceals or falsifies any account or any record or document made or required for an accounting purpose, or

(b) in furnishing information for any purpose, produces or makes use of any account or any such record or document, which to his knowledge is or may be misleading, false or deceptive in a material particular,

commits an offence and is liable on conviction to imprisonment for a term not exceeding seven years.

(2) For the purposes of this section, a person who makes or concurs in making in any account or other document an entry which is or may be misleading, false or deceptive in a material particular, or who omits or concurs in omitting a material particular from an account or other document, is to be treated as falsifying the account or document.

Officers of company liable for certain offences committed by company.

**222.** (1) Where an offence under this Part is committed by a body corporate and is proved to have been committed with the consent or connivance of any director, manager, secretary or other similar officer of the body corporate, or any person who was purporting to act in any such capacity, he as well as the body corporate commit that offence and are liable to be proceeded against and punished accordingly.

(2) Where the affairs of a body corporate are managed by its members, this section shall apply in relation to the acts or defaults of a member in connection with his functions of management as if he were a director of the body corporate.

False statement by company directors, etc.

**223.** (1) Where a director or officer (by whatever name called) of a body corporate or unincorporated association (or person purporting to act as such), with intent to deceive the members or creditors of the body corporate or association about its affairs, publishes or concurs in publishing a written statement, account or other document which to his knowledge is or may be misleading, false or deceptive in a material particular, he commits an offence and is liable on conviction to imprisonment for a term not exceeding seven years.

(2) For the purposes of this section, a person who has entered into a security for the benefit of a body corporate or association shall be deemed to be a creditor of it.

(3) Where the affairs of a body corporate or association are managed by its members, this section shall apply to any statement, account or other document which a member publishes or concurs in publishing in connection with his functions of management as if he were an officer of that body corporate or association.

**Destruction, etc. of valuable security, or procuring execution of same by deception.**

**224.** (1) Any person who dishonestly, with a view to gain for himself or another, or with intent to cause loss to another, destroys, defaces or conceals any valuable security, any will or other testamentary document or any original document of or belonging to, or filed or deposited in, any court of justice or any Government department, commits an offence and is liable on conviction to imprisonment for a term not exceeding seven years.

(2) Any person who dishonestly, with a view to gain for himself or another, or with intent to cause loss to another, by any deception procures the execution of a valuable security, commits an offence and is liable on conviction to imprisonment for a term not exceeding seven years.

(3) Subsection (2) shall apply in relation to the making, acceptance, indorsement, alteration, cancellation or destruction in whole or in part of a valuable security, and in relation to the signing or sealing of any paper or other material in order that it may be made or converted into, or used or dealt with as, a valuable security, as if that were the execution of a valuable security.

(4) For the purposes of this section, "deception" has the same meaning as in section 217 and "valuable security" means any document creating, transferring, surrendering or releasing any right to, in or over property, or authorising the payment of money or delivery of any property or evidencing the creation, transfer, surrender or release of any such right or the payment of money or the delivery of any property, or the satisfaction of any obligation.

**Blackmail.**

**225.** (1) A person commits the offence of blackmail, if with a view to gain for himself or another, or with intent to cause loss to another, he makes any unwarranted demand with menaces.

(2) For the purpose of subsection (1), a demand with menaces is unwarranted unless the person making it does so in the belief

TAB 88

BVI Insolvency Act 2003
§§ 2, 3, 5, 8-12, 197, 244-252, 254, 256, 401, 456, 467

**VIRGIN ISLANDS**

**INSOLVENCY ACT, 2003**
**No. 5 of 2003**

**VIRGIN ISLANDS**

**INSOLVENCY ACT, 2003**

**ARRANGEMENT OF SECTIONS**

Section

**PART I**

**PRELIMINARY PROVISIONS**

1. Short title and commencement.
2. Interpretation.
3. Meaning of “company”.
4. Meaning of “subsidiary” and “holding company”.
5. Meaning of “connected person” and “related company”.
6. Meaning of “director”.
7. Meaning of “unlicensed financial services business”.
8. Meaning of “insolvent”.
9. Meaning of “creditor”, “secured creditor” etc.
10. Meaning of “liability”.
11. Admissible claims.
12. Non-admissible claims.
13. Meaning of “public document”.

**PART II**

**CREDITORS’ ARRANGEMENTS**

**Division 1 - Interpretation**

14. Interpretation for and scope of this Part.
15. Arrangements.
16. Remuneration of supervisor and interim supervisor.

## PART I

## PRELIMINARY PROVISIONS

1. (1) This Act may be cited as the Insolvency Act, 2003.

Short title and commencement.

(2) The provisions of this Act come into operation on such date or dates as may be appointed by the Governor by proclamation published in the *Gazette* and different dates may be appointed for different provisions and different purposes.

2. (1) In this Act, unless the context otherwise requires,

Interpretation.

"administration order" has the meaning specified in section 76;

"administrative receiver" has the meaning specified in section 142;

"administrator", in relation to a company, means an administrator appointed under section 79;

"arrangement" means a company creditors' arrangement under Part **II**, Division **2** or an individual creditors' arrangement under Part **II**, Division **3**, as the case may be;

"articles" means

(a) the articles of association of a company, or

(b) where the context permits, in the case of a foreign company the articles of association, by-laws or such other document having the same effect by whatever name called;

"asset" includes money, goods, things in action, land and every description of property wherever situated and obligations and every description of interest, whether present or future or vested or contingent, arising out of, or incidental to, property;

"bankrupt" means an individual against whom a bankruptcy order is made under Part **XII**;

"bankruptcy trustee" means the person appointed by the Court to be the trustee of the assets of a bankrupt;

"bankrupt's estate" has the meaning specified in section 313;

"board", in relation to a body corporate, means

     (a)  the board of directors, committee of management, council or other governing authority of the body corporate, or

     (b)  if the body corporate has only one director, that director;

"business day" means any day other than a Saturday, Sunday or public holiday in the Virgin Islands;

"charge" includes a mortgage, a fixed charge and a floating charge, whether crystallised or not;

"chargee" means the holder of a charge and includes a person in whose favour a charge is to be given or executed under an agreement, whether on demand or otherwise;

"chattel leasing agreement" means an agreement for the bailment of goods which is capable of subsisting for more than three months;

"Civil Procedure Rules" means the Eastern Caribbean Supreme Court Civil Procedure Rules 2000;

No. 12 of 2001      "Commission" means the Financial Services Commission established under the Financial Services Commission Act, 2001;

Cap. 285      "Companies Act" means the Companies Act (Cap. 285);

"company" has the meaning specified in section 3;

"connected person"

     (a)  in relation to a company or a foreign company has the meaning specified in section 5(1), and

     (b)  in relation to an individual has the meaning specified in section 5(3);

"Court" means the High Court;

Cap. 35      "court rate" means the rate of interest specified in section 7 of the Judgements Act (Cap 35);

"creditor" and "secured creditor" have the meanings specified in section 9;

"creditors' committee" means a committee appointed under section

421;

"director" has the meaning specified in section 6;

"disqualification order" has the meaning specified in section 260(1);

"disqualification undertaking" has the meaning specified in section 260(2);

"document" means a document in any form and includes

(a)  any writing or printing on any material,

(b)  any record of information or data, however compiled, and whether stored in paper, electronic, magnetic or any non-paper based form and any storage medium or device, including discs and tapes,

(c)  books and drawings, and

(d)  a photograph, film, tape, negative, facsimile or other medium in which one or more visual images are embodied so as to be capable (with or without the aid of equipment) of being reproduced,

and without limiting the generality of the foregoing, includes any court application, order and other legal process and any notice;

"dollar" or "$" means the lawful currency for the time being of the United States of America;

"eligible insolvency practitioner" means an insolvency practitioner who is eligible to act in relation to a company, foreign company or individual in accordance with section 482;

"floating charge" means a charge created by a company or a foreign company which is, or as created was, a floating charge;

"foreign company" means a body corporate that is incorporated, registered or formed outside the Virgin Islands but excludes a company within the meaning of section 3;

"insolvency practitioner" means a person acting in a capacity specified in section 474(1);

"insolvent",

    (a)   in relation to a company or a foreign company, has the meaning specified in section 8(1), and

    (b)   in relation to an individual, has the meaning specified in section 8(2);

No. 15 of 1994        "Insurance Act" means the Insurance Act, 1994;

No. 15 of 1994        "insurance company" means a company or a foreign company that holds, or at any time in the previous two years has held, a licence as an insurer issued under the Insurance Act;

"interim supervisor" means the person appointed as the interim supervisor under a proposal for an arrangement;

Cap. 291        "International Business Companies Act" means the International Business Companies Act (Cap. 291);

"liability" has the meaning specified in section 10;

"licensed insolvency practitioner" means a person holding a licence to act as an insolvency practitioner issued under section 476;

"liquidator", in relation to a company or a foreign company, means a liquidator appointed under section 159;

"member", in relation to a company, includes

    (a)   a member of a company limited by guarantee; and

Cap. 285        (b)   a person to whom shares in a company have been transferred or transmitted by law, even though that person is not a member of the company within the meaning of the Companies Act;

"memorandum" means

    (a)   the memorandum of association of a company, or

    (b)   where the context permits, in the case of a foreign company its memorandum of association or other constituting document, by whatever name called;

"officer", in relation to a body corporate, includes a director and secretary of that body corporate but does not include an administrator, liquidator, receiver, supervisor or interim supervisor;

"Official Receiver" means the Official Receiver appointed by the Commission under section 488;

"preferential claim" means a claim of a type prescribed by the Rules as a preferential claim;

"preferential creditor" means a creditor having a preferential claim;

"prescribed" means prescribed by the Rules and "prescribed form" means a form specified in the Rules;

"prescribed priority" means

    (a)   in a liquidation, the priority for the payment of the costs and expenses of a liquidation prescribed in the Rules, and

    (b)   in a bankruptcy, the priority for the payment of the costs and expenses of a bankruptcy prescribed in the Rules;

"public document" has the meaning specified in section 13;

"receiver" means the receiver of the whole or any part of the assets of a company or a foreign company and includes

    (a)   a manager and a receiver and manager,

    (b)   a receiver of income, and

    (c)   an administrative receiver;

"receiver appointed out of court" means a receiver appointed in the exercise of a power conferred by a debenture or other instrument;

"Registrar" means the Registrar of Companies appointed under the Companies Act;    Cap. 285

"regulated person" means a person that holds a prescribed financial services licence;

"related company" means a company that is related to another company in accordance with section 5(2);

"remuneration" includes properly incurred expenses and disbursements;

"retention of title agreement" means any agreement for the sale of goods under which the seller reserves title in the goods until payment, but excludes an agreement that constitutes a charge on the goods;

"Rules" means the Insolvency Rules made under section 498;

"security interest" includes a charge and a lien;

"statement of affairs" means a statement of the affairs of a company or a foreign company complying with section 277 and "verified statement of affairs" means a statement of affairs that has been verified by affidavit;

"statement of assets and liabilities" means a statement of the assets and liabilities of an individual complying with section 366 and "verified statement of assets and liabilities" means a statement of assets and liabilities that has been verified by affidavit;

"statutory demand" means a demand made under section 155;

"subsidiary" and "holding company" have the meanings specified in section 4;

"supervisor" means the person appointed to act as the supervisor of an arrangement under Part **II**;

"unlicensed financial services business" has the meaning specified in section 7; and

"Virgin Islands court" means any court having jurisdiction in the Virgin Islands.

(2) References in this Act or in the Rules to the "venue" for any proceeding, attendance before the Court or for a meeting are to the time, date and place for the proceeding, attendance or meeting.

Meaning of "company".

3. Unless this Act expressly provides otherwise, "company" means

Cap. 285

(a) a company incorporated under the Companies Act; or

(b) an international business company incorporated or continued under the International Business Companies Act.

Meaning of "subsidiary" and "holding company".

4. (1) A company is a "subsidiary" of another company, its "holding company", if that other company

(a) holds a majority of the voting rights in it,

(b) is a member of it and has the right to appoint or remove a majority of its board,

(c) is a member of it and controls alone, pursuant to an agreement with other members, a majority of the voting rights in it,

or if it is a subsidiary of a company which is itself a subsidiary of that other company.

(2) For the purposes of subsection (1), "company" includes a foreign company and any other body corporate.

Meaning of "connected person" and "related company".

5. (1) In relation to a company, "connected person" means any one or more of the following

(a) a promoter of the company;

(b) a director or member of the company or of a related company;

(c) a beneficiary under a trust of which the company is or has been a trustee;

(d) a related company;

(e) another company one of whose directors is also a director of the company;

(f) a nominee, relative, spouse or relative of a spouse of a person referred to in paragraphs (a) to (c);

(g) a person in partnership with a person referred to in paragraphs (a) to (c); and

(h) a trustee of a trust having as a beneficiary a person who is, apart from this paragraph, a connected person.

(2) A company is related to another company if

    (a) it is a subsidiary or holding company of that other company;

(b) the same person has control of both companies; and

(c) the company and that other company are both subsidiaries of the same holding company.

(3) In relation to an individual, "connected person" means any one or more of the following

(a) a relative, spouse or relative of a spouse of the individual;

(b) a person in partnership with the individual;

(c) a relative or spouse of a person in partnership with the individual;

(d) a company in respect of which he is a connected person under subsection (1);

(e) a trustee of a trust having as a beneficiary a person who is, apart from this paragraph, a connected person.

(4) For the purposes of this section, "company" includes a foreign company and any other body corporate.

Meaning of "director".

6. (1) Subject to subsection (3), "director" in relation to a body corporate includes

(a) a person occupying or acting in the position of director by whatever name called;

(b) a person in accordance with whose directions or instructions a director or the board of a body corporate may be required or is accustomed to act; and

(c) a person who exercises, or is entitled to exercise, or who controls, or is entitled to control, the exercise of powers which, apart from the memorandum or articles, would fall to be exercised by the board.

(2) Notwithstanding subsection (1)

(a) a person is not to be regarded as a director of a body corporate by reason only that a director or the board act on advice given by him in a professional capacity; and

(4) It shall be a condition of an order made under subsection (2) permitting a company to dispose of assets referred to in section 85(1) that are not subject to a floating charge, that

(a) the net proceeds of the disposal; and

(b) if those proceeds are less than such amount as the Court may determine, or as may be agreed, to be the fair market value of the assets disposed of, the sum required to make good the deficiency;

shall be applied towards discharging the sums payable to the interested person concerned.

(5) Where a condition under subsection (4) relates to two or more security interests, the net proceeds of the disposal and any sum required to be paid under subsection (4)(b) shall be applied towards discharging the sums secured by those security interests in the order of their priorities.

(6) Where the Court makes an order under subsection (2) it may make such consequential orders as it considers fit, including

(a) giving directions as to the conduct of the disposal;

(b) making provision for the protection of the proceeds of the disposal.

(7) Where an order is made under subsection (2), the company shall, within 14 days of the date of the order, file with the Registrar a notice in the prescribed form together with a sealed copy of the order.

(8) A company commits an offence if it

(a) contravenes subsection (7), without reasonable excuse; or

(b) fails to comply with a condition imposed under this section.

ADMINISTRATORS

General duties of administrator.

87. (1) An administrator shall, on his appointment, take into his custody or under his control the assets to which the company in administration is or appears to be entitled.

(2) The administrator shall manage the business, assets and affairs of the company

(a)  in furtherance of the purposes set out in the administration order;

(b)  after the approval of proposals under section 102, in accordance with those proposals; and

(c)  in accordance with any directions that may be given by the Court.

(3)  Whilst a company is in administration, the directors and other officers of the company remain in office, but they cease to have any powers, functions or duties other than those required or permitted under this Part.

Duty to prepare report.

88.  (1)  The administrator of a company shall, within sixty days of the commencement of the administration, prepare a report as to whether, in his opinion, further enquiries are desirable with respect to

(a)  any matter relating to the promotion, formation or insolvency of the company or the conduct of the business or affairs of the company; and

(b)  possible claims under sections 254 to 256.

(2)  The administrator shall send a copy of the report prepared under subsection (1)

(a)  to each creditor of the company; and

(b)  if in his report he states that further enquiries are desirable with respect to a matter referred to in subsection (1), to the Official Receiver.

Duty to report to Commission.

89.  (1)  Subject to subsection (2), if it appears to the administrator of a company that the company is carrying on or has carried on unlicensed financial services business, he shall as soon as reasonably practicable report the matter to the Commission.

(2)  Subsection (1) does not apply where the administration order was made on the application of the Commission.

(3)  Where the administrator makes a report to the Commission under subsection (1) he shall, for the purposes of section 105, treat the company as if it was a regulated person.

General powers of administrator.

90.  (1)  The administrator of a company may

(a)  remove any director of the company;

(b)   appoint a person to be director of the company, whether to fill a vacancy or not;

(c)   call a meeting of the members or the creditors of the company;

(d)   require a receiver, other than a qualifying administrative receiver, to vacate office;

(e)   do anything necessary for the management of the business, assets and affairs of the company;

(f)   apply to the Court for directions in respect of the administration of the company;

(g)   use the company's seal; and

(h)   do all acts on behalf of the company and execute any deed, receipt or other document in the name of the company.

(2)   Without limiting subsection (1), the administrator has the powers specified in Schedule **1**.                                                               Schedule 1

(3)   The following persons are not concerned to inquire whether the administrator is acting within his powers

(a)   a person dealing with the administrator in good faith and for value; and

(b)   a person who acquires any interest in assets of the company in administration from a person referred to in paragraph (a) in good faith and for value.

(4)   The acts of an administrator of a company are valid notwithstanding any defect in his nomination, appointment or qualifications.

(5)   Where a receiver is required to vacate office under subsection (1)(d) the Court may, on the application of the administrator or the receiver, may make such directions as it considers appropriate, including directions as to

(a)   the terms upon which assets are to be passed to the administrator;

(b)   the payment of the debts of preferential creditors; and

(c)   the payment of the remuneration of the receiver.

Power to deal
with assets
subject to
floating charge..

91.    (1)    The administrator of a company may dispose of any assets of the company that are subject only to a floating charge, whether or not the charge has crystallised.

(2)    Where assets are disposed of or otherwise dealt with under subsection (1), the holder of the security interest has the same priority in respect of any assets of the company directly or indirectly representing the assets disposed of as he would have had in respect of the assets subject to the security interest.

Application to
Court to deal
with other
charged assets.

92.    (1)    The Court may, on the application of the administrator, make an order authorizing the administrator to dispose of

(a)    assets of the company that are subject to a security interest that is not a floating charge; and

(b)    assets that are being used or occupied by or in the  possession of the company but of which some other person is the owner or lessor, including

(i)    goods supplied under a hire purchase, conditional sale or chattel leasing agreement, and

(ii)    goods supplied subject to a retention of title agreement;

if it considers that the disposal of the assets, with or without other assets, would be likely to promote one or more of the purposes specified in the administration order.

(2)    The administrator shall give five business days notice of an application under subsection (1) to

(a)    the holder of the charge over; or

(b)    the owner or lessor of;

the assets in respect of which the application is made.

(3)    It shall be a condition of an order under subsection (1) that

(a)    the net proceeds of the disposal; and

(b)    if those proceeds are less than such amount as the Court may determine, or as may be agreed, to be the fair market value of the assets disposed of, the sum required to make good the deficiency;

shall be applied towards discharging the sums payable to the interested person concerned.

(4) Where a condition under subsection (3) relates to two or more security interests, the net proceeds of the disposal and any sum required to be paid under subsection (3)(b) shall be applied towards discharging the sums secured by those security interests in the order of their priorities.

(5) Where an order is made under subsection (1), the administrator shall

(a) forthwith serve a sealed copy of the order on the holder of the charge or the owner or lessor of the goods, as the case may be; and

(b) within 14 days of the date of the order, file a notice in the prescribed form with the Registrar.

(6) An administrator commits an offence if he

(a) contravenes subsection (5), without reasonable excuse; or

(b) fails to comply with a condition imposed under this section.

Administrator as agent of company.

93. When performing a function or exercising a power as administrator of a company in administration, the administrator acts as the company's agent.

Removal and resignation of administrator.

94. (1) The Court may, on the application of a creditor of a company in administration or on its own motion, remove an administrator from office.

(2) An administrator

(a) may resign in such circumstances as may be prescribed or with the leave of the Court; and

(b) shall resign if he ceases to be an eligible insolvency practitioner.

(3) An administrator ceases to hold office with effect from the date that an administration order is discharged.

Vacancy in office of administrator of company.

95. (1) Where the administrator of a company in administration

(a) dies;

(b) is removed under section 94(1); or

    (c) resigns under section 94(2);

the Court may, on the application of a person specified in subsection (2) or on its own motion, fill the vacancy.

(2) An application under subsection (1) may be made

(a) by any continuing administrator;

(b) by the creditor's committee, if any; or

(c) where there is no administrator or no creditor's committee, by the company in administration, the board of the company or a creditor of the company.

(3) The provisions of this Act and the Rules applicable to giving notice of and advertising an administration order apply to an order of the Court filling a vacancy under subsection (1).

Remuneration of administrator.

96. (1) The administrator of a company is entitled to receive remuneration for his services as administrator.

(2) The remuneration payable to an administrator shall be fixed applying the principles set out in section 432.

Administrator to have charge over assets of company.

97. (1) The administrator has the following charges on the assets of the company in his possession or control:

(a) a first ranking charge for any sums payable in respect of debts or liabilities incurred, whilst he was administrator, under contracts entered into by him or a predecessor of his in the carrying out of the functions of administrator; and

(b) a second ranking charge for his remuneration.

(2) Subject to subsection (3), the charges specified in subsection (1)

(a) rank in priority to any floating charge to which the assets of the company may be subject; and

(b) continue to subsist after the termination of the administration.

(3) Where a debenture or other instrument creates a fixed charge and a floating charge over the assets of a company, subsection (2)(a) does not apply to any assets of the company that are subject to the fixed charge.

(4) A liability arising out of a contract of employment adopted by an administrator, or his predecessor, is a debt or liability for the purposes of subsection (1)(b) if

(a) it is a liability to pay a sum by way of wages or salary or a contribution to an occupational pension scheme; and

(b) it is in respect of services rendered wholly or partly after the adoption of the contract;

but not otherwise.

(5) For the purposes of subsection (4),

(a) wages or salary payable in respect of a period of holiday or absence from work through sickness or other good cause are deemed to be wages or salary in respect of services rendered in that period;

(b) a sum payable in lieu of holiday is deemed to be wages or salary in respect of services rendered in the period by reference to which the holiday entitlement arose; and

(c) that part of the liability representing payment in respect of services rendered before the adoption of the contract of employment shall be disregarded.

Release of administrator.

98. (1) A person who ceases to be the administrator of a company, may apply to the Court for his release and the Court may grant the release unconditionally or upon such conditions as it considers proper, or it may withhold it.

(2) If the Court withholds the release, it may make a compensation order against the former administrator under section 254.

(3) Subject to subsection (5), where a former administrator is released under this section, he is discharged from all liability in respect of any act or default of his in relation to the administration of the company.

(4) An order for the release of a former administrator may be revoked by the Court if the release was obtained by fraud or the suppression or concealment of any material fact.

(5) Subsection (3) does not prevent the Court from making an order under section 254 against an administrator who has been released under this section.

(6)    An administrator who obtains his release under this section shall file a notice in the prescribed form with the Registrar.

Statement of affairs.

99.    (1)    In this section, "relevant person" has the meaning set out in section 275.

(2)    The administrator of a company may require one or more relevant persons to prepare and submit to him a statement of affairs.

(3)    Subject to section 280, the administrator shall file with the Court each statement of affairs and each affidavit of concurrence that he receives.

## ADMINISTRATOR'S PROPOSALS

Administrator's proposals and creditors meeting.

100.    (1)    Subject to subsection (3), the administrator shall

(a)    prepare a report setting out his proposals for the achievement of one or more of the purposes in the administration order;

(b)    call a meeting of creditors for a date no later than  sixty days after the date of the administration order for the purpose of considering whether to approve his proposals;

(c)    send a copy of his report to each creditor together with the notice of the meeting;

(d)    send a copy of the notice calling the meeting and his report to each member of the company;

(e)    file a copy of the notice calling the meeting together with his report with the Registrar; and

(f)    cause the creditors' meeting to be advertised.

(2)    The report prepared by the administrator under subsection (1)(a) shall contain the matters prescribed by the Rules.

(3)    The administrator is not required to call a meeting of creditors under subsection (1)(b) where

(a)    he is of the opinion that the company has sufficient assets to enable each creditor of the company to be paid in full; and

(b)    the report prepared under subsection (1)(a) contains a statement that

      (i) the administrator is of the opinion that the company has sufficient assets to enable each creditor of the company to be paid in full, and

(ii) the administrator does not intend to call a meeting of creditors under this section.

(4) Notwithstanding subsection (3), if requested to do so by creditors whose debts amount to at least 10 per cent in value of the total debts of the company, the administrator shall call a meeting of creditors to be held no later than 30 days after the date upon which he receives the request.

(5) A request for a meeting under subsection (4) must be delivered to the administrator in the manner and within the period prescribed.

(6) An administrator who contravenes subsection (1) commits an offence.

Attendance at meeting of directors and others.

101. (1) If the administrator considers that it is reasonable to require the presence at a creditors' meeting called under 100 of a person specified in subsection (4), the administrator may, by notice, require the person to attend.

(2) In determining whether it is reasonable to require a person to attend the creditors' meeting, the matters that the administrator shall have regard to include

(a) the likely benefits of the person's attendance;

(b) the travel and associated expenses that will be incurred by him in attending the meeting, unless the administrator is prepared to pay those expenses;

(c) the distance that he would be required to travel to attend the meeting; and

(d) the time that it would take him to travel to and from and attend the meeting.

(3) A notice under subsection (1) requiring a person to attend a creditors' meeting shall be sent to that person at least 14 days prior to the date of the meeting and shall be accompanied by a copy of his report on his proposals.

(4) Subsection (1) applies to any officer of the company and any person who, at any time during the two years prior to the date of the notice, was an officer of the company.

(5)    A person commits an offence if

    (a)    he receives a notice to attend a creditors' meeting under subsection (1); and

    (b)    without reasonable excuse, he fails to attend the meeting.

Consideration of proposals by creditors.

102.  (1)    At the creditors' meeting called under section 100, the creditors may resolve to

    (a)    approve the administrator's proposals, with or without amendment;

    (b)    reject the proposals; or

    (c)    adjourn the meeting.

(2)    A resolution to approve the administrator's proposals is invalid and of no effect if

    (a)    the proposals have been amended without the consent in writing of the administrator; or

    (b)    the proposal has been amended otherwise than in accordance with section 103.

(3)    The administrator shall, within 14 days of the conclusion of a meeting called under section 100

    (a)    report the result of the meeting to the Court and file a copy of that report with the Registrar; and

    (b)    send a notice setting out the result of the meeting to every creditor.

(4)    The report and notice required under subsection (3) shall have annexed to it details of

    (a)    the proposals considered at the meeting and of any amendments to those proposals that were considered; and

    (b)    such proposals and amendments as were approved.

(5)    If the creditors resolve not to approve the administrator's proposals or fail to pass one of the resolutions specified in subsection (1), the Court may, by order

     (a) discharge the administration order and make such consequential provisions as it considers fit;

(b) adjourn the hearing, conditionally or unconditionally; or

(c) make an interim order or any other order that it considers fit.

(6) An administrator who contravenes subsection (3) commits an offence.

Amendment of proposals at creditors' meeting.

103. (1) Where, at a meeting called under section 100, the creditors wish to approve an amended proposal, the meeting shall be adjourned for sufficient time to enable the administrator to give all creditors not present or represented at the meeting at least two business days notice

(a) of the venue of the adjourned meeting; and

(b) of the amended proposal to be considered at the adjourned meeting.

(2) Where a meeting is adjourned under subsection (1), section 102 applies to the adjourned meeting.

(3) Subsection (1) does not apply if

(a) every creditor who was given notice of the meeting under section 100 is present or represented at the meeting; or

(b) the chairman of the meeting certifies in writing that an amendment is to correct minor errors or is otherwise not material.

Modification of proposals.

104. (1) Where proposals have been approved under section 102 and the administrator subsequently considers that they should be substantially modified, he shall

(a) prepare a report setting out his proposed modifications;

(b) call a meeting of creditors for the purpose of considering the report;

(c) send a copy of his report to each creditor together with the notice of the meeting;

(d) send a copy of the notice convening the meeting together with his report to each member of the company;

(e) file a copy of the notice calling the meeting together with his report with the Registrar; and

(f) cause the creditors' meeting to be advertised.

(2) At the creditors' meeting referred to in subsection (1), the creditors may resolve to

(a) approve the administrator's proposed modifications to the proposals, with or without amendment;

(b) reject the proposed modifications; or

(c) adjourn the meeting.

(3) Section 102(2) applies to the creditors' approval of the administrator's proposed modifications to the proposal under this section and if the creditors wish to amend the administrator's proposed modifications, section 103 applies.

(4) The administrator shall, within 14 days of the date of the meeting held under subsection (1)

(a) report the result of the meeting to the Court and file a copy of the report with the Registrar; and

(b) send a notice setting out the result of the meeting to every creditor.

(5) The report and notice required under subsection (4) shall have annexed to it details of

(a) the modifications to the proposal considered at the meeting and of any amendments to those modified proposals that were considered; and

(b) such proposals and amendments as were approved.

(6) An administrator who contravenes subsection (4) commits an offence.

MISCELLANEOUS

Commission's rights where company a regulated person.

105. Where a company in administration is or has been a regulated person,

(a) every notice or other document required to be sent to a creditor of the company under this Part shall also be sent to the Commission;

and

(b) notice shall be given to the Commission of any application to the Court under this Part in respect of the company.

Administrator's duty to keep accounting records.

106. (1) An administrator shall keep accounting records that correctly record and explain the receipts, expenditure and other transactions of the company in administration.

(2) The administrator shall retain the accounting records kept under subsection (1) for a period of not less than six years after the termination of the administration.

(3) An administrator who contravenes this section commits an offence.

Administrator to prepare and send out regular accounts and reports.

107. (1) An administrator shall prepare

(a) accounts of the receipts and payments of the company in administration; and

(b) a report on the progress of the administration;

covering the periods specified in subsection (2).

(2) The accounts and report prepared under subsection (1) shall cover

(a) the period of six months following his appointment;

(b) each subsequent period of six months; and

(c) where he ceases to act as administrator

(i) the period from the end of the period covered by the last accounts required to be prepared under this section, or if he acted as administrator for less than six months from the date of his appointment, to the date of his ceasing to act, and

(ii) the period from the date of his appointment to the date of his ceasing to act, unless prepared in accordance with subparagraph (i).

(3) An administrator shall, within sixty days of the last day of the period covered by the accounts and report

(a) file a copy of the accounts and report with the Court and with the Registrar;

(b)  send a copy of the accounts and report to each member of the creditors' committee, if any; and

(c)  if the company is or has been a regulated person file a copy of the accounts and report to the Commission.

(4)  An administrator who contravenes this section commits an offence.

Notification.   108. (1)  Where a company is in administration, every document of a type specified in subsection (2) shall

(a)  state that the company is in administration; and

(b)  specify the name of the administrator.

(2)  Subsection (1) applies to

(a)  every public document issued by or on behalf of the company; and

(b)  every public document issued by or on behalf of the administrator of the company on which the name of the company appears.

(3)  If subsection (1) is contravened the company, and each officer or administrator of the company who causes, permits or acquiesces in the contravention, commits an offence.

Meetings of creditors.   109. (1)  The administrator shall call a meeting of creditors if

(a)  a meeting is requisitioned by the creditors of the company in accordance with subsection (2); or

(b)  he is directed to do so by the Court.

(2)  A creditors' meeting may be requisitioned in accordance with the Rules by 10 per cent in value of the creditors of the company.

Discharge or variation of administration order.   110. (1)  The administrator of a company may, at any time, apply to the Court for the administration order to be discharged or to be varied to add to or change the purposes specified in the administration order.

(2)  An administrator shall make an application under subsection (1) if

(a)  he considers that the purposes specified in the order have been achieved or are incapable of achievement; or

(b) he is required to do so by a meeting of creditors.

(3) On the hearing of an application under subsection (1), the Court may discharge or vary the administration order and make such consequential provision as it considers fit, or adjourn the hearing conditionally or unconditionally, or make an interim order or any other order it considers fit, including an order under section 111.

Appointment of liquidator or dissolution of company on discharge of administration order.

111. (1) Where the Court makes an order for the discharge of an administration order made in respect of a company and the Court is satisfied that the company is insolvent

(a) the Court may make an order for the appointment of an eligible insolvency practitioner to be the liquidator of the company; or

(b) if it is satisfied that no useful purpose would be served by the appointment of a liquidator, the Court may dissolve the company.

(2) The Court may appoint the administrator of a company to be the liquidator under subsection (1)(a).

(4) An order under subsection (1)(a) takes effect as an order made under section 162 on the application of the company.

(5) Where an order is made for the appointment of a liquidator under this section, Part **VI** applies to the liquidation of the company.

Filing copy of discharge order with Registrar.

112. (1) Where an administration order is discharged or varied, the administrator or where the order is discharged the person who, immediately before the discharge, was the administrator of the company shall, within 14 days of the date of the order effecting the variation or discharge, file a copy of the order with the Registrar.

(2) A person who contravenes subsection (1) commits an offence.

PROTECTION OF INTERESTS OF CREDITORS AND MEMBERS

Application in respect of moratorium period.

113. (1) During the period beginning with the commencement of the moratorium period and ending with the making of an administration order, the Court may, on an application made by a creditor or member of the company, by a person affected by section 84 or, where the company is or has been a regulated person, by the Commission,

    (a)  give directions in relation to any matter arising in connection with that section; or

    (b)  make such other order as it considers fit.

  (2)  Without limiting subsection (1), an order under that subsection may

    (a)  regulate the management by the directors of the company's affairs, business and assets during the remainder of the moratorium period;

    (b)  require the directors to refrain from doing or continuing an act complained of by the applicant, or to do an act that the applicant has complained they have omitted to do;

    (c)  require the calling of a meeting of creditors or members for the purpose of considering such matters as the Court may direct; and

    (d)  make such provision as the Court considers necessary to protect the interests of one or more creditors of the company during the moratorium period.

  (3)  In making an order under this section, the Court shall have regard to the need to safeguard the interests of persons who have dealt with the company in good faith and for value.

Application on grounds of unfair prejudice.

114. (1)  At any time when an administration order is in force, an application may be made by a creditor or member of a company or, where the company is or has been a regulated person by the Commission for an order under subsection (2) on one or both of the following grounds:

    (a)  that the company's affairs, business and assets are being, or have been, managed by the administrator in a manner which unfairly prejudices the interests of the member or creditor; or

    (b)  that any actual or proposed act or omission of the administrator is or would be so prejudicial.

  (2)  Subject to subsections (3) and (4), where it is satisfied as to either of the grounds specified in subsection (1), the Court may make such order as it considers fit for giving relief in respect of the matters complained of, or adjourn the hearing conditionally or unconditionally, or make an interim or any other order that it considers fit.

  (3)  An order under subsection (2) shall not prejudice or prevent

    (a)  the implementation of proposals approved by the creditors under section 102; or

    (b)  where the application for the order was made more than 28 days after the approval of any proposals or revised proposals under section 102 or 104, the implementation of those proposals or revised proposals.

  (4)  Without limiting subsection (2), an order under that subsection may

    (a)  regulate the management by the administrator of the company's affairs, business and assets;

    (b)  require the administrator to refrain from doing or continuing an act complained of by the applicant, or to do an act that the applicant has complained he has omitted to do;

    (c)  require the calling of a meeting of creditors or members for the purpose of considering such matters as the Court may direct; and

    (d)  discharge the administration order and make such consequential provision as the Court considers fit.

  (5)  Section 91 is not to be taken as prejudicing an application to the Court under this section.

## PART IV

## RECEIVERSHIP

### PRELIMINARY

Interpretation for and scope of this Part.

115. (1)    In this Part, unless the context otherwise requires, "company" means the company in respect of whose assets a receiver is or may be appointed.

(2)    This Part applies to a receiver appointed

(a)    by the Court;

(b)    under a debenture or other instrument; or

(c)    under or in accordance with any other enactment.

(3)    Unless this Act expressly states otherwise, where, in respect of a receiver  appointed by the Court (other than as an administrative receiver), there is a conflict between this Act and the provisions of any other enactment or rule of law or the Civil Procedure Rules, the provisions of the enactment or rule of law or the Civil Procedure Rules, as the case may be, shall prevail.

(4)    Where an administrative receiver is appointed in respect of a company, that company is referred to in this Act as "in administrative receivership".

### GENERAL

Persons not to be appointed or act as receiver.

116. (1)    Subject to subsection (2), the following persons are not eligible to be appointed as receiver in respect of a company and shall not accept appointment or act as such a receiver

(a)    a mortgagee of any assets of the company;

(b)    a person who is, or within the previous 2 years has been,

(i)    an officer or employee of a mortgagee of any assets of the company, or

(ii)    a shareholder in or member of the company or a related company;

(c)    a person who, pursuant to section 477 is disqualified from holding a licence;

    (d) a person who, in an insolvency proceeding, would not be eligible to act as an insolvency practitioner in respect of the company pursuant to section 482(2);

(e) a body corporate; and

(f) such other persons as may be prescribed.

(2) The Court may appoint

(a) the Official Receiver; or

(b) a person who is not eligible under subsection (1);

as a receiver, other than an administrative receiver.

(3) A person who accepts or purports to accept appointment or acts or purports to act as a receiver contrary to subsection (1) commits an offence.

Appointment of joint receivers.

117. (1) A power conferred by a debenture or other instrument to appoint a receiver includes the power to appoint

(a) two or more joint receivers;

(b) an additional receiver to act jointly with the receiver in office; and

(c) a receiver to succeed a receiver who has vacated office;

unless the debenture or other instrument expressly provides otherwise.

(2) Joint receivers may act jointly or severally unless the instrument under which, or the Court order by which, they are appointed expressly provides otherwise.

(3) Unless the context otherwise requires, in this Act and the Rules, “receiver” and “administrative receiver” includes two or more persons appointed as joint receivers or joint administrative receivers, as the case may be.

Notice of appointment.

118. (1) A receiver shall forthwith upon being appointed

(a) send a notice of his appointment to the company; and

(b) file a notice of his appointment

(i) with the Registrar, and

(ii)  if the company is or has been a regulated person, with the Commission.

(2)  In addition to complying with subsection (1), an administrative receiver shall

(a)  subject to subsection (3), within five business days after being appointed, cause a notice of his appointment to be advertised; and

(b)  within 28 days after being appointed, send a notice of his appointment to all creditors of the company in receivership.

(3)  Subsection (2)(a) does not apply to a receiver appointed

(a)  to act jointly with an existing administrative receiver; or

(b)  to act in place of an administrative receiver who has died or ceased to act.

(4)  A receiver who contravenes subsection (1) and an administrative receiver who contravenes subsection (2) commits an offence.

Notification of receivership.

119. (1)  Where a company is in receivership, every document to which subsection (2) applies shall contain a statement that a receiver has been appointed.

(2)  Subsection (1) applies to

(a)  every public document issued by or on behalf of the company; and

(b)  every public document issued by or on behalf of the receiver or any liquidator of the company on which the name of the company appears.

(3)  A failure to comply with subsection (1) does not affect the validity of the document.

(4)  A person who contravenes subsection (1), or who causes, permits or acquiesces in a contravention of subsection (1), commits an offence.

Vacation of office.

120. (1)  The office of receiver becomes vacant if the person holding the office

(a)  dies;

(b)  resigns;

(c)   vacates his office in accordance with subsection (2); or

(d)   is removed from office in accordance with section 123.

(2)   A receiver appointed out of court shall vacate his office forthwith if he ceases to be eligible to act as a receiver in accordance with section 116(1).

(3)   Where a receiver vacates office in accordance with subsection (2), he shall, as soon as practicable, give notice to

(a)   the person who appointed him;

(b)   the company, or

(i)   if the company is in liquidation, its liquidator, and

(ii)   if the company is in administration, its administrator; and

(c)   the members of the creditors' committee, if any.

(4)   A receiver appointed by the Court shall as soon as practicable notify the Court if he ceases to be eligible to act as a receiver in accordance with section 116(1).

(5)   Where a vacancy in the office of receiver occurs as a result of the resignation or removal of the person holding office as receiver or as a result of the person holding office vacating office under subsection (4), that person shall, within seven days of his ceasing to hold office, give notice in the prescribed form to the Registrar.

(6)   Where a receiver vacates office, unless the Court otherwise orders

(a)   his remuneration; and

(b)   any indemnity to which he is entitled out of the assets of the company;

shall be charged on and paid out of any assets of the company that are in his custody or under his control at that time in priority to any security interest held by the person by or on whose behalf he was appointed.

(7)   A person who contravenes subsections (2), (3), (4) or (5) commits an offence.

196. (1) For the purposes of this section, a "past member" of a company is a person who ceased to be a member of the company at any time during the period of one year before the commencement of the liquidation of the company.

(2) Unless the Court is satisfied that the members of a company are able to discharge the liabilities set out in 195(1), a past member of a company in liquidation is liable to contribute to the assets of the company for the purposes specified in that subsection to the same extent as a member.

(3) Notwithstanding subsection (2), a past member is not liable to contribute to the assets of the company in respect of any liability of the company contracted after he ceased to be a member.

Dividends payable to member.

197. A member, and a past member, of a company may not claim in the liquidation of the company for a sum due to him in his character as a member, whether by way of dividend, profits, redemption proceeds or otherwise, but such sum is to be taken into account for the purposes of the final adjustment of the rights of members and, if appropriate, past members between themselves.

Liability where limited company becomes unlimited company.

198. (1) This section applies where an unlimited company in liquidation was at some former time registered as a limited company.

(2) A person who ceased to be a member of a company before the company became registered as an unlimited company, and has not since become a member of the company, is liable to contribute to the assets of the company only to the extent that he would have been liable had the company remained registered as a limited company.

Liability where unlimited company becomes limited company.

199. (1) This section applies where a limited company in liquidation was at some former time registered as an unlimited company.

(2) Notwithstanding section 196, if a company referred to in subsection (1) goes into liquidation within the period of one year from the date on which it was registered as a limited company, a person who was a member of the company at the date of its registration as a limited company is liable, without limit, to contribute to the assets of the company in respect of liabilities contracted before that time.

Liability of personal representative.

200. The personal representatives of a member or past member who has died are liable to contribute out of his estate to the assets of the company under sections 195, 196, 198 and 199 to the same extent as the member.

Effect of member or past member becoming bankrupt.

201. The liquidator of a company is entitled to submit a claim in the bankruptcy or liquidation of any member or past member of the company in respect of any contribution that the member or past member is required to make under sections 195, 196, 198 and 199.

(2) In carrying on the insurance company's long term business under subsection (1), the liquidator may agree to the variation of any contracts of insurance at the commencement of the liquidation, but he shall not effect any new contracts of insurance.

(3) On the application of the liquidator of a long term insurance company, the Court may by order reduce the amounts of the contracts made by the company in the course of carrying on its long term business.

(4) An order under subsection (3) may be made subject to such conditions as the Court considers appropriate.

(5) Without limiting section 186 or Schedule **2**, the liquidator of a long term insurance company may appoint an actuary to investigate and report to him on the long term business of the company and, if appropriate, to conduct actuarial valuations of the business.

Schedule 2

243. (1) In the liquidation of a long term insurance company, the assets of the segregated funds of the company shall first be applied to meet the company's long term liabilities attributable to such funds.

Protection of segregated funds and assets.

(2) If the value of the assets referred to in subsection (1) exceeds the amount of the long term liabilities of the company attributable to the segregated funds, the excess is an asset of the company available for distribution in accordance with this Act.

(3) Where the Court makes an order under section 254(3) in respect of a long term insurance company requiring a person to repay, restore or account for money or other assets, to pay compensation to the company or to pay interest to the company, the Court shall, insofar as the delinquency relates to assets belonging to the company's segregated funds, order that the money, assets or contribution is to be treated for the purposes of subsection (1) as assets of those funds.

## PART VIII

## VOIDABLE TRANSACTIONS

244. (1) In this Part,

Interpretation for this Part.

"insolvent liquidation" means a liquidation of a company where the assets of the company are insufficient to pay its liabilities and the expenses of the liquidation;

"insolvency transaction" has the meaning specified in subsection (2).

"onset of insolvency" means

(a)  the date on which the application for the administration order was filed, where a company is in liquidation and the liquidator was appointed by the Court immediately following the discharge of an administration order;

(b)  the date on which the application for the appointment of the liquidator was filed, where a company is in liquidation and the liquidator was appointed by the Court in circumstances other than those set out in paragraph (a); or

(c)  the date of the appointment of the liquidator, where a company is in liquidation and the liquidator was appointed by the members.

"voidable transaction" means

(a)   an unfair preference;

(b)   an undervalue transaction;

(c)   a floating charge that is voidable under section 247; and

(d)   an extortionate credit transaction.

"vulnerability period", means,

(a)  for the purposes of sections 245, 246 and 247

(i)  in the case of a transaction entered into with, or a preference given to, a connected person, the period commencing 2 years prior to the onset of insolvency and ending on the appointment of the administrator or, if the company is in liquidation, the liquidator; and

(ii)  in the case of a transaction entered into with, or a preference given to, any other person, the period commencing six months prior to the onset of insolvency and ending on the appointment of the administrator or, if the company is in liquidation, the liquidator; and

(b) for the purposes of section 248, the period commencing 5 years prior to the onset of insolvency and ending on the appointment of the administrator or, if the company is in liquidation, the liquidator;

(2) A transaction is an insolvency transaction if

(a) it is entered into at a time when the company is insolvent; or

(b) it causes the company to become insolvent;

(3) For the purposes of subsection (2), "insolvent" has the meaning specified in section 8(1) with the deletion of paragraph (c)(i).

(4) This Part applies in respect of

(a) a company that is in administration; and

(b) a company and a foreign company that is in liquidation and, where appropriate, "company" includes a foreign company.

Unfair preferences.

245. (1) Subject to subsection (2), a transaction entered into by a company is an unfair preference given by the company to a creditor if the transaction

(a) is an insolvency transaction;

(b) is entered into within the vulnerability period; and

(c) has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if the transaction had not been entered into.

(2) A transaction is not an unfair preference if the transaction took place in the ordinary course of business.

(3) A transaction may be an unfair preference notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a transaction entered into by a company within the vulnerability period has the effect specified in subsection (1)(c) in respect of a creditor who is a connected person, unless the contrary is proved, it is presumed that the transaction was an insolvency transaction and that it did not take place in the ordinary course of business.

Undervalue transactions.

246. (1) Subject to subsection (2), a company enters into an undervalue transaction with a person if

(a) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration; or

(b) the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company; and

(c) in either case, the transaction concerned

(i) is an insolvency transaction; and

(ii) is entered into within the vulnerability period.

(2) A company does not enter into an undervalue transaction with a person if

(a) the company enters into the transaction in good faith and for the purposes of its business; and

(b) at the time when it enters into the transaction, there were reasonable grounds for believing that the transaction would benefit the company.

(3) A transaction may be an undervalue transaction notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a company enters into a transaction with a connected person within the vulnerability period and the transaction falls within subsection (1)(a) or subsection (1)(b), unless the contrary is proved, it is presumed that

(a) the transaction was an insolvency transaction; and

(b) subsection (2) did not apply to the transaction.

Voidable floating charges.

247. (1) Subject to subsection (2), a floating charge created by a company is voidable if

(a) it is created within the vulnerability period; and

(b) it is an insolvency transaction.

(2) A floating charge is not voidable to the extent that it secures

(a) money advanced or paid to the company, or at its direction, at the same time as, or after, the creation of the charge;

(b) the amount of any liability of the company discharged or reduced at the same time as, or after, the creation of the charge;

(c) the value of assets sold or supplied, or services supplied, to the company at the same time as, or after, the creation of the charge; and

(d) the interest, if any, payable on the amount referred to in paragraphs (a) to (c) pursuant to any agreement under which the money was advanced or paid, the liability was discharged or reduced, the assets were sold or supplied or the services were supplied.

(3) For the purposes of this section, where a company creates a floating charge in favour of a connected person within the vulnerability period, unless the contrary is proved, it is presumed that the charge was an insolvency transaction.

(4) For the purposes of subsection (2)(c), the value of assets or services sold or supplied is the amount in money which, at the time they were sold or supplied, could reasonably have been expected to be obtained for the sale or supply of the goods or services in the ordinary course of business and on the same terms, apart from the consideration, as those on which the assets or services were sold or supplied to the company.

Extortionate credit transactions.

248. A transaction entered into by the company within the vulnerability period for, or involving the provision of, credit to the company is an extortionate credit transaction if, having regard to the risk accepted by the person providing the credit

(a) the terms of the transaction are or were such as to require grossly exorbitant payments to be made (whether unconditionally or in certain contingencies) in respect of the provision of credit; or

(b) the transaction otherwise grossly contravenes ordinary principles of fair trading.

Orders in respect of voidable transactions.

249. (1) Subject to section 250, where it is satisfied that a transaction entered into by a company is a voidable transaction the Court, on the application of the liquidator of the company,

(a)  may make an order setting aside the transaction in whole or in part;

(b)  in respect of an unfair preference or an undervalue transaction, may make such order as it considers fit for restoring the position to what it would have been if the company had not entered into that transaction; and

(c)  in respect of an extortionate credit transaction, may by order provide for any one or more of the following:

    (i)  the variation of the terms of the transaction or the terms on which any security interest for the purposes of the transaction is held;

    (ii)  the payment by any person who is or was a party to the transaction to the liquidator of any sums paid by the company to that person by virtue of the transaction;

    (iii) the surrender by any person to the liquidator of any asset held by him as security for the purposes of the transaction; and

    (iv)  the taking of accounts between any persons.

(2)  Without prejudice to the generality of subsection (1)(b), an order under that paragraph may

(a)  require any assets transferred as part of the transaction to be vested in the company;

(b)  require any assets to be vested in the company if it represents in any person's hands the application either of the proceeds of sale of assets transferred or of money transferred, in either case as part of the transaction;

(c)  release or discharge, in whole or in part, any security interest given by the company or the liability of the company under any contract;

(d)  require any person to pay, in respect of benefits received by him from the company, such sums to the liquidator as the Court may direct;

(e)  provide for any surety or guarantor whose obligations to any person were released or discharged, in whole or in part, under the transaction, to be under such new or revived obligations to that

person as the Court considers appropriate;

(f) provide for security to be provided for the discharge of any obligation imposed by or arising under the order, for such an obligation to be charged on any assets and for the security interest or charge to have the same priority as a security interest or charge released or discharged, in whole or in part, under the transaction;

(g) provide for a person effected by an order made under subsection (1) to prove in the liquidation of the company in such amount as the Court considers fit; and

(h) require the company to make a payment or transfer assets to any person affected by an order made under subsection (1).

(3) Subject to section 250, in respect of an unfair preference or an undervalue transaction, an order under subsection (1) may affect the assets of, or impose any obligation on, any person whether or not he is the person with whom the company in question entered into the transaction.

Limitations on orders under section 249.

250. (1) This section applies to an order made under section 249(1) in respect of an unfair preference or an undervalue transaction.

(2) An order to which subsection (1) applies shall not

(a) prejudice any interest in assets that was acquired in good faith and for value from a person other than the company, or prejudice any interest deriving from such an interest; or

(b) require a person who received a benefit from the transaction in good faith and for value to pay a sum to the liquidator, except where that person was a party to the transaction or, in respect of an unfair preference, the preference was given to that person when he was a creditor of the company.

(3) For the purposes of subsection (2), where a person would, apart from the requirement for good faith, fall within the circumstances specified in paragraph (a) or (b), it is presumed, unless the contrary is proved, that he acquired the interest or received the benefit in good faith.

(4) Subsection (3) does not apply to a person

(a) who, at the time of the transaction, had notice of

(i) the fact that the transaction was an unfair preference or an undervalue transaction, as the case may be; or

(ii)  the relevant proceedings as defined in subsection (5); or

(b)  who was, at the time of the transaction, a connected person.

(5)  For the purposes of subsection (4), a person has notice of the relevant proceedings if,

(a)  in the case of a company in administration, he had notice of the filing of the application on which the administration order was made;

(b)  in the case of a company where a liquidator was appointed immediately following the discharge of an administration order, he had notice of the filing of the application on which the administration order was made or the filing of the application on which the order appointing a liquidator was made; or

(c)  in the case of a company where a liquidator was appointed in circumstances other than those set out in paragraph (b), he had notice of the filing of the application on which the order appointing a liquidator was made.

Recoveries.    251. Any money paid to, assets recovered or other benefit received by the liquidator as a result of an order made under section 249 are deemed to be assets of the company available to pay unsecured creditors of the company.

Remedies not exclusive.    252.    The provisions of this Part apply without prejudice to the availability of any other remedy, even in relation to a transaction that the company had no power to enter into.

## PART IX

## MALPRACTICE

Interpretation for this Part.    253.  In this Part,

(a)  a company or a foreign company goes into insolvent liquidation if a liquidator is appointed at a time when its assets are insufficient to pay its liabilities and the expenses of the liquidation; and

(b)  a relevant company is a company or a foreign company that has gone into insolvent liquidation.

Summary remedy against delinquent officers and others.

254. (1) On the application of the liquidator of a relevant company, the Court may make an order under subsection (3) where it is satisfied that a person specified in subsection (2)

(a) has misapplied or retained, or become accountable for any money or other assets of the company; or

(b) has been guilty of any misfeasance or breach of any fiduciary or other duty in relation to the company.

(2) An order under subsection (3) may be made against a person

(a) who is or has been an officer of the company;

(b) who has acted as liquidator of the company;

(c) who, in the case of a relevant company that is not a foreign company, has acted as administrator, administrative receiver, supervisor or interim supervisor of the company; or

(d) who, not being a person falling within paragraphs (a) or (b), is or has been concerned in the promotion, formation, management, liquidation or dissolution of the company.

(3) Where subsection (1) applies, the Court may make one or more of the following orders against the person:

(a) that he repays, restores or accounts for the money or other assets, or any part of it;

(b) that he pays to the company as compensation for the misfeasance or breach of duty such sum as the Court considers just; and

(c) that he pays interest to the company at such rate as the Court considers just.

(4) The Court shall not make an order under subsection (3) unless it has given the person the opportunity

(a) to give evidence, call witnesses and bring other evidence in relation to the application; and

(b) to be represented, at his own expense, by a legal practitioner who may put to him, or to other witnesses, such questions as the Court may allow for the purpose of explaining or qualifying any answers or evidence given.

(5)    Application may not be made for an order under this section against a liquidator or an administrator who has been released, except with the leave of the Court.

(6)    Nothing in this section prevents any person from instituting any other proceedings in relation to matters in respect of which an application may be made under this section.

Fraudulent trading.

255.  (1)    On the application of the liquidator of a relevant company, the Court may make an order under subsection (2) where it is satisfied that, at any time before the commencement of the liquidation of the company, any of its business has been carried on

      (a)    with intent to defraud creditors of the company or creditors of any other person; or

      (b)    for any fraudulent purpose.

(2)    Where subsection (1) applies, the Court may declare that any person who was knowingly a party to the carrying on of the business in such manner are liable to make such contribution, if any, to the company's assets as the Court considers proper.

Insolvent trading.

256.  (1)    On the application of the liquidator of a relevant company, the Court may make an order under subsection (2) against a person who is or has been a director of the company if it is satisfied that

      (a)    at any time before the commencement of the liquidation of the company, that person knew or ought to have concluded that there was no reasonable prospect that the company would avoid going into insolvent liquidation, and

      (b)    he was a director of the company at that time.

(2)    Subject to subsection (3), where subsection (1) applies, the Court may order that that the person concerned makes such contribution, if any, to the company's assets as the Court considers proper.

(3)    The Court shall not make an order against a person under subsection (2) if it is satisfied that after he first knew, or ought to have concluded, that there was no reasonable prospect that the company would avoid going into insolvent liquidation, he took every step reasonably open to him to minimise the loss to the company's creditors.

(4) For the purposes of subsections (1) and (3), the facts which a director of a company ought to know or ascertain, the conclusions which he ought to reach and the steps reasonably open to him which he ought to take are those which would be known or ascertained, or reached or taken, by a reasonably diligent person having both

(a) the general knowledge, skill and experience that may reasonably be expected of a person carrying out the same functions as are carried out by that director in relation to the company; and

(b) the general knowledge, skill and experience that that director has.

(5) The reference in subsection (4) to the functions carried out in relation to a company by a director of the company includes any function which he does not carry out but which have been entrusted to him.

(6) Nothing in this section affects section 255.

Recoveries under sections 255 and 256.

257. Any money paid to, assets recovered or other benefit received by the liquidator as a result of an order made under section 255 or section 256 are deemed to be assets of the company available to pay unsecured creditors of the company.

Ancillary orders.

258. (1) Where the Court makes an order under section 255 or section 256, it may make give such directions or make such further order as it considers proper for giving effect to the order.

(2) Without limiting subsection (1), the Court may

(a) provide for the liability of any person under the order to be a charge on any debt or obligation due from the company to him, or on any mortgage or charge or any interest in a mortgage or charge on assets of the company held by or vested in him, or any person on his behalf, or any person claiming as assignee from or through the person liable or any person acting on his behalf; and

(b) from time to time make such further order as may be necessary for enforcing any charge imposed under this subsection.

(3) For the purposes of subsection (2), "assignee"

(a) includes a person to whom or in whose favour, by the directions of the person made liable, the debt, obligation, mortgage or charge was created, issued or transferred or the interest created, but

bankruptcy order was filed;

"voidable transaction" means

(a) an unfair preference;

(b) an undervalue transaction;

(c) a voidable general assignment of book debts; or

(d) an extortionate credit transaction;

"vulnerability period" means,

(a) for the purposes of sections 401, 402 and 403,

(i) in the case of a transaction entered into with, or a preference given to, a connected person, the period commencing 2 years prior to the onset of insolvency and ending on the date of the bankruptcy order; and

(ii) in the case of a transaction entered into with, or a preference given to, any other person, the period commencing six months prior to the onset of insolvency and ending on the date of the bankruptcy order; and

(b) for the purposes of section 404, the period commencing 5 years prior to the onset of insolvency and ending on the date of the bankruptcy order;

(2) A transaction is an insolvency transaction if

(a) it is entered into at a time when the debtor is insolvent; or

(b) it causes the debtor to become insolvent;

(3) For the purposes of subsection (2)(b), an individual is insolvent if he is unable to pay his debts as they fall due for payment.

(4) This Part applies in respect of an individual only if a bankruptcy order is made against him.

Unfair preferences.

401. (1) Subject to subsection (2), a transaction entered into by an individual is an unfair preference given by the individual to a creditor if the transaction

(a) is an insolvency transaction;

(b) is entered into within the vulnerability period; and

(c) has the effect of putting the creditor into a position which, in the event of the individual becoming a bankrupt, will be better than the position he would have been in if the transaction had not been entered into.

(2) A transaction is not an unfair preference if the transaction took place in the ordinary course of business.

(3) A transaction may be an unfair preference notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a transaction entered into by an individual within the vulnerability period has the effect specified in subsection (1)(c) in respect of a creditor who is a connected person, unless the contrary is proved, it is presumed that the transaction was an insolvency transaction and that it did not take place in the ordinary course of business.

Undervalue transactions.

402. (1) Subject to subsection (2), an individual enters into an undervalue transaction with a person if

(a) he makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for him to receive no consideration; or

(b) he enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by him; and

(c) in either case, the transaction concerned

(i) is an insolvency transaction; and

(ii) is entered into within the vulnerability period.

(2) An individual does not enter into an undervalue transaction with a person if

(a) the individual enters into the transaction in good faith and for the purposes of his business; and

(b) at the time when he enters into the transaction, there were

(3) In granting relief under this section to a representative of a foreign ancillary proceeding, the Court shall be satisfied that the relief relates to property that, under the law of the Virgin Islands, should be administered in the foreign ancillary proceeding or concerns information required in that proceeding.

Protection of creditors and other interested persons.

455. (1) In granting or denying relief under section 452 or 454, or in modifying or terminating relief under subsection (3), the Court shall be satisfied that the interests of the creditors and other interested persons, including the debtor, are adequately protected.

(2) The Court may subject relief granted under section 452 or 454 to such conditions as it considers appropriate, including the giving of any security interest or the filing of any bond.

(3) The Court may, at the request of the foreign representative or a person affected by relief granted under section 452 or 454, or at its own motion, modify or terminate the relief.

Actions to avoid acts detrimental to creditors.

456. (1) Subject to subsection (2), upon recognition of a foreign proceeding, the foreign representative shall have power to apply to the Court for an order under section 249 or 405, as the case may be.

(2) The Court shall not make an order under section 249 or 405 on the application of the foreign representative of a recognised foreign proceeding unless it is satisfied that,

(a) in the case of an application under section 249, the foreign representative has roles and functions that are equivalent or broadly similar to the roles and functions of a liquidator appointed under this Act; and

(b) in the case of an application under section 405, the foreign representative has roles and functions that are equivalent or broadly similar to the roles and functions of a bankruptcy trustee appointed under this Act.

(3) When the foreign proceeding is a foreign ancillary proceeding, the Court shall be satisfied that the action relates to property that, under the law of the Virgin Islands, should be administered in the foreign ancillary proceeding.

Intervention by foreign representative in proceedings in the Virgin Islands.

457. Upon recognition of a foreign proceeding, the foreign representative may, if the requirements of the law of the Virgin Islands are met, intervene in any proceedings in which the debtor is a party.

(3)    The designation of a country for the purposes of Part **XVIII** does not affect the validity of any order made under this Part.

Order in aid of foreign proceeding.

467. (1)    For the purposes of this section "property" means property that is subject to or involved in the foreign proceeding in respect of which the foreign representative is authorized.

(2)    A foreign representative may apply to the Court for an order under subsection (3) in aid of the foreign proceeding in respect of which he is authorized.

(3)    Subject to section 468, upon an application under subsection (1), the Court may

(a)    restrain the commencement or continuation of any proceedings, execution or other legal process or the levying of any distress against a debtor or in relation to any of the debtor's property;

(b)    subject to subsection (4), restrain the creation, exercise or enforcement of any right or remedy over or against any of the debtor's property;

(c)    require any person to deliver up to the foreign representative any property of the debtor or the proceeds of such property;

(d)    make such order or grant such relief as it considers appropriate to facilitate, approve or implement arrangements that will result in a co-ordination of a Virgin Islands insolvency proceeding with a foreign proceeding;

(e)    appoint an interim receiver of any property of the debtor for such term and subject to such conditions as it considers appropriate;

(f)    authorize the examination by the foreign representative of the debtor or of any person who could be examined in a Virgin Islands insolvency proceeding in respect of a debtor;

(g)    stay or terminate or make any other order it considers appropriate in relation to a Virgin Islands insolvency proceeding; or

(h)    make such order or grant such other relief as it considers appropriate.

(4)    An order under subsection (3) shall not affect the right of a secured creditor to take possession of and realise or otherwise deal with property of the debtor over which the creditor has a security interest.

(5) In making an order under subsection (3), the Court may apply the law of the Virgin Islands or the law applicable in respect of the foreign proceeding.

Matters to be considered by Court in determining application under section 467.

468. (1) In determining an application under section 467, the Court shall be guided by what will best ensure the economic and expeditious administration of the foreign proceeding to the extent consistent with

(a) the just treatment of all persons claiming in the foreign proceeding;

(b) the protection of persons in the Virgin Islands who have claims against the debtor against prejudice and inconvenience in the processing of claims in the foreign proceeding;

(c) the prevention of preferential or fraudulent dispositions of property subject to the foreign proceeding, or the proceeds of such property;

(d) the need for distributions to claimants in the foreign proceedings to be substantially in accordance with the order of distributions in a Virgin Islands insolvency; and

(e) comity.

(2) An order under section 467 shall not, without the consent of the person concerned,

(a) affect the right of any creditor of the debtor to benefit from set-off as provided for in section 150; or

(b) result in a person who is a preferential creditor of the debtor, or who in a Virgin Islands insolvency proceeding in respect of the debtor would be a preferential creditor, receiving less than he would receive in a Virgin Islands insolvency proceeding .

(3) The Court shall not make an order under 467 that is contrary to the public policy of the Virgin Islands.

Limitation on effect of application under this Part.

469. (1) Subject to subsection (2), an application to the Court by a foreign representative under section 467 does not submit the foreign representative to the jurisdiction of the Court for any other purpose except with regard to the costs of the proceedings.

(2) The Court may make an order under this Part conditional on the compliance by the foreign representative with any other order of the Court.

TAB 89

BVI Securities and Investment Business Act 2010 § 91

**No. 2 of 2010**

**VIRGIN ISLANDS**

# SECURITIES AND INVESTMENT BUSINESS ACT, 2010

## ARRANGEMENT OF SECTIONS

*Section*

**PRELIMINARY PROVISIONS**

**1.** Short title and commencement.
**2.** Interpretation.
**3.** Meaning of "investment activity" and "investment business".

**PART I**

**INVESTMENT BUSINESS**

*Unauthorised investment business*

**4.** Prohibition on unauthorised investment business.

*Licensing*

**5**. Categories of, and restrictions on, investment business licence.
**6.** Application for, and issuance of, licence.

*Financial Resource Requirements*

**7**. Maintenance of financially sound condition.
**8.** Maintenance of capital resources.
**9.** Shares.

**91.** (1) A person commits an offence if, for the purpose specified in subsection (2), he

Misleading statements and market manipulation.

(a) makes a statement, promise or forecast which he knows to be misleading, false or deceptive;

(b) dishonestly conceals any material facts; or

(c) recklessly makes, whether dishonestly or otherwise, a statement, promise or forecast which is misleading, false or deceptive.

(2) The purpose referred to in subsection (1) is the purpose of inducing another person, whether or not that other person is the person to whom the statement, promise or forecast is made or from whom the facts are concealed,

(a) to enter, or offer to enter into, or refrain from entering into, an agreement or arrangement the making of which or performing of which constitutes investment business; or

(b) to exercise, or refrain from exercising, any rights conferred by an investment.

(3) Subsection (2) applies whether the person intended to induce the other person or was reckless as to whether it would induce that other person, in the manner specified in that subsection.

(4) A person commits an offence if he does any act or engages in any course of conduct and

(a) the act or course of conduct concerned creates a false or misleading impression as to the market, price or value of an investment;

(b) the person does the act or engages in the course of conduct concerned for the purpose of creating the impression and thereby inducing another person

(i) to deal in the investment; or

(ii) refrain from doing so or to exercise, or refrain from exercising, any rights conferred by that investment.

(5) A person commits an offence under this section only if

(a) the statement, promise or forecast is made in, or from, the Virgin Islands;

(b) the facts are concealed in, or from, the Virgin Islands; or

    (c)    the arrangement referred to in subsection (2)(a) are made in, or from, the Virgin Islands.

    (6)    A person who commits an offence under this section is liable

    (a)    on summary conviction, to a fine not exceeding forty thousand dollars or imprisonment for a term not exceeding three years, or both; or

    (b)    on conviction on indictment, to a fine not exceeding one hundred thousand dollars or imprisonment for a term not exceeding five years, or both.

Defences.

**92.**    (1)    A person does not commit an offence under section **91** in relation to a statement, promise or forecast if

    (a)    the statement, promise or forecast was made in respect of a securities market; and

    (b)    he proves that he acted in compliance with the market rules applicable to the securities market concerned.

    (2)    A person does not commit an offence under section **91** in relation to an act or a course of conduct if he undertook the act, or engaged in the course of conduct, in respect of a securities market and he proves that

    (a)    he reasonably believed that the act or conduct would not create an impression that was false or misleading as to the matters contained in section **91**(4); or

    (b)    he acted in compliance with the market rules applicable to the securities market concerned.

*General exclusion*

Monetary policy exclusion.

**93.**    Sections **88** and **91** do not apply to anything done by a person acting on behalf of a public sector body in pursuit of

    (a)    monetary policies;

    (b)    policies with respect to exchange rates; or

    (c)    policies with respect to the management of public debt or foreign exchange reserves.

TAB 90

BVI and other Islands: The Supreme Courts Order 1967 (SI 1967/223)

STATUTORY INSTRUMENTS.

1967 No. 223

ASSOCIATED STATES

# THE SUPREME COURT ORDER 1967.

*Made* – – – *22nd February,* 1967
*Coming into Operation* *27th February,* 1967

[*This Order is printed as amended by the Anguilla, Montserrat and Virgin Islands (Supreme Court) Order* 1983 (*U.K. — S.I.* 1983 *No.* 1108), *S.R.O.* 41/1975, 42/1975, 12/1976 *and* 29/1978 *and S.I.* 2/1985, 10/1985 *and* 27/1990.]

At the Court at Buckingham Palace, the 22nd day of February, 1967.

*Present,*
*The Queen's Most Excellent Majesty in Council*

Her Majesty, by virtue and in exercise of Her powers under section 6 of the West Indies Act 1967*(a)*, is pleased, by and with the advice of Her Privy Council, to order, and it is hereby ordered, as follows:—

## PART 1—INTRODUCTORY

Citation, commencement and revocation.

**1.** (1) This Order may be cited as the Supreme Court Order 1967.

S. I. 1983 No. 1108

(2) This Order shall come into operation on 27th February 1967:

Provided that the provisions of subsection (3) of this section and sections 18 to 23 of this Order shall come into operation on such later date (hereinafter referred to as "the prescribed date") as the Chief Justice may by order prescribe.

(3) The Windward Islands and Leeward Islands (Courts) Order in Council 1959*(b)*, as amended*(c)*, (hereinafter referred to as "the Order of 1959") and the British Caribbean Court of Appeal Order in Council 1962*(d)*, as amended *(e)*, (hereinafter referred to as "the Order of 1962") are revoked in so far as they have effect as part of the law of each State:

*(a)* 1967 c.4.
*(b)* S.I. 1959/2197 (1959 I, p.563).
*(c)* The relevant amending Orders are S.I. 1960/1658, 1962/1084, 1967/162 (1960 I, p. 473; 1962 II, p. 1220).
*(d)* S.I. 1962/1086 (1962 II, 1247)
*(e)* The relevant amending Orders are S.I. 1962/1245, 1962/1870, 1966/575, 1966/1455 (1962 II pp. 1367, 2186; 1966

Provided that the provisions of sections 21(2) and 22(5) of the Order of 1959 and article 9 of the Order of 1962 shall continue in force as part of the law of each State as if those Orders had not been revoked.

Interpretation. S.I. 1983 No. 1108

**2.** (1) In this Order "State" means any of the following, that is to say—

Antigua, and Barbuda
Dominica,
Saint Christopher and Nevis,
Saint Lucia, and
Saint Vincent and the Grenadines.

(2) In this Order any reference to a State shall be construed as including a reference to its dependencies (if any).

(3) In this Order, unless the context otherwise requires, any reference to the holder of an office by the term designating his office shall be construed as including a reference to any person who, under and to the extent of any authority in that behalf, is for the time being performing the functions of that office.

(4) *(a)* Where any person has vacated any office established by or under this Order he may, if qualified, again be appointed to hold that office from time to time.

*(b)* A person may be appointed to an office established by or under this Order notwithstanding that some other person may be holding that office when that other person is on leave of absence pending the relinquishment of the office; and where two or more persons are holding the same office by reason of an appointment made in pursuance of this paragraph, then, for the purposes of any function conferred upon the holder of that office, the person last appointed shall be deemed to be the sole holder of the office.

(5) Any act done for the purposes of this Order by the Judicial and Legal Services Commission or the interim Commission established by section 24 of this Order signified in writing under the hand of the Chairman of the Commission.

(6) The Interpretation Act 1889*(a)* shall apply, with the

*(a)* 1889 c.63.

necessary adaptations, for the purpose of interpreting this Order and otherwise relation thereto as applies for the purpose of interpreting, and in relation to. Acts of Parliament.

Application to Saint Vincent.

**3.** Until such time as Saint Vincent assumes a status of association with the United Kingdom in accordance with the provisions of the West Indies Act 1967, references in this Order to the Premier of a State shall, in their application to Saint Vincent, be construed as references to the Administrator of Saint Vincent, acting in his discretion.

PART II—THE SUPREME COURT

Establishment of Supreme Court.
S.I. 1983 No. 1108

**4.** (1) There shall be a Supreme Court for the States which shall be styled the Eastern Caribbean Supreme Court and shall be a superior court of record.

(2) The Supreme Court shall consist of a Court of Appeal and a High Court of Justice.

S.I. 10/1985.

(3) Subject to the provisions of subsection (5) of this section, the judges of the Court of Appeal shall be the Chief Justice, who shall be President of the Court, and three Justices of Appeal.

S.I. 10/1985.

(4) Subject to the provisions of subsection (5) of this section, the judges of the High Court shall be the Chief Justice and nine Puisne Judges.

(5) The number of Justices of Appeal and of Puisne Judges of the High Court may be varied by order of the Chief Justice made with the concurrence of the Premiers of all the States:

Provided that no office of Justice of Appeal or Puisne Judge shall be abolished while there is a substantive holder thereof without the consent of the holder thereof.

(6) The Court of Appeal and the High Court shall be deemed to be duly constituted notwithstanding a vacancy in the office of any judge of the Court.

(7) The Court of Appeal and the High Court shall each have and use a seal bearing the style of the court and a device approved by the Chief Justice.

Appointment of judges.

**5.** (1) The Chief Justice shall be appointed by Her Majesty by Letters Patent and the Justices of Appeal and the Puisne Judges shall be appointed on behalf of Her Majesty by the Judicial and Legal Services Commission.

(2) A person shall not be qualified to be appointed—

*(a)* as Chief Justice or a Justice of Appeal unless—

(i) he has been for a period or periods amounting in the aggregate to not less than five years a judge of a court of unlimited jurisdiction in civil and criminal matters in some part of the Commonwealth or a court having jurisdiction in appeals from such a court; or

(ii) he is qualified to practise as an advocate in such a court, and has so practised, for a period of, or periods amounting in the aggregate to, not less than fifteen years;

*(b)* as a Puisne Judge unless—

(i) he is or has been a judge of a court of unlimited jurisdiction in civil and criminal matters in some part of the Commonwealth or a court having jurisdiction in appeals from such a court; or

(ii) he is qualified to practise as an advocate in such a court, and has so practised, for a period of or periods amounting in the aggregate to not less than ten years.

(3) For the purposes of subsection (2) of this section references in that subsection to a period or periods during which a person has practised as an advocate in any such court as is mentioned in that subsection shall be construed as including a period or periods during which a person—

*(a)* has been serving in the office of judge of any such court; or

*(b)* after having become qualified to practise as an advocate in any such court, has been serving in a public office in some part of the Commonwealth the functions of which include appearing as an advocate in any such court or in the office of magistrate, or

registrar of a court, in some part of the Commonwealth.

Acting judges.

**6.** (1) The Judicial and Legal Services Commission may designate generally or for a specific occasion one of the Justices of Appeal to act as Chief Justice in the event that the office of the Chief Justice is vacant or that the Chief Justice is for any reason unable to perform the functions of his office.

(2) If one of the Justices of Appeal is acting as Chief Justice or if the office of a Justice of Appeal or a Puisne Judge is vacant or if a Justice of Appeal or a Puisne Judge is for any reason unable to perform the functions of his office, the Judicial and Legal Services Commission may appoint a person qualified for appointment as a Justice of Appeal or Puisne Judge to act as a Justice of Appeal or Puisne Judge, as the case may be.

(3) A person appointed under this section to act as Chief Justice, a Justice of Appeal or a Puisne Judge shall (unless he earlier resigns his appointment or is removed therefrom in pursuance of the provisions of section 8 of this Order) continue to act in that office for the period, if any, for which he was appointed or until a person has been appointed to and assumed, or has resumed, the functions of that office, as the case may be.

(4) Any person appointed to the office of, or to act as, Chief Justice, Justice of Appeal or Puisne Judge may, notwithstanding the vacation of his office or the termination of his appointment otherwise than in pursuance of the provisions of section 8 of this Order, sit as a judge for the purpose of giving judgment or otherwise in relation to any proceeding heard by him while he was holding the office of judge.

Oaths.

**7.** Every person appointed to be a judge of the Court of Appeal or the High Court shall, before entering upon his functions as such, take the oaths set out in schedule 1 to this Order.

Tenure of office of judges.

**8.** (1) Subject to the following provisions of this section, a judge of the Court of Appeal shall hold office until he attains the age of sixty-five years and a Puisne Judge shall hold office until he attains the age of sixty-two years:

Provided that the Judicial and Legal Services Commission acting with the concurrence of the Premiers of all the States may permit a judge to continue in his office after attaining the age prescribed in this subsection for a period or periods not exceeding in the aggregate three years.

(2) The provisions of subsection (1) of this section shall not apply to a person appointed to act as a judge of the Court of Appeal or the High Court in respect of his acting appointment.

(3) A judge may be removed from office only for inability to discharge the functions of his office (whether arising from infirmity of body or mind or any other cause) or for misbehavior, and shall not be so removed except in accordance with the following provisions of this section.

(4) The Chief Justice may be removed from office by order of Her Majesty and other judges of the Supreme Court shall be removed from office by order of the Judicial and Legal Services Commission if the question of the removal from office has, in pursuance of the next following subsection, been referred to the Judicial Committee of Her Majesty's Privy Council under any enactment enabling Her Majesty in that behalf and the Judicial Committee has advised Her Majesty that the Chief Justice or the judge, as the case may be, ought to be removed from office for inability as aforesaid or misbehaviour.

(5) If, in the case of the Chief Justice, the Premier of one of the States to which this Order applies represents to the Lord High Chancellor of Great Britain or if, in the case of any other judge of the Supreme Court, the Judicial and Legal Services Commission represents to the Chief Justice that the question of removing the Chief Justice or other judge, as the case may be, for inability as aforesaid or for misbehaviour ought to be investigated then—

(*a*) the Lord Chancellor or the Chief Justice, as the case may be, shall appoint a tribunal which shall consist of a Chairman and not less than two other members selected by the Lord Chancellor or the Chief Justice, as the case may be from among persons who hold or have held office as a judge of a court of unlimited jurisdiction in criminal and civil matters in some part of the Commonwealth

or as a judge of a court having jurisdiction in appeals from any such court; and

(*b*) that tribunal shall enquire into the matter and report on the facts thereof to the Lord Chancellor or the Chief Justice, as the case may be, and recommend whether the question of the removal of the Chief Justice or other judge, as the case may be, should be referred by Her Majesty to the Judicial Committee.

(6) The provisions set out in schedule 2 to this Order shall apply in relation to tribunals appointed under the last foregoing subsection or to the members thereof.

(7) If the question of removing the Chief Justice or other judge of the Supreme Court has been referred to a tribunal under subsection (5) of this section the Lord Chancellor, in the case of the Chief Justice, or the Judicial and Legal Services Commission, in the case of any other judge of the court, may suspend the Chief Justice or other judge, as the case may be, from performing the functions of his office.

(8) Any such suspension may at any time be revoked by the Lord Chancellor or the Judicial and Legal Services Commission, as the case may be, and shall in any case cease to have effect—

(*a*) if the tribunal recommends that the question of the removal of the judge from office should not be referred by Her Majesty to the Judicial Committee; or

(*b*) if the Judicial Committee advises that the judge ought not to be removed from office.

(9) Any expenses, in connection with proceedings under this section, authorised by the Lord Chancellor or the Chief Justice, as the case may be, shall be regarded as part of the expenses of the Supreme Court.

Jurisdiction in the States.

**9.** (1) The High Court shall have, in relation to a State, such jurisdiction and powers as may be conferred on it by the Constitution or any other law of the State.

(2) The Court of Appeal shall have, in relation to a State, such jurisdiction to hear and determine appeals and

to exercise such powers as may be conferred on it by the Constitution or any other law of the State.

(3) The process of the Supreme Court shall run throughout the States and any judgment of the Court shall have full force and effect and may be executed and enforced in any of the States.

(4) The provisions of subsection (3) of this section shall be without prejudice to the provisions of the constitution of each State relating to fundamental rights and freedoms.

Jurisdiction in other territories. S.I. 1983 No. 1108

**10.** The High Court and Court of Appeal may exercise such jurisdiction and powers, and any judge or the Chief Registrar of the Supreme Court may exercise such functions, as may be conferred upon them respectively in relation to Anguilla, Montserrat or the Virgin Islands by or under any law in force in Anguilla, Montserrat or the Virgin Islands, as the case may be.

PART III—GENERAL

Remuneration, etc. of judges.

**11.** (1) The Chief Justice, the Justices of Appeal and the Puisne Judges shall be paid the salaries specified in schedule 3 to this Order, and shall be entitled to such allowances and shall have such terms and conditions of office as may from time to time be determined by the Judicial and Legal Services Commission with the concurrence of the Premiers of all the States:

Provided that—

*(a)* the salaries specified in schedule 3 to this Order may be altered by order made by the Judicial and Legal Services Commission with the concurrence of the Premiers of all the States;

*(b)* the salary and allowances (other than allowances which are not taken into account in the computation of pensions) of a judge shall not be reduced and the terms and conditions of office applicable to a judge upon his appointment shall not be made less favourable to him during the currency of that appointment.

(2) Where a judge is entitled to exercise an option in relation to his salary or the other matters referred to in proviso *(b)* to subsection (1) of this section, the option as exercised by him shall be deemed for the purposes of that proviso to be in his favour.

Chief Registrar and other officers.

**12.** (1) There shall be, for all the States, an office of Chief Registrar and such other offices of the Supreme Court as the Chief Justice may from time to time prescribe by order made with the concurrence of the Premiers of all the States; and the holders of such offices shall be paid such salaries and allowances and shall have such terms and conditions of office as may from time to time be determined by the Chief Justice with the concurrence of the Premiers of all the States.

(2) Power to make appointments to the office of Chief Registrar and to the other offices prescribed under this section and to exercise disciplinary control over persons holding or acting in such offices shall vest in the Judicial and Legal Services Commission.

(3) Power to make appointments to offices conferred by the provisions of this section shall be construed as including power to appoint a person to perform the functions of any such office during any period during which it is vacant or the holder thereof is unable for any reason to perform those functions.

(4) The power to constitute offices and make appointments thereto conferred by this section shall be in addition to any power conferred by the Constitution of any State to constitute the offices of and appoint for that State a registrar and other officers of the High Court.

Pensions of judges,.Chief Registrar and other officers.

**13.** (1) For the purposes of any laws, regulations and other instruments relating to the grant of pensions, gratuities and other like benefits 'the judges, Chief Registrar and the holders of the other offices of the Supreme Court referred to in section 12(1) of this Order shall be in the service of such State as the Chief Justice may, in each case, from time to time direct; and any such direction given by the Chief Justice shall take effect as from such date as may be specified by the Chief Justice and shall take effect as an appointment to a pensionable office in that service.

(2) Where by virtue of this section any payment is made out of the funds of a State the Governments of the other

States shall pay to the Government of that State the proportions of that payment specified by or under section 15 of this Order; and the sums that are required by virtue of this subsection to be paid by the Government of any State are hereby charged on the Consolidated Fund of that State.

**14.** (1) Any person who is appointed to any office established by or under this Order may resign from that office by writing under his hand addressed, in the case of the Chief Justice, to the Lord Chancellor and, in any other case, to the Chairman of the Judicial and Legal Service Commission.

Resignations.

(2) The resignation of any person from any such office shall take effect when the writing signifying the resignation is received by the Lord Chancellor or the Chairman, as the case may be.

**15.** The expenses of the Supreme Court (including the remuneration and allowances referred to in section 11 of this Order but less any sums that may be paid towards the expenses by the Governments of Anguilla, Montserrat and the Virgin Islands) shall, except as otherwise provided by agreement between the Governments of all the States, be borne by the Governments of the States in equal proportions; and the sums that are required by virtue of this section or any such agreement to be paid by the Government of any State are hereby charged on the Consolidated Fund of that State.

Expenses of the Court.

S.I. 1983 No. 1108

**16.** The Chief Justice shall assign a Puisne Judge to each State who shall reside in the State to which he is assigned.

Posting of Judges.

**17.** (1) Subject to the provisions of this Order and any other law in force in any of the States, the Chief Justice and any other two judges of the Supreme Court selected by him may make rules of court for regulating the practice and procedure of the Court of Appeal and the High Court in relation to their respective jurisdiction and powers in respect of any of the States.

Rules of Court.

(2) Without prejudice to the generality of the foregoing subsection such rules may be made for any of the following purposes—

(*a*) for regulating the sittings of the Court of Appeal and the High Court, and the selection of judges for any purpose;

(*b*) for prescribing forms and fees in respect of proceedings in the Supreme Court and relating to costs of and incidental to any such proceedings;

(*c*) for prescribing the times in which any requirement of the rules is to be complied with;

(*d*) for prescribing and regulating the powers and duties of the Chief Registrar, registrars and officers of court;

(*e*) for providing for summary determination of any appeal which appears to the court to be frivolous or vexatious or to be brought for the purposes of delay;

(*f*) for prescribing cases in which, and conditions upon which, an appellant in a criminal appeal shall be entitled to be present at the hearing of the appeal;

(*g*) for providing for a reference from a decision of a single judge of the Court of Appeal to the Court of Appeal;

(*h*) for regulating the right of practising before the Supreme Court and the representation of persons concerned in any proceedings therein.

(3) Rules made under this section may fix the number of judges of the Court of Appeal who may sit for any purpose:

Provided that—

(*a*) an uneven number of judges shall sit, which for the purposes of any final determination by the court other than the summary dismissal of an appeal, shall not be less than three; and

(*b*) any determination by the court on any matter (whether final or otherwise) shall, where more than one judge sits, be according to the opinion of the majority of the judges who sit for the purpose of determining that matter.

(4) Rules made under this section may provide for and regulate the execution and enforcement in any State of the

process of the Court of Appeal or the High Court in exercise of any powers and jurisdiction conferred upon it in pursuance of section 9 or 10 of this Order.

(5) No rule of court which may involve an increase in the expenses of the Supreme Court shall be made except with the concurrence of the Premiers of all the States; but the validity of a rule of court shall not in any proceedings in any court be called in question on the ground only that it was a rule to which the concurrence of the Premiers was necessary and that they did not concur or are not expressed to have concurred in the making thereof.

PART IV—JUDICIAL AND LEGAL SERVICES COMMISSION

Establishment of Commission.

**18.** (1) There shall be a Judicial and Legal Services Commission (hereinafter referred to as the "Commission") for the States which shall consist of the following persons, that is to say—

*(a)* the Chief Justice, who shall be the Chairman;

*(b)* such Justice of Appeal or Puisne Judge as may from time to time be designated in that behalf by the Chief Justice;

*(c)* a person, appointed by the Chief Justice with the concurrence of the Premiers of not less than four of the States, who has been a judge of a court of unlimited jurisdiction in civil and criminal matters in some part of the Commonwealth or a court having jurisdiction in appeals from any such court, not being a person who is practising as an advocate before the Supreme Court; and

*(d)* two members selected in accordance with the provisions of subsection (2) of this section.

(2) The persons for the time discharging the functions of Chairman of the Public Service Commissions of two States being States for the time being designated in that behalf by the Chief Justice, shall be ex-officio members of the Commission:

Provided that—

*(a)* except as otherwise provided in any agreement between the Governments of all the States, the Chief Justice shall designate States

in such manner that the Chairman of the Public Service Commissions of the States sit as members of the Commission in rotation for periods of three years, the order of rotation among the States to be as follows:—

S.I. 1983 No. 1108

(i) Antigua and Barbuda, and Dominica;

(ii) Saint Christopher, and Nevis

(iii) Saint Lucia and Saint Vincent and the Grenadines; and

*(b)* where the Chairman of the Public Service Commission of any designated State is in practice as an advocate before the Supreme Court, that Public Service Commission shall nominate another of its members, not being a person so in practice, to sit on the Commission on his stead.

(3) The office of the appointed member of the Commission shall become vacant—

*(a)* at the expiration of three years from the date of his appointment;

*(b)* if he practises as an advocate before the Supreme Court; or

*(c)* if the question of his ceasing to be a member of the Commission has been referred by the Chief Justice, acting on the recommendation of the Premiers of not less than four of the States, to a tribunal consisting of a Chairman and two other persons appointed by the Chief Justice, and that tribunal has recommended that such person should cease to be a member of the Commission.

(4) The Commission shall not be disqualified for the transaction of business by reason of any vacancy amongst its members.

Functions and procedure of Commission.

**19.** (1) The Commission shall perform such functions as are conferred on it by this Order or any other law for the time being in force in any State.

(2) The Commission may by regulation or otherwise regulate its own procedure and confer powers and impose

duties on any officer or authority of the Government of a State for the purposes of the exercise of its functions:

Provided that, except in the case of an officer of the High Court no such powers or duties shall be conferred upon any officer in the public service of a State without the consent of the Premier of the State.

Staff.

**20.** The Commission may employ such officers as are necessary for the purpose of the exercise of its functions as the Chairman with the concurrence of the Premiers of all the States may appoint.

Expenses.

**21.** The members of the Commission other than the Chief Justice and the Justice of Appeal or Puisne Judge, shall be paid such remuneration as the Chief Justice may with the concurrence of the Premiers of all the States prescribe; and the Governments of the States shall, except as otherwise provided by agreement between the Governments of all the States, contribute in equal proportions to the expenses of the Commission; and the sums that are required by virtue of this section to be paid by the Government of any State are hereby charged on the Consolidated Fund of that State.

PART V—TRANSITIONAL PROVISIONS

Pending proceedings.

**22.** (1) Any proceedings originating in any of the States and pending immediately before the prescribed date in the British Caribbean Court of Appeal or in the Supreme Court or the Court of Appeal of the Windward Islands and Leeward Islands may be continued and concluded on or after that date—

(*a*) in the case of proceedings pending in the British Caribbean Court of Appeal, in the Court of Appeal; and

(*b*) in the case of proceedings pending in the Supreme Court or the Court of Appeal of the Windward Islands and Leeward Islands, in the High Court.

(2) An appeal shall lie to the Court of Appeal on and after the prescribed date from any judgment of the Supreme Court of the Windward Islands and Leeward Islands given before the prescribed date in any proceedings originating in any of the States as if it were a judgment of the High Court.

(3) Any judgment of the British Caribbean Court of Appeal that was given but not satisfied before the prescribed date in any proceedings originating in any of the States may be enforced on or after the prescribed date as if it were a judgment of the Court of Appeal and any such judgment of the Court of Appeal or the High Court of the Windward Islands and Leeward Islands may be so enforced as if it were a judgment of the High Court.

(4) Until such time as other provision is made in that behalf by any law in force in a State, an appeal shall lie to the High Court from the decision of a magistrate in that State in any case in which an appeal would have lain to the Court of Appeal of the Windard Islands and Leeward Islands if the Order of 1959 had not been revoked.

Exisiting laws, etc.

**23.** (1) Any rule of court made under or kept in force by the Order of 1959 or the Order of 1962 and having effect as part of the law of a State immediately before the prescribed date shall continue in force on and after that date notwithstanding the revocation of those Orders.

(2) Any law (including any rule of court) other than the Order of 1959 and the Order of 1962 having effect as part of the law of a State immediately before the prescribed date shall have effect on and after the prescribed date as if—

*(a)* references therein to the British Caribbean Court of Appeal were references to the Court of Appeal; and

*(b)* references therein to the Supreme Court or the Court of Appeal of the Windward Islands and Leeward Islands were references to the High Court.

(3) The foregoing provisions of this section shall be without prejudice to any powers conferred by any law in force in a State upon any person or authority to make provision for any matter, including the amendment or revocation of any law (including any rule of court) having effect as part of the law of that State immediately before the prescribed date or the making on or after that date of rules of court so having effect.

Interim Commission.

**24.** (1) Until the prescribed date, the powers conferred on the Judicial and Legal Services Commission by sections 5

and 12 of this Order maybe exercised by an interim Commission consisting of—

(i) the Chief Justice, who shall be the Chairman;

(ii) one person, appointed by the Chief Justice, who is or has been a judge of a court of unlimited jurisdiction in civil and criminal matters in some part of the Commonwealth or a court having jurisdiction in appeals from any such court; and

(iii) three persons appointed by the Chief Justice with the concurrence of the Premiers or, as the case may be Chief Ministers of not less than four of the States, one of whom has been a judge of such a court.

(2) A person who is in practice as an advocate before the Supreme Court established by the Order of 1959 shall not be appointed under subsection (1) of this section.

Terms of service of judges.

**25.** Until other provision is made under section 11(1) of this Order, the allowances of the judges of the Court of Appeal and of the High Court and their terms and conditions of service, other than their salaries, shall be those to which the judges of the Supreme Court established by the Order of 1959 were entitled or which were applicable to them immediately before the commencement of this Order.

*W. G. Agnew.*

---

SCHEDULE 1 Section 7.

*Forms of Oaths and Affirmations*

**1.** Oath of Allegiance

I .......................................................................... do swear that I will be faithful and bear true allegiance to Her Majesty Queen Elizabeth the Second, Her Heirs and Successors, according to law. So help me God.

**2.** Affirmation of Allegiance

I ..................................................................... do solemnly and sincerely affirm and declare that I will be faithful and bear true allegiance to Her Majesty Queen Elizabeth the Second, Her Heirs and Successors, according to law.

**3.** Oath for due execution of office

I .......................................................................................................................

do swear that I will well and truly serve Her Majesty Queen Elizabeth the Second in the office of (*here insert the description of the office*). So help me God.

**4.** Affirmation for due execution of office

I ..........................................................................................................................

do solemnly and sincerely affirm and declare that I will well and truly serve Her Majesty Queen Elizabeth the Second in the office of (*here insert the description of the office*).

SCHEDULE 2 Section 8(6).

*Provisions applying in relation to tribunals appointed under section 8(5)*

**1.** The members of a tribunal may make such rules for their own guidance, and the conduct and management of proceedings before them and the hours and times and places for their sittings, as they may, from time to time, think fit, and may, from time to time, adjourn for such time and to such place as they may think fit.

**2.** The members of a tribunal shall have the powers of a judge of the High Court to summon witnesses, and to call for the production of books and documents, and to examine witnesses on oath, and no member shall be liable to any action or suit for any matter or thing done by him as such.

**3.** Any person whose conduct is the subject of inquiry by a tribunal shall be entitled to, and any other person may by leave of the tribunal, be represented by counsel at the whole of the inquiry.

**4.** Any witness who shall wilfully give false evidence in any such inquiry, concerning the subject matter of such inquiry, shall be guilty of perjury, and be liable to be prosecuted and punished accordingly.

**5.** All persons summoned to attend and give evidence or to produce documents or any other matter at any sitting of a tribunal, shall be bound to obey the summons served upon them as fully, in all respects, as witnesses are bound to obey subpoenas issued from the High Court, and shall be entitled to the like expenses as if they had been summoned to attend the High Court on a criminal trial, if the same shall be allowed by the tribunal, but the tribunal may disallow the whole or any part of such expenses in any case, if they think fit. Orders for the payment of such witnesses shall be made, as nearly as may be, as orders are made for the payment of witnesses at the High Court. Every person refusing or omitting, without sufficient cause, to attend at the time and place mentioned in the summons served on him, and every person attending, but leaving the enquiry without the permission of the tribunal, or refusing to answer, or to answer fully and satisfactorily to the best of his knowledge and belief, all questions put to him by or with the concurrence of the tribunal, or refusing or omitting, without sufficient cause, to produce any documents or other matters in his possession or under his control and mentioned or referred to in the summons served on him, and every person who shall, at any sitting of a tribunal, wilfully insult any member or servant of the tribunal or wilfully interrupt the proceedings of the tribunal, shall be liable, on summary conviction, to a penalty not exceeding two hundred dollars.

**6.** No statement made by any person who is called as a witness before a tribunal in answer to any question put by or with the concurrence of the tribunal shall, except in cases of indictments for perjury, be admissible in evidence in any civil or criminal proceeding.

SCHEDULE 3

Section 11.

*Salaries of judges of Supreme Court*

SI 27/1990.

| | |
|---|---|
| Chief Justice ... ... ... ... ... ... | Eastern Caribbean Currency (E.C.C.) $105,600 per year |
| Justice of Appeal ... ... ... ... ... | Eastern Caribbean Currency (E.C.C.) $85,800 per year |
| Puisne Judge ... ... ... ... ... ... | Eastern Caribbean Currency (E.C.C.) $72,600 per year |

EXPLANATORY NOTE

*(This Note is not part of the Order.)*

This Order makes provision for a new Supreme Court consisting of a High Court and a Court of Appeal for Antigua, Dominica, Grenada, Saint Christopher, Nevis and Anguilla, Saint Lucia, and Saint Vincent. Provision is also made so that these courts may be given jurisdiction in respect of Montserrat and the Virgin Islands. The Order establishes a Judicial and Legal Services Commission.

TAB 91

Cayman Islands Companies Law (2013 Revision) § 145(1)

**CAYMAN ISLANDS**

Supplement No. 6 published with Extraordinary Gazette No. 82 of 11th October, 2013.

# COMPANIES LAW

## (2013 REVISION)

Cap. 22 (Law 3 of 1961) of the 1963 Revised Edition of the Laws consolidated with Laws 12 of 1962, 9 of 1966, 1 of 1971, 7 of 1973, 24 of 1974, 25 of 1975, 19 of 1977, 16 of 1978, 8 of 1980, 21 of 1981, 34 of 1983, 2 of 1984, 22 of 1984, 15 of 1985, 38 of 1985, 24 of 1987, 14 of 1988, 14 of 1989, 10 of 1990, 3 of 1991, 23 of 1991 (part), 11 of 1992, 3 of 1993, 23 of 1993, 33 of 1993, 2 of 1994, 8 of 1994, 14 of 1996, 26 of 1997, 4 of 1998, 6 of 1998, 20 of 1998 (part), 5 of 1999, 7 of 2000 (part), 5 of 2001, 10 of 2001, 29 of 2001, 46 of 2001, 22 of 2002, 26 of 2002, 28 of 2003, 13 of 2006, 15 of 2007, 12 of 2009, 33 of 2009, 37 of 2010, 16 of 2011, 29 of 2011, 6 of 2012, 14 of 2012, 29 of 2012, 1 of 2013, 6 of 2013 and the Companies (Amendment of Schedule) Order, 2011.

    (a) where a creditor has had notice of a meeting having been called at which a resolution for voluntary winding up is to be proposed, the date on which he had notice is substituted for the purpose of subsection (1) for the date of commencement of the winding up;

(b) a person who purchases in good faith under a sale by the bailiff any goods of a company on which execution has been levied in all cases acquires a good title to them against the liquidator; and

(c) the rights conferred by subsection (1) on the liquidator may be set aside by the Court in favour of the creditor to such extent and subject to such terms as the Court thinks fit.

(3) For the purposes of this Law-

(a) an execution against goods is completed by seizure and sale;

(b) an execution against securities is completed upon making a charging order absolute;

(c) an attachment of a debt is completed by receipt of the debt; and

(d) an execution against land is completed by the registration of a charging order.

Voidable preference

145. (1) Every conveyance or transfer of property, or charge thereon, and every payment obligation and judicial proceeding, made, incurred, taken or suffered by any company in favour of any creditor at a time when the company is unable to pay its debts within the meaning of section 93 with a view to giving such creditor a preference over the other creditors shall be invalid if made, incurred, taken or suffered within six months immediately preceding the commencement of a liquidation.

(2) A payment made as aforesaid to a related party of the company shall be deemed to have been made with a view to giving such creditor a preference.

(3) For the purposes of this section a creditor shall be treated as a "related party" if it has the ability to control the company or exercise significant influence over the company in making financial and operating decisions.

Avoidance of dispositions made at an undervalue
2011 Revision

146. (1) In this section and section 147-

(a) "disposition" has the meaning ascribed in Part VI of the Trusts Law (2011 Revision);

(b) "intent to defraud" means an intention to wilfully defeat an obligation owed to a creditor;

(c) "obligation" means an obligation or liability (which includes a contingent liability) which existed on or prior to the date of the relevant disposition;

(d) "transferee" means the person to whom a relevant disposition is made and shall include any successor in title; and

TAB 92

English Companies Act 1948 § 320



# COMPANIES ACT 1948

*11 & 12 Geo. 6. Chapter 38*

*LONDON*
HER MAJESTY'S STATIONERY OFFICE
*Reprinted* 1965

**VOL 1/2**

PART V. —*cont.*

(*c*) references to remuneration in respect of a period of holiday include any sums which, if they had been paid, would have been treated for the purposes of the National Insurance Act, 1946, or any enactment repealed by that Act as remuneration in respect of that period; and

(*d*) the expression " the relevant date " means—

(i) in the case of a company ordered to be wound up compulsorily, the date of the appointment (or first appointment) of a provisional liquidator, or, if no such appointment was made, the date of the winding-up order, unless in either case the company had commenced to be wound up voluntarily before that date; and

(ii) in any case where the foregoing sub-paragraph does not apply, means the date of the passing of the resolution for the winding up of the company.

(9) This section shall not apply in the case of a winding up where the relevant date as defined in subsection (7) of section two hundred and sixty-four of the Companies Act, 1929, as originally enacted, occurred before the commencement of this Act, and in such a case the provisions relating to preferential payments which would have applied if this Act had not passed shall be deemed to remain in full force.

*Effect of Winding Up on antecedent and other Transactions.*

Fraudulent preference.

**320.**—(1) Any conveyance, mortgage, delivery of goods, payment, execution or other act relating to property made or done by or against a company within six months before the commencement of its winding up which, had it been made or done by or against an individual within six months before the presentation of a bankruptcy petition on which he is adjudged bankrupt, would be deemed in his bankruptcy a fraudulent preference, shall in the event of the company being wound up be deemed a fraudulent preference of its creditors and be invalid accordingly:

Provided that, in relation to things made or done before the commencement of this Act, this subsection shall have effect with the substitution, for references to six months, of references to three months.

(2) Any conveyance or assignment by a company of all its property to trustees for the benefit of all its creditors shall be void to all intents.

(3) In the application to Scotland of this section, the expression " fraudulent preference " includes any alienation

or preference which is voidable by statute or at common law on the ground of insolvency or notour bankruptcy, the expression "bankruptcy petition" means petition for sequestration and for the words "three months" there shall be substituted the words "sixty days".

**Liabilities and rights of certain fraudulently preferred persons.**

**321.**—(1) Where, in the case of a company wound up in England, anything made or done after the commencement of this Act is void under the last foregoing section as a fraudulent preference of a person interested in property mortgaged or charged to secure the company's debt, then (without prejudice to any rights or liabilities arising apart from this provision) the person preferred shall be subject to the same liabilities, and shall have the same rights, as if he had undertaken to be personally liable as surety for the debt to the extent of the charge on the property or the value of his interest, whichever is the less.

(2) The value of the said person's interest shall be determined as at the date of the transaction constituting the fraudulent preference, and shall be determined as if the interest were free of all incumbrances other than those to which the charge for the company's debt was then subject.

(3) On any application made to the court with respect to any payment on the ground that the payment was a fraudulent preference of a surety or guarantor, the court shall have jurisdiction to determine any questions with respect to the payment arising between the person to whom the payment was made and the surety or guarantor and to grant relief in respect thereof, notwithstanding that it is not necessary so to do for the purposes of the winding up, and for that purpose may give leave to bring in the surety or guarantor as a third party as in the case of an action for the recovery of the sum paid.

This subsection shall apply, with the necessary modifications, in relation to transactions other than the payment of money as it applies in relation to payments.

**Effect of floating charge.**

**322.**—(1) Where a company is being wound up, a floating charge on the undertaking or property of the company created within twelve months of the commencement of the winding up shall, unless it is proved that the company immediately after the creation of the charge was solvent, be invalid, except to the amount of any cash paid to the company at the time of or subsequently to the creation of, and in consideration for, the charge, together with interest on that amount at the rate of five per cent. per annum or such other rate as may for the time being be prescribed by order of the Treasury:

TAB 93

English Companies Act 1985 § 615

(c) for references to the trustee, substitute references to the liquidator, and

(d) for references to the bankrupt, substitute references to the company.

Preferential payments.

**614.**—(1) In a winding up the preferential debts listed in Schedule 19 shall be paid in priority to all other debts, but with the exceptions and reservations specified in that Schedule.

(2) The preferential debts shall—

(a) rank equally among themselves and be paid in full, unless the assets are insufficient to meet them, in which case they shall abate in equal proportions, and

(b) so far as the assets of the company available for payment of general creditors are insufficient to meet them, have priority over the claims of holders of debentures under any floating charge created by the company, and be paid accordingly out of any property comprised in or subject to that charge.

(3) Subject to the retention of such sums as may be necessary for the costs and expenses of the winding up, the preferential debts shall be discharged forthwith so far as the assets are sufficient to meet them; and in the case of the debts to which priority is given by paragraph 8 of Schedule 19 (social security payments), formal proof of them is not required except in so far as is otherwise provided by general rules.

(4) In the event of a landlord or other person distraining or having distrained on any goods or effects of the company within 3 months next before the date of a winding-up order, the preferential debts are a first charge on the goods or effects so distrained on, or the proceeds of their sale; but in respect of any money paid under such a charge, the landlord or other person has the same rights of priority as the person to whom the payment is made.

*Effect of winding up on antecedent and other transactions*

Fraudulent preference.

**615.**—(1) Any conveyance, mortgage, delivery of goods, payment, execution or other act relating to property made or done by or against a company within 6 months before the commencement of its winding up which, had it been made or done by or against an individual within 6 months before the presentation of a bankruptcy petition on which he is adjudged bankrupt, would be deemed in his bankruptcy a fraudulent preference, is in the event of the company being wound up deemed a fraudulent preference of its creditors and invalid accordingly.

(2) Any conveyance or assignment by a company of all its property to trustees for the benefit of all its creditors is void to all intents.

(3) In the application of this section to Scotland, " bankruptcy petition " means petition for sequestration.

Liabilities and rights of those fraudulently preferred (England and Wales).

**616.**—(1) Where in the case of a company wound up in England and Wales anything made or done is void under section 615 as a fraudulent preference of a person interested in property mortgaged or charged to secure the company's debt, then (without prejudice to any rights or liabilities arising apart from this provision) the person preferred is subject to the same liabilities, and has the same rights, as if he had undertaken to be personally liable as surety for the debt to the extent of the charge on the property or the value of his interest, whichever is the less.

(2) The value of the person's interest is determined as at the date of the transaction constituting the fraudulent preference, and as if the interest were free of all incumbrances other than those to which the charge for the company's debt was then subject.

(3) On an application made to the court with respect to any payment on the ground that the payment was a fraudulent preference of a surety or guarantor, the court has jurisdiction to determine any question with respect to the payment arising between the person to whom the payment was made and the surety or guarantor, and to grant relief in respect of it.

(4) The court's jurisdiction under subsection (3) is exercisable notwithstanding that the determination of the question is not necessary for the purposes of the winding up; and the court may for the purposes of that subsection give leave to bring in the surety or guarantor as a third party as in the case of an action for the recovery of the sum paid.

(5) Subsections (3) and (4) apply, with the necessary modifications, in relation to transactions other than the payment of money as they apply in relation to payments.

Effect of floating charge.

**617.**—(1) Where a company is being wound up, a floating charge on its undertaking or property created within 12 months of the commencement of the winding up is invalid (unless it is proved that the company immediately after the creation of the charge was solvent), except to the amount of any cash paid to the company at the time of or subsequently to the creation of, and in consideration for, the charge, together with interest on that amount.

TAB 94

English Companies Act 2006 § 40



# Companies Act 2006

## CHAPTER 46

## CONTENTS

### PART 1

GENERAL INTRODUCTORY PROVISIONS

*Companies and Companies Acts*

1 Companies
2 The Companies Acts

*Types of company*

3 Limited and unlimited companies
4 Private and public companies
5 Companies limited by guarantee and having share capital
6 Community interest companies

### PART 2

COMPANY FORMATION

*General*

7 Method of forming company
8 Memorandum of association

*Requirements for registration*

9 Registration documents
10 Statement of capital and initial shareholdings
11 Statement of guarantee
12 Statement of proposed officers
13 Statement of compliance

# PART 4

## A COMPANY'S CAPACITY AND RELATED MATTERS

*Capacity of company and power of directors to bind it*

### 39 A company's capacity

(1) The validity of an act done by a company shall not be called into question on the ground of lack of capacity by reason of anything in the company's constitution.

(2) This section has effect subject to section 42 (companies that are charities).

### 40 Power of directors to bind the company

(1) In favour of a person dealing with a company in good faith, the power of the directors to bind the company, or authorise others to do so, is deemed to be free of any limitation under the company's constitution.

(2) For this purpose—
- (a) a person "deals with" a company if he is a party to any transaction or other act to which the company is a party,
- (b) a person dealing with a company—
  - (i) is not bound to enquire as to any limitation on the powers of the directors to bind the company or authorise others to do so,
  - (ii) is presumed to have acted in good faith unless the contrary is proved, and
  - (iii) is not to be regarded as acting in bad faith by reason only of his knowing that an act is beyond the powers of the directors under the company's constitution.

(3) The references above to limitations on the directors' powers under the company's constitution include limitations deriving—
- (a) from a resolution of the company or of any class of shareholders, or
- (b) from any agreement between the members of the company or of any class of shareholders.

(4) This section does not affect any right of a member of the company to bring proceedings to restrain the doing of an action that is beyond the powers of the directors.

But no such proceedings lie in respect of an act to be done in fulfilment of a legal obligation arising from a previous act of the company.

(5) This section does not affect any liability incurred by the directors, or any other person, by reason of the directors' exceeding their powers.

(6) This section has effect subject to—

section 41 (transactions with directors or their associates), and
section 42 (companies that are charities).

TAB 95

English Insolvency Act 1986 §§ 123, 238-241, 339, 423-426, 436

PART IV

(*d*) the company does not commence its business within a year from its incorporation or suspends its business for a whole year,

(*e*) the number of members is reduced below 2,

(*f*) the company is unable to pay its debts,

(*g*) the court is of the opinion that it is just and equitable that the company should be wound up.

(2) In Scotland, a company which the Court of Session has jurisdiction to wind up may be wound up by the Court if there is subsisting a floating charge over property comprised in the company's property and undertaking, and the court is satisfied that the security of the creditor entitled to the benefit of the floating charge is in jeopardy.

For this purpose a creditor's security is deemed to be in jeopardy if the Court is satisfied that events have occurred or are about to occur which render it unreasonable in the creditor's interests that the company should retain power to dispose of the property which is subject to the floating charge.

Definition of inability to pay debts.

**123.**—(1) A company is deemed unable to pay its debts—

(*a*) if a creditor (by assignment or otherwise) to whom the company is indebted in a sum exceeding £750 then due has served on the company, by leaving it at the company's registered office, a written demand (in the prescribed form) requiring the company to pay the sum so due and the company has for 3 weeks thereafter neglected to pay the sum or to secure or compound for it to the reasonable satisfaction of the creditor, or

(*b*) if, in England and Wales, execution or other process issued on a judgment, decree or order of any court in favour of a creditor of the company is returned unsatisfied in whole or in part, or

(*c*) if, in Scotland, the induciae of a charge for payment on an extract decree, or an extract registered bond, or an extract registered protest, have expired without payment being made, or

(*d*) if, in Northern Ireland, a certificate of unenforceability has been granted in respect of a judgment against the company, or

(*e*) if it is proved to the satisfaction of the court that the company is unable to pay its debts as they fall due.

(2) A company is also deemed unable to pay its debts if it is proved to the satisfaction of the court that the value of the

company's assets is less than the amount of its liabilities, taking into account its contingent and prospective liabilities.

(3) The money sum for the time being specified in subsection (1)(*a*) is subject to increase or reduction by order under section 416 in Part XV.

Application for winding up.

**124.**—(1) Subject to the provisions of this section, an application to the court for the winding up of a company shall be by petition presented either by the company, or the directors, or by any creditor or creditors (including any contingent or prospective creditor or creditors), contributory or contributories, or by all or any of those parties, together or separately.

(2) Except as mentioned below, a contributory is not entitled to present a winding-up petition unless either—

(*a*) the number of members is reduced below 2, or

(*b*) the shares in respect of which he is a contributory, or some of them, either were originally allotted to him, or have been held by him, and registered in his name, for at least 6 months during the 18 months before the commencement of the winding up, or have devolved on him through the death of a former holder.

(3) A person who is liable under section 76 to contribute to a company's assets in the event of its being wound up may petition on either of the grounds set out in section 122(1)(*f*) and (*g*), and subsection (2) above does not then apply; but unless the person is a contributory otherwise than under section 76, he may not in his character as contributory petition on any other ground.

This subsection is deemed included in Chapter VII of Part V of the Companies Act (redeemable shares; purchase by a company of its own shares) for the purposes of the Secretary of State's power to make regulations under section 179 of that Act.

(4) A winding-up petition may be presented by the Secretary of State—

(*a*) if the ground of the petition is that in section 122(1)(*b*) or (*c*), or

(*b*) in a case falling within section 440 of the Companies Act (expedient in the public interest, following report of inspectors, etc.).

(5) Where a company is being wound up voluntarily in England and Wales, a winding-up petition may be presented by the official receiver attached to the court as well as by any

may for the time being be, or in a place outside the United Kingdom.

(4) Any person who appears or is brought before the court under section 236 or this section may be examined on oath, either orally or (except in Scotland) by interrogatories, concerning the company or the matters mentioned in section 236(2)(*c*).

*Adjustment of prior transactions (administration and liquidation)*

Transactions at an undervalue (England and Wales).

**238.**—(1) This section applies in the case of a company where—

(*a*) an administration order is made in relation to the company, or

(*b*) the company goes into liquidation;

and " the office-holder " means the administrator or the liquidator, as the case may be.

(2) Where the company has at a relevant time (defined in section 240) entered into a transaction with any person at an undervalue, the office-holder may apply to the court for an order under this section.

(3) Subject as follows, the court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not entered into that transaction.

(4) For the purposes of this section and section 241, a company enters into a transaction with a person at an undervalue if—

(*a*) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration, or

(*b*) the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company.

(5) The court shall not make an order under this section in respect of a transaction at an undervalue if it is satisfied—

(*a*) that the company which entered into the transaction did so in good faith and for the purpose of carrying on its business, and

(*b*) that at the time it did so there were reasonable grounds for believing that the transaction would benefit the company.

PART VI

Preferences (England and Wales).

**239.**—(1) This section applies as does section 238.

(2) Where the company has at a relevant time (defined in the next section) given a preference to any person, the office-holder may apply to the court for an order under this section.

(3) Subject as follows, the court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not given that preference.

(4) For the purposes of this section and section 241, a company gives a preference to a person if—

(*a*) that person is one of the company's creditors or a surety or guarantor for any of the company's debts or other liabilities, and

(*b*) the company does anything or suffers anything to be done which (in either case) has the effect of putting that person into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if that thing had not been done.

(5) The court shall not make an order under this section in respect of a preference given to any person unless the company which gave the preference was influenced in deciding to give it by a desire to produce in relation to that person the effect mentioned in subsection (4)(*b*).

(6) A company which has given a preference to a person connected with the company (otherwise than by reason only of being its employee) at the time the preference was given is presumed, unless the contrary is shown, to have been influenced in deciding to give it by such a desire as is mentioned in subsection (5).

(7) The fact that something has been done in pursuance of the order of a court does not, without more, prevent the doing or suffering of that thing from constituting the giving of a preference.

"Relevant time" under ss. 238, 239.

**240.**—(1) Subject to the next subsection, the time at which a company enters into a transaction at an undervalue or gives a preference is a relevant time if the transaction is entered into, or the preference given—

(*a*) in the case of a transaction at an undervalue or of a preference which is given to a person who is connected with the company (otherwise than by reason only of being its employee), at a time in the period of 2 years ending with the onset of insolvency (which expression is defined below),

PART VI

(*b*) in the case of a preference which is not such a transaction and is not so given, at a time in the period of 6 months ending with the onset of insolvency, and

(*c*) in either case, at a time between the presentation of a petition for the making of an administration order in relation to the company and the making of such an order on that petition.

(2) Where a company enters into a transaction at an undervalue or gives a preference at a time mentioned in subsection (1)(*a*) or (*b*), that time is not a relevant time for the purposes of section 238 or 239 unless the company—

(*a*) is at that time unable to pay its debts within the meaning of section 123 in Chapter VI of Part IV, or

(*b*) becomes unable to pay its debts within the meaning of that section in consequence of the transaction or preference;

but the requirements of this subsection are presumed to be satisfied, unless the contrary is shown, in relation to any transaction at an undervalue which is entered into by a company with a person who is connected with the company.

(3) For the purposes of subsection (1), the onset of insolvency is—

(*a*) in a case where section 238 or 239 applies by reason of the making of an administration order or of a company going into liquidation immediately upon the discharge of an administration order, the date of the presentation of the petition on which the administration order was made, and

(*b*) in a case where the section applies by reason of a company going into liquidation at any other time, the date of the commencement of the winding up.

**Orders under ss. 238, 239.**

**241.**—(1) Without prejudice to the generality of sections 238(3) and 239(3), an order under either of those sections with respect to a transaction or preference entered into or given by a company may (subject to the next subsection)—

(*a*) require any property transferred as part of the transaction, or in connection with the giving of the preference, to be vested in the company,

(*b*) require any property to be so vested if it represents in any person's hands the application either of the proceeds of sale of property so transferred or of money so transferred,

(*c*) release or discharge (in whole or in part) any security given by the company,

PART VI

(*d*) require any person to pay, in respect of benefits received by him from the company, such sums to the office-holder as the court may direct,

(*e*) provide for any surety or guarantor whose obligations to any person were released or discharged (in whole or in part) under the transaction, or by the giving of the preference, to be under such new or revived obligations to that person as the court thinks appropriate,

(*f*) provide for security to be provided for the discharge of any obligation imposed by or arising under the order, for such an obligation to be charged on any property and for the security or charge to have the same priority as a security or charge released or discharged (in whole or in part) under the transaction or by the giving of the preference, and

(*g*) provide for the extent to which any person whose property is vested by the order in the company, or on whom obligations are imposed by the order, is to be able to prove in the winding up of the company for debts or other liabilities which arose from, or were released or discharged (in whole or in part) under or by, the transaction or the giving of the preference.

(2) An order under section 238 or 239 may affect the property of, or impose any obligation on, any person whether or not he is the person with whom the company in question entered into the transaction or (as the case may be) the person to whom the preference was given; but such an order—

(*a*) shall not prejudice any interest in property which was acquired from a person other than the company and was acquired in good faith, for value and without notice of the relevant circumstances, or prejudice any interest deriving from such an interest, and

(*b*) shall not require a person who received a benefit from the transaction or preference in good faith, for value and without notice of the relevant circumstances to pay a sum to the office-holder, except where that person was a party to the transaction or the payment is to be in respect of a preference given to that person at a time when he was a creditor of the company.

(3) For the purposes of this section the relevant circumstances, in relation to a transaction or preference, are—

(*a*) the circumstances by virtue of which an order under section 238 or (as the case may be) 239 could be made in respect of the transaction or preference if the company were to go into liquidation, or an administration order were made in relation to the company, within a

particular period after the transaction is entered into or the preference given, and

(*b*) if that period has expired, the fact that the company has gone into liquidation or that such an order has been made.

(4) The provisions of sections 238 to 241 apply without prejudice to the availability of any other remedy, even in relation to a transaction or preference which the company had no power to enter into or give.

Gratuitous alienations (Scotland).

**242.**—(1) Where this subsection applies and—

(*a*) the winding up of a company has commenced, an alienation by the company is challengeable by—

(i) any creditor who is a creditor by virtue of a debt incurred on or before the date of such commencement, or

(ii) the liquidator ;

(*b*) an administration order is in force in relation to a company, an alienation by the company is challengeable by the administrator.

(2) Subsection (1) applies where—

(*a*) by the alienation, whether before or after 1st April 1986 (the coming into force of section 75 of the Bankruptcy (Scotland) Act 1985), any part of the company's property is transferred or any claim or right of the company is discharged or renounced, and

1985 c

(*b*) the alienation takes place on a relevant day.

(3) For the purposes of subsection (2)(*b*), the day on which an alienation takes place is the day on which it becomes completely effectual ; and in that subsection " relevant day " means, if the alienation has the effect of favouring—

(*a*) a person who is an associate (within the meaning of the Bankruptcy (Scotland) Act 1985) of the company, a day not earlier than 5 years before the date on which—

(i) the winding up of the company commences, or

(ii) as the case may be, the administration order is made ; or

(*b*) any other person, a day not earlier than 2 years before that date.

(4) On a challenge being brought under subsection (1), the court shall grant decree of reduction or for such restoration of property to the company's assets or other redress as may be

otherwise towards the outgoings of the premises, the bankrupt does not, by virtue of those payments, acquire any interest in the premises.

PART IX

*Adjustment of prior transactions, etc.*

Transactions at an undervalue.

**339.**—(1) Subject as follows in this section and sections 341 and 342, where an individual is adjudged bankrupt and he has at a relevant time (defined in section 341) entered into a transaction with any person at an undervalue, the trustee of the bankrupt's estate may apply to the court for an order under this section.

(2) The court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if that individual had not entered into that transaction.

(3) For the purposes of this section and sections 341 and 342, an individual enters into a transaction with a person at an undervalue if—

(*a*) he makes a gift to that person or he otherwise enters into a transaction with that person on terms that provide for him to receive no consideration,

(*b*) he enters into a transaction with that person in consideration of marriage, or

(*c*) he enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the individual.

Preferences.

**340.**—(1) Subject as follows in this and the next two sections, where an individual is adjudged bankrupt and he has at a relevant time (defined in section 341) given a preference to any person, the trustee of the bankrupt's estate may apply to the court for an order under this section.

(2) The court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if that individual had not given that preference.

(3) For the purposes of this and the next two sections, an individual gives a preference to a person if—

(*a*) that person is one of the individual's creditors or a surety or guarantor for any of his debts or other liabilities, and

(*b*) the individual does anything or suffers anything to be done which (in either case) has the effect of putting that person into a position which, in the event of the

PART XV

(2) An order under this section may make different provision for different cases and may contain such incidental, supplemental and transitional provisions as may appear to the Lord Chancellor necessary or expedient.

(3) An order under this section shall be made by statutory instrument subject to annulment in pursuance of a resolution of either House of Parliament.

(4) For the purposes of this section the estate of a deceased person is insolvent if, when realised, it will be insufficient to meet in full all the debts and other liabilities to which it is subject.

Recognised banks, etc.

**422.**—(1) The Secretary of State may, by order made with the concurrence of the Treasury and after consultation with the Bank of England, provide that such provisions in the first Group of Parts as may be specified in the order shall apply in relation to—

(*a*) recognised banks and licensed institutions within the meaning of the Banking Act 1979, and

1979 c. 37.

(*b*) institutions to which sections 16 and 18 of that Act apply as if they were licensed institutions,

with such modifications as may be so specified.

(2) An order under this section may make different provision for different cases and may contain such incidental, supplemental and transitional provisions as may appear to the Secretary of State necessary or expedient.

(3) An order under this section shall be made by statutory instrument subject to annulment in pursuance of a resolution of either House of Parliament.

## PART XVI

### PROVISIONS AGAINST DEBT AVOIDANCE (ENGLAND AND WALES ONLY)

Transactions defrauding creditors.

**423.**—(1) This section relates to transactions entered into at an undervalue; and a person enters into such a transaction with another person if—

(*a*) he makes a gift to the other person or he otherwise enters into a transaction with the other on terms that provide for him to receive no consideration;

(*b*) he enters into a transaction with the other in consideration of marriage; or

(*c*) he enters into a transaction with the other for a consideration the value of which, in money or money's

PART XVI

worth, is significantly less than the value, in money or money's worth, of the consideration provided by himself.

(2) Where a person has entered into such a transaction, the court may, if satisfied under the next subsection, make such order as it thinks fit for—

(*a*) restoring the position to what it would have been if the transaction had not been entered into, and

(*b*) protecting the interests of persons who are victims of the transaction.

(3) In the case of a person entering into such a transaction, an order shall only be made if the court is satisfied that it was entered into by him for the purpose—

(*a*) of putting assets beyond the reach of a person who is making, or may at some time make, a claim against him, or

(*b*) of otherwise prejudicing the interests of such a person in relation to the claim which he is making or may make.

(4) In this section " the court " means the High Court or—

(*a*) if the person entering into the transaction is an individual, any other court which would have jurisdiction in relation to a bankruptcy petition relating to him;

(*b*) if that person is a body capable of being wound up under Part IV or V of this Act, any other court having jurisdiction to wind it up.

(5) In relation to a transaction at an undervalue, references here and below to a victim of the transaction are to a person who is, or is capable of being, prejudiced by it; and in the following two sections the person entering into the transaction is referred to as " the debtor ".

Those who may apply for an order under s. 423.

**424.**—(1) An application for an order under section 423 shall not be made in relation to a transaction except—

(*a*) in a case where the debtor has been adjudged bankrupt or is a body corporate which is being wound up or in relation to which an administration order is in force, by the official receiver, by the trustee of the bankrupt's estate or the liquidator or administrator of the body corporate or (with the leave of the court) by a victim of the transaction;

(*b*) in a case where a victim of the transaction is bound by a voluntary arrangement approved under Part I or Part VIII of this Act, by the supervisor of the volun-

tary arrangement or by any person who (whether or not so bound) is such a victim ; or

(*c*) in any other case, by a victim of the transaction.

(2) An application made under any of the paragraphs of subsection (1) is to be treated as made on behalf of every victim of the transaction.

Provision which may be made by order under s. 423.

**425.**—(1) Without prejudice to the generality of section 423, an order made under that section with respect to a transaction may (subject as follows)—

(*a*) require any property transferred as part of the transaction to be vested in any person, either absolutely or for the benefit of all the persons on whose behalf the application for the order is treated as made ;

(*b*) require any property to be so vested if it represents, in any person's hands, the application either of the proceeds of sale of property so transferred or of money so transferred ;

(*c*) release or discharge (in whole or in part) any security given by the debtor ;

(*d*) require any person to pay to any other person in respect of benefits received from the debtor such sums as the court may direct ;

(*e*) provide for any surety or guarantor whose obligations to any person were released or discharged (in whole or in part) under the transaction to be under such new or revived obligations as the court thinks appropriate ;

(*f*) provide for security to be provided for the discharge of any obligation imposed by or arising under the order, for such an obligation to be charged on any property and for such security or charge to have the same priority as a security or charge released or discharged (in whole or in part) under the transaction.

(2) An order under section 423 may affect the property of, or impose any obligation on, any person whether or not he is the person with whom the debtor entered into the transaction ; but such an order—

(*a*) shall not prejudice any interest in property which was acquired from a person other than the debtor and was acquired in good faith, for value and without notice of the relevant circumstances, or prejudice any interest deriving from such an interest, and

PART XVI

(*b*) shall not require a person who received a benefit from the transaction in good faith, for value and without notice of the relevant circumstances to pay any sum unless he was a party to the transaction.

(3) For the purposes of this section the relevant circumstances in relation to a transaction are the circumstances by virtue of which an order under section 423 may be made in respect of the transaction.

(4) In this section "security" means any mortgage, charge, lien or other security.

## PART XVII

## MISCELLANEOUS AND GENERAL

Co-operation between courts exercising jurisdiction in relation to insolvency.

**426.**—(1) An order made by a court in any part of the United Kingdom in the exercise of jurisdiction in relation to insolvency law shall be enforced in any other part of the United Kingdom as if it were made by a court exercising the corresponding jurisdiction in that other part.

(2) However, without prejudice to the following provisions of this section, nothing in subsection (1) requires a court in any part of the United Kingdom to enforce, in relation to property situated in that part, any order made by a court in any other part of the United Kingdom.

(3) The Secretary of State, with the concurrence in relation to property situated in England and Wales of the Lord Chancellor, may by order make provision for securing that a trustee or assignee under the insolvency law of any part of the United Kingdom has, with such modifications as may be specified in the order, the same rights in relation to any property situated in another part of the United Kingdom as he would have in the corresponding circumstances if he were a trustee or assignee under the insolvency law of that other part.

(4) The courts having jurisdiction in relation to insolvency law in any part of the United Kingdom shall assist the courts having the corresponding jurisdiction in any other part of the United Kingdom or any relevant country or territory.

(5) For the purposes of subsection (4) a request made to a court in any part of the United Kingdom by a court in any other part of the United Kingdom or in a relevant country or territory is authority for the court to which the request is made to apply, in relation to any matters specified in the request, the insolvency law which is applicable by either court in relation to comparable matters falling within its jurisdiction.

PART XVII

In exercising its discretion under this subsection, a court shall have regard in particular to the rules of private international law.

(6) Where a person who is a trustee or assignee under the insolvency law of any part of the United Kingdom claims property situated in any other part of the United Kingdom (whether by virtue of an order under subsection (3) or otherwise), the submission of that claim to the court exercising jurisdiction in relation to insolvency law in that other part shall be treated in the same manner as a request made by a court for the purpose of subsection (4).

1977 c. 45.

(7) Section 38 of the Criminal Law Act 1977 (execution of warrant of arrest throughout the United Kingdom) applies to a warrant which, in exercise of any jurisdiction in relation to insolvency law, is issued in any part of the United Kingdom for the arrest of a person as it applies to a warrant issued in that part of the United Kingdom for the arrest of a person charged with an offence.

(8) Without prejudice to any power to make rules of court, any power to make provision by subordinate legislation for the purpose of giving effect in relation to companies or individuals to the insolvency law of any part of the United Kingdom includes power to make provision for the purpose of giving effect in that part to any provision made by or under the preceding provisions of this section.

(9) An order under subsection (3) shall be made by statutory instrument subject to annulment in pursuance of a resolution of either House of Parliament.

(10) In this section " insolvency law " means—

(*a*) in relation to England and Wales, provision made by or under this Act or sections 6 to 10, 12, 15, 19(*c*) and 20 (with Schedule 1) of the Company Directors Disqualification Act 1986 and extending to England and Wales ;

1986 c. 46.

(*b*) in relation to Scotland, provision extending to Scotland and made by or under this Act, sections 6 to 10, 12, 15, 19(*c*) and 20 (with Schedule 1) of the Company Directors Disqualification Act 1986, Part XVIII of the Companies Act or the Bankruptcy (Scotland) Act 1985 ;

1985 c. 66.

(*c*) in relation to Northern Ireland, provision made by or under the Bankruptcy Acts (Northern Ireland) 1857 to 1980, Part V, VI or IX of the Companies Act (Northern Ireland) 1960 or Part IV of the Companies (Northern Ireland) Order 1978 ;

1960 c. 22 (N.I.).
S.I. 1978/1042 (N.I. 12).

(*d*) in relation to any relevant country or territory, so much of the law of that country or territory as corresponds to provisions falling within any of the foregoing paragraphs;

and references in this subsection to any enactment include, in relation to any time before the coming into force of that enactment the corresponding enactment in force at that time.

(11) In this section " relevant country or territory " means—

(*a*) any of the Channel Islands or the Isle of Man, or

(*b*) any country or territory designated for the purposes of this section by the Secretary of State by order made by statutory instrument.

Parliamentary disqualification.

**427.**—(1) Where a court in England and Wales or Northern Ireland adjudges an individual bankrupt or a court in Scotland awards sequestration of an individual's estate, the individual is disqualified—

(*a*) for sitting or voting in the House of Lords,

(*b*) for being elected to, or sitting or voting in, the House of Commons, and

(*c*) for sitting or voting in a committee of either House.

(2) Where an individual is disqualified under this section, the disqualification ceases—

(*a*) except where the adjudication is annulled or the award recalled or reduced without the individual having been first discharged, on the discharge of the individual, and

(*b*) in the excepted case, on the annulment, recall or reduction, as the case may be.

(3) No writ of summons shall be issued to any lord of Parliament who is for the time being disqualified under this section for sitting and voting in the House of Lords.

(4) Where a member of the House of Commons who is disqualified under this section continues to be so disqualified until the end of the period of 6 months beginning with the day of the adjudication or award, his seat shall be vacated at the end of that period.

(5) A court which makes an adjudication or award such as is mentioned in subsection (1) in relation to any lord of Parliament or member of the House of Commons shall forthwith certify the adjudication or award to the Speaker of the House of Lords or, as the case may be, to the Speaker of the House of Commons.

PART XVIII

power at any general meeting of a company have effect with any necessary modifications.

Expressions used generally.

**436.** In this Act, except in so far as the context otherwise requires (and subject to Parts VII and XI)—

"the appointed day" means the day on which this Act comes into force under section 443;

"associate" has the meaning given by section 435;

"business" includes a trade or profession;

1985 c. 6.

"the Companies Act" means the Companies Act 1985;

1974 c. 39.

"conditional sale agreement" and "hire-purchase agreement" have the same meanings as in the Consumer Credit Act 1974;

"modifications" includes additions, alterations and omissions and cognate expressions shall be construed accordingly;

"property" includes money, goods, things in action, land and every description of property wherever situated and also obligations and every description of interest, whether present or future or vested or contingent, arising out of, or incidental to, property;

"records" includes computer records and other non-documentary records;

1978 c. 30.

"subordinate legislation" has the same meaning as in the Interpretation Act 1978; and

"transaction" includes a gift, agreement or arrangement, and references to entering into a transaction shall be construed accordingly.

## PART XIX

## FINAL PROVISIONS

Transitional provisions, and savings.

**437.** The transitional provisions and savings set out in Schedule 11 to this Act shall have effect, the Schedule comprising the following Parts—

Part I: company insolvency and winding up (matters arising before appointed day, and continuance of proceedings in certain cases as before that day);

TAB 96

English Insolvency Rules 1986, as Amended, Rule 13.12
(in its current form, and in its form before 2006)

# BUTTERWORTHS INSOLVENCY LAW HANDBOOK

Eighteenth edition

Editors

GLEN DAVIS QC

MARCUS HAYWOOD



**[6.1111]**
**[13.12 "Debt", "liability" (winding up)**

(1) "Debt", in relation to the winding up of a company, means (subject to the next paragraph) any of the following—

[(a) any debt or liability to which the company is subject—
(i) in the case of a winding up which was not immediately preceded by an administration, at the date on which the company went into liquidation;
(ii) in the case of a winding up which was immediately preceded by an administration, at the date on which the company entered administration.]

(b) any debt or liability to which the company may become subject after that date by reason of any obligation incurred before that date; and

(c) any interest provable as mentioned in Rule 4.93(1).

(2) For the purposes of any provision of the Act or the Rules about winding up, any liability in tort is a debt provable in the winding up, if either—

[(a) the cause of action has accrued—
(i) in the case of a winding up which was not immediately preceded by an administration, at the date on which the company went into liquidation;
(ii) in the case of a winding up which was immediately preceded by an administration, at the date on which the company entered administration.]

(b) all the elements necessary to establish the cause of action exist at that date except for actionable damage.

(3) For the purposes of references in any provision of the Act or the Rules about winding up to a debt or liability, it is immaterial whether the debt or liability is present or future, whether it is certain or contingent, or whether its amount is fixed or liquidated, or is capable of being ascertained by fixed rules or as a matter of opinion; and references in any such provision to owing a debt are to be read accordingly.

(4) In any provision of the Act or the Rules about winding up, except in so far as the context otherwise requires, "liability" means (subject to paragraph (3) above) a liability to pay money or money's worth, including any liability under an enactment, any liability for breach of trust, any liability in contract, tort or bailment, and any liability arising out of an obligation to make restitution.

(5) This Rule shall apply where a company is in administration and shall be read as if—

[(a) references to winding up were references to administration,
(b) references to administration were references to winding up,
(c) references to going into liquidation were references to entering administration, and
(d) references to entering administration were references to going into liquidation.]]

**NOTES**

Substituted by the Insolvency (Amendment) Rules 2006, SI 2006/1272, r 4, subject to transitional provisions in r 3 thereof at **[2.55]**.

Para (1): sub-para (a) substituted by the Insolvency (Amendment) Rules 2010, SI 2010/686, r 2, Sch 1, para 498(1), (2), subject to transitional provisions in r 6(1) of, and Sch 4, para 1 to, the 2010 Rules at **[2.93]**, **[2.95]**, and previously read as follows:

"(a) any debt or liability to which the company is subject at the date on which it goes into liquidation;".

Para (2): sub-para (a) substituted by SI 2010/686, r 2, Sch 1, para 498(1), (3), subject to transitional provisions in r 6(1) of, and Sch 4, para 1 to, the 2010 Rules at **[2.93]**, **[2.95]**, and previously read as follows:

"(a) the cause of action has accrued at the date on which the company goes into liquidation; or".

Para (5): words in square brackets substituted for original words "references to winding-up were a reference to administration." by SI 2010/686, r 2, Sch 1, para 498(1), (4), subject to transitional provisions in r 6(1) of, and Sch 4, para 1 to, the 2010 Rules at **[2.93]**, **[2.95]**.

Application: see the note at the beginning of this Part.

Prior to the substitution by the 2006 Rules, r 13.12 (as amended by SI 2003/1730, r 12, Sch 1, para 65, subject to savings in r 5(3), (4) thereof at **[2.25]**) read as follows:

**"13.12 "Debt", "liability" (winding up)**

(1) "Debt", in relation to the winding up of a company, means (subject to the next paragraph) any of the following—
(a) any debt or liability to which the company is subject at the date on which it goes into liquidation;
(b) any debt or liability to which the company may become subject after that date by reason of any obligation incurred before that date; and
(c) any interest provable as mentioned in rule 4.93(1).

(2) In determining for the purposes of any provision of the Act or the Rules about winding up, whether any liability in tort is a debt provable in the winding up, the company is deemed to become subject to that liability by reason of an obligation incurred at the time when the cause of action accrued.

(3) For the purposes of references in any provision of the Act or the Rules about winding up to a debt or liability, it is immaterial whether the debt or liability is present or future, whether it is certain or contingent, or whether its amount is fixed or liquidated, or is capable of being ascertained by fixed rules or as a matter of opinion; and references in any such provision to owing a debt are to be read accordingly.

(4) In any provision of the Act or the Rules about winding up, except in so far as the context otherwise requires, "liability" means (subject to paragraph (3) above) a liability to pay money or money's worth, including any liability under an enactment, any liability for breach of trust, any liability in contract, tort or bailment, and any liability arising out of an

obligation to make restitution.

[(5) This Rule shall apply where a company is in administration and shall be read as if references to winding-up were a reference to administration.]".

**[6.1112]**

**[13.12A "Authorised deposit-taker and former authorised deposit-taker"**

(1) "Authorised deposit-taker" means a person with permission under Part 4 of the Financial Services and Markets Act 2000 to accept deposits.

(2) "Former authorised deposit-taker" means a person who—

(a) is not an authorised deposit-taker,

(b) was formerly an authorised institution under the Banking Act 1987, or a recognised bank or a licensed institution under the Banking Act 1979, and

(c) continues to have liability in respect of any deposit for which it had a liability at a time when it was an authorised institution, recognised bank or licensed institution.

(3) Paragraphs (1) and (2) must be read with—

(a) section 22 of the Financial Services and Markets Act 2000;

(b) any relevant order under that section; and

(c) Schedule 2 to that Act.]

**NOTES**

Inserted by the Financial Services and Markets Act 2000 (Consequential Amendments and Repeals) Order 2001, SI 2001/3649, art 381.

Banking Act 1987: repealed by the Financial Services and Markets Act 2000 (Consequential Amendments and Repeals) Order 2001, SI 2001/3649, art 3(1)(d).

**[6.1113]**

**13.13 Expressions used generally**

[(1) "Business day" means any day other than a Saturday, a Sunday, Christmas Day, Good Friday or a day which is a bank holiday in any part of [England and Wales] under or by virtue of the Banking and Financial Dealings Act 1971 . . . ]

(2) "The Department" means [the Department for Business, Innovation and Skills].

[(2A) "Duly authorised representative" means, in relation to a corporation, a person who is authorised by or under the constitution of the corporation to act on behalf of the corporation; and like expressions are to be construed accordingly.]

(3) "File in court" [and "file with the court"] means deliver to the court for filing.

(4) "The Gazette" means the London Gazette.

[(4A) "Gazetted" means [advertised] once in the Gazette.]

[(4B) "Standard contents" means—

(a) in relation to a notice to be gazetted, the contents specified in Rules 12A.33 to 12A.35; and

(b) in relation to a notice to be advertised in any other way, the contents specified in Rules 12A.38 to 12A.40.]

(5) "General regulations" means regulations made by the Secretary of State under Rule 12.1.

[(6) "Practice direction" means a direction as to the practice and procedure of any court within the scope of the CPR.

(7) "Prescribed order of priority" means the order of priority of payments laid down by Chapter 20 of Part 4 of the Rules, or Chapter 23 of Part 6.]

[(8) "Centre of main interests" has the same meaning as in the EC Regulation.

(9) "Establishment" has the meaning given by Article 2(h) of the EC Regulation.

(10) "Main proceedings" means proceedings opened in accordance with Article 3(1) of the EC Regulation and falling within the definition of insolvency proceedings in Article 2(a) of the EC Regulation and

(a) in relation to England and Wales . . . set out in Annex A to the EC Regulation under the heading "United Kingdom", and

(b) in relation to another member State, set out in Annex A to the EC Regulation under the heading relating to that member State.

(11) "Member State liquidator" means a person falling within the definition of liquidator in Article 2(b) of the EC Regulation appointed in proceedings to which it applies in a member State other than the United Kingdom.

(12) "Secondary proceedings" means proceedings opened in accordance with Articles 3(2) and 3(3) of the EC Regulation and falling within the definition of winding-up proceedings in Article 2(c) of the EC Regulation, and

(a) in relation to England and Wales . . . set out in Annex B to the EC Regulation under the heading "United Kingdom", and

(b) in relation to another member State, set out in Annex B to the EC Regulation under the heading relating to that member State.

TAB 97

English Law of Property Act 1925 § 172

(6) In this section, "testamentary disposition" means an instrument executed by the lunatic or defective while of full testamentary capacity, which, if unrevoked, might, on his death, be proved as a will or codicil; and the court may act on such evidence as to the existence or absence of a testamentary disposition as it thinks fit.

(7) At any time before the death of the lunatic or defective, the court may, as respects any property remaining subject to the trusts of a settlement made under this section, on being satisfied that any material fact was not disclosed to the court when the settlement was made, or on account of any substantial change in circumstances, by order vary the settlement in such manner as it thinks fit, and give any consequential directions.

(8) For the purposes of this section, "the court" means the Judge in Lunacy, or, in such cases as may be prescribed by rules of court, the High Court.

(9) Rules in lunacy or, as respects cases within the jurisdiction of the High Court, rules of court, may be made for giving effect to the provisions of this section, and in particular for compelling information to be furnished respecting, and production of, testamentary dispositions, and the lodgment thereof in court, for prescribing what notices, if any, of the proceedings are to be served, for dispensing with such notices and, when necessary, for making representation orders.

## Part IX.

### Voidable Dispositions.

Voluntary conveyances to defraud creditors voidable.

**172.**—(1) Save as provided in this section, every conveyance of property, made whether before or after the commencement of this Act, with intent to defraud creditors, shall be voidable, at the instance of any person thereby prejudiced.

(2) This section does not affect the operation of a disentailing assurance, or the law of bankruptcy for the time being in force.

(3) This section does not extend to any estate or interest in property conveyed for valuable consideration and in good faith or upon good consideration

A.D. 1925.

and in good faith to any person not having, at the time of the conveyance, notice of the intent to defraud creditors.

Voluntary disposition of land how far voidable as against purchasers.

**173.**—(1) Every voluntary disposition of land made with intent to defraud a subsequent purchaser is voidable at the instance of that purchaser.

(2) For the purposes of this section, no voluntary disposition, whenever made, shall be deemed to have been made with intent to defraud by reason only that a subsequent conveyance for valuable consideration was made, if such subsequent conveyance was made after the twenty-eighth day of June, eighteen hundred and ninety-three.

Acquisitions of reversions at an under value.

**174.**—(1) No acquisition made in good faith, without fraud or unfair dealing, of any reversionary interest in real or personal property, for money or money's worth, shall be liable to be opened or set aside merely on the ground of under value.

In this subsection "reversionary interest" includes an expectancy or possibility.

(2) This section does not affect the jurisdiction of the court to set aside or modify unconscionable bargains.

## PART X.

## WILLS.

Contingent and future testamentary gifts to carry the intermediate income.

**175.**—(1) A contingent or future specific devise or bequest of property, whether real or personal, and a contingent residuary devise of freehold land, and a specific or residuary devise of freehold land to trustees upon trust for persons whose interests are contingent or executory shall, subject to the statutory provisions relating to accumulations, carry the intermediate income of that property from the death of the testator, except so far as such income, or any part thereof, may be otherwise expressly disposed of.

(2) This section applies only to wills coming into operation after the commencement of this Act.

Power for tenant in tail in possession

**176.**—(1) A tenant in tail of full age shall have power to dispose by will, by means of a devise or bequest referring specifically either to the property or to the

TAB 98

New Zealand Companies Amendment Act 2006 § 27(2)

**25 Meaning of failure to comply**

Section 285 is amended by adding the following subsection as subsection (2):

"(2) In subsection (1), **relevant duty** includes the duty of a person in his or her capacity as administrator or deed administrator of a company."

**26 Orders to enforce liquidator's duties**

(1) Section 286 is amended by repealing subsection (5) and substituting the following subsection:

"(5) If the Court is satisfied that a person is unfit to act as a liquidator by reason of persistent failures to comply or the seriousness of a failure to comply,—

"(a) the Court must make a prohibition order; and

"(b) the period of the order is a matter for the discretion of the Court but the Court may make a prohibition period for an indefinite period."

(2) Section 286(7) is amended by omitting "within the preceding 5 years".

## Voidable transactions

**27 Transactions having preferential effect**

(1) The heading to section 292 is omitted and the heading "**Insolvent transaction voidable**" substituted.

(2) Section 292 is amended by repealing subsections (1) to (4) and substituting the following subsections:

"(1) A transaction by a company is voidable by the liquidator if it—

"(a) is an insolvent transaction; and

"(b) is entered into within the specified period.

"(2) An **insolvent transaction** is a transaction by a company that—

"(a) is entered into at a time when the company is unable to pay its due debts; and

"(b) enables another person to receive more towards satisfaction of a debt owed by the company than the person would receive, or would be likely to receive, in the company's liquidation.

"(3) In this section, **transaction** means any of the following steps by the company:

“(a) conveying or transferring the company’s property:
“(b) creating a charge over the company’s property:
“(c) incurring an obligation:
“(d) undergoing an execution process:
“(e) paying money (including paying money in accordance with a judgment or an order of a court):
“(f) anything done or omitted to be done for the purpose of entering into the transaction or giving effect to it.

“(4) In this section, **transaction** includes a transaction by a receiver, except a transaction that discharges, whether in part or in full, a liability for which the receiver is personally liable under section 32(1) of the Receiverships Act 1993 or otherwise personally liable under a contract entered into by the receiver.

“(4A) A transaction that is entered into within the restricted period is presumed, unless the contrary is proved, to be entered into at a time when the company is unable to pay its due debts.

“(4B) Where—
“(a) a transaction is, for commercial purposes, an integral part of a continuing business relationship (for example, a running account) between a company and a creditor of the company (including a relationship to which other persons are parties); and
“(b) in the course of the relationship, the level of the company’s net indebtedness to the creditor is increased and reduced from time to time as the result of a series of transactions forming part of the relationship;
then—
“(c) subsection (1) applies in relation to all the transactions forming part of the relationship as if they together constituted a single transaction; and
“(d) the transaction referred to in paragraph (a) may only be taken to be an insolvent transaction voidable by the liquidator if the effect of applying subsection (1) in accordance with paragraph (c) is that the single transaction referred to in paragraph (c) is taken to be an insolvent transaction voidable by the liquidator.”

(3) Section 292(5) is amended by omitting “subsection (2)(a)(ii) of this section” and substituting “subsections (1) and (4B)”.

(4) Section 292(6) is amended by omitting "(3) of this section" and substituting "(4A)".

(5) Nothing in this section makes voidable a transaction that was completed before this section came into force, if that transaction would not have been voidable if this section had not come into force.

**28 Voidable charges**

(1) Section 293 is amended by repealing subsection (1) and substituting the following subsections:

"(1) A charge over any property or undertaking of a company is voidable by the liquidator if—

"(a) the charge was given within the specified period; and

"(b) immediately after the charge was given, the company was unable to pay its due debts.

"(1A) Subsection (1) does not apply if—

"(a) the charge secures money actually advanced or paid, or the actual price or value of property sold or supplied to the company, or any other valuable consideration given in good faith by the grantee of the charge at the time of, or at any time after, the giving of the charge; or

"(b) the charge is in substitution for a charge given before the specified period."

(2) Section 293(3) is amended by omitting "(1)(c) of this section" and substituting "(1A)(b)".

(3) Section 293(5) is amended by omitting "(1)(a)" and substituting "(1A)(a)"

(4) Section 293(6) is amended by omitting "a year" wherever it appears and substituting in each case "2 years".

**29 New section 294 substituted**

Section 294 is repealed and the following section substituted:

**"294 Procedure for setting aside transactions and charges**

"(1) A liquidator who wishes to set aside a transaction or charge that is voidable under section 292 or 293 must—

"(a) file a notice with the Court that meets the requirements set out in subsection (2); and

"(b) serve the notice as soon as practicable on—

TAB 99

UK Co-operation of Insolvency Courts
(Designation of Relevant Countries and Territories)
Order 1986 (SI 1986/2123)

1986 No. 2123

INSOLVENCY

# The Co-operation of Insolvency Courts (Designation of Relevant Countries and Territories) Order 1986

Thomson Reuters (Legal) Limited.

UK Statutory Instruments Crown Copyright. Reproduced by permission of the Controller of Her Majesty's Stationery Office.

| | |
|---|---|
| *Made* | *2nd December 1986* |
| *Coming into Force* | *29th December 1986* |

The Secretary of State, in exercise of the powers conferred on him by section 426(11) of the Insolvency Act 1986, hereby makes the following Order:—

**Extent**

Preamble: England, Wales

Law In Force

**1.**

This Order may be cited as the Co-operation of Insolvency Courts (Designation of Relevant Countries and Territories) Order 1986 and shall come into force on 29th December 1986.

**Commencement**

art. 1: December 29, 1986

**Extent**

art. 1: England, Wales

Law In Force

**2.**

The countries and territories specified in the Schedule to this Order are hereby designated relevant countries and territories for the purposes of section 426 of the Insolvency Act 1986.



**Commencement**

art. 2: December 29, 1986

**Extent**

art. 2: England, Wales

Law In Force

*Michael Howard,*
Parliamentary Under Secretary of State,
Department of Trade and Industry.

2nd December 1986.

**SCHEDULE**

**RELEVANT COUNTRIES AND TERRITORIES**

**Article 2**

Law In Force

ANGUILLA
AUSTRALIA
THE BAHAMAS
BERMUDA
BOTSWANA
CANADA
CAYMAN ISLANDS
FALKLAND ISLANDS
GIBRALTAR
HONG KONG
REPUBLIC OF IRELAND
MONTSERRAT
NEW ZEALAND
ST. HELENA
TURKS AND CAICOS ISLANDS
TUVALU
VIRGIN ISLANDS



**Commencement**

Sch. 1 para. 1: December 29, 1986

**Extent**

Sch. 1 para. 1: England, Wales

---

## EXPLANATORY NOTE

*(This note is not part of the Order)*

This Order designates as relevant countries and territories for the purpose of section 426 of the Insolvency Act 1986 the countries and territories specified in the Schedule to the Order. The courts of the countries and territories so designated will have the right under section 426 to request assistance in matters of insolvency law from courts having jurisdiction in relation to insolvency law in any part of the United Kingdom. The Order comes into force on 29th December 1986.



## Modifications

| Provision | Modification | Notes | Further Information |
|---|---|---|---|
| **Whole Document** | Limited Liability Partnerships Regulations (Northern Ireland) 2004/307, Sch. 5(II) para. 6 | | Pt VII reg. 10(1)(b) |



## Table of Contents

**Co-operation of Insolvency Courts (Designation of Relevant Countries and Territories) Order 1986/2123** ........ 1
Preamble ........ 1
art. 1 ........ 1
art. 2 ........ 1
Signatures ........ 2
**Schedule 1 RELEVANT COUNTRIES AND TERRITORIES** ........ 2
para. 1 ........ 2
**Explanatory Note** ........ 3
para. 1 ........ 3
**Modifications** ........ 4
**Table of Contents** ........ 5



TAB 100

UK Cross-Border Insolvency Regulations 2006 (SI 2006/1030),
Schedule 1, Articles 20-23

## 2006 No. 1030

## INSOLVENCY

# The Cross-Border Insolvency Regulations 2006

Thomson Reuters (Legal) Limited.

UK Statutory Instruments Crown Copyright. Reproduced by permission of the Controller of Her Majesty's Stationery Office.

| | |
|---|---|
| *Made* | *3rd April 2006* |
| *Coming into force* | *4th April 2006* |

These Regulations are made in exercise of the powers conferred by section 14 of the Insolvency Act 2000.

In accordance with section 14(6) of that Act, the Lord Chancellor and the Scottish Ministers have agreed to the making of these Regulations.

A draft of these Regulations has been laid before Parliament in accordance with section 14(5) of that Act and approved by a resolution of each House of Parliament.

Accordingly, the Secretary of State makes the following Regulations:

**Extent**

Preamble: United Kingdom

Law In Force

**1.— Citation, commencement and interpretation**

(1) These Regulations may be cited as the Cross-Border Insolvency Regulations 2006 and shall come into force on the day after the day on which they are made.

(2) In these Regulations "the UNCITRAL Model Law" means the Model Law on cross-border insolvency as adopted by the United Nations Commission on International Trade Law on 30th May 1997.

**[** (3) In these Regulations "overseas company"has the meaning given by section 1044 of the Companies Act 2006 and "establishment", in relation to such a company, has the same meaning as in the Overseas Companies Regulations 2009. **]** [1]

Westlaw UK



Article 20. Effects of recognition of a foreign main proceeding

Law In Force

**1.**
Upon recognition of a foreign proceeding that is a foreign main proceeding, subject to paragraph 2 of this article—

(a) commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities is stayed;

(b) execution against the debtor's assets is stayed; and

(c) the right to transfer, encumber or otherwise dispose of any assets of the debtor is suspended.

Law In Force

**2.**
The stay and suspension referred to in paragraph 1 of this article shall be—

(a) the same in scope and effect as if the debtor, in the case of an individual, had been adjudged bankrupt under the Insolvency Act 1986 or had his estate sequestrated under the Bankruptcy (Scotland) Act 1985, or, in the case of a debtor other than an individual, had been made the subject of a winding-up order under the Insolvency Act 1986; and

(b) subject to the same powers of the court and the same prohibitions, limitations, exceptions and conditions as would apply under the law of Great Britain in such a case,

and the provisions of paragraph 1 of this article shall be interpreted accordingly.

Law In Force

**3.**
Without prejudice to paragraph 2 of this article, the stay and suspension referred to in paragraph 1 of this article, in particular, does not affect any right—

(a) to take any steps to enforce security over the debtor's property;

(b) to take any steps to repossess goods in the debtor's possession under a hire-purchase agreement;

(c) exercisable under or by virtue of or in connection with the provisions referred to in article 1(4); or

(d) of a creditor to set off its claim against a claim of the debtor,

being a right which would have been exercisable if the debtor, in the case of an individual, had been adjudged bankrupt under the Insolvency Act 1986 or had his estate sequestrated under the Bankruptcy (Scotland) Act 1985, or, in the case of a debtor other than an individual, had been made the subject of a winding-up order under the Insolvency Act 1986.

Law In Force

**4.**
Paragraph 1(a) of this article does not affect the right to—

(a) commence individual actions or proceedings to the extent necessary to preserve a claim against the debtor; or



(b) commence or continue any criminal proceedings or any action or proceedings by a person or body having regulatory, supervisory or investigative functions of a public nature, being an action or proceedings brought in the exercise of those functions.

Law In Force

**5.**

Paragraph 1 of this article does not affect the right to request or otherwise initiate the commencement of a proceeding under British insolvency law or the right to file claims in such a proceeding.

Law In Force

**6.**

In addition to and without prejudice to any powers of the court under or by virtue of paragraph 2 of this article, the court may, on the application of the foreign representative or a person affected by the stay and suspension referred to in paragraph 1 of this article, or of its own motion, modify or terminate such stay and suspension or any part of it, either altogether or for a limited time, on such terms and conditions as the court thinks fit.

## Article 21. Relief that may be granted upon recognition of a foreign proceeding

Law In Force

**1.**

Upon recognition of a foreign proceeding, whether main or non-main, where necessary to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including—

(a) staying the commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities, to the extent they have not been stayed under paragraph 1(a) of article 20;

(b) staying execution against the debtor's assets to the extent it has not been stayed under paragraph 1(b) of article 20;

(c) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under paragraph 1(c) of article 20;

(d) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

(e) entrusting the administration or realisation of all or part of the debtor's assets located in Great Britain to the foreign representative or another person designated by the court;

(f) extending relief granted under paragraph 1 of article 19; and

(g) granting any additional relief that may be available to a British insolvency officeholder under the law of Great Britain, including any relief provided under paragraph 43 of Schedule B1 to the Insolvency Act 1986[14] .



Law In Force

**2.**

Upon recognition of a foreign proceeding, whether main or non-main, the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in Great Britain to the foreign representative or another person designated by the court, provided that the court is satisfied that the interests of creditors in Great Britain are adequately protected.

Law In Force

**3.**

In granting relief under this article to a representative of a foreign non-main proceeding, the court must be satisfied that the relief relates to assets that, under the law of Great Britain, should be administered in the foreign non-main proceeding or concerns information required in that proceeding.

Law In Force

**4.**

No stay under paragraph 1(a) of this article shall affect the right to commence or continue any criminal proceedings or any action or proceedings by a person or body having regulatory, supervisory or investigative functions of a public nature, being an action or proceedings brought in the exercise of those functions.

Article 22. Protection of creditors and other interested persons

Law In Force

**1.**

In granting or denying relief under article 19 or 21, or in modifying or terminating relief under paragraph 3 of this article or paragraph 6 of article 20, the court must be satisfied that the interests of the creditors (including any secured creditors or parties to hire-purchase agreements) and other interested persons, including if appropriate the debtor, are adequately protected.

Law In Force

**2.**

The court may subject relief granted under article 19 or 21 to conditions it considers appropriate, including the provision by the foreign representative of security or caution for the proper performance of his functions.

Law In Force

**3.**

The court may, at the request of the foreign representative or a person affected by relief granted under article 19 or 21, or of its own motion, modify or terminate such relief.



Article 23. Actions to avoid acts detrimental to creditors

Law In Force

**1.**
Subject to paragraphs 6 and 9 of this article, upon recognition of a foreign proceeding, the foreign representative has standing to make an application to the court for an order under or in connection with sections 238, 239, 242, 243, 244, 245, 339, 340, 342A, 343, and 423 of the Insolvency Act 1986[15] and sections 34, 35, 36, 36A and 61 of the Bankruptcy (Scotland) Act 1985[16] .

Law In Force

**2.**
Where the foreign representative makes such an application ("an article 23 application"), the sections referred to in paragraph 1 of this article and sections 240, 241, 341, 342, 342B to 342F, 424 and 425 of the Insolvency Act 1986[17] and sections 36B and 36C of the Bankruptcy (Scotland) Act 1985[18] shall apply—

(a) whether or not the debtor, in the case of an individual, has been adjudged bankrupt or had his estate sequestrated, or, in the case of a debtor other than an individual, is being wound up or is in administration, under British insolvency law; and
(b) with the modifications set out in paragraph 3 of this article.

Law In Force

**3.**
The modifications referred to in paragraph 2 of this article are as follows—

(a) for the purposes of sections 241(2A)(a) and 342(2A)(a) of the Insolvency Act 1986, a person has notice of the relevant proceedings if he has notice of the opening of the relevant foreign proceeding;
(b) for the purposes of sections 240(1) and 245(3) of that Act, the onset of insolvency shall be the date of the opening of the relevant foreign proceeding;
(c) the periods referred to in sections 244(2), 341(1)(a) to (c) and 343(2) of that Act shall be periods ending with the date of the opening of the relevant foreign proceeding;
(d) for the purposes of sections 242(3)(a), (3)(b) and 243(1) of that Act, the date on which the winding up of the company commences or it enters administration shall be the date of the opening of the relevant foreign proceeding; and
(e) for the purposes of sections 34(3)(a), (3)(b), 35(1)(c), 36(1)(a) and (1)(b) and 61(2) of the Bankruptcy (Scotland) Act 1985, the date of sequestration or granting of the trust deed shall be the date of the opening of the relevant foreign proceeding.

Law In Force

**4.**
For the purposes of paragraph 3 of this article, the date of the opening of the foreign proceeding shall be determined in accordance with the law of the State in which the foreign proceeding is taking place, including any rule of law by virtue of which the foreign proceeding is deemed to have opened at an earlier time.



Law In Force

**5.**

When the foreign proceeding is a foreign non-main proceeding, the court must be satisfied that the article 23 application relates to assets that, under the law of Great Britain, should be administered in the foreign non-main proceeding.

Law In Force

**6.**

At any time when a proceeding under British insolvency law is taking place regarding the debtor—

(a) the foreign representative shall not make an article 23 application except with the permission of—

(i) in the case of a proceeding under British insolvency law taking place in England and Wales, the High Court; or

(ii) in the case of a proceeding under British insolvency law taking place in Scotland, the Court of Session; and

(b) references to "the court" in paragraphs 1, 5 and 7 of this article are references to the court in which that proceeding is taking place.

Law In Force

**7.**

On making an order on an article 23 application, the court may give such directions regarding the distribution of any proceeds of the claim by the foreign representative, as it thinks fit to ensure that the interests of creditors in Great Britain are adequately protected.

Law In Force

**8.**

Nothing in this article affects the right of a British insolvency officeholder to make an application under or in connection with any of the provisions referred to in paragraph 1 of this article.

Law In Force

**9.**

Nothing in paragraph 1 of this article shall apply in respect of any preference given, floating charge created, alienation, assignment or relevant contributions (within the meaning of section 342A(5) of the Insolvency Act 1986) made or other transaction entered into before the date on which this Law comes into force.

Article 24. Intervention by a foreign representative in proceedings in Great Britain

Law In Force

Upon recognition of a foreign proceeding, the foreign representative may, provided the requirements of the law of Great Britain are met, intervene in any proceedings in which the debtor is a party.



TAB 101

UK Financial Services and Markets Act 2000 § 397

# Financial Services and Markets Act 2000

## CHAPTER 8

## ARRANGEMENT OF SECTIONS

PART I

THE REGULATOR

Section
1. The Financial Services Authority.

*The Authority's general duties*

2. The Authority's general duties.

*The regulatory objectives*

3. Market confidence.
4. Public awareness.
5. The protection of consumers.
6. The reduction of financial crime.

*Corporate governance*

7. Duty of Authority to follow principles of good governance.

*Arrangements for consulting practitioners and consumers*

8. The Authority's general duty to consult.
9. The Practitioner Panel.
10. The Consumer Panel.
11. Duty to consider representations by the Panels.

*Reviews*

12. Reviews.
13. Right to obtain documents and information.

*Inquiries*

14. Cases in which the Treasury may arrange independent inquiries.
15. Power to appoint person to hold an inquiry.

ch0800c79a 15-06-00 12:52:03 ACT Unit: pag1 RA Proof 8.6.2000

(f) 282(3), (6) or (7)(b);

(g) 321(2) or (5).

Statements under section 395: consultation.

**396.**—(1) Before issuing a statement of procedure under section 395, the Authority must publish a draft of the proposed statement in the way appearing to the Authority to be best calculated to bring it to the attention of the public.

(2) The draft must be accompanied by notice that representations about the proposal may be made to the Authority within a specified time.

(3) Before issuing the proposed statement of procedure, the Authority must have regard to any representations made to it in accordance with subsection (2).

(4) If the Authority issues the proposed statement of procedure it must publish an account, in general terms, of—

(a) the representations made to it in accordance with subsection (2); and

(b) its response to them.

(5) If the statement of procedure differs from the draft published under subsection (1) in a way which is, in the opinion of the Authority, significant, the Authority must (in addition to complying with subsection (4)) publish details of the difference.

(6) The Authority may charge a reasonable fee for providing a person with a copy of a draft published under subsection (1).

(7) This section also applies to a proposal to revise a statement of policy.

## PART XXVII

## OFFENCES

### *Miscellaneous offences*

Misleading statements and practices.

**397.**—(1) This subsection applies to a person who—

(a) makes a statement, promise or forecast which he knows to be misleading, false or deceptive in a material particular;

(b) dishonestly conceals any material facts whether in connection with a statement, promise or forecast made by him or otherwise; or

(c) recklessly makes (dishonestly or otherwise) a statement, promise or forecast which is misleading, false or deceptive in a material particular.

(2) A person to whom subsection (1) applies is guilty of an offence if he makes the statement, promise or forecast or conceals the facts for the purpose of inducing, or is reckless as to whether it may induce, another person (whether or not the person to whom the statement, promise or forecast is made)—

(a) to enter or offer to enter into, or to refrain from entering or offering to enter into, a relevant agreement; or

(b) to exercise, or refrain from exercising, any rights conferred by a relevant investment.

(3) Any person who does any act or engages in any course of conduct which creates a false or misleading impression as to the market in or the price or value of any relevant investments is guilty of an offence if he does so for the purpose of creating that impression and of thereby inducing another person to acquire, dispose of, subscribe for or underwrite those investments or to refrain from doing so or to exercise, or refrain from exercising, any rights conferred by those investments.

(4) In proceedings for an offence under subsection (2) brought against a person to whom subsection (1) applies as a result of paragraph (a) of that subsection, it is a defence for him to show that the statement, promise or forecast was made in conformity with price stabilising rules or control of information rules.

(5) In proceedings brought against any person for an offence under subsection (3) it is a defence for him to show—

(a) that he reasonably believed that his act or conduct would not create an impression that was false or misleading as to the matters mentioned in that subsection;

(b) that he acted or engaged in the conduct—

  (i) for the purpose of stabilising the price of investments; and

  (ii) in conformity with price stabilising rules; or

(c) that he acted or engaged in the conduct in conformity with control of information rules.

(6) Subsections (1) and (2) do not apply unless—

(a) the statement, promise or forecast is made in or from, or the facts are concealed in or from, the United Kingdom or arrangements are made in or from the United Kingdom for the statement, promise or forecast to be made or the facts to be concealed;

(b) the person on whom the inducement is intended to or may have effect is in the United Kingdom; or

(c) the agreement is or would be entered into or the rights are or would be exercised in the United Kingdom.

(7) Subsection (3) does not apply unless—

(a) the act is done, or the course of conduct is engaged in, in the United Kingdom; or

(b) the false or misleading impression is created there.

(8) A person guilty of an offence under this section is liable—

(a) on summary conviction, to imprisonment for a term not exceeding six months or a fine not exceeding the statutory maximum, or both;

(b) on conviction on indictment, to imprisonment for a term not exceeding seven years or a fine, or both.

(9) "Relevant agreement" means an agreement—

(a) the entering into or performance of which by either party constitutes an activity of a specified kind or one which falls within a specified class of activity; and

(b) which relates to a relevant investment.

10-03635-jpm Doc 173-6 Filed 01/13/17 Entered 01/13/17 22:34:28 Ex C part 5 Pg 600 of 686

(10) "Relevant investment" means an investment of a specified kind or one which falls within a prescribed class of investment.

(11) Schedule 2 (except paragraphs 25 and 26) applies for the purposes of subsections (9) and (10) with references to section 22 being read as references to each of those subsections.

(12) Nothing in Schedule 2, as applied by subsection (11), limits the power conferred by subsection (9) or (10).

(13) "Investment" includes any asset, right or interest.

(14) "Specified" means specified in an order made by the Treasury.

Misleading the Authority: residual cases.

**398.**—(1) A person who, in purported compliance with any requirement imposed by or under this Act, knowingly or recklessly gives the Authority information which is false or misleading in a material particular is guilty of an offence.

(2) Subsection (1) applies only to a requirement in relation to which no other provision of this Act creates an offence in connection with the giving of information.

(3) A person guilty of an offence under this section is liable—

(a) on summary conviction, to a fine not exceeding the statutory maximum;

(b) on conviction on indictment, to a fine.

Misleading the Director General of Fair Trading. 1998 c. 41.

**399.** Section 44 of the Competition Act 1998 (offences connected with the provision of false or misleading information) applies in relation to any function of the Director General of Fair Trading under this Act as if it were a function under Part I of that Act.

*Bodies corporate and partnerships*

Offences by bodies corporate etc.

**400.**—(1) If an offence under this Act committed by a body corporate is shown—

(a) to have been committed with the consent or connivance of an officer, or

(b) to be attributable to any neglect on his part,

the officer as well as the body corporate is guilty of the offence and liable to be proceeded against and punished accordingly.

(2) If the affairs of a body corporate are managed by its members, subsection (1) applies in relation to the acts and defaults of a member in connection with his functions of management as if he were a director of the body.

(3) If an offence under this Act committed by a partnership is shown—

(a) to have been committed with the consent or connivance of a partner, or

(b) to be attributable to any neglect on his part,

the partner as well as the partnership is guilty of the offence and liable to be proceeded against and punished accordingly.

(4) In subsection (3) "partner" includes a person purporting to act as a partner.

TAB 102

UK Financial Services Act 2012 § 89



# Financial Services Act 2012

CHAPTER 21

Explanatory Notes have been produced to assist in the understanding of this Act and are available separately

£38.00

**88 Exemption from liability in damages**

(1) Neither the investigator appointed under section 84 nor a person appointed to conduct an investigation on the investigator's behalf under section 87(8) is to be liable in damages for anything done or omitted in the discharge, or purported discharge, of functions in relation to the investigation of a complaint.

(2) Subsection (1) does not apply—

(a) if the act or omission is shown to have been in bad faith, or

(b) so as to prevent an award of damages made in respect of an act or omission on the ground that the act or omission was unlawful as a result of section 6(1) of the Human Rights Act 1998.

## PART 7

### OFFENCES RELATING TO FINANCIAL SERVICES

**89 Misleading statements**

(1) Subsection (2) applies to a person ("P") who—

(a) makes a statement which P knows to be false or misleading in a material respect,

(b) makes a statement which is false or misleading in a material respect, being reckless as to whether it is, or

(c) dishonestly conceals any material facts whether in connection with a statement made by P or otherwise.

(2) P commits an offence if P makes the statement or conceals the facts with the intention of inducing, or is reckless as to whether making it or concealing them may induce, another person (whether or not the person to whom the statement is made)—

(a) to enter into or offer to enter into, or to refrain from entering or offering to enter into, a relevant agreement, or

(b) to exercise, or refrain from exercising, any rights conferred by a relevant investment.

(3) In proceedings for an offence under subsection (2) brought against a person to whom that subsection applies as a result of paragraph (a) of subsection (1), it is a defence for the person charged ("D") to show that the statement was made in conformity with—

(a) price stabilising rules,

(b) control of information rules, or

(c) the relevant provisions of Commission Regulation (EC) No 2273/2003 of 22 December 2003 implementing Directive 2003/6/EC of the European Parliament and of the Council as regards exemptions for buy-back programmes and stabilisation of financial instruments.

(4) Subsections (1) and (2) do not apply unless—

(a) the statement is made in or from, or the facts are concealed in or from, the United Kingdom or arrangements are made in or from the United Kingdom for the statement to be made or the facts to be concealed,

(b) the person on whom the inducement is intended to or may have effect is in the United Kingdom, or

    (c)   the agreement is or would be entered into or the rights are or would be exercised in the United Kingdom.

**90    Misleading impressions**

(1)   A person ("P") who does any act or engages in any course of conduct which creates a false or misleading impression as to the market in or the price or value of any relevant investments commits an offence if—

    (a)   P intends to create the impression, and

    (b)   the case falls within subsection (2) or (3) (or both).

(2)   The case falls within this subsection if P intends, by creating the impression, to induce another person to acquire, dispose of, subscribe for or underwrite the investments or to refrain from doing so or to exercise or refrain from exercising any rights conferred by the investments.

(3)   The case falls within this subsection if—

    (a)   P knows that the impression is false or misleading or is reckless as to whether it is, and

    (b)   P intends by creating the impression to produce any of the results in subsection (4) or is aware that creating the impression is likely to produce any of the results in that subsection.

(4)   Those results are—

    (a)   the making of a gain for P or another, or

    (b)   the causing of loss to another person or the exposing of another person to the risk of loss.

(5)   References in subsection (4) to gain or loss are to be read in accordance with subsections (6) to (8).

(6)   "Gain" and "loss"—

    (a)   extend only to gain or loss in money or other property of any kind;

    (b)   include such gain or loss whether temporary or permanent.

(7)   "Gain" includes a gain by keeping what one has, as well as a gain by getting what one does not have.

(8)   "Loss" includes a loss by not getting what one might get, as well as a loss by parting with what one has.

(9)   In proceedings brought against any person ("D") for an offence under subsection (1) it is a defence for D to show—

    (a)   to the extent that the offence results from subsection (2), that D reasonably believed that D's conduct would not create an impression that was false or misleading as to the matters mentioned in subsection (1),

    (b)   that D acted or engaged in the conduct—

        (i)   for the purpose of stabilising the price of investments, and

        (ii)   in conformity with price stabilising rules,

    (c)   that D acted or engaged in the conduct in conformity with control of information rules, or

    (d)   that D acted or engaged in the conduct in conformity with the relevant provisions of Commission Regulation (EC) No 2273/2003 of 22 December 2003 implementing Directive 2003/6/EC of the European

TAB 103

Virgin Islands (Courts) Order 1967 (SI 1967/231)

STATUTORY INSTRUMENTS

1967 No. 231

CARIBBEAN AND NORTH ATLANTIC TERRITORIES

# THE VIRGIN ISLANDS (COURTS) ORDER 1967

| | |
|---|---|
| *Made - - -* | *22nd February 1967* |
| *Laid before Parliament* | *24th February 1967* |
| *Coming into Operation* | *27th February 1967* |

[*This Order is printed as amended by the Montserrat and Virgin Islands (Supreme Court) Modifications Order* 1983 *(U.K.—S.I.* 1983 *No.* 1112*)*]

At the Court at Buckingham Palace, the 22nd of February 1967

*Present,*

*The Queen's Most Excellent Majesty in Council*

Her Majesty, by virtue and in exercise of Her powers under sections 4, 5, and 7 of the West Indies Act 1962(a), is pleased, by and with the advice of Her Privy Council, to order, and it is hereby ordered as follows:—

Citation and commencement.

**1.** (1) This Order may be cited as the Virgin Islands (Courts) Order 1967.

(2) This Order shall come into operation on 27th February 1967.

Interpretation.

**2.** (1) In this Order—

S.I. 1983 No. 1112.

"the Court of Appeal" means the Court of Appeal established by the Supreme Court Order 1967(b);

S.I. 1983 No. 1112.

"the High Court" means the High Court established by the Supreme Court Order;

"the Order of 1959" means the Windward Islands and Leeward Islands (Courts) Order in Council 1959(c), as amended(d);

"the Order of 1962" means the British Caribbean Court of Appeal Order in Council 1962(e), as amended(f);

(a) 1962 c. 19. (b) S.I. 1967/223. (c) S.I. 1959/2197 (159 I, p, 56 (d) The relevant amending Orders are S.I. 1960/1658, 1962/1084 (1960 I, p. 473; 1962 II, p. 1220) (e) S.I. 1962/1096 (1962 II, p. 1247) (f) The relevant amending Orders are S.I. 1962/1245, 1962/1870, 1966/575, 1966/1455 (1962 II, pp. 1367, 2186 1966, p. 1226, III, p. 3858).

"the prescribed date" means the date prescribed under section 1(2) of the Supreme Court Order.

(2) The Interpretation Act 1889(a) shall apply, with the necessary adaptations, for the purpose of interpreting this Order and otherwise in relation thereto as it applies for the purpose of interpreting, and in relation to, Acts of the Parliament of the United Kingdom.

Revocation of existings Orders.

**3.** The Order of 1959 and the Order of 1962 are revoked, in so far as they have effect as part of the law of the Virgin Islands, with effect from the prescribed date:

Provided that the provisions of sections 21(2) and 22(5) of the Order of 1959 and article 9 of the Order of 1962 shall continue in force as part of the law of the Virgin Islands as if those Orders had not been revoked.

Amendment of Article 21 of Letters Patent of 1959.

**4.** Article 21 of the Virgin Islands Letters Patent 1959(b) is amended by the addition of the following proviso:—

"Provided that power to make appointments to the office in the public service of the Virgin Islands of any magistrate or any registrar or other officer of the High Court established by the Supreme Court Order 1967 who is required to possess legal qualifications and to exercise disciplinary control over or remove from office any person holding or acting in any such office shall vest in the Governor, acting after consultation with the Chief Justice".

Pending proceedings.

**5.** (1) Any proceedings originating in the Virgin Islands and pending immediately before the prescribed date in the British Caribbean Court of Appeal or in the Supreme Court or the Court of Appeal of the Windward Islands and Leeward Islands may be continued and concluded on or after that date—

*(a)* in the case of proceedings pending in the British Caribbean Court of Appeal, in the Court of Appeal; and

*(b)* in the case of proceedings pending in the Supreme Court or the Court of Appeal of the Windward Islands and Leeward Islands, in the High Court.

(a) 1889 c. 63 (b) 1959 II, p. 3450.

(2) An appeal shall lie to the Court of Appeal on and after the prescribed date from any judgment of the Supreme Court of the Windward Islands and Leeward Islands given before the prescribed date in any proceedings originating in the Virgin Islands as if it were a judgment of the High Court.

(3) Any judgment of the British Caribbean Court of Appeal that was given but not satisfied before the prescribed date in any proceedings originating in the Virgin Islands may be enforced on or after the prescribed date as if it were a judgment of the Court of Appeal and any such judgment of the Court of Appeal or the High Court of the Windward Islands and Leeward Islands may be so enforced as if it were a judgment of the High Court.

(4) Until such time as other provision is made in that behalf by any law in force in the Virgin Islands, an appeal shall lie to the High Court from the decision of a magistrate in the Virgin Islands in any case in which an appeal would have lain to the Court of Appeal of the Windward Islands and Leeward Islands if the Order of 1959 had not been revoked.

Existings laws, etc.

**6.** (1) Any rule of court made under or kept in force by the Order of 1959 or the Order of 1962 and having effect as part of the law of the Virgin Islands immediately before the prescribed date shall continue in force on and after that date notwithstanding the revocation of those Orders.

(2) Any law (including any rule of court) other than the Order of 1959 and the Order of 1962 having effect as part of the law of the Virgin Islands immediately before the prescribed date shall have effect on and after the prescribed date as if—

*(a)* references therein to the British Caribbean Court of Appeal were references to the Court of Appeal; and

*(b)* references therein to the Supreme Court or the Court of Appeal of the Windward Islands and Leeward Islands were references to the High Court.

(3) The Chief Justice and any other two judges of the Supreme Court may by order provide that any rules of court made under section 17 of the Courts Order shall have effect as part of the law of the Virgin Islands subject to such exceptions, adaptations or modifications as may be specified in the order and any such order may include provision for the amendment

or revocation of any rule of court so having effect immediately before the prescribed date.

(4) The foregoing provisions of this section shall be without prejudice to any powers conferred by any law in force in the Virgin Islands upon any person or authority to make provision for any matter, including the amendment or revocation of any law (including any rule of court) having effect as part of the law of the Virgin Islands immediately before the prescribed date or the making on or after that date of rules of court so having effect.

*W. G. Agnew.*

EXPLANATORY NOTE

(This Note is not part of the Order.)

Provision has been made by the West Indies Associated States Supreme Court Order 1967 for a new Court of Appeal and High Court for Antigua, Dominica, Grenada, St. Christopher, Nevis and Anguilla, St. Lucia and St. Vincent and under section 10 of that Order the new courts may exercise in relation to the Virgin Islands such jurisdiction and powers as may be conferred upon them by any law in force in the Virgin Islands.

This Order revokes the Windward Islands and Leeward Islands (Courts) Order in Council 1959 and the British Caribbean Court of Appeal Order in Council 1962 as part of the law of the Virgin Islands and contains transitional provisions under which the new courts may exercise the jurisdiction and powers hitherto exercised under the law of the Virgin Islands by the courts established by those Orders.

It also makes a consequential amendment to the Virgin Islands Letters Patent 1959.

TAB 104

West Indies Associated States Supreme Court (Virgin Islands)
Ordinance 1969

**No. 9 of 1993**

VIRGIN ISLANDS

# WEST INDIES ASSOCIATED STATES SUPREME COURT (VIRGIN ISLANDS) (AMENDMENT) ACT, 1993

## ARRANGEMENT OF SECTIONS

*Section*

**1.** Short title and commencement.
**2.** Amendment of section 1 of Cap. 80.
**3.** Insertion of a new section 60A in the principal Act.
**4.** Repeal and replacement of section 62 of the principal Act.

**I Assent**
**Peter A. Penfold**
**Governor**
**14th January, 1993**

## VIRGIN ISLANDS

## No. 9 of 1993

An Act to amend the West Indies Associated States Supreme Court (Virgin Islands) Ordinance, Cap. 80.

[ Gazetted ]

ENACTED by the Legislature of the Virgin Islands as follows –

Short title and commencement.

**1.** This Act may be cited as the West Indies Associated States Supreme Court (Virgin Islands) (Amendment) Act, 1993 and shall come into operation on such day as the Governor may appoint by Proclamation published in the Gazette.

Amendment of section 1 of Cap. 80.

**2.** Section 1 of the West Indies Associated States Supreme Court (Virgin Islands) Ordinance, Cap. 80, hereinafter referred to as the principal Act is amended by deleting the words "West Indies Associated States" and substituting therefor the words "Eastern Caribbean".

Insertion of section 60A in the principal Act.

**3.** The principal Act is amended by inserting, immediately after section 60, the following section –

"Deputy Registrar

60A. The powers and duties of the Registrar may be exercised by the Deputy Registrar acting under and in accordance with the general or special instructions of the Registrar.".

Repeal and replacement of section 62 of the principal Act.

**4.** Section 62 of the principal Act is repealed and the following section substituted therefor –

"Acting Registrar

62. Whenever the Registrar is on leave or ill or otherwise unable to perform the duties of his office, the Governor, acting after consultation with the Chief Justice, may appoint a fit and proper person to act, during pleasure,

for the Registrar, and, until an appointment is made, the Deputy Registrar shall act as Registrar unless the Deputy Registrar is on leave, ill or otherwise unable to perform the duties of Registrar, in which case, the most senior Clerk officiating in the Registry shall act as Registrar; the person who acts as Registrar shall have all the powers, and be charged with all the duties of the Registrar.".

Passed the Legislative Council this 29th day of December, 1993.

K. L. FLAX,
Speaker.

HUGH A. HODGE,
Clerk of the Legislative Council.

TAB 105

*Bowstead and Reynolds on Agency* (20th ed, 2016)
at §§ 8-062, 8-063, 8-207, 8-208, 8-210

THE COMMON LAW LIBRARY

# BOWSTEAD AND REYNOLDS

## ON

# AGENCY

*TWENTIETH EDITION*

BY

**Peter Watts,** QC, LLB (Hons) (Cantuar), LLM (Cantab)

*Professor of Law, University of Auckland*
GENERAL EDITOR

AND

**F. M. B. Reynolds,** QC(Hon.), DCL, FBA

*Honorary Bencher of the Inner Temple;*
*Professor of Law Emeritus in the University of Oxford*
*and Emeritus Fellow of Worcester College Oxford*

SWEET & MAXWELL

THOMSON REUTERS

the same day, the agent contacts the claimants to say that he has located a red Jaguar in another town. Some days later, he arranges to meet the claimants at a motorway service station, closer to the claimants' home, in order formally to cancel the agreement for the blue car and substitute new documentation for the red one. A further week later, the agent meets the claimants at the same service station and the silver Jaguar is exchanged for the red one together with a sum of money. The agent is fraudulent; neither he nor the defendant has authority to sell the red car, and the agent on-sells the silver one without arranging for discharge of the outstanding hire purchase debt. The defendant is held vicariously liable for the deceits; the agent's apparent authority was not lost by the off-premises dealings.[312]

## Article 74

### FRAUD OF AGENT IS NOT INCOMPATIBLE WITH APPARENT AUTHORITY

**8–062** An act of an agent within the scope of his apparent authority does not cease to bind his principal merely because the agent was acting fraudulently and in furtherance of his own interests.

*Comment*

**8–063** This principle is applicable to cases of contract[313]; in tort[314]; in the disposition of property[315]; a similar result even appears in criminal cases.[316] But for the principal to be responsible under agency principles the agent must normally have been acting within the scope of his actual or apparent authority.[317] It is a well-known proposition that the mere fact that the principal by appointing an agent gives that agent the opportunity to steal or otherwise to behave fraudulently does not without more make him liable.[318] Furthermore, the fact that an agent is acting in furtherance of his own interests may negative actual authority[319] and may, if

[312] *Quinn v CC Automotive Group Ltd* [2010] EWCA Civ 1412; [2011] 2 All E.R. (Comm) 584.

[313] Illustrations 1 and 2; *Bryant, Powis & Bryant v Quebec Bank* [1893] A.C. 170 at 180; *A.L. Underwood Ltd v Bank of Liverpool* [1924] 1 K.B. 775 at 791–792; *Lloyds Bank v Chartered Bank of India, Australia & China* [1929] 1 K.B. 40; *Uxbridge Permanent Benefit Building Society v Pickard* [1939] 2 K.B. 248; *Alliance and Leicester BS v Edgestop Ltd* [1993] 1 W.L.R. 1462.

[314] *Lloyd v Grace, Smith & Co* [1912] A.C. 716; *Uxbridge Permanent Benefit Building Society v Pickard*, above; *Morris v C.W. Martin & Sons Ltd* [1966] 1 Q.B. 716.

[315] Many of the cases involve fraud on the part of the agent: see, e.g. *Oppenheimer v Attenborough & Son* [1908] 1 K.B. 221; *Canadian Laboratory Supplies Ltd v Engelhard Industries of Canada Ltd* [1979] 2 S.C.R. 787; (1979) 97 D.L.R. (3d) 1; *Lexi Holdings Plc v Pannone & Partners* [2009] EWHC 2590 (Ch); cf. *De Gorter v Attenborough & Son* (1904) 21 T.L.R. 19.

[316] See *Moore v Bresler Ltd* [1944] 2 All E.R. 515.

[317] See *Ruben v Great Fingall Consolidated* [1906] A.C. 439; *Morris v C.W. Martin & Sons Ltd* [1966] 1 Q.B. 716; *Polkinghorne v Holland* (1934) 51 C.L.R. 143 (partner). But see the next paragraph and also Articles 72 and 83–85. As to vicarious liability in tort, see Article 90.

[318] *Farquharson Bros & Co v King & Co* [1902] A.C. 325, Illustration 6 to Article 84; *Ruben v Great Fingall Consolidated* [1906] A.C. 439; *Morris v C.W. Martin & Sons Ltd* [1966] 1 Q.B. 716 at 726, 737, 740–741; *Leesh River Tea Co v British India Steam Navigation Co* [1967] 2 Q.B. 250; *Koorangang Investments Pty Ltd v Richardson & Wrench Ltd* [1982] A.C. 462, Illustration 4.

[319] See Article 23; Article 95, Illustration 11. Especially when the agent is practising a fraud on the principal himself: *Kwei Tek Chao v British Traders and Shippers Ltd* [1954] 2 Q.B. 459; below, para.8–213.

known to him or such that he ought to know it, put the third party on notice as regards apparent authority.[320] As regards forgery, a forger may profess not to act for but as the person whose document he forges[321]; and a counterfeit document may of itself be ineffective. The forger may nonetheless have apparent authority to warrant the genuineness of the document, but the normal requirements for a holding out must to that effect be established.[322]

*Illustrations*

**8–064**

(1) A is authorised in writing to act as the agent of B for the purpose of underwriting policies of insurance, and carrying on the ordinary business of underwriting, at Lloyd's, in the name and on behalf of B, in accordance with the usual custom of Lloyd's. A, in his own interests, and in abuse of his authority, underwrites a guarantee policy in B's name, the assured acting in good faith, but having no knowledge of the existence of the written authority or of its terms. It is in the ordinary course of business at Lloyd's to underwrite such policies, and A was therefore acting within the scope of his apparent authority, though in fraud of B. B is bound by the policy.[323]

(2) A was entrusted by B with the letting of B's flat. A, as a condition of granting C a tenancy of the flat, demanded an illegal premium which C paid to A. The premium was recoverable by C by virtue of the Landlord and Tenant (Rent Control) Act 1949 s.2(5). Held, that C could recover the premium from B.[324]

(3) A gave B a power of attorney authorising him to draw cheques on A's banking account and apply the money for A's purposes. B fraudulently drew cheques on A's account, signing the cheques "A by B his attorney", and paid the cheques into his own banking account to meet an overdraft. B's bankers applied the cheques in reduction of the overdraft without making inquiries as to B's authority. Held, that B's bankers were bound by the terms of B's actual authority, which did not extend to paying B's debts with A's money; that they had converted the cheques; and as, from the form of the cheques, they had notice that the money was not B's money, they were negligent in not making inquiry as to B's authority and therefore could not avail themselves of the protection of the Bills of Exchange Act 1882 s.82, and were liable to A for the amount of the cheques.[325]

(4) An employee of valuers is told not to issue valuations for a particular group of companies. He nevertheless does so, on his employer's headed notepaper, and

---

[320] Illustration 3; and see Article 73.

[321] A possible explanation of *Ruben v Great Fingall Consolidated* [1906] A.C. 439.

[322] For the ways in which forgery may be committed, see Forgery and Counterfeiting Act 1981 ss.1 and 2–5; also above, para.2–057. As to estoppel against setting up a forgery, see cases cited above, para.8–040.

[323] *Hambro v Burnand* [1904] 2 K.B. 10, a famous and controversial case which can be and has been taken to refer also to actual authority. See Comment to Article 23 for further discussion; see (1903) 17 HarvL.Rev. 56; (1934) 50 L.Q.R. 228–230; (1935) 1 U Toronto L.J. 42–43; (1972) 89 S.A.L.J. 60; Watts (2002) 2 O.U. Commonwealth L.J. 93 at 96–98; see also *Refuge Ass. Co Ltd v Kettlewell* [1909] A.C. 243.

[324] *Navarro v Moregrand Ltd* [1951] 2 T.L.R. 674; cf. *Barker v Levinson* [1951] 1 K.B. 342. See also *Credit Services Investments Ltd v Evans* [1974] 2 N.Z.L.R. 683; *Gordon v Selico Co Ltd* [1986] 1 E.G.L.R. 71.

[325] *Midland Bank Ltd v Reckitt* [1933] A.C. 1; *John v Dodwell and Co Ltd* [1918] A.C. 563; *Nelson v Larholt* [1948] 1 K.B. 339. See Article 73; Cheques Act 1957 s.4 as amended.

(9) An agent with a power of attorney for several principals to purchase racehorses borrows money for the purpose from a bank. The bank makes disclosures requisite under credit contract legislation to the attorney. It has made the disclosure to his principals thereby.[1267]

(10) A vendor's solicitor receives tender of a personal cheque as deposit on a land transaction. He does not have implied authority to accept payment by that method, but he does have implied authority to receive it for the purposes of communicating to the vendor the fact of its tender. The purchaser can assume that that fact has been communicated and can further assume that the tender has been accepted if a prompt rejection does not follow.[1268]

(11) An insurer is prepared to renew a policy only on the basis of adding a terrorism exclusion to the policy, and communicates that fact to the broker acting for the insured, the latter not communicating this change to the insured. Held, the insured is bound by the notification to the broker of the change of terms.[1269]

## Article 95

### KNOWLEDGE ACQUIRED THROUGH AGENT

**8–207** (1) The law may impute to a principal knowledge relating to the subject matter of the agency which the agent acquires while acting within the scope of his authority.[1270]

(2) Where an agent is authorised to enter into a transaction in which his own knowledge is material, knowledge which he acquired outside the scope of his authority may also be imputed to the principal.[1271]

(3) Where the principal has a duty to investigate and make disclosure, he may have imputed to him not only facts which he knows but also material facts of which he might expect to have been told by his agents.[1272]

(4) Knowledge is not attributed to the principal where the principal is claiming in respect of a breach of duty of his own agent, and, perhaps, where the agent is defrauding the principal in the transaction at issue.[1273]

---

1267 *National Australia Finance Ltd v Fahey* [1990] 2 N.Z.L.R. 482.

1268 *Southbourne Investments Ltd v Greenmount Manufacturing Ltd* [2008] 1 N.Z.L.R. 30 (NZSC) at [20].

1269 *Axa Corporate Solutions SA v National Westminster Bank Plc* [2010] EWHC 1915 (Comm).

1270 *Taylor v Yorkshire Insurance Co Ltd* [1913] 2 Ir.R. 1 at 21, per Palles C.B. See also *Merry v Abney* (1663) 1 Ch. Cas. 38; *Jennings v Moore* (1708) 2 Vern. 609; affd sub nom. *Blenkarne v Jennens* (1709) 2 Bro. P.C. 278 (HL); *Le Neve v Le Neve* (1748) 1 Ves. Sen. 64, Illustration 22; (1748) 3 Atk. 646; *Doe d. Willis v Martin* (1790) 4 T.R. 39; *Boursot v Savage* (1866) L.R. 2 Eq. 134; *Rolland v Hart* (1871) L.R. 6 Ch.App. 678; *Real Estate Opportunities Ltd v Aberdeen Asset Managers Jersey Ltd* [2007] EWCA Civ 197; [2007] 2 All E.R. 791 at [49].

1271 See *El Ajou v Dollar Land Holdings Ltd* [1994] 2 All E.R. 685 at 702; but see Comment.

1272 See *El Ajou v Dollar Land Holdings Ltd*, above,; but see Comment.

1273 See, e.g. *Belmont Finance Corp Ltd v Williams Furniture Ltd* [1979] 1 Ch. 250 at 261–262. But see below, para.8–213.

*Comment*

**8–208** **Introduction.** The law on this topic is constituted by a plethora of cases in different contexts, which are extremely difficult to reduce to any order. It may be useful therefore to draw attention initially to some main points that may be found lying within them.[1274] Assuming as a starting point that the knowledge of an agent can and must sometimes be imputed to the principal, and for the present simply cutting through the undergrowth of the cases, the main points that need to be considered are as follows.

(a) It is always necessary to consider the context of the particular legal issue to which imputation of knowledge might be pertinent. There is no over-arching principle that a principal is deemed to know at all times and for all purposes that which his agent knows.[1275] In particular, a distinction needs to be drawn between imputation of knowledge in the context of the formation or execution of a contract between arm's length parties, and imputation in the context of the imposition of tortious or restitutionary liability. Cases of the former sort turn on the express or implied understandings between the parties, and, in the absence of express agreement, can usually be reduced to determining what a party could reasonably expect the counterparty to know, given the state of knowledge of their respective agents.[1276] This type of case is always very fact specific. Cases of the latter sort involve *imposed* obligations, and require the law to formulate relatively firm principles. Questions of knowledge play a particularly prominent role in restitutionary liability, either as an element of the cause of action or as a factor in the application of defences.[1277] There can be cases of a third sort, where the operation of a statutory rule turns on the state of a party's knowledge. There, it is a question of statutory construction what rules of imputation were intended; the context of the provision will be highly relevant, as in the contractual context, but the inference may also be that the legislature intended to borrow the rules used in tortious and restitutionary situations.[1278] Normally, however, it is unsatisfactory to borrow case law from one context for use in another.

(b) Is knowledge acquired outside the agency attributed to the principal? The English view tends to utilise the notion of the agent's authority and say no; but then to seek to create exceptions which prove extremely difficult to formulate. *Restatement, Third,* follows the view (which was held by

[1274] See Watts, in *Unjust Enrichment in Commercial Law* (Degeling and Edelman eds, 2008), Ch.21. For the US position, see DeMott, (2003) 13 Duke J.Comp. and Int.L. 291; Scordato (2004) 10 Fordham J. Corporate and Financial L. 129; Loewenstein (2013) 85 U. Colorado L.R. 305.

[1275] See *Moulin Global Eyecare Trading Ltd v CIR* [2014] HKCFA 22 at [106].

[1276] See *Jafari-Fini v Skillglass Ltd* [2007] EWCA Civ 261 at [97], per Moore-Bick LJ, Illustration 20. For an example where, as a matter of construction, imputation was found inapplicable, see *Infiniteland Ltd v Artisan Contracting Ltd* [2005] EWCA Civ 758; [2006] 1 B.C.L.C. 632.

[1277] On this, see Watts in *Unjust Enrichment in Commercial Law* (Degeling and Edelman eds, 2008), Ch.21.

[1278] See, e.g. *Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 2 A.C. 500.

Seavey[1279]) that how the knowledge was acquired is irrelevant, provided that it is "material to the agent's duties to the principal".[1280] It will be seen below that much is likely to turn on the scope of the agent's mandate. Sometimes an intermediary may be found not to be agent at all but rather agent for another party to the transaction,[1281] while at the other end of the spectrum the agent may have been delegated the whole carriage of the transaction, with solicitors and canvassing agents often performing roles lying between these two extremes.

(c) Should there be an exception for cases where the agent is acting in fraud of the principal in the very transaction in which the knowledge is sought to be imputed, with the result that the agent is unlikely, or certain not, to pass on the knowledge? This is often referred to as the "fraud exception". Both in English law and the *Restatement* it is thought that there should be such an exception, though for English law the exception is, despite many references to it in the case law, open to serious question, at least as a defence to tortious or restitutionary claims.[1282] It is undoubtedly true that where an agent has acted in breach of duty to his principal, the law needs to preclude the agent and parties associated with him from asserting that they cannot be sued by the principal because the principal must be deemed to know what his miscreant agent knew. But imputation of knowledge simply does not operate in such circumstances. No exception is therefore necessary there, and even if it were it would need to cover any breach of duty owed the principal by the agent, and not just fraud. For that reason it would be misleading to refer to it as "the *fraud* exception".[1283]

(d) A position should be taken on how to deal with situations where the agent may claim (reasonably, if the knowledge notice came to him a long time before, or he deals with sufficient such transactions to confuse them) to have forgotten the information in question. This problem is seldom addressed specifically[1284]: courts have tended to look for a clearer guide in some other feature of the rule. The problem could perhaps be approached by use of the burden of proof. Many of the old cases concern solicitors dealing with mortgages in their locality in a way that is less common nowadays.[1285] Similar unsettled questions arise in relation to the knowledge of an agent who has ceased to work for the principal before the relevant transaction arises. If the relevant transaction takes place after the departure, the knowledge may no longer be imputed.[1286]

---

1279 The Reporter for *Restatement, Second*: (1916) 65 U.Pa.L.Rev. 1 at 23 onwards.

1280 § 5.03.

1281 *Salkeld Investments Ltd v West One Loans Ltd* [2012] EWHC 2701 (QB) at [45].

1282 See below, para.8–213.

1283 See further below, para.8–213.

1284 There is some discussion of the question in the corporate context in *Beach Petroleum NL v Johnson* (1993) 115 A.L.R. 411 at para.22.36. See also, albeit in a slightly different context, *Re Montagu's ST* [1987] Ch. 264.

1285 See e.g. *Warrick v Warrick* (1745) 3 Atk. 291; *Worsley v Earl of Scarborough* (1746) 3 Atk. 392.

1286 *Crossco No.4 Unltd v Jolan Ltd* [2011] EWHC 803 (Ch) at [172]; affd [2011] EWCA Civ 1619.

(e) In what circumstances can the knowledge of more than one agent be aggregated in the principal? It seems that in causes of action where it is necessary to establish dishonesty in the defendant, it is not, in general, possible to aggregate in the defendant bits of knowledge held separately by the defendant's otherwise innocent agents. The main exemplars are the torts of deceit, and interference with contractual relations, and the equitable action for dishonest assistance in a breach of fiduciary duty.[1287] The position may be different if there is evidence that the principal deliberately structured its business to avoid being affected by inconvenient knowledge.[1288] Aggregation is, it seems, possible where the cause of action does not require proof of dishonesty, as in actions for knowing receipt of trust property in breach of trust.[1289] But again the position may be different where what is at issue are discrete transactions with different employees acting for the principal on each occasion, with no single transaction in itself sufficiently indicating anything amiss.[1290]

The foregoing issues should be distinguished from those which impose some form of duty of inquiry, or at least say that a party must be taken to know something, as in the case of a party alleging apparent authority.[1291] Concepts of constructive knowledge need to be kept separate from imputed knowledge, although the two can operate in tandem. Imputed knowledge, where it operates, deems the principal to have the actual knowledge which the agent has. It does not answer the question whether that knowledge would be sufficient to generate a duty of inquiry in the principal. That turns on the rules of the relevant cause of action.[1292]

What follows is intended as an account of the English cases. The Article is based in part on the judgment of Hoffmann LJ in *El Ajou v Dollar Land Holdings Ltd*.[1293] This appears to accept the separation off of notification cases as stated in Article 94 above, and to lay down the two categories of cases for the imputation of knowledge stated in Rules (2) and (3) above. It would be misleading in a

---

1287 cf. *Real Estate Opportunities Ltd v Aberdeen Asset Managers Jersey Ltd* [2007] EWCA Civ 197; [2007] 2 All E.R. 791 at [50].

As to deceit, see above, para.8–185. See generally Dugdale (2006) 12 N.Z. Business L.Q. 3. See too *Progressive Enterprises Ltd v Commerce Commission* (2009) 9 N.Z. Business L.C. 102,485 (no aggregation for offence requiring mens rea); affd (2010) 9 N.Z. Business L.C. 103,060 at [38]; *McNamara v Auckland City Council* [2012] 3 N.Z.L.R. 701 at [161] and [176] (NZSC) (defence of good faith not circumventable by aggregating knowledge).

1288 See *Australian Competition and Consumer Commission v Radio Rentals Ltd* (2006) 146 F.C.R. 292 at [179].

1289 See *National Provincial Bank of England v Jackson* (1886) 33 Ch.D. 1 at 12; *Efploia Shipping Corp Ltd v Canadian Transport Co Ltd* [1958] 2 Ll. L. Rep. 449 at 457; *Krakowski v Eurolynx Properties Ltd* (1995) 183 C.L.R. 563 at 583; *NIML Ltd v Man Financial Australia Ltd* (2006) 15 V.R. 156 at [38]; *Public Trustee v Guardian Trust & Executors Co of New Zealand Ltd* [1939] N.Z.L.R. 613 at 644; affd [1942] N.Z.L.R. 115 (PC).

1290 *Australian Competition and Consumer Commission v Radio Rentals Ltd* (2006) 146 F.C.R. 292 at [179] (no unconscionability in retailer where mildly mentally impaired man buys many items of electrical goods on different visits to the retailer's two stores, dealing with a range of sales people, none of whom appreciates the extent of his disability).

1291 See Article 72.

1292 For further discussion, see Watts, *Unjust Enrichment in Commercial Law* (Degeling and Edelman eds, 2008), Ch.21.

1293 [1994] 2 All E.R. 685.

practitioner's work not to state these categories, which are stated in other books also[1294]; but some reservations are expressed about them below. Rule (1), which did not figure in Hoffmann LJ's account, preserves a general rule of imputation for the reasons stated below; and Rule (4) seeks to state the fraud exception.

**8–209** **Rule (1). Rationales for imputation.** This gives a general indication of an often stated approach to this part of the law. Apart from general pragmatic justifications,[1295] two main reasons are given for imputing knowledge to the principal for the purposes of a common law rule. The first is that of the identity of principal and agent. This rather conceptual approach can be explained on the basis that a principal should not be able by using an agent to put himself in a better position than that in which he would have been if he had dealt personally. This is a very old idea in the case law, well illustrated by a dictum of Lord Northington LC's in *Sheldon v Cox*: "[It] is a fixed and settled principle that notice to an agent is notice to the principal. If it were otherwise it would cause great inconvenience, and notice would be avoided in every case by employing agents".[1296] Consistently, knowledge acquired by an agent after the relevant contract has been completed will no more bind the principal than if the principal had itself acquired the knowledge at that stage.[1297] *Aliter*, where the knowledge is acquired before the contract becomes unconditional.[1298] The position is less clear where knowledge is acquired before the principal has provided its consideration and the principal can withdraw from the contract.[1299]

The second explanation is that where an agent receives information which it would be his duty to pass on to his principal, it may be assumed or presumed in favour of the third party, at least in the absence of explicit indications to the contrary, that he has done so.[1300] This explanation may permit the imputation of knowledge acquired outside the agency, which is a key problem of this part of the law. It has been said that such reasoning is "rather a justification of the rule than a reason for it".[1301] It links with the so-called fraud exception discussed below.[1302] With varying indications as to the strength of the supposed presumption, it has a long history in the cases, but there are as many cases that do not support it, and it was rejected in *El Ajou*.[1303] Hoffmann LJ admitted that there

---

[1294] e.g. *Lewin on Trusts* (18th edn), para.42–51.

[1295] e.g. "Policy and the safety of the public": per Lord Brougham LC in *Kennedy v Green* (1834) 3 Myl. & K. 699 at 719.

[1296] (1764) 2 Eden 224 at 228. See too *Boursot v Savage* (1866) L.R. 2 Eq. 134 at 142, per Kindersley VC: "I confess my own impression is, that the principle on which the doctrine rests is this: that my solicitor is alter ego; he is myself; I stand in precisely the same position as he does in the transaction, and therefore his knowledge is my knowledge; and it would be a monstrous injustice that I should have the advantage of what he knows without the disadvantage."; *Vane v Vane* (1873) L.R. 8 Ch.App. 383 at 400. See further Watts (2001) 117 L.Q.R. 300 at 301.

[1297] *Kettlewell v Watson* (1882) 21 Ch.D. 685 at 712.

[1298] *MBF Australia Ltd v Malouf* [2008] NSWCA 214. See also *Forsyth v Blundell* (1973) 129 C.L.R. 477.

[1299] See *Atterbury v Wallis* (1856) 8 De G.M. & G. 454 at 466.

[1300] See, e.g. *Boursot v Savage* (1866) L.R. 2 Eq. 134 at 142; *Rolland v Hart* (1871) L.R. 6 Ch.App. 678.

[1301] Mechem, *Law of Agency* (2nd edn), § 1806.

[1302] See below, para.8–213.

[1303] See *Espin v Pemberton* (1859) 3 De G. & J. 547 at 555; *Rolland v Hart* (1871) L.R. 6 Ch.App. 678 at 681–682; *Boursot v Savage* (1866) L.R. 2 Eq. 134 at 142. For other cases not supporting the presumption as the basis of imputation, see (2001) 117 L.Q.R. 300 at 304–308.

were situations in which a weak presumption that information had been passed on might be applied, but no more, and treated the reasoning as primarily applicable to notification cases .[1304] On analysis, it is an unsatisfactory explanation for imputation. In the first place, it is apparent from the case law that imputation can occur even though it is clear beyond doubt that the principal was personally unaware of the relevant fact, and that therefore there has not been any communication by the agent. In such circumstances, the rationale would have to work as an irrebuttable presumption,[1305] which is an artifice. Secondly, it is not obvious how obligations as between principal and agent can confer rights on third parties, who are strangers to that relationship. Thirdly, it is unrealistic to assume that there is in fact a duty as between principal and agent that the agent will inform the principal of all matters of relevance to the principal's business that the agent learns; one of the reasons for using agents is to free the principal's time for other things.

**8–210** **Only knowledge acquired while performing mandate prima facie imputed.** It is implicit in Rule (1) that only knowledge acquired by an agent whilst performing the tasks delegated by the principal will be imputed. Knowledge acquired before appointment, or even in the period of appointment but whilst not engaged for the principal, would not be imputed. Such an approach has been taken in decisions over many years[1306]; though it is rejected by both *Restatement, Second* and *Restatement, Third*.[1307] If it is correct, it creates an important limitation on the whole doctrine.[1308] The rule would be consistent with either general rationale discussed in the previous paragraph, but arguably not dictated by them. Another explanation that has been given from time to time is that it is unreasonable to expect a busy agent, such as a solicitor, to recall all information that might be relevant to a client's affairs when it was learned while acting for other clients. This rationale emerged early in judgments of Lord Harwicke LC, in particular *Warrick v Warrick*[1309]:

> "[N]otice should be in the same transaction: this rule ought to be adhered to, otherwise it would make purchasers and mortgagees' titles depend altogether on the memory of their counsellors and agents, and oblige them to apply to persons of less eminence as counsel, as not being so likely to have notice of former transactions."

---

1304 [1994] 2 All E.R. 685 at 703–704.

1305 See *Kettlewell v Watson* (1882) 21 Ch.D. 685 at 705 (presumption irrebuttable).

1306 See, e.g. *Taylor v Yorkshire Insurance Co Ltd* [1913] 2 Ir.R. 1 at 21 and other cases there cited; *Mountford v Scott* (1818) 3 Madd. 34 at 40; *Farah Constructions Pty Ltd v Say-Dee Pty Ltd* (2007) 236 C.L.R. 89 at [125] (assumption by court that only knowledge acquired within mandate is imputable); *Hickman v Turn and Wave Ltd* [2011] 3 N.Z.L.R. 318 at [192], reversed on other grounds [2013] 1 N.Z.L.R. 741.

1307 See *Restatement, Third*, § 5.03.

1308 See further Watts [2005] N.Z.L. Rev. 307, discussing *Waller v Davies* [2005] 3 N.Z.L.R. 814; upheld on different grounds [2007] 2 N.Z.L.R. 508. See also Watts, *Unjust Enrichment in Commercial Law* (Degeling and Edelman eds, 2008), Ch.21.

1309 (1745) 3 Atk. 291 at 293. See also *Preston v Tubbin* (1684) 1 Vern. 286; *Worsley v The Earl of Scarborough* (1746) 3 Atk. 392: "It is settled, that notice to an agent or counsel who was employed in the thing by another person, or in another business, and at another time, is no notice to his client, who employs him afterwards; and it would be very mischievous if was so, for the man of most practice and greatest eminence would then be the most dangerous to employ."

This led some later judges to suggest that if two matters for separate principals took place so close to one another that the knowledge acquired in the first matter must have been still present in the agent's mind, imputation could occur. So, Lord Eldon LC stated in *Mountfort v Scott*[1310]:

> "The Vice-Chancellor in this case appears to have proceeded upon the notion that notice to a man in one transaction is not to be taken as notice to him in another transaction; in that view of the case it might fall to be considered, whether one transaction might not follow so close upon the other, as to render it impossible to give a man credit for having forgotten it. I should be unwilling to go so far as to say, that if an attorney has notice of a transaction in the morning, he shall be held in a Court of Equity to have forgotten it in the evening; it must in all cases depend upon the circumstances."

At least in respect of unconnected transactions, the tendency nonetheless has been to conform to the understanding that knowledge needs to have been acquired by the agent whilst acting for the principal.[1311] The position where the earlier relevant transaction was for the same principal is different.[1312] And it can be expected that courts will be resistant to arguments that two connected transactions were nonetheless discrete for the purposes of the rules of imputation. Beyond that, there remains room for argument that much may turn on the degree of authority exercised by the relevant agent. Where, for instance, it is clear that it is only through the auspices of the agent that the principal could have obtained the property or rights that are now contested by the claimant, it would be wrong to allow the principal to adopt the agent's actions whilst disowning the agent's knowledge of the claimant's prior rights.[1313] The well-known dictum of Lord Halsbury LC in *Blackburn, Low & Co v Vigors* provides support for such an approach[1314]:

> "Some agents so far represent the principal that in all respects their acts and intentions and their knowledge may truly be said to be the acts, intentions, and knowledge of the principal. Other agents may have so limited and narrow an authority both in fact and in the common understanding of their form of employment that it would be quite

1310 *Fuller v Benett* (1843) 2 Hare 394. See also *Hargreaves v Rothwell* (1836) 1 Keen 154; *Burnard v Lysnar* [1927] N.Z.L.R. 757.

1311 See *Fuller v Benett* (1843) 2 Hare 394; *O'Keefe v London & Edinburgh Insurance Co Ltd* [1928] N.I. 85 at 97, per Andrews LJ: "The danger of making the agent's memory of bygone transactions a jury question is obvious, and recollection or forgetfulness by the agent of matters known to him previous to that relation is not allowed to affect the liability of the principal except in certain well-recognised cases."

1312 See *Brotherton v Hatt* (1706) 2 Vern. 574; *Jennings v Moore* (1708) 2 Vern. 609; affd sub nom. *Blenkarne v Jennens* (1709) 2 Bro. P.C. 278 (HL); *Le Neve v Le Neve* (1748) 1 Ves. Sen. 64; (1748) 3 Atk. 646; *Doe d. Willis v Martin* (1790) 4 T.R. 39; *Rolland v Hart* (1871) L.R. 6 Ch.App. 678.

1313 See, e.g. *Jessett Properties Ltd v UDC Finance Ltd* [1992] 1 N.Z.L.R. 138; *Permanent Trustee Australia Co Ltd v FAI General Insurance Co Ltd* (2001) 50 N.S.W.L.R. 679 at 692–697 (reversed on other issues (2003) 214 C.L.R. 514).

1314 (1887) 12 App.Cas. 531 at 537–538. See too *Brittain v Brown* (1871) 24 L.T. 504 at 506, per Cockburn CJ: "I quite agree that where a man employs an attorney or agent, and places him in his own place and treats him as alter ego, there the doctrine contended for would apply, viz., that a principal is bound by the knowledge of his agent. But it is very different when the contract itself is not placed in the hands of an agent, but the agent is, as here, employed about a matter entirely subsidiary and accessory to the contract"; *Grand Trunk Railway Co of Canada v Robinson* [1915] A.C. 740 at 747.

inaccurate to say that such an agent's knowledge or intentions are the knowledge or intentions of his principal . . . "

This would provide an explanation for the actual result in the *El Ajou* case, itself a case concerned with knowledge acquired outside the agency, and more convincing than the reasoning actually used in that case, which was to fashion a special rule for companies.[1315] Hoffmann LJ alluded to other situations where a principal can be affected by his agent's knowledge acquired before or outside the agency. These are also somewhat problematic and are the subject of Rules (2) and (3).[1316]

**8–211** **Rule (2). Agent's own knowledge material.** This category, the first mentioned by Hoffmann LJ in which previously acquired knowledge or knowledge acquired outside the agency is attributed to the principal, is said to refer to situations where the agent's knowledge affects "the terms or performance" of an authorised contract.[1317] It is said not to rest on imputation, but rather on a special duty resting on agents to insure, who are apparently treated as central examples of the category. This duty is derived from a dictum of Lord Macnaghten in *Blackburn, Low & Co v Vigors*[1318] but although a category of this nature has much to commend it, difficulties of detail were subsequently pointed out by Handley JA in the Court of Appeal of New South Wales in a case in which knowledge of agents acquired outside the agency was imputed to the principal.[1319] First, the view of Lord Macnaghten was a minority view and the majority proceeded by more traditional reasoning in not treating the knowledge of a former agent as that of the principal.[1320] Too much should not however be read into the wording of short judgments in a dispute the answer to which was fairly obvious. Secondly, and more important, non-disclosure by an agent to insure does not affect the "terms or performance" of the contract of insurance, but rather its validity.[1321] Thirdly, one of two other (and older) cases cited[1322] can be said plainly to have been based on general imputation of knowledge rather than on any more limited principle; and neither, though both are in fact examples of an agent entrusted with carrying through a transaction, relates to the agent to insure first mentioned.[1323] In the Australian case the principal was in the end held

1315 [1994] 2 All E.R. 685 at 705, Illustration 16. See further below, para.8–214.

1316 e.g. Illustrations 7–11 and 15; and *Bank of Credit and Commerce International SA v Aboody* [1990] 1 Q.B. 923 at 974–975. But see Law of Property Act 1925 s.199(i)(ii), below, para.8–215.

1317 See the *El Ajou* case [1994] 2 All E.R. 685 at 702.

1318 (1887) 12 App.Cas. 531 at 542–543 (Illustration 5), cited in the *El Ajou case*, above, at 703. cf. *Blackburn, Low & Co v Haslam* (1888) 21 Q.B.D. 144. This speech is often said to be the basis of s.19 of the Marine Insurance Act 1906.

1319 *Permanent Trustee Australia Co Ltd v FAI General Insurance Co Ltd* (2001) 50 N.S.W.L.R. 679: see esp. para.76 onwards; reversed on other grounds (2003) 214 C.L.R. 514.

1320 See pp.537–538 and 540–541. This was accepted by Phillips J in *Deutsche Ruckversicherung AG v Walbrook Insurance Co Ltd* [1995] 1 W.L.R. 1017 at 1034, though not as a central point of his judgment. But in *SA d'Intermediaries Luxembourgeois v Farex Gie* [1995] L.R.L.R. 116, Hoffmann LJ adhered to his earlier view: see also Dillon LJ at 142–143, but cf. Saville LJ at 156.

1321 See *Banque Keyser Ullmann SA v Skandia (UK) Insurance Co Ltd* [1990] 1 Q.B. 665 at 777–781; [1991] 2 A.C. 249 at 280.

1322 *Dresser v Norwood* (1864) 17 C.B.(N.S.) 466 at 481 (Illustration 3).

1323 The other is *Turton v L & NW Ry Co* (1850) 15 L.T. (O.S.) 92 (agent to conclude contract of carriage).

# Bowstead & Reynolds on Agency 20th Ed.

## Main Volume

## Chapter 8 - Relations Between Principals and Third Parties

## Section 4. - Notification to and Knowledge Acquired through Agent

### Article 94

### Notification to Agent

### Illustrations

*[Add to end of first sentence of fn.1264 deleting full stop]*

#### 8-206

... [1962] 1 W.L.R. 1184] ; *CF Asset Finance Ltd v Okonji [2014] EWCA Civ 870* at [22].

### Article 95

### Knowledge Acquired through Agent

*[Add to end of fn.1270 deleting full stop]*

#### 8-207

... [2007] 2 All E.R. 791 at [49]] ; *UBS AG (London Branch) v Kommunale Wasserwerke Leipzig GmbH [2014] EWHC 3615 (Comm)* at [762].

*[Replace Rule (4) and footnote 1273 with the following]*

... told by his agents.1272]

(4) Knowledge is not attributed to the principal where the principal is claiming in respect of a breach of duty of his own agent that relates to the information in question.[1273] Otherwise, whether a fraudulent or miscreant agent's knowledge is imputable to the principal depends upon the type of legal issue that arises.[1273a] There is, therefore, no general fraud exception to imputation of the knowledge, or the acts, of an agent.

### Comment

#### Introduction

*[Add to end of first sentence of fn.1276 deleting full stop]*

#### 8-208

... Illustration 20] ; *Bilta (UK) Ltd v Nazir (No 2) [2015] UKSC 23; [2016] A.C. 1* at [198]; *Hut Group Ltd v Nobahar-Cookson [2014] EWHC 3842 (QB)* at [226]; affd on other points *[2016] EWCA Civ 128.*

*[Add to end of fn.1278 deleting full stop]*

... [1995] 2 A.C. 500] ; *G-Star Raw CV v Rhodi Ltd [2015] EWHC 216 (Ch)* at [167] (civil liability for knowingly importing items that infringe copyright); Jeanswest Corp (New Zealand) Ltd v G-Star Raw CV [2015] NZCA 14 at [111] (copyright).

*[Add to end of fn.1281 deleting full stop]*

... [2012] EWHC 2701 (QB) at [45]] ; Cassegrain v Gerard Cassegrain & Co Pty Ltd [2015] HCA 2; (2015) 316 A.L.R. 111 at [41] (husband not agent for wife in fraudulent transfer of property to her).

*[Add to end of point (b)]*

... these two extremes.] Where, as is common in conveyancing transactions, a solicitor acts for more than one party to the transaction, each instructing client will usually be imputed with what the solicitor learns while acting for either party; knowledge will not usually be compartmentalised.[1281a]

*[Add to text following footnote entry 1283]*

..."the fraud exception".1283] The judgments in *Bilta (UK) Ltd v Nazir (No.2)* now establish, in England at least, that there is no general fraud exception to imputation.[1283a]

*[Add to end of fn.1290 deleting full stop]*

... the extent of his disability)] ; *Glencore International AG v MSC Mediterranean Shipping Co SA [2015] EWHC 1989 (Comm); [2015] 2 Lloyd's Rep. 508* at [23] (knowledge on part of prior agents of third party's practices not imputed for purpose of construction of contract made by later agents).

## Only Knowledge Acquired While Performing Mandate Prima Facie Imputed

*[Add to end of fn.1313]*

### 8-210

... (2003) 214 C.L.R. 514).] cf. Cassegrain v Gerard Cassegrain & Co Pty Ltd [2015] HCA 2; (2015) 316 A.L.R. 111 at [41] (where the defendant was (puzzlingly) held to be the purely passive recipient of property, deputing no agency tasks to obtain it).

## Rule (2). Agent's Own Knowledge Material

*[Add to end of fn.1318 deleting final full stop]*

### 8-211

... Marine Insurance Act 1906] (due to be replaced from August 2016 by the Insurance Act 2015).

*[Add to end of fn.1324 deleting final full stop]*

... cf. Marine Insurance Act 1906 s.19] (due to be replaced from August 2016 by the Insurance Act 2015. See Macgregor, in Busch, Macgregor and Watts (eds), *Agency Law in Commercial Practice* (2016), Ch.11).

## Rule (3). Duty to Investigate

*[Add new sentence after third sentence of fn.1338]*

### 8-212

... para.18–9 onwards.] These sections are due to be replaced from August 2016 by the Insurance Act 2015.

## Rule (4). Claims By Principal Against Own Agent, and Fraud of Agent

*[Add to text following footnote entry 1341]*

### 8-213

... is it straightforward.1341] The judgments in *Bilta (UK) Ltd v Nazir (No.2)* now make it clear, in England at least, that there is no general fraud exception to imputation.[1341a]

*[Add to end of fn.1344]*

... 300 at 316–318.] See now *Bilta (UK) Ltd v Nazir (No.2) [2015] UKSC 23; [2016] A.C. 1* at [7], [202].

*[Add to end of fn.1345]*

... (1846) 3 C.B. 16".] See now *Bilta (UK) Ltd v Nazir (No.2) [2015] UKSC 23; [2016] A.C. 1* at paragraphs given in fn.1341a above.

*[Add to end of fn.1347 deleting full stop]*

... [2011] NSWCA 389] ; *UBS AG (London Branch) v Kommunale Wasserwerke Leipzig GmbH [2014] EWHC 3615 (Comm)* at [616] and [639].

*[Add to end of fn.1352 deleting full stop]*

... 2 B.C.L.C. 328 at [124]] ; *Bilta (UK) Ltd v Nazir (No.2) [2015] UKSC 23; [2016] A.C. 1* at [198]; *Hut Group Ltd v Nobahar-Cookson [2014] EWHC 3842 (QB)* at [226]; affd on other points *[2016] EWCA Civ 128.*

*[Add to end of fn.1354 deleting full stop]*

... of my lie"'] ; *OMV Petrom SA v Glencore International AG [2015] EWHC 666 (Comm)* at [152].

## Law of Property Act 1925 s.199(1)(II)

*[Replace last appearance of the word "agent" in the penultimate sentence with the word "principal"]*

### 8-215

... acting for the same] principal [in both transactions.1378

## Illustrations

*[Add to end of fn.1384 deleting final full stop]*

### 8-216

... not imputed to underwriters)] ; *Glencore International AG v MSC Mediterranean Shipping Co SA [2015] EWHC 1989 (Comm); [2015] 2 Lloyd's Rep. 508* at [23].

---

1273. See, *e.g. Belmont Finance Corp Ltd v Williams Furniture Ltd [1979] 1 Ch 250 at 261–262*. See *Bilta (UK) Ltd v Nazir (No 2) [2015] UKSC 23; [2016] A.C 1* at [7], [202] and for more detail, below, para.8-213.

1273a. *Bilta (UK) Ltd v Nazir (No 2) [2015] UKSC 23; [2016] A.C. 1* at [9], [41]–[45], [181]–[182], [191], [202], [207]. See further below, para.8-213.

1281a. See the cases cited in para 8-210 below, and particularly those in fn.1312.

1283a. *[2015] UKSC 23; [2016] A.C. 1*. For details, see below, para.8-213.

1341a. See *Bilta (UK) Ltd v Nazir (No.2) [2015] UKSC 23; [2016] A.C. 1* at [9], [41]–[45], [181]–[182], [191], [202], [207].

© 2017 Sweet & Maxwell



TAB 106

*Chitty on Contracts* (32nd ed, 2015) at § 31-061

THE COMMON LAW LIBRARY

RARY

# CHITTY ON CONTRACTS

THIRTY-SECOND EDITION

VOLUME II

## SPECIFIC CONTRACTS

SWEET & MAXWELL

THOMSON REUTERS

holding-out by the company,[371] whether specific or general, as under the indoor management rule. There are various cases on the authority of company officials, but practices change and in case of doubt it will be best to rely on contemporary evidence of practice.[372] The reasoning would not apply to a forgery in the sense of a counterfeit (as opposed to unauthorised) signature.[373]

**31–061** **Agent acting in fraud of principal.** The fact that the agent acted in his own interests and in fraud of his principal will not relieve the principal of liability if in fact the agent's act was in other respects within the scope of his apparent authority.[374] This rule is not confined to the case of a contract made by an agent. A principal is bound by acts done by an agent in the scope of his apparent authority, whether in contract or tort or otherwise.[375] "A third party, dealing in good faith with an agent acting within his ostensible authority, is not prejudiced by the fact that as between the principal and his agent the agent is using his authority in such a way that the principal can rightly complain that the agent is using his authority for his own benefit and not for that of his principal".[376] But where the third party has notice from the nature of the transaction that he is or may be dealing with an agent who is exceeding his authority, the principal is not bound[377] and the fact that the agent's acts are manifestly for his own benefit may amount to such notice.[378] And it is a standard proposition that a principal is not

[371] In *Crabtree-Vickers Pty Ltd v Australian Direct Mail Advertising and Addressing Co Pty Ltd* (1975) 133 C.L.R. 72 the High Court of Australia, following dicta of Diplock L.J. in the *Freeman & Lockyer* case, above, n.360, held that the holding-out must be by a person with actual authority within the company. This seems doubtful: provided the authority *finally* traces back to a person with actual authority, it is submitted that the person whose representation of authority is relied on may have apparent authority only to make it: *ING Re (UK) Ltd v R & V Versicherung AG* [2006] EWHC 1544 (Comm), [2006] 2 All E.R. (Comm) 870.

[372] See *Panorama Developments (Guildford) Ltd v Fidelis Furnishing Fabrics Ltd* [1971] 2 Q.B. 711 (changed role of company secretary); *United Bank of Kuwait Ltd v Hammoud* [1988] 1 W.L.R. 1051, 1063, per Staughton L.J.; *First Energy (UK) Ltd v Hungarian International Bank Ltd* [1993] 2 Lloyd's Rep. 194.

[373] *Northside Developments Pty Ltd v Registrar-General* (1990) 170 C.L.R. 146: see Prentice (1991) 107 L.Q.R. 14; Watts (2002) 2 O.U.C.L.J. 93 (arguing for special rules for deeds in general). But a party may be estopped by subsequent conduct from setting up the forgery: *Greenwood v Martins Bank Ltd* [1933] A.C. 51. See also the possible operation of s.44 of the Companies Act 2006 in the context of forgeries, discussed in *Lovett v Carson Country Homes Ltd* [2009] EWHC 1143 (Ch), [2009] 2 B.C.L.C. 196 at [99]. See further *Bowstead and Reynolds on Agency*, 20th edn (2014), para.8–042.

[374] *Hambro v Burnand* [1904] 2 K.B. 10 (sometimes however said to be a case on actual authority); *Navarro v Moregrand Ltd* [1951] 2 T.L.R. 674; *Briess v Woolley* [1954] A.C. 233 and many other cases.

[375] *Lloyd v Grace, Smith & Co* [1912] A.C. 716; *Polkinghorne v Holland* (1934) 51 C.L.R. 143; *Uxbridge Permanent Benefit Building Society v Pickard* [1939] 2 K.B. 248; *Navarro v Moregrand* [1951] 2 T.L.R. 674; *Morris v CW Martin & Sons Ltd* [1966] 1 Q.B. 716; *United Bank of Kuwait v Hammoud* [1988] 1 W.L.R. 1051; and see below, para.31–075.

[376] *Lloyds Bank Ltd v Chartered Bank of India* [1929] 1 K.B. 40, 56, per Scrutton L.J.; see also *Corporation Agencies Ltd v Home Bank of Canada* [1927] A.C. 318.

[377] *John v Dodwell* [1918] A.C. 563; and see above, para.31–056.

[378] e.g. *Reckitt v Barnett, Pembroke & Slater Ltd* [1929] A.C. 176 (attorney drew cheques for private debts); *Midland Bank Ltd v Reckitt* [1933] A.C. 1; cf. *Reckitt v Nunburnholme* (1929) 45 T.L.R. 629. See also *Lysaght Bros & Co Ltd v Falk* (1905) 2 C.L.R. 421.

liable merely because by appointing the agent he gives him the opportunity to behave fraudulently.[379]

31–062 **Apparent authority of Crown agents.** Special considerations apply to the Crown and public authorities, since it is plain that no official can be given the power to validate ultra vires acts, and the freedom of action of the Crown or a public authority to do its public duty should not easily be fettered.[380] It has been said that "no public officer, unless he possesses some special power, can hold out on behalf of the Crown that he or some other public officer has the right to enter into a contract in respect of the property of the Crown when in fact no such right exists",[381] and though this may be overstated, apparent authority in such an agent is not easy to establish.[382] In general estoppel reasoning has to some extent been superseded in the area by the notions of legitimate expectations and abuse of power,[383] but where agents of a foreign government are in question there is room for the application of similar reasoning.[384]

### (c) *Undisclosed Principal*

31–063 **Doctrine of the undisclosed principal.** It has long been established that a principal who was at the time of contracting undisclosed can sue or be sued on the contract of his agent,[385] though the juristic basis of this rule, and therefore the full scope of its application, is still uncertain. Indeed, many points as to its application have never been thought through.[386] It has been said that the contract is that of the principal[387]; but in fact the law in many respects treats the contract as that of the agent, for the third party cannot be deprived of the agent's liability should he desire it,[388] and can usually plead against the principal all defences that

[379] *Farquharson Bros & Co v King & Co* [1902] A.C. 325; *Morris v CW Martin & Sons Ltd* [1966] 1 Q.B. 716; *Leesh River Tea Co v British India SN Co* [1967] 2 Q.B. 250; *Canadian Laboratory Supplies Ltd v Engelhard Industries of Canada Ltd* [1979] 2 S.C.R. 787, (1979) 97 D.L.R. (3d) 1; *Kooragang Investments Pty Ltd v Richardson & Wrench Ltd* [1982] A.C. 462; *Crédit Lyonnais Bank Nederland NV v ECGD* [2000] 1 A.C. 486 (agent assisted in tort of deceit but did not commit it). As to exclusion of liability for fraud of an agent see *HIH Casualty & General Insurance Ltd v Chase Manhattan Bank* [2003] UKHL 6, [2003] 2 Lloyd's Rep. 61.

[380] See *Southend-on-Sea Corp v Hodgson (Wickford) Ltd* [1962] 1 Q.B. 416.

[381] *Att-Gen for Ceylon v Silva* [1953] A.C. 461, 479. But cf. 480. See Vol.I, para.11–013. See also *JE Verreault et Fils v Att-Gen for Quebec* [1977] 1 S.C.R. 41; (1975) 57 D.L.R. (3rd) 403.

[382] As to constitutional limitations on the agent of a foreign state see *Donegal International Ltd v Republic of Zambia* [2007] EWHC 197 (Comm), [2007] 1 Lloyd's Rep. 397.

[383] See Vol.I, paras 11–033 et seq.

[384] See *Bowstead and Reynolds on Agency*, 20th edn (2014), para.12–022; *PEC Asia Ltd v Golden Rice Co Ltd* [2014] EWHC 1583 (Comm), [2014] B.C.C. 628, where evidence from distinguished Indian lawyers was considered.

[385] *Duke of Norfolk v Worthy* (1808) 1 Camp. 337; *Browning v Provincial Insurance Co of Canada* (1873) L.R. 5 P.C. 263, 272; *Siu Yin Kwan v Eastern Insurance Co Ltd* [1994] 2 A.C. 199, giving (at 376) a useful statement of the rules. The doctrine was applied to a breach under s.14(5) of the Sale of Goods Act 1979 in *Boyter v Thomson* [1995] 2 A.C. 628; see Brown (1996) 112 L.Q.R. 49.

[386] See, e.g. *Maynegrain v Compafina Bank* [1982] 2 N.S.W.L.R. 141 (attornment), discussed in *Bowstead and Reynolds on Agency*, 20th edn (2014), paras 8–172, 8–173.

[387] *Keighley, Maxsted & Co v Durant* [1901] A.C. 240, 261; above, para.31–029.

[388] *O'Herlihy v Hedges* (1803) 1 Sch. & Lef. 123; and see *Higgins v Senior* (1841) 8 M. & W. 834. See also *Public Trustee v Taylor* [1978] V.R. 289 (signature "for himself or as agent for an undisclosed principal": signatory liable).

TAB 107

Goff & Jones *The Law of Unjust Enrichment* (9th ed, 2016)
at §§ 3-13, 3-16, 9-94-9-97

THE COMMON LAW LIBRARY

# GOFF & JONES

# THE LAW OF UNJUST ENRICHMENT

Ninth Edition

edited by

Charles Mitchell
*Professor of Law, University College London*

and

Paul Mitchell
*Professor of Law, University College London*

and

Stephen Watterson
*University Lecturer in Law, University of Cambridge, and John Collier Fellow at Trinity Hall, Cambridge*

SWEET & MAXWELL

THOMSON REUTERS

breach of it where ordinary contractual remedies can apply and payment of damages is the secondary liability for which the contract provides."

**3–12** The very broad terms of the reasoning quoted above are not supported by authority. The suggestion, in the final sentence quoted, that where there is a breach of contract, there is "no room" for a remedy other than damages, is incorrect—there are many authorities in which, following a breach of contract, a remedy in unjust enrichment has been given.[35] It is also incorrect to assert that an intention to exclude all remedies in unjust enrichment can be imputed to contracting parties. Certainly the parties might expressly exclude or limit remedies in unjust enrichment, or the terms of their contract may lead to the conclusion that a remedy in unjust enrichment has been displaced[36]; but those possibilities depend on the facts of the individual case, and cannot be automatically presumed. Finally, the point about the historical development of unjust enrichment in situations where there was no contract or no effective contract has worrying echoes of the quasi-contract fallacy. The fact that, under the influence of that fallacy, remedies in unjust enrichment were previously confined to such situations is hardly an argument for continuing those restrictions now that the quasi-contract fallacy has been exploded. In short, the current relationship between unjust enrichment and contractual liability is far more subtle and nuanced than Cooke J was prepared to allow. As a matter of authority, the decision in *Taylor*'s case can be supported on a narrower basis, which is hinted at later in the judgment,[37] namely, that if the claimant had been allowed to claim in unjust enrichment, it would have subverted the contractual allocation of risk. The claimant having performed services which were assigned a financial value in his contract of employment (through salary and the bonus scheme), it would have been inappropriate for the law of unjust enrichment to allow him to reopen the question of the value of those services.[38]

### (b) *Subsisting Contract*

#### (i) *Current Law*

**3–13** Where there is a contract between the parties relating to the benefit transferred, no claim in unjust enrichment will generally lie while the contract is subsisting.[39] Thus, in *Kwei Tek Chao v British Traders and Shippers Ltd*[40] the buyer of goods was unable to recover the price paid on the ground of failure of consideration

---

[35] e.g. *Rowland v Divall* [1923] 2 K.B. 500; *Warman v Southern Counties Car Finance Corp Ltd* [1949] 2 K.B. 576; *Butterworth v Kingsway Motors Ltd* [1954] 1 W.L.R. 1286; *Barber v NWS Bank Plc* [1996] 1 W.L.R. 641.

[36] See para.3–28 and following.

[37] *Taylor* (fn.33) at [25].

[38] See further, para.3–40 and following.

[39] *Weston v Downes* (1778) 1 Doug. 23; 99 E.R. 19; *Towers v Barrett* (1786) 1 T.R. 133; 99 E.R. 1014; *Hulle v Heightman* (1802) 2 East. 145; 102 E.R. 324; *De Bernardy v Harding* (1853) 8 Exch. 822, 155 E.R. 1586; *Kwei Tek Chao v British Traders and Shippers Ltd* [1954] 2 Q.B. 459; *Diamandis v Wills* [2015] EWHC 312 (Ch) at [84]. For a critique of the rule see A. Tettenborn, "Subsisting Contracts and Failure of Consideration—A Little Scepticism" [2002] R.L.R. 1; for a proposal that the rule should be abolished see S. Smith, "Concurrent Liability in Contract and Unjust Enrichment: The Fundamental Breach Requirement" (1999) 115 L.Q.R. 245.

[40] *Kwei Tek Chao v British Traders and Shippers Ltd* [1954] 2 Q.B. 459.

because he had accepted the goods and affirmed the contract. Once the contract has come to an end for a reason other than frustration,[41] a claim in unjust enrichment may be available provided that the requirements for liability in unjust enrichment are satisfied.

(ii) *Historical Explanations for Subsisting Contract Rule*

**3–14** Historically, two explanations were often given for the principle that a claim in unjust enrichment was not available if the contract remained open. The first was that the claim in unjust enrichment should not be overused. As Lord Mansfield CJ remarked:

> "I am a great friend to the action for money had and received; and therefore I am not for stretching, lest I should endanger it."[42]

The concern about overuse was particularly relevant in the late 18th century, when the full scope of the action was beginning to be explored,[43] and its lack of formal requirements made it an attractive alternative to a claim for breach of contract (where the contract had to be accurately pleaded). Today the action for money had and received is too well established to be put at risk of extinction through overuse, and the pleading arguments do not apply.

**3–15** The second explanation often used was that a remedy in unjust enrichment was a kind of implied contractual remedy, and, as such, could not be permitted where it differed from the remedy under an express contract. For instance, in *Steven v Bromley & Son* Scrutton LJ observed that:

> "It is a commonplace of the law that there can be no implied contract as to matters covered by an express contract until the express contract is displaced."[44]

Since it is now recognised that liability in unjust enrichment cannot be explained by reference to an implied contract, this kind of reasoning can no longer be supported. However, today the general principle is justifiable on a different basis, which emphasises the parties' own allocations of risk and valuations, as expressed in the contract.

(iii) *Contractual Allocation of Risk*

**3–16** The general principle that no claim in unjust enrichment is permitted where a contract governing the benefit in question is still in force between the parties is today justifiable on the basis that the law should give effect to the parties' own

[41] Law Reform (Frustrated Contracts) Act 1943 regulates the consequences of frustration. See Ch.15.

[42] *Weston v Downes* (1778) 1 Doug 23; 99 E.R. 19. See also *Longchamp v Kenny* (1779) 1 Doug. 137; 99 E.R. 91.

[43] *Moses v Macferlan* (1760) 2 Burr. 1005; 97 E.R. 676, considered in W. Swain, "*Moses v Macferlan* (1760)" in C. Mitchell and P. Mitchell (eds), *Landmark Cases in the Law of Restitution* (Oxford: Hart Publishing, 2006), p.19.

[44] *Steven v Bromley & Son* [1919] 2 K.B. 722 at 727. For further examples see *Stoomvaart Maatschappij Nederlandsche Lloyd v General Mercantile Co Ltd (The Olanda)* [1919] 2 K.B. 728n. at 730, per Lord Dunedin: "As regards quantum meruit where there are two parties who are under contract quantum meruit must be a new contract, and in order to have a new contract you must get rid of the old contract"; *Re Richmond Gate Property Co Ltd* [1965] 1 W.L.R. 335.

allocations of risk and valuations, as expressed in the contract, and should not permit the law of unjust enrichment to be used to overturn those allocations or valuations.[45] The point can be illustrated by reference to *Re Richmond Gate Property Co Ltd*,[46] where the claimant had been employed by the company as its managing director. The company's articles provided that the managing director's remuneration was to be "such amount as the directors shall determine", but the company went into voluntary liquidation before any amount had been fixed. The claimant claimed £400 as the value of enriching services which, at the company's request, he had conferred on it. His claim failed. Plowman J clearly regarded a claim in unjust enrichment as an inferior type of contractual claim, stating that:

> "Since there is an express contract with the company in regard to the payment of remuneration it seems to me that any question of quantum meruit is automatically excluded."[47]

While that language would not be appropriate today (for reasons given above), the result can be supported in terms of risk allocation. The claimant took the risk of the directors fixing his remuneration at whatever level they chose, which might be above or below the market rate, and which included the risk that they might not fix it at all. If the claimant had been allowed to claim in unjust enrichment, that contractually allocated risk would have been subverted.

### (iv) *The Scope of the Contractual Allocation of Risk*

**3–17** If the underlying explanation for the principle that there is no claim in unjust enrichment where the contract is still subsisting, is that the contractual allocation of risk must be respected, an important consequence follows: claims in unjust enrichment should be permitted, even where a contract is still subsisting, if those claims do not undermine the contractual risks. For instance, a claim in unjust enrichment might yield a lower award than a claim for damages for breach of a subsisting contract, but might be preferred for procedural or evidential reasons. In principle, such a claim should be allowed.[48]

### (v) *Subsisting Contract: Earlier Authorities*

**3–18** It is important to note that before the House of Lords' decision in *Fibrosa Spolka Akcynja v Fairbairn Lawson Combe Barbour Ltd*,[49] it was thought that no claim in unjust enrichment could lie unless the contract had been rescinded ab initio.[50] In other words, before 1942 it was necessary for the parties to be put back into the position they had occupied before the contract was entered into. This view no

[45] E. McKendrick, "The Battle of Forms and the Law of Restitution" (1988) 8 O.J.L.S. 197, 202 and following; J. Beatson, "Restitution and Contract: Non-Cumul?" (2000) 1 *Theoretical Inquiries in Law* 83; C. Mitchell (fn.4) para.18.78.

[46] *Re Richmond Gate Property Co Ltd* [1965] 1 W.L.R. 335.

[47] *Re Richmond Gate* (fn.46) at 337.

[48] Beatson (fn.45) at 93–94.

[49] *Fibrosa Spolka Akcyjna v Fairbairn Lawson Combe Barbour Ltd* [1943] A.C. 32.

[50] *Chandler v Webster* [1904] 1 K.B. 493; *Mussen v Van Diemen s Land Co* [1938] 1 Ch. 253. The rule can be traced back at least as far as *Dutch v Warren* (1721) 1 Str. 406; 93 E.R. 598, reported more fully by Mansfield CJ in *Moses* (1760) 2 Burr. 1005 at 1010–1012; 97 E.R. 676 at 681.

"serious" mistake is needed.[212] To similar effect are cases considering the ambit of the courts' equitable jurisdiction to set aside voluntary transactions, which have eschewed attempts to liberalise the jurisdiction along the same lines as the common law, and re-emphasised historic requirements for a "serious" mistake.[213]

### (b) *Justifying Grounds/Transactional Obstacles*

**9–93** Where a benefit is conferred by one party on another pursuant to certain types of transaction, then—even if the transaction is entered under a mistake which suffices to support an unjust enrichment claim—no such claim is available if the transaction provides the defendant with a "justifying ground", i.e. a legal right to receive the benefit which justifies his enrichment.[214] To recover, the claimant must have the transaction set aside before he can bring his claim for unjust enrichment, and to do this he may have to comply with different and more rigorous requirements than govern his unjust enrichment claim.

#### (i) *Contracts*

**9–94** Where a benefit is mistakenly conferred by one party on another under a contract, a claim in unjust enrichment will commonly fail even if the mistake would otherwise support such a claim. As we explain in Ch.3, the contract will bar the claim, to the extent that it entitles the defendant to receive the relevant benefit. For the claim to succeed, the claimant will need to show that the contract is invalid, being either non-existent, void or voidable. This is not a matter for the law of unjust enrichment, but the law of contract.[215]

**9–95** An illustration is provided by *Fairfield Sentry Ltd (In Liquidation) v Migani*.[216] FSL, a mutual investment fund, sought to recover sums paid to fund subscribers on redemption of their investments. The redemption payments were calculated on the basis of a valuation of the fund that had been determined by FSL's directors on the basis of a grossly incorrect assumption. The prescribed net asset valuation had been based on a valuation of the assets of another fund, in which FSL had invested, which—unknown to FSL's directors—was in truth a valueless entity: a vehicle for a fraudulent Ponzi scheme. Could FSL recover the redemption payments on the ground of mistake? The Privy Council held that this turned on the status and terms of the contract, pursuant to which the payments were ostensibly made. As Lord Sumption explained:[217]

---

[212] *Deutsche Morgan Grenfell Group Plc v IRC* [2006] UKHL 49; [2007] 1 A.C. 558 at [84]–[87] per Lord Scott.

[213] See the cases noted at paras 9–134—9–142, and see further paras 9–143 and following.

[214] See Chs 2 and 3.

[215] For a full description, see leading works on the law of contract: e.g. H.G. Beale (ed), *Chitty on Contracts*, 32nd edn (London: Sweet and Maxwell, 2015) vol.1, Chs 6 and 7. See too O'Sullivan et al (fn.150) esp. Chs 4, 5 and 7; and J. Cartwright, *Misrepresentation, Mistake and Non-Disclosure*, 3rd edn (London: Sweet and Maxwell, 2012).

[216] *Fairfield Sentry Ltd (In Liquidation) v Migani* [2014] UKPC 9; [2014] 1 C.L.C. 611; the claim was resolved on the basis of BVI law, which was said to be relevantly identical to English law: at [17].

[217] *Fairfield* (fn.216) at [18] (relying for these propositions on *Kleinwort Benson* (fn.52) at 408 per Lord Hope; A. Burrows, *A Restatement of the English Law of Unjust Enrichment* (Oxford: Oxford University Press, 2012) s.3(b); and *Barclays Bank v Simms* (fn.163) at 695).

> "The basic principle is not in dispute. The payee of money 'cannot be said to have been unjustly enriched if he was entitled to receive the sum paid to him' . . . Or [put differently] 'in general, an enrichment is not unjust if the benefit was owed to the defendant by the claimant under a valid contractual, statutory or other legal obligation'. Therefore, to the extent that a payment made under a mistake discharges a contractual debt of the payee, it cannot be recovered, unless (which is not suggested) the mistake is such as to avoid the contract: . . . So far as the payment exceeds the debt properly due, then the payer is in principle entitled to recover the excess."

**9–96** On the facts, the contract under which the redemption payments were made was a valid contract, which obliged FSL to pay the net asset value per share as determined by the directors at the time of redemption. On that basis, the redemption payments that were made—although quantified on the basis of grossly mistaken assumptions—were contractually due, and for that reason were irrecoverable.

**9–97** If the claimant, who is mistaken, wishes to call into question the contract's validity on the basis of his mistake, he will often face greater hurdles than are set by the law of unjust enrichment: a contract is not rendered void or voidable by any causative mistake. There is a very important divide between induced and uninduced mistakes. An induced mistake will readily render a contract voidable, if induced by a misrepresentation, whether fraudulent[218] or non-fraudulent,[219] by the other contracting party, his agent or a third party to his knowledge.[220] A contract can also be avoided if it has been induced by the other party's non-disclosure, in cases where the law requires pre-contractual disclosure.[221] In contrast, a common mistaken assumption only renders the contract void at law if the risk of error is not allocated by the contract, and the mistake is "fundamental"[222]; and an uninduced unilateral mistake similarly generates relief only in very limited circumstances.[223]

### (ii) *Other Justifying Grounds*

**9–98** Although they are certainly the most common, contracts are not the only legal transactions that might in principle constitute "justifying grounds"; reference should be made to our discussion of (other) justifying grounds in Ch.2. For present purposes, the important point is that recent authority in the area of relief for mistake raises an important question whether the grounds examined there can be regarded as exhaustive. In *Pitt v Holt*[224] the Supreme Court had its first opportunity to examine the ambit of the long-standing equitable jurisdiction to

---

[218] At law or in equity: *Peek v Gurney* (1871) L.R. 13 Eq. 79; *Newbigging v Adam* (1886) 34 Ch.D. 582 (CA) at 592.

[219] Historically, generally in equity only: see *Redgrave v Hurd* (1881) 20 Ch.D. 1 at 12.

[220] e.g. *Bainbrigge v Browne* (1881) 18 Ch.D. 188 at 197; *Barclays Bank v O'Brien* [1994] 1 A.C. 180 at 197; *Credit Lyonnais Bank Nederland NV v Burch* [1997] 1 All E.R. 144 at 152; *Royal Bank of Scotland Plc v Etridge (No.2)* [2002] 2 A.C. 773 at [40]. On third-party misrepresentations generally, see e.g. O'Sullivan et al (fn.150), Ch.9.

[221] On which see *Chitty on Contracts* (fn.215), para.7–155 and following; O'Sullivan et al (fn.150), Ch.5.

[222] Especially *Bell* (fn.156); *Great Peace* (fn.156). The *Great Peace* case clarifies that there is no separate, and potentially wider, equitable doctrine of common mistake: cf. *Solle v Butcher* [1950] 1 K.B. 671.

[223] e.g. a mistake as to the contract's terms, known to the other party, as in *Hartog* (fn.156).

[224] *Pitt v Holt* [2013] UKSC 26, [2013] 2 A.C. 108.

TAB 108

Goode, *Principles of Corporate Insolvency Law* (4th ed, 2011)
at §§ 13-03, 13-12, 13-19, 13-26, 13-107

# PRINCIPLES OF CORPORATE INSOLVENCY LAW

by

**Roy Goode**

SWEET & MAXWELL

THOMSON REUTERS

transaction, which is neither invalid nor necessarily wholly reversible but may be set aside, wholly or in part, or simply varied, as the justice of the case requires.[16] Again, the statutory provisions are not self-executing; they have to be invoked by the office-holder.

An entirely distinct power of avoidance is given to the Pensions Regulator (TPR) to order restoration of assets to a defined benefit occupational pension scheme where these were transferred by a transaction at an undervalue.[17] This is not discussed further.

For brevity, all of these forms of adjustment will be referred to as "avoidance" in the ensuing pages but it should be constantly borne in mind that this term is shorthand for a widely differing range of effects and reliefs. In particular, where payments or transfers of property made by the company are void, they are deemed to remain assets of the company in its own right so as to be susceptible to capture by a floating charge or fixed charge over after-acquired property of the same description, whereas recoveries resulting from a court order after application by the liquidator are considered to be held for the creditors and not for the company itself and are therefore not captured by a prior security.[18] Further, a transferee from the company under a disposition which is void *ab initio* and who then deals with the transferred asset, whether absolutely or in any other way, commits a conversion if the asset is tangible and is liable to a proprietary restitutionary claim for the proceeds whatever the nature of the asset. A transferee under a disposition that is initially valid who later deals with the asset after it has become void against a particular category of third party may incur a liability to that party for interference with his interest, as where the holder of an unregistered floating charge which has crystallised sells it without the consent of a person who had become the holder of a fixed security interest after expiry of the 21 days allowed for registration of the floating charge. By contrast, no wrong is committed by a person holding a good title to an asset under a disposition to him by the company the effect of which is merely reversible who deals with the asset prior to the avoidance of the disposition under the statutory provisions.

## 2. *THE POLICIES UNDERLYING THE AVOIDANCE PROVISIONS*

**13–03** The conditions of avoidance vary according to the particular ground of avoidance involved but are for the most part dictated by a common policy, namely to protect the general body of creditors against a diminution of the assets available to them by a transaction which confers an unfair or improper

[16] ibid., s.244.
[17] Pensions Act 2004 ss.52–53.
[18] See below, paras 13–140 et seq.

advantage on the other party. All but two of the grounds of avoidance known to insolvency law[19] involve the unjust enrichment of a particular party at the expense of other creditors, whether they are preferential creditors or ordinary unsecured creditors.[20] Once this crucial point is grasped, much of the legislative structure falls into place. The unjust enrichment may affect other creditors in one of two ways. It may reduce the company's net asset value, as where it involves a transfer of the company's property to another party, otherwise than as a creditor, at a wholly inadequate price or a purchase of property by the company at an inflated price; or it may, without disturbing the company's net asset position, involve payment or transfer to a particular creditor in satisfaction or reduction of his debt, thereby giving him a preference over other creditors in disregard of the priority position of preferential creditors or, if there remains enough to pay them in full, then in breach of the *pari passu* principle of distribution among ordinary unsecured creditors. The avoidance provisions may thus be seen as necessary both to preserve the company's net asset value and to ensure equality of distribution, at least among classes of creditors.[21] Whether the defendant is or should be entitled to avail himself of defences and cross-claims that would be available in answer to claims of unjust enrichment at common law is a question we shall discuss later in this chapter.[22]

Section 238, which deals with transactions at an undervalue, is aimed at improper reduction of the company's net asset value and is thus conceptually linked to the common law anti-deprivation rule, while s.239 is linked to the common law *pari passu* principle and addresses unfair preferences. However, there are significant differences between the common law principles and the statutory provisions in that: (i) the former operate only on uncompleted transactions, the latter on completed transactions; (ii) the former are aimed at payments and transfers fixed to occur at the point of an insolvency proceeding, while the latter operate retrospectively by providing for the reversal of transactions concluded within the prescribed statutory period prior to an insolvency proceeding; and (iii) a provision in breach of

19 The two exceptions are failure to register a registrable charge and the making of a post-petition disposition of the company's property without the court's authorisation.

20 In *Hollicourt (Contracts) Ltd v Bank of Ireland* [2001] Ch. 555, it was common ground that a claim under s.127 of the Insolvency Act 1986 is restitutionary in character. See the judgment of Mummery L.J. at [22]. However, this is true only in the sense that the asset disposed of in breach of s.127 has to be given back. It does not follow that the purpose and effect are to reverse an unjust enrichment, for there may have been none, s.127 applying as much to transactions for full value as to those at an undervalue. Unjust enrichment is therefore not the basis of this ground of avoidance. The point is more fully discussed below in paras 13–03 and 13–145 et seq.

21 See *Rubin v Eurofinance SA* [2010] EWCA Civ 895, in which this passage was cited by Ward L.J. at [55], adding (at [61]) that the statutory avoidance mechanisms under the Insolvency Act and the US Bankruptcy Code "are integral to and are central to the collective nature of bankruptcy and are not merely incidental procedural matters".

22 Below, paras 13–145 et seq.

the common law rules is void, whilst a transaction in breach of s.238 or s.239 is valid but its effects are reversible in the discretion of the court on the application of the office-holder.

It will be apparent from what is said above that the phrase "unjust enrichment" is here used in a restricted sense to denote the conferment on the other party of an unfair or improper benefit to the prejudice of its existing *creditors*. Damage to the members of the company is not our present concern. If the directors improperly apply the company's assets, they can be called to account by the members. If the company is solvent, it is the members' prerogative to ratify the improper acts of the directors, for only the members themselves are injured. The position is otherwise where the company is insolvent, for then it is the creditors who have the primary interest in the proper application of the company's assets, although this can usually be asserted only when the company is in winding up or administration.[23]

There is a subsidiary policy underlying the avoidance provisions, namely the protection of an insolvent company's business from dismemberment through the improper disposition of its assets.

**13–04** A third policy is sometimes invoked as the rationale of the rule against preferences, namely deterrence of future creditors from gaining an unfair advantage. But it is hard to see why a creditor should be deterred from taking the benefit of a preference when if he is lucky the company will survive the preference period, the liquidator might anyway take no steps to recover the preference and even if he does the worst that happens is that the creditor will have to give up the benefit he received.[24]

Despite references to the first two of these two policies in a number of cases, it cannot be said that the underlying rationale of the statutory provisions has been very clearly articulated either by the legislature or by the courts. The point has been trenchantly made by a leading scholar, Professor Andrew Keay, with reference to Australia's insolvency laws:

> "Over the years avoidance provisions have regularly come under the scrutiny of the courts. Yet, there is little evidence of the courts seeking to ascertain the rationale for the existence of these provisions. It is submitted that the existence of such provisions is not a matter which excites any debate in Australia. There has been hardly any consideration of the underlying basis for the decisions; in fact there are few cases in which the reason for the inclusion of avoidance provisions in corporation or bankruptcy legislation has been mentioned."[25]

---

[23] See below, para.13–06.

[24] See to similar effect Vern Countryman, "The Concept of a Voidable Preference in Bankruptcy" (1985) 38 Vand. L. Rev. 713, 747; and David Gray Carlson, "Security Interests in the Crucible of Voidable Preference" (1995) U. Ill. L. Rev. 211, 215.

[25] Andrew Keay, "In Pursuit of the Rationale Behind the Avoidance of Pre-Liquidation Transactions" (1996) 18 Sydney Law Rev. 55.

## 6. *TRANSACTIONS AT AN UNDERVALUE*[51]

### *(i) Overview*

**The basic provision**

13–12 Where a company in administration or liquidation has at a relevant time entered into a transaction with any person at an undervalue and the statutory defence referred to below is not available, the office-holder may apply to the court to order restoration of the status quo, with consequential relief.[52]

As we shall see below, there is no possibility of overlap between the provisions relating to transactions at an undervalue and those relating to preferences. This is because s.238, relating to transactions at an undervalue, is concerned with payments or transfers that reduce the company's net asset value and thus do not cover payments or transfers to a creditor, while to the extent that a payment is made to a creditor in excess of what is due to him, he does not receive it *qua* creditor and is thus vulnerable only under s.238, not s.239.

**What constitutes a transaction at an undervalue**

13–13 A company enters into a transaction with a person at an undervalue if it:

(1) makes a gift to that person; or

(2) otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration; or

(3) enters into a transaction with that person for a consideration the value of which is significantly less than the value, in money or money's worth, of the consideration provided by the company.[53]

"Transaction" is defined as including a gift, agreement or arrangement, and references to entering into a transaction are to be construed accordingly.[54]

---

[51] See *Transaction Avoidance in Insolvencies* (above, n.28), Ch.4, and see John Armour, "Transactions at an Undervalue" in Armour and Bennett (eds), *Vulnerable Transactions in Corporate Insolvency*, 2002, p.37. For the power of the Pensions Regulator to direct the restoration of assets transferred from an occupational defined benefits scheme under a transaction at an undervalue, see the Pensions Act 2004 ss.52–53.

[52] Insolvency Act 1986 ss.238, 240 and 241. "Relevant time" is defined in s.240. See below, para.13–39, text and n.121.

[53] Insolvency Act 1986 s.238(4).

[54] Insolvency Act 1986 s.436.

"Arrangement" is widely construed, covering any form of agreement between the parties, formal or informal, oral or in writing.[55]

**Examples of transactions at an undervalue**

**13–14** The company enters into a transaction at an undervalue where it:

(1) makes a gift of property;

(2) undertakes a burden (for example, binds itself to supply goods or services) for no consideration (this would usually require a deed);

(3) purchases an asset for significantly more, or sells an asset for significantly less, than its value;

(4) takes an asset on lease or hire at a rent significantly above the rental value of the asset or lets it out on lease or hire at a rent significantly below its rental value;

(5) agrees to pay for services a sum significantly more, or to charge for services a sum significantly less, than their value;

(6) allows an asset to be retained by the other party in satisfaction of a claim against the company which is significantly less than the value of the asset or takes an asset in satisfaction of a claim which is significantly more than the value of the asset;

(7) accepts in satisfaction of a debt a sum significantly less than the recoverable value of the debt; or

(8) gives a guarantee or indemnity and receives by way of benefit significantly less than the value of the benefit conferred by the guarantee or takes a guarantee or indemnity against a benefit which is significantly less in value than that of the guarantee.

In all of these cases, the company either receives nothing for what it supplies or pays significantly too much or receives significantly too little to ensure equality of exchange, and the transaction will be vulnerable under s.238 unless the statutory defence under s.238(5) is available. The same applies to the distribution of a declared dividend at a time when the company is insolvent, and this could also be attacked as a preference.[56] Most of the examples given are straightforward and require no explanation. However, it will be

[55] *Feakins v Department for Environment Food and Rural Affairs* [2007] B.C.C. 54, discussed below, para.13–45.
[56] See below, para.13–78, n.181.

necessary to say something about gifts, transactions for no consideration, the benefits to be considered in valuing the consideration and the treatment of guarantees, and to explain the omission from the list of security given by the company for a previously unsecured loan.

It will be obvious that where a transaction is attacked on the ground of significant inequality of exchange, difficult questions of valuation may arise which are similar in kind to those previously discussed in relation to the test of insolvency.[57] As will be seen, what matters is the true value of a benefit received or given up, which is not necessarily its stated or face value.

### Conditions to be satisfied under s.238

**13–15** The court cannot make an order under s.238 unless the following seven conditions are satisfied:

(1) the company is in liquidation or administration;

(2) application for the order is made by the liquidator or administrator;

(3) a transaction was concluded;

(4) the company was a party to the transaction;

(5) the transaction was at an undervalue;

(6) the transaction was entered into at a relevant time; and

(7) the company was unable to pay its debts at the time of or in consequence of entering into the transaction.

Even where all of these elements are present, the court may be precluded from making any order by reason of s.238(5) of the Act. Under s.241, the court has wide powers both as to the orders it can make to reverse the effect of the transaction and as to the persons against whom an order can be made but the particular defendant may be protected by s.241(3) of the Act. It is also necessary to consider whether a restitutionary defence or cross-claim is available based on principles of unjust enrichment.

### Onus of proof

**13–16** In general, the onus lies on the office-holder to show that the above seven conditions are satisfied and on the defendant to make out a defence under s.238(5) or 241(3). But in the case of a transaction entered into by the company with a

[57] Above, paras 4–32 et seq.

person connected with the company,[58] condition (7) is presumed to be satisfied unless the contrary is shown,[59] and there is a presumption against good faith as regards such a person in the circumstances set out in s.241(2A).[60]

### *(ii) The elements in detail*

#### Company is in liquidation or administration

**13–17** The statutory provisions do not apply unless the company is in liquidation or administration. The reasons for this have already been discussed.[61]

#### Application is made by the liquidator or administrator

**13–18** The requirement that the application for an order be made by the relevant office-holder reflects two considerations. First, the remedy is not automatic, it has to be sought. This is because the application of the statutory provisions depends on a careful examination of the facts and does not lend itself to an automatic trigger. Secondly, the remedy is also necessarily discretionary, since the circumstances may vary widely from case to case, and because it is designed for the protection of the creditors generally in an insolvency proceeding it would be inappropriate to allow application to be made by anyone other than the liquidator or administrator as the representative of the creditors' interests. So it is not open to a creditor or group of creditors or to a member or group of members to invoke the statutory provisions. What they are entitled to do, if they believe that the liquidator or administrator is neglecting to pursue a remedy which ought to be pursued, is to apply to the court,[62] although the court will be slow to substitute its own judgement for that of the office-holder.

#### "Transaction"

**13–19** The word "transaction" has a very wide meaning. It is not confined to contracts[63] but extends to gifts and other arrangements which are not based on contract, and where there is a contract, "transaction" may cover not only that contract but any linked transaction, even though involving a different

[58] See below, para.13–39, n.121.
[59] Insolvency Act 1986 s.240(2).
[60] See below, para.13–68.
[61] Above, para.13–09.
[62] Under the Insolvency Act 1986 ss.167(3), 168(5) and 212(1) (liquidator) or Sch.B1 para.74 (administrator).
[63] *Re HHO Licensing Ltd* [2008] 1 B.C.L.C. 223.

party.[64] In Australia, it has been established in a series of cases that "transaction" is wide enough to include: a series of steps over a period involving several parties and not always contractual consequences; a unilateral act[65]; and arrangements giving rise to an estoppel.[66] A court order directing a transfer has also been held to constitute a transaction[67] and is susceptible to avoidance under the insolvency provisions, for example, in the case of a collusive consent order for a transfer at an undervalue or by way of preference. But apart from court orders and gifts, there has to be some element of dealing, this being implicit in the word "transaction" itself and being reinforced by the references in s.238 to: (a) the "entry into" a transaction; (b) "with a person"; and (c) "on terms that provide".[68]

### The company as party to the transaction

**13–20** Section 238 applies only where it is the company that enters into the transaction at an undervalue. So a transaction is not within the ambit of the section unless the company is a party to it. The first step is thus to identify the relevant transaction. So in a case involving s.423 of the Act, when debtors to a bank decided to place farming assets out of its reach by forming a company of which they were the sole directors and shareholders, selling the farming stock and other agricultural assets to the company at a proper value and then procuring the grant to it of a 20-year agricultural tenancy of the farm, the relevant transactions were the sale and the tenancy agreement, not the incorporation of the company and the issue of shares in it, so that the impact of the sale and the grant of the tenancy on the value of the shares in the company was irrelevant.[69] In *Secretary of State for the Environment, Food and*

[64] See *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] 1 W.L.R. 143, discussed in more detail below, para.13–31; *Re Taylor Sinclair (Capital) Ltd, Knights v Seymour Pierce Ellis Ltd* [2001] 2 B.C.L.C. 176; and *Feakins v Department for Environment, Food and Rural Affairs* [2007] B.C.C. 54.

[65] e.g. a gift (expressly provided by the section) or a declaration of trust, as in *Ramlort Ltd v Reid* [2004] B.P.I.R. 985.

[66] *Australian Kitchen Industries Pty Ltd v Albarran* (2005) 51 A.C.S.R. 604, a decision of the New South Wales Supreme Court, in which Barrett J. cited, amongst other authorities, *Re Emanuel (No.14) Pty Ltd, Macks v Blacklaw & Shadforth Pty Ltd* (1997) 14 A.L.R. 281; and *Somerset Marine Inc v New Cap Reinsurance Corp* [2003] NS.W.C.A. 38.

[67] *Hill v Haines* [2008] Ch. 412.

[68] *Re Taylor Sinclair (Capital) Ltd, Knights v Seymour Pierce Ellis Ltd* [2001] 2 B.C.L.C. 176, *per* Robert Englehart Q.C. (sitting as a Deputy High Court Judge); and *Re HHO Licensing Ltd* [2008] B.C.L.C.,223 *per* Peter Leaver Q.C. at para. 31. See further Armour, "Transactions at an Undervalue", 2003, pp.55 et seq.

[69] *National Westminster Bank Plc v Jones* [2002] 1 B.C.L.C. 55. The statement by Lord Scott in *Brewin Dolphin*, cited above n.64, at [20] that "the issue in the present case is not, in my opinion, to identify the section 238(4) 'transaction'; the issue is to identify the section 238(4) 'consideration' " is not, it is thought, intended to deny the importance of identifying the relevant transaction but is simply a consequence of his conclusion that in the case before the House of Lords the various linked contracts all formed part of the transaction, so that the real question to be considered *in that case* was what constituted the consideration.

However, Ho and Mokal are surely right in saying that so long as a transaction has no effect on the debtor's net asset value, s.238 is not engaged, so that if a diminution in the debtor's assets is reversed by a recovery under ss.239 and 241, it must follow that s.238 cannot apply.

*(2) Distinction between gifts and other no-consideration transactions*

**13–25** A gift by definition involves a transfer of an asset for no consideration. However, as s.238(4)(a) implies, there are other types of transaction which are unsupported by consideration but are not gifts because they do not involve the transfer of an asset. These include unperfected gift-promises (normally binding only if by deed or by way of proprietary estoppel), voluntary releases of a debt and voluntary acceptance of part-payment in satisfaction of a debt.

**Valuing benefits received or given up**

*(1) The approach to the valuation*

**13–26** Prima facie the value of an asset is not less than the amount that a reasonably well-informed purchaser is prepared, in arm's-length negotiations, to pay for it.[90] Where there is a market for assets of the type in question, in general the figure to be taken is the market value.[91] This is normally to be determined by expert evidence. The fact that the parties took reasonable steps to obtain an accurate valuation is not in itself the determining factor, for the valuation may have ignored relevant factors or taken into account factors that should not have been considered or may simply have been based on a mistaken view as to the attributes of what was being sold.[92]

Even where there is no mistake as to the quality of the subject matter, there may be significant differences among competent experts as to an asset's value. In such a case, the court has to weigh the expert testimony and do the best it can to determine the appropriate figure or alternatively the appropriate range of figures within which the value must lie. In the former case, the transaction will be a sale at an undervalue if at a price significantly below the amount so determined, even if that price was supported by one of the valuers; in the latter case, the transaction should be upheld if the price falls anywhere within the range selected,[93] but if

[90] *Brewin Dolphin*, cited above n.64, *per* Lord Scott at [30].
[91] *Re Brabon, Treharne v Brabon* [2001] B.C.L.C. 11, *per* Jonathan Parker L.J. at 38.
[92] *Re Brabon, Treharne v Brabon*, cited above n.91, at 38–41.
[93] *Ramlort Ltd v Reid* [2004] B.P.I.R. 985; and *Ailyan v Smith* [2010] EWHC 24 (Ch). See below, para.13–32.

significantly below the lowest figure of that range, it should be held a transaction at an undervalue.

*(2) From whose viewpoint?*

**13–27** The question to be determined in each case is whether the value of the consideration given by the company significantly exceeds the value received by the company. This has to be assessed from the viewpoint of the company, not the other party.[94] So while an asset of the company may be disposed of for full value, the sale may nevertheless be a transaction at an undervalue if its effect is to reduce the value of the remaining assets held by the company and this effect was part of the bargain. In other words, the consideration provided by the company is considered to include any bargained-for detriment it suffers to its remaining assets or business, for example, because of a "ransom" power it confers on the other party.[95] Conversely, the fact that an asset has a special value to the purchaser—for example, for where it is a painting which completes his collection—is to be ignored in determining whether the company has parted with it at an undervalue; what has to be compared (leaving aside questions of detriment) is the consideration received by the company and the market value of the asset rather than its ransom value.

*(3) Values to be based on the totality of the transaction*

**13–28** In valuing the consideration on either side for the purpose of determining whether there is a significant inequality of exchange—for which purpose both values must be measurable in money or money's worth[96]—it is necessary to look at the whole of the transaction and the totality of the benefits the party dealing with the company will receive, not merely the market value in isolation from other factors. This is well illustrated by the decision of the Court of Appeal in *Agricultural Mortgage Corp Plc v Woodward*[97]:

> The first defendant had borrowed money from the plaintiff and given in security a charge by way of legal mortgage of his farm. Shortly before expiry of the deadline set by the plaintiff for payment of arrears outstanding under the mortgage the first defendant granted the second defendant

[94] *Re M.C. Bacon Ltd (No.2)* [1990] B.C.L.C. 324, *per* Millett J. at 340.

[95] *Agricultural Mortgage Corp Plc v Woodward* [1994] B.C.C. 688. But not, it is thought, unbargained-for detriment.

[96] *Re M.C. Bacon*, cited above n.94.

[97] Cited above n.95. The case involved s.423 of the Insolvency Act 1986 (transactions defrauding creditors), not s.238 but s.423 imports the requirement of s.238 that the transaction be at an undervalue.

the making of an order in their favour, which is entirely within the court's discretion.

One difficult question remains. In the case of a creditor or surety not connected with the company, a preference is voidable only if the onset of insolvency occurs within six months; in the case of a creditor or surety connected with the company, it is two years. Now suppose that a payment is made to the creditor nine months before the onset of insolvency and the creditor is not connected with the company, whereas the surety is a director. If the decision to pay the creditor was influenced by a desire to prefer the surety, can an order be made against the creditor under s.241(1)(d) when he himself would no longer be susceptible to a claim as a preferred party? It is thought that the answer is no[262] and that the appropriate order is one for payment direct against the surety, who on making the payment will be entitled to prove for its amount as creditor in the winding up.

**Relationship between transactions at an undervalue and preferences**

**13–107** As stated earlier,[263] there can be no overlap in the impact of the statutory provisions relating to transactions at an undervalue and those concerning preferences. That is to say, it is not possible for the same part of a payment to fall simultaneously within s.238 and s.239. It may be helpful to identify more precisely the relationship between the two sets of provisions.

(1) A key distinction is that the provisions relating to transactions at an undervalue are aimed at payments, transfers or other acts which diminish the company's assets, whereas the provisions relating to preferences are concerned with transactions that unfairly favour one creditor at the expense of the others, whether or not they diminish the company's assets. For example, payment of a debt which does not exceed the amount due is not a transaction at an undervalue, as the net asset position is unchanged, whilst to the extent that the payment exceeds what is due to the creditor, he does not receive it *qua* creditor and his liability, if any, arises under s.238, not s.239. This was the position in *Re HHO Licensing Ltd*[264] where the company paid an amount for services substantially in excess of their value. To the extent of the value of the services the payment was a preference under s.239, to the extent of the excess it was a transaction at an undervalue under s.238. We have already seen that where the company gives security for a previously

[262] *Contra* Prentice, "Some Observations on the Law Relating to Preferences" in Cranston (ed.), *Making Commercial Law*, 1997, pp.458–459.
[263] Above, para.13–12.
[264] [2008] 1 B.C.L.C. 223.

unsecured loan, there is no diminution in the company's net asset value, only a possible preference of one creditor at the expense of the others. This is because any realisation of the security by the creditor *pro tanto* reduces the company's indebtedness.[265]

(2) The provisions relating to transactions at an undervalue are concerned with the existence of a significant imbalance between a payment, transfer or other act and the consideration for which it is made or done. If the bargain is fair, the provisions do not apply. By contrast, the preference provisions are concerned not with the fairness of the original bargain but with the improvement of the creditor's position relative to other creditors on a winding up notionally occurring immediately after the payment, transfer, etc. in question. So payment by an insolvent company of one creditor but not the others gives rise to a preference.

(3) The rules as to preference are confined to payments, transfers, etc. in favour of an existing creditor, and thus do not apply to gifts, whereas the rules as to transactions at an undervalue are aimed exclusively at transfers involving a gift element.

(4) The two sets of statutory provisions have two characteristics in common. First, both transactions at an undervalue and preferences are determined without reference to the bona fides of the payee or transferee. Secondly, both sets of provisions embody a subjective element in that the company's good faith is an ingredient of the defence to a claim to upset a transaction made at an undervalue, while the avoidance of a preference requires the company to be influenced by a desire to prefer.

(5) For policy reasons which remain unclear, the backward reach of the provisions relating to transactions at an undervalue is two years in all cases, whereas for preferences the normal period is six months and the two-year period is confined to preferences in favour of a person connected with the company otherwise than solely as its employee.

## 8. EXTORTIONATE CREDIT TRANSACTIONS

### Re-opening of extortionate credit transactions

**13–108** Under s.244 of the Insolvency Act 1986, the court may set aside or vary a transaction for, or involving, the provision of credit to the company where the following conditions are satisfied:

[265] See above, para.13–38.

TAB 109

Halsbury's Laws of England, Vol 11 (5th ed, 2015) at §§ 30, 37

Halsbury's Laws of England/CIVIL PROCEDURE (VOLUME 11 (2015), PARAS 1-503; VOLUME 12 (2015), PARAS 504-1218); VOLUME 12A (2015), PARAS 1219-1775)/1. CIVIL PROCEDURAL LAW: SOURCES AND FRAMEWORK/(5) JUDICIAL DECISIONS AS AUTHORITIES/30. Court of Appeal decisions.

**30. Court of Appeal decisions.**

The decisions of the Court of Appeal[1] upon questions of law must be followed by Divisional Courts[2] and courts of first instance[3], and, as a general rule, are binding on the Court of Appeal[4] until a contrary determination has been arrived at by the Supreme Court[5]. There are, however, three exceptions to this rule[6]; thus:

(1) the Court of Appeal is entitled and bound to decide which of two conflicting decisions of its own it will follow[7];
(2) it is bound to refuse to follow a decision of its own which, although not expressly overruled, cannot, in its opinion, stand with a decision of the Supreme Court[8]; and further is not bound by one of its decisions if the Supreme Court has decided the case on different grounds, ruling that the issue decided by the Court of Appeal did not arise for decision[9]; and
(3) the Court of Appeal is not bound to follow a decision of its own if given *per incuriam*[10].

Unlike the Supreme Court, the Court of Appeal does not have liberty to review its own earlier decisions[11].

A decision is given *per incuriam* when the court has acted in ignorance of a previous decision of its own or of a court of co-ordinate jurisdiction which covered the case before it, in which case it must decide which case to follow[12]; or when it has acted in ignorance of a Supreme Court decision, in which case it must follow that decision[13]; or when the decision is given in ignorance of the terms of a statute or rule having statutory force14, or when, in rare and exceptional cases, it is satisfied that the earlier decision involved a manifest slip or error[15] and there is no real prospect of a further appeal to the Supreme Court[16]. A decision should not be treated as given *per incuriam*, however, simply because of a deficiency of parties[17], or because the court had not the benefit of the best argument[18], and, as a general rule, the only cases in which decisions should be held to be given *per incuriam* are those given in ignorance of some inconsistent statute or binding authority[19]. Even if a decision of the Court of Appeal has misinterpreted a previous decision of the Supreme Court, the Court of Appeal must follow its previous decision and leave the Supreme Court to rectify the mistake[20].

A decision of the Court of Appeal occasioned by the members of the court being equally divided is not binding on the Court of Appeal[21], as there is no common law or statutory rule to oblige a court to bow to its own decisions, and a court only does so on grounds of judicial comity, which does not exist where a court is equally divided[22]. It is undesirable that different divisions of the Court of Appeal should say different things in relation to the same matter[23].

A full Court of Appeal has no greater powers than a division of the court and, except in the cases mentioned above, has no power to overrule a previous decision of a division of the court[24]. Where, however, there is an apparent conflict between two previous decisions of the court, it is not uncommon for the matter to be argued before a full court as the decision of such a court carries greater weight[25].

In its criminal jurisdiction, the Court of Appeal applies the same principles as on the civil side, but recognises that there are exceptions[26]:

(a) where the applicant is in prison and in the full court's opinion wrongly so[27];

(b) where the court thinks that the law was misunderstood or misapplied[28]; and
(c) where the full court is carrying out its duty to lay down principles and guidelines in relation to sentencing[29].

The full Court of Appeal is not precluded by its own rule of *stare decisis* in respect of final orders from overriding an interlocutory order of two lords justices which the court considers to be wrong[30], but decisions of a two judge court now have the same authority as a three judge court[31].

As a general rule, the Court of Appeal in Northern Ireland follows decisions of the Court of Appeal in England on the construction of a statute[32].

Where an asylum applicant's counsel conceded, on the basis of a Court of Appeal decision in an unconnected case, that the applicant could not show that she had suffered persecution within the purposes of the Convention and Protocol relating to the Status of Refugees, and the Supreme Court subsequently reverses the Court of Appeal decision on which counsel had based the concession, the Court of Appeal subsequently held that she should not be bound by counsel's concession[33].

1 For present purposes the Court of Appeal may be considered as co-ordinate with the former Court of Appeal in Chancery (*Re South Durham Iron Co, Smith's Case* (1879) 11 ChD 579, CA; *Mills v Jennings* (1880) 13 ChD 639, CA), the Lords Justices (*Pledge v Carr* [1895] 1 Ch 51, CA), and the Court of Exchequer (where its decision is treated as good law by the Court of Appeal in Chancery) (*Hanau v Ehrlich* [1911] 2 KB 1056, CA; on appeal [1912] AC 39, HL). A decision of the Exchequer Chamber binds the Court of Appeal: *Maine and New Brunswick Electrical Power Co v Hart* [1929] AC 631, PC. It seems that a decision of the Lord Chancellor sitting alone did not bind the Court of Appeal: see *Wheeldon v Burrows* (1879) 12 ChD 31, CA; *Ashworth v Munn* (1880) 15 ChD 363, CA; *Re Watts, Cornford v Elliott* (1885) 29 ChD 947, CA; but see *Gard v City of London Sewers Comrs* (1885) 28 ChD 486, CA; *Gibson v Fisher* (1867) LR 5 Eq 51; *Re Lloyd, Lloyd v Lloyd* [1903] 1 Ch 385, CA. The former Court of Criminal Appeal and Court for Crown Cases Reserved are also co-ordinate: cf note 2. As to the Civil Division of the Court of Appeal see **COURTS AND TRIBUNALS** vol 24 (2010) PARA 689; and as to the Criminal Division see **COURTS AND TRIBUNALS** vol 24 (2010) PARA 690.

2 *R v Northumberland Compensation Appeal Tribunal, ex p Shaw* [1951] 1 KB 711, [1951] 1 All ER 268, DC (where, however, the court did not apply a Court of Appeal decision which was inconsistent with earlier Supreme Court decisions which had not been cited to the Court of Appeal); *Read v Joannon* (1890) 25 QBD 300. In a criminal matter, a Divisional Court is bound by a decision of the former Court of Criminal Appeal (*Russell v Smith* [1958] 1 QB 27, [1957] 2 All ER 796, DC, per Lord Goddard CJ) or of the former Court for Crown Cases Reserved (*Ruse v Read* [1949] 1 KB 377, [1949] 1 All ER 398, DC). The Court for Crown Cases Reserved was succeeded by the Court of Criminal Appeal, which was in turn succeeded by the Court of Appeal (Criminal Division). The Supreme Court of the United Kingdom exercises the appellate jurisdiction that was removed from the House of Lords with effect from 1 October 2009: see **COURTS AND TRIBUNALS** vol 24 (2010) PARA 640 et seq.

3 *Trimble v Hill* (1879) 5 App Cas 342, PC; *Carnell v Harrison* [1916] 1 Ch 328 (affd on another point: [1916] 1 Ch 328 at 336, CA); *Consett Industrial and Provident Society v Consett Iron Co* [1922] 2 Ch 135, CA; *Huddersfield Police Authority v Watson* [1947] KB 842, [1947] 2 All ER 193, DC. Where a colonial statute is in the same terms as an English statute, a court of a dominion or colony should follow a Court of Appeal decision on the construction of the English statute: *Trimble v Hill* (1879) 5 App Cas 342, PC; *Nadarajan Chettiar v Walauwa Mahatmee* [1950] AC 481, PC. But where an appellate court in a dominion or colony regulated by English law differs from the Court of Appeal, it is not right to assume that the former court is wrong: *Robins v National Trust Co* [1927] AC 515, PC. It is the practice of the Australian courts to follow Court of Appeal decisions on questions of law and equity common to both countries, but those decisions do not bind the Privy Council: *New South Wales Stamp Duties Comr v Pearse* [1954] AC 91, [1954] 1 All ER 19, PC.

A judge of first instance should not say that a recent Court of Appeal decision was wrong: *Lane v Willis* [1972] 1 All ER 430, [1972] 1 WLR 326, CA. As to the discretion of a judge of first instance to adjourn a case pending the hearing of an appeal from a relevant Court of Appeal decision which binds him see *Re Yates' Settlement Trusts, Yates v Paterson* [1954] 1 All ER 619, [1954] 1 WLR 564, CA. A judge at first instance is bound by *ex parte* (without notice) decisions of the Court of Appeal: see *Amanuel v Alexandros Shipping Co, The Alexandros P* [1986] QB 464, [1986] 1 All ER 278.

4 *Re South Durham Iron Co, Smith's Case* (1879) 11 ChD 579, CA; *The Vera Cruz (No 2)* (1884) 9 PD 96, CA (affd sub nom *Seward v The Vera Cruz* 10 App Cas 59, HL); *Velazquez Ltd v IRC* [1914] 3 KB 458, CA; *Speyer Bros v Rodriguez* (1917) 87 LJKB 171, CA (affd sub nom *Rodriguez v Speyer Bros* [1919] AC 59, HL); *Consett Industrial and Provident Society v Consett Iron Co* [1922] 2 Ch 135, CA; *Wheeler v Wirrall Estates Ltd* [1935] 1 KB 294, CA; *Marshall v Lindsey County Council* [1935] 1 KB 516, CA; and see *Hughes v Oxenham* [1913] 1 Ch 254, CA; *Birchal v Birch, Crisp & Co* [1913] 2 Ch 375, CA; *Miliangos v George Frank (Textiles) Ltd* [1975] QB 487, [1975] 1 All ER 1076, CA; affd [1976] AC 443, [1975] 3 All ER 801, HL; *Gallie v Lee* [1969] 2 Ch 17, [1969] 1 All ER 1062, CA; *Barrington v Lee* [1972] 1 QB 326, [1971] 3 All ER 1231, CA.

5 *Trimble v Hill* (1879) 5 App Cas 342, PC; *Consett Industrial and Provident Society v Consett Iron Co* [1922] 2 Ch 135, CA;

*Young v Bristol Aeroplane Co Ltd* [1944] KB 718, [1944] 2 All ER 293, CA (affd [1946] AC 163, [1946] 1 All ER 98, HL). The rule, which applies to a full court of the Court of Appeal as it applies to the Court of Appeal as normally constituted (*Young v Bristol Aeroplane Co Ltd* [1946] AC 163, [1946] 1 All ER 98, HL), was reaffirmed expressly and unequivocally in *Davis v Johnson* [1979] AC 264, [1978] 1 All ER 1132, HL. The rule applies also to a Divisional Court (*Huddersfield Police Authority v Watson* [1947] KB 842, [1947] 2 All ER 193, DC; *Melias Ltd v Preston* [1957] 2 QB 380, [1957] 2 All ER 449, DC) and to a judge of first instance (*Armstrong v Strain* [1951] 1 TLR 856). See also *Condé Nast Publications Ltd v Customs and Excise Comrs* [2006] EWCA Civ 976, [2007] 2 CMLR 904.

So that a decision may be treated as overruled, one must find either a decision of a superior court inconsistent with that arrived at in the case in question, or an expression of opinion on the part of the court as a whole that the case was wrongly decided on its own facts, and not merely that it ought not to be treated as an authority in a case arising out of different facts: *Consett Industrial and Provident Society v Consett Iron Co* [1922] 2 Ch 135, CA. See also *A-G of St Christopher, Nevis and Anguilla v Reynolds* [1980] AC 637, [1979] 3 All ER 129, PC.

6    *Young v Bristol Aeroplane Co Ltd* [1944] KB 718, [1944] 2 All ER 293, CA (where the exceptions are set out); affd [1946] AC 163, [1946] 1 All ER 98, HL. These are the only exceptions: *Davis v Johnson* [1979] AC 264, [1978] 1 All ER 1132, HL. This must be taken as nullifying earlier attempts to spell out further exceptions, eg in *Worcester Works Finance Ltd v Cooden Engineering Co Ltd* [1972] 1 QB 210, [1971] 3 All ER 708, CA (liberty to depart from earlier decision which had been disapproved by the Privy Council).

7    *Ross Smith v Ross Smith* [1961] P 39, [1961] 1 All ER 255, CA (revsd on another ground: [1963] AC 280, [1962] 1 All ER 344, HL); *Tiverton Estates Ltd v Wearwell Ltd* [1975] Ch 146, [1974] 1 All ER 209, CA. See also *Craddock v Hampshire County Council* [1958] 1 All ER 449, [1958] 1 WLR 202, CA (where the court felt bound to accept the interpretation put on one of its decisions by another of its decisions); *W and JB Eastwood Ltd v Herrod (Valuation Officer)* [1968] 2 QB 923 at 934, [1968] 3 All ER 389 at 393, CA (where Lord Denning MR said that such a choice was to be preferred to the endless task of distinguishing the indistinguishable and reconciling the irreconcilable) (affd [1971] AC 160, [1970] 1 All ER 774, HL); *Cathrineholm A/S v Norequipment Trading Ltd* [1972] 2 QB 314, [1972] 2 All ER 538, CA (where the preferred decision had not yet been reported).

8    It seems that this exception refers to a House of Lords (now the Supreme Court: see note 2) decision which is subsequent to the Court of Appeal decision, as in *Fitzsimmons v Ford Motor Co Ltd (Aero Engines)* [1946] 1 All ER 429, CA; *Wilson v Chatterton* [1946] KB 360, [1946] 1 All ER 431, CA; *Re Lambton's Marriage Settlement, May v IRC* [1952] Ch 752, [1952] 2 All ER 201, CA; *A and J Mucklow Ltd v IRC* [1954] Ch 615, [1954] 2 All ER 508, CA; *Browning v War Office* [1963] 1 QB 750, [1962] 3 All ER 1089, CA. In *Williams v Glasbrook Bros Ltd* [1947] 2 All ER 884 at 885, CA, where the exception is referred to, the word 'subsequent' is used. An earlier House of Lords (now the Supreme Court) decision inconsistent with a later Court of Appeal decision, and not cited to the Court of Appeal, will render the Court of Appeal decision of no value as given *per incuriam*. But if the earlier House of Lords (now the Supreme Court) decision was cited to the Court of Appeal and expressly or impliedly distinguished by that court, a problem of some difficulty arises: see *Noble v Southern Rly Co* [1940] AC 583 at 598, [1940] 2 All ER 383 at 392, HL, where Lord Wright inclined to the view that the law laid down by the House of Lords (now the Supreme Court) should be followed.

9    *Al-Mehdawi v Secretary of State for the Home Department* [1990] 1 AC 876, sub nom *R v Secretary of State for the Home Department, ex p Al-Mehdawi* [1989] 1 All ER 777, CA; revsd on other grounds [1990] 1 AC 876, [1989] 3 All ER 843, HL.

10    See eg *Industrial Properties (Barton Hill) Ltd v Associated Electrical Industries Ltd* [1977] QB 580, [1977] 2 All ER 293, CA. The *per incuriam* rule does not only apply to Court of Appeal decisions; but it does not apply to a decision of an appellate court superior to that in which the rule is sought to be invoked: *Cassell & Co Ltd v Broome* [1972] AC 1027, [1972] 1 All ER 801, HL; *Baker v R* [1975] AC 774, [1975] 3 All ER 55, PC.

11    *Practice Note (Judicial Precedent)* [1966] 3 All ER 77, sub nom *Practice Statement* [1966] 1 WLR 1234, HL; *Davis v Johnson* [1979] AC 264, [1978] 1 All ER 1132, HL. However, the Court of Appeal is not precluded from referring a question to the European Court of Justice when that question has already been decided by an earlier Court of Appeal decision: *Trent Taverns v Sykes* [1999] NPC 9, (1999) Times, 5 March, CA. As to references to the European Court see PARA 1586 et seq.

Where the *ratio* of an earlier decision of the Court of Appeal is directly applicable to the circumstances of a case before the court but that decision has been wrongly distinguished in a later decision of the court, in principle it must be open to the court to apply the ratio of the earlier decision and to decline to follow the later decision: *Starmark Enterprises Ltd v CPL Distribution Ltd* [2001] EWCA Civ 1252, [2002] Ch 306, [2002] 4 All ER 264.

12    *Young v Bristol Aeroplane Co Ltd* [1944] KB 718, [1944] 2 All ER 293, CA; *R v Northumberland Compensation Appeal Tribunal, ex p Shaw* [1951] 1 KB 711, [1951] 1 All ER 268, DC. In *Farrell v Alexander* [1976] QB 345 at 369, [1976] 1 All ER 129 at 145, CA, Scarman LJ translated '*per incuriam*' as 'Homer nodded'. In *Huddersfield Police Authority v Watson* [1947] KB 842, [1947] 2 All ER 193, DC, Lord Goddard CJ said that a decision was given *per incuriam* when a case or statute had not been brought to the court's attention and the court gave the decision in ignorance or forgetfulness of the existence of the case or statute. However, a decision given in ignorance of an EU directive was not *per incuriam*: *Duke v Reliance Systems Ltd* [1988] QB 108, [1987] 2 All ER 858, CA; affd on different grounds on appeal sub nom *Duke v GEC Reliance Ltd* [1988] AC 618, [1988] 1 All ER 626, HL. See also *Williams v Fawcett* [1986] QB 604, [1985] 1 All ER 787, CA.

13    See note 12.

14    *Young v Bristol Aeroplane Co Ltd* [1944] KB 718, [1944] 2 All ER 293, CA. See also *Lancaster Motor Co (London) Ltd v Bremith Ltd* [1941] 1 KB 675, [1941] 2 All ER 11, CA; *A and J Mucklow Ltd v IRC* [1954] Ch 615, [1954] 2 All ER 508, CA; *Willis*

*v Association of Universities of the British Commonwealth (No 2)* [1965] 2 All ER 393, [1965] 1 WLR 836, CA; *Farrell v Alexander* [1976] QB 345, [1976] 1 All ER 129 (affd [1978] AC 59, [1976] 2 All ER 721, HL). For a Divisional Court decision disregarded by that court as being *per incuriam* see *Nicholas v Penny* [1950] 2 KB 466, sub nom *Penny v Nicholas* [1950] 2 All ER 89, DC.

15    *Williams v Fawcett* [1986] QB 604, [1985] 1 All ER 787, CA; *Rickards v Rickards* [1990] Fam 194 [1989] 3 All ER 193, CA.

16    *Rakhit v Carty* [1990] 2 QB 315, [1990] 2 All ER 202, CA; *Rickards v Rickards* [1990] Fam 194, [1989] 3 All ER 193, CA.

17    *Morelle Ltd v Wakeling* [1955] 2 QB 379, [1955] 1 All ER 708, CA.

18    *Bryers v Canadian Pacific Steamships Ltd* [1957] 1 QB 134, [1956] 3 All ER 560, CA, per Singleton LJ (affd sub nom *Canadian Pacific Steamships Ltd v Bryers* [1958] AC 485, [1957] 3 All ER 572, HL); *Critchell v Lambeth Borough Council* [1957] 2 QB 535, [1957] 2 All ER 108, CA.

19    *A and J Mucklow Ltd v IRC* [1954] Ch 615, [1954] 2 All ER 508, CA; *Morelle Ltd v Wakeling* [1955] 2 QB 379, [1955] 1 All ER 708, CA. See also *Bonsor v Musicians' Union* [1954] Ch 479, [1954] 1 All ER 822, CA, where the *per incuriam* contention was rejected and, on appeal to the House of Lords (now the Supreme Court: see note 2), although the House overruled the case which bound the Court of Appeal, the House agreed that that court had been bound by it: see [1956] AC 104, [1955] 3 All ER 518, HL.

20    *Williams v Glasbrook Bros Ltd* [1947] 2 All ER 884, CA.

21    *The Vera Cruz (No 2)* (1884) 9 PD 96, CA (affd sub nom *Seward v The Vera Cruz* (1884) 10 App Cas 59, HL); *Hobson v Sir WC Leng & Co* [1914] 3 KB 1245, CA. In *Hart v Riversdale Mill Co* [1928] 1 KB 176 at 189, CA, Scrutton LJ expressed the view that the Court of Appeal is bound by a decision of the Exchequer Chamber occasioned by the judges of that court being equally divided; but see *Smith v Lambeth Assessment Committee* (1882) 10 QBD 327, CA, and *The Vera Cruz (No 2)* (1884) 9 PD 96, CA, if, as suggested in *Hanau v Ehrlich* [1911] 2 KB 1056, CA, an Exchequer Chamber decision is to be regarded as equivalent to a Court of Appeal decision. See note 1; and PARA 32.

22    *The Vera Cruz (No 2)* (1884) 9 PD 96, CA; affd sub nom *Seward v The Vera Cruz* (1884) 10 App Cas 59, HL.

23    *Harnett v Harnett* [1974] 1 All ER 764, [1974] 1 WLR 219, CA; *R v Charles* [1976] 1 All ER 659, [1976] 1 WLR 248, CA (affd sub nom *Metropolitan Police Comr v Charles* [1977] AC 177, [1976] 3 All ER 112, HL).

24    *Young v Bristol Aeroplane Co Ltd* [1944] KB 718, [1944] 2 All ER 293, CA, where the previous cases, including some *dicta* to the contrary, are reviewed. See also that case on appeal [1946] AC 163, [1946] 1 All ER 98, HL; and *Glaskie v Watkins* as reported in (1927) 137 LT 132, CA. See also *Langley v North West Water Authority* [1991] 3 All ER 610, [1991] 1 WLR 697, CA; following *Williams v Fawcett* [1986] QB 604, [1985] 1 All ER 787, CA.

25    *Young v Bristol Aeroplane Co Ltd* [1944] KB 718, [1944] 2 All ER 293, CA.

26    It is not clear whether the emphatic reaffirmation of the strictures of *Young v Bristol Aeroplane Co Ltd* [1944] KB 718, [1944] 2 All ER 293, CA, in *Davis v Johnson* [1979] AC 264, [1978] 1 All ER 1132, HL (a civil case), extends to the Criminal Division of the Court of Appeal, but it is suggested that, subject to these three exceptions, it does. The first judgment in *Davis v Johnson* [1979] AC 264, [1978] 1 All ER 1132, HL, was given by Lord Diplock who, as Diplock LJ in *R v Gould* [1968] 2 QB 65, [1968] 1 All ER 849, CA, spelt out the exception summarised in head (b) in the text, and specifically accepted that it did not fall within any of the exceptions laid down in *Young v Bristol Aeroplane Co Ltd* [1944] KB 718, [1944] 2 All ER 293, CA. See also *R v Charles* [1976] 1 All ER 659, [1976] 1 WLR 248, CA; affd sub nom *Metropolitan Police Comr v Charles* [1977] AC 177, [1976] 3 All ER 112, HL.

27    *R v Taylor* [1950] 2 KB 368, [1950] 2 All ER 170, CCA; *R v Spencer, R v Smails* [1985] QB 771, [1985] 1 All ER 673, CA (affd on appeal [1987] AC 128, [1986] 2 All ER 928, HL). See also *R v Jenkins* [1983] 1 All ER 1000, CA.

28    *R v Gould* [1968] 2 QB 65, [1968] 1 All ER 849, CA. This power to depart from previous decisions is restricted to cases where such departure is in favour of the accused: *DPP v Merriman* [1973] AC 584, [1972] 3 All ER 42, HL.

29    *R v Newsome* [1970] 2 QB 711, [1970] 3 All ER 455, CA.

30    *Boys v Chaplin* [1968] 2 QB 1, [1968] 1 All ER 283, CA; affd on other grounds sub nom *Chaplin v Boys* [1971] AC 356, [1969] 2 All ER 1085, HL. But see *Langley v North West Water* [1991] 3 All ER 610, [1991] 1 WLR 697, CA, explaining and emphasising that the earlier decisions related to appeals in interlocutory proceedings.

31    *Langley v North West Water Authority* [1991] 3 All ER 610, [1991] 1 WLR 697, CA.

32    *McGuigan v Pollock* [1955] NI 74, NI CA; and see the discussion in *Beaufort Developments (NI) Ltd v Gilbert-Ash (NI) Ltd* [1997] NI 142 at 153, NI CA; cf, however, *R v McCandless* [2001] NI 86, NI CA.

33    *R (on the application of Ivanvskiene) v Special Adjudicator* [2001] EWCA Civ 1271, [2001] All ER (D) 456 (Jul).

Halsbury's Laws of England/CIVIL PROCEDURE (VOLUME 11 (2015), PARAS 1-503; VOLUME 12 (2015), PARAS 504-1218); VOLUME 12A (2015), PARAS 1219-1775)/1. CIVIL PROCEDURAL LAW: SOURCES AND FRAMEWORK/(5) JUDICIAL DECISIONS AS AUTHORITIES/37. Privy Council decisions.

**37. Privy Council decisions.**

As a general rule, the decisions of the Judicial Committee of the Privy Council[1] are not binding on English courts[2], but are treated as being of great weight and are commonly followed[3] in similar cases[4]. The Privy Council does not act on the rule that it is bound by its own previous decisions, but it will only differ with the greatest hesitation[5]. Where the *rationes decidendi* of two Privy Council decisions conflict with one another and the later does not purport to overrule the earlier, the domestic court may choose which *ratio decidendi* it will follow[6].

1 As to the Judicial Committee of the Privy Council see **CONSTITUTIONAL AND ADMINISTRATIVE LAW** vol 20 (2014) PARA 147.

2 *London Joint Stock Bank v Macmillan and Arthur* [1918] AC 777, HL; *Service v Sundell* (1929) 99 LJKB 55, CA. This rule has been applied in the Court of Appeal in *Leask v Scott* (1877) 2 QBD 376, CA; *The City of Chester* (1884) 9 PD 182, CA; *Greenlands Ltd v Wilmshurst and London Association for Protection of Trade* [1913] 3 KB 507, CA; (revsd on another point sub nom *London Association for Protection of Trade v Greenlands Ltd* [1916] 2 AC 15, HL, where, however, Earl Loreburn said at 28 that a Privy Council decision 'is of equal authority with our own'); *Stephenson v Thompson* [1924] 2 KB 240, CA; *Fanton v Denville* [1932] 2 KB 309, CA; and in the High Court in *Ranelagh v Ranelagh* (1893) 41 WR 549; *Dulieu v White & Sons* [1901] 2 KB 669; *Gore-Booth v Bishop of Manchester* [1920] 2 KB 412; *Diamond Alkali Export Corpn v Bourgeois* [1921] 3 KB 443; *Venn v Todesco* [1926] 2 KB 227; *Lynn v Bamber* [1930] 2 KB 72; *Low v Fry* (1935) 152 LT 585; *Re Vitamins Ltd's Application* [1955] 3 All ER 827, [1956] 1 WLR 1; *Smith v Leech Brain & Co Ltd* [1962] 2 QB 405, [1961] 3 All ER 1159; *Doughty v Turner Manufacturing Co Ltd* [1964] 1 QB 518, [1964] 1 All ER 98, CA; *Worcester Works Finance Ltd v Cooden Engineering Co Ltd* [1972] 1 QB 210, [1971] 3 All ER 708, CA.

Where, however, the Privy Council exercises jurisdiction as an English appellate court, eg in ecclesiastical or prize matters, its decisions are binding on courts of first instance: see eg *Combe v Edwards* (1877) 2 PD 354. As to precedent in ecclesiastical courts see **ECCLESIASTICAL LAW** vol 34 (2011) PARA 1032.

3 Cf *Port Line Ltd v Ben Line Steamers Ltd* [1958] 2 QB 146, [1958] 1 All ER 787, where Diplock J declined to follow *Lord Strathcona Steamship Co Ltd v Dominion Coal Co Ltd* [1926] AC 108, PC, on the ground that it was wrongly decided.

4 See the decisions cited in note 2. A decision of the Privy Council, when it is the highest court of appeal (ie from certain courts of member states of the Commonwealth, and from courts of British overseas territories), is binding on all such courts (*Robins v National Trust Co* [1927] AC 515, PC), even though the decision can no longer be regarded as a guiding authority in England, Scotland or Ireland (*Stevenson v Bagham* [1922] NZLR 225; *Hogan v City of Regina* [1924] 2 WWR 307; *Penman v Winnipeg Electric Rly Co* [1925] 1 WWR 156; *Johnson v Commonwealth* (1927) 27 SRNSW 133), unless the decision is on a subject governed by English law and there is a subsequent decision of the supreme tribunal to settle English law (ie the Supreme Court: see PARA 29), which differs from the Privy Council and points out in express terms in what respect the Privy Council erred; in such circumstances it is the duty of courts overseas to apply the law as settled by the Supreme Court (*Will v Bank of Montreal* [1931] 2 WWR 364). The view was expressed in *Negro v Pietro's Bread Co Ltd* [1933] OR 112 that a Privy Council decision is binding only on the courts from which the appeal is taken, but this view is contrary to the opinion expressed in *Fatuma Binti Mohamed Bin Salim Bakhshuwen v Mohamed Bin Salim Bakhshuwen* [1952] AC 1, PC. In *Australian Consolidated Press Ltd v Uren* [1969] 1 AC 590, [1967] 3 All ER 523, PC, the Privy Council held that the decision in *Rookes v Barnard* [1964] AC 1129, [1964] 1 All ER 367, HL, was not binding on the High Court of Australia, since before that decision it had been settled law in Australia that the award of exemplary damages in libel cases was not so circumscribed as to be permissible only within the limits of the categories defined in *Rookes v Barnard* (see **DAMAGES** vol 29 (2014) PARA 325 et seq). In exceptional circumstances, a Privy Council decision may be regarded as displacing an earlier decision of the Supreme Court on the same issue: *R v James, R v Karimi* [2006] EWCA Crim 14, [2006] QB 588, [2006] 1 All ER 759 (composition of Privy Council and belief that it was making definitive statement on the issue demonstrated inferior courts were to follow that ruling in future). The Supreme Court of the United Kingdom exercises the appellate jurisdiction that was removed from the House of Lords with effect from 1 October 2009: see **COURTS AND TRIBUNALS** vol 24 (2010) PARA 640 et seq.

5 *Gideon Nkambule v R* [1950] AC 379, PC; *Cushing v Dupuy* (1880) 5 App Cas 409, PC; *Read v Bishop of Lincoln* [1892] AC 644, PC; *A-G for Ontario v Canada Temperance Federation* [1946] AC 193, PC. See also *Gore-Booth v Bishop of Manchester* [1920] 2 KB 412, CA; *Will v Bank of Montreal* [1931] 2 WWR 364.

6 *Baker v R* [1975] AC 774, [1975] 3 All ER 55, PC. In *Hughes & Vale Pty Ltd v State of New South Wales* [1955] AC 241,

[1954] 3 All ER 607, PC, the Privy Council declined to follow an overseas decision of long standing. As to the *ratio decidendi* see PARA 25.

**UPDATE**

**37  Privy Council decisions**

NOTE 4--The Supreme Court has considered the binding nature of decisions of the Privy Council on the courts of England and Wales and set out the procedure to be followed where the *Judicial Committee of the Privy Council Practice Direction* (see **COURTS AND TRIBUNALS** vol 24 (2010) PARA 673 et seq) applies: *Willers v Joyce (No 2)* [2016] UKSC 44, [2016] 3 WLR 534, [2016] All ER (D) 98 (Jul) (discussed in A Firm Foundation? 167 NLJ 7709, p 16: Stuart Pickford and Vivien Yip).

TAB 110

*Jowitt's Dictionary of English Law* (4th ed, 2015): "transaction"

# Jowitt's Dictionary of English Law

## Volume 2: J–Z

Fourth Edition

**Daniel Greenberg**
*Editor*
Barrister; Parliamentary Counsel, Berwin Leighton Paisner LLP; Legal Adviser, Office of Speaker's Counsel, House of Commons

**Klara Banaszak**
*Deputy Editor*

**Yisroel Greenberg**
*Assistant Editor*

SWEET & MAXWELL

THOMSON REUTERS

**Training, Military.** Unauthorised military training is illegal, by the Unlawful Drilling Act 1819. See Sedition. As to compulsory military training, see National Service.

**Training Services Agency.** See the Employment and Training Act 1973 s.1; Social Security Act 1973 Sch.28; Health and Safety at Work etc. Act 1974 Sch.10. The body was abolished by the Employment and Training Act 1981 s.9.

**Traitor** (Lat. *traditor*). One who, being trusted, betrays; one guilty of treason. See Treason.

**Traitor's gate.** The river gate of the Tower of London by which traitors, and State prisoners generally, were committed to the Tower.

**Tramps.** See Casual pauper; Vagabonds.

**Tramways.** Rails for conveyance of traffic along a road not owned, as a railway is, by those who lay down the rails and convey the traffic, the rails being level with the surface of the ground, which is, or may be, laid along a public road so that the space occupied by the line is available for ordinary wheeled traffic as well as for tramway cars. A tramway is constructed under a provisional order made pursuant to the Tramways Act 1870, or under a private Act of Parliament, unless it is such a tramway as comes within the meaning of the term "light railway" (*q.v.*). A local authority may purchase a tramway within six months after the expiration of 21 years from the time of authorisation of construction, or within six months after the expiration of every subsequent period of seven years, under the Tramways Act 1870 s.43, as amended by the Local Government Act 1933 (*London Street Tramways Co. v London CC* [1894] A.C. 489).

**Trani, Laws of.** A code of maritime law which originated in 1063 at the Italian seaport of Trani, situate on the Adriatic about 80 miles north of Brindisi. They are printed, with a translation, in Sir Francis Twiss' edition of the *Black Book of the Admiralty*, vol.4. The full title of the code is the *Ordinamenta et Consuetudo Maris, edita per Consules Civitatis Trani*.

**Transaction.** A very broad term which as used in legislation is capable of including all kinds of legal, commercial and other agreements and other arrangements. For judicial and statutory constructions and definitions in different contexts see *Stroud's Judicial Dictionary*.

**Transaction at an undervalue.** A transaction entered into by a company which has since gone into liquidation or administration or an individual who has since been made bankrupt which was either a gift by the company or the individual or which was entered into on terms which provided that the company or the individual received no consideration or which provided consideration to be received by the company or the individual the value of which in money or money's worth is significantly less than the value in money or money's worth of the consideration provided by the company (Insolvency Act 1986 ss.238, 339). In relation to individuals who have been declared bankrupt a transaction entered into in consideration of marriage or the formation of a civil partnership can also be a transaction at an undervalue (Insolvency Act 1986 s.339). In order for a trustee in bankruptcy, a liquidator or an administrator to be entitled to bring proceedings in relation to a transaction at an undervalue the transaction must have been undertaken at a relevant time (Insolvency Act 1986 ss.240, 341). In relation to a company however the court will not made an order if it is satisfied that the company entered into the transaction in good faith, for the purpose of carrying on its business and at the time it did so there were reasonable grounds for believing the transaction would benefit the company (Insolvency Act 1986 s.238).

**Transcript.** (1) A copy; anything written from an original; an official copy of certain proceedings in a court.

(2) In the Privy Council, when an appeal was brought to the Judicial Committee, the appellant had formerly to see that a transcript of the proceedings and evidence in the court below was prepared and transmitted to the Colonial Office by the proper officer. What was formerly called the transcript is now known as the record, which is transmitted to the Registrar of the Privy Council (see Judicial Committee (Appellate Jurisdiction) Rules Order 2009 (SI 2009/224), Sch., r.20).

See Shorthand-writers.

**Transcripto pedis finis levati mittendo in cancellarium, De.** A writ which was used for certifying to the Court of Chancery the foot (or chirograph) of a fine (*q.v.*) levied before the justices in eyre (Reg.Brev. 169).

**Transcripto recognitionis factae coram justiciariis itinerantibus, De.** A writ which was used for certifying a recognisance taken before the itinerant justices (or justices in eyre) (Reg.Brev. 151).

**Transept.** The part of a church between the nave and the choir. In churches of the Gothic style the ends of the transept project on each side of the edifice. Prima facie the transept belongs to the incumbent and the churchwardens.

**Transfer.** To convey; to make over to another; the document by which property, as shares in a public company, is made over by one person to another.

(1) In the law of property, a transfer is where a right passes from one person to another, either (i) by virtue of an act done by the transferor with that intention, as in the case of a conveyance or assignment by way of sale or gift, etc.; or (ii) by operation of law, as in the case of forfeiture, bankruptcy, descent, or intestacy. A transfer may be absolute or conditional, by way of security, etc. See Assignment; Bill of sale; Conveyance.

(2) "Transfer" is used principally in the sense of voluntary transfer, and is applied especially to the operation of changing the ownership of stock, shares, etc., whether by registering an assignment or other instrument, or by making a simple entry in the register kept for that purpose. The person making the transfer is called the transferor, and the person to whom it is made the transferee.

(3) By the Companies Act 2006 ss.541, 544 and 770 shares or other interests of a member in a company are personal estate transferable in manner provided by the articles of the company, and a transfer of shares or debentures is not to be registered except on production of a proper instrument of transfer (as provided for by the articles). See Share; Stock.

(4) Under the Court Funds Rules 1987 r.15 stocks and other securities may be lodged in court in certain circumstances or pursuant to an order persons pending the proceedings, in order that they may be kept in safety until the time comes for them to be transferred out of court to the parties entitled. Part 30.7 CPR provides for money to be notionally transferred from one court to another where that is more convenient. See Certificate; Payment into court.

(5) The Law of Property Act 1925 s.52 provides that, with certain exceptions, all conveyances of land or of any interest therein are void for the purpose of conveying or creating a legal estate unless made by deed. There are no requirements as to the form of deed required to convey or create an estate in unregistered land provided the

TAB 111

Lewison, *The Interpretation of Contracts* (6th ed, 2015)
at §§ 7.10, 12.19, 14.04

# THE INTERPRETATION OF CONTRACTS

6TH EDITION

SIR KIM LEWISON
*A Lord Justice of Appeal*

SWEET & MAXWELL

THOMSON REUTERS

## 10. PARTY NOT TO TAKE ADVANTAGE OF OWN WRONG

**A contract will be interpreted so far as possible in such a manner as not to permit one party to it to take advantage of his own wrong.[248]**

**7.10** This principle has a long history, and can be traced back to Lord Coke's day.[249] In *Rede v Farr*,[250] a tenant who had failed to pay his rent asserted that by reason of a proviso for re-entry which said that the lease would be void in the event of breach of obligation his lease was at an end. Lord Ellenborough said:

> "In this case, as to this proviso, it would be contrary to an universal principle of law, that a party shall never take advantage of his own wrong, if we were to hold that a lease, which in terms is a lease for twelve years, should be a lease determinable at the will and pleasure of the lessee; and that a lessee by not paying his rent should be at liberty to say that the lease is void."

This formulation suggests that it is a rule of law. However, the decision could be justified on the basis that the court was construing the word "void" in the proviso for re-entry as meaning "voidable". In *New Zealand Shipping Co v Societe des Ateliers et Chantiers de France*,[251] Lord Atkinson seems to have treated it as a matter of construction. He said:

> "It is undoubtedly competent for the two parties to a contract to stipulate by a clause that the contract shall be void upon the happening of an event over which neither of the parties shall have any control, cannot bring about, prevent or retard. ... But if the stipulation be that the contract shall be void on the happening of an event which one or other of them can by his own act or omission bring about, then the party, who by his act or omission brings that event about, cannot be permitted either to insist upon the stipulation himself or to compel the other party, who is blameless, to insist upon it, because to permit the blameable party to do either would be to permit him to take advantage of his own wrong, in the one case directly, and in the other case in a roundabout way, but in either way putting an end to the contract."

In the same case, Lord Finlay L.C. seems to have treated the principle as a rule of law, while Lord Wrenbury treated it as a question of construction. In *Cheall v APEX*,[252] in commenting on the *New Zealand* case, Lord Diplock spoke of:

> "the well known rule of construction that, except in the unlikely case that the

---

248 This paragraph was referred to with approval in *Extra MSA Services Cobham Ltd v Accor UK Economy Hotels Ltd* [2010] EWHC 775 (Ch) and *Fitzroy Development Ltd v Fitzrovia Properties Ltd* [2011] EWHC 1849 (Ch).

249 In Co Litt 206b, Lord Coke says: "If a man make a feoffment in fee, upon condition that the feoffee shall re-infeoff him before such a day, and before the day the feoffor disseise the feoffee, and hold him out by force until the day be past, the state of the feoffee is absolute; for the feoffor is the cause wherefore the condition cannot be performed, and therefore shall never take advantage for non-performance thereof. And so it is if A be bound to B that JS shall marry Jane G before such a day, and before the day B marry with Jane, he shall never take advantage of the bond, for that he himself is the mean that the condition could not be performed. And this is regularly true in all cases." Lord Coke also mentions the principle at Co Litt 148b in its Latin form: "*nullus commodum capere potest de injuria sua propria.*"

250 (1817) 6 M. & S. 121.

251 [1918] A.C. 1.

252 [1983] 2 A.C. 181. See also the dissenting judgment of Donaldson L.J. [1983] Q.B. 126 at 144.

contract contains clear express provisions to the contrary, it is to be presumed that it was not the intention of the parties that either party should be entitled to rely upon his own breaches of his primary obligations as bringing the contract to an end."

He described "this rule of construction" as being paralleled by the "rule of law" that a contract cannot be brought to an end by self-induced frustration. The principle may be seen as an aspect of the principle of interpretation that leans against interpretations that produce unreasonable or absurd consequences that could not have been intended.[253]

In *Great Elephant Corp v Trafigura Beheer BV*,[254] Longmore L.J. said:

"it would be absurd if Vitol could excuse themselves from the consequences of that breach by reference to the Force Majeure clause when it was their own breach of contract that caused the supposed force majeure in the first place. So to allow Vitol would be to allow them to take advantage of their own wrong."

It is considered that the principle as applied in England and Wales and Australia[255] is one of construction rather than of law, and may be ousted by the express terms of the contract.[256] In *Gyllenhammar & Partners International Ltd v Sour Brodogradevna Industrija*,[257] a shipbuilding contract stated that it was subject to the builder declaring that a guarantee had been obtained; and also declaring that all necessary permissions and approvals had been obtained. It went on to say that if these had not been obtained within 30 days of the date of the contract then the contract should become null and void. Hirst J. held that this language was sufficiently clear to oust the principle. He said:

"So far as the *New Zealand* and *Cheall* cases are concerned, it seems to me that the express terms of art. 23 exclude the general rule of construction, since sub-cl. (a) and (c) could not operate in the absence of a breach by the party concerned, thus rendering reliance on the general rule impossible for the same reasons as it was impossible for the plaintiff to rely on APEX's r. 14 in the *Cheall* case."

In *Decoma UK Ltd v Haden Drysys International Ltd*,[258] the Court of Appeal held that the words of a "crystal clear" clause in a contract could not be overridden by

---

253 *Financial Ombudsman Service v Heather Moor & Edgecomb Ltd* [2009] 1 All E.R. 328, per Stanley Burnton L.J.

254 [2013] EWCA Civ 905.

255 *Suttor v Gundowa* (1950) 81 C.L.R. 418 at 441; *Gange v Sullivan* (1966) C.L.R. 418 at 442; *Hope Island Resort Holdings Pty Ltd v Jefferson Properties (Qld) Pty Ltd* [2005] QCA 315; *Gold City Developments Pty Ltd v Portpride Pty Ltd* [2010] WASC 148.

256 *Micklefield v SAC Technology Ltd* [1990] 1 W.L.R. 1002. However, in *Kensland Realty Ltd v Whaleview Investment Ltd* [2001] HKCFA 57, the Court of Final Appeal of Hong Kong doubted the correctness of this case, because relevant Australian authority was not cited. The Australian cases are *Peter Turnbull & Co Pty Ltd v Mondus Trading Co (Australia) Pty Ltd* (1953–53) 90 C.L.R. 235 and *Mahoney v Lindsay* (1981) 55 A.J.L.R. 118. But in *Decoma UK Ltd v Haden Drysys International Ltd* [2006] EWCA Civ 723 reaffirmed the view that the principle is one of construction only, although *Kensland Realty* does not appear to have been cited. The same appears to be true in Australia. In England and Wales the question has now been resolved by *BDW Trading Ltd v JM Rowe (Investments) Ltd* [2011] EWCA Civ 548 reaffirming that the question is one of interpretation.

257 [1989] 2 Lloyd's Rep. 430.

258 [2006] EWCA Civ 723.

the principle. In *Petroplus Marketing AG v Shell Trading International Ltd*,[259] Andrew Smith J. said:

> "It is a general principle of construction that prima facie it will be presumed that the parties intended that neither should be entitled to rely on his own breach of duty to obtain a benefit under a contract, at least where the breach of duty is a breach of an obligation under that contract: see *Chitty on Contracts*, Vol 1 at para 12-082. This is sometimes presented not as a matter of contractual construction but an implied contractual term that a right or benefit conferred upon a party shall not be available to him if he relies upon his own breach of the contract to establish his claim: Chitty on Contracts Vol 1 at para 13-012. However analysed, the principle is not inflexible or absolute: it may be displaced by express contractual provision or by the parties' intention to be understood from the express terms: *Richco International Ltd. v Alfred C Toepfer International GMBH*."[260]

He held on the construction of the particular contract that the principle had been displaced by the terms of the contract. In *The Law Debenture Trust Corp Plc v Elektrim SA*,[261] Sales J. also applied the principle as one of construction. Thus English law continues to take the view that the principle is one of interpretation rather than a rule of substantive law. In *BDW Trading Ltd v JM Rowe (Investments) Ltd*,[262] Patten L.J. said:

> "Although there has been a certain amount of academic discussion as to whether the principle has the status of a rule of law which is imposed upon the parties to a contract almost regardless of what they have agreed, it is now clear as a matter of authority that the application of the principle can be excluded or modified by the terms of the contract and that its scope in any particular case will depend upon the construction of the relevant agreement."

This may be taken to have settled the question up to the level of the Court of Appeal.

However, the Court of Final Appeal of Hong Kong has held that the principle may be given effect either as a principle of construction or as a rule of law, according to what is appropriate in the circumstances[263]; and this has been followed at first instance in England.[264] If applied as a rule of substantive law, the principle precludes the wrongdoer from taking advantage of his own wrong however clearly the contract may appear to entitle him to do so.[265]

The cases thus far referred to concern claims that a contract has been terminated entirely. However, the principle has a broader application. Thus in *Harmsworth*

---

259 [2009] EWHC 1024 (Comm).

260 [1991] 1 Lloyd's Rep. 136 at 144.

261 [2009] EWHC 1801.

262 [2011] EWCA Civ 548; *Office of Fair Trading v Ashbourne Management Services Ltd* [2011] EWHC 1237 (Ch). In *Zhoushan Jinhaiwan Shipyard Co Ltd v Golden Exquisite Inc* [2014] EWHC 4050 (Comm) the principle was held not to apply on the particular interpretation of the contract.

263 *Kensland Realty Ltd v Whale View Investment Ltd* [2001] HKCFA 57.

264 *Rother District Investments Ltd v Corke* [2004] 1 E.G.L.R. 47. In the light of *BDW Trading Ltd v JM Rowe (Investments) Ltd* [2011] EWCA Civ 548, this must be taken to have been wrong on this point.

265 *Kensland Realty Ltd v Whale View Investment Ltd*, above, doubting *Micklefield v SAC Technology Ltd* [1990] 1 W.L.R. 1002.

*Pension Funds Trustees Ltd v Charringtons Industrial Holdings Ltd*,[266] it was held that for the purpose of assessing rent under a rent review clause, the tenant must be assumed to have complied with its repairing covenant, for otherwise it would be taking advantage of its own breach of covenant in order to depress the rent which would otherwise be payable.

So also in *Alghussein Establishment v Eton College*,[267] an agreement for lease contained a covenant by the intending lessee to build. A clause in the agreement provided that if for any reason due to the wilful default of the tenant the development should remain uncompleted by a certain date the lease should forthwith be completed. The House of Lords held that the tenant was not entitled to take advantage of his own wilful default in securing a benefit under a continuing contract, namely the obtaining of the lease. Lord Jauncey of Tullichettle said:

> "Although the authorities to which I have already referred involve cases of avoidance the clear theme running through them is that no man can take advantage of his own wrong. There was nothing in any of them to suggest that the foregoing proposition was limited to cases where the parties in breach were seeking to avoid the contract and I can see no reason for so limiting it. A party who seeks to obtain a benefit under a continuing contract is just as much taking advantage of his own wrong as a party who relies on his breach to avoid a contract and thereby escape his obligations."

However, in order to bring the principle into operation, the relevant breach of duty must be a duty owed by one party to the other under the terms of the contract. Thus where the contract imposes no obligations on one party to it (for example because it is a unilateral contract, such as an option) there is no room for the principle to operate.[268] In addition, breach of a duty whether contractual or non-contractual to a stranger to the contract will not suffice.[269]

It is also necessary to show that the contractual rights or benefits which the party in question is seeking to assert or claim arise as a direct result of that party's prior breach of contract.[270]

In order to displace the principle there must be "a clear contractual intention to be gathered from the express provisions of the contract".[271] The contractual intention is to be decided by the application of the ordinary principles applicable to the interpretation of contracts and the implication of terms.[272] Where a contract gave a party the right to terminate "without prejudice to the rights of any one party against the other for any antecedent breach of the terms" of the contract, those words were insufficient to displace the principle.[273]

*Illustrations*

1. A lease of a mine contained a forfeiture clause which provided that the lease would be void if the lessee ceased to mine for two years. It was held that the word

---

266 (1985) 49 P. & C.R. 297.

267 [1988] 1 W.L.R. 587.

268 *Little v Courage Ltd* (1994) 70 P. & C.R. 469 CA.

269 *Cheall v APEX* [1983] 2 A.C. 180.

270 *Kensland Realty Ltd v Whale View Investment Ltd* [2001] HKCFA 57; *Nina's Bar Bistro Pty Ltd v MBE Corp (Sydney) Pty Ltd* [1984] 3 N.S.W.L.R. 613.

271 *Richco International v Alfred C. Toepfer International* [1991] 1 Lloyd's Rep. 136.

272 *BDW Trading Ltd v JM Rowe (Investments) Ltd* [2011] EWCA Civ 548.

273 *Sainsbury's Supermarkets Ltd v Bristol Rovers (1883) Ltd* [2015] EWHC 2002 (Ch).

"void" should be construed as meaning "voidable at the option of the lessor" and did not entitle the tenant to put an end to the lease.

*Quesnel Forks Gold Mining Co Ltd v Ward*[274]

2. A share option scheme provided for employees of subsidiaries of a public company to acquire shares in the company at favourable prices. The scheme was open only to employees. The company sold one of its subsidiaries to a third party, and an employee of the former subsidiary claimed that the company could not take advantage of its own wrong in selling the subsidiary to defeat the exercise of his option. It was held that the company owed no obligation to the employee not to sell the subsidiary, and consequently the sale was not a wrong for that purpose.

*Thompson v ASDA-MFI Group Plc*[275]

3. A lease contained a covenant by the tenant to register assignments within a stipulated time. In a licence to assign, sureties guaranteed performance of the tenant's covenants by the assignee. A proviso to the licence stated that it was to become void if the assignment was not registered in accordance with the covenant. The assignment was not so registered. It was held that the sureties remained liable because they had guaranteed performance by the assignee of the tenant's covenant to register the assignment, and they could not rely on their own breach of covenant caused by the failure to register the assignment in order to avoid liability.

*Cerium Investments Ltd v Evans*[276]

4. An agreement for the sale of shares gave the seller the option to repurchase the shares, completion to take place on the option completion date. The contract provided that all rights attaching to the shares should vest in the seller on the option completion date. The seller exercised the option but was unable to complete on the option completion date. It was held that since the failure to complete was due to the seller's wilful default, the contract should be construed so as not to permit him to take advantage of his own wrong. Accordingly the buyer continued to be able to vote the shares as he chose.

*JRRT (Investments) Ltd v Haycraft*[277]

5. A contract for the sale of land provided for completion at 1 p.m. on September 2. Time was of the essence. The contract also provided for payment of the completion monies to be by cashiers' orders or cheques in favour of such person as the vendor might direct. One hour and 47 minutes before the time for completion, the vendor issued a direction about how the completion monies were to be apportioned. That was a breach of an implied term to the effect that a direction had to be given at a time which enabled the purchaser to comply with it before completion. Consequently the vendor was not entitled to insist on strict compliance with the completion deadline, and a tender of the purchase monies six minutes late was a valid tender.

*Kensland Realty Ltd v Whale View Investment Ltd*[278]

---

[274] [1920] A.C. 222. See also *Doe d. Bryan v Bancks* (1821) 4 B. & Ald. 401.
[275] [1988] 2 W.L.R. 1093.
[276] [1991] 1 E.G.L.R. 80 CA.
[277] [1993] B.C.L.C. 401.
[278] [2001] HKCFA 57.

which to all intents and purposes ipso facto determines the contract unless an aggrieved party elects to waive the breach.[281] Since the principles applicable to deviation cases are a matter of the substantive law of contracts of carriage and bailment it is not proposed to deal with the subject further in this work.

## 19. Exclusion of Particular Rights or Remedies

**Clear words are necessary before the court will hold that a contract has taken away rights or remedies which one of the parties to it would have had at common law.[282]**

**12.19** Some contractual provisions seek to prevent parties from relying upon what would otherwise be their legal rights at common law. In general, parties are permitted to do so.[283] However:

> "in construing such a contract one starts with the presumption that neither party intends to abandon any remedies for its breach arising by operation of law, and clear express words must be used in order to rebut this presumption."[284]

This observation is "essentially one of common sense; parties do not normally give up valuable rights without making it clear that they intend to do so".[285]

Similarly, in *Trafalgar House Construction (Regions) Ltd v General Surety & Guarantee Co Ltd*,[286] Lord Jauncey of Tullichettle said:

> "There is no doubt that in a contract of guarantee parties may, if so minded, exclude any one or more of the normal incidents of suretyship. However, if they choose to do so clear and unambiguous language must be used to displace the normal legal consequences of the contract …".

In *HIH Casualty and General Insurance Ltd v Chase Manhattan Bank*,[287] Lord Bingham of Cornhill said:

---

decided whether the deviation cases and the warehouse cases must be regarded as dead and buried along with the doctrine of fundamental breach.

280 Coote B. "*Exemption Clauses*". In John Bell (ed), *The Cambridge Law Journal* (London: Sweet & Maxwell, 1964), p.94,

281 See also *Alexander v Railway Executive* [1951] 2 K.B. 82, although the observations on the effect of a fundamental breach on an exemption clause must be treated with caution in so far as they apply to cases other than contracts of carriage or bailment.

282 This paragraph was cited with approval in *Seadrill Management Services Ltd v OAO Gazprom* [2009] EWHC 1530 (Comm) (affirmed [2010] EWCA Civ 691).

283 Subject, of course, to rules of public policy (e.g. that the jurisdiction of the court as to matters of law cannot be ousted by agreement).

284 *Gilbert-Ash (Northern) Ltd v Modern Engineering (Bristol) Ltd* [1974] A.C. 689, per Lord Diplock; *Stocznia Gdanska SA v Latvian Shipping Co* [1998] 1 W.L.R. 574 at 585, per Lord Goff of Chieveley. In *Nile Co for the Export of Agricultural Crops v Bennett (H & JM) (Commodities) Ltd* [1986] 1 Lloyd's Rep. 555, Evans J. said that the words had to be "clear and unequivocal". This is a more stringent test than merely "clear" but was also used by Lord Diplock in the *Gilbert-Ash* case. See also *BICC Plc v Burndy Corp* [1985] Ch. 232; *Aston FFI (Suisse) SA v Louis Dreyfus Commodities Suisse SA* [2015] EWHC 80 (Comm), [2015] 1 Lloyd's Rep. 413.

285 *Seadrill Management Services Ltd v OAO Gazprom* [2010] EWCA Civ 691 per Moore-Bick L.J.

286 [1996] A.C. 199 at 208C.

287 [2003] 1 All E.R. (Comm) 349.

"The courts should not ordinarily infer that a contracting party has given up rights which the law confers on him to an extent greater than the contract terms indicate he has chosen to do; and if the contract terms can take legal and practical effect without denying him the rights he would ordinarily enjoy if the other party is negligent, they will be read as not denying him those rights unless they are so expressed as to make clear that they do."

Thus in most cases, a right of set-off will only be excluded where the clause refers to set-off expressly.[288] So a clause in a lease which required the rent to be paid "without deduction" did not exclude a right of equitable set-off.[289] A provision requiring payment "without any deduction or set off whatsoever" has been held sufficient to exclude any right of deduction or set-off.[290] The omission of the word "whatsoever" makes no difference.[291] In interpreting an "anti set-off" clause the guidelines in *Canada Steamship Lines Ltd v R.*[292] do not apply.[293] However, where a clause in a contract extended rather than excluded a party's right to withhold payment it was not to be "read in a niggardly fashion"; and therefore extended to unliquidated claims.[294]

In *FG Wilson (Engineering) Ltd v John Holt & Company (Liverpool) Ltd*,[295] Popplewell J. said:

"A right of set-off may be excluded by agreement of the parties. If set-off is to be excluded by contract, clear and unambiguous language is required[296] … But no more than that is required. In particular such a term is not to be treated in the same way as an exclusion clause."[297]

He added that such a clause should not be approached in a mechanistic way:

"Whether the set-off would operate as a substantive defence or as a remedy, what matters in each case is whether there has been clearly expressed an intention that the payment is to be made without reference to the claim which would otherwise be set-off. Where the language used does not mention set-off, it may be difficult for a party to satisfy the requirement of clarity if the clause relied on does not in terms qualify the payment obligation. Conversely where the provision does

---

288 For example *Hong Kong & Shanghai Banking Corp v Klockner & Co AG* [1990] 2 Q.B. 514; *The Fedora* [1986] 2 Lloyd's Rep. 441 CA; *Coca Cola Financial Corp v Finsat International Ltd* [1998] Q.B. 43 CA; *John Dee Group v WMH (21) Ltd* [1997] B.C.C. 518; *Society of Lloyds v Leighs* [1997] C.L.C. 1398 CA.

289 *Connaught Restaurants Ltd v Indoor Leisure Ltd* [1994] 1 W.L.R. 501 CA. However, in Australia there is a body of authority to the effect that a covenant to pay "without deduction" has the effect of excluding set-off. The authorities are collected in *Sandbanks Holdings Pty Ltd v Durkan* [2010] WASCA 122.

290 *Star Rider Ltd v Inntrepreneur Pub Co* [1998] 1 E.G.L.R. 53.

291 *Altonwood Ltd v Crystal Palace FC (2000) Ltd* [2005] EWHC 292 (Ch).

292 [1952] A.C. 192.

293 *Continental Illinois National Bank & Trust Co of Chicago v Papanicolau* [1986] 2 Lloyd's Rep. 441; *Skipskredittforeningen v Emperor Navigation* [1998] 1 Lloyd's Rep. 66.

294 *Geldof Metaalconstructie NV v Simon Carves Ltd* [2010] B.L.R. 401.

295 [2012] EWHC 2477 (Comm); [2012] 2 Lloyd's Rep. 479.

296 *Modern Engineering (Bristol) Ltd v Gilbert-Ash (Northern) Ltd* [1974] A.C. 689 at 717, 722–723; *Connaught Ltd v Indoor Leisure Ltd* [1994] 1 W.L.R. 501; *Esso Petroleum Co Ltd v Milton* [1997] 1 W.L.R. 938; *BOC Group Plc v Centeon LLC* [1999] 1 All E.R. (Comm) 970.

297 *Continental Illinois National Bank & Trust Company of Chicago v Papanicolaou (The Fedora)* [1986] 2 Lloyd's Rep. 441; *WRM Group Ltd v Wood* [1998] C.L.C. 189.

expressly qualify the payment obligation, it may readily be construed as sufficiently clear to be effective (as in *Coca-Cola Financial Corp v Finsat Ltd* [1998] Q.B.43; *WRM v Wood and Rohlig (UK) Ltd v Rock Unique Ltd* [2011] EWCA Civ 18). But there is no principle of construction that a no set-off clause cannot be effective unless it is expressed in terms to qualify the payment obligation."

His decision was upheld on appeal[298] in which Longmore L.J. said that it was "difficult to think of clearer words than that a party 'shall not apply any set-off'."

A similar principle applies where the contract seeks to restrict one party's right to adduce evidence in relation to a dispute which would be admissible were that dispute to be litigated in court[299] and where it seeks to prevent one party from relying on a non-contractual sample in support of a claim to reject goods.[300] The same approach is also applied where it is alleged that a contract deprives an injured contracting party of damages to which he would otherwise be entitled,[301] and where it is alleged that an accrued obligation and corresponding right has been discharged by later events.[302] A similar approach applies in considering whether an exemption clause deprives one party of any remedy in the event of breach[303]; whether the right to sue for damages for breach of contract has been excluded by the terms of the contract[304] and whether the right to forfeit a deposit has been excluded by the terms of the contract.[305] The same approach applies to the question whether a clause excluded other valuable rights conferred by the contract.[306] A clause may be effective to exclude the right of set-off, yet not be clear enough to exclude the right to counterclaim for damages.[307]

In *Stocznia Gdynia SA v Gearbulk Holdings Ltd*,[308] it was common ground that the test of construction for a court to apply in ascertaining whether the parties intended to oust any common law or extra-contractual remedies, such as to constitute the terms of the contract as a complete code, is by reference to a requirement for "clear words". Burton J. held that the words of the clause in that case were not clear enough to disapply the common law relating to repudiation and acceptance. His decision on this point was upheld by the Court of Appeal[309] in which Moore-Bick L.J. said:

"In paragraph 88 of his judgment in *Stocznia Gdanska S.A. v Latvian Shipping Co*[310] Rix L.J. expressed the view that where contractual and common law rights

298 [2013] EWCA Civ 1232; [2014] 1 All E.R. 785.

299 *Lindsay (WN) & Co Ltd v European Grain and Shipping Agency Ltd* [1963] 1 Lloyd's Rep. 437; *European Grain & Shipping Ltd v R&H Hall Plc* [1990] 2 Lloyd's Rep. 139.

300 *Verheijdens Veevoeder Commissiehandel BV v IS Joseph Inc* [1981] 1 Lloyd's Rep. 102.

301 *The Selda* [1999] 1 Lloyd's Rep. 729 CA; *Pearce & High Ltd v Baxter* [1999] C.L.C. 749 CA.

302 *Marine Trade SA v Pioneer Freight Futures Ltd* [2010] 1 Lloyd's Rep. 631.

303 *Kudos Catering (UK) Ltd v Manchester Central Convention Complex Ltd* [2013] EWCA Civ 38; [2013] 2 Lloyd's Rep. 270.

304 *RP Explorer Master Fund v Chilukuri* [2013] EWHC 103 (Ch); *IG Index Ltd v Ehrentreu* [2013] EWCA Civ 95.

305 *Griffon Shipping LLC v Firodi Shipping Ltd* [2013] EWHC 593 (Comm); [2013] 2 Lloyd's Rep. 50 (affirmed [2013] EWCA Civ 1567; [2014] 1 Lloyd's Rep. 471).

306 *Gard Marine & Energy Ltd v China National Chartering Co Ltd* [2013] EWHC 2199 (Comm); [2014] 1 Lloyd's Rep. 59.

307 *IG Index Ltd v Ehrentreu* [2013] EWCA Civ 95.

308 [2008] 2 Lloyd's Rep. 202.

309 [2009] 1 Lloyd's Rep. 461.

310 [2002] 2 Lloyd's Rep. 436.

overlap it would be too harsh to regard the use of a contractual mechanism of termination as ousting the common law mechanism, at any rate against a background of an express reservation of rights. In this case I would go further. In my view it is wrong to treat the right to terminate in accordance with the terms of the contract as different in substance from the right to treat the contract as discharged by reason of repudiation at common law. In those cases where the contract gives a right of termination they are in effect one and the same."

He added:

"The court is unlikely to be satisfied that a party to a contract has abandoned valuable rights arising by operation of law unless the terms of the contract make it sufficiently clear that that was intended. The more valuable the right, the clearer the language will need to be."

Similarly, in *Dalkia Utilities Services Plc v Celtech International Ltd*,[311] cl.14 of a contract entitled one party to terminate it in a number of different circumstances, none of which would necessarily have amounted to a repudiatory breach of contract. Clause 15 contained provisions for payment in the event of termination. Christopher Clarke J. held that cl.15 did not apply to a repudiatory breach that was accepted. He said:

"Clause 14 contains nine separate categories of circumstances in which one party or the other may terminate the agreement. In all of these categories the right to terminate would or could arise in circumstances which did not give rise to a right of termination at common law. Clause 15 deals with the consequences that will follow according to which ground for termination has been invoked. The natural reading of clause 15.7, in that context, is that the only rights or remedies that will arise in respect of a termination on any of the bases provided for by clause 14 will be those specified in clause 15. Secondly, clause 15.7 does not seem to me sufficiently clear, as it would need to be, to exclude the parties' common law right to accept a repudiatory breach of contract (eg an outright refusal to perform) as discharging the innocent party from further liability and to claim damages for the loss of the contract. The presumption is that it does not unless there are clear express words to that effect."

Where an arbitration agreement states that the award will be "final and binding" or "final conclusive and binding" that is not clear enough to exclude the right of appeal under the Arbitration Act 1996.[312]

Thus where a clause in a contract does exclude a remedy, the clause will be narrowly construed. In *Acsim (Southern) Ltd v Danish Contracting and Development Co Ltd*,[313] a building contract provided that the rights of the parties as to set-off were fully set out in the contract and no other rights relating to set-off should be implied. The Court of Appeal held that the reference to "set-off?" was to be construed as a reference to set-off as defined by judicial decisions, and did not prevent the

[311] [2006] 1 Lloyd's Rep. 599.

[312] *Essex CC v Premier Recycling Ltd* [2007] B.L.R. 233; *Shell Egypt West Manzala GmbH v Dana Gas Egypt Ltd* [2010] 2 All E.R. (Comm) 442. Commonwealth authorities to the opposite effect are considered in both cases.

[313] (1989) 47 B.L.R. 55 CA.

employer from defending itself against a claim for payment on the ground that the value of the work for which the sum was claimed had been diminished by the contractor's breaches of contract.

In *Port of Tilbury (London) Ltd v Stora Enso Transport & Distribution Ltd*,[314] a contract contained a clause prohibiting set-off, deduction and counterclaim save as otherwise expressly permitted by the contract. Another clause in the contract permitted the withholding of a genuinely disputed sum. The question was whether the latter clause enabled one party to resist payment under a take or pay clause by reliance on an unliquidated claim where both liability and quantum were disputed. The Court of Appeal held that the clause was limited to challenges to the quantum of invoices, and did not permit the set off of a disputed cross claim.

A particular remedy may be excluded by implication, but only if the implication is a necessary one.[315] Thus a requirement that payments under the contract be made by direct debit may exclude the right of set-off by necessary implication.[316]

In *Tele2 International Card Company SA v Post Office Ltd*,[317] cl.16 of a contract provided:

> "In no event shall any delay, neglect or forbearance on the part of any party in enforcing (in whole or in part) any provision of this Agreement be or be deemed to be a waiver thereof or a waiver of any other provision or shall in any way prejudice any right of that party under this Agreement".

The question arose whether this clause prevented conduct amounting to an affirmation of the contract. Aikens L.J. said:

> "In short, clause 16 cannot prevent the fact of an election to abandon the right to terminate from existing: either it does or it does not. This conclusion is reinforced, I think, by the terms of clause 16 itself. Although it stipulates that 'in no event shall any delay, neglect or forbearance' on the part of any party in enforcing a provision of the Agreement '... be or be deemed to be a waiver' of the provision or '... shall in any way prejudice any right of that party under this Agreement', it does not deal at all with the issue of election of whether or not to exercise a contractual right. The general law demands that a party which has a contractual right to terminate a contract must elect whether or not to do so. This clause does not attempt to say that the doctrine of election shall not apply—even assuming that any contractual provision could exclude the operation of the doctrine."

It is doubtful whether a clause in a contract could disapply the doctrine of election. There is a logical inconsistency in one party claiming that a contract is at an end, while at the same time relying on a clause in the contract to support that claim. In *Stocznia Gdynia SA v Gearbulk Holdings Ltd*,[318] Moore-Bick L.J. said:

> "One can now see that it is impossible for a party to terminate a contract, in the sense of discharging both parties from further performance, whether by invok-

---

314 [2009] 1 Lloyd's Rep. 391.
315 *Liberty Mutual Insurance Co (UK) Ltd v HSBC Bank Plc* [2002] EWCA Civ 691.
316 *Esso Petroleum Co Ltd v Milton* [1997] 1 W.L.R. 938 CA.
317 [2009] EWCA Civ 9.
318 [2009] 1 Lloyd's Rep. 461.

> ing a term which entitles him to do so or by exercising his rights under the general law, and at the same time treat it as continuing, since the two are inconsistent. Either the primary obligations remain for performance, or they do not."

In the context of waiver of forfeiture of leases, similar clauses have been held ineffective in *R. v Paulson*[319] and *Expert Clothing Service & Sales Ltd v Hillgate House Ltd*.[320] However clauses of this king have been upheld in Australia[321] and New Zealand.[322]

In *Novasen SA v Alimenta SA*,[323] Popplewell J. held that a similar approach applies to the question whether the contract enlarges the remedies that would be available at common law. He said:

> "The issue before me is the converse of that which was there being considered, which was whether a right to damages or other remedy conferred by law was excluded by contract; whereas in this case the question is whether the contract confers a right to damages where no such right would arise at law. Nevertheless in my view similar principles should apply. The parties should be taken to have contracted against the background that their remedies will, in the absence of specific contrary agreement, be regulated by the system of law chosen to govern their contractual relations. If no remedy, in the form of an entitlement to damages, is conferred by law, clear words will be required to confer a contractual entitlement to such remedy. That is especially so where (a) the contractual term is a standard clause drafted and adopted by a trade body and (b) the contractual term is to confer a right of recovery in circumstances where no loss has in fact been suffered. Such a remedy is contrary to the compensatory principle governing the quantum of damages for breach of contract."

*Illustrations*

1. A contract for the sale of goods provided for particular machinery for resolving a dispute. The buyer was to advise the seller of any complaint. Inspections were then to be made, and a surveyor's report was consequently to be produced by the buyer. If no agreement was reached at that stage the parties were to "settle the dispute". It was held that the machinery was effective with the exception of the last stage and accordingly prevented the buyers from rejecting the goods.
*Nile Co for the Export of Agricultural Crops v Bennett (H & JM) Ltd*[324]

2. A building contract required the payment of monies by a contractor to a subcontractor pursuant to interim certificates. The contract provided that the contractor was to be at liberty to deduct from any certified payment the amount of any bona fide contra-account and/or other claims which the contractor had against

---

[319] [1921] 1 A.C. 271.
[320] [1986] Ch. 340.
[321] *Ovendale Pty Ltd v Anthony* (1966) 117 C.L.R. 539.
[322] *Inner City Businessmen's Club v James Kirkpatrick* [1975] 2 N.Z.L.R. 636.
[323] [2013] EWHC 345 (Comm); [2013] 1 Lloyd's Rep. 648.
[324] [1986] 1 Lloyd's Rep. 555.

the subcontractor. It was held that those words entitled the contractor to withhold payments under a right of set-off.
*Gilbert Ash (Northern) Ltd v Modern Engineering (Bristol) Ltd*[325]

3. A lease required the tenant to pay the rent "without deduction". It was held that these words were not sufficiently clear to exclude the tenant's right to equitable set-off.
*Connaught Restaurants Ltd v Indoor Leisure Ltd*[326]

4. A guarantee required payment "without set-off or counterclaim and without deductions or withholdings whatsoever". It was held that these words covered counterclaims based on negligence.
*The Fedora*[327]

5. A building contract provided for payment in accordance with architect's certificates "less only (i) retention money as hereinafter described (ii) any sum previously paid". A third exception in the standard form permitting deduction by way of set-off for breach of contract by the contractor had been deleted. Having regard to the deletion it was held that the contract excluded the right of set-off.
*Mottram Consultants Ltd v Bernard Sunley & Sons Ltd*[328]

6. A contract for the sale of goods said that in default of performance damages would be "based on the difference between the contract price and either the default price … or the actual or estimated value of the goods". It was held that damages "based on" those criteria did not mean that damages were "limited to" those criteria and that a claim for wasted expenditure could be made.
*The Selda*[329]

## 20. NON-RELIANCE CLAUSES

**If a contract contains a clause acknowledging that a party has not relied on any representation in entering into it, the clause will take effect as a contractual estoppel, subject to the effect, if any, of the Consumer Rights Act 2015. However, such a clause cannot exclude liability for fraudulent misrepresentation by a party to the contract.**

**12.20** It is common to include in certain kinds of contracts an express acknowledgment by each of the parties that they have not been induced to enter the contract by any representations other than those contained in the contract itself.

In *Quest 4 Finance Ltd v Maxfield*,[330] Teare J. said:

"The commercial purpose of the declaration of non-reliance, which is part of the relevant background, is to ensure, in the interests of certainty, that the rights of the parties are governed by the terms of the written contract. Thus the maker of

[325] [1974] A.C. 689.
[326] [1994] 1 W.L.R. 501 CA.
[327] [1986] 2 Lloyd's Rep. 441 CA.
[328] [1975] 2 Lloyd's Rep. 197 HL.
[329] [1999] 1 Lloyd's Rep. 729 CA.
[330] [2007] 2 C.L.C. 706.

at a valuation or goods which comply with a specified description. The contract may say that the value of the property or the question of whether the goods comply with the description shall be determined by a named person as an expert. In such a case, the agreement is to sell at what the expert considers to be the value or to buy goods which the expert considers to be in accordance with the description. The court's view on these questions is irrelevant."

It is this principle which underpins the general rule that in the absence of fraud or collusion the parties are bound by an expert's determination, provided that he answers the right question.[24]

Thus, where a contract provided for the payment of 55 per cent of the open market value of certain shares "as determined by an independent chartered accountant" it was held that the determination of the value by the accountant was essential to the determination of the contractual entitlement. One of the factors which led the court to that conclusion was that there are many ways of valuing shares, and which method to adopt would be a matter of judgment for the independent accountant.[25] In other words the court's view of how the shares should be valued was irrelevant.

As a matter of interpretation of the contract, if it provides for payment only of an amount certified by a third party, then a determination by the third party is a condition precedent to the obligation to pay.[26] Where, however, ascertainment of a price or value by the contractually prescribed method is inessential to the substance of the contract and an objective criterion can be identified,[27] the court will provide its own machinery if the contractual machinery breaks down,[28] at least where the reason for the breakdown is not the default of the party seeking the alternative machinery.[29]

## 4. OBLIGATIONS TO BE DECIDED BY ONE PARTY TO THE CONTRACT

**A contract may provide for one party to the contract himself to decide some issue which arises under the contract, whether it is a question of interpretation or a matter of mixed fact and law. However, if the contract does not expressly provide for the possibility of intervention by the court if the decision-making party has acted unreasonably, perversely or in bad faith, a term to that effect is likely to be implied.**

**14.04** In *Re Brown v GIO Insurance Ltd*,[30] Chadwick L.J. said:

"... I can see no objection in principle to a bargain in which one party is left to decide (i) what the facts are in relation to some matter which is to arise in the future and which is plainly intended to have some contractual consequence under a provision of the contract which they have made and (ii) whether or not that combination of facts does fall within that provision. The jurisdiction of the court

24 See paras 14.07 and 18.07, below.

25 *Gillat v Sky Television Ltd* [2001] All E.R. (Comm) 461 CA.

26 *Sharpe v San Paulo Railway Co* (1873) L.R. 8 Ch. App. 597. See para.13.09, below.

27 *BJ Aviation Ltd v Pool Aviation Ltd* [2002] 2 P. & C.R. 25.

28 *Sudbrooke Trading Estate Ltd v Eggleton* [1983] 1 A.C. 444.

29 *Infiniteland Ltd v Artisan Contracting Ltd* [2006] 1 B.C.L.C. 632.

30 [1998] C.L.C. 650. See also *The Glacier Bay* [1996] 1 Lloyd's Rep. 370; *Bradbury v British Broadcasting Corp* [2015] EWHC 1368 (Ch).

is not ousted in those circumstances; provided that the agreement which the parties have reached on that matter allows the court to interfere if the decision-making party has acted unreasonably, perversely or in bad faith. It seems to me that the court will be ready (in the absence of express words to the contrary), to construe the contract, if necessary by implying an appropriate term, so as to impose on the decision-making party an obligation to act reasonably and in good faith."

So where a mortgage provided for the payment of interest at a rate determined by the lender, the Court of Appeal held that it was an implied term of the mortgage that the lender would not set the interest rate "dishonestly, for an improper purpose, capriciously or arbitrarily". It was also an implied term that the discretion to set an interest rate would not be exercised unreasonably in the sense that there was no material on which a reasonable person could have exercised the discretion in the way he did.[31]

However, the mere fact that a choice is to be made by one party to the contract does not necessarily mean that he has a discretion. Thus in *Skidmore v Dartford & Gravesham NHS Trust*,[32] a contract of employment provided for three types of disciplinary offence. A different procedure applied to different types of offence. The contract provided that it was for the employer to decide into which type the particular case fell. Lord Steyn said:

"The trust is entitled to decide what disciplinary route should be followed. That decision must, however, comply with the terms of the contract. If a non-conforming decision is taken and acted upon, there is a breach of contract resulting in the usual remedies. The only escape from this position would be if it could be shown that the parties agreed wording in their contract making it clear that the employer's decision would be final thereby excluding the role of the court except, of course, in cases of bad faith or possibly the absence of reasonable grounds for the decision. There is no such provision in the present contract. It does, of course provide that 'It is for the authority to decide under which category a case falls'. This provision merely states the obvious: the trust must take the initial decision to commence the appropriate disciplinary procedure. It is, however, quite insufficient to exclude the normal consequences of a failure to follow the agreed contractual procedures".

## 5. WHETHER CERTIFICATE OR APPROVAL MAY BE UNREASONABLY WITHHELD

**Where a contract is to be performed to the satisfaction of a third party, the third party is not usually required to act reasonably in deciding whether or not to express satisfaction or to issue a certificate. But where the contract is to be performed to the satisfaction of one of the parties to it, it will usually be implied that he should act reasonably.[33]**

**14.05** An important distinction must be drawn between contracts in which satisfac-

[31] *Paragon Finance Plc v Nash* [2002] 1 W.L.R. 685; *Malione v BPB Industries Ltd* [2002] I.R.L.R. 452 CA.

[32] [2003] I.C.R. 721 HL.

[33] The equivalent paragraph in a previous edition was referred to with apparent approval in *Skidmore v Dartford & Gravesham NHS Trust* [2003] I.C.R. 721 HL. See also *Anders & Kern UK Ltd v CGU*

TAB 112

*Muir Hunter on Personal Insolvency*, (loose-leaf)
edited by John Briggs and Christopher Brougham QC at § 3-2260

# Muir Hunter on Personal Insolvency

**Authors**

JOHN BRIGGS, LLB
*of Gray's Inn, Barrister.*
*A Deputy Bankruptcy Registrar of the High Court*

CHRISTOPHER BROUGHAM QC, BA
*of Inner Temple, Barrister.*
*A Deputy Bankruptcy Registrar of the High Court*
*Bencher of the Inner Temple*

**Contributor**

STEPHEN BAISTER, MA, PhD
*Chief Bankruptcy Registrar of the High Court*

**The Development of English Bankruptcy Law**

DAVID GRAHAM QC, MA, BCL,
*of Middle Temple, Barrister*
*Visiting Professor of Law, Faculty of Business,*
*Kingston University*

**Foreword by**

THE LATE RT HON. LORD JUSTICE DILLON, PC

SWEET & MAXWELL

THOMSON REUTERS

to make a claim for about ten years. The registrar, having concluded that the trustee was guilty of inordinate and exceptional delay, exercised his discretion (see the notes to subs.339(2)) not to make an order. Mann J., in allowing the trustee's appeal, held that delay by itself, unmixed with any other circumstances, cannot be a relevant reason for declining to grant relief ([2010] EWHC 1033 (Ch) at [34], [35]). The respondents appealed to the Court of Appeal, but not on this point ([2011] EWCA Civ 119; [2011] 1 W.L.R. 1617). However, the Court's opinion on the question of the delay was summarised in these words of Rix LJ at [61]:

> "I have some sympathy for [the registrar's] position, but it has to be said that he ought to have had more information about the reasons for the delay and possible prejudice to the [respondents] before reaching his conclusion. However, trustees who for no good reason sit on their hands when aware of a claim under s.339 in respect of a matrimonial home, may find themselves in difficulty."

*Subsection (2)*

**3-2259** This subsection states that, where an application is made under s.339, the court "shall ... make such order as it thinks fit for restoring the position to what it would have been if [the prospective bankrupt] had not entered into" the transaction at an undervalue. Section 342(1) contains a list of orders that the court "may" make in order to achieve this objective, but the list is inexhaustive and is expressly without prejudice to the generality of s.339(2). Although the subsection uses the word "shall", it would appear that the court may, in its discretion, decline to make any order at all (*Re Paramount Airways Ltd (No.2)* [1993] Ch. 223 CA, at 239G–H). For an example of an exceptional case in which the court declined to make an order, see *Singla v Brown* [2007] EWHC 405 (Ch); [2008] Ch. 357. See also *Trustee in Bankruptcy of Claridge v Claridge* [2011] EWHC 2047 (Ch) and the comments thereon in the notes to s.423(2). In *Walker v WA Personnel Ltd* [2002] B.P.I.R. 621, the court (Judge Havelock-Allan QC) rejected a submission that monetary compensation rather than revesting of assets would generally be appropriate in a case where the assets transferred had altered since the date of transfer. For two cases (both under IA 1986 s.423: s.423(2)(a) and s.339(2) are to the same effect) in which the court was willing to order monetary compensation rather than the revesting of assets, see *Gil v Baygreen Properties Ltd* [2004] EWHC 1732 (Ch); [2005] B.P.I.R. 95 and *Pena v Coyne* [2004] B.P.I.R. 1286.

In *Ramlort Ltd v Reid* [2004] EWCA Civ 800; [2004] B.P.I.R. 985, Jonathan Parker LJ (with whom Waller LJ and Judge LJ concurred) agreed with the approach in the *Walker v WA Personnel Ltd* case above. In Jonathan Parker LJ's view, in considering what is the appropriate remedy on the facts of any particular case, the court should not start from any a priori position. Each case will turn on its particular facts, and the task of the court in every case is to fashion the most appropriate remedy with a view to restoring, so far as is practical and just to do so, the position as it "would have been if [the debtor] had not entered into the transaction". In some cases that remedy may take the form of reversing transactions; in others it may not. Moreover, in deciding how to exercise the statutory discretion as to remedy, the court must inevitably have regard to subsequent events, and to the facts as they are at the date of the order. On the facts of the *Ramlort Ltd v Reid* case, there were no obstacles to a straightforward reversal of the transaction and Jonathan Parker LJ took the view, like the trial judge, that the most appropriate remedy in the particularly unusual circumstances of the case was to set aside the declaration of trust on terms that the transfereee recovered the payments which it made: in other words to reverse the transaction.

*Subsection (3)*

**3-2260** This subsection defines the "undervalue" requirement of a transaction falling within the section.

Under subs.(3)(a), a gift by a prospective bankrupt, or any arrangement made by him providing for no consideration to be received by him, falls within the section.

Under subs.(3)(b) so too does a transaction "in consideration of marriage or the formation of a civil partnership". This marks a reversal of the position as it was under s.42 of the 1914 Act, under which a settlement "made before and in consideration of marriage" was expressly excluded from the purview of the section.

Subsection (3)(c) is the one most likely to give rise to contention. Under this subsection, a transaction is at an undervalue if it is entered into by the prospective bankrupt "for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the" prospective bankrupt.

The value of the consideration is to be assessed as at the date of the transaction. Some commentators have suggested that *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] UKHL 2; [2001] 1 W.L.R. 143, a case concerned with s.238(4)(b), the corporate equivalent of this subsection, casts doubt on this proposition. In that case the House of Lords had to consider the value of a covenant to pay rent over a period of four years, contained in a sublease of computer equipment. Lord Scott, in delivering the judgment of the House, found that the creation of the sublease constituted, ipso facto, a breach of a term of the headlease, which thereupon became terminable at any time by the head lessors and the equipment liable to be repossessed—events which, in fact, subsequently occurred.

> "If a covenant with the precarious character of [the] covenant in the sublease is to have value attributed to it for s.238 purposes, the value must ... be placed on a more firm footing than that of speculative suggestion. The actual events that took place [after the creation of the sublease], before any payment under the sublease had become due, are ... relevant" (ibid., at [24]).

> "[It was] submitted that these ex post facto events ought not to be taken into account in valuing [the] covenant as at [the date of the sublease]. I do not agree. In valuing the covenant as at that date, the critical uncertainty is whether [and how long] the sublease would survive .... Where the events, or some of them, on which the uncertainties depend have actually happened, it seems to me unsatisfactory and unnecessary for the court to wear blinkers and pretend that it does not know what has happened ... For the purposes of s.238(4)..., and the valuation of the consideration ... reality should ... be given preference over speculation. I would hold, taking account of the events that took place in the [months immediately following the creation of the sublease], that the value of [the] covenant ... was nil. After all, if, following the signing of the sublease, [the sublessor] had taken the sublease to a bank or finance house and had tried to raise money on the security of the covenant, I do not believe that the bank or finance house, with knowledge about the circumstances surrounding the sublease, would have attributed any value at all to the sublease covenant" (ibid., at [26]).

> "Where the value of the consideration ... is as speculative as is the case here, it is ... for the party who relies on that consideration to establish its value" (ibid., at [27]).

It is submitted that there is nothing in the language of the judgment, taken as a whole, that contradicts the proposition that the value of the consideration is to be assessed as at the date of the transaction. Nor does the judgment lay down a rule that that value is to be assessed with the benefit of hindsight; any such rule would deter many perfectly proper commercial transactions. In *Re Thoars (Deceased)* [2002] EWHC 2416 (Ch); [2003] B.P.I.R. 489 (subsequently named *Ramlort Ltd v Reid*), the Vice-Chancellor in declining to try a preliminary issue as to the value of the consideration provided by the debtor, took the ratio decidendi of *Brewin Dolphin Bell Lawrie Ltd*, above, to be that: (1) the value of the consideration in money or money's worth is to be assessed as at the date of the transaction; (2) if at that date value is dependent on the occurrence or non-occurrence of some event and that event occurs before the assessment of value has been completed then the valuer may have regard to it; but (3) the valuer is entitled, indeed bound, to take account of all other matters relevant to the determination of value as at the date of the transaction (*Re Thoars (Deceased)*, above, at [17]). "In the same way that Lord Scott of Foscote referred.to the likelihood of [the sublessor] raising money on the security of the covenant so the valuer is entitled to consider the likelihood of a lottery ticket being sold for more than the value of the stake before the draw has been carried out, notwithstanding that he knows that thereafter it entitled the holder to £5m" (ibid., at [20]).

In *Stanley v TMK Finance Ltd* [2010] EWHC 3349 (Ch); [2011] B.P.I.R. 876, the only disputed issue of law between the parties was the extent to which the court was entitled to take account of later events in determining value at an earlier date. Specifically, the issue was whether the court could take account of the sale of a property in October 2006 in determining its value as at May 2005. Having considered Lord Scott's speech in *Phillips v Brewin Dolphin Bell Lawrie Ltd* (above), David Richards J stated that Lord Scott was not intending to introduce a hindsight test or principle:

> "The purpose for which the Applicants seek to rely on the sale of the property in October 2006 ... is to establish that a price agreed for this property between independent third parties in 2006 shows what the open market value was in May 2005, because the evidence establishes that there was no material difference in market conditions between those dates ... [A]s a matter of principle, the court is entitled on this basis to have regard to the price agreed in 2006. It is not an application of a hindsight principle ... It is simply using the later sale to establish by inference the market value at the earlier date" (ibid., at [15], [16]).

In an Irish corporate insolvency case (*Levy McCallum Ltd v Allen* [2007] NI Ch. 3), the impugned transaction was the giving of a guarantee. "The value of the guarantee to a creditor depends on the financial strength/weakness of the principal debtor [at the date of the guarantee] and the extent to which the creditor is therefore dependent upon the guarantee. Inevitably such an assessment would require the ... liquidator, upon whom the onus lies, to put the necessary material before the court to enable this assessment to be made ... The other side of the balancing exercise involves an assessment of the value of the consideration received by the surety" (ibid, at [46], [47]). See also the discussion of this case in *Tailby v HSBC Bank Plc* [2015] B.I.P.R. 143.

In *McDonald v Hanselmann* [1998] 28 A.C.S.R. 49, Young J, sitting in the Equity Division of the Supreme Court of New South Wales, had to consider the meaning of "uncommercial transaction" within the meaning of the Corporations Law s.588B. A company, three months before going into administration, had sold to the son of one of its directors certain equipment together with the company's client base and the goodwill of its business for $40,000:

> "I have to deal with the questions of value. Value is not a matter which is decided in a vacuum. Value usually is associated with a person. The pure concept of value is, of course, what a reasonable objective person would pay for the property rather than lose it, but very often property will have a special value to a person because of factors unique to that person ... If that special fact is known to the vendor and to other persons, it may be a matter to take into account when working out what the hypothetical objective purchaser would pay rather than lose it ..." (p.53 at 35 to p.54 at 5).

> "[T]he controller of the company knew that his son was ... willing to take virtually the whole of the plant and equipment for his new business. [W]here one has such a situation even if there are no

other potential buyers, the value of the property is the amount which the only purchaser would be prepared to pay for it rather than to lose the property" (p.55 at 15 to 20).

By way of contrast, in *Hargreaves v Salt* [2010] EWHC 3549 (Fam); [2011] B.P.I.R. 656, a case concerned, in effect, with the transfer of "a substantial villa", the court rejected a submission that market value as defined by the RICS was not the true test of value for the purposes of s.339, insofar as the transferor had been under great pressure to sell the villa and had been willing to offer it to anybody who was prepared to take over the mortgage and certain other debts, rather than offer it for sale on the open market.

> "I was not referred to any authority which suggested that the value to be identified by the court is to be determined by what the seller is subjectively willing to accept, as distinct from the price which a purchaser might reasonably be expected to pay given the market conditions at the time. No doubt in evaluating that price the conditions relevant to the market at that time, and particularly any factors requiring the property to be marketed over a truncated period are relevant to establishing what price a purchaser might be expected to pay." (ibid., at [26])

> "The focus of [the] authorities … is … on what a purchaser would be prepared to pay and not what a seller would be willing to accept in the hypothetical transaction. The authorities show that the existence of a purchaser must be assumed even if, on the evidence, there was a restricted or even no market for the relevant asset at the time of the transaction … [T]he focus … must always be on what a hypothetical purchaser would be prepared to pay and not on what the vendor would be prepared to accept." (ibid., at [29])

In *Barber v CI Ltd* [2006] B.C.C. 927, the court held that where A, to whom B has lent money borrowed from C, repays the money directly to C, in circumstances constituting a voidable preference of B, the payment by A to C is a transaction at an undervalue within this section. The judge accepted counsel's submission, based upon the last paragraph of the above quotation from *Brewin Dolphin Bell Lawrie Ltd*, above, that a preferential payment, which is inevitably susceptible to challenge, cannot amount to consideration for the making of that very payment.

In the case of *Re Thoars (Deceased)*; sub nom. *Reid v Ramlort Ltd* above, the trial ([2003] EWHC 1999 (Ch); [2003] B.P.I.R. 1444) was concerned with whether a declaration of trust dated July 26, 1996, whereby Mr Thoars, who was suffering from cirrhosis of the liver, declared that he held the benefits of a Scandia life insurance policy on trust for Ramlort Ltd, was a transaction at an undervalue. It was common ground that as consideration for the making of the declaration of trust Ramlort Ltd made two payments. One was a payment of £1,100 to a third party, the other was a payment of £1,900 which the Judge found at the trial, was made by way of a loan to Mr Thoars. HH Judge Norris QC found that as at the date of the declaration of trust the policy had a minimum value of £10,000. As to the payments made by Ramlort Ltd as consideration, the Judge valued each payment at nil and he accordingly found that the making of the declaration of trust was a transaction at an undervalue within the meaning of s.339. By his Order the Judge ordered that the proceeds of the policy (amounting to some £180,000), together with accrued interest, be held on trust to repay to Ramlort Ltd the sums of £1,900 and £1,100 which Ramlort Ltd had paid as a consideration, and subject thereto, on trust for Mr Reid, the judicial factor for the insolvent estate of Mr Thoars, who had died on 19 September 1996, the day after he underwent a liver transplant. On appeal to the Court of Appeal, [2004] EWCA Civ 800; [2004] B.P.I.R. 985, Ramlort Ltd challenged the Judge's findings as to the minimum value of the policy and as to the value of the consideration provided by it, contending that as at the date of the declaration of trust the policy was not worth significantly more than the consideration which Ramlort Ltd gave for it and accordingly the declaration of trust was not a transaction at an undervalue. In the alternative, it contended that the appropriate remedy was not to set aside the declaration of trust, but rather for Ramlort Ltd to pay monetary compensation equal to the amount of the undervalue. The Trial Judge had accepted Ramlort Ltd's submission that the values of the policy and of the consideration given for it had to be assessed as at the date of the transaction and that the general rule is that the value is to be ascertained by reference to what a purchaser would have paid. The Judge went on to make the qualification that he did not regard it as an absolute requirement in every case that the court should arrive at specific values. As regards Ramlort Ltd's submission that on the evidence of its expert that the value of the policy as at the date of the declaration of trust was its surrender value of £71, the Trial Judge said that looking at the reality of the situation the surrender value was only the value that Scandia could be compelled to pay if the policy-holder exercised the unilateral right to surrender the policy. But if Mr Thoars, facing a liver transplant and with severely impaired mortality, had gone to Scandia and said: "at the moment you are on risk for £185,000, I have only paid two premiums but I am willing to release you from your obligation; what will you pay me?" [it is incredible] that Scandia would have said: "£71 not a penny more". In agreeing with the Trial Judge's approach, Jonathan Parker LJ (with whom Waller LJ and Judge LJ concurred) said that there was nothing in the express provisions of s.339(3)(c) which requires the court to ascribe a precise figure either to the outgoing value or to the incoming value. It will apply whenever the court is satisfied that, whatever the precise values may be, the incoming value is on any view "significantly less" than the outgoing value. Moreover, even in the absence of direct evidence of the existence of a special purchaser for the policy, Jonathan Parker LJ was unable to accept the proposition that the conclusion must follow that its value was no more than its surrender value of £71. The appeal was substantially dismissed, the Court of Appeal considering that the Judge was fully entitled to find that the outgoing value was at least £10,000. The

Court of Appeal did not find it necessary to hear argument on the point made in the Respondent's Notice that in valuing the policy as at the date of the declaration of trust the Judge should have taken account of the fact that Mr Thoars had died shortly thereafter.

In *Carman v Letchford*; sub nom. *Re Hollier (A Bankrupt)* [2010] EWHC 3155 (Ch); [2014] B.P.I.R. 927, HH Judge Hodge QC, sitting in the Chancery Division, stated:

> "As appears from the leading judgment of Jonathan Parker LJ in *Re Thoars (Deceased)* [above], the court is not required, for the purposes of deciding whether there is a significant difference between the incoming and outgoing values, to have reference to expert evidence as to values but is entitled to apply a common sense approach and can, if necessary, take from a range of possible values those which are most favourable to the party seeking to uphold the transaction in question" (at [7]).

Significantly less

**3-2261** The expression "significantly less" is not a term of art. Its applicability to any particular case must depend upon the facts of that case. The determination of rights by reference to adverbs of magnitude can often lead to a considerable area of uncertainty, as was demonstrated, for example, by the various interpretations given to the adjective "substantial", running from "not insubstantial" to "quite large", contained in the phrase "a substantial portion of the whole rent" used in the Rent and Mortgage Interest Restrictions Act 1923 s.10(1) (repealed) (see *Palser v Grinling* [1948] A.C. 291 HL, and subsequent cases). Under s.42(1) of the 1914 Act, a purchaser in good faith and "for valuable consideration" was excluded from the purview of s.42. For the purposes of that subsection, the courts construed the expression "purchaser ... for valuable consideration" as meaning the provider of a commercial quid pro quo; that is to say, someone who could be said to have given a consideration for his purchase which had a real and substantial value, and not one which was merely nominal or trivial or colourable (see *Re Abbott (Bankrupt No.8 of 1980)* [1983] Ch. 45 DC, at 54E–H, 57G–H). The old law effectively located the invalidity point above the level of "nominal" or "insignificant", but below the level of equality. It is plain that, by the adoption of the term "significantly less", the legislature intended to give the court a margin within which to seek to do justice between the recipient and the creditors generally, according to the particular circumstances of the case.

Can the giving of security be a transaction at an undervalue?

**3-2262** In *Re MC Bacon Ltd (No.1)* [1990] B.C.L.C. 324, Millett J. had to consider whether the giving of a debenture by a company to a bank, with which it had existing overdraft facilities, was a transaction at an undervalue within IA 1986 s.238.

> "[Section 238(4)(b)] requires a comparison to be made between the value obtained by the company for the transaction, and the value of consideration provided by the company. Both values must be measurable in money or money's worth and both must be considered from the company's point of view. In my judgment, the [liquidator's] claim to characterise the granting of the bank's debenture as a transaction at an undervalue is misconceived. The mere creation of a security over a company's assets does not deplete them and does not come within the paragraph. By charging its assets the company appropriates them to meet the liabilities due to the secured creditor and adversely affects the rights of other creditors in the event of insolvency. But it does not deplete its assets or diminish their value. It retains the right to redeem and the right to sell or remortgage the charged assets. All it loses is the ability to apply the proceeds otherwise than in satisfaction of the secured debt. That is not something capable of valuation in monetary terms and is not customarily disposed of for value ... By granting the debenture the company parted with nothing of value, and the value of the consideration which it received in return was incapable of being measured in money or money's worth." (ibid., at 340g–341b).

This passage was approved in *National Bank of Kuwait v Menzies* [1994] B.C.C. 119 CA, and was further applied in *Agricultural Mortgage Corp Plc v Woodward* [1995] 1 B.C.L.C. 1 CA.

However, in *Hill v Spread Trustee Co Ltd* [2006] EWCA Civ 542; [2007] 1 W.L.R. 2404 at [138], Arden LJ, with the concurrence of other members of the Court, said:

> "[Counsel for the appellants] sought to argue that as a matter of law the grant of security involved no diminution in the value of [the prospective bankrupt's] assets ... As to that, I would observe that section 423(1)(c) [in the same terms as s.339(3)(c)] did not refer to a diminution in assets and does not depend on the grant of proprietary rights. The grant of other rights can constitute consideration; this approach is supported by section 425 [in terms similar to s.342] which refers to "obligations" and "benefits" as well as to property. If it had been necessary to find the grant of a proprietary right, I would provisionally not have accepted the argument that the grant of security in this case did not involve the disposition of any property right in favour of the [appellants]. Obviously there is no change in the physical assets of the debtor when the security is given but there seems to be no reason why the value of the right to have recourse to the security and to take priority over other creditors, which the debtor creates by granting the security, should be left out of