# EXHIBIT A

PI Defendants' Skeleton Argument
for the Trial of Preliminary Issues
dated 15 July 2011

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
VIRGIN ISLANDS
COMMERCIAL DIVISION

CLAIM NO BVIHC (COM) 357/2009

FAIRFIELD SENTRY LIMITED (in liquidation)

Claimant

and ALFREDO MIGANI and others

Defendants

CLAIM NO BVIHC (COM) 404/2009

FAIRFIELD SENTRY LIMITED (in liquidation)

Claimant

and BANCO GENERAL SA / BANCA PRIVADA and others

Defendants

CLAIM NO BVIHC (COM) 425/2009

FAIRFIELD SENTRY LIMITED (in liquidation)

Claimant

and BANK JULIUS BAER & CO LIMITED and others

Defendants

CLAIM NO BVIHC (COM) 5/2010

FAIRFIELD SENTRY LIMITED (in liquidation)

Claimant

and BANK JULIUS BAER & CO LIMITED and others

Defendants

CLAIM NO BVIHC (COM) 15/2010

FAIRFIELD SENTRY LIMITED (in liquidation)

Claimant

and ARBITRAL FINANCE INC and others

Defendants

CLAIM NO BVIHC (COM) 30/2010

FAIRFIELD SENTRY LIMITED (in liquidation)

Claimant

and BANK JULIUS BAER & CO LIMITED and others

Defendants

CLAIM NO BVIHC (COM) 153/2010

FAIRFIELD SENTRY LIMITED (in liquidation)

Claimant

and WISE GLOBAL FUND LIMITED

Defendant

CLAIM NO BVIHC (COM) 20/2011

FAIRFIELD SENTRY LIMITED (in liquidation)

Claimant

and CREDIT SUISSE LONDON NOMINEES LIMITED

Defendant

---

## SKELETON ARGUMENT OF THE DEFENDANTS
## ON THE PRELIMINARY ISSUES

---

1.     The Court is familiar with the background to this matter, having ordered the trial of these preliminary issues on 20 April 2011. The issues to be determined are set out in the Schedule to the Order made on that date [1/1 p 6].

2.     In this skeleton argument, the Defendants address the following topics:

(i)      The provisions of the Articles of Association of the Claimant ('Sentry') relating to the redemption process;

(ii)     The redemption process in practice and the documents involved;

(iii)    The meaning of 'certificate';

(iv)    The authority of Sentry's administrator Citco Fund Services (Europe) BV ('Citco') and its investment manager Fairfield Greenwich (Bermuda) Ltd ('FGB') to issue the relevant documents;

(v)     The answers to Preliminary Issues (1), (2) and (3);

(vi)    The matters raised in Sentry's witness statements in relation to Preliminary Issues (1), (2) and (3);

(vii)   The good consideration defence and the answer to Preliminary Issue (4).

3.      In summary, it is the Defendant's case that Sentry's claims for restitution of redemption payments must fail, both because binding certificates of the Net Asset Value per Share and of the Redemption Price were given by or on behalf of Sentry, and because the Defendants gave good consideration for the redemption payments. The contrary conclusions for which Sentry apparently contends are not merely wrong as a matter of law. They would also make drastic and highly damaging inroads into commercial certainty and business efficacy in the investment funds industry, which operates on the basis that in managing their affairs investors can rely on the finality of the Net Asset Values on which concluded transactions are based.

(i)     Provisions of the Articles of Association relating to the redemption process

4.      The Defendants draw attention to the following provisions of Sentry's Articles of Association [2/1].

5.      **Article 1** contains various definitions, to some of which reference is made below. The use of initial capitals in this part of the skeleton argument indicates that a term is defined in Article 1.

6.      **Article 9** deals with the issue of Shares. Under this Article:

    (i)      Sentry may issue Shares on receipt by it or its authorised agent of an application in a form determined by the Directors;

    (ii)     The issue of Shares is to be made on the Dealing Day on which, or immediately following the day on which, the application is received, provided that the application is received at or before the Dealing Time;

    (iii)    Shares are to be issued at not less than the Subscription Price determined in accordance with paragraph (2) of Article 9 (and in any event at no less than par value);

    (iv)    Payment is to be made in the Base Currency (US$) at such time and place and in such manner as the Directors may determine;

    (v)     Under paragraph (2), the Subscription Price for each Share is to be the Net Asset Value of each Share, as determined in accordance with Article 11, as at the close of business in Amsterdam on the Valuation Day immediately preceding the Dealing Day on which such issue is made.[1]

7.     Article 10 deals with the redemption of Shares. Under this Article:

    (i)      Sentry must[2] redeem or purchase Shares on receipt by it or its authorised agent of a request in writing by a Member (the 'Applicant') specifying the number and class of Shares to be redeemed;

    (ii)     The redemption or purchase of Shares is to be made on the Dealing Day on which, or immediately following the day on which, the written request is received, provided that the request is received at or before the Dealing Time;

    (iii)    Shares are to be redeemed or purchased at the Redemption Price determined in accordance with paragraph (2) of Article 10;[3]

    (iv)    Payment is to be made to the Applicant in the Base Currency as soon as practicable after the relevant Dealing Day, being normally 30 days;[4]

---

1 Save in the case of an initial issue of Shares, when the Subscription Price is at the discretion of the Directors.
2 Subject to the provisions of the Memorandum and Articles of Association and the Act (defined as the International Business Companies Act [now repealed] as amended from time to time).
3 Less a charge of 2% to be applied in certain circumstances that are not presently relevant.

(v)    During any period when determination of the Net Asset Value ('NAV') is suspended pursuant to Article 11, no Shares shall be redeemed or purchased, and unfulfilled redemption requests may be withdrawn, but the Applicant is not otherwise entitled to withdraw a duly made request without the consent of the Directors;

(vi)    Under paragraph (2), the Redemption Price for each Share is to be the NAV per Share, as determined in accordance with Article 11, as at the close of business in Amsterdam on the Dealing Day on which such redemption is effected, less such sum (if any) as the Directors may consider represents the appropriate provision for fiscal and sale charges which would be incurred on the sale of assets of Sentry;

(vii)    Under paragraph (4), upon the redemption or purchase of a Share being effected pursuant to Article 10, the Member ceases to be entitled to any rights in respect of that Share (except accrued rights to dividends) and accordingly his name is to be removed from the Register with respect thereto.

8.    Under the definitions in Article 1, save in the event that the Directors determine otherwise:

(i)    The Valuation Day is the last business day[5] of each month.

(ii)    For subscriptions:

    (a)    The Dealing Day is the first business day following the Valuation Day;

    (b)    The Dealing Time is 5 pm Amsterdam time on the third to last business day of the month.

