# EXHIBIT B

Judgment of Bannister J dated
16 September 2011

**BRITISH VIRGIN ISLANDS**
**EASTERN CARIBBEAN SUPREME COURT**
**IN THE HIGH COURT OF JUSTICE**
**COMMERCIAL DIVISION**

**CLAIM NO. BVIHC (COM) 30/2010 AND 7 other Claims**

**BETWEEN:**

### FAIRFIELD SENTRY LIMITED (IN LIQUIDATION)

### BANK JULIUS BAER & CO. LTD & 33 Others

**Appearances:**  Mr Dominic Chambers QC and Ms Arabella di Iorio for the Maples & Calder Defendants
Lord Falconer of Thoroton QC, Mr Paul Webster QC and Ms Nadine Whyte for the O'Neal Webster Defendants
Mr Mark Hapgood QC, Mr Alan Roxburgh, Mr Philip Kite and Mr Kissock Laing for the Harneys Defendants
Mr David Lord QC, Mr Robert Foote and Ms Claire Goldstein for the Ogier Defendants
Mr Michael Brindle QC, Mr Andrew Westwood and Mr William Hare for the Claimant

### JUDGMENT

[2011:  28, 29 July 16 September]

(Preliminary issues - claimant mutual fund in liquidation – claimant suing pre-liquidation redeemers for return of redemption moneys on grounds of mistake – claimant alleging NAV's calculated under mistake of fact induced by fraud of BLMIS – claimant alleging that true NAV's nil or nominal – whether claimant precluded from recovering by Articles of Association – whether binding certificate – whether claimant precluded from recovering by fact that redeemers gave consideration by surrendering their shares – whether claimant precluded absolutely or only as to true value of shares at time of surrender)

[1]    **Bannister J [ag]:**  Fairfield Sentry Limited ('Sentry'), a BVI registered company, was a well known feeder fund for Bernard L Madoff Investment Securities Limited ('BLMIS').  It is said, although there are no figures to back this up, that 95% of funds placed with it for investment went into BLMIS.  BLMIS collapsed in December 2008 when its proprietor, Bernard L Madoff, admitted that it had been run as a Ponzi scheme.  BLMIS is now in SIPA liquidation in the United States.  Sentry was placed in liquidation here on 21 July 2009.

[2]     From early 2010 onwards and with the permission of the Court the joint Liquidators of Sentry caused it to bring proceedings against various investors who had, prior to the liquidation, made requests under Sentry's Articles of Association for some or all of their shares to be redeemed and who had, as a result, surrendered those shares in exchange for the redemption price.  That price was calculated, or at any rate was supposed to have been calculated, in accordance with the provisions of Article 11 of Sentry's Articles of Association.  It is Sentry's case in these and related proceedings that hundreds of millions of dollars were paid out in response to redemption requests made by the defendants to those claims whereas, so it is alleged, the true NAV's upon which the redemption prices were based were nil or little better than nil because, so it is pleaded, BLMIS was operated as a Ponzi scheme.

[3]     This contention raises some interesting questions in itself.  If, for example, BLMIS and, correspondingly, Sentry was always worth nothing or little better than nothing, how was it able to find the US$135m that is said to have been returned to redeeming investors in the specimen case which has been used for the trial of these preliminary issues during March 2004 alone?  How are the joint Liquidators going to prove that Sentry was at all material times worth nothing?  How are they going to show, if they ever get that far and if it should turn out that reimbursement is to be measured by deducting the true value of the shares at the moment of redemption from the redemption price received for them, what was the true value of the shares surrendered in respect of any given redemption?  If the NAV's should at all times have been nil or little more, what right has Sentry to the money which it seeks to recover from redeemers and, correspondingly, who can show an entitlement to such money as may be recovered?

[4]     Fortunately, these questions do not need to be decided in the course of this application, which arises from an order which I made on 20 April 2011 for the trial of preliminary issues.  The issues were scheduled to the order, but before setting them out I think it would be helpful if I stated some of the factual background.

**Sentry's Articles of Association**

[5]     Sentry's Articles of Association are by implication governed by BVI law.  Redemption of shares was governed by Article 10.  It was common ground that a member wishing to redeem all or part of his shareholding had to submit a redemption request to Sentry not later than 5 pm Amsterdam time not less than fifteen days before the last business day of the month.  If he did

that Sentry was obliged to redeem the shares.  In practice, the request would be submitted to Citco Funds Services (Europe) BV ('Citco'), to which Sentry had delegated (among other things) the tasks of calculating and publishing NAV's and processing and dealing with all correspondence relating to redemptions.  These functions and tasks were delegated pursuant to a written Administration Agreement dated 20 February 2003, terminable on 90 days notice either side.  It was not suggested by Mr Michael Brindle QC, who appeared together with Mr Andrew Westwood and Mr William Hare for Sentry, that the Administration Agreement had been terminated at any time before Sentry went into liquidation

[6]    Article 10 provided that the redemption should be effected at a price determined in accordance with the provisions of Article 11 ('the redemption price') and that in the ordinary way the redemption price would be paid within thirty days after the relevant NAV had been determined. Since the relevant NAV for the purposes of redemptions was the NAV determined as at the last business day of the month in which the redemption request was received by Citco ('the Valuation Day'), it follows that the redeeming member would not know, when submitting his redemption request, the price which he would be paid on redemption.  That could not be ascertained until Citco, on behalf of the directors, had completed the necessary calculations during the following month.

[7]    Article 11(1) was in the following terms:

'DETERMINATION OF NET ASSET VALUE

11(1)    The Net Asset Value per Share of each class shall be determined by the Directors as at the close of business on each Valuation Day (except when determination of the Net Asset Value per Share has been suspended under the provisions of paragraph (4) of this Article), on such other occasions as may be required by these Articles and on such other occasion as the Directors may from time to time determine.

The Net Asset Value per Share shall be calculated at the time of each determination by dividing the value of the net assets of the Fund by the number of Shares then in issue or deemed to be in issue and by adjusting for each class of Shares such resultant number to take into account any dividends, distributions, assets or liabilities attributable to such class of Shares pursuant to paragraph (2) of Article 4, all determined and calculated as hereinafter provided.

Any certificate as to the Net Asset Value per Share or as to the Subscription Price or Redemption Price therefor given in good faith by or on behalf of the Directors shall be binding on all parties.'

3

[8]    Article 10(4) provided (among other things, that

> 'Upon the redemption or purchase of a Share being effected pursuant to this Article, the Member shall cease to be entitled to any rights in respect of that Share . . . and accordingly his name shall be removed from the Register [of Members] with respect thereto.'

**The Private Placement Memorandum and 'Long Form' Subscription Agreement**

[9]    I was referred to certain passages in these documents as either supplementing or reflecting the provisions of the Articles of Association.  There was no discussion as to their admissibility as an aid to construction of the Articles of Association and I mention them merely to indicate the nature of the material with which I was provided and to identify some of the more significant parts of these documents.

[10]    The Private Placement Memorandum ('PPM'), for example, tells the prospective investor that all decisions on the value of assets and liabilities of Sentry and the determination of NAV will be made by the directors.  It refers to the position of Citco, as briefly outlined in paragraph [5] above.  There is heavy emphasis on the risky nature of making an investment in the fund and it is expressly stated that investors bear the risk of any decline in NAV between the submission of a redemption request and the calculation of the redemption price on the next following Valuation Day.  Mr Brindle QC drew my attention to the fact that the word 'certificate' is used in the PPM in the context of verification of documents of identity and so forth.

[11]    The Long Form Subscription Agreements mention that monthly 'statements' will be provided and warn investors that valuations contained in them may be based on estimated and unaudited figures.  There is further heavy emphasis on risk.

**The documents relied upon by the defendants**

[12]    I was shown some of the monthly statements sent out by Citco and which are mentioned in the Long Form Subscription Agreements ('monthly statements').  Most of them appear to have been sent out about two weeks after the end of the month.  Each sets out in its top right hand corner the date of the statement and the date upon which the latest valuation was made.  In a section of the monthly statement headed 'Fund Net Asset Values' are set out the NAV as at the last preceding Valuation Day and as at the Valuation Day last preceding that.  In the next section of the monthly statements, headed "Account Value', are set out the value of the member's account as at these two dates and any dealings on the account in the interval

between those two dates are summarised.  Those dealings (if any) are further particularised in the final section of the statement headed 'Summary of Activity.'  As would be expected the figures disclosed are supported in each case by the NAV per share upon which the account was valued at each valuation day and at which each reported transaction completed.

[13]    Each monthly statement had a rubric at its foot stating:

> 'For more information or any inquiries, please contact [Citco]'

[14]    I was also shown what have been referred to on this application as 'contract notes.'  These documents, too, were sent out by Citco and contained the rubric which I have mentioned above.  Their opening statement was

> 'In accordance with your instructions we confirm having REDEEMED the following voting shares from FAIRFIELD SENTRY LIMITED.'

There then followed: (1) the relevant valuation and trade[1] dates at which the shares were treated as valued and redeemed; (2) the number of shares redeemed; (3) the redemption price of each share redeemed; (4) the gross redemption proceeds; (5) the net redemption proceeds;[2] (5) the 'proceeds paid to date (which were apparently always identical to the last two preceding figures); and (6) a note of the number of shares (if any) held by the investor following the redemption.

[15]    I was also taken to various emails sent out by Citco or by Fairfield Greenwich (Bermuda) Limited, Sentry's fund manager, ('FGG') to members telling them of the final NAV of the relevant Sentry shares held by the recipient as at the preceding valuation day.

[16]    Finally I was shown a typical screenshot from a dedicated website maintained by FGG which allowed members in possession of the relevant code to access current NAV's for their Sentry shares.  The screenshot contained both estimated and final NAV.

**The Issues**

[17]    The issues are as follows:

> (1) Whether any (and, if so, which) of the documents copies of which are exhibited at pages 2 to 17 inclusive of exhibit PRK-1 to the affidavit of

---

[1] this was the first business day after the valuation day
[2] these figures were invariably identical, since it was not the practice to make deductions permitted by the Articles from the redemption price

Philip Kite sworn in the proceedings the short title and first reference to which is Fairfield Sentry Limited (in liquidation) –v- Bank Julius Baer & Co Limited and others BVIHC(COM) 30/2010 on 8 March 2011 (or copies of any further documents which may be exhibited to any witness statement made in connection with this issue) ("the documents") is a certificate within the meaning of Article 11(1) of the Articles of Association of the Claimant ("Article 11(1)", "the Articles");

(2) If the answer to (1) is yes, whether any (and, if so, which) of the documents is
(a) A certificate as to the Net Asset Value per share ('NAV') or
(b) A certificate as to Redemption Price
within the meaning of the Articles;

(3) If the answer to (2)(a) or (b) is yes:
Whether the publication or delivery by the Claimant
(a) as a matter of information only, or
(b) in connection with a redemption request
of a document containing substantially the same items of information as a document identified as falling with (2)(a) or (b) above to a redeeming or redeemed Member of the Claimant precludes the Claimant from asserting that money paid to that redeeming or redeemed Member or redemption exceeded the true Redemption Price and as such is recoverable as to the excess from such redeeming Member.

For the purposes of this issue 'document' includes emails and materials accessible on a website maintained by the Claimant or Citco Fund Services (Europe) BV or Fairfield Greenwich Group.

(4) Whether a redeeming Member of the Claimant in surrendering its shares gave good consideration for the payment by the Claimant of the Redemption Price and, if so, whether that precludes the Claimant from asserting that the money paid to that Member on redemption exceeded the true Redemption Price and as such is recoverable as to the excess from such redeeming Member.'

[18]    Issues (1) to (3) involve the construction of Sentry's Articles of Association and the question of mixed fact and law whether any particular documents issued by or on behalf of Sentry or its board of directors amounted to a certificate for the purposes of Article 11(1).  Issue (4) is largely a question of general law said to arise from the mechanisms by which redemptions were carried out.

**Discussion**

**(A)  Issues (1) to (3)**

[19]    There was no controversy as to issue (2), so that this part of the application turned on issues (1) and (3).

[20]    I was taken by Counsel for the Defendants to two authorities in relation to the certificate point. The first, **Reg v The Vestry of St Mary, Islington**,[3] was concerned with the question whether a letter from a churchwarden to the vestry asking to be paid £500 to enable him to discharge his liabilities under a contract which he had entered into at their behest was a certificate for the purposes of the Burials Act 1855 ('the Act') and thus entitled him to reimbursement.  Pollock B noted that the Act did not require any particular matter to be certified and that the word 'certificate' was perfectly general.  He noted that the letter did not specify the purpose for which the churchwarden required the money, but that the implication was that it was for the repairs which he had been asked to carry out.  He concluded on this basis that the requirement for a certificate was amply satisfied by the letter.  AL Smith J, concurring, said that for the purposes of the Act a certificate must be in writing and must be a certificate of expenses that have to be paid.  He held that the document signed by the churchwarden satisfied those requirements.

[21]    I was also taken to **Rexhaven v Nurse**[4], where HH Judge Colyer QC, sitting as a deputy Judge of the Chancery Division, held that a letter sent by a landlord's agents to a tenant stating that

> 'we are pleased to detail below our estimate for service charge expenditure for the period to December 24. 1993'

satisfied the conditions of a lease requiring the managing agent of a block of flats to send the lessees a certificate on or before the usual quarter days estimating the amount of service charge for the following quarter and providing that a certificate so sent would be binding and conclusive and that the amount so certified was to be paid by the lessee on demand.

[22]    The Judge held that a certificate must be in writing and that it must formally attest to a fact.  He did not say what he meant by 'formally', but added that some degree of solemnity or formality was needed for the document to satisfy the requirement of the lease in question.

[23]    I note that one thing which these cases have in common is that in neither did the Court hold that a document could not be a certificate unless it had the word 'Certificate' at its head.  While the

---

[3] (1890) 25 QBD 523
[4] (1996) HLR 241

7

cases show that a certificate must be in writing and that, provided that the purpose of a certificate can be gathered from its terms and context, the Court will not be astute to invalidate it for defects of form and are helpful to that extent, they were dealing with rather different situations. The decision which had to be made in each case was whether a particular document was effective to trigger the obligations of another party to a particular contract[5] or statutory scheme.[6] No obligation of any party to Sentry's Articles of Association is triggered or set in motion by the issue of a certificate within the meaning of Article 11(1). So that this case is not *in pari materia* with either **St Mary, Islington**[7] or **Rexhaven**.[8]

[24]    In order to determine whether any of the documents relied upon by the Defendants is a certificate for the purposes of Article 11(1), Article 11(1) must be considered (a) as a whole (b) in the context of the entirety of Sentry's Articles of Association and (c) against the background of the commercial purposes which Sentry's Articles of Association were intended to regulate.

[25]    The structure of Article 10 is that the parties[9] to the Articles of Association agree that on receipt of a timely redemption request Sentry must[10] redeem the shares specified in the request at the redemption price. The redemption price is the NAV per share as determined in accordance with Article 11 on (in short) the next following Valuation Day.[11]  The submission of a timely redemption request thus concludes a contract for the surrender of the shares by the redeeming member and their purchase by Sentry, but the price at which that trade is to take place will not be ascertained at that moment. Article 11(1) provides that the NAV is to be determined by the Directors.[12]  Articles 11(2) and 11(3) establish the principles upon which the Directors are to determine the NAV. The final paragraph of Article 11(1) provides that any certificate as to the NAV per share or (for present purposes) the Redemption Price given by or on behalf of the Directors in good faith shall be binding on all parties.

[26]    In my judgment this scheme is the familiar one in which parties agree to sell and purchase property at a price to be determined by a third party.[13]  Ordinarily the third party to whom the valuation is entrusted will be an expert in the subject matter of the bargain selected by the

---

[5] **Rexhaven** (supra)
[6] **St Mary, Islington**(supra)
[7] (supra)
[8] (supra)
[9] s 11 Business Companies Act, 2004
[10] Article 10(1)
[11] Articles 1 and 10(2)
[12] for ease of reading I shall refer in what follows to the Directors without mentioning the fact of delegation of the task of calculation to Citco
[13] compare **Campbell v Edwards** [1976] 1 WLR 403

parties.  In Sentry's case the parties have selected the Directors, presumably on the grounds that they or the persons to whom their powers have been delegated are best placed to establish the value of the fund's assets.

[27]    I agree that to come within the final paragraph of Article 11(1) a certificate must be in writing.  Mr Brindle QC submits that it must also be signed by the Directors or on their behalf.    I accept this submission.    In my judgment, an unsigned certificate is, in the absence of some special agreement governing the case, a contradiction in terms.[14]    This approach is, in my view, consistent with the use of the word 'given' in the final paragraph of Article 11(1).  'Given by', followed by the name of the giver, means, in respect of a document, 'signed by,' as in the now rather outdated expression 'given under my hand, etc.'    'All parties', in the context of Articles of Association, must mean all parties bound by those Articles – i.e. the membership *inter se* and each member on the one hand and Sentry on the other.

[28]    In my judgment a certificate will fall within the final paragraph of Article 11(1) only when it is a certificate given by or on behalf of the Directors in their character as the body responsible for determining Net Asset Value under Article 11.  I say this because in order so to qualify the certificate must certify a valuation carried out by or on the instructions of the Directors.  They may authorise a third party to carry out the calculation and to sign the certificate of determination on their behalf, but the certificate remains that of the Directors, not of the authorised signatory.  A third party might inform others of the value of the NAV determined by the Directors, but it would be an abuse of language, in my judgment, to describe such a third party as *certifying*    the determination.

[29]    The question, therefore, is whether any of the documents relied upon by the Defendants on this application is a certificate 'as to' the Net Asset Value and/or Redemption Price which has been signed by or on behalf of the Directors.

[30]    The contract notes cannot, in my judgment, be certificates within the meaning of Article 11(1).  Not only are they unsigned, but their purpose was not to certify a determination made by the Directors but to evidence the terms upon which Sentry itself was purchasing the shares of the redeeming member.  They are documents produced on behalf of Sentry, not on behalf of the Directors as the body responsible for determining NAV.

---

[14] cf per AL Smith J in **St Mary, Islington** (supra) at 529

[31]    The monthly statements certainly contain, within the section headed 'Fund Net Asset Values,' the information which one would expect to find in a certificate given by or on behalf of the Directors, but that does not, in my judgment, make them certificates signed by or on behalf of the Directors under Article 11.  They are documents from which the inference may be drawn that the Directors have arrived at the valuation contained in the relevant section of the statement but that is not, in my judgment, the same as a certificate 'given' by or on behalf of the Directors.  The statements are not signed by or on behalf of the Directors.  If the question is asked whether the monthly statements, or any particular parts of the monthly statements, are certificates given on behalf of the Directors as to their valuation of the fund at any particular date, the answer must, in my judgment, be 'No'.  They are documents distributed by the fund administrators informing investors, among other things, of the NAV determined, it is to be inferred by the recipient, by or on the instructions of the Directors at given dates.  That does not make them certificates given by or on behalf of the Directors.  Chestertons' letter of 21 March 1974[15] was a certificate.  The monthly statements, in my judgment, are not.

[32]    For the same reasons, none of the emails (certainly not the emails from FGG) can be regarded as a certificate given by or on behalf of the Directors.  The same goes for the screenshot.

[33]    The documents relied upon by the Defendants are compelling evidence of the NAV determined by the Directors as at particular Valuation Days but they are not, in my judgment, certificates within the meaning of Article 11(1).

## (B) Issue (4)

[34]    Left to myself I would have held that the redemption of shares in this case amounted to a bargain and sale for which the consideration received by Sentry was the surrender of the rights of the redeeming shareholder.  I cannot see how the subsequently discovered fact that BLMIS was a Ponzi scheme can be said to have vitiated that bargain so as to entitle Sentry to recover the redemption money/purchase price any more than could the discovery that a planning authority had not in fact granted consent for residential development vitiate a contract for the purchase of building plots by reason of the purchaser's own mistaken assumption that it had.[16]  I further fail to understand how Sentry can recover the redemption price in circumstances in which *restitutio in integrum* is no longer possible.

---

[15] **Campbell v Edwards** (supra)
[16] see per Lord Scott in **Deutsche Morgan Grenfell Group plc v IRC** [2006] UKHL 49 at paragraphs 84, 85

[35]    I was referred to **Aiken v Short**.[17] and **Barclays Bank Ltd v WJ Simms Son & Cooke Southern Ltd**.[18]  Neither case involved a sale and purchase.  In the first, a bank paid off a debt due by a customer to a third party in the mistaken belief that the debt was secured on property which stood as security for the customer's account.  It was held that the third party creditor had given good consideration by accepting the payment as discharging the debt due to her from the bank's customer.  In his short judgment Pollock CB said:

> 'Suppose it was to be announced that there was to be a dividend on the estate of a trader, and persons to whom he was indebted went to an office and received instalments of the debts due to them, could the party paying recover back the money if it turned out that he was wrong in supposing that he had the funds in hand?'

That appears to me to expose the fallacy upon which the present case is founded.  **Barclays Bank v Simms**[19] takes the matter no further.  It decided that payment on a cheque made by a bank in breach of mandate was ineffective to discharge the drawer's obligation on it and the bank was thus entitled to recover, in contradistinction to the situation in **Aiken v Short**.[20] The cases are authority for the proposition that a party will not be able to recover a payment made by mistake where the payer has received consideration from the payee.

[36]    In my judgment, therefore, it is not open to Sentry now to seek to recover the price which it paid for the purchase of the shares of redeeming investors simply because it calculated the NAV upon information which has subsequently proved unreliable for reasons unconnected with any of the redeemers.

**Conclusion**

[37]    My answer to issues (1) and (2), therefore, is 'No'.  Issue (3) does not fall for determination.  My answer to issue (4) is yes.

                                                        **Commercial Court Judge**
                                                        16 September 2011

---

[17] (1856) 1 H&N 210
[18] [1980] QB 677
[19] (supra)
[20] (supra)

# EXHIBIT C

Order of Bannister J dated l6
September 2011, entered 12 October 2011

THE EASTERN CARIBBEAN SUPREME COURT

IN THE HIGH COURT OF JUSTICE

BRITISH VIRGIN ISLANDS

(COMMERCIAL DIVISION)



FEE STAMPS ON
ORIGINAL
$ 25.06

Claim No: BVIHC (COM) 357/2009

FAIRFIELD SENTRY LIMITED (in Liquidation)
-and-
ALFREDO MIGANI & 22 Others

Claim No:  BVIHC (COM) 404/2009

FAIRFIELD SENTRY LIMITED (in Liquidation)
-and-
BANCO GENERAL SA/BANCA PRIVADA & 30 Others

Claim No: BVIHC (COM) 425/2009

FAIRFIELD SENTRY LIMITED (in Liquidation)
-and-
BANK JULIUS BAER & CO LTD & 26 Others

Claim No. BVIHC (COM) 5/2010

FAIRFIELD SENTRY LIMITED (in Liquidation)
-and-
BANK JULIUS BAER & CO. LTD. and Others

Claim No. BVIHC (COM) 15/2010

FAIRFIELD SENTRY LIMITED (in Liquidation)
-and-
ARBITRAL FINANCE INC & 23 Others

Claim No.  BVIHC (COM) 30/2010

FAIRFIELD SENTRY LIMITED (in Liquidation)
-and-
BANK JULIUS BAER & CO LTD & 33 Others

Claim No. BVIHC.(COM) 153/2010

FAIRFIELD SENTRY LIMITED (in Liquidation)
-and-
WISE GLOBAL FUND LIMITED

Claim No. BVIHC (COM) 20/2011

FAIRFIELD SENTRY LIMITED (in Liquidation)
-and-
CREDIT SUISSE LONDON NOMINEES LIMITED

1

---

## ORDER

---

**BEFORE**      **The Honourable Justice Edward Bannister Q.C. [Ag]**

**DATED**       **16 September 2011**

**ENTERED**     12ᵗʰ October 2011

**UPON** the trial of the Preliminary Issues held on 28 and 29 July 2011 pursuant to the Order dated 20 April 2011, which was made after hearing the Notices of Application filed on behalf of the Applicants/Preliminary Issues Defendants ("the PI Defendants") dated 2 February 2011, 2 March 2011, 9 March 2011 and 28 March 2011

**UPON** hearing (i) Dominic Chambers QC and Arabella di Iorio on behalf of the Maples and Calder PI Defendants, (ii) David Lord QC, Robert Foote and Clare Goldstein on behalf of the Ogier PI Defendants, (iii) Mark Hapgood QC and Kissock Laing on behalf of the Harneys PI Defendants, and (iv) Lord Falconer QC, Paul Webster QC and Nadine Whyte on behalf of the O'Neal Webster PI Defendants, and Michael Brindle QC, Andrew Westwood and William Hare on behalf of the Claimant

**AND UPON** reading the witness statements of Mr Peter Füglistaller dated 18 May 2011, Mr Albertus Lokhorst dated 13 May 2011, and Mr Kenneth Krys dated May 2011, the affidavit of Mr Phillip Kite sworn on 8 March 2011 and the other documents recorded on the Court file as having been read

**AND UPON** a further hearing on 16 September 2011 attended by Mark Hapgood QC and David Lord QC by telephone on behalf of the PI Defendants and Michael Brindle QC by telephone on behalf of the Claimant, and local counsel as set out above

**IT IS HEREBY ORDERED AND ADJUDGED THAT:**

2

1.    The answer to Preliminary Issue (1), namely

>  *"Whether any (and, if so, which) of the documents copies of which are exhibited at pages 2 to 17 inclusive of exhibit PRK-1 to the affidavit of Philip Kite sworn in the proceedings the short title and first reference to which is Fairfield Sentry Limited (in liquidation) – v – Bank Julius Baer & Co. Limited and others BVIHC(COM) 30/2010 on 8 March 2011 (or copies of any further documents which may be exhibited to any witness statement made in connection with this issue) ("the documents") is a certificate within the meaning of Article 11(1) of the Articles of Association of the Claimant ("Article 11(1)", "the Articles")"*

is "No".

2.    Notwithstanding the fact that the answer to Preliminary Issue (1) means that Preliminary Issue (2) does not by its terms fall for determination, the answer to Preliminary Issue (2), namely

>  *"If the answer to (1) is yes, whether any (and, if so, which) of the documents is*
>  *(a)    a certificate as to the Net Asset Value per share ("NAV") or*
>  *(b)    a certificate as to Redemption Price*
>  *within the meaning of the Articles".*

is, on the basis of the answer to Preliminary Issue (1), "No".

3.    Preliminary Issue (3), namely

>  *"If the answer to 2(a) or (b) is yes:*
>  *Whether the publication or delivery by the Claimant*
>  *(a)    as a matter of information only, or*
>  *(b)    in connection with a redemption request*
>  *of a document containing substantially the same items of information as a document identified as falling within 2(a) or (b) above to a redeeming or redeemed Member of the Claimant precludes the Claimant from asserting that money paid to that redeeming or redeemed Member on redemption exceeded the true Redemption Price and as such is recoverable as to the excess from such redeeming Member.*

> *For the purposes of this issue "document" includes emails and materials accessible on a website maintained by the Claimant or Citco Fund Services (Europe) BV or Fairfield Greenwich Group."*

does not fall for determination.

4.    The answer to Preliminary Issue (4), namely

> *"Whether a redeeming Member of the Claimant in surrendering its shares gave good consideration for the payment by the Claimant of the Redemption Price and, if so, whether that precludes the Claimant from asserting that the money paid to that Member on redemption exceeded the true Redemption Price and as such is recoverable as to the excess from such redeeming Member.*

is "Yes and Yes".

5.    The following directions are made regarding the subsequent conduct of these proceedings:

(i)    A single application for summary judgment shall be issued and served as soon as possible (and preferably by close of business on Monday 19 September 2011) on behalf of one PI Defendant to be selected by the PI Defendants;

(ii)    The Claimant's evidence in answer shall be served as soon as possible thereafter (and preferably by close of business on 23 September 2011);

(iii)    The application may be heard by telephone and shall be heard during the week of 26 September 2011 on a day convenient to the parties and to the Court with a time estimate of half a day.

6.    The question of costs and the incidence thereof is stood over until after the determination of the summary judgment application.

7.    Paragraphs 4 and 5 of the Order of this Court dated 20 April 2011 are extended until the determination of the summary judgment application.

8.    Permission to appeal is refused to both sides.  Any relevant time limit for appealing to the Court of Appeal is extended to 7 days after the determination of the summary judgment application.


BY ORDER OF THE COURT


_____
REGISTRAR

# EXHIBIT D

Fifth Witness Statement of Kenneth Krys
dated 26 September 2011

FEE STAMPS ON
ORIGINAL
100.00

Kenneth Krys
Fifth
Respondent
Filed: 26.09.11

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
BRITISH VIRGIN ISLANDS
COMMERCIAL DIVISION



BVIHC(COM) 30/2010

**B E T W E E N:**

> **ABN AMRO FUND SERVICES (ISLE OF MAN) NOMINEES LIMITED**
> (formerly FORTIS (ISLE OF MAN) NOMINEES LIMITED)
>
> **Applicant/ 4th Defendant**
>
> and
>
> **FAIRFIELD SENTRY LIMITED (in liquidation)**
>
> **Respondent/ Claimant**

---

## FIFTH WITNESS STATEMENT OF KENNETH KRYS

---

I, **KENNETH KRYS**, of KRyS Global, 2nd Floor, Commerce House, 181 Main Street, P.O. Box 930, Road Town, Tortola, BVI, **SAY AS FOLLOWS**:

1. Joanna Lau and I are the joint liquidators (together, **"the Liquidators"**) of Fairfield Sentry Limited (**"Sentry"**), Fairfield Sigma Limited, and Fairfield Lambda Limited.

2. Save where otherwise sufficiently appears the facts and matters hereinafter are within my own knowledge. Where the facts and matters hereinafter are not within my own knowledge, I believe them to be true and the sources and grounds of my belief are set out.

3. I make this witness statement in opposition to the application (**"the Application"**) by the Applicant for an order that Sentry's claim be dismissed following the decision on the Preliminary Issue (4) in the judgment handed down by the Court on 16 September 2011

("**the PI Judgment**") and/ or for an order that summary judgment in favour of the Applicant be entered against Sentry.

4.  The Application was issued on 20 September 2011 and I am informed by Forbes Hare, that, together with the supporting affidavit of Phillip Kite ("**Mr Kite**"), it was served on their offices later that day, by email at 14.55 and then by delivery by hand at 15.40. The Liquidators have therefore had limited time in which to respond to the Application and it has not had the fourteen days notice of an application for summary judgment prescribed by CPR 15.4(1).

5.  In paragraph 11 of his affidavit in support of the Application, Mr Kite expresses the belief that in view of the PI judgment on the Preliminary Issues the claim in these proceedings is bound to fail and/ or there is no real prospect of Sentry succeeding on the claim.

6.  The Liquidators respectfully contend that, contrary to Mr Kite's expression of belief, the claim is not bound to fail or has no prospect of succeeding and that judgment under CPR 15.2(a) or CPR 26.1(2)(i) should not be granted in favour of the Applicant, whether as a representative defendant on behalf of all of the defendants to the eight actions in respect of which the Preliminary Issues were heard or otherwise.

7.  The Statement of Claim makes two claims against the Defendants, including the Applicant. The first (paragraph 11) is a claim in unjust enrichment and the second (paragraph 12) is a claim that Sentry is entitled to set aside the redemption of shares by the Defendants on the grounds that the payment of the Aggregate Redemption Sum (as defined in paragraph 8 of the Statement of Claim) was effected under a mutual mistake. It is my belief that the PI Judgment does not address, other than incidentally, the issue of mutual mistake and that, accordingly, the claim made in paragraph 12 of the Statement of Claim cannot be said to be bound to fail.

8.  Further and in any event, it is my belief that the defence of good consideration is one which is dependent upon the party relying on the defence having given the relevant consideration in good faith. It is Sentry's contention that there are serious, arguable grounds that that was not the case in respect of defendants to these claims. The

2

Liquidators have been provided by Irving H. Picard, trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("**BLMIS**") and the Madoff estate, with complaints which he has made against (among others) certain of the BVI defendants in the United States Bankruptcy Court, Southern District of New York. Exhibited to this witness statement are copies of the complaints made by Mr Picard against (among others) HSBC Private Bank (Suisse) SA, which is the Eighth Defendant in the present proceedings, and UBS (Luxembourg) SA, which is the Thirty Fourth Defendant ("**the Picard Complaints**"). In those complaints it is alleged (among other things) that the relevant defendants enabled Madoff's Ponzi scheme, were well aware of indicia of fraud surrounding BLMIS and that, notwithstanding knowledge that BLMIS was likely a fraud, they nonetheless chose to enable Madoff's fraud for their own gain. The Picard Complaints refer to numerous matters which are said to demonstrate explicit awareness of red flags indicating that Madoff was engaged in fraud (see, for example, paragraphs 144-226 of the complaint in relation to HSBC Private Bank (Suisse) SA and paragraphs 103-197 of the complaint in relation to UBS (Luxembourg) SA).

9. The matters raised in the Picard Complaints raise serious issues as to good faith and/ or knowledge, which require further investigation and consideration by the Liquidators. The Liquidators have begun the process of investigating these issues with respect to both the Applicant and other Defendants. As a result of the Settlement Agreement that the Liquidators reached with the BLMIS Trustee, dated May 9, 2011, and approved by this Court by Order entered June 24, 2011 and the document and information sharing provisions thereof, the Liquidators are entitled to access to documentation the BLMIS Trustee has collected in his own investigation, including documents concerning the good faith and knowledge of Defendants in these proceedings. The Liquidators have recently begun the process of collecting and reviewing this documentation. The Liquidators have just executed a separate Common Interest, Privilege & Confidentiality Agreement ("**the Common Interest Agreement**") with the BLMIS Trustee, and expect to receive a counter-executed copy of Common Interest Agreement later today. Per the terms of this Common Interest Agreement, the Liquidators recently requested documents from the BLMIS Trustee that would be relevant to the good faith and knowledge of Defendants in these proceedings. The Liquidators are still coordinating with the BLMIS Trustee on

3

these requests, and they have yet to receive, let alone review, all relevant documents in the BLMIS Trustee's possession on the good faith and knowledge issues.

10. In the context of reviewing documents and their possible relevance to the claims against the Defendants, it is also appropriate to refer to two other matters: (a) the difficulties which the Liquidators have experienced in obtaining relevant documents from Citco Fund Services Europe BV; and (b) the restrictions on the Liquidators' ability to review potentially relevant documents imposed by the order directing the trial of the Preliminary Issues.

11. As to (a), those difficulties which the Liquidators have experienced were explained by me in my third witness statement dated 8 April 2011 (see in particular paragraph 9 of that witness statement).

12. As to (b), by paragraph 6 of the order directing the trial of the Preliminary Issues, Sentry and the Liquidators were refused permission to index the documents under their control and to review them for the purpose of locating documents (if any) which might be relevant to the determination of the Preliminary Issues. Accordingly, the Liquidators have, to date, been unable to review the documents which are under their control which might be relevant to the Preliminary Issues.

13. Depending upon the outcome of the Liquidators' investigations it may be that Sentry can demonstrate that defendants to the present claims did not act in good faith in redeeming their shares or that there are other claims (for example, in knowing receipt) which Sentry should be permitted to bring. It is submitted that it would be not be appropriate or just to grant judgment in favour of the Applicant or any other defendant until the Liquidators have had a proper opportunity to consider those matters, the documents relevant to them and their impact on the claims by Sentry against each of the defendants. As a result of the matters referred to in paragraphs 9-12 above the Liquidators have not yet had that opportunity. The Liquidators have concentrated to date on the claims as currently formulated, which do not require bad faith to be alleged. This was in part inevitable, because of the difficulties outlined above in relation to the obtaining of further information, but I also believe that it is sensible from a case management point of view

4

to have dealt with the simpler (currently pleaded) claims first, since if those are well founded questions of bad faith do not need to be addressed.

14. In all the circumstances, I respectfully request that the Applicant's application for the dismissal of the Claimant's claim and/or for summary judgment in favour of the Applicant be dismissed.

15. I believe that the facts stated in this witness statement are true.

...................................

