# EXHIBIT 3



# Sales Prospectus with integrated Fund Contract
## SAAF II (CH)

February 2010

Contractual umbrella fund under Swiss law with special risk (type: "other funds for alternative investments") with the following Subfunds:
**SAAF II (CH) Global Fund**
**SAAF II (CH) Long Short Equity Fund**
**SAAF II (CH) Europe L/S Equity Fund (in Liquidation)**

SAAF II (CH) was established by Swiss Investment Company SIC Ltd., Zurich, as the Fund Management Company and Clariden Leu Ltd., Zurich, as the Custodian Bank.

SAAF II (CH) is an umbrella fund with special risk of the type "other funds for alternative investments" and comprises several Subfunds. Each Subfund may directly or indirectly pursue a non-traditional investment strategy, the risks of which are not comparable to those of collective investment schemes of the type "securities funds".

The Subfunds currently available invest mainly in various open-ended or closed-ended collective investment schemes that may pursue non-traditional investment strategies and use non-traditional investment techniques (non-traditional target funds) and that involve risks that are not comparable to those of collective investment schemes of the type "securities funds". Most non-traditional target funds are governed by the laws of countries in which the legal framework and supervision do not conform to the standards prevailing in Switzerland. Investors in these funds must be prepared and able to accept capital losses on the amounts invested. Investors' attention is expressly drawn to the risk notices contained in the Prospectus. The Fund Management Company makes every effort to minimize these risks by means of diversification and the strict selection of target funds. Despite the strict selection process, the possibility of a total loss on individual Subfunds cannot be ruled out.

This is an English translation of the official German prospectus. In case of discrepancies between the German and the English text, the German text shall prevail.



## Part I  Prospectus

This Prospectus with integrated Fund Contract and the most recent annual or semi-annual report (if published after the latest annual report) serve as the basis for all subscriptions of Shares in the Subfunds.

Only the information contained in the Prospectus or in the Fund Contract will be deemed to be valid.

## 1       Information on the Fund

### Main parties

**Fund Management Company:**
Swiss Investment Company SIC Ltd.
Claridenstrasse 19, CH–8002 Zurich
Postal address:            XS, CH–8070 Zurich
Phone:      +41 (0) 58 205 37 60
Fax:        +41 (0) 58 205 37 67

**Custodian Bank, Paying Agent and Distributor:**
Clariden Leu Ltd.
Bahnhofstrasse 32, CH–8070 Zurich
Phone:      +41 (0) 844 844 001
Fax:        +41 (0) 58 205 62 56
e-mail:     funds@claridenleu.com
Website:    http://www.claridenleu.com

**Investment Manager:**
Clariden Leu Ltd.
Bahnhofstrasse 32, CH–8070 Zurich
Phone:      +41 (0) 844 844 001
Fax:        +41 (0) 58 205 62 56

**Statutory Auditors:**
KPMG Ltd
Badenerstrasse 172, CH–8004 Zurich

## 2       Information on the Fund

### 2.1     General information on the Fund

SAAF II (CH) is an umbrella fund in contractual form under Swiss law of the type "other funds for alternative investments" pursuant to the Swiss Federal Act on Collective Investment Schemes of June 23, 2006, and comprises the following Subfunds:

– SAAF II (CH) Global Fund
– SAAF II (CH) Long Short Equity Fund
– SAAF II (CH) Europe L/S Equity Fund (in Liquidation)

The Fund Contract was drawn up by Swiss Investment Company SIC Ltd. as the Fund Management Company and submitted to the Swiss Financial Market Supervisory Authority (FINMA) with the consent of Clariden Leu Ltd. as the Custodian Bank. The Fund Contract was approved by FINMA for the first time on November 14, 2002.

The Subfunds are based on a collective investment agreement (Fund Contract), under which the Fund Management Company undertakes to provide the investor with a stake in a Subfund in proportion to the number of Shares acquired by the investor in the Subfund concerned, and to manage the Subfund independently and in its own name in line with the Fund Contract and the relevant statutory provisions. The Custodian Bank is party to the Fund Contract in accordance with the tasks conferred upon it by the law and the Fund Contract.

The investors' entitlement is in respect of the assets and income of only that Subfund in which they participate. In the case of liabilities accruing to an individual Subfund, only that Subfund is liable.

In accordance with the Fund Contract, the Fund Management Company is entitled to establish, liquidate or merge different Share Classes for each Subfund at any time, subject to the consent of the Custodian Bank and the approval of the supervisory authority.

There are currently the following Share Classes in the Subfunds:

| SAAF II (CH) Global Fund: | A Class CHF | Minimum investment 1 Share |
|---|---|---|
| | A Class EUR | Minimum investment 1 Share |
| | A Class USD | Minimum investment 1 Share |
| | IA Class CHF | Minimum investment CHF 500,000 |
| | IA Class  EUR | Minimum investment EUR 500,000 |
| | IA Class USD | Minimum investment USD 500,000 |

| SAAF II (CH) Long Short Equity Fund: | A Class CHF: | Minimum investment 1 Share |
| | A Class EUR | Minimum investment 1 Share |
| | A Class USD | Minimum investment 1 Share |
| | IA Class CHF | Minimum investment CHF 500,000 |
| | IA Class EUR | Minimum investment EUR 500,000 |
| | IA Class USD | Minimum investment USD 500,000 |
| | | |
| SAAF II (CH) Europe L/S Equity Fund (in Liquidation): | A Class CHF: | Minimum investment 1 Share |
| | A Class EUR | Minimum investment 1 Share |
| | A Class USD | Minimum investment 1 Share |
| | IA Class EUR | Minimum investment EUR 500,000 |

All these Classes are distribution Classes.

The IA Class differs from the A Class in that it has the higher minimum investment amount mentioned above and a lower management fee (cf. §19.1) charged by Clariden Leu Ltd. and its distribution and cooperation partners.

The IA Class is open to all investors prepared to make the minimum investment. If redemptions by an investor result in them holding less than the minimum investment amount, the Fund Management Company may pursuant to §6.6 enforce a switch into another Share Class in which the investor is entitled to hold Shares. Insofar as banks and securities dealers hold Shares for the account of their clients, the minimum investment requirement must be met at the level of the client.

The decision on whether the participation criteria have been met lies at the discretion of the Custodian Bank.

In the case of subscriptions of Shares accepted by the Fund Management Company from group companies of Swiss Investment Company SIC Ltd. or Clariden Leu Ltd. (in their own name), compliance with the limits specified in the Fund Contract (minimum initial investment amount/minimum investment holding) may be waived for nine months in respect of establishing and also maintaining Share Classes. This situation of maintaining a Share Class arises when all investors in a Share Class redeem their Shares and Swiss Investment Company SIC Ltd. and/or Clariden Leu Ltd. either remain as the sole investor in that Share Class or subscribe a Share of that Share Class as the sole new investor.

The Share Classes do not constitute segregated pools of assets. Although costs are in principle charged only to the Share Class for which the service in question was rendered, the possibility of a Share Class being held liable for the liabilities of another Share Class therefore cannot be ruled out.

Pursuant to §3.6 of the Fund Contract, the Fund Management Company may manage part or all of the assets of different investment funds jointly (pooling).

## 2.2    Information on the investment policy and the investment restrictions

### 2.2.1    Overview of the investment objectives of the Subfunds and the general investment policy

The investment objective of the individual Subfunds is to achieve a long-term performance in line with the risk profile of the Subfund in question via diversified investments primarily in Swiss or foreign collective investment schemes (referred to below as "target funds") that pursue alternative investment strategies and styles and/or engage in alternative investments (generally known as hedge funds or non-traditional funds). In accordance with the investment objective, the Fund Management Company invests the assets of the Subfunds primarily in units or shares of Swiss or foreign non-traditional collective investment schemes ("non-traditional target funds"). These investments are open-ended collective investment schemes or closed-ended collective investment schemes traded on an exchange or other regulated market open to the public (in particular investment companies, trusts, and limited partnerships). In so doing, the Fund Management Company will invest predominantly in foreign non-traditional collective investment schemes for which no distribution authorization has been/can be obtained in Switzerland due to the lack of equivalent supervision (Art. 120.2 CISA).

Unlike traditional target funds, where securities are acquired with own capital (long positions), with the investment strategies of non-traditional target funds the investments are in some cases also short (short positions), and in some cases borrowing and derivative financial instruments are used to achieve leverage. In some cases, non-traditional target funds may without restriction use derivative financial instruments and pursue non-traditional investment styles and investment strategies (e.g. long/short equity, relative value, equity hedge, directional trading, and event driven), which may entail special risks.

The risks of the investments in non-traditional target funds are not comparable to the investment risks in collective investment schemes of the type "securities funds". Hence, the Fund belongs in the type "other funds for alternative investments". The special risks of the investments of this Fund and the Subfunds are explained in 2.2.6 below.

Not including cash and cash equivalents pursuant to §9, up to one third of the assets of a Subfund may be invested in (i) debt securities and rights traded on an exchange or other regulated market open to the public, issued by private sector and public sector borrowers worldwide and denominated in a freely convertible currency, (ii) equities and other equity-type securities and rights (participation certificates, dividend-right certificates, etc.) traded on an exchange or other regulated market open to the public, issued by companies worldwide, (iii) money market instruments issued by private sector and public sector borrowers worldwide and denominated in a freely convertible currency, provided they are liquid, can be readily valued and are traded on an exchange or other regulated market open to the public; money market instruments which are not traded on an exchange or other regulated market open to the public may be acquired only if the issue or the issuer is subject to provisions regarding creditor and investor protection and if the money market instruments are issued or guaranteed by issuers pursuant to Art. 74.2 CISO, (iv) units or shares in traditional collective investment schemes under Swiss law ("securities funds" and "other funds for traditional investments", but excluding "other funds for alternative investments" and "real estate funds"), and/or units or shares in open-ended collective investment schemes from a member state of the OECD that are subject to government supervision and engage in traditional investments, excluding foreign collective investment schemes whose investment policy corresponds to that of Swiss "other funds for alternative investments" or "real estate funds". In the case of foreign collective investment schemes, these need not have been authorized for public sale in or from Switzerland by the Swiss supervisory authority.

#### 2.2.1.1  Definition of the individual investment strategies of non-traditional target funds

The possible investment strategies of non-traditional target funds are defined below. Corresponding information for direct and indirect traditional investments is not provided here. The investment strategies used for each Subfund and the maximum weighting bandwidths are set down under 2.2.8 et seq. below.

**Directional trading**

Directional trading strategies seek to exploit general market movements through directional positions in a wide range of different capital market instruments. Investment forms in this strategy are often operated with a very high degree of flexibility. The investment focus and approach may be changed substantially and frequently. The use of high leverage and unhedged derivative financial instruments is typical for this strategy. Sub-strategies include global macro, managed futures, and short-term traders.

**Relative value**

The relative value strategy class seeks to exploit price inefficiencies in the valuation of similar financial instruments. In doing so, directional positions, i.e. positions that depend on the performance of an individual market, are largely avoided. The price difference between similar instruments (spread) is assessed using quantitative price models, statistical analysis or fundamental analysis. A profit is made on purchasing a (relatively) undervalued instrument and short selling a (relatively) overvalued instrument if the prices converge on their fair value, thus narrowing the spread.

Relative value strategies tend to generate stable returns with low volatility. In assessing the strategies, however, attention must be paid to the fact that under extreme market circumstances, e.g. if spreads were to widen due to liquidity-driven market disruptions, considerable losses can suddenly arise. Given that price inefficiencies normally only occur on a limited scale, the investments are leveraged to increase the returns. At the same time, the use of this technique also increases any losses incurred. Relative value sub-strategies include convertible bond arbitrage, fixed-income arbitrage, and statistical arbitrage.

**Event driven**

Event-driven strategies seek to profit from extraordinary corporate events, for example restructuring, takeovers, mergers, spin-offs, liquidations, bankruptcies, etc. A key success factor for this strategy is painstaking research, and in addition to the usual fundamental data of a company, legal and structural aspects, for example, also have to be assessed quickly and accurately. Event-driven sub-strategies include in particular risk arbitrage, distressed securities, and special situations.

**Equity hedge**

The equity hedge strategy essentially consists of buying undervalued stocks and short selling overvalued stocks. In some cases, derivative financial instruments are also used to reduce anticipated market risks. On the basis of the dependency on overall market performance, a distinction can be drawn between long bias (strong positive correlation with the equity market), no bias (low correlation), and short bias (strong negative correlation). One sub-strategy of equity hedge is long/short equity.

#### 2.2.2  Portfolio structure of the Subfunds of SAAF II (CH)

The Subfunds invest in non-traditional investments using the fund-of-funds approach and a wide range of non-traditional investment strategies. They seek to achieve an optimal spread of investments in terms of risk and return across the various non-traditional investment strategies. The investments are diversified, as a rule across several of the aforementioned investment strategies.

Depending on the assessment of the opportunities and risks of non-traditional investments, the Fund Management Company may invest the assets of the Subfunds to varying extents in traditional investments.

The Fund Management Company reserves the right to change the composition of the portfolio and to add other investment strategies for non-traditional investments and/or to omit existing strategies. If significant changes are made, the Prospectus will be amended accordingly.

#### 2.2.3  Comparing traditional and non-traditional investments

By contrast with traditional investments, where securities are acquired with own capital (long positions), with non-traditional or alternative investment strategies – which are for example used by hedge funds - the securities are in some cases also sold short (short positions), and borrowing and derivative financial instruments are used to achieve leverage. Many of these hedge funds may without restriction use derivative financial instruments (e.g. options, futures, forward foreign exchange transactions and swaps, as well as interest-rate swaps) and pursue alternative investment styles and strategies, which may entail special risks. Another frequent characteristic of hedge funds is for their managers to invest their own money in the fund.

