**BROWN RUDNICK LLP**
David J. Molton
May Orenstein
Daniel J. Saval
Marek P. Krzyzowski
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800

**KELLOGG, HANSEN, TODD,**
**FIGEL & FREDERICK, P.L.L.C.**
Michael K. Kellogg (admitted *pro hac vice*)
Aaron M. Panner (admitted *pro hac vice*)
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C.  20036
Telephone: (202) 326-7900

*Counsel for the Foreign Representatives*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 15 Case |
| FAIRFIELD SENTRY LIMITED, et al., | Case No: 10-13164 (SMB) |
| Debtors in Foreign Proceedings. | Jointly Administered |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al., | |
| Plaintiffs, | Adv. Pro. No. 10-03496 |
| -against- | |
| THEODOOR GGC AMSTERDAM, et al., | Administratively Consolidated |
| Defendants. | |

## DECLARATION OF GABRIEL MOSS QC IN
## FURTHER SUPPORT OF MOTION FOR LEAVE TO AMEND
## AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1

I, GABRIEL MOSS QC, do hereby declare, under penalty of perjury under the laws of the United States of America, that the following is true and correct to the best of my knowledge and belief:

1.     I am the same Gabriel Moss QC who executed a declaration herein on October 20, 2016 in Support of the Foreign Representatives' Motion for Leave to Amend (the "Initial Moss Declaration") and my qualifications for giving expert evidence of English and BVI law remain substantially the same. My means of knowledge remain the same.

2.     Since submitting the Initial Moss Declaration, I have argued a number of points of BVI law on behalf of Kenneth M. Krys and Charlotte Caulfield, in their capacities as joint liquidators (the "Liquidators") of Fairfield Sentry Limited, in liquidation, Fairfield Sigma Limited, in liquidation, and Fairfield Lambda Limited, in liquidation (collectively, the "Funds"), in a three day appeal before the East Caribbean Court of Appeal ("ECCA") from the dismissal by Leon J. of the applications, by a relatively small group of Defendants in these proceedings, some of whom were defendants to the former BVI proceedings, for relief under s.273 of the BVI Insolvency Act 2003 and for an anti-suit injunction. The ECCA reserved their decision - it is not known when judgment will be given. There is some overlap between the arguments put to the ECCA on behalf of the Liquidators and the matters dealt with in this further declaration. I believe that the arguments put on behalf of the Liquidators to the ECCA are consistent with the views expressed in this declaration.

3.     Though it follows that I have acted and am continuing to act as counsel to the Liquidators in proceedings in the BVI, I should make clear that:

a.     My remuneration for giving expert evidence in this matter is not in any way dependent on the success or otherwise of any motion or proceeding.

2

b.      To the extent matters stated in this further declaration are statements of legal opinion, such statements represent my view of the law of the BVI as a practicing BVI attorney.  In preparing this further declaration, I have adopted the approach of a person who gives expert evidence and owes a duty to the Court to be objective and which overrides any obligations to the person from whom the expert has received instructions or by whom he is paid.

c.      Nothing in this declaration is intended to waive privilege in relation to any advice that has been given to the Liquidators.  I am not authorized to and do not waive privilege in any respect.

4.      I submit this further declaration in order to set out my views as a practising BVI attorney in response to points made in the *Declaration of Simon Mortimore QC in Opposition to Plaintiffs' Motion for Leave to Amend and in Support of the Defendants' Motion to Dismiss* (the "Mortimore Declaration"), which the Defendants in these proceedings have offered to support their opposition to the Liquidators' motions to amend and in support of the Defendants' motions to dismiss.  Except as otherwise indicated, all facts set forth in this further declaration are based upon my personal knowledge or learned from my review of relevant documents, including, without limitation, the Sample Amended Complaints and the Citco Documentation (each as defined in paragraph 4 of the Initial Moss Declaration), the Mortimore Declaration and the authorities discussed or referenced therein, the *Defendants' Consolidated Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to Amend and in Support of Defendants' Motion to Dismiss*, and the authorities included in the *Compendium of Authorities Cited In Further Declaration of Gabriel Moss QC In Support of Motion for Leave to Amend* attached hereto as Exhibit A.

3

5.      Although Mr. Mortimore and I both practise from the same "chambers", we are not partners or members of a firm but instead are independent sole practitioners.   The "chambers" system allows for the sharing of certain services and expenses, but care is taken to avoid any leak of confidential information.

**I.      THE COMMON LAW CLAIMS**

**A.      Introduction**

6.      In Sections 2 - 6 of the Mortimore Declaration, Mr. Mortimore expresses the view that the common law restitution/unjust enrichment and related common law claims set out in the Sample Amended Complaints would be bound to fail if pursued in a BVI Court applying BVI law.   In the Mortimore Declaration, Mr. Mortimore puts forward five reasons that might be summarised as follows:

a.      The decision of the Privy Council in the *Fairfield Sentry v Migani* case means that the claims are *res judicata* (paragraphs 17 - 69 );

b.      The claims would fail on the merits because the fact that certificates were issued by Citco in bad faith does not mean that they do not bind the Funds as a result of an analogy with a Cayman Islands case called *Weavering* (paragraphs 70 - 74) or as the result of the application of a rule of agency or general law (paragraphs 75 - 92);

c.      The Funds' claim would be barred by the principle *ex turpi causa non oritur actio* (paragraphs 93 - 98);

d.      Citco's bad faith would itself provide a defence to the claims (paragraphs 99 - 100);

4

     e.      The facts and matters pleaded against Citco do not in fact allege an arguable case of bad faith (paragraphs 108 - 116).

    7.      Mr. Mortimore further expresses the view that, if pursued in a BVI Court applying BVI law:

     a.      The contractual claims would be bound to fail because the court would not imply the necessary term (paragraphs 101 - 107);

     b.      The claims against the alleged bad faith recipients would be bound to fail as a matter of law (paragraphs 117 - 129) or on the facts (paragraphs 130 - 134).

    8.      I do not agree with Mr. Mortimore's views on any of these issues, for the reasons which I set out in detail below. My view remains as set out in the Initial Moss Declaration filed in support of the motion for leave to file the amended complaints, *i.e.*, that the common law claims set out in the Sample Amended Complaints each set out a properly arguable claim as a matter of BVI law. In other words, they are in my view claims which would not be dismissed at a preliminary stage but would go to trial with discovery and cross-examination.

    9.      As I explain below, in some respects (including perhaps most obviously in relation to the concepts of 'cause of action estoppel' and 'privity of interest') Mr. Mortimore has, with the greatest of respect to him, mis-stated or misunderstood the law. In other respects he has expressed a view on factual questions or on questions of mixed fact and law which (a) does not seem to me to be expert evidence but rather argument on the merits, and (b) is in any event wrong.

B.    **Ground One: *Res Judicata***

10.    I agree with Mr. Mortimore[1] that there are substantive and procedural rules of BVI law which prevent a party, in appropriate circumstances, from re-litigating issues that have been decided in earlier proceedings or which could and should have been raised in earlier proceedings. These rules are generally known as the principles of *res judicata*. There are several different varieties of *res judicata*, which were helpfully enumerated by the UK Supreme Court in *Virgin Atlantic Airways v Zodiac Seats UK Ltd* [2014] AC 160 at paragraph 17. Mr. Mortimore refers to and relies upon three of the varieties of *res judicata*: (i) cause of action estoppel; (ii) issue estoppel and (iii) *Henderson v Henderson* abuse of process. I will first address the decision of the Privy Council in *Fairfield Sentry v Migani* which is said to give rise to the *res judicata*, and then set out briefly the law in relation to each of these varieties of *res judicata*, before finally addressing Mr. Mortimore's views as to their application to the present case.

i.    The decision in *Fairfield Sentry v Migani*

11.    I have already set out in the Initial Moss Declaration a description of what the Privy Council decided (and did not decide) in its judgment in *Fairfield Sentry v Migani*. In paragraphs 17 - 34 of the Mortimore Declaration, Mr. Mortimore sets out his own account. To the extent that his account differs from my own, I respectfully suggest that the account set out in the Initial Moss Declaration is the more accurate.

12.    There is one respect in particular in which Mr. Mortimore's account is erroneous and potentially misleading. Mr. Mortimore suggests that, in dismissing the appeal in respect of Preliminary Issue 4, the Privy Council approved the decision of the judges at first instance and in

---

[1] At paragraph 41 of the Mortimore Declaration.

the EC Court of Appeal that *irrespective of whether or not the documents issued by Citco were certificates*, the Funds could not recover redemption payments because in surrendering their shares the redeemers gave "good consideration" for the payments that they received.   That suggestion is completely wrong.

13.    As a general point, it is perfectly common for an appellate court to reach the conclusion that an appeal should fail on the basis of reasons which differ from those in the courts below.  In those circumstances, the appeal will be dismissed (which in US parlance means that the judgment of the lower court is affirmed).  That obviously does not mean that the reasoning of the courts below has been approved: one must look to the decision and reasoning of the appellate court to see the basis on which the appellant has failed in its appeal, what issues have been decided against it and on what basis.  If the reasoning of the appellate court differs from that of the court below, it will be the reasoning of the appellate court that forms the basis of any res judicata, and not the reasoning of the court below.[2]

14.    The decision of the judge at first instance in *Fairfield Sentry v Migani* (Bannister J.) was to the effect that the documents issued by Citco were not certificates and so the Funds were not bound by them.  However, he held that the fact that the redeemers had surrendered their shares in *itself* meant that they had given 'good consideration' for the redemption payments and so had a complete defence to a claim for restitution/unjust enrichment.   On Bannister J's approach it made no difference whether the sum paid by the Funds represented a sum that the relevant Fund was legally obliged to pay or not - the surrendering of the shares (even if the sums paid vastly exceeded the amounts that the redeemers were contractually entitled to receive) was,

---

[2] Where a judgment is affirmed on appeal, the judgment below ceases to be a source of any *res judicata*: see Spencer Bower & Handley, *Res Judicata* (4th Ed, 2009) at paragraph 2.33 citing Scottish (*Shedden v Patrick* (1854) 1 Macq. 535) and Australian (*Wishart v Fraser* (1941) 64 CLR 470 and *R v Marks* (1981) 147 CLR 471) authority. It would appear that there is no reported case in England or the BVI in which a litigant has ever tried to rely on a judgment of a court below as giving rise to *res judicata* where the case was the subject of a judgment by an appellate court.

to Bannister J, sufficient consideration. The reasoning of the ECCA was slightly different in that they did undertake some analysis of what the Funds were contractually obliged to pay, but they came to the same conclusion: that whatever the true value of the shares, the fact that they had been surrendered in return for the redemption proceeds meant that there was a defence of good consideration.

15.    If and to the extent that Bannister J or the ECCA was suggesting that there was a 'good consideration' defence to the claims even if the sums paid exceeded the amounts that the Funds were contractually obliged to pay, that reasoning was rejected by the Privy Council. The Privy Council considered that if any sum was paid beyond the contractual entitlement, it was "in principle" (i.e. subject to any defences) entitled to recover the excess: paragraph 18. The reasoning of the Privy Council proceeded in the following steps:

a.    The certificate issue and the good consideration issue, though argued separately, were closely related and had to be considered together (paragraph 6);[3]

b.    The basic principle was "not in dispute" that (i) *to the extent* that a payment discharges a contractual debt of the payer, it is not recoverable in restitution but (ii) *to the extent* that the payment exceeds the debt properly due, then it is in principle recoverable (paragraph 18);[4]

---

[3] "6. On 20 April 2011, Bannister J in the Commercial Division of the High Court of the British Virgin Islands ordered four preliminary issues to be tried. The first three issues have together been called the "Article 11" question. These issues were all concerned with the question whether certain transaction documents issued to Members of the Fund recording the NAV per share or the redemption price upon redemption were binding on the Fund under Article 11 of its Articles, which deals with the effect of certain "certificates". It is now accepted, and rightly accepted, by the Fund that if they were binding the present claims must fail. The fourth issue was whether the Defendants have a defence on the ground that by their surrendering their shares they gave good consideration for the money that they received on redemption. This has been called the "Good Consideration" question. The two questions were argued separately below and before us. But for reasons which will be explained, they are closely related and have to be considered together."

[4] "18. ...to the extent that a payment made under a mistake discharges a contractual debt of the payee, it cannot be recovered, unless (which is not suggested) the mistake is such as to avoid the contract: *Barclays Bank Ltd v W.J.*

c.     The question was therefore whether, on a true construction of the Funds' Articles (the "Articles"), the sums that the Funds were contractually obliged to pay were the redemption price measured by reference to the true value of the Funds' assets, or the redemption price determined by the directors at the time (paragraph 19); [5]

d.     The Articles envisaged that the sums that the Funds were contractually obliged to pay should be the sums certified by (or on behalf of) the directors at the time of redemption, in accordance with the certification provision in Article 11(1)(c). This provision should be broadly construed so as to cover informal documents such as the redemption statements issued by Citco.  The Privy Council expressly held that, where the Articles contained a certification provision, the contractual obligation was in accordance with the certificate, thus rejecting any idea that the Articles in this case could be construed so that a redeemer would be contractually entitled to a payment based on a mistaken NAV even if no certificate was issued (paragraph 24). [6]

---

*Simms Son & Cooke (Southern) Ltd* [1980] QB 677, 695. So far as the payment exceeds the debt properly due, then the payer is in principle entitled to recover the excess."

[5] "19. It follows that the Fund's claim to recover the redemption payments depends on whether it was bound by the redemption terms to make the payments which it did make. That in turn depends on whether the effect of those terms is that the Fund was obliged upon a redemption to pay (i) the true NAV per share, ascertained in the light of information which subsequently became available about Madoff's frauds, or (ii) the NAV per share which was determined by the Directors at the time of redemption. If (ii) is correct then, the shares having been surrendered in exchange for the amount properly due under the Articles, the redemption payments are irrecoverable."

[6] "24. If, as the Articles clearly envisage, the Subscription Price and the Redemption Price are to be definitively ascertained at the time of the subscription or redemption, then the NAV per share on which those prices are based must be the one determined by the Directors at the time, whether or not the determination was correctly carried out in accordance with Articles 11(2) and (3). That means either (i) that the Directors' determination at the time must be treated as conclusive whether or not there is a certificate under Article 11(1)[c]; or else (ii) that Article 11(1)[c] must be read as referring to the ordinary transaction documents recording the NAV per share or the Subscription or Redemption Price which will necessarily be generated and communicated to the Member at the time, and not to some special document issued at the discretion of the Directors. The Board considers, for the reasons given below, that in a case where a provision for certification such as Article 11(1)[c] has been included as part of the mechanics of subscription and redemption, the correct approach is the second one."

16.    Since there was no issue in the BVI proceedings as to whether Citco had acted in bad faith in issuing certificates, it followed that the sums paid by the Funds to the redeemers in that case represented sums that were contractually due and no more, and were therefore irrecoverable for the reasons set out in paragraph 18 - in other words since the redeemers had received no more than their contractual entitlement as a result of the binding certification of NAV, they had given 'good consideration' for the receipt of that amount.

17.    It is absolutely plain from the Privy Council's judgment that if any redeemer received more than he was contractually entitled to, the excess would in principle and subject to any defences be recoverable (which might be said to be an unremarkable and unsurprising conclusion): paragraph 18.  It is equally plain from the Privy Council's decision that "*the correct approach is the second one*" in paragraph 24 of its judgment that the question of contractual entitlement depended on the certification provision.  Thus it is essential to the reasoning of the Privy Council that a binding certificate was issued.  One can test the position by asking what the effect of the Privy Council's judgment would be if there were a redeemer who had received no documentation from Citco at all.  He would have no 'certificate' given by or on behalf of the directors to rely on and therefore no contractual entitlement to any certified sum.  He would have no right to hold the Funds to the mistaken calculation given by or on behalf of the directors and would have no right to be paid anything other than the redemption amount calculated by reference to the true NAV.

18.    Mr. Mortimore's attempt to suggest that the Privy Council's judgment contained "two independent reasons" for finding against the Funds (at paragraph 34 of the Mortimore Declaration) thus involves a fundamental and obvious misreading of the judgment.  The judgment does not contain two independent reasons: the approach taken by Bannister J on the

good consideration issue cannot stand with the different and inconsistent approach taken by the Privy Council.  It follows that Mr. Mortimore's assertion (at paragraphs 68 - 69 of the Mortimore Declaration) that the Funds "are bound" by Bannister J's decision on that issue is also wrong.

19.    While reviewing the decision of the Privy Council there is one further obvious point to make: the Privy Council did not decide whether (and if so how) the outcome would be different if the certificates issued by Citco were issued in bad faith.  Nothing in the judgment addresses that issue, which had not been raised and so was not before the court.

ii.    Cause of action estoppel

20.    Cause of action estoppel is the name given in English/BVI law to the principle common to most legal systems that once a court has adjudicated on a particular claim before it, that decision is final as between the parties to that claim: they cannot seek to re-litigate the same claim all over again.  In other words, as Lord Sumption put it in the *Virgin* case, "once a cause of action has been held to exist or not to exist, that outcome may not be challenged by either party in subsequent proceedings."[7]  So, if a claimant fails in a claim for breach of contract against a defendant, it is not open to the claimant to issue a second claim against the same defendant in relation to the same breach of contract, even if the law has changed,[8] or he has thought of new and better legal arguments, or fresh evidence has been discovered that changes the appearance of the facts.[9]

21.    There are two important features of cause of action estoppel that Mr. Mortimore appears in the Mortimore Declaration to overlook or misunderstand.

---

[7] *Virgin Atlantic Airways v Zodiac Seats UK Ltd* [2013] 3 WLR 299 at paragraph 17.

[8] *Re Waring (No2)* [1948] Ch 221.

[9] *Arnold v National Westminster Bank* [1991] 2 AC 93 at 103 per Lord Keith of Kinkel: this is subject to the exception that if the fresh evidence shows the earlier judgment to have been obtained by fraud, the litigant might be entitled to re-open the first claim.

22.      The first important feature of cause of action estoppel is that it only prevents re-litigation of the <u>identical</u> cause of action - i.e. *the same claim*.  It does not prevent a party from bringing claims in respect of separate causes of action - i.e. separate claims - even if they arise out of the same relationship and the legal basis of each claim is the same.  The point can be illustrated by way of example: imagine a situation in which party A and party B have entered into a contract under which party A agrees to sell one automobile to party B per month for a year at a price of US$10,000 per vehicle.  The vehicles are delivered and party B fails to pay.  Party A brings a debt/breach of contract claim in respect of the sum due for the first vehicle, but loses the claim because he fails to produce sufficient evidence of the agreement at trial.  There is no cause of action estoppel to prevent him from bringing separate proceedings in respect of each of the other sums due in respect of each of the other vehicles, because each debt constitutes a separate cause of action and a separate claim.  That conclusion is not affected by the fact that the legal basis for each claim/cause of action is the same (i.e. a claim for a debt/breach of contract) and the parties and the contract provision relied upon are the same.

23.      The leading authority is the decision of the UK House of Lords in *Arnold v National Westminster Bank* [1991] 2 AC 93, a case which in fact involved issue estoppel.  There, the litigation was between a landlord and tenant.  The lease contained a rent review clause which provided for a periodical rent review on defined terms.  The landlord had triggered a rent review and a dispute arose as to the proper construction of the defined terms.  That dispute was litigated, with the judge finding for the landlord.  A few years later, the rent review was triggered again and the lessees sought to raise the same argument as to the proper construction of the clause.  A judgment in an unrelated case had, in the intervening years, suggested that their construction was in fact correct.  The landlord contended that an issue estoppel as to the proper construction of the

12

clause arose out of the earlier proceedings.  It was held that there was no issue estoppel and that the tenants were free to re-argue the point by reference to the new authority suggesting that they were right.

24.      No one even suggested in *Arnold* that there was a cause of action estoppel, though the parties were the same, the contract clause at issue was the same and the legal theory underlying the claim (exercise of a rent review clause) was the same.  Each triggering of the rent review clause gave rise to a separate cause of action.  Nevertheless, Lord Keith referred to cause of action estoppel so as to distinguish it from issue estoppel.  He said (at 103):

> "Cause of action estoppel arises where the cause of action in the later proceedings is identical to that in the earlier proceedings, the latter having been between the same parties or their privies and having involved the same subject matter.  In such a case the bar is absolute in relation to all points decided unless fraud or collusion is alleged, such as to justify setting aside the earlier judgment.  The discovery of new factual matter which could not have been found out by reasonable diligence for use in the earlier proceedings does not, according to the law of England, permit the latter to be re-opened."

25.      That dictum was cited with approval by Lord Sumption in his judgment in *Virgin* at paragraph 20, where he noted the fact that cause of action estoppel did not apply in *Arnold* because the claims concerned different rent reviews (albeit between the same parties and pursuant to the same contract clause) and therefore different causes of action.

26.      The second important feature of cause of action estoppel is that it applies only as between the parties to the original litigation.  The 'parties' are for this purpose deemed to include those who have "privity of interest" with a party.  Cause of action estoppel does not apply as between a party to the original litigation and a third party.  Mr. Mortimore refers to this requirement at paragraph 46 of the Mortimore Declaration, but the conclusions that he expresses at paragraphs 52 and 53 of the Mortimore Declaration suggest that he has fundamentally misunderstood what "privity of interest" means under English/BVI law.

13

27.    The usual definition of "privity of interest" is that of Sir Robert Megarry V-C in

*Gleeson v J Wippell & Co Ltd* [1977] 1 WLR 510, quoted by Mr. Mortimore at paragraph 46 of

the Mortimore Declaration, i.e., an estoppel cannot be relied upon by someone who was not

*party* to the original action:

> "unless there is a sufficient degree of identity between the [original litigant] and the third
> party.  I do not say that one must be the alter ego of the other: but it does seem to me that,
> having due regard to the subject matter of the dispute, there must be a sufficient degree of
> identification between the two to make it just to hold that the decision to which one was
> party should be binding in proceedings to which the other is party.  It is in that sense that
> I would regard the phrase "privity of interest." Thus in relation to trust property I think
> there will normally be a sufficient privity between the trustees and their beneficiaries to
> make a decision that is binding on the trustees also binding on the beneficiaries, and vice
> versa."

28.    Other than clarifying the situation in trust cases, that approach is rather vague.

Another test was put forward by Floyd LJ in the English Court of Appeal in *Resolution*

*Chemicals v H Lundbeck* [2013] EWCA Civ 924 at paragraph 32 (also quoted by Mr. Mortimore

at paragraph 49 of the Mortimore Declaration):

> "in my judgment a court which has the task of assessing whether there is privity of
> interest between a new party and a party to previous proceedings needs to examine (a) the
> extent to which the new party had an interest in the subject matter of the previous action;
> (b) the extent to which the new party can be said to be, in reality, the party to the original
> proceedings by reason of his relationship with that party, and (c) against this background
> to ask whether it is just that the new party should be bound by the outcome of the
> previous litigation."

29.    The practical application of these tests is discussed in the leading practitioner

work on the subject (*Res Judicata*, Spencer Bower and Handley, 4th Edition 2009) at paragraphs

9.38 - 9.45.  The examples which the authors give are of situations in which the privy is the legal

successor to the rights and liabilities of the original litigant by death, insolvency, assignment or

statute,[10] or claims "under or through or on behalf of the original litigant".[11]  In each of those

---

[10] Ibid paragraph 9.38.

[11] Ibid paragraphs 9.43 – 9.45.

cases, the person estopped is in some way "identified" with the original litigant as a matter of law.  Privity of interest may also arise where (i) the party to the original litigation was a company and the new party is a controlling shareholder who controlled the conduct of the original litigation and could thus be said to have been the "real" party to it[12] and (ii) the original litigation determines the legal or beneficial rights of the privy and it can be said that the privy could and should have intervened in the original litigation if he wished to be heard.[13]

30.    It is clear that privity of interest does <u>not</u> exist merely because the original litigation involved the determination of the same legal or factual questions that will determine the liability of the new party.  This is clear from the result in both *Gleeson, supra,* and *Resolution Chemicals, supra,* in both of which it was held that there was no privity of interest and no estoppel:

a.    In *Gleeson, supra,* the original defendant (Denne) manufactured shirts designed for it by Wippell.  Gleeson sued Denne for breach of copyright, contending that Wippell had copied her design.  Gleeson lost that action on the grounds that the design was not copied.  Gleeson then sued Wippell for breach of the same copyright on the basis of the same facts.  It was held that there was no privity of interest between Denne and Wippell and so no estoppel arose.

b.    In *Resolution Chemicals, supra,* the original claimant (Arrow) sued Lundbeck for a declaration that a pharmaceutical patent held by Lundbeck was invalid.  Arrow

---

[12]    *Johnson v Gore Wood* [2002] 2 AC 1, but note that in *Virgin* Lord Sumption doubted whether this was correct (*Virgin* at paragraph 25): it appears to have been based on a concession by counsel in *Johnson* and is difficult to reconcile with the restrictive approach to the circumstances in which the court will pierce the corporate veil laid down by the UK Supreme Court in *Prest v Petrodel* [2013] 2 AC 415 (another judgment of Lord Sumption).

[13]    *House of Spring Gardens v Waite* [1991] 1 QB 241, referred to in *Res Judicata* at paragraph 9.45. In that case judgment was given against three joint tortfeasors. Two of the defendants applied to set the judgment against all three of them aside and failed. It was held that the third defendant was estopped from making the same application *inter alia* on the grounds that he was privy to the earlier application.

lost that action and the patent was held valid.  Resolution Chemicals, a company

in the same corporate group as Arrow, then sued Lundbeck for a declaration that

the same patent was invalid, claiming to have better evidence than Arrow had put

forward (including new evidence of prior art).  It was held that there was no

privity of interest between Arrow and Resolution because Resolution had had no

"concrete interest" in the earlier action, and so no estoppel arose.

31.    In both *Gleeson, supra,* and *Resolution Chemicals, supra,* there was a legal

relationship between the original litigant and the new party, and the original litigation had

obviously had the potential to impact on the business or interests of the new party.  The new

party would thus have been "interested" in the outcome of the original litigation in the colloquial

sense.  That did not affect the finding that the new party had not had an "interest" in the original

litigation.

32.    A good way to test whether parties are privies is to bear in mind that in

English/BVI law estoppels must be mutual, *i.e.,* there can only be an estoppel if it applies to both

parties to the later litigation, whatever the outcome of the original litigation.   This is a

fundamental rule that applies to both cause of action estoppel and issue estoppel and which has

been reaffirmed many times.[14]  In *Gleeson, supra*, itself, Megarry V-C put the matter this way (at

516):

> "I think that the matter may be tested by a question that I put to Mr. Skone James in
> opening.  Suppose that in the Denne action the plaintiff, Miss Gleeson, had succeeded,
> instead of failing.  Would the decision in that action that Wippell had indirectly copied
> the Gleeson drawings be binding on Wippell, so that if sued by Miss Gleeson, Wippell
> would be estopped by the Denne decision from denying liability? Mr. Skone James felt
> constrained to answer Yes to that question.  I say "constrained" because it appears that
> for privity with a party to the proceedings to take effect, it must take effect whether that

---

[14]  See e.g. *Petrie v Nuttall* (1856) 11 Exch 569, *Spencer v Williams* (1871) LR 2 P&D 230 at 237, *Carl Zeiss
Stiftung v Rayner & Keeler (No 3)* [1970] Ch 506 at 541, all cited in *Res Judicata* at paragraph 9.05 (where it is
noted that US law may have taken a different course).

party wins or loses. … In such a case, Wippell would be unable to deny liability to Miss Gleeson by reason of a decision reached in a case to which Wippell was not a party, and in which Wippell had no voice. Such a result would clearly be most unjust. Any contention which leads to the conclusion that a person is liable to be condemned unheard is plainly open to the gravest of suspicions. A defendant ought to be able to put his own defence in his own way, and to call his own evidence. He ought not to be concluded by the failure of the defence and evidence adduced by another defendant in other proceedings unless his standing in those other proceedings justifies the conclusion that a decision against the defendant in them ought fairly and truly to be said to be in substance a decision against him."

33.    Thus in order for a cause of action estoppel to arise in the present case, not only would it be necessary for the cause of action to be identical, but it would also be necessary for the Court to conclude that if the cause of action/issue had been decided in the Funds' favour in the BVI, that determination would have bound the party seeking to take advantage of the estoppel. I address the application of the law to the facts of this case further below.

iii.    Issue estoppel

34.    The classic definition of issue estoppel is that given by Diplock LJ in the English Court of Appeal in *Thoday v Thoday* [1964] P181 at page 198:

"There are many causes of action which can only be established by proving that two or more different conditions are fulfilled. Such causes of action involve as many separate issues between the parties as there are conditions to be fulfilled by the plaintiff in order to establish his cause of action; and there may be cases where the fulfilment of an identical condition is a requirement common to two or more different causes of action. If in litigation upon one such cause of action any of such separate issues as to whether a particular condition has been fulfilled is determined by a court of competent jurisdiction, either upon evidence or upon admission by a party to the litigation, neither party can, in subsequent litigation between one another upon any cause of action which depends upon the fulfilment of the identical condition, assert that the condition was fulfilled if the court has in the first litigation determined that it was not, or deny that it was fulfilled if the court in the first litigation determined that it was."