(iii)    For redemptions:

    (a)    The Dealing Day is the Valuation Day;

---

4 Subject to extension when the determination of the NAV has been suspended by declaration of the Directors pursuant to Article 11, or when the relevant share certificate, if any, has not been lodged as required by Article 10.

5 Defined in Article 1 as "*any day which is not a Saturday or a Sunday and that is not a public holiday or a day on which banks are generally authorised or obliged by law or regulation to close in the Netherlands, the Republic of Ireland or the United States of America*".

(b)    The Dealing Time is 5 pm Amsterdam time on the day
15 business days before the Dealing Day.

9.    Thus, in relation to redemptions, the request had to be submitted by 5 pm Amsterdam
time 15 business days before the Dealing/Valuation Day, which was the last business
day of the month. Once the request was received, both Sentry and the redeeming
shareholder were bound by it, unless the determination of the NAV was suspended.
The redemption was to be effected on the Dealing/Valuation Day and the proceeds
were to be paid as soon as practicable thereafter.

10.    Article 11(1) deals with the determination of the NAV per Share. Under this
paragraph of Article 11:

(i)    The NAV of each class of Share is to be determined by the Directors as
at the close of business on each Valuation Day (except when
determination of the NAV has been suspended under Article 11(4));

(ii)    The NAV per Share is to be calculated by dividing the value of the net
assets of Sentry by the number of Shares in issue or deemed to be in
issue, and by making an adjustment for dividends, distributions, assets
and liabilities attributable to each class of Share.

11.    Article 11(1) also includes the crucial provision:

*"Any certificate as to the Net Asset Value per Share or as to the Subscription
Price or Redemption Price therefor given in good faith by or on behalf of the
Directors shall be binding on all parties."*

12.    Article 11(2) and Article 11(3) contain further provisions relevant to the
determination of the NAV per Share. Article 11(2) defines the net assets of Sentry and
sets out circumstances in which Shares are deemed to be, or not to be, in issue. Article
11(3) contains detailed provisions as to the manner in which certain types of asset are
to be valued.

13.    **Article 11(4)** permits the Directors to suspend the determination of the NAV per Share in certain circumstances.

### (ii)    The redemption process in practice and the documents involved

14.    The operation of the redemption process in practice is described in the statement of the Defendants' witness Peter Füglistaller [1/6]. Mr Füglistaller is Head of Special Mandates in Hedge Fund Execution at Credit Suisse (Zurich) AG ('CSZ'). From 2001 his duties included supervising the management of CSZ's investments in Sentry. So far as the Defendants are aware, his account of the redemption process is uncontroversial.

15.    As Mr Füglistaller explains [§§ 7-9], the first step in the process was the submission of a redemption request to Citco, Sentry's administrator, at least 15 business days before the Dealing Day on which the shares were to be redeemed. CSZ generally used a standard form of redemption request but this was not mandatory. The redemption request would specify the number of shares, or the value of the shares, to be redeemed. The NAV per Share on the Dealing Day, and thus the Redemption Price, would not be known at this stage, although "*we would have had a pretty good idea of what the expected NAV was likely to be based on the previous performance of the fund*". Mr Füglistaller produces an example of such a request [2/4/102]. As noted above, in the case of redemptions the Valuation Day and the Dealing Day are the same.

16.    Shortly after receiving the request, Citco would confirm its receipt and the number or value of the shares to be redeemed [Füglistaller § 9]. This was usually done by a confirmation document in a standard form [2/4/109]. As can be seen, this document was issued before the Dealing Day and does not specify the Redemption Price or the NAV per Share, but identifies the 'Trade Date', the 'Valuation/NAV Date' (i.e. the Valuation Day) and the 'Settlement Date' (i.e. the due/expected date of payment).

17.   The redemption would then be effected on the Dealing Day and the (former) shareholder would then receive a contract note[6] from Citco, typically around the middle of the following month. Payment was normally made shortly after the contract note was sent [Füglistaller § 9]. Several of these contract notes are in evidence [2/3/80-87, 2/4/110]. It will be seen that, once again, they identify the 'Trade Date' and the 'Valuation/NAV Date'. They also invariably indicate the actual or expected date of payment and, importantly, the number of shares redeemed, the Redemption Price, and the gross and net redemption proceeds.

18.   Citco also sent monthly statements to all investors [Füglistaller §§ 8, 10]. Three such statements are in evidence. To take one of them [2/3/88] as an example:

   (i)     It is dated 17 February 2004;

   (ii)    The NAV per Share as at 31 December 2003 (US$957.8430) is shown in no fewer than 4 places:

         (a)    Under the heading 'Fund Net Asset Values', as the offer price on that date;

         (b)    Under the same heading, as the bid price on that date;

         (c)    Under the heading 'Account Value', as the NAV on that date;

         (d)    Under the heading 'Summary of Activity', as the NAV in relation to a redemption of shares on that date by the shareholder to whom the statement was sent. The contract note relating to this redemption [2/3/83] shows the same figure of US$957.8430 as the Redemption Price.

   (iii)   The NAV per Share as at 31 January 2004 (US$966.8686) appears in 3 places, corresponding to (ii)(a) to (c) above.

19.   A similar pattern is followed in the other two monthly statements that are in evidence [2/3/89, 2/4/98-99]. The first of these refers to a redemption of 4,526.29 shares (Contract No 41904202) and gives the NAV per Share as US$1,148.8427. The

---

6 In some of the pleadings these documents have been described as confirmations of redemption.

contract note relating to this redemption [2/3/87] gives exactly the same figure as the Redemption Price.

20.    Mr Füglistaller refers to a number of other relevant types of document which were not an essential part of the redemption process but which nonetheless constituted communications of the NAV to the shareholders.

21.    One of these types of document was a weekly report, distributed by Fairfield Greenwich (UK) Ltd, of the <u>estimated</u> NAV of several funds within the Fairfield Greenwich Group ('FGG'), including Sentry [Füglistaller § 6, 2/4/100-101]. Since the figures set out in these reports (a) were calculated weekly and therefore not, or not necessarily, as at the Dealing Days and (b) were explicitly described as estimates, the Defendants do not rely on them as certificates of the NAV for the purposes of Article 11(1). But it is relevant to note the distinction that is drawn between estimated and final NAV figures in the disclaimer in the covering e-mail [2/4/100]:

> *"Estimated figures are for information purposes only and are STRICTLY for internal use. In this way, neither FGG nor you can be held liable for any errors or changes in the estimated numbers that may affect adversely or otherwise the final published month-end figure."*

22.    This contrast between the estimated NAV (as at various dates during the month) and the final month-end NAV is also found on an example of a screenshot from Citco's online pricing service [2/3/95] which is exhibited to the statement of Mr Kite of Harneys. This example shows the 'Estimated NAV' at a number of dates in December 2003 and January 2004 and the 'NAV' at 30 November 2003 and 31 December 2003. The latter figures (US\$954.7766 and US\$957.8430 respectively) correspond exactly with the figures shown as Redemption Prices on contract notes relating to redemptions effected on those dates [2/3/82-84]. Mr Füglistaller did not himself use the information on Citco's website, but his colleagues did [Füglistaller § 13].