Kenneth Krys

Dated   26 September 2011

THE EASTERN CARIBBEAN SUPREME
COURT
IN THE HIGH COURT OF JUSTICE
BRITISH VIRGIN ISLANDS
COMMERCIAL DIVISION

BVIHC(COM) 30/2010

B E T W E E N:

ABN AMRO FUND SERVICES (ISLE OF
MAN) NOMINEES LIMITED
(formerly FORTIS (ISLE OF MAN)
NOMINEES LIMITED)

Applicant/ 4th Defendant

and

FAIRFIELD SENTRY LIMITED (in
liquidation)

Respondent/ Claimant

---

## FIFTH WITNESS STATEMENT OF KENNETH KRYS

---

Forbes Hare

P.O. Box 4649
Road Town, Tortola
British Virgin Islands
Tel: (284) 494 1890
Fax: (284) 494 1316

**Legal Representatives of the Respondent**

# EXHIBIT E

Order of Bannister J dated 10 October 2011,
entered 22 June 2012

**THE EASTERN CARIBBEAN SUPREME COURT**

**IN THE HIGH COURT OF JUSTICE**

**BRITISH VIRGIN ISLANDS**

**(COMMERCIAL DIVISION)**



Claim No: BVIHC (COM) 357/2009

<div align="center">

**FAIRFIELD SENTRY LIMITED (in Liquidation)**
-and-
**ALFREDO MIGANI & 22 Others**

</div>

Claim No: BVIHC (COM) 404/2009

<div align="center">

**FAIRFIELD SENTRY LIMITED (in Liquidation)**
-and-
**BANCO GENERAL SA/BANCA PRIVADA & 30 Others**

</div>

Claim No: BVIHC (COM) 425/2009

<div align="center">

**FAIRFIELD SENTRY LIMITED (in Liquidation)**
-and-
**BANK JULIUS BAER & CO LTD & 26 Others**

</div>

Claim No. BVIHC (COM) 5/2010

<div align="center">

**FAIRFIELD SENTRY LIMITED (in Liquidation)**
-and-
**BANK JULIUS BAER & CO. LTD. and Others**

</div>

Claim No. BVIHC (COM) 15/2010

<div align="center">

**FAIRFIELD SENTRY LIMITED (in Liquidation)**
-and-
**ARBITRAL FINANCE INC & 23 Others**

</div>

Claim No. BVIHC (COM) 30/2010

<div align="center">

**FAIRFIELD SENTRY LIMITED (in Liquidation)**
-and-
**BANK JULIUS BAER & CO LTD & 33 Others**

</div>

Claim No. BVIHC.(COM) 153/2010

<div align="center">

**FAIRFIELD SENTRY LIMITED (in Liquidation)**
-and-
**WISE GLOBAL FUND LIMITED**

</div>

Claim No. BVIHC (COM) 20/2011

<div align="center">

**FAIRFIELD SENTRY LIMITED (in Liquidation)**

</div>

-and-
**CREDIT SUISSE LONDON NOMINEES LIMITED**

---

**ORDER**

---

**BEFORE:**    The Honourable Justice Edward Bannister Q.C. [Ag]

**DATED:**    **10 October 2011**

**ENTERED:**    **22 June 2012**

**UPON** the hearing of the application in Claim No:  BVIHC (COM) 30/2010 by the 20th defendant ABN AMRO Fund Services (Isle of Man) Nominees Limited dated 19 September 2011 ("the ABN AMRO Application")

**AND UPON HEARING** Mark Hapgood, QC Kissock Laing and Phillip Kite for the 20th defendant/applicant and Michael Brindle QC and William Hare for the claimant/respondent

**AND** in the exercise of the Court's jurisdiction under CPR 15.2

**IT IS ORDERED THAT:**

1.    The claim against the applicant is dismissed;

2.    The respondent shall pay the applicant's costs of the application, such costs to be assessed if not agreed.

**CONSEQUENTIALLY UPON THE ABOVE ORDER** and in the exercise of the Court's jurisdiction under CPR 26.1(2)(w) and CPR15.2

**AND UPON HEARING** (i) Dominic Chambers QC and Arabella di Iorio on behalf of the Maples and Calder Preliminary Issues Defendants and on behalf of all other defendants to the above claims represented by Maples and Calder; (ii) David Lord QC, Robert Foote and Clare Goldstein on behalf of the Ogier Preliminary Issues Defendants and on behalf of all other defendants to the above claims represented by Ogier; (iii) Mark Hapgood QC Phillip Kite Kissock Laing and Colleen Farrington on behalf of the Harneys Preliminary Issues Defendants and on behalf of all other defendants to the above claims

represented by Harneys and (iv) Paul Webster QC and Nadine Whyte on behalf of the
O'Neal Webster Preliminary Issues Defendants and on behalf of all other defendants to
the above claims represented by O'Neal Webster; and Michael Brindle QC, William Hare
and Eleanor Morgan on behalf of the Claimant

**IT IS ORDERED THAT:**

3.    The following claims are dismissed against the following defendants:

    **(a)    Claim No: BVIHC (COM) 357/2009:**

        (i)     Bank Julius Baer & Co Limited

        (ii)    EFG Bank SA

        (iii)   Quilvest Finance Limited

        (iv)    SG Private Banking (Suisse) SA

        (v)     SNS Global Custody BV

    **(b)    Claim No: BVIHC (COM) 404/2009:**

        (i)     Bank Julius Baer & Co Limited

        (ii)    Caja de Ahorros y Monte de Piedad de Madrid

        (iii)   Credit Suisse London Nominees Limited

        (iv)    Deutsche Bank (Suisse) SA

        (v)     Lloyds TSB Bank

        (vi)    Quilvest Finance Limited

        (vii)   SG Private Banking (Suisse) SA

        (viii)  SNS Global Custody BV

        (ix)    Lombard Odier Darier Hentsch & Cie

    **(c)    Claim No: BVIHC (COM) 425/2009:**

        (i)     Bank Julius Baer & Co Limited

        (ii)    SNS Global Custody BV

        (iii)   Credit Suisse London Nominees Limited

        (iv)    Deutsche Bank (Suisse) SA

        (v)     Quilvest Finance Limited

        (vi)    UBS (Cayman Islands) Limited

        (vii)   UBS AG New York

        (viii)  Lombard Odier Darier Hentsch & Cie

        (ix)    UBS (Cayman) Limited

        (x)     Mirabaud & Cie

    **(d)    Claim No:  BVIHC (COM) 5/2010:**

        (i)     Bank Julius Baer & Co Limited

       (ii)    SNS Global Custody BV

       (iii)   ABN AMRO (formerly Fortis (Isle of Man) Nominees Limited)

       (iv)   Quilvest Finance Limited

       (v)    UBS AG New York

       (vi)   UBS (Cayman) Limited

**(e)**    **Claim No: BVIHC (COM) 15/2010:**

       (i)    Bank Julius Baer & Co Limited

       (ii)    SNS Global Custody BV

       (iii)   Martello Nominees Limited

       (iv)   Pictet & Cie

       (v)    Quilvest Finance Limited

       (vi)   UBS (Luxembourg) SA

       (vii)  Deutsche Bank Trust Company Americas

**(f)**    **Claim No: BVIHC (COM) 30/2010:**

       (i)    Bank Julius Baer & Co Limited

       (ii)    SNS Global Custody BV

       (iii)   EFG Bank SA

       (iv)   Credit Suisse London Nominees Limited

       (v)    Lloyds TSB Bank

       (vi)   Martello Nominees Limited

       (vii)  SG Private Banking (Suisse) SA

       (viii) ABN AMRO (formerly Fortis (Isle of Man) Nominees Limited)

       (ix)   EFG Bank European Financial GR Switzerland

       (x)    Buckmore Nominees Limited

       (xi)   UBS (Cayman) Limited

       (xii)  UBS (Luxembourg) SA

       (xiii) Pictet & Cie

**(g)**    **Claim No: BVIHC (COM) 153/2010:**

       (i)    Wise Global Fund Limited

**(h)**    **Claim No: BVIHC (COM) 20/2011:**

       (i)    Credit Suisse London Nominees Limited

4.    Subject to paragraph 5 below (which applies to the Preliminary Issues costs only and not the remainder of the Preliminary Issues Defendants' costs which are to be dealt with in accordance with this paragraph) the claimant shall pay the defendants' costs of those claims, to be assessed if not agreed.

**UPON THE FURTHER HEARING** of the question of the costs of the trial of preliminary issues held on 28 and 29 July 2011 (those costs to include, further to the Order of the Court dated 20 April 2011 the costs of the application for preliminary issues), such question having been stood over pursuant to the Order of the Court dated 16 September 2011 for determination after the hearing of the ABN AMRO Application

**AND UPON** the appearances for the Maples and Calder, Ogier, Harneys and O'Neal Webster Preliminary Issues defendants being as set out above

**IT IS ORDERED THAT:**

5.    The claimant shall pay 75% of the Preliminary Issues defendants' costs of the trial of preliminary issues (those costs to include the costs of the application for preliminary issues) such costs to be assessed if not agreed.

BY ORDER OF THE COURT

REGISTRAR

# EXHIBIT F

Sentry's Skeleton Argument in Support
of Appeal dated 5 January 2012

LODGED
Registrar's Office
JAN 0 5 2011
Virgin Islands
at 3:26

THE EASTERN CARIBBEAN SUPREME COURT

VIRGIN ISLANDS

### IN THE COURT OF APPEAL

Claim Nos: BVIHC (COM) 357/2009, 404/2009, 425/2009, 5/2010, 15/2010, 30/2010,

153/2010 and 20/2011

Civil Appeal No: 62 of 2011


B E T W E E N:

### FAIRFIELD SENTRY LIMITED (in Liquidation)

**Claimant/ Appellant**

and

### ALFREDO MIGANI & 22 others

### BANCO GENERAL SA/BANCA PRIVADA & 30 others

### BANK JULIUS BAER & CO LTD & 26 others

### BANK JULIUS BAER & CO LTD and others

### ARBITRAL FINANCE INC & 23 others

### BANK JULIUS BAER & CO LTD & 33 others

### WISE GLOBAL FUND LIMITED

### CREDIT SUISSE LONDON NOMINEES LIMITED

**Defendants/ Respondents**

---

### CLAIMANT'S SKELETON ARGUMENT IN SUPPORT OF
### APPEAL AGAINST ORDERS OF
### 16 SEPTEMBER 2011 AND 10 OCTOBER 2011

---

### Introduction

1.      This is the skeleton argument of Fairfield Sentry Limited (in liquidation) (**"Sentry"**)
        in support of its appeals against the decisions of Bannister J contained in paragraph 4

of the order of 16 September 2011 and paragraphs 1-5 of the order of 10 October 2011.

2.   The appeals are brought with the leave of the Court of Appeal, granted by order dated 5 December 2011.

3.   In addition to Sentry's appeals, the Respondents appeal (with the leave of the Court of Appeal) against paragraphs 1-3 of the order of 16 September 2011.

**The proceedings below**

4.   Sentry is a BVI company incorporated under the terms of the International Business Companies Act 1984 which was, at all material times, operated as an investment fund under the Mutual Funds Act 1996. The substantial majority of Sentry's funds was invested with Bernard L. Madoff Investment Securities LLC ("BLMIS").

5.   As is well known, BLMIS collapsed in December 2008 when Bernard Madoff admitted that it had been run as a Ponzi scheme. Sentry was placed into liquidation on 21 July 2009. A Ponzi scheme[1], as the Court will be aware, is a fraudulent investment operation which pays fictitious "returns" to its investors out of their own money or from the money of subsequent investors, rather than from any actual profit earned. Such schemes are insolvent from inception[2] and doomed to collapse, because the assets (typically, the most recent investments by existing or new investors) will always be less than the liabilities, i.e. the amounts owed to all investors. This situation can only persist so long as the fraud remains unrevealed and ever greater amounts of new money are brought into the scheme to make redemption payments to investors based on the fictitious returns. It is the Ponzi scheme's ability to make these redemption payments which enables (i) the scheme to continue unrevealed, and (ii) the continued pursuit and procurement of new money to sustain the scheme.

---

[1] In *Donell v Kowell* 533 F.3d 762 (9th Cir. 2008) the United States Court of Appeal for the Ninth Circuit said that, "A Ponzi scheme is a financial fraud that induces investment by promising extremely high, risk-free returns, usually in a short time period, from an allegedly legitimate business venture. 'The fraud consists of funnelling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment.' *In re United Energy Corp., 944 F.2d 589, 590 n.1 (9th Cir. 1991).* See also *Hirsch v Arthur Andersen & Co.* 72 F. 3d 1085, 1088 n.3 (2nd Cir. 1995).

[2] See further para 17(c) below.

6.      By its claims made in the proceedings subject to these appeals, Sentry sought
        recovery from the Defendants of monies paid to them on redemption of shares in
        Sentry. The Articles of Association of Sentry ("the Articles") provided that the price
        at which shares were to be redeemed ("the Redemption Price") was the Net Asset
        Value ("NAV") per share, as calculated in accordance with the Articles.

7.      It is Sentry's case that the NAV was calculated under a mistake of fact because
        BLMIS was throughout operating a Ponzi scheme such that its investments in BLMIS
        were lost from the date of investment. As a consequence, the NAV was at all times
        nil or a nominal value and the Redemption Price should accordingly have been nil or
        a nominal sum. That factual basis must be assumed to be true for the purposes of the
        preliminary issues and the summary judgment application. In the circumstances,
        Sentry contends that the Defendants have been unjustly enriched at its expense and
        they are liable to make restitution in the aggregate amount of redemptions.

8.      The Defendants filed Defences denying Sentry's claims. Two pleaded defences are
        relevant for the purposes of the appeals now before the Court: the Article 11 defence
        and the good consideration defence. The Article 11 defence is the subject of the
        Defendants' appeal and will be addressed in the skeleton argument dealing with that
        appeal.   The defence which is of relevance to Sentry's appeal is the good
        consideration defence, by which the Defendants contend that in surrendering their
        shares in Sentry they gave good consideration for the payment of the Redemption
        Price and thereby have a complete defence to the claims for repayment.

9.      On 20 April 2011 Bannister J ordered the trial of four preliminary issues in relation to
        the Article 11 and good consideration defences ("the Preliminary Issues").
        Preliminary Issues (1)-(3) related to the Article 11 defence and (4) related to the good
        consideration defence.

10.     The Preliminary Issues were tried by Bannister J on 26 and 27 July 2011 and
        judgment was handed down on 16 September 2011. By his judgment, Bannister J
        effectively decided the Article 11 defence in favour of Sentry and the good
        consideration defence in favour of the Defendants. It is the Judge's determination of

the good consideration defence which is the subject of the present appeal. The determination of the Article 11 defence is the subject of the Defendants' appeals. There is an obvious tension between these findings. Although the Judge has (correctly) found that there were no binding certificates, he has effectively found that the uncertified statements of NAV were just as binding as certificates would have been, simply because, as will always be the case, the redeeming members gave up their shares (even if wholly worthless) in return for their money.

11.    Following judgment on the Preliminary Issues, one of the Defendants, ABN AMRO Fund Services (Isle of Man) Nominees Limited, applied for summary judgment. That application was heard by Bannister J on 27 September 2011 and judgment was handed down on 10 October 2011. The precise form of the Order made by Bannister J on that occasion have not yet been finalised due to a dispute as to its terms but, in effect, the Judge dismissed Sentry's claims against ABN AMRO Fund Services (Isle of Man) Nominees Limited and the other Defendants to the claims in which the Preliminary Issues had been tried. Sentry appeals against those dismissals.

**Appeal against Order of 16 September 2011**

12.    Preliminary Issue (4) was formulated as follows:

> *"Whether a redeeming Member of the Claimant in surrendering its shares gave good consideration for the payment by the Claimant of the Redemption Price and, if so, whether that precludes the Claimant from asserting that the money paid to that Member on redemption exceeded the true Redemption Price and as such is recoverable as to the excess from such redeeming Member."*

13.    Notwithstanding the extent of the argument before him at the hearing in July 2011, in his judgment of 16 September 2011 Bannister J disposed of Preliminary Issue (4) in just three short paragraphs (paragraphs [34]-[36]). The Judge held that the redemption of shares by the Defendants amounted to a bargain and sale for which the consideration received by the Appellant was the surrender of the rights of the redeeming shareholder (paragraph [34]) and that a party (here Sentry) would not be able to recover a payment made by mistake where the payer had received any consideration from the payee (paragraph [35]).

*No new contract or bargain*

14.    In paragraph [34] of the judgment, the Judge said that:

> *"Left to myself I would have held that the redemption of shares in this case amounted to a bargain and sale for which the consideration received by Sentry was the surrender of the rights of the redeeming shareholder."*

The Judge went on to say that he could not see how the subsequently discovered fact that BLMIS was a Ponzi scheme could be said to have vitiated that bargain (namely, the purported bargain for the redemption of shares) so as to entitle Sentry to recover the redemption price paid to the redeeming shareholder. He added, somewhat puzzlingly, that he did not see how the redemption price could be recovered in circumstances in which *resitutio in integrum* is no longer possible.

15.    However, the Judge was wrong to hold that that the redemption of shares by the Defendants amounted to a fresh bargain and sale, the consideration for which (on the part of the Defendants) was the surrender of their rights as shareholders in Sentry. In fact, there was no new and separate "redemption contract"; on the contrary, the redemption of shares took place pursuant to an existing contract which was contained in Article 10 of the Articles, as the Judge himself had earlier recorded at paragraphs [5]-[6] of his judgment[3]. This is not a case in which there was a fresh contract or bargain for the redemption of shares but simply (mistaken) performance of an existing contract: see *Havela Investments Ltd v Royal Trust Co of Canada (C.I) Ltd* [1986] 1 AC 207 at 226C-G, 234D-235G.

16.    Accordingly, there was no new bargain which needed to be vitiated[4] and the Judge was wrong so to hold. This error is fundamental to the Judge's reasoning as it was to the argument of the Defendants at the hearing. The Defendants sought to escape from the conclusion that on the assumed facts there was nothing of any real value given up

---

[3] See also paragraph 82 of the Defendants' skeleton argument below ("*The redemption payments in the present case were made in the context of contractual relationships between Sentry and the Defendants under the Articles.*")

[4] The passage from the speech of Lord Scott in *Deutsche Morgan Grenfell Group plc v IRC* [2006] UKHL 49 at [84]-[85] to which the Judge referred in footnote 16 was dealing with a different situation and is of no application here.

in return for the redemption monies by creating the alleged "redemption contracts", and then arguing that there could be no restitution unless those contracts were void. If the correct contractual analysis had been adopted, there would have been no coherent answer to Sentry's claim.

## *Shares and associated rights of no value*

17.    The shares which were surrendered by the Defendants and the rights which accompanied them were, on the facts which must be assumed for present purposes, of no value. This is because:

(a)    The overwhelming majority of funds placed by the Defendants with Sentry for investment were invested in BLMIS.

(b)    At all material times BLMIS was run as a Ponzi scheme.

(c)    As such, BLMIS operated as a fraudulent scheme which was, as a matter of law, insolvent from inception: see the US cases of *Armstrong v Collins* 2010 WL 1141158 (S.D.N.Y.) at [21] (*"Courts have also held that debtors operating Ponzi schemes are, by definition, insolvent"*), *ATM Financial Services, LLC* 2011 WL 2580763 (Bkrtcy, M.D.Fla.) at [6] (*"There is little debate that a company run as a Ponzi scheme is insolvent as a matter of law"*) and *Janvey v Alguire* 2011 WL 2937949 (C.A.5 (Tex.)) at [9] (*"This Circuit has found that a Ponzi scheme 'is, as a matter of law, insolvent from its inception.'"*), together with the additional cases cited therein. See also, to like effect, the decision of the Court of Queen's Bench of Alberta in *Re Titan Investments Limited Partnership* 2005 ABQB 637 at [16] (*"I find the American approach [to Ponzi schemes] to be reasonable. It is apparent that there were never sufficient funds in the Partnership to enable Titan to pay out its partners at the alleged unit values of the partnership, and the scheme would have collapsed at any time that a sufficient number of investors demanded redemptions. I therefore adopt the American authorities and find that Titan, which was run as a Ponzi scheme by Comte, was insolvent from its inception."*).

(d)    Sentry's investments in BLMIS were therefore lost from the date on which they were made.

(e)    Accordingly, the NAV of Sentry was at all material times nil or, in the alternative, a nominal sum.

(f)    As such, the shares in Sentry which were surrendered by the Defendants (and the rights attached to those shares) were of nominal or no value.

### *No good consideration*

18.    The NAV of Sentry being nil or, in the alternative, a nominal sum there was no basis for the Judge to treat the surrender of shares of no value as being "good consideration". Although the Judge said (rightly) in paragraph [4] of his judgment that questions of value of the NAV did not need to be decided in the course of the determination of the Preliminary Issues, it is plain from a reading of the transcript of the hearing (see, for example, pages 198-204 of the transcript for 28 July 2011) that he had real difficulty in accepting this. Sentry submits that the Judge's scepticism (which was in any event ill-founded) affected his judgment. If, as he should have done for these purposes, the Judge had accepted that the true NAV was nil or nominal, then there was no basis for treating the surrender of worthless shares as being anything approaching "good consideration".

19.    It is important to recognise that "consideration" in the context of good consideration as a defence to a claim for recovery of a mistaken payment has a different meaning from "consideration" in its classical context, formulated in the context of the law relating to the formation of a contract. It is well-established that in the context of the formation of a contract the value of the consideration does not matter, provided that it is not nil, and the court does not generally concern itself with its adequacy. However, in the context of the law of restitution "consideration" has a different meaning: Goff & Jones, *The Law of Restitution*, 7th ed. (2007), para 41-002; Virgo, *The Principles of the Law of Restitution*, 2nd ed. (2006) at p.172. In this context, it does not matter whether there was or was not consideration given when the relevant contract (namely

the subscription contract contained in the Articles) was entered into, provided that at the time when restitution is sought it can be said that any such initial consideration has turned out to be valueless or of nominal value.

20.    It follows, for the purposes of the law of restitution, that something which might be "consideration" for the purposes of the creation of a contract (viz. something which may be very small) is not necessarily also "good consideration" sufficient to defeat an otherwise good claim for restitution. Support for such an approach is to be found in the following passage in Virgo, *The Principles of the Law of Restitution*, supra, at p 173[5]:

> "The defences of good consideration and change of position have a similar rationale, namely that where the defendant has provided consideration or his or her position has changed it is not just and equitable that the defendant should be required to make full restitution of the benefits received to the claimant. This common rationale assists in the resolution of a particular uncertainty about the ambit of the defence of good consideration, namely whether the defence defeats the restitutionary claim completely or only to the extent of the consideration provided. *The better view is that, by analogy with the defence of change of position, the restitutionary claim should only be defeated to the extent that consideration has been provided. So, for example, if the claimant mistakenly pays £1,000 to the defendant who provides goods worth £150 in return, the restitutionary claim will only be defeated to the extent of £150.*" (emphasis added)

21.    Thus, if the value of the thing given up in return for a mistaken payment is small, but more than nominal, then as a matter of principle that does not defeat the claim altogether, but reduces it to the extent of that value. This is obviously just and in accordance with the fundamental principle underlying the law of restitution, namely unjust enrichment. How can a defendant who has received £1000 by mistake be allowed to hold on to the whole of that sum simply because he gave a tin whistle in return?

22.    There is support in the case law for this approach, to be found in the judgments of Waller LJ and Thorpe LJ in *Lloyds Bank plc v. Independent Insurance Co. Ltd* [2000] 1 Q.B. 110 at 125G-126A and 129C. Although this case and Professor Virgo's book were extensively debated at the hearing, the Judge fails to deal with this point at all in

---

[5] See also Goff & Jones, *The Law of Restitution*, supra, at 41-002, where it is said that such a position may be *"the more acceptable principle"*.

his judgment, which is a fundamental defect, since from the judgment it would appear that the Judge has either overlooked the point or failed to appreciate its significance.

23.    Since the hearing, substantial support for Sentry's position has been provided by the latest (8th) edition of Goff & Jones, now entitled *"The Law of Unjust Enrichment"* rather than *"The Law of Restitution"*. In a substantial shift from the 7th edition the authors of the leading textbook in the law of restitution now say (para. 29-19) that it is to be doubted whether "good consideration" is to be treated as a distinct defence under the law of restitution and now adopt a position close to that of Professor Virgo. They distinguish (at paras 29-19 and 29-20) between two-party and three-party cases:-

> *"In two-party cases, where a claimant pays money to a defendant to discharge a legal obligation that he owes the defendant, any claim to recover the money could be met by the response that the defendant's enrichment is justified by the legal right that he had to receive the money....Moreover, even if that were not enough to bar the claim, the defendant would also be entitled to rely on the change of position defence..., having released his legal right against the claimant in exchange for the payment."*

24.    The present case is a two-party case. Applying the approach of Goff & Jones: (a) the Defendants could not here justify their enrichment on the basis of the legal right to receive the money, since they had no such right, and (b) application of the change of position defence would lead to the *pro tanto* approach which Sentry advocates.

25.    In three-party cases, where a claimant pays money to a defendant to discharge a legal obligation that the claimant owes to a third party, Goff & Jones (para 29-20) advocate the application of the change of position defence, and they note the judgment of Waller LJ in the *Independent Insurance* case in support of this. This is despite the authors' express citation of *Aiken v. Short* (1856) 1 H&N 210 and *Barclays Bank Ltd v. W.J. Simms Son & Cooke (Southern) Limited* [1980] QB 677, the only two cases to which the Judge makes reference in his judgment.

26.    Those two cases represent the only stated support for the Judge's position (save for the misconceived "redemption contract" point) and are cited by him in paragraph [35] of his judgment. He does not seem to have derived much assistance from the

*Barclays* case, but rather derives his conclusion from the *Aiken* case. He was wrong to do so for three reasons:

(i)   *Aiken* does not represent the true modern approach. When, in 1856, *Aiken* was decided, there was no concept of "change of position" which could have provided a flexible and just defence to the claim. The true modern approach to this issue is represented by Virgo, Goff & Jones and the majority in *Independent Insurance*;

(ii)  Because *Aiken* was a three-party case, where the mistaken payment did undoubtedly discharge a debt owed by the recipient to a third party, having been paid with his authority. In the present (two-party) case the payment did not discharge a debt owed by Sentry to the Defendants, since Sentry's whole point in this litigation is it owed no such debt because the true NAV was nil or nominal and the Defendants as redeemers were entitled to nothing;

(iii) Because, even if the three-party analogy is followed, in *Aiken* both the existence and the amount of the debt or obligation satisfied by the mistaken payment was not disputed or in issue. The payer, having discharged the debt of the third-party obligor, was entitled to seek reimbursement from him, and it is right and proper that he was denied the right to recoup the mistaken payment from the payee. In *Barclays,* on the other hand, the claimant bank paid without mandate from its customer and had no right to reimbursement from the customer, and the defence of "good consideration" failed.

27.   The law of restitution is not concerned with the original contract (if there is one) but with whether or not anything of value is given up for the mistaken payment. The simple fact in the present case is that at the time of the redemption there was nothing of value which was given up at all. There was therefore no good consideration for the mistaken payments made by Sentry.

28.   It follows that the Judge was wrong to hold that in surrendering their shares in return for redemption payments the Defendants had given good consideration such that

Sentry was precluded from recovering those payments. The Judge should have answered Preliminary Issue (4) in the negative.

## Appeal against Order of 10 October 2011

29.    The Judge was wrong to hold that Sentry had no real prospect of succeeding on the claims. For the reasons set out above, the Judge was wrong to decide Preliminary Issue (4) in the way he did; had he decided the issue correctly he should have held that Sentry was not precluded from asserting that the money paid to members on redemption exceeded the true Redemption Price and as such was recoverable as to the excess from such redeeming member. Had he so held, the Judge would not have held that Sentry had no real prospect of succeeding on the claims. That would have been sufficient to dispose of any application for summary judgment.

30.    In any event, having held (incorrectly, Sentry submits) that the redemption of shares amounted to a fresh contract, the Judge was wrong to hold that such contract was not void for common mistake. It is common ground, as stated by Robert Goff J. in the *Barclays* case at 695E that " *...if the money was due under a contract between the payer and the payee, there can be no recovery...unless the contract itself is held void for mistake.* ". It also common ground that whether or not a contract is void for mistake depends upon the principles set out by the Court of Appeal in the *Great Peace* [2003] QB 679. This requires that the mistake should render performance of the contract in accordance with its terms something different from the performance which the parties contemplated. The Judge correctly sets out the relevant principles at paragraphs [13]–[16] of the second judgment.

31.    Nevertheless, the Judge said (at paragraph [17] of the second Judgment) that the fact, if true, that upon redemption the directors of Sentry should have declared a nil NAV did not make the contract for redemption void. In so holding the Judge failed to have any or any proper regard to the fact that the reason why the directors should have declared a nil NAV was that BLMIS was operating a fraudulent Ponzi scheme, contrary to the fundamental assumption of the parties. It was not a genuine investment scheme at all, but a scam. The alleged NAV founding the payment was a fiction. The "redemption contract" (if it ever existed) was an integral part of the fraud

and bore no relation to what the Defendants thought that they were agreeing to. In the circumstances, the Judge should have had no difficulty at all in holding that the parties were mistaken as to a fundamental assumption on which the contract was founded, thus rendering performance of the essence of the contract impossible.

32. Further and in any event, the Judge was wrong to refuse Sentry's application for an adjournment of the summary judgment application. The Judge referred (in paragraph [20] of his judgment) to a passage in the judgment of Robert Goff J in the *Barclays* case at 695G-H recognising the possibility that the defence of good consideration might not be available to a defendant who had not acted in good faith and (correctly) accepted that there may be circumstances where, if it be demonstrated that a party knows his counterparty is acting under a mistake, it may be unconscionable for the party to retain the benefit of the transaction (whilst expressing reservations, without making any finding, as to the applicability of that principle where there was no possibility of putting the parties back in the position in which they were before the transaction was entered into).

33. Although the Judge stated that he saw the difficulties of the joint liquidators of Sentry in addressing the issue of good faith, he failed to give any or any adequate weight to those difficulties or to the matters set out in the fifth witness statement of Mr Kenneth Krys (one of Sentry's liquidators) dated 26 September 2011 and in particular:

(i) The fact that the joint liquidators of Sentry had only recently become entitled to access to documents which Mr Irving H. Picard, trustee for the liquidation of the business of BLMIS and the Madoff estate, had collected in his own investigation, including documents concerning the good faith and knowledge of defendants to the claims: see paragraph 9 of Mr Krys's fifth witness statement.

(ii) The fact that certain documents provided to the joint liquidators of Sentry by the BLMIS trustee included complaints which he had made against (among others) certain of the defendants to the claims in the United States Bankruptcy Court, Southern District of New York, alleging that the relevant defendants enabled Madoff's Ponzi scheme, were well aware of indicia of fraud

surrounding BLMIS and that, notwithstanding knowledge that BLMIS was likely a fraud, they nonetheless chose to enable Madoff's fraud for their own gain: see paragraph 8 of Mr Krys's fifth witness statement. Such documents raise serious issues as to good faith and/ or knowledge.

(iii)    The fact that the joint liquidators of Sentry had yet to receive, let alone been able to review, all relevant documents in the possession of the BLMIS trustee on the issue of good faith and/ or knowledge: see paragraph 9 of Mr Krys's fifth witness statement.

(iv)    The fact that the joint liquidators of Sentry reasonably required further time in which to investigate and consider issues of good faith and/ or knowledge.

(v)    The difficulties which the joint liquidators of Sentry had experienced in obtaining relevant documents from Citco Fund Services Europe BV (as explained by Mr Krys in his third witness statement dated 8 April 2011): see paragraphs 10-11 of Mr Krys's fifth witness statement.

(vi)    The fact that by paragraph 6 of the Order of 20 April 2011 directing the trial of the Preliminary Issues the Judge had refused permission to the joint liquidators of Sentry to index the documents under their control and to review them for the purpose of locating documents (if any) which might be relevant to the determination of the Preliminary Issues. Accordingly, the joint liquidators of Sentry had been unable to review the documents under their control which might be relevant to the Preliminary Issues: see paragraphs 10-11 of Mr Krys's fifth witness statement.

(vii)    The fact that any attempt by Sentry to raise issues based on the lack of good faith and/ or knowledge in any subsequent proceedings would or might be met with defences of limitation and/ or abuse of process.

34.    In view of those matters, the Judge should have held that it was not appropriate nor just to grant summary judgment against Sentry until such time as the joint liquidators had had a proper and reasonable opportunity to consider those matters, the documents

relevant to them and their impact on the claims against the defendants. Accordingly, the Judge should have adjourned the further hearing of the application for summary judgment in order to enable that to happen.

## Conclusion

35.    This was pre-eminently not a case for summary judgment:

(1)    The points of law which arise are of fundamental importance and the law of restitution (and the role which the defence of good consideration has to play in it)[6] is in the process of development. The Judge should have decided preliminary issue (4) in favour of Sentry. Alternatively, since at their lowest the arguments of Sentry on "good consideration" are strongly arguable in an uncertain legal area, the Judge should not have felt able to decide the preliminary issue (4) in the Defendants' favour.

(2)    If there was a "redemption contract", the Judge could not legitimately conclude at the summary judgment stage that the contract was not void for mistake.

(3)    It was plainly unfair and unreasonable to refuse to adjourn the giving of a final and summary judgment in the circumstances described, especially where the effect of this would be to prevent any allegations of notice or bad faith from being pursued hereafter.

36.    For the reasons set out above, the appeal should be allowed, Preliminary Issue (4) answered in the negative and the application for summary judgment dismissed.

> MICHAEL BRINDLE QC
> ANDREW WESTWOOD
> WILLIAM HARE

---

[6] See, for example, Professor Virgo's statement that the role of the defence within the modern law of restitution "is a matter of particular controversy": *The Principles of the Law* of Restitution, 2nd ed. (2006) at p. 172.

THE EASTERN CARIBBEAN SUPREME COURT

VIRGIN ISLANDS

IN THE COURT OF APPEAL

Claim Nos: BVIHC (COM) 357/2009, 404/2009, 425/2009, 5/2010,
15/2010, 30/2010, 153/2010 and 20/2011

Civil Appeal No: 62 of 2011

B E T W E E N:

FAIRFIELD SENTRY LIMITED (in Liquidation)

Claimant/ Appellant

and

ALFREDO MIGANI & 22 others

BANCO GENERAL SA/BANCA PRIVADA & 30 others

BANK JULIUS BAER & CO LTD & 26 others

BANK JULIUS BAER & CO LTD and others

ARBITRAL FINANCE INC & 23 others

BANK JULIUS BAER & CO LTD & 33 others

WISE GLOBAL FUND LIMITED

CREDIT SUISSE LONDON NOMINEES LIMITED

Defendants/ Respondents

---

CLAIMANT'S SKELETON ARGUMENT IN SUPPORT OF
APPEAL AGAINST ORDERS OF
16 SEPTEMBER 2011 AND 10 OCTOBER 2011

---

Forbes Hare

P.O. Box 4649
Road Town, Tortola
British Virgin Islands
Tel: (284) 494 1890
Fax: (284) 494 1316

# EXHIBIT G

Judgment of EC Court of Appeal

dated 13 June 2012

EASTERN CARIBBEAN SUPREME COURT
TERRITORY OF THE VIRGIN ISLANDS

IN THE COURT OF APPEAL

HCVAP 2011/041

On appeal from the Commercial Division

BETWEEN:

QUILVEST FINANCE LIMITED

Appellant/Defendant

**and**

FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/042

BETWEEN:

[1] CAJA DE AHORROS Y MONTE DE PIEDAD DE MADRID
[2] DEUTSCHE BANK (SUISSE) SA

Appellants/Defendants

**and**

FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/043

BETWEEN:

SNS GLOBAL CUSTODY BV

Appellant/Defendant

**and**

FAIRFIELD SENTRY LIMITED (In Liquidation)

Respondent/Claimant

1

HCVAP 2011/044

BETWEEN:

DEUTSCHE BANK TRUST COMPANY AMERICAS

Appellant/Defendant

and

FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/045

BETWEEN:

[1]  BANK JULIUS BAER & CO LIMITED
[2]  LLOYDS TSB BANK
[3]  MARTELLO NOMINEES LIMITED (formerly MEESPIERSON   NOMINEES
     (GUERNSEY) LIMITED)
[4]  ABN AMRO FUND SERVICES (ISLE OF MAN) NOMINEES   LIMITED (formerly
     FORTIS (ISLE OF MAN) NOMINEES LIMITED)

Appellants/Defendants

and

FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/046

BETWEEN:

WISE GLOBAL FUND LIMITED

Appellant/Defendant

and

FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

2

**HCVAP 2011/047**

**BETWEEN:**

**[1] LOMBARD, ODIER, DARIER, HENTSCH & CIE**
**[2] MIRABAUD & CIE**

Appellants/Defendants

**and**

**FAIRFIELD SENTRY LIMITED (in Liquidation)**

Respondent/Claimant

**HCVAP 2011/048**

**BETWEEN:**

**[1] SG PRIVATE BANKING (SUISSE) SA**
**[2] LOMBARD, ODIER, DARIER, HENTSCH & CIE**

Appellants/Defendants

**and**

**FAIRFIELD SENTRY LIMITED (in Liquidation)**

Respondent/Claimant

**HCVAP 2011/049**

**BETWEEN:**

**[1] EFG BANK SA**
**[2] EFG BANK EUROPEAN FINANCIAL GROUP SA**
**[3] PICTET & CIE**
**[4] SG PRIVATE BANKING (SUISSE) SA**

Appellants/Defendants

**and**

**FAIRFIELD SENTRY LIMITED (in Liquidation)**

Respondent/Claimant

3

**HCVAP 2011/050**

**BETWEEN:**

<div style="text-align: center;">

[1] EFG BANKS SA
[2] SG PRIVATE BANKING (SUISSE) SA

</div>

<div style="text-align: right;">

Appellants/Defendants

</div>

<div style="text-align: center;">

and

</div>

<div style="text-align: center;">

FAIRFIELD SENTRY LIMITED (in Liquidation)

</div>

<div style="text-align: right;">

Respondent/Claimant

</div>

**HCVAP 2011/051**

**BETWEEN:**

<div style="text-align: center;">

PICTET & CIE

</div>

<div style="text-align: right;">

Appellant/Defendant

</div>

<div style="text-align: center;">

and

</div>

<div style="text-align: center;">

FAIRFIELD SENTRY LIMITED (in Liquidation)

</div>

<div style="text-align: right;">

Respondent/Claimant

</div>

**HCVAP 2011/052**

**BETWEEN:**

<div style="text-align: center;">

CREDIT SUISSE LONDON NOMINEES LIMITED

</div>

<div style="text-align: right;">

Appellant/Defendant

</div>

<div style="text-align: center;">

and

</div>

<div style="text-align: center;">

FAIRFIELD SENTRY LIMITED (in Liquidation)

</div>

<div style="text-align: right;">

Respondent/Claimant

</div>

<div style="text-align: center;">

4

</div>

**HCVAP 2011/054**

**BETWEEN:**

**[1] CREDIT SUISSE LONDON NOMINEES LIMITED**
**[2] BUCKMORE NOMINEES LIMITED**

Appellants/Defendants

**and**

**FAIRFIELD SENTRY LIMITED (in Liquidation)**

Respondent/Claimant

**HCVAP 2011/055**

**BETWEEN:**

**CREDIT SUISSE LONDON NOMINEES LIMITED**

Appellant/Defendant

**and**

**FAIRFIELD SENTRY LIMITED (in Liquidation)**

Respondent/Claimant

**HCVAP 2011/056**

**BETWEEN:**

**CREDIT SUISSE LONDON NOMINEES LIMITED**

Appellant/Defendant

**and**

**FAIRFIELD SENTRY LIMITED (in Liquidation)**

Respondent/Claimant

**HCVAP 2011/058**

**BETWEEN:**

> **[1] UBS AG NEW YORK**
> **[2] UBS (CAYMAN) LIMITED**

<div align="right">Appellants/Defendants</div>

<div align="center">and</div>

> **FAIRFIELD SENTRY LIMITED (in Liquidation)**

<div align="right">Respondent/Claimant</div>

**HCVAP 2011/059**

**BETWEEN:**

> **[1] UBS (CAYMAN) LIMITED**
> **[2] UBS (LUXEMBOURG) SA**

<div align="right">Appellants/Defendants</div>

<div align="center">and</div>

> **FAIRFIELD SENTRY LIMITED (in Liquidation)**

<div align="right">Respondent/Claimant</div>

**HCVAP 2011/060**

**BETWEEN:**

> **[1] UBS (CAYMAN ISLANDS) LIMITED**
> **[2] UBS AG NEW YORK**
> **[3] UBS (CAYMAN) LIMITED**

<div align="right">Appellants/Defendants</div>

<div align="center">and</div>

> **FAIRFIELD SENTRY LIMITED (in Liquidation)**

<div align="right">Respondent/Claimant</div>

<div align="center">6</div>

HCVAP 2011/061

BETWEEN:

## UBS (LUXEMBOURG) SA

Appellant/Defendant

**and**

## FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/062

BETWEEN:

## FAIRFIELD SENTRY LIMITED (in Liquidation)

Appellant/Claimant

**and**

**[1] ALFREDO MIGANI & 22 others**
**[2] BANCO GENERAL SA/BANCA PRIVADA & 30 others**
**[3] BANK JULIUS BAER & CO LTD & 26 others**
**[4] BANK JULIUS BAER & CO LTD and others**
**[5] ARBITRAL FINANCE INC and 23 others**
**[6] BANK JULIUS BAER & CO LTD & 33 others**
**[7] WISE GLOBAL FUND LIMITED**
**[8] CREDIT SUISSE LONDON NOMINEES LIMITED**

Respondents/Defendants

**Before:**
    The Hon. Mde. Janice M. Pereira           Justice of Appeal
    The Hon. Mr. Davidson Kelvin Baptiste    Justice of Appeal
    The Hon. Mr. Don Mitchell              Justice of Appeal [Ag.]

**Appearances:**
    Mr. Mark Hapgood, QC, with him, Mr. Phillip Kite, Mr. Kissock Laing and Ms.
    Colleen Farrington, for the Harney Westwood & Riegels Appellants/Respondents
    Mr. David Lord, QC, with him, Mr. Robert Foote and Ms. Claire Goldstein, for the
    Ogier Appellants/Respondents

7

Mr. Dominic Chambers, QC, with him, Ms. Arabella Di Iorio, for the Maples &
Calder Appellants/Respondents
Mr. David Railton, QC, with him, Mr. Paul Webster, QC and Ms. Nadine Whyte, for
the O'Neal Webster Appellants/Respondents
Mr. Michael Brindle, QC, with him, Mr. Andrew Westwood, Mr. William Hare and
Mr. Robert Nader, for Fairfield Sentry Limited

---

2012:   January 17, 18;
June 13.