#### 2.2.4  Advantages and disadvantages of a fund-of-funds structure for non-traditional investments

Acting as funds of funds, the Subfunds buy shares/units of numerous hedge funds, which pursue different investment styles and strategies. This approach limits the risk associated with losses on individual target funds. Significant advantages and disadvantages for investors in a fund of funds versus direct investments in individual hedge funds are as follows:

Advantages:
– broad diversification of risk across different investment styles and strategies;
– the Investment Manager's comprehensive selection process using qualitative and quantitative criteria;
– ongoing controlling and monitoring of the various target funds;
– collective investment instruments such as the Subfunds also open up investments in this asset class to investors who either have no direct access to hedge funds due to their high minimum investment requirements or wish to limit their exposure for other reasons.

Disadvantages:
– possible impairment of performance due to broad diversification of risk;
– the target funds are also charged costs, which are incurred in addition to the Subfund's direct costs.

**2.2.5    Investment process for investments in hedge funds**

**2.2.5.1 Portfolio structure and investment strategies**

The portfolio structures and investment strategies are based primarily on the targeted risk/return profile, the opportunities and risks of the individual investment strategies and as the result of quantitative considerations. An optimized portfolio in terms of risk and return is achieved by optimally exploiting diversification effects, both between the various investment strategies and between the individual target funds. The dependence on market factors is analyzed over a longer period, and the probable performance of the portfolio under different market scenarios is checked. In addition to the quantitative analysis, the portfolio structure is also influenced by fundamental macroeconomic analyses and the assessment of trends on the global financial markets.

**2.2.5.2 Selection and controlling process**

The Investment Manager is constantly on the lookout for the best investment opportunities in the hedge fund universe in strategies geared to interest-rate trends. Potential investment opportunities are preselected using quantitative and qualitative criteria. Selection criteria used in this phase in respect of target funds are specifically the experience of the portfolio management team, transparency, performance and correlation with various indexes and markets, liquidity, fund size, and legal structure.

The target funds have a high degree of freedom with regard to the strategies, investment instruments, and techniques they use. The careful selection of the individual portfolio managers is therefore of the utmost importance.

Before being placed on the list of target funds eligible for investment, each candidate is subjected to a structured, systematic, qualitative, quantitative, and operational evaluation process ("due diligence"). This process includes an in-depth analysis of aspects such as the persons involved, the investment and risk management processes, and the strategies and performance.

**2.2.5.3 Monitoring/risk management**

Risk is reduced by investing in a diversified portfolio. The ongoing monitoring of the correlation and risk characteristics both of the individual target funds and the portfolio makes it possible to quickly adapt the portfolio in line with changing market conditions.

All target funds and portfolio managers are continually monitored. Regular analysis of risk and returns over time and by comparison with rival products, and of changes in correlations with indexes and other target funds, coupled with regular contact and further on-site visits, are aimed at identifying negative developments at an early stage.

**2.2.6    Special risks of target funds**

In respect of their investments in non-traditional target funds, the Subfunds are exposed to the following risks (this list is not exhaustive).

**2.2.6.1 General considerations**

Hedge funds differ from traditional collective investment schemes in certain key respects. As a rule, hedge funds may invest without restriction in derivative financial instruments (e.g. options, futures, foreign exchange forward transactions and swaps). They can sell securities short (short positions) and can achieve leverage by borrowing and using derivative instruments. It is possible for each individual hedge fund to suffer a total loss.

Investments in hedge funds therefore entail additional risk potential in addition to the usual market, credit, and liquidity risks of traditional investments. There can be no guarantee that a Subfund will achieve its investment objective. The value of Shares can be subject to considerable fluctuations. An investment must be viewed as a long-term commitment.

An investment in the Fund/Subfunds may not be suitable for all investors. Moreover, potential investors' attention is drawn to the fact that this Fund/the Subfunds are designed as a medium to long-term investment. Investors are advised only to invest part of their overall portfolio in the Fund/Subfunds and not to finance this investment by borrowing. The Fund Management Company and Investment Manager intend to minimize the investment risks through strict monitoring and controlling of the target funds.

**2.2.6.2 Market risks**

The Subfunds invest in target funds that in turn invest in various capital markets and financial instruments around the world, which can prove to be very volatile. Economic factors, economic policy measures, political uncertainty, foreign exchange restrictions, changes in the law, etc. can have a negative effect on the underlying investments and their returns.

**2.2.6.3 Leverage**

Target funds can borrow to make additional investments (leverage). If the returns and/or capital gains generated in the case of these investments are greater than the interest payable on the loans, the Fund's assets increase at a greater rate than they would without this leverage. Conversely, if prices fall, the value of the Fund's assets will show a disproportionately greater decline.

Leverage may be achieved not only by borrowing but also through the use of derivative financial instruments. The Fund Management Company may also borrow for the Subfunds the equivalent of up to 25% of the net assets of a Subfund. Borrowing to finance investments represents a special risk.

**2.2.6.4 Short selling**

Target funds can engage in short selling. Short selling theoretically involves unlimited downside risks as there is no limit to the potential increase in the value of the underlying before the position is closed out.

**2.2.6.5 Emerging markets**

Investments in target funds that invest in emerging markets are subject to special risks due to the early stage of development of these markets, specifically political and regulatory risks, liquidity risks, capital risks, and the risk of sudden capital flight.

**2.2.6.6 Liquidity risk**

There is as a rule no liquid market for the target funds, which can prevent the Fund Management Company from realizing gains on investments in due time. Under certain circumstances, it may only be possible to sell target funds at a price below their net asset value. Individual target funds may also hold investments that are difficult to value and/or illiquid.

### 2.2.6.7  Currency risk

The investments of the Subfunds and their target funds may be denominated in many different currencies with no obligation to hedge these investments against the Subfund's accounting currency. Currencies can be subject to considerable fluctuations in certain periods, and this can result in considerable losses. The currency risk is accentuated further in the case of target funds that use leverage and/or invest in "weak" currencies, specifically those of emerging market countries.

### 2.2.6.8  Inadequate legislation and supervision

The Subfunds will probably invest mainly in target funds that have not been authorized for public distribution in Switzerland by the Swiss supervisory authority and that originate from countries not eligible for authorization in Switzerland under the practice of the Swiss Financial Market Supervisory Authority due to the failure to specify equivalent legislation and/or supervision pursuant to Art. 120.2 CISA. To reduce this risk, each target fund is subjected to an intensive due diligence process.

### 2.2.6.9  Independence and conflicts of interest of the portfolio managers of the target funds

The performance of the Subfunds depends not only on the market risks, but also on the skills and integrity of the individual portfolio managers of the target funds. Neither the Fund Management Company nor the Investment Manager has any influence on the investment decisions of the portfolio managers or any control over the management of the target funds' assets. However, the Subfunds invest in target funds that are audited at least once a year by recognized, independent auditors. As a rule, the portfolio managers of the target funds receive a performance-related fee, which can represent an incentive to make speculative and/or risky investments. Furthermore, portfolio managers of hedge funds invest their own money in their funds, which can lead to conflicts of interest.

### 2.2.6.10  Brokers

Some target funds use brokers as custodians rather than banks. It is possible that these brokers may not have the credit rating of a bank and may not be subject to regulation and supervision comparable to those of Swiss custodian banks.

### 2.2.6.11  Transparency

As a rule, the target funds are not obliged to publicly justify their transactions and activities. Hence it is not easy for investors to identify changes in strategy and the attendant risks.

The list in 2.2.6.1 to 2.2.6.11 is not an exhaustive list of all potential risk factors. The Fund Management Company will endeavor to limit all risks by monitoring the individual target funds. Attention is drawn to the fact that an investment in the Subfunds is to be seen as a long-term commitment that may be subject to considerable fluctuations in value.

### 2.2.7  Investment restrictions

In investing the assets of the individual Subfunds, the Fund Management Company and the Investment Manager are subject to the restrictions set down in §15 "Risk diversification" of the Fund Contract.

### 2.2.8  Additional information on the Subfunds

### 2.2.8.1  SAAF II (CH) Global Fund

**Investment policy**

The investments of this Subfund are made in accordance with the investment policy set down in 2.2.1 above.

The strategies used and their maximum weightings are as follows:

| Strategy | Weighting |
|---|---|
| Relative value | 0 to 50% |
| Event driven | 0 to 50% |
| Equity long/short | 0 to 50% |
| Directional trading | 0 to 50% |
| Traditional investments | 0 to 33%* |

(* Not including cash and cash equivalents pursuant to §9 of the Fund Contract, up to one third of the fund assets may be invested for this Subfund in the so-called traditional investments listed in §8.3 of the Fund Contract. These include in particular (i) debt securities and rights, (ii) equities and other equity-type securities and rights, (iii) money market instruments as well as units or shares in traditional collective investment schemes.)

### 2.2.8.2  SAAF II (CH) Long Short Equity Fund

**Investment policy**

The investments of this Subfund are made in accordance with the investment policy set down in 2.2.1 above.

The strategies used and their maximum weightings are as follows:

| Strategy | Weighting |
|---|---|
| Equity long/short | 66 to 100% |
| Relative value | 0 to 33% |
| Event driven | 0 to 33% |
| Directional trading | 0 to 33% |
| Traditional investments | 0 to 33%* |

(* Not including cash and cash equivalents pursuant to §9 of the Fund Contract, up to one third of the fund assets may be invested for this Subfund in the so-called traditional investments listed in §8.3 of the Fund Contract. These include in particular (i) debt securities and rights, (ii) equities and other equity-type securities and rights, (iii) money market instruments as well as units or shares in traditional collective investment schemes.)

### 2.2.8.3 SAAF II (CH) Europe L/S Equity Fund (in Liquidation)

#### Investment policy

As regards the investments of SAAF II (CH) Europe L/S Equity Fund (in Liquidation), on a consolidated basis at least two thirds of the assets of the Subfund should have a qualified connection to Europe. Such a connection is deemed to exist if:

- the investment policy of a target fund envisages mainly investments in securities of issuers from Europe;
- the investment policy of a target fund envisages mainly investments that are subject to the currency or economic risks of countries in Europe;

Issuers from Europe are deemed to be companies that have their registered office in Europe, or companies that have their registered office in another country but carry out the bulk of their business activities in Europe or predominantly hold participations in companies that have their registered office in Europe as a holding company.

Given the wide range of investments that non-traditional target funds typically engage in and the lack of transparency with regard to the current investments of a non-traditional collective investment scheme, there is a certain degree of uncertainty inherent in the assessment of their risk exposure in respect of Europe.

The strategies used and their maximum weightings are as follows:

| Strategy | Weighting |
|---|---|
| Relative value | 0 to 33% |
| Event driven | 0 to 33% |
| Equity long/short | 66 to 100% |
| Directional trading | 0 to 20% |
| Traditional investments | 0 to 33%* |

(* Not including cash and cash equivalents pursuant to §9 of the Fund Contract, up to one third of the fund assets may be invested for this Subfund in the so-called traditional investments listed in §8.3 of the Fund Contract. These include in particular (i) debt securities and rights, (ii) equities and other equity-type securities and rights, (iii) money market instruments as well as units or shares in traditional collective investment schemes.)

### 2.2.9 Use of derivative financial instruments

The Fund Management Company uses derivatives for the efficient management of the Subfunds' assets. However, even under extreme market circumstances, these may not result in a deviation from the investment objectives or a change in the investment character of the Fund. The modified Commitment Approach II (extended process) is applied to the assessment of risk.

Derivatives form part of the investment strategy and are not used solely to hedge investment positions.

Both basic forms of derivatives and exotic derivatives may be used, as described in more detail in the Fund Contract (cf. §12), provided the underlying assets are permitted as investments under the investment policy. Derivative transactions may be concluded either on an exchange or another regulated market open to the public, or in OTC (over-the-counter) trading. In addition to market risks, derivatives are also subject to counterparty risk, i.e. the risk that the party to the contract may not be able to meet its obligations and may thus cause a financial loss.

In addition to credit default swaps (CDSs), all other types of credit derivatives may be acquired (e.g. total return swaps [TRSs], credit spread options [CSOs], credit linked notes [CLNs]) by which credit risks can be transferred to third parties (so-called risk buyers). The risk buyers receive a premium as compensation. The size of this premium depends, among other things, on the probability of a loss event occurring and the maximum size of the loss; both factors are generally difficult to assess, which increases the risk associated with credit derivatives. The Subfunds may act as both risk buyers and risk sellers.

The use of derivatives may have a leverage effect on the assets of the Subfunds or may correspond to a short sale. The total exposure in derivatives may be up to 100% of the net assets of a Subfund, and the total exposure of the Subfund may thus be up to 200% of its net assets. When taking into account the possibility of temporary borrowing amounting to up to 30% of the net assets of a Subfund pursuant to §13.2, the overall exposure of the Subfund may be up to 230% of its net assets.

**Details of the investment policy and its restrictions, as well as the approved investment techniques and instruments (especially derivatives and the extent of their use) can be found in the Fund Contract (see Part II, §§7–15).**

**No guarantee can be given that the objective of the investment policy will be achieved. Accordingly, the value of the Shares and the returns they generate may go up as well as down.**

### 2.3 Profile of the typical investor

The Subfunds are suitable for investors with a long-term investment horizon who want to invest in a broadly diversified portfolio of other funds. The Subfunds are recommended as an addition to a well diversified securities portfolio, so as to achieve an optimized risk/return profile thanks to the low correlation with traditional investments. The investors must be able to accept stronger fluctuations and a protracted decline in the net asset value of the Fund Shares. They are aware of the key risks entailed in alternative investments.