35.    In other words, in a case in which no cause of action estoppel arises because the new litigation involves a new cause of action, an issue estoppel may arise if (a) there was an issue between the parties which it was necessary for the court in the original litigation to decide

and which it in fact decided and (b) the same issue arises for decision in the new litigation between those parties.  As Lord Sumption put it in *Virgin* at paragraph 17:

> "Fourth, there is the principle that even where the cause of action is not the same in the later action as it was in the earlier one, some issue which is necessarily common to both was decided on the earlier occasion and is binding on the parties."

36.    Again, two important features of issue estoppel are not clearly brought out in the Mortimore Declaration.  The first is that, as with cause of action estoppel, issue estoppel applies only where the parties to the new litigation are the same as the parties to the original litigation, or are their privies.  The meaning of 'privy' is the same, and again the fact that the issue estoppel would be *mutual* will be a relevant factor in determining whether or not someone is a privy.

37.    The second is that the issue in relation to which it is said that the estoppel arises must be an issue that was actually determined by the court in the original litigation (and must be an issue that was necessary to its decision in the case and not merely incidental to it - see *Sun Life Assurance v Lincoln National Life Assurance* [2004] EWCA Civ 1660 at paragraphs 40 - 44).  If a party has, for any reason, not raised an issue in the original litigation, there can be no issue estoppel in relation to it.[15]  If it is an issue which it can be said *could and should* have been raised in the original litigation, then seeking to raise it later might give rise to a *Henderson* abuse of process argument, but that is a different point considered in the next section.

iv.    *Henderson v Henderson* abuse of process

38.    As Mr. Mortimore notes (at paragraph 54 of the Mortimore Declaration) the rule in *Henderson v Henderson* (1843) 3 Hare 100 is a rule of *procedural* and not substantive law

---

[15]    Arnold J in *Lilly Icos v 8pm Ltd* [2009] EWHC 1905 (Ch) stated: "the Defendants contend that the issue is now *res judicata* as a result of Mann J's judgment. In my judgment this argument is a complete non-starter. There can be no issue estoppel in relation to a point which Mann J did not decide because it was not raised before him." See also *Moss v Anglo-Egyptian Navigation Company* (1865) LR 1 ChApp 108 at 114 – 116 per Lord Cranworth (the Lord Chancellor): "It would not have been sufficient in such a case to plead the former suit and the decree of dismissal, it would have been necessary to couple with that an averment of facts sufficient to show that the question raised in the second suit had been adjudicated upon in the first. This is not, it must be understood, a technical rule at all, but it is one of substance..."

under English/BVI law.  In broad terms, it provides that the court has a discretion to strike out (i.e. dismiss) a claim as an abuse of the court's process if a party seeks to raise a matter which was not raised, but which the court considers *could and should* have been raised, in earlier litigation and justice and public policy requires that the claim should be dismissed as an abuse of the court's process (see the summary of Lord Sumption in *Virgin* at paragraph 17 *supra* and cases cited below).

39.    A *Henderson* abuse will usually involve new litigation between the same parties as the original litigation, and gives a court a discretion to provide additional protection beyond cause of action estoppel and issue estoppel by preventing the parties from seeking to litigate issues that could and should have been raised between them first time round.  It is right to note that, because it involves an exercise of the court's broad discretion to protect its own proceedings from abuse rather than the application of any substantive law, a *Henderson* abuse of process can arise even where the parties to the later litigation are not the same as those in the original litigation.  However, it is generally not abusive for a party to seek to litigate issues which he is not estopped from litigating: in order for abuse to arise where the parties are not the same there must be something that takes the case out of the ordinary.

40.    The authorities on this point were helpfully reviewed and summarised recently by the English Court of Appeal in *Michael Wilson & Partners v Sinclair* [2017] EWCA Civ 3, leading to the following summary of the principles:

> "(2) An abuse may occur where it is sought to bring new proceedings in relation to issues that have been decided in prior proceedings.  However, there is no prima facie assumption that such proceedings amount to an abuse, see *Bragg v. Oceanus*; and the court's power is only used where justice and public policy demand it, see Lord Hoffmann in the *Arthur Hall* case.
>
> (3) To determine whether proceedings are abusive the Court must engage in a close 'merits based' analysis of the facts.  This will take into account the private and public interests involved, and will focus on the crucial question: whether in all the circumstances

a party is abusing or misusing the court's process, see Lord Bingham in *Johnson v. Gore Wood* and Buxton LJ in *Taylor Walton v. Laing*.

(4) In carrying out this analysis, it will be necessary to have in mind that: (a) the fact that the parties may not have been the same in the two proceedings is not dispositive, since the circumstances may be such as to bring the case within 'the spirit of the rules', see Lord Hoffmann in the *Arthur Hall* case; thus (b) it may be an abuse of process, where the parties in the later civil proceedings were neither parties nor their privies in the earlier proceedings, if it would be *manifestly unfair* to a party in the later proceedings that the same issues should be re-litigated, see Sir Andrew Morritt V-C in the *Bairstow* case; or, as Lord Hobhouse put it in the *Arthur Hall case, if there is an element of vexation in the use of litigation for an improper purpose*.

(5) It will be a rare case where the litigation of an issue which has not previously been decided between the same parties or their privies will amount to an abuse of process, see Lord Hobhouse in *In re Norris*." [Emphasis added.]

41.    In the *Michael Wilson* case itself, an arbitration had taken place between MWP and a former director of MWP called Mr. Emmott, in which MWP alleged that Mr. Emmott had received certain shares from Mr. Sinclair by way of a bribe or secret profit.  Mr. Emmott's defence was that he had not received the shares beneficially and was merely holding them on behalf of Mr. Sinclair and to his order.  Mr. Sinclair was closely involved in the arbitration - he funded Mr. Emmott's defence and was an important witness.  The tribunal rejected MWP's claim and held that the shares belonged to Mr. Sinclair.  MWP then commenced court proceedings resurrecting precisely the same allegations against Mr. Sinclair - that the shares had been paid to Mr. Emmott as a bribe or secret profit.  Mr. Sinclair sought to strike out the claim on the grounds of *Henderson* abuse of process.  The English Court of Appeal held that there was no abuse: MWP was entitled to run the same case against Mr. Sinclair because he had not been a party to the arbitration.  The Court of Appeal noted in particular the fact that MWP would not have been entitled to enforce the arbitration award against Mr. Sinclair if it had won - the lack of mutuality was regarded by the Court of Appeal as a "*highly material, if not dispositive*" indicator that the new claim was not abusive (paragraph 90) (emphasis added).

20

42.     The key necessary but not sufficient condition of *Henderson* abuse of process is that it can be said that the party who is said to be acting abusively "could and should" have raised the issue that it now seeks to raise in the earlier litigation.  In *Johnson v Gore Wood* [2002] 2 AC 1, a controlling shareholder caused his company to bring a negligence claim against solicitors.  The claim was settled.  He then sought to bring a claim in respect of his own losses caused by the same alleged negligence.  The solicitors contended that the claim was an abuse of process: their contention was dismissed by the UK House of Lords and the claim was allowed to proceed.  Lord Bingham of Cornhill described the court's approach as follows:

> "*Henderson v Henderson* abuse of process, as now understood, although separate and distinct from cause of action estoppel and issue estoppel, has much in common with them.  The underlying public interest is the same: that there should be finality in litigation and that a party should not be twice vexed in the same matter.  This public interest is reinforced by the current emphasis on efficiency and economy in the conduct of litigation, in the interests of the parties and the public as a whole.  The bringing of a claim or the raising of a defence in later proceedings may, without more, amount to abuse if the court is satisfied (the onus being on the party alleging abuse) that the claim or defence should have been raised in the earlier proceedings if it was to be raised at all.  I would not accept that it is necessary, before abuse may be found, to identify any additional element such as a collateral attack on a previous decision or some dishonesty, but where those elements are present the later proceedings will be much more obviously abusive, and *there will rarely be a finding of abuse unless the later proceeding involves what the court regards as unjust harassment of a party*.  It is, however, wrong to hold that because a matter could have been raised in earlier proceedings it should have been, so as to render the raising of it in later proceedings necessarily abusive.  That is to adopt too dogmatic an approach to what should in my opinion be a broad, merits-based judgment which takes account of the public and private interests involved and also takes account of all the facts of the case, focusing attention on the crucial question whether, in all the circumstances, a party is misusing or abusing the process of the court by seeking to raise before it the issue which could have been raised before.  As one cannot comprehensively list all possible forms of abuse, so one cannot formulate any hard and fast rule to determine whether, on given facts, abuse is to be found or not.  Thus while I would accept that lack of funds would not ordinarily excuse a failure to raise in earlier proceedings an issue which could and should have been raised then, I would not regard it as necessarily irrelevant, particularly if it appears that the lack of funds has been caused by the party against whom it is sought to claim.  While the result may often be the same, it is in my view preferable to ask whether in all the circumstances a party's conduct is an abuse than to ask whether the conduct is an abuse and then, if it is, to ask whether the abuse is excused or justified by special circumstances.  Properly applied, and whatever the legitimacy of its descent,

21

the rule has in my view a valuable part to play in protecting the interests of justice."
[emphasis added]

43.     In determining whether a party "should" have brought forward an issue in the original litigation it is necessary to inquire what the party knew at the time.  This is obviously a question of fact to be determined on the evidence.  If a party did not know the facts upon which his new argument is based until after the original litigation - or only became aware of them at a late stage in that litigation - it obviously cannot be said that he "should" have advanced the argument based on those facts in the original litigation: see e.g. *Stuart v Goldberg Linde* [2008] 1 WLR 823 (English Court of Appeal) at paragraphs 53 and 70.  Moreover, while, as the court pointed out in *Henderson*, a party should bring forward his whole claim with "reasonable diligence" in the original action, there is *no duty on a litigant to take care to uncover facts which might support additional claims or arguments* (see e.g. Stuart at paragraph 59).[16]

v.     Application of the principles to the facts

44.     A significant part of the Mortimore Declaration consists of an expression of Mr. Mortimore's views as to how the legal principles should be applied to the facts of this case.  That may go beyond the proper province of an expert witness on BVI/English law - I would have thought that it is a matter for the US Bankruptcy Court to determine the facts and to assess how the legal principles apply to them.  However, I have been asked to address Mr. Mortimore's views so as to make clear why I do not agree with them.

45.     Mr. Mortimore contends that various estoppels arise out of the decision of the Privy Council in the *Migani* case or alternatively that a BVI Court would strike out the claim on

---

[16]  See BVI Civil Procedure Rules 2000 r21.2 - 21.3 (dealing with "representative actions", where one party claims or defends an action explicitly on behalf of others with the same interest) and English Civil Procedure Rules 1998 r19.6 (representative actions) and 19.11 - 19.13 (where a court makes a "group litigation order" - similar to the US concept of class actions). The circumstances in which the representative party procedure can be used are discussed in *Emerald Supplies v British Airways plc* [2011] Ch 345. The BVI action was <u>not</u> a representative action.

procedural grounds as a *Henderson* abuse of process.    It is convenient to deal with these contentions separately.

    vi.    <u>Estoppels</u>

46.    The first point to make is that it is absolutely plain that no cause of action or issue estoppels can arise under BVI law out of the *Migani* case as between the Funds and any redeemer who was not a party to the BVI proceedings.    Any argument that redeemers who were not party to those proceedings would be regarded as being 'privity of interest' with the redeemers who were parties to those proceedings would have no prospect of success in the BVI. There is no respect in which any redeemer can be legally 'identified' with another.    They are separate persons, who had separate contracts with the Funds.    They are not sued as trustee or executor or successor or liquidator or assignee of other redeemers who were party to the BVI proceedings.    They are not sued in any capacity in which they have acted through or on behalf of a party to the BVI proceedings.    They are not controlling shareholders of parties to the BVI proceedings who controlled the conduct of that litigation.    The redeemers who were not parties to the BVI proceedings had no legal or beneficial interest in the BVI proceedings.    Their contracts were separate: a determination of liability in respect of one redeemer's redemption did not alter the legal rights or obligations of any other redeemer.    It cannot be said that they could and should have intervened in the BVI proceedings if they wished to take any points on their redemptions.

47.    In other words, the facts of this case do not come close to meeting any of the tests for privity of interest.    The position can be tested by asking, as in *Gleeson*, whether, if the Funds had succeeded in their claims against redeemers in the BVI proceedings, the many hundreds of international institutions who were not party to the BVI proceedings would have accepted that

that judgment bound them too.  It is obvious that they would have regarded that proposition as absurd and unjust, and so do I.

48.    At paragraph 53 of the Mortimore Declaration, Mr. Mortimore expresses the extraordinary view that it is "but a short step" from the fact that the US Proceedings were stayed by Judge Lifland pending the outcome of the appeal on the preliminary issues hearing in the BVI to the conclusion that estoppels arise as between the Funds and redeemers who were not party to the BVI proceedings.  Mr. Mortimore is profoundly mistaken.  The fact that Judge Lifland stayed the US Proceedings tells one nothing as to whether or not an estoppel arises under BVI law.  It is a wholly impermissible leap to use that fact as the basis for a conclusion that there is privity of interest between redeemers who were party to the BVI proceedings and those who were not. There is no legal basis upon which that leap could be justified.  Under English and BVI law it is possible for parties and non-parties to agree that one or a number of cases be tried as "test cases" and that the result would bind the non-parties.  Nothing of that sort was agreed here.

49.    The position in relation to redeemers who were parties to the BVI proceedings is obviously different from the position of non-parties:

a.    Cause of action estoppels would arise as between the Funds and any parties to the BVI proceedings in respect of the redemption payments that were sought to be recovered in the BVI proceedings, where those claims have been dismissed by the BVI High Court.  Such estoppels do not arise out of the Privy Council's decision (which was a decision on preliminary issues only and did not constitute an adjudication of any claims) but out of the later disposal of the claims by the BVI High Court by way of summary judgment.  However, as I understand it (and as I am informed the US defendants themselves have conceded in their motion papers

24

for dismissal), none of the redemption payments that were sought to be recovered in the BVI proceedings have been claimed in the US Proceedings. Defendants acknowledge this when they say in their brief (at p. 8) that the Liquidators' common law claims "concerned different time periods than those in the BVI Actions." No cause of action estoppel can therefore arise in relation to parties (or non-parties).

b.    No cause of action estoppel can arise as between the Funds and any parties (or non-parties) to the BVI proceedings in respect of redemption payments that were not sought to be recovered in the BVI proceedings. This is because each allegedly overpaid redemption payment gives rise to a separate cause of action.[17] For cause of action estoppel to be applicable, the causes of action would have to be identical, i.e. would have to relate to the same alleged overpayment.

c.    Issue estoppels will not arise as between the Funds and those who were parties to claims in the BVI proceedings but who did not join in the preliminary issues application, because (a) the decision in *Migani* was not a decision in their claims and (b) there is no privity of interest between those parties and those redeemers who were party to the claims in which the preliminary issues were determined. Though those parties might be said to have 'sat back' and allowed others to litigate issues relevant to their own liability, they in fact had no legal interest in

---

[17] I understand that this is consistent with U.S. law, including in the context of avoidance claims under the U.S. Bankruptcy Code. *See Messer v. Bentley Manhattan, Inc. (In re Madison Bentley Assocs., LLC)*, 516 B.R. 724, 730-31 & n.19 (S.D.N.Y. 2014) ("a new claim for fraudulent conveyance accrues at the time of each conveyance"); *Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 480 B.R. 480, 492 (S.D.N.Y. 2012) ("[T]he law is clear that each preferential and fraudulent transaction is treated separately and distinctly."); *Official Comm. of Unsecured Creditors of 360Networks (USA) Inc. v. Pirelli Commc'ns Cables and Sys. USA LLC (In re 360networks (USA) Inc.)*, 367 B.R. 428, 434 (Bankr. S.D.N.Y. 2007) ("each potential preferential transfer is a separate and distinct transaction").

the claims in which the preliminary issues were determined. A finding of privity in this case would therefore go beyond that in any of the authorities. The authority that perhaps come closest to supporting Mr. Mortimore's position is *House of Spring Gardens*, where the litigant who did not join in the earlier application was held to be bound by its outcome, but in that case the non-joining litigant's legal rights *were* affected by the earlier application: if it had succeeded, the judgment against him would have been set aside. Mr. Mortimore's view that privity should be held to exist in these cases because otherwise "the purpose of ordering the Preliminary Issues would be negated" (Mortimore Declaration paragraph 52) is obviously wrong - the Privy Council's decision determined the important legal issues as to whether the Funds could in principle recover payments that exceeded the amounts that they were legally obliged to pay, and as to whether the documents issued by Citco constituted 'certificates'. The decision on those issues is binding only on those who were party to the application, but it is also useful in providing a clear indication as to how the same specific questions would likely be answered if raised between other parties (thus I understand that in these actions the Funds have accepted that the documents issued by Citco were 'certificates').

50.    There *would* be an issue estoppel as between the Funds and the parties to those claims in the BVI proceedings in which the preliminary issues applications were made ("the PI Defendants") in respect of issues actually decided by the Privy Council in the *Migani* case and which formed a necessary part of that decision. That means that as against those parties the Funds cannot challenge the Privy Council's decision that (i) to the extent that the payments made

26

*which were the subject of those proceedings* by the Funds constituted payment of sums that it was legally obliged to pay, the payments cannot be recovered (paragraph 18 of the Privy Council judgment), (ii) whether or not the sums paid by the Funds represent sums contractually due depends on the certification provisions in the Articles (paragraph 24) and (iii) the documents sent out by Citco constituted 'certificates' for the purposes of Article 11(1) of the Articles (paragraph 30). As I understand it, the Funds do not in fact seek to contest any of those propositions in the US Proceedings, whether against the PI Defendants (in respect of whom an issue estoppel would arise) or any other defendant.

51.     However, there was no issue before the Privy Council as to whether certificates issued by Citco would bind the Funds if they were issued in bad faith (or as to what the position would be if that were the case). It follows that that issue was not decided by the Privy Council and no issue estoppel can arise in respect of it. At paragraphs 60 - 67 of the Mortimore Declaration, Mr. Mortimore seeks to suggest that the Funds are "bound" by the Privy Council's decision in a way that prevents them from raising the issue of bad faith before this Court. It is not clear on what basis he is there contending that the Funds are "bound", but if he is intending to suggest that an issue estoppel arises then he is wrong. He nowhere refers to any decision of the Privy Council on the bad faith issue: there was no such decision. Instead he seems to make a factual argument that the Funds "were aware of" the bad faith issue and "chose not to" put it forward (Mortimore Declaration paragraphs 63 and 66). That is an allegation that the matter "could and should" have been raised - i.e. that *Henderson* abuse applies. I address that allegation below.

52.     I have already addressed above Mr. Mortimore's erroneous contention that the Funds are "bound" by the decisions of Bannister J and the ECCA on the 'good consideration'

issue.  If he intends to suggest that an issue estoppel arises, he is again quite wrong: to the extent that Bannister J and the ECCA considered that a defence of good consideration arose independently of whether or not the documents issued by Citco were certificates that bound the Funds, that reasoning is inconsistent with and was thus implicitly rejected by the Privy Council's judgment and in particular paragraphs 18, 19 and 24 thereof.

53.    Defendants who were not party to the preliminary issues in the BVI cannot of course rely on issue estoppel in any event, because they cannot on any basis be regarded as "privies", as I have explained above.  Even if they had been "privies", the same analysis as applies in the case of parties to the BVI preliminary issues would apply to them.  Cause of action estoppel cannot apply because the causes of action in the US relate to different redemptions and are therefore different causes of action.  No issue estoppel can arise in relation to the issue of whether certificates issued by Citco bind the Funds in the absence of good faith because that issue was not before the Privy Council and so was not decided by it.  No issue estoppel can arise out of Bannister J or the ECCA's decisions that there was a defence of 'good consideration' independently of the certification provisions because those decisions are inconsistent with the Privy Council's approach.  The mere fact that the appeal was dismissed does not mean that the reasoning of the courts below was endorsed by the Privy Council.

vii.    <u>Henderson abuse of process</u>

54.    The first point to make is that since *Henderson* abuse of process is a procedural issue, the question whether the US Bankruptcy Court considers its process to be abused must be a procedural matter for it to determine in accordance with its own rules and an employment of the BVI procedural rule of *Henderson* by it may not be appropriate.

28

55.    However, if the issue were to come before a BVI Court I would expect it to reject any argument that the present case involves a *Henderson* abuse of process.

56.    The positon in relation to redeemers who were not party to the BVI proceedings is again quite clear.  It will be a "rare" or exceptional case in which someone who was not a party to the original litigation can claim that it is abusive for a litigant to raise against him a claim which he is not estopped from raising.  I am not aware of any case in which there has been held to be such an abuse merely because a similar claim or issue has been determined as against that litigant in proceedings against a different party.  In order to show abuse, the redeemers who were not party to the BVI proceedings would have to show that it was "unfair" or that there was some "vexation" or "harassment" in the Funds proceeding with these claims against them.  I cannot see any basis on which it could sensibly be suggested that there is unfairness or harassment in proceeding in the US Bankruptcy Court with claims that were not tried in the BVI.  A comparison with the outcome of *Michael Wilson*, where the non-party had been closely involved in the earlier dispute but still no abuse of process was held to arise when allegations directly contradictory to the findings in the earlier dispute were made against him, is helpful: the redeemers who were not parties to the BVI proceedings are in a much weaker position to claim abuse of process than the non-party in the *Michael Wilson* case, whose argument still failed.

57.    For those who *were* party to the BVI proceedings, the question is whether it can be said that the Funds "could and should" have raised the issue as to whether it made a difference to the outcome if Citco was acting in bad faith in the BVI proceedings such that it is abusive for them now to seek to do so, albeit in claims relating to different redemption payments.  I do not think that a BVI Court would consider there to be a *Henderson* abuse of process in this case on the facts as currently before the court, for at least three reasons:

a.      I understand from Forbes Hare, the Liquidators' BVI attorneys, that the Funds did not have sufficient material to allege bad faith against Citco at the time of the trial of the preliminary issues in the BVI proceedings.  Making an allegation of bad faith in England and in the BVI is a serious matter which requires counsel as a matter of professional conduct to have a proper basis on which to make the allegation.[18]  It was therefore not open to the Funds to seek to allege that Citco had acted in bad faith in the BVI proceedings.  In those circumstances, there was no issue in the BVI proceedings to which Citco's bad faith was then relevant, and any attempt to raise such an issue would have been rejected as improper and in any event irrelevant on the facts as then known.  I do not understand Mr. Mortimore's suggestion (at paragraphs 62 - 63 of the Mortimore Declaration) that "it was open" to the Funds to raise issues of bad faith when they lacked the evidential basis to do so.  Mr. Mortimore's suggestion (at paragraph 67 of the Mortimore Declaration) that the issue of bad faith was "within the scope" of the certificate issues is equally perplexing.  I agree that the bad faith issue, if it had been raised, would certainly have been an issue that might have had an impact on the decision on the certification issue, but I cannot see how it can possibly be said that the Funds could and should have raised an issue which it was not open to them to raise based on the material that they held at the time.

---

[18] See e.g. *Medcalf v Mardell* [2003] 1 AC 120 at paragraph 22 per Lord Bingham: "The parties to contested actions are often at daggers drawn, and the litigious process serves to exacerbate the hostility between them. Such clients are only too ready to make allegations of the most damaging kind against each other. While counsel should never lend his name to such allegations unless instructed to do so, the receipt of instructions is not of itself enough. Counsel is bound to exercise an objective professional judgment whether it is in all the circumstances proper to lend his name to the allegation. As the rule recognises, counsel could not properly judge it proper to make such an allegation unless he had material before him which he judged to be reasonably credible and which appeared to justify the allegation."

b.      This conclusion is further supported by the fact that the order for the trial of
preliminary issues expressly preserved the Funds' right to assert that it was not
liable to the redeemers on the basis of facts not actually known to the Liquidators
(though it is likely that that would have been the position, as a matter of law, in
any event).[19]  Mr. Mortimore's suggestion that the order "did not permit the Funds
to raise a new legal argument...simply because [they] learned of some new fact
relevant to it" (at paragraph 61 of the Mortimore Declaration) makes no sense.
That is precisely what the order expressly permitted.

c.      Even if all that I have said above were wrong, I would in any event be surprised if
the BVI court were to regard it as abusive for the Funds to raise arguments in
relation to one redemption that were not raised in proceedings concerned with a
separate redemption.  If a litigant is owed two separate debts, the fact that he
might fail in proceedings claiming the first debt because he omits to run good
arguments does not mean that it is abusive for him to run different or better
arguments when separately claiming the second debt.[20]

58.     It follows that I disagree with Mr. Mortimore's view (at paragraph 56 of the
Mortimore Declaration) that the BVI Court would find the present proceedings to involve a
*Henderson* abuse.

##      C.      Ground Two: Merits of the bad faith argument

59.     As I concluded at paragraph 52 of the Initial Moss Declaration, I consider the
Funds to have an arguable case on the merits of the common law and contractual claims as

---

[19] BVI Court's 20 April 2011 order directing trial of preliminary issues, paragraph 2 (Exhibit N to the *Declaration of William Hare in Support of Motion For Leave To Amend* dated 21 October 2016 [Dkt. No. 925]).
[20] *Arnold v. National Westminster Bank* [1991] 2 AC 93, discussed above.

pleaded.  I remain of that view, essentially for the reasons that I have in the Initial Moss Declaration.

60.    At paragraphs 70 - 92 of the Mortimore Declaration, Mr. Mortimore puts forward four arguments as to why he says the Funds (at paragraph 58) "are precluded" from pursuing the common law and contractual claims by reference to their merits.  Mr. Mortimore argues that a BVI Court would hold that the Funds are bound by certificates issued by Citco even if issued in bad faith:

a.    By reference to the *Weavering* decision (paragraphs 70 - 74);

b.    Because Citco was the Funds' agent (paragraphs 75 - 82);

c.    Because of s.31 of the BVI Business Companies Act 2004 (paragraphs 83 - 85);

d.    Because otherwise they would be impermissibly relying on their own wrong (paragraphs 88 - 92).

61.    I understand Mr. Mortimore to be offering his opinion that the claims would fail. In putting forward his opinion, it seems to me that Mr. Mortimore has gone beyond the role of an expert and is seeking to argue the case.  It is also not clear to me that Mr. Mortimore has addressed the correct standard: as I understand it the question is whether or not the claims put forward by the Funds are arguable (i.e. using US parlance, whether the claims state a claim under applicable law), not whether they will ultimately succeed at trial after full evidence and argument.  I am reluctant to descend into that arena, but I have been asked to address and respond to each of Mr. Mortimore's four arguments.

viii.    <u>Weavering</u>

62.    Mr. Mortimore refers to the decision of the Cayman Islands Court of Appeal in *Skandinaviska Enskilda Bank v Conway* CICA No 2 of 2016 (commonly referred to as

"*Weavering*") as supporting his position.  In my view, the *Weavering* judgment does not add anything material to the decision of the Privy Council in *Migani* insofar as the present case is concerned.

63.    The first point to note about *Weavering* is that it is an example of a case in which an insolvency avoidance claim analogous to that being advanced by the Liquidators in this case *succeeded*.    The claim in *Weavering* was brought by a company's liquidators against a redeeming shareholder.  The liquidators were seeking to recover redemption payments from a redeeming shareholder on the grounds that (having been calculated by reference to fictitious assets) they constituted voidable preferences under the Cayman Islands statutory avoidance regime.  The first instance (trial) court granted a declaration that the payments had been invalid preferences and ordered them to be repaid.  His judgment was upheld (affirmed) by the Cayman Islands Court of Appeal.

64.    On appeal, the redeemer argued that the payments could not be recovered because the company had not been insolvent at the time of the payment.  This argument was based on an assertion that the redemption payments which constituted the company's major debts had not been contractually due because the valuations issued by the company were non-binding as a result of the fraud of a director involved in their preparation.  That argument was rejected.