23.    Finally, Mr Füglistaller says that CSZ was informed of the NAV per Share on the relevant Dealing Days in e-mails, faxes or mailings from Citco and/or from Sentry's Investment Manager, FGB. While CSZ has not retained these communications, they were similar to certain documents exhibited to Mr Kite's statement [Füglistaller § 11].



Those documents are e-mails from Citco [2/3/90-92] and FGB [2/3/93-94] which state in terms, and in some cases with the emphasis of italics, the *final* NAV per Share of Sentry on the last day of the previous month. Once again there is an exact correspondence between the final NAV per Share as stated in these e-mails and the Redemption Price as shown on contract notes (where available) relating to redemptions effected on the relevant dates, as can be seen from the following references:

| Dealing Day | E-mail(s) | Date of e-mail(s) | NAV per Share | Contract Note(s) | Date of contract note(s) | Redemption Price |
|---|---|---|---|---|---|---|
| 31 December 2003 | 2/3/90 (Citco) | 16 January 2004 | US$957.8430 | 2/3/84 | 16 January 2004 | US$957.8430 |
| | | | | 2/3/83 | 22 January 2004 | US$957.8430 |
| 31 January 2004 | 2/3/91 (Citco) | 17 February 2004 | US$966.8686 | 2/3/85 | 26 February 2004 | US$966.8686 |
| 29 February 2004 | 2/3/93 (FGB) | 12 March 2004 | US$971.7380 | 2/3/86 | 19 March 2004 | US$971.7380 |
| | 2/3/92 (Citco) | 18 March 2004 | US$971.7380 | | | |

24.    The dates of the e-mails show that they were sent around the middle of the month, which was about the same time as contract notes were sent to the shareholders whose shares had been redeemed at the end of the previous month.

25.    At the end of his statement [1/6 p 5], Mr Füglistaller says as follows with regard to the various documents to which he has referred:

> "*14. We clearly understood that the NAV per share, and the Redemption Price as so confirmed by Citco on behalf of the Fairfield Funds, were final and binding. Indeed I cannot recall an occasion on which Citco or the Fairfield Funds attempted to revise the NAV per share or the Redemption Price once it had been formally confirmed by the documents I have referred to above.*

> *16. In my experience the confirmation of the NAV and Redemption Prices by these documents is perfectly standard in the funds industry. Regular and accessible information on the NAV figure is clearly vital for an investor and investors rely on administrators, in this case Citco, to confirm the NAV."*

### (iii)    The meaning of 'certificate'

26.    As noted above, Article 11(1) provides that in certain circumstances a 'certificate' as to the NAV per Share or as to the Redemption Price is binding. The Articles give no definition of what is meant by a 'certificate'. In order to determine whether any of the documents relied upon by the Defendants is a 'certificate', it is necessary to consider the meaning of that word.

27.    Two authorities provide relevant guidance. *The Queen v The Vestry of St Mary, Islington* (1890) 25 QBD 523 concerned a statutory provision for the costs of maintaining disused churchyards to be *"repaid ... upon the certificate ... of the churchwardens"*. The churchwarden sent a letter asking for payment of £500 before he had entered into a contract for the works. He then entered into the contract and incurred liability for an amount in excess of £500. The Court held that he was entitled to be *"repaid"* even though he was not yet out of pocket. Pollock B held at p 527 that the requirement for a certificate was *"amply satisfied by the letter"*. A L Smith J held as follows at p 529:

> *"It is further said that there must be a "certificate" of the churchwardens before the overseers are justified in paying them. What sort of certificate is necessary? It must clearly be in writing. A precept or a request to pay satisfies the language of the section. It must be a certificate of expenses which have to be paid. In my opinion the document signed by the prosecutor satisfies that meaning of the word ..."*

28.    Although the facts were very different from those of the present case, the decision is of assistance in that it shows that, beyond the need for a certificate to be in writing, the Court did not identify any specific criteria that had to be met in order for a document to meet the description of 'certificate', and readily accepted that a letter could suffice.

29.    *Rexhaven Ltd v Nurse* (1996) 28 HLR 241 concerned forfeiture of a lease for non-
        payment of the service charge. The lease required the management company to
        estimate the costs for the next quarter and to send to the lessee:

> "*a certificate of the amount so estimated and of the proportion thereof to be
> contributed by the lessee and the lessee shall be liable to contribute as
> aforesaid and such certificates shall be binding and conclusive and the
> amount so certified shall be paid by the lessee to the Management Company
> on demand*".

30.    By the time of the disputed events, the amounts due in respect of the service charge
        had, for reasons that are immaterial, become payable directly to the landlord. The
        landlord's agents wrote a letter to the lessee, expressed as a request for payment of
        £190 under the lease in respect of the interim service charge, and a further letter
        giving a detailed breakdown of "*our estimate of service charge expenditure*". Judge
        Colyer QC, sitting in the Chancery Division, held that the second letter was a
        certificate. He said:

> "*The lease gives no definition of what is meant by "a certificate". So what is a
> certificate for the purposes of this clause? Has the word any established
> meaning, so that if a draftsman used it without defining the word, the reader
> would know what the term means? "Certify" and cognate expressions
> deriving therefrom, are widely used terms. Extracts of documents at* (sic) *title
> are certified every day of the week by solicitors as true copies. Facts are
> certified as correct, and so on. But in final analysis the word is usually otiose
> and adds little, if anything, to the recital of the extract or the facts and the
> verifying signature of the party who provides it. Use of the word sometimes
> makes it clear that that party warrants the truth of what is certified - a
> somewhat otiose concept where the landlord is certifying its own estimate.
> Clearly however, "a certificate" is a document. It has to be written out. Mr
> Neuberger adopts Chambers' definition of the word: "Certificate - a written
> definition of fact". The Concise Oxford English Dictionary, I observe, has a
> slightly different definition. "A document formally attesting a fact." Mr
> Neuberger submits that as to the certificate, to require a person to provide a
> certificate of its own estimate, that is as opposed to a certificate of an actual
> expenditure, is no more than to require that person to provide a statement in
> writing of the estimate and that the letters of September 29, 1993 and October
> 27, 1993, which I have read, taken together comply with the provision of the
> lease. He says that the purpose of the provision in the lease is to ensure that
> the tenant has knowledge of the total estimate of expenditure and the*

*proportion that is payable by her. The purpose was more than met by those two letters.*