---

*Civil appeal – Commercial – Net Asset Value – Ponzi scheme – Trial of Preliminary Issues
– What constitutes a certificate as to Net Asset Value per Share and Redemption Price
within the meaning of Article 11(1) of Articles of Association of Fairfield Sentry – Mistake –
Whether NAV per Share should be revalued – Contract – Mutual mistake – Common
mistake – Whether surrendering shares was good consideration for payment of the
Redemption Price – Whether contract voidable in equity or common law – Whether
restitutionary claim available*

Fairfield Sentry Limited ("Sentry") had invested a substantial amount of its funds with
Bernard L. Madoff Investment Securities LLC ("BLMIS") on behalf of its shareholders
between 1997 and 2008. BLMIS collapsed shortly thereafter when its proprietor, Bernard
L. Madoff, admitted that it had been run as a Ponzi scheme.   Both companies
subsequently went into liquidation, BLMIS in the United States, and Sentry in the Territory
of the Virgin Islands.

Sentry commenced a number of proceedings in the Virgin Islands against various former
shareholders who had redeemed their shares in the company.  The Articles of Association
of Sentry stipulated that the price at which the shares were to be redeemed was to be
calculated by reference to the company's Net Asset Value ("NAV").  Article 11 also
provided that: "Any certificate as to the Net Asset Value per Share or as to the ...
Redemption Price therefor given in good faith by or on behalf of the Directors shall be
binding on all parties."

Sentry argued that in redeeming the shares, the NAV had been calculated under a mistake
since BLMIS was in fact operating a Ponzi scheme and Sentry's investments in BLMIS
were lost from the date of their investment in the company.  Accordingly, its NAV was at all
times either nil or a nominal value, so that the aggregate redemption sums should have
been either nil or nominal.  Sentry therefore contended that the former shareholders had
been unjustly enriched at its expense and were liable to make restitution to the company of
the amounts paid to them when the shares were redeemed.

The former shareholders (the defendants in the court below), in their pleaded defences contended, in essence, that the redemption proceeds had been paid out under a certificate as to the NAV pursuant to Article 11 and as such was conclusive and binding on Sentry. They relied on various documents comprising emails, contract notes, monthly statements as well as computer screen shots ("the Documents") as constituting certificates for the purposes of Article 11. They also contended that in surrendering their shares they gave good consideration for the payment of the Redemption Price and as such this was a complete defence to Sentry's claim.

The Article 11 Defence and the Good consideration Defence formed the basis of preliminary issues which were tried by the court below. The trial judge found in favour of Sentry in respect of the Article 11 Defence but found in favour of the former shareholders on the Good Consideration Defence. He subsequently, pursuant to a summary judgment application made by one of the former shareholders, dismissed Sentry's claims. The former shareholders appealed the judge's findings in respect of the Article 11 Defence. Sentry appealed against the judge's findings in relation to the Good Consideration Defence and in respect of the summary judgment given against it dismissing its claims.

**Held:** dismissing the appeals against the learned trial judge's findings in relation to the Article 11 Preliminary Issues and upholding his finding on the Article 11 Defence; awarding one set of costs to Fairfield Sentry to be in two-thirds of the amount assessed below, and dismissing the appeal against the learned trial judge's finding in relation to the Good Consideration defence and the grant of Summary Judgment and awarding costs to the former shareholders (as one set of costs) to be fixed at two thirds of the amount as assessed below, that:

1. Article 11(1) does not require that a certificate be signed. If this was the case, then the Article would have expressly so stated. The absence of a signature on a Document would not necessarily preclude it from being deemed a certificate for the purpose of Article 11(1).

   **North Shore Ventures Ltd. v Anstead Holdings Inc. and Others** [2011] 3 W.L.R. 628 distinguished.

2. The learned trial judge was right in holding that none of the Documents could have amounted to certificates. Firstly, the plain wording of the Article is that there can be a determination published without it having been certified. Secondly, the function that the Directors had delegated to Fairfield Greenwich and Citco was that of calculation; there is nothing in the documentation that indicates a delegation of either determination or certification. Thirdly, there is no reason why under Article 11 there cannot be an uncertified determination which is not binding; the plain meaning of the wording of the Article is that not every determination is intended to be binding on the parties. Fourthly, the mere stating of a precise price will not suffice for any Document to amount to a certificate. The learned trial judge was correct to find that a certificate must be something more than a simple statement.

Lastly, the certificate must have been issued either by the Directors or by some agency to whom the power to certify was delegated. The Documents were not issued by the Directors, nor was there any delegation of the power to certify.

3. A claimant may be entitled to restitution if he can show that a defendant was unjustly enriched at his expense. However, this payment may be irrecoverable where the claimant was required to pay by contract. In the present case, there were specified contractual obligations to be fulfilled by both Sentry and former shareholders by virtue of Article 10 of Sentry's Articles of Association. The former shareholders fully performed all their obligations under the contract. Upon a request by them for redemption of their shares, Sentry was contractually bound to pay the Redemption Price for the shares, the Redemption Price having been determined by the Directors of Sentry. Sentry, in paying the Redemption Price did so in the discharge of its debt obligations to the redeeming shareholders pursuant to Sentry's Articles which remained perfectly valid and in force.

   **Goff & Jones: The Law of Unjust Enrichment** (8th edn., Sweet & Maxwell 2011) considered.

4. The alleged mistaken calculation of the NAV does not undermine the legal obligation which required that Sentry pay the Redemption Price to the former shareholders upon their request. Sentry's contractual obligations gave rise to a debt obligation whatever the value of the shares and the surrender of the rights to the shares by the former shareholders was good consideration which would defeat Sentry's restitutionary claim.

5. The fact that BLMIS was operating as a Ponzi scheme did not render the contract between Sentry and the former shareholders impossible to perform. The subject matter of the subscription contract was the shares; as such the subject matter existed. The contract for the shares was with Sentry and not with BLMIS, and therefore it mattered not what the value of Sentry's investment in BLMIS was as this did not form part of the contract. It was clearly possible for Sentry to redeem or purchase the shares at a price which was fixed by its own Directors. Essentially, there remained a contract between Sentry and the former shareholders which was never invalidated. On the true construction of the contract it was still possible to be performed.

   **Deutshe Morgan Grenfell Group plc v Inland Revenue Commissioners and another** [2007] 1 A.C. 558 applied; **Bell and Another v Lever Brothers, Limited** [1932] A.C. 161 applied.

   10

6.  Mistake as to a quality of the thing contracted for would not affect assent unless it was the mistake of both parties, and was as to the existence of some quality which made the thing without the quality essentially different from the thing as it was believed to be. It cannot be said that there existed a common mistake for the alleged mistaken calculation of the NAV was solely a mistake of Sentry's. Likewise it cannot be said that there was anything essentially different about the subscription contract when it became known that BLMIS was operating as a Ponzi scheme, for the subscription contract was for the shares and the redemption payment was for the surrender of the shares. Thus, Sentry's payment for the redeemed shares based on Sentry's alleged mistaken calculation of the NAV did not nullify Sentry's obligation to pay on redemption.

**Bell and Another v Lever Brothers, Limited** [1932] A.C. 161 applied; **Great Peace Shipping Ltd v Tsavliris Salvage (International) Ltd** [2003] Q.B. 679 applied.

7.  Applicants for summary judgment are entitled to have their applications dealt with on the facts as they are, not as they might be. The adjournment sought by Sentry in the hope of turning up information which may assist or strengthen its case was rightly refused.

## JUDGMENT

[1]    **MITCHELL, JA [AG.]:**  Fairfield Sentry Limited ("Sentry") was the largest of the 'feeder funds' which invested monies with Bernard L. Madoff Investment Securities LLC ("BLMIS") on behalf of its shareholders between 1997 and 2008. BLMIS collapsed in December 2008 when its proprietor, Bernard L. Madoff, admitted that it had been run as a Ponzi scheme. BLMIS is now in liquidation in the United States. Sentry was placed in liquidation in the Virgin Islands on 21st July 2009. It has commenced a number of proceedings in the Virgin Islands ("the Clawback Actions") against various shareholders who redeemed their shares in Sentry. The total amount claimed by Sentry in the Clawback Actions is more than US$1 billion.

[2]    Sentry's Articles of Association ("the Articles") stipulated that the price at which the shares were to be redeemed should be calculated by reference to the Net Asset Value ("NAV") of Sentry. The Articles contained detailed provisions as to how the NAV was to be calculated. The claim made by Sentry in each of the Clawback

11

Actions is identical and is based on an alleged mistake in the calculations of the NAV of the shares redeemed by Sentry at the request of the shareholder in question.

[3]     Sentry alleges that the NAV was calculated under a mistake as BLMIS was in fact operating a Ponzi scheme, and Sentry's investments in BLMIS were lost from the date of their investment in BLMIS. As a result, Sentry alleges, its NAV was at all times either nil or a nominal value, so that the aggregate redemption sums should have been either nil or nominal. The consequence was that the defendants to the Clawback Actions have been unjustly enriched at its expense. The defendants are liable to make restitution to Sentry of the amounts paid to them when Sentry redeemed their shares.

[4]     The defendants to the Clawback Actions have all served defences. Broadly speaking, the individual defences are similar. Some are factually intensive. If a full trial had been held of all the matters raised in the defences it would have been a lengthy and expensive exercise. In order to try to avoid that, some of the defendants (the "P I Defendants") proposed that preliminary issues be tried in relation to two of the pleaded defences, the Article 11 Defence and the Good Consideration Defence. The learned trial judge accepted this proposal and formulated the preliminary issues himself. The preliminary issue trial related to a total of eight of the Clawback Actions. There were two issues, the first of which related to the Article 11 Defence and the second, to the Good Consideration Defence. They were:[1]

> "(1)     Whether any (and, if so, which) of the documents copies of which are exhibited at pages 2 to 17 inclusive of exhibit PRK-1 to the affidavit of Phillip Kite sworn in the proceedings the short title and first reference to which is Fairfield Sentry Limited (in liquidation) - v- Bank Julius Baer & Co Limited and others BVIHC(COM) 30/2010 on 8 March 2011 (or copies of any further documents which may be exhibited to any witness statement made in

---

[1] See "Schedule of Preliminary Issues to be tried" which forms part of the order of Bannister J. dated 20th April 2011.

connection with this issue) ("the documents") is a certificate within the meaning of Article 11(1) of the Articles of Association of the Claimant ("Article 11(1)", "the Articles");

(2)    If the answer to (1) is yes, whether any (and, if so, which) of the documents is:

        (a)  a certificate as to the Net Asset Value per share ('NAV'); or

        (b)  a certificate as to Redemption Price within the meaning of the Articles;

(3)    If the answer to (2)(a) or (b) is yes:

        Whether the publication or delivery by the Claimant

        (a) as a matter of information only, or

        (b) in connection with a redemption request

of a document containing substantially the same items of information as a document identified as falling within (2)(a) or (b) above to a redeeming or redeemed Member of the Claimant precludes the Claimant from asserting that money paid to that redeeming or redeemed Member on redemption exceeded the true Redemption Price and as such is recoverable as to the excess from such redeeming Member.

For the purposes of this issue 'document' includes emails and materials accessible on a website maintained by the Claimant or Citco Fund Services (Europe) BV or Fairfield Greenwich Group.

(4)    Whether a redeeming Member of the Claimant in surrendering its shares gave good consideration for the payment by the Claimant of the Redemption Price and, if so, whether that precludes the Claimant from asserting that the money paid to that Member on redemption exceeded the true Redemption Price and as such is recoverable as to the excess from such redeeming Member."

**The Article 11 Defence**

[5]    The Article 11 Defence refers to Article 11 of the Articles which makes provision for the determination of the NAV. The Article provides:

"11. (1) The Net Asset Value per Share of each class shall be determined by the Directors as at the close of business on each Valuation Day (except when determination of the Net asset Value per Share has been suspended under the provisions of paragraph (4) of this Article), on such

13

other occasions as may be required by these Articles and on such other occasions as the Directors may from time to time determine.

The Net Asset Value per Share shall be calculated at the time of each determination by dividing the value of the net assets of the Fund by the number of Shares then in issue or deemed to be in issue and by adjusting for each class of Shares such resultant number to take into account any dividends, distributions, assets or liabilities attributable to such class of Sharers pursuant to paragraph (2) of Article 4, all determined and calculated as hereinafter provided.

Any certificate as to the Net Asset Value per Share or as to the Subscription Price or Redemption Price therefor given in good faith by or on behalf of the Directors shall be binding on all parties."

There is no definition in the Articles as to the meaning of the word 'certificate' in the last paragraph of this Article.

[6]     The first paragraph of Article 11(1) provides that the NAV per Share shall be determined by Sentry's Directors at the close of business on each Valuation Day and it stipulates how the NAV is to be calculated. The P I Defendants' position was that the above provision was satisfied when their shares in Sentry were redeemed. The legal effect is to prevent Sentry from attempting to go behind, disturb or recalculate the NAV.

[7]     Some of the documents referred to in the Preliminary Issues (the "Documents") were issued by Fairfield Greenwich (Bermuda) Ltd. ("Fairfield Greenwich"). Fairfield Greenwich was Sentry's investment manager, to which the Directors had contractually delegated the day to day management of the fund. These Documents included e-mails stating the NAV per Share. The P I Defendants submitted that these were given with the actual and/or ostensible authority of the Directors, and so constituted 'certificates' within the meaning of Article 11(1). Sentry's witness, Albertus Lokhorst, formerly a Senior Account Manager employed by Citco, said in paragraph 7 of his witness statement that Citco was authorised by Fairfield Greenwich to issue monthly statements to registered shareholders.

14

"Citco" refers to Citco Fund Services (Europe) BV. Citco was the manager of Sentry under an Administration Agreement between Citco and Sentry dated 20th February 2003. In those circumstances, the P I Defendants submitted, Fairfield Greenwich itself must have had actual authority to send e-mails on behalf of the Directors containing the same information as to the NAV per Share as the monthly statements.    Alternatively, and at the very least, Fairfield Greenwich had ostensible authority to send those e-mails by virtue of its position as Sentry's investment manager. This is the Article 11 Defence.

[8]     The P I Defendants also alleged that, irrespective of the NAV per Share, they gave good consideration for Sentry's payment of the Redemption Price for the shares and that also provides them with a complete defence to Sentry's claims (the "Good Consideration Defence") which is dealt with by my learned sister Pereira J.A. whose judgment I have had the opportunity to read and with which I entirely agree and have nothing further to add.

[9]     A number of points are to be noted about the structure and terms of Article 11(1):

    (a)    The first sub-paragraph provides for the *determination* by the Directors of Sentry of the NAV per Share at the close of business on each Valuation Day;

    (b)    The second sub-paragraph provides how the NAV per Share is to be *calculated* at the time of each determination;

    (c)    The third sub-paragraph then provides that *any certificate* as to the NAV per Share given in good faith by or on behalf of the Directors of Sentry is binding on the parties.

[10]    The argument on the Article 11 Defence before the learned trial judge turned on whether or not there had been the requisite *certification* of the NAV by or on behalf of the Directors. The significance of the certification issue for the P I Defendants, they argued, was that once the NAV had been certified by or on behalf of the

Directors given in good faith it would be binding on all parties, and the Clawback Actions must fail.

[11]    It is common ground that, by the Administration Agreement, Citco was obliged, subject to the orders, instructions and directions of the Directors, to calculate and publish the NAV per Share and to deal with all correspondence and communications in relation to the redemption of Shares. The P I Defendants submitted that, in consequence of this Agreement, Citco had actual and/or ostensible authority to issue certificates on behalf of the Directors within the meaning of the Articles, and the Documents issued by Citco constituted certificates "given ... on behalf of the Directors" within the meaning of Article 11(1). A certificate can be given not only by the Directors but by another on their behalf. Sentry submitted that none of the Documents amounted to a certificate, and the judge was right so to find. While the Directors had delegated to Citco the power to *calculate* the NAV they had not similarly delegated the power to *determine* or the power to *certify*.

[12]    The judge's findings were as follows:

   "[29]    The question, therefore, is whether any of the documents relied upon by the Defendants on this application is a certificate 'as to' the Net Asset Value and/or Redemption Price which has been signed by or on behalf of the Directors.

   "[30]    The contract notes cannot, in my judgment, be certificates within the meaning of Article 11(1). Not only are they unsigned, but their purpose was not to certify a determination made by the Directors but to evidence the terms upon which Sentry itself was purchasing the shares of the redeeming member. They are documents produced on behalf of Sentry, not on behalf of the Directors as the body responsible for determining the NAV.

   "[31]    The monthly statements certainly contain, within the section headed 'Fund Net Asset Values,' the information which one would expect to find in a certificate given by or on behalf of the Directors, but that does not, in my judgment, make them certificates signed by or on behalf of the Directors under Article 11. They are documents from which the inference may be drawn

16

that the Directors have arrived at the valuation contained in the relevant section of the statement but that is not, in my judgment, the same as a certificate 'given' by or on behalf of the Directors. The statements are not signed by or on behalf of the Directors. If the question is asked whether the monthly statements, or any particular parts of the monthly statements, are certificates given on behalf of the Directors as to their valuation of the fund at any particular date, the answer must, in my judgment, be 'No'. They are documents distributed by the fund administrators informing investors, among other things, of the NAV determined, it is to be inferred by the recipient, by or on the instructions of the Directors at given dates. That does not make them certificates given by or on behalf of the Directors. Chesterton's letter of 21 March 1974[15] [*Campbell v Edwards [1976] 1 WLR 403*] was a certificate. The monthly statements, in my judgement, are not.

"[32]    For the same reasons, none of the emails (certainly not the emails from [Fairfield Greenwich]) can be regarded as a certificate given by or on behalf of the Directors. The same goes for the screenshot.

"[33]    The documents relied upon by the Defendants are compelling evidence of the NAV determined by the Directors as at particular Valuation Days but they are not, in my judgment, certificates within the meaning of Article 11(1)."

[13]    The judge handed down his judgment on 16th September 2011. By the above, he, in effect, determined the Article 11 issue in favour of Sentry. In essence, the judge found simply that there was no 'certificate' given by or on behalf of the Directors. He held that none of the documents relied on by the P I Defendants was a 'certificate' within the meaning of Article 11(1) and therefore there was nothing that was binding on Sentry and the P I Defendants. It is the judge's finding in relation to the Article 11 issue that constitutes the appeals listed as HCVAP 2011/41-52, 54-56, and 58-61 brought by the P I Defendants ("from now on referred to as the "P I Appellants") in this matter.

**The Argument**

17

[14]    The P I Appellants submitted that while the judge correctly recognised that, in determining whether any of the Documents relied upon by the P I Appellants was a certificate, he had to consider Article 11(1) "against the background of the commercial purposes which Sentry's Articles of Association were intended to regulate". However, having recognised that the commercial purposes background was determinative, the judge did not identify those purposes and failed to take any such purposes into account.

[15]    The P I Appellants submitted that the evidence which the judge failed to take into account came from Mr Peter Füglistaller, the Head of Special Mandates in Hedge Fund Execution at Credit Suisse (Zurich) AG at paragraph 16 of his witness statement:

> "In my experience the confirmation of the NAV and Redemption Prices by these documents [that is, the documents relied upon by the Appellants as being "certificates"] is perfectly standard in the funds industry. Regular and accessible information on the NAV figure is clearly vital for an investor and investors rely on administrators, in this case Citco, to confirm the NAV."

[16]    The P I Appellants submitted that the background facts which the judge failed to take into account included the following:

(1)    The central importance of the calculation of the monthly NAV to Sentry's entire business operations, and in particular to the price of its shares for subscription and redemption purposes;

(2)    The wide-ranging and far-reaching decisions made by investors and others in reliance on the NAV as determined in accordance with the Articles;

(3)    The importance of certainty and finality in all commercial dealings, but especially so in the context of redeeming shares in Sentry because many of the shareholders were acting as nominees and would therefore have to account to their clients for the proceeds of redemption.

18

[17]    The P I Appellants relied on a number of Documents as being certificates within
the meaning of Article 11(1).  These included: (a) the contract notes; (b) the
monthly statements; (c) the e-mails; and (d) the screenshot.  The judge wrongly
held, they submitted, that the contract notes were not certificates within the
meaning of Article 11.  The *contract notes* were sent out by Citco on behalf of the
Directors.   They evidenced the terms on which Sentry was purchasing the
redeemed shares.  The terms on which Sentry was purchasing the shares were
dictated by the determination of the NAV and the Redemption Price made by the
Directors.  The *monthly statements* were issued by Citco and contained the NAV
per Share as determined by Citco.  They were issued by Citco under express
authority from the Directors.  They contained the NAV per Share as calculated by·
Citco under the express authority of the Directors.  The judge held that they were
not certificates.  The *e-mails* were from Citco and Fairfield Greenwich to various
customers.   They showed the final NAV per Share on Valuation Days.   The
*screenshots* were captures taken from Citco's online pricing service website.  They
also showed the NAV per Share on Valuation Days, and were similarly, they
submitted, wrongly held by the judge not to be certificates.

[18]    Mr. Brindle, QC, on behalf of Sentry, submitted that the learned trial judge was
correct to hold that none of the Documents amounted to a certificate as described
in Article 11.  None of the *contract notes* called itself a certificate or certified
anything.  It was not signed by anyone.  In the box it said that the transaction has
been effected "In accordance with your instructions".  It was no more than a note
recording a transaction, a contract.  It went on to say "For more information ...
please contact Citco."  If it was a certificate it would be final, clear and binding, and
there would be no suggestion that further information might be forthcoming.  This
was a Citco document, and there was no indication that it was issued on behalf of
the Directors.   Similarly, he submitted, the *monthly statements* consisted
principally of a summary of activities during a particular month.  While a part of it
did contain a statement of the NAV, it was principally designed to be a record or

19

account of monthly activities. It was not signed, nor did it call itself a certificate. Mr. Brindle, QC submitted that these characteristics were indicators but were not conclusive of their being certificates. The *e-mails* were signed but they appeared to be designed to give information. The phrase, "Please be advised ..." suggested the e-mail conveyed information, gave advice, not that it certified anything. They were entirely Citco documents and did not possess any degree of formality or certification, nor did they suggest they were given for or on behalf of the Directors of Sentry. Some of them were headed "Pricing information", so that is what they were. They ended with words to the effect, "If you do not wish to receive periodic messages such as this one in future, please unsubscribe by clicking here." This was not what one would expect from a certificate. The *screenshots*, he submitted, were grabs from the Citco website where information was stored. Such a screenshot could not possibly be held to be a certificate.

[19]    The P I Appellants further submitted that the judge was wrong to hold in paragraph 27 of his judgment that in order for a document to be a certificate it needed to be signed by the Directors or on their behalf. He was wrong to hold that an unsigned certificate is a contradiction in terms. The absence of a signature is not determinative of the question whether a document is a certificate. By giving an unduly technical and narrow construction to the word 'certificate', Sentry seeks to exclude all the documents that would normally be issued in the course of processing redemption requests.

[20]    Sentry, in response, submitted that the judge was right to find as he did. The absence of a signature is not a trump point, but an indication point. While a document is not required to be signed to qualify as a 'certificate', it would be some indication as to whether the document had the requisite degree of formality. None of the Documents has either the necessary formality or attests to the truth of the matters contained in it. In any event, Sentry submitted, even if one or more of the Documents was a 'certificate', it does not follow that any action based on mistake is thereby precluded. The phrase "binding on all parties" was designed to ensure

20

they could not argue over the calculation of the NAV, not to prevent restitution in a case of fundamental mistake.

[21]    The P I Appellants further submitted that the judge was wrong to hold in paragraph 27 of his judgment that "all parties" in the context of the Articles must mean all parties bound by those Articles.    These would be the members as among themselves, and each member on the one hand and Sentry on the other.    The judge failed to appreciate the distinction between the NAV per Share and the Redemption Price.    The last paragraph of Article 11(1) refers to a certificate as to the NAV per Share or as to the Subscription or Redemption Price.    A certificate as to the Subscription or Redemption Price would only ever be issued to the subscriber or redeemer in question (as opposed to all shareholders).    Accordingly, the judge should have held, it was submitted that the phrase "all parties" in Article 11(1) means, in relation to the Subscription Price and the Redemption Price, all parties to the certificate (as opposed to all parties bound by the Articles).

[22]    The P I Appellants further submitted that the learned trial judge was wrong to hold in paragraph 28 of his judgment that a document will fall within the final paragraph of Article 11(1) only when it is a certificate given by or on behalf of the Directors in their character as the body responsible for determining the NAV under Article 11. That adds, they submitted, an unnecessary and unwarranted requirement which is not found in the words of Article 11(1) which merely requires the certificate to be given "by or on behalf of the Directors".    The Article makes no distinction between different characters in which the Directors may act when they exercise the powers and fulfil the responsibilities given to them as Directors.    The judge should have held that the correct question to ask was simply whether the Documents relied upon by the P I Appellants as constituting certificates were issued "by or on behalf of the Directors".

[23]    The P I Appellants further submitted that the judge was wrong at paragraph 30 of his judgment to discount the possibility of the contract notes being certificates on

21

the ground that their purpose was not to certify a determination made by the Directors but to evidence the terms upon which Sentry itself was purchasing the shares of the redeeming members. This, they submitted, was an unsustainable distinction, because under Article 10(2) the Redemption Prices that the shareholders were entitled to receive were based on the NAV determinations made by the Directors. Any formal communication of a Redemption Price necessarily was a certification of the determination of both the NAV and the Redemption Price, i.e., the terms on which the shares of the redeeming members were being purchased by Sentry. The question was one of formality, but this was not dealt with by the judge.

[24]    In any event, it was submitted, the judge should have held that, whatever other purposes the Documents may or may not have served, each of them fulfilled the purpose of being a certificate within the meaning of Article 11(1), and the fact that a Document may have served other purposes did not prevent it from being a certificate.

**The Law**

[25]    No conclusive authority, lexicographical, judicial, or statutory, on the qualities required for a document to be a 'certificate' has been produced for the assistance of the Court. The P I Appellants offered the case of **The Queen v The Vestry of St Mary, Islington**.[2] This concerned a statutory provision for the costs of maintaining disused churchyards to be "repaid ... upon the certificate of the ... churchwardens". The churchwarden sent a letter asking for payment of £500 before he had entered into a contract for the works. He then entered into the contract and incurred liability for an amount in excess of £500. The Court held that he was entitled to be "repaid" even though he was not yet out of pocket. Pollock B. held at page 527 that the requirement for a certificate was "amply satisfied by the letter".

---

[2] (1890) L.R. 25 Q.B.D. 523.

[26]    The P I Appellants also offered **Rexhaven Ltd. v Nurse and Another**.[3]  This concerned forfeiture of a lease for non-payment of the service charge.  The lease required the management company to estimate the costs for the next quarter and to send the lessee:

> "... a certificate of the amount so estimated and of the proportion thereof to be contributed by the lessee and the lessee shall be liable to contribute as aforesaid and such certificates shall be binding and conclusive and the amount so certified shall be paid by the lessee to the Management Company on demand".

[27]    By the time of the disputed events, the amounts due in respect of the service charge had become payable directly to the landlord.  The landlord's agents wrote a letter to the lessee, expressed as a request for payment of £190 under the lease in respect of the interim service charge, and a further letter giving a detailed breakdown of "our estimate of service charge expenditure".  Judge Colyer, QC, sitting in the Chancery Division, held that the second letter was a certificate.  He said:[4]

> "I accept, however, the propositions that Mr Neuberger has relied upon and in these circumstances I find that the letter of October 27, which of course was precise as to its figures, did satisfy the requirement for "a certificate", by which word I see the draftsman of this lease was requiring nothing more or less than a formal statement in writing of the precise amount or amounts.  I would observe, but this is *obiter dicta*; that if the figures had been scribbled on the back of an envelope and handed in a highly informal manner to the tenant, in my view that would not be enough.  Some degree of solemnity or formality is needed for a document to satisfy the requirement of this lease.  It is not enough that it be scribbled down casually.  It has to be written down and it has to be written down with precision; but here it was.  I therefore see no hope of success in the defence that there was no good certificate in this case."

The P I Appellants rely on these two cases as authority for the proposition that a certificate is not required to contain the word 'certificate' for it to amount to such.

---

[3] (1996) 28 H.L.R. 241 at 244.
[4] At p. 250.

23

[28]   The dictionaries provide little assistance in determining whether any of the Documents relied on in this case amount to a 'certificate'. **Osborn's Concise Law Dictionary**[5] defines the word as meaning "A statement in writing by a person having a public or official status concerning some matter within his knowledge or authority". The definition in **Jowitt's Dictionary of English Law**[6] is identical, while giving examples of the principal varieties of certificates relating to legal matters taken from the cases and statutes. **Daniel Greenberg: Stroud's Judicial Dictionary of Words and Phrases**[7] gives various examples of the use of the word from the cases and statutes, and defines it as follows: "A 'certificate', ex vi termini [from the force of the term], imports that the party certifying knows the fact that he certifies", and cites Kenyon C.J. in **Farmer v Legg**.[8] What is certain is that the document is not required to be headed with the word "certificate". Further, the document would import that the party issuing it was certifying that he knows the fact that the document certifies.

[29]   There are very few decisions in the West Indies of assistance. **Re Stewardship Credit Arbitrage Fund Ltd.**[9] was a decision of the Commercial Court in Bermuda. In this case, the company's bye-laws included a 'certificate' provision that was materially identical to that in Article 11(1). The company argued that the particular NAV was wrong because 70% of the assets had been lost to a Mr. Petters who had been charged with fraud in the United States (the "Petters fraud") and there was no realistic prospect that the company would recover value from the assets. In delivering his judgment refusing to recalculate the NAV, Bell J. emphasised the enormous practical difficulties of recalculating the NAV. He said:

> "[47]    This argument ignores at least two factual matters.   First, it ignores the provisions of bye-law 19.2 which provides:

---

[5] 11th edn., Sweet & Maxwell 2012.
[6] 3rd edn., Sweet & Maxwell 2012.
[7] 7th edn., Sweet & Maxwell 2012.
[8] 7 T.R. 191.
[9] (2008) 73 WIR 136.

'Any certificate as to Net Asset Value, a Class NAV, a Series NAV or the Net Asset Value per Participating Share of any Class or Series or as to the Subscription Price or Redemption Price therefor given in good faith by or on behalf of the Board shall be binding on all parties.'

For the company, it was suggested that there was no evidence that a certificate had been provided by the NAV calculation agent, who was identified in the prospectuses. Any such certificate would of course have been available to the company, but not to the Gottex funds. One would have expected that if the company wished to run this argument, it would have furnished evidence as to the position in relation to the production of a certificate.

[48]    But that point apart, it is perfectly apparent that there are enormous difficulties in determining the true position, even if such an argument were to be accepted. There is no logic in simply recalculating the NAV at the redemption date for the Gottex funds of 31 March 2008, when the Petters fraud was not discovered until some months later; there would also be a need to effect a recalculation of the position when the Gottex funds first invested, and no doubt also in relation to all other redemptions and subscriptions. As Mr Potts put it, it would be necessary to unravel the entire operation of the fund and the magnitude of such a task cannot be over emphasised. It also seems to me that to do the exercise properly, the company would need to know the true position in relation to the value of the underlying loan collateral for each revision date, or, put another way, the extent of the Petters fraud in relation to each such collateral, a truly impossible task. No doubt that is precisely why the relevant bye-law contained the provision which it did, making for certainty once the NAV had been determined."

From the judgment of Bell J., a number of principles can be extracted. One, it is clear that the parties proceeded on the assumption that no certificate had been issued. It was accepted that a certificate would have barred the requested revaluation. The company itself wished to revalue the NAV. It would not have been in its interest to produce a certificate shutting it out from such a revaluation. But, neither did the other party argue that the issuing of contract notes and other documentation quoting the NAV amounted to a certificate. So, the point was not decided by Bell J.

25

[30]    In the Matter of Livingston International Fund Ltd. (In Liquidation)[10] was a decision of Rawlins J. (as he then was) in the High Court in the Territory of the Virgin Islands. The Fund was being wound up. Interested parties had concerns and positions that were contrary to some of the recommendations that the Liquidator made in his Reports. The concerns related mainly to the calculation of the NAV and the payment dates for valuations for unpaid redemptions and outstanding redemption requests that preceded the suspension of redemption payments. The Liquidator recommended that the NAV should be recalculated for a particular period. Parties that would be adversely affected by a recalculation did not agree with this recommendation. The Liquidator referred the issues to the Court for determination. Regulation 69 of the Articles of Association provided, according to paragraph [74] of the judgment, that the NAV for the purpose of issuing and redeeming shares shall be determined by or under the direction of the Directors as at each applicable Valuation Date. It also stated that if the Directors and the auditors disagreed on the NAV and were unable to arrive at an agreement, the Directors should make the final determination. Further, Regulation 72 provided that any valuations made pursuant to the Articles shall be binding on all parties. Rawlins J. decided:

> "[84]    ... Regulation 72 of the Articles of Association of the Fund is intended to promote certainty and business efficacy. Investors, particularly significant investors in private Funds, make far reaching decisions and, in turn, incur significant financial obligations on the basis of reported NAV's. ... For purposes of business efficacy in this case, I see no good reason to find that the published NAV's are not binding under Regulation 72."

This case can be distinguished from ours as a certificate was not required by the Articles before the NAV would be binding on the parties. This judgment gives us no assistance in identifying what could amount to a certificate.

---

[10] British Virgin Islands Claim No. BVIHCV 2002/197 (delivered 19th May 2004, unreported).

26

[31]    **Minster Trust Ltd. v Traps Tractors Ltd. and Others,**[11] relied on by Sentry is
equally unhelpful. Here, a seller had let out plant and machinery on hire to
contractors by a contract which provided that:[12]

> "On the completion of the hire each machine will be ... reconditioned by
> you ... under the supervision and to the satisfaction of the Hunt
> Engineering Company and the hire will cease on ... the issuance of their
> certificate that the machines have been satisfactorily overhauled on a fully
> reconditioned basis".

While the work of reconditioning was being carried out under the supervision of
Hunts and before their final reports had been made, the seller sold the machinery
by a contract of sale which provided that all the machines were to be supplied with
the Hunt Engineering Certificate that they have been fully reconditioned to their
satisfaction. Hunt's standard was a recognised standard in the industry. The final
reports on each machine forwarded by Hunts to the seller, and tendered by the
seller to the buyers as certificates under the contract of sale, were headed
"Inspection report". These reports stated, among other things, that the unit in
question "was accepted as reconditioned to the required standards". By this,
Hunts meant the standard required by the contract with the firm that did the
reconditioning, not up to their own standard. The parties intended that there
should be a certificate from Hunts that the machines had been reconditioned up to
an objective Hunts' standard. The reconditioning of the machines was
subsequently found to be unsatisfactory, and the buyers claimed damages against
the seller for breach of contract. Hunts did not consider themselves as certifying in
terms of the contract of sale, but as reporting to their customer for whom alone the
report was intended on the satisfactory completion of the reconditioning contract.
It was held by Devlin J. in the Queen's Bench Division that the 'inspection reports'
were not a compliance with the contract of sale and were not conclusive as to the
standard of reconditioning, and the seller was, accordingly, in breach of contract. I
do not think that there is anything in this judgment that can offer assistance on the

---

[11] [1954] 1 W.L.R. 963.
[12] See p. 964 of the judgment.

27

issues raised in this case, save that it is clear that the document did not have to call itself a certificate. It is the nature of the document that matters.

**Conclusion**

[32]    Applying the law as expressed above, it would seem, in my judgment, that there is no requirement in Article 11(1) for a certificate to be signed. The Article merely says that a certificate must be "given" by or on behalf of the Directors. I accept the argument of the P I Appellants that if the Article required a certificate to be signed it would have said so.[13]

[33]    However, I am satisfied that the learned trial judge was right to reject all of the Documents as amounting to a certificate for the following reasons. Article 11 deals with the different issues of determination, calculation and certification. The plain wording of the Article is that there can be a determination published without it having been certified. The wording "any" certificate suggests that it was not obligatory that there always be a certification on each occasion that the NAV is published. There is nothing in the Article to suggest that every publication of the NAV amounts to a certification as to its accuracy.

[34]    The function that the Directors had delegated to Fairfield Greenwich and Citco was the function of calculation. There is nothing in the documentation that indicates a delegation of either of determination or of certification. While the Directors were entitled by the wording of the Article to delegate the function of certifying, there is nothing to indicate that they did in fact do so. It cannot be right that every statement of a precise NAV given in good faith by Citco or Fairfield Greenwich on behalf of Sentry whether in a contract note, in an email, or on a website amounts to a certification by or on behalf of the Directors. There would then, as in the **Livingston** case, be no need to expressly require that a calculation may be

---

[13] In North Shore Ventures Ltd. v Anstead Holdings Inc. and Others [2011] 3 W.L.R. 628 the relevant provision expressly stated that the certificate was to be "signed by North Shore".

certified. All published calculations once determined by the Directors would be automatically certified.

[35]   There is no reason why under Article 11 there cannot be an uncertified determination which is not binding. The entire process of calculation of the NAV and its determination operates well and the process goes forward subject to the fact that it is not binding until it is certified by or on behalf of the Directors. The plain meaning of the wording of our Article 11 is that, unlike in the **Livingston** case, not every determination is intended to be binding on the parties.

[36]   The mere stating of a precise price will not suffice for any document to amount to a certificate, as urged by the P I Appellants. The learned trial judge was correct to find that a certificate must be something more than a simple statement. It must be a document which contains some formal stamp to the truth of the matter in issue. In the case of a certificate as required by Sentry's Articles, the document must not merely state the NAV but purport to certify the Directors' determination of it.

[37]   Further, according to Article 11 the certificate must have been issued either by the Directors or by some agency to whom the power to certify was delegated. The documents were not issued by the Directors, nor was there any delegation either in the Administration Agreement or elsewhere of the power to certify. I am satisfied that the learned trial judge was correct to find that none of the Documents relied on by the P I Appellants as constituting a certificate amounts to the requisite certificate.

[38]   The commercial purpose point urged by the P I Appellants and relating to the finality and certainty of the NAV is attractive. However, while the re-calculation of the NAV might on occasion be burdensome and difficult, it does not appear from the language of Article 11 or from the authorities that this exercise should never be possible. There would otherwise be no point in providing for the possibility of the NAV being certified so as to bring finality to any question as to the accuracy of its

29

calculation. In any event, Sentry is not seeking in this case to have the NAV recalculated. No recalculation is required on the basis of the claims made by Sentry. Sentry is seeking to have the NAV revalued and declared of nil or of nominal value. This is purely a legal issue and does not involve any complex mathematical recalculation.

[39]    The learned trial judge's finding at paragraph 27 that "all parties" in the context of the Articles must mean all parties bound by the Articles is neither here nor there. This conclusion of his does not go to the merit or substance of his finding. The clause was inserted into the Articles to provide that once a certificate had been issued by or on behalf of the Directors, no party to a particular document could argue over the calculation of the NAV. None of the Documents amounted to the requisite certificate for the issue to develop any significance.

[40]    The fact that the learned trial judge found that the monthly statements and other Documents served other purposes than that of certifying the NAV is not of any significance. It is clear from his judgment that a certificate can perform additional roles such as giving information. What he found was that none of the Documents met the key element of putting a formal and binding stamp to the NAV.

[41]    For all these reasons I would dismiss the appeals against the learned trial judge's findings in relation to the Article 11 Preliminary Issues, and I would uphold his finding on the Article 11 Defence, even if for different reasons. I would award costs (as one set) to Sentry to be in two thirds of the amount assessed below.

Don Mitchell
**Justice of Appeal [Ag.]**

Janice M. Pereira
**Justice of Appeal**

I concur.

Davidson K. Baptiste
**Justice of Appeal**

I concur.