### 2.4 Brief information on tax regulations relevant to the Fund

The Umbrella Fund and Subfunds have no legal personality in Switzerland, and as such are subject to neither income nor capital tax.

The Swiss federal withholding tax deducted from the Subfunds' domestic income can be reclaimed in full for the Subfund concerned by the Fund Management Company.

Income and capital gains realized outside Switzerland may be subject to the relevant withholding tax deductions imposed by the country of investment. Insofar as is possible, these taxes will be reclaimed by the Fund Management Company on behalf of investors domiciled in Switzerland under the terms of double taxation treaties or other such agreements.

Distributions of income made by the Subfunds to investors domiciled in Switzerland are subject to Swiss federal withholding tax (source tax) at 35%. Any capital gains paid on a separate coupon are not subject to withholding tax.

Investors domiciled in Switzerland are entitled to reclaim any deducted withholding tax by declaring it in their tax returns or by submitting a separate application for refund.

Distributions of income to investors domiciled outside Switzerland are made free of Swiss withholding tax, provided at least 80% of the income of the Subfund concerned stems from foreign sources, and subject to presentation of confirmation from a bank stating that the Shares in question are held at the bank in the custody account of an investor domiciled outside Switzerland, and that the distributions of income are credited to this investor's account (domicile declaration/affidavit). No guarantee can be given that at least 80% of the income of a Subfund will stem from foreign sources.

If withholding tax is charged to an investor domiciled outside Switzerland due to the lack of a domicile declaration, he or she may submit a claim for reimbursement under Swiss law directly to the Swiss Federal Tax Administration in Berne.

The income distributed and/or the interest realized on the sale or redemption of Shares is in principle subject in Switzerland to EU savings tax.

Based on the provisions of the directive issued by the Council of the European Union in respect of taxation of interest income, and under the terms of the agreement reached between Switzerland and the EU as part of bilateral negotiations, Switzerland has undertaken to retain tax on certain interest payments made by investment funds, in the case of both distributions of income and the sale or redemption of fund units, in respect of natural persons whose tax domicile is in an EU member state. This tax is retained at 15% (20% from 2008 and 35% from 2011). Subject to explicit instructions by the recipient of the interest payment, the recipient may make a voluntary disclosure to the fiscal authorities in their tax domicile instead of being subject to this tax retention.

This tax information is based on the current legal situation and practice. It is subject to changes in legislation, the decisions of the courts and the decrees and practices of the tax authorities. This applies in particular – albeit not exclusively – with regard to the regulations on tax retention relating to the EU savings tax.

Taxation and other tax implications for investors who hold, buy or sell Fund or Subfund Shares are based on the relevant tax law provisions to which the investors are subject in their country of domicile.

# 3    Information on the Fund Management Company

## 3.1    General information on the Fund Management Company

The management of the Fund is the responsibility of Swiss Investment Company SIC Ltd., which has its registered office and main administrative office in Zurich. Since its foundation as a joint-stock company (Aktiengesellschaft) in 1986, the Fund Management Company has been active in the fund business.

As at December 31, 2008, the fully paid-up share capital of the Fund Management Company amounted to CHF 5.62 million, divided into 562 registered shares of CHF 10,000 each. The Fund Management Company is ultimately a wholly-owned subsidiary of the Credit Suisse Group, which has its registered office in Zurich.

The Board of Directors of the Fund Management Company currently comprises the following persons:
–   Heinz Hofmann, Chairman,
–   Max Cotting, Vice-Chairman,
–   Emil Stark, Director.

The Executive Board comprises the following persons:

-   Markus Hafner, CEO
-   Hans-Ulrich Halter, member of the Executive Board (Head of Compliance),
-   Patrick Thalmann, member of the Executive Board (Head of Fund Accounting/Reporting/BT).

The Fund Management Company manages a total of 42 collective investment schemes in Switzerland, with assets under management totaling CHF 6.22 billion on December 31, 2008.

Members of management with special professional qualifications:

-   **Markus Hafner** (born in 1969), CEO, graduated with a degree in business economics (Betriebsökonom FH) from the University of Applied Sciences Northeastern Switzerland in Windisch/Brugg in 1997. In 2001, he also completed his training as a certified auditor. In 1997, he joined the audit financial services department of a major audit firm. From 2000 to 2002, Mr. Hafner was active in the Fund Management Company as its Compliance Officer. After further work as a lead auditor for a major audit company in the field of audit financial services, he rejoined the Fund Management Company in May 2006 as Head of Product Management. At the beginning of September 2007, Mr. Hafner was appointed CEO of the Fund Management Company. Given the wide range of tasks he has performed in the investment fund sector, he is well acquainted with all financial market instruments, in particular also alternative investments. Mr. Hafner has continued to expand his expertise in the field of alternative investments in recent years by taking specialized courses.

-   **Hans-Ulrich Halter** (born in 1973), Head of Compliance, graduated with a degree in business economics (Betriebsökonom HWV) from the Lucerne School of Business at the Lucerne University of Applied Sciences and Arts in 1999. In 2002, he also completed his training as a certified auditor. In 1999, he joined the audit financial services department of a major audit firm. From 2003 to 2005, Mr. Halter worked as a lead auditor in Dublin and was specifically active in the field of alternative investments. In June 2007, Mr. Halter took over responsibility for compliance at the Fund Management Company as Head of Compliance. Given the wide range of auditing tasks he has performed in the investment fund sector and his work as Head of Compliance, he is well acquainted with all financial market instruments, in particular also alternative investments. Mr. Halter has continued to expand his expertise in the field of alternative investments in particular in recent years by taking specialized courses.

**3.2**    **Delegation of investment decisions**

The Fund Management Company has delegated investment decisions in respect of the Subfunds to Clariden Leu Ltd., Zurich as Investment Manager. The latter also acts as the Custodian Bank of the Fund. Clariden Leu Ltd. is a bank and as such is subject to the supervision of the Swiss Financial Market Supervisory Authority.

Clariden Leu Ltd. has many years of experience in the management of collective investment schemes. The precise execution of this mandate is governed by an investment management agreement concluded between the Fund Management Company and the Investment Manager on January 29, 2007. The investment management activities are conducted at Clariden Leu Ltd. by employees in organizational units that are not involved in the performance of the rights and obligations of the Custodian Bank.

Further information on Clariden Leu Ltd. can be found in Section 4 of this Prospectus.

The following employees are currently responsible for the selection of individual managers of alternative investments and the target funds of the Fund:

- **Dr. Peter Labhart** (born in 1970). Graduated in economics at the University of Zurich in 1995, majoring in finance and banking. He initially worked as an assistant at the university from 1996 to 1999 and later joined the academic staff, lecturing at the university's Swiss Banking Institute. During this time, he wrote his dissertation on "The capital market's information needs and how reporting adds value" under Prof. R. Volkart and carried out detailed studies of market inefficiencies and investment strategies that target them. He joined the academic staff at Indiana University Bloomington in 1997 on the invitation of the Kelley School of Business. In 2000, he moved to Bank Sarasin & Co. Ltd, where he took on various roles in institutional banking. Before being appointed Head of Alternative Investments at the bank in 2005, he worked in portfolio management at Sarasin Chiswell in London. He became Head of Alternative Investment Products at Clariden Leu Ltd. in February 2008. His area of responsibility includes hedge funds, insurance-linked investments, real estate, commodities, and private equity. He is also responsible for investment policy in alternative investments. He has dealt with hedge fund strategies in depth since 1996, both in his professional capacity and as part of his research work. Dr. Labhart has written and co-authored a number of specialist articles.

- **Lorenz Altwegg** (born in 1972). Graduated in economic science at the University of Zurich in 1997, majoring in financial theory and marketing. After a number of years working as a business consultant and project management specialist with the Holcim Group and gaining experience in institutional investment consulting with the Credit Suisse Group, he joined the alternative investments business at Bank Sarasin & Co. Ltd at the start of 2001. Up to 2005, he was Senior Client Advisor for hedge funds and in charge of product management and investor relations operations. From 2005 to the start of 2008, he headed the hedge fund investments department at Bank Sarasin & Co. Ltd and was responsible for hedge fund product development. He took charge of the Hedge Funds department at Clariden Leu Ltd. in February 2008 and deputizes for the Bank's entire Alternative Investments business. Mr. Altwegg is Chairman of the Bank's Hedge Fund Investment Committee and co-author of a number of specialist articles.

**3.3**    **Appointment of an Investment Advisor**

In the case of the Subfunds SAAF II (CH) Global Fund and SAAF II (CH) North America L/S Equity Fund, the Investment Manager is supported by an external Investment Advisor in preparing input for the decision-making process in respect of the investments of these Subfunds in hedge funds. Olympia Capital Management S.A. ("Olympia"), which has its registered office in Paris, France, acts as the Investment Advisor. Olympia is a company specialized in the management of funds of hedge funds and other non-traditional investments and traditional multi-manager investment products, as well as in advising investors on funds of hedge funds and other alternative investments. Olympia has been active in this segment since 1989 and has more than 75 employees.

No Investment Advisor is currently used for SAAF II (CH) Europe L/S Equity Fund (in Liquidation).

**3.4**    **Delegation of other specific tasks**

The Fund Management Company has also delegated the distribution and marketing of the Fund and the Subfunds to Clariden Leu Ltd., Zurich as Principal Distributor. The latter also acts as the Custodian Bank of the Fund and the Subfunds. The precise execution of this mandate is governed by an agreement concluded between the Fund Management Company and Clariden Leu Ltd. on January 29, 2007.

Further information on Clariden Leu Ltd. can be found in Section 4 of this Prospectus.

**3.5**    **Exercise of membership and creditors' rights**

The Fund Management Company exercises the membership and creditors' rights associated with the investments of the Subfunds it manages independently and exclusively in the interests of the investors. The Fund Management Company will, upon request, provide investors with information on the exercise of membership and creditors' rights.

In the case of scheduled routine transactions, the Fund Management Company is free to exercise membership and creditors' rights itself or to delegate their exercise to the Custodian Bank or a third party.

In the case of all other events that might have a lasting impact on the interests of the investors, such as, in particular, the exercise of membership and creditors' rights the Fund Management Company holds as a shareholder or creditor of the Custodian Bank or another related legal entity, the Fund Management Company will exercise the voting rights itself or issue explicit instructions. In such cases, it may base its actions on information it receives from the Custodian Bank, the portfolio manager, the company or from third parties or from the press.

The Fund Management Company is free to waive the exercise of membership and creditors' rights.

# 4    Information on the Custodian Bank

Clariden Leu Ltd. acts as the Custodian Bank ("the Custodian Bank"). The Custodian Bank was founded in 1955 as a joint-stock company (Aktiengesellschaft), with its registered office and main administrative office in Zurich, and currently has share capital of CHF 50 million, divided into 500,000 fully paid-up registered shares of CHF 100 par value each. The shareholders' equity (share capital and declared reserves) of the Custodian Bank amounted to CHF 1,019 million on December 31, 2008. The Custodian Bank is primarily active in the fields of asset management and investment advice, as well as the issuing of investment products.

The Custodian Bank is ultimately a subsidiary of the Credit Suisse Group, which has its registered office in Zurich.

The Custodian Bank may delegate the safekeeping of the Subfunds' assets to third-party custodians and collective securities depositaries in Switzerland and abroad. In such cases, it is liable for applying due diligence when choosing and instructing the third parties, as well as for monitoring their constant compliance with the selection criteria.

The use of third-party custodians and collective securities depositaries means that deposited securities are no longer owned solely by the Fund Management Company, which instead becomes only a co-owner.

# 5    Information on third parties

The Paying Agent, Distributor, and Statutory Auditors are listed in Section 1 of this Prospectus.

# 6    Further information

## 6.1    Useful information

| | Security no. | ISIN | Minimum investment |
|---|---|---|---|
| SAAF II (CH) Global Fund Class A-CHF | 2009898 | CH0020098981 | 1 Share |
| SAAF II (CH) Global Fund Class A-EUR | 2005644 | CH0020056443 | 1 Share |
| SAAF II (CH) Global Fund Class A-USD | 795536 | CH0007955369 | 1 Share |
| SAAF II (CH) Global Fund Class IA-CHF | | | CHF 500,000 |
| SAAF II (CH) Global Fund Class IA-EUR | | | EUR 500,000 |
| SAAF II (CH) Global Fund Class IA-USD | | | USD 500,000 |
| SAAF II (CH) Long Short Equity Fund A-CHF | 1649623 | CH0016496231 | 1 Share |
| SAAF II (CH) Long Short Equity Fund A-EUR | 1649624 | CH0016496249 | 1 Share |
| SAAF II (CH) Long Short Equity Fund A-USD | 1649625 | CH0016496256 | 1 Share |
| SAAF II (CH) Long Short Equity Fund IA-CHF | | | CHF 500,000 |
| SAAF II (CH) Long Short Equity Fund IA-EUR | | | EUR 500,000 |
| SAAF II (CH) Long Short Equity Fund IA-USD | | | USD 500,000 |
| SAAF II (CH) Europe L/S Equity Fund (in Liquidation) A-CHF | 1649628 | CH0016496280 | 1 Share |
| SAAF II (CH) Europe L/S Equity Fund (in Liquidation) A-EUR | 1649629 | CH0016496298 | 1 Share |
| SAAF II (CH) Europe L/S Equity Fund (in Liquidation) A-USD | 1 649 630 | CH0016496306 | 1 Share |
| SAAF II (CH) Europe L/S Equity Fund (in Liquidation) IA-EUR | | | EUR 500,000 |

**Listing:** none

**Financial year:** January 1 to December 31

**Accounting currency:**
SAAF II (CH) Global Fund:                                              the US dollar
SAAF II (CH) Long Short Equity Fund:                              the US dollar
SAAF II (CH) Europe L/S Equity Fund (in Liquidation):      the euro

**Shares:** Bearer Shares

As a rule, all Share Classes do not take the form of actual certificates and exist purely  as book entries. Investors are not entitled to demand delivery of a Share certificate.