65.    The analysis of the Cayman Islands Court of Appeal started with the language of the valuation provision in the company's articles.[21]    It provided that "*any valuations made pursuant to these Articles shall be binding on all parties*".  The valuation provision thus did not include any provision equivalent to that in Article 11(1) here to the effect that valuations would be binding only if issued "in good faith".

---

[21]    Judgment paragraph 24: "In common with the judge, it seems to me that the appropriate place to start is article 34 [of the company's Articles of Association]."

66.      The Cayman Islands Court of Appeal then endorsed Lord Sumption's view that achieving certainty is generally important in the calculation of NAVs, and held that the Articles *in that case* required the NAVs to be binding on all parties even if issued in bad faith.  That *cannot* be so in the present case, because Article 11(1) expressly provides that certificates of NAV are to be binding on all parties *if* issued "in good faith."   In other words, the Funds' Articles expressly envisage the possibility that determinations of NAV will not be binding if not issued in good faith.   Mr. Mortimore's suggestion (at paragraph 73 of the Mortimore Declaration) that the BVI Court would "follow" *Weavering* and decide that it is not permissible to re-open a determination of NAV even in the event of bad faith ignores the fact that Article 11(1) in this case (but not in *Weavering*) contains an express good faith requirement.

67.      I would also note that:

a.      It is important to keep in mind the context and result of the dispute in *Weavering*. The argument that the redeeming shareholder was running was that the valuation provision in a company's articles should be construed in such a way as to enable a redeeming shareholder who had received a windfall as a result of a fraud that had bankrupted the company to retain it by reason of that very fraud.  That would have been an extraordinary result, and it is unsurprising that the Cayman courts did not consider that the valuation provision should be so construed.   In the present case, the redeeming shareholders are again seeking to use the valuation provisions in the Articles to retain a windfall that they have received as a result of fraud.  It seems to me that there is a similarly powerful argument to be made that the certification provision in Article 11(1) should not be construed in this case so as to allow redeemers to retain a windfall at the expense of the remaining

34

shareholders, particularly where the agent who was responsible for the company paying the windfall was acting in bad faith.

b.    The redeeming shareholder in *Weavering* conceded and relied on the fact that the liquidators might have had a claim for restitution on the basis of mistaken payment had the claim not been time barred as a result of the applicable statute of limitation.[22]  The redeeming shareholder did not suggest that such a claim would have been defeated by the valuation provision.  In the present case, the Liquidators have brought a claim for restitution on the basis of such a mistaken overpayment.

68.    Mr. Mortimore asserts at paragraph 74 of the Mortimore Declaration that the fact that the Articles in this case contain an express qualification by reference to good faith "is not a good ground for *distinguishing*" *Weavering*, and he then refers to what he describes as the "commercial necessity" of achieving certainty.  It will be recalled that the Privy Council considered in *Migani* that where there was a certification provision the necessary certainty was achieved by interpreting the certification requirement broadly to include informal statements of value.  Given that there is a certification provision here in Article 11(1) and that this expressly requires good faith, the present case is clearly distinguishable from *Weavering*.  The finding in *Weavering* that bad faith did not remove the conclusive effect of the valuations issued by the company simply cannot apply here in the light of the different express wording of Article 11(1).

69.    My view draws some support from the judgment of the Supreme Court of Bermuda in *Kingate Global Fund Limited v Kingate Management Limited* [2015] Bda 65 Com. That case concerned another fund that had invested assets with BLMIS.  The fund's articles

---

[22] Judgment paragraph 20.

contained a valuation provision which stated that "*in the absence of bad faith or manifest error, the Net Asset Calculations made by the Administrator shall be conclusive and binding on all shareholders*." The question before the court was as to whether such calculations were also binding as between the fund and its investment manager when it came to calculation of the investment manager's fees.   This turned on construction of the investment management agreement.   However, the pertinent point for present purposes is that it was common ground between the parties to that case (and accepted by the court at paragraph 108 of its judgment) that the valuations would *not* be binding as between the Kingate fund and its members/investors in the event of bad faith on the part of the Administrator.   That might appear obvious, but is a proposition with which Mr. Mortimore would presumably have to disagree in order to maintain his arguments.

ix.    Citco was the Funds' agent

70.    I agree with Mr. Mortimore (at footnote 81 of the Mortimore Declaration) that there is a *general principle* of English/BVI law that the acts of an agent within the scope of his authority do not cease to bind the principal *merely* because the agent was acting fraudulently.   I disagree with Mr. Mortimore in his assertion that the principle has any impact on the resolution of this dispute.   I say this for three reasons.

71.    First and most fundamentally, Mr. Mortimore is confusing (a) the principle by which the acts of an agent create rights and obligations for his principal as a matter of general law with (b) the entirely different question of whether, as a matter of contract interpretation, the acts of Citco have satisfied the contractual requirements for the creation of a right on the part of redeemers that goes above and beyond the position as a matter of general law so as to prevent the

Funds from recovering mistaken redemption payments which, as a matter of general law, the Funds would otherwise be entitled to recover.

72.     The distinction is basic and can be illustrated by way of example:

a.      A bank employs an agent to enter into loan agreements on its behalf.  The agent enters into a loan agreement, dishonestly breaching the underwriting requirements, with an innocent customer.  The bank is bound by the loan agreement.  The agent's dishonest motive is irrelevant.

b.      The loan agreement contains an express provision which states that the interest rate on the loan will be reduced if the agent "in good faith" issues a certificate that the borrower is a class A risk.  The agent dishonestly issues such a certificate.  The bank is not obliged to reduce the interest rate, because a condition upon which that additional contractual right depended was not met.

73.     The same analysis applies here.  The question of whether or not Citco acted in good faith does not go to the question of whether the documents that it issued were 'binding' on the Funds in the sense of creating legal rights and obligations for them as a matter of general law. Whether or not Citco acted in good faith is relevant to the question of whether the redeemers can establish the contractual requirements necessary to give them the contractual right (which does not arise as a matter of general law) to hold and bind the Funds to the valuations set out in the certificates and so prevent the Funds from recovering payments that they made by mistake.

74.     Mr. Mortimore's suggestion (at paragraphs 77 - 78 of the Mortimore Declaration) that the certificates would be 'binding' and so produce a 'conclusive effect' upon which the redeemers could rely at common law is incorrect.  At common law, the documents issued by Citco would have no 'conclusive effect' at all - just as a bank statement issued by a bank does

not at common law have a 'conclusive effect' preventing the bank from recovering payments that it later discovers to have been made by mistake.[23]    As the Privy Council itself expressly recognized and held at paragraph 24 of their judgment in *Migani* cited above, the conclusive effect of the documents issued by Citco on the Funds' NAV is derived from their compliance with the requirements of Article 11(1).  If they do not comply with those requirements (e.g. because they were not issued in good faith) then they have no conclusive effect.

75.    Second, even if that were not right, and if it were the case that the certificates had 'conclusive effect' at common law, the explicit reference to a requirement of good faith in Article 11(1) would be effective to alter the position.  This is a matter of construction of the Articles: the express inclusion of the qualification that the certificate must have been issued "in good faith" in order to produce a conclusive effect is clear.  Mr. Mortimore is correct in his assertion that there is a principle of construction that clear words are required before the court will conclude that the parties have intended that common law rights should be taken away but (i) as I have explained there is no common law right to treat certificates as 'conclusive' and so preventing recovery of mistaken payments, and (ii) even if that were not so it seems to me that the words used here are clear.

76.    Third, if and to the extent that Mr. Mortimore is suggesting that as a matter of law a principal who has been defrauded by his agent cannot recover sums mistakenly paid away as a result of that fraud from unjustly enriched recipients because he is 'bound' by the agent's actions, then I can only say that I know of no authority that could be said to justify such a plainly unjust result.  On the contrary, one would expect a principal who pays away money as a result of a mistake induced by his agent's fraud to be able to recover that money from recipients (save to

---

[23] *Tai Hing Cotton Mill Ltd v Liu Chong Hing Bank Ltd* [1986] AC 80. The Privy Council expressly recognised that it would be *possible* to give conclusive effect to such statements by including an appropriately worded clause in the bank-customer contract, but there was no such clause in that case.

the extent that they can raise defences, such as change of position or bona fide purchase for value).

77.      At paragraphs 79 - 82 of the Mortimore Declaration, Mr. Mortimore embarks on an exercise of attempting to construe Article 11(1) as not allowing the Funds to escape the effect of a certificate even if it is not issued in good faith.  On the face of it, the language of Article 11(1) is clear - a certificate is only 'binding' (i.e. produces a conclusive effect which prevents a party from later questioning or recovering payments) if it is issued in good faith.  That qualification is not restricted in its application.  If Mr. Mortimore is suggesting that it is not arguable as a matter of construction that the Funds are not 'bound' by a certificate if it is issued in bad faith, I can only say that I disagree with him.  The Fund's case seems to me to be plainly arguable.[24]

      x.      Section 31 of the BVI Business Companies Act

78.      Mr. Mortimore's reliance on s.31(1)(e) is misplaced as a result of the same fundamental mistake that he has made when relying on the equivalent rule of common law: he is confusing the general *validity* of a document issued by Citco as agent with the additional requirements set out by Article 11(1) which are to be fulfilled if the document is to be treated as *conclusive* so as to preclude recovery of sums that would otherwise be recoverable, which is an effect that the documents would not have as a matter of general or common law in the absence of a contractual provision.

79.      In other words, the Funds are not seeking to suggest that the certificates issued by Citco were "not valid or genuine" and so incapable of producing their ordinary consequences

---

[24] I understand that "arguable" is another term that may be unfamiliar to US lawyers. In English legal parlance it is used (among other things) to denote a case that is sufficiently strong so as not to be susceptible to summary dismissal and which merits full argument at trial. I use it because I understand this to be broadly similar to the test that the US Bankruptcy Court will apply on the motion to dismiss.

under the general law; their case is that the redeemers are not entitled to the *additional* right to treat the certificates as conclusive, which does not arise as a matter of general law and is conferred by Article 11(1) only on certificates that were issued in good faith. Nothing in s.31 prevents a company from entering into a contract that confers *additional* rights on a counterparty (such as the right to treat a certificate as conclusive against all parties) over and above the consequences that the documents would have as a matter of general law only if defined conditions are met.

80.    That obvious proposition can be illustrated by an everyday example: it is common in construction contracts to include a provision whereby a "final certificate" issued by an architect is taken to be conclusive evidence as to the sum due to the building contractor unless challenged within a certain period.[25]  In order to constitute a "final certificate" the document must fulfil certain requirements as to its form and content.  Let us suppose that the architect issues an account statement containing errors that result in underpayment to the contractor.  The contractor will not be able to argue that the statement is invalid on the basis that the architect was acting outside the scope of his authority.  But he will be perfectly entitled to argue that the document is not a "final certificate" because it does not fulfil the contractual requirements of such a document, and so is not conclusive as to the sum due.[26]  The same analysis applies in the present case: the Funds are not seeking to contend that the documents issued by Citco were "not valid or genuine", but rather that they were not given in good faith and therefore do not fulfil the express requirement of Article 11(1) which is needed to make them conclusive.

---

[25] See e.g. *Beaufort Developments (NI) Ltd v Gilbert-Ash (NI) Ltd* [1991] 1 AC 266.
[26] *Keating on Construction Contracts* (10th Ed) at paragraphs 5-054 - 5-055.

xi.    Reliance on own wrong

81.    It is a principle of English/BVI law that a contract will generally be construed in such a way as to prevent a party from taking advantage of its own wrong.  Mr. Mortimore refers to this principle and asserts that (a) a term should be implied into the Articles that the Funds would calculate the NAV in good faith, and (b) that this term was breached by Citco's failure to calculate the NAV in good faith because Citco's bad faith should be attributed in law to the Funds and that (c) Article 11(1) ought to be interpreted in such a way as to prevent the Funds from avoiding the otherwise conclusive effect of certificates in reliance on their 'own' wrong.  I disagree.

82.    As to the first step, I have set out in the Initial Moss Declaration the circumstances in which a term will be implied into a contract as a matter of BVI law.  The principal test is where the term is so obvious as to go without saying or is required to give the contract "business efficacy" or where the contract would "lack commercial or practical coherence" without that term (*Marks & Spencer plc v BNP Paribas Securities Services Trust Co (Jersey) Ltd* [2016] AC 742 at paragraph 21).

83.    English/BVI law does not generally imply a term that commercial parties will act in good faith in the exercise of their contractual rights: under English/BVI law contract parties are generally free to exercise their rights as set out in the contract irrespective of the purity of their motives.[27]  If a contract confers a discretion on one party, the exercise of which will affect the rights of the other party, the court may imply a term that the discretion will be exercised in

---

[27] *Mid Essex Hospital Services NHS Trust v Compass Group UK and Ireland Ltd* [2013] EWCA Civ 200 at paragraph 105; *Greenclose Ltd v National Westminster Bank plc* [2014] EWHC 1156 (Ch) at [150]; *Myers v Kestrel Acquisitions Ltd* [2015] EWHC 916 (Ch).

good faith and not arbitrarily, capriciously or irrationally.[28]  But whether a term is to be implied

in any given case will depend on a close analysis of the contract in question in order to determine

whether the *Marks & Spencer* test for implication of a term is met.

84.     In the present case, the parties have set out expressly a detailed set of terms for

the calculation of the NAV by the Funds or their agents, and in Article 11(1) have provided

explicitly for the circumstances in which a determination of NAV is to be treated as binding and

conclusive as between the parties (including an explicit requirement that it should have been

issued in good faith).  If a determination is not the subject of a certificate issued in good faith, it

will not be conclusive and so can be re-opened by any party.  Given the full and explicit

treatment which the parties have afforded the subject in their agreement, I doubt that a BVI

Court would consider it necessary or appropriate to imply further terms in relation to the giving

of certificates.  I certainly do not think it can be said to be so obvious as to go without saying that

further terms should be implied as suggested by Mr. Mortimore, or that the Articles "lack

commercial or practical coherence" if construed as the Funds suggest that they should be.

85.     As to the second step, this depends crucially on the question of whether Citco's

bad faith should be attributed as a matter of law to the Funds.  The circumstances in which the

bad faith of an agent should be attributed to the principal represents a difficult topic with which

English/BVI law is wrestling at the moment.  The most recent authority is the decision of the UK

Supreme Court in *Bilta v Nazir* [2016] AC 1.  As an indication of the controversy and differing

judicial views surrounding this topic, the presiding judge of the UK Supreme Court considered in

that case that the UK Supreme Court's previous most recent pronouncement on these issues - a

case called *Moore Stephens v Stone & Rolls* [2009] AC 1391 - should "be put on one side in a

---

[28] *Socimer International Bank v Standard Bank London* [2008] EWCA Civ 116; *Mid Essex Hospital Services NHS Trust v Compass Group UK and Ireland Ltd* [2013] EWCA Civ 200 at paragraphs 77 – 83.

42

pile and marked 'not to be looked at again'" and confined as a decision relevant only to its own facts.[29]

86.    The actual issue in *Bilta* was as to whether, where a principal (in that case a company) seeks to claim damages from its agent in respect of a breach of duty by that agent, the claim should fail because the agent's dishonest state of mind (and therefore his knowledge of his own breach) is attributed to the principal, meaning that it will be held to have been a party to the breach of duty and therefore seeking to bring a claim based on its own illegal act.   The UK Supreme Court unanimously and unsurprisingly held that the answer to that question was "no".[30] In that type of situation, the bad faith of the agent was not to be attributed to the principal so as to provide the agent with a defence.

87.    Some members of the court went on to consider *obiter* the circumstances in which an agent's state of mind is attributed in law to the principal (see Lord Sumption at paragraphs 71 - 78 (he also spent paragraphs 79 - 81 of his judgment discussing the meaning of *Stone & Rolls*, but the other members of the court did not agree with what he said about that).   Lords Toulson and Hodge at paragraphs 180 - 209 start with the proposition that an agent's state of mind in relation to matters connected with the agency is ordinarily attributed to the principal but that this does not apply where the "fraud exception"[31]  applies (Sumption at 82, Toulson/Hodge at 181). Lords Hodge and Toulson concluded that whether the "fraud exception" applies in relation to any particular claim depends on the context in which it arises (paras 191 and 202).   That is a conclusion with which the other members of the Supreme Court agreed (see Lord Mance at para

---

[29] *Bilta* at paragraph 30.

[30]  Lord Neuberger (with whom Lord Clarke and Lord Carnwath agreed) at paragraph 6, Lord Mance at paragraph 33, Lord Sumption at paragraph 94, Lords Toulson and Hodge at paragraphs 129 – 130.

[31]  *i.e.* (putting it generally, and without going into the complications and controversies) an exception to the ordinary rules of attribution which prevents any attribution in a case where the principal is a victim of the fraud perpetrated by the agent.

44, and Lord Neuberger (and those who agreed with him) who said that that was as far as they were prepared to go (para 9)).

88.    Lords Toulson and Hodge concluded by identifying three examples of situations in which the rules of attribution and the fraud exception might apply differently in different contexts (para 204).  The first is where a third party claims against the principal for loss caused by the agent's wrongdoing: here there will ordinarily be attribution so as to hold the principal liable (para 205).  The second is where the principal claims against the wrongdoing agent for the breach of duty: here there will be no attribution (para 206).  The third is where the principal claims against a third party for loss caused to it by the agent's breach of duty - *here attribution will depend on the nature of the claim*.  A person sued for "knowing receipt" of the principal's property, for example, would not be able to rely on attribution so as to defeat a claim (para 207).

89.    No one in the Supreme Court in *Bilta* considered the position in a case in which a principal seeks restitution from an innocent recipient of money wrongly paid away as a result of the actions of a dishonest agent, and it is right to say that there is currently no clear authority directly on point.  However, in my view it is unlikely that a BVI Court would hold that the agent's knowledge of his own breach of duty should be attributed to the principal so as to defeat a restitution claim against an innocent recipient of the principal's property.  I say this for three reasons:

    a.    Non-attribution of the agent's fraud in such a situation is consistent with the position in "knowing receipt" claims, where knowledge of the fraud is not attributed to the principal whose money has been paid away.  I would expect restitution claims to be treated in a similar way to knowing receipt claims.

44

b.    There are many cases in which a principal has in fact recovered money from an innocent third party where it has been paid away as the result of the actions of a dishonest agent. Indeed, the leading case on restitution in English law is an example of just that: *Lipkin Gorman v Karpnale* [1991] 2 AC 548 was a case in which a dishonest lawyer took funds from his firm's bank account and spent them at a casino. The casino was an innocent recipient of the money - it did not know the source. The firm was held to be entitled to restitution in an amount equal to the amount received by the casino (less the amounts that the casino had paid to the partner as winnings). The lawyer was an agent of the firm. If his knowledge of his own breach of duty had been attributed to the firm, the claim could not have succeeded, since the firm would have been treated as having authorised the payments. There was no suggestion that such attribution would be appropriate.

c.    As I have already noted above, it would be extraordinarily unjust if a principal's claim for restitution of money from someone unjustly enriched by its receipt (and who had no defence of change of position etc) were to be defeated by the agent's bad faith or fraud - it would leave third party recipients with a windfall at the expense of the principal (who in many cases will be a victim of the fraud). In my view, English/BVI law would not permit that result.

90.    I therefore disagree with Mr. Mortimore's suggestion (at paragraph 91) that Citco's bad faith would be attributed to the Funds so as to defeat the Funds' claims for recovery of the overpayment. It follows that the second step in his analysis is also wrong.

91.    As to the third step in the analysis (that to permit the Funds to rely on Citco's bad faith would be to allow the Funds to take advantage of their own wrong):

45

a.    It depends upon the correctness of the first two steps, i.e. the assertions that the Funds acted in breach of the Articles and that Citco's bad faith should be attributed in law to the Funds.  As set out above, I do not believe that either of those assertions is correct.

b.    In any event, Mr. Mortimore's suggestion that the conclusion that the certificates are not to be given a conclusive effect in accordance with Article 11(1) involves the Funds "benefitting" from Citco's bad faith seems to me to be a simplistic and unrealistic view, for two reasons.

c.    First, if Citco issues a certificate in bad faith that understates the NAV, the party that loses is the redeemer whose redemption payment is calculated by reference to that NAV.  In that situation, if it comes to the attention of the Funds that Citco has issued a certificate in bad faith that has understated the NAV, it will be in the interests of the redeeming shareholders that those certificates should not be conclusive in accordance with Article 11(1), which applies to all shareholders as well as the Funds.  Where, as here, Citco has in bad faith *over*stated the NAV, the parties that *ultimately* lose out from the damage caused to the Funds by the reduction of the Funds' assets resulting from the overpaid redemptions are the *remaining* shareholders, who will inevitably face a situation in which the assets remaining to fund their redemptions (or distributions in a liquidation) are lower than they ought to have been.  In that situation, it is in the interests of both the Funds and the remaining shareholders (who are parties to the same Articles and Article 11 as the redeeming shareholders) that the certificates should not be conclusive.  It therefore does not seem to me that the principle that a contract

46

should generally be construed in such a way that a party cannot take advantage of its own wrong has any relevance to the issue before the court: the question of whether the certificates issued by Citco are binding or not is one that can benefit either the redeeming or remaining shareholders.

d.    This point was in fact considered in *Weavering*, where the court reached a conclusion similar to that which I express above.  The redeeming shareholder, seeking like the redeemers here to retain the benefit of the overpayment made as a result of a fraud, contended that the liquidators' claim was founded on a fraud and should therefore be rejected on that ground.  The Cayman Islands Court of Appeal rejected the argument in the following terms:

*"Whoever the beneficiaries of the fraud were (and they will have included Magnus Peterson, at least until his imprisonment, and shareholders who managed to redeem at inflated NAVs more than six months before the commencement of the liquidation) they do not include unpaid redeemers.  They will have suffered from the fraud by acquiring their shares at inflated prices, and will not have been able to extricate themselves.  What available assets there are will have to be distributed pari passu amongst them, and for that purpose it is immaterial whether they prove by reference to the inflated redemption values which they expected to receive but did not, or by reference to some revised NAV - at least so long as there is consistency among them.  By contrast, however, [the appellant] is (as it acknowledges) currently a beneficiary of the fraud, having received redemption payments by reference to the inflated NAV; and, to the extent that anyone is relying on illegality, it is [the appellant] by asserting its entitlement to retain the inflated redemption values."*

e.    The same is true here.  The parties that have currently benefitted from Citco's bad faith are the Defendants - redeemers who have been paid out by reference to the inflated NAV.  The Liquidators' actions are aimed at undoing the effect of the fraud by recovering sums paid as a result of the fraud (and as a result of Citco's bad faith) so that they can be distributed among the unpaid members pari passu.

47

To say that that involves the Funds 'benefitting' from Citco's fraud seems to me to be unrealistic and incorrect.

f.  Second, it is important to bear in mind (as set out above) that the question is whether the redeemers should be entitled to rely on the contractual provision giving certificates issued in good faith by Citco a conclusive effect.  In cases where there is a binding certification provision in the Articles, it is only such a certificate that can have conclusive effect: see *Migani* at paragraph 24 as set out above.  To say that under the present circumstances the redeemers cannot bring themselves within the relevant contractual provision, so that the certificates do not have conclusive effect, does not seem to me to involve the Funds "taking advantage" of anything: it is simply that the contractual conditions for the conferral of an additional right, which in this case would benefit the redeemers, are not met.

92.  Ultimately the question of whether or not the certificates issued by Citco should be given a conclusive effect notwithstanding bad faith on the part of Citco is a question of construction of Article 11(1).  The principle of construction that would be applied by a BVI Court is to give effect to the presumed objective intentions of the parties by construing the language used in its commercial context (see generally *Arnold v Britton* [2015] AC 1619 (SC) at paragraphs 14 - 23).  It seems to me that the construction put forward by the Funds - that in circumstances in which the contract explicitly states that certificates shall only be binding if issued in good faith, certificates should not be given conclusive effect unless issued in good faith - is, per English/BVI law, in accordance with the plain meaning of the words in the contract and

*does not*, as explained above (including by reference to *Weavering*) lead to an absurd or illogical result.

### D.    **Ground Three: *Ex Turpi Causa***

93.    It is a rule of English/BVI procedure that the court will not lend its aid to a person whose cause of action is founded on an illegal (or, possibly, immoral) act.[32] This is the principle often known by its Latin tag *ex turpi causa non oritur actio* but in modern parlance usually called the 'illegality' defence, and it can be traced to a dictum of Lord Mansfield in *Holman v Johnson* (1775) 1 Cowp 341 at 343:

> "If, from the plaintiff's own stating or otherwise, the cause of action appears to arise *ex turpi causa*, or the transgression of a positive law of this country, there the court says he has no right to be assisted.  It is upon that ground the court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff.  So if the plaintiff and the defendant were to change sides, and the defendant were to bring his action against the plaintiff, the latter would then have the advantage of it; for where both are equally at fault, *potior est conditio defendentis*."

94.    Mr. Mortimore suggests that this rule would provide the redeemers with a defence if the matter were litigated in the BVI (Mortimore Declaration paragraphs 93 - 98).  Mr. Mortimore is quite mistaken.  *Ex turpi causa* is wholly irrelevant to the present claim.

95.    The first reason for this is that, as Mr. Mortimore himself states, the *ex turpi causa* principle is capable of applying where a cause of action is founded on an illegal act.  That is not the case here.  The Funds' various common law causes of action against each redeemer are founded on the allegation that the Funds paid more by way of redemption proceeds to that redeemer than it was contractually entitled to receive, and that the overpayment would not have been made based on the Funds' true assets.  There is nothing illegal or immoral about either the

---

[32] "The effect of illegality is not substantive but procedural" *Tinsley v Milligan* [1994] 1 AC 340 at p374 per Lord Browne-Wilkinson. The reasoning in *Tinsley* (that the question of whether the court should uphold or dismiss the claim depends on the way that the claim is pleaded) was disapproved by the Supreme Court in *Patel v Mirza* [2016] 3 WLR 399, but there is no reason to doubt that the rule is procedural rather than substantive (and so would be applied by the BVI court as the *lex fori*, whatever law governed the underlying claim).

making of the payment or the claim to recover it if the facts alleged about Citco's conduct are found to be correct.

96.    Citco's bad faith is only relevant to the question of whether the redeemers can raise a defence that the certificates issued by Citco are conclusive on the question of whether the sums that they received are sums to which they were contractually entitled.  In order for that defence to be available, it is necessary (so the Funds say) for the certificates to have been "issued in good faith".   The correct application of the contractual test for the conclusiveness of certificates, upon which certificates the redeemers seek to rely, cannot render the Funds' claims illegal or immoral.

97.    However, if, contrary to my view, the *ex turpi causa* principle were held to be in play at all, I do not believe that it would lead the court to withhold relief in the present case in any event:

a.    The question of whether the Funds themselves should be regarded as having acted dishonestly would depend upon whether or not Citco's bad faith falls to be attributed to the Funds.  As set out above, I do not consider that it would be.

b.    If Citco's bad faith were to be attributed to the Funds, the question would then arise as to whether it would be appropriate for the court to withhold relief in all the circumstances of the case, having considered "(a)...the underlying purpose of the prohibition that has been transgressed, b) considering conversely other relevant public policies which may be rendered ineffective or less effective by denial of the claim, and c) keeping in mind the possibility of overkill unless the law is applied with a due sense of proportionality" (per Lord Toulson in *Patel v*

50

*Mirza* [2016] 3 WLR 399). I do not believe that application of this test would lead the court to withhold relief in the present case.

98.    In *Patel v Mirza*, the claimant paid £620,000 to the defendant to purchase shares in a listed company. Both parties had access to insider information about the company, and the proposed share purchase therefore involved illegal insider trading. The purchase did not take place (because the government contract that the company had been expecting to receive - which was the subject of the inside information - did not materialise). The claimant brought a restitution claim seeking to recover the money paid to the defendant. His claim *succeeded*. The UK Supreme Court held that it was not barred by the illegality (*ex turpi causa*) defence. The majority held that the court should adopt a '*factors-based*' approach considering the three points set out above. Lord Toulson referred with approval to the list of factors propounded by an academic writer (Professor Burrows) as follows:

> "If the formation, purpose or performance of a contract involves conduct that is illegal (such as a crime) or contrary to public policy (such as a restraint of trade), the contract is unenforceable by one or either party if to deny enforcement would be an appropriate response to that conduct, taking into account where relevant-
>
> (a) how seriously illegal or contrary to public policy the conduct was;
>
> (b) whether the party seeking enforcement knew of, or intended, the conduct;
>
> (c) how central to the contract or its performance the conduct was;
>
> (d) how serious a sanction the denial of enforcement is for the party seeking enforcement;
>
> (e) whether denying enforcement will further the purpose of the rule which the conduct has infringed;
>
> (f) whether denying enforcement will act as a deterrent to conduct that is illegal or contrary to public policy;
>
> (g) whether denying enforcement will ensure that the party seeking enforcement does not profit from the conduct;
>
> (h) whether denying enforcement will avoid inconsistency in the law thereby maintaining the integrity of the legal system."