*I accept that the plaintiff's case here derives some assistance from R. v. St. Mary's Vestry, Islington 25 QBD 523, especially the observations on pages 527 and 529. I derive some assistance, although of course that authority is only persuasive since I am construing a document from the observations that were made in that case. I accept, however, the propositions that Mr Neuberger has relied upon and in these circumstances I find that the letter of October 27, which of course was precise as to its figures, did satisfy the requirement for "a certificate", by which word I see the draftsman of this lease was requiring nothing more or less than a formal statement in writing of the precise amount or amounts. I would observe, but this is obiter dicta; that if the figures had been scribbled on the back of an envelope and handed in a highly informal manner to the tenant, in my view that would not be enough. Some degree of solemnity or formality is needed for a document to satisfy the requirement of this lease. It is not enough that it be scribbled down casually. It has to be written down and it has to be written down with precision; but here it was. I therefore see no hope of success in the defence that there was no good certificate in this case."*

31.    Thus, in the context of the lease, the Court held that the certificate had to be "*a formal statement in writing of the precise amount or amounts*" but that nothing more was required. The level of formality that is expected can be gathered from the fact that, once again, a letter was considered sufficient, and from the *obiter dicta* to the effect that, by contrast, it would not have been enough for the information to be "*scribbled down casually*" or handed to the tenant "*in a highly informal manner*".

32.    The Defendants submit that Judge Colyer's reasoning in *Rexhaven Ltd v Nurse* is correct and they invite the Court to follow it. It is further submitted that Sentry's determination of the NAV is comparable to the landlord's estimate of the service charge in that case. Both involved the gathering of information and (at least potentially) the exercise of a degree of judgment to arrive at the valuation or estimate that would fix the amount that the other party had to pay (in the case of the tenant or a subscriber for shares in Sentry) or would be entitled to receive (in the case of a redeemer of shares in Sentry). The function of the 'certificate' clause in the lease in *Rexhaven Ltd v Nurse* was analogous to that of the 'certificate' provision in Article 11(1).

33.    It should therefore be concluded that any document which is *"a formal statement in writing of the precise amount"* of the NAV per Share, the Subscription Price or the Redemption Price was a 'certificate' for the purposes of Article 11(1).

34.    It is unclear to the Defendants precisely what Sentry submits would be necessary in order for a document to constitute a 'certificate' within the meaning of Article 11(1). But it appears to be implicit in Sentry's case that neither the NAV per Share nor the Redemption Price was ever certified to any redeeming shareholder, even though the Articles clearly contemplate that certificates would be given.

(iv)    The authority of Citco and FGB to issue the relevant documents

35.    It was suggested, speculatively, on behalf of Sentry at the hearing on 18 April 2011 that documents might exist that showed that Citco was not authorised by the Directors of Sentry to issue certificates under Article 11(1).

36.    Fortunately the Court need not speculate, but can instead refer to the Administration Agreement between Sentry and Citco dated 20 February 2003 [2/2].

37.    By **Clause 2** of that agreement, Sentry appointed Citco to provide the Services, defined in Clause 1 as the services specified in Schedules 2 and 4 [2/2/54].

38.    **Clause 3.1(b)** provided that Citco was at all times to:

> *"exercise its powers and perform its duties in connection with the provision of the Services under this Agreement subject to the orders, instructions, directions of the Directors"* [2/2/55]

39.    Under **Schedule 2**, the Services to be provided included the following [2/2/69-70]:

> *"calculation of the Net Asset Value and the Net Asset Value per Share on a monthly basis in accordance with the Fund Documents"* (Part 1(a))

> *"publishing the Net Asset Value per Share (of each class if appropriate) as requested by [Sentry]"* (Part 2 (e))

*"dealing with and replying to all correspondence and other communications addressed to [Sentry] in relation to the ... redemption ... of Shares"* (Part 2 (j))

40.    Only one[7] of the 8 actions with which the Court is concerned includes claims in respect of redemptions pre-dating this Administration Agreement, and there is in any event no evidence to show that the scope of Citco's authority as administrator was materially different before this agreement was made.[8]

41.    The Administration Agreement remained in force until at least 14 August 2006, and in all probability longer, as can be seen from Sentry's Private Placement Memorandum of that date [2/128], which includes the following passage:

> *"Pursuant to an administration agreement, dated February 20, 2003, between [Citco] and [Sentry] ... Citco serves as the administrator for [Sentry], under the overall direction of [Sentry]'s Board of Directors. As administrator, Citco has the responsibility for furnishing the day-to-day administrative services which [Sentry] may require, such as: accounting services; maintaining [Sentry]'s books and records; preparation of reports and accounts; calculation of Net Asset Value and fees; communications with shareholders ..."* [2/151]

42.    There is no evidence to suggest that Citco's authority was restricted or diminished at any material time after the date of this Private Placement Memorandum.

43.    Sentry's witness Albertus Lokhorst, formerly a Senior Account Manager employed by Citco, states that Citco:

> *"... was authorized by the Funds' investment manager, to whom the Funds' Directors contractually delegated the day to day management of the Funds, to issue the monthly investor statements to registered shareholders."*[9] [1/7 § 7]

44.    He does not say (and it would be most remarkable if he did) that Citco lacked authority to issue any of the other documents that it actually issued, as a matter of routine, to the registered shareholders, as described by Mr Füglistaller and discussed above.

---

7 BVIHC(COM) 20/2011.
8 Citco had been Sentry's administrator since 1999 [1/6/2, Füglistaller § 6].
9 The Funds to which he refers are Sentry and its sister funds Fairfield Lambda Ltd and Fairfield Sigma Ltd.

45.    In short, it is perfectly obvious that Citco had actual authority, on behalf of Sentry, to calculate and publish the NAV, and to communicate with shareholders both generally and specifically in relation to redemption requests.

46.    Alternatively, and at the very least, Citco had ostensible authority[10] to perform these acts on behalf of Sentry, since it was held out by Sentry to the shareholders as having such authority by its appointment as Sentry's administrator, and by the description of its responsibilities in the Private Placement Memorandum. Furthermore, under the 'indoor management' principle,[11] the shareholders were entitled to assume that if any internal procedures had to be followed in order for Sentry to confer authority on Citco then those procedures had been properly observed.

47.    Moreover, Sentry's investment manager, from whom Mr Lokhorst says that Citco received authority to issue the monthly statements, was FGB. If, as Mr Lokhorst says, FGB had the power to authorise Citco (in addition to the authority possessed by Citco in any event under the Administration Agreement) to issue the monthly statements [2/3/88-89, 2/4/98-99], it can scarcely be doubted that FGB itself had actual authority to send the e-mails [2/3/93-94] that contained the same information as to the NAV per Share as the monthly statements. Alternatively, and at the very least, FGB has ostensible authority to send those e-mails by virtue of its position as Sentry's investment manager.