30

**The Good Consideration Issue**

[42]    **PEREIRA, JA:**  The second preliminary issue determined by the learned trial
judge was whether a redeeming member of Sentry in surrendering its shares gave
good consideration for the payment by Sentry of the Redemption Price and, if so,
whether that precludes Sentry from asserting that the money paid to that member
on redemption exceeded the true Redemption Price and as such is recoverable as
to the excess from such redeeming member.

[43]    This second issue shares a common background to the Article 11 issue and is
quite adequately set out by my learned brother Mitchell JA [Ag.] in his judgment
and need not be repeated.  The learned trial judge determined this issue against
Sentry and this is the subject of Sentry's appeal in Appeal No. 62 of 2011.

[44]    Sentry's claim is that the total NAV of the redemptions sought by the P I
Respondents was calculated at various times and they were paid
US$135,405,694.70 upon the redemption of their shares.  The NAV was
calculated under a mistake of fact as, unbeknown to the Sentry, BLMIS was in fact
operating a Ponzi scheme and Sentry's investments in BLMIS were therefore lost
from the date of Sentry's investments.  The NAV was at all times either nil or a
nominal sum.  In the circumstances, the P I Respondents have been unjustly
enriched at the expense of Sentry and are liable to make restitution.  Further or
alternatively, Sentry is entitled to set aside the redemptions on the ground that the
payment of the Redemption Price was effected under a mutual mistake.

[45]    The defences are all broadly similar.  First, the redemption proceeds were paid to
discharge a debt owed to each of the P I Respondents.  Once Sentry had
accepted the P I Respondents' requests to redeem the shares, Sentry became
indebted to each of them for the amount of the Redemption Price.  Sentry, in
consideration of each of the P I Respondents redeeming its shares and
relinquishing its rights as a shareholder in accordance with the Articles, discharged

31

the debt which it owed to each P I Respondent by paying to it the Redemption Price for its shares.  Each P I Respondent gave good consideration for Sentry's payment so that they have not been unjustly enriched at Sentry's expense.  Their position is that, irrespective of the NAV per share, they gave good consideration for Sentry's payment of the redemption price for the shares and that provides them with a complete defence to Sentry's claims.  This is described as the Good Consideration Defence.

[46]    The conflicting interests in our case are stark.  Do the Good Consideration Defence and the common law rule on mutual mistake, among other factors, prevent Sentry from recovering the Redemption Price paid out to the earlier redeemers who were, as a consequence of the way the fraud was designed, paid excessive sums allegedly the proceeds of investments in Bernie Madoff's Ponzi scheme?  Does the need for certainty in business transactions trump the right of a payer who has mistakenly paid sums of money in excess of the sums that were actually due to recover the excess?  Or, is a feeder fund company entitled to claw back all sums which it had received from a Ponzi scheme that was masquerading as an investment scheme and which it had then paid out to some of its investors, so that all its duped investors who had lost their investment and received little or nothing may be repaid their investment funds pro rata?

[47]    The learned trial judge on the Good Consideration Issue found as follows:

> "[34]    Left to myself I would have held that the redemption of shares in this case amounted to a bargain and sale for which the consideration received by Sentry was the surrender of the rights of the redeeming shareholder.  I cannot see how the subsequently discovered fact that BLMIS was a Ponzi scheme can be said to have vitiated that bargain so as to entitle Sentry to recover the redemption money/purchase price any more than could the discovery that a planning authority had not in fact granted consent for residential development vitiate a contract for the purchase of building plots by reason of the purchaser's own mistaken assumption that it had. [16] [*See per Lord Scott in Deutsch Morgan Grenfell Group plc v IRC [2006] UKHL 49 at paragraphs 84, 85.*]  I further fail to understand how Sentry can recover the

32

redemption price in circumstances in which *restitutio in integrum* is no longer possible.

[35]    I was referred to **Aiken v Short.**[17] [*(1856) 1 H&N 210*] and **Barclays Bank Ltd v WJ Simms Son & Cooke Southern Ltd.**[18] [*[1980] QB 677*] Neither case involved a sale and purchase. In the first, a bank paid off a debt due by a customer to a third party in the mistaken belief that the debt was secured on property which stood as security for the customer's account. It was held that the third party creditor had given good consideration by accepting the payment as discharging the debt due to her from the bank's customer. In his short judgement Pollock CB said:

> 'Suppose it was to be announced that there was to be a dividend on the estate of a trader, and persons to whom he was indebted went to an office and received instalments of the debts due to them, could the party paying recover back the money if it turned out he was wrong in supposing that he had the funds in hand?'

That appears to me to expose the fallacy upon which the present case is founded. **Barclays Bank v Simms**[19] [(supra)] takes the matter no further. It decided that payment on a cheque made by a bank in breach of mandate was ineffective to discharge the drawer's obligation on it and the bank was thus entitled to recover, in contradistinction to the situation in **Aiken v Short.**[20] [(supra)]. The cases are authority for the proposition that a party will not be able to recover a payment made by mistake where the payer has received consideration from the payee.

[36]    In my judgment, therefore, it is not open to Sentry now to seek to recover the price which it paid for the purchase of the shares of redeeming investors simply because it calculated the NAV upon information which has subsequently proved unreliable for reasons unconnected with any of the redeemers."

[48]    Another of the issues between the parties was the question whether the process of redemption created a new contract by way of sale. The learned trial judge found that it did. He held that the redemption of shares by the defendants amounted to a fresh bargain and sale for which the consideration received by Sentry was the surrender of the share rights of the redeeming shareholders and that Sentry would

33

not be able to recover a payment made by mistake where the payer had received any consideration from the payee. He was unable to see how the subsequently discovered fact that BLMIS was a Ponzi scheme could be said to have vitiated that bargain, i.e., the purported bargain for the redemption of shares, so as to entitle Sentry to recover the Redemption Price paid to the redeeming shareholder.

[49]    The learned trial judge, (notwithstanding his misgivings[14]) having been persuaded to deal with the second issue as being one of pure law, framed the question in relation to the Good Consideration Defence in this way:

> "Whether a redeeming Member of the Claimant in surrendering its shares gave good consideration for the payment by the Claimant of the Redemption Price, and if so, whether that precludes the Claimant from asserting that the money paid to that Member on redemption exceeded the true Redemption Price and as such is recoverable as to the excess from such redeeming Member."

[50]    It is trite that the approach which must then be adopted in determining the question as a preliminary issue is on the assumption that the case, as pleaded, is true.

[51]    A useful starting point, in my view, is by referring to Sentry's pleaded case in relation to the Good Consideration issue. Sentry pleaded at paragraphs 9, 10, 11 and 12 of its statement of claim as follows:

> "9.    The NAV was calculated under a mistake of fact as, unbeknown to the Claimant, BLMIS was in fact operating a ponzi scheme and its investments in BLMIS were therefore lost from the date of the Claimant's investment.
>
> 10.    In the premises, the NAV of the Claimant at all times was nil or a nominal value and the Aggregate Redemption Sum should, accordingly have been nil, or in the alternative, a nominal sum.
>
> 11.    In the circumstances, the Defendants have been unjustly enriched at the expense of the Claimant, and the Defendants are liable to make restitution to the Claimant in the aggregate sum of US$135,

---

[14] See para. 3 of the judgment.

34

405,694.70, or in the alternative the difference between that sum and the said nominal amount.

12.    Further or alternatively, the Claimant is entitled to set aside the redemption of the Defendants' shares on the ground that the payment of the Aggregate Redemption sum was effected under a mutual mistake."

[52]    The learned judge was criticised, in my view unfairly, for holding that surrendering of the shares and the payment of the redemption price amounted, in effect, to a new contract. This assumption may no doubt have had its origin in the way Sentry pleaded its case which no doubt had a bearing on the framing of the question for determination.

**A new or existing contract?**

[53]    On appeal, the argument advanced by Sentry relying on the House of Lords decision in **Harvela Investments Ltd. v Royal Trust Company of Canada (C.I.) Ltd. and Others**,[15] is that the surrendering of the Shares and the payment of the Redemption Price did not amount to a new contract; rather that this took place pursuant to an existing contract which was contained in Article 10 of Sentry's Articles. Sentry says that this was simply (mistaken) performance of an existing contract. Sentry, pursuant to the contract contained in the Articles was obliged to redeem the shares and was already bound to pay pursuant to Article 10. It had no option. Likewise, as the P I Respondents point out, the request once received by Sentry, could not be withdrawn without the consent of Sentry's directors. Both Sentry and a redeeming shareholder would at that point become bound to fulfil certain obligations each to the other.

[54]    In **Harvela**, the first defendant, a Jersey trust company was one of the trustees of a settlement and the registered holder on behalf of the trustees of shares in a company in which the plaintiff and the second defendant and his family also

---

[15] [1986] A.C. 207; [1985] 3 W.L.R. 276; [1985] 2 All E.R. 966.

owned shares. Whichever of the latter two groups acquired the trustees' shares would gain control of the company. Offers were made by both, and the first defendant decided to invite them to submit revised offers on identical terms and conditions. They invited each to submit any revised offer that it might wish to make by sealed tender by a certain date and time. The first defendant bound itself to accept the highest offer that complied with the terms. The plaintiff's offer was for a certain price. The second defendant's offer was for a specified amount in excess of any other offer, i.e., the price would be determined by reference to the price in any other offer. The first defendant informed both offerors that in the circumstances they were bound to accept and did accept the second defendant's offer. In an action by the plaintiff claiming the shares the High Court gave judgment in their favour. The Court of Appeal allowed an appeal. On appeal to the House of Lords it was held that the undertaking to accept the highest offer only invited fixed bids. The invitation on its true construction had created a fixed bidding sale and the second defendant had not been entitled to submit, and the first defendant had not been entitled to accept, a referential bid. The first defendant's acceptance of the second defendant's offer had been sent with the intention of fulfilling what they thought was their existing obligation due to their mistaken belief that they were bound to accept the second defendant's referential bid, not of creating any new obligation, and, accordingly, no second contract independent of the invitation had come into existence as a result of that message.

[55]    I am satisfied on the facts of **Harvela**, that the conclusion arrived at by the House of Lords was correct in principle. I do not consider however, for the reasons which will unfold in this judgment that the ruling in that decision is of any particular relevance here.

[56]    An issue arose on the appeal as to whether we should assume that the redeemed shares and associated rights had any value. At the hearing before the learned trial judge the parties had agreed to proceed on the basis that, even if the shares are valueless, on the mere fact they were delivered the good consideration defence

36

would apply. I have already stated above the assumption which must be made in relation to the pleaded cases, as this is an appeal from the determination of a preliminary issue based on the cases of the parties as pleaded. No evidence has been led.

[57]    The law generally regards the surrendering of contractual rights as constituting good consideration. A very clear example of this is provided by the case of **Bell and Another v Lever Brothers, Limited.**[16] Lever Brothers employed the two defendants who committed serious breaches of their contracts of employment, which would have justified their summary dismissal. In ignorance of this fact, Lever Brothers entered into agreements with them to terminate their services on terms that they would receive substantial sums in compensation. The defendants themselves did not have in mind, when these agreements were concluded, that they could have been dismissed without compensation. The agreements were concluded under a common mistake as to the respective rights of the parties. When Lever Brothers discovered the directors' wrongdoing it claimed rescission of the agreements and repayment of the compensation.

[58]    Justice Wright at first instance found that the mistake or misapprehension was as to the substance of the whole consideration and went "to the root of the whole matter". He concluded that the court, as a court of equity, could do all that justice required to constitute a restitutio in integrum. He ordered repayment of the money paid under the agreement. The Court of Appeal upheld this judgment. Scrutton L.J. held that the principle to be applied was the same as that applicable in the case of frustration. Either the contract was void because of an implied term that its validity shall depend on the existence at the time of the contract, and during its term of performance, of a particular state of facts, or that there is a mutual mistake of the parties, who have made the contract believing that a particular foundation to it exists, which is essential to its existence. In either case the absence of the

---

[16] [1932] A.C. 161.

assumed foundation made the contract void. Greer L.J. in concurring was of the view that a mistake as to the fundamental character of the subject matter of the contract was one which, if mutual, the law would regard as rendering the contract void.

[59]    On appeal, the House of Lords, by a majority, reversed this decision. Lord Atkin held that mistake would only nullify consent where the parties contracted under the common mistaken assumption that the subject matter of the contract existed when, in fact, this was not the case. Mistake as to a quality of the thing contracted for would not affect assent unless it was the mistake of both parties, and was as to the existence of some quality which made the thing without the quality essentially different from the thing as it was believed to be. He held that it was wrong to decide that an agreement to terminate a definite specified contract was void if it turned out that the agreement had already been broken and could have been terminated otherwise. The contract released was the identical contract in both cases, and the party paying for release got exactly what he bargained for. It seemed immaterial that he could have got the same result in another way, or that if he had known the true facts he would not have entered into the bargain. From a commercial standpoint, the contracts of employment which the two directors surrendered might have been worthless because both directors were liable to instant dismissal without compensation. But, in the eyes of the law, the surrender of those contracts was sufficient consideration to support the large compensation payments which the directors were paid.

[60]    Sentry concedes, based on the legal principles derived from the case law that if there was a new or separate redemption contract Sentry would not be able to recover the sums. On that basis it accepts that it would fall under the **Bell v Lever Brothers** principle where the parties had in fact made a fresh contract. However, Sentry says there was no new 'redemption contract' here - the only contract being the subscription contract contained in the Articles.

38

[61]    Sentry says that there could be no good consideration given by the P I Respondents as the redeemable shares and the rights attached to them were, in essence, worthless.   This is so, argues Mr. Brindle, QC on behalf of Sentry, because:

(a)    The overwhelming majority of funds placed by the P I Respondents with Sentry for investment were invested in BLMIS;

(b)    At all material times BLMIS was run as a Ponzi scheme and thus as a fraudulent scheme was, as a matter of law insolvent from inception;[17]

(c)    Sentry's investments in BLMIS were therefore lost from the date they were made;

(d)    Accordingly, the NAV of Sentry was at all material times nil, or alternatively, a nominal sum;

(e)    Thus the shares surrendered to Sentry were of nominal or no value.

[62]    The central plank in Sentry's argument is that Sentry owed no debt to the P I Respondents and therefore the mistaken payment to them could not be said to be made in discharge of a debt obligation of Sentry.  This is so, says Sentry, because its true NAV was nil or nominal and thus the P I Respondents (as redeemers) were entitled to nothing.  In essence, that here, the P I Respondents cannot justify their enrichment since they had no legal right to receive it.

[63]    Sentry relies on the latest edition of **Goff & Jones: The Law of Unjust Enrichment**.[18]  So does Mr. Hapgood, QC on behalf of the P I Respondents. Chapter 2 sets the stage for a claim based on unjust enrichment.  It says:

"English law provides that a claimant will be entitled to restitution if he can show that a defendant was enriched at his expense, and that the circumstances are such that the law regards this enrichment as unjust. For example, a claimant will have a prima facie right to restitution where

---

[17] See Re Titan Investments Limited Partnership, Judicature Act, 2005 ABQB 637.
[18] 8th edn., Sweet & Maxwell 2011, p. 21, para. 2-01.

he has transferred a benefit to a defendant by mistake, under duress, or for a basis that fails. Nevertheless, the defendant can escape liability if another legal rule entitles him to keep the benefit, and this rule overrides the rule generated by the law of unjust enrichment which holds that the defendant should make restitution. For example, a claimant may have paid money to a defendant by mistake, **but the payment may be irrecoverable if the claimant was required to pay by statute or by contract**. Although the claimant has a prima facie claim in unjust enrichment, the defendant's enrichment is justified by the statute or contract, with the result that the claimant's right to restitution is nullified.[1] *[Kleinwort Benson Ltd v Lincoln CC [1999] 2 A.C. 349 at 407-408, per Lord Hope, followed in Test Claimants in the F.I.I Litigation v HMRC [2010] EWCA Civ 103; [2010] S.T.C 1251 at 181], per Arden L.J.].* (My emphasis).

[64]    Sentry therefore says, in reliance upon the texts **Goff & Jones: The Law of Restitution**[19] and **Graham Virgo: The Principles of the Law of Restitution**,[20] that it does not matter whether there was or was not consideration given when the relevant contract (namely the subscription contract contained in the Articles) was entered into, provided that at the time when restitution is sought it can be said that any such initial consideration has turned out to be valueless or of nominal value. Further, if there was some value in the shares then it operates pro tanto.

[65]    Mr. Hapgood, QC made the general point that contract almost always trumps restitution. He relies also on the passage cited at paragraph 63 above from **Goff & Jones**. He put forward four propositions on behalf of the P I Respondents:

(i)     A sum paid in discharge of a contractual debt cannot generally be recovered;

(ii)    Redemption payments were paid to discharge a contractual debt unless Sentry's Article 10 obligation was void;

(iii)   That the one contract, two-contracts theories are irrelevant to proposition (ii); and

---

[19] 7th edn., Sweet & Maxwell 2007, para. 41-002.
[20] 2nd edn., Oxford University Press 2006, p. 171.

(iv)    Even if wrong on (ii) and (iii) the redeemers in any event gave
good consideration such as to defeat a restitutionary claim.

**The Law**

[66]    It is common ground that the case at bar is a two party case. The learned trial
judge in his judgment referred to the cases of **Aiken v Short**[21] and **Barclays
Bank Ltd v W. J Simms Son & Cooke (Southern) Ltd. and Another**.[22] These
were three party cases. The text writers **Goff & Jones**[23] and **Professor Virgo**[24]
distinguish between two-party and three party cases. **Goff & Jones** at para. 29-
19 state as follows:

> "In two- party cases, where a claimant pays money to a defendant to
> discharge a legal obligation that he owes the defendant, any claim to
> recover the money could be met by the response that the defendant's
> enrichment is justified by the legal right that he had to receive the
> money....Moreover, even if that were not enough to bar the claim, the
> defendant would also be entitled to rely on the change of position
> defence...having released his legal obligation against the claimant in
> exchange for the payment."

[67]    The **Barclays Bank Ltd v W. J Simms** case, even though it concerned a tri-partite
situation, dealt with the principles under which money paid under a mistake of fact
is recoverable. It may be considered as a classic statement of the law on mistake.
It was concerned with a payment made by the claimant bank which payment
discharged (or was alleged to have discharged) an obligation owed to the
defendant by a third party. In the tripartite situation there is no contractual
relationship between the claimant and the defendant. Barclays Bank claimed a
sum of money from the first defendant and the second defendant, the receiver of
the first defendant. The bank claimed it had paid the money under a mistake of fact
when the second defendant presented a cheque drawn on the bank in favour of the

---

[21] (1856) 1 Hurlstone & Norman 210.
[22] [1980] Q.B. 677.
[23] Supra note 18.
[24] Supra note 19.

41

first defendant.   The bank had overlooked its customer's instructions to stop payment on the cheque.

[68]     Goff J. conducted an extensive review of the authorities dealing with the principles on which money paid under a mistake of fact is recoverable.   He stated his conclusions as follows:

> "From this formidable line of authority certain principles can, in my judgment, be deduced: (1) If a person pays money to another under a mistake of fact which causes him to make the payment, he is prima facie entitled to recover it as money paid under a mistake of fact. (2) His claim may however fail if (a) the payer intends that the payee shall have the money at all events, whether the fact be true or false, or is deemed in law so to intend; or (b) the payment is made for good consideration, in particular if the money is paid to discharge, and does discharge, a debt owed to the payee (or a principal on whose behalf he is authorised to receive the payment) by the payer or by a third party by whom he is authorised to discharge the debt; or (c) the payee has changed his position in good faith, or is deemed to have done so."[25]

Goff J. added a footnote to principle 1.  He said:

> "Of course, **if the money was due under a contract** between the payer and the payee, there can be no recovery on this ground **unless the contract itself is held void for mistake** (as in Norwich Union Fire Insurance Society Ltd. v. Wm. H. Price Ltd. [1934] A.C. 455) or **is rescinded** by the plaintiff." (My emphasis).

These statements in my view lend credence to Mr. Hapgood, QC's contention and are well recognised by Goff & Jones, on which Sentry places heavy reliance, that contract will ordinarily, defeat a restitutionary claim.  This proposition holds true even under the modern law of restitution in recognition of the sanctity of contractual obligations.

[69]     Principle 2(b) encapsulates the defence of good consideration.  The defence may fail if the payer's mistake was induced by the payee, or possibly where the payee, being aware of the payer's mistake, did not receive the money in good faith.  For

---

[25] Supra note 20, p. 695.

42

the present purposes, neither of these situations arise in this case (as no such allegations have been made), and we can assume that the defendants acted throughout entirely innocently.

[70]    Goff J. referred to two circumstances in which the defence of good consideration would or might fail because the transaction in which the consideration was given itself fell to be set aside (i.e. where the mistake was induced by the payee or bad faith by the payee). Similarly, Lord Scott in the **Deutsche Morgan Grenfell plc v Inland Revenue Commissioners and another**[26] case below, in addressing the situation in which the parties are in a contractual relationship, referred to the possibility that the defence would fail because the mistake enabled the contract to be set aside, or because the contract was void from the outset, or was avoided before payment.

[71]    In **Deutshe Morgan Grenfell Group plc** the House of Lords considered a bipartite situation. The House did not disapprove of what Goff J. said in **Barclays Bank v W. J Simms**. Lord Scott of Foscote in considering the question whether money paid or property transferred under a mistake is necessarily recoverable said that, "It surely all depends on the part played by the mistake, whether of fact or law, in the sequence of events that has led to the payment or transfer."[27] After giving an example he then referred to the three circumstances set out by Goff J. in **Barclays Bank v W. J Simms** in which a restitutionary claim may fail. He then referred to the fundamental difference between the first and third circumstance on the one hand, and the second circumstance on the other. He then had this to say:

> "... Neither of these types of case [referring to the first and third circumstances] invalidates Robert Goff J's general proposition that if a mistake of fact causes a payment to be made that would not have been made but for the mistake, the payer will have a cause of action for its recovery. They are not true exceptions. The second however, does invalidate that proposition. If a contract has been entered into that would not have been entered into but for a mistake, but the contract is then

---

[26] [2007] 1 A.C. 558.
[27] Ibid, para. 84.

43

completed by a payment of the price for the goods or services that the payee has supplied, the payment cannot be recovered unless the contract can be set aside. The proposition seems such an obviously correct one that it may seem pointless to ask why it is that it is correct. But I think the question does need to be asked for the answer casts, in my opinion, valuable light on the nature of the restitutionary remedy for the recovery of money paid under a mistake.

85. The reason, it seems to me, why the proposition is correct is that the mistake does not necessarily undermine the legal obligation which required the payment of the money or for the discharge of which the money was paid. If the mistake does enable the contract to be set aside then, subject to a change of position defence, the money should be recoverable. **If the contract was void from the outset (as in the "swaps" cases) or had been avoided before the payment was made, the money should be recoverable. But if the legal obligation under which the money was paid cannot be, or has not been, invalidated, then, in my opinion, whether or not it can be shown that "but for" the mistake in question the money would not have been paid, a restitutionary remedy for the recovery of the money would not be available.**" (My emphasis).

[72]     The leading modern authority on the law of mutual or common mistake in England is the decision of the Court of Appeal in **Great Peace Shipping Ltd v Tsavliris Salvage (International) Ltd**,[28] where Lord Phillips MR handed down the judgment of the Court. Tsavliris was commissioned to salvage the Cape Providence. It contacted an information service to enquire about ships near enough to the stricken ship to assist with the salvage and was told that the Great Peace was only 35 miles away from the Cape Providence. Tsavliris therefore chartered the Great Peace from its owners for five days. It sought no warranty or further information from the owners as to its position. In fact, unbeknown to both parties, the Great Peace was 410 miles away from the Cape Providence and would take several extra days to get to her. On discovering this, Tsavliris chartered another, nearer ship, cancelled the charter with the Great Peace, and refused to pay anything. The owners of the Great Peace sued for five days charter. Tsavliris defended by

---

[28] [2003] Q.B. 679.

44

alleging that the charter contract was either void at common law or, alternatively, voidable in equity, for common mistake. The trial judge applied the construction approach and gave judgment for the claimants. He held that while there was an implied condition precedent that the Great Peace was close enough to provide the specified service, this condition was satisfied, so the contract was valid.

[73]    On appeal, Lord Phillips MR considered the history of the development of the law of common mistake and of frustration of contracts. He rejected the theory of the implied term as being unrealistic. He continued:

> "73      ...Where a fundamental assumption upon which an agreement is founded proves to be mistaken, it is not realistic to ask whether the parties impliedly agreed that in those circumstances the contract would not be binding. The avoidance of a contract on the ground of common mistake results from a rule of law under which, if it transpires that one or both of the parties have agreed to do something which it is impossible to perform, no obligation arises out of that agreement.
>
> [74]    In considering whether performance of the contract is impossible, it is necessary to identify what it is that the parties agreed would be performed. This involves looking not only at the express terms, but at any implications that may arise out of the surrounding circumstances. In some cases it will be possible to identify details of the "contractual adventure" which go beyond the terms that are expressly spelt out, in others it will not.
>
> [75]    Just as the doctrine of frustration only applies if the contract contains no provision that covers the situation, the same should be true of common mistake. If, on true construction of the contract, a party warrants that the subject matter of the contract exists, or that it will be possible to perform the contract, there will be no scope to hold the contract void on the ground of common mistake.
>
> [76]    If one applies the passage from the judgment of Lord Alverstone CJ in Blakeley v Muller & Co 19 TLR 186, which we quoted above, to a case of common mistake, it suggests that the following elements must be present if common mistake is to avoid a contract: (i) there must be a common assumption as to the

45

> existence of a state of affairs;  (ii) there must be no warranty by
> either party that that state of affairs exists;  (iii) the non-existence
> of the state of affairs must not be attributable to the fault of either
> party;  (iv) the non-existence of the state of affairs must render
> performance of the contract impossible;  (iv) the state of affairs
> may be the existence, or a vital attribute, of the consideration to
> be provided or circumstances which must subsist if performance
> of the contractual adventure is to be possible."

While the decision does not bind this court, it is undoubtedly a correct statement of
the law of common mistake in the Eastern Caribbean.

[74]    Sentry has not sought to say that the subscription contract is to be set aside or
avoided.  Indeed as the P I Respondents point out and as noted by the trial judge,
Sentry could not seek this as it is quite clear that restitutio in integrum is no longer
possible.  Rather, say the P I Respondents, what Sentry seeks to say is that the
contracts between itself and its shareholders were void ab initio – in short that
there was no contractual relationship at all.   However, during the course of oral
argument Mr. Brindle, QC made clear that Sentry was not seeking to void the
contract in the Articles of Association.  He says there was no contract induced by
the mistake.  He further contended that there was no need to set aside the
subscription contract in order to recover.

### What was the contract?

[75]    With the legal principles extracted from the cases firmly in mind I return to the
question: what was the contract here?  Accepting that there was one existing
contract namely the subscription contract as contained in Sentry's Articles then
that contract calls for examination and then to consider the part played by the
mistake in the sequence of events leading to the payment by Sentry.

[76]    A proper starting point is the Private Placement Memorandum ("PPM").  The PPM
is the source of the offer to subscribe.  It sets out the rules for investment and for
the redemption of the resulting shares.  There is an entire section therein entitled

'Risk Factors'[29] which makes it clear that the purchase of shares in the Fund (Sentry) involves substantial risks that are incident to the Fund's allocation of assets to different types of investments. It then set out various risk factors. Included among them is this risk at paragraph 17:

> "**Possibility of Misappropriation of Assets.** When the Fund invests utilizing the "split strike conversion" strategy or in a Non–SSC Investment Vehicle, it will not have custody of the assets invested. Therefore there is always the risk that the personnel of any entity with which the Fund invests could misappropriate the securities or funds (or both) of the Fund."

The PPM also stated that the Split Strike Conversion strategy is implemented by BLMIS.[30] This makes it clear that Sentry was investing its shareholders subscription monies with full awareness of the risk of misappropriation. The shareholder was similarly aware of that risk. The shareholder, pursuant to the subscription agreement took the shares pursuant to the terms of the subscription agreement, the PPM and Sentry's Memorandum and Articles of Association. The PPM clearly stated that the shares were being issued only on the basis of the information contained in the PPM. The P I Respondents accordingly contend that Sentry must be deemed to have accepted the risks; and that the risks were on both sides. I agree. The P I Respondents say that the risk described at paragraph 17 of the PPM is precisely what happened here as the employees of BLMIS misappropriated the monies.

[77]    The contractual obligations arising under Sentry's Articles must then be considered. Article 9 deals with the issuance of shares in Sentry following payment of the subscription price which is in turn based on the NAV as determined pursuant to Article 11. Article 10 then provides for the redemption of shares. In essence, on receipt of a redemption request Sentry is then obliged to redeem or purchase the shares.[31] The redemption or purchase of the shares is then effected

---

[29] See Record of Appeal Tab 11 pp. 130-135 or the Private Placement Memorandum pp. 17-22.

[30] See Record of Appeal p. 122 or Private Placement Memorandum p. 9.

[31] Unless there has been a suspension as permitted under the Articles, a circumstance not relevant to this case.

at the redemption price which is the NAV per share. The NAV is determined in accordance with Article 11. Article 11 says that the NAV is determined by the Directors of Sentry and goes on further to say how the NAV is to be calculated. Upon the redemption or purchase of the shares the redeeming member's entitlement to any rights in the shares ceases.

[78]     Under the subscription contract then, what were the obligations of the parties? For the shareholder it may be said firstly to subscribe for the shares by payment of the subscription price based on the NAV. Sentry's obligation on receipt of the subscription price was to issue to the subscriber, the shares for which payment was made. These obligations of the contract were here performed by the P I Respondents and Sentry. Sentry then took the subscription monies and invested them with BLMIS fully aware of the risks. The investment may yield a good return or it may be lost. The next stage contemplated by the contract was the redemption of the shares. To trigger this process, the shareholder submits a redemption request. On receipt of the redemption request, Sentry's obligation to redeem the shares and pay the redemption price based on the NAV as determined, (not by the redeeming shareholder but by Sentry) was activated. Indeed the redemption request could not be withdrawn without Sentry's consent.

[79]     I agree with the P I Respondents that even within the context of the Article 10 contract it is clear to me that the exercise by a shareholder of his right of redemption would trigger contractual obligations on the part of Sentry, which were to redeem or purchase the shares and pay the redemption price as determined by it. I am also in full agreement with the P I Respondents that whether it was the existing Article 11 contract or whether the redemption request may be said to have brought about a new redemption contract is, to my mind wholly irrelevant. The simple fact is that the Article 10 contract clearly provided for the shareholder to redeem his shares, and that on the receipt of a redemption request given pursuant to the provisions of the Article, Sentry's obligation to redeem the shares and to pay the redemption price based on the NAV (whatever Sentry determined the NAV to

48

be) had been called in. The mistake here in terms of the sequence of events, may be said to have occurred at the point of the determination of the NAV by Sentry. Sentry's obligation to pay had already arisen. Put another way, Article 10 gave rise to a debt obligation on the part of Sentry in favour of the subscribing shareholder who had in fact performed all its obligations under the Article 10 contract and the redemption payment was made to discharge that debt obligation. Sentry by payment of the redemption price which was required for the performance of its side of the bargain, did exactly that – a redemption on its part and a payment to the redeeming shareholder to which the shareholder was entitled.

[80]    I accordingly reject Mr. Brindle, QC's argument that no debt was due because due to the Ponzi scheme run by BLMIS, Sentry's NAV was nil or a nominal sum. I agree with the P I Respondents that Sentry's contractual obligations gave rise to a debt obligation whatever the value of the shares and the surrender of the rights to the shares by the P I Respondents, in my view, having fully performed their part of the contract, gave good consideration which defeats Sentry's restitutionary claim.

[81]    The facts of this case falls to me squarely within the principle 2(b) as set out by Goff J. in **Barclays Bank v W. J Simms** and further expounded upon in the **Deutsche Morgan Grenfell** decision. I do not consider that the mistake here undermined the legal obligation placed upon Sentry under the contract which required it to pay the redemption price by way of discharging its obligations on the redemption of the shares. The subject matter of the contract was the shares. The contract for the shares was with Sentry and not with BLMIS, and therefore it mattered not what was the value of Sentry's investment in BLMIS. This did not form part of the contract. It was Sentry who had to determine the value of the payment for the redeemed shares but making that determination or having mistakenly so determined it, does not nullify the obligation to pay on redemption. The initial consideration was the subscription monies. I do not consider that it was of no value. The initial consideration was also fixed by reference to Sentry's NAV.

49

Sentry, clearly obtained something of value when it issued the shares pursuant to the Article 10 contract. On the payment of the redemption price Sentry got precisely what it paid for - the shares. Sentry was not carrying on a fraudulent Ponzi scheme. Indeed in the context of the subscription contract and Article 10 Sentry got all that it bargained for. This was not a contract where it can be said that the subject matter either did not exist, or ceased to exist or where the performance of the terms were impossible. It cannot be said that it was impossible for Sentry to redeem or purchase the shares at a price to be fixed solely by Sentry. Indeed the mistake as to Sentry's NAV cannot be said to be a common mistake but Sentry's. As was said by Lord Atkin in **Bell v Lever Brothers**, mistake as to a quality of the thing contracted for would not affect assent unless it was the mistake of both parties, and was as to the existence of some quality which made the thing without the quality essentially different from the thing as it was believed to be. The subscription contract was for the shares, and the redemption payment for the surrender of the shares and not for a specific value of any interest or investment in BLMIS.

[82]    In relation to **Bell v Lever Brothers**, Lord Phillips in **Great Peace Shipping** stated that it is generally accepted that the principles of the law of common mistake expounded by Lord Atkin were based on the common law. The issue, he said was whether there subsists a separate doctrine of common mistake founded in equity which enables the court to intervene in circumstances where the mistake does not render the contract void under the common law principles. The Court answered this question in the negative. The Court held that:

> "There was no equitable jurisdiction to grant rescission for common mistake in circumstances that fell short of those in which the common law held a contract void; that it was not possible to distinguish between a mistake or common misapprehension which was fundamental in equity and one which had a quality which made the thing contracted for essentially different from the thing that it was believed to be at common law..."

[83]    Another passage of Lord Phillips' judgment in **Great Peace Shipping** bears recital. At paragraph 85 he states thus:

> "...Supervening events which defeat the contractual adventure will frequently not be the responsibility of either party. Where, however, the parties agree that something shall be done which is impossible at the time of making the agreement, it is much more likely that, on the true construction of the agreement, one or the other will have undertaken the responsibility for the mistaken state of affairs. This may well explain why cases where contracts have been found to be void in consequence of common mistake are few and far between."

Here, the risk factors were spelled out, in relation to the shares in the PPM which formed part of the terms under which the shares were subscribed under the subscription agreement. It is not alleged that the subscription agreement (Article 10 contract) was void or ought to be set aside. There was an allocation of risks. It was contemplated that if the Fund (Sentry) did well then shareholders benefited from a higher yield on a return of their investments on redemption. If the Fund lost the investments then likewise the shareholder would take the loss. This was the risk understood and accepted by both sides. Accordingly it cannot be said that because Sentry mistakenly calculated its NAV at the time of redemption due to BLMIS's Ponzi scheme, that it made the contract as between Sentry and its shareholders essentially different from what it was believed to be.

[84]    **Goff & Jones**[32] at para. 3-16 has this to say:

> "The general principle that no claim in unjust enrichment is permitted where a contract governing the benefit in question is still in force between the parties is today justifiable on the basis that the law should give effect to the parties' own allocations of risk and valuations, as expressed in the contract, and should not permit the law of unjust enrichment to be used to overturn those allocations or valuations."

[85]    The P I Respondents make the general point in response to Sentry's restitution claim, that allowing such a claim is a recipe for uncertainty and confusion in commercial transactions. They rely on the dictum of Lord Goff in **Scandinavian**

---

[32] Supra note 16.

51

**Trading Tanker Co AB v Flota Petrolera Ecuatoriana (The Scaptrade),**[33] where he said:

> "It is of the utmost importance in commercial transactions that, if any particular event occurs which may affect the parties' respective rights under a commercial contract, they should know where they stand. The court should so far as possible desist from placing obstacles in the way of either party ascertaining his legal position, if necessary with the aid of advice from a qualified lawyer, because it may be commercially desirable for action to be taken without delay, action which may be irrevocable and which may have far-reaching consequences. It is for this reason, of course, that the English courts have time and again asserted the need for certainty in commercial transactions – for the simple reason that the parties to such transactions are entitled to know where they stand, and to act accordingly."

[86]    I am happy to adopt this statement. It cannot be doubted that certainty is key in commercial transactions. Many modern day commercial transactions have a global dimension with far reaching consequences. Parties must be able to know what their legal position is and to make decisions based on that knowledge. It is therefore not surprising that throughout all the case law and the modern treatises on restitutionary remedies that such remedies invariably always give way to contractual obligations once ascertained or has led to the view that the law of unjust enrichment is a means of adjusting the relationships between parties 'whose rights are not met by some stronger doctrine of law" (such as the law of contract) and that the courts award restitution as a means of resolving "residual" problems.[34]

[87]    For these reasons, albeit via a different route, I agree with the ultimate conclusion arrived at by the learned trial judge that the P I Respondents gave good consideration for the surrender of their shares and Sentry's restitutionary claim would be defeated. It is simply not open to Sentry to recover the redemption prices which it paid for the purchase of the redeemed shares because it has now been

---

[33] [1983] Q.B. 529, p. 540.
[34] See Niru Battery Manufacturing Co and Another v Milestone Trading Ltd and Others [2003] EWCA Civ 1446; [2004] Q.B. 985 at [192]; and discussed by Goff & Jones – The Law of Unjust Enrichment (8th edn. Chapter 2).

52

discovered that it determined its NAV on unreliable or erroneous information from BLMIS which had nothing to do whatsoever with any of Sentry's shareholders. The shareholders fully performed all their obligations under the contract. Sentry, in paying the redemption price, did so in the discharge of its debt obligations to the redeeming shareholders pursuant to Sentry's Articles which remained perfectly valid and in force. Accordingly, I would dismiss Sentry's appeal on this issue.

**The Summary Judgment**

[88]    Following delivery of the 16th September judgment, ABN Amro applied for summary judgment. The learned trial judge in his decision handed down on 10th October 2011 dismissed Sentry's claim against that defendant and granted summary judgment. He ordered that Sentry pay the costs of the application, such costs to be assessed if not agreed. He also ordered Sentry to pay 75% of the P I Respondents' costs of the trial of the Preliminary Issues, to include the costs of the application for preliminary issues, such costs to be assessed if not agreed.

[89]    At paragraph 17 of his judgment, after considering the decision in **Great Peace Shipping** and the principles expounded therein went on to say as follows:

> "If one applies these principles to the present case, the question is whether the fact, contrary to the assumed understanding of both parties, that BLMIS was a Ponzi scheme, means that Sentry was unable to perform the contract which arose when a redemption notice was served in accordance with its Articles of Association. Sentry contracted to invest its members' money and return its product when demanded on the basis of a rateable proportion of Sentry's NAV. The fact that a fund in which it invested and which...was mistakenly believed by Sentry and ABN Amro to have been genuine, turned out to have been run fraudulently had no impact whatsoever upon Sentry's ability to perform these obligations. The fact, if true that upon redemption by ABN Amro, Sentry's directors should have declared a nil NAV does not make the contract void...Sentry's case on common mistake confuses (1) a shared mistaken assumption the truth of which is a necessary condition for the performance of a particular contract with (2) a shared mistaken assumption about the background against which it is expected that the contract will be performed. The

53

former case will mean that no contract can as a matter of law, be concluded. The latter will not."

With these observations I entirely agree.