**Distribution of income:** The net income of the Subfunds will be distributed per Share Class to the investors annually at the latest within four months of the end of the financial year in the reference currency of the Share Class in question. The Fund Management Company may make additional interim distributions from the income.
Up to 30% of the net income of the Subfunds including income carried forward from previous financial years may be carried forward to the new account. If the net income in a financial year including income carried forward from previous financial years is less than 1% of the net assets of a Subfund and is less than 1.00 per Share in the accounting currency, a distribution may be waived and the entire net income carried forward to the new account of the Subfund concerned.

## 6.2    Terms for the issue and redemption of Fund Shares

### SAAF II (CH) Global Fund and SAAF II (CH) Long Short Equity Fund

Shares of the Subfunds are issued and redeemed on the last bank business day of each month in Zurich ("Issue Date"/"Redemption Date").

No issues or redemptions of Shares will take place under the exceptional circumstances defined in §17.6 of the Fund Contract.

Subscription orders must be received by the Custodian Bank by 3 p.m. at the latest on the 25th day of a given calendar month (or if this date falls on a weekend, the preceding Friday) to be valid on the Issue Date of that calendar month. Orders received by the Custodian Bank after this time will be processed on the following Issue Date. Orders will be settled once the net asset value of the Share Class subscribed is available, as a rule within fifteen bank business days after the pertinent Issue Date.

The net asset value taken as the basis for the settlement of the order is therefore not known at the time of subscription. It is calculated on the Issue Date.

Notice of the termination of Shares must be received by the Custodian Bank by 3 p.m. at the latest on the 25th day of a given calendar month (or if this date falls on a weekend, the preceding Friday) to be valid on the Redemption Date of the following calendar month. Orders received by the Custodian Bank after this time will be processed on the following Redemption Date. The payment of the redemption price is usually made with the value date at the latest on the fifteenth bank business day after the pertinent Redemption Date.

The net asset value taken as the basis for the settlement of the order is therefore not known at the time the redemption order is placed. It is calculated on the Redemption Date.

The NAV of a Share of a given Class of a Subfund is determined by the proportion of the market value of the Subfund's assets attributable to that Class, minus any of the Subfund's liabilities that are attributed to that Class, divided by the number of Shares of that Class in circulation. It will be rounded to 1/100 of one unit of the accounting currency of the Subfund concerned.

The issue and redemption prices of the Shares of a Class of a Subfund are based on the NAV per Share of the Class concerned calculated for the corresponding Issue or Redemption Date pursuant to §16. In the case of Share issues, an issuing commission may be added to the net asset value pursuant to §18, and in the case of redemptions, a redemption commission may be deducted from the net asset value pursuant to §18.

The issue price will be rounded up to 1/100 of one unit of the accounting currency. The value date will be set on the Issue Date. The redemption price will be rounded down to 1/100 of one unit of the accounting currency. The value date will be set on the Valuation Date.

Calculation examples

| | Issue of Fund Shares | Redemption of Fund Shares |
|---|---|---|
| Subscription/redemption orders received by Custodian Bank | 25th calendar day of a given month (or if this date falls on a weekend, the preceding Friday (May 25, 2009, 3 p.m.)) | 25th calendar day of a given month (or if this date falls on a weekend, the preceding Friday (May 25, 2009, 3 p.m.)) |
| Issue/Redemption Date | Month-end of the given calendar month (May 31, 2009) | Month-end of the following calendar month (June 30, 2009) |
| Valuation Date | As a rule, fifteen working days after the Issue Date (June 19, 2009) | As a rule, fifteen working days after the Redemption Date (July 21, 2009) |
| Value Date (subscriptions) | Issue Date (May 31, 2009) | |
| Value Date (redemptions) | | Valuation Date (July 21, 2009) |

Incidental costs for the sale and purchase of investments (standard brokerage charges, fees, taxes, etc.) incurred by a Subfund when investing the amount paid in by the investor, or in the sale of that portion of investments corresponding to a redeemed Share, are charged to the assets of that Subfund.

The Shares do not take the form of actual certificates and exist purely as book entries. If Share certificates were issued at an earlier date, they must be returned upon submission of a redemption application.

Any taxes and duty due on the issue and redemption of Fund Shares in certain countries will be charged to the investor.

6.3     **Fees and incidental costs**

Fees and incidental costs charged to the investor (excerpt from §18 of the Fund Contract):

- Issuing commission accruing to the Fund Management Company,
  Custodian Bank and/or distributors in Switzerland and abroad:                    a maximum of 5%

- Redemption commission accruing to the Fund Management Company,                    a maximum of 2%
  Custodian Bank and/or distributors in Switzerland and abroad:

- Commission for the payment of liquidation proceeds:                    0.50% of the net asset value

Fees and incidental costs charged to the Subfunds (excerpt from §19 of the Fund Contract):

- Management fee charged by the Fund Management Company:

  SAAF II (CH) Global Fund
      A Class                    a maximum of 2.5% p.a.
      IA Class                    a maximum of 1.75% p.a.

  SAAF II (CH) Long Short Equity Fund
      A Class                    a maximum of 2.5% p.a.
      IA Class                    a maximum of 1.75% p.a.

  SAAF II (CH) Europe L/S Equity Fund (in Liquidation)
      A Class                    a maximum of 2.5% p.a.
      IA Class                    a maximum of 1.75% p.a.

The management fee will be used for the administration, asset management and distribution of the Subfunds, as well as the remuneration of the Custodian Bank for the safekeeping of the Subfunds' assets, the handling of the payment transactions of the Umbrella Fund/Subfunds, and the performance of the other tasks of the Custodian Bank listed in §4 of the Fund Contract.

Furthermore, the fees and incidental costs listed under §19 of the Fund Contract may also be charged to the Fund.

Information on the rates actually used and the commissions actually charged can be found in the annual and semi-annual reports.

The management fee of the target funds in which investments are made may not exceed 5%. The maximum rate of the management fee of the target funds in which investments are made must be disclosed in the annual report.

The Fund Management Company may pay reimbursements from the distribution component to the following institutional investors who, from the commercial perspective, hold Shares of the Subfunds for third parties:

- life insurance companies
- pension funds and other retirement provision institutions
- investment foundations
- Swiss fund management companies
- foreign fund management companies and providers
- investment companies

The Fund Management Company may also pay trailer fees from the distribution component to the following distributors and sales partners:

- authorized distributors
- fund management companies, banks, securities dealers, Swiss Post, and insurance companies
- sales partners who place Fund Shares exclusively with institutional investors with professional treasury facilities
- asset managers

Total expense ratio (TER) and portfolio turnover rate (PTR)

The TER cannot be stated at present as there is no information available for the bulk of the target funds.

The portfolio turnover rate (PTR) was:

**SAAF II (CH) Global Fund**

| | |
|---|---|
| 2006: | 79.28% |
| 2007: | 4.43% |
| 2008: | 35.03% |

**SAAF II (CH) Long Short Equity Fund**

| | |
|---|---|
| 2006: | 78.15% |
| 2007: | 70.89% |
| 2008: | 58.22% |

**SAAF II (CH) Europe L/S Equity Fund (in Liquidation)**

| | |
|---|---|
| 2006: | 56.75% |
| 2007: | 69.98% |
| 2008: | 39.46% |

Investments in related collective investment schemes

In the case of investments in other collective investment schemes that are managed directly or indirectly by the Fund Management Company itself or a company with which it is related by virtue of common management or control or by way of a direct or indirect stake of more than 10% of the capital or votes, no issuing and redemption commissions and only a reduced management fee are charged pursuant to §19.4 of the Fund Contract.

Fee splitting agreements and non-pecuniary benefits ("soft commissions")

The Fund Management Company has concluded no fee splitting agreements.

The Fund Management Company has not concluded any agreements in respect of soft commissions.

**6.4    Publications of the Fund**

Further information on the Fund may be found in the latest annual or semi-annual report. Current information can also be found on the Internet at www.claridenleu.com.

The Prospectus with the integrated Fund Contract and the latest annual or semi-annual report may be obtained free of charge from the Fund Management Company, Custodian Bank or from any Distributor.

Changes to the Fund Contract, Fund Management Company or Custodian Bank, as well as the dissolution of the Fund, will be published by the Fund Management Company in the Swiss Official Gazette of Commerce as well as on the Internet platform www.swissfunddata.ch.

Prices are published daily for all Share Classes on the Internet platform www.swissfunddata.ch. The Fund Management Company may at any time have the prices of the Subfunds published in other media.

**6.5    Sales restrictions**

With respect to the distribution of Shares outside Switzerland, the regulations valid in the country in question apply. The Shares of the Fund and the Subfunds are not authorized for public distribution outside Switzerland. In particular, they have not been registered under the United States Securities Act of 1933, and Shares may not be offered, sold, resold or delivered directly or indirectly in the United States or to US persons, residents, companies or other legal entities established or managed under US law, unless such action is taken in connection with transactions which do not violate the said Act. In the context of this document, the term "United States" refers to the United States of America, its individual states, territories, and possessions as well as all other areas subject to its jurisdiction. US citizens resident outside the United States are entitled to be the beneficial owners of Shares of the Fund in accordance with Regulation S of the Securities Act Release No. 33–6863 (May 2, 1990).

**6.6**    **Detailed regulations**

All further information on the Fund and the Subfunds, such as the method used for the valuation of the Funds' assets, a list of all fees and incidental costs charged to the investor and the Subfunds, and the appropriation of net income, can be found in detail in the Fund Contract.

# 7     Glossary

**Broker**
Dealer who in particular carries out stock market transactions on behalf and for the account of target funds (securities dealer).

**CISA**
Swiss Federal Act on Collective Investment Schemes of June 23, 2006

**CISO**
Ordinance on Collective Investment Schemes of November 22, 2006

**CISO-FINMA**
Ordinance of the Swiss Financial Market Supervisory Authority on Collective Investment Schemes of December 21, 2006

**Class**
A collective investment scheme can be broken down into different classes with different characteristics (reference currency, investor segment, distribution or reinvestment of income, etc.).

**Closed-ended collective investment scheme**
Collective investment scheme or company that has no obligation to redeem its units / shares at the net asset value.

**Convertible bond**
Debt instrument that confers on its bearer the right to switch it into one or more shares of a company under certain conditions.

**Coupon**
Coupon attached to share certificates and certificates of fixed-income securities. The bank will pay any dividends or interest due on submission of the coupon.

**Credit rating**
Assessment of a borrower or a counterparty in respect of their ability to pay.

**Custodian bank**
For Swiss collective investment schemes, the custodian bank is the bank that is responsible for the safekeeping of the fund's assets, for issues and redemptions, and for the payment transactions of the collective investment scheme. The custodian bank monitors the collective investment scheme's compliance with the investment guidelines set down in the law and the fund regulations.

**Delta**
The delta states how much the value of an option will change if the price of the underlying changes by one unit, assuming all other influencing factors remain the same. In the case of calls, the delta can have a value between 0 and 1, while with puts the delta ranges between 0 and −1. The minus sign shows that the value of a put option falls if the price of the underlying rises.

**Derivatives/derivative financial instruments**
Financial contracts, the price or value of which is derived from an underlying. Possible underlyings include equities, bonds, currencies, commodities, other derivative financial instruments, reference rates (e.g. interest rates, exchange rates), and indexes. Possible forms of derivatives themselves include options, futures, forward contracts, and swaps.

**Distributors**
Fund management company, custodian bank and other parties entitled to sell the units/shares of a collective investment scheme and holding the appropriate authorization.

**Diversification**
The spreading of investments across different currencies, countries, sectors, investment vehicles, securities, etc.

**Exchange-traded funds**
Participations in collective investment schemes (companies, unit trusts, structures similar to investment funds), the investments of which reflect an index and that are traded on an exchange or other regulated market open to the public.

**Fund management company**
Manages contractual investment funds independently and in its own name for the account of the investors (cf. Art. 30 CISA).

**Fund of funds**
Collective investment scheme that acquires units in other Swiss and foreign collective investment schemes.

**Futures**
Standardized forward contracts traded on an exchange. Based on the underlying assets, a distinction is made between commodity futures and financial futures.

**Index basket**
Debt instrument based on several indexes.

**Index certificate**
Debt instrument based on a certain equity index or another index.

**Investment companies**
Investment entities constituted under company law that manage their assets (indirectly those of their shareholders).

**Leverage**
Effect generated by borrowing in combination with long or short positions or by using derivative financial instruments.

**Long position**
Purchasing securities without the buyer closing out the position by selling the same securities, resulting in an increase in value if the price of the securities rises.

**Net asset value/NAV**
Total value of all the assets of a collective investment scheme as of a certain reference date, minus any liabilities and costs.

**Open-ended collective investment scheme**
Collective investment scheme in which investors may terminate their participation at any time or at regular intervals. The collective investment scheme or a third party is obliged to redeem units/shares at the net asset value.