51

99.     Applying those factors, even if Citco's bad faith were to be attributed to the Funds, it is clear to me that this would not lead to denial of the claim:

a.     The 'illegality' alleged involves recklessness by Citco in the conduct of its duties. While the consequences of its actions were no doubt 'serious' for those investors left out of pocket as a result, it is not 'seriously illegal' conduct by the Funds that seems to me to lead to the conclusion that the Funds should be prohibited from recovering mistaken payments as a matter of public policy.

b.     The primary victim of Citco's recklessness was the Funds whose assets were reduced by the overpayments *and the remaining shareholders* who would lose out as a result.  The redeemers *benefited* from Citco's bad faith.  I cannot understand how it could possibly be said that permitting the Funds to recover the overpayments made by the Funds from those who benefited from the bad faith, in order to distribute them amongst the non-redeeming shareholders (who were victims), could be objectionable or undermine the law or its aims in any way.  On the contrary, allowing the Funds to recover overpayments from redeemers would further the aim of the law rendering Citco's bad faith conduct unlawful by reducing the harm caused by Citco's bad faith actions and restoring the position to that which would have existed had the bad faith actions not occurred.

100.     It follows that I disagree firmly with Mr. Mortimore's view (at paragraph 97 of the Mortimore Declaration) that the application of *ex turpi causa* or the illegality defence would lead the BVI Court to refuse to grant relief.  On the contrary, the principles that underlie the *ex turpi causa* rule (if contrary to my view they applied at all) would strongly point towards

granting relief to the Funds so as to undo the consequences of Citco's bad faith and render the

law prohibiting such bad faith conduct more effective.[33]

101.    I understand that Defendants have argued for the application of the English *ex
turpi causa* defense with reference to U.S. decisions applying the *in pari delicto* defense under

New York law.  See Br. at 54; Mortimore Decl. 93-98.  Notwithstanding Defendants' apparent

position that the two doctrines are the same (as set forth in their brief at page 54, note 35), there

appear to be material differences between the English and New York doctrines.  Among other

things and importantly, I understand that under the *in pari delicto* doctrine, if the wrongdoing of

a company's agent is imputed to the company (which occurs unless an "adverse interest

exception" applies, and I understand that this exception is defeated if there is *any* benefit to the

company from the wrongdoing, including prolonging the company's existence and or providing

a short term benefit even though the wrongdoing is a detriment to the company in the long term),

the defense is applied mechanically and rigidly, without the court having the discretion to

consider whether the application would be fair or otherwise appropriate under the circumstances.

In contrast to that inflexible approach, and as I have set forth in detail above, an English/BVI

court must engage in a flexible, factors-based approach before applying the *ex turpi causa*

defense, even if the wrongdoing of the company's agents can be imputed to the company.

### E.    Ground Four: The effect of Citco's bad faith on the restitution claims

102.    At paragraphs 99 - 100 of the Mortimore Declaration, Mr. Mortimore suggests

that if Citco acted in bad faith, it follows that the Funds cannot make good their claim to have

overpaid redemption monies by mistake because Citco's recklessness as to the true NAV will be

---

[33]  To the extent that Defendants seek to apply *ex turpi causa* based on allegations of wrongdoing by the Funds'
former manager, FGG, such application would be unwarranted for the same reasons I have described.

attributed to the Funds.[34]   The point is a bad one.   As I have already pointed out above, it would be wrong to attribute Citco's bad faith to the Funds, the immediate victims of Citco's bad faith, or through them to the defrauded investors remaining in the Funds.   It is not the law that a principal, whose dishonest agent causes him to pay to a third party money that is not properly due, is barred from recovering that money because his agent's knowledge of his own fraud is attributed to him.   That would leave the third party with an entirely undeserved windfall benefit at the principal's expense.   Not only is that conclusion inconsistent with the outcome of cases such as *Lipkin Gorman* but it is unjustifiable as matter of justice and common sense.

### F.   Ground Five: The adequacy of the pleading of bad faith

103.     At paragraphs 108 - 116 of the Mortimore Declaration, Mr. Mortimore expresses the view that the claim that Citco acted in bad faith will fail on the facts.   Although what constitutes the applicable standard for "bad faith" under English/BVI is a proper subject for expert exposition (and I will address that standard below), it is my understanding that applying that standard to the Funds' pleadings is not an appropriate topic for expert evidence (i.e. that is the function of the Court).   Whether the Sample Amended Complaints meet US pleading standards and whether the matters alleged will result in a factual finding that Citco in fact acted in bad faith are matters well outside the purview of an expert in BVI law,[35] but since I have been asked to respond to these points I will do so.

---

[34]   I understand that Defendants raise the same argument by reference to the alleged knowledge of employees of Fairfield Greenwich group, the Funds' investment manager. Obviously the state of knowledge of those employees and the nature of their relationship to the Funds are not matters that can be determined on a summary basis, but in principle the analysis would be the same: if Fairfield Greenwich employees (a) were agents of the Funds and (b) could be shown to have acted in bad faith, their knowledge will not be attributed to the Funds for the purposes of a claim by the Funds to recover money paid away. In any event, knowledge held by an agent who was not the one responsible for making the payment is irrelevant to the question of whether the payment was made by mistake: *BP Oil International Ltd v Target Shipping Ltd* [2012] EWHC 1590 (Comm) (partly reversed on appeal but not on this issue: [2013] EWCA Civ 196).

[35]   It has been held, unremarkably, that "[g]ood faith is a question of fact." *In re Handman and Wicox's Contract* [1902] 1 Ch. 599, 604 (Stirling LJ).

104.    Mr. Mortimore seems to me to mischaracterise the pleadings (and take a too narrow view of the law) when he says that showing a lack of good faith depends on demonstrating wilful blindness or "blind-eye" knowledge on the part of Citco that the NAV statements were wrong.    A person will be held to have acted in bad faith (or dishonestly or fraudulently) in English/BVI law if he acted:

a.    Knowing that what he was doing was wrongful;

b.    Suspecting that what he was doing was wrongful but deliberately not taking steps to check the position in order to avoid having his suspicions confirmed (known as "wilful blindness" or "Nelsonian knowledge"); *or*

c.    Recklessly, indifferent as to whether or not what he was doing was wrongful or lacking any belief that what he was doing was right.    Such recklessness might be inferred from a failure to take obvious steps to check the position or in cases falling short of wilful blindness, in which a person suspects that what he is doing might be wrongful, but fails to take steps to clarify the position for extraneous reasons.

105.    Thus in *Derry v Peek* (1889) 14 App.Cas 337, the UK House of Lords held that a person would be acting "fraudulently" for the purposes of a claim in deceit if he made a false statement (per Lord Herschell at 374):

*"(1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless whether it be true or false.  Although I have treated the second and third as distinct cases, I think the third is but an instance of the second, for one who makes a statement under such circumstances can have no real belief in the truth of what he states."*

106.    In *The London Joint Stock Bank v. Simmons* [1892] A.C. 201, 223, Lord Herschell also pointed out that:

*"[O]f course, if there is anything to arouse suspicion, to lead to a doubt whether the person purporting to transfer them is justified in entering into the contemplated*

55

*transaction the case would be different, the existence of such suspicion or doubt would be inconsistent with good faith. And if no inquiry were made, or if on inquiry the doubt were not removed and the suspicion dissipated, I should have no hesitation in holding that good faith was wanting in a person thus acting."*

107.    In *Royal Brunei Airlines v Tan* [1995] AC 378, the Privy Council held that a person would be acting "dishonestly" for the purposes of a claim in dishonest assistance in breach of a trust if he was (per Lord Nicholls at 389 - 390):

*"simply not acting as an honest person would in the circumstances. This is an objective standard...*

*In most situations there is little difficulty in identifying how an honest person would behave. Honest people do not intentionally deceive others to their detriment. Honest people do not knowingly take others' property. Unless there is a very good and compelling reason, an honest person does not participate in a transaction if he knows it involves a misapplication of trust assets to the detriment of the beneficiaries. Nor does an honest person in such a case deliberately close his eyes and ears, or deliberately not ask questions, lest he learn something he would rather not know, and then proceed regardless.*

*[...]*

*The individual is expected to attain the standard which would be observed by an honest person placed in those circumstances. It is impossible to be more specific. Knox J. captured the flavour of this, in a case with a commercial setting, when he referred to a person who is "guilty of commercially unacceptable conduct in the particular context involved:" see Cowan de Groot Properties Ltd. v. Eagle Trust Plc. [1992] 4 All E.R. 700 , 761. Acting in reckless disregard of others' rights or possible rights can be a tell-tale sign of dishonesty. An honest person would have regard to the circumstances known to him, including the nature and importance of the proposed transaction, the nature and importance of his role, the ordinary course of business, the degree of doubt, the practicability of the trustee or the third party proceeding otherwise and the seriousness of the adverse consequences to the beneficiaries. The circumstances will dictate which one or more of the possible courses should be taken by an honest person. He might, for instance, flatly decline to become involved. He might ask further questions. He might seek advice, or insist on further advice being obtained. He might advise the trustee of the risks but then proceed with his role in the transaction. He might do many things. Ultimately, in most cases, an honest person should have little difficulty in knowing whether a proposed transaction, or his participation in it, would offend the normally accepted standards of honest conduct."*

108.    In *Three Rivers District Council v Bank of England* (No.3) [2003] 2 AC 1, the UK House of Lords held that in order to show that a public official was acting in "bad faith" for the purposes of a claim of misfeasance in public office if (per Lord Hobhouse at 230):

> *"The official concerned must be shown not to have had an honest belief that he was acting lawfully; this is sometimes referred to as not having acted in good faith. [...] Another way of putting it is that he must be shown either to have known that he was acting unlawfully or to have wilfully disregarded the risk that his act was unlawful. This requirement is therefore one which applies to the state of mind of the official concerning the lawfulness of his act and covers both a conscious and a subjectively reckless state of mind, either of which could be described as bad faith or dishonest."*[36]

109.    In the same case, Lord Steyn set out his conclusion on the point (at 191-2) as follows:

> *"The alternative form of liability requires an element of bad faith. This leads to what was a disputed issue. Counsel for the Bank pointed out that there was no precedent in England before the present case which held recklessness to be a sufficient state of mind to ground the tort. Counsel argued that recklessness was insufficient. The Australian High Court and the Court of Appeal of New Zealand have ruled that recklessness is sufficient [...] This is an organic development, which fits into the structure of our law governing intentional torts. The policy underlying it is sound: reckless indifference to consequences is as blameworthy as deliberately seeking such consequences. It can therefore now be regarded as settled law that an act performed in reckless indifference as to the outcome is sufficient to ground the tort [...] The plaintiff must prove that the public officer acted with a state of mind of reckless indifference to the illegality of his act."*

110.    It can be seen that the tests for 'fraud', 'dishonesty' and 'bad faith' in these three judgments are in essence the same, and that the language used overlaps. The key point is that recklessness, in the sense of indifference to the truth or to the legitimacy of one's acts (including a failure to act on suspicions for extraneous reasons), will amount to bad faith (and fraud and dishonesty).

---

[36] Note that: "Although a dishonest state of mind is a subjective mental state, the standard by which the law determines whether it is dishonest is objective...[*i.e.*] If by ordinary standards a defendant's mental state would be characterised as dishonest, it is irrelevant that the defendant judges by different standards." *Barlow Clowes International Ltd (in liquidation) v Eurotrust International Ltd* [2006] 1 WLR 1476 per Lord Hoffmann at paragraph 10 (Privy Council).

111.    In my view, the Sample Amended Complaints that are the subject of this application allege matters which, if proved at trial, would meet the relevant threshold of recklessness and thus bad faith on the part of Citco under BVI/English law.  I believe Mr. Mortimore's opinion to the contrary to be based on his mischaracterisation of the pleading and/or of English/BVI law as to what amounts to bad faith, and also to involve a peculiarly restricted and unrealistic reading of the Sample Amended Complaints themselves.

112.    I would also note that it is odd that Mr. Mortimore uses the term "gross negligence" on a number of occasions in the Mortimore Declaration.  That is not a term that has any particular meaning in English/BVI law: in English/BVI law there is no legal significance to degrees of negligence, and "gross negligence is ordinary negligence with a vituperative epithet", per Rolfe B. in *Wilson v Brett* (1843) 12 L.J. Ex. 264.  "Generally speaking in civil cases 'gross' negligence has no more effect that negligence without an opprobrious epithet", per Lord Wright in *Caswell v Powell Duffryn Associated Collieries Ltd* [1940] A.C. 152 at 175.

### G.    The Contractual Claims

113.    Mr. Mortimore suggests at paragraph 101 of the Mortimore Declaration that the only common law claim to which Citco's bad faith is relevant is the breach of contract claim (the 12th and 13th claim in the Sample Amended Complaints).  This suggestion is incorrect.  The Funds do not need to rely on Citco's bad faith as part of their cause of action in respect of any of their claims (including the breach of contract claims).  However, I presume that the redeemers are going to assert that they have a defence to the restitution, unjust enrichment and breach of contract claims by reference to the certificates issued by Citco.  If they do raise such a defence, Citco's bad faith will be relevant to it.  The Funds refer to Article 11(1) and Citco's bad faith in the pleading of the breach of contract claims, but it is not a necessary part of the cause of action

58

that Citco acted in bad faith: it again will be relevant only if the redeemers seek to defend the claim by reference to the certificates issued by Citco.

114.    In the Initial Moss Declaration I expressed the view that it is arguable that the contract between each member and the Fund contains an implied term that, if sums are overpaid to the redeeming member (i.e. in excess of their contractual entitlements) those sums must be repaid to the Funds.  I remain of that view: it is at least arguable that it is so obvious as to go without saying or necessary to give the contracts practical, commercial and legal coherence that in the event the Funds pay money to the redeemers that exceeds the sum that they are properly due, the redeemers should be required to repay it.   Mr. Mortimore offers four reasons (at paragraph 103 of the Mortimore Declaration) which he says lead him to the view that such a term would not be implied.

a.    First, he says that "the same ground is covered" by sections 56 - 59, 62 and 63 of the BVI Business Companies Act 2004.  This is a bad point.  Section 58 provides that a company distribution (i.e. a dividend) may be recovered under BVI law, even if the payment made was of a sum contractually due, if at the time of payment the fund did not satisfy the statutory solvency test.  The other provisions do not seem to relate to recovery of payments at all.  None has anything to do with recovery of redemption payments where redemption takes place pursuant to a request of the shareholder or a situation in which the fund has paid out more to a redeemer than was properly due.

b.    Second, he says that the same ground is covered by the law of restitution/unjust enrichment.  This is again a bad point: it is common for a term to be implied into a contract where a similar cause of action exists already at common law.  The

most obvious example is the term invariably implied into a contract for the provision of professional services as a matter of English law that the services will be provided with reasonable care and skill.  An equivalent duty arises at common law, and it is common for claimants to sue in both contract and tort in relation to the same conduct, in reliance on the contractual and common law duties (see e.g. *Henderson v Merrett Syndicates* [1995] 2 AC 145 at 176 per Lord Goff.

c.      Third, he says that the implied term is commercially unsound for the reasons given by Lord Sumption in the *Migani* case.  This betrays a misunderstanding of the implied term.  The term to be implied simply provides that if sums have been paid that exceeded the amount contractually due then they should be repaid.  Lord Sumption would not have disagreed with that proposition: *indeed he held it to represent the general law at paragraph 18 of his judgment.*[37]  Lord Sumption's disagreement with the Funds was as to whether the sums paid had been contractually due: he held that they had, by reference to the certification provisions as set out above (paragraph 24).

d.      Fourth Mr. Mortimore says that the term is "one-sided" because redeeming members have no need of it.  I do not understand this objection: if the term is obvious or necessary it will be implied whether its operation is likely to benefit one party or both.

---

[37] See also *Aspect Contracts (Asbestos) Ltd  v Higgins Construction plc* [2015] 1 WLR 2961(a case concerned with a claim to recover a sum overpaid pursuant to an erroneous adjudication of a construction dispute) at paragraph 24 per Lord Mance: "I emphasise that, on whatever basis the right arises, the same restitutionary considerations underlie it. If and to the extent that the basis on which the payment was made falls away as a result of the court's determination, an overpayment is, retrospectively, established. Either by contractual implication or, if not, then by virtue of an independent restitutionary obligation, repayment must to that extent be required. The suggested implication, on which the preliminary issue focuses, goes to repayment of the sum (over)paid."

115.    Mr. Mortimore's objections therefore seem to me to be wrong and I remain of the view that it is at least arguable that a term to the effect that money that has been overpaid should be repaid would be implied into the parties' contractual arrangements as a matter of BVI law.  A claim raising such an argument would not in my opinion be struck out (dismissed) by the BVI courts.

### H.    The Claims against bad faith recipients

116.    In the Initial Moss Declaration, I expressed the view that the Funds have an arguable (and in my view correct) case as a matter of BVI law that any redeemer who received redemption payments in 'bad faith'[38] should not be able to raise a defence to either the contractual or restitution claim to the effect that (as a result of the certification by Citco) they were contractually entitled to the sum that they received, even if that defence were held to be open to other redeemers who had acted in good faith.  I remain of that view.

117.    Mr. Mortimore disagrees (at paragraphs 120 - 123 of the Mortimore Declaration) with my view that a term would be implied into the parties' contractual arrangements so as to prevent a bad faith redeemer from retaining overpaid redemption proceeds (by reference to the authorities set out in the Initial Moss Declaration at paragraph 47).  He makes a number of bad points:

a.    First, he says that no such implied term is pleaded in the amended complaints. That is true but irrelevant: the point I was dealing with was as to whether the redeemers might have a *defence* to the claim.  The Funds' claim depends only on showing receipt of sums exceeding the amount to which redeemers were contractually entitled.  The question of whether a term should be implied that

---

[38] 'Bad faith' here means the same thing as set out above, i.e. it includes wilful blindness and reckless disregard for the truth.

redeemers should not be permitted to rely on the otherwise conclusive effect of certificates issued by Citco will only arise if and when any alleged bad faith redeemer pleads a defence asserting that they received no more than they were contractually entitled to receive in reliance on the certification provision. The point that I am making is that, if that happens, the Funds will be able to meet that defence by relying on an implied term that a bad faith recipient is not entitled to rely on the conclusiveness of a certificate. I do not know the practice in the US Bankruptcy Court, but it certainly would not be usual practice in English/BVI procedure to plead a response to a potential defence that has not yet been raised.

b.    Second, Mr. Mortimore notes that Article 11(1) contains no express qualification on the conclusiveness of certificates issued by Citco based upon the good faith of the recipient. That is true, and is why such a qualification would have to be implied. Mr. Mortimore's observation does no more than re-state the issue.

c.    Third, Mr. Mortimore says that the implied term is not necessary because the "ground is covered" by the BVI statutory provisions and the law of unjust enrichment. I have already addressed this argument above: it is mistaken.

118.    Mr. Mortimore also disagrees (at paragraphs 124 to 129 of the Mortimore Declaration) with my reading of the judgment of Goff J in *Barclays Bank v WJ Simms Son & Cooke (Southern) Ltd* [1980] 1 QB 677 at 695, and in particular footnote 2b where Goff J remarks that a payee might not be able to raise a defence of good consideration to a claim for restitution where he did not receive the money in good faith. Mr. Mortimore appears to suggest that Lord Sumption restricted or in some way disapproved that remark in *Migani*. He did not:

Lord Sumption was not concerned with and was not discussing a case in which bad faith is alleged (because there was no such case before him).

119.    It is fair to say that Goff J's remark is expressed tentatively ("*or possibly*...") and that there is no decided authority in which the question of whether a person who would otherwise have a contractual entitlement to receive a payment loses the right to retain it if they act in bad faith has been considered.  However, my own view is that Goff J's point was right as a matter of English/BVI law.

120.    Further, Mr. Mortimore suggests that the pleading of bad faith against HSBC and Citigroup would be regarded as inadequate.  His view is dependent upon the same erroneous view as to the circumstances in which a finding of bad faith is justified under English/BVI law, mischaracterisation of the Funds' pleading and peculiarly narrow and unrealistic reading of that pleading as is his view in relation to the allegations of bad faith on the part of Citco.  I believe that the question of whether the Funds' pleading of HSBC's and Citigroup's bad faith meets the pleading standard for the US Bankruptcy Court is not a matter on which Mr. Mortimore or I can express a view, and our views as to whether it would be regarded as acceptable pleading in the BVI are irrelevant.  But for what it is worth, my view is that the allegations of bad faith made against HSBC and Citigroup would pass muster for pleading purposes before a BVI Court.

121.    Finally, I understand that an issue has been raised as to whether the knowledge of "bad faith recipients" who are registered shareholders of the Funds can generally be attributed or imputed[39] to their customers who are beneficial owners of the shares. A number of points can be made.  The first point to make is that imputation of the registered shareholder's bad faith to its customers *is not necessary* to prevent such a customer from raising a defence to either the

---

[39] Attribution and imputation mean the same thing for present purposes, and I use the terms interchangeably

Liquidators' contractual or restitution claim to the effect that (as a result of the certification by Citco) it was contractually entitled to the sum received, even if that defence were held to be open to other redeemers who had acted in good faith.  This is because it is the *registered shareholders* that are to be treated as the party to the Articles and so it is the *registered shareholder's good faith* that is relevant when considering whether a certificate is to be treated as 'binding'.  The position as set out in Article 8 of the Articles ("The Company shall be entitled to treat the registered holder of any share as the absolute owner thereof and accordingly shall not be bound to recognise an equitable or other claim to, or interest in, such share on the part of any other person.") reflects the general law, as now found in s.42 of the BVI Business Companies Act 2004, that a company is entitled to treat the person entered on the share register as the only person entitled to exercise any rights attaching to the share (and to receive any distributions). The Subscription Agreements, at paragraph 27, further provides, *inter alia*: "If Subscriber is subscribing as trustee, agent, representative or nominee for another person (the 'Beneficial Shareholder'), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder.  Subscriber has all the requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder."  In other words, all that matters with respect to this point is the bad faith of the registered shareholder and subscriber; the registered shareholder/subscriber's customers are bound by the consequences thereof.

122.    If contrary to my view attribution of knowledge to the registered shareholder's customers were necessary, the general position as I have set out above is that, as a matter of English/BVI law, the knowledge of an agent connected with the subject matter of his agency and acquired in the course of his employment is attributed to the principal.  The fact that the

registered shareholder's good faith might be based on information acquired prior to the commencement of his agency is irrelevant, provided he holds the necessary knowledge in the course of his agency. Although there is surprisingly little authority on this question, the question of whether an agent is held to have knowledge in the course of his agency probably depends on an assessment of all of the facts. In *Mountford v Scott* (1823) 37 ER 1105, there was a question as to whether an attorney's knowledge of the purpose of a transaction, acquired as a result of prior instructions, could bind the principal. Lord Eldon (the Lord Chancellor) held that it could, depending on the circumstances. He said "The Vice-Chancellor in this case appears to have proceeded upon the notion that notice to a man in one transaction is not to be taken as notice to him in another transaction; in that view of the case it might fall to be considered, whether one transaction might not follow so close upon the other, as to render it impossible to give a man credit for having forgotten it. I should be unwilling to go so far as to say, that if an attorney has notice of a transaction in the morning, he shall be held in a Court of Equity to have forgotten it in the evening; it must in all cases depend upon the circumstances."

123.    As to whether attribution would be ruled out by Citco's own bad faith, as discussed herein, the answer depends on the purpose for which you are seeking to attribute knowledge. Where a claimant is seeking to make a claim against a person for knowing receipt of misapplied money, and the person acted through an agent who knows that the money was misapplied, it will be no defence for the principal to say that his agent acted fraudulently (*see Bilta,* at paragraph 205, per Lords Hodge and Toulson, this being an example of the 'first' type of case, where there is attribution (while the Funds' position vis-a-vis Citco is an example of the 'third' type of case where there is no attribution)). Indeed, to the extent that it is claimed that the beneficial owners through Citco try to deny attribution by claiming that they were victims, it

seems absurd for Defendants to claim that they have been the victim of the bad faith when they, through the overpaid redemptions to them, are actually the real beneficiaries of it.  *See Weavering* (discussed and quoted herein).

**I.    Other issues: ministerial receipt**

124.    In addition to addressing Mr. Mortimore's arguments, I have been asked to address a point which I am told has been raised by certain Defendants but which is not discussed by Mr. Mortimore.  The point is this: certain of the Defendants have, I am told, suggested that they might have a defence to the common law claims, as well as the BVI statutory avoidance claims, on the grounds that they received redemption proceeds as mere agents for their customers.

125.    Quite how the Defendants will put such a defence of course remains to be seen. However, it is difficult to envisage how such a defence could succeed as a matter of BVI law on the facts here:

a.    A person who has received a payment by mistake may have a defence to a claim for restitution if he can show that he has changed his position in good faith in reliance on receipt of the payment such that it would be inequitable now to require him to make restitution.  The existence of this defence was first recognised in English law by the House of Lords in *Lipkin Gorman*, supra.

b.    Prior to *Lipkin Gorman*, there were some authorities which suggested that where a mistaken payment was received by an agent and had been paid over to his principal, he might have a defence to a claim in restitution on the grounds of "ministerial receipt" - *i.e.* that he received the payment as agent only, such that

66

the correct defendant to the claim was his principal.[40]  It is not clear whether this defence still exists, or has been subsumed within the broader defence of "change of position": if it does exist it does not seem to add anything to the change of position defence.

c.    If the defence does still exist, it requires the recipient to show that he received and paid over the money acting in his capacity as agent, i.e. that the 'real' parties to the transaction by which the payment was made are the payer and the recipient's principal.    That cannot be the case here.    The Articles explicitly provide (in Article 8) that the Funds are entitled to treat the registered holder of any share as the absolute owner thereof and accordingly shall not be bound to recognise - in connection with the common law claims as well as the BVI statutory avoidance claims - any equitable or other claim to or interest in such share on the part of any other person.    In other words, as between the Funds and the registered shareholders and for all purposes, the registered shareholders were to be treated as acting on their own account as principals.[41]    The redeeming shareholders thus received the redemption monies on their own account as principals with rights and obligations as against the Funds on their own account.    It is entirely possible that in acquiring and redeeming their shares the redeeming shareholders were acting on the instructions of customers with whom they had a separate contractual

---

[40] *Buller v Harrison* (1777) 2 Cowp. 565 per Lord Mansfield; *Portman Building Society v Hamlyn Taylor Neck* [1998] 4 All ER 202 per Millett LJ.

[41] A way to test this is that if the registered shareholders had acted as agent, the law would have treated their customers (rather than them) as parties to the Articles ("There is no doubt whatever as to the general rule as regards an agent, that where a person contracts as agent for a principal, the contract is the contract of the principal and not that of the agent; and, prima facie, at common law the only person who may sue is the principal and the only person who can be sued is the principal" *Montgomerie v UK Mutual Steamship Association* [1891] 1 QB 370 per Wright J at 371). That is obviously not what was intended by any party here: it follows that the registered shareholders acted as principals in signing up to the Articles, including in relation to redemptions.

relationship, and by which sums equivalent to the redemption monies were credited by them to the customer, but that does not alter the fact that the investments were made and the payments received by the redeeming shareholders acting as the absolute owners of the shares and thus as principals.

**J.**   **Other issues: damages**

126.   I understand that Defendants have argued that the Funds suffered no "net injury" upon their redemption purchases because they also sold shares to Defendants at an inflated price. In BVI law, the only remedy is to rescind and claim back the purchase price. This right is lost upon liquidation. Under the rule established in *Houldsworth v City of Glasgow Bank* 5 App Cas 317 (HL), which applies in the context of BVI law, once liquidation ensues, a contract for the subscription of the shares cannot be rescinded and subscription monies cannot be recovered from the company. Rather, upon liquidation, a shareholder's rights against the company are limited to its rights as shareholder. Given the inability to reclaim any of the purchase price, the Defendants have no counter-claim or set off based on the purchase of shares. Thus, while the Defendants, pursuant to the terms of their subscription agreements, assumed an irrevocable obligation to purchase shares upon acceptance of their subscriptions, those Defendants could not assert a claim against the Funds for rescission of their investment upon the Funds' entry into liquidation proceedings. It cannot then be said that the Funds' sale of shares to Defendants and the Funds' redemption purchases from Defendants were on equal legal footing as a matter of BVI law.