48.    The only remaining point in relation to the authority of Citco (and FGB) is foreshadowed in the statement of Mr Lokhorst, who says: [1/7 § 8]

> "*I am not aware that [Citco] was ever instructed by the Directors, or whether the Directors ever instructed anyone else, to issue a "certificate" with respect to the monthly NAV for the Funds.*"

49.    It appears, therefore, that Sentry may argue that Citco could only have had authority to issue certificates if its instructions had specifically referred to issuing 'certificates'.

---

10 The general principle is stated as follows in *Bowstead and Reynolds on Agency* (ed. 19, 2010) at 8-013: "*Where a person, by words or conduct, represents or permits it to be represented that another person has authority to act on his behalf, he is bound by the acts of that other person with respect to anyone dealing with him as an agent on the faith of any such representation, to the same extent as if such other person had the authority that he was represented to have, even though he had no such actual authority.*"
11 *Royal British Bank v Turquand* (1856) 6 E&B 327.

But that argument confuses two quite separate questions. The first question, which the Defendants submit should be answered affirmatively, is whether Citco had authority to issue the relevant documents on behalf of Sentry. The second is whether those documents were 'certificates'. That is an issue of law, the answer to which cannot depend on the terms of any instructions given to Citco by the Directors, or on any opinion that the Directors or Citco may have held as to whether or not the documents were 'certificates'. It is this question that is raised in Preliminary Issue (1).

(v)    The answers to Preliminary Issues (1), (2) and (3)

50.    Preliminary Issue (1) asks:

> *"Whether any (and, if so, which) of the documents copies of which are exhibited at pages 2 to 17 inclusive of exhibit PRK-1 to the affidavit of Phillip Kite sworn in the proceedings the short title and first reference to which is Fairfield Sentry Limited (in liquidation) –v– Bank Julius Baer & Co Limited and others BVIHC(COM) 30/2010 on 8 March 2011 (or copies of any further documents which may be exhibited to any witness statement made in connection with this issue) ("the documents") is a certificate within the meaning of Article 11(1) of the Articles of Association of the Claimant ("Article 11(1)", "the Articles")"*

51.    Preliminary Issue (2) asks:

> *"If the answer to (1) is yes, whether any (and, if so, which) of the documents is*
> *(a)    a certificate as to the Net Asset Value per share ('NAV') or*
> *(b)    a certificate as to the Redemption Price*
> *within the meaning of the Articles"*

52.    The Defendants accept that the redemption request [2/4/102], the confirmation of receipt of the redemption request [2/4/109] and the weekly estimated NAV report [2/4/100-101] are not certificates.

53.    The Defendants submit that, in respect of the remaining categories of document, Preliminary Issues (1) and (2) should be answered as follows :

(i)    Contract notes [2/3/80-87, 2/4/110]



Each of these is a certificate as to the Redemption Price because it is a formal statement in writing of the precise amount of the Redemption Price

(ii)   Monthly statements [2/3/88, 2/3/89, 2/4/98-99]

Each of these is a certificate as to the NAV per Share because it is a formal statement in writing of the precise amount of the NAV per Share. It is also a certificate as to the Redemption Price because it makes clear that no deductions are being made from the NAV per Share.

(iii)   E-mails from Citco [2/3/90-92]

Each of these is a certificate as to the NAV per Share because it is a formal statement in writing of the precise amount of the NAV per Share

(iv)   E-mails from FGB [2/3/93-94]

Each of these is a certificate as to the NAV per Share because it is a formal statement in writing of the precise amount of the NAV per Share

(v)   Citco's online pricing service [2/3/95]

This is a certificate as to the NAV per Share because (where it refers to the 'NAV' as opposed to the 'Estimated NAV') it is a formal statement in writing of the precise amount of the NAV per Share

54.   In the case of each document identified above as a certificate, it is submitted that the requirement of formality (as well as those of writing and precision) is easily satisfied. All of these documents were, as they appeared to be, communications of a serious

nature relating to Sentry's shares and dealings therein, and their contents are in no way comparable to Judge Colyer's example of figures *"scribbled on the back of an envelope"*.

55.   In a world in which business transactions are routinely conducted by electronic means, it cannot be right to insist that the writing must be contained in a physical document as opposed to being transmitted by e-mail or displayed on a website. The reason why writing is required is that it is capable of objective proof by production of copies of the relevant documents, which avoids the inherent uncertainty of disputes about oral communications. That indicates that writing contained in an e-mail or on a website is sufficient, provided that it has the necessary qualities of formality and precision. The e-mails from Citco and FGB were the equivalent of letters, written with the same degree of formality as would be expected in a hard-copy letter on a business matter. The website was a pricing service provided to investors, and thus a formal rather than a casual communication of pricing information. Both the e-mails and the website contained statements of the precise amount of the NAV per Share.

56.   Preliminary Issue (3) asks:

> *"If the answer to (2)(a) or (b) is yes:*
> *Whether the publication or delivery by the Claimant*
> > *(a) as a matter of information only, or*
> > *(b) in connection with a redemption request*
> *of a document containing substantially the same items of information as a document identified as falling within (2)(a) or (b) above to a redeeming or redeemed Member of the Claimant precludes the Claimant from asserting that money paid to that redeeming or redeemed Member on redemption exceeded the true Redemption Price and as such is recoverable as to the excess from such redeeming Member.*
> *For the purposes of this issue 'document' includes emails and materials accessible on a website maintained by the Claimant or Citco Fund Services (Europe) BV or Fairfield Greenwich Group."*

57.   It is the Defendants' understanding that Preliminary Issue (3) is intended to ascertain whether the publication or delivery, either as a matter of information only or in connection with a redemption request, of either (i) the specific documents identified as certificates of the NAV per Share or Redemption Price under Preliminary Issues

(1) and (2) or (ii) other documents of the same type (such as contract notes in respect
of other redemptions of Sentry shares or monthly statements covering other months or
issued to other shareholders in Sentry) has the preclusive effect described.

58.     The Defendants submit that the answer to Preliminary Issue (3) is yes, by reason of
the express terms of Article 11(1), and that this is so irrespective of whether the
publication or delivery of the document occurred in connection with a redemption
request or as a matter of information only.

59.     That distinction is immaterial because it is not drawn in the relevant paragraph of
Article 11(1), which simply provides that a certificate as to the NAV per Share or as
to the Subscription Price or Redemption Price therefor:

> "*given in good faith by or on behalf of the Directors shall be binding on all
> parties*"

60.     Had it been intended to exclude certificates given "*as a matter of information only*",
the draftsman would have said so. Moreover, since under Articles 10 and 11 the NAV
per Share, and hence the Redemption Price, was always calculated only after the
relevant redemption requests had been submitted, it is difficult to see how any
shareholder or former shareholder who might wish to rely on a certificate as binding
could ever be said to have received that certificate as a *mere* matter of information.
The communication of the NAV per Share to a shareholder who had already
submitted a redemption request was not a matter of information only, but was
indicative, and in the case of a certificate determinative, of the amount that he was
entitled to be paid in respect of his redemption.