[90]    The learned judge went on to make the point that Sentry's claim as pleaded appears to treat the contract between Sentry and a redeemer as liable to be rescinded rather than void and referred to **Great Peace** as being 'clear authority that there is no jurisdiction in equity to rescind a contract binding in law on the grounds of common mistake. I have already referred to this at paragraph 82 above. He again reiterated that rescission is not available in circumstances as here where restitutio in integrum is impossible. He accordingly concluded that either way the claim made at paragraph 12 of Sentry's case, coupled with his decision on the good consideration point was bound to fail. With this conclusion I also agree. The learned judge quite rightly, could only deal with the case as pleaded.

[91]    On the adjournment issue sought by Sentry in the hope that they may turn up information which may show knowledge of BLMIS's Ponzi scheme or bad faith on the part of redeemers, I need only repeat paragraph 22 of the learned judge's judgment with which I entirely agree:

> "...Applicants for summary judgment are entitled to have their applications dealt with on the facts as they are, not as they might be, and I have never heard of a summary judgment application being adjourned to give the unsuccessful party an opportunity to improve his position by searching for material upon which to make fresh allegations."

He, in my view, quite rightly refused the adjournment.

### Conclusion

[92]   For the reasons which I have given, I would dismiss Sentry's appeal on all points. I would award costs on this appeal to the P I Respondents (as one set of costs) to be fixed at two thirds of the amount as assessed below.

Janice M. Pereira
Justice of Appeal

I concur.

Davidson K. Baptiste
Justice of Appeal

I concur.

Don Mitchell
Justice of Appeal [Ag.]

# EXHIBIT H

Order of EC Court of Appeal

dated 13 June 2012

**HIGH COURT CIVIL APPEAL NO. 61 OF 2011**

**BETWEEN:**

## UBS (Luxembourg) SA

Applicant

**and**

### Fairfield Sentry Limited (in Liquidation)

Respondent

**HIGH COURT CIVIL APPEAL NO. 62 OF 2011**

**BETWEEN:**

### Fairfield Sentry Limited (In Liquidation)

Applicant

**and**

1. **Alfred Migani & 22 Others**
2. **Banco General SA/Banca Privada & 3o others**
3. **Bank Julius Baer & Co. Ltd & 26 others**
4. **Bank Julius Baer & Co. Lt & others**
5. **Arbitral Finance Inc. & 23 others**
6. **Bank Julius Baer & Co. Ltd. & 33 others**
7. **Wise Global Fund Limited**
8. **Credit Suisse London Nominees Limited**

Respondents

**Certificate of Result of Appeal**

This appeal was heard on 17th and 18th January, 2012 before Her Ladyship, the Hon. Mde. Janice M. Pereira, Justice of Appeal, His Lordship, The Hon. Mr. Davidson Kelvin Baptiste, Justice of Appeal and His Lordship, the Hon. Mr. Don Mitchell, Justice of Appeal [Ag.] in the presence of Mr. Mark Hapgood, QC with him, Mr. Phillip Kite, Mr. Kissock Laing and Ms. Colleen Farrington, for the Harney Westwood & Riegels Appellants/Respondents Mr. David Lord, QC with him, Mr. Robert Foote and Ms. Claire Goldstein for the Ogier Appellants/Respondents, Mr. Dominic Chambers, QC with him, Ms. Arabella Di Iorio for the Maples & Calder Appellants/Respondents, Mr. David Railton, QC, with him, Mr. Paul Webster, QC and Ms. Nadine Whyte, for the O'Neal Webster Appellants/Respondents, and Mr. Michael Brindle, QC with him, Mr. Andrew Westwood, Mr. William Hare and Mr. Robert Nader, for Fairfield Sentry Limited;

I HEREBY CERTIFY that an Order was made as follows:

1. The appeal is dismissed against the learned trial judge's findings in relation to the Article 11 Preliminary issues and upholding his finding on the Article 11 Defence.

2. One set of costs is awarded to Fairfield Sentry to be in two-thirds of the amount assessed below.

3. The appeal against the learned trial judge's finding in relation to the Good Consideration defence and the grant of Summary Judgment is dismissed.

4. Costs is awarded to the former shareholders (as one set of costs) to be fixed at two thirds of the amount assessed below.



Dated the 13th day of June 2012

..................................................

Chief Registrar

**The Eastern Caribbean Supreme Court**

<div align="center">In the Court of Appeal</div>

Territory of the Virgin Islands

**HIGH COURT CIVIL APPEAL NO. 41 OF 2011**

**BETWEEN:**

<div align="center">

**Quilvest Finance Limited**

</div>

<div align="right">

15th Defendant/Appellant

</div>

<div align="center">

**and**

</div>

<div align="center">

**Fairfield Sentry Limited (In Liquidation)**

</div>

<div align="right">

Claimant/Respondent

</div>

**HIGH COURT CIVIL APPEAL NO. 42 OF 2011**

**BETWEEN:**

<div align="center">

1. **Caja De Ahorros Y Monte De Piedad De Madrid**
2. **Deutsche Bank (Suisse) SA**

</div>

<div align="right">

8th and 16th Defendants/Appellants

</div>

<div align="center">

**and**

</div>

<div align="center">

**Fairfield Sentry Limited (In Liquidation)**

</div>

<div align="right">

Claimant/Respondent

</div>

**HIGH COURT CIVIL APPEAL NO. 43 OF 2011**

**BETWEEN:**

<div align="center">

**SNS Global Custody BV**

</div>

<div align="right">

4th Defendant/Appellant

</div>

<div align="center">

**and**

</div>

<div align="center">

**Fairfield Sentry Limited (In Liquidation)**

</div>

<div align="right">

Claimant/Respondent

</div>

HIGH COURT CIVIL APPEAL NO. 44 OF 2011

BETWEEN:

### Deutsche Bank Trust Company Americas

22nd Defendant/Appellant

and

### Fairfield Sentry Limited (In Liquidation)

Claimant/Respondent

HIGH COURT CIVIL APPEAL NO. 45 OF 2011

BETWEEN:

1.  **Bank Julius Baer & Co Limited**
2.  **Lloyds TSB Bank PLC**
3.  **Martello Nominees Limited (formerly Meespierson Nominees (Guernsey) Limited**
4.  **ABN AMRO Fund Services (Isles of Man) Nominees Limited (formerly Fortis (Isle of Man) Nominees Limited)**

1st, 10th, 11th, 20th Defendants/Appellants

and

### Fairfield Sentry Limited (In Liquidation)

Claimant/Respondent

BETWEEN:

HIGH COURT CIVIL APPEAL NO. 46 OF 2011

### Wise Global Fund Limited

Defendant/Appellant

and

### Fairfield Sentry Limited (In Liquidation)

Claimant/Respondent

20.AUG.2012 17:08 7584573601       EASTERN CARIBBEAN SUPREME COURT  #2490 P.004 /009
10-03635-jpm   Doc 174-2   Filed 01/13/17   Entered 01/13/17 22:36:46   Ex. B-N
Pg 109 of 212

## HIGH COURT CIVIL APPEAL NO. 47 OF 2011

**BETWEEN:**

1. Lambard, Odier, Darier, Hentsch & CIE
2. Mirabaud & CIE

Appellants

and

Fairfield Sentry Limited (in Liquidation)

Respondent

## HIGH COURT CIVIL APPEAL NO. 48 OF 2011

**BETWEEN:**

1. SG Private Banking (Suisse) SA
2. Lambard, Odier, Darier, Hentsch & CIE

Appellants

and

Fairfield Sentry Limited (in Liquidation)

Respondent

## HIGH COURT CIVIL APPEAL NO. 49 OF 2011

**BETWEEN:**

1. EFG Bank SA
2. EFG Bank European Financial Group SA
3. Pictet & CIE
4. SG Private Banking (Suisse) SA

Appellants

and

Fairfield Sentry Limited (in Liquidation)

Respondent

## HIGH COURT CIVIL APPEAL NO. 50 OF 2011

**BETWEEN:**

1. EFG Bank SA
2. SG Private Banking (Suisse) SA

Appellants

and

Fairfield Sentry Limited (in Liquidation)

Respondent

## HIGH COURT CIVIL APPEAL NO. 51 OF 2011

**BETWEEN:**

Pictet & CIE

Appellant

and

Fairfield Sentry Limited (in Liquidation)

Respondent

## HIGH COURT CIVIL APPEAL NO. 52 OF 2011

**BETWEEN:**

Credit Suisse London Nominees Limited

Applicant

and

Fairfield Sentry Limited (in Liquidation)

Respondent

**HIGH COURT CIVIL APPEAL NO. 54 OF 2011**

**BETWEEN:**

### Credit Suisse London Nominees Limited et al

Applicants

**and**

### Fairfield Sentry Limited (in Liquidation)

Respondent

**HIGH COURT CIVIL APPEAL NO. 55 OF 2011**

**BETWEEN:**

### Credit Suisse London Nominees Limited

Applicant

**and**

### Fairfield Sentry Limited (in Liquidation)

Respondent

**HIGH COURT CIVIL APPEAL NO. 56 OF 2011**

**BETWEEN:**

### Credit Suisse London Nominees Limited

Applicant

**and**

### Fairfield Sentry Limited (in Liquidation)

Respondent

HIGH COURT CIVIL APPEAL NO. 58 OF 2011

BETWEEN:


### UBS (AG) New York et al

Applicants


### and
### Fairfield Sentry Limited (in Liquidation)

...

Respondent


## HIGH COURT CIVIL APPEAL NO. 59 OF 2011


BETWEEN:


### UBS (Cayman) Limited et al

Applicants


### and
### Fairfield Sentry Limited (in Liquidation)

Respondent


## HIGH COURT CIVIL APPEAL NO. 60 OF 2011


BETWEEN:


### UBS (Cayman) Limited et al

Applicants


### and
### Fairfield Sentry Limited (in Liquidation)

Respondent

# EASTERN CARIBBEAN SUPREME COURT

### P.O. BOX 1093
### CASTRIES, ST.LUCIA
### WEST INDIES
### FACSIMILE TRANSMISSION

| | |
|---|---|
| Telephone: | [758] 457-3600 |
| Fax: | [758] 457-3601 |
| email: | offices@eccourts.org |

**DATE:**  20th August, 2012

**CONTACT:**  Forbes Hare
1-284-494-1316

Harney Westwood & Riegels
1-284-494-3547

Ogier
1-284-494-0883

Maples and Calder
1-284-852-3097

O'Neal Webster
1-284-494-5811

**CC:**  The Registrar
1-284-494-6664

**ORGANISATION:**  Chambers, Territory of the Virgin Islands

**SENDER:**  Chief Registrar

NO. OF PAGES INCLUDING COVER PAGE:
MESSAGE:

### Fairfield Sentry Limited (In Liquidation) v Alfredo Migani et al
### High Court Civil Appeal No. 62 of 2011

Dear Sirs,

Please find the attached the certificate of result of appeal in the captioned matters for your information and kind attention.

Yours faithfully,

Chief Registrar

# EXHIBIT I

Judgment of EC Court of Appeal
dated 4 October 2012

EASTERN CARIBBEAN SUPREME COURT
TERRITORY OF THE VIRGIN ISLANDS

## IN THE COURT OF APPEAL

HCVAP 2011/041-052
HCVAP 2011/054-056
HCVAP 2011/058-062

BETWEEN:

### FAIRFIELD SENTRY LIMITED (In Liquidation)

Applicant/Respondent

and

[1] ALFREDO MIGANI & 22 others
[2] BANCO GENERAL SA/BANCA PRIVADA & 30 others
[3] BANK JULIUS BAER & CO LTD & 26 others
[4] BANK JULIUS BAER & CO LTD and others
[5] ARBITRAL FINANCE INC and 23 others
[6] BANK JULIUS BAER & CO LTD & 33 others
[7] WISE GLOBAL FUND LIMITED
[8] CREDIT SUISSE LONDON NOMINEES LIMITED

Respondents/Applicants

Before:
    The Hon. Mde. Janice M. Pereira          Chief Justice [Ag.]
    The Hon. Mde. Louise Blenman          Justice of Appeal
    The Hon. Mr. Mario Michel          Justice of Appeal

Appearances:
    Mr. Jonathan Crowe, QC with him, Mr. Andrew Westwood for Fairfield Sentry Limited
    Mr. Mark Hapgood, QC with him, Mr. Kissock Laing for the Harney Westwood & Riegels Respondents/Defendants
    Mr. Paul Webster, QC with him, Ms. Nadine Whyte for the O'Neal Webster Respondents/Defendants
    Mr. Robert Foote with him, Ms. Claire Goldstein for the Ogier Respondents/Defendants
    Ms. Arabella di Iorio with her, Ms. Victoria Lord and Mr. Brian Lacey for Maples and Calder Respondents/Defendants

2012: October 3, 4.

_____

*Civil appeal – Conditional appeal for leave to appeal to Her Majesty in Council – Whether leave of court is a prerequisite where an appeal lies as of right – Whether court has an inherent jurisdiction to extend time for filing application for conditional leave to appeal.*

Both the appellant (Sentry) and the respondents ("PI Defendants") had judgment determined by this Court in their favour on issues pertaining to the interpretation of Article 11 of Sentry's Articles of Association and whether the PI Defendants had given good consideration on surrendering their shares respectively.    Thereafter, they made applications for conditional leave to appeal to Her Majesty in Council ("the application") against various parts of the judgment.    They both claimed that their appeals lie as of right to the Privy Council as the matter in dispute was of the value of £500 or upwards and the decision given was a final one in civil proceedings.

The application made by the PI Defendants was made within twenty-one days which is the time limit prescribed under Article 4 of **The Virgin Islands (Appeals to the Privy Council) Order 1967** ("the 1967 Order"); however Sentry's application was made outside the time limit.  Sentry contended that the Court has an inherent jurisdiction within which time can be extended for the filing of the application; furthermore, that the PI Defendants' application was required to be served within the twenty-one day period and was accordingly also out of time.  Sentry also argued that since the appeal is as of right, leave to appeal is not necessary.

**Held:** granting the PI Defendants' application for conditional leave to appeal; dismissing Sentry's application for leave to appeal; and ordering that Sentry pay one set of costs in respect of the PI Defendants on the application, that:



1. Article 4 of the 1967 Order stipulates that leave to appeal shall be made within twenty one days of the date of the decision appealed from and that the applicant shall give all other parties concerned notice of his intended application.  The PI Defendants complied with this two-stage requirement.  There is nothing in Article 4 which makes the validity of the application for leave to appeal dependant on the service of the application within twenty one days.  Accordingly the PI Defendants' application for leave to appeal, it being an appeal as of right and timely, is valid.

   **Texan Management Limited et al v Pacific Electric Wire & Cable Company Limited** [2009] UKPC 46 followed; **John Goddard v National Development Corporation** St. Lucia High Court Civil Appeal No. 17 of 1988 (delivered 25th October 1990, unreported) not followed.

2. Although the appeal is an appeal as of right, leave of the Court of Appeal is still obligatory.  The purpose of the application for leave to appeal is to confirm that the

appeal is 'as of right' and to impose such limited conditions as are permitted by law.

**E. Anthony Ross v Bank of Commerce (Saint Kitts Nevis) Trust and Savings Association Limited** [2010] UKPC 28 applied.

3.  While the inherent jurisdiction may supplement rules of court, it cannot be used to lay down procedure which is contrary to or inconsistent with them, and therefore where the subject matter of an application is governed by a rule it should be dealt with in accordance with that rule and not by exercising the court's inherent jurisdiction. In light of this, Article 4 gave specific directions regarding the time line for making an application for leave to appeal. As such the Court cannot invoke its inherent jurisdiction so as to arrogate to itself a power to extend the time as limited in Article 4. The application for leave to appeal must be dealt with in accordance with the terms and conditions of Article 4 of the 1967 Order.

## ORAL JUDGMENT

[1]  **PEREIRA CJ [AG.]:** This is the judgment of the Court. The appellants in civil appeals 41-52, 54-56 and 58-61 of 2011 and described for ease of reference in the proceedings below as the "PI Defendants", and Fairfield Sentry (by its liquidators), the appellant in civil appeal 62 of 2011, ("Sentry") have all made applications for leave to appeal to Her Majesty in Council against various parts of the decision of the Court of Appeal given on 13th June 2012. The Court of Appeal dismissed the appeals of the PI Defendants and also Sentry's appeal against the decision of Bannister J following trial of various preliminary issues which he had ordered.

[2]  Three of the issues concerned the question whether certain documents were certificates within the meaning of Article 11 of Sentry's Articles of Association and are conveniently termed the "Article 11 Issue". The fourth preliminary issue concerned the question whether in surrendering shares in Sentry the PI Defendants had given good consideration for payment of redemption monies and is conveniently termed the "Good Consideration Issue". The Article 11 Issue was determined both in the court below and by this Court in favour of Sentry and the Good Consideration Issue was determined both in the court below and in this Court in favour of the PI Defendants.

### The Applications – whether the appeals are as of right.

[3]     It is common ground that the applications of the PI Defendants and Sentry would satisfy the criteria contained in Article 3(1)(a) of **The Virgin Islands (Appeals to the Privy Council) Order 1967** ("the 1967 Order") which states, in effect, that an appeal lies as of right from a decision of the Court of Appeal to Her Majesty in Council where:

(a)  the matter in dispute is of the value of £500 or upwards; and

(b)  the decision is a final one in civil proceedings.

The applicants all agree (rightly) that the value of the matter in dispute is considerably in excess of £500 and that the decisions on the preliminary issues finally determined those issues between the parties. Here, we rely and adopt the dictum of Sir John Donaldson MR in **White v Brunton**[1] and applied by the Privy Council in **Stratmore Group Ltd. v A.M. Fraser and Others**[2] and cited with approval in **Othniel R. Sylvester v Satrohan Singh**[3] where he stated as follows:

> "Where there is a split trial or more accurately, in relation to a non-jury case, a split hearing, any party may appeal without leave against an order made at the end of one part if he could have appealed against such an order without leave if both parts had been heard together and the order had been made at the end of the complete hearing."

### The Timeliness of the Applications

[4]     Article 4 of the 1967 Order say that:

> "Applications to the Court [meaning the 'Court of Appeal' by definition in the 1967 Order] for leave to appeal shall be made by motion or petition within twenty-one days of the date of the decision appealed from, and the applicant shall give all other parties concerned notice of his intended application."

It is accepted that the PI Defendants have made their application within the 21 day time line set out in Article 4. Sentry, admittedly, has not. In fact Sentry's application was filed on 9th August 2102, some 36 days out of time.

---

[1] [1984] QB 570, p. 573.

[2] [1992] 2 AC 172.

[3] St. Vincent and the Grenadines High Court Civil Appeal No. 10 of 1992 (delivered 18th September 1995, unreported).

[5]     Sentry takes the point that the PI Defendants are not timely as, notwithstanding
        that their applications were timeously filed, they were not served within the 21 day
        period, which Sentry argues, was also required under Article 4 of the 1967 Order.
        Sentry relies on **John Goddard v National Development Corporation**,[4] a
        decision of the Court of Appeal, in which the Court of Appeal construed the similar
        provision and concluded that the 21 day period applied to both the making of the
        application and the serving of the application on the parties.

[6]     Whilst it is accepted that Article 4 requires both the filing and the service of the
        application, we are not persuaded that Article 4, on a proper reading of it, requires
        that the application must also be served within the 21 day period in order, so to
        speak, for the application to be a valid application.  Article 4 in our view makes
        clear that the motion or petition must be made (filed) within 21 days, but does not
        in turn say that it must be served within 21 days.  It says nothing of the sort and
        were that the intent (which there are good reasons to doubt – not the least of
        which may involve practical difficulties of service on all the parties) then this could
        easily have been stated by saying 'made and served on the parties concerned,
        within 21 days.'  In **Texan Management Limited et al v Pacific Electric Wire &
        Cable Company Limited**[5] the Privy Council opined, in effect, in relation to rule 9.7
        of the **Civil Procedure Rules 2000** which required that an application under that
        rule was to be made within the time limited for filing a defence and which further
        required that it must be supported by evidence on affidavit, that, "Nor is there is
        anything in ECR CPR 9.7 or Part 11 which makes the validity of an application
        dependant on service or filing of evidence in support at the time the application is
        filed or served".  We adopt this approach, as we consider that the situation here,
        as it relates to service, is analogous.  In our view, the decision in **John Goddard**
        must be treated as having been decided *per incuriam.*

---

[4] St. Lucia High Court Civil Appeal No. 17 of 1988 (delivered 25th October 1990, unreported).
[5] [2009] UKPC 46, para. 78.

[7]     As it relates to the PI Defendants then, the applications for leave to appeal to Her
        Majesty in Council, being timely, and having satisfied the criteria, are granted
        subject to the usual conditions which are contained at the end of this decision.

        **Whether leave of the Court of Appeal is a prerequisite where an appeal
        lies as of right**

[8]     Sentry argues and seeks a declaration to the effect that it does not require the
        leave of this Court where its appeal is as of right.   It says that Article 3(1)(a)
        imposes no such requirement and, in essence, none should be read in.  However,
        prior to the advent of the **Judicial Committee (Appellate Jurisdiction) Rules
        Order 2009** ("the 2009 Rules") there was no doubt that even where an appeal was
        'as of right' to Her Majesty in Council, it was required that leave be first sought and
        obtained from the Court of Appeal.  There was some doubt as to this requirement
        after the 2009 Rules came into effect particularly having regard to the fact that the
        2009 Rules revoked the **Judicial Committee (General Appellate Jurisdiction)
        Rules Order 1982**.  But Lord Mance in **E. Anthony Ross v Bank of Commerce
        (Saint Kitts Nevis) Trust and Savings Association Limited**[6] makes it clear,
        (whether the point may be said to have been conceded in that appeal, or that the
        Privy Council was there referring to the long established practice – traced back to
        the 19th Century), that where an appeal lies "as of right' it is still necessary for
        leave to be obtained from the court appealed from even though the granting of
        leave in such cases is not discretionary; that the purpose of the application for
        leave to appeal is to confirm that the appeal is 'as of right' and to impose such
        limited conditions as are permitted by law.   These conditions are contained in
        Article 5 of the 1967 Order.

[9]     We accordingly, hold that notwithstanding that Sentry's appeal lies as of right,
        Sentry is still required to obtain the leave of this Court, within the time permitted
        under Article 4 of the 1967 Order and would refuse the declaration sought.

---

6 [2010] UKPC 28.

### Power to extend the 21 day time limit

[10]    Sentry says that this Court may extend the 21 day period given in Article 4 of the
1967 Order and in essence cure its delay, by invoking the Court's overriding
objective to do justice between the parties by use of the Court's inherent
jurisdiction.   They also rely on a footnote in **Alfa Telecom Turkey Limited v
Cukurova Finance International Limited et al**[7] where Edwards JA indicated that
Article 4 appeared to now be modified by Rule 11(2) of the 2009 Rules which
specifies 56 days.  But this cannot be the case, as Article 4, speaks to applications
to this Court whereas Rule 11(2) of the 2009 Rules speaks to applications to the
Judicial Committee of the Privy Council ("JCPC").  She could only be taken to
have been referring to the fact that although applications to this Court must be
made within 21 days, nonetheless, where application is made to the JCPC the
longer time limit applies.  Accordingly, this does not assist Sentry.

[11]    As to the resort to the inherent jurisdiction, whereas there is no doubt that the
Court retains an inherent jurisdiction as was said in the cases of **Danone Asia
PTE Limited et al v Golden Dynasty Enterprise Limited et al**[8] and **Trade and
Commerce Bank (Through Richard Fogerty, Its Joint Official Liquidator) v
Island Point Properties S.A. et al**,[9] by this Court, it remains the case that the
inherent jurisdiction of the Court cannot be prayed in aid to flout a clear provision.
In **Texan Management Limited et al v Pacific Electric Wire & Cable Company
Limited**[10] the Privy Council had this to say:

> "... the modern tendency is to treat the inherent jurisdiction as inapplicable
> where it is inconsistent with the CPR, on the basis that it would be wrong
> to exercise the inherent jurisdiction to adopt a different approach and
> arrive at a different outcome from that which would result from an
> application of the rules: **Raja v Van Hoogstraten** (No 9) [2008] EWCA Civ
> 1444, [2009] 1 WLR 1143. That decision concerned the court's power

---

[7] Territory of the Virgin Islands High Court Civil Appeal Nos. 18 and 24 of 2010 (delivered 20th July 2011,
unreported).

[8] Territory of the Virgin Islands High Court Civil Appeal No. 2 of 2009 (delivered 28th September 2009,
unreported).

[9] Territory of the Virgin Islands High Court Civil Appeal No. 12 of 2009 (delivered 13th August 2010,
unreported).

[10] [2009] UKPC 46, para. 57.

under the inherent jurisdiction to set aside an order made without notice *ex debito justitiae*. It was held that although the inherent jurisdiction may supplement rules of court, it cannot be used to lay down procedure which is contrary to or inconsistent with them, and therefore where the subject matter of an application is governed by the CPR it should be dealt with in accordance with them and not by exercising the court's inherent jurisdiction."

We adopt this approach. Article 4 is clear. It lays down a time line of 21 days for the making of an application and gives no power to this Court to extend that time, and we do not consider that it would be correct to invoke the inherent jurisdiction of this Court so as to arrogate to itself a power to extend the time as limited in Article 4, where neither in Article 4 nor in any other provision contained in the 1967 Order is such a power (save where specifically permitted) given, and thereby engage a procedure to arrive at a different outcome to that contemplated by Article 4. This power appears to be reserved to the JCPC under the 2009 Rules. This Court has no power to extend the time under Article 4 of the 1967 Order.

[12]    Accordingly, we are constrained to conclude that Sentry's application, having been made out of time, must be dismissed, and we so order. Sentry shall bear the costs of the PI Defendants on its application, (limited to one set of costs in respect of all). Having so concluded, there is no need to delve into the question of extension of time considerations.

[13]    The Court makes the following orders:

1.  That Sentry's application for leave to appeal to Her Majesty in Council is hereby dismissed. Sentry shall bear one set of costs in respect of the PI Defendants on the application. Costs to be assessed unless agreed within fourteen days.

    **It is also ordered that**:

2.  The applications of the appellants in civil appeals 41-52, 54-56 and 58-61 of 2011 (PI Defendants) for conditional leave to appeal to Her Majesty in

Council are hereby granted and that the appeals be consolidated. Leave is hereby granted by way of a single order, on the following conditions:

(a)     The appellants do collectively pay into Court the sum equivalent to £500 sterling pursuant to section 5(a) of the Virgin Islands (Appeals to Privy Council) Order 1967 (Statutory Instruments 1967 No. 224) such payment to be made within 90 days from today's date for the due prosecution of the appeals and the payment of all such costs as may become payable by the appellants in the event of their not obtaining an order granting them final leave to appeal, or of the appeal being dismissed for non-prosecution, or of the Judicial Committee of the Privy Council ordering the appellants to pay the costs of the appeal (as the case may be).

(b)     The appellants shall apply to this Court within thirty (30) days of receipt of the Certificate of the Registrar that the security for costs ordered herein has been given within the time prescribed to the satisfaction of the Registrar and that the appellants have otherwise complied with this Order, for an order for final leave to appeal to Her Majesty in Council.

(c)     The appellants shall prepare the record of appeal and shall transmit the same to the Registrar of the Supreme Court of the Virgin Islands within sixty (60) days of the determination by Her Majesty in Council of Sentry's application to Her Majesty in Council for special eave to appeal, or of Sentry abandoning its application (whichever happens later) upon final leave to appeal being granted and shall include a copy of the orders granting conditional leave and final leave.

3. The costs in the applications shall be costs in the appeals to Her Majesty in Council

# EXHIBIT J

Order of EC Court of Appeal

dated 15 May 2013





IN THE EASTERN CARIBBEAN SUPREME COURT
IN THE COURT OF APPEAL
TERRITORY OF THE VIRGIN ISLANDS

## Consolidated Civil Appeals Nos: 41-52, 54-56 and 58-61 of 2011

(Claim Nos: BVIHC(COM) 357/2009, 404/2009, 425/2009, 5/2010, 15/2010, 30/2010, 153/2010 and 20/2011)

BETWEEN:

> QUILVEST FINANCE LIMITED (Appeal No: 41)
> CAJA DE AHORROS Y MONTE DE PIEDAD DE MADRID (Appeal No: 42)
> DEUTSCHE BANK (SUISSE) SA (Appeal No: 42)
> SNS GLOBAL CUSTODY BV (Appeal No: 43)
> DEUTSCHE BANK TRUST COMPANY AMERICAS (Appeal No: 44)
> BANK JULIUS BAER & CO LIMITED (Appeal No: 45)
> LLOYDS TSB BANK (Appeal No: 45)
> MARTELLO NOMINEES LIMITED (Appeal No: 45)
> ABN AMRO FUND SERVICES (ISLE OF MAN) NOMINEES LIMITED (Appeal No: 45)
> WISE GLOBAL FUND LIMITED (Appeal No: 46)
> LOMBARD, ODIER, DARIER, HENTSCH & CIE (Appeals Nos: 47 & 48)
> MIRABAUD & CIE (Appeal No: 47)
> SG PRIVATE BANKING (SUISSE) SA (Appeals Nos: 48, 49 & 50)
> EFG BANK SA (Appeals Nos: 49 & 50)
> EFG BANK EUROPEAN FINANCIAL GROUP SA (Appeal No: 49)
> PICTET & CIE (Appeals Nos: 49 & 51)
> CREDIT SUISSE LONDON NOMINEES LIMITED (Appeals Nos: 52, 54, 55 & 56)
> BUCKMORE NOMINEES LIMITED (Appeal No: 54)
> UBS AG NEW YORK (Appeals Nos: 58 & 60)
> UBS (CAYMAN) LIMITED (Appeals Nos: 58, 59 & 60)
> UBS (LUXEMBOURG) LIMITED (Appeals Nos: 59 & 61)
> > **Appellants in Appeal Nos 41-52, 54-56, 58- 61**

-and-

FAIRFIELD SENTRY LIMITED (in Liquidation)
> **Respondent in Appeal Nos 41-52, 54-56, 58- 61**

## ORDER

The Appellants' Application for Final Leave to Appeal to Her Majesty in Council dated 27 February 2013 supported by the affidavit of Ben Mays sworn on 27 February 2013 with exhibit "BM 1" was heard on 6 May 2013 by The Honourable Madame Janice M Pereira, Chief Justice, The Honourable Mr Don Mitchell, Justice of Appeal, and The Honourable Madame Louise Blenman, Justice of Appeal.

Upon hearing Miss Arabella di Iorio for the Appellants and Mr Robert Nader for the Respondent and the Respondent not opposing the Appellants' Application

I **HEREBY CERTIFY** that an Order was made as follows:

1. Final leave to appeal to Her Majesty in Council is granted; and

2. The costs of this application are costs in the appeal to Her Majesty in Council.

Dated this 15ᵗ day of **May**, 2013

Chief Registrar

IN THE EASTERN CARIBBEAN SUPREME COURT
IN THE COURT OF APPEAL
TERRITORY OF THE VIRGIN ISLANDS

## Consolidated Civil Appeals Nos: 41-52, 54-56 and 58-61 of 2011

(Claim Nos: BVIHC(COM) 357/2009, 404/2009, 425/2009, 5/2010, 15/2010, 30/2010, 153/2010 and 20/2011)

BETWEEN:

**QUILVEST FINANCE LIMITED** (Appeal No: 41)
**CAJA DE AHORROS Y MONTE DE PIEDAD DE MADRID** (Appeal No: 42)
**DEUTSCHE BANK (SUISSE) SA** (Appeal No: 42)
**SNS GLOBAL CUSTODY BV** (Appeal No: 43)
**DEUTSCHE BANK TRUST COMPANY AMERICAS** (Appeal No: 44)
**BANK JULIUS BAER & CO LIMITED** (Appeal No: 45)
**LLOYDS TSB BANK** (Appeal No: 45)
**MARTELLO NOMINEES LIMITED** (Appeal No: 45)
**ABN AMRO FUND SERVICES (ISLE OF MAN) NOMINEES LIMITED** (Appeal No: 45)
**WISE GLOBAL FUND LIMITED** (Appeal No: 46)
**LOMBARD, ODIER, DARIER, HENTSCH & CIE** (Appeals Nos: 47 & 48 )
**MIRABAUD & CIE** (Appeal No: 47)
**SG PRIVATE BANKING (SUISSE) SA** (Appeals Nos: 48, 49 & 50)
**EFG BANK SA** (Appeals Nos: 49 & 50)
**EFG BANK EUROPEAN FINANCIAL GROUP SA** (Appeal No: 49)
**PICTET & CIE** (Appeals Nos: 49 & 51)
**CREDIT SUISSE LONDON NOMINEES LIMITED** (Appeals Nos: 52, 54, 55 & 56)
**BUCKMORE NOMINEES LIMITED** (Appeal No: 54)
**UBS AG NEW YORK** (Appeals Nos: 58 & 60)
**UBS (CAYMAN) LIMITED** (Appeals Nos: 58, 59 & 60)
**UBS (LUXEMBOURG) LIMITED** (Appeals Nos: 59 & 61)
                    **Appellants in Appeal Nos 41-52, 54-56, 58- 61**

-and-

**FAIRFIELD SENTRY LIMITED** (in Liquidation)
                    **Respondent in Appeal Nos 41-52, 54-56, 58- 61**

―――――――――――――――

## ORDER

―――――――――――――――

**Maples and Calder**
**Legal Practitioners for the Appellants**

# EXHIBIT K

Sentry's Notice of Appeal

dated 13 August 2012

In the Judicial Committee of the Privy Council

# Notice of appeal
## (or application for permission to appeal)



**Jurisdiction**

British Virgin Islands

**Court of origin**

Eastern Caribbean Supreme Court, Commercial Division

Fairfield Sentry Limited (in Liquidation)

———— V ————

(1) Alfredo Migani & 22 others; (2) Banco General SA/Banca Privada & 30 others; (3) Bank Julius Baer & Co Ltd & 26 others; (4) Bank Julius Baer & Co Ltd and others; (5) Arbitral Finance Inc and 23 others; (6) Bank Julius Baer & Co Ltd & 33 others; (7) Wise Global Fund Limited; (8) Credit Suisse London Nominees Limited

**Appeal number**

**Date of filing**

| 1 | 3 | / | 0 | 8 | / | 2 | 0 | 1 | 2 |
|---|---|---|---|---|---|---|---|---|---|
| D | D | | M | M | | Y | Y | Y | Y |

**Appellant's agents**

Macfarlanes LLP
20 Cursitor Street
London
EC4A 1LT

**Respondent's agents**

None Specified

# 1. Appellant

**Appellant's full name**

Fairfield Sentry Limited (in Liquidation)

**Original status**

☑ Claimant    ☐ Defendant

☐ Petitioner    ☐ Respondent

## Agent

**Name**

Macfarlanes LLP

**Address**

20 Cursitor Street
London

| | |
|---|---|
| Telephone no. | 020 7831 9222 |
| Fax no. | 020 7831 9607 |
| DX no. | 138 Chancery Lane |

**Postcode**    E C 4 A   1 B D          **Ref.**

**Email**

bsd@macfarlanes.com

**How would you prefer us to communicate with you?**

☐ DX    ☑ Email

☐ Post    ☐ Other *(please specify)*

**Are you going to apply to be treated as a financially assisted person?**

☐ Yes    ☑ No

If Yes, you must provide sworn evidence about your financial circumstances.

## Counsel

**Name**

Jonathan Crow QC

**Address**

4 Stone Buildings
Lincoln's Inn
London

| | |
|---|---|
| Telephone no. | 020 7242 5524 |
| Fax no. | 020 7831 7907 |
| DX no. | 385 Chancery Lane |

**Postcode**    W C 2 A   3 X T

**Email**

J.Crow@4stonebuildings.com

**Counsel**

Name: Andrew Westwood

Address: 7 Stone Buildings
Lincoln's Inn
London

Telephone no. 020 7406 1200

Fax no. 020 7406 1300

DX no.

Postcode: W C 2 A   3 S Z

Email: awestwood@maitlandchambers.com

## 2. Respondent

Respondent's full name: Alfredo Migani and others

Original status:
- [ ] Claimant
- [✓] Defendant
- [ ] Petitioner
- [ ] Respondent

**Agent**

Name: None Specified

Address:

Telephone no.

Fax no.

DX no.

Postcode:

Ref.

Email:

Is the respondent in receipt of a Community Legal Service fund certificate or publicly funded?

[ ] Yes   [ ] No

**Counsel**

Name | None Specified

Address

Telephone no.

Fax no.

DX no.

Postcode

Email

**Counsel**

Name

Address

Telephone no.

Fax no.

DX no.

Postcode

Email

# 3. Decision being appealed

Name of Court | Eastern Caribbean Supreme Court, Court of Appeal

Names of Judges | The Hon, Mde. Janice M Pereira
The Hon. Mr. Davidson Kelvin Baptiste
The Hon. Mr. Don Mitchell

Date of order/decision | 1 3 / 0 6 / 2 0 1 2
D D    M M M    Y Y Y Y

## 4. Permission to appeal

If you have permission to appeal complete **Part A** or complete **Part B** if you require permission to appeal.

**PART A**

Name of Court granting permission

Date permission granted

| | | / | | | | / | | | | |
| D | D | | M | M | M | | Y | Y | Y | Y |

Conditions on which permission granted

**PART B**

☑ The appellant applies to the Judicial Committee for permission to appeal.

## 5. Information about the decision being appealed

Please set out

- Narrative of the facts
- Statutory framework
- Chronology of proceedings
- Orders made in the Courts below
- Issues before the Court appealed from
- Treatment of issues by the Court appealed from
- Issues in the appeal

Please see document attached to this Form as Appendix "A"

## 6. Grounds of appeal

Please see document attached to this Form as Appendix "B"

Counsel's name or signature:

## 7. Other information about the appeal

Are you applying for an
extension of time?

☐ Yes    ☑ No

If Yes, please explain why

What order are you asking the Judicial Committee to make?

Order being appealed    ☑ set aside    ☐ vary

Original order    ☑ set aside    ☐ restore    ☐ vary

**Are you asking the
Judicial Committee to:**
depart from one of its own
decisions or from one made
by the House of Lords or
the United Kingdom
Supreme Court?

☐ Yes    ☑ No

If Yes, please give details below:

**Will you or the respondent request an expedited hearing?**

☐ Yes    ☑ No

If Yes, please give details below:

## 8. Certificate of Service

Either complete this section or attach a separate certificate

**The date on which this form was served on the**

1st Respondent    | 1 | 3 | / | 8 | | / | 2 | 0 | 1 | 2 |

2nd Respondent    | 1 | 3 | / | 8 | | / | 2 | 0 | 1 | 2 |

I certify that this document was served on

BVI Counsel for Alfredo Migani and all other Respondents

by

Forbes Hare, BVI Counsel for the Appellant

by the following method

In person and by hand

Signature

## 9. Other relevant information

Details of the judgment
appealed against

References to Law
Report in which any
relevant judgment is
reported.

Subject matter
catchwords for indexing.

good consideration; share redemption;

**Please return your completed form to:**

The Judicial Committee of the Privy Council, Parliament Square, London  SW1P 3BD
DX157230 Parliament Square 4

Telephone: 020 7960 1500        Fax: 020 7960 1501
email: jcpcregistry@jcpc.gsi.gov.uk
www.jcpc.gov.uk





APPENDIX "A" - SECTION 5 - BACKGROUND

1.1    The Appellant, Fairfield Sentry Limited (in liquidation) (the "**Appellant**") is a BVI
incorporated company and was registered as a mutual fund pursuant to the terms of
the BVI Mutual Funds Act 1996. Until 11 December 2008 it carried on business as
an open ended investment fund operating largely as a feeder fund into Bernard L.
Madoff Investment Securities LLC ("**BLMIS**"). Approximately 95% of the
Appellant's assets were invested in BLMIS.