**Option**
Instrument embodying the right (but not the obligation) to purchase (call) or sell (put) within a specified period a fixed quantity of a certain underlying at a price determined in advance.

**Securities**
Transferable securities and book-entry securities issued on a large scale and traded on an exchange or other regulated market open to the public.

**FINMA**
Swiss Financial Market Supervisory Authority. FINMA is the Swiss supervisory authority for banks, collective investment schemes, securities dealers, and stock exchanges.

**Share**
Claim against the Fund Management Company in respect of participation in the assets and income of the Fund/Subfunds.

**Short selling**
cf. Short position.

**Short position**
Sale of securities the seller does not own, without this position being closed out by purchasing the same securities. A (negative) exposure to securities that results in an increase in value if their price falls.

**SICAF**
Société d'investissement à capital fixe. Investment company with fixed capital, set up for the purpose of collective investment.

**SICAV**
Société d'investissement à capital variable. Investment company with variable capital, set up for the purpose of collective investment.

**Subfund**
Segment of an umbrella fund.

**Swap**
Agreement on the exchange of future payment streams, e.g. in respect of interest (interest-rate swap), currencies (currency swap), other securities positions and/or obligations or a combination thereof. Swaps are derivative financial instruments.

**Target funds**
Swiss and foreign collective investment schemes in which other collective investment schemes invest. These may be open-ended funds or closed-ended funds traded on an exchange or other regulated market open to the public, or other collective investment schemes of all types, in particular contractual investment funds, investment companies, SICAVs, SICAFs, unit trusts or limited partnerships.

**Underlying**
Asset or reference rate underlying a derivative financial instrument.

**Unit trusts**
Structured collective investment schemes established under trust law.

**Volatility**
Benchmark or yardstick for price fluctuations of an investment over a certain period. Frequently expressed by the "standard deviation".

## Part II    Fund Contract

## I    Fund name; name and registered office of Fund Management Company and Custodian Bank

§1

1.  An umbrella fund with special risk in contractual form under Swiss law of the type "other funds for alternative investments" with several subfunds (umbrella fund structure) has been established under the name of "SAAF II (CH)" (hereinafter referred to as the "Investment Fund" or "the Fund") in accordance with Art. 25 et seq. in conjunction with Art. 68 et seq., Art. 71, and Art. 92 et seq. of the Swiss Federal Act on Collective Investment Schemes of June 23, 2006 (CISA).

There are currently the following Subfunds:
- SAAF II (CH) Global Fund
- SAAF II (CH) Long Short Equity Fund
- SAAF II (CH) Europe L/S Equity Fund (in Liquidation)

2.  The Fund Management Company is Swiss Investment Company SIC Ltd., which has its registered office in Zurich.

3.  The Custodian Bank is Clariden Leu Ltd., which has its registered office in Zurich.

## II    Rights and obligations of the parties to the contract

§2    **The Fund Contract**

The legal relationship between the investor on the one hand and the Fund Management Company and the Custodian Bank on the other is governed by the present Fund Contract and the applicable provisions of the legislation on collective investment schemes.

§3    **The Fund Management Company**

1.  The Fund Management Company manages the Subfunds at its own discretion and in its own name, but for the account of the investors. It decides in particular on the issuance of Shares, the investments, and their valuation. In selecting the investments of the individual Subfunds, it uses the corresponding selection and controlling processes that have been developed for the requirements of the individual Subfunds of the Fund and that are explained in the Prospectus. It calculates the net asset values of the Subfunds and determines the issue and redemption prices as well as distributions of income. It exercises all rights associated with the Umbrella Fund and the Subfunds.

2.  The Fund Management Company and its agents are subject to the duties of loyalty, due diligence and disclosure. They act independently and exclusively in the interests of the investors. They implement the organizational measures that are necessary for proper management. They ensure the provision of transparent financial statements and provide appropriate information on the Umbrella Fund and the Subfunds.

3.  The Fund Management Company can for all or individual Subfunds delegate investment decisions as well as specific tasks, provided this is in the interests of efficient management. It will commission only persons who are qualified to execute the task properly, and must ensure the proper instruction as well as the supervision and monitoring of the performance of the task.

The Fund Management Company is liable for the actions of its agents as if they were its own actions.

4.  With the consent of the Custodian Bank, the Fund Management Company may submit a change to the present Fund Contract to the supervisory authority for approval (cf. §26), and may also establish further Subfunds with the approval of the supervisory authority.

5.  The Fund Management Company can merge individual Subfunds with other Subfunds or with other investment funds pursuant to the provisions set down under §24 and can dissolve individual Subfunds pursuant to the provisions set down under §25.

6.  The Fund Management Company can manage part or all of the assets of different investment funds or subfunds jointly (pooling), provided these are managed by the same fund management company and the assets are held in safekeeping by the same custodian bank. This must not give rise to any additional costs for the investors. Pooling does not give rise to any liability between the funds or subfunds involved. The Fund Management Company must at all times be in the position to allocate the investments of the pool to the individual investment funds or subfunds involved. The pool does not constitute a separate fund in its own right.

7.  The Fund Management Company is entitled to receive the fees stipulated in §§18 and 19. It is further entitled to be released from the liabilities assumed in the proper execution of its tasks, and to be reimbursed for expenses incurred in connection with such liabilities.

§4    **The Custodian Bank**

1.  The Custodian Bank is responsible for the safekeeping of the Subfunds' assets. It handles the issue and redemption of Fund Shares as well as payments on behalf of the Subfunds.

2.  The Custodian Bank and its agents are subject to the duties of loyalty, due diligence and disclosure. They act independently and exclusively in the interests of the investors. They implement the organizational measures that are necessary for proper management. They ensure the provision of transparent financial statements and provide appropriate information on the Umbrella Fund and the Subfunds.

3.  The Custodian Bank may delegate the safekeeping of the Subfunds' assets to third-party custodians and collective securities depositaries in Switzerland or abroad. In such cases, it is liable for applying due diligence when choosing and instructing the third parties, as well as for monitoring their constant compliance with the selection criteria. The Prospectus contains information on the risks involved. In the case of fiduciary investments, the settlement and transfer risks stemming from the fiduciary agreement are borne by the assets of the Subfund concerned.

4.　The Custodian Bank ensures that the Fund Management Company complies with the law and the Fund Contract. It checks whether the calculation of the net asset values and of the issue and redemption prices of the Shares as well as the investment decisions are in compliance with the law and the Fund Contract, and whether the income is appropriated in accordance with the Fund Contract. The Custodian Bank is not responsible for the choice of investments which the Fund Management Company makes in accordance with the investment regulations.

5.　The Custodian Bank is entitled to receive the fees stipulated in §§18 and 19. It is further entitled to be released from the liabilities assumed in the proper execution of its tasks, and to be reimbursed for expenses incurred in connection with such liabilities.

6.　The Custodian Bank is not responsible for the safekeeping of the assets of the target funds in which the Subfunds invest, unless this task has been delegated to it.

### §5　The investor

1.　On concluding the contract and making a payment in cash, the investor acquires a claim against the Fund Management Company in respect of a participation in the assets and income of the Subfund concerned. The claim is evidenced in the form of Shares.

2.　The investors' entitlement is in respect of the assets and income of only that Share Class of that Subfund in which they participate. In the case of liabilities accruing to an individual Subfund, only that Subfund is liable.

3.　Investors are only obliged to remit payment for the Share(s) they subscribe in the Subfund concerned. They are not held personally liable for the liabilities of the Umbrella Fund or Subfund.

4.　Investors may at any time request that the Fund Management Company supply them with the necessary information regarding the basis on which the net asset values per Share are calculated. If investors express an interest in more detailed information on specific business transactions effected by the Fund Management Company, such as the exercise of membership and creditors' rights, they must be given such information by the Fund Management Company at any time. The investors may request at the courts of the registered office of the Fund Management Company that the Statutory Auditors or another expert investigate the matter which requires clarification and furnish the investors with a report.

5.　The investors may terminate the Fund Contract pursuant to §17 and demand that their participation in the Subfund be paid out in cash. If Share certificates were issued, they must be returned.

6.　If requested, the investors are obliged to provide the Fund Management Company, the Custodian Bank, and their agents with proof that they comply with or continue to comply with the provisions laid down in the law or the Fund Contract in respect of participation in a Subfund or in a Share Class. Furthermore, they are obliged to inform the Fund Management Company, the Custodian Bank, and their agents immediately once they no longer meet these prerequisites.

7.　The Fund Management Company in conjunction with the Custodian Bank must make an enforced redemption of the Shares of an investor at the current redemption price if:

   a.　this is necessary to safeguard the reputation of the financial market, specifically to combat money laundering;
   b.　the investor no longer meets the statutory or contractual requirements for participation in a Subfund.

8.　The Fund Management Company in conjunction with the Custodian Bank may also make an enforced redemption of the Shares of an investor at the current redemption price if:

   a.　the participation of the investor in a Subfund is such that it could have a significant detrimental impact on the economic interests of the other investors, in particular if the participation could result in tax disadvantages for the Umbrella Fund or a Subfund in Switzerland or abroad;
   b.　the investor has acquired or holds their Shares in violation of provisions of a law to which they are subject either in Switzerland or abroad, of the present Fund Contract or the Prospectus;

there is a detrimental impact on the economic interests of the investors, in particular in cases where individual investors seek by way of systematic subscriptions immediately followed by redemptions to achieve a pecuniary gain by exploiting the time differences between the setting of the closing prices and the valuation of the assets of the Subfunds (market timing).

### §6　Shares and Share Classes

1.　For each Subfund, the Fund Management Company can establish different Share Classes and can also merge or dissolve Share Classes at any time subject to the consent of the Custodian Bank and the approval of the supervisory authority. All Share Classes embody an entitlement to a participation in the undivided assets of the Subfund concerned, which are not segmented. This participation may differ due to class-specific costs or distributions or class-specific income, and the various Share Classes of a Subfund may therefore have different net asset values per Share. Class-specific costs are covered by the assets of a Subfund as a whole.

2.　Notification of the establishment, dissolution or merger of Share Classes will be published in the media of publication. Only mergers are deemed a change to the Fund Contract pursuant to §26.

3.　The various Share Classes of the Subfunds may differ from one another in terms of their cost structure, reference currency, currency hedging, policy with regard to distribution or reinvestment of income, the minimum investment required, and investor eligibility.

Fees and costs are only charged to the Share Class of a Subfund for which the respective service is performed. Fees and costs that cannot be clearly allocated to one Share Class of a Subfund will be charged to the individual Share Classes on a pro rata basis in relation to their proportion of the Fund's assets.

4.　There are currently the following Share Classes in the individual Subfunds:

**SAAF II (CH) Global Fund:**
Class A–CHF
Class A–EUR
Class A–USD
Class IA–CHF
Class IA–EUR
Class IA–USD

**SAAF II (CH) Long Short Equity Fund:**
Class A–CHF
Class A–EUR
Class A–USD
Class IA–CHF
Class IA–EUR
Class IA–USD

**SAAF II (CH) Europe L/S Equity Fund (in Liquidation):**
Class A–CHF
Class A–EUR
Class A–USD
Class IA–EUR

All these Classes are distribution Classes.

The Share Classes of each Subfund differ from each other only in the permanent hedging of the reference currency of the corresponding Share Class against the accounting currency.

The IA Class differs from the A Class in that it has a higher minimum investment amount and lower commission rates. The minimum investment required is specified in the Prospectus. This Share Class is open to all investors prepared to make the minimum investment. If redemptions by an investor result in them holding less than the minimum investment amount, the Fund Management Company may pursuant to §6 below enforce a switch into another Share Class in which the investor is entitled to hold Shares. Insofar as banks and securities dealers hold Shares for the account of their clients, the minimum investment requirement must be met at the level of the client.

The decision on whether the participation criteria have been met lies at the discretion of the Custodian Bank.

In the case of subscriptions of Shares accepted by the Fund Management Company from group companies of Swiss Investment Company SIC Ltd. or Clariden Leu Ltd. (in their own name), compliance with the limits specified in the Fund Contract (minimum initial investment amount/minimum investment holding) may be waived for nine months in respect of establishing and also maintaining Share Classes. This situation of maintaining a Share Class arises when all investors in a Share Class redeem their Shares and Swiss Investment Company SIC Ltd. and/or Clariden Leu Ltd. either remain as the sole investor in that Share Class or subscribe a Share of that Share Class as the sole new investor.

5. As a rule, all Share Classes do not take the form of actual certificates and exist purely as book entries. Investors are not entitled to demand delivery of a Share certificate.

6. The Fund Management Company is obliged to instruct investors who no longer meet the requirements for holding a Share Class to undertake within 30 calendar days the necessary measures to ensure that they once again meet the requirements for holding the Share Class concerned, or that their Shares are within the same period redeemed pursuant to §17, transferred to a person who does meet the aforementioned requirements, or switched into Shares of another Class whose requirements the investor does meet. If an investor fails to comply with this demand, the Fund Management Company may, in cooperation with the Custodian Bank, make an enforced switch into another Share Class of the Subfund or, should this not be possible, enforce the redemption of the Shares in question pursuant to §5.7.


# III      Investment policy guidelines

# A       Investment principles

**§7      Compliance with investment regulations**

1. In selecting the individual investments of each Subfund, the Fund Management Company must adhere to the principle of balanced risk diversification and comply with the percentage limits defined below. These percentages relate to the assets of the Subfund in question at market value and must be complied with at all times. The individual Subfunds must have fulfilled the terms of the investment restrictions within six months of the expiry of the subscription period (launch).