**II.**   **THE BVI INSOLVENCY ACT CLAIMS**

127.   I agree with Mr. Mortimore that the BVI Insolvency Act is to a considerable extent modelled on, and I would add, copied from certain parts of the English (strictly speaking British, as there are also Scottish law provisions) Insolvency Act 1986. At paragraph 138 of the

Mortimore Declaration, Mr. Mortimore says there are some differences in relation to unfair preferences and undervalued transactions. There is in fact one significant change in relation to preferences, whereby BVI law abandons the subjective element of intention or desire to prefer required in English law and adopts an objective view, but provides for a defence of "ordinary course of business". With regard to undervalue transactions and other aspects of unfair preferences, the changes are essentially cosmetic and are changes in drafting style rather than substance.

128.    I respectfully disagree with paragraph 146 of the Mortimore Declaration. Sections 245 and 246 are correctly placed under the heading "Voidable Transactions". There is nothing misleading in the title. Mr. Mortimore says that these sections have no substantive effect with regard to the transaction or any property subject to the transaction. He says that the "… only consequences that the liquidator may apply to the BVI court for an order under Section 249". Although this is true in an arid, technical sense, it does not give a correct picture as to the substance. A comparison of the English statute in terms of Sections 238 (Undervalues), 239 (Preferences), Section 240 (Relevant Time) and Section 241 (Remedies) on the one hand and Sections 245, 246 and 249 of the BVI Act on the other, suggests that, apart from the substantive change in the law relating to preferences mentioned above, the provisions are substantially the same. It is merely a matter of drafting style that in Section 238 of the English Insolvency Act 1986, which deals with undervalues, the general remedy is mentioned in Section 238(3)[42] and the specific remedies in s.241, whereas remedies are not mentioned in Section 246 of the BVI Act, but only in section 249.

---

[42] "Subject as follows, the Court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not entered into that transaction."

129.    Details of the wide range of orders available under Section 238 of the English Act are set out in Section 241.  The reason for setting out the various types of remedies in Section 241 is because the same specific, detailed remedies also apply to Section 239 in relation to preferences.

130.    Likewise, Section 239(3) mentions the remedy in relation to preferences briefly:-

"Subject as follows, the Court shall, on such application, make such order as it thinks fit for restoring the position to what it would have been if the company had not given that preference."

Again, however, the specific types of relief available are set out in detail in Section 241(1).

131.    The range of remedies that are available in relation to both undervalues and preferences in the English Act are set out in Section 241(1) as specific types of relief and are expressly stated to be "Without prejudice to the generality of Sections 238(3) and 239(3)".

132.    The drafting style therefore of the English Act is to have in the case of both preferences and undervalues a general relief provision in sections 238 and 239, backed up by a series of specific types of relief in Section 241.

133.    The draftsman of the BVI Act, in copying over and adapting the English provisions, has decided not to have this degree of duplication and to list remedies only in Section 249.  This drafting decision makes absolutely no difference to the substance of the provisions. Sections 245 and 246 of the BVI Act are, as the side-note says, just as much about "Voidable Transactions" as Sections 238 and 239 of the English Act.  Indeed the only purpose of the point which Mr. Mortimore makes with regards to the different drafting styles is to try and find an argument later based on the fact that Sections 245 and 246 do not themselves contain a remedy provision.

70

134.    Starting at paragraph 151 of the Mortimore Declaration, Mr. Mortimore adopts the dogmatic and unsubstantiated theory of Professor Goode to the effect that there is no overlap between Sections 245 and 246, i.e. between undervalue and preference claims.    Neither Mr. Mortimore nor Professor Goode cites any statutory wording or case-law authority for this.    In my view this is a dogmatic and impractical approach which has no basis either in the language of the Statute or in any case law or interpretation.    The general approach of the English courts is essentially pragmatic rather than dogmatic.    Where dogmatic concepts have been introduced by judges, they have usually been overturned by the higher courts: see the examples given below.

135.    At paragraph 153 of the Mortimore Declaration, Mr. Mortimore relies on the case of *Re MC Bacon Limited*.    This was a decision by Mr. Justice Millett who, like Professor Goode, is occasionally prone to dogmatic statements which prove to be impractical.    These do not usually survive when considered by the appellate courts.[43]

136.    In the *MC Bacon* case, decided by Millett J. at the first instance (i.e. trial court) level, a liquidator claimed that the grant of a security interest was voidable on the grounds that it was a voidable preference under Section 239 of the English Act or an avoidable undervalue under Section 238 of the English Act.    The actual holding was that (i) there was no voidable preference in that case because there was no subjective element as required by the English Act, *i.e.* a desire to prefer the creditor bank which received the security interest, and (ii) the grant of the security interest in favour of the bank was not voidable as an undervalue because it was neither a gift nor a transaction at an undervalue.

137.    Mr. Mortimore correctly describes the result of the undervalue claim as being based on alleged conceptual impossibility on the basis that a security interest simply appropriates

---

[43]    By way of example, in *Re Charge Card Services* [1987] Ch 150, Millett J. stated that it was "conceptually impossible" for there to be a charge-back, i.e. for a lender to take a security interest in a debt due to it. This dogmatic theory was rejected by Lord Hoffman in the House of Lords in *Re BCCI (No8)* [1998] AC 214 at 228.

the debtor's assets to meet liabilities due to the secured creditor and adversely affects the rights of other creditors in the event of insolvency, but it does "not deplete its assets or diminish their value". This was a controversial first instance (trial court level) rationale on the subject of the undervalue claim.

138.    Unfortunately, Mr. Mortimore does not explain that the dogmatic view of Millett J. in the *MC Bacon* case has been thoroughly doubted in a subsequent case in the English Court of Appeal. In *Hill v Spread Trustee Co Limited* [2007] 1 BCLC 450 the English Court of Appeal considered a personal insolvency proceeding. The case concerned a claim by the trustee in bankruptcy to avoid amongst other things a security interest granted by way of undervalue for the purpose of defrauding creditors within Section 423 of the Insolvency Act 1986. Although Section 423 of the English Act is the descendant of fraudulent conveyance provisions going back at least to the Statute of Elizabeth c.1570, in the English Insolvency Act it has been drafted by copying much of the drafting of Section 238, the undervalue provision, and thus provides for setting aside undervalue transactions, in the case of both personal and corporate debtors, where it can be shown that the purpose of the undervalue transaction was to remove assets from the potential grasp of creditors.

139.    The judge at first instance had found that the security interest had been granted in order to put assets beyond the reach of HMRC (the United Kingdom's tax authority - equivalent to the US IRS) and that there was no consideration for giving those security interests. Various issues were raised in the Court of Appeal, including questions of whether the limitation period for the claim had expired.

140.    The question of whether the grant of a security interest could be voidable as an undervalue was specifically raised by Catherine Newman QC on behalf of the recipients of the security interest:

> "[93] Miss Newman submits that a transaction which grants security cannot be for no consideration because a charge does not deplete the debtor's assets. In my judgment this argument must be rejected. Miss Newman's argument relies on the holding of Millet J. as he then was in *Re MC Bacon Limited* [1990] BCLC 324 at 340-341 that the grant of security cannot constitute a transaction at an undervalue. It does not follow from this that a transaction involving the grant of security can never amount to a transaction for no consideration. In my judgment it is no different from any other transaction in that respect. This in my judgment was also the view of Millett J. who was careful to point out that the security in the case before him was not given without consideration because it was given in exchange for forbearance by the creditor ([1990] BCLC at 324 at 340)."

141.    Thus the Court of Appeal first of all distinguished the MC Bacon case and held that it did not apply to the creation of a security interest *for no consideration at all*.

142.    Lady Justice Arden at paragraph [138] later went on to consider the position that would pertain if there had been *some* consideration for the giving of the security interest. Lady Justice Arden stated at paragraph [138]:

> "… Miss Newman, however, sought to argue that as a matter of law the grant of security involved no diminution in the value of [the debtor's] assets. Therefore the fact that the consideration provided by the trustees was negligible did not bring the transactions within this paragraph. As to that, I would observe that s423(1)(c) does not refer to a diminution in assets and does not depend on the grant of proprietary rights. The grant of other rights can constitute consideration; this approach is supported by s425 which refers to "obligations" and "benefits" as well as to property. If it had been necessary to find the grant of a proprietary right, I would provisionally not have accepted the argument that the grant of security in this case did not involve the disposition of any property right in favour of the trustees. Obviously there is no change in the physical assets of the debtor when the security is given but there seems to be no reason why the value of the right to have recourse to the security and to take priority over other creditors, which the debtor creates by granting the security, should be left out of account. In the circumstances, **I would respectfully doubt whether the holding in Re MC Bacon Limited [1990] BCLC 324 on which Miss Newman relied could apply to the later charges, which were in fact charges by way of legal mortgage, especially in the light of what was said by Lord Hoffman and Lord Millett in *Re Leyland Daf Limited, Buchler v Talbot* [2004] UKHL 9 at [29], [51], [2004] 1 BCLC 281 at [29], [51], [2004] 2 AC 298, respectively….** The holding in *MC Bacon* was applied by this Court in *National Bank of Kuwait v Menzies* [1994] 2 BCLC 306, where a further assign was made of a debt that

73

had already been assigned by way of charge, and if this point had to be decided we would
have to consider whether that case was distinguishable or was now binding on this point
in the light of the *Buchler* case. However it is not necessary for me to express a final
view on these points on this appeal." [emphasis added][44]

143.    Thus, although the point was strictly speaking left open, the general impression is
that the dogmatic reasoning of Millett J. in the *MC Bacon* case has been disapproved at Court of
Appeal level and in my view it is the statement in the Court of Appeal in England that is likely to
be followed by the courts of the British Virgin Islands.

144.    I should add that Lady Justice Arden was in the minority, dissenting, on the point
relating to the limitation bar, but part of the unanimous consensus in the Court of Appeal on
other points. This can be seen from the relatively short judgments of Sir Martin Nourse and Lord
Justice Waller, which agree with Lady Justice Arden on all points except the limitation issue.

---

[44] Note that having disapproved of the relevant dogmatic reasoning in *MC Bacon*, Arden LJ leaves open two
possible arguments for further decision: (i) if the matter had to be decided by the English Court of Appeal, would
they be bound by their previous decision in *Menzies*, which applied *MC Bacon*, or could *Menzies* be distinguished?
(ii) if *Menzies* could not be distinguished, should the Court of Appeal follow, in preference to *Menzies*, the reasoning
of the House of Lords (the predecessor of the UK Supreme Court) in the *Buchler* case? The force of *Menzies* as a
precedent is in my own view weakened by the fact that it was a claim brought by a litigant in person and argued by
that litigant in person before the Court of Appeal. Thus there was no professional legal argument on the conceptual
impossibility point in favour of Mr. Menzies. Moreover, the Court of Appeal in so far as relevant struck out
(dismissed) Mr. Menzies' pleadings on the basis that there was no viable claim under s.423 of the English Act. The
leading judgment of Sir Christopher Slade does not mention *MC Bacon* or any other case on undervalue transactions
and is based largely on the fact that there was on the evidence *no creation of the security interest that Mr. Menzies
sought to invalidate*. The concurring judgment of Balcombe LJ does not discuss conceptual impossibility but quotes
a long passage from *MC Bacon* which includes the point about creation of a security interest not being an
undervalue transaction and then states that Millett J.'s reasoning applies to the letter of instruction which Mr.
Menzies claimed was the creation of a security interest. However, in the light of the finding that the letter of
instruction did not create a security interest, the reference to *MC Bacon* was unnecessary. In my view therefore the
*Menzies* case is distinguishable and thus even a first instance judge could, and in my opinion would, decline to apply
the conceptual impossibility reasoning in *M C Bacon* in the light of it being doubted by Arden LJ in the Court of
Appeal in *Hill*.

K.    **Entry into a transaction**

145.    Mr. Mortimore QC starting at paragraph 155 of the Mortimore Declaration deals with the question of the meaning of "transaction" and entering into a transaction, for the purposes of Sections 245 and 246 of the BVI Statute.

146.    I don't disagree with the description of "transaction" given by Mr. Mortimore by quoting from Jowitt's Dictionary of English Law or with the citation from case law in footnote 146 of the Mortimore Declaration.

147.    I do not however agree with the emphasis placed by Mr. Mortimore on the question of *entering* into a transaction.    He suggests at paragraph 162 of the Mortimore Declaration that this requires the BVI court to focus on the "inception" of the transaction.    This appears to be directly contrary to the approach in his own footnote 146 where the quotes from case law do not restrict consideration of entering into a transaction to the "inception".    The purpose of this unjustifiably narrow reading appears to be to suggest that "… a company does not enter into a transaction if it merely pays a debt in accordance with the terms of the transaction already entered into" (Mortimore Declaration Paragraph 166).    With the greatest respect to Mr. Mortimore, this interpretation cannot possibly be correct.    Section 245 of the BVI Act, although redrafted in some respects and substituting an objective rather than a subjective view, is very firmly based on Section 239 of the English Insolvency Act, which deals with the giving of voidable preferences.    Section 239(2) speaks of giving "a preference" to any person.    It is the case under Section 239 and was the case in previous versions of the provision that a mere payment of a debt could be, and indeed usually was the "preference" that was avoided.    In fact,

the English Act was inspired by the report of the Cork Committee[45] which at paragraph 1208 gave as the first example of a preference the payment in whole or in part of a debt.

148.    As mentioned above, the BVI draftsman has to some extent simplified and consolidated the drafting of the preference and undervalue provisions and instead of using "preference" in the body of Section 245 uses the term "transaction" as in Section 246. Nevertheless the intention is clear, not only from the fact that Section 245 is largely copied over from Section 239 of the English Act, but also from the side-note description in the Act of "unfair preferences".

149.    Frankly, the idea that by using "transaction" the law of preferences in the BVI has been radically altered so as to exclude mere preferential payments of debts already due, would be astonishing and absurd.  I am not aware of any BVI case which supports this view and Mr. Mortimore does not cite any.

150.    Instead, Mr. Mortimore in paragraph 165 of the Mortimore Declaration suggests as follows:-

> "If all payments and discharge of credit made by an individual during what later turns out to have been the vulnerability period could be impugned by the bankruptcy trustee under Section 401, an individual who is in financial difficulties would find it impossible to obtain professional advice or to obtain the necessities of life unless he paid in advance for all goods or services".

151.    I note that Section 401 (which is part of the BVI Act dealing with individual bankruptcies), like Section 245, has a side-note:  "Unfair preferences".  Just as Section 245 of the BVI Act is substantially copied from Section 239 of the English Insolvency Act, Section 401, dealing with individuals, is largely copied from Section 340 of the English Act which deals with "preferences".  Once again, the parallel redrafting and the use of "transaction" in the BVI version

---

[45] Insolvency Law and Practice: Report of the Review Committee (June 1982) Cmnd 8558.

is plainly not intended to make any substantial difference.  Thus under the English provision "all

payments and discharge of credit made by an individual during what later turns out to have been

in the vulnerability period could be impugned by the bankruptcy trustee", in accordance with Mr.

Mortimore's point in paragraph 165.  In England, this does not seem to create the problem that

Mr. Mortimore suggests.  Individuals in financial difficulties do not find it impossible to obtain

professional advice or to obtain the necessities of life.  However, it would be fair to say that

professional advisers dealing with both individuals and companies in financial difficulties may

well want "money on account" as security in a case of subsequent bankruptcy or liquidation.

With regard to the necessities of life, my belief is that these are either paid for in cash or obtained

by a use of credit cards if credit is required.  In England it is also the case that it would be

extremely difficult to imagine that the necessary desire to prefer a supplier of necessities of life

would exist.  In the BVI, that subjective element is not required and instead there is the defence

of "ordinary course of business" provided by Section 401(2).  The defence is a slightly odd one

in the case of an individual, if he is not carrying on a business.  It may be that "ordinary course

of business" in such a context would have to be interpreted sensibly so as to include ordinary

every day transactions such as buying the necessities of life on credit or repaying credit card

companies.  But even if that were not correct, the fact that a trustee in bankruptcy might be able

to recover money from traders providing the necessities of life or from credit card companies is

not a good reason for interpreting "transaction" in Section 245 radically and in such a way as to

prevent the simple payment of debts already due from being voidable preferences, particularly in

corporate insolvency cases.  That would largely deprive Section 245 of effect, since the typical

case of preference, as mentioned by the Cork Committee, will be payments of debts already due.

152.    Starting at paragraph 168 of the Mortimore Declaration, Mr. Mortimore commences a section which argues that it was the redemptions and not the redemption payments which were the "transactions" entered into by the funds.  This is plainly too restrictive, for the reasons I have already set out.

153.    One can see from the definition and citations put forward by Mr. Mortimore that "transaction" is a word of very wide import and could describe a number of different things.  It can refer to the process of redemption as a whole or it can refer to the redemption payments.  Mr. Mortimore cites no case law to the contrary.

154.    With regard to paragraph 169 of the Mortimore Declaration, I don't agree with Mr. Mortimore's statement that the Redemption is "not a fresh contract", although his statement that "… it is sufficiently distinct from the original subscription to be capable of being a transaction for the purposes of Sections 245 and 246" means that we are not far apart in the end result.  It seems to me that a redemption could be viewed in two different ways.  It can on the one hand be seen as an incident of a pre-existing contract, embodied in the company's Articles of Association, as mentioned by Mr. Mortimore in his footnote 156.  But it can also be seen as a fresh contract of sale, albeit entered into pursuant to the terms of a pre-existing contract.  The Oxford Dictionary of English points out that the origin of the word "redemption" goes back via late Middle English, through Old French to the Latin "*redemptio* (n-)" which comes from "*redimere*", which means "buy back".  A "redemption" is thus a buying back by the company of a share which has been sold to an investor.  The terms for such a buy back may have been set by a previous contract, i.e., the Articles and/or by a subscription agreement, but the actual redemption itself can be seen as a separate contract.  I doubt whether my view here is fundamentally different from that of Mr. Mortimore in paragraph 169 of the Mortimore

Declaration where he says that the redemption "… is sufficiently distinct from the original subscription to be capable of being a transaction for the purposes of Sections 245 and 246. [Citation omitted]".

155.    I do however fundamentally disagree with Mr. Mortimore when he suggests that the Redemption Payment cannot be viewed as a distinct transaction.  As I mention above, the notion of "transaction" is very wide and payments can be "transactions", particularly for the purpose of the voidable preference provisions and therefore Mr. Mortimore's suggested restriction is dogmatic, impractical and unsupported by case law, as well as suggesting a radical and damaging departure from the model of English law preferences.

156.    Also at paragraph 170 of the Mortimore Declaration, Mr. Mortimore also puts forward an argument, which he discusses later, relating to the plea as to insolvency.  I will deal with that in its proper place below.

157.    In my view, for the reasons stated above, both the redemption process as a whole and the redemption payments can each be seen as "transactions" for the purposes of the undervalue and preference provisions.  I cannot read the quote from the amended complaint set out by Mr. Mortimore in paragraph 171 of the Mortimore Declaration as saying anything to the contrary.  The quotation simply states the obvious, namely that the payments were paid as a result of Notices of Redemption by investors invoking the redemption process under the Articles.

**L.    Reliance on hindsight**

158.    Again I will deal with the points outlined by Mr. Mortimore in paragraphs 172 to 174 of the Mortimore Declaration in their proper place below but I would mention at this point that the exclusion of any hindsight is directly contrary to a decision by the highest UK court, *Phillips v. Brewin Dolphin Bell Lawrie Ltd* [2001] 1 WLR 143, HL, which Mr. Mortimore

himself cites (albeit he claims that it is an exception).  At paragraphs 173 and 174 Mr. Mortimore

proposes the "test of the information reasonably available to an objective observer".  However,

there is no basis for such a test either in the wording of the BVI Statute (or in the wording of the

English Statute) or in the case law.  The balance that the courts strike in fact involves the use of a

degree of hindsight to the extent that subsequent events shed light on the true position at the

material date.

> **M.**    **Section 8 - the unfair preference claims**

159.    At paragraph 175 of the Mortimore Declaration, Mr. Mortimore states that he

proposes to explain "…why, assuming the factual allegations set forth in the Amended

Complaint were true, the Liquidators have failed to state a claim that the Redemptions, …

constitute unfair preferences under Section 245 …".

160.    I find this surprising, as I would assume that the role of an expert witness is to set

out the law and at most to explain its application to the facts.  The question of whether a claim in

the United States has been sufficiently pleaded would seem to me a matter of US procedural law

to be decided by the learned US judge.  However, I have been asked to comment on what Mr.

Mortimore says, which seems to be more argument rather than evidence.

161.    Accordingly, I address first of all Mr. Mortimore's summary under paragraph 175

of the Mortimore Declaration:-

> a.    Mr. Mortimore suggests that at the time each redemption notice was given each
>
> Defendant Institution was a member of the fund, *i.e.*, a shareholder, in relation to
>
> the shares being redeemed, *and not* a "creditor".  With respect to him, that is
>
> clearly wrong.   The starting point is that it is firmly established as a matter of
>
> BVI law that a member who has redeemed becomes a creditor (deferred behind

outside creditors) in between the time of redemption and payment: this was specifically decided by the ECCA on appeal from the BVI in the case of *Monarch Pointe*[46].  Mr. Mortimore's view seems to be based on the notion that the transaction had to be viewed as the start of the redemption only and not as including or being the payment to the creditor.  I have already explained that this is a wholly implausible reading of the preference provision in Section 245 of the BVI Act, under which the payment by itself would qualify as a "transaction".  Even if one viewed the process of redemption as a whole as the "transaction", the member/shareholder of the Fund, as soon as he had redeemed, became a "creditor" to whom a preference could be given.  Furthermore, even if one took just the moment at which the redemption "was entered into", as Mr. Mortimore suggests, i.e. when the process of redemption was commenced, each defendant was a creditor of the fund, *i.e.*, a contingent creditor.  It would become a present creditor as soon as the redemption took place, or if different, when the redemption price became due.  A contingent creditor is one whose claim is not an immediate debt or liability but is a debt or liability which depends on some future event taking place for it to become an actual debt.[47]  When each redemption is "entered into", i.e., the process of redemption is commenced by the redeemer giving notice to the Fund, the position is that (unless the redemption process is suspended) the redeemer will inevitable become a creditor in accordance with the ECCA decision mentioned above as soon as the redemption takes place.  Accordingly, even on the

---

[46]  *Somers Dublin Ltd  A/C KBCS v Monarch Pointe Fund Ltd* (11 March 2013, HCVAP 2011/040, on appeal from the Commercial Division of the BVI High Court.
[47]  *Re Sutherland* [1963] AC 235, applied in the insolvency context in *Re T&N Ltd* [2006] 1 WLR 1728 and *Secretary of State for Trade & Industry v Frid* [2004] 2 AC 506.

narrow technical and unrealistic approach taken by Mr. Mortimore, at the point of entry into the Redemption each redeemer is a contingent creditor of the relevant fund and therefore a "creditor" within s.245. Section 10(2) of the BVI Act states that for the purposes of the Act a "liability" may inter alia be "contingent". Liabilities existing at the start of a liquidation are "admissible as claims" in the liquidation: s.11 of the BVI Act. A "creditor" is someone who has a claim which would be an admissible claim in a liquidation. Accordingly, the shareholders as contingent creditors were "creditors" within the BVI Act, as even at the start of the redemption they had claims which could be made in a subsequent liquidation.

b.    Mr. Mortimore suggests that at the time of the redemptions and the payments the funds were not insolvent in the sense of being unable to pay their debts as they fell due and the payments did not cause the funds to become unable to pay their debts. This is a mixed question of fact and law, but insofar as one can tell from the case law, an English or BVI court would probably find that the funds were insolvent for reasons which I elaborate below.[48]

c.    Mr. Mortimore suggests that the redemptions and payments were not unfair preferences because they took place in the ordinary course of business. However, with respect to Mr. Mortimore, his suggestion, which is again a mixed question of law and fact, is completely irrelevant in this context. At least as far as the BVI and English rules of pleading are concerned, only the cause of action need be pleaded and not the lack of any defence. The cause of action in respect of an unfair preference under Section 245 requires an allegation and proof of the three

---

[48] *See* paragraph 171 and following.

matters set out in Sections 245(1)(a), (b) and (c).  These can be described as the requirement of insolvency, the suspect period and the need to show a factual preference.  Section 245(2) states:

"A transaction is not an unfair preference if the transaction took place in the ordinary course of business".

    d.    Section 245(2) is not part of the cause of action and need not be pleaded as part of a cause of action.[49]  Section 245(2) creates the defence of "ordinary course of business" which needs to be pleaded and proved by a defendant.  Moreover, such case law material as there is on the subject of "ordinary course of business" from English and New Zealand law authorities, including the Privy Council, which acts in effect as the Supreme Court for the BVI, suggests that the payment of sums calculated by reference to assets that do not exist (because there is an underlying fraud) cannot be said to be in the ordinary course of business of investment funds.[50]

162.    At paragraph 176, Mr. Mortimore agrees that since the Defendant Institutions were members "there are presumptions that the funds were unable to pay their debts as they fell due" and that the redemptions or payments were "not made in the ordinary course of business". However Mr. Mortimore goes on to suggest that the presumptions are rebutted by the facts pleaded in the amended complaints "when the illegitimate resort to hindsight is disregarded as irrelevant".  I disagree, for the reasons set out below.  The presumptions demonstrate that lack of insolvency and the ordinary course of business defence need to be pleaded and proved by the Defendants.

---

[49] It is *possible* to plead facts which negative a potential defence but it is not *necessary* to do so.
[50] *See* paragraphs 213-217.

N.     **The Defendant Institutions were not only members at the time the Redemptions were entered into but were also creditors**

163.    As explained above, the defendant financial institutions were members/shareholders at the time they gave notice to redeem and started the redemption process. They were also contingent creditors who became immediate creditors once the redemption took place.

164.    At paragraph 182, Mr. Mortimore suggests that it is "the time when the transaction is entered into" that determines whether a person is a creditor, capable of being given a preference.  I have set out above why that is too narrow a view but that even if it were correct the members/shareholders in this case were at that point contingent creditors and therefore "creditors" within the BVI Act.

165.    In paragraph 182, Mr. Mortimore poses the example of a company in financial difficulties entering into a transaction with a new supplier to which it owes no debt for the supply of goods on 7 days credit.  Mr. Mortimore appears to admit that immediately after the transaction is entered into "it could be said that the supplier had become a contingent creditor …".  That is correct.  Mr. Mortimore however goes on to say:-

> "Between performance and receipt of payment the supplier would be a creditor, but it would be absurd to suggest that the transaction entered into gave, or could be capable of giving, the supplier a preference."

166.    With the greatest of respect to Mr. Mortimore it is absolutely obvious that legally the supplier is a creditor and therefore capable of receiving a voidable preferential payment.  To illustrate, supposing that the contract for supply is entered into on day 1, payable on day 7 and the goods are supplied on day 2.  Suppose further that on day 3 the debtor decides that because of his perilous financial position he needs to file for liquidation on day 8 but decides to pay the supplier on day 7 as contractually required.  In England, there would be no doubt that the

supplier had received a factual preference and the question would be whether the debtor desired

to create a preference.  Unless there was some personal motive, such as a personal relationship or

wish to do business in some other corporate guise in the future, it is very unlikely that there will

have been a desire to prefer and thus a voidable preference.  But that is because of the lack of a

desire to prefer required by the English preference claim (but not by the BVI preference claim),

not because the supplier was not a creditor.  In the BVI, the payment meets all the criteria for

being a preference (since "desire" or "intent" is not an element of the BVI preference claim as

explained above) and is made in favour of an undoubted creditor.  The only question is whether

the creditor can defend himself and claim that the payment was in the ordinary course of

business.  Again, there would be no doubt that the supplier was a creditor at the time that he was

paid.  In fact of course he was a contingent creditor, as Mr. Mortimore appears to admit,

"Immediately after the transaction is entered into …".  There is nothing "absurd" about the

supplier being a "creditor", capable of being given a "preference":  the question under the BVI

Act is whether a defence can be established by pleading and proving that the payment was made

in the ordinary course of business.  There is nothing "absurd" about that being the issue, in

accordance with the statutory wording.  Again, Mr. Mortimore cites no BVI case law for his

eccentric and impractical interpretation.

167.    At paragraph 184, Mr. Mortimore suggests that it is "not correct or meaningful"

to describe a redeeming member as a contingent creditor in the period starting with the receipt of

the redemption request.  I respectfully disagree.  The only point Mr. Mortimore makes is to say

that until Dealing Day (I would say "redemption", since there could be an argument as to when

redemption actually takes place) the redeeming member "remains a registered member and

entitled to any rights … in respect of the shares being redeemed".  I entirely agree with Mr.