61.     The Defendants further submit that, in the terms of Preliminary Issue (3), the
preclusive effect of a certificate as to the NAV per Share is just the same as that of a
certificate as to the Redemption Price. Either type of certificate precludes Sentry from
asserting that the sum paid on redemption exceeded the true Redemption Price, and as
such is recoverable as to the excess, because under Article 10(2) the Redemption
Price is based directly on the NAV per Share. Accordingly, once a binding certificate

had been given as to the NAV per Share, the Redemption Price would fall to be determined by reference to the certified NAV per Share.[12]

62.    The Defendants have not admitted in their pleadings that the Directors of Sentry acted in good faith. This in no way detracts from the preclusive effect of a certificate for the purposes of Preliminary Issue (3). While Article 11(1) refers to a certificate given "*in good faith*", it is a general principle of construction that a contract will be construed, so far as possible, so as not to permit one party to take advantage of his own wrong: see the review of the relevant authorities by Vos J in *Extra MSA Services Cobham Ltd v Accor UK Economy Hotels Ltd* [2011] EWHC 775 (Ch) at paragraphs 23-34. Hence Article 11(1) is not to be construed as enabling Sentry to rely (nor has Sentry sought to rely)[13] on its own bad faith in order to defeat what would otherwise be a good defence, namely that a binding certificate was given as to the NAV per Share or Redemption Price. The requirement for good faith in Article 11(1) is there to protect subscribing shareholders against the possibility that the Directors might in bad faith certify an overstated NAV per Share and/or Subscription Price, and to protect redeeming shareholders against the possibility that the Directors might in bad faith certify an understated NAV per Share and/or Redemption Price. It is not there to protect Sentry in the opposite situations, by enabling Sentry to escape from the consequences of understating the values in relation to subscriptions, or of overstating the values in relation to redemptions, in circumstances where its Directors have acted in bad faith.

63.    Thus, where a certificate of the NAV per Share and/or the Redemption Price is given to a redeeming shareholder, Article 11(1) operates as a contractual allocation of the risk of overstatement of the values to Sentry and, provided that the certificate has been given in good faith, of the risk of understatement of the values to the shareholder.

---

12 In practice it appears that the NAV per Share and the Redemption Price were always the same, because the deduction representing provision for fiscal and sale charges contemplated by Article 10(2) was not applied. See, for example, the NAV per Share at 31.12.2003 shown at 2/3/90 and the Redemption Price for a redemption on that date shown at 2/3/83.

13 Moreover if it were to do so its claims would be bound to fail on the ground that bad faith was inconsistent with the assertion of mistake that is the foundation of the pleaded causes of action.

64.   Finally, the Defendants draw attention to two cases in which issues as to the finality
of calculated NAVs were considered. In *Re Stewardship Credit Arbitrage Fund Ltd*
(2008) 73 WIR 136, a decision of the Commercial Court in Bermuda, the company's
bye-laws included a 'certificate' provision materially identical to that in Article 11(1)
[§ 47]. Bell J emphasised the enormous practical difficulties of recalculating the NAV
and observed [§ 48]:

> *"No doubt that is precisely why the relevant bye-law contained the provision
> that it did, making for certainty once the NAV had been determined."*

65.   In *Re Livingston International Fund Ltd* (BVIHCV 2002/197, 19 May 2004), there
was no requirement for a certificate, and Regulation 72 of the Articles of Association
provided that any valuations made pursuant to the Articles would be binding on all
persons [§ 74]. This Court refused to sanction recalculation of the NAVs. Rawlins J
(as he then was) said [§ 84]:

> *"... Regulation 72 of the Articles of Association of the Fund is intended to
> promote certainty and business efficacy. Investors, particularly significant
> investors in private Funds, make far reaching decisions and, in turn, incur
> significant financial obligations on the basis of reported NAVs ... For
> purposes of business efficacy in this case, I see no good reason to find that the
> published NAVs are not binding under Regulation 72."*

(vi)   <u>The matters raised in Sentry's witness statements in relation to Preliminary Issues (1),
(2) and (3)</u>

66.   At this point it is convenient to address two matters raised in Sentry's witness
statements that, according to Sentry's liquidator Kenneth Krys, *"militate against any
finding"* that the NAV was capable of certification by Citco or that documents issued
by Citco can be characterised as 'certificates' [1/8/6 § 14].

67.   The first is that some of the subscription agreements for shares in Sentry contained the
following provision:

> "10. *Valuations*. Subscriber understands that the value of its Shares and
> redemptions thereof, and the performance of [Sentry], may be based on
> unaudited and in some cases, estimated, valuations of [Sentry]'s investments
> and that any valuation provided in Subscriber's account statement may be an
> unaudited, estimated value."

68.    An example of this wording in a subscription agreement may be found at 2/5/118. Mr
Krys says in paragraph 5 of his statement [1/8/3] that the wording appears in:

> "[a]ll of the Long Form Subscription Agreements that are available for review
> by the Liquidators (without making a full search of their documents) and are
> known to have been entered into by Defendants in these proceedings".

69.    Whether that be so or not,[14] this clause does not assist Sentry. The proposition that the
value of Sentry's shares, or redemptions thereof "*may be based on unaudited and in
some cases, estimated, valuations of [Sentry]'s investments*" merely reflects the
manner in which Article 11(3) directs that the value of Sentry's net assets should be
calculated. That paragraph of Article 11 contains no requirement that the valuations of
Sentry's assets should be audited and expressly contemplates that in some
circumstances estimates will be made. Thus Article 11(3)(e) states:

> "... where on the last business (sic) of the month any cash or other asset of
> [Sentry] has been realised or contracted to be realised there shall be included
> in the assets of [Sentry], in place of such cash or other asset, the assets
> receivable by [Sentry] in respect thereof, provided that if the value of such
> assets is not then known exactly then its (sic) value shall be as estimated by
> the Directors"

70.    It is therefore entirely consistent with Article 11 that the NAV per Share, and hence
the Subscription Price and the Redemption Price, should be determined on the basis of
unaudited and, in some cases, estimated valuations of Sentry's investments. It follows
that the fact that the NAV per Share, the Subscription Price or the Redemption Price
may have been based on unaudited or estimated valuations is no bar to a binding

---

14 Curiously, Mr Krys says in paragraph 9 on the next page [1/8/4]: "*The Liquidators and their counsel have
located the Long Form Subscription Agreement for the Applicant UBS (Luxembourg) SA (in respect of its
investment in Sentry) which lacks the provision referred to in paragraph 5 above.*" UBS (Luxembourg) SA is a
defendant in BVIHC (COM) 15/2010 and BVIHC (COM) 30/2010. Mr Krys goes on to give a further example,
not involving a defendant in these proceedings, of a long form subscription agreement that lacks the relevant
clause. He says that the Liquidators are unable to confirm to what if any extent the forms of subscription
agreement in which the clause does not appear were used [1/8/4-5 §§ 10-11].

certificate thereof being given under Article 11(1). Indeed it may be thought that part of the purpose served by the 'certificate' provision in Article 11(1) is precisely to ensure that concluded subscriptions and redemptions cannot be re-opened on the ground that a later audit has shown that the underlying investments were incorrectly valued or that an estimate made by the Directors has proved to be wrong.