1.2    As is well known, the principal of BLMIS, Bernard L. Madoff, was arrested on 11
December 2008 and subsequently confessed that BLMIS was in fact operated as a
multi-billion dollar Ponzi scheme since its creation. Mr Madoff pleaded guilty in the
US criminal courts to a number of fraud-related criminal offences and other charges
for which he was sentenced to 150 years in prison on 29 June 2009.

1.3    As a result of the US Securities Exchange Commission investigation into BLMIS and
the arrest of Mr Madoff, on 18 December 2008 the Appellant suspended the
calculation of its Net Asset Value ("**NAV**") and all subscriptions for and redemptions
of shares.

1.4    The Appellant has issued a large number of claims in the BVI seeking to reclaim
monies paid to former redeemers in the Appellant (the "**Respondents**") on the
grounds that, inter alia, they were paid on the basis of a mistake as to the Appellant's
NAV (the "**Redeemer Claims**"). The total value of the Redeemer Claims, if
successful, is in excess of USD1 billion. The Liquidator of the Appellant (the
"**Liquidator**") asserts that:

(i)    The Respondents acquired shares in the Appellant by way of an investment.

(ii)   At various times prior to 18 December 2008, the Respondents applied to
redeem shares in the Appellant in accordance with the provisions of the
Appellant's Articles of Association (the "**Articles**").

1

(iii)  The Articles provided that the price at which shares in the Appellant were to be redeemed by investors should be calculated with reference to the NAV of the Appellant.

(iv)  The NAV was calculated under a mistake of fact as, unbeknown to the Appellant, BLMIS was in fact operating a Ponzi scheme and its investments in BLMIS were therefore lost from the date of the fund's investment.

(v)  The Appellant's NAV was at all times nil or a nominal value and the redemption sums paid to the Respondents should, accordingly, have been nil or in a nominal sum.

(vi)  The Respondents have been unjustly enriched at the expense of the Appellant and are liable to make restitution to the Appellant.

(vii)  The Appellant is entitled to set aside the redemption of the Respondents' shares on the grounds that payment of redemption monies was effected under a mutual mistake.

(viii)  The Appellant is entitled to interest.

1.5  The Respondents oppose the Redeemer Claims, averring (amongst other matters) that:

(i)  The Articles provide that the NAV was to be determined by the directors of the Appellant and calculated pursuant to the formula set out in article 11 of the Articles.  Article 11(1) provides that:

*"Any certificate as to the Net Asset Value per Share or as to the Subscription Price or Redemption Price therefore given in good faith by or on behalf of the Directors shall be binding on all parties."*

(ii)  The NAV had been calculated in accordance with the formula set out in Article 11(1) and the NAV had been properly determined by the Appellant's directors in accordance with the provisions of Article 11(1).

2

(iii)    The Appellant's directors had certified the NAV in accordance with Article
11(1) so that the NAV is binding on the Appellant and the Respondents and
the Appellant cannot now seek to go behind, disturb or recalculate the NAV.

(iv)    The redemption monies were paid in consideration of each of the Respondents
redeeming its shares in the Appellant and relinquishing its rights as a
shareholder in accordance with the Articles. The Respondents have, therefore,
given good consideration for that payment with the consequence that the
Respondents have not been unjustly enriched.

1.6    Following an application by a number of Respondents to several of the Redeemer
Claims for directions that certain issues be tried as Preliminary Issues, and by order
dated 20 April 2011 (the **"Preliminary Issues Order"**), Mr Justice Bannister QC
ordered that the following matters be tried as Preliminary Issues:

(i)    Whether (and, if so, which) of the documents relied upon by the Respondents
(the **"Documents"**) is a certificate within the meaning of Article 11(1);

(ii)    If the answer to 1.6(i) is yes, whether (and, if so, which) of the Documents is
(a)    a certificate as to the NAV; or
(b)    a certificate as to Redemption Price
within the meaning of the Articles;

(iii)    If the answer to 1.6(ii)(a) or (b) is yes:
whether the publication or delivery by the Appellant
(a)    as a matter of information only, or
(b)    in connection with a redemption request
of a document containing substantially the same items of information as a
document identified as falling within 1.6(ii)(a) or (b) above to a Respondent
precludes the Appellant from asserting that money paid to that Respondent

3

exceeded the true Redemption Price and as such is recoverable as to the excess from such Respondent; and

(iv)    Whether a Respondent, in surrendering its shares, gave good consideration for the payment by the Appellant of the Redemption Price and, if so, whether that precludes the Appellant from asserting that the money paid to that Respondent on redemption exceeded the true Redemption Price and as such is recoverable as to the excess from such Respondent.

1.7    The trial of the Preliminary Issues was heard by Mr Justice Bannister QC in the Commercial Division of the High Court of Justice of the Virgin Islands on 28-29 July 2011. By judgment dated 16 September 2011 (the **"First Instance Decision"**), the Court held that:

(i)    none of the Documents constituted a certificate within the meaning of Article 11(1); and

(ii)    in surrendering its shares, a redeeming Respondent gave good consideration for the payment by the Appellant of the Redemption Price and the Appellant was, therefore, precluded from asserting that the money paid to that Respondent on redemption exceeded the true Redemption Price.

1.8    Following an application for summary judgment made by one Respondent, the judge subsequently dismissed the Appellant's claims against those Respondents who had applied for the trial of the Preliminary Issues and refused an application by the Appellant for an adjournment in order to enable the Liquidator to investigate matters of good faith.

1.9    The Appellant and the Respondents each appealed the First Instance Decision:

(i)    in Civil Appeals 41-52 and 54-56 of 2011, the Respondents appealed the finding that none of the Documents constituted a certificate within the meaning of Article 11(1); and

4

(ii)   in Civil Appeal 62 of 2011, the Appellant appealed the finding that in surrendering its shares, a Respondent gave good consideration for the payment of the Redemption Price by the Appellant and the Appellant is, therefore, precluded from asserting that the money paid to that Respondent on redemption exceeded the true Redemption Price.

1.10   The appeals were heard by the Eastern Caribbean Supreme Court, in the Court of Appeal (the "**ECSC Court of Appeal**") on 17-18 January 2012. By judgment dated 13 June 2012, the ECSC Court of Appeal dismissed the appeals and upheld the First Instance Decision, finding, inter alia, that:

(i)    None of the Documents constituted a certificate within the meaning of Article 11(1).

(ii)   In surrendering their shares the Respondents gave good consideration which defeated the Appellant's restitutionary claims. It was not open to the Appellant to recover the redemption prices which it paid for the purchase of the redeemed shares because it had subsequently been discovered that the NAV had been determined on unreliable or erroneous information from BLMIS. The Respondents fully performed all their obligations under the contract in the Articles and the Appellant, in paying the redemption price, did so in the discharge of its debt obligations pursuant to the Articles, which remained perfectly valid and in force.

1.11   In this application, the Appellant seeks leave to appeal the ruling in Civil Appeal 62 of 2011 upholding the ruling that in surrendering its shares, a Respondent gave good consideration for the payment of the Redemption Price by the Appellant and the Appellant is, therefore, precluded from asserting that the money paid to that Respondent on redemption exceeded the true Redemption Price.

1.12    The Respondents have applied to the ECSC Court of Appeal for leave to appeal the Court of Appeal's judgment that there was no "certification" of the NAVs within the meaning of Article 11(1) of the Articles.

1.13    The Appellant has also applied to the ECSC Court of Appeal in respect of the Court of Appeal's judgment that the redemption of the shares constituted good consideration so as to bar the Appellant from recovering monies paid to Respondents in excess of the true Redemption Price. In that regard:

(i)     as soon as practical after receiving the Court of Appeal's Judgment, the Appellant (as a company in liquidation) sought and obtained sanction of the Court of Appeal to take steps to appeal the 13 June 2012 decision to the Privy Council;

(ii)    on 9 August, 2012, the Appellant filed an application in the Court of Appeal for a declaration as to its right, alternatively for leave, to appeal the 13 June 2012 decision of the Court of Appeal to the Privy Council;

(iii)   the Appellant's position is that the appeal is one which, having regard to the provisions of The Virgin Islands (Appeals to the Privy Council) Order 1967, as amended ("the 1967 Order"), lies as of right and thus one which does not require leave of the ECSC Court of Appeal; however if the appeal is one which requires leave within the meaning of section 4 of the 1967 Order the time for making such an application *prima facie* passed before the Appellant was able to obtain sanction to make the application; and

(iv)    accordingly, in light of the value and significance of the issues involved the application for leave to the Privy Council is made out of an abundance of caution.

1.14    The central issue in this appeal is whether in surrendering their shares the Respondents gave good consideration such as to preclude the Appellant from asserting and pursuing claims to recover monies paid in excess of the true

Redemption Price.  The issue involves important questions as to the role of the defence of good consideration in the modern law of restitution (if any), questions which are the subject of academic debate and controversy in a developing area of the law.   The role of the defence of good consideration is not only a matter of considerable general legal importance but also of particular importance in the context of redemptions by shareholders in mutual funds affected by fraud in the Virgin Islands and other offshore financial centres.

APPENDIX "B" - SECTION 6 – GROUNDS OF APPEAL

No good consideration

1.1    The Court of Appeal (and the Judge at first instance, **"the Judge"**) was wrong to hold
that the Respondents had given and the Appellant had received good consideration in
the form of the surrender of shares in the Appellant and the rights attached to those
shares.  In so holding the Court of Appeal failed to give any appropriate weight to the
following matters in particular:

(i)    The overwhelming majority of funds placed by the Respondents with the
Appellant for investment were invested in Bernard L. Madoff Investment
Securities LLC (**"BLMIS"**).

(ii)    At all material times BLMIS was run as a Ponzi scheme.

(iii)    As such, BLMIS operated as a fraudulent scheme which was, as a matter of
law, insolvent from inception.

(iv)    The Appellant's investments in BLMIS were therefore lost from the date on
which they were made.

(v)    Accordingly, the Net Asset Value (**"NAV"**) of the Appellant was at all
material times nil or, in the alternative, a nominal sum.

(vi)    As such, the shares in the Appellant which were surrendered by the
Respondents (and the rights attached to those shares) were of nominal or no
value.

1.2    The NAV of the Appellant being nil or, in the alternative, a nominal sum, the
Respondents gave up nothing of value on redemption.  Accordingly, there was no
good consideration for the mistaken payments made by the Appellant.

1.3    The Court of Appeal was wrong to hold, whether by virtue of the terms of the Private
Placement Memorandum, the Articles of the Appellant or otherwise, that the

1

Appellant was deemed to be accepting, among other things, the risk that BLMIS was run as a fraudulent Ponzi scheme and was not a genuine investment scheme at all. Such a holding was not justified by the terms of the Private Placement Memorandum, the Articles of the Appellant or at all.

1.4   In the circumstances, to the extent that they did receive sums from the Appellant calculated by reference to a mistaken (and not the true) NAV the Respondents were not entitled to such sums and were unjustly enriched at the Appellant's expense.

1.5   If and to the extent that the defence of good consideration continues to exist as a separate defence for the purposes of the law of restitution (which is doubted in the most recent edition of Goff & Jones[1]), there was in the circumstances of the case no basis for treating and the Court of Appeal was wrong to treat the surrender of shares of no (alternatively nominal) value as being good consideration such as to preclude any claim for recovery of sums paid by the Appellant in excess of the true redemption price.

1.6   Accordingly, the Court of Appeal (and the Judge) should have held that in surrendering their shares the Respondents did not give good consideration for payment by the Appellant of the redemption price and that the Appellant was not precluded from asserting that the money paid to the Respondents on redemption exceeded the true redemption price and, as such, was recoverable as to the excess from the Respondents. The Court of Appeal (and the Judge) should therefore have answered Preliminary Issue (iv) in the negative.

1.7   In the alternative, the Court of Appeal (and the Judge) was wrong not to hold that the defence of good consideration only operated *pro tanto* to the extent of the value of the consideration provided. The Court of Appeal (and the Judge) should have held that, to the extent that the redemption of shares by the Respondents (and the surrender of rights attached to those shares) constituted good consideration (which the Appellant

---

[1] See para 29-19 of Goff & Jones, *The Law of Unjust Enrichment*, 8th ed.

denies), it did so only to the extent of the true value of the shares redeemed and did
not preclude the Appellant from recovering the excess which was paid over.

Mistake

2.1    Further, if and to the extent that redemption gave rise to a fresh contract for which the
surrender of shares and associated rights constituted good consideration (which the
Appellant denies), the Court of Appeal (and the Judge) was wrong to hold that the
payment of the redemption price by the Appellant by way of discharge of its
obligations was not undermined by mistake. In so holding, the Court of Appeal failed
to give any or any appropriate weight to the following matters in particular:

(i)    At all material times, the true NAV of the Appellant was and should have been
declared to be nil (alternatively a nominal sum).

(ii)    The reason why the true NAV of the Appellant was nil (alternatively a
nominal sum) was because BLMIS was operating a fraudulent Ponzi scheme;
it was not a genuine investment scheme at all but a scam. The purported NAV
was at all material times a fiction. The Court of Appeal was wrong to hold
that it was not open to the Appellant to recover the redemption price which it
paid because it subsequently discovered that it had determined the NAV on the
basis of "unreliable or erroneous information" from BLMIS. The reality was
that the NAV had always been wrong, being based on the assumption that the
Ponzi scheme was in fact a true investment scheme, which it was not.

(iii)    The fact that BLMIS was a fraudulent Ponzi scheme was contrary to the
fundamental assumption of both the Appellant and the Respondents. The
Court of Appeal was wrong to hold, whether by virtue of the terms of the
Private Placement Memorandum, the Articles of the Appellant or otherwise,
that the Appellant was deemed to be accepting, among other things, the risk
that BLMIS was run as a fraudulent Ponzi scheme and was not a genuine
investment scheme at all. Such a holding was not justified by the terms of the
Private Placement Memorandum, the Articles of the Appellant or at all.

3

       (iv)     In such circumstances, the Court of Appeal should have held that the parties were mistaken as to a fundamental assumption on which the redemption obligation was founded, thus rendering performance of the essence of the obligation impossible.

2.2     Accordingly, the Court of Appeal was wrong to hold that the Appellant's claims were bound to fail.

Adjournment of summary judgment application

3.1     The Court of Appeal (and the Judge) was wrong to refuse the application by the Appellant for an adjournment of the summary judgment application. The Court of Appeal (and the Judge) recognised the possibility that the defence of good consideration might not be available to a defendant who had not acted in good faith but agreed with the Judge that there should be no adjournment in order to enable the Appellant to investigate such matters further. The Judge had stated that he saw the difficulties of the joint liquidators of the Appellant in addressing the issue of good faith but both he and the Court of Appeal failed to give any or any adequate weight to those difficulties or to the matters set out in the fifth witness statement of Mr Kenneth Krys (one of the then joint liquidators of the Appellant) dated 26 September 2011 and in particular:

       (i)     The fact that the joint liquidators of the Appellant had only recently become entitled to access to documents which Mr Irving H. Picard, trustee for the liquidation of the business of BLMIS and the Madoff estate, had collected in his own investigation, including documents concerning the good faith and knowledge of defendants to the claims.

       (ii)    The fact that certain documents provided to the joint liquidators of the Appellant by the BLMIS trustee included complaints which he had made against (among others) certain of the defendants to the claims in the United States Bankruptcy Court, Southern District of New York, alleging that the

relevant defendants enabled Madoff's Ponzi scheme, were well aware of indicia of fraud surrounding BLMIS and that, notwithstanding knowledge that BLMIS was likely a fraud, they nonetheless chose to enable Madoff's fraud for their own gain. Such documents raise serious issues as to good faith and/ or knowledge.

(iii)     The fact that the joint liquidators of the Appellant had yet to receive, let alone been able to review, all relevant documents in the possession of the BLMIS trustee on the issue of good faith and/ or knowledge.

(iv)     The fact that the joint liquidators of the Appellant reasonably required further time in which to investigate and consider issues of good faith and/ or knowledge.

(v)     The difficulties which the joint liquidators of the Appellant had experienced in obtaining relevant documents from Citco Fund Services Europe BV (as explained by Mr Krys in his third witness statement dated 8 April 2011).

(vi)     The fact that by paragraph 6 of the Order of 20 April 2011 directing the trial of the Preliminary Issues the Judge had refused permission to the joint liquidators and the Appellant to index the documents under their control and to review them for the purpose of locating documents (if any) which might be relevant to the determination of the Preliminary Issues. Accordingly, the joint liquidators of the Appellant had been unable to review the documents under their control which might be relevant to the Preliminary Issues.

(vii)     The fact that any attempt by the Appellant to raise issues based on the lack of good faith and/ or knowledge in any subsequent proceedings would or might be met with defences of limitation and/ or abuse of process.

3.2     Had the Court of Appeal (and the Judge) given any or any adequate weight to those matters, it should have held that it was not appropriate nor just to grant summary judgment against the Appellant until such time as the joint liquidators had had a proper and reasonable opportunity to consider those matters, the documents relevant

to them and their impact on the claims against the defendants.  Accordingly, the Court of Appeal (and the Judge) should have adjourned the further hearing of the application for summary judgment in order to enable that to happen.

# EXHIBIT L

Order in Council
dated 13 March 2013

JCPC/2012/0061

# AT THE COURT AT BUCKINGHAM PALACE

## The 13th day of March 2013

### PRESENT

### THE QUEEN'S MOST EXCELLENT MAJESTY
### IN COUNCIL

The following report of the Judicial Committee of the Privy Council was read—

"Having considered an application for permission to appeal from a judgment of the Court of Appeal of The British Virgin Islands dated the 13th June 2012 in the matter of

## FAIRFIELD SENTRY LIMITED (IN LIQUIDATION)
*Appellant*

- and -

## ALFREDO MIGANI AND OTHERS
*Respondents*

and having considered written submissions from the parties, we have agreed to report to Your Majesty as our opinion that the application for permission to appeal should be GRANTED on the substantive issue and REFUSED on the adjournment issue.

Permission is refused on the procedural issue as the application does not raise an arguable point of law of general public importance which ought to be considered by the Judicial Committee at this time bearing in mind the case has already been the subject of judicial decision and reviewed on appeal."

**HER MAJESTY** was pleased by and with the advice of Her Privy Council to approve the report and to order that those charged with administering the Court of Appeal of The British Virgin Islands and all others whom it may concern are to ensure that it is punctually observed and obeyed.



*Richard J Wilson*

*Clerk of the Privy Council*

# EXHIBIT M

Sentry's Case for Appeal on the Good Consideration
Issue dated 4 February 2014

<u>IN THE JUDICIAL COMMITTEE OF THE PRIVY COUNCIL</u>      <u>JCPC 2012/0061</u>
<u>ON APPEAL FROM THE EASTERN CARIBBEAN SUPREME COURT</u>    <u>2013/0058</u>
<u>COURT OF APPEAL, TERRITORY OF THE VIRGIN ISLANDS</u>        <u>2013/0059</u>
                                                                   <u>2013/0060</u>
                                                                   <u>2013/0061</u>

B E T W E E N:-

### FAIRFIELD SENTRY LIMITED
### (in liquidation)

Appellant

- and -

### QUILVEST FINANCE LIMITED
### & OTHERS

PI Defendants

———————————————————————

# CASE
### FOR THE
# APPELLANT
### IN RELATION TO THE
# GOOD CONSIDERATION APPEAL

———————————————————————

MACFARLANES LLP

20 Cursitor Street

London

EC4A 1LT

Ref: BSD/WAW/629125

# I.  INTRODUCTION

## (1) PRELIMINARY

1.  These are the submissions of Fairfield Sentry Limited (in liquidation) ("**Sentry**" or "**the Company**") on appeal from the judgment of the Court of Appeal of the Territory of the Virgin Islands ("**the Court of Appeal**") dated 13 June 2012 ("**the CA Judgment**") **[Rec 1/8]** in relation to the 'Good Consideration Appeal'.[1]  There is a related appeal by the Respondents ("**the PI Defendants**") in relation to a separate issue arising under Sentry's Articles of Association ("**the Articles**") as to whether certain documents relied upon by the PI Defendants constitute 'certificates' as to the Net Asset Value ("**NAV**") of shares in Sentry ("**Shares**"), or as to the "**Redemption Price**" for the Shares, within the meaning of Article 11(1) of the Articles ("**the Article 11 Appeal**").

2.  These submissions have been prepared on the assumed basis that the Committee will already be familiar with:

    2.1.  the CA Judgment **[Rec 1/8]**;

    2.2.  the judgments of Bannister J (Ag) ("**the Judge**") dated 20 April, 16 September and 10 October 2011 **[Rec 1/1, 1/3 & 1/5]**;  and

    2.3.  the Statement of Facts and Issues dated 13 September 2013 ("**SFI**").

3.  Sentry will adopt in this Case the same abbreviations as are used in the SFI.

---

[1] See §40(b) of the Statement of Facts and Issues; see generally the CA Judgment, §42–87 **[Rec 1/8/86–108]**.

(2) HOW THE ISSUE ARISES

**4.**     Sentry is a company incorporated in the British Virgin Islands.  Between 1997 and 2008 it acted as a 'feeder fund' for investing money through Bernard L Madoff Investment Securities LLC ("**BLMIS**").  Investors were able to put money with BLMIS by becoming shareholders in Sentry, and they realised their investment with BLMIS by redeeming their Shares in Sentry.

**5.**     The mutual rights and obligations of Sentry and its investors were set out in the Subscription Agreements under which investors agreed to become shareholders in Sentry **[Rec 2/52]**, which incorporated[2] the Company's Articles **[Rec 2/27]**, and also a Private Placement Memorandum ("**PPM**") **[Rec 2/30]**.   Under the Articles, the Subscription Price for Shares was to be determined in accordance with Article 9 **[Rec 2/27/323]**, and the Redemption Price was to be determined in accordance with Article 10 **[Rec 2/27/324]**.  In particular, the Redemption Price was defined in Article 10(2) as the NAV per Share, as determined in accordance with Article 11 as at the close of business in Amsterdam on the Dealing Day on which redemption was effected, less various charges.

**6.**     Article 11**[Rec 2/27/328]** provided that the NAV should be calculated at the time of each determination by dividing "*the value of the net assets of the Fund*" by the number of Shares then in issue (or deemed to be in issue).

**7.**     Sentry invested approximately 95% of its assets through BLMIS.  BLMIS claimed to have invested the funds in a mixture of shares in 'blue-chip' companies and options contracts (referred to as a 'split-strike' strategy).[3]  In fact, as is now well known and beyond dispute, the purported investments were fictitious and all money provided to BLMIS by Sentry (and by many others) was in fact used by it to maintain a fraudulent Ponzi scheme whereby sums paid out to redeeming investors to reflect the 'profits' they were told they had earned were in reality paid out from the money contributed by other investors.

---

[2] See §1 of the Subscription Agreement **[Rec 2/52/486]**, which provides:  "*Subscriber subscribes for the Shares pursuant to the terms herein, the [Private Placement] Memorandum, and the Fund's Memorandum and Articles of Association (collectively "the Fund Documents")*".

[3] See the Amended Complaint in the US Bankruptcy Court, at §36 **[Rec 2/56/609]**; see also the description of Sentry's 'Investment Policies' in its PPM **[Rec 2/30/405]**.

**8.**    From the Company's perspective, the result was that whenever the Directors of Sentry (or the Administrator) came to value the "*net assets of the Fund*" for the purpose of redemptions, they mistakenly valued 'assets' which did not in fact exist.  The true net assets of the Fund consisted of **(i)** such cash as might be held for Sentry by the Administrator, Citco Fund Services (Europe) BV, **(ii)** such cash (if any) as might be identified in BLMIS's hands as representing money belonging or owed to Sentry, **(iii)** the value of any claims against BLMIS and those associated with it in respect of their breaches of contract and fraud and **(iv)** any non-BLMIS investments.

**9.**    Nevertheless, Sentry paid out redemption amounts to the PI Defendants when they redeemed their Shares based on the mistaken belief that the net assets of the Fund included the assets in which BLMIS claimed to have invested.  Assuming that Article 11 **[Rec 2/27/328]**, on its true construction, provided that the Redemption Price would be calculated by reference to the value of the <u>actual</u> net assets of the Fund, then the sums which Sentry paid to the PI Defendants were far higher than the sums to which they were in reality entitled under the contract, as a result of Sentry's mistaken belief.

**10.**    The consequence of Sentry's mistaken payments is that the PI Defendants received the benefit of fictitious profits on their investments, paid out from funds received by BLMIS from, among others, those Members who did not redeem their Shares before the BLMIS fraud was revealed. The PI Defendants have accordingly profited from that fraud, whereas those who did not redeem their Shares before December 2008 have lost virtually the whole of their investment. Indeed, as with any Ponzi scheme, those Members who redeemed their Shares before the Company collapsed ("**the Redeemers**") have been paid out using money invested by, among others, the non-redeeming Members.  In bringing these claims against the Redeemers, Sentry is therefore seeking to recover the sums they were paid to the extent that they exceed the redemption amount which the Company was in reality liable to pay on a true construction of the relevant contractual documents.  The Company's intention is that, once it knows how much it will be able to recover, the correct redemption amounts based on its true net assets will be calculated so as to permit the funds to be distributed correctly and equitably as between all those who invested in Sentry, instead of allowing the fraud perpetrated by BLMIS to have a disproportionate impact on Members, depending on an accident of history as to whether or not they happened to redeem their Shares before the fraud was revealed.

**11.**    The PI Defendants have raised numerous defences to Sentry's claims.  This appeal concerns one of those defences – namely, the argument that restitution is not available because the PI Defendants provided 'good consideration' for the payments made by Sentry.  The issues raised

3

in this appeal and in the Article 11 Appeal are thus separate, although they may overlap, depending on how the Committee approaches the task in hand, as explained below.


## (3) THE ISSUES


### (i)  The true issue

12.    The single issue raised in this appeal can be very simply stated.  Sentry made payments to the PI Defendants of sums which it says **(i)** exceeded the amounts that it was contractually liable to pay and **(ii)** were so paid as the result of a mistake.  Sentry now seeks restitution of those payments to the extent that they exceeded the sums it was in truth liable to pay. The PI Defendants contend (among other things) that they are not required to make restitution on the grounds that they gave 'good consideration' because the payments operated to discharge a debt due from Sentry.  That gives rise to the fundamental question whether, as a matter of principle, a defence of 'good consideration' is available in answer to a claim in restitution, and if so whether it applies only to the extent of the debt discharged:  that is the issue under appeal ("**the Good Consideration Issue**").[4]


### (ii)  The consequential issues

13.    Once that question of principle has been answered, the matter can then be remitted to the Judge for him to determine the consequential issues that will arise on the facts of this case, including questions such as **(i)** whether it is now impractical to recalculate the NAV,[5] **(ii)** whether the NAV was in fact properly calculated by the Directors in accordance with the Articles and (as a result) whether the Company paid the Redeemers no more than they were contractually entitled to receive,[6] **(iii)** whether the claims are barred by estoppel,[7] and **(iv)** whether there is a defence on the facts based on change of position[8] or set-off.[9]

---

[4] See Preliminary Issue (4), as ordered by the Judge, quoted in §26 of the SFI, and the single issue for this Committee set out in §40(b) of the SFI.

[5] See for example §11 of the Credit Suisse Defence **[Rec 1/17/235]**.

[6] See for example §15(1) of the Credit Suisse Defence **[Rec 1/17/236]**.

[7] See for example §15(2) & (3), & §27–32 of the Credit Suisse Defence **[Rec 1/17/236]**.

[8] See for example §36–39 of the Credit Suisse Defence **[Rec 1/17/242]**.

14.     None of these formed any part of the Preliminary Issues, and in particular the Judge did not answer the question in §13(ii) above ("**the Contractual Issue**"), because he (rightly) regarded Preliminary Issue (4)[10] (the Good Consideration Issue) as "*largely a question of general law*".[11] However, the CA Judgment may have taken a different approach:  rather than directly answering the question of principle ("does good consideration provide a defence to a claim in restitution?") it appears to have dismissed Sentry's appeal on the assumed basis that, on the facts of this case, there was no overpayment because "*Sentry's contractual obligations gave rise to a debt obligation whatever the value of the shares*"[12] and that the resulting "*legal obligation placed upon Sentry under the contract ... required it to pay the redemption price by way of discharging its obligations*".[13]  In other words, the CA Judgment appears to proceed on the assumption that the answer to the Contractual Issue is that Redeemers were contractually entitled to be paid whatever Redemption Price was calculated by the Directors or others, irrespective of how mistaken that calculation might have been.

15.     There would be no objection to the CA Judgment if, properly understood, it was saying no more than that, as a matter of principle, good consideration provides a defence to a claim in restitution <u>if and to the extent</u> that the payment in any given case was made in the due discharge of a debt owed by the payer to the payee.  If that is all the Court of Appeal was saying, then the Contractual Issue could be remitted to the trial Judge (along with all the other issues in the Defences) to determine whether, on the true construction of all the contractual documents and in the events which have happened in this case, there has in fact been any overpayment. However, it would seem (and the PI Defendants will no doubt contend) that the Court of Appeal may have gone much further, and held that in this case the Company's claim in restitution cannot succeed because on the facts it paid no more than the Redeemers were contractually entitled to receive in any event – namely, a Redemption Price calculated by the Directors or others, no matter how mistakenly.

16.     If that is the true *ratio* and effect of the CA Judgment, it is objectionable on numerous grounds:

---

[9] See for example §40 of the Credit Suisse Defence **[Rec 1/17/242]**.

[10] Quoted in §26 of the SFI.

[11] See §18 of his judgment dated 16 September 2011 **[Rec 1/3/23]**:  see also the consequential questions he said would arise even if Sentry were correct in relation to Issue (4), in §3 of that judgment **[Rec 1/3/19]**.

[12] CA Judgment, §80 **[Rec 1/8/104]**.

[13] CA Judgment, §81 **[Rec 1/8/104]**.  See also the reference in §79 **[Rec 1/8/103]** to a redemption notice triggering "*contractual obligations on the part of Sentry, which were to redeem or purchase the shares and <u>pay the redemption price as determined by it</u>*" (emphasis added);  and the reference in §86 **[Rec 1/8/107]** to claims in restitution having to yield to "*contractual obligations <u>once ascertained</u>*" (emphasis added).

16.1. the court did not answer the question of principle (the Good Consideration Issue);

16.2. instead, it disposed of the appeal on the basis of a different, fact-specific question (the Contractual Issue) which it had not been asked;

16.3. it reached its conclusion in the appeal on the basis of an <u>assumption</u> as to the answer to the Contractual Issue, without either considering or giving a reasoned judgment on the correct interpretation of the relevant contractual provisions;

16.4. it made that assumption without reference to the full suite of relevant contractual documents, in particular the Subscription Agreement;[14]

16.5. more specifically, it failed to take into account the fact that the Subscription Agreement expressly states that a subscriber understands that "*the value of its Shares <u>and redemptions thereof</u> ... may be based on unaudited and in some cases, estimated, valuations of the Fund's investments*"[15] (emphasis added);

16.6. further, it failed  to take account of the fact that the Subscription Agreement is in any event governed by New York law, as to which there was no evidence before the court;[16]

16.7. it failed to take into account the fact that the Contractual Issue is pending for determination in the US Redeemer claims mentioned in §21 of the SFI;

16.8. it held that the Company was contractually bound to pay, and each Redeemer was contractually entitled to receive, such sum as might ostensibly have been calculated as the Redemption Price, without such amount having been certified pursuant to Article 11 – thereby construing the Articles in such a way as to render those certification provisions redundant;  and

16.9. indeed, there is an internal inconsistency in the CA Judgment, because in the context of the Article 11 Appeal the court specifically (and correctly) held that the Company had <u>not</u> issued any binding certificates, and yet its assumed answer to the Contractual Issue *de facto* has the effect of rendering a non-certified calculation of the Redemption Price every bit as binding and irreversible as a certificated determination.

---

[14] In particular, see §1 of the Subscription Agreement **[Rec 2/52/486]** quoted in footnote 2 above.

[15] See §10 **[Rec 2/52/490]**.

[16] See §18 **[Rec 2/52/491]**.

17. In short, the Court of Appeal failed to distinguish between the question of principle (which it was asked), and the application of that principle to the facts of this case (which it was not asked). The resulting confusion may mean that this appeal can be added to the long list of cases which illustrate the potential risks in ordering preliminary issues.

18. For the reasons outlined in §16 above, Sentry respectfully submits that this Committee should only answer the Good Consideration Issue, and should not also attempt to answer the Contractual Issue, which will involve questions of fact (as to what the Directors and/or the Administrator did) and also questions of New York law (as to which no evidence was called before the Judge, for good reasons, and which are in any event pending in the US Redeemer claims). Sentry is not trying to duck a determination of the Contractual Issue: rather, it is simply trying to ensure that that issue is addressed at the right stage, by the right court, armed with the right material. For the avoidance of doubt, and even without relying on any provisions of New York law, there are cogent arguments for saying that the Court of Appeal was entirely wrong to assume that the answer is that these PI Defendants were paid no more than they were contractually entitled to receive. In order to assist the Committee, Sentry has included in this Case an outline of those arguments in §56–66 below – not by way of inviting this Committee to resolve the matter, but by way of illustrating the flaws in the Court of Appeal's approach in assuming that the answer favoured the PI Defendants.

### (iii) The non-issue

19. Finally, there was a debate in the courts below as to **(i)** whether the redemption of any Shares was effected pursuant to (a) the contract between the Company and its Members contained in the Articles, or (b) a separate contract of redemption concluded between each Redeemer and the Company whenever the Redeemer served a redemption notice on the Company, and **(ii)** if there was a separate contract of redemption, whether it could be set aside on the grounds of mutual mistake.[17] That issue has been formally preserved in §40(c) of the SFI. However, Sentry submits that it does not need to be resolved in this appeal. The question is one of principle, namely whether 'good consideration' is a defence to a claim in restitution: it will not affect the answer to that question to inquire whether the consideration in this particular case is alleged to have been provided pursuant to a single contract with all Members embodied in the Articles, or pursuant to a succession of separate contracts of redemption with each Redeemer.

---

[17] CA Judgment, §48 [1/8/88].

**20.** For these reasons, Sentry will not seek to argue that there were any separate contracts of redemption, nor that (if there were any such separate contracts) they could be avoided on the grounds of mutual mistake.

## II.  THE GOOD CONSIDERATION ISSUE

### (1)  SENTRY'S POSITION IN OUTLINE

21.    Sentry's position is that the answer to the main issue is simple:

21.1.    There is no defence of 'good consideration' to a claim for restitution. Where a claimant pays a defendant a sum which is in reality due to the defendant and thereby discharges a debt owed to the defendant, a claim for restitution of the sum that was due will fail **(i)** because the defendant is not 'unjustly' enriched by the payment and/or **(ii)** because the discharge of the debt owed to the defendant means that there has been a change of position, in the amount of the debt discharged.  A purported <u>further</u> defence of 'good consideration' adds nothing to the analysis, introduces unnecessary complication and confusion, and should not be recognised.

21.2.    Alternatively, if the defence does exist, it is available only in answer to a claim for restitution of the sum that was actually due to the defendant.  It does not provide a defence to a claim for restitution of a sum that exceeds the amount that was in reality due to the defendant.  Any sum paid in excess of the amount that was actually due to the defendant is recoverable.

22.    The position can be illustrated by a commonplace example.  Suppose that an individual owes her energy provider £50 for gas and electricity consumed.  By mistake, she pays £500.  She is entitled to restitution of £450.  The remaining £50 represents a sum that the individual was in reality liable to pay, and so to that extent (and only to that extent) the energy company is not unjustly enriched by its receipt; alternatively, the payment discharged the £50 debt and so the energy company has changed its position to that extent.  On either analysis, the energy company has a defence to a claim for repayment to the extent of the £50.  However, the energy company cannot seek to retain the balance of £450 by contending that it gave 'good consideration' for the payment as a whole – any 'consideration' it gave was only in respect of the sum that was in reality due – *i.e.* £50.  The energy company has not given any 'consideration' for the windfall of £450.

9

23.    To take another example, suppose that a wine merchant agrees to sell 6 bottles of wine to a customer for £60.  By mistake, he delivers 12 bottles to his customer.  He is entitled to restitution of 6 bottles because only 6 out of the 12 represent the goods that he was in reality liable to deliver so as to discharge his obligation to the customer.  The customer cannot keep all 12 bottles by contending that he gave 'good consideration' by paying the £60.  That consideration was only in respect of an order for 6 bottles.  He gave no consideration for the extra 6.

24.    The consequence is that the PI Defendants' defence of 'good consideration' should be rejected.


(2)  THE 'GOOD CONSIDERATION' DEFENCE IN OUTLINE

25.    The classic statement from which the existence of the 'good consideration' defence has been inferred was given in *Barclays Bank v. Simms* [**Auth, Tab 3**].[18]  In that case Robert Goff J set out a number of propositions, including 'Proposition 2(b)' which was that a claim for money paid under a mistake of fact may fail if –

> "*the payment is made for good consideration, in particular if the money is paid to discharge, and does discharge, a debt owed to the payee (or a principal on whose behalf he is authorised to receive the payment) by the payer or a third party on whose behalf he is authorised to discharge the debt.*"

The judge immediately went on to hold that the defence would not be available to a defendant who induced the payer's mistake or (possibly) who did not receive the money in good faith.

26.    The defence is generally said to arise in situations where a claimant has mistakenly paid a sum of money which has the effect of discharging a debt which was owed to the defendant.  The 'good consideration' is said to be constituted by the discharge of the debt.

27.    As set out above, Sentry advances two alternative submissions, though there is an overlap between them:

27.1.    The primary submission is that, as a matter of general principle, there is no defence of 'good consideration' to a claim in restitution.  Robert Goff J's Proposition 2(b) [**Auth,**

---

[18] *Barclays Bank Ltd v. W.J. Simms Son & Cooke (Southern) Ltd* [1980] QB 677, at 695 [**Auth, Tab 3**].

**Tab 3**], whilst true, merely reflects either **(i)** the fact that the discharge of a debt due to the recipient cannot lead to the conclusion that he has been 'unjustly' enriched, or **(ii)** the ordinary operation of other well-recognised defences and principles of law.

27.2.  The alternative submission is that, even if the defence does exist as a matter of principle, it only applies *pro tanto* to enable a defendant to resist a claim for recovery of money he was in reality owed, and it does not apply to the extent that a claimant seeks restitution of sums paid in excess of the amount that was due.

28.  Each of these submissions is addressed in turn below.

## (3)  SUBMISSION ONE: THERE IS NO DEFENCE OF 'GOOD CONSIDERATION'

### (i)  Introduction

29.  Where a person makes a payment that is lawfully due, the recipient is not 'unjustly' enriched at the expense of the paying party, if and to the extent that the sum paid was due to him and the payment discharges the debt.  There is nothing 'unjust' in receiving a payment which is owed.  An alternative way of putting the same point is to say that, because the law treats the payment as discharging the liability which is owed to the recipient, the recipient experiences a change of position in reliance on the receipt in the amount of the debt that is discharged.  A defendant who has received no more than he is owed and whose rights as creditor have been discharged will therefore have a defence to any claim for restitution of that sum as a result of the fact that **(i)** there was nothing 'unjust' in his receipt of the money and/or **(ii)** he has changed his position.