2. If the limits are exceeded as a result of market-related changes, the investments must be restored to the permitted level within a reasonable period, taking due account of the investors' interests. If the limits relating to derivatives pursuant to §12 below are exceeded due to a change in the delta, this is to be rectified within three bank business days at the latest, taking due account of the investors' interests. In the case of non-traditional investments, this period will generally be longer.

**§8      Investment objectives and policy**

1. The investment objective of the individual Subfunds is to achieve a long-term performance in line with the risk profile of the Subfund in question via diversified investments primarily in Swiss or foreign collective investment schemes (referred to below as "target funds") that pursue alternative investment strategies and styles and/or engage in alternative investments (generally known as hedge funds or non-traditional funds).

2.  In accordance with the investment objective, the Fund Management Company invests the assets of the Subfunds primarily in units or shares of Swiss or foreign non-traditional collective investment schemes ("non-traditional target funds"). These investments are open-ended collective investment schemes or closed-ended collective investment schemes traded on an exchange or other regulated market open to the public (in particular investment companies, trusts, and limited partnerships). In so doing, the Fund Management Company will invest predominantly in foreign non-traditional collective investment schemes for which no distribution authorization has been/can be obtained in Switzerland due to the lack of equivalent supervision (Art. 120.2 CISA). In addition to this, the Fund Management Company may make direct investments pursuant to Section 3 below.

Investments may also be made in derivative financial instruments and structured products (e.g. certificates, fund-linked notes, etc.) or similar financial instruments, which have as their underlying investments pursuant to the above criteria. The derivatives are either traded on an exchange or another regulated market open to the public, or are traded OTC;
Investments in derivatives traded OTC (OTC transactions) are only permitted for (i) the counterparty is a regulated financial intermediary specializing in this business, and (ii) the OTC derivatives can be traded daily or returned to the issuer at any time. In addition, it must be possible for them to be valued in a reliable and transparent manner. Derivatives may be used pursuant to §12.

Unlike traditional target funds, where securities are acquired with own capital (long positions), with the investment strategies of non-traditional target funds the investments are in some cases also sold short (short positions), and in some cases borrowing and derivative financial instruments are used to achieve leverage. In some cases, non-traditional target funds may without restriction use derivative financial instruments and pursue non-traditional investment styles and investment strategies (e.g. long/short equity, relative value, equity hedge, directional trading, and event driven), which may entail special risks.

The risks of the investments in non-traditional target funds are not comparable to the investment risks in collective investment schemes of the type "securities funds". Hence, the Fund belongs in the type "other funds for alternative investments". The special risks of the investments of this Investment Fund/the Subfunds must be disclosed and explained in detail in the Prospectus.

3.  Not including cash and cash equivalents pursuant to §9, up to one third of the assets of a Subfund may be invested in:

    a)  debt securities and rights traded on an exchange or other regulated market open to the public, issued by private sector and public sector borrowers worldwide and denominated in a freely convertible currency;
    b)  equities and other equity-type securities and rights (participation certificates, dividend-right certificates, etc.) traded on an exchange or other regulated market open to the public, issued by companies worldwide;
    c)  money market instruments issued by private sector and public sector borrowers worldwide and denominated in a freely convertible currency, provided they are liquid, can be readily valued, and are traded on an exchange or other regulated market open to the public; money market instruments which are not traded on another regulated market open to the public may be acquired only if the issue or the issuer is subject to provisions regarding creditor and investor protection and if the money market instruments are issued or guaranteed by issuers pursuant to Art. 74.2 CISO.
    d)  units or shares in traditional collective investment schemes under Swiss law ("securities funds" and "other funds for traditional investments", but excluding "other funds for alternative investments" and "real estate funds"), and/or units or shares in open-ended collective investment schemes from a member state of the OECD that are subject to government supervision and engage in traditional investments, excluding foreign collective investment schemes whose investment policy corresponds to that of Swiss "other funds for alternative investments" or "real estate funds". In the case of foreign collective investment schemes, these need not have been authorized for public sale in or from Switzerland by the Swiss supervisory authority.
    e)  Derivative financial instruments and structured products (e.g. certificates, fund-linked notes, etc.) or similar financial instruments, which do not have investments pursuant to Section 2 as their underlying. The derivatives are either traded on an exchange or another regulated market open to the public, or are traded OTC;
        Investments in derivatives traded OTC (OTC transactions) are only permitted if (i) the counterparty is a regulated financial intermediary specializing in this business, and (ii) the OTC derivatives can be traded daily or returned to the issuer at any time. In addition, it must be possible for them to be valued in a reliable and transparent manner. Derivatives may be used pursuant to §12.

4.  Subject to the provisions of §19.4, the Fund Management Company may invest in units or shares of other collective investment schemes that are managed directly or indirectly by the Fund Management Company itself or a company with which it is related by virtue of common management or control or by way of a direct or indirect stake of more than 10% of the capital or votes ("related target funds").

5.  The investments of SAAF II (CH) Global Fund and SAAF II (CH) Long Short Equity Fund are made in accordance with Sections 2 and 3 above. The following investment restrictions apply additionally for the Subfund SAAF II (CH) Europe L/S Equity Fund (in Liquidation):

    5.1  As regards the investments of SAAF II (CH) Europe L/S Equity Fund (in Liquidation), on a consolidated basis at least two thirds of the assets of the Subfund should have a qualified connection to Europe. Such a connection is deemed to exist if:

        a. the investment policy of a target fund envisages mainly investments in securities of issuers from Europe;
        b. the investment policy of a target fund envisages mainly investments that are subject to the currency or economic risks of countries in Europe;

        Issuers from Europe are deemed to be companies that have their registered office in Europe, or companies that have their registered office in another country but carry out the bulk of their business activities in Europe or predominantly hold participations in companies that have their registered office in Europe as a holding company.

        Given the wide range of investments that non-traditional target funds typically engage in and the lack of transparency with regard to the current investments of a non-traditional collective investment scheme, there is a certain degree of uncertainty inherent in the assessment of their risk exposure in respect of Europe.

§9    Cash and cash equivalents

The Fund Management Company may also hold cash and cash equivalents in an appropriate amount for each Subfund in the currency of account of the Subfund concerned or in any other currency in which investments are permitted for the Subfund concerned or which is the reference currency of a Share

Class. Cash and cash equivalents comprise bank deposits as well as claims from repurchase agreements at sight or on demand with maturities up to twelve months.

## B    Investment techniques and instruments

### §10    Securities lending

1. The Fund Management Company may for the account of the Subfunds lend all types of securities which are traded on an exchange or other regulated market open to the public. However, it may not lend securities acquired under a reverse repo transaction.

2. The Fund Management Company may lend securities in its own name and for its own account to a borrower ("principal") or appoint an intermediary to put the securities at the disposal of the borrower either indirectly on a fiduciary basis ("agent") or directly ("finder").

3. The Fund Management Company will only carry out securities lending transactions with first-class borrowers or intermediaries which are specialized in transactions of this type, such as banks, brokers, and insurance companies, as well as recognized securities clearing organizations that guarantee the proper execution of the securities lending transactions.

4. If the Fund Management Company must observe a notice period, which may not be more than 10 bank business days, before it can legally repossess the loaned securities, it may not per Subfund lend more than 50% of the eligible holding of a particular security. However, should the borrower or the intermediary contractually guarantee to the Fund Management Company that it may legally repossess loaned securities on the same or following bank business day, then the entire eligible holding of a particular security may be lent.

5. The Fund Management Company must conclude an agreement with the borrower or intermediary whereby the latter pledges or transfers collateral to the Fund Management Company for the purposes of guaranteeing restitution in accordance with Art. 8 CISO-FINMA. The value of the collateral must at all times be equal to at least 105% of the market value of the loaned securities or at least 102% if the collateral consists of (i) liquid assets or (ii) fixed or variable-interest securities that have a current long-term rating of at least AAA, Aaa or the equivalent from a ratings agency recognized by FINMA. Moreover, the borrower or intermediary is liable for ensuring the prompt, unconditional payment of any income accruing during the lending period, as well as for the assertion of other proprietary rights and for the return of securities of the same type, quantity, and quality as per the terms of the agreement.

6. The Custodian Bank must ensure that the securities lending transactions are handled in a secure manner in line with the agreements and in particular must monitor compliance with the requirements relating to collateral. For the duration of the lending transactions it will also be responsible for the corporate actions assigned to it under the custody account regulations and for asserting all rights associated with the loaned securities, provided these have not been ceded under the terms of an applicable framework agreement.

### §11    Securities repurchase agreements

1. The Fund Management Company may enter into securities repurchase agreements for the account of the Subfunds. Securities repurchase agreements may be concluded as either repos or reverse repos.

   A repo is a legally binding transaction whereby one party (the borrower or repo seller) undertakes to temporarily transfer ownership of specific securities to another (the lender or repo buyer) against remuneration, while the lender undertakes to return to the borrower securities of the same type, quantity, and quality at the end of the repo term together with any income earned during such term. The price risk associated with the securities must be borne by the borrower for the duration of the repo transaction.

   From the perspective of the counterparty (lender), a repo is a reverse repo. By means of a reverse repo, the Fund Management Company acquires securities for investment purposes and at the same time agrees to return securities of the same type, quantity, and quality and to transfer all income received during the term of the reverse repurchase agreement.

2. The Fund Management Company may conduct repurchase agreements in its own name and on its own account with a counterparty ("principal"), or may instruct an intermediary to conclude repurchase agreements with a counterparty either indirectly in a fiduciary capacity ("agent") or directly ("finder").

3. The Fund Management Company will conduct repurchase agreements only with first-class counterparties and intermediaries specializing in transactions of this type, such as banks, brokers, and insurance companies or recognized securities clearing organizations that guarantee the proper execution of the repurchase agreements.

4. The Custodian Bank must ensure that the repurchase agreements are conducted in a secure manner and that the contractual terms are complied with. It must ensure on a daily basis that fluctuations in the value of the securities used in the repo transactions are compensated in cash or securities (mark to market). It is also responsible for the duration of the repurchase agreement for the corporate actions assigned to it under the custody account regulations and for asserting all rights pertaining to the securities used in the repo transactions, provided these have not been ceded under the terms of an applicable framework agreement.

5. For repo transactions, the Fund Management Company may use all types of securities which are traded on an exchange or other regulated market open to the public. It may not use securities acquired under a reverse repo for repo transactions.

6. If the Fund Management Company must observe a notice period, which may not be more than 10 bank business days, before it can legally repossess the securities used in a repo transaction, it may not per Subfund use more than 50% of the eligible holding of a particular security for repos. However, should the counterparty or the intermediary contractually commit to the Fund Management Company that it may legally repossess securities used in a repo transaction on the same or following bank business day, then the entire holdings of a particular security eligible for repo transactions may be used.

7. Engaging in repo transactions is deemed to be taking up a loan pursuant to §13, unless the money received is used to acquire securities of the same type, quality, credit rating, and maturity in conjunction with the conclusion of a reverse repo.

8. With regard to reverse repos, the Fund Management Company may only acquire fixed or variable-interest securities issued or guaranteed by the Swiss Confederation, cantons, and municipalities, or by issuers which have the minimum credit ratings required by the supervisory authority.

9. Claims arising from reverse repos are deemed to be cash and cash equivalents pursuant to §9 and not extending a loan pursuant to §13.

**§12    Derivative financial instruments**

1. The Fund Management Company may use derivatives for the efficient management of the Subfunds' assets. In respect of the portion of the Fund's assets not invested in target funds, derivatives may be used not only for hedging purposes (exposure-increasing). As regards the portion of the Fund's assets invested in target funds, derivatives may only be used to hedge the currency risk (exposure-reducing). The Fund Management Company must ensure that even under extreme market circumstances, the financial effect of the use of derivatives does not result in a deviation from the investment objectives set out in this Fund Contract and in the Prospectus, and that it does not change the investment character of the Subfunds. Furthermore, the underlyings of the derivatives must be permitted as investments for the Subfund concerned according to the present Fund Contract.

   The collective investment schemes legislation envisages three risk assessment processes for the use of derivatives: Commitment Approaches I and II for "simple investment funds" and the model approach combined with stress tests for "complex investment funds". A modified Commitment Approach II is used for the Fund. Commitment Approach II is an extended process. Both leverage and short selling are permitted.

2. The overall exposure of a Subfund associated with derivatives may therefore not exceed 100% of its net assets, and the overall exposure may not exceed a total of 200% of its net assets. When taking into account the possibility of temporary borrowing of a Subfund amounting to up to 30% of its net assets pursuant to §13.2, the overall exposure of the Subfund concerned may be up to 230% of its net assets.

   The provisions of this clause apply to the individual Subfunds.

   The Fund Management Company must at all times be able to meet the payment and delivery obligations entered into in respect of the derivatives from the assets of the Subfund concerned in accordance with collective investment schemes legislation.

3. The Fund Management Company may in particular use basic forms of derivatives such as call or put options whose value at expiration is linearly dependent on the positive or negative difference between the market value of the underlying and the strike price and is zero if the difference is preceded by the opposite algebraic sign, credit default swaps (CDSs), swaps whose payments are dependent on the value of the underlying or on an absolute amount in both a linear and a path-independent manner, as well as futures and forward transactions whose value is linearly dependent on the value of the underlying. It may also use combinations of basic forms of derivatives, as well as derivatives whose economic mode of operation cannot be described by a basic form of derivative or a combination of basic forms of derivatives (exotic derivatives).