Mortimore that a member who remains on the register remains in some respects a shareholder entitled to shareholder rights until the shares are redeemed and, strictly speaking, until his name is removed from the register of members.  However that in no way excludes him from being also a creditor or contingent creditor.

168.    In *Sibun v Pearce* (1890) 44 Chancery Division 354 the question arose as to the status of members of a "building society" between the time that the member gave notice of withdrawal but had not yet received payment.  Building societies were financial institutions which took deposits and lent money in order to enable persons to buy houses.  The members of a building society were informally referred to as "depositors", because they deposited money with the building society.  However, legally, the deposit make them a member of the building society. However, once the member gave notice to withdraw his "deposit" and before he received payment, he became a creditor for the amount of the proposed withdrawal.  To what extent and for how long he remained a member prior to payment depended on the rules of the building society i.e. the contract between the member and the building society.[51]

169.    In the Court of Appeal in *Sibun v Pearce* Lord Justice Lindley stated at page 371:

> "Now, what is the position of a member who has given notice of withdrawal, but who has not been paid back the amount due to him for his subscriptions?  Some say he is a member; some say he is a creditor.  The true mode of describing him is to describe him as a member who has given notice of withdrawal and is entitled to payment.  That he is not an ordinary creditor is plain.  He cannot come into competition with outside creditors. On the other hand, as between himself and the continuing members, he is entitled to be paid the amount due to him before they can divide the assets.  In that sense he is a creditor …."

170.    This approach of the English Court of Appeal was adopted by the ECCA in the *Monarch Pointe* case cited above at paragraphs [23]-[24], overturning the view of Mr. Justice Bannister of the BVI court at first instance.

---

[51] See *Monarch Pointe* cited above at paragraph [23].

171.    It is therefore clear both in England and in the BVI at appellate court level that a member who gives notice of redemption is, prior to payment and removal from the register of members, both a member and a creditor.  Accordingly Mr. Mortimore's approach is wrong and contrary to the case law binding in the BVI.

172.    Mr. Mortimore at paragraph 185 describes the suggestion that between giving notice of redemption and payment the redeeming member is a deferred creditor in relation to a liquidation as being "controversial" and he does not agree with it.  Whether or not Mr. Mortimore agrees with the proposition, it is the law as set out in the appellate level cases.  There is nothing "controversial" in the Liquidators' proposition under BVI law.

173.    Mr. Mortimore in footnote 165 refers to the *Monarch Pointe* case and makes the entirely erroneous suggestion that *Monarch Pointe* commented on an earlier judgment of the East Caribbean Court of Appeal in the *Westford case*[52] "in a way which leaves some uncertainty as to whether or not a former member with a claim for unpaid redemption monies may be a creditor in the liquidation of the company within Sections 2(1) and 9 with an admissible claim within Section 11".  There is no such uncertainty at all.  As Mr. Mortimore states, the *Monarch Pointe* case held that a member with a claim for unpaid redemption monies "was entitled to participate in a surplus after ordinary creditors had been paid in full".  But that was because he was a deferred creditor.  That was the entire point of the *Monarch Pointe* case.

174.    In order to explain the background to the *Monarch Pointe* decision, I need to say something about the previous relevant decisions of the ECCA.  In the *Westford* case cited above, the holding was that an unpaid redeemer did not have standing to apply for the appointment of liquidators, *i.e.*, to petition the court to put the company into liquidation.  With the greatest

---

[52] *Westford Special Situations Fund Limited v Barfield Nominees Limited* (28 March 2011, ACVAP 2010/014.

respect to the panel that decided *Westford*, the result actually makes no sense.  Section 162(2) of

the BVI Insolvency Act expressly gives standing to apply for the appointment of liquidators to 6

types of applicant, including (b) "a creditor" and (c) "a member".   Since even a member

expressly has standing (subject to case law which says that he must have a proper interest,

usually a right to receive surplus assets after payment of all creditors) it makes no sense to hold

that a member who has given notice of redemption but has not yet received his redemption

monies, and is therefore a creditor (albeit deferred behind outside creditors) has no standing to

apply for liquidation.[53]

175.    Under the system of precedent in England and the BVI, subsequent first instance

courts in the BVI and the East Caribbean Court of Appeal itself were bound to follow the result

in *Westford*, (i.e. that a member who has given notice but has not been paid has no standing to

petition for winding up) whether or not they thought it made sense.

176.    There are however well-known techniques whereby, for example, a precedent can

in a future case, where the point to be decided is not exactly the same, be "distinguished" from

the current case and be drastically restricted in its application.  The ECCA took the opportunity

to take this approach in the *Shell Pensioenfonds* case mentioned at paragraph 19 of the judgment

in Monarch Pointe.  Commenting on the decision in *Westford*, Pereira J.A. stated inter alia:-

" … in **Westford** … it was held that a redeeming shareholder claiming redemption
proceeds was not a creditor <u>for the purposes of bringing insolvency proceedings under</u>

---

[53]    The limited effect of the decision in *Westford* is clear from the *Westford* judgment itself, where there are repeated
statements that the redeemed shareholders will be regarded as a creditor for most purposes: e.g. "The redeemed
shareholder, **notwithstanding that he is a creditor of the company in the wider sense in respect of any unpaid
redemption proceeds**, encounters a restriction on the steps he can initiate in relation to a liquidation of the
company. By virtue of section 197 of the IA the redeemed shareholder, ***notwithstanding that he may be a creditor
of the company in the wider sense***, simply does not get the right to apply to wind up the company or claim in its
liquidation in the same way as an ordinary 'third party' creditor….***Put succinctly, the redeeming member is a
creditor of the company but not a creditor to apply*** …." (paragraph 21). See also paragraph 25: "It is true that the
respondents [redeeming shareholders] **were creditors of the Fund in respect of any outstanding redemption
payments**….In short, the respondents, although **they are creditors of the Funds**, are not creditors with standing to
apply for the appointment of liquidators or to claim in a liquidation of the Fund."

the **Insolvency Act 2003** of the Virgin Islands. *I underline this portion to make clear that Westford did not decide that an unpaid redeeming member is not a creditor of the company*. It merely decided that as between outside creditors and redeeming members … the **Insolvency Act 2003** subordinated the "inside" creditor's (sic) rights to those of the "outside" creditor, and that the Insolvency Act, 2003 restricted the right of an inside creditor, whose claim was derived from the inside creditor's character as a member, to bring insolvency proceedings as a creditor in reliance on such a claim. *There is no statement in Westford which can or should be taken to mean that an unpaid redeemer is not a creditor of the company at all* …" [Emphasis added]

177.    It is on this basis that in *Monarch Pointe* the ECCA holds at paragraph [20]:

"It is clear from the dicta in **Shell Pensioenfunds** *(sic)* and **Westford** that *a redeeming member is a creditor in respect of his redemption payment* (save for the purpose of filing an application to appoint a liquidator)." [Emphasis added]

178.    Although it was clear from other parts of the BVI Insolvency Act that a redeeming member was a creditor prior to payment (as explained above), Mr. Mortimore in his footnote 165 refers to Section 197 of the BVI Insolvency Act, which required explanation by the ECCA in the *Monarch Pointe* case. It will be recalled that whilst "admissible claims" in a liquidation could be based on contingent liabilities (Sections 10 and 11), they had to be "admissible" in the liquidation of the debtor under Section 9(1)(a). Whilst at first sight it is obvious that both the redeemer's contingent liability when he gives notice of redemption and his actual liability once payment for the redemption is due are admissible as claims in a liquidation (albeit deferred to outside creditors) an over-literal and insensitive interpretation of Section 197 could suggest the contrary. Section 197 provides:-

"A member, and a past member, of a company may not claim in the liquidation of the company for a sum due to him in his character as a member, whether by way of dividend, profits, redemption proceeds or otherwise, but such sum is to be taken into account for the purposes of the final adjustment to the rights of members and, if appropriate past members between themselves."

179.    The ECCA in *Monarch Pointe* dealt with Section 197 as follows, at paragraph [24]:-

> "It is clear that the purpose of Section 197 of the Act is merely to subordinate the former members' claims (along with other claims arising out of membership) as creditor to that of ordinary unsecured (and usually external) creditors.  When Section 197 says that a past member "may not claim in the liquidation" it must be read as referring to and barring claims as an ordinary unsecured creditor, and not as barring claims as a deferred creditor as part of the "final adjustment of the rights of members and … past members between themselves".  This analysis is in accordance with the approach of this Court in **Westford's** case."

180.    To conclude on this point, therefore, it is clear that the latest decisions of the ECCA - *Shell Pensioenfonds* and *Monarch Pointe* - have effectively clarified and distinguished *Westford* to apply only to the narrow question of standing to apply for the appointment of liquidators and has accepted that redeeming members are creditors able to claim in the liquidation, albeit behind ordinary unsecured creditors.  This led to the holding in *Monarch Pointe* that unpaid redeemers had to be paid out of assets behind ordinary unsecured creditors but *ahead* of members who had not redeemed.

181.    It follows that Mr. Mortimore is incorrect in saying that the Defendants could not have been paid a preference within Section 245 of the BVI Act.

**O.    <u>The insolvency of the funds</u>**

182.    With respect to Mr. Mortimore, I cannot agree with his summary of the position in relation to insolvency at paragraph 188 of the Mortimore Declaration:

a.    Depending on the circumstances, regard can be had to debts which will or may become due more than a short period later;

b.    There is no restriction to debts which were known or ought to have been known at the relevant time "without intrusion of hindsight";  hindsight can be used where it sheds light on the position at the relevant time;

c.  I do not agree that no account can be taken of possible clawback claims on behalf of a third party's estate which has yet to enter insolvency proceedings, although if my view of the facts is relevant, there is no need to do this in the present case.

183.  I agree with Mr. Mortimore that for the purposes of the BVI law of preferences and undervalues the company has to be "insolvent" on what is commonly referred to as the "cash flow" or "commercial" test of insolvency.  However, the case law interpretation of this type of insolvency in England is such that it has a substantially widened scope.  The English law approach is certain to be followed in the BVI.

184.  At paragraph 190, Mr. Mortimore suggests that in the context of Section 8(1)(c)(ii) of the BVI Act the reference to "debts" refers to "liquidated monetary obligation".  I respectfully do not agree.  The word "debts" is not defined in the BVI Act.  However, the insolvency test is derived from Section 123 of the English Insolvency Act.  For that purposes "debt" is defined in Rule 13.12(1) of the Insolvency Rules 1986 as follows:-

" "Debt", in relation to the winding-up of a company, means … any of the following -

a.  Any debt or liability to which the company is subject -

  i)  In the case of a winding up which is not immediately preceded by administration, at the date in which the company went into liquidation;

  ii)  In the case of a winding up which was immediately preceded by administration, at the date on which the company entered administration.

b.  Any debt or liability to which the company may become subject after that date by reason of any obligation incurred before that date …"

185.  The position is then amplified by Insolvency Rule 13.12(3):-

"For the purposes of references in any provision of the Act or Rules about winding up to a debt or liability, it is immaterial whether the debt or liability is present or future, whether it is certain or contingent, or whether its amount is fixed or liquidated, or is capable of being ascertained by fixed rules or as a matter of opinion; and references in any such provision to owing a debt are to be read accordingly."

186.    I cannot therefore agree that the reference to "debts" is restricted to liquidated monetary obligations as Mr. Mortimore suggests.  In the context of a definition of insolvency I would expect the BVI courts to follow the approach of English law and in this context read "debts" in a way similar to the approach of the English Insolvency Rules.  Thus "debts" can, contrary to what Mr. Mortimore suggests, include obligations "the amount of which is not ascertained" and obligations of which the debtor may be wholly unaware.

187.    Mr. Mortimore relies, in support of his suggestion, on the definition of "liabilities" in Section 10 of the BVI Act.  That definition, pursuant to Section 10(1), is similar in wording to the definition of "liability" in insolvency rule 13.12(4) of the English statutory provisions:-

> "In any provision of the Act or the Rules about winding up, except in so far as the context otherwise requires, "liability" means … a liability to pay money or monies worth, including any liability under an enactment, any liability for breach of trust, any liability in contract, tort or bailment, and any liability arising out of an obligation to make restitution."

> I note that a liability in tort is likely to be unliquidated and therefore "liability" both under the BVI Act and the English Act includes claims for unliquidated amounts.

188.    Mr. Mortimore appears to put emphasis on the additional words in Section 10 of the BVI Act which do not appear in the equivalent definition in the English Act:  " … and "liability" includes a debt".  As far as I can see, since "liability", which can be for an unliquidated sum, "includes a debt", the indication appears to be that a debt can also be for an unliquidated sum.

189.    I am not at all sure that in the end the liquidated/unliquidated issue makes any difference.  The claims that made the Funds insolvent were in my view liquidated claims.

190.    With regard to Mr. Mortimore's paragraphs 191-192, I entirely agree with the passage from the Court of Appeal quoted at paragraph 192, but not with Mr. Mortimore's

attempt to place a limited meaning upon it.  It may help to give a bit of background.  As Mr.

Mortimore explains in paragraph 191, the leading decisions in this area are *Re Cheyne Finance*

*Plc* (2) [2007] EWHC 2402 (Ch) and *Eurosail*, in which the decision in *Re Cheyne Finance* was

approved by the UK Supreme Court.[54]

191.    In *Re Cheyne Finance*, receivers applied to the court in October 2007 for

directions as to whether the company should be regarded as insolvent. The work that they had

done suggested that it could continue to pay its debts until November 2008 or February 2009,

depending on the timing and size of discounts that it would be likely to have to give on sales.

The judge (Briggs J - now Briggs LJ in the English Court of Appeal) held that the receivers were

entitled to conclude that the company was insolvent by reference to the likelihood that it would

be unable to pay its debts in the future.   He referred to a number of Australian cases in which the

issue had been considered (probably because, unlike the UK, insolvency in Australia depends

upon showing cash flow insolvency - there is no alternative 'balance sheet insolvency' test) and

which had reached a clear conclusion that future debts should be taken into account in

determining solvency because "the question of whether a company was able to pay its debts as

they fell due was a question of fact to be decided as a matter of commercial reality in the light of

all the circumstances." (per McGarvie J in *Taylor v Australia and New Zealand Banking Group*

*Ltd* (1988) 6 ACLC 808).  The judge concluded:

> "51    It is clear from that brief review of the Australian decisions that in an environment
> shorn of any balance sheet test for insolvency, cash-flow or commercial
> insolvency is not to be ascertained by a slavish focus only on debts due as at the
> relevant date.   Such a blinkered review will, in some cases, fail to see that a
> momentary inability to pay is only the result of a temporary lack of liquidity soon
> to be remedied, and in other cases fail to see that due to an endemic shortage of
> working capital a company is on any commercial view insolvent, even though it

---

[54] *BNY Corporate Trustee Services Limited v Eurosail UK Plc* [2013] 1 WLR 1408.

may continue to pay its debts for the next few days, weeks or even months before an inevitable failure.

52      Furthermore, the common sense requirement not to ignore the relevant future was found to be implicit in the Australian cases in the simple phrase "as they become due".

53      Returning to the English legislation, it is, in my view, critical to note that when separating out balance sheet insolvency from commercial insolvency in 1985 the legislature did not merely remove the requirement to include contingent and prospective liabilities in framing section 123(1)(e) out of its predecessor, but added what in Australia have always been regarded as the key words of futurity, namely the phrase "as they fall due".  In that context "fall due" is, in my judgment, synonymous with "become due".

54      Mr. Trower submitted that the existence of the balance sheet test in section 123(2) makes an Australian type of approach to the commercial insolvency test unnecessary, because a company will always be balance sheet insolvent in circumstances where a review of future debts shows that it is commercially insolvent.  I disagree.  First, I can see no good reason why the developed understanding in Australia of the nature of the exercise required by the phrase "unable to pay debts as they become (or fall) due" should not be recognised when the same phrase is, for the first time, deliberately inserted into the English insolvency test.  The Australian approach makes commercial sense, whereas the blinkered approach of ignoring the future does not."

192.    This approach was endorsed and adopted by the Supreme Court in *Eurosail*.

Although *Eurosail* was a decision on balance-sheet rather than cash flow/commercial insolvency,

Lord Walker, with whom the rest of the Supreme Court judges agreed, made it clear that the

words "unable to pay its debts as they fall due" looked not only to the present but also to the

future.  At paragraph 25 he said that the cash flow/commercial insolvency test "… focuses not on

a single debt, but on all the company's debts "as they fall due" (words which look to the future as

well as the present)".  At paragraph 34, Lord Walker endorsed the decision in *Cheyne* that the

effect of the removal from the cash flow insolvency test of a reference to the contingent

prospective liabilities of a company (which had appeared in the previous version of the Statute)

and its replacement with the reference to the company's inability to pay debts "as they fall due"

was not to remove the relevance of any element of futurity but to replace "one futurity

94

requirement, namely to include contingent and prospective liabilities, with another more flexible and fact-sensitive requirement". Importantly, Lord Walker considered that the cash flow test was concerned, not simply with debts presently due, "but also with debts falling due from time to time in the reasonably near future". (Paragraph [37]).

193.    Unfortunately, Mr. Mortimore in paragraph 191 reduces "reasonably near future" to "near future". That is not accurate; nor is the phrase "short period" in paragraph 188(a) of the Mortimore Declaration. What is "the reasonably near future" will, according to the English case law, depend on all the circumstances, as the passage from the *Casa Estates* case quoted by Mr. Mortimore in paragraph 192 shows. The passage from the English Court of Appeal in relation to the test being flexible and fact-sensitive comes from the Supreme Court decision in *Eurosail* at paragraph [34], approving *Cheyne* at paragraph 56. Moreover, it is clear from the second paragraph quoted from the *Casa Estates* case at paragraph 192 of the Mortimore Declaration that the court should not confine itself simply to looking at the immediate future. The Court of Appeal refers to a company being potentially insolvent on a cash flow basis even though in fact it continues to pay its debts for months.

194.    It is worth adding a further quote from the *Casa Estates* case at paragraph [29]:-

> " … even when applying the cash-flow test it is not enough merely to ask … whether the company is for the time being paying its debts as they fall due. As Briggs J. said in *Cheyne Finance*, a realistic examination may reveal that a company is on any commercial view insolvent, even though it may continue to pay its debts for the time being."

195.    I am not aware of any decision in English or BVI law dealing directly with the question of cash flow/commercial insolvency in the context of a Ponzi scheme. There is however a very relevant dictum in the *Casa Estates* case in the English Court of Appeal which

Mr. Mortimore curiously does not cite to or quote from.  At paragraph [30] one finds the following:-

> "[The trial judge] was at pains to point out that he was not (and we are not) dealing with a Ponzi scheme.  But a hypothetical corporate Ponzi scheme will test the point.  In the early stages of a Ponzi scheme money flows in from investors promising high returns.  Money from new investors is used to pay the promised returns to existing investors.  ***On the face of it therefore the company is managing to pay its debts as they fall due.  But the underlying reality is that, sooner or later, the whole house of cards will collapse.***  The accumulating liabilities to new investors cannot hope to be matched by any real investments:  they are dependent on the continued inflow of new money.  When that dries up, the game is up.  ***In any commercial sense the company is insolvent from the beginning***.  What a commercial approach requires the court to do is not to stop automatically at the answer to the question:  is the company for the time being paying its debts as they fall due?  In an appropriate case it must go on to enquire:  how is it managing to do so?" [emphasis added]

196.    In the *Casa Estates* case, the debtor company misused deposits supplied by investors and paid debts due to previous investors as they fell due out of further investors' deposits.  The Court of Appeal held that the debtor company was insolvent.[55]  As Lewison L.J. said at paragraph [31]:

> " …If [company] was only able to continue to pay its debts as they fell due by taking new deposits, and using them to pay off old debts, ***in any commercial sense the company was insolvent, whether on a cash flow basis or a balance sheet basis***." [emphasis added]

197.    Lord Justice Lewison's points accord with the view that I understand the US Bankruptcy Court to take.  My understanding of case law in the United States and Canada, without claiming to be able to give expert evidence on the laws of either of those countries, but looking at the case law as persuasive but not binding authority, suggests that Ponzi schemes are regarded as being insolvent from the beginning.[56]

---

[55]  Strictly speaking the Court of Appeal only held that the judge below was entitled to find that the recipient of the undervalue transactions as a connected party had not rebutted the presumption that the company was cash flow insolvent at the time that it made the payments.  In the present case of course the Defendants are also connected parties and it is also up to them to rebut the presumption, about which more will be said below.

[56]  *Cunningham v. Brown*, 265 U.S. 1, 8 (1924) (explaining that due to his fraudulent scheme, Charles Ponzi "was always insolvent, and became daily more so, the more his business succeeded"); *Picard v. Madoff (In re Bernard L.*

198.    The Funds here were not in and of themselves Ponzi schemes, but they were

almost entirely reliant on the fictitious profits and assets in the Madoff Ponzi scheme, BLMIS, in

order to pay the debts that arose from redemption requests.  Adopting the commercial approach

advocated by Lewison L.J. in the *Casa Estates* case in the English Court of Appeal, the answer

to the enquiry as to how the Funds were able to pay their debts as they fell due is that they could

only do so by reason of payments of fictitious profits and assets received from BLMIS (or from

the investments of new shareholders that otherwise would have been directed for investment in

BLMIS).  That money in turn came from new investments by defrauded investors in BLMIS.

Accordingly, when considering the question of cash flow/commercial insolvency, the approach I

have referred to above is as applicable in the case of the Funds as in the case of a Ponzi scheme

itself.

199.    It is also the case that the Fund's US lawyers, Brown Rudnick, will argue that as a

matter of US and New York law:-

a.    At the moment BLMIS made redemption payments to the Funds they became

subject to claims by investors and other creditors of BLMIS to avoid those

payments under State fraudulent conveyance law;

b.    Those claims would be considered as current, non-contingent debts arising at the

date of the redemption payments, all of the events giving rise to potential cause of

action having occurred by that date.

200.    If the argument of Brown Rudnick is correct, on each occasion that the Funds

received redemption payments from BLMIS the Funds became indebted to investors and other

creditors of BLMIS to at least the extent of the payments received.  Assuming that to be the case,

---

*Madoff Inv. Secs. LLC)*, 458 B.R. 87, 110 n.15 (Bankr. S.D.N.Y. 2011) ("Ponzi schemes are, by definition, at all
times insolvent.").

then any assessment of the Funds' solvency should take into account those debts. Those claims would appear to be both liquidated and non-contingent and thus even on Mr. Mortimore's view such as to make the Funds unable to pay their debts as they fell due.

201.    At paragraphs 193 and 194 Mr. Mortimore says that "…No account is taken of liabilities that the debtor did not know of at the relevant time and ought not to have known of".

202.    On the basis of the UK Supreme Court's approach in the *Eurosail* case, the question of insolvency is an objective one and, as a result, there can be no relevance in what the debtor does or does not know or what he ought to have known. In particular the language of the BVI Act, like the English Act, asks whether the Funds were insolvent or not. There is no reference in the Statute limiting the facts to facts known to the debtor.

203.    Neither of the passages quoted by Mr. Mortimore in paragraphs 193 and 194 of the Mortimore Declaration support any suggestion that the test was wholly or partially subjective or based on what was known or ought to have been known by the debtor. If the passages quoted do suggest that the test is anything other than objective, then the Australian decisions are inconsistent with the UK Supreme Court's decision in *Eurosail* and would not be followed in the BVI. The judges of (the Judicial Committee of) the Privy Council, (effectively the supreme court for the BVI), are the same as the judges of the UK Supreme Court.

204.    Moreover the next Australian quote Mr. Mortimore introduces, at paragraph 195 appears to take the objective view of "a reasonable observer". Furthermore, to be fair to the quotes taken from the Australian cases, Mr. Mortimore does not suggest that they relate to the circumstances of a Ponzi scheme. The passages quoted therefore come from very different contexts.

205.    Mr. Mortimore's paragraphs 193-196 are headed "no intrusion of hindsight" and appear designed to support a suggestion that hindsight will not be taken into account.  As I mentioned above, that is not a correct statement of English law.

206.    In the House of Lords case of *Phillips v Brewin Dolphin Bell Lawrie Limited* [2001] BCC 864 the question was whether there had been an undervalue transaction within Section 238 of the English Insolvency Act.  The question arose whether, for the purposes of Section 238, knowledge of matters which took place after the transaction could be relevant. Lord Scott said at page 872:-

> "Mr. Mitchell submitted that these ex post facto events ought not to be taken into account in valuing PCG's sub-lease covenant as at 10 November 1989.  I do not agree.  In valuing the covenant as at that date, the critical uncertainty is whether the sub-lease would survive for the four years necessary to enable all the four £312,500 payments to fall due, or would survive long enough to enable some of them to fall due, or would come to an end before any had fallen due.  Where the events, or some of them, on which the uncertainties depend have actually happened, it seems to me unsatisfactory and unnecessary for the court to wear blinkers and pretend that it does not know what has happened.  Problems of a comparable sort may arise for judicial determination in many different areas of the law.  The answers may not be uniform and may depend upon a particular context in which the problem arises.  For the purposes of Section 238(4) however, and the valuation of the consideration for which a company has entered into a transaction, reality should, in my opinion, be given precedence over speculation."

207.    This is a key part of the reasoning in the *Brewin Dolphin* case and essential to the holding.  It is also a holding in the precise context of insolvency avoidance on the grounds of an undervalue transaction, as in the present case.

208.    It may be that the purpose of using hindsight is to ascertain the true objective position at the time the undervalue transaction takes place.  Thus, having cited the *Brewin Dolphin* case and the passage from the judgment of Lord Scott, Sir Christopher Slade in the English Court of Appeal in *Joiner v George* [2003] BCC 298 at paragraph 71 stated:-

> "The particular context in which Lord Scott had regard to events which occurred after the date of the sub-lease was for the purpose of confirming that the covenant, which could already be seen as "precarious" from the outset, in fact had a nil value.  He recognised

that the approach which he adopted might not be applicable in other areas of the law. He was not stating any general principle with regard to valuation, still less with regard to the valuation of shares in a company."

209.    The *Joiner* case was not an insolvency law avoidance of transactions case but concerned the valuation of shares. The fact that hindsight may not be applicable in that type of case does not detract from the fact that the court with the highest authority in England has held that hindsight can be used in the context of insolvency law transaction avoidance. Decisions of the House of Lords are persuasive in Australia but not binding. In the BVI decisions of the House of Lords (now the UK Supreme Court) are theoretically not binding, but in practice are treated as binding because, apart from rare exceptions, the judges of the House of Lords/Supreme Court on the one hand and those of the Privy Council, which is the de facto Supreme Court for the BVI, are the same.

210.    To summarise, there can be no doubt that in the context of BVI insolvency law transaction avoidance hindsight can be relevant. The quotations that Mr. Mortimore refers to in paragraphs 197 and 198 of the Mortimore Declaration say nothing to the contrary.

### P.    The factual position on insolvency

211.    It seems to me that in attempting to judge the position on the pleadings in relation to insolvency Mr. Mortimore goes well beyond the scope of expert evidence of English and BVI law. He makes judgments as to facts and the sufficiency of pleadings which I would have thought were matters for the learned US judge. Nevertheless, I have been asked to deal with Mr. Mortimore's points.

212.    With regard to sufficiency of pleading issues, I would respectfully repeat that under English and BVI conflicts rules such as questions would seem to be matters for the US judge to decide under US law.

213.     However, if and to the extent English/BVI law is relevant, the general approach of the English and BVI courts is to allow any amendment required to make up for any deficiencies in pleading, as long as that does not cause injustice to the defendant.

214.     Mr. Mortimore at paragraph 200 and following assumes that the burden is on the Defendants to overturn the presumption of insolvency.  In terms of adequacy of pleading, under English/BVI law the Liquidators will not have to plead insolvency but simply that it is presumed.  Mr. Mortimore however suggests that "… the Defendant Institutions are clearly able to overturn that presumption relying solely on the facts alleged in the amended complaints and the absence of statements therein with regard to alleged unpaid debts (save as mentioned below)."  There are two problems with this.

215.     First, Mr. Mortimore significantly understates the importance and effect of the presumption.  The position was set out by Lewison LJ in *Casa Estates* at paragraph 43:

> "Finally, [counsel for the appellant] criticised [the trial judge] for having said that he was not in a position to make findings of fact on some of the matters debated before him.  But this overlooks the statutory presumption that the company was insolvent when the payments were made.  *A presumption is a provisional conclusion that must be displaced by contrary evidence.  It is not the same as a trial at which the court starts, so to speak, with a blank sheet of paper.  If the judge is not in a position to make a finding of solvency, the presumption prevails.  Equally, if he is not in a position to make one or more findings about the building blocks in the case that the company was solvent, then the presumption is not displaced."* [emphasis added]

216.     Mr. Mortimore's effort to displace the presumption is done not by reference to arguments or evidence deployed by the Defendants, but rather by attempting to find alleged deficiencies in, or draw inferences from, matters pleaded by the Liquidators However, the Liquidators have pleaded matters that give rise to the statutory presumption of insolvency.  That presumption will stand unless and until the Defendants plead and prove matters that displace it.