71.    The second matter raised by Sentry's witnesses [1/7 § 12, 1/8/5 §§ 12-13] is that the following wording appeared in at least some of the Private Placement Memoranda issued by Sentry:

> "*As administrator, Citco has the responsibility for furnishing the day-to-day administrative services which [Sentry] may require, such as: ... calculation of Net Asset Value and fees ...*
> *To the extent that Citco relies on information supplied by [Sentry], any investee fund of [Sentry] or any brokers engaged by [Sentry], in connection with making any of the aforementioned calculations, Citco's liability for the accuracy of such calculations is limited to the accuracy of its computations. Citco shall not be liable for the accuracy of the underlying data provided to it.*"

72.    An example of this wording appears at 2/5/151, which is part of Sentry's Private Placement Memorandum dated 14 August 2006 [2/5/128].[15]

73.    Once again this wording does not help Sentry. It does no more than assert that Citco's liability for inaccuracies in the calculation of the NAV is limited in the respects stated. That may or may not be a correct summary of Citco's legal position under the Administration Agreement [see clause 6 at 2/2/59-60] or otherwise. Whether it is or not is beside the point. The question whether or not Citco is liable to Sentry, or to anyone else, for inaccuracies in the calculation of the NAV is a separate issue from the question whether the confirmation of the NAV per Share and/or Redemption Price to the shareholders by Citco constituted a certificate binding as between Sentry and the shareholders.

(vii)    The good consideration defence and the answer to Preliminary Issue (4)

---

15 The Private Placement Memorandum produced by Mr Krys [2/6/213, 2/6/231] is irrelevant because it does not relate to Sentry.

74.    The final matter for decision is Preliminary Issue (4), which asks:

> "*Whether a redeeming Member of the Claimant in surrendering its shares gave good consideration for the payment by the Claimant of the Redemption Price and, if so, whether that precludes the Claimant from asserting that the money paid to that Member on redemption exceeded the true Redemption Price and as such is recoverable as to the excess from such redeeming Member*"

75.    In *Barclays Bank Ltd v W. J. Simms Son & Cooke (Southern) Ltd* [1980] QB 677, Robert Goff J conducted an extensive review of the authorities dealing with the principles on which money paid under a mistake of fact is recoverable. He stated his conclusions as follows (695C-D):

> "*From this formidable line of authority certain simple principles can, in my judgment be deduced: (1) If a person pays money to another under a mistake of fact which causes him to make the payment, he is prima facie entitled to recover it as money paid under a mistake of fact. (2) His claim may however fail if (a) the payer intends that the payee shall have the money at all events, whether the fact be true or false, or is deemed in law so to intend; or (b) the payment is made for good consideration, in particular if the money is paid to discharge, and does discharge, a debt owed to the payee (or a principal on whose behalf he is authorised to make the payment) by the payer or by a third party by whom he is authorised to discharge the debt; or (c) the payee has changed his position in good faith, or is deemed in law to have done so.*"

76.    This "*celebrated formulation*"[16] was approved by the English Court of Appeal in *Lloyds Bank plc v Independent Insurance Co Ltd* [2000] QB 110.

77.    Principle (2)(b) encapsulates the defence of good consideration. Robert Goff J added the following footnote to this principle (695G):

> "*This is founded upon the decision in Aiken v Short, 1 H & N 210, and upon dicta in Kerrison v Glyn, Mills, Currie & Co., 81 LJ KB 465. However, even if the payee has given consideration for the payment, for example by accepting the payment in discharge of a debt owed to him by a third party on whose behalf the payer is authorised to discharge it, that transaction may itself be set aside (and so provide no defence to the claim) if the payer's mistake was induced by the payee, or possibly even where the payee, being aware of the*

---

16 per Peter Gibson LJ in *Lloyds Bank plc v Independent Insurance Co Ltd* at 129H.

> *payer's mistake, did not receive the money in good faith: cf. Ward & Co v
> Wallis [1900] 1 QB 675, 678-679, per Kennedy J."*

78.  As Peter Gibson LJ noted in *Lloyds Bank plc v Independent Insurance Co Ltd* at
     130C-D, the footnote provides an explanation of the use of the word *"may"* in *"His
     claim may fail"*.

79.  Both *Barclays Bank Ltd v W. J. Simms Son & Cooke (Southern) Ltd* and *Lloyds Bank
     plc v Independent Insurance Co Ltd* were concerned with tripartite situations in
     which the payment made by the claimant discharged (or was alleged to have
     discharged) an obligation owed to the defendant by a third party. The same is true of
     *Aiken v Short* (1856) 1 H&N 210 on which Robert Goff J founded his Principle
     (2)(b).

80.  In the tripartite situation there is no contractual relationship between the claimant and
     the defendant. The operation of Principle (2)(b) in a bipartite situation where a
     contract exists between the parties was considered by Lord Scott of Foscote[17] in
     *Deutsche Morgan Grenfell Group plc v IRC* [2006] UKHL 49, [2007] 1 AC 558. In a
     passage directed specifically to that principle, at paragraphs 84-85, he said this:

     > *"84. ... If a contract has been entered into that would not have been entered
     > into but for a mistake, but the contract is then completed by a payment of the
     > price for the goods or services that the payee has supplied, the payment
     > cannot be recovered unless the contract can be set aside. The proposition
     > seems such an obviously correct one that it may seem pointless to ask why it is
     > that it is correct. But I think the question does need to be asked for the answer
     > casts, in my opinion, valuable light on the nature of the restitutionary remedy
     > for the recovery of money paid under a mistake.*
     >
     > *85. The reason, it seems to me, why the proposition is correct is that the
     > mistake does not necessarily undermine the legal obligation which required
     > the payment of the money or for the discharge of which the money was paid. If
     > the mistake does enable the contract to be set aside then, subject to a change
     > of position defence, the money should be recoverable. If the contract was void
     > from the outset (as in the "swaps" cases) or had been avoided before the
     > payment was made, the money should be recoverable. But if the legal*

---

17 Lord Scott dissented on the question whether the claimant in that case had acted under a mistake of law in
paying the tax that it sought to recover. He held that it had not. But the contrary conclusion of the majority on
the facts of that case does not invalidate Lord Scott's analysis, set out above, of the position where the parties
are in a contractual relationship.