30.  Invoking a defence of 'good consideration' adds nothing to this analysis.  It is simply a different way of making the point that the recipient is not unjustly enriched because he has received no more than he was legally entitled to receive.  Indeed, far from adding anything to the analysis, invoking a defence of 'good consideration' serves only to cause confusion by introducing (more) jargon and unnecessary complexity into this field of the law.  There is no justification for it.  It serves no useful purpose.  Sentry's primary position is thus that the defence of 'good consideration' should not be recognised as having any separate existence.

31.     In considering the existence and operation of this supposed defence, it has become conventional to distinguish between 'two-party' and 'three-party' cases.  Two-party cases concern a payer (C) and a payee (D), and a debt owed by the payer to the payee.  Three-party cases concern a payer (C) and a payee (D), and a debt owed by a third party (X) to the payee.  The present case is, of course, a two-party case.  The difference between the two situations is that in three-party cases it will not always be clear whether the payment by the claimant (C) is effective to discharge the debt owed by the third party (X) to the recipient (D).  This makes the analysis slightly more complicated in relation to three-party cases, and for this reason the two are addressed separately below, before drawing the strands together.

### (ii) Two-party cases

32.     It is particularly doubtful whether the defence of 'good consideration' exists in two-party situations, such as the present.  In this context, all the court needs to ask is whether or not the sum mistakenly paid was in reality due under a contract (or other pre-existing obligation) between the payer and the recipient.  If it _was_, then the presence of the contractual obligation means that no claim in restitution is capable of arising in the first place because there is no 'unjust' enrichment – hence there is no place for a 'defence'**[Auth, Tabs 16 & 39]**.[19]  If the sum paid was <u>not</u> due under the contract, then the defence has no application, for the reasons discussed below **[Auth, Tab 39]**.[20]  In either situation, the defence of 'good consideration' is redundant and has no work to do.

33.     Thus, as Professor Burrows explains in the context of arguing that the defence should not be recognised **[Auth, Tab 44]**:[21]

> "_The importance of a mistaken payment being made for good consideration is not that this constitutes a defence but that this means that the payment is being made under a contract so that, unless the contract is invalid, there is no prima facie right to restitution._"

---

[19] _Kleinwort Benson Ltd v. Lincoln City Council_ [1999] 2 AC 349, at 407–8 (_per_ Lord Hope) **[Auth, Tab 16]**. See also Burrows, _A Restatement of the English Law of Unjust Enrichment_ (2012) **[Auth, Tab 39]**, ss. 1(1), 3(6) & 10(6) (pp. 5–6 & 10) and the commentary thereon (pp. 25, 32–33 & 69):  the same point is picked up in the Introduction (p. xii).  The _Restatement_ was written by Professor Burrows with assistance from an advisory group of judges, practitioners and academics, including Lords Rodger, Walker and Mance, Moore-Bick & Etherton LJJ, Beatson & Henderson JJ, Stephen Moriarty QC & Laurence Rabinowitz QC, and Professors Chambers, McMeel, Mitchell, Stevens, Tettenborn & Virgo, among many others.

[20] See also by analogy the position that arises on subrogation in order to prevent a defendant from being 'over indemnified':  ss. 3(7) & 36(3) of Burrows' _Restatement_ (pp. 6 & 21) and the commentary thereon (pp. 175–177) **[Auth, Tab 39]**.

[21] _Good consideration in the law of unjust enrichment_ (2013) 129 LQR 329, at 331**[Auth, Tab 44]**.

34.  This uncontroversial statement of the law in two-party cases follows naturally from the propositions in *Goff & Jones* **[Auth, Tab 43]**,[22] that "*the law should give effect to the parties' own allocations of risk and valuations, as expressed in the contract, and should not permit the law of unjust enrichment to be used to overturn those allocations*", and conversely that "*claims in unjust enrichment should be permitted, even where a contract is still subsisting, if those claims do not undermine the contractual risks*".  Thus, if a debt is due under a contract, and the debtor mistakenly overpays the creditor, the debtor cannot recover what was properly owed, but he can recover the excess payment **[Auth, Tabs 27 & 19]**.[23]

### (iii) Three-party cases

35.  The present case is, of course, a two-party case, so the role (if any) of good consideration as a defence in three-party cases is not strictly relevant.  Nevertheless, it may assist to consider it briefly.

36.  In a three-party case, the question for the court is not whether the sum mistakenly paid was in fact due under a contract (or other pre-existing obligation) between the payer and the recipient, but **(i)** whether the sum mistakenly paid was in fact due under a contract or other pre-existing obligation between the third party (X) and the recipient (D) <u>and</u> **(ii)** whether the payment was effective to discharge the third party's debt.

37.  This minor added complication means that the payment is not aptly described as being made 'under a contract'.  That, however, does not alter the fact that the 'good consideration' defence performs no role which is not already performed by other defences or principles, and in particular by the defence of change of position.  Indeed, the precise scope of these other defences and principles will be much better understood and recognised in future cases if the redundant complicating feature of the supposed 'good consideration' defence is done away with.  These defences and principles are as follows:

   37.1.  <u>Change of position.</u>  If the payment made by C to D had the effect of discharging the debt due from X to D, D can usually be considered to have changed his position to the extent of the value of the debt discharged, and so will have a defence to that extent in relation to any restitution claim brought by C.

---

[22] *The Law of Unjust Enrichment* (8th ed., 2011) **[Auth, Tab 43]** at §13-16 – 13-17.

[23] For the avoidance of doubt, he can recover the excess without setting aside the contract:  see *Roxborough v. Rothmans of Pall Mall Australia Ltd* [2001] HCA 68, (2001) 208 CLR 516 **[Auth, Tab 27]**; and *Miles v. Wakefield* [1987] 1 AC 539 **[Auth, Tab 19]**.

(1) In *Lloyds Bank v. Independent Insurance* [**Auth, Tab 17**],[24] Waller LJ (with whose reasoning Thorpe LJ agreed) indicated that he considered the case was best analysed using the change of position defence.[25] If the payment does not discharge the debt owing from the third party, then change of position will not operate and restitution should be permitted.

(2) *Goff & Jones* likewise notes that the change of position defence will be available in a three-party case, on the basis that the defendant will have released its legal right in exchange for the payment [**Auth, Tab 43**].[26]

(3) Although the existence of the good consideration defence does appear to have greater judicial recognition in Australia, it is noteworthy that at least one case was decided on the basis that the defendant could rely on the change of position defence, with all discussion of the good consideration defence being *obiter* [**Auth, Tab 12**].[27]

**37.2.** <u>*Bona fide* purchase.</u>  Some defendants in three-party cases will be entitled to rely on the defence of *bona fide* purchase [**Auth, Tab 43**].[28]  The circumstances in which that is possible will depend on the precise scope of the defence, which remains to be fully elucidated.  Such elucidation will be more readily achieved in future cases if the confusion introduced by the good consideration defence is removed.

**37.3.** <u>Contractual allocation of risk.</u>  *Goff & Jones* suggests that "*the three-party cases [may] also [be] amenable to analysis as cases where recovery was denied because the defendant's enrichment was justified by his contract with the third party*" [**Auth, Tab 43**].[29]  That approach appears to receive support from Peter Gibson LJ in *Lloyds Bank v. Independent Insurance* [**Auth, Tab 17**] and from the Court of Appeal decision in *Costello v. MacDonald* [**Auth, Tab 7**],[30] in which it was held that restitution should be barred in a tripartite context because allowing restitution would undermine the way in which the parties had arranged their affairs.

---

[24] *Lloyds Bank plc v. Independent Insurance Co Ltd* [2000] QB 110 [**Auth, Tab 17**].

[25] *Ibid*, at 125–126; see also Peter Gibson LJ at 132 [**Auth, Tab 17**].

[26] *Ibid*, at p. 722 [**Auth, Tab 43**].

[27] *Hills Industries Ltd v. Australian Financial Services and Leasing Pty Ltd* [2012] NSWCA 380 (CA NSW) [**Auth, Tab 12**].

[28] *Goff & Jones*, at p. 722 [**Auth, Tab 43**].

[29] *Ibid*, at p. 722 [**Auth, Tab 43**].

[30] [2011] EWCA Civ 930 [**Auth, Tab 7**]; [2012] QB 244 [**Auth, Tab 7**].

### (iv) Drawing the strands together

38.   Sentry is not the first party to note the lack of utility in the supposed defence of 'good consideration', or to question whether it really represents a separate defence at all.  The view that good consideration should be abandoned altogether as a defence and its role performed by other defences has significant and growing academic support:

  38.1.   Its existence as a separate defence has been disavowed in the latest edition of *Goff & Jones*, in which the authors say they "*doubt that it has a role to perform that cannot be performed by other principles.*" [**Auth, Tab 43**] [31]  They propose that the existence of a contract or another legal obligation as a justifying ground and/or the change of position defence should replace the good consideration defence in the two-party situation, and that the change of position defence, the defence of *bona fide* purchase, and/or the existence of contract as a justifying ground could replace the good consideration defence in a three-party case.

  38.2.   The good consideration defence is not included in Professor Burrows' *Restatement* [**Auth, Tab 39**],[32] on the basis that its existence is "*very controversial*" and cases such as *Lloyds Bank v. Independent Insurance* [**Auth, Tab 17**] are better explained by the change of position defence.  In a recent article commenting on an Australian case [**Auth, Tab 12**],[33] Professor Burrows succinctly concludes [**Auth, Tab 44**]:[34]

    "*While in the law of unjust enrichment, there are the defences of change of position, payment over as agent, and bona fide purchase, there is no defence of good consideration.*"

39.   A similar trend can be detected in the English case-law.  In particular, the Court of Appeal in *Lloyds Bank v. Independent Insurance* appears to have been content to decide the case without relying on any defence of good consideration [**Auth, Tab 17**].[35]

40.   For the reasons outlined above, the Committee is invited to clarify the law by declaring that 'good consideration' does not provide a separate defence to a claim based on restitution.

---

[31] *Ibid*, at pp. §29-19 [**Auth, Tab 43**].

[32] Burrows' *Restatement*, pp. 16–19 & p. 135 [**Auth, Tab 39**].

[33] *Hills Industries v. Australian Financial Services and Leasing* [**Auth, Tab 12**].

[34] *Good consideration in the law of unjust enrichment* (2013) 129 LQR 329, at p. 332 [**Auth, Tab 44**].

[35] *Ibid*, at 125–126 & 132 [**Auth, Tab 17**].

(4)  SUBMISSION TWO:  ANY DEFENCE OF 'GOOD CONSIDERATION' APPLIES ONLY TO THE AMOUNT OF THE DISCHARGED DEBT

### (i)  Introduction

41.     If, contrary to the foregoing, the good consideration defence exists at all, as a matter of general principle it is only available up to the value of the discharged debt, and it does not operate so as to bar a claim for the recovery of any excess.  In short, Sentry submits that the PI Defendants have been unjustly enriched to the extent (if at all) that they have been paid more than they were contractually entitled to receive.

42.     In response, the PI Defendants contend that they have not been unjustly enriched, but their argument is based on an erroneous and over-literal reading of Robert Goff J's Proposition 2(b) in *Simms* **[Auth, Tab 3]**:  it does not reflect the true function of the defence (assuming it exists at all).

43.     The true position is that, where a payment is made in order to discharge a debt, and a debt is in fact discharged, the effect of the good consideration defence (assuming it exists) is to prevent the recovery of the payment only up to the face value of the discharged debt.  A court will not allow a £100 cash payment to satisfy a £200 debt, absent the provision of further valuable consideration from the debtor such as early payment **[Auth, Tabs 10 & 6]**.[36]  Conversely, it should not treat a £200 cash payment as wholly irrecoverable satisfaction of a £100 debt, absent the provision of further valuable consideration from the creditor.  No such consideration was provided here.

44.     This conclusion follows not only from an application of common sense, but also from an examination of the rationale for the good consideration defence, and it derives further support from the authorities (across various jurisdictions) and from academic commentary.

---

[36] See for example *Foakes v. Beer* (1884) 9 App Cas 605, at 613–614, 623–624 & 629–630 **[Auth, Tab 10]**; *Commissioners of Stamp Duties v. Bone* [1977] AC 511, at 519 **[Auth, Tab 6]**.

### (ii) The rationale of the defence of good consideration

45.   The defence of good consideration (assuming it exists) serves the purpose of recognising that recipients who, on receipt of a mistaken payment, apply the money so as to discharge a debt owed to them, cannot be said to be <u>unjustly</u> enriched.

46.   This intuitively obvious rationale for the defence of good consideration has judicial recognition:

46.1.   Lord Hope, speaking *obiter* in *Kleinwort Benson v. Lincoln City Council*,[37] said that it is necessary to ask in mistake claims whether the "*payee [had] a right to receive the sum which was paid to him*" because "*the payee cannot be said to have been unjustly enriched if he was entitled to receive the sum paid to him*" **[Auth, Tab 16]**.

46.2.   Peter Gibson LJ, in *Lloyds Bank v. Independent Insurance*, supported Lord Hope's comments and observed that it "*cannot be said of a payment made to discharge a debt*" (absent the inducement of mistake and good faith qualifications) that a defendant "*has been unjustly enriched by the payment made to it*" **[Auth, Tab 17]**.[38]

46.3.   Dawson and Brennan JJ, in *David Securities v. Commonwealth Bank of Australia*,[39] both recognised that the concern of the good consideration defence is to recognise circumstances where "*the existence of good consideration for the payment of money made under a mistake will make it unjust to order restitution of the money*" **[Auth, Tab 8]**.[40]

47.   It follows as a matter of logic that mistaken payments <u>are</u> recoverable where they are made in excess of what is required to discharge the debt, because recipients in such circumstances <u>are</u> unjustly enriched to the extent of the excess.

48.   An alternative rationale advanced for the existence of the good consideration defence is the need to protect transactional security.  In *Hills Industries v. Australian Financial Services and Leasing* **[Auth, Tab 12]**,[41] Allsop P appeared to assimilate the good consideration defence to the *bona fide* purchase for value defence in this regard, stating that its underlying legal policy is

---

[37] [1999] 2 AC 349, at pp. 407–408 **[Auth, Tab 16]**.

[38] *Ibid*, at p. 132 **[Auth, Tab 17]**.

[39] [1992] HCA 48; (1992) 175 CLR 353 **[Auth, Tab 8]**.

[40] *Ibid*, at §6 & §10, discussed further below **[Auth, Tab 8]**.

[41] *Hills Industries v. Australian Financial Services and Leasing* **[Auth, Tab 12]**.

founded on the need to protect "*transactional security in exchanges in respect of consideration*" **[Auth, Tab 12]**.  However, transactional security is only an interest worthy of protection where the recipient is in reality entitled to the money received in the transaction on a true construction of the transactional documents, as impliedly recognised by Allsop P.[42]  Nothing in the transactional security analysis suggests that transfers of funds over and above what is contractually owed to the recipient require or deserve protection.

### (iii) The case-law on the defence of good consideration

49.    Robert Goff J founded his Proposition 2(b) on the decisions in *Aiken v. Short* **[Auth, Tab 1]**,[43] and *Kerrison v. Glyn, Mills, Currie* **[Auth, Tab 15]**.[44]  It is clear from those decisions that the good consideration defence in effect asks whether the sums received by a defendant were actually due to him, not whether the payment was made to discharge a debt irrespective of the relationship between the amount of that debt and the amount of the payment actually made:

   49.1.    Thus, in *Aiken v. Short* **[Auth, Tab 1]** a debtor asked his bank to pay a sum of £200 that he owed to the defendant.  The bank made the payment and the debt was discharged.  The bank later claimed that it had acted while operating under a mistake as to its security rights against the debtor, and that it would not have made the payment to the third party requested by the debtor had it understood the lack of security rights between it and its customer, the debtor.   Its claim to recover the payment was dismissed because the defendant "*had a perfect right to receive the money from [the claimant]*",[45] or "*[t]he money which the defendant got from her debtor was actually due to her*".[46]

   49.2.    In *Kerrison v. Glyn, Mills, Currie*, Lord Atkinson explained that the claimant was not able to recover because he was "*simply in the position of a debtor who had paid to his creditor the debt he owed*" **[Auth, Tab 15]**.[47]

50.    In <u>no</u> case before the present has it ever been held (or apparently even suggested) that a defendant should be entitled to retain money paid to him by mistake and which the claimant

---

[42] *Ibid*, at §110 & §112 **[Auth, Tab 12]**.

[43] (1856) 1 H & N 210 **[Auth, Tab 1]**.

[44] *Kerrison v. Glyn, Mills, Currie & Co* (1911) 81 LJKB 465 **[Auth, Tab 15]**.

[45] *Ibid*, at p. 214, *per* Pollock CB **[Auth, Tab 1]**.

[46] *Ibid*, at p. 215, *per* Bramwell B **[Auth, Tab 1]**.

[47] *Ibid*, at p. 468 **[Auth, Tab 15]**.

had not been legally liable to pay, merely because the payment happened to discharge some lesser debt due from the claimant.

51.     Robert Goff J's Proposition 2(b) was discussed in the Court of Appeal in *Lloyds Bank v. Independent Insurance* **[Auth, Tab 17]**.  The majority's approach to the existence of the defence of good consideration was decidedly lukewarm, as set out above.  It considered that the change of position analysis was co-extensive with the good consideration analysis, at least in that case.  As such, the change of position defence operates *pro tanto*, *i.e.* in relation to the value of the change of position.  If the two defences are co-extensive then it follows that the good consideration defence must operate *pro tanto* as well, *i.e.* in relation to the value of the debt discharged.  There is nothing in that case to support the PI Defendants' contention that Sentry's overpayment is not recoverable.

52.     Australian cases further support the proposition that the good consideration defence applies only to the extent that a payment actually discharges a pre-existing debt.

   52.1.   In *Clarke v. Abou-Samra* **[Auth, Tab 5]**,[48] the Supreme Court of South Australia, speaking through Kourakis J (now CJ) held that, in a three-party case where the amount of the indebtedness was in dispute but the presence of a debt of some value was not:[49]

   > "*To the extent that the payment discharged the pre-existing debt of [the payer] to [the payees], [the payees] have a good defence to the claim for payment made under mistake. As to any excess, [the payees] can have no claim to retain the money against [the third party whose money it ultimately was].*"

   52.2.   This reasoning was approved by Allsop P in *Hills Industries v Australian Financial Services and Leasing,* **[Auth, Tab 12]**[50] as being "*consistent with the defence of discharge or consideration by discharge operating in Australia*" **[Auth, Tab 12]**.[51] Allsop P noted that, where the defence applies, "*no enquiry will be made as to the worth of the debt that was discharged*".[52]  This statement applies only to the question whether the debt is actually worth its face value, *i.e.* whether the debtor "*was ever*

---

[48] [2010] SASC 205 **[Auth, Tab 5]**.

[49] *Ibid*, at §5 & §83 **[Auth, Tab 5]**.

[50] [2012] NSWCA 380 (CA NSW) **[Auth, Tab 12]**.

[51] *Ibid*, at §138 **[Auth, Tab 12]**.

[52] *Ibid*, at §83 **[Auth, Tab 12]**.

*likely to be in a position to repay it at any relevant time*".[53]  The face value of the debt discharged must, however, be relevant:  and it is relevant because the good consideration defence only applies up to the actual value of the debt discharged.

52.3.  Brennan J in *David Securities v Commonwealth Bank of Australia* **[Auth, Tab 8]** also made clear that the good consideration defence only applies to the extent that the defendant was actually owed the money received in discharge of a debt:[54]

> "*To the extent that a payment satisfies a defendant's right to receive it, the defendant gives good consideration and is not unjustly enriched. If the defendant receives more than his due, he may be unjustly enriched to the extent of the excess and restitution may be ordered pro tanto*".

53.  Further, this view is consistent with the American Law Institute's *Restatement Third, Restitution and Unjust Enrichment* (2011) **[Auth, Tab 37]**, s. 67, which formulated a 'bona fide payee' rule with somewhat broader application than the good consideration defence, and which stated in material part:

> "*[A] payee without notice takes payment free of a restitution claim to which it would otherwise be subject, but only <u>to the extent that</u> (a) the payee accepts the funds in satisfaction or reduction of the payee's valid claim as creditor of the payor or of another person*" (emphasis added).

**(iv) Academic views on the defence of good consideration**

54.  Academic discussion equally supports the conclusion that the question asked by the good consideration defence (assuming it exists at all) is whether the defendant was entitled to the sum received under a valid contractual obligation, and that any excess must be returned:

54.1.  Professor Burrows suggests that the defence "*would apply where the defendant (D) in good faith obtained a benefit from the claimant (C) that D was entitled to under a valid obligation owed by a third party (X)*" **[Auth, Tab 39]**.[55]  It follows that, even if the defence does apply in two-party cases, it applies only to the extent that the debt was in reality owed under a valid contractual obligation.

54.2.  Professor Virgo likewise explains that, in the context of the good consideration defence, the consideration consists of the discharge of the debt itself, and "*[t]he defence will operate in such circumstances because the discharge of the debt means*

---

[53] *Ibid*, at §83**[Auth, Tab 12]**.

[54] *Ibid*, at §6 **[Auth, Tab 8]**.

[55] Burrows' *Restatement*, p. 135 **[Auth, Tab 39]**.

*that the defendant is no longer enriched at the expense of the claimant <u>to the value of the discharged debt</u>*" (emphasis added) **[Auth, Tab 46]**.[56]

### (v)  Conclusion

**55.**    In the premises, the defence of good consideration has no application to the present case.  The sums that Sentry seeks to recover are the sums that it has paid in excess of that which was contractually due to the PI Defendants.  It cannot be said that the PI Defendants gave any consideration, whether good, bad or indifferent, for the receipt of those sums.  To the extent that they received more than they were contractually entitled to receive, they have been unjustly enriched at Sentry's expense.  The case must be remitted to the first instance Judge to determine whether the PI Defendants have indeed received more than they were entitled to receive, and if so whether they can rely on defences of change of position or other recognised defences to a claim for restitution.

---

[56] *The Principles of the Law of Restitution* (2nd ed., 2006), p. 174 **[Auth, Tab 46]**.

### III.  THE CONTRACTUAL ISSUE

(1) Introduction

56.     For the reasons outlined in §13–18 above, Sentry respectfully submits that this Committee
should only answer the Good Consideration Issue, and should not attempt also to answer the
Contractual Issue.  Lest there be any doubt, Sentry is not adopting this position because it lacks
confidence in the strength of its case on the Contractual Issue.  Even assuming that the answer
to that issue would be governed by BVI law (but see the Subscription Agreement[57]), it is
apparent for the reasons outlined below that the Court of Appeal was entirely wrong to assume
that the PI Defendants were paid what they were contractually entitled to receive, irrespective
of whether the Redemption Price had been calculated on the basis of a mistake.

57.     For convenience, the relevant parts of Articles 10 and 11 **[Rec 2/27/324–328]** are set out below
(with paragraph numbering inserted in Article 11(1) for ease of reference):

> "*10(1) Subject to the provisions of the Memorandum, these Articles, and the Act and
> subject as hereinafter, the Company shall on receipt by it or its authorised agent of a
> request in writing ... by a Member ("the Applicant") specifying the number and class of
> Shares to be redeemed redeem or purchase all or any portion of the Shares registered in
> the Applicant's name PROVIDED THAT:*
> ...
> > *(b) the redemption ... of Shares pursuant to this Article shall be effected at the
> > Redemption Price determined in accordance with paragraph (2) of this Article ...*
>
> *(2) The Redemption Price for each Share shall be the Net Asset Value per Share (as
> determined in accordance with Article 11) ...*
>
> *11(1) [a] The Net Asset Value per Share of each class shall be determined by the
> Directors as at the close of business on each Valuation Day (except when determination
> of the Net Asset Value per Share has been suspended under the provisions of paragraph
> (4) of this Article), on such other occasions as may be required by these Articles and on
> such other occasions as the Directors may from time to time determine.*
>
> *[b] The Net Asset Value per Share shall be calculated at the time of each determination
> by dividing the value of the net assets of the Fund by the number of Shares then in issue
> or deemed to be in issue and by adjusting for each class of Shares such resultant number
> to take into account any dividends, distributions, assets or liabilities attributable to such
> class of Shares pursuant to paragraph (2) of Article 4, all determined and calculated as
> hereinafter provided.*

---

[57] See §1 and §18 of the Subscription Agreement [2/52].

**[c]** *Any certificate as to the Net Asset Value per Share or as to the Subscription Price or Redemption Price therefor given in good faith by or on behalf of the Directors shall be binding on all parties.*"

## (2) THE CORRECT APPROACH TO INTERPRETATION

58.    There is unlikely to be any dispute as to the correct approach to the interpretation of the relevant contractual provisions:

  58.1.    the task is to ascertain the meaning which the contract would convey to a reasonable person having all the background knowledge that would reasonably be available to the audience to whom the document was addressed;

  - *Investors Compensation Scheme Limited v. West Bromwich Building Society* [1998] 1 WLR 896, at 912 **[Auth, Tab 13]**;

  - *Attorney General of Belize & others v. Belize Telecom Limited* [2009] UKPC 10, [2009] 1 WLR 1988, at [16] **[Auth, Tab 2]**;

  - *Rainy Sky SA v. Kookmin Bank* [2011] UKSC 50, [2011] 1 WLR 2900, at [14] & [21] **[Auth, Tab 23]**.

  58.2.    in general, words should be given their natural and ordinary meaning, particularly in formal documents: *ICS v. West Bromwich* **[Auth, Tab 13]**, at 913D–E;

  58.3.    contractual provisions should be construed so as to avoid redundancy: *Lewison on The Interpretation of Contracts* (5th ed.), §7.03, and the cases cited therein **[Auth, Tab 45]**;

  58.4.    individual contractual provisions are not to be considered in isolation but in the context of the contract as a whole: *Lewison*, §7.02, and the cases cited **[Auth, Tab 45]**;

  58.5.    where there is more than one linked contract forming part of the same transaction, the provisions of each contract should be construed consistently: *Lewison*, §3.03 **[Auth, Tab 45]**, and the cases cited.

(3) THE CORRECT INTERPRETATION OF THE ARTICLES

59.    The Company's Articles set out the following regime for redeeming Shares:

59.1.    Under Article 10(1) **[Rec 2/27/324]**, on receipt of a valid notice from a Member, the Company came under an obligation to redeem the Shares "*Subject to the provisions of ... these Articles*".   It is therefore stating the obvious to say that the detailed obligations of the Company and the detailed entitlements of a Member on any redemption were defined principally by the Articles.[58]

59.2.    Under Article 10(1)(b) **[Rec 2/27/325]**, the redemption of any Shares "*shall be effected at the Redemption Price determined in accordance with paragraph (2) of this Article*" (less certain charges).   That being the position, a Member was not contractually entitled to receive, and the Company was not contractually obliged to pay, a Redemption Price that was <u>not</u> determined in accordance with Article 10(2).

59.3.    Under Article 10(2) **[Rec 2/27/326]**, the Redemption Price for each Share "*shall be the Net Asset Value per Share (as determined in accordance with Article 11)*" (less certain provisions).   That being the position, a Member was not contractually entitled to receive, and the Company was not contractually obliged to pay, a Redemption Price that was <u>not</u> fixed by reference to the NAV per Share determined in accordance with Article 11.

59.4.    Paragraph [b] of Article 11(1) **[Rec 2/27/328]** specifies the mechanism to be adopted in calculating the NAV per Share.   In particular, it provides that the NAV per Share "*shall be calculated ... by dividing the value of <u>the net assets</u> of the Fund by the number of Shares then in issue or deemed to be in issue*" (emphasis added), and then making certain adjustments.

59.5.    Paragraph [c] of Article 11(1) **[Rec 2/27/328]** provides for a certificate as to the NAV per share or the Redemption Price to be binding if it is issued in good faith by or on behalf of the Directors.

---

[58] As noted in §5 above, the overarching contract between each investor and the Company was embodied in the Subscription Agreement **[Rec 2/52]**, which incorporated the Articles and the PPM.

60.    On that basis, Sentry would (when the issue arises for determination) make the following submissions on the wording of the Articles:

    60.1.    The natural meaning of the words used in paragraph [b] of Article 11(1) is that, in calculating the "*Net Asset Value per Share*", the Directors were required to divide the value of the <u>actual</u> net assets of the Fund by the number of Shares in issue, or deemed to be in issue.  In particular, paragraph [b] refers to the value of "*the net assets of the Fund*" – not to any valuation of the assets that were assumed or believed to form part of the Fund.

    60.2.    That natural meaning is reinforced by the wording of Article 11(3), which sets out detailed provisions for the Directors to exercise certain discretions in valuing the net assets of the Fund, and also includes certain specific deeming provisions.  If the expression "*the net assets of the Fund*" had been intended to refer to "*assets which the Fund does not own but which the Directors believe it owns*" then specific wording to this effect would have been needed, and Article 11(3) would not have been expressed as it was.

    60.3.    The natural meaning of "*net assets of the Fund*" is further reinforced by the taxonomy used in the Articles more widely.  In particular, the "*Net Asset Value*" (using capital letters) is a term of art, referring to the NAV per Share, which is defined as an amount determined by the Directors in accordance with Article 11.[59]  By contrast, the expression "*the net assets of the Fund*" is <u>not</u> a term of art, and in particular it is not defined by reference to any assessment made by the Directors by reference to their belief as to what comprised those assets.  That reinforces the inference that paragraph [b] is talking about the value of the <u>true</u> net assets – not a valuation performed by the Directors according to their subjective <u>belief</u> as to what comprised the net assets of the Fund.

61.    Sentry's answer to the Contractual Issue is also consistent with the operation of Article 11 more generally.  As the Court of Appeal rightly held,[60] paragraph [c] of Article 11(1) permitted, but did not require, the Directors to issue a 'certificate' as to the NAV per Share in any given case.  If such a certificate was given in good faith, it was "*binding on all parties*".  In the absence of any such certificate, a determination of the Redemption Price was therefore not 'binding' – no

---

[59] See the definitions in Article 1 **[Rec 2/27/318]**.

[60] CA Judgment, §33 **[Rec 1/8/83]**.  The reasons why the Court of Appeal was correct in this regard will be developed in Sentry's Case in answer to the Article 11 Appeal.

doubt in part because there would be room for uncertainty as to whether the net assets of the Fund had been correctly identified and valued. The purpose of allowing the Directors to issue a certificate, but not requiring them to do so as a matter of routine, was accordingly to provide a mechanism for resolving the uncertainty that was otherwise inherent in the process.[61] By contrast, the assumption apparently made by the Court of Appeal in relation to the Contractual Issue **(i)** renders the certification process otiose and **(ii)** is inconsistent with the court's (correct) conclusion on the Article 11 issue.

62.    More generally, the Company's answer to the Contractual Issue is consistent with commercial sense and fairness. Although on the facts of this case there has been a significant overpayment, the commerciality of the parties' competing interpretations must be tested on the assumed basis that the Directors (or the Company's administrator) might have made mistakes that worked either to the advantage or to the disadvantage of a Redeemer. For example, the Directors might have valued the net assets of the Fund in the erroneous belief that it owned certain stock in a company which had gone into insolvent liquidation, when in reality that stock had been sold before the insolvency and the proceeds had been invested in a company that was thriving.[62] If that happened, then it would visit an unfair disadvantage on the Redeemers if they were unable to reopen the valuation. There is no sensible commercial reason for interpreting the Articles as depriving an investor in that kind of situation of the true value of his investment. Conversely, there is no sensible commercial reason for obliging the Company to redeem Shares at an erroneously inflated price, simply because the Directors were under the mistaken belief that it owned assets which it did not.

63.    The unfairness of the result for which the PI Defendants contend is obvious from the facts of this case: they are claiming to be entitled to retain the full amount of the Redemption Price paid to them, at the expense of those Members who did not redeem before the BLMIS fraud was revealed, and whose money was therefore used through the Ponzi scheme to enrich the Redeemers. The unfairness of this outcome can be illustrated even more dramatically if the facts were slightly different. Assume that some Members had served notices of redemption but had not been paid when the fraud was revealed. On the PI Defendants' argument, the Company would be contractually bound to pay the Redemption Price that had been determined in ignorance of the fraud. That would mean that the Redeemers could then enforce their

---

[61] To this extent, the issues in this appeal overlap with those in the Article 11 Appeal.

[62] It should be recalled that all investment decisions were being taken and executed by BLMIS, so Sentry would not have had first-hand knowledge of the relevant sales and purchases of stock.

contractual entitlement to an erroneous overpayment in priority to the other Members of the Company, even after the fraud was revealed [**Auth, Tab 28**].[63]

64. The Court of Appeal appears to have considered that the provisions of the PPM [**Rec 2/30**] were relevant in this context, because they refer to the possible risk of misappropriation.[64] However, that is with respect irrelevant: the PPM merely contained a suitable risk warning to inform potential investors that the funds would be placed out of Sentry's control, and that there was a consequent risk they might be lost. The identification of that risk was relevant to a prospective investor's decision whether to invest: it does not lead to the conclusion that the Company would be obliged to pay a Redemption Price calculated on the erroneous assumption that the assets had <u>not</u> been misappropriated.

65. By contrast, what the Court of Appeal failed to take into account is **(i)** the fact that the overarching contract between investors and the Company was defined by the Subscription Agreement [**Rec 2/52**], **(ii)** the Subscription Agreement expressly provides that each investor acknowledged that "*the value of its Shares <u>and redemptions thereof</u> ... may be based on unaudited and in some cases, estimated, valuations of the Fund's investments*"[65] (emphasis added) **(iii)** the Subscription Agreement is governed by New York law,[66] **(iv)** there was no evidence before the Judge as to the meaning and effect of the Subscription Agreement and/or of the parties' mutual rights and liabilities under New York law because, as the Judge himself said, the Good Consideration Issue was essentially a question of general legal principle,[67] *i.e.* it did not involve an application of that principle to the facts of this case, and **(v)** in all the circumstances it was wrong to try deciding (let alone to assume, without clearly deciding) the answer to the Contractual Issue.

---

[63] As to the priority of unpaid Redeemers over unredeemed Members in a BVI liquidation, see the recent Court of Appeal judgment in *Somers Dublin Ltd v. Monarch Pointe Fund Limited*, HCVAP 2011/040, 11 March 2013 [**Auth, Tab 28**].

[64] CA Judgment, §76 & §83 [**Rec 1/8/102 & 106**].

[65] See §10 [**Rec 2/52/490**].

[66] See §18 [**Rec 2/52/491**].

[67] See §18 of his judgment dated 16 September 2011 [**Rec 1/3/23**].

(4) CONCLUSION

**66.**    For the reasons outlined above, the Company submits that **(i)** the Committee should not attempt to answer the Contractual Issue, and **(ii)** in answering the Good Consideration Issue, it should not assume (as the Court of Appeal did) that, on the true construction of the relevant contractual documents, a Redeemer was contractually entitled to be paid whatever Redemption Price was calculated by or on behalf of the Directors, irrespective of how erroneously that calculation was conducted.  Rather, the correct answer to the Contractual Issue (as and when it is duly determined) is likely to be that the Redeemers were only entitled to be paid a Redemption Price duly calculated by reference to the value of the <u>actual</u> net assets of the Fund.

# IV.  CONCLUSION

**67.**    This appeal should be allowed for the following among other

<p align="center">REASONS</p>

(1)  The PI Defendants are not entitled to rely on a defence of 'good consideration' because it does not exist.

(2)  Alternatively, the PI Defendants are not entitled to rely on the good consideration defence as a complete answer to Sentry's claim, but only to the extent of the debt (if any) actually discharged.

(3)  The case must accordingly be remitted to the first instance Judge in order to determine whether the sum paid by Sentry exceeded the sum that was due to the PI Defendants on a true construction of the relevant contractual provisions (and whether any of the other defences raised by the PI Defendants apply).

<div align="right">

**Jonathan Crow QC**
4 Stone Buildings

**Andrew Westwood**
Maitland Chambers

**Stephen Midwinter**
Brick Court Chambers

4 February 2014

</div>

# EXHIBIT N

Sentry's Case for Appeal on the Certificate
Issue dated 18 February 2014

<u>IN THE JUDICIAL COMMITTEE OF THE PRIVY COUNCIL</u>      <u>JCPC 2012/0061</u>
<u>ON APPEAL FROM THE EASTERN CARIBBEAN SUPREME COURT</u>     <u>2013/0058</u>
<u>COURT OF APPEAL, TERRITORY OF THE VIRGIN ISLANDS</u>     <u>2013/0059</u>
                                                             <u>2013/0060</u>
                                                             <u>2013/0061</u>

B E T W E E N:-

### FAIRFIELD SENTRY LIMITED
**(in liquidation)**

*Respondent*

- and -

### QUILVEST FINANCE LIMITED
### & OTHERS

*Appellants*

_____

# CASE
### FOR THE
# RESPONDENT
### IN RELATION TO THE
# ARTICLE 11 APPEAL
_____

MACFARLANES LLP
20 Cursitor Street
London
EC4A 1LT

Ref:  BSD/WAW/629125

# I.  INTRODUCTION

## (1) PRELIMINARY

1.  These are the submissions of Fairfield Sentry Limited (in liquidation) ("**Sentry**" or "**the Company**") in response to an appeal by certain defendants ("**the PI Defendants**") in relation to a dispute arising under Sentry's Articles of Association ("**the Articles**") as to whether certain documents on which the PI Defendants now seek to rely ("**the Documents**") constitute 'certificates' as to the Net Asset Value ("**NAV**") of shares in Sentry ("**Shares**"), or as to the "**Redemption Price**" for the Shares, within the meaning of Article 11(1) of the Articles ("**the Article 11 Issue**").[1]  There is also a separate appeal by the Company (which is being heard at the same time as this appeal) which is concerned with the question whether the PI Defendants can resist the restitutionary claims brought by the Company on the basis of a defence of 'good consideration'.[2]

2.  These submissions have been prepared on the assumed basis that the Committee will already be familiar with:

   2.1.    the judgment of the Court of Appeal of the Territory of the Virgin Islands ("**the Court of Appeal**") dated 13 June 2012 ("**the CA Judgment**") **[Rec 1/8]**;

   2.2.    the judgments of Bannister J (Ag) ("**the Judge**") dated 20 April, 16 September and 10 October 2011 ("**the 1st instance Judgments**") **[Rec 1/1, 1/3 & 1/5]**;

   2.3.    the Statement of Facts and Issues dated 13 September 2013 ("**SFI**");

   2.4.    the written case on behalf of the PI Defendants dated 4 February 2014 ("**the PI Defendants' Case**").

---

[1] See §40(a) & §50–53 of the Statement of Facts & Issues.

[2] See §40(b) & §42–47 of the Statement of Facts & Issues.

**3.**     Sentry will adopt in this Case the same abbreviations as are used in the SFI.

**4.**     For convenience, the wording of Article 11(1) **[Rec 2/27/328]** is set out below, with lettering inserted in square brackets for ease of reference, and with emphasis added:

> "**[a]** *The Net Asset Value per Share of each class shall be determined by the Directors as at the close of business on each Valuation Day (except when determination of the Net Asset Value per Share has been suspended under the provisions of paragraph (4) of this Article), on such other occasions as may be required by these Articles and on such other occasions as the Directors may from time to time determine.*
>
> **[b]** *The Net Asset Value per Share shall be calculated at the time of each determination by dividing the value of the net assets of the Fund by the number of Shares then in issue or deemed to be in issue and by adjusting for each class of Shares such resultant number to take into account any dividends, distributions, assets or liabilities attributable to such class of Shares pursuant to paragraph (2) of Article 4, all determined and calculated as hereinafter provided.*
>
> **[c]** *Any certificate as to the Net Asset Value per Share or as to the Subscription Price or Redemption Price therefor given in good faith by or on behalf of the Directors shall be binding on all parties.*"

## (2) THE ISSUES

**5.**     The preliminary issues ordered by the Judge (which are set out in full at §26 of the SFI) identify three closely related questions:

**5.1.**     whether any of the Documents were 'certificates' within Article 11;

**5.2.**     if so, whether they were certificates as to **(i)** the NAV or **(ii)** the Redemption Price;

**5.3.**     if so, whether Sentry is precluded from recovering money paid to members of the Company ("**Members**") who received such 'certificates' on the grounds that the amount paid exceeded the true Redemption Price.