4. a) Derivatives are broken down by the Fund Management Company into the three risk categories of market risk, credit risk, and currency risk. If a derivative entails risks in different categories, it will be included in each of the corresponding risk categories with its underlying equivalent. In the case of futures, forwards, and swaps, the underlying equivalent is determined by taking the product of the number of contracts and the contract value. In the case of options, it is determined by taking the product of the number of contracts, the contract value, and the delta (provided one has been calculated).

   b) Counterpositions in derivatives on the same underlying and in investments in that underlying may be netted off against one another.

   c) Counterpositions in different underlyings may be netted off against one another only if they are similar in terms of market risk, credit risk, and currency risk and exhibit a high correlation.

   d) Call options sold and put options purchased may be included in the netting process only if their delta has been calculated.

   e) For each risk category, the absolute amounts of the underlying equivalents of the derivatives are added together, subject to any netting in accordance with b to d. In none of the three risk categories may the sum of the underlying equivalents ever exceed the net assets of the Subfund concerned.

   f) Payment obligations in respect of derivatives must at all times be covered by near-money assets, debt securities and rights or equities that are traded on an exchange or other regulated market open to the public, in accordance with collective investment schemes legislation. These near-money assets and investments may be used to cover several derivative positions at the same time, provided these are subject to a market risk or credit risk and are based on the same underlyings.

   g) Physical delivery obligations in respect of derivatives must at all times be covered by the corresponding underlyings or by other investments, provided the associated risks, such as market risks, currency risks, and interest risks, are similar to those of the underlying to be delivered, the investments and the underlyings exhibit a high correlation, the investments and the underlyings are highly liquid, and, should delivery be requested, they may be purchased or sold at any time. Underlyings may be used as cover for several derivative positions at the same time, provided these are subject to a market risk, credit risk or currency risk and are based on the same underlyings.

5. The Fund Management Company may use both standardized and non-standardized derivatives. It may conclude transactions in derivatives on an exchange or other regulated market open to the public or in OTC (over-the-counter) trading.

6. a) The Fund Management Company may conclude OTC transactions only with regulated financial intermediaries specialized in such types of transactions that ensure proper execution of the contract. If the counterparty is not the Custodian Bank, the former or the guarantor must meet the minimum credit rating requirements laid down in collective investment schemes legislation under Art. 33 CISO-FINMA.

   b) It must be possible to reliably and verifiably value an OTC derivative on a daily basis and to sell, liquidate or close out the derivative at market value at any time.

c)    If no market price is available for an OTC-traded derivative, it must be possible to determine the price at any time based on the market value of the underlyings using appropriate valuation models that are recognized in practice. Moreover, before the conclusion of such transactions, specific offers must be obtained from at least two potential counterparties, and the most favorable offer must be accepted, under due consideration of the price, credit rating, risk distribution, and the range of services offered by the counterparties. The conclusion of the transaction and pricing must be clearly documented.

7.    In respect of compliance with the statutory and contractual investment restrictions (maximum and minimum limits), derivatives are to be factored in in accordance with the legislation on collective investment schemes.

8.    The Prospectus contains further information on:

- the importance of derivatives as part of the investment strategy;
- the effect of the use of derivatives on the risk profile of the Fund;
- the counterparty risks attached to derivatives;
- any increased volatility and increased overall exposure (leverage effect) resulting from the use of derivatives;
- any use of credit derivatives.

### §13    Taking up and extending loans

1.    The Fund Management Company may not grant loans for the account of the Subfunds. Securities lending transactions pursuant to §10 and securities repurchase agreements taking the form of reverse repos pursuant to §11 are not deemed to be loans within the meaning of this paragraph.

2.    The Fund Management Company may borrow up to the equivalent of 30% of the net assets of a Subfund at standard market terms both for investment purposes and to satisfy redemption orders. Securities repurchase agreements taking the form of repos pursuant to §11 are deemed to be borrowing within the meaning of this paragraph unless the funds obtained are used as part of an arbitrage transaction for the acquisition of securities of the same type, quality, credit rating, and maturity in connection with a reverse repo.

### §14    Encumbrance of the Fund's assets

1.    No more than 70% of the net assets of a Subfund may be pledged or ownership thereof transferred as collateral by the Fund Management Company at the expense of that Subfund.

2.    The Subfunds' assets may not be encumbered with guarantees. An exposure-increasing credit derivative is not deemed to be a guarantee within the meaning of this paragraph.

## C    Investment restrictions

### §15    Diversification of risk

1.    The regulations on risk diversification pursuant to the present §15 must include the following:

a)    investments pursuant to §8, with the exception of index-based derivatives, provided the index is sufficiently diversified, is representative of the market it relates to and is published in an appropriate manner;

b)    cash and cash equivalents pursuant to §9;

c)    claims against counterparties arising from OTC transactions.

The regulations on risk diversification apply to each individual Subfund of the Umbrella Fund.

2.    Companies which form a group in accordance with international accounting regulations are deemed to be a single issuer.

3.    Including the derivatives, the Fund Management Company may invest up to a maximum of 10% of the assets of a Subfund in securities and money market instruments issued by the same issuer. The total value of the securities and money market instruments of issuers in which more than 5% of a Subfund's assets are invested may not exceed 40% of that Subfund's assets. The provisions of Sections 4 and 5 apply notwithstanding.

4.    The Fund Management Company may invest up to a maximum of 20% of the assets of a Subfund in sight and time deposits with the same bank. Cash and cash equivalents pursuant to §9 must be included in this limit.

5.    The Fund Management Company may invest up to a maximum of 10% of the assets of a Subfund in OTC transactions with the same counterparty. If the counterparty is a bank domiciled in Switzerland or in a member state of the European Union or another country in which it is subject to supervision equivalent to that in Switzerland, this limit is increased to 20% of the assets of the corresponding Subfund.

6.    Investments, deposits, and claims pursuant to Sections 3 to 5 above and issued by the same issuer/borrower may not in total exceed 20% of the assets of the Subfund.

7.    Investments pursuant to Section 3 above of the same group of companies may not in total exceed 20% of the assets of a Subfund. The higher limits pursuant to Section 13 below apply notwithstanding.

8.    The Fund Management Company may invest up to a maximum of 20% of the assets of a Subfund in units or shares of the same target fund. If an issuer of target funds also functions as the issuer/borrower of other investments pursuant to Section 1, these must be taken into account in determining the 20% restriction pursuant to the present Section 8.

9.    Up to a maximum of 30% of the assets of a Subfund may be invested in target funds managed by the same portfolio manager.

10.   The Fund Management Company may not acquire participation rights which in total represent more than 10% of the voting rights of an issuing company or would enable it to exert a material influence on the management of an issuing company, unless an exception is granted by the supervisory authority.

11.   The Fund Management Company may acquire for the assets of a Subfund up to a maximum of 10% each of the non-voting equity, debt and/or money market instruments of the same issuer as well as a maximum of 25% of the units or shares of another target fund. These restrictions do not apply if the gross amount of the debt instruments, money market instruments or the units/shares of other target funds cannot be calculated at the time of the acquisition.

12.   The restrictions in Sections 10 and 11 above do not apply in the case of securities and money market instruments that are issued or guaranteed by a country or a public-law entity from the OECD or by an international public-law organization to which Switzerland or a member state of the European Union belongs.

13.   The limit of 10% specified in Section 3 is increased to 35% in the case of securities or money market instruments that are issued or guaranteed by a OECD member state, a public-law entity from the OECD or by an international public-law organization to which Switzerland or a member state of the European Union belongs. The aforementioned securities or money market instruments will not be taken into account in the application of the 40% limit pursuant to Section 3. However, the individual limits specified in Sections 3 and 5 may not be added together with this limit of 35%.

## IV    Calculation of the net asset values and the issue and redemption of Fund Shares

### §16    Calculation of the net asset values

1.    The net asset value of each Subfund and the proportions of assets attributable to the individual Classes are calculated in the accounting currency of the Subfund concerned at the market value as of the end of the financial year and on each day that Shares of that Subfund are issued or redeemed ("Issue Date"/"Redemption Date").

2.    Investments traded on an exchange or another regulated market open to the public, including closed-ended collective investment schemes, are to be valued at the current prices paid on the main market, subject to Sections 3 and 4 below. Other items, rights or investments for which no current price is available are to be valued on the basis of the price that it is likely to be obtained in a diligent sale at the time the value is determined. In such cases, the Fund Management Company will use appropriate and recognized valuation models and principles to determine the market value (fair value).

3.    The value of money market instruments not traded on an exchange or other regulated market open to the public is determined as follows: the valuation price of such investments is successively adjusted in line with the repayment price, taking the net purchase price as the basis and ensuring that the investment returns calculated in this manner are kept constant. If market conditions change significantly, the valuation basis for the individual investments is adjusted to reflect the new market rate of return. If no current market price exists, the basis taken will, as a rule, be the valuation of money market instruments with similar characteristics (issuer quality and place of domicile, issue currency, maturity).

4.    Open-ended collective investment schemes are valued at their redemption price/net asset value. If they are regularly traded on an exchange or another regulated market open to the public, the Fund Management Company may value them in accordance with Section 2.

5.    The NAV of a Share of a given Class of a Subfund is determined by the proportion of the market value of the Subfund's assets attributable to that Class, minus any of the Subfund's liabilities that are attributed to that Class, divided by the number of Shares of that Class in circulation. It will be rounded to 1/100 of one unit of the accounting currency of the Subfund concerned.

6.    The proportion of the market value of the net assets of a Subfund (the Subfund's assets minus its liabilities) attributable to the individual Share Classes is determined for the first time at the initial issue of more than one Class of Shares (if this occurs simultaneously) or the initial issue of a further Share Class. The calculation is made on the basis of the assets accruing to the Subfund concerned for each Share Class. The proportion is recalculated when one of the following events occurs:

a)    when Shares are issued and redeemed;

b)    on the pertinent date for distributions, provided that (i) such distributions are only made for individual Classes (distribution classes) or provided that (ii) the distributions of the various Classes differ when expressed as a percentage of the respective net asset value or provided that (iii) different commissions or costs are charged on the distributions of the various Classes when expressed as a percentage of the distribution;

c)    when the net asset value is calculated, as part of the allocation of liabilities (including due or accrued costs and commissions) to the various Share Classes, provided that the liabilities of the various Share Classes are different when expressed as a percentage of the respective net asset value, especially if (i) different commission rates are applied for the various Share Classes or if (ii) class-specific costs are charged for currency conversions or currency hedging transactions;

d)    when the net asset value is calculated, as part of the allocation of income or capital gains to the various Share Classes, provided the income or capital gains stem from transactions (e.g. from currency hedging transactions) made solely in the interests of one Share Class or in the interests of several Share Classes but disproportionately to their proportion of the net assets of a Subfund.

### §17    Issue and redemption of Shares

1.    Shares of all Classes of the Subfunds SAAF II (CH) Global Fund and SAAF II (CH) Long Short Equity Fund will be issued or redeemed on each Issue and Redemption Date of a Subfund. The Issue and Redemption Date is the last bank business day of each month in Zurich. The net asset value is calculated in the following month on the basis of the closing prices from the Issue and Redemption Date. Subscriptions for a given calendar month will be accepted by the Custodian Bank at any time up to the cut-off time on the 25th calendar day of that month (or if this date falls on a weekend,

the preceding Friday) as specified in the Prospectus. Notice of the termination of Shares must be received by the Custodian Bank by the cut-off time on the 25th calendar day of a given month (or if this date falls on a weekend, the preceding Friday) as specified in the Prospectus for the Shares to be redeemed on the Redemption Date of the following calendar month.

2.  The issue and redemption prices of the Shares of a Class of a Subfund are based on the NAV per Share of the Class concerned calculated for the corresponding Issue or Redemption Date pursuant to §16. In the case of Share issues, an issuing commission may be added to the net asset value pursuant to §18, and in the case of redemptions, a redemption commission may be deducted from the net asset value pursuant to §18.

3.  Incidental costs for the sale and purchase of investments (standard brokerage charges, fees, taxes, etc.) incurred by a Subfund when investing the amount paid in by the investor, or in the sale of that portion of investments corresponding to a redeemed Share, are charged to the assets of that Subfund.

4.  The issue and redemption prices are rounded off to the smallest currency unit.

5.  The Fund Management Company may suspend the issue of Shares of all Classes of any Subfund at any time, and may reject applications for the subscription or switching of Shares. This is especially the case if investment demand exceeds supply (market liquidity) and the investment objective therefore cannot be attained.

6.  Under the following exceptional circumstances, the Fund Management Company may temporarily and by way of exception suspend the redemption of Shares of any Class of the Subfunds affected in the interest of all investors:

    a.  if a market which is the basis for the valuation of a significant portion of the assets of a Subfund is closed or if trading on such a market is subject to restrictions or suspended;
    b.  in the event of a political, economic, military, monetary or other emergency;
    c.  if transactions are rendered impossible for the Subfund owing to foreign exchange restrictions or restrictions on other asset transfers;
    d.  if redemptions are so extensive that they could have a significant negative impact on the interests of the remaining investors in the Subfund.

7.  The Fund Management Company must immediately inform the Statutory Auditors and the supervisory authority of the suspension decision. It must also notify the investors in a suitable manner.

8.  No Shares of a Subfund will be issued as long as the redemption of Shares of that Subfund is suspended for the reasons given under Section 6a to 6c.

9.  Switching from one Subfund to another and from one Class to another is possible subject to notice being given. Such switches will be made free of charge and if possible already at the end of the current month.