217.     Second, Mr. Mortimore is simply wrong to suggest that the facts as pleaded do not demonstrate insolvency.  The proposition that a company that can only meet its liabilities by

receiving payments that represent the proceeds of fraud, and which will inevitably sooner or later

cease and be reclaimed, cannot be said to be able to meet its debts as they fall due, represents

both common sense and the position on case law authority as cited above.

218.    At paragraph 209, Mr. Mortimore suggests that the claims of the BLMIS trustee

cannot be relied upon to show that the Funds were unable to pay their debts at any time prior to

the trustee's appointment.    That is not correct.    The fact that the trustee of BLMIS upon

appointment had a massive clawback claim as against the Funds which has been accepted by the

Liquidators in a large number can be relied on pursuant to the *Brewin Dolphin* decision of the

House of Lords to indicate that the Funds were insolvent at the time of the redemptions.

219.    But even if that were wrong, as Mr. Mortimore states in paragraph 210, the

Liquidators rely on the allegation that "each time the Funds withdrew monies from BLMIS an

equivalent liability immediately arose to the creditors and investors in BLMIS".  Mr. Mortimore

says he is "far from clear as to how under BVI law or any common law rule the Funds would

have such immediate liability".  However the Liquidators allege that this liability arose under US

or New York law and therefore the position under BVI or common law is not relevant.

220.    Mr. Mortimore further objects that even if BLMIS did have a claim of the sort

alleged, BLMIS did not make it and would not make it as long as Mr. Madoff remained in

control of BLMIS, which was the position until 11th December 2008.  However, the test for

insolvency is objective and does not depend on whether Mr. Madoff would or would not make a

claim.  Even more fundamentally, as I understand the position from Brown Rudnick, the US or

New York law is that, prior to the commencement of the BLMIS SIPA proceeding, the claim is

not that of BLMIS but of creditors and investors in BLMIS, as the pleading quoted by Mr.

Mortimore clearly states in his own paragraph 210.  Moreover, Mr. Mortimore's discussion of

potential defences under English or BVI law to a claim under BVI law is irrelevant, given that the claim is under US or New York law.

221.    Accordingly there is no basis for Mr. Mortimore's conclusion in his paragraph 212 that the Funds, assuming the factual allegations made in the Sample Amended Complaints are true, were able to pay their debts as they fell due under BVI law.  Such a conclusion not only flies in the face of the statutory presumption under BVI law and the need in terms of English/BVI procedure to plead and prove a defence seeking to overturn the presumption, but also the *Casa Estates* case.

### Q.    Ordinary course of business

222.    As I have already stated, "ordinary course of business" is a defence which has to be pleaded and proved by the Defendants, not a constituent part of the cause of action.  At paragraph 214 Mr. Mortimore notes that in the amended complaints, the Liquidators alleged that the payments were not made in the ordinary course of the Funds' business.  That pleading is sufficient to raise a case which the Defendants must rebut by pleading and proving a case as to how they say the payments were in the ordinary course of business.  Moreover, the Liquidators' plea is supported by the statutory presumption in s.245(4) of the BVI Insolvency Act that payments made to a "connected person" (which would include redeeming members) do not take place in the ordinary course of business.  Again, it is for the Defendants to plead and prove a case that overturns that presumption.

223.    Accordingly, with respect to Mr. Mortimore, his analysis in respect of the defence of "ordinary course of business" is irrelevant to the question of whether the liquidators have sufficiently pleaded their case, at least as a matter of BVI law.

224.     At paragraph 215 Mr. Mortimore again tries to rule out hindsight in relation to the "ordinary course of business" defence and for the reasons already mentioned above, that is not correct.

225.     I do not agree with Mr. Mortimore's analysis of the case law relating to "ordinary course of business".  The phrase is not defined in the BVI Insolvency Act.  The same phrase appeared in Section 266 of the New Zealand Companies Act 1955, which dealt with preferences. That provisions was considered by the Privy Council in the *Countrywide* case cited by Mr. Mortimore at paragraph 221.  I note that in the quoted passage from the Privy Council Mr. Mortimore has underlined the words "in the actual setting in which it took place" and "the section therefore requires examination of the actual transaction in its factual setting".  Mr. Mortimore has however not underlined the passages which refer to the standard being judged "objectively".

226.     Importantly, Mr. Mortimore does not refer to a passage which is key to the present case:[57]

> "There are difficulties in drawing upon formulations in different words of statutory tests and treating them as applicable in all circumstances.  Such difficulties are increased where those formulations originate in different legal or factual content.  This is particularly so where the test is essential one of fact in any event.  For these reasons as presently informed by the argument in this case, their Lordships do not adopt any particular formulation.  Nor is it necessary for this case to make any comprehensive statement, suitable for all cases, of the criteria for determining when a transaction is to be held to have taken place in the ordinary course of business for the purpose of Section 266 and the corresponding Section in the 1993 Act."

227.     Given that the test is described as being *a factual question*,[58]  it seems to me well beyond the scope of expert evidence for Mr. Mortimore to come to a conclusion on whether the defence can be made out in this case.

---

[57] *Countrywide Banking Corp Ltd v Dean* [1998] AC 338 at 349.

228.    Incidentally, I note that in the quotation set out by Mr. Mortimore in his paragraph 222, it is said that the onus of proof is on the creditor to show ordinary course of business, which of course corroborates my view that "ordinary course of business" is a defence and not part of the cause of action.  The fact that it is for the Defendants to plead and prove that the transaction was not in the ordinary course of business further flows in this case from the statutory presumption to which I have referred.

229.    Mr. Mortimore summarises his conclusions at paragraph 224.   As to those conclusions:-

a.      I agree with Mr. Mortimore that the question of whether or not a transaction took place in the "ordinary course of business" is to be judged objectively, but I disagree with his exclusion of hindsight, for the reasons set out above;

b.      I do not agree that a "broad" approach should be taken to the assessment of whether or not a transaction took place in the ordinary course of business - the test falls to be applied as it stands and there is no suggestion that the court should lean one way or the other.   I am not entirely sure what Mr. Mortimore means by a "broad approach".   It is not a term that appears in any of the extracts that he cites. Nor does Mr. Mortimore's point appear to be relevant in the special circumstances of (a) a payment to a connected person such as a redeeming member where there is an express statutory presumption that the transaction did

---

[58]  *Aveling Barford Ltd v. Perion Ltd & Ors*, [1989] 5 BCC 677(Hoffman J)  (re ordinary course: "*The court looks at the substance rather than the outward appearance.*") (emphasis added); *In the matter of Freerider Ltd*, FSD 48/2009 (Grand Court of Cayman Islands) (para 15: re ordinary course "*It is essentially a matter of fact in light of the particular circumstances in each case.*") (emphasis added); *In the matter of Wyser-Pratte Eurovalue Fund, Ltd.*, FSD 167 of 2010 (Grand Court of the Cayman Islands) (Para 25: re ordinary course: "In my judgment it cannot be characterized as something which shareholders should have anticipated as likely to happen in the ordinary course of business."; para 20: "*In my judgment Counsel's submission is highly artificial and ignores the commercial realities. There is nothing in the Company's offering documents which would lead its shareholders to anticipate that the suspension of redemption and the imposition of a wind down plan is something which may happen 'in the ordinary course of business.'*") (emphasis added).

not take place in the ordinary course of business or (b) a Ponzi scheme or a feeder

fund into a Ponzi scheme;

c.    I agree with Mr. Mortimore that "normal" good faith commercial transactions by

an insolvent party will not be invalidated:  however, as set out above I would not

have thought that there is anything "normal" in an investment fund paying out in

respect of fictitious profits and assets, using monies fraudulently obtained by

BLMIS from new investors.  It also ignores the presumption in respect of

payments to redeeming members that such transactions are not in the ordinary

course of business.  Although there is no English or BVI case directly in point,

there is a strong indication in my opinion in the *Casa Estates* case that in the case

of a Ponzi scheme the payment out of fictitious profits and assets using defrauded

investors' monies could not be described as a "normal good faith commercial

transaction".  Applying the test set out in the *Wyser-Pratte* case referred to above,

it cannot be said that the events that took place, with payments out of sums

calculated on the basis of fraudulent and non-existent assets, was the sort of thing

that shareholders "should have anticipated" as likely to happen if they invested.

*See Wyser-Pratte Eurovalue Fund, Ltd., supra* n. 53.  The same approach in my

opinion would be taken by the BVI courts.

230.    At paragraph 225 Mr. Mortimore suggests that the proper inference "from what is

alleged and what is not alleged" is that the redemption payments " … were entirely normal,

unremarkable business transactions and that they took place in the ordinary course of the Funds'

business as investment companies, which placed their investments almost entirely with BLMIS.

Even leaving aside the curious notion of attempting to infer a defence both from what is alleged

106

and what is not alleged by the claimant/plaintiff (an extraordinary approach which I have never come across before), I cannot accept for a moment that the correct inference from the pleadings is that the redemption payments were "normal" or "unremarkable business transactions" or that they took place "in the ordinary course of the Funds' businesses as investment companies, which placed their investments almost entirely with BLMIS". It cannot be in the ordinary course of business of an investment company to pay out in respect of fictitious profits and assets and even less so where the money used to make payments was money which had been fraudulently obtained by BLMIS from new investors.

231. Mr. Mortimore once again at paragraph 226 says that one cannot have regard under BVI law to subsequent events. I have dealt with this above. It is entirely mistaken and unsupported by any authority; the authority in fact makes clear that for the purposes of assessing whether transactions fall within the statutory avoidance provisions it is entirely permissible and appropriate to regard the transactions as they actually were, i.e. by reference to the facts as they actually stood rather than fiction. That is an unsurprising conclusion.

232. At paragraph 227, Mr. Mortimore accepts that the burden is on the Defendant Institutions to overturn the presumption and one can perhaps infer from that that he accepts that we are dealing with defences and not allegations which form part of the cause of action. For the reasons stated above, I cannot for a moment accept that the facts alleged in the Sample Amended Complaints established under BVI that the redemption payments took place in the ordinary course of business.

R.    **Section 9:  the undervalue claim**

233. At paragraph 228 of the Mortimore Declaration, Mr. Mortimore suggests that the Liquidators have failed to state a claim that the redemptions or payments constitute undervalue

transactions either because of reasons (a) and (b) together or alternatively reason (c) or reason (d) on its own:-

a.   If the Liquidators' pleaded case is correct, and there is no certificate given in good faith by Citco, then there is no debt and no discharge of a debt and thus the redemption took place and the payment was made for no consideration;

b.   If there is no binding certificate and no debt, but the shares redeemed had some value, nevertheless that value was "significantly less" than the amount of the payments made to the redeemers;

c.   The Funds at the material times were insolvent - I have dealt with that above;

d.   Mr. Mortimore's suggestion that the redemptions and payments were entered into by the Funds in good faith and for the purposes of the Funds' business and that there were reasonable grounds for believing that they would benefit the Funds, are matters (like the ordinary course issue regarding preferences) of defence which have to be pleaded and proved by the defendants pursuant to Sub-Section 246(2). Accordingly a claimant/plaintiff as far as English/BVI law is concerned is not required to plead or prove absence of good faith etc.  Not only that, but as Mr. Mortimore accepts in paragraph 229 of the Mortimore Declaration there is actually a presumption under BVI law that the funds were unable to pay their debts and also that the good faith defence was not available.  Again, rather astonishingly, Mr. Mortimore claims that a court can regard the presumptions rebutted, not by facts pleaded and proved by the Defendants but by relying on facts pleaded by the claimants/plaintiffs, adjusted by removing any resort to hindsight.  Furthermore hindsight cannot be disregarded, as I have shown above

108

by reference to case law authority from the highest source in the English legal system.

234.    With regard to Mr. Mortimore's paragraph 231, I respectfully repeat the points I have made above about the fact that both the entire redemption process and the payments can each be regarded as "transactions" for the purposes of the BVI statutory provisions.

**S.    No consideration**

235.    In paragraph 232, Mr. Mortimore states that the redeemed shares "had value, reflected in the applicable NAV …".  However, if there were no binding certificates, there was no binding NAV and no debt, as a result of which the fund received no consideration for its payment.  It is arguable that, ignoring the purported NAV, the real NAV must have had some value and therefore some consideration may have been given for the payment.  However, if the alleged consideration is, as Mr. Mortimore suggests, the discharge of an obligation to pay the Redemption Price established by a Citco certificate, since there was no binding certificate there was no actual obligation to pay the amount of the Redemption Price.

236.    Mr. Mortimore suggests in his paragraph 232 that " … the redemption increased the NAV on subsequent Dealing Days for the benefit of the Fund and its members".  I'm afraid I cannot follow this at all.  Even if one were to assume that there was a legal liability to pay the amount of the Citco certificate, I cannot see how the redemption increases the NAV on subsequent Dealing Days for the benefit of the Fund and its members.  As far as I can see, if the Funds were liable to pay out redemptions based on fictitious profits and assets, then the assets available for the continuing members were substantially depleted by the payments that were made.

237.    Mr. Mortimore also suggests at paragraph 232 that the redemption payment, by discharging the Fund's obligation to pay the Redemption Price would not have depleted the balance sheets of the Fund.  I cannot agree with this either.  Again assuming that there was a conclusive certificate given by Citco which created a liability in the amount of the stated NAV, and that the payment discharged the obligation to pay the Redemption Price, it seems to me obvious that this depleted the actual assets of the Fund.  It is the real position of the Fund that ought to be reflected in its balance sheet.  The fact that, until the fraud was discovered, the balance sheets would in practice present a fictitious picture, hardly suggests that the Funds and the remaining members were not losing assets.

**T.    Significant undervalue**

238.    With regard to Mr. Mortimore's paragraph 233, the first point is that the Liquidators' pleading does not actually rely on hindsight at all but on liabilities created by US and New York law at the time that monies from BLMIS were paid to the Funds.  However, even if hindsight had to be relied upon, as I point out above, there is authority at the highest level which suggests that hindsight can be used in the present type of context.

239.    Mr. Mortimore refers to the "current market price" at the time of the redemptions. I cannot understand this reference.  I am informed that the shares were listed but not traded and so not, as far as I am aware, available for sale on any "market".  Even if there had been a market, the market price does not in this type of case give an accurate indication of the true value of the shares, which was either zero or minimal.  Likewise, I can't see the relevance of "what was known to a reasonably well-informed purchaser" in this type of context.  As I have shown above, the cases are consistent that an objective view must be taken.  What was known or not known to a purchaser is in my opinion irrelevant.

10-03635-jpm    Doc 271    Filed 04/03/17    Entered 04/03/17 18:29:57    Main Document
Pg 111 of 136

240.    At paragraph 238 Mr. Mortimore quotes three lines from the *Brewin Dolphin* case taken out of context to suggest that the value of an asset "offered for sale" is prima facie not less than the amount that a reasonably well-informed purchaser is prepared, in arms-length negotiations to pay for it.

241.    As the passage itself suggests, the context in the *Brewin Dolphin* case was a negotiated sale of assets.  That is completely different from the context here where there is no negotiation and no third party purchaser engaged in an arms-length negotiation.

242.    Again I am puzzled by the reference in paragraph 238 to "open market value" where as far as I am aware there is no market and where the quote refers to an arms-length transaction "after proper marketing".  Likewise, the further quote referring to a "rational and reasonably well-informed purchaser, having knowledge of the actual characteristics of what it is he is buying" does not seem apposite for the present circumstances.  One could add that if there had been a market and an arms-length negotiation by a purchaser, had that purchaser made himself "reasonably well-informed" then, having regard to the presence of numerous red flags in relation to Mr. Madoff's business, a "rational and reasonably well-informed purchaser" would probably have declined to buy at any price.

243.    With regard to the suggestion in Mr. Mortimore's paragraph 238 that the relevant criterion is the value that an asset "was generally thought" to have at the time of the relevant transaction, that cannot be correct in my view.  As I have already mentioned above, the case law requires the value to be ascertained on an objective basis.[59]  The "generally thought" test for value cannot therefore be the correct one in this context.

---

[59] i.e. *Brewin Dolphin* and *Joiner* cited above.

244.    Mr. Mortimore in paragraph 239 of the Mortimore Declaration again suggests that "no account can be taken of subsequent events" and cites the *Joiner* case which I have cited above.  However, the *Joiner* case had nothing to do with insolvency law or avoidance claims for preferences or under values.  The *Joiner* case concerned an action for damages for breach of contract.  Mr. Mortimore cites paragraph 68 and 70 in *Joiner*.  Paragraph 70 in fact contains the quote from Lord Scott in *Brewin Dolphin* which allows recourse to hindsight.  Paragraph 68 reflects not the court's judgment but an argument by the appellant, who accepts that "the basic rule in valuing shares in a company is to reject evidence of events which occurred after the valuation date …".  That general rule exists because the valuation is required to be as at a particular date, as Sir Christopher Slade points out in the next paragraph, paragraph 69.  While the Court of Appeal in *Joiner* declined to apply hindsight to a valuation of shares for the purposes of a breach of contract claim where the valuation was required to be by reference to a fixed date, the Court of Appeal did not and of course had no power to dissent from the statement of Lord Scott in the *Brewin Dolphin* case which related specifically to a claim to avoid a transaction at an under value under Section 238 of the English Insolvency Act, being a similar context to Section 246 of the BVI Act.

245.    Mr. Mortimore attempts in paragraph 240 of the Mortimore Declaration to relegate *Brewin Dolphin* and the cases which follow it to being an "exception" to the general rule.  He claims that the exception applies only where at the time that the transaction is entered into the value of the asset is known by the parties or would be known to a reasonably well-informed purchaser to be uncertain or precarious or subject to a contingency.  Those conditions are not imposed by the House of Lords.  As stated by the House of Lords, *the use of hindsight is*

*the general rule*, at least in the present context and the types of situation mentioned by Mr. Mortimore are just examples of situations in which hindsight is useful.

246.    At footnote 220 Mr. Mortimore cites the first instance decision at an interlocutory stage of *Re Thoars*.  This was a case of a debtor who was dying of cirrhosis of the liver but was likely to survive if he received a transplant.  He assigned the benefit of his life policy to the defendant and the question arose as to whether the defendant had provided sufficient consideration.  The debtor subsequently died and his insolvency representative made a claim under Section 339 of the English Insolvency Act, the individual bankruptcy equivalent of Section 238 of the English Act in relation to companies and Section 246 of the BVI Act.  The judge at first instance hearing a preliminary issue as to whether hindsight could be used in valuing the life policy at the time of its transfer rejected an argument that he was not bound by the House of Lords decision in the *Brewin Dolphin* case, at paragraph 17, which Mr. Mortimore cites.  He describes the holding in the *Brewin Dolphin* case as follows:-

> "(1) The value of the consideration in money or monies worth is to be assessed as at the date of the transaction, (2) if at that date the value is dependent on the occurrence or non-occurrence of some event and that event occurs before the assessment of value has been completed then the valuer may have regard to it but (3) the valuer is entitled, indeed bound, to take account of all other matters relevant to the determination of the value as at the date of the transaction."

> Mr. Mortimore does not refer to an important subsequent passage at paragraph [20]:-

> "Subsequent events, though admissible, are only evidence on which the valuer may rely.  The actual value remains a question of fact for his determination on all the evidence.  In the same way that Lord Scott of Foscote referred in para 26 to the likelihood of AJB raising money on the security of the covenant so the valuer is entitled to consider the likelihood of a lottery ticket being sold for more than the value of the stake before the draw has been carried out, notwithstanding that he knows that thereafter it entitled the holder to £5mn.

> [21] This conclusion demonstrates the inappropriateness of the preliminary issue in this case.  The value of the policy as at 26th July 1996 is a question of fact for the determination of the court on all the evidence.  It will depend on the court's evaluation of the expert valuation evidence.  That may, in turn, depend on the court's evaluation of

medical evidence as to the cause of death because the deceased died of cardiac arrest, not from cirrhosis of the liver.  Death caused by the latter was more or less expected depending on whether or not the deceased had a liver transplant;  but was there any expectation of death from the former and if so to what extent?  *It is not for me on the trial of this or any other preliminary issue, to express any view as to how the judge at the trial should resolve the issues of fact.*  The decision of the House of Lords in Phillips shows that evidence as to when the deceased died and why is admissible but it is for the judge at trial to determine what, if any, effect on the value of the policy as at 26th July 1996 those facts may have." [emphasis added]

247.    The judge at first instance declined to give any answer to the preliminary issue. Accordingly, he made no decision in the case other than to refuse to make a decision.  What is important in terms of his dicta, however, is that the question of hindsight is one which has to be looked at as a factual and not simply a legal issue and has to be judged in the light of all the facts found at the trial.  The case is also interesting because the judge regards himself as bound by the House of Lords decision and Lord Scott's statement about hindsight on the basis that the context, and under value transaction avoidance claim, was similar.  This suggests that a BVI judge would also follow the House of Lords decision in *Brewin Dolphin* in the present insolvency avoidance context.

248.    At footnote 220 to paragraph 240 of the Mortimore Declaration, Mr. Mortimore also cites the case of *Stanley* for the proposition that hindsight can only be used " … only where at the time of the transaction is entered into the value of the asset is known by the parties or would be known to a reasonably well-informed purchaser to be uncertain (or precarious) or subject to a contingency …".

249.    *Stanley* was a first instance (trial judge level) decision in relation to a claim by liquidators of a debtor for relief under Section 238 and 241 of the English Insolvency Act. Referring to the *Brewin Dolphin* case at paragraph 7, the judge says that "… the consideration passing between the parties is to be valued as at the date of the transaction …".  I note that valuation is to be "as at" the date of the transaction, in other words it is to be assessed on an

114

objective basis.  The judgment also points out at paragraph 7 that the approach of taking the value of an asset prima facie as being not less than the amount that a reasonably well-informed purchaser is prepared, in arms-length negotiations, to pay for it " … assumes the existence of a market for the asset …".  As I have pointed out above, in the present case there is no question of a third party purchaser, no question of an arms-length or any other negotiation and no market.

250.    At paragraph 8 the judgment points out that the only disputed issue of law between the parties in the *Stanley* case was the extent to which the court was entitled to take account of later events in determining value at an earlier date.  In particular the issue was whether the court could take into account a sale of the property about one and a half years after the transaction sought to be impugned.

251.    Referring again to the *Brewin Dolphin* case the judge considered that it "… establishes that, in appropriate circumstances, regard may be had to subsequent events, but it was in the context of attributing value to a covenant which was, on the facts known at the date of the transaction, precarious.  I note therefore that in *Stanley* it was accepted that the House of Lords had decided that hindsight could be used "in appropriate circumstances" and the particular circumstances related to the value of an asset which was known to be precarious at the time of the transaction.

252.    Further at paragraph 14, the judge agrees with comments by Professor Goode:-

"Lord Scott's speech has generated much debate on the use of hindsight to determine a value at the time of the transaction.  But it seems clear that Lord Scott was not in truth applying a hindsight test; rather he was relying on evidence of subsequent events to show that from the outset the covenant of the sub-lease was so precarious and its value so speculative that even at the time it was entered into a bank or finance house with knowledge of the surrounding circumstances would not have attributed any value to the sub-lease covenant."

253.    Whether or not one labels the approach in *Brewin Dolphin* as "hindsight" or simply "relying on evidence of subsequent events" is perhaps an academic and arid question.

115

The important point is that on any view the House of Lords in *Brewin Dolphin* established that "in appropriate circumstances", such as an insolvency law avoidance claim, evidence of subsequent events can be relied on to show the true value of an asset at the time of a transaction for the purpose of showing that it was a transaction at an undervalue.   Neither the House of Lords in *Brewin Dolphin* nor the judgment in *Stanley*, nor Professor Goode in the passage quoted in *Stanley* suggests that "appropriate circumstances" are restricted to the specific facts in *Brewin Dolphin* or the specific condition laid down by Mr. Mortimore in paragraph 240 of the Mortimore Declaration.

254.    As I have already mentioned above, there is actually no need to look at subsequent events on the facts of the present case.   However, if there were such a need, it would in my view be "appropriate" to look at what happened subsequently to judge the true value of the shares being redeemed at the time of the redemptions and payments.   Even if Mr. Mortimore's suggested condition in paragraph 240 of the Mortimore Declaration were correct, despite the lack of any support in the case law that he cites, it would seem to me to be highly arguable that the true value of the shares purchased was "uncertain" - it was something that depended on highly complex assessments of asset value and judgments that were (supposed to be) carried out by Citco.   Thus if there were a need to look to subsequent events to demonstrate that the shares were either wholly or mostly valueless, there were "appropriate circumstances" in which that should be done.   One would also have to ask the question, on Mr. Mortimore's test, whether and to what extent the supposed "well-informed purchaser" would know of the various 'red flags' which existed in relation to Madoff and his activities - a deeply factual inquiry which (if the test existed at all) would clearly require a careful investigation at trial.   At paragraph 242 of the Mortimore Declaration, Mr. Mortimore cites the case of *Brabon*.   That was a case of bankruptcy, *i.e.*,

116

personal insolvency, where there was a claim under Section 339 of the English Act, the

equivalent of Section 238 in respect of companies and Section 246 in the BVI Act.  The case was

decided primarily on the basis that the transaction was not actually entered into by the debtor but

was a sale by the debtor's mortgagee.  As the judge stated:-

> "In the light of that conclusion, it is strictly unnecessary to address the valuation issue."

> In going on to consider the valuation issue, the judge in *Brabon* referred to the property
> having been sold to an independent third party purchaser "…on the open market, after
> having been properly advertised and marketed …". He considered that the sale price
> would in general represent the open market value of the land and the date of sale.  The
> facts were obviously very far removed from those of the present case and do not seem to
> me to shed any light on the question at hand.

255.    At paragraph 243 Mr. Mortimore cites a passage from Muir Hunter on Personal

Insolvency which suggests that nothing in the *Brewin Dolphin* case "contradicts the proposition

that the value of the consideration is to be assessed as at the date of the transaction.  Nor does the

judgment lay down a rule that value is to be assessed with the benefit of hindsight; any such rule

will deter many perfectly proper commercial transactions".

256.    I entirely agree with the suggestion that consideration must be assessed "as at" the

date of the transaction, in other words one must try to assess *objectively* what the consideration

was worth as at that date.  I also agree that *Brewin Dolphin* does not lay down a rule that value is

to be assessed in every case with the benefit of hindsight:  as we have seen, "hindsight" will be

applied in appropriate cases, or putting it a different way, subsequent facts can be looked at to

assess the real value of the consideration at the date of the transaction.

257.    I do not at all follow the suggestion that any hypothetical rule to the effect that

value is to be assessed with the benefit of hindsight "would deter many perfectly proper

commercial transactions".  Such commercial transactions would normally be entered into by

companies, particularly in the case of the BVI.  I do not see how there would be any deterrents to

entering into "perfectly proper commercial transactions" given that the legislature has provided a specific defence for such cases. Section 238(5) of the English Act provides a defence if the counterparty shows that the debtor entered into the transaction in good faith and for the purposes of carrying on its business and that at the time it did so there were reasonable grounds for believing that the transaction would benefit the company.

258.    Whether that actually makes any difference in the present case is doubtful. As articulated in the *Casa Estates* case, and, additionally, if Brown Rudnick's argument is correct, no hindsight is required to show that the Funds were insolvent at the time of the redemptions and payments.

259.    However, in case any resort to hindsight is needed, it seems to me that there is ample authority at the highest level for using hindsight in this context. The passages quoted by Mr. Mortimore at paragraphs 197 and 198 of the Mortimore Declaration do not say anything to the contrary. The same defence has been copied over into Section 246 of the BVI Act. Parallel defences are also provided in individual insolvency in both England and the BVI, in the latter case by Section 402(2) of the BVI Act.

### U.    Allegation of undervalue in the Amended Complaints

260.    At paragraph 244 of the Mortimore Declaration, Mr. Mortimore suggests that " … it is not correct under BVI law to take into account the subsequent emergence of the BLMIS Ponzi fraud when considering the value of shares in the Funds redeemed prior to that discovery". I do not agree. It is clear from the case law discussed above that value has to be considered objectively "as at" the transaction, namely the redemption or payment. It is also clear from *Brewin Dolphin* and the other cases cited above that in "appropriate circumstances" the court will take into account what can be referred to either as "hindsight" or subsequent events

118

shedding light on the true value at the time of the transaction.  Accordingly, in accordance with English case law, which would be applied in the BVI, it is both possible and necessary to look at the real value of the shares offered as consideration for the redemption payments.