*obligation under which the money was paid cannot be, or has not been, invalidated, then, in my opinion, whether or not it can be shown that "but for" the mistake in question the money would not have been paid, a restitutionary remedy for the recovery of the money would not be available."*

81.    In his footnote relating to Principle 2(b), set out above, Robert Goff J referred to two circumstances in which the defence of good consideration would or might fail because the transaction in which the consideration was given itself fell to be set aside (mistake induced by the payee, and bad faith of the payee). Similarly, Lord Scott, addressing the situation in which the parties are in a contractual relationship, referred to the possibility that the defence would fail because the mistake enabled the contract to be set aside, or because the contract was void from the outset, or was avoided before payment was made.

82.    The redemption payments in the present case were made in the context of contractual relationships between the Sentry and the Defendants under the Articles. The provisions of Article 10, under which Sentry was obliged to redeem shares on receipt of a request in writing to do so, can be seen as the equivalent of an option granted to the shareholders to sell their shares on the terms set out in the Articles.[18] As noted earlier, once a redemption request was received, both Sentry and the redeeming shareholder were bound by it, unless the determination of the NAV was suspended. It is submitted, therefore, that at the point at which the redemption request was received, a binding contractual relationship came into existence between Sentry and the shareholder for the redemption of the shares in accordance with the Articles, and in particular Articles 10 and 11.

83.    In these circumstances, and in the light of the authorities considered above, the Defendants submit that:

    (i)    The redemption payments were *prima facie* made for good consideration, namely the surrender of the shares;

    (ii)    They are accordingly irrecoverable on grounds of mistake unless either (a) the mistake enables the contract to be set aside or (b) the payments

---

18 The Courts have sometimes analysed an option as an irrevocable offer and sometimes as a conditional contract, although strictly speaking it is neither but a relationship *sui generis*: see *Spiro v Glencrown Properties Ltd* [1991] Ch 537.

were not made to discharge, or did not discharge, obligations owed to
the Defendants.

84.    As to (ii)(a), Sentry has pleaded [1/10] that it is entitled to *"set aside the redemption
of the Defendants' shares on the grounds that the payment of the Aggregate
Redemption sum was effected under a mutual mistake"*. But the doctrine of mutual (or
common) mistake applies to a contract at the time of its formation. It is therefore
necessary to consider the position at the time when the redemption requests were
received.

85.    In *Great Peace Shipping Ltd v Tsavliris Salvage (International) Ltd* [2003] QB 679,
Lord Phillips of Worth Matravers MR said at paragraph 73:

> *"The avoidance of a contract on the ground of common mistake results from a
> rule of law under which, if it transpires that one or both of the parties have
> agreed to do something which it is impossible to perform, no obligation arises
> out of that agreement."*

86.    In this case, there is simply no question of the parties having entered into a contract
that was impossible to perform. The shares could be surrendered and the Redemption
Price, whatever it might be determined to be as at the Dealing Day, could be paid. If
Sentry had established facts before the NAV per Share was determined that led to a
lower Redemption Price than expected, the Defendants would have had no right to
withdraw from the transaction. The contract was fully capable of performance
whatever the 'true' NAV per Share may have been. There is therefore no prospect of
the redemption being set aside for common mistake.

87.    As to (ii)(b), if Sentry was acting in good faith, then the redemption payments must
have been intended to discharge its obligations under the Articles. But, perhaps more
importantly, the payments did discharge obligations under the Articles, because the
Redemption Price payable for each share under Article 10 was based on *"the Net
Asset Value per Share (as determined in accordance with Article 11)"*, and the
determination under Article 11 was to be made by the Directors. Accordingly, once
the Directors (or Citco on their behalf) had made a determination of the NAV per

Share, Sentry came under an obligation to pay the Redemption Price based upon that NAV per Share. No doubt it would have been open to the Directors to revise their determination prior to making payment, had grounds for doing so emerged, provided that no certificate as to the NAV per Share or Redemption Price had yet been issued. But, even apart from a certificate, a redemption payment made in accordance with the current determination of the Directors as to the NAV per Share would have been made in discharge of a genuine obligation under the Articles. This can be seen as a further illustration of the way in which Articles 10 and 11 operate as a contractual allocation of risk. Once a redemption payment has been made in accordance with the current determination of the Directors as to the NAV per Share, the risk that the value has been overstated falls on Sentry.

88.   Sentry has pleaded [1/10 § 8] that the NAV was calculated and that the amounts paid to the Defendants were the amounts that had been determined to be payable.

89.   It follows that the payments were made for good consideration, in accordance with the Articles, and that they cannot be recovered. The answer to both limbs of Preliminary Issue (4) is, therefore, yes.

DOMINIC CHAMBERS QC

ARABELLA DI IORIO

For the Maples and Calder Defendants


LORD FALCONER QC

PAUL WEBSTER QC

NADINE WHYTE

For the O'Neal Webster Defendants


MARK HAPGOOD QC

ALAN ROXBURGH

PHILLIP KITE

KISSOCK LAING

For the Harneys Defendants

DAVID LORD QC
ROBERT FOOTE
CLAIRE GOLDSTEIN
For the Ogier Defendants

15 July 2011

THE EASTERN CARIBBEAN SUPREME
COURT
IN THE HIGH COURT OF JUSTICE
VIRGIN ISLANDS
COMMERCIAL DIVISION

CLAIM NO BVIHC (COM) 357/2009

BETWEEN

FAIRFIELD SENTRY LIMITED
(in liquidation)

Claimant

and

ALFREDO MIGANI and others
Defendants

and 7 other actions

---

# SKELETON ARGUMENT OF
# THE DEFENDANTS
# ON THE PRELIMINARY ISSUES

---

HARNEY WESTWOOD & RIEGELS
Craigmuir Chambers,
PO Box 71,
Road Town,
Tortola VG1110,
British Virgin Islands

MAPLES & CALDER
Sea Meadow House,
PO Box 173,
Road Town,
Tortola VG1110,
British Virgin Islands

OGIER
4th Floor,
Qwomar Complex,
PO Box 3170,
Road Town,
Tortola VG1110,
British Virgin Islands

O'NEAL WEBSTER
Simmonds Building,
30 DeCastro Street,
Road Town,
Tortola,
British Virgin Islands

Legal Practitioners for the Defendants