**6.**     There is no longer any dispute over the third issue:  Fairfield accepts that if (contrary to its main case) any of the Documents is a 'certificate' within Article 11, then the Company cannot maintain a cause of action based on restitution for the purpose of recovering any overpayment so certified.[3]  Furthermore, none of the parties has sought to differentiate between the first and

---

[3] Sentry is accordingly not now pursuing the arguments outlined in its Skeleton Arguments at first instance, §14–19 **[Rec 6/63/1885]** and in the Court of Appeal, §29–30 **[Rec 6/65/1919]**.

second questions.  The SFI, §40(a), accordingly reduces the appeal to a single main issue, namely whether any of the Documents constitutes a 'certificate' within Article 11 such as to provide the redeeming Members with a defence to Sentry's claim pursuant to that Article.

7.    For the purposes of this Case, Sentry submits that the answer to that question needs to be approached in two stages:

7.1.    First, what is the correct interpretation of Article 11?  That in turn requires the following subsidiary issues to be addressed:

(1)  What is the correct approach to the interpretation of the Articles?

(2)  What is the natural meaning of the words used in Article 11(1)?

(3)  Does the factual matrix or the commercial context require a different interpretation to be imposed?

(4)  Does the case-law relating to the redemption of shares in off-shore investment funds require a different interpretation to be imposed?

(5)  Does the general law relating to 'certificates' require a different interpretation to be imposed?

7.2.    Secondly, how does the interpretation of Article 11 apply to the Documents in this case?  That requires two subsidiary issues to be addressed:

(1)  Were any of these Documents 'certificates' within the meaning of Article 11(1)?

(2)  Were any of them issued by or on behalf of the Company's Directors?

## II. THE INTERPRETATION OF THE ARTICLES

### (1) THE CORRECT APPROACH TO INTERPRETATION

8.      There is no dispute as to the correct approach to the interpretation of Article 11.  As was common ground below –

8.1.      the task is to ascertain the meaning which the provision would convey to a reasonable person having all the background knowledge that would reasonably be available to the audience to whom the document was addressed;

- *Investors Compensation Scheme Limited v. West Bromwich Building Society* [1998] 1 WLR 896, at 912 **[Auth, Tab 13]**;

- *Attorney General of Belize & others v. Belize Telecom Limited* [2009] UKPC 10, [2009] 1 WLR 1988, at [16] **[Auth, Tab 2]**;

- *Rainy Sky SA v. Kookmin Bank* [2011] UKSC 50, [2011] 1 WLR 2900, at [14] & [21] **[Auth, Tab 23]**;

8.2.      in general, words should be given their natural and ordinary meaning, particularly in formal documents:  *ICS v. West Bromwich* **[Auth, Tab 13]**, at 913D–E.

8.3.      relevant evidence of the 'factual matrix' in which a contract is made is admissible as an aid to its interpretation:

- *Prenn v. Simmons* [1971] 1 WLR 1381, at 1383–1384 **[Auth, Tab 22]**;

- *Mannai Investments Co Ltd  v. Eagle Star Life Assurance Co Ltd* [1997] AC 749, at 774 & 779 **[Auth, Tab 18]**.

### (2) THE NATURAL MEANING OF THE WORDS IN ARTICLE 11(1)

9.      As the Court of Appeal rightly observed in §9 of its judgment **[Rec 1/8/70]**, the three paragraphs in Article 11(1) each contain different elements:

4

**9.1.**    Paragraph [a] provides for the <u>determination</u> by the Directors of the NAV per Share at the close of business on each Valuation Day (as defined):  this imposes a duty on the Directors.

**9.2.**    Paragraph [b] provides the formula for the NAV to be <u>calculated</u>:  this sets out the mathematical process by which the Directors' duty is to be discharged.

**9.3.**    Paragraph [c] provides that any <u>certificate</u> as to the NAV (or as to the Subscription Price or Redemption Price), given in good faith by or on behalf of the Directors, would be binding on the parties:  this is dealing with the contractual effect of any such certificate as between the Company and a subscribing or redeeming Member.

**10.**    Significantly, Article 11(1) does not <u>require</u> a certificate to be issued on every Valuation Day, or on any other occasion.  The Articles expressly require the NAV to be <u>determined</u> and <u>calculated</u> (as is apparent from the use of the word "*shall*" in both paragraphs):[4]  but there is no equivalent obligation for the NAV (or for the Subscription or Redemption Prices) to be <u>certified</u>.  This is apparent both **(i)** from the absence of the word 'shall' from paragraph [c], and also **(ii)** from the use of the words "<u>*Any*</u> *certificate*" at the beginning of that paragraph:  if (contrary to Sentry's argument) a certificate <u>had</u> been required on every Valuation Day as a matter of course, then paragraph [c] would have referred to "*Each certificate*".  As it is, Article 11(1) simply provides that <u>if</u> a certificate were given (in good faith by or on behalf of the Directors) then it would be binding.

**11.**    For these reasons, it was plainly contemplated by the draftsman of the Articles that on at least some (or possibly all) Valuation Days there would not be a certificate.  The Court of Appeal was therefore correct to find (in §33 of its judgment **[Rec 1/8/83]**) that the plain meaning of Article 11(1) was that the Directors could discharge their duty to determine the NAV and any Redemption Price by calculating and publishing a figure, without certifying it.

---

[4] The matter is put beyond doubt by the interpretation provisions in Article 1, which expressly provide that: "*The word "may" shall be construed as permissive and the word "shall" shall be construed as imperative*" **[Rec 2/27/320]**.  In the circumstances, the use of the word 'shall' in each of paragraphs [a] and [b] of Article 11(1), and its omission from paragraph [c], must have been intentional.

(3) THE FACTUAL MATRIX & THE COMMERCIAL PURPOSE OF ARTICLE 11

12.    The PI Defendants argue that "*the commercial purpose of the certification provision ... was to provide certainty and finality*".[5]  In summary, Sentry makes the following response:

    12.1.  First, it may indeed be true to say that the purpose of the certification provision is to achieve certainty and finality:  but identifying that purpose does not assist the PI Defendants in relation to the actual issue under appeal – namely whether <u>these</u> Documents were certificates.  In the abstract, Sentry does not dispute the importance of certainty:  but stating the proposition at such a high level of generality (as the PI Defendants do) does not assist in identifying <u>which</u> documents were intended to achieve the <u>relevant degree</u> of certainty to constitute 'certificates' under these Articles.

    12.2.  Second, although certainty may be a desirable objective in the commercial world, so is accuracy.  The PI Defendants' argument gives unjustified primacy to certainty at the expense of accuracy.

    12.3.  Third, the PI Defendants' submissions ignore (or at best misconstrue) the relevant commercial context:  for the reasons outlined in §13–14 below, it is apparent from a careful consideration of the relevant contracts and the relevant context that the Court of Appeal's judgment is entirely correct.

    12.4.  Finally, for the reasons outlined in §14.10 and §14.11 below, the PI Defendants' interpretation of Article 11 would produce commercially illogical results.

13.    In searching for the correct interpretation of Article 11, it is important to consider the provision in the context of the whole suite of 'Fund Documents' under which a prospective investor would become a Member of Sentry:[6]

    13.1.  The Subscription Agreement **[Rec 2/52, 2/53]** contained the following provision at §10 **[Rec 2/52/490, 2/53/504]**:

        "*Valuations:  Subscriber understands that the value of its Shares <u>and redemptions thereof</u> ... may be based on unaudited and in some cases, estimated, valuation of the Fund's investments and that any valuation provided*

---

[5] See §27 of the PI Defendants' Case:  see also for example the Written Submissions on behalf of Credit Suisse London Nominees Limited in the Court of Appeal, §27 **[Rec 6/64/1899]**.

[6] The 'Fund Documents' comprised **(i)** the Subscription Agreement, **(ii)** the Memorandum and Articles of Association, and **(iii)** the Private Placement Memorandum:  see §1 of the Subscription Agreement **[Rec 2/52/486]** & **[Rec 2/53/500]**.

*in Subscriber's account statement may be an unaudited, estimated value*" (emphasis added).

It was, therefore, <u>expressly</u> recognised that at least some statements provided by Sentry to its Members setting out the ostensible amount of the NAV might not be definitive.

13.2.  The Private Placement Memorandum ("**PPM**") **[Rec 2/30]** states clearly that Shares were issued "*only on the basis of the information in [the PPM] and any attachments [thereto]*" **[Rec 2/30/392]**.

(1)  The definition in the PPM of the Fund's 'Business Objective' **[Rec 2/30/398]** and the description of its 'Investment Policies' **[Rec 3/30/405]** make clear (albeit in slightly prolix jargon) that the Fund was (as §8 of the SFI puts it more pithily) a 'feeder-fund' for Bernard L. Madoff Investment Securities LLC ("**BLMIS**"): in other words, Sentry was neither making discretionary investment management decisions itself, nor was it holding the underlying securities that were ostensibly being acquired. In the circumstances, a Member of Sentry would know that any valuation of its Fund, and hence of the NAV of each Share, was essentially parasitic on the valuation of investments under the control of BLMIS.

(2)  This was made explicitly clear in the PPM **[Rec 2/30/413]**:

"*As Administrator, Citco has the responsibility for furnishing the day to day administrative services which the Fund may require, such as: ... calculation of Net Asset Value ...*

*To the extent that Citco relies on information supplied by the Fund, any investee fund of the Fund or any brokers engaged by the Fund, in connection with making any of the aforementioned calculations, Citco's liability for the accuracy of such calculations is limited to the accuracy of its computations. Citco shall not be liable for the accuracy of the underlying data provided to it.*"

Although this was, in terms, a provision inserted for the purpose of limiting the liability of the administrator, Citco Fund Services (Europe) BV ("**Citco**"), in itself it further underlined the potential risk of inaccurate statements of NAV.

13.3.  Furthermore, the parties would be aware that any valuation of the NAV would involve elements of judgment on which opinions could reasonably vary. For example:

(1)  under Article 11(3)(a) **[Rec 2/27/329]** the Directors might have to apply a discount in respect of doubtful debts;

7

(2) under Article 11(3)(b) **[Rec 2/27/329]** securities for which no 'bid' and 'asked' prices were available would be valued as the Directors might determine;

(3) under Article 11(3)(c) **[Rec 2/27/330]** the Directors could make adjustments to the valuation of any shares held in an investment company;

(4) under Article 11(3)(d) **[Rec 2/27/330]** any investment or security or other property for which no price quotations were available would have to be determined in such manner as the Directors might from time to time consider appropriate;

(5) under Article 11(3)(e) **[Rec 2/27/330]**, the Directors might need to estimate the value of certain assets;

(6) finally, under Article 11(3)(f) **[Rec 2/27/331]** the Directors could depart from the stipulated valuation mechanisms "*in the case of extraordinary circumstances*".

**13.4.** More specifically, there were also a number of elements of uncertainty in relation to the price at which any Member's Shares would be redeemed:

(1) In order to redeem his Shares, a Member had to give 15 days' notice to the Company expiring on the last business day of a month.[7] The Redemption Price of each Share was its NAV at the close of business on the day the Shares were redeemed, not on the day on which the notice of redemption was served:[8] in other words, a Member took the risk of any movement in value between the service of the notice and the Dealing Day on which redemption actually occurred.[9] In the circumstances, any suggestion made by the PI Defendants that the publication each business day of the then current NAV provided them with certainty as to the price at which they might redeem their Shares is simply wrong. Any commercial decision they might have taken to redeem their Shares would involve a significant element of speculative risk as

---

[7] See Article 10(1)(a) **[Rec 2/27/324]**, read together with the definitions of 'Dealing Time', 'Dealing Day' and 'Valuation Day' in Article 1 **[Rec 2/27/317 *et seq*]**. The same arrangement is described in less formal language in the PPM, under the heading 'Redemptions at the Option of the Shareholders' **[Rec 2/30/420]**.

[8] See Articles 10(1)(b) and 10(2) **[Rec 2/27/324]**.

[9] This is made explicit in the PPM **[Rec 2/30/420]**: "*Shareholders bear the risk of any decline in Net Asset Value from the date notice of intent to redeem is given until the redemption date*".

to what might happen to the NAV in the 15 days (at least) between the service of a notice of intention to redeem, and the actual date of redemption.

**(2)** There were also other elements of uncertainty in the pricing of any redemption.  For example, Article 10(2) **[Rec 2/27/326]** provides that the Redemption Price of each Share on any given Dealing Day would be the NAV "*less such sum (if any) as the Directors may consider represents the appropriate provision for fiscal and sale charges which would be incurred on the sale of assets of the Company*".  In the circumstances, it is entirely wrong for the PI Defendants to suggest that the daily publication of a figure for the NAV of each Share necessarily informed them of the prevailing Redemption Price:  on the contrary, even disregarding any fluctuations in the NAV between the date on which a proposed redemption was notified and the date on which it was effected, there would (or could) be a difference between the NAV and the Redemption Price: and the amount of any such difference would depend on an exercise of the Directors' discretion.

14.    With these various commercial and contextual factors in mind, any interpretation of Article 11 must be informed by the following considerations:

**14.1.**    First, the Articles are a document of the utmost formality, constituting a contract between the Members and the Company.[10]  They need to be interpreted as such.

**14.2.**    Second, the periodic publication of the Fund's NAV was incapable of providing Members with absolute certainty as to the Redemption Price at which their investments would actually be realised.  It would plainly give them some indication of the price at which their Shares would be redeemed, but it would not provide absolute certainty.

**14.3.**    Third, it is apparent that any valuation of the NAV might be contentious.  It was entirely possible that disputes would arise between a Member and the Company as to any particular elements within a valuation, or with regard to a valuation as a whole.  For these reasons, there would inevitably be a degree of tension between the interests of certainty and the interests of accuracy.

---

[10] See s. 11(1) of the BVI Business Companies Act 2004 **[Auth, Tab 36]**.

14.4.    Fourth, it is in the nature of things that errors can occur.  In the present situation, such errors could be either **(i)** mathematical errors in conducting any mechanical valuations, and/or **(ii)** errors of judgment in conducting any evaluative exercise, and/or **(iii)** clerical errors in recording any valuations in written form when issuing the numerous account statements, contract notes *etc*. to the Company's Members.  For these reasons also, there would be further scope for tension between the interests of certainty and those of accuracy.

14.5.    Fifth, any such errors made by the Company might unduly favour the Member or the Company (or, as in this case, might unduly favour one group of Members as against another):  either party might therefore wish to have the opportunity to revisit a valuation.  If the mistake had involved a significant undervaluation of the NAV, no doubt the redeeming Members would have been as enthusiastic to reopen the valuation as the PI Defendants are now in seeking to prevent it from happening.

14.6.    Sixth, for good commercial reasons, it was expressly recognised in the Subscription Agreement, in the Articles and in the PPM that the Company might issue statements as to the NAV which were not 'certificates' within Article 11(1).  Indeed, it is abundantly clear from the contractual documents outlined above, and from the wide range of Documents on which the PI Defendants now seek to rely, that the Company would indeed be issuing information as to the ostensible level of the NAV in numerous different forms and through numerous different media (*e.g.* emails, account statements, internet sites *etc.*).

14.7.    Eighth, no doubt for these very reasons, both the Company and its Members would know that a published valuation which was <u>not</u> certified under Article 11(1) was <u>not</u> necessarily definitive, and was not intended to be binding.  Viewed separately from both the Company's and from the Members' perspective, there were perfectly good commercial reasons for this arrangement.

14.8.    Conversely, it was important that any elements of doubt could be eliminated in the interests of achieving commercial certainty:  hence the possibility of issuing a binding certificate.  In other words, the possibility of issuing a certificate (but the absence of any obligation to do so) provided the balancing mechanism between the competing interests of accuracy and of certainty.

14.9.    As a result, it is crucial, when interpreting Article 11 and applying it to the facts of any given case, to bear in mind the importance to the parties of being able to identify

which documents were, and which were not, certificates.  The PI Defendants' approach would create enormous uncertainty, because it would allow documents to be treated as certificates when they contain nothing on their face to identify them as such.

**14.10.** More particularly, the PI Defendants' approach would create an impossible position if there were any discrepancy between the valuations stated in the numerous different statements of NAV which the Company might issue:  if every such statement was a certificate, but there was some difference between (say) a valuation in an email and a valuation in an account statement, then on the PI Defendants' analysis they would both be certificates, each of which would be equally binding.  That cannot be a sensible interpretation of the Articles:  the possibility (but not the requirement) of issuing a certificate was clearly intended to provide a mechanism for resolving uncertainty, not for perpetuating or compounding it.  As a result, any document which is to be properly classified as a certificate under Article 11 must on its face provide some clear indication that it is purporting to certify the accuracy of what it states, and not merely providing information.

**15.** Turning to the PI Defendants' detailed arguments, they seek to rely on four points in §27 of their Case:

**15.1.** First, they say that any determination of the NAV would involve an exercise of judgment.[11]  That is true – but, far from supporting the PI Defendants' argument, it militates in favour of the Company's interpretation, for the reasons outlined in §13–14 above.  The need for judgmental decisions to be taken explains the scope for potential disagreement, and hence the desirability of allowing disputable judgments to be revisited:  conversely, the interests of commercial certainty demand that an express mechanism should be included to allow further disputes to be closed down where appropriate.

**15.2.** Second, the PI Defendants say that investors would take "*wide-ranging and far-reaching decisions in reliance on the NAV per Share*".[12]  That assertion needs to be handled with some care.  **(i)** In so far as the PI Defendants are talking about the periodic publication of the NAV of the Fund, that would not have given Members a precise

---

[11] PI Defendants' Case, §27(a).

[12] PI Defendants' Case, §27(b).

figure for any prospective Redemption Price, for the reasons outlined in §13.4 above. **(ii)** In so far as the PI Defendants are talking about any statement of the Redemption Price, it would have been apparent from the matters outlined in §13–14 above that, in the absence of a certificate, any such statements might be open to challenge and variation (either upwards or downwards):  if a redeeming Member needed absolute certainty as to the Redemption Price in order to inform any wide-ranging or far-reaching decision, he could invite the Directors to issue a certificate.

**15.3.** Third, the PI Defendants assert that "*recalculating the NAV would be hugely complex*".[13]  There are several responses.  **(i)** First, this is a bald assertion unsupported by any reference to the evidence in this case.  **(ii)** Second, there is no good reason to assume that it is true:  it may be no more complicated to calculate the true NAV based on the net assets of the Fund that are now known to have existed than it would have been to calculate the assumed NAV at the time of each redemption.  It might be laborious, but it may not be too difficult.  **(iii)** Third, the correct interpretation of the Articles cannot be dictated by the facts of this particular case.  There might have been any number of easily re-calculable errors which, in the ordinary course of investing and redeeming, both the Members and the Company would have wanted to revisit in any honestly conducted investment fund.  The fact (if it is a fact) that recalculation would be 'hugely complex' on the extraordinary facts of this case (extraordinary because of the huge scale of the BLMIS fraud) cannot alter the purpose Article 11 was intended to fulfil.  **(iv)** Finally, the point does not assist the PI Defendants in any event.  If, in any given case, there are competing interpretations of a contract, and one interpretation would be impossible to apply in practice, then the other interpretation would be preferred:  but that is not this case, even on the PI Defendants' own argument.  They are not contending that recalculation would be <u>impossible</u> – only that it would be 'hugely complex'.  Even assuming that is true, it takes them nowhere.

**15.4.** The PI Defendants' fourth point[14] is a reprise of their argument based on the importance of certainty.  As noted above, Sentry agrees in general terms that certainty is a desirable objective in commercial life – but so is accuracy.  Furthermore, in the present context there was express recognition of the elements of uncertainty surrounding both **(i)** the day-to-day valuation of investments in Sentry, and **(ii)** the issue by the Company of documents purporting to contain a statement of any such valuation.

---

[13] PI Defendants' Case, §27(c).

[14] PI Defendants' Case, §27(d).

That provides the context in which this Committee can assess the question whether <u>every single</u> Document on which the PI Defendants now seek to rely was intended to be a 'certificate' within Article 11(1). Sentry submits that the answer is obviously "no": the possibility of the Company issuing a certificate in any particular case, but the absence of any obligation to do so, offered the appropriate balance between certainty and accuracy by supplying a mechanism for delivering certainty where other, less formal statements would not, and thereby closing down further disputes.

16. In conclusion, the desirability of achieving certainty in commercial transactions might well have provided a good motivation for a Member requesting the issue of a certificate in any particular case – especially if (as some Members apparently were) they were holding Shares in Sentry as nominees for a principal to whom they would need to account:[15] but it cannot logically serve as a justification for treating every Document on which the PI Defendants now seek to rely as a 'certificate', not least because **(i)** that would rob the concept of all meaning,[16] **(ii)** it would overlook the clear wording and effect of Article 11(1), which does not require certificates to be issued in relation to each redemption, **(iii)** it would ignore the commercial rationale for providing the <u>possibility</u> of issuing certificates, rather than imposing an obligation to do so, and **(iv)** it would produce uncertainty and (worse) illogical results with potentially competing certificates providing different NAVs or Redemption Prices.

17. For these reasons, far from requiring a different interpretation to be imposed on Article 11, the commercial context and the factual matrix strongly support the interpretation outlined in §10–12 above.

## (4) The Case-Law on Off-Shore Investment Funds

18. The Court of Appeal (like the Judge) rightly found that the two authorities relied on by the PI Defendants in this connection do not support their argument:

---

[15] See for example the CA Judgment, §16(3) **[Rec 1/8/73]**.

[16] The PI Defendants expressly acknowledge as much: they say in §11(a)(iii) of their Case that any determination of the NAV per Share "*is binding as between Sentry and the redeeming Member <u>irrespective of whether a certificate is given</u>*" (emphasis added). If that is the correct approach, one is left wondering why the certification provision was included at all.

18.1.    The decision of the Commercial Court of Bermuda in *Re Stewardship Credit Arbitrage Fund Limited* **[Auth, Tab 25]**,[17] where there was a similar certification provision in the fund's articles to the one in Article 11(1) in this case, simply pointed to the practical difficulties of recalculating the NAV.[18] There was no argument in that case as to whether a certificate had indeed been issued, or whether there was any difference between <u>determining</u> the NAV and <u>certifying</u> the NAV.[19] Accordingly, the case says nothing about the Article 11 Issue.

18.2.    No assistance can be derived from the decision of the BVI High Court in *Re Livingston International Fund Limited* either **[Auth, Tab 24]**.[20] In contrast to Sentry's Article 11(1), the articles in that case did not require a certificate before the NAV was binding: they simply provided that any valuations made pursuant to the Articles would be binding. The court was therefore not concerned with the question whether the documents under consideration were 'certificates'.

19.    For these reasons, the case-law does not require any different interpretation to be imposed on Article 11.

## (5) The General Law on 'Certificates': Form & Function

20.    The Court of Appeal noted in §25 of its judgment **[Rec 1/8/77]** that "*no conclusive authority, lexicographical, judicial or statutory*" on the qualities required for a document to be a 'certificate' had been produced. That is no doubt because the meaning of the word 'certificate' will vary according to the particular context in which it is used. That being the position, Sentry submits that **(i)** only limited assistance will be derived from any case-law, and **(ii)** it is neither necessary nor desirable to attempt an exhaustive definition of the word 'certificate' in order to dispose of this appeal.

---

[17] (2008) 73 WIR 1368 **[Auth, Tab 25]**.

[18] *Ibid* at §47–48 **[Auth, Tab 25]**.

[19] This is most apparent from the final sentence of §48 of the judgment, in which the court comments that the likely difficulty of recalculating the NAV was no doubt "*why the relevant bye-law contained the provision which it did, making for certainty once the NAV had been <u>determined</u>*" (emphasis added).

[20] BVIHCV 2002/197, 19 May 2004 **[Auth, Tab 24]**.

21.    Nevertheless, it is apparent both from the natural meaning of the word in ordinary usage, and also from legal authority, that describing a document as a 'certificate' carries connotations as to function, as to form and as to effect.   **(i)** As to function, it describes a document that is specifically intended to verify some fact, or facts;   **(ii)** as to form, it indicates a suitable degree both of formality and also of certainty as to its status – both elements being important, and finally **(iii)** as to effect, the consequences of a certificate having been issued (or not issued) in any given case will be expressly provided either in the applicable contract or in statute law or otherwise.   The degree of formality that may be required of a certificate in any given case will accordingly be dictated by the particular context, specifically by the significance of the effects of issuing (or not issuing) a certificate:  the more important or irreversible a certificate might be, the more formality is likely to be required.

22.    Looking first at dictionary definitions:

    **22.1.**    *The Oxford English Dictionary* (2nd ed., 1989), defines 'certificate' as a "*document wherein a fact is formally certified or attested*" **[Auth, Tab 47]**.

    **22.2.**    *Chambers Dictionary* (12th ed., 2011) defines a 'certificate' as "*a written declaration, official or formal, of some fact*" **[Auth, Tab 48]**.

    **22.3.**    *Black's Law Dictionary* (9th ed.) defines a certificate as:  "*A document in which a fact is formally attested*" **[Auth, Tab 49]**.

23.    Furthermore, in general legal usage a certificate is a document whose purpose is formally to attest a fact.  For example, a letter from a parish priest congratulating a couple on having been married by him on a stated date may contain essentially the same information as a marriage certificate:  but the marriage certificate is without doubt a different document in law, because of both its form and its purpose.  Similarly, a letter from a company thanking a person for having subscribed a stated amount of money for shares in the company which have been allotted to him may contain essentially the same information as a share certificate:  but the share certificate is in law a different document, because its form and purpose is to provide evidence, as between the company and the shareholder, of the allotment and ownership of the shares.[21]  The defining quality of a certificate is, therefore, not the content of the information, but the purpose and formality of recording it.

---

[21] See for example Article 14 of Sentry's Articles **[Rec 2/27/335]**.

24.    Turning to the case-law, as Devlin J said in *Minster Trust Ltd v. Traps Tractors Ltd* [**Auth, Tab 20**],[22] in the context of an argument as to whether certain documents were 'certificates' within the meaning of a contract: "*A document which has to be handled in commerce must be in a form which leaves no reasonable doubt as to its nature*".  This reflects the formal requirement of certainty as to the status of a document before it can properly be regarded as a certificate.

25.    No real assistance is to be gained from the two cases on which the PI Defendants relied in the courts below: *The Queen, The Vestry of St Mary's Islington* [**Auth, Tab 34**],[23] and *Rexhaven v. Nurse* [**Auth, Tab 26**].[24]  As the PI Defendants accepted before the Judge, the documents in those cases were of a different type to those alleged to be certificates in the present case [**Rec 4/59/1105**].  The PI Defendants appear to be relying on them now in support of the proposition that there is no universal requirement under the general law for a certificate to be signed, or stamped, or sealed:[25]  that is no doubt true, because the formal requirements of a certificate will vary from case to case, but it does not assist the PI Defendants in establishing that these Documents were certificates.  All that these two authorities show is that each case will turn on its own facts and the particular context in which the word 'certificate' is used.

26.    For the reasons outlined above, there is no principle of general law relating to certificates that requires any different approach to Article 11 than that set out above.

## (6)  Conclusion

27.    For the reasons outlined above, Sentry submits that the Court of Appeal was right to hold (as it did in §36 of its judgment [**Rec 1/8/84**]) that, for a document to be a certificate, it "*must be something more than a simple statement*" and "*must not merely state the NAV but purport to certify the Directors' determination of it*".  That is the approach that must be adopted in considering the Documents on which the PI Defendants rely in this case.

---

[22] [1954] 1 WLR 963, at 981 [**Auth, Tab 20**].

[23] (1890) 25 QBD 523 [**Auth, Tab 34**].

[24] (1996) 28 HLR 241 [**Auth, Tab 26**].

[25] PI Defendants' Case, §23–26.

## III.  THE DOCUMENTS IN THIS CASE

### (1) INTRODUCTION

28.    The Documents on which the PI Defendants now seek to rely as being 'certificates' within the meaning of Article 11(1) are as follows:[26]

    28.1.    Contract notes sent by Citco to Members who had applied for the redemption of their Shares in Sentry, which contained a statement (or purported statement) as to the Redemption Price for those Shares **[Rec 2/31 – 2/38 & 2/51]**.

    28.2.    Monthly statements sent by Citco to Members containing a statement (or purported statement) of the NAV per Share on the previous two Valuation Days (and, where redemptions had occurred during the relevant month, the Redemption Price (or purported Redemption Price)) **[Rec 2/39 – 2/40 & 2/47/472]**.

    28.3.    E-mails sent to Members by Citco and by the investment manager to which Sentry had delegated the day-to-day management of the Fund, namely Fairfield Greenwich (Bermuda) Limited ("**FGB**"), stating the final NAV (or purported final NAV) per Share for a particular month **[Rec 2/41 – 2/45]**.

    28.4.    A screenshot taken from Citco's website stating the NAV (or purported NAV) per Share on various Valuation Days **[Rec 2/46]**.

---

[26] See §25 of the SFI, and more particularly the definition of the first preliminary issue ordered by the Judge, quoted in §26 of the SFI.

(2) THE DOCUMENTS ARE NOT CERTIFICATES

### (i)  Introduction

29.     Sentry submits that none of the Documents was a 'certificate' within the meaning of Article 11(1).  The following submissions apply equally to all of the Documents:

>    **29.1.**     None of them was described as a 'certificate' or anything similar.

>    **29.2.**     None of them purports to certify the NAV, or the Redemption Price.

>    **29.3.**     None of them was described as having been issued pursuant to the power of certification under Article 11(1).

>    **29.4.**     None of them described the NAV or the Redemption Price which they contained as 'binding' on the parties, either pursuant to Article 11(1) or otherwise.

30.     For the reasons outlined in §14 above (in particular at §14.9) that is sufficient to demonstrate that none of the Documents was a 'certificate' within Article 11.  In addition, however, a number of separate submissions can also be made in relation to each of the specific categories of Document which put the matter beyond argument.

### (ii)  The contract notes

31.     Any contract notes were issued after the relevant redemption had occurred, as their terms make clear:  "*In accordance with your instructions we confirm having REDEEMED the following voting shares from FAIRFIELD SENTRY LIMITED*" **[Rec 2/31 *et seq*]**.  As such, their function was not (and could not be) to inform any proposed investment decision by a Member, nor to certify either the NAV or the Redemption Price at which a prospective redemption would take place, but simply to record the historical fact that a redemption of voting shares had already occurred;  to state the expected payment date;  and to record the balance of any voting shares retained by that Member following the redemption. As such, the contract notes contained information – no doubt, important information:  but they were not, and did not purport to be, certifying anything.

32.     The matter is put beyond doubt by the fact that each contract note contains the following statement at the bottom of the page:  "*For more information or any inquiries, please contact Citco Investor Relations Group*" (emphasis added).  This makes clear **(i)** that the document was

issued for the purpose of providing information (hence the reference to 'more' information being available) – *i.e.* not for the purpose of certifying anything;  **(ii)** that the information was issued by Citco, not by the Directors of Sentry.

### (iii)  The monthly statements

33.    The purpose of the monthly statements **[Rec 2/39 – 2/40 & 2/47/472]** was again to provide information on a range of matters (including the account value and a summary of any account activity).   In the overall context discussed above, the fact that the statements also contained information as to the NAV at any given dates does not make them 'certificates'.   Neither their status as monthly statements nor anything in their wording suggests that they were intended to certify anything.

34.    Indeed the reverse is true, because the monthly statements included the same wording as the contract notes:  "*For more information or any inquiries, please contact Citco Investor Relations Group*".   In the circumstances, the same comments as those made in §35 above are equally applicable here.

### (iv)  The emails

35.    It is stating the obvious to say that an email is, in general terms, an informal mode of communication, and it would require very clear wording before an email could properly be regarded as a certificate with binding legal consequences.   There is no such clear wording in any of the emails on which the PI Defendants rely in this case.   In particular:

   35.1.    One of them **[Rec 2/41]** has the wording "*Maybe spam*" in its subject header:  this suggests that the emails were distributed so indiscriminately and to such a multitude of recipients that they cannot properly have been intended to be regarded as 'certificates' of anything.

   35.2.    The true nature of the Citco emails is revealed by the introductory wording:  "*Please be advised that ...*" **[Rec 2/41]**.   It is clear that the purpose of the emails was to advise members of the value of the NAV per Share at a given date:  the emails did not, and did not purport to, certify that value within the meaning of Article 11(1).

   35.3.    Furthermore, the Citco emails contained similar wording to that on the contract notes and the monthly statements to the effect that, if the recipient had "*any questions or required further information*" (emphasis added) he should contact Citco **[Rec 2/41]**.

The points made in §35 above in connection with such wording apply equally in this context.

**35.4.**   The position with regard to the FGB emails is even more clear.  They contain this wording:  *"If you do not wish to receive periodic messages such as this one in future, please unsubscribe by clicking here"* **[Rec 2/44]**.  That exactly describes the emails: they were periodic messages containing information, not binding certificates.  It is inconceivable that certificates which were intended to be contractually binding on the parties could have been described in such informal terms, or that the opportunity of not receiving such documents would be offered by clicking on an 'unsubscribe' email address.

### (v)  The screenshot

**36.**   Finally, the screenshot was captured from Citco's online pricing service website **[Rec 2/46]**. As such, it was published generally to anyone with access to the website,[27] rather than being issued to any specific investor who was contemplating a redemption of his Shares:  like the emails, its very form lacks even the beginnings of any appearance of being a certificate.

**37.**   Furthermore, its content confirms the purely informative nature of the website.  It shows various figures described as 'Estimated NAV' and 'NAV' as at various dates, under the banner heading 'Citco Trading & Balances'.  As such, the screenshot is nothing more than a statement for information as at certain specified dates:  it lacks both the necessary formality of a certificate and also the necessary purpose of certifying any of the stated figures.

### (3)  THE DOCUMENTS WERE NOT ISSUED "BY OR ON BEHALF OF THE DIRECTORS"

**38.**   In order to be binding under Article 11(1), a document must not only be a 'certificate' but it must also be given *"by or on behalf of the Directors"* of Sentry.  Even assuming that the Committee were to reject the Company's principal argument and hold that any of the Documents was otherwise capable of being a certificate, nevertheless none of them would

---

[27] See the 1st Instance Judgment, §16 **[Rec 1/3/22]**.

satisfy the definition in Article 11(1) because none was issued as such by or on behalf of the Directors.

39.   There is (and can be) no suggestion that any of the Documents was issued 'by' the Directors. The only question is whether they were issued 'on behalf of' the Directors. So far as that is concerned, the PI Defendants put their case on three alternative bases:

   39.1.  first, they say there was actual authority;[28]

   39.2.  second, they say there was implied authority;[29]

   39.3.  third, they seek to rely on ostensible authority.[30]

40.   As to the first point, the PI Defendants' argument is unsustainable, because there was no evidence of any express authority having been conferred by the Directors on any agent to issue certificates under Article 11. Indeed, the evidence shows the reverse. Under an Administration Agreement dated 20 February 2003 **[Rec 2/28/361-387]** Sentry appointed Citco to provide certain specified Services, subject to the orders, instructions and directions of the Directors of the Company. The Services included:

   40.1.  calculation of the NAV and the NAV per Share on a monthly basis;[31]

   40.2.  processing payments in respect of subscriptions and redemptions;[32]

   40.3.  publishing the NAV per Share (of each class if appropriate) as requested by Sentry;[33]

   40.4.  dealing with and replying to all correspondence and other communications addressed to Sentry in relation to the subscription, redemption, transfer and (where relevant) conversion of Shares.[34]

---

[28] PI Defendants' Case, §39.

[29] PI Defendants' Case, §40.

[30] PI Defendants' Case, §41.

[31] Schedule 1, Part 1, §(a) **[Rec 2/28/379]**.

[32] Schedule 1, Part 2, §(b) **[Rec 2/28/380]**.

[33] Schedule 1, Part 2, §(e) **[Rec 2/28/380]**.

[34] Schedule 1, Part 2, §(j) **[Rec 2/28/380].**

41.     Accordingly, while Sentry delegated the calculation and publication of the NAV and NAV per Share to Citco, it did <u>not</u> delegate any exercise of the Directors' power to issue <u>certificates</u>.

42.     Further, the evidence below was that Citco had not been instructed by the Directors of Sentry to issue any certificates as to the NAV on their behalf.[35]

43.     Similarly, there was and is no evidence that the Directors of Sentry delegated to FGB their power to issue certificates under Article 11(1) either.

44.     As to the PI Defendants' second argument, it is entirely circular and equally unsustainable. Assuming that there was no <u>express</u> delegation of the power to issue certificates, it would on the facts of this case be entirely inconsistent then to conclude that there was nevertheless an <u>implied</u> delegation of that power, because that would ignore the plain separation between the three elements in Article 11(1), and in particular it would disregard the fact that the issue of a certificate is a discretionary matter which requires the document in question to be issued for a specific, identified purpose.

45.     Finally, the PI Defendants cannot logically rely on ostensible authority, for at least two separate reasons:

    45.1.     First, the doctrine is wholly inapplicable.  The only question under this heading is whether in fact the Documents were issued 'on behalf of' the Directors, within the meaning of the contract between the parties:  that is not capable of being answered by reference to general law principles of ostensible authority, which come into play when there is a dispute as to whether a counter-party is dealing with a principal or an agent **[Auth, Tab 38]**.[36]  There is no doubt in this case that the Redeemers were intending to deal only with the Company as principal when redeeming their Shares.  Since the Company is a legal person, it can only act through human agents.  The only question is whether the Documents in this case were issued on behalf of one group of agents (the Directors) or another (Citco and FGB).  Ostensible authority has nothing to say in that context.

---

[35] See the witness statement of Mr Lokhorst, at §8 **[Rec 1/23/287]**.

[36] See generally *Bowstead & Reynolds on Agency* (19th ed.), at §8-013 *et seq* **[Auth, Tab 38]**.

**45.2.** Second, even if the doctrine of ostensible authority were capable of applying, the PI Defendants have identified no representations made by or on behalf of the Directors that they had delegated the power of issuing certificates to Citco or FGB.

**46.** Finally, as a matter of form, none of the Documents on which the PI Defendants seek to rely purports to have been issued by or on behalf of the Directors of Sentry.

**47.** In the circumstances, none of the Documents is capable of being 'binding' within Article 11(1).

## IV.  CONCLUSION

48.  The effect of the PI Defendants' approach is that numerous different statements of a figure for the NAV per Share would amount to 'certificates' within the meaning of Article 11(1).  That only has to be stated in order for its inherent improbability to be recognised:  and any consideration of the actual Documents in hand confirms the conclusion that they were not 'certificates'.

49.  As such, Sentry respectfully submits that the PI Defendants' appeal should be dismissed with costs, for the following, among other –

### REASONS

(1)    BECAUSE the Court of Appeal correctly held that none of the Documents was a 'certificate' within the meaning of Article 11(1).

(2)    ALTERNATIVELY BECAUSE none of the Documents were issued by or on behalf of the Directors within the meaning of that Article.

**Jonathan Crow QC**
4 Stone Buildings

**Andrew Westwood**
Maitland Chambers

**Stephen Midwinter**
Brick Court Chambers

18 February 2014