# V    Fees and incidental costs

### §18    Fees and incidental costs charged to the investor

1.  For the issuance of Shares, investors can be charged an issuing commission not exceeding 5% of the net asset value, which is payable to the Fund Management Company, Custodian Bank and/or distributors in Switzerland and abroad. The currently applied maximum rate is stated in the Prospectus.

2.  For the redemption of Shares, investors can be charged a redemption commission not exceeding 2% of the net asset value, which is payable to the Fund Management Company, Custodian Bank and/or distributors in Switzerland and abroad. The currently applied maximum rate is stated in the Prospectus.

3.  If a Subfund is dissolved, the Custodian Bank will charge investors a commission of 0.5% of the net asset value for disbursing the proceeds of the liquidation.

### §19    Fees and incidental costs charged to the Subfunds' assets

1.  For the administration, asset management, and distribution of the Subfunds, as well as the remuneration of the Custodian Bank for the safekeeping of the Subfunds' assets, the handling of the payment transactions of the Umbrella Fund/the Subfunds, and the performance of the other tasks of the Custodian Bank listed in §4, the Fund Management Company charges the Subfunds a management fee not exceeding 2.5% p.a. (A Class) or 1.75% p.a. (IA Class) on the net asset value of the individual Subfunds. The management fee is calculated on the basis of the NAV and transferred to the Fund Management Company monthly. The Fund Management Company is responsible for the remuneration of the Custodian Bank for the services listed in the present Section 1.

    The Fund Management Company must disclose in the Prospectus whether it pays reimbursements to investors and/or trailer fees to distributors.

2.  Furthermore, the Fund Management Company and the Custodian Bank are entitled to reimbursement of the following costs incurred in the course of executing the Fund Contract:

    a)  The costs for the publication of prices.
    b)  The costs for notices to investors in the official publications of the Umbrella Fund/Subfunds.
    c)  The costs for printing the annual and semi-annual reports and costs for having them translated into the official languages of Switzerland and English.
    d)  Fees charged by the Statutory Auditors for regular auditing.
    e)  Costs incurred by the Fund Management Company or the Custodian Bank for any necessary extraordinary actions they take when acting in the interests of the investors, including costs for legal advice.
    f)  The annual fees for supervision of the Umbrella Fund/Subfunds in Switzerland.
    g)  Costs for obtaining foreign tax data, up to a maximum of CHF 4,500 (or the equivalent) per Subfund.

3.   In addition, the Subfunds bear all the incidental costs incurred in connection with the management of their assets for the sale and purchase of investments (standard brokerage charges, fees, and taxes). These costs are charged directly with the purchase or sale price of the investments concerned.

4.   If the Fund Management Company acquires shares in other collective investment schemes that are managed directly or indirectly by the Fund Management Company itself or a company with which it is related by virtue of common management or control or by way of a direct or indirect stake of more than 10% of the capital or votes ("related target funds"), only a reduced management fee not exceeding 0.25% p.a. may be charged to the Subfunds' assets in respect of such investments. Furthermore, the Fund Management Company may not charge to the Subfunds any issuing or redemption commissions of the related target funds.

If the Fund Management Company invests in shares of a related target fund pursuant to the above paragraph that has a lower actual (all-in) management fee than the actual management fee pursuant to Section 1, the Fund Management Company may – instead of charging the aforementioned reduced fee on the assets invested in this related target fund – charge the difference between the actual management fee of the investing Subfund and the actual (all-in) management fee of the related target fund.

5.   Fees may only be charged to the Subfund for which a certain service is performed. Costs that cannot be clearly allocated to one Subfund will be charged to the individual Subfunds on a pro rata basis in relation to their proportion of the Fund's assets.

6.   The management fee of the target funds in which investments are made may not exceed 5%, taking any reimbursements into account. The maximum rate (taking any reimbursements into account) of the management fee of the target funds in which investments are made must be disclosed in the annual report.

7.   At the level of the target funds, substantial costs and commissions regularly arise that are also borne economically by indirect investors such as the investors in the Fund. Target funds often charge performance fees in addition to fixed management fees. Any reductions in commissions, trailer fees, distribution remuneration payments, etc. due in respect of investments made for the Subfunds in other investment funds are credited exclusively to the assets of the Subfund concerned. Such reductions tend to be rare in the case of hedge funds. In the case of related target funds, as a rule no such reductions, trailer fees or remunerations are made/paid.

8.   The following costs may also be charged to the Subfunds' assets:

   –   customary bank charges in connection with the safe custody of assets by third parties (Sub-Custody);
   –   all taxes and duties levied on the assets of the Subfund concerned, its income, and any outlays charged to the assets of the Subfund concerned.

9.   Information on the rates actually applied within the schedule of maximum commission rates established in the present §19 is disclosed in the annual and semi-annual reports.

## VI    Financial statements and audits

### §20    Financial statements

1.   The accounting currencies of the individual Subfunds are as follows:

   SAAF II (CH) Global Fund:                                the US dollar
   SAAF II (CH) Long Short Equity Fund:                     the US dollar
   SAAF II (CH) Europe L/S Equity Fund (in Liquidation):    the euro

   The financial year runs from January 1 to December 31.

2.   The Fund Management Company will publish an audited annual report for the Umbrella Fund and the Subfunds within four months of the end of the financial year.

3.   The Fund Management Company will publish a semi-annual report for the Umbrella Fund and the Subfunds within two months following the end of the first half of the financial year.

4.   In the report section of the annual and semi-annual reports, the Fund Management Company will in particular provide information on the performance of the individual investment strategies and styles and on the value of any investments that are difficult to value pursuant to §16.

5.   The investor's right to obtain information under §5.4 applies notwithstanding.

### §21    Audits

The Statutory Auditors will examine whether the Fund Management Company and the Custodian Bank have acted in compliance with the provisions of the Fund Contract, the CISA, and the Code of Conduct of the Swiss Funds Association SFA. The annual report will contain a short report by the Statutory Auditors on the published annual financial statements.

## VII    Appropriation of net income

**§22**

1. The net income of the Subfunds will be distributed per Share Class to the investors annually at the latest within four months of the end of the financial year in the reference currency of the Share Class in question.

2. The Fund Management Company may make additional interim distributions from the income.

3. Up to 30% of the net income of the Subfunds including income carried forward from previous financial years may be carried forward to the new account. If the net income in a financial year including income carried forward from previous financial years is less than 1% of the net assets of a Subfund and is less than 1.00 per Share in the accounting currency, a distribution may be waived and the entire net income carried forward to the new account of the Subfund concerned.

4. Capital gains realized on the sale of assets and rights can be distributed by the Fund Management Company or retained for the purpose of reinvestment.

## VIII    Publications of the Umbrella Fund/Subfunds

**§23**

1. The media of publication of the Umbrella Fund/Subfunds are deemed to be the print media or electronic media specified in the Prospectus. Notification of any change in a medium of publication must be published in the media of publication.

2. The following information must in particular be published in the media of publication: summaries of material amendments to the Fund Contract, indicating the offices from which the amended wording may be obtained free of charge, any change of Fund Management Company and/or Custodian Bank, the creation, dissolution or merger of Share Classes, as well as the liquidation of the Umbrella Fund/Subfunds. Amendments that are required by law and do not affect the rights of investors or are of an exclusively formal nature may be exempted from the duty to publish subject to the approval of the supervisory authority.

3. For each Subfund, each time Shares are issued or redeemed the Fund Management Company will publish both the issue and the redemption prices together or the net asset value with a footnote "excluding commissions" for all Share Classes in at least one of the print media or electronic media specified in the Prospectus. Prices are published daily.

4. The Prospectus with integrated Fund Contract and the annual and semi-annual reports may be obtained free of charge from the Fund Management Company, the Custodian Bank, and all distributors.

## IX    Restructuring and dissolution

**§24**    **Mergers**

1. Subject to the consent of the Custodian Bank, the Fund Management Company can merge individual Subfunds with other Subfunds or with other investment funds by transferring – as of the time of the merger – the assets and liabilities of the Subfund(s)/investment fund(s) being acquired to the acquiring Subfund/investment fund. The investors of the Subfund/investment fund being acquired will receive the corresponding number of shares in the acquiring Subfund/investment fund. The Subfund/investment fund being acquired is terminated without liquidation when the merger takes place, and the fund contract of the acquiring Subfund/investment fund will also apply for the Subfund/investment fund being acquired.

2. Subfunds/investment funds may only be merged if:
   a) provision for this is made in the relevant fund contracts;
   b) they are managed by the same fund management company;
   c) the relevant fund contracts are basically identical in terms of the following provisions:

   – the investment policy, risk diversification, and the risks associated with the investment

   – the appropriation of net income and capital gains

   – the type, amount, and calculation of all fees, the issue and redemption commission together with the incidental costs for the purchase and sale of the investments (brokerage fees, charges, duties) that may be charged to the assets of the fund or the subfund or to the investors

   – the redemption conditions;

   – the duration of the contract and the conditions of dissolution;

   d) the valuation of the assets of the funds or subfunds involved, the calculation of the exchange ratio, and the transfer of the assets and liabilities take place on the same day;
   e) no costs arise as a result for either the funds/subfunds or the investors.

3. If the merger is likely to take more than one day, the supervisory authority may approve limited deferment of redemption in respect of the shares of the subfunds/funds involved.

4. The Fund Management Company must submit the proposed merger together with the merger schedule and intended changes to the Fund Contract to the supervisory authority for review at least one month before their planned publication. The merger schedule must contain detailed information on the reasons for the merger, the investment policies of the subfunds/funds involved and any differences between the acquiring subfund/fund and the subfund(s)/fund(s) being acquired, the calculation of the exchange ratio, any differences with regard to remunerations and any tax implications for the subfunds/funds, as well as a statement from the competent auditors pursuant to the CISA.

5. The Fund Management Company must publish a notice of the proposed changes to the Fund Contract pursuant to §23.2 and the proposed merger together with the merger schedule at least two months before the planned date of merger in the official publications of the subfunds/funds in question. In this notice, the Fund Management Company must inform the investors that they may lodge objections with the supervisory authority within 30 days from the final publication or request redemption of their units in accordance with the provisions of the fund contracts.

6. The auditors must check directly that the merger is being carried out correctly, and submit a report containing their comments in this regard to the Fund Management Company and the supervisory authority.

7. The Fund Management Company must inform the supervisory authority of the conclusion of the merger and publish notification of the completion of the merger, the confirmation from the auditors regarding the proper execution of the merger, and the exchange ratio without delay in the official publications of the subfunds/funds involved.

8. The Fund Management Company must make reference to the merger in the next annual report of the acquiring subfund/fund and in the semi-annual report if published prior to the annual report. If the merger does not take place on the last day of the usual financial year, an audited closing statement must be produced for the subfund/fund being acquired.

§25    **Term and dissolution**

1. The Umbrella Fund/Subfunds have been established for an indefinite period.

2. Either the Fund Management Company or the Custodian Bank may dissolve the Umbrella Fund or individual Subfunds by terminating the Fund Contract subject to one month's notice.

3. The individual Subfunds may be dissolved by order of the supervisory authority, in particular if at the latest one year after the expiry of the subscription period (launch) or a longer extended period approved by the supervisory authority at the request of the Custodian Bank and the Fund Management Company a Subfund does not have net assets of at least 5 million Swiss francs (or the equivalent).

4. The Fund Management Company must inform the supervisory authority of the dissolution immediately and must publish notification in the media of publication.

5. Once the Fund Contract has been terminated, the Fund Management Company can immediately liquidate the assets of the Subfund(s) concerned. If the supervisory authority has ordered the dissolution of a Subfund, it must be liquidated forthwith. The payment of the liquidation proceeds to investors is the responsibility of the Custodian Bank. If the liquidation proceedings are protracted, payment may be made in installments. Prior to the final payment, the Fund Management Company must obtain authorization from the supervisory authority.

# X    Changes to the Fund Contract

§26

If changes are to be made to this present Fund Contract, or if the merger of Share Classes or a change in the Fund Management Company or Custodian Bank is planned, the investors may lodge objections with the supervisory authority within 30 days of the last relevant notice published. In the event of a change to the Fund Contract (including the merger of Share Classes), the investors can also demand the redemption of their Shares in cash subject to the contractual period of notice. Exceptions in this regard are cases pursuant to §23.2 that have been exempted from the duty to publish with the approval of the supervisory authority.

# XI    Applicable law, jurisdiction

§27

1. The Umbrella Fund and the individual Subfunds are subject to Swiss law, in particular the Swiss Federal Act on Collective Investment Schemes (CISA) of June 23, 2006, the Ordinance on Collective Investment Schemes of November 22, 2006 (CISO), and the Ordinance of the Swiss Financial Market Supervisory Authority on Collective Investment Schemes of December 21, 2006 (CISO–FINMA).

The court of jurisdiction is the court at the Fund Management Company's registered office. The Fund Management Company, the Custodian Bank, and the distributors reserve the right to recognize the jurisdiction of countries in which Fund Shares are publicly distributed and the competence of other courts resulting therefrom.

2. Only the German version is valid and binding for the interpretation of the present Fund Contract.

3. The present Fund Contract will enter into force on February 10, 2010.

4. The present Fund Contract replaces the Fund Regulations of October 27, 2008.

The Fund Management Company:
Zurich, _____

Swiss Investment Company SIC Ltd.:


_____


The Custodian Bank:
Zurich, _____

Clariden Leu Ltd.:


_____

**Clariden Leu Ltd**
Investment Funds
Bahnhofstrasse 32
CH–8070 Zurich
Tel. +41 844 844 001
funds@claridenleu.com
www.claridenleu.com