261.    At paragraph 245 Mr. Mortimore states that in the present case "…the value of the redeemed shares was fixed in accordance with their Articles".  However, that is irrelevant when it comes to avoiding an undervalue transaction or pursuing other avoidance claims provided by a country's insolvency regime.  In a claim to avoid an undervalue transaction, the liquidators and the court cannot be prevented from alleging and finding respectively that, whatever sum the company may have committed itself to pay by contract, the shares were in fact valueless or almost valueless.  It will frequently be the case that a company transfers property at an undervalue pursuant to a contract.  If the thing transferred away by the company pursuant to the contract exceeds in value the thing received by the company pursuant to the contract, then the transfer will have been at an undervalue.  The fact that the transfer was carried out pursuant to a contract is irrelevant.

262.    At paragraph 245 Mr. Mortimore also suggests that because redeemed shares were cancelled, that would enhance the Net Asset Value per share on the next Valuation Day for the purpose of calculating the price of shares issued to new investors or existing members, increasing their investments.  I am afraid I cannot follow this at all.  As I see it, the paying out of real assets (money) in exchange for the cancellation of valueless or almost valueless shares is an unambiguous detriment to remaining shareholders or new investors.  Even on a technical basis, I cannot see how redemptions enhance the NAV per share.

263.    Further at paragraph 245, Mr. Mortimore suggests that the Redemption Price and the corresponding subscription price " … represented the open market value of shares in the

Funds at all times prior to 11 December 2008 ….”  Again, I cannot follow this.  There was no open market in the shares as far as I am aware.  Nor can I accept as uncontroversial that the Funds were “… rational and reasonably well-informed purchasers of their shares…”. A rational and reasonably well-informed purchaser, having knowledge of the multiple red flags applying to Madoff, might never have put its assets into BLMIS.

264.    In paragraph 246 of the Mortimore Declaration, Mr. Mortimore suggests that the value of the redeemed shares was fixed “ … on what was in effect an open market basis”.  Again I cannot follow this, since there was no market in the shares as far as I am aware.  On the basis of this false premise, Mr. Mortimore concludes in paragraph 246 that “ … there is no scope for using hindsight to take into account the subsequent discovery of the BLMIS Ponzi scheme”.  Not only is this conclusion based on a false premise, but case law authority at the highest level suggests that “hindsight” or facts taking place subsequently can in appropriate cases be used to ascertain the true value of an asset “as at” the date of the transaction.  At a minimum, this approach must be arguable in the present case.

265.    At paragraph 247 Mr. Mortimore accepts that even if there were a binding certificate the transaction can still be held to be an undervalue.

266.    Mr. Mortimore goes on to argue in paragraph 247 of the Mortimore Declaration that even if the NAV were incorrect, it was the value used by the Funds and redeeming shareholders and that unless “ … a reasonably well-informed purchaser could have discovered at the time each Redemption was entered into that the Funds published NAV per share was effected by fraud or was based on false information from BLMIS, that published NAV stands as evidence of the price that a purchaser would pay for shares in the Funds, even though hindsight reveals that the NAV was inaccurate”.  Again, I have a number of problems with this approach.  Firstly,

a reasonably well-informed purchaser might have discovered very considerable doubts in relation to Madoff and would therefore have significant reasons to doubt the accuracy of the NAV.  Secondly, the fact that a purchaser would pay for shares in the Funds at the rate of the NAV is not conclusive as to the real value of the shares "as at" the date of the transaction.  This is not a situation of a sale after proper marketing and negotiation to an independent third party. The redemptions are sales back to the company:  there is no market and no negotiation - simply the establishment of a NAV on a false basis.  As seen above, the case law shows that "hindsight" or subsequent facts which shed light on the real value at the time of the transaction can in appropriate cases be used to show that the NAV was inaccurate and that the shares were valueless or nearly valueless.

267.    At paragraph 248, Mr. Mortimore suggests that the BVI court would be assisted by the KPMG reports when considering "…what a reasonably well-informed person with reasonable diligence have found out about BLMIS and the Funds' NAVS…".  Even just taking Mr. Mortimore's summary, the identification of fraud and operational risks might well have meant that a reasonably well-informed purchaser would want to stay well-clear of Madoff and his operation.  However, this is ultimately a question of fact for discovery, evidence, cross-examination and a trial.  The position of a "reasonably well-informed person" could not be established in a BVI court on a summary basis: English and BVI Courts do not permit summary hearings to be used to determine contested issues of fact.[60]

V.    **Insolvency**

268.    With regard to paragraph 249 of the Mortimore Declaration, I have dealt with the question of insolvency above, and the impact of the presumption on the matter, and I don't

---

[60] *Swain v Hillman* [2001] CP Rep 16 per Lord Woolf; cited with approval by the House of Lords in *Three Rivers District Council v Bank of England (No3)* [2003] 2 AC 1.sectio

121

accept that the facts pleaded in the amended complaints show that the Funds remained able to pay their debts as they fell due in the way in which that test is applied in the English case law, which is likely to be followed in the BVI.

### W.    The good faith business transaction defence

269.    With regard to paragraph 250 of the Mortimore Declaration, I have already pointed out that this is a defence and not part of the cause of action and therefore does not need to be pleaded.  Mr. Mortimore appears to accept that insofar as he accepts that the burden of proof is on the Defendants to show that the defence applies.  Again, as I set out in the Initial Moss Declaration, there is a statutory presumption that where a transaction is entered into with a connected person (as would be the case here) the transaction is not a good faith business transaction for the purposes of the section.  It will be necessary for the Defendants to plead and prove a case as to how the transaction could be said to have been entered into by the Funds (a) for the purposes of its business and (b) there were reasonable grounds for believing that the transaction would benefit the company.

270.    Without wishing to pre-empt what such a defence might say, it is very difficult indeed to see how these payments could be said to satisfy either test.  The purpose of the section 246(2) exception is said to enable those running a struggling company to enter into transactions at what would otherwise be regarded as unfavourable terms in order to keep the company going (e.g. a fire sale of assets - see *Palmer's Company Law* at paragraph 15.564).  That is not the situation here: the Funds were simply buying back shares in accordance with the redemption provisions of the Articles, and paying more than the shares were worth due to a mistaken understanding as to what constituted the Funds' assets.  The redemption transactions were not intended to "benefit the company" - at best they were intended to be neutral in effect.  Indeed,

the redemptions were prima facie harmful to the Funds' interests since they reduced the amount of money under management.

271.    At paragraph 253 Mr. Mortimore again attempts to exclude "hindsight".  In the light of the case law discussed above, "hindsight" or evidence of matters that occurred subsequently can in appropriate cases, such as the present, shed light on the position at the time of the transaction.

## X.    The allegation in the Amended Complaints

272.    Mr. Mortimore states in paragraph 254 that the amended complaints "do not allege that the Funds acted otherwise than in good faith …".  As I have already said, this mistakes both the constituent elements of the claim and the burden of proof.  A company does not need to plead or prove a negative, i.e. that a transaction was not in good faith.  The elements that a claimant needs to plead are those set out in s.246(1), i.e. that a transaction took place at an undervalue and was either an insolvency transaction or within the vulnerability period.  The Liquidators have pleaded those elements.  It is for the Defendants to plead and prove a defence if they can.  This is particularly obvious where, as here, the statutory presumptions apply.  See *Casa Estates*, *supra*.

273.    At paragraph 255 Mr. Mortimore says that the redemptions and redemption payments "were normal business transactions pursuant to the Articles".  I respectfully disagree. The payment on sums in respect of fictitious profits and non-existent assets cannot be "normal business transactions".  Nor does this involve "inadmissible use of hindsight" as Mr. Mortimore suggests.  As shown above, the UK case law requires an objective view of matters "as at" the date of the transactions and "hindsight" or evidence of matters taking place subsequently which

shed light on the true position at the time of the transactions is admissible.  At a minimum it is arguably so.

274.    At paragraph 256, Mr. Mortimore appears either to be giving factual evidence or coming to conclusions in relation to the evidence, somewhat ahead of a defence, discovery, cross-examination and a trial.  This approach would not be accepted in the BVI courts.

At paragraph 256, Mr. Mortimore concludes that there were reasonable grounds for believing that the redemptions and payments "would benefit the Funds".  I completely disagree.  Mr. Mortimore suggests that "it benefited the business of the Funds, as described in the preceding paragraph, for them to comply with their obligations to redeem shares in accordance with the Articles …".  I cannot follow this at all.  As I have said, it can only benefit the business of the funds to make redemption payments if they were in some way related to the profits and assets which were purportedly being paid.  It could not benefit the business of the Funds to pay out real assets (cash) in exchange for valueless or near valueless shares on the basis of fictitious profits and assets.  Moreover, when the Funds requested and accepted monies from BLMIS and paid them out to redeemers, according to Brown Rudnick they incurred liabilities in the amounts taken from defrauded investors via BLMIS which the Funds could not pay.  Not only is Mr. Mortimore's suggestion in accurate and illogical, but it would defy common sense to describe the payment of cash in respect of fictitious profits and assets (or the consequent incurring of huge liabilities to defrauded investors in BLMIS) as benefiting an investment fund.

275.    At paragraph 257, Mr. Mortimore again suggests that it is possible on the basis of facts stated in the amended complaints "and inference from what is not stated, but which the liquidators would be expected to state if the facts existed," that the Liquidators had failed to state a claim of undervalue transaction, since the redemptions and payments are protected by Section

124

246(2).  This is an astonishing suggestion from several points of view.  Firstly, I understand that, under U.S. rules, a defence to which a statutory presumption applies for the benefit of the plaintiff can only be established at the pleading stage if the pleading itself states facts that clearly rebut the presumption.  For the reasons stated above, I cannot see how it could be said that the complaints do so.  Not only that, but it is suggested that it is also possible to rely on what the claimant/plaintiff has <u>not</u> stated.  This strikes me as being wholly unprecedented, completely novel and radical and wholly unlikely to be found attractive or plausible by the BVI courts.  Furthermore, the suggestion that it is for Liquidators to state a claim by negativing a defence, again to which a statutory presumption applies for the benefit of the plaintiff, is plainly wrong in terms of BVI and English pleading procedures.

### Y.    Part 10: Orders under Section 249 of the BVI Act

276.    The first point to make clear is that there is absolutely no doubt that the statutory avoidance provisions in section 245 and 246 have extraterritorial effect, i.e. they apply in respect of transactions whether undertaken inside or outside the BVI.  This was made clear by reference to the equivalent English provisions by the Supreme Court in Bilta v Nazir [2016] AC 1 at paragraphs 106 - 111 per Lord Sumption.  He said:

> "Section 213 [of the English Act] is one of a number of discretionary powers conferred by statute on the English court to require persons to contribute to the deficiency who have dealt with a company now in liquidation in a manner which has depleted its assets.  None of them have any express limits on their territorial application.  Another such provision, section 238 , which deals in similar terms with preferences and transactions at an undervalue, was held by the Court of Appeal to apply without territorial limitations in In re Paramount Airways Ltd [1993] Ch 223.  Delivering the leading judgment in that case, Sir Donald Nicholls V-C observed (i) that current patterns of cross-border business weaken the presumption against extraterritorial effect as applied to the exercise of the courts' powers in conducting the liquidation of a United Kingdom company; (ii) that the absence in the statute of any test for what would constitute presence in the United Kingdom makes it unlikely that presence there was intended to be a condition of the exercise of the power; and (iii) that the absence of a connection with the United Kingdom would be a factor in the exercise of the discretion to permit service out of the proceedings

as well in the discretion whether to grant the relief, which was enough to prevent injustice.  These considerations appear to me, as they did to the Chancellor and the Court of Appeal, to be unanswerable and equally applicable to section 213."[61]

**Z.    The court to which application is made**

277.    At paragraph 259, Mr. Mortimore suggests that Sections 245 and 246 do not actually state that a transaction is void or voidable.  As I have explained above, that is simply a consequence of the different drafting arrangements of the relevant Sections in the English and BVI Acts.

278.    At paragraph 260, Mr. Mortimore misstates the definition of "court" in the BVI Insolvency Act.  The definition does not state "BVI court", as Mr. Mortimore suggests.  The definition states that "court" means the "High Court": Section 2(1) of the BVI Act.  The difference is significant because there are other courts in the BVI which would not be the correct venue for any insolvency application.  These other courts are Magistrates' Courts.  The purpose of defining "court" as "the High Court" is to ensure that procedurally cases are brought in the High Court and not in the Magistrates' Court.

279.    It is clear from other provisions in the BVI Act that the Act is very conscious of the fact that there are other courts in the BVI.  Thus there is a definition of "Virgin Islands court" as meaning "any court having jurisdiction in the Virgin Islands":  Section 2(1) of the BVI Act.  Section 8(1)(b) provides that a company or foreign company is insolvent if " … execution or other process issued on a judgment, decree or order of a Virgin Islands court in favour of a creditor of the company is returned wholly or partly unsatisfied …".  Similarly, Section 8(2)(b) of the BVI Act states that an individual is insolvent if  "… execution or other process issued on a judgment, degree or order of a Virgin Islands Court in favour of a creditor of the individual is

---

[61] At paragraphs 212-214 of the decision, two other judges of the Supreme Court that considered the issue in that case, Lords Toulson and Hodge, joined in Lord Sumption's position.

returned wholly or partly unsatisfied".  Section 52(2) of the BVI Act provides for a discretionary

stay where a moratorium order is pending:-

> "Any Virgin Islands court, or any tribunal in the Virgin Islands, in which procedures are pending against a debtor may, on proof that an application under Section 51 has been made by the debtor, either stay those proceedings or allow them to continue on such terms as it considers just".

> Section 174(1) provides that where an application for the appointment of a liquidator has been filed but not yet determined or withdrawn certain parties may apply for a discretionary stay "… where any action or proceeding is pending against the company in any other Virgin Islands court or tribunal in the Virgin Islands …".

280.    The fact that the definition of Court is to do with venue and is procedural can also

be seen from the parallel position in England, which I described in detail in the *Hellas* case that

the US court will be familiar with.  See *In re Hellas Telecommunications (Luxembourg) II SCA,*

*535 B.R. 543 (Bankr. S.D.N.Y. 2015)*.  The *Hellas* case concerned a slightly more elaborate

venue provision set out in a special definition of "the court" in Section 423(4) of the English Act.

The reason for a special and more elaborate definition is that Section 423, unlike Section 238 and

Section 239 or Sections 245, 246 and 249 of the BVI Act, applies to both companies and

individuals.  Venue provisions in England respectively for individual and corporate insolvency

proceedings have significant differences in terms of the jurisdiction of local courts.  Some local

courts have personal insolvency jurisdiction but not necessarily corporate insolvency jurisdiction

and vice versa.  The High Court in England has jurisdiction in all cases.

281.    Turning now to the parallel situation in relation to Sections 238 and 239 of the

English Act, which are both in the corporate insolvency part of the English Act, one has to go to

Section 251 for the general definition in corporate cases.  Section 251 provides that "the court"

"in relation to a company, means the court having jurisdiction to wind up the company".  In

order to find out which court will have jurisdiction to wind up the company one goes to Section

117 headed "**High Court and county court jurisdiction**".  Section 117(1) says that the High

Court has jurisdiction to wind up any company registered in England and Wales.  Section 117(2)

sets out a parallel provision for the jurisdiction of county courts.

282.    In order not to be misled by the use of the word "jurisdiction", one needs to read

Section 117 in the light of Section 118.  Section 118(1) of the English Act provides:-

> "Nothing in Section 117 invalidates a proceeding by reason of its being taken in the wrong court".

> Moreover, Section 118(2) provides:-

> "The winding up of a company by the court in England and Wales or any proceedings in the winding up, may be retained in the court in which the proceedings were commenced, although it may not be the court in which they ought to have been commenced."

283.    It is clear from this that Section 117 in referring to "jurisdiction" is actually

providing for the correct venue in which winding up proceedings should be brought.  It is very

striking that commencing a winding up proceeding in the county court, even where it has no

"jurisdiction" does not invalidate the proceeding and, as a result of Section 118(2) the

proceeding need not even be transferred to the High Court.

284.    The various statutory provision show that the question of which court a litigant is

directed to in relation to insolvency proceedings is a question of appropriateness and procedure

and not the validity of the proceedings.

285.    It also needs to be emphasised that every statutory provision conferring powers on

a court that I have ever come across which refers to a "court" refers to the courts of the same

law-country.  I have yet to see any provision in an insolvency statute which purports to confer

powers on a foreign court.  Yet it is common that foreign courts apply English or English law

based laws, *including statutory provisions*.  There is nothing in the relevant English or BVI

legislation which in any way prohibits or prevents a foreign court from using those provisions.

128

286.    On the contrary, it is clear from such case law as there is in England that where the foreign court has the type of definition one finds in the present case, there is absolutely no bar to a foreign court exercising the relevant statutory power.

287.    In *England v Smith* [2001] Ch 419 the English Court of Appeal dealt with the case where it was asked to apply a power under Australian insolvency law to order the examination on oath of a witness whose evidence was required for an action brought by liquidators in Australia.  As one would expect, the Australian statute in its express terms gave the power to order an examination on oath to its own courts.  Section 596B of the Australian Corporation Law provided that "The Court" could summon a person for examination about an insolvent corporation's affairs.  The term "Court" was defined in Section 58AA of the Australian Corporation Law as referring to those Australian courts.  Nevertheless, the English Court of Appeal made an order that there be an examination on oath pursuant to Australian law by an Australian judge in England.  Not only that, but in deciding whether or not to order an examination the English court chose to apply Australian case law criteria in preference to English case law criteria.  It is perfectly true that the English court was able to use an express statutory power in Section 426 of the UK Insolvency Act 1986 to apply Australian law.  However, if the definition of "Court" in the Australian statute had restricted the use of the statutory powers of discretionary examination to the Australian courts, the English court would have been powerless to apply Australian law and Australian remedies.  The point was so obvious that it was not even argued in this case.

288.    Whether or not BVI law can be applied by the US Courts is a matter for the US courts to decide and on which I cannot offer any expert opinion.  I do note that I have been made aware of a decision from the US Court of Appeals for the Second Circuit stating "there are few if

any countries in the world whose body of law is more amenable to application in the United States than Great Britain's." [62]

289.    Mr. Mortimore at paragraph 261 says that the "BVI Insolvency Act does not give foreign courts authority to make an order under Section 249". It is true but unremarkable that the BVI statute does not address itself to a foreign court: nor does any other insolvency statute that I have ever seen. However, the point in the present case appears to be that the BVI Act in no way prevents a foreign court, if it has power to do so under its own law, to apply BVI law. The fact that it is clear that the statutory avoidance provisions are intended to have effect without territorial limitation (as set out above) strongly supports the proposition that BVI law would have no difficulty with those provisions being applied by foreign courts in aid of a BVI insolvency.

290.    I need however to deal with the two appeals in *Carlyle Capital* which Mr. Mortimore refers to at paragraph 261. These decisions do not in any way prevent foreign courts from applying BVI law. I note that Mr. Mortimore does not appear to suggest that they do.

291.    The references to the powers of the Guernsey court in the Carlyle Capital Case, which was heard by the Guernsey Court of Appeal state briefly and without detailed reasons that only the Guernsey court can make orders in respect of a "wrongful trading" claim under Guernsey Insolvency Law dealing with a provision substantially copied over from the English Act. The brief and unreasoned statements in that case need to be understood in their context. The statements refer to a *forum non conveniens* challenge in which the Guernsey Court of Appeal had to consider whether different proceedings, including a wrongful trading claim, were to continue either in the Guernsey courts or in the Delaware Chancery Court. In the first Carlyle Capital judgment of 5th March 2012, in the midst of the *forum non conveniens* discussion, which

---

[62] *Gross v. British Broadcasting Corp.*, 386 F.3d 224 (2d Cir. 2004).

leads to a conclusion that the various factors "tell strongly in favour of Guernsey as the forum conveniens." (Paragraph 49), there is a brief statement as follows in paragraph 48:-

> "The Chancery Court of Delaware does not have jurisdiction to consider all the claims. As far as wrongful trading is concerned, the Royal Court under the 1994 Law is the only Court which has jurisdiction:  see the references to the Court in the 1994 Law, Section 67C and 117(1)."

However, this brief statement needs to be seen in the following context:-

a.    The Guernsey court had uncontested expert evidence to the effect that the Chancery Court of Delaware had no jurisdiction to deal with Guernsey wrongful trading claims, so there was no evidence suggesting that the Delaware Court could deal with the wrongful trading claim under Guernsey law.

b.    There is no suggestion in the case that the liquidators had obtained recognition under Chapter 15 and thus had standing in the US to seek such relief.  The expert evidence in relation to Delaware law was therefore correct.

c.    Since the Chancery Court of Delaware could not, without Chapter 15 recognition, give any relief to the Guernsey liquidators, the statement by the Guernsey court that "the Royal Court under the 1994 Law is the only court which has jurisdiction" is quite literally true, not because of the definition of "court" but because the Chancery Court of Delaware had no jurisdiction to give relief.

d.    Since there was no evidence that the Delaware court could grant relief, there appears to have been no discussion of whether the definition of "court" in the Guernsey legislation in any way prevented a foreign court applying the Guernsey law provision.  The question would have been purely academic.

131

292.    In the absence of any Chapter 15 recognition and in the absence of any supporting expert evidence of US law, no credible suggestion could be made to the Guernsey court that any court in the US could apply the Guernsey statutory provision relating to wrongful trading.

293.    The reference in the second *Carlyle Capital* case on 27th April 2012 simply refers back to the brief statements in the earlier case.  At paragraph 73 the court quotes from paragraph 48 of the judgment in the first *Carlyle Capital* case, which I have already referred to.  There is no further reasoning or argument on the point.

294.    Accordingly, there is no doubt at all that the Guernsey Court of Appeal was entirely correct in saying that on the facts of that case the Delaware Chancery Court had no jurisdiction to apply Guernsey Insolvency Law wrongful trading provisions and only the Guernsey court could do so.  However, there is nothing in the case, other than the briefest of references to the definition of "court" that suggests that there is any bar or obstacle to a foreign court, with power to do so, to apply Guernsey Insolvency Law.  As we have seen in the discussion of the English Court of Appeal case of *England v Smith (Re Southern Equities)*, the fact that foreign legislation (unsurprisingly) defines "court" by reference to its own courts is no obstacle to the English Court of Appeal applying the foreign insolvency law.

295.    At paragraph 261, Mr. Mortimore refers to the case of *Galbraith v Grimshaw* in 1910 in which it was pointed out that the Scottish Insolvency Law avoidance provisions had no application in England and the English provisions of that type only apply to an English insolvency proceeding.  The Scottish trustee fell "between two stools".  I note that Mr. Mortimore at footnote 229 claims that this 1910 decision was cited approvingly by Lord Walker in the *Grupo Torras* case.  That is not correct.  In fact at paragraph 41 Lord Walker quotes academic criticism of *Galbraith v Grimshaw* by Professor Ian Fletcher, who describes the case as

132

a "somewhat unsophisticated, if not disingenuous, decision, which purports to disallow any possibility that the rules of law enforced in one jurisdiction may enjoy effect elsewhere by virtue of rules of private international law in force in the other countries concerned" and suggests that it is overdue for reconsideration. Lord Walker further points out that the decision has been described as "unfortunate" in *Anton, Private International Law, Second Ed (1990), at p734*.

296.     In fact, the Privy Council in the *Grupo Torras* case, being the de facto Supreme Court for the BVI (as well as Cayman, from which that appeal arose), as the appellate court which the BVI courts would follow, if necessary in preference to decisions of the House of Lords, appears to have come to a decision inconsistent with that in *Galbraith v Grimshaw*. One of the points argued in *Galbraith v Grimshaw* was that the Scottish law avoidance provision should have effect in England as a result of the Bankruptcy Act 1883 which provided for Scottish and other British courts having jurisdiction in bankruptcy or insolvency to act in aid of each other. That provision was the ancestor of Section 122 of the Bankruptcy Act 1914, an Imperial statute which applied throughout the British Empire. The cross-border effect of the 1883 statute was dismissed by the Lord Chancellor Lord Loreburn in *Galbraith v Grimshaw* by saying:-

"I think that affects procedure and does not enlarge the rule to which I have alluded".

Lord Macnaghten, giving a concurring judgment stated:-

297.     "It may have been intended by the Legislature that bankruptcy in one part of the United Kingdom should produce the same consequences throughout the whole Kingdom. But the Legislature has not said so. The Act does not say that a Scotch sequestration shall have effect in England as if it were an English bankruptcy of the same date."

298.     In the *Grupo Torras* case by contrast the Privy Council gave substantive effect to Section 122 of the Bankruptcy Act 1914 (which it held still applied outside the UK despite its repeal by the UK Insolvency Act of 1986), in order to allow the courts of the Cayman Islands to

set aside two Cayman trusts established by the debtor, who was bankrupt in the Bahamas.  In fact

the Privy Council held that the jurisdiction conferred by Section 122 of the 1914 Act in the

Cayman Islands and the other territories in which it remained in force was essentially as wide as

that conferred by its successor, the modern Section 426 of the Insolvency Act 1986.  The powers

given by the statute were not merely auxiliary but operated as though there were a hypothetically

bankruptcy in the assisting law-country.   That is of course directly contrary to the view in

*Galbraith v Grimshaw* that the predecessor provision did not have substantive effect.  It is clear

from *Grupo Torras* that the decision in *Galbraith v Grimshaw* would now be decided in the

opposite direction.  At paragraph 45, Lord Walker, instead of approving *Galbraith v Grimshaw*

stated:-

> "Their Lordships see some force in the criticisms which have been made of … Galbraith
> v Grimshaw … The distinction between "rights" and "remedies" is not, in the context of
> auxiliary jurisdiction in bankruptcy, marked by a bright line …".

299.    To sum up, Mr. Mortimore is with respect completely incorrect in saying that

Lord Walker in the *Grupo Torras* case cited *Galbraith v Grimshaw* "approvingly".   To the

contrary, he appears to have accepted criticism of the decision and he and the rest of the Privy

Council came to a decision directly contrary to that in *Galbraith v Grimshaw* by use of the

statutory ancestor of Section 426 of the Insolvency Act 1986 (the provision which was applied in

*England v Smith*).

## AA.    <u>Cross-border scope of Section 249</u>

300.    At paragraph 263, Mr. Mortimore accepts that "the BVI court can also ask a

foreign court for assistance, but whether the foreign court can assist by applying provisions of

the BVI Insolvency Act, such as Section 249, depends on the power given to the foreign court

under its own laws".  While that is true, it is <u>not</u> only in cases where the BVI court itself asks for

assistance but also where the court-appointed liquidator, who are officers of the BVI Court who I

understand are prosecuting the BVI avoidance action in the US with the sanction of the ECCA, asks for assistance that the foreign court can apply provisions of BVI Insolvency Law.  Of course the giving of assistance must be compatible with the laws of the foreign court.

301.    Stepping back, it may be useful to consider the approach that the Liquidators have taken in the present case.  As liquidators of a BVI entity, they are faced with a situation in which a significant portion of the assets of the company represents claims against entities situated outside the BVI, and with respect to whom a judgment by the BVI court would likely be unenforceable outside the jurisdiction.  The one factor common to all of those entities is that in their Subscription Agreements they agreed to New York jurisdiction in respect of disputes, and many have assets or bank accounts in the US (or will otherwise be motivated to comply with orders of the US Bankruptcy Court - it is much easier to avoid doing business through the BVI than it is to avoid doing business through the US).  In those circumstances, the Liquidators have sought to pursue their claims in a single forum where Chapter 15 provides a mechanism for resolution.  It is difficult to see why the courts in either the BVI or the US should wish to prevent the claims being resolved in an orderly and efficient manner in the US Bankruptcy Court, where they can be dealt with in a single forum in accordance with the goal of modified universalism and recognition that underpins Chapter 15, the Model Law and insolvency procedures throughout the developed world.

**BB.** <u>**Discretion**</u>

302.    I note that Mr. Mortimore does not suggest that the fact that the giving of relief under Sections 245-249 is subject to the exercise of a discretion prevents the discretion being exercised by a foreign court.  That is clear from the example of *England v Smith* cited above, where the English court pursuant to its statutory powers exercised an Australian Insolvency Law discretion pursuant to Australian law and ordered an examination on oath by an Australian judge.


Executed on March 30, 2017
London, UK


_____/s/ Gabriel Moss_____
Gabriel Moss, QC