# EXHIBIT A

## COMPENDIUM OF AUTHORITIES CITED IN FURTHER DECLARATION OF
## GABRIEL MOSS QC IN SUPPORT OF MOTION FOR LEAVE TO AMEND

| **TAB** | |
|---|---|
| | **US CASES** |
| 1. | *Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.),* 480 B.R. 480, 492 (S.D.N.Y. 2012) |
| 2. | *Cunningham v. Brown,* 265 U.S. 1, 8 (1924) |
| 3. | *Gross v. British Broadcasting Corp.,* 386 F.3d 224 (2d Cir. 2004). |
| 4. | *Hosking v. TPG Capital Mgmt., L.P. (In re Hellas Telecomms. (Lux.) II SCA)*, 535 B.R. 543 (Bankr. S.D.N.Y. 2015) |
| 5. | *Messer v. Bentley Manhattan, Inc. (In re Madison Bentley Assocs., LLC),* 516 B.R. 724 (S.D.N.Y. 2014) |
| 6. | *Official Comm. of Unsecured Creditors of 360Networks (USA) Inc. v. Pirelli Commc'ns Cables and Sys. USA LLC (In re 360networks (USA) Inc.),* 367 B.R. 428, 434 (Bankr. S.D.N.Y. 2007) |
| 7. | *Picard v. Madoff (In re Bernard L. Madoff Inv. Secs. LLC),* 458 B.R. 87 (Bankr. S.D.N.Y. 2011) |
| | **FOREIGN CASES** |
| 8. | *Al Sabah v Grupo Torras SA* [2005] 2 AC 333, Privy Council on appeal from the Court of Appeal of the Cayman Islands |
| 9. | *Arnold v Britton* [2015] AC 1619 (SC) |
| 10. | *Arnold v National Westminster Bank* [1991] 2 AC 93 |
| 11. | *Aspect Contracts (Asbestos) Ltd v Higgins Construction plc* [2015] 1 WLR 2961 |
| 12. | *Aveling Barford Ltd v. Perion Ltd & Ors, [1989]* 5 BCC 677(Hoffman J) |
| 13. | *Barclays Bank Ltd v WJ Simms Son & Cooke (Southern) Ltd* [1980] 1 QB 677, English High Court |
| 14. | *Barlow Clowes International Ltd (in liquidation) v Eurotrust International Ltd* [2006] 1 WLR 1476 |
| 15. | *Beaufort Developments (NI) Ltd v Gilbert-Ash (NI) Ltd* [1999] 1 AC 266 |
| 16. | *Bilta (UK) Ltd v Nazir* [2016] AC 1, UK Supreme Court |
| 17. | *BNY Corporate Trustee Services Ltd v Eurosail-UK 2007-3BL plc* [2013] 1 WLR 1408, UK Supreme Court |
| 18. | *BP Oil International Ltd v Target Shipping Ltd* [2012] EWHC 1590 (Comm) |
| 19. | *Buller v Harrison* (1777) 2 Cowp. 565 |

| TAB | |
|-----|---|
| 20. | *Carl Zeiss Stiftung v Rayner & Keeler (No 3)* [1970] Ch 506 |
| 21. | *Carlyle Capital Corporation Ltd v Conway*, 11/2012, Court of Appeal of the Island of Guernsey |
| 22. | *Carlyle Capital Corporation Ltd v Conway* [2013] 2 Lloyd's Rep 179, Court of Appeal of the Island of Guernsey |
| 23. | *Caswell v Powell Duffryn Associated Collieries Ltd* [1940] A.C. 152 |
| 24. | *Compass Group UK and Ireland Ltd* v. *Mid Essex Hospital Services NHS Trust* [2013] EWCA Civ 200 |
| 25. | *Countrywide Banking Corporation Ltd v Dean* [1998] AC 338, Privy Council on appeal from the Court of Appeal of New Zealand |
| 26. | *Cowan de Groot Properties Ltd. v. Eagle Trust Plc.* [1992] 4 All E.R. 700 , 761 |
| 27. | *Derry v Peek* (1889) 14 App Cas 337, House of Lords |
| 28. | *England v Smith* [2001] Ch 419 |
| 29. | *Fairfield Sentry Ltd v Migani* [2014] UKPC 9, Privy Council |
| 30. | *Galbraith v Grimshaw* [1910] AC 508, House of Lords |
| 31. | *Gleeson v J Wippell & Co Ltd* [1977] 1 WLR 510, English High Court |
| 32. | *Greenclose Ltd v National Westminster Bank plc* [2014] EWHC 1156 (Ch) |
| 33. | *Henderson v Henderson* (1843) 3 Hare 100, English Court of Chancery |
| 34. | *Henderson v Merrett Syndicates* [1995] 2 AC 145 |
| 35. | *Hill v Spread Trustee Co Limited* [2007] 1 BCLC 450 |
| 36. | *Holman v Johnson* (1775) 1 Cowp 341 |
| 37. | *Houldsworth v City of Glasgow Bank* 5 App Cas 317 (HL) |
| 38. | *House of Spring Gardens v Waite* [1991] 1 QB 241 |
| 39. | *In re Handman and Wicox's Contract* [1902] 1 Ch. 599, 604 (Stirling LJ) |
| 40. | *In the matter of Freerider Ltd*, FSD 48/2009 (Grand Court of Cayman Islands) |
| 41. | *In the matter of Wyser-Pratte Eurovalue Fund*, Ltd., FSD 167 of 2010 (Grand Court of the Cayman Islands) |
| 42. | *Johnson v Gore Wood* [2002] 2 AC 1, House of Lords |

| TAB | |
|---|---|
| 43. | *Joiner v George* [2003] BCC 298, English Court of Appeal |
| 44. | *Kingate Global Fund Ltd v Kingate Management Ltd* [2015] (Bda) 65 Com |
| 45. | *Lilly Icos v 8pm Ltd* [2009] EWHC 1905 (Ch) |
| 46. | *Lincoln National Life Insurance Co v Sun Life Assurance* [2004] EWCA Civ 1660 |
| 47. | *Lipkin Gorman v Karpnale* [1991] 2 AC 548 |
| 48. | *Marks & Spencer plc v BNP Paribas Securities Services Trust Co (Jersey) Ltd* [2016] AC 742, UK Supreme Court |
| 49. | *Medcalf v Mardell* [2003] 1 AC 120 |
| 50. | *Michael Wilson & Partners v Sinclair* [2017] EWCA Civ 3 |
| 51. | *Montgomerie v UK Mutual Steamship Association* [1891] 1 QB 370 |
| 52. | *Moore Stephens v Stone & Rolls* [2009] AC 1391 |
| 53. | *Moss v Anglo-Egyptian Navigation Company* (1865) LR 1 ChApp 108 at 114 – 116 |
| 54. | *Mountford v Scott* (1823) 37 ER 1105 |
| 55. | *Myers v Kestrel Acquisitions Ltd* [2015] EWHC 916 (Ch) |
| 56. | *National Bank of Kuwait v Menzies* [1994] 2 BCLC 306 |
| 57. | *Patel v Mirza* [2016] UKSC 42, UK Supreme Court |
| 58. | *Petrie v Nuttall* (1856) 11 Exch 569 |
| 59. | *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] 1 WLR 143, House of Lords |
| 60. | *Portman Building Society v Hamlyn Taylor Neck* [1998] 4 All ER 202 |
| 61. | *Prest v Petrodel* [2013] 2 AC 415 |
| 62. | *R v Marks* (1981) 147 CLR 471 |
| 63. | *Re BCCI (No8) [1998] AC 214* |
| 64. | *Re Brabon* [2001] 1 BCLC 11, English High Court |
| 65. | *Re Casa Estates (UK) Ltd* [2014] 2 BCLC 49, English Court of Appeal |

| TAB | |
|-----|---|
| 66. | *Re Charge Card Services* [1987] Ch 150 |
| 67. | *Re Cheyne Finance Plc* (2) [2007] EWHC 2402 (Ch) |
| 68. | *Re MC Bacon Ltd* [1990] BCLC 324, English High Court |
| 69. | *Re Paramount Airways Ltd* [1993] Ch 223, English Court of Appeal |
| 70. | *Re Sutherland* [1963] AC 235 |
| 71. | *Re T&N Ltd* [2006] 1 WLR 1728 |
| 72. | *Re Thoars, Reid v Ramlort Ltd* [2003] 1 BCLC 499, English High Court |
| 73. | *Re Waring (No2)* [1948] Ch 221 |
| 74. | *Resolution Chemicals Ltd v H Lundbeck A/S* [2013] EWCA Civ 924, English Court of Appeal |
| 75. | *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378, Privy Council on appeal from the Court of Appeal of Brunei |
| 76. | *Secretary of State for Trade & Industry v Frid* [2004] 2 AC 506 |
| 77. | *Shedden v Patrick* (1854) 1 Macq. 535 |
| 78. | *Sibun v Pearce* (1890) 44 Chancery Division 354 |
| 79. | *Skandinaviska Enskilda Banken AB (PUBL) v Conway*, CICA No 2 of 2016, 18 November 2016 ("*Weavering* Case") |
| 80. | *Socimer International Bank v Standard Bank London* [2008] EWCA Civ 116 |
| 81. | *Somers Dublin Ltd A/C KBCS v Monarch Pointe Fund Ltd* HCVAP 2011/040, 11 March 2013, the EC Court of Appeal |
| 82. | *Spencer v Williams* (1871) LR 2 P&D 230 |
| 83. | *Stanley v TMK Finance Ltd* [2010] EWHC 3349 (Ch), English High Court |
| 84. | *Stuart v Goldberg Linde* [2008] 1 WLR 823 (English Court of Appeal) |
| 85. | *Swain v Hillman* [2001] CP Rep 16 per Lord Woolf |
| 86. | *Tai Hing Cotton Mill Ltd v Liu Chong Hing Bank Ltd* [1986] AC 80 |
| 87. | *Taylor v Australia and New Zealand Banking Group Ltd* (1988) 6 ACLC 808) |
| 88. | *The London Joint Stock Bank v. Simmons* [1892] A.C. 201, 223 |

| TAB | |
|-----|---|
| 89. | *Thoday v Thoday* [1964] P181 |
| 90. | *Three Rivers District Council v Bank of England (No 3)* [2003] 2 AC 1, House of Lords |
| 91. | *Tinsley v Milligan* [1994] 1 AC 340 |
| 92. | *Virgin Atlantic Airways v Zodiac Seats UK Ltd* [2013] 3 WLR 299 |
| 93. | *Westford Special Situations Fund Ltd v Barfield Nominees Ltd*, HCVAP 2010/014, 28 March 2011, the EC Court of Appeal |
| 94. | *Wilson v Brett* (1843) 12 L.J. Ex. 264 |
| 95. | *Wishart v Fraser* (1941) 64 CLR 470 |
| **RULES & STATUTES** | |
| 96. | BVI Business Companies Act ("BCA") 2004 §§ 11, 31, 42, 56-59, 62-64, 250 |
| 97. | BVI Insolvency Act 2003 §§ 2, 3, 5, 8-12, 52, 174, 197, 244-252, 254, 256, 401, 402, 456, 467 |
| 98. | English Insolvency Act 1986 §§ 117, 118, 123, 238-241, 251, 339, 423-426, 436 |
| 99. | English Insolvency Rules 1986, as Amended, Rule 13.12 (in its current form, and in its form before 2006) |
| 100. | New Zealand Companies Act 1955 §266 |
| **OTHER AUTHORITIES** | |
| 101. | Anton, *Private International Law*, Second Ed (1990), at p734 |
| 102. | Goode, *Principles of Corporate Insolvency Law* (4th ed, 2011) at §§ 13-03, 13-12, 13-19, 13-26, 13-107 |
| 103. | *Insolvency Law and Practice: Report of the Review Committee* (June 1982) Cmnd 8558 |
| 104. | *Jowitt's Dictionary of English Law* (4th ed, 2015): "transaction" |
| 105. | *Keating on Construction Contracts* (10th Ed) at paragraphs 5-054 - 5-055 |
| 106. | *Muir Hunter on Personal Insolvency*, (loose-leaf) edited by John Briggs and Christopher Brougham QC at § 3-2260 |
| 107. | Palmer's Company Law at paragraph 15.564 |
| 108. | Spencer Bower & Handley, *Res Judicata* (4th Ed, 2009) at paragraphs 2.33, 9.05, 9.38-9.45 |

# TAB 1

480 B.R. 480
United States District Court,
S.D. New York.

In re M. FABRIKANT & SONS, INC., et al., Debtors.
Buchwald Capital Advisors LLC, as
Trustee of the MFS GUC Trust, Appellant,
v.
JP Morgan Chase Bank, N.A., et al., Appellees.

Nos. 11 Civ. 2649 (RJS), 06–
12737 (SMB), 06–12739(SMB).
|
Oct. 1, 2012.

**Synopsis**

**Background:** Unsecured creditors committee in Chapter 11 case of jewelry companies, subsequently succeeded by trust pursuant to plan of liquidation, brought adversary proceeding against lenders and gold consignor, asserting claims to avoid and recover alleged fraudulent and preferential transfers. The Bankruptcy Court, 394 B.R. 721, granted in part and denied in part motion to dismiss amended complaint, and thereafter, 2009 WL 3806683, granted in part and denied in part motion to dismiss second amended complaint. Defendants moved to dismiss third amended complaint. The Bankruptcy Court, Stuart M. Bernstein, J., 447 B.R. 170, granted the motion in part and denied it in part. Plaintiff appealed.

**Holdings:** The District Court, Richard J. Sullivan, J., held that:

[1] the bankruptcy court properly declined to "collapse" and treat as a single transaction, for fraudulent conveyance purposes, transactions between lenders and debtors and subsequent transactions between debtors and their affiliates;

[2] plaintiff failed to satisfy the Rule 9(b) pleading standard with respect to its subsequent fraudulent transfer claims; and

[3] plaintiff's preference claims were untimely.

Affirmed.

West Headnotes (20)

[1]  **Fraudulent Conveyances**
    ⮡ Transactions Subject to Attack by Creditors

In order to collapse two transactions and treat them as a single transaction under fraudulent conveyance law, a plaintiff must establish that: (1) a party gave the debtor fair value in exchange for the debtor's property, but the debtor then gratuitously reconveyed what it received to a third party, taking nothing in return, and (2) the party to the transaction with the debtor that is sought to be avoided must have had actual or constructive knowledge of the entire scheme that renders its exchange with the debtor fraudulent.

2 Cases that cite this headnote

[2]  **Bankruptcy**
    ⮡ Nature and Form of Transfer
    **Bankruptcy**
    ⮡ Trustee as representative of debtor or creditors
    **Corporations and Business Organizations**
    ⮡ Conveyances When Insolvent or in Contemplation of Insolvency

Bankruptcy court properly declined to "collapse" and treat as a single transaction, for fraudulent conveyance purposes, loan transactions between lenders and Chapter 11 debtors and subsequent transactions between debtors and affiliates, whereby debtors reconveyed loan proceeds to affiliates, allegedly for less than reasonably equivalent value; rather than identify pairs of transactions that actually amounted to integrated, fraudulent transfers, plaintiff merely asserted that transactions between lenders and debtors, in the aggregate, resulted in net loss to debtors, and so plaintiff failed to identify unified scheme to defraud, particularly given evidence that some of debtors' transactions with affiliates were

supported by consideration and so were legitimate, and plaintiff did not support contention that lenders were actually or constructively aware that debtors would reconvey loan proceeds to affiliates for less than reasonably equivalent value. 11 U.S.C.A. §§ 544, 548; N.Y.McKinney's Debtor and Creditor Law § 276.

Cases that cite this headnote

---

[3]    **Fraudulent Conveyances**
    👉 Transactions Subject to Attack by Creditors

In order to bring a collapsing fraudulent conveyance claim, a plaintiff must identify a set of transfers that can be said to constitute a unified scheme to defraud creditors of the debtor; the question, then, is whether a series of transactions amounted to a "single, integrated transaction," where the debtor was in effect an intermediary who made a "gratuitous transfer" to a third party of the value it had received.

1 Cases that cite this headnote

---

[4]    **Fraudulent Conveyances**
    👉 Transactions Subject to Attack by Creditors

While plaintiff asserting a collapsing fraudulent conveyance claim was not required show a perfectly matched flow of consideration from lenders to debtors' affiliates via debtors, that is, a $5 million loan from lenders to debtors and a $5 million transfer from debtors to affiliates, without receiving value in return, plaintiff nonetheless had to identify specific transactions in which some portion of loan proceeds that debtors received were gratuitously reconveyed to affiliates as part of a single transaction.

Cases that cite this headnote

---

[5]    **Fraudulent Conveyances**
    👉 Facts putting on inquiry

In determining whether constructive notice of allegedly fraudulent scheme has been established, courts look to "red flags" that should have put the grantee on notice of potential fraud.

Cases that cite this headnote

---

[6]    **Corporations and Business Organizations**
    👉 Bona fide purchasers

Signals of general "infirmities" in a company, which could merely reflect a poor business model, incompetent management, insufficient capital, and a host of other deficiencies other than fraud, are inadequate to trigger inquiry notice, for purposes of determining whether plaintiff asserting a collapsing fraudulent conveyance claim has established constructive notice of the allegedly fraudulent scheme.

Cases that cite this headnote

---

[7]    **Federal Civil Procedure**
    👉 Fraud, mistake and condition of mind

Party alleging fraud must state with particularity the circumstances constituting fraud. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

1 Cases that cite this headnote

---

[8]    **Federal Civil Procedure**
    👉 Fraud, mistake and condition of mind

Since it is a serious matter to charge a person with fraud, a plaintiff is not permitted to do so unless he is in a position and is willing to put himself on record as to what the alleged fraud consists of specifically. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

Cases that cite this headnote

---

[9]    **Federal Civil Procedure**
    👉 Fraud, mistake and condition of mind

To adequately allege intentional fraudulent conveyance consistent with the rule requiring that all averments of fraud be stated with particularity, a complaint must

specify the property that was allegedly conveyed, the timing and frequency of those allegedly fraudulent conveyances, and the consideration paid. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

Cases that cite this headnote

[10]    **Bankruptcy**
         Pleading;dismissal
Plaintiff failed to satisfy the pleading standard of the rule requiring that all averments of fraud be stated with particularity with respect to its claims for intentional fraudulent conveyance; although plaintiff asserted that debtors' payments to several different entities over the course of nearly a year, or two years with respect to one recipient, constituted "granular detail" sufficient to satisfy the standard, plaintiff failed to identify in its complaint the dates and amounts of particular transfers alleged to be fraudulent. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

Cases that cite this headnote

[11]    **Bankruptcy**
         Time limitations;computation
         **Bankruptcy**
         Construction, execution, and performance
Preference claims asserted by trust, as successor in interest to unsecured creditors committee, were untimely; preference claims were not asserted until more than a year after the firm deadline set forth in the bankruptcy court's final cash collateral order for the filing of avoidance claims against lenders, fact that committee or trust filed "an" adversary complaint against lenders before the deadline did not open the door to later amendments to bring in wholly separate claims, and the subject preference claims were new causes of action, not more definite or specific allegations that clarified general allegations of fraudulent transfers in the original complaint, and so did not "relate back" to the original

complaint. 11 U.S.C.A. § 547; Fed.Rules Civ.Proc.Rule 15, 28 U.S.C.A.

1 Cases that cite this headnote

[12]    **Bankruptcy**
         Time limitations;computation
In avoidance litigation, each transfer is treated as a separate transaction for purposes of applying the "relation back" doctrine.

Cases that cite this headnote

[13]    **Limitation of Actions**
         Amendment of Pleadings
In order for an amendment to relate back to an earlier pleading, that earlier pleading must have put the defendants on notice of what must be defended against in the amended pleadings. Fed.Rules Civ.Proc.Rule 15, 28 U.S.C.A.

1 Cases that cite this headnote

[14]    **Federal Civil Procedure**
         Complaint
While additional legal theories may be added to an earlier pleading, the earlier pleading must inform the defendants of the facts that support those new claims. Fed.Rules Civ.Proc.Rule 15, 28 U.S.C.A.

Cases that cite this headnote

[15]    **Federal Civil Procedure**
         Claim for relief in general
Although a plaintiff need not set forth an intricately detailed description of the asserted basis for relief, the pleadings must give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. Fed.Rules Civ.Proc.Rule 15, 28 U.S.C.A.

1 Cases that cite this headnote

[16]    **Limitation of Actions**

👈 **Amendment Restating Original Cause of Action**

Amendment will relate back to an earlier pleading if the transactions arose from the same course of business and involve the same evidence, even if new legal theories are asserted. Fed.Rules Civ.Proc.Rule 15, 28 U.S.C.A.

Cases that cite this headnote

**[17]    Limitation of Actions**
    👈 **Nature of action in general**

Each preferential and fraudulent transaction is treated separately and distinctly, for purposes of applying the relation-back doctrine; proof offered for one transaction does not govern as to another and, as such, relation back cannot be ordered between different transactions merely for being similar or arising from the same conduct. Fed.Rules Civ.Proc.Rule 15, 28 U.S.C.A.

Cases that cite this headnote

**[18]    Limitation of Actions**
    👈 **Nature of action in general**

"Mere allegation" that all of the subject transactions are fraudulent does not make them part of the same conduct, for purposes of applying the relation-back doctrine. Fed.Rules Civ.Proc.Rule 15, 28 U.S.C.A.

Cases that cite this headnote

**[19]    Federal Civil Procedure**
    👈 **Complaint**

Overly general original pleadings do not provide defendants with adequate notice as to what facts they are to defend against and, therefore, such general allegations cannot be hooks on which to hang later amended pleadings. Fed.Rules Civ.Proc.Rule 15, 28 U.S.C.A.

Cases that cite this headnote

**[20]    Federal Civil Procedure**

👈 **Liberality in allowing amendment**

Rule governing amendment of pleadings is to be liberally construed, particularly where an amendment does not allege a new cause of action but merely makes defective allegations more definite and precise. Fed.Rules Civ.Proc.Rule 15(c), 28 U.S.C.A.

Cases that cite this headnote

**Attorneys and Law Firms**

*483 Lindsey Godfrey of Susman Godfrey LLP, Seattle, WA, for Debtor.

Arun Srinivas Subramanian of Susman Godfrey LLP, New York, NY, Johnathan Jeffrey Ross of Susman Godfrey LLP, Houston, TX, for Appellant.

Steven J. Mandelsberg of Hahn & Hessen LLP, New York, NY, for Appellee JP Morgan Chase Bank, N.A.

Ingrid Bagby of Cadwalader, Wickersham & Taft LLP, New York, NY, for Appellee ABN AMRO Bank N.V.

Paul S. Samson of Reimer & Braunstein LLP, Boston, MA, for Appellee Bank of America, N.A.

William J. Brown of Phillips Lytle LLP, New York, NY, for Appellee HSBC Bank USA, National Association.

Andrew C. Gold of Herrick, New York, NY, for Appellee Bank Leumi.

Russell Lowell Reid of Sheppard Mullin Richter & Hampton, New York, NY, for Appellee Israel Discount Bank of New York.

Matthew Roseman of Cullen and Dykman, LLP, Garden City, NY, for Appellee Antwerpse Diamantbank, N.V.

Michael T. Conway of LeClairRyan, New York, NY, for Appellees Sovereign Precious Metals, LLC and Sovereign Bank.

MEMORANDUM AND ORDER

**RICHARD J. SULLIVAN**, District Judge.

Buchwald Capital Advisors, LLC, which serves as Trustee of the MFS GUC Trust ("Appellant" or the "GUC Trust"), appeals from the January 25, 2011 Order of the Honorable Stuart M. Bernstein, Bankruptcy Judge, granting in part and denying in part the motion of the defendant banks [1] (collectively, "Appellees" or the "Banks") to dismiss Appellant's Third Amended Complaint in its adversary proceeding. For the reasons set forth below, the Court affirms the Bankruptcy Court's Order in its entirety.

[1]    Appellees are JP Morgan Chase Bank, N.A. ("JPMC"); ABN AMRO Bank N.V. ("ABN"); Bank of America, N.A.; HSBC Bank, National Association ("HSBC"); Bank Leumi USA ("Bank Leumi"); Israel Discount Bank of New York ("IDB"); Antwerpse Diamantbank, N.V. ("ADB"); Sovereign Precious Metals LLC ("SPM"); and Sovereign Bank ("Sovereign").

## I. BACKGROUND

Debtors M. Fabrikant & Sons ("MFS") and Fabrikant–Leer International ("FLI") (collectively, "Debtors") each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on November 17, 2006. Both debtors are jewelry companies owned or controlled by members of the Fortgang family. *In re M. Fabrikant & Sons, Inc.* ("*Fabrikant III*"), 447 B.R. 170, 176–77 (Bankr.S.D.N.Y.2011). In 2007, the unsecured creditors' committee, succeeded by Appellant pursuant to the Plan of Liquidation, filed suit against the Banks, secured creditors of the Debtors, alleging fraudulent conveyance. Specifically, Appellant alleges that the Banks participated **\*484** in a scheme whereby they made secured loans to Debtors, knowing that the proceeds of the loans would subsequently be fraudulently transferred to several companies (collectively, the "Affiliates") that were owned or controlled by members of the Fortgang family but which, for the most part, did not own and were not owned by the Debtors. Additionally, Appellant seeks recovery of funds that it alleges MFS fraudulently transferred to various Affiliates and were subsequently reconveyed to certain Banks. Finally, Appellant seeks recovery of alleged preferential payments made to the Banks within ninety

days of the petition date. (*See generally* Third Amended Complaint ("TAC")).

On October 10, 2008, the Bankruptcy Court granted in part and denied in part the Banks' motion to dismiss the Amended Complaint. *In re M. Fabrikant & Sons, Inc.* ("*Fabrikant I*"), 394 B.R. 721 (Bankr.S.D.N.Y.2008). Thereafter, Appellant filed a Second Amended Complaint, which the Bankruptcy Court again dismissed in part. *In re M. Fabrikant & Sons, Inc.* ("*Fabrikant II*"), No. 06–12737(SMB), 2009 WL 3806683 (Bankr.S.D.N.Y. Nov.10, 2009). Appellants then filed their TAC. Once again, the Bankruptcy Court dismissed the TAC in part. *Fabrikant III*, 447 B.R. 170. Appellant appealed from *Fabrikant III* on April 19, 2011 and filed its brief on May 31, 2011. The appeal was fully submitted as of August 3, 2011.

## II. LEGAL STANDARDS

District courts are vested with appellate jurisdiction over bankruptcy court rulings pursuant to 28 U.S.C. § 158(a)(1). Specifically, "Congress intended to allow for immediate appeal in bankruptcy cases of orders that finally dispose of discrete disputes within the larger case." *In re Fugazy Exp., Inc.,* 982 F.2d 769, 775 (2d Cir.1992) (internal quotation marks omitted). Where, as here, a bankruptcy court has dismissed a complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6), the district court reviews the bankruptcy court's conclusions of law *de novo. In re Bennett Funding Grp.,* 146 F.3d 136, 138 (2d Cir.1998).

Federal Rule of Civil Procedure 8(a) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." In order to survive a motion to dismiss, a complaint must "provide the grounds upon which his claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007). Plaintiffs must also allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Conversely, a pleading that only offers "labels and

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.    5

conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955. If the plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Id.* In reviewing a motion to dismiss, pursuant to Rule 12(b)(6), the Court must accept as true all factual allegations in the Complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns,* 493 F.3d at 98.

However, all averments of fraud must be "state[d] with particularity." Fed.R.Civ.P. 9(b). Thus, to comply with the heightened pleading standard of Rule 9(b), a plaintiff must: "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state **\*485** where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.,* 375 F.3d 168, 187 (2d Cir.2004) (citing *Harsco Corp. v. Segui,* 91 F.3d 337, 348 (2d Cir.1996)). Additionally, although Rule 9(b) relaxes the specificity requirement for scienter, that "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *In re Carter–Wallace, Inc., Sec. Litig.,* 220 F.3d 36, 39 (2d Cir.2000) (internal quotations and citations omitted). A complaint still must "allege facts that give rise to a strong inference of fraudulent intent." *Id.*

## III. DISCUSSION

The GUC Trust appeals the Bankruptcy Court's dismissal of: (1) Counts I–IV (the " 'Collapsing' Fraudulent Conveyance Claims"); (2) Counts VIII–X (the "Subsequent Fraudulent Conveyance Claims") with respect to their claims of *intentional* fraudulent conveyance; (3) Count XI (the "Preference Claims"); and (4) Count XII (the "Disallowance Claim") of the TAC. The Court addresses each in turn.

### A. Counts I–IV: "Collapsing" Fraudulent Conveyance Claims

Counts I–IV of the TAC allege that, beginning in 2003, the Banks knowingly made numerous secured loans to Debtors, and Debtors subsequently reconveyed the proceeds of those loans to the Affiliates for less than

reasonably equivalent value. According to Appellant, Debtors' dealings with the Banks and the Affiliates should be collapsed and viewed as a single transaction. And, because Debtors did not retain the loan proceeds, Appellants contend that the conveyance of liens from Debtors to the Banks was a fraudulent transfer, in violation of 11 U.S.C. §§ 544, 548, and New York law.[2]

[2]    Specifically, Count I seeks to avoid obligations incurred by the Debtors to the Banks from January 2003 to the petition date pursuant to 11 U.S.C. § 544 and N.Y. D.C.L. § 276; Count II seeks to avoid obligations incurred by FLI from January 2005 to the petition date, pursuant to 11 U.S.C. § 548; Count III seeks to avoid obligations incurred by MFS from January 2005 to the petition date, pursuant to 11 U.S.C. § 548; and Count IV seeks to avoid the security interests and liens that secured all of those obligations from October 2004 until the Banks sold their claims, pursuant to 11 U.S.C. §§ 544, 548, and 550.

### 1. Applicable Law

Pursuant to 11 U.S.C. § 548, a transfer made or obligation incurred within two years of the petition date may be avoided as intentionally or actually fraudulent if it was made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." 11 U.S.C. § 548(a)(1)(A). Alternatively, a transfer is constructively fraudulent if the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation; and was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation." *Id.* § 548(a)(1)(B).[3]

[3]    Similarly, a transfer for less than reasonably equivalent value is constructively fraudulent if the debtor: "was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; [or] intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured." 11 U.S.C. § 548(a)(1)(B)(ii)(I)-(III).

**\*486** Similarly, under New York Debtor and Creditor Law section 276, a conveyance made or obligation incurred "with actual intent, as distinguished from intent

presumed in law, to hinder, delay, or defraud either present or future creditors" is fraudulent; under section 273, a conveyance or obligation is "fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." [4]

[4]    Section 544(b) of the Bankruptcy Code provides a cause of action to avoid transfers that are fraudulent under applicable state law.

[1]    [2]    In this case, because the amount of the loans that Debtors received is roughly equivalent to the value of the liens that they gave the Banks in return, there is no allegation that these transactions were, standing alone, fraudulent conveyances. (Appellant Br. 15.) However, Appellant argues that when the transactions between the Banks and Debtors and the transactions between Debtors and the Affiliates are collapsed, the liens given to the Banks are fraudulent conveyances. (Id.) In order to collapse two transactions and treat them as a single transaction under fraudulent conveyance law, a plaintiff must establish that: (1) a party gave the debtor fair value in exchange for the debtor's property, but the debtor then gratuitously reconveyed what it received to a third party, taking nothing in return; and (2) the party to the transaction with the debtor that is sought to be avoided, "must have [had] actual or constructive knowledge of the entire scheme that renders [its] exchange with the debtor fraudulent." *HBE Leasing Corp. v. Frank,* 48 F.3d 623, 635 (2d Cir.1995). The Court proceeds to consider whether the Bankruptcy Court correctly concluded that Appellant failed to plead either required element.

## 2. Whether the Trustee Adequately Pleaded That the Loans Were Reconveyed

On appeal, Appellant argues that the TAC contains sufficient factual allegations to collapse the transactions and that the Bankruptcy Court improperly drew inferences in favor of the Banks, rather than GUC Trust, when it held otherwise. (Appellant's Br. 20–21 & n. 14.) Specifically, the Trustee takes issue with the Bankruptcy Court's focus on the TAC's failure to allege specific pairings of transactions between the Banks and Debtors on the one hand, and Debtors and the Affiliates on the other. (Id. at 19.)

[3]    In order to bring a collapsing fraudulent conveyance claim, a plaintiff must identify a set of transfers that can be said to constitute a unified scheme to defraud creditors of the debtor. *HBE Leasing,* 48 F.3d at 635; *see Orr v. Kinderhill Corp.,* 991 F.2d 31, 35–36 (2d Cir.1993). The question, then, is whether a series of transactions amounted to a "single, integrated transaction," where the debtor was in effect an intermediary who made a "gratuitous transfer" to a third party of the value it had received. *Orr,* 991 F.2d at 35–36. Following the Second Circuit's instructions, the Bankruptcy Court in *Fabrikant II* identified what it viewed as the "fundamental flaw" in the Trustee's legal theory: namely, that the Trustee sought to recover the "unpaid balance of all loans" that had been extended by the Banks rather than an amount based on an aggregation of the specific transfers it alleged were fraudulent. *Fabrikant III,* 447 B.R. at 184. According to the Bankruptcy Court, "[i]t was implausible to contend that every transfer from the debtors to the ... Affiliates was fraudulent" because, among **\*487** other reasons, it appeared from the pleadings that Debtors actually owed the Affiliates money and, therefore, engaged in various clearly legitimate transactions. *Id.* Thus, in *Fabrikant II,* the Bankruptcy Court granted the Trustee leave to amend and directed the Trustee to identify specific transfers that might be properly "collapsed" upon repleading. *Id.* at 185.

Nevertheless, Appellant failed to comply with this directive and, in *Fabrikant III,* Judge Bernstein again found that the TAC failed to "allege that a particular Lending Bank made a specific advance that was subsequently reconveyed fraudulently with that Lending Bank's knowledge or consent." *Id.* at 191. The Bankruptcy Court concluded that, by not pleading pairs of loans made by the Banks to Debtors with conveyances from Debtors to the Affiliates, the TAC did not allege any transfers that were part of a single scheme. [5] *Id.* at 191. The Court agrees.

[5]    Judge Bernstein noted that the Trustee represented at oral argument that the transactions listed in paragraph 61 of the TAC did not involve loans to Affiliates that were the subject of the scheme; accordingly, the Court disregards this paragraph, as Appellants requested.

Rather than identify pairs of transactions that actually amounted to integrated, fraudulent transfers—as case law requires and the Bankruptcy Court clearly directed—Appellant merely asserts that the transactions between

the Banks and the Debtors, in the aggregate, resulted in a net loss to Debtors. (*See, e.g.,* TAC ¶¶ 44, 58–59.) Clearly, more is required to state a collapsing fraudulent conveyance claim. As the Bankruptcy Court recognized, the Trustee's "net transfer theory only makes sense when all of the transfers are presumptively fraudulent, as in the case of a Ponzi scheme." *Fabrikant II,* 2009 WL 3806683, at \*13 n. 19 (citation omitted). However, the Trustee "does not state or imply that Fabrikant was run as a Ponzi scheme." *Id.*

[4]    In essence, Appellant alleges that the TAC states a claim because the Debtors reconveyed *some* portion of the loan proceeds that they received from the Banks to the Affiliates without receiving anything in return. (Appellant Br. 19; *e.g.,* TAC ¶¶ 6, 75.) While Appellant need not show a perfectly matched flow of consideration from the Banks to the Affiliates via Debtors—*i.e.,* a five-million-dollar loan from the Banks to Debtors and a five-million-dollar transfer from Debtors to the Affiliates, without receiving value in return—Appellant nonetheless must identify specific transactions in which some portion of loan proceeds that Debtors received were gratuitously reconveyed to Affiliates as part of a single transaction. *See HBE Leasing,* 48 F.3d at 635. For largely the reasons explained in *Fabrikant III,* Appellants have failed to do so. *See Fabrikant III,* 447 B.R. at 189–93.

Nevertheless, Appellant asserts that the claims should proceed because resolving the particular loans made by the Banks that were improperly reconveyed to the Affiliates can be done on the merits following discovery. (Appellant Br. 27.) However, while Appellant is correct that *Twombly* did not impose a "probability requirement" and requires only that a claim be plausible, the allegations in the TAC do not *plausibly* establish that loans from the Banks were reconveyed to Affiliates as part of a single transaction. Because the TAC does not match any loans, from the Banks to Debtors, to transfers, from Debtors to the Affiliates, the TAC offers only conclusions without factual support that these transactions should be collapsed.

**\*488**    Moreover, the implausibility of Appellant's assertion that these transactions should be collapsed is all the more apparent in view of the fact that the TAC states, and Appellant concedes in its brief, that "some portion of [the Banks'] loans were used for the legitimate purchase and sale of jewelry or other corporate

activities." (Appellant Br. at 19; *see* TAC ¶¶ 45.) For those transfers from Debtors to the Affiliates that were supported by consideration, there is no basis for finding that the liens given by Debtors to the Banks should be avoided as fraudulent conveyances. *See* 11 U.S.C. § 548(a); *In re NextWave Personal Commc'ns, Inc.,* 200 F.3d 43, 56 (2d Cir.1999) ("Under the avoidance provisions of the [Bankruptcy] Code, a transfer or obligation is or is deemed to be a fraudulent conveyance —and therefore avoidable—if the debtor received less than a reasonably equivalent value in exchange for such transfer or obligation." (citation and internal quotation marks omitted)); *In re Old CarCo LLC,* No. (DLC), 2011 WL 5865193, at \*7 (S.D.N.Y. Nov. 22, 2011). By acknowledging that at least some of the transfers from Debtors to the Affiliates were in fact for reasonably equivalent value, the TAC essentially undercuts the notion that the transactions at issue constituted a unified scheme to defraud Debtors' creditors.

Accordingly, because the TAC does not allege that any particular loans from the Banks were gratuitously reconveyed to the Affiliates, the Court finds that the facts alleged in the TAC do not plausibly suggest that these transactions should be collapsed, and the Bankruptcy Court properly dismissed the "Collapsing" Fraudulent Transfer Claims.

### 3. Whether the Banks had Knowledge

The "Collapsing" Fraudulent Conveyance Claims additionally fail because the TAC does not provide factual support for the contention that the Banks were *actually* or *constructively* aware that Debtors would reconvey the loan proceeds to the Affiliates for less than reasonably equivalent value. *See HBE Leasing,* 48 F.3d at 635.

First, the TAC offers no facts to support the claim that the Banks had actual knowledge beyond the wholly conclusory assertion that the Banks were "intimately involved in the formulation or implementation of the plan by which the proceeds of the loan were channeled to the third-party," *In re Sunbeam Corp.,* 284 B.R. 355, 370 (Bankr.S.D.N.Y.2002); (TAC ¶ 79), or that the Banks otherwise had actual knowledge of the alleged fraudulent scheme. Such a "formulaic recitation" of the elements of the cause of a fraudulent conveyance claim will not suffice

to meet the federal pleading standard. *See Twombly,* 550 U.S. at 570, 127 S.Ct. 1955.

**[5]  [6]**  Similarly, the TAC also fails to allege that the Banks had constructive knowledge of the alleged scheme. In determining whether constructive notice has been established, courts have looked to "red flags" that should have put the grantee on notice of potential fraud. *In re Bayou Grp., LLC,* 439 B.R. 284, 314 (S.D.N.Y.2010). However, signals of general "infirmities" in a company, which could merely reflect "a poor business model, incompetent management, ... insufficient capital, and a host of other deficiencies" other than fraud, are inadequate to trigger inquiry notice. *Id.* The TAC alleges that, as a general matter, the Banks were aware of the Debtors' finances, the volume of their transactions with the Affiliates, and that the Affiliates were, by and large, unrelated to Debtors. (TAC ¶¶ 79, 80–83, 85–87, 89, 118–119.) The TAC also alleges that transfers to the Affiliates were poorly documented and inconsistent with "standard business practices," with ledger entries often not showing maturity dates **\*489** or collateral provided to secure advances. (*Id.* ¶¶ 45–46, 54–55, 60.) Additionally, the TAC alleges that the Banks treated accounts receivable from the Affiliates differently from Debtors' other assets. (*See id.* ¶¶ 96, 98–101 (noting that various bank documents excluded accounts receivable from the Affiliates when determining the Debtors' "borrowing base" and represented that a large portion of those accounts were overdue).) In particular, the TAC alleges that Bank of America noted in 2005 that MFS had high leverage and marginal profitability relative to sales and that its accounts receivable collateral was "poor." (*Id.* ¶¶ 94, 102.) In 2004, ABN "identified a negative borrowing base between $3 and $16.6 million." (*Id.* ¶ 94.)

However, although these allegations could conceivably raise some doubts as to Debtors' financial stability, they hardly rise to the level of suggesting fraud. Indeed, the facts alleged in the TAC actually undermine the suggestion that the Banks knew or should have known that their loans would be funneled to the Affiliates while providing no benefit to Debtors. For example, the attachments to the TAC show large payments coming to Debtors from the Affiliates, some of which appear to far exceed the amount being transferred from Debtors to the Affiliates. (TAC Ex. C.) Moreover, as the Bankruptcy Court noted, a 2002 report produced by JPMC, and referenced in the TAC, revealed that MFS

owed the Affiliates far more than the Affiliates owed MFS. *Fabrikant III,* 447 B.R. at 183; (*see* TAC ¶¶ 96–97). Thus, it is far from obvious that the flow of cash from Debtors to the Affiliates should have alerted the Banks to the likelihood that Debtors were not benefiting from the loans or even that their relationship with the Affiliates was a net negative.

Moreover, Appellant's contention—that the Banks were aware of, but indifferent to, the fact that all of the Fortgang companies were simultaneously insolvent and simply shuffling money around to meet short-term obligations—requires an inference that is highly implausible, bordering on the absurd. In essence, Appellant alleges that the Banks took the massive risk of continuing their lending relationships with the Fortgang companies (*id.* ¶¶ 109–114) on the speculative hope that "there may be sufficient liquidity in the 'Fabrikant Empire' ... as a whole to enable the Banks to obtain repayment" through personal guarantees and "other pressure" (*id.* ¶¶ 78, 108, 122–123). Such an assertion would be nonsensical if the Banks were in fact aware that Debtors and the Affiliates had to use the same dollars to repay separate obligations. Put simply, drawing all inferences in favor of Appellant, it is difficult to see what benefit the Banks could hope to obtain by lending ever-larger amounts of money to failing companies. The TAC's wholly conclusory allegations that the Banks were "[c]louded in judgment due to lavish commissions" (*id.* ¶ 78) is equally implausible, since the loss of principal would have far outweighed the commissions earned on the loans, *cf., e.g., Pungitore v. Barbera,* No. 11 Civ. 6249(VB), 2012 WL 2866293, at \*4 (S.D.N.Y. Mar. 29, 2012) (declining to draw implausible inference proffered by plaintiff and instead dismissing claims based on far more plausible inference drawn from the facts alleged in the complaint).

Considering the TAC in its entirety, the Court has little difficulty concluding that Appellants have failed to allege constructive knowledge on the part of the Banks. Instead, the far more plausible inference is that the Banks were confident that Debtors could continue operating based on the overall strength of the Fortgang companies. Consistent with this inference, Bank Leumi's note in 2002 that a weak Affiliate might nonetheless be creditworthy because it was " 'under the umbrella' of the M. Fabrikant Group" (TAC ¶ 106), suggests **\*490** not a nefarious ploy, but confidence—however misguided —that the companies continued to be creditworthy.

Likewise, that SPM believed MFS to be creditworthy based on MFS's "demonstrated liquidity" (*id.* ¶ 111)—an apparent reference to its year-end "cleanup" payments on its open lines of credit—makes no sense if SPM understood that MFS repaid its loans by means of an elaborate shell game. In short, the TAC fails to allege plausibly that the Banks were even aware of the alleged scheme as a *general* matter, much less that they were aware either that any particular advance would be fraudulently conveyed or that the scheme was so pervasive that fraudulent reconveyance was likely.

Moreover, the TAC alleges that as of 2006—the year when Debtors filed their bankruptcy petitions—the Banks believed that they had extended too many loans to Debtors and that intercompany lending was problematic. (*Id.* ¶¶ 94, 104.) That these communications were in connection with "the debtors' attempts to maintain [their] credit facility" (*id.*) suggests that the Banks realized *at that time,* and not before, that the Debtors might be insolvent.

Additionally, even if the allegations were sufficient with respect to *some* of the Banks, Appellant repeatedly conflates all of the Banks in the TAC, such as where it alleges that the loans "funded fraudulent transfers to the ... Affiliates of which the Banks were themselves creditors"—even though only four of the banks had lending relationships with the Affiliates—and that "the Banks" relied on liquidity in the "Fabrikant Empire" as a whole for repayment. (*Id.* ¶¶ 120, 122–123, 126.) Appellant's tenuous theory as to the Banks' motive as a group is even more implausible with regard to the Banks that have no alleged relationship with the Affiliates and, thus, apparently were participating in a scheme to defraud themselves based on Appellant's assertions. Appellant has utterly failed to plead a plausible cause of action against *each* Bank, relying instead on sweeping and conclusory allegations that the lenders "operated as a single syndicate of lenders." (*Id.* ¶ 91.)

Accordingly, the Court finds that the TAC fails to plausibly allege that the Banks were aware, actually or constructively, that Debtors would reconvey the loan proceeds to the Affiliates for less than reasonably equivalent value. Therefore, the Court affirms the Bankruptcy Court's dismissal with prejudice of Counts I through IV because the TAC does not plausibly allege either required element of a collapsible fraudulent conveyance.

### B. Counts VIII–X: Subsequent Fraudulent Transfer Claims

Counts VIII, IX, and X allege that MFS transferred funds to the Affiliates for less than reasonably equivalent value and that the Affiliates reconveyed those funds to ABN, IDB, HSBC, and Sovereign.

**[7]** **[8]** **[9]**    As noted above, pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, a party alleging fraud must "state with particularity the circumstances constituting fraud." "'Since '[i]t is a serious matter to charge a person with fraud,' a plaintiff is not permitted to do so 'unless he is in a position and is willing to put himself on record as to what the alleged fraud consists of specifically.' " *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.,* 216 F.Supp.2d 198, 221 (S.D.N.Y.2002) (quoting *Segal v. Gordon,* 467 F.2d 602, 607 (2d Cir.1972)). Accordingly, in order to adequately allege intentional fraudulent conveyance consistent with Rule 9(b), a complaint must specify "the property that was allegedly conveyed, the timing and frequency of those allegedly fraudulent conveyances, [and] the consideration paid." *Id.; see also* **\*491** *Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp.,* No. 04 Civ. 4971(NG)(MDG), 2006 WL 2802092, at \*9 (E.D.N.Y. Sept. 28, 2006) (dismissing claims of intentional fraudulent conveyance where complaint did "not identify how many transfers plaintiff is challenging or the specific dates and amounts of those transfers" and instead "aggregate[d] the transfers into lump sums over three to five year time periods").

**[10]**    Appellant asserts that Debtors' payments to several different entities over the course of nearly a year, or two years with respect to Affiliate VSI, LLC, constitute "granular detail" sufficient to satisfy Rule 9(b)'s pleading standard. (Appellant Br. 31.) However, the sole case that they cite for the proposition that individual payments need not be identified, *S.E.C. v. Feminella,* 947 F.Supp. 722, 732–33 (S.D.N.Y.1996), arose in the securities context and appears inconsistent with more recent precedent applicable to fraudulent conveyance claims, *see, e.g.,* *United Feature Syndicate,* 216 F.Supp.2d at 221 (dismissing fraudulent conveyance claim under Rule 9(b) that did "not specify the property that was allegedly conveyed, the timing and frequency of those allegedly fraudulent conveyances, or the consideration paid").

Thus, the Court agrees with the Bankruptcy Court that Appellant's failure to identify in the TAC the dates and amounts of particular transfers alleged to be fraudulent is fatal to any claim for intentional fraudulent conveyance. Accordingly, the Court affirms the Bankruptcy Court's dismissal of Counts VIII, IX, and X with prejudice.

### C. Count XI: Preference Claims

Count XI seeks recovery of numerous transfers made by Debtors to the Banks within ninety days of the filing of its bankruptcy petition. The Bankruptcy Court, relying primarily on its opinion in *Fabrikant II,* determined, first, that Appellant lacked standing to raise the Preference Claims, and, further, that, even if Appellant had standing, the Preference Claims were untimely.

**[11]** The Court agrees that the Preference Claims were untimely. Pursuant to the Bankruptcy Court's Final Order Authorizing Debtors' Use of Cash Collateral and Granting Adequate Protection Claim and Lien (the "Final Cash Collateral Order" or "FCCO"), the deadline for filing avoidance claims was October 1, 2007. Notwithstanding that firm deadline, Appellant failed to assert the Preference Claims until it filed its Second Amended Complaint on December 1, 2008—more than a year after the deadline. *Fabrikant III,* 447 B.R. at 181.

Appellant argues that the FCCO merely prevented the GUC Trust from initiating *new* adversary proceedings after the deadline. (Appellant's Br. 34–35.) Appellant further argues that "[t]he preferential payments made by the Debtors were among these precise transfers that the Trustee originally sought recovery of on fraudulent conveyance grounds" in the first complaint and, therefore, the claims relate back to the filing date of the original Complaint pursuant to Federal Rule of Civil Procedure 15. (*Id.* at 35.)

**[12]** The FCCO provides in relevant part that the Creditors' Committee (Appellant's predecessor in interest) had until October 1, 2007 "to commence an adversary proceeding against any of the Lender Parties for the purpose of", *inter alia,* filing avoidance claims. [6] (No. 07– **\*492** 2780(SMB), Doc. No. 16–2, ¶ 22.) The FCCO further provides that "[t]he Committee shall be barred forever from commencing a Challenge if the Committee has failed to do so within such stated time period." (*Id.*)

Although it is true that Appellant filed *an* adversary proceeding against Appellees within the stated time period, the Court does not read the FCCO to mean that Appellant's filing of *any* complaint against Appellees before the deadline opened the door to later amendments to bring in wholly separate claims. Instead, the most logical reading of the FCCO is that no *new* avoidance claims can be raised after October 1, 2007. Holding otherwise would be inconsistent with the rule that, in avoidance litigation, each transfer is treated as a separate transaction for purposes of applying the "relation back" doctrine. *See In re 360networks ( USA) Inc.,* 367 B.R. 428, 434 (Bankr.S.D.N.Y.2007) ("[A] preference action based on one transfer does not put defendant on notice of claims with respect to any other unidentified transfers.").

[6]  Specifically, the FCCO provides that the Committee may file such suits "through and until the earlier of the one hundred and twentieth (120th) day following the date on which notice of its appointment is filed by the U.S. Trustee (or the first business day thereafter if such day is not a business day)." (No. 07–2780(SMB), Doc. No. 16–2, ¶ 22.) The parties do not appear to disagree that such date is October 1, 2007. (*See* Appellants' Br. 35.)

**[13]  [14]  [15]  [16]**   Of course, a time-barred claim may be raised in an amendment and related back to the date of the timely complaint if "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed.R.Civ.P. 15(c)(1)(B). In order for an amendment to relate back to an earlier pleading, that earlier pleading must have "put the defendants ... on notice of what must be defended against in the amended pleadings." *Barr v. Charterhouse Grp. Int'l, Inc.,* 238 B.R. 558, 573–74 (Bankr.S.D.N.Y.1999) (citations omitted); *see also Adelphia Recovery Trust v. Bank of Am., N.A.,* 624 F.Supp.2d 292, 333–34 (S.D.N.Y.2009). Additional legal theories may be added later, but the earlier pleading "must inform the defendants of the facts that support those new claims." *Barr,* 238 B.R. at 574. Although a plaintiff need not set forth "an intricately detailed description of the asserted basis for relief, ... the pleadings [must] 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " *Baldwin Cnty. Welcome Ctr. v. Brown,* 466 U.S. 147, 149 n. 3, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Thus, an amendment will relate back if the

transactions arose from the same course of business and involve the same evidence, even if new legal theories are asserted. *White v. White Rose Food,* 128 F.3d 110, 116 (2d Cir.1997); *see also In re Global Crossing, Ltd.,* 385 B.R. 52, 65 n. 16 (Bankr.S.D.N.Y.2008) (finding that fraudulent conveyance claim related back to preference claim where both involved "claims under section 550 to recover the $20 million paid just before the Debtors' bankruptcy filing, at a time when [the debtor] was allegedly insolvent" and, therefore, arose out of the same "transaction or occurrence"). On the other hand, if the transaction is different in kind from those originally alleged, or if new facts and transactions are alleged, the new allegation does not relate back. *In re Metzeler,* 66 B.R. 977, 983 (Bankr.S.D.N.Y.1986).

[17]  [18]  Moreover, the law is clear that each preferential and fraudulent transaction is treated separately and distinctly. *Id.* at 984; *see also 360networks,* 367 B.R. at 429. Proof offered for one transaction does not govern as to another and, as such, relation back cannot be ordered between different transactions merely for being similar or arising from the same conduct. *Metzeler,* 66 B.R. at 984. The "mere allegation" that all of the transactions are fraudulent does not make them part of the same conduct. *Id.* at 983.

**\*493**  In the instant case, the original Complaint alleges only that "[f]rom October 2004 until it sold its claim, the defendants received liens and security interests and *proceeds thereof* from Fabrikant to secure the fraudulent obligations previously alleged." (Compl. ¶ 71 (emphasis added).) Plaintiff does not identify any other reference within the original Complaint to transfers from Debtors to the Banks that could encompass the Preference Claims. (Appellant's Br. 35.) [7]

[7]    The Complaint also alleges that on January 13, 2006, FLI guaranteed MFS's debt, and, on July 7, 2006, the Debtors incurred an obligation to Sovereign on account of MFS's purchase of gold. (Compl.¶¶ 34–39.) However, neither of these transactions took place within ninety days of Debtors' bankruptcy petition, and, therefore, those allegations could not have put the Banks on notice of possible Preference Claims.

[19]  The general allegation that transfers from October 2004 until Appellees sold their claims were fraudulent fails to identify any particular objectionable transactions. Overly general original pleadings do not provide defendants with adequate notice as to what facts they are to defend against, and, therefore, such general allegations cannot be hooks on which to hang later amended pleadings. *See, e.g., Fair Hous. in Huntington Comm. v. Town of Huntington,* No. 02–CV–2787 (DRH), 2010 WL 2730757, at *7 (E.D.N.Y. July 8, 2010) (finding that the original Complaint's general reference to the town's "ongoing exclusionary housing practices" was insufficient to place defendants on notice for all future alleged discriminatory acts with regard to housing within the town).

[20]  Although "Rule 15(c) [is] to be liberally construed, particularly where an amendment does not allege a new cause of action but merely ... make[s] defective allegations more definite and precise," *Siegel v. Converters Transp., Inc.,* 714 F.2d 213, 216 (2d Cir.1983) (quotation marks and citation omitted), the TAC does not provide more specificity to cure a defective allegation; rather, it alleges a new cause of action and reaches for a general hook to hang it on. Accordingly, the Preference Claims do not relate back to the original Complaint—the only timely pleading —and thus were properly dismissed by the Bankruptcy Court.

Because the Court affirms dismissal of Count XI on timeliness grounds, the Court need not consider the Bankruptcy's determination that Appellant lacked standing to raise the Preference Claims.

### D. Count XII: Disallowance Claim

Count XII of the TAC seeks disallowance of Appellees' claims based on the allegations of fraudulent conveyances and preferences. Accordingly, Count XII rises and falls with the above-discussed claims. (Appellant Br. 36.) The Bankruptcy Court dismissed Count XII as against JPMC, Bank of America, HSBC, Bank Leumi, and ADB with prejudice; however, it dismissed the claim as against Sovereign and SPM, with leave to replead based on its dismissal without prejudice of Count VII, and denied the motion as to ABN and IDB. *Fabrikant III,* at 196–97.

Because the Court has affirmed the Bankruptcy Court's rulings on the fraudulent conveyance and Preference Claims, the Court also affirms the Bankruptcy Court's dismissal with prejudice of Count XII as to JPMC, Bank of America, HSBC, Bank Leumi, and ADB.

**\*494** the TAC. The Clerk of the Court is respectfully directed to close this case.

## IV. CONCLUSION

For the foregoing reasons, the Court affirms the Bankruptcy Court's January 25, 2011 order granting in part and denying in part the Banks' motion to dismiss

SO ORDERED.

**All Citations**

480 B.R. 480

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 2

🚩 KeyCite Yellow Flag - Negative Treatment
Declined to Extend by U.S. v. Ovid, E.D.N.Y., June 8, 2012

44 S.Ct. 424
Supreme Court of the United States.

CUNNINGHAM

v.

BROWN et al.

No. 213.
|
Argued March 12, 1924.
|
Decided April 28, 1924.

On Certiorari to the Circuit Court of Appeals for the First Circuit.

Separate suits in equity by James A. Lowell and others, trustees in bankruptcy of Charles Ponzi, against Benjamin Brown, against H. W. Crockford, against Patrick W. Horan, against Frank W. Murphy, and against Thomas Powers, respectively. All the trustees died pending the litigation, and Henry V. Cunningham was substituted for the last survivor. Decrees for defendants (280 Fed. 193) were affirmed by the Circuit Court of Appeals (284 Fed. 936), and the trustee brings certiorari. Reversed.

West Headnotes (5)

**[1]**    **Bankruptcy**
🔑 Property Held by Debtor as Trustee, Agent, or Bailee

Bankrupt's defrauded creditors can follow their money wherever they can trace it, and assert possession of it on the ground that there was a resulting trust in their favor, or they can establish a lien for what was due them in any particular fund, of which he has made it a part, without violating the bankruptcy rule against preference.

115 Cases that cite this headnote

**[2]**    **Bankruptcy**

🔑 Preferences

Where it was impossible to trace the money of bankrupt's defrauded creditors, they became merely creditors to the extent of their loss, and payment of their claims by bankrupt within the prescribed four months is a preference.

34 Cases that cite this headnote

**[3]**    **Bankruptcy**
🔑 Preferences

A defrauded minor, to whom bankrupt has made a payment, is in no better situation than adults in like situation, as a minor is not exempt from the defeat of an unlawful preference by Bankruptcy Act, § 60b, as amended by Act June 25, 1910, § 11 (Comp.St. § 9644).

1 Cases that cite this headnote

**[4]**    **Bankruptcy**
🔑 Nature of Transfer

Where numerous creditors loaned bankrupt money, accepting his notes promising them at the end of 90 days $150 for every $100 loaned, or to pay unmatured notes at par of the actual loan, creditors who took advantage of the agreement to pay before maturity, after they had reason to believe that bankrupt was insolvent, secured "voidable preferences," under Bankruptcy Act, § 60b, as amended by Act June 25, 1910, § 11 (Comp.St. § 9644).

70 Cases that cite this headnote

**[5]**    **Trusts**
🔑 Mutual Rights and Liabilities of Cestuis Que Trust

**Trusts**
🔑 Effect of Payments or Withdrawals from Commingled Funds

Where the fund with which wrongdoer is dealing is wholly made up of fruits of frauds perpetrated against a myriad of victims, the rule that the first withdrawals from a fund, in which were mingled the moneys of several defrauded claimants insufficient to satisfy

them all, are charged against the first deposits, and claimants are entitled to be paid in the inverse order in which their moneys went into the account, has no application.

84 Cases that cite this headnote

**Attorneys and Law Firms**

**\*\*425  \*2** Mr. Edward F. McClennen, of Boston, Mass., for petitioner.

Mr. John H. Devine, of Boston, Mass., for respondents Crockford and others.

**\*4** Mr. Louis Goldberg, of Boston, Mass., for respondent Brown.

**Opinion**

**\*7** Mr. Chief Justice TAFT delivered the opinion of the Court.

These were six suits in equity brought by the trustees in bankruptcy of Charles Ponzi to recover of the defendants sums paid them by the bankrupt within four months prior to the filing of the petition in bankruptcy on the ground that they were unlawful preferences. All the trustees have died or resigned pending the litigation, and Cunningham, having been substituted for the last survivor, is now the sole trustee. The actions were tried together in the District Court, and were argued together in the Circuit Court of Appeals, and all the bills were dismissed in both courts. The facts and defenses are the same in all the cases, except that, in that of Benjamin Brown, there was an additional defense that he was a minor when the transactions occurred. We have brought the cases into this court by writ of certiorari.

The litigation grows out of the remarkable criminal financial career of Charles Ponzi. In December, 1919, with a capital of $150, he began the business of borrowing money on his promissory notes. He did not profess to receive money for investment for account of the lender. He borrowed the money on his credit only. He spread the false tale that on his own account he was engaged in buying international postal coupons in foreign countries and selling them in other countries at 100 per cent. profit, and that this was made possible by the excessive differences in the rates of exchange following the war. He was willing, he said, to give others the opportunity to share with him this profit. By a written promise in 90 days to pay them $150 for every $100 loaned, he induced thousands to lend him. He stimulated their avidity by **\*8** paying his 90-day notes in full at the end of 45 days, and by circulating the notice that he would pay any unmatured note presented in less than 45 days at 100 per cent. of the loan. Within eight months he took in $9,582,000, for which he issued his notes for $14,374,000. He paid his agents a commission of 10 per cent. With the 50 per cent. promised to lenders, every loan paid in full with the profit would cost him 60 per cent. He was always insolvent, and became daily more so, the more his business succeeded. He made no investments of any kind, so that all the money he had at any time was solely the result of loans by his dupes.

The defendants made payments to Ponzi as follows:

| | |
|---|---:|
| Benjamin Brown, July 20th............................................................................ | $ 600 |
| Benjamin Brown, July 24th............................................................................ | 600 |
| H. W. Crockford, July 24th............................................................................ | 1,000 |
| Patrick W. Horan, July 24th........................................................................... | 1,600 |
| Frank W. Murphy, July 22d........................................................................... | 600 |
| Thomas Powers, July 24th............................................................................. | 500 |
| H. P. Holbrook, July 22d............................................................................... | 1,000 |

By July 1st, Ponzi was taking in about $1,000,000 a week. Because of an investigation by public authority, Ponzi ceased selling notes on July 26th, but offered and continued to pay all unmatured notes for the amount originally paid in, and all matured notes which had run 45 days, in full. The report of the investigation caused a run on Ponzi's Boston office by investors seeking payment,

Cunningham v. Brown, 265 U.S. 1 (1924)

44 S.Ct. 424, 68 L.Ed. 873

and this developed into a wild scramble when, August 2d, a Boston newspaper, most widely circulated, declared Ponzi to be hopelessly insolvent, with a full description of the situation, written by one of his recent employees. To meet this emergency, Ponzi concentrated all his available money from other banks in Boston and New England in the Hanover Trust Company, a banking concern in Boston, which had been his chief depository. There was no evidence of any general **\*9** attempt by holders of unmatured notes to secure payment prior to the run which set in after the investigation July 26th.

The money of the defendants was paid by them between July 20th and July 24th and was deposited in the Hanover Trust Company. At the opening of business July 19th, the balance of Ponzi's deposit accounts at the Hanover Trust Company was $334,000. At the close of business July 24th it was $871,000. This sum was exhausted by withdrawals of July 26th of $572,000, of July 27th of $228,000, and of July 28th of $905,000, or a total of more than $1,765,000. In spite of this, the account continued to show a credit balance, because new deposits from other **\*\*426** banks were made by Ponzi. It was finally ended by an overdraft on August 9th of $331,000. The petition in bankruptcy was then filed. The total withdrawals from July 19th to August 10th were $6,692,000. The claims which have been filed against the bankrupt estate are for the money lent, and not for the 150 per cent. promised.

Both courts held that the defendants had rescinded their contracts of loan for fraud and that they were entitled to a return of their money; that other dupes of Ponzi who filed claims in bankruptcy must be held not to have rescinded, but to have remained creditors, so that what the latter had paid in was the property of Ponzi; that the presumption was that a wrongdoing trustee first withdrew his own money from a fund mingled with that of his cestui que trustent, and therefore that the respective deposits of the defendants were still in the bank and available for return to them in rescission; and that payments to them of these amounts were not preferences, but merely the return of their own money.

We do not agree with the courts below. The outstanding facts are not really in dispute. It is only in the interpretation of those facts that our difference of view arises.

**\*10** In the first place, we do not agree that the action of the defendants constituted a rescission for fraud and

a restoration of the money lent on that ground. As early as April, his secretary testifies that Ponzi adopted the practice of permitting any who did not wish to leave his money for 45 days to receive it back in full without interest, and this was announced from time to time. Two of the defendants expressly testified to this. It was reiterated in the public press in July and by the investigating public authorities. There is no evidence that these defendants were consciously rescinding a contract for fraud. Certainly Ponzi was not returning their money on any admission of fraud. The lenders merely took advantage of his agreement to pay his unmatured notes at par of the actual loan. Such notes were paid under his agreement exactly as his notes which were matured were paid at par and 50 per cent. The real transaction between him and those who were seeking him is shown by the fact that there were 500 to whom he gave checks in compliance with his promise, and who were defeated merely because there were no more funds.

The District Court found that, when these defendants were paid on and after August 2d, they had reason to believe that Ponzi was insolvent. The statute (section 60b of the Bankruptcy Act, as amended by Act June 25, 1910, c. 412, 36 St. 838, 842 [Comp. St. § 9644]), requires that, in order that a preference should be avoided, its beneficiary must have reasonable cause to believe that the payment to him will effect a preference; that is, that the effect of the payment will be to enable him to obtain a greater percentage of his debt than others of the creditors of the insolvent of the same class. The requirement is fully satisfied by the evidence in this case, no matter where the burden of proof. On the morning of August 2d, when news of Ponzi's insolvency was broadly announced, there was a scramble and **\*11** a race. The neighborhood of the Hanover Bank was crowded with people trying to get their money, and for eight days they struggled. Why? Because they feared that they would be left only with claims against an insolvent debtor. In other words, they were seeking a preference by their diligence. Thus they came into the teeth of the Bankruptcy Act, and their preferences in payment are avoided by it.

[2] [3] But, even if we assume that the payment of these unmatured notes was not according to the contract with Ponzi, and that what the defendants here did was a rescission for fraud, we do not find them in any better case. They had one of two remedies to make them whole. They could have followed the money wherever they could trace it and have asserted possession of it on the ground that there was a resulting trust in their favor, or they

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.    3

could have established a lien for what was due them in any particular fund of which he had made it a part. These things they could do without violating any statutory rule against preference in bankruptcy, because they then would have been endeavoring to get their own money, and not money in the estate of the bankrupt. But to succeed they must trace the money, and therein they have failed. It is clear that all the money deposited by these defendants was withdrawn from deposit some days before they applied for and received payment of their unmatured notes. It is true that by the payment into the account of money coming from other banks and directly from other dupes the bank account as such was prevented from being exhausted; but it is impossible to trace into the Hanover deposit of Ponzi after August 1st, from which defendants' checks were paid, the money which they paid him into that account before July 26th. There was, therefore, no money coming from them upon which a constructive trust, or an equitable lien could be fastened. Schuyler v. Little-field, 232 U. S. 707, 34 Sup. Ct. 466, 58 L. Ed. 806; In re *12 Mulligan (D. C.) 116 Fed. 715; In re Matthews' Sons, 238 Fed. 785, 151 C. C. A. 635; In re Stenning, [1895] 2 Ch. 433. In such a case, the defrauded lender becomes merely a creditor to the extent of his loss and a payment to him by the bankrupt within the prescribed period of four months is a preference. Clarke v. Rogers, 228 U. S. 534, 33 Sup. Ct. 587, 57 L. E. 953. In re Door, 196 Fed. 292, 116 C. C. A. 112; In re Kearney (D. C.) 167 Fed. 995.

[4] Lord Chancellor Eldon, in Clayton's **427 Case, [1816] Ch. 1 Merivale, 572, held that, in a fund in which were mingled the moneys of several defrauded claimants insufficient to satisfy them all, the first withdrawals were to be charged against the first deposits, and the claimants were entitled to be paid in the inverse order in which their moneys went into the account. Ponzi's withdrawals from his account with the Hanover Trust Company on July 26, 27, and 28 were made before defendants had indicated any purpose to rescind. Ponzi then had a defeasible title to the money he had received from them, and could legally withdraw it. By the end of July 28th he had done so, and had exhausted all that was traceable to their deposits. The rule in Clayton's Case has no application.

The courts below relied on the rule established by the English Court of Appeals in Knatchbull v. Hallett, L. R. 13 Ch. D. 696, in which it was decided by Sir George Jessel, Master of the Rolls, and one of his colleagues, that, where a fund was composed partly of a defrauded claimant's money and partly of that of the wrongdoer, it would be presumed that in the fluctuations of the fund it was the wrongdoer's purpose to draw out the money he could legally and honestly use rather than that of the claimant, and that the claimant might identify what remained as his res, and assert his right to it by way of an equitable lien on the whole fund, or a proper pro rata share of it. National Bank v. Insurance Co., 104 U. S. 54, 68, 26 L. Ed. 693; Hewitt v. Hayes, 205 Mass. 356, 91 N. E. 332, 137 Am. St. Rep. 448. To make the rule applicable here, we must infer that in the deposit and withdrawal *13 of more than $3,000,000 between the deposits of the defendants prior to July 28th, and the payment of their checks after August 2d, Ponzi kept the money of defendants on deposit intact and paid out only his subsequent deposits. Considering the fact that all this money was the result of fraud upon all his dupes, it would be running the fiction of Knatchbull v. Hallett into the ground to apply it here. The rule is useful to work out equity between a wrongdoer and a victim; but, when the fund with which the wrongdoer is dealing is wholly made up of the fruits of the frauds perpetrated against a myriad of victims, the case is different. To say that, as between equally innocent victims, the wrongdoer, having defeasible title to the whole fund, must be presumed to have distinguished in advance between the money of those who were about to rescind and those who were not, would be carrying the fiction to a fantastic conclusion.

After August 2d the victims of Ponzi were not to be divided into two classes, those who rescinded for fraud and those who were relying on his contract to pay them. They were all of one class, actuated by the same purpose to save themselves from the effect of Ponzi's insolvency. Whether they sought to rescind, or sought to get their money as by the terms of the contract, they were, in their inability to identify their payments, creditors, and nothing more. It is a case the circumstances of which call strongly for the principle that equality is equity, and this is the spirit of the bankrupt law. Those who were successful in the race of diligence violated not only its spirit, but its letter, and secured an unlawful preference.

[5] We do not see that a minor whose money could not be identified is in a better situation that that of the other defendants. Like them, on August 2d, he was only a creditor of Ponzi, and was moved to avoid insolvency by a preference just as they were. A minor is not exempt *14 from the defeat of an unlawful preference by section 60b of the Bankruptcy Act as amended.

The decrees are reversed.

**All Citations**

265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 3

KeyCite Yellow Flag - Negative Treatment
Distinguished by In re Optimal U.S. Litigation, S.D.N.Y., August 10, 2012

386 F.3d 224
United States Court of Appeals,
Second Circuit.

Pat GROSS, Plaintiff–Appellant,

v.

BRITISH BROADCASTING

CORPORATION, Defendant–Appellee,

Twenty Twenty Television, Ltd., Defendant.

No. 03–7306.
|
Argued May 3, 2004.
|
Decided Oct. 8, 2004.

**Synopsis**
**Background:** American filmmaker filed suit against British broadcast company alleging unjust enrichment and misappropriation of ideas. The United States District Court for the Southern District of New York, 2003 WL 346110, Hellerstein, J., dismissed the suit on the ground of forum non conveniens, and appeal was taken.

**Holdings:** The Court of Appeals, Cardamone, Circuit Judge, held that:

[1] filmmaker's choice of forum was entitled to very strong deference, and

[2] weighing of private and public interest factors did not warrant dismissal of suit on forum non conveniens grounds.

Vacated and remanded.

West Headnotes (10)

[1]     **Federal Courts**
          ⚷ Forum Non Conveniens

The doctrine of "forum non conveniens" allows a district court to refuse to entertain jurisdiction of a case even when jurisdiction is authorized by the letter of a general venue statute.

2 Cases that cite this headnote

[2]     **Federal Courts**
          ⚷ Forum Non Conveniens
        **Federal Courts**
          ⚷ Convenience of parties and witnesses; location of evidence

Under the doctrine of forum non conveniens, a trial court may decline jurisdiction when doing so would best serve the convenience of the parties and the ends of justice.

2 Cases that cite this headnote

[3]     **Federal Courts**
          ⚷ Forum non conveniens

An appellate court will reverse a district court's decision to dismiss a case for forum non conveniens only if the appellate court determines it clearly has abused its discretion.

2 Cases that cite this headnote

[4]     **Federal Courts**
          ⚷ Forum non conveniens

In the context of a forum non conveniens ruling, a district court abuses its discretion when its decision rests either (1) on an error of law, or (2) on a clearly erroneous finding of fact, or (3) if the court fails to consider all the relevant factors or unreasonably balances those factors.

Cases that cite this headnote

[5]     **Federal Courts**
          ⚷ Presumptions and burden of proof

A plaintiff's choice of forum is presumptively entitled to substantial deference.

47 Cases that cite this headnote

**[6]**    **Federal Courts**
   🗝 Parties' choice of forum;forum-shopping

In forum non conveniens determination, American filmmaker's choice of forum was entitled to very strong deference in action brought by filmmaker against British broadcasting company for unjust enrichment and misappropriation of ideas, where filmmaker brought the suit in her home forum, and that forum was one in which the British company was amenable to process, and there was no reason to suggest that the home forum was chosen for illegitimate reasons.

23 Cases that cite this headnote

**[7]**    **Federal Courts**
   🗝 Public and private interests;balancing interests
**Federal Courts**
   🗝 Availability and adequacy

In forum non conveniens determination, a party's claim of financial hardship is not an appropriate aspect of determining the availability of an alternative forum, but rather is a factor to be considered in the balancing of interests that bear on convenience, a balancing process that is to be performed after identifying an alternative forum.

4 Cases that cite this headnote

**[8]**    **Federal Courts**
   🗝 Convenience of parties and witnesses; location of evidence
**Federal Courts**
   🗝 Public and private interests;balancing interests

In forum non conveniens determination, private interest factors to be considered include relative ease of access to sources of proof, availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses, possibility of view of premises, if view would be appropriate to the action, and all other

practical problems that make trial of a case easy, expeditious and inexpensive.

6 Cases that cite this headnote

**[9]**    **Federal Courts**
   🗝 Public and private interests;balancing interests

In forum non conveniens determination, weighing of private and public interest factors did not warrant dismissal of suit brought by American filmmaker against British broadcasting company for unjust enrichment and misappropriation of ideas; filmmaker was of modest means and the burden of litigating abroad was likely a greater obstacle to filmmaker than to broadcasting company, the subject matter of the suit was creative work and so the suit itself had less natural connection to any particular forum, and although English law would govern most of the claims of the case, which would suggest some preference for England, English law was amenable to application in the United States.

18 Cases that cite this headnote

**[10]**    **Federal Courts**
   🗝 Burden placed on court and public
**Federal Courts**
   🗝 Conflict of laws
**Federal Courts**
   🗝 Public and private interests;balancing interests

In forum non conveniens determination, the public interest factors include: the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

12 Cases that cite this headnote

**Attorneys and Law Firms**

**\*226** Eamonn Dornan, New York, NY (Russell A. Smith, Smith Dornan & Shea P.C., New York, NY, of counsel), for Plaintiff–Appellant.

Laura R. Handman, New York, NY (Peter Karanjia, Davis Wright Tremaine LLP, New York, New York, of counsel), for Defendant–Appellee British Broadcasting Corp.

Before: CARDAMONE and JACOBS, Circuit Judges, and KORMAN, District Judge. *

\*    Honorable Edward R. Korman, Chief Judge of the United States District Court for the Eastern District of New York, sitting by designation.

**Opinion**

CARDAMONE, Circuit Judge.

Plaintiff Pat Gross (plaintiff or appellant) filed suit against the defendant British Broadcasting Corporation (BBC) in which she alleges that without her permission the BBC used her idea for a documentary film about militant animal rights activists. Her complaint raises a number of legal theories, but at its core it alleges unjust enrichment and misappropriation of ideas. The BBC is a corporation existing under English law and established by Royal Charter with its principal office in London, England. The documentary about which Gross complains aired only in the United Kingdom (U.K.). She lives in New York City and chose to file the suit in her home forum, the United States District Court for the Southern District of New York where the case came before Judge Alvin Hellerstein. The BBC has a presence in New York, and is unquestionably subject to personal jurisdiction in the Southern District. The district court nevertheless decided that courts in Great Britain were a more appropriate forum for the trial of this action. Accordingly, in a judgment entered February 26, 2003 it granted the BBC's motion to dismiss plaintiff's complaint on the ground of *forum non conveniens.* Plaintiff timely appeals the dismissal of her suit.

It is not uncommon for more than one forum to have jurisdiction to hear a case. Under our legal system, plaintiffs make the initial selection of their preferred venue by filing the suit in a particular forum. We have consistently held that when the plaintiff is a U.S. citizen and she selects her home forum, that choice is ordinarily **\*227** entitled to substantial deference from the courts, especially when there is no challenge regarding the legitimacy of the plaintiff's motives for choosing her home forum.

The common law doctrine of *forum non conveniens* permits a court to decline to exercise jurisdiction when the convenience of the parties and the interests of justice indicate a foreign forum would be the more appropriate forum. But, because of the substantial deference to a U.S. citizen's choice of her home forum, the balance of interests must strongly favor the defendant to justify dismissal of plaintiff's complaint on such grounds. District courts have discretion to determine whether the interests of justice favor dismissal for *forum non conveniens,* yet that discretion is not unfettered. In this case, we think the district court's dismissal of plaintiff's suit was manifestly unreasonable and thus an abuse of discretion. We therefore vacate the order dismissing plaintiff's suit and remand to the district court for further proceedings.

BACKGROUND

A. *Facts Alleged in the Complaint*

When we review a case dismissed at the pleading stage, we accept as true the factual allegations set forth in the plaintiff's complaint. Pat Gross is an American citizen who has lived and worked in New York City for 22 years. She has 15 years experience in the U.S. television industry as a documentary filmmaker and has researched and produced numerous documentaries that have been broadcast by, among others, CBS, Court TV, and the Public Broadcasting System. She has worked in the industry as a producer, director, researcher and screenwriter. In 1998 she conceived the idea for a documentary-style TV series on the history of the modern animal rights movement and the extremist activities of some of its members in America and Europe. In November of that year she approached the BBC with her research and ideas, having already produced several documentaries for defendant earlier. According to her affidavit, plaintiff entitled the series "Beastly Business." Plaintiff planned to focus on exposing extremist activities and demonstrating

how powerful international organizations have exploited
animal welfare for profit.

The BBC is a major television broadcaster based in
London and is a non-profit corporation organized under
English law. The BBC broadcasts a broad array of
programming to the British public and its services are
publicly funded by the British government. Thus Gross
traveled to London in November 1998 to present her
proposal to the BBC. She spoke to several executives there
who expressed interest in her project.

While in London, Gross was referred to an executive
producer at defendant Twenty Twenty Television, Ltd.
(Twenty Twenty), an independent production company,
organized under English law, and with its principal
place of business in England. Twenty Twenty produces
documentaries that have been broadcast in both England
and the United States. Plaintiff discussed her proposal
with that company's executives, and they jointly agreed
that Twenty Twenty would co-produce the documentary,
although Gross would continue to be responsible
for selling the proposal to the BBC. Her agreement
with Twenty Twenty provided that she would retain
proprietary rights in the series, receive producer credits,
produce and direct at least one episode, and participate
at least as an assistant director on others. If series
were accepted by the BBC, Twenty Twenty would pay
40 percent of the up-front production costs, and receive
production credit and compensation in return.

 *228  Together, plaintiff and Twenty Twenty developed
a "Treatment"—essentially a summary and written pitch
for the series—to present to the BBC. The Treatment
referred to some of the research Gross had already
completed on the project. She thought her proposal
contained newsworthy information, and that some of
the information she submitted was "time-sensitive and
volatile." Because of this Gross was anxious for the BBC
to make a decision quickly.

In December 1998 plaintiff expressed some dissatisfaction
over Twenty Twenty's work related to the Treatment
and the BBC commission. She thought the work lacked
professionalism and that there were defects in the
presentation. Nevertheless, the BBC once more expressed
interest in the project, and in January 1999, plaintiff again
traveled from New York to London to meet with BBC
executives.

During the first half of 1999, Gross unsuccessfully sought
a commitment from the BBC. In March 1999 she was
informed that one of the BBC's channels had declined
to commission the series, and that plaintiff and Twenty
Twenty should revise the Treatment and resubmit it.
They revised the Treatment, and Twenty Twenty then
resubmitted it in April 1999, though Gross asserts she did
not give permission for the resubmission. Further delays
arose, due in part to funding constraints at the BBC.
By June 1999 plaintiff was concerned that the series was
becoming untimely.

On June 14, 1999 she states she formally withdrew the
Treatment from both the BBC and from Twenty Twenty.
She did this by sending several emails and faxes to
executives of both defendants declaring that she was
withdrawing the series "effective immediately." Twenty
Twenty responded that it could not force the BBC to
make a quick decision, and that it would not accept her
withdrawal. Plaintiff began shopping the series to U.S.
broadcasters.

On July 14, 1999 a Twenty Twenty executive informed
her that a BBC channel had commissioned the series. She
reminded both Twenty Twenty and the BBC that she had
withdrawn the series, but was told that the BBC was going
ahead with the production. A BBC executive contacted
Gross and asked her to reconsider her withdrawal, to
which she responded she would reconsider only if Twenty
Twenty was replaced as co-producer.

Communication between plaintiff and both the
defendants ceased shortly thereafter. The BBC went on
to produce the series without Gross, and eventually
broadcast the documentary as a three-part production
entitled "Beastly Business." The series aired in late 2000
and early 2001, and was shown only on a BBC channel
in the U.K., not in the U.S. Plaintiff contends this
production relied on her research and ideas.

B. *Proceedings Below*

Plaintiff filed her suit against the BBC and Twenty
Twenty on July 9, 2002 in the Southern District of New
York, and her amended complaint raises 12 causes of
action. As the district court noted, her complaint is based
primarily on theories of misappropriation of ideas and

unjust enrichment. Twenty Twenty moved to dismiss the complaint for lack of personal jurisdiction, and on December 4, 2002, plaintiff voluntarily dismissed her claims against that defendant. Shortly thereafter she also voluntarily dismissed her cause of action for violations of the Lanham Act.

The BBC filed a motion to dismiss for *forum non conveniens,* on which the district court held a hearing. It first ruled that Twenty Twenty was not an indispensable party, and that the action could proceed **\*229** against the BBC alone. The trial court noted that Twenty Twenty could voluntarily defend itself if it felt its interests were being prejudiced, and that the BBC in any event retained the right to sue Twenty Twenty, if it chose to do so.

With respect to the *forum non conveniens* motion, the district court recognized plaintiff was entitled, on a *prima facie* basis, to vindicate her rights in her home forum. But, it went on to point out that British law would apply to this action, and that the relevant witnesses, aside from plaintiff, resided in Britain. The trial court conducted an oral analysis of the appropriate factors relating to a *forum non conveniens* motion, and determined that the balance of overall interests favored dismissal of the case.

Gross declared that if she were forced to sue in Britain, her action would in reality be barred because she could not afford the litigation expenses, since the British system does not permit contingent fee arrangements for such actions. The BBC countered that comparable arrangements were indeed available in some circumstances, and that any difficulty plaintiff would face obtaining counsel was due to the weakness of her causes of action. The district court expressed concern regarding Gross' ability to obtain counsel in the U.K. It addressed this concern by conditioning its dismissal on the BBC's acceptance of certain conditions designed to alleviate her difficulty in retaining British counsel. It suggested, for example, that the parties agree to waive fee-shifting arrangements that award attorneys' fees to the prevailing party, so that plaintiff would not face an oppressive financial burden if she lost.

In a written memorandum, the district court memorialized its earlier analysis and dismissed plaintiff's suit on the ground of *forum non conveniens.* It did so after the BBC willingly consented to three conditions the district court imposed: (1) refraining from seeking security for costs and

attorneys' fees from Gross; (2) waiving any right it might have under British law as a prevailing party to seek costs and attorneys' fees from plaintiff; and (3) refraining from interference with plaintiff's efforts to obtain an attorney on a contingent fee basis. The trial court also ruled that the waiver of prevailing party's costs and attorneys' fees should be mutual, so that Gross would have to waive her right to seek such fees from the BBC if she prevailed. The court's contemporaneous order dismissing plaintiff's complaint explicitly incorporated those conditions. We proceed to an analysis of the law.

## DISCUSSION

**[1]   [2]**   The doctrine of *forum non conveniens* allows a district court to refuse to entertain jurisdiction of a case "even when jurisdiction is authorized by the letter of a general venue statute." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 507, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). A trial court may decline jurisdiction when doing so would "best serve the convenience of the parties and the ends of justice." *Koster v. (American) Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 527, 67 S.Ct. 828, 91 L.Ed. 1067 (1947). The "change of venue" statute, 28 U.S.C. § 1404(a), is ordinarily used as the vehicle to transfer a case when the preferred forum is another district court. But, if the preferred venue is a foreign court, a federal trial court may dismiss under the doctrine of *forum non conveniens.*

**[3]   [4]**   The decision to dismiss a case for *forum non conveniens* is confided to the sound discretion of the district court, to which we accord substantial deference. *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 257, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); **\*230** *DiRienzo v. Philip Morris Servs. Corp.,* 294 F.3d 21, 27 (2d Cir.2002). We reverse that court's decision only if we determine it clearly has abused its discretion. *Pollux Holding Ltd. v. Chase Manhattan Bank,* 329 F.3d 64, 70 (2d Cir.2003). In the context of a *forum non conveniens* ruling, a district court abuses its discretion when its decision rests either (1) on an error of law, or (2) on a clearly erroneous finding of fact, or (3) if the court fails to consider all the relevant factors or unreasonably balances those factors. *See Piper Aircraft,* 454 U.S. at 257, 102 S.Ct. 252; *Pollux,* 329 F.3d at 70.

In a recent *en banc* decision, we set out the multi-stage analysis a district court must perform to evaluate a *forum non conveniens* motion. *See Iragorri v. United Techs. Corp.,*

274 F.3d 65 (2d Cir.2001) (*en banc* ). The initial inquiry is to determine the degree of deference to which the plaintiff's choice of forum is entitled. *Id.* at 73. Once that determination is made, the court must conduct the analysis set out in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). Under *Gilbert,* step two is to determine whether an adequate alternative forum exists. If the answer is "yes," then the final, or third step, is to balance the private and public interests to decide whether the case should be adjudicated in the plaintiff's choice of forum or in the alternative forum proposed by defendant. *Gilbert,* 330 U.S. at 507–09, 67 S.Ct. 839.

### I Deference to Plaintiff's Choice of Forum

 **[5]** As we explained in *Iragorri,* a plaintiff's choice of forum is presumptively entitled to substantial deference. 274 F.3d at 70–71. Indeed, our legal system has traditionally deferred to the plaintiff's choice of forum, and "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gilbert,* 330 U.S. at 508, 67 S.Ct. 839.

However, the degree of deference to the plaintiff's forum depends in part on a number of considerations, such as the plaintiff's own connection to that forum. The Supreme Court in *Piper Aircraft* explained that a plaintiff's choice of her home forum is ordinarily entitled to great deference because it is presumed to be convenient. 454 U.S. at 255–56, 102 S.Ct. 252. By contrast, if a foreign plaintiff selects a U.S. forum, that presumption of convenience is less plausible. In such a circumstance, the defendant may be able to demonstrate that the location was selected by plaintiff for forum-shopping reasons, such as the belief that local liability rules or damage awards will be favorable to it.

In *Iragorri* we confronted an intermediate proposition, one of a U.S. plaintiff suing in a U.S. forum that was not her home. We reconciled that situation with the strong deference for U.S. plaintiffs suing in their home forum and the weaker deference for foreign plaintiffs by applying a sliding scale

The more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the

greater the deference that will be given to the plaintiff's forum choice. Stated differently, the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for *forum non conveniens.*

274 F.3d at 71–72. Thus, while the initial presumption is to defer to the plaintiff's choice, the *Iragorri* scale is a tool to assess **\*231** whether there are reasons to doubt the presumption of convenience.

 **[6]** Here there are somewhat conflicting considerations. Appellant flew to England in hopes of making a deal with the companies located there. She should not be surprised therefore that most of the witnesses and relevant documents are there. By seeking out business in that country, Gross could reasonably expect that disputes arising from those contacts might be litigated in the courts of Great Britain. Conversely, the BBC knew Ms. Gross was an American who lived in New York, and that much of her research on the project had been performed in the United States. The BBC's own presence in New York is reason for the BBC to expect that circumstances may arise that would require it to litigate here.

We think it significant that plaintiff has sued in her *home* forum, and that forum is one in which the BBC is amenable to process. We took *Iragorri en banc* to consider the deference due to a U.S. plaintiff suing *outside* her home forum. Nothing in our sliding scale approach calls into question the very strong deference traditionally given a U.S. plaintiff suing in her home forum. Importantly, the district court did not mention anything to suggest that appellant chose the forum for illegitimate reasons, nor do we find such evidence in the record. This case therefore presents a situation in which courts should initially be at their most deferential: a U.S. plaintiff suing at home for valid reasons. This conclusion does not foreclose a dismissal for *forum non conveniens,* since the forum may prove to be excessively burdensome to the defendant, *see Piper Aircraft,* 454 U.S. at 256 n. 23, 102 S.Ct. 252, but the starting point will be one that substantially favors the plaintiff.

The district court recognized this by noting that "[appellant] is entitled to the protection and the rights and vindication of the rights from a New York forum, at least on a *prima facie* basis." But that deference should have been very great indeed, and the fact that the trial court so readily ruled in favor of the defendant's choice of forum leads us to question whether the district court in fact gave appropriate deference to the plaintiff's choice.

II Adequate Alternative Forum

The next step is to determine whether an alternative forum is available, because application of *forum non conveniens* doctrine "presupposes at least two forums in which the defendant is amenable to process." *Gilbert,* 330 U.S. at 506–07, 67 S.Ct. 839. The alternative forum is normally acceptable if the defendant is amenable to process in the alternate forum, *see Capital Currency Exch., N.V. v. Nat'l Westminster Bank PLC,* 155 F.3d 603, 609 (2d Cir.1998), aside from the "rare circumstances" in which "the remedy offered by the other forum is clearly unsatisfactory." *Piper Aircraft,* 454 U.S. at 254 n. 22, 102 S.Ct. 252.

[7]  The BBC is unquestionably amenable to process in England and in fact has consented to be sued there. Appellant's concerns regarding the financial difficulties impeding her ability to sue in England do not affect the conclusion that England is an adequate alternative forum. A party's claim of financial hardship is not an appropriate aspect of determining the *availability* of an alternative forum, but rather is a factor to be considered in the balancing of interests that bear on convenience, a balancing process that is to be performed *after* identifying an alternative forum. *Murray v. British Broad. Corp.,* 81 F.3d 287, 292 (2d Cir.1996). Thus, the alternate forum element is satisfied.

**\*232**  III Balancing of Public and Private Interests

Having identified the degree of preference for plaintiff's forum and the availability of an adequate alternative forum, the third step and the most substantial part of the analysis is to weigh the public and private interests to determine if the ends of justice would be served by dismissing the case from plaintiff's chosen forum.

Although the district court identified most of the appropriate factors and stated that the factors "come out ... heavily in favor of dismissal," its own analysis of the factors does not support such conclusion. When the district court judge addressed each factor, he himself concluded that the factors were either neutral or, at most, slightly favored England. This conclusion falls far short of the level of oppressiveness to defendant required to overturn a U.S. plaintiff's choice of her home forum. In short, the district court's ruling was the result of a demonstrably unreasonable balancing of the factors and hence amounted to an abuse of discretion. We turn to those factors.

A. *Private Interest Factors*

[8]  As enumerated in *Gilbert,* the private interest factors include

> relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.

330 U.S. at 508, 67 S.Ct. 839.

With respect to sources of proof and witnesses, the trial court determined that the relevant probative evidence and essential witnesses, aside from appellant, were located in England. It did note, however, that documents can easily be produced anywhere, and "witnesses tend to be deposed where they reside." It went on to state that even if the case were tried in New York, Gross would still have to travel to England to take depositions. It concluded that "there is very little in the balance of convenience that would change, regardless of whether it is a New York forum or a United Kingdom forum."

Recognizing that "most cases of this nature settle," the district judge distinguished between the discovery phase, "during which there is very little to choose between a UK forum and a New York forum," and an unlikely trial, during which "there will be more to choose in relationship

to the UK forum." The district court was of the view that during discovery—which it believed was the most important period—the choice of forum was neutral. If the case proceeded to trial, it believed the balance of interests tipped somewhat in favor of England.

In considering the BBC's overall burden in defending the instant action in New York, the district court stated that "the BBC is suable here. It has litigated here in more than a half dozen occasions. It has been a plaintiff here and has been a defendant here. This is a neutral proposition."

The district court judge then addressed appellant's concerns with respect to obtaining representation in England. Considering the conditions it required the parties to accept, the judge decided that "that proposition becomes a mutual one." Although the parties continue to dispute on appeal whether appellant can in fact obtain adequate representation in England, we need not resolve that dispute, for resolving it will not help the BBC in any event. If the BBC is correct and representation is available, then the choice of England or **233** New York is neutral with respect to this issue. If appellant is correct, and she cannot obtain counsel in England, then the balance tips in favor of New York. In consequence, under no circumstances does the representation issue favor England.

The district court ended up by considering any remaining "catchall considerations," in particular the availability of Twenty Twenty as a defendant. It ruled that Twenty Twenty was not an indispensable party, and that it would be available through depositions, or could voluntarily defend its interests either in New York or in the U.K. In any event, it reminded the BBC that it would retain the right to sue Twenty Twenty if it saw fit to do so. These catchall considerations were "not appropriate or compelling one way or another."

[9]   In sum, the district court's own analysis of the private interest factors concluded that each factor was neutral except the availability of witnesses, which was neutral during discovery and somewhat favored England during the unlikely event of a trial. We do not see how this analysis tips the balance of interests strongly in favor of England, and it is plainly insufficient to overcome the initial presumption in favor of plaintiff's choice of her home forum.

We note, in addition, two further considerations that support retaining the case in New York. First, appellant is an individual who claims to be of modest means; the burden of litigating abroad is likely a greater obstacle to an individual than to a large business corporation. *See Carey v. Bayerische Hypo–Und Vereinsbank AG,* 370 F.3d 234, 238 (2d Cir.2004). Second, the subject matter of this suit is not like a real property action with a physical connection to a particular location. Rather, the subject matter is creative work—intellectual property—and so the suit itself has less natural connection to any particular forum, leaving the convenience of the parties to be the primary consideration.

We commented in *Iragorri* that defendants as much as plaintiffs may be concerned with litigation tactics or forum shopping rather than convenience, and may move for dismissal under *forum non conveniens* to further those goals. We counseled district courts to "arm themselves with an appropriate degree of skepticism in assessing whether the defendant has demonstrated genuine inconvenience and a clear preferability of the foreign forum." 274 F.3d at 75. Although we express no view on whether the BBC filed this motion as a litigation tactic, it has not persuaded us that defending in the Southern District would be particularly burdensome to it.

### B. *Public Interest Factors*

[10]   The public interest factors include the administrative difficulties flowing from court congestion; the

> local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

*Piper Aircraft,* 454 U.S. at 241 n. 6, 102 S.Ct. 252; *see Gilbert,* 330 U.S. at 509, 67 S.Ct. 839.

The district court did not specifically address these factors, except to the extent they were a part of its "catchall

considerations." However, once again they are either neutral or at most slightly favor England. English law would govern most of the claims in this case, which suggests some preference for England. We note **\*234** however that there are few if any countries in the world whose body of law is more amenable to application in the United States than Great Britain's. The district court did not comment on the application of English law, and we do not believe application of such law creates a burden on the court.

The remaining factors do not tip notably one way or the other. Gross is from New York and the BBC is from Great Britain, so each forum can claim a connection to one of the parties. Overall the public interest factors may tip somewhat in favor of England, but not significantly. Once again, this is insufficient to support dismissal.

## IV Conditions Upon Dismissal

Finally, we must say a word about the conditions imposed on the parties as part of the dismissal. In this case, the BBC's motion to dismiss was granted only after the parties agreed to waive their statutory rights relating to contingent fees and fee-shifting for prevailing parties.

It is not uncommon for a district court to qualify a dismissal for *forum non conveniens* on the movant's acceptance of certain conditions to reduce the prejudice to the plaintiff. For example, if the district court is unsure that the defendant would in fact be amenable to suit in the proposed foreign forum, it may require the defendant to consent to jurisdiction in that forum before dismissing the case. *See, e.g., Jota v. Texaco Inc.,* 157 F.3d 153, 159 (2d Cir.1998). Or if the statute of limitations will have run before the new action is filed, the court may ask the defendant to waive its arguments on that ground. *See, e.g., Aguinda v. Texaco, Inc.,* 303 F.3d 470, 480 (2d Cir.2002). This makes some sense since it is the defendant who is seeking to have the action effectively transferred for its convenience.

In the above examples, the defendant is asked to cede a *personal* defense that is waivable at its will. *Cf. Davis v. Bryan,* 810 F.2d 42, 44 (2d Cir.1987) (statute of limitations is a personal defense that is waived if not promptly pleaded); *Concession Consultants, Inc. v. Mirisch,* 355 F.2d 369, 371 (2d Cir.1966) (venue is a personal privilege that

is waivable at will); *Evans v. Syracuse City Sch. Dist.,* 704 F.2d 44, 47 (2d Cir.1983) (failure to raise defense of *res judicata* promptly results in waiver).

The conditions imposed in the case at bar are somewhat more troublesome to us because they are primarily institutional rather than personal in nature. A legal system's rules pertaining to fee-shifting and contingent fees reflect policy judgments about the goals of that legal system, the incentives for and against litigation, and the availability of representation in various circumstances. The British system has over the years engaged in a lengthy public debate that has lead to a series of contentious changes in its allowance of conditional fee arrangements in certain circumstances.

Beginning in 1928, a government report on legal aid urged local law societies to provide free services for the poor since contingent fee arrangements had been opposed by the Law Society since 1912. In 1949 England created a comprehensive legal aid system and continued in 1979 through the Royal Commission on Legal Services to recommend against contingency fees. There were numerous studies and reports issued through the 1980s, particularly the Green Papers that reopened the issue of contingency fees. Finally, in 1990 the Courts and Legal Services Act of 1990 approved conditional fee agreements, which took five years to come into effect. *See, e.g.,* Richard L. Abel, *An American Hamburger Stand in St. Paul's Cathedral: Replacing Legal Aid with Conditional* **\*235** *Fees in English Personal Injury Litigation,* 51 DePaul L.Rev. 253 (2001) (surveying the recent developments in British conditional fee arrangements); Michael Zander, *Will the Revolution in the Funding of Civil Litigation in England Eventually Lead to Contingency Fees?,* 52 DePaul L.Rev. 259 (2002) (same).

There is a point at which conditions cease to be a limitation on the defendant and become instead an unwarranted intrusion on the transferee forum's policies governing its judicial system. By applying conditions that implicate the British legal system's rules on fee-shifting and the availability of contingent fees, the district court effectively stepped into the middle of Britain's policy debate on those issues. Principles of comity demand that we respect those policies. We urge the district courts to be cognizant of the prudential choices made by foreign nations and not to impose conditions on parties that

may be viewed as having the effect of undermining the considered policies of the transferee forum.

<div style="text-align:center">

CONCLUSION

</div>

Accordingly, for the reasons stated, the judgment of the district court dismissing plaintiff's complaint is vacated

and the case is remanded to the Southern District of New York for further proceedings not inconsistent with this opinion.

**All Citations**

386 F.3d 224

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 4

In re Hellas Telecommunications (Luxembourg) II SCA, 535 B.R. 543 (2015)

KeyCite Yellow Flag - Negative Treatment
Distinguished by In re ICP Strategic Credit Income Fund Ltd.,
Bankr.S.D.N.Y., September 15, 2015

535 B.R. 543
United States Bankruptcy Court,
S.D. New York.

In re: **Hellas Telecommunications (Luxembourg)
II SCA**, Debtor in a Foreign Proceeding.
Andrew Lawrence Hosking and Simon James
Bonney, in their capacity as joint compulsory
liquidators and duly authorized foreign
representative s of Hellas Telecommunications
(Luxembourg) II SCA, Plaintiffs,
v.
**TPG Capital Management, L.P.**, et al., Defendants.

Case No. 12−10631 (MG)
|
Adv. Proc. No. 14−01848 (MG)
|
Signed August 19, 2015

**Synopsis**
**Background:** Joint compulsory liquidators of foreign
debtors that were the subject of insolvency proceedings
pending in England sought leave to amend complaint that
they had filed for post-recognition relief in ancillary
Chapter 15 proceeding.

**Holdings:** The Bankruptcy Court, Martin Glenn, J., held
that:

[1] even assuming that provision of English insolvency law
that provided for fraudulent transfer claims involving
insolvent debtor to be adjudicated in English High Court
was in nature of jurisdictional, and not mere venue,
provision, bankruptcy court had jurisdiction over
fraudulent transfer claims asserted by liquidators under
English law;

[2] fraudulent transfer law of the United Kingdom, rather
than of Luxembourg, governed fraudulent transfer
avoidance claims that liquidators sought to assert;

[3] liquidators stated fraudulent transfer claims under
actual fraud provision of English insolvency law that were
plausible on their face;

[4] liquidators' unjust enrichment claims were not barred

by existence of written contract governing challenged
transaction;

[5] bankruptcy court did not have discretion to
permissively abstain from hearing proceeding brought by
liquidators for post-recognition relief

[6] choice of United States forum by joint compulsory
liquidators was entitled to considerable deference; and

[7] amendment could not be denied on "bad faith," "undue
delay," or "prejudice" grounds.

Motion granted in part and denied in part..

West Headnotes (48)

[1]    **Bankruptcy**
       Pleading;  dismissal

       Liberal standard for granting leave to amend
       must be balanced against other important goals,
       such as need to preserve integrity and efficiency
       of judicial system. Fed. R. Civ. P. 15(a).

       Cases that cite this headnote

[2]    **Bankruptcy**
       Pleading;  dismissal

       Court may deny motion for leave to amend
       pleading if amendment (1) has been delayed
       unduly, (2) is sought for dilatory purposes or is
       made in bad faith, (3) would prejudice opposing
       party, or (4) would be futile, such as amended
       pleading not surviving motion to dismiss for
       failure to state claim. Fed. R. Civ. P. 15(a).

       Cases that cite this headnote

[3]    **Bankruptcy**

☞Pleading; dismissal

While scienter may be pled generally, allegations of scienter must give rise to a strong inference of fraudulent intent by showing that defendants had both motive and opportunity to commit fraud, or by stating facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. Fed. R. Civ. P. 9(b).

Cases that cite this headnote

**[4]**    **Bankruptcy**
☞Pleading; dismissal

Courts relax, but do not eliminate, the particularity requirement for pleading fraud when plaintiff is bankruptcy trustee or third party who is pleading fraud on second-hand information. Fed. R. Civ. P. 9(b).

Cases that cite this headnote

**[5]**    **Bankruptcy**
☞Pleading; dismissal

Degree of particularity required for allegations of fraud by bankruptcy trustee or by someone else not a party to challenged transaction should be determined in light of such circumstances as whether plaintiff had opportunity for discovery of those who may have knowledge of pertinent facts. Fed. R. Civ. P. 9(b).

Cases that cite this headnote

**[6]**    **Bankruptcy**
☞Cases Ancillary to Foreign Proceedings

Joint compulsory liquidators of foreign debtors that were the subject of insolvency proceedings pending in England would be afforded some, but only little, latitude in pleading their fraudulent

transfer claims with requisite particularity, where liquidators had been afforded benefit of wide-ranging discovery that, while it had not resulted in deposition of every potential witness, was overwhelmingly complete at time that liquidators sought leave to file amended complaint. Fed. R. Civ. P. 9(b), 15(a).

Cases that cite this headnote

**[7]**    **Bankruptcy**
☞Cases Ancillary to Foreign Proceedings

Even assuming that provision of English insolvency law that provided for fraudulent transfer claims involving insolvent debtor to be adjudicated in English High Court was in nature of jurisdictional, and not mere venue, provision, bankruptcy court in which foreign representatives of English debtors had filed petitions for ancillary Chapter 15 relief had subject matter jurisdiction over foreign representatives' fraudulent transfer claims, as matter governed, not by English law, but by United States federal law. 28 U.S.C.A. § 1334(b).

Cases that cite this headnote

**[8]**    **Courts**
☞Actions under laws of foreign country

Whether a United States federal court has subject matter jurisdiction is question of federal law, even when the applicable substantive law at issue is foreign.

1 Cases that cite this headnote

**[9]**    **Bankruptcy**
☞Cases Ancillary to Foreign Proceedings

While bankruptcy court in which foreign representatives had filed their Chapter 15

petition was bound to apply substantive law of foreign nation under whose laws debtors were being liquidated when adjudicating foreign representatives' fraudulent transfer claims, it was not bound to follow the foreign nation's procedural law, including its venue provisions.

Cases that cite this headnote

[10] **Bankruptcy**
🔑Cases Ancillary to Foreign Proceedings

To extent that provision of English insolvency law regarding proper forum for adjudicating fraudulent transfer claims could be interpreted as preventing joint compulsory liquidators of foreign debtors that were the subject of insolvency proceedings pending in England from pursuing fraudulent transfer claims in Chapter 15 proceeding that they had commenced in aid of English insolvency cases in the United States, provision would conflict with cross-border insolvency regulations that had been adopted in the United Kingdom, and that had primacy, to extent of any conflict, over English insolvency law.

Cases that cite this headnote

[11] **Bankruptcy**
🔑Pleading; dismissal

Federal pleading rules do not compel a litigant to anticipate potential affirmative defenses, such as statute of limitations, and to affirmatively plead facts in avoidance of such defenses.

Cases that cite this headnote

[12] **Bankruptcy**
🔑Fraudulent transfers
**Fraudulent Conveyances**
🔑Good faith of purchasers

Fraudulent transfer defendant, and not party asserting fraudulent transfer claim, bears burden of proof with respect to good faith transferee defense under both New York law and the Bankruptcy Code. 11 U.S.C.A. § 548(c).

Cases that cite this headnote

[13] **Action**
🔑What law governs

Under New York choice of law rules, court must first determine whether there is actual conflict between relevant laws of the implicated jurisdictions, based on whether such laws provide different substantive rules, and whether the differences are relevant to the issue to be determined and have a significant possible effect on outcome of trial.

Cases that cite this headnote

[14] **Torts**
🔑What law governs

Where there is actual conflict between relevant laws implicated in tort action, New York applies an "interest analysis" to identify the jurisdiction that has the greatest interest in litigation based on occurrences within each jurisdiction, or contacts of parties with each jurisdiction, that relate to the purpose of the particular law in conflict.

Cases that cite this headnote

[15] **Fraudulent Conveyances**
🔑What law governs

For conduct-regulating laws, including fraudulent conveyance statutes, New York courts generally follow the lex loci rule, and law of the jurisdiction where tort occurred will generally apply because that jurisdiction has

greatest interest in regulating behavior within its
borders.

Cases that cite this headnote

**[16]    Torts**
🔑 What law governs

New York choice of law rules do not require
uncompromising adherence to lex loci rule in
tort cases; however, when allegedly wrongful
conduct occurs in a place different from place of
injury, it is the place of allegedly wrongful
conduct that generally has superior interest in
protecting reasonable expectation of parties who
relied on laws of that place to govern their
primary conduct and in admonitory effect that
applying its law will have on similar conduct in
future.

Cases that cite this headnote

**[17]    Bankruptcy**
🔑 Cases Ancillary to Foreign Proceedings

Fraudulent transfer law of the United Kingdom,
rather than of Luxembourg, governed fraudulent
transfer avoidance claims that foreign
representatives sought to assert, in ancillary
Chapter 15 proceeding, to set aside redemption
of convertible preferred equity certificates
(CPECs) in debtor that was the subject of
insolvency case pending in England; while
debtor was Luxembourg entity, with registered
offices in Luxembourg, on date that redemption
occurred, it was also a dormant shelf company
that did not generate any operating revenues or
have any employees, such that debtor's nominal
registration in Luxembourg was insufficient to
tip court's "interests" analysis toward
application of Luxembourg law, particularly
where redemption transaction was planned,
authorized, and executed by entities and
personnel operating out of England, Italy,
Germany, and the United States, not out of
Luxembourg, and where initial funds transfer
was made between English banking accounts

and funded with proceeds of sub notes marketed
and sold in substantially greater amounts to
English, as opposed to Luxembourg, investors;
application of United Kingdom law would not
lead to absurd result, but was consistent with
result militated under European Union
Insolvency Regulation.

Cases that cite this headnote

**[18]    Bankruptcy**
🔑 Cases Ancillary to Foreign Proceedings

Allegations in amended complaint filed by joint
compulsory liquidators of foreign debtors that
were the subject of insolvency cases pending in
England, that defendants, acting through
sponsors that they formed, owned and
controlled, participated in redemption of
convertible preferred equity certificates
(CPECs) of one of the debtors, despite being
party to internal concerns about quantum of debt
that was being incurred as potentially
over-leveraging debtor and rendering it
insolvent, in order to obtain proceeds of
transaction, and that this CPEC redemption was
carried out without obtaining any independent
appraisal or other good faith, arm's-length
determination of market value of CPECs so as to
provide premium price to CPEC holders at
expense of corporate creditors, and especially of
creditors who purchased the sub notes issued to
fund redemption, stated fraudulent transfer
claims under actual fraud provision of English
insolvency law that were plausible on their face,
so that liquidators' motion for leave to amend
complaint to assert such claims in ancillary
Chapter 15 proceeding could not be denied on
grounds of futility. Fed. R. Civ. P. 15(a).

Cases that cite this headnote

**[19]    Implied and Constructive Contracts**
🔑 Effect of Express Contract

It is general rule of New York law that no claim
for unjust enrichment lies where the subject

matter of claim is covered by written contract; however, this general rule applies only when existence of contract governing transaction in question is undisputed.

Cases that cite this headnote

[20]    **Bankruptcy**
Cases Ancillary to Foreign Proceedings

Allegations in complaint filed by joint compulsory liquidators of foreign debtors that were the subject of insolvency proceedings pending in England, that redemption agreement for equity interests in one of debtors falsely represented that redemption price was determined by debtor's board of managers on basis of equity value of debtor's assets when, in fact, the redemption price had been reverse engineered from enterprise value invented by entities that hoped to benefit from redemption, and that redemption was in nature of dividend or distribution to equity holders that was devoid of any consideration, plausibly alleged facts calling validity of redemption agreement into question, such that liquidators' unjust enrichment claims were not barred by existence of written contract governing challenged transaction.

Cases that cite this headnote

[21]    **Implied and Constructive Contracts**
Unjust enrichment
**Implied and Constructive Contracts**
Effect of Express Contract

Under New York law, unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim.

Cases that cite this headnote

[22]    **Bankruptcy**
Cases Ancillary to Foreign Proceedings

While unjust enrichment claim was not available if it simply duplicated, or replaced, conventional contract or tort claim, joint compulsory liquidators of foreign debtors that were the subject of insolvency proceedings pending in England were entitled to plead fraudulent transfer and unjust enrichment claims in the alternative in ancillary proceeding for relief under Chapter 15.

Cases that cite this headnote

[23]    **Bankruptcy**
Cases Ancillary to Foreign Proceedings

Upon recognition of proceeding as foreign main proceeding, foreign representative may obtain relief available to a trustee under the Bankruptcy Code, except for relief available under the Chapter 5 avoidance provisions. 11 U.S.C.A. § 1521(a).

Cases that cite this headnote

[24]    **Bankruptcy**
Cases Ancillary to Foreign Proceedings

While, following recognition of foreign proceeding, foreign representatives are prohibited from pursuing Chapter 5 avoidance claims, this does not mean that they are barred from pursuing all avoidance claims, including claims under applicable foreign law. 11 U.S.C.A. § 1521(a).

Cases that cite this headnote

[25]    **Bankruptcy**
Cases Ancillary to Foreign Proceedings

Unjust enrichment claims asserted by joint compulsory liquidators of foreign debtors that were the subject of insolvency proceedings

pending in England, not to set aside redemption transaction allegedly engineered for benefit of debtor's equity holders at creditors' expense, but for order requiring disgorgement of all payments, profits, fees, benefits, incentives and other compensation obtained by equity holder as result of its allegedly wrongful conduct, was not identical to fraudulent transfer avoidance claim pursuant to Chapter 5 of the Bankruptcy Code, so as not to be barred by provision of Chapter 15 prohibiting foreign representatives from pursuing Chapter 5 avoidance claims. 11 U.S.C.A. §§ 548(a), 1521(a).

Cases that cite this headnote

[26]    **Federal Courts**
👈Bankruptcy

Bankruptcy court did not have discretion to permissively abstain from hearing proceeding brought by joint compulsory liquidators of foreign debtors that were the subject of insolvency proceedings pending in England for post-recognition relief. 28 U.S.C.A. § 1334(c)(1).

Cases that cite this headnote

[27]    **Federal Courts**
👈Bankruptcy

Even if bankruptcy court had discretion to permissively abstain from hearing proceeding brought by joint compulsory liquidators of foreign debtors for post-recognition relief, court would decline to abstain from hearing liquidators' fraudulent transfer and unjust enrichment claims. 28 U.S.C.A. § 1334(c)(1).

Cases that cite this headnote

[28]    **Federal Courts**
👈Bankruptcy

Courts must be sparing in their exercise of permissive abstention in proceedings before them in exercise of their bankruptcy jurisdiction, and may abstain only for a few extraordinary and narrow exceptions. 28 U.S.C.A. § 1334(c)(1).

Cases that cite this headnote

[29]    **Bankruptcy**
👈Discretion
**Federal Courts**
👈Discretion in general

Whether to dismiss cause of action on forum non conveniens grounds is a decision that lies wholly within broad discretion of court and should be reversed only if that discretion has been clearly abused.

Cases that cite this headnote

[30]    **Federal Courts**
👈Denial, dismissal, or transfer

Federal court may act sua sponte to dismiss action on grounds of forum non conveniens.

Cases that cite this headnote

[31]    **Federal Courts**
👈Timeliness issues

Motion to dismiss on forum non conveniens grounds may be made at any time.

Cases that cite this headnote

[32]    **Federal Courts**

*In re Hellas Telecommunications (Luxembourg) II SCA*, 535 B.R. 543 (2015)

👈Timeliness issues

In evaluating whether plaintiff's choice of forum is convenient, or whether cause of action should be dismissed on forum non conveniens grounds, court may consider defendant's delay in bringing motion to dismiss on basis of forum non conveniens.

1 Cases that cite this headnote

[33]    **Federal Courts**
👈Forum Non Conveniens

Courts engage in three-step analysis when deciding whether to dismiss cause of action for forum non conveniens, under which they first determine the degree of deference properly accorded to plaintiff's choice of forum, then determine whether an adequate alternative forum exists, and finally balance series of factors involving the private interests of parties in maintaining litigation in the competing forums and any public interests at stake.

Cases that cite this headnote

[34]    **Federal Courts**
👈Presumptions and burden of proof

Defendant moving to dismiss on forum non conveniens grounds bears burden of establishing that adequate alternative forum exists and then to show that the pertinent private and public interest factors tilt strongly in favor of trial in foreign forum.

Cases that cite this headnote

[35]    **Federal Courts**
👈Parties' choice of forum;  forum-shopping
**Federal Courts**
👈Presumptions and burden of proof

When plaintiff has brought cause of action in its home forum, courts give plaintiff's choice of forum substantial deference in deciding whether to dismiss on forum non conveniens grounds, as plaintiff's home forum is presumed to be convenient.

1 Cases that cite this headnote

[36]    **Federal Courts**
👈Parties' choice of forum;  forum-shopping

Foreign plaintiff's choice of United States as forum is entitled to less deference on motion to dismiss on forum non conveniens grounds, as there is possibility of forum shopping, and there is little reason to assume that the United States is convenient forum for foreign plaintiff.

Cases that cite this headnote

[37]    **Federal Courts**
👈Parties' choice of forum;  forum-shopping

In deciding whether plaintiff's choice of forum was motivated by genuine convenience, so as to be entitled to deference on motion to dismiss on forum non conveniens grounds, courts consider (1) convenience of plaintiff's residence in relation to chosen forum, (2) availability of witnesses or evidence to forum district, (3) defendant's amenability to suit in the forum district, (4) availability of appropriate legal assistance, and (5) other reasons relating to convenience or expense.

1 Cases that cite this headnote

[38]    **Federal Courts**
👈Parties' choice of forum;  forum-shopping

Circumstances that are indicative of forum shopping, and that weigh against according deference to plaintiff's choice of forum on

In re Hellas Telecommunications (Luxembourg) II SCA, 535 B.R. 543 (2015)

motion to dismiss on forum non conveniens grounds, include (1) attempts to win a tactical advantage resulting from local laws that favor plaintiff's case, (2) the habitual generosity of juries in forum district, (3) plaintiff's popularity or defendant's unpopularity in region, or (4) inconvenience and expense to defendant resulting from litigation in chosen forum.

Cases that cite this headnote

[39]   **Bankruptcy**
🔑Cases Ancillary to Foreign Proceedings

Choice of United States forum by joint compulsory liquidators of foreign debtors which were the subject of insolvency proceedings pending in England, in electing to pursue their fraudulent transfer and unjust enrichment claims in Chapter 15 proceeding for post-recognition relief, was entitled to considerable deference on motion to dismiss these claims on forum non conveniens grounds, where liquidators, while living abroad, appeared to be motivated by considerations of convenience in pursuing claims in the United States to reach assets located within its borders, where liquidators' counsel were based in New York, as were number of witnesses, where there was no evidence that liquidators sought to gain any tactical advantage by pursuing claims in the United States, and where it was likely that defendants, that were based overwhelmingly in the United-State, would suffer less inconvenience and expense by litigating in United States than in European forum; indeed, defendants' delay in waiting more than a year to file dismissal motion belied any claim that the United States was not convenient forum.

Cases that cite this headnote

[40]   **Federal Courts**
🔑Availability and adequacy
**Federal Courts**
🔑Amenability to process

Alternative forum is ordinarily "adequate," as factor bearing on whether cause of action should be dismissed on forum non conveniens grounds, if defendants are amenable to service of process there and the forum permits litigation of subject matter of dispute.

Cases that cite this headnote

[41]   **Federal Courts**
🔑Availability and adequacy

Court cannot dismiss action on forum non conveniens grounds unless it is satisfied that litigation may be conducted elsewhere against all defendants; if there is no adequate alternative forum, then court's inquiry ends, and motion to dismiss must be denied.

Cases that cite this headnote

[42]   **Bankruptcy**
🔑Cases Ancillary to Foreign Proceedings

Unavailability of alternate forum which could exercise jurisdiction over all of parties from whom foreign representatives sought to recover on fraudulent transfer and unjust enrichment theories prevented bankruptcy court from concluding that amendment by which foreign representatives sought to add these fraudulent transfer and unjust enrichment claims would be futile on basis of forum non conveniens. Fed. R. Civ. P. 15(a).

Cases that cite this headnote

[43]   **Bankruptcy**
🔑Pleading; dismissal

For amendment to pleading to be denied on "bad faith" grounds, amendment itself must embody unfair strategic maneuvering. Fed. R. Civ. P.

15(a).

Cases that cite this headnote

**[44]**    **Bankruptcy**
👉Cases Ancillary to Foreign Proceedings

Amendment by which joint compulsory liquidators of foreign debtors that were the subject of insolvency proceedings pending in England, following dismissal of fraudulent transfer claims that they asserted pursuant to New York law, belatedly sought to add fraudulent transfer claims grounded in English law, could not be denied on "bad faith" grounds solely because liquidators had failed to anticipate that bankruptcy court would not allow liquidators to pursue these New York law claims, upon ground that such claims belonged to debtors' New York creditors and that liquidators lacked standing to assert them. Fed. R. Civ. P. 15(a).

Cases that cite this headnote

**[45]**    **Bankruptcy**
👉Pleading; dismissal

Party is generally allowed to amend its pleadings in the absence of showing by nonmovant of prejudice or bad faith. Fed. R. Civ. P. 15(a).

Cases that cite this headnote

**[46]**    **Bankruptcy**
👉Pleading; dismissal

Prejudice to nonmoving party, of kind that will support denial of motion for leave to amend pleading, is considered in relation to length of movant's delay in seeking leave to amend; the longer the period of unexplained delay, the less will be required of nonmoving party in terms of

showing of prejudice. Fed. R. Civ. P. 15(a).

Cases that cite this headnote

**[47]**    **Bankruptcy**
👉Pleading; dismissal

In determining whether defendant would be prejudiced by amendment allowing plaintiff to add a claim, courts consider whether the assertion of new claim would (1) require defendant to expend significant additional resources to conduct discovery and prepare for trial, (2) significantly delay the resolution of dispute, or (3) prevent plaintiff from bringing a timely action in another jurisdiction.

Cases that cite this headnote

**[48]**    **Bankruptcy**
👉Cases Ancillary to Foreign Proceedings

Amendment by which joint compulsory liquidators of foreign debtors that were the subject of insolvency proceedings pending in England, following dismissal of fraudulent transfer claims that they asserted pursuant to New York law, belatedly sought to add fraudulent transfer claims grounded in English law, could not be denied on "undue delay" or "prejudice" theory, where liquidators, while failing to anticipate that bankruptcy court would find that they did not have standing to pursue New York law claims, which belonged to debtors' New York creditors, promptly sought to amend after New York law claims were dismissed, and where claims that liquidators sought to add by amendment were based on same events underlying the causes of action asserted in original complaint and involved similar elements, thus requiring little incremental discovery or further delay to resolve. Fed. R. Civ. P. 15(a).

Cases that cite this headnote

In re Hellas Telecommunications (Luxembourg) II SCA, 535 B.R. 543 (2015)

**Attorneys and Law Firms**

**\*550** Chadbourne & Parke LLP, Attorneys for Plaintiffs as against All Defendants except Defendant Deutsche Bank AG, 1301 Avenue of the Americas, New York, New York 10019, By: Howard Seife, Esq., Andrew Rosenblatt, Esq., Marc D. Ashley, Esq.

Wolf Haldenstein Adler Freeman & Herz LLP, Attorneys for Plaintiffs as against Defendant Deutsche Bank AG, 270 Madison Avenue, New York, New York 10016, By: Alan McDowell, Esq., Jeremy Cohen, Esq.

Kasowitz, Benson, Torres & Friedman LLP, Attorneys for the TPG Defendants, 1633 Broadway, New York, New York 10019, By: Paul M. O'Connor III, Esq., Andrew K. Glenn, Esq.

Ropes & Gray LLP, Attorneys for Defendant Apax Partners, L.P., 1211 Avenue of the Americas, New York, New York 10036, By: Robert S. Fischler, Esq., Stephen C. Moeller–Sally, Esq.

Cahill Gordon & Reindel LLP, Attorneys for Defendant Deutsche Bank AG, 80 Pine Street, New York, New York 10005, By: Charles A. Gilman, Esq., Kevin J. Burke, Esq., Philip V. Tisne, Esq., Frederick W. Vaughan, Esq.

Latham & Watkins LLP, Attorneys for the TCW Defendants, 355 South Grand Avenue, Los Angeles, California 90071, By: Wayne S. Flick, Esq. (pro hac vice ), Amy C. Quartarolo, Esq. (pro hac vice )

### *MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT*

MARTIN GLENN, UNITED STATES BANKRUPTCY JUDGE

Andrew Lawrence Hosking and Bruce Mackay (together, the "Plaintiffs"), in their **\*551** capacity as Joint Compulsory Liquidators of Hellas Telecommunications (Luxembourg) II SCA ("Hellas II"), filed a complaint (the "Complaint," ECF Doc. # 1), seeking to avoid and recover an initial transfer made by Hellas II to its parent entity in the amount of approximately €1.57 billion and to

avoid and recover approximately €973.7 million of subsequent transfers allegedly made to several named defendants and an unnamed class of transferees (together, the "Original Defendants"). The Complaint asserted actual and constructive fraudulent transfer causes of action under the New York Debtor and Creditor Law ("NYDCL") against each of the Original Defendants, and an unjust enrichment claim under unspecified law against the Original Defendants affiliated with the private equity firms Apax Partners LLP ("Apax Partners") and TPG Capital Management, L.P. ("TPG Capital").

The Original Defendants moved to dismiss the Complaint on various grounds, including lack of standing, lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim. The Court granted in part and denied in part the motions to dismiss. *See Hosking v. TPG Capital Mgmt., L.P. (In re Hellas Telecomms. (Lux.) II SCA),* 524 B.R. 488 (Bankr.S.D.N.Y.2015) ("*Hosking I*"). The Complaint was dismissed for lack of personal jurisdiction as to Apax Partners and the foreign-based Original Defendants affiliated with Apax Partners and TPG Capital, *see id.* at 512; however, the Court concluded that personal jurisdiction could be exercised over each of the other Original Defendants, *see id.* at 513.[1] The Plaintiffs' NYDCL fraudulent transfer claims were dismissed for lack of standing.[2] *See id.* at 529 & n. 41. Only the unjust enrichment claim survived against the United States ("U.S.")-based Original Defendants affiliated with Apax Partners and TPG Capital. *See id.* at 529, 539.

The Plaintiffs now seek leave to file a first amended complaint (the "First Amended Complaint" or "FAC," Ashley Decl. Ex. A) that: (1) joins additional proposed defendants (the "Proposed Defendants");[3] (2) withdraws the unjust enrichment claim against Apax NY; (3) removes TCW Asset Management Company ("TCW Asset") and TCW Group Inc. ("TCW Group") as Defendants; and (4) pleads new causes of action sounding in fraudulent transfer under UK and Luxembourg law (the "Additional Claims") against several of the Original Defendants and the Proposed Defendants (together, the "Defendants"). **\*552**[4] (*See* the "Motion," ECF Doc. # 153 at 1–3.)

The Additional Claims include: (1) an actual fraudulent transfer claim under section 423 of the UK's Insolvency Act 1986 (the "Insolvency Act") against all Defendants except Apax NY (the "Section 423 Claim");[5] (2) a fraudulent trading claim under section 213 of the Insolvency Act against all Defendants except the TPG Affiliate Defendants and the Transferee Class (the "Section 213 Claim"); and, (3) in the alternative to the

Section 423 Claim and the Section 213 Claim, an actual fraudulent transfer claim under Article 1167 of the Luxembourg Civil Code and Article 448 of the Luxembourg Commercial Code against all Defendants except Apax NY (the "Article 1167 Claim"). (*Id.* at 2.) The First Amended Complaint also asserts an unjust enrichment claim against the TPG Capital Defendants, the TPG Advisors IV Defendants, and the T3 Advisors II Defendants under New York or, in the alternative, UK or Luxembourg law. (FAC ¶¶ 227–231.)

Oppositions to the Motion (collectively, the "Oppositions") were filed by: (i) Apax NY (the "Apax Opposition," ECF Doc. # 164);[6] (ii) the TPG Defendants (the "TPG Opposition," ECF Doc. # 161);[7] (iii) TCW (the "TCW Opposition," ECF Doc. # 158); and (iv) DB (the "DB Opposition," ECF Doc. # 162).[8] The Plaintiffs filed a reply (the "Reply," ECF Doc. # 174).[9] On July 22, 2013, the Court heard argument and took the Motion under submission.

The Defendants argue that the Motion should be denied because it was filed in bad faith, was unduly delayed, and is unduly prejudicial to the Defendants. According to the Defendants, the Plaintiffs made a poor decision to plead their original claims solely under New York law and now improperly seek a do-over after the parties spent months and millions of dollars litigating. The Defendants also argue that amending the Complaint is futile because each of the claims in the First Amended Complaint fails to state a plausible claim for relief: (1) a claim under section 423 of the Insolvency Act cannot be adjudicated by a court outside the UK; (2) **553** the Section 213 Claim fails to adequately plead scienter; (3) the Plaintiffs lack standing to bring the Article 1167 Claim (a "creditor" claim); (4) the unjust enrichment claim is barred because (i) contracts governed the challenged transfers, (ii) the claim is duplicative of fraudulent transfer claims, (iii) section 546(e) of the Bankruptcy Code preempts the claim, and (iv) the claim is barred in a chapter 15 case by section 1521(a)(7) of the Bankruptcy Code because it seeks identical relief to a claim under section 548 (which cannot be brought in a chapter 15 case); (5) the claims should be dismissed on international comity grounds; and, finally, (6) the claims should be dismissed based on *forum non conveniens*. The Court must also address choice of law principles in deciding whether UK or Luxembourg law applies.

As explained below, the Court concludes that the First Amended Complaint was not filed in bad faith, was not unduly delayed, and is not unduly prejudicial to the Defendants; the Section 423 Claim can be adjudicated by this Court; UK law governs the Plaintiffs' claims because

it has a palpably greater interest in the subject of the claims; the First Amended Complaint adequately pleads the Section 213 Claim against each applicable Defendant; the Article 1167 Claim is futile—the Plaintiffs lack standing to bring the claim because it belongs to creditors; the unjust enrichment claim is not futile for any of the reasons argued; the claims should not be dismissed on international comity grounds because permissive abstention is not available under the circumstances; and the claims should not be dismissed under the *forum non conveniens* doctrine because the Defendants have failed to establish that an adequate alternative forum exists to adjudicate the claims. Accordingly, the Motion for leave to file the First Amended Complaint is **GRANTED in part** and **DENIED in part**.

## I. *BACKGROUND*

### A. Facts Alleged in the First Amended Complaint[10]

In June 2005, eight investment funds (the "Sponsors") allegedly formed by TPG Capital and Apax Partners used a special purpose vehicle ("Troy GAC") to acquire approximately 80% of the equity in TIM Hellas Communications S.A. ("TIM Hellas")—a Greek telecommunications services provider—in a leveraged transaction. (*See* FAC ¶¶ 111–116.) In March 2005, TPG[11] and Apax[12] allegedly organized a group of entities under Luxembourg law in preparation for the acquisition of TIM Hellas, including Hellas II, Hellas Telecommunications, S.à r.l. ("Hellas"), Hellas Telecommunications I, S.à r.l. ("Hellas I"), Hellas Telecommunications Finance SCA ("Hellas Finance"), and other related entities. (*See id.* ¶ 113.) Hellas II and Hellas Finance were wholly owned by Hellas I, which in turn was wholly owned by Hellas. (*Id.* ¶ 114.) Hellas, the ultimate parent of the Hellas entities, was wholly owned by the Sponsors. (*Id.*) The Sponsors acquired **554** the remaining shares of TIM Hellas in November 2005 through Troy GAC, and the acquisition was principally funded by debt issued by the Hellas entities. (*See id.* ¶ 118.) Subsequently, the Sponsors' equity interests in TIM Hellas were cancelled, and TIM Hellas merged into Troy GAC; the surviving entity became a wholly owned subsidiary of Hellas II. (*See id.* ¶ 119.)

On June 15, 2005, Hellas issued 490,000 convertible preferred equity certificates ("CPECs") to the Sponsors with a par value of €49 million. (*Id.* ¶ 124.) The Sponsors transferred €49 million to Hellas in exchange for the CPECs. (*Id.*) At the same time, Hellas I—the direct subsidiary of Hellas and direct parent of Hellas II—issued

490,000 CPECs to Hellas, and Hellas II issued an equivalent number of CPECs to Hellas I. (*Id.*)

In a stock purchase deal that closed on January 31, 2006, TPG and Apax allegedly used Hellas and its related entities to acquire Q–Telecom, a business unit of a large mobile telecommunications provider in Greece. (*See id.* ¶ 131.) The Q–Telecom acquisition was principally financed with debt issued by a subsidiary of Hellas II and cash contributed by one or more of Hellas II's other subsidiaries. (*See id.* ¶ 132.) On the same day, the Sponsors transferred €28.3 million to Hellas in exchange for 282,681 additional CPECs issued by Hellas to the Sponsors.[13] (*Id.* ¶ 133.)

By June 2006, TPG and Apax "put in motion plans to dispose of [Hellas II]'s subsidiaries in a sale to a third party." (*Id.* ¶ 139.) TPG and Apax engaged Morgan Stanley and Lehman Brothers as financial advisors in connection with an auction of TIM Hellas. (*See id.* ¶ 141.) Morgan Stanley and Lehman Brothers prepared an information memorandum to be distributed to prospective purchasers (the "Information Memorandum"), which was prepared with input from TPG and Apax and approved by TIM Hellas's board of directors. (*Id.*) TPG and Apax demanded a sale price of at least €3.5 billion, more than double the total consideration paid to acquire TIM Hellas and Q–Telecom. (*Id.* ¶ 142.)

Morgan Stanley and Lehman Brothers contacted more than 30 parties to solicit their participation in the auction; however, less than half of these parties expressed sufficient interest to receive a copy of the Information Memorandum. (*Id.* ¶ 143.) On October 9, 2006, five parties submitted first-round, non-binding bids to acquire TIM Hellas. (*Id.*) These bids implied an enterprise value of TIM Hellas ranging from €2.5–3.8 billion. (*See id.*) Three parties were invited to the second round of the auction and provided access to certain diligence information. (*See id.*) The deadline for these second-round bidders to submit binding offers was extended from November 27, 2006 to November 30, 2006; however, the auction failed to generate any binding offers despite the extension. (*Id.* ¶ 144.) By December 2006, TPG and Apax abandoned the auction after bidders failed to meet their price and "instead took steps to extract those returns from [Hellas II] under the guise of a purported 'refinancing' of its debt." (*Id.*)

On or about December 21, 2006, the following multi-step transaction was completed (the "December 2006 Transaction"): (1) Hellas II issued €960 million and $275 million of Floating Rate Subordinated Notes due 2015 (the "Sub Notes"); (2) Hellas Finance and certain subsidiaries of Hellas issued additional ***555** series of notes, the proceeds of which were transferred or loaned to Hellas II; (3) Hellas II transferred a total of approximately €1.57 billion to its parent, Hellas I, of which approximately €978.7 million was paid to redeem CPECs issued by Hellas II;[14] (4) Hellas I paid approximately €973.7 million to Hellas to redeem CPECs issued by Hellas I; and (5) Hellas paid the Sponsors approximately €973.7 million to redeem CPECs issued by Hellas (the "December 2006 CPEC Redemption"). (*See id.* ¶¶ 160–61, 68.) The Sponsors subsequently transferred the proceeds of the December 2006 CPEC Redemption to the Transferee Defendants and the Transferee Class. (*See id.* ¶¶ 170, 207, 221.)

In February 2007, TPG and Apax sold Hellas and its subsidiaries to Weather Investments S.p.A.—later renamed WIND Telecom S.p.A. ("Weather Investments")—an Italian corporation. (*See id.* ¶ 192.) Weather Investments purchased 100% of the equity of Hellas for €500 million, €6,435,736 of which was allocated toward the purchase of the remaining CPECs previously issued by Hellas to the Sponsors at the par value of €1 per CPEC. (*Id.* ¶ 195.) Hellas II's financial statements for the year ending December 31, 2007 indicated that its debt-service obligations grew and resulted in a net financial loss of more than €259.5 million; its "leverage remained high at 12.4x EBIT, while its cash interest coverage declined to 1.2x EBIT." (*Id.* ¶ 198.) On June 5, 2008, Apax Partners paid Weather Investments €500 million for a 5% equity stake in the company. (*Id.* ¶ 199.)

From December 21, 2006 (i.e., the date of the December 2006 Transaction) through the February 2007 sale of Hellas to Weather Investments, TPG and Apax collected "consulting fees" from Hellas II. (*See id.* ¶ 191.) Over this period of time, Hellas II "paid a minimum of €1.22 million in additional 'consulting fees' to Hellas I and, directly or indirectly, Hellas I then paid approximately those same amounts to TPG and Apax (the "Consulting Fees Transfer")." (*Id.*)

In 2009, Hellas II began considering a potential restructuring of its capital structure. (*See id.* ¶ 201.) In anticipation of such a restructuring, Hellas II moved its center of main interests from Luxembourg to the UK in August 2009, including by moving its head office and operating office to London, England. (*Id.*) On November 26, 2009, the High Court of Justice of England and Wales (the "High Court") approved placing Hellas II into administration in England and appointed joint administrators (the "Administrators"). (*Id.*) On December 1, 2011, the High Court discharged the Administrators

and ruled that Hellas II should be instead wound-up through a compulsory liquidation. (*Id.* ¶ 152.) The UK's Secretary of State for Trade and Industry appointed the Plaintiffs as Joint Compulsory Liquidators on December 5, 2011.[15] (*See id.* ¶ 18.)

**B. Procedural History**

On February 16, 2012, the Debtor filed a chapter 15 petition for recognition of its **556** foreign proceeding in this Court. (*See* Case No. 12–10631, ECF Doc. # 1.) The Court entered an order granting recognition of the Debtor's foreign main proceeding on March 14, 2012. (*See* Case No. 12–10631, ECF Doc. # 17.) This adversary proceeding was commenced nearly two years later, on March 13, 2014. (*See* ECF Doc. # 1.)

In the Complaint, the Plaintiffs alleged that Hellas II was insolvent at the time of the December 2006 CPEC Redemption and that the Original Defendants received portions of the proceeds of such transaction from one or more Sponsors. (*See* Compl. ¶¶ 23–74, 118.) The Plaintiffs sought to avoid and recover the following transfers as actual or constructive fraudulent transfers under the NYDCL: (i) the initial transfer of €1.57 billion Hellas II made to Hellas I; (ii) the subsequent transfers Hellas II ultimately made to the Original Defendants through the Sponsors; and (iii) the Consulting Fees Transfer made from Hellas II to TPG and Apax. (*See id.* ¶¶ 155–168.) The Plaintiffs also asserted an unjust enrichment claim against TPG and Apax for their receipt of payments made in the course of the December 2006 Transaction, the December 2006 CPEC Redemption, and the Consulting Fees Transfer. (*See id.* ¶¶ 169–173.)

The Original Defendants filed motions to dismiss the Complaint on various grounds, including lack of personal jurisdiction, lack of subject matter jurisdiction, lack of standing, and failure to state a claim. (*See* ECF Doc. # # 37, 41, 46, 50.) The Plaintiffs filed oppositions to the motions to dismiss (ECF Doc. # # 79, 83, 84), and the Original Defendants filed reply briefs (ECF Doc. ## 90, 91, 94, 98).[16]

On November 7, 2014, the Court entered an order scheduling a hearing on the motions to dismiss and directing the parties to brief choice of law issues. (ECF Doc. # 115) On November 21, 2014, the Plaintiffs and the Original Defendants (collectively) filed supplemental briefs on choice of law. (ECF Doc. # # 121, 122.) On December 3 and 16, 2014, the Court heard oral argument on the motions to dismiss and took the matter under submission.

On January 29, 2015, the Court issued the *Hosking I* opinion granting in part and denying in part the motions to dismiss. *See Hosking I,* 524 B.R. at 536. On February 13, 2015, the TPG and Apax Original Defendants filed a motion seeking limited reargument on their motion to dismiss the unjust enrichment claim (ECF Doc. # 139), arguing that the Court should reconsider *Hosking I* and dismiss the unjust enrichment claim because the opinion did not address their argument that the unjust enrichment claim is barred by section 546(e) of the Bankruptcy Code. (*See id.* at 1–2.) The Plaintiffs filed an objection to the motion for reargument (ECF Doc. # 144), and the TPG and Apax Original Defendants filed a reply (ECF Doc. # 146). On March 9, 2015, the Court issued an opinion granting the TPG and Apax Original Defendants' motion for limited reargument in order to address the section 546(e) argument, but denying their motion to dismiss the unjust enrichment claim, holding that such claim is not preempted by section 546(e) as a matter of law. *See Hosking v. TPG Capital Mgmt., L.P. (In re Hellas Telecomms. (Lux.) II SCA),* 526 B.R. 499, 515 (Bankr.S.D.N.Y.2015) ("*Hosking II* ").

Briefing on the Plaintiffs Motion to amend was completed on June 3, 2015. The Court held a hearing on the Motion to amend the Complaint on July 22, 2015 and **557** took the matter under submission. This Opinion follows.

**C. The Parties' Arguments**

*1. The Plaintiffs*

The Plaintiffs argue that they should be granted leave to amend the Complaint because the First Amended Complaint: (1) is not futile; (2) is not proposed in bad faith; (3) has not been unduly delayed; and (4) would not unduly prejudice the Defendants. (Motion at 7.)

First, the Plaintiffs contend that the First Amended Complaint is not futile because it states a claim upon which relief can be granted as to each of the Additional Claims. (*Id.*) According to the Plaintiffs, the First Amended Complaint adequately alleges each Additional Claim (*id.* at 8–10), they have standing to assert each Additional Claim (*id.* at 10–13), and each Additional Claim is timely (*id.* at 13–16).

Second, the Plaintiffs assert that there is no plausible basis to find that the Motion reflects malice or any other bad faith on the part of the Plaintiffs. (*Id.* at 16) The Plaintiffs note that the Court dismissed their NYDCL fraudulent transfer claims for lack of standing in *Hosking I,* but

stated that it would not prejudge whether the Plaintiffs would have standing to assert fraudulent transfer claims under applicable foreign law. (*Id.*) According to the Plaintiffs, the Motion is consistent with this observation and reflects their good faith intention to amend the Complaint to assert the Additional Claims under applicable foreign law. (*Id.*)

Third, the Plaintiffs argue that the Motion was not unduly delayed. (*Id.* at 17.) Soon after the *Hosking I* opinion was issued and before any Defendant filed an answer to the Complaint, the Plaintiffs negotiated the *Fourth Case Management and Scheduling Order* (the "Scheduling Order," ECF Doc. # 142), which provided them 30 days to file a motion for leave to amend the Complaint from the date the order was entered. (*See* Motion at 5–6, 17.) The Court entered the Scheduling Order on February 17, 2015 (*id.* at 5), and the Plaintiffs timely filed their Motion 30 days later (*see id.* at 17).

Finally, the Plaintiffs assert that the Defendants will not be unduly prejudiced by the First Amended Complaint. (*Id.*) Because the Additional Claims all relate to the same conduct, transactions, and occurrences alleged in the Complaint, the Defendants would be required to spend few, if any, incremental resources to defend against the Additional Claims. (*Id.* at 17–18.)

### 2. Apax NY

The only claim asserted against Apax NY in the First Amended Complaint is the Section 213 Claim. (Apax Opp. at 1.) Apax NY argues that the Motion should be denied because it is futile against it for two reasons:[17] (1) the substantive law of Luxembourg applies under New York choice of law rules, and Luxembourg law has no equivalent to section 213 of the Insolvency Act; and (2) the First Amended Complaint does not adequately plead that Apax NY had knowledge of, or was party to, Hellas II's alleged fraud. (*See id.*)

First, Apax NY argues that there is an actual conflict between the laws of the UK and Luxembourg, and therefore a choice of law analysis is required under New York choice of law rules. (*See id.* at 5.) An actual conflict between UK and Luxembourg **\*558** law exists because (i) Luxembourg law has no equivalent to section 213 of the Insolvency Act (*id.* (citing Prüm Decl. ¶¶ 6–12)); and (ii) a claim under the Luxembourg statute most closely resembling section 213, article 495–1 of the Luxembourg Commercial Code, can only be asserted in a Luxembourg bankruptcy proceeding (*id.* (citing Prüm Decl. ¶¶ 13–16)).

According to Apax NY, the Court should hold that Luxembourg law governs because Luxembourg has a greater interest in this litigation than the UK (*Id.* at 5–6.) The UK's interest in having its law applied to this adversary proceeding is primarily based on the fact that Hellas II's foreign main proceeding is pending in the UK as a result of Hellas II changing its "center of main interests" from Luxembourg to the UK well after the December 2006 Transaction took place. (*Id.* at 7.) In contrast, the actions underlying the Section 213 Claim significantly involved Luxembourg entities and individuals and were effected pursuant to agreements governed by Luxembourg law. (*See id.* at 6–7.)

Second, Apax NY argues that the First Amended Complaint does not state a claim against Apax NY because it fails to adequately plead that Apax NY had knowledge of, or was a party to, Hellas II's alleged fraud in effectuating the December 2006 Transaction.[18] (*See id.* at 9 n.4.) Specifically, Apax NY asserts that the First Amended Complaint does not adequately allege two necessary elements of a section 213 claim against Apax NY—(i) knowledge of the alleged fraud; and (ii) knowing participation in the alleged fraud. Instead, it improperly uses group-pleading that does not sufficiently identify any conduct supportive of this claim against Apax NY individually. (*See id.* at 13–14.)

### 3. The TPG Defendants

The TPG Defendants argue that the Motion should be denied because the Plaintiffs' proposed amendments (i) are unduly delayed, evincing bad faith (*see* TPG Opp. at 9–13); and (ii) are futile (*see id.* at 13).[19] According to the TPG Defendants, the Plaintiffs could have alleged the Additional Claims at the outset of this Adversary Proceeding but strategically chose not to, opting instead to forum- and law-shop by asserting solely New York law claims in a U.S. court. (*See id.* at 9–10.) Despite the Court raising issues with the Plaintiffs' choice of pleading New York law claims nearly a year before the Motion was filed, the Plaintiffs did not seek to amend the Complaint until after the Court issued the *Hosking I* opinion dismissing the NYDCL claims. (*See id.* at 11.) Moreover, the Plaintiffs admit that they seek to amend their Complaint to address the *Hosking I* opinion, essentially seeking to use *Hosking I* as an advisory opinion and to "obtain a complete do-over after [the] adverse ruling." (*Id.* (emphasis omitted).)

The TPG Defendants also argue that the First Amended Complaint is futile because each of the claims asserted

would be dismissed as a matter of law (*id.* at 13) and the First Amended Complaint would be dismissed under the doctrine of *forum non conveniens* (*id.* at 28). First, they argue that the Section 423 Claim is futile because it can only be brought in a court that has jurisdiction to wind up Hellas II and, since this Court lacks such jurisdiction, it also lacks subject matter jurisdiction over the Section 423 Claim. (*See id.* at 13–14.) Second, they contend that the Section 213 Claim is futile because the First Amended Complaint does not adequately plead that Hellas II defrauded its creditors ( **\*559** *id.* at 15), or that any of the TPG Defendants were "knowingly parties" to the alleged fraud (*see id.* at 16–18).[20] The TPG Defendants argue that the Plaintiffs fail to plead fraudulent intent with the requisite degree of specificity, especially in light of the advanced stage of fact discovery, and they instead rely on improper group pleading. (*See id.* at 17–18.) Third, the TPG Defendants assert that the Article 1167 Claim is futile because the Plaintiffs lack standing to assert it: such a claim belongs to a company's creditors, not its liquidators appointed under non-Luxembourgish law. (*See id.* at 18–20.) Fourth, the TPG Defendants argue that the Plaintiffs' "new" unjust enrichment claim is futile because: (i) contracts governed the CPEC redemptions, and an unjust enrichment claim must be dismissed where an enforceable contract governs the dispute (*see id.* at 20–21); (ii) it duplicates the other tort-based claims, and an unjust enrichment claim is not available where it simply duplicates a tort claim (*see id.* at 21–22); (iii) it is preempted by section 1521(a)(7) of the Bankruptcy Code because it is virtually identical to an actual fraudulent transfer claim under the Bankruptcy Code and therefore seeks the same relief available under section 548 (*see id.* at 22–23); and (iv) it is barred by section 546(e) of the Bankruptcy Code (*see id.* at 23–28). Finally, the TPG Defendants argue that the First Amended Complaint would be dismissed under the doctrine of *forum non conveniens*. (*See id.* at 28–35.)

### 4. TCW

The First Amended Complaint asserts the Section 423 Claim and the Article 1167 Claim against TCW. (*See* FAC ¶¶ 205–212, 219–226.) TCW argues that the Motion is futile because the First Amended Complaint fails to state either claim against any TCW Defendant.[21] (*See* TCW Opp. at 1.)

First, TCW contends that section 423 of the Insolvency Act must be read in conjunction with section 425(2), which provides that an order made under section 423:

(a) shall not prejudice any interest in property which was acquired from a person other than the debtor and was acquired in good faith, for value and without notice of the relevant circumstances, or prejudice any interest deriving from such an interest, and

(b) shall not require a person who received a benefit from the transaction in good faith, for value and without notice of the relevant circumstances to pay any sum unless he was a party to the transaction.

(*Id.* at 6–7) (quoting Insolvency Act 1986, c. 45, § 425(2) (Eng.)).) TCW asserts that section 425(2)(a) applies because each TCW Defendant allegedly received proceeds from "a person other than the debtor." (*See id.* at 7.) Accordingly, TCW argues that the Section 423 Claim against TCW is futile because the First Amended Complaint does not allege that: (i) any TCW Defendant acted in bad faith; (ii) knew of Hellas II's alleged fraudulent intent in carrying out the December 2006 Transaction or knew that the price of the December 2006 CPEC Redemption may have been inflated; (iii) was involved in the December 2006 CPEC Redemption in a capacity **\*560** other than as a passive recipient of funds; or (iv) any TCW Defendant received proceeds from the December 2006 CPEC Redemption without providing any value in return. (*See id.* at 8.) TCW further argues that section 425(2)(b) bars the Section 423 Claim against certain TCW Defendants because the First Amended Complaint does not allege that such Defendants were a party to the challenged December 2006 CPEC Redemption. (*See id.* at 11.)

Second, TCW contends that the First Amended Complaint fails to state the Article 1167 Claim against TCW because it does not allege either of two alternative, necessary elements for such claim: (1) that any TCW Defendant is an "accomplice of the fraud;" or (2) that the transfer of proceeds of the December 2006 CPEC Redemption to TCW lacked "valuable consideration." (*See id.* at 12–14.)

### 5. DB

Each of the Additional Claims is asserted against DB in the First Amended Complaint. (*See* FAC ¶¶ 205–226.) DB argues that the Motion should be denied as futile for three reasons.[22] First, DB argues that principles of international comity mandate denying the Motion because the Additional Claims are asserted by foreign Plaintiffs, under foreign law, and are based on conduct that occurred overseas. (*See* DB Opp. at 5–8.) According to DB, these overwhelmingly foreign claims should be resolved in the

UK and/or Luxembourg, not in this Court. (*See id.*) Second, DB argues that the doctrine of *forum non conveniens* favors the dismissal of the Additional Claims because: (i) the foreign Plaintiffs' choice of forum, admittedly selected for strategic reasons, is entitled to no deference (*see id.* at 9–10); (ii) a UK court is an adequate alternative forum (*see id.* at 10–11); and (iii) the balance of public and private factors considered in a *forum non conveniens* analysis weigh in favor of dismissal (*see id.* at 12–16). Third, DB contends that the Section 213 Claim against DB is futile because the First Amended Complaint does not plead a strong inference of DB's fraudulent intent, which is required in light of the extensive discovery taken to date. (*See id.* at 16–21.)

## II. *DISCUSSION*

### A. Amendment of a Pleading under FRCP 15(a)

[1]FRCP 15(a), made applicable to this Adversary Proceeding by Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7015, provides:

> A party may amend its pleading once as a matter of course within: (A) 21 days after serving it; or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under [FRCP] 12(b), (e), or (f), whichever is earlier.

FED. R. CIV. P. 15(a)(1); *see* FED. R. BANKR. P. 7015 (adopting FRCP 15 for adversary proceedings). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." FED. R. CIV. P. 15(a)(2). In such cases, "[t]he court should freely give leave when justice so requires." *Id.*; *accord In re Metzeler,* 66 B.R. 977, 981 (Bankr.S.D.N.Y.1986) ("Leave to amend is to be freely granted as Rule 15(a) provides." **\*561** ). The liberal standard for granting leave to amend must be balanced by other important goals such as the need to preserve the integrity and efficiency of the judicial system. *In re Everfresh Beverages, Inc.,* 238 B.R. 558, 570 (Bankr.S.D.N.Y.1999).

[2]A court may deny a motion for leave to amend "if the amendment (1) has been delayed unduly, (2) is sought for dilatory purposes or is made in bad faith, (3) [would prejudice] the opposing party ..., or (4) would be futile."

*Lee v. Regal Cruises, Ltd.,* 916 F.Supp. 300, 303 (S.D.N.Y.1996) (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). "An amendment to a complaint is futile if the proposed claim could not withstand a motion to dismiss pursuant to [FRCP] 12(b)(6)." *Lucente v. Int'l Bus. Machs. Corp.,* 310 F.3d 243, 258 (2d Cir.2002) (citing *Dougherty v. N. Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 88 (2d Cir.2002)).

To survive a motion to dismiss under FRCP 12(b)(6), a complaint need only allege "enough facts to state a claim for relief that is plausible on its face." *Vaughn v. Air Line Pilots Ass'n, Int'l,* 604 F.3d 703, 709 (2d Cir.2010) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (citation omitted). Plausibility "is not akin to a probability requirement," but rather requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation omitted).

[3]FRCP 9(b) requires a plaintiff alleging claims sounding in fraud to "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). On the other hand, a party's requisite mental state, or scienter, "may be alleged generally." *Id.*; *see Cohen v. Koenig,* 25 F.3d 1168, 1173 (2d Cir.1994) ("[T]he language of Rule 9(b) means that great specificity [is] not required with respect to ... allegations of ... scienter." (citation omitted)). Despite FRCP 9(b)'s relaxed standard for pleading scienter, allegations of scienter must "give rise to a strong inference of fraudulent intent." *Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir.2001) (quoting *Novak v. Kasaks,* 216 F.3d 300, 307 (2d Cir.2000)). "The requisite 'strong inference' of fraud may be established either by (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.' " *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 290–91 (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994)).

The parties disagree about the standard applicable to pleading the fraud-based elements of the Section 213 Claim. With respect to pleading the circumstances constituting fraud, the Plaintiffs argue that they are subject to a more liberal pleading standard because they are outsiders to the December 2006 CPEC Redemption (*see* Reply at 12), while the Defendants contend that such a relaxed pleading standard does not apply where, as here, the "Plaintiffs have received extensive document

discovery ... and taken multiple depositions of key witnesses" (DB Opp. at 17; *see* TPG Opp. at 18). In response, the Plaintiffs contend that they have not completed important discovery, including depositions of potentially key witnesses, and a heightened pleading standard only applies when discovery is complete. (Reply at 12–13.)

[4] [5] [6]Courts relax, but do not eliminate, the particularity requirement for pleading fraud where the plaintiff is a **\*562** bankruptcy trustee or a "third party[ ] who is pleading fraud on secondhand information." *Devaney v. Chester,* 813 F.2d 566, 569 (2d Cir.1987) (quoting *Hassett v. Zimmerman (In re O.P.M. Leasing Servs., Inc.),* 32 B.R. 199, 202 (Bankr.S.D.N.Y.1983)). Reflecting the policy concerns underlying the relaxed particularity standard imposed on trustees and other third parties, the Second Circuit explained that "the degree of particularity required should be determined in light of such circumstances as whether the plaintiff has had an opportunity to take discovery of those who may possess knowledge of the pertinent facts." *Id.*; *see Billard v. Rockwell Int'l Corp.,* 683 F.2d 51, 57 (2d Cir.1982) ("The policies underlying Rule 9(b) call upon us to require greater precision than is found in this complaint when full discovery has been had in a prior case."); *Liquidating Tr. v. Daimler AG (In re Old CarCo LLC),* 435 B.R. 169, 192 (Bankr.S.D.N.Y.2010) (finding no justification to relax the particularity requirement for trust's intentional fraudulent conveyance claim where complaint was filed after "Rule 2004 discovery was conducted that allowed access to numerous documents, as well as the depositions of many witnesses"); *Devaney v. Chester,* 709 F.Supp. 1255, 1261 (S.D.N.Y.1989) (dismissing trustee's fourth amended complaint for deficient allegations of fraud where trustee "had the benefit of wide-ranging discovery before filing" the complaint). While the Court is mindful of the Plaintiffs' assertion that they have not been able to depose every potential witness, fact discovery is overwhelmingly complete. Accordingly, the Plaintiffs will be afforded some, but little, latitude in pleading fraud with particularity.

## B. Futility

### 1. The Section 423 Claim[23]

The Defendants against whom the Section 423 Claim is asserted argue that the Section 423 Claim is futile because the Court lacks subject matter jurisdiction over the claim. Section 423(4) of the Insolvency Act provides that only the High Court or another court with jurisdiction to wind

up the debtor may grant relief under section 423. (*See* TPG Opp. at 13–14; TCW Opp. at 6 n.3.) Because this Court is neither the High Court nor a court with jurisdiction to wind up Hellas II, the Defendants contend that the Court lacks subject matter jurisdiction over the Section 423 Claim. (*See* TPG Opp. at 14; TCW Opp. at 6 n.3.) The Plaintiffs respond that section 423(4) "is a purely procedural English venue statute, and is therefore inapplicable in this Court even where English substantive law applies." (Reply at 7.) Because federal procedural law applies where a federal court adjudicates non-federal claims, the Plaintiffs contend, section 423(4) must be disregarded in favor of the applicable federal venue statutes, which establish that this Court is the proper venue for the Adversary Proceeding. (*See id.* at 7–9.)

After the Plaintiffs filed their Reply, TCW filed a letter on behalf of all the Defendants against whom the Section 423 Claim is asserted (the "Section 423 Defendants' Letter," ECF Doc. # 177), advancing a new argument based on a recent **\*563** Ninth Circuit decision, *Seismic Reservoir 2020, Inc. v. Paulsson,* 785 F.3d 330 (9th Cir.2015). The Defendants argue that the reasoning in *Siesmic,* affirming dismissal of a Canadian statutory claim which, the court concluded, could only be brought in a specified court in Canada, likewise applies to a claim under section 423. (*See* Section 423 Defs.' Letter at 1 (citing *Seismic Reservoir,* 785 F.3d at 335).) Therefore, the Defendants argue, the Section 423 Claim fails to state a claim upon which relief may be granted. (*See id.* (citing *Seismic Reservoir,* 785 F.3d at 335).)

TCW and the TPG Defendants also object to the Section 423 Claim on an alternative basis, arguing that section 425(2) of the Insolvency Act provides exceptions to a transferee's liability under section 423 but the Plaintiffs failed to plead the absence of each element of section 425(2). (*See* TCW Opp. at 6–14; TPG Opp. at 18 n.18.) In response, the Plaintiffs argue that section 425(2) is an affirmative defense to liability under section 423 for good faith transferees; the Plaintiffs do not have to plead the absence of good faith. (Reply at 21.) But even if the Plaintiffs must plead the inapplicability of a section 425(2) defense, the Plaintiffs argue the defense is unavailable under the circumstances because TCW and the TPG Defendants provided no consideration to Hellas II in the December 2006 CPEC Redemption. (*See id.* at 22–24.) Finally, the Plaintiffs argue the section 425(2) defense only applies to subsequent transferees; the First Amended Complaint alleges sufficient facts to collapse the steps of the December 2006 CPEC Redemption and find that none of the TCW or TPG Defendants was a subsequent transferee. (*See id.* at 24–25.)

As discussed below, the Court concludes: (1) it has subject matter jurisdiction over the Section 423 Claim under statutes enacted by Congress; (2) adjudication of the Section 423 Claim by this Court is consistent with the UK's cross-border insolvency regime; (3) this Court can grant the Plaintiffs relief under section 423 of the Insolvency Act; and (4) the Plaintiffs need not plead the inapplicability of section 425(2) to state a claim under section 423. Accordingly, the Section 423 Claim is not futile.

### a. The Court Has Subject Matter Jurisdiction over the Section 423 Claim

[7]Section 423 of the Insolvency Act applies to "transactions entered into at an undervalue." Insolvency Act 1986, c. 45, § 423(1) (Eng.). Under such circumstances, "the court may ... make such order as it thinks fit for—(*a* ) restoring the position to what it would have been if the transaction had not been entered into, and (*b* ) protecting the interests of persons who are victims of the transaction." *Id.* § 423(2). However, section 423(4) provides:

In this section "the court" means the High Court or—

(*a* ) if the person entering into the transaction is an individual, any other court which would have jurisdiction in relation to a bankruptcy petition relating to him;

(*b* ) if that person is a body capable of being wound up under Part IV or V of this Act, any other court having jurisdiction to wind it up.

*Id.* § 423(4).

According to Gabriel Moss QC ("Moss"), the Plaintiffs' expert on UK law, "section 423(4) is a provision relating to venue in the English courts and is procedural in nature." (Moss Decl. ¶ 4(a).) Moss asserts that section 423(4) addresses "complex English venue problems" concerning insolvency proceedings. (*See id.* ¶ 7.) Section 423(4) provides that any section **\*564** 423 claim can be filed in the High Court. (*Id.*) Additionally, a section 423 claim may also proceed in "a local court with personal insolvency jurisdiction" in the case of an individual debtor, and in a local court with jurisdiction to wind up "a corporate debtor (or a debtor treated as if it were a corporate debtor, such as a partnership)" in the case of a corporate debtor. (*Id.*) Barry Isaacs QC ("Isaacs"), the TPG Defendants' expert on UK law, does not address

whether section 423(4) is a purely procedural venue provision. Rather, Isaacs states that section 117 of the Insolvency Act sets forth the jurisdiction to wind up a company registered in England and Wales. (Isaacs Decl. ¶ 10; *see id.* ¶¶ 8–9.) Section 117(1) provides the High Court with such jurisdiction, and section 117(2) "provides that the county court of the district in which the company's registered office is situated has concurrent jurisdiction with the High Court where the amount of the company's share capital paid up or credited as paid up does not exceed €120,000." (*Id.* ¶ 10.)

The Defendants argue that the Court lacks subject matter jurisdiction over the Section 423 Claim, citing *Sunnyside Development Company LLC v. Cambridge Display Technology Limited,* No. C 08–01780(MHP), 2008 WL 4450328 (N.D.Cal. Sept. 29, 2008). (*See* TPG Opp. at 14 (citing *Sunnyside,* 2008 WL 4450328, at \*9); TCW Opp. at 6 n.3 (same).) In *Sunnyside,* the U.S. District Court for the Northern District of California granted the defendants' motion to dismiss a claim under section 423 of the Insolvency Act for lack of subject matter jurisdiction. 2008 WL 4450328, at \*9. The defendants in *Sunnyside* argued that the district court lacked subject matter jurisdiction over the section 423 claim, emphasizing that section 423(4) defines "the court" authorized to issue appropriate orders under section 423 as "the High Court [of England and Wales]." *Id.* In response, the plaintiff argued that jurisdiction over claims brought under section 423 is conferred to foreign courts under section 426(4), which provides that "courts having jurisdiction in relation to insolvency law in any part of the United Kingdom shall assist the courts having the corresponding jurisdiction in any other part of the United Kingdom or any relevant country or territory." *Id.* (citing Insolvency Act 1986, c. 45, § 426(4) (Eng.)). The court agreed with the defendants, finding that "section 426(4) does not confer jurisdiction on any court" but rather "only provides for cooperation among courts that already have jurisdiction." *Id.*

The Plaintiffs argue that the TPG Defendants' reliance on *Sunnyside* is misplaced because the court in that case "failed to consider whether section 423(4) should be disregarded on the grounds that it is procedural rather than substantive in nature." (Reply at 10.) Rather, the Plaintiffs contend, the proper choice of law analysis was performed by the court in *Perforaciones Martímas Mexicans S.A. de C.V. v. Grupo TMM S.A. de C.V.,* 2007 WL 1428654 (S.D.Tex. May 10, 2007), a case that is purportedly "directly on point." (Reply at 10.)

The court in *Perforaciones* held that Mexican substantive law applied to a dispute arising from a collision between a

Mexican-owned ship and a Mexican-owned mobile drilling unit in Mexican waters. *See Perforaciones,* 2007 WL 1428654, at *3–5. Thereafter, the defendants filed a petition to limit its liability for the incident in Mexico. *Id.* at *1. Because applicable Mexican law required all claims regarding the incident to be brought in the same Mexican court in which the limitation petition was filed, the defendants moved to dismiss the plaintiffs' Texas federal court action on the grounds that the Mexican statute's forum limitation provision controlled. *Id.* at *6. However, the court **565** rejected the defendants' argument, finding that the forum limitation provision is procedural and "[s]ince U.S. courts apply U.S. procedural law, the instant claim does not have to be heard in the same court in which the Mexican [petition] is pending." *Id.*

While *Sunnyside* is the only decision directly addressing whether a U.S. court has jurisdiction to adjudicate a claim under section 423 of the Insolvency Act, it does not provide much guidance. The *Sunnyside* decision did not address the issue before this Court—whether section 423(4) constitutes a venue provision that need not be applied by U.S. federal courts.[24]

[8]In *Wachovia Bank v. Schmidt,* 546 U.S. 303, 126 S.Ct. 941, 163 L.Ed.2d 797 (2006), the U.S. Supreme Court distinguished venue from subject matter jurisdiction as follows:

> [V]enue and subject-matter jurisdiction are not concepts of the same order. Venue, largely a matter of litigational convenience, is waived if not timely raised. Subject-matter jurisdiction, on the other hand, concerns a court's competence to adjudicate a particular category of cases; a matter far weightier than venue, subject-matter jurisdiction must be considered by the court on its own motion, even if no party raises an objection.

*Id.* at 305, 126 S.Ct. 941. Unlike jurisdiction, which concerns a court's power to render a valid judgment, venue "relates solely to the place where jurisdiction should or may be exercised." *U.S. ex rel. Rudick v. Laird,* 412 F.2d 16, 20 (2d Cir.1969). Whether a U.S. federal court has subject matter jurisdiction is a question of federal law, even where the applicable substantive law at issue is foreign. *See Al Fatah Int'l Navigation Co. v. Shivsu Canadian Clear Waters Tech. (P) Ltd.,* 649 F.Supp.2d 295, 299 n. 4 (S.D.N.Y.2009) ("The subject

matter jurisdiction of federal courts is limited and supplied by federal statutes; it could not possibly be supplied by foreign law." (citing *Euro Tr. Trading S.A. v. Allgrains U.K. Co.,* Case No. 09 Civ. 4483(GEL), 2009 WL 2223581, at *3 (S.D.N.Y. July 27, 2009))); *Flame S.A. v. Freight Bulk Pte. Ltd.,* 762 F.3d 352, 366 (4th Cir.2014) (Wilkinson, J., concurring) (concurring in holding that domestic law determines whether a contract or judgment is maritime and emphasizing that "[w]hile foreign law may or may not be instructive under the circumstances, it cannot determine the subject matter jurisdiction of an American court"); *cf. Kontrick v. Ryan,* 540 U.S. 443, 452, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004) ("Only Congress may determine a lower federal court's subject-matter jurisdiction." (citing *U.S. CONST. art. III, § 1*)). Additionally, federal law governs the determination whether venue for an action pending in federal court is proper. *See Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 27–28, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988) (holding that federal law governed parties' venue dispute because federal statute controlled the issue and "represent[ed] a valid exercise of Congress' constitutional powers"); *see also Martinez v. Bloomberg LP,* 740 F.3d 211, 220 (2d Cir.2014) (" 'Questions of venue and the *enforcement* of forum selection clauses are essentially procedural, rather than substantive, in nature,' and therefore should be governed by federal law." (quoting *Jones v. Weibrecht,* 901 F.2d 17, 19 (2d Cir.1990)) (citing **566** *Am. Dredging Co. v. Miller,* 510 U.S. 443, 453, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994)); *In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.,* 238 B.R. 25, 46–47 (Bankr.S.D.N.Y.1999) (applying federal common law to determine that New York was proper venue for ancillary proceeding under former Bankruptcy Code section 304); *Friedman v. Revenue Mgmt. of N.Y., Inc.,* 839 F.Supp. 203, 206 (S.D.N.Y.1993), *aff'd,* 38 F.3d 668 (2d Cir.1994) ("Determination as to proper federal venue strictly depends on federal law." (citing *Leroy v. Great W. United Corp.,* 443 U.S. 173, 183 n. 15, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979))). Consequently, applicable federal law—not section 423(4) of the Insolvency Act—dictates whether the Court lacks subject matter jurisdiction over the Section 423 Claim and whether venue is proper.

The Court has already held that it has subject matter jurisdiction over this Adversary Proceeding under section 1334(b) of title 28 of the United States Code (the "Judicial Code"). *See Hosking I,* 524 B.R. at 515 ("Notwithstanding that the Plaintiffs' claims are all state law claims brought in an adversary proceeding related to a chapter 15 proceeding, this adversary proceeding is related to a case under title 11 [of the Judicial Code]." (citing *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.,* 639 F.3d 572, 579 (2d Cir.2011))). The fact that the First

Amended Complaint asserts claims under foreign law, rather than New York state law, does not alter the Court's conclusion. Additionally, this Court is the proper venue for this Adversary Proceeding because it is where Hellas II's chapter 15 case is pending. Section 1410 of the Judicial Code governs venue of cases ancillary to foreign proceedings and provides that a case under chapter 15 of the Bankruptcy Code may be commenced in the federal district court for the district:

(1) in which the debtor has its principal place of business or principal assets in the United States;

(2) if the debtor does not have a place of business or assets in the United States, in which there is pending against the debtor an action or proceeding in a Federal or State court; or

(3) in a case other than those specified in paragraph (1) or (2), in which venue will be consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative.

28 U.S.C. § 1410. Section 1409 of the Judicial Code governs venue of proceedings arising under the Bankruptcy Code or arising in or related to cases under the Bankruptcy Code and provides, in relevant part, that such a proceeding "may be commenced in the district court in which such case is pending." *Id.* § 1409(a).

[9]The Court's conclusion that it has subject matter jurisdiction over the Section 423 Claim is bolstered by the following additional observations. First, section 423(4) of the Insolvency Act appears to be a procedural venue provision clarifying where a section 423 claim may be brought in the UK. (*See* Moss Decl. ¶ 7.) While the Court is bound to apply the substantive law of the UK to adjudicate the Section 423 Claim, it is not bound to follow UK procedural law. *See, e.g., Bournias v. Atl. Mar. Co.,* 220 F.2d 152, 154 (2d Cir.1955) ("In actions where the rights of the parties are grounded upon the law of jurisdictions other than the forum, it is a well-settled conflict-of-laws rule that the forum will apply the foreign substantive law, but will follow its own rules of procedure." (citing RESTATEMENT OF CONFLICT OF LAWS § 585 (1934); JOSEPH H. BEALE, THE CONFLICT OF LAWS § 584.1 (1935); GEORGE WILFRED STUMBERG, PRINCIPLES OF CONFLICT OF LAWS 134 *et seq.* (2d ed. 1951))); **\*567** *Adelphia Recovery Tr. v. Bank of Am., N.A.,* 624 F.Supp.2d 292, 307 (S.D.N.Y.2009) (holding that substantive law of Pennsylvania but procedural law of the U.S District Court for the Southern District of New York governed claims because "[a] court usually applies its own local law rules

prescribing how litigation shall be conducted even when it applies the local law rules of another state to resolve other issues in the case" (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWSS § 122 (1971))).[25]

Second, neither Isaacs nor Moss has identified any English decision indicating that section 423(4) is an exclusive jurisdiction provision. However, even if section 423(4) were an exclusive jurisdiction provision, this Court is not bound to enforce it. *See, e.g., Randall v. Arabian Am. Oil Co.,* 778 F.2d 1146, 1152–53 (5th Cir.1985) (refusing to enforce exclusive jurisdiction provision of Saudi Arabian labor law statute); *Seismic Reservoir,* 785 F.3d at 334 (holding that exclusive jurisdiction provision of Canadian statute did not divest the district court of jurisdiction to adjudicate claim alleged under such statute); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 91 ("A state may entertain an action even though the state of the applicable law has provided that action on the particular claim shall not be brought outside its territory."). Consequently, the Section 423 Claim is not futile on the basis that the Court lacks subject matter jurisdiction over such claim.

### b. *Resolution of the Section 423 Claim by this Court Is Consistent with the UK's Cross–Border Insolvency Regulations*

[10]The United Nations Commission on International Trade Law ("UNCITRAL") proposed the adoption of a model law on cross-border insolvency in 1997 (the "Model Law"). *See* G.A. Res. 52/158, annex, Model Law on Cross–Border Insolvency of the United Nations Commission on International Trade Law (Dec. 15, 1997). The Model Law was developed in an effort to address unpredictable and efficient procedures for dealing with international insolvency proceedings. *See* Tristan G. Axelrod, *UK Supreme Court Highlights Parochial Roadblocks to Cooperative Cross–Border Insolvency in* Rubin v. Eurofinance SA, 31 WIS. INT'L L.J. 818, 825 (2014). Under the Model Law, a central authority is granted administrative powers over the debtor's estate; debtors and creditors are encouraged "to then file ancillary proceedings in foreign countries." *Id.* "Issues in these ancillary proceedings can be litigated and assets can be administered in a manner consistent with the laws of the debtor's 'centre of main interests' [ ]." *Id.*

The U.S. and the UK each adopted versions of the Model Law. *See id.* at 820. "In 2005, Congress adopted chapter 15 of the Bankruptcy Code, which is based on the Model Law...." *In re Atlas Shipping A/S,* 404 B.R. 726, 732–33

(Bankr.S.D.N.Y.2009). In 2006, the UK adopted **568** the Cross–Border Insolvency Regulations 2006 (the "CBIR"), also based on the Model Law. *See* Cross–Border Insolvency Regulations 2006, SI 2006/1030, ¶ 2(1) (hereinafter CBIR); *see also* Hosking I, 524 B.R. at 524 (noting that the CBIR is UK's equivalent to chapter 15 of the Bankruptcy Code). The CBIR incorporates a modified version of the Model Law and has the force of law in the UK. CBIR, sch. 1 (hereinafter UK Model Law).

In advancing their argument that the Court cannot adjudicate the Section 423 Claim, the Defendants ignore that the CBIR trumps British insolvency law where the two conflict. Specifically, the CBIR modifies British insolvency law as follows:

> (1) British insolvency law (as defined in article 2 of the UNCITRAL Model Law as set out in Schedule 1 to these Regulations) and Part 3 of the Insolvency Act 1986 shall apply with such modifications as the context requires for the purpose of giving effect to the provisions of these Regulations.

> (2) In the case of any conflict between any provision of British insolvency law or of Part 3 of the Insolvency Act 1986 and the provisions of these Regulations, the latter shall prevail.

CBIR ¶ 3. The UK Model Law defines "British insolvency law" in relevant part as "provision extending to England and Wales and made by or under the Insolvency Act 1986 (with the exception of Part 3 of that Act) or by or under that Act as extended or applied by or under any other enactment (excluding the [ ] [CBIR] )...." UK Model Law, art. 2(a)(i). Accordingly, to the extent that Section 423(4) of the Insolvency Act conflicts with the CBIR, the CBIR prevails. *See* CBIR ¶ 3(2).

If section 423(4) were an exclusive jurisdiction provision, as the Defendants suggest, but which the Court rejects, it would conflict with the CBIR. Article 1 of the UK Model Law provides in relevant part that the CBIR applies where "assistance is sought in a foreign State in connection with a proceeding under British insolvency law...." UK Model Law, Art. 1, ¶ 1(b). Additionally, Article 5 of the UK Model Law provides that "[a] British insolvency officeholder is authorised to act in a foreign State on behalf of a proceeding under British insolvency law, as permitted by the applicable foreign law." *Id.* art. 5. The Plaintiffs filed the Adversary Proceeding in this Court—a foreign court—in connection with Hellas II's proceeding under British insolvency law and to obtain personal jurisdiction over the Defendants. The Plaintiffs, as the Joint Compulsory Liquidators of Hellas II, fall within the definition of "British insolvency officeholder." *See id.*

Art. 2(b)(ii) (including within definition "a person acting as an insolvency practitioner within the meaning of [S]ection 388" of the Insolvency Act); Insolvency Act 1986, c. 45, § 388(1)(a) (Eng.) (including within definition a company's "liquidator"). The Plaintiffs allege various avoidance claims under foreign law, which may be adjudicated by this Court under chapter 15 of the Bankruptcy Code. *See* 11 U.S.C. § 1521(a)(7) (permitting court to grant foreign representative "any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a)"); *Fogerty v. Petroquest Res., Inc. (In re Condor Ins. Ltd.),* 601 F.3d 319, 329 (5th Cir.2010) (holding that section 1521(a)(7) of the Bankruptcy Code does not preclude court from adjudicating claims under foreign avoidance law). To the extent that section 423(4) would preclude the Plaintiffs from seeking relief on their Section 423 Claim in this Court, it conflicts with the CBIR's provisions authorizing the Plaintiffs to act "on behalf of a proceeding under British insolvency law" in the U.S. "as permitted by" U.S. law. UK Model Law, art. 5. Consequently, even if section **569** 423(4) were an exclusive jurisdiction provision, it would be trumped by the provisions of the CBIR.[26] The Defendants argument, if successful, would effectively mean that the Joint Compulsory Liquidators could not recover undervalue transfers if personal jurisdiction could not be obtained against the transferee defendants in the High Court in the UK. The Model Law as adopted in the UK and the U.S. was designed to prevent such a result.

### c. *The Court Can Grant Relief under Section 423 of the Insolvency Act*

In the Section 423 Defendants' Letter, the Defendants against whom the Section 423 Claim is asserted advance a new theory why the Section 423 Claim is futile. According to these Defendants, the Section 423 Claim would not survive a motion to dismiss for failure to state a claim upon which relief can be granted because "Section 423 ... empowers only certain courts to grant the remedies set forth in the statute and ... this Court is not among the courts empowered under Section 423 to grant the remedies Plaintiffs seek." (Section 423 Defs.' Letter at 1.) To support this argument, the Defendants attach the Ninth Circuit's recent *Seismic Reservoir* decision.

In *Seismic Reservoir,* a California corporation asserted federal and state law claims against a California shareholder and director of the plaintiff's Canadian parent company. *Seismic Reservoir,* 785 F.3d at 332. The defendant asserted various counterclaims against two

Canadian directors of the plaintiff under state and foreign law, including a counterclaim for shareholder oppression under section 242 of the Alberta Business Corporations Act (the "Alberta Act"). *See id.* The district court dismissed the Alberta Act counterclaim for lack of subject matter jurisdiction, finding that "the Alberta Act vested exclusive jurisdiction in the Court of the Queen's Bench of Alberta." *Id.* On appeal, the Ninth Circuit held that the district court erred in dismissing the counterclaim for lack of jurisdiction but affirmed the judgment of dismissal on the grounds that the "counterclaim arising under the Alberta Act d[id] not raise a cause of action for which the district court could grant relief." *Id.* at 333. Specifically, the Ninth Circuit held that the district court had jurisdiction over the Alberta Act counterclaim under section 1332 of the Judicial Code, and the Alberta Act's exclusive jurisdiction did not divest the district court of its jurisdiction because foreign law does not dictate the subject matter jurisdiction of U.S. courts. *See id.* at 334–35. The Ninth Circuit concluded that dismissal was nonetheless appropriate under FRCP 12(b)(6) because the Alberta Act "provided a remedy available only through 'the Court of Queen's Bench of Alberta,' " *id.* at 335 (quoting Business Corporations Act, R.S.A. 2000, c. B–9, s. 1(m) (Can.)), and therefore "the counterclaim ... [wa]s one upon which no relief could be granted by the district court," *id.*

This Adversary Proceeding is distinguishable from *Seismic Reservoir* in several respects. First, the counterclaim at issue in *Seismic* arose under a Canadian corporate governance statute, not section 423 of the Insolvency Act. While the Ninth Circuit noted that Canadian law conclusively established that "only an Alberta Court has jurisdiction to grant a remedy for oppression brought in respect of an Alberta corporation," *id.* at 333, the Court **\*570** has been unable to locate any equally determinative UK precedent addressing whether section 423(4) is an exclusive jurisdiction provision. Second, it is not clear whether section 242 of the Alberta Act has extraterritorial effect. Section 423 of the Insolvency Act, on the other hand, does apply extraterritorially if the transactions to be avoided bear a sufficient connection with the UK. *See Concept Oil Servs. Ltd. v. En–Gin Grp. L* [2013] EWHC (Comm) 1897[77] (Eng.); *accord Fortress Value Recovery Fund I LLP v Blue Skye Special Opportunities Fund LP* [2013] EWHC (Comm) 14[113]–[114] (Eng.). Third, and significantly, *Seismic* did not involve chapter 15 of the Bankruptcy Code, the purpose of which is to provide means to facilitate cooperation between U.S. and foreign courts and efficiently administer cross-border insolvencies. *See* 11 U.S.C. § 1501(a). Finally, the Court concludes that it can grant relief upon the Section 423 Claim

Where a person has entered into an undervalue transaction, section 423(2) provides that the court may make an order to "(*a* ) restor[e] the position to what it would have been if the transaction had not been entered into, and (*b* ) protect[ ] the interests of persons who are victims of the transaction." Insolvency Act 1986, c. 45, § 423(2). Additionally, section 425 provides a non-exhaustive list of provisions that may be included in an order made under section 423. *See 4Eng Ltd. v. Harper* [2009] EWHC (Ch) 2633[12] (Eng.). Specifically, section 425(1) provides:

> Without prejudice to the generality of [S]ection 423, an order made under that section with respect to a transaction may (subject as follows)—
>
> > (*a* ) require any property transferred as part of the transaction to be vested in any person, either absolutely or for the benefit of all the persons on whose behalf the application for the order is treated as made;
> >
> > (*b* ) require any property to be so vested if it represents, in any person's hands, the application either of the proceeds of sale of property so transferred or of money so transferred;
> >
> > (*c* ) release or discharge (in whole or in part) any security given by the debtor;
> >
> > (*d* ) require any person to pay to any other person in respect of benefits received from the debtor such sums as the court may direct;
> >
> > (*e* ) provide for any surety or guarantor whose obligations to any person were released or discharged (in whole or in part) under the transaction to be under such new or revived obligations as the court thinks appropriate; [and]
> >
> > (*f* ) provide for security to be provided for the discharge of any obligation imposed by or arising under the order, for such an obligation to be charged on any property and for such security or charge to have the same priority as a security or charge released or discharged (in whole or in part) under the transaction.

*Id.* § 425(1). While it is not clear that the Court could grant all the relief enumerated in section 425(1), it does not follow that—consistent with section 423(2)—the Court cannot order the avoidance and recovery of assets transferred by Hellas at an undervalue if they are located in the U.S. Furthermore, the CBIR specifically contemplates a foreign court providing assistance to a UK

court "where assistance is sought in connection with a proceeding under British insolvency law." UK Model Law, Art. 1, ¶ 1(b). Chapter 15 expressly provides that the foreign representatives may **571** be entrusted with the "realization of all or part of the debtor's assets in the United States." 11 U.S.C. § 1521(a)(5); see also id. § 1521(b) (permitting entrusting distribution of debtor's assets in the U.S. to the foreign representative). A judgment entered in a foreign representative's avoidance action in the U.S. will be enforced in the UK under common law principles if the defendant appears in the action. See Rubin v. Eurofinance SA [2010] UKSC 46[6]–[10] (Eng.) (holding that avoidance orders made in insolvency proceedings by foreign court will not be enforced in the UK unless the defendant was present in the foreign country when the proceedings were commenced or submitted to the foreign court's jurisdiction. Based on the foregoing, the Court concludes that the Section 423 Claim is not futile—the Court can grant relief under section 423 of the Insolvency Act.

### d. The Plaintiffs Need Not Plead the Inapplicability of Section 425(2) of the Insolvency Act

[11] [12]"The pleading requirements in the Federal Rules of Civil Procedure ... do not compel a litigant to anticipate potential affirmative defenses, such as the statute of limitations, and to affirmatively plead facts in avoidance of such defenses." Abbas v. Dixon, 480 F.3d 636, 640 (2d Cir.2007) (citing Jones v. Bock, 549 U.S. 199, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007)); see United States ex rel. Maritime Admin. v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi., 889 F.2d 1248, 1254 (2d Cir.1989) (holding that plaintiff was not required to plead that defendant affirmative defense because FRCP 8(c) "imposed upon [the defendant] the burden of pleading it"); Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980) (holding that plaintiff did not have burden of pleading lack of defendant's qualified immunity to state a civil rights claim under 42 U.S.C. § 1983, finding that "[s]ince qualified immunity is a defense, the burden of pleading it rests with the defendant" (citation omitted)). A statutory exception constitutes an affirmative defense, which the defendant has the burden of pleading. Rosen v. Brookhaven Capital Mgmt., Co., Ltd., 194 F.Supp.2d 224, 227 (S.D.N.Y.2002). Moreover, a defendant, not plaintiff, bears the burden of proof with respect to good faith transferee affirmative defenses to fraudulent transfer actions under New York law and the Bankruptcy Code. See Gowan v. Patriot Grp., LLC (In re Dreier LLP), 452 B.R. 391, 445–51 (Bankr.S.D.N.Y.2011) (holding that defendants bear burden of proof regarding good faith

affirmative defenses under the NYDCL and section 548 of the Bankruptcy Code); Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC), 439 B.R. 284, 303 (S.D.N.Y.2010) ("[The plaintiff] was not obligated to plead and prove that [the defendants] had received their redemption payments in bad faith. Instead, [the defendants] had the obligation under Section 548(c) [of the Bankruptcy Code] to prove their good faith as an affirmative defense." (citing Sharp Int'l Corp. v. State St. Bank & Tr. Co. (In re Sharp Int'l Corp.), 403 F.3d 43, 54–55 (2d Cir.2005))); Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.), 310 B.R. 500, 508 (Bankr.S.D.N.Y.2002) ("[S]ection 548(c) [of the Bankruptcy Code] designates the transferee's good faith as an affirmative defense which may be raised and proved by the transferee at trial." (citing 11 U.S.C. § 548(c))). But see Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.), 337 B.R. 791, 802 (Bankr.S.D.N.Y.2005) (citing United States v. McCombs, 30 F.3d 310, 326 (2d Cir.1994)) (observing that plaintiff has burden of proof on element of transferee's lack of good faith under the NYDCL's constructive fraudulent transfer provision, *572 "since it is essential to a finding of fair consideration," an element of the claim).

According to the Plaintiffs' expert on UK law, English law recognizes a general bona fide purchaser defense, which must be pleaded and proved by the defense. (Moss Decl. ¶ 14.) This bona fide purchaser defense was codified in section 241(2) of the Insolvency Act and applies to actions to set aside undervalue and preference transactions. (Id. ¶ 15.) Section 425(2) reflects "a similarly worded statutory defense," which "is described in a standard annotated version of the statute as 'protection for bona fide purchasers for value and without notice.' " (Id. (quoting LEN SEALY & DAVID MILMAN, ANNOTATED GUIDE TO THE INSOLVENCY LEGISLATION 492 (16th ed. 2013)).) While Moss acknowledges that he is not aware of any case interpreting whether section 425(2) constitutes an affirmative defense (see id. ¶ 18), the English Court of Appeal has held that the comparable defense set forth in section 241(2) must be pleaded by the defendant (see id. ¶ 19 (citing Re Sonatacus Ltd [2007] EWCA (Civ) 31 (Eng.), [2007] BCC 186).) According to Moss, the similar language and structure between section 241(2) and section 425(2) leads him to conclude that section 425(2) "inevitably will have the same interpretation [as section 241(2) ], namely that it provides a defense rather than constituting an element of the claim, and that the onus is on the defendant to plead and prove good faith within section 425(2)." (Id. ¶ 20.)

In *4Eng Ltd.,* the High Court considered the operation of sections 423 and 425—a novel issue of law. *4Eng Ltd.* [2009] EWHC at [12] (noting that "there is no relevant authority governing the operation of these statutory provisions"). Justice Sales observed that section 423(2) sets forth the "broad objective" of a remedy for a claim under section 423, and "[a] wide jurisdiction is ... conferred upon the court to fashion a suitable remedy." *4Eng Ltd.* [2009] EWHC at [12]. Section 425, on the other hand, provides "[a]n extensive, non-exhaustive list of the wide range of orders which may be made in pursuit of that objective...." *Id.* Justice Sales noted that while a transferee's liability under section 423 does not depend on "any particular mental state or action ... that does not mean that such matters are irrelevant for defining the extent of the liability to be imposed, or the order to be made, at the next stage in the analysis, when the court considers the question of remedy under [section] 423(2) and [section 425]." *Id.* at [11].

In light of Moss's arguments and Justice Sales's observations in the *4Eng Ltd.* decision, the Court finds that section 425(2) of the Insolvency Act is either an affirmative defense or a provision establishing factors for the court to consider in fashioning a remedy under section 423—it does not set forth any elements of a claim under section 423. Thus, the Section 423 Claim is not futile on the basis that the Plaintiffs failed to plead the inapplicability of section 425(2).

## 2. The Section 213 Claim

Section 213 of the Insolvency Act imposes liability on knowing participants in any business of a debtor company that was carried on with the intent to defraud creditors or any other person. *See* Insolvency Act 1986, c. 45, § 213 (Eng.). The Defendants argue that the Section 213 Claim is futile for two reasons: (1) Luxembourg law applies under choice of law principles, but Luxembourg law has no equivalent to section 213 of the Insolvency Act (*see* Apax Opp. at 5–7; TPG Opp. at 15; DB Opp. at 22); and (2) the Plaintiffs fail to adequately plead that Hellas II defrauded its creditors by completing the December 2006 CPEC Redemption (*see* Apax Opp. at 9 n.4; TPG Opp. at 15–16; DB Opp. at 22), **\*573** or that the Defendants were knowing parties to the alleged fraud (*see* TPG Opp. at 16–18; Apax Opp. at 10–16; DB Opp. at 22). The Plaintiffs respond by arguing that England, not Luxembourg, has the greater interest in the application of its law to the Plaintiffs' claims (Reply at 16–19), and the Section 213 Claim is adequately pleaded under UK law (*see id.* at 10–16).

### a. *UK Law Applies to the Section 213 Claim*

[13]First, the parties agree that the Court should apply New York choice of law rules to determine which jurisdiction's law applies to the Section 213 Claim. (*See* Apax Opp. at 5–7 (arguing that Luxembourgish law applies under New York choice of law rules); Reply at 17–19 (arguing that UK law applies under New York choice of law rules).) Under New York choice of law rules, the Court must first determine whether there is an "actual conflict" between the relevant laws of the implicated jurisdictions. *GlobalNet Financial.com, Inc. v. Frank Crystal & Co.,* 449 F.3d 377, 382 (2d Cir.2006) (citing *In re Allstate Ins. Co. v. Stolarz,* 81 N.Y.2d 219, 597 N.Y.S.2d 904, 613 N.E.2d 936, 937 (1993); *Zurich Ins. v. Shearson Lehman Hutton, Inc.,* 84 N.Y.2d 309, 618 N.Y.S.2d 609, 642 N.E.2d 1065 (1994)). An actual conflict exists where such laws provide different substantive rules; the differences must be relevant to the issue to be determined and have a "significant *possible* effect on the outcome of the trial." *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.,* 414 F.3d 325, 331 (2d Cir.2005) (emphasis in original) (citations marks omitted). However, "[i]f no actual conflict exists, and if New York is among the relevant jurisdictions, the court may simply apply New York law." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 672 F.3d 155, 157 (2d Cir.2012) ( *"Licci I "*) (citations omitted).

[14] [15]Second, the parties agree that there is an actual conflict between UK law and Luxembourg law with respect to the Section 213 Claim. "[W]here there is a conflict of law in cases involving tort claims, 'New York applies an "interest analysis" to identify the jurisdiction that has the greatest interest in the litigation based on the occurrences within each jurisdiction, or contacts of the parties with each jurisdiction, that relate to the purpose of the particular law in conflict.' "[27] *Drenis v. Haligiannis,* 452 F.Supp.2d 418, 427 (S.D.N.Y.2006) (quoting *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,* 446 F.Supp.2d 163, 192 (S.D.N.Y.2006)); *see also Geron v. Seyfarth Shaw LLP (In re Thelen LLP),* 736 F.3d 213, 219 (2d Cir.2013) ("New York's interest analysis requires that 'the law of the jurisdiction having the greatest interest in the litigation will be applied and ... the [only] facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict.' " (quoting *GlobalNet,* 449 F.3d at 384))). For conduct-regulating laws, including fraudulent conveyance statutes, courts generally follow the *lex loci* rule and "the law of the

jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Drenis,* 452 F.Supp.2d at 427 (quoting *Pension Comm.,* 446 F.Supp.2d at 192); *accord Lyman Commerce Solutions, Inc. v. Lung,* Case No. 12–cv–4398 (TPG), 2014 WL 476307, at *3 (S.D.N.Y. Feb. 6, 2014); *see also* **\*574** *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.,* 216 F.Supp.2d 198, 215–16 (S.D.N.Y.2002) (holding that Canadian law applied to fraudulent conveyance claim because "the conveyance alleged by [the plaintiffs] to be fraudulent—the transfer of funds held by [one defendant] to the [other defendants]—took place in Canada").

[16]New York choice of law rules do not require an uncompromising adherence to the *lex loci* rule. *See Golden Archer Invs., LLC v. Skynet Fin. Sys.,* 908 F.Supp.2d 526, 539 (S.D.N.Y.2012) (noting that the court "do[es] not blindly follow the *lex loci* rule" in applying the interest analysis to conduct-regulating laws (citations omitted)). But when the allegedly wrongful conduct occurs in a place different from the place of injury, the Second Circuit dictates that "it is the place of the allegedly wrongful conduct that generally has superior 'interests in protecting the reasonable expectation of the parties who relied [on the laws of that place] to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future.' " *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 739 F.3d 45, 50–51 (2d Cir.2013) ("*Licci II* ") (quoting *Schultz v. Boy Scouts of Am., Inc.,* 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679, 684–85 (1985)); *see also Lyman,* 2014 WL 476307, at *3 (concluding that for fraudulent conveyance claims, "the location of injury does not control; instead, it is the location of the defendant's conduct that controls" (citation omitted)).

[17]The Plaintiffs argue that England has the greatest interest in seeing its law applied to the claims alleged in the First Amended Complaint. (Reply at 17.) According to the Plaintiffs, the First Amended Complaint alleges that little material conduct relating to the December 2006 CPEC Redemption occurred in Luxembourg. (*Id.*) Specifically, the First Amended Complaint asserts that: (i) the December 2006 Transaction was planned, authorized, and executed by entities and personnel operating out of England, Italy, Germany, and the U.S., not Luxembourg (*id.* citing FAC ¶¶ 22–39, 49–57, 86–91, 99–100, 122, 147–178)); (ii) the December 2006 CPEC Redemption was overwhelmingly funded with the proceeds of Sub Notes that were marketed and sold in substantially greater amounts to U.S. and English investors, not Luxembourgish investors (*id.* (citing FAC ¶¶ 163–164));

(iii) the funds raised by Hellas II and its subsidiaries were subsequently transferred among non-Luxembourgish accounts, including accounts in England, Germany, and the U.S. (*see id.* (citing FAC ¶ 167); (iv) with the exception of two Luxembourgish individuals, the majority of the managers who signed the board resolutions authorizing the December 2006 CPEC Redemption were located in England and Italy (*see id.* (citing FAC ¶ 175)); (v) TPG and Apax executives located in England and Italy signed the redemption agreements authorizing the December 2006 CPEC Redemption (the "Redemption Agreements") (*id.* (citing FAC ¶¶ 173–174)); (vi) the initial transfer from Hellas II to Hellas I and the subsequent transfer from Hellas I to Hellas were made between English bank accounts (*id.* (citing FAC ¶ 168); and (vii) after passing through a Luxembourgish bank account, the overwhelming proportion of proceeds from the Hellas-entity transfers was disbursed around the world, including to Defendants located in the U.S., England, and Belgium; only €2.5 million and $2.88 million was subsequently distributed in Luxembourg (*id.* at 17–18 (citing FAC ¶¶ 169–170)). Because Luxembourg's relationship to the challenged transfers is relatively insignificant as compared to England and other jurisdictions, the Plaintiffs argue **\*575** that English law applies. (*See id.* at 18–19.)

The Plaintiffs further contend that the European Union's (the "E.U.") insolvency regime may be considered by the Court. (*Id.* at 19.) Under the policies embodied in the E.U.'s Council Regulation (EC) No. 1346/2000 of 29 May 2000 on insolvency proceedings (the "E.U. Insolvency Regulation")[28]—which has been adopted by England and Luxembourg—Luxembourg would defer to English insolvency law (subject to certain inapplicable exceptions) because Hellas II's insolvency proceedings were opened in the UK. (*See id.*) Accordingly, the Plaintiffs suggest, applying English law to the Section 213 Claim would be consistent with the insolvency regime applicable to both the UK and Luxembourg.

By contrast, the Defendants argue that the choice of law analysis weighs in favor of the application of Luxembourg law because: (1) Hellas II was a Luxembourg entity that had its registered offices in Luxembourg in December 2006 (Apax Opp. at 6 (citing FAC ¶ 113)); (2) Hellas, the entity that authorized Hellas II's participation in the December 2006 Transaction, also was a Luxembourg entity that had its registered offices in Luxembourg in December 2006 (*see id.* (citing FAC ¶ 113)); (3) Hellas's board of managers included two residents of Luxembourg (*id.* (citing FAC ¶¶ 19, 113); (4) the non-debtor Hellas entities that redeemed the CPECs were Luxembourg entities with registered offices in

Luxembourg (*id.* (citing FAC ¶ 113)); and (5) the CPECs and the Redemption Agreements are governed by Luxembourg law and contain forum selection clauses that require litigation to be brought in a Luxembourg court (*id.* (citation omitted)). According to the Defendants, the Plaintiffs have effectively conceded that Luxembourg has a significant interest in the December 2006 Transaction by virtue of the fact that they brought two other lawsuits relating to the CPEC redemptions in Luxembourg. (*Id.* at 6–7.) Additionally, the Defendants argue that England's interest in the December 2006 Transaction largely stems from the fact that Hellas II's "foreign main proceeding is pending in the U.K. as a result of [Hellas II]'s change of its 'center of main interests' well after the December 2006 Transaction was effected." (*Id.* at 7.)

While the interest analysis does not clearly favor the application of either jurisdiction's law, the Court holds that the UK has the greater interest in having its substantive law govern the Plaintiffs' claims. At all times relevant to the December 2006 Transaction, Hellas II and its parent entities were Luxembourg entities with their registered offices in Luxembourg. (*See* FAC ¶ 113.) However, the First Amended Complaint alleges that these entities were dormant shelf companies that did not generate any operating revenues or have any employees. (*Id.*) The nominal registration status of these entities in Luxembourg is not enough to tip the interest analysis toward the application of Luxembourg law. *See Thelen LLP*, 736 F.3d at 220 (holding that partnership's status as a registered California entity did not alter conclusion that New York law should apply to fraudulent transfer claims). The Court acknowledges that the First Amended Complaint alleges that the initial transfers were made between these Luxembourg-based shelf companies (*see id.* ¶¶ 113, 160–161), and the Redemption Agreement authorizing the initial transfer between Hellas II and Hellas I indicated that it was signed in **\*576** Luxembourg (*see id.* ¶ 173). However, the First Amended Complaint also alleges that the signors of that Redemption Agreement were located in England and Italy when it was executed. (*Id.*) Moreover, the First Amended Complaint alleges that this initial transfer was made between English bank accounts (*see id.* ¶ 168) and was principally funded from the proceeds of the Sub Notes, a substantially greater proportion of which was held by UK custodians than by Luxembourg custodians (*see id.* ¶¶ 160–164). Furthermore, the First Amended Complaint alleges that a substantial amount of the actions relating to the December 2006 Transaction were taken by entities and individuals located in countries outside Luxembourg, including the UK. (*See id.* ¶¶ 23–29, 49–57, 86–91, 99–100, 122, 147–178.)

Finally, it bears mentioning that the application of UK law to the Plaintiffs' claims does not lead to an absurd result under the insolvency regime applicable to both the UK and Luxembourg. To the contrary, applying the substantive law of the UK to the Plaintiffs' claims is consistent with the result militated under the E.U. Insolvency Regulation. While the Court need not apply foreign choice of law rules under the circumstances, *see Hosking I*, 524 B.R. at 521 (citing *Weiss v. La Suisse*, 141 Fed.Appx. 31, 34 (2d Cir.2005)), it is appropriate to underscore that a UK or Luxembourg court faced with determining which law to apply to the claims at issue would likely conclude that UK law governs, *see* E.U. Insolvency Regulation, art. 4(m) (providing that the law of the state in which a debtor's proceedings are opened determines "the rules relating to the voidness, voidability or unenforceability of legal acts detrimental to creditors"). Consequently, the Section 423 Claim is not futile on choice of law grounds.

### b. *Whether the Section 213 Claim is Adequately Pleaded*

[18]Section 213 of the Insolvency Act governs fraudulent trading claims and provides:

> (1) If in the course of the winding up of a company it appears that any business of the company has been carried on with *intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose,* the following has effect.

> (2) The court, on the application of the liquidator may declare that any persons who were *knowingly parties to the carrying on of the business in the manner above-mentioned* are to be liable to make such contributions (if any) to the company's assets as the court thinks proper.

Insolvency Act 1986, c. 45, § 213 (Eng.) (emphasis added). A person is a "part[y] to the carrying on of the business" if it "is involved in, and assists and benefits from, the offending business." *Banque Arabe Internationale d'Investissement SA v. Morris* [2002] B.C.C. 407, 414 (Eng.). With respect to the scienter element, a plaintiff need not allege that a defendant had actual knowledge of the business's fraudulent purpose to state a claim for fraudulent trading under section 213; however, something more than gross negligence on the part of the defendant is required. *See Morris v. Bank of India* [2005] EWCA (Civ) 693[14] (Eng.). Indeed, liability under section 213 will lie if a defendant has "blind-eye" knowledge of a fraudulent intent to carry on

any business of the debtor. *Id.* "[B]lind-eye knowledge requires ... a suspicion that the relevant facts do exist and a *deliberate decision to avoid confirming that they exist.*" *Id.* (emphasis added). However, blind-eye knowledge is not established where a defendant has an amorphous or **\*577** speculative suspicion that the relevant facts exist. *Id.* "[I]n order for there to be blind-eye knowledge, the suspicion must be *firmly grounded and targeted on specific facts,*" and the defendant's "deliberate decision must be a decision to avoid obtaining confirmation of facts in whose existence the individual has *good reason to believe.*" *Id.* (emphasis added).

As a threshold matter, the Defendants argue that the Section 213 Claim is futile because the First Amended Complaint does not adequately plead that Hellas II's business was carried on with fraudulent intent and, therefore, the Defendants necessarily could not be knowing participants to such fraud. (*See* Apax Opp. at 9 n.4; TPG Opp. at 15–16.) The Court disagrees. The First Amended Complaint alleges facts giving rise to the strong inference that Hellas II carried on business with the intent to defraud its creditors when it executed the December 2006 CPEC Redemption and the Consulting Fees Transfer.

For instance, the First Amended Complaint alleges that Hellas II carried out the December 2006 CPEC Redemption "in knowing disregard of the fact that [Hellas II] was insolvent or would be rendered insolvent thereby, and of the foreseeable disastrous consequences for [Hellas II] and its creditors, and in particular the holders of the Sub Notes...." (FAC ¶ 210(a).) Hellas II's intent to defraud creditors through this transaction is further supported by the allegation that the December 2006 CPEC Redemption "was made without fair or adequate consideration because the CPECs were redeemed at a premium of €951.3 million over their aggregate par value." (*Id.* ¶ 207.) Moreover, Hellas II allegedly fixed the redemption price for the transaction "without a good-faith, arm's-length determination of market value" (*id.* ¶ 210(c)), and without obtaining an independent appraisal (*id.* ¶ 210(d)). Additionally, Hellas II allegedly consummated the December 2006 CPEC Redemption and the Consulting Fees Transfer to the detriment of its creditors and "in knowing disregard of the fact that TPG and Apax would improperly benefit" from such transactions. (*Id.* ¶ 210(i).)

These allegations sufficiently give rise to a strong inference that the December 2006 CPEC Redemption and the Consulting Fees Transfer were carried out with the intent to defraud Hellas II's creditors. Whether the First Amended Complaint adequately pleads that each

Defendant against whom the Section 213 Claim is asserted was a knowing party to these transactions is a different matter that is examined next as to each Defendant.

### i. The Section 213 Claim against All TPG Defendants Except the TPG Affiliate Defendants

The organizational structure of the TPG Defendants and their relationship to the Hellas entities is complex but important to describe. TPG Capital, the hub of the intricate network of affiliated investment funds, was founded by Bonderman, Coulter, and Price in 1992.[29] (*Id.* ¶ 23.) Bonderman is the President of TPG Capital, and Coulter is the Senior Vice President of TPG Capital. (*Id.* ¶¶ 27, 29.) TPG Capital's founders are also the sole shareholders of TPG Advisors IV, Inc., the general partner of TPG GenPar IV, L.P., which, in turn, is the general partner of TPG Partners IV, L.P. and was a manager of Sponsor TPG Troy LLC until its dissolution. (*Id.* ¶¶ 49–50.) Accordingly, TPG Capital's founders are the sole owners of the TPG Advisors IV Defendant with management control over the other TPG Advisors IV Defendants and Sponsor TPG Troy LLC. (*See id.* ¶¶ 28, 42, 49–52.)

Bonderman and Coulter are also the sole shareholders of T3 Advisors **\*578** II, Inc. (*Id.* ¶ 53.) Additionally, Bonderman is the President and Chairman of the board of directors of T3 Advisors II, Inc., and Coulter is the Vice President and a member of the board of directors of T3 Advisors II, Inc. (*Id.*) T3 Advisors II, Inc. is the general partner of T3 GenPar II, L.P., which, in turn, is the general partner of each of the other T3 Advisors II Defendants and was the manager of Sponsor T3 Troy LLC until its dissolution. (*See id.* ¶¶ 54–56.) Accordingly, Bonderman and Coulter—two of TPG Capital's founders and the senior management of TPG Capital—are the sole owners, managers, and directors of the T3 Advisors II Defendant with management control over the other T3 Advisors II Defendants and Sponsor T3 Troy LLC. (*See id.* ¶¶ 28, 43, 53–57.)

Non-party TPG Europe is a London-based limited liability partnership and affiliate of TPG Capital. (*See id.* ¶ 23.) TPG Europe's managing members are two Delaware limited liability companies, whose sole members are Bonderman and Coulter, respectively. (*Id.* ¶ 32.) Non-party Philippe Costeletos ("Costeletos") "was at all relevant times a member and co-head of TPG Europe, and ... served as a director of Hellas and TIM Hellas." (*Id.*) Non-party Matthias Calice ("Calice") "was at all

relevant times a member of TPG Europe and served as a director of Hellas, TIM Hellas, and several of the Sponsors." (*Id.*) Specifically, Calice was a director of seven of the eight Sponsors that collectively held all of Hellas's CPECs and common stock. (*See id.* ¶¶ 42–47.)

Altogether, TPG Defendants were members of only two of the eight Sponsors: TPG Troy LLC and T3 Troy LLC. (*See id.* ¶¶ 42–43.) No TPG Capital Defendant was directly a member of these Sponsors; however, all of TPG Capital's founders are the sole shareholders of the TPG Advisors IV Defendant with management control over Sponsor TPG Troy LLC (*see id.* ¶¶ 28, 42, 49–52), and Bonderman and Coulter are the sole shareholders of the T3 Advisors II Defendant with management control over Sponsor T3 Troy LLC (*see id.* ¶¶ 28, 43, 53–57).

The board of managers of Hellas—Hellas II's ultimate parent entity—consisted of six non-party individuals, only two of which—Calice and Costeletos—are affiliated with TPG Capital by virtue of their membership and management roles in TPG Europe. (*See id.* ¶¶ 19, 32.) The board of directors of TIM Hellas—Hellas II's subsidiary operating company—was comprised of ten members, again, only three of which—Calice, Costeletos, and Vincenzo Morelli—are affiliated with TPG Capital. (*See id.* ¶¶ 32, 122.)

Having laid out the complicated organizational structure of the TPG Defendants and their relationship to the Hellas entities, the Court now turns to the allegations in the First Amended Complaint concerning the TPG Defendants against whom the Section 213 Claim is asserted to determine whether the Section 213 Claim is adequately pleaded.

The First Amended Complaint alleges that "the operations of TPG Capital and its affiliates, including TPG Europe, have been governed by a unified management at all relevant times." (*Id.* ¶ 24.) All partners of TPG Capital and TPG Europe are permitted to participate in the "Investment Review Committee, which considers investment recommendations concerning TPG's investments from acquisition through exit" (*id.*), and, at all relevant times, all final decisions concerning TPG's investments, including the investments in TIM Hellas and Q–Telecom, were allegedly made by the vote of TPG's founders, including Bonderman, Coulter, and Price (at least until Price became Partner Emeritus in 2006) (*id.*). Moreover, TPG's Investment Review Committee was allegedly **\*579** presented with the December 2006 Transaction in early December 2006. (*Id.*) On December 16, 2006, Vincenzo Morelli, an employee of an unidentified TPG entity, wrote Coulter an email "warning

of the precarious position in which [Hellas II] would find itself upon execution of the December 2006 Transaction...." (*Id.* ¶ 159.) "Upon information and belief," TPG Capital—through its founders Bonderman, Coulter, and Price—approved TPG's participation in the December 2006 Transaction. (*Id.*)

Hellas—as sole manager and general partner of Hellas II—adopted board resolutions approving the December 2006 CPEC Redemption on December 18, 2006 (the "December 18 Resolutions"), which were executed by the members of Hellas's board of managers, including Calice and Costeletos. (*See id.* ¶ 175.) The December 18 Resolutions set forth that Hellas II "intends to participate in a new refinancing of the existing indebtedness ... the proceed[s] of which shall be used for the repayment of existing deeply subordinated shareholder loans." (*Id.* ¶ 176.) The December 18 Resolutions also recited that the "Optional Redemption Price" for the redemption of CPECs would be set by the board "based on the equity value of [Hellas II] and its Subsidiaries on an arm's length basis." (*Id.*) However, no meeting of the board to determine the Optional Redemption Price was allegedly held and no arm's length determination of the Optional Redemption Price was ever made. (*See id.* ¶ 176–179.) Instead, KPMG LLP ("KPMG") allegedly reverse engineered the Optional Redemption Price based on "an invented enterprise value" of Hellas II supplied by Tanguy Serra ("Serra"), an employee of an unidentified TPG entity.[30] (*Id.* ¶ 178.)

Subsequently, the December 2006 CPEC Redemption was completed. To redeem the CPECs issued by Hellas II to Hellas I, the entities entered into a redemption agreement dated December 21, 2006 (the "Hellas I Redemption Agreement"). (*Id.* ¶ 173.) "The Hellas Redemption Agreement recited that the Optional Redemption Price of €35.82 per CPEC allegedly had been 'determined by the Board of Managers on the basis of the equity value of the Company and its Subsidiaries by resolutions adopted on December 18, 2006.' " (*Id.*) Calice—along with Giancarlo Aliberti ("Aliberti") of Apax Partners—executed the Hellas I Redemption Agreement on behalf of Hellas II and Hellas I. (*Id.*) To redeem the CPECs issued by Hellas to the Sponsors, the entities entered into a separate redemption agreement dated December 21, 2006 (the "Sponsor Redemption Agreement"). (*Id.* ¶ 174.) "The Sponsor Redemption Agreement likewise recited that the Optional Redemption Price of €35.57 per CPEC allegedly had been 'determined by the Board of Managers on the basis of the equity value of the Company and its Subsidiaries by resolutions adopted on December 18, 2006.' " (*Id.*) Again, Calice and Aliberti executed the Sponsor Redemption Agreement on

behalf of Hellas and each Sponsor. (*Id.*)

The Sponsors managed by entities owned by the TPG Capital Defendants received nearly €400 million in cash proceeds from the December 2006 CPEC Redemption. (*See id.* ¶¶ 42–43.) TPG Troy LLC received approximately €352,934,646, and T3 Troy LLC received approximately €46,667,144. (*See id.*) Ultimately, Bonderman, Coulter, and Price each received cash proceeds from these amounts. (*See id.* **\*580** ¶¶ 28, 30–31.) TPG Capital also received €495,000 from the Consulting Fees Transfer. (*Id.* ¶ 191.)

Accepting all the alleged facts as true, the Court concludes that the First Amended Complaint pleads facts giving rise to the strong inference that each of the TPG Defendants had the requisite scienter to support liability under section 213 of the Insolvency Act. While TPG's active participation in the December 2006 Transaction was primarily taken through the actions of non-party TPG Europe's employees, TPG Capital and TPG Europe share a unified management. Moreover, the TPG Defendants against whom the Section 213 Claim is asserted include TPG Capital, its founders and top executives, and entities they wholly own and control. The December 2006 Transaction was allegedly submitted to these ultimate decision makers for approval and received their blessing, notwithstanding that concerns regarding the quantum of debt involved in the transaction and the "crisis and setback [that needed] to be absolutely avoided" were shared with one of TPG Capital's co-founders. (*Id.* ¶ 159.) These shared concerns raise a strong inference that the TPG Defendants' top brass had a factual basis to suspect that Hellas II was carrying on business with a fraudulent purpose through the December 2006 Transaction, but the TPG Defendants turned a blind eye to this suspicion. Consequently, the Court concludes that the First Amended Complaint adequately pleads a Section 213 Claim against the applicable TPG Defendants.

### ii. The Section 213 Claim against Apax NY

The First Amended Complaint alleges that Apax Partners is a London-based private equity firm and "the holding partnership for the worldwide Apax partnership," of which Apax NY is a part. (*See id.* ¶ 34.) Like TPG Capital, "[t]he operations of Apax Partners and Apax [NY] have been governed by a unified management...." (*Id.* ¶ 35.) Apax's management consists of a seven-member "Executive Committee," including two executives of Apax NY—John Megrue ("Megrue") and Mitch Truwit ("Truwit"). (*Id.*) Truwit is co-CEO for the

worldwide Apax organization (*id.*), while Megrue is the Chairman of Apax NY and sits on various committees for the global organization, "which consider potential investments and make investment decisions concerning Apax's investments from acquisition through exit, including with respect to Apax's investment in TIM Hellas and Q–Telecom" (*id.* ¶ 39).

On December 4, 2006, Apax's "International Exit Committee"—one of such committees that considers and makes investment decisions—held a meeting to discuss, and ultimately approve, "Apax's participation in the December 2006 Transaction." (*Id.* ¶ 154.) According to the minutes of this meeting (the "International Exit Committee Minutes," Fischler Decl. Ex. A), Megrue—the Chairman of Apax NY—and the Apax deal team members that helped plan the transaction were in attendance.[31] (*See* FAC ¶ 154; Fischler **\*581** Decl. Ex. A.) Among the Apax deal team members in attendance at the meeting were Frank Ehmer ("Ehmer") and Shashank Singh ("Singh"). (Fischler Decl. Ex. A.) In a December 2, 2006 email, TPG's Serra emailed Singh and indicated that the parties were "putting the business under huge pressure to take [their] money out a few months early." (FAC ¶ 152.) Additionally, during a conference call among DB, TPG, and Ehmer in the days preceding the December 4 meeting, the parties discussed the "[c]oncern ... that an aggressive recap overburdens the company and risks the equity at a 2 year exit," as memorialized in a December 3, 2006 email from David Bugge ("Bugge"), an employee of DB. (FAC ¶ 153.) As a result of this concern, Bugge wrote that the "[b]alance seems to be going away from a mega recap to doing a smaller recap of around 500m [euro]." (*Id.*) The International Exit Committee Minutes reflect that two alternative recapitalization proposals were considered along with the relative risks and rewards. (*See* Fischler Decl. Ex. A.) However, "TPG and Apax nonetheless decided to execute the December 2006 Transaction with the largest quantum of debt available, putting the interests of themselves and their investors over [Hellas II] and its creditors." (FAC ¶ 154.)

These allegations tenuously give rise to a strong inference that Megrue had a suspicion that the December 2006 Transaction was being conducted with a fraudulent purpose but refrained from confirming that this was the case. While these allegations barely plead requisite scienter on the part of Apax NY, they are sufficiently particular in light of the fact that the depositions of "Megrue, Singh, and Bugge—all noticed and awaiting proposed dates from [the] Defendants—remain to be conducted." (Reply at 16.) Accordingly, the Court holds that the Section 213 Claim is not futile against Apax NY.

### iii. The Section 213 Claim against DB

The First Amended Complaint alleges that DB prepared a presentation for TPG and Apax on October 17, 2006, which proposed that " '[a]s an alternative to the current ongoing sale process,' they 'aggressively recapitalise [sic] the business' to 'allow for significant distributions to shareholders.' " (FAC ¶ 149.) DB's presentation offered two refinancing options: one proposal that would provide a €746 million distribution to CPEC holders with Hellas II bearing €2.8 billion in total debt, and another proposal that would provide a € 531 million distribution to CPEC holders at a €2.5 billion total debt load. (*Id.*) On the same date, Apax's Ehmer responded to DB by email: "Come on—we love you guys. Even more so if you up your proposal to €3bn." (*Id.* ¶ 150.) Ehmer sent another email to DB on October 20, 2006, indicating that there was a reasonable chance that Apax and TPG would pursue a recapitalization and stating "frankly, you will need to think a bit more about quantum." (*Id.*) In response, DB submitted a subsequent presentation on November 10, 2006, laying out two revised recapitalization options. (*Id.*) Each of the two options would result in Hellas II bearing €2.95 billion in total debt; " 'Recap option 1' and 'Recap option 2' would permit a distribution to CPEC holders of €896 million or €944.3 million, respectively." (*Id.*)

As alleged in the First Amended Complaint, TPG and Apax ultimately determined to trudge forward with the December 2006 Transaction, "despite internal concerns that a debt quantum and shareholder of th[e] size would risk overleaveraging **\*582** [Hellas II] and render[ ] it insolvent." (*Id.* ¶ 152.) These concerns were allegedly shared with DB, as evidenced by Bugge's December 3, 2006 email memorializing a conference call among DB, TPG, and Apax, in which Bugge wrote that the concern was that the December 2006 Transaction "overburdens the company" and the "[b]alance seems to be going away from a mega recap to doing a smaller recap of around 500m [euro]." (*Id.* ¶ 153.)

These particularized allegations of DB's scienter are meager. However, in light of the fact that "none of the four [DB] personnel that [the] Plaintiffs noticed last year has ... been made available for deposition" (Reply at 13), these allegations give rise to a strong inference that DB had blind-eye knowledge that the December 2006 Transaction was being pursued with a fraudulent purpose. The facts alleged support the inference that DB had a suspicion, grounded in identifiable facts, that Hellas II and its controlling entities had determined to complete the December 2006 Transaction with the intent to defraud

creditors. Consequently, the Section 213 Claim is not futile as to DB.

### 3. The Article 1167 Claim

The Plaintiffs plead their Article 1167 Claim in the alternative to the Section 423 Claim and the Section 213 Claim. (*See* Motion at 2.) The Defendants argue that the Article 1167 Claim is futile because the Plaintiffs lack standing.[32] (*See* TPG Opp. at 18–20; TCW Opp. at 1; DB Opp. at 22.) Specifically, the Defendants assert that a claim under article 1167 of the Luxembourg Civil Code (restated in article 448 of the Luxembourg Commercial Code) belongs solely to the debtor's creditors. (*See* TPG Opp. at 18–19.) While a Luxembourg bankruptcy receiver (i.e., *curateur* ) would have standing to bring such an action on behalf of creditors, the Plaintiffs have submitted no authority establishing that a receiver or liquidator of a foreign debtor has standing to bring such an action on behalf of creditors in a foreign court. (*See id.* at 19.) The Plaintiffs acknowledge the truth of the Defendants' premises but reject their conclusion. The Plaintiffs assert that they represent the interests of Hellas II's creditors in the same manner a *curateur* would and, therefore, they "should be treated identically as a matter of Luxembourg law." (Reply ¶ 20.)

According to Marc Thewes ("Thewes"), the Plaintiffs' expert on Luxembourg law, "[a]rticle 1167 ... is a codification of what is commonly known as the Paulian Action ... [and] provides that creditors may on their own behalf, attack transactions made by their debtor in fraud of their rights." (Thewes Decl. ¶ 3.) Thewes asserts that "[t]here is no principle of Luxembourg law or any Luxembourg court judgment of which [he is] aware that would prevent court-appointed liquidators in English insolvency proceedings ... from likewise bringing a Paulian Action in the collective interest of the creditors...." (*Id.* ¶ 4.) To the contrary, pursuant to the E.U. Insolvency Regulation "Luxembourg must recognize the authority of court-appointed liquidators in English insolvency proceedings as on par with the authority of court-appointed receivers in Luxembourgish insolvency proceedings." (*Id.*; *see id.* Ex. 1, art. 2(a).) However, Thewes further asserts that under the E.U. Insolvency Regulation, "a court-appointed liquidator in an English insolvency proceeding would not have occasion to rely upon Article 1167 even in secondary insolvency proceedings pending in Luxembourg." (*Id.* ¶ 9.) Under article 4(2)(m) of the E.U. Insolvency Regulation, **\*583** "a liquidator appointed in an insolvency proceeding opened in a Member State outside of Luxembourg ... [must] use the remedies offered

by that Member State's insolvency law instead of using Article 1167 of the Civil Code." (*Id.*; *see* E.U. Insolvency Regulation, art. 4(2)(m).)

As the Court previously held, "[n]othing in schedule 4 of the Insolvency Act, the CBIR, or any U.K. Law presented to the Court by the parties" supports the conclusion that the Plaintiffs, as liquidators, "have the authority to bring *any or all* claims on behalf of [Hellas II]'s creditors." *Hosking I,* 524 B.R. at 527. And the Plaintiffs have not provided any further evidence establishing that they have carte blanche authority to bring such claims on behalf of creditors, including the Article 1167 Claim. Accordingly, the Article 1167 Claim is futile due to the Plaintiffs lack of standing.[33] The Motion for leave to amend the Complaint to assert the Article 1167 Claim is therefore **DENIED**.

### 4. The Unjust Enrichment Claim

The TPG Defendants argue that the Plaintiffs' unjust enrichment claim is futile for a number of reasons. First, the unjust enrichment claim would not survive a motion to dismiss for failure to state claim because the Redemption Agreements governed the challenged transfers, and an unjust enrichment claim must be dismissed where an enforceable contract governs the subject of such claim. (TPG Opp. at 20.) Second, the unjust enrichment claim would be dismissed because it merely duplicates the Plaintiffs' other tort-based claims. (*See id.* at 21–22.) Third, the unjust enrichment claim is preempted by section 1521(a)(7) of the Bankruptcy Code, which bars foreign representatives from seeking the relief available under section 548 of the Bankruptcy Code. (*Id.* at 22.) Because the unjust enrichment claim is virtually identical to an actual fraudulent transfer claim under section 548 of the Bankruptcy Code, the TPG Defendants argue, the Plaintiffs seek the same relief available under section 548. (*Id.*)

Finally, the TPG Defendants renew their argument made in *Hosking II* : The unjust enrichment claim is barred by section 546(e) of the Bankruptcy Code, which prohibits the avoidance of certain types of applicable transfers. (*See id.* at 23.) First, the TPG Defendants acknowledge that in *Hosking II,* the Court adhered to its ruling in *Hosking I* and denied their motion to dismiss the unjust enrichment claim, holding that section 546(e) does not preempt an unjust enrichment claim as a matter of law "where ... the common law claim alleges facts substantially identical to an *actual* fraudulent conveyance claim under section 548(a)(1)(A) [of the Bankruptcy Code]." (*Id.* (citing

*Hosking II,* 526 B.R. at 510).) However, the TPG Defendants argue that the unjust enrichment claim is not virtually identical to a claim under section 548(a)(1)(A) because it is based on transfers that occurred beyond section 548's two-year look-back period. (*See id.* at 25–26.) Second, in light of the fact that the Court questioned whether section 546(e) applies extraterritorially in *Hosking II,* the TPG Defendants argue that section 546(e) indeed does apply to extraterritorial transfers. (*See id.* at 27–28.)

The Plaintiffs first assert that their unjust enrichment has already survived the TPG Defendants' motions to dismiss and for reargument, and none of the TPG Defendants' rehashed arguments warrant the Court revisiting its prior rulings. (Reply at 25.) Second, the Plaintiffs argue that their unjust enrichment claim is not futile **\*584** on the basis that the Redemption Agreements purportedly governed the December 2006 CPEC Redemption because the First Amended Complaint alleges facts sufficient to put the validity of such contracts in dispute. (*See id.* at 26–29.) Third, the Plaintiffs contend that their unjust enrichment claim need not be dismissed on the basis that it "duplicates" their tort-based fraudulent transfer claims because they were pleaded in the alternative. (*See id.* at 30.) Fourth, the Plaintiffs argue that section 546(e) does not preempt their unjust enrichment claim because: (i) the redemption payments do not fall within the scope of section 546(e) (*see id.* at 31–32); (ii) section 546(e) does not preempt the unjust enrichment claim because such claim is virtually identical to a claim under section 548(a)(1)(A) of the Bankruptcy Code (*see id.* at 32–33); and (iii) section 546(e) does not apply extraterritorially (*see id.* at 33–34). Finally, the Plaintiffs argue that section 1521(a)(7) of the Bankruptcy Code does not preempt their unjust enrichment claim because such claim constitutes a common law claim that exists independently of federal bankruptcy law. (*See id.* at 34–36.)

### a. The Unjust Enrichment Claim Is Not Futile on the Basis that Contracts Governed the Subject Matter of the Claim

[19]"It is a general rule under New York law that no claim for unjust enrichment lies where the subject matter of the claim is covered by a written contract." *Sofi Classic S.A. de C.V. v. Hurowitz,* 444 F.Supp.2d 231, 249 (S.D.N.Y.2006) (citing *Mathias v. Jacobs,* 238 F.Supp.2d 556, 571 (S.D.N.Y.2002)). However, this general rule only applies "when the existence of a contract governing the transaction in question is undisputed." *Id.* (citing *Mathias,* 238 F.Supp.2d at 571); *see Robinson v. Day,* 103

A.D.3d 584, 586–87, 960 N.Y.S.2d 397 (N.Y.App.Div.2013) (rejecting defendants' argument that unjust enrichment claim fails because contracts cover its subject matter, finding that "there is a bona fide dispute as to the existence of a contract" (quoting *IIG Capital LLC v. Archipelago, L.L.C.,* 36 A.D.3d 401, 405, 829 N.Y.S.2d 10 (N.Y.App.Div.2007))); *Am. Tel. & Util. Consultants v. Beth Israel Med. Ctr.,* 307 A.D.2d 834, 835, 763 N.Y.S.2d 466 (N.Y.App.Div.2003) ("[W]here there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue, plaintiff may proceed upon a theory of quantum meruit and will not be required to elect his or her remedies." (citation omitted)).

[20] The Court concludes that the First Amended Complaint alleges facts sufficient to put the validity of the Redemption Agreements in dispute. The First Amended Complaint alleges that the Redemption Agreements misrepresent that the Optional Redemption Price to be used for the December 2006 CPEC Redemption was determined by Hellas's board of managers on the basis of the equity value of Hellas II and its subsidiaries when in fact such Optional Redemption Price was reverse engineered from an enterprise value invented by TPG and Apax. (*See* FAC ¶¶ 173–174, 176–178.) The First Amended Complaint also alleges facts plausibly suggesting that the Redemption Agreements are unenforceable for want of consideration by stating that "the December 2006 CPEC Redemption was a dividend or distribution to shareholders devoid of any consideration." (*Id.* ¶¶ 207, 210.) To the extent the TPG Defendants argue that the Consulting Fees Transfer, which is subject to the unjust enrichment claim, is also governed by a valid contract (*see* TPG Opp. at 21), the First Amended Complaint alleges facts suggesting that any such contract also lacked consideration (*see* FAC ¶ 208 ("The Consulting Fees **\*585** Transfer was made without fair or adequate consideration, including because TPG and Apax provided no 'consulting' or 'management' services of value to the Company or its subsidiaries.")).

b. *The Unjust Enrichment Claim Is Not Futile on the Basis that it Is Duplicative of the Fraudulent Transfer Claims*

[21] [22] "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Corsello v. Verizon New York, Inc.,* 18 N.Y.3d 777, 944 N.Y.S.2d 732, 967 N.E.2d 1177, 1185 (2012) (citations omitted) ("Unjust enrichment is not a catchall cause of action to be used when others fail."); *see*

*Samiento v. World Yacht Inc.,* 10 N.Y.3d 70, 854 N.Y.S.2d 83, 883 N.E.2d 990, 996 (2008) (affirming dismissal of unjust enrichment claim because "plaintiffs have an adequate remedy at law"). A fraudulent transfer claim shares many features of a claim for unjust enrichment. *See Tese–Milner v. Edidin & Assocs. (In re Operations N.Y. LLC),* 490 B.R. 84, 99 (Bankr.S.D.N.Y.2013) ("The doctrine of fraudulent conveyance rests on principles of unjust enrichment." (quoting RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 48 cmt. a (2011))). However, FRCP 8(a) provides that "[r]elief in the alternative or of several different types may be demanded." FED. R. CIV. P. 8(a)(3). Indeed, courts have refused to dismiss unjust enrichment claims on the basis that they were duplicative of fraudulent transfer claims, noting that "it is conceivable that the plaintiff could recover under one theory but not the other." *In re Operations N.Y. LLC,* 490 B.R. at 100; *see Silverman v. H.I.L. Assocs. Ltd. (In re Allou Distribs., Inc.),* 387 B.R. 365, 412 (Bankr.E.D.N.Y.2008) ("While there can be no doubt that the Trustee would not be entitled to duplicative relief, there similarly is no doubt that at the pleadings stage, a plaintiff is not required to elect a single theory upon which to proceed."); *cf. Amusement Indus., Inc. v. Midland Ave. Assocs., LLC,* 820 F.Supp.2d 510, 529–32, 537–38 (S.D.N.Y.2011) (denying motions to dismiss unjust enrichment and NYDCL fraudulent transfer claims without addressing whether such claims were duplicative of one another). The Court holds that the unjust enrichment claim is not barred as duplicative of the Additional Claims sounding in fraudulent transfer. Rather, the unjust enrichment claim is validly pleaded in the alternative to such Additional Claims pursuant to FRCP 8(a).

c. *The Unjust Enrichment Claim Is Not Futile on the Basis that* Section 546(e) of the Bankruptcy Code *Bars Such Claim*

The TPG Defendants' argument that the unjust enrichment claim is futile because it is barred under section 546(e) has already been considered and rejected. The Court declines to further address this argument under the law of the case doctrine. *See Sanders v. Sullivan,* 900 F.2d 601, 605 (2d Cir.1990) ("Under the law of the case doctrine, this court adheres 'to its own decision at an earlier stage of the litigation' unless there are 'cogent' or 'compelling' reasons not to, such as 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.' " (quoting *Doe v. N.Y.C. Dep't of Soc.*

*Servs.,* 709 F.2d 782, 789 (2d Cir.1983)); *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Young,* Case No. 91 Civ. 2923(CSH), 1996 WL 383135, at *1 (S.D.N.Y. July 9, 1996) ("The law of the case doctrine posits that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case" unless the decision "is clearly erroneous and would work a manifest injustice.' " (quoting **\*586** *Arizona v. California,* 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983))).

d. *The Unjust Enrichment Claim Is Not Futile on the Basis that Section 1521(a)(7) of the Bankruptcy Code Preempts Such Claim*

[23]Upon recognition, a foreign representative is entitled to certain mandatory relief pursuant to section 1520 of the Code and the assistance of the bankruptcy court in administering the foreign main proceeding. *See Atlas Shipping,* 404 B.R. at 738–39; 11 U.S.C. § 1520. Section 1521(a) of the Bankruptcy Code also authorizes the court to grant a foreign representative certain additional forms of relief upon recognition, including "any additional relief that may be available to a trustee, *except for* relief available under sections 522, 544, 545, 547, 548, 550, and 724(a)." 11 U.S.C. § 1521(a)(7). In other words, a foreign representative may obtain relief available to a trustee under the Bankruptcy Code except for the relief available under chapter 5's avoidance provisions.[34] *See Metzeler v. Bouchard Transp. Co. (In re Metzeler),* 78 B.R. 674, 677 (Bankr.S.D.N.Y.1987) ( "[A] foreign representative may assert, under [chapter 15's predecessor statute], only those avoiding powers vested in him by the law applicable to the foreign estate.").

[24]This restriction on asserting avoidance actions is unique to chapter 15 of the Bankruptcy Code. The UNCITRAL Model Law upon which chapter 15 is based does not include this exception and instead permits "the recognizing court to grant any appropriate relief and grant[ ] standing to the foreign representatives to bring avoidance actions under the law of the recognizing state[,] purposefully le[aving] open the question of which law the court should apply...." *Condor,* 601 F.3d at 326–27 (citing UNCITRAL, *Model Law on Cross Border Insolvency,* art. 23 (1997); UNCITRAL, *Guide to Enactment of the UNCITRAL Model Law on Cross–Border Insolvency,* ¶ 166 (1997)). During the debates and negotiations that led to the enactment of the Model Law, the U.S. representatives expressed concerns about the choice of law issues raised in allowing foreign representatives to bring avoidance actions in the recognizing court. *Id.* The

Fifth Circuit has explained that

> [a]voidance laws have the purpose and effect of re-ordering the distribution of a debtor's assets, erasing the results of debtor and creditor actions in favor of the collective priorities established by the distribution statute.... When courts mix and match different aspects of bankruptcy law, the goals of any particular bankruptcy regime may be thwarted and the end result may be that the final distribution is contrary to the result that either system applied alone would have reached.

*Id.* at 326 (citations omitted). In an attempt to resolve or address these choice of law issues, the U.S. prohibits foreign representatives of ancillary chapter 15 cases from bringing avoidance actions under U.S. law, but permits foreign representatives of chapter 15 cases who have filed a corresponding plenary chapter 7 or 11 case to bring such claims. *Compare* 11 U.S.C. § 1521(a)(7), *with id.* § 1523(a). This does not mean, however, that ancillary chapter 15 foreign representatives are prohibited from bringing *all* avoidance actions—in *Condor,* the Fifth Circuit held that foreign representatives are entitled to bring avoidance actions under applicable foreign law. **\*587** *Condor,* 601 F.3d at 329. In so holding, the *Condor* court observed that section 1521(a)(7)'s prohibition on bringing chapter 5 avoidance actions does not necessarily reflect Congress's intention to deny foreign representatives any avoidance powers supplied under applicable foreign law. *Id.* at 324 ("If Congress wished to bar all avoidance actions whatever their source, it could have stated so; it did not.").

[25]In any event, the Plaintiffs' unjust enrichment claim is not identical to an avoidance action, particularly an avoidance action authorized by chapter 5 of the Bankruptcy Code, but rather is a "standard common law" claim that "exist[s] independently of the bankruptcy." *In re Fairfield Sentry Ltd. Litig.,* 458 B.R. 665, 684 (S.D.N.Y.2011) (holding that unjust enrichment claim was a state law claim not created by federal bankruptcy law). While the unjust enrichment claim bears close resemblance to the Plaintiffs' Additional Claims sounding in fraudulent transfer, it is not a cause of action created by chapter 5 of the Bankruptcy Code. The relief the Plaintiffs seek in connection with their unjust enrichment claim is similar to the relief available to a trustee under chapter 5's avoidance powers, but not identical relief. Through a

successful avoidance action, a plaintiff may void a fraudulent transfer, effectively rendering it as if it never occurred. *See* 11 U.S.C. § 544 ("The trustee ... may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable ...."); *id.* § 548 ("The trustee may avoid any transfer...."). While a plaintiff may seek rescission of a transfer as a remedy for an unjust enrichment claim, RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 54, the primary aim of a claim for unjust enrichment is restitution, *see, e.g., Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.,* 448 F.3d 573, 586 (2d Cir.2006) (observing that an element of a claim for unjust enrichment is "that equity and good conscience require restitution" (quoting *Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir.2000))). Furthermore, the Plaintiffs do not seek avoidance of the December 2006 CPEC Redemption or the Consulting Fees Transfer in connection with their unjust enrichment claim. Rather, they "seek restitution from TPG and an order of this Court disgorging all payments, profits, fees, benefits, incentives and other compensation obtained by TPG as a result of its wrongful conduct." (FAC ¶ 230.) For all of the above reasons, the Court concludes that the unjust enrichment claim is not futile.

### 5. International Comity

[26] The Defendants argue that the Motion should be denied on the basis of international comity because the Additional Claims are asserted under foreign law and based on conduct that occurred overseas. (*See* DB Opp. at 5–8; TPG Opp. at 1 n.1.) According to the Defendants, given that Hellas II's insolvency proceeding is pending in England, and England has a greater interest in applying and interpreting its law under the circumstances, the Additional Claims should proceed before an English court. (*See* DB Opp. at 5–8.) The Plaintiffs argue that the Defendants effectively seek abstention based on the principle of international comity; however, federal law explicitly does not permit permissive abstention from an adversary proceeding that is related to a chapter 15 case. (*See* Reply at 47.) Moreover, according to the Plaintiffs, comity militates in favor of granting their Motion because: (i) federal courts must exercise the jurisdiction conferred on them (*id.*); (ii) "courts apply international comity in favor of foreign bankruptcy proceedings to protect the interest of the estates and the equitable distribution to creditors" (*id.* at 48 (citation omitted)); and (iii) "courts regularly refuse to abstain from actions where the wrongful **\*588** conduct occurred abroad" (*id.* (citation omitted)).

The Plaintiffs are correct: Federal law does not authorize permissive abstention of this Adversary Proceeding.[35] Section 1334 of the Judicial Code confers jurisdiction over bankruptcy cases. *See* 28 U.S.C. § 1334(a)–(b). Section 1334(c)(1) sets forth the circumstances under which a court may abstain from hearing certain types of bankruptcy-related proceedings and provides, in relevant part:

> *Except with respect to a case under chapter 15 of title 11,* nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

*Id.* § 1334(c)(1) (emphasis added). Most courts that have interpreted the exclusionary scope of this provision have held that it applies to "both the Chapter 15 case itself and cases 'arising in or related to' Chapter 15 cases...." *Firefighters' Ret. Sys. v. Citco Grp. Ltd.,* 788 F.3d 425, 431 (5th Cir.2015); *British Am. Ins. Co. Ltd. v. Fullerton (In re British Am. Ins. Co. Ltd.),* 488 B.R. 205, 239–40 (Bankr.S.D.Fla.2013) (holding that there is no "provision in federal law permitting abstention from matters arising under chapter 15 or arising in a chapter 15 case"); *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.),* 452 B.R. 64, 83 (Bankr.S.D.N.Y.2011), *rev'd on other grounds,* 458 B.R. 665 (S.D.N.Y.2011) (same). *But see Abrams v. Gen. Nutrition Cos.,* Civil Action No. 06–1820(MLC), 2006 WL 2739642, at *7 (D.N.J. Sept. 25, 2006) (holding that section 1334(c)(1) only prevents a court from exercising discretionary abstention over a case "under" chapter 15, not "an action that is 'related to' a bankruptcy case").

The court in *Abrams* held that section 1334(c)(1) did not limit its discretion to abstain from hearing a removed state court action related to a chapter 15 case, finding that the statute only provided an exception to permissive abstention with respect to cases "under" chapter 15 and the removed "action [wa]s only 'related to', not 'under' th[e] bankruptcy case." *Id.* However, the *Abrams* court's analysis has been criticized on the basis that its reading of section 1334(c)(1) "conflate[d] the terms 'proceeding' and 'case.'" *In re Fairfield Sentry Ltd.,* 452 B.R. at 83 n. 19. As the *Fairfield Sentry* court correctly observed, "[t]he language of the statute provides that the case, not the proceeding, exists 'under' title 11; the proceeding still need only 'aris[e] under title 11 or aris[e] in or [be] related to a case under title 11.'" *Id.* (quoting 28 U.S.C. § 1334(c)(1)).

In *Maxwell Communication Corporation plc v. Barclays*

Bank plc (In re Maxwell Communication Corporation plc), 170 B.R. 800 (Bankr.S.D.N.Y.1994), the bankruptcy court dismissed an adversary proceeding related a case under chapter 15's predecessor, former section 304 of the Bankruptcy Code, holding that international comity militated dismissal of the claims. See id. at 818, aff'd, 186 B.R. 807 (S.D.N.Y.1995), aff'd, 93 F.3d 1036 (2d Cir.1996) ( "Because I find that English law ought govern, considerations of comity dictate that these suits be dismissed."). However, the Maxwell decision is inapposite because it predated Congress's enactment of chapter 15 and the corresponding amendments to section 1334(c) that exclude chapter 15 cases and related proceedings *589 from permissive abstention. See Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, § 1501, 119 Stat 23, 215 (2005) (providing that the amendment to section 1334(c) shall take effect 180 days after April 20, 2005 and shall not apply to cases commenced before such date).

[27] [28]Since the Court may not abstain from hearing an adversary proceeding related to a case under chapter 15, the First Amended Complaint is not futile on international comity grounds.[36]

### 6. Forum Non Conveniens

Finally, the Defendants argue that the Motion should be denied as futile because the First Amended Complaint would be dismissed under the doctrine of forum non conveniens. (See TPG Opp. at 28–35; Apax Opp. at 5 n.2; DB Opp. at 9–16.) They argue that forum non conveniens dismissal is warranted because the Additional Claims are asserted under foreign law,[37] which requires the parties to rely on foreign law experts to brief foreign law issues, the Plaintiffs' choice of forum deserves little or no deference, adequate alternative forums can adjudicate the Plaintiffs' claims, and the various public and private factors considered in determining whether to dismiss an action for forum non conveniens weigh in favor of dismissal. (See TPG Opp. at 28–35.) According to the Plaintiffs, courts in the Second Circuit apply a two-step test to determine whether to dismiss an action for forum non conveniens. (Reply at 36 (citation omitted).) Under this two-step test, the defendant bears the burden of demonstrating that: (i) an adequate, presently available alternative forum exists; and (ii) the balance of public and private interest factors militate heavily in favor of such alternative forum. (Id. (citation omitted).) The Plaintiffs argue that the Defendants have not, and cannot, satisfy their burden of establishing either of these prongs. (Id.)

[29] [30] [31] [32]Whether to dismiss an action on forum non conveniens grounds is a decision that " 'lies wholly within the broad discretion of the district court' and should be reversed only if 'that discretion has been clearly abused.' " Peregrine Myanmar Ltd. v. Segal, 89 F.3d 41, 46 (2d Cir.1996) (quoting Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC, 81 F.3d 1224, 1232 (2d Cir.1996)). A federal court may act sua sponte to dismiss an action on grounds of forum non conveniens. See Chambers v. NASCO, Inc., 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (discussing the courts' inherent power to dismiss *590 an action sua sponte for forum non conveniens ); see In re Alcon Shareholder Litig., 719 F.Supp.2d 263, 279 (S.D.N.Y.2010) (dismissing action sua sponte on forum non conveniens grounds). Additionally, a motion to dismiss on forum non conveniens grounds may be made at any time. 15 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3828 (4th ed.2008); cf. Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG, 160 F.Supp.2d 722, 742 (S.D.N.Y.2001) ("[T]he caselaw seems to be clear that forum non conveniens motions are not governed by the same time constraints imposed by Rule 12(h) of the Federal Rules of Civil Procedure on personal jurisdiction and venue motions." (citations omitted)). However, in evaluating whether a plaintiff's choice of forum is convenient, the court may consider the defendant's delay in bringing a motion to dismiss on the basis of forum non conveniens. Genpharm Inc. v. Pliva–Lachema a.s., 361 F.Supp.2d 49, 59 (E.D.N.Y.2005) (citation omitted).

[33] [34]In the Second Circuit, courts apply a three-step analysis to determine whether to dismiss an action for forum non conveniens. Wilson v. Eckhaus, 349 Fed.Appx. 649, 650 (2d Cir.2009) (noting that the Second Circuit adopted a "three-step inquiry" to analyze forum non conveniens dismissal); see Iragorri v. United Techs. Corp., 274 F.3d 65, 73–74 (2d Cir.2001) (en banc) (adopting three-step process for determining whether forum non conveniens dismissal is appropriate). First, the court must "determine [ ] the degree of deference properly accorded the plaintiff's choice of forum." Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 153 (2d Cir.2005) (citing Iragorri, 274 F.3d at 73). Second, "after determining whether the plaintiff's choice is entitled to more or less deference," the court must determine "whether an adequate alternative forum exists." Iragorri, 274 F.3d at 73; see Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 100 (2d Cir.2000) (citing Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 n. 22, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 506–07, 67 S.Ct. 839, 91 L.Ed.

In re Hellas Telecommunications (Luxembourg) II SCA, 535 B.R. 543 (2015)

1055 (1947)). Third, the court must "then balance a series of factors involving the private interests of the parties in maintaining the litigation in the competing forums and any public interests at stake." *Wiwa,* 226 F.3d at 100 (citing *Gilbert,* 330 U.S. at 508–09, 67 S.Ct. 839). "The defendant has the burden to establish that an adequate alternative forum exists and then to show that the pertinent factors 'tilt[ ] strongly in favor of trial in the foreign forum.' " *Id.* (quoting *R. Maganlal & Co. v. M.G. Chem. Co.,* 942 F.2d 164, 167 (2d Cir.1991)); *see Iragorri,* 274 F.3d at 74–75 ("A defendant does not carry the day simply by showing the existence of an adequate alternative forum. The action should be dismissed only if the chosen forum is shown to be genuinely inconvenient and the selected forum significantly preferable.")

a. *Deference to the Plaintiffs' Choice of Forum*

[35] [36] A plaintiff's choice of forum is entitled to great deference. *Allstate Life Ins. Co. v. Linter Grp. Ltd.,* 994 F.2d 996, 1001 (2d Cir.1993) (citations omitted); *Gilbert,* 330 U.S. at 508, 67 S.Ct. 839 ("[U]nless the balance [of factors] is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."). Where a plaintiff has brought an action in its home forum, courts give the plaintiff's choice of forum substantial deference "because it is presumed to be convenient." *Iragorri,* 274 F.3d at 71 (citing *Piper,* 454 U.S. at 255–56, 102 S.Ct. 252). A foreign plaintiff's choice of the U.S. as a forum is entitled to less deference because "it 'is much less reasonable' to presume that the choice was made for **\*591** convenience." *Id.* (quoting *Piper,* 454 U.S. at 256, 102 S.Ct. 252). "In such circumstances, a plausible likelihood exists that the selection was made for forum-shopping reasons...." *Id.* Even if forum-shopping reasons did not inform the foreign plaintiff's decision to file an action in a U.S. court, "there is nonetheless little reason to assume that it is convenient for a foreign plaintiff." *Id.*

The Defendants argue that the Plaintiffs' choice of forum is entitled to little or no deference because they are foreign liquidators who have "admitted the strategic and tactical bases for filing suit in this jurisdiction, citing to the fact that New York law and the forum were chosen because 'constructive fraud claims no longer were—were never available in the U.K.' " (DB Opp. at 10 (citing Dec. 16, 2014 Hr'g Tr. 29:5–8).) Defendants argue that because the Plaintiffs' choice of forum clearly evidences forum shopping, their choice is entitled to no deference. (*See id.*) Furthermore, the Defendants contend that the UK and Luxembourg are both adequate

alternative forums to adjudicate the Plaintiffs' claims. (*See* TPG Opp. at 32–33.) While acknowledging that certain of the U.S.-based Defendants may not be amenable to service of process in these jurisdictions, the Defendants nonetheless assert that "courts regularly condition *forum non conveniens* dismissal on submission to jurisdiction in the alternative forum." (*Id.* at 33 (citing cases).)

The Plaintiffs argue that their choice of forum was motivated by "genuine convenience and should be afforded substantial deference." (Reply at 40.) According to the Plaintiffs, their choice of forum critically permits them "to perfect personal jurisdiction over all 44 Defendants named in the FAC plus the hundreds of additional U.S. transferees who are putative defendant class members." (*Id.*) Additionally, the majority of the proceeds of the December 2006 CPEC Redemption ultimately "entered the U.S. and is thus potentially available for efficient judgment here." (*Id.* (citation omitted).) The Plaintiffs contend that the Defendants have not established that all the Defendants and the Transferee Class are subject to foreign personal jurisdiction. (*Id.* at 37–39.) Moreover, Luxembourg lacks subject matter jurisdiction over the Plaintiffs' avoidance-based claims under the E.U. Insolvency Regulation. (*Id.* at 39 & n.26.)

[37] [38] In determining the degree of deference to be afforded to a foreign plaintiff's choice of a U.S. forum, courts consider various factors to ascertain whether the plaintiff's forum choice was motivated by convenience or instead the desire to forum shop. *See Norex,* 416 F.3d at 155 (citing *Iragorri,* 274 F.3d at 72). The following factors are generally considered relevant in determining whether the plaintiff's choice of forum was motivated by genuine convenience: "[1] the convenience of the plaintiff's residence in relation to the chosen forum, [2] the availability of witnesses or evidence to the forum district, [3] the defendant's amenability to suit in the forum district, [4] the availability of appropriate legal assistance, and [5] other reasons relating to convenience or expense." *Id.* (quoting *Iragorri,* 274 F.3d at 72). "Circumstances indicative of forum shopping ... include '[1] attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, [2] the habitual generosity of juries in the United States or in the forum district, [3] the plaintiff's popularity or the defendant's unpopularity in the region, or [4] the inconvenience and expense to the defendant resulting from litigation in that forum.' " *Id.* (quoting *Iragorri,* 274 F.3d at 72).

[39] The above factors weigh in favor of granting the Plaintiffs' choice of forum substantial deference. First, the "[c]ircumstances **\*592** indicative of forum shopping" are

not present here. There is no evidence that any of the parties are relatively more or less popular here than in any other jurisdiction. It is likely that the Defendants, who are overwhelmingly U.S.-based entities and individuals, would suffer less inconvenience and expense litigating in the U.S. than in a European forum. Except for the fact that the Plaintiffs' choice of forum was based, in part, on their mistaken belief that they could assert a constructive fraudulent transfer claim under U.S. law (*see* Reply at 41), it is not clear that they sought any tactical advantage resulting from local laws that favor their case.

Second, the factors evidencing a plaintiff's motivation by genuine convenience indicate that the Plaintiffs' choice of forum was substantially driven by such considerations. While this Court is not necessarily convenient in relation to England, the Plaintiffs' residence, the Plaintiffs' counsel is located in New York. Moreover, this Adversary Proceeding is related to a chapter 15 case and concerns Hellas II's assets located in the U.S.; it therefore necessarily was brought in the U.S., and New York is a relatively convenient U.S. forum in relation to England. The twenty-three witnesses noticed for depositions are scattered throughout the world; eight witnesses are located in the U.S., twelve witnesses (including the Plaintiffs) are located in England, and the remaining three witnesses are located in Austria, Italy, and India. (Reply at 44.). The Defendants have allegedly not asserted that any witnesses under their control would be unavailable to testify at deposition or trial. (*Id.*) Nor is there any single forum that appears to obviate the issue regarding witness availability. (*Id.*) In any event, because the Defendants are "sophisticated global financial institutions ... for whom producing documents or witnesses in any forum poses no special inconvenience" (*id.* at 43), this factor is not wholly consequential. Moreover, the Defendants are subject to personal jurisdiction in this Court and are represented by capable legal counsel located in New York. (*Id.* at 41, 43.) *See Norex,* 416 F.3d at 155–56 (noting that "substantial deference" to a plaintiff's choice of forum is generally appropriate when "such a choice is made to obtain jurisdiction" over the defendant). Finally, the Defendants have not filed a motion to dismiss on *forum non conveniens* grounds more than one year after the Adversary Proceeding was commenced, notwithstanding that motions to dismiss were briefed, argued, and decided, and discovery has been overwhelmingly completed. The Defendants' delay in moving for *forum non conveniens* dismissal belies their assertion that this Court is not a convenient forum.

b. *The Existence of an Adequate Alternative Forum*

[40]  [41]The Defendants have not established that an adequate alternative forum exists. "An alternative forum is ordinarily adequate if the defendants are amenable to service of process there and the forum permits litigation of the subject matter of the dispute." *In re Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine,* 311 F.3d 488, 499 (2d Cir.2002) (citing *Piper,* 454 U.S. at 254 n. 22, 102 S.Ct. 252). A court cannot dismiss an action on *forum non conveniens* grounds unless it "satisf[ies] itself that the litigation may be conducted elsewhere against all defendants." *PT United Can Co. Ltd. v. Crown Cork & Seal Co.,* 138 F.3d 65, 73 (2d Cir.1998) (citing *Blanco v. Banco Industrial de Venezuela, S.A.,* 997 F.2d 974, 981 (2d Cir.1993)). "If there is no adequate alternative forum, the inquiry ends, and the motion to dismiss is denied." *Id.* (citing *Piper,* 454 U.S. at 254 n.22, 102 S.Ct. 252).

[42]  **\*593** The Defendants argue that the UK and Luxembourg are both adequate alternative forums. (*See* TPG Opp. at 32–33.) With respect to the UK, two of the Additional Claims are brought exclusively under UK law, the unjust enrichment claim is asserted in the alternative under UK law, and the majority of the relevant witnesses and certain Defendants dismissed for lack of personal jurisdiction are located in the UK. (*Id.* at 33.) The Defendants argue that Luxembourg is an adequate alternative forum because the Plaintiffs have already commenced litigation in Luxembourg concerning the December 2006 Transaction, the Article 1167 Claim is asserted under Luxembourg law, and the unjust enrichment claim is asserted in the alternative under Luxembourg law. (*Id.*)

Yet, the Defendants have not established that each Defendant is amenable to service of process in either the UK or Luxembourg; nor have they asserted that they consent to personal jurisdiction in either jurisdiction. While a defendant's agreement to submit to the jurisdiction of the foreign forum will generally satisfy the requirement that the defendant be amenable to process there, *see DiRienzo v. Philip Servs. Corp.,* 232 F.3d 49, 57 (2d Cir.2000), *vacated in part on other grounds,* 294 F.3d 21 (2d Cir.2002), the Defendants have not agreed to submit to the jurisdiction of either the UK or Luxembourg. They therefore have failed to establish the existence of an adequate alternative forum at this time. *See Rio Tinto PLC v. Vale S.A.,* Case No. 14 Civ. 3042(RMB), 2014 WL 7191250, at *13 (S.D.N.Y. Dec. 17, 2014) ("The Court finds that England is not, in this instance, an adequate alternative forum to New York because, as noted, Defendants Cilins and Touré, who reside in the United States, may not be amenable to service of process by English courts.").

It is important to note, however, that a UK court may very well have personal jurisdiction over DB, a German company that "conducted the majority of its activities in connection with the alleged claims from its London Branch...." (DB Opp. at 11 n.7.) Indeed, counsel for DB acknowledged that a UK court would have jurisdiction over DB at the hearing on the Motion. (*See* July 22, 2015 Hr'g Tr. 79:15–17, ECF Doc. # 179.) While the UK may therefore be an adequate (and even convenient) forum with respect to DB, the Court nonetheless concludes that the claims against DB should not be dismissed on *forum non conveniens* grounds under the circumstances. First, the Plaintiffs have not filed and "have no current plan" to file an action in the UK against the foreign-based Original Defendants that were dismissed for lack of personal jurisdiction in *Hosking I*. (*See id.* at 12:6–12.) Accordingly, there is no pending action in the UK to which the action against DB could be transferred. Second, the overwhelming majority of the Defendants—indeed every Defendant except DB—is located in the U.S. and not indisputably subject to personal jurisdiction in the UK. Therefore, dismissing the action as to DB on *forum non conveniens* grounds would force the Plaintiffs to inefficiently litigate the same claims in two different courts, based on the same facts, and supported by the same evidence. At this time, the Court cannot agree that this would be an appropriate result.[38] As a result, for all the above reasons, the Court concludes that the First Amended Complaint is not futile on the basis of *forum non conveniens*.

### *594 C. Bad Faith

[43] [44]"[W]hile there is little law in the Second Circuit on what constitutes bad faith in the context of a motion for leave to amend a pleading, the precedent that exists indicates that the amendment itself must embody unfair strategic maneuvering." *On Track Innovations Ltd. v. T–Mobile USA, Inc.,* Case No. 12 Civ. 2224(JCF), 2014 WL 406497, at *5 (S.D.N.Y. Feb. 3, 2014) (internal citations omitted); *see Primetime 24 Joint Venture v. DirecTV, Inc.,* Case No. 99 Civ. 3307(MHD), 2000 WL 426396, at *5 (S.D.N.Y. Apr. 20, 2000) ("[W]hen the opponent of an amendment asserts that the movant is acting in bad faith, there must be something more than mere delay or inadvertence for the court to refuse to allow amendment." (citations omitted)).

The Defendants argue that the Motion should be denied on the basis that it was filed in bad faith, asserting that the Second Circuit's decision in *State Trading Corporation of India v. Assuranceforeningen Skuld,* 921 F.2d 409 (2d Cir.1990), is directly on point. (TPG Opp. at 9 (citing *State Trading,* 921 F.2d at 418).) The Plaintiffs argue that

*State Trading* is distinguishable and "instead only serve[s] to illustrate that bad faith is absent here." (Reply at 3.)

In *State Trading,* the Second Circuit held that the district court did not abuse its discretion in denying a plaintiff's motion for leave to amend its complaint on the basis that the amendment was unduly delayed and sought in bad faith. 921 F.2d at 417–18. The plaintiff was an Indian owner of cargo lost in a capsized ship who asserted claims solely under Connecticut law against the Norwegian insurer of the Belgian ship owner. *See id.* at 410–11. The parties disputed whether the choice of law provision in the insurance policy governing the dispute required the application of Norwegian or Panamanian law, *see id.* at 411, but the magistrate judge granted the defendant summary judgment, finding that, in any event, "it was inappropriate to apply Connecticut law because the only nexus Connecticut had to the insurance policy was the presence within the state of [the defendant]'s exclusive U.S. agent," *id.* at 412. After judgment was entered, the plaintiff moved for reconsideration and leave to amend its complaint to add causes of action under Norwegian and Panamanian law. *Id.* The district court adopted the magistrate judge's recommendation that the motion to amend be denied "because of [the plaintiff]'s unjustified delay in seeking to amend its complaint nineteen months after [the defendant] first challenged the applicability of Connecticut law." *Id.*

On appeal, the Second Circuit held that the district court did not abuse its discretion in denying leave to amend, finding that it was not unreasonable to impute lack of good faith to the plaintiff for its undue delay in seeking leave to amend. *Id.* at 418. The plaintiff's lack of good faith was further evidenced by the fact that it did not file a proposed amended complaint with its motion for leave to amend. *Id.* (citing *Twohy v. First Nat'l Bank of Chi.,* 758 F.2d 1185, 1197 (7th Cir.1985) (holding that failure to include proposed amended complaint with motion for leave to amend indicates lack of diligence and good faith)). Additionally, the court gave credence to the defendant's argument that the plaintiff "deliberately chose not to amend its complaint earlier to include causes of action based on foreign law because any admission that foreign law applied to this case would have increased the chance of dismissal on forum selection clause or *forum non conveniens* grounds." *Id.*

*State Trading* is distinguishable for a number of reasons. First, unlike in *State Trading,* the Plaintiffs arguably had a **\*595** good faith basis to originally assert NYDCL fraudulent transfer claims based on transfers made to entities and individuals in the U.S., which were funded with Sub Notes sold in the U.S. and governed by New

In re Hellas Telecommunications (Luxembourg) II SCA, 535 B.R. 543 (2015)

York choice of law provisions. (*See* Compl. ¶¶ 23–40, 49–73, 77–78, 121–122.) Second, unlike in *State Trading,* there is little to suggest that the Plaintiffs chose not to seek leave to amend its Complaint to assert the Additional Claims in order to stymy a potential motion to dismiss on *forum non conveniens* grounds. In light of the fact that the Defendants never moved to dismiss for *forum non conveniens* despite having ample opportunity to do so, it is not clear that the Plaintiffs' failure to originally plead the Additional Claims was done in order to thwart the prospect of *forum non conveniens* dismissal. Third, unlike in *State Trading,* no judgment has been entered by the Court. Indeed, no summary judgment motions have yet been filed. Finally, as set forth below, the Plaintiffs did not unduly delay seeking leave to amend their Complaint. While the Plaintiffs clearly could, and perhaps should, have originally pleaded their claims under foreign law, the fact that they seek to do so now is not necessarily indicative of bad faith.

### D. Undue Delay and Undue Prejudice

[45] [46] [47]A party is generally allowed "to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *Block v. First Blood Assocs.,* 988 F.2d 344, 350 (2d Cir.1993) (citing *State Teachers Ret. Bd. v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir.1981)). Prejudice is considered in relation to the length of a plaintiff's delay in seeking leave to amend. *See id.* "[T]he longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice." *Evans v. Syracuse City Sch. Dist.,* 704 F.2d 44, 47 (2d Cir.1983). In determining whether a defendant is prejudiced by an amendment adding a claim, courts in the Second Circuit "consider whether the assertion of the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Block,* 988 F.2d at 350 (citations omitted).

[48]The Court concludes that the Plaintiffs did not unduly

delay filing the First Amended Complaint and the Defendants are not unduly prejudiced by the filing. First, soon after *Hosking I* was decided and before any Defendant filed an answer to the Complaint, the Plaintiffs negotiated the Scheduling Order permitting them 30 days to file the Motion. (Motion at 17.) The Plaintiffs then filed the Motion within the time period allowed by the Scheduling Order. (*Id.*) With the benefit of hindsight, the Plaintiffs should have filed a motion for leave to amend their Complaint before the Court ruled on the prior motions to dismiss. However, the Plaintiffs believed in good faith that their claims asserted under New York law would survive a motion to dismiss. And they should not be denied leave solely on the basis that their assumption turned out to be incorrect. Second, the First Amended Complaint does not unduly prejudice the Defendants. The Additional Claims are based on the same events underlying the causes of action asserted in the original Complaint and involve similar elements, thus requiring little incremental discovery or further delay to resolve. Further, each of the Proposed Defendants is related to the Original Defendants and therefore little incremental resources will be required to be spent on legal defense.

### *596 III. CONCLUSION

For all of the foregoing reasons, the Motion is **GRANTED in part** and **DENIED in part**. The Motion is **DENIED** as to the Article 1167 Claim because such claim is futile. The Motion is **GRANTED** in all other respects.

### IT IS SO ORDERED.

### All Citations

535 B.R. 543

### Footnotes

1    Specifically, the Complaint was dismissed for lack of personal jurisdiction as to: (i) Apax Partners, Apax Partners Europe Managers Ltd., Apax Europe VI GP Co. Ltd., Apax Europe VI GP, L.P., Apax Europe VI–A, L.P., Apax Europe VI–1, L.P., Apax WW Nominees Ltd., and Martin Halusa (collectively, "Apax Europe"); and (ii) TPG Capital, LLP ("TPG Europe").

2    Additionally, the Court dismissed the Plaintiffs' actual fraudulent conveyance claim alleged under the NYDCL on choice of law grounds, finding that United Kingdom ("UK") or Luxembourg law, rather than New York law, applied to such claims. *See Hosking I,* 524 B.R. at 521.

In re Hellas Telecommunications (Luxembourg) II SCA, 535 B.R. 543 (2015)

3    The Proposed Defendants include: (1) TPG FOF IV, L.P., TPG FOF IV–QP, L.P., TPG Equity IV–A, L.P. f/k/a TPG Equity IV, L.P., TPG Management IV–B, L.P., TPG Coinvestment IV, L.P., TPG Associates IV, L.P., TPG Management IV, L.P., TPG Management III, L.P., Bonderman Family Limited Partnership, Bondo–TPG Partners III, L.P., Dick W. Boyce, Kevin R. Burns, Justin Chang, Jonathan Coslet, Kelvin Davis, Andrew J. Dechet, Jamie Gates, Marshall Haines, John Marren, Michael MacDougall, Thomas E. Reinhart, Richard Schifter, Todd B. Sisitsky, Bryan M. Taylor, Carrie A. Wheeler, James B. Williams, and John Viola (collectively, "the TPG Affiliate Defendants"), and William S. Price III ("Price"); and (2) TCW Capital Investment Corporation ("New TCW").

4    The Defendants include: (1) Apax Partners, L.P. ("Apax NY"); (2)(a) TPG Capital, David Bonderman, James Coulter, and Price (collectively, the "TPG Capital Defendants"); (b) TPG Advisors IV, Inc., TPG GenPar IV, L.P., and TPG Partners IV, L.P. (collectively, the "TPG Advisors IV Defendants"); (c) T3 Advisors II, Inc., T3 GenPar II, L.P., T3 Partners II, L.P., and T3 Parallel II, L.P. (collectively, the "T3 Advisors II Defendants"); and (d) the TPG Affiliate Defendants (together with the TPG Capital Defendants, the TPG Advisors IV Defendants, the T3 Advisors II Defendants, the "TPG Defendants"); (3) TCW/Crescent Mezzanine III, LLC, TCW/Crescent Mezzanine Partners III L.P., TCW/Crescent Mezzanine Trust III, TCW/Crescent Mezzanine Partners III Netherlands, L.P., and New TCW (collectively, "TCW"); (4) Deutsche Bank Aktiengesellschaft ("DB"); and (5) an unnamed class of transferees (the "Transferee Class").

5    The Section 423 Claim is asserted against: (i) the TPG Defendants, DB, and TCW (collectively, the "Transferee Defendants"); (ii) the Transferee Class; and (iii) TPG Capital. (See FAC ¶¶ 205–212.)

6    The Apax Opposition is supported by the declarations of Robert S. Fischler (the "Fischler Decl.," ECF Doc. # 164–1) and André Prüm (the "Prüm Decl.," ECF Doc. # 164–2).

7    The TPG Opposition is supported by the declarations of Barry Isaacs QC (the "Isaacs Decl.," ECF Doc. # 166) and André Prüm (the "Prüm Decl.," ECF Doc. # 167).

8    The DB Opposition is supported by the declaration of Peter J. Linken (the "Linken Decl.," ECF Doc. # 163).

9    The Reply is supported by the declarations of Gabriel Moss QC (the "Moss Decl.," ECF Doc. # 172) and Marc Thewes (the "Thewes Decl.," ECF Doc. # 173).

10    The facts recited in this Opinion are the facts alleged in the proposed First Amended Complaint and accepted as true for purposes of resolving the Motion. See E*Trade Fin. Corp. v. Deutsche Bank AG, 420 F.Supp.2d 273, 282 (S.D.N.Y.2006) ("For the purposes of evaluating futility [of a proposed amendment to a pleading], the 12(b)(6) standard is applied: all well pleaded allegations are accepted as true, and all inferences are drawn in favor of the pleader." (citing Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir.1993))).

11    "Apax" refers collectively to the Apax NY Defendant and its non-party affiliates, Apax Europe.

12    "TPG" refers collectively to the TPG Defendants and their non-party affiliate, TPG Europe.

13    Hellas transferred the €28.3 million to Hellas I, who then transferred this amount to Hellas II; in exchange, corresponding CPECs were issued from Hellas II to Hellas I, and then from Hellas I to Hellas. (See FAC ¶ 133.)

14    The remaining portion of the €1.57 billion transferred from Hellas II to Hellas I was allegedly used to pay the €500 million Floating Rate Senior PIK Notes due 2014 issued by Hellas Finance (and guaranteed by Hellas I), as well as interest on such notes, and approximately €48.8 million in additional transaction costs associated with the December 2006 Transaction. (See FAC ¶¶ 135, 160.)

15    Andrew Lawrence Hosking and Carl Stuart Jackson were originally appointed as Joint Compulsory Liquidators; Mr. Jackson was replaced by Simon James Bonney on May 17, 2013, and Mr. Bonney was replaced by Bruce Mackay on May 7, 2014. (FAC ¶ 18.)

16    The Plaintiffs also filed a supplemental opposition to DB's reply brief (ECF Doc. # 104), and DB responded by surreply (ECF Doc. # 106).

17    Apax NY also asserts that the Motion should be denied for reasons briefed by other Defendants and joins in the Oppositions filed by the TPG Defendants and DB to the extent they argue that the Motion should be denied due to the

Plaintiffs' bad faith and undue delay, on international comity grounds, and *forum non conveniens* grounds. (*See* Apax Opp. at 5 & n.2.)

18    According to Apax NY, the Section 213 Claim is subject to Federal Rule of Civil Procedure ("FRCP") 9(b)'s heightened pleading standards for fraud claims. (Apax Opp. at 8.)

19    The TPG Defendants also join the other Defendants' Oppositions on a number of issues. (*See* TPG Opp. at 1 n.1.)

20    The TPG Defendants also join in the section of the Apax Opposition that argues that the Section 213 Claim is futile on choice of law grounds. (*See* TPG Opp. at 15.)

21    TCW also joins in the sections of the TPG Opposition that argue that: (i) the proposed amendments are not in good faith; (ii) the Section 423 Claim is futile because it cannot be asserted in this Court; and (iii) the Article 1167 Claim is futile because it belongs to creditors, not the Plaintiffs, as liquidators. (*See* TCW Opp. at 1.)

22    DB also joins in the section of the Apax Opposition that argues that the Section 213 Claim is futile on choice of law grounds (*see* DB Opp. at 22), and in the sections of the TPG Opposition that argue that: (i) the Motion should be denied due to the Plaintiffs' inexcusable, undue delay in filing the Motion; (ii) the Section 423 Claim is futile because it cannot be asserted in this Court; and (iii) the Article 1167 Claim is futile because it belongs to creditors, not the Plaintiffs, as liquidators (*see id.* at 4–5, 22).

23    "Determination of a foreign country's law is an issue of law." *Itar–Tass Russian News Agency v. Russian Kurier, Inc.,* 153 F.3d 82, 92 (2d Cir.1998) (citing FED. R. CIV. P. 44.1 and *Bassis v. Universal Line, S.A.,* 436 F.2d 64, 68 (2d Cir.1970)). To determine foreign law, FRCP 44.1 provides that "the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." FED. R. CIV. P . 44.1. Additionally, FRCP 44.1 permits "the court ... to conduct '[its] own research and interpretation' into the content of foreign law." *In re Tyson,* 433 B.R. 68, 78 (S.D.N.Y.2010) (citations omitted).

24    Additionally, because the plaintiff in *Sunnyside* was a private party, rather than Joint Compulsory Liquidators appointed in a UK winding-up proceeding, as is the case here, the *Sunnyside* court did not address whether UK's adoption of the Cross–Border Insolvency Regulations 2006, addressed in Section II.B.1.b., below, provides authority for the Plaintiffs to maintain the Section 423 Claim in this case.

25    The Court in *Erie Railroad Company v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), held that "[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state." *Erie,* 304 U.S. at 78, 58 S.Ct. 817. Simply put, the *Erie* doctrine requires "federal courts sitting in diversity [to] apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.,* 518 U.S. 415, 427, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). However, the *Erie* doctrine is not limited to federal courts sitting in diversity. Rather, the *Erie* doctrine applies, "whatever the ground for federal jurisdiction, to any issue or claim which has its source in state law." *Maternally Yours v. Your Maternity Shop,* 234 F.2d 538, 540 n.1 (2d Cir.1956) (citations omitted); *cf. In re Coudert Bros. LLP,* 673 F.3d 180, 187 (2d Cir.2012) (noting that *Erie* clarified that "state law provides the rules of decision for the *merits* of state law claims in bankruptcy court" (citing *Erie,* 304 U.S. at 77, 58 S.Ct. 817)).

26    Unlike the issue in *Sunnyside,* 2008 WL 4450328, where the court concluded that section 426(4) of the Insolvency Act, which provides that a UK court shall assist courts in foreign countries, does not provide jurisdiction for a foreign court to adjudicate a claim under section 423, this case raises a different issue under UK Model Law, Art. 1, ¶ 1(b), which provides authority for a foreign court to assist UK courts in insolvency proceedings.

27    While it is not clear that the Section 213 Claim is a tort claim, the parties' assume that it is for choice of law purposes. (*See* Apax Opp. at 6; Reply at 17.) Accordingly, the Court applies New York's interest analysis to the Section 213 Claim without deciding whether it constitutes a tort claim.

28    Council Regulation 1346/2000, On Insolvency Proceedings, 2000 O.J. (L 160) 1(EC) (hereinafter E.U. Insolvency Regulation).

29    Price became a Partner Emeritus of TPG Capital in 2006. (FAC ¶ 31.)

30    The First Amended Complaint does not specify which TPG entity Serra was employed by or whether it was a TPG Defendant as opposed to TPG Europe. However, because Serra is not a Defendant, he presumably was employed by

In re Hellas Telecommunications (Luxembourg) II SCA, 535 B.R. 543 (2015)

non-party TPG Europe.

31    While the First Amended Complaint does not allege that the December 4, 2006 meeting of the Apax International Exit Committee was attended by these deal team members, the minutes of the meeting indicate their attendance. (*See* Fischler Dec. Ex. A.) Ordinarily a court cannot consider documents extraneous to a complaint for purposes of determining the sufficiency of the pleadings, *see Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002), but a document may be considered "where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint," *id.* (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995)). The Court will consider the minutes of the International Exit Committee's December 4, 2006 meeting because they are integral to the Plaintiffs' allegations regarding the presence of committee members at that meeting and were relied on by the Plaintiffs in drafting the First Amended Complaint. (*See* Reply at 14 (citing Fischler Decl. Ex. A).)

32    TCW also argues that the Article 1167 Claim is not adequately pleaded as to any TCW Defendant. (*See* TCW Opp. at 12–14.) Because the Court holds that the Article 1167 Claim is futile for other reasons, it is unnecessary to address this argument.

33    Alternatively, the Article 1167 Claim is futile on choice of law grounds because the Court holds that UK, not Luxembourg, law governs the Plaintiffs' claims. (*See* discussion *supra* Section B.2.a.)

34    Section 1507 of the Bankruptcy Code also provides that "[s]ubject to the specific limitations stated elsewhere in this chapter the court, if recognition is granted, may provide additional assistance to a foreign representative under this title or under other laws of the United States." *Id.* § 1507(a).

35    Mandatory abstention is also not applicable because no Defendant has timely moved for abstention. *See* 28 U.S.C. § 1334(c)(2) ( "*Upon timely motion* of a party in a proceeding based upon a State law claim or State law cause of action ....") (emphasis added).

36    Even if permissive abstention could be applied to an adversary proceeding in a chapter 15 case, the Court would decline to abstain here. Permissive abstention is a doctrine affording courts discretion whether to abstain from hearing certain matters, but "Courts must be sparing in their exercise of permissive abstention, and may abstain only for a few extraordinary and narrow exceptions." *CCM Pathfinder Pompano Bay, LLC v. Compass Fin. Partners LLC,* 396 B.R. 602, 607 (S.D.N.Y.2008) (internal citations omitted); *accord In re Residential Capital, LLC,* 519 B.R. 890, 903 (Bankr.S.D.N.Y.2014) ("A federal court must be 'sparing' in its exercise of permissive abstention 'because [it] possess[es] a virtual unflagging obligation ... to exercise the jurisdiction given [to it].' " (quoting *Kirschner v. Grant Thornton LLP (In re Refco, Inc. Sec. Litig.),* 628 F.Supp.2d 432, 446 (S.D.N.Y.2008))). Courts in this district commonly consider multiple factors in deciding whether to permissively abstain, *see In re WorldCom, Inc. Sec. Litig.,* 293 B.R. 308, 332 (S.D.N.Y.2003), many of which are similar to the factors courts apply in considering application of *forum non conveniens,* which is considered and rejected in the next section of this Opinion.

37    The unjust enrichment claim is also asserted under foreign law in the alternative. (TPG Opp. at 30.)

38    The Court does not decide whether *forum non conveniens* dismissal as to DB would be appropriate at a later time if, for instance, the Plaintiffs commenced a similar action in the UK against the Original Defendants that were dismissed for lack of personal jurisdiction in *Hosking I.*

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

---

# TAB 5

516 B.R. 724
United States District Court,
S.D. New York.

In re MADISON BENTLEY
ASSOCIATES, LLC, Debtor.
Gregory Messer, as Chapter 7 Trustee, Plaintiff,
v.
Bentley Manhattan, Inc., Manhattan
Motorcars, Inc., and Brian Miller, Defendants.

No. 14–cv–2315 (LAK).
|
Bankruptcy No. 09–15479 (SHL).
|
Adversary No. 10–03487 (SHL).
|
Signed Aug. 22, 2014.
|
As Corrected Sept. 15, 2014.

**Synopsis**
**Background:** Chapter 7 trustee brought adversary proceeding to pierce corporate veil and to require related artificial entities to turn property over for administration by trustee, as well as to recover from these related entities on actual or constructive fraudulent transfer grounds. Defendants moved for summary judgment on trustee's claims on standing and limitations grounds, and trustee filed a cross-motion.

**Holdings:** After reviewing the Bankruptcy Court's recommended findings of fact and conclusions of law, the District Court, Lewis A. Kaplan, J., held that:

[1] veil-piercing claim was claim that belonged to estate, and that trustee had standing to pursue;

[2] alleged fraudulent transfer of Chapter 7 debtor's rights as assignee under commercial lease occurred, for limitations purposes, each time that debtor permitted related entities to occupy premises to exclusion of debtor in order to operate automobile dealership and without compensating debtor for that use, and not simply on date that debtor first allowed these entities to take possession; and

[3] trustee could not rely on discovery rule to extend, more than six years back from date that debtor's bankruptcy petition was filed, the "lookback" period for avoidance of transfers as actually fraudulent to creditors.

Granted in part and denied in part.

West Headnotes (12)

[1] **Bankruptcy**
⬤ In general;standing

Bankruptcy trustee has standing to assert claim against third party if claim could have been asserted by the debtor prepetition, and if the claim is a general one, which is not for any particularized injury, and which could have been brought by any creditor of the debtor.

Cases that cite this headnote

[2] **Bankruptcy**
⬤ In general;standing

If cause of action belongs to the estate, then trustee has exclusive standing to assert it, while if cause of action belongs solely to creditors, then trustee has no such standing.

Cases that cite this headnote

[3] **Corporations and Business Organizations**
⬤ Nature of remedy

Under New York law, corporation can assert a veil-piercing claim against itself.

1 Cases that cite this headnote

[4] **Bankruptcy**
⬤ In general;standing
**Bankruptcy**
⬤ Rights of Action;Contract Rights Generally

Veil-piercing claim, which Chapter 7 trustee asserted against other artificial entities related to bankrupt limited liability company (LLC) in attempt to compel these other entities to

turn over their assets for administration as property of the estate, was claim that belonged to estate, and that trustee had standing to pursue, regardless of fact that debtor-LLC listed only a single creditor on its bankruptcy schedules. 11 U.S.C.A. §§ 541(a), 542(a).

Cases that cite this headnote

**[5]   Bankruptcy**
       In general;standing

Under New York law, bankruptcy trustee may bring alter ego cause of action on behalf of corporate debtor in an attempt to collect property of the estate for benefit of all creditors if such an action is not personal to any particular creditor.

1 Cases that cite this headnote

**[6]   Bankruptcy**
       In general;standing

Cause of action is personal to particular creditor, such that trustee will not have standing to pursue it, if the third-party defendant directly harmed creditor, as opposed to harming the debtor directly and the creditor indirectly through the debtor.

Cases that cite this headnote

**[7]   Bankruptcy**
       Time limitations;computation

Alleged constructively fraudulent transfer of Chapter 7 debtor's rights as assignee under commercial lease occurred, for limitations purposes, each time that debtor permitted related entities to occupy premises to exclusion of debtor in order to operate automobile dealership and without compensating debtor for that use, and not simply on date that debtor first allowed these entities to take possession of premises, where there was no contention that entities occupied premises pursuant to sublease, whether written or oral, but merely as licensees of debtor; accordingly, Chapter 7 trustee's constructive fraudulent transfer claims were

not time-barred, to extent based on related entities' occupation of premises over the six-year "lookback" period established by New York statute of limitations on constructive fraudulent transfer claims. 11 U.S.C.A. § 544; N.Y.McKinney's Debtor and Creditor Law § 273.

1 Cases that cite this headnote

**[8]   Fraudulent Conveyances**
       Particular Estates and Interests

Grant of license to use real property constitutes a "conveyance" subject to New York fraudulent conveyance law. N.Y.McKinney's Debtor and Creditor Law § 270.

Cases that cite this headnote

**[9]   Limitation of Actions**
       Fraud in the purchase, sale, or acquisition of property

**Limitation of Actions**
       Fraud in sale of property

Under New York law, actual fraudulent transfer claim must be brought within six years of date of the fraud, or within two years after plaintiff discovered the fraud, or could with reasonable diligence have discovered it, whichever is longer. N.Y.McKinney's Debtor and Creditor Law § 276; N.Y.McKinney's CPLR 203(g), 213(8).

Cases that cite this headnote

**[10]  Limitation of Actions**
       Fraud in sale of property

Under New York law, two-year discovery period for party to bring actual fraudulent transfer claim begins to run from time at which plaintiff had information from which he reasonably could have inferred that the challenged conveyance was made with actual intent to hinder, delay, or defraud creditors. N.Y.McKinney's Debtor and Creditor Law § 276; N.Y.McKinney's CPLR 203(g), 213(8).

Cases that cite this headnote

**[11]  Bankruptcy**
👉 Time limitations;computation

Alleged actually fraudulent transfer of Chapter 7 debtor's rights as assignee under commercial lease occurred, for limitations purposes, each time that debtor permitted related entities to occupy premises to exclusion of debtor in order to operate automobile dealership and without compensating debtor for that use, and not simply on date that debtor first allowed these entities to take possession of premises, where there was no contention that entities occupied premises pursuant to sublease, whether written or oral, but merely as licensees of debtor; accordingly, Chapter 7 trustee's actually fraudulent transfer claims were not time-barred, to extent based on related entities' occupation of premises over the minimum six-year "lookback" period established by New York statute of limitations on actual fraudulent transfer claims. 11 U.S.C.A. § 544; N.Y.McKinney's Debtor and Creditor Law § 276; N.Y.McKinney's CPLR 203(g), 213(8).

Cases that cite this headnote

**[12]  Bankruptcy**
👉 Time limitations;computation

Chapter 7 trustee could not rely on discovery rule to extend, more than six years back from date that debtor's bankruptcy petition was filed, the "lookback" period for avoidance as actually fraudulent to creditors of the repeated transfers that continually occurred each time that debtor allowed related entities to exercise debtor's leasehold rights, to exclusion of debtor, to operate automobile dealership on premises pursuant to license gratuitously granted by debtor; lessor, which had been provided with copy of commercial insurance policy that named these related entities rather than debtor, and which received rental payment on checks written from related

entity's account, had sufficient information in its possession to put it on inquiry notice of fraudulent transfer long prior to when New York's two-year discovery rule might have extended the basic six-year "lookback" period farther back into the prebankruptcy past. 11 U.S.C.A. § 544; N.Y.McKinney's Debtor and Creditor Law § 276; N.Y.McKinney's CPLR 203(g), 213(8).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*726** Abner T. Zelman, Kucker & Bruh, LLP, for the Plaintiff.

Jerome Reisman, Reisman Peirez Reisman & Capobianco, LLP, for the Defendants.

## MEMORANDUM OPINION

LEWIS A. KAPLAN, District Judge.

Before the Court are cross-motions for summary judgment in an adversary proceeding filed in the Bankruptcy Court. The trustee and the defendants cross-moved for summary judgment on the trustee's claims (1) for a declaration that defendants Bentley Manhattan and Manhattan Motorcars are alter egos of the debtor corporation [1] and that their property therefore is vested with the estate under Sections 541 and 542(a) of the Bankruptcy Code and (2) to recover the full value of defendants' exercise of debtor's rights under a lease on the ground that the exercise of those rights constituted a fraudulent conveyance. The Bankruptcy Judge issued proposed findings of fact and conclusions of law (the "PFC") on the motions. The PFC proposed that the Court hold that the trustee does not have standing to pursue a veil piercing claim against the defendants and that the fraudulent conveyance claims are time barred. The trustee objected and the Court considers de novo those portions of the PFC to which objection has been made. [2]

[1]    Brian Miller owns the debtor and the two defendant entities entirely or in part.

*In re Madison Bentley Associates, LLC,* 516 B.R. 724 (2014)

[2]    *See* FED. R. BANKR. P. 9033; *Adelphia Recovery Trust v. FLP Grp., Inc.,* 11 Civ. 6847(PAC), 2012 WL 264180, at *7 (S.D.N.Y. Jan. 30, 2012).

## Background

### I. Facts[3]

[3]    The Bankruptcy Court concluded that the facts material to its determination of the motions were undisputed. The Court adopts its findings of facts. The following is a brief summary.

On March 21, 2000, defendant Brian Miller formed the debtor corporation, Madison Bentley Associates. He was and is Madison Bentley Associates' sole owner. **\*727** On March 29, 2000, MMC Madison LLC ("MMC"), a non-party corporation, signed a 10–year lease for a commercial space at 437 Madison Avenue, New York, New York with owner Madison Avenue Leasehold, LLC ("Owner") through the owner's agent, Sage Realty Corporation for a term beginning on June 15, 2000. Miller signed the lease as MMC's "Managing Member" and he and his father signed personal guarantees for the first three years of the lease term.

The lease provided that the "Tenant shall use and occupy demised premises for automobile showroom for Rolls–Royce and Bentley motor cars and executive offices in connection therewith." It provided also that MMC could assign or sublease the property with the owner's consent or to permit a "Related Entity" to use the property upon notice to the owner. On July 18, 2000, MMC assigned the lease to the debtor with the Owner's consent,[4] and Miller and his father renewed their three-year guarantees.

[4]    Miller signed on behalf of both MMC and the debtor.

The Owner then was aware that MMC and the debtor both were newly formed entities and that they had no assets other than the lease and the apparent ability to operate a Rolls Royce and Bentley showroom on the premises. During the debtor's tenure, Bentley Manhattan—a defendant corporation owned by Miller that was not a party to the lease—wrote most of the monthly rent checks. Bentley Manhattan had three employees who worked at the premises, selling various Bentley accessories, while Manhattan Motorcars, yet another defendant corporation owned by Miller, owned the cars that were displayed there. On July 7, 2000, shortly before

MMC assigned the lease to the debtor, the debtor and Bentley Manhattan obtained a certificate of insurance. The certificate listed the insured as "Bentley Manhattan Inc." and "Madison Bentley Associates LLC."[5]

[5]    Miller Aff. [10–ap–3487 DI 26], Ex. 9.

The debtor stopped paying rent on September 29, 2003, soon after the Millers' three-year guarantees expired, and vacated the premises. The Owner sued the debtor, Miller, and Miller's father in New York State Supreme Court for damages for unpaid rent for the remainder of the ten-year lease. The state court dismissed the complaint as to the Millers but on June 24, 2009, awarded the Owner a $1.2 million judgment against the debtor.

Several months later, on September 11, 2009, the debtor filed a Chapter 7 bankruptcy petition, listing the Owner as its sole creditor. The trustee subsequently initiated this adversary proceeding against Miller, Bentley Manhattan, and Manhattan Motorcars.

## Discussion

### I. The Trustee's Standing to Pursue a Veil Piercing Claim

The PFC proposed holding that the trustee does not have standing to seek a declaration that Bentley Manhattan and Manhattan Motorcars are alter egos of the debtor. It reasoned that "[t]he claim is an injury to a third party, namely the Owner, for the failure to pay rent. Indeed, it is undisputed that the Owner is the only creditor in this case. Thus, no other party, other than the Owner, will benefit from pursuit of this alter ego claim."[6] The trustee objected to the PFC, arguing principally that the trustee has standing because the veil piercing claim is brought pursuant to Section 542 of the Bankruptcy Code and for the benefit of the debtor's estate rather than on behalf or for the benefit of the Owner. The defendants responded **\*728** that this argument elevates form over substance.

[6]    DI 1 at 16.

[1]    [2]    A trustee has standing to assert a claim against a third-party if (a) it could have been asserted by the debtor pre-petition and (b) the "claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor."[7] In other words, "if the cause of action belongs to the estate,

the trustee has exclusive standing to assert it; conversely, if the cause of action belongs solely to the ... creditors, the trustee has no standing to assert it." [8]

7    *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.,* 884 F.2d 688, 701, 704–05 (2d Cir.1989).

8    *In re Granite Partners, L.P.,* 194 B.R. 318, 324–25 (Bankr.S.D.N.Y.1996).

**[3]**    The Court adopts the PFC's proposal that the trustee has satisfied the first prong of the test. The weight of authority in New York holds that a corporation can assert a veil piercing claim against itself. [9] To the extent that the defendants can be said to have objected, their objections are overruled. That the debtor would not have been able to bring a veil piercing claim in exactly the same form (*i.e.,* pursuant to Sections 541 and 542(a) of the Bankruptcy Code), does not mean that it could not have brought such a claim at all.

9    *See In re Yerushalmi,* 487 B.R. 98, 106 (Bankr.E.D.N.Y.2012) (collecting cases).

**[4]**    As to the second prong, the operative question is whether the trustee's veil piercing claim properly is classified as being on behalf of the debtor corporation as opposed to the sole creditor. The Court holds that the trustee has standing because the claim belongs to the estate.

For one, the trustee has brought the veil piercing claim pursuant to Sections 541 and 542(a) of the Bankruptcy Code. Those provisions enumerate what constitutes property of the estate in bankruptcy and require entities that have "possession, custody, or control ... of property that the trustee may use, sell, or lease ... [to] deliver to the trustee, and account for, such property or the value of such property." [10] In order to obtain any such property from the defendants, the trustee here seeks a declaration that they are alter egos of the debtor. A claim brought in this form by its very nature is on behalf of debtor corporation. [11] The nature of the claim therefore distinguishes this case from *O'Leary v. Indotronix Int'l Corp. (In re Chandre Corp.),* [12] upon which the PFC relies. In *O'Leary,* a creditor had an outstanding judgment against the debtor, which subsequently had transferred its assets to certain third parties. The trustee brought an action to enforce the judgment pursuant to the N.Y.

CPLR against the debtor and, on an alter ego theory, against the third parties. Such a claim on a money judgment in favor of the creditor naturally belongs to the creditor. Although it perhaps is a fine point, the veil piercing claim in this case was not brought to collect the judgment owed by the debtor to the creditor. Instead, it was brought to for a declaration as to whether property of one of the defendants in fact was property **\*729** of the estate because the debtor and the creditor were alter egos.

10    11 U.S.C. §§ 541, 542(a).

11    *See Yerushalmi,* 487 B.R. at 107 ("Part two of the St. Paul analysis of a bankruptcy trustee's standing to pursue an alter [ego] claim is also satisfied. The Trustee is asserting a generalized injury to all creditors and is seeking to recover property—which is allegedly property of the estate—for the benefit of all creditors. He bases his standing on sections 541, 542 and 704, not section 544. His standing in this case does not derive from an injury to any one particular creditor—a fact which is now underscored by the effective reversal of the Shiboleth judgment against the Debtor.").

12    03–35669    (CGM),    2005 WL 3789129 (Bankr.S.D.N.Y. Oct. 28, 2005).

**[5]    [6]**    The substance of the claim supports the Court's holding as well. "Under New York law, a trustee may bring an alter ego cause of action on behalf of a corporate debtor in an attempt to collect property of the estate for the benefit of all creditors if such an action is not personal to any particular creditor." [13] An action is personal to a particular creditor if the third-party defendant directly harmed it, as opposed to harming the debtor directly and the creditor indirectly through the debtor. [14] Here, the issue is not which entity was harmed—it is whether the property of one of the defendants in fact is property of the bankrupt estate. Moreover, any "harm" to the Owner was indirect—it was suffered only because the estate of the bankrupt does not include property which otherwise would have been available to satisfy the Owner's judgment. In effect, if one properly may characterize Sections 541 and 542 as involving any question of harm, the "harm" simply is that one or more of the defendants have some property that rightly belongs to the debtor's estate. This is a harm first to the debtor's estate and only secondarily to the creditor.

**13**    *Kalb, Voohis & Co. v. Am. Fin. Corp.*, 92 Civ. 7754(RPP), 1993 WL 180368, at *6 (S.D.N.Y. May 24, 1993), *aff'd* 8 F.3d 130 (2d Cir.1993) (quoting *In re Harry C. Partridge Jr. & Sons, Inc.*, 112 B.R. 593, 596 (Bankr.S.D.N.Y.1990)) (emphasis omitted).

> The defendants cite several cases involving the application of California, not New York, law in support of their position.

**14**    *See, e.g., id.* at *6–*7 (citing *St. Paul*, 884 F.2d at 704).

The Court notes also that the fact that there is only one creditor in this case does not automatically alter this result. [15] Precisely the same analysis would apply in a case with hundreds of creditors as in a case with a single creditor. In either event, the claim against the putative alter ago would be one belonging to the corporation. Indeed, the test is whether the injury, if "injury" were the right term in an action for a declaration that property of a non-debtor, putative alter ego in fact belongs to the estate, was direct or derivative, not the number of creditors that may exist. If Congress intended to limit the Bankruptcy Code's applicability to single-creditor bankruptcies, the Court presumes that it would have done so expressly. That any funds recovered here likely will be disbursed to the sole creditor through the debtor's estate does not affect the inquiry under *St. Paul.*

**15**    *See, e.g., Solow v. Stone*, 994 F.Supp. 173, 179 (S.D.N.Y.) (applying Delaware law, the court held "[i]f the harm is to the corporation, and therefore affects the entire corporate structure, an individual plaintiff has not suffered a particularized injury, regardless of whether he is the corporation's sole creditor."), *aff'd*, 163 F.3d 151 (2d Cir.1998); *Bd. of Directors of Chestnut Grove Condo. Unit Owners' Ass'n v. Resolution Trust Corp.*, 161 B.R. 860, 863 (D.D.C.1993) ( "Our reasoning applies whether or not the plaintiff remains the only scheduled creditor of TB Capital.").

## II. Fraudulent Conveyance

The Bankruptcy Court proposed granting the defendants' motion for summary judgment on plaintiff's fraudulent conveyance claims based on its conclusions that (1) the debtor transferred its interest in the lease through a sublease or assignment when the defendant entities first started operating on the property and (2) the Owner had enough information that it should have investigated the possibility of fraud earlier than September 11, 2007.

The trustee objected. He argued that no conveyance took place in mid–2000 when the defendant corporations began occupying the premises because the debtor **\*730** did not enter into an agreement to sublease or assign the lease. The alleged conveyance occurred when the defendants stopped performing the debtor's obligation under the lease. The trustee reasoned that "the transfer to the Defendants of the use of the Premises leased to the Debtor was not *fraudulent*—i.e., without fair consideration and/or with actual intent to defraud—as long as the Defendants complied with the leasehold obligations of paying rent and conducting a car dealership business on the Premises." [16]

**16**    Objections [DI 2] at 15.

He argued also that the statute of limitations should be tolled equitably because the Owner, in consequence of misrepresentations by the debtor, did not learn until the Chapter 7 case was filed that the debtor had no legal right to operate a car dealership and that the dealership at the premises was operated by the defendant corporations. On essentially the same basis, he contends that the record does not support holding that the Owner knew about the fraud from as early as mid–2000.

### A. Constructive Fraud

**[7]**    The Bankruptcy Court accurately set out the legal standard governing the statute of limitations for constructive fraud claims. Under the applicable New York state law, a constructive fraud action must be brought within six years of when "the fraud or conveyance occurs." [17] The statute of limitations is tolled upon the filing of the bankruptcy petition. Accordingly, in order to come within the limitations period, the fraud or conveyance must have occurred within the six years preceding September 11, 2009.

**17**    *Bloomfield v. Bloomfield*, 280 A.D.2d 320, 321, 721 N.Y.S.2d 15, 16 (1st Dep't 2001).

The Bankruptcy Court concluded that "the conveyance occurred when the Defendants started using the Premises because that is when the Debtor allegedly conveyed the value of the property to the Defendants." But that view ignores the nature of the apparent relationship among the parties and the nature of the transaction itself. The property's value under the lease is alleged to have been its potential use as a showroom for Bentley and Rolls–Royce cars. Absent an actual assignment, sublease, or some

other evidence demonstrating that the debtor and the defendants understood and intended to transfer that value from the debtor to the defendants fully and completely on the date that the occupancy began, there is no basis for holding that any transfer occurred at that time as opposed to continuously during the period of occupancy.

To the contrary, the parties concede that the transfer of rights of the debtor under the lease was "continual or ongoing." The defendants do not contend that the transfer was an assignment or a sublease to them, let alone that it occurred pursuant to a written or even verbal agreement executed on X date and to run for any particular term or even on a month-to-month or other basis. Rather, it is undisputed that the arrangement among the debtor and the defendants was one in which the debtor effectively transferred its right under the lease to operate a car dealership or showroom to the defendants on each and every day that the defendants so used the premises. In effect, it was a license to use and profit from the property for which the debtor did not receive adequate consideration. As in *Mills v. Everest Reinsurance Co.,* [18] each day that the defendants used the property that Owner leased to the debtor, to the debtor's exclusion, the assets available to the debtor were reduced. "Therefore, each transfer constitute[d] a **\*731** separate conveyance for purposes of calculating the date upon which the statute of limitations accrued." [19]

[18]   410 F.Supp.2d 243, 254 (S.D.N.Y.2006).

[19]   *Id.; see also id.* at 255 ("Indeed, because a new claim for fraudulent conveyance accrues at the time of each conveyance, it would be illogical and contrary to the spirit of the law to treat a series of transfers as one transaction for the purpose of determining when the statute of limitations was triggered.").

 [8]   Finally, there is no question that the grant of a license to use real property constitutes a conveyance subject to fraudulent conveyance law. " 'Conveyance' includes every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or incumbrance." [20] This has been held to include "a release of the debtor's interest in [ ] realty" [21] and, by parity of reasoning, a license of its use.

[20]   N.Y. DEBT. & CRED. L. § 270 (McKinney).

[21]   *348–352 W. 27th St. Corp. v. Dropkin,* 178 Misc. 815, 818, 36 N.Y.S.2d 740, 743 (Sup.Ct.N.Y.Co.1942). This case arguably lends support to the trustee's contention that the fraudulent transfer occurred when the defendants caused the debtor to abandon the premises and stop making lease payments. However, that argument was raised for the first time in the trustee's objections and the Court thus declines to entertain it. *Cf. Ortiz v. Barkley,* 558 F.Supp.2d 444, 451 (S.D.N.Y.2008) ("a district court generally should not entertain new grounds for relief or additional legal arguments not presented to the magistrate"). This does not foreclose the Bankruptcy Court from considering this argument on remand.

Accordingly, the constructive fraudulent conveyance claims are not time barred to the extent that they accrued after September 11, 2003.

 *B. Actual Fraud*

 **[9]    [10]    [11]**   A claim for actual fraud is timely only if brought within six years of the date the fraud occurred or within two years from the date on which the plaintiff discovered or with reasonable diligence could have discovered the fraud. [22] The two-year discovery period began to run from the point at which the plaintiff "had information from which [he] reasonably could have inferred that the challenged ... conveyance ... was made with actual intent to hinder, delay, or defraud." [23] Such information triggers a "duty to inquire." [24] For the reasons discussed above, the Court holds that the six-year look back period does not bar the trustee's action for actual fraud. As the Bankruptcy Court recognized, however, even if the fraudulent conveyance was ongoing up to September 29, 2003, the trustee likely will not be able to recover any proceeds from the defendants' use of the premises earned before September 11, 2003. The Court accordingly goes on to evaluate the trustee's objection to the Bankruptcy Court's proposal that the two-year notice period had run by the time the trustee initiated this action.

[22]   *Miller v. Polow,* 14 A.D.3d 368, 787 N.Y.S.2d 319 (1st Dep't 2005); *Leone v. Sabbatino,* 235 A.D.2d 460, 461, 652 N.Y.S.2d 628, 629 (2d Dep't 1997).

[23]   *Miller,* 14 A.D.3d at 368, 787 N.Y.S.2d at 320 (citations and internal quotation marks omitted).

[24]   *Citicorp Trust Bank, FSB v. Makkas,* 67 A.D.3d 950, 953, 889 N.Y.S.2d 656, 659 (2d Dep't 2009), *abrogated*

*on other grounds by* *Coyle v. Lefkowitz,* 89 A.D.3d 1054, 934 N.Y.S.2d 216 (2d Dep't 2011).

**[12]** In determining when the two-year notice period began to run, the Court must evaluate whether the undisputed evidence shows that the trustee (standing in the shoes of the Owner) had information from which to infer that there may have been a fraud before September 11, 2007. [25] To the **\*732** extent that "it does not conclusively appear that [the Owner] had knowledge of facts from which the fraud could reasonably be inferred, a complaint should not be dismissed on motion and the question should be left to the trier of facts." [26]

[25] *Miller,* 14 A.D.3d at 368, 787 N.Y.S.2d at 320.

[26] *Trepuk v. Frank,* 44 N.Y.2d 723, 724, 405 N.Y.S.2d 452, 376 N.E.2d 924 (1978).

As is noted above, the Bankruptcy Court proposed holding that the two-year discovery period began to run in mid–2000, when the defendant corporations first occupied the premises. This is based on its proposal that the Court hold that the Owner had sufficient notice of the fraud through its knowledge that (a) the debtor was a shell corporation without assets or income; (b) entities other than the debtor were operating a business on the premises; and (c) entities other than the debtor made rent payments.

The Court agrees that the undisputed evidence conclusively shows that the Owner had ample information before September 2007 from which to infer that there may have been a fraud and that it should investigate further. The Owner argues that while it knew that the debtor was a newly formed entity without assets at the time it received the lease assignment, it believed that the debtor had the ability to operate a car dealership or showroom and earn a profit therefrom. While that well may be true, there was ample evidence that Bentley Manhattan, Inc., not the debtor, was operating on the premises. For example, Miller sent the Owner's agent the certificate of liability insurance, which explicitly stated that the insured were "Bentley Manhattan Inc." and "Madison Bentley Associates LLC." [27] It was clear from the certificate that Bentley Manhattan Inc. was a legal entity distinct form Madison Bentley Associates and that it was operating on the premises. This triggered a duty to investigate. The facts that there were prominently displayed signs for "Bentley Manhattan" at the premises and the majority of the monthly rent checks came from "Bentley Manhattan"

indicated further that a third party, and not the debtor, was operating the showroom on the premises. As a result, the Owner had ample information from which to glean that the leaseholder—Madison Bentley Associates—had no assets or income at any time. The contention that the Owner believed that Bentley Manhattan for Madison Bentley Associates was a doing business name, assuming the truth of that claim of subjective understanding, does not overcome the fact that the information known to the Owner—including the certificate of liability insurance, which listed Bentley Manhattan as a legal entity separate from Madison Bentley Associates—gave rise to a duty to investigate which, had it been discharged, would have revealed the actual situation.

[27] Miller Aff. [10–ap–3487 DI 26], Ex. 9.

The trustee's objections are overruled and the Court adopts the PFC's proposal that the two-year notice period applicable to claims of actual fraud began to run in or about July of 2000 and had run by the time this action was initiated. [28]

[28] The trustee is not entitled to equitable tolling for substantially the same reasons.

*Conclusion*

Plaintiff's motion for summary judgment is granted to the extent that the Court determines that the trustee has standing to bring the alter ego claims asserted in his first claim for relief. In all other respects, it is remanded to the Bankruptcy Court. Defendants' cross-motion for summary judgment dismissing the complaint is granted to the extent that the trustee's second and third claims for relief seek to recover proceeds of the defendants' exercise **\*733** of debtor's right to operate a car dealership on the premises for any period preceding September 11, 2003. It is denied in all other respects. The case is remanded to the Bankruptcy Court for further proceedings consistent with this opinion.

SO ORDERED.

**All Citations**

516 B.R. 724

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**End of Document**                                        © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 6

367 B.R. 428
United States Bankruptcy Court,
S.D. New York.

In re 360NETWORKS (USA) INC., et al., Debtors.
The Official Committee of Unsecured
Creditors of 360Networks (USA) Inc., et
al., and 360Networks (USA) Inc., by and
through The Official Committee of Unsecured
Creditors of 360Networks (USA) Inc., et al.,
v.
Pirelli Communications Cables
and Systems USA LLC, Defendant.

Bankruptcy No. 01–13721 (ALG).
|
Adversary No. 03–04267 (MG).
|
April 24, 2007.

**Synopsis**

**Background:** After time for filing avoidance complaints
had passed, official unsecured creditors' committee moved
for leave to amend its original, timely-filed preference
complaint to assert avoidance claim with respect to
additional transfers not identified in original complaint.

**[Holding:]** The Bankruptcy Court, Martin Glenn, J., held
that original preference complaint filed by unsecured
creditors' committee, in stating that recovery was sought
in at least the amount of $17,330,644.54, did not put
defendant on notice that committee might later seek to
avoid, as preferences, other transfers not identified in its
original complaint, so that amended complaint would not
relate back, and amendment was properly denied as futile.

Motion denied.

West Headnotes (12)

**[1]    Bankruptcy**
        Pleading;Dismissal

Purpose of general "notice" pleading
requirement, i.e., that complaint must contain
a short and plain statement of claim showing
that pleader is entitled to relief, is to provide
fair notice of claim and grounds upon which
it rests; requirement is designed to permit
defendant to have a fair understanding of
what plaintiff is complaining about and to
know whether there is legal basis for recovery.
Fed.Rules Civ.Proc.Rule 8(a), 28 U.S.C.A.

3 Cases that cite this headnote

**[2]    Bankruptcy**
        Time Limitations;Computation

Whether creditors' committee's proposed
amendment of its preference complaint to seek
to avoid additional transfers made to same
transferee would relate back to date of filing
of original complaint was governed not by
general "notice" pleading rule, but by Federal
Rule of Civil Procedure that specifically dealt
with amended pleadings and with whether
they related back. Fed.Rules Civ.Proc.Rules
8(a), 15(c)(2), 28 U.S.C.A.

Cases that cite this headnote

**[3]    Bankruptcy**
        Pleading;Dismissal

While leave to amend pleading should be
freely granted, amendment should be denied
as futile where additional claims sought to
be asserted would be barred on limitations
grounds, unless amendment would relate
back. Fed.Rules Civ.Proc.Rule 15(a, c), 28
U.S.C.A.

Cases that cite this headnote

**[4]    Bankruptcy**
        Limitations and Time to Sue;
        Computation

Burden of proving that proposed amendment
will relate back is on party seeking leave
to amend pleading. Fed.Rules Civ.Proc.Rule
15(c), 28 U.S.C.A.

Cases that cite this headnote

**[5]    Bankruptcy**
👈 Time Limitations;Computation

Primary consideration for court in deciding whether proposed amendment to unsecured creditors' committee's preference complaint, in which committee sought to avoid additional transfers, would relate back to date original complaint was filed was whether this original complaint put defendant on notice that additional transfers might be pursued at later date. Fed.Rules Civ.Proc.Rule 15(c)(2), 28 U.S.C.A.

4 Cases that cite this headnote

**[6]    Bankruptcy**
👈 Limitations and Time to Sue; Computation

In deciding whether amended complaint will relate back, courts do not consider subjective state of mind or what one party was thinking when it filed its original complaint, but will instead objectively consider whether original complaint put other party on notice as to cause of action being asserted against it. Fed.Rules Civ.Proc.Rule 15(c)(2), 28 U.S.C.A.

1 Cases that cite this headnote

**[7]    Bankruptcy**
👈 Limitations and Time to Sue; Computation

Principal inquiry for court, in deciding whether amended complaint will relate back, is whether adequate notice of matters raised in amended pleading has been given to opposing party by the general fact situation alleged in original pleading. Fed.Rules Civ.Proc.Rule 15(c)(2), 28 U.S.C.A.

1 Cases that cite this headnote

**[8]    Bankruptcy**
👈 Limitations and Time to Sue; Computation

Relation back of later time-barred claims sought to be raised in amendment is inappropriate, where facts in original pleading do not provide defendant with notice of facts out of which this time-barred claim arises. Fed.Rules Civ.Proc.Rule 15(c)(2), 28 U.S.C.A.

Cases that cite this headnote

**[9]    Bankruptcy**
👈 Limitations and Time to Sue; Computation

For amended pleading to relate back, general factual allegations made in original pleading must be enough to put opposing party on notice as to potential action that awaits it. Fed.Rules Civ.Proc.Rule 15(c)(2), 28 U.S.C.A.

1 Cases that cite this headnote

**[10]    Bankruptcy**
👈 Limitations and Time to Sue; Computation

To determine whether amended pleading relates back, court must objectively consider whether general fact allegations set forth in original pleading gave defendant notice of additional claims; matters that are outside of original complaint are irrelevant. Fed.Rules Civ.Proc.Rule 15(c)(2), 28 U.S.C.A.

1 Cases that cite this headnote

**[11]    Bankruptcy**
👈 Time Limitations;Computation

Original preference complaint filed by unsecured creditors' committee, in stating that recovery was sought in at least the amount of $17,330,644.54, did not put defendant on notice that committee might later seek to avoid, as preferences, other transfers not identified in its original complaint, so that amended complaint that committee sought to file to avoid additional transfers after relevant

limitations period had run would not relate back, and amendment was properly denied as futile. Fed.Rules Civ.Proc.Rule 15(c)(2), 28 U.S.C.A.

2 Cases that cite this headnote

[12]    **Bankruptcy**
👉 Time Limitations;Computation

Each potential preferential transfer is a separate and distinct transaction, and preference complaint based on one transfer does not put defendant on notice of claims with respect to any other unidentified transfers, for purpose of deciding whether amended complaint adding claim with respect to these previously unidentified transfers will relate back. Fed.Rules Civ.Proc.Rule 15(c)(2), 28 U.S.C.A.

5 Cases that cite this headnote

**Attorneys and Law Firms**

*430 Norman N. Kinel, Esq., Terence D. Watson, Esq., Dreier LLP, New York, NY, Attorneys for the Official Committee of Unsecured Creditors of 360networks (USA) inc., et al., and the Estate of 360networks (USA) inc.

Richard P. Krasnow, Esq., Richard L. Levine, Esq., Christopher Marcus, Esq., Weil, Gotshal & Manges LLP, New York, NY, Attorneys for Pirelli Communications Cables and Systems LLC.

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR LEAVE TO AMEND THE COMPLAINT**

MARTIN GLENN, United States Bankruptcy Judge.

The Official Committee of Unsecured Creditors of 360networks (USA) inc., *et al.* (the "Plaintiff") brought an action against Pirelli Communications Cables and Systems USA LLC ("Pirelli" or the "Defendant") seeking the avoidance, recovery, and turnover of certain preferential transfers pursuant to §§ 547 and 550 of the

Bankruptcy Code. *See* Complaint (ECF Doc. No. 1). In its original complaint (the "Complaint"), filed on June 17, 2003, Plaintiff sought to avoid and recover preferential transfers in the aggregate sum of "at least $17,330,644.54." Attached to the Complaint as Exhibit A is a schedule showing a detailed breakdown of each transfer, with check number, payment date, invoice number, invoice date and payment amount. The statute of limitations for Plaintiff's avoidance actions expired on June 27, 2003. On February 17, 2007, Plaintiff filed a motion (the "Motion") seeking (i) a determination that an amendment to the Complaint is not required for the Plaintiffs to avoid and recover additional transfers in the amount of $12,350,815.69, or, in the alternative, (ii) permission to amend the Complaint and for a finding that the proposed amended complaint will relate back to the filing of the Complaint and will not be barred by the applicable statute of limitations. For the reasons explained below, the Court holds that an amendment to the Complaint would be required, but would be futile because the statute of limitations has expired with respect to the additional transfers. An amendment to add the additional transfers would not relate back to the original Complaint under Fed.R.Civ.P. 15(c)(2). Therefore, the request for leave to amend is denied.

**I. DISCUSSION**

**A. The Parties Contentions**

In its Motion, Plaintiff contends that it is entitled to seek the recovery of additional transfers in the amount of $12,350,815.69, *431 bringing the total amount sought to $29,681,460.23, from Pirelli without amending the Complaint because the Complaint satisfies the liberal pleading requirements of Rule 8(a)(2) of the Federal Rules of Civil Procedure. Specifically, Plaintiff points to the language of the Complaint seeking the avoidance and recovery of preferential transfers made by the Debtor to Pirelli in the amount of "at least $17,330,644.54." *See* Complaint ¶ 1, at 2 (ECF Doc. No. 1). Plaintiff contends that this language provided Pirelli with fair notice that more than $17,330,644.54 was at issue by explicitly demanding the avoidance and recovery of "at least" $17,330,644.54.

In the event the Court deems an amendment necessary, Plaintiff seeks leave of Court to amend the Complaint under Fed.R.Civ.P. 15(a) and further contends that,

pursuant to Fed.R.Civ.P. 15(c), the amendment should be deemed to relate back to the filing of the Complaint so as not to be barred by the statute of limitations. Plaintiff states that an amendment will relate back to the filing of an original complaint where, like here, (i) the original complaint evidences an intent to seek recovery of more than the specifically identified transfers and (ii) the amendment merely quantifies the amount sought in the original complaint. Plaintiff contends that any amendment to the Complaint here should similarly be deemed to relate back to the date of the filing of the Complaint since the Complaint clearly provided Pirelli with sufficient notice of the Plaintiff's intent to seek recovery of more than or "at least" $17,330,644.54, and the amendment merely amplifies the transfers referred to in the Complaint.

In its reply brief, Plaintiff further argues that the amendment should relate back to the timely filed Complaint because the transfers all arise out of the same common core of operative facts. Specifically, Plaintiff contends that between 1999 and mid–2001 the Debtor and its predecessors purchased a large amount of fiber-optic cable from Pirelli pursuant to a Supply Agreement executed in January 1999 (the "Supply Agreement") and that all of the transfers were payments for such fiber-optic cable. *See* Reply to Motion at 6 (ECF Doc. No. 17).

The Defendant contends that the Plaintiff should be required to seek leave to amend the Complaint because the actual language of the Complaint did not put it on notice that additional transactions might be challenged and, therefore, the requirements of Fed.R.Civ.P. 8 have not been satisfied. Defendant states that the Complaint, not any other source, must provide the defendant with fair notice and here the Complaint does not contain any information—or even a hint—that Plaintiff may later pursue additional transfers.

Defendant further argues that leave to amend should be denied because amending the Complaint would be futile since these additional transfers do not "relate back" to the original Complaint under Fed.R.Civ.P. 15(c). The Defendant argues that for Plaintiff's proposed amendment to "relate back" the Court must find, among other things, that the Complaint provided fair and reasonable notice to Pirelli that transfers in addition to those specifically identified in the Complaint would or could be challenged. The Defendant argues that the only language to which

Plaintiff points to support its assertion that Pirelli had notice that additional transfers may be challenged is that the Complaint seeks avoidance and recovery of "at least $17,330,644.54." Defendant states that the phrase "at least" serves only to preserve the Plaintiff's right to seek an increase in its recovery as a result of interest and that the Complaint makes no reference to other transfers, course of conduct, or any other **432** fact that might link any other transfers that occurred during the preference period.

## B. Application of Rule 8 of Fed.R.Civ.P.

[1] Rule 8(a) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and governs the specificity necessary to state a claim under Fed.R.Civ.P. 12(b)(6). The purpose of the statement is to provide "fair notice" of the claim and "the grounds upon which it rests." *Enron Corp. v. J.P. Morgan Sec., Inc. ( In re Enron Corp.),* 325 B.R. 671 (Bankr.S.D.N.Y.2005) (citing *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In other words, "[Rule 8] is designed to permit the defendant to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery." *Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991).

[2] Rule 8 does not control the issue before the Court. Plaintiff's argument that it is not required to amend the Complaint because the Complaint meets the liberal pleading standard of Rule 8(a)(2) appears to be an attempt to make an end-run around the requirements of Rule 15(c)(2). Plaintiff cites *Family Golf Centers, Inc. v. Acushnet Co. ( In re Randall's Island Family Golf Centers, Inc.),* 290 B.R. 55 (Bankr.S.D.N.Y.2003) and *Official Comm. of Unsecured Creditors of the IT Group, Inc. v. Brandywine Apartments ( In re The IT Group, Inc.),* 313 B.R. 370, 371 (Bankr.D.Del.2004) in support of its argument. Plaintiff's reliance on these cases is misplaced. Neither case involved a proposed amendment seeking recovery of new payments after the expiration of the statute of limitations. *See In re Randall's Island,* 290 B.R. at 64–65 (denying a motion to dismiss subsequent complaint that sought to recover the same transfers made by the same payor to the same transferee as the initial complaint, because the complaint met the liberal pleading standard under Rule 8); *In re The IT Group,* 313 B.R. 370 (considering the liberal pleading standard of Rule 8(c) in the context of a motion to dismiss where defendant alleged that plaintiff failed to plead the required elements for a preferential transfer). All of the

cases cited by Plaintiff that address the issue of amending a complaint to recover additional payments analyze the issue under Rule 15(c)(2).

Even assuming *arguendo* that Rule 8 is relevant to this analysis, the Court finds that the Complaint does not satisfy the notice pleading requirements of Rule 8 with respect to the additional preference claims. The only language to which Plaintiff points to support its contention that the Defendant had notice that additional transfers may be challenged is that the Complaint seeks avoidance and recovery of "at least $17,330,644.54." However, the terms "at least" appear to apply to the sum of the transfers, specifically identified in Exhibit A to the Complaint, rather than the number of transfers being pursued. *See* Complaint ¶ 11, at 4. Further, the term "at least $17,330,644.54" was explained in the relief requested section to mean the stipulated amount plus interest as of the date of the Demand Letter. *See* Complaint at 5 ("[D]eclaring that Pirelli pay the amount of at least $17,330,644.54, representing the amount owed by Pirelli, plus interest from the date of the Demand Letter as permitted by law"). The Complaint does not include any additional language that would put the Defendant on notice of these additional transfers.

**C. Application of Fed.R.Civ.P. 15**

[3]    Rule 15(a) provides that leave to amend is to be freely granted. **\*433** Fed.R.Civ.P. 15(a). But an amendment should be denied where the additional claims sought to be asserted would be barred by the statute of limitations unless the amendment relates back under Rule 15(c). *Metzeler v. Bouchard Transp. Co., Inc. (In re Metzeler),* 66 B.R. 977, 981 (Bankr.S.D.N.Y.1986). The dispositive issue in this matter, therefore, is whether the additional transfers set forth in the proposed amendment to the Complaint would "relate back" under Rule 15(c). If the additional transfers set forth in the proposed amendment to the Complaint do not relate back then allowing the Plaintiff to amend the Complaint would be futile.

[4]    Rule 15(c), made applicable by Bankruptcy Rule 7015, provides in relevant part:

An amendment of a pleading relates back to the date of the original pleading when ...

(2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or

occurrence set forth or attempted to be set forth in the original pleading....

Fed.R.Civ.P. 15(c). "[T]he purpose of Rule 15 is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities," however, a court must not "undermine the purpose of repose for which statutes of limitations were designed." *Enron Corp. v. J.P. Morgan Sec. Inc. (In re Enron Corp.),* 357 B.R. 257, 263 (Bankr.S.D.N.Y.2006) (citations and quotations omitted). The moving party who asserts the relation back bears the burden of proof. *In re Enron Corp.,* 298 B.R. 513, 522 (Bankr.S.D.N.Y.2003).

[5]    [6]    The primary consideration in determining whether the proposed amendment to the Complaint should relate back is whether the Complaint put the defendant on notice that additional transfers may be pursued at a later date. Courts will not consider the subjective state of mind of what one party was thinking when it filed its original complaint, but will instead objectively consider whether the original complaint put the other party on notice as to the cause of action being asserted against it. *Enron Corp. and Nat'l Energy Prod. Corp. v. Granite Constr. Co. (In re Enron Corp.),* No. 03–93172, 2006 WL 2400369, \* 10 (Bankr.S.D.N.Y. May 11, 2006) (citing *In re Kam Kuo Seafood Corp.,* 67 B.R. 304, 306 (Bankr.S.D.N.Y.1986)).

[7]    [8]    Under Rule 15(c)(2), an amended pleading relates back to an earlier pleading if the amended pleading sets forth claims arising out of the same conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading. "The principal inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party by the general fact situation alleged in the original pleading." *Id.* (citing *Weiss v. Alicea (In re Alicea),* 230 B.R. 492, 498–99 (Bankr.S.D.N.Y.1999)); *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 86–87 (2d Cir.1999) ("Under Fed.R.Civ.P. 15(c), the central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations 'by the general fact situation alleged in the original pleading.' ") (quotations and citations omitted); *Rosenberg v. Martin,* 478 F.2d 520 (2d Cir.1973) ("[T]he inquiry in a determination of whether a claim should relate back will focus on the notice given by the general fact situation set forth in the original pleading.") (citing *Snoqualmie Tribe v. United States,* 178 Ct.Cl. 570, 372

F.2d 951, 960 (1967)) (quotations omitted). "If the facts in the original pleading do not provide defendant with notice of facts out of which the time-barred claim arises then **\*434** relation back is inappropriate." *106 Mile Transp. Associates v. Koch,* 656 F.Supp. 1474, 1487 (S.D.N.Y.1987).

**[9]** The general factual allegations made in the original pleading must be enough to put the opposing party on notice as to the potential action that awaits it. *Enron Corp.,* 2006 WL 2400369 at *11. "One test that many courts have employed in order to determine whether an amendment to pleadings will relate back is to determine whether the initial complaint put the defendants ... on notice of what must be defended against in the amended pleadings. This test does not require that the prior complaint put the defendants on notice of new or additional legal theories that the plaintiffs seek to assert against the defendants, but it must inform the defendants of the facts that support those new claims." *Barr v. Charterhouse Group Int'l, Inc. (In re Everfresh Beverages, Inc.),* 238 B.R. 558, 573–74 (Bankr.S.D.N.Y.1999) (citations omitted).

**[10]** Plaintiff goes to great lengths to set forth numerous facts outside of the Complaint that, it claims, gave Pirelli notice, well in advance of the expiration of the applicable statute of limitations, that Plaintiff would be seeking the recovery of all preferential transfers received by each of the defendants in the preference actions. *See* Motion at 9. However, as discussed above, the Court must objectively consider whether the general fact allegations set forth in the Complaint gave Defendant notice of additional claims; matters outside of the Complaint are irrelevant for purposes of a Rule 15(c)(2) analysis.

**[11]** Here, the Complaint fails to set forth any facts putting the Defendant on notice that additional transactions may be challenged. Specifically, no facts are alleged regarding the nature of the Debtor's relationship with Pirelli or the nature of the transfers made between the Debtor or Pirelli during the alleged preference period. The Complaint merely alleges that "[o]n or within ninety (90) days before the Petition Date, 360 made preferential transfers to or for the benefit of Pirelli in the aggregate sum of at least $17,330,644.54, in cash...." Exhibit A to

the Complaint identifies specific transfers; it does not provide any information from which the Defendant can glean that the Debtor intended to challenge additional transfers. The Complaint does not mention the Supply Agreement between the Debtor and Pirelli, raised by the Debtor for the first time in its reply memorandum. The Court finds that the Defendant was not put on notice that additional transfers may be pursued at a later date. Indeed, the plain language of the Complaint reflects that no other claims were being asserted or contemplated. Under these circumstances, relation back of the proposed amendment is inappropriate. *See, e.g., Kam Kuo,* 67 B.R. at 308 (denying motion for leave to amend because among other things "the original complaint assert[ed] no such continuing close relationship or conduct from which both the originally pleaded and subsequently pleaded transactions sprung").

**[12]** Further, the mere fact that all of these transactions are potentially preferential transfers is of no consequence when performing a Rule 15(c)(2) analysis. In the context of preference actions, each potential preferential transfer is a separate and distinct transaction: a preference action based on one transfer does not put defendant on notice of claims with respect to any other unidentified transfers. *Kam Kuo,* 67 B.R. at 308; *see Metzeler v. Bouchard Transp. Co. (In re Metzeler),* 66 B.R. 977, 984 (Bankr.S.D.N.Y.1986) ("Courts have consistently treated preferential transactions as separate and distinct under Rule 15(c)"). For these reasons, the Court concludes that the proposed amendment **\*435** would not relate back to the timely filed Complaint.

## II. CONCLUSION

For the reasons provided above, the Plaintiff's Motion to Amend the Complaint is DENIED.

**IT IS SO ORDERED.**

**All Citations**

367 B.R. 428, 48 Bankr.Ct.Dec. 58

---

**End of Document**     © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 7

458 B.R. 87
United States Bankruptcy Court,
S.D. New York.

In re BERNARD L. MADOFF
INVESTMENT SECURITIES LLC, Debtor.
Irving H. Picard, as Trustee for the
Liquidation of Bernard L. Madoff
Investment Securities LLC, Plaintiff,
v.
Peter B. Madoff, Mark D. Madoff, Andrew H.
Madoff, and Shana D. Madoff, Defendants.

Bankruptcy No. 08–01789 (BRL).
|
Adversary No. 09–1503 (BRL).
|
Sept. 22, 2011.

**Synopsis**

**Background:** Trustee for substantively consolidated liquidation, under Securities Investor Protection Act (SIPA), of investment company and its principal brought adversary proceeding against principal's brother, two sons, and niece, asserting claims to avoid and recover alleged preferential and fraudulent transfers under Bankruptcy Code and New York law, claims to disallow and equitably subordinate defendants' claims filed in SIPA proceeding, and common-law tort claims for breach of fiduciary duty, negligence, conversion, unjust enrichment, constructive trust, and accounting. Defendants moved to dismiss.

**Holdings:** The Bankruptcy Court, Burton R. Lifland, J., held that:

[1] complaint adequately alleged that transfers of bonuses and salaries were made for less than reasonably equivalent value or fair equivalent value, as required to state claims for constructive fraudulent transfer;

[2] safe harbor provision did not provide basis for dismissing constructive fraudulent transfer claims stemming from defendants' withdrawals of alleged fictitious profits from investment advisory accounts;

[3] complaint did not sufficiently plead preferential transfers claims;

[4] trustee did not sufficiently plead claims to recover subsequent transfers;

[5] trustee adequately pleaded claim for disallowance of defendants' SIPA claims;

[6] trustee adequately pleaded claim for equitable subordination; and

[7] New York's Martin Act did not preempt common-law claims.

Motion granted in part and denied in part.

West Headnotes (85)

**[1]    Bankruptcy**
    Pleading

Claim brought under Bankruptcy Code's actual fraudulent transfer provision or New York's actual fraudulent transfer statute must be supported by enough factual allegations to satisfy the pleading requirements set forth under fraud pleading rule. 11 U.S.C.A. § 548(a)(1)(A); Fed.Rules Bankr.Proc.Rule 7009, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.; N.Y.McKinney's Debtor and Creditor Law § 276.

Cases that cite this headnote

**[2]    Bankruptcy**
    Fraudulent transfers

Presumption of actual intent to defraud arising from Ponzi scheme, on grounds that transfers made in course of Ponzi scheme could have been made for no purpose other than to hinder, delay, or defraud creditors, establishes debtors' fraudulent intent required for actual fraudulent transfer claims under both Bankruptcy Code and New York actual fraudulent transfer statute. 11 U.S.C.A. § 548(a)(1)(A); Fed.Rules Bankr.Proc.Rule

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.    1

7009, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.; N.Y.McKinney's Debtor and Creditor Law § 276.

1 Cases that cite this headnote

**[3]    Bankruptcy**
👉 Fraudulent transfers

Ponzi scheme presumption applied to establish actual fraudulent intent element, as to transferors, of fraudulent transfer claims asserted under Bankruptcy Code and New York law, given breadth and notoriety of Ponzi scheme and principal's criminal admission, and given that challenged transfers, which included redemptions of fictitious profits and payments of salaries, served to further Ponzi scheme. 11 U.S.C.A. § 548(a)(1)(A); Fed.Rules Bankr.Proc.Rule 7009, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.; N.Y.McKinney's Debtor and Creditor Law § 276.

9 Cases that cite this headnote

**[4]    Bankruptcy**
👉 Fraudulent transfers

Ponzi scheme presumption that transfers made in course of Ponzi scheme were made with actual intent to hinder, delay, or defraud creditors applies only to transferor's intent. 11 U.S.C.A. § 548(a)(1)(A); Fed.Rules Bankr.Proc.Rule 7009, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.; N.Y.McKinney's Debtor and Creditor Law § 276.

12 Cases that cite this headnote

**[5]    Bankruptcy**
👉 Pleading

For trustee to state claim for actual fraudulent transfer under either Bankruptcy Code or New York law, complaint need not negate transferee's good faith. 11 U.S.C.A. § 548(a)(1)(A), (c); N.Y.McKinney's Debtor and Creditor Law §§ 276, 278.

**[6]    Bankruptcy**
👉 Pleading

Defendants' good faith affirmative defense did not appear on the face of complaint asserting actual fraudulent transfer claims under Bankruptcy Code and New York law, given allegations that defendants had notice of fraud and were cognizant of irregularities in their own investment advisory accounts with transferor-investment company, and therefore good faith was not viable ground for dismissal for failure to state claim upon which relief could be granted. 11 U.S.C.A. § 548(a)(1)(A), (c); Fed.Rules Bankr.Proc.Rule 7012, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.; N.Y.McKinney's Debtor and Creditor Law §§ 276, 278.

2 Cases that cite this headnote

**[7]    Bankruptcy**
👉 Pleading

For complaint to state prima facie claim for actual fraudulent transfer under Bankruptcy Code or New York law, transfers sought to be avoided must be identified with particularity required by fraud pleading rule. 11 U.S.C.A. § 548(a)(1)(A); Fed.Rules Bankr.Proc.Rule 7009, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

Cases that cite this headnote

**[8]    Securities Regulation**
👉 Proceedings

Trustee in liquidation, under Securities Investor Protection Act (SIPA), of investment company and its principal failed to satisfy fraud pleading rule in identifying transfers that were subject of actual fraudulent transfer claims asserted under Bankruptcy Code and New York law, even under more relaxed standards applied to claims raised by bankruptcy trustee, where trustee did not specify which count of complaint he

sought to employ to avoid each challenged transfer, trustee did not indicate how he arrived at total sum that he sought to avoid under each count, total number of transfers that were included in each sum, or which statutory lookback period upon which he intended to rely, and majority of challenged transfers were not identified completely. 11 U.S.C.A. § 548(a)(1)(A); Securities Investor Protection Act of 1970, 15 U.S.C.A. § 78aaa et seq.; Fed.Rules Bankr.Proc.Rule 7009, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.; N.Y.McKinney's Debtor and Creditor Law § 276.

Cases that cite this headnote

**[9]    Bankruptcy**
    👉 Pleading

To satisfy fraud pleading rule's particularity requirement, party asserting actual fraudulent transfer claim must ordinarily allege (1) the property subject to the transfer, (2) the timing and, if applicable, frequency of the transfer, and (3) the consideration paid with respect thereto. 11 U.S.C.A. § 548(a)(1)(A); Fed.Rules Bankr.Proc.Rule 7009, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

2 Cases that cite this headnote

**[10]    Bankruptcy**
    👉 Pleading

Even under relaxed standard for allegations of fraud applied where actual fraudulent transfer is asserted by bankruptcy trustee, pleadings still must be particular enough to fulfill purpose of fraud pleading rule: to protect the defending party's reputation, to discourage meritless accusations, and to provide detailed notice of fraud claims to defending parties. Fed.Rules Bankr.Proc.Rule 7009, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

1 Cases that cite this headnote

**[11]    Bankruptcy**
    👉 Pleading

Complaint sufficiently identified, pursuant to fraud pleading rule, transfers sought to avoided and recovered as actual fraudulent transfers under Bankruptcy Code and New York law where complaint alleged transferee, transferor, and specific transfer dates and amounts. 11 U.S.C.A. § 548(a)(1)(A); Fed.Rules Bankr.Proc.Rule 7009, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.; N.Y.McKinney's Debtor and Creditor Law § 276.

Cases that cite this headnote

**[12]    Federal Courts**
    👉 Property in General

Claim for award of attorney fees pursuant to New York's fraudulent transfer statutes was not ripe for determination at motion-to-dismiss stage of adversary proceeding asserting actual fraudulent transfer claims. N.Y.McKinney's Debtor and Creditor Law §§ 276, 276–a.

1 Cases that cite this headnote

**[13]    Securities Regulation**
    👉 Proceedings

Pursuant to Bankruptcy Code's strong-arm statute, trustee in liquidation, under Securities Investor Protection Act (SIPA), of investment company and its principal had standing to invoke New York's discovery rule to make timely state-law actual fraudulent transfer claims based on transfers that occurred more than six years before SIPA liquidation's filing date where trustee alleged that, at all times relevant to transfers, fraudulent scheme perpetrated by company was not reasonably discoverable by at least one of company's unsecured creditors and one or more creditors had and continued to hold allowable matured or unmatured unsecured claims against company, which provided sufficient notice to defendants of at least one category of creditors on whose claims

trustee relied. 11 U.S.C.A. § 544(b); Securities Investor Protection Act of 1970, 15 U.S.C.A. § 78aaa et seq.; N.Y.McKinney's Debtor and Creditor Law § 276; N.Y.McKinney's CPLR 203(g), 213(8).

1 Cases that cite this headnote

[14]  **Bankruptcy**
👉 Trustee as representative of debtor or creditors

So long as trustee provides sufficient notice to defendants of at least one category of creditors that have standing to avoid an actual fraudulent transfer under non-bankruptcy law, trustee has standing to assert that actual fraudulent transfer claim under Bankruptcy Code's strong-arm statute. 11 U.S.C.A. § 544(b).

2 Cases that cite this headnote

[15]  **Fraudulent Conveyances**
👉 Sufficiency in general
**Fraudulent Conveyances**
👉 Elements of fraud in general

Lack of fair consideration can be established under New York's constructive fraudulent transfer laws by showing either a lack of fair equivalent property or a lack of good faith on the part of the transferee. N.Y.McKinney's Debtor and Creditor Law §§ 272, 273, 274, 275.

6 Cases that cite this headnote

[16]  **Bankruptcy**
👉 Insolvency of debtor
**Fraudulent Conveyances**
👉 Solvency of Grantor

By virtue of its engagement in Ponzi scheme, investment company was insolvent at relevant times for purposes of alleged constructive fraudulent transfers challenged under Bankruptcy Code and New York law. 11 U.S.C.A. §§ 544, 548(a)(1)(B); N.Y.McKinney's Debtor and Creditor Law §§ 273, 274, 275.

2 Cases that cite this headnote

[17]  **Bankruptcy**
👉 Pleading

Plaintiff asserting constructive fraudulent transfer claim under either Bankruptcy Code or New York law need only satisfy general fraud pleading rule, rather than heightened standards of fraud pleading rule, by providing short and plain statement of claim showing entitlement to relief. 11 U.S.C.A. §§ 544, 548(a)(1)(B); N.Y.McKinney's Debtor and Creditor Law §§ 273, 274, 275; Fed.Rules Bankr.Proc.Rules 7008, 7009, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rules 8(a)(2), 9(b), 28 U.S.C.A.

2 Cases that cite this headnote

[18]  **Bankruptcy**
👉 Pleading;dismissal

Purpose of general pleading requirement is to ensure that defendant receives fair notice of what the claim is and the grounds upon which it rests. Fed.Rules Bankr.Proc.Rule 7008, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 8(a)(2), 28 U.S.C.A.

Cases that cite this headnote

[19]  **Bankruptcy**
👉 Pleading;dismissal

Sole consideration in evaluating pleadings under general pleading rule is whether, consistent with the requirements of the rule, complaint gives defendant sufficient notice to prepare an answer, frame discovery, and defend against the charges. Fed.Rules Bankr.Proc.Rule 7008, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 8(a)(2), 28 U.S.C.A.

2 Cases that cite this headnote

[20]  **Bankruptcy**
👉 Pleading

In re Bernard L. Madoff Inv. Securities LLC, 458 B.R. 87 (2011)

55 Bankr.Ct.Dec. 139

Claims for constructive fraudulent transfer which were based on allegations that defendants, who worked for investment company involved in Ponzi scheme, had breached their fiduciary duties by failing to perform their compliance responsibilities, and thus did not provide value for their wages, did not sound in fraud and did not have to satisfy fraud pleading rule. 11 U.S.C.A. §§ 544, 548(a)(1)(B); N.Y.McKinney's Debtor and Creditor Law §§ 273, 274, 275; Fed.Rules Bankr.Proc.Rule 7009, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

Cases that cite this headnote

[21]    **Bankruptcy**
　　🔑 Pleading

In asserting claims for constructive fraudulent transfer under Bankruptcy Code and New York law, complaint adequately alleged that loans purportedly extended to defendants, who were executives of investment company that engaged in Ponzi scheme, were made for less than reasonably equivalent value or fair equivalent value where complaint alleged that promissory notes given in exchange for loans were executed pro forma without intent to repay and that no payment of principal, interest, or otherwise had been made since loans occurred. 11 U.S.C.A. §§ 544, 548(a)(1)(B); N.Y.McKinney's Debtor and Creditor Law §§ 273, 274, 275.

4 Cases that cite this headnote

[22]    **Bankruptcy**
　　🔑 Fraudulent transfers

Fictitious profits from a Ponzi scheme are deemed to have been received for less than reasonably equivalent value, as required to avoid such transfers as constructive fraudulent transfers under Bankruptcy Code. 11 U.S.C.A. § 548(a)(1)(B).

3 Cases that cite this headnote

[23]    **Bankruptcy**
　　🔑 Pleading

By alleging that executives for investment company that engaged in Ponzi scheme breached their fiduciary duties to company and thus did not provide services which might otherwise have constituted adequate consideration in exchange for executives' receipt of salaries and bonuses, complaint adequately alleged that transfers of bonuses and salaries were made for less than reasonably equivalent value, as required to state claims for constructive fraudulent transfer under Bankruptcy Code, or without fair equivalent value, as required to state claim under New York law. 11 U.S.C.A. § 548(a)(1)(B); N.Y.McKinney's Debtor and Creditor Law §§ 273, 274, 275.

4 Cases that cite this headnote

[24]    **Bankruptcy**
　　🔑 Pleading;dismissal

In accordance with the liberal pleading requirements of general pleading rule, plaintiff need not provide specific facts to support its allegations. Fed.Rules Bankr.Proc.Rule 7008, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 8(a), 28 U.S.C.A.

Cases that cite this headnote

[25]    **Bankruptcy**
　　🔑 Pleading;dismissal

General pleading rule does not require that complaint be a model of clarity or exhaustively present the facts alleged, as long as it gives each defendant fair notice of what plaintiff's claim is and the facts upon which it rests. Fed.Rules Bankr.Proc.Rule 7008, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 8(a), 28 U.S.C.A.

Cases that cite this headnote

[26]    **Bankruptcy**
　　🔑 Pleading

Under general pleading rule, allegations that $6,645,000 was transferred from investment company to attorney of company's executive in two consecutive months of particular year for purchase of home provided sufficient information to apprise defendants of claim that transfers were constructively fraudulent transfers under Bankruptcy Code and New York law. 11 U.S.C.A. §§ 544, 548(a)(1)(B); Fed.Rules Bankr.Proc.Rule 7008, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 8 (a), 28 U.S.C.A.; N.Y.McKinney's Debtor and Creditor Law §§ 273, 274, 275.

1 Cases that cite this headnote

[27] **Bankruptcy**
👉 Pleading

Under general pleading rule, complaint asserting constructive fraudulent transfer claims against executives for investment company that engaged in Ponzi scheme adequately alleged challenged transfers, such as withdrawals from investment advisory accounts and use of company's credit cards to pay personal expenses, even though complaint aggregated transfers over six-year period and thus failed to identify transfers sought to be avoided under Bankruptcy Code and those sought to be avoided under New York law; executives had notice of allegations that they provided insufficient value for transfers at a time when company was insolvent. 11 U.S.C.A. §§ 544, 548(a)(1)(B); Fed.Rules Bankr.Proc.Rule 7008, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 8(a), 28 U.S.C.A.; N.Y.McKinney's Debtor and Creditor Law §§ 273, 274, 275.

1 Cases that cite this headnote

[28] **Bankruptcy**
👉 Pleading

Complaint failed to adequately plead, under general pleading rule, claims for constructive fraudulent transfer under Bankruptcy Code and New York law as to aggregated transfers that extended beyond any applicable

lookback period and transfers that were listed without associated dates, since court could not determine whether such claims fell within any applicable lookback period. 11 U.S.C.A. §§ 544, 548(a)(1)(B); Fed.Rules Bankr.Proc.Rule 7008, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 8(a), 28 U.S.C.A.; N.Y.McKinney's Debtor and Creditor Law §§ 273, 274, 275.

Cases that cite this headnote

[29] **Limitation of Actions**
👉 Fraud in obtaining possession of or title to property

New York discovery rule is not available to allow plaintiff to avoid constructive fraudulent transfers occurring more than six years before filing of complaint. N.Y.McKinney's Debtor and Creditor Law §§ 273, 274, 275; N.Y.McKinney's CPLR 203(g), 213(8).

Cases that cite this headnote

[30] **Securities Regulation**
👉 Proceedings

Bankruptcy Code's safe harbor provision, barring avoidance of settlement payment made by or to, or for benefit of, stockbroker in connection with securities contract, provided affirmative defense that was not clearly established on face of complaint in action by trustee in liquidation of investment company and its principal under Securities Investor Protection Act (SIPA) asserting constructive fraudulent transfer claims against company's executives based on alleged withdrawals of fictitious profits from Ponzi scheme, given questions regarding whether principal was "stockbroker," whether payments were "settlement payments," and whether "securities contract" ever existed, and application of safe harbor to transfers occurring in Ponzi scheme was also contrary to purposes of safe harbor and incompatible with SIPA, and therefore safe harbor did not provide basis for dismissing claims. 11 U.S.C.A. §§ 101(53A)(A, B), 546(e), 548(a)

(1)(B), 741(7)(A)(i–xi), (8); Securities Investor Protection Act of 1970, §§ 6(b), 8(c)(3), 15 U.S.C.A. §§ 78fff(b), 78fff–2(c)(3).

Cases that cite this headnote

**[31]    Bankruptcy**
👉 Avoidance rights and limits thereon, in general

Settlement payments subject to Bankruptcy Code's safe harbor barring trustee's avoidance of settlement payment made by or to, or for benefit of, stockbroker in connection with securities contract must be made in the context of a securities transaction. 11 U.S.C.A. § 546(e).

Cases that cite this headnote

**[32]    Bankruptcy**
👉 Avoidance rights and limits thereon, in general

Bankruptcy Code's safe harbor barring trustee's avoidance of settlement payment made by or to, or for benefit of, stockbroker in connection with securities contract is intended to promote stability and instill investor confidence in the commodities and securities markets. 11 U.S.C.A. § 546(e).

Cases that cite this headnote

**[33]    Bankruptcy**
👉 Pleading

Claims to avoid and recover preferential payments are not held to the heightened pleading requirements of fraud pleading rule. 11 U.S.C.A. § 547(b); Fed.Rules Bankr.Proc.Rule 7009, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

1 Cases that cite this headnote

**[34]    Securities Regulation**
👉 Proceedings

Trustee in liquidation, under Securities Investor Protection Act (SIPA), of investment company and its principal adequately pleaded

that defendants to which alleged preferential transfers were made were company's "insiders," triggering one-year preference lookback period, where defendants were all close relatives of company's principal and were officers or senior managers at company. 11 U.S.C.A. §§ 101(31)(B), 547(b); Securities Investor Protection Act of 1970, 15 U.S.C.A. § 78aaa et seq.; Fed.Rules Bankr.Proc.Rule 7008, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 8(a)(2), 28 U.S.C.A.

Cases that cite this headnote

**[35]    Securities Regulation**
👉 Proceedings

Ponzi scheme in which investment company engaged was presumptively insolvent, and therefore trustee in liquidation, under Securities Investor Protection Act (SIPA), of company and its principal was not required to allege specific facts supporting company's insolvency at times of challenged transfers in asserting preferential transfer claims against company's insiders. 11 U.S.C.A. § 547(b); Securities Investor Protection Act of 1970, 15 U.S.C.A. § 78aaa et seq.

2 Cases that cite this headnote

**[36]    Securities Regulation**
👉 Proceedings

Allegations that challenged payments were compensation for services performed prior to when payment was made adequately pleaded element of preferential transfer claim requiring that payment be made to creditor on account of antecedent debt in action by trustee in liquidation, under Securities Investor Protection Act (SIPA), of investment company and its principal against company's officers and senior managers. 11 U.S.C.A. § 547(b); Securities Investor Protection Act of 1970, 15 U.S.C.A. § 78aaa et seq.

1 Cases that cite this headnote

**[37]    Securities Regulation**

👉 Proceedings

Trustee in liquidation, under Securities Investor Protection Act (SIPA), of investment company and its principal did not sufficiently plead preferential transfers claims asserted against company's officers and senior managers where allegations aggregated challenged transfers into lump sum, without specifying such information as number of preferences, amount of any specific preference, or identity of person who received specific preferences, which did not provide enough notice for officers and senior managers to prepare answer or affirmative defenses, such as whether transfer was made in ordinary course of business or whether there was contemporaneous exchange for new value. 11 U.S.C.A. § 547(b, c); Securities Investor Protection Act of 1970, 15 U.S.C.A. § 78aaa et seq.; Fed.Rules Bankr.Proc.Rule 7008, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 8(a), 28 U.S.C.A.

1 Cases that cite this headnote

**[38]    Securities Regulation**
👉 Proceedings

Trustee in liquidation, under Securities Investor Protection Act (SIPA), of investment company and its principal did not sufficiently plead claims under Bankruptcy Code and New York law to recover fraudulent transfers subsequently transferred to defendants, who were family members of principal and insiders of company, where trustee merely pleaded, on information and belief, that subsequent transfers were made, either directly or indirectly, without providing any sort of estimate of amount of purported subsequent transfers or information as to when or how transfers occurred, leaving defendants without notice as to which subsequent transfers were sought to be recovered. 11 U.S.C.A. § 550(a)(2); Securities Investor Protection Act of 1970, 15 U.S.C.A. § 78aaa et seq.; Fed.Rules Bankr.Proc.Rule 7008, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 8(a), 28 U.S.C.A.; N.Y.McKinney's Debtor and Creditor Law § 278.

3 Cases that cite this headnote

**[39]    Bankruptcy**
👉 Pleading

In determining whether a claim to recover fraudulent transfers from a subsequent transferee is adequately pled, general pleading rule governs. 11 U.S.C.A. § 550(a) (2); Fed.Rules Bankr.Proc.Rule 7008, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 8(a), 28 U.S.C.A.

3 Cases that cite this headnote

**[40]    Securities Regulation**
👉 Claims of broker-dealers and other noncustomers

Trustee in liquidation, under Securities Investor Protection Act (SIPA), of investment company and its principal adequately pleaded claim for disallowance of SIPA claims of company officers and senior managers by alleging that officers and senior managers were recipients of transfers of company's property that were recoverable under Bankruptcy Code and SIPA and that transfers had not been returned to trustee. 11 U.S.C.A. § 502(d); Securities Investor Protection Act of 1970, 15 U.S.C.A. § 78aaa et seq.

Cases that cite this headnote

**[41]    Bankruptcy**
👉 Effect of avoidable transfer and surrender thereof

Purpose of bankruptcy statute permitting disallowance of any claim of any entity that is a transferee of a voidable transfer is to preclude entities that have received voidable transfers from sharing in the distribution of assets unless and until the voidable transfer has been returned to the estate. 11 U.S.C.A. § 502(d).

Cases that cite this headnote

**[42]** **Securities Regulation**

👉 Claims of broker-dealers and other noncustomers

Trustee in liquidation, under Securities Investor Protection Act (SIPA), of investment company and its principal adequately pleaded claim to equitably subordinate SIPA claims of company officers and senior managers who were principal's family members where complaint alleged that officers and senior managers breached their fiduciary duties to company, directly harming it, and that officers and senior managers were unjustly enriched at company's expense due to their failures to adequately perform their fiduciary duties. 11 U.S.C.A. § 510(c); Securities Investor Protection Act of 1970, 15 U.S.C.A. § 78aaa et seq.

Cases that cite this headnote

**[43]** **Bankruptcy**

👉 Determination of priority

To plead equitable subordination successfully, complaint must contain enough facts to satisfy each part of the following three-part test: (1) that defendant-claimant engaged in inequitable conduct, (2) that the misconduct caused injury to the creditors or conferred an unfair advantage on defendant-claimant, and (3) that bestowing the remedy of equitable subordination is not inconsistent with bankruptcy law. 11 U.S.C.A. § 510(c).

Cases that cite this headnote

**[44]** **Bankruptcy**

👉 Inequitable conduct

Under Bankruptcy Code, equitable subordination is confined to offsetting specific harm that creditors have suffered on account of the inequitable conduct, and is remedial, not penal. 11 U.S.C.A. § 510(c).

Cases that cite this headnote

**[45]** **Securities Regulation**

👉 In general;collection of assets

Given the "hybrid" nature of a liquidation under Securities Investor Protection Act (SIPA), SIPA trustee has at least as many powers and responsibilities as an ordinary bankruptcy trustee under Bankruptcy Code. Securities Investor Protection Act of 1970, § 7(a), 15 U.S.C.A. § 78fff–1(a).

Cases that cite this headnote

**[46]** **Bankruptcy**

👉 In general;standing

Bankruptcy trustee has standing to assert claims against corporate insiders alleging injury to debtor.

1 Cases that cite this headnote

**[47]** **Securities Regulation**

👉 Proceedings

Trustee in liquidation, under Securities Investor Protection Act (SIPA), of investment company and its principal had standing to assert common-law claims against company's officers, directors, and managers to the extent that claims belonged to company's estate. Securities Investor Protection Act of 1970, 15 U.S.C.A. § 78aaa et seq.

Cases that cite this headnote

**[48]** **Bankruptcy**

👉 In general;standing

"*Wagoner* rule" deprives trustee of standing to bring in federal court a common law claim that is clearly defeated by the doctrine of in pari delicto barring wrongdoer's recovery against commensurate wrongdoer.

2 Cases that cite this headnote

**[49]** **Action**

👉 Illegal or immoral transactions

Under New York law, the doctrine of "in pari delicto" operates as an affirmative defense whereby a wrongdoer, or a plaintiff

asserting a claim on behalf of a wrongdoer, is generally barred from recovering against a commensurate wrongdoer.

1 Cases that cite this headnote

[50]    **Corporations and Business Organizations**
    👉 Adverse Interest

Under "*Wagoner* rule," a claim against a third party for defrauding a corporation accrues to creditors, not to the guilty corporation.

1 Cases that cite this headnote

[51]    **Corporations and Business Organizations**
    👉 Adverse Interest

*Wagoner* rule, providing that claim against third party for defrauding corporation accrues to creditors, not the guilty corporation, and in pari delicto rule, barring wrongdoer's recovery against commensurate wrongdoer, do not apply to actions of fiduciaries who are corporation's insiders in the sense that they either are on the board or management, or in some other way control the corporation.

4 Cases that cite this headnote

[52]    **Corporations and Business Organizations**
    👉 Corporation acts through officers or agents
    **Corporations and Business Organizations**
    👉 Presumptions

Under New York law, corporation is represented by its officers and agents, and all of their corporate acts, including fraudulent ones, are subject to the presumption of imputation to the corporation.

Cases that cite this headnote

[53]    **Securities Regulation**
    👉 Proceedings

Trustee in liquidation, under Securities Investor Protection Act (SIPA), of investment company and its principal sufficiently alleged

that positions of defendants, who were senior officers, directors, and compliance managers at company, rendered them insiders and fiduciaries, and thus was not barred from asserting common-law claims against on company's behalf by *Wagoner* rule, which provided that claim against third party for defrauding corporation accrued to creditors, not guilty corporation, or doctrine of in pari delicto, barring wrongdoer's recovery against commensurate wrongdoer. Securities Investor Protection Act of 1970, 15 U.S.C.A. § 78aaa et seq.

1 Cases that cite this headnote

[54]    **Corporations and Business Organizations**
    👉 Wrongful Acts or Omissions

General partners, sole shareholders, and sole decision makers are "insiders" or "fiduciaries" of corporation for purposes of in pari delicto doctrine under New York common law.

5 Cases that cite this headnote

[55]    **Corporations and Business Organizations**
    👉 Wrongful Acts or Omissions

Under New York law, even a third-party professional, typically the quintessential outsider, may surrender an in pari delicto defense to claim where it exerts sufficient domination and control over guilty corporation to render it an insider.

3 Cases that cite this headnote

[56]    **Corporations and Business Organizations**
    👉 Fiduciary Duties as to Management of Corporate Affairs in General
    **Implied and Constructive Contracts**
    👉 Unjust enrichment
    **Trusts**
    👉 Breach of Duty by Person in Fiduciary Relation in General

Common-law claims for breach of fiduciary duty, negligence, conversion, unjust enrichment, constructive trust, and accounting asserted by trustee in liquidation,

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.    10

under Securities Investor Protection Act
(SIPA), of investment company and its
principal against company's insiders and
fiduciaries were not based on fraud,
deception, unreasonable future promise,
or false representation, but instead relied
upon allegations that defendants failed to
carry out their compliance and supervisory
responsibilities and improperly used company
funds for personal use, and therefore New
York's Martin Act, which authorized State
Attorney General to pursue claims arising
out of securities fraud, did not apply to
preempt claims. Securities Investor Protection
Act of 1970, 15 U.S.C.A. § 78aaa et seq.;
N.Y.McKinney's General Business Law §
352–c.

Cases that cite this headnote

[57]   **Fraud**
           Fiduciary or confidential relations
       Under New York law, elements of a cause
       of action to recover damages for breach of
       fiduciary duty are (1) the existence of a
       fiduciary relationship, (2) misconduct by the
       defendant, and (3) damages directly caused by
       the defendant's misconduct.

       4 Cases that cite this headnote

[58]   **Negligence**
           Elements in general
       Elements of a claim for negligence under New
       York law are (1) a duty owed to the plaintiff
       by the defendants, (2) breach of that duty, and
       (3) injury substantially caused by that breach.

       2 Cases that cite this headnote

[59]   **Securities Regulation**
           Proceedings
       Trustee in liquidation, under Securities
       Investor Protection Act (SIPA), of investment
       company and its principal adequately alleged
       existence of fiduciary relationship between
       company and individuals who served as
       company's chief compliance officer, senior

managers and co-directors of trading, and
compliance director and in-house counsel in
support of claim, under New York law, for
breach of fiduciary duty, given allegations
that each relationship was characterized by
trust and reliance and an assumption of
control and responsibility for company's
affairs. Securities Investor Protection Act of
1970, 15 U.S.C.A. § 78aaa et seq.

Cases that cite this headnote

[60]   **Securities Regulation**
           Proceedings
       Trustee in liquidation, under Securities
       Investor Protection Act (SIPA), of investment
       company and its principal plausibly alleged,
       as element of claims under New York
       law for breach of fiduciary duty and
       negligence, that conduct of company's chief
       compliance officer (CCO), senior managers,
       and compliance director, whether intentional
       or negligent, breached their duties to properly
       supervise company's operations; trustee
       alleged that CCO and compliance director
       failed to monitor compliance with federal
       securities laws and regulations, that senior
       managers were, as licensed options principals,
       responsible for monitoring and approving
       company's options and transactions, and that
       all defendants, in violation of company's anti-
       money laundering compliance program, did
       not investigate or detect suspicious transfers
       by company to foreign affiliate for which three
       defendants were directors. Securities Investor
       Protection Act of 1970, 15 U.S.C.A. § 78aaa
       et seq.

Cases that cite this headnote

[61]   **Corporations and Business Organizations**
           Fiduciary Duties as to Management of
       Corporate Affairs in General
       Under New York law, fiduciary duties
       include discharging corporate responsibilities
       in good faith and with conscientious fairness,
       morality, and honesty in purpose and

displaying good and prudent management of the corporation.

2 Cases that cite this headnote

**[62]    Corporations and Business Organizations**
👉 Fiduciary Duties as to Management of Corporate Affairs in General

Under New York law, fraudulent activities of investment company's principal, in operating Ponzi scheme, did not serve as supervening cause that severed causal link between alleged breaches of fiduciary duties by company's officers and senior managers and foreseeable harm resulting to company, so as to preclude liability of officers and senior managers for such breaches, since officers and senior managers were best situated and obligated to uncover or prevent principal's fraud, but instead allegedly shirked their duties and engaged in improper personal use of company funds.

Cases that cite this headnote

**[63]    Negligence**
👉 Intentional or criminal acts

Under New York law, when the intervening, intentional act of another is itself the foreseeable harm that shapes the duty imposed, the defendant who fails to guard against such conduct will not be relieved of liability when that act occurs.

Cases that cite this headnote

**[64]    Damages**
👉 Particular cases in general
**Fraud**
👉 Exemplary

Complaint stated claim for award of punitive damages, on claims for negligence and breach of fiduciary duty against officers and senior managers of investment company involved in Ponzi scheme, by alleging that officers and senior managers failed to provide meaningful supervision of company and ignored numerous red flags and irregularities

to enrich themselves and their outside business ventures at company's expense.

Cases that cite this headnote

**[65]    Damages**
👉 Nature and Theory of Damages Additional to Compensation

Under New York law, punitive damages serve the dual purposes of punishing the offending party while deterring similar conduct by others.

Cases that cite this headnote

**[66]    Damages**
👉 Grounds for Exemplary Damages

To be liable for punitive damages in tort causes of action under New York law, defendant's actions must constitute willful or wanton negligence or recklessness.

Cases that cite this headnote

**[67]    Damages**
👉 Grounds for Exemplary Damages

Acts are "wanton" and "reckless," as required for award of punitive damages under New York law, when done in a manner showing heedlessness and an utter disregard for the rights and safety of others.

Cases that cite this headnote

**[68]    Damages**
👉 Nature and Theory of Damages Additional to Compensation

Decision to award punitive damages resides in the sound discretion of the original trier of facts under New York law.

Cases that cite this headnote

**[69]    Account**
👉 Fiduciary relations

Complaint stated claim for accounting under New York law by alleging that officers and

senior managers of investment company had fiduciary relationship with company and that they breached those duties to company and diverted its assets for their own benefit, including by using company funds to pay their personal expenses.

Cases that cite this headnote

**[70]    Account**
👉 Nature and grounds of right to an account

Under New York law, an accounting is a cause of action that seeks an adjustment of the accounts of the parties and a rendering of a judgment for the balance ascertained to be due.

Cases that cite this headnote

**[71]    Account**
👉 Fiduciary relations

**Account**
👉 Bill, complaint, or petition

To state claim for accounting under New York law, it is not necessary to identify a particular asset or fund of money in defendant's possession, but it is necessary to establish the existence of a confidential or fiduciary relationship and a breach of the duty imposed by that relationship respecting property in which the party seeking the accounting has an interest.

Cases that cite this headnote

**[72]    Bankruptcy**
👉 In general;standing

Trustee is permitted to pursue an accounting action to determine the extent of self-dealing by debtor-corporation's senior executives and the value of the assets of debtor-corporation.

Cases that cite this headnote

**[73]    Implied and Constructive Contracts**
👉 Unjust enrichment

Allegations that investment company's officers and senior managers misappropriated company's funds for improper personal uses, such as funding personal business ventures and homes, and that officers and senior managers failed to perform legal compliance and supervisory responsibilities which they were legally obligated to perform for company but nevertheless received astronomical compensation from company, stated claim for unjust enrichment under New York law.

Cases that cite this headnote

**[74]    Trusts**
👉 Nature of constructive trust

In determining whether to impose a constructive trust under New York law, courts consider four factors, although those factors are merely useful guides and are not talismanic, including (1) a confidential or fiduciary relationship, (2) a promise, express or implied, (3) a transfer made in reliance on that promise, and (4) unjust enrichment.

Cases that cite this headnote

**[75]    Trusts**
👉 Nature of constructive trust

Imposition of constructive trust under New York law requires a showing that property is held under circumstances which render unconscionable and inequitable the continued holding of that property, and that the remedy is essential to prevent unjust enrichment.

Cases that cite this headnote

**[76]    Implied and Constructive Contracts**
👉 Unjust enrichment

Unjust enrichment claim brought under New York law must be predicated on factual allegations that defendant was enriched at plaintiff's expense, and that it is against equity and good conscience to permit defendant to retain what is sought to be recovered.

Cases that cite this headnote

**[77]  Implied and Constructive Contracts**
   Unjust enrichment

To prove unjust enrichment claim under New York law, it is necessary to show that one party has received money or a benefit at the expense of another; the transaction must be unjust.

Cases that cite this headnote

**[78]  Implied and Constructive Contracts**
   Unjust enrichment

Under New York law, whether there is unjust enrichment may not be determined from a limited inquiry confined to an isolated transaction, and, instead, there must be a realistic determination based on a broad view of the human setting involved.

Cases that cite this headnote

**[79]  Trusts**
   Allegations as to creation and existence of trust

Under New York law, complaint which sufficiently alleged that investment company's officers and senior managers were unjustly enriched by property rightfully belonging to company stated claim for imposition of constructive trust.

Cases that cite this headnote

**[80]  Bankruptcy**
   Property held by debtor as trustee, agent, or bailee

Effect of constructive trust in bankruptcy is to take property out of the debtor's estate.

2 Cases that cite this headnote

**[81]  Conversion and Civil Theft**
   Assertion of ownership or control in general

Under New York law, "conversion" is an unauthorized assumption and exercise of the right of ownership over property belonging to another to the exclusion of the owner's rights.

Cases that cite this headnote

**[82]  Conversion and Civil Theft**
   Assertion of ownership or control in general
**Conversion and Civil Theft**
   Title and Right to Possession of Plaintiff

Under New York law, a conversion action requires plaintiff to have legal ownership or an immediate superior right of possession to the property that he seeks to recover and defendant to exercise unauthorized dominion over that property to the alteration of its condition or to the exclusion of plaintiff's rights.

Cases that cite this headnote

**[83]  Conversion and Civil Theft**
   Money and commercial paper; debt

When money, rather than a chattel, is the property at issue in action for conversion under New York law, it must be specifically identifiable.

1 Cases that cite this headnote

**[84]  Conversion and Civil Theft**
   Money and commercial paper; debt

If allegedly converted money is incapable of being described or identified in the same manner as a specific chattel, it is not the proper subject of a conversion claim under New York law.

1 Cases that cite this headnote

**[85]  Conversion and Civil Theft**
   Money and commercial paper; debt

Under New York law, complaint that did not seek a specific amount of money converted from particular account of investment

company, but rather sought an award of compensatory damages in amount to be determined at trial, failed to state claim for conversion against company's officers and senior managers.

[1] Cases that cite this headnote

**Attorneys and Law Firms**

**\*99** Baker & Hostetler LLP, By: David J. Sheehan, John Siegal, Marc D. Powers, New York, NY, for Plaintiff, Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff.

Paul, Weiss, Rifkind, Wharton & Garrison LLP, By: Martin Flumenbaum, Stephen J. Shimshak, Andrew J. Ehrlich, Hannah S. Sholl, New York, NY, for Defendant, Andrew H. Madoff, individually and as Executor of the Estate of Mark D. Madoff.

Lankler Siffert & Wohl LLP, By: Charles T. Spada, New York, NY, for Defendant, Peter B. Madoff.

Smith Valliere PLLC, By: Timothy A. Valliere, New York, NY, for Defendant, Shana D. Madoff.

*MEMORANDUM DECISION AND ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTIONS TO DISMISS TRUSTEE'S COMPLAINT*

BURTON R. LIFLAND, Bankruptcy Judge.

Before this Court are the motions (the "Motions to Dismiss") of Mark D. Madoff[1] and Andrew H. Madoff, Peter M. Madoff, **\*100** and Shana D. Madoff (the "Defendants") seeking to dismiss the complaint (the "Complaint") filed in the above-captioned adversary proceeding by Irving H. Picard, Esq. (the "Trustee," or "Plaintiff"), trustee for the substantially consolidated Securities Investor Protection Act ("SIPA")[2] liquidation ("SIPA Liquidation") of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff ("Madoff"), pursuant to Federal Rule of Civil Procedure

("Rule") 12(b)(6), made applicable herein by Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7012.[3]

[1] Mark D. Madoff passed away on December 11, 2010. The parties have stipulated that Mark D. Madoff in the above-captioned adversary proceeding is substituted by the Estate of Mark D. Madoff and Andrew H. Madoff, as Executor. *See* Stipulation and Order Substituting Party at p. 2 (dated Apr. 19, 2011) (Dkt. No. 47). For ease of reference, the Estate of Mark D. Madoff and Andrew H. Madoff, Executor, are referred to herein as Mark Madoff or Mark.

[2] SIPA sections 78fff(b) and 78fff–2(c)(3) allow a SIPA Trustee to utilize the avoidance powers enjoyed by a bankruptcy trustee. *See In re Bernard L. Madoff Inv. Sec. LLC,* 2011 WL 3568936, at \*12 n. 10 (*In re BLMIS I* ) (2d Cir. Aug. 16, 2011) ("A SIPA liquidation is a hybrid proceeding."). SIPA section 78fff(b) provides that "[t]o the extent consistent with the provisions of this chapter, a liquidation proceeding shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of title 11." 15 U.S.C. § 78fff(b). SIPA section 78fff–2(c)(3) states, in relevant part: "whenever customer property is not sufficient to pay in full the claims set forth in subparagraphs (A) through (D) of paragraph (1), the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11." 15 U.S.C. § 78fff–2(c)(3).

[3] There is no paucity of decisional law regarding Bernard Madoff and the Trustee's restitutional litigation relating to this Ponzi saga. Instructive and pertinent to the factors to consider when parsing a Rule 12(b) motion to dismiss arising from the Madoff case is the recent decision of U.S. District Judge Kimba Wood (the "District Court") reviewing the Trustee's pleading sufficiency in another Madoff matter set at the same pleading stage as this one. *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC),* 11 MC 0012, 2011 WL 3897970, at \*13 (S.D.N.Y. Aug.31, 2011) (*Merkin I* ).

The instant Complaint differs from all others connected to the Madoff Ponzi scheme in one significant respect: its named Defendants are Madoff's brother, two sons, and niece. As set forth in the Complaint, the Defendants held senior management positions at BLMIS, which, the Trustee asserts, was "operated as if it was the family piggy

bank," with the Defendants living in multi-million dollar homes and relying on BLMIS funds to pay for vacations, travel, and other personal expenses—all while failing to fulfill their responsibilities as high ranking employees of the business. This failure was unsurprising given their close familial relationship with Madoff and proximity to BLMIS, both of which undergird the claim at the heart of the Trustee's Complaint: that if anyone was in a position to prevent Madoff's scheme, it was the Defendants, who, instead, stood by profiting mightily while allowing it to persist. The Defendants nevertheless steadfastly contend their involvement with BLMIS was entirely legitimate, and they, above all others, were betrayed by their family's patriarch. But even if they were victims of the cruelest betrayal, the Complaint alleges that the Defendants' failures to fulfill their responsibilities at BLMIS facilitated egregious harms.

The Trustee accordingly seeks to avoid and recover transfers made to the Defendants in the collective amount of over $198 million under various sections of the Bankruptcy Code (the "Code") and New York Debtor and Creditor Law [4] (the "NYDCL"); as well as to utilize sections of the Code to disallow and equitably subordinate those claims filed by the Defendants in the SIPA proceeding (collectively, **101** the "Bankruptcy Claims"). [5] In addition, the Trustee seeks tort damages for BLMIS by bringing claims under New York common law for breach of fiduciary duty, negligence, conversion, unjust enrichment, constructive trust, and accounting (the "Common Law Claims"). The Complaint, however, contains some correctable pleading deficiencies, and will need to be amended in part in order to stand as a matter of law. [6] Thus, as set forth below, the Defendants' Motions to Dismiss are DENIED in part and GRANTED in part.

[4]    N.Y. Debt. & Cred. Law § 270 *et seq.* (McKinney 2001).

[5]    In accordance with this Court's decision in *Picard v. Merkin* the Trustee withdrew the claim for immediate turnover of alleged customer property pursuant to section 542 of the Code. 440 B.R. 243, 249–51 (Bankr.S.D.N.Y.2010) (*Merkin I* ) (dismissing the Trustee's turnover claim); *see also* Letter to Judge Burton R. Lifland in response to the Court's August 4, 2011 request for a supplemental brief addressing the decision in *Picard v. HSBC Bank PLC,* No. 11–CV–0763, *et al.* (S.D.N.Y. July 28, 2011) at p. 2, n. 1

(No. 09–01503) (dated Aug. 12, 2011) (Dkt. No. 50) [Hereinafter "Trustee's Supplemental Letter"].

[6]    The Complaint, like in a game of horseshoes, is a leaner rather than a ringer in that it misses the target, but comes close enough to score. For further discussion on leaners and ringers, see http://www. horseshoepitching.com/rules/ Content.html (last visited on Sept. 21, 2011).

### BACKGROUND

A comprehensive discussion of the facts underlying the SIPA Liquidation and Madoff's Ponzi scheme is set forth in this Court's prior decisions. *See In re Bernard L. Madoff Inv. Sec. LLC,* 424 B.R. 122, 125–32 (Bankr.S.D.N.Y.2010) (*In re BLMIS I* ), aff'd, Nos. 10–2378, *et al.,* 2011 WL 3568936 (2d Cir. Aug. 16, 2011) (*In re BLMIS II* ); *see also Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC),* 440 B.R. 243, 249–51 (Bankr.S.D.N.Y.2010) (*Merkin I* ), *leave to appeal denied,* 2011 WL 3897970, at *13 (S.D.N.Y. Aug. 31, 2011) (*Merkin II* ).

### I. THE DEFENDANTS

#### A. Peter B. Madoff

Peter B. Madoff ("Peter") is Madoff's brother and was BLMIS's Senior Managing Director and Chief Compliance Officer ("CCO"). He is a law school graduate and held a number of securities licenses with the Financial Industry Regulatory Authority ("FINRA"), including Series 1, 4, and 5. Peter was the Director of the Securities Industry Financial Markets Associations ("SIFMA"), a member of the Board of Governors and the Executive Committee of the National Stock Exchange, the Vice Chairman of the FINRA Board of Governors, as well as a Director of the National Securities Clearing Corporation. He also served on NASDAQ's Executive Committee Board of Governors. Compl. ¶ 6.

As the CCO of BLMIS, Peter was allegedly responsible for adopting and administering compliance procedures to prevent and detect fraud and to identify and address significant compliance issues in accordance with SEC and FINRA regulations. Compl. ¶¶ 28–36. His duties included, *inter alia,* preparing the annual review of BLMIS's investment advisory business's ("IA Business") compliance program, performing qualitative tests of

BLMIS's internal compliance procedures, and assessing whether such procedures were effectively implemented. Compl. ¶¶ 28–36.

Peter is alleged to have received at least $60,631,292 from BLMIS, including, but not limited to, withdrawals of fictitious profits from investment advisory accounts at BLMIS ("IA Accounts"); salaries and bonuses from 2001 to 2008 in the total **\*102** amount of $20,067,920; loans totaling $13,244,649.30; and various other payments funding purchases of real estate, business investments, a life insurance policy, personal credit card bills, and the purchase and restoration of an Aston Martin automobile. [7] Compl. ¶¶ 65–73.

[7]   Peter transferred his ownership interest in the Aston Martin to the Trustee on May 4, 2011. Shortly thereafter, the Trustee won approval from this Court to retain an auctioneer to transport, store, repair and sell the Aston Martin at auction. *See* Order Authorizing the Sale of the Property of the Estate at p. 2 (No. 08–01789) (dated June 15, 2011) (Dkt. No. 4165). In August 2011, the Aston Martin was sold at auction for $225,000. *See* Notice of Sale of Aston Martin (No. 08–01789)(date Sept. 21, 2011) (Dkt. 4377).

**B. Mark D. Madoff and Andrew H. Madoff**

Mark D. Madoff ("Mark") and Andrew H. Madoff ("Andrew"), Madoff's sons, were Co–Directors of Trading at BLMIS and served as Controllers and Directors of Madoff Securities International Ltd. ("MSIL"), a U.K. affiliate of BLMIS. [8] Both held securities licenses with FINRA, including Series 4, 7, 24, and 55, and were members of various securities organizations. Mark was Chairman of the FINRA Inter–Market Committee, Governor of the Securities Traders Association ("STA"), Co–Chair of the STA Trading Committee, a member of the FINRA Membership Committee and Mutual Fund Task Force, President of the Securities Trader Association of New York ("STANY"), Chairman of the FINRA Regulation District Ten Business Conduct Committee, and Chairman of the Securities Industry and Financial Markets Association ("SIFMA") NASDAQ committee. Similarly, Andrew was Chairman of the Trading, Trading Issues and Technology, and Decimalization and Market Data Committees and Subcommittees at SIFMA. He was also a member of

the FINRA District Ten and NASDAQ Technology Advisory Committees. Compl. ¶¶ 7, 8.

[8]   MSIL was placed into liquidation in the U.K. shortly after the commencement of this SIPA liquidation. On April 14, 2009, the joint provisional liquidators for MSIL filed a chapter 15 petition in the United States Bankruptcy Court for the Southern District of Florida seeking recognition of the U.K. liquidation. Following a transfer of that case to the Southern District of New York, this Court granted recognition of the U.K. liquidation as a foreign main proceeding. *See* Order Recognizing Foreign Proceeding at p. 2 (No. 09–12998) (dated June 6, 2009) (Dkt. No. 25).

Andrew and Mark were purportedly responsible for ensuring compliance with BLMIS's policies and procedures, as well as applicable securities laws. Compl. ¶¶ 28–36, 47–49.

Mark allegedly received at least $66,859,311 from BLMIS, including, but not limited to, withdrawals of fictitious profits from IA Accounts; salaries and bonuses from 2001 to 2008 in the total amount of $29,320,830; real estate loans in the amount of $15,126,589; and payments funding real estate purchases, business investments, and personal credit card bills. Compl. ¶¶ 74–84. Likewise, Andrew allegedly received at least $60,644,821 from BLMIS, including, but not limited to, withdrawals of fictitious profits from IA Accounts; $31,105,505 in salary and bonuses between 2001 and 2008; loans totaling $11,285,000; and various other payments funding business investments, the purchase and maintenance of a boat, and personal credit card expenses. Compl. ¶¶ 85–94.

**C. Shana Madoff**

Shana Madoff ("Shana"), Madoff's niece, served as the in-house Counsel and Compliance Director for BLMIS. She is a law **\*103** school graduate and a member of the FINRA Consultative Committee; STANY; NASD's Market Regulation Committee, the SIFMA Self–Regulatory and SRO Committee, and the SIFMA Continuing Education Committee. Compl. ¶ 9.

Like Peter, Shana was purportedly responsible for monitoring BLMIS's operations and ensuring compliance with federal securities laws and regulations and corresponding FINRA rules and regulations. Compl. ¶¶ 28–36, 43–46.

Shana allegedly received at least $10,607,876 from BLMIS, including, but not limited to, withdrawals of fictitious profits from IA Accounts; salaries from 2001 to 2008 in the amount of $3,832,878; as well as various payments funding the purchase of a home, business investments, interior decoration, rent, and personal credit card expenses. Compl. ¶¶ 95–98.

### MOTION TO DISMISS UNDER RULE 12(b)(6) STANDARD OF REVIEW

Rule 12(b)(6) allows a party to move to dismiss a cause of action for "failure to state a claim upon which relief can be granted." FED.R.CIV.P. 12(b)(6); FED. R. BANKR.P. 7012(b). When considering a motion to dismiss under Rule 12(b)(6), a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); EEOC v. Staten Island Sav. Bank, 207 F.3d 144, 148 (2d Cir.2000).

To survive a motion to dismiss, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED.R.CIV.P. 8(a)(2); FED. R. BANKR.P. 7008. A recitation of the elements of the cause of action supported by mere conclusory statements, however, is insufficient. Iqbal, 129 S.Ct. at 1949. Rather, a complaint must state "a plausible claim for relief," id. at 1950, which would be the case where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," id. at 1949. Finally, in determining plausibility, this Court must "draw on its judicial experience and common sense," id. at 1950, to decide whether the factual allegations "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555, 127 S.Ct. 1955.

### DISCUSSION

## I. THE BANKRUPTCY CLAIMS

In Counts Two through Ten of the Complaint, the Trustee seeks to avoid and recover payments totaling $198,743,299 made to or for the benefit of the Defendants pursuant to sections 544, 547, 548, 550, and 551 of the

Code and various sections of the NYDCL. The Trustee alleges that more than 383 transfers totaling $141,034,907 to or for the benefit of the Defendants in the six year period (the "Six–Year Transfers") prior to December 11, 2008 (the "Filing Date"),[9] and are avoidable and recoverable under sections 544, 550(a), and 551 of the Code and sections 273 through 276 of the NYDCL. Compl. ¶ 106. Of the Six–Year Transfers, at least 129 totaling $58,666,811 were allegedly made within two years prior to the Filing Date (the "Two–Year Transfers") and are avoidable and recoverable *104 under sections 548(a)(1), 550(a), and 551 of the Code. Compl. ¶ 107. Of the Two–Year Transfers, $7,364,048 was received by the Defendants within one year of the Filing Date (the "Preferences") and avoidable and recoverable under Code sections 547, 550(a), and 551. Compl. ¶ 108. Additionally, the Trustee alleges that BLMIS transferred a further $57,708,392 to the Defendants prior to six years before the Filing Date. Compl. ¶ 109. Finally, in Counts Eleven and Twelve of the Complaint, the Trustee requests that the proofs of claims filed by the Defendants in the SIPA Liquidation should be disallowed and equitably subordinated pursuant to relevant sections of the Code.

[9]     On December 11, 2008, Bernard Madoff was arrested by federal agents for violation of criminal securities laws, including, inter alia, securities fraud investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities Exchange Commission filed a complaint in United States District Court for the Southern District of New York. Compl. ¶ 13; see also In re BLMIS I, 424 B.R. at 125–32.

### A. Actual Fraud Under the Code and the NYDCL
In Counts Three and Five of the Complaint, the Trustee seeks to avoid and recover, under a theory of actual fraud, Two Year Transfers pursuant to section 548(a)(1)(A), and Six Year Transfers under section 544 of the Code and section 276 of the NYDCL (collectively, the "Actual Fraudulent Transfers"). With regard to the Trustee's Actual Fraudulent Transfers claims, although the Complaint adequately alleges the element of intent, it fails, in many instances, to state the factual circumstances constituting the fraud as required by Rule 9(b).

 [1]   Pursuant to section 548(a)(1)(A) of the Code, a trustee must establish the debtor "made such transfer ... with actual intent to hinder, delay, or defraud." 11 U.S.C.

§ 548(a)(1)(A). Under section 276 of the NYDCL, a trustee similarly may avoid any "conveyance made ... with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors." NYDCL § 276. A claim brought under either statute must be supported by enough factual allegations to satisfy the pleading requirements set forth under Rule 9(b). *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 351 F.Supp.2d 79, 106–07 (S.D.N.Y.2004); *Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y., Inc. (In re Andrew Velez Constr., Inc.),* 373 B.R. 262, 269 (Bankr.S.D.N.Y.2007). Specifically, the "circumstances constituting fraud or mistake" must be pled with "particularity," but "[m]alice, intent, knowledge, and other conditions of a person's mind" may be pled generally. FED.R.CIV.P. 9(b); FED. R. BANKR.P. 7009.

### i. The Trustee Has Adequately Alleged the Element of Intent in His Actual Fraudulent Transfer Claims in Accordance with Rule 9(b)

**[2]** **[3]** As a matter of law, the "Ponzi scheme presumption" establishes the debtors' fraudulent intent as required under both the Code and the NYDCL. *Gowan v. The Patriot Group, LLC (In re Dreier LLP),* 452 B.R. 391, 428 (Bankr.S.D.N.Y.2011). There is a presumption of actual intent to defraud because "transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors." *Id.* at 423; *McHale v. Boulder Capital LLC (In re The 1031 Tax Group),* 439 B.R. 47, 72 (Bankr.S.D.N.Y.2010) ("If the Ponzi scheme presumption applies, actual intent for purposes of section 548(a)(1)(A) is established as a matter of law.") (internal quotations omitted). The breadth and notoriety of the Madoff Ponzi scheme leave no basis for disputing the application of the Ponzi scheme presumption to the facts of this case, particularly in light of Madoff's criminal admission. See **\*105** *Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC),* No. 09–1305, 2011 WL 3274077, at \*8 (Bankr.S.D.N.Y. Aug. 1, 2011); *Picard v. Chais (In re Bernard L. Madoff Inv. Sec. LLC),* 445 B.R. 206, 221 (Bankr.S.D.N.Y.2011); *see also Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.),* 397 B.R. 1, 12 (S.D.N.Y.2007) (relying on transferor's criminal guilty plea to establish the existence of a Ponzi scheme). Moreover, while it is conceivable that "certain

transfers may be so unrelated to a Ponzi scheme that the presumption should not apply," the Actual Fraudulent Transfers at issue here, including redemptions of fictitious profits and payments of salaries, "serve[d] to further [the] Ponzi scheme," and are therefore presumed fraudulent. *In re Manhattan Inv. Fund Ltd.,* 397 B.R. at 11.

**[4]** **[5]** **[6]** The Ponzi scheme presumption applies only to the *transferor's* intent. *See Patriot,* 452 B.R. at 424. The Defendants, however, posit that the *transferee's* fraudulent intent must be established to state a claim under section 276 of the NYDCL. The District Court rejected this precise argument in *Merkin II,* explaining that "relevant cases, together with analysis of the statute, convince the Court that, to state a claim under Section 276, a plaintiff need allege fraudulent intent by only the transferor." 2011 WL 3897970, at \*6 (citing *Patriot,* 452 B.R. at 435) (emphasis added); *see also Cohmad,* 454 B.R. at 330 ("[I]t is the transferor's intent alone, and not the intent of the transferee, that is relevant under NYDCL § 276.") (quoting *Patriot,* 452 B.R. at 433); *Gowan v. Wachovia Bank, N.A. (In re Dreier LLP),* 453 B.R. 499, 510 (Bank.S.D.N.Y.2011) (holding that for the "reasons stated [in *Patriot*], the plaintiff is only required to plead the fraudulent intent of the transferor under DCL § 276"). The District Court reasoned that "transferee's intent ... is material under the statute, but, because Section 278 is an affirmative defense, the transferee's intent should be considered on a full evidentiary record, either at the summary judgment phase or at trial." *Merkin II,* 2011 WL 3897970, at \*6. Consequently, "[f]or the purposes of a motion to dismiss, the trustee need state with particularity only the circumstances constituting the fraud and allege the requisite actual intent by the *transferor* to hinder, delay, or defraud creditors." *Id.* (emphasis added). Thus, irrespective of whether an actual fraudulent transfer claim is brought under the Code or the NYDCL, a transferee's good faith "need not be negated by the Trustee in the Complaint" as the Defendants contend. *Cohmad,* 454 B.R. at 330 (quoting *Sec. Inv. Prot. Corp. v. Stratton Oakmont, Inc.,* 234 B.R. 293, 318 (Bankr.S.D.N.Y.1999)). [10] The element of intent for each of the Trustee's Actual Fraudulent **\*106** Transfer claims is therefore established as a matter of law by virtue of the Ponzi scheme presumption.

[10]     Accordingly, the Defendants' arguments that they "took for value" and "in good faith" are affirmative defenses under sections 548(c) of the Code and 278

of the NYDCL and thus "should be considered
as a full evidentiary record, either at the summary
judgment phase or at trial." *Merkin II,* 2011 WL
3897970, at *6 (citing *Patriot,* 452 B.R. at 435); *see
also Mendelsohn v. Jacobowitz (In re Jacobs),* 394
B.R. 646, 659 (Bankr.E.D.N.Y.2008) ("An innocent
purchaser must affirmatively show good faith in order
to take advantage of [NYDCL] section 278(2)."); 
*Bayou Superfund LLC v. WAM Long/Short Fund
II LP (In re Bayou Grp., LLC),* 362 B.R. 624,
631 (Bankr.S.D.N.Y.2007) ("The good faith/value
defense provided in Section 548(c) is an affirmative
defense, and the burden is on the defendant-transferee
to plead and establish facts to prove the defense.").
If the affirmative defense "appears on the face of
the complaint," however, an exception to this rule
may apply. *Pani v. Empire Blue Cross Blue Shield,*
152 F.3d 67, 74–75 (2d Cir.1998). This exception
does not apply here. Indeed, the Trustee sufficiently
alleges the Defendants had notice of fraud and
were cognizant of the irregularities in their own IA
Accounts. Accordingly, the Defendants' affirmative
defense of good faith is not a viable ground for
dismissal under Rule 12(b)(6).

### ii. The Trustee Has Not Identified All of the Actual Fraudulent Transfers with Particularity Under Rule 9(b)

**[7]**    **[8]**    The fraudulent intent of the debtor/transferor is
one essential element of a *prima facie* claim brought under
either section 548(a)(1)(A) of the Code or section 276 of
the NYDCL. A second requirement is that the transfers
sought to be avoided must be identified with particularity
in accordance with Rule 9(b). FED.R.CIV.P. 9(b); FED.
R. BANKR.P. 7009. Here, many of the Actual Fraudulent
Transfers are not so identified.

**[9]**    To satisfy Rule 9(b)'s particularity requirement, a
party must ordinarily allege: "(1) the property subject to
the transfer, (2) the timing and, if applicable, frequency
of the transfer and (3) the consideration paid with
respect thereto." *Pereira v. Grecogas Ltd., (In re Saba
Enters., Inc.),* 421 B.R. 626, 640 (Bankr.S.D.N.Y.2009);
*see also United Feature Syndicate, Inc. v. Miller Features
Syndicate, Inc.,* 216 F.Supp.2d 198, 221 (S.D.N.Y.2002).
Where the actual fraudulent transfer claim is asserted
by a bankruptcy trustee, however, courts in this district
take "a more liberal view ... since a trustee is an
outsider to the transaction who must plead fraud from
second-hand knowledge." *Nisselson v. Softbank AM Corp.*

*(In re MarketXT Holdings Corp.),* 361 B.R. 369, 395
(Bankr.S.D.N.Y.2007) (quoting *Picard v. Taylor (In re
Park South Sec., LLC),* 326 B.R. 505, 517, 516, 518
(Bankr.S.D.N.Y.2005)) (internal quotations omitted). As
the Second Circuit recently noted, "[f]raud is endlessly
resourceful and the unraveling of weaved-up sins may
sometimes require the grant of a measure of latitude
to a SIPA trustee." *In re BLMIS,* 654 F.3d 229, 238
n. 7 (granting SIPA trustees discretion to determine the
method to calculate net equity).

**[10]**    Of course, "relaxing the particularity requirement"
of Rule 9(b) does not "eliminate" it. *Devaney v. Chester,*
813 F.2d 566, 569 (2d Cir.1987). Pleadings still must be
particular enough to fulfill Rule 9(b)'s purpose: "to protect
the defending party's reputation, to discourage meritless
accusations, and to provide detailed notice of fraud
claims to defending parties." *Tronox Inc. v. Anadarko
Petroleum Corp. (In re Tronox Inc.),* 429 B.R. 73, 92
(Bankr.S.D.N.Y.2010) (citing *In re Everfresh Beverages,
Inc.,* 238 B.R. 558, 581 (Bankr.S.D.N.Y.1999)); *see also
Shields v. Citytrust Bancorp., Inc.,* 25 F.3d 1124, 1128
(2d Cir.1994) ("[S]ince Rule 9(b) is intended to provide
a defendant with fair notice of a plaintiff's claim, to
safeguard a defendant's reputation from improvident
charges of wrongdoing, and to protect a defendant
against the institution of a strike suit ... the relaxation
of Rule 9(b)'s specificity requirement for scienter must
not be mistaken for license to base claims of fraud on
speculation and conclusory allegations."). Such is not the
case here where opacity, rather than particularity, best
describes the allegations underlying the Trustee's Actual
Fraudulent Transfer claims in Counts Three and Five of
the Complaint.

To begin with, the Trustee fails to specify which
Count he seeks to employ to avoid each Actual
Fraudulent Transfer. For example, under Count Three,
the Complaint fails to identify which of the Two
Year Transfers are additionally Preferences. [11] Similarly,
with respect Count **\*107** Five, the Complaint states
$57,708,392 was transferred at some time earlier than six
years prior to the Filing Date without specifying how
many individual Actual Fraudulent Transfers comprise
this sum. The Trustee does not provide how he arrives
at: (1) the total sum he seeks to avoid under Counts
Three or Five, (2) the total number of discrete Actual
Fraudulent Transfers included in each sum, and (3) which
statutory look back period he intends to apply to each

of these Transfers, and no inference to ameliorate these deficiencies can be drawn on the basis of the allegations contained in the Complaint.

11       Pursuant to section 547(b)(4)(B) of the Code, the one year statutory look back period applies because the Complaint sufficiently alleges that the Defendants are "insiders" of BLMIS under section 101(31) of the Code, which defines an "insider" of a debtor corporation as an individual who was, among other things, a director, officer, or person in control of the debtor, or a relative of a director, officer, or person in control of the debtor. 11 U.S.C. §§ 101(31)(B), 547(b)(4)(B).

Second, piecing together the facts contained in the Complaint reveals that the majority of the Actual Fraudulent Transfers are not identified completely. Peter's 1954 Aston Martin provides an illustrative example: allegedly there were four payments totaling approximately $274,562 for its purchase and restoration, but it is not clear how, to whom, or when those payments were made. Compl. ¶ 73; *see Official Comm. of Unsecured Creditors of M. Fabrikant & Sons Inc. v. JPMorgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.),* 394 B.R. 721, 734 (Bankr.S.D.N.Y.2008) (emphasizing "the Amended Complaint does not identify any specific transfer, transferor, transferee, or date of transfer"); *see also Alnwick v. European Micro Holdings, Inc.,* 281 F.Supp.2d 629, 646 (E.D.N.Y.2003) (dismissing intentional fraudulent transfer claim that failed to identify the assets transferred and identified the date of transfer as "on or about 2001"). Similarly opaque are the allegations that between 2002 and 2008 the Defendants used BLMIS funds to pay company credit card bills that included personal charges. Compl. ¶¶ 73, 84, 94, 98; *see Fed. Nat'l. Mortgage Ass'n v. Olympia Mortgage. Corp.,* No. 04–CV–4971, 2006 WL 2802092, at *2, *9 (E.D.N.Y. Sept. 28, 2006) ("[T]he Amended Complaint ... aggregates the transfers into lump sums over three to five year time periods [and] does not, with respect to each transaction, specify the mechanism of transfer or even the type of property transferred.").

Rectifying the majority of these pleading deficiencies upon amendment should not prove to be a Herculean task. For example, more detailed information appears to be readily accessible to the Trustee given that the Complaint already includes information related to the credit cards used by the Defendants as well as examples of personal charges

paid by BLMIS. Compl. ¶¶ 73, 84, 94, 98. Similarly, since the Trustee has indicated that *four* payments were made for the purchase and restoration of the Aston Martin, he likely can specify the method, amount, and date of each of those payments without much difficulty. Compl. ¶ 73. The Complaint as it currently stands, however, has too many porous and disparate factual allegations to provide a legal basis to sustain many of the Trustee's Actual Fraudulent Transfer claims. 12 *See Fed. Nat'l. Mortgage Ass'n,* 2006 WL 2802092, at *9 (finding allegations insufficient for the heightened **\*108** Rule 9(b) pleading standard where the Amended Complaint did "not identify how many transfers plaintiff is challenging or the specific dates and amounts of those transfers"); *Fabrikant,* 394 B.R. at 733 (noting that "[a]llegations that a debtor made an aggregate amount or series of cash or other transfers over a period of time" failed to meet the particularity standard set forth under Rule 9(b)).

12       It bears noting that the complaints filed by the Trustee in connection with Madoff Ponzi scheme, those that withstood Rule 9(b) scrutiny included multiple exhibits detailing the payments that the Trustee sought to avoid as actual fraudulent transfers. *See, e.g., Cohmad,* 454 B.R. at 329; *Chais,* 445 B.R. at 220; *Merkin I,* 440 B.R. at 258. No such exhibits were attached to the Complaint.

[11]    Notwithstanding these pleading deficiencies, the Complaint nevertheless identifies a few Actual Fraudulent Transfers with Rule 9(b) particularity (the "Particularly Pled Actual Fraudulent Transfers"). *See Fed. Nat'l. Mortgage Ass'n.,* 2006 WL 2802092, at *18 (dismissing the Complaint as to all but one actual fraudulent transfer, which was pled with sufficient particularity). For each of these Particularly Pled Actual Fraudulent Transfers, the Complaint alleges the transferee, transferor, and specific dates and amounts: Peter received a $9 million loan from the operating account for BLMIS's IA Business at JP Morgan Chase Bank (the "703 Account") on December 12, 2007, Comp ¶ 73; Mark redeemed $1,956,205 from his IA Account, numbered 1M0142, on or about July 24, 1998, $5,331,853 from his IA Account on or about April 3, 2002, and $1,956,205 from his children's IA Account, numbered 1M0143, on or about July 24, 1998, Compl. ¶¶ 78, 79, 82; and Andrew redeemed $1,956,205 from his IA Account, numbered 1M0140, on or about July 24, 1998, $5,331,853 from his IA Account, numbered 1M0140, on or about April 3, 2002, and $1,956,305 from his children's IA Account, numbered 1M0141, on or about July 24,

1998, Compl. ¶¶ 88, 89, 92. Another two Particularly Pled Actual Fraudulent Transfers [13] were made on October 31, 2000 to satisfy capital calls: one from BLMIS's operating account in the amount of $1,223,237.19 satisfied a capital call due to Madoff Technologies LLC by Shana, Compl. ¶ 98, and the second, in the amount of $54,915.25, satisfied a capital call due to Madoff Technologies LLC by Peter Madoff and came from one of BLMIS's operating accounts, Compl. ¶ , 73; *see Fed. Nat'l. Mortgage Ass'n, 2006 WL 2802092, at \*2* (upholding claim against Samuel Pinter to avoid and recover a transfer of $300,000 that was made from Olympia to Midwood in October 2002 to satisfy a loan taken by Samuel Pinter). Therefore, this is not the death knell of the Complaint.

[13]    The Court assumes that the Trustee seeks to recover these two transfers under a benefit theory pursuant to section 550(a)(1) of the Code. Compl. ¶ 73 ("[T]he Trustee has identified the following transfers to Peter or *on his behalf* for which BLMIS received no corresponding benefit or value.") (emphasis added); *see also Stratton Oakmont, Inc.,* 234 B.R. at 317–18 ("At this juncture, all the Trustee needs to demonstrate is a possible legal theory such that he is allowed to go forward and put on evidence. Although this benefit theory is not explicitly stated in the Complaint, recovery under § 550(a) is not subject to a particularized pleading standard and I am allowed to consider theories that are not articulated, so long as there are facts alleged to support them.").

[12]    Accordingly, except with regard to Particularly Pled Actual Fraudulent Transfers, Counts Three and Five [14] of the Complaint are dismissed, with leave to **\*109** amend the Complaint within forty five days.

[14]    Count Five's request for attorneys' fees under section 276–a of the NYDCL is not ripe for determination at this early stage. *See Patriot,* 452 B.R. at 435 (finding that "attorneys' fees will only be recoverable if the Trustee establishes at trial actual fraudulent intent by Defendants"); *see also Cohmad,* 454 B.R. at 332 n. 10 ("While the transferee's intent is an element of a claim under section 276–a, unlike under section 276, attorneys' fees will be recoverable provided that the Trustee establishes fraudulent intent on the part of the defendants at trial.").

**B. The Trustee Has Sufficiently Pled the Application of the Discovery Rule to Avoid the Particularly Pled**

**Actual Fraudulent Transfers Occurring Prior to Six Years Before the Filing Date**

[13]    All but one of the Particularly Pled Actual Fraudulent Transfers occurred more than six years prior to the Filing Date. Consequently, these Transfers can be avoided only by invoking New York's "discovery rule," which permits a plaintiff to commence a cause of action predicated on actual fraud within two years of the date the fraud was or should have been discovered with reasonable diligence. NYCPLR §§ 213(8), 203(g); *see Silverman v. United Talmudical Acad. Torah Vyirah, Inc. (In re Allou Distribs., Inc.),* 446 B.R. 32, 67 (Bankr.E.D.N.Y.2011) ("New York state law fixes the limitations period for claims under the DCL. A claim based on actual fraud under DCL Section 276 must be brought within the later of six years from the date of the fraud or conveyance, or two years from the date that the fraud should have been discovered."). For reasons stated below, Trustee has standing under section 544(b) to invoke the discovery rule for the Particularly Pled Actual Fraudulent Transfers that occurred more than six years before the Filing Date.

[14]    Pursuant to well-established case law, so long as a bankruptcy trustee provides sufficient notice to the defendants of at least one category of creditors that have standing to avoid an actual fraudulent transfer under non-bankruptcy law, the trustee has standing to assert that actual fraudulent transfer claim under section 544(b) of the Code. *Global Crossing Estate Rep. v. Winnick,* No. 04–CIV–2558, 2006 WL 2212776, at \*11 (S.D.N.Y. Aug. 3, 2006) ("[T]o identify the category of creditors with potentially viable claims ... is unquestionably enough to put defendants on notice of the creditors who supply the basis for the right to sue, and will permit them to answer, seek relevant discovery, and defend against these claims."); *see also Musicland Holding Corp. v. Best Buy Co. (In re Musicland Holding Corp.),* 398 B.R. 761, 780 (Bankr.S.D.N.Y.2008) (failing "to locate a case in this district supporting the proposition that the plaintiff must name the qualifying creditor in the complaint, or suffer dismissal"). Indeed, "there is no authority for the proposition that [a bankruptcy trustee] must be more specific than to identify the category of creditors with potentially viable claims" in order to state a claim under section 544 of the Code. *Winnick,* 2006 WL 2212776, at \*11; *see In re RCM Global Long Term Cap. Appreciation. Fund, Ltd.,* 200 B.R. 514, 523–24 (Bankr.S.D.N.Y.1996) (holding that pleading the existence of an unsecured creditor with an allowable claim is sufficient); *see also In*

10-03635-jpm    Doc 271-1    Filed 04/03/17    Entered 04/03/17 18:29:57    Exhibit A -
In re Bernard L. Madoff Inv. Securities LLC, 458 B.R. 87 (2011)    Part 1    Pg 121 of 538

55 Bankr.Ct.Dec. 139

*re Musicland,* 398 B.R. at 780 ("Thus, *RCM* supports the proposition that the plaintiff may plead the existence of the qualifying creditor generally, and prove the existence of an actual, qualifying creditor at trial.").

The Complaint provides sufficient notice to the Defendants of at least one category of creditors on whose claims the Trustee bases his standing to avoid transfers under New York's discovery rule: defrauded BLMIS customers. Specifically, it states that "[a]t all times relevant to transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS," Compl. ¶ 161, and that "[a]t all times relevant to the transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured **\*110** claims against BLMIS that were and are allowable...." Compl. ¶ 162. These allegations, when viewed in conjunction with the aforementioned case law, compel this Court to conclude the Trustee has standing under section 544(b) of the Code to avoid and recover the Particularly Pled Actual Fraudulent Transfers made more than six years before the Filing Date.

**C. Constructive Fraud Under the Code and the NYDCL**
In Counts Four, Six, Seven, and Eight of the Complaint, the Trustee seeks to avoid and recover, under a theory of constructive fraud, Two Year Transfers pursuant to section 548(a)(1)(B) of the Code, and Six Year Transfers under section 544 of the Code and sections 273–275 of the NYDCL (collectively the "Constructive Fraudulent Transfers"). This Court finds most, but not all, of the allegations corresponding to the Constructive Fraudulent Transfers provide sufficient information to sustain the Trustee's avoidance claims under the liberal pleading standards of Rule 8(a), as set forth below.

**[15]    [16]** Section 548(a)(1)(B) of the Code requires the Trustee to show, *inter alia,* BLMIS did not receive "reasonably equivalent value" for any of the transfers alleged to be fraudulent. 11 U.S.C. § 548(a)(1)(B). Similarly, under sections 273 through 275 of NYDCL, the Trustee must demonstrate BLMIS did not receive "fair consideration" for the same. NYDCL §§ 273–275. It has been found, " 'reasonably equivalent value' in Section 548(a)(1)(B), [and] 'fair consideration' in the [NYDCL] ... have the same fundamental meaning." *Balaber–Strauss v. Sixty–Five Brokers (In re Churchill Mortgage Inv. Corp.),* 256 B.R. 664, 677 (Bankr.S.D.N.Y.2000) *(Churchill*

*I),* aff'd, *Balaber–Strauss v. Lawrence,* 264 B.R. 303 (S.D.N.Y.2001) *(Churchill II* ). Fair consideration can be established by showing either a lack of "fair equivalent" property or a lack of good faith on the part of the transferee. NYDCL § 272 (defining "fair consideration"); *see Patriot,* 452 B.R. at 443 ("To defeat a motion to dismiss, the Trustee need only allege a lack of 'fair consideration' by pleading a lack of 'fair equivalent' value or a lack of good faith on the part of the transferee."); *Silverman v. Sound Around, Inc. (In re Allou Distribs., Inc.),* 404 B.R. 710, 716 (Bankr.E.D.N.Y.2009) ("[F]air consideration has two components—the exchange of fair value and good faith—and both are required.") (internal quotations omitted). [15]

[15]    Contrary to the Defendants' position, BLMIS was insolvent at the time of the Constructive Fraudulent Transfers given that Ponzi schemes are, by definition, at all times insolvent. *See Armstrong v. Romano,* Nos. 01 Civ. 2437, *et al.,* 2010 WL 1141158, at \*20 (S.D.N.Y. Mar. 24, 2010); *Daly v. Deptula (In re Carrozzella & Richardson),* 286 B.R. 480, 486 n. 17 (D.Conn.2002) ("[A] number of courts have held that an enterprise engaged in a Ponzi scheme is insolvent from its inception and becomes increasingly insolvent as the scheme progresses."); *see also Cunningham v. Brown,* 265 U.S. 1, 8, 44 S.Ct. 424, 68 L.Ed. 873 (1924) (noting Charles Ponzi, the namesake of the Ponzi scheme, "was always insolvent, and became daily more so, the more his business succeeded. He made no investments of any kind, so that all the money he had at any time was solely the result of loans by his dupes.").

**[17]    [18]    [19]** Under both the Code and the NYDCL, courts consistently hold that "claims of constructive fraud do not need to meet the heightened pleading requirements of Fed.R.Civ.P. 9(b)." *Bank of Commc'ns v. Ocean Dev. Am., Inc.,* No. 07–CIV–4628, 2010 WL 768881, at \*6 (S.D.N.Y. Mar. 8, 2010). Rather, the Trustee need only satisfy Rule 8(a) by providing a "short and plain statement of **\*111** the claim showing that [he] is entitled to relief." FED.R.CIV.P. 8(a)(2); *see also Enron Corp. v. Granite Constr. Co. (In re Enron Corp.),* No. 03–93172, 2006 WL 2400369, at \*5 (Bankr.S.D.N.Y. May 11, 2006) ("The Court does not see any reason to break with its precedent in applying Rule 8(a) in evaluating the pleadings in a constructive fraudulent conveyance matter herein."); *Stratton Oakmont, Inc.,* 234 B.R. at 319 ("The pleading of constructive fraud [under the NYDCL], as opposed to actual fraud, must only comply with F.R.C.P. 8(a)....").

The purpose of this pleading requirement is to ensure that the defendant receives "fair notice of what the ... claim is and the grounds upon which it rests." *Scheidelman v. Henderson (In re Henderson),* 423 B.R. 598, 612 (Bankr.N.D.N.Y.2010) (quoting *Twombly,* 550 U.S. at 545, 127 S.Ct. 1955) (internal quotations omitted). Indeed, "the sole consideration should be whether, consistent with the requirements of Rule 8(a), the complaint gives the defendant sufficient notice to prepare an answer, frame discovery, and defend against the charges." *Nisselson v. Drew Indus., Inc. (In re White Metal Rolling & Stamping Corp.),* 222 B.R. 417, 429 (Bankr.S.D.N.Y.1998) (internal citations omitted).

[20] The Defendants concede that Rule 9(b) is typically not applicable because the conduct of the transferee is normally irrelevant to constructive fraud, which merely looks at the value given and the solvency of the transferor. They contend nevertheless that Rule 9(b) does apply in the instant proceeding because the underlying allegations sound in fraud. But not every allegation of wrongful conduct sounds in fraud for purposes of Rule 9(b); the Trustee has not alleged, and need not allege for purposes of constructive fraud, that the Defendants were involved in the kind of misrepresentation or deceit that would require a heightened pleading standard. Instead, the only relevant allegation to this Constructive Fraudulent Transfer claim is that the Defendants breached fiduciary duties by failing to perform compliance responsibilities and therefore did not provide value for their wages. Such a breach of a fiduciary duty does not implicate Rule 9(b). *See Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Secs. Corp.,* No. 00 Civ. 8688, 2002 WL 362794, at *8 (S.D.N.Y. Mar. 6, 2002) (holding breaches of fiduciary duties "by conduct not amounting to fraud, *such as by breaching its duties of care, disclosure and loyalty* " do not require the heightened standards of Rule 9(b)) (emphasis added). Furthermore, the Second Circuit has indicated that Rule 8(a) applies to constructive fraud claims even in cases where the courts consider the transferee's knowledge of the fraud and underlying conduct. *See Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.),* 403 F.3d 43, 53–54 (2d Cir.2005) (discussing constructive fraud and raising Rule 9(b) only in subsequent discussions of actual fraud); *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.),* 337 B.R. 791, 801 (Bankr.S.D.N.Y.2005) ( "[I]n [ *Sharp* ], the Second Circuit considered a motion to dismiss a complaint that asserted claims of constructive

and intentional fraudulent conveyance under New York State law. It held that the intentional fraud claims had to be pleaded in compliance with Rule 9(b) but did not imply that the constructive fraud claims had to meet any such requirement.").

### i. The Trustee Has Sufficiently Pled that BLMIS Did Not Receive Value for Purposes of Constructive Fraud Under the Code and the NYDCL

[21] The Constructive Fraudulent Transfers that the Trustee seeks to avoid include Defendants' withdrawals of fictitious **\*112** profits and receipt of salaries, bonuses, gifts, and loans from BLMIS. The Trustee has adequately alleged all of the Constructive Fraudulent Transfers were made for less than "reasonably equivalent" or "fair equivalent" value.

[22] With respect to the Defendants' withdrawals of profits from their BLMIS IA Accounts, courts have consistently held that fictitious profits from a Ponzi scheme are deemed to have been received for less than reasonably equivalent value and can be avoided. *See Sender v. Buchanan (In re Hedged–Inv. Assoc., Inc.),* 84 F.3d 1286, 1290 (10th Cir.1996) (holding payments in excess of original investment do not provide any value); *Scholes v. Lehmann,* 56 F.3d 750, 757 (7th Cir.1995) ("The paying out of profits to [the defendant] not offset by further investments by him conferred no benefit on the corporations...."); *In re Bayou Grp., LLC,* 439 B.R. 284, 338 (S.D.N.Y.2010) ("Because Appellants provided no value in exchange for the fictitious profits they received, that portion of their redemption payments is voidable as a constructive fraudulent conveyance."); *Patriot,* 452 at 440 n. 44 ("The Court's conclusion that the Defendants did not provide reasonably equivalent value for the payments in excess of principal is consistent with those courts that have held that investors in a Ponzi scheme are not entitled to retain the fictitious profits they received."). In addition, the Trustee's allegations, if proven, show that BLMIS received nothing in return for the gifts and loans the Defendants received. Although promissory notes were exchanged for some of these Constructive Fraudulent Transfers, the Trustee has sufficiently alleged such notes were executed *pro forma* without intent to repay. In particular, the Trustee could not find any payment of principal, interest, or otherwise that was given in exchange

for the loans since the time they were made, which in some instances dates back to 2003.

**[23]**  The Defendants unsuccessfully argue that their services constituted reasonably equivalent value and fair consideration given to BLMIS in exchange for their salaries. In support of this contention, the Defendants rely upon *Churchill I* where the court found the brokers provided value for the commissions they received by performing their duties. 256 B.R. at 667. The Defendants posit that their salaries cannot be avoided since, they claim, the Trustee has not alleged their salaries "were disproportionate to like commissions paid for like services in the marketplace ... by similar but legitimate business entities." *Id.* at 679. The Defendants are mistaken: the Trustee has sufficiently alleged they breached fiduciary duties to BLMIS, and thus did not provide services that might otherwise have constituted adequate consideration in exchange for their receipt of salaries and bonuses. *See* Section II.C. *infra.*

Notwithstanding the Defendants' arguments to the contrary, this conclusion is consistent with the decision in *Churchill I.* There, the trustee sought to recover commissions paid to brokers by debtors for bringing investors into a Ponzi scheme, on the theory that services enlarging the scope of the debtors fraudulent scheme do not give value. In rejecting the trustee's theory, the *Churchill I* court reasoned that the debtors' involvement in a fraudulent enterprise did not determine whether value was given under section 548 of the Code. 256 B.R. at 679. The focus, instead, should be on the specific transaction, and a court should concentrate on the "value of the goods and services provided rather than on the impact the goods and services had on the bankrupt enterprise." *Id.* at 680. The court in *Churchill I* went on to hold that because the trustee conceded **\*113** there was nothing unlawful or fraudulent in the way the brokers were hired or carried out their duties, the brokers "earned what they were paid fairly and without wrongdoing," and the claims to recover their commissions dismissed as a matter of law. *Id.*

In contrast to *Churchill I,* where the brokers faithfully carried out their duties, the Trustee here takes direct aim at the "astronomical" compensation—including payments to Mark and Andrew of $4.8 million in 2006 and over $9 million in 2007—that was paid despite the Defendants' *failure to fulfill their employment duties.* Compl. ¶¶ 74, 85. Therefore, even if the Defendants' wages were

proportionate to the wages of senior management in legitimate enterprises, a fact the Trustee does not concede, the Defendants returned less than reasonable equivalent value to BLMIS as a result of their alleged lack of faithful service. *See Churchill I,* 256 B.R. at 684 ("Nor shall this decision prejudice the Trustee's right to assert fraudulent conveyance claims based upon evidence showing that commissions were paid (for example, to insiders) that exceeded the value of broker services.").

In any event, the Court need not make a finding as to whether the Defendants' services constituted adequate value, as these issues often involve factual inquiries inappropriate for a motion to dismiss. *In re Actrade Fin. Techs. Ltd.,* 337 B.R. at 804 ("[T]he question of reasonably equivalent value ... is fact intensive, and usually cannot be determined on the pleadings."). At this early stage, the Trustee has adequately pled a lack of reasonably equivalent value with regard to the transfers for purposes of section 548(a)(1)(B) of the Code and sections 273 through 275 of the NYDCL.

### ii. The Trustee Has Pled Nearly Every Constructive Fraudulent Transfer in Satisfaction of Rule 8(a)

**[24]    [25]**  In accordance with the liberal pleading requirements of Rule 8(a), "[t]he plaintiff need not provide specific facts to support its allegations." *Fabrikant,* 394 B.R. at 735 (quoting *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007)). This is because Rule 8(a) does not require that "a complaint be a model of clarity or exhaustively present the facts alleged, as long as it gives each defendant fair notice of what the plaintiff's claim is and the facts upon which it rests." *Anwar v. Fairfield Greenwich Ltd.,* 728 F.Supp.2d 372, 422 (S.D.N.Y.2010) (internal quotations and citations omitted). Indeed, courts have found that allegations aggregating transfers into lump sums over several years without identifying the number of transfers, the dates of the transfers, or the amount of any specific transfer will satisfy Rule 8(a) pleading requirements. *See, e.g., The Unencumbered Assets, Trust v. JP Morgan Chase Bank (In re Nat'l Century Fin. Enters., Inc. Inv. Litig.),* 617 F.Supp.2d 700, 722 (S.D.Ohio 2009) ("Though the complaint fails to specify the exact dates and amounts of the dividend payments, this claim is subject to Rule 8's liberal pleading standard...."); *Fed. Nat'l Mortgage Ass'n,* 2006 WL 2802092, at \*9 (finding complaint alleged

constructively fraudulent transfers despite aggregating "the transfers into lump sums over three to five year time periods" without identifying the mechanism of the transfer).

**[26]** **[27]** Accordingly, many of the allegations underlying the Constructive Fraudulent Transfers in the Complaint satisfy the notice pleading standard of Rule 8(a), including a number of the allegations that aggregate these Transfers over several years. For instance, the Trustee's allegation that $6,645,000 was **\*114** transferred to Mark's attorney in May and June of 2008 for the purchase of a Nantucket home provides sufficient information to apprise the Defendants of the claim.[16] Compl. ¶ 84. The facts surrounding these Constructive Fraudulent Transfers provide Mark with sufficient notice of what the Trustee intends to prove; namely, that a transfer of $6,645,000 for the purchase of a home is avoidable under the Code and the NYDCL because Mark provided less than reasonably equivalent value to BLMIS, while it was insolvent. Similarly, the Complaint aggregates Constructive Fraudulent Transfers over the six years (the "Six Year Aggregations"), and consequently fails to identify whether any of these Transfers, occurred within two years of the Filing Date. For example, withdrawals by Mark and Andrew of at least $7.3 million from IA Accounts after April 2004, Compl. ¶¶ 80, 90, and transfers between 2002 and 2008 to pay for personal expenses charged to the Defendants' credit cards. Compl. ¶¶ 73, 84, 94, 98. While it is unclear what amount is sought as avoidable under the Code and what amount is sought under the NYDCL, the Defendants have notice of the Trustee's allegations that the Defendants provided insufficient value for the Six Year Aggregations at a time that BLMIS was insolvent. As such, the allegations contain sufficient information for Defendants to prepare for litigation on the merits, satisfying Rule 8(a). *See Fabrikant,* 394 B.R. at 736 (holding Rule 8(a) was satisfied despite the complaint aggregating transfers over "a period lasting nearly four years" and it was impossible to determine what amount was sought under the Code).

16    These are just illustrative examples of some of the many Constructive Fraudulent Transfers that have been adequately pled. Only those identified in the following paragraphs have not been so pled.

**[28]** **[29]** Other allegations are not as satisfactory. Certain aggregations in the Complaint (the "Longer

Aggregations")[17] include transfers that extend beyond any applicable look-back period[18] and it is unclear which ones, if any, the Trustee seeks to avoid as constructively fraudulent. Other transfers are listed in the Complaint without providing any date associated with the transfer (the "Undated Transfers"),[19] **\*115** and this Court is unable to determine whether the Trustee is even seeking to avoid them as constructively fraudulent. To the extent that the Court is unable to determine whether a transfer falls under the look-back period of any applicable law, the Trustee's claim to avoid it as a Constructive Fraudulent Transfer fails under Rule 8(a) to provide "the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Erickson,* 551 U.S. at 93, 127 S.Ct. 2197 (internal quotations omitted) (emphasis added).

17    The Longer Aggregations include: (1) the Defendants' salaries and bonuses between 2001 and 2008, Compl. ¶¶ 65, 74, 85, 96 (this does not include the $4.8 million dollar bonus to both Mark and Andrew in 2006 which has been properly pled under the NYDCL, and the bonus of over $9 million dollars to both Mark and Andrew in 2007 which has been properly pled under the Code and the NYDCL, Compl. ¶¶ 74, 85); (2) transfers from BLMIS between 1996 and 2008 funding a life insurance policy for Peter, Compl. ¶ 73; (3) payments on Peter's behalf between January 18, 2000 and April 11, 2006 to limited partnerships where Peter was an investor, Compl. ¶ 73; (4) payments in 2002 to the Beacon Point Marine in Connecticut where Andrew kept a boat, Compl. ¶ 94; (5) payments in 2001 and 2002 to "Lock and Hackle," a fly fishing and hunting membership club in Miami, Florida on Andrew's behalf, Compl. ¶ 94; and (6) Shana's withdrawals of fictitious profits from her IA Account prior to December 2008, Compl. ¶ 97.

18    In the context of constructive fraud, the New York discovery rule is not available to allow a plaintiff to avoid transfers occurring more than six years before the Filing Date. *See Tenamee v. Schmukler,* 438 F.Supp.2d 438, 446 (S.D.N.Y.2006) ("The statute of limitations for ... constructive fraud is six-years, although unlike the case of actual fraud the two year discovery rule does not apply."); *Williams v. Infra Commerc Anstalt,* 131 F.Supp.2d 451, 456 (S.D.N.Y.2001) (holding constructive fraud claims under the NYDCL do "not receive the benefit of the discovery rule, since actual intent to defraud is not an element of that statute").

19    The Undated Transfers are: (1) payments from
      BLMIS to finance Peter's, Mark's, and Andrew's
      ownership stakes in Madoff Brokerage Trading and
      Technology, LLC, Compl. ¶ 73, 84, 94; (2) payment
      by BLMIS of to fund Peter's share of a capital call
      by Madoff Technologies, LLC, Compl. ¶ 73; and (3)
      payments by MSIL for the purchase and restoration
      of Peter's Aston Martin automobile, Compl. ¶ 73.

While discovery is sometimes necessary to assist a trustee
in clarifying the circumstances surrounding particular
Constructive Fraudulent Transfers—for instance when
the trustee has no access to the debtor's books and records
or the books and records are in shambles—the Trustee
here has not provided any such explanation. Accordingly,
the Motions to Dismiss the Trustee's Constructive
Fraudulent Transfer claims are granted with respect to
the Longer Aggregations and the Undated Transfers, with
leave to amend the Complaint within forty five days. As
to the remainder of the Trustee's Constructive Fraudulent
Transfer claims, the Motions to Dismiss are denied.

### iii. Section 546(e) Does Not Provide
### a Basis for Dismissing The Trustee's
### Constructive Fraudulent Transfer Claims

[30]    Mark and Andrew unsuccessfully argue their
withdrawals of fictitious profits are insulated from
liability by the "safe harbor" of section 546(e) of the
Code, which provides, in relevant part, that "the trustee
may not avoid ... [a] settlement payment ... made by
or to (or for the benefit of) a ... stockbroker ... in
connection with a securities contract." 11 U.S.C. §
546(e). "Settlement payment" is defined as a "preliminary
settlement payment, a partial settlement payment, an
interim settlement payment ... or any other similar
payment commonly used in the securities trade." 11
U.S.C. § 741(8). A "stockbroker" is a person who has
a customer and "that is engaged in the business of
effecting transactions in securities." 11 U.S.C. § 101(53)(A)
(A), (B). A "securities contract" is defined as, *inter
alia*, "a contract for the purchase, sale, or loan of a
security." 11 U.S.C. § 741(7)(A)(i)–(xi). Mark and Andrew
contend that the Constructive Fraudulent Transfers made
from their IA Accounts are settlement payments by a
stockbroker pursuant to a securities contract, and thus
cannot be avoided. *See* Memorandum of Law in Support
of Defendants Mark and Andrew Madoff's Motion to
Dismiss at p. 38, 39 (No. 09–01503) (dated March, 15,

2010) (Dkt. No. 13) [Hereinafter "Mark and Andrew
Mot."].

In *Merkin I,* this Court addressed virtually identical
arguments, and found that they were at best premature,
as section 546(e) provides an affirmative defense that,
unless clearly established on the face of the Complaint,
does not tend to controvert the Trustee's *prima facie*
case. 440 B.R. at 266; *see also Merkin II,* 2011 WL
3897970, at *12 ("This Court finds no substantial grounds
for difference of opinion as to the correctness of the
standards relied on by the Bankruptcy Court in its refusal
—at the pleading stage—to dismiss on the grounds of ...
546(e) [is an] affirmative defense."); *116 DeGirolamo
v. Truck World, Inc. (In re Laurel Valley Oil Co.),* No.
07–6109, 2009 WL 1758741 (Bankr.N.D.Ohio June 16,
2009). Assuming, *arguendo,* that the section 546(e) defense
were timely, the Court cannot find as a matter of law that
it applies to the transactions at issue. Whether Madoff,
through BLMIS, was a stockbroker "engaged in the
business of effecting transactions in securities" is dubious.
11 U.S.C. § 101(53A)(B). Courts have held that Ponzi
scheme operators do not affirmatively "make securities
transactions happen" on behalf of legal "customers,"
and thus do not fit the definition of "stockbroker" for
purposes of section 546(e). *See Johnson v. Neilson (In
re Slatkin),* 525 F.3d 805, 817 (9th Cir.2008); *Wider v.
Wootton,* 907 F.2d 570, 573 (5th Cir.1990). As asserted
in the Complaint, Madoff, through BLMIS, "never
in fact purchased any of the securities he claimed to
have purchased for customer accounts." Compl. ¶ 25;
*see Merkin II,* 2011 WL 3897970, at *12 (finding "no
substantial grounds for difference of opinion" with this
Court's determination in *Merkin I* that Madoff is not a
stockbroker as a matter of law); *see also Merkin I,* 440
B.R. at 266–68.

[31]    For the same reason, it is doubtful whether the
payments from BLMIS to the Defendants are settlement
payments as contemplated by the statute. Settlement
payments subject to the safe harbor of section 546(e) must
be made in the context of a "securities transaction." *See
In re Enron Creditors Recovery Corp. v. Alfa, S.A.B. de
C.V.,* 09–5122, 09–5142, 2011 WL 2536101, at *7 (2d Cir.
June 28, 2011) (noting "[w]e like our sister circuits, agree
that in the context of the securities industry a settlement
refers to the completion of a securities transaction....")
(internal quotations omitted); *Contemporary Indus. Corp.
v. Frost,* 564 F.3d 981, 985 (8th Cir.2009); ("[A] settlement

payment is generally the transfer of cash or securities made to complete the securities transaction.") (internal quotations and citations omitted); *Kaiser Steel Corp. v. Charles Schwab & Co.,* 913 F.2d 846, 849 (10th Cir.1990) (explaining settlement is "the completion of a securities transaction"); *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.),* 263 B.R. 406, 475 (S.D.N.Y.2001) ("The term 'settlement' as commonly used in connection with purchases and sales in the securities trade refers to acts that occur at different states of the process towards completion of the securities transaction."). While the Second Circuit recently defined "transaction in securities" broadly, *In re Enron Creditors Recovery Corp.,* 651 F.3d at 335–37 (holding settlement payment does not require change in ownership of the security and limiting the requirement of "commonly used in the securities trade" in connection with settlement payments), it suggested that "settlement payments" must be made in relation to an actual securities transaction, *id.* at 336–37 ("Because Enron's redemption payments *completed a transaction in securities,* we hold that they are settlement payments within the meaning of *§ 741(8).*") (emphasis added); *see also Official Comm. of Unsecured Creditors of Quebecor World (USA) Inc. v. Am. United Life Ins. Co. (In re Quebecor World (USA) Inc.),* No. 08–01417, 2011 WL 3157292, at *11 (Bankr.S.D.N.Y. July 27, 2011) ("The practical effect of the [Enron] opinion is to make it more difficult for a plaintiff ... to maintain a viable cause of action for avoidance in relation to prepetition transfers made to complete *a transaction involving a security.*") (emphasis added). Here, where securities may never have been bought, sold, or otherwise existent at BLMIS, withdrawals from IA Accounts may not constitute "settlement payments" under section 546(e) of the Code. Certainly in this case, where the Defendants received astronomical returns on comparably **\*117** negligible investments, [20] the Trustee is entitled to discovery in order to ascertain the extent of the Defendants' knowledge about the fraudulent activities affecting their IA Accounts.

---

[20] Specifically, Andrew invested only $912,062 into IA Accounts, yet he redeemed $17,117,566; Mark invested only $745,482 into IA Accounts, yet he redeemed $18,105,456; Peter invested only $32,146 into IA Accounts, yet he redeemed $16,252,004; and Shana invested only $1,364,975 into IA Accounts, yet she redeemed $1,666,436. Compl. ¶¶ 66, 76, 86, 97. Additionally, some IA Accounts showed purported

gains despite lacking any principal to support such gains. Compl. ¶¶ 67, 77–80, 87–90.

Additionally, even if BLMIS were a stockbroker, the Court is unable to conclude that a "securities contract" ever existed. The Defendants do not explain what qualifies as an investment contract in this case and merely conclude that "the Bankruptcy Code's definition of a 'securities contract' certainly covers the transactions here." Mark and Andrew Mot. at p. 39. Surely the IA Account agreements are not investment contracts as a matter of law; this Court has previously questioned whether they effect "the purchase, sale, or loan of a security" between the parties or contemplate any particular security transaction. 11 U.S.C. § 741(7)(A). At most, they merely authorize Madoff to act as "agent and attorney in fact to buy, sell and trade in stocks, bonds, options and any other securities" in the future on the Fund Defendants' behalf. *See Merkin I,* 440 B.R. at 267.

[32] Moreover, as this Court has previously held, the application of section 546(e) must be rejected as contrary to the purpose of the safe harbor provision and incompatible with SIPA. Section 546(e) was intended to promote stability and instill investor confidence in the commodities and securities markets. *Merkin I,* 440 B.R. at 267 (citing H. Rep. No. 97–420, at 1 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583, 583 (stating the purpose of 546(e), as amended, is to protect "the stability of the market")); *Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.),* 247 B.R. 51, 105 (Bankr.S.D.N.Y.1999) (stating that a goal of 546(e) is to "promote investor confidence"). Courts have held that to extend safe harbor protection in the context of a fraudulent securities scheme would be to "undermine, not protect or promote investor confidence ... [by] endorsing a scheme to defraud SIPC," and therefore contradict the goals of the provision. *Id.* (declining to extend section 546(e)'s safe harbor protection to a party implicated in a fraudulent scheme). Further, in the context of a SIPA proceeding, applying the safe harbor provision would negate its remedial purpose by eliminating most avoidance powers granted to a trustee under SIPA. *See* 15 U.S.C. §§ 78fff(b), 78fff–2(c)(3). [21] Simply put, the Constructive Fraudulent Transfers sought to be avoided emanate from Madoff's massive Ponzi scheme, and the safe harbor provision does not insulate transactions like these from attack. Indeed, it defies credulity that the Defendants, who are insiders on the basis of the facts alleged, were ever contemplated to be the

parties eligible to invoke the safe harbor provision under section 546(e).

21    Significantly, in the context of a SIPA proceeding, the Code provisions, including section 546(e), are incorporated only "*to the extent consistent with the provisions of [SIPA].*" SIPA § 78fff(b) (emphasis added).

In light of the foregoing, I hold that the Defendants' arguments under section 546(e) fail to establish a basis for dismissing the Trustee's Constructive Fraudulent Transfer claims.

### *118 D. The Trustee Has Failed To Adequately Allege Preference Claims

The Trustee has insufficiently pled Count Two of the Complaint to avoid and recover Preferences.

### i. The Trustee Has Adequately Pled the Statutory Elements of a Preference Claim

[33]    Section 547(b) of the Code provides that a trustee may avoid a transfer from BLMIS, if the transfer is made to or for the benefit of a creditor, for or on account of an antecedent debt, while the debtor was insolvent, and within one year before the date of the filing of the petition if the creditor was an insider, as well as allows such creditor to receive more than it would in a chapter 7 liquidation. 11 U.S.C. § 547(b). Claims to avoid and recover preferential payments are not held to the heightened pleading requirements of Rule 9(b). *See Family Golf Ctrs., Inc. v. Acushnet Co. (In re Randall's Island Family Golf Ctrs.),* 290 B.R. 55, 64 (Bankr.S.D.N.Y.2003). Accordingly, under Rule 8(a), the Trustee must provide only a "short and plain statement of the claim showing that [he] is entitled to relief." FED.R.CIV.P. 8(a)(2).

[34]    [35]    [36]    The Trustee has adequately pled the requisite elements with regard to the Preferences. The Trustee has sufficiently alleged the Defendants are insiders of BLMIS subject to a one-year preference look back period, as all of the Defendants are close relatives of Madoff and were officers or senior managers at BLMIS. *See* 11 U.S.C. § 101(31)(B) (defining insiders of a corporate debtor to include officers of the debtor and "relative[s] of a general partner, director, officer,

or person in control of the debtor"). Additionally, as discussed above, Ponzi schemes are presumptively insolvent, and the Trustee need not allege specific facts supporting the insolvency of BLMIS at the times of the preferential transfers. Finally, the Trustee alleges the Preferences were compensation for services performed by the Defendants prior to payment, and suffice to show the payments were to a creditor on account of an antecedent debt. *See Pryor v. Cohen (In re Blue Point Carpet, Inc.),* 102 B.R. 311, 320–21 (Bankr.E.D.N.Y.1989) (finding that salary payments paid on the date due were avoidable preferences). 22

22    Salary payments are often subject to the affirmative defenses enumerated in section 547(c) of the Code, such as transfers made in the ordinary course of business. *See* 11 U.S.C. § 547(g) ("[T]he creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the non-avoidability of a transfer under subsection (c) of this section."); *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.),* 78 F.3d 30, 39 (2d Cir.1996) ("A creditor asserting the [ordinary course of business] defense bears the burden of proving each of the three elements by a preponderance of the evidence."). As no Defendant has raised these affirmative defenses and their applicability is not clear from the face of the Complaint, the court need not address at this time whether they apply to defeat the Preference claims.

### ii. The Trustee Has Not Identified the Preferences with Sufficient Information

[37]    The Trustee's Preference claims fail to provide the minimum information required by Rule 8(a). The Trustee's allegations aggregate the transfers into a lump sum without specifying the number of Preferences, the amount of any specific Preference, or which defendant received any specific Preference. 23 While Rule 8(a) does not require specific factual detail, *119 such bare allegations fail to provide sufficient notice for the Defendants to prepare an answer or affirmative defenses, such as whether the transfer was made in the ordinary course of business or whether there was a contemporaneous exchange for new value. *See State Bank and Trust Co. v. Spaeth (In re Motorwerks, Inc.),* 371 B.R. 281, 293–94 (Bankr.S.D.Ohio 2007). The allegations here are dissimilar to the trustee's allegations in *Court–Appointed Receiver for Lancer Management*

*Group LLC v. 169838 Canada, Inc.*, where the court found that the Complaint contained sufficient factual information despite "lumping" the defendants together without identifying the transfers attributable to each Defendant. No. 05–60235–CIV, 2008 WL 2262063, at *3 (S.D.Fla. May 30, 2008). In that case, the complaint contained an exhibit indicating the particular transfers from particular funds on particular dates, and accordingly provided sufficient information for the defendants to form an answer despite not identifying which defendant received what transfer. Here, by contrast, the Preferences and the Defendants are both grouped together without any specifics provided. Again, while dismissal might not be required in all such circumstances, the Trustee has not come forth with any explanation for these minimalistic pleadings. The Trustee's Preference claims in Count Two are therefore dismissed with leave to amend within forty five days.

> 23    The only allegation in the Complaint specific to the Preferences is that "the compensation payments received by the four ... Defendants during the period from December 11, 2007[to] the Filing Date in the collective amount of $7,364,048 were made during the one year period prior to the Filing Date and are additionally recoverable as avoidable preference payments...." Compl. ¶ 108. The Complaint does not contain any facts or allegations that sufficiently detail the specific transfers made within one year of the Filing Date.

### E. The Trustee Fails to Adequately Plead his Claims To Recover Subsequent Transfers From the Defendants

**[38]**    The Trustee has insufficiently pled Count Ten of the Complaint to recover funds subsequently transferred to the Defendants (the "Subsequent Transfers") under section 550(a)(2) of the Code and section 278 of the NYDCL. See 11 U.S.C. § 550(a)(2) (allowing recovery from "any immediate or mediate transferee of such initial transferee"); NYDCL § 278 (allowing recovery from "any person"); *Farm Stores, Inc. v. Sch. Feeding Corp.,* 477 N.Y.S.2d 374 (N.Y.App.Div.1984) ("*[E]ach transferee ... is liable to the creditor to the extent of the value of the money or property he or she wrongfully received.*") (emphasis added).

**[39]**    In determining whether a claim to recover fraudulent transfers from a subsequent transferee is adequately pled, Rule 8(a) governs. *Stratton Oakmont, Inc.,* 234 B.R. at 317–18 ("[R]ecovery under § 550(a) is not subject to a

particularized pleading standard...."); *see Silverman v. K.E.R. U. Realty Corp. (In re Allou Distribs., Inc.),* 379 B.R. 5, 30 (Bankr.E.D.N.Y.2007) (indicating "in order to prove a Section 550(a)(2) claim, [the] burden is not so onerous as to require 'dollar-for-dollar accounting' of 'the exact funds' at issue" and that "if dollar-for-dollar accounting is not required at the proof stage, then surely it is not required at the pleading stage either"). The purpose of this pleading requirement is to ensure the defendant receives "fair notice of what the ... claim is and the grounds upon which it rests." *In re Henderson,* 423 B.R. at 612 (internal quotations omitted).

Here, the Complaint merely alleges that "[o]n information and belief, some or all of the transfers were subsequently transferred by one or more [of the Defendants] **\*120** to another Family Defendant, either directly or indirectly" without providing any sort of estimate of the amount of the purported Subsequent Transfer, or when or how such Transfer occurred. Compl. ¶ 167. While the Complaint's failure to indicate specific amounts does not in and of itself warrant dismissal of the Subsequent Transfer claims, *K.E.R. U. Realty Corp.,* 379 B.R. at 30–31 (finding a subsequent transfer claim adequately pled where the complaint stated, "at least tens of millions of dollars were fraudulently diverted from [debtor] to [initial transferees] ... [and] a portion of these fraudulently diverted funds was transferred from the [initial transferees] to, or for the benefit of, the [subsequent transferees]"), its failure to provide even a modicum of specificity with respect to the Subsequent Transfers so as to put the Defendants on notice as to which ones the Trustee seeks to recover does so warrant. *See Gowan v. Amaranth LLC (In re Dreier LLP),* No. 10–03493, 2011 WL 2412601, at *11 (Bankr.S.D.N.Y. June 16, 2011).

The *Amaranth* court held similarly vague allegations to be insufficient to sustain a subsequent transfer claim. 452 B.R. 451, 2011 WL 2412601, at *11 ("The only scintilla of evidence put forth by the Trustee is a bald assertion that 'it is likely that Amaranth Partners invested the money DLLP transferred to it pursuant to the Note Fraud to Amaranth LLC'.... The Trustee merely asserts that '*[o]n information and belief,* Amaranth Partners transferred its Transfers to Amaranth LLC.' ") (emphasis in the original). To arrive at this conclusion, the *Amaranth* court distinguished the facts alleged by the trustee in that case from those alleged by this Trustee in *Merkin I* and concluded that in *Merkin I,* "the complaint satisfied

the Rule 8(a) pleading requirement because it provided 'fair notice' to the defendants of the claims against them because certain exhibits attached to the complaint indicated the percentage of fees and commissions that the defendants purported to receive on account of the transfers to an initial transferee." *Amaranth,* 452 B.R. at 465 (citing *Merkin I,* 440 B.R. at 270). Indeed, the complaint in *Merkin I* identified the subsequent transfers in predetermined amounts in the Funds' Offering Memoranda, which was attached as an exhibit, and "thus adequately apprises the Merkin Defendants, the alleged recipients of these fees, of which transactions are claimed to be fraudulent and why, when they took place, how they were executed and by whom." 440 B.R. at 270 (internal quotations omitted). No such information is provided here.

Accordingly, Count Ten of the Complaint to recover Subsequent Transfers is dismissed with leave to amend within forty five days.

### F. The Trustee has Sufficiently Pled a Basis For Disallowing the Defendants' SIPA Claims

[40]  [41]  The Trustee has sufficiently pled Count Eleven of the Complaint to disallow the Defendants' SIPA claims under section 502(d) of the Code, which states, "the court shall disallow any claim of any entity ... that is a transferee of a [voidable] transfer." 11 U.S.C. § 502(d). The purpose of this section is to "preclude entities that have received voidable transfers from sharing in the distribution of assets unless and until the voidable transfer has been returned to the estate." *In re Mid. Atl. Fund, Inc.,* 60 B.R. 604, 609 (Bankr.S.D.N.Y.1986); *see also In re MacMenamin's Grill Ltd.,* 450 B.R. 414 (Bankr.S.D.N.Y.2011) (recognizing the distinction between "transfer" and "obligation" as relevant to a determination of the applicability of section 502(d)) (citing *In re Asia Global Crossing, Ltd.,* 333 B.R. 199, 204 (Bankr.S.D.N.Y.2005)). The Defendants **\*121** are allegedly "the recipients of transfers of BLMIS' property which are recoverable" under the Code and SIPA, and those transfers have not been returned to the Trustee. Compl. at ¶ 174 (emphasis added). As a result, the Trustee's claim under section 502(d) of the Code is adequately pled. The Motions to Dismiss Count Eleven of the Complaint are therefore denied.

### G. The Trustee Has Adequately Alleged a Claim for Equitable Subordination of the Defendants' SIPA Claims

[42]  The Trustee has sufficiently pled Count Twelve of the Complaint to equitably subordinate the Defendants' SIPA claims, pursuant to section 510(c) of the Code, which empowers this Court to "subordinate for the purposes of an allowed interest to all or part of another allowed interest." 11 U.S.C. § 510(c).

[43]  [44]  "To plead equitable subordination successfully, a complaint must contain enough facts to satisfy each part of the following three-part test: (1) that the [Defendants] engaged in inequitable conduct, (2) that the misconduct caused injury to the creditors or conferred an unfair advantage on the defendant-claimant, and (3) that bestowing the remedy of equitable subordination is not inconsistent with bankruptcy law." *In re Hydrogen, L.L.C.,* 431 B.R. 337, 358 (Bankr.S.D.N.Y.2010) (citing *In re Mobile Steel Co.,* 563 F.2d 692, 700 (5th Cir.1977)). Such subordination is confined to offsetting "specific harm that creditors have suffered on account of the inequitable conduct;" it "is remedial, not penal." *In re SubMicron Sys. Corp.,* 291 B.R. 314, 327–29 (D.Del.2003); *see also Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.),* 379 B.R. 425, 434 (S.D.N.Y.2007). Thus, undoing inequality is at the core of 510(c)'s grant of authority. *Societa Internazionale Turismo, S.P.A v. Barr (In re Lockwood),* 14 B.R. 374, 380–81 (Bankr.E.D.N.Y.1981). ("The fundamental aim of equitable subordination is to undo or offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of bankruptcy results.") (internal quotations omitted).

The Complaint is replete with allegations that the Defendants have left much to be. *See* Comp ¶¶ 28–29, 32, 37–39, 43, 45, 47–49, 51–58, 73, 94, 98, 182. As explained in-depth below, the Complaint sufficiently alleges that the Defendants breached their fiduciary duties to BLMIS and those breaches directly harmed the same. *See* Section II.C. *infra; Official Comm. of Unsecured Creditors of the Debtors v. Austin Fin. Servs., Inc., (In re KDI Holdings, Inc.),* 277 B.R. 493, 511 (Bankr.S.D.N.Y.1999) (observing that the remedy of equitably subordination has been applied in cases, where it was found that the defendants breached their fiduciary duties). It additionally alleges that the Defendants were unjustly enriched at the expense of BLMIS due to

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

their failures to adequately perform these duties. *See* Section II.E. *infra.* These factual allegations set out the Defendants' "inequitable conduct" injurious to creditors, and moreover, these allegations establish that the remedy of equitable subordination in this instance would not be inconsistent with bankruptcy law. *See Adelphia Commc'ns Corp. v. Bank of Am. (In re Adelphia Commc'ns Corp.),* 365 B.R. 24, 67 (Bankr.S.D.N.Y.2007). Thus, in the event one exists, any allowed interest of the Defendants in the BLMIS SIPA Liquidation should be equitably subordinated. Accordingly, the Motions to Dismiss count twelve of the Complaint are denied.

\* \* \*

 **\*122**  For the foregoing reasons, the Motions to Dismiss the Bankruptcy Claims are denied except with regard to the Trustee's Preference claims in Count Two, Actual and Constructive Fraudulent Transfer claims in Counts Three through Nine to the extent stated herein, and Subsequent Transfer claims in Count Ten, with leave to amend the Complaint within forty five days.

## II. THE COMMON LAW CLAIMS

Through the Common Law Claims the Trustee seeks to recover damages suffered by BLMIS as a result of the Defendants' failure to perform duties arising from their management roles at BLMIS. To support these Claims, the Complaint alleges that the Defendants were directors, officers, managers, and fiduciaries with broad oversight of BLMIS as a whole, and that their responsibilities included developing and implementing a supervisory system to prevent and report any fraudulent activity occurring within BLMIS. Specifically, according to BLMIS's purported compliance policies, the Defendants were required to "respond to red flags," closely scrutinize "any aberrational activity," and "monitor ... the activities of BLMIS personnel to ensure that the policies and procedures ... [were] being followed." Compl. ¶ 33. The Trustee alleges the Defendants failed to implement and comply with these policies, thereby directly enabling Madoff's Ponzi scheme to continue undetected to the detriment of BLMIS.

Before reaching the merits of the Common Law Claims, the Court must first determine whether the Trustee has standing to assert them, and second, if he does, whether New York General Business Law §§ 352 *et seq.,* commonly referred to as the Martin Act, otherwise preempts him

from bringing them. N.Y. Gen. Bus. Law §§ 352 *et seq.* (McKinney 2010). As set forth below in greater detail, this Court finds the Trustee has standing to assert Common Law Claims on behalf of the BLMIS estate, and the Martin Act does not preempt him from pursuing them against the Defendants.

### A. The Trustee Possesses Standing to Pursue the Common Law Claims on behalf of the BLMIS Estate

 **[45]  [46]  [47]**  Given the "hybrid" nature of a SIPA liquidation, *In re BLMIS II,* 654 F.3d 229, at 242 n. 10, a SIPA trustee has at least as many powers and responsibilities as an ordinary bankruptcy trustee under *Title 11. See also* 15 U.S.C. § 78fff–1(a) ("A trustee shall be vested with the same powers and title with respect to the debtor and the property of the debtor, including the same rights to avoid preferences, as a trustee in a case under *Title 11.").* An ordinary bankruptcy trustee, pursuant to Second Circuit precedent, has standing to assert claims against corporate insiders alleging injury to the debtor. *In re The Mediators, Inc.,* 105 F.3d 822, 826–27 (2d Cir.1997) ("We agree that a bankruptcy trustee, suing on behalf of the debtor under New York law, may pursue an action for breach of fiduciary duty against the debtor's fiduciaries."); *St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.,* 884 F.2d 688, 702 n. 3 (2d Cir.1989) (finding that "causes of action that could be asserted by the debtor are property of the estate and should be asserted by the trustee...."); *In re Keene Corp.,* 164 B.R. 844, 853 (Bankr.S.D.N.Y.1994) ("Section 720 of New York's Business Corporation law expressly authorizes a corporation or bankruptcy trustee to sue the corporation's officers and directors for breach of fiduciary duty, including misappropriation or diversion of assets...."). The rationale for this is plain: section 541(a) (1) of the Code defines property of the estate as "all **\*123** legal or equitable interests of the debtor ... as of the commencement of the case" including the estate's causes of action. *In re Smart World Techs., LLC,* 423 F.3d 166, 175 (2d Cir.2005) (citing *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 205 n. 9, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983)). It follows, therefore, that the Trustee has standing to assert the Common Law Claims, to the extent these Claims belong to the BLMIS estate. [24]

24    The district court in *Picard v. HSBC Bank PLC* held that the Trustee lacks standing—both directly and under theories of bailment, subrogation, assignment or contribution—to assert common law claims

against third parties *on behalf of BLMIS customers.* Nos. 11 Civ.763, 11 Civ. 836, 454 B.R. 25, 2011 WL 3200298, at \*3 (S.D.N.Y. July 28, 2011). Here, although Common Law Claims appear to have been asserted on behalf of customers and the BLMIS estate, *see, e.g.,* Compl. ¶¶ 182, 184 (alleging breach of fiduciary duty owed to, and damages caused to, "BLMIS and its customers"), the Trustee has since insisted that he "is not suing [the Defendants] on behalf of the firm's customers but on behalf of the firm itself for [the Defendants'] failures to carry out faithfully their duties to BLMIS." Trustee's Supplemental Letter at 2. In light of this supplemental submission, and in accordance with the holding in *HSBC,* this Court need only address the plausibility of the Trustee's Common Law Claims to the extent they are asserted on behalf of the BLMIS estate.

**[48] [49] [50] [51] [52] [53]** In *HSBC,* the Trustee, as successor in interest to Madoff and BLMIS, lacked standing under the *Wagoner* rule[25] to bring common law fraud claims against the defendants (the "HSBC Defendants"). 454 B.R. at 29. The allegations presented here do not compel the same conclusion. Indeed, the HSBC Defendants were undisputedly third parties and *Wagoner* provides, "a claim *against a third party* for defrauding a corporation accrues to creditors, not to the guilty corporation." 944 F.2d at 114 (emphasis added); *see also In re Verestar, Inc.,* 343 B.R. 444, 479 (Bankr.S.D.N.Y.2006) ("[A] plaintiff acting on behalf of a debtor cannot sue *an outside professional or other third party* for damages for which the corporation itself can be held responsible.") (emphasis added). By contrast, the Defendants in the instant proceeding are alleged to be fiduciaries and insiders of BLMIS, and it is well established that the *Wagoner* and *in pari delicto* rules do "not apply to actions of fiduciaries who are insiders in the sense that they either are on the board or in management, *or in some other way control the corporation.*" *In re Optimal U.S. Litig.,* No. 10 Civ. 4095, 2011 WL 3809909, at \*9 (S.D.N.Y. Aug. 26, 2011) (internal quotations omitted)(emphasis in the original); *Winnick,* 2006 WL 2212776, at \*15 ("Courts have held that the Wagoner and 'in pari delicto' rules do not apply to claims against corporate insiders for breach of their fiduciary duties.") (citing *In re the Mediators, Inc.,* 105 F.3d at 826–27); *In re Grumman Olson Indus., Inc.,* 329 B.R. 411, 425 (Bankr.S.D.N.Y.2005) ("[T]he *Wagoner* Rule does not bar claims against corporate fiduciaries...."); *Tese–Milner v. Beeler (In re Hampton Hotel Investors, L.P.),* 289 B.R. 563, 577 n. 23 (Bankr.S.D.N.Y.2003) ("The *Wagoner*

Rule only deals with claims against third parties. It does not proscribe actions against insiders for breach of fiduciary duty, which are **\*124** properly claims of the trustee."); *Official Committee of Unsecured Creditors v. Austin Fin. Serv., Inc. (In re KDI Holdings, Inc.),* 277 B.R. 493, 518 (Bankr.S.D.N.Y.1999) ("[T]he *in pari delicto* doctrine is inapplicable where a cause of action is brought against an insider.")[26] Consequently, to the extent that the Trustee has established the Defendants' positions at BLMIS rendered them insiders and fiduciaries, he is not barred by *Wagoner* or *in pari delicto* from asserting claims against them on behalf of BLMIS.

[25]  The *Wagoner* rule "deprive[s] a trustee from even having standing to bring in federal court a common law claim that is clearly defeated by the doctrine of *in pari delicto.*" 454 B.R. at 29 (citing *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114 (2d Cir.1991)). Under New York law, the doctrine of *in pari delicto* operates as an affirmative defense whereby a wrongdoer, or a plaintiff asserting a claim on behalf of a wrongdoer, is generally barred from recovering against a commensurate wrongdoer. *Kirschner v. KPMG LLP,* 15 N.Y.3d 446, 912 N.Y.S.2d 508, 938 N.E.2d 941, 958–59 (2010).

[26]  The rationale for the insider exception to the *in pari delicto* doctrine stems from the agency principles upon which the doctrine is premised; a corporate insider, whose wrongdoing is typically imputed to the corporation, should not be permitted to use that wrongdoing as a shield to prevent the corporation from recovering against him. *Official Comm. of Unsecured Creditors v. Shapiro (In re Walnut Leasing Co.),* No. 99–526, 1999 WL 729267, at \*5 (E.D.Pa. Sept. 8, 1999) ("Vis-à-vis their corporations, insiders cannot avoid the consequences of their own handiwork."). Indeed, a corporation "is represented by its officers and agents," and "all [of their] corporate acts—including fraudulent ones —are subject to the presumption of imputation" to the corporation. *Kirschner,* 912 N.Y.S.2d 508, 938 N.E.2d at 951(internal quotations omitted); *see also In re Oakwood Homes Corp.,* 356 Fed.Appx. 622, 627 n. 4 (3rd Cir.2009) ("The exception derives from the fact that corporations act through their directors, officers, and controlling stockholders."); *Granite Partners, L.P. v. Bear, Stearns & Co. Inc. (In re Granite Partners, L.P.),* 194 B.R. 318, 332 (Bankr.S.D.N.Y.1996) ("*In pari delicto* ... does not apply to corporate insiders or partners. Otherwise,

a trustee could never sue the debtor's insiders on account of their own wrongdoing.").

[54] [55] General partners, sole shareholders, and sole decision makers are "insiders" or fiduciaries in the context of the *in pari delicto* doctrine under New York common law. *In re Adelphia Communs. Corp.,* 322 B.R. 509, 529 n. 18 (Bankr.S.D.N.Y.2005) (holding general partner was insider who could not use *in pari delicto* defense); *Granite Partners, L.P. v. Bear, Stearns & Co., Inc.,* 17 F.Supp.2d 275, 308 (S.D.N.Y.1998) (holding sole voting shareholders and sole general partners are insiders whose wrongdoing is imputed to plaintiff). "No reported authority suggests an *officer or director* can assert the defense of *in pari delicto* " to escape liability to the corporation on whose behalf he or she acted. *In re Walnut Leasing Co.,* 1999 WL 729267, at *5, n. 12 (emphasis added). Even a third-party professional, typically the quintessential outsider, may surrender an *in pari delicto* defense where it exerts sufficient domination and control over the guilty corporation to render itself an insider. *See, e.g., In re KDI Holdings, Inc.,* 277 B.R. at 518 ("[T]he Committee has alleged sufficient facts with regard to Austin's and Schneider's insider status through domination and control to render the *in pari delicto* defense inapplicable in this case"); *see also In re IDI Constr. Co., Inc.,* 345 B.R. 60, 67 (Bankr.S.D.N.Y.2006) (holding that *in pari delicto* did not bar a claim against a consultant involved in the fraud).

The Complaint alleges that the Defendants were senior officers, directors, and compliance managers of BLMIS. Comp. ¶¶ 28–36. Peter, an experienced and licensed investment and legal professional, held the title of Senior Managing Director and Chief Compliance Officer of BLMIS and was designated principal responsible for supervising BLMIS personnel in the absence of Madoff himself. Comp. ¶¶ 37–42. Mark and Andrew, also investment professionals, held titles of Co–Directors of Trading at BLMIS, and were designated as personally responsible for carrying out the Firm's policy in Madoff's absence. Comp. ¶¶ 47–51. Shana was in-house Counsel and Compliance Director of **125** BLMIS and the sole custodian for most BLMIS compliance documents and regulatory materials; she was responsible for overseeing compliance with firm policy as well as investigating and correcting reported aberrational activity. Comp. ¶¶ 43–46. These and other similar allegations set forth in Complaint suffice to establish, for relevant purposes, that

the Defendants were fiduciaries and insiders of BLMIS. *See Kirschner,* 912 N.Y.S.2d 508, 938 N.E.2d at 951.

Accordingly, the *Wagoner* rule and the *in pari delicto doctrine* do not bar the Trustee from asserting Common Law Claims on behalf of BLMIS against the Defendants.

## B. The Trustee's Common Law Claims are Not Preempted by New York's Martin Act

[56] For the better part of a century, the Martin Act has empowered the New York State Attorney General to take action against fraudulent practices involving securities. *See Anwar,* 728 F.Supp.2d at 359. When originally enacted in 1921, the Martin Act granted the Attorney General the power "to bring actions to enjoin imminent frauds" but "failed to address fraudulent activities that had been already completed." *Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgt. Inc.,* 80 A.D.3d 293, 915 N.Y.S.2d 7, 11 (N.Y.App.Div.2010). This changed, however, in 1955 with the enactment of section 352–c, which authorizes the Attorney General to institute criminal and civil proceedings, predicated "on mere conduct, absent any proof of scienter or criminal intent." *Id.* As the Martin Act currently stands, these statutory powers remain available under section 352–c, provided, however, that the Attorney General limits all Martin Act prosecutions to:

(a) Any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale;

(b) Any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;

(c) Any representation or statement which is false, where the person who made such representation or statement: (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representations or statements made.

N.Y. Gen. Bus. Law § 352–c (McKinney 2010).

The Common Law Claims arise from the Defendants' alleged derelictions of internal management duties and misuses of company funds unrelated to any specific investment accounts under management or any particular investment advice or decision. *See* Compl. ¶¶ 28–36,

42, 46, 49, 52–58. Thus, absent allegations of one of the types of conduct prohibited by the Martin Act—fraud, deception, unreasonable future promise, or false representation related to the sale of security—these Claims do not implicate its plain language. *See Assured Guar. (UK) Ltd.,* 915 N.Y.S.2d at 12 ("The plain language of the Martin Act does not explicitly preempt all common-law claims.").

The Defendants nevertheless contend that if the Common Law Claims were permitted to go forward, the policy underlying the Martin Act would be undermined or otherwise compromised. They explain that the Martin Act grants the New York Attorney General exclusive power over all claims arising out of securities fraud, and thus "[t]o allow private plaintiffs to bring common law claims related to the Martin **\*126** Act would detract from the New York State Attorney's exclusive enforcement power over the Act." Mark and Andrew Mot. at 12. To support their position, the Defendants rely on decisions issued by federal courts in the Southern District of New York that have held that the Martin Act precludes a private right of action for any non-fraud tort claim that arises in the securities context and lacks a scienter element. *See, e.g., In re Beacon Assoc.'s Litig.,* 745 F.Supp.2d 386, 431 (S.D.N.Y.2010); *Abbey v. 3F Therapeutics, Inc.,* No. 06 Civ. 409, 2009 WL 4333819, at \*14 (S.D.N.Y. Dec. 2, 2009); *Pro Bono Invs., Inc. v. Gerry,* No. 03 Civ. 4347, 2005 WL 2429787, at \*16 (S.D.N.Y. Sept. 30, 2005); *Sedona Corp. v. Ladenburg Thalmann & Co., Inc.,* No. 03 Civ. 3120, 2005 WL 1902780, at \*21–23 (S.D.N.Y. Aug. 9, 2005). These decisions, however, represent only one side of an ongoing debate among federal and state courts in New York over the Martin Act's preemptive effect. The other side of the debate, which the New York Attorney General has joined, [27] holds that neither the plain language of the Martin Act nor its legislative intent supports preemption of all non-fraud common law claims. *See, e.g., Anwar,* 728 F.Supp.2d at 365; *Assured Guar. (U.K.) Ltd.,* 915 N.Y.S.2d at 15; *CMMF, LLC v. J.P. Morgan Inv. Mgt. Inc.,* 78 A.D.3d 562, 915 N.Y.S.2d 2, 6 (N.Y.App.Div.2010); *Caboara v. Babylon Cove Dev.,* 54 A.D.3d 79, 862 N.Y.S.2d 535, 538–39 (N.Y.App.Div.2008).

[27]    In at least two separate amicus curiae briefs filed in New York courts, the Attorney General has taken the position that the Martin Act does not preempt any private right of action in the investment securities

context. Brief for the Attorney General of the State of New York as Amicus Curiae, *CMMF, LLC v. J.P. Morgan Inv. Mgt. Inc.,* 78 A.D.3d 562, 915 N.Y.S.2d 2 (N.Y.App.Div.2010) (No. 601924/09); Brief for the Attorney General of the State of New York as Amicus Curiae, *Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgt. Inc.,* 80 A.D.3d 293, 915 N.Y.S.2d 7 (N.Y.App.Div.2010)(No. 603755/08).

Here, because "the Attorney General has, by operation of statute, no enforcement power," it is "difficult to see how permitting a common law claim to go forward would interfere with the state's legislature's enforcement mechanism." *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC,* No. 02 Civ. 0767, 2003 WL 22052894, at \*5 (S.D.N.Y. Sept. 2, 2003) *see also Hecht v. Andover Assocs. Mgmt. Corp.,* 910 N.Y.S.2d 405, 2010 WL 1254546, \*9 (N.Y.Sup.2010) (finding that fiduciary duty and other common law claims arising from Madoff-related matters were not based on the type of misconduct that the Attorney General prosecutes as Martin Act violations, and thus were not preempted by the Martin Act). Indeed, the Common Law Claims are not based on fraud, deception, unreasonable future promise, or false representation, but instead on allegations that the Defendants failed to carry out their compliance and supervisory responsibilities and improperly used company funds for personal use. Similar circumstances arose in *Louros v. Kreicas,* 367 F.Supp.2d 572, 595–96 (S.D.N.Y.2005), which involved various common law claims against an investment advisor who had discretionary authority over the investments of his client. There, the court determined that the claims for breach of fiduciary duty were based on "failures to manage Lourous's account properly and to keep him informed" and "do[] not come within the purview of the Martin Act." *Id.* Specifically, in sustaining the breach of fiduciary duty claim, the court reasoned the "reach of the [Martin] Act" cannot be "unlimited" and thus "[a] claim of breach of duty that involves securities but does not allege any kind of dishonesty or deception implicates neither the plain language **\*127** of the statute nor its policies." *Id.; see also Hecht,* 910 N.Y.S.2d 405, \*9 (same).

The Motions to Dismiss on Martin Act preemption grounds are therefore denied.

\* \* \*

Having determined that the Martin Act and the *Wagoner* Rule do not affect the Trustee's ability to assert

the Common Law Claims, this Court now turns to whether these Claims survive Rule 12(b)(6) scrutiny. The Trustee's Common Law Claims for breach of fiduciary duty, negligence, unjust enrichment, constructive trust, and accounting in Counts Thirteen, Sixteen, Fifteen, Seventeen, and Eighteen of the Complaint, respectively, survive Rule 12(b) scrutiny. The Trustee's claim for conversion in Count Fourteen of the Complaint, however, is dismissed with leave to amend within forty five days.

### C. The Trustee's Claims for Breach of Fiduciary Duty and Negligence are Adequately Pled

[57] [58] Under New York law, "[t]he elements of a cause of action to recover damages for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct." *Rut v. Young Adult Inst., Inc.,* 74 A.D.3d 776, 901 N.Y.S.2d 715, 717 (N.Y.App.Div.2010). Similarly, the elements of a claim for negligence under New York law are: "(i) a duty owed to the plaintiff by the defendants; (ii) breach of that duty; and (iii) injury substantially caused by that breach." *Lombard v. Booz–Allen & Hamilton, Inc.,* 280 F.3d 209, 215 (2d Cir.2002).

[59]   The Complaint alleges that each Defendant's relationship with BLMIS was fiduciary in nature since it was "characterized by trust and reliance" as well as an "assumption of control and responsibility for the affairs of [the firm]." *TP Grp., Inc. v. Wilson,* No. 89 Civ. 2227, 1990 WL 52131, at *3 (S.D.N.Y. Apr. 17, 1990). Peter was BLMIS's CCO, responsible for ensuring that the IA Business had compliance procedures in place to detect any potential fraud. Compl. ¶¶ 37–42. Mark and Andrew were senior managers and supervisors of the firm and its Co–Directors of Trading. Compl. ¶¶ 47–49. Shana was BLMIS's Compliance Director, as well as compliance counsel and in-house counsel. Compl. ¶¶ 43–46; *see also Andy Warhol Found. for Visual Arts, Inc. v. Hayes (In re Hayes),* 183 F.3d 162, 168 (2d Cir.1999) (explaining that "the attorney-client relationship entails one of the highest fiduciary duties imposed by law" and includes the duty of "operating competently"). At this stage of the proceedings, the allegations set forth in Complaint are sufficient to establish that a fiduciary relationship existed between the Defendants and BLMIS.[28]

[28]   The precise nature and scope of the fiduciary relationship that each individual Defendant had with BLMIS need not be ascertained at this stage. Indeed, courts applying New York law have consistently held that such a determination is a mixed question of law and fact and cannot always be determined on a motion to dismiss. *See Am. Int'l Group, Inc. v. Greenberg,* 23 Misc.3d 278, 877 N.Y.S.2d 614 (N.Y.Sup.Ct.2008) (denying a motion to dismiss on the grounds that "factual issues concerning the precise nature and scope of the [fiduciary] relationship ... undoubtedly must be explored"); *see also Nisselson v. Ford Motor Credit Co. (In re Monahan Ford Corp. of Flushing),* 340 B.R. 1, 41 (Bankr.E.D.N.Y.2006) (explaining that "whether fiduciary duties actually arose between the parties is a question of fact not properly addressed" at the motion to dismiss stage).

[60]   Just as the Trustee has sufficiently alleged the existence of a fiduciary relationship between the Defendants and BLMIS, so has the Trustee plausibly alleged **\*128** that the Defendants' conduct, whether intentional or negligent, constituted a breach of that relationship. Indeed, a plausible inference can be drawn from the facts alleged that the Defendants breached their duties, expressly set forth in BLMIS compliance manuals and mandated by applicable securities laws and regulations, to properly supervise BLMIS operations. For example, Peter is alleged to have regularly failed to perform those duties expressly delegated to him in BLMIS's internal compliance manuals including, but not limited to, "verify[ing] compliance with [BLMIS's allocation and trade aggregation] policies and procedures" and "conduct[ing] periodic reviews of allocation records in order to verify that order allocations are being made in accordance with [BLMIS's] ... procedures." Compl. ¶ 42. Shana similarly failed to monitor BLMIS's compliance with federal securities laws and regulations and corresponding FINRA rules and regulations, even as she assisted her father, Peter, in drafting the annual review of the IA Business compliance program. Compl. ¶ 43, 46. While Shana argues that her duties applied to discreet, legitimate operations of BLMIS, the Complaint provides an email in which she concedes that "the Compliance Departments' [sic] monitoring and oversight of compliance issues extends to all areas of the firm's business." Compl. ¶ 45. The Complaint alleges that Andrew and Mark, FINRA-registered securities principals, played roles in the IA business at various times and, upon information and belief, had "direct, investment related contacts and

communications with investors in the IA business." Compl. ¶ 49. Peter and Andrew were licensed options principals and were correspondingly responsible for monitoring and approving the options and transactions of the firm. Compl. ¶¶ 47–49. Additionally, in violation of BLMIS's Anti–Money Laundering compliance program, the Defendants failed to investigate or detect suspicious transfers of BLMIS funds to MSIL, even though Mark, Andrew, and Peter were all directors of MSIL.[29]

29　Bernard Madoff and Frank DiPascali, a former BLMIS employee, have pled guilty to money laundering charges arising from these transactions.

**[61]** The Second Circuit's opinion in *Gully v. National Credit Union Administration Board* illustrates how the Defendants' derelictions of their compliance and supervisory duties constitute breaches notwithstanding Madoff's confessed masterminding of the fraud. 341 F.3d 155, 159 (2d Cir.2003). In *Gully*, a manager of a credit union was accused of breach of fiduciary duty for failing to monitor or stop her father, the "dominant figure" at the union, from incurring personal charges on its credit card. *Id.* In finding that the manager "in effect, participated in h[er father's] scheme," the Second Circuit determined that her not doing anything to correct or prevent misconduct and failure to exercise reasonable diligence was "particularly egregious," given her conflict of interest and that she was the only one to police her own father. *Id.* at 165–66. The Second Circuit's reasoning in *Gully* is in line with longstanding New York precedent holding fiduciaries to a standard "stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is ... the standard of behavior." *Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545 (1928). Fiduciary duties include discharging corporate responsibilities "in good faith and with conscientious fairness, morality and honesty in purpose" and displaying "good and prudent management of the corporation." ***129** *Alpert v. 28 Williams St. Corp.,* 63 N.Y.2d 557, 569, 483 N.Y.S.2d 667, 473 N.E.2d 19 (1984) (internal quotations omitted).

**[62]** **[63]** With that in mind, the Defendants may not escape liability by pointing to Madoff's fraudulent undertakings. Put another way, Madoff's fraudulent activities do not constitute a supervening cause that severs the causal link between the Defendants' above-mentioned breaches and the foreseeable resulting harm to BLMIS. More to the point, "when the intervening, intentional act

of another is itself the foreseeable harm that shapes the duty imposed, the defendant who fails to guard against such conduct will not be relieved of liability when that act occurs." *Kush v. City of Buffalo,* 59 N.Y.2d 26, 33, 462 N.Y.S.2d 831, 449 N.E.2d 725 (1983); *see also Derdiarian v. Felix Contracting Corp.,* 51 N.Y.2d 308, 316, 434 N.Y.S.2d 166, 414 N.E.2d 666 (1980) ("[A]n intervening act may not serve as a superseding cause, and relieve an actor of responsibility, where the risk of the intervening act occurring is the very same risk which renders the actor negligent."). Indeed, of all the possible parties to uncover or prevent the fraud, the Defendants were those best situated, and in fact obligated, to do so. Yet, on the basis of the facts alleged, the Defendants shirked their compliance and supervisory duties, engaged in improper personal use of BLMIS funds, and consequently impoverished BLMIS while permitting its descent towards its eventual demise. As such, the Trustee has adequately stated claims for breach of fiduciary duty and negligence against the Defendants.

### i. Punitive Damages for Negligence and Breach of Fiduciary Duty Claims

**[64]** For his negligence and breach of fiduciary duty claims, the Trustee asserts that the Defendants' "conscious, willful, wanton, and malicious conduct entitles [him], on behalf of BLMIS and its creditors, to an award of punitive damages in an amount to be determined at trial." Comp ¶¶ 187, 205. For the following reasons, the Trustee's pursuit of punitive damages against the Defendants cannot be dismissed at this early stage of the case.

**[65]** **[66]** **[67]** **[68]** Under New York law, punitive damages serve the dual purposes of punishing the offending party while deterring similar conduct by others. *See Ross v. Louise Wise Servs., Inc.,* 28 A.D.3d 272, 812 N.Y.S.2d 325, 331 (N.Y.App.Div.2006). To be liable for punitive damages in tort causes of action, a defendant's actions must "constitute willful or wanton negligence or recklessness." *Gruber v. Craig,* 208 A.D.2d 900, 618 N.Y.S.2d 84, 85 (N.Y.App.Div.1994) (internal quotations omitted). Acts are wanton and reckless when done in a manner "showing heedlessness and an utter disregard for the rights and safety of others." *Id.* The decision to award punitive damages "reside[s] in the sound discretion

of the original trier of facts." *Louise Wise Servs., Inc.,* 812 N.Y.S.2d at 331 (internal quotations omitted).

The Trustee has sufficiently alleged that the acts and omissions of the Defendants were performed under circumstances showing "heedlessness and an utter disregard" for the rights or interests of BLMIS and, ultimately, all those who foreseeably relied upon its professed integrity. As discussed extensively above, the Trustee has been unable to identify any meaningful supervision of BLMIS by the Defendants. *See, e.g.,* Compl. ¶ 47. These alleged failures to adequately fulfill their jobs were not, as Mark and Andrew contend, mere "passive shortcomings" regarding their compliance duties. Mark and Andrew Mot. at 45. Rather, the Defendants spent every day for over twenty years in the **\*130** offices of the firm where the Ponzi scheme occurred, allegedly ignoring numerous red flags and irregularities at BLMIS in order to enrich themselves and their outside business ventures at the expense of BLMIS. *See* Compl. ¶¶ 58, 62, 74, 84, 85, 94. These failures therefore may well be considered wanton and malicious conduct under the circumstances. Thus, it cannot be "conclusively determined at this stage of the litigation ... that the wrongful conduct alleged is not sufficiently egregious to warrant the imposition of punitive damages." *D'Amour v. Ohrenstein & Brown, LLP,* No. 601418/06, 2007 WL 4126386, at \*20 (N.Y.Sup.Ct. Aug. 13, 2007).

### D. The Trustee Has Adequately Pled Claims for an Accounting of Funds Allegedly Diverted from BLMIS

[69]   The Trustee has sufficiently alleged Count Eighteen of the Complaint, which states that in order "to compensate BLMIS for the amount of monies the [Defendants] diverted from BLMIS for their own benefit, it is necessary for the [Defendants] to provide an accounting of any transfer of funds, assets or property received from BLMIS." Compl. ¶ 214.

[70]   [71]   Under New York law, an accounting is a cause of action that seeks "an adjustment of the accounts of the parties and a rendering of a judgment for the balance ascertained to be due." *DiTolla v. Doral Dental IPA of New York, LLC,* 469 F.3d 271, 275 (2d Cir.2006) (internal quotations omitted). Its purpose is to "help sort out what assets are involved [and] enable the parties to meaningfully pursue their respective claims concerning their private or business arrangement." *Wesselmann v. Int'l. Images,* 259 A.D.2d 448, 687 N.Y.S.2d 339 (N.Y.App.Div.1999)

(finding that where the parties shared a close working relationship, an accounting is appropriate to determine what assets are involved. It is not necessary to "identify a particular asset or fund of money in the defendant's possession." *DiTolla,* 469 F.3d at 275 (internal quotations omitted). But it is necessary to establish the "existence of a confidential or fiduciary relationship and a breach of the duty imposed by that relationship respecting property in which the party seeking the accounting has an interest." *Palazzo v. Palazzo,* 121 A.D.2d 261, 503 N.Y.S.2d 381 (N.Y.App.Div.1986); *see Akkaya v. Prime Time Transp., Inc.,* 45 A.D.3d 616, 845 N.Y.S.2d 827, 828 (N.Y.App.Div.2007); 1 N.Y. Jur.2d *Accounts and Accounting* § 34 (2011) (finding a fiduciary relationship between the parties and wrongdoing by the defendant to be "essential elements of an equity complaint where an accounting is demanded").

[72]   The Complaint states a claim for an accounting because it sufficiently alleges the Defendants had a fiduciary relationship with BLMIS and they breached their duties imposed by that relationship regarding the property in which the Trustee has an interest. *See Stratton Oakmont, Inc.,* 234 B.R. at 335. As explained above, the Complaint sufficiently alleges that the Defendants breached their fiduciary duties to BLMIS and diverted BLMIS assets for their own benefit. *See* Comp ¶¶ 28–29, 32, 37–39, 43, 45, 47–49, 51–58, 73, 94, 98, 182. One instance where an accounting is particularly appropriate is with regard to the BLMIS funds allegedly used to pay the Defendants' personal expenses. Comp ¶¶ 73, 84, 94, 98. Under these circumstances, an accounting would "help sort out what assets are involved" and determine the Defendants' disposition, if any, of BLMIS property, compel them to disgorge improper gains, and obtain information in aid of recovering their withdrawals of fictitious **\*131** profits. *Wesselmann,* 687 N.Y.S.2d at 341. [30]

[30]       The Defendants contend the Trustee should be limited solely to discovery in order to determine the amount of money at issue. A bankruptcy trustee is permitted, however, to pursue an accounting action to determine the extent of self-dealing by a corporation's senior executives and the value of the assets of the debtor corporation. *See In re Colonial Mortgage Bankers Corp.,* 1989 Bankr.LEXIS 2783, \*18 (Bankr.D.P.R. Apr. 12, 1989) (noting that "one of the purposes of an accounting is to separate

the commingled funds and assets of the defendants
from the ones of the estate," the court enjoined the
defendants "from transferring any personal assets
until the [trustee's] accounting is performed").

### E. The Trustee's Unjust Enrichment and Constructive Fraud Claims Are Adequately Pled

**[73]** Count Fifteen of the Complaint states that the
Defendants benefited from the receipt of money from
BLMIS at its expense, without adequately compensating
or providing value to it, and that "[e]quity and good
conscience require full restitution of the monies received
by [Defendants] from BLMIS." Compl. ¶¶ 195–96. Count
Seventeen further states that "because of past unjust
enrichment of the [Defendants], the Trustee is entitled to
the imposition of a constructive trust with respect to any
transfer of funds, assets, or property from BLMIS as well
as any profits received by the [Defendants] in the past or
on a going forward basis in connection with BLMIS."
Compl. ¶ 209. Both Counts Fifteen and Seventeen of
the Complaint pass muster under Rule 12(b) because
the Trustee has alleged enough facts in the Complaint
to sustain his claims for unjust enrichment and the
imposition of a constructive trust against the Defendants.

**[74]** **[75]** **[76]** **[77]** **[78]** New York courts have
long recognized that "a court of equity in decreeing a
constructive trust is bound by no yielding formula. The
equity of the transaction must shape the measure of
relief." *Beatty v. Guggenheim Exploration Co.,* 225 N.Y.
380, 386, 122 N.E. 378 (1919); *see also Counihan,* 194 F.3d
at 362 (same). [31] New York courts insist upon "a showing
that property is held under circumstances that render
unconscionable and inequitable the continued holding of
that property and that the remedy is essential to prevent
unjust enrichment." *Counihan v. Allstate Ins. Co.,* 194
F.3d 357, 362 (2d Cir.1999); *see also Golden Budha Corp.
v. Canadian Land Co. of Am., N.V.,* 931 F.2d 196, 202
(2d Cir.1991). An unjust enrichment claim brought under
New York law must be predicated on factual allegations
that the defendant was enriched at the plaintiff's expense,
and that "it is against equity and good conscience to
permit [the defendant] to retain what is sought to be
recovered." *Mandarin Trading Ltd. v. Wildenstein,* 16
N.Y.3d 173, 182, 919 N.Y.S.2d 465, 944 N.E.2d 1104
(2011). To prove such a claim, it is necessary to show
that "one party has received money or a benefit at the
expense of another." *See* **\*132** *Amusement Indus., Inc. v.
Stern,* No. 07–11586, 2010 WL 445906, at \*21 (S.D.N.Y.

Mar.1, 2010) (internal citations omitted). The transaction
must be "unjust." *McGrath v. Hilding,* 41 N.Y.2d 625, 627,
394 N.Y.S.2d 603, 363 N.E.2d 328 (1977). But, "whether
there is unjust enrichment may not be determined from a
limited inquiry confined to an isolated transaction. It must
be a realistic determination based on a broad view of the
human setting involved." *Id.*

[31]

> In determining whether to impose a constructive trust
> under New York law, courts consider four factors:
> (1) a confidential or fiduciary relationship; (2) a
> promise, express or implied; (3) a transfer made in
> reliance on that promise; and (4) unjust enrichment.
> *Sharp v. Kosmalski,* 40 N.Y.2d 119, 386 N.Y.S.2d 72,
> 351 N.E.2d 721, 723(1976). However, "these factors
> are merely useful guides and are not talismanic."
> *Coco v. Coco,* 107 A.D.2d 21, 485 N.Y.S.2d 286
> (N.Y.App.Div.1985) (internal quotations omitted);
> *see also In re Koreag,* 961 F.2d at 352 ("Although
> these factors provide important guideposts, the
> constructive trust doctrine is equitable in nature
> and not to be rigidly limited.") (internal quotations
> omitted); *Palazzo,* 503 N.Y.S.2d at 383–84 ("[T]he
> power of equity to employ a constructive trust to
> reach a just result is not strictly limited by the
> conditions set forth in *Sharp v. Kosmalski.*").

Here, the Defendants allegedly misappropriated BLMIS's
funds for improper personal uses such as funding
personal business ventures and homes. Compl. ¶¶ 66–
99. The Defendants also allegedly failed to perform legal
compliance and supervisory responsibilities they were
legally obligated to perform at BLMIS, but nevertheless
received substantial compensation from the same.
Compl. ¶¶ 28, 37, 43, 57, 58, 64. These and other
similar facts alleged in the Complaint, when viewed
in conjunction with the relevant precedent, sufficiently
establish that the Defendants ended up with BLMIS's
funds that they should not possess, and more to point,
in possessing them, the Defendants unjustly enriched
themselves at the expense of BLMIS.

**[79]** **[80]** As the Trustee has sufficiently alleged that the
Defendants are unjustly enriched by property rightfully
belonging to BLMIS, the Trustee has adequately pled
the requisite equitable basis for the imposition of a
constructive trust. *Simonds v. Simonds,* 45 N.Y.2d 233,
242, 408 N.Y.S.2d 359, 380 N.E.2d 189 (1978) ("[T]he
purpose of a constructive trust is the prevention of unjust
enrichment."). Contrary to the Defendants' arguments
that a constructive trust can "wreak havoc" with the Code,

10-03635-jpm    Doc 271-1    Filed 04/03/17    Entered 04/03/17 18:29:57    Exhibit A -
In re Bernard L. Madoff Inv. Securities LLC, 458 B.R. 87 (2011)    Part 1    Pg 138 of 538

55 Bankr.Ct.Dec. 139

*see* Mark and Andrew Mot. p. 21 n. 10, this Court's conclusion squares with Second Circuit precedent that counsels against freely imposing constructive trusts in bankruptcy proceedings. *See In re Flanagan,* 503 F.3d 171, 182 (2d. Cir.2007); *Superintendent of Ins. v. Ochs (In re First Central Fin. Corp.),* 377 F.3d 209, 217 (2d Cir.2004). As the Second Circuit recently explained,

> The effect of a constructive trust in bankruptcy is profound. While the bankrupt estate is defined very broadly under § 541(a)(1) of the Bankruptcy Code to include all legal or equitable interests of the debtor, any property that the debtor holds in constructive trust for another is excluded from the estate pursuant to § 541(d) ... A constructive trust thus places its beneficiary ahead of other creditors with respect to the trust *res.*

*In re Flanagan,* 503 F.3d at 182. Simply put, "the effect of constructive trust in bankruptcy is to take property out of the debtor's estate.... This type of privileging of one unsecured claim over another clearly thwarts the principle of ratable distribution underlying the Bankruptcy Code." *Id.; see also In re First Central,* 377 F.3d at 217 ("By creating a separate allocation mechanism outside the scope of the bankruptcy system ... the constructive trust doctrine can wreak ... havoc with the priority system ordained by the Bankruptcy Code."). It follows, therefore, that these concerns only apply in cases where the property in question is held by the estate, and is set to be equitably distributed among general unsecured creditors, which is patently not the case here. *In re Flanagan,* 503 F.3d at 182 ("It is ... not the debtor who generally bears the burden of a constructive trust in bankruptcy, but the debtor's general creditors."). In the pending matter, where the property in question is not possessed by the Trustee but rather by the Defendants, the same threat does not exist, and thus imposing the constructive trust to prevent each Defendant's unjust enrichment at the expense of BLMIS does not clash with the underlying property principles of equitable distribution under the Code or under SIPA.

**\*133** Thus, for the aforementioned reasons, the Motions to Dismiss Counts Fifteen and Seventeen of the Complaint are denied.

## F. The Trustee's Claim for Conversion is Dismissed

**[81]    [82]    [83]    [84]    [85]**    Under New York law, "[c]onversion is an unauthorized assumption and exercise of the right of ownership over [property] belonging to another to the exclusion of the owner's rights." *Traffix v. Herold,* 269 F.Supp.2d 223, 228 (S.D.N.Y.2003). Specifically, a conversion action requires that the plaintiff has legal ownership or an immediate superior right of possession to the property he seeks to recover and that the defendant exercised an unauthorized dominion over that property "to the alteration of its condition or to the exclusion of the plaintiff's rights." *Ancile Inv. Co. Ltd. v. Archer Daniels Midland Co.,* 784 F.Supp.2d 296, 311 (S.D.N.Y.2011); *Mia Shoes, Inc. v. Republic Factors Corp.,* No 96–CIV–7974, 1997 WL 525401, at \*3 (Bankr.S.D.N.Y. Aug. 21, 1997) (same). When money, rather than a chattel, is the property at issue, it "must be specifically identifiable." *Interior by Mussa, Ltd. v. Town of Huntington,* 174 Misc.2d 308, 664 N.Y.S.2d 970, 972 (N.Y.App.Div.1997). In fact, "if the allegedly converted money is incapable of being described or identified in the same manner as a specific chattel ... it is not the proper subject of a conversion." *Id.*

Because the Complaint does not seek a specific amount of money converted from a particular account, but rather "an award of compensatory damages in an amount to be determined at trial" it fails to state a claim for conversion under New York law. Compl. ¶ 192. The Complaint asserts vague, unsubstantiated allegations that "BLMIS had a possessory right and interest to its assets, including its customers' investment funds," Compl. ¶ 189, and "[t]he Family Defendants converted the investment funds of BLMIS customers when they received money originating from other BLMIS customer accounts in the form of loans, payments, and other transfers. These actions deprived BLMIS and its creditors of the use of this money," Compl. ¶ 190. Such allegations "merely refer[ ] to unspecified monies and assets" and give "no indication of an identifiable fund or otherwise segregated amount, nor ... any description of the alleged transfer or transfers from which the Court could infer a specifically identified fund of money." *Global View Ltd. Venture Capital v. Great Central Basin Exploration, L.L.C.,* 288 F.Supp.2d 473, 480 (S.D.N.Y.2003); *see also Cal Distrib. Inc. v. Cadbury Schweppes Americas Beverages, Inc.,* No. 06 Civ. 0496, 2007 WL 54534 (S.D.N.Y. Jan. 5, 2007). These allegations are inadequate to sustain the Trustee's conversion claim against the Defendants. Thus, Count Fourteen of the

In re Bernard L. Madoff Inv. Securities LLC, 458 B.R. 87 (2011)
55 Bankr.Ct.Dec. 139

Complaint is dismissed with leave to amend within forty five days.

### CONCLUSION

For the aforementioned reasons, the Motions to Dismiss are denied except with regard to the Trustee's: (1) Preference claims in Count Two, (2) Actual and Constructive Fraudulent Transfer claims in Count Three through Nine to the extent stated herein, (3) Subsequent Transfer claims in Count Ten, and (4) his conversion claim in Count Fourteen, with leave to amend the Complaint

within forty five days consistent with the foregoing determinations.

Thus, to the extent described above, the Motions to Dismiss the Complaint are DENIED in part and GRANTED in part.

**IT IS SO ORDERED.**

**All Citations**

458 B.R. 87, 55 Bankr.Ct.Dec. 139

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 8

333

A

Privy Council

# Al Sabah and another *v* Grupo Torras SA

## [2005] UKPC 1

B

2004   Oct 25, 26, 27;                    Lord Hoffmann, Lord Scott of Foscote,
2005    Jan 11                                 Lord Rodger of Earlsferry,
                                            Lord Walker of Gestingthorpe and
                                           Lord Brown of Eaton-under-Heywood

C

*Cayman Islands — Bankruptcy — Jurisdiction — Courts of one British territory assisting those of another in bankruptcy matters — Whether provision in Westminster statute continuing to apply in overseas territory after repeal in United Kingdom — Whether similar provision in Cayman legislation having equivalent effect — Whether Cayman court having jurisdiction to act in aid of Bahamian bankruptcy — Bankruptcy Act 1914 (4 & 5 Geo 5, c 59), s 122*[1] *— Insolvency Act 1985 (c 65), ss 235, 236, Sch 10*[2] *— Insolvency Act 1986 (c 45), s 426*[3] *— Bankruptcy Law (Laws of the Cayman Islands, 1997 rev, c 7), ss 107, 156*[4]

D

*Statute — Repeal — Extraterritorial effect — Imperial statute repealed by post-imperial statute of Westminster Parliament — Whether repeal taking effect outside United Kingdom*

The trustee in bankruptcy of a debtor in the Bahamas obtained from the Bahamian court a letter of request directed to the Grand Court of the Cayman Islands seeking its aid in setting aside two Cayman trusts established by the debtor. The Grand Court held that it had jurisdiction to provide such assistance under either section 156 of the Bankruptcy Law of the Cayman Islands or section 122 of the

E

Bankruptcy Act 1914 or under the court's inherent jurisdiction, and that it should as a matter of discretion grant the Bahamian trustee powers under section 107 of the Cayman Bankruptcy Law to enable him to set aside the trusts. An appeal by the debtor's wife and son, who were beneficiaries under the trusts, was dismissed by the Court of Appeal of the Cayman Islands.

On the appellants' appeal to the Privy Council—

*Held,* (1) that section 156 of the Cayman Bankruptcy Law was a re-enactment in

F

identical terms of section 161 of the Jamaican Bankruptcy Law 1880 under which, prior to Jamaica becoming independent and while the Cayman Islands were still being governed as a dependency of Jamaica, the bankruptcy courts of Jamaica and the Grand Court of the Cayman Islands were required to act in each other's aid in bankruptcy matters; that section 161 did not in terms have any extraterritorial effect outside Jamaica and the Cayman Islands and it was hard to see what effect, extraterritorial or otherwise, could sensibly have been intended by its re-enactment,

G

following Jamaica's independence, in a legal system under which there was only one bankruptcy court; and that, accordingly, section 156 of the Cayman Bankruptcy Law had no practical present effect in the Cayman Islands and could not be relied upon in aid of a Bahamian bankruptcy ( *post,* paras 17, 21–22, 26–27).

(2) Dismissing the appeal, that section 122 of the Bankruptcy Act 1914, which provided for mutual assistance between bankruptcy courts throughout the United Kingdom and the British Empire, had been repealed under sections 235(3) and

H

236(2) of and Schedule 10 to the Insolvency Act 1985 in so far as it applied within the

[1] Bankruptcy Act 1914, s 122: see post, para 15.
[2] Insolvency Act 1985, ss 235, 236, Sch 10: see post, para 29.
[3] Insolvency Act 1986, s 426: see post, para 38.
[4] Bankruptcy Law, s 107: see post, para 6.
    S 156: see post, para 21.

334

Al Sabah v Grupo Torras SA (PC)                                    [2005] 2 AC

United Kingdom, but continued to apply to former colonial territories overseas unless and until an Order in Council made under section 236(5) of the 1985 Act extended the effect of the 1985 Act to any such territory; and that, since no such Order had yet been made in respect of the Cayman Islands, the Grand Court had jurisdiction under section 122 of the 1914 Act to act in aid of a Bahamian bankruptcy ( post, paras 32, 34).

Ukley v Ukley [1977] VR 121 considered.

Per curiam. If the Grand Court had no statutory jurisdiction to act in aid of a foreign bankruptcy it might have had some limited inherent power to do so. But it cannot have had inherent jurisdiction to exercise the extraordinary powers conferred by section 107 of its Bankruptcy Law in circumstances not falling within the terms of that section. The non-statutory principles on which British courts have recognised foreign bankruptcy jurisdiction are more limited in their scope and the inherent jurisdiction of the Grand Court cannot be wider ( post, para 35).

(3) That the jurisdiction conferred by section 122 of the 1914 Act in the Cayman Islands and the other territories in which it remained in force was essentially as wide as that conferred by section 426 of the Insolvency Act 1986 in that the powers it conferred were not merely auxiliary but operated as though there were a hypothetical bankruptcy in the receiving territory; and that, accordingly, it authorised the Cayman Grand Court to exercise in favour of the Bahamian trustee a statutory power, under section 107 of the Bankruptcy Law, which might not have been available to him if the trusts were governed by Bahamian law ( post, paras 36, 41, 45–46, 48).

In re Osborn; Ex p Tree [1931–32] B & CR 189 and In re a Debtor (Order in Aid No 1 of 1979), Ex p Viscount of the Royal Court of Jersey [1981] Ch 384 considered.

Hall v Woolf (1908) 7 CLR 207 and Galbraith v Grimshaw [1910] AC 508, HL(E) distinguished.

Decision of the Court of Appeal of the Cayman Islands affirmed.

The following cases are referred to in the judgment of their Lordships:

Ayres; Ex p Evans, In re (1981) 34 ALR 582; sub nom Ayres v Evans (1981) 39 ALR 129
Bank of Credit and Commerce International SA, In re (No 9) [1994] 2 BCLC 636
Callender, Sykes & Co v Colonial Secretary of Lagos [1891] AC 460, PC
Dallhold Estates (UK) Pty Ltd, In re [1992] BCLC 621
Debtor (Order in Aid No 1 of 1979), In re A, Ex p Viscount of the Royal Court of Jersey [1981] Ch 384; [1980] 3 WLR 758; [1980] 3 All ER 665
Galbraith v Grimshaw [1910] AC 508, HL(E)
Grupo Torras SA v Al Sabah [1999] CLC 1469
Hall v Woolf (1908) 7 CLR 207
Hart, In re; Ex p Green [1912] 3 KB 6, CA
Hughes v Hannover Rückversicherungs-AG [1997] 1 BCLC 497, CA
Osborn, In re; Ex p Tree [1931–32] B & CR 189
R v Jameson [1896] 2 QB 425, DC
Radich v Bank of New Zealand (1993) 116 ALR 676
Tucker (A Bankrupt), In re (unreported) 27 September 1988, CA, Guernsey
Ukley v Ukley [1977] VR 121

The following additional cases were cited in argument:

Attorney General for Alberta v Huggard Assets Ltd [1953] AC 420; [1953] 2 WLR 768; [1953] 2 All ER 951, PC
Dent (A Bankrupt), In re [1994] 1 WLR 956; [1994] 2 All ER 904, DC
Dick v McIntosh [2001] FCA 1008; [2002] FCA 1135
First International Bank of Grenada Ltd, In re (unreported) 23 January 2002, Royal Court of Jersey
Fogarty, In re [1904] QWN 67

335

[2005] 2 AC                                    Al Sabah v Grupo Torras SA (PC)

A    *Globe-X Canadiana Ltd, In re* (unreported) 28 May 2003, Eastern Caribbean
         Supreme Court (Anguilla)
     *Greenaway, In re* (1910) 27 WN (NSW) 112
     *Hoe, In re* (1957) 34 HKCU 1; 49 HKCU 1
     *Jackson, In re* [1973] NI 67
     *James (An Insolvent), In re (Attorney General intervening)* [1977] Ch 41; [1977]
         2 WLR 1; [1977] 1 All ER 364, CA
B    *Kelly v Jones* (1852) 7 NBR 473
     *Leisurenet Ltd, In re* (unreported) 26 February 2002, Royal Court of Jersey
     *Oasis Merchandising Services Ltd, In re* [1995] 2 BCLC 493
     *Paramount Airways Ltd, In re* [1993] Ch 223; [1992] 3 WLR 690; [1992] 3 All ER 1,
         CA
     *R v Marais, In re; Ex p Marais* [1902] AC 51, PC
     *Television Trade Rentals Ltd, In re* [2002] EWHC 211 (Ch); [2002] BPIR 859
C    *Tucker, In re* 1987–89 MLR 106

     **APPEAL** from the Court of Appeal of the Cayman Islands
         The appellants, Barbara Alice Al Sabah and Mishal Roger Al Sabah, who
     were the wife and son of the debtor, Sheikh Fahab Mohammed Al Sabah,
     and were beneficiaries of two trusts set up by him in the Cayman Islands,
     appealed against the decision of the Court of Appeal of the Cayman Islands
D    (Zacca P, Rowe and Taylor JJA) on 1 October 2003 that the Grand Court of
     the Cayman Islands had jurisdiction to comply with a letter of request
     obtained from the Grand Court of the Bahamas by the second respondent,
     Clifford Culmer, as the debtor's trustee in bankruptcy in the Bahamas, who
     sought to set aside the two trusts under powers conferred by Cayman
     legislation. The first respondent, Grupo Torras SA, was a Spanish company
     which sought to recover in the Cayman Islands sums owed by the debtor in
E    satisfaction of a judgment obtained in earlier English proceedings.
         The facts are stated in the judgment of their Lordships.

         *Robin Dicker QC* and *Adrian Beltrami* for the appellants. The wording
     of section 156 of the Cayman Bankruptcy Law was enacted first as section 64
     of the Jamaican Bankruptcy Law 1871 and then as section 161 of the
     Jamaican Bankruptcy Law 1880 as a provision facilitating and mandating
F    auxiliary assistance between local bankruptcy courts. The term "all the
     courts in bankruptcy" meant all the courts subject to the Jamaican
     Bankruptcy Law. There was nothing in section 64 of the 1871 Law or
     section 161 of the 1880 Law to suggest that they were intended to have a
     wider non-domestic application. [Reference was also made to sections
     60 and 102 of the 1871 Law and section 167 of the 1880 Law.] The
G    Jamaican provision therefore applied only in Jamaica and, after 1894, in the
     Cayman Islands, which was then governed as a dependency of Jamaica and
     whose Grand Court was given jurisdiction in bankruptcy matters under the
     Cayman Islands Administration of Justice Law 1894.
         The effect of the Cayman Statute Law Revision (Amendments) Act 1963
     was to amend the 1880 Law in so far as it applied separately to Jamaica and
     the Cayman Islands. However, the fact that there was only a single court in
H    the Cayman Islands capable of administering the bankruptcy jurisdiction did
     not alter the meaning of the words used in section 161 of the Jamaican
     Bankruptcy Law 1880 and re-enacted as section 156 of the Cayman
     Bankruptcy Law. Either section 156 envisaged the creation of further
     bankruptcy courts within the Cayman Islands or its wording is simply one of

a number of copying errors or anomalies.  [Reference was also made to sections 3 and 66.] A review of bankruptcy statutes passed by other colonial legislatures does not provide conclusive assistance: compare the Bahamian Bankruptcy Law 1870; Hong Kong Bankruptcy Ordinance 1891; Gibraltar Bankruptcy Ordinance 1934 and New Zealand Bankruptcy Law 1883. Section 156 therefore cannot enable the Cayman Grand Court to act in aid of the courts of any other jurisdiction.

Section 122 of the Bankruptcy Act 1914 ceased to have effect in the Cayman Islands when that Act was repealed and replaced in the United Kingdom by the Insolvency Act 1985. [Reference was made to *Halsbury's Laws of England*, 4th ed (1974), vol 6, paras 1200–1202 and *In re James (An Insolvent) (Attorney General intervening)* [1977] Ch 41.] The combined effect of section 235 of and Part IV of Schedule 10 to the 1985 Act, the Insolvency Act 1985 (Commencement No 2) Order 1986 (SI 1986/185) and the Insolvency Act 1985 (Commencement No 5) Order 1986 (SI 1986/1924) was to repeal section 122 of the 1914 Act.  The repeal operated as a repeal of the reciprocal regime of auxiliary assistance both in the United Kingdom and in any dependent territories in which the law had hitherto had direct effect. [Reference was made to sections 15 and 16 of the Interpretation Act 1978; the Jesuits etc Act 1584 (27 Eliz 1, c 2); the Roman Catholics Act 1844 (7 & 8 Vict c 102); the Statute Law Revision Acts of 1867, 1871, 1873, 1874 and 1875 and the Statute Law (Repeals) Acts of 1973, 1976, 1981 and 1995.] The effect of the 1985 Act was to introduce a new and more extensive regime for judicial assistance in different terms (which eventually became section 426 of the Insolvency Act 1986), with express provision for dependent territories to adopt the new scheme (by Order in Council) if they so wished.  In relation to those jurisdictions which have adopted the new section 426 scheme or its equivalent, there has been no question of any additional or separate repeal of section 122 of the 1914 Act because it has already been repealed: see the Insolvency Act 1986 (Guernsey) Order 1989 (SI 1989/2409); article 48 of the Bankruptcy (Desastre) (Jersey) Law 1990 and section 1 of the Bankruptcy Act 1988 of the Isle of Man.  [Reference was also made to *Muir Hunter on Personal Insolvency* (looseleaf ed), issues prior to September 2002; *Halsbury's Laws of England* 4th ed (1974), vol 6, para 1186 and 4th ed (1974) (2003 reissue), vol 6, paras 865–877; *Smart, Cross-Border Insolvency*, 2nd ed (1998), p 406; *McDonald, Henry and Meek, Australian Bankruptcy Law and Practice*, 5th ed (1996), para 29.0.10 and the Irish Bankruptcy Act 1988, section 142.] There is no indication that the Cayman Islands considered that section 122 still formed part of their law.

The Court of Appeal correctly concluded that the purpose of Commencement Order No 2 was to repeal section 122 of the 1914 Act in so far as it conferred authority and imposed duties on bankruptcy courts of the dependencies.  *Ukley v Ukley* [1977] VR 121 is distinguishable on its facts. [Reference was also made to Evidence (Proceedings in Other Jurisdictions) Act 1975 and Evidence (Proceedings in Other Jurisdictions) (Cayman Islands) Order 1978 (SI 1978/1890), section 3.] If, on the other hand, the 1914 Act were still valid in the Cayman Islands, it would not be open to the Cayman legislature to repeal it; nor could it pass extra-territorial legislation: see Cayman Islands (Constitution) Order in Council 1972 (SI 1972/1101), Schedule 2, sections 29 and 58; West Indies Act 1962, section 5; Colonial Laws Validity Act 1865 (28 & 29 Vict c 63), section 2; *Halsbury's Laws of*

[2005] 2 AC                                        Al Sabah v Grupo Torras SA (PC)

A    *England*, 4th ed (2003 reissue), vol 6, paras 840–841 and *In re R v Marais;
     Ex p Marais* [1902] AC 51.
         There was no basis for reliance on the court's inherent jurisdiction. There
     is no jurisdiction to grant a party a power to obtain relief under a statute
     whose terms do not entitle the party to relief. It follows that Smellie CJ had
     no jurisdiction to grant the second respondent the statutory powers
     accorded to a trustee in bankruptcy in the Cayman Islands, in particular the
B    powers under section 107 of the Cayman Bankruptcy Law, and
     Henderson J and the Court of Appeal were wrong to uphold his order.
         As to the nature of the assistance which may be given by the Cayman
     court to the conduct of a Bahamian bankruptcy, section 107 only applies to a
     Cayman bankruptcy. Section 122 of the 1914 Act creates an auxiliary or
     remedial jurisdiction in the court to facilitate the process of a foreign
C    bankruptcy; it does not create any new rights, nor does it enable the foreign
     bankruptcy to be treated for substantive purposes as a local bankruptcy: see
     *Hall v Woolf* (1908) 7 CLR 207, 210–212; *Radich v Bank of New Zealand*
     (1993) 116 ALR 676, 692–695; *In re Ayres, Ex p Evans* (1981) 34 ALR 582,
     589, 591; *Ayres v Evans* (1981) 39 ALR 129, 132; *Galbraith v Grimshaw*
     [1910] AC 508, 510–513; *Dick v McIntosh* [2001] FCA 1008, para 19;
D    [2002] FCA 1135, para 18; *In re Osborn; Ex p Tree* [1931–2] B & CR 189,
     190, 194; *In re Fogarty* [1904] QWN 67 and *In re Greenaway* (1910) 27 WN
     (NSW) 112. The order of Smellie CJ was therefore too wide and the Court of
     Appeal wrong to consider it a legitimate exercise of jurisdiction under
     section 156 of the Bankruptcy Law, on the basis of a "hypothesis of
     jurisdiction" under which the Bahamian bankruptcy was to be treated as a
     Cayman bankruptcy and the second respondent trustee as a Cayman trustee
E    in bankruptcy: see *In re Osborn* [1931–32] B & CR 189 and *Radich v Bank
     of New Zealand* 116 ALR 676, 695. Section 107 of the Cayman Bankruptcy
     Law only applies in relation to transactions effected within a set period of a
     Cayman bankruptcy order, and the only beneficiary of the section is the
     Cayman official identified in the Bankruptcy Law as the trustee in
     bankruptcy.
F        Section 426 of the 1986 Act, though directed towards the same general
     aim as section 122 of the 1914 Act, is drafted in very different terms. Its
     focus is not jurisdiction but law: see *Smart, Cross-Border Insolvency*, p 417.
     The development of the concept of the hypothesis of jurisdiction in relation
     to section 426 in cases such as *Hughes v Hannover Rückversicherungs-AG*
     [1997] 1 BCLC 497; *In re Dallhold Estates (UK) Pty Ltd* [1992] BCLC 621
     and *In re Bank of Credit and Commerce International SA (No 9)* [1994]
G    2 BCLC 636 therefore does not provide the support which the Court of
     Appeal sought to find in them.
         As to the issue of appropriateness or discretion, although the Bahamas
     have an almost identical voidable disposition provision, it is subject to the
     restriction that the transfer is made by a "trader": no such restriction applies
     under the Cayman legislation, which is more favourable to the respondents.
     However, even if section 156 of the Cayman Bankruptcy Law is to be
H    interpreted in the same way as section 426 of the 1986 Act, considerations of
     private international law should still apply. The proper law to be applied to
     the transactions to be avoided is that of the country with the closest and
     most real connection with the transaction: see *Bridge and Stevens, Cross-
     Border Security and Insolvency* (2001), pp 279–281; *Smart, Cross-Border*

*Insolvency,* p 419; *In re Television Trade Rentals Ltd* [2002] BPIR 859, 864    *A*
and *In re Paramount Airways* [1993] Ch 223, 240. [Reference was also
made to *In re Oasis Merchandising Services Ltd* [1995] 2 BCLC 493.]

   *Andrew Popplewell QC* and *Paul Wright* for the respondents. "Courts"
in section 156 refers to foreign courts. The use of the plural in the section in
making provision for one court to respond to another only makes sense if
Grand Court (the sole court exercising bankruptcy jurisdiction in the    *B*
Cayman Islands) can assist courts outside the Cayman Islands. By contrast,
sections 157 and 158 use "court" in the singular to refer only to the Cayman
Grand Court. [Reference was also made to section 135 of the New Zealand
Insolvency Act 1967 and section 29 of the Australian Bankruptcy Act 1966.]

   As to section 122 of the 1914 Act, there was nothing in the Insolvency Act
1985 or the statutory instruments made thereunder which repealed its    *C*
application and effect as an Imperial provision in the Cayman Islands.
[Reference was made to sections 213, 235(3), 236(2) and (5) of and Part IV of
Schedule 10 to the 1985 Act; Commencement Orders No 2 and No 5;
section 426 of the Insolvency Act 1986 and the Co-operation of Insolvency
Courts (Designation of Relevant Countries and Territories) Order 1986 (SI
1986/2123).] Statutes of the Westminster Parliament are not to be regarded
as having effect in overseas territories unless they clearly so provide: see    *D*
*Attorney General for Alberta v Huggard Associates Ltd* [1953] AC 420,
436, 441 and *Bennion, Statutory Interpretation,* 4th ed, (2002), paras 282,
283. The same principle applies to repealing enactments: see *Halsbury's
Laws,* 4th ed (1974), vol 6, paras 1104–1106; 4th ed (1974) (2003 reissue),
vol 6, para 821; *Ukley v Ukley* [1977] VR 121, 124 and *Kelly v Jones* (1852)
7 NBR 473. The logical result of the relevant provisions of the 1985 Act was    *E*
to repeal section 122 so far as it applied to the UK because it was part of a
code that was being replaced, but to leave it intact so far as it applied to
other territories unless and until its replacement was extended to, or some
equivalent provision was made in, those territories. [Reference was made to
*In re Hoe* (1957) 34 HKCU 1; 49 HKCU 1; *In re Tucker* 1987–89 MLR 106
and *In re Tucker (A Bankrupt)* (unreported) 27 September 1988.]

   If neither section 156 of the Cayman Bankruptcy Law nor section 122 of    *F*
the 1914 Act applies, a large hole in the insolvency regime of the Cayman
Islands is opened up, thereby destroying the reciprocity which underlies the
designation of the Cayman Islands as a relevant territory under section 426
of the Insolvency Act 1986. Both Smellie CJ and Henderson J rightly agreed
that the Cayman Court must have inherent jurisdiction to fill that hole and
grant the relief sought: see *In re Globe-X Canadiana Ltd* (unreported)    *G*
28 May 2003. [Reference was also made to *In re First International Bank
of Grenada Ltd* (unreported) 23 January 2002 and *In re Leisurenet Ltd*
(unreported) 26 February 2002.]

   As to section 107 of the Cayman Bankruptcy Law, the courts below
rightly rejected the contention that it only affords remedies to the Cayman
trustee in bankruptcy, not the second respondent trustee. Section 156 of the
Cayman Bankruptcy Law and section 122 of the 1914 Act confer    *H*
jurisdiction to provide assistance on a hypothetical assumption of
jurisdiction, i e, by putting the overseas trustee in a position equivalent to
that of the Cayman trustee under a Cayman bankruptcy, "in regard to
similar matters within their respective jurisdictions". The distinction

A    between creating rights and conferring remedies, derived from *Hall v Woolf*
7 CLR 207, 212 is a false one and has no basis in the wording of section 122.
There is nothing in *Galbraith v Grimshaw* [1910] AC 508; *In re Fogarty*
[1904] QWN 67; *In re Greenaway* 27 WN (NSW) 112; *In re Osborn,
Ex p Tree* [1931–2] B & CR 189, 189; *Radich v Bank of New Zealand* 116
ALR 676, 695, 700; *Dick v McIntosh* [2001] FCA 1008 or *In re Jackson*
[1973] NI 67, 69, 71, 73 to prevent the hypothesis of local jurisdiction
B    applying, just as it does under section 426(5) of the 1986 Act: see *In re
Dallhold Estates (UK) Pty Ltd* [1992] BCLC 621, 626; *Hughes v Hannover
Rückversicherungs-AG* [1997] 1 BCLC 497, 505, 511, 513, 516, 517; *In re
Bank of Credit and Commerce International SA (No 9)* [1994] 2 BCLC 636,
643 and *In re Television Trade Rentals Ltd* [2002] BPIR 859.

C        Section 107 has its origin in English statutes: see section 91 of the 1869
Act; section 47 of the Bankruptcy Act 1883; section 42 of the 1914 Act and
section 339 of the 1986 Act. It does not operate automatically; void means
voidable: see *In re Hart; Ex p Green* [1912] 3 KB 6, 9–10. The trustee must
apply to the court, and the grant of relief is discretionary: see *In re Dent
(A Bankrupt)* [1994] 1 WLR 956, 959–961. The right vested in the trustee is
a contingent one. The property involved in the avoidable transaction must
D    be within the jurisdiction of the receiving court in order for it to render
assistance in the first place. Jurisdiction should not depend on the
happenstance of where the foreign bankruptcy takes place. The purpose of
section 122 is to take that out of the equation. The receiving court should
apply the proper law of the transaction, not of the requesting bankruptcy.
Section 107 does not therefore create rights so much as recognise and give
effect to existing (if contingent) rights created elsewhere. Any other
E    conclusion would deprive sections 156 and 122 of any effect and render
them arbitrary and capricious. They are enabling provisions which permit
an exercise of discretion, and would be otiose if all they permitted was for
the receiving court to exercise a discretion it already possessed. Reliance on
them cannot be categorised as either forum shopping or otherwise
inappropriate in the circumstances.

F        *Dicker QC* replied.

*Cur adv vult*

11 January 2005. The judgment of their Lordships was delivered by
**LORD WALKER OF GESTINGTHORPE**

1    The appellants Barbara Alice Al Sabah and Mishal Roger Al Sabah are
G    the wife and adult son respectively of Sheikh Fahad Mohammed Al Sabah
("the debtor"). The debtor was formerly head of the Kuwait Investment
Authority in London. It embarked on a huge programme of investment in
Spain through a Spanish company named Grupo Torras SA ("GT"). With
the help of co-conspirators the debtor defrauded GT on a very large scale.
The misappropriations were effected by four separate fraudulent schemes
between 1988 and 1990. After a long civil trial in London the debtor was
H    found liable for very large damages (see *Grupo Torras SA v Al Sabah* [1999]
CLC 1469). There have subsequently been various proceedings in different
parts of the world by which GT, and more recently the debtor's Bahamian
trustee in bankruptcy, have sought to recover funds in order to satisfy the
judgment. GT has so far recovered about US$178m from the debtor or

340
Al Sabah v Grupo Torras SA (PC)                                    [2005] 2 AC

A

trusts established by him, but that is only a small part of the total indebtedness.

2    The debtor is now resident in the Bahamas.  On 29 June 2001 he was adjudicated bankrupt under the Bahamian Bankruptcy Act 1870.  The bankruptcy was deemed to have commenced on 6 February 2001.  GT's proof of debt was for a sum of the order of US$80om.  On 30 July 2001 the first meeting of creditors was held and Mr Clifford Culmer, a partner in BDO Mann Judge of Nassau, was appointed as trustee in bankruptcy.

B

3    The debtor is the settlor in respect of two trusts governed by the law of the Cayman Islands.  One is the Comfort Trust, which he established (under the name of the Chester Trust) under Bahamian law on 29 September 1992.  On 30 December 1992 a corporate trustee resident in the Cayman Islands, Bank of Butterfield International (Cayman) Ltd, was appointed as trustee of the trust and on 12 February 1993 the trust's proper law was changed to that of the Cayman Islands, and its name was changed to its present name.  The debtor is the principal beneficiary under this trust and the appellants are also beneficiaries.  The other is the Eaglet Trust, established on 14 February 1992 and governed from its inception by Cayman law.  The trustees are Pictet Trustee SA (a Swiss company) and Pictet Bank and Trust (Cayman) Ltd (a Cayman company).  The appellant Mishal Al Sabah is the principal beneficiary under this trust.

C

D

4    The trustee in bankruptcy's case is that the two trusts own and control, through a network of companies, very valuable assets (the Comfort Trust alone is said to be worth over US$27m) which enable the debtor, despite his bankruptcy, to enjoy a life of luxury.  On 31 August 1995 GT commenced proceedings in the Cayman Islands (cause No 271 of 1995) against the trustee of the Comfort Trust and various companies owned by the trustee, pleading proprietary claims.  The pleadings have been extensively amended and the proceedings are still on foot.  GT has also obtained summary judgment from the Grand Court of the Cayman Islands in effect converting its English money judgment into a Cayman money judgment.  These Cayman proceedings are of no more than background relevance to the claim by the Bahamian trustee in bankruptcy, which is of central importance in this appeal.

E

F

*The letter of request and subsequent proceedings*

5    On 14 February 2002 the trustee in bankruptcy made an ex parte application to the Bahamian Grand Court for an order under section 122 of the Bankruptcy Act 1914 of the United Kingdom (or alternatively under the inherent jurisdiction) requesting aid from the Grand Court of the Cayman Islands.  On 12 March 2002 Lyons J gave a short reasoned judgment (mainly concerned with section 122 of the Bankruptcy Act 1914) and made an ex parte order for a letter of request to be issued seeking assistance under three heads: (i) that Mr Culmer's appointment as trustee in bankruptcy of the property of the debtor should be recognised in the jurisdiction of the Cayman Islands; (ii) that the trustee should be granted "all general law powers and the statutory powers accorded to a trustee in bankruptcy in [the jurisdiction of the Cayman Islands] and in particular . . . the powers under section 107 of the [Cayman] Bankruptcy Law (1997 Revision)"; and (iii) that he should be granted such other powers as the Grand Court of the Cayman Islands thought fit.

G

H

[2005] 2 AC                                    Al Sabah v Grupo Torras SA (PC)

A    6   Section 107 of the Bankruptcy Law (1997 Revision) of the Cayman
Islands provides that any voluntary settlement (an expression which is
widely defined) of property is to be void against the trustee in bankruptcy if
the settlor is made bankrupt (i) within two years after the date of the
settlement or (ii) within ten years after the date of the settlement unless (in
the latter case) the beneficiaries can prove that the settlor was, when he made
the settlement, able to pay all his debts without the aid of the property
B    comprised in the settlement (and that the settled property passed to the
trustee on execution of the settlement).  Although this enactment speaks of
the settlement being "void" it is common ground that this should be
interpreted as "voidable" in accordance with the decision of the English
Court of Appeal in *In re Hart; Ex parte Green* [1912] 3 KB 6.  If the Cayman
trusts are to be set aside under section 107, that can be achieved only by an
C    order of a court of competent jurisdiction, prima facie the Grand Court of
the Cayman Islands.

   7   The Bankruptcy Act 1987 of the Bahamas contains (in section 71)
provisions similar to those of section 107 of the Cayman statute but they are
not identical.  In particular, the power conferred by section 71 of the
Bahamian statute is exercisable only if the bankrupt settlor was (apparently
at the time of the settlement) a trader (within the meaning of a rather old-
D    fashioned statutory definition).  Their Lordships heard no argument as to
whether the debtor was at any time a trader within the meaning of the
Bahamian statute and they express no view on the point.  But it appears to
have been one of the considerations which led the trustee in bankruptcy to
seek a letter of request to the Cayman court.  The other consideration may
have been doubt as to whether the Cayman court would give effect to an
E    order of the Bahamian court setting aside a trust governed by Cayman law.
Their Lordships express no view on that point either; it was mentioned in the
course of the hearing but was not fully argued, and is of no direct relevance
to the outcome of this appeal (its only relevance is that if the doubt is well-
founded, it shows that the Bahamian trustee in bankruptcy, like the Scottish
trustee in bankruptcy in *Galbraith v Grimshaw* [1910] AC 508, 510 may
still "find himself . . . falling between two stools").
F
   8   The Bahamian court's letter of request came before the Grand Court
of the Cayman Islands on 15 March 2002, when Smellie CJ considered it
ex parte.  He made an immediate order (followed by a written judgment
delivered on 27 March 2002) acceding to the letter of request and (in
particular) granting the Bahamian trustee in bankruptcy the powers
conferred by section 107.  The main points in his judgment can be
G    summarised as follows: (i) that section 156 of the Bankruptcy Law (1997
Revision) of the Cayman Islands, and further or alternatively section 122 of
the Bankruptcy Act 1914 of the United Kingdom, authorised the Grand
Court to act on the letter of request; (ii) that the Grand Court should as a
matter of discretion confer the section 107 powers, since any Cayman assets
relevant to the bankruptcy were likely to be held in trust; and (iii) that the
order could in any case be made under the court's inherent jurisdiction.
H
   9   The matter then came before Henderson J inter partes on three days in
September 2002.  Henderson J also had before him an application to join the
trustee in bankruptcy as a co-plaintiff in cause No 271 of 1995.  He reserved
judgment and handed down a written judgment on 8 November 2002.  In
relation to the letter of request Henderson J decided: (i) that the Chief Justice

had rightly exercised jurisdiction (although Henderson J took a rather
different view as to the reasons); (ii) that the order should not be set aside on
grounds of material non-disclosure (this is not an issue in the appeal to the
Board); and (iii) that any further exercise of the Court's discretion should be
postponed until after a full consideration of the evidence.

10    The appellants appealed to the Court of Appeal of the Cayman
Islands and the appeal came before that court (Zacca P, Rowe and
Taylor JJA) in July 2003. On 1 October 2003, the Court of Appeal (in a
reserved judgment of the court delivered by Taylor JA) dismissed the appeal.
The appellants now appeal to Her Majesty in Council with final leave
granted on 5 December 2003. The principal issues in the appeal are as
follows. (i) Was the Court of Appeal correct in its view that the Grand Court
had jurisdiction under section 156 of the Bankruptcy Law (1997 Revision)?
(ii) If not, did the Grand Court have jurisdiction under section 122 of the
Bankruptcy Act 1914 of the United Kingdom (on the basis that it was not
repealed by the Insolvency Act 1985) or under its inherent jurisdiction?
(iii) If the Grand Court had jurisdiction under any of these routes, did it
have power to confer the section 107 powers on a Bahamian trustee in
bankruptcy?

*The legislation*

11    In considering these issues it is necessary to look closely at the terms
and antecedents of a number of statutory provisions, including in particular
section 156 of the Bankruptcy Law (1997 Revision) of the Cayman Islands
and section 122 of the Bankruptcy Act 1914 of the United Kingdom. As the
Court of Appeal recorded, it had had submissions covering enactments
passed in the United Kingdom, Jamaica and the Cayman Islands over a
period of more than 130 years, and the judgments at first instance and in the
Court of Appeal reflect the care with which all the courts below have
approached this difficult task. Their Lordships have also had the benefit of
thorough research and admirable arguments from both sides; the depth of
the research is particularly impressive in view of the severe damage and
disruption which has unfortunately been suffered in the Cayman Islands as a
result of the recent hurricane.

12    Before embarking on the detail of the legislation their Lordships
think it desirable to set out some basic points about legislation in the
imperial context. The earliest statute to which it is necessary to refer is
the Bankruptcy Act 1869 (32 & 33 Vict c 71) of the United Kingdom. In the
middle of the reign of Queen Victoria the British Empire was nearing its
fullest geographical extent (although there was some later expansion,
especially in Africa) and the establishment of local legislatures (dating back
to the 1850s in the case of most states of Australia, to the 18th century in the
case of most of the provinces of Canada, and to the early 17th century in the
case of Bermuda) marked the beginnings of the long progress towards
independent status within the Commonwealth. The enactment of the
Colonial Laws Validity Act 1865 (28 & 29 Vict c 63) ("an Act to remove
doubts as to the validity of colonial laws") reaffirmed the superior power of
the Westminster Parliament but made clear that colonial laws could depart
from any non-statutory rules of common law or equity. The 1865 Act did
not in terms refer to the enactment of laws with extraterritorial effect. But
most colonial legislatures had powers (granted either under the Royal

A    Prerogative, or by the Westminster Parliament) to make laws "for the peace, order and good government" of the territory in question and this implied (but did not clearly define) some territorial restrictions. This gave rise to many difficulties both before and after the 1865 Act: see generally D P O'Connell, "The Doctrine of Colonial Extra-Territorial Legislative Incompetence" (1959) 75 LQR 318. The 1865 Act has of course ceased to apply to independent members of the Commonwealth, the first repeals

B    having been effected by the Statute of Westminster 1931. The balance of law-making authority, as between the Crown and the Westminster Parliament, was regulated (in relation to settled colonies) by the British Settlements Act 1887 (50 & 51 Vict c 54): see generally *Halsbury's Laws of England* 4th ed, (2003 Reissue) Vol 6, paras 821–823.

C    13    During the 19th century the English court was fairly ready to hold that an Act of the Westminster Parliament, especially if concerned with general rules of law, was intended to apply throughout the empire. So in *Callender, Sykes & Co v Colonial Secretary of Lagos* [1891] AC 460, the Board held (at a time when Nigeria had no bankruptcy law of its own) that the general vesting provisions of the Bankruptcy Act 1869 of the United Kingdom (and not merely provisions about reciprocal enforcement) applied in Nigeria. But the Westminster Parliament's supreme legislative

D    competence has in practice been more and more constrained by two factors. One has been an increasingly strong constitutional convention (eventually given statutory force, in relation to the Commonwealth countries to which it applied, by the Statute of Westminster 1931) not to interfere, unasked, in the laws of Commonwealth countries which enjoyed representative government. The other has been the courts' long-standing practice, in

E    construing statutes of the Westminster Parliament, of presuming that their intended territorial extent is limited to the United Kingdom, unless it is clear that a wider extent is intended: see for instance the observations of Lord Russell of Killowen CJ in *R v Jameson* [1896] 2 QB 425, 430. This presumption is of long standing but (with increasingly precise drafting techniques) it appears to have become stronger over the years, and it has become common for an Act of the Westminster Parliament to contain power

F    for all or part of its provisions to be extended to British territories by Order in Council. A detailed commentary on the current position as to the territorial extent of an Act of Parliament can be found in *Bennion, Statutory Interpretation*, 4th ed (2002), at pp 275–305.

G    14    At the time of the enactment of the United Kingdom Bankruptcy Act 1869 the Bahamas were a British colony acquired by settlement; Jamaica was a British colony acquired by conquest; and the Cayman Islands were a British colony acquired by settlement but governed (under the Cayman Islands Act 1863 (26 & 27 Vict c 31) of the Westminster Parliament) as a dependency of Jamaica. The Bahamas became fully independent in 1973; Jamaica became fully independent in 1962; and the Cayman Islands are still a British colony, now officially termed a British overseas territory. Before the

H    1863 Act the Cayman Islanders had magistrates and a parish meeting which exercised limited law-making powers. The effect of the 1863 Act was to confirm the existing arrangements so far as they went, but the islanders' institutions became subject to the jurisdiction of the Governor, legislature and Supreme Court of Jamaica. The law of Jamaica was in general to apply to the Cayman Islands. That state of dependency continued until 1959. It is

344

Al Sabah v Grupo Torras SA (PC)                              [2005] 2 AC

of central importance to the first issue, that is the construction of section 156    A
of the Cayman Bankruptcy Law.

   15   The Bankruptcy Act 1869 of the United Kingdom provided
principally for bankruptcies in England.  The Scottish law of bankruptcy
developed on very different lines and had its own statutes enacted by the
Westminster Parliament (see generally Professor McBryde's work on
[Scottish] *Bankruptcy*, 2nd ed (1995), at pp 2–4).  Ireland also had its own    B
statutes enacted at Westminster.  Nevertheless the 1869 Act had some
extraterritorial effect, as already noted.  In particular, sections 73 to 77
contained provisions which provided in different ways for mutual
recognition and assistance in respect of bankruptcy proceedings in other
parts of the United Kingdom and throughout the British Empire.  Section 74
is the most important for present purposes.  It was re-enacted (with a small
change of language to which neither side attached importance) as section 118    C
of the Bankruptcy Act 1883 (46 & 47 Vict c 52) and again re-enacted
(without any change) in section 122 of the Bankruptcy Act 1914.
Section 122 is in the following terms:

    "The High Court, the county courts, the courts having jurisdiction in
bankruptcy in Scotland and Ireland, and every British court elsewhere
having jurisdiction in bankruptcy or insolvency, and the officers of those    D
courts respectively, shall severally act in aid of and be auxiliary to each
other in all matters of bankruptcy, and an order of the court seeking aid,
with a request to another of the said courts, shall be deemed sufficient to
enable the latter court to exercise, in regard to the matters directed by the
order, such jurisdiction as either the court which made the request or the
court to which the request is made, could exercise in regard to similar    E
matters within their respective jurisdictions."

   16   The principal bankruptcy statute in force in the Bahamas is the
Bankruptcy Act 1870 (33 Vict c 13).  It did not contain any power
comparable to section 74 of the United Kingdom Bankruptcy Act 1869 (the
antecedent of section 122).  But when he ordered the despatch of a letter of
request, Lyons J was satisfied that section 122 applied in the Bahamas,    F
having been specially mentioned in a Bahamian enactment (after the
Bahamas became fully independent in 1973) entitled "Acts of the United
Kingdom Parliament applying in or affecting the Bahamas otherwise than by
virtue of an enactment of the Legislature of the Bahamas".  The correctness
of that conclusion is not an issue in this appeal.

   17   The legislative history in Jamaica and the Cayman Islands is more
complicated.  The Jamaican Bankruptcy Law 1871 (Law 25 of 1871) did    G
contain, in section 64, provisions similar but by no means identical to those
of section 74 of the Bankruptcy Act 1869.  Section 64 was in the following
terms:

    "All the courts in bankruptcy, and the officers of such courts, shall act
in aid of and shall be auxiliary to each other in all matters of bankruptcy,
and any order of any one court in a proceeding in bankruptcy may, on    H
application to another court, be made an order of such other court, and
may be carried into effect accordingly: And an order of any court in
bankruptcy seeking aid, together with a request to another of the said
courts, shall be deemed sufficient to enable the latter court to exercise, in

[2005] 2 AC                                    Al Sabah v Grupo Torras SA (PC)

A    regard to the matters directed by such order, the like jurisdiction which
     the court which made the request, as well as the court to which the
     request is made, could exercise in regard to similar matters within their
     respective jurisdictions."

     These provisions do not in terms have any extraterritorial effect.
     Bankruptcy law was administered in Jamaica by several district courts
B    whose jurisdiction was based on the residence or place of business of the
     debtor, with an appeal to the Supreme Court (see sections 60 and 62 of the
     1871 Act).  The Grand Court of the Cayman Islands did not have any
     jurisdiction in bankruptcy until the enactment (as a Jamaican statute) of
     the Cayman Islands Administration of Justice Law 1894 (c 18).  Section 40
     of that law provided:

C        "The Grand Court shall have and exercise all the jurisdiction and
     powers in bankruptcy now vested in the Chief Court of Bankruptcy of
     Jamaica, save and except the jurisdiction now vested in the Supreme
     Court of Judicature of Jamaica as the Chief Court of Bankruptcy sitting
     as a Court of Appeal, but any such appeal shall lie to the full Court of the
     Supreme Court of Judicature of Jamaica, and all the bankruptcy laws and
D    rules now in force in Jamaica shall extend and apply to the Cayman
     Islands and to the said Grand Court."

     The reference to the Chief Court of Bankruptcy of Jamaica is explained by
     changes made by sections 3 to 11 of the Jamaican Bankruptcy Law 1880
     (c 32), which established the High Court of Justice as the Chief Court of
     Bankruptcy, and gave limited jurisdiction (where the estate of the debtor was
E    worth less than £200) to the resident magistrates' courts, with an appeal (in
     either case) to the Court of Appeal.

         18   So after 1894 section 64 of the Jamaican Bankruptcy Law 1871 (by
     then re-enacted as section 161 of the Jamaican Bankruptcy Law 1880) still
     made sense, with a very limited degree of extraterritorial effect as between
     the Grand Court of the Cayman Islands and the various Jamaican courts
     with original jurisdiction in bankruptcy (the Court of Appeal of Jamaica
F    having jurisdiction to hear appeals from all of them).  These statutory
     provisions remained in force throughout the first half of the 20th
     century.  The Cayman Islands were still a dependency of Jamaica at the
     inception of the short-lived British Caribbean Federation.  But the Cayman
     Islands and Turks and Caicos Islands Act 1958 repealed the Cayman Islands
     Act 1863 and provided for the Cayman Islands to have a new constitution,
G    granted by the Cayman Islands (Constitution) Order in Council 1959
     (SI 1959/863).  This provided for the Governor of Jamaica to be ex-officio
     the Governor of the Cayman Islands, with limited legislative powers
     conferred concurrently on the Governor with the advice and consent of the
     Cayman Legislative Assembly (on the one hand) and the legislature of
     Jamaica (on the other hand), with power being reserved to Her Majesty in
     Council to amend or vary the Order in Council.

H        19   The 1959 Order in Council was revoked by the Cayman Islands
     (Constitution) Order in Council 1962 (SI 1962/1646), which was intended
     to take effect on 6 August 1962, simultaneously with Jamaica's attainment
     of full independence under the Jamaica Independence Act 1962.  The 1962
     Order in Council was inadvertently not laid before Parliament and was

346
Al Sabah v Grupo Torras SA (PC)                                        [2005] 2 AC

brought into force retrospectively by the Cayman Islands (Constitution)      *A*
Order 1965 (SI 1965/1860). The present constitution was brought into
force by the Cayman Islands (Constitution) Order 1972 (SI 1972/1101).
Both the 1962 and the 1972 Constitutions conferred law-making power "for
the peace, order and good government of the Islands" on the Administrator
(later the Governor) with the advice and consent of the Legislative Assembly,
with power reserved to Her Majesty in Council.

20   That completes the relevant constitutional history. But it is      *B*
necessary to go back a little in time to the enactment of the Cayman
Bankruptcy Law 1964. The general effect of the various constitutional
instruments was to maintain existing laws in force in the Cayman Islands,
subject to any necessary modifications. But with Jamaica's independence it
was appropriate for the Cayman Islands to have their own body of statute
law. That was the purpose of the Revised Edition (Laws of the Cayman      *C*
Islands) Law 1960 (a Cayman enactment). It provided (in section 3) for the
Governor to appoint commissioners to prepare a revised edition of the laws
of the Cayman Islands and (in section 8) a Table of the Acts and Laws in
force on 31 December 1963. The commissioners had power (in section 4) to
make a variety of formal or verbal changes (no doubt in the interests of
clarity, simplicity, uniformity and accuracy) but section 6 provided:      *D*

"(1) The powers conferred upon the commissioners by section 4 of this
Law shall not be taken to imply any power in them to make any alteration
or amendment in the matter or substance of any Act or Law or part
thereof.

"(2) In every case where any such alteration or amendment is, in the      *E*
opinion of the commissioners, desirable, the commissioners shall draft a
Bill setting forth such alterations and amendments and authorising them
to be made in the revised edition, and every such Bill shall, subject to the
sanction of the Governor, be submitted to the Legislative Assembly and
dealt with in the ordinary way."

Several amendments to the Jamaican Bankruptcy Law 1880 were made by      *F*
the enactment of the Statute Law Revision (Amendments) Law 1963 which
was passed by the Cayman Legislative Assembly (apparently under section 6
(2) of the 1960 Law) but no amendment of section 161 was made by those
means. Such textual alterations as were made must have been made under
the limited powers conferred by section 4 of the 1960 Law.

21   The commissioners' labours did in due course produce three volumes
of statutes entitled "The Laws of the Cayman Islands 1963", with the
Bankruptcy Law as chapter 7. It is still in force, with some amendments not      *G*
material to this appeal, as the Bankruptcy Law (1997 Revision). There has
never been any change to section 156 which (with the side note
"Enforcement of warrants and orders of courts") is in the following terms:

"All the courts in bankruptcy and the officers of such courts, shall act
in aid of and be auxiliary to each other in all matters of bankruptcy and
any order of any one court in a proceeding in bankruptcy may, on      *H*
application to another court, be made an order of such other court, and
be carried into effect accordingly. An order of any court in bankruptcy
seeking aid, together with a request to another of the said courts, shall be
deemed sufficient to enable the latter court to exercise in regard to the

A    matters directed by such order, the like jurisdiction which the court which made the request, as well as the court to which the request is made, could exercise in regard to similar matters within their respective jurisdictions."

22   It will be apparent that most of the language of the section, like that of section 161 of the Jamaican Bankruptcy Law 1880, is close to that of section 122 of the Bankruptcy Act 1914 of the United Kingdom.   But
B    whereas the United Kingdom statute applied to all British courts, the only extraterritorial operation of the Jamaican statute was very limited (and constitutionally unexceptionable), that is to the Cayman Islands as Jamaica's dependency.   Under section 156 of the Cayman statute it is very hard to see what effect (extraterritorial or otherwise) could sensibly have been intended, since the Cayman Islands had only one court with bankruptcy jurisdiction, and its Governor and Legislative Assembly had (at
C    best) very limited power to legislate with extraterritorial effect.

*The first issue: section 156*

23   So their Lordships come to the first issue, the meaning of "all the courts in bankruptcy" at the beginning of section 156.   It is, once the
D    background has been explained, a short point of statutory construction. The Court of Appeal noted four possible interpretations: (i) all United Kingdom and British courts (the view of the Chief Justice); (ii) all bankruptcy courts worldwide (the view of Henderson J); (iii) all bankruptcy courts in the Cayman Islands (of which there was only one, so that the provision would have no present application at all); and (iv) Cayman and Jamaican bankruptcy courts (a view which neither side put forward in the
E    Court of Appeal, and which the Court of Appeal regarded as untenable).

24   The Court of Appeal preferred the view of the Chief Justice.   The court was reluctant to find that section 156 had no coherent present meaning, and was directed simply to the possibility of there being more than one Cayman court with bankruptcy jurisdiction at some time in the future (a possibility which would in any event have called for primary legislation).
F    The court attached little weight to the argument that the Governor and the Legislative Assembly had no general power of extraterritorial legislation by treating section 156 as a sort of declaratory repetition or re-enactment of section 122 of the Bankruptcy Act 1914 so as to provide a complete bankruptcy code for the Islands:

"We believe the proper view to be that a correct statement of prevailing
G    law contained in an enactment will fall within the competence of the enacting body notwithstanding that such body does not itself have authority to make or change the law so stated—that such a practice is constitutionally unobjectionable, whether in state or provincial legislation, municipal by-laws, rules and regulations of administrative tribunals or other branches of government or by-laws or articles of a body corporate created under statutory authority."
H
The court also relied (as did the respondents before the Board) on the contrast in language between "courts" in section 156 (and its Jamaican antecedents) and the singular "court" (defined as the Chief Court in Bankruptcy) in sections 157 and 158 (and their Jamaican antecedents).

25   Their Lordships readily understand why the Court of Appeal was anxious to interpret section 156, if possible, in a way that gives it a sensible present effect.  But for the legislative history as summarised above the Court of Appeal's interpretation might have been possible, although to treat section 156 simply as a declaratory repetition of the United Kingdom provision would involve some remoulding of the statutory language.  The section would have to be read as conferring on the Grand Court authority to send letters of request to United Kingdom courts and other British courts, and as placing it under a duty to respond to letters of request from such courts, while leaving the powers and duties of the other courts to be conferred or imposed by other legislation enacted in the United Kingdom or elsewhere in the Commonwealth.

26   But in their Lordships' view the history of the Jamaican legislation, and the way in which it has been transposed into Cayman legislation, make such an interpretation impossible.  When the transposition took place the state of Jamaican law was that for nearly a century section 64 of the Bankruptcy Law 1871, and then section 161 of the Bankruptcy Law 1880, had provided a system of co-operation in bankruptcy matters which made sense in the domestic context of Jamaica.  Section 122 of the Bankruptcy Act 1914 and its antecedents provided for mutual assistance between the Jamaican courts and the British courts.  It is inconceivable that the commissioners appointed under the Revised Edition (Laws of the Cayman Islands) Law 1960 (who seem, from the contents of the Statute Law Revision (Amendments) Law 1963, to have been scrupulous about what might be regarded as amendments of substance) should have intended to make a significant change of substance without invoking the procedure in section 6 (2) of the 1960 Law.  This aspect of the matter does not seem to have been raised in the Court of Appeal, which seems to have thought that the amendment to section 161 was included in the 1963 amending statute.

27   Their Lordships must therefore conclude that the commissioners cannot have understood the effect of this part of the Jamaican legislation.  Had they done so they would have realised that there was no way in which it needed to be, or could sensibly be, transposed into a legal system under which there was only one bankruptcy court.  Section 156 has no practical present effect in the Cayman Islands.  Therefore the appellants succeed on the first issue.

*The second issue: repeal of section 122*

28   This issue is also an issue of statutory construction, the relevant statute being the Insolvency Act 1985 of the United Kingdom.  The question is whether that Act repealed section 122 in its entirety, and across the whole range of its extent, or repealed it in relation to the United Kingdom but left it in force in relation to the Channel Islands, the Isle of Man, and all other parts of Her Majesty's Dominions (including fully independent Commonwealth countries) in which it was still in force.  Although this too is in the end a short point of construction it is by no means an easy one.  Counsel on both sides put forward some elaborate arguments representing the fruits of painstaking research.  But the only sure conclusions that their Lordships can draw are that the drafting techniques of successive generations of parliamentary counsel have not been wholly uniform, and the reasons for variations in their techniques are often obscure.

[2005] 2 AC                                        Al Sabah v Grupo Torras SA (PC)

A    29    The relevant provisions of the 1985 Act are as follows.

   (i) Section 213 provided for mutual assistance between courts within different parts of the United Kingdom, and between its courts and those of a "relevant country or territory". It was the predecessor of section 426 of the Insolvency Act 1986, which is discussed below as part of the third issue.

   (ii) Section 235(3): "The enactments mentioned in Schedule 10 to this Act are hereby repealed to the extent specified in the third column of that
B    Schedule."

   (iii) Section 236(2):

      "This Act shall come into force on such day as the Secretary of State may, by order made by statutory instrument, appoint; and different days may be so appointed for different purposes and for different provisions."

C    (iv) Section 236(3) provided that certain provisions of the Act do not extend to Scotland. Subsection (4) provided that with certain exceptions (including section 235 and the relevant parts of Schedule 10, Part IV) the Act does not extend to Northern Ireland.

   (v) Section 236(5):

      "Her Majesty may, by Order in Council, direct that such of the
D    provisions of this Act as are specified in the Order shall extend to any of the Channel Islands or any colony with such modifications as may be so specified."

   (vi) Schedule 10, Part III (Bankruptcy repeals) included the following:

| | | |
|---|---|---|
E | 4 & 5 Geo 5, c 59 | The Bankruptcy Act 1914 | The whole Act, except sections 121 to 123. |

   (vii) Schedule 10, Part IV (Other repeals) included the following:

| | | |
|---|---|---|
| 4 & 5 Geo 5, c 59 | The Bankruptcy Act 1914 | Sections 121 to 123. |

F    30    The Secretary of State made two relevant commencement orders on 6 February 1986 and 10 November 1986 respectively. The Insolvency Act 1985 (Commencement No 2) Order 1986 (SI 1986/185) provided for the coming into force on 1 April 1986 of most of the provisions of section 213 and of Schedule 10 "except insofar as it relates to courts in the United Kingdom acting in aid of and being auxiliary to British courts elsewhere".
G    The Insolvency Act 1985 (Commencement No 5) Order (SI 1986/1924) provided for the coming into force on 29 December 1986 (with a very few immaterial exceptions) of all the remaining provisions of the 1985 Act.

   31    No Order in Council was made under section 236(5) extending any provision of the Insolvency Act 1985 to the Cayman Islands, nor has any such Order ever been made under section 442 of the Insolvency Act 1986 (which replaced section 236(5)). In particular, there has been no such
H    extension of the repeal of section 122. The respondents rely on this simple point as their key argument. The appellants say that no extension of the repeal was necessary, since section 122 was repealed outright by the Insolvency Act 1985 itself. They contend that the presumption against extraterritorial operation of a United Kingdom statute does not apply (at

any rate with the same force) to a repeal.  They point to other statutes
(especially Statute Law Revision Acts and Statute Law (Repeals) Acts
ranging from 1867 to 1995) in which clear words of exception were used—
for instance, in section 2(3) of the Statute Law (Repeals) Act 1995:

> "this Act does not repeal any enactment so far as the enactment forms
> part of the law of a country outside the United Kingdom; but Her Majesty
> may by Order in Council provide that the repeal by this Act of any
> enactment specified in the Order shall on a date so specified extend to any
> of the Channel Islands or any colony."

They point to the Insolvency Act 1986 (Guernsey) Order 1989 (SI
1989/2409), by which section 426 of the Insolvency Act 1986 was extended
to Guernsey.  This Order in Council did not include any express repeal of
section 122.  Similarly, Jersey and the Isle of Man have enacted their own
provisions for mutual assistance (in article 48 of the Bankruptcy (Desastre)
(Jersey) Law 1990 and section 1 of the Manx Bankruptcy Act 1988
respectively) without any express repeal of section 122.

32    The Court of Appeal did not find it necessary to reach a definite
conclusion on this point, although it appears to have been inclined towards
the view that section 122 had not been repealed in relation to the Cayman
Islands.  This inclination seems to have been based partly on the decision of
the Full Court of the Supreme Court of Victoria in *Ukley v Ukley* [1977]
VR 121, 124–125, which attached great weight to the power to extend the
relevant statute (the Evidence (Proceedings in other Jurisdictions) Act 1975)
by Order in Council (although not to Victoria) and concluded, at p 131, after
a full discussion of the authorities, that there is "no sufficient reason for
distinguishing between a statute which repeals an earlier statute and one
which amends it".  Mr Dicker, for the appellants, sought to distinguish this
case because Victoria, unlike the Cayman Islands, had full self-government
at the time when the 1975 Act was passed.  Mr Popplewell, for the
respondents, was right in commenting that the position of the Cayman
Islands is really an a fortiori case.

33    It is surprising that there should be any room for doubt as to whether
an important provision of primary legislation has or has not been fully
repealed by a modern statute which appears to have been drafted skilfully
and with close attention to detail.  It is particularly noteworthy that in
section 236(4) the draftsman has painstakingly excepted certain repeals (all
affecting Ireland) from the general provision that the Act does not extend to
Northern Ireland.

34    After carefully considering all the competing arguments their
Lordships have come to the conclusion that the Insolvency Act 1985 did not
repeal section 122 in its application outside the United Kingdom.
Section 236(4) (the provision about Irish repeals) and section 236(5) (the
power for Her Majesty by Order in Council to extend any of the provisions
of the Act to certain territories outside the United Kingdom) strongly
support the natural reading of section 235(3) and Schedule 10.  The only
possible drafting defect was that parliamentary counsel omitted
(presumably as unnecessary) precautionary formulae (such as that used in
the 1995 Act mentioned in para 31 above) which have been used from time
to time, both before and since the 1985 Act, by other parliamentary counsel.
That carries little weight as against the matters just mentioned.  Nor can

[2005] 2 AC                                        Al Sabah v Grupo Torras SA (PC)

A   much weight be attached to the fact that there may have been an oversight
    (or a deliberate reliance on implied repeal) in subsequent instruments
    affecting the Channel Islands and the Isle of Man.  Therefore the respondents
    succeed on the second issue.

        35   The respondents relied in the alternative, on the second issue, on the
    inherent jurisdiction of the Grand Court.  This point was not much
    developed in argument and their Lordships can deal with it quite shortly.  If
B   the Grand Court had no statutory jurisdiction to act in aid of a foreign
    bankruptcy it might have had some limited inherent power to do so.  But it
    cannot have had inherent jurisdiction to exercise the extraordinary powers
    conferred by section 107 of its Bankruptcy Law in circumstances not falling
    within the terms of that section.  The non-statutory principles on which
    British courts have recognised foreign bankruptcy jurisdiction are more
C   limited in their scope (see *Dicey & Morris, Conflict of Laws*, 13th ed (2000),
    vol 2, pp 1181–2, 1186–3) and the inherent jurisdiction of the Grand Court
    cannot be wider.

    *The third issue: section 107*

        36   The conclusion that section 122 of the Bankruptcy Act 1914 remains
D   in force in the Cayman Islands leads to the third issue, that is the nature and
    width of the jurisdiction that it confers on the Grand Court.  In particular,
    does it authorise the Grand Court to exercise in favour of the Bahamian
    trustee in bankruptcy a special statutory power which might not be available
    to him (because of the "trader" requirement) if the trusts in question were
    governed by Bahamian law and the trustees were resident in the Bahamas
    and facing proceedings in the Bahamian court?

E       37   Mr Popplewell has urged the Board to give an affirmative answer to
    that question.  He has pointed to the alternatives spelled out in the latter part
    of section 122: "such jurisdiction as either the court which made the request,
    or the court to which the request is made, could exercise in regard to similar
    matters within their respective jurisdictions."  He has submitted that this
    equates the receipt and acceptance of a letter of request with a hypothetical
    bankruptcy in the receiving territory, with consequences described as
F   follows by Chadwick J in *In re Dallhold Estates (UK) Pty Ltd* [1992]
    BCLC 621, 626, a case on section 426 of the Insolvency Act 1986:

            "The scheme of subsection (5) appears to me to be this.  The first step is
        to identify the matters specified in the request.  Secondly, the domestic
        court should ask itself what would be the relevant insolvency law
        applicable by the domestic court to comparable matters falling within its
G       jurisdiction.  Thirdly, it should then apply that insolvency law to the
        matters specified in the request, notwithstanding that on this hypothesis,
        those are matters which would not, or might not, otherwise fall within its
        jurisdiction by reason of some foreign element."

    Rattee J agreed with that passage in *In re Bank of Credit and Commerce
    International SA (No 9)* [1994] 2 BCLC 636, 655, and both decisions were
H   referred to with approval by the Court of Appeal in *Hughes v Hannover
    Rückversicherungs-AG* [1997] 1 BCLC 497, 511–515.

        38   To this Mr Dicker replied that these are all recent authorities on
    section 426 of the Insolvency Act 1986, which is in different and wider terms
    than section 122, and that the Court of Appeal was in error in treating them

as having any relevance to section 122.  It is therefore appropriate to set out the relevant provisions of section 426:

"(4) The courts having jurisdiction in relation to insolvency law in any part of the United Kingdom shall assist the courts having the corresponding jurisdiction in any other part of the United Kingdom or any relevant country or territory.

"(5) For the purposes of subsection (4) a request made to a court in any part of the United Kingdom by a court in any other part of the United Kingdom or in a relevant country or territory is authority for the court to which the request is made to apply, in relation to any matters specified in the request, the insolvency law which is applicable by either court in relation to comparable matters falling within its jurisdiction.  In exercising its discretion under this subsection, a court shall have regard in particular to the rules of private international law."

Subsection (10) contains a wide definition of "insolvency law". Subsection (11) defines "relevant country or territory" as any of the Channel Islands, the Isle of Man, and any country or territory which the Secretary of State designates by statutory instrument.

39  Mr Dicker submitted that section 122 (like its statutory predecessors, but unlike section 426) conferred an essentially auxiliary jurisdiction, which granted new remedies but did not create new rights. The High Court of Australia said as much (in relation to section 118 of the Bankruptcy Act 1883 of the United Kingdom) in *Hall v Woolf* (1908) 7 CLR 207, 212.  Moreover in *Galbraith v Grimshaw* [1910] AC 508, 511–512 Lord Macnaghten said:

"It may have been intended by the legislature that bankruptcy in one part of the United Kingdom should produce the same consequences throughout the whole kingdom.  But the legislature has not said so. The Act does not say that a Scotch sequestration shall have effect in England as if it were an English bankruptcy of the same date.  It only says that the courts of the different parts of the United Kingdom shall severally act in aid of and be auxiliary to each other in all matters of bankruptcy.  The English court, no doubt, is bound to carry out the orders of the Scottish court, but in the absence of special enactment the Scottish court can only claim the free assets of the bankrupt.  It has no right to interfere with any process of an English court pending at the time of the Scotch sequestration."

40  *Galbraith v Grimshaw* was primarily concerned with section 117 of the Bankruptcy Act 1883.  What the House of Lords actually decided was that where a Scottish sequestration (that is, bankruptcy) occurred about a fortnight after an English garnishee order nisi, the judgment creditor prevailed over the trustee in bankruptcy, although the result would have been different if both the attachment and the bankruptcy had occurred in the same jurisdiction (whether England or Scotland).  The attachment in England had not been completed, but the fact that it had started meant that the garnished debt was no longer "free assets" of the bankrupt.  But in referring to the court's auxiliary function Lord Macnaghten must have had in mind section 118.

[2005] 2 AC                                    Al Sabah v Grupo Torras SA (PC)

A    41    The general tenor of his opinion is adverse to the notion of a
hypothetical bankruptcy in the receiving territory, as the operation of
section 426 has been described in the recent authorities already mentioned.
In *The Law of Insolvency*, 3rd ed (2002), at p 773, Professor Ian Fletcher has
criticised *Galbraith v Grimshaw* as a

B        "somewhat unsophisticated, if not disingenuous, decision, which
        purports to disallow any possibility that the rules of law in force in one
        jurisdiction may enjoy effect elsewhere by virtue of rules of private
        international law in force in the other countries concerned",

and he suggests that it is overdue for reconsideration.  The decision has also
been described as "unfortunate" in *Anton, Private International Law*, 2nd ed
(1990), at p 734.

C    42    Section 122 was given a cautious interpretation by Farwell J in *In re
Osborn; Ex p Tree* [1931–32] B & CR 189, a case in which an Isle of Man
trustee in bankruptcy was seeking the assistance of the English court in
relation to the bankrupt's immovable property in England.  *In re Osborn* is
one of very few reported English cases on the operation of section 122.  It
has since been cited in many overseas cases in relation to the degree of
D    discretion which the receiving court has in applying the apparently
mandatory terms of section 122 (or comparable overseas enactments).
Another of the rare English cases on section 122 is *In re A Debtor (Order
in Aid No 1 of 1979), Ex p Viscount of the Royal Court of Jersey* [1981]
Ch 384, 399, 400 in which Goulding J (after noting the striking differences
between insolvency laws in England and Jersey) said:

E        "The word 'bankruptcy' in section 122, if indeed it refers at all to
        *process* of bankruptcy, must, in my judgment, be construed in a wide
        sense, for the section is designed to produce co-operation between courts
        acting under different systems of law, and it would be much restricted if
        extended only to jurisdictions which reproduce all the main features of
        English procedure.  Dodd J took much the same view of a similar
        provision in the Bankruptcy (Ireland) Amendment Act 1872: see *In re
F        Bolton* [1920] 2 IR 324, 327."

    43    In addition to *Hall v Woolf* 7 CLR 207 and *Ukley v Ukley* [1977]
VR 121 their Lordships were referred to a number of other Australian
authorities, the most important of which are *In re Ayres; Ex p Evans* (1981)
34 ALR 582 and on appeal *Ayres v Evans* (1981) 39 ALR 129; and *Radich v
Bank of New Zealand* (1993) 116 ALR 676.  These cases are of limited
G    assistance since they are concerned with section 29 of the Bankruptcy Act
1966 of the Commonwealth of Australia, which although similar in its
general scope to both section 122 and section 426, is not in identical terms to
either.  The key provisions of section 29 are in subsections (2) and (3):

H        "(2) In all matters of bankruptcy, the court: (a) shall act in aid of and be
        auxiliary to the courts of the external territories, and of prescribed
        countries, that have jurisdiction in bankruptcy; and (b) may act in aid of
        and be auxiliary to the courts of other countries that have jurisdiction in
        bankruptcy.
        "(3) Where a letter of request from a court of an external territory, or
        of a country other than Australia, requesting aid in a matter of

354
Al Sabah v Grupo Torras SA (PC)                                      [2005] 2 AC

bankruptcy is filed in the court, the court may exercise such powers with
respect to the matter as it could exercise if the matter had arisen within its
own jurisdiction."

In *In re Ayres* the Federal Court of Australia was largely concerned with the
aspect of indirect enforcement of the revenue laws of a foreign country (the
New Zealand Inland Revenue Department was a major creditor of the
bankrupt). There are passing references to the judgments in *Hall v Woolf*
and *Galbraith v Grimshaw* but the main issue was as to the mandatory
nature of the court's response to a letter of request.

44   *Radich's* case 116 ALR 676 was concerned with whether a debtor,
already bankrupt in New Zealand, should be made subject to a further
sequestration order in Australia. It was held on appeal that the Australian
court had erred in exercising its discretion to bring about a second
bankruptcy. The Federal Court was critical of *Hall v Woolf*, Einfeld J,
at p 683, saying that it had produced a "virtual nonsense" and Drummond J,
at p 692, referring to "unsatisfactory aspects of the reasoning" in it. But all
three Justices regarded it as a decision on unusual facts (involving a change
of domicile in the course of the bankruptcy). Drummond J said of
section 29(3), at p 695:

"The jurisdiction the Australian court has under section 29(3) is a wide
one . . . The Australian court is not limited in providing assistance to a
foreign court to cases in which the Australian and the foreign court have
powers that mirror each other. If there is a 'matter of bankruptcy' within
section 29(3) before the foreign court, the Australian court, in response
to a request for aid, can exercise any of the powers it has under the
Bankruptcy Act 1966 if that same matter had arisen in Australia, being
powers the exercise of which will provide assistance to the foreign court
in the circumstances of the particular case."

So here the Federal Court saw section 29(3) as importing a hypothetical
bankruptcy in the receiving state.

45   Their Lordships see some force in the criticisms which have been
made of *Hall v Woolf* 7 CLR 207 and *Galbraith v Grimshaw* [1910]
AC 508. The distinction between "rights" and "remedies" is not, in the
context of auxiliary jurisdiction in bankruptcy, marked by a bright line
(though their Lordships cannot accept Mr Popplewell's submission that
even the debtor himself, before his bankruptcy, had some inchoate right to
have his own trusts set aside). Section 122 is expressed in terms of
exercising jurisdiction; section 29(3) is expressed in terms of exercising
powers; section 426(5) is expressed in terms of applying insolvency law.
That is not in their Lordships' view a sound basis for concluding that
section 426 has conferred different and wider powers on the court which
receives a letter of request. The Court of Appeal in *Hughes v Hannover
Rückversicherungs-AG* [1997] 1 BCLC 497, 515 did not take that view.
Moreover there is nothing in the report of the Cork Committee on
Insolvency Law and Practice (1982) (Cmnd 8558) to suggest that
section 426 was intended to make a large extension in the court's auxiliary
jurisdiction in bankruptcy otherwise than in a geographical sense (that is, by
extending its scope to any "relevant country or territory"): see Chapter 49,
especially paras 1909–1913.

[2005] 2 AC                                       Al Sabah v Grupo Torras SA (PC)

A    **46**  For these reasons their Lordships conclude, despite Mr Dicker's skilful submissions in support of the appeal, that the jurisdiction conferred by section 122 is, in the Cayman Islands and the other territories in which it remains in force, essentially as wide as that conferred by section 426. Therefore the respondents succeed on the third issue.

**47**  In reaching this conclusion their Lordships have not overlooked the express provision in section 426(5) requiring the court to have regard to the rules of private international law.  If asked to exercise its powers under

B    section 426 the English court may find it necessary to consider whether the requesting court has properly exercised jurisdiction over a debtor with no obvious connection with its territory, and it might also, in some circumstances, have to take account of the general principle against enforcement of the public laws of another country.  But that was true of section 122 also: see the judgment of the Court of Appeal of Guernsey in

C    *In re Tucker (A Bankrupt)* (unreported) 27 September 1988. Considerations of private international law may be material in subsequent proceedings which the Bahamian trustee in bankruptcy takes in the Grand Court.  But their Lordships have no reason to suspect that there will be any real doubt about the debtor's sufficient connection with the Bahamas, where he is permanently resident.  Moreover the larger of the trusts in question, the

D    Comfort Trust, was originally governed by Bahamian law, and the switch to the Cayman Islands seems to have taken place when the English proceedings against the debtor were already imminent.  Their Lordships have no criticism of the observations made by the Court of Appeal as to the Grand Court's eventual exercise of discretion in this matter.

**48**  Their Lordships will therefore humbly advise Her Majesty that this appeal should be dismissed with costs.

E
*Solicitors: Alan Taylor & Co; Baker & McKenzie.*

P M M

F    _____

G

H

# TAB 9

**Arnold v. Britton and others**

On appeal from: [2013] EWCA Civ 902

SC

10 June 2015

**[2015] UKSC 36**

**2015 WL 3555408**

before Lord Neuberger , President Lord Sumption
Lord Carnwath Lord Hughes Lord Hodge
Judgment Given On 10 June 2015

**Analysis**

Heard on 26 January 2015

**Representation**

•Appellants Timothy Morshead QC Rawdon Crozier
(Instructed by Fursdon Knapper Solicitors).
•Respondent Michael Daiches (Instructed by
Morgan la Roche Solicitors).

**Judgment**

Lord Neuberger: (With whom Lord Sumption and Lord
Hughes agree)

1  This appeal concerns the interpretation of service
charge contribution provisions in the leases of a number
of chalets in a caravan park in South Wales.

**The facts**

2  The facts may be summarised as follows (although
they are more fully set out by Lord Carnwath in paras
81 to 103).

3  Oxwich Leisure Park is on the Gower Peninsular, and
contains 91 chalets, each of which is let on very similar
terms. The five leases which we have seen were granted
between 1978 and 1991, either for a premium (of less

than £20,000) or in return for the lessee constructing
the chalet. Each of the 91 chalets was let on a lease
which was for a term of 99 years from 25 December
1974 and reserved a rent of £10 per annum increasing
by £5 for each subsequent period of 21 years. Para (2)
of the recital of each lease contains the statement that
the chalets on the Leisure Park were intended to be
subject to leases "upon terms similar in all respects to
the present demise."

4  Clause 3 of each lease contains various covenants by
the lessee, and it is introduced by the words:

> "The lessee hereby covenants with
> the lessor and with and for the
> benefit of the owners and lessees
> from time to time during the
> currency of the term hereby granted
> of the other plots on the estate so
> far as the obligations hereinafter
> mentioned are capable of benefitting
> them …"

The covenants that follow concern use, repair,
alienation and the like. Crucially for present purposes,
clause 3(2) is a covenant to pay an annual service charge.
Each lease also contains covenants by the lessor. One
such covenant is to provide services to the Park, such
as maintaining roads, paths, fences, a recreation ground
and drains, mowing lawns, and removing refuse. The
lessor also covenants in clause 4(8) that leases of other
chalets "shall contain covenants on the part of the
lessees thereof to observe the like obligations as are
contained herein or obligations as similar thereto as the
circumstances permit."

5  Twenty-five of the chalets are said by the respondent,
the current owner of the Leisure Park and the landlord
under the leases, to be subject to leases containing a
service charge provision in clause 3(2), which requires
the lessee to pay for the first year of the term a fixed sum
of £90 per annum, and for each ensuing year a fixed sum
representing a 10% increase on the previous year – ie
an initial annual service charge of £90, which increases
at a compound rate of 10% in each succeeding year.
The issue on this appeal is whether the respondent's
interpretation of clause 3(2) in those 25 leases is correct.

6  Of the 25 leases in question, 21 were granted between 1977 and 1991. Prior to the grant of most of those 21 leases, the other 70 chalets had been the subject of leases granted from the early 1970s. In each of those 70 leases, clause 3(2) was a covenant by the lessee:

> "To pay to the Lessor without any deduction in addition to the said rent a proportionate part of the expenses and outgoings incurred by the Lessor in the repair maintenance renewal and the provision of services hereinafter set out the yearly sum of Ninety Pounds and value added tax (if any) for the first three years of the term hereby granted increasing thereafter by Ten Pounds per Hundred for every subsequent three year period or part thereof."

The effect of this clause, at least on the face of it, is that the initial service charge of £90 per annum was to be increased on a compound basis by 10% every three years, which is roughly equivalent to a compound rate of 3% per annum.

7  The 21 leases referred to in para 6 have two slightly different versions of clause 3(2), but the clause can be set out in the following form (with the words shown in bold included in 14 of the 21 leases, but not in the other seven):

> "To pay to the Lessor without any deductions in addition to the said rent **as** a proportionate part of the expenses and outgoings incurred by the Lessor in the repair maintenance renewal **and renewal of the facilities of the Estate** and the provision of services hereinafter set out the yearly sum of Ninety Pounds and Value Added tax (if any) for the first Year of the term hereby granted increasing thereafter by Ten Pounds per hundred for every subsequent year **or part** thereof."

8  To complicate matters a little further, the service charge clause in four of these 21 leases (being three of the seven which did not include the words in bold in the preceding quotation), had the word "for" before "the yearly sum of Ninety Pounds". These four leases also included a proviso to the effect that, so long as "the term hereby created is vested in the [original lessees] or the survivor of them", clause 3(2) would be treated as being in the form set out in para 6 above. This proviso has ceased to have effect as these four leases are no longer vested in the original lessees.

9  Finally, the service charge clause in four of the 70 leases referred to in para 6 above were varied pursuant to deeds of variation executed between October 1998 and August 2002 so as to be identical to that set out in para 7 above, including the words in bold.

**The issues between the parties**

10  As already explained, the respondent, the current landlord, contends that the service charge provisions in clause 3(2) of the 25 leases referred to in paras 6 to 9 above have the effect of providing for a fixed annual charge of £90 for the first year of the term, increasing each subsequent year by 10% on a compound basis. The appellants, the current tenants under 24 of the 25 leases, primarily contend that the respondent's construction results in such an increasingly absurdly high annual service charge in the later years of each of the 25 leases that it cannot be right. They argue that, properly read, each service charge clause in the 25 leases requires the lessee to pay a fair proportion of the lessor's costs of providing the services, subject to a maximum, which is £90 in the first year of the term, and increases every year by 10% on a compound basis. In other words, the appellants argue that, in effect, the words "up to" should be read into the clause set out in para 7 above, between the words "the provision of services hereinafter set out" and "the yearly sum of Ninety Pounds". The appellants also have an alternative contention, based on the provisions of recital (2), the opening words of clause 3 and the provisions of clause 4(8) of their leases, namely that the lessor cannot recover more by way of service

charge than could be recovered under each of the first 70 leases.

**The evidence**

11   Apart from the documents themselves and the published Retail Price Index (RPI) for each of the years 1970-2010, there is no evidence as to the surrounding circumstances in which the 21 leases were executed, other than the fact that the four leases referred to in para 8 above were granted to individuals connected with the lessor. Following a request from the court, we were also told that three of the four deeds of variation referred to in para 9 above were entered into with the lessor's daughter as lessee.

12   I do not find it surprising that we have not been provided with any further evidence. So far as the wording of clause 3(2) is concerned, there may have been letters or notes of discussions in connection with the original drafting and granting (and, in the four cases referred to in para 9 above, the amending) of the leases. But, even if such notes or letters had survived, I very much doubt that they would have thrown any light on what was intended to be the effect of the drafting of the various forms of clause 3(2). Even if they had done, they would probably have been inadmissible as I strongly suspect that they would merely have shown what one party thought, or was advised, that the clause meant. If such documents had shown what both parties to the lease in question intended, they would probably only have been admissible if there had been a claim for rectification.

13   As to the possibility of other material, I am unconvinced that, even if it existed, evidence of the original level of services, the original cost of the services or any investigations made on behalf of a potential lessee in relation to the original services and their cost would have assisted on the issue of what clause 3(2) of any of the 25 leases meant. The provisions for increase at the end of clause 3(2) of each lease were plainly included to allow for inflation, and the only evidence which appears to me to be potentially relevant would be contemporary assessments of the actual and anticipated annual rate of inflation, and, as already mentioned, we have the RPI for each of the years in question.

**Interpretation of contractual provisions**

14   Over the past 45 years, the House of Lords and Supreme Court have discussed the correct approach to be adopted to the interpretation, or construction, of contracts in a number of cases starting with Prenn v Simmonds [1971] 1 WLR 1381 and culminating in Rainy Sky SA v Kookmin Bank [2011] UKSC 50; [2011] 1 WLR 2900 .

15   When interpreting a written contract, the court is concerned to identify the intention of the parties by reference to "what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean", to quote Lord Hoffmann in Chartbrook Ltd v Persimmon Homes Ltd [2009] UKHL 38, [2009] 1 AC 1101 , para 14. And it does so by focussing on the meaning of the relevant words, in this case clause 3(2) of each of the 25 leases, in their documentary, factual and commercial context. That meaning has to be assessed in the light of (i) the natural and ordinary meaning of the clause, (ii) any other relevant provisions of the lease, (iii) the overall purpose of the clause and the lease, (iv) the facts and circumstances known or assumed by the parties at the time that the document was executed, and (v) commercial common sense, but (vi) disregarding subjective evidence of any party's intentions. In this connection, see Prenn at pp 1384-1386 and Reardon Smith Line Ltd v Yngvar Hansen-Tangen (trading as HE Hansen-Tangen) [1976] 1 WLR 989 , 995-997 per Lord Wilberforce, Bank of Credit and Commerce International SA (in liquidation) v Ali [2002] 1 AC 251 , para 8, per Lord Bingham, and the survey of more recent authorities in Rainy Sky , per Lord Clarke at paras 21-30.

16   For present purposes, I think it is important to emphasise seven factors.

17    First, the reliance placed in some cases on commercial common sense and surrounding circumstances (eg in Chartbrook , paras 16-26) should not be invoked to undervalue the importance of the language of the provision which is to be construed. The exercise of interpreting a provision involves identifying what the parties meant through the eyes of a reasonable reader, and, save perhaps in a very unusual case, that

meaning is most obviously to be gleaned from the language of the provision. Unlike commercial common sense and the surrounding circumstances, the parties have control over the language they use in a contract. And, again save perhaps in a very unusual case, the parties must have been specifically focussing on the issue covered by the provision when agreeing the wording of that provision.

18  Secondly, when it comes to considering the centrally relevant words to be interpreted, I accept that the less clear they are, or, to put it another way, the worse their drafting, the more ready the court can properly be to depart from their natural meaning. That is simply the obverse of the sensible proposition that the clearer the natural meaning the more difficult it is to justify departing from it. However, that does not justify the court embarking on an exercise of searching for, let alone constructing, drafting infelicities in order to facilitate a departure from the natural meaning. If there is a specific error in the drafting, it may often have no relevance to the issue of interpretation which the court has to resolve.

19  The third point I should mention is that commercial common sense is not to be invoked retrospectively. The mere fact that a contractual arrangement, if interpreted according to its natural language, has worked out badly, or even disastrously, for one of the parties is not a reason for departing from the natural language. Commercial common sense is only relevant to the extent of how matters would or could have been perceived by the parties, or by reasonable people in the position of the parties, as at the date that the contract was made. Judicial observations such as those of Lord Reid in Wickman Machine Tools Sales Ltd v L Schuler AG [1974] AC 235 , 251 and Lord Diplock in Antaios Cia Naviera SA v Salen Rederierna AB (The Antaios) [1985] AC 191 , 201, quoted by Lord Carnwath at para 110, have to be read and applied bearing that important point in mind.

20  Fourthly, while commercial common sense is a very important factor to take into account when interpreting a contract, a court should be very slow to reject the natural meaning of a provision as correct simply because it appears to be a very imprudent term for one of the parties to have agreed, even ignoring the benefit of wisdom of hindsight. The purpose of interpretation

is to identify what the parties have agreed, not what the court thinks that they should have agreed. Experience shows that it is by no means unknown for people to enter into arrangements which are ill-advised, even ignoring the benefit of wisdom of hindsight, and it is not the function of a court when interpreting an agreement to relieve a party from the consequences of his imprudence or poor advice. Accordingly, when interpreting a contract a judge should avoid re-writing it in an attempt to assist an unwise party or to penalise an astute party.

21  The fifth point concerns the facts known to the parties. When interpreting a contractual provision, one can only take into account facts or circumstances which existed at the time that the contract was made, and which were known or reasonably available to both parties. Given that a contract is a bilateral, or synallagmatic, arrangement involving both parties, it cannot be right, when interpreting a contractual provision, to take into account a fact or circumstance known only to one of the parties.

22  Sixthly, in some cases, an event subsequently occurs which was plainly not intended or contemplated by the parties, judging from the language of their contract. In such a case, if it is clear what the parties would have intended, the court will give effect to that intention. An example of such a case is Aberdeen City Council v Stewart Milne Group Ltd [2011] UKSC 56, 2012 SCLR 114 , where the court concluded that "any … approach" other than that which was adopted "would defeat the parties' clear objectives", but the conclusion was based on what the parties "had in mind when they entered into" the contract (see paras 17 and 22).

23  Seventhly, reference was made in argument to service charge clauses being construed "restrictively". I am unconvinced by the notion that service charge clauses are to be subject to any special rule of interpretation. Even if (which it is unnecessary to decide) a landlord may have simpler remedies than a tenant to enforce service charge provisions, that is not relevant to the issue of how one interprets the contractual machinery for assessing the tenant's contribution. The origin of the adverb was in a judgment of Rix LJ in McHale v Earl Cadogan [2010] EWCA Civ 14, [2010] 1 EGLR 51 , para 17. What he was saying, quite correctly, was that the court should

WESTLAW   © 2017 Thomson Reuters.

not "bring within the general words of a service charge clause anything which does not clearly belong there". However, that does not help resolve the sort of issue of interpretation raised in this case.

**Discussion: interpretation of clause 3(2)**

24  When one turns to clause 3(2) of each of the 91 leases of the chalets in Oxwich Park, the natural meaning of the words used, at least until one considers the commercial consequences, seems clear. The first half of the clause (up to and including the words "hereinafter set out") stipulates that the lessee is to pay an annual charge to reimburse the lessor for the costs of providing the services which he covenants to provide, and the second half of the clause identifies how that service charge is to be calculated.

25  The fact that the second half of the clause results in the service charge being a fixed sum, rather than a sum dependent on the costs to the lessor of providing the contractual services is readily explicable. As stated in Wonnacott's *The History of the Law of Landlord and Tenant in England and Wales* (2012), p 106, clauses which provide for charges which vary with the costs of providing services have resulted, at least since around 1960, in "more trouble between landlord and tenant than anything else". Further, legislation which started to come into force in 1972 has rendered it progressively more difficult for an "amateur landlord" (to use Wonnacott's expression) to recover a disputed service charge calculated on such a basis. The fact that the second half of the clause goes on to provide for a fixed increase in the annual sum is also readily explicable: the parties assumed that the cost of providing the services in sterling terms would increase, or, to put the same point another way, they assumed that the value of money would fall.

26  Davis LJ concisely explained the thinking behind the clause in the course of his judgment in the Court of Appeal, [2013] EWCA Civ 902, para 52:

"Lack of correspondence between outlay and receipt is the almost inevitable consequence of such a clause if the parties have elected for a fixed charge formula. It has a

similarity with a liquidated damages clause: it represents the parties' estimate at the outset for the future with neither guarantee nor even expectation of entire coincidence with the eventual outcome. But the advantage is certainty. The parties know from the outset where they stand. Moreover, it is a surrounding circumstance legitimately to be taken into account here that the leases were made at a time of inflation – in some years, very significant inflation – which the parties, objectively and commercially speaking, could be expected to want to confront. They chose to do so by this particular formula of increase."

27  In those seven leases where the word "as" is not included, I suppose that it might be said that this is not clear unless words such as "quantified in the sum of" were included in order to link the two halves of the clause, but that is, to my mind, a really pedantic argument. Although perfectionist drafting might suggest the inclusion of such words, it seems to me that the absence of such words cannot fairly be invoked to suggest ambiguity or a lack of clarity. The reasonable reader of the clause would see the first half of the clause as descriptive of the purpose of clause 3(2), namely to provide for an annual service charge, and the second half as a quantification of that service charge.

28  It is true that the first part of the clause refers to a lessee paying a "proportionate part" of the cost of the services, and that, unless inflation increases significantly in the next 50 years, it looks likely that the service charge payable under each of the 25 leases may exceed the cost of providing services to the whole of the Leisure Park. However, if, as I believe is clear, the purpose of the second part of the clause is to quantify the sum payable by way of service charge, then the fact that, in the future, its quantum may substantially exceed the parties' expectations at the time of the grant of the lease is not a reason for giving the clause a different

meaning. As already explained, the mere fact that a court may be pretty confident that the subsequent effect or consequences of a particular interpretation was not intended by the parties does not justify rejecting that interpretation.

29  However, given the way things have turned out, it is tempting to latch onto the absence of words such as "quantified in the sum of", and to see the two halves of clause 3(2) as mutually inconsistent in their effect. This would be on the ground that the first half of the clause requires the lessee to pay a "proportionate part" of the cost to the lessor of providing services, whereas the latter half requires the lessee to pay a sum which could exceed the whole of that cost. On that basis, it might be said that the court can reject or modify one half to give effect to the real intention of the parties – see eg Walker v Giles (1848) 6 CB 662 . However, as explained in para 24 and 25 above, this argument would, in my view, involve the court inventing a lack of clarity in the clause as an excuse for departing from its natural meaning, in the light of subsequent developments.

30  Were it not for the percentage increases of 10% per annum specified in the 25 service charge clauses which are being considered on this appeal, coupled with the subsequent history of inflation in the United Kingdom, that would be the end of it. Thus, it seems to me that the original 70 leases (referred to in para 6 above), with a clause 3(2), which provided for increases of about 3% per annum (at a time when inflation was running at a significantly higher rate), should plainly be interpreted in the way in which the respondent contends. However, the consequences of the annual sum of £90 being increased annually by 10% on a compound basis are plainly unattractive, indeed alarming, to a lessee holding a chalet under one of the 25 leases. If one assumes a lease granted in 1980, the service charge would be over £2,500 this year, 2015, and over £550,000 by 2072. This appears to be an alarming outcome for the lessees, at least judging by how things look in 2015, because annual inflation in the last 15 years has hardly ever been above 4%, indeed has been under 3% for ten of those years, and has notoriously been falling recently almost to the point of turning negative, whereas the service charge over that period has increased, and will continue to increase, by 10% per annum.

31  The appellants argue that these figures illustrate the extreme unlikelihood of the parties to the 21 leases (or to the four subsequent deeds of variation) and, in particular the lessees, having intended to agree that the original £90 service charge would be automatically increased by 10% annually on a compound basis. Accordingly, they contend, the latter half of clause 3(2) should be interpreted as imposing a maximum on the annual service charge recoverable by the lessor. In other words, the effect of the clause is said to be that the lessor is entitled to an appropriate percentage of the annual cost of providing the contracted services, subject to a maximum – which was initially £90, but which increases by 10% compound annually.

32  Despite the unattractive consequences, particularly for a lessee holding a chalet under one of the 25 leases, I am unconvinced by this argument. It involves departing from the natural meaning of clause 3(2) in each of those leases, and it involves inserting words which are not there.

33  Further, the appellants' argument involves attributing to the parties to the 25 leases an intention that there should be a varying service charge and that the lessor (or some other unspecified person) should assess the total costs of the services and determine the appropriate proportion of the cost of the contractual services to allocate to each chalet. Although I accept that it has an element of circularity, it appears to me that the average reader of clause 3(2) would have thought that those are exercises which the clause seems to have been designed to avoid.

34  Although there are one or two very small errors in the drafting, I do not consider that anything has gone significantly wrong with the wording of clause 3(2) of any of the 25 leases. As already explained, I would reject the notion that, on a natural reading, the two parts of the clause do not relate to each other, or appear to say different things, even in the seven cases where the word "as" is not included: as the Court of Appeal said, the first half imposes a liability for an annual service charge and the second half explains how it is to be assessed. I do not think that the reference to part of a year in the closing words of the clause (para 7 above refers), or the inclusion of an unnecessary "for" (para 8 above refers), in some of the 25 leases can possibly justify departing from the natural meaning

of clause 3(2). At best the reference to part of a year is meaningless. However, given that the 99 year term of each lease ran from Christmas 1974, all of them would have ended part way through a year, as they would also have been very likely to do if surrendered or forfeited. Furthermore, the fact that some clauses refer not merely to "repair maintenance and renewal", but also to "renewal of facilities on the Estate" seems to me to be irrelevant to the issue on this appeal.

35   Quite apart from the fact that the effect of clause 3(2) appears clear in each lease as a matter of language, I am far from convinced by the commercially-based argument that it is inconceivable that a lessee would have agreed a service charge provision which had the effect for which the respondents contend, at least in the 1970s and much of the 1980s. Although I would have expected most solicitors to have advised against it, and imprudent though it undoubtedly has turned out to be (at least so far), a lessee could have taken the view that a fixed rate of increase of 10% per annum on a fixed initial service charge, at a time when annual inflation had been running at a higher rate for a number of years (well over 10% per annum between 1974 and 1981, indeed over 15% per annum for six of those eight years; although it was less than 10% per annum after 1981), was attractive or at least acceptable.

36   If inflation is running at, say 10% per annum, it is, of course, very risky for both the payer and the payee, under a contract which is to last around 90 years, to agree that a fixed annual sum would increase automatically by 10% a year. They are taking a gamble on inflation, but at least it is a bilateral gamble: if inflation is higher than 10% per annum, the lessee benefits; if it is lower, the lessor benefits. On the interpretation offered by the appellants, it is a one way gamble: the lessee cannot lose because, at worst, he will pay the cost of the services, but, if inflation runs at more than 10% per annum, the lessor loses out.

37   The fact that a court may regard it "unreasonable to suppose that any economist will be able to predict with accuracy the nature and extent of changes in the purchasing power of money" over many decades (to quote Gibbs J in Pennant Hills Restaurants Pty Ltd v Barrell Insurances Pty Ltd [1981] HCA 3, (1981) 145 CLR 625 , 639) is nothing to the point. People enter into all sorts of contracts on the basis of hopes, expectations and assessments which no professional expert would consider prudent, let alone feel able to "predict with accuracy". I have little doubt that many fortunes have been both made and lost (and sometimes both) by someone entering into such a contract.

38   In terms of commercial justification, the analysis in paras 34 and 35 above becomes more difficult to invoke the further one moves on from 1981, the last year when inflation was above 10% per annum, although in 1990 it almost hit that figure. Accordingly, while I think the analysis comfortably applies to the 21 leases referred to in paras 6 to 8 above, which were granted between 1977 and 1990, it is unconvincing in relation to the four leases whose service charge provisions were amended around 2000, as mentioned in para 9 above.

39   It seems rather extraordinary that a lessee under a lease which provided for an increase in a fixed service charge at the rate of 10% over three years should have agreed to vary the lease so that the increase was to be at the rate of 10% per annum, at a time when inflation was running at around 3% per annum. However, I do not accept that this justifies reaching a different result in relation to any of the four leases which were varied in 2000. Three of them are relatively easily explicable, as the lessee who agreed the variation was closely connected with the lessor. The fact that they were subsequently assigned is, I accept, remarkable, but that later fact cannot affect the interpretation of the deeds. As to the fourth deed, it was, on any view, an improvident variation to have agreed, but, as already explained, that is not enough to justify the court rewriting the contract under the guise of interpreting it. Further, given that, at least in my view, there could be no ground for suggesting that the original clause 3(2) in the three leases (providing as it did for an annual increase of around 3%) had any effect other than that for which the respondent contends, it is particularly difficult to suggest that the substituted clause, which changed the annual increase to 10%, but was otherwise identically worded (save that it included the word "as" and was therefore even clearer), should have a different effect.

40   I note in this connection that, at a time when inflation was running at well over 10% per annum from 1974 to 1980 (possibly excepting 1984), the lessor was granting leases which provided, in effect, for increases

in the £90 at the rate of about 3% per annum (para 6 above refers). Of course, that cannot be taken into account when interpreting any of the 25 leases, but it shows the lessor was prepared to take what appears to have been an unwise decision which was not entirely dissimilar from the unwise decision which, in my view, the lessees under the 25 leases took.

41  I do not think that this is a case where the approach adopted by this court in Aberdeen City Council can assist the appellants. Unlike that case, this is not a case where one of the parties has done something which was not contemplated by the contract. It is clear that the 10% per annum increase in clause 3(2) was included to allow for a factor which was out of the control of either party, namely inflation. In my judgment, there is no principle of interpretation which entitles a court to re-write a contractual provision simply because the factor which the parties catered for does not seem to be developing in the way in which the parties may well have expected.

42  It also appears to me that there is a degree of inconsistency in the appellants' case. That case is, of course, ultimately based on the unlikelihood of a lessor and lessee of a single chalet agreeing that an initial annual service charge of £90 should be increased at a rate which could well lead to the annual charge being an absurdly high figure – possibly more than the cost of providing the services for the whole Leisure Park. But it is also rather unlikely (albeit less unlikely, I accept) that they will have agreed a ceiling on the annual service charge which would become so absurdly high that it would be meaningless. In other words, it can be said with some force that the appellants' solution to the problem which they identify does not actually address the problem: it merely changes its commercial consequences.

43  I should add that, subject to the point dealt with in the next section of this judgment, I am unconvinced that any assistance can be gained from the differences between the various forms of clause 3(2). It seems to me positively unlikely that the lessees under the later 21 leases would have been aware of the terms of clause 3(2) of the earlier 70 leases. But, even if they had been so aware, it seems to me that it would assist the respondent's case, not that of the appellants. That is because, given that it appears clear that the second half

of clause 3(2) in the earlier 70 leases operated to quantify the service charge, then it seems to me (as explained in the last sentence of para 39 above) that it is very unlikely that the parties can have intended the almost identically worded second half of clause 3(2) in the later 21 leases to have a very different effect from that in the earlier 70 leases.

44  In his judgment at para 116, Lord Carnwath rightly points out that, even after he assigns the lease, the original lessee is bound for the duration (at least if it was granted before 1996). However, I do not see what that adds in this case: on any view, these leases involve long term commitments on both sides. I agree with his view in para 117 that a prospective lessee of a flat in a block or the like (as here) will normally be likely to have less negotiating freedom as to the terms than in relation to a "free standing" property. But so will the lessor, and either is free to walk away if he regards the terms as unsatisfactory.

45  I am also unconvinced that the remedies available (whether in common law or under statute) to the parties in the event of a breach in connection with services or service charge, as discussed in Lord Carnwath's para 121-123, assists on the issue we have to decide. We are concerned with what a service charge clause means, not how it is being operated.

46  Finally on this first point, Lord Carnwath makes some remarks about service charge provisions in his para 119. There will, I suspect, be many cases where his observations are very much in point: indeed, they may well be normally in point. However, the lessor has no duty to be "fair" when negotiating the terms of a lease (any more than the lessee does), although it may well be in his interest to be (or at least to appear to be) fair. But, whosever interpretation is correct, clause 3(2) was self-evidently not a "normal" service charge clause: on the respondent's case, the landlord might get more or less than the costs of providing the services; on the appellants' case, the landlord might get less than the costs of providing the services.

### Discussion: the effect of clause 4(8) and the terms of the other leases

47  The appellants, at the invitation of the court, argued that clause 4(8), which as explained in para 4

above required leases of chalets to be granted subject to identical or similar obligations, substantially mitigated the effect of clause 3(2) of their leases. They contended that clause 4(8), when read together with the opening words of clause 3 and para (2) of the recital to each lease, referred to in paras 3 and 4 above, enable them to limit the service charge which the landlord could otherwise recover under clause 3(2).

48    The appellants' argument in this connection proceeds in two steps. First, as a result of clause 4(8), the opening words of clause 3, and para (2) of the recital in each of their leases, a term was implied into their leases to the effect that clause 3(2) was in the same terms as clause 3(2) of the leases of chalets which had already been granted – ie the 70 leases referred to in para 6 above. Secondly, in those circumstances the lessor is now precluded from recovering more by way of service charge than would be recoverable under the terms of the service charge provisions in the 70 leases – ie £90 plus 10% compounded every three years. While this argument has obvious attraction, I would reject it.

49    The purpose of clause 4(8), the opening words of clause 3, and recital (2) was, I would accept, to create what is sometimes referred to as a "building scheme", but, at least in the present context is more accurately described as a letting scheme. Such a scheme, which is recognised and given effect to by equity, has to be apparent from the terms of the relevant leases (or, very unusually, from a side agreement entered into by each lessee with the lessor). A letting scheme involves properties within a given area being let on identical or similar terms, normally by the same lessor, with the intention that the terms are to be enforceable not only by the lessor against any lessee, but as between the various lessees – even by an earlier lessee of one property against a later lessee of another property. There is plainly a strong case for saying the combination of para (2) of the recital, the opening words of clause 3 and the provisions of clause 4(8) establishes that there is such a scheme in relation to the chalets in the Leisure Park. Accordingly, I am prepared to assume that there was envisaged that there would be a degree of reciprocity and mutual enforceability between the lessees of chalets when it came to the covenants they entered into.

50    However, in my view, the appellants' reliance on the scheme in order to limit the service charges recoverable

under clause 3(2) of their leases faces a number of problems.

51    First, it seems to me to be unclear whether a provision such as clause 3(2) could be or was subject to the scheme. There is room for argument whether a letting scheme can only extend, like freehold schemes, to restrictive covenants, or whether it can also extend to positive covenants (on the basis that positive covenants between lessor and lessee are enforceable as between their respective successors, whereas only restrictive covenants are enforceable as against successors of covenantors in relation to freeholds). Even if a leasehold scheme can extend to positive covenants, it is also questionable whether a lessee's covenant to pay a service charge, or any other sum of money to the lessor, can be within the ambit of a scheme.

52    Secondly, in so far as they are dealing with the provisions of leases of other chalets, clause 4(8), and (arguably) the opening words of clause 3 and recital (2) appear to refer to future lettings, not to past lettings. It is quite a bold step to imply a term as to what has happened in the past from an express provision which is limited to the future. Having said that, there is considerable practical force in the contention that the scheme contemplated by the three provisions could only work if leases of all the chalets, past, present and future, were on the same terms.

53    Thirdly, even if the appellants' argument based on an implied term was otherwise correct, there would still be considerable force in the contention that it would not exonerate the appellants from complying with their obligations under clause 3(2). It seems clear that, where there is a letting scheme, a tenant can enjoin the landlord from letting a property within the scheme area on terms which are inconsistent with the scheme. However, as far as I am aware, there is no case where the landlord has been held liable to a tenant in damages (or otherwise) for having let a property within the scheme area on such terms, prior to the grant of the tenant's lease.

54    Fourthly, even if these arguments are all rejected, the closing words of clause 4(8) clearly permit a degree of variation between the terms of the leases of different chalets. If the second part of clause 3(2) is intended to reflect the level of projected inflation, then the parties

may well have regarded it as almost inevitable that any annual or triennial adjustment would vary from time to time. On that basis, there may be no breach of any implied term anyway.

55    However, it is unnecessary to address the four points identified in paras 51-54 above, because, in my judgment, there is a fatal flaw in the appellants' argument based on an implied term. In effect, the appellants' case is that the implied term in each of the 21 leases is that the lessor was not asking anything of the lessee which had not been, or would not be, required of lessees of other chalets, whether their leases were in the past or the future. However, it seems to me that, assuming everything else in the appellants' favour, that would not be the correct term to imply. As I see it, if there is an implied term along the lines argued for, it is that the already existing 70 leases of chalets contain a clause 3(2) identical with that in the appellant's leases – ie that the 70 existing leases have service charges which increase at the compound rate of 10% per annum as in the 21 leases.

56    In so far as it relates to the 70 existing leases, the implied term suggested by the appellants is inconsistent with both (a) an express term of the appellants' leases, namely clause 3(2) itself, and (b) what is implied in relation to future leases. As to point (a), the appellants' suggested implied term means that clause 3(2) involves a 10% increase every three years, whereas there is an express term to the effect that the 10% increase is every year; and it is a fundamental principle that one cannot imply a term which is inconsistent with an express term. As to point (b), any reader of an appellant's lease who was asked what future leases of chalets would contain by way of a service charge provision would answer that it would be the same as that in the instant lease – ie £90 pa subject to an increase of 10% per annum compounded; and the implied term applicable to future leases should be the same as that applicable to past leases.

57    If the appellants are right in their contention that there is an implied term, the term which I would favour (as set out at the end of para 55 above) runs into neither of these difficulties. It amounts to saying that, as clause 3(2) of an appellant's lease means that the service charge is to be £90 pa increasing by 10% pa compounded, there is a term implied into the lease that that is what the

existing leases provide and it is what future leases will provide.

58    If, as the appellants contend, there is an implied term, but that is its correct characterisation, it is difficult to see how it can help them. An appellant can say that the fact that the 70 existing leases contain a different clause 3(2) means that there is a breach of the implied term, but it is hard to see what damage or other injury has been suffered if the respondent now insists on enforcing clause 3(2) of their leases against the appellants. If an appellant could show that the value of his lease was reduced because the lessor had not granted the first 70 leases with the same clause 3(2) as was in the appellant's lease, the consequent reduction in the value of that lease could well be the appropriate measure of damages. But I cannot at the moment see on what basis the breach can assist an appellant in resisting the full financial consequences of the clause 3(2) he entered into.

59    I should add that, if, contrary to my view expressed in para 43 above, the lessees under the later 21 leases would have been aware of the terms of clause 3(2) of the earlier 70 leases (as Lord Carnwath suggests), it would negative any reliance which the lessees under the 21 leases could place on clause 4(8), as just discussed. This is because the later lessees would have known of, and accepted, the departure from the original clause 3(2).

**Conclusion**

60    Accordingly, in agreement with the reasons given by Lord Hodge in this court, Davis LJ in the Court of Appeal and Morgan J in the High Court, I would dismiss this appeal, and I do not consider that the appellants are assisted by the additional argument raised in this court. I should, however, make five final points.

61    First, the Court of Appeal suggested that the only way the lessees under the 25 leases could escape from their problems would be by surrendering or suffering forfeiture. In case this is misinterpreted, it is right to point out that surrender is consensual between lessee and lessor, and forfeiture involves unilateral action by a lessor, and so neither course can be forced on the lessor.

62   Secondly, I have considerable sympathy with Lord Carnwath's conclusion that the appeal should be allowed (not least because it is a much more satisfactory outcome in common sense terms, particularly viewed as at today), and I acknowledge that his reasons are as powerful as his conclusion allows. However, for the reasons I have given, I cannot agree with him.

63   Thirdly, the fact that four leases were granted to associates of the lessor with the proviso described in para 8 above, and that three of the deeds of variation described in para 9 above were entered into with a lessee who was a close relation of the lessor, is worthy of comment. It suggests that the lessor or her advisers may have appreciated the potential disadvantages of the clause now contained in the 25 leases. However, I do not see how it can assist the lessees on the issue in these proceedings, namely the interpretation of the clause in the 25 leases.

64   Fourthly, as Lord Carnwath records in para 155 below, it appears that the respondent realistically recognises the unsatisfactory situation in which the lessees under the 25 leases find themselves, and is prepared to agree appropriate amendments to their leases. I hope that a fair and just amendment can be agreed.

65   Finally, as Lord Carnwath also points out in paras 90-93 below, there are various statutory provisions which protect tenants against unreasonable service charges, but none of them apply here. The present case suggests that there may be a strong case for extending such provisions to cases such as the present, even though they involve a fixed sum payable by way of service charge. But that is a policy issue for Parliament, and there may be arguments either way.

Lord Hodge: (agrees with Lord Neuberger)

66   I agree that the appeal must be dismissed for the reasons which Lord Neuberger sets out. But it is a highly unsatisfactory outcome for the chalet tenants who are affected by the annual escalator of the service charge. It is not clear whether there are many long leases containing fixed service charges with escalators which are beyond the reach of statutory regulation. If there are, there may be a case for Parliament to consider

extending the provisions that protect tenants against unreasonable service charges.

67   Mr Morshead QC for the appellants submitted in his written case that what was important was "(a) that the risk [of inflation falling and remaining substantially below 10%] would have been obvious to the officious, reasonable bystander who must be imagined interrogating the actual parties and (b) that no reasonable person in the position of the parties, looking at the leases in their entirety and in context, would understand them to have intended that the tenants should assume that risk". He envisaged that in a hypothetical dialogue the officious bystander would warn the parties of the risks of their proposed contract and they would make it clear that that was not their intention.

68   In the course of the debate we were referred directly or by reference to several cases concerning the remediation of a mistake by construction or the implication of a term. In my view they do not give the support that Mr Morshead needs.

69   In Homburg Houtimport BV v Agrosin Private Ltd (The Starsin) [2004] 1 AC 715 the mistaken omission of words in a clause was apparent because the bill of lading had been modelled on a standard clause. The person who had transposed the standard clause into the bill of lading had omitted a phrase in the standard clause in which the same word had appeared at the end of two consecutive phrases. The mistake was clear and it was apparent what correction was called for (paras 22 and 23 per Lord Bingham).

70   In Chartbrook Ltd v Persimmon Homes Ltd [2009] 1 AC 1101 a definition, which contained a grammatical ambiguity, made no commercial sense if interpreted in accordance with the ordinary rules of syntax. The background to the deal and the internal context of the contract showed that there was a linguistic mistake in the definition, which the court was able to remove by means of construction. In his speech Lord Hoffmann (at p 1114) referred with approval to the judgment of Carnwath LJ in KPMG LLP v Network Rail Infrastructure Ltd [2007] Bus LR 1336 . In that case, which concerned a rent review clause in a lease, it was clear from the terms of the clause that its wording did not make sense. The court was assisted by an

earlier agreement which set out the then intended clause containing a parenthesis, of which only part had remained in the final lease. It was not clear whether the parties had mistakenly deleted words from the parenthesis, which they had intended to include, or had failed to delete the parenthesis in its entirety. But that uncertainty as to the nature of the mistake, unusually, did not matter as the outcome was the same on either basis.

71   In Aberdeen City Council v Stewart Milne Group Ltd [2011] UKSC 56, 2012 SCLR 114 the internal context of the contract provided the answer. The sale contract provided for the payment to the vendor of a further sum on disposal of the land by the purchaser. Two of the methods of disposal required the parties to ascertain the market value of the property on disposal in calculating the additional payment and the other used the "gross sales proceeds" in calculating that payment. The purchaser sold the site at an under-value to an associated company, a circumstance which on the face of the contract the parties had not contemplated. The courts at each level interpreted the provision, which used the gross sales proceeds in the calculation, as requiring a market valuation where there was a sale which was not at arm's length. They inferred the intention of the parties at the time of the agreement from the contract as a whole and in particular from the fact that the other two methods of disposal required such a valuation. While this line of reasoning was criticised by Professor Martin Hogg ((2011) Edin LR 406) on the ground that it protected a party from its commercial fecklessness, it seems to me to be the correct approach in that case as the internal context of the contract pointed towards the commercially sensible interpretation.

72   The context, whether internal to the contract or otherwise, provides little assistance in this case. Beyond the words of the relevant clauses, there is the context of the other provisions of each of the 25 individual leases which are at issue. They are long leases, having a term of 99 years. The court in interpreting the leases can and should take into account the great difficulty in predicting economic circumstances in the distant future and ask itself whether the parties really intended to do so.

73   The court also can and should take into account the economic circumstances which prevailed at the time each lease was entered into. It is clear from the table which Lord Carnwath has set out in para 100 of his judgment that between 1974 and 1988 the use of a 10% annual escalator achieved a result which was not far off the diminution of the value of money in the difficult economic circumstances that then prevailed. The future was and is unknown.

74   Little else is known and I do not think that it is appropriate to speculate about the extent to which lessees would have known the terms of earlier leases. In my view there is much to be said for the practice, which Lord Drummond Young and other judges have encouraged in Scotland, of requiring parties to give notice in their written pleadings both of the nature of the surrounding circumstances on which they rely and of their assertions as to the effect of those facts on the construction of the disputed words: MRS Distribution Ltd v DS Smith (UK) Ltd 2004 SLT 631 , para 14. Such notice of relevant facts, which are either admitted or proved at trial, would avoid disputes on appeal such as whether the affected lessees were aware of the earlier leases.

75   While there are infelicities in the language of the relevant clauses in some of the leases and no clear explanation of minor changes in drafting, I am not persuaded that the meaning of the language is open to question when full weight is given to the very limited factual matrix with which the courts have been presented in this case. We are invited to construe that which reads on a first consideration as a fixed service charge with an escalator to deal with future inflation, as a variable service charge which is subject to a cap to which the escalator applies. I find that very difficult. In my view there is nothing in the relevant context to support the construction of the clause as creating a cap, other than the view, which events have fully justified, that it was unwise of the lessees to agree to a fixed service charge with an escalator based on an assumption that the value of money would diminish by 10% per year.

76   This conclusion is not a matter of reaching a clear view on the natural meaning of the words and then seeing if there are circumstances which displace that meaning. I accept Lord Clarke's formulation of the

unitary process of construction, in Rainy Sky SA v Kookmin Bank [2011] 1 WLR 2900 , para 21:

> "[T]he exercise of construction is essentially one unitary exercise in which the court must consider the language used and ascertain what a reasonable person, that is a person who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract, would have understood the parties to have meant. In doing so the court must have regard to all the relevant surrounding circumstances. If there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other."

77  This unitary exercise involves an iterative process by which each of the rival meanings is checked against the provisions of the contract and its commercial consequences are investigated ( Re Sigma Finance Corp ([2009] UKSC 2) [2010] 1 All ER 571 , para 12 per Lord Mance). But there must be a basis in the words used and the factual matrix for identifying a rival meaning. The role of the construct, the reasonable person, is to ascertain objectively, and with the benefit of the relevant background knowledge, the meaning of the words which the parties used. The construct is not there to re-write the parties' agreement because it was unwise to gamble on future economic circumstances in a long term contract or because subsequent events have shown that the natural meaning of the words has produced a bad bargain for one side. The question for the court is not whether a reasonable and properly informed tenant would enter into such an undertaking. That would involve the possibility of re-writing the parties' bargain in the name of commercial good sense. In my view, Mr Morshead's formulation (para 67 above), on which his case depends, asks the court to re-write the parties' leases on this illegitimate basis.

78  Nor is this a case in which the courts can identify and remedy a mistake by construction. Even if, contrary to my view, one concluded that there was a clear mistake in the parties' use of language, it is not clear what correction ought to be made. The court must be satisfied as to both the mistake and the nature of the correction: Pink Floyd Music Ltd v EMI Records Ltd [2010] EWCA Civ 1429 , para 21 per Lord Neuberger MR. This is not an unusual case, such as KPMG (above) in which a mistake was obvious on the face of the contract and the precise nature of the correction had no effect on the outcome.

79  My conclusion that the court does not have power to remedy these long term contracts so as to preserve the essential nature of the service charge in changed economic circumstances does not mean that the lessees' predicament is acceptable. If the parties cannot agree an amendment of the leases on a fair basis, the lessees will have to seek parliamentary intervention.

Lord Carnwath: (dissenting)

**Preliminary comments**

80  The contractual provisions in this case pose unusual interpretative challenges, which may call for unusual solutions. The leases with we are concerned are of 25 chalets within Oxwich Leisure Park, in South Wales. It is an estate of 91 such chalets first developed in 1974. It is in an attractive holiday location close to Oxwich Beach on the Gower Peninsular. The challenges arise from a combination of factors. The intention, stated in the preamble to each lease, was that they should be "upon terms similar in all respects …". Yet we are faced with five forms of service charge provision, agreed over a period of some 20 years, the variations in which at first sight defy rational analysis. As interpreted by the Court of Appeal, they would lead over the course of the leases to supposedly "proportionate" service charges becoming wholly disproportionate to the costs of the relevant services, to extreme and arbitrary differences between the treatment of different groups of leases within the estate, and to the prospect in the foreseeable future of potentially catastrophic financial consequences for the lessees directly concerned.

81  It does not help that, remarkably, the case has come to us with minimal evidence to explain the circumstances, or "factual matrix", in which these variations were agreed at different times, or even simply to add some context or colour to the bare legal and statistical analysis. That applies even to the most recent, and most surprising, of the transactions, effected as recently as 2000, and to which Mrs Arnold the present respondent was herself a party. Nor have we been told anything about how the clauses have been operated in practice at any time: for example how the estate has been managed and what costs incurred by the lessor, what service charge payments have been demanded of the various categories of lessee, and what has happened to any surplus.

82  It is to be borne in mind also that in the early 1970s (when this clause was first devised) variable service charge provisions were a relatively "new and modern" addition to the law, prompted in part by rapidly increasing prices (see Mark Wonnacott, *The History of the Law of Landlord and Tenant in England and Wales* (2012) p 105; Hyams v Titan Properties Ltd (1972) 24 P & CR 359 ). Since then, it is said in the same history ( *ibid* p 106), service charges have caused "more trouble between landlord and tenant than anything else", but they have in turn been regulated by statute to such an extent as to make it "all but impossible for an amateur landlord to recover (a service charge) in the event of a dispute". Whether or not that extreme view is justifiable, the need for special measures to safeguard the interests of lessees has been acknowledged by the legislature, which has thus for the most part relieved the courts of responsibility for developing a common law response to the problems.

83  As I shall explain, these leases are a rare example of a category of residential lease which has slipped through the statutory net. That is of no direct relevance to the legal issues before us, save that it may help to explain why no ready solutions are to be found in the authorities. Furthermore, in so far as policy has a part to play in the development of the common law, it may be legitimate to seek guidance in the approaches adopted by the legislature in analogous contexts (see Johnson v Unisys Ltd [2003] 1 AC 518 para 37, per Lord Hoffmann).

**The leases**

84  The first lease was granted on 26 October 1974. Of the others most were granted during the 1970s, and are not directly involved in the present dispute. The 25 with which we are concerned were granted (or varied) in the period from 1980 to 2000. Whenever granted, all the leases (with one immaterial exception) were expressed as being for terms of 99 years starting from 25 December 1974, and for a yearly rent of £10, increasing by £5 for every subsequent period of 21 years. Each lease began with a preamble which described the "lessor" as the owner of the land edged pink on the attached lay-out plan ("the estate") and stated:

> "(2)  It is intended to erect chalets on the estate and to grant leases upon terms similar in all respects to the present demise."

The lessees' covenants (clause 3) limited the use to that of a "holiday residence of a single family" from March to October (clause 3(12)).

85  It seems from the examples before us that the earliest leases were granted in return for lessees' covenants to construct chalets in accordance with plans approved by the lessors (eg chalet 40 — lease dated 9 August 1977, clause 3(3)). Later chalets, presumably after erection of chalets by the lessor or others, were granted without such a covenant but for a premium (eg £13,000 for chalet 76 — lease dated 22 September 1980; £16,500 for chalet 96 –lease dated 1 July 1985). Otherwise no issue arises on the lessee's covenants other than clause 3(2) relating to service charges, to which I will come.

86  The lessors in turn covenanted to provide various common services. They included constructing and maintaining the roads and footways (unless or until becoming maintainable at public expense), mowing lawns, maintaining a recreation ground, keeping fences and drains in good repair, issuing regulations, and arranging refuse collection and a regular patrol to discourage vandalism during the unoccupied period (clause 4). By clause 4(viii) the lessors covenanted:

"(viii)   That the Leases granted by the Lessors of all other plots on or comprised in the estate shall contain covenants on the part of the Lessees thereof to observe the like obligations as are contained herein or obligations as similar thereto as the circumstances permit."

87   Five leases have been selected for the purpose of showing the different versions of clause 3(2) relevant to the dispute. The principal difference is between the original leases, granted between 1974 and 1980, in which an initial service charge figure of £90 is increased by 10% every three years ("the triennial formula"), and later leases in which it is increased by 10% every year ("the annual formula"). The five versions were applied as follows (the selected lease in each case is indicated in brackets):

• i)   *Version 1* (Chalet 40, dated 9 August 1977) — This was the "original version", applied to 70 leases granted mainly during the 1970s. The first was granted on 26 October 1974. The rest followed at a steady rate over the next six years at an average of just over 12 per year, until 1980 when seven were granted in this form, the last on 9 July 1980. Four of these leases (granted between August 1977 and July 1980) were varied in 2000 to incorporate the annual formula (see version 5 below).
• ii)   *Version 2* (Chalet 76, dated 22 September 1980) — This version applied to 14 leases granted between August 1980 and February 1983, the first being dated 11 August 1980.
• iii) *Version 3* (Chalet 96 dated 1 July 1985) — This applied to three leases granted between July 1985 and January 1988.
• iv)   *Version 4* (Chalet 29 dated 22 March 1991) — This applied to four leases granted between December 1988 and March 1991.
• v)   *Version 5* (Deed of variation dated 20 August 2000) — This applied to four leases previously subject to version 1.
The lessors for the first three selected leases in this list were Mr A and Mr B Lewis; for version 4, Mrs J Short; and for version 5, Mrs Arnold, the present respondent.

In the result the triennial formula now applies to 66 leases on the estate, the annual formula to 25.

88   I now set out the five clauses, emphasising the parts which are material to the dispute:

**Version 1 – triennial (1974-1980)**

"To pay to the Lessors without any deductions in addition to the said rent *a proportionate part* of the expenses and outgoings incurred by the Lessors in the repair maintenance renewal and the provision of services hereinafter set out the yearly sum of Ninety Pounds and value added tax (if any) *for the first three years* of the term hereby granted increasing thereafter *by Ten Pounds per Hundred for every subsequent Three year period or part thereof* ."

**Version 2 – annual (1980-1983)**

"To pay to the Lessors without any deductions in addition to the said rent *as a proportionate part* of the expenses and outgoings incurred by the Lessors in the repair maintenance and renewal *of the facilities of the Estate and the provisions* of services hereinafter set out the yearly sum of Ninety pounds and Value Added tax (if any) *for the first year of the term* hereby granted increasing thereafter *by ten pounds per hundred for every subsequent year or part thereof* ."

Apart from the change from the triennial to the annual 10% rate, other differences are the lengthening of the expression "… renewal and the provision of services" to "renewal of the facilities of the Estate and the provisions ( *sic* ) of

services", and the inclusion of "as" before "a proportionate part."

### Version 3 – annual (1985-1988)

"To pay to the Lessor without any deductions in addition to the said rent *a proportionate part* of the expenses and outgoings incurred by the Lessor in the repair maintenance renewal and the provision of services hereinafter set out the yearly sum of Ninety Pounds and Value Added tax (if any) *for the first Year of the term hereby granted increasing thereafter by Ten Pounds per hundred for every subsequent year thereof* ."

Changes from version 2 are: reversion to the expression "renewal and the provision of services", the omission of "as" before "a proportionate part", and the omission at the end of "or part (thereof)."

### Version 4 – annual subject to triennial proviso (1988-1991)

"To pay to the Lessor without any deductions in addition to the said rent *a proportionate part* of the expenses and outgoings incurred by the Lessor in the repair maintenance renewal and the provision of services hereinafter set out *for* the yearly sum of Ninety Pounds and value Added tax [if any] *for the first year of the term hereby granted increasing thereafter by Ten Pounds per Hundred for every subsequent year thereof* ."

This version was subject to a proviso:

"Provided always and it is hereby expressly agreed that *whilst the term hereby created is vested in the said William Richard Short and the said Janice Short or the survivor of them* then maintenance shall be calculated as follows:–

To pay to the Lessor without any deduction in addition to the said rent *a proportionate part* of the expenses and outgoings incurred by the Lessor in

the repair maintenance renewal and the provision of services hereinafter set out the yearly sum of Ninety Pounds and value added tax (if any) *for the first three years of the term hereby granted increasing thereafter by Ten Pounds per Hundred for every subsequent three year period or part*

*thereof .*"

The main clause is identical to version 3 save for the insertion of "for" before "the yearly sum". The proviso had the effect of substituting temporarily the triennial formula as in version 1, but that has ceased to be operative following the disposal of the lease by the Shorts.

**Version 5 – varied from triennial to annual (2000)**

In four of the original 1970s version 1 leases (triennial), a Deed of Variation dated 20th August 2000, at the same time as revising the extent of land demised, substituted with effect from the beginning of the lease a new clause 3(2) in the form of version 2 (annual formula).

89 Although we have been invited to consider all five versions, the most important for the purposes

Arnold v Britton, 2015 WL 3555406 (2015)

of interpretation are the first (October 1974) and the second (August 1980), and the circumstances surrounding them. The first is not directly in issue but set the drafting pattern, and provided the background to what followed. The second saw the first incorporation of the controversial annual formula. The later versions are of more limited relevance, save in so far as they throw some light on how the clauses were interpreted in practice, or help to illustrate the relative merits of the rival interpretations.

**The statutory provisions**

90   By sections 18-19 of the Landlord and Tenant Act 1985 , a "service charge" (as defined) payable by a tenant of a "dwelling", is limited to an amount which reflects the costs "reasonably incurred" in the provision of services. The controls originally applied only to "flats" but were extended by amendment in 1987 to include "dwellings" as defined ( Landlord and Tenant Act 1987 section 60 ). It is not in dispute, in these proceedings at least, that the chalets are "dwellings" for this purpose. The issue is whether the charges are "service charges" as defined by section 18(1) :

> "'service charge' means an amount payable by the tenant of a dwelling as part of or in addition to the rent –
>
> (a)   which is payable, directly or indirectly, for services, repairs, maintenance, improvements or insurance or the landlord's costs of management, and
>
> (b)   the whole or part of which varies or may vary according to the relevant costs."

91   The lessees submit that properly interpreted the clause imposes an obligation to pay a "proportionate part" of the costs incurred, subject only to an upper limit or cap determined by reference to the formula in the second part of the clause. On this footing it is an amount which "varies or may vary according to

the relevant costs" ( section 18(1)(b) ). The respondent submits that charge is outside the statutory definition because the annual amount is fixed by that formula, without any reference to the costs actually incurred by the lessor. If the lessees are right, the amount of the charge is limited to the amounts reasonably incurred. If the lessor is right, there is no statutory limit or other control.

92   Other safeguards for lessees were introduced by the 1987 Act, but none covers the present situation. Thus it introduced a new right for any party to a long lease (not only the lessee) of a "flat" to apply to the court (now the first-tier tribunal) for an order varying a lease on the grounds that it "fails to make satisfactory provision" in respect of various matters, one being the computation of service charges, but this did not apply to other forms of dwelling such as in this case. There is a more general provision, for application by "a majority of parties" for variation of a number of leases under a single lessor ( section 75 ), but again it applies only to flats. On the other hand, section 40 , which allows similar applications for variation of insurance provisions, applies to "dwellings" in general. It is difficult to detect any legislative purposes for these distinctions. The present case illustrates the potentially unfortunate consequences for parties to those rare forms of residential lease which for no apparent reason fall outside any of the protections given by the legislative scheme.

93   For completeness, I note also that no issue arises in the present proceedings as to the possible application of other more general protections relating to unfair contractual terms. Sections 2 to 4 of the Unfair Contract Terms Act 1977 do not in any event apply to contracts relating to the creation or transfer of interests in land ( Schedule 1, paragraph 1(b) ). No such limitation appears in the Unfair Terms in Consumer Contracts Regulations 1999 (SI 1999/2083), which give effect in this country to EC Directive 93/13/EEC of 5 April 1993 on unfair terms in consumer contracts. The Directive was first transposed in 1994 Regulations (SI 1994/3159) which were later replaced by the 1999 Regulations. The 1994 Regulations came into effect on 1 July 1995, and therefore would not it seems apply to contracts concluded before that date ( regulation 1 ; Chitty on Contracts para 37-087). Accordingly, it could be relevant if at all only to version 5 (2000).

**The proceedings**

94   We know very little about the background to the present dispute. It first reached the courts in September 2011 in the form of an application by the appellant lessees to the county court for pre-action disclosure. The application was said to be in anticipation of a representative application to resolve an ambiguity in the service charge clause, which "appears to result in a variable service charge but on the other hand create a fixed service charge". It also spoke of the lessees' concerns that the sums collected by way of service charge were exceeding the amount of "legitimate" expenditure by "such a substantial amount as to produce a credit balance that should be held in a service charge trust account"; and also that the lessor had disposed of the former clubhouse for the park to provide accommodation for her daughter. They sought disclosure of information about the sums collected as service charge and the amounts expended since 2005.

95   An order for disclosure was made on 20 September 2011, but was quickly met by an application by the lessor for declaratory relief relating to the interpretation of the service charge clause, following which the disclosure order was stayed pending the determination of these proceedings. The application sought in particular a declaration that on the true interpretation of the service charge clause, the sum payable was not a "service charge" within the meaning of section 18 of the Landlord and Tenant Act 1985 . In the county court, HHJ Jarman QC determined the issue in favour of the lessees. But his decision was reversed on appeal to Morgan J, whose judgment was upheld by the Court of Appeal (Richards, Davis and Lloyd Jones LJJ). The lessees appeal to this court with permission granted by the court itself.

96   The issue between the parties has throughout been very narrow: that is, whether the figure of £90 as inflated is to be read as a fixed amount, or as an upper limit or cap. That in turn depends on whether it is permissible and appropriate to read in such words as "limited to" (Judge Jarman's words) or "up to" before the reference to "ninety pounds". As Mr Morshead submits in his printed case:

"There is no need to undertake an elaborate drafting exercise. The necessary effect can be achieved by implying the words 'up to' before the words 'Ninety pounds'; and, in versions 2 and 5, deleting the word 'as'."

97   Giving the single judgment in the Court of Appeal, Davis LJ rejected that approach, holding in substantial agreement with Morgan J that the addition of these words–

"… would involve subverting the proper process of construction of the language actually used and would in truth involve the court rewriting the bargain the parties have made." (para 45)

He rejected the argument that this interpretation would consign the first part of the clause to "mere surplusage". Its function was to identify "the character of the payment to be made". The words "a proportionate part" were apt for a situation where "other lessees also are contributing to the overall service charge, which is in consequence to be apportioned between them". Although he accepted that the word "incurred" was "the language of actual outlay", it was "entirely explicable when one appreciates that this part of the sub-clause identifies the character of the payment being made" (paras 48-49). He also pointed to other difficulties in Mr Morshead's interpretation, in particular the problems of calculating a "proportionate" amount, and the lack of any protection for the lessor if the inflation regularly exceeded 10% (para 53).

**Inflation calculations**

98   The judge was shown without objection two sets of tables, one showing the annual Retail Price Index (RPI) from 1948 to 2012, taken from figures

Arnold v Britton, 2015 WL 3555406 (2015)

published by the Office of National Statistics ("the inflation table"); the other, the effect of the increases of service charge compounded over the period of the leases in accordance with respectively the annual and the triennial formula ("the compounding table"). As I understand it, the information in these tables is accepted as forming part of the factual matrix against which it is appropriate to judge the parties' contractual intentions at the relevant dates. There are some minor but apparently immaterial differences between the hard-copy and electronic versions of the compounding table; I have used the latter.

99  It is helpful to focus on the rates which would have been in immediate contemplation of the parties at dates when each of the five versions was first agreed: that is, 26 October 1974 (the date of the first lease on the estate incorporating version 1, rather than the 1977 lease which was used as an example at the hearing); 11 August 1980 (the first version 2 lease); 1 July 1985 (version 3); 1 December 1988 (the first version 4 lease); 20 August 2000 (version 5). The table below includes also the rate in contemplation at the date of the county court hearing (June 2012), and in the last year of the lease (2072). The figures in the compounding table are given for 25 December 1974, the commencement of the lease period, and for the same date in each subsequent year. For illustrative purposes I have taken the rate for the year commencing after each of the identified dates (ie 25 December next following each such date), which would have been the rate applicable to the first complete year under each new lease.

100  The resulting figures (rounded) for annual service charges at each such years:

|      | Triennial | Annual     | [Actual inflation] |
|------|-----------|------------|--------------------|
| 1974 | £90       | £90        | £90                |
| 1980 | £109      | £159       | £219               |
| 1985 | £132      | £257       | £310               |
| 1988 | £145      | £342       | £350               |
| 2000 | £212      | £1,073     | £557               |
| 2012 | £311      | £3,366     | £794               |
| 2072 | £1,900    | £1,025,004 | N/A                |

[The last column shows for purposes of comparison the equivalent figures implied by actual inflation, arrived at by increasing the initial £90 by the recorded price increases over the period from 1974 to each of the selected years. Though not in evidence before us, those figures have been taken from the "inflation calculator" on the Bank of England's website, and are used for illustration only.]

101  The rate of price increase during the 1970s can also be contrasted with the pattern in the previous and subsequent decades. Average annual inflation in the 1950s and 1960s was of the order of 3.5–4%. (It had averaged 2.5% in the 50 years from 1900 to 1950.) It then rose sharply to 6.4% in 1970 and 9.3% in 1973, followed by a much steeper rise to 16% in 1974 and an annual peak of 24.2% in 1975. It dropped to 8.3% in 1978 before rising again to 16% in 1980. The annual rate fell to 12% in 1981, and then to around 5-6% in the period 1983-85 (immediately before version 3), 4-5% in 1986-1988 (before version 4), and 3% in 2000 (version 5). It has remained at, or below, that low level ever since.

102  The compounding table enables comparisons to be drawn between the contributions made respectively by the 66 "triennial" and the 25 "annual" leases over different periods, if the lessor is correct. For example, on the 1988 figures, the triennial leases would have contributed a total of £8,712 (66 × £132), slightly more than the total contribution of the annual leases (£8,550

= 25 × £342). On the basis of the figures in the third column, the combined total (£17,262) was still much lower than the figure required to keep pace with actual inflation since 1974 (91 × £350 = £31,850). The figures at or about the time of the hearing show a very different picture. On the 2012 figures the triennial leases would have been contributing a total of £18,612 (66 × £282) compared to £84,150 (25 × £3,366) contributed by the annual leases. The total amount (£102,762) was now substantially more than that required to keep pace with inflation (91 × £794 = £72,254). (These figures differ slightly from those in the submitted tables due to rounding.)

103   The table also shows the amounts that, on the lessor's interpretation, would be payable under each formula over the whole period from 24 December 2013 to the end of the term (2072). The total amount payable during that period under each "annual" lease would be £11,238,016, compared to £53,386 payable for the same period under each "triennial" lease.

**Inflation and the factual matrix**

104   There is no difficulty in principle in taking account of the calculations in the compounding table, which require no outside information, and could have been carried out by the parties (or a reasonable observer) at any of the relevant dates. On the Court of Appeal's interpretation, the figures show increases which appear extraordinary in themselves, in the light of modern conditions of low inflation. No less importantly, they result in dramatically increasing, and ultimately grotesque, differences between the amounts payable by the two different groups of lessees on the same estate. This consequence could and should have been anticipated at the time, certainly by the lessors who were parties to both groups of leases and responsible for maintaining reasonable equivalence between them.

105   The use to be made of the historic inflation figures raises rather different questions. By agreeing to their use, the parties impliedly ask us to assume that the figures up to and including those for each of the relevant years (or the then most recently published figures) would been have been known to the parties at the time, and therefore must be taken as part of the relevant factual matrix. This is no doubt a reasonable working

assumption to indicate the general trend as known to the public.

106   It is however highly artificial to be asked to take account of the bare statistics, without reference to the political and economic circumstances which surrounded them, so far as they were common knowledge at the time. We are not required to assume total ignorance of current events, in the parties or their reasonable observers. It would not have been difficult to obtain information about contemporary perceptions of the direction of inflation, whether from official reports of the time, or from reports in the South Wales press. Even without such evidence, we are entitled in my view to assume knowledge of some of the key events: for example, of the dramatic rise in oil prices at the end of 1973 and again in 1979, each followed by a sharp increase in inflation in the following year; and also of the election in 1979 of a new Conservative government committed to controlling inflation. We are not required to assume that predictions about future inflation were made in a vacuum.

107   We are also entitled, as part of the factual matrix, to take account of the nature and circumstances of the estate, as they would have been perceived by potential purchasers. It was planned as a holiday estate close to a popular beach. Potential buyers were likely to come from people already familiar with the area from previous visits with their families. It is fair to assume also that they would have regarded the acquisition of a holiday chalet, not simply as source of pleasure, but also as a long term investment for them and their families. They would have been keen to avoid undue financial burden or risk. It would be strange if they had not taken the opportunity to talk to existing residents about their own experiences of the estate and its management, and of the associated costs. This will become relevant when considering what knowledge of previous terms should be attributed to the first version 2 lessees.

**Approach to interpretation**

108   In an unusual case such as this, little direct help is to be gained from authorities on other contracts in other contexts. As Tolstoy said of unhappy families, every ill-drafted contract is ill-drafted "in its own way". However, the authorities provide guidance as to the interpretative tools available for the task. The general

principles are now authoritatively drawn together in an important passage in the judgment of Lord Clarke JSC in Rainy Sky SA v Kookmin Bank [2011] 1 WLR 2900 , paras 14-30. As that passage shows, there is often a tension between, on the one hand, the principle that the parties' common intentions should be derived from the words they used, and on the other the need if possible to avoid a nonsensical result.

109  The former is evident, as Lord Clarke emphasised, in the rule that "where the parties have used unambiguous language, the court must apply it" (para 23). However, in view of the importance attached by others to the so-called "natural meaning" of clause 3(2), it is important to note that Lord Clarke (paras 20-23) specifically rejected Patten LJ's proposition that–

> "… unless the most natural meaning of the words produces a result so extreme as to suggest that it was unintended, the court must give effect to that meaning."

In Lord Clarke's view it was only if the words used by the parties were "unambiguous" that the court had no choice in the matter.

110   He illustrated the other side of the coin by quotations from Lord Reid in Wickman Machine Tools Sales Ltd v L Schuler AG [1974] AC 235 , 251:

> "The fact that a particular construction leads to a very unreasonable result must be a relevant consideration. The more unreasonable the result, the more unlikely it is that the parties can have intended it, and if they do intend it the more necessary it is that they shall make that intention abundantly clear."

and Lord Diplock in Antaios Cia Naviera SA v Salen Rederierna AB (The Antaios) [1985] AC 191 , 201:

> "If detailed and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business common sense it must yield to business common sense."

As a rider to the last quotation, Lord Clarke cited the cautionary words of Hoffmann LJ ( Co-operative Wholesale Society Ltd v National Westminster Bank plc [1995] 1 EGLR 97 , 99):

> "This robust declaration does not, however, mean that one can rewrite the language which the parties have used in order to make the contract conform to business common sense. But language is a very flexible instrument and, if it is capable of more than one construction, one chooses that which seems most likely to give effect to the commercial purpose of the agreement."

111  I agree with Mr Morshead (questioning in this respect the approach of Davis LJ, para 35) that it may be unnecessary and unhelpful to draw sharp distinctions between problems of ambiguity and of mistake, or between the different techniques available to resolve them. In Chartbrook Ltd v Persimmon Homes Ltd [2009] 1 AC 1101 , para 23, Lord Hoffmann cited with approval a passage of my own (in KPMG LLP v Network Rail Infrastructure Ltd [2007] Bus LR 1336 , para 50) where I discussed the role of what is sometimes called "interpretation by construction". I criticised the tendency to deal separately with "correction of mistakes" and "construing the paragraph 'as it stands'", as though they were distinct exercises, rather than as "aspects of the single task of interpreting the agreement in its context, in order to get as close as possible to the meaning which the parties intended". Lord Hoffmann added:

"What is clear from these cases is that there is not, so to speak, a limit to the amount of red ink or verbal rearrangement or correction which the court is allowed. All that is required is that it should be clear that something has gone wrong with the language and that it should be clear what a reasonable person would have understood the parties to have meant." (para 25)

112 Another permissible route to the same end is by the implication of terms "necessary to give business efficacy to the contract". I refer again to Lord Hoffmann's words, this time in Attorney General of Belize v Belize Telecom Ltd [2009] UKPC 10, [2009] 1 WLR 1988 , para 22, explaining the "two important points" underlined by that formulation:

"The first, conveyed by the use of the word 'business', is that in considering what the instrument would have meant to a reasonable person who had knowledge of the relevant background, one assumes the notional reader will take into account the practical consequences of deciding that it means one thing or the other. In the case of an instrument such as a commercial contract, he will consider whether a different construction would frustrate the apparent business purpose of the parties. … The second, conveyed by the use of the word 'necessary', is that it is not enough for a court to consider that the implied term expresses what it would have been reasonable for the parties to agree to. It must be satisfied that it is what the contract actually means."

113 Aberdeen City Council v Stewart Milne Group Ltd [2011] UKSC 56 is a useful recent illustration in this court of how these various principles may be deployed, to enable the court to achieve a commercially sensible result in the face of apparently intractable language. A contract for the sale of development land gave the council the right to an uplift (described as "the profit share") in certain defined circumstances, one being the sale of the property by the purchaser. The issue was the calculation of the profit share, which the contract defined as a specified percentage of the "estimated profit" (defined by reference to "open market value") or "the gross sale proceeds". The issue was how the definition should be applied in the case of a sale by the purchaser to an associated party at an undervalue. The court held in agreement with the lower courts that, in that event, notwithstanding the apparently unqualified reference to gross sale proceeds, the calculation should be based on open market value.

114 In a concurring judgment, with which all the members of the court agreed, Lord Clarke referred to his own judgment in Rainy Sky as indicating the "ultimate aim", that is:

"… to determine what the parties meant by the language used, which involves ascertaining what a reasonable person would have understood the parties to have meant; the relevant reasonable person being one who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract." (para 28)

As he pointed out, "on the face of it" the reference in the contract to the gross sale proceeds was a reference to the "actual sale proceeds" received by the appellants. It was not easy to conclude "as a matter of language" that the parties meant, not the actual sale proceeds, but the amount the appellants would have received on an arm's length sale at market value of the property;

nor was it easy to conclude that the parties "must have intended" the language to have that meaning. He referred to the comment of Baroness Hale in the course of the argument that:

> "... unlike Rainy Sky , this is not a case in where there are two alternative available constructions of the language used. It is rather a case in which, notwithstanding the language used, the parties must have intended that, in the event of an on sale, the appellants would pay the respondents the appropriate share of the proceeds of sale on the assumption that the on sale was at a market price."

He thought the problem should be solved by implying a term to the effect that, in the event of a sale which was not at arm's length in the open market, an open market valuation should be used. As he explained:

> "If the officious bystander had been asked whether such a term should be implied, he or she would have said "of course". Put another way, such a term is necessary to make the contract work or to give it business efficacy."

He preferred the use of an implied term to "a process of interpretation", although "the result is of course the same". (paras 30-33)

115  As Mr Morshead observes, the result in Aberdeen City could probably have been explained equally as a case of correction by interpretation. In any event, this example provides support for his proposition that, where an ordinary reading of the contractual words produces commercial nonsense, the court will do its utmost to find a way to substitute a more likely alternative, using whichever interpretative technique is most appropriate to the particular task.

**Residential leases**

116  Long residential leases are an exceptional species of contract, and as such may pose their own interpretative problems. In no other context is a private individual expected to enter into a financial commitment extending for the rest of his or her life, and probably beyond. The original lessee may have been unaware that (at least under contracts before the Landlord and Tenant (Covenants) Act 1995 ) he was taking on a personal legal commitment which could continue even after he had disposed of any interest in the property itself ( Norwich Union Life Insurance Society v Low Profile Fashions Ltd (1991) 64 P & CR 187 ). So far as it relates only to ground rent, the commitment is unlikely to be burdensome, and it may be readily accepted as a necessary incident of a valuable property interest. Service charges are a different matter, since the amounts may be substantial, and, apart from statute, the lessee is likely to have no direct control over the lessor's expenditure.

117  Where the lease is for one of a number of units in a managed building or estate, provision has to be made for expenditure by the lessor on common services and maintenance, and for the cost to be shared between the lessees. Substantial equivalence of rights and obligations under such leases is normally important for all parties, both for the good management of the building or estate, and for harmony among those living within it. Equivalence can only be achieved by the lessor, who alone is party to them all. After the first lease has been negotiated and granted, later incoming lessees will usually have little choice in practice but to accept the covenants in the form dictated by the lessor. Their reasonable expectation will be that all have been granted in like terms, both in terms of covenants and in terms of sharing financial responsibility for services, with a view to ensuring fair distribution of the overall cost. Often that expectation and the lessor's responsibility for achieving it, will be expressed in the terms of the lease (as here, in the preamble and clause 4(viii)).

118  Mr Daiches submits, correctly in my view, that the effect of such words is to create "a letting scheme, or local law, of negative obligations mutually enforceable in equity between all occupiers of the properties on the estate". He cites authorities such as In re Dolphin's

Conveyance [1970] Ch 654 , which related to an estate of freehold properties. Examples of the same principle as applied to leasehold developments are given in the textbooks (see *Megarry & Wade Law of Real Property* 8th ed (2012), para 32-079). As I understand his argument, he asks us to infer that a clause such as 4(viii) has to "look to the future not the past", and that accordingly it is not to be construed as containing any implied representation as to previous leases. I cannot agree. In my view, the existence of such a scheme reinforces the view that each lessee has a legitimate interest in the form and content of all leases within the development, whenever granted. Even if, as in clause 4(viii), the lessor's responsibility is expressed as an obligation in respect of future leases, it should in its context (including the preamble) be read also as containing an implied representation that leases previously granted are also in substantially the same form.

119  Provision for services is normally dealt with by reciprocal covenants, positive in form: by the lessor to arrange and pay for the carrying out of the necessary services, and by the lessees to pay their respective shares of the costs so incurred. There is no common format for such service charge covenants, and they can and do vary greatly between different buildings or estates. Unlike negative covenants, it seems that they are not mutually enforceable as such, but the expectation is that they will have been drafted to ensure that the lessees' financial obligations are shared fairly between them all. Again this is in the interests of good management and harmony within the development for both lessor and lessees. Differences may be necessary to cater for differences in size of the individual units or other features, but otherwise they will normally be in a standard form in all the leases.

120  In the courts below there was some discussion of the "restrictive" approach said to be appropriate to service charge provisions ( McHale v Earl Cadogan [2010] 1 EGLR 51 , para 17 per Rix LJ). I agree, if by this it is meant that the court should lean towards an interpretation which limits such clauses to their intended purpose of securing fair distribution between the lessees of the reasonable cost of shared services.

121  Support for this approach is to be found also in the disparity in practice between the potential remedies available to each party for breach by the other. A lessor who fails to maintain services at the level thought appropriate by the lessees is in principle open to enforcement action in court. But the practical effect of such action for the lessees is uncertain in the absence of a precise definition of what he is required to provide. If there has been a complete breakdown of services, they may be able to obtain injunctive relief or appointment of their own manager. In less extreme circumstances the form of remedy or the extent of any damages may be difficult to define.

122  By contrast, the lessor's remedies for breach of the service charge clause are all too clear. In the Court of Appeal, Davis LJ was apparently content to assume that the charges might " *in extremis* , force some of these lessees into surrender or forfeiture" (para 57). However, if by this he intended to imply that either escape-route would be available to the lessees other than by agreement with the lessors, he would have been wrong. Apart from any special provision, the lessee's obligation, once the service charge has been determined, will have crystallised into a contractual obligation to pay a fixed amount. That is in principle enforceable by a simple action through the courts, and ultimately by forfeiture and bankruptcy. The legislature intervened long ago to provide some statutory relief against forfeiture ( Law of Property Act 1925, section 146 ). But that provides no protection against enforcement of the personal liability to pay the contractual amount.

123  As already explained, the scope for abuse has been recognised by the legislature in the special provision made for controlling "variable" charges as defined in the 1987 Act. Fixed service charges do not normally give rise to the same risk of abuse. The lessee is given the certainty of a fixed financial commitment, and the lessor has the advantage of simplified administration. Provision is needed to deal with price inflation. But if this is fixed by reference to an independent formula, such as an official inflation index, there is no significant risk to either party. The approach adopted in this case seems highly unusual, if not unique. Even where the legislature has not intervened, the courts have a responsibility in my view to ensure that such clauses are interpreted as far as possible not only to give effect to their intended purpose, but also to guard against unfair and unintended burdens being placed on the lessees.

Arnold v Britton, 2015 WL 3555406 (2015)

**Interpretation of clause 3(2)**

124   Against that general background, I come to consider the construction of clause 3(2) in its various versions. At first sight, the main principles seem reasonably clear:

> • i)  The intention was that all the leases should be on terms as "similar … as the circumstances permit", and that it was the lessors' responsibility to achieve such equivalence (necessarily, since only they would be party to all of them) (preamble (2); clause 4(8))
> • ii)  The commercial purpose of clause 3(2) was to enable the lessor to recover from the lessees the costs incurred by him in maintaining the estate on their behalf, the payment by each lessee being intended to represent a "proportionate" part of the expenses so incurred.
> • iii)  Although there was a general description of the services which the lessor was contractually obliged to provide, the extent of those services was not precisely defined by the lessors' covenants (clause 4), which left to them a large measure of discretion as to the amounts to be spent in practice.

In themselves, these features are typical and uncontroversial. It is at the next stage, in giving effect to those principles, that the clause becomes problematic.

125   It is clear to my mind that something has gone wrong with the drafting, at least in the original wording, as it appeared in the 1974 version, and (apart from the change of inflation formula) was repeated in 1985 and 1988. The clause imposes an obligation to pay, but contains two different descriptions of the payable amount: by reference, first, to a "proportionate part of the expenses and outgoings incurred by the Lessor in the repair maintenance renewal and the provision of services …", and secondly, to a "yearly sum" determined by reference to a fixed formula. There are two linguistic problems. First, there is no grammatical connection to show the relationship between the two descriptions. Secondly, they are mutually inconsistent. A figure can be determined as a proportionate part of some other variable amount, or it can be a yearly sum, fixed by a predetermined formula; but it cannot be both. There is an inherent ambiguity which needs to be resolved.

126   In the Court of Appeal Davis LJ thought that the first part of the clause was designed simply to identify "the character of the payment to be made" (para 48). I find that unconvincing. If the intention was to indicate no more than the purpose of the payment, one would have expected some such general words as "by way of contribution to the services", not a detailed and specific formula. Conversely, if the character of the contributions was to be that of payments determined by reference to a fixed formula and nothing else, the description in the first part was neither accurate nor useful. Proportionality had no part to play in such a fixed calculation, nor any relation to reality after 1980 if the court's interpretation is correct. Nor is it easy to explain the purpose of the specific reference to "expenses and outgoings incurred" by the lessor on a defined range of services, unless it was intended to play some material part in the calculation.

127   At this point it is convenient to note the minor differences of wording in some later versions. A change such as the omission of the words "or part …" in version 3 can readily be dismissed as a copying error. Others give more room for argument. It would be tempting to read more significance into the word "as", which appears for the first time in the important 1980 version 2. Grammatically, it may be said (with Davis LJ – para 54), the insertion of the word "as" implies that the operative text is in the second part of the clause, the first part being merely descriptive. There are two difficulties with that explanation. First, for the reasons I have given, neither the reference to proportionality nor the detail of the formula in the first part is compatible with that limited sense. Secondly, there are linguistic indications the other way. The word "as" did not survive into any of the later versions, except the 2000 deed of variation (version 5), which seems to have been copied directly from version 2. Version 2 itself also saw the introduction of a new reference to expenditure on "the renewal of the facilities of the estate", which is hard to explain if the detail of the first part had no practical significance. Version 4 added to the mystery by adopting a different connecting word "for", this time in front of the second description (" *for* the yearly sum of ninety pounds"). That is even more difficult to interpret, but if anything it seems to imply that it was the first part of the clause which was the primary description. In the end I conclude that no persuasive guidance, one way or the other, is to be derived from these minor changes.

128   There are only two realistic possibilities for the second part of the clause, which are those respectively adopted by Judge Jarman, on the one hand, and Morgan J and the Court of Appeal, on the other. Either it is a fixed amount which in effect supplants any test of proportionality under the first part; or it is no more than an upper limit to the assessment of a proportionate amount. I reject the theoretical alternative that it was designed as a lower limit for the benefit of the lessors. That interpretation would have made no sense at all in relation to version 1, agreed at a time when the possibility of inflation falling *below* 3% would have occurred to no-one as a risk requiring special provision, particularly for the lessor who unlike the lessees was in control the level of his own expenditure. There is thus no doubt that this part of the clause was originally designed for the benefit of the lessees, and I see no reason to think that its purpose had radically changed by the time of version 2.

129   Davis LJ was concerned as to the practicalities of determining the "proportionate" amount of the qualifying expenditure. Morgan J (para 51) described it as "workable but not ideal". I do not see any great difficulty. The relevant items are precisely defined. The lessor has simply to demonstrate (to the lessees and if necessary to the court) that the expenditure has been properly incurred on those items, and that it has been divided "proportionately" between the lessees.

130   I note that in Hyams v Titan Properties (see para 82 above), which was decided two years before the first of these leases, the court had to fix the terms of a new business lease under the Landlord and Tenant Act 1954 taking account of rapid price inflation. Buckley LJ recorded that "the modern practice generally accepted … was to make service charges payable on a proportional basis". In that case (where there were nine units) the court approved a clause "requiring the tenant to pay one-ninth of the cost of providing the services under the covenant in addition to the rent payable under the lease". There was no suggestion that this formulation was defective in the absence of specific machinery to settle the figure. The first half of clause 3(2) follows the same model, allowing for the fact that the precise number of units was probably not known at the outset, so that it was not possible to put in a specific fraction. The use of the same figure of £90 in all the

leases (whatever its precise purpose) would have been a strong indication that equal shares were intended.

131   I turn therefore to consider the two alternatives as applied to each of the five versions in its own context. In the words of the authorities, we must inquire "what a reasonable person would have understood the parties to have meant", that person being one who had "all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract", and who would have also taken into account "the practical consequences of deciding that it means one thing or the other". Where necessary the reasonable observer can be invited notionally to take on the more active role of "officious bystander", in order to interrogate the parties as to their common intentions.

**The five versions in context**

**Version 1 (October 1974 — July 1980)**

132   It is impossible to do more than guess at the common intentions of the parties to the first lease in relation to this part of clause 3(2). It is hard at first sight to see any rational basis for selecting a rate of 10% every three years, at a time when annual inflation was running at around twice that rate. At little over 3% per year, it was a little low even by reference to the inflation of the two previous decades, although it was in line with the historic long term average.

133   In such inflationary conditions, there is no difficulty in understanding why it was acceptable to the lessees. It is the lessor's thinking which needs explaining. We know nothing of the first lessors (the Lewises). They may perhaps have been builders, themselves involved in the development of the estate, and so more able to absorb the initial costs of maintenance in their other expenditure. If so, to make the estate attractive to purchasers, they may have gambled on being able to bear the price increases during the early years, in the expectation of inflation falling to more reasonable levels in the near future. (Comparable optimism seems to have been reflected in their view of ground rent, which was to be increased by only 50% every 21 years.)

134   In any event, their apparent generosity would be more explicable if, as may have been the case, the

Arnold v Britton, 2015 WL 3555408 (2015)

figure of £90 was based not simply on an estimate of current costs, but gave a reasonable margin for anticipated inflation in the short term. That possibility is borne out to some extent by the fact that the triennial formula survived, apparently without question, for six years of high inflation. If so, it is certainly possible that, even during that period, it was treated as a cap, the contributions being based on a share of actual expenditure from year to year. (Unlike Morgan J — para 32 — I see no basis, in the absence of evidence, for any positive inference that service charges were paid, then or later, "in accordance with the lessor's interpretation".)

135 Since version 1 is not in issue, it is unnecessary to decide between the alternative interpretations at this stage. Version 1 does however provide the necessary background to the contentious versions which came later. It makes clear that the inclusion of a specific figure for inflation was designed originally for the benefit of the lessees not the lessor. It may also enable one to discount any intention on the part of the Lewises at least to take unfair advantage of their lessees.

**Version 2 (August 1980 – February 1983)**

136 As I have said, the fact that it took the Lewises six years to react to the apparent disparity between the triennial formula and actual inflation suggests that, one way or another, they were able to maintain expenditure within the initial figure for some time. The change of heart may well have been triggered by the renewed jump in inflation in 1979, which reached its peak in summer 1980, although it is notable that the last version 1 lease was granted as late as July 1980. If the Court of Appeal is right, there was then in August 1980 a dramatic change in their thinking, from the exaggerated optimism which had prevailed over the last six years, to such abject pessimism about the future of the economy that they thought it reasonable to assume continuing 10% inflation for the remaining 93 years of the leases, and to expect their purchasers to share that assumption.

137 If that is the correct interpretation, they would have been contemplating an impossibility, even for economists. In Pennant Hills Restaurants Pty Ltd v Barrell Insurances Pty Ltd [1981] HCA 3, (1981) 145 CLR 625 , 639 Gibbs J spoke of the reasons for making no allowance for inflation in awards for future loss:

"It is unreasonable to suppose that any economist will be able to predict with accuracy the nature and extent of changes in the purchasing power of money during a period extending for several decades ahead. Whether inflation increases or is brought under control depends upon political and economic events and decisions at home and abroad as to whose occurrence it is not possible to do more than conjecture. Predictions as to the economic future in 30 years time may perhaps be made by a soothsayer but expert evidence cannot rationally be given on such a subject." (cited with approval by Lord Hope in Helmot v Simon [2012] UKPC 5 , para 45)

If that is unreasonable for an economist, how much less likely is it as an explanation of the thinking of the lessors or lessees of these modest holiday chalets in August 1980?

138 The improbability becomes even more striking when one compares the figures for the new and old groups of lessees. It is true that, even as a cap, the annual formula would result in the new lessees paying more initially than the existing lessees (£159 in 1980, compared to £109 under version 1). But over the period of the lease the differences become grotesque. On the Court of Appeal's interpretation the parties were accepting, as a mathematical certainty, that by the end of the lease period each lessee's service charges would have totalled over £11m, more than 200 times the amounts payable by the existing lessees. Put the other way, if the assumed prediction were correct, the lessees of more than two-thirds of the chalets on the estate would by then have contributed 200 times less than the figure necessary for the lessors' expenditure to keep pace with inflation. Even from the lessors' point of view, that scenario implied commercial disaster.

139 Whatever the lessors' state of mind, it beggars belief that the new lessees would have been content to proceed

on that basis. It is particularly improbable for a person of ordinary means investing perhaps limited savings in a holiday home. It is simply inconceivable that such a potential purchaser would have been willing to accept a prediction of continuing inflation at that level for over 90 years, and to take that as a basis for undertaking a contractual obligation lasting for the rest of his life and beyond without any escape route.

140 There has been some discussion before us as to whether the lessees would have known of the comparable clauses in the previous leases. Mr Daiches asks us (and through us the reasonable observer) to proceed on the basis that the new lessees in 1980 would have been unaware of the triennial formula used in the previous leases, and says that is the basis on which the case has been approached hitherto. I am unwilling to make that assumption, which I regard as wholly unrealistic. It is not on any view an assumption that can be made in respect of versions 4 and 5, where the change was apparent on the face of the documents (see below).

141 Even without direct information in the documents, a potential purchaser in 1980 could be expected to have wanted to satisfy himself about the existing arrangements within the estate, and would have had a legitimate interest in doing so. Absent bad faith, it is hard to see any reason why the lessor would have wished or felt able to hide information about the previous leases. In any event, it could readily have been discovered by talking to other lessees within the estate. In Lord Clarke's words, it would have been "background knowledge … reasonably … available to the parties" in the circumstances of the contract. I would accordingly approach the interpretation of version 2 on the assumption that both parties (like their reasonable observer) would have been aware of the proposed change from the triennial formula, and that they are to be taken as having accepted the change for what they regarded as good reasons.

142 On the basis that it was intended as a cap, the lessees' thinking is understandable. They would have needed persuasion to take the leases on less generous terms than their predecessors. On the other hand, they would have understood that any assumptions made in 1974 about the prospects of an early fall in inflation had been falsified by events. They would have understood also that the lessor would find it difficult

to support reasonable expenditure on services without some adjustment. We do not of course know what if anything may have been said about increasing future contributions from the existing lessees to ensure fair distribution. But from their own point of view, with current inflation at or around 20%, substitution of a limit of ten per cent might have been seen by them as an acceptable compromise for the immediate future, while allowing for a return to more normal levels in the medium term. That may not be a complete explanation, but it is at least plausible, unlike the alternative.

143 As in the Aberdeen Council case, we can imagine the responses of lessor and lessee to questioning by the officious bystander as to the purpose of the clause. Did they really intend to enter into a contract which had the extraordinary long term implications outlined in the previous paragraphs? I find it hard to conceive of any other response than "of course not; it is a cap not a fixed amount". The alternative would have seemed absurd and unreasonable to both, as much to the lessor as to the lessees.

144 The Court of Appeal thought they were applying the "natural meaning" of the clause, and that it was not the task of the court to relieve the lessees of a "bad bargain" entered into in different circumstances, albeit possibly without having done their arithmetic. For the reasons I have given, I am not convinced that the "natural meaning" is that adopted by the Court of Appeal, at least once one discounts the inclusion of the word "as" in version 2, or that, even if it is, it relieves the court of the obligation to seek a sensible result. On the other side of the coin, I agree with Mr Morshead that "bad bargain" is a gross understatement of the implications of their interpretation, which as he says were from the outset "not only stark but disastrous". Nor do I see any reason to assume that these contracting parties, treated (in Lord Hoffmann's words) as alive to the "practical consequences" of the alternative interpretations, should have been ignorant of the ordinary principles governing compound interest.

**Version 3 (1985)**

145 By this time inflation had fallen significantly to around 5-6%. Pessimistic thoughts about the future direction of inflation for the foreseeable future would have largely dissipated. If it was difficult in 1980, it

would surely be impossible now, for the reasonable observer to imagine the parties committing themselves, even in the medium term, to a fixed inflation figure of almost double the current rate. As a cap, it would hardly have attracted attention.

## Version 4 (1988)

146  By this time annual inflation had fallen to less than 5%. The annual formula produced a figure more than double that implied by the triennial formula, but one closely comparable to that resulting from actual inflation since 1974 (£342 compared to £350, in the table at para 100 above). If the then lessor, Mrs Short, was still charging her pre-1980 lessees by reference to the lower triennial rate, it raises a question of how she was covering her own expenditure on services, in circumstances where two-thirds of the leases were contributing at only half the rate implied by inflation since 1974. That may suggest either that she was able in practice to keep expenditure to a level significantly below that implied by inflation, or possibly that in order to maintain services at a reasonable level some of the pre-1980 lessees had been persuaded to pay more than their strict obligation.

147  The only novel feature of this version is that it was subject to a proviso in effect substituting the triennial formula during the tenure of the named lessees. It appears to have escaped notice in the courts below that the example used for this version was in a lease between the lessor, Mrs J Short, and herself and a Mr W R Short (her husband) as joint lessees. Since the hearing it has been confirmed that she had the same interest in the other three "proviso" leases granted between 1988 and 1991. They were clearly not arms-length transactions.

148  We know nothing about Mrs Short, or her thinking. It is difficult to understand how this special personal protection could have been reconciled with her obligation to the other post-1980 leases (under clause 4(viii)) to ensure that the covenants in these leases were as "similar … as the circumstances permit". It is even more difficult, at least on the Court of Appeal's interpretation, to understand how she would have explained the change to her future assignees, who were to lose that protection. The contrast between the two versions could not have been drawn more clearly to their attention. On the basis that the revised

percentage figure was no more than a cap, they may plausibly have been content to accept an obligation to keep pace with inflation, in line with other post 1980-lessees. The alternative assumes that, at time when inflation rates were less than 5% and apparently falling, they knowingly accepted a continuing obligation to pay service charges increasing at twice that rate for the rest of the term. On any view that is absurd.

## Version 5 (2000)

149  By this time inflation had fallen to about 3%. The clause 3(2) figure was by now more than five times greater under the annual formula than under the triennial formula. As Mr Daiches accepts, the parties to these transactions were fully aware of the differences between the two versions. In those circumstances, whatever the changes in the extent of their holdings, there is on the face of it no rational explanation for four lessees agreeing not only to the loss of the protection of version 1, but to the substitution of a permanent obligation to pay service charges increasing at a rate three times the then current rate of inflation.

150  Since these variations were agreed only 15 years ago, and since by this time the respondent, Mrs Arnold, was herself directly involved, it might have been thought that she at least would be able to throw some light on these extraordinary transactions. After the hearing, the parties were put on notice of the court's concern on this point, and invited to comment. It has emerged that three out of the four variations were agreed between Mrs Arnold and her daughter, Mrs Fraser (signed under a power of attorney by Mrs Arnold's son). The fourth was a Mrs Pace, of whom no information has been provided, save that she is apparently still the owner of the chalet, and she is named as one of the defendants in these proceedings.

151  If there was in Mrs Arnold's thinking a rational explanation for these particular variations, she has not taken the opportunity to disclose it. Instead of such direct evidence, Mr Daiches remarkably asks us to imagine a series of "inferences" drawn by the parties (including his client and her daughter) and the reasonable observer. They would have inferred, he says, that version 1 lessees were paying less than the rates required by inflation and that there were in consequence "historic shortfalls" in the lessor's service

charge income; and that the multiplier was to be increased, not only to take account of actual inflation since 1974, and to reflect the fact that it might once again rise to levels above that implied by the triennial formula, but also to compensate the lessor both for past shortfalls, and for the risk that he or she might not be able to persuade other lessees to agree to similar increases in the future.

152  With respect to Mr Daiches I have to say that, even in this extraordinary case, I find these submissions quite astonishing. Given that his client and her daughter were the principal parties to these transactions, why on earth should the court be expected to draw "inferences" as to what was in their minds? Why should we speculate as to the extent of any "historic shortfalls", when she presumably has access to the actual accounts, and has resisted the lessees' requests for disclosure? What evidence is there that by 2000 anyone was seriously concerned about an imminent risk of return to double-digit inflation? Finally, what possible reason would these lessees have had for wishing to "compensate" the lessor for the past or future financial consequences of imperfections in leases for which they were not responsible?

153  With regard to the only independent party, Mrs Pace, Mr Daiches asks us to note that her variation was agreed shortly after the sale of the lease to her by the respondent herself. It should not be difficult, he says, to "infer that the purchase price paid by her to the respondent reflected her agreement to increase the multiplier". Although she is apparently one of the appellants represented by Mr Morshead, he has not volunteered any specific explanation on her behalf. He merely points to the difficulty of imagining any price reduction or other inducement sufficient to compensate her for "the devastating implications" of the multiplier if it operates as Mrs Arnold contends.

154  In the absence of further evidence from either side, it is impossible to draw any clear conclusions about the purpose of these curious transactions. It is enough to observe that, viewed objectively, they are at least consistent with an interpretation which limits the lessees' future exposure to actual inflation, within a defined limit. On the lessors' interpretation, as with version 4, they make no sense at all.

## Conclusion

155  The true explanation for these wretchedly conceived clauses may be lost in history, but the problems for the parties are all too present and deeply regrettable. No doubt in recognition of such considerations, Mr Daiches, on behalf of Mrs Arnold, indicated that his client "fully understands the appellants' predicament and is sympathetic to it", and that if the appeal fails there would have to be a re-negotiation of the leases "for pragmatic if not for legal reasons". She wished it to be stated openly that –

> "… she is willing for the appellants' leases to be renegotiated on terms that would, among other things, involve the leases being varied by substituting an adjustment linked to the Consumer Price Inflation index instead of the current fixed adjustment of 10% per annum."

156  Although on its face this indication seems helpful and realistic, it is not clear what it would mean in practical terms. It rightly acknowledges that the problems may well be incapable of truly satisfactory resolution by conventional legal analysis. The main obstacle may be that hinted at in Mr Daiches' post-hearing submission. That is the need to find some way of making good the shortfall resulting from the unrealistically low contributions required from more than two-thirds of the lessees under the pre-1980 leases. Even if the lessees' interpretation prevails, it will still leave an unhappy imbalance between these lessees, and the version 1 lessees, who will be left paying substantially less than their proportionate share.

157  Whatever the strict legal position, the other lessees may perhaps be persuaded that they have a common interest in the good management of the estate, and at least a moral obligation to contribute their fair share of its costs. A long-running dispute of this kind can hardly be conducive to the atmosphere appropriate to a holiday location, even for those not directly involved. It is to be hoped that some way can be found of bringing

them into the discussions. On any view, the case seems to cry out for expert mediation, if it has not been attempted before, preferably not confined to the present parties. If thought appropriate, one possibility might be an application by consent to the President of the First-Tier Tribunal (Property Chamber – Residential Property) to appoint as mediator a senior judge of that tribunal, with the benefit of that tribunal's experience of dealing with service charge issues under statute. However, that must be a matter for the parties not this court.

158  It is necessary therefore to return to the essential question: what in the view of a reasonable observer did clause 3(2) mean? It will be apparent from my detailed analysis that I regard the consequences of the

lessor's interpretation as so commercially improbable that only the clearest words would justify the court in adopting it. I agree with HH Judge Jarman QC that the limited addition proposed by the lessees does not do such violence to the contractual language as to justify a result which is commercial nonsense.

159  For these reasons, in respectful disagreement with the majority, I would have allowed the appeal and restored the order of HH Judge Jarman QC.

Crown copyright

© 2017 Sweet & Maxwell

2015 WL 3555408

---

**End of Document**                                                                © 2017 Thomson Reuters.

# TAB 10

**\*490  Arnold and Others v.
National Westminster Bank Plc**

House of Lords

25 April 1991

**(1991) 62 P. & C.R. 490**

( Lords Keith of Kinkel, Griffiths , Oliver
of Aylmerton, Jauncey of Tullichettle and Lowry ):
April 25, 1991

### Analysis

Landlord and tenant—Issue estoppel—Rent review clause
—Greater of existing or fair market rent payable on
review—First review date—Clause referred to arbitrator
—Determined that fair market rent to be fixed as if
hypothetical lease contained provisions for rent review
—Overturned by Walton J.—Rent 20 per cent. higher—
Not in accord with subsequent guidelines—Second review
date—Tenants claimed rectification of lease—Landlords
claimed issue estoppel—Whether issue estoppel absolute
—Whether affected by change in law

By a lease dated October 28, 1976, premises were
demised to the respondents until June 24, 2008 at
an initial rent of £800,000, subject to periodic
reviews. The rent from each review date was to be
the greater of a rent equal to that payable during the
last preceding rent period and the "fair market rent."
The definition of "fair market rent" presupposed a
hypothetical lease for the unexpired term. At the first
review date in 1983, a dispute arose as to whether
the "fair market rent" was to be fixed on the basis
that the hypothetical lease contained (a) the same
provisions for rent review as the actual lease or (b)
no such provisions. The arbitrator decided (a) to be
the correct method of calculation and fixed the rent
at £1,003,000, 20 per cent. lower than if (b) had
been used. On appeal by the landlords, Walton J.
held that (b) was the correct formula and he refused
leave to appeal. The Court of Appeal held that it
had no jurisdiction to entertain an appeal against that
decision. Subsequent decisions indicated that Walton

J. had wrongly construed the rent review clause. On
the second review date in 1988, the tenants sought
rectification of the lease and a determination as to the
true construction of the clause. The landlords claimed
issue estoppel based on Walton J.'s decision on the 1983
review. Sir Nicolas Browne-Wilkinson V.-C. [1] held
that the tenants were not so barred; the law admitted
of special circumstances which could prevent an issue
estoppel arising. Such circumstances included relevant
new material not available at the time of the first
decision and this could include a change in the law.
The Court of Appeal affirmed the judgment of the Vice
Chancellor. [2] On appeal to the House of Lords:

**Held,** dismissing the appeal, that one of the purposes
of estoppel was to work justice between the parties
and that there could be an exception to issue estoppel
in the special circumstance that there had become
available to a party further material relevant to the
correct determination of a point involved in earlier
proceedings, whether or not that point had been
specifically raised and decided, being material which
could not by reasonable diligence have been adduced
in those proceedings. A change in the law subsequent
to the first decision was capable of bringing the case
within the exception and the instant case presented
special circumstances such as to require the question of
construction to be reopened.

**Cases cited:**

•(1) Amax International Ltd. v. Custodian Holdings
Ltd. [1986] 2 E.G.L.R. 111, C.A.

•(2) Badar Bee v. Habib Merican Noordin [1909]
A.C. 615, P.C.

•(3) Basingstoke & Deane Borough Council v. Host
Group Ltd. [1988] 1 W.L.R. 348; [1988] 1 All E.R.
824; 56 P. & C.R. 31, C.A.

•(4) Brisbane City Council v. Att.-Gen. for
Queensland [1979] A.C. 411; [1978] 3 W.L.R. 299;
[1978] 3 All E.R. 30, P.C.

•  (5)    British Gas Corp. v. Universities
Superannuation Scheme [1986] 1 W.L.R. 398; [1986]
1 All E.R. 978; 52 P. & C.R. 111 .

•(6) Carl Zeiss Stiftung v. Rayner & Keeler Ltd. (No.
2) Ltd. [1967] 1 A.C. 853; [1966] 3 W.L.R. 125; [1966]
2 All E.R. 536, H.L.

•  (7)  Duchess of Kingston's Case (1776) 1 Leach 146 .

•(8) Equity & Law Life Assurance Society plc v. Bodfield Ltd. (1987) 54 P. & C.R. 290, C.A.

•(9) Fidelitas Shipping Co. Ltd. v. V/O Exportchleb [1966] 1 Q.B. 630; [1965] 2 W.L.R. 1059; [1965] 2 All E.R. 4, C.A.

• (10) Greenhalgh v. Mallard [1947] 2 All E.R. 255 .

• (11) Henderson v. Henderson (1843) 3 Hare 100 .

•(12) Hoystead v. Commissioner of Taxation [1926] A.C. 155, P.C.

• (13) Hoysted v. Federal Commissioner of Taxation (1921) C.L.R. 537 .

•(14) Hunter v. Chief Constable of the West Midlands Police [1982] A.C. 529; [1981] 3 W.L.R. 906; [1981] 3 All E.R. 727, H.L.

•(15) Mills v. Cooper [1967] 2 Q.B. 459; [1967] 2 W.L.R. 1343; [1967] 2 All E.R. 100, D.C.

• (16) National Westminster Bank plc v. Young (Arthur) McClelland Moore & Co. [1985] 1 W.L.R. 1123; [1985] 2 All E.R. 817, C.A., affirming [1985] E.G.L.R. 61 .

•(17) New Brunswick Railway Co. v. British and French Trust Corp. [1939] A.C. 1. H.L.

•(18) Phosphate Sewage Co. Ltd. v. Molleson (1879) 4 App. Cas. 801, H.L.

•(19) Property and Reversionary Investment Corp. Ltd. v. Templar [1977] 1 W.L.R. 1223, C.A.

• (20) Pugh v. Smiths Industries Ltd. (1982) 264 E.G. 823 .

•(21) R. v. Humphrys [1977] A.C. 1, H.L.

• (22) R. v. Inhabitants of the Township of Hartington Middle Quarter (1855) 4 E. & B. 780 .

•(23) Thoday v. Thoday [1964] P. 181; [1964] 2 W.L.R. 371; [1964] 1 All E.R. 341, C.A.

• (24) United Scientific Holdings Ltd. v. Burnley Borough Council ; Cheapside Land Development Co. v. Messels Service Co. [1978] A.C. 904; [1977] 2 W.L.R. 806; 33 P. & C.R. 220, H.L.

•(25) Yat Tung Investment Co. Ltd. v. Dao Heng Bank Ltd. [1975] A.C. 581; [1975] 2 W.L.R. 690, P.C.

**Appeal** by the National Westminster Bank plc, landlords of Rolls Buildings in Fetter Lane, against a decision of the Court of Appeal (Dillon, Staughton and Mann L.JJ.) given on November 8, 1989, (see (1990) 59 P. & C.R. 389 ) whereby their Lordships upheld a decision of Sir Nicolas Browne-Wilkinson V.-C. given on July 1, 1988,, (see (1989) 58 P. & C.R. 175 ) in favour

of the respondents, Arnold and others, tenants of the said premises. The facts are stated in the judgment of Lord Keith of Kinkel.

**Representation**

• Terence Cullen, Q.C. and Hazel Williamson, Q.C. for the appellants (defendants).
• James Munby, Q.C. and Jonathan Gaunt for the respondents (plaintiffs).

Lord Keith of Kinkel.

This appeal raises an important question concerning the availability and extent of exceptions to that branch of the rule of estoppel *per rem judicatam* which has come to be known as issue estoppel.

The appellants are landlords of premises in Fetter Lane let to the respondents, a firm of chartered accountants, under a sub-under-lease ("the **\*492** lease") dated October 28, 1976. The lease demised the premises to the respondents for a term of just under 32 years from that date, the expiry being on June 24, 2008. It provided for an initial yearly rent of £800,000, subject to review on June 24, 1983, 1988, 1993, 1998 and 2004. The rent from each rent review date is whichever is the greater of a rent equal to the rent payable during the last preceding rent period and the "fair market rent" at the relevant review date, which in default of agreement is to be fixed by arbitration. The "fair market rent" is defined as meaning:

such amount as shall represent a yearly rent at which the demised premises might reasonably be expected to be let at the relevant review date in the open market by a landlord to a tenant without a premium with vacant possession and subject to the provisions of this sub-underlease other than the rent hereby reserved there being disregarded any effect on rent of any of the matters set out in paragraphs (a) (b) or (c) of section 34 of the

Landlord and Tenant Act 1954 (as amended).

When the first rent review date came up in 1983 a dispute arose and it was referred to an arbitrator. There was disputed in particular whether under the definition of "fair market rent" the rent under the hypothetical lease for the unexpired residue of the term fell to be fixed on the basis (a) that it contained the same provisions for five-year rent reviews as the actual lease or (b) that it contained no provision for review. The arbitrator decided that the hypothetical lease should be treated as containing provision for five-yearly rent reviews, and on that basis fixed the rent at £1,003,000 per annum. In case he should prove to be wrong on the question of construction, he determined that if the hypothetical lease contained no provision for rent reviews the rent would be about 20 per cent. higher, namely £1,209,000.

An appeal by the landlords on the point of construction came before Walton J. He held that the arbitrator was wrong and that the hypothetical lease should be treated as not containing any provision for rent review, so that the rent payable was £1,209,000: National Westminster Bank plc. v. Arthur Young McClelland Moore & Co. The lessees asked Walton J. for leave to appeal and for a certificate under section 1(7)(b) of the Arbitration Act 1979 that there was a question of law of general public importance or one which for some other special reason ought to be considered by the Court of Appeal, but both were refused. The lessees then sought to appeal to the Court of Appeal against the refusal of Walton J. to grant a certificate. The Court of Appeal held that it had no jurisdiction to entertain such an appeal: National Westminster Bank plc. v. Arthur Young McClelland Moore & Co. (Practice Note).

In the course of his judgment Walton J. said [3] :

> The first and I think probably the main question which arises here is whether, when the arbitrator is deciding what is to be the fair market rent for the next rent period, he is to do that upon the basis that the lease contains (as, of course, we know it

does in fact contain) a rent review clause or whether, on the other hand, he is to fix the fair market rent on the basis that there is no such clause in the lease. I do not  **493** think that there is a presumption one way or the other. I think that in every case that must depend upon the precise terms of the lease, because it must be very much borne in mind that there is no such thing as a fair market rent of any premises in the abstract. There is only a fair market rent upon a set of abstractions which may be actual, may be hypothetical and in most cases under rent reviews are a mixture of the one and the other. For example, here we have that the premises are expected to be let with vacant possession which is, of course, something which we know as a fact just is not the case because the tenants are actually in possession and are certainly not just going to move out for the purpose of a rent review. So the attempt by Mr. Morritt [who was appearing for the tenants] to poison my mind in advance to achieve the lower of the two values by defining the fair market rent as something which favours the tenant, as in fact he was attempting to do, I do not think impresses me very much.

In the subsequent case of British Gas Corporation v. Universities Superannuation Scheme Ltd. Sir Nicolas Browne-Wilkinson V.-C. had to consider a somewhat similar rent review clause. The hypothetical lease there was to be one "containing the same provisions (other than as to the yearly rent)" as the actual lease. The Vice-Chancellor held that the hypothetical lease fell to be treated as including the rent review clause. He said [4] :

> In these circumstances, there are in my judgment conflicting decisions

Arnold v National Westminster Bank Plc (No.1) (1991) 62 P. & C.R. 490 (1991)

as to the correct approach to the construction of these clauses. I am accordingly free to adopt the approach I prefer. In my judgment the correct approach is as follows: (a) words in a rent exclusion provision which require *all* provisions as to rent to be disregarded produce a result so manifestly contrary to commercial common sense that they cannot be given literal effect; (b) other clear words which require the rent review provisions (as opposed to all provisions as to rent) to be disregarded (such as those in Pugh case) must be given effect to however wayward the result; (c) subject to (b), in the absence of special circumstances it is proper to give effect to the underlying commercial purpose of a rent review clause and to construe the words so as to give effect to that purpose by requiring future rent reviews to be taken into account in fixing the open market rental under the hypothetical letting.

In Equity and Law Life Assurance Society plc. v. Bodfield Ltd. Dillon L.J., in the course of a judgment concurred in by Fox and Russell L.JJ., expressed himself as welcoming and approving the guidelines so laid down by the Vice-Chancellor. [5] The Vice-Chancellor's approach was again approved by the Court of Appeal in Basingstoke and Deane Borough Council v. Host Group Ltd. [6] It may also be noted that in Amax International Ltd. v. Custodian Holdings Ltd. Hoffmann J. construed a rent review clause in terms similar to the present one in the opposite sense to that favoured by Walton J.

It therefore appears that there are powerful grounds for the view that Walton J. wrongly construed the rent review clause in the parties' lease, **\*494** and that he did so by virtue of an approach to the question of construction which was wholly incorrect in law.

In these circumstances, when the second rent review date occurred in 1988 the respondents sought to reopen the question of construction. They brought an action by writ claiming rectification of the lease so as to produce the result that the rent review clause is not left out of account and also a determination as to the true construction of the clause. The appellants applied to strike out the claim for a declaration on construction on the ground that the respondents were barred by issue estoppel from relitigating the very point decided by Walton J. That matter, as a preliminary issue, came before Sir Nicolas Browne-Wilkinson V.-C. who on July 1, 1988, gave judgment holding that the respondents were not so barred. [7] He took the view that the law admitted of special circumstances which could prevent an issue estoppel from arising, that such special circumstances included the situation where relevant new material, not available at the time of the first decision, had since come to light, and that such new material might include not only the discovery of new facts but also a change in the law. He said [8] :

> The question therefore is whether, given a subsequent change in the law indicating that the earlier decision was wrong, the injustice of holding the plaintiff in the second action bound by the erroneous decision in law in the first action outweighs the hardship to the other party in having to relitigate the matter and the public interest in the finality of legal proceedings.

As regards the circumstances of the instant case, he expressed himself as having no doubt that justice did require the matter to be relitigated. The relevant factors were these [9] :

> 1. There is a continuing contractual relationship of landlord and tenant under which, if there is an issue estoppel, the decision of Walton J. will regulate four further rent

WESTLAW    © 2017 Thomson Reuters.

Arnold v National Westminster Bank Plc (No. 1) (1991) 62 P. & C.R. 490 (1991)

reviews and thereby affect the rent payable until the end of the term.

2. Because of the peculiarities of the procedure applicable to appeals from arbitrators, unlike the ordinary case of a prior decision by a judge, the decision of Walton J. was not subject to appeal. Therefore a matter of a very great financial importance involving millions of pounds will, if an issue estoppel applies, be decided on a point of law which the lessees have never had the opportunity to test in the higher courts.

3. The decision whether or not to permit an appeal was the decision of Walton J. himself and there was no right of appeal against his refusal to certify the matter fit for appeal. The lessees took every possible step to test the decision in the earlier case in the higher courts but without success.

4. Subsequent decisions, in particular that of the Court of Appeal in the Equity and Law Life case, make it, at the lowest, strongly arguable that the decision of Walton J. was wrong.

**\*495**

On appeal by the appellants the Court of Appeal (Dillon, Staughton and Mann L.JJ.) on November 8, 1989, affirmed the judgment of the Vice-Chancellor upon substantially the same grounds. [10] The appellants now appeal, with leave given here, to your Lordships' House.

It is appropriate to commence by noticing the distinction between cause of action estoppel and issue estoppel. Cause of action estoppel arises where the cause of action in the later proceedings is identical to that in the earlier proceedings, the latter having been between the same parties or their privies and having involved the same subject matter. In such a case the bar is absolute in relation to all points decided unless fraud or collusion is alleged, such as to justify setting aside the earlier judgment. The discovery of new factual matter which could not have been found out by reasonable diligence for use in the earlier proceedings does not, according to the law of England, permit the latter to be reopened. The rule in Scotland, which recognises the doctrine of *res noviter veniens ad notitiam* is different: see Phospate Sewage Co. Ltd. v. Molleson . [11] There is no authority there, however, for the view that a change in the law can constitute *res noviter* . The principles upon which cause of action estoppel is based are expressed in the maxims *nemo debet bis vexari pro una et eadem causa* and *interest rei publicae ut finis sit litium* . Cause of action estoppel extends also to points which might have been but were not raised and decided in the earlier proceedings for the purpose of establishing or negativing the existence of a cause of action. In Henderson v. Henderson Sir James Wigram V.-C. expressed the matter thus [12] :

> In trying this question, I believe I state the rule of the Court correctly, when I say, that where a given matter becomes the subject of litigation in, and of adjudication by, a court of competent jurisdiction, the Court requires the parties to that litigation to bring forward their whole case, and will not (except under special circumstances) permit the same parties to open the same subject of litigation in respect of matter which might have been brought forward as part of the subject in contest, but which was not brought forward, only because they have, from negligence, inadvertence, or even accident, omitted part of their case. The plea of *res judicata* applies, except in special cases, not only to points :upon which the Court was actually required by the parties to form an opinion

and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time.

It will be seen that this passage appears to have opened the door towards the possibility that cause of action estoppel may not apply in its full rigour where the earlier decision did not in terms decide, because they were not raised, points which might have been vital to the existence or non-existence of a cause of action. The passage has since frequently been treated as settled law, in particular by Lord Shaw, giving the advice of the Judicial Committee of the Privy Council, in Hoystead v. Commissioner of Taxation . That particular part of it which admits the possible existence of exceptional **\*496** cases was approved by Lord Kilbrandon in Yat Tung Investment Co. Ltd. v. Dao Heng Bank Ltd. [13] :

> The shutting out of a "subject of litigation"—a power which no court should exercise but after a scrupulous examination of all the circumstances—is limited to cases where reasonable diligence would have caused a matter to be earlier raised; moreover, although negligence, inadvertence or even accident will not suffice to excuse, nevertheless "special circumstances" are reserved in case justice should be found to require the non-application of the rule.

Issue estoppel may arise where a particular issue forming a necessary ingredient in a cause of action has been litigated and decided and in subsequent proceedings between the same parties involving a different cause of action to which the same issue is relevant one of the parties seeks to reopen that issue. This form of estoppel seems first to have appeared in

The Duchess of Kingston's Case . A later instance is R. v. Inhabitants of the Township of Hartington Middle Quarter . The name "issue estoppel" was first attributed to it by Higgins J. in the High Court of Australia in Hoysted v. Federal Commissioner of Taxation . It was adopted by Diplock L.J. in Thoday v. Thoday . Having described cause of action estoppel as one form of estoppel per rem judicatam , he said [14] :

> The second species, which I will call "issue estoppel," is an extension of the same rule of public policy. There are many causes of action which can only be established by proving that two or more different conditions are fulfilled. Such causes of action involve as many separate issues between the parties as there are conditions to be fulfilled by the plaintiff in order to establish his cause of action; and there may be cases where the fulfilment of an identical condition is a requirement common to two or more different causes of action. If in litigation upon one such cause of action any of such separate issues as to whether a particular condition has been fulfilled is determined by a court of competent jurisdiction, either upon evidence of upon admission by a party to the litigation, neither party can, in subsequent litigation between one another upon any cause of action which depends upon the fulfilment of the identical condition, assert that the condition was fulfilled if the court has in the first litigation determined that it was not, or deny that it was fulfilled if the court in the first litigation determined that it was.

Issue estoppel, too, has been extended to cover not only the case where a particular point has been raised and specifically determined in the earlier proceedings,

Arnold v National Westminster Bank Plc (No.1) (1991) 62 P. & C.R. 490 (1991)

but also that where in the subsequent proceedings it is sought to raise a point which might have been but was not raised in the earlier. In Fidelitas Shipping Co. Ltd. v. V/O Exportchleb Diplock L.J. said [15]:

> In the case of litigation the fact that a suit may involve a number of different issues is recognised by the RSC which contain provision enabling one or more questions (whether of fact or law) in an action to be tried before others. Where the issue separately **\*497** determined is not decisive of the suit, the judgment upon that issue is an interlocutory judgment and the suit continues. Yet I take it to be too clear to need citation of authority that the parties to the suit are bound by the determination of the issue. They cannot subsequently in the same suit advance argument or adduce further evidence directed to showing that the issue was wrongly determined. Their only remedy is by way of appeal from the interlocutory judgment and, where appropriate, an application to the appellate court to adduce further evidence: but such application will only be granted if the appellate court is satisfied that the fresh evidence sought to be adduced could not have been available at the original hearing of the issue even if the party seeking to adduce it had exercised due diligence.

> This is but an example of a specific application of the general rule of public policy, *nemo debet bis vexari pro una et eadem causa*. The determination of the issue between the parties gives rise to what I ventured to call in Thoday v. Thoday an "issue estoppel." It operates in subsequent suits between the same parties in which

the same issue arises. *A fortiori* it operates in any subsequent proceedings in the same suit in which the issue has been determined. The principle was expressed as long ago as 1843 in the words of Wigram V.-C. in Henderson v. Henderson which were expressly approved by the Judical Committee of the Privy Council in Hoystead v. Commissioner of Taxation. I would not seek to better them.

Then in Brisbane City Council v. Att.-Gen. for Queensland Lord Wilberforce giving the advice of Judical Committee of the Privy Council, said [16]:

> The second defence is one of " *res judicata* ." There has, of course, been no actual decision in litigation between these parties as to the issue involved in the present case, but the appellants invoke this defence in its wider sense, according to which a party may be shut out from raising in a subsequent action an issue which he could, and should, have raised in earlier proceedings. The classic statement of this doctrine is contained in the judgment of Wigram V.-C. in Henderson v. Henderson and its existence has been reaffirmed by this Board in Hoystead v. Commissioner of Taxation. A recent application of it is to be found in the decision of the Board in Yat Tung Investment Co. Ltd. v. Dao Heng Bank Ltd. It was, in the judgment of the Board, there described in these words [17]:

> > … there is a wider sense in which the doctrine may

be appealed to, so that it becomes an abuse of process to raise in subsequent proceedings matters which could and therefore should have been litigated in earlier proceedings.

This reference to "abuse of process" has previously been made in Greenhalgh v. Mallard , *per* Somervell L.J. and their Lordships endorse it. This is the true basis of the doctrine and it ought only to be applied when the facts are such as to amount to an abuse: otherwise there is a danger of a party being shut out from bringing forward a genuine subject of litigation.

The difficulty which I see about issue estoppel is a practical one. Suppose the first case is one of trifling importance but it involves for one party proof of facts which would be expensive and troublesome; and that party can see the possibility that the same point may arise if his opponent later raises a much more important claim. What is he to do? The second case may never be brought. Must he go to great trouble and expense to forestall a possible plea of issue estoppel if the second case is brought? This does not arise in cause of action estoppel: if the cause of action is important, he will incur the expense: if it is not, he will take the chance of winning on some other point. It seems to me that there is room for a good deal more thought before we settle the limits of issue estoppel. But I have no doubt that issue estoppel does exist in the law of England. And, if it does, it would apply in the present case, if the earlier judgment had been a final judgment of an English court.

It thus appears that, although Henderson v. Henderson was a case of cause **\*498** of action estoppel, the statement there by Wigram V.-C. has been held to be applicable also to issue estoppel. That statement includes the observation that there may be special circumstances where estoppel does not operate. The instant case is concerned with the nature of such special circumstances.

There are indications that special circumstances may exist where the earlier proceedings have resulted in a default judgment. I refer to New Brunswick Railway Co. v. British and French Trust Corp. [18] Then in Carl Zeiss Stiftung v. Rayner & Keeler Ltd. (No. 2) , where the earlier proceedings had taken place in a foreign court, Lord Reid stated [19] :

In the same case Lord Upjohn went so far as to express doubts about the application to issue estoppel of the full breadth of the statement by Wigram V.-C. in Henderson v. Henderson . He said [20] :

All estoppels are not odious but must be applied so as to work justice and, not injustice and I think the principle of issue estoppel must be applied to the circumstances of the subsequent case with this overriding consideration in mind.

Arnold v National Westminster Bank Plc (No.1) (1991) 62 P. & C.R. 490 (1991)

In Mills v. Cooper the question arose whether the respondent, having been found by magistrates not to have been a gipsy on a certain date upon which he had been charged with unlawfully encamping on a highway, had the protection of issue estoppel in relation to a similar charge relating to a later date. It was held that the status of gipsy was not an unalterable one, so that the respondent might well be a gipsy at one time though not at another. Diplock L.J. made the following general observation about issue estoppel [21] :

> That doctrine, so far as it affects civil proceedings, may be stated thus: a party to civil proceedings is not entitled to make, as against the other party, an assertion, whether of fact or of the legal consequences of facts, the correctness of which is an essential element in his cause of **\*499** action or defence, if the same assertion was an essential element in the previous cause of action or defence in previous civil proceedings between the same parties or their predecessors in title and was found by a court of competent jurisdiction in such previous civil proceedings to be incorrect, unless further material which is relevant to the correctness or incorrectness of the assertion and could not by reasonable diligence have been adduced by that party in the previous proceedings has since become available to him.

In Hunter v. Chief Constable of the West Midlands Police Lord Diplock said, [22] with the concurrence of the other members of the House, that this passage had been adopted and approved by your Lordships' House in R. v. Humphrys .

It is to be noted that there appears to be no decided case where issue estoppel has been held not to apply by reason that in the later proceedings a party has brought forward further relevant material which he could not

by reasonable diligence have adduced in the earlier. There is, however, an impressive array of dicta of high authority in favour of the possibility of this. It was argued for the appellants that exceptions to the rule of issue estoppel should be admitted only in the case of the earlier judgment being a default or a foreign judgment and further that an exception should not be recognised where the point at issue had actually, as here, been raised and decided in the earlier proceedings, but only where the point might have been but was not so raised and decided. The later dicta are, however, adverse to these arguments. It was argued that there was no logical distinction between cause of action estoppel and issue estoppel and that, if the rule was absolute in the one case as regards points actually decided, so it should be in the other. But there is room for the view that the underlying principles upon which estoppel is based, public policy and justice, have greater force in cause of action estoppel, the subject matter of the two proceedings being identical, than they do in issue estoppel, where the subject matter is different. Once it is accepted that different considerations apply to issue estoppel, it is hard to perceive any logical distinction between a point which was previously raised and decided and one which might have been but was not. Given that the further material which would have put an entirely different complexion on the point was at the earlier stage unknown to the party and could not by reasonable diligence have been discovered by him, it is hard to see why there should be a different result according to whether he decided not to take the point, thinking it hopeless, or argued it faintly without any real hope of success. In my opinion your Lordships should affirm it to be the law that there may be an exception to issue estoppel in the special circumstance that there has become available to. a party further material relevant to the correct determination of a point involved in the earlier proceedings, whether or not that point was specifically raised and decided, being material which could not by reasonable diligence have been adduced in those proceedings. One of the purposes of estoppel being to work justice between the parties, it is open to courts to recognise that in special circumstances inflexible application of it may have the opposite result, as was observed by Lord Upjohn in the passage which I have quoted above from his speech in the Carl Zeiss case.

**\*500**

Arnold v National Westminster Bank Plc (No. 1) (1991) 62 P. & C.R. 490 (1991)

It is next for consideration whether the further relevant material which a party may be permitted to bring forward in the later proceedings is confined to matters of fact, or whether what may not entirely inappositely be described as a change in the law may result in, or be an element in special circumstances enabling an issue to be reopened. Counsel for the respondents argued that the passage quoted above from the judgment of Diplock L.J. in Mills v. Cooper specifically recognised the possibility of a change in the law having this effect, by its references to "an assertion, whether of fact or of the legal consequences of facts" and to "further material which is relevant to the correctness or incorrectness of the assertion." A change in the law, so it was contended, must clearly be further material which was relevant to the correctness or incorrectness of an assertion of the legal consequences of facts. I do not, for myself, feel able to accept that Lord Diplock had a change in the law in mind when he wrote the passage in question. If he had done so, I consider that he would have expressed himself more specifically. Your Lordships should appropriately, in my opinion, regard the matter as entire and approach it from the point of view of principle. If a judge has made a mistake, perhaps a very egregious mistake, as is said of Walton J.'s judgment here, and a later judgment of a higher court overrules his decision in another case, do considerations of justice require that the party who suffered from the mistake should be shut out, when the same issue arises in later proceedings with a different subject matter, from reopening that issue?

A certain analogy can, in my view, be drawn with the principles governing the situation where leave to appeal out of time is sought. In Property and Reversionary Investment Corp. Ltd. v. Templar a landlord's claim for increased rent under a rent review clause had been dismissed upon the ground of non-compliance with the time limit for initiating the review. Two-and-a-half years later this House reversed two decisions of the Court of Appeal which had proceeded upon the same basis: United Scientific Holdings Ltd. v. Burnley Borough Council and Cheapside Land Development Co. Ltd. v. Messels Service Co. The Court of Appeal granted the landlord leave to appeal out of time against the judgment dismissing his claim. Roskill L.J. said [23] :

> The real point here, as Mr. Goodhart ultimately accepted, is

whether it is right that these parties should have their continuing contractual relationship governed by a lease the terms of which have assumedly been erroneously construed in the court below. I think that notwithstanding Mr. Hunt's submissions put the case that the landlords should be left to receive the lower rent for the next 18 months or so (which was until the next rent review date) and thereafter become entitled to claim the higher rent in accordance with the House of Lords' decision, there are special circumstances which justify leave to appeal out of time.

Cumming-Bruce L.J. said [24] :

> Now that the House of Lords has decided that the proper construction of the contract is other than that decided by the judge, I agree that there are special circumstances here because it does not seem just that *501 future obligations between the parties to the lease should depend upon the construction now shown to be wrong.

In the instant case there was no right of appeal against the judgment of Walton J. because he refused to grant a certificate that the case included a question of law of general public importance. There can be little doubt that he was wrong in this refusal, as is shown by the large volume of litigation on the construction of rent review clauses and the decisions in that field which I have mentioned earlier. I consider that anyone not possessed of a strictly legalistic turn of mind would think it most unjust that a tenant should be faced with a succession of rent reviews over a period of over 20 years all proceedings upon a construction of

his lease which is highly unfavourable to him and is generally regarded as erroneous. It is true that the chosen method of settling disputes about rent reviews, namely arbitration, involves that the right of appeal from the judge of first instance is subject to limitations. But these limitations were not present when the lease was entered into in 1976, having been introduced by the Arbitration Act 1979 . There is much force also in the view that the landlord, if the issue cannot be reopened, would most unfairly be receiving a very much higher rent than he would be entitled to on a proper construction of the lease. The public interest in seeing an end to litigation is of little weight in circumstances under which, failing agreement, there must in any event be arbitration at each successive review date. Estoppel *per rem judicatam* , whether cause of action estoppel or issue estoppel, is essentially concerned with preventing abuse of process. In the present case I consider that abuse of process would be favoured rather than prevented by refusing the respondents permission to reopen the disputed issue. Upon the whole matter I find myself in respectful agreement with the passage in the judgment of Sir Nicolas Browne-Wilkinson V.-C. where he said 25 :

> In my judgment a change in the law subsequent to the first decision is capable of bringing the case within the exception to issue estoppel. If, as I think, the yardstick of whether issue estoppel should be held to apply is the justice to the parties, injustice can flow as much from a subsequent change in the law as from the subsequent discovery of new facts. In both cases the injustice lies in a successful party to the first action being held to have rights which in fact he does not possess. I can therefore see no reason for holding that a subsequent change in the law can *never* be sufficient to bring the case within the exception. Whether or not such a change does or does not bring the case within the exception must depend on the exact circumstances of each case.

I am satisfied, in agreement with both courts below, that the instant case presents special circumstances such as to require the respondents to be permitted to reopen the question of construction decided against them by Walton J., that being a decision which I regard as plainly wrong.

My Lords, for these reasons I would dismiss the appeal.

Lord Griffiths.

I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Keith of Kinkel. I agree with it and, for the reasons which he has given, I, too, would dismiss this appeal.

**\*502**
Lord Oliver of Aylmerton.

I have had the advantage of reading in draft the speeches of my noble and learned friends, Lord Keith of Kinkel and Lord Lowry. I agree with both speeches and for the reasons given by them I, too, would dismiss this appeal.

Lord Jauncey of Tullichettle.

I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Keith of Kinkel. I agree with it and, for the reasons which he has given, I, too, would dismiss this appeal.

Lord Lowry.

At first I had misgivings at the prospect of dismissing this appeal but, having seen the speech of my noble and learned friend, Lord Keith of Kinkel, which I have had the opportunity of reading in draft, and having also carefully read again the judgments of the Vice-Chancellor and the Court of Appeal, I am now clearly persuaded that this is the right course to take. With a view to stating my initial outlook and ultimate conclusions, I would adopt my noble and learned

friend's recital of the facts and his terminology, as well as his conclusions.

My starting points on issue estoppel were The Duchess of Kingston's Case and R. v. Inhabitants of the Township of Hartington Middle Quarter . Basing myself on these cases, which have never been overruled or disapproved and have often been expressly followed, I found it remarkable that from Henderson v. Henderson until Mills v. Cooper the doctrine of new evidence not discoverable by reasonable diligence seems to have operated in relation to "non-issue estoppel" but was not heard of in connection with issue estoppel, the idea of which had been developed as a branch of estoppel *per rem judicatam* , the main branch being cause of action estoppel. The accepted principle of finality seems to have been applied equally to each branch: the decision of an issue which was essential to the decision of the action was treated in the same way as the decision of the action itself. In one way the logic of not distinguishing issue estoppel from cause of action is unassailable. If the decided issue was crucial in the first action, it remained crucial in the second, and the important point was that the issue was decided (not neglected or overlooked, as in non-issue estoppel) and was essential to the decision of the first action; it was therefore equivalent to the decision itself and was an equally great obstacle to a claim in the second action.

It seemed to me that the proviso enunciated by Diplock L.J. in Mills v. Cooper [26] was not founded on authority. It was, in fact, part of an *obiter dictum* unrelated to the case in hand. Although delivered *ex tempore* , the judgment, drew upon several phrases in decided cases and appeared to have resulted from careful preparation with a view to defining constructively the law of issue estoppel. The approvals given in R. v. Humphrys and Hunter v. Chief Constable of the West Midlands Police are *obiter* endorsements of *obiter dicta* , so far as the vital words are concerned, and only Lord Hailsham of St. Marylebone [27] comes close to voicing a specific approval of the proviso. Their Lordships, moreover, had no need in those two cases to focus on the finer points of the estoppel doctrine, and 24 years after Mills v. Cooper there has not been until the present case an actual example of issue estoppel being distinguished in the result from cause of action estoppel.

The reliance on "new law" in the proviso was a new departure. It was conceded before your Lordships that the presentation of a new argument or the discovery of a previously overlooked authority would not suffice: the new law must take the form of a new decision; but it seems that this could come about by a lucky accident or even as a result of encouraging another litigant to take the same point. In Property and Reversionary Investments Corp. Ltd. v. Templar a new decision opened the way for the Court of Appeal to exercise its discretion by permitting a late appeal; that case was not an example of defeating an issue estoppel, since the granting of leave to appeal out of time meant that success was achieved in what was still a pending action.

It appears from this review that there are significant arguments in favour of the proposition that issue estoppel constitutes a complete bar to relitigating a point once it has been decided but I am now of the opinion that the court can, and in exceptional circumstances should, relax that rule.

I think the first clue, though not an obvious one, is to be found in certain words of Wigram V.-C. in Henderson v. Henderson [28] which were contained in the passages approved by the Judicial Committee of the Privy Council in Hoystead v. Commissioner of Taxation , [29] and recalled by Diplock L.J. in Fidelitas Shipping Co. Ltd. v. V/O Exportchleb [30] :

> The plea of *res judicata* applies, except in special cases, not only to points upon which the court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time.

I refer to the comment on this passage which was made by Sir Nicolas Browne-Wilkinson, V.-C. [31]

In Fidelitas Lord Denning, M.R. had already said [32] :

Arnold v National Westminster Bank Plc (No. 1) (1991) 62 P. & C.R. #ID[1991]

The rule then is that, once an issue has :been raised and distinctly determined between the parties, then, as a general rule, neither party can be allowed to fight that issue all over again. The same issue cannot be raised by either of them again in the same or subsequent proceedings except in special circumstances, see Badar Bee v. Habib Merican Noordin . [33]

The reference to Badar Bee clouds the issue most unfortunately, since that case has nothing to say to the proposition for which it was cited as an authority. Nonetheless, I respectfully agree with the observation of Dillon L.J. [34] that development of the law in Fidelitas

flows logically from the earlier cases. My noble and learned friend Lord Keith has already drawn attention to the important statements of Lord Reid and Lord Upjohn in *504 Carl Zeiss Stiftung v. Rayner & Keeler Ltd. (No. 2) which effectively encourage the proposition that the doctrine of issue estoppel is not inflexible.

Once the possibility of relying on special circumstances is established as a legal proposition, I have no hesitation in agreeing that the circumstances of this case are special and indeed exceptional.

Accordingly, I, too, would dismiss the appeal.

### Representation

•Solicitors— Stephenson Harwood ; Freshfields.

Appeal dismissed.  *505

Footnotes

| 1 | (1989) 58 P. & C.R. 175 . |
| 2 | (1990) 59 P. & C.R. 389. |
| 3 | [1985] 1 E.G.L.R. 61 at p. 62. |
| 4 | [1986] 1 W.L.R. 398 at p. 403; 52 P. & C.R. 111 at p. 115. |
| 5 | (1987) 54 P. & C.R. 290 at p. 293. |
| 6 | [1988] 1 W.L.R. 348 at pp. 353, 355; 56 P. & C.R. 31 at p. 38. |
| 7 | (1989) 58 P. & C.R. 175 . |
| 8 | Ibid. at p. 181. |
| 9 | Ibid. at p. 182. |
| 10 | (1990) 59 P. & C.R. 389 . |
| 11 | (1879) 4 App. Cas. 801 at p. 814. per Earl Cairns. |
| 12 | [1843] 3 Hare 100 at p. 114. |
| 13 | [1975] A.C. 581 at p. 590. |
| 14 | [1964] P. 181 at p. 198. |
| 15 | [1966] 1 Q.B. 630 at p. 642. |
| 16 | [1979] A.C. 411 at p. 425. |
| 17 | [1975] A.C. 581 at p. 590. |
| 18 | [1939] A.C. 1 at p. 21. per Lord Maugham L.C., at p. 28, per Lord Russell, at p. 38, per Lord Wright. |
| 19 | [1967] 1 A.C. 853 at p. 917. |
| 20 | Ibid. at p. 947. |
| 21 | [1967] 2 Q.B. 459 at p. 468. |
| 22 | [1982] A.C. 529 at p. 541. |
| 23 | [1977] 1 W.L.R. 1223 at p. 1225. |
| 24 | Ibid. at p. 1225. |
| 25 | (1989) 58 P. & C.R. 175 at p. 182. |
| 26 | [1967] 2 Q.B. 459 at pp. 468–469. |
| 27 | [1977] A.C. 1 at p. 39. |
| 28 | [1843] 3 Hare 100 at p. 115. |
| 29 | [1926] A.C. 155 at p. 170. |
| 30 | [1966] 1 Q.B. 630 at p. 643. |

WESTLAW   © 2017 Thomson Reuters.

| 31 | [1989] 58 P. & C.R. 175 at p. 180. |
| 32 | [1966] 1 Q.B. 630 at 640. |
| 33 | [1909] A.C. 615 at p. 623, *per* Lord Macnaghten. |
| 34 | (1990) 59 P. & C.R. 389 at p. 399. |

(1991) 62 P. & C.R. 490

© 2017 Sweet & Maxwell

---

**End of Document**
© 2017 Thomson Reuters.

# TAB 11

**Aspect Contracts (Asbestos)
Limited v. Higgins Construction plc**

On appeal from: [2013] EWCA Civ 1541

SC

17 June 2015

**[2015] UKSC 38**

**2015 WL 3630423**

before Lord Mance Lord Wilson Lord
Sumption Lord Reed Lord Toulson
Judgment Given On 17 June 2015

**Analysis**

Heard on 14 and 15 April 2015

**Representation**

•Appellant Andrew Bartlett QC Isabel Hitching
(Instructed by Silver Shemmings LLP ).
•Respondent Fiona Sinclair QC Richard Liddell
(Instructed by Mills & Reeve LLP ).

**Judgment**

Lord Mance: (With Whom Lord Wilson, Lord Sumption,
Lord Reed and Lord Toulson Agree)

**Introduction**

1  This appeal raises difficult and important issues
about the effect of adjudication pursuant to provisions
implied into a construction contract under section
108(5) of the Housing Grants, Construction and
Regeneration Act 1996 , read with the Scheme
for Construction Contracts (England and Wales)
Regulations 1998 (SI 1998 No 649). The construction
contract (within the broad meaning assigned by
section 104(2) of the 1996 Act) was a contract
by the respondent, Aspect Contracts (Asbestos) Ltd
("Aspect"), to carry out an asbestos survey and report
on blocks of maisonettes in Hounslow which the

appellant building contractor, Higgins Construction
Plc ("Higgins"), was considering redeveloping.

2  The survey was conducted in March 2004 and
the report was dated 27 April 2004. During the
redevelopment in early 2005, Higgins allegedly found
and had to have removed asbestos containing materials
which had not been identified in the report. A dispute
consequently arose with Aspect.

3  Negotiation and mediation having failed, Higgins
referred the dispute to adjudication, claiming £822,482
damages plus interest. The claim was for breach of
contractual and/or conterminous tortious duties to
exercise reasonable skill and care. By a decision dated
28 July 2009, the adjudicator, Ms Rosemary Jackson
QC, concluded that Aspect had been in breach of such
duties causing Higgins loss in various, though not all,
respects alleged by Higgins, and ordered that Aspect
pay Higgins £490,627, plus interest which amounted,
at the date of the decision, to £166,421.05. She also
ordered Aspect to pay her own fees of £8,750 plus VAT.
On 6 August 2009 Aspect duly paid Higgins £658,017,
a sum which included further interest from the date of
the decision.

4  Higgins did not commence any proceedings, whether
to recover the balance of its claim, £331,855 plus
interest, or otherwise. The limitation period expired on
the face of it on or about 27 April 2010 for any action by
Higgins founded on breach of the construction contract
and at the very latest by early 2011 for any action
founded on tort: Limitation Act 1980, sections 2 and 5 .
Higgins was evidently content to let matters rest. It did
not, so far as appears, ask Aspect to agree, and Aspect
did not agree, to treat the adjudicator's decision as final.

**Aspect's claim**

5  Only after the expiry of both the above-mentioned
limitation periods did Aspect on 3 February 2012 itself
commence the present proceedings seeking to recover
the sum it paid on 6 August 2009. It did so without
giving prior notice that it was dissatisfied with Ms
Jackson's decision or going through any pre-action
protocol procedure.

6 Aspect confines itself expressly to a contention that no
sum was due to Higgins on an examination of the merits

of the original dispute, regarding the alleged failure to identify and report the existence of asbestos containing materials beyond those mentioned in its report. It claims that the sum of £658,017 is repayable accordingly. Higgins however seeks to counterclaim for the £331,855 balance of its claim and interest. Only in relation to this balance does Aspect raise a limitation plea, under sections 2 and 5 of the Limitation Act . These sections provide that any action founded on, respectively, tort or simple contract "shall not be brought after the expiration of six years from the date on which the cause of action accrued".

7  Aspect rests its claim on an implied term, alternatively in restitution. The implied term is that:

> "in the event that a dispute between the parties was referred to adjudication pursuant to the Scheme and one party paid money to the other in compliance with the adjudicator's decision made pursuant to the Scheme, that party remained entitled to have the decision finally determined by legal proceedings and, if or to the extent that the dispute was finally determined in its favour, to have that money repaid to it."

**The present proceedings**

8  By consent on 31 January 2013 Akenhead J ordered the trial of a preliminary issue as to (a) the existence of the implied term, (b) the limitation period applicable to any such implied term, (c) the limitation period applicable to the counterclaim, and (d) the existence or otherwise of a claim for restitution. By a clear and comprehensive judgment dated 23 May 2013, he held that there was no such implied term as alleged, that Aspect could have claimed a declaration of non-liability at any time within six years after performance of the contract, upon the grant of which declaration the court would then have had ancillary and consequential power to order repayment, but that any such claim was

now time-barred. He also held that there was, in these circumstances and in the absence of any recognised basis like mistake or duress and of any right to have the adjudicator's decision set aside, no claim in restitution.

9  The Court of Appeal (Longmore, Rimer and Tomlinson LJJ) [2014] 1 WLR 1220, in a concise judgment given by Longmore LJ, reached an opposite conclusion. It held that the Scheme implied that any overpayment could be recovered. It noted that Higgins's contrary case faced a number of difficult questions, such as, first, the fairness of a conclusion that required any claim for repayment to be made within six years of the original contractual performance, second, the juridical basis for a conclusion that a declaration of non-liability would carry with it a right to order repayment and, third, the correctness of the judge's conclusion that a declaration of non-liability was liable to be time-barred. Aspect did not pursue its pleaded restitutionary claim before the Court of Appeal.

10  The present appeal follows by this court's permission. In giving permission, the court informed the parties that:

> "without prejudging whether it would be open to [Aspect] to raise any positive point on restitution, the Supreme Court may wish as part of the context to have explained the legal position regarding restitution."

The parties accordingly exchanged cases which addressed the position regarding restitution, and, during the course of the hearing, Miss Fiona Sinclair QC for Aspect sought permission to raise a case in restitution based on the payment made. Mr Andrew Bartlett QC for Higgins resisted this, and the court heard submissions on it *de bene esse* . In the event, since the issue was raised at first instance and is one of pure law, I consider that permission should be granted to Aspect to rely upon restitution as an alternative to its primary claim based on an implied term.

**The legislation**

11  Section 108 of the Housing Grants, Construction and Regeneration Act 1996 (in its original form, as in force before its presently immaterial amendment by the Local Democracy, Economic Development and Construction Act 2009 ) provides:

> "108.–  Right to refer disputes to adjudication.
>
> (1)   A party to a construction contract has the right to refer a dispute arising under the contract for adjudication under a procedure complying with this section.
>
> For this purpose 'dispute' includes any difference.
>
> (2) The contract shall —
>
> (a) enable a party to give notice at any time of his intention to refer a dispute to adjudication;
>
> (b)  provide a timetable with the object of securing the appointment of the adjudicator and referral of the dispute to him within 7 days of such notice;
>
> (c)  require the adjudicator to reach a decision within 28 days of referral or such longer period as is agreed by the parties after the dispute has been referred;
>
> (d) allow the adjudicator to extend the period of 28 days by up to 14 days, with the consent of the party by whom the dispute was referred;
>
> (e) impose a duty on the adjudicator to act impartially; and
>
> (f)  enable the adjudicator to take the initiative in ascertaining the facts and the law.
>
> (3)  The contract shall provide that the decision of the adjudicator is binding until the dispute is finally determined by legal proceedings, by arbitration (if the contract provides for arbitration or the parties otherwise agree to arbitration) or by agreement.
>
> The parties may agree to accept the decision of the adjudicator as finally determining the dispute.
>
> (5)   If the contract does not comply with the requirements of subsections (1) to (4), the adjudication provisions of the Scheme for Construction Contracts apply"

12  Section 114 provides that:

> "(1)   The Minister shall by regulations make a scheme ('the Scheme for Construction Contracts') containing provision about the matters referred to in the preceding provisions of this Part.
>
> ….
>
> (4)  Where any provisions of the Scheme for Construction Contracts apply by virtue of this Part in default of contractual provision agreed by the parties, they have effect as implied terms of the contract concerned."

13  The Scheme contained in the Schedule to the Regulations is in parallel terms to those indicated in

section 108(1) to (4), with slight differences which no-one suggests are significant. It provides:

(1)   Any party to a construction contract (the 'referring party') may give written notice (the 'notice of adjudication') at any time of his intention to refer any dispute arising under the contract, to adjudication. …

(3) The notice of adjudication shall set out briefly–

(a) the nature and a brief description of the dispute and of the parties involved,

(b)  details of where and when the dispute has arisen, …

(1)  The adjudicator shall reach his decision not later than —

(a)  twenty eight days after receipt of the referral notice mentioned in paragraph 7(1), or

(b) forty two days after receipt of the referral notice if the referring party so consents, or

(c)  such period exceeding twenty eight days after receipt of the referral notice as the parties to the dispute may, after the giving of that notice, agree.

…

(2)  The decision of the adjudicator shall be binding on the parties, and they shall comply with it until the dispute is finally determined by

legal proceedings, by arbitration (if the contract provides for arbitration or the parties otherwise agree to arbitration) or by agreement between the parties."

14  By providing that the decision of an adjudicator is binding and that the parties shall "comply with it", paragraph 23(2) of the Scheme makes the decision enforceable for the time being. It is enforceable by action founded on the contractual obligation to comply with the decision combined, in a normal case, with an application for summary judgment. The limitation period for enforcement will be six years from the adjudicator's decision. But the decision is only binding and the obligation to comply with it only lasts "until the dispute is finally determined" in one of the ways identified. By use of the word "until", paragraph 23(2) appears to contemplate that there will necessarily be such a determination. The short time limits provided by paragraph 19(1) also indicate that adjudication was envisaged as a speedy provisional measure, pending such a determination. But there is nothing to prevent adjudication being requested long after a dispute has arisen and without the commencement of any proceedings. Further, it seems improbable that the Scheme imposes on either party any sort of obligation to start court or arbitration proceedings in order to confirm its entitlement. Either or both of the parties might understandably be content to let matters rest.

15  Section 108(3) of the Act and paragraph 23(2) of the Scheme might in the above circumstances have been more realistic if they had expressed the binding nature of an adjudicator's decision as extending "unless and until". As already explained, it seems clear that neither party is obliged ever to commence legal proceedings, and that if neither does the adjudicator's decision continues to bind. In this respect, an adjudication cannot be equated with an interim payment ordered by the court in the course of court proceedings. The recipient of such an interim payment cannot discontinue the proceedings without the payer's consent or the court's permission, and is therefore at risk of being ordered to make repayment as a condition of discontinuance: see CPR 25.8(2)(a) and 38.2(2)(b) .

### Analysis of the question on this appeal

16 The key question is how far a paying party, here Aspect, is able to disturb the provisional position established by an adjudicator's decision, by itself commencing proceedings after the time has elapsed when Higgins could bring any claim founded on the original breach of contract or tort. That depends upon the basis of any claim by Aspect to recover the sum it has provisionally paid under the adjudicator's decision. Just as Higgins has a right to enforce payment pursuant to an adjudicator's decision, so Aspect must on some basis be able to recover such a payment, if it is established, by legal proceedings, arbitration or agreement, that such sum was not due in respect of the original dispute.

17 Without the ability to recover such a payment, the Scheme makes no sense. Adjudication is conceived as a provisional measure. At a cash flow level, Higgins remains entitled to the payment unless and until the outcome of legal proceedings, arbitration or negotiations, leads to a contrary conclusion. But at the deeper level of the substantive dispute between the parties, the parties have rights and liabilities, which may differ from those identified by the adjudication decision, and on which the party making a payment under an adjudication decision must be entitled to rely in legal proceedings, arbitration or negotiations, in order to make good a claim to repayment on some basis. Aspect's case is, as I have noted, that this entitlement arises from the payment, to the extent that this is subsequently shown not to have been due, and is based on an implied term or alternatively restitution.

### Higgins's primary case

18 In contrast, on Higgins's case, Aspect's only entitlement is to seek declaratory relief, and, after obtaining a declaration, to rely on a power in the court to grant consequential relief by way of an order for repayment. Higgins submits that any such claim to declaratory relief became time-barred in contract in April 2010 and in tort at the same date (or at latest by early 2011), so that there is now no way in which Aspect can in the present proceedings ask the court to order repayment. That corresponds with the result at which Akenhead J arrived. It involves in Higgins's

submission an appropriate correlation of the time limits within which Higgins can pursue claims against Aspect and Aspect can pursue claims against Higgins.

19 I have no difficulty in accepting that Aspect could at any time, from at least the development in early 2005 of the original dispute, have asked the court to declare that it had not committed any breach of contract or incurred any tortious liability to Higgins, and that the court would have regarded proceedings of this nature for a declaration as entirely admissible and appropriate. But, in common with the Court of Appeal, I cannot accept that this is a complete analysis of the route by which Aspect could and should have pursued the claim which it now brings. It ignores a core ingredient of and the immediate trigger to Aspect's current claim, which is that it has been ordered to make and has made a large payment in 2009. It is artificial to treat a claim to recover that sum as based on an alleged cause of action accruing in 2004 or early 2005. To treat Aspect's remedy as being to seek a declaration, and then to invite the court to use its alleged consequential powers in order to grant the relief which is the true object of the proceedings, is equally artificial.

20 Mr Bartlett did not, to my mind, identify any authority for the proposition that a court can or should make orders consequential upon a declaration of non-liability for the payment of any sums which the recipient would not have a right to claim on some independent juridical basis. The majority judgments in Guaranty Trust Company of New York v Hannay [1915] 2 KB 536 do not support such a proposition. They show that declarations may be given in situations where there is, or is as yet, no cause of action. A common example is where a claim is made by an insured against liability insurers seeking a declaration that they will be liable to indemnify him in respect of any third party liability which he may be found to have. But consequential relief depends, as Pickford LJ indicated at pp 558–559, upon the existence of a cause of action, or interference, actual or threatened, with a right. When Bankes LJ said at p 572 that the word "relief" was "not confined to relief in respect of a cause of action", he was referring to the requirement under the Judicature Act 1873, section 100 and the then RSC O XVI rule 1 that there must in every action be a person seeking relief, and to the possibility of claiming "relief" by way of a declaration when no such cause of action exists. He was not suggesting that

a claim for such a declaration could be accompanied by consequential relief ordering a payment to which there was no independent right.

21  I am furthermore unable to accept that a claim for a declaration that a person has not committed a tort or breach of contract is a claim falling within, respectively, section 2 or 5 of the Limitation Act 1980 , or that either section could be applied by analogy as Higgins also submitted. A claim for a declaration that a contractual right has accrued has been held at first instance to be a claim involving a cause of action founded on simple contract: P&O Nedlloyd BV v Arab Metals Co (The "UB Tiger") [2005] EWHC 1276 (Comm), [2005] 1 WLR 3733 , para 20. Accepting without considering that analysis, a claim for a declaration that a person has not broken a contract might also be regarded as a claim "founded on simple contract" (though a claim that a person was not party to any contract certainly could not be); however a claim that a person has not broken a contract could not be a claim in respect of which it could sensibly be said that any "cause of action" had accrued, still less accrued on any particular date. On that basis section 5 could not apply, directly or by analogy.

22  As to section 2 , a claim that a person had not committed a tort could not in any circumstances sensibly be regarded as a claim founded on tort, quite apart from the impossibility of identifying any "date on which the cause of action accrued", for the purpose of applying section 2 either directly or by analogy. The special time limit for negligence claims provided by section 14A of the Limitation Act 1980 would also be impossible to apply in relation to a claim for negative declaratory relief as to the absence of any liability in tort. Miss Sinclair submitted that what the adjudicator described as Higgins's "coterminous" tort claim was capable of being submitted to adjudication, along with its contract claim. In support of that proposition, Miss Sinclair referred to Premium Nafta Products Ltd v Fili Shipping Co Ltd [2007] UKHL 40 , as superseding the more limited approach taken in Fillite (Runcorn) Ltd v Aqua-lift (1989) 45 BLR 27 (CA) — see also Woolf v Collis Removal Service [1948] 1 KB 11 , 18–19, Astro Vencedor Co Na SA v Mabanaft GmbH [1971] 2 QB 588 , 595, Empresa Exportadora de Azucar v Industria Azucarera Nacional SA [1983] 2 Lloyd's Rep 171 , 183 and Chimimport plc v G D'Alexio Sas [1994] 2 Lloyd's Rep 366 , 371–372; Mr Bartlett did

not accept that the approach taken in Premium Nafta could apply to statutory adjudication, but I am very content to proceed on that basis. But Mr Bartlett went on to submit, with reference to section 108(1) of the 1996 Act and paragraph 1(1) of the Scheme, that this would necessarily mean that any tort claim which Higgins has must, even if it could be the subject of adjudication at all, be capable of being regarded as a claim "arising under" the contract, and to submit that such a claim would not be subject to section 14A of the 1980 Act (or, presumably, to section 2 ). It is unnecessary to say more than that I do not, at present advised, accept this submission. Assuming, as I am presently prepared to, that a coterminous tort claim can fall within the language of section 108(1) of the 1996 Act and paragraph 1(1), it does not follow that it ceases to be a tort claim for limitation purposes. So the usual rule would apply that limitation periods in contract and tort are separate matters, even where the tort claim is based essentially on negligence in the performance of contractual obligations: see eg Henderson v Merrett Syndicates Ltd [1995] 2 AC 145 , esp at p 185E-G per Lord Goff. Finally, I understand Mr Bartlett also to suggest that, whatever the limitation position, Aspect, having been adjudicated liable in both contract and tort, would need to bring proceedings to establish that it was not liable within the limitation periods applicable to both, if it was to recover anything. Suffice it to say that I am unpersuaded by this suggestion, though this is not critical to the decision of this appeal in view of what follows below.

23  In my view, it is a necessary legal consequence of the Scheme implied by the 1996 Act into the parties' contractual relationship that Aspect must have a directly enforceable right to recover any overpayment to which the adjudicator's decision can be shown to have led, once there has been a final determination of the dispute. I agree with the Court of Appeal that the obvious basis for recognition of this right is by way of implication arising from the Scheme provisions which are themselves implied into the construction contract. I prefer to express the implication in the way I have, because it focuses on the core element of Aspect's claim which is to recover an alleged overpayment. The implied term which Aspect pleads tends to open the way to Higgins's argument, which I reject, that the essence of Aspect's claim is to declaratory relief and that this is relief which Aspect has always been

("remained") entitled to pursue, since the contract was first performed, and has now become time-barred.

24   I emphasise that, on whatever basis the right arises, the same restitutionary considerations underlie it. If and to the extent that the basis on which the payment was made falls away as a result of the court's determination, an overpayment is, retrospectively, established. Either by contractual implication or, if not, then by virtue of an independent restitutionary obligation, repayment must to that extent be required. The suggested implication, on which the preliminary issue focuses, goes to repayment of the sum (over)paid. But it seems inconceivable that any such repayment should be made — in a case such as the present, years later — without the payee having also in the meanwhile a potential liability to pay interest at an appropriate rate, to be fixed by the court, if not agreed between the parties. In restitution, there would be no doubt about this potential liability, reflecting the time cost of the payment to the payer and the benefit to the payee: see eg Sempra Metals Ltd v Inland Revenue Commissioners [2007] UKHL 34, [2008] AC 561 . Whether by way of further implication or to give effect to an additional restitutionary right existing independently as a matter of law, the court must have power to order the payee to pay appropriate interest in respect of the overpayment. This conclusion follows from the fact that, once it is determined by a court or arbitration tribunal that an adjudicator's decision involved the payment of more than was actually due in accordance with the parties' substantive rights, the adjudicator's decision ceases, retrospectively, to bind.

25   Since Aspect's cause of action arises from payment and is only for repayment, it is, whether analysed in implied contractual or restitutionary terms, a cause of action which could be brought at any time within six years after the date of payment to Higgins, ie after 6 August 2009. For this purpose an independent restitutionary claim falls to be regarded as "founded on simple contract" within section 5 of the Limitation Act : Kleinwort Benson Ltd v Sandwell Borough Council [1994] 4 All ER 890 , 942–943, per Hobhouse J, not questioned by the House of Lords in Kleinwort Benson Ltd v Lincoln City Council [1999] 2 AC 349 , when it had to consider whether, in the circumstances of that case, section 32(1)(c) of the Act operated so as to extend the normal six-year limitation period.

26   Higgins complains that this gives Aspect a one-way throw and undermines finality. By delaying commencement of the present claim until 2012, Aspect can sue to recover all or part of the £658,017 paid to Higgins, without having the risk of ending up worse off, since Higgins is barred by limitation from pursuing the £331,855 balance of its original claim.

27   That consequence follows, however, from Higgins's own decision not to commence legal proceedings within six years from April 2004 or early 2005 and so itself to take the risk of not confirming (and to forego the possibility of improving upon) the adjudication award it had received. Adjudication was conceived, as I have stated, as a provisional mechanism, pending a final determination of the dispute. Understandable though it is that Higgins should wish matters to lie as they are following the adjudication decision, Higgins could not ensure that matters would so lie, or therefore that there would be finality, without either pursuing legal or arbitral proceedings to a conclusion or obtaining Aspect's agreement.

28   Further, as Akenhead J pointed out in para 43 of his judgment, this is not one of those "very typical" building contract cases where there are set-offs and cross-claims on each side, each allegedly over-topping the other. In such cases, if there is an adjudication award within six years from performance, without any further proceedings being commenced, both sides are after the six year period time-barred in respect of any claim to any balance which they originally contended to be due them. Any further proceedings would be limited to a claim for repayment by the party required by the adjudication to pay a net balance to the other.

29   Aspect accepts by its pleadings and Miss Sinclair confirmed in her oral submissions that what Aspect contends for, in support of its claim for repayment, is the determination of the parties' original rights and liabilities as they stood when they were adjudicated upon by the adjudicator. Aspect does not suggest that it is of any relevance that the limitation period would now have expired, if Higgins were now assumed to be bringing an action for the total of £822,482 plus interest originally claimed, or for the £490,627 plus interest awarded by the adjudicator. Aspect is in my view correct in this approach. What the Scheme

contemplates is the final determination of the dispute referred to the adjudicator, because it is that which determines whether or not the adjudicator was justified in his or her assessment of what was due under the contract.

30 The Scheme cannot plausibly mean that, by waiting until after the expiry of the limitation period for pursuit of the original contractual or tortious claim by Higgins, Aspect could automatically acquire a right to recover any sum it had paid under the adjudicator's award, without the court or arbitration tribunal having to consider the substantive merits of the original dispute, to which the adjudicator's decision was directed, at all. If and so far as the adjudicator correctly evaluated a sum as due between the parties, such sum was both due and settled. A subsequent court or arbitration determination to the same effect would simply confirm that such sum was due and was correctly settled as being due. Any limitation period which would apply to a claim for such a sum, if it had not yet been settled, is in these circumstances quite irrelevant.

31 I accept, without further examination, that the final determination of the dispute might be affected in a particular case by circumstances occurring after the adjudicator's decision, and that in such a case any payment ordered by the adjudicator might be shown now to have been more than was, in the light of subsequent events, justified. A claim for an adjustment could then exist, but it would exist on the basis of those subsequent events. As I have already indicated, the justification for an adjudicator's decision cannot however be undermined by pointing out that, if payment of a sum which was due when ordered had not in fact been ordered and made, it would have become too late by virtue of limitation to pursue a separate claim for such sum by whatever date the proceedings for final determination were begun. If the adjudicator's order was justified on the basis of the underlying dispute, the payment made pursuant to it was due: the payment met obligations which the payer had. It meant that the payee had no claim to any further payment, while retaining the right to ask the court finally to determine that this is the case.

32 One further point requires stating. In finally determining the dispute between Aspect and Higgins, for the purpose of deciding whether Higgins should

repay all or any part of the £658,017 received, the court must be able to look at the whole dispute. Higgins will not be confined to the points which the adjudicator in his or her reasons decided in its favour. It will be able to rely on all aspects of its claim for £822,482 plus interest. That follows from the fact that the adjudicator's actual reasoning has no legal or evidential weight. All that matters is that a payment was ordered and made, the justification for which can and must now be determined finally by the court. Similarly, if Aspect's answer to Higgins's claim to the £490,627 plus interest ordered to be paid had been not a pure denial of any entitlement, but a true defence based on set-off which the adjudicator had rejected, Aspect could now ask the court to re-consider and determine the justification for that defence on its merits.

**Higgins's alternative case**

33 Higgins also submitted that, if, as I conclude, Aspect had six years from the making of payment under the adjudication in which to commence proceedings for repayment, asking the court for this purpose to determine the original dispute, the corollary ought to be that Higgins also has a fresh six-year period from the making of such payment in which to bring proceedings for any balance which the adjudicator refused to award. But there is no basis upon which to recognise a payee as acquiring by virtue of the receipt of a payment a fresh right to claim any further balance allegedly due. Higgins argued that the adjudicator's refusal of the balance might be regarded as an "allowance", analogous to a payment. Even if, contrary to the fact, the balance had been disallowed because of some set-off which Aspect had asserted, I would not accept this argument. Higgins would have had a claim to the balance which it could and should have pursued within six years of the cause of action for such balance first arising on performance of the contract or the commission of any tort by Aspect.

**Conclusion**

34 It follows that, in my opinion, the Court of Appeal was correct in its disposal of the present appeal. A differently constituted Court of Appeal in Walker Construction (UK) Ltd v Quayside Homes Ltd [2014] EWCA Civ 93, [2014] 1 CLC 121 indicated, obiter, that it would follow the decision of Akenhead J in the

Aspect Contracts (Asbestos) Ltd v Higgins Construction Plc, 2015 WL 3630423 (2015)

present case, without having had drawn to its attention the present Court of Appeal's decision, given during the interlude between submissions and judgment in Walker . It follows from the present judgment that the obiter observations in Walker were wrong and must be over-ruled, and that the present appeal should be dismissed.

Crown copyright

© 2017 Sweet & Maxwell
2015 WL 3630423

---

**End of Document**

© 2017 Thomson Reuters.

# TAB 12

*677  **Aveling Barford Ltd v. Perion Ltd & Ors**

Chancery Division

17 April 1989

**(1989) 5 B.C.C. 677**

HoffmannJ.

Judgment delivered 17 April 1989

**Analysis**

*Ultra vires* —Unlawful return of capital—Fiduciary duty
—Company in financial difficulty was controlled by sole
beneficial shareholder—Company property sold to Jersey
company controlled by company's beneficial owner at
alleged undervalue—Whether sale was breach of fiduciary
duty—Whether sale could be validated by unanimous
shareholder approval.

This was a motion to set aside a judgment in default of
defence ordering certain payments and an inquiry as to
damages and compensation on the footing that the first
defendant ("Perion") was accountable as a constructive
trustee for the proceeds of sale of a property in
Grantham which it acquired from the plaintiff ("AB")
in February 1987 nominally for £350,000 and sold in
August 1987 for £1.5m.

In 1986 AB's entire issued share capital was owned
directly or indirectly by a Singapore businessman, "L".
The company was in financial difficulties, but assets
exceeded liabilities, disregarding a £22m debt owed by
AB to its Liberian holding company. Although solvent
 *678  on a balance sheet basis ignoring that debt, it
had an accumulated deficit on profit and loss account
of nearly £18m. AB later went into liquidation.

The Grantham property was valued in October 1986 at
£650,000. Perion was a Jersey company controlled by
L. In October 1986 it resolved to acquire the Grantham
property from AB for £350,000. A sale by AB to Perion
at that price was completed in February 1987. In June
1987 Perion was offered £1.4m for the property, and
Perion sold it in August for £1.5m.

AB's auditors signed off the accounts to 31 March
1987, including the sale of the Grantham property to
Perion, in November 1987. The auditors were shown a
contract dated January 1987 between AB and Perion
under which Perion was to pay AB £400,000 if it sold
the property within a year for more than £800,000. The
accounts were unanimously approved by shareholders
at AB's annual general meeting in December 1987.

The question for the court was whether Perion had
a good arguable defence to liability as a constructive
trustee.

Perion argued that whether or not the sale was a breach
of fiduciary duty by L as a director, it could not be
challenged by the company because it was unanimously
approved by shareholders, informally at the time of sale
and formally when the 1987 accounts were adopted at
AB's general meeting.

*Held,* dismissing Perion's motion to set aside judgment:

1  To sell on the terms of the January contract would
have been a breach of fiduciary duty. If the value of the
property was £650,000, as L believed, Perion could have
sold the next day for that sum making an immediate
profit of £300,000 at AB's expense, since nothing more
was payable to AB unless the property was sold for
more than £800,000. If the February sale was in breach
of duty and liable to be set aside, L had no right to
confirm it retrospectively as a sale at £750,000 at a time
when L knew the value to have further increased.

2  The sale to Perion was not a genuine exercise of
the company's power under its memorandum to sell its
assets. It was a sale at a gross undervalue for the purpose
of enabling a profit to be realised by an entity controlled
and put forward by its sole beneficial shareholder. This
was a dressed-up distribution and, the company having
at the time no distributable reserves, an unauthorised
return of capital which was ultra vires and incapable
of validation by shareholder approval or ratification. (
Ridge Securities Ltd. v. I.R. Commrs. [1964] 1 W.L.R.
479 , Re Halt Garage (1964) Ltd. [1982] 3 All E.R. 1016
and Rolled Steel Products (Holdings) Ltd. v. British
Steel Corporation & Ors. [1986] Ch. 246; (1984) 1 BCC
99,158 , applied .)

3  The fact that the distribution was to Perion rather than to L or L's other entities which actually held the shares in AB was irrelevant.

**The following cases were referred to in the judgment:**

• Halt Garage (1964) Ltd., Re [1982] 3 All E.R. 1016 .
• Ridge Securities Ltd. v. I.R. Commrs. [1964] 1 W.L.R. 479 .
• Rolled Steel Products (Holdings) Ltd. v. British Steel Corporation & Ors. [1986] Ch. 246; (1984) 1 BCC 99,158 .

**Representation**

• Mr. Simon Mortimore (instructed by Cameron Markby ) for the plaintiff.
• Mr: Edward Bannister (instructed by Payne Hicks Beach ) for the defendants.

**JUDGMENT**
Hoffmann J.:

This is a motion to set aside a judgment in default of defence ordering certain payments and an inquiry as to damages and compensation on the footing that the first defendant ("Perion") is accountable as constructive trustee for the proceeds of sale of a property in Grantham which it acquired from the plaintiff ("Aveling Barford"), **\*679** nominally for £350,000, in February 1987 and sold for £1,560,000 in August of the same year. The main question to be decided is whether Perion has shown that it has a good arguable defence.

Aveling Barford is a well-known Grantham company, now in liquidation, whose most famous product was steamrollers. In late 1986 its entire issued share capital was directly or indirectly owned or controlled by a Singapore businessman called Dr. Lee Kin Tat. The company was in financial difficulties and had exhausted its credit facilities with its bankers, Standard Chartered Bank. The company's balance sheet as at 31 March 1987 shows that if one ignores the sum of £22,804,310 owed to its holding company, a Liberian

corporation controlled by Dr. Lee called Aveling Barford (Hong Kong) Ltd. ("AB (HK)"), the assets exceeded liabilities by £5,726,604. The auditors, Messrs. Coopers & Lybrand, had quite properly disregarded the AB (HK) debt for the purpose of certifying the accounts on a going concern basis because Dr. Lee had agreed that the debt should be interest free and subordinated to the claims of all other creditors. The assets included substantial sums owing by connected companies and investments in subsidiaries which may not turn out to be recoverable and there may therefore be a question about how far the balance sheet can be taken at face value. But for the purposes of this motion I think that it must be taken as showing that at all material times, ignoring the AB (HK) debt, Aveling Barford was solvent. On the other hand, it had made a heavy loss over the period of the accounts and had an accumulated deficit on profit and loss account of nearly £18m. It was therefore plainly not in a position to make any distributions to shareholders.

The property in question was a site of about 18 acres including a Georgian mansion and sports fields called "Arnoldfield" which in happier days Aveling Barford had used as a sports and social centre for its employees. In 1985 it was decided to sell the property and during 1986 the company negotiated through Messrs. Strutt & Parker with the planning authority for permission to build houses on the former sports grounds. By October 1986 the planning authority had agreed in principle that in exchange for a gift of part of the land with bowling greens and tennis courts it would grant permission to build houses on 13.2 acres. On this basis Strutt & Parker in a letter to Aveling Barford dated 20 October 1986 valued the property at £650,000.

Perion is a Jersey company which has at all material times been controlled by Dr. Lee. It is held through the familiar mechanism of a Jersey trustee company holding the shares on the trusts of a settlement for the benefit of Dr. Lee's family. On 24 October 1986, at a meeting of its Jersey directors, Perion resolved to acquire Arnoldfield from Aveling Barford for £350;000. The minutes recorded that £250,000 would be raised on mortgage from Business Mortgages Trust plc ("BMT") and that the rest would be provided by Dr. Lee as an interest free loan.

WESTLAW   © 2017 Thomson Reuters.

The mortgage had been arranged by Mr. Robin Chapman of Messrs. Albery Chapman & Co., who acted as solicitors both to Aveling Barford and to Perion. On 4 November BMT sent a formal offer approving the loan subject to a satisfactory valuation. The valuation on behalf of BMT was carried out by Messrs. Humberts, who valued the property at £1,150,000. On 20 November they sent a copy of their report to Mr. Conder of Aveling Barford under cover of a letter saying:

> "Our valuation has obviously been prepared from a mortgage point of view but we feel strongly that the property if widely marketed will attract considerable interest and may well achieve a figure in excess of those we have outlined."

This optimism, although amply justified by the event, may not have been unconnected with Humberts' proposal that they should market the development land instead of Strutt & Parker.

**\*680**

On 24 November Dr. Lee signed on behalf of Perion accepting the mortgage offer from BMT. Arnoldfield was charged to Standard Chartered Bank to secure Aveling Barford's substantial indebtedness. On 12 December Messrs. Albery Chapman sent a peremptory telex to the manager of the bank's Nottingham branch, where the account was kept, asking for release of the deeds. They said that a sale had been agreed at £350,000 and that unless the bank acted immediately "the company will be in breach of contract". There is no evidence that any binding contract had yet come into existence but the telex had the desired effect: the bank consented to the sale on condition that the proceeds were paid into Aveling Barford's overdrawn account. On 5 January 1987 Albery Chapman sent the engrossed conveyance from Aveling Barford to Perion to Mr. Murphy, the managing director of Aveling Barford, to be executed and returned,

> "so that I may be in a position to complete the sale as soon as the … planning permission has been finally resolved."

The conveyance was duly executed.

On 26 January 1987 planning permission was formally granted and the deed of gift in favour of the planning authority was executed. On the same day Mr. Chapman wrote on behalf of Perion to Royal Trust Company of Canada requesting a further loan of £500,000 on the security of Arnoldfield, which he said Perion had already acquired. By way of encouragement, Mr. Chapman enclosed a copy of Humberts' valuation. On 30 January Arnoldfield was insured in the names of Perion and BMT in the sum of £1,163,840.

On 3 February 1987 Mr. Chapman wrote to Mr. Murphy telling him that the BMT money would be received that day and that he needed £105,708.48 to enable the transaction to be completed. This money would be returned to Aveling Barford through payment of the proceeds into the Standard Chartered Bank account but Mr. Chapman would then need £85,000 back to cover costs including stamp duty, provide £40,000 to Perion to enable it to pay interest on the BMT loan and another £10,000 for Perion's account in Jersey. These payments were made the following day but the conveyance was dated 3 February. It was executed by Mr. Chapman and Dr. Lee on behalf of Perion and expressed to be in consideration of £350,000. Stamp duty was paid on a consideration of £350,000. On completion, therefore, Perion provided no money for the purchase. Nor did Dr. Lee provide the loan contemplated by Perion's board resolution. The whole consideration came either from BMT or Aveling Barford itself. Aveling Barford also paid the costs and the interest on the BMT loan. It was only when Perion resold the property in August that it was able to repay these moneys.

In the summer of 1987 Strutt & Parker marketed Arnoldfield and received a tender dated 25 June in the sum of £1,400,000 from Barratt East Midland Ltd. At about this time Messrs. Coopers & Lybrand were auditing the accounts to 31 March 1987, which of course included the sale to Perion. Mr. Murphy told the accountants on 10 July that he believed that there

Aveling Barford Ltd v Perion Ltd, (1989) 5 B.C.C. 677 (1989)

was an agreement under which Perion was to pass back to Aveling Barford any profits it realised on the sale of Arnoldfield to a third party. Inquiry of Mr. Chapman about this alleged agreement produced on 17 July a faxed copy of what purported to be a contract dated 10 January 1987 between Aveling Barford and Perion for the sale of Arnoldfield. The consideration was expressed to be £350,000 but cl. 9 read as follows:

> "In addition to the consideration referred to herein, the purchaser shall pay to the vendor the further sum of £400,000 in the event that the purchaser shall sell the property within one year from the date hereof at a sum in excess of £800,000, and this clause shall not merge upon completion."

There is, to put it mildly, some doubt about the authenticity of this document. It purports to be signed by Mr. Chapman on behalf of Perion. No copy signed on behalf of **\*681** Aveling Barford has ever been found and no one at Aveling Barford knew anything about it. There is no reference to such a contract in any of the papers before July 1987. It post-dates the engrossment of the conveyance which was sent to Mr. Murphy for execution on 5 January. It also pre-dates the commencement of Perion's insurance policy by 20 days. It is inconsistent with the board minute of Perion authorising a purchase at £350,000. No stamp duty on the additional consideration was ever paid. 10 January was a Saturday and the contract names 3 February as the date for completion, showing remarkable prescience since it was only on that day that Albery Chapman asked for the money to enable completion to take place. But I need not dwell upon these inconsistencies because I am willing for the purposes of this motion to assume that the contract was an authentic document.

On 5 August 1987 Perion sold Arnoldfield to Barratt East Midland for £1,526,000. In response to further inquiries from Coopers & Lybrand, Mr. Chapman told them that the price of £750,000 had been based upon the Strutt & Parker valuation. On the basis of a representation letter from Dr. Lee to this effect,

Coopers & Lybrand signed off the accounts on 28 November. They showed a £668;498 profit over book value on the sale of Arnoldfield as an exceptional item. The accounts were unanimously approved on behalf of all shareholders at the annual general meeting held on 7 December 1987.

Dr. Lee says on affidavit that he never saw Humberts' valuation. Nor did he know, at the time when the conveyance was executed, that planning permission had been granted. I find both these contentions surprising but I do not propose to disbelieve Dr. Lee on affidavit. Mr. Chapman, however, was fully aware of the facts and he was the person who acted on behalf of both Aveling Barford and Perion in carrying out the transaction. It seems to me that for the purpose of deciding whether Perion was entitled to retain the benefit of the sale, Mr. Chapman's knowledge must be imputed to both Perion and Dr. Lee. But even without this knowledge and accepting everything that Dr. Lee says he knew and did not know, the sale cannot in my judgment stand. If the value of the land was £650,000 as Dr. Lee says he believed, Perion could have sold it next day for that sum to a third party or even a related company and made an immediate profit of £300,000 at the expense of Aveling Barford. Only if it was sold for more than £800,000 would cl. 9 have come into operation. To sell on these terms must in my judgment have been a breach of fiduciary duty.

Mr. Bannister said that even if the 10 January contract was a rewriting of history in the summer of 1987, when it was plain that Perion would be reselling for more than £800,000, it was reasonable for the parties retrospectively to affirm the sale at £750,000, which would have been a proper sum to fix as the value in February 1987. I do not agree. If the February sale was, as I think, a breach of duty and liable to be set aside at the time, Dr. Lee or Mr. Chapman on his behalf had no right to confirm if retrospectively as a sale at £750,000 at a time when they knew the value to be over £1,400,000. It was the duty of the directors to set aside the February sale and obtain the full value of the land for Aveling Barford. On any view, therefore, the sale was a breach of fiduciary duty by Dr. Lee. Perion, through Dr. Lee and Mr. Chapman, knew all the facts which made it a breach of duty and was therefore accountable as a constructive trustee.

Aveling Barford Ltd v Perion Ltd, (1989) 5 B.C.C. 677 (1989)

In the alternative, Mr. Bannister submitted that whether or not the sale to Perion was a breach of fiduciary duty by Dr. Lee, it cannot be challenged by the company because it was unanimously approved by the shareholders. This approval was both informal and formal. Informal approval was given at the time of the sale by virtue of the fact that Dr. Lee owned or controlled the entire issued share capital. Formally, a sale at £750,000 was approved when the 1987 accounts were adopted at the company's annual general meeting. For the purposes of this motion I shall assume that shareholder consent was given in both these ways.

**\*682**

The general rule is that any act which falls within the express or implied powers of a company conferred by its memorandum of association, whether or not a breach of duty on the part of the directors, will be binding upon the company if it is approved or subsequently ratified by the shareholders: see Rolled Steel Products (Holdings) Ltd. v. British Steel Corporation & Ors. [1986] Ch. 246; (1984) 1 BCC 99,158 , at p. 296; 99,194. But this rule is subject to exceptions created by the general law and one such exception is that a company cannot, without the leave of the court or the adoption of a special procedure, return its capital to its shareholders. It follows that a transaction which amounts to an unauthorised return of capital is ultra vires and cannot be validated by shareholder ratification or approval. Whether or not a transaction is a distribution to shareholders does not depend exclusively on what the parties choose to call it. The court looks at the substance rather than the outward appearance. Thus in Ridge Securities Ltd. v. I.R. Commrs. [1964] 1 W.L.R. 479 *Pennycuick* J. was concerned with a tax avoidance scheme by a solvent company which involved the grant of a debenture to its parent under which very large and uncommercial sums were payable, purportedly as interest. The judge said that the "interest" payments were ultra vires because they were dressed-up gifts of capital to the parent company (at p. 495):

> "A company can only lawfully deal with its assets in furtherance of its objects. The corporators may take assets out of the company by way of dividend or, with leave of the court, by way of reduction of capital, or in a winding up. They

may of course acquire them for full consideration. They cannot take assets out of the company by way of voluntary disposition, however described, and, if they attempt to do so, the disposition is ultra vires the company."

That case was followed by *Oliver* J. in Re Halt Garage (1964) Ltd. [1982] 3 All E.R. 1016 . In that case the liquidator of the company challenged payments of £30 a week purporting to be director's remuneration to a director and shareholder who had rendered no services to the company. *Oliver* J. decided that so far as the payments exceeded £10 a week, which he considered to be the maximum remuneration reasonably payable to someone who merely held the office of director, they were dressed-up returns of capital to a shareholder and therefore ultra vires. The test, said the judge (at p. 1039), was:

> "… whether the transaction in question was a genuine exercise of the power (to pay remuneration). The motive is more important than the label. Those who deal with a limited company do so on the basis that its affairs will be conducted in accordance with its constitution, one of the express incidents of which is that the directors are entitled to be paid remuneration. Subject to that, they are entitled to have the capital kept intact. They have to accept the shareholders' assessment of the scale of that remuneration but they are entitled to assume that, whether liberal or illiberal, what is paid is genuinely remuneration and that the power is not used as a cloak for making payments out of capital to the shareholders as such."

This did not mean that the payments need to have been made fraudulently or in bad faith (at p. 1043):

> "... bona fides (in the sense of absence of fraudulent intention) and genuineness are (not) necessarily the same thing."

Applying his test, the judge said that no challenge could be made to the payments made at a time when the company had enough distributable reserves to have made equivalent payments by way of dividend. But thereafter:

> "the sums paid to (the director) were so out of proportion to any possible value attributable to her holding of office that the court is entitled to treat them as not being genuine payments of remuneration at all but dressed-up dividends out of capital, like the dressed-up payments of 'interest' in the Ridge Securities case."

**\*683**

So it seems to me in this case that looking at the matter objectively; the sale to Perion was not a genuine exercise of the company's power under its memorandum to sell its assets. It was a sale at a gross undervalue for the purpose of enabling a profit to be realised by an entity controlled and put forward by its sole beneficial shareholder. This was as much a dressed-up distribution as the payment of excessive interest in Ridge Securities or excessive remuneration in Halt Garage . The company had at the time no distributable reserves and the sale was therefore ultra vires and incapable of validation by the approval or ratification of the shareholder. The fact that the distribution was to Perion rather than to Dr. Lee or his other entities which actually held the shares in Aveling Barford is in my judgment irrelevant.

Mr. Bannister relied upon a passage in the judgment of Slade L.J. in Rolled Steel Products (Holdings) Ltd. v. British Steel Corporation at p.295; 99,193:

> "... if a particular act ... is of a category which, on the true construction of the company's memorandum, is *capable* of being performed as reasonably incidental to the attainment or pursuit of its objects, it will not be rendered ultra vires the company merely because in a particular instance its directors, in performing the act in its name, are in truth doing so for purposes other than those set out in its memorandum. Subject to any express restrictions on the relevant power which may be contained in the memorandum, the state of mind or knowledge of the persons managing the company's affairs or of the persons dealing with it is irrelevant in considering questions of corporate capacity."

Mr. Bannister says that this was an act within the terms of the memorandum. It may have been a sale at an undervalue, but it was certainly a sale: a conveyance in exchange for a payment in money. It was not a sham. The terms of the transaction were in no way different from those appearing on the face of the documents. The purpose for which it was done was therefore irrelevant. Mr. Bannister submits that the test for the genuineness of the transaction proposed by Oliver J. in Re Halt Garage admits by the back door all the questions about the motives, state of mind and knowledge of the company's directors which the Court of Appeal appeared to have expelled by the front door in the Rolled Steel case.

It is clear however that Slade L.J. (at p. 296; 99,194) excepted from his general principle cases which he described as involving a "fraud on creditors". As an example of such a case, he cited Re Halt Garage . Mr. Bannister said that frauds on creditors meant

transactions entered into when the company was insolvent. In this case Aveling Barford was not at the relevant time insolvent. But I do not think that the phrase was intended to have such a narrow meaning. The rule that capital may not be returned to shareholders is a rule for the protection of creditors and the evasion of that rule falls within what I think *Slade* L.J. had in mind when he spoke of a fraud upon creditors. There is certainly nothing in his judgment to suggest that he disapproved of the actual decisions in Re Halt Garage or Ridge Securities . As for the transaction not being a sham, I accept that it was in law a sale. The false dressing it wore was that of a sale at arms' length

or at market value. It was the fact that it was known and intended to be a sale at an undervalue which made it an unlawful distribution.

It follows that in my judgment even on the view of the facts most favourable to Perion, it has no arguable defence and the motion to set aside the judgment must be dismissed.

(Order accordingly)  **\*684**

© 2017 Sweet & Maxwell

(1989) 5 B.C.C. 677

---

**End of Document**                                                     © 2017 Thomson Reuters.

# TAB 13

*1 Q.B.*

A

## BARCLAYS BANK LTD.
*v.*
### W. J. SIMMS SON & COOKE (SOUTHERN) LTD. and Another

### [1977 B. No. 679]

1979   March 21, 22, 23, 26, 27, 28, 29, 30;                Robert Goff J.

B        April 24

*Bill of Exchange—Cheque—Payment under mistake of fact—Cheque
drawn on bank—Instructions to bank not to pay on presenta-
tion—Money erroneously paid on presentation—Whether bank
entitled to recover sum from payee*

C

A housing association drew a cheque for £24,000 on its
account with the plaintiff bank, in favour of a building company,
there being sufficient funds in the association's account to meet
the cheque. The following day a receiver was appointed to call
in the building company's assets, and as a result the association
phoned the bank to give instructions to stop the cheque, sub-
sequently confirming its telephone instructions in writing to the
bank. The bank's computer was programmed accordingly, and
the following morning the amendment to the computer was

D

checked by the bank's staff. That same day the receiver
presented the cheque, and the bank's paying official, overlook-
ing the stop instruction, made payment on that date. The bank
did not give notice to the company or the receiver of its claim
for repayment on the day the cheque was paid but subsequently
demanded repayment of the sum of £24,000 from the receiver,
who refused to make repayment.

On a claim by the plaintiff bank against the company and

E

the receiver for repayment of £24,000 as money paid under a
mistake of fact : —

*Held,* giving judgment for the plaintiff bank, that money
paid under a mistake of fact was prima facie recoverable
provided that the payer did not intend the payee to have the
money in any event, the money was not paid for good consider-
ation, and the payee had not in good faith changed his position
(post, pp. 695B–D, 699A–B); that those principles applied to a

F

bank that erroneously acted without a mandate from its
customer in circumstances where the payee was not deemed to
have changed his position by a failure to give notice of dis-
honour; and that, since by section 50 (2) (c) of the Bills of
Exchange Act 1882 there was no requirement for notice of
dishonour to be given on a simple unendorsed cheque, the
plaintiff bank's erroneous payment without a mandate had
been made in circumstances where the defendants had not

G

changed their position either in fact or in law and, accordingly,
the bank was entitled to repayment of the sum of £24,000
(post, pp. 700F–G, 702G—703A, C–E).

*Kelly* v. *Solari* (1841) 9 M. & W. 54; *Kleinwort, Sons &
Co.* v. *Dunlop Rubber Co.* (1907) 97 L.T. 263, H.L.(E.) and
*R. E. Jones Ltd.* v. *Waring and Gillow Ltd.* [1926] A.C. 670,
H.L.(E.) applied.

*Cocks* v. *Masterman* (1829) 9 B. & C. 902 distinguished.

H

*Barclay & Co. Ltd.* v. *Malcolm & Co.* (1925) 133 L.T.
512 doubted.

*Chambers* v. *Miller* (1862) 13 C.B.N.S. 125 and *National
Westminster Bank Ltd.* v. *Barclays Bank International Ltd.*
[1975] Q.B. 654 considered.

Barclays Bank v. W. J. Simms Ltd.                                    [1980]

The following cases are referred to in the judgment:

*Aiken* v. *Short* (1856) 1 H. & N. 210; 25 L.J. Ex. 321                              A

*Barclay & Co. Ltd.* v. *Malcolm & Co.* (1925) 133 L.T. 512.

*Chambers* v. *Miller* (1862) 13 C.B.N.S. 125; 32 L.J.C.P. 30.

*Cocks* v. *Masterman* (1829) 9 B. & C. 902.

*Colonial Bank* v. *Exchange Bank of Yarmouth, Nova Scotia* (1885)
    11 App.Cas. 84, P.C.

*Diplock, In re* [1948] Ch. 465; [1948] 2 All E.R. 318, C.A.

*Fibrosa Spolka Akcyjna* v. *Fairbairn Lawson Combe Barbour Ltd.* [1943]    B
    A.C. 32; [1942] 2 All E.R. 122, H.L.(E.).

*Imperial Bank of Canada* v. *Bank of Hamilton* [1903] A.C. 49, P.C.

*Jones (R. E.) Ltd.* v. *Waring and Gillow Ltd.* [1925] 2 K.B. 612, C.A.;
    [1926] A.C. 670, H.L.(E.).

*Kelly* v. *Solari* (1841) 9 M. & W. 54.

*Kerrison* v. *Glyn, Mills, Currie & Co.* (1911) 81 L.J.K.B. 465, H.L.(E.).

*Kleinwort, Sons & Co.* v. *Dunlop Rubber Co.* (1907) 97 L.T. 263, H.L.(E.).    C

*Larner* v. *London County Council* [1949] 2 K.B. 683; [1949] 1 All E.R.
    964, C.A.

*London and River Plate Bank Ltd.* v. *Bank of Liverpool Ltd.* [1896]
    1 Q.B. 7.

*Morgan* v. *Ashcroft* [1938] 1 K.B. 49; [1937] 3 All E.R. 92, C.A.

*National Westminster Bank Ltd.* v. *Barclays Bank International Ltd.* [1975]
    Q.B. 654; [1975] 2 W.L.R. 12; [1974] 3 All E.R. 834.                         D

*Norwich Union Fire Insurance Society Ltd.* v. *Wm. H. Price Ltd.* [1934]
    A.C. 455, P.C.

*Pollard* v. *Bank of England* (1871) L.R. 6 Q.B. 623.

*Porter* v. *Latec Finance (Qld.) Pty. Ltd.* (1964) 111 C.L.R. 177.

*Price* v. *Neal* (1762) 3 Burr. 1354.

*Sinclair* v. *Brougham* [1914] A.C. 398, H.L.(E.).

*Thomas* v. *Houston Corbett & Co.* [1969] N.Z.L.R. 151.                         E

*United Australia Ltd.* v. *Barclays Bank Ltd.* [1941] A.C. 1; [1940]
    4 All E.R. 20, H.L.(E.).

*Ward & Co.* v. *Wallis* [1900] 1 Q.B. 675.

*Weld-Blundell* v. *Synott* [1940] 2 K.B. 107; [1940] 2 All E.R. 580.


The following additional cases were cited in argument:

*Deutsche Bank (London Agency)* v. *Beriro & Co.* (1895) 73 L.T. 669, C.A.    F

*Gowers* v. *Lloyds and National Provincial Foreign Bank Ltd.* [1938] 1
    All E.R. 766, C.A.

*Krebs* v. *World Finance Co. Ltd.* (1958) 14 D.L.R. (2d) 405.

*Liggett (B.) (Liverpool) Ltd.* v. *Barclays Bank Ltd.* [1928] 1 K.B. 48.

*Morison* v. *London County and Westminster Bank Ltd.* [1914] 3 K.B. 356,
    C.A.

*Simpson* v. *Eggington* (1855) 10 Exch. 845.                                   G

*South Australian Cold Stores Ltd.* v. *Electricity Trust of South Australia*
    (1957) 98 C.L.R. 65.

*Steam Saw Mills Co. Ltd.* v. *Baring Bros. & Co. Ltd.* [1922] 1 Ch. 244,
    C.A.

*Westminster Bank Ltd.* v. *Hilton* (1926) 136 L.T. 315, H.L.(E.).

*Yagerphone Ltd., In re* [1935] Ch. 392.


                                                                               H

ACTION

By a writ dated December 5, 1977, the plaintiff, Barclays Bank Ltd.,
claimed £24,000 with interest from the first defendants, W. J. Simms Son &

**1 Q.B.**          Barclays Bank v. W. J. Simms Ltd.

A  Cooke (Southern) Ltd., and the second defendant, William Sowman, a chartered accountant and receiver of the first defendants. The basis of the claim was that the plaintiff bank had paid the money under a mistake of fact when the second defendant presented a cheque drawn on the bank for the sum of £24,000 by the Royal British Legion Housing Association Ltd. in favour of the first defendants.

The facts, as agreed between the parties, are stated in the judgment.

B

*David Hunter Q.C.* and *Peter Cresswell* for the plaintiff bank. The general rule as to payment or satisfaction by a third person is that it is not sufficient to discharge a debtor, unless it is made by the third person as agent, for and on behalf of the debtor and with his prior authority or subsequent ratification: see *Simpson* v. *Eggington* (1855) 10 Exch. 845. The relationship of banker and customer is basically one of debtor and creditor
C  but with regard to the drawing and payment of the customer's cheques as against his money in the banker's hands, the relation is that of principal and agent: see *Westminster Bank Ltd.* v. *Hilton* (1926) 136 L.T. 315. One of the banker's basic obligations is to honour his customer's cheques, provided there are sufficient funds in the account. When a customer, as principal, draws, and a banker as agent honours such a cheque, then the banker is
D  paying on behalf of his customer. Alternatively, if the banker ought to be regarded as acting as principal, then he is likewise so acting on behalf of his customer. Another equally basic obligation of the banker is to obey his customer's instructions to countermand payment. This obligation is peculiar to cheques: see section 75 of the Bills of Exchange Act 1882 and *Byles on Bills of Exchange*, 23rd ed. (1972), p. 431. A banker who pays a cheque in defiance of notice of countermand, pays without authority and
E  without mandate. Whether he is to be regarded as acting as agent or principal, he acts on his own behalf. Other examples of a banker who has no authority to pay are: a banker who ignores or overlooks notice of death; a banker who pays on a cheque bearing the forged signature of the drawer; a banker who pays pursuant to an agreement with his customer which is void for mistake. When a banker pays within his mandate, the position
F  is that he is acting pursuant to an obligation to his customer and discharging a duty to his customer. He is paying on behalf of his customer, to a recipient, who on those instructions is entitled to receive the money. The bank can then debit the customer's account, and no enforceable obligation arises directly between the banker and the payee. The banker is only the drawee of the cheque. He is not an acceptor.

G  When a banker pays without a mandate, in all cases (with the possible exception of where he pays pursuant to an agreement with his customer which is void for mistake), the position is that he pays solely as principal and on his own behalf. He is not entitled to debit his customer's account unless and until the customer ratifies. Ratification or estoppel apart, if he debits his customer's account the only defence he would have to an action
H  for a declaration that he was not entitled to debit would be a defence based on *B. Liggett (Liverpool) Ltd.* v. *Barclays Bank Ltd.* [1928] 1 K.B. 48. That defence only arises if the banker can show that the money which he has paid has been expended wholly or in part in satisfaction of debts due

and owing by the customer to the recipient, and extends only so far as that
can be established.

A

If the customer draws a cheque when there are insufficient funds in his
account and without making prior arrangements with the bank, the position
is that the drawing of the cheque is a request for overdraft facilities. The
bank has no obligation to grant such facilities or to honour the cheque.
It is free to choose. If the bank chooses to pay, this creates an enforce-
able obligation against the customer. By these means the banker pays   B
with a mandate.

Where money is paid under a mistake of fact, and would not have been
paid if the payer had known that the alleged fact was untrue, it is against
conscience for the payee to retain it: see *Kelly* v. *Solari* (1841) 9 M. & W.
54. The rule as stated in *Aiken* v. *Short* (1856) 1 H. & N. 210 appears to
restrict the right of recovery more narrowly than does *Kelly* v. *Solari*, but   C
cannot be regarded as exhaustive in the sense that no mistake, which does
not induce the payer to believe that payment will discharge or reduce his
liability, will found an action for money had and received: see *Morgan* v.
*Ashcroft* [1938] 1 K.B. 49; *Colonial Bank* v. *Exchange Bank of Yarmouth,
Nova Scotia* (1885) 11 App.Cas. 84; *Thomas* v. *Houston Corbett & Co.*
[1969] N.Z.L.R. 151; *United Australia Ltd.* v. *Barclays Bank Ltd.* [1941]
A.C. 1, *Larner* v. *London County Council* [1949] 2 K.B. 683 and *Fibrosa*   D
*Spolka Akcyna* v. *Fairbairn Lawson Combe Barbour Ltd.* [1943] A.C. 32.

Where money is paid under a mistake of fact, and is demanded back
from the payee who received it before his position was altered to his dis-
advantage, the money must be repaid: see *Kleinwort, Sons & Co.* v. *Dunlop
Rubber Co.* (1907) 97 L.T. 263. Accordingly, the proposition that the only
mistake which will ground recovery is a mistake which leads the payer to   E
believe that he is liable to the payee to pay it to him, is invalid. See also,
*Kerrison* v. *Glyn, Mills, Currie & Co.* (1911) 81 L.J.K.B. 465. Even though
the mistake was not a mistake as between a plaintiff and defendant, the
plaintiff can recover the money as having been paid under mistake of fact:
see *R. E. Jones Ltd.* v. *Waring and Gillow Ltd.* [1925] 2 K.B. 612. The
principle that in order that there should be grounds for recovery, the mis-
take must have been between payer and payee, has been rejected and re-   F
formulated in terms which provide that the mistake must have caused the
payment: see *Weld-Blundell* v. *Synott* [1940] 2 K.B. 107 and *Porter* v.
*Latec Finance (Qld.) Pty. Ltd.* (1964) 111 C.L.R. 177. If, however, a
person pays money under a mistake of fact, being liable to pay it, if the
fact of which he was ignorant does not discharge him from that liability,
he cannot recover it: see *Steam Saw Mills Co. Ltd.* v. *Baring Bros. &*   G
*Co. Ltd.* [1922] 1 Ch. 244.

Where a bank has no mandate to pay, and acts with the mistaken belief
that it has a mandate, then the bank is paying as principal on its own
behalf, and not on behalf of the customer. The payee receives money paid
on the bank's behalf alone. The effect of the mistake is to bring banker
and payee directly into contact with each other in a two party situation
from which the drawer is wholly excluded. This is quite contrary to their   H
intentions. In such circumstances both banker and payee are affected by
the same mistake and the mistake operates between banker and payee: see

**1 Q.B.**                    Barclays Bank v. W. J. Simms Ltd.

A *Porter* v. *Latec Finance (Qld.) Pty. Ltd.* and *National Westminster Bank Ltd.* v. *Barclays Bank International Ltd.* [1975] Q.B. 654.

A bank may honour a cheque without realising that there are insufficient funds in the account, and by mistake grant overdraft facilities to the drawer: see *Chambers* v. *Miller* (1862) 13 C.B.N.S. 125 and *Pollard* v. *Bank of England* (1871) L.R. 6 Q.B. 623. In such a situation the bank would pay on behalf of its customer, albeit with money mistakenly pro-
B vided by the bank for this purpose. The payee would receive precisely what he expected, namely moneys paid to him on behalf of the drawer of the cheque. The transaction would be the tri-partite transaction envisaged, affecting customer, banker and payee. In such circumstances it can, if necessary, be said that a mistake of this nature does not operate between banker and payee. However, if the mistake between the banker and the customer is so fundamental as to render the relevant agreement
C void, then the situation may be the same as where there is no mandate.

If in an action for the recovery of money paid under a mistake of fact, special principles apply to bankers, so that the nature and quality of the banker's mistake becomes material, the proper distinction to be made is between the situation where there is a mandate, and that where there is no mandate.

D The money when received by the receiver did not become part of the general assets of the company, but was impressed with a trust: see *In re Yagerphone Ltd.* [1935] Ch. 392. [Reference was also made to: *Deutsche Bank (London Agency)* v. *Beriro & Co.* (1895) 73 L.T. 669; *Gowers* v. *Lloyds and National Provincial Foreign Bank Ltd.* [1938] 1 All E.R. 766; and *Krebs* v. *World Finance Co. Ltd.* (1958) 14 D.L.R. (2d) 405.]

E *E. C. Evans Lombe Q.C.* and *Michael Crystal* for the defendants. On the facts set out in the agreed statement and shown by its supporting documents, the amount claimed is irrecoverable from the company and from the receiver, because it was paid by the bank and received by the company in discharge of the obligation of the housing association under the building contract pleaded, and/or the cheque pleaded. Alternatively, on the same facts and on the assumption that, contrary to the above
F submission, it is held that the amount claimed is recoverable from the company as a money debt, it is irrecoverable from the receiver because an action for money had and received does not lie against the receiver in respect of it, and it cannot be traced into the receiver's hands.

The bank are not entitled to recover because there was no mistake of fact between the plaintiff and the defendants, or either of them, or alter-
G natively, any mistake was confined to the plaintiffs. A person who intends to make a voluntary payment and thinks that he is making a certain kind of voluntary payment, is not making such payment under a mistake of fact which is fundamental or basic: see *Morgan* v. *Ashcroft* [1938] 1 K.B. 49.

Since the plaintiff bank failed to give notice of its claim on the day
H the cheque was paid, it could not recover the money: see *Cocks* v. *Masterman* (1829) 9 B. & C. 902; *Price* v. *Neal* (1762) 3 Burr. 1354 and *Paget's Law of Banking*, 8th ed. (1972), p. 377. The plaintiff bank could only succeed if it established that the money was impressed with a trust

**Barclays Bank v. W. J. Simms Ltd.**          **[1980]**

in its favour, and this it could not do: see *In re Diplock* [1948] Ch. 465.  A
Where money is paid by mistake of fact due to a mistake by a third party,
and not due to any mistake on the part of the payee, it is not recoverable:
see *Barclay & Co. Ltd.* v. *Malcolm & Co.* (1925) 133 L.T. 512. Where
the money is due under a contract between the payer and the payee, there
can be no recovery on that ground, unless the contract itself is void for
mistake or is rescinded by the plaintiff: see *Norwich Union Fire Insurance
Society Ltd.* v. *Wm. H. Price Ltd.* [1934] A.C. 455. It is a defence to  B
the claim that the payee has given consideration for the payment: see
*Ward & Co.* v. *Wallis* [1900] 1 Q.B. 675.

A voluntary payment, as in *Morgan* v. *Ashcroft* [1938] 1 K.B. 49,
is a payment made without legal obligation. Where such payment is
made, the payer cannot generally recover the money from the payee,
even where it has been paid under a mistake of fact, unless the mistake  C
is fundamental: see *Morgan* v. *Ashcroft*; *Sinclair* v. *Brougham* [1914]
A.C. 398 and *Aiken* v. *Short*, 1 H. & N. 210.

Once a cheque is discharged by payment and the money has been
received by the payee in good faith, the presenter of the cheque is under
no liability to repay: see *Morison* v. *London County and Westminster
Bank Ltd.* [1914] 3 K.B. 356.

*Hunter Q.C.* in reply. The need for a claimant to give notice of  D
dishonour (see *Cocks* v. *Masterman*, 9 B. & C. 902) only applies
where notice of dishonour is required: see *Imperial Bank of Canada* v.
*Bank of Hamilton* [1903] A.C. 49; *London and River Plate Bank Ltd.* v.
*Bank of Liverpool Ltd.* [1896] 1 Q.B. 7 and *National Westminster Bank
Ltd.* v. *Barclays Bank International Ltd.* [1975] Q.B. 654. Notice of
dishonour is not required to be given on a simple unendorsed cheque: see  E
section 50 (2) (c) of the Bills of Exchange Act 1882.

*Cur. adv. vult.*

April 24. ROBERT GOFF J. read the following judgment. This case
raises for decision the question whether a bank, which overlooks its
customer's instructions to stop payment of a cheque and in consequence  F
pays the cheque on presentation, can recover the money from the payee as
having been paid under a mistake of fact. The point is one on which there
is no decision in this country; and it is a point, I was told, of considerable
importance to bankers, not only because it is an everyday hazard that
customers' instructions may be overlooked, but because modern technology,
rather than eliminating the risk, has if anything increased it.

The matter comes before the court on agreed facts, which I now propose  G
to set out in this judgment. On June 10, 1971, W. J. Simms Son & Cooke
(Southern) Ltd. (which I shall call " the company ") granted to National
Westminster Bank Ltd. a mortgage debenture which provided, inter alia:

"2. The company as beneficial owner . . . (v) charges by way of
floating security its undertaking and all its other property, assets and
rights whatsoever and wheresoever present or future.  H

"7. At any time after this security shall have become enforceable
[National Westminster] may by writing . . . appoint any person . . .
to be a receiver of the property hereby charged . . . Any receiver so

A    appointed shall be the agent of the company and the company shall be
solely responsible for his acts or defaults and for his remuneration and
any receiver so appointed shall have power: (i) to take possession of,
collect and get in the property hereby charged and for that purpose to
take any proceedings in the name of the company or otherwise . . .
(v) to do all such other acts and things he may consider necessary or
desirable for the realisation of any property hereby charged.

B    " 8.   All moneys received by any receiver shall be applied by him
in the following order: (i) in payment of the costs charges and expenses
of and incidental to the appointment of the receiver and the exercise
of all or any of his powers and of all outgoings paid by him; (ii) in
payment of remuneration to the receiver at such rates as may be agreed
between him and the bank at or at any time after his appointment;
(iii) in or towards satisfaction of the amount owing on this security;
C    (iv) the surplus (if any) shall be paid to the company or other person
entitled to it."

The mortgage debenture was registered pursuant to section 95 of the
Companies Act 1948, on June 24, 1971.

On June 21, 1976, the company entered into a contract in the R.I.B.A.
D    Standard Form of Building Contract, 1963 edition with the Royal British
Legion Housing Association Ltd. (which I shall call " the association ") to
perform certain works for the association at Borstal Road, Rochester, Kent,
for the total sum of £699,024. Clause 25 of the building contract provided:

    " (2)   In the event of a receiver or manager of his business or under-
taking duly appointed, or possession taken, by or on behalf of the
holders of any debentures secured by a floating charge, of any property
E    comprised in or subject to the floating charge, the employment of the
contractor under this contract shall be forthwith automatically deter-
mined but the said employment may be reinstated and continued if the
employer and the contractor his . . . receiver or manager shall so
agree.   (3)   In the event of the employment of the contractor being
determined as aforesaid and so long as it has not been reinstated and
F    continued, the following shall be the respective rights and duties of the
employer and contractor: (a) The employer may employ and pay other
persons to carry out and complete the works . . . (b) The employer
may pay any supplier or sub-contractor for any materials or goods
delivered or works executed for the purposes of this contract (whether
before or after the date of determination) in so far as the price thereof
has not already been paid by the contractor.   The employer's rights
G    under this paragraph are in addition to his rights to pay nominated sub-
contractors as provided in clause 27 (c) of these conditions and
payments made under this paragraph may be deducted from any such
due or to become due to the contractor . . . (d) The contractor shall
allow or pay to the employer in the manner hereinafter appearing the
amount of any direct loss and/or damage caused to the employer
H    by the determination.   Until after completion of the works under
paragraph (a) of this sub-clause the employer shall not be bound by
any provision of this contract to make any further payment to the
contractor, but upon such completion and the verification within a

reasonable time of the accounts therefor the architects shall certify
the amount of expenses properly incurred by the employer and the  A
amount of any direct loss and/or damage caused to the employer by
the determination and, if such amounts when added to the moneys paid
to the contractor before the date of determination exceed the total
amount which would have been payable on due completion in accord-
ance with this contract, the difference shall be a debt payable to the
employer by the contractor; and if the said amounts when added to  B
the said moneys be less than the said total amount, the difference shall
be a debt payable by the employer to the contractor."

On September 2, 1977, Messrs. Michael Aukett Associates, the
architect under the building contract, issued an interim certificate based on
a valuation of works performed at August 25, 1977, certifying that £24,000
was payable under the building contract by the association to the company.  C

At all material times the association has been a customer of the plaintiffs,
Barclays Bank Ltd. at their branch at 78, Victoria Street, London S.W.1
(which I shall call " the branch ").

On Monday, September 12, 1977, the association drew a cheque for
£24,000 on its account with Barclays at the branch in favour of the company
in payment of the interim certificate. At all material times there were
sufficient funds in the account to meet the cheque.  D

On Tuesday, September 13, 1977, pursuant to the terms of the mortgage
debenture, National Westminster appointed Mr. William Sowman, a
chartered accountant, to be receiver of the undertaking, property and assets
of the company.

On Thursday, September 15, 1977, at 9.20 a.m. the association tele-
phoned the branch and instructed Barclays to stop payment on the cheque.  E
The branch immediately prepared that instruction for the computer which
was then programmed accordingly. On the morning of Friday,
September 16, 1977, a member of the branch staff checked the computer
amendment applied report to ensure that the stop details had been recorded
correctly. The association subsequently confirmed its telephone instructions
in writing to Barclays.

The cheque was received by Mr. Sowman in the ordinary course of post  F
and his assistant paid in the cheque at the Waddon branch of National
Westminster with a direction that the cheque be specially cleared. It is
not suggested that in giving such instruction for special clearance or at any
time prior to the cheque being specially cleared, Mr. Sowman, or his
assistant or the company, was aware of the instructions given by the
association to Barclays on Thursday, September 15, 1977.  G

Late on Thursday, September 15, or early on Friday, September 16,
1977, a special presentation from the Waddon branch of National West-
minster was received by the branch enclosing the cheque. Details of its
presentation were recorded in the Branch Fate Register on Friday,
September 16, 1977, and the cheque was paid by the branch that day due
to a mistake by the paying official at the branch who overlooked the stop  H
instruction. A credit for National Westminster's special presentation
account was sent to National Westminster in the branch credit transfers
that evening.

A   The cheque was rejected by Barclays' computer on Monday, September 19, 1977, the next business day, and was placed to the debit of the computer's suspense account for the work of September 16, 1977. The cheque was subsequently filed with the association's vouchers and its omission from the association's statement was discovered at Barclays' central accounting unit, on Monday, September 19, 1977. On September 27, 1977, Barclays' head office telephoned the branch to state that there was

B   an outstanding item for £24,000. The branch then telephoned the association to establish the reason for payment being countermanded. The association have since confirmed to Barclays, (1) that they heard of the receiver's appointment on about September 14, 1977, and (2) that they decided to stop the cheque in the belief that they were entitled so to act under the building contract.

C   Barclays subsequently demanded repayment of the cheque from Mr. Sowman who declined to make such repayment. Correspondence ensued between Barclays and its solicitors and Mr. Sowman and his solicitors. The bank subsequently commenced proceedings claiming repayment of the £24,000 from the company and/or Mr. Sowman as moneys paid under a mistake of fact. Mr. Sowman has at all times since December 1977 held £24,000 in a separate account pending a decision in these proceedings.

D   In the receivership there is likely to be a deficiency as regards the preferential creditors. There will certainly be a substantial deficiency in the receivership for National Westminster, the mortgage debenture-holder.

In the action as constituted, the plaintiff bank claimed to be entitled to recover the money from the first defendants (the defendant company) and the second defendant (the receiver) as money paid under a mistake of fact. Pleadings were served: in the defence, apart from certain non-admissions of

E   fact (which were subsequently resolved in the agreed facts), the substantial point taken by the defendants was that the plaintiff bank were not entitled to recover because there was no mistake of fact between the plaintiffs and the defendants or either of them, alternatively that any mistake or misapprehension of fact was confined to the plaintiffs. This point went to the nature of the mistake necessary to ground recovery, the matter to

F   which the greater part of the argument in the case was devoted; and the defendants' argument on this point was (as will be seen) the subject of some development.

However, in the course of argument other points were raised by the defendants. These were as follows. (1) The money was irrecoverable from either defendant, because it was paid by the plaintiff bank and received by the defendant company in discharge of the association's obligation to the

G   company under the building contract or alternatively under the cheque. (2) Since the plaintiff bank failed to give notice of its claim on the day when the cheque was paid, it was unable (on the principle in *Cocks* v. *Masterman* (1829) 9 B. & C. 902 and other cases) to recover the money. (3) In any event, no action lay against the receiver. (4) It was at one time submitted that the effect of the crystallisation of the floating charge was that the

H   plaintiff bank could only succeed if it could establish that the money was impressed with a trust in its favour, and this, it was submitted, on the authority of *In re Diplock* [1948] Ch. 465 and other cases, the plaintiff bank could not establish. This submission provoked the response

by the plaintiff bank that the money was indeed impressed with such a trust, **A**
and would not therefore go as a windfall to the defendant company's
creditors; alternatively that the plaintiff bank would if necessary seek leave
to join as defendants the National Westminster Bank, as the immediate
recipients of the payment. In the outcome the point was not pursued by
the defendants; and it was recognised by them that, since the action was
intended to be in the nature of a test case to ascertain whether money paid
in the circumstances of the present case was recoverable, the plaintiff **B**
bank's action should not fail for want of parties and that, upon the
plaintiff bank not proceeding further against the receiver, the receiver would
procure payment of any sum found due by the judgment.

I propose to deal with the matter as follows. I shall first consider
the principles upon which money is recoverable on the ground that it has
been paid under a mistake of fact. Next, I shall consider the application **C**
of those principles to a case where a bank has paid, under a mistake of
fact, a cheque drawn upon it by a customer. Third, I shall consider how
far the defence in *Cocks* v. *Masterman*, 9 B. & C. 902 is available to defeat
a claim brought by a bank which has paid a cheque under a mistake of
fact. Lastly, I shall consider the application of these principles to the
present case.

**D**

*1. The principles upon which money is recoverable on the ground
that it has been paid under a mistake of fact.*

Nearly 40 years ago, Asquith J. stated that "it is notoriously difficult
to harmonise all the cases dealing with payment of money under a mistake
of fact,": see *Weld-Blundell* v. *Synott* [1940] 2 K.B. 107, 112. This is
indeed true, and it does not make easy the task of the trial judge, whose **E**
duty it is both to search for guiding principles among the authorities, and
to pay due regard to those authorities by which he is bound. I have
however come to the conclusion that it is possible for me, even in this field,
to achieve both these apparently irreconcilable objectives. The key to the
problem lies, in my judgment, in a careful reading of the earliest and most
fundamental authorities, and in giving full effect to certain decisions of
the House of Lords. It is necessary therefore for me to review the leading **F**
authorities.

I shall go straight to three early cases, the first of which provided the
basis of the modern law on this topic. That is *Kelly* v. *Solari* (1841) 9
M. & W. 54. The action was brought by the plaintiff, as one of the
directors of Argus Life Assurance Co., to recover from the defendant a
sum of money alleged to have been paid to her under a mistake of fact. **G**
The evidence was that the money had been paid to her, as executrix of
her deceased husband, upon a policy on the life of her husband, in entire
forgetfulness that the assured had by mistake allowed the policy to lapse
by reason of non-payment of the premium. At the trial, Lord Abinger
directed a nonsuit, expressing the opinion that if the directors had had
knowledge, or the means of knowledge, of the policy having lapsed, the
plaintiff could not recover; but he reserved leave to the plaintiff to move **H**
to enter a verdict for him for the amount claimed. The plaintiff obtained
a rule nisi accordingly, or for a new trial. The principal issue in the case
was therefore whether negligence on the part of the plaintiff precluded

**1 Q.B.**                 Barclays Bank v. W. J. Simms Ltd.                 **Goff J.**

A  recovery; it was held that it did not, a conclusion that has stood ever since. For present purposes, however, the case is important for a statement of principle by Parke B., in the following terms, at pp. 58–59:

"I think that where money is paid to another under the influence of a mistake, that is, upon the supposition that a specific fact is true, which would entitle the other to the money, but which fact is untrue, and the money would not have been paid if it had been known to
B  the payer that the fact was untrue, an action will lie to recover it back, and it is against conscience to retain it; . . . If, indeed, the money is intentionally paid, without reference to the truth or falsehood of the fact, the plaintiff meaning to waive all inquiry into it, and that the person receiving shall have the money at all events, whether the fact be true or false, the latter is certainly entitled to retain it; but if it is paid under the impression of the truth of a fact which is untrue,
C  it may, generally speaking, be recovered back, however careless the party paying may have been, in omitting to use due diligence to inquire into the fact."

Rolfe B. also said, at p. 59:

"... wherever [money] is paid under a mistake of fact, and the party would not have paid it if the fact had been known to him, it
D  cannot be otherwise than unconscientious to retain it."

The case was concerned with a payment made with the intention of discharging a supposed liability of the plaintiff to the defendant. It is no doubt for that reason that the first part of Parke B.'s statement of principle was directed to such a case; though it is to be observed that, in the context of such a case, Parke B. did not place any restriction on the nature of the
E  mistake which would ground recovery. But it would not, in my judgment, be right to infer that Parke B. was stating that money paid under a mistake of fact was only recoverable in cases where the plaintiff's mistake led him to believe that he was under a liability to the defendant to pay the money to him. There is nothing to indicate that the first part of his statement of principle was intended so to restrict the right of recovery;
F  indeed later in his judgment he stated the principle of recovery in broader terms, as did Rolfe B., which appears to indicate that it is sufficient to ground recovery that the plaintiff's mistake has caused him to make the payment.

The second of these three cases is *Aiken* v. *Short* (1856) 1 H. & N. 210. The plaintiffs were bankers. The bank was the transferee from one Carter of an inheritance to which Carter was supposedly entitled. The plaintiffs
G  paid £266 16s. 6d. (£200 plus interest) to the defendant in discharge of a debt owed by Carter to the defendant, which was secured by an equitable mortgage on Carter's supposed inheritance. It transpired that Carter had no inheritance; and the plaintiffs claimed to recover the money from the defendant as having been paid under a mistake of fact. It was held by the Court of Exchequer that the money was in those circumstances irre-
H  coverable. It is a crucial fact in the case that, the payment having been authorised by Carter, it was effective to discharge the debt which was in fact owed by Carter to the defendant; the defendant therefore gave consideration for the payment which was, for that reason, irrecoverable. This

was the basis of the decision of both Pollock C.B. and Platt B.; it seems
likely, from interventions in the argument, that Martin B. (who was absent    A
when judgment was given) would have decided the case on the same basis.
Pollock C.B. said, at p. 214:

> " The bank had paid the money in one sense without any consideration,
> but the defendant had a perfect right to receive the money from
> Carter, and the bankers paid for him . . . The money was, in fact,
> paid by the bank as the agents of Carter."          B

Platt B. said, at p. 215:

> " Carter referred [the defendant] to the bank, who paid the debt,
> and the bond was satisfied. The money which the defendant got from
> her debtor was actually due to her, and there can be no obligation
> to refund it."          C

The case is however remembered principally for an obiter dictum of
Bramwell B. He said, at p. 215:

> " In order to entitle a person to recover back money paid under a
> mistake of fact, the mistake must be as to a fact which, if true, would
> make the person paying liable to pay the money; not where, if true,
> it would merely make it desirable that he should pay the money."          D

He recognised that the bankers were under no antecedent obligation to
pay the money: they " were at liberty to pay or not, as they pleased ":
and, " having voluntarily parted with their money to purchase that which
the defendant had to sell," they were unable to recover. It appears from
the rather fuller report in 25 L.J. Ex. 321, 324 that Bramwell B. did not
necessarily regard his statement of principle as comprehensive. But,          E
strictly construed, it appears to restrict the right of recovery more
narrowly than did Parke B. in *Kelly* v. *Solari*, 9 M. & W. 54. It purports
to exclude recovery in cases where the plaintiff's mistake did not lead
him to believe that he was liable to pay the money to the defendant; and
it appears in particular to exclude recovery in a case where the plaintiff
had paid the money to the defendant in the mistaken belief, not that he          F
was liable to the defendant to pay it, but that he was under an obligation
to a third party to pay it to the defendant, even when the payment did not
discharge a debt owing to the defendant who therefore gave no consideration
for it. Subsequent decisions of the House of Lords show that so restricted
a statement of the principle of recovery does not represent the law.

The third of the early cases to which I must refer is *Chambers* v. *Miller*
(1862) 13 C.B.N.S. 125, not because it sheds any particular light on this          G
branch of the law, but because its effect has been misrepresented in certain
textbooks, and in particular a dictum of Erle C.J. has frequently been
cited out of context and so misunderstood. The case was not concerned
with recovery of money paid under a mistake of fact, but with an action
for assault and false imprisonment. The plaintiff was a clerk, who
presented for payment at the defendant's bank a cheque held by his          H
employers, drawn on the bank by one of their customers. The cashier,
overlooking the fact that the customer's account was insufficient to meet
the cheque, received it and placed the amount in cash on the counter.

**1 Q.B.**          **Barclays Bank v. W. J. Simms Ltd.**          **Goff J.**

A    The plaintiff counted the money, and was counting it a second time when the cashier, realising his mistake, returned and said that the cheque could not be paid. The plaintiff put the money in his pocket, whereupon the cashier detained him, under threat of being given into custody on a charge of theft; he was so detained until he handed over the money, when he was given back the cheque uncancelled. The cheque was subsequently presented to the drawer and paid by him. The crucial question in the

B    case was whether, in these circumstances, the property in the money had passed to the bearer of the cheque. All the members of the court held that it had, and a rule nisi to enter a verdict for the defendant was accordingly discharged.

It was part of the defendant's argument that the money was recoverable, as having been paid under a mistake of fact. However that was, as at least two members of the court recognised (see p. 135, *per* Williams J.,

C    and pp. 136–137, *per* Byles J.), irrelevant to the question whether the property had passed; indeed, where an action is brought to recover money paid under a mistake of fact, property will almost invariably have passed to the defendant, the effect of the action, if successful, being simply to impose on the defendant a personal obligation to repay the money. Furthermore, the kind of mistake that will ground recovery is, as Parke B.'s

D    statement of the law in *Kelly* v. *Solari*, 9 M. & W. 54 shows, far wider than the kind of mistake which will vitiate an intention to transfer property. The court was satisfied in *Chambers* v. *Miller*, 13 C.B.N.S. 125 that the cashier's mistake did not prevent the property in the money from passing. It was in the context of considering that question that Erle C.J. referred to the mistake as being "not as between [the cashier] and the bearer of the cheque, but as between him and the customer": see p. 133.

E    This dictum has, however, been taken out of its context and it has subsequently been suggested on its authority that no action will lie to recover money paid under a mistake of fact, unless the mistake was "as between" the payer and the payee, in the sense that both parties were suffering under the same mistake. *Chambers* v. *Miller* provides, in my judgment, no basis for any such proposition, which was later to be authoritatively rejected by

F    the House of Lords.

Such are the early cases most frequently cited on this topic. I propose to go next to three cases in the House of Lords, in which the law on this subject was authoritatively established, but before I do so, I will first refer to a decision of the Privy Council, which was later to be relied upon in one of the cases in the House of Lords. This is *Colonial Bank* v. *Exchange Bank of Yarmouth, Nova Scotia* (1885) 11 App.Cas. 84. A firm called

G    B. Rogers & Son were in business in Yarmouth, Nova Scotia. They instructed agents in Antigua to remit certain funds to the Halifax branch of the Bank of British North America. The agents paid the funds into the plaintiff bank, and gave them "rather ambiguous instructions" for their remittance in favour of the Bank of British North America, which omitted any reference to that bank's branch in Halifax. The plaintiff bank then

H    gave instructions to New York agents to carry out the instructions so received by them from B. Rogers' agents. The New York agents proceeded to put the New York Branch of the Bank of British North America in funds, but gave them instructions in terms which erroneously required

**Goff J.**                    **Barclays Bank v. W. J. Simms Ltd.**                    **[1980]**

payment "for account Yarmouth Bank, credit of Rogers." The Bank of
British North America had no branch in Yarmouth, but considered that  A
the proper way of remitting funds to Yarmouth was to pay them to the
defendant bank, with whom they had arrangements. This they did, paying
the money to the defendant bank, "credit of Rogers." It so happened
that Rogers was a customer of the defendant bank, and was considerably
in their debt at the time, and so they put the money to the credit of Rogers,
and to the debit of the Bank of British North America. On the following  B
day the Bank of British North America in New York, having been advised
by Rogers of the mistake, called for the repayment of the money from the
defendant bank; this was refused on the ground that the credit had been
"used," which meant that it had been placed in the defendant bank's
books in reduction of Rogers' indebtedness to them. It was held that the
plaintiff bank were entitled to recover the money from the defendant bank.
The principal question in the case was whether the plaintiff bank had a  C
sufficient interest to proceed directly against the defendant bank for the
money. But for present purposes, the decision is of interest because the
plaintiff bank did not suffer under a mistake which led them to believe
that they were under any liability to the defendants to pay the money to
them; indeed nobody, in the whole chain of parties, believed that they
were under any such liability. The decision is therefore clearly contrary  D
to the view, founded on Bramwell B.'s dictum in *Aiken* v. *Short*, 1 H. & N.
210, that to ground recovery, a mistake of fact must fall within any such
restrictive category; indeed there is nothing in the advice of the Board in
this case, which was delivered by Lord Hobhouse, to suggest that there
is any limitation to be placed upon the category of mistake necessary to
ground recovery, other than that it must have caused the payment.

   I come then to the three cases in the House of Lords. The first is  E
*Kleinwort, Sons & Co.* v. *Dunlop Rubber Co.* (1907) 97 L.T. 263. A
firm called Messrs. Kramrisch were rubber merchants, who were financed
both by the appellants Messrs. Kleinworts, and by another merchant
bank, Messrs. Brandts. Kramrisch supplied the respondents, the Dunlop
Rubber Co., with a quantity of rubber, directing them to pay the price to
Brandts, who had an equitable mortgage upon it. The respondents  F
mistakenly paid it to the appellants, who received it in good faith. Messrs.
Kramrisch failed and the respondents were subsequently held liable to pay
the money to Messrs. Brandts. They claimed to recover from the
appellants the money they had mistakenly paid to them. It was held that
they were entitled to recover it as having been paid under a mistake of
fact. The main question in the case was whether the appellants could
rely upon the defence of change of position; but that plea was conclusively  G
negatived by the answers of the jury at the trial. For present purposes,
the interest of the case lies in two matters. First, there was no question
of the respondents mistakenly believing that they were under any liability
to the appellants to pay the money to them. Second, Lord Loreburn L.C.
stated the principle of recovery in very broad terms. He said, at p. 264:

   "... it is indisputable that, if money is paid under a mistake of fact  H
   and is redemanded from the person who received it before his position
   has been altered to his disadvantage, the money must be repaid in
   whatever character it was received."

**1 Q.B.**                **Barclays Bank v. W. J. Simms Ltd.**                **Goff J.**

A    The second of these cases is *Kerrison* v. *Glyn, Mills, Currie & Co.* (1911)
81 L.J.K.B. 465. The appellant paid a sum of money to the respondents,
for the account of a New York bank called Kessler & Co., in anticipation
of a liability to recoup Kessler & Co. for advances made by them to
a mining company in Mexico in which the appellant was interested.
Unknown to the appellant or the respondents, Kessler & Co. were insolvent
at the time of the payment. The money was not paid over by the
B    respondents to Kessler & Co.; but since Kessler & Co. were indebted to
them, the respondents claimed to be entitled to retain the money and
declined to refund it to the appellant. It was held that the appellant was
entitled to recover the money from the respondents. Two questions
arose in the case. First, whether the arrangements between the appellant
and Kessler & Co. were such that he was indebted to Kessler & Co. in the
sum of money; it was held by the House of Lords (differing from the Court
C    of Appeal on this point) that he was not, and that the money was paid
only in anticipation of a future liability. Had the appellant been so
indebted, it was recognised by the House of Lords that the money would
have been paid in discharge of an existing debt and would have been
irrecoverable, despite the fact that the appellant had paid it under the
misapprehension that Kessler & Co. were solvent. Lord Atkinson, who
D    delivered the leading speech, said, at p. 470:

"[The appellant] lodged the money in the belief that Kessler & Co.
were a living commercial entity able to carry on their business as
theretofore, that they were in a position to honour and would honour
the drafts of the Bote Mining Co. up to the sum which he, in anticipa-
tion, sent to recoup them for their repeated advances. Kessler &
Co. had, in fact, ceased to be in that position."
E
The second question was whether the fact that the respondents were
bankers enabled them to resist the appellant's claim, on the ground that
money once paid in to a bank ceases altogether to be the money of the
payer. That was held to be irrelevant.

This decision, too, is therefore inconsistent with the proposition that
F    the only mistake which will ground recovery is a mistake which leads the
payer to believe that he is liable to the payee to pay it to him. But the
case is also of interest for present purposes because of statements in the
speeches of their Lordships relating to the type of mistake which will
ground recovery. These are in very broad terms. Lord Atkinson said,
at p. 470:

"I cannot doubt but that on general principles . . . [the appellant]
G        would be entitled to recover back money paid in ignorance of these
vital matters as money paid in mistake of fact."

Lord Shaw of Dunfermline said, at p. 471:

"The money was paid . . . under the mistake of fact—which was
material, and was indeed the only reason for payment—that Kessler
& Co. could perform their obligations."
H
Lord Mersey said, at p. 472, that the facts brought the case directly
within the terms of the judgment of Lord Loreburn L.C. in *Kleinwort,
Sons & Co.* v. *Dunlop Rubber Co.*, 97 L.T. 263, and then quoted the

passage from that judgment which I have set out above. He went on
to dismiss an attempt by the respondents " to take the case out of this   A
plain and simple rule of law." It is to be observed that Lord Loreburn
L.C. was a member of the Judicial Committee in *Kerrison* v. *Glyn, Mills,
Currie & Co.,* 81 L.J.K.B. 465, and concurred, as did the Earl of Halsbury.

It thus appears that, provided the plaintiff's mistake is " vital " or
" material," which I understand to mean · that the mistake caused the
plaintiff to pay the money, the money is prima facie recoverable; but that   B
if the payment discharged an existing debt owing to the payee (or to a
principal on whose behalf the payee is authorised to receive the payment),
it is irrecoverable. Such a conclusion is, if I may say so with respect,
entirely consistent with the decision in *Aiken* v. *Short,* 1 H. & N. 210,
though not with the dictum of Bramwell B. in that case.

The third decision of the House of Lords to which I must refer is   C
*R. E. Jones Ltd.* v. *Waring and Gillow Ltd.* [1926] A.C. 670. The facts
of the case are complicated and somewhat unclear, due in part to the
curious way in which they were found, since they appear to have been
taken by the trial judge from the opening speech of the plaintiff's counsel.
In summary, a rogue named Bodenham obtained from the respondents
furniture and other effects to a value of over £13,000 on hire purchase
terms, under which the down payment was to be £5,000. It appears that   D
Bodenham defaulted in making the down payment, and that the respon-
dents then repossessed the goods. Bodenham then approached the
appellants, informing them that he represented a firm of motor manu-
facturers called International Motors who had control of a car called the
" Roma " car, and he persuaded the appellants to accept an appointment
as agents for the sale of the car in certain parts of this country, one term
of the agency being the payment of a deposit of £5,000 (£10 for each of   E
500 cars). Bodenham told the appellants that the people who were financing
the thing and who were the principals behind him in the matter were the
respondents, and that the deposit might be paid to them. The appellants then
made out two cheques payable to the order of the respondents, one for
£2,000 and one for £3,000, and handed them to Bodenham; he handed them
to the respondents, who received them from him in respect of his deposit   F
under the hire purchase agreement. The respondents' accountant observed
that the cheques bore the signature of only one director; he then arranged
with the appellants to exchange them for one cheque for £5,000, duly signed.
This exchange was effected in good faith, nothing being said about the nature
of the transaction. The cheque for £5,000 was cashed by the respondents,
who then restored to Bodenham the furniture they had seized, and let him
have some more. Subsequently, the fraud came to light, and it transpired   G
that there was no International Motors and no " Roma " car. The respon-
dents resumed possession of the furniture. The appellants claimed
repayment of the sum of £5,000 from the respondents.

The trial judge gave judgment for the appellants; but his judgment
was reversed by the Court of Appeal [1925] 2 K.B. 612. The reasons
given by the members of the court vary; but for present purposes the   H
significant judgment is that of Pollock M.R. He held that the appellants'
claim to recover the money as paid under a mistake of fact must fail,

A because the mistake was not a mistake *as between* the appellants and the respondents. He referred to the dicta of Parke B. in *Kelly* v. *Solari*, 9 M. & W. 54, and of Bramwell B. in *Aiken* v. *Short*, 1 H. & N. 210; he also referred to the decision in *Chambers* v. *Miller*, 13 C.B.N.S. 125, and to the dictum of Erle C.J. in that case (in the version reported in 32 L.J. C.P. 30, 32). He concluded, at p. 632:

B   "The plaintiffs and the defendants were each of them under mis-apprehensions—. . .—and different mistakes of fact. It appears to me, therefore, that it is not possible for the plaintiffs to recover the money as having been paid under a mistake of fact."

The House of Lords were however unanimous in concluding that the appellants' mistake of fact was sufficient to ground recovery, though a minority considered that the respondents had a good defence to the claim
C because they had changed their position in good faith. The House accordingly allowed the appeal. For present purposes, I am only concerned with the nature of the mistake which will ground recovery. Viscount Cave L.C. (with whose speech Lord Atkinson agreed) stated the principle in very broad terms, which show that he considered it sufficient for the plaintiff to show that he suffered under a mistake of fact which caused
D the payment. He said, at pp. 679–680:

   "The plaintiffs were told by Bodenham that he represented a firm called International Motors which was about to be formed into a company, that the firm had control of a car called the 'Roma' car which he described as an existing car, and that the defendants were financing the firm and were the principals behind him and behind International Motors in the matter. Believing these statements to be
E   true, the plaintiffs entered into an agreement which bound them to pay a deposit of £5,000 on 500 Roma cars; and still believing them to be true, and that the respondents as the nominees of International Motors could give a good receipt for the £5,000, they paid that sum to the respondents. In fact the statements were untrue from beginning to end; and the money was, therefore, paid under a mistake of fact
F   induced by the false statements of a third party and, apart from special circumstances, could be recovered. As to the general principle, it is sufficient to refer to the well known case of *Kelly* v. *Solari*, and to the more recent decisions in *Colonial Bank* v. *Exchange Bank of Yarmouth, Nova Scotia* and *Kerrison* v. *Glyn, Mills, Currie & Co.*"

It is significant that Viscount Cave L.C. did not consider it necessary to
G identify the precise capacity in which the appellants supposed that the respondents received the money; it was enough for him that the appellants supposed that the respondents were "nominees" of International Motors who could give a good receipt for the money—a purely neutral term. It follows that he did not regard it as necessary that the appellants should have supposed that they were liable to the respondents to pay the money
H to them, as is borne out by his citation of *Colonial Bank* v. *Exchange Bank of Yarmouth, Nova Scotia*, 11 App.Cas. 84 and of *Kerrison* v. *Glyn, Mills, Currie & Co.*, 81 L.J.K.B. 465. It is scarcely surprising that Lord Atkinson, who delivered the leading speech in *Kerrison's* case, agreed with

Viscount Cave L.C. on this aspect of the case.    Lord Shaw of Dunfermline    A
also agreed with Viscount Cave L.C. that the money was paid under a mis-
take of fact.    He concluded, at p. 686, that it seemed quite clear that the
appellants would never have parted with the money if they had had any
knowledge of the real truth, and that the money was recoverable.    It
appears from his statement of the facts that he did not consider that the
appellants mistakenly believed that they were liable to the respondents to
pay the money to them.    Lord Sumner, at pp. 691–692, stated the facts    B
in terms which show that he considered that the appellants supposed that,
in paying the money, they were discharging an obligation to International
Motors, not an obligation to the respondents.    Lord Carson, in agreeing
with Viscount Cave L.C. that the money was paid under a mistake of
fact, cited and relied upon both the dictum of Parke B. and the very
broad dictum of Rolfe B. in *Kelly* v. *Solari,* 9 M. & W. 54, of which at
least the latter requires only that the plaintiff's mistake should have caused    C
him to pay the money.

I wish to make three comments on the decision of the House of Lords
in *R. E. Jones Ltd.* v. *Waring and Gillow Ltd.* [1926] A.C. 670.    First, the
House of Lords must have rejected the view, expressed by Pollock M.R.,
that to ground recovery the mistake must have been " as between " payer
and payee, in the sense of having been a mistake shared by both parties.    D
Second, it is implicit in the speeches of all their Lordships that it is not a
prerequisite of recovery that the plaintiff must have mistakenly believed that
he was liable to the defendant to pay the money to him.    Third, as I under-
stand their Lordships' speeches, in particular the speech of Viscount Cave
L.C. (with which Lord Atkinson agreed) and the speeches of Lord Shaw and
Lord Carson, it is sufficient to ground recovery that the plaintiff's mistake    E
should have caused him to pay the money to the payee.

I should add, with great respect, that the reasoning, if not the decision, of
Roche J. in *Barclay & Co. Ltd.* v. *Malcolm & Co.* (1925) 133 L.T. 512
cannot in my judgment be reconciled with the decision of the House of
Lords in *R. E. Jones Ltd.* v. *Waring and Gillow Ltd.* [1926] A.C. 670.
It is striking that *Barclay & Co. Ltd.* v. *Malcolm & Co.* was argued and    F
decided between the decisions of the Court of Appeal and the House of
Lords in *R. E. Jones Ltd.* v. *Waring and Gillow Ltd.*    Moreover, leading
counsel for the plaintiffs in *Barclay & Co. Ltd.* v. *Malcolm & Co.* had
appeared for the respondents in *R. E. Jones Ltd.* v. *Waring and Gillow
Ltd.* before the Court of Appeal only three months earlier.    The decision
of the Court of Appeal in the latter case is not mentioned in the report    G
of *Barclay & Co. Ltd.* v. *Malcolm & Co.*; but that case is very briefly
reported in the Law Times reports, and it is inconceivable that so recent
an authority, in which counsel had appeared, was not cited to Roche J.
In *Barclay & Co. Ltd.* v. *Malcolm & Co.,* the plaintiff bank had mistakenly
paid the same sum twice to the defendants, in the belief that a confirming
letter from another bank constituted a second set of instructions.    Roche    H
J. held that the money was not recoverable.    The first and principal
ground upon which he so held was expressed by him in the following
words, at p. 513:

A    " It is not contrary to good conscience that the defendants should be
allowed to keep the money in question. The mistake was in no way
due to them. The mistake which was made concerned only the
plaintiffs and the Warsaw Bank by whom the plaintiffs were instructed,
and it was not a mistake with regard to the legality of one person to pay
or the right of another person to receive. The nearest authority appears
to be *Chambers* v. *Miller* . . . In my view, the first point gives a good
B    defence to the action."

Such reasoning is, in my judgment, inconsistent with the ratio decidendi of
the decision of the House of Lords in *R. E. Jones Ltd.* v. *Waring and
Gillow Ltd.* [1926] A.C. 670.

From this formidable line of authority certain simple principles can, in
my judgment, be deduced: (1) If a person pays money to another under a
C    mistake of fact which causes him to make the payment, he is prima facie
entitled to recover it as money paid under a mistake of fact. (2) His claim
may however fail if (a) the payer intends that the payee shall have the money
at all events, whether the fact be true or false, or is deemed in law so to
intend; or (b) the payment is made for good consideration, in particular if
the money is paid to discharge, and does discharge, a debt owed to the
D    payee (or a principal on whose behalf he is authorised to receive the pay-
ment) by the payer or by a third party by whom he is authorised to discharge
the debt; or (c) the payee has changed his position in good faith, or is
deemed in law to have done so.

To these simple propositions, I append the following footnotes: (a)
*Proposition* 1. This is founded upon the speeches in the three cases in the
House of Lords, to which I have referred. It is also consistent with the
E    opinion expressed by Turner J. in *Thomas* v. *Houston Corbett & Co.*
[1969] N.Z.L.R. 151, 167. Of course, if the money was due under a contract
between the payer and the payee, there can be no recovery on this ground
unless the contract itself is held void for mistake (as in *Norwich Union
Fire Insurance Society Ltd.* v. *Wm. H. Price Ltd.* [1934] A.C. 455) or is
rescinded by the plaintiff. (b) *Proposition* 2 (*a*). This is founded upon the
F    dictum of Parke B. in *Kelly* v. *Solari*, 9 M. & W. 54. I have felt it necessary
to add the words " or is deemed in law so to intend " to accommodate the
decision of the Court of Appeal in *Morgan* v. *Ashcroft* [1938] 1 K.B. 49, a
case strongly relied upon by the defendants in the present case, the effect of
which I shall have to consider later in this judgment. (c) *Proposition* 2 (*b*).
This is founded upon the decision in *Aiken* v. *Short*, 1 H. & N. 210, and
upon dicta in *Kerrison* v. *Glyn, Mills, Currie & Co.*, 81 L.J.K.B. 465.
G    However, even if the payee has given consideration for the payment, for
example by accepting the payment in discharge of a debt owed to him by a
third party on whose behalf the payer is authorised to discharge it, that
transaction may itself be set aside (and so provide no defence to the claim)
if the payer's mistake was induced by the payee, or possibly even where the
payee, being aware of the payer's mistake, did not receive the money in
H    good faith: cf. *Ward & Co.* v. *Wallis* [1900] 1 Q.B. 675, 678–679, *per*
Kennedy J. (d) *Proposition* 2 (*c*). This is founded upon the statement of
principle of Lord Loreburn L.C. in *Kleinwort, Sons & Co.* v. *Dunlop
Rubber Co.*, 97 L.T. 263. I have deliberately stated this defence in broad

terms, making no reference to the question whether it is dependent upon     A
a breach of duty by the plaintiff or a representation by him independent
of the payment, because these matters do not arise for decision in the
present case.  I have however referred to the possibility that the defendant
may be deemed in law to have changed his position, because of a line of
authorities concerned with negotiable instruments which I shall have to
consider later in this judgment, of which the leading case is *Cocks* v.
*Masterman*, 9 B. & C. 902.  (e) I have ignored, in stating the principle of     B
recovery, defences of general application in the law of restitution, for
example where public policy precludes restitution.  (f) The following pro-
positions are inconsistent with the simple principle of recovery established
in the authorities: (i) That to ground recovery, the mistake must have
induced the payer to believe that he was liable to pay the money to the
payee or his principal. (ii) That to ground recovery, the mistake must
have been " as between " the payer and the payee.  Rejection of this test     C
has led to its reformulation (notably by Asquith J. in *Weld-Blundell* v.
*Synott* [1940] 2 K.B. 107 and by Windeyer J. in *Porter* v. *Latec Finance
(Qld.) Pty. Ltd.* (1964) 111 C.L.R. 177, 204) in terms which in my judgment
mean no more than that the mistake must have caused the payment.

   In the case before me, Mr. Evans Lombe submitted on behalf of the
defendants that I could not proceed on the basis of the simple principles     D
I have stated, because I was precluded from so doing by binding
authority, viz. the decision of the Court of Appeal in *Morgan* v. *Ashcroft*
[1938] 1 K.B. 49.  That case came on appeal from the county court.  The
respondent was a bookmaker, with whom the appellant was in the habit
of making bets.  The respondent claimed that his clerk mistakenly credited
the appellant twice over with a sum of £24 2s. 1d., and claimed to recover
that sum from the appellant as having been paid under a mistake of fact.     E
The county court judge held that the respondent was entitled to recover the
money.  The Court of Appeal allowed the appeal, holding that the money
was not recoverable.  The first ground of the court's decision was that, in
order to ascertain whether there had been an overpayment, it would be
necessary for the court to examine the state of account between the parties,
and that the court could not do, by reason of the Gaming Act 1845.  How-     F
ever the court also held that the money was in any event not recoverable as
having been paid under a mistake of fact.  Mr. Evans Lombe relied in
particular on a passage in the judgment of Sir Wilfrid Greene M.R., in
which he stated, at p. 66:

   ". . . a person who intends to make a voluntary payment and thinks
   that he is making one kind of voluntary payment whereas upon the
   true facts he is making another kind of voluntary payment, does not     G
   make the payment under a mistake of fact which can be described as
   fundamental or basic."

That passage Mr. Evans Lombe identified as being the crucial passage in Sir
Wilfrid Greene M.R.'s judgment on this point; and he submitted further
that the expression " voluntary payment " must here be understood as a     H
payment made without legal obligation, so that, generally speaking, a person
who makes a payment without the intention of discharging a legal obligation
cannot recover the money from the payee although it has been paid under

A   a mistake of fact except possibly in circumstances where the mistake can
be described as fundamental, for example where the mistake is as to the
identity of the payee.

It is legitimate to observe the consequences of Mr. Evans Lombe's
submission. If he is right, money would be irrecoverable in the following,
by no means far-fetched, situations. (1) A man, forgetting that he has
already paid his subscription to the National Trust, pays it a second time.
B   (2) A substantial charity uses a computer for the purpose of distributing
small benefactions. The computer runs mad, and pays one beneficiary
the same gift one hundred times over. (3) A shipowner and a charterer
enter into a sterling charterparty for a period of years. Sterling depreciates
against other currencies; and the charterer decides, to maintain the goodwill
of the shipowner but without obligation, to increase the monthly hire pay-
ments. Owing to a mistake in his office, the increase in one monthly hire
C   payment is paid twice over. (4) A Lloyd's syndicate gets into financial
difficulties. To maintain the reputation of Lloyd's, other underwriting
syndicates decide to make gifts of money to assist the syndicate in difficulties.
Due to a mistake, one syndicate makes its gift twice over. It would not be
difficult to construct other examples. The consequences of Mr. Evans
Lombe's submission are therefore so far-reaching that it is necessary to
D   examine the ratio decidendi of this part of the decision in *Morgan* v.
*Ashcroft* to ascertain whether it produces the result for which Mr.
Evans Lombe contends.

Only two judges sat to hear the appeal in *Morgan* v. *Ashcroft* [1938]
1 K.B. 49—Sir Wilfrid Greene M.R. and Scott L.J. Furthermore, there
are considerable differences between their two judgments on this part of
the case. First, there was a difference in the basic philosophy expounded
E   by the two judges. Sir Wilfrid Greene M.R. favoured the so-called
"implied contract" theory as the basis of recovery of money paid under
a mistake of fact. Citing a well-known dictum of Lord Sumner from
*Sinclair* v. *Brougham* [1914] A.C. 398, 452, he rejected the principle of
unjust enrichment and stated that the claim was based upon an imputed
promise to repay: [1938] 1 K.B. 49, 62. Scott L.J. adopted a less
F   restricted view. While accepting that the moral principle of unjust
enrichment had been rejected as a universal or complete legal touchstone
whereby to test the cause of action, he referred to passages from the works
of eminent jurists and concluded, at p. 76, that his citations emphasised:

"the importance of trying to find some common positive principles
upon which these causes of action called 'implied contracts' can be
said to rest, and which will not altogether exclude that of unjust
G   enrichment embodied in those citations."

Scott L.J.'s approach has been amply vindicated by subsequent develop-
ments in the law, as is shown in particular by authoritative statements of
principle in the House of Lords by Lord Atkin in *United Australia Ltd.* v.
*Barclays Bank Ltd.* [1941] A.C. 1, 28–29 and by Lord Wright in *Fibrosa
H   Spolka Akcyjna* v. *Fairbairn Lawson Combe Barbour Ltd.* [1943] A.C. 32,
61.

How far Sir Wilfrid Greene M.R.'s narrower philosophic approach
affected his analysis in *Morgan* v. *Ashcroft* [1938] 1 K.B. 49 is difficult to

tell; but there was a further difference between him and Scott L.J., in their view of the nature of the mistake which will ground recovery of **A** money paid under a mistake of fact. Again, Sir Wilfrid Greene M.R. adopted a more restricted view. He founded himself upon the dictum of Bramwell B. in *Aiken* v. *Short*, 1 H. & N. 210, which he accepted as an authoritative statement of law " so far as regards the class of mistake with which he was dealing," i.e. in " cases where the only mistake is as to the nature of the transaction." From that dictum he deduced the conclusion **B** on which Mr. Evans Lombe relied before me, viz. that if a person thinks that he is making one kind of voluntary payment, whereas on the true facts he is making another kind of voluntary payment, his mistake is not fundamental or basic and therefore cannot ground recovery: see pp. 65–67 of the report. Scott L.J., on the other hand, was not prepared to accept Bramwell B.'s dictum as authoritative; in particular, he referred to *Kerrison* v. *Glyn, Mills, Currie & Co.*, 81 L.J.K.B. 465 and said that the decision of **C** the House of Lords in that case seemed to him " conclusive that the rule as stated in *Aiken* v. *Short*, 1 H. & N. 210 cannot be regarded as final and exhaustive in the sense that no mistake, which does not induce in the mind of the payer a belief that payment will discharge or reduce his liability, can ground an action for money had and received ": see pp. 73–74 of the report. In these circumstances it is by no means easy to determine the **D** ratio decidendi of this part of the case. It may well be found in the opinion of both judges that an overpayment of betting debts by a bookmaker is not made under a mistake of fact sufficiently fundamental to ground recovery, apparently on the basis that the payment is in any event intended to be a purely voluntary gift, because " the law prevents the plaintiff from saying that he intended anything but a present " (see p. 77, *per* Scott L.J.), and the plaintiff is therefore deemed in law to intend that the payee shall **E** be entitled to retain the money in any event.

That the ratio decidendi is not to be found in the passage from Sir Wilfrid Greene M.R.'s judgment on which Mr. Evans Lombe relied is shown by the fact that the subsequent decision of the Court of Appeal in *Larner* v. *London County Council* [1949] 2 K.B. 683 is, in my judgment, inconsistent with that passage. In that case, the London County Council had resolved **F** to pay all their employees who went to the war the difference between their war service pay and their civil pay until further order. Mr. Larner was an ambulance driver employed by the council, who was called up in 1942. As a result of his failure to keep the council accurately informed about changes in his war service pay, the council overpaid the difference. In contending that the overpayment was irrecoverable, Mr. Larner's counsel relied upon the dictum of Bramwell B. in *Aiken* v. *Short*, 1 H. & N. 210. The Court **G** of Appeal however held that the money was recoverable. Denning L.J., who delivered the judgment of the court, declined to follow that dictum, because he said, at p. 688, " . . . that dictum, as Scott L.J. pointed out in *Morgan* v. *Ashcroft*, cannot be regarded as an exhaustive statement of the law." He pointed out that the council

**H**

> " made a promise to the men which they were in honour bound to fulfil. The payments made under that promise were not mere gratuities. They were made as a matter of duty: . . ."

**1 Q.B.**                    **Barclays Bank v. W. J. Simms Ltd.**                **Goff J.**

but he went on to state that it was irrelevant that the council's promise
A was unsupported by consideration or unenforceable by action. It was
enough that the council would never have paid the money to Mr. Larner
had they known the true facts: see p. 688 of the report. It is doubt-
ful if the decision in *Larner* v. *London County Council* [1949] 2 K.B.
683 is one of which Sir Wilfrid Greene M.R. would have approved; but,
if I may say so with respect, it is entirely consistent with the principles
B of recovery established in the earlier decisions of the House of Lords
to which I have referred. Accordingly it is those principles which I
intend to apply in the present case.

II. *Where a bank pays a cheque drawn upon it by a customer of the
bank, in what circumstances may the bank recover the payment from
the payee on the ground that it was paid under a mistake of fact?*
C It is a basic obligation owed by a bank to its customer that it will
honour on presentation cheques drawn by the customer on the bank,
provided that there are sufficient funds in the customer's account to
meet the cheque, or the bank has agreed to provide the customer with
overdraft facilities sufficient to meet the cheque. Where the bank
honours such a cheque, it acts within its mandate, with the result that
D the bank is entitled to debit the customer's account with the amount of
the cheque, and further that the bank's payment is effective to discharge
the obligation of the customer to the payee on the cheque, because the
bank has paid the cheque with the authority of the customer.

In other circumstances, the bank is under no obligation to honour its
customer's cheques. If however a customer draws a cheque on the bank
without funds in his account or agreed overdraft facilities sufficient to
E meet it, the cheque on presentation constitutes a request to the bank to
provide overdraft facilities sufficient to meet the cheque. The bank
has an option whether or not to comply with that request. If it declines
to do so, it acts entirely within its rights and no legal consequences
follow as between the bank and its customer. If however the bank pays
the cheque, it accepts the request and the payment has the same legal
F consequences as if the payment had been made pursuant to previously
agreed overdraft facilities; the payment is made within the bank's man-
date, and in particular the bank is entitled to debit the customer's
account, and the bank's payment discharges the customer's obligation to
the payee on the cheque.

In other cases, however, a bank which pays a cheque drawn or
purported to be drawn by its customer pays without mandate. A bank
G does so if, for example, it overlooks or ignores notice of its customer's
death, or if it pays a cheque bearing the forged signature of its customer
as drawer, but, more important for present purposes, a bank will pay
without mandate if it overlooks or ignores notice of countermand of the
customer who has drawn the cheque. In such cases the bank, if it pays
the cheque, pays without mandate from its customer; and unless the
H customer is able to and does ratify the payment, the bank cannot debit
the customer's account, nor will its payment be effective to discharge
the obligation (if any) of the customer on the cheque, because the bank
had no authority to discharge such obligation.

It is against the background of these principles, which were not in dispute before me, that I have to consider the position of a bank which $A$ pays a cheque under a mistake of fact. In such a case, the crucial question is, in my judgment, whether the payment was with or without mandate. The two typical situations, which exemplify payment with or without mandate, arise first where the bank pays in the mistaken belief that there are sufficient funds or overdraft facilities to meet the cheque, and second where the bank overlooks notice of countermand given by $B$ the customer. In each case, there is a mistake by the bank which causes the bank to make the payment. But in the first case, the effect of the bank's payment is to accept the customer's request for overdraft facilities; the payment is therefore within the bank's mandate, with the result that not only is the bank entitled to have recourse to its customer, but the customer's obligation to the payee is discharged. It follows that the payee has given consideration for the payment; with the consequence $C$ that, although the payment has been caused by the bank's mistake, the money is irrecoverable from the payee unless the transaction of payment is itself set aside. Although the bank is unable to recover the money, it has a right of recourse to its customer. In the second case, however, the bank's payment is without mandate. The bank has no recourse to its customer; and the debt of the customer to the payee on the cheque $D$ is not discharged. Prima facie, the bank is entitled to recover the money from the payee, unless the payee has changed his position in good faith, or is deemed in law to have done so.

It is relevant to observe that if, in *Chambers* v. *Miller*, 13 C.B.N.S. 125, the action had, instead of being a claim by the bearer for damages for false imprisonment, taken the form of a claim by the paying bank for recovery of the money as having been paid under a mistake of fact, that $E$ claim would, on the foregoing analysis, have failed, because the mistake of the bank in that case was a mistaken belief that there were sufficient funds in the customer's account to meet the cheque. Similarly in *Pollard* v. *Bank of England* (1871) L.R. 6 Q.B. 623, where a bank paid a bill of exchange accepted by one of their customers payable at the bank, in ignorance of the fact that the balance of the credit of the $F$ acceptors at the bank was insufficient to meet the bill and indeed that the acceptance had, in the general sense, stopped payment (and so were unable to pay their debts when they fell due), the bank was held to be unable to recover from the payee the money so paid: see p. 631 of the report, *per* Blackburn J., who delivered the judgment of the court. In both these cases, the bank acted within its mandate; but where the bank's mistake relates not to sufficiency of funds in its customer's account, $G$ but arises from ignorance or oversight of a notice of countermand, the bank acts without mandate, and the money is in my judgment prima facie recoverable.

III. *If a bank pays a cheque under a mistake of fact, in what circumstances has the payee a good defence to the bank's claim to recover the* $H$ *money, on the principle in Cocks v. Masterman, 9 B. & C. 902?*

The authorities on this topic have recently been analysed by Kerr J. in *National Westminster Bank Ltd.* v. *Barclays Bank International Ltd.*

A    [1975] Q.B. 654, an analysis which I gratefully adopt and which makes it unnecessary for me to burden this judgment with a full analysis of the authorities. The case before Kerr J. was concerned with a claim by the plaintiff bank to recover from the defendant bank a sum paid by it on a forged cheque presented by the defendant bank on behalf of a customer for special collection, which the plaintiff bank had paid to the defendant bank in ignorance of the forgery, and the defendant bank had then

B    credited to its customer's account. A principal question in the case was whether the plaintiff bank was estopped from claiming repayment by a representation, in honouring the cheque, that the cheque was genuine. Kerr J., in holding that the bank made no such representation and was not so estopped, considered the line of cases, commencing with the decision of Lord Mansfield in *Price* v. *Neal* (1762) 3 Burr. 1354, in which payments of bills of exchange which contained forged signatures had been

C    held irrecoverable on a number of grounds. The early cases on the topic culminated in the leading case of *Cocks* v. *Masterman,* 9 B. & C. 902. In that case the plaintiff bankers paid a bill which purported to have been accepted by their customer, in ignorance of the fact that the acceptance was forged—a fact they did not discover until the day after payment. It was held by the Court of King's Bench that they could not recover

D    the money from the defendants, the holders' bankers. Bayley J., who delivered the judgment of the court, said, at pp. 908–909:

"... we are all of opinion that the holder of a bill is entitled to know, on the day when it becomes due, whether it is an honoured or dishonoured bill, and that, if he receive the money and is suffered to retain it during the whole of that day, the parties who paid it cannot recover it back. The holder, indeed, is not bound by law (if

E    the bill be dishonoured by the acceptor) to take any steps against the other parties to the bill till the day after it is dishonoured. But he is entitled so to do, if he thinks fit, and the parties who pay the bill ought not by their negligence to deprive the holder of any right or privilege. If we were to hold that the plaintiffs were entitled to recover, it would be in effect saying that the plaintiffs might deprive

F    the holder of a bill of his right to take steps against the parties to the bill on the day when it becomes due."

The principle to be derived from this case is probably that, if the plaintiff fails to give notice on the day of payment that the bill contained a forged signature and that the money, having been paid in ignorance of that fact, is being claimed back, the defendant is deprived of the opportunity of

G    giving notice of dishonour on the day when the bill falls due, and so is deemed to have changed his position and has a good defence to the claim on that ground. But, whatever the precise basis of the defence, it is clearly founded on the need for the defendant to give notice of dishonour; and it can therefore have no application where notice of dishonour is not required. Thus in *Imperial Bank of Canada* v. *Bank of Hamilton*

H    [1903] A.C. 49, it was held by the Privy Council that the defence had no application to an unendorsed cheque in which the amount of the cheque had been fraudulently increased by the drawer after it had been certified. The cheque was regarded as a total forgery, and not as a negotiable

Goff J.        **Barclays Bank v. W. J. Simms Ltd.**        **[1980]**

instrument at all.  Lord Lindley, who delivered the advice of the Board,    A
said, at p. 58:

> " The cheque for the larger amount was a simple forgery; and Bauer,
> the drawer and forger, was not entitled to any notice of its dis-
> honour by non-payment.  There were no indorsers to whom notice of
> dishonour had to be given.  The law as to the necessity of giving
> notice of dishonour has therefore no application.  The rule laid
> down in *Cocks* v. *Masterman*, 9 B. & C. 902, and recently reasserted    B
> in even wider language by Mathew J. in *London and River Plate
> Bank Ltd.* v. *Bank of Liverpool Ltd.* [1896] 1 Q.B. 7, has reference
> to negotiable instruments, on the dishonour of which notice has to be
> given to some one, namely, to some drawer or indorser, who would
> be discharged from liability unless such notice were given in proper
> time.  Their Lordships are not aware of any authority for applying    C
> so stringent a rule to any other cases.  Assuming it to be as
> stringent as is alleged in such cases as those above described, their
> Lordships are not prepared to extend it to other cases where notice
> of the mistake is given in reasonable time, and no loss has been
> occasioned by the delay in giving it."

Likewise, in *National Westminster Bank Ltd.* v. *Barclays Bank Inter-*    D
*national Ltd.* [1975] Q.B. 654, Kerr J. held that the defence had no
application in the case which he had to consider of a wholly forged
cheque, which was also not a negotiable instrument at all.

In a passage in *Paget's Law of Banking,* 8th ed. (1972) p. 377, which
was relied upon by Mr. Evans Lombe for the defendants in the present
case, it is suggested that the law as expounded by Lord Lindley in *Im-*    E
*perial Bank of Canada* v. *Bank of Hamilton* [1903] A.C. 49 is open to
criticism, on the ground that if a bill is paid and the money is thereafter
reclaimed, no dishonour takes place until the money is reclaimed and
therefore no notice of dishonour can be given until then, from which it
follows that it is hard to conceive of any case of payment by mistake
where the opportunity of giving notice of dishonour is lost.  I am unable
to accept this criticism.  If the money is recovered, then the bill will    F
not have been paid on the due date or at all, for the payment will not
have discharged the debt due upon the bill.  It follows that, in such a case,
the bill is in fact dishonoured on the day it falls due, and as Bayley J. in
*Cocks* v. *Masterman*, 9 B. & C. 902 and Lord Lindley in *Imperial Bank
of Canada* v. *Bank of Hamilton* [1903] A.C. 49 both contemplated,
unless notice of the plaintiff's claim is given on that date, the opportunity
of the defendant to give notice of dishonour on that day is lost.  Like    G
Lord Lindley in the *Imperial Bank of Canada* case I can find nothing
inconsistent with this conclusion in the decision of Mathew J. in *London
and River Plate Bank Ltd.* v. *Bank of Liverpool Ltd.* [1896] 1 Q.B. 7.

It is therefore a prerequisite of the application of the defence that the
defendant should be under a duty to give notice of dishonour.  The pro-
visions regarding notice of dishonour in the Bills of Exchange Act 1882    H
are contained in sections 48 to 50 of the Act.  In section 50 (2) are set out
the circumstances in which notice of dishonour is dispensed with.  For
present purposes, the relevant provision is contained in section 50 (2) (c),

A   which provides (inter alia) that notice of dishonour is dispensed with, as regards the drawer, where the drawer has countermanded payment. It follows that in the case of a simple unendorsed cheque, payment of which is countermanded by the drawer, notice of dishonour is not required; and in such a case the payee cannot invoke the defence established in *Cocks* v. *Masterman,* 9 B. & C. 902.

It is to be observed that, in *Imperial Bank of Canada* v. *Bank of*
B *Hamilton* [1903] A.C. 49, Lord Lindley described the rule laid down in *Cocks* v. *Masterman* as a stringent rule. It is not merely stringent, but very technical. It is possible that if, in due course, full recognition is accorded to the defence of change of position, there will be no further need for any such stringent rule and the law can be reformulated on a more rational and less technical basis. Whether the law will hereafter

C   develop in this way remains to be seen.


IV. *Application of the foregoing principles to the present case.*

In the light of the above principles, it is plain that in the present case the plaintiff bank is entitled to succeed in its claim. First, it is clear that the mistake of the bank, in overlooking the drawer's instruction to stop payment of the cheque, caused the bank to pay the cheque. Second, since
D the drawer had in fact countermanded payment, the bank was acting without mandate and so the payment was not effective to discharge the drawer's obligation on the cheque; from this it follows that the payee gave no consideration for the payment, and the claim cannot be defeated on that ground. Third, there is no evidence of any actual change of position on the part of either of the defendants or on the part of the
E National Westminster Bank; and, since notice of dishonour is not required in a case such as this, the payee is not deemed to have changed his position by reason of lapse of time in notifying them of the plaintiff's error and claiming repayment.

I must confess that I am happy to be able to reach the conclusion that the money is recoverable by the plaintiff bank. If the bank had not failed to overlook its customer's instructions, the cheque would have
F been returned by it marked " Orders not to pay," and there would have followed a perfectly bona fide dispute between the association and the receiver on the question, arising on the terms of the building contract, whether the association was entitled to stop the cheque—which ought to be the real dispute in the case. If the plaintiff bank had been unable to recover the money, not only would that dispute not have been ventilated
G and resolved on its merits but, in the absence of ratification by the association, the plaintiff bank would have had no recourse to the association. Indeed, if under the terms of the building contract the money had not been due to the defendant company, non-recovery by the plaintiff bank would have meant quite simply a windfall for the preferred creditors of the defendant company at the plaintiff bank's expense. As however I
H have held that the money is recoverable, the situation is as it should have been; nobody is harmed, and the true dispute between the association and the receiver can be resolved on its merits.

I have however to consider the identity of the party against whom the

**Goff J.**                    **Barclays Bank v. W. J. Simms Ltd.**                    **[1980]**

plaintiff bank is entitled to judgment. As at present advised I am reluctant to enter judgment against the defendant company without further A argument. I say that because the argument before me was concentrated on the right of recovery generally, and there was not fully canvassed before me the question whether, assuming that the National Westminster Bank received the payment as agent for the defendant company, an action will lie against its principal to whom the bank had neither paid the money nor done anything equivalent to payment. I will be glad, B therefore, to hear submissions from counsel as to how the parties wish the matter to be taken from here.

[There followed a discussion with counsel, in the course of which the defendants by their counsel conceded that, for the purposes of the case before the court, the receipt of the money by the National Westminster Bank, as collecting banker or agent of the first defendants (the defendant company), was a sufficient receipt of the money by the first C defendants to enable the defendants to entitle the plaintiff bank to judgment for the sum so paid as against the first defendants. His Lordship then entered judgment for the plaintiff bank against the first defendants for £26,451·38p (£24,000 together with £2,451·38p by way of interest) and by consent ordered that the first defendants pay the plaintiff bank's costs of the action up to and including March 23, 1979, with D no order as to costs thereafter. The action against the second defendant (the receiver) was dismissed, with no order as to costs.]

> *Judgment for the plaintiff against first*
> *defendants with costs up to March 23,*
> *1979.*
> *Action against second defendant dis-* E
> *missed with no order as to costs.*

Solicitors: *Durrant Piesse; Harvey, Ingram, Leicester.*

                                   **R. D.**

                                                                      F

———————

                                                                      G

END OF VOLUME AND OF QUEEN'S BENCH SERIES FOR 1980.            H

# TAB 14

**Barlow Clowes International Ltd. (In Liquidation),
Nigel James Hamilton, Michael Anthony Jordon
v. Eurotrust International Limited, Peter Stephen
William Henwood, Andrew George Sebastian**
No. Privy Council Appeal No. 38 of 2004
Court of Appeal of the Isle of Man
10 October 2005

**2005 WL 2493292**

Before: Lord Nicholls of Birkenhead ,
Lord Steyn , Lord Hoffmann , Lord
Walker of Gestingthorpe , Lord Carswell
Monday 10th October, 2005

**Analysis**

**Judgment**

1   In the mid-1980s Mr Peter Clowes, through a
Gibraltar company called Barlow Clowes International
Ltd ("Barlow Clowes"), operated a fraudulent off-shore
investment scheme purporting to offer high returns
from the skilled investment of funds in UK gilt-edged
securities. He attracted about £140 million, mainly from
small UK investors. Most of the money was dissipated
in the personal business ventures and extravagant living
of Mr Clowes and his associates. In 1988 the scheme
collapsed and Mr Clowes was afterwards convicted and
sent to prison.

2   Some of the investors' funds were paid away during
1987 through bank accounts maintained by companies
administered from the Isle of Man by a company
providing off-shore financial services which was then
called International Trust Corporation (Isle of Man)
Ltd ("ITC"). The principal directors were Mr Peter
Henwood and Mr Andrew Sebastian. In proceedings
in the Common Law Division of the High Court of
the Isle of Man, Barlow Clowes (now in liquidation)
claimed that Mr Henwood, Mr Sebastian and, through
them, ITC, dishonestly assisted Mr Clowes and one of
his principal associates, Mr Cramer, to misappropriate
the investors' funds.

3   After a trial lasting 31days, during which Mr
Henwood and Mr Sebastian gave evidence and were
cross-examined at length, the Acting Deemster (Hazel
Williamson QC) found that Mr Henwood was liable
for dishonestly assisting in the misappropriation of
three sums: £577,429 paid away on 8 June 1987, £6
million paid away on 7 July 1987 and £205,329 paid
away on 12 November 1987. She found Mr Sebastian
similarly liable for the same sums and an additional
£1,799,603.32 paid away on 22 June 1987 and ITC
liable, through Mr Henwood and Mr Sebastian, for all
four payments. She dismissed a limitation defence.

4   All three defendants appealed to the Staff of
Government Division of the High Court. Mr Sebastian
and ITC appealed solely on the limitation point
and their appeals were dismissed. Mr Henwood's
appeal against the finding that he had given dishonest
assistance was allowed on the ground that it was
not supported by the evidence. Against that decision
Barlow Clowes appeals to Her Majesty in Council. Mr
Sebastian and ITC have taken no further part in the
proceedings.

5   The circumstances in which Mr Henwood and ITC
came to be involved in the affairs of Barlow Clowes
are set out with exemplary clarity in the judgment of
the Acting Deemster and only the briefest summary
is necessary here. ITC provided off-shore financial
services. In particular, it formed and administered off-
shore companies, provided off-shore directors who
would act upon the instructions of beneficiaries, opened
bank accounts and moved money, sometimes through
its own client account. In 1985 it was introduced to
Mr Guy Cramer, a young businessman who was an
associate of Mr Clowes but who had ventures of his
own, probably funded with Barlow Clowes investors'
money. He instructed ITC to form and administer a
number of off-shore companies.

6   Between May 1986 and February 1987 ITC dealt
with a series of payments from Barlow Clowes to off-
shore companies which they administered on behalf of
Mr Cramer. The Acting Deemster considered 10 such
transactions, mostly in amounts of between £100,000
and £250,000, but with one payment of £1,137,500,
from Barlow Clowes to companies under Mr Cramer's
personal control. There was no apparent commercial

purpose for these transactions, still less any reason for their being routed through the ITC client account or from one off-shore Cramer company to another. Counsel for Barlow Clowes invited the judge to find that even at that stage Mr Henwood and Mr Sebastian must have entertained strong suspicion that the money had been misappropriated and that the services of ITC were being used to conceal its origins. The judge found that Mr Sebastian probably did have suspicions but refused to find that Mr Henwood did so. ITC had a good deal of other business besides that of Mr Cramer. Mr Henwood, she said, was not of a naturally curious disposition concerning matters which did not affect him personally and might not have applied his mind to what was happening.

7   All this changed in the spring of 1987 when Mr Cramer and Mr Clowes decided to merge their interests by a "reverse take-over" by Barlow Clowes of a listed company called James Ferguson Holdings plc ("JFH") controlled by Mr Cramer. ITC began to provide off-shore services for the combined entity and became much more involved in its affairs. On 2 April 1987 Mr Henwood went to Gibraltar and met Mr Clowes. Later that month, Mr Henwood went to the Bahamas with Mr Cramer and they discussed the possibility of absorbing Mr Henwood's ITC business into the JFH group, providing financial services from the Barlow Clowes offices in Geneva. Mr Henwood saw the possibility of becoming virtually a partner of Mr Clowes and Mr Cramer and began to take a lively interest in their business. On 5 June 1987 Mr Henwood went with Mr Clowes and Mr Cramer to Geneva to plan the development of the Barlow Clowes business, including the integration of ITC. Mr Henwood learned a great deal about the nature of the Barlow Clowes business and the source of its liquid funds.

8   It was during this summer of 1987 that the two impugned transactions, referred to by the judge as transactions 11 and 15, took place. The first part of transaction 11 was the payment on 3 March 1987 of £1,886,415 from Barlow Clowes through ITC's client account to a Cramer company called Ryeman Ltd. The money was required to enable Ryeman to put itself forward as a sub-underwriter of a rights offer by JFH which formed part of the reverse takeover by which the Barlow Clowes companies were injected into JFH. The money was not required for sub-underwriting and

remained in the Ryeman account until 8 June 1987 when Mr Henwood authorised the payment of £577,429 for Mr Cramer's personal business. The judge found that by that time Mr Henwood knew enough about the origins of the money to have suspected misappropriation and that he acted dishonestly in assisting in its disposal.

9   The first part of transaction 15 was the payment on 22 June 1987 by Barlow Clowes to Ryeman of £7 million in connection with a proposed bid for a brewery company which was being made by Mr Clowes and Mr Cramer. On 7 July 1987 Mr Henwood and Mr Sebastian authorised the transfer of £6 million of this money to Mr Cramer's personal account. Here again, the judge held that Mr Henwood was acting dishonestly. In November 1987 Mr Henwood and Mr Sebastian authorised the payment of £205,329 of the remaining transaction 15 money to a company controlled by Mr Clowes. The judge found this also to be dishonest assistance.

10   The judge stated the law in terms largely derived from the advice of the Board given by Lord Nicholls of Birkenhead in Royal Brunei Airlines Sdn. Bhd. v Tan [1995] 2 AC 378 . In summary, she said that liability for dishonest assistance requires a dishonest state of mind on the part of the person who assists in a breach of trust. Such a state of mind may consist in knowledge that the transaction is one in which he cannot honestly participate (for example, a misappropriation of other people's money), or it may consist in suspicion combined with a conscious decision not to make inquiries which might result in knowledge: see Manifest Shipping Co Ltd v Uni-Polaris Insurance Co Ltd [2003] 1 AC 469 . Although a dishonest state of mind is a subjective mental state, the standard by which the law determines whether it is dishonest is objective. If by ordinary standards a defendant's mental state would be characterised as dishonest, it is irrelevant that the defendant judges by different standards. The Court of Appeal held this to be a correct state of the law and their Lordships agree.

11   The judge found that during and after June 1987 Mr Henwood strongly suspected that the funds passing through his hands were monies which Barlow Clowes had received from members of the public who thought that they were subscribing to a scheme of investment in gilt-edged securities. If those suspicions were correct, no honest person could have assisted Mr Clowes and

Mr Cramer to dispose of the funds for their personal use. But Mr Henwood consciously decided not to make inquiries because he preferred in his own interest not to run the risk of discovering the truth.

12  Their Lordships consider that by ordinary standards such a state of mind is dishonest. The judge found that Mr Henwood may well have lived by different standards and seen nothing wrong in what he was doing. He had an

> "exaggerated notion of dutiful service to clients, which produced a warped moral approach that it was not improper to treat carrying out clients' instructions as being all important. Mr Henwood may well have thought this to be an honest attitude, but, if so, he was wrong."

13  Lord Neill of Bladen QC, who appeared for Mr Henwood, submitted to their Lordships that such a state of mind was not dishonest unless Mr Henwood was aware that it would by ordinary standards be regarded as dishonest. Only in such a case could he be said to be *consciously* dishonest. But the judge made no finding about Mr Henwood's opinions about normal standards of honesty. The only finding was that by normal standards he had been dishonest but that his own standard was different.

14  In submitting that an inquiry into the defendant's views about standards of honesty is required, Lord Neill relied upon a statement by Lord Hutton in Twinsectra Ltd v Yardley [2002] 2 AC 164 , 174, with which the majority of their Lordships agreed:

> "35.    There is, in my opinion, a further consideration which supports the view that for liability as an accessory to arise the defendant must himself appreciate that what he was doing was dishonest by the standards of honest and reasonable men. A finding by a judge that a defendant has been dishonest is a

grave finding, and it is particularly grave against a professional man, such as a solicitor. Notwithstanding that the issue arises in equity law and not in a criminal context, I think that it would be less than just for the law to permit a finding that a defendant had been 'dishonest' in assisting in a breach of trust where he knew of the facts which created the trust and its breach but had not been aware that what he was doing would be regarded by honest men as being dishonest.

> "36.    … I consider that the courts should continue to apply that test and that your Lordships should state that dishonesty requires knowledge by the defendant that what he was doing would be regarded as dishonest by honest people, although he should not escape a finding of dishonesty because he sets his own standards of honesty and does not regard as dishonest what he knows would offend the normally accepted standards of honest conduct."

15  Their Lordships accept that there is an element of ambiguity in these remarks which may have encouraged a belief, expressed in some academic writing, that Twinsectra had departed from the law as previously understood and invited inquiry not merely into the defendant's mental state about the nature of the transaction in which he was participating but also into his views about generally acceptable standards of honesty. But they do not consider that this is what Lord Hutton meant. The reference to "what he knows would offend normally accepted standards of honest conduct" meant only that his knowledge of the transaction had to be such as to render his participation contrary to normally acceptable standards of honest conduct. It did

not require that he should have had reflections about what those normally acceptable standards were.

16   Similarly in the speech of Lord Hoffmann, the statement (in para 20) that a dishonest state of mind meant "consciousness that one is transgressing ordinary standards of honest behaviour" was in their Lordships' view intended to require consciousness of those elements of the transaction which make participation transgress ordinary standards of honest behaviour. It did not also to require him to have thought about what those standards were.

17   On the facts of Twinsectra , neither the judge who acquitted Mr Leach of dishonesty nor the House undertook any inquiry into the views of the defendant solicitor Mr Leach about ordinary standards of honest behaviour. He had received on behalf of his client a payment from another solicitor whom he knew had given an undertaking to pay it to Mr Leach's client only for a particular use. But the other solicitor had paid the money to Mr Leach without requiring any undertaking. The judge found that he was not dishonest because he honestly believed that the undertaking did not, so to speak, run with the money and that, as between him and his client, he held it for his client unconditionally. He was therefore bound to pay it upon his client's instructions without restriction on its use. The majority in the House of Lords considered that a solicitor who held this view of the law, even though he knew all the facts, was not by normal standards dishonest.

18   Their Lordships therefore reject Lord Neill's submission that the judge failed to apply the principles of liability for dishonest assistance which had been laid down in Twinsectra . In their opinion they were no different from the principles stated in Royal Brunei Airlines v Tan which were correctly summarised by the judge.

19   Their Lordships now address the grounds upon which the Staff of Government Division allowed Mr Henwood's appeal. Having set out the Acting Deemster's findings at some length, they said that she could have held Mr Henwood liable unless she could find that he had

> "solid grounds for suspicion, which
> he consciously ignored, that the

disposals in which Mr Henwood participated involved dealings with misappropriated funds."

20   Their Lordships think that, on the facts of the case, this was an accurate way of putting the matter. The question for the Staff of Government Division was whether there was evidence upon which the Acting Deemster could have made such a finding.

21   The court referred to the judge's findings that Mr Henwood had been made fully aware of the nature of Barlow Clowes' business by his visits to Gibraltar and Geneva, that he knew that over £1 million had been "propelled" through an off-shore shell company controlled by Mr Cramer in three tranches between 5 and 14 May 1987 and that in consequence of the talks about merging ITC into the Clowes/Cramer group, Mr Henwood had begun to wonder where all Mr Cramer's money came from. She concluded that—

> "it did come home to Mr Henwood
> during this period that there must be
> some real possibility that the monies
> which Mr Cramer was putting
> through ITC, emanating as he knew
> from Barlow Clowes, could well be
> gilt investors' money."

22   Another matter which the judge took into account was Mr Henwood's knowledge of previous dishonesty by Mr Cramer. No sooner had he become a client of ITC in 1985 than he enlisted their support (which was willingly given) in a fraudulent scheme to pretend that a company he controlled had entered into leases at substantial rents with independent tenants. The charade even included Mr Cramer (through ITC) placing advertisements in the Financial Times and answering them himself in the guise of a different company. The sub-underwriting agreement which led to the transaction 11 payment of £1,886,415 to Ryeman had also involved a pretence, which Mr Henwood knew

10-03635-jpm    Doc 271-1    Filed 04/03/17    Entered 04/03/17 18:29:57    Exhibit A -
Part 1    Pg 264 of 538

Barlow Clowes International Ltd (In Liquidation) v Eurotrust..., 2005 WL 2493292...

to have been dishonest, that Ryeman was independent of Mr Cramer and Barlow Clowes.

23  Finally, the judge had regard to the lies which Mr Henwood told in evidence. In flat contradiction to what he had said on previous occasions, he denied that he had had any knowledge of the Barlow Clowes business or the money-laundering transactions which passed through ITC and the companies it was administering. With conspicuous fairness the judge noted that people sometimes tell lies for reasons other than a belief that they are necessary to conceal guilt: compare R v Lucas (Ruth) [1981] QB 720 . She said of Mr Henwood's denial that he knew about the nature of the Barlow Clowes business:

> "This is quite obviously a lie, and it is so desperate a lie, that I ask myself why he should resort to it. It could be that when he learned about the nature of Barlow Clowes' business he was not prompted to be suspicious, and he is now lying out of fear that this would not be believed — or it could be that he did become suspicious and he is lying in such an extreme way because he does not think that merely denying that he drew suspicious conclusions is a credible position. This could only be because he himself would not think it potentially credible. Given that there is some evidence that Mr Henwood was, indeed, beginning to question the source of Mr Cramer's supposed wealth, I find that the latter is the more likely explanation. I think Mr Henwood lied about actually gaining knowledge of Barlow Clowes' business at this time precisely because such knowledge caused him to ask himself questions which he now realizes are damning."

24  The Staff of Government Division dealt with this mass of evidence by saying:

> "The evidential basis for [the finding of suspicions which were consciously ignored] therefore wholly stems from the Acting Deemster's legitimate disbelief of much of Mr Henwood's oral testimony coupled with the inferences she draws from it. These are that he knew the money came from members of the Barlow Clowes group and because he knew the money came from this source and the general nature of the group's business he must, as a matter of objective assessment, also have appreciated that the disposals were of money which had been misappropriated in breach of trust."

25  This is, with all respect, a travesty of the judge's findings. Her findings did not stem wholly from her disbelief of Mr Henwood's evidence. The appellate court had itself recounted the other matters upon which the judge relied and which have been summarized above. She did not say that "as a matter of objective assessment" Mr Henwood must have appreciated that the disposals were of misappropriated money. She said that as matter of Mr Henwood's subjective state of mind, he suspected this to have been the case.

26  The court went on to say that the judge's reasoning displayed the dangers of "drawing inferences from inferences", a process which they had earlier said was "notoriously productive of injustice". Their Lordships have some difficulty in understanding what this means. Mr Henwood's various subjective states of mind — whether or not he suspected misappropriation and whether he consciously decided not to ask questions about the transactions in which he was assisting — were facts. Since there is no window into another mind, the only way to form a view on these matters is to draw inferences from what Mr Henwood knew, said and did, both then and later, including what he said in evidence. That is what the judge did and it is hard to see what other method could have been adopted. The Acting

Deemster, who had seen Mr Henwood giving evidence for six days, was in a far better position than the Staff of Government Division to arrive at the right answer.

27  The appellate court then went on to say that because Mr Henwood knew the general nature of the businesses of the members of the Barlow Clowes group, it was not a necessary inference that he would have concluded that the disposals were of moneys held in trust. That was because there was no evidence that Mr Henwood—

> "knew anything about, for example, the actual conduct of the businesses of members of the Barlow Clowes group, the contractual arrangements made with investors, the mechanisms for management of funds under the group's control, the investment and distribution policies and the precise involvement of Mr Cramer in the group's affairs."

28  Their Lordships consider that this passage displays two errors of law. First, it was not necessary (as the Staff of Government Division had themselves said earlier in the judgment) that Mr Henwood should have concluded that the disposals were of moneys held in trust. It was sufficient that he should have entertained a clear suspicion that this was the case. Secondly, it is quite unreal to suppose that Mr Henwood needed to know all the details to which the court referred before he had grounds to suspect that Mr Clowes and Mr Cramer were misappropriating their investors' money. The money in Barlow Clowes was either held on trust for the investors or else belonged to the company and was subject to fiduciary duties on the part of the directors. In either case, Mr Clowes and Mr Cramer could not have been entitled to make free with it as they pleased. In Brinks Ltd v Abu-Saleh [1996] CLC 133 , 151 Rimer J expressed the opinion that a person cannot be liable for dishonest assistance in a breach of trust unless he knows of the existence of the trust or at least the facts giving rise to the trust. But their Lordships do not agree. Someone can know, and can certainly suspect, that he is assisting in a misappropriation of money without knowing that the money is held on trust

or what a trust means: see Twinsectra Ltd v Yardley [2002] 2 AC 164 at para 19 (Lord Hoffmann) and para 135 (Lord Millett). And it was not necessary to know the "precise involvement" of Mr Cramer in the group's affairs in order to suspect that neither he nor anyone else had the right to use Barlow Clowes money for speculative investments of their own.

29  Their Lordships accordingly consider that there was abundant evidence on which the judge was entitled to make the findings of fact which she did about the disposal of £577,429 of the transaction 11 money on 8 June 1987. The Staff of Government Division should not have set them aside.

30  By the time of the later transactions, Mr Henwood had even more reason to be suspicious. In particular, he had been told on 2 July 1987 by two employees in the Geneva office that Mr Clowes and Mr Cramer were misappropriating clients' money. Mr Clowes had subsequently persuaded the employees to say that they had been misunderstood, but Mr Henwood knew he had understood them perfectly well. The Staff of Government nevertheless found that even in these circumstances, the judge was not entitled to find that he must have entertained suspicions which he chose not to investigate. They said that he might have thought his suspicions would somehow be disabused or that he might have relied upon the word of Mr Clowes that all was well.

31  The difficulty about this reasoning is that Mr Henwood never said in evidence that he thought his suspicions might be disabused or that he had made inquiries of Mr Clowes and been given a reassuring answer. Mr Henwood's evidence, which the judge found to be untruthful, was that he knew nothing and had no reason to suspect anything. A state of mind in which suspicion had been allayed was entirely the invention of the Staff of Government Division. There was no evidence that Mr Henwood had tried to seek any explanation whatever and their Lordships consider that the judge was fully justified in concluding that this was the result of a deliberate and dishonest decision.

32  Their Lordships will therefore humbly advise Her Majesty that the appeal should be allowed and the decision of the Acting Deemster restored. Mr Henwood must pay the appellants' costs in the Staff

WESTLAW   © 2017 Thomson Reuters.

of Government Division and before their Lordships' Board.

Crown copyright

© 2017 Sweet & Maxwell

2005 WL 2493292

**End of Document**

© 2017 Thomson Reuters.

# TAB 15

*830  **Beaufort Developments (NI)
Ltd v. Gilbert-Ash NI Ltd & Ors.**

House of Lords

20 May 1998

**[1998] C.L.C. 830**

Lord Goff of Chieveley , Lord Lloyd of Berwick , Lord
Nolan , Lord Hoffmann and Lord Hope of Craighead

Judgment delivered 20 May 1998

### Analysis

Contract—Building contract—Arbitration—Contractor
sought stay of proceedings by employer under JCT
building contract—Whether arbitrator had wider power
than court to review architect's decisions and certificates—
Whether proceedings should be stayed— Arbitration Act
(Northern Ireland) 1937, s. 4 .

This was an appeal raising the question whether the
decision in Northern Regional Health Authority v
Derek Crouch Construction Co Ltd [1984] QB 644 , that
a power given to the arbitrator in a building contract
to 'open up review and revise any certificate' of the
architect, could only be exercised by the arbitrator and
not by the courts, was rightly decided.

Beaufort (the employer) entered into a contract on the
JCT standard form with Gilbert-Ash (the contractor)
for the construction of an office block in Belfast. The
works were not completed on time. The contractor
blamed the architects and the employer blamed them
both. The contractor claimed that it was entitled to
payment from the employer, under certificates issued by
the architects and by way of payment for extra work.
The employer claimed it was entitled to damages against
the contractor and architects for breach of contract. The
contractor served notice to concur in the appointment
of an arbitrator pursuant to the arbitration clause
in the contract. The employer issued a writ against
the contractor and architects and the contractor then
applied for a stay of the employer's action under s. 4
of the Arbitration Act (Northern Ireland) 1937 . The

master granted a stay and his decision was affirmed by
the judge, reluctantly because the architects could not
be required to take part in the arbitration and there
was a risk of conflicting decisions in the arbitration and
litigation against the architects. However he considered
that he was bound by the decision in Northern Regional
Health Authority v Derek Crouch Construction Co Ltd
[1984] QB 644 to hold that an arbitrator would have the
power under cl. 41.4 of the JCT contract to 'open up,
review and revise' certificates of the architects which the
court did not have. If the stay was refused the contractor
would therefore be at a grave disadvantage in that it
would be faced with architects' certificates which the
court could not review. The Northern Ireland Court of
Appeal followed Crouch and upheld that decision. The
employer appealed.

*Held* , allowing the appeal:

The discretion should have been exercised to refuse
a stay, as the judge would have done had he felt
free to do so. Northern Regional Health Authority
v Derek Crouch Construction Co Ltd [1984] QB 644
was wrongly decided and should be overruled. The
Court of Appeal in Crouch considered that cl. 41.4
conferred a special power on the arbitrator because
without it architects' certificates would be binding on
the parties. But on the true construction of the contract
such certificates were not binding and were open to
review by any tribunal called upon to determine the
rights of the parties whether arbitral or judicial. The
binding nature of the certificates could not be derived
from the provisions of cl. 41.4 itself. Clause 30.9 made
the final certificate conclusive as to certain matters and
cl. 30.10 provided that otherwise architects' certificates
should not be conclusive. ( Robins v Goddard [1905]
1 KB 294 approved ; Northern Regional Health
Authority v Derek Crouch Construction Co Ltd [1984]
QB 644 overruled ; Balfour Beatty Civil Engineering
Ltd v Docklands Light Railway Ltd [1996] CLC 1435
doubted.)

**The following cases were referred to in the speeches:**

• Balfour Beatty Civil Engineering Ltd v Docklands
Light Railway Ltd [1996] CLC 1435; (1996) 78 BLR 42 .
•Benstrete Construction Ltd v Angus Hill (1987) 38
BLR 115
•Brodie v Corporation of Cardiff [1919] AC 337

Beaufort Developments (NI) Ltd v Gilbert-Ash (NI) Ltd, [1998] C.I.L.L 1998)

• Dawnays Ltd v F G Minter Ltd and Trollope & Colls Ltd [1971] 1 WLR 1205

• East Ham Corp v Bernard Sunley & Sons Ltd [1966] AC 406

• Kaye (P & M) Ltd v Hosier & Dickinson Ltd [1972] 1 WLR 146

• Minster Trust Ltd v Traps Tractors Ltd [1954] 3 All ER 136

• Modern Engineering (Bristol) Ltd v Gilbert-Ash (Northern) Ltd (1973) 71 LGR 162 (CA ); [1974] AC 689 (HL)

• National Coal Board v William Neill & Son (St Helens) Ltd [1985] QB 300

• Neale v Richardson [1938] 1 All ER 753

• Northern Regional Health Authority v Derek Crouch Construction Co Ltd [1984] QB 644

• Robins v Goddard [1905] 1 KB 294

• Taunton-Collins v Cromie [1964] 1 WLR 633

## Representation

• Declan Morgan QC and Gavin Bonnar BL (instructed by Crawford & Lockhart ) for the employer.
• Donnell J Deeny QC and Mark T Horner QC (instructed by L'Estrange & Brett ) for the contractor.
• John Thompson QC and D Marriman BL (instructed by McCloskey & Co ) for the architects.

## SPEECHES

Lord Goff of Chieveley:

I have had the advantage of reading in draft the speech prepared by my noble and learned friend, Lord Hoffmann. I find myself to be in complete agreement with his reasoning and his conclusion; and I too am satisfied that, with all respect to the distinguished members of the Court of Appeal who decided the case, Northern Regional Health Authority v Derek Crouch Construction Co Ltd [1984] QB 644 was wrongly decided and must be overruled . I too would therefore allow the appeal — a conclusion which, I have no doubt, will be welcomed by the courts in Northern Ireland who would, if they had been free to do so, have wished to follow the same course. Like Lord Hoffmann, I gladly

acknowledge my debt to the writings of Mr I N Duncan Wallace QC on the subject.

Lord Lloyd of Berwick:

Standard forms of building contract have often been criticised by the courts for being unnecessarily obscure and verbose. But in fairness one should add that it is sometimes the courts themselves who have added to the difficulty by treating building contracts as if they were subject to special rules of their own.

Two recent examples illustrate the point. In Dawnays Ltd v F G Minter Ltd and Trollope & Colls Ltd [1971] 1 WLR 1205 the Court of Appeal held that when a sum is certified by an architect as due under a building contract (in that case the RIBA form) the employer has no right of set-off. The justification for this decision was said to be that cash flow is the life blood of the building trade: see Modern Engineering (Bristol) Ltd v Gilbert-Ash (Northern) Ltd (1973) 71 LGR 162 per Lord Denning at p. 167. The decision came as something of a surprise in the official referees' corridor. It was overruled a few years later when the Modern Engineering reached the House: [1974] AC 689 . 'It is not to be supposed' Lord Diplock said, at p. 718D:

'that so an elementary an economic proposition as the need for cash flow in business enterprises escaped the attention of judges throughout the 130 years which had lapsed between Mondel v Steel (1841) 8 M & W 858 and Dawnays' case in 1971…'

*832 And so the House held, restoring the decision of Judge Edgar Fay QC, that the ordinary common law right of set-off, whereby a breach of warranty may be set up in diminution of the price, applies as much to building contracts as to contracts for the sale of goods.

In the meantime Dawnays' case had been followed in five other cases in the Court of Appeal. This is not surprising when one considers the pressure of litigation in this field. One erroneous decision of the Court of Appeal is bound to lead to others.

The same applies to the second example, although the intervening period has been somewhat longer. The arbitration clause in Northern Regional Health Authority v Derek Crouch Construction Co Ltd [1984] QB 644 gave the arbitrator the power to 'open up review and revise any certificate' of the architect, as does the arbitration clause in the present case. The Court of Appeal held this special power was confined to the arbitrator, on whom it had been conferred by the arbitration clause. It could not be exercised by the courts. Since it would have been unjust to the contractors to deprive them of the opportunity of challenging the architect's certificates in that case, the Court of Appeal held that the arbitrations (there were two of them) should go ahead.

As in Dawnays' case, it appears that the decision in the Crouch case came as a surprise. Official referees had been opening up and revising certificates as a matter of course for many years without any objection from the parties.

It is clear from Pringle J's judgment in the present case, that but for the decision in Crouch , he would not have granted the defendant a stay of the Plaintiffs' action under s. 4 of the Arbitration Act (Northern Ireland) 1937 , and the Court of Appeal would have upheld his decision. In my view they would have been right. So the question is whether the Crouch case was correctly decided.

In the present case we are concerned with cl. 30.9, 30.10 and 41.4. Clause 30.9 provides that the final certificate is to be conclusive evidence of the matter certified in accordance with the elaborate provisions set out in that clause. Clause 41.4, the arbitration clause, provides, as one would expect, that the arbitrator's powers to open up and revise certificates are subject to cl. 30.9. So the arbitrator has no power to open up and revise the final certificate, save as provided by cl. 30.9, and in particular by cl. 30.9.3. But we are not here concerned with the final certificate. It has not yet been issued.

Nothing in cl. 30.9 affects any certificate other than the final certificate. Indeed cl. 30.10 specifically provides:

> 'Save as aforesaid no certificate of the architect shall of itself be conclusive evidence that any works materials or goods to which it relates are in accordance with this contract.'

Interim certificates granted by the architect in the course of a building contract are an important part of the contractual machinery. But there is nothing in the present contract to make interim certificates conclusive; nor was there in the Crouch case. So there is no need for the contract to confer on the courts the power to open up and revise interim certificates. The power already exists, as part of the court's ordinary power to enforce the contract in accordance with its terms.

Then can it be said that the jurisdiction of the courts to open up and revise interim certificates is impliedly excluded by the terms of the arbitration clause? I do not pause to consider whether such an ouster of the court's powers would be effective in law; on any view it would require the clearest of language. I can find no such language in cl. 41.4. Since an arbitrator's powers, unlike the powers of the court, are derived ultimately from the contract under which he is appointed, it is by no means unusual to find his powers spelt out in longhand. Thus under the old law (until changed by s. 30 of the Arbitration Act 1996 ) an arbitrator had no power to rule on his own jurisdiction. Since he could not pull himself up by his own boot straps, he could not decide whether a valid arbitration *833 agreement had ever come into existence. But the High Court can rule on its own jurisdiction. Similarly an arbitrator could not rule on a question whether the contract ought to be rectified. So it is not surprising to find the parties conferring on the arbitrator an express power to rectify the contract. But it would be hopeless to argue that because the parties had by cl. 41.4 conferred on the arbitrator an express power to rectify the contact, they had by implication curtailed the power of the court to rectify the contract. By the same token, the courts power to open up and revise interim certificates is not excluded by the express power to open up and revise certificates conferred on the arbitrator.

For these reasons, and those given by Lord Hoffmann and Lord Hope, with which I agree, I would hold that the Crouch case was wrongly decided, and, like them, would allow the appeal.

Beaufort Developments (NI) Ltd v Gilbert-Ash (NI) Ltd, [1998] C.L.C. 830 (1998)

Lord Nolan:

I confess to much sympathy with the very distinguished and experienced judges who have expressed or assented to the view that a clause such as cl. 41.4 of the building contract giving the arbitrator power to 'open up, review and revise any certificate, opinion, decision … requirement or notice …' confers upon him a discretion wider than that available to a court. The language used is not that of the Supreme Court Practice. It seems to suggest an informal and constructive approach to the resolution of problems occurring in the course of the building work, an approach appropriate to the work of an arbitrator who is chosen because he is an architect rather than a judge.

I am, however, persuaded by the arguments of Mr Declan Morgan QC, and by the opinions of your Lordships whose speeches I have had the opportunity of reading in draft, that the Court of Appeal in Northern Regional Health Authority v Derek Crouch Construction Co Ltd [1984] QB 644 placed a weight on cl. 41.4 greater than it will bear. I am persuaded in particular that cl. 41.4, read in the context of the contract as a whole, cannot properly be construed as giving an interim certificate (as distinct from a final certificate) any conclusive effect in litigation between the parties. Further, I am satisfied that the clause cannot be regarded as conferring upon the arbitrator the power to modify the contract. I find it difficult to conceive of a contract properly so called which conferred upon a third party the power to modify its terms.

The decision in the Crouch case has stood unchallenged, although not uncriticised, for 14 years. It has now been virtually superseded by s. 9(4) of the Arbitration Act 1996 , unless and until (if ever) s. 86 of that Act is brought into operation. Yet on the view of the law which has prevailed in your Lordships' House the relevant dicta in the Crouch case must clearly be overruled , in justice to the appellants. Pringle J and the Court of Appeal in Northern Ireland would plainly have refused a stay to the respondents, on the compelling ground that to grant it would lead to duplication of proceedings, had it not been for their reluctant acceptance of what was said in the Crouch case. The same objection to a stay did not, as it

happens, arise in the Crouch case itself because all three of the parties concerned submitted to arbitration by the same arbitrator. Mr Donnell Deeny QC, for the first named respondent, persuasively invited your Lordships to assume that the same consequence would follow if the stay were upheld in the present case, but the assumption was not one which Mr Morgan was prepared to support.

I, too, would therefore allow the appeal.

Lord Hoffmann:

The question before your Lordships is whether an arbitrator appointed to decide a dispute arising under a building contract in the JCT standard form has a power to review decisions and certificates of the architect which is not available to a court. The English Court of Appeal so held in Northern Regional Health Authority v Derek Crouch Construction Co Ltd [1984] QB 644 but your Lordships are invited to say that they were wrong. *834

The clause which is said to give the arbitrator these exceptional powers is 41.4, of which the relevant parts are as follows:

'…the arbitrator shall, without prejudice to the generality of his powers, have power to rectify the contract so that it accurately reflects the true agreement made by the employer and the contractor, to direct such measurements and/or valuations as may in his opinion be desirable in order to determine the rights of the parties and to ascertain and award any sum which ought to have been the subject of or included in any certificate and to open up, review and revise any certificate, opinion, decision … requirement or notice and to determine all matters in dispute which shall be to him in the same manner as if no such certificate, opinion, decision, requirement or notice had been given.'

The words particularly relied upon are those which confer a power 'to open up, review and revise any certificate, opinion, decision … requirement or notice' and determine matters in dispute as if they had not been given. The Court of Appeal in the Crouch case said that these were special powers conferred exclusively upon the arbitrator. Browne-Wilkinson LJ said, at p. 667 that in an action 'questioning the validity of an architect's certificate or opinion', the jurisdiction of the court would be limited to deciding whether or not the certificate or opinion was invalid for bad faith or excess of power. It could not revise the certificate on the ground that the court thought it was wrong. A clause such as 41.4, on the other hand, gave the arbitrator 'power not only to enforce the contractual obligations but to modify them'. Sir John Donaldson MR also said that the arbitrator could vary the certificates to create new rights and obligations which would not otherwise arise from the contract. Dunn LJ said that one could not imply a term that if the dispute was litigated instead of arbitrated, the court should have a similar power.

My Lords, I have no doubt that it is open to the parties to enter into an agreement of the kind described by the Court of Appeal in the Crouch case. I put aside the purely theoretical question of whether it is right to speak of the architect or arbitrator having power to modify the contractual obligations of the parties. I find this a strange concept. The powers of the architect or arbitrator, whatever they may be, are conferred by the contract. It seems to me more accurate to say that the parties have agreed that their contractual obligations are to be whatever the architect or arbitrator interprets them to be. In such a case, the opinion of the court or anyone else as to what the contract requires is simply irrelevant. To enforce such an interpretation of the contract would be something different from what the parties had agreed. Provisions of this kind are common in contracts for the sale of property at a valuation or goods which comply with a specified description. The contract may say that the value of the property or the question of whether the goods comply with the description shall be determined by a named person as an expert. In such a case, the agreement is to sell at what the expert considers to be the value or to buy goods

which the expert considers to be in accordance with the description. The court's view on these questions is irrelevant.

It is less usual, though certainly theoretically possible, to add a second tier to arrangements of this kind, and to provide that a party who is dissatisfied with the view of one expert shall be entitled to call for the opinion of another, which shall then be final and binding. From the point of view of the court, the final outcome is no different from that in the case of a single expert. The contractual obligations of the parties depend upon the opinion of the one expert or the other and not upon its own view of the matter.

It is this two-tier arrangement which the Court of Appeal in the Crouch case considered that the JCT contract had created; what Sir John Donaldson MR afterwards called, cryptically but vividly, an 'internal arbitration': see Benstrete Construction Ltd v Angus Hill (1987) 38 BLR 115 at p. 118. It is internal in the sense that it does not adjudicate upon the rights and duties of the parties but is part of the machinery for determining *835 what they are. The court appears to have considered that in the absence of a second tier power of the arbitrator to open up, review and revise the architect's certificates, they would (if given in good faith and within the ambit of the relevant contractual provisions) be binding upon the parties. So the critical question is whether, upon the true construction of the contract, such certificates are binding. Unless they are, there is no need for any special second-tier arrangement. They will be open to review by any tribunal called upon to determine the rights of the parties, whether arbitral or judicial.

The judgments of the Court of Appeal contain no very detailed analysis of the provisions of the contract which are said to confer upon the architect this power to issue binding certificates. Although none of the judges say so expressly, there is an implied suggestion that one can infer such a power from the very fact that the arbitrator is given a power to 'open up, review and revise'. This is the argument from redundancy; the parties are presumed not to say anything unnecessarily and unless the decisions of the architect were binding, there would be no need to confer upon the arbitrator an express power to open up, review and revise them. The later judgment of Sir John Donaldson MR in Benstrete

Construction Ltd v Angus Hill (1987) 38 BLR 115, in which he distinguished Crouch on the ground that the contract in the latter case did not have a similar arbitration clause, tends to support the view that he had adopted this form of reasoning.

I think, my Lords, that the argument from redundancy is seldom an entirely secure one. The fact is that even in legal documents (or, some might say, especially in legal documents) people often use superfluous words. Sometimes the draftsmanship is clumsy; more often the cause is a lawyer's desire to be certain that every conceivable point has been covered. One has only to read the covenants in a traditional lease to realise that draftsmen lack inhibition about using too many words. I have no wish to add to the anthology of adverse comments on the drafting of the JCT standard form contract. In the case of a contract which has been periodically renegotiated, amended and added to over many years, it is unreasonable to expect that there will be no redundancies or loose ends. It is therefore necessary to make a careful examination of the contract as a whole in order to discover whether upon its true construction it does confer binding power upon the decisions of the architect or whether there is some other explanation for the 'open up, review and revise' power in cl. 41.4. It is also important to have regard to the course of earlier judicial authority and practice on the construction of similar contracts. The evolution of standard forms is often the result of interaction between the draftsmen and the courts and the efforts of the draftsman cannot be properly understood without reference to the meaning which the judges have given to the language used by his predecessors.

The substantive provisions of the agreement state the principal obligations of the parties in clear and objective terms. The contractor is obliged by condition 2.1 to 'carry out and complete the works in accordance with the contract documents, using materials and workmanship of the quality and standards therein specified'. In this particular contract, the preliminary articles defined the 'Works' as the construction of a nine-storey office block as described in the contract documents. Condition 8.1.3 provides that all work is to be carried out in a proper and workmanlike manner and by condition 23.1.1 the contractor is to proceed 'regularly and diligently' with the works and complete them on or before the completion date. The contract

specified 14 January 1995 as the completion date and said that the contract price was to be £1,700,000.

This framework of carefully defined contractual obligation is not easily reconcilable with a broad discretion, said to be conferred in the first instance upon the architect and subject to review by an arbitrator, to vary or modify the rights of the parties or to have them conclusively determined by the judgment of one or the other. The parties have **\*836** agreed that a particular building is to be constructed out of specified materials in a workmanlike manner and that the work should proceed regularly and diligently to completion by a specified date. No doubt within this framework there is room for judgment about what amounts to proper workmanship and diligent progress. But one would not ordinarily describe the exercise of such judgment as a power to modify the contractual rights. These are questions which require the application of objective standards and with which the courts are routinely familiar.

The contract provides for the issue by the architect of certificates or statements in writing as to his opinion on various matters. For present purposes, these documents may be treated as similar. As Devlin J said in Minster Trust Ltd v Traps Tractors Ltd [1954] 3 All ER 136 , at p. 145B: 'The mere use of the word "certificate" is not decisive.' In the absence of express words, the parties are highly unlikely to have intended that some of these statements of opinion should be binding and others not. I shall give a few examples. Clause 30 provides for the issue of interim certificates of the value of the work for which the contractor is from time to time entitled to payment. Clause 30.1.1 provides that the contractor is entitled to payment within 14 days after the issue of the certificate. Clause 25, which deals with extension of time, lists a number of 'Relevant Events' such as force majeure or failure to provide instructions or information which the parties accept as capable of delaying completion beyond the completion date without breach of the contractor's primary obligation to proceed diligently with the works. By cl. 25.3, if the architect is of opinion that a relevant event is likely to delay completion beyond the completion date, he must give the contractor an appropriate extension of time by a written notice fixing a new completion date. Clause 26 deals with claims for loss and expense caused by deferment of giving possession of the site or various

WESTLAW    © 2017 Thomson Reuters.                                                                                                    6

matters such as provision of information for which the employer or architect is responsible. Here again, the architect is required to state his opinion that loss or expense has been caused, or is likely to be caused, by one of the specified matters, whereupon the amount is ascertained by the quantity surveyor and added to the contract price. Finally, cl. 30.8 provides for the issue of a final certificate stating the balance due from employer to contractor or vice versa.

Clause 30.9 expressly makes the final certificate conclusive evidence as to various matters. But there is no other express provision which says that any certificate or expression of opinion is to be binding upon the parties in the same way as the determination of an expert. Clause 30.10, immediately after the provisions dealing with the final certificate, says:

> 'Save as aforesaid no certificate of the architect shall of itself be conclusive evidence that any works, materials or goods to which it relates are in accordance with this contract.'

This clause has itself been the subject of refined arguments of the inclusio unius, exclusio alterius variety. The clause refers to certificates, therefore it must have been intended that other statements of opinion by the architect should be conclusive. The clause refers only to works, materials and goods being in accordance with the contract, therefore it must have been intended that certificates as to other matters such as extensions of time should be conclusive. In a contract such as this, such arguments are just as dangerous as the argument from redundancy, of which they are in truth merely a variety. If arguments of this kind are to be pursued, what seems to me much more compelling is that the contract contains express and elaborate terms which provide for conclusiveness as to various matters for one certificate and one only, namely the final certificate.

If the certificates are not conclusive, what purpose do they serve? If one considers the practicalities of the construction of a building or other works, it seems to me that parties could reasonably have intended that they should have what might be called a provisional

**\*837** validity. Construction contracts may involve substantial work and expenditure over a lengthy period. It is important to have machinery by which the rights and duties of the parties at any given moment can be at least provisionally determined with some precision. This machinery is provided by architect's certificates. If they are not challenged as inconsistent with the contractual terms which the parties have agreed, they will determine such matters as when interim payments are due or completion must take place. This is something which the parties need to know. No doubt in most cases there will be no challenge.

On the other hand, to make the certificate conclusive could easily cause injustice. It may have been given when the knowledge of the architect about the state of the work or the effect of external causes was incomplete. Furthermore, the architect is the agent of the employer. He is a professional man but can hardly be called independent. One would not readily assume that the contractor would submit himself to be bound by his decisions, subject only to a challenge on the grounds of bad faith or excess of power. It must be said that there are instances in the 19th century and the early part of this one in which contracts were construed as doing precisely this. There are also contracts which provided that in case of dispute, the architect was to be arbitrator. But the notion of what amounted to a conflict of interest was not then as well understood as it is now. And of course the inclusion of such clauses is a matter for negotiation between the parties or, in a standard form, the two sides of the industry, so that what is acceptable will to some extent depend upon the bargaining strength of one side or the other. At all events, I think that today one should require very clear words before construing a contract as giving an architect such powers.

The language and practical background of the JCT contract does not therefore suggest that any certificates other than the final certificate were intended to have conclusive effect. I return, therefore, to cl. 41.4, from which the Court of Appeal in the Crouch case drew the opposite conclusion. It is worth noticing in passing that, in addition to the power to 'open up, review and revise', it also confers express powers to rectify the contract and to direct measurements and valuations. It seems plain that the reason for the inclusion of these powers in cl. 41.4 is to confer upon the arbitrator the plenitude of power to 'determine the rights of the parties' which

would be possessed by a court. If the power to 'open up, review and revise' was intended to be peculiar to the arbitrator, it would at any rate be different in its purpose from the other powers.

At this stage, however, I wish to refer to an important authority on a clause in similar language which may be taken to have formed part of the background to the inclusion of cl. 41.4 in the JCT Standard Form Contract 1980 edition which was used in this case. It is Robins v Goddard [1905] 1 KB 294 . This concerned an RIBA form of contract, of which cl. 17 dealt with defects 'arising in the opinion of the architect from materials or workmanship not in accordance with the drawings or specification'. It provided that the contractor should make good such defects at his own cost 'unless the architect should decide that the contractor ought to be paid for them'. The contract also included an arbitration clause which conferred power to 'open up, review and revise' any certificate, opinion etc. of the architect. The contractor sued upon unpaid architect's certificates and the employer counterclaimed on the ground that the work done and materials supplied were not in accordance with the terms of the contract. Farwell J held that the fact that the architect had not expressed an opinion in accordance with cl. 17 that the work and materials were not in accordance with the contract was conclusive and that the court therefore had no jurisdiction to entertain the counterclaim.

Mr Duke KC argued for the contractor that the contract meant that 'the certificate of the architect is to be final unless and until it is appealed under the arbitration clause'. He mentioned one express exception in the contract but said that 'in all other cases the **\*838** certificates are final so long as the only mode of reviewing them by means of the arbitration clause is not adopted'. In other words, he was contending for precisely the two-tier system of conclusive determination which the Court of Appeal adopted in the Crouch .

The Court of Appeal unanimously rejected this argument. In fact, they stood it on its head. Collins MR said that the arbitrator's power to open up review and revise showed that the architect's certificates were not intended to be conclusive at all. And if they were not conclusive, they were no more conclusive in litigation

than in arbitration. The power to open up and review, said the Master of the Rolls, at p. 301:

> 'negatives the contention that the defendant is debarred by the certificates of the architect from setting up bad workmanship on the building and the introduction of improper materials.'

It followed that he could challenge them in an arbitration or, if there was no arbitration, before the court. Stirling LJ said, at p. 303 that, rather as I have suggested to your Lordships is the case with the JCT contract in this case, the language of the rest of the RIBA contract did not support the view that certificates were intended to be conclusive. But, he added: 'When we come to the arbitration clause the matter is free from doubt'. The effect of the power to open up and revise was that:

> 'These certificates, therefore, were not intended to be absolutely binding and conclusive. No doubt on an application made at the proper time the dispute might have been referred to arbitration; but it has not been referred, and the matter remained open for decision under the ordinary jurisdiction of the courts, and the defendant was entitled to his ordinary legal remedies and to have his case heard.'

I have said that Robins v Goddard [1905] 1 KB 294 is an important case. This is not because it lays down any proposition of law but because it tells us what the Court of Appeal, nearly a century ago, when the 'open up, review and revise' formula seems to have been relatively new, thought that it was intended to do. Not, as the Court of Appeal said in Crouch , to enable certificates otherwise conclusive to be revised by an arbitrator and no one else, but to make it clear that such certificates were not conclusive at all. The court

clearly took the view that the draftsman had seen no need to confer an express power on the court in the same terms as the arbitration clause. The court's jurisdiction was unlimited. It was the arbitrator's powers which need to be spelled out. On this view, the power to open up, review and revise falls into place alongside the other powers conferred by cl. 41.4 as a power which a court would in any event possess.

During the 80 years between Robins v Goddard and Crouch [1984] QB 644 , I can find no authority in which a construction inconsistent with the earlier case was adopted. In Neale v Richardson [1938] 1 All ER 753 similar reasoning was used in a case in which the question was whether the contractor could sue without a certificate which the architect had refused to issue. The arbitration clause empowered the arbitrator to decide all disputes, which, on the authority of Brodie v Corporation of Cardiff [1919] AC 337 , the court construed to include disputes as to whether or not a certificate should have been issued. There had been no arbitration because the arbitrator (who was also the architect) refused to act, but the court decided in general terms that the non-issue of the certificate was not conclusive and therefore if the arbitrator had power to decide that the money was owing, the court must have it also. Scott LJ said, at p. 758F–G:

> 'If … the parties did not choose to enforce the domestic tribunal, or were prevented by the action of the agreed tribunal from doing so, the King's courts regained their full jurisdiction, and then the county court judge was entitled to decide the issue as to the certificate which the architect would have decided as arbitrator, had he acted as such.'

**\*839**  It is true that Robins v Goddard seems to have been a cause of perplexity to some members of your Lordships' House in East Ham Corp v Bernard Sunley & Sons Ltd [1966] AC 406 . Lord Upjohn in particular said at p. 441 that he found it a 'rather difficult case' and that while not doubting the actual decision, he did not find it easy to follow some of the observations in the judgments. Lord Pearson also said at p. 447 that

the effect of the case was not clear. I venture to suggest that the problem lay not so much in what Robins v Goddard decided but the extraordinary proposition for which counsel was seeking to rely upon it in the East Ham case. He appears to have submitted that even if the contract expressly made a certificate conclusive (as did the contract in the East Ham case) but conferred upon an arbitrator a special power to revise it, the court would automatically acquire a similar power if the matter was litigated. In other words, a two-tier structure of conclusive certificates could not be created even by express language. Viscount Dilhorne dealt with the matter accurately and concisely when he said, at p. 424B–D:

> '…[I]t appears to be thought in some quarters that, if special powers are given to an arbitrator, they devolve on the court should there be litigation. I do not regard the decision in Robins v Goddard as establishing or, indeed, supporting such a proposition. In that case, as I understand it, the Court of Appeal held that the arbitration clause, which gave power to an arbitrator to open up, review and revise a certificate, showed beyond doubt that the certificates in that case were not conclusive and, the certificates not being conclusive, the court was not obliged to treat them as if they were.'

P & M Kaye Ltd v Hosier & Dickinson Ltd [1972] 1 WLR 146 , another decision of this House, also concerned a final certificate expressly declared by the contract to be conclusive. The arbitration clause (cl. 35) gave the arbitrator power to decide any dispute including 'any matter or thing left by this contract to the discretion of the architect' but there had been no request for arbitration. The House held that a final certificate was conclusive not only in relation to any later litigation but also in relation to litigation already commenced. Your Lordships are not concerned with this aspect of

the decision, but Lord Wilberforce said near the end of his speech, at p. 158:

> 'Had the matter gone to arbitration the position would no doubt have been different: this is because clause 35 of the contract confers very wide powers upon arbitrators to open up and review certificates which a court would not have.'

I understand Lord Wilberforce to have meant that the contract in question, which expressly declared final certificates to be conclusive but gave an arbitrator a special power to revise them, had successfully created a two-tier structure of binding certificates. There is nothing to support the view that certificates which are not said to be conclusive or binding can be assumed to have such effect merely because the arbitrator is given an express power to open up and revise them.

In Gilbert-Ash (Northern) Ltd v Modern Engineering (Bristol) Ltd [1974] AC 689 the issue was whether a contractor, sued by a sub-contractor on interim certificates, could set off an unliquidated claim for damages for late and defective work. The Court of Appeal had held in a number of decisions that there was a strong presumption (amounting, as Lord Diplock said (at p. 717) virtually to a rule of law) that the contract excluded the right of set off. The House overruled these cases, Lord Diplock saying, at p. 717H that so far from there being a presumption that set-off was excluded:

> '…one starts with the presumption that neither party intends to abandon any remedies for its breach arising by operation of law, and clear express words must be used in order to rebut this presumption.'

It was submitted to your Lordships that this presumption supports an argument that the contract should be construed so as to preserve the common law

remedies of the parties for breach of contract rather than making their rights subject to the binding **\*840** decision of the architect. But I think that such an argument may be circular: if the decision of the architect is as conclusive as that of an expert, subject only to second-tier revision by an arbitrator, then the rights of the parties are defined by reference to the opinions of the architect or arbitrator and there is no question of any independent breach of contract. More to the point, however, is a later passage in Lord Diplock's speech, in which he referred to the power of an arbitrator to open up, review and revise any certificate and went on to say, at p. 720B–D:

> 'Counsel for the respondent felt compelled to concede, in my view rightly, that the employer if sued in an action for the amount stated as due in an interim certificate would be entitled to challenge the certificate on the ground that the work included in the calculation of that amount was not properly executed; though counsel contended that in order to resist payment on this ground the employer would have to have already submitted to arbitration the dispute as to whether or not the certificate was in accordance with the conditions of the contract and then to apply for a stay of action under section 4 of the Arbitration Act 1950 . The arbitration clause, however, does not make an award a condition precedent to a right of action, let alone a condition precedent to a right of defence; and I see no grounds in law to prevent the employer from defending the action by setting up the contractor's breach of warranty in doing defective work even though this involves challenging the architect's certificate that the work had been properly executed.'

This passage seems to me a clear and explicit statement that in the case of a certificate expressly stated (by the equivalent of cl. 30.10 of the JCT contract) not to be conclusive, the court has exactly the same right to interpret the contractual obligations of the parties as an arbitrator would have had.

This was the state of the authorities at the time when Crouch came before the Court of Appeal . Dunn LJ introduced his discussion of this question by saying, at p. 663F: 'Perhaps surprisingly there is no direct authority on the point which is binding on us.' He made no reference to Robins v Goddard [1905] 1 KB 294 and appears to have regarded the issue as being, not whether the certificates were conclusive in the first place, but whether (assuming them to be conclusive) one could imply into the contract a term that the court was to have the same power to revise them as the arbitrator. Not surprisingly, he rejected the implication of such a term. Browne-Wilkinson LJ also made no reference to Robins v Goddard , agreed that there was no authority directly in point and said, at p. 669 that his view was supported by the 'weight of judicial dicta'. Sir John Donaldson MR did refer to Robins v Goddard , but only in relation to the comments upon that case in East Ham Corporation v Bernard Sunley & Sons Ltd [1966] AC 406 . He mentioned the comment of Viscount Dilhorne as to the proposition which Robins v Goddard did not support but made no reference to his summary of what the case actually decided. It was the latter which was, in my opinion, binding upon the Court of Appeal in Crouch and should have been determinative on the question before them. None of the judges made reference to what Lord Diplock had said in Gilbert-Ash (Northern) Ltd v Modern Engineering (Bristol) Ltd [1974] AC 689 , although it appears from the report at p. 649 that counsel drew attention to the passage and submitted (in my view rightly) that it supported the proposition that:

> 'where a dispute as to the quality of work is litigated as opposed to arbitrated the court would be entitled to consider the matter on the basis of the evidence adduced and so would not be bound by the architect's certificate.'

In my opinion, therefore, the dicta on this point in Northern Regional Health Authority v Derek Crouch Construction Co Ltd [1984] QB 644 were both obiter and wrong. Since then, however, 14 years had passed and the building industry has lived with the Crouch construction of the standard building contracts. There have also been legislative changes. **\*841** Section 43A of the Supreme Court Act 1981 , inserted by s. 100 of the Courts and Legal Services Act 1990 , provides that if all parties agree, the High Court may exercise any specific powers which the contract confers upon an arbitrator.

The discretion of the court to refuse a stay on the grounds of an arbitration clause has been abolished by s. 9(4) of the Arbitration Act 1996 , which provides that 'a stay must be granted unless the arbitration agreement is null and void, inoperative, or incapable of being performed'. This provision is subject to s. 86 , which excludes its operation in domestic operations and retains the court's discretion. Section 86 has not however been brought into force and it is not clear whether it will be. For the moment, the mandatory stay required by s. 9(4) appears to be of general application. So the possibility of litigating contracts containing an arbitration clause except by the consent of all parties has been much reduced.

Nevertheless, it seems to me that cases since Crouch show that the decision has caused such uncertainty and even injustice that its dicta should be disapproved. I refer in particular to the recent decision of the Court of Appeal in Balfour Beatty Civil Engineering Ltd v Docklands Light Railway [1996] CLC 1,435; (1996) 78 BLR 42 . It was a claim for extension of time and loss and expense under the ICE conditions of contract, which had been amended, first, by substituting the employer's representative for the engineer and secondly, by deleting the arbitration clause. The contract provided for the employer to certify extensions of time and loss and expense claims. But there was no provision that they were to be binding or conclusive. Nevertheless, the court held that there was no power to 'open up, review or revise' them such as an arbitrator might have had if there was an arbitration clause in the usual form and that, as a matter of construction, 'the contractor's entitlement was to depend upon the

employer's judgment': per Sir Thomas Bingham MR at p. 1,442B; 57. Your Lordships will remember that in Benstrete Construction Ltd v Angus Hill (1987) 38 BLR 11 at p. 118 Sir John Donaldson MR appeared to be saying that the Crouch construction of the certification clauses as conclusive in litigation was based upon the fact that the contract created an 'internal arbitration'. But in the Balfour Beatty case the contractors were held, even in the absence of an arbitration clause or any express language as to the certificates being conclusive, to have subjected themselves to the judgment of the employer. It is true, as Sir Thomas Bingham MR remarked, at p. 1,442C; 57:

> 'It is not for the court to decide whether the contractor made a good bargain or a bad one; it can only give fair effect to what the parties agreed.'

On the other hand, in deciding exactly what the parties did agree, it seems to me that in the absence of express language, one should not assume so uncommercial a bargain. I do not think that the Balfour Beatty case would have been decided as it was if not for the shadow of the Crouch decision that certificates, even if not declared to be conclusive, can be questioned only for bad faith or excess of power. I do not think that anyone in the industry can be said to have acted in reliance on the Crouch case and I would therefore overrule it. I must acknowledge the assistance which I have had in reaching this conclusion from the writings of Mr I N Duncan Wallace QC.

The significance of doing so in the present case can be briefly stated. Beaufort Developments Ltd ('the employer') entered into a contract dated 3 May 1994 with Gilbert-Ash NI Ltd ('the contractor') for the construction of a nine-storey office block in Belfast. The contract was in the standard JCT form, 1980 edition Private Without Quantities. By a separate contract it employed the firm of Parker & Scott ('the architects') as architects. The works were not completed on time; an outcome for which the contractor blamed the architects and the employer blamed them both. For example, some work had to be done over again and there are disputes over whether this was on account of

the contractor's bad workmanship or use of wrong materials or the architects' **\*842** failure to provide adequate drawings and information. There is also a dispute over whether this and other matters actually caused the delay in completion. The contractor claimed that it was entitled to payment from the employer, both under certificates issued by the architects for work done under the contract and by way of payment for extra work. The employer claimed that it was entitled to damages against contractor and architects for breach of contract.

Litigation commenced on 31 August 1995 when the contractor issued a writ claiming about £230,000 and interest due under six architects' certificates. On 9 October 1995 the employer served an unilluminating defence, denying liability and alleging that it was entitled to set off a cross-claim in a larger amount. On 15 November 1995 the contractor served a notice to refer and concur in the appointment of an arbitrator pursuant to the arbitration clause in the contract. It referred in general terms to the areas of dispute such as the responsibility for delay and the contractor's claims to payment for extra work. On 5 December 1995 the employer issued a writ which named both the contractor and the architects as defendants. It claimed damages for negligence and breach of contract. On 7 February 1996 the contractor issued a summons for a stay of the employer's action pursuant to s. 4 of the Arbitration Act (NI) 1937 . The agreement between the employer and the architects also contained an arbitration clause but the architects did not make a similar application.

Master Wilson granted the stay and on appeal his decision was affirmed by Pringle J. He did so with reluctance because he said that the architects could not be required to take part in the arbitration between the employer and the contractor and there was a very real risk of conflicting decisions in the arbitration and the litigation against the architects. But he considered that he was bound by the Crouch case [1984] QB 644 to hold that an arbitrator would have the power to 'open up, review and revise' certificates or opinions of the architect which the court did not possess. If a stay was refused, the contractor would therefore be at a 'grave disadvantage in that it will be faced with architect's certificates which the court will not be able to review'. In the Court of Appeal, Carswell LCJ prefaced his judgment by saying:

'On the hearing of this appeal counsel for the contractor did not seek to challenge the correctness of the judge's view that if it were not for the effect of the Crouch decision a stay should not be granted in the present case. Nor did counsel for the employer or counsel for the architects challenge his conclusion that if the Crouch decision is to be followed in this jurisdiction it would be unjust to the contractor to refuse a stay. The argument before us turned on the correctness of the Crouch decision and whether this court should follow it.'

As in my opinion the Crouch case was wrongly decided, I think that the discretion should have been exercised as Pringle J would have done if he felt free to do so. I would therefore allow the appeal.

Lord Hope of Craighead:

The application by Gilbert-Ash NI Ltd ('the contractor') for a stay of the action by Beaufort Developments (NI) Ltd ('the employer') was made under s. 4 of the Arbitration Act (Northern Ireland) 1937. The grant of a stay under that section is discretionary. It is plain from the reasons which Pringle J gave for affirming the master's decision to grant the stay that he would have refused the application had it not been for the decision of the Court of Appeal in Northern Regional Health Authority v Derek Crouch Construction Co Ltd [1984] QB 644. As he pointed out, the circumstances in the present case are very similar to those in Taunton-Collins v Cromie [1964] 1 WLR 633.

In that case, as here, the contract between the employer and the contractor contained an arbitration clause. The architect, in response to the employer's claim against him, put part of the blame for the unsatisfactory building on the contractor. The employer then joined the contractor as a defendant to his action against the

architect. The contractor's *843 application for a stay in reliance on the arbitration clause was refused by the official referee, and an appeal against his decision was dismissed. This was because to grant a stay would have resulted in two sets of proceedings. There would have been an arbitration as against the contractor and an action as against the architect. There would have been a substantial risk of different decisions on the same question and on the same facts. Pearson LJ said, at p. 638 that there were very strong reasons based on the principle of avoiding a multiplicity of proceedings for permitting the action to continue as an action by the employer against both defendants.

Pringle J noted that there were many issues of fact to be determined in the present case. They included the reasons for the delay which had occurred in the completion of the works by the contractor, the standard of workmanship and materials and the question whether acceleration of the works had given rise to additional costs. He said that he could foresee very considerable difficulties in dealing with these issues, and that in his opinion the risk of conflicting decisions was a very real one. Nevertheless he felt obliged to uphold the stay in view of the consequences to the contractor of the decision in the Crouch case if the dispute between it and the employer were not to be dealt with by an arbitrator. The Court of Appeal decided, with some hesitation, to follow the decision in the Crouch case. But Carswell LCJ made it clear in the course of his judgment that the court had considerable reservations about the soundness of that decision. He said that, if the matter were res integra, he would have been attracted to an interpretation of the contract which would have avoided the need to go to arbitration to avoid injustice to the contractor.

The situation in this case has therefore brought out into the open difficulties created by the decision of the Court of Appeal in the Crouch case which have been lying not far below the surface since it was made. The fundamental question is whether the court has been deprived, by the power which the parties have given to their arbitrator to open up, review and revise certificates, opinions and decisions of the architect, of its ordinary power to determine the rights and obligations of the parties and to provide them with the usual remedies. In the Crouch case [1984] QB 644 at p. 667D Browne-Wilkinson LJ said:

'In no circumstances would the court have power to revise such certificate or opinion solely on the ground that the court would have reached a different conclusion since so to do would be to interfere with the agreement of the parties.'

I shall return to this passage later when I come to examine that case in more detail. For the time being it is sufficient to notice that the basis for this view is the difference which was said to exist between the powers of the court and those conferred by the agreement of the parties on the arbitrator. The power of the court, it was said, was to enforce the contract, while the arbitrator had been given the power, which the court does not possess, to modify it. This proposition has come to be applied generally to all cases where the arbitrator has been given power to open up, review and revise certificates.

The contract in the present case was entered into under the JCT Standard Form of Building Contract (1980 edn) (Private Without Quantities). It incorporated amendments numbers 1 to 12 together with the Adaptation Schedule for Northern Ireland and the Contractor's Designed Portion Supplement. By art. 5 of the articles of agreement the parties agreed to refer their disputes to arbitration in accordance with cl. 41 of the conditions. Clause 41.4 of the conditions, so far as relevant to this case, provides:

'the arbitrator shall, without prejudice to the generality of his powers, have power to rectify the contract so that it accurately reflects the true agreement made by the employer and the contractor, to direct such measurements and/or valuations as may in his opinion be desirable in order to determine the rights of the parties and to ascertain and award any sum which ought to have been the subject of or included in any certificate

and to open up, review and revise any certificate, **844** opinion, decision … requirement or notice and to determine all matters in dispute which shall be submitted to him in the same manner as if no such certificate, opinion, decision, requirement or notice had been given.'

Clause 41.5 provides that, subject to cl. 41.6 which enables either party to appeal to the High Court on any question of law, the award of such arbitrator shall be final and binding on the parties. Clause 30 deals with certificates and payments to the contractor. Clause 30.9 makes provision as to the effect of the final certificate, while cl. 30. 10 makes provision as to the effect of certificates other than the final certificate. Clause 30.9 provides that, except in certain circumstances, the final certificate shall be conclusive evidence 'in any proceedings arising out of or in connection with the contract (whether by arbitration under article 5 or otherwise)' as to various matters about which decisions have had to be made by the architect under the contract. Clause 30.10 provides:

'Save as aforesaid no certificate of the architect shall of itself be conclusive evidence that any works, materials or goods to which it relates are in accordance with this contract.'

Had it not been for the weight of contrary authority I would not have found much difficulty in reaching the following conclusions about the effect of these provisions relating to the powers of the arbitrator and the finality to be given to certificates. In the first place, the function of cl. 41.4 is to define the powers which are to be given to the arbitrator. An arbitrator has no jurisdiction except that which the parties choose to confer upon him by their agreement to refer their disputes to an arbitrator. The whole question as to the extent of his powers rests upon contract. So it is

necessary that the agreement should set out all the powers which he is to have in order that he may determine all the matters which are in dispute. But it is not to be thought that by conferring powers on the arbitrator the parties are limiting the ordinary powers of the court to determine their rights and obligations under the contract. In the present case, for example, cl. 41.4 gives power to the arbitrator to rectify the contract. The court already has that power, but it might well have been in doubt as to whether the power of the court could be exercised by the arbitrator. There is nothing in cl. 41.4 to suggest that, by conferring this power on the arbitrator, the parties intended to remove this power from the court.

Then there are the provisions about the certificates. In the present case the contractor seeks payment of the sums certified as due for payment under six interim certificates. It appears that it will also seek to maintain a claim against the employer for additional costs which are not the subject of any certificate by the architect. The employer for its part claims, by way of set off against any sums due to the contractor, amounts in respect of delay in completion of the construction and fitting out works and damages for breach of its obligation to provide materials and workmanship to the standard which the contract required. These are matters about which the contract provides for decisions to be taken or opinions to be given by the architect. But there is no express contractual provision to which one can point which has the effect of giving finality to the various decisions and opinions which he has made. We are not concerned in this case with any question as to the conclusive effect of the final certificate because, although a certificate of practical completion was issued in June 1996, the final certificate has not yet been issued. It is made quite clear by cl. 30.10 that the interim certificates which the architect has issued are not of themselves to be conclusive evidence.

On this approach, if there is no stay, the court will be able to exercise all its ordinary powers to decide the issues of fact and law which may be brought before it and to give effect to the rights and obligations of the parties in the usual way. It will have all the powers which it needs to determine the extent to which, if at all, either party was in breach of the contract and to determine what sums, if any, are due to be paid by one **\*845** party to the other whether by way of set off or in addition to

those sums which have been certified by the architect. It will not be necessary for it to exercise the powers which the parties have conferred upon the architect in order to provide the machinery for working out their contract. Nor will it be necessary for it to exercise the power which cl. 41.4 confers on the arbitrator to revise certificates. This is because the court does not need to make use of the machinery under the contract to provide the parties with the appropriate remedies. The ordinary powers of the court in regard to the examination of the facts and the awarding of sums found due to or by either party are all that is required. There would be no risk of any injustice to the contractor.

In Taunton-Collins v Cromie [1964] 1 WLR 633 at p. 636 Pearson LJ said that in that case there was a conflict between two well established principles. One was that parties should normally be held to their contractual agreements. Where the parties have agreed that any dispute or difference between them should be referred to arbitration the court should be willing to say by its decision what the parties have already said by their contract. The other principle was that a multiplicity of proceedings was highly undesirable. In that case it was the principle of avoiding a multiplicity of proceedings which prevailed. The effect of the decision of the Court of Appeal in the Crouch case has been to reverse the result of balancing these two principles.

But that case also, it may be said, involved the application of two well established principles. The first is that which was expressed by Browne-Wilkinson LJ [1984] QB 644 at p. 667B in these terms:

> 'In principle, in an action based on contract the court can only enforce the agreement between the parties: it has no power to modify that agreement in any way.'

The second, which was not referred to at all in the judgments in that case, is that which was described by Lord Diplock in Modern Engineering (Bristol) Ltd v Gilbert-Ash (Northern) Ltd [1974] AC 689 at p. 718E:

Beaufort Developments (NI) Ltd v Gilbert-Ash (NI) Ltd, [1998] C1 C 450 (1998)

'So when one is concerned with a building contract one starts with the presumption that each party is to be entitled to all those remedies for its breach as would arise by operation of law, including the remedy of setting up a breach of warranty in diminution or extinction of the price of material supplied or work executed under the contract. To rebut that presumption one must be able to find in the contract clear unequivocal words in which the parties have expressed their agreement that this remedy shall not be available in respect of breaches of that particular contract.'

The facts in the Crouch case can be stated quite shortly. There had been delays in the completion of the work under the main contract and by a nominated subcontractor. An arbitrator had been appointed on a reference under the main contract between the contractor and the authority. The same arbitrator had been appointed in a reference under the subcontract in which the nominated subcontractor was proceeding in the contractor's name in its arbitration with the authority. The arbitrator was empowered under cl. 35(3) of the conditions under the main contract to open up, review and revise the architect's certificates, opinions, decisions, requirements or notices. There had been no final certificate. The question was whether the arbitration proceedings should be stayed. One of the issues raised in the case — although it was not necessary to decide this issue in order to dispose of the appeal — was whether the official referee in the High Court had the power to open up, review and revise the certificates, opinions, decisions, requirements or notices of the architect which had been given to the arbitrator by cl. 35(3) of the main contract.

Dunn LJ said, at p. 663F, that the court had been told that it was common practice for the official referee to open up and review certificates and other decisions of the architect and he observed that there were decisions of high authority either way as to whether this **\*846**

was competent. In his summary of the competing arguments he said that the authority had relied on obiter dicta of Lord Wilberforce in Hosier & Dickinson Ltd v P & M Kaye Ltd [1972] 1 WLR 146 at p. 158 and of Viscount Dilhorne and Lord Cohen in East Ham Corp v Bernard Sunley & Sons Ltd [1966] AC 406 at p. 424 and 432. The other side had contended that in order to give business efficacy to the contract there must be an implied term that if the parties were to litigate rather than arbitrate the court was to have the same powers as the arbitrator. At p. 664D–E he went on:

'In my judgment it is not necessary to imply the term suggested in clause 35. The contract gives the architect wide discretionary powers as to the supervision, evaluation and progress of the works. The parties have agreed that disputes as to anything left to the discretion of the architect should be referred to arbitration, and clause 35 gives wide powers to the arbitrator to review the exercise of the architect's discretion and to substitute his own views for those of the architect. Where parties have agreed on machinery of that kind for the resolution of disputes, it is not for the court to intervene and replace its own process for the contractual machinery agreed by the parties.'

Browne-Wilkinson LJ began his discussion of this point at p. 667B with the statement of principle that the court had power only to enforce the contract, not to modify it in any way. He went on to say that, if the parties have agreed on a specified machinery for establishing their obligations, the court cannot substitute a different machinery. He then distinguished the powers of the court from those of the arbitrator. The parties had agreed that certain rights were to be determined by the certificate or opinion of the architect. In no circumstances would the court have power to revise such certificate or opinion solely on the ground that it would have reached a different conclusion, as to do so would be to interfere with that agreement. But the

powers conferred on the arbitrator were different. He had been given power to modify the contractual rights by varying the architect's certificates and opinions if he disagreed with them and to substitute his own discretion for that of the architect. He summed the matter up at pp. 667H–668A with these words:

> 'Therefore as a matter of principle I reach the conclusion that if this matter were to be litigated in the High Court (whether before the official referee or a judge) the court would not have power to open up, review and revise certificates or opinions as it thought fit since so to do would be to modify the contractual obligations of the parties. The limit of the court's jurisdiction would be to declare inoperative any certificate or opinion given by the architect if the architect had no power to give such certificate or opinion or had otherwise erred in law in giving it. The court could not (as an arbitrator could) substitute its own discretion for that of the architect.'

Sir John Donaldson MR, at pp. 671–673, also drew a distinction between the power of the court and those which had been conferred on the arbitrator. He said that the powers conferred on the arbitrator seemed to him to involve the exercise of a completely novel jurisdiction which was quite different from the function of the court. He described the court's function as being to determine facts and to enforce the contractual rights of the parties. The arbitrator had that function also, but he also had the right and duty which the court did not possess to review the architect's decisions and, if appropriate, to substitute his own. He also found support for his opinion that the court would not be able to exercise the power to open up and review which cl. 35 of the JCT contract had given to the arbitrator in the dicta to which Dunn LJ had referred in the East Ham case [1966] AC 406 and in what Lord Wilberforce had said, in the Hosier & Dickinson case [1972] 1 WLR 146 at p. 158.

The statement of principle with which Browne-Wilkinson LJ began his discussion of this point seems to me, with respect, to be both relevant and accurate. I do not think that **847** it can be doubted that in a case which has been based on contract the court's function is to enforce the agreement of the parties, not to modify their agreement in any way. But I have the impression that in the discussion which follows, and in the remarks which were made by the other judges, two other important points were overlooked and that the description of the arbitrator's powers as including a power to modify the contract, for what it is worth, is less than accurate.

The first point is that there is a difference between an agreement that machinery is to be used to implement or to give effect to the contract and an agreement that the parties' rights are to be determined solely by means of that machinery. An agreement which falls into the first category will be needed in almost every building or engineering contract. Some method has to be laid down for dealing with such matters as variations to the contract works and the making of interim payments to the contractor as the work proceeds. But an agreement of that kind does not imply any limitation on the ordinary powers of the court. Nor does it confer any powers on the architect or engineer, or in his turn on the arbitrator, which restrict the power of the court, in the event of litigation, to conduct its own inquiry into the facts. Its purpose is simply to enable the contract to be worked out upon the agreed terms to achieve the result to which it was directed. The purpose of an agreement which falls into the second category, on the other hand, is to exclude the point at issue from being determined by the court. If the parties have agreed that a dispute between them is to be determined conclusively by the architect or engineer, or in the event of dispute by an arbitrator, the sole function of the court is to give effect to the agreement which they have made. Its jurisdiction is to enforce the contract. Its duty is to ensure that the decision of the architect or the engineer or, in his turn, of the arbitrator is given the conclusive effect which has been agreed. But none of the judges in the Crouch case addressed the question whether the certificates or opinions of the architect which the arbitrator had power to open up, review and revise were agreed by the parties to the contract to have effect as conclusive evidence.

The second point is this. The powers which the court ordinarily has to determine and give effect to the rights and obligations of the parties to a contract differ from the additional powers which, in the typical building or engineering contract, are given to the architect or the engineer and, in the event of any dispute about their exercise, to the arbitrator. The purpose of these additional powers is not to deprive the court of its ordinary powers to determine their rights and obligations under the contract. Their purpose is to enable the architect or engineer, and in the event of a dispute about their exercise the arbitrator, to do things in the course of the execution of the contract which the court could not do. This point was well expressed by Piers Ashworth QC, sitting as a deputy High Court judge, in National Coal Board v William Neill & Son (St Helens) Ltd [1985] QB 300 at p. 309C–F, where he said:

> 'I have heard much argument on the effect of arbitration clauses. I cannot help feeling that a certain unjustified mystique has been attributed to them. In general an arbitration clause does no more that provide an alternative method of resolving disputes. It is hoped that it is simpler, quicker and cheaper than resorting to a court of law. In building contracts an arbitrator is frequently given additional powers which would not otherwise be open to him and are not open to a judge to exercise. For example, by clause 15 of this contract the contractor is required to proceed with the work in accordance with the instructions of the engineer. By sub-clause (b) he is entitled to dispute any such instruction and to refer to arbitration. Were it not for this sub-clause, clearly the contractor would have no right to dispute or litigate about any such instruction and, even within sub-clause (b), he cannot dispute such an instruction before a court. In this respect, it is right to say the arbitrator has additional powers to a court. But in general, as I have said, arbitration

is simply an alternative way of resolving disputes.'

*848

So there is this difference between the provision of an agreed machinery for giving effect to the contract and the taking of decisions or the expressions of opinion which may be necessary from time to time to its exercise. Where the parties have conferred additional powers on the architect, the engineer or the arbitrator, the function of the court is to give effect to the agreement of the parties as to the use of that machinery. The court cannot give the instructions or issue the certificates. But the fact that decisions are taken or opinions are expressed in the course of the working out of that machinery does not, of itself, affect the ordinary powers of the court if litigation becomes necessary. That would only be so if the parties had agreed that those decisions or opinions were to receive effect as conclusive evidence.

Then there is the question whether it was accurate for the court in the Crouch case to describe the power which was given by the conditions in the JCT contract to the arbitrator to open up, review and revise certificates and opinions of the architect as a power to modify the contract. It was primarily on this ground that the distinction was drawn between the powers of the arbitrator and those of the court. In my opinion the correct analysis is that the power which is given to the arbitrator in the event of a dispute about the exercise of his powers by the architect is a power to give effect to the contract, not to modify it.

In Modern Engineering (Bristol) Ltd v Gilbert-Ash (Northern) Ltd [1974] AC 689 at p. 717B Lord Diplock said that a building contract is an entire contract for the sale of goods and work and labour for a lump sum price payable by instalments as the goods are delivered and the work is done. Decisions have to be taken from time to time about such essential matters as the making of variation orders, the expenditure of provisional and prime cost sums and the extension of time for carrying out the works under the contract. Decisions also have to be taken from time to time as to the adjustments which may have to be made to the contract sum on account of these matters and on the amounts to be paid

to the contractor by way of instalments towards a final settlement of the sums to which he is entitled under the contract. But in taking their decisions on all these matters the duty of the architect or the arbitrator is to give effect to the contract, not to alter or modify it. Variations can only be made to the contract within the limits which the parties themselves have agreed. From time to time in order to exercise these functions the architect or the arbitrator must apply the provisions of the contract to the facts. But in this regard their position in the resolution of disputes between the parties is no different from that enjoyed in the exercise of its ordinary powers by the court.

For these reasons I consider that the Court of Appeal in Crouch , having started from the correct principle, fell into error in its application to the facts. Unlike both East Ham and Hosier & Dickinson it was not a case in which there had been a final certificate. There was no issue between the parties as to whether any of the certificates which had been issued had been agreed to be conclusive evidence of the facts stated in them. In East Ham it was held that the effect of the relevant provisions of the building contract was that the final certificate was conclusive evidence and that it could not be reopened even by the arbitrator. In the Hosier & Dickinson case Lord Morris of Borth-y-Gest said, at p. 153B–C that the fact that the parties had agreed to the conclusiveness of a certificate as a matter of evidence did not involve any ouster of the jurisdiction of the court. Lord Wilberforce said, at p. 157D, that to describe it as doing so would be to misdescribe the effect attributed to it by the contract. There was no discussion of any of these points in the Crouch case. But the effect of the decision was to confer a similar status on the certificates and opinions of the architect, subject only to their review by an arbitrator, without having identified any provision in the contract which removed these matters from the ordinary jurisdiction of the court.

In the Crouch case [1984] QB 644 both Dunn LJ and Sir John Donaldson MR, at pp. 663H and 673C relied on the dictum of Lord Wilberforce in Hosier & Dickinson Ltd v P & M Kaye Ltd [1972] 1 WLR 146 at p. 158, where he said: **849

‘Had the matter gone to arbitration the position would no doubt have

been different: this is because clause 35 of the contract confers very wide powers upon arbitrators to open up and review certificates which a court would not have.’

I agree that, at first sight, this dictum may be taken to suggest that the court can never open up and review certificates where such wide powers in that regard are given to the arbitrator. But I think that to read the dictum in this way would be to take it out of its context. The context is to be found in what Lord Wilberforce said, at p. 157E–H about the provisions of the contract which dealt with the effect of the final certificate. He said, at p. 157E that the court proceedings had raised the question whether the work done and the materials used were such as should have been done and used under the contract, and that an essential question was what standard was to be set for this. It was in that context that he examined the provisions about the final certificate. He concluded that there could be no objection to a clause which provided that it was the architect's standard which was to be relevant and that his final certificate was to be conclusive evidence. The only circumstances in which, by cl. 30(7) of the conditions in that contract, the final certificate was not to be conclusive evidence were where there had been a written request by either party, within certain time limits, to concur in the appointment of an arbitrator.

It seems to me that the discussion in the Hosier & Dickinson case put the matter on the correct basis. On the one hand there is the principle which was expressed by Lord Diplock in Modern Engineering (Bristol) Ltd v Gilbert-Ash (Northern) Ltd [1974] AC 689 , by which clear unequivocal words must be used to deprive a party to a contract of recourse to the court for the ordinary exercise of its powers and the granting of the ordinary remedies. On the other hand there is the principle that the court must give effect to the contract which the parties have made for themselves. If the contract provides that the sole means of establishing the facts is the expression of opinion in an architect's certificate, that provision must be given effect to by the court. But in all other respects, where a party comes to the court in the search of an ordinary remedy under the contract or for a remedy in respect of an alleged breach of it,

the court is entitled to examine the facts and to form its own opinion upon them in the light of the evidence. The fact that the architect has formed an opinion on the matter will be part of the evidence. But, as it will not be conclusive evidence, the court can disregard his opinion if it does not agree with it.

For these reasons I agree with Lord Hoffmann that the Crouch case was wrongly decided and should be overruled. I also consider that the answers which the Court of Appeal gave to the questions which were before it in Balfour Beatty Civil Engineering Ltd v Docklands Light Railway Ltd [1996] CLC 1,435; (1996) 78 BLR 42 were the wrong answers. That was a case in which there was no arbitration clause, but there was no provision in the contract agreeing that the opinion of the employer's representative was to be conclusive evidence in the event of a dispute. The fact that the contract did not provide an agreed means of challenging the judgment of the employer's representative did not affect the power of the court to examine the issue and to form its own judgment in the light of the evidence.

I can return now to the facts of this case. There has been no final certificate. No certificates or opinion have been issued or given which the parties have agreed shall be taken to provide conclusive evidence as to the matters which are in dispute. The court is thus in no different position in regard to such expressions of opinion as have been given as would be an arbitrator. It does not have the additional power which an arbitrator has under this contract to issue fresh certificates in place of those already issued by the architect. But it does not need that power in order to resolve the disputes which have **\*850** arisen in this case. In these circumstances there would be no injustice to the contractor in refusing a stay. To grant a stay would be to risk conflicting decisions in the separate proceedings which would be needed to determine the respective responsibilities to the employer of the contractor and of the architect. I would therefore allow the appeal and refuse a stay of the proceedings in the High Court.

(Appeal allowed)  **\*851**

© 2017 Sweet & Maxwell

[1998] C.L.C. 830

---

End of Document

© 2017 Thomson Reuters.

# TAB 16

Jetivia SA and another v. Bilta (UK)
Limited (in liquidation) and others
On appeal from: [2013] EWCA Civ 968
SC
22 April 2015

**[2015] UKSC 23**

**2015 WL 1786084**

before Lord Neuberger , President Lord
Mance Lord Clarke Lord Sumption Lord
Carnwath Lord Toulson Lord Hodge
Judgment Given On 22 April 2015

**Analysis**

Heard on 14 and 15 October 2014

**Representation**

• Appellants Alan Maclean QC Colin West
(Instructed by MacFarlanes LLP ).
• Respondents Christopher Parker QC Rebecca Page
(Instructed by Gateley LLP ).
• Intervener Michael Gibbon QC (Instructed by
Howes Percival LLP ).

**Judgment**
Lord Neuberger: (with whom Lord Clarke and Lord
Carnwath agree)

**Introductory**

1   The facts giving rise to this appeal can be shortly
summarised, although they are more fully set out in
the judgments of Lord Sumption at paras 56-59 and of
Lords Toulson and Hodge at paras 113-116 below.

2   Bilta (UK) Ltd is an English company which was
compulsorily wound up in November 2009 pursuant
to a petition presented by HMRC. Bilta's liquidators
then brought proceedings against, inter alia, its two

former directors, Mr Chopra, who was also its sole
shareholder, and Mr Nazir; and Jetivia SA, a Swiss
company and its chief executive, Mr Brunschweiler,
who is resident in France ("the four defendants").

3   The pleaded claim alleges that the four defendants
were parties to an unlawful means conspiracy to injure
Bilta by a fraudulent scheme, which involved Messrs
Chopra and Nazir breaching their fiduciary duties
as directors, and Jetivia and Mr Brunschweiler ("the
appellants") dishonestly assisting them in doing so. The
liquidators claim (i) through Bilta, (a) damages in tort
from each of the four defendants, (b) compensation
based on constructive trust from the appellants, and
(ii) directly from each of the four defendants, a
contribution under section 213 of the Insolvency Act
1986 .

4   The case against the four defendants is based on the
contention that between April and July 2009, Messrs
Chopra and Nazir caused Bilta to enter into a series
of transactions relating to European Emissions Trading
Scheme Allowances with various parties, including
Jetivia, and that those transactions constituted what are
known as carousel frauds. The effect of the transactions
was that they generated (i) an obligation on Bilta
to account to HMRC for output VAT and (ii) an
obligation on HMRC to pay a slightly lower sum by
way of input VAT to another company. While the input
VAT was paid by HMRC, it was inherent in the fraud
that Bilta would always be insolvent and unable to pay
the output VAT to HMRC. The amount of output VAT
for which Bilta consequently remains liable is said to be
in excess of £38m.

**The application to strike out**

5   The appellants applied to strike out Bilta's claim
against them on the ground that (i) Bilta could not
maintain the proceedings in view of the principle *ex
turpi causa non oritur actio* , or, to put it another way,
the appellants were bound to defeat the claims against
them on the basis of an illegality defence, and (ii) in so
far as the claims were based on section 213 , it could
not be invoked against the appellants as it does not have
extra-territorial effect. The application was dismissed
by Sir Andrew Morritt C, whose decision was upheld
by the Court of Appeal. The appellants now appeal to
the Supreme Court.

6  In common with all members of the court, I consider that this appeal should be dismissed because the Court of Appeal were right to hold that (i) illegality cannot be raised by Jetivia or Mr Brunschweiler as a defence against Bilta's claim because the wrongful activity of Bilta's directors and shareholder cannot be attributed to Bilta in these proceedings, and (ii) section 213 of the Insolvency Act 1986 has extra-territorial effect.

## Attribution

7  So far as attribution is concerned, it appears to me that what Lord Sumption says in his paras 65-78 and 82–97 is effectively the same in its effect to what Lords Toulson and Hodge say in their paras 182-209. Both judgments reach the conclusion which may, I think be stated in the following proposition. Where a company has been the victim of wrong-doing by its directors, or of which its directors had notice, then the wrong-doing, or knowledge, of the directors cannot be attributed to the company as a defence to a claim brought against the directors by the company's liquidator, in the name of the company and/or on behalf of its creditors, for the loss suffered by the company as a result of the wrong-doing, even where the directors were the only directors and shareholders of the company, and even though the wrong-doing or knowledge of the directors may be attributed to the company in many other types of proceedings.

8  It appears to me that this is the conclusion reached by Lord Sumption and Lords Toulson and Hodge as a result of the illuminating discussions in their respective judgments — in paras 65-78 and 82–95 and paras 182-209.

9  Particularly given the full discussion in those passages, I do not think that it would be sensible for me to say much more on the topic. However, I would suggest that the expression "the fraud exception" be abandoned, as it is certainly not limited to cases of fraud — see per Lord Sumption at para 71 and Lords Toulson and Hodge at para 181. Indeed, it seems to me that it is not so much an exception to a general rule as part of a general rule. There are judicial observations which tend to support the notion that it is, as Lord Sumption says in his para 86, an exception to the agency-based rules of attribution, which is based on public policy — or

common sense, rationality and justice, according to the judicial observations quoted in paras 72, 73, 74, 78 and 85 of Lord Sumption's judgment. However, I agree with Lord Mance's analysis at paras 37-44 of his judgment, that the question is simply an open one: whether or not it is appropriate to attribute an action by, or a state of mind of, a company director or agent to the company or the agent's principal in relation to a particular claim against the company or the principal must depend on the nature and factual context of the claim in question.

## Section 213 of the 1986 Act

10  I agree with Lord Sumption and Lords Toulson and Hodge for the reasons they give in paras 107-110 and 210–218 that section 213 of the 1986 Act has extra-territorial effect, at least to the extent of applying to individuals and corporations resident outside the United Kingdom.

## The matters in dispute

11  There are some issues on which Lord Sumption and Lords Toulson and Hodge differ. In that connection, I think that there are three areas of disagreement to which it is right to refer, and, taking them in the order in which it is most convenient to discuss them, they are as follows.

12  First, there is disagreement as to the basis upon which a defence based on illegality, or *ex turpi causa* , is to be approached – compare Lord Sumption at paras 60-63 and 98–100 with Lords Toulson and Hodge at paras 170-174. Secondly, Lords Toulson and Hodge would also dismiss this appeal on the attribution issue on the ground of statutory policy (see their paras 122-130), whereas Lord Sumption would not (see his paras 98-102). Thirdly, there are differences between Lord Sumption and Lords Toulson and Hodge as to the proper interpretation of two cases, namely Stone & Rolls Ltd v Moore Stephens [2009] UKHL 39, [2009] 1 AC 1391 (see Lord Sumption at paras 79-81 and Lords Toulson and Hodge at paras 134-155), and Safeway Foodstores Ltd v Twigger [2010] EWCA Civ 1472, [2011] 2 All ER 841 (see Lord Sumption at para 83 and Lords Toulson and Hodge at paras 156-162).

**The proper approach to the illegality defence**

13  First, then, there is the proper approach which should be adopted to a defence of illegality. This is a difficult and important topic on which, as the two main judgments in this case show, there can be strongly held differing views, and it is probably accurate to describe the debate on the topic as involving something of a spectrum of views. The debate can be seen as epitomising the familiar tension between the need for principle, clarity and certainty in the law with the equally important desire to achieve a fair and appropriate result in each case.

14  In these proceedings, Lord Sumption considers that the law is stated in the judgments in the House of Lords in Tinsley v Milligan [1994] 1 AC 340, which he followed and developed (with the agreement of three of the four other members of the court, including myself and Lord Clarke) in Les Laboratoires Servier v Apotex Inc [2014] UKSC 55, [2014] 3 WLR 1257 . He distinguishes the judgment of Lord Wilson in Hounga v Allen [2014] UKSC 47, [2014] 1 WLR 2889 as involving no departure from Tinsley v Milligan , but as turning on its own context in which "a competing public policy required that damages should be available even to a person who was privy to her own trafficking" (para 47). By contrast Lord Toulson (who dissented from that approach in Les Laboratoires ) and Lord Hodge favour the approach adopted by the majority of the Court of Appeal in Tinsley and treat that of Lord Wilson in para 42ff of Hounga as supporting that approach.

15  In my view, while the proper approach to the defence of illegality needs to be addressed by this court (certainly with a panel of seven and conceivably with a panel of nine Justices) as soon as appropriately possible, this is not the case in which it should be decided. We have had no real argument on the topic: this case is concerned with attribution, and that is the issue on which the arguments have correctly focussed. Further, in this case, as in the two recent Supreme Court decisions of Les Laboratoires and Hounga , the outcome is the same irrespective of the correct approach to the illegality defence.

16  It would, in my view, be unwise to seek to decide such a difficult and controversial question in a case where it is not determinative of the outcome and where

there has been little if any argument on the topic. In Les Laboratoires , the majority did opine on the proper approach not because it was necessary to decide the appeal, but because they considered that the Court of Appeal (who had reached the same actual decision) had adopted an approach which was inconsistent with Tinsley . Similarly in Hounga , as Lord Sumption has shown in para 99, it may well not have been necessary to consider the proper approach to the illegality defence, but it nonetheless remains the fact that it was the subject of argument, and that Lord Wilson did express a view on the point, and two of the four other members of the court agreed with his judgment.

17 Les Laboratoires provides a basis for saying that the approach in Tinsley has recently been reaffirmed by this court and that it would be inappropriate for this court to visit the point again. However, it was not argued in Les Laboratoires that Tinsley was wrongly decided, and, as Lord Toulson pointed out in his judgment, the majority decision was reached without addressing the reasoning in Hounga . Lord Sumption is right to say that, unless and until this court refuses to follow Tinsley , it is at the very least difficult to say that the law is as flexible as Lords Toulson and Hodge suggest in their judgment, but (i) in the light of what the majority said in Hounga at paras 42-43, there is room for argument that this Court has refused to follow Tinsley , and (ii) in the light of the Law Commission report, the subsequent decisions of the Court of Appeal, and decisions of other common law courts, it appears to me to be appropriate for this court to address this difficult and controversial issue – but only after having heard and read full argument on the topic.

**The role of statutory policy in this case**

18  As well as dismissing this appeal on the attribution issue on the same grounds as Lord Sumption, Lords Toulson and Hodge would also dismiss the appeal on the grounds of statutory policy. They suggest that it would make a nonsense of the statutory duty contained in section 172(3) of the Companies Act 2006 (and explained by them in their paras 125-127), if directors against whom a claim was brought under that provision could rely on the *ex turpi causa* or illegality defence. That defence would be based on the proposition, relied on by the appellants in this case, that, as the directors in question (here the first and second defendants, Mr

Nazir and Mr Chopra) were, between them, the sole directors and shareholders of Bilta, their illegal actions must be attributed to the company, and so the defence can run.

19  I agree with Lords Toulson and Hodge that this argument cannot be correct. Apart from any other reason, it seems to me that Lord Mance must be right in saying in his para 47 that, at least in this connection, the 2006 Act restates duties which were part of the common law. It also appears to me to follow that, if Lords Toulson and Hodge are right about the proper approach to the illegality principle, then their reasoning in paras 128-130 would be correct. However, I would not go further than that, because, as I have already indicated, this is not an appropriate case in which this court should decide conclusively (in so far as the issue can ever be decided conclusively) on the right approach to the illegality principle. It is unnecessary to decide the right approach even in order to determine whether the illegality defence can be run in relation to the section 172(3) claim in the present case.

20  That is, of course, because it is clear, for the very reasons given by Lord Toulson and Lord Hodge in paras 126-130 that a claim against directors under section 172(3) cannot be defeated by the directors invoking the defence of *ex turpi causa* . It is clear from "the language of the rule ([as] it is in a statute) and its content and policy" that the "act (or knowledge or state of mind) was *for this purpose* [not] intended to count as the act etc of the company", to quote and apply the test laid down by Lord Hoffmann in Meridian Global Funds Management Asia Ltd v Securities Commission [1995] 2 AC 500 , 507, set out by Lord Sumption at the end of his para 67.

**The proper analysis of Stone & Rolls and of Safeway Foodstores**

21  In para 3.32 of the Report referred to above, the Law Commission observed that "[i]t is difficult to anticipate what precedent, if any, Stone & Rolls will set regarding the illegality defence", explaining that, in their view at any rate, "there was no majority reasoning" with the members of the committee "reaching different conclusions on how the defence should be applied". The confusing nature of the decision has been commented on in a number of articles (see eg Halpern Stone &

Rolls Ltd v Moore Stephens: An Unnecessary Tangle (2010) 73 MLR 487 , Watts, Audit Contracts and Turpitude (2010) 126 LQR 14 and Illegality and agency law: authorising illegal action [2011] JBL 213 , Ferran, Corporate Attribution and Directing Mind and Will (2011) 127 LQR 239 , Watson, Conceptual Confusion: Organs, Agents and Identity in the English Courts (2011) 23 Sing Ac Law Jo 762 ).

22  These critics have been joined by Lord Walker himself, who was of course a member of the majority in Stone & Rolls . In the course of his illuminating judgment in Moulin Global Eyecare Trading Ltd (in liquidation) v Commissioner of Inland Revenue [2014] HKCFA 22, (2014) 17 HKCFAR 218 , he described the decision in Stone & Rolls as a "controversial exception" to a general rule and referred to its facts as "extreme and exceptional" — see para 133. In para 106, he rightly added that the judgment of Patten LJ in the Court of Appeal in the present case had "achieved a welcome clarification of the law in this area". Casting further doubt on the decision in Stone & Rolls , in para 101 of Moulin Global Lord Walker recanted part of his reasoning in the House of Lords.

23  It seems to me that the view that it is very hard to seek to derive much in the way of reliable principle from the decision of the House of Lords in Stone & Rolls is vindicated by the fact that, in their judgments in this case, Lord Sumption and Lords Toulson and Hodge have reached rather different conclusions as to the effect of the majority judgments.

24  Particularly given the difference between them as to the *ratio decidendi* of Lord Phillips's opinion, and subject to what I say in the next four paragraphs, I am of the view that, so far as it is to be regarded as strictly binding authority, Stone & Rolls is best treated as a case which solely decided that the Court of Appeal was right to conclude that, on the facts of the particular case, the illegality defence succeeded and that the claim should be struck out. I believe that this largely reflects the views of both Lord Sumption (see his para 81) and Lords Toulson and Hodge (see their para 152-154).

25  But it would be unsatisfactory for us to leave the case without attempting to provide some further guidance as to its effect, in so far as we fairly can. For that purpose I welcome Lord Sumption's enumeration of the three

propositions which he suggests in his para 80 can be derived from Stone & Rolls . With the exception of the first, I agree with what he says about them, although even the second and third propositions are supported by only three of the judgments at least one of which is by no means in harmony with the other two.

26  Subject to that, I agree that the second and third of the propositions which Lord Sumption identifies in his para 80 can be extracted from three of the judgments in Stone & Rolls . Those propositions concern the circumstances in which an illegality defence can be run against a company when its directing mind and will have fraudulently caused loss to a third party and it is relying on the fraud in a claim against a third party. The second proposition, with which I agree, is that the defence is not available where there are innocent shareholders (or, it appears, directors). The third proposition, with which I also agree, is that the defence is available, albeit only on some occasions (not in this case, but in Stone & Rolls itself) where there are no innocent shareholders or directors.

27  I need say no more about the second proposition, which appears to me to be clearly well-founded. As to the third proposition, I agree with Lords Toulson and Hodge that it appears to be supported (at least in relation to a company in sound financial health at the relevant time) by the reasoning in the clear judgment of Hobhouse J in Berg, Sons & Co Ltd v Mervyn Hampton Adams [2002] Lloyd's Rep PN 41, which was referred to with approval and quoted from in Stone & Rolls by Lord Phillips (at paras 77-79) and Lord Walker (at paras 150, 158-161), and indeed by Lord Mance, dissenting (at paras 258-260).

28  However, I note that Lord Mance suggests that it should be an open question whether the third proposition would apply to preclude a claim against auditors where, at the relevant audit date, the company concerned was in or near insolvency. While it appears that the third proposition, as extracted from three judgments in Stone & Rolls , would so apply, I have come to the conclusion that, on this appeal at least, we should not purport definitively to confirm that it has that effect. I am of the view that we ought not shut the point out, in the light of (a) our conclusion that attribution is highly context-specific (see para 9 above), (b) Lord Walker's change of mind (see para 22

above), (c) the fact that the three judgments in Stone & Rolls which support the third proposition) are not in harmony (in the passages cited at the end of para 27 above), and (d) the fact that the third proposition is in any event not an absolute rule (see the end of para 26 above).

29  I cannot agree that the first proposition identified by Lord Sumption, namely that the illegality defence is only available where the company is directly, as opposed to vicariously, responsible for the illegality, can be derived from Stone & Rolls (whether or not the proposition is correct in law, which I would leave entirely open, although I see its attraction). I agree that, in paras 27-28, Lord Phillips accepted that the illegality defence is available against a company only where it was directly, as opposed to vicariously, responsible for it, albeit that that was ultimately an obiter conclusion. More importantly, I do not think that Lord Walker accepted that proposition at paras 132-133: he merely identified an issue as to whether the company was "primarily … liable for the fraud practised on KB, or was merely vicariously liable for the fraud of Mr Stojevic", but as he then went on to accept that the Court of Appeal "was clearly right in holding that" the company "was primarily … liable", he did not have to address the point in question.

30  Subject to these points, the time has come in my view for us to hold that the decision in Stone & Rolls should, as Lord Denning MR graphically put it in relation to another case in In re King [1963] Ch 459 , 483, be "put on one side and marked 'not to be looked at again'". Without disrespect to the thinking and research that went into the reasoning of the five Law Lords in that case, and although persuasive points and observations may be found from each of the individual opinions, it is not in the interests of the future clarity of the law for it to be treated as authoritative or of assistance save as already indicated.

31  I turn, finally, to Safeway Foodstores . Lord Sumption has accurately summarised the effect of the decision in his para 83. Lords Toulson and Hodge deal with it a little more fully and much more critically in their paras 157-162. I would take a great deal of persuading that the Court of Appeal did not arrive at the correct conclusion in that case. However, I do not believe that it would be right on this appeal to

express a concluded opinion as to whether the case was rightly decided, and, if so, whether the reasoning of the majority or of Pill LJ was correct. It is unnecessary to reach any such conclusion and the points were not argued in detail before us: indeed, they were hardly addressed at all.

Lord Mance:

32   The respondent, Bilta (UK) Ltd ("Bilta"), claims damages from the appellants for losses suffered through its involvement in a carousel fraud on the Revenue. The defendants in the proceedings include Bilta's two directors, Mr Chopra who was also its sole shareholder and Mr Nazir, as well as a Swiss company, Jetivia SA ("Jetivia"), and Jetivia's chief executive, Mr Brunschweiler. Jetivia and Mr Brunschweiler are the appellants in this appeal. The scheme involved the purchase of carbon credits by Bilta from sources outside the United Kingdom (so not subject to VAT), followed by their resale (mostly at a loss, if one takes the basic resale price excluding VAT) to UK companies registered for VAT, and the remission of the proceeds to Jetivia and other offshore companies. Inevitably, the scheme rendered Bilta at all material times insolvent, it cannot meet its liabilities to the Revenue and the present claim is brought by liquidators, for the ultimate benefit no doubt of the Revenue as Bilta's creditors.

33   The appellants' defence is that Bilta was through its directors and shareholder party to illegality which precludes it pursuing its claim. I have read with great benefit the judgments prepared by Lords Toulson and Hodge, by Lord Sumption and by Lord Neuberger. Neither they, nor I understand any other member of the Court, consider that the defence can succeed, and I agree that it cannot. But there are some differences in reasoning, particularly regarding the general approach to be adopted to illegality. Save perhaps for a slight difference of view (in para 52 below) regarding Safeway Stores Ltd v Twigger [2010] EWCA Civ 1472, [2011] 2 AER 814 , I agree on all points in substance with Lord Neuberger.

34   This is not, in my view, the occasion on which to embark on any re-examination either of the House of Lords' decision in Tinsley v Milligan [1994] 1 AC 340 or of the Supreme Court's recent decisions in Hounga

v Allen [2014] UKSC 47; [2014] 1 WLR 2889 and Les Laboratoires Servier v Apotex Inc [2014] UKSC 55; [2014] 3 WLR 1257 . There was no challenge to or detailed examination of any of these decisions. I agree however that these cases and their inter-relationship merit further examination by this court whenever the opportunity arises.

35   The present appeal raises the question whether a company can pursue its directors and sole shareholder for breaches of duty towards the company depriving it of its assets. Lord Toulson and Lord Hodge consider that the straightforward answer to the question is that that it would deprive the duties which the shareholder-directors owed Bilta of all content, if the defence of illegality were open to the appellants. But they consider that, if analysed in terms of attribution, the case is not one where the shareholder-directors' acts and state of mind can or should be attributed to Bilta. More generally, they favour a policy-based approach to illegality, but I will not examine that possibility, in view of what I have said in para 34.

36   Lord Sumption in contrast sees the case as turning on rules of attribution, which he views as applying "regardless of the nature of the claim or the parties involved" (para 86) and amongst which he identifies a rule that the acts and state of mind of a directing mind and will be attributed to a company. But he qualifies the effect of his analysis by reference to a policy-based "breach of duty exception" which covers the present case in order "to avoid, injustice and absurdity", as Lord Walker put it in a passage in Moulin Global Eyecare Trading Ltd v The Commissioner of Inland (Hong Kong Final Court of Appeal) FACV (No 5 of 2013) , which Lord Sumption quotes in para 85. Later in his judgment however in para 92, he modifies this approach by describing it as no more than a "valuable tool of analysis."

37   In common, as I see it, with Lords Neuberger, Toulson and Hodge, and for reasons which I set out in paras 39-44 below, I do not think it appropriate to analyse the present case as one of prima facie attribution, which is then negatived under a breach of duty exception. As Lord Sumption's judgment demonstrates, it would, however, make no difference to the outcome in this case, if the matter were to be so analysed, though the plethora of difficult authority to

which such an analysis has given rise, far from proving its value, argues for what is to my mind a simpler and more principled analysis.

38  One way or another, it is certainly unjust and absurd to suggest that the answer to a claim for breach of a director's (or any employee's) duty could lie in attributing to the company the very misconduct by which the director or employee has damaged it. A company has its own separate legal personality and interests. Duties are owed to it by those officers who constitute its directing mind and will, similarly to the way in which they are owed by other more ordinary employees or agents. All the shareholders of a solvent company acting unanimously may in certain circumstances (which need not here be considered, since it is not suggested that they may apply) be able to authorise what might otherwise be misconduct towards the company. But even the shareholders of a company which is insolvent or facing insolvency cannot do this to the prejudice of its creditors, and the company's officers owe a particular duty to safeguard the interest of such creditors. There is no basis for regarding the various statutory remedies available to a liquidator against defaulting officers as making this duty or its enforcement redundant.

39  Rules of attribution are as relevant to individuals as to companies. An individual may him- or herself do the relevant act or possess the relevant state of mind. Equally there are many contexts in which an individual will be attributed with the actions or state of mind of another, whether an agent or, in some circumstances, an independent contractor. But in relation to companies there is the particular problem that a company is an artificial construct, and can only act through natural persons. It has no actual mind, despite the law's persistent anthropomorphism — as to which see the references by Lord Hoffmann in Meridian Global Funds Management Asia Ltd v Securities Commission [1995] 2 AC 500 , 507A and 509G-H to the absence of any "ding an sich", and by Professor Eilis Ferran in Corporate Attribution and the Directing Mind and Will (2011) 127 LQR 239 , 239–240 to the distracting effect of references to a company's "brain and nerve centre" or "hands."

40  As Lord Hoffmann pointed out in Meridian Global at pp 506–507, the courts' task in all such situations is to

identify the appropriate rules of attribution, using for example general rules like those governing estoppel and ostensible authority in contract and vicarious liability in tort. It is well-recognised that a company may as a result of such rules have imputed to it the conduct of an ordinary employee, and this is so also in the context of illegality. By acquiescing in the overloading of the hauliers' lorries in Ashmore, Benson, Pease & Co Ltd v A v Dawson Ltd [1973] 1 WLR 828 the consignors' assistant transport manager and his assistant made the haulage contract unenforceable at the instance of the consignors, who were unable to recover when a lorry toppled over damaging the goods being carried. But it is not always appropriate to apply general rules of agency to answer questions of attribution, and this is particularly true in a statutory context. Particular statutory provisions may indicate that a particular act or state of mind should only be attributed when undertaken or held by a company's "directing mind and will": see eg Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd [1915] AC 705 and Tesco Supermarkets Ltd v Nattrass [1972] AC 153 , cited in Meridian Global at pp 507–509. In contrast in Meridian Global itself the company was for criminal purposes attributed with the conduct and knowledge of the senior portfolio manager who, without knowledge of the board or managing director, had entered into the relevant transaction of which the company had failed to give notice as required by the legislation.

41  As Lord Hoffmann made clear in Meridian Global , the key to any question of attribution is ultimately always to be found in considerations of context and purpose. The question is: whose act or knowledge or state of mind is *for the purpose* of the relevant rule to count as the act, knowledge or state of mind of the company? Lord Walker said recently in Moulin Global , para 41 that: "One of the fundamental points to be taken from Meridian is the importance of context in any problem of attribution". Even when no statute is involved, some courts have suggested that a distinction between the acts and state of mind of, on the one hand, a company's directing mind and will or "alter ego" and, on the other, an ordinary employee or agent may be relevant in the context of third party relationships. This is academically controversial: see Professor Peter Watts, The company's alter ego – an impostor in private law (2000) LQR 525 ; Campbell and Armour, Demystifiying the civil liability of corporate agents (2003) CLJ 290 .

Any such distinction cannot in any event override the need for attention to the context and purpose in and for which attribution is invoked or disclaimed.

42 Where the relevant rule consists in the duties owed by an officer to the company which he or she serves, then, whether such duties are statutory or common law, the acts, knowledge and states of mind of the company must necessarily be separated from those of its officer. The purpose of the rule itself means that the company cannot be identified with its officers. It is self-evidently impossible that the officer should be able to argue that the company either committed or knew about the breach of duty, simply because the officer committed or knew about it. This is so even though the officer is the directing mind and will of the company. The same clearly also applies even if the officer is also the sole shareholder of a company in or facing insolvency. Any other conclusion would ignore the separate legal identity of the company, empty the concept of duty of content and enable the company's affairs to be conducted in fraud of creditors.

43 At the same time, however, if the officer's breach of duty has led to the company incurring loss in the form of payments to or liability towards third parties, the company must be able as part of its cause of action against its officer to rely on the fact that, in that respect, its officer's acts and state of mind were and are attributable to the company, causing it to make such payments or incur such liability. In other words, it can rely on attribution for one purpose, but disclaim attribution for another. The rules of attribution for the purpose of establishing or negating vicarious liability to third parties differ, necessarily, from the rules governing the direct relationship inter se of the principal and agent.

44 It follows that I would, like Lords Toulson and Hodge (para 191), endorse the observations of Professors Peter Watts and Francis Reynolds QC as editors of *Bowstead & Reynolds on Agency* 19th ed, (2010) para 8-213, in relation to the argument that a principal should be attributed with the state of mind of his agent who has defrauded him, so as to relieve either the agent or a third party who had knowingly assisted in the fraud:

> "Such arguments by defendants, though hazarded from time to time, are plainly without merit. However, in such situations imputation has no reason to operate. The rules of imputation do not exist in a state of nature, such that some reason has to be found to disapply them. Whether knowledge is imputed in law turns on the question to be addressed."

The same point is made in rephrased terms in their 20th ed (2014), para 8-213:

> "The simple point is that, were the principal deemed to possess the agent's knowledge of his own breaches of duty, and thereby to have condoned them, the principal could never successfully vindicate his rights. … [T]here is no need for an exception as such. The putative defence that the exception is used to rebut is premised on the fallacy that the principal is prima facie deemed to know at all times and for all purposes that which his agents know. As observed already, imputation never operated in such a way. Before imputation occurs, there needs to be some purpose for deeming the principal to know what the agent knows. There is none in this type of case."

45 The breach of duty exception has been more plausibly deployed in situations where the issue is the legal effect of relations between the company and a third party. For example, in J C Houghton & Co v Nothard, Lowe and Wills [1928] AC 1 , the issue was whether the knowledge of the directors of the latter company should be attributed to it, with the effect that the latter company could and should be treated as estopped from denying that it had consented to a

particular arrangement with a third party company. However, the arrangement was one that was against the company's interests and for the benefit of the third party company which the directors also controlled and which was in financial difficulties. In the words of Viscount Dunedin, both common sense and authority in the form of In re Hampshire Land Co [1896] 2 Ch 743 led to the conclusion that, although "It may be assumed that the knowledge of directors is in ordinary circumstances the knowledge of the company", that cannot be so if the knowledge of an infringement of the company's rights is "only brought home to the man who himself was the artificer of such infringement" (pp 14–15). Even in this context it may be questioned whether an analysis involving prima facie imputation subject to exception is necessary or fruitful: see Professor Peter Watts' critique in Imputed knowledge in agency law – excising the fraud exception (2001) LQR 300 , 316 et seq. Since it leads to a right result and involves a different context to the present, I need however say no more about that here.

46  With regard to Stone & Rolls Ltd v Moore Stephens [2009] 1 AC 1391 I do not propose to say very much. The potential qualification on the application of the maxim *ex turpi causa* , which the majority accepted in the case of a company with innocent shareholders indicates that they too must ultimately have regarded context as having at least some relevance to attribution, and Lord Walker has in Moulin now explicitly withdrawn from the position that attribution operates independently of context: see paras 41 and 101. More fundamentally, the context in which issues of attribution arose in Stone & Rolls was different from the present. The company's claim was against its auditors rather than against an officer. Lord Phillips at least in the majority clearly saw that as important, in particular in the light of what he viewed as the scope of an auditor's duty. I remain of the view, which I expressed in para 265 in Stone & Rolls , that this ought to have been the central issue in that case, not a preliminary issue about *ex turpi causa* into which the majority view, that the claim even though pursued for the benefit of the company's creditors should fail, was in the event fitted. I note that Professor Eilis Ferran takes a similar view in her article, cited at para 39 above, at p 251; see also the statement by Professor Peter Watts, Audit contracts and turpitude (2010) LQR 126 , that "Ultimately, what divided the judges in Stone & Rolls was determining the classes of innocent parties

whose interests the contract of audit is designed to protect" (p 14).

47  I say nothing of course about the correct answer to a question addressed in terms of what an auditor's duty would or should have been. However, so far as concerns the nature and enforceability of a company's claim for misconduct by its directing mind and sole shareholder, I remain of the views expressed in paras 224-225 in Stone & Rolls :

> "224.  … [B]efore the House Mr Sumption's submission was that S & R could only claim against Mr Stojevic on a narrow basis for abstraction of its moneys (a proprietary claim like that mentioned by O'Connor LJ in Caparo …: see para 214 above); and that any claim against him for damages for breach of duty as an officer would be barred by the maxim *ex turpi causa* because it would involve pleading S & R's fraud on the banks. I do not accept this submission. It would mean that, if one element of Mr Stojevic's fraud on the banks had involved persuading the banks to pay the funds direct into an account represented as being S & R's but in fact Mr Stojevic's, S & R could not sue Mr Stojevic. Mr Stojevic's common law duty as a director to S & R was to conduct its affairs honestly and properly. Section 172(1) of the Companies Act 2006 now states the duty, in terms expressly based on common law rules and equitable principles (see section 170(3) ), as being to 'act in the way he considers, in good faith, would be most likely to promote the success of the company for the benefit of its members as a whole' — a duty made expressly 'subject to any enactment or rule of law requiring directors, in certain circumstances, to consider or act in the interests

Bilta (UK) Ltd (in Liquidation) v Nazir, 2015 WL 1786084 (2015)

of creditors of the company': see section 172(3) . Section 212 of the Insolvency Act 1986 provides a summary remedy available in the course of winding up against anyone who is or has been an officer of the company in respect of, *inter alia* , 'any misfeasance or breach of any fiduciary or other duty in relation to the company'. (This is in addition to the specific remedies that apply in circumstances of fraudulent or wrongful trading under sections 213 and 214 .)

225. As between S & R and Mr Stojevic, Mr Stojevic's fraud on the banks was and is just as objectionable as the later abstraction of moneys to which it was designed to lead. In holding a director responsible in such a case, a company is as a separate legal entity enforcing duties owed to it by the director. It is not acting inconsistently, or asking the court to act inconsistently, with the law. It is a remarkable proposition, that the directing mind of a company can commit the company to a scheme of fraud and then avoid liability in damages if the company would have to plead and rely on this scheme to establish such liability. …"

48 Like Lord Neuberger, I would not endorse Lord Sumption's suggestion (paras 79 and 80) that Stone & Rolls establishes an apparently general and context-unspecific distinction between personal and vicarious liability as central to the application of the illegality defence. Outside the statutory sphere, where such a distinction originated and has been found useful, there is very little authority for any such distinction, and there is certainly none for its application as a key to a resolution of issues of attribution in the context of

illegality. Its origin in that context lies in a concession by counsel (Mr Jonathan Sumption QC), no doubt tactically well-judged, in Stone & Rolls (p 1443B-C). The only member of the House who referred to this concession as a requirement, along with turpitude, of an *ex turpi causa* defence was Lord Phillips, but he did so expressly on the basis that (para 24):

> "Those … are valid qualifications to the defence of *ex turpi causa* in the context in which it is raised on this appeal. They are not, however, of general application to the defence of *ex turpi causa* ."

49 As I have already noted in para 40 above, with reference to Ashmore, Benson , it is not the law that the ordinary principles of attribution are replaced in the case of a company, any more than they are in the case of an individual, by some general principle that the only relevant conduct or state of mind is that of someone who is or can be treated as an alter ego or directing mind and will of the relevant company or individual. In his article *Audit contracts and turpitude* , to which I have referred in para 46 above, at p 17, Professor Watts says this about the way in which the concept of directing mind and will entered the debate in Stone & Rolls :

> "Their Lordships were drawn into recognising the mind-and-will concept by Mr Sumption QC's concession on the auditor's behalf … that a claimant cannot be caught by the *ex turpi causa* rule except as a result of his own conduct, 'not conduct for which he is vicariously liable or which is otherwise attributed to him under principles of the law of agency'. This is simply wrong. Generally speaking, the *ex turpi causa* rule will preclude a principal from taking advantage of an agent's illegal acts (see eg Apthorp v Nevill (1907) 23 TLR 575 for a human principal, and Ashmore, Benson Pease & Co Ltd v

AV Dawson Ltd [1973] 1 WLR 828 CA for a company). Nonetheless, as we have noted, context is important with the *ex turpi* rule, and in the case of contracts designed to deal with the risks of agents' dishonesty (such as audit and insurance contracts) the law looks to where guilt really lies."

50  With regard to the three points for which Lord Sumption suggests in para 80 that Stone & Rolls is authority, it follows from what I have said in paras 48-49 that I do not agree that the case is authority for the first point, viz that the illegality defence is only available to a company where it is "directly" as opposed to vicariously responsible for the illegality. As Professor Watts says, there are no doubt some limited contexts in which this may be the appropriate analysis, but there is no such general rule. I agree with Lord Sumption's second point, viz that the House rejected the auditor's argument that merely because Mr Stojevic was the company's mind and will and sole owner, his conduct and state of mind should be attributed to Stone & Rolls in relation to its claim against its auditors. I have already pointed out in para 46 above that the majority was thereby at least accepting that context must have some relevance. The third point appears a factually correct representation of the outcome of Stone & Rolls , though the present appeal does not raise the correctness in law of that outcome, which may one day fall for reconsideration.

51  I turn to a defence of circuity of action which the appellants suggest arises on this appeal. The claim against Jetivia and Mr Brunschweiler is that they dishonestly assisted Mr Chopra's and Mr Nazir's breaches of duty towards Bilta, or were co-conspirators with Mr Chopra and Mr Nazir. On the face of it, Jetivia and Mr Brunschweiler cannot raise a defence of illegality if Mr Chopra and Mr Nazir cannot. The suggestion is that Jetivia could have a defence of circuity of action. This is, I understand, on the basis that any liability on its part arose from a conspiracy between Bilta, through Mr Chopra and Mr Nazir, and Mr Brunschweiler. Apart from this being unpleaded, I cannot, at present at least, see how a company

(here Jetivia) which is through its director or other agent held liable to another company (here Bilta) for dishonestly assisting or conspiring with the latter company's directors or agents to cause loss to the latter company can then turn round and say that it has been damaged by the former company by the very liability which it has incurred to the former company. That would turn the law governing dishonest assistance and conspiracy on its head.

52  I sympathise with the views expressed by Lords Toulson and Hodge in paras 156-162 regarding the Court of Appeal decision in Safeway Stores Ltd v Twigger [2010] EWCA Civ 1472, [2011] 2 All ER 814 , but any decision about its correctness must be for another day, after full argument.

53  For the reasons given by Lords Sumption, Toulson and Hodge and again in agreement with Lord Neuberger, I consider that section 213 of the Insolvency Act 1986 has extra-territorial effect, and do not regard any reference to the Court of Justice as necessary.

54  It follows that I also would dismiss the appeal.

Lord Sumption:

55  The main issue on this appeal is the scope of the rule of public policy *ex turpi causa non oritur actio* . "No court will lend its aid to a man who founds his cause of action on an immoral or an illegal act": Holman v Johnson (1775) 1 Cowp 34*l* , 343 (Lord Mansfield CJ). It is convenient to call this the illegality defence, although the label is not entirely accurate for it also applies to a very limited category of acts which are immoral without being illegal.

**The proceedings**

56  Bilta (UK) Ltd is an English company which was ordered to be wound up by the High Court on 29 November 2009 on the application of Her Majesty's Revenue and Customs. Before that order was made, its sole directors were Mr Chopra and Mr Nazir. Mr Chopra was also Bilta's sole shareholder.

57  The present proceedings were brought by Bilta (through its liquidators) against the two former

directors and a Swiss company, Jetivia SA, together with Jetivia's chief executive Mr Brunschweiler. There are other defendants also, but for present purposes they can be ignored. The appeal arises out of a preliminary issue on the pleadings as between Bilta on the one hand and Jetivia and Mr Brunschweiler on the other. In summary, Bilta's pleaded allegation is that between April and July 2009 the two directors caused Bilta to engage in fraudulent trading in carbon credits (European Emissions Trading Scheme Allowances) recorded on the Danish Emission Trading Registry. The fraud was very simple. At the relevant time carbon credits traded between parties both of whom were in the United Kingdom were treated as taxable supplies subject to VAT at the standard rate of 15%, but if either the buyer or the seller of the credit was outside the United Kingdom, the sale was not subject to VAT. Bilta bought carbon credits free of VAT from Jetivia. It resold them back-to-back to UK companies registered for VAT. In most cases, the onsale price of the credits net of VAT was artificially fixed at a level marginally below Bilta's purchase price, thus enabling Bilta's UK buyer to sell them on at a small profit. The proceeds of Bilta's sales, together with the VAT thereon, were paid either to Bilta and then on to Jetivia, or directly by the UK buyers to Jetivia or an offshore company called THG. Since Bilta had no other business and no assets other than the cash generated by its sales, the result was to make the company insolvent and to generate a liability on Bilta's part to account to HMRC which it was unable to satisfy.

58   As against the directors, Bilta's claim is that in breach of their fiduciary duties they organised and participated in a conspiracy to

> "defraud and injure [Bilta] … by trading in carbon credits and dealing with the proceeds therefrom in such a way as to deprive [Bilta] of its ability to meet its VAT obligations on such trades, namely to pass the money (which would otherwise have been available to [Bilta] to meet such liability) to accounts offshore, including accounts of Jetivia …" (Amended Particulars of Claim, para. 14(a))

As against Jetivia and Mr Brunschweiler, the allegation is that they were (i) liable as parties to the same conspiracy (ii) accountable as constructive trustees on the footing of knowing assistance in the dishonest diversion of book-debts due to Bilta. Jetivia, but not Mr Brunschweiler, is also said to be liable to account on the footing of knowing receipt of the proceeds of those book-debts. As against all parties, there is in addition a claim for fraudulent trading under section 213 of the Insolvency Act 1986 .

59   The victim identified in the pleading is Bilta. It is not in terms pleaded that it was any part of the object of the scheme to defraud HMRC. Patten LJ in the Court of Appeal considered that the case had to be decided without regard to the possibility that HMRC were a victim. But that, with respect, seems unrealistic. In Everet v Williams (1725) , the famous case in which two highwaymen sought an account of their partnership profits, they did not plead the nature of their business. But that did not prevent the court from looking through the gaps and circumlocutions to the substance of the transaction: see (1893) 9 LQR 197. The substance of the transactions in issue on this appeal, if the pleaded facts are true, is a fraud on HMRC, who will be the real losers. The pleadings describe a classic "missing trader" fraud. Whether it was technically a carousel fraud (in which the trader sells to a connected entity, arranges for the latter to obtain a VAT refund, then pays away the VAT collected and disappears) or the simpler so-called "acquisition fraud" where he simply disappears without accounting for VAT, does not matter. The common feature of both is the intention of the fraudster to collect VAT and disappear before it can be accounted for, and this is the aspect of the scheme which founds the pleaded case of conspiracy. The dishonesty alleged against the directors consists wholly in their having removed assets of Bilta which would otherwise have been available to pay creditors, in particular HMRC.

**The illegality defence**

60   Although it begs many questions, the most succinct and authoritative statement of the law remains that of Lord Mansfield CJ in Holman v Johnson (1775) 1 Cowp 34 l, 343:

"No court will lend its aid to a man who founds his cause of action on an immoral or an illegal act. If, from the plaintiff's own stating or otherwise, the cause of action appears to arise ex turpi causa, or the transgression of a positive law of this country, there the court says that he has no right to be assisted. It is upon that ground the court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff. So if the plaintiff and defendant were to change sides, and the defendant was to bring his action against the plaintiff, the latter would then have the advantage of it; for where both are equally in fault, potior est conditio defendentis."

Thus stated, the law of illegality is a vindication of the public interest as against the legal rights of the parties. The policy is one of judicial abstention, by which the judicial power of the state is withheld where its exercise in accordance with ordinary rules of private law would give effect to advantages derived from an illegal act.

61    In the two centuries which followed Lord Mansfield's apparently simple proposition, it was among the most heavily litigated rules of common law, and by the end of the twentieth century it had become encrusted with an incoherent mass of inconsistent authority. The main reason for this was the unfortunate tendency of the common law to fragmentation, as judges examined each case in its own factual and legal context without regard to broader legal principle. By the time that the illegality defence came before the Court of Appeal in Euro-Diam Ltd v Bathurst [1990] 1 QB 1 , the law of illegality had generated a mass of sub-rules, each appropriate to its own context, a state of affairs which necessarily gave rise to difficulty when the law had to be applied to situations which were either new or not classifiable according to existing categories. The Court of Appeal resolved this problem by treating the whole body of authority as illustrative of a process which was essentially discretionary in nature. Kerr LJ, delivering

the only reasoned judgment, expressed that principle at p 35 by saying that the test was whether

"in all the circumstances it would be an affront to the public conscience to grant the plaintiff the relief which he seeks because the court would thereby appear to assist or encourage the plaintiff in his illegal conduct or to encourage others in similar acts."

That question, he suggested, needed to be approached "pragmatically and with caution, depending on the circumstances". This view of the law was unanimously rejected by the House of Lords four years later in Tinsley v Milligan [1994] 1 AC 340 . Lord Goff of Chievely, delivering the leading judgment on this point, said that it

"would constitute a revolution in this branch of the law, under which what is in effect a discretion would become vested in the court to deal with the matter by the process of a balancing operation, in place of a system of rules ultimately derived from the principle of public policy enunciated by Lord Mansfield CJ in Holman v Johnson ." (p 363B).

62   The Law Commission struggled valiantly with the issue in the early years of this century, and at one point proposed a structured statutory discretion of the kind which has been adopted in New Zealand. It abandoned this proposal in the expectation that the courts would reintroduce a measure of the flexibility which Tinsley v Milligan had rejected. But Tinsley v Milligan is binding authority, subject to review in this court, and in the twenty years since it was decided, the highest court has never been invited to overrule it. In those circumstances, the law has moved in a different direction, accepting that the illegality defence depends on a rule of law which applies regardless of the equities of any particular case

but seeking to rationalise an area that has generated a perplexing mass of inconsistent case-law. In its recent decision in Les Laboratoires Servier v Apotex Inc [2014] UKSC 55; [2014] 3 WLR 1257 at paras 19-20, this court reaffirmed the principle that the illegality defence is based on a rule of law on which the court is required to act, if necessary of its own motion, in every case to which it applies. It is not a discretionary power on which the court is merely entitled to act, nor is it dependent upon a judicial value judgment about the balance of the equities in each case: In the light of the rejection of the public conscience test, it is incumbent on the courts to devise principled answers which are no wider than is necessary to give effect to the policy stated by Lord Mansfield and are certain enough to be predictable in their application.

63  In Les Labratoires Servier , it was pointed out that the illegality defence commonly raised three questions: (i) what are the "illegal or immoral acts" which give rise to the defence? (ii) what relationship must those acts have to the claim? (iii) on what principles should the illegal or immoral acts of an agent be attributed to his principal, especially when the principal is a company? Les Laboratoires Servier was about the first of the three questions. It is authority for the proposition that the illegality defence is potentially engaged by any act of the claimant which is criminal or dishonest or falls into a limited number of closely analogous categories. It is not disputed that the acts alleged in this case were of that kind. Various tests have been proposed for the connection which the law requires between the illegal act and the claim, but it has not been disputed that any of them would be satisfied on the facts alleged in this case. It is obvious, and apparent from the pleadings, that the claim against both the directors and Jetivia is directly founded on the VAT frauds.

64  The sole question on this part of the appeal is therefore the third. As applied to the present case, it is whether the dishonesty which engages the illegality defence is to be attributed to Bilta for the specific purpose of defeating its claim against the directors and their alleged co-conspirators. The question is whether the defence is available to defeat an action by a company against the human agent who caused it to act dishonestly for damages representing the losses flowing from that dishonesty. The Chancellor of the High Court and Court of Appeal both held that it was not. While

there are dicta in the judgments below, especially in the Court of Appeal, which range wider than is really necessary, their essential reason was the same, namely that the agent was not entitled to attribute his own dishonesty to the company for the purpose of giving himself immunity from the ordinary legal consequences of his breach of duty. For reasons which I shall explain below, I think that the courts below were right about that, and I understand that view to be shared by every other member of the court.

**Attribution**

65  English law might have taken the position that a company, being an artificial legal construct, was mindless. If it had done that, then legal wrongs which depended on proof of some mental element such as dishonesty or intention could never be attributed to a company and the present question could not arise. In the early years of English company law, there were powerful voices which denied that a tort dependent on proof of a mental element could be committed by a company. For many years this view was principally associated with Lord Bramwell, who in a well-known dictum in Abrath v North Eastern Railway Co [1886] 11 App Cas 247 , 250–251, declared that a fictitious person was "incapable of malice or of motive" even if the whole body of its directors or shareholders in general meeting approved its acts for improper reasons. This question was, however, settled as far as English civil law was concerned by the end of the nineteenth century. As Lord Lindley put it in Citizens' Life Assurance Co Ltd v Brown [1904] AC 423 , 426, once companies were recognised by the law as legal persons, they were liable to have the mental states of agents and employees such as dishonesty or malice attributed to them for the purpose of establishing civil liability. In the criminal law, the notion that a corporation was incapable of committing an offence requiring mens rea persisted rather longer. It was asserted in both the first edition (1909) and the second edition (1933) of Halsbury's Laws of England . But it was rejected in a series of decisions in 1944: see Director of Public Prosecutions v Kent and Sussex Contractors Ltd [1944] KB 146 ; R v ICR Haulage Ltd [1944] KB 551 ; Moore v I Bresler Ltd [1944] 2 All ER 515 . It is now well established that a company can be indicted for conspiracy to defraud ( R v ICR Haulage Ltd [1944] KB 551) or manslaughter before statute intervened in 2007 ( Attorney-General's

Reference (No 2 of 1999) [2000] QB 796 ), provided
that an agent with the relevant state of mind can be
sufficiently identified with it. It cannot be emphasised
too strongly that neither in the civil nor in the criminal
context does this involve piercing the corporate veil. It
is simply a recognition of the fact that the law treats
a company as thinking through agents, just as it acts
through them.

66  It follows that in principle, the illegality defence
applies to companies as it applies to natural persons.
This is the combined effect of the company's legal
personality and of the attribution to companies of the
state of mind of those agents who for the relevant
purpose can be said to think for it. But the principles can
only apply to companies in modified form, for they are
complex associations of natural persons with different
interests, different legal relationships with the company
and different degrees of involvement in its affairs. A
natural person and his agent are autonomous in fact as
well as in law. A company is autonomous in law but
not in fact. Its decisions are determined by its human
agents, who may use that power for unlawful purposes.
This gives rise to problems which do not arise in the case
of principals who are natural persons.

67  The question what persons are to be so far
identified with a company that their state of mind
will be attributed to it does not admit of a single
answer. The leading modern case is Meridian Global
Funds Management Asia Ltd v Securities Commission
[1995] 2 AC 500 . The primary rule of attribution is
that a company must necessarily have attributed to
it the state of mind of its directing organ under its
constitution, ie the board of directors acting as such
or for some purposes the general body of shareholders.
Lord Hoffmann, delivering the advice of the Privy
Council, observed that the primary rule of attribution
together with the principles of agency and vicarious
liability would ordinarily suffice to determine the
company's rights and obligations. However, they would
not suffice where the relevant rule of law required that
some state of mind should be that of the company itself.
He explained, at p 507:

> "This will be the case when a
> rule of law, either expressly or by
> implication, excludes attribution on
> the basis of the general principles

of agency or vicarious liability. For
example, a rule may be stated in
language primarily applicable to a
natural person and require some act
or state of mind on the part of that
person "himself" as opposed to his
servants or agents. This is generally
true of rules of the criminal law,
which ordinarily impose liability
only for the actus reus and mens rea
of the defendant himself."

The directing organ of the company may expressly
or implicitly have delegated the entire conduct of its
business to the relevant agent, who is actually although
not constitutionally its "directing mind and will" for all
purposes. This was the situation in the case where the
expression "directing mind and will" was first coined,
Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd
[1915] AC 705 . Such a person in practice stands in
the same position as the board. The special insight of
Lord Hoffmann, echoing the language of Lord Reid
in Tesco Supermarkets Ltd v Nattrass [1972] AC 153
, 170, was to perceive that the attribution of the state
of mind of an agent to a corporate principal may also
be appropriate where the agent is the directing mind
and will of the company for the purpose of performing
the particular function in question, without necessarily
being its directing mind and will for other purposes.

> "This is always a matter of
> interpretation: given that it was
> intended to apply to a company,
> how was it intended to apply?
> Whose act (or knowledge, or state of
> mind) was for this purpose intended
> to count as the act etc. of the
> company? One finds the answer to
> this question by applying the usual
> canons of interpretation, taking into
> account the language of the rule (if
> it is a statute) and its content and
> policy." (p 507, and see pp 509–511)

Bilta (UK) Ltd (in Liquidation) v Nazir, 2015 WL 1786084 (2015)

68 A modern illustration of the attribution of knowledge to a company on the basis that its agent was its directing mind and will for all purposes is Royal Brunei Airlines Sdn Bhd v Tan [1995] 2 AC 378, where the Privy Council was concerned with the knowledge required to make a company liable as a constructive trustee on the footing of knowing assistance in a dishonest breach of trust. The defendants were a one-man company, BLT, and the one man, Mr Tan. At pp 392–393, Lord Nicholls, delivering the advice of the Board, observed that Mr Tan had known the relevant facts and was therefore liable. "By the same token, and for good measure, BLT also acted dishonestly. Mr Tan was the company and his state of mind is to be imputed to the company". On the other hand, El Ajou v Dollar Land Holdings Ltd [1994] 2 All ER 685 did not concern a one-man company. The issue was whether knowledge of the origin of funds received for investment by Dollar Land Holdings, a public company, could be imputed to it so as to found a liability to account as a constructive trustee on the footing of knowing receipt. Lord Hoffmann, delivering the leading judgment of the Court of Appeal and applying the principles which he would later explain in Meridian Global , held that the company was fixed with the knowledge of one Mr Ferdman, its part-time chairman and a non-executive director, because he had acted as its directing mind and will for the particular purpose of arranging its receipt of the tainted funds.

69 These refinements can give rise to nice questions of fact. But their application in a case like the present one is perfectly straightforward. On the pleaded facts, Mr Chopra and Mr Nazir were the directing organ of Bilta under its constitution. They constituted the board. Mr Chopra was also the sole shareholder. As between Bilta and Jetivia it is common ground on the pleadings that they were the "directing mind and will" of Bilta for all purposes, and certainly in relation to those of its functions which are relevant in these proceedings.

70 The search for a test of a company's direct or "personal" liability has sometimes been criticised as a distraction or an artificial anthropomorphism, and it is certainly true that English law might have developed along other lines. As it is, the distinction between a liability which is direct or "personal" and one which is merely vicarious is firmly embedded in our law and has had a considerable influence on the way it

has developed in relation to both kinds of liability. Vicarious liability does not involve any attribution of wrongdoing to the principal. It is merely a rule of law under which a principal may be held strictly liable for the wrongdoing of someone else. This is one reason why the law has been able to impose it as broadly as it has. It extends far more widely than responsibility under the law of agency: to all acts done within the course of the agent's employment, however humble and remote he may be from the decision-making process, and even if his acts are unknown to the principal, unauthorised by him and adverse to his interest or contrary to his express instructions ( Lloyd v Grace Smith & Co [1912] AC 716) , indeed even if they are criminal ( Lister v Hesley Hall Ltd [2002] 1 AC 215) . Personal or direct liability, on the other hand, has always been fundamental to the application of rules of law which are founded on culpability as opposed to mere liability. One example, as Lord Hoffmann pointed out in Meridian Global , is provided by the rules governing criminal responsibility, which do not usually recognise vicarious responsibility. Another is the class of statutory provisions dependent on a company's personal misconduct, such as a shipowner's right to limit his liability for a loss which is not attributable to his "personal act or omission": see article 4 of the Convention on Limitation of Liability for Maritime Claims (1976) ( Merchant Shipping Act 1995, Schedule 7, Part 1 ), a principle derived from the nineteenth century Merchant Shipping Acts of the United Kingdom. A third example is provided by the illegality defence, which the House of Lords held in Stone & Rolls v Moore Stephens [2009] 1 AC 391 to apply only to direct and not to vicarious responsibility. It is, for example, the reason why public policy precludes recovery under a liability policy in respect of a criminal act where the insured's liability is personal or direct, but not where it is purely vicarious: Lancashire County Council v Municipal Mutual Insurance Ltd [1997] QB 897 , 907. As cases like this illustrate, if the illegality defence were to be engaged merely by proof of a purely vicarious liability, it would apply irrespective of any question of attribution, to any case in which the human wrongdoer was acting within the scope of his employment. This would extend the scope of the defence far more widely than anything warranted by the demands of justice or the principle stated by Lord Mansfield. On the footing that the attribution of culpability is essential to the defence, the concept of a

"directing mind and will" remains valuable. It describes a person who can be identified with the company either generally or for the relevant purpose, as distinct from one for whose acts the company is merely vicariously liable.

**The exception: breach of the agent's duty to the company**

71    Bilta's answer to this, which was accepted by both the judge and the Court of Appeal, is that the dishonesty of Mr Chopra and Mr Nazir is not to be attributed to Bilta, because in an action for breach of duty against the directors there cannot be attributed to the company a fraud which is being practised against it by its agent, even if it is being practised by a person whose acts and state of mind would be attributable to it in other contexts. It is common ground that there is such a principle. It is commonly referred to as the fraud exception, but it is not limited to fraud. It applies in certain circumstances to prevent the attribution to a principal of his agent's knowledge of his own breach of duty even when the breach falls short of dishonesty. In the context of the illegality defence, which is mainly concerned with dishonest or criminal acts, this exception from normal rules of attribution will normally arise when it is sought to attribute to a principal knowledge of his agent's fraud or crime but that is not inherent in the underlying principle. I shall call it the "breach of duty exception."

72  The breach of duty exception is commonly referred to as the Hampshire Land principle, after the judgment of Vaughan Williams J in In re Hampshire Land [1896] 2 Ch 743 . This case did not involve any allegation of fraud. The facts were that the Hampshire Land Company had borrowed money from a building society. The borrowing required the authority of the shareholders in general meeting, but their authority, although it was given, was vitiated by defects in the notice by which it was summoned. The issue was whether a building society was affected by notice of the irregularity so as to be prevented from relying on the internal management rule. The contention was that the building society was on notice because its secretary happened also to be the secretary of the borrower, and in the latter capacity he knew the facts. In the course of discussing that question, the judge observed at p 749:

"If Wills had been guilty of a fraud, the personal knowledge of Wills of the fraud that he had committed on the company would not have been knowledge of the society of the facts constituting that fraud; because common sense at once leads one to the conclusion that it would be impossible to infer that the duty either of giving or receiving notice will be fulfilled where the common agent is himself guilty of fraud."

73    Vaughan Williams J's dictum was subsequently adopted by two members of the House of Lords in Houghton & Co v Nothard, Lowe & Wills [1928] AC 1 , where the issue was whether a company was bound by an arrangement adverse to the company's interest which had been made by two of its directors for their own benefit and was never approved by the board. It was contended that the knowledge of the two directors could be attributed to the company so as to found a case of acquiescence. Viscount Dunedin (at p 14) summarily rejected the suggestion that the company could be treated as knowing about a director's breach of duty by virtue only of the knowledge of the defaulting director himself:

"My Lords, there can obviously be no acquiescence without knowledge of the fact as to which acquiescence is said to have taken place. The person who is sought to be estopped is here a company, an abstract conception, not a being who has eyes and ears. The knowledge of the company can only be the knowledge of persons who are entitled to represent the company. It may be assumed that the knowledge of directors is in ordinary circumstances the knowledge of the company. The knowledge of a mere official like the secretary would only be the knowledge of the company if the thing of which knowledge is

predicated was a thing within the ordinary domain of the secretary's duties. But what if the knowledge of the director is the knowledge of a director who is himself particeps criminis, that is, if the knowledge of an infringement of the right of the company is only brought home to the man who himself was the artificer of such infringement? Common sense suggests the answer, but authority is not wanting."

He then cited the dictum of Vaughan Williams J. Lord Sumner agreed, observing (p 19) that it would be "contrary to justice and common sense to treat the knowledge of such persons as that of their company, as if one were to assume that they would make a clean breast of their delinquency."

74  These dicta are concerned only with the attribution of knowledge. The argument which they reject is that there is no breach of duty because the company must be deemed to know the facts and therefore cannot be misled or must be supposed to have consented. They are not concerned with the ambit of the illegality defence or the breach of duty exception to it. For the first full consideration of the exception, one must move forward seven decades to the decision of the Court of Appeal in Belmont Finance Ltd v Williams Furniture Ltd [1979] Ch 250 , which is the starting point for the modern law. That case arose out of an elaborate scheme, to which Belmont's directors were party, to extract value from Belmont by causing it to buy the shares of a company called Maximum at a considerable overvalue. This was a breach of the fiduciary duties of the directors. Their object was to recycle the profit on the sale of Maximum so that it could be used to fund the purchase by three companies associated with the directors of Belmont's own shares. This was not only a breach of the directors' fiduciary duty but a criminal contravention of what was then section 54 of the Companies Act 1948 . Belmont subsequently went into liquidation, and an action was brought in its name by receivers for damages for breach of duty against the directors who had authorised the transaction, and for an account on the footing of knowing receipt against the

three companies. The plaintiff was met by the illegality defence. The judge dismissed the action at the close of the plaintiff's case on that ground, holding that the company was a party to the conspiracy. This was because it must be taken to have known, through its directors, that the asset was over-valued and that the purpose of the transaction was to fund the purchase of Belmont's shares. Reversing the judge, Buckley LJ said (pages 261–262):

> "But in my view such knowledge should not be imputed to the company, for the essence of the arrangement was to deprive the company improperly of a large part of its assets. As I have said, the company was a victim of the conspiracy. I think it would be irrational to treat the directors, who were allegedly parties to the conspiracy, notionally as having transmitted this knowledge to the company; and indeed it is a well-recognised exception from the general rule that a principal is affected by notice received by his agent that, if the agent is acting in fraud of his principal and the matter of which he has notice is relevant to the fraud, that knowledge is not to be imputed to the principal. So in my opinion the plaintiff company should not be regarded as a party to the conspiracy, on the ground of lack of the necessary guilty knowledge."

75  In Attorney-General's Reference (No 2 of 1982) [1984] 1 QB 624 two men were charged with theft from a company which they wholly owned and controlled. The issue was whether, for the purpose of section 2(1)(b) of the Theft Act 1968 , they had appropriated the property of another "in the belief that [they] would have the other's consent if the other knew of the appropriation and the circumstances of it". The argument was that they must have had that belief because the company had

no other will than theirs, so that it must be taken to consent to whatever they consented to. This argument had been accepted by the trial judge but it failed in the Court of Appeal for two reasons. One turned on the construction of the Theft Act and is of no present relevance. The other was that the decision in Belmont Finance "directly contradicts the basis of the defendants' argument in the present case. There can be no reason, in our view, why the position in the criminal law should be any different."

76  In Brink's Mat v Noye [1991] 1 Bank LR 68 , gold had been stolen from Brink's Mat's warehouse and delivered to a company called Scadlynn to be melted down, recast and sold. The directors and sole shareholders of Scadlynn, who were well aware that the gold was stolen, caused the proceeds to be paid into the company's bank account and then paid away, thus leaving it without assets to meet its liabilities to Brink's Mat. The appeal arose out of an application by Brink's Mat to amend the pleadings so as to add a number of claims against the bank. The proposed amendments proceeded on the basis that since the payments into Scadlynn's bank account represented property to which Brink's Mat was beneficially entitled, it was entitled to enforce Scadlynn's rights against the bank. It was alleged that the bank was liable to Scadlynn as a constructive trustee on the footing of knowing receipt and that Brink's Mat was entitled to enforce that liability for its own benefit. One of the issues which arose was whether Scadlynn would have been precluded from advancing a claim against the bank because it had known (through its directors) about the origin of the gold. Mustill LJ, rejecting this argument, considered that "the corporate entity named Scadlynn was, however, odd the notion may seem at first sight, the victim of wrongful arrangements to deprive it improperly of a large part of its assets": p 72. Nicholls LJ, agreeing, observed (p 73):

> "On the facts alleged in the proposed amendments, Scadlynn was at all material times being used by Chappell and Palmer and others for a fraudulent purpose, viz, to realize the proceeds of sale of the robbery. But the plaintiff was not implicated in any such fraudulent purpose. On the contrary, along with the

owners of the gold, the plaintiff was the intended victim of the scheme. Likewise, Scadlynn itself was an intended victim, in that Scadlynn was being used as a vehicle for committing a fraud on its creditors and a fraud on those beneficially interested in property held by Scadlynn. In those circumstances the fraudulent purposes of those controlling Scadlynn are not to be imputed to the company itself: see Belmont Finance Corporation Ltd v Williams Furniture Ltd [1979] Ch 250 , per Buckley LJ at pp 261–262."

77  Arab Bank v Zurich Insurance [1999] 1 Lloyd's Rep 262 was a decision of Rix J arising out of a claim under the Third Parties (Rights against Insurers) Act 1930 against the liability insurer of a valuer. The valuer was alleged to have issued fraudulent valuations to induce banks to lend money to third parties. The valuations had been issued by a Mr Browne, who was the managing director and also a personal assured. The insurer defended the claim on the ground that the company was not entitled to indemnity under the policy because Browne's dishonesty was attributable to it by virtue of his knowledge. Rix J thought that Browne would on ordinary principles of attribution have been treated as the directing mind and will of the valuer for the relevant purpose (pp 278–279). But he rejected the illegality defence because it was inconsistent with the terms of the contract of insurance under which Mr Browne and the company were separately insured each for his own interest (pp 272–273). It followed that only Mr Browne would be precluded from recovering. The attribution of his knowledge to the company would be contrary to the agreement to insure their interests separately. The company's liability was therefore purely vicarious. Having made these points, Rix J dealt briefly (and obiter ) at p 282 with the question of attribution. He said that although Browne's valuations were frauds on the lending banks, the valuer itself should be treated as a "secondary victim", first because Browne's frauds exposed it to liability to the banks, and secondly because Browne's conduct involved "such a breach of duty to

[the valuer] as in justice and common sense must entail that it is impossible to infer that the knowledge of his own dishonesty was transferred to [the valuer]." He thought that the position might well be different in the case of a one-man company.

78 McNicholas Construction Co Ltd v Customs & Excise Commissioners [2000] STC 553 arose out of a classic VAT fraud against the Customs and Excise. The fraudsters submitted invoices to McNicholas for VAT in respect of non-existent goods and services. The company's site managers, who were in league with them, procured the VAT to be paid to them. The VAT was then reclaimed as input tax from the Customs and Excise. The scheme inflicted a loss on the Customs & Excise but the net financial effect on the company was neutral. The Customs & Excise claimed statutory penalties on the basis that that the company's conduct was dishonest. This case was simply about attribution. The illegality defence did not arise, for McNicholas was claiming nothing. Dyson J held that as a matter of construction the statute implicitly fixed the company with the knowledge of those of its employees who handled its VAT payments, including the site managers. The company argued that knowledge of the fraud should nevertheless not be imputed to it because it was a victim of the fraud, which exposed it to statutory penalties. Rejecting this argument (at paras 55-56), the judge said:

"In my judgment, the tribunal correctly concluded that there should be attribution in the present case, since the company could not sensibly be regarded as a victim of the fraud. They were right to hold that the fraud was "neutral" from the company's point of view. The circumstances in which the exception to the general rule of attribution will apply are where the person whose acts it is sought to impute to the company knows or believes that his acts are detrimental to the interests of the company in a material respect … It follows that, in judging whether a company is to be regarded as the victim of the acts of a person, one should consider

the effect of the acts themselves, and not what the position would be if those acts eventually prove to be ineffective. As the tribunal pointed out, in Director General of Fair Trading v Pioneer Concrete (UK) Ltd [1995] 1 AC 456 the company suffered a large fine for contempt of court on account of the wrongful acts of its managers. The fact that their wrongful acts caused the company to suffer a financial penalty in this way did not prevent the acts and knowledge of the managers from being attributed to it. The [breach of duty exception] is founded in common sense and justice. It is obvious good sense and justice that the act of an employee should not be attributed to the employer company if, in truth, the act is directed at, and harmful to, the interests of the company. In the present case the fraud was not aimed at the company. It was not intended by the participants in the fraud that the interests of the company should be harmed by their conduct."

The Court of Appeal approved this reasoning in rejecting a somewhat similar argument in Bank of India v Morris [2005] BCC 739 . The facts of this case, baldly summarised, were that BCCI had placed deposits with Bank of India on unusual terms as part of a scheme to window-dress its accounts at the year-end. The liquidators of BCCI brought proceedings against Bank of India under section 213 of the Insolvency Act on the ground that it had been knowingly party to the carrying on of business by BCCI with intent to defraud. The judge found that the general manager of the Bank of India had deliberately turned a blind eye to what was going on, and that his knowledge was attributable to the bank. The bank advanced an argument somewhat similar to that which had been advanced by McNicholas before Dyson J. The Court of Appeal rejected it for the same reason, namely that the general manager's acts were not targeted at Bank of India: see paras 114-118.

79 This was the state of the authorities when Stone & Rolls v Moore Stephens [2009] 1 AC 1391 came before the courts. Stone & Rolls was a company created solely for the purpose of defrauding banks. It never did anything else. The author of the frauds was a Mr Stojevic, its sole director, manager and shareholder. The action was brought by the company at the instance of its liquidators against the auditors on the basis that if they had exercised due skill and care, they would have discovered that the company had no legitimate business. The course of frauds against the bank would then have ceased earlier than it actually did. They claimed the losses said to have been incurred as the direct result of the company's course of fraudulent behaviour continuing for longer than it would otherwise have done. The House of Lords held that the illegality defence applied and upheld the order of the Court of Appeal striking out the proceedings. It is a difficult case to analyse, because it was decided by a majority comprising Lord Phillips, Lord Walker and Lord Brown and there are significant differences between the reasoning of Lord Walker (with whom Lord Brown agreed) and Lord Phillips. But the fact that they differed on critical points does not undermine the authority of their speeches on those points on which they were agreed.

80 Lord Phillips and Lord Walker were agreed on three points for which the case is accordingly authority. The first was that the illegality defence is available against a company only where it was directly, as opposed to vicariously, responsible for it: see Lord Phillips at paras 27-28. Lord Walker refers to this at paras 132-133 and must have taken the same view, for if vicarious liability was enough to engage the illegality defence the attribution of Mr Stojevic's knowledge to the company (with which the whole of the rest of his speech is concerned) would have been irrelevant. This is because the company was vicariously liable for Mr Stojevic's defaults whether or not it was treated as privy to them. Secondly, the majority was agreed in rejecting the primary argument of the auditors that once it was shown that the directing mind and will of a company (whether generally or for the relevant purpose) had caused it to defraud a third party and that the company was relying on that fraud to found its cause of action, the illegality defence necessarily barred the claim. Both Lord Phillips (para 63) and Lord Walker (para 173)

rejected this submission as too broad, because it would involve the attribution of the agent's dishonesty to the company even if there were innocent directors or shareholders. Accordingly, both of them regarded it as critical that Stone & Rolls was a "one-man company", ie a company in which, whether there was one or more than one controller, there were no innocent directors or shareholders. Third, Lord Phillips and Lord Walker were agreed that, as between a "one-man" company and a third party, the latter could raise the illegality defence on account of the agent's dishonesty, at any rate where it was not itself involved in the dishonesty.

81 There are difficulties about treating Stone & Rolls as authority for any wider principles than these. There are two main reasons for this. The first is that Lord Phillips and Lord Walker differed in their reasons for holding that the illegality defence could be taken against a one-man company. Lord Walker adopted the "sole actor" principle, a label which he derived from the case-law of the United States, but which he supported by reference to ordinary principles of English company law. Lord Phillips on the other hand was guided by the principle that a loss is recoverable only if the relevant duty was to protect against loss of that kind: South Australia Asset Management Corporation v York Montague Ltd [1997] AC 191 . He regarded this as expressing a rule of policy, which led him to conclude that Mr Stojevic constituted the entire constituency whose interests the auditors were bound to protect. It followed in his opinion that there was no reason not to attribute his state of mind to the company for the purposes of the illegality defence. The second reason is that Lord Phillips's view that it was no part of the purpose of an audit report to protect the interests of current or prospective creditors was peculiarly his own. Although Lord Walker agreed with it (see para 168), the proposition was not part of his reasoning on the impact of illegality. This has proved more controversial than any other feature of the reasoning in the case: see, for example, E Ferran, "Corporate attribution and the directing mind and will" (2011) 127 LQR 239, paras 251-257. The scope of an auditor's duty and its relationship to the illegality defence may one day need to be revisited by this court, but it is not an issue in this appeal.

**Application to claims by the company against the defaulting agent**

82  The real issue in the present case is a different one. Does the illegality defence bar a claim by the company against the dishonest agent who procured the fraud, in the same way as it bars a claim by the company against an honest outsider who is said to be liable to indemnify them? In Stone & Rolls the question whether the illegality defence would have been available to Mr Stojevic to defeat an action by the company did not arise directly, but it was considered by every member of the committee. Lord Phillips did not express a concluded view. Lord Walker presumably thought that the company could not have sued Mr Stojevic, since he regarded them as co-conspirators and likened their case to an action for an account between highwaymen (paras 187-188). Lord Scott and Lord Mance thought that Mr Stojevic could not have raised the defence against the company. Since then the position as between the company and its dishonest agent has reached the Court of Appeal twice, in Safeway Stores Ltd v Twigger [2011] All ER 841 , where the illegality defence succeeded, and in the present case where it failed. The same question was considered, although it did not arise directly, by the Court of Final Appeal of Hong Kong in Moulin Global Eyecare Trading Ltd v Commissioner of Inland Revenue FACV (No 5 of 2013) (decided on 13 March 2014) , in which Lord Walker gave the leading judgment.

83  Safeway Stores was an action against a number of directors and senior employees of a supermarket group who by exchanging pricing information with competitors had caused the company to contravene section 2 of the Competition Act 1998 . Under section 36 of the Act, the company became liable to a penalty, provided that the OFT was satisfied that it had committed the infringement "intentionally or negligently". Safeway was not a one-man company, but the statutory scheme had the peculiarity, which was critical to the reasoning of the Court of Appeal, that the offence was not capable of being committed by the individuals directly responsible. The Act imposed the prohibition and the resulting penalty only on the company. It was held that this required the attribution of the infringement to the company and its non-attribution to the defendants. On that ground, it was held that to apply the breach of duty exception so as to allow recovery of the penalty from the defendants would be inconsistent with the statutory scheme. The decision is not authority for any proposition applying more generally.

84  In the present case, the Court of Appeal dealt with the question as a matter of general principle and reached a different conclusion. Patten LJ, delivering the leading judgment, considered that the answer depended on the duty which was sought to be enforced and the parties between whom the issue was raised. In an action against the company by a third party who had been defrauded, the company was responsible. But it did not follow that the company was to be treated as responsible for a fraud for the purposes of an action against the dishonest director. In such an action, the illegality defence cannot be available, whether the damages claimed arose from the liability which the company was caused to incur to a third party or from the direct abstraction of the company's assets. Patten LJ's reasoning on these points is encapsulated in paras 34 and 35 of his judgment:

> "34.  …attribution of the conduct of an agent so as to create a personal liability on the part of the company depends very much on the context in which the issue arises. In what I propose to refer to as the liability cases like El Ajou, Tan, McNicholas and Morris , reliance on the consequences to the company of attributing to it the conduct of its managers or directors is not enough to prevent attribution because, as Mummery LJ pointed out, it would prevent liability ever being imposed. As between the company and the defrauded third party, the former is not to be treated as a victim of the wrongdoing on which the third party sues but one of the perpetrators. The consequences of liability are therefore insufficient to prevent the actions of the agent being treated as those of the company. The interests of the third party who is the intended victim of the unlawful conduct take priority over the loss which the company will suffer through the actions of its own directors.

35. But, in a different context, the position of the company as victim ought to be paramount. Although the loss caused to the company by its director's conduct will be no answer to the claim against the company by the injured third party, it will and ought to have very different consequences when the company seeks to recover from the director the loss which it has suffered through his actions. In such cases the company will itself be seeking compensation by an award of damages or equitable compensation for a breach of the fiduciary duty which the director or agent owes to the company. As between it and the director, it is the victim of a legal wrong. To allow the defendant to defeat that claim by seeking to attribute to the company the unlawful conduct for which he is responsible so as to make it the company's own conduct as well would be to allow the defaulting director to rely upon his own breach of duty to defeat the operation of the provisions of sections 172 and 239 of the Companies Act whose very purpose is to protect the company against unlawful breaches of duty of this kind. For this purpose and (it should be stressed) in this context, it ought therefore not to matter whether the loss which the company seeks to recover arises out of the fraudulent conduct of its directors towards a third party (as in McNicholas and Morris ) or out of fraudulent conduct directed at the company itself which the Chancellor accepted was what is alleged in the present case. There is a breach of fiduciary duty towards the company in both cases."

Patten LJ declined to apply the sole actor principle for two reasons. First, he considered that it had no place in the context of a claim by the company against the fraudulent director, because it would be inconsistent with the duty of the directors to have regard to the interests of creditors and to the statutory restrictions on the ratification of breaches of the duty of directors. Secondly, he regarded it as having the support of only Lord Walker and Lord Brown in Stone & Rolls and did not accept that it was "now an established feature of English law for all purposes."

85 Moulin Global Eyecare Trading Ltd FACV (No 5 of 2013) was an application for judicial review of the decision of the Hong Kong Commissioner of Inland Revenue to reject a claim by Moulin for the repayment of tax overpaid in a previous years of assessment. Repayment had been claimed on the ground that the company's profits for the reference year had been fraudulently inflated by certain of its then directors. The Commissioner contended that no repayment could be claimed because the dishonesty of the directors was attributable to the company. In the Court of Final Appeal the claim failed because neither of the two provisions of the Inland Revenue Ordinance relied upon applied as a matter of construction. For present purposes, the relevant provision was section 70A which provided for the reopening of an assessment on the ground of "error". Lord Walker, with whom the majority of the court agreed, held that there was no error because for the purpose of preparing the company's tax returns, its directing mind and will consisted of the two directors who knew the facts and had deliberately falsified them. Their dishonesty was therefore to be attributed to the company. "A deliberate lie is not an 'error' for the purposes of that section." Lord Walker considered that the ordinary rules of attribution should apply unless the breach of duty exception was engaged. He resiled from the view that he had expressed in Stone & Rolls (at para 145) that the fraud exception applied generally to any issue as to a company's notice, knowledge or complicity. Reviewing the authorities in the light of the Court of Appeal's decision in the present case, he concluded that the breach of duty exception was in fact of limited application. Its rationale was to prevent the illegality defence from barring a claim by a company against its

Bilta (UK) Ltd (in Liquidation) v Nazir, 2015 WL 1786084 (2015)

own agents. He summarised the proper scope of the
exception as follows, in para 80:

> "The situation to which it most
> squarely applies (and some would
> say, the only situation to which
> it should properly be applied) is
> where a director or senior employee
> of a company seeks to rely on
> his own knowledge of his own
> fraud against the company as a
> defence to a claim by the company
> against him (or accomplices of
> his) for compensation for the loss
> inflicted by his fraud. The injustice
> and absurdity of such a defence
> is obvious, and for more than
> a century judges have had no
> hesitation in rejecting it."

It is clear that Lord Walker numbered himself among
the "some" who would say that this was the only
situation in which the fraud exception should properly
be applied. At para 106(4) of his summary, he said:

> "The underlying rationale of the
> fraud exception is to avoid the
> injustice and absurdity of directors
> or employees relying on their own
> awareness of their own wrongdoing
> as a defence to a claim against them
> by their own corporate employer."

And at para. 106(6):

> "But the exception does not apply to
> protect a company where the issue is
> whether the company is liable to a
> third party for the dishonest conduct
> of a director or employee."

86   The problem posed by the authorities is that
until the Court of Appeal's decision in this case, they
have generally treated the imputation of dishonesty
to a company as being governed by tests dependent
primarily on the nature of the company's relationship
with the dishonest agent, the result of which is then
applied universally. This was the point made by Lord
Walker in Stone & Rolls at para 145, from which he
resiled in Moulin . The fundamental point made by
the Court of Appeal in this case and the Court of
Final Appeal in Moulin is that, while the basic rules
of attribution may apply regardless of the nature of
the claim or the parties involved, the breach of duty
exception does not. I agree with this. It reflects the
fact that the rules of attribution are derived from the
law of agency, whereas the fraud exception, like the
illegality defence which it qualifies, is a rule of public
policy. Viewed as a question of public policy, there is
a fundamental difference between the case of an agent
relying on his own dishonest performance of his agency
to defeat a claim by his principal for his breach of
duty; and that of a third party who is not privy to the
fraud but is sued for negligently failing to prevent the
principal from committing it.

87   There are three situations in which the question of
attribution may arise. First, a third party may sue the
company for a wrong such as fraud which involves a
mental element. Secondly, the company may sue either
its directors for the breach of duty involved in causing it
to commit that fraud, or third parties acting in concert
with them, or (as in the present case) both. Third, the
company may sue a third party who was not involved
in the directors' breach of duty for an indemnity against
its consequences.

88   In the first situation, the illegality defence does not
arise. The company has no claim which could be barred,
but is responding to a claim by the third party. It will
be vicariously liable for any act within the course of the
relevant agent's employment, and in the great majority
of cases no question will arise of attributing the wrong,
as opposed to the liability, to the company. Where
the law requires as a condition of liability that that
the company should be personally culpable, as Lord
Nicholls appears to have assumed it did in Royal Brunei
Airlines , the sole function of attribution is to fix the
company with the state of mind of certain classes of its
agents for the purpose of making it liable. The same

is true in cases like McNicholas , involving statutory civil penalties for quasi-criminal acts. It is also true of cases like El Ajou where the relevant act (receipt of the money) was unquestionably done by the company but the law required as a condition of liability that it should have been done with knowledge of some matter. This will commonly be the case with proprietary claims, where vicarious liability is irrelevant.

89 A claim by a company against its directors, on the other hand, is the paradigm case for the application of the breach of duty exception. An agent owes fiduciary duties to his principal, which in the case of a director are statutory. It would be a remarkable paradox if the mere breach of those duties by doing an illegal act adverse to the company's interest was enough to make the duty unenforceable at the suit of the company to whom it is owed. The reason why it is wrong is that that the theory which identifies the state of mind of the company with that of its controlling directors cannot apply when the issue is whether those directors are liable to the company. The duty of which they are in breach exists for the protection of the company against the directors. The nature of the issue is therefore itself such as to prevent identification. In that situation it is in reality the dishonest directors who are relying on their own dishonesty to found a defence. The company's culpability is wholly derived from them, which is the very matter of which complaint is made.

90 This would be obvious if the company were suing the agent for a criminal or dishonest act committed against it where there was no third party involved: for example where the agent had embezzled the company's funds and made off with them. This was the situation before the Court of Appeal in Attorney-General's Reference (No 2 of 1982) [1984] 1 QB 624 , when the notion of attribution and the inference of consent were alike rejected. The position would have been no different if consent had been more than an inference, for example because the fraudsters had procured the company's express consent in their capacity as its sole directors or shareholders: see Prest v Prestodel Resources Ltd [2013] 2 AC 415 , 491. As Lord Browne-Wilkinson put it in Director of Public Prosecutions v Gomez [1993] AC 442 , 496–497,

"… it would offend both common sense and justice to hold that the very control which enables such

people to extract the company's assets constitutes a defence to a charge of theft from the company. The question in each case must be whether the extraction of the property from the company was dishonest, not whether the alleged thief has consented to his own wrongdoing."

Where the directors simply embezzle the company's funds the question of attribution arises but the illegality defence does not. There is no wrongdoing by the company. But the analysis would be precisely the same if there were. This was the position in Belmont Finance Ltd v Williams Furniture Ltd [1979] Ch 250 , where the directors' scheme for abstracting the company's assets necessarily involved a criminal contravention by the company of the Companies Act . The Court of Appeal declined to attribute knowledge of the conspiracy to the company so as to make it party to the scheme. This was because the company's claim was against the directors who had authorised the transaction. They could not raise the illegality defence by fixing the company with knowledge of their own plans, for the same reason that the defendants in Attorney-General's Reference (No 2 of 1982) could not raise the defence of consent on that basis. This is so whether the company is a one-man company or not, because the objection to the attribution of the culpable directors' state of mind to the company is that they are being sued for abusing their powers. It is the same objection whether they were one, some or all of the directors and whether or not they were also shareholders. In Belmont Finance , it was held on appeal from the judgment after trial that the directors' knowledge was not to be attributed to Belmont although the transaction was formally approved by the Board and completed under the company's seal: see [1980] 1 All ER 393, 398. If the fraudulent agent cannot raise the defence of illegality in these circumstances, the same must be true of third parties who are under an ancillary liability for participating in the fraudulent agent's wrong: co-conspirators, aiders and abetters, knowing assisters and receivers, and so on. That was the basis on which in Belmont Finance it was held that the companies who sold the Maximum shares at an overvalue and acquired

Belmont's shares were potentially liable along with the culpable directors of Belmont.

91 The position is different where the company is suing a third party who was not involved in the directors' breach of duty for an indemnity against its consequences. In the first place, the defendant in that case, although presumably in breach of his own distinct duty, is not seeking to attribute his own wrong or state of mind to the company or to rely on his breach of duty to avoid liability. Secondly, as between the company and the outside world, there is no principled reason not to identify it with its directing mind in the ordinary way. For a person, whether natural or corporate, who is culpable of fraud to say to an innocent but negligent outsider that he should have stopped him in his dishonest enterprise is as clear a case for the application of the illegality defence as one could have. Stone & Rolls was a case of just this kind. Leaving aside the admittedly important question of the scope of an auditor's duty, if the illegality defence had not applied in that case, it could only have been because (i) the company was treated in point of law as a mindless automaton, or (ii) the defence could never apply to companies even in circumstances where it would have applied to natural persons. Neither proposition is consistent with established principle.

92 The technique of applying the general rules of agency and then an exception for cases directly founded upon a breach of duty to the company is a valuable tool of analysis, but it is no more than that. Another way of putting the same point is to treat it as illustrating the broader point made by Lord Hoffmann in Meridian Global that the attribution of legal responsibility for the act of an agent depends on the purpose for which attribution is relevant. Where the purpose of attribution is to apportion responsibility between a company and its agents so as to determine their rights and liabilities to each other, the result will not necessarily be the same as it is in a case where the purpose is to apportion responsibility between the company and a third party.

93 This makes it unnecessary to address the elusive distinction between primary and secondary victimhood. That distinction could arise only if the application of the breach of duty exception depended on where the loss ultimately fell, or possibly on where the culpable directors intended it to fall. If, however, the application

of the exception depends on the nature of the duty and the parties as between whom the question arises, the only question is whether the company has suffered any loss at all.

**Application to Bilta**

94 As between Bilta and its former directors, the present action is brought to recover compensation for breach of the duties which they owed to the company. They are alleged to have broken those duties by causing it to conduct its business in a manner calculated to prevent it from meeting its obligation to account to HMRC for VAT. In particular, they are alleged to have caused the proceeds of the sales to UK purchasers, together with the VAT charged on them, to be paid out to Jetivia. Those proceeds were either the property of Bilta (in those cases where they reached Bilta's accounts), or were owed to Bilta (in those cases where they were paid by the UK purchasers directly to Jetivia). In either case, they represented assets of Bilta. Since the issue thus stated arises directly between the company and its directors, the fraud exception applies and the illegality defence cannot lie. Whether the payment out to Jetivia of funds which may represent the fruits of the fraud is truly a loss may well be a difficult question, but it is a different question which will have to be examined in the light of all the facts at a trial. It does not affect the application of the fraud exception.

95 Jetivia and Mr Brunschweiler are in no different position from the directors, since the claim against them is that they were party to the directors' misfeasance. They are said to have participated in the conspiracy to defraud Bilta, and to have knowingly assisted the directors' breach of their fiduciary duties. The claim against Jetivia for an account on the footing of knowing receipt is likewise based on an allegation of participation in the directors' misfeasance, since it is based on that company's knowledge (through Mr Brunschweiler) that the receipts represented assets of Bilta which the directors had caused to be paid to Jetivia in breach of their fiduciary duties.

96 Before leaving these questions I should briefly refer to two further arguments of the appellants. The first is that if Jetivia is liable to Bilta for conspiring with Bilta's directors, then Bilta is liable on the same basis to Jetivia for conspiring with Mr Brunschweiler against

Jetivia. The claim therefore fails for circuity. The Court of Appeal ignored this ingenious and problematical argument, and I would do so too. The facts which would be necessary to found it are not agreed or even pleaded. The second argument is that Bilta has suffered no loss because they had not been deprived of any assets that they had legitimately acquired. In the words of Lord Phillips in Stone & Rolls , at para 5, "if a person starts with nothing and never legitimately acquires anything, he cannot realistically be said to have suffered any loss". Lord Walker (para 171) agreed. These observations were, however, made with reference to the facts of that case, which had been found in great detail by Toulson J in parallel proceedings between the defrauded banks and Stone & Rolls . It is not in my opinion appropriate to examine how far they are analogous to the facts of the present case at a stage of the proceedings when those facts are far from clear.

97  For these reasons, which substantially correspond to those of the Court of Appeal and those expressed by Lord Toulson and Lord Hodge in the second part of their judgment (on attribution), I would dismiss the appeal on the illegality defence. So far as that point is concerned, this is enough to decide the present appeal.

**Policy**

98  I add to my judgment on this point only because Lord Toulson and Lord Hodge would also decide the appeal on the ground that the application of the illegality defence is inconsistent with a statutory policy requiring directors to have regard to the interests of the creditors of an insolvent or prospectively insolvent company. Since I am unwilling to follow them down that route, I should briefly explain why.

99  Given that the illegality defence is based on public policy, it is understandable that policy should have been invoked in a number of academic and judicial analyses of these problems. It is, however, important to bear in mind the proper role of policy in the law of illegality, for arguments based upon it can easily degenerate into the kind of discretionary weighing of the equities which was rejected in Tinsley v Milligan and Les Laboratoires Servier v Apotex Inc. The fact that the illegality defence is based on policy does not entitle a court to reassess the value or relevance of that policy on a case-by-case basis. In a broad sense, any rule of law which imposes

civil liability in respect of a wrong may be described as a reflection of legal policy. It does not follow that the courts may apply the illegality defence or not according to the relative importance which they attach to the policy underlying it by comparison with desirability of allowing an otherwise sound claim to succeed. This was the essential problem about the reasoning of the Court of Appeal in Les Laboratoires Servier , which explains why this court felt unable to adopt that reasoning while arriving at the same result.

100  The illegality defence is based on the subordination of private rights and liabilities to certain interests belonging to the public sphere. The underlying rationale, as I sought to explain in Les Laboratoires Servier , at paras 23 and 25, is that the rights of private parties to remedies in private law may be overridden if the claims based on them are founded on "acts which are contrary to the public law of the state and engage the public interest". These are acts which engage what in French and other civil law systems would be categorised as interests belonging to the *ordre public* or, as a writer has put it, "that part of law that is not at the free disposition of private individuals" (R de Lange, "The European Public Order", *Erasmus Law Review* 3 (2007), 11). This is why a judge, as a public officer, may be required to take a point on illegality of his own motion, contrary to the ordinary adversarial practice of the English courts. And it is why ordinary private wrongs, sounding in tort or contract, do not give rise to the illegality defence.

101  Courts normally examine the policy rationale of a rule of law in order to discover what the rule is, not in order to decide whether they approve of its application in a particular case. The scope for conflict between competing public policies is therefore limited. It is, however, implicit in the reasoning in Les Laboratoires Servier that there is one situation in which an examination of competing policies may be required, and that is where a competing public policy (as opposed to a competing legal interest) requires the imposition of civil liability notwithstanding that the claim is founded on illegal acts. A good example is a claim for damages for breach of EU or national competition law, which may in certain circumstances succeed notwithstanding that it is founded on a contract or other act which is unlawful: Case C-453/99 ECR I-6314 Crehan v Courage Ltd at paras 34, 36; Crehan v Inntrepreneur Pub Co

CPC [2004] 2 CLC 803 at paras 149-153. This is because the correction by an award of damages of the economic effects of the breach of public competition law is required in order to give effect to its purpose.

102 More recently, a somewhat similar question came before this court in a very different context in Hounga v Allen [2014] UKSC 47 . This was a claim for unlawful discrimination in relation to the claimant's dismissal. Eighteen months before her dismissal, Ms Hounga's employer had conspired with her to bring her into the United Kingdom under a false identity and had arranged for her to receive a visitor's visa for six months. The factual basis on which the appeal was argued was that "by dismissing her Mrs Allen discriminated against Miss Hounga in that on racial grounds, namely on ground of nationality, she treated Miss Hounga less favourably than she would have treated others": see para 3. It was contended that in these circumstances the claim was barred because it was founded on the illegal conspiracy. There was no doubt that the relevant illegality constituted turpitude and no issue about attribution. The question was whether the employee's unlawful entry into the United Kingdom was sufficiently connected to her dismissal. Because Ms Hounga had no right to work in the United Kingdom, her contract of employment was illegal and unenforceable. But she had a distinct cause of action for the statutory tort of discrimination: see paras 24-25. To make good that cause of action Ms Hounga did not rely, and did not need to rely on the circumstances in which she had entered into the United Kingdom, either by way of pleading or by way of evidence. They were in reality no more than background facts. The reliance test, which had been adopted in Tinsley v Milligan , is the narrowest test of connection which is consistent with the existence of an illegality test at all, and by that test, Ms Hounga would certainly have been entitled to succeed. But in Cross v Kirkby [2000] EWCA Civ 426, the Court of Appeal had suggested a wider test of connection, dependent on whether the illegal act was "inextricably bound up with" the facts on which the cause of action depended even if it was unnecessary to rely on it. This would have substantially extended the range of cases in which the illegality defence could apply. Lord Wilson (with whom Baroness Hale and Lord Kerr agreed), regarded the question whether the "inextricable connection" test applied to the facts of that case as the "bigger question": see para 41. He

answered it by holding that international conventions against human trafficking required that compensation should be available, so that the "inextricably bound up" test could not be applied in those circumstances. The court was not purporting to depart from Tinsley v Milligan without saying so. It simply recognised the case before it as one in which a competing public policy required that damages should be available even to a person who was privy to her own trafficking. Lord Hughes (with whom Lord Carnwath agreed) did not agree with the majority's construction of the relevant conventions, but agreed in the result on the ground that the illegal entry was not sufficiently closely connected with the dismissal. The result was that although the panel disagreed on the effect of the conventions, so far as the law of illegality was concerned, there was no inconsistency between their approaches. On the footing that the conventions required a right of damages to be available, the illegality defence failed on both grounds. The result of Hounga v Allen would have been exactly the same even if Ms Hounga had entered the United Kingdom legally or had done so illegally by her own unaided efforts (so that no question of trafficking arose) and the Allens had merely known of and taken advantage of that fact. In its recent decision in R (on the application of Best) v Chief Land Registrar [2015] EWCA Civ 17 , the Court of Appeal was divided on the significance of Hounga although it was able to decide the case without reference to it. Arden LJ expressed some scepticism about its significance as a statement of principle of general application. It will be apparent from what I have said that I have considerable sympathy for her approach.

103 In the present case, Lord Toulson and Lord Hodge have suggested that such a relevant countervailing public policy may be found in the rule requiring the directors of an actually or potentially insolvent company to have regard to the interests of creditors. I would prefer to leave this question open for two reasons.

104 The first is that it is not by any means clear that the duty of directors to have regard to the interests of creditors does require the imposition of civil liability notwithstanding the illegality defence. It is true that many of the central principles and detailed rules of company law are matters of public policy. They do not simply sound in private law. This is in particular true

of those rules which impose duties for the benefit of third parties, such as creditors, who are not party to the contract of incorporation. These rules include rules for the conservation of capital, and for ensuring that companies do not trade while insolvent. More generally, section 172 of the Companies Act 1972 , which includes among the general duties of directors a duty to "promote the success of the companies for the benefit of its members as a whole", treats the interests of members as corresponding to those of employees, suppliers, customers and, in certain respects the public at large. The common law goes further than this, treating the interests of an actually or prospectively insolvent company as synonymous with those of its creditors: West Mercia Safetyware v Dodd [1988] BCLC 250 . The duty to have regard to the interests of creditors is not one of the general duties of directors identified in the statute, but the common law duty is preserved by section 172(3) of the Act, notwithstanding the directors' obligation to serve the interests of members. However, it does not follow that the public policy reflected in these principles requires the imposition of civil liability on directors notwithstanding the illegality defence. One reason is that although the general duties of directors have effect notwithstanding any enactment or rule of law, by way of exception to this the company may in principle validly authorise something which would otherwise be a breach of those duties: Companies Act 2006, section 180(4) and (5) . Another is that the Companies Acts confer on the liquidator of a company in the course of winding up a wide range of statutory powers which enable effect to be given to these principles whether or not an ordinary civil action is available. These include not only provisions for misfeasance proceedings against directors and other officers, but provisions for recovering the dissipated assets of insolvent companies from third parties. These points were not fully developed in argument, and I do not think that it is desirable to resolve them on the present appeal. As presently advised, I cannot accept that sections 172 and 180 are a sufficient answer to Jetivia's reliance on the illegality defence.

105  There is, however, a more fundamental reason why I would prefer not to go down this path in the present case, which is that it is unnecessary and undesirable. This is a case about attribution. It was approached in that way in both courts below, and that seems to me to be realistic. The problem about the policy argument is

that it focuses too narrowly on the status of Mr Chopra and Mr Nazir as directors and on the insolvency of this particular company given the way in which they caused it to carry on business. In my opinion, it is perfectly clear that the illegality defence would fail even if these particular features of the facts were not present, just as in Hounga v Allen , the illegality defence would have failed even if Ms Hounga had not been trafficked. The company would be entitled to claim against Mr Chopra and Mr Nazir (and any collaborator of theirs) for their breach of duty to the company even if those gentlemen had not been directors but mere agents who happened to be the company's directing mind and will for the relevant particular purpose. It is equally clear that the company would be entitled to claim against them if it were solvent. I am unwilling to decide this case on a basis which invites distinctions between different situations which are irrelevant to the principle that we are applying. I would be extremely reluctant to see the law of illegality revert to the multiplicity of micro-topics and sub-rules which once characterised it. I agree with Lord Toulson and Lord Hodge that Occam's Razor is a valuable analytical tool, but only if it is correctly understood. *Entia non sunt multiplicanda praeter necessitatem* . Do not gratuitously multiply your postulates.

**Insolvency Act 1986, section 213**

106  This is a short point and a straightforward one.

107  Section 213 of the Insolvency Act provides:

> "(1)  If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose, the following has effect.
>
> (2)  The court, on the application of the liquidator may declare that any persons who were knowingly parties to the carrying on of the business in the manner above-mentioned are to

WESTLAW  © 2017 Thomson Reuters.

be liable to make such contributions (if any) to the company's assets as the court thinks proper."

The appellants' case is that the provision has no extraterritorial effect and therefore no application to Jetivia which is domiciled in Switzerland or Mr Brunschweiler, who is domiciled in France. In effect the submission is that in subsection (2) "any persons" means only persons in the United Kingdom. In my opinion this argument is misconceived.

108  Most codes of insolvency law contain provisions empowering the court to make orders setting aside certain classes of transactions which preceded the commencement of the liquidation and may have contributed to the company's insolvency or depleted the insolvent estate. They will usually be accompanied by powers to require those responsible to make good the loss to the estate for the benefit of creditors. Such powers have been part of the corporate insolvency law of the United Kingdom for many years. In the case of a company trading internationally, it is difficult to see how such provisions can achieve their object if their effect is confined to the United Kingdom.

109  The English court, when winding up an English company, claims world-wide jurisdiction over its assets and their proper distribution. That jurisdiction is not universally recognised, but it is recognised within the European Union by articles 3 and 16 of Council Regulation (EC) No 1346/2000 . In Schmid v Hertel [2014] 1 WLR 633, the Court of Justice of the European Union considered these articles in the context of the jurisdiction of the German courts to make orders setting aside transactions with a bankrupt. It held not only that articles 3 and 16 applied to such orders, but that member states must be treated as having power to make them notwithstanding any limitations under its domestic law on the territorial application of its courts' orders.

110  Section 213 is one of a number of discretionary powers conferred by statute on the English court to require persons to contribute to the deficiency who have dealt with a company now in liquidation in a manner which has depleted its assets. None of them have any

express limits on their territorial application. Another such provision, section 238 , which deals in similar terms with preferences and transactions at an undervalue, was held by the Court of Appeal to apply without territorial limitations in In re Paramount Airways Ltd [1993] Ch 223 . Delivering the leading judgment in that case, Sir Donald Nicholls V-C observed (i) that current patterns of cross-border business weaken the presumption against extra-territorial effect as applied to the exercise of the courts' powers in conducting the liquidation of a United Kingdom company; (ii) that the absence in the statute of any test for what would constitute presence in the United Kingdom makes it unlikely that presence there was intended to be a condition of the exercise of the power; and (iii) that the absence of a connection with the United Kingdom would be a factor in the exercise of the discretion to permit service out of the proceedings as well in the discretion whether to grant the relief, which was enough to prevent injustice. These considerations appear to me, as they did to the Chancellor and the Court of Appeal, to be unanswerable and equally applicable to section 213 .

111  I would accordingly dismiss the appeal on this point also.

Lord Toulson and Lord Hodge:

112  When the directors of a company involve it in a fraudulent transaction, is the company barred by the doctrine of illegality from suing them and their accessories for losses caused by their breach of fiduciary duty? Secondly, does section 213 of the Insolvency Act 1986 ("IA 1986"), which empowers a liquidator of a company registered in the United Kingdom to seek financial contributions from persons involved in the company's fraudulent trading, have extra-territorial effect? These questions arise on an appeal by Jetivia SA ("Jetivia") and Mr Brunschweiler against the dismissal of their applications for the summary dismissal or striking out of the claims against them.

113  Bilta (UK) Ltd ("Bilta"), a company incorporated in England, seeks through its joint liquidators, Mr Hellard and Mr Ingram, to recover damages or equitable compensation in respect of its alleged loss. As against the directors, Bilta claims damages for

conspiracy or equitable compensation for breach of fiduciary duty. The conspiracy is alleged to have been an unlawful means conspiracy, and the unlawful means are the directors' alleged breach of their fiduciary duties. As against Jetivia and Mr Brunschweiler, Bilta claims damages for conspiracy or compensation for dishonest assistance in the directors' breach of their fiduciary duties. Since the matter comes before the court on Jetivia's and Mr Brunschweiler's application for the claims against them to be summarily struck out or dismissed, it is to be assumed for present purposes that the factual allegations made in Bilta's amended particulars of claim are capable of proof, and there is no need to repeat the word "alleged" whenever referring to the defendants' conduct. The liquidators also pursue a separate claim for fraudulent trading under section 213 of IA 1986 . Jetivia is a Swiss company and Mr Brunschweiler, who is resident in France, is its sole director.

114   Bilta had two directors, Mr Nazir and Mr Chopra ("the directors"), who are the first and second defendants. Mr Chopra owned all the issued shares. Bilta was registered for the purposes of VAT. Its only trading activity, which took place between 22 April and 21 July 2009, was trading in European Emissions Trading Scheme Allowances ("EUAs"), which are commonly known as carbon credits. EUAs were treated as taxable supplies under the VAT Act 1994 until 31 July 2009. Since then they have been zero-rated. The VAT status of supplies of the EUAs at the relevant time explains Bilta's activities.

115  In short, Bilta bought large numbers of EUAs from overseas suppliers, including Jetivia, free of VAT, and sold them in the UK with VAT to companies described as "first line buffers", which immediately sold them on. The price for which Bilta sold the EUAs was lower before VAT than the price at which it bought, and Bilta was therefore never going to be in a position to meet its liabilities to HM Revenue and Customs ("HMRC"). Bilta had minimal capital and was insolvent virtually from the outset. The money payable to Bilta, including the VAT due to HMRC, was either paid to Bilta and paid on by it to its overseas supplier, or was paid by the first line buffer (or a later company in the chain) directly to Bilta's supplier, or was otherwise paid to offshore accounts. At the end of the chain the EUAs would be resold to a company outside the UK, generating a right

to a VAT refund. It is a familiar kind of carousel or missing trader fraud.

116   Bilta was insolvent throughout the period of its trading in EUAs. In that three-month period, Bilta sold more than 5.7m EUAs for about £294m. Its liability for VAT on those transactions amounts to £38,733,444. It did not submit any VAT returns to HMRC. On the application of HMRC Mr Hellard and Mr Ingram were appointed provisional liquidators of Bilta on 29 September 2009. They commenced the company's claim against the defendants who were its directors and other parties, including the appellants. The company was compulsorily wound up on 25 November 2009. The proceedings were amended on 13 October 2011 to include the liquidators' claims under section 213 of IA 1986 .

117   Patten LJ has set out the principal allegations in Bilta's particulars of claim in paras 9-14 of his impressive judgment. We can therefore summarise them very briefly. Bilta's pleaded case focuses on the injury done to it rather than to HMRC. It alleges that the appellants among others were parties to a conspiracy to defraud and injure it by depriving it of the money needed to pay its VAT liabilities and thereby rendering it insolvent. The conspirators knew that their fraudulent scheme involved the breach by Mr Nazir and Mr Chopra of their fiduciary duties as directors of Bilta. Against its directors Bilta claims compensation for breach of fiduciary duty, damages for unlawful means conspiracy and a contribution under section 213 of IA 1986 . Against the appellants Bilta alleges that they were parties to the conspiracy to defraud it, that they are liable for dishonestly assisting Mr Nazir and Mr Chopra in the breaches of their fiduciary duties to it and (under section 213 ) for carrying on its business with intent to defraud creditors.

118   On 30 July 2012 Sir Andrew Morritt, the Chancellor of the High Court, dismissed the appellants' application for summary dismissal of the claims. He held that the maxim *ex turpi causa non oritur actio* (no action may be founded on illegal or immoral conduct) was not available as a defence to Bilta's directors or the appellants and that section 213 of IA 1986 had extra-territorial effect. The Court of Appeal (the Master of the Rolls, Rimer and Patten LJJ) in a judgment dated 31 July 2013 dismissed the appellants' appeal.

119  The principal issues raised by this appeal in relation to the defence based on the maxim *ex turpi causa* are (i) the purpose of that maxim and its application in relation to Bilta's claims and (ii) the circumstances in which and mechanisms by which the knowledge of directors and other persons is attributed to a legal person such as a registered company. The other issue is whether section 213 of IA 1986 has extra-territorial effect. We deal with each in turn.

**Illlegality: ex turpi causa non oritur actio**

120   At the heart of Bilta's claims is the allegation that the directors acted in breach of their fiduciary duties to the company, in concert with others including Jetivia and its director, Mr Brunschweiler. Although the directors have played no part in the current proceedings, it is rightly accepted by the parties to the appeal that in relation to the defence of illegality there is no distinction to be drawn between the position of Jetivia and Mr Brunschweiler and that of the directors. The primary question for the court is whether Bilta's claim against the directors for breach of fiduciary duty is barred by the doctrine of illegality. If so, the claim for damages for conspiracy must equally fail, since the breach of fiduciary duty constitutes the unlawful means on which Bilta relies. And the converse also applies.

121  The appellants argue that Bilta's claims against its directors are barred by reason of the criminal nature of its conduct under their control. Its function was to serve as a vehicle for defrauding HMRC, and it is submitted that the doctrine of illegality bars it from suing the directors who caused its participation in the scheme, and their co-conspirators, as a means of recovering the company's loss for the benefit of the company's creditors.

122  In any case where the defence of illegality is raised, it is necessary to begin by considering the nature of the particular claim brought by the particular claimant and the relationship between the parties. So we start with the nature of the directors' duty to Bilta.

123  It is well established that the fiduciary duties of a director of a company which is insolvent or bordering on insolvency differ from the duties of a company which is able to meet its liabilities, because in the case of

the former the director's duty towards the company requires him to have proper regard for the interest of its creditors and prospective creditors. The principle and the reasons for it were set out with great clarity by Street CJ in Kinsella v Russell Kinsela Pty Ltd (in liquidation) (1986) 4 NSWR 722 , 730:

> "In a solvent company the proprietary interests of the shareholders entitle them as the general body to be regarded as the company when questions of the duty of directors arise. If, as a general body, they authorise or ratify a particular action of the directors, there can be no challenge to the validity of what the directors have done. But where a company is insolvent the interests of the creditors intrude. They become prospectively entitled, through the mechanism of liquidation, to displace the power of the shareholders and directors to deal with the company's assets. It is in a practical sense their assets and not the shareholders' assets that, through the medium of the company, are under the management of the directors pending either liquidation, return to solvency, or the imposition of some alternative administration."

124  This passage was cited with approval by Dillon LJ in West Mercia Safetywear v Dodd [1988] BCLC 250 , 252–253. The principle now has statutory recognition in the Companies Act 2006 . In Part 10, Chapter 2 of the Act, concerning the general duties of directors, section 172 provides:

> "(1)  A director of a company must act in the way he considers, in good faith, would be most likely to promote the success of the company

for the benefit of its members as a whole…

…

(3) The duty imposed by this section has effect subject to any enactment or rule of law requiring directors, in certain circumstances, to consider or act in the interests of creditors of the company."

125 Section 180 (5) provides that the general duties under the Act have effect (except as otherwise provided or the context otherwise requires) notwithstanding any enactment or rule of law. A director of an insolvent company is not directly a fiduciary agent of the creditors and cannot be sued by an individual creditor for breach of the fiduciary duty owed by the director to the company ( Yukong Line Ltd v Rendsburg Investments Corporation (No 2) [1998] 1 WLR 294 ).

126 Instead, the protection which the law gives to the creditors of an insolvent company while it remains under the directors' management is through the medium of the directors' fiduciary duty to the company, whose interests are not to be treated as synonymous with those of the shareholders but rather as embracing those of the creditors.

127 Such protection would be empty if it could not be enforced. To give effect to it, this action is brought by the liquidators in the name of the company to recover, for the benefit of the creditors, the loss caused to the company by the directors' breach of their fiduciary duty.

128 It is argued on behalf of the appellants that it would offend against the doctrine of illegality for the claim to succeed. It is said that the fact that the errant directors were in sole control of the company makes it unlawful for the company to enforce their fiduciary duty towards it. If this were the law, it would truly deserve Mr Bumble's epithet – "a ass, a idiot". For it would make a nonsense of the principle which the law has developed for the protection of the creditors of an insolvent company by requiring the directors to act in good faith with proper regard for their interests.

129 It has been stated many times that the doctrine of illegality has been developed by the courts on the ground of public policy. The context is always important. In the present case the public interest which underlies the duty that the directors of an insolvent company owe for the protection of the interests of the company's creditors, through the instrumentality of the directors' fiduciary duty to the company, requires axiomatically that the law should not place obstacles in the way of its enforcement. To allow the directors to escape liability for breach of their fiduciary duty on the ground that they were in control of the company would undermine the duty in the very circumstances in which it is required. It would not promote the integrity and effectiveness of the law, but would have the reverse effect. The fact that they were in sole control of the company and in a position to act solely for their own benefit at the expense of the creditors, makes it more, not less, important that their legal duty for the protection of the interests of the creditors should be capable of enforcement by the liquidators on behalf of the company.

130 For that reason in our judgment this appeal falls to be dismissed. The courts would defeat the very object of the rule of law which we have identified, and would be acting contrary to the purpose and terms of sections 172(3) and 180(5) of the Companies Act , if they permitted the directors of an insolvent company to escape responsibility for breach of their fiduciary duty in relation to the interests of the creditors, by raising a defence of illegality to an action brought by the liquidators to recover, for the benefit of those creditors, the loss caused to the company by their breach of fiduciary duty. In everyday language, the purpose of the inclusion of the creditors' interests within the scope of the fiduciary duty of the directors of an insolvent company towards the company is so that the directors should not be off the hook if they act in disregard of the creditors' interests. It would be contradictory, and contrary to the public interest, if in such circumstances their control of the company should provide a means for them to be let off the hook on the ground that their illegality tainted the liquidators' claim.

131   There would be much to say for ending this judgment at this point, except that it would be wrong not to identify the principal counter arguments and show that we have considered them. There is an attendant risk, in going on at further length, of losing sight of the simple and central point that the defence of illegality would undermine the rule of law, reinforced by Act of Parliament, which exists for the protection of those for whose benefit the action is brought, namely the creditors who have a right to such assets as the liquidators may recover in the name of the company. We see no need, for example, to get into the subject of attribution and the Hampshire Land principle in order to decide the appeal, but in discussing it (as we do below) we hope by the end to achieve some simplicity and clarity.

132   We turn to the question whether any authorities present an impediment to this approach and whether they require reconsideration.

133   Mr Alan Maclean QC's primary submission was that it follows from the decision of the House of Lords in Stone & Rolls Ltd v Moore Stephens [2009] UKHL 39, [2009] 1 AC 1391 that Bilta's claims are barred by the doctrine of illegality by reason of its being a "one-man company" which engaged in deliberate fraud.

134   Stone & Rolls has been a much debated and much criticised case. A lot of the criticism stems from the fact that there were five judgments running to nearly 100 pages, the judges were divided three to two, and differing reasons were given by the majority. The claim was by a company in liquidation against the firm of chartered accountants, who had acted as its auditors, for negligence and breach of contract in failing to detect and report that the company's business consisted mainly of defrauding banks (by obtaining credit through presenting false documents purportedly relating to commodity trading which was fictitious). The company was under the complete control of a Mr Stojevic. When the bank which was the principal victim discovered the fraud it sued the company and Mr Stojevic and obtained judgment for over $90m. The judgment was unpaid, the company was put into liquidation and it brought proceedings through the liquidators against the accountants for the benefit of the creditors. Negligence was admitted, but the accountants applied successfully to strike out the action on the ground of illegality. The shares in the company were held by an Isle of Man company, whose shareholders were nominee companies acting under a trust. In the proceedings brought by the bank Mr Stojevic was evasive about the beneficial interest behind the trust, although he acknowledged that he had a beneficial interest in the company, and there was no evidence to suggest that any innocent person had a share in it. All but one of the House of Lords (Lord Scott) proceeded on the basis that the company was Mr Stojevic's company in the fullest sense.

135   The opinions of the majority (Lords Phillips, Walker and Brown), although differently expressed in various ways, have in common that they identified two features which were critical to their analysis. One concerned the scope of the accountants' duty. The other was the fact that no one who had any part in the ownership or management of the company was unaware of the fraud which the accountants failed to detect and report. Put shortly, the majority (in disagreement with Lord Mance) held that the accountants owed no contractual or tortious duty of care in respect of the interests of the creditors, notwithstanding that the company's solvency depended on the fraud being undetected. Their sole duty was to report to the company the matters which the directors and shareholders ought to know for the purpose of making informed decisions. If those people were already aware of and complicit in the fraud, that fact provided a complete barrier to the claim. Lord Phillips was explicit that the case turned critically on whether the auditor's duty extended to protecting those for whose benefit the claim was brought. He also observed that one fundamental proposition appeared to him to underlie the reasoning of Lord Walker and Lord Brown – that the duty owed by an auditor to the company was for the benefit of the interests of the shareholders, but not those of the creditors – and that here lay the critical point of difference of opinion between them and Lord Mance (para 68).

136  While it would shorten this judgment considerably if we were to say simply that the present case is plainly distinguishable from Stone & Rolls on its facts, since this case concerns directors who unquestionably owed duties for the protection of the interests of the creditors (unlike the auditor, according to the opinions of the majority in Stone & Rolls ), the case has caused so much

difficulty that it would be wrong for us to leave it there. It is therefore necessary to analyse the judgments in closer detail before expressing our final view about its status.

137 Lord Phillips summarised his conclusions (para 18) before developing his analysis. He said that those for whose benefit the claim was brought (the creditors) fell outside the scope of any duty owed by the accountants; and that the sole person for whose benefit the accountants' duty was owed (Mr Stojevic, who owned and ran the company) was himself the person responsible for the fraud. In those circumstances he said that *ex turpi causa* afforded a defence.

138 Lord Phillips made some comments about the law of illegality and the decision of the House of Lords in Tinsley v Milligan [1994] 1 AC 340 . He rejected the idea that Tinsley v Milligan laid down a universal test of *ex turpi causa* . It was concerned with the effect of illegality on title to property. It established that once title had passed, it could not be attacked on the basis that it passed pursuant to an illegal transaction. If title could be asserted without reliance on the illegality, the defendant could not rely on illegality to defeat the title (para 21). But he did not believe that it was right to proceed generally on the basis that the reliance test could automatically be applied as a rule of thumb, because it was necessary to consider the policy underlying the *ex turpi causa* maxim in order to decide whether the defence was bound to defeat the claim (para 25).

139 Lord Phillips said that the underlying policy in relation to contractual obligations could be divided into two principles: the court will not enforce a contract which is expressly or impliedly forbidden by statute or is entered into with the intention of committing an illegal act; and the court will not assist a claimant to recover a benefit from his own wrongdoing. In the instant case the claim is not brought for the benefit of the shareholder/directors, but for the benefit of the defrauded creditors for whose benefit the relevant duty was owed. Whereas in Stone & Rolls no such duty was owed for the benefit of the creditors, in this case it was. On Lord Phillips' analysis of Tinsley v Milligan there is no inconsistency between that decision and the reasons which we have given for dismissing this appeal.

140 Lord Phillips considered the consequences of the primary argument advanced by the accountants in a case where the company carried on a legitimate business and had honest shareholders, but the person who was in charge of running it ("its directing mind and will") involved it in fraudulent trading, which its auditors negligently failed to discover and report. In such circumstances any claim by the company for the benefit of the shareholders, whose interests the auditors should have protected, would according to the accountants' argument be barred by the very wrongdoing which the auditors' negligence had allowed to occur (paras 29-30). Lord Phillips did not accept that if Stone & Rolls had been a company with independent shareholders, which had been "high-jacked" by Mr Stojevic, its claim would necessarily have been defeated by reason of the reliance test or the underlying principle of public policy (para 63).

141 Lord Phillips considered that where a company's complaint was that its directing mind and will had infected it with turpitude, if *ex turpi causa* was not to apply, "the reason should simply be that the public policy underlying it does not require its application" (para 60). That would be a very easy conclusion where all the shareholders were innocent (para 61). He considered that the situation would be more problematic if some shareholders were innocent and some were not, but it was not necessary for the court to solve that problem in the case of Stone & Rolls , because it had no innocent shareholders. In short, whether *ex turpi causa* applied was dependent on identifying the underlying public policy and on identifying for whose benefit the action was being brought.

142 In Stone & Rolls (as in the present case) there was a good deal of argument about "attribution" and the application of the so-called Hampshire Land principle ( In re Hampshire Land Co [1896] 2 Ch 743) , but in a passage which is important to Lord Phillips' analysis he said that the real issue was not whether the fraud should be attributed to the company but whether *ex turpi causa* should defeat the company's claim for breach of the auditor's duty, and that this depended critically on whether the scope of the auditor's duty extended to protecting those for whose benefit the claim was brought (para 67).

WESTLAW    © 2017 Thomson Reuters.

143 Lord Phillips proceeded to examine that issue and he concluded that the accountants owed no duty for the protection of the company's creditors. (That, of course, places them in stark contrast with the directors of an insolvent company.) In examining that question Lord Phillips cited with approval the decision of Hobhouse J in Berg, Sons & Co Ltd v Mervyn Hampton Adams (1992) [2002] Lloyd's Rep PN 41 . That was also a claim by a company in liquidation, brought for the benefit of its creditors (banks and discount houses), against a firm of chartered accountants which had acted as the company's auditors. The company operated under the sole control of a Mr Golechha, who was the beneficial owner of its entire share capital. The accountants were found to have acted with lack of proper skill in accepting too readily assurances given to them by Mr Golechha about the recoverability of certain debts owed to the company. The judge found that the auditors ought to have qualified the company's accounts. At the relevant time the company was not insolvent, but it was accepted (as indeed the accountants had said in a letter to Mr Golechha) that it was foreseeable that the company's bankers and discount houses with whom it did business might place some reliance on its audited accounts. The company asserted, but did not prove, that Mr Golechha's conduct had been fraudulent. The claim failed on various grounds, including reasons directly comparable to the position in Stone & Rolls .

144   Lord Phillips quoted (paras 78 and 79) the following passages from Hobhouse J's judgment:

> "It follows [from the decision of the House of Lords in Caparo Industries Plc v Dickman [1990] 2 AC 605] that the purpose of the statutory audit is to provide a mechanism to enable those having a proprietary interest in the company or being concerned with its management or control to have access to accurate financial information about the company. Provided that those persons have that information, the statutory purpose is exhausted. What those persons do with the information is a matter for them and falls outside the scope of the statutory purpose. In the present case the first plaintiffs

have based their case not upon any lack of information on the part of Mr Golechha but rather upon the opportunity that the possession of the auditor's certificate is said to have given for the company to continue to carry on business and to borrow money from third parties. Such matters do not fall within the scope of the duty of the statutory auditor."

…

> "However one identifies the company, whether it is the head management, or the company in general meeting, it was not misled and no fraud was practised on it. This is a simple and unsurprising consequence of the fact that every physical manifestation of the company Berg was Mr Golechha himself. Any company must in the last resort, if it is to allege that it was fraudulently misled, be able to point to some natural person who was misled by the fraud. This the plaintiffs cannot do."

145   Lord Phillips observed that this comment demonstrated that Hampshire Land had no application to the facts of that case, but that it also had wider implications (para 80). It supported the proposition that the law could not rationally hold the auditor liable when the entire shareholder body and the entire management was embodied in a single individual who knew everything because he had done everything. The passages set out above correspond with and support the twin factors to which we have referred (para 26) as central to the reasoning of the majority – the limited nature of the auditors' duty, and the knowledge of everyone involved in the ownership and management of the company about the matters which the auditors

failed to discover and report to them. Lord Phillips returned to those points at the end of his judgment (para 86).

146    Lord Walker concluded that he would apply what he referred to as the "sole actor" principle to a claim made against its former auditors by a company in liquidation, where the company was a one-man company engaged in fraud, and the auditors were accused of negligence in failing to call a halt to the fraud (para 168). He defined what he meant by a one-man company, by reference to what Hobhouse J had said in Berg v Adams , as "a company which has no individual concerned in its management and ownership other than those who are, or must (because of their reckless indifference) be taken to be, aware of the fraud or breach of duty with which the court is concerned" (para 161). He cited Berg v Adams as a clear case of a one-man company, which did not involve fraud, but in which every physical manifestation of the company was Mr Golechha himself who knew all about the irrecoverable loans; and there is a clear echo of Hobhouse J's judgment in Lord Walker's explanation for rejecting Stone & Rolls' claim (para 168). He said that any duty of care owed by the auditors was to the company as a whole, not to current or prospective creditors, and that there was no protection which the auditors could give to the company if the only human embodiment of the company knew all about its fraudulent activities.

147    Lord Walker's judgment was a great deal more detailed than that summary, because he considered the various arguments advanced by the company, but his critical reasoning was that the auditors were in a very different position from the company's directors (para 190), their duty of care was limited in the way that he identified, and the company's sole actor knew all that was to be known.

148    Lord Brown agreed with Lord Walker. He said that the claim against the accountants ran diametrically counter to the principles established in Caparo and was difficult to reconcile with Hobhouse J's decision in Berg v Adams (para 202). In that case (see para 144 above) Hobhouse J had said that the claim against the accountants was based on the opportunity which possession of the auditor's certificate was said to have given for the company to continue to carry on business

and borrow money, but such matters did not fall within the scope of the auditor's duty. Similarly, said Lord Brown, the assumed negligence of the accountants had enabled the company to continue to carry on business, in this case stealing rather than borrowing from third parties.

149    What divided the minority (Lords Scott and Mance) from the majority is that they took a different view about the classes of parties in respect of whose interests the auditors owed a duty of care. They both regarded the insolvency of the company as critical, but Lord Mance set out his reasoning more fully. He held that just as a director's fiduciary duty to a company which is insolvent or bordering on insolvency embraces a duty to the company's creditors, a parallel principle applied to the auditor, so that the duty of care owed by an auditor to such a company embraced a duty to have regard to the interests of the creditors. He distinguished Berg v Adams because in that case the company was solvent at each audit date (paras 260 and 265). He said that the fact that Stone & Rolls was insolvent at each audit date was critical. He defined the issue as being whether the auditors' duty to the company extended, like the directors', beyond the protection of the interests of shareholders in a situation where the auditors ought to have detected the company's insolvency. He observed that the centrality of this issue may have been obscured by the spread of argument over other issues (para 265). He considered that it was not inconsistent with Caparo to hold that the company was entitled to pursue a claim against the auditors for loss resulting from its breach of its duty in failing to detect that the company was subject to a continuing fraudulent scheme in circumstances in which it was insolvent (paras 269-271).

150    Lord Scott emphasised the public policy foundation of the doctrine of illegality. For this reason he differentiated between an action for damages for breach of the auditors' duty of care brought by a solvent company and a similar action brought by an insolvent company. If the company had remained solvent, an action against the auditors which would have enabled Mr Stojevic to benefit from any damages would have offended the *ex turpi causa* rule. But the company was insolvent and there was no possibility of Mr Stojevic benefitting from any damages recoverable from the accountants. There was therefore no public policy reason to bar an action against the auditors based on

Bilta (UK) Ltd (in Liquidation) v Nazir, 2015 WL 1786084 (2015)

their breach of duty. "The wielding of a rule of public policy" he said, "in circumstances where public policy is not engaged constitutes, in my respectful opinion, bad jurisprudence" (paras 119-122).

151    Critics of Stone & Rolls for being over long and diffuse have a fair point, and commentators and practitioners have found the case difficult. Lord Walker himself commented in Moulin Global Eyecare Trading Ltd (in liquidation) v The Commissioner of Inland Revenue, HKFCA, final Appeal (No 5 of 2013) (Civil), 13 March 2014 , that it is difficult to extract a clear ratio from the speeches of the majority, and he praised the Court of Appeal in the present case for achieving a welcome clarification of the law (paras 100 and 106). We have endeavoured to apply Occam's razor in concentrating on the critical features of the case: the scope of the auditors' duty and the inability of the company to show that anyone who had any part in the ownership or management of the company was misled by the auditors' negligence, which was a prerequisite for the company's claim to succeed.

152    Much of the difficulty of Stone & Rolls is that the treatment of the issues was more roundabout, for example with much discussion of principles of attribution. We have already referred to the fact that Lord Phillips considered that the real issue was not about attribution, but about the scope of the auditors' duty, and to Lord Mance's comment that the centrality of this issue had been obscured by the spread of argument over other issues. The centrality of the point was further emphasised by the parallel with Berg v Adams which each of the majority drew in their judgments. That parallel had nothing to do with the fraudulent nature of Stone & Rolls' business. The restricted nature of the auditors' duty and the knowledge of those in charge of the company had the same significance whether the nature of the business was fraudulent ( Stone & Rolls ) or not ( Berg v Adams ). Likewise, Lord Mance's ground for distinguishing Berg v Adams had nothing to do with whether the business was lawful or fraudulent. Lord Mance distinguished Hobhouse J's decision because the insolvency of Stone & Rolls at the time of the statutory audits made all the difference in his view to the scope of the auditors' duty. We are not of course concerned in this case to revisit the point of disagreement between Lord Mance and the majority on that question. The finding that all

whose interests were the subject of the auditors' duty of care knew the facts which the auditors failed to detect was dispositive. The conclusion of the majority that the claim was therefore barred by illegality may be seen as a reflection upon the illegal nature of the conduct as a matter of fact and perhaps a perceived need to bring their conclusion within the scope of the issues as argued, but it was not the illegality which on a proper analysis of their reasoning drove the conclusion. As Lord Phillips observed, the fundamental proposition which underlay the reasoning of Lord Walker, Lord Brown and himself was that the auditors owed no duty for the benefit of those for whose benefit the claim was brought. It necessarily followed that the claim should be struck out.

153 Lord Sumption analyses the case differently. There is no disguising the fact that serious difficulties arise from the different ways in which the majority expressed themselves. The Law Commission in its report on The Illegality Defence (2010) Law Com 320, commented at para 3(32):

> "It is difficult to anticipate what precedent, if any, Stone & Rolls will set regarding the illegality defence. Though there was a majority verdict, there was no majority reasoning, with all their Lordships reaching different conclusions on how the defence should be applied."

154 We conclude that Stone & Rolls should be regarded as a case which has no majority ratio decidendi. It stands as authority for the point which it decided, namely that on the facts of that case no claim lay against the auditors, but nothing more.

155    Stone & Rolls in any event does not support Mr Maclean's primary submission that in the present case Bilta's claims are barred because it was a one-man company. The duty of the directors was significantly different from the duty of the statutory auditors, and Stone & Rolls' attempt to compare the two was rejected by the majority (see, for example, Lord Walker at para 190), although it found favour with Lord Mance. The fact that Stone & Rolls was a one-man company

was relevant because it meant that the company was unable to point to anyone involved in the ownership or management of the company who was adversely affected by the accountants' failure to discover what that one man had concealed from it. But it does not follow that the person in charge of a one-man company can never be liable for any form of wrongdoing towards the company. As Lord Mance pointed out in Stone & Rolls (para 230), the controller of a one-man company who dishonestly strips its assets is guilty of theft from the company ( Attorney-General's Reference (No 2 of 1982) [1984] QB 624 ). If the majority had agreed with Lord Mance's view as to the scope of the auditors' duty, it is plain from their reasoning that they would not have struck out the action, albeit that it was a one-man company and its activities were fraudulent. They saw the claim as an attempt to get around Caparo , whereas Lord Mance saw no conflict with Caparo .

156  Mr Maclean also relied on the decision of the Court of Appeal in Safeway Stores Ltd v Twigger [2010] EWCA Civ 1472, [2011] 2 All ER 841 . The issue was whether a company could recover the amount of financial penalties imposed on it by the Office of Fair Trading, for anti-competitive activity in contravention of the Competition Act 1998 , from the directors or employees who were responsible for the illegal activity in breach of their contractual and fiduciary duties to the company. The court held that the claim was barred by the illegality principle.

157  The leading judgment was given by Longmore LJ. His reasoning was as follows:

> • i)  The company's liability to the OFT was not a vicarious liability for the wrongful conduct of its directors or employees, because the Competition Act did not impose any liability on the directors or employees for which the company could be held vicariously responsible. The liability under the Act was imposed on the company itself, which acted (as any company must) through agents.
> • ii)  The liability was therefore the "personal" liability of the company, so that its claim against the directors and employees was based on its own wrongdoing.
> • iii)  Its claim was therefore barred by illegality.
> • iv)  It was not open to the company to argue that it was a victim of the directors' and employees'

misconduct, and to rely on the Hampshire Land principle, because the statutory scheme imposed responsibility on the company.
> • v)  It was unnecessary to consider the position if the company's liability had been strict, because the OFT could only impose a penalty under the Competition Act if the infringement had been committed intentionally or negligently by the company.

158  If that reasoning is sound, it would support Mr Maclean's argument that the doctrine of illegality should apply in the present case, although this would have nothing to do with Bilta being a one-man company.

159  We disagree with the reasoning. We have been greatly helped by the analysis provided by Professor Watts in a characteristically lucid article, Illegality and agency law: authorising illegal action [2011] JBL 213 .

160  Safeway's direct liability (or "personal" liability in the words of the Court of Appeal) under the Competition Act arose through the acts of its directors and employees as its agents, but should the company therefore be denied the right to hold its errant directors and employees to account? We agree with Professor Watts' proposition that

> "… it simply does not follow that because under the law of agency a principal becomes directly a party to an illegal agreement as a result of its agents' acts, it is thereby to be deprived of its rights under separate contracts, not otherwise illegal, with its employees and other agents to act in its interests and to exercise due care and skill. Indeed, it would not follow even if the 1998 Act *were* found to have invoked some sui juris concept of direct liability other than the law of agency.
>
> In the absence of some countervailing policy reason, it is not just for someone who falls foul

of a statute by reason of the acts of its employees or other agents to add to its burdens and disabilities by depriving it of any recourse against those employees or other agents."

161 Unless there are special circumstances, the innocent shareholders should not be made to suffer twice. The reasoning in Safeway , if taken to its logical conclusion, would also mean that the company could not lawfully dismiss the errant employees or directors; for to rely on their misconduct would be to rely on its own misconduct, as Professor Watts has observed. It might be argued that unfair dismissal is different, but that could only be on public policy grounds.

162 Reference to public policy takes us to the only basis on which we consider that the decision of the Court of Appeal in Safeway may have been justified. Pill LJ considered that the policy of the Competition Act would be undermined if undertakings were able to pass on their liability to their employees. That may have been a sound reason for striking out Safeway's claims, and we express no view as to the merits of the decision. We accept that there may be circumstances where the nature of a statutory code, and the need to ensure its effectiveness, may provide a policy reason for not permitting a company to pursue a claim of the kind brought in Safeway .

163 In Bowman v Secular Society Ltd [1917] AC 406 the House of Lords established the principle that the illegality of a company's objects does not make its existence invalid in law. Put broadly, a company has the same power to act illegally as an individual. Lord Parker of Waddington also stated at 439:

"[I]f the directors of the society applied its funds for an illegal object, they would be guilty of misfeasance and liable to replace the money, even if the object for which the money had been applied were expressly authorised by the memorandum."

164 That is a generalisation. It would be harsh on directors if the law were to impose strict liability, and to do so would exceed the general duties of directors set out in the Companies Act . But the reasoning of Longmore LJ would negate the company's right of recourse against the director who acted in breach of his fiduciary duty if his conduct as its agent was such as to give rise to a direct liability of the company to a third party. That would be inconsistent with the dictum of Lord Parker and contrary to ordinary principles of agency. As we have said, where the liability arises under a statute, there may in some circumstances be cause to conclude that the statutory scheme would be undermined by allowing the principal to enforce its ordinary right of recourse against its agent, but that would be a departure from ordinary rules of agency based on the specific nature of the statutory scheme and the requirements of public policy arising from it.

165 Brink's Mat Ltd v Noye [1991] 1 Bank LR 68 provides an illustration of the application of Lord Parker's dictum. The proceeds of the theft of gold bullion from a warehouse owned by the plaintiffs were laundered through the bank account of a company called Scadlynn Ltd with Barclays Bank. The directors and sole shareholders of Scadlynn were signatories of the account and drew cheques on it for cash totalling nearly £8m over four months. The plaintiffs sought to enforce rights which Scadlynn was said to possess against the bank in consequence of the payments out of its account. The issue before the Court of Appeal (Mustill and Nicholls LJJ and Sir Roualeyn Cumming-Bruce) was whether the pleading should be permitted. This raised the question, among others, whether it was open to Scadlynn to sue the bank in respect of withdrawals made or authorised by the company's sole directors and shareholders. The court held that there was no reason why Scadlynn, which was being put into compulsory liquidation, should be prevented from enforcing such a claim for the benefit of the creditors who would look to the assets for the satisfaction of their debts. Nicholls LJ described the existence of the directors' fiduciary duties to the company as a means by which the law sought to protect the company's creditors. In that context, Mustill LJ rightly described Scadlyn as being an intended victim of arrangements intended

dishonestly to deprive it of a large part of its assets and Nicholls LJ agreed with him.

166 Mr Maclean submitted that there was no scope for applying the Hampshire Land principle (so as not to attribute the directors' conduct to Bilta because they were acting in fraud of the company) in the circumstances that Bilta is a one-man company and in any event that Bilta's role in the fraud was that of villain and not victim. The argument proceeds on the false premise that Bilta's role must be characterised in the same way both as between Bilta and HMRC and as between the company and its directors; and that the attribution of the fraud to the company for the first purpose applies equally when considering the second. We do not consider the question of attribution to be the real issue in this case. The real issue is simpler: whether it is contrary to public policy that the company, through the liquidators, should enforce for the benefit of its creditors the duty which the directors owed for the protection of the creditors' interests as part of their fiduciary duty to the company. In this respect we echo Lord Phillips' observation in Stone & Rolls (para 67) that the real issue was not whether the fraud should be attributed to the company, but whether *ex turpi causa* should defeat the company's claim for breach of the auditors' duty. This, as he said, depends critically on whether the scope of that duty extends to protecting those for whose benefit the claim was brought. The answer to that question in the present case is clear. The directors' fiduciary duty to the company did extend to protecting the interests of those for whose benefit the claim is brought. However, because the issue of attribution loomed large in the course of argument (as it did in Stone & Rolls ), and because the topic has caused a fair amount of confusion, we address it below in the hope of providing some clarification.

167 Mr Maclean further submitted that Bilta's claims fall within the illegality principle because the claims are inextricably linked with, and it is relying on, its own dishonest actions. The flaw in this argument is that when a company is insolvent or on the border of insolvency its interests are not equated solely with the proprietary interests of its owners. Company law requires that the interests of creditors receive proper consideration by the shareholders and directors. Although the creditors are not shareholders, as creditors they are recognised at that point as having

a form of stakeholding in, or being a constituency of, the company which is under the management of the directors, and their interests are to be protected at law through the directors' fiduciary duty to the company, which encompasses proper regard for the creditors' interests. It is therefore misleading to say that when the company, through the liquidators, brings an action against the directors for breach of that duty, the company (whose interests *ex hypothesi* include the interests of those for whose benefit the duty is owed and the action is brought) is claiming in respect of "its" dishonest actions.

168 The argument about reliance harks back to Tinsley v Milligan . We have referred (at para 138) to Lord Phillips' treatment of that case in Stone & Rolls and to his statement that whether *ex turpi causa* should apply should depend on whether the public policy underlying it required its application. Tinsley v Milligan sparked a debate which has continued ever since then. This is not surprising because the judges in that case themselves considered the law to be very unsatisfactory, but they were of the opinion that it was beyond judicial reform, although it was based on public interest and was a common law doctrine. Lord Goff referred to the New Zealand Illegal Contracts Act 1970 , which provides that the court may deal with an illegal contract "howsoever as the court in its discretion thinks just". He suggested that there should be a full inquiry, and said that he would be more than happy if a new system could be evolved which was satisfactory in its effect and capable of avoiding indiscriminate results.

169 The Law Commission studied the subject over many years with wide consultation. It did not recommend that the court should have an open ended discretion. However, it agreed with the great majority of consultees and commentators that the law was in an unsatisfactory state if, in the words of Lord Browne-Wilkinson in Tinsley v Milligan , "The effect of illegality is not substantive but procedural". The objections were well expressed by McHugh J in the High Court of Australia in Nelson v Nelson (1995) 184 CLR 538 , 609 (and many others have written or spoken in similar vein):

> "The [reliance] rule has no regard to the legal and equitable rights of the parties, the merits of the

case, the effect of the transaction in undermining the policy of the relevant legislation or the question whether the sanctions imposed by the legislation sufficiently protect the purpose of the legislation. Regard is had only to the procedural issue; and it is that issue and not the policy of the legislation or the merits of the parties which determines the outcome. Basing the grant of legal remedies on an essentially procedural criterion which has nothing to do with the equitable positions of the parties or the policy of the legislation is unsatisfactory, particularly when implementing a doctrine which is founded on public policy."

The Law Commission did not recommend that the solution should be statutory. Its reason or primary reason was not the difficulty of obtaining Parliamentary time for law reform, although that has been a serious problem. Its study of various possible legislative models did not result in it finding an altogether satisfactory version, but there also appeared to the Commission to be signs of fresh judicial thinking since Tinsley v Milligan . It considered that judicial reform was the best way forward and it made recommendations to that end. The Commission suggested that it was within the power of the courts to develop the law in a way which was neither simply discretionary nor arbitrary and indiscriminate, but which had regard to the underlying public policies, and its recommendations were intended to assist the courts in that direction.

170 In Gray v Thames Trains Ltd [2009] AC 1339 , para 30, Lord Hoffmann said that the doctrine is founded not on a single rationale but number of policy objectives. His observation was echoed by Lord Phillips in Stone & Rolls (at para 25). We have given our reasons for saying that application of the doctrine in the present context would undermine the purpose and relevant provisions of the Companies Act for the protection of the creditors of insolvent companies through the duty imposed on the directors towards the company.

171 There may be cases which are less clear cut where there are public policy arguments which pull in opposite directions. Hounga v Allen [2014] UKSC 47, [2014] 1 WLR 2889 was such a case. The claimant was a victim of unlawful discrimination occurring within the context of a contract of employment, which was contrary to the terms on which the claimant had been permitted to enter the United Kingdom. Lord Wilson, giving the judgment of the majority, adopted Lord Phillips' statement in Stone & Rolls that the reliance test was not to be applied automatically but that it was necessary to consider the policy underlying *ex turpi causa* in order to decide whether it should defeat the claim. He referred next to the test of inextricable link and said that he would conclude that the link was missing. But he did not consider that to be the determining question for reasons which he set out in the critical part of his judgment under the heading "Public policy". He said (para 42):

> "The defence of illegality rests upon the foundation of public policy … 'Rules which rest upon the foundation of public policy, not being rules which belong to the fixed or customary law, are capable, on proper occasion, of expansion or modification': Maxim Nordenfelt Guns and Ammunition Co v Nordenfelt [1893] 1 Ch 630 , 661 (Bowen LJ). So it is necessary, first, to ask 'What is the aspect of public policy which founds the defence?' and, second, to ask 'But is there another aspect of public policy to which application of the defence would run counter?'"

172 Lord Wilson examined what, if any, considerations of public policy underlying the doctrine of illegality, in particular the importance of preserving the integrity of the legal system (highlighted by McLachlin J in Hall v Hebert [1993] 2 SCR 159) , militated in favour of applying the defence to defeat Miss Hounga's claim, and he judged them scarcely to exist. He considered next the second question which he had posed in para

42. He concluded that there was an important aspect of public policy to which application of the defence would run counter, namely the protection of victims of trafficking, about which the United Kingdom was party to a European Convention . Lord Wilson described as fanciful the idea that an award of compensation to the claimant would give the appearance of encouraging others to enter into illegal contracts of employment, whereas its refusal might engender a belief among employers that they could discriminate against such employees with impunity (para 44), and he said that to uphold the defence of illegality would run strikingly counter to the prominent strain of current public policy against trafficking and in favour of protection of its victims (para 52). He concluded his judgment by saying:

> "The public policy in support of the application of that defence, to the extent that it exists at all, should give way to the public policy to which its application is an affront."

173 Lord Sumption says that the illegality defence is not dependent on a judicial value judgment about the balance of the equities in each case, and he cites Tinsley v Milligan and Les Laboratoires Servier v Apotex Inc [2014] UKSC 55 [2014] 3 WLR 1257 . In Tinsley v Milligan the House of Lords disapproved the "public conscience" test which had been developed by the Court of Appeal. But that decision did not preclude this court from adopting the approach in Hounga v Allen set out above at para 129 above. Lord Wilson's statement was one of principle. It was made after a review of the authorities in which Lord Wilson referred to the rejection of the public conscience test in Tinsley v Milligan (para 28). Lord Wilson's statement was part of the ratio decidendi in Hounga v Allen because it formed the foundation for the conclusion in the final paragraph of the judgment, to which we have referred at para 174. It is not the court's practice consciously to depart from an earlier decision of the House of Lords or Supreme Court without saying so. No member of the court in Les Laboratoires Servier suggested that the court's approach in Hounga v Allen had been wrong. The issue in Les Laboratoires Servier was whether the doctrine of illegality should be expanded beyond the reach of

previous authorities to include a tort of strict liability. The decision is not inconsistent with ratio of Hounga v Allen . Some of the dicta are in a different direction from Hounga v Allen but that is not a sufficient reason to conclude that the majority consciously meant to disapprove the approach in Hounga v Allen . Since the hearing of the appeal, the Court of Appeal has considered Hounga v Allen and Les Laboratoires Servier in R (on the application of Best) v Chief Land Registrar [2015] EWCA Civ 17 . Sales LJ, with whom McCombe LJ agreed, analysed them at paras 51 to 61 and adopted the analytical framework of Lord Wilson in weighing the considerations of public policy in favour of and against applying the ex turpi causa defence in the particular circumstances. He did not consider Les Laboratoires Servier to be incompatible with that approach and he applied Lord Wilson's guidance at para 70 and following. Arden LJ dissociated herself from the reliance on Hounga v Allen by the majority (paras 111 to 112). The analysis of Sales LJ accords with our views.

174 The Law Commission's report has been considered in some detail by the Court of Appeal on two occasions, Les Laboratoires Servier and Parkingeye Ltd v Somerfield Stores Ltd [2013] 1 QB 840 . In a chapter in "English and European Perspectives on Contract and Commercial Law: Essays in honour of Hugh Beale", Professor Andrew Burrows, writing before the decision of this court in Les Laboratoires Servier commended these decisions as an example of the work of the Commission helping to influence judicial law reform. The report has not so far been considered in any detail by this court, nor has this court been invited to review the decision in Tinsley v Milligan . The differences between Lord Sumption and us suggest to us that there is a pressing need for both. In any future review the court would undoubtedly wish to examine the law in other countries and particularly the judgments of the High Court of Australia in Nelson v Nelson , all of which merit reading.

### Conspiracy

175 For the reasons explained we have concentrated on the claim against the directors for breach of fiduciary duty, which the appellants are said dishonestly to have assisted. It is difficult to see that the claim for conspiracy adds anything. Mr Maclean argued that the real

Bilta (UK) Ltd (in Liquidation) v Nazir, 2015 WL 1786084 (2015)

conspiracy was to injure HMRC and that it is artificial to regard there as having been a conspiracy against Bilta, when it was in truth nothing more than a vehicle for defrauding HMRC. It may be that Bilta will fail to establish the conspiracy alleged, but the merits of that argument are not fit for determination on a summary application. Bilta has a triable case, and the only issue before the court is whether it must fail for illegality. In that respect the appellants are on no stronger ground in relation to conspiracy than in relation to the breach of fiduciary duty relied on as the unlawful means. It is perhaps worth observing that in Berg Sons & Co Ltd v Adams Hobhouse J noted that there was no allegation of conspiracy by the accountants and Mr Golechha to defraud the company (p 1066), implying that this would have made a potential difference. In this case there is an allegation of conspiracy between the directors and others to defraud the company. It does not alter the analysis to say that the aim of the dishonest director shareholders was to make a dishonest profit for themselves and their accomplices at the expense of HMRC, for this itself involved a breach of fiduciary duty towards Bilta (representing the interests of its creditors) and the intentional causation of loss to Bilta.

## Loss

176 Mr Maclean submitted that Bilta suffered no loss since it began life with negligible assets and never acquired any lawful assets, so it had none to lose. He relied on an obiter dictum of Lord Phillips to similar effect in Stone & Rolls (para 5), but Lord Mance observed (para 231) that to cause a deficit to a company making it insolvent is to cause it loss. Lord Phillips described his own remark as an initial impression and it was no part of his reasoning.

177 In Brink's Mat Ltd v Noye one of the arguments advanced by the bank was that Scalynn suffered no loss because it never had any property of its own and held the proceeds of the bullion on trust. The argument was dismissed. Nicholls LJ observed that a director was as much in breach of fiduciary duties which he owed to the company if he misappropriated property of which the company was a trustee as if he misappropriated property belonging beneficially to the company.

178 A company's profit and loss account and its balance sheet may be positive or negative. When the

directors caused Bilta to incur VAT liabilities, and simultaneously caused it to misapply money which should have been paid to HMRC, leaving the company with large liabilities and no means of paying them, the directors caused it to suffer a recognisable form of loss.

## Circuity

179 The appellants also submit that if Bilta is entitled to a remedy against Jetivia because it conspired with Bilta's directors, so also is Jetivia entitled to claim against Bilta for conspiring with Mr Brunschweiler against it. There is, it is submitted, circuity of action. In our view Jetivia will be liable only if it is established that it knowingly assisted in the fraud against Bilta, which would result from Mr Brunschweiler's knowledge and actions being attributed to it. We discuss attribution below. If the fraud against HMRC was designed to benefit Jetivia and the other overseas suppliers, we see no reason why there should not be such attribution and doubt if Jetivia would have a claim against Bilta. But, as Lord Sumption states, the facts relevant to this issue have not been pleaded.

## Attribution

180 The issue of attribution arises in the context that Mr Nazir and Mr Chopra were the only directors of the company and Mr Chopra was its sole shareholder. Bilta in its amended particulars of claim (at para 42) referred to them as its "directing mind and will". While there is a role in our law for the concept of the directing mind and will of a company, it is important to analyse that role and in particular to avoid the dangers of ascribing human attributes to a non-natural person such as a company.

181 In most circumstances the acts and state of mind of its directors and agents can be attributed to a company by applying the rules of the law of agency. It has become common to speak of "the Hampshire Land principle" or the "fraud exception" as the exception to an otherwise general rule that attribution occurs. It is our view that "the fraud exception" is not confined to fraud but is simply an instance of a wider principle that whether an act or a state of mind is to be attributed to a company depends upon the context in which the question arises. "The fraud exception", applied to prevent an agent

from pleading his own breach of duty in order to bar his principal's claim against him, is the classic example of non-attribution. But it is not the only one.

182  We set out our conclusions on the importance of context to the process of attribution in paragraphs 202–209 below. Before then, we examine the case law which has led us to those conclusions.

183  The starting point in an analysis of attribution is the recognition of the separate personality of the company, which the House of Lords recognised long ago in Salomon v Salomon & Co Ltd [1897] AC 22 and which this court recently confirmed in Prest v Petrodel Resources Ltd [2013] 2 AC 415 . A company, the creation of law, is, in Lord Halsbury's words ( Salomon at p 33), "a real thing" and has a legal existence even if it is controlled by one person. Because the company is not a natural person it can operate only by the acts of its officers, employees and agents. In Aberdeen Railway Co v Blaikie Brothers (1854) 1 Macq 461 , 471, Lord Cranworth LC stated:

> "The directors are a body to whom is delegated the duty of managing the general affairs of the company. A corporate body can act only by agents."

Similar statements about the necessity of agency can be found in Ferguson v Wilson (1866) LR 2 Ch App 77 (Cairns LJ at p 89) and Citizen's Life Assurance Co Ltd v Brown [1904] AC 423 , (Lord Lindley at p 426).

184  While a company cannot act but through the agency of others, it can incur obligations and have rights; and directors, including a sole director who is also the sole shareholder of a company, owe it the general duties set out in sections 171 to 177 of the Companies Act 2006 . The company can also incur liability to a third party because the law holds it responsible for the tortious acts and omissions of an employee.

185  Lord Diplock stated the principles in a contractual context in Photo Production Ltd v Securicor Transport Ltd [1980] AC 827 , 848:

"My Lords, it is characteristic of commercial contracts, nearly all of which today are entered into not by natural legal persons, but by fictitious ones, ie companies, that the parties promise to one another that something will be done. … Such a contract is the source of primary legal obligations upon each party to it to procure that whatever he has promised will be done is done …

Where what is promised will be done involves the doing of a physical act, performance of the promise necessitates procuring a natural person to do it; but the legal relationship between the promisor and the natural person by whom the act is done, whether it is that of master and servant, or principal and agent, or of parties to an independent sub-contract, is generally irrelevant. If that person fails to do it in the manner in which the promisor has promised to procure it to be done, as, for instance, with reasonable skill and care, the promisor has failed to fulfil his own primary obligation. This is to be distinguished from 'vicarious liability' – a legal concept which does depend upon the existence of a particular legal relationship between the natural person by whom a tortious act was done and the person sought to be made vicariously liable for it. In the interests of clarity the expression should, in my view, be confined to liability for tort."

186  Such vicarious liability is indirect liability; it does not involve the attribution of the employee's act to the company. It entails holding that the employee has

committed a breach of a tortious duty owed by himself, and that the company as his employer is additionally answerable for the employee's tortious act or omission.

187  A company can incur direct liability in at least three circumstances. First, the provisions of company legislation, a company's constitution (its articles of association, including provisions of a company's memorandum of association now deemed to be provisions of its articles by section 28 of the Companies Act 2006 ("the 2006 Act")) and the non-statutory rules of company law provide that certain acts of its board of directors are treated as the acts of the company. For example, in the Companies (Model Articles) Regulations 2008 (SI 2008/3229) Schedule 3, article 3 provides that "[s]ubject to the articles, the directors are responsible for the management of the company's business, for which purpose they may exercise all the powers of the company". Similarly, certain resolutions of the shareholders in general meeting are treated as the acts of the company. Further, the non-statutory "consent principle", that shareholders who have a right to vote may by unanimous agreement bind the company in a matter in which they had power to do so by passing a resolution at a general meeting ( In re Duomatic Ltd [1969] 2 Ch 365 ), is preserved by section 281(6) of the 2006 Act.

188  Secondly, a company can also incur direct liability through the transactions of agents within the scope of their agency (actual or apparent). Thus, when an agent commits his or her company to a contract, the company incurs direct liabilities (and acquires rights) as a party to the contract under ordinary principles of the law of agency.

189  Thirdly, a statute or subordinate legislation or a regulatory body's code or rules of the common law or equity may impose liabilities or confer rights on a company. For example, a company as a legal entity is owed by its directors the general duties set out in sections 171 to 176 of the Companies Act even when the controlling director is also the sole shareholder.

190  In Meridian Global Funds Management Asia Ltd v Securities Commission [1995] 2 AC 500 , Lord Hoffmann (at p 506) pointed out that it is a necessary part of corporate personality that there should be rules by which acts are attributed to the company. First,

he identified the "primary rules of attribution" from company law, which is the first of the direct forms of liability which we describe above. He then referred to the general principles of agency and vicarious liability which in most circumstances determine a company's rights and obligations (p 507B). He recognised that there was a third category where, exceptionally, a rule of law expressly or impliedly excludes attribution on the basis of those general principles. For this third category, which is relevant to the third form of direct liability (above), he stated: "the court must fashion a special rule of attribution for the particular substantive rule". He described the fashioning of that special rule of attribution in these terms (p 507E-F):

> "This is always a matter of interpretation: given that it is intended to apply to a company, how is it intended to apply? Whose act (or knowledge or state of mind) was *for this purpose* intended to count as the act etc. of the company? One finds the answer to this question by applying the usual canons of interpretation, taking into account the language of the rule (if it is a statute) and its content and policy."

191  The relevance of the context in which the question is asked – "Is X's conduct or state of mind to be treated as the conduct or state of mind of the company for the purpose in hand?" – is not limited to Lord Hoffmann's third category. The legal context, ie the nature and subject matter of the relevant rule and duty, is always relevant to that question. In *Bowstead & Reynolds on Agency* (20th ed 2014) Professor Peter Watts and Professor Francis Reynolds stated (at para 8-213):

> "Before imputation occurs there needs to be some purpose for deeming the principal to know what the agent knows."

WESTLAW   © 2017 Thomson Reuters.   46

In the 19th ed the learned editors made the same point in the same paragraph thus:

> "The rules of imputation do not exist in a state of nature, such that some reason must be found to disapply them. Whether knowledge is imputed in law turns on the question to be addressed."

We agree; an analysis of the relevant case law supports that view in relation to each category of rules of attribution. We turn first to the special rules of attribution which Lord Hoffmann saw as providing the answer in exceptional cases when the other rules did not determine the company's rights and obligations.

192    Thus, in Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd [1915] AC 705 , the Merchant Shipping Act 1894 excluded the liability of a ship-owner for loss or damage if it occurred "without his actual fault or privity". That phrase prevented the ship-owner incurring such liability vicariously. The House of Lords treated the fault of Mr J M Lennard, who was a director of another company which managed the ship, was registered in the ship's register as the manager, and was also a director of the ship-owning company, as the fault of the latter company. Both Viscount Haldane LC and Lord Dunedin, who gave the only substantive speeches in the case saw the question as one of statutory construction which depended on the particular facts of the case. In Tesco Supermarkets Ltd v Nattrass [1972] AC 153 , the supermarket company was charged with an offence under the Trade Descriptions Act 1968 . It pleaded a defence under section 24 of the Act namely (a) that the commission of the offence was due to the act or default of another person, in this case the manager of the store at which the misleading representations as to price had occurred, and (b) that it had taken all reasonable precautions to avoid the commission of such an offence. The House of Lords upheld that defence. Like the Divisional Court, the House of Lords treated the store manager as "another person" for the purpose of section 24 of the Act and focused on the question whether the task of taking reasonable precautions was that of the board of the company or was delegated to its store managers. It construed the statutory defence as

allowing an employer who was personally blameless to escape liability and held that in this case the board of directors had not delegated their management functions to the shop managers. As a result Tesco established the statutory defence.

193    As in each case the court is engaged in the interpretation of a particular statute and in its application to particular facts, other statutory provisions have given rise to different approaches. Thus in Tesco Stores Ltd v Brent London Borough Council [1993] 1 WLR 1037 the Divisional Court was concerned with the offence in section 11 of the Video Recordings Act 1984 of supplying a video recording to a person under the age specified in the classification certificate. The court rejected Tesco's statutory defence that it had neither known nor had reasonable grounds to believe that the purchaser was under 18. It distinguished Tesco Supermarkets Ltd v Nattrass , holding that the knowledge or information that the section 11(2) defence addressed was that of the employee who supplied the video film to the purchaser and not that of the company's senior management.

194    In Attorney General's Reference (No 2 of 1982) [1984] 1 QB 624, to which we referred in para 155 above, the Court of Appeal had to consider whether a person or persons who through shareholding and directorship had total control of a company were capable of stealing the property of the company. This involved, among other things, considering section 2(1)(b) of the Theft Act 1968 which provides that a person's appropriation of property is not regarded as dishonest "if he appropriates the property in the belief that he would have the other's consent if the other knew of the appropriation and the circumstances of it". The Court of Appeal held that the company could not be regarded as "the other" for the purpose of this provision because the mind and will of the defendants fell to be treated as the mind and will of the company. The defendants could be charged with theft of the company's property and their appropriate defence (if made out) would be that they appropriated the property in the honest belief that they had the right to deprive the company of it ( section 2(1)(a) ). Again, the court approached the question of attribution as one of statutory construction.

195    In McNicholas Construction Co Ltd v Customs and Excise Commissioners [2000] STC 553 Dyson J

Bilta (UK) Ltd (In Liquidation) v Nazir, 2015 WL 1786084 (2015)

attributed to a main contractor the knowledge of its site managers that fraudulent invoices for sub-contract labour were being created, in circumstances in which the main contractor suffered no loss because it could claim input VAT but evaded income tax. Section 60 of the Value Added Tax Act 1994 imposes civil penalties on a person who dishonestly acts or omits to act for the purpose of evading VAT. Dyson J recorded that it was common ground in that case that the knowledge and dishonest acts of the site managers could be attributed to the main contractors only if a special rule of attribution, of which Lord Hoffmann had written in Meridian , could be applied. He stated (para 44):

> "The question in each case is whether attribution is required to promote the policy of the substantive rule, or (to put it negatively) whether, if attribution is denied, that policy will be frustrated."

He held (paras 48-49) that the statutory policy of discouraging the dishonest evasion of VAT would be frustrated if the knowledge of the employees of a company who had to play a part in the making and receiving of supplies, as well as those involved in its VAT arrangements, were not attributed to the employing company. Further, as the participants in the fraud had not intended to harm the interests of their employing company, there was no basis for excluding such attribution.

196  The Court of Appeal took a similar approach in Morris v Bank of India, [2005] 2 BCLC 328 which concerned a claim for fraudulent trading under section 213 of the Insolvency Act 1986 . The court upheld Patten J's finding that the knowledge, which the general manager of Bank of India's London branch had of BCCI's fraud, was to be attributed to his employers for the purpose of section 213 . In paras 156-162 above we discussed Safeway Stores Ltd v Twigger . What is relevant for present purposes is that the court in that case looked to the wording and policy of the relevant statute in order to determine whether the acts and the intention or negligence underlying those acts were to be attributed to the company.

197  It is not only in the field of statute that the court, when deciding whether to attribute another's act or state of mind to a company, has regard to the purpose of the rule of law which is in play. In the different context of a claim based on knowing receipt of the proceeds of a fraud, the Court of Appeal in El Ajou v Dollar Land Holdings plc [1994] 2 All ER 685 had to consider whether the knowledge of an agent who was also the director of a company should be attributed to that company. Mr Ferdman, who was a non-executive director of Dollar Land, had made the arrangements by which Dollar Land acquired an interest in assets in which others had invested funds that they had earlier obtained by fraud. He had acted without the authority of a resolution by Dollar Land's board. Because Mr Ferdman managed and controlled the transactions, the court attributed his knowledge to the company, treating him as the directing mind and will of the company in relation to those transactions. The court recognised that different persons could be treated as the directing mind and will of a company for different purposes (Rose LJ at p 699h and Hoffmann LJ at p 706e). While a Mr Stern generally managed Dollar Land, Mr Ferdman was for the purpose of the receipt of the funds the company's mind and will, and on that basis his knowledge of the fraud was attributed to the company. The plaintiff's alternative basis of attribution on the ground of agency failed. We see force in the suggestion by the editors of *Bowstead & Reynolds on Agency* (at para 8.214) that the rules of agency could have resulted in imputation of knowledge in that case. But in the event the court decided otherwise. Thus the only basis on which Mr El Ajou succeeded was the attribution of Mr Ferdman's knowledge to the company based on the concept of a person being a company's directing mind and will in relation to a particular transaction. Similarly, although in that case it was not necessary to do so in order to establish Mr Tan's accessory liability for dishonest assistance of a breach of trust, the Judicial Committee of the Privy Council in Royal Brunei Airlines Sdn Bhd v Tan [1995] 2 AC 378 (p 393B-C) attributed Mr Tan's objective dishonesty to the travel agency company which he controlled.

198  The courts have also had to consider questions of attribution of knowledge or actions in a contractual context such as that of an insurance policy. In that context the terms of the insurance policies are relevant

and can be decisive as the court seeks to give effect to the intentions of the parties as expressed in their contract. In Arab Bank plc v Zurich Insurance Co [1999] 1 Lloyd's Rep 262 Rix J addressed a professional indemnity policy which covered the legal liability of both a company which provided estate agency and valuation services and its directors. The assumed facts included the assertion that one of the directors, who was the managing director, had made a number of fraudulent valuations in the company's name. The plaintiffs obtained judgments against the company, which went into liquidation, and sought to enforce them against the insurance company under the Third Parties (Rights against Insurers) Act 1930 . Zurich purported to avoid the policy on the basis of the director's fraud. But the insurance policy included fidelity insurance which indemnified the company against liabilities resulting from the fraudulent acts of a director. Because he construed the policy as insuring the company and its directors as separate insureds, the logic of the policy was that the guilty knowledge and conduct of a director could not be attributed to the company for the purpose of giving effect to the insurance contract even if he were the directing mind and will of the company in relation to the particular transactions. He referred to Lord Hoffmann's analysis of a special rule of attribution which we have quoted in para 190 above, and held that in the context of the particular contract he was not prepared to find that the fraudulent director was the directing mind and will of the company (pp 278–279). In Morris v Bank of India [2005] 2 BCLC 328 the Court of Appeal (at paras 122-124) explained the Arab Bank case as a case which rested on the construction of the terms of the insurance contract.

199    In Belmont Finance Corporation Ltd v Williams Furniture Ltd [1979] Ch 250 (" Belmont No 1"), the Court of Appeal considered a claim by the receiver of an insolvent company ("A") that its shareholders and directors had dishonestly conspired to use A's funds to purchase shares in another company ("B") at an excessive price and thereby give unlawful financial assistance to the shareholders of B to purchase A's shares. The Court of Appeal held that the directors' knowledge that they were effecting an illegal transaction should not be imputed to A because the object of the conspiracy was improperly to deprive A of a large part of its assets. Buckley LJ (pp 261–262) explained the non-attribution on the basis that when an agent, who is

acting in fraud of his principal, has knowledge which is relevant to the fraud, that knowledge is not imputed to the principal to defeat the company's claim against the conspirators (as to which rule see Bowstead & Reynolds on Agency 20th ed 2014 paras 8-207 (article 95 rule 4) and 8–213). When the case returned to the Court of Appeal after a retrial, (Belmont Finance Corporation Ltd v Williams Furniture Ltd (No 2) [1980] 1 All ER 393 (" Belmont No 2 ")) the court's findings made clear that the transaction had been approved by resolution at a formal board meeting of A and completed at two further board meetings, including by the sealing by A of the share transfers of B's issued share capital (Buckley LJ at p 398G-H). Although the transaction was clearly subject to what Lord Hoffmann in the Meridian Global Funds case [1995] 2 AC 500 described as the primary rules of attribution, the knowledge which some of A's directors (Mr James and Mr Foley) had of the illegal transaction and their misfeasance was not attributed to A so as to bar its claim but was attributed to the defendant parent companies of which they were officers.

200    We think that the court would have reached the same conclusion in the Belmont case if it had approached the question of attribution on the basis that the board of directors of A was its "directing mind and will" because the company was pursuing a claim against, among others, its directors for conspiracy. Were it otherwise a company could not vindicate its rights against its directors and those who assisted them or benefited from the conspiracy. This approach is consistent with the older case of Gluckstein v Barnes [1900] AC 240 , in which the promoters of a company, who also comprised its entire board of directors, were aware of a secret profit which they made on the asset which they had sold to the company. The House of Lords looked at the question of disclosure in the context of the particular claim. The Earl of Halsbury LC thought that it was absurd to suggest that the knowledge of those who were hoodwinking the shareholders should be treated as disclosed to the company (p 247) and Lord Robertson (p 258) agreed, stating colourfully that "the boardroom was occupied by the enemy."

201    Finally, in Moulin Global Eyecare Trading Ltd v Commissioner of Inland Revenue, to which we have referred, the Court of Final Appeal of Hong Kong was

concerned with a claim by way of judicial review by an insolvent company's liquidator to be entitled to object out of time to tax assessments and obtain repayment of the tax paid on the basis that its former management had fraudulently inflated its profits over several years. The company's entitlement to object out of time and also to claim repayment based on error in its tax returns depended on whether the company was attributed with its managers' knowledge of the fraud. The majority of the court held that the company was to be attributed with the knowledge of its management. In the leading judgment, which contained an admirable analysis of the law, Lord Walker of Gestingthorpe NPJ supported an approach to the attribution to a company of a director's knowledge in civil cases which had regard to the factual situation in which they arose and the purpose of the legal rules that were in play. See his summary (at para 129). He distinguished between:

• (i) claims by the company against its directors or employees and their accomplices for loss which the company suffered as a result of their wrongdoing, where it was absurd to allow the directors or employees to rely on their own awareness of their wrongdoing and attribute it to the company as a defence against its claim, and
• (ii) third party claims against a company for loss caused to the third party by the misconduct of a director or employee, where the dishonesty of the director or employee would not prevent his act and knowledge being attributed to the company.

202  It is clear from those cases that a finding that a person is for a specific purpose the "directing mind and will" of a company, when it is not merely descriptive, is the product of a process of attribution in which the court seeks to identify the purpose of the statutory or common law rule or contractual provision which might require such attribution in order to give effect to that purpose. Similarly, when the question of attribution arises in the context of an agency relationship, the nature of the principal's or other party's claim is highly material as the learned editors of *Bowstead and Reynolds* discuss at para 8-213. Even when the primary rules of attribution apply, where the transaction is approved by the board of directors and completed under company seal as in Belmont (No 2), the court will not attribute to a company its directors' or employees'

knowledge of their own wrongdoing to defeat the company's claim against them and their associates. We agree with Lord Walker in Moulin's case when (at para 113) having discussed the Court of Appeal's judgment in this case he stated:

> "the crucial matter of context includes not only the factual and statutory background, but also the nature of the proceedings in which the question [of attribution] arises."

203  In our view, that applies to the knowledge of directors whether one applies the primary rules of attribution of the company's constitution (the cases of Gluckstein v Barnes and Belmont (No 2) ), the rules of attribution of agency ( Belmont (No 1) ), or the special rules of attribution which Lord Hoffmann discussed in the Meridian Global Funds case. Where a company's liability is only vicarious, it is attributed with responsibility for the act of the other, usually the employee; but neither the other's act nor his or her state of mind is attributed to the company.

204  It is helpful in the civil sphere, to consider the attribution of knowledge to a company in three different contexts, namely (i) when a third party is pursuing a claim against the company arising from the misconduct of a director, employee or agent, (ii) when the company is pursuing a claim against a director or an employee for breach of duty or breach of contract, and (iii) when the company is pursuing a claim against a third party.

205  In the first case, where a third party makes a claim against the company, the rules of agency will normally suffice to attribute to the company not only the act of the director or employee but also his or her state of mind, where relevant. In this context, the company is like the absent human owner of a business who leaves it to his managers to run the business, while he spends his days on the grouse moors (to borrow Staughton LJ's colourful metaphor in PCW Syndicates v PCW Reinsurers [1996] 1 WLR 1136 , 1142). Where the rules of agency do not achieve that result, but the terms of a statute or contract are construed as imposing

Bilta (UK) Ltd (in Liquidation) v Nazir, 2015 WL 1786084 (2015)

a direct liability which requires such attribution, the court can invoke the concept of the directing mind and will as a special rule of attribution. Thus where the company incurs direct liability as a result of a wrongful act or omission of another (as in Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd and McNicholas Construction Co Ltd v Customs and Excise Comrs ) it is deemed a wrongdoer because of those acts or omissions. If it is only vicariously liable for its employee's tort, it is responsible for the act of the other without itself being deemed a wrongdoer and without the employee's state of mind being attributed to it.

206  In the second case, where the company pursues a claim against a director or employee for breach of duty, it would defeat the company's claim and negate the director's or employee's duty to the company if the act or the state of mind of the latter were to be attributed to the company and the company were thereby to be estopped from founding on the wrong. It would also run counter to sections 171 to 177 of the 2006 Act, which sets out the director's duties, for the act and state of mind of the defendant to be attributed to the company. This is so whether or not the company is insolvent. A company can be attributed with knowledge of a breach of duty when, acting within its powers and in accordance with section 239 of the 2006 Act, its members pass a resolution to ratify the conduct of the director. But, as this court discussed in Prest v Petrodel Resources Ltd [2013] 2 AC 415 , para 41, shareholders of a solvent company do not have a free hand to treat a company's assets as their own. Further, as we have discussed, actual or impending insolvency will require the directors to consider the interests of the company's creditors when exercising their powers. This might prevent them from seeking such ratification. Similarly, where a company ratifies a breach of duty by an agent or employee, it must be attributed with the relevant knowledge. But otherwise, as the courts have recognised since at least Gluckstein v Barnes [1900] AC 240 , it is absurd to attribute knowledge to the company and so defeat its claim.

207 In the third case, where the company claims against a third party, whether or not there is attribution of the director's or employee's act or state of mind depends on the nature of the claim. For example, if the company were claiming under an insurance policy, the knowledge of the board or a director or employee or agent could

readily be attributed to the company in accordance with the normal rules of agency if there had been a failure to disclose a material fact. But if the claim by the company, for example for conspiracy, dishonest assistance or knowing receipt, arose from the involvement of a third party as an accessory to a breach of fiduciary duty by a director, there is no good policy reason to attribute to the company the act or the state of mind of the director who was in breach of his fiduciary duty. If the company chose not to sue the director who was in breach of his duty, the third party defendant could seek a contribution from him or her under the Civil Liability (Contribution) Act 1978 . We have set out above why we consider that the defence of illegality is not available to a company's directors or their associates who are involved in a conspiracy against the company or otherwise act as accessories to the directors' breach of duty. Equally, there is no basis for attributing knowledge of such behaviour to the company to found an estoppel.

208  In the present case Patten LJ rightly stated that attribution of the conduct of an agent so as to create liability on the part of the company depends very much on the context in which the issue arises. He said that as between the company and the defrauded third party, the company should be treated as a perpetrator of the fraud; but that in the different context of a claim between the company and the directors, the defaulting directors should not be able to rely on their own breach of duty to defeat the operation of the provisions of the Companies Act in cases where those provisions were intended to protect the company (paras 34 and 35).

209  We agree. Accordingly, if, contrary to our view, the doctrine of illegality were insensitive to context and to competing aspects of public policy, the rules of attribution would achieve the same result and preserve Bilta's claim.

**Insolvency Act 1986 section 213**

210  The appellants' second challenge is that the court's powers under section 213 of IA 1986 do not extend to people and corporations resident outside any of the jurisdictions of the United Kingdom.

211  Section 213 of IA 1986 provides:

"(1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose, the following has effect.

(2) The court, on the application of the liquidator may declare that any persons who were knowingly parties to the carrying on of the business in the manner above-mentioned are to be liable to make such contributions (if any) to the company's assets as the court thinks proper."

212  The appellants accept that the English courts have jurisdiction *in personam* . Their challenge is to the court's subject matter jurisdiction as discussed by Hoffmann J in MacKinnon v Donaldson, Lufkin and Jenrette Securities Corpn [1986] 1 Ch 482 , 493 and Lawrence Collins LJ in Masri v Consolidated Contractors International (UK) Ltd and Others (No 2) [2008] 2 All ER (Comm) 1099 , paras 30 and 31. It relates to whether the court can regulate the appellants' conduct abroad. Whether a court has such subject matter jurisdiction is a question of the construction of the relevant statute. In the past it was held as a universal principle that a United Kingdom statute applied only to United Kingdom subjects or foreigners present in and thus subjecting themselves to a United Kingdom jurisdiction unless the Act expressly or by necessary implication provided to the contrary ( Ex p Blain (1879) 12 Ch D 522 , James LJ at p 526). That principle has evolved into a question of interpreting the particular statute ( Clark v Oceanic Containers Inc [1983] 2 AC 130 , Lord Scarman at p 145, Lord Wilberforce at p 152; Masri v Consolidated Contractors (UK) Ltd and others (No 4) [2010] 1 AC 90 , Lord Mance at para 10; and Cox v Ergo Versicherung [2014] AC 1379 , Lord Sumption at paras 27-29). In Cox Lord Sumption suggested that an intention to give a statute extra-territorial effect could be implied if the purpose of the legislation could not effectually be achieved without such effect (para 29).

213  In our view section 213 has extra-territorial effect. Its context is the winding up of a company registered in Great Britain. In theory at least the effect of such a winding up order is worldwide ( Stichting Shell Pensioenfonds v Krys [2015] 2 WLR 289 at paras 34 and 38). The section provides a remedy against any person who has knowingly become a party to the carrying on of that company's business with a fraudulent purpose. The persons against whom the provision is directed are thus (a) parties to a fraud and (b) involved in the carrying on of the now-insolvent company's business. Many British companies, including Bilta, trade internationally. Modern communications enable people outside the United Kingdom to exercise control over or involve themselves in the business of companies operating in this country. Money and intangible assets can be transferred into and out of a country with ease, as the occurrence of VAT carousel frauds demonstrates. We accept what HMRC stated in their written intervention: there is frequently an international dimension to contemporary fraud. The ease of modern travel means that people who have committed fraud in this country through the medium of a company (or otherwise) can readily abscond abroad. It would seriously handicap the efficient winding up of a British company in an increasingly globalised economy if the jurisdiction of the court responsible for the winding up of an insolvent company did not extend to people and corporate bodies resident overseas who had been involved in the carrying on of the company's business.

214  In our view the Court of Appeal reached the correct decision in In re Paramount Airways Ltd [1993] Ch 223 , in which it held that the court had jurisdiction under section 238 of IA 1986 (which empowers the court to make orders against any person to reverse transactions at an undervalue) to make an order against a foreigner resident abroad. Sir Donald Nicholls V-C expressed the view (p 239D-E) that Parliament did not intend to impose any limitation on the expression "any person" in sections 238 and 239 of IA 1986 and that it must be left to bear its literal, natural meaning. We reach the same conclusion in relation to the use of that expression in section 213 for essentially the same reasons. The section, like sections 238 and 239 and also section 133 (which

concerns the public examination of persons responsible for the formation and running of a British company) share the statutory context of the winding up of a British company. The Court of Appeal considered section 133 in In re Seagull Manufacturing Co Ltd [1993] Ch 345 . Peter Gibson J, who produced the leading judgment, expressed the views (a) that Parliament could not have intended that a person who had been responsible for the state of affairs of an insolvent British company should escape liability to be investigated simply because he was not within the jurisdiction (p 354G-H) and (b) that reasons of international comity would not prevent the summoning for public examination of a person who had participated in the running of a British company (p 356E). Hirst LJ said (p 360G-H) that the process of investigating why a company had failed would be frustrated if a non-resident director were immune from public examination. Again, that reasoning is in our view both correct and equally applicable to section 213 .

215  The appellants argued that it was wrong that they should be required to defend themselves against a claim when it would only be after the substantive hearing that the court could decide whether to exercise its jurisdiction on the basis that the defendants were sufficiently connected with England. We do not agree. While the court which hears the claim will have to decide whether in all the circumstances the appellants are sufficiently connected with England, we think that the respondents have a good arguable case that they are. The substance of the section 213 allegation is that the appellants were party to a conspiracy to defraud Bilta in the context of a wider VAT fraud, that they were parties to the conduct of Bilta's business to that end, and that Jetivia obtained the proceeds of that fraud. If Bilta's liquidators establish those allegations after trial, we think it is likely that the court would decide to exercise its jurisdiction under section 213 of IA 1986 against the appellants, their foreign residence notwithstanding.

216  Bilta's liquidators also asserted that the English courts had jurisdiction by virtue of article 3(1) Council Regulation 1346/2000 on insolvency proceedings ("the European Insolvency Regulation"). It provides:

> "The courts of the member state within the territory of which the centre of a debtor's main interests is situated shall have jurisdiction to open insolvency proceedings. In the case of a company or legal person, the place of the registered office shall be presumed to be the centre of its main interests in the absence of proof to the contrary."

217  In Schmid v Hertel (Case C-328/12) [2014] 1 WLR 633, the Court of Justice of the European Union ("CJEU") held (a) that article 3(1) conferred international jurisdiction to hear and determine actions which derive directly from those proceedings and which are closely connected with them (para 30) and (b) that the court of the relevant Member State had jurisdiction to hear and determine an action to set aside a transaction by virtue of insolvency that is brought against a person who is not resident in the territory of a Member State (para 39). Thus, Bilta's liquidators submitted, the European Insolvency Regulation , so interpreted, conferred jurisdiction against both appellants. On the other hand, the appellants submitted that the question whether the territorial reach of section 213 of IA 1986 was worldwide was now governed by the European Insolvency Regulation , whose natural meaning was that it related to relationships between Member States and not with third party states. Mr Maclean said that the decision in Schmid was controversial and suggested that there should be a reference to the CJEU to determine whether the section 213 proceedings were covered by the European Insolvency Regulation .

218  We do not think that it is necessary to rely on the European Insolvency Regulation as the Court of Justice has interpreted it in Schmid in order to determine whether there is subject matter jurisdiction against Jetivia. If the proceedings against Jetivia were not covered by the Regulation, there is a basis for the exercise of subject matter jurisdiction in our domestic law, as we have discussed above. There is therefore no need for a reference to the CJEU.

### Conclusion

219  We therefore would dismiss the appeal.

Crown copyright

2015 WL 1786084

© 2017 Sweet & Maxwell

**End of Document**

© 2017 Thomson Reuters.

# TAB 17

**BNY Corporate Trustee Services Limited and others v. Neuberger Berman Europe Ltd (on behalf of Sealink Funding Ltd) and others**

**BNY Corporate Trustee Services Limited and others v. Eurosail-UK 2007-3BL plc**

On appeal from: [2011] EWCA Civ 227

SC

9 May 2013

**[2013] UKSC 28**

**2013 WL 1841752**

before Lord Hope , Deputy President Lord Walker Lord Mance Lord Sumption Lord Carnwath

Judgment Given On 9 May 2013

*Analysis*

Heard on 25 and 26 February 2013

**Representation**

- •Appellant/Cross- respondents Gabriel Moss QC Richard Fisher (Instructed by Sidley Austin LLP ).
- •2nd Respondent/Cross- appellant Robin Dicker QC Jeremy Goldring (Instructed by Berwin Leighton Paisner LLP ).
- •1st Respondent David Allison (Instructed by Allen & Overy LLP ).

**Judgment**

Lord Walker (with whom Lord Mance, Lord Sumption and Lord Carnwath agree)

**Introduction**

1  Sections (1) and (2) of section 123 of the Insolvency Act 1986 ("the 1986 Act") provide as follows:

"(1)  A company is deemed unable to pay its debts –

(a)    [non-compliance with a statutory demand for a debt exceeding £750 presently due]

(b)  to (d) [unsatisfied execution on judgment debt in terms appropriate to England and Wales, Scotland and Northern Ireland respectively]

(e)  if it is proved to the satisfaction of the court that the company is unable to pay its debts as they fall due.

(2)   A company is also deemed unable to pay its debts if it is proved to the satisfaction of the court that the value of the company's assets is less than the amount of its liabilities, taking into account its contingent and prospective liabilities."

A company in the situation described in subsection (1) (e) is often said to be "cash- flow" insolvent. A company in the situation described in subsection (2) is often said to be "balance-sheet" insolvent, but that expression is not to be taken literally. It is a convenient shorthand expression, but a company's statutory balance sheet, properly prepared in accordance with the requirements of company law, may omit some contingent assets or some contingent liabilities. There is no statutory provision which links section 123(2) of the 1986 Act to the detailed provisions of the Companies Act 2006 as to the form and contents of a company's financial statements. This appeal is concerned with the construction and effect of section 123(1)(e) and (2) as incorporated into the documentation of an issue of loan notes.

2    The statutory provisions were incorporated, with some small modifications, into the conditions applicable to loan notes issued in the course of a securitisation transaction comprising a portfolio of non-conforming mortgage loans secured on residential

BNY Corporate Trustee Services Ltd v Eurosail-UK..., 2013 WL 1841752...

10-03635-jpm    Doc 271-1    Filed 04/03/17    Entered 04/03/17 18:29:57    Exhibit A -
Part 1    Pg 345 of 538

property in the United Kingdom. The issuer is Eurosail-UK 2007–3BL plc ("Eurosail"), one of many similar single purpose entities ("SPEs") set up by the Lehman Brothers group (but off the balance sheet of any of that group's companies) not long before its collapse. Eurosail is the principal respondent to this appeal, and it has a cross-appeal on a subsidiary issue. The other respondent appearing before this court, BNY Corporate Trustee Services Ltd ("the Trustee") is part of the BNY Mellon Group. It is the trustee for the holders ("Noteholders") of loan notes of various classes issued by Eurosail. It has adopted a neutral attitude in the proceedings (as explained in its written case), and has not appeared by counsel before this court. But it will, in the event that the appeal succeeds and the cross-appeal fails, have an important judgment to make as to material prejudice to the Noteholders' interests.

3   In 2007 Eurosail (described in the documentation as "the Issuer") acquired a portfolio of mortgage loans, secured on residential property in England and Scotland and denominated in sterling, to the principal amount of approximately £650m. Most of the mortgages were regarded as "non-conforming" in that they did not meet the lending requirements of building societies and banks. This purchase was funded by the issue on 16 July 2007 of loan notes in five principal classes (A, B, C, D and E) comprising 14 different subclasses, some denominated in sterling, some in US dollars and some in euros. In the designation of the classes "a" indicated that the loan was denominated in euros, "b" US dollars and "c" pounds sterling. The senior (class A) notes were divided into three subclasses, denominated in one of the three currencies, designated and issued as follows:

| A1b | US$200,000,000 |
| A1c | £102,500,000 |
| A2a | € 64,500,000 |
| A2b | US$100,000,000 |
| A2c | £ 63,000,000 |
| A3a | €215,000,000 |
| A3c | £ 64,500,000 |

The B, C, D and E Notes were issued in smaller amounts, with variations in currency but no subclasses having different priorities as between themselves. There were also some notes designated as ETc "revenue-backed" notes. The total sum raised was just under £660,000,000. After payment of costs and expenses of the issue the initial surplus of assets over prospective liabilities (if taken at face value) was quite small.

4   The provisions of section 123(1) and (2) of the 1986 Act are incorporated into an important provision in the conditions of issue of the Notes ("the Conditions"). Condition 9(a) (events of default) provides that the Trustee may on the occurrence of any of five specified events (an "Event of Default") serve on Eurosail a

written notice (an "Enforcement Notice") declaring the Notes to be due and repayable. In some circumstances the Trustee is obliged to serve such a notice. In the absence of an Event of Default the A1 Notes were repayable in 2027 at latest (in fact they have already been repaid, as have the revenue-backed notes). All the other Notes are repayable in 2045 at latest.

5   The Events of Default include (Condition 9(a)(iii)):

"The Issuer, otherwise than for the purposes of such amalgamation or reconstruction as is referred to in sub-paragraph (iv) below, ceasing or, through or consequent upon an official action of the Board of Directors of the Issuer, threatens to cease to carry on business or a

substantial part of its business or being unable to pay its debts as and when they fall due or, within the meaning of section 123(1) or (2) (as if the words 'it is proved to the satisfaction of the court' did not appear in section 123(2) of the Insolvency Act 1986 (as that section may be amended from time to time), being deemed unable to pay its debts…"

Under a proviso to Condition 9(a), an occurrence falling within sub-paragraph (iii) counts as an Event of Default only if the Trustee certifies to Eurosail that it is, in the Trustee's sole opinion, materially prejudicial to the interests of the Noteholders.

6    The service of an Enforcement Notice would have immediate and far- reaching consequences for all the Noteholders (other than the A1 and ETc Noteholders, whose Notes have already been fully redeemed). As described in more detail below, an Enforcement Notice shifts their rights from the regime prescribed in Condition 2(g) (priority of payments prior to enforcement) to the regime prescribed in Condition 2(h) (priority of payments post-enforcement). Under the latter regime Noteholders of Class A3 ("A3 Noteholders") rank pari passu with Noteholders of Class A2 ("A2 Noteholders") for repayment of principal. That is in contrast with the present regime, under which A2 and A3 Noteholders rank pari passu for interest payments (clause 2(g)(vi)) but A2 Noteholders have priority over A3 Noteholders in receiving repayments of principal out of funds representing principal sums received on the redemption of mortgages in the portfolio (those funds being included in the definition of "Actual Redemption Funds" in the preamble to the Conditions): Condition 5(b)(i)(2) and (3).

7    It is in these circumstances that the construction of section 123(2) of the 1986 Act, as incorporated into Condition 9(a)(iii), has assumed such importance. Eurosail, together with those of the A2 Noteholders who appeared below, succeeded before Sir Andrew Morritt C [2010] EWHC 2005 (Ch), [2011] 1 WLR 1200,

and the Court of Appeal [2011] EWCA Civ 227, [2011] 1 WLR 2524. The Court of Appeal considered that section 123(2) should be interpreted broadly and in line with standards of commercial probity:

> "A balance has to be drawn between the right of an honest and prudent businessman, who is prepared to work hard, to continue to trade out of his difficulties if he can genuinely see a light at the end of the tunnel, and the corresponding obligation to 'put up the shutters', when, by continuing to trade, he would be doing so at the expense of his creditors and in disregard of those business considerations which a reasonable businessman is expected to observe."

(That is a quotation from paragraph 216 of the *Report of the Review Committee on Insolvency Law and Practice* (1982) (Cmnd 8558), better known as the Cork Report, reflecting the view of Professor Goode; this passage is quoted in para 54 of the judgment of Lord Neuberger MR in the Court of Appeal). The appellant A3 Noteholders say that this passage is not in point. They have argued for a much stricter construction. They have emphasised that a company's inability to pay its debts is no more than a precondition to the exercise of the court's jurisdiction, which is discretionary, to make a winding up order or an administration order. The precondition to be satisfied should be, they have argued, transparent and certain, leaving scope for the exercise of discretion on the hearing of the petition. There has also been argument as to whether the statutory text (as incorporated in an amended form, and also allowing for possible future legislative amendment) must bear the same meaning as it would in actual winding-up proceedings, or whether it can and should, as incorporated, take account of the commercial context of the Conditions.

8    Those, in outline summary, are the positions of the opposing parties on the appeal. The cross-appeal, which is relevant only if the appeal is successful, is concerned with the so-called Post-Enforcement Call

Option ("PECO") which is a subsidiary (but technically important) part of the securitisation transaction.

9   Before going further into the complexities of the appeal I would comment that the image invoked by Professor Goode of an honest and prudent trader working hard to turn his business round relates, as was pointed out by Mr Moss QC for the appellants, to the law of insolvency as it applies to individuals. Even if translated into corporate terms, it has very little bearing on the situation in which Eurosail now finds itself. Its present financial position and future prospects are not matters for which Eurosail and its managers merit either praise or criticism, since those matters are almost entirely out of their control. They depend on three imponderables: first, (since the currency and interest-rate hedging arrangements with the Lehman Brothers group have failed, leaving Eurosail with a claim in its insolvency) the movements of the US dollar and the euro relative to the pound sterling; secondly, movements in LIBOR or equivalent interest rates on loans denominated in those three currencies; and thirdly, the performance of the United Kingdom economy in general, and the United Kingdom residential property market in particular, as influencing the performance of the mortgage portfolio.

**The transaction documents**

10   The legal documents relating to the securitisation issue are, as Lord Neuberger MR put it, regrettably and forbiddingly voluminous. Apart from the Conditions themselves there was a formal trust deed made between the Trustee and Eurosail, a Liquidity Facility Agreement, currency swaps agreements, a Fixed/ Floating Swap Agreement, a BBR Swap Agreement and other agreements relating to administrative matters (there is a full list of "transaction documents" in the definition of that expression in the preamble to the Conditions). Several expressions used in the Conditions involve a paperchase to other documents in order to find their definitions. Mr Moss opened the documents very lightly, moving rapidly from Condition 9(a)(iii) to concentrate his submissions on the construction of section 123(1) and (2) of the 1986 Act. Mr Dicker QC (for Eurosail) went into the Conditions more fully to pave the way for his contextual arguments. Without pre-judging those arguments I think it is necessary, if only in order to appreciate the consequences of the opposing arguments, to have an outline understanding of how the SPE (which counsel concurred in describing as a "closed system" or "wrapper") operated before the collapse of Lehman Brothers, of how it operates now (after the collapse of Lehman Brothers but before any Enforcement Notice), and of how it would operate after the service of an Enforcement Notice.

11   Interest is payable on all unredeemed Notes quarterly in arrears, the first payment having been made on 13 September 2007. The annual rate of interest is linked to LIBOR or its dollar or euro equivalents (Condition 4(c)(i)), exceeding that rate by a margin (the "Relevant Margin" as defined in the preamble) which varies from 0.07% for A1b Notes to 4% for E Notes.

12   Mortgage interest received by Eurosail (the principal component in the "Available Revenue Fund") cascades down the metaphorical waterfall set out in the 24 sub-paragraphs of Condition 2(g) (priority of payments prior to enforcement). The first claims on the income stream are for remuneration, charges and expenses; then (sub-paragraph (iv)) sums due to the Liquidity Facility Provider, and (sub-paragraph (v), but only until the collapse of Lehman Brothers) sums payable under or in connection with the Fixed/Floating Swap Agreement and the BBR Swap Agreement (but not any currency swaps). Payments to currency swaps counterparties were linked to interest payments to particular classes of Noteholders, so that payments to counterparties in respect of A Noteholders come into the provision for payment of interest to those Noteholders, which is made pari passu as between all the A sub-classes (Condition 2(g)(vi)). The next priority (Condition 2(g)(vii)) was for payment-off of any A Principal Deficiency (another expression defined in the preamble), but in practice such a deficiency could arise only if all the junior classes of Notes had become valueless. Next in the waterfall come similar groups of provisions for payment of interest, sums due to the currency swaps counterparties (and any B Principal Deficiency) in respect of B Notes (Condition 2(g)(viii) and (ix)) and so on for all the other classes (Condition 2(g)(x) to (xv)).

13   On 15 September 2008 Lehman Brothers Holdings Inc ("LBHI"), the guarantor of the swaps counterparty, Lehman Brothers Special Financing Ltd ("LBSF") filed for Chapter 11 bankruptcy, as did LBSF on 3 October

WESTLAW   © 2017 Thomson Reuters.

2008. The swaps were terminated on 13 November 2009. Eurosail has made a claim against LBHI's and LBSF's bankrupt estates for about $221,000,000. At the time of the hearings below, the claim had not been admitted and no distribution has been made in respect of it. During the last three years sterling has depreciated significantly against both the euro and the dollar, but the prevailing low level of interest rates has resulted in a surplus ("excess spread") of mortgage interest received by Eurosail, which has enabled it to continue to pay in full the interest on all the outstanding Notes of every class.

14  In the meantime, both before and after the collapse of Lehman Brothers, Eurosail received principal sums from time to time as principal secured by the mortgages was repaid, either by way of partial or total redemption by mortgagors, or by enforcement of the security against mortgagors who were in default. These sums have been and are at present applied under Condition 5(b)(i) as "Actual Redemption Funds", on each date for payment of interest, in repaying the principal of the Notes in the order of priority A1 (now fully repaid), A2, A3, B, and so on. There is a proviso to Condition 5(b) under which the order of priority may be altered. The first possible variation (proviso (A)) applies if all the A1 and A2 Notes have been redeemed and other (favourable) specified conditions are satisfied: the A3 to E1c Notes then rank pari passu. Conversely, under the other variation (proviso (B)), which applies if there is an A Principal Deficiency, priority is granted to the A Notes as a single class ranking pari passu.

15  Events of default are regulated by Condition 9. The events specified in Condition 9(a) are, apart from that already set out (para 5 above): default in payment for three business days of any principal or interest due on any of the Notes; breach by Eurosail of any of its obligations and failure to remedy the breach (if remediable) for 14 days after notice of the breach given by the Trustee; the making of an order or resolution for the winding up of Eurosail, otherwise than for an approved amalgamation or reconstruction; and the initiation of insolvency or administration proceedings, or the levying of execution (subject to various qualifications which it is unnecessary to set out in detail).

16  If the Event of Default is an event under Condition 9(a)(iii) or a breach of Eurosail's obligations, there is a further requirement that the Trustee shall have certified to Eurosail "that such event is, in its sole opinion, materially prejudicial to the interests of the Noteholders." For this purpose the Trustee may under the trust deed (as recorded in Condition 2(c)) "have regard only to (i) the interests of the A Noteholders if, in the Trustee's sole opinion, there is a conflict between the interests of the A Noteholders (or any Class thereof) and the interests of the B Noteholders, the C Noteholders, the D Noteholders and/or the E Noteholders." This provision does not indicate how the Trustee is to exercise its discretion in the event of a conflict (such as there now potentially is) between the interests of the A2 Noteholders and the A3 Noteholders. If there is an Event of Default (and, in the cases just mentioned, it is materially prejudicial) the Trustee may at its discretion serve an Enforcement Notice on Eurosail. Moreover it is obliged to do so if requested or directed (i) by holders of at least 25% of the outstanding "Most Senior Class of Notes" (defined as meaning the A Noteholders, rather than a subclass of them) or (ii) by an extraordinary resolution of the holders of that class. This court was not shown any evidence, and did not hear any submissions, as to whether either of those requirements would be likely to be satisfied in practice.

17  On service of the Enforcement Notice the Notes become immediately due and payable and the Noteholders' security becomes enforceable (Condition 9(b)). Thereupon the order of priority shifts from that in Condition 2(g) to that in Condition 2(h). It is unnecessary to go through all the detail of Condition 2(h). The all-important change is that under Condition 2(h)(v) the available funds are applicable to pay "pari passu and pro rata (1) all amounts of interest and principal then due and payable on the A1c Notes, the A2c Notes and the A3c Notes and (2) [subject to provisions about currency swaps that have now lapsed] any interest and principal then due and payable on the A1b Notes, the A2a Notes, the A2b Notes and the A3a Notes, respectively." In practical terms, the A2 Notes would no longer have priority, in terms of principal, to the A3 Notes.

18  The opening words of condition 2(h) express the Trustee's obligation as being to make payments

"to the extent of the funds available to [Eurosail] and from the proceeds of enforcement of the Security" (with exceptions that need not be detailed). The penultimate provision of Condition 2(h) provides: "The Noteholders have full recourse to [Eurosail] in respect of the payments prescribed above and accordingly are entitled to bring a claim under English law, subject to the Trust Deed, for the full amount of such payments in accordance with Condition 10 (Enforcement of Notes)". Mr Dicker did not challenge Mr Moss's submission that the opening words do not contradict the penultimate provision, and that seems to be correct. The opening words are directed to the Trustee's obligations, not to those of Eurosail.

19    Condition 5(j) contains the PECO (Post Enforcement Call Option) which is the subject of the cross-appeal. This option (which has been given effect to as a separate written agreement between the Trustee and a company named or referred to as OptionCo) is regarded in the industry as a means of achieving the effect of limited recourse without the adverse tax consequences that would then have followed from a simple express non-recourse provision. The operative part of Clause 5(j) is as follows:

> "All of the Noteholders will, at the request of the holder of the Post Enforcement Call Option, sell all (but not some only) of their holdings of the Notes to the holder of the Post Enforcement Call Option, pursuant to the option granted to it by the Trustee (as agent for the Noteholders) to acquire all (but not some only) of the Notes (plus accrued interest thereon), for the consideration of one euro cent per Euro Note outstanding, one dollar cent per Dollar Note outstanding and one penny per Sterling Note outstanding (and for these purposes, each Global Note shall be one Note) in the event that the Security for the Notes is enforced, at any time after the date on which the Trustee determines that the proceeds of such enforcement are insufficient, after payment of all other claims

ranking higher in priority to the Notes and pro rata payment of all claims ranking in equal priority to the Notes and after the application of any such proceeds to the Notes under the Deed of Charge, to pay any further principal and interest and any other amounts whatsoever due in respect of the Notes."

**Bankruptcy remoteness**

20    "Bankruptcy remoteness" was the expression used by Standard & Poor's credit-rating agency, and generally in the industry, to describe one criterion for a SPE to obtain a satisfactory credit rating for its loan notes (see "European Legal Criteria for Structured Finance Transactions" published by Standard & Poor's (28 August 2008), and the comments of the Chancellor [2011] 1 WLR 1200, para 8 and Lord Neuberger of Abbotsbury MR [2011] 1 WLR 2524, para 28). This is not the place to consider either the reliability of the credit-rating agencies' judgments on Notes secured by sub-prime mortgages, or the influence that their judgments seem to have had in the market (caused, some have suggested, by the industry's general inability to comprehend the risks inherent in its own creations). But the notion of "bankruptcy remoteness", even if imperfectly understood, underlay many features of the Conditions and the arrangements of which they formed part.

21    In developing his contextual argument that this court should (if necessary) mould the meaning of section 123(1) and (2) , as incorporated into Condition 9(a)(3) so as to take account of commercial realities, Mr Dicker drew particular attention to five features of the arrangements. They are set out and discussed in section B2 of Eurosail's case. Most of them have been mentioned already, at least in passing, but it may be helpful to bring them together in summary form. They are relevant not only (arguably) to the issue of construction but also (without room for argument) to determining the likely length of deferment of Eurosail's long- term liabilities under the Conditions, in the

absence of an Event of Default which triggers an Enforcement Notice. These points are covered at some length in the witness statements of Mr Mark Filer, a director of Wilmington Trust SP Services (London) Ltd, Eurosail's corporate services provider.

22   The five salient features of the Conditions and the supporting documentation bearing on the likely deferment of Eurosail's obligations in respect of principal and interest are as follows:

•   (1)   Condition 2(g) defines Eurosail's obligations for payment of interest on the Notes (after remuneration, charges and expenses) in terms of the Available Revenue Fund (see para 12 above). If that source is insufficient for payment of interest on any of the Junior Notes (that is, those which are not A Notes) the obligation is deferred (while accruing interest) under Condition 6(i) and (j), if necessary until the final redemption date in 2045.

•   (2)   Temporary shortages of income can be provided for by the Liquidity Facility (reimbursements to which have a high order of priority under Condition 2(g)(iv)).

•   (3)   As to principal, redemption of Notes (other than the redeemed A1 Notes and the revenue-backed Notes) is not due until 2045. Until then redemption is limited to the Actual Redemption Funds (as defined in the preamble) which are applied in the appropriate order of priority under Condition 5(b) (see para 14 above).

•   (4)   Any loss of principal resulting from default on mortgages is termed a 'Principal Deficiency' and is recorded in the Principal Deficiency Ledger (the detailed provisions as to this are found not in the Conditions but in Clauses 8 and 9 of the Cash/Bond Administration Agreement). If there is surplus income from the mortgage payments, the 'excess spread' can be used to reduce or eliminate any Principal Deficiency on whatever is the highest- ranking class of Notes with a deficiency. Recoupment of a Principal Deficiency takes priority to the payment of interest on lower-ranking Notes (see para 12 above).

•   (5)   Finally there is the PECO, which is intended to produce the same, or a similar result as an express limited-recourse provision (see paras 18 and 19 above).

## The legislation

23   This court was taken to the legislative history of sections 122 and 123 of the 1986 Act, and it will be necessary to refer to it in some detail. But it may be better to start with the sections themselves. The 1986 Act was a consolidating statute which gave effect to the amendments made by the Insolvency Act 1985 . Section 122(1) , as amended, provides seven cases in which a company may be wound up by the court, of which the most important are the last two:

> "(f)   the company is unable to pay its debts,
>
> (g)   the court is of the opinion that it is just and equitable that the company should be wound up."

Section 123(1) then sets out five cases (stated or summarised in para 1 above) in which a company "is deemed unable to pay its debts."

24   The four cases in paragraphs (a) to (d) of section 123(1) are true deeming provisions. A company's non-compliance with a statutory demand, or non-satisfaction of execution of a judgment debt, is a matter that can be proved quite simply, usually by a single short witness statement. If proved, it establishes the court's jurisdiction to make a winding up order, even if the company is in fact well able to pay its debts. If however a debt which has been made the subject of a statutory demand is disputed on reasonable grounds, the petitioner is adopting what has been called a high-risk strategy, and the petition may be dismissed with indemnity costs: In Re a Company 12209 of 1991 [1992] BCLC 865 , 868 (Hoffmann J).

25   Section 123(1)(e) is significantly different in form:

> "if it is proved to the satisfaction of the court that the company is unable to pay its debts as they fall due."

This is not what would usually be described as a deeming provision. It does not treat proof of a single specific default by a company as conclusive of the general issue of its inability to pay its debts. Instead it goes to that very issue. It may open up for inquiry a much wider range of factual matters, on which there may be conflicting evidence. The range is wider because section 123(1)(e) focuses not on a single debt (which under paragraphs (a) to (d) has necessarily accrued due) but on all the company's debts "as they fall due" (words which look to the future as well as to the present).

26  The words "as they fall due" did not appear in the legislation until the Insolvency Act 1985 . Similarly the express reference in section 123(2) to the test of "the value of the company's assets is less than the amount of its liabilities, taking into account its contingent and prospective liabilities" did not appear before the Insolvency Act 1985 . In the present case both the Chancellor and the Court of Appeal treated the present legislative provisions as materially different from those previously in force: [2011] 1 WLR 1200, para 24; [2011] 1 WLR 2524, para 53. Yet when this point was raised during the passage of the Insolvency Bill in 1985, the government spokesman in House of Lords, Lord Lucas of Chilworth, stated:

> "Commons Amendment No 458 gives effect to the way in which the courts have interpreted section 518 of the Companies Act [1985] ; that was previously section [223] of the 1948 Act. We are not seeking to amend the law by this amendment; merely to give effect to that interpretation by the courts, namely, that section 518 contains both a cash flow and a balance sheet test." Hansard (HL Debates, 23 October 1985, col 1247)

In these circumstances it is necessary to look quite closely at the legislative history. In considering it I have derived great assistance from a variety of academic commentary, including an article by Dr Peter Walton,

"Inability to pay debts": beyond the point of no return? [2013] JBL 212.

27  The starting point is sections 79 and 80 of the Companies Act 1862 (25 & 26 Vict, c 89), the general structure of which is similar to that of sections 122 and 123 of the 1986 Act. Section 80(4) of the 1862 Act stated the test simply as:

> "Whenever it is proved to the satisfaction of the court that the company is unable to pay its debts."

However, it is to be noted that under section 158 , once a winding up order had been made, "all debts payable on a contingency, and all claims against the company, present or future, certain or contingent, ascertained or sounding only in damages, shall be admissible to proof against the company, a just estimate being made, so far as is possible, of the value of all such debts or claims as may be subject to any contingency or sound only in damages, or for some other reason do not bear a certain value." So a contingent or prospective creditor could not present a petition, but if another creditor presented a petition and secured a winding up order, contingent and prospective liabilities were admitted to proof.

28  In In Re European Life Assurance Society (1869) LR 9 Eq 122 Sir William James V-C dismissed a petition for the winding up of a company which had issued large numbers of life policies and annuity contracts, and appeared to be in financial difficulties. In an extempore judgment he decided, with very little reasoning, that (p127) "inability to pay debts must refer to debts absolutely due." He then proceeded to consider at greater length, but to dismiss, the alternative "just and equitable" ground in section 79(5) of the Companies Act 1862 . As to this ground he said at p128:

> "And in my view of the law of the case it would be just and equitable to wind up a company like this assurance company if it were made out to my satisfaction that it is, not in any technical sense but, plainly and commercially insolvent – that is to say, that its

BNY Corporate Trustee Services Ltd v Eurosail-UK..., 2013 WL 1841752...

10-03635-jpm    Doc 271-1    Filed 04/03/17    Entered 04/03/17 18:29:57    Exhibit A -
Part 1    Pg 352 of 538

assets are such, and its existing liabilities are such, as to make it reasonably certain – as to make the court feel satisfied – that the existing and probable assets would be insufficient to meet the existing liabilities. I take it that the court has nothing whatever to do with any question of future liabilities, that it has nothing whatever to do with the question of the probability whether any business which the company may carry on tomorrow or hereafter will be profitable or unprofitable. That is a matter for those who may choose to be the customers of the company and for the shareholder to consider."

So here, it seems, the Vice-Chancellor was applying a balance-sheet test, but only to existing liabilities, in the context of the "just and equitable" ground. He did not refer to any of the authorities that had been cited. It may be unfortunate that his judgment has come to be regarded as a leading case.

29  Shortly afterwards the law was changed in relation to life offices by the Life Assurance Companies Act 1870 (33 & 34 Vict, c 61), which was effectively the beginning of the modern statutory regulation of life assurance. There was no general change until section 28 of the Companies Act 1907 , which made an amendment which was then consolidated by the Companies (Consolidation) Act 1908 . The latter provided in section 130(iv) that a company should be deemed to be unable to pay its debts:

"if it is proved to the satisfaction of the court that the company is unable to pay its debts, and, in determining whether a company is unable to pay its debts, the court shall take into account the contingent and prospective liabilities of the company."

The amendment made by the Companies Act 1907 was introduced on the recommendation of the Loreburn Committee (Report of the Company Law Amendment Committee) (1906) (Cd 3052), para 43, which was influenced by section 21 of the Life Assurance Companies Act 1870 . The amendment is described by Dr Walton [2013] JBL 212, 228 as an abbreviated version of section 21 . But there is not a very close parallel, since section 21 referred to a life office being insolvent (meaning, apparently, balance-sheet insolvent) rather than its being unable to pay its debts. But the admission of contingent and prospective liabilities, and especially long-term liabilities, must tend to focus attention on balance-sheet considerations. Thus in In Re Capital Annuities Ltd [1979] 1 WLR 170 , 185, Slade J observed:

"From 1907 onwards, therefore, one species of 'inability to pay its debts' specifically recognised by the legislature as a ground for the making of a winding up order in respect of any company incorporated under the Companies Acts was the possession of assets insufficient to meet its existing, contingent and prospective liabilities."

Essentially the same wording appeared in section 223(d) of the Companies Act 1948 and in section 518(e) of the Companies Act 1985 . Two cases decided under section 223(d) call for mention.

30  The first is In Re a Company (also referred to as Bond Jewellers) [1986] BCLC 261, decided by Nourse J on 21 December 1983 . Like In Re European Life Assurance Society , it was an extempore judgment given without citation of authority, in order to avoid delay, but it has been much cited. It was referred to in both Houses of Parliament during the committee stages of the Insolvency Bill. It concerned a tenant company with a propensity for postponing payment of its debts until threatened with litigation. Nourse J felt unable to make an order under section 223(d) , and considered, but ultimately did not make an order, on the "just and

equitable" ground in section 222(f) . The case is of interest as illustrating (at p 263) that the phrase "as they fall due", although not part of the statutory text, was understood to be implicit in section 223(d) . It is also of interest for the judge's observation on the second point in section 223(d) (now embodied, in different words, in section 123(2) of the 1986 Act):

> "Counsel says that if I take into account the contingent and prospective liabilities of the company, it is clearly insolvent in balance sheet terms. So indeed it is if I treat the loans made by the associated companies as loans which are currently repayable. However, what I am required to do is to 'take into account' the contingent and prospective liabilities. That cannot mean that I must simply add them up and strike a balance against assets. In regard to prospective liabilities I must principally consider whether, and if so when, they are likely to become present liabilities."

31  The second case, Byblos Bank SAL v Al-Khudhairy [1987] BCLC 232, was a considered judgment of Nicholls LJ (with whom Slade and Neill LJJ agreed) delivered after 11 days of argument. It concerned the disputed validity of the appointment of a receiver in June 1985, before either the Companies Act 1985 or the Insolvency Act 1985 was in force. The ostensible ground for appointment of the receiver was not made out, but the bank relied on a new ground, section 223(d) . Nicholls LJ observed (p 247):

> "Construing this section first without reference to authority, it seems to me plain that, in a case where none of the deeming paras (a), (b) or (c) is applicable, what is contemplated is evidence of (and, if necessary, an investigation into) the present capacity of a company to pay all its debts. If a debt presently

payable is not paid because of lack of means, that will normally suffice to prove that the company is unable to pay its debts. That will be so even if, on an assessment of all the assets and liabilities of the company, there is a surplus of assets over liabilities. That is trite law.

It is equally trite to observe that the fact that a company can meet all its presently payable debts is not necessarily the end of the matter, because para (d) requires account to be taken of contingent and prospective liabilities. Take the simple, if extreme, case of a company whose liabilities consist of an obligation to repay a loan of £100,000 one year hence, and whose only assets are worth £10,000. It is obvious that, taking into account its future liabilities, such a company does not have the present capacity to pay its debts and as such it 'is' unable to pay its debts."

Nicholls LJ then referred to the judgment of James V-C in In Re European Life Assurance Society LR 9 Eq 122 , including the passage quoted at para 28 above, and commented (p 248):

> "In my view the exercise described by James V-C is the exercise required to be done under section 223 (now section 518 of the 1985 Act)."

He also referred to the decisions of Slade J in In Re Capital Annuities Ltd [1979] 1 WLR 170 and Nourse J in In Re A Company [1986] BCLC 261 as consistent with the views he had expressed.

32  In my view these authorities go quite a long way to establishing that neither the notion of paying debts

"as they fall due", nor the notion of balance-sheet insolvency, was unfamiliar before the enactment of the Insolvency Act 1985 . But petitions by contingent or prospective creditors have been rare even after the repeal in 1986 of the standard requirement for such a creditor to provide security for costs. One reason for that is no doubt the difficulty of quantifying contingent and prospective liabilities to the satisfaction of the court. Another may be the fact that well-advised commercial lenders will insist on contractual conditions under which deferred liabilities are accelerated in the event of the borrower getting into financial difficulties.

33  The far-reaching reforms effected by the Insolvency Acts of 1985 and 1986 , together with related subordinate legislation, were influenced by the report of the Cork Committee, published in 1982. One of its recommendations (para 535) was that "the sole ground upon which the court may make an insolvency order in respect of a debtor, whether individual or corporate, will be that the debtor is unable to pay his or its debts." The Committee proposed three cases in which the debtor would be deemed to be insolvent and unable to pay his or its debts. The first two corresponded to the cases in section 123(1)(a) to (d) of the 1986 Act. The third case was:

> "(c)    Where the applicant is a contingent or prospective creditor to whom the debtor is or may become indebted in a sum of not less than the prescribed amount, being a debt not yet presently due and payable, and it is proved to the satisfaction of the court that the ultimate repayment of the debt is in jeopardy because the debtor's liabilities, including contingent and prospective liabilities, exceed the debtor's assets."

This proposal limited the balance-sheet insolvency test to applications by contingent or prospective creditors whereas the Byblos Bank case suggested that it was also relevant to the payment of debts "as they fall due". That point was noted by Briggs J in his perceptive judgment

In Re Cheyne Finance plc (No 2) [2008] Bus LR 1562 . He referred at paras 42-43 to similar language ("as they become due") used in Australian companies' legislation, which until 1992 had a single test based on an inability to pay debts "as they become due" – a phrase which looks to the future, as Griffith CJ said in Bank of Australasia v Hall (1907) 4 CLR 1514 , 1527. There is a good deal of later Australian authority, mentioned in the judgment of Briggs J, to the same effect.

34  In Re Cheyne Finance Plc (No 2) was concerned with a security trust deed which (in contrast to Condition 9(a)(iii) in the present appeal) incorporated into its definition of "insolvency event" the terms of section 123(1) , but not section 123(2) . It was therefore necessary to consider how far section 123(1)(e) was concerned, not only with debts that were immediately payable, but also with those that would be payable in the future. Briggs J decided, rightly in my view, that that is what section 123(1)(e) requires (para 56):

> "In my judgment, the effect of the alterations to the insolvency test made in 1985 and now found in section 123 of the 1986 Act was to replace in the commercial solvency test now in section 123(1)(e) , one futurity requirement, namely to include contingent and prospective liabilities, with another more flexible and fact sensitive requirement encapsulated in the new phrase 'as they fall due.'"

Briggs J considered (para 35), again rightly in my view, that the Byblos Bank case was a case about ability to pay debts as they became due, but that the Court of Appeal recognised that balance-sheet insolvency is not irrelevant to that issue.

### The practical effect of section 123

35  There is no doubt that, as a matter of form, the statutory test for a company being unable to pay its debts is materially different (as the Chancellor and the Court of Appeal observed) from the position under

the Companies Act 1985 . Section 123(1)(e) introduced the words "as they fall due" and section 123(2) has introduced a direct reference to a company's assets and liabilities. These two provisions, both labelled as "deeming" provisions (though neither is obviously of that character) stand side by side in section 123(1)(e) and section 123(2) with no indication of how they are to interact.

36   It seems likely that part of the explanation lies in the history of the passage through Parliament of the Insolvency Bill in 1985, and the lengthy and interrupted process of review and consultation which had preceded it. This process began as long ago as October 1976 when the Secretary of State announced his intention of setting up what became the Review Committee chaired by Mr (later Sir) Kenneth Cork. It produced an interim report in October 1979 (after a change of government) and its final report in 1982. The whole protracted process is described by Professor Ian Fletcher QC in his *Law of Insolvency* 4th ed (2009), pp 16–22. He explains how there was no official reaction to the final report until a spate of financial scandals early in 1984:

> "At relatively short notice the government White Paper, referred to above, was published in February 1984 together with an indication that legislation was imminent. In consequence, very little time was allowed for interested parties to submit comments before the drafting of the Insolvency Bill was embarked upon, and the Bill itself was introduced in the House of Lords on 10 December 1984. This regrettable mishandling of the period of preparation for the first major overhaul of insolvency law for over 100 years cannot but be lamented. The inadequate manner in which consultation was conducted, coupled with the near-total lack of any form of public debate about the issues of policy and principle at the heart of any radical recasting of insolvency law, were an inauspicious prelude to what was to become a most

contentious and confused episode of legislative history. Thereby, what ought to have been a largely non- controversial, non-Party Bill became the subject of highly dramatic proceedings before both Houses, and also in Committee, and damage was unquestionably inflicted upon the ultimate quality of a highly technical piece of legislation whose detailed provisions were but vaguely understood by all but a minority of those participating in its enactment, but whose social and economic importance was nonetheless immense. The Bill's deficiencies, due to haste in preparation, together with the vicissitudes of the parliamentary process, resulted in a quite exceptional number of amendments being tabled to the Insolvency Bill, estimated to have approached 1,200 by the time of Royal Assent. A high proportion of these amendments were tabled by the Government itself, and many were adopted virtually without debate during the closing stages of proceedings." (para 1-034)

37   Despite the difference of form, the provisions of section 123(1) and (2) should in my view be seen, as the Government spokesman in the House of Lords indicated, as making little significant change in the law. The changes in form served, in my view, to underline that the "cash-flow" test is concerned, not simply with the petitioner's own presently-due debt, nor only with other presently-due debt owed by the company, but also with debts falling due from time to time in the reasonably near future. What is the reasonably near future, for this purpose, will depend on all the circumstances, but especially on the nature of the company's business. That is consistent with Bond Jewellers , Byblos Bank and Cheyne Finance . The express reference to assets and liabilities is in my

WESTLAW   © 2017 Thomson Reuters.

BNY Corporate Trustee Services Ltd v Eurosail-UK, 2013 WL 1841752

view a practical recognition that once the court has to move beyond the reasonably near future (the length of which depends, again, on all the circumstances) any attempt to apply a cash-flow test will become completely speculative, and a comparison of present assets with present and future liabilities (discounted for contingencies and deferment) becomes the only sensible test. But it is still very far from an exact test, and the burden of proof must be on the party which asserts balance-sheet insolvency. The omission from Condition 9(a)(iii) of the reference to proof "to the satisfaction of the court" cannot alter that.

38  Whether or not the test of balance-sheet insolvency is satisfied must depend on the available evidence as to the circumstances of the particular case. The circumstances of Eurosail's business, so far as it can be said to have a business at all, are quite unlike those of a company engaged in normal trading activities. There are no decisions to be made about choice of suppliers, stock levels, pricing policy, the raising of new capital, or other matters such as would constantly engage the attention of a trading company's board of directors. Instead Eurosail is (in Mr Moss's phrase) in a "closed system" with some resemblance to a life office which is no longer accepting new business. The only important management decision that could possibly be made would be to attempt to arrange new hedging cover in place of that which was lost when Lehman Brothers collapsed. To that extent Eurosail's present assets should be a better guide to its ability to meet its long-term liabilities than would be the case with a company actively engaged in trading. But against that, the three imponderable factors identified in para 9 above – currency movements, interest rates and the United Kingdom economy and housing market – are and always have been outside its control. Over the period of more than 30 years until the final redemption date in 2045, they are a matter of speculation rather than calculation and prediction on any scientific basis.

39  At first instance the Chancellor started with three propositions derived from the case law (paras 29 to 32): that the assets to be valued are the present assets of the company; that "contingent and prospective liabilities" are not to be taken at their full face value; and that:

"'Taking account of' must be recognised in the context of the

overall question posed by the subsection, namely whether the company is to be deemed to be insolvent because the amount of its liabilities exceeds the value of its assets. This will involve consideration of the relevant facts of the case, including when the prospective liability falls due, whether it is payable in sterling or some other currency, what assets will be available to meet it and what if any provision is made for the allocation of losses in relation to those assets." (para 32)

He then set out four reasons (paras 34 to 37) for concluding (para 38) that the value of Eurosail's assets exceeded its liabilities, "having taken account of its contingent and prospective liabilities to such extent as appears to be necessary at this stage."

40  In the Court of Appeal Lord Neuberger MR did not disagree with anything in the Chancellor's judgment so far as it related to statutory construction. He did however go further in his detailed discussion of section 123(2) . He observed (para 44):

"In practical terms, it would be rather extraordinary if section 123(2) was satisfied every time a company's liabilities exceeded the value of its assets. Many companies which are solvent and successful, and many companies early on in their lives, would be deemed unable to pay their debts if this was the meaning of section 123(2) . Indeed, the issuer is a good example of this: its assets only just exceeded its liabilities when it was formed, and it was more than possible that, even if things went well, it would fall from time to time within the ambit of section 123(2) if the appellants are right as to the meaning of that provision."

BNY Corporate Trustee Services Ltd v Eurosail-UK ', 2013 WL 1541752...

10-03635-jpm    Doc 271-1    Filed 04/03/17    Entered 04/03/17 18:29:57    Exhibit A -
Part 1    Pg 357 of 538

41  Lord Neuberger MR developed this at paras 47 to 49 of his judgment:

> "47.    More generally, I find it hard to discern any conceivable policy reason why a company should be at risk of being wound up simply because the aggregate value (however calculated) of its liabilities exceeds that of its assets. Many companies in that position are successful and creditworthy, and cannot in any way be characterised as 'unable to pay [their] debts'. Such a mechanistic, even artificial, reason for permitting a creditor to present a petition to wind up a company could, in my view, only be justified if the words of section 123(2) compelled that conclusion, and in my opinion they do not.

> 48.    In my view, the purpose of section 123(2) has been accurately characterised by Professor Sir Roy Goode in *Principles of Corporate Insolvency Law* , 3rd ed (2005). Having referred to section 123(1)(e) as being the 'cash flow test' and to section 123(2) as being the 'balance sheet test', he said this, at para 4-06:

> > 'If the cash flow test were the only relevant test [for insolvency] then current and short-term creditors would in effect be paid at the expense of creditors to whom liabilities were incurred after the company had reached the point of no return because of an incurable deficiency in its assets.'

> 49.    In my judgment, both the purpose and the applicable test of section 123(2) are accurately encapsulated in that brief passage."

42  Toulson LJ agreed with Lord Neuberger MR but expressed himself in a more guarded way. He agreed that Professor Sir Roy Goode had "rightly discerned the underlying policy" (para 115) but added (para 119) that Professor Goode's reference to a company having "reached the point of no return because of an incurable deficiency in its assets" illuminates the purpose of the subsection but does not purport to be a paraphrase of it. He continued:

> "Essentially, section 123(2) requires the court to make a judgment whether it has been established that, looking at the company's assets and making proper allowance for its prospective and contingent liabilities, it cannot reasonably be expected to be able to meet those liabilities. If so, it will be deemed insolvent although it is currently able to pay its debts as they fall due. The more distant the liabilities, the harder this will be to establish."

BNY Corporate Trustee Services Ltd v Eurosail-UK..., 2013 WL 1841752...

10-03635-jpm    Doc 271-1    Filed 04/03/17    Entered 04/03/17 18:29:57    Exhibit A -
Part 1    Pg 358 of 538

I agree with what Toulson LJ said here, and with great respect to Lord Neuberger MR I consider that "the point of no return" should not pass into common usage as a paraphrase of the effect of section 123(2) . But in the case of a company's liabilities that can as matters now stand be deferred for over 30 years, and where the company is (without any permanent increase in its borrowings) paying its debts as they fall due, the court should proceed with the greatest caution in deciding that the company is in a state of balance-sheet insolvency under section 123(2) .

**Reasoning in the courts below**

43  Sir Andrew Morritt C, having set out some general propositions as to the effect of section 123 (1)(e) and (2) (in paras 29 to 32 of his judgment, summarized above), rejected the A3 Noteholders' submission that Eurosail was plainly insolvent for the purposes of section 123(2) as applied by Condition 9(a)(iii). He relied on four points, set out in paras 34 to 37 of his judgment. First, Eurosail's claims in the insolvencies of LBHI and LBSF, though not admitted, could not be ignored. The secondary market indicated that the claim was worth 35% to 37% of US$221m (that is, a value of the order of £60m). Second, a large part of the total deficiency that was claimed to exist was due to conversion into sterling at the prevailing spot rate of liabilities not due for payment until 2045. Third, the future liabilities were fully funded in the limited sense that deficiencies resulting from mortgage defaults reduced Eurosail's liability to the Noteholders through the operation of the Principal Deficiency Ledger. Fourth, the Chancellor was able to infer that a calculation of the then present values of assets and liabilities would not show a deficiency, since Eurosail was well able to pay its debts as they fell due, there was no deficiency on the Principal Deficiency Ledger, and projected redemptions of each class of A Notes were in advance of the maturity dates.

44  In the Court of Appeal counsel appearing for the A2 Noteholders did not feel able to give complete support to the Chancellor's second point, and Lord Neuberger MR accepted (para 67) the submission of counsel for the appellants:

> "As Mr Sheldon [then appearing for the A3 Noteholders] said, one has to

value a future or contingent liability in a foreign currency at the present exchange rate. By definition, that is the present sterling market value of the liability."

I would also respectfully question the Chancellor's third point. The Chancellor had earlier in his judgment, at para 13, referred to clause 8 of the Cash/Bond Administration Agreement, which provides for the maintenance of Principal Deficiency Ledgers. That seems to be the basis of his point about liabilities being self-cancelling. But clause 8 seems to be concerned with no more than an accountancy exercise, not with a permanent extinction of liabilities. It operates to defer liabilities for principal until the final redemption date, if circumstances require, and provided that an Enforcement Notice is not given in the meantime. But Condition 2(h) provides for Eurosail to be liable on a full recourse basis post-enforcement, as already noted (para 18 above).

45  Lord Neuberger MR did not accept that a forecast deficiency based on then current exchange rates could be dismissed as entirely speculative. He started (para 63) from Eurosail's audited accounts for the year ending 30 November 2009, which showed a net liability of £74.557m. He noted (paras 63 to 74) that this figure required two substantial amendments (one for the Lehman Brothers claim, and the other for the full recourse factor) "which, ironically and coincidentally, virtually cancel each other out" (para 69). So his final discussion and conclusion (paras 75 to 83) starts with an assumed deficiency of the order of £75m.

46  Against that Lord Neuberger MR set three factors. The first was that a deficiency of £75m, with an aggregate principal sum of just over £420m outstanding on the mortgages, was less than 17% of the assets. Secondly, the deficity was largely based on the assumption that exchange rates would remain constant (para 76):

> "Of course, they are as likely to move in an adverse direction as they are to move in a favourable direction, but the volatility of those

10-03635-jpm    Doc 271-1    Filed 04/03/17    Entered 04/03/17 18:29:57    Exhibit A -
Part 1    Pg 359 of 538

BNY Corporate Trustee Services Ltd v Eurosail-UK..., 2013 WL 1841752...

rates tell against the appellants given that they have to establish that the issuer has reached the point of no return."

Thirdly, the court was looking a long way ahead (para 78):

> "Not only do all the unredeemed notes have a final redemption date in 2045, but it appears from the evidence that the weighted average term of the remaining mortgages is in the region of 18 years, and the rate of early redemption has slowed significantly and is likely, according to expert assessment, to remain low for the time being."

47  Lord Neuberger MR accepted that there was a real possibility that, if no Enforcement Notice was served, events might turn out to the disadvantage of the A3 Noteholders (para 79):

> "However, as mentioned, a future or contingent creditor of a company can very often show that he would be better off if the company were wound up rather than being permitted to carry on business. In a commercially sensible legal system that cannot of itself justify the creditor seeking to wind up the company."

Toulson and Wilson LJJ agreed with this reasoning. Toulson LJ emphasised the importance of the liabilities being distant in time (para 119, quoted in para 42 above). The appeal was therefore dismissed, as was the cross-appeal.

## Conclusions

48  The crucial issue, to my mind, is how far the Court of Appeal's conclusion depended on the "point of no return" test. For reasons already mentioned, I consider that that is not the correct test, if and in so far as it goes beyond the need for a petitioner to satisfy the court, on the balance of probabilities, that a company has insufficient assets to be able to meet all its liabilities, including prospective and contingent liabilities. If it means no more than that, it is unhelpful, except as illuminating (as Toulson LJ put it) the purpose of section 123(2) .

49  In my view the Court of Appeal would have reached the same conclusion without reference to any "point of no return" test; and I would myself reach the same conclusion. Eurosail's ability or inability to pay all its debts, present or future, may not be finally determined until much closer to 2045, that is more than 30 years from now. The complex documentation under which the loan notes were issued contains several mechanisms (identified in para 22(1) to (4) above, the PECO being disregarded for present purposes) for ensuring that liabilities in respect of principal are, if necessary, deferred until the final redemption date, unless the post-enforcement regime comes into operation. The movements of currencies and interest rates in the meantime, if not entirely speculative, are incapable of prediction with any confidence. The court cannot be satisfied that there will eventually be a deficiency.

50  I would therefore dismiss the appeal. I would also dismiss the cross-appeal, for the same reasons as were given by the Chancellor and the Court of Appeal. It is not necessary to consider Mr Dicker's arguments based on supposed inconsistencies and commercial realities, except to say that they would have encountered serious difficulties in the light of this court's decision in Enviroco Ltd v Farstad Supply A/S [2011] UKSC 16, [2011] 1 WLR 921 : see the judgment of Lord Collins of Mapesbury, with which the other members of the court agreed, at paras 51 and 52. The loan notes documentation did indeed contain some provisions (identified in paras 128 to 134 of Eurosail's case) which are inconsistent with the post-enforcement regime being triggered by a temporary deficiency of assets. But the court might well have taken the view, on documents of such complexity, that the draftsman had simply failed

to grasp all its many and various implications, and that it was not for the court to rewrite the documents for the parties.

Lord Hope

51  I would dismiss the appeal for the reasons given by Lord Walker. I would also dismiss the cross-appeal, which concerns the effect of the PECO on the application of section 123(2) of the 1986 Act as incorporated into Condition 9(a)(iii). The question which it raises no longer needs to be answered as the Noteholders' appeal on the question whether Eurosail ("the Issuer") was unable to pay its debts was not successful. But Sir Andrew Morritt C [2011] 1 WLR 122 gave his view on it in paras 39-44 of his judgment, and so too did Lord Neuberger MR in the Court of Appeal [2011] 1 WLR 2524 in paras 84-100. A PECO is widely used in securitisation transactions of the kind that was entered into in this case, and we have been told that the question is of some importance to the securitisation market more generally. So it is appropriate that we should give our reasons for agreeing with the Chancellor and the Court of Appeal that it has no effect on the way the liability of the Issuer to the Noteholders for the purposes of the default provision in Condition 9(a)(iii) is to be calculated.

52  The Trustee entered into a PECO Agreement on behalf of the Noteholders on 16 July 2007, which is the same date as that on which the Notes were issued. By Clause 3.1 it granted an option to a company called Eurosail Options Ltd (referred to in the Agreement as "OptionCo"):

> "to acquire all (but not some only) of the Notes (plus accrued interest thereon) in the event that the Security for the Notes is enforced and the Trustee, after the payment of the proceeds of such enforcement, determines that the proceeds of such enforcement are insufficient, after payment of all claims ranking in priority to or pari passu with the Notes pursuant to the Deed of Charge, to pay in full all principal and/or interest and any

other amounts whatsoever due in respect of the Notes. The Trustee shall promptly after the Security is enforced and the proceeds of such enforcement are paid, make a determination of whether or not there is such an insufficiency. If the Trustee determines that there is such an insufficiency the Trustee shall forthwith give notice (the 'Insufficiency Notice') of such determination to OptionCo and the Issuer."

53  Clause 3.1 has to be read together with Condition 5(j) (see para 19, above), which provides that each Noteholder will, on the exercise of the option conferred on OptionCo, sell to the company the whole of his holding of notes for the nominal consideration for which the PECO provides. It also has to be read together with the Event of Default described in Condition 9(a)(iii): see para 5, above. Under that provision a default occurs, among other things, in the event of the Issuer:

> "being unable to pay its debts as and when they fall due or, within the meaning of section 123(1) or (2) (as if the words 'it is proved to the satisfaction of the court' did not appear in section 123(2)) of the Insolvency Act 1986 (as that section may be amended from time to time), being deemed unable to pay its debts".

54  The Prospectus at p 26 contains this explanation of the effect of these provisions, under the heading "Considerations related to the Instruments", for prospective purchasers:

> "Although the Instruments will be full recourse obligations of the

BNY Corporate Trustee Services Ltd v Eurosail-UK..., 2013 WL 1841752...

10-03635-jpm    Doc 271-1    Filed 04/03/17    Entered 04/03/17 18:29:57    Exhibit A -
Part 1    Pg 361 of 538

Issuer, upon enforcement of the security for the Instruments, the Trustee … will, in practice, have recourse only to the Loans and Collateral Security, and to any other assets of the Issuer then in existence as described in this document…"

55  The purpose of a PECO is to achieve bankruptcy remoteness for the issuer. Its aim is to prevent the issuer from being susceptible to insolvent winding up proceedings by ensuring so far as possible that, if its assets prove to be insufficient to meet its liabilities, a director of the issuer will not instigate bankruptcy proceedings in respect of it. Bankruptcy remoteness is one of the criteria used by the rating agencies which issuers of notes seek to satisfy so that their instruments will achieve the highest possible credit rating. That criterion is satisfied in other jurisdictions by provisions which limit the rights of noteholders against the issuer to the value of the issuer's assets. Until recent tax legislation altered the position, limited recourse provisions of that kind gave rise to UK stamp duty reserve tax at the rate of 1.5% of the amount subscribed for them. As the Chancellor explained in para 40, the PECO is designed to achieve the same result as limited recourse provisions, but without the adverse tax consequences.

56  The Issuer accepts that, as a matter of contract, the liabilities were unlimited in recourse. But it maintains that the commercial reality was that the liabilities alleged to be the debts that the issuer was unable to pay to the Noteholder were liabilities which it would never have to meet. In the event that the assets of the Issuer were exhausted, any claim that the Noteholder had against the Issuer would be assigned to the option holder. That, it is said, would bring an end to the claim. So it would be wrong to treat the Issuer as falling within section 123(2) as incorporated into Condition 9(a)(iii) on the ground that it was unable to pay its debts, as in practice it was never intended or expected that the liabilities would be paid except out of the underlying assets available to the Issuer.

57  The soundness of this approach depends however on whether, in law, the PECO affects the liability of the Issuer to the Noteholder. In answering this question it is important to appreciate that the question is not whether the Issuer should actually be wound up on the grounds described in section 123(2) , but whether its financial position is such that it falls within that subsection for the purposes of the default provision in Condition 9(a)(iii). The answer to that question is to be found by examining the wording of the Condition in the context of the provisions of the transaction documents as a whole. Does the PECO in any way alter the conclusion that would otherwise be drawn that the Issuer's assets were less than its liabilities and that it was unable to pay its debts?

58  The Chancellor based his judgment that it did not on the wording of section 123(2) , as amended for the purposes of Condition 9(a)(iii). He held that if, in the application of that subsection the court concluded that the value of the company's assets was less than the amount of its liabilities, taking into account its contingent and prospective liabilities, the PECO had no effect on those liabilities at all: para 43. As he put it, the liabilities of the Issuer remain the same, whether or not there is a PECO or, if there is, whether or not the call option has been exercised. Unless and until the option holder releases the Issuer from all further liability, which it is under no obligation to do, the liability of the Issuer is unaffected.

59  Lord Neuberger reached the same conclusion, but for fuller reasons: see paras 92-97. He said that, reading the relevant provisions of the documents together, they established that the Issuer's liability to the Noteholders was to be treated as a liability of full recourse at least until the security was enforced and, arguably, until the option was exercised and the transfer to the option holder was completed. There was the statement in the Prospectus mentioned in para 54, above. It suggested a two-stage process, under which the Issuer's liability was treated initially as full recourse and liability would become limited recourse only on enforcement of the security. There was the closing part of clause 6.7 of the Deed of Charge which, having restricted the ability of the Trustee to enforce the Noteholders' rights on enforcement of the Security beyond the Issuer's assets, provided that this "shall not apply to and shall not limit the obligations of the Issuer to the [Noteholders]

BNY Corporate Trustee Services Ltd v Eurosail-UK, 2013 WL 1841752...

under the Instruments and this Deed." And there was the provision in Condition 2(h), which stated in terms that the Noteholders had full recourse to the Issuer in respect of payments due and that they were entitled to bring a claim under English law for the full amount of such payments.

60  Finally Lord Neuberger referred to the wording of Condition 9(a)(iii) itself. It was hard to see why any reference should be made in that Condition to section 123(2) if the Noteholders' rights against the Issuer were not to be treated as full recourse until the enforcement of the security. He also said that there was nothing commercially insensible in the conclusion that, for the purpose of Condition 9(a)(iii), the Noteholders' rights against the Issuer were treated as being of full recourse, notwithstanding the PECO: para 100.

61  The A3 Noteholders submit that the key operative provision is Clause 3.1 of the PECO itself. It makes it plain that it does not have the effect of limiting the liability of the Issuer in respect of the Notes to the value of the Issuer's assets. Its reference to there being an "insufficiency" of assets after enforcement to meet whatever is "due in respect of the Notes" is a clear indication that it contemplates that the amount of the liabilities that the Notes have created must be capable of exceeding the value of the assets of the Issuer. Then there is the time at which the option is exercisable. It is not said to have any operative effect at all prior to enforcement of the security. So at all times prior to its exercise the Noteholders remain entitled to payment in accordance with the Conditions. And even when exercised all it does is provide a mechanism by which the right to be paid under the Notes is assigned to OptionCo.

62  As the Issuer relies on commercial reality rather than legal form, the legal effect of the documents is not really in dispute. The common intention of the parties is said by the Issuer to be quite different. Its argument is that, as inclusion of a PECO rather than a contractual limited recourse provision was done solely for tax reasons, it was not intended or understood to alter the commercial nature, effect and operation of the asset-backed securitisation. As a matter of contract the liabilities were unlimited in recourse. As a matter of commercial substance and in practice, they were the equivalent of a provision by which the rights of

Noteholders were expressly limited. The Issuer's case is that its future obligations to pay principal under the Notes should be taken into account only to the extent that its assets were sufficient to pay for them. As Mr Dicker QC for the Issuer put it at the end of his argument, legal form should not triumph over commercial substance.

63  I do not think that it is possible to distinguish the intended commercial effect of these provisions from their legal effect in this way. The exercise that Condition 9(a)(iii) predicates is the quantification of the amount of the Issuers' assets and liabilities in order to determine whether there has been an Event of Default. The legal effect and the commercial effect of the PECO, on its true analysis, both point in the same direction. It has no effect, for the purpose of that quantification, on the amount of the Issuer's liabilities. To limit those liabilities as the Issuer contends would contradict the parties' clearly expressed commercial intention as found in the contractual documents. The fact that the economic result of the PECO may be the same as if the Noteholders' right of recourse had been limited to the Issuer's assets is beside the point. It can be expected to achieve bankruptcy remoteness as effectively. But it would not be in accordance with the true meaning of the documents to treat the two methods as if they had the same effect in law.

64  The ultimate aim in construing provisions of the kind that are in issue in this case, as it is when construing any contract, is to determine what the parties meant by the language that they have used. Commercial good sense has a role to play when the provisions are open to different interpretations. The court should adopt the more, rather than the less, commercial construction: Rainy Sky SA v Kookmin Bank [2011] UKSC 50, [2011] 1 WLR 2900 . But, for the reasons given by the Chancellor and Lord Neuberger MR, the meaning to be given to the language that the parties used in this case is not open to doubt. The suggestion that to give effect to that meaning is to surrender to legal form over commercial substance amounts, in effect, to an invitation to depart from the settled role of commercial good sense. Its role is to find out what the parties meant when they entered into the arrangement, not to replace it with something which is not to be found in the language of the documents at all.

Crown copyright

© 2017 Sweet & Maxwell

2013 WL 1841752

**End of Document**                                                                    © 2017 Thomson Reuters.

# TAB 18

**BP Oil International Limited v. Target Shipping Limited**
Case No: 2010-728
High Court of Justice Queen's
Bench Division Commercial Court
14 June 2012

**[2012] EWHC 1590 (Comm)**

**2012 WL 2065172**

Before: Mr Justice Andrew Smith
Date: 14/06/2012

**Analysis**

Hearing dates: 12, 13, 16 and 19 December 2011 and 12, 13 and 16 January 2012

**Representation**

• John Russell and Paul Toms (instructed by Clyde & Co ) for the Claimant.
• Steven Berry QC and Thomas Raphael (instructed by Lax & Co ) for the Defendant.

**Judgment**
Mr Justice Andrew Smith:

**Introduction**

1  This case arises from a difference about how much was payable by the charterers under a charterparty by which BP Oil International Limited ("BP") hired the oil tanker "Target" from her owners, Target Shipping Limited (the "Owners"), and in particular about whether BP are entitled to recover some $1 million that the Owners charged them by way of overage freight and that, as BP claim, they paid by mistake.

2  The vessel loaded a cargo of fuel oil in Odessa and Marmara Ereglisi ("Marmara") in March 2010 and discharged it at Galveston and Houston. On 5 May 2010 BP paid against the Owners' invoice hire of US

$3,651,215.32, a sum calculated on the basis that freight was payable in respect of all the oil carried, that is to say on 86,821.957 mt of oil loaded at Odessa and on 26,021.543 mt loaded Marmara. BP contend:

• i) That they were liable to pay the Owners only $2,635,862.37, a sum calculated on the basis that freight was payable on 80,000 mt, the minimum quantity to be loaded under the terms of the charterparty, and that $1,015,352 is recoverable; or alternatively:
• ii)  That they were liable to pay only $2,846,582.43, a sum calculated on the basis that freight was payable only on the oil loaded at Odessa and not on that loaded at Marmara, and that $804,632.89 is recoverable; or in the further alternative
• iii)  That the Owners were entitled to only $3,440,495.26, a sum calculated on the basis that freight was payable on 80,000 mt loaded at Odessa and all the oil loaded at Marmara, and that $210,720.06 is recoverable.

(There is a minor difference between the parties about these calculations reflecting a disagreement about the proper treatment of brokers' commission that emerged in the course of closing submissions. I deferred consideration of this question on the basis that, if necessary, I would hear submissions about it after delivering this judgment.)

3  The Owners contend that their invoice for $3,651,215.23 was for the sum properly due under the terms of the charterparty agreed in February 2010. They have alternative contentions:

• i)  That, even if under the original terms of the charterparty freight was not payable on the oil loaded in Marmara, nevertheless, because of exchanges between the parties (in particular, exchanges on and shortly after 11 March 2010 about the vessel loading at Marmara and/or exchanges on 16 March 2010 when the vessel was at Marmara and/or subsequent exchanges before discharge of the cargo was completed at Houston), BP were liable for freight in that sum or at least they are estopped from disputing their liability for it.
• ii)  That the parties agreed that BP should pay $3,651,215.23 by a compromise agreement in the course of exchanges about the Owners' invoice.

BP Oil International Ltd v Target Shipping Ltd, 2012 WL 2065172 (2012)

• iii) That in any case any overpayment by BP is not recoverable on the grounds that it was paid under a mistake or on any other basis.

4 Thus, the broad issues between the parties are:

• i) Whether under the original terms of the charterparty the Owners were entitled to freight calculated at the agreed rate on all the cargo carried (as they contend) or to freight calculated on the minimum cargo specified in the charterparty (as is BP's primary case) or to freight calculated only on cargo loaded at Odessa (as is BP's secondary case) or on some other basis;

• ii) Whether the exchanges between the parties during the voyage affect how much freight BP are liable to pay or give rise to an estoppel against BP with regard to their liability for freight (and, in the context of this issue, there is a question whether BP were entitled to instruct the vessel to load at Marmara);

• iii) Whether the parties made a compromise agreement about the amount payable by BP; and

• iv) Whether BP are entitled to recover any overpayment as money paid under a mistake. (BP also pleaded cases (i) that any overpayment was recoverable because of implied terms in the charterparty that the Owners would render invoices only for sums properly due and would reimburse any overpayment if the Owners invoiced them for more, and (ii) that the overpayment was the result of the Owners' negligent misrepresentation in their invoice of the sum for which BP were liable; but both those contentions were abandoned.)

**The parties**

5    The "Target" is a modern aframax tanker with a capacity of some 112,000 mt. She was hired to BP by the Owners under a voyage charterparty agreed on 26 February 2010 between BP's brokers, Sovereign Shipbrokers ("Sovereign"), and her commercial managers, Geden Operations Limited ("Geden").

6 Geden are a subsidiary of Geden Lines, who are based in Istanbul. In early 2010 Geden managed some fifteen tankers (although they now manage more vessels), and their Tanker Chartering Manager was and is Mr Alexander Cooper. He has been employed by Geden since October 2009, having worked in the shipping industry since 1983, and he worked in London. He was responsible for the hire of tankers both on time charters and on the spot market, and he dealt with the hire of the "Target" to BP. Geden's managing director was and is Mr John Uttley.

7 The important negotiations and exchanges relating to the fixture were conducted by Sovereign by Mr John Savage, who had worked for them as a broker for some seven years. Mr Simon Glanville, another broker, and Mr James Wackett, who was training to be a broker, were involved relatively peripherally. Ms Shirin Jenkins was responsible at Sovereign for operational matters relating to the vessel.

8 The charter of the vessel was handled within the BP group by Mr Andrew Finlinson, who worked for BP Shipping Ltd ("BP Shipping") until October 2010, having joined the group on their graduate scheme in 2000. In October 2010 he joined BP as a trader. Before then he was working in BP Shipping's Chartering Department, dealing with crude and fuel oil business and both chartering vessels out and hiring in tonnage on the spot market for BP. Mr Finlinson was not responsible for operational matters: they were handled by BP Shipping's Operations Department, and within the department Ms Mariska Bassie and Mr Sam Megwa shared the ship operator's role for the "Target". BP had sold none of the fuel oil when it was shipped on the "Target", and its sale was handled by Mr Daniel Rathbone, who has worked as a Crude and Fuel Oil Trader for BP since 1999. The payment of the Owners' freight invoice was authorised by BP's Demurrage Department, and specifically by Ms Rebecca Myers, who was then employed by BP as a Demurrage Negotiator, and her superior, Mr Simon Rickwood, a Senior Demurrage Negotiator, who has worked for BP for some 21 years and in their Demurrage Department for about six years. The payment processes were dealt with by Mr Jason Matthews, then an Ancillaries Financial Operator, and by Mr George Witsey of BP's Global Data Management Team.

WESTLAW    © 2017 Thomson Reuters.

BP Oil International Ltd v Target Shipping Ltd, 2012 WL 2065122 (2012)

**The charterparty**

9 The terms of the charterparty were set out in a "recap" email (the "Recap") sent on 26 February 2010 at 11.14am by Sovereign to Mr Cooper and Mr Finlinson, which was introduced with the words, "Pleased to confirm following fixture with all subs [subjects] in order". It was made between the Owners and BP Shipping "for and on behalf of" BP. The terms were not reduced to any more formal document, and the Recap records the contract that, subject to any later variation arising from exchanges or the parties' conduct in the course of the voyage, governed the hire of the vessel.

10 The Recap provided that the hire was on the terms of the amended BPVoy 4 form. This standard form, after stating the agreement between owners and charterers for hire of a vessel, includes a Part 1 comprising sections A to M to be completed for the specific charter, a Part 2 comprising standard clauses numbered 1 to 49 (which may, of course, be adapted and amended by the parties), and a "BP Shipping Questionnaire" (which in this case was a Q88 form sent on 25 February 2010: see para 39 below). The Recap set out agreed terms by reference to the sections of Part 1 of the BPVoy 4 form, including additional clauses or "rider clauses" under section L of Part 1; amendments to the standard wording of Part 2 of the form that the parties had agreed; and additional clauses, by way of "Mandatory Additional Clauses" and "Voyage Specific Additional Clauses" (or "SACs").

11 Part 2 of the BPVoy 4 form includes at clause 31 a provision headed "Freight Rate". Amendments to the standard wording of the clause were agreed and recorded in the Recap and, as amended, clause 31 of the charterparty was (as far as is material for present purposes) in these terms:

> "31.1 The Freight Rate shall be that stated in Section H of PART 1. If the cargo quantity stated in Section C of PART 1 is a minimum quantity, then the freight payable for any cargo loaded in excess of the said minimum quantity shall, notwithstanding this Clause 31, be at the Overage rate stated in Section

H of PART 1, unless a lump sum freight has been agreed in which case no Overage shall be payable. Where the Freight Rate stated in Section H of PART 1 is expressed as a percentage of Worldscale the Worldscale rate shall be the rate in force at the date of this Charter.

> 31.3 If a lumpsum freight is agreed for the voyage this shall be in respect of the overall voyage of the Vessel from the first loading port to the final discharge port…

> 31.4 Freight shall be payable immediately after completion of discharge, on the gross quantity of cargo loaded by the Vessel as evidenced in the bills of lading … ".

(Sub-clause 31.2 was deleted by the Recap, the rest of sub-clause 31.4 is irrelevant and so is sub-clause 31.5.)

12 Section C of Part 1 was about "Cargo Quantity", and the Recap dealt with section C and section D ("Cargo Description") under the heading "Cargo Quantity, Description" as follows:

> "Minimum 80,000 mts CHOPT [sc. charterers' option] up to full cargo of fuel oil.

> …

> Owners warrant vessel loads 87,000 metric tonnes basis 12.5m Odessa, 112,000 metric tonnes basis no restrictions."

13  Clause 31.1 also referred to Section H of Part 1. The standard form of this section reads:

> "H Freight Rate — ("Freight Rate") Increase in Freight Rate applicable to increased speed per knot, or per rata, between Charter Speed and Maximum Speed: — Overage (if any) at 50% of Freight Rate".

The Recap provided in relation to this section under the heading "(H) Freight Rate/Overage/Commission" as follows:

> "Basis  load  Odessa/Singapore: USD3,000,000 lumpsum 1 to 1
>
> Euromed:  WS  [Worldscale]  120 basis  mfr  [minimum  flat  rate] Augusta
>
> USG [US Gulf] WS 135
>
> USAC  [US  Atlantic  Coast]  / CARIBS [Caribbean Sea] WS 140
>
> If  discharge  east  of  Singapore charterers  to  pay  lumpsum  rate agreed  for  Singapore  minus  USD 20,000  plus  additional  freight coming out of following formula:
>
> > 80.000  mt  × flat rate Spore [Singapore]  to actual discharge port(s)  ×  WS 110  with  no overage
>
> Suez  Canal transit costs to

be for Owners account

All  lumpsum freight  rates basis  1st  load to  last discharge port,

Worldscale 2010 to apply

Overage: Overage 50pct applicable  for Euromed discharge only

Address Commission: 1.25  pct address  on  F/ DF/D  [freight, dead  freight, demurrage]

Brokerage Commission: 1.25  pct Sovereign Shipbrokers on F/DF/D."

In this judgment, I shall refer to the words "Overage 50pct applicable for Euromed discharge only" as the "Euromed overage freight term".

14  The reference to Worldscale was to the New Worldwide Tanker Nominal Rate Scale, which is annually issued jointly by Worldscale Association (London) Limited and the Worldscale Association (NYC) Inc. The Preamble to the relevant (2010) version of the Worldscale rates explains (at Part A, para 4) that, "All rate calculations, which are made in USD, are per tonne for a full cargo for the standard vessel based upon

BP Oil International Ltd v Target Shipping Ltd, 2012 WL 2065172 (2012)

a round voyage from loading port or ports to discharge port or ports and return to the first loading port" on the basis of various specified suppositions, such as that the vessel has a total capacity of 75,000 tonnes. The rates are not designed to indicate a fair or reasonable rate of hire and they contemplate that, as in this case, agreed market rates will be expressed in terms of a percentage (here 120%, 135% and 140%) of the nominal rate for the relevant voyage.

15   BP contend that they were entitled to require the Owners, having initially loaded oil at Odessa, to proceed to Marmara and to load more cargo there. Their case is that they were so entitled under a Voyage Specific Additional Clause, SAC6, which the Recap stated was included in the Charterparty and which was headed "BP Backload Cargoes Clause". The Owners dispute this, and I set SAC6 out in full at paragraph 167 below, where I consider this issue.

16  I should also refer to BP's entitlement to issue revised voyage orders under clause 22 of Part 2. Clause 22.1 (as amended by the Recap) provided that:

> "If at any time after the date of this Charter, Charterers, notwithstanding that they may have nominated a loading or discharge port, wish to issue revised Charterers' Voyage Orders [an expression defined in clause 3.1 as "any written instruction issued by the Charterers in respect of the Vessel at any time during the period of this Charter, including any amendments, corrections or revisions thereto"] and instruct Owners to stop and/or divert the Vessel to an alternative within any Ranges stated in Section E or F of PART 1, or cause her to await orders at one or more locations at Master's discretion, Owners shall issue such revised Charterers' Voyage Orders and the Master shall comply with such revised instructions as soon as the Vessel is free of any previous charter commitments".

17  Clause 3.1 provided that:

> "Subject to the provision of this Charter the Vessel shall proceed to the loading port (the term "port" shall include any port, berth, dock, loading or discharging anchorage or offshore location, submarine line, single point or single buoy mooring facility, alongside vessels or lighters, or any other place whatsoever as the context requires) stated in Section E of PART 1, or to such other port (always within the Ranges stated in Section E of PART 1) as is separately or subsequently identified in Charterers' Voyage Orders … ".

18  The Recap included these provisions about section E of Part 1 ("Loading Port(s)/Range(s) at Charterers' Option") and section F ("Discharge Port(s)/Range(s) at Charterers' Option") under the heading "Load/Discharge Ranges":

> "LOADING RANGE: 1/2 Port(s) Ukraine Black Sea excl Yuzni …

> DISCHARGING RANGE: 1/2 Port(s) Euromed not east of but incl Greece excl. Albania, Yugo, former Yugo, but incl Croatia.

> AND/OR IN CHOPT: 1/2 Port(s) STS Spore/Japan range, excl Chinese river ports, ….

> OR IN CHOPT: 1/2 Port(s) USG excl Florida/Mississippi.

OR IN CHOPT 1/2 Port(s) USAC
if NYK NNGWB [sc. New York,
not north of George Washington
Bridge].

OR IN CHOPT 1/2 Port(s) Caribs
excl….

East and West options non-
combineable."

19  The charterparty also included the following interim
ports clause (in the rider clauses in section (L) of part 1):

"Where freight is payable by
lumpsum, following clause to apply:
base freight is payable basis 1st
loadport to last discharge port.
Charterers to pay for additional
interim load or discharge port(s)
at cost, i.e. the difference between
actual steaming time performed
and a theoretical direct passage (at
stipulated c/p speed) from first load
port to final discharge port …".

**The trial**

20  The documentation was unnecessarily voluminous:
no use was made of the majority of the 22 bundles.
At the pre-trial review I made a direction under CPR
32PD 27.2 that the documents in the 14 files in the "C"
series should not be admissible in evidence (unless a
party applied at trial to adduce a particular document:
no application was made). The documentary evidence
was therefore confined to documents in the "A" file
(the Recap, versions of the BPVoy 4 terms and the
New Worldwide Tanker Nominal Freight Scale (2010)),
the "Core Bundle" of four files in the "E" series, and
(formally) two files of miscellaneous documents in the

"D" series, which were referred to only in incidental
footnotes in the Owners' submissions.

21  BP called as witnesses Mr Savage, Mr Finlinson, Mr
Rickwood, Ms Myers and Mr Rathbone. They adduced
a witness statement of Ms Bassie as hearsay evidence
under the Civil Evidence Act 1995 , but in the event BP
did not rely upon her evidence. The Owners did not wish
to cross-examine Ms Matthews or Mr Witsey, and their
witness statements were received in evidence.

22  The Owners' only witness was Mr Cooper.

23  Most of the evidence in chief was given by the
witnesses confirming their statements, but I required Mr
Finlinson, Mr Savage and Mr Cooper to give orally
all their evidence about important and controversial
telephone conversations on 11 and 16 March 2010.

24  Sovereign and Geden conducted some of their
exchanges by email, and print-outs of them were in
evidence. Occasionally they communicated by Yahoo
messaging and a record of those communications was
kept and disclosed by the Owners. There were also
important communications between Mr Savage and Mr
Cooper orally by telephone and there is no recording of
those telephone conversations: the evidence of them was
the (often significantly different) accounts of Mr Savage
and Mr Cooper.

25  Mr Savage communicated with BP by telephone
and by email. Many of the calls were recorded (as I
understand it, by BP) and the recordings were available:
for the most part I received the evidence of these
conversations by way of transcripts, but I listened
to parts of some of them. On occasions calls were
made to or from Mr Finlinson's mobile, rather than
BP's landline, and there was no recording of those
conversations.

26  My impression of BP's witnesses is as follows:

• i)  Mr. Finlinson was a clever witness and had,
I think, thought a great deal about his evidence
before giving it. He was confident and articulate
and sometimes argumentative. I am left with the
impression that often he could not distinguish
between his contemporaneous views about the
meaning of the charterparty and arguments which

have since come to him or of which he has heard and convinced himself. He made some assertions in his evidence that I cannot accept. I shall refer to examples later in my judgment, but I give two illustrations here: his refusal to accept that at the time of the fixture BP were in a weaker negotiating position than the Owners was, in my judgment, unrealistic (see para 46 below); and I reject his evidence that he spoke to Mr Rathbone on 26 February 2010 about BP not being liable under the charterparty for any overage freight on transatlantic voyages (see para 43 below). I do not think that he was dishonest in his evidence, but in my judgment his overconfidence and his enthusiasm for BP's arguments sometimes compromised its accuracy and reliability.

• ii)    I consider Mr. Savage was honest in his evidence. He was vulnerable to criticism for carelessness in relation to the "Target" fixture: for example, as I shall explain (at para 60 below), he gave firm advice to Mr. Finlinson on 11 March 2010 about BP being entitled under SAC 6 to order the vessel to Marmara to load, but had not given any proper consideration to the terms of the charterparty before doing so. Further, when it became apparent that BP and the Owners contended for different interpretations of the charterparty, Mr. Savage was less than candid with his principal's representative, Mr. Finlinson: in particular, he mis-stated the prospects of the Owners agreeing to compromise the difference by accepting that BP should pay transatlantic overage freight at the rate of 50%, and he wrongly said that Mr Cooper had suggested this. I attribute this to his anxiety to broke a compromise agreement to resolve the problem.

• iii)   Ms Myers was undoubtedly honest in her evidence, and was seeking as best she could to assist the court. However she had no real recollection of dealing with the Owners' invoice, which for her must have been an absolutely routine task. She readily accepted that she did not remember "too much" about the circumstances in which she considered the Owners' invoice. She had some vague memory of what she thought when dealing with this matter in April 2010 and early May 2010, but she could not distinguish what she knew or thought when checking the invoice and authorising

payment from what she learned and thought after payment.

• iv)   The evidence of Mr Rickwood and of BP's other (less important) witnesses (Mr. Rathbone, who gave oral evidence, and Ms Bassie, Mr. Matthews and Mr. Witsey, who did not do so) appeared to me reliable.

27 I find it difficult to rely upon Mr. Cooper's evidence, in particular when it was in conflict with that of Mr. Savage. I consider that his credibility was much damaged by his evidence about an email about the "Target" fixture and the dispute concerning it that he sent Mr. Uttley on 9 May 2010. In it he said that he set out an "Approx time line to best of my recall". According to Mr. Cooper, its purpose was to meet BP's arguments about their rights under SAC6: he said in cross-examination, "When I was writing this memo, I had in mind SAC6, not overage". I cannot accept that: the email rehearsed arguments about overage freight and did not refer to SAC6, merely alluding to "loading the vessel in the Sea of Marmara" as something that BP "did not have the option to do under the c/p".

28    At the start of the email Mr. Cooper referred to "notes written up May 4th – 6th 2010". Mr. Cooper kept some notes of telephone calls in a notebook, and they referred to conversations with Mr Savage on 5 and 6 May 2010 about the overage freight on the "Target" fixture. (There is no recognisable pattern to Mr Cooper's notes: for example, there is nothing about his conversations with Mr Savage on 16 March 2010, to which I refer at paras 76ff below.)

29 Mr Cooper did not refer to his notes or his notebook in his first witness statement dated 9 September 2011: indeed, he said in it that "following his discussions that with Mr Savage on 16 March … it was never suggested to [him] that full freight would not be payable, until out of the blue we received BP's message of 7 May" (in which BP advanced an argument that the position with regard to freight on the Marmara cargo was governed by SAC6: see para 141 below). The notes were disclosed only by way of the Owners' supplementary disclosure, having initially been omitted.

30  In his second witness statement, dated 18 November 2011, Mr Cooper referred to the notes (which by then

had been disclosed). He said that since making his first statement he had "found a notebook which contains some of the conversations that I had in respect of the fixture"; and that he had originally thought that it did not contain relevant material about the "Target" and "had not reviewed it until recently". However, his evidence in cross-examination was that he had reviewed the notebook before signing his first witness statement, but, finding no relevant entries in it before about the middle of April 2010 (or, as he later said, 27 April 2010), he had assumed that it contained nothing relevant.

31  The position is unsatisfactory and Mr Cooper's explanations are inconsistent. I cannot accept that he reviewed the notebook before making his first witness statement, and I reject his evidence in cross-examination about that. (The position is the more curious because the email refers to notes written up on 4–6th May 2010. On Mr. Cooper's account he would have had no reason to have written notes before BP questioned the payment that they made on 5th May 2010. However, as far as that specific point is concerned, I accept that Mr. Cooper probably made an error about the dates when he was composing his email.) Mr Cooper had entirely forgotten when he made his first witness statement about his conversations with Mr Savage in May 2010, and I consider that this casts some doubt upon how much he could really remember about his earlier conversations with Mr Savage.

32  Moreover, the email to Mr. Uttley of 9 May 2010 itself indicates that, even when he wrote it, Mr. Cooper did not remember clearly the fixture and other arrangements for the "Target". He stated that the vessel had already been fixed on subjects when the option for discharge in the European Mediterranean was agreed, but he was wrong about when the option was agreed. Further, he said in the email itself that he could not remember exactly when he told Mr. Savage that the Owners "would not agree 50% overage at any other destination". Neither point is important in itself and they do not go to the honesty of Mr. Cooper's evidence, but they reflect on the quality of his recollection.

### The fixture

33  The parties presented evidence about the negotiations leading to the Recap and the parties' intentions during them. Little if any of it was relevant

and admissible with regard to the issues about the proper interpretation of the charterparty. No doubt much of it was included in the witness statements because, when they were exchanged, the Owners had a claim for rectification of the original charterparty, which they abandoned before trial. However, the parties referred to this evidence as background to their later exchanges (which, on the Owners' case resulted in an agreement to vary the charterparty, and would allow them, if necessary, to rectify that later variation or collateral contract or to set up an estoppel against BP), and the evidence gives some information about the circumstances known to both parties in which the charterparty was agreed.

34  In late 2009 and early 2010 BP had a term contract under which they lifted fuel oil cargoes from Odessa on the Black Sea. The most usual destination for the oil was Singapore, but some was shipped to the United States and rather less to Mediterranean destinations, such as the Greek Islands. When arranging carriage for these cargoes Mr Finlinson's practice was not to request at the outset all the discharge options that BP might require because, he thought, this might create uncertainty and make a fixture less attractive to owners. Instead he would initially express interest in vessels to load at Odessa and discharge at Singapore, for which he would seek to agree a lump sum freight, and then, when owners had "bitten", he would request further discharge options.

35  On about 22 February 2010, Mr Finlinson asked Sovereign to find out what vessels were available for these operations. Sovereign identified two apparently appropriate vessels, the "Target" and the "Black Sea", and after preliminary discussions with the owners Mr Glanville reported to Mr Finlinson about them on 24 February 2010. BP chartered both vessels. I mention the fixture of the "Black Sea", hired from Tanker Pacific Management, only by way of background.

36  As far as the "Target" is concerned, the first enquiry of Geden was about a vessel for discharge at Singapore, and Geden put forward an offer for hire at a lump sum for this voyage, with different terms of hire for discharge east of Singapore. On the morning of 24 February 2010 Mr Savage sent Mr Cooper a Yahoo message at 11.40 asking whether BP could have a "Med discharge option". Within two minutes, Mr Cooper

responded, "Yes, ws 120 mfr Augusta", that is to say he offered a Mediterranean discharge option on the basis of freight at 120% of the applicable Worldscale rate, with a minimum of the rate for a voyage from the load port to Augusta, Sicily. At 11.59 Mr Savage passed on to Geden BP's further request that the charterparty include an option for discharge by ship to ship transfer at Malta or Cyprus, but Geden refused this. Mr Cooper thought that such an operation might delay the vessel and compromise her next fixture.

37  At 12.23 on 24 February 2010 Mr Glanville wrote to Mr Finlinson setting out summaries of Sovereign's discussions with owners about both vessels. He stated rates for the "Target" for discharge at Singapore and east of Singapore and also for a voyage from Odessa with Mediterranean discharge. These were the rates later included in the Recap. (In his evidence, Mr Savage thought that the option for Mediterranean discharge was granted only in the afternoon of 24 February 2010, but it must have been discussed earlier in the day. Nothing turns on this.)

38  In his email to Mr. Uttley on 9 May 2010 Mr Cooper stated that Geden were "very reluctant" to grant this option. BP submitted that Mr Cooper was not reluctant, that his account to Mr Uttley was misleading, and that this reflects badly upon Mr Cooper's credibility as a witness. I reject that submission (although, as I have said, for other reasons I regard Mr Cooper as an unreliable witness). I agree that no reluctance to grant the option on Geden's part is apparent from the exchanges between the parties nor from Mr Cooper's report to the Owners at 15.39 on 24 February 2010, in which he provided preliminary voyage estimates and mentioned that it would be attractive to have the vessel available at Augusta for her next trip: it would appear from these documents that the option was readily granted. I also recognise that Mr Cooper said in cross-examination that he agreed to the option because he was confident that market rates for hire of vessels in the Mediterranean were rising, although he also said that he was "not particularly keen" to grant it. However, Mr Finlinson's evidence was that Mr Savage advised him that "there was some resistance from Owners to the possibility of a Mediterranean discharge option at a market rate". In view of that, I reject this criticism of Mr Cooper's account to Mr Uttley.

39  When the Mediterranean discharge option was first discussed, neither Mr Cooper nor Mr Savage referred to what overage freight (if any) should be payable if it was exercised, that is to say what BP should pay if the vessel loaded "overage" or cargo in excess of the minimum amount to be stipulated in the charterparty. (I use the term "overage" in this sense in this judgment, the expression "overage freight" for sums that charterers are liable to pay in respect of overage, and the expression "transatlantic overage freight" for sums that charterers are liable to pay in respect of overage on a voyage to a port or ports in the United States Gulf ("USG") and United States Atlantic Coast ("USAC") and Caribbean ranges. I shall also adopt, as convenient labels and without prejudice to the parties' arguments about whether they are accurate and appropriate, the expressions "full overage freight" and "full transatlantic overage freight" to mean (transatlantic) overage freight payable at the same rate as freight for the minimum cargo.) Nothing about overage freight was mentioned in Mr Glanville's report to Mr Finlinson, except that there would be no overage freight in the event of discharge east of Singapore. However, as I conclude, later on 24 February 2010 Mr Savage and Mr Cooper discussed overage freight in the event of Mediterranean discharge: BP proposed through Mr Savage and Mr Cooper agreed that in those circumstances overage freight should be at the rate of 50% of full overage freight. On 24 February 2010 at 17.57 Mr Wackett sent to Mr Finlinson an email by way of a draft recap of a fixture for the "Target" subject to the approval of BP's management by 17.00 on 25 February 2010 or, if later, within an hour after they received the vessel's "Q88" information. (A "Q88" is a standard questionnaire used for fixtures such as this: the completed Q88 form was in fact sent on 25 February 2010 at 16.32.) By this time Mr Savage and Mr Cooper had spoken about overage freight in the event of a Mediterranean discharge, and Mr Wackett's draft recap included the Euromed overage freight term.

40  There was a difference between the witness statements of Mr Savage and Mr Cooper about how the wording of the Euromed overage freight term came to be agreed, and in particular why the word "only" was introduced into it. According to Mr Savage, he believed that the wording was provided to Mr Watchett by Mr Glanville and the purpose was to make clear that the 50% overage freight did not apply if the cargo was

discharged in Singapore or elsewhere in the Far East. In his statement Mr Cooper said that he emphasised to Mr Savage that the agreement to 50% overage freight was limited to discharge at ports in the European Mediterranean, and his purpose was to "[signal] up that additional cargo for any destination that [BP] might later ask for (other than Far East or Euromed) would be at full freight". As I have said at paragraph 32, in his report to Mr Uttley of 9 May 2010 Mr Cooper said that, although he could not "remember exactly" when he did so, he believed that he instructed Mr Savage about the wording because Geden would not agree to overage freight at 50% in the event of discharge at any other destination. The difference is not important, but I would prefer Mr Savage's evidence. I accept that Mr Cooper said something to Sovereign that led to the Euromed overage freight term being included in the draft recap, but it is probable, in my judgment, that the exact wording was composed within Sovereign. Mr Cooper never intended to make any agreement for less than full overage freight except in the event of discharge in the European Mediterranean, but I do not accept that he told Sovereign this before the draft recap was sent.

41   On 25 February 2010 at 9.13 Mr Finlinson wrote in an email to Mr Rathbone about the terms for hire of the two vessels that he was waiting for the results of an inspection of the "Target", and he observed that, if she did not clear vetting, no alternative aframax vessel was available and BP would have to look into using smaller, "handysize", tankers. In fact, BP inspectors had approved the "Target" by 13.40. In the email Mr Finlinson reported to Mr Rathbone about the Euromed overage freight term, writing "50% overage on the Med option only".

42   The draft recap of 24 February 2010 had not included any transatlantic discharge options. On 25 February 2010 Mr Rathbone indicated to Mr Finlinson that BP might need to discharge the cargo in the United States or the Caribbean. In the afternoon of 25 February 2010, when Geden's deadline for holding the "Target" "on subjects" was about to expire, Mr Finlinson instructed Mr Savage to ask for options to discharge at USG and USAC and Caribbean ports. Geden quoted rates of Worldscale 135 for USG ports and Worldscale 140 for USAC and Caribbean ports, and Mr Cooper agreed to hold the vessel "on subjects" until 11.00 on 26 February 2010.

43   Mr Finlinson said nothing to Mr Savage about BP paying overage freight on these options, and Mr Savage did not mention overage to Mr Finlinson in this context. Mr Finlinson did not send Mr Rathbone an email when the transatlantic discharge options were agreed, but his evidence was that he was "pretty sure" that he told Mr Rathbone that "there was zero overage on the US option", and that he believed that this was so because the Euromed overage freight term stipulated overage freight only if the Mediterranean discharge option was exercised. In his witness statement, Mr Rathbone said that he knew from his conversations with Mr Finlinson that "zero percent overage" had been agreed for "the States" (as well as for discharge east of Singapore). However, in cross-examination he said that he had no recollection of being told this before 11 March 2010, and I consider this evidence to be more readily reconciled with the exchanges between Mr Finlinson and Mr Rathbone on 11 March 2010 (to which I refer at paras 54ff below) and to be more reliable. I reject the evidence that Mr Finlinson spoke to Mr Rathbone about transatlantic overage freight in February 2010.

44   During the afternoon on 25 February 2010 Mr Finlinson also requested that the terms of the fixture include certain clauses of the standard BPVoy 4 form, in particular the "backloading clause", SAC6. The Owners agreed to this.

45   On 26 February 2010 at 10.56 Mr Finlinson telephoned Sovereign and instructed them to lift the subjects on both the "Target" and the "Black Sea", but almost immediately after he had done so Mr Rathbone asked Mr Finlinson if he could improve the rates for the transatlantic discharge options on the "Target" fixture. At 10.57 Mr Finlinson passed the request to Sovereign, describing these rates as "ridiculous". Mr Savage approached Mr Cooper, but Geden would not accept a reduction and the rates were agreed accordingly. At 11.09 Mr Cooper reported to the Owners in Istanbul that the vessel was fully fixed and commented that they had had "a lucky break on this one" and that "Now we have the exciting wait to see where they will discharge. Singapore or States will give us the best daily return".

46   The Owners submitted that throughout the negotiations they were in a strong negotiating position

BP Oil International Ltd v Target Shipping Ltd, 2012 WL 2065172 (2012)

and BP were (as they put it) "over a barrel". When he was cross-examined Mr Finlinson denied that the Owners had the stronger negotiating position, and said that market conditions were "actually quite weak" for owners. Even if market conditions generally were softening for owners, I cannot accept that BP were not in the weaker bargaining position when negotiating the fixture: the Owners were, as Mr Cooper said in cross-examination, "very much in the driving seat", and Mr Finlinson, as I conclude, must have realised this. BP needed to move oil from Odessa, and, as Mr Finlinson told Mr Rickwood, the only alternative was to use less convenient handysize tankers. BP's difficult negotiating position to secure the hire of the vessel was reflected in the high lumpsum freight for a voyage to Singapore.

47    However, there is no evidence that BP were under great commercial or other pressure to secure the transatlantic discharge options, and I reject that part of the Owners' submission. The freight agreed for these options was on the high side, and Mr Cooper's message on 26 February 2010 at 11.09 reflects this, but (in the absence of significant evidence to the contrary) I accept his evidence in cross-examination that, while transatlantic discharge was better for the Owners than Mediterranean discharge, a voyage to the Far East would have been the most profitable outcome for them.

**The voyage**

48    On 26 February 2010 BP told Sovereign to give instructions that the vessel proceed to Odessa for orders, and Sovereign passed the instructions to the Owners at 13.08. On 2 March 2010, they gave further voyage orders, including orders to load at Odessa and to proceed through the Bosporus, the Dardanelles and the Suez Canal: the instructions were, "Operation: For Orders, Port: Singapore". Geden passed the orders to the Owners with the comment, "Singapore for orders which is good, they could of course change but it looks good for now!" On 7 March 2010 the "Target" berthed at Odessa, and began loading a cargo of high sulphur fuel oil. Although the vessel had capacity for 112,000 mt of fuel oil, draught restrictions at Odessa limited the cargo that she could load there to some 87,000 mt. The "Target" completed loading 86,821 mt on 11 March 2010, and she sailed from Odessa that evening at 19.42. At 18.13 on 12 March 2010 Sovereign passed to Geden further instructions for the "Target": that she was to

proceed to Marmara for loading a further cargo. The orders also stated, "Operation: For orders. Port USA".

49    The "Target" proceeded to Marmara, a port on the northern shore of the Marmara Sea, at which there is a storage facility for oil coming out of Odessa. (It is not within the range "Ukraine Black Sea", and so not within the loading range specified in the Recap under section "C"). The vessel served notice of readiness on 14 March 2010. She came into berth at Marmara after 10.00 on 16 March 2010. She weighed anchor at 10.12, took a pilot on board at 10.30, connected a cargo hose at 11.18 and began loading the further 26,049.589 mt of fuel oil at 13.12. Loading having been completed at 16.42 on 17 March 2010, she sailed from Marmara at 23.54 that night. At 8.31 on 26 March 2010 BP, through Sovereign, gave orders for discharge at Galveston and Houston. Cargo was discharged at Galveston on 13 and 14 April 2010, and the remaining cargo discharged at Houston between 21 and 23 April 2010. (The times that I have given here and elsewhere in this judgment are Greenwich Mean Time.)

**Exchanges between 11 and 16 March 2010**

50    The Owners contend that on 11 March 2010 Mr Finlinson, knowing BP might want to load additional cargo at Marmara and then to exercise an option to discharge the whole cargo in the United States, conceived the idea that BP would not have to pay any transatlantic overage freight, including on additional cargo loaded at Marmara, and shared his idea with Mr Rathbone and Mr Savage; and that then Mr Finlinson and Mr Savage decided not to alert Mr Cooper or the Owners to this, although (at least) Mr Finlinson realised that Mr Cooper understood and expected that the Owners were entitled to full transatlantic overage freight (or at least to some transatlantic overage freight). The purpose, it is alleged, was to exploit the Owners' mistake and (as it was put) to "trick" Mr Cooper into allowing the vessel to go to Marmara to load more oil for transatlantic discharge because Mr Finlinson and Mr Savage recognised that BP could not require under the terms of the charterparty that the "Target" load at Marmara.

51    The Owners also say that on 16 March 2010 in further conversations with Mr Savage Mr Cooper made it clear that, unless BP were willing to pay full

transatlantic overage freight, they should not load at
Marmara, and the matter was left on the basis that BP
would revert to the Owners if they dissented from this;
and that then they proceeded to load the additional
cargo without indicating dissent.

52   Against this, it is BP's case that on and after 11
March 2010 Mr Finlinson believed that no transatlantic
overage freight was payable (either on cargo loaded at
Odessa or at Marmara), that he understood that Mr
Savage shared this view, but that, believing that BP
were entitled to have the vessel to load at Marmara, he
did not think about what Mr Cooper or the Owners
might understand about the charterparty's terms about
overage freight. They say that Mr Savage thought that
Mr Finlinson was probably right in his interpretation of
what the charterparty although he came to have some
unexpressed misgivings about it, and until about 16
March 2010 he too thought that BP were entitled to
give orders for loading at Marmara. Before 16 March
2010 he did not believe or suspect that Mr Cooper
or the Owners expected that full transatlantic overage
freight would be payable, and he did not believe that
the Owners would have refused to load at Marmara
had they been told how Mr Finlinson understood
the charterparty's provisions about overage freight
(although he did not think about why the charterparty
entitled BP to load at Marmara). BP contend that on 16
March 2010, when Mr Cooper told Mr Savage that he
thought the Owners entitled to full transatlantic overage
freight, Mr Savage responded that BP thought that no
transatlantic overage freight was payable, and in any
case deny that Mr Cooper indicated that the Marmara
cargo should not be loaded unless BP accepted the
Owners' position.

53   These issues require consideration in some detail
of the exchanges on and after 11 March 2010 between
Sovereign and Mr Cooper and between Sovereign and
Mr Finlinson. At about 10.52 on 11 March 2010 Mr
Rathbone asked Mr Finlinson in a Yahoo message
whether BP could discharge the cargo at two ports,
specifically Marmara and Agio (near Corinth). At 10.54
Mr Finlinson replied that they could do so. At 10.58
he telephoned Mr Savage and told him that BP were
considering discharging the cargo at Marmara and then
Agio "just because the rate to Singapore is ridiculous".
He told Mr Savage that, as he interpreted the Recap,
BP were entitled to do this because they were entitled to

discharge in Greece "with Marmara under the interim
top up load discharge clause". He asked whether, if BP
discharged the cargo at Marmara and Agio, the Owners
would agree to a "slightly sharper rate" than that based
on a minimum voyage to Augusta. Mr Savage was not
optimistic that the Owners would do so, but said that
he would see what he could do. Apparently both Mr
Finlinson and Mr Savage thought that discharge at
Marmara was permitted under the interim ports clause,
but Mr Finlinson wanted to achieve a better rate by
having Marmara treated as a discharge port.

54   At 11.10 Mr Rathbone asked Mr Finlinson by
Yahoo messaging about the rates for transatlantic
voyages for both the "Black Sea" and the "Target":
whether they both had a minimum quantity of 80,000
mt and whether there was 50% overage freight for
additional cargo. At 11.19 Mr Finlinson responded that
both charters were on the basis of minimum cargoes
of 80,000 mt, and that "I got you no overage", adding
that "On the "Target" overage only applies if Med
discharge". Mr Rathbone reverted to check that there
was not transatlantic overage freight at 50% at 11.28
and again at 11.53 when his message was "so free
frt [freight] on the top up", and Mr Finlinson twice
confirmed in response that the "Target" charterparty so
provided.

55   Between Mr Rathbone's first inquiry about rates
at 11.10 and Mr Finlinson's response at 11.19, Mr
Finlinson spoke to Mr Savage at 11.12. He asked about
the rates under the charterparties of the "Target" and
the "Black Sea" for transatlantic voyages and suggested
in relation to the "Target", "… so we got min [cargo of]
80 [thousand mt] US Gulf 135, overage 50% applicable
for Euromed discharge only, so in theory we have got
free overage to go in TA [transatlantic], yeah?" Mr
Savage's response was "Yeah". After some exchanges
about the "Black Sea", Mr Finlinson returned to the
"Target" and Mr Savage said "Overage zero per cent".

56  Mr Finlinson spoke with Mr Glanville at Sovereign
at 11.31 and referred in their conversation to the terms
on which the "Target" was chartered. The exchange
between them was:

> AF: "… on the "Target" we just
> have 0% overage, yeah?".

BP Oil International Ltd v Target Shipping Ltd, 2012 WL 2065172 (2012)

SG: "Yeah".

AF: "There is no additional freight cost?"

SG: "That's what was agreed, yeah. Well, that's how it read; there was 0% overage and when we agreed at the last minute the Med rates – sorry, the TA rates — he [Mr Cooper] didn't ask for any charge."

AF "No, but I'm just making sure there is no – just having a look; there is the interim load port clause … it's just standard interim port clause so it covers costs. It says where the freight is payable by a lump sum"

Mr Savage then took over the conversation from Mr Glanville. He said that he was waiting for Mr Cooper's response about the request made by Mr Finlinson at 10.58 for a lower rate if there was discharge at Marmara and Agio, and the conversation continued:

AF: "…So just to clarify on the "Target" on the TA rate. So we fixed min 80, it says overage 0% unless in the Med and the interim ports clause just talks about — it deals with costs, the freight payable by a lump

sum. So if we clearly did – well effectively I'm assuming it's going to be Odessa, Houston flat rate, times 80, times the Worldscale rate with Marmara as a top-up port, but there's no adjustment to the actual freight".

JS: "Well, you just do it purely as an interim, that was all."

AF: "Yeah, so effectively I'm paying him the cost but I'm not paying him any freight over the extra -".

JS: "No."

57   Mr Savage and Mr Finlinson spoke again at 11.56 about discharging cargo at Marmara and Agio, and Mr Finlinson observed that BP were not entitled to discharge at Marmara under the terms of the charterparty if they were paying a Worldscale freight (as they would be for a transatlantic voyage). Mr Savage said that he would be able to make arrangements with the Owners for BP to do so, and Mr Finlinson agreed

that this would be preferable to BP depending on the interim ports clause.

58  Mr Savage then spoke to Mr Cooper, and they discussed the position about the vessel calling at Marmara. Although neither Mr Savage nor Mr Cooper recalled the conversation, I infer that they had spoken about the vessel calling at Marmara to discharge cargo rather than to load. This is confirmed by Mr Savage's telephone conversation with Mr Finlinson at 12.32, in which he reported upon his conversation with Mr Cooper: he described Mr Cooper as being "awkward" because he hoped for a voyage to the Far East, and Mr Savage observed that without the Owners' agreement BP were not entitled to discharge at Marmara either under SAC6, unless some cargo was back-loaded, or under the interim ports clause, which applied only if they were paying a lump sum freight.

59  Shortly after this BP explored the possibility of discharging in the Bahamas, and, through Sovereign, asked the Owners about how much cargo the "Target" could carry without her draught at the Vopak terminal (in the Bahamas) becoming unsafe.

60  At 13.35 Mr Finlinson told Mr Savage that BP would need to load additional cargo (to "top-up") at Marmara if BP decided upon transatlantic discharge. Mr Savage said that this was "definitely covered in your SAC", that is to say permitted by the charterparty under clause SAC6. By the afternoon on 11 March 2010 (if not before) the Owners had learned that BP might want to load at Marmara: at 16.11 Mr Cooper received an internal email asking him to check whether BP had "any intention with respect to loading further in Marmara", and this enquiry was sent, through Sovereign, to BP.

61  At 15.20 Mr Rathbone sought by Yahoo messaging further confirmation from Mr Finlinson that BP had "free overage on the "Target" above 80kt", and Mr Finlinson responded that they "definitely" had it. When Mr Rathbone sent his message, Mr Finlinson happened to be on the telephone to Mr Savage about another fixture, and towards the end of the call Mr Finlinson spoke of the "Target", saying, "Target, we've definitely got overage above 80kt, yes?". Mr Savage responded, "Definitely got free overage … recap says, "overage" yes, "zero". Only for Med it's 50%".

62  Later that afternoon at 17.14 Mr Rathbone yet again sought confirmation about overage freight payable under the "Target" charterparty, and asked Mr Finlinson whether it would be due on cargo loaded at Odessa over the minimum quantity of 80,000mt. Mr Finlinson replied that it was not, but before doing so he again telephoned to Mr Savage at 17.17 and asked what the freight would be on a cargo of 87,000mt loaded at Odessa for transatlantic carriage. Mr Savage replied that it was the Worldscale rate (which he wrongly referred to as being at 120%, not 135% or 140%) multiplied by 80,000. The exchange continued as follows:

AF:  "…The trader's constantly checking and I'm just making sure that I am not missing a trick and checking it's right."

JS: "Well if I say to the owner –"

AF: "I know, I know, I know, but that's fine –"

JS: "He's going to go, 'We can't do this', and I'm just saying on paper –"

AF: (inaudible)

JS: "- which was agreed in the recap which we talked about, it does say, 'The overage for 0% was for Med only'."

AF: "Yes."

JS: "Overage at 50% sorry for Med only."

AF: "Yes, okay."

10-03635-jpm    Doc 271-1    Filed 04/03/17    Entered 04/03/17 18:29:57    Exhibit A - Part 1    Pg 379 of 538

BP Oil International Ltd v Target Shipping Ltd, 2012 WL 2065172 (2012)...

Later in the conversation Mr Savage said that Mr Cooper would "really kick up a fuss" about what was happening "on the Target", and that he (Mr Savage) would then respond, "Well, you know, as per the charterparty, basically that's the way I've interpreted it". Mr Finlinson replied that he was not suggesting that Mr Savage "ask him [Mr Cooper] because he'll just moan". They referred to the term of the Recap about the overage for Mediterranean discharge "only", and Mr Savage said, "…if he kicks up a fuss, we'll just say 'Look, Alex you know, he's done the deal on that basis and that's what it says in the recap'". He commented that Mr Cooper would "never speak to [him] again but never mind".

63   Mr Finlinson and Mr Savage spoke again at 17.38. Mr Cooper had called Mr Savage and said that, although BP were enquiring about draughts for discharging at the Bahamas, they were not entitled under the charterparty to discharge there. He had said that he would discuss granting an option for this the following morning. Mr Finlinson wanted the matter resolved that evening. Mr Savage spoke again to Mr Cooper, who said that, if the option was agreed, he would want help with operational matters, and there were exchanges about how much cargo the vessel might safely carry to various discharge ports. At 17.57 Mr Savage told Mr Finlinson that Geden would grant an option to discharge in the Bahamas. Nothing was said to Mr Cooper about transatlantic overage freight.

64   On 12 March 2010 Mr Savage sent a Yahoo message to Mr Finlinson at 9.19 confirming that Geden had agreed to a Bahamas discharge option at the same rate as for USAC and Caribbean discharge, that is to say at a 140 Worldscale rate. Shortly afterwards Mr Finlinson and Mr Savage had a long telephone conversation that was mostly about other fixtures, but

Mr Finlinson referred in passing to the "Target" and being "relieved to get that nil rate". I interpret this as meaning that he was relieved that the vessel was going to Marmara to load and to carry the additional cargo without incurring transatlantic overage freight. This remark suggests to my mind that Mr Finlinson did not think it certain throughout 11 March 2010 that the charterparty, properly interpreted, meant that no transatlantic overage freight was payable and that BP were entitled to load additional cargo at Marmara. Mr Finlinson was, I think, initially less confident about his interpretation of the charterparty than he now believes.

65   In a telephone conversation at 15.49 between Mr Finlinson and Mr Savage, which was mostly about the vessel's draughts and how much cargo could be loaded, Mr Savage again confirmed BP's Bahamas discharge option and Mr Finlinson asked for a written addendum to the charterparty covering it. On 15 March 2010 at 10.08 Mr Cooper sent Mr Savage such an addendum (addendum no 1).

66   At 15.37 on 12 March 2010 Sovereign had sent to Geden a further request of BP, that the "Target" should conduct open sampling at Marmara. In response, Geden requested instructions from BP about their intentions for the vessel "as all that we have received so far is 'Singapore for orders'". BP provided further orders, which Sovereign sent on to Geden at 18.13. They included these: "Port: Marmara Ereglisi, ETA March 14 2010 (00.00), Operation(s): Load", and "Operation: For Orders, Port USA". They also mentioned the quantity of cargo to be loaded at Marmara, approximately 26,021.543mt. Mr Savage's evidence was that he did not see these orders until 16 March 2010 after the "Target" had started loading, and I accept that. It was only in the afternoon of 16 March 2010 that he knew that BP had actually directed her to the United States for orders, although Mr Finlinson had told him in their conversation at 11.08 that morning that the cargo was "going to the States". (I conclude that it was only then that he knew that the "Target" would pretty certainly be going to America: as I interpret it, the exchange at 10.25 demonstrates this: see para 74 below. Clearly Mr Savage knew earlier that it was a possibility, but a voyage to the Far East seemed more likely. Mr Savage was not fully aware of operational matters: for example, in his conversation with Mr Finlinson at 10.25 he said that the vessel was already loading, and at 11.08

he said that she had already sailed from Marmara.) Mr Cooper too did not see the orders until 16 March 2010, but he accepted in cross-examination that he realised that BP might want to load some such quantity, that they "might want to fill the ship up".

67  On 13 March 2010 the vessel passed through the Bosporus straits. That day Mr Cem As, who worked in Geden's chartering department in Istanbul, sent an email to Mr Cooper that BP had appointed agents to load cargo at Marmara. Mr Cooper responded that Geden should check the terms of the Recap because he thought that BP might be relying upon the interim port clause, although, as he recalled, "they can only do this if discharge East". (He presumably had it in mind that the interim ports clause dealt with voyages "Where freight is payable by lumpsum".) Later, at 14.51 he confirmed that he thought this to be the position and added, "If they go to States (which was their intention so far) it will be as per WS (which should be better for us)".

68  At 18.52 on 13 March 2010, in response to enquiries from BP about cargo being transferred within the vessel and oil loaded at Marmara being separated from the Odessa cargo, Mr Cooper wrote about arrangements for managing cargo operations at Marmara: "Please also point out to [BP] that the vessel is about to arrive at Marmara so all time lost waiting for instructions is for charterers' account…. Lastly … we would remind [BP] that the internal transfer operations will take approx 12–14 hours … and that all time and costs for this operations are for charterers' account". The "Target" arrived at Marmara roads early on 14 March 2010 and at 2.13 she tendered notice of readiness, stating that the vessel was ready to load cargo "in all respect accordance … with all terms, conditions and exceptions of the governing C/P". At 21.05 BP, via Sovereign, gave orders that that the vessel should commence the internal transfer of cargo in preparation for loading more oil, and she did so the next morning.

69  Mr Savage telephoned Mr Finlinson at 10.25 on 16 March 2010, saying that they needed to "kind of iron some stuff out" about the vessel loading at Marmara. He said that the operation was not covered by the interim ports clause unless the freight was a lump sum (sc. the vessel went to the Far East) and the "backload clause", that is to say SAC6, did not permit it "because it's in the load region, not the discharge

region". Whatever precisely Mr Savage meant by this, he clearly no longer believed that, as he had said on 11 March 2010, the operation was "definitely covered" by SAC6. He continued "well, it's not a problem getting you the option to load there, but I'm going to have to straighten this out". Mr Finlinson, apparently unconcerned, simply responded "Right".

70  Mr Savage also told Mr Finlinson that Mr Cooper had "still overlooked the overage at zero". He did not claim to have a detailed recollection of a conversation with Mr Cooper that led to this remark, but he described the circumstances as follows. On 14 or 15 March 2010 Mr Cooper had first suggested to him that the charterparty should be amended to include Marmara as a load port, but initially Mr Finlinson had not thought that an addendum was required because he believed that BP were already entitled to load cargo there under the charterparty. However, when it became apparent that the voyage might not be to the Far East and the freight might therefore not be for a lump sum, it "made sense" to Mr Savage (as he put it) that, because the loading operation would not then be covered by the interim ports clause, the charterparty should, as Mr Cooper suggested, be amended to provide for it. Early on 16 March 2010, or possibly late on 15 March 2010, Mr Cooper again spoke to Mr Savage by telephone about the vessel loading at Marmara and the need for an appropriate addendum to the charterparty if there was a transatlantic voyage. According to Mr Savage, however, nothing was said about BP paying overage freight, although a question was raised about whether BP should pay one "flat rate" for the voyage from Odessa to the US Gulf and another for a voyage from Marmara to the US Gulf.

71  Mr Finlinson did not remember telling Mr Savage that he did not think an addendum necessary, but this would have been consistent with his understanding of the charterparty. His evidence was that he was confident that the charterparty already entitled BP to load at Marmara, although he accepted that he "may not have looked at [SAC6] in great detail", he "knew it was there and [BP] could depend on it". While he might not have been as sure of the position as he suggested in his evidence, I accept that he supposed that the charterparty allowed BP to load at Marmara.

72  Mr Cooper agreed with Mr Savage that he had suggested that there should be an addendum to deal with the loading operation, and Mr Savage questioned whether it was necessary. He thought that this exchange was "later in the day" on 16 March 2010 (as he put it in cross-examination) or "after loading at Marmara had taken place" (as he put it in his witness statement), but agreed that he was not sure when he first spoke of an addendum. I do not consider that Mr Cooper's evidence significantly contradicted this part of Mr Savage's evidence and in any case I accept Mr Savage's account and his explanation of the background to his remark about Mr Cooper "still overlook[ing] the overage at zero".

73  After Mr Savage had spoken to Mr Finlinson at 10.25 on 16 March 2010, he had at least one further telephone conversation with Mr Cooper before telephoning Mr Finlinson again. There is dispute about what was said in it, and I shall revert to that. When Mr Savage telephoned Mr Finlinson at 11.08 he told him that Mr Cooper had "just cottoned on about the overage". Mr Savage's account to Mr Finlinson about his conversation with Mr Cooper is set out in the agreed transcript as follows:

> "He [Mr Cooper] said, 'As there's actually no overage stated at all for the States, then isn't it we pay on Worldscale on, amount of cargo loaded?' So I said, 'Where does it say that in the charterparty?', and he said 'Well', he said, 'As per Worldscale' and I have looked through Worldscale and I can't see anything which says that. …. But that is their opinion. I said, 'Well, you know'. He said, 'if he wants to do 50% [note: I have here amended the transcript from "if he won't do 50%" to reflect what I heard when listening to the recording], you know, I'm willing to be reasonable, I'll need to check it with Greece but I don't think so', because I said to him, 'We want to pay for oil on actual voyage the oil pays". [note: these were Mr Savage's words, but his intended meaning is less than

clear]. He said, 'Well', he said, 'no, I want to do it as per Worldscale and then we'll get paid the overage, and then the overage came up and he starts saying, 'Oh', and he said, 'According to me BP are going to be paying 100% overage for this'. So I said, 'Well, where do you get that from?' So he said, 'Well' … he said, 'It says only overage 50% only for Med only'. That is the wording specifically says on the recap, it's for Med only, 50%, and he's saying, 'Well, as it doesn't specify for TA [Transatlantic] … he's saying that there's no overage for this, which means it's on actual cargo loaded. Which is different from my interpretation of it. …. I mean, he's just said, 'Look, I'll do one, two, ports, Marmara Ereglisi, 50% overage, and then that's, you know, I'm happy to do that'."

74  Mr Finlinson's reaction can be heard on the recording. He sounds dispirited by Mr Savage's news that Mr Cooper said that the Recap did not "specify for TA", but he did not express surprise about Mr Cooper's understanding of the charterparty or that his own interpretation was not shared by the Owners. He said "we" (which I understand to refer to BP) had "all along" considered that "0% overage" had been agreed, and that, if the matter went to arbitration, "this could go down to what we have agreed". Mr Savage pointed out that transatlantic overage freight had not been discussed in negotiations ("It was never negotiated down to 0%"), and suggested that an arbitration might decide that the transatlantic overage freight was at the rate of 50% in view of trade custom and the default provision in the BPVoy 4 form, although he had agreed with Mr Finlinson's opinion about the proper interpretation of the charterparty. Mr Finlinson sought to confirm that Mr Cooper had agreed to an option to load at Marmara "on condition that it's 50% overage", but Mr Savage responded that Mr Cooper had said

that he needed "to speak to Greece" about that. The
conversation continued:

> AF: "So the condition is that he will
> only give Marmara on the basis that
> it is 50%?"

> JS: "Well, if doesn't really matter
> now anyway because you have sailed
> from there." [Note: the vessel had
> not in fact sailed from Marmara:
> loading began only at 13.12.]

> AF: "Sorry? It is decided already,
> yes?"

> JS: "Yes. To some degree, this is just
> – I mean it's not holding up anything
> operationally."

> AF: "No, but hang on. Why have
> they given permission for something
> that they didn't actually …?"

> JS: "Well, this could also be used as
> your, to some degree they can say,
> you – you could go east now which
> makes this all go away. Because if it
> goes to the east – "

> AF: "Yes, it is not sold – it's going to
> the States."

> JS: "I know. I mean it could be
> argued either way because I said to
> him, 'Well then, why did they do this
> before', I said, 'Well, you know, as
> per the Worldscale east option?' As
> it is going TA [transatlantic] now,
> this comes into play. I mean, he
> didn't notice this until now either, so
> …"

> AF: "Yes … "

75  The account that Mr Savage gave to Mr Finlinson of
his discussions with Mr Cooper does not fit comfortably
with either his own evidence or with that of Mr Cooper
about them. However, both witnesses agreed that some
reference was made to the possibility of BP paying
transatlantic overage freight at 50%, at least upon
additional cargo loaded at Marmara. Moreover, at
10.55 Mr Savage sent Mr Cooper a Yahoo message
about an agreement for transatlantic carriage that BP
had made with another owner, Heidmar: that BP should
pay overage freight at 50% of the applicable Worldscale
rate on cargo loaded at an interim port in excess of
92,000 mt, but no overage freight was to be charged for
other cargo. (I infer that 92,000 mt was chosen as the
cut-off point because that is the draught restriction at
some US ports.) Mr Savage then wrote to Mr Cooper
at 10.56, "I presume that you aren't going to give any
free overage above 80K, if any". These messages to my
mind provide some confirmation that, before they were
sent, Mr Cooper and Mr Savage had spoken at least
once by telephone, that Mr Savage had suggested to Mr
Cooper transatlantic overage freight at 50% and that
Mr Cooper had neither agreed to the suggestion nor
rejected it outright. The reference to "free overage" also
suggests, I think, that Mr. Savage said something about
cargo being carried without incurring liability for extra
freight, and so is at least consistent with his evidence
that he referred to BP's contention that no overage
freight was payable. In his second witness statement
Mr. Cooper disputed this, saying that, when Mr Savage
referred to "free overage" he had understood that he
meant "free overage (as opposed to zero overage")
… was anything below 100%". He resiled from that
evidence in cross-examination. What he said in his
witness statement could not have been true.

76  Mr Savage's evidence was that between his
two conversations with Mr Finlinson at 10.25 and
11.08 he spoke again with Mr Cooper, and they
discussed agreeing upon an addendum about loading at
Marmara, as Mr Cooper had previously suggested. In
this context he told Mr Cooper that BP thought that

BP Oil International Ltd v Target Shipping Ltd, 2012 WL 2065122 (2012)

no overage freight was payable on "the transatlantic rates", explaining that BP inferred this from the Euromed overage freight term. He recalled that Mr Cooper read through the BPVoy 4 form while they were on the telephone, and explained that he thought that the Euromed overage freight term displaced the standard provision for 50% overage in the BPVoy 4, with the result that BP were liable for full transatlantic overage freight. He described Mr Cooper as "thinking on his feet, so to speak, reasoning it out", and said that Mr Cooper's response that full freight was payable was not "an immediate retort when I said zero per cent". He denied that Mr Cooper ever said that the Owners would not accept orders to go to Marmara or to load cargo there unless BP agreed to pay transatlantic overage freight on any additional cargo, but Mr Cooper simply asserted his, or the Owners', understanding of what the charterparty terms meant. Mr Savage said that he told Mr Cooper that he "had taken [his points] and would pass them on to BP", but not that he agreed with them.

77    According to Mr Savage, they also discussed whether Mr Cooper would accept a compromise about transatlantic overage freight. He agreed that he had probably asked for a compromise "as a favour". He said that his recollection, albeit vague, was that Mr Cooper had indicated that he would "speak to Greece" about whether the Owners would accept transatlantic overage freight of 50%, but explained in cross-examination that the reference to Greece, which was echoed in his later conversation with Mr Finlinson, was a "slip of the tongue": Geden were, of course, based in Istanbul and not in Greece.

78   Mr Cooper's evidence in chief was that he recalled his discussions with Mr Savage on 16 March 2010, "not the precise words, but certainly the whole of the discussions". It became clear in cross-examination that his recollection was not as good as this would suggest: he could not recall how many conversations they had had, and was confused about what was said in different conversations.

79   Mr Cooper described his first conversation with Mr Savage as "very brief": he recounted that Mr Savage telephoned him, introduced the subject of overage freight, and observed that the charterers were to pay overage freight at 50% only in the event of Mediterranean discharge. Mr Cooper said that his

reaction was to laugh with Mr Savage, and to remark that that was "a jolly good job, because it looks like we may be going to the States now and full freight would apply"; and Mr Savage responded that he would speak to BP. He accepted that Mr Savage might have said that "it could be interpreted as zero" (sc. that the charterparty might be interpreted as providing that no transatlantic overage freight was payable), although he did not recall him doing so.

80   He gave evidence of further discussions with Mr Savage about the position. I found his answers about them in cross-examination difficult to follow, but I understood him to say that Mr Savage telephoned him again (for either a second or a third conversation that day), and they discussed transatlantic overage freight when they both had a copy of the Recap to hand. He said that Mr Savage was "effectively asking us for a favour", and put him under "enormous pressure" to accept a reduced transatlantic overage freight, telling him that Mr Finlinson would be in trouble with his "bosses".

81    According to Mr Cooper, in one of their conversations (he could not recall in which) he told Mr Savage that "he should be very clear to BP that if they were intending to take the cargo to the United States they have to be very clear that full freight was to apply and if they weren't clear about that, they should not load the cargo". This evidence echoed what he had stated in his e-mail of 9 May 2010 to Mr Uttley ("I told them not to load the additional cargo if they were not prepared to pay overage 100% in the event of the vessel discharging States."). Mr Cooper said that this was not stated by way of an ultimatum, or in an argumentative manner, but by way of discussion. Mr Savage had no recollection of this. It is possible that Mr Cooper observed that, if BP loaded the cargo at Marmara, the consequence would be that they would be liable for full overage freight on a transatlantic voyage and that BP should be prepared for this: Mr Savage might well not have remembered those words, because Mr Cooper would only have been stating what was implicit, as Mr Savage understood, in Mr Cooper's interpretation of the charterparty. I reject any suggestion that by this observation Mr Cooper meant (or would reasonably have been taken to mean) that BP should *agree* to pay full transatlantic overage freight, still less that, unless they so agreed, the Owners would not load the Marmara cargo. Mr Savage would

not only have recalled such a conversation: he would have warned BP that loading might not be permitted unless they agreed to full transatlantic overage freight.

82   Importantly, Mr Cooper agreed that Mr Savage might have told him that BP were not happy to pay "full freight", and that, as BP interpreted the charterparty, they were not liable for transatlantic overage freight, although, he said, Mr Savage was not "pushing the point that hard". According to Mr Cooper, Mr Savage spoke of an argument that the Owners would not be entitled to any transatlantic overage freight and, whatever the precise words used, he took it that Mr Savage, as BP's broker, was conveying BP's interpretation of the charterparty. Mr Cooper said that he responded that "full freight" had been agreed, and insisted that they should abide by the agreement.

83   Mr Cooper's evidence in cross-examination was that Mr Savage later telephoned him again, apparently having spoken to BP, and told him, "They are aware, it is fine". (Initially Mr Cooper's evidence was, as I understood it, that Mr Savage said this when they first discussed transatlantic overage freight, but that could not be correct: Mr Savage must have spoken to Mr Finlinson or someone else at BP before telling Mr Cooper that BP were "aware".) I accept that Mr Savage probably confirmed that BP were aware that the Owners contended that "full overage freight" would be payable, but not that he said more than this. Whatever his precise words, I do not accept that he said anything that could reasonably have conveyed to Mr Cooper that BP agreed that the charterparty provided for full transatlantic overage freight or that they agreed to pay it. Mr Savage's evidence was that he "could see merits in [Mr Cooper's] argument but I knew BP were going to disagree as much with his 100 per cent as he did with the 0 per cent". That was obviously so, and I accept Mr Savage's evidence. In my judgment, in these circumstances Mr Savage, as an experienced broker, would not have indicated BP's consent to, or even acquiescence in, the Owners' position. He clearly understood the difficulty that had arisen and would not have aggravated it in this way.

84   At 16.25 Mr Cooper sent an email to Mr Savage that the Owners had no orders about where they were to proceed, saying that their only instructions from BP were that the "Target" should go to Singapore

for orders; and he asked for updated orders at BP's earliest convenience. As I have said, he had overlooked the orders given on 12 March 2010 at 18.13: see para 66 above. At 16.30 Ms Bassie, through Sovereign, confirmed the order to proceed for the USA for orders.

85   Mr. Cooper's evidence was that, had BP responded to what he had said on 16 March 2010 by refuting his interpretation of the charterparty, or had they said that they would not pay full overage freight for the Marmara cargo, the Owners "would have refused to load", but not without taking legal advice. As I understood his evidence, he meant that the Owners would have prevented the loading operation if they had advice that they were entitled to do so. Certainly I do not accept that they would have done so without such legal advice. Nor do I accept that a lawyer properly appraised of the facts would have advised that the Owners were entitled to refuse to load, given that the vessel had already proceeded to Marmara as directed by BP and given that until after 16 March 2010 BP were entitled to give such orders under the interim ports clause (because they had not given orders that precluded them from directing the vessel to the Far East). Moreover, there is a further reason to conclude that the Owners would not have prevented the loading operation. Mr Cooper must have contemplated that BP might need some time to consider what he had said, and possibly to take legal advice, before responding to it. Only then would the Owners, on Mr Cooper's account, have taken legal advice. By then, the loading operation at Marmara would probably have been completed. I cannot accept that, had BP, having taken a reasonable time to consider their position, responded to the Owners rejecting their interpretation of the charterparty, matters would have so developed that the Marmara cargo was not loaded; nor can I accept that on 16 March 2010 it occurred to Mr Cooper that this might happen.

86   I add that Mr. Cooper accepted that, once the vessel had loaded the Marmara cargo, the Owners would not have refused to discharge in the United States on the grounds that, by loading at Marmara (which they were entitled to do only if they would be liable for lump sum freight), BP had made an election not to exercise their options for discharge in the United States or the Caribbean.

**Conclusions about the exchanges between 11 and 16 March 2010**

87   These being the exchanges between the parties, I make the following findings, first about what Mr Cooper, Mr Finlinson and Mr Savage thought in the period between 11 and 15 March 2010, and then about the exchanges on 16 March 2010.

88   Mr Cooper: Mr Cooper never supposed that BP were entitled to direct the "Target" to Marmara to load unless she were going to the Far East. However, it did not occur to him that the Owners should prevent BP from loading cargo there, and I consider that probably he did not think about whether they were entitled to do so when the matter was first raised on 11 March 2010. By about 14 March 2010 he had come to realise that, while under the interim ports clause BP were entitled to load at Marmara for a Far East voyage, they were not if she went to America. He therefore wanted the position covered in an addendum, but he regarded this as a simple administrative matter to amend an omission and not as a concession that BP needed to negotiate or about which the Owners were minded to be difficult. As Mr Cooper said in cross-examination, the Owners were co-operating with BP and not trying to create problems. I agree with the submission of Mr John Russell (who represented BP) that the voyage orders to load at Marmara were accepted before Mr Cooper thought about whether and if so why BP were entitled to order this. I also accept that the Owners would have co-operated in this way regardless of what they thought was the contractual position about paying transatlantic overage freight on Marmara cargo. (In coming to this conclusion, I do not overlook that the Owners had not been amenable when BP approached them about discharging cargo at Marmara: there were obvious commercial reasons that they should resist that plan in that they were expecting and hoping for a much longer voyage.)

89   I accept that Mr Cooper's impression throughout this period was that full transatlantic overage freight would be payable in respect of all the cargo that the "Target" carried, but he did not think about this in any detail before 16 March 2010: I do not believe that Mr Cooper was sufficiently attentive to detail carefully to have considered the terms of the Recap or analysed their application to the voyage that BP proposed. For example, as he eventually admitted in cross-examination and as I conclude, when fixing the vessel he overlooked that the Recap included SAC6. (His initial reluctance to accept this was not to his credit.) He also overlooked BP's voyage orders sent to the vessel on 12 March 2010.

90   I conclude that, much as Mr Savage described, it was only when he was speaking to Mr Savage on 16 March 2010 that Mr Cooper examined the terms of the Recap to justify what he had previously assumed to be the position about transatlantic overage freight. Mr Cooper's evidence was that he had had no reason "to address his mind to any question of overage" after the fixture was concluded in February 2010 until 16 March 2010 when he discussed it with Mr Savage, particularly since he had initially thought that BP were unlikely to opt for a transatlantic voyage.

91   I therefore reject Mr Russell's submission that before 16 March 2010 Mr Cooper had no view at all about whether BP would be liable to pay transatlantic overage freight. Mr Russell pointed out that, when the Euromed overage freight term was negotiated, nothing was said about overage freight for other discharge ranges, and indeed Mr Cooper accepted that nothing was said about transatlantic overage freight before 16 March 2010. But that does not belie Mr Cooper's evidence that he thought that BP were liable for full transatlantic overage freight under the charterparty.

92   Mr Russell sought to make something of voyage estimates prepared by Mr Cooper because none were made on the basis of full (or any) transatlantic overage freight before 18 March 2010. Mr Cooper's previous estimates had been made on the basis of cargo of 80,000 mt, the minimum quantity under the charterparty, including one made on 11 March 2010 (for a voyage discharging at Freetown, Bahamas, and returning to Gibraltar) although by then Mr Cooper knew that in fact the "Target" had loaded some 87,000 mt at Odessa. The voyage estimates are consistent with my conclusions that Mr Cooper was not careful about the detailed arrangements for the voyage and that he was not thinking about overage freight when Mr Savage spoke to him on 11 March 2010 about the vessel going to Marmara, and they do not persuade me that Mr Cooper understood that the Owners would not be entitled to transatlantic overage freight.

BP Oil International Ltd v Target Shipping Ltd, 2012 WL 2065172 (2012)

93  Mr Russell also referred to Mr Cooper's evidence that, when the fixture was negotiated, he had been reluctant to agree to the transatlantic discharge options, and submitted that he would not have been if he had thought that it provided for full transatlantic overage freight. I am not convinced by this argument: Mr Cooper could not have been confident that BP would load significantly more than the minimum cargo, and in any event he was concerned about the positioning of the vessel after a transatlantic voyage. I can readily understand that Mr Cooper would have much preferred the certainty of a lump sum freight for a voyage to the Far East.

94  Both BP and the Owners sought to rely upon Mr Cooper's email of 13 March 2010, in which he wrote that a voyage "to States … should be better for us" (see para 67 above). I do not consider that Mr Cooper's email supports the contention of either party or provides any evidence about what he thought about BP's liability for transatlantic overage freight. The Owners argued that the email reflects that Mr Cooper expected that transatlantic overage freight would be paid upon additional cargo loaded at Marmara. Mr Cooper said in cross-examination, "I think I am telling them if they load more cargo, we earn a lot more money". But his comment was made in the context of observing that freight for a transatlantic voyage was based on Worldscale rates, and I agree with BP's submission that it is explicable on the simple basis that the Worldscale rate for a voyage via Marmara would be higher than for a voyage direct from Odessa to the United States. Mr Cooper's evidence was that, when account is taken of additional bunkers and port costs, the Owners would not profit from going to Marmara and this would be to their disadvantage. However, Mr Cooper's message on 13 March 2010 did not, I infer, reflect such detailed calculations: his phraseology ("which *should* be better for us", emphasis added) to my mind indicates otherwise.

95  On the other hand BP argued that, if Mr Cooper had really thought that the Marmara cargo would attract full freight, he would have written more enthusiastically about taking on additional cargo for a transatlantic voyage: he would have appreciated that the Owners would earn much more freight, and would have said so. Mr Russell observed that in his email to the Owners

on 13 April 2010 (to which I refer at para 119 below) Mr Cooper specifically referred to the Owners earning full transatlantic overage freight on the entire cargo: that was after his discussions with Mr Savage on 16 March 2010. Mr Russell argued that the distinctly more tentative phraseology of the email of 13 March 2010 reflects Mr Cooper's recognition that the Owners would not be paid for the additional cargo, and the only benefit to them was the increased flat rate freight due to the additional distance. In my judgment, this places unrealistic weight upon the precise wording of the email.

96  Mr Finlinson: the Owners' case that BP believed that they were mistaken about the freight payable under the charterparty and Mr Finlinson decided to exploit the mistake depends largely, if not entirely, upon the conversation at 17.17 on 11 March 2010. Mr Finlinson did not, as he told me and I accept, have a specific recollection of the conversation.

97  The background to the conversation is that, having agreed the fixture on 26 February 2010, Mr Finlinson had little if any involvement with the "Target" for nearly two weeks, and he had no reason to think about the fixture until 11 March 2010 when Mr Rathbone asked him about whether BP would be charged transatlantic overage freight at 50%. Mr Finlinson was busy with other matters, and on 11 March 2010 he and Mr Savage were not only concerned with the "Target" but also with the fixture for the "Black Sea" because the recap for that fixture had been drawn up incorrectly. Moreover, on 11 March 2010 BP had not decided where the cargo on the "Target" should be sold, nor decided to direct her to the United States. Although the trial focused on what transatlantic overage freight was payable for the "Target", at the time this was not Mr Finlinson's main concern.

98  According to Mr Finlinson, he had always believed that no transatlantic overage freight was payable. I accept that evidence, although, as with Mr Cooper, I conclude that this belief was not the product of careful consideration of what the Recap said. Until 11 March 2010, it depended simply upon his impression of the effect of the freight arrangements and he was not certain about the position, but on 11 March 2010 his belief was confirmed by his conversations with Sovereign.

99   It did not, as I conclude, occur to Mr Finlinson around this time that, as he put it, "there [was] going to be an issue calling at Marmara, the owner [was] going to refuse to call at Marmara". He had been encouraged in this view by Mr Savage in the conversation at 13.35 on 11 March 2010, in which Mr Savage said that because "your SAC is unamended" there was no problem about a "top-up". However, I do not believe that Mr Finlinson had by then come to a considered view that BP were entitled under SAC6 to load at Marmara: as I explain below (at para 113) I conclude that he later conceived this argument. Initially Mr Finlinson considered that the interim ports clause might be applicable whatever the vessel's destination, and (as he told me and I accept) he appreciated that it would not be only on 16 March 2010. Mr Finlinson said in his evidence that, "At this stage [sc. on 11 March 2010] I knew that the charterparty contained SAC6 but it also contained an interim port clause, so without looking at either clause in great detail I knew that by having those clauses in there, then performing a top up operation would be something I would be able to do". Mr Finlinson supposed (rightly) that, whatever BP's legal rights under the charterparty, the Owners would not be minded to cause BP problems and would co-operate with their plans; and so he was not really concerned about whether BP could have insisted upon the diversion to Marmara if the Owners refused. This, I think, is why, when in the 10.25 call on 16 March 2010 Mr Savage explained that BP were not entitled to load at Marmara either under the interim ports clause or under SAC6, he readily accepted Mr Savage's assurance that "it's not a problem getting you the option to load there": Mr Finlinson had never supposed that there would be a problem, whatever the legal position.

100   I also accept Mr Finlinson's evidence that he did not have it "at the forefront of his mind" how the Owners might have interpreted the charterparty (with regard to transatlantic overage freight or anything else) when he was discussing the possibility of loading additional cargo at Marmara. He did not see himself as engaged in negotiations about the fixture but as involved with operational decisions. As he put it in cross-examination: "there was no negotiation around that time. And so to me, it was more an operational point of the charterparty".

101 There is no evidence that I accept that Mr Finlinson thought at any time before 16 March 2010 that Mr Cooper or the Owners considered that full transatlantic overage freight on any cargo loaded at Marmara was or even might be payable. In their conversation at 17.17 on 11 March 2010 Mr Finlinson and Mr Savage recognised that Mr Cooper did not appreciate that, as Mr Finlinson thought, the Owners would not earn any transatlantic overage freight, and expected that Mr Cooper would be disappointed and cross when he learned this. But nothing in the conversation indicates that Mr Finlinson had had this in mind earlier, still less that it influenced BP's exchanges with the Owners or their decision to load at Marmara or their decision to direct the vessel to America. Indeed the conversation at 17.17 was not about the freight that would be payable on a Marmara cargo but the freight payable on the Odessa cargo of 87,000 mt.

102   With regard to what Mr Finlinson thought on 11 March 2010, therefore, I conclude:

  • i) That he believed that according to the terms of the Recap no transatlantic overage freight would be payable, and he thought that Mr Savage shared this view. However, Mr Finlinson had not given the matter much thought, and was not sure about the position before speaking to Mr Savage about it. He did not think about how Mr Cooper or the Owners might understand the contractual position, but expected that they would be unhappy about a transatlantic voyage, mainly because they would be unhappy about not earning any overage freight. (Mr Finlinson said in cross-examination that he expected that this would be Mr Cooper's reaction partly because he hoped for a voyage to the Far East, but he anticipated, in my judgment, that the disappointment would be mainly because of the transatlantic overage freight.)
  • ii) That he did not expect that there would be any difficulty in having the vessel load additional cargo at Marmara, supposing (again without giving the matter thought and without considering what the Owners might believe the contractual position to be) that they were entitled to require this under the charterparty and expecting that in any case the Owners would co-operate with BP about this.

103   Mr Finlinson did not consider that on 11 March 2010 he was making any arrangements that were improper or unconscionable or dishonest. He considered that he was simply discussing with BP's broker the chartering arrangements in response to Mr Rathbone's enquiries.

104   Mr Savage: when the fixture was concluded, in so far as Mr Savage considered what transatlantic overage freight would be payable, he had in mind that usually overage freight was paid at 50% of full freight and rather assumed that BP would being paying at that rate. He did not voice this to either BP or Mr Cooper. When on 11 March 2010 Mr Finlinson expressed the view that on the proper interpretation of the Recap no transatlantic overage freight was payable, he subscribed to it. I accept his evidence that he instinctively had misgivings about this interpretation, but, as I conclude, being unable to pinpoint any flaw in Mr Finlinson's argument, he accepted it and did not express his misgivings to Mr Finlinson. He did not think that Mr Cooper would readily accept that BP should not be liable for any transatlantic overage freight, but it did not occur to him before 16 March 2010 that Mr Cooper might believe that the charterparty provided for, or the Owners expected to be paid, full transatlantic overage freight.

105   When Mr Savage made his witness statement, he said he did not think "at the time" that BP were entitled under SAC6 to divert to load at Marmara. He had apparently forgotten about what he had said on 11 March 2010 in the conversation at 13.35. It was not suggested to him in cross-examination that he was deliberately misleading Mr Finlinson on 11 March 2010, and I conclude that, when he said that the loading operation at Marmara for transatlantic discharge was "definitely covered" by SAC6, he genuinely believed this, although he had not considered the position carefully. When the "Target" fixture was made, Mr Savage had thought that she "was always going to go east" and this was still what he expected; and then the operation would have been permitted by the interim ports clause. It did not occur to Mr Savage, as he told me and I accept, that the Owners might refuse orders for a transatlantic voyage because the vessel had loaded at Marmara.

106   The "trick" allegation: it is clear from the conversation at 17.17 on 11 March 2011 that Mr

Finlinson and Mr Savage realised that Mr Cooper did not appreciate that, as at least Mr Finlinson supposed, the Owners would not earn transatlantic overage freight, and they thought that he would be disappointed and displeased when he realised the position. However, I reject the Owners' suggestion that Mr Finlinson and Mr Savage were engaged in a strategy to "trick" them into allowing the Marmara loading. They decided not to raise the matter with Mr Cooper on 11 March 2010: Mr Finlinson thought that there was no reason to do so because, as he saw it, he was engaged in essentially operational matters and not in negotiations, and Mr Savage saw no reason to cause ill-feeling unnecessarily given that the voyage would probably be to the Far East. (Mr Steven Berry QC, who represented the Owners, did not submit that Mr Savage knew on 11 March 2010 that the "Target" was to be ordered to America.) BP and Sovereign simply thought that Mr Cooper had misunderstood the agreed terms of the charterparty. They had done nothing to create his perceived misunderstanding.

107   16 March 2010: I make these findings about the exchanges on 16 March 2010:

• i)   At the time of their first exchanges in the morning of 16 March 2010 neither Mr Savage nor Mr Cooper knew that the vessel had been instructed to go to the United States for orders. They knew that she might be ordered there, but both thought it more likely that her voyage would be to the Far East.
• ii)   Mr Savage and Mr Cooper had a conversation before 10.25 on 16 March 2010 and discussed the arrangements for loading at Marmara and whether there should be an addendum to the charterparty to record them. Nothing was said about overage freight. I cannot accept that Mr Savage would have told Mr Finlinson that Mr Cooper had overlooked "the overage point" if it had been discussed.
• iii)   After 10.25 Mr Savage and Mr Cooper spoke again. In exchanges initiated by Mr Cooper about the arrangements for loading at Marmara, transatlantic overage freight was discussed for the first time. In my judgment, it is more likely that the question first arose in this context, as Mr Savage said, than that Mr Savage, having decided with Mr Finlinson not to discuss overage freight with Mr Cooper, should start a conversation about the

overage freight payable in the event of the cargo being discharged in the Mediterranean.

• iv)  Before those discussions, Mr Cooper had supposed that the charterparty provided for full transatlantic overage freight, although he had not examined the relevant provisions of the Recap and the BPVoy 4 form. In the conversation after 10.25 on 16 March 2010, he made his view clear to Mr Savage.

• v)  Mr Savage responded that the charterparty was open to another interpretation, that no transatlantic overage freight was payable, and he made Mr Cooper aware that BP maintained this interpretation.

• vi)  In that conversation or another conversation later that day, Mr Savage and Mr Cooper went through the Recap together, and Mr Cooper sought to justify his interpretation by reference to it.

• vii)  Mr Savage did not become embroiled in debate about the proper interpretation of the contract, but he did not say anything or indicate that he agreed with Mr Cooper's interpretation, nor that BP accepted it, nor that he thought that BP would do so.

• viii)  Mr Savage tried to engage Mr Cooper in discussions of a compromise (and for this purpose send the Yahoo message about BP's arrangement with Heidmar). Mr Cooper showed little interest, although he did, as I conclude, say that he would discuss the position with the Owners. (Mr Cooper could not have referred to speaking to Greece, as Mr Savage reported to Mr Finlinson: he probably referred to speaking to the Owners, and Mr Savage reported this to Mr Finlinson in terms of speaking to Greece, an understandable and inconsequential mistake.)

• ix)  However, when Mr Savage spoke to Mr Finlinson at 11.08, Mr Savage gave a false picture of Geden being willing to compromise about transatlantic overage freight. I infer that he was trying to bring the parties into discussions to resolve the problem, and to encourage BP to put forward a proposal in order to achieve this.

• x)  Mr Cooper never suggested to Mr Savage that BP should enter into a new agreement about transatlantic overage freight: the discussion was only about what the existing agreement meant.

• xi)  Mr Cooper never indicated that the Owners would prevent or hamper the loading at Marmara, or that they would do so unless BP accepted his interpretation of the charterparty. He never supposed that they would do so.

• xii)  Mr Cooper expected that Mr Savage would report to BP their discussions and his interpretation of the charterparty, and Mr Savage confirmed to him that he had done so. They both expected a response from BP.

**Mr Finlinson's response to his conversations with Mr Savage on 16 March 2010**

108   At the end of their conversation at 1025 on 16 March 2010, Mr Savage and Mr Finlinson agreed that lawyers should be consulted. But Mr Finlinson did not consult BP's lawyers: he said that he looked for a BP in-house lawyer but, not finding him in his office, Mr Finlinson simply reviewed the Recap himself. Although he appreciated that there had been two interpretations of the charterparty (that it "could be argued both ways"), he became all the more convinced of his interpretation of it and that no transatlantic overage freight was payable. He did not take further steps to obtain legal advice.

109   BP's Demurrage Department were responsible for scrutinising freight invoices. The Owners' pleaded case is that, when in due course they passed the Owners' claim for full overage freight for payment, they had "either been informed of the arguments by Mr Finlinson or, if not, had analysed and formed their own view as to the meaning and application of the relevant charterparty terms, recognising that there was scope for dispute with regard thereto, while in possession of all the relevant facts". I shall come later to what examination of the invoice was conducted, but I conclude that Mr Finlinson did not inform the Demurrage Department of the exchanges or arguments about what overage freight was payable. I accept his evidence that he did not do so: there is no contrary evidence.

110 Mr Finlinson was cross-examined about why he did not warn the Demurrage Department of the difference between himself and Mr Cooper that had emerged about whether BP were liable for transatlantic overage

freight. He explained that there were no procedures for the Chartering Department to pass information to the Demurrage Department. (Ms Myers too knew of no practice of the Chartering Department putting notes on files or sending emails for the attention of those checking invoices.) But, as Mr Finlinson acknowledged and Ms Myers and Mr Rickwood confirmed, this would not have prevented him from contacting the Demurrage Department about such matters as an ambiguous or unclear charterparty term had he wished to do so. He said at one point in cross-examination that in March and April 2010 he wrongly understood that BP had a system to check freight invoices against the amount of freight that the trader expected to be incurred: his evidence about this was not entirely clear, but in any case he knew that there was no "official or standard" way within BP's systems of the Demurrage Department making such checks. However, this might be, it did not occur to him on 16 March 2010 that an excessive invoice would be passed for payment. Accordingly, he did not speak to anyone about the difference over interpretation of the charterparty or about BP's liability for overage freight because he saw no need to do so. He knew that the invoice would be checked before payment, and assumed that the Demurrage Department, on checking the Owners' invoice, would share his view about BP's liability.

111   When Mr Finlinson was being cross-examined, I was rather sceptical about this explanation for him not contacting the Demurrage Department, but on reflection I accept it. I conclude that he was so confident (or overconfident) in his own opinion about what the Recap provided that he discounted any other interpretation of what had been agreed. He satisfied himself that he was right, and, as he put it, "obviously my focus had moved on to other parts of my job". I accept Mr Finlinson's evidence and his explanation about why he did not make any real efforts to contact others about the matter rather than, as the Owners suggested to him, it was "to avoid the potential embarrassment to [him] that would ensue".

112   When he studied the Recap on 16 March 2010, he convinced himself that the Owners' interpretation was obviously wrong, and put aside the doubts that he had had while speaking to Mr Savage. This was not a sensible view, but my impression from his evidence is that he is self-assured and overconfident, and perhaps

even arrogant; and I conclude that he was blinded to arguments that his opinions were wrong, or might be wrong. He therefore thought that, in all likelihood, that the Owners would not seek overage freight and the problem would go away, but, if it did not, it could be dealt with when BP rejected their invoice. In the meanwhile, he got on with his other work, and thought no more about the question of overage freight. What did not occur to him was what happened: that BP would pay the Owners' invoice, including full transatlantic overage freight. I cannot accept that, as the Owners suggested, he recognised that the conflicting arguments about the meaning of charterparty and decided to keep quiet about them, or that he resigned himself to BP being charged full transatlantic overage freight by the Owners. He was not a man to give in so quietly, nor would he have thought that it would go unnoticed if BP made an unexpected payment of $1 million by way of freight.

113   According to Mr Finlinson's evidence, when he reviewed the Recap, he also "focused" on SAC6 and thought that this entitled BP to load at Marmara and then to direct the vessel to America: he "was happy with the SAC6 being in there, that everything seemed to be in order". The reasoning was that SAC6 entitled BP to load additional cargo at any port (whether or not within the agreed ranges) en route to the discharge port, and under SAC6 freight was to be calculated (at the Worldscale rate for the voyage actually performed, including the distance attributable to the call at Marmara, the extra loading port) on the quantity of cargo originally loaded (and disregarding the Marmara cargo). Under clause SAC6(c)(i) (see para 167 below) it would follow that freight should be charged upon the cargo loaded at Odessa, including the overage of 6,821 mt.

114   The Owners invited me to reject Mr Finlinson's evidence that he conceived that SAC6 might apply to the Marmara operation on 16 March 2010 and to conclude that he did so only in May 2010 after BP had paid the Owners full transatlantic overage freight. Certainly Mr Finlinson did not share the argument with Mr Savage before 7 May 2010 (see para 141 below), but I reject the Owners' submission that it is apparent from his conversations with Sovereign that day that the idea had only just occurred to him. As I have said, I accept that Mr Finlinson read SAC6 when he reviewed

the Recap, and that he thought that it covered the Marmara loading and so might assist if the dispute with the Owners continued. I cannot accept, however, that Mr Finlinson immediately appreciated that under clause SAC6 BP would be liable to pay full transatlantic overage freight on the Odessa overage cargo. That is inconsistent with "everything seem[ing] to be in order": his assurance to Mr Rathbone would have been wrong and BP's freight on a transatlantic voyage would be some £210,000 more than had been expected. In March 2010 his mind was on the Marmara cargo and, as I conclude, the implication of his interpretation of SAC6 for the Odessa overage occurred to Mr Finlinson only after the Owners' invoice had been paid. I do not think that Mr Finlinson was being dishonest in his evidence about this, but he has convinced himself that he thought about how SAC6 applied to the voyage more clearly and in more detail on 16 March 2010 than he did.

**Exchanges after the Marmara loading**

115   Mr. Savage's evidence was that after 16 March 2010 Mr. Cooper asked him "numerous times" about "what [was] going on" (which I take to mean what was going on with regard to whether BP accepted that full transatlantic overage freight was payable on the Marmara cargo), and that he responded only that BP were aware of the Owners' interpretation of the charter party. I accept that evidence. I conclude that he never indicated that BP accepted that the Owners' interpretation was correct, or even that he himself agreed with it. Although he was expecting BP to contact him, he did not chase them for a response when they did not do so. The very fact that Mr Cooper asked so often about the position demonstrates, to my mind, that he did not understand that BP had accepted his interpretation of the charterparty about overage freight or that the difference of interpretation was resolved in the Owners' favour.

116   According to Mr Cooper, he suggested that the position about transatlantic overage freight be recorded in an addendum, but this was never done. On 18 March 2010, Mr Cooper sent by Yahoo messaging suggested wording for an addendum to cover the Marmara loading: "1/2 port(s) Ukraine Black Sea Excl Yuzni but including Marmara (Max load port expenses for owners account in Ukraine $250,000 basis single loading port)". Mr Savage sent the proposal to Mr Finlinson, but

Mr Finlinson did not respond to it: his evidence was that he does not recall seeing it, and in the absence of any evidence for the contrary and any reason that Mr Finlinson should dissemble about this, I accept that evidence. If Mr Finlinson ever saw the draft, he overlooked it.

117   The draft did not refer to overage freight. Mr Savage said that he would not have expected it to do so. The difference about transatlantic overage freight was not a matter for an addendum to the charterparty because, as he saw it, the difficulty was not about what the terms of the charterparty were or should be, but about what they meant. The Owners never suggested, he said, that there should be "an addendum with a 100%", and he knew that BP would not have agreed to such an addendum in such terms.

118   Mr Cooper explained that the draft did not refer to overage freight for this reason: he spoke to Mr Savage about an addendum to the charterparty to cover loading the Marmara cargo for carriage to America, and he "restate[d]" that BP should be liable for full overage freight; and Mr. Savage responded that it was not necessary for this to be mentioned in the addendum because "everything is fine" and "BP was aware", and he thought that BP had accepted his interpretation of the charterparty.

119   On 10 April 2010 the vessel gave notice of readiness to discharge part of the cargo at Galveston. On 12 April 2010 BP indicated that, after discharging some cargo at Galveston, they wished to discharge oil at IMTT St Rose, Louisiana, before going to Houston to complete discharge. Mr Cooper responded that IMTT St Rose was on the Mississippi and outside the agreed USG discharge range, but in an internal email of 13 April 2010 he wrote to the Owners that he did not think this was "bad news" because the freight was Worldscale 135 on 112,000 mt of cargo: "as we are getting WS 135 on 112 kt, so the increase in the flat rate should more than cover it".

120   According to Mr Cooper, when it was suggested that BP might want the option to discharge at IMTT St Rose, he was reminded of his previous exchanges and he again asked Mr Savage by telephone whether they should confirm the position about transatlantic overage freight in an addendum; and Mr Savage told him that

Mr Finlinson had not questioned the Owners' position and that no addendum was required. BP's case, based on Mr Savage's evidence, is that, when at around this time Mr Cooper again asked about whether BP had responded about transatlantic overage freight, he said that they had not: he did not say that Mr Finlinson had not questioned the Owners' contention about full transatlantic overage freight or therefore no addendum was necessary.

121    In the event the "Target" did not go to IMTT St Rose, but after leaving Galveston, she went direct to Houston and discharged the remaining oil there. She completed discharge at Galveston on 13 April 2010, gave notice of readiness to discharge at Houston on 14 April 2010 and completed discharge there between 21 and 23 April 2010.

122    I reject the evidence of Mr Cooper that before he sent that draft addendum on 18 March 2010 and that around 12 or 13 April 2010 Mr Savage indicated that BP (or Mr Finlinson) had accepted BP's interpretation of the charterparty. If Mr Cooper had thought on 18 March 2010 that this difference had been resolved, he would have had every reason to refer to it in the addendum, or at least in his messages to Mr Savage about the addendum. I do not believe that Mr Savage said in this context that "everything is fine": this was not put to Mr Savage when he was cross-examined or suggested before Mr Cooper was being cross-examined. Mr Savage probably had told Mr Cooper by 18 March 2010 that BP were aware of his interpretation of the charterparty, but that did not suggest that they had accepted it. Indeed, to my mind, the expression "BP are aware", if anything, suggests otherwise, and in any event I consider that the wording of Mr Cooper's draft lends support for BP's contention that he did not then believe that the difference about transatlantic overage freight was resolved.

123    With regard to the discussions when BP spoke of discharging at IMTT St Rose, again I prefer Mr. Savage's evidence. He knew that Mr. Finlinson disputed the interpretation of the charterparty: I reject the suggestion that he indicated otherwise to Mr Cooper.

124    I accept that, when BP did not respond to the interpretation that he had advanced, Mr Cooper became increasingly optimistic that they had resigned

themselves to it and would pay full transatlantic overage freight, but I do not accept that he was ever certain of this, still less that Mr Savage had misled him to think that BP had agreed to this.

**Payment of the invoice**

125    Freight was due for payment when discharge was complete, but on 16 April 2010 the Owners, at Sovereign's request, sent a "Preliminary Freight Invoice" (the "Preliminary Invoice") for "net freight" of $3,652,662.19, which represented a "grand total" of $3,696,843.87 less BP's address commission of $44,181.68. It was based on Worldscale 135 for 112,871.546 mt, and requested that BP "kindly confirm all in order".

126    In BP's Demurrage Department, Ms Myers dealt with the invoice for freight on the "Target" fixture, but she did not have authority to pass invoices for more than $2 million, and Mr Rickwood, as a Senior Demurrage Negotiator, also approved the payment. I infer that Ms Myers received the Preliminary Invoice on about 22 April 2010: that is when BP's "Openbooks" computer system records her first dealing with it. She learned from the Recap that freight was calculated on a Worldscale basis for the transatlantic voyage, and confirmed that the invoice properly reflected the voyage by consulting BPOS (the BP Operational System), into which BP entered vessel movements and communications. She also used BPOS to check the cargo quantity and the Worldscale rate and that discharge was complete. She raised and resolved a number of questions about the Owners' invoice. Most concerned administrative matters and are inconsequential: for example, she required that the invoice should not be described as a "preliminary" invoice and that it should be made out to BP Oil International (whereas the Preliminary Invoice referred to BP), and on 23 April 2010 Geden sent an amended invoice accordingly. On 26 April 2010 BP noticed that the bank details for payment shown on the invoice did not match details in the Recap, and as a result on 27 April 2010 an addendum to the charterparty (addendum no 2) was made to the charterparty so that it corresponded with the invoice.

127    Ms Myers also noticed that the Preliminary Invoice included sums ($115,750 for waiting time and

$44,559.59 for bunkers) relating to the vessel passing through the Turkish Straits, but the Owners had not credited BP with corresponding address commission. On 26 April 2010 she asked through Sovereign that the Owners should adjust the invoice to allow for this, writing to Sovereign, "Could you please have owners deduct this commission and re-issue. If owners are in dispute of this deduction, please have them revise the freight invoice removing the Turkish Straits and Bunker charges, and forward freight for immediate processing…Reissuing the Turkish Straits separately". Mr Cooper accepted Ms Myer's point, giving instructions in these terms: "[BP] have a fair point, it's not wrong that they should have an address comm. on the time for Turkish straits. Please re-issue accordingly …". The Owners sent a revised invoice for a net sum of $3,651,215.32, giving BP credit for this address commission.

128    In her evidence, Ms Myers accepted that, as she understood it, in 2010 it was, and it remains, an open question in the shipping trade whether charterers are entitled to address commission in respect of such charges, the contrary argument being that they are akin to demurrage. The Owners contend that, although the amount involved was something less than $2,000, the agreement about this address commission entailed a "material concession" on their part, and that therefore, when BP later paid the amount of the revised invoice, they concluded a binding agreement with the Owners that the sum charged, including the overage freight, was payable.

129    Ms Myers was satisfied with the invoice for $3,651,215.32, and she presented it to Mr Rickwood for approval together with other documents including the Recap. He checked only what he called "higher level items", working on the assumption that Ms Myers would already have checked the details of the invoice. He therefore looked whether the invoice was addressed to the correct entity within BP, whether the discharge was complete and whether the correct Worldscale rate had been used to calculate freight. He approved payment of the invoice for $3,696,843.87 by signing a copy of it, and he returned it to Ms Myers. He did not recall having any discussions with Ms Myers about the invoice before doing so. At 14.29 Ms Myers entered in BP's Openbooks system that the invoice was agreed (the entry in the system showing the gross amount of

$3,696,843,87, rather than the amount net of address commission).

130    Thereafter BP's procedures for making payment started, but they were delayed, apparently for technical reasons. In the end, in order to avoid further delay because of the requirements of BP's electronic systems, Mr Matthews processed the invoice manually, and on 4 May 2010 he passed it to the "cash team". According to Mr Matthews, it was paid by Ms Anna Zagorska at 10.00 on 5 May 2010. Mr Witsey assisted in the process, in particular by ensuring that bank account details were properly recorded in BP's systems.

131    When he approved the invoice for payment, Mr. Rickwood appreciated that the Recap specified 50% overage freight for some discharge options but said nothing about transatlantic overage freight. His evidence was that, although he thought full overage freight unusual, he "must have presumed" that this had been agreed because he did not think that an owner would carry additional cargo without charging any overage freight. He had not, he said, come across a fixture recap that did not specify an overage rate for each range of discharge ports, and it did not cross his mind that the Owners would not be entitled to some overage freight. I accept his evidence about that.

132    Further, it did not occur to Mr Rickwood that the invoice might have been inconsistent with the Recap in that the Recap did not provide for additional cargo to be loaded at Marmara. He was not aware of SAC6, BP's back-loading clause, which he had not previously needed to consider.

133    When she processed the invoice, Ms Myers thought that SAC6 took effect only if some cargo was backloaded, and she said that before passing the invoice for payment, she gave no consideration to clause SAC6 or to whether it entitled BP to require the Owners to divert to Marmara to load additional cargo. In her evidence she said that she believed that she noticed a "mismatch" between the Recap and the invoice in that the vessel had loaded at Marmara, and that she had spoken about this to a "senior" (a more senior member of the Demurrage Department, either Mr Rickwood or a Mr Sean Mahon); and she said that she and her "senior" must have been satisfied about this because the invoice was paid, but she could not recall how they

resolved this matter. Ms Myers had only a hazy memory about this: I conclude that she probably did speak to Mr Mahon about this (not Mr Rickwood, as I conclude in view of his evidence), but whatever their discussions it did not occur to them that this might affect BP's liability for overage freight.

134   In her witness statement, Ms Myers said that her usual practice when she examined freight invoices was to consider any charge for overage freight; and that, when she dealt with the invoice for the "Target", she noticed that the invoice included overage freight at 100%, whereas the Recap said that overage freight for "Euromed discharge only" was 50% and there was no overage freight for discharge east of Singapore. She nevertheless authorised payment of the invoice of 27 April 2010, "because I assumed it was correct and relied on the invoice as being honest and accurate". She said that she does not know why she assumed that the overage freight charge was "fine on the basis of the documents, and can only put my mistake down to human error in the sense that I incorrectly relied on the invoice". She also said that she might have "assumed that there must have been a subsequent agreement about the overage rate applicable to the additional cargo".

135   It became clear in cross-examination, while Ms Myers recalled noticing a discrepancy between the overage rate charged on the invoice and the provisions of the Recap and of speaking to a "senior" about it, she could not remember whether this was before or after the invoice had been paid by BP. Ms Myers was an honest and straightforward witness, but she had no real memory about these events, which were, after all, a routine part of her work in 2010. Any answers elicited from her when pressed about what she noticed before payment and what she noticed afterwards are not, to my mind, reliable. She simply did not know.

136   Despite what she said in her witness statement, I conclude that Ms Myers did not notice the discrepancy or discuss the overage freight charged by the Owners before payment. I think it more likely that she realised this only later, after the invoice had been paid. This conclusion has some small support from her evidence that after payment she spoke with Mr Mahon about the overage freight and he said that it should have been "charged at 50%". More importantly, if before

authorising payment Ms Myers had perceived that there was a discrepancy of over $1 million between the Recap and the invoice with regard to overage freight, she would have spoken to a "senior" about it, and taken steps to resolve the position before the invoice was passed for payment: the amount involved was too much to have been ignored. In any case. her clear evidence, which I accept, was that when she authorised the payment she thought the invoice correct. If Ms Myers noticed the discrepancy at all, she did so, I conclude, after the invoice was paid. (At one point in cross-examination, she used language that might suggest that the discrepancy was noticed only after the freight had been paid: "we just thought, we've paid the freight…". I do not rely upon this, as Mr Russell invited me to do, as evidence that the "mismatch" was noticed only after payment: the language of Ms Myers' answers was too imprecise to bear that detailed analysis. I disregard this answer in reaching my conclusion about when (if at all) the discrepancy was noticed. In re-examination, Ms Myers confirmed what had become obvious: that she did not recall whether any discussions with her "senior" were before or after she had authorised payment of the invoice and the invoice had been paid.)

137   Mr Berry elicited further answers from Ms Myers in cross-examination about the decision to pay the invoice: she accepted that she might have concluded that it was arguable that overage freight was payable on cargo in excess of the minimum quantity since the charterparty said nothing about transatlantic overage freight. At one point in cross-examination she agreed with Mr Berry that she and her "senior" concluded that the invoice should be paid although they realised that there were "arguments going either way" about whether BP were liable for overage freight, and if so whether they were liable for full overage freight. When asked why, nevertheless, the invoice was passed for payment, she said that they had relied upon Sovereign, as brokers, "trusting that they would have checked the invoice", although she also said that she did not recall communicating with them about this. Her answers about this were confusing, and it was obvious from her manner, in my judgment, that Ms Myers was confused when she gave them. They are not reliable.

138   I shall draw together my findings about the state of mind of Mr Finlinson, Ms Myers and Mr Rickwood

10-03635-jpm Doc 271-1 Filed 04/03/17 Entered 04/03/17 18:29:57 Exhibit A - Part 1 Pg 395 of 538

BP Oil International Ltd v Target Shipping Ltd, 2012 WL 2065172 (2012)...

over the period leading to the payment of the Owners' invoice:

• i) Mr Finlinson was confident that BP were not liable for any transatlantic overage freight, and believed that BP would not pay any demand for overage freight. He dismissed from his mind (unreasonably) any possibility that those responsible in BP for making payments to the Owners would not interpret the charterparty as he did, or that they might authorise payment if the Owners made (what he would consider) unwarranted demands for freight

• ii) Ms Myers did not realise or suspect that there was or might be a discrepancy between the Owners' invoice which she passed for payment and the terms of the Recap about overage freight (and therefore she had no discussions about this with a "senior"); any concerns that she had about the Recap not providing for the vessel loading at Marmara were resolved (probably following some conversation with Mr Mahon) by the time that she authorised payment but in any case this did not cause her to question whether BP were liable for the overage freight; she authorised the payment because she thought that the invoice was correct, that is to say it reflected the freight that the Owners were entitled to charge under the terms of the Recap; and if she had doubted this or thought that there was room for argument about it, she would not have passed the invoice for payment.

• iii) Mr Rickwood knew that the Recap said nothing about transatlantic overage freight but it did not occur to him that no transatlantic overage freight was payable or that the invoice was or might be inaccurate in that regard or in any other respect.

**After payment of the invoice**

139 BP's Management Information team checked estimates made by traders of freight charges, and on 4 May 2010 a member of the team left on Mr Rathbone's desk a copy of the Owners' invoice, and queried it. Mr Rathbone was understandably unhappy about this, and on 5 May 2010 at 9.38 he sent a Yahoo message to Mr Finlinson that "Got a freight bill in front of me for the "Target". Sure it's wrong. They have charged us the full freight off the full volume, 112 kt. This was the one

that was basis 80 with free overage on the last 32kt." Mr Finlinson acknowledged it at 9.41. This exchange was shortly before BP actually paid the invoice. Mr Finlinson asked Mr Savage to speak to Mr Cooper about the invoice.

140 On 5 May 2010 Mr Savage spoke to Mr Cooper in at least three conversations, which Mr Cooper recorded briefly in his notebook. In at least one of them, Mr Savage asked that the Owners accept overage freight at the rate of 50%. Mr Cooper refused to contemplate this, repeating his position that the Owners were entitled to full overage freight. On 6 May 2010 Mr Cooper telephoned Mr Savage and offered, if it would help Mr Finlinson, to telephone Mr Lars Dencker, the Global Head of Chartering at BP Shipping Ltd, and to explain that the rate for transatlantic overage freight had not been negotiable as far as the Owners were concerned and that, while Mr Finlinson had done their best "to push us to accept a lower rate", the Owners were not prepared to agree to this. Mr Cooper believed that he made this offer because Mr Savage had told him that Mr Finlinson could lose his job if the Owners made no concession: on 5 May 2010 Mr Finlinson had told Mr Savage that he had been left "in an extremely difficult situation internally" and that he "could be out of a job". He told Mr Rathbone that he was "having a [night]mare". (Apparently Mr Cooper's offer was declined: Mr Cooper did not telephone Mr Dencker.)

141 On 7 May 2010, Mr Finlinson had exchanges with Sovereign about his argument that SAC6 entitled BP to load at Marmara. He discussed it in a telephone conversation at 8.34, and then set it out in an email that he requested be passed to the Owners, which concluded "…Charterers reject Owners claim for freight basis 112,871kt. Under SAC6 freight must be charged against the volume lifted at Odessa against flat rate of Odessa + Marmara … to Offshore Galveston … + Houston". By this time, therefore, Mr Finlinson had come to appreciate that, if his interpretation of SAC6 was correct and it applied to the diversion to Marmara, BP had been liable for full overage freight on the Odessa overage. Mr Finlinson said in cross-examination that he was "effectively conceding freight from min 80,000 to min 87,000" as "a way of moving on the discussion, to move on the negotiation, to try to reach a conclusion". He was undoubtedly under pressure internally at BP to resolve the difficulty and was looking to achieve a

BP Oil International Ltd v Target Shipping Ltd, 2012 WL 2065172 (2012)...

10-03635-jpm    Doc 271-1    Filed 04/03/17    Entered 04/03/17 18:29:57    Exhibit A -
Part 1    Pg 396 of 538

settlement of the difference, but, if his answer in cross-examination meant that he still thought that BP had not been liable for any overage freight, I do not accept it. He had convinced himself of the SAC6 argument, and he now recognised the inevitable consequence of it.

142  On 7 May 2010 Sovereign invoiced the Owners for commission of $45,628.55, which was calculated on the basis of freight for the full cargo of 112,871.546 mt. Mr Savage explained that this was not because he considered the Owners entitled to the freight that they charged but because Sovereign's commission was calculated according to what the Owners in fact received. I accept that explanation: this invoice does not indicate what Mr Savage believed had been agreed between BP and the Owners or assist to resolve any other issue between the parties.

143  On 13 May 2010 BP's in-house lawyer wrote to the Owners asserting the argument based on SAC6 and calling for them to repay the overage freight on the Marmara cargo (some $911,482). Apparently BP did not assert in that communication or at any time before bringing these proceedings that no overage transatlantic freight was payable under the terms of the charterparty. Mr Berry submitted that this supports the Owners' submission that after the conversations on 16 March 2010 Mr Finlinson was not convinced about his interpretation of the charterparty that BP were not liable for any overage freight. I am not persuaded by that: as I have said, the implications of the SAC6 argument were appreciated only later. Others in BP who examined the dispute after payment had been made might not have been convinced of Mr Finlinson's interpretation of the Recap provisions about overage freight apart from the SAC6 argument, but that is different (and irrelevant).

### The meaning of the original charterparty: overage freight

144  There are two issues between the parties about the proper construction of the terms of the charterparty:

• i)  Whether (subject to the SAC6 argument) BP were liable for overage freight upon cargo in excess of the minimum quantity of 80,000 mt, and if so at what rate; and

• ii)  Whether BP were entitled to require the vessel to call at Marmara to load cargo, and if so how this affected their liability for overage freight.

145  With regard to overage freight and leaving aside SAC6:

• i)  The Owners contend that upon the proper interpretation of the original terms of the charterparty they are entitled to full transatlantic overage freight on all the cargo carried in excess of the minimum quantity of 80,000 tonnes.

• ii)  BP contend that upon the proper interpretation of the terms they were not liable for any overage freight.

• iii)  During the hearing I suggested a third possibility, that the Owners might be entitled to reasonable overage freight upon all the cargo carried in excess of the minimum quantity. Neither party supported that suggestion, but the Owners submitted that, if that approach were adopted, BP's claim should be dismissed because a reasonable rate for overage would be full overage freight, or at least that BP had not discharged the burden upon them of proving otherwise and so of proving that they had overpaid the Owners; and that in any case BP are estopped from making a claim on this basis because both parties understood or assumed that the charterparty stipulated a transatlantic overage freight rate (although they had different understanding about what rate was stipulated). Mr Russell submitted that, if I conclude that overage at a reasonable rate was payable and that, in principle, BP are entitled to recover any overpayment, there should be a further hearing to determine what that rate was.

146  The starting point of the Owners' primary contention is that freight for a transatlantic voyage was to be calculated on a Worldscale rate. The Owners submit that an agreement for freight at Worldscale rates contemplates freight calculated by reference to tonnes of cargo, and that, unless the parties agree otherwise, by reference to the tonnes of cargo actually carried under the charterparty. A stipulation for a minimum cargo does not in itself imply otherwise. The Owners recognise that in the tanker trade parties commonly

agree to overage freight at less than the full rate, but they do not always do so. Any such agreement is for a discount below what would otherwise be payable, and in the absence of such agreement charterers are liable for full overage freight. Here there was no agreement: the standard BPVoy 4 form would have provided that "Overage (if any) at 50% of Freight Rate", but this was displaced by the Euromed overage freight term.

147 BP's response to this argument is based upon clause 31 of the BPVoy 4 form. Mr Russell submitted that this contemplates that freight might be agreed on one of two main bases: lump sum freight, when, in essence, the charterers will pay an agreed sum regardless of how much cargo is actually carried; and freight based on a rate per tonne, which in practice is usually based on an agreed multiple of the Worldscale rate for the voyage undertaken. In the latter case, clause 31 (unless materially amended) provides that, where the cargo quantity stated in Section C of Part 1 is a minimum quantity and more cargo is in fact carried, there are to be two components to the freight: freight calculated at the agreed rate on the minimum quantity, and overage freight calculated at the rate stated in Section H of Part 1 on cargo in excess of the minimum quantity. The default overage freight rate in the printed form is 50% of the freight rate, unless the parties agree otherwise.

148 In this case, the charterparty terms provided for a minimum quantity. However, as BP submit, the parties agreed that the default overage rate of 50% should not be charged except if the vessel discharged at a port in the European Mediterranean, and they did not agree upon any other rate for overage freight. BP contend that therefore the parties did not reach any agreement about a rate for transatlantic overage freight, and so did not agree that BP should pay the second component of the freight under clause 31 if BP exercised the option for a transatlantic voyage. In other words, there was no relevant "Overage rate stated in Section H of Part 1", and accordingly no overage freight is payable. On the contrary, as BP interpret the Recap, the parties agreed that the only overage freight that BP should pay was 50% overage freight in the event of discharge at a port in the European Mediterranean; and they were to pay no overage freight unless the Recap so provided and so they were to pay no transatlantic overage freight.

149 Generally where two or more interpretations of a charterparty (or other business contract) are possible, an interpretation that has improbable commercial consequences is avoided. As explained in the judgment of Lord Clarke in Rainy Sky v Kookmin, [2011] UKSC 50 , there are two aspects to this enquiry: (i) what meaning would be given to the agreement by businessmen in the ordinary course of their dealings (see para 27 of Lord Clarke's judgment, where he cited Lord Halsbury's rule in Glynn v Margetson & Co, [1893] AC 351 , 359, and Lord Bingham's endorsement of it in Homburg Houtimport BV v Agrosin Privaet Ltd, The "Starsin", [2004] 1 AC 725 para 10); and (ii) which interpretation appears to the court to be the more, rather than the less, commercial construction. The latter is a proper consideration even through neither or none of the rival constructions flouts common sense: see paras 29 and 30 of Lord Clarke's judgment, where he cited and endorsed the approach of Longmore LJ in Barclays Bank plc v HHY Luxembourg SARL, [2010] EWCA Civ 1248 , at paras 25 and 26.

150 In this case, however, it is not to my mind of much help in deciding between the parties' rival interpretations either to examine what would be expected in ordinary business dealings or which interpretation gives more commercial purpose to the agreement. Neither the Owners' nor BP's interpretation flouts common sense in as much as it would be a perfectly workable arrangement for BP to pay either full transatlantic overage freight or no transatlantic overage freight, but, in my judgment, both interpretations produce a result that businessmen would consider unusual and would be commercially surprising. In what might be tacit recognition of this, both Mr Russell and Mr Berry submitted that their clients' preferred interpretation gives the only possible meaning to the charterparty, and that it is unnecessary and inappropriate to depart from the clear meaning of the language of the charterparty terms in order to find an interpretation that the market would expect or that the court considers more commercially sensible.

151 I should expand upon these points. I reject the suggestion that, if full overage freight were payable, it would make it pointless for the parties to have agreed upon a minimum quantity of cargo. First, the Euromed overage freight term required that the parties specify on what cargo 50% overage freight was to be charged if

the vessel discharged in the European Mediterranean. More generally, unless the charterparty provided for lump sum freight for all voyages, a purpose and effect of a minimum cargo provision is to protect owners by committing the charterers to dead freight if they underload.

152  Nor does it assist BP that owners often calculate their earnings on the assumption that only the minimum cargo will be loaded (as indeed did Mr Cooper in his voyage estimates up to and including that made on 11 March 2010). This makes it no more likely that they would not negotiate the best deal that they could, and would be unlikely to carry extra freight without charge. On the other hand, I am not persuaded by the argument that no owner would have agreed to incur costs involved in carrying extra cargo without charging more freight. The vessel could not safely load more than about 87,000 mt at Odessa, and, if she was to carry more than that, the probability was that, as happened, she would earn a higher Worldscale rate through calling at another loading port. Mr Cooper sought to demonstrate that the Owners did not profit from calling at Marmara, but the extra costs involved in carrying extra cargo were too small for this to be a significant consideration in construing the charterparty. Certainly this consideration does not persuade me that, at the time of the fixture, it would have flouted common sense for the parties to have made the agreement for which BP contend.

153  I conclude from the evidence that it would be unusual either for the parties to agree upon full overage freight for a voyage under a charterparty of this kind, or for them to agree that no overage freight should be charged. Mr Savage described overage freight at a rate of 50% as a "custom of the trade". It is not suggested that there was such a trade custom or usage of any technical legal kind, but I accept his evidence that this is what is most usually agreed in the tanker industry. This was confirmed by the evidence of Mr Rathbone, who thought that 50% overage freight was "an industry standard". According to Mr Cooper, in his 27 years in the shipping industry he had seen charters in which it was provided that there should be no overage freight only "occasionally", and in these cases it had always been explicitly stated. I accept that evidence, which was not challenged. It was corroborated by Mr Savage, who said that "an owner would not normally expect to

do 0% overage without it being explicitly agreed". It would, as I conclude, have been very unusual for the parties, if they intended that no overage freight should be payable, to have provided for this in the Recap as obliquely as, on BP's interpretation, they did. Of course, as BP observe, no overage freight would have been paid had the Target been ordered to the Far East, but BP would then have paid a high lump sum. On the other hand, Mr Cooper also accepted in cross-examination that it would "certainly not [be] common occurrence" for charterers to pay full overage freight on as much as 32,000mt; Mr Rickwood, who had worked at BP for some 20 years, told Mr Finlinson on 6 May 2010 that he had "never seen 100% overage on any fixture"; and Mr Finlinson said that full overage freight would have "stood out dramatically".

154  It is convenient next to say something about the background (or factual matrix) upon which the Owners rely. First, they had, they submit, a strong hand in negotiating the fixture and therefore it is the less likely that they would have foregone overage freight altogether and the more likely that BP would have agreed to full overage freight. I am not persuaded by that argument: as I have said, I accept that BP needed the fixture to avoid having to use handysize vessels to lift oil from Odessa, but there is no evidence that in February 2010 they particularly needed the transatlantic discharge options.

155  Secondly, Mr Berry observed that the bills of lading issued at Odessa by the Master, which were drawn "to order" of either BP or ING bank, all stated "freight payable as per charterparty". They recorded that some 86,841mt had been loaded, and it would have been impossible to distinguish which bills recorded that part of the minimum cargo was loaded (so as to attract freight at the agreed Worldscale rate for that cargo) and which recorded that overage cargo had been loaded (so as to attract overage freight, if any). This, he submitted, suggests that the parties considered that it made no difference as far as freight was concerned whether a bill referred to part of the minimum cargo or to overage cargo, that is to say that all cargo incurred freight at the same Worldscale rate (unless the charterer was paying a lump sum freight). However, the bills were dated between 7 and 11 March 2010 (inclusive): they were issued after the charterparty was agreed and are not a legitimate tool for interpreting it.

156  Against this background, I turn to interpreting the wording of the charterparty. The first question, as it seems to me, is about the interpretation of the Euromed overage freight term, "Overage: Overage 50 pct applicable for Euromed discharge only". Does the word "only" qualify simply "overage" or does it qualify "overage 50 pct"? In other words, does "only" mean that the only overage freight payable under the charterparty is freight at 50% rate of the applicable Worldscale rate in the event of discharge in the European Mediterranean, or that overage of 50% is to be paid only in these circumstances? Either interpretation, of course, means that the "fall-back" provision in the standard BPVoy 4 form is limited in its application to when the cargo is discharged in the European Mediterranean. (To my mind, the word "applicable" in the Euromed overage freight term puts this beyond doubt.) But BP had two main arguments that the Euromed overage freight term means more that this, and its effect is that no overage freight at all is payable except in the event of European Mediterranean discharge.

157  First, there is no other default provision in the standard form or in the Recap. Mr Russell argued that the parties are not to be taken to have left a lacuna in their agreement, and the Euromed overage freight term is to be given a meaning that avoids this consequence. Against this, Mr Berry submitted that no lacuna would result if the Euromed overage freight term applies only when cargo was discharged in the European Mediterranean because, he argued, the effect of the first sentence of clause 31 is that the freight rate specified in the Recap applies to all cargo unless an overage freight rate is specified so as to "trigger" the application of the second sentence. I reject that argument. The natural meaning of clause 31, in my judgment, is that the second sentence applies whenever the cargo quantity stated in section C is a minimum quantity, and not only if an overage freight rate for overage cargo is specified.

158  Secondly, as it seems to me, BP can rely on the heading to section (H) of the Recap and its structure. The heading, "Freight rate/overage/commission", was not reproduced from the standard BPVoy 4 form, but was bespoke for this fixture: indeed, in the BPVoy 4 standard form, it is not contemplated that section H will deal with commission. The provisions under this heading in the Recap mostly deal with freight rate, overage freight and commission in that same order, although this observation must be qualified: they state that there is no overage freight in the event of discharge east of Singapore in the provision dealing with freight rate; and they include wording about Suez Canal transit costs, which are not reflected in the heading (and not contemplated by the standard BPVoy 4 form). Within this structure the only provision providing for the payment of overage freight is that dealing with discharge in the European Mediterranean. The inference is, BP argue, that the provisions were designed to provide a complete code for overage freight under the charterparty, and the word "only" is used to make this clear.

159  Both BP's arguments are undeniably logical, but in the end, to my mind, they place a weight upon the precise and literal words of section (H) generally and the Euromed overage freight term in particular that they simply will not bear in a document of this kind. The question is whether the Euromed overage freight term in the context of section (H) of the Recap more naturally bears one or other of the possible meanings to which I have referred. I do not think that it does more naturally mean that BP are liable for no overage freight except in the event that cargo is discharged in the European Mediterranean: as I read it, it naturally means that the parties have agreed upon overage freight at the rate of 50% in that event and that the agreement for a 50% rate does not apply in other circumstances. It follows that the literal wording of this term does not support either BP's contention or the Owners' contention as to what, if any, transatlantic overage freight was payable.

160  BP's interpretation rests four-square, therefore, upon the meaning of clause 31 and its effect when the parties have not made an agreement about overage freight applicable in the relevant circumstances. I cannot accept that the parties are to be taken to have agreed that no overage freight should be payable in circumstances where they have not agreed upon an applicable rate for it. As Mr Berry put it in his final submissions, that "confuses the absence of specification with the specification of zero". (Mr Berry does not need to rely upon his observation that clause 31 includes the words, "unless a lump sum freight has been agreed in which case no Overage shall be payable";

but they are consistent with the submission that the parties apparently did not contemplate that in other circumstances no overage freight would be paid.)

161  I am driven to conclude, both by examination of the wording of the relevant contractual provisions and upon consideration of the natural commercial expectations of the parties, that they are not to be taken to have agreed either that BP should be liable for full transatlantic overage freight or that they should not be liable for any transatlantic overage freight. They did not evince either intention in the Recap. The structure of their contract called for agreement about this, and the parties did not make any relevant agreement.

162  I consider that in these circumstances the Owners are entitled to reasonable overage freight. The general rule is that, "Where, under a contract for the supply of a service, the consideration for the service is not determined by the contract, left to be determined in a manner agreed by the contract or determined by the course of dealing between the parties, there is an implied term that the party contracting with the supplier will pay a reasonable charge", and "What is a reasonable charge is a question of fact": see section 15 of the Supply of Goods and Services Act, 1982 , codifying the common law. This rule applies to charterparties: see Scrutton on Charterparties (21st Ed., 2008, art 169 p.301, "If no rate of freight is expressly agreed, the shipowner will be entitled to a reasonable sum.") and Voyage Charters (3rd Ed, 2007) para 13.17. The principle applies not only when the contract makes no provision about any part of the price, but also when one party does extra work under a contract for which no price has been agreed (such as extra work under a building contract) or when one element of consideration contemplated by the parties has been agreed but another has not (such as when an employer and an employee have agreed upon the amount of a basic wage but not of a bonus that the employee was to receive): see Chitty on Contracts (30th Ed, 2008) Vol 1 at para 29-072. In Tropwood AG of Zug v Jade Enterprises Ltd, (The Tropwind") (No 2), [1981] 1 Lloyd's Rep 45 , 57 Robert Goff J enunciated the general principle that, when services are rendered at the express or implied request of the charterers, they will ordinarily be liable to pay a reasonable remuneration for the services rendered by way of a contractual liability. Although in the Court of Appeal [1982] 1

Lloyd's Rep 232, 237 Lord Denning MR said that it does not apply after owners have withdrawn the vessel from service (a view with which Dunn LJ and Fox LJ did not associate themselves), I do not understand that he disagreed with Robert Goff J's statement of principle.

163  I therefore conclude, subject to BP's argument based on SAC6, which I next consider, that this principle applies to the transatlantic overage freight in this case. The parties' agreement, objectively construed, contemplated in clause 31 that they should state in section H a transatlantic overage freight rate, but they did not do so. The implication is that BP were liable for overage freight in a reasonable sum.

**The meaning of the original charterparty: SAC6**

164  The second issue about the interpretation of the charterparty concerns SAC6. BP contend that they were entitled under SAC6 to require the "Target" to call and load cargo at Marmara, that they exercised that right when they gave orders to the vessel at 18.13 on 12 March 2010 and that the Owners were obliged to accept and comply with those orders. They say that therefore freight should have been calculated (under the provisions of SAC6) on the basis of the freight originally loaded, that is to say on the basis of the Odessa cargo, although at the Worldscale rate applicable for a voyage via Marmara.

165  The Owners submit:

• i)  That BP were not entitled under SAC 6 to require the vessel to load at Marmara.
• ii)  That, even if they were, BP only exercised the right if they purported to do so, if not expressly at least by necessary implication; and BP did not purport to exercise rights under SAC6 when they gave orders on 12 March 2010, and cannot now invoke it.
• iii)  That, even if BP were entitled under SAC6 to order the "Target" to load at Marmara and have effectively exercised their right to do so, freight was not to be calculated as BP contend.

166  I shall consider these issues in turn. Here both parties accept, indeed contend, that, if SAC6

is uncertain or ambiguous, it should be given the interpretation which produces the more businesslike or commercially probable result.

**Were BP entitled under SAC6 to order the "Target" to Marmara to load?**

167  SAC6 reads as follows:

> "(a) Charterers shall have the option of instructing Owners to:—
>
> (i) divert the vessel to any port(s)/place(s) en route, even where such port(s)/place(s) is/are not within the Ranges stated in Section E or F of PART 1, but provided that such port/place is within the rotation of discharge port(s)/place(s) previously nominated, and there load additional cargo or discharge cargo carried under this Charter, or any part thereof, and backload a cargo, as described in the Charter Party, or as otherwise agreed, for final discharge at a port(s)/place(s) within the Ranges stated in Section F of PART 1; or
>
> (ii) backload a cargo as described in the Charter Party, or as otherwise agreed, after the vessel has discharged the cargo described in Section C and D of PART 1, or any part thereof, at a port(s)/place(s) within the Ranges stated in Section F of PART 1, for final discharge at a port(s)/place(s) within the Ranges stated in Section F of PART 1.
>
> (b) If Charterers exercise either option under paragraph (a) above, the port(s)/place(s) at which the Vessel calls for backloading a cargo shall constitute either an additional loadport (under (a)(i) above) or an additional discharge

port (under (a)(ii) above) and any additional time used in loading or discharging a backload cargo, including without limitation, time used performing any shifting or tank cleaning required, shall count as laytime or, if the Vessel is on demurrage, as demurrage.

> (c) If freight in respect of the voyage is:—
>
> (i) on a Worldscale basis, freight shall be calculated on the cargo quantity originally loaded but in respect of the voyage ultimately performed;
>
> (ii) on a lump sum basis the call at the additional port shall be compensated in accordance with Clause 31.3 of this Charter, together with any port costs incurred at the additional port."

168  It is common ground that Marmara was not in the loading range stipulated in the charterparty: it is on the Sea of Marmara, and so it is not in the "Black Sea" loading range. It is also common ground that Marmara is a port that was en route for all possible destinations for the "Target" after she had sailed from Odessa. It is not, however, between any discharge ports that BP could have nominated: the Sea of Marmara is not part of the Mediterranean sea but a separate sea, and in any case it is not in the "Euromed" discharge range, which is limited to "NEOBIG" ports (ports that are "not east of but including Greece").

169  BP say that they were entitled to order the vessel to Marmara because, on the proper interpretation of the charterparty, clause SAC6(a)(i) allows the charterers to instruct owners to divert (i) to any port or place provided only that it is "en route", and (ii) for the purpose of loading additional cargo (as well as for the purpose of a combined discharging and backloading operation). These submissions were said to

raise questions about the "geographical scope" and the "operational scope" of SAC6 respectively, and I shall adopt that terminology.

170   The issue about the geographical scope of SAC6 is essentially this: does it, as BP contend, allow charterers to divert a vessel load at any port or place if it is en route to any of the ports or places at which she might, under the terms of the charterparty, be discharged; or does it, as the Owners contend, only allow the charterers to order the vessel to an additional port that is en route between ports or places that they have previously nominated for discharge. The Owners' interpretation, as I read SAC6, gives an ordinary and natural meaning to the words, "but provided that such port/place is within the rotation of discharge port(s)/place(s) previously nominated" (the "rotation proviso"): it means that charterers are entitled to exercise the right conferred by SAC6 only if they have made nominations for discharge and so gives effect to the words "previously nominated"; and it gives a natural meaning to the word "rotation".

171   BP, however, advance two main arguments in support of their interpretation. First, they argue that the rotation proviso does not impose an additional restriction upon the charterers' right under SAC6 where, as here, no discharge port has been nominated when it is exercised. The rotation proviso, it is said, applies only when there has been a nomination of a discharge port or place (or discharge ports or places), and then it bolsters the requirement that the diversion must be "en route", making it clear that rights under SAC6 may not be used by the charterers to require the vessel to "back-track" or to divert from her route. Accordingly, if a discharge nomination has (or discharge nominations have) been made, the port to which the vessel is diverted under SAC6 must lie on the route dictated by the nominated port(s) or place(s).

172   This interpretation, it is said, gives the clause a businesslike and commercially sensible interpretation because it would be pointless to limit the operation of the clause to circumstances in which the charterers had nominated a discharge port or ports. BP say that this would be particularly anomalous because (i) it would mean that SAC6 has no application if the charterparty itself specifies the discharge port(s) and for this reason no nomination was made or required, and (ii) under

clause 22 of Part 2 charterers' orders can be revised, and so no nomination irrevocably determines where the vessel will discharge. On the other hand, there would no commercial purpose in confining the application of SAC6 to diversions between discharge ports, not least because this would mean that the clause has no application if a single discharge port or place is nominated. Further, BP say that their interpretation would mean that SAC6 works consistently with the interim ports clause, which applies where a lump sum freight is payable: charterers can invoke the interim ports clause without having nominated where the vessel is to discharge.

173   I am unable to accept this interpretation. It is inconsistent with the language of the rotation proviso, and nothing in the wording of SAC6 justifies disregarding the rotation proviso where discharge ports have not been nominated: it gives SAC6 a wide application that I cannot accept was intended by the parties. It would, as Mr Berry submitted, allow charterers to evade the charterparty loading range and (if BP's contentions on other points were accepted) allow them to carry large quantities of extra cargo without paying extra freight.

174   I add that Mr Russell also advanced an ingenious argument that the wording of SAC6 is inconsistent with the Owners' interpretation allowing diversion only to ports between nominated discharge ports or places. He pointed out that the wording at the end of sub-clause (a)(i) refers to discharge at a single port or place (as well as ports and places), and submitted that, since it is contemplated the final discharge might be at one port or place, SAC6 cannot be intended to apply only where the vessel is to travel between discharge ports or places. I accept Mr Berry's response that this places excessive weight upon the literal wording of the clause, "a port(s)/place(s)" being standard terminology of no particular significance. Further, even within the limits of a linguistic exercise Mr Russell's submission is not convincing: the phraseology would accommodate the case where the vessel went between a discharge port and a discharge place.

175   BP's alternative argument is that, if, as a matter of construction, the charterers are entitled to invoke SAC6 only where they have made a discharge nomination, then this requirement was met by the time that

they directed the "Target" to Marmara because there was a sufficient nomination when the charterparty was concluded. Their argument is that, in order to give sensible effect to SAC6, it must be supposed that charterers can invoke it when the charterparty itself nominates a specific discharge port (or specific discharge ports). If this is so, as BP submitted, there is also a nomination for the purposes of SAC6 where, as here, the charterparty provides for an option of different discharge ranges and the vessel would be en route to any of them that is still available having regard to any directions that the charterers have given.

176   BP submit that this not only gives SAC6 a businesslike meaning but is supported by the language of the clause. It allows to charterers to instruct the vessel to a "port" or a "place", and the term "port" is given a wide meaning in clause 3.1 of the BPVoy 4 form: see para 17 above. BP argued in view of this that it would be surplusage in SAC6 to refer to "place(s)" unless it covers discharge ranges that are specified before the nomination of a particular port within a range; and therefore the charterparty itself sufficiently nominated "places" for the purposes of SAC6.

177   I do not find this argument persuasive. To my mind it would mean that the language in clause SAC6 is unnatural in two respects: it seems to me that the word "nominated" contemplates, in the context of a charterparty specifying various discharge ranges, an act (or acts) of nomination separate from the charterparty itself (even though because of clause 22 any nomination(s) would be revocable); and I consider it strained to describe a range as a place. BP's contention depends upon an argument of surplusage, and such arguments are often little help in construing charterparties, whose draftsmen tend to use "linguistic overkill" (no less than the draftsmen of leases about whom Hoffmann J coined the expression in Tea Trade Properties Ltd v CIN Properties Ltd, [1990] 1 EGLR 155 ).

178   BP have another argument. They submit that, even if the specification of discharge ranges in the charterparty does not amount to previous nomination, by 12 March 2010 discharge ports or places had been nominated because on 2 March 2010 BP directed the "Target" to Singapore "for orders", and on 12 March 2010 they directed her to the USA "for orders". I

reject this argument: a specification to proceed for orders is not a discharge nomination, and in any case the direction to the USA was not, in my judgment, a direction to a "place" within the meaning of SAC6.

179   In any case both these arguments of BP would only answer the objection to their interpretation that the rotation proviso requires previous nomination. They do not engage with the difficulty that the word "rotation" presents.

180   I come to SAC6's operational scope. The question here is whether, as BP submit, it permits charterers to load additional cargo where none has been discharged, or whether, as the Owners submit, it permits loading only where cargo has been discharged.

181   SAC6 is headed "BP Backload Cargoes Clause", and nothing in the charterparty precludes reference to headings to assist interpretation. It is common ground that in this context "backloading" does not refer to loading cargo for a return voyage, but to loading after cargo has been discharged. I do not need here to consider whether the expression covers only loading replacement cargo or whether it also covers loading cargo in excess of what has been discharged. On any view BP's interpretation would mean that, despite the heading, SAC6 permits operations other than backloading. Moreover, BP's interpretation strains the language of sub-clause (b), which refers to the vessel calling at a port or place (or ports or places) "for backloading" when the charterer exercises an option under the clause.

182   However, BP submit that their interpretation is justified by sub-clause (a) because it confers two options: (i) to "load additional cargo", and (ii) "to discharge cargo … or any part thereof, and backload a cargo … ". Thus, BP argue, the clause states that charterers may simply load additional cargo. This argument, in my judgment, loses its force once the geographical scope of SAC6 is recognised, and indeed it corroborates the Owners' interpretation of its geographical scope. SAC6 has application only once the vessel has been to a discharge port or place and discharged some of her cargo. Then charterers may divert her to backload, either by way simply of loading cargo ("additional cargo") at the port to which she has been diverted or by way of discharging more cargo there

before backloading. In either case, the operation is by way of backloading.

183   I conclude that BP's direction that the vessel proceed to Marmara was not within the geographical scope of SAC6, and the loading there, without discharging any of the Odessa cargo, was not within its operational scope.

**If BP would have been entitled under clause SAC6 to order the "Target" to Marmara to load, did they exercise it (or can they now invoke it)?,**

184   SAC6, both in form and in substance, confers an option (or options) upon charterers. BP do not contend that they expressly invoked clause SAC6 or communicated to the Owners an intention to rely on the clause when they gave orders on 12 March or at any time during the voyage or before 5 May 2010 when the Owners' invoice was paid. The Owners submit that they cannot retrospectively invoke the clause. BP dispute this.

185   Generally where a contract includes an option of this kind, what Lord Devlin called a "business option" in Reardon Smith Line Ltd v Ministry of Agriculture Fisheries and Food, [1963] AC 691 , 731, it is subject to some provision, implied if not express, that the option holder is to communicate to the other party that he is electing to use it. Lord Devlin said this:

> "The essence of what I have called a business option is that the character of the obligation is altered to suit the option holder. There must, therefore, be some provision, express or implied, for its exercise within a reasonable time and for the communication of the election to the other party. It would be wholly unreasonable for the principal obligation in a contract to be altered without the other party being informed."

186   I consider that this general principle applies here: there is every reason that it should do so, and this case illustrates in at least two ways the commercial inconvenience that would result if the charterers did not have to communicate an election to exercise an option under SAC6. They confirm, I think, that it is to be inferred that the parties intended that BP should have to communicate it to the Owners if they exercised an option under SAC6.

187   First, when BP directed the vessel to Marmara, they had not made a nomination for discharge. They could still have given orders for the vessel to discharge in the Far East, and in those circumstances the freight would have been by way of a lump sum. It is BP's case (although disputed by the Owners) that, when they directed vessel to Marmara, they were entitled to give those directions either under the interim ports clause or by invoking SAC6. The implication of BP's submission is that they could have relied on SAC6 without communicating an election to do so, and leave the Owners uncertain whether the operation had the financial consequences stated in the interim ports clause or those of the SAC6 regime. This strikes me as commercially improbable.

188   Secondly, the Owners are entitled to freight immediately upon discharge. They needed to know by then (at the latest) whether BP had elected to divert the vessel under SAC6 if they were to invoice the charterers for the freight properly due. Indeed, BP's argument would, I think, have this curious consequence. They do not claim to have elected to exercise the option when the Owners invoiced them and payment was made on 5 May 2010. Unless and until it was exercised, SAC6 did not affect the proper calculation of the freight. When BP paid freight which was calculated without regard to SAC6 and without taking account of the possibility that BP might later invoke SAC6, they cannot, as I see it, be said to be paying because of any mistake. But since this last point was not argued before me, I say no more about it.

189   I conclude that, since BP did not communicate an election to invoke SAC6 when they directed the vessel to load at Marmara, they could not now rely upon it.

**If BP had made an effective election under SAC6, what would the financial consequences have been?**

190  If I am right in these conclusions, the question how a valid election under SAC6 would affect the calculation of freight does not arise, but I shall briefly state my conclusions about it. If charterers exercise an option under SAC6 and freight is on a Worldscale basis, SAC6(c)(i) provides that it is to be calculated on the basis of the "cargo quantity originally loaded". The issue between the parties is whether, as BP submit, this refers to the quantity of cargo loaded before the charterers elected to have the vessel divert or, as the Owners submit, the quantity of cargo that had been loaded before any was discharged. Accordingly, BP argue that, if they validly diverted the "Target" to load at Marmara under SAC6, the freight is to be calculated on the basis of the cargo quantity of 86,812 mt loaded at Odessa. The Owners argue that in any event it is to be calculated on the basis of the total cargo loaded at both Odessa and Marmara.

191  BP submit that only their interpretation gives effect to the word "originally". Although I am inclined to agree that, in isolation, the word would most naturally refer to the Odessa cargo only, it is not unambiguous, and BP's interpretation would bring such commercially improbable consequences that I would reject it, at least if BP's interpretation of either the geographical scope or the operational scope of SAC6 were correct. In many cases it would allow charterers to avoid freight charges by loading much of the cargo at a port to which they had diverted the vessel under SAC6. I therefore reject BP's interpretation of SAC6(c)(i), and prefer the Owners'. (I recognise that if, following discharge of some cargo, the charterers loaded replacement cargo and some further additional cargo, there might be scope for debate whether freight would be payable on the excess, but I need not determine that.)

**The legal significance of the exchanges in connection with the vessel going to Marmara**

192  I come to the Owners' arguments that, because of their exchanges with BP and BP's conduct before payment of the freight on 5 May 2010, BP cannot dispute their liability for full transatlantic overage freight. The Owners rely upon:

• i)  Their exchanges and BP's conduct around 12 to 14 March 2010 in connection with the "Target" going to Marmara.
• ii)  Their exchanges and BP's conduct on 16 March 2010 when the vessel was at Marmara;
• iii)  Their exchanges and BP's conduct after the vessel left Marmara and before discharge at Houston; and
• iv)  Their exchanges and BP's conduct around 27 April 2010.

193  The Owners submit that the context of the exchanges between 12 and 14 March 2010 was this. Since SAC6 did not cover the vessel diverting to Marmara to load, BP were not entitled to order the vessel there. As a matter of legal analysis, therefore, their direction that the vessel go to Marmara to load was an offer to the Owners that Marmara should be treated as a loadport under the charterparty. The Owners accepted that offer when on 14 March 2010 they gave notice of readiness that the vessel was ready to load in according with the charterparty. Accordingly, as the Owners contend, the parties agreed that the "Target" should go to Marmara and load there on the terms of the charterparty as to freight (and other matters).

194  Assuming that BP were not entitled under SAC6 to order the vessel to load at Marmara, this analysis is essentially uncontroversial and I accept it. There is room for debate about some inconsequential details: for example, the notice of readiness expressly referred to the terms of the charterparty and it might therefore be regarded as a counter-offer rather than an acceptance of BP's offer, but in my judgment BP's offer was always implicitly on the basis the charterparty terms should apply to the diversion to Marmara and therefore I prefer the Owners' analysis on this point. ("… if the new term merely makes express what would otherwise be implied, it does not destroy the effectiveness of the acceptance": Lark v Outhwaite, [1991] 2 Lloyd's Rep. 132 , 139 and Chitty on Contracts (30th Ed, 2008) Vol 1 para 2&-032.) BP's primary contention is that the agreement that the vessel should go to Marmara was concluded at the latest on 13 March 2010 when in his email at 18.52 Mr Cooper clearly conveyed that the Owners would proceed to Marmara. On that detail I prefer BP's analysis to the Owners': I do not think that after Mr Cooper's email the Owners could have

refused to go to Marmara without being in breach of contract. But nothing turns upon that, nor upon BP's further argument that the variation was agreed even earlier when on 12 March 2010 the Owners received without demur and apparently passed on to the vessel BP's directions to load at Marmara. Further, at the relevant time BP were still entitled to order the vessel to Marmara under the interim ports clause, BP not having made a nomination for discharge, and therefore the agreed variation was not, I think, that the vessel should go to Marmara, but that, notwithstanding the Owners accepted directions to Marmara, BP preserved their right to order American, Caribbean or Euromed discharge. But again this difference of analysis does not matter.

195  This being so, it is common ground that the effect of the parties' agreement that the Target should load at Marmara (or should do so without BP foregoing their right to make a discharge nomination – or nominations — that would attract freight on a Worldscale basis) was that, if the terms of the charterparty on their true construction meant that full transatlantic overage freight was payable on cargo carried from Odessa, it was also payable on the Marmara cargo. I have however rejected the Owners' argument that the charterparty is so to be construed. The Owners pursue two further arguments that nevertheless because of the exchanges about the vessel going to Marmara they are entitled to full transatlantic overage freight. (They advanced them to meet BP's argument that as a matter of interpretation of the charterparty the Owners were not entitled to any transatlantic overage freight, but I must also consider them in relation to my conclusion that under it the Owners were entitled to a reasonable sum by way of overage freight.) They are that the agreement made in relation to the vessel going to Marmara should be rectified and that BP are precluded by an estoppel by silence or acquiescence from disputing their entitlement to full transatlantic overage freight. (At the start of the trial the Owners also submitted that the parties' exchanges gave rise to an agreement that BP should pay full transatlantic overage freight on any cargo loaded at Marmara. The argument was that, when the parties agreed that the vessel should load at Marmara, BP knew that the Owners were so agreeing on the basis that full transatlantic overage freight would be payable if the vessel discharged in America, and in these circumstances the parties' intentions are not to

be ascertained by an objective interpretation of their exchanges. This argument was, in my view rightly, abandoned in the Owners' closing submissions.)

### Rectification

196  The Owners contend that a contract will be rectified for unilateral mistake where one party knows that the other is acting under a mistake and it would in the circumstances be unconscionable for the party who is not mistaken to insist on the written words of the contract. In support of this general submission they cite the judgments of Buckley LJ in Thomas Bates v Wyndhams, [1981] 1 WLR 505 , 516A-B and Jacobs LJ (with whom May LJ expressed cautious agreement) in Littman v Aspen Oil (Broking) Ltd, [2005] EWCA Civ 1579 at para 24 (although both Buckley LJ and Jacobs LJ expressed themselves in terms of whether it would be inequitable to rely upon the mistake, rather than whether it would be unconscionable).

197  The issue about rectification is unusual in this case in four respects: first, there is not really a claim for rectification. The issue arises because the Owners say that, had BP not paid the invoiced overage freight, they could have brought a claim for rectification in order to support a claim for payment of the freight.

198    Secondly, rectification is about correcting documents to record what was or is taken to have been the parties' contractual intention. It is not, I think, easy to identify what document is, on the Owners' case, to be corrected: that is to say, to identify a document that the Owners believed expressed their bargain but did so inaccurately. This is because the Owners' complaint does not really arise because of what was said (or not said) in the exchanges around the time that they agreed that the "Target" should go to Marmara. The effect of those exchanges was that any cargo loaded at Marmara should be carried on the terms of the charterparty with regard to freight. The Owners' mistake was about what those terms meant or how they applied to the Marmara cargo.

199    Thirdly, there is no evidence that either Mr Finlinson or Mr Savage thought that Mr Cooper or the Owners believed that they would be entitled to *full* transatlantic overage freight. At its highest, the Owners' case, I think, must be that Mr Finlinson or Mr Savage

or both knew (or suspected) that the Owners thought that BP would be liable for *some* overage freight and that the Owners would be displeased (or furious) when they learned that (as at least Mr Finlinson thought) BP were liable for none at all. The general rule is that rectification is available in cases of unilateral mistake only if A was mistaken and B knew what his mistake was; and it is generally not enough if B knew that A was mistaken but not what the mistake was: Chitty on Contracts (30th Ed, 2008) Vol 1 para 5-121. (See too Chitty on Contracts at para 5-086 who suggest that in these circumstances where a contract is "formed simply by an exchange of correspondence, it is void". Neither party so argued in this case, but this discussion in Chitty underlines the difficulties facing the Owners on the rectification issue.) The Owners seek nevertheless to show that they were entitled to have the agreement rectified so as to provide for full transatlantic overage freight. This would introduce more favourable terms than on any view BP knew or thought or suspected the Owners intended should apply to the Marmara cargo. I know of no precedent for rectifying a contract on the grounds of unilateral mistake so as to make for more favourable provision for the mistaken party than the other party realised he had in mind, and I should be reluctant so to expand the remedy. As Blackburne J observed in George Wimpey UK Ltd v V.I. Construction Ltd, [2005] EWCA Civ 77 at para 75, in these circumstances rectification is a drastic remedy because it imposes on one party a contract that he did not and did not intend to make, and relieves the other of a contract that he made, albeit without intending to do so.

200  Fourthly, in order to meet this difficulty, Mr Berry submitted that both Mr Finlinson and Mr Savage knew that the Owners were mistaken in that they did not realising that (on BP's case) the charterparty provided for no transatlantic overage freight and sought to profit from that mistake, and therefore BP are precluded from arguing that no freight is payable on the Marmara cargo. That argument does not assist the Owners if I am correct that under the charterparty the Owners are entitled to reasonable freight.

201  Leaving these points aside, however, I am in any event not persuaded that rectification would have been justified. The essential features of the case are these:

• i)  On around 11 March 2010, and until 16 March 2010, while Mr Cooper's impression was that the Owners would earn under the charterparty full transatlantic overage freight, BP and Sovereign had not caused or encouraged this belief on Mr Cooper's part.

• ii)  Neither Mr Finlinson nor Mr Savage thought that Mr Cooper expected that the Owners would be entitled to full transatlantic overage freight. They recognised that he would be unhappy and disappointed and cross if BP ordered the vessel to America or the Caribbean and the Owners earned no overage freight, but that was not in the forefront of their minds.

• iii)  It did not occur to either Mr Finlinson or Mr Savage that the Owners might refuse directions from BP to go to Marmara and load more cargo there. Mr Finlinson's impression was that BP were entitled to give such orders and Mr Savage shared this view at least on 11 March 2010, but neither really considered the legal position because they expected that the Owners would agree to the diversion in any event.

• iv)  There is no evidence that I accept that, had the Owners known that they would not be entitled to full transatlantic overage freight, they would have refused to load at Marmara or would have refused to do so unless BP abandoned their option to discharge in America and the Caribbean.

202  In order for the Owners to succeed on the rectification issue, they would have to show that BP (or possibly Sovereign) knew their mistake, or at least that they wilfully and recklessly shut their eyes to it, or intended the Owners to labour under a mistake and suspected that they were mistaken, so that, if BP were not guilty of sharp practice, it would affect their (corporate) conscience to take advantage of the mistake: Snell's Equity (32nd Ed., 2010) p.461. I do not consider that BP (or Sovereign) were guilty of sharp practice, or acted unconscionably or inequitably in connection with the "Target" diverting to Marmara or the exchanges with the Owners about the diversion. Nor do I think that it was unconscionable (or inequitable) for them to dispute the Owners' claim for full transatlantic overage freight. In my judgment neither Mr Finlinson nor Mr Savage (or more generally neither BP nor Sovereign) acted dishonourably or

improperly or unconscionably in giving instructions for the diversion to Marmara to load without first advising Mr Cooper of Mr Finlinson's interpretation of the charterparty. They were not seeking to "trick" Mr Cooper or the Owners into a course of conduct to which they would not otherwise have agreed, and they did not do so. The Owners accepted orders for the diversion and they expected to be paid freight in accordance with the charterparty terms. They would not have expected BP when giving instructions for the diversion to explain to them how they interpreted the charterparty terms any more that it would have occurred to them to explain their interpretation when they accepted the orders.

203 The law recognises that in arms' length negotiations a party is generally entitled to achieve the best deal that he can. As Sedley LJ observed in the George Wimpey case (loc cit at para 60) "honesty alone is too pure a standard for business dealings because it omits legitimate self-interest". This is why I reject Mr Berry's submission that Mr Finlinson had "no real answer to the criticism that his conduct was unethical" because, when it was suggested to him as a closing question in his cross-examination that it had been, he replied that it was "a difficult one to answer" but that he would not say that it was unethical. Not only did Mr Berry omit any mention of the second part of Mr Finlinson's answer, but Mr Finlinson was quite right to recognise the difficulties inherent in the question and I consider it to his credit that he did so. The law does not consider that it is necessarily unconscionable or otherwise improper for one commercial party to benefit from another commercial party's misunderstanding of the meaning or implications of a contract, and he is under no general duty to draw attention to mistakes or misunderstandings that he knows or suspect that the other has or might have made. Mr Russell illustrated this by decisions at first instance: in Oceanic Village v Shirayama Shokusan, [1999] EGCS 83 , Neuberger J refused rectification to a "foreigner without the benefit of independent advice", commenting that rectification is not available because a party "has missed a point or has failed to appreciate the possible or likely effect of a particular provision"; and in The "Ypatia Halcoussi", [1985] 2 Lloyd's Rep 364 Bingham J refused rectification of a settlement agreement although one party made a mistake in calculations about the claim and the other might have been "amazed at his own good fortune" and thought that the other party had overlooked a claim, without actually knowing it.

204 The court will seldom, if ever, order rectification on the basis of a unilateral mistake in a case such as this, where two substantial parties, both experienced in the trade and in negotiations of the kind in question, make a commercial agreement, unless the mistake has influenced the party seeking rectification to enter into an agreement. And the court will seldom, if ever, order rectification for unilateral mistake unless the other party is responsible for the mistake: see, for example, the George Wimpey case (loc cit) at para 70 per Blackburne J. Neither BP nor Sovereign were responsible for Mr Cooper's mistaken belief that BP would be liable for full transatlantic overage freight; and the Owners did not agree to divert to Marmara because of his mistake.

**Estoppel arising from the exchanges before the vessel arrived at Marmara**

205 I therefore reject the rectification claim and come to the Owners' argument that because of an estoppel by silence or acquiescence BP are precluded from disputing their liability for the freight that they paid. I can deal with this briefly because I reject it for largely the same reasons as I reject the rectification argument. Indeed, in Chartbrook Ltd v Persimmon Homes Ltd, [2008] EWCA Civ at para 137, Lawrence Collins LJ characterised rectification for unilateral mistake as "a species of equitable estoppel that precludes the party who knows of the other party's mistake from resisting rectification".

206 The argument that BP are subject to an estoppel depends upon them showing that BP (or possibly Sovereign) were under a duty to tell the Owners that BP did not accept that they would be liable for full transatlantic overage freight. I do not consider that they were under any such duty. I find it difficult to see how such a duty could arise given that BP and Sovereign did nothing, as I conclude, to induce or encourage any misunderstanding on Mr Cooper's part: see The "Stolt Loyalty", [1993] 2 Lloyd's Rep 281 , 291. In any case, Mr Cooper and the Owners did not rely to their detriment upon their misunderstanding: the Owners would in any case have agreed to load at Marmara without requiring BP to abandon the options for transatlantic discharge. I reject this argument of the Owners based on estoppel.

**The exchanges and BP's conduct when the vessel was at Marmara.**

207 The Owners also contend that the exchanges on 16 March 2010 and BP's response (or failure to respond) to them prevent BP from disputing that they were liable for full transatlantic overage freight on the Marmara cargo. The legal bases for this contention are (i) that the exchanges gave rise to a contract between the parties that such freight should be payable, and (ii) that BP are estopped from disputing their liability because of the exchanges.

**Contract resulting from exchanges on 16 March 2010**

208 The Owners' primary argument that the parties' exchanges on 16 March 2010 give rise to a contract that BP should be liable for full transatlantic overage freight is this: that the Owners made clear to Mr Savage their interpretation of the charterparty and, as Mr Berry submitted, that BP should not load oil at Marmara unless they accepted the Owners' interpretation, and thereby offered to load the Marmara cargo on those terms; and that BP accepted that offer by loading the Marmara cargo without dissenting from the Owners' interpretation. The Owners plead that "the parties thereby agreed to vary the charterparty on 16 March to provide for Marmara … as an additional loadport, and it was an express, alternatively an implied, term of that variation agreement that, in respect of destinations to which Worldscale rates applied, the charterparty provided that full freight would be paid on additional cargo there loaded (apart from Euromed discharge in respect of which 50% overage would apply)…".

209 It is convenient first to make these observations about how the Owners formulate this argument:

• i) First, they present their case in conventional terms of a contract formed by offer and acceptance. Although the law does not inflexibly require that the formation of a contract can be so analysed (see The "Zephyr", [1984] 1 Lloyd's Rep 58 , 72 per Hobhouse J and Trentham v Archital Luxfer, [1993] 1 Lloyd's Rep 25 , 27 per Steyn LJ) and I would not reject the Owners' argument simply because the contract that they allege could not bear

such analysis, in this case the analysis makes clear the difficulties facing the argument.

• ii) The agreement is pleaded in terms of a variation of the charterparty. It might equally, I think, have been put in terms of a collateral contract. But nothing to my mind turns upon this distinction.

• iii) The agreement is said to apply only to the Marmara cargo, and not to the overage loaded at Odessa.

• iv) The Owners, by an amendment of their defence, pleaded a secondary case, that "If … there was no agreement express or implied as to the freight payable for the carriage of cargo from Marmara … and/or the charterparty provision for [Worldscale] 135 does not apply to the carriage of such cargo to the US Gulf, Owners were entitled to a reasonable freight and/or a quantum meruit on the Marmara … cargo, which in the circumstances will be the charterparty freight for carriage to the US Gulf, alternatively a Worldscale freight of at least [Worldscale] 135". This argument was not pursued at trial and the Owners did not adduce evidence or present argument as to how much reasonable freight would be or what would constitute quantum meruit. (In their reply BP pleaded that it would be nothing.)

210 I do not accept that the parties made any agreement on 16 March 2010 that affects BP's liability for freight. I reject the argument because (i) the evidence does not support their contention that Mr Cooper made the offer that they assert, and I conclude that he did not do so; and (ii) BP did nothing that would have constituted acceptance of the alleged or any offer about freight.

211 Mr. Cooper did not, as I conclude, offer to allow the vessel to load at Marmara upon the basis that BP would agree to pay for full transatlantic overage freight on the cargo loaded. By 16 March 2010 the Owners and BP had already agreed that the vessel should load at Marmara, and Mr Cooper recognised that. When he and Mr Savage had their conversation in which Mr Savage learned that he had "cottoned on about overage" (as Mr Savage reported to Mr Finlinson), he did not offer terms on which the Owners would carry Marmara cargo, but asserted an interpretation of the charterparty. Nothing justifies the Owners' contention

that he offered to carry the Marmara overage on different terms as to freight from those applicable to the Odessa overage.

212  An offer can, of course, be accepted by conduct but conduct amounts to acceptance of an offer only if it is clear that the offeree did the act of alleged acceptance with the intention (objectively evinced) of accepting it: Chitty on Contracts (30th ed, 2008) Vol 1 para 2-030. I cannot accept that BP evinced such an intention when on 16 March 2010 they proceeded to have the Marmara cargo loaded. I so conclude notwithstanding Mr. Savage told Mr. Cooper (as was the case) that BP were aware of how Mr Cooper interpreted the charterparty with regard to transatlantic overage freight. After all, the vessel had already reached Marmara and weighed anchor by the time that Mr Cooper first spoke to Mr Savage about this. It occurred to nobody that the loading operation should be halted and the "Target" resume her voyage without taking on more cargo if BP disputed Mr Cooper's interpretation. The loading operation was not an unequivocal act of the sort that would (objectively) indicate an intention to enter into a contract. Nor does the fact that BP did not respond to the information that Mr. Savage passed to them about his conversation with Mr. Cooper unequivocally evince such an intention. In a case like this it would be inconsistent with the principle in Felthouse v Bindley, (1862) CBNS 869 to regard BP's silence or inactivity as their acceptance of, or agreement to, any contractual arrangement.

213  I therefore conclude that the Owners and BP made no agreement about freight when the vessel was at Marmara. In any case, I do not accept that in their conversations on 16 March 2010 Mr. Savage and Mr. Cooper spoke with the intention of varying the contractual relationship between the Owners and BP (or, more exactly, that objectively they evinced contractual intent).

214  I add for good measure that in my judgment, even if BP were to be taken to have made a promise or have entered into a commitment, the Owners did not provide BP with consideration for it. On 16 March 2010 the Owners were obliged to load at Marmara if so instructed by BP. They had agreed to do so by 13 March 2010, if not earlier (see para 194 above), and in any case they were so obliged under the interim ports

clause unless and until BP exercised a discharge option that attracted Worldscale freight. The circumstances of this case are not such that the Owners provided consideration for any undertaking on the part of BP by performing an existing contractual commitment: see Chitty on Contracts (30th Ed), 2008 at para 3-068. This was not a case like Williams v Roffey Bros and Nicholls (Contractors) Ltd, [1991] 1 QB 1 : BP did nothing to initiate any collateral agreement or variation, and I have rejected any suggestion that the Owners provided a "factual benefit" as consideration: sc. that they fulfilled their obligation to allow the loading operation in consideration of a commitment or undertaking given by BP. In any case, whether or not the Owners were contractually obliged to load at Marmara, I do not accept that they did so or cooperated in loading the vessel in exchange for or in consideration of any undertaking or commitment on the part of BP about overage freight.

**Estoppel arising from the exchanges while the vessel was at Marmara**

215  The Owners' alternative contention is that BP are not entitled to dispute that full freight is payable on the Marmara cargo because their exchanges with Sovereign give rise to an estoppel by representation or an estoppel by convention or both. I can deal with this contention shortly. Even on Mr. Cooper's account about what he and Mr. Savage said on 16 March 2010, BP did not, through Mr. Savage or otherwise, represent unequivocally that they would pay full transatlantic overage freight on the Marmara cargo. What he said was met, if not with silence, with the response that "BP is aware", which cannot on any view be described as an unequivocal statement that supports the Owners' contention. It would not have been such a statement even if Mr. Cooper had not been told (as he accepted that he might have been and I conclude that he was) that BP did not accept his interpretation of the charter party and considered that they were not liable for transatlantic overage freight. Nor can I accept that BP made an unequivocal representation of any relevant kind by going ahead with the loading operations. Similarly the exchanges cannot found an argument that BP and the Owners established a shared interpretation of the charterparty so as to give rise to estoppel by convention.

216  Moreover, for reasons that I have already given, I do not accept that the Owners' conduct was affected by anything that BP said or did not say or by anything that BP did or did not do. The Owners have not established reliance upon any representation or anything that might make it inequitable for BP to dispute the Owners' interpretation of the charterparty terms.

**Estoppel through events after 16 March 2010**

217  The Owners have further arguments that BP accepted that they should pay full transatlantic overage freight on the Marmara cargo or acquiesced in the Owners' contention that they should do so or are estopped from denying that they were so liable. These, as pleaded by the Owners, are based upon (i) what Mr Savage is alleged to have said on 17 March 2010 and 13 April 2010, and (ii) the fact that, after receiving the preliminary invoice dated 16 April 2010, BP had the cargo discharged at Houston. Mr Savage, as I have concluded, said nothing to Mr Cooper around 17 March 2010 or 13 April 2010 that might justify these contentions; nor is there any evidence that anything that Mr Savage said (or did not say) at those times influenced the Owners to act to their detriment.

218  Mr Berry did not, I think, pursue any argument based upon the fact that the cargo was discharged at Houston after the preliminary invoice had been submitted. I do not understand this part of the Owners' pleaded case. At one time it was apparently suggested that the Owners acted to their detriment in reliance on BP's conduct or representations by "invoicing BP for full freight". They would have so invoiced BP in any case, and they did not rely upon anything that BP said or did when they so presented their invoice; and the Owners suffered no detriment by presenting the invoice as they did. Nor was there any possibility that the Owners might have prevented discharge at Houston, but for some representation or other conduct on the part of BP or Sovereign.

**The authority of Sovereign and Mr Savage**

219  I have thus far considered (and rejected) the Owners' various arguments based upon the events between 11 March 2010 and the completion of discharge at Houston on the assumption that Mr Savage and

Sovereign had all relevant authority to act for BP and that all their knowledge is to be attributed to BP. There was no issue on the pleadings or in the list of issues about this: BP pleaded in relation to the conclusion of the original fixture in February 2010 that Mr Savage had no actual or ostensible authority to agree any term about freight or overage without their specific agreement, but I have not needed to decide issues about how the original fixture was concluded.

220  The factual basis upon which the Owners relied in support of their case that Mr Savage had authority to commit BP to the arrangements and to create the estoppels that they allege is this:

• i)  Mr Savage, as the Owners submitted, was the broker through whom the charterparty and its addenda were concluded, and he was the exclusive broking channel.
• ii)  Mr Cooper understood, reasonably, that messages to and from Mr Savage were, in effect, to and from BP, and Mr Finlinson and Mr Savage indicated nothing otherwise.
• iii)  As Mr Savage acknowledged, he had told Mr Cooper that he would convey to BP what Mr Cooper said, in particular about the interpretation of the charterparty. He never indicated that what he said to Mr Cooper represented his own position, rather than BP's.

I accept all this, except the first proposition is, I think, strictly true of Sovereign rather than Mr Savage. The more difficult question is that what it establishes about Mr Savage's, or Sovereign's, authority.

221  There is authority that a shipping broker does not have customary authority to commit his principal to a charterparty: "A broker, even an exclusive broker, is not in the shipping trade regarded as having authority to commit his principal without reference back to them. In other words there is no usual authority vesting in a broker to commit his principals to a contract": Polish SS Co v A J Williams Fuels (Overseas Sales) Ltd., [1989] 1 Lloyd's Rep 511 , 514, and see Bowstead and Reynolds on Agency (19th Ed, 2010) para 3-037. If that is so, this would be another reason to reject the arguments of rectification and an agreement to vary the charterparty (or a collateral agreement). However, I do not find this view easily reconciled with Woodstock Shipping Co v Kyma Compania Naviera SA, (The "Wave"), [1981]

1 Lloyd's Rep 521 , in which Mustill J emphatically rejected the argument that a shipbroker "as the chosen method of communication of negotiation in behalf of the owners" did not have ostensible, if not actual, authority to agree terms of a time charter on behalf of his principal.

222 Mr Berry submitted that, although Mr Savage was not authorised to agree to terms, he had authority to tell the Owners that BP agreed terms and so to commit them to the position that he stated. He cited the statement in Time Charters (6th Ed, 2008) at para 2.35 that, "Where a broker has been appointed to act, and is acting, as a channel of communication, it is suggested that he has apparent authority to report that his principal has agreed …. In such cases, the communication of the principal's intentions is the essence of the role a broker is engaged to perform, accordingly, the way in which the broker performs that role ought to bind his principal." I am not attracted by a distinction between authority to agree and authority to report agreement: it seems to me inconsistent with the decision of Mance J in Hanjin Shipping Co Ltd v Zenith Chartering Corp (The "Mercedes Envoy"), [1995] 2 Lloyd's Rep 559 , 560 to infer from an appointment to convey messages or pass on communications authority (whether actual or ostensible) to bind the principal to misstatements of the principal's messages and communications: authority to state something does not generally import authority to mis-state it (see British Bank of the Middle East v Sun Life Assurance Co of Canada (UK) Ltd, [1983] 2 Lloyd's Rep 9 , 12 per Ackner LJ, whose judgment was upheld in the House of Lords); and, most importantly, it would be artificial and to my mind unsatisfactory to draw such a distinction in the context of the typical conversational style of brokers.

223 Because these issues were not clearly before the court, I did not receive full submissions about them. I consider that they raise real difficulties for all the Owners' arguments based upon the exchanges in March 2010 and in April before discharge at Houston, but I need not resolve them and in the circumstances do not do so.

**Agreement through exchanges about the Owners' invoice**

224 The Owners have one more argument that BP became liable for the full amount of their final invoice:

that, in consideration of the Owners agreeing to make the small deduction from their invoice in respect of address commission, they and BP agree that otherwise BP were liable for the freight for which they had been invoiced. I reject that submission. These exchanges about the invoice were no more than administrative procedures to correct a technical invoicing error. The suggestion that the parties evinced an intention to resolve all differences between them about overage freight is farfetched. I have set out at paragraph 127 above Ms Myers' request for the deduction. It was not an offer to resolve any dispute, even the limited question of the address commission. It was an invitation either to correct an error or to defer the question for later and separate consideration so as to avoid delaying payment of all the freight. Mr Cooper understood it for what it was, as his message to the Owners made clear. He accepted that an invoicing error had been made, and the Owners issued an amended invoice accordingly. This exchange was not contractual. (This conclusion makes it unnecessary to consider BP's alternative argument that any agreement of the kind that the Owners allege would be vitiated for mistake.)

**Conclusion on BP's liability for freight**

225 In my judgment, therefore, under the terms of the charterparty BP were liable for transatlantic overage freight in a reasonable amount. Nothing that occurred before they paid the Owners' invoice on 5 May 2010 increased their liability or precluded them from disputing a greater liability.

**Mistake**

226 This leads to the question whether, if the amount that BP paid by way of overage freight is more than a reasonable amount, they can recover the excess. English law has no general principle that a party is entitled to recover money that he paid when he was not obliged to do so. He must establish that his case is within a recognised category for recovery on the grounds of restitution or unjust enrichment: Deutsche Morgan Grenfell Group plc v IRC, [2006] UKHL 49 at para 21 per Lord Hoffmann. A payment made by mistake is one such category, and BP seek to prove a mistake (of law or fact) and that the mistake caused them to pay the Owners' invoice: Kleinwort Benson v Lincoln

City Council, [1999] 2 AC 349 , 407H per Lord Hope. They are entitled in some circumstances to rely upon the mistake of an employee or other agent who made or caused the payment, an "activating agent" to adopt the convenient label from Goff & Jones, The Law of Unjust Enrichment (8th Ed, 2011) para 9-55.

227  BP submit that:

• i)  Their activating agents in this case were Mr Rickwood and Ms Myers;
• ii)  Both of them authorised payment of the Owners' invoice because they believed that it was correct and the invoiced sum was properly due to the Owners;
• iii)  They both were mistaken in their beliefs; and
• iv)  But for their mistaken beliefs neither of them would have authorised payment, and BP would not have made it.

228  I accept the first of these submissions. Mr Berry distinguished Mr Rickwood and Ms Myers from Mr Witsey and Mr Matthews, whose states of mind were, he submitted, irrelevant because "The state of mind of persons in clerical functions who merely execute the decisions of those responsible is irrelevant". I agree with Mr Berry that in this case the states of mind of Mr Witsey and Mr Matthews are irrelevant, but this is not because a mistake by a person with a clerical position whose job is to execute the decisions of others is never relevant to whether a payment by his employer is made by mistake or because the state of mind of such an employee can never justify a claim for money paid under a mistake, but because here Mr Witsey and Mr Matthews made no mistake in carrying out their roles in relation to the payment to the Owners. Their jobs were to arrange for BP to pay sums that the Demurrage Department had authorised, and they duly did so. Had BP overpaid because Mr Witsey and Mr Matthews (or one of them) had arranged for more to be paid than was authorised by the Demurrage Department, their states of mind would have been relevant. The question who is regarded as an activating agent depends upon the nature of the mistake that caused the payment. Here the mistake, on BP's case, was that payment of the invoice was authorised when it should not have been, and so their case depends on the states of mind of those who authorised it. I add that, although the exchange

between Mr Rathbone and Mr Finlinson on 5 May 2010 (see para 139 above) shows that they were both aware of the amount of the invoice some 20 minutes before it was actually paid, the Owners do not suggest that anything turns on that happenchance of timing, and the argument before me proceeded on the basis that for practical purposes payment was made when Mr Matthews completed processing it on 4 May 2010. Nor did the Owners suggest that it makes any difference that apparently someone in the Management Information team queried the invoice on 4 May 2010.

229  However, Mr Berry also submitted that Ms Myers alone was BP's activating agent, and that Mr Rickwood was not a relevant agent. My conclusions about Ms Myers' state of mind at the relevant time mean that this submission does not assist the Owners, but in any case I reject it. Mr Berry's starting point is that Mr Rickwood "did not think about it because it was not his job to think about it": that is to say, Mr Rickwood checked the so-called "higher level items" and left it to Ms Myers to examine the invoice in more detail, and there is no suggestion that he was in dereliction of his duties in this. Therefore, Mr Berry argues, any misunderstanding that he had in that he supposed that the invoiced amount represented BP's liability was not a mistake about anything that it was his job to check or consider, and, even if he can be regarded as mistaken at all given that he was not tasked with considering the important question, any mistake in that regard was not BP's mistake. The flaw in Mr Berry's argument is, to my mind, that it conflates what Mr Rickwood's job, or authority, was and the processes by which he properly carried out his job. Although he could properly do his duty to BP by carrying out only limited checks, nevertheless he was one of BP's agents to ensure that BP did not make payments for which they were not liable, and he made a mistake as BP's agent when he authorised the payment of the Owners' invoice in the mistaken belief that it was for an amount for which BP were liable.

230  I have already stated my findings about the states of mind of Mr Rickwood and Ms Myers at the relevant time (see para 138 above), and it follows from them that I uphold BP's second submission. Their third submission is in accordance with my conclusions about the proper interpretation of the charterparty and my rejection of the Owners' other arguments about what BP

agreed to pay and about estoppels. I accept the fourth submission on the basis of the evidence of Mr Rickwood and Ms Myers.

231 I should deal with two arguments about these conclusions. First, BP argued that, if any relevant distinction is to be made between what Mr Rickwood and Ms Myers thought, Mr Rickwood's position "is the more important because he was ultimately responsible for payment". I accept that it would have sufficed for BP to have proved that Mr Rickwood was mistaken as they allege: I would, if necessary, have concluded that but for his mistake alone the payment would not have been authorised and so not made. BP did not argue that it would have sufficed that only Ms Myers had been so mistaken and but for her mistake the payment would not have been made. I therefore express no view about that, except to observe that her mistake alone might have been regarded as a sufficient cause of the payment: as Lord Hope said in Deutsche Morgan Grenfell Group plc v IRC , loc cit at para 59, "A wrong turning half way along the journey is just as capable of being treated as a relevant mistake as one that is made on the doorstep at the point of arrival".

232 Secondly, Mr Berry submitted that a paying party cannot recover his payment as being made under a mistake if he was uncertain whether or not he is liable to pay. The cases and academic discussions variously refer to a person who pays in such circumstances as having waived inquiry into the true facts (as it was put in Kelly v Solari, (1841) 9 M & W 54 ) or having paid by way of "settlement of an honest claim" (see the Kleinwort Benson case, loc cit at p.382G/H per Lord Goff), or having accepted the risk (see the Kleinwort Benson case at p.401H per Lord Hoffmann), or having assumed it (see Goff & Jones, cit sup, at para 9-27). Clearly, a payor does not pay because of a mistake whenever he makes a payment for which he is not liable: he might pay voluntarily, either by way of a gift or simply out of goodwill or (more probably in business relationships) because he considers it in his commercial interest to do so or in order "to close the transaction" (as Lord Reading CJ put it in Maskell v Horner, [1915] 3 KB 106 , 118). And often there is no mistake if the payor does not know whether the payment is one for which he was liable or is voluntary, but decides to pay: if he decides or intends, as Robert Goff J said in Barclays Bank v W J Simms, [1980] 1 QB 677 , 695C/D, "that the payee

should have the money at all events, whether the fact be true or false, or is deemed in law so to have intended". These various answers to a claim all amount to a defence on the basis that there is not the requisite causative link between any mistake about liability and the payment (as Mr Russell submitted and the editors of Goff & Jones suggest to be the case).

233 In my judgment, these circumstances do not arise here on the facts. Particularly where the mistake in question is one of law (and I think that Mr Rickwood's mistake is, and Ms Myers' mistake probably is, to be so regarded), difficult questions can arise about whether (and if so when) a payor has a claim if he (or his activating agent) had doubts about his liability. The law has not worked out an answer: the position was considered in Marine Trade SA v Pioneer Freight Futures Co, [2009] EWCA 2656 (Comm) by Flaux J, who said (at para 76) that "… the furthest that a court of first instance could or should go as to the current state of the law is that there may be cases in which a payor can still be said to be under a mistake, even if he has doubts, provided that he paid concluding that it was more likely than not that he was liable to pay". This does not mean, of course, that the converse is true: that a payor will necessarily be regarded as mistaken if he pays because he is uncertain about whether he is liable but thinks it more likely than not that he is. Businessmen do not make decisions upon the basis of an assessment on the basis of probabilities and the payor might well have decided to take the risk of making an unnecessary payment even if he thought that he was probably not liable. All that matters in this case, on the basis of my findings, is that mere passing uncertainty about whether there is liability in the mind of the payor or his activating agent when considering what to do does not amount to doubt of the kind that might preclude recovery, and these difficult questions arise when the payor has persisting doubt when the decision to pay was taken and acted upon (a point emphasised by Lord Brown made in the Deutsche Morgan Grenfell case, loc cit at para 175, when answering Lord Hoffmann's example of the quiz contestant uncertain about the musical composer). I have concluded that neither Mr Rickwood nor Mrs Myers had doubts of that or any relevant kind. Any uncertainty that Mr Rickwood had about overage freight was transient, and he had set it aside by the time that he signed the invoice to record his approval that it should be paid. As for Ms Myers, I find

that she never had any relevant doubts about BP being liable for the invoiced amount once the Owners had given credit for the address commission. Had they had doubts, they would not have authorised the payment.

234  I therefore cannot accept Mr Berry's submission that, once a payor (or his activating agent) thinks that there are grounds for disputing liability which he considers might possibly be right, there is no question of the payment being made under a relevant mistake. On this basis, he argued that it is fatal to BP's claim that Ms Myers at one point thought that there might be an argument upon the basis of which BP could dispute liability for overage freight. I have concluded that in fact Ms Myers had no such thoughts before the payment was authorised and made, but in any case I cannot accept that it would defeat BP's claim if at some time before authorising the payment Ms Myers had thought that the invoice might be disputed but then wrongly decided that there were no grounds for doing so. Equally I would reject any argument that BP are not entitled to recover the overpayment because Mr Rickwood realised that the Recap said nothing about transatlantic overage freight and regarded full overage freight as unusual, but still thought that BP were liable for it. In these circumstances I reject the Owners' submissions that by making the payments after they had been authorised by Ms Myers and Mr Rickwood and possibly Mr Mahon BP "assumed the risk of error", or that through their employees in the Demurrage Department they "waived inquiry" and so are precluded from claiming that the payment resulted from a mistake.

235  I conclude, therefore, that BP's claim should succeed, subject to the Owners' arguments based on Mr Finlinson's conduct, state of mind and role. Mr Berry submitted that this defeats the claim, because, if those who authorise payment on behalf of a claimant are mistaken but there is another employee of the payor "who has the relevant responsibilities in respect of the transaction and the ability to object to payment, and who is not mistaken in the relevant sense, and knows that unless he objects to payment there is a risk that it will be made, but decides not to object, then it is his decision not to object which is the cause of the payment, not the mistake of those who authorise payment". He cited in support of this proposition the judgments of Atkinson J in Anglo-Scottish Beef Sugar Corp v Spalding, [1937] 2 KB 607 and Pilcher J in Turvey v

Dentons, [1953] 1 QB 218 . Pilcher J put it as follows (loc cit at p.224):

> "It is, however, clear upon authority that where, as in the present case, a limited liability company is concerned and payments are made under a bona fide mistake of fact by an authorized agent of the company, the fact that some other agent of the company may have had full knowledge of all the facts does not disentitle the company to recover the money so paid, provided that the agent with the full knowledge does not know that the payments are being made on an erroneous basis."

In support of this proposition, Pilcher J cited the Anglo-Scottish Beef Sugar case, but the judgment of Atkinson J provides no real support for it and in particular for Pilcher J's broad qualification to the general position. Atkinson J considered a claim to recover money that a company had paid for water on the instructions of a factory manager who had been unaware that his employer's managing director had concluded an agreement (the "second agreement") with the supplier that reduced their liability. In response to the argument that the company could not recover the overpayment because of the managing director's knowledge, Atkinson J responded that, "... the mere fact that some agent of the company knew of the second agreement is immaterial so long as he had no idea that it was being acted on".

236  The editors of Goff & Jones, cit sup at para 9-61, describe Pilcher J's statement of principle as "not obviously correct", because there is no good reason that "relief should *automatically* be denied where another agent knows the true facts, and that another agent will or may pay under a mistaken belief, but fails to take steps to ensure that that agent is informed of the truth before he acts". They observe that Pilcher J's principle would deny the payor a remedy where there has been a failure of internal communication in the payor entity, a result inconsistent with the doctrine of Kelly v Solari ,

10-03635-jpm    Doc 271-1    Filed 04/03/17    Entered 04/03/17 18:29:57    Exhibit A - Part 1    Pg 416 of 538

BP Oil International Ltd v Target Shipping Ltd, 2012 WL 2065172 (2012)...

loc cit, that carelessness or lack of due diligence on the part of the payor is no bar to relief.

237   Thus far I agree with the observation in Goff & Jones, and for this reason I reject the Owners' submission that BP "assumed the risk of error" because they did not have procedures to ensure that the Demurrage Department were aware of the views of BP Shipping's Chartering Department about such matters as what the charterparty provided with regard to overage freight and the application of SAC6. But their observation leads to the question whether and if so when a principal (P) will be denied relief by reason of knowledge of an agent (A1) other than the person actually making or authorising payment (A2). Goff & Jones suggests that this question might be answered by recognising that the basis upon which relief might be denied (consistently with the general law governing restitutionary claims) is that P is taken to have intended that the payments should be made "regardless of the true facts"; and therefore (apparently) relief is denied only if A1 so intended and his intention is to be attributed to P. In these circumstances, it is said, the cause of the payment by P would not be the mistake of A2 but the intention of A1, attributed to P. Thus, the statement of mind of A1 justifies relief being denied, on Goff & Jones' analysis, only if an intention of A1 that payment be made *regardless of the true facts* is to be attributed to P. This seems an unlikely state of affairs in a structured entity, such as BP would appear to be (and I infer is). As Goff & Jones observes (loc cit), it would, at least typically, arise only if A1 is superior to A2 in the structure of employees.

238   If this view is correct, Mr Finlinson's state of mind would not defeat BP's claim. He was not Mr Rickwood's or Ms Myers' superior: there is no evidence of their relative grades within the BP group structure, but he was employed by a different company and not BP. More importantly, nothing suggests that he had authority to have BP pay money (over $1 million) *regardless of the true facts* , and that, if he so intended, his intention is to be attributed to BP. Indeed, it is difficult to conceive that he intended that BP should make a payment regardless of the true facts unless to avoid his employers learning about how he had (mis)managed the transaction (a purpose that would almost inevitably fail, since such expenditure could hardly have gone unnoticed, and that I do not accept that he had), and then his intention would not be attributed to BP.

239   I think that Goff & Jones restrict rather too far the circumstances in which a principal's claim can be defeated by the state of mind of an employee who is not their paying agent, and I accept Mr Berry's submission that in some circumstances Mr Finlinson's state of mind would have defeated BP's claim if he, knowing or suspecting that BP would or might pay more to the Owners than they were liable to pay, did not object to it and decided not to prevent it. Mr Finlinson was, as Mr Berry said, "responsible for the transaction", and more specifically responsible for deciding how much freight (including transatlantic overage freight) should be paid by BP. If he had accepted that the freight should include full transatlantic overage freight, it could not, to my mind, be said that *BP* made a mistake. It might be that Mr Rickwood and Ms Myers were mistaken in that they supposed that the payment that they authorised reflected the freight that BP, through Mr Finlinson, had accepted by agreeing to the terms of the Recap; but if, in fact Mr Finlinson had agreed or decided that additional freight should be paid, *BP* could not be said to be mistaken in making the payment, or, to put it another way, BP cannot have the mistake of Mr Rickwood or that of Ms Myers attributed to them. This would clearly be so if Mr Finlinson had contracted in the exchanges in March 2010 that full transatlantic overage freight should be paid, and it would then have been beside the point if the Demurrage Department, knowing nothing of these exchanges, authorised the payment of the Owners' invoice wrongly assuming that it reflected what had been agreed in the Recap. It would make no difference, in my judgment, if Mr Finlinson had so agreed in March 2010 but the agreement was not contractual (say, because it was not supported by consideration): in those circumstances, any payment for overage freight would not have been in respect of a liability and so, in one sense, would have been voluntary, but it would have been a freight payment that Mr Finlinson was authorised to decide that BP should make. Nor would I consider the position materially different if, by the time that the Owners delivered their invoice, Mr Finlinson, although he had not agreed with them that BP would pay full transatlantic overage freight, had decided or accepted that in all the circumstances BP should pay it (or that they should not refuse to pay if the Owners

demanded it), because, for example, BP's chances of resisting a claim did not justify the time and expense of disputing the matter.

240 As I have said, Mr Berry's argument was presented as one of causation, and I can see that a decision by Mr Finlinson not to object to payment of full transatlantic overage freight would have broken the chain of causation resulting from the mistaken decisions of Ms Myers and Mr Rickwood. In the Franked Investment Group litigation, the Court of Appeal at [2010] EWCA Civ 103 said (at para 182) that the test of causation for unjust enrichment is a "but for" test (as has been widely accepted since the decision of Robert Goff J in Barclays Bank v W J Simms , loc cit at p.695C), but: "In applying the 'but for' test, it is important to identify the operative mistake and to limit recoverable loss to what is directly caused by it". (I do not understand the judgments in the case of the Supreme Court, [2012] UKSC 19, to state otherwise.) However, whether it is seen in terms of whether there was a mistake on the part of BP or in terms of causation, I accept that BP's claim should not succeed if Mr Finlinson, their relevant agent for deciding what freight should be paid, had decided that BP should pay full overage freight or had resigned himself to paying BP paying it if the Owners so demanded and for this reason did not intervene to prevent the payment.

241 BP's answer to this contention is not that, when Mr Finlinson did not intervene, he thought that BP were or might be liable for overage freight or had decided that they should pay it. Their case is that he was confident (as I conclude, wrongly confident) that BP were not so liable and that BP would not be paying it. (If he had recognised the implication of his interpretation of SAC6, he would, like Mr Rickwood and Ms Myers albeit for a different reason, have mistakenly believed that BP were liable for full freight on the Odessa overage, but I have concluded that he did not appreciate this until after BP had paid the Owners.) BP's answer is that Mr Finlinson did not think that overage freight would be paid, or that it might be. I have accepted Mr Finlinson's evidence about that, and concluded that it did not occur to Mr Finlinson that those responsible for checking the Owners' invoice might not interpret the Recap as he had done or that they might authorise payment. The position is like that in the Anglo-Scottish

Beet Sugar case, in which the managing director had no idea that the second agreement was not being acted on.

242 This leaves the Owners with one remaining argument. They submit that the mistake in this case would be characterised as a mistake of law, albeit as to the construction of a private contract, and, as I have said, I accept this: see the Kleinwort Benson case, loc cit at p.407E per Lord Hope. They say that relief in respect of monies paid under a mistake of law is refused where it is paid in settlement of an honest claim, at least if one (or both) of two conditions are satisfied.

243 I have alluded to the first suggested condition, or to a closely related submission of Mr Berry, at paragraph 234 above: that the question of law was considered by "appropriate persons" who were in a position to assess whether payment should be made, and they authorised payment. Mr Berry cited no authority that, in my judgment, provides any support for the proposition that this would answer a claim, I can see no basis for it in principle and I reject it.

244 With regard to their argument based on the second suggested condition, the Owners say that BP's claim should be refused because, in view of the exchanges about the interpretation of the Recap with regard to transatlantic overage freight, a reasonable recipient of BP's payment would have concluded that the payment was made in order to close the transaction, BP having accepted the Owners' interpretation. Again, Mr Berry cited no case in which a claim has been rejected on this basis and I am aware of none. He sought, however, to support this argument by reference to two authorities. One was the decision of the Court of Appeal in Maskell v Horner, [1915] 3 KB 106 , the source, I think, of the use in this context of the expression "close the transaction"; but that case was not one of mistake and does not, to my mind, lend any support to the Owners' argument.

245 Mr Berry also referred to the remarks of Lord Hoffmann in his speech in the Deutsche Morgan Grenfell case (cit sup) at paras 26 and 27. Lord Hoffmann floated the suggestion that, in cases where a payor was in doubt whether he was liable, the law might adopt an objective test to determine whether he should be regarded as having made the payment by mistake: that the question whether the payor should be treated as having taken the risk of paying

when not liable should depend upon "the objective circumstances surrounding the payment as they could reasonably have been known to both parties". The Owners' argument does not exactly reflect the thinking of Lord Hoffmann, who was contemplating a test depending on the view of an objective observer rather than what a reasonable recipient might think. More importantly, Lord Hoffmann (whose observations, as far as I am aware, remain isolated as judicial remarks) was digressing in his speech to introduce thinking about how the law might engage with the problem encapsulated in Lord Hope's now famous remark in the Kleinwort Benson case (loc cit at p.410B/C) that a state of doubt and mistake are different and a payor who has doubts assumes the risk that he might be wrong. Lord Hoffmann pointed to a possible path for the development of the law (the attractions of which might be thought the greater in a case such as this where the liability was for a reasonable sum), but his thinking does not represent the present law and Lord Hoffmann did not suggest otherwise. In any case, these questions arise where a paying party, or some relevant agent of the paying party, has material doubts about whether there is liability, and that is not the position in this case.

246   This is not a case in which the payor's claim is defeated because it was by way of payment of an honest claim. BP are entitled to recover the amount of any overage freight for which they were not liable.

### Conclusion

247  I therefore conclude that BP were liable not for full overage freight but for overage freight in a reasonable sum; that they paid any part of the overage freight that was more than that under a mistake; and that they are entitled to recover any excess.

248   This leads to the procedural question to which I referred at paragraph 145 above. The case that on its

true interpretation the charterparty provided for BP to pay transatlantic overage freight at a reasonable rate was not pleaded or opened by either party, and it is understandable that BP did not prepare for trial with a view to meeting it. It was not identified in an agreed revised list of issues presented at the start of the trial. This does not prevent the court from construing the charterparty as it thinks right: the court is not restricted to choosing between two interpretations both of which it considers wrong. The Owners contend, however, that BP have failed to prove that the full overage freight that BP paid was more than a reasonable rate, and that therefore they have not proved their claim and it should be dismissed. That would not be a just or fair disposal of the claim. It is understandable that BP conducted the case as they did. Indeed, when the Owners pleaded in their defence that under an agreed variation of the charterparty BP were to be liable for full transatlantic overage freight in respect of the Marmara cargo (an argument that was not pursued), they did so in terms that appeared to accept that they assumed the burden of proving what amount was reasonable. I conclude that the just order is that there should be an inquiry as to the proper amount (if any) that BP should recover. On such an inquiry the Owners can (if they see fit) raise the argument of estoppel to which I referred at paragraph 145.

249    I invite submissions about the issue about commissions to which I hav0e referred at the end of paragraph 2 above, unless the parties can reach agreement about it; and also about the terms of the order (including directions for any inquiry).

250   I am grateful to all counsel for their detailed submissions and considerable help.

Crown copyright

© 2017 Sweet & Maxwell

2012 WL 2065172

© 2017 Thomson Reuters.

# TAB 19

*1243  Buller v. Harrison

📄 Image 1 within document in PDF format.

4 February 1777

(1777) 2 Cowper 565

98 E.R. 1243

1777

## Analysis

Tuesday, Feb. 4th, 1777. Mr. Justice Aston absent. If money be paid by mistake to an agent, and placed by him to the account of his principal, but not paid over, money had and received to the use of the person so paying it by mistake will lie against the agent.—The mere passing such money in account or making rest, without any new credit given, fresh bills accepted or further sum advanced for the principal in consequence of it, is not equivalent to a payment of it over.

[Referred to, *Newall* v. *Tomlinson* , 1871, L. R. 6 C. P. 410. Distinguished, *Owen* v. *Cronk* [1895], 1 Q. B. 265.]

Upon shewing cause why a new trial should not be granted in this case, Lord Mansfield read his report as follows:

[566] This was an action for money had and received, brought by the plaintiff against the defendant, to recover back a sum of 2100*l.* paid him as due upon a policy of insurance, as agent for the insured, Messrs. Ludlow and Shaw, resident at New York. This sum the plaintiff had paid, thinking the loss was fair. Notice of the loss was given by the defendant to the plaintiff on the 20th of April. Part of the money was paid at that time, and the remainder on the 6th of May following; on which day the defendant passed the whole sum in his account with Messrs. Ludlow and Shaw, and gave credit to them for it against a sum of 3000l. in which they stood *1244 indebted to him. On the 17th of May, notice was given by the plaintiff to the defendant that it was a foul loss. At this time, nothing had happened to alter the situation of the defendant, or to make it different

from what it was on the 20th of April. He had accepted no fresh bills, advanced no sum of money, nor given any new credit to his principals; but affairs between them and him remained precisely in the same situation as on the 20th of April. The question at the trial was, whether this action could be maintained against the defendant, as agent of the insured; which depended on this; whether the defendant's having placed this money to the account of his principals, in the manner before stated, was equivalent to a payment of it over.

In general the principle of law is clear; that if money be mispaid to an agent expressly for the use of his principal, and the agent has paid it over, he is not liable in an action by the person who mispaid it: because it is just, that one man should not be a loser by the mistake of another; and the person who made the mistake is not without redress, but has his remedy over against the principal. On the other hand it is just, that as the agent ought not to lose, he should not be a gainer by the mistake. And therefore, if after the payment so made to him, and before he has paid the money over to his principal, the person corrects the mistake; the agent cannot afterwards pay it over to his principal, without making himself liable to the real owner for the amount. But the present case turns upon this; that the agent was precisely in the same situation at the time the mistake was discovered, as before. At the trial I inclined to think the plaintiff ought to recover; but did not direct the jury; and they found for the defendant. I am satisfied I mistook in leaving it open to the jury: for it is clearly a question of law, not a matter of fact: and in conscience the defendant is not en- [567] -titled to retain the money. Therefore I should have let it to the jury in this manner; if you are satisfied that the money was paid by mistake, and the defendant's situation not altered by any new circumstance since, but that every thing remained in the same state as it was on the 20th of April, you ought to find for the plaintiff.

Mr. Bearcroft and Mr. Davenport, who shewed cause, insisted that the defendant had a right to retain the money in question. That the ship, which was the subject of insurance, was supposed to be sea-worthy; and the object of the voyage was to satisfy 2100*l.* part of the debt due to the defendant, their factor. They had insured, therefore, accordingly, and drawn bills on Holland to that amount; which bills would undoubtedly have been honoured, if the ship had come safe. That upon the

ship being lost, and the money due on the insurance coming into the defendant's hands; he had given his principals credit for so much on account, and had struck the balance. This by the verdict the jury clearly had considered as a rest in the books of the defendant, and not a mere placing to account; and therefore was to all intents and purposes equivalent to a payment over. As to the fact of there being no change in the situation of the defendant and his principals, because the debt was not increased, there was no necessity that it should be increased; or that any new credit should be given. It was sufficient that the money was fully carried to account by the defendant, and considered by him as his property at the time, and for eleven days after. It might be too, that under this idea he was lulled into security, and did not take any means during that interval, to get the money from New York. If so, he would at least be a sufferer by the delay, if the verdict should be set aside.

Mr. Wallace and Mr. Dunning were in support of the rule; but Lord Mansfield thought the case so clear, that his Lordship stopped Mr. Dunning, as being unnecessary to give himself any trouble.

Lord Mansfield.—I am very glad this motion has been made: for I desire nothing so much as that all questions of mercantile law should be fully settled and ascertained; and it is of much more consequence that they should be so, than which way the decision is. The jury were embarrassed on the question whether this was a payment over. To many purposes it would be. It is now argued, that this is not a mere placing to account, but a making rest. If it were, it would not vary the case a straw. **[568]** I verily believe the jury were entangled in considering it as a payment over. There is no imputation upon a man who trusts to a misrepresentation of the insured. It is greatly to his honour; but it makes it of consequence to him to know, how far his remedy goes if he is imposed upon. The whole question at the trial was, whether the defendant, who was an agent, had paid the money over. Now, the law is clear, that if an agent pay over money which has been paid to him by mistake, he does no **\*1245** wrong; and the plaintiff must call on the principal; and in the case of *Muilman* versus ———, where it appeared that the money was paid over, the plaintiff was nonsuited. But, on the other hand, shall a man, though innocent, gain by a mistake, or be in a better situation than if the mistake had not happened? Certainly not. In this case, there was no new credit, no acceptance of new bills, no fresh goods bought or money advanced. In short, no alteration in the situation which the defendant and his principals stood in towards each other on the 20th of April. What then is the case? The defendant has trusted Ludlow and Co. and given them credit. He trafficks to the country where they live, and has agents there who know how to get the money back. The plaintiff is a stranger to them and never heard of their names. Is it conscientious then, that the defendant should keep money which he has got by their misrepresentation, and should say, though there is no alteration in my account with my principal, this is a hit, I have got the money and I will keep it? If there had been any new credit given, it would have been proper to have left it to the jury to say, whether any prejudice had happened to the defendant by means of this payment: but here no prejudice at all is proved, and none is to be inferred. Under these circumstances I think (and Mr. Justice Aston with whom I have talked the matter over is of the same opinion) that the defendant has no defence in point of law, and in point of equity and conscience he ought not to retain the money in question.

Mr. Justice Willes and Mr. Justice Ashhurst were of the same opinion.

Per Cur. Rule for a new trial absolute.

© 2017 Sweet & Maxwell

98 E.R. 1243

---

**End of Document**                                    © 2017 Thomson Reuters.

# TAB 20

lien he might have to wait many, many months, perhaps years, before   **A**
he obtained judgment. In those circumstances it was thought right in
exercising the equitable jurisdiction as between vendor and purchaser to
give the vendor the summary remedy of an immediate order for payment
of the purchase price into court without giving the option to the purchaser
of going out of possession.

But it appears to me that today the position is quite different. Today
a vendor who has not been paid can apply for summary judgment and can   **B**
obtain it in a proper case within a matter of weeks. That being the position,
it appears to me that justice to the plaintiff does not require that this harsh
order should be made against the defendant. It may be that in some extreme
cases where great and lasting continuing damage is being done to the
plaintiff's property it would be right to make the order which I am asked
to make on this application. But that is not the position in this case and
I do not think I ought to make the order asked. I will, however, make an   **C**
order in the *Greenwood* v. *Turner* [1891] 2 Ch. 144 form as Mr. Newcombe
asked me to do.

> *Order for lodgment in court on or before*
> *November* 14, 1969, *or within four days*
> *after service of the order of balance of*
> *unpaid purchase money with interest at*   **D**
> *contract rate from June* 30, 1969, *to*
> *date of lodgment and in default of*
> *lodgment an order for delivery up of*
> *possession.*

Solicitors: *Gibson & Weldon for Poole, Bairstow & Co., Bedford;*   **E**
*Joynson-Hicks & Co. for Waltons, Luton.*

---

CARL ZEISS STIFTUNG *v.* RAYNER & KEELER LTD.
AND OTHERS (NO. 3)                                **F**

[1955 C. No. 4445]

1968  Nov. 29; Dec. 2, 3, 4, 5, 6, 9, 10, 11;
1969  Feb. 5                                          Buckley J.

> *Estoppel—Per rem judicatam—Issue estoppel—Interlocutory*   **G**
> *summons by defendants to stay proceedings on ground that*
> *plaintiff's solicitors acting without authority—House of Lords'*
> *ruling that summons to be treated as separate action to which*
> *plaintiff not a party — Amendment of statement of claim —*
> *Summons by plaintiff seeking to strike out parts of the defences*
> *as being res judicatae—Decisions of foreign courts on trade*
> *mark matters relied upon by plaintiff—Other foreign judgments*
> *relied upon by defendants as creating a " counter-estoppel "—*
> *Whether reasoned judgments or formal records to be con-*   **H**
> *sidered for purposes of estoppel—Whether interlocutory judg-*
> *ments capable of creating estoppel—Whether plaintiff privy to*
> *plaintiff's solicitors in defendants' summons to stay proceedings*

A     —*Whether decisions of foreign courts on trade mark matters capable of creating estoppel in United Kingdom—Judge's discretion to strike out matters res judicatae—R.S.C., Ord. 18, r. 19.[1]*

*Practice — Pleadings — Striking out — Interlocutory summons by defendants to stay proceedings on ground that plaintiff's solicitors acting without authority—House of Lords affirming decision that plaintiff's solicitors acting with plaintiff's authority —Amendment of statement of claim—Summons by plaintiff*

B *seeking to strike out parts of defences as being res judicatae— Decisions of foreign courts on trade mark matters relied upon by plaintiff as creating an estoppel—Other foreign judgments relied on by defendants as creating " counter-estoppel " — Whether reasoned judgments or formal records to be considered for purposes of estoppel—Whether interlocutory judgments capable of creating an estoppel—Whether plaintiff privy to plaintiff's solicitors in defendants' summons to stay pro-*

C *ceedings—Judge's discretion to strike out matters res judicatae —R.S.C., Ord. 18, r. 19.*

*Practice—Abuse of process—Inherent jurisdiction to prevent— Decision by judge on interlocutory summons by defendants to stay proceedings—Allegation that plaintiff's solicitors acting without authority — Decision of House of Lords affirming judge's decision that solicitors acted with plaintiff's authority— Subsequent summons by plaintiff seeking to strike out parts of*

D *defences as being res judicatae—Judge's discretion whether to strike out such pleas or not—R.S.C., Ord. 18, r. 19.*

*Conflict of Laws—Foreign judgment—Issue estoppel—Whether decision of competent foreign court on trade mark matters capable of creating estoppel in this country.*

*Conflict of Laws—Domicile—Change—Whether foreign company can change domicile of own volition—Whether another proper law may be substituted for law of primary domicile.*

E *Company—Foreign company—Domicile—Whether foreign company can change domicile of own volition—Whether another proper law may be substituted for law of primary domicile.*

    The Carl Zeiss Stiftung (the " original Stiftung ") was founded in 1896 at Jena under the law of the Grand Duchy of Saxe-Weimar-Eisenach, which in 1918 became part of the state of Thuringia. The Stiftung was governed by a statute

F which provided that the industrial activities of the optical and glassworks business of the Stiftung (as distinguished from those functions which were charitable or sociological) should be carried on separately, each having its own board of management but directed by a single " special board " (being the department concerned with the affairs of the university of Jena). The statute laid down the constitution of the board, and provided for the appointment of its deputy in the event of the special board ceasing to act or in consequence

G of political changes. In 1918 the Thuringian Minister of

---

[1] R.S.C., Ord. 18, r. 19: " (1) The court may at any stage of the proceedings order to be struck out or amended any pleading or the indorsement of any writ in the action, or anything in any pleading or in the indorsement, on the ground that—(*a*) it discloses no reasonable cause of action or defence, as the case may be; or (*b*) it is scandalous, frivolous or vexatious; or (*c*) it may prejudice, embarrass or delay the fair trial of the action; or (*d*) it is otherwise an abuse of the

H process of the court; and may order the action to be stayed or dismissed or judgment to be entered accordingly, as the case may be. (2) No evidence shall be admissible on an application under paragraph (1) (*a*). (3) This rule shall, so far as applicable, apply to an originating summons and a petition as if the summons or petition, as the case may be, were a pleading."

Zeiss Stiftung v. Rayner & Keeler (No. 3)            [1970]

Education became the special board. Thuringia ceased to
exist during the American occupation in 1945, the functions    A
of the special board being then exercised by the Ministry of
Education of the Provincial Government. After the Americans
withdrew in July 1945, Jena was in the District of Gera of the
German Democratic Republic, set up in the Eastern Zone of
Germany by Soviet Russia. The relevant state department
thereafter was the Council of Gera.

The German Democratic Republic was not recognised by
H.M. Government which continued to recognise the Soviet    B
Union as the sole governing authority, de jure, of that part
of Germany.

When the American forces withdrew they took with them
all the members of both boards of management, and a
considerable amount of equipment and material used in the
optical and glass businesses, and a factory was built and
equipped near Heidenheim in the Western Zone, to manu-
facture optical instruments. A sales organisation was also    C
built up in Western Germany and throughout the world.
By two orders, dated February 23, 1949, and May 22, 1954,
the Government of Baden-Württemberg, which had been set
up by the American authorities in the Western Zone, purported
to transfer the " Sitz " of the original Stiftung first to Heiden-
heim and Jena jointly, and then to Heidenheim alone.

On June 21, 1945, before the Americans withdrew, a
deputy of the original Stiftung had been appointed by the    D
Provincial Thuringian Ministry of Education, and he purported
to appoint new members of the boards of management of
the optical business and the glassworks, and, despite the
removal to Russia as reparations of much of the machinery
and plant, the businesses were re-established in the Eastern
Zone. However, by decrees of the Russian occupying
authorities, dated April 14 and April 28, 1948, all the assets    E
of the businesses, or at any rate all those in the Eastern Zone,
were confiscated and transferred to separate legal entities,
known as Volks-Eigene-Betriebe (V.E.B.'s), but this confiscation
did not affect the assets of the original Stiftung which were
not employed in either of the businesses.

These events produced a rupture of relations between the
businesses in the Eastern and Western Zones, and a spate of
litigation followed, mostly relating to patent and trade mark    F
matters, in many countries, including the Eastern and Western
Zones of Germany, Pakistan, India, France the United States
of America, and the United Kingdom.

Proceedings in the United Kingdom were commenced
in 1955 by the plaintiff in a passing-off action, claiming as
the original Stiftung in the Eastern Zone. The first and second
defendants were companies incorporated in the United King-
dom, trading in goods manufactured in the Western Zone    G
of Germany in the Federal German Republic by the third
defendant (who similarly claimed to be the original Stiftung,
or, alternatively, to be a corporate body under the laws of the
Federal German Republic " identical " with the original
Stiftung). On December 7, 1956, the defendants issued a
summons seeking to stay the proceedings on the ground that
the solicitors purporting to act for the plaintiff were not in fact
acting with the plaintiff's authority. On March 6, 1964, Cross    H
J. dismissed that summons. The defendants appealed to the
Court of Appeal who allowed the appeal. On the plaintiff's
appeal the House of Lords in the main affirmed the decision
of Cross J. In December 1967, the statement of claim

A   was drastically amended so as to allege that the members
of the boards of management of the optical and glass
businesses had resigned on or about June 23, 1945, and
had been replaced; that the two Württemberg decrees pur-
porting to transfer the "Sitz" of the original Stiftung to
Heidenheim were invalid; that the business being carried on
in the Western Zone of Germany was, and always had been,
the property of the plaintiff, and that all its trade marks,
trade names, patents, goods, and other assets, including those
B   in the United Kingdom, belonged in fact to the plaintiff.
Alternatively, it was alleged that they were held on trust for
the plaintiff, and in the further alternative the original claims
as to passing-off were maintained.

After delivery of the defences, the plaintiff sought to
strike out certain paragraphs in the defence of the third
defendant (and of the other defences in so far as they incor-
porated those paragraphs) as being res judicatae. The allegations
C   the plaintiff sought to have struck out were, first, those in para-
graph 1 of the defence, "insofar as" that paragraph contained
an allegation that the third defendant was the original Stiftung
and in paragraph 2 where that allegation was made specifically.
Secondly those in paragraph 3 "insofar as" that paragraph
alleged that the original Stiftung's domicile had ever shifted
from Jena or that the original statute governing the original
Stiftung had ever been amended accordingly.   Thirdly, the
D   allegation in paragraph 5 (b) that under the law of the Federal
Republic the third defendant was a validly constituted corpora-
tion capable of owning rights and property, carrying on business
on its own account and of suing and being sued.   Further the
plaintiff sought to have struck out any alternative allegation
in paragraph 5 (c) that the third defendant, although not the
original Stiftung, was "identical" therewith according to
any relevant system of law, or, in paragraph 5 (d), that the
E   original Stiftung had ceased to exist or, in paragraph 7, that
the plaintiff was not a properly and validly constituted Stiftung.
Finally, the plaintiff sought to have deleted any allegation dis-
puting that the members of the boards of management in Jena
had, as was claimed, resigned and been replaced.

The plaintiff relied upon four decisions as showing that
the defendants were estopped from alleging the matters set
out above by reason of the operation of the doctrine of
F   estoppel per rem judicatam; the four decisions so relied upon
being (a) that of Cross J., (b) that of the House of Lords,
(c) a decision of Qadeeruddin J. in the High Court of West
Pakistan at Karachi, and (d) a decision of the Joint Registrar
of Trade Marks in India.   The defendants submitted that the
plaintiff was estopped from relying upon any such estoppel
which there might be, by reason of a counter-estoppel resulting
from the decision of Mansfield J. in the District Court in the
G   Southern District of New York, U.S.A., and the decision of
the Paris Court of Appeal, confirmed by the Cour de Cassation.

On the motion : —

*Held*, (1) that where, as in the present case, the court
had to consider "issue estoppel" the relevant considerations
were more subtle than those where the court had simply to
consider "cause of action estoppel per rem judicatam";
in the latter case where a party sought to re-litigate a cause of
H   action, upon which a competent court had already adjudicated
between the parties, the court should, at the earliest oppor-
tunity, frustrate any such attempt by striking out the
proceedings as vexatious and an abuse of process; but in the

former case, if one party was barred by issue estoppel from
raising an issue which he nevertheless sought to raise, and   A
his opponent sought, by interlocutory motion, to have the
offending plea struck out, the judge had a discretion under
R.S.C., Ord. 18, r. 19 whether or not to do so and, in the
exercise of such discretion, he should not refuse to strike
out the plea merely because it involved deciding a difficult
or complicated question as to whether the issue raised was
res judicata, but he should decide that question, however
difficult or obscure the point might be (provided of course   B
that the relevant and necessary information was before him);
but having decided it, he was not bound to strike out the
plea, even if the issue had been shown to be res judicata;
the onus in an interlocutory proceeding being on the plaintiff
to establish that failure to strike out would result in one
of the vices mentioned in R.S.C., Ord. 18, r. 19 (post, pp.
537c—538c).

   *Golding* v. *Wharton Salt Works Co.* (1876) 1 Q.B.D. 374,   C
C.A. applied.

   (2) That to establish an estoppel per rem judicatam a party
had to show (i) that there had already been a judicial decision
by a competent court or tribunal, (ii) of a final character, (iii)
of the same question as that sought to be put in issue by the
plea in respect of which the estoppel was claimed, and (iv)
between the same parties or their privies. Finality, for
this purpose, meant that the decision (a) did not leave some-   D
thing, ex facie, to be judicially determined or ascertained before
the decision could become effective and enforceable, as, for
instance, an order for an account or an inquiry, and (b) was
not subject to subsequent discharge, revision, modification
or review by the court or tribunal making the decision,
as, for example, an interlocutory order for an interim injunc-
tion until judgment or further order. A person could not be
regarded as a privy, unless the privy relationship was such   E
as to operate whether the question was decided in favour of the
party to the proceedings or against him; thus if a plaintiff
successfully sued one who had purported to deal with him
as agent, for damages for breach of warranty of authority,
it was impossible to regard the person on whose behalf the
unsuccessful defendant purported to act as privy to the
defendant in the action. A mere interest in the outcome of
litigation did not make the person so interested a privy to   F
some party to that litigation. There was nothing in the
solicitor's relationship with his client which rendered them
privy to one another for the purposes of the doctrine of
estoppel (post, pp. 538G—539B, 541A—542B).

   *Mercantile Investment & General Trust Co.* v. *River
Plate Trust, Loan & Agency Co.* [1894] 1 Ch. 578 and dicta
of Lord Guest and of Lord Upjohn in *Carl Zeiss Stiftung* v.
*Rayner & Keeler Ltd.* (*No. 2*) [1967] 1 A.C. 853, 937, 945;   G
[1966] 3 W.L.R. 125; [1966] 2 All E.R. 536, H.L.(E.) applied.

   (3) That where a party sought to strike out some part of
his opponent's pleading, he had to indicate clearly exactly what
it was he wanted struck out; if the allegation objected to was
not in express terms it was not sufficient merely to ask that
it be struck out " in so far as it may contain " such an
allegation (post, p. 538c–E); that, accordingly, as the third
defendant had not specifically alleged in paragraph 1 of his   H
defence that it was the original Stiftung, that part of the
plaintiff's notice of motion which sought to have that paragraph
of the defence struck out " in so far as it might contain an

A allegation " to that effect was misconceived even though it might be that, when read with other parts of the defence, paragraph 1 of the defence might carry such an implication (post, p. 538C–E).

(4) That a final decision of a competent court or tribunal in a foreign country on a trade mark matter and between the same parties or their privies could in law form the basis for an estoppel per rem judicatam in this country; in

B such a case, was there no reason why the decision could not create an estoppel, even though discovery of documents could not be insisted upon by the parties to the proceedings (post, pp. 538H, 546D–F).

(5) (On the assumption, which appeared to be binding both on the court and on the Court of Appeal, that, for the purposes of estoppel, the court ought to have regard only to the formal records of decisions and not to the reasons given by the judges in their reasoned judgments for those decisions, and applying

C the principles set out above) that it was apparent from the four decisions relied on as creating an estoppel, that the plaintiff was neither a party nor a privy to the proceedings before Cross J. and the House of Lords, and that, therefore, no estoppel binding on the plaintiff and on the third defendant could result therefrom, but that both Qadeeruddin J. in the High Court of West Pakistan at Karachi and the Joint Registrar of Trade Marks in India had held, in proceedings between the

D plaintiff and the third defendant, that the plaintiff did exist as a corporate body in East Germany, and that therefore the defendants were estopped from denying the plaintiff's existence in the present proceedings (post, pp. 540A–C, 540H—542A, C–D, H—543C, F, 546A–B).

(6) That it was a fair inference to be drawn from the formal orders made by Qadeeruddin J. in Pakistan and by

E the Joint Registrar of Trade Marks in India that the plaintiff was, according to East German law, the original Stiftung (although neither judge had considered the status of the third defendant according to West German law or the position of the Council of Gera), but that there was nothing to estop the defendants from alleging that, by West German law, or indeed by any other law than East German law, the third defendant was the original Stiftung. It necessarily followed,

F therefore, that the third defendant would be precluded from arguing that the original Stiftung had ceased to exist in East Germany or that the plaintiff was not the original Stiftung according to East German law, these matters having become res judicata against the third defendant; but that since they were not similarly res judicata against the first and second defendants, who were neither parties nor privies to the proceedings in Pakistan and India, the court would in the exercise of its discretion refuse to strike out these

G particular allegations (post, p. 543C–H).

(7) That nothing in the American or French proceedings could be relied upon as creating any " counter-estoppel " because: (i) in the case of the American proceedings, (a) it had not been established that the decision of Mansfield J. was final in the relevant sense, and (b) it was at least doubtful whether the present plaintiff could be regarded as a privy to any of the defendants in those proceedings, and (ii) in the

H case of the French proceedings, there was nothing which could afford any basis for a plea of res judicata or " counter-estoppel " since it was not established that the decision was incapable of review by the deciding court or that any part of it would

### Zeiss Stiftung v. Rayner & Keeler (No. 3)                    [1970]

be treated in France as being incapable of re-litigation between
the same parties in another action, and so it was not "final"   A
in the relevant sense (post, pp. 547E–G, 548c–E).

(8) That, accordingly, the only part of the pleadings which
the court, in its discretion, would order to be struck out was
the denial of the existence of the plaintiff contained in the first
sentence of paragraph 7 of the defence (post, p. 548F–G).

*Per curiam.* That assuming—contrary to what appeared to
be authority binding both upon the court and on the Court of
Appeal—that the court should have regard to the reasoned   B
judgments of the decisions relied upon as creating an estoppel,
the following further conclusions should be reached:—

(1) That in so far as the decisions of Cross J. and of the
House of Lords were concerned, there was nothing that
rendered any question as to the status or character of the
third defendant res judicata because: (i) such question must
be answered by reference to West German law which was not
investigated either by Cross J. or by the House of Lords, (ii)   C
any decision of such a question would not have been necessary
for the purposes of those proceedings but purely collateral, and
(iii) the plaintiff was neither a party nor a privy to any party
to those proceedings. It was, therefore, unnecessary to consider
whether any relevant finding or decision of Cross J. or of the
House of Lords was "final" (post, p. 542c–D).

(2) That neither the judgment of Qadeeruddin J. in   D
Pakistan nor the judgment of the Joint Registrar of Trade Marks
in India contained any decision which debarred the third
defendant from alleging that it was, by West German law,
or by any other system of law, except East German law, the
original Stiftung (post, p. 543F).

(3) That, the first and second defendants not being
parties or privies to the proceedings in Pakistan or India,
even if the third defendant had been estopped by those decisions   E
*from alleging that the third defendant was, and the plaintiff*
was not, the original Stiftung, nevertheless that issue would
have, in any event, to be investigated at the trial and, therefore,
the court would not have exercised its discretion to strike
out that allegation (post, p. 543G–H).

(4) That if the allegation in paragraph 3 of the defence,
that the "Sitz" (not the domicile) of the third defendant had
been transferred from Jena to Heidenheim in the Federal   F
Republic, and article 3 of the original statute amended accord-
ingly, was intended to mean that the domicile of the original
Stiftung or its proper law had been changed by the substitution
of another system of law, the issue so raised could not be res
judicata since it would clearly involve a possible conflict between
the laws of East and West Germany and none of the four
decisions relied on as creating an estoppel had even considered
West German law. Equally if the paragraph merely meant that   G
the administrative centre or principal place of business of the
original Stiftung had been transferred it must involve questions
of foreign law which had not been judicially considered and
therefore could not be res judicata. Accordingly there was no
reason for striking out paragraph 3 (post, pp. 543H—544G).

(5) That since West German law was not considered by any
of the four decisions relied on as creating an estoppel, two
further questions both involving a consideration of West   H
German law, namely (i), whether under West German law the
third defendant was a validly and properly constituted cor-
poration capable of owning property and of carrying on busi-
ness on its own account, and (ii) whether under that same law

A  the third defendant was a corporation "identical" with the
original Stiftung, were equally incapable of creating an estoppel
and accordingly there was no reason for striking out paragraphs
5 (b) and 5 (c) of the defence (post, p. 544E–H).

(6) That the findings of Cross J. in relation to the allega-
tions in the defence that the relevant members of the boards
of management of the optical business and the glass works
of the original Stiftung did not resign or cease to be members
thereof were unnecessary for the determination of any question
B  which Cross J. or the House of Lords had had to decide and
were, therefore, wholly collateral to the summons before the
court and could not for that reason found any claim to an
estoppel; similarly, there was no reason arising out of the
Pakistani or Indian decisions why an estoppel should be
created or the material paragraphs struck out, even though
Cross J. clearly intended to determine the questions once
and for all (post, pp. 546G–547A).

C  (7) The word "domicile" in respect of a corporation
aggregate must refer to that country the law of which is
the proper law of the corporation governing its constitution
and powers. A corporation cannot of its own volition,
and apart from its proper law, abandon one domicile and
adopt another, as a natural person can. Its primary domicile
must be under that law under which it was incorporated. It
must be at least theoretically possible that, by operation of the
D  proper law for the time being of a corporation, another system
of law may be substituted as the proper law of the corporation
(post, p. 544B–D).


The following cases are referred to in the judgment:

E  *Carl Zeiss, Heidenheim* v. *V. E. B. Carl Zeiss, Jena and D. I. A. Deutscher
Innen und Aussenhabdel Feinmechanik—Optik*, heard by the Federal
Supreme Court on July 24, 1957 (I.Z.R.) 21/56; Sammlung der
Deutschen Entscheidungen zum Interzonalen Privatrecht (hereinafter
referred to as S.D.E. 1954–57 No. 222; G.R.U.R. 1958 p. 189) on
appeal from the Dusseldorf Court of Appeal, January 13, 1956.

*Carl Zeiss Stiftung* v. *Rayner & Keeler Ltd.* [1965] Ch. 525; [1964] 3
W.L.R. 905; [1964] 3 All E.R. 326, C.A.

F  *Carl Zeiss Stiftung* v. *Rayner & Keeler Ltd.* (*No. 2*) [1964] R.P.C. 299;
[1965] Ch. 596; [1965] 2 W.L.R. 277; [1965] 1 All E.R. 300, C.A.;
[1967] 1 A.C. 853; [1966] 3 W.L.R. 125; [1966] 2 All E.R. 536
H.L.(E.).

*Carl Zeiss Stiftung, Jena* v. *Bauersfeld, Henrichs, Kuppenbender, and
the firm Carl Zeiss, Heidenheim* (heard in the following courts in
the Federal Republic of Germany on the following dates: Provincial
Court of Stuttgart, July 31, 1954, Provincial Court of Appeal, April 6,
G  1955 (I.U. 127/1954, S.D.E.) 1958–59 No. 217); Federal Supreme
Court, January 28, 1958 (I.Z.R. 122/55, S.D.E. 1958–59 No. 60);
Provincial Court of Appeal of Stuttgart, October 29, 1958 (I.U. 41/58,
S.D.E. 1958–59 No. 60); Federal Supreme Court, November 15, 1960
(I.Z.R. 10/59, S.D.E. 1960–61 No. 52). Unreported in England.

*Carl Zeiss Stiftung (doing business under the name and style Carl Zeiss
and Zeiss Ikon A.G.)* v. *V.E.B. Carl Zeiss, Jena, Steelmaster Inc.,
H  Ercona Corporation, Exakta Camera Co. Inc., Camera Speciality
Co. Inc.* (*Carl Zeiss Inc.* being an additional defendant to the counter-
claim) (judgment delivered on November 7, 1968, in the District Court
of the Southern District of New York, U.S.A.).

Zeiss Stiftung v. Rayner & Keeler (No. 3)                    **[1970]**

*Carl Zeiss Stiftung, Heidenheim's Applications Nos. 161569, and 161570,*
*and Carl Zeiss Stiftung, Jena's opposition thereto; Carl Zeiss* **A**
*Stiftung, Jena's Application No. 165927, and Carl Zeiss Stiftung,*
*Heidenheim's opposition thereto* (judgment delivered by M. L. Kapoor,
Joint Registrar of Trade Marks in India on March 12, 1968).

*Carl Zeiss Stiftung (trading as Carl Zeiss, Heidenheim) v. Carl Zeiss,*
*Jena* (miscellaneous Appeals Nos. 11 and 12 of 1962, judgment
delivered on September 29, 1967, in the High Court of West Pakistan
at Karachi).                                                        **B**

*Golding* v. *Wharton Salt Works Co.* (1876) 1 Q.B.D. 374, C.A.

*Kingston (Duchess of)'s Case* (1776) 20 State Tr. 355.

*Marginson* v. *Blackburn Borough Council* [1939] 2 K.B. 426; [1939]
1 All E.R. 273, C.A.

*Mercantile Investment & General Trust Co.* v. *River Plate Trust, Loan*
*& Agency Co.* [1894] 1 Ch. 578.                                    **C**

*V.E.B. Carl Zeiss, Jena and the Carl Zeiss Stiftung, Jena v. Carl Zeiss,*
*Heidenheim and the Carl Zeiss Stiftung, Heidenheim* (heard by
the Paris Court of Appeal, on April 2, 1963, and confirmed by the
Cour de Cassation on March 15, 1966).

*V.E.B. Carl Zeiss, Jena, the firm Werner Jähnert, and the firm Hans*
*Pollnow v. Carl Zeiss, Heidenheim,* heard by the Federal Supreme
Court on February 6, 1959 (I.Z.R. 50/57; I.Z.R. 150/57, S.D.E.
1958–59 No. 140, G.R.U.R. 1959 p. 367), on appeal from the Dussel- **D**
dorf Court of Appeal, January 11, 1957, and June 25, 1957.

The following additional cases were cited in argument:—

*Banco de Bilbao* v. *Sancha* [1938] 2 K.B. 176; [1938] 2 All E.R. 253, C.A.

*Bell* v. *Holmes* [1956] 1 W.L.R. 1359; [1956] 3 All E.R. 449.

*Birch* v. *Birch* [1902] P. 130.                                   **E**

*Broken Hill Proprietary Co. Ltd.* v. *Broken Hill Municipal Council* [1926]
A.C. 94, P.C.

*Cadam* v. *Beaverbrook Newspapers Ltd.* [1959] 1 Q.B. 413; [1959]
2 W.L.R. 324; [1959] 1 All E.R. 453, C.A.

*Caffoor* v. *Income Tax Commissioner* [1961] A.C. 584; [1961] 2 W.L.R.
794; [1961] 2 All E.R. 436, P.C.

*Conquer* v. *Boot* [1928] 2 K.B. 336, D.C.

*Cow* v. *Casey* [1949] 1 K.B. 474; [1949] 1 All E.R. 197, C.A.     **F**

*Duedu* v. *Yiboe* [1961] 1 W.L.R. 1040, P.C.

*Dulles' Settlement (No. 2), In re* [1951] Ch. 842; [1951] 2 All E.R.
69, C.A.

*Evans* v. *Barclays Bank and Galloway* [1924] W.N. 97, C.A.

*Fidelitas Shipping Co. Ltd.* v. *V/O Exportchleb* [1966] 1 Q.B. 630; [1965]
2 W.L.R. 1059; [1965] 2 All E.R. 4, C.A.

*Fidelitas Shipping Co. Ltd.* v. *V/O Exportchleb* [1963] 2 Lloyd's Rep. **G**
113, C.A., affirming [1963] 1 Lloyd's Rep. 246.

*General Electric Co. Ltd.'s Patent Application, In re* [1964] R.P.C. 413,
C.A.

*Godard* v. *Gray* (1870) L.R. 6 Q.B. 139.

*Green* v. *Weatherill* [1929] 2 Ch. 213.

*Greenwood* v. *Turner* [1899] 2 Ch. 144, C.A.

*Hedley Byrne & Co. Ltd.* v. *Heller & Partners Ltd.* [1964] A.C. 465; **H**
[1963] 3 W.L.R. 101; [1963] 2 All E.R. 575, H.L.(E.).

*Henderson* v. *Henderson* (1843) 3 Hare 100.

*Hoystead* v. *Commissioner of Taxation* [1926] A.C. 155, P.C.

A
*Hubbuck & Sons Ltd.* v. *Wilkinson, Heywood & Clarke Ltd.* [1899] 1 Q.B.
   86, C.A.

*Initial Services Ltd.* v. *Putterill* [1968] 1 Q.B. 396; [1967] 3 W.L.R.
   1032; [1967] 3 All E.R. 145, C.A.

*Keech* v. *Sandford* (1726) 2 Eq.Ca.Abr. 741; Sel.Cas.t.King 61, 175.

*Kemsley* v. *Foot* [1951] 2 K.B. 34; [1951] 1 All E.R. 331, C.A., affirmed
   [1952] A.C. 345; [1952] 1 All E.R. 501, H.L.(E.).

B
*Kirkness* v. *John Hudson & Co. Ltd.* [1955] A.C. 696; [1955] 2 W.L.R.
   1135; [1955] 2 All E.R. 345, H.L.(E.).

*Koenigsberg, In re, Public Trustee* v. *Koenigsberg* [1949] Ch. 348; [1949]
   1 All E.R. 804, C.A.

*Kok Hoong* v. *Leong Cheong Kweng Mines Ltd.* [1964] A.C. 993; [1964]
   2 W.L.R. 150; [1964] 1 All E.R. 300, P.C.

*Massachusetts Saw Works' Application, In re* (1918) 35 R.P.C. 137.

C
*Morrison, Rose & Partners* v. *Hillman* [1961] 2 Q.B. 266; [1961] 3 W.L.R.
   301; [1961] 2 All E.R. 891, C.A.

*New Brunswick Railway Co.* v. *British & French Trust Corporation
   Ltd.* [1939] A.C. 1; [1938] 4 All E.R. 747, H.L.(E.).

*Nouvion* v. *Freeman* (1889) 15 App.Cas. 1, H.L.(E.).

*Penn-Texas Corporation* v. *Murat Anstalt (No. 2)* [1964] 2 Q.B. 647;
   [1964] 3 W.L.R. 131; [1964] 2 All E.R. 594, C.A.

*Pim* v. *Curell* (1840) 6 M. & W. 234.

D
*Reg.* v. *Hartington Middle Quarter (Inhabitants)* (1855) 4 E. & B. 780.

*Rex* v. *Knaptoft (Inhabitants)* (1824) 2 B. & C. 883.

*Reichel* v. *Magrath* (1889) 14 App.Cas. 665, H.L.(E.).

*Simpson* v. *Fogo* (1863) 1 Hem. & M. 195.

*Society of Medical Officers of Health* v. *Hope* [1960] A.C. 551; [1960]
   2 W.L.R. 404; [1960] 1 All E.R. 317, H.L.(E.).

*Stephenson* v. *Garnett* [1898] 1 Q.B. 677, C.A.

E
*Thoday* v. *Thoday* [1964] P. 181; [1964] 2 W.L.R. 371; [1964] 1 All
   E.R. 341, C.A.

*Waters* v. *Sunday Pictorial Newspapers Ltd.* [1961] 1 W.L.R. 967; [1961]
   2 All E.R. 758, C.A.

*Watson* v. *Rodwell* (1876) 3 Ch.D. 380, C.A.

*Wenlock* v. *Moloney* [1965] 1 W.L.R. 1238; [1965] 2 All E.R. 871, C.A.

*Winnan* v. *Winnan* [1949] P. 174; [1948] 2 All E.R. 862, C.A.

F
MOTION.

By notice of motion dated May 29, 1968, the plaintiff, Carl Zeiss
Stiftung, who claimed to be a corporate body recognised and governed by
the law in force in the Eastern Zone of Germany, sought, under R.S.C.,
Ord. 18, r. 19, to strike out as matters which were res judicatae parts of the
defence of the third defendant, Carl Zeiss Stiftung, who claimed to be a
G corporate body recognised and governed by the law of the Federal German
Republic, in the Western Zone of Germany. The plaintiff also sought to
strike out so much of the defences of the first and second defendants, Rayner
& Keeler Ltd. and Degenhardt & Co. Ltd. respectively, as incorporated
those parts of the defence of the third defendant.

The facts are stated in the judgment.

H
*John Arnold Q.C., Douglas W. Falconer Q.C.* and *Jeremiah L. Harman
Q.C.* for the plaintiff. The doctrine of res judicata exists both as to causes
of action and as to issues essential to a cause of action. The issues must

be the same, and not merely the facts incidental to specific issues, but they need not be separately or specifically determined; it is sufficient if it can be seen that the issue arose and was determined by implication. If the issue was decided either expressly or by implication, there can be no objection to the decision as a res judicata on the ground that it was irregularly or incorrectly decided, or that it was based on an error of fact, or that some point was not put forward in argument, or that some admission was made that did not have to be made. That at least is the position so far as relates to English judgments.

The general principles can be found in *Spencer Bower on Res Judicata* (1924), p. 103, para. 161. That passage was written before the theory, or perhaps the " heresy," of " fact estoppel " existed. Paragraph 162 deals with " issue estoppel "; and see also paragraphs 159 and 160.

*Reg.* v. *Hartington Middle Quarter (Inhabitants)* (1855) 4 E. & B. 780 is commonly regarded as the origin of " issue estoppel." Earlier, in the *Duchess of Kingston's* case (1776) 20 State Tr. 355, the principles appear only in certain obiter dicta.

If there are no new facts in evidence there is a parity between the causes, even though there might have been such new facts that could have been advanced: see *Hoystead* v. *Commissioner of Taxation* [1926] A.C. 155, 162, 165 and 170. Res judicata arises not only on investigation, but also where the matter is either not argued or is allowed to go by default. [Reference was made to *Rex* v. *Knaptoft (Inhabitants)* (1824) 2 B. & C. 883 and *Caffoor* v. *Income Tax Commissioner* [1961] A.C. 584 and to *Broken Hill Proprietary Co. Ltd.* v. *Broken Hill Municipal Council* [1926] A.C. 94.] Reliance is placed on *Society of Medical Officers of Health* v. *Hope* [1960] A.C. 551, 559, 560, 562 and 564 to 566, as showing that issue estoppel goes beyond matters of debate at the trial and applies to matters admitted but not argued: see also *New Brunswick Railway Co.* v. *British and French Trust Corporation Ltd.* [1939] A.C. 1, 19, 20 and 21, and *In re Koenigsberg, Public Trustee* v. *Koenigsberg* [1949] Ch. 348, 358, 359 and 361. All that the *Koenigsberg* case shows is that if a decision is not dependent for its validity on an admission, then that admission does not bind the party making it; if the admission is essential to the validity of the decision then of course it remains binding: see *per* Somervell L.J., at p. 362, with whom Evershed L.J. agreed. [Reference was made to *Winnan* v. *Winnan* [1949] P. 174, 181; *Duedu* v. *Yiboe* [1961] 1 W.L.R. 1040, 1044, 1045 and 1046; and *Thoday* v. *Thoday* [1964] P. 181.]

The remedy of striking out a part of a pleading should of course only be employed where the case is a plain and obvious one, i.e., where the court concludes that there is a plain res judicata. But a conclusion is none the less plain and obvious because the court has to think long and carefully and decide the relevant law after considering a mass of complicated evidence.

The court has no discretion once res judicata is clearly established; but it must be clearly established. The last paragraph of the judgment of Diplock L.J. in *Thoday* v. *Thoday*, upon which reliance is placed, contains a helpful dissertation on " issue estoppel " and on the narrow but important distinction between " issue estoppel " and " fact estoppel," and between an " estoppel in pais " and an " estoppel per rem judicatam."

A  *Kok Hoong* v. *Leong Cheong Kweng Mines Ltd.* [1964] A.C. 993, 1010, 1011, 1012, establishes that a default judgment can give rise to an issue estoppel.

As to whether a mistake in a judgment prevents the creation of an estoppel, see *Henderson* v. *Henderson* (1843) 3 Hare 100, 115, and *Fidelitas Shipping Co. Ltd.* v. *V/O Exportchleb* [1966] 1 Q.B. 630, *per* Lord Denning M.R., at pp. 636–638 and 639–641, and see also *per* Diplock

B  L.J.  For the history of what happened in the latter case, see *Fidelitas Shipping Co. Ltd.* v. *V/O Exportchleb* [1963] 2 Lloyd's Rep. 113, C.A.; affirming [1963] 1 Lloyd's Rep. 246.  The case is curiously similar to the present proceedings, but the present is an even stronger case of estoppel.

The rules of English law apply generally to foreign judgments, provided, of course, that the foreign judgment is not reversible in the court which has made the decision, but particular care should be taken when

C  considering a foreign judgment to see that the issues were precisely the same, since it is possible to err through unfamiliarity with foreign procedure: see *Simpson* v. *Fogo* (1863) 1 Hem. & M. 195.  One must, of course, proceed on the footing that nothing said in the foreign court is incorrect.

On the subject of the nature and existence of " counter-estoppel," it is

D  anticipated that the defendants will contend that although A has a foreign or English judgment decisive of one or more issues, that will not found an estoppel if B has an English or foreign judgment the other way.  The plaintiff's answer to any such argument is that no such doctrine as that of " counter-estoppel " exists in English law: see *Spencer Bower on Res Judicata* (1924), paras. 266–270.  One estoppel per rem judicatam can never be estopped by another decision per rem judicatam.  The only con

E  ceivable case of counter-estoppel would be by showing (say) that the plaintiff had agreed not, or had been adjudicated disentitled, to rely on an earlier decision.

Turning to the question of privity, two aspects must be considered. (1) In the present case the question of privity arises in relation to the decisions of Cross J. and of the House of Lords in this way, namely, that

F  the party on the plaintiff's side was, as the House of Lords held, the firm of solicitors acting for the plaintiff, whereas in the present proceedings the plaintiff itself is a party, and the question therefore arises, in relation to the summons before Cross J. and the House of Lords, whether the present plaintiff had sufficient privity to sustain the doctrine of estoppel per rem judicatam. (2) The second aspect to be considered is that if foreign judgments are, as is contended, in pari materia the first question may not

G  matter, since the present plaintiff was directly a party to the foreign proceedings relied on, viz., the proceedings in Pakistan and India.

There is no clear decision on the privity point in the House of Lords' judgments; Cross J. did not regard the point as significant, but he clearly took the view that the parties to the proceedings included the plaintiff, and thought that he was deciding points which would be res judicata between

H  the plaintiff and the defendants.  Furthermore, the House of Lords also intended that their decision should be regarded as res judicata between the plaintiff and the defendants.  The House of Lords did not overlook the privity point: see [1967] 1 A.C. 853, 913, 936, 937.  Before the House of

Lords the question was open, and the effect of their decision is that the
plaintiff's solicitors were properly instructed by the plaintiff and therefore  **A**
that the plaintiff had a most acute interest in the proceedings and was for
that reason a privy.

There are two sorts of privy in interest: (a) A person who has relied on
a party's advantage in a decision, after the decision has been given, and
(b) a person who at the time agrees to stand by and assist in obtaining the
decision.  In Pakistan and in India it is conceded that the first and second  **B**
defendants were not parties and were not privies.  But the plaintiff and the
third defendants were both parties to those proceedings so the court has no
discretion, but must strike out those parts of the defence which the plain-
tiff's motion seeks to have struck out.  It is heresy to suggest that the
principles applicable to striking out an action or a defence on the ground
that it displays no cause of action are applicable to res judicata.  The
court's duty is to reach a conclusion on the law and if an estoppel per rem  **C**
judicatam is made out it must strike out the offending action or plea.  The
proceedings should be stopped at the earliest possible moment and should
not be allowed to proceed to trial: see *Cow* v. *Casey* [1949] 1 K.B. 474,
481; *Kirkness* v. *John Hudson & Co. Ltd.* [1955] A.C. 696, 710, 711, 712,
and *In re General Electric Co. Ltd.'s Patent Application* [1964] R.P.C. 413.

For a decision to be clear, the process of arriving at it does not have to  **D**
be simple.  It is no ground for avoiding an estoppel that certain arguments
were not advanced to the court making the decision.  On a consideration
of all the circumstances, and relying on the decisions of the House of
Lords, of Cross J., and of the Pakistan and Indian judgments, the relief
sought should be granted and parts of the defendants' defences struck out
accordingly.

[Reference was also made to *Reichel* v. *Magrath* (1889) 14 App.Cas.  **E**
665.]

*Michael R. E. Kerr Q.C., Christopher J. Slade Q.C.* and *B. J. Davenport*
for the defendants.  This application is an abuse of the process of the court,
and misconceived.  It should never have been put forward as an applica-
tion to strike out.  Not a single case under the rule under which this
application has to be made has been cited.  The rule in question is R.S.C.,  **F**
Ord. 18, r. 19.  It is highly doubtful whether any estoppel could be based
on either the Pakistan or Indian decisions, and nothing whatever that
happened before either Cross J. or the House of Lords could possibly
create an estoppel.  The alternative, however, of having the matter tried
as a preliminary issue would have been doomed to failure, since (1) it could
not have disposed of the action, and (2) it would have involved investigating
a mass of detail which must be left to the trial of the action.  [Reference  **G**
was made to the *Annual Practice, 1967*, R.S.C., Ord. 18, r. 19 (1), (2), (3),
(4) and (5) and the notes thereto.]

If a point is one for serious discussion it is not a case for striking out;
the point must be shown either to be unarguable or "obviously and almost
incontestably unsustainable."  Here the plaintiff has, therefore, to show that
it is too plain even for argument that there is an estoppel, yet this is the  **H**
sixth day of argument.  [Reference was made to *Hubbuck & Sons Ltd.* v.
*Wilkinson, Heywood & Clarke Ltd.* [1899] 1 Q.B. 86; *Kemsley* v. *Foot*
[1952] A.C. 345; *Waters* v. *Sunday Pictorial Newspapers Ltd.* [1961] 1

A   W.L.R. 967; *Evans* v. *Barclays Bank and Galloway* [1924] W.N. 97; and
*Wenlock* v. *Moloney* [1965] 1 W.L.R. 1238.]

*Birch* v. *Birch* [1902] P. 130; *Conquer* v. *Boot* [1928] 2 K.B. 336; and
*Green* v. *Weatherill* [1929] 2 Ch. 213, referred to in the notes to R.S.C.,
Ord. 18, r. 19 (5), do not bear out the text for which they are cited, and
have nothing to do with estoppel.

Striking out is a discretionary remedy: see R.S.C., Ord. 18, r. 19 (4).
B   There is no duty to consider the matter in full and "decide at the end of
the day": see R.S.C., Ord. 18, r. 19 (2), and the following cases as
examples of the use of discretion: *Evans* v. *Barclays Bank and Galloway*
[1924] W.N. 97; *Hedley Byrne & Co. Ltd.* v. *Heller & Partners Ltd.* [1964]
A.C. 465; *Kemsley* v. *Foot* [1951] 2 K.B. 34, 38, 53; *Waters* v. *Sunday
Pictorial Newspapers Ltd.* [1961] 1 W.L.R. 967, 974; *Cadam* v. *Beaver-
brook Newspapers Ltd.* [1959] 1 Q.B. 413; *Wenlock* v. *Moloney* [1965]
C   1 W.L.R. 1238, 1242; *Golding* v. *Wharton Salt Works Co.* (1876) 1 Q.B.D.
374; *Watson* v. *Rodwell* (1876) 3 Ch.D. 380, 381, 383; and *Initial Services
Ltd.* v. *Putterill* [1968] 1 Q.B. 396, 407.

The court will not drive a party from the judgment seat unless his case
is unarguable and has no chance of succeeding. Here the plaintiff is seeking
to drive the defendants from the judgment seat on the basis that they have
D   had their day in court, for that is the basis of the plea of estoppel per rem
judicatam.

The following submissions on the "merits" of the application are made
under protest, and only in order to show that the defendants have at the
least an arguable case. The pleas which are sought to be struck out are
capable of being advanced as a defence. If the plaintiff relies on an
E   estoppel per rem judicatam the proper way to raise the matter is by way
of reply. If the defendants sought to contend, after discovery, that there
was an answer to the plea of estoppel per rem judicatam, for instance that
the judgment relied on was obtained by fraud, that would be a mattter of
rejoinder; but if the plaintiff succeeds, the defendants will have no oppor-
tunity to raise such a plea, since their defence would already have been
struck out. No case like this has been cited.

F   It is arguable that no plea of issue estoppel can be based on interlocu-
tory proceedings a fortiori, that no such plea can be based on a proceeding
outside the action (to which the plaintiff has been held not to be a party,
but only his solicitors) in which the plaintiff's authority to bring the
action has been called in question. In relation to interlocutory proceedings
generally there can never be an issue estoppel, but only an estoppel in
relation to the order actually made. Therefore, the sole effect of the
G   judgments of Cross J. and of the House of Lords is that the plaintiff is
properly before the court and that the proceedings are properly authorised
by the Council of Gera. If the defendants sought to controvert that
position it would not be a question of res judicata, but of an abuse of the
process of the court.

As a matter of principle it would be extraordinary if a party could be
H   put in jeopardy as a result of issues decided in the course of interlocutory
proceedings. In Order 14 proceedings, in applications for interim injunc-
tions, or for the appointment of a receiver, etc., serious questions of fact
often have to be decided on a prima facie basis as a result of which the

court will make an order and may be tempted to give a full judgment in
terms not limited to the prima facie position, but as if deciding certain    A
issues in the action finally.    There is no justification for applying the
principles of res judicata to a truly interlocutory proceeding.    Neither
Cross J. nor the House of Lords decided that any " issue " or other form
of estoppel would result from the summons.    If that were not so the con-
sequences would be extreme and very serious.    One would either not dare
to take points, or one would be forced to take them fully; or if one did not    B
take them fully it might be said that one should have done so.    It would
be completely alien to the English system of procedure that issues should
be decided finally on interlocutory proceedings on a prima facie basis only.
The plaintiff is attempting to prevent the defendants from defending them-
selves, before they have delivered a defence or had the benefit of discovery.
How can there be " issue estoppel " before the issues themselves have been
crystallised by the delivery of a defence?    The defendants will have lost    C
before their case has been before the court.

The old authorities suggest that interlocutory proceedings for injunc-
tions stand in a special position in relation to issue estoppel in that they
cannot be given in evidence in the same way as proceedings in which a
final order has been made: see *Pim* v. *Curell* (1840) 6 M. & W. 234,
which shows that even in relation to their evidential effect a distinction was    D
drawn between interlocutory and final judgments.    The only case which
even suggests that res judicata, let alone issue estoppel, could arise from
interlocutory proceedings—and in that case the judge held it did not—was
*Stephenson* v. *Garnett* [1898] 1 Q.B. 677, 680, 681, 682.    For references to
the fact that issue estoppel arises only on final judgments and not on pro-
ceedings of this nature, see the judgment of Cross J. [1964] R.P.C. 299, 332,
and the argument of Guy Aldous Q.C. [1967] 1 A.C. 853, 890, which was    E
adopted by Lord Reid at p. 918, by Lord Hodson at pp. 933, 934, 935, by
Lord Upjohn at pp. 941–942, and by Lord Wilberforce at p. 969.    This
argument is adopted here.

To summarise: (1) res judicata is not applicable to interlocutory but
only to final proceedings.    (2) A fortiori issue estoppel does not apply to
interlocutory proceedings, but (3) an attempt to controvert the effect of an    F
interlocutory order or decision is vexatious and an abuse of the process of
the court, and will be prevented under the inherent jurisdiction.    Inter-
locutory orders are therefore binding between the parties but are not res
judicata and do not give rise to issue estoppel.

The settled procedure in English courts is to decide an action on its
" merits " between parties to an action begun by writ in the absence of
contrary order as follows: (i) a definition of the issues by full pleadings;    G
(ii) discovery and investigation of documents relative to all pleaded issues.
English courts attach great importance to the widest discovery; (iii) then
and then only is there a full hearing of the issues pleaded on the basis of
the documents disclosed, with full oral evidence.    But since there is also a
manifold variety of interlocutory reliefs that may be granted, the issues will
often appear in a preliminary and incomplete manner in interlocutory pro-
ceedings, and decisions may be required on such material as is then before    H
the court.    Such decisions will not produce issue estoppels in the action.
A party who does not argue his points either fully or at all at that stage

A   runs only a risk of failing to get the interlocutory relief sought, and of having to pay the other side's costs. It is the difference between losing a battle and losing the war.

The summons before Cross J. and the House of Lords may have been an unwise attempt to " knock out " the plaintiff; it failed and has cost the defendants heavily. But nothing that happened can prevent the parties having the issues which were there raised determined in the ordinary and

B   proper manner at the trial of the action itself.

*Fidelitas Shipping Co. Ltd.* v. *V/O Exportchleb* [1966] 1 Q.B. 630 was not a case where the facts were found in a preliminary or interlocutory proceeding before the hearing of the " lis " on its merits; the facts were found by an umpire in an arbitration, and since the arbitrator is the final judge of fact the decision was obviously binding between the parties.

C   The plaintiff's case therefore fails in limine, but there is a second point which is equally fatal to it, namely, the sort of interlocutory proceedings on which it is here sought to base an estoppel, i.e., a summons seeking to establish that one of the parties was not properly before the court. This could not in any event produce an estoppel: see *per* Lord Reid [1967] 1 A.C. 853, 916, 917. Lord Reid was not there speaking in relation to foreign judgments and seems to have approved of *Marginson* v. *Blackburn*

D   *Borough Council* [1939] 2 K.B. 426. See also *per* Lord Hodson at p. 928, Lord Upjohn at pp. 946 and 947, and *per* Lord Wilberforce at p. 965. The sort of summons that came before Cross J. can never give rise to an estoppel between the plaintiff on the record and the defendants; see the argument of Guy Aldous Q.C. as succinctly put in [1964] R.P.C. 299, 304. [Reference was made to *Banco de Bilbao* v. *Sancha* [1938] 2 K.B. 176.]

E   The views of the House of Lords as to who were parties and privies to the summons are of great interest: see *per* Lord Reid [1967] 1 A.C. 853, 909, 910, *per* Lord Hodson at p. 928, *per* Lord Guest at pp. 935, 936 and 937, *per* Lord Upjohn at pp. 944, 947 and 948, and *per* Lord Wilberforce (who was in a minority) at pp. 950–951.

Cross J. states at [1964] R.P.C. 299, 333, that in his view winning a trade mark or passing off action in one jurisdiction does not necessarily

F   mean that it will give rise to an estoppel in another jurisdiction.

Estoppel must be mutual: see *Halsbury's Laws of England*, 3rd ed., Vol. 15 (1956) p. 201. That means that the party alleging the estoppel must be estopped himself had the decision gone the other way. Here, if the House of Lords' decision had gone the other way, there would have been no estoppel against the plaintiff on the record, namely, Carl Zeiss Stiftung. The only parties on the plaintiff's side would have been the firm

G   of solicitors, Messrs. Courts & Co. Another writ could have been issued at once with Carl Zeiss Stiftung as plaintiff but through another firm of solicitors, and while that would no doubt have been " vexatious " the new proceedings would not have been affected by res judicata. But if in a second action by the same or another firm of solicitors it were alleged that the action had been set in motion on another footing altogether than

H   through the Council of Gera, then the action could not be prevented from going on, either on the ground that it was vexatious or on the ground of res judicata: see *per* Lord Upjohn at p. 948.

The summons which came before Cross J. defined " the issue " as

Zeiss Stiftung v. Rayner & Keeler (No. 3)                    [1970]

" whether the action was commenced and is being maintained without the
plaintiff's authority." Lord Upjohn at pp. 941 and 949 and Lord Wilber-    A
force at pp. 950 to 951 purported to decide what they called " issues," and
Lord Wilberforce distinguishes what he calls " substantive " issues, and
contrasts them with the issue on the summons. [Reference was made to
Cross J. [1964] R.P.C. 299, 321; Lord Reid [1967] 1 A.C. 909, Lord
Hodson at p. 926 and Lord Guest at p. 930.] There was no argument
before either Cross J. or the House of Lords as to whether those pro-    B
ceedings could give rise to issue estoppel in the action itself, and while the
observations of their Lordships may carry some weight at the hearing they
lend no support to the present application to strike out parts of the defence.

The absence of discovery in the proceedings before Cross J. and the
House of Lords is of importance. So far it is in the American proceedings
that the fullest discovery against the East German firm has been given, but
the American rules are still narrower than the English rules. Discovery is    C
vital on such questions as the resignations, confiscation, and the identity of
the plaintiff with the original Stiftung. It is contrary to all ideas of justice
that the defendants should be precluded from arguing these issues with full
discovery, through no fault of their own. Until there has been full dis-
covery the full position as to the truthfulness and completeness of the
evidence before Cross J. and in Pakistan and India will not be known. If    D
the evidence does not bear out the plaintiff's allegations then those judg-
ments were improperly obtained, and cannot in any event support any
estoppel for that reason.

The main issues now are quite different from those before Cross J. and
the House of Lords, or in Pakistan or India. An issue then unthought of
has become the main issue. The issue as to " identity " has been raised in
a wholly different form. Whereas before Cross J. the independent exist-    E
ence of the third defendant was not disputed, the plaintiff now contends
that the third defendant either does not exist at all, or alternatively that all
its assets are held in trust for the plaintiff. The summons before Cross J.
dealt only with a passing-off action, and the independent existence of those
alleged to be passing off was unchallenged. It would be highly unfair if
the defendants were now fixed with " issues " decided in proceedings before    F
such a claim was ever raised. The previous proceedings dealt only with
the right to trade in the Zeiss name in particular territories. It would be
wrong to hold the defendants to what they chose to contend and how they
chose to contend it, at a time when the claims made and the stakes involved
were completely different. On the basis of the speeches in the House of
Lords it is also arguable that no issue estoppel would arise because it would
be unjust in the circumstances.    G

The main issues sought to be struck out are as follows: (1) The identity
issue; (2) the confiscation issue; and (3) the resignation issue.

(1) The identity issue. The only question previously before the court
was whether the East German Stiftung (the Carl Zeiss Stiftung in existence
in the German Democratic Republic) was in fact before the court. Even
assuming, however, that this summary goes too far, the most that was    H
decided was " whether the plaintiff was by the law of the German Demo-
cratic Republic the Stiftung founded in 1896 by Abbé." Now, however,
the issues as to identity are, or at least include, the following: (i) Is the

A  plaintiff the same entity as the third defendant, i.e., is the third defendant
a mere branch of the plaintiff?  And (ii) Is the third defendant by West
German law, i.e., the law of the Federal German Republic, the Stiftung
founded by Abbé or, alternatively, if the third defendant is not the original
Stiftung, is it " identical " with the original Stiftung founded by Abbé, i.e.,
is it the successor of the original Stiftung having all its legal attributes?

The identity between the third defendant and the original Stiftung
B  according to West German law is a question which has never been con-
sidered at all, either by Cross J. or the House of Lords; nor of course has
the relationship between the West and East German entities ever been con-
sidered.  The validity of the West German decrees on which the existence
of the West German entity depends has not been gone into.  Its status and
rights have never been in issue: see per Cross J. [1964] R.P.C. 299, 335;
[1967] 1 A.C. 853, 866; and per Lord Reid at p. 920.  But it is beyond
C  doubt that the status of the West German entity can only be considered by
reference to West German law: see per Lord Denning M.R. [1965] Ch. 526.

Paragraphs 2 and 3 of the defence, relating to the status of the third
defendant and to the transfer of the " Sitz " of the original Stiftung from
Jena to Heidenheim, are clearly matters which require to be considered
according to West German law.  The transfer of the " Sitz " is part and
D  parcel of the identity issue, but it was never in issue before Cross J., who
was asked, for the purposes of the summons, to proceed on the footing that
it had not been transferred.  That admission was made solely for the pur-
poses of that summons in view of the cost and complication involved in
dealing with it then; but in interlocutory proceedings one is not bound to
take every single point.

If paragraph 5 (b) of the defence is to be struck out the third defendant
E  will be precluded from proving that it exists; yet it is being sued.  Again it
is a paragraph which must be considered according to West German law,
and the same applies also to paragraph 5 (c).

The identity issue is virtually inseparable from the confiscation and
resignation issues.  They must all be considered together.

(2) The confiscation issue.  Paragraph 5 (d) and the first two sentences
F  of paragraph 7 arise out of the same facts, and overlap with each other and
with the passing-off issue.  The factual questions involved are (i) whether
what has occurred in East Germany has caused the original Stiftung
founded by Abbé to cease to exist, and (ii) whether the present action has
been brought to enforce confiscatory decrees in favour of a foreign govern-
ment.  Both these questions involve a consideration as to the extent to
which the assets of the original Stiftung have been expropriated.  Next
G  comes the question as to what has happened to the trade marks: see per
Cross J. [1964] R.P.C. 299, 328.  Then there is the question as to the exact
relationship between the plaintiff (the East German entity) and the V.E.B.'s;
see per Cross J. [1964] R.P.C. 299, 317.  Finally there is the question
whether the original Stiftung has been " revitalised " purely as a " sham "
for the purposes of the present action.  On none of these points has there
H  been discovery, and all these questions are really part and parcel of one
question, namely, whether the action is one designed to enforce foreign
confiscatory decrees.

(3) The resignation issue.  Cross J. was asked, for the purposes of the

**Zeiss Stiftung v. Rayner & Keeler (No. 3)**    **[1970]**

summons only, to assume that the resignations had taken place. A party
is always entitled to make such concessions in interlocutory proceedings,    **A**
without thereby risking being barred from taking upon himself the burden
of proving the contrary at the trial.

It is only points which are necessary to a decision which can give rise
to an estoppel: see *Penn-Texas Corporation* v. *Murat Anstalt (No. 2)*
[1964] 2 Q.B. 647, 660. For the question which Cross J. had to decide it
was quite unnecessary to decide the resignation issue. [Reference was    **B**
made to the observations of Lord Wilberforce [1967] 1 A.C. 853, 964,
citing the *Fidelitas* case [1966] 1 Q.B. 630.]

Cross J. did not hold that it was necessary to decide the question; he
merely decided the question in the hope that it would not be raised again.
Had Cross J. held it to be necessary he would have been wrong. The
House of Lords said nothing at all on the question whether it was necessary    **C**
to decide it.

As to the Pakistan and Indian judgments, it is very doubtful how far
foreign judgments, let alone trade mark proceedings, will produce issue
estoppels, or at least as to the circumstances in which they will do so. In
the proceedings in Pakistan and India neither the pleadings nor the evidence
is available, and there was no discovery. The character of the action and
the relief claimed have been drastically amended since the Pakistan and    **D**
Indian judgments were delivered. The findings of Cross J. were accepted
both by the parties and by the judge in the Pakistan case. The judge, how-
ever, also stated that he reached his conclusions independently. The first
and second defendants were not parties to the proceedings in Pakistan or
India, and the plaintiff has conceded that they were not privies either.
Since there is a discretion whether to strike out or not, that is an important
reason for not striking out the defence of the third defendant, because the    **E**
first and second defendants would not be bound anyway. Furthermore,
the Pakistan and Indian decisions relate only to trade mark matters, con-
cerning trading in particular territories. The consequences would be far-
reaching if an issue decided in such matters in one jurisdiction could
operate as an issue estoppel in another jurisdiction. There is no instance
of such an application of res judicata, either in trade mark matters or in    **F**
relation to foreign judgments.

Finally there is the question of counter-estoppel. If any estoppel could
result from either the Pakistan or Indian decisions, it is at least arguable
that the plaintiff would be precluded from relying on any such estoppel by
reason of the decisions in the American and French proceedings, which
came to a contrary conclusion. The third defendant was a plaintiff in the
American proceedings and the V.E.B. Carl Zeiss Jena was a defendant.    **G**
An earlier judgment could act as a counter-estoppel to prevent the plaintiff
relying on a later decision. The subject is one of great doubt. If the
passage in *Spencer Bower on Res Judicata* (1924), p. 160, represents the
law the present argument is wrong, but no authority is cited for the pro-
positions there stated. Furthermore, the passage is dealing with cause of
action estoppel, and not issue estoppel. For the only reference to the    **H**
subject in the present case see [1964] R.P.C. 299, 305, and *per* Cross J. at
p. 335. It just cannot be right that the English courts are bound to follow
what was decided in Pakistan and India and disregard what has happened

A  elsewhere, e.g., as in the United States of America and France. This branch of the law being wholly undeveloped, the solution may well be that the English court will decide the case on its merits with no estoppels from foreign jurisdictions. In America there has been no final order, because of an appeal about anti-trust laws relating to the counterclaim, but when that order is made there will be a possible res judicata. [Reference was made to *Bell* v. *Holmes* [1956] 1 W.L.R. 1359; *Morrison, Rose & Partners* v.

B  *Hillman* [1961] 2 Q.B. 266, 277; and *Goddard* v. *Gray* (1870) L.R. 6 Q.B. 139.]

If, before the action comes on for trial, a final judgment is given in the United States, nothing can prevent the third defendant from pleading that judgment and an estoppel based thereon, subject of course to establishing that the V.E.B. is a privy of the plaintiff. The fact that these proceedings were started later than the present action is immaterial.

C  In the result there is abundant material to show that no estoppel can arise in this case.

*Christopher J. Slade Q.C.* following. The French proceedings were between the plaintiff (in these proceedings) and the V.E.B. Carl Zeiss, Jena, on one side and the firm Carl Zeiss, Heidenheim, and the Carl Zeiss Stiftung, Heidenheim, on the other side. The first judgment was that of

D  the Paris Court of Appeal, and it dealt with the issues of identity, domicile and resignation, finding in favour of the third defendant (in these proceedings). The date of the judgment, April 2, 1963, was earlier in date than that of either the Pakistan or Indian judgments, and the judgment was of a final nature. The following arguments were put forward on behalf of the plaintiff in these proceedings but were rejected by the French court, namely (1) that the Carl Zeiss Stiftung, Jena, was the same Stiftung as that

E  originally founded by Abbé at Jena; (2) by corollary that the Carl Zeiss Stiftung, Heidenheim, was not the same Stiftung as the original Stiftung; (3) that the legal domicile of the original Stiftung had not been validly transferred to Heidenheim; and (4) that the old members of the board of management had not resigned, but were still in office. All these points were directly in issue in the French proceedings as they are directly in

F  issue in the present proceedings, and they were all decided against the present plaintiff.

The second French judgment is that of the Cour de Cassation and is dated March 15, 1966. This too is earlier in date than the Pakistan and Indian judgments. The judgment found that the domicile of the original Stiftung had been validly transferred and it confirmed the decision of the Paris Court of Appeal.

G  *John Arnold Q.C.* in reply. In a plain and obvious case, for estoppel per rem judicatam, it is right to strike out the offending allegations at this stage, when argument would be precluded by estoppel. Cross J. expected that his decisions would create estoppels. It may be right or wrong that that fact alone should make the case a plain and obvious one for estoppel per rem judicatam. In such circumstances it is reasonable to assume that

H  the court might well strike out the offending allegations in order to prevent their being re-litigated. Therefore, to call the present application an abuse of process is to use intemperate and coarse hyperbole. Placed in the forefront of the defendants' argument is the proposition that the case put

forward in the pleadings must be shown to be unarguable. The cases cited
in support of that proposition all had two characteristics: (i) they had   A
nothing to do with res judicata, and (ii) in none of them was there a valid
cause of action, or defence as the case may be.

It is well known that the pleading sought to be struck out must be
unarguable; but one of the cases where a thing is unarguable is where the
court forbids it to be argued: see R.S.C., Ord. 18, r. 19. Where there is
an estoppel, a party is entitled as of right to get his opponent's offending   B
pleading struck out. The court has no discretion to allow the pleading to
stand. The following cases were not concerned with estoppels per rem
judicatam, but with the inherent arguability or otherwise of the case being
advanced: *Evans* v. *Barclays Bank and Galloway* [1924] W.N. 97; *Kemsley*
v. *Foot* [1951] 2 K.B. 34; *Waters* v. *Sunday Pictorial Newspapers Ltd.*
[1961] 1 W.L.R. 967; *Cadam* v. *Beaverbrook Newspapers Ltd.* [1959] 1
Q.B. 413; *Wenlock* v. *Moloney* [1965] 1 W.L.R. 1238; *Golding* v. *Wharton*   C
*Salt Works Co.* (1876) 1 Q.B.D. 374; and *Initial Services Ltd.* v. *Putterill*
[1968] 1 Q.B. 396. The difference in the present case is that the matter
is susceptible of clear decision and the court has a duty to decide whether or
not there is an estoppel.

It is obvious that in the vast majority of cases interlocutory proceedings
involve no final decisions at all. Most of them are motions for interim   D
injunctions, orders for preserving the status quo, or for the appointment of
a receiver, etc., or to secure payment into court, etc. They are all based,
subject to special instances such as *Greenwood* v. *Turner* [1891] 2 Ch. 144,
on a prima facie prospect of success at the trial, and on the balance of con-
venience. Obviously estoppel cannot be based on a prima facie case only.
But no one suggests that Cross J. made his decision solely on a prima facie
basis. His Lordship decided the issues before him definitely. Nor did the   E
House of Lords reach tentative conclusions only.

In *Pim* v. *Curell* (1840) 6 M. & W. 234 the only orders made were
an interim injunction and an order for an interim account, both classic
examples of the interlocutory jurisdiction of the equity courts. In *Stephen-
son* v. *Garnett* [1898] 1 Q.B. 677 all three judgments of the Court of
Appeal proceed on the footing that but for the fact that the county court   F
judge below lacked jurisdiction, there would have been a res judicata, but
because there was no res judicata the Court of Appeal struck the pro-
ceedings out under the inherent jurisdiction. If there had been a res
judicata strictly so-called the Court of Appeal would have struck out on
that ground.

Clearly therefore (a) an interlocutory judgment can found a res judicata,
(b) res judicata justifies striking out, and (c) where there is no res judicata   G
in law, but the issue has nevertheless been decided, the court will strike out
under the inherent jurisdiction.

As to "finality," the decision relied on must of course be a proper
decision and not a mere opinion, and it must not be open to review by the
court hearing the matter and making the decision. [Reference was made to
*Banco de Bilbao* v. *Sancha* [1938] 2 K.B. 176.]   H

As to whether any estoppel can arise out of a proceeding which is really
outside the present action, i.e., the summons to strike out for want of
authority, it is fanciful to suggest that the present plaintiff had no interest

A    in the outcome of those proceedings, and therefore lacked privity. As it turned out the action was held to be the action of the plaintiff Stiftung, and one of the possible forms of relief on the summons would have been dismissal of the action. The fact that there would have been no estoppel against the plaintiff had the result gone the other way is not very startling.

B    Some at least of the issues now raised are precisely the same as the "questions" considered by Cross J. and the House of Lords, and while the House of Lords may not have decided how far the issues coincided, their observations must be weighty when those issues are sought to be re-litigated.

There is no authority which suggests that any difficulty in relation to the doctrine of res judicata arises in connection with the earlier English decisions owing to the fact that discovery was not then available, or made use of. Mr. Kerr's argument as to discovery has no basis at all. It can be shown to be wrong because in English proceedings a default judgment creates a binding estoppel.

C    Different considerations might apply in relation to foreign judgments, but it is incorrect to suggest that in Pakistan and India discovery is not available.

D    While it is correct that at the time of the hearings before Cross J. and the House of Lords the issues involved were purely trade mark matters and passing off, and not the *Keech* v. *Sandford* (1726) Sel.Cas.t.King 61 point, that fact is wholly immaterial. The facts as to the resignations were fully gone into before Cross J. and it is incorrect to say that he was asked to assume that there had been resignations. Applying the test laid down by Lord Denning M.R. in *Penn-Texas Corporation* v. *Murat Anstalt (No. 2)* [1964] 2 Q.B. 647 it is clear that Cross J. did decide the question as to the resignations, since the defendants appealed against his decision. The argument as to article 114 of the original statute was raised in evidence as also was the validity of the two Württemberg decrees. Clearly, therefore, a decision on these points was essential to Cross J.'s decision. Consideration of these points was necessary to arrive at the conclusion that the Carl Zeiss Stiftung had survived as a juristic entity in East Germany; that the confiscation of its assets as reparations or otherwise did not affect its existence.

E

F

To establish an estoppel based on the Pakistan and Indian decisions two things must be shown: (1) that the judgments were of final effect, i.e., could not be reviewed by the courts making the decisions, and (2) that res judicata is a principle applicable by those courts themselves. If no principle of res judicata were applicable in the foreign jurisdiction, the decision could have no effect here. However, the plaintiff has established these two requirements in relation to the Pakistan and Indian decisions, and the onus therefore passes to the defendants if they wish to criticise them. It has been said that one cannot rely on foreign judgments dealing only with local matters, but every foreign judgment deals only with local matters. Trade mark jurisprudence does take account of res judicata: see *In re Massa-chusetts Saw Works' Application* (1918) 35 R.P.C. 137.

G

H    Since the American decision is not yet final the relevance of the question as to counter-estoppel is confined to the French decisions. A foreign judgment on an issue is available to establish an estoppel even though it was

delivered in an action commenced after the commencement of the pro- A
ceedings in which it is sought to use it. Here the defendants could have
sought to rely on the French decision as an estoppel, but not having done
so at the relevant time they are now prevented from seeking to do so, by
an estoppel in pais. [Reference was made to *In re Dulles' Settlement
(No. 2)* [1951] Ch. 842.]

In any event, the French decisions exhibit none of the required
characteristics. There is no evidence that they were " final " and not B
subject to review by the courts making the decisions, nor is there any
evidence to show that the French courts themselves regarded them as
creating estoppels per rem judicatam. [Reference was made to *Nouvion
v. Freeman* (1889) 15 App.Cas. 1, and the judgments in the House of Lords
in the present case [1967] 1 A.C. 853, 919, 936, 969.] All that the French
proceedings decided was that there was no *written* resignation, and the
courts concluded that whether or not the plaintiff was the original Stiftung C
was irrelevant. No decision on that point was ever reached.

*Cur. adv. vult.*

Feb. 5. BUCKLEY J. read the following judgment. It is a strange and
confusing circumstance of this case that the principal antagonists, the
plaintiff and the third defendant, are called by the same name. The plaintiff D
is or claims to be a corporate body recognised and governed by the law
in force in the Eastern Zone of Germany; the third defendant is or claims
to be a corporate body recognised and governed by the law of the Federal
German Republic. Sacrificing accuracy somewhat recklessly for the sake
of brevity, I am tempted to say that the object of the action is to determine
which of these two bodies, if either, is the other, and, if not, whether either,
and if so which, is another corporate body of the same name, or, if not in E
fact such third body, is identical with it. If this is not a wholly accurate
way of stating the case—and in seriousness I would say that it is not—it
will appear that the issues which are involved are scarcely less complicated
and metaphysical than they would be if it were.

The story which lies behind the action is a complicated one and has
already been told at some length by Cross J. in a judgment delivered on F
an earlier interlocutory application in this action (see *Carl Zeiss Stiftung
v. Rayner & Keeler Ltd. (No. 2)* [1964] R.P.C. 299). In this judgment
I shall only draw attention as shortly as I can to those parts of the story
which are relevant to the present application.

By this motion the plaintiff seeks to have certain parts of the third
defendant's defence—and also so much of the other two defendants'
defence as incorporates those parts of the third defendant's defence by G
reference—struck out as pleading matters which are res judicatae.

In 1896 a body of a corporate nature was formed under the law of
the then Grand Duchy of Saxe-Weimar-Eisenach by the name of Carl
Zeiss Stiftung. This body I will call the original Stiftung. It was regulated
by a statute, many articles of which are set out in English in Cross J.'s
judgment. Article 1 stated the objects of the original Stiftung. It is H
sufficient for present purposes to say that its functions consisted (a) of
carrying on certain industrial activities of a commercial kind and (b) of
promoting or taking part in other more general activities of a technological

A and sociological character. The activities of the original Stiftung were centred in Jena, a city in the Grand Duchy. Article 3 of the statute, under the heading " Domizil," provides that the legal " Sitz " of the Stiftung should be Jena. This word " Sitz " was by common consent translated " domicile " in the proceedings before Cross J.; but in the present proceedings the accuracy of this translation is questioned.

B The original Stiftung took over from its founders the businesses and assets of two distinct existing industrial concerns, an optical business carried on under the name " Carl Zeiss " and a glassworks carried on under the name " Schott und Genossen." The statute committed the supreme direction of the affairs of the Stiftung to a " Stiftungsverwaltung," or special board, and provided that its industrial activities should be carried on as separate businesses, each under a " Geschäftsleitung," or board of manage-

C ment, nominated by the special board. An official called a " Stiftungskommissar," or deputy of the Stiftung, was to represent the special board on each board of management. Article 5 constituted that department of the State service of the Grand Duchy, under which the affairs of the university of Jena were for the time being placed, to be the special board of the Stiftung.

Articles 113 and 114 were in these terms:

D    " Article 113: . . . Should, in consequence of political changes in the state, the provision according to 5 of this statute with reference to the representation of the Stiftung become untenable, this representation including the appointment of the deputy of the Stiftung within the meaning of 5 then the statutory administration of the Carl Zeiss Stiftung shall be made over to that department of state, which with regard to the university of Jena occupies the place of the State Depart-

E    ment of the Grand Duchy of Saxe-Weimar acting as the special board, provided that its seat is in Thuringia, otherwise to the highest administrative authorities in Thuringia. Article 114: . . . Should at any time a special board corresponding to the provisions of 5 or 113 no longer exist, then until the new formation of such, the representation and administration of the Carl Zeiss Stiftung is to be taken over forthwith

F    by the executive board of management of the optical works and in the event of the latter board of management no longer existing, by the board of management of the oldest works of the Stiftung in Jena or its neighbourhood."

The original Stiftung, through the media of two separate boards of management, carried on the two businesses profitably from the time of

G its foundation until the events which I shall mention later occurred at the end of the second world war. It thus became possessed of assets of considerable value, apart from the assets of the two businesses. Some of these assets consisted of property used for activities of a charitable or sociological character carried on by the special board, such as a school, a library and a hospital, at Jena.

H The territory which formerly belonged to the Grand Duchy has experienced several political changes. In 1918, with the establishment of the German Republic, the Grand Duchy ceased to exist, and its territory, with others, was amalgamated to form the state of Thuringia. The

**Buckley J.**          Zeiss Stiftung v. Rayner & Keeler (No. 3)          **[1970]**

Thuringian Minister of Education then became responsible for the affairs
of the university of Jena and so became the special board of the Stiftung.          A

In 1935 the Third Reich was established by the National Socialists.
The powers of the former state governments, including that of Thuringia,
were assumed by the central government of the Reich, which was repre-
sented in each state by an official called the "Reichs-Stathalter," who, as
the highest administrative authority in Thuringia, became the special board
under article 113 of the statute.          B

In April, 1945, American troops occupied Thuringia, the Third Reich
ceased to exist, and with it the office of Reichs-Stathalter. From that time
until July 1, 1945, or thereabouts, the American occupying forces exercised
sovereign powers in that part of Germany. They set up a Thuringian
Provincial Government, including a Ministry of Education, upon which
the functions of the special board of the Stiftung devolved.

This state of affairs did not, however, last for long. By agreement          C
between the victorious powers, Germany was divided into zones of occupa-
tion. Thuringia was included in the Russian or Eastern Zone. The
American forces withdrew, and at about July 1, 1945, Thuringia was
occupied by the Russians. Since that time Her Majesty's Government
has recognised the state and government of the Union of Soviet Socialist
Republics as alone entitled de jure to exercise governing authority in that          D
part of Germany.

It appears that in 1949 the U.S.S.R. set up the German Democratic
Republic to govern that part of Germany which was in Russian occupation.
Her Majesty's Government, however, has never recognised either the state
or the government of the German Democratic Republic de jure, or de facto,
and still regards the state and government of the U.S.S.R. as sovereign in
the Eastern Zone of Germany. It seems that until July, 1952, Thuringia          E
remained a "Land" with a government and administration of its own, but
that in July, 1952, it was divided into a number of districts, in one of which,
namely, the District of Gera, the city of Jena is situate. It seems that in
each district a council, or "Rat," was established with executive functions.

The defendants allege that the "Sitz" of the original Stiftung was
transferred from Jena to Heidenheim an der Brenz on about June 24, 1945,          F
in compliance with orders given on behalf of General Eisenhower, as
Supreme Allied Commander and Commander of the American Forces in
Europe. When the American forces left Jena at the end of June, 1945,
they took with them all the members of the boards of management of the
optical business and of the glassworks as they existed at June 23, 1945,
and a considerable quantity of equipment and material used in the busi-
nesses. The plaintiff says that all these people resigned from the two boards          G
on or about June 23, 1945, but the defendants deny this. The members
in question of the official board were named Bauersfeld, Henrichs, Kuppen-
bender and Joos. They re-established the optical business in West Germany,
with very considerable success. A factory has been built and equipped
near Heidenheim for the production of high quality optical instruments.
Branches have been re-established or opened in a number of cities in West          H
Germany, and a sales organisation has been re-created in West Germany
and abroad throughout the western world.

The first and second defendants are traders who have dealt in the

A   United Kingdom in goods made in the course of this optical business carried on in West Germany and marketed under the names " Carl Zeiss " and " Zeiss."

Meanwhile in the Eastern Zone a Dr. Barth (who on June 21, 1945, before the withdrawal of the American forces from Thuringia, had been appointed by the newly constituted Thuringian Ministry of Education in its capacity as special board of the original Stiftung to be deputy of the
B   Stiftung), acting on behalf of the special board, appointed or purported to appoint new members of the boards of management of the optical business and of the glassworks.   Under the management of these gentlemen, and notwithstanding the removal to Russia, as reparations, of much the greater part of the machinery and plant employed in the businesses at Jena, the works in Jena were re-equipped, and both businesses were re-established there.

C   In 1948, however, all the assets, or at any rate all those in the Eastern Zone, were confiscated by order of the Russian occupying authorities, and became Volks Eigene Betriebe, or publicly owned enterprises, (V.E.B.'s). These were later given the status of separate legal entities known as the V.E.B. Carl-Zeiss, Jena, and the V.E.B. Schott, Jena, respectively.   This confiscation did not affect those assets of the original Stiftung which were
D   not employed in either of the businesses.   The precise relationships between the two V.E.B.'s and the original Stiftung seem never to have been defined.

These events in the East brought about a final rupture between the managements of the businesses established or re-established, as the case may be, in the East and those in West Germany.   In February, 1949, the Government of Württemberg, at the instance of Bauersfeld, Henrichs and Kuppenbender, by an order made in that month and confirmed in May,
E   1949, ordered that article 3 of the statute of the original Stiftung should be amended so as to provide that the legal seat of the Stiftung was at Jena and Heidenheim, and further ordered that Bauersfeld, Henrichs and Kuppenbender should administer and represent the Stiftung in accordance with article 114 of the statute until a special board in accordance with article 113 should have been re-constituted.   Other formal steps were taken by
F   these three in West Germany, which were referred to by Cross J.   Ultimately, in 1954, by a further governmental order of Württemberg, article 3 was further amended by deleting the reference to Jena so as to read : " The legal seat of the Carl Zeiss Stiftung is at Heidenheim."

In the courts of West Germany, that is of the German Federal Republic, a body known as the Carl Zeiss Stiftung is recognised as existing under West German law with its seat at Heidenheim and is regarded as being the
G   original Stiftung.   On the other hand, in the courts of East Germany the original Stiftung is regarded as still existing with its seat at Jena.   The governmental body which occupies the place, in relation to the University of Jena, corresponding to that formerly occupied by the State Department of the Grand Duchy of Saxe-Weimar is the Council of the District of Gera. The Council of Gera has acted or purports to have acted as the special
H   board of the original Stiftung, and has been recognised as such in the courts of East Germany.

Following the breach between the managements in East and West Germany there has been what Cross J., very reasonably, described as a

spate of litigation between them. First, those in East Germany obtained
an advisory opinion from the East German Supreme Court about the   A
identity of the plaintiff with the original Stiftung, and thereafter commenced
an action in the provincial court of Stuttgart in Western Germany, the
plaintiff in which was described as the Carl Zeiss Stiftung, represented by
the Council of Gera, and the defendants were Bauersfeld, Henrichs, Kuppen-
bender, and, it would seem, the present third defendant, described as the
firm Carl Zeiss of Heidenheim. This action had a long history. From the   B
provincial court it went on appeal to the provincial Court of Appeal, and
on further appeal to the Federal High Court of the German Federal
Republic. That court sent the case back to the provincial Court of Appeal
to consider whether or not the personal defendants had resigned from the
board of management of the optical business. In October, 1958, the
provincial Court of Appeal heard the case for the second time and decided,
amongst other things, that the personal defendants had not resigned. The   C
plaintiff again appealed to the Federal High Court, who dismissed the
appeal in November, 1960. That action, which I will call " the Stuttgart
action," is referred to in more detail by Cross J., and is also discussed in
the speeches in the House of Lords, whither the summons heard by Cross
J. was ultimately taken.

There has been other litigation between various parties in both East   D
and West Germany relating to the business, to which I need not refer. There
has also been litigation of one kind or another in a number of other
countries as well as the present action in the United Kingdom. Of these
it will be necessary for me to make some reference to proceedings in India,
Pakistan, France and the United States of America, all of which are said
to have bearings upon the questions I have to consider.

At this point I must say something about the course and form of the   E
present action. The writ was issued on October 20, 1955. The third
defendant was then described therein merely as " Carl Zeiss," the name
under which the optical business was carried on in West Germany. The
relief claimed by the writ in its original form was confined to relief against
alleged passing-off as the plaintiff's goods by the defendants of goods dealt
in by them under the name " Carl Zeiss." The statement of claim was   F
delivered on December 23, 1955. This in its original form was confined to
allegations and relief in respect of passing-off.

On December 7, 1956, the defendants issued a summons seeking a stay
of all further proceedings in the action on the ground that it had been
commenced and was being maintained without the plaintiff's authority, and
an order that Messrs. Courts & Co., the solicitors purporting to act for the
plaintiff, should pay the defendants' costs. That summons did not come   G
before a judge until November, 1963, when it was heard by Cross J. The
long delay which occurred in bringing it before the court was attributed by
Cross J., at least in part, to the wish of the parties to await the final outcome
of the Stuttgart action, which was not finally disposed of in the Federal
High Court until November, 1960.

On March 10, 1960, the writ and statement of claim were amended so   H
as to describe the third defendant as " Carl Zeiss Stiftung "; a claim for a
further injunction was at the same time added to the relief sought, and an
amendment of no present significance was made to the allegations in the

A  body of the statement of claim. The action continued to relate only to alleged passing-off. The statement of claim then contained, and still contains, an allegation that the third defendant is a German organisation having its registered office at Heidenheim in West Germany and is a competitor of the plaintiff.

When the summons came before Cross J. no defence had yet been delivered, and consequently, so far as pleadings were concerned, the issues
B  in the action had not yet been defined, nor had any discovery taken place. The summons was, however, heard on affidavit evidence filed on each side and deponents were cross-examined. From this evidence the nature of the issues between the parties relevant to this summons was apparent. The hearing before Cross J. was a long one, and he eventually delivered a long and detailed reserved judgment. He dismissed the summons.

C  Before I deal with that judgment and the appellate history of that application, it will be convenient for me to explain the present state of the pleadings and the nature of the present application.

In October, 1967, when still no defence had yet been delivered,
·  the statement of claim was further and drastically amended. For the first time allegations were introduced to the effect, stated shortly, that Bauersfeld and the other then members of the boards of management resigned on or
D  about June 23, 1945, and that new boards of management were appointed in East Germany, that the Württemberg decrees which purported to change the legal seat of the original Stiftung were invalid, that the business carried on in West Germany is and has always been the property of the plaintiff, and that all its trade marks, trade names, patents, goods and other assets, including any in the United Kingdom, belong to the plaintiff. In the alternative, the plaintiff alleges that, if the business carried on in West
E  Germany belongs to the third defendant, it was acquired by the third defendant without consideration, and that all the assets of that business, including any in the United Kingdom, are or have been, or are deemed to be or to have been, the property of the plaintiff, or are or were held in trust for the plaintiff. On the basis of such allegations the plaintiff claims a declaration that all the assets of the business carried on in West Germany
F  are the property of the plaintiff, and to have those assets transferred to itself, and an account against the defendants. The passing-off allegations and claims remain as alternative allegations and relief. These new allegations throw into dramatic prominence and make much more important than before what happened in and between 1945 and 1948 in both East and West Germany and the two Württemberg decrees.

The third defendant delivered its defence on February 2, 1968. Para-
G  graphs 1 and 2 are in the following terms:

" 1. The third named defendants Carl Zeiss Stiftung are a corporate entity duly constituted and incorporated in that name under the law of its domicile, the Federal Republic of Germany, and having its ' Sitz ' (seat and registered office) at Heidenheim on Brenz in the said Federal Republic. The third named defendants Carl Zeiss Stiftung, are here-
H  inafter called ' the third defendants.' 2. The third defendants contend that they are Carl Zeiss Stiftung constituted in about 1896 in accor- dance with articles of association drawn up by Dr. Ernst Abbé in or

about August, 1896 and subsequently amended from time to time and in any event deny that the plaintiffs are the said Carl Zeiss Stiftung."    A

Paragraph 3 proceeds:

" The third defendants admit and aver that prior to June, 1945 article 3 of the said articles provided that the ' Sitz ' (not the domicile) of the third defendants should be at Jena and that the ' Sitz ' of the third defendants was at Jena until the said date. By reason of some or all of the following facts and matters the ' Sitz ' of the third defendants was transferred to Heidenheim on Brenz in the Federal Republic of Germany and the said article was amended accordingly."    B

The paragraph then goes on to refer to the occupation of Thuringia by the Americans, the transfer to Heidenheim in June, 1945, in compliance with General Eisenhower's orders, of the " Sitz," the boards of manage-ment and certain of the assets of " the third defendants," the Russian occupation of Thuringia, a Russian sequestration order of October, 1945, the Russian confiscation order of 1948, the establishment of the State of Württemberg-Baden, the two decrees of that state of 1949 and 1954, amending or purporting to amend article 3 of the statute of the original Stiftung, certain formal steps whereby the acts of the occupying forces were given validity under the law of the Federal Republic of Germany, and    D two judgments of the administrative courts in West Germany upholding the validity of the two Württemberg decrees.    C

Paragraph 5 contains the following alternative pleas in the event of the third defendant being held not to be the original Stiftung:

" If which is denied the third defendants are not the Carl Zeiss Stiftung originally founded by Abbé as contended in paragraph 2 hereof then    E the third defendants contend as follows: (a) The status of the third defendants and the rights of the third defendants in respect of property in or emanating from the Federal Republic of Germany falls to be decided under the law of the said Federal Republic: (b) Under the law of the said Federal Republic the third defendants are a validly and properly constituted corporation capable of owning rights and property, carrying on business on their own account, and suing and    F being sued. (c) Under the said law the third defendants are a corpora-tion identical with the Carl Zeiss Stiftung founded by Abbé, as recognised by judgments of the Federal Supreme Court dated June 24, 1957 and February 6, 1959 (set out in paragraph VI of the appendix to the case before the House of Lords herein at page 1268 et seq. and at page 1333 et seq. respectively). (d) The Carl Zeiss    G Stiftung founded by Abbé ceased to exist by reason of the confiscatory decrees referred to in paragraph 3 (c) and (d) hereof and the transfer of the assets of the optical and the glass works to the said V.E.B.'s and/or to the Soviet Union and/or the German Democratic Republic."

I pass over paragraph 6, which contains a definition, and read paragraph 7:    H

" The third defendants do not admit that the plaintiffs are any or any properly or validly constituted Stiftung. Further, the third defendants do not admit that the administration of the plaintiffs or the appointment

A    of a deputy of the plaintiffs has been transferred to the Council of the
District of Gera as alleged in paragraph 3 of the re-amended statement
of claim, and deny that if such transfer has been made it has been
made in pursuance of article 113 of the said articles. The third
defendants further deny that the administration and/or the appoint-
ment of a deputy of the Stiftung founded by Abbé have been transferred
to the said council pursuant to the said article or at all."

B    I need not refer to paragraph 8.

By paragraph 9 the third defendant admits that Bauersfeld, Henrichs,
Kuppenbender and Joos were the members of the board of management
of the optical business and that one Hirsch, one Schott and Henrichs were
the members of the board of management of the glass-works at and before
about June 23, 1945, but denies that these gentlemen resigned from the
C    respective boards and that any appointments were made in their places.

By paragraph 10 the third defendant admits that all the gentlemen
whom I have just named went to West Germany on or about June 24, 1945,
and alleges that they did so under American orders. By the same paragraph
certain powers of attorney relied on by the plaintiff are admitted "as
documents," but it is denied that they were given by or on behalf of the
D    plaintiff.

I have now referred to all those parts of the defence which are assailed
by the plaintiff on this motion. I do not think I need refer to any other part.

The other two defendants have delivered a joint defence, in paragraph
14 of which they say that they will rely so far as necessary on the facts
pleaded in paragraphs 1, 3 and 5 as well as certain other paragraphs of the
defence of the third defendant.

E    By this motion the plaintiff seeks an order—

"that the following paragraphs of the defence of the third defendant
and of the defence of the first and second defendants so far as their
defence incorporates the said paragraphs may be struck out as
pleading matters which are res judicatae. (a) Paragraph 1 insofar as
it may contain an allegation that the third defendants are the Carl Zeiss
F    Stiftung as founded by Dr. Ernst Abbé at Jena in about 1896, (b)
Paragraph 2. (c) Paragraph 3 insofar as it may contain either an
allegation that the domicile of the Carl Zeiss Stiftung as founded
by the said Dr. Abbé as aforesaid is or ever has been elsewhere than
at Jena or an allegation that article 3 of the articles constituting the
said Carl Zeiss Stiftung does not refer to the domicile of the said
Carl Zeiss Stiftung. (d) Paragraph 5 (b) (e) Paragraph 5 (c) insofar
G    as it may contain an allegation that the third defendants, on the footing
that they are not the Carl Zeiss Stiftung as founded by the said Dr.
Abbé as aforesaid, are nevertheless identical with the said Carl Zeiss
Stiftung according to any system of law relevant to these proceedings.
(f) Paragraph 5 (d) (g) The first two sentences of paragraph 7
(h) Paragraphs 9 and 10 insofar as they contain allegations (i) that
H    persons called Bauersfeld, Henrichs, Kuppenbender and Joos did not
resign from or otherwise cease to be members of the board of manage-
ment of the optical business carried on under the name 'Carl Zeiss'
on or about June 23, 1945 (ii) that persons called Hirsch, Schott and

the said Henrichs did not resign from or otherwise cease to be members
of the board of management of the glass business carried on under    A
the name Schott and Genossen on or about June 23, 1945 (iii) that
persons called Schrade, Sandmann and Schomerus were not appointed
members of the board of management of the said optical business
on or about June 23, 1945 (iv) that persons called Dunger, Heintz,
Klemm and the said Schrade were not appointed members of the
board of management of the said glass business on or about June 23,    B
1945."

The notice of motion contains an intimation that the grounds of the
application are

" that the said paragraphs (a) disclose no reasonable defence to this
action (b) are frivolous or vexatious (c) will tend to prejudice,
embarrass and delay the fair trial of this action (d) are an abuse of    C
the process of the court and should be struck out under the inherent
jurisdiction so to do."

These grounds echo the terms of R.S.C., Ord. 18, r. 19, under which
this motion is made.

It will, I hope, be clear from what I have said that not only are the
factual issues in this case complicated and the facts, in some respects at    D
least, obscure : difficult questions of conflict of laws are almost certain
to arise out of the circumstance that the facts give rise to different and
conflicting results according to whether they are viewed in the light of
East German law or of West German law. How far the one system of law
or the other is to prevail for the purposes of this action may prove a
difficult problem.

Cross J., as I have said, dismissed the defendants' summons. He did    E
so on the ground that by East German law, which he held to be the relevant
law for determining the plaintiff's status, the original Stiftung had not ceased
to exist and the Council of Gera, by whom the solicitors acting or purport-
ing to act for the plaintiff in the action had been instructed, were the
special board and as such had power to instruct solicitors on the plaintiff's
behalf.    F

The defendants appealed. In the Court of Appeal, *Carl Zeiss Stiftung
v. Rayner & Keeler Ltd.* [1965] Ch. 525, C.A., they raised for the first
time the question whether or not H.M. Government had recognised the
German Democratic Republic or its government. The Court of Appeal
directed that a certificate should be obtained from the Foreign Secretary
upon this question. Later the Court of Appeal directed certain further
questions to be addressed to the Foreign Secretary. In answer to these    G
questions the Secretary of State certified to the effect that H.M. Government
had not recognised the German Democratic Republic or its government
either de jure or de facto but did recognise the State and Government of the
Union of Soviet Socialist Republics as de jure entitled to exercise governing
authority in East Germany. The Court of Appeal, *Carl Zeiss Stiftung* v.
*Rayner & Keeler (No.* 2) [1965] Ch. 596, C.A., allowed the appeal revers-    H
ing Cross J. on the ground that the court could not recognise the Council of
Gera, since it was the product of an unrecognised régime. This was, of
course, a wholly different ground of decision from any discussed before

A   Cross J. or by him. The Court of Appeal consequently had no occasion to deal with Cross J.'s judgment.

The plaintiff now appealed to the House of Lords, who reversed the Court of Appeal on the ground that the act of the Government of the German Democratic Republic should be recognised as the act of the Russian Government operating through the medium of a subordinate body set up by it to act on its behalf in East Germany. The House of Lords

B   went on to discuss Cross J.'s reasons for dismissing the summons, which in the main they approved: see Carl Zeiss Stiftung v. Rayner & Keeler Ltd. (No. 2) [1967] 1 A.C. 853, H.L.(E.).

I now come to the consideration of the present application. This jurisdiction under R.S.C., Ord. 18, r. 19, an exercise of which results in excluding all or certain issues in prospective litigation in limine from consideration by the court, is one which, as has often been said, should be

C   exercised with great caution. For a party to seek to relitigate a cause of action which has already been finally adjudicated upon by a competent court so that further litigation is barred by what has been called " cause of action estoppel per rem judicatam " would clearly be vexatious and an abuse of the process of the court, and any such attempt should, no doubt, be frustrated by the court as soon as it is brought to its attention.

D   More subtle considerations may, however, arise when the case is not one of " cause of action estoppel " but of " issue estoppel," as in the present case. If the circumstances are such that one party is barred by issue estoppel from raising an issue which he nevertheless seeks to raise, two courses are open to his opponent: he can plead the estoppel and leave the matter to be dealt with at the trial or, as in the present case, he can attempt to have the offending plea struck out of the pleadings. If he

E   adopts the latter course the court has, in my judgment, as I shall indicate, a discretion whether to strike out the plea or not.

It has been suggested in this case that, if the question, whether the issue is res judicata, is a difficult or complicated one, this in itself is a sufficient ground for refusing to strike out the plea. I cannot think that this is right. If, as will normally be the case, the relevant information is

F   before the court before which the interlocutory application comes, the judge ought then to decide whether the issue is res judicata or not, however difficult or obscure the point may be, for it will not become less so by waiting for the trial. If, on the other hand, the necessary information is not before him, the application will be premature and should fail.

On the other side it has been suggested that, if it is once shown that a particular issue is res judicata, the court is bound to strike out any plea

G   by the estopped party which raises that issue. I feel unable to accept that argument. R.S.C., Ord 18, r. 19, is framed in language which is not mandatory but permissive. Its predecessors in earlier rules of court have always been treated as conferring a discretionary jurisdiction. (See, for example, Golding v. Wharton Salt Works Co. (1876) 1 Q.B.D. 374.) If it were the fact that in certain kinds of circumstance, such as that an

H   issue which is res judicata has been pleaded, the court would always exercise the jurisdiction in a particular way, this would not import that the jurisdiction was not discretionary but merely that in such circumstances the discretion ought to be exercised in that particular way. I do not think,

**Buckley J.**        **Zeiss Stiftung v. Rayner & Keeler (No. 3)**        **[1970]**

however, that, because an issue is res judicata, the court in the exercise     A
of its discretion should always strike out an allegation raising that issue.
The court, for example, might consider in a particular case that the better
course would be for the claim of res judicata to be raised by pleading
(which is, after all, the normal method of dealing with an estoppel) and
dealt with at the trial.   Or the court might consider that the negligible
importance of the subject-matter of the alleged estoppel made the cost of
an application to strike out the offending plea unjustifiable, or that the     B
opposite party had a triable answer to the alleged estoppel.   It appears
to me that, if a party adopts the course taken by the plaintiff here, it is for
him as applicant to show that to allow the offending plea to stand in the
pleading will in fact give rise to one of the vices mentioned in R.S.C., Ord.
18, r. 19, of such a quality and in such circumstances that the court ought,
in the exercise of its discretion, to strike out the offending matter.   Every
case must depend on its own facts.                                             C

When a party to an action seeks to obtain an order striking out some
part of his opponent's pleading, it is, in my judgment, incumbent on him to
indicate clearly what he wants to be struck out.   This the present notice
of motion does not do so far as paragraph 1 of the defence of the third
defendant (to which I will henceforth refer as " the defence ") is concerned.
That paragraph does not contain any express allegation to the effect         D
that the third defendant is the original Stiftung.   It may be that, when
read in conjunction with other paragraphs of the defence, paragraph 1
carries an implication that the third defendant is the original Stiftung, but
no deletion from paragraph 1 can affect this.   In my opinion, therefore,
paragraph (a) of the relief asked for in the notice of motion is misconceived.

The identification of both the third defendant and the plaintiff with the    E
original Stiftung is put in issue by paragraph 2 of the defence.   It will
be convenient to deal with the allegation relating to the plaintiff in con-
junction with the first sentence of paragraph 7 of the defence.   I deal now
with the allegation relating to the third defendant.   The plaintiff asserts
that this is res judicata by reason of (a) the judgment of Cross J., (b) the
decision of the House of Lords, (c) a decision of Qadeeruddin J. in the High  F
Court of West Pakistan at Karachi on two appeals from an order of the
Registrar of Trade Marks at Karachi, (d) a decision of the Joint Registrar
of Trade Marks in India, whereby he accepted an application by the
present plaintiff for registration of a mark in the Indian register of trade
marks and rejected a similar application by the third defendant.

To make good a claim of estoppel per rem judicatam the party asserting
the estoppel must establish: (1) that there has already been a judicial     G
decision by a competent court or tribunal, (2) of a final character, (3) of
the same question as that sought to be put in issue by the plea in respect
of which the estoppel is claimed, (4) between the same parties, or their
privies, as the parties between whom the question is sought to be put in
issue.

There is no question but that the decisions of Cross J. and of the House  H
of Lords as well as the Pakistani and Indian decisions which are relied
upon are all judicial decisions by competent courts or tribunals.   It is said,
however, as regards the English decisions, that these, being interlocutory,

A    are not of a final character. Many interlocutory orders, such, for instance, as an interim injunction limited to take effect only until judgment or further order, clearly involve no final decision of any issue between the parties either expressly or, since they depend only upon a prima facie case being made out, by implication. Finality for this purpose means that the decision (a) is one which does not ex facie, as in the case of an order for an account or inquiry, leave something to be judicially determined or ascer-

B    tained before the decision can become effective or enforceable, and (b) is not subject to subsequent discharge, rescission, modification or any other form of review by the court or tribunal making the decision.

The order made by Cross J. and affirmed by the House of Lords was, in substance, for the dismissal of the defendants' summons for a stay of the action and, in form, a refusal to make any order on the summons except as to costs. There can be no doubt about the finality of such an order within

C    its limited scope. The defendants could not thereafter have properly made a new application for a stay of this action except upon new grounds. It must preclude the defendants from thereafter alleging in proceedings against Courts & Co. that Messrs. Courts & Co. were not duly authorised to raise this action on behalf of the plaintiff. That was the primary issue before Cross J., and it was clearly considered by him on its merits, and

D    finally disposed of so far as any court of first instance is concerned. The order would not prevent the defendants disputing the authority of Courts & Co. or other solicitors acting or purporting to act for the plaintiff in another action.

By way of " issue estoppel," however—a doctrine discussed in some detail in the House of Lords on the appeal on the summons to stay this action—it is possible that particular issues decided by Cross J. or the House

E    of Lords, as incidents of the decision of the then primary issue, may be res judicatae, so that in other proceedings in this action or outside it between the same parties (that is, the defendants and Messrs. Courts & Co.) or their privies, either party would be estopped from disputing them. In this connection one must consider what decisions in those earlier proceedings were necessary to the disposal of that application and whether they were

F    of a final character in the relevant sense.

Having regard to the terms of the summons, Cross J.'s order, in my judgment, necessarily implies a decision on his part that this action had not been commenced by the plaintiff's solicitors without the plaintiff's authority. Mr. Kerr, for the defendants, has conceded that in consequence of that order the defendants can no longer assert that the Council of Gera was not competent to instruct solicitors on behalf of the plaintiff in this

G    action. It must, in my view, follow from this—although Mr. Kerr's concession did not in terms go so far—that the defendants cannot, in the absence of a change of circumstances, now assert that the plaintiff is not a body competent through the Council of Gera to instruct solicitors and to sue as a plaintiff in an action in this country. To this extent at least the decision of Cross J., though interlocutory, was, in my judgment, final in the

H    relevant sense and is binding on the parties to it and their privies.

Cross J.'s order, read in the light of the application upon which it was made, does not appear to me to carry any further necessary implication. If I refer to the judgment of Cross J. and to the speeches in the House of

Lords I find that Cross J. made a number of findings and decided a
number of issues upon which his views were broadly approved in the House   **A**
of Lords. There seems, however, to be a considerable body of authority
binding on me and on the Court of Appeal in support of the view that I
ought to have regard only to the formal record and not to any reasons given
by Cross J. in his judgment or, as I think must follow, by the House of Lords.
(See *Spencer Bower on Res Judicata* (1924), p. 113, and cases there cited.)

In a more recent case—namely, *Marginson* v. *Blackburn Borough*   **B**
*Council* [1939] 2 K.B. 426, in which the court does not seem to have been
referred to this passage in *Spencer Bower* or to any of the cases there
cited—the Court of Appeal, at p. 437, expressed a contrary view. I have
heard no argument on this aspect of the matter, and accordingly, as a
precautionary measure, I will state my views upon the assumption that I
should have regard to the reasoned judgments.

The primary question before Cross J. was not whether the plaintiff   **C**
is the original Stiftung: it was, as he indicated [1964] R.P.C. 299, 321,
whether according to the law in force in the Eastern Zone of Germany
such a corporation as the plaintiff existed, and, if so, whether the persons
who instructed Messrs. Courts & Co. in this action had, under the same
law, authority to give such instructions on the plaintiff's behalf: and see
*per* Lord Reid [1967] 1 A.C. 853, 909. Cross J. reached an affirmative   **D**
view on each of these questions, and I feel no doubt that he did so because
he considered that, according to the relevant law in the Eastern Zone of
Germany, the original Stiftung continued in existence notwithstanding
the Russian confiscatory decrees and was still governed by the provisions
of its constituent statute so far as applicable to the existing circumstances,
with the result that the Council of Gera had the powers of its special board;
in other words, that in the contemplation of East German law the plaintiff   **E**
is the original Stiftung. On the other hand, he held, [1964] R.P.C. 299,
326, that in contemplation of West German law the " foundation," by which
I think he clearly meant the original Stiftung, was " domiciled " in Heiden-
heim under the two Württemberg decrees. In these circumstances I think
that it is reasonably clear that Cross J. was not expressing a concluded view
that the plaintiff was for all purposes to be regarded as the original Stiftung   **F**
and that the third defendant was not to be so regarded for any purpose, but
merely the view that, since the status of the plaintiff as a competent plaintiff
in this action was to be ascertained in the light of the plaintiff's own proper
law, namely, East German law, the plaintiff must be accepted as having
a corporate existence under that law, and that the Council of Gera must
be accepted as having authority to instruct solicitors on its behalf. I find
nothing said in the House of Lords inconsistent with this. Indeed, the   **G**
status of the third defendant under West German law was irrelevant to
anything which Cross J. and the House of Lords had to decide. The only
question before them was whether the plaintiff's solicitors were duly
authorised to bring and prosecute this action. The status and character
of the third defendant under West German law could have no bearing,
direct or incidental, upon this. Any decision about it by Cross J. or the   **H**
House of Lords would have been purely collateral to the subject-matter
of the summons and so could not give rise to any estoppel per rem judicatam:
see in this connection the advice of the judges in the *Duchess of Kingston's*

A  case (1776) 20 State Tr. 355, in the note at p. 538n., cited by Lord Reid in [1967] 1 A.C. 853, 913.

Moreover, it was made clear in the House of Lords that the issues on the summons, that is to say, the lis thereby brought before the court, must be regarded as being exclusively between the defendants and Messrs. Courts & Co., the solicitors acting for the plaintiff or purporting to do so, to which the plaintiff itself was not a party: see *per* Lord Reid, at p.

B  910, *per* Lord Guest, at p. 986, and *per* Lord Upjohn, at pp. 944, 945. In other words, the proceedings on the summons must be treated as a claim by the defendants against the solicitors for breach of warranty of authority, to which the plaintiff, on whose authority the solicitors were relying, was not a party. Such an issue could not be raised in the action itself. Though brought procedurally before the court by a summons in the action, the application was in truth a separate action. A decision in such proceedings

C  could not give rise to an estoppel per rem judicatam between the defendants and the plaintiff unless the plaintiff was the privy of the solicitors for the purpose of those proceedings.

In my judgment, if a third party is or becomes a privy of a party to proceedings so as to be affected by a decision in those proceedings, per rem judicatam, the privy relationship must be such as to operate whether the

D  decision in question goes, or has gone, in favour of the party to the proceedings or against him. The relationship cannot be conditional upon the character of the decision. Where a plaintiff successfully sues one who has purported to deal with him as an agent for damages for breach of warranty of authority, it seems to me impossible to regard the person, on whose behalf the unsuccessful defendant purported to act, as privy to the defendant in the action. The plaintiff's success neither confers any benefit on

E  that person nor imposes any obligation upon him. It establishes as between the parties to the action that the third party was in no way concerned with the transaction in respect of which the proceedings were brought, a result which, in the absence of any other ground of privity, seems to me incapable of consistency with the third party being privy to the defendant's defence of the action. The plaintiff in the present case says that in con-

F  sequence of the decisions of Cross J. and the House of Lords it can now be seen that the plaintiff has at all times had a real interest in this action, as the principal of Messrs. Courts & Co., so that it can now be seen that it had indeed an interest in the success of Messrs. Courts & Co. on the summons. It is thus established, they say, that there was sufficient privity of interest between the plaintiff and Messrs. Courts & Co. in relation to

G  the proceedings on the summons. It is not everyone who has some interest in the outcome of litigation that is to be regarded as privy to some party to that litigation for the purpose of the doctrine of res judicata: see, for example, *Mercantile Investment & General Trust Co.* v. *River Plate Trust, Loan & Agency Co.* [1894] 1 Ch. 578. I have been referred to no authority which indicates at all clearly what kind of interest in earlier

H  litigation relied upon as constituting a res judicata is sufficient to render someone, who was not a party and is not a successor in title to a party to that litigation, privy to a party for the purposes of the doctrine. For the reason which I have indicated, I do not think that the plaintiff in the present

case ought to be regarded as having been privy to the proceedings on the
summons to stay.

    The question whether and to what extent the plaintiff and Messrs.
Courts & Co. should be regarded as having been privy the one to the
other was not before the House of Lords, who were concerned with the
question whether there had been privity between the Council of Gera
and Messrs. Courts & Co.; but Lord Guest, at p. 937, observed that no
case had been referred to in England in which a solicitor had been held
privy to the party instructing him, and Lord Upjohn said, at p. 945:

    " I can see nothing in the solicitor's relationship with his client which
    renders them privy to one another in the ordinary sense in which
    privy or privity is used for the purposes of the doctrine."

These dicta support the view I have formed.

    I am consequently of opinion that nothing decided by Cross J. or the
House of Lords renders any question about the status or character of the
third defendant res judicata, on three grounds: (1) that any such question
must be answered by reference to West German law, which was not investi-
gated either by Cross J. or the House of Lords; (2) that any decision of such
a question would not have been necessary for the purposes of those pro-
ceedings but purely collateral; and (3) that the plaintiff was not a party to
those proceedings nor privy to any party to those proceedings.

    It is consequently unnecessary for me to go on to consider to what
extent any relevant finding or decision of Cross J. or of the House of Lords
ought for present purposes to be regarded as having been final.   This
question may, I think, present a dilemma.   No finding or decision would
occasion an estoppel unless it were final, but it may be said that no finding
or decision on an interlocutory application, apart from the actual relief
granted (which may or may not be of a final nature), is final in the relevant
sense unless, in consequence of the doctrine of res judicata, it is a bar to
further litigation of that issue.   Possibly the solution of this apparent
dilemma may depend upon whether the issue was explicitly raised in the
earlier proceedings and the parties ought to be treated as having then put
forward all the facts and arguments which they then considered to be
relevant to its resolution, so that the issue was fully considered on its
merits in a judicial manner.   Difficulties of the kind noticed by Lord Reid,
at p. 917, are likely, I think, to arise in a particularly acute form upon
interlocutory proceedings, where the parties are unlikely to wish to incur
in the preliminary stages of an action all the trouble and expense which
may be involved in thrashing out a complicated issue.

    In both Pakistan and India the plaintiff and the third defendant each
applied for registration of a trade mark.   Each opposed the other's appli-
cations.   In each jurisdiction the plaintiff's application succeeded and
the third defendant's failed.   In Pakistan the third defendant appealed
to the High Court against the acceptance of the plaintiff's application
and the rejection of its own.   The appeal failed.   The evidence establishes
that in Pakistan the judgment of the High Court was the judgment of a
competent court and conclusive in the sense that its subject-matter
cannot be litigated again before that court exercising the same jurisdic-
tion.   It also establishes that in Pakistan the doctrine of res judicata

A  extends to "issue estoppel" as well as to "cause of action estoppel."
The evidence also establishes that the decision of the Registrar of Trade
Marks in India, from whom no appeal was made, was a decision of a
competent tribunal, the subject-matter of which could not be relitigated
except by way of appeal to the High Court, and that the law of res judicata
in India extends to all matters directly and substantially in issue between
the parties in earlier proceedings.   Both orders were consequently final
B  for the purpose of the doctrine of res judicata.   From each of these decisions
an inevitable inference arises, that the tribunal treated the present plaintiff
as an existing body capable of being the registered proprietor of a trade
mark and entitled to registration in respect of the mark which was the
subject-matter of its application, and that it held that the third defendant
was not entitled either to object successfully to such registration or to be
registered as proprietor of the mark which was the subject-matter of its
C  application.

On the whole I think that it is also a fair inference from each of these
decisions, that the tribunal regarded the present plaintiff as being in
contemplation of its proper law, namely, East German law, the original
Stiftung.   No other point of origin of the plaintiff than the foundation of
the original Stiftung seems ever to have been suggested.   Without looking
D  at the reasons given in the judgments I doubt whether any further infer-
ence can be drawn in either case.   If I am justified in paying regard to the
reasons contained in the judgments, I find that Qadeeruddin J. in Pakistan,
came to the conclusion that by East German law the original Stiftung had
not ceased to exist there but was in fact the present plaintiff and that
that was the body having a reputation in goods sold in Pakistan under
marks containing the word "Zeiss."   He was not concerned with and
E  did not consider the status of the third defendant under West German
law.   Similarly, I find that the Joint Registrar of Trade Marks in India
confined himself to considering the status of the plaintiff and that of the
third defendant under East German law alone.   He reached no conclusion
about the status or character of the third defendant under any other system
of law.

F  Accordingly, in my judgment, neither the Pakistani judgment nor the
Indian contains any decision which debars the third defendant from
alleging that it is, by West German law, or indeed any other system of law
except East German law, the original Stiftung.

The present first and second defendants were not parties to the pro-
ceedings in either Pakistan or India, and it is conceded that they were
not privy to the third defendant for the purposes of those proceedings,
G  which accordingly cannot debar them from asserting that the third defen-
dant is, and the plaintiff is not, the original Stiftung.   It seems, therefore,
that this is an issue which will have to be investigated at the trial, whether
the third defendant is estopped in this respect or not, with the result that
the cost and trouble of preparing for trial on this issue is inevitable.

In these circumstances, had I thought that the third defendant was
H  estopped, I should nevertheless have been disinclined to strike out para-
graph 2 of the defence.   This would, of course, put no obstacle in the way
of the plaintiff pleading the alleged estoppel against the third defendant.

To paragraph 3 of the defence similar observations and reasons apply

as to paragraph 1, save that I think that paragraph 3 does imply an
assertion that the third defendant is the original Stiftung. For the reasons
I have stated in respect of paragraph 2 of the defence I do not consider
that the defendants are debarred from making such an assertion. Paragraph
3 of the defence does not, as I understand it, contain any allegation that
the domicile of the original Stiftung is, or ever has been elsewhere than
at Jena. It does allege that the " Sitz " of the third defendant, which in
the context must, I think, also mean the " Sitz " of the original Stiftung, has
been transferred to Heidenheim, but it denies that, or at any rate puts in
issue whether, the German word " Sitz " means whatever " domicile " means
in English law in relation to a corporation. The word " domicile " is
sometimes used by English lawyers in respect of a corporation aggregate,
and such use is, I think, by way of analogy to the use of the word in respect
of a natural person. I doubt if this analogy is altogether satisfactory.
As I understand the law, the word " domicile " in respect of a corporation
aggregate must refer to that country the law of which is the proper law of
the corporation, that is, the law governing its constitution and powers.
A corporation cannot, I think, of its own volition, and apart from its proper
law, abandon one domicile and adopt another, as a natural person can.
Its primary domicile must be under that law under which it was incorporated.
It must, however, I think, be at least theoretically possible that by operation
of the proper law for the time being of a corporation, another system of
law may be substituted as the proper law of the corporation. Whether
the defendants intend by the defence to assert that the alleged transfer
of the " Sitz " of the third defendant had under some relevant system of
law some such effect as this is not clear to me, for, with due respect to the
pleader, the defence does not seem to me to indicate what consequence is
supposed to follow from the alleged transfer. If, however, this be the inten-
tion, the point must involve consideration of what at any relevant moment
or moments should be regarded as the proper law of the original Stiftung
or of the third defendant. Clearly in the first instance the proper law
of the original Stiftung was the law of the Grandy Duchy of Saxe-Weimar;
but, having regard to the political vicissitudes of Thuringia and to the
possible conflict between East and West German law, this aspect of the
case, which was not relevant to what Cross J. and the House of Lords
had to decide, has, in my judgment, not yet been judicially considered,
either expressly or by implication, in any litigation relied upon in these
proceedings, and cannot be res judicata. If, however, the plea means some-
thing else—for instance that the administrative centre or principal place
of business was transferred—this must involve questions of foreign law
which, so far as I can tell, have not yet been judicially considered and so
cannot be res judicata.

Paragraph 3 of the defence may, I think, well be open to criticism
on grounds of obscurity, but it does not appear to me to raise any issue
which is res judicata.

Paragraph 5 (b) of the defence raises an issue which manifestly involves
consideration of West German law. For reasons already indicated, this
issue is not, in my opinion, res judicata.

Paragraph 5 (c) also raises an issue which can only be resolved by

A  reference to West German law, and for the same reasons is not, in my opinion, res judicata.

Paragraph 5 (d) of the defence and the first two sentences of paragraph 7, as well as the latter part of paragraph 2 of the defence, contain allegations which are directly contrary to the decisions of Cross J. and the House of Lords, who held that the original Stiftung still exists under East German law in the person of the plaintiff and that the Council of Gera is,

B  and has the powers of, its special board under its constituent statute. Had I thought that those decisions could support the plaintiff's claim of res judicata I should have directed that these allegations should all be struck out, for I should have regarded them in the terms in which they are pleaded as vexatious and an abuse of the process of the court. But I have already indicated that in my judgment those decisions do not support that claim, on the ground of lack of privity. These allegations are also, I think, in

C  conflict with the Pakistani and Indian decisions. Formal written grounds of appeal were delivered in the Pakistani proceedings, to which I think I am entitled to refer, even if I ought not to look at the reasoned judgment. They clearly raise, in my opinion, the issue whether the decisions of the West German courts in the Stuttgart action ought to be preferred to the decisions in the East German courts, and consequently whether the original

D  Stiftung should be considered as having ceased to exist in East Germany. It would not follow from this material alone that the case was decided by Qadeeruddin J. on the ground of a decision of this issue, but, as I have already said, I think it is a fair inference from his formal decision that he did regard the present plaintiff as being the original Stiftung under East German law, and when I look at his reasoned judgment I find that this was

E  the case. On the other hand, he decided nothing about the position of the Council of Gera. On the contrary, in paragraph 28 of his judgment he said that no such question had been raised in the appeal and that the question was not before him.

The Joint Registrar of Trade Marks in India also held that under East German law the present plaintiff was the original Stiftung, but decided nothing about the position of the Council of Gera.

F  I consider, therefore, that a prima facie case is made out for saying that the allegations contained in paragraph 5 (d) and in the latter part of paragraph 2 of the defence are res judicatae against the third defendant, but, since it is not similarly concluded against the first and second defendants and is relied upon by these defendants, I consider, for reasons similar to those indicated earlier in this judgment in respect of paragraph 2 of the defence, that, even if there is here an estoppel per rem judicatam binding

G  on the third defendant, the best course will be for me not to strike the plea out but to leave the plaintiff to plead the estoppel by way of reply. It is conceivable that the third defendant may wish to plead some rejoinder. In these circumstances I think that I should not now express any concluded opinion on this part of the case, but I should leave it to the trial judge to decide whether my provisional view is correct.

H  The first and second defendants do not rely on paragraph 7 of the defence. By the first sentence of that paragraph the third defendant puts in issue the existence of the plaintiff as a Stiftung. In fact, however, it has not been suggested either before me or, I think, in any of the other relevant

litigations that if the plaintiff exists at all it is not a Stiftung. This plea
really amounts,- I think, to a denial of the plaintiff's existence. Whether **A**
it should be so interpreted or read in a more restricted sense, this question
has, in my judgment, been decided against the third defendant in both
the Pakistani and the Indian decisions so as to be res judicata against
them. The third defendant should not, I think, be allowed to reagitate
that particular question in this action. The first sentence of paragraph
7 of the defence should be struck out.                                        **B**

It has been urged that this should not be so because, since the decisions
in Pakistan and India, the character of this action and of the relief claimed
has been drastically altered by amendment. This seems to me to be irre-
levant. An issue determined in action A may be res judicata for the purposes
of action B between the same parties, although action B was not com-
menced until after judgment in action A.

It is said that I have not all the documentation in the Pakistani and **C**
Indian proceedings before me. This is so, but I think I have enough to
reach a conclusion, at least in the case of Pakistan, where I have the
lengthy and detailed grounds of appeal before me. The third defendant
has not sought to introduce any more material to displace any impression
conveyed by the material which I have.

It is also urged that the Pakistani and Indian proceedings did not **D**
involve the discovery of documents and that the resulting registration of
trade marks had only domestic effect within Pakistan and India respectively.
I know of no ground for confining the doctrine of res judicata to decisions in
proceedings in which discovery of documents can be insisted upon. Indeed,
I think there is no foundation for such a suggestion, nor do I see any
reason for treating the Pakistani and Indian decisions as other than com-
petent decisions for the purposes of the doctrine, because the relief sought **E**
in them was of the kind which it was. They were judicial decisions in
contested proceedings involving the decision of contested issues raised
in those proceedings upon which I have no reason to suppose that the
parties did not have a full opportunity of producing all the evidence and
arguments they wished to produce.

I will deal later with an argument presented by the defendants, that **F**
the plaintiff cannot rely on the Pakistani and Indian decisions because
of certain contrary decisions in other countries.

I come now to the relief sought in respect of paragraphs 9 and 10 of
the defence. Cross J. dealt with the question whether Bauersfeld,
Henrichs and Kuppenbender did or did not resign from the board of manage-
ment of the optical business [1964] R.P.C. 299 at p. 322 to 325 of his
judgment. It is, in my opinion, clear from what he said at the middle of **G**
p. 322 that he considered—and, I respectfully think, rightly—that in
making a finding of fact in this respect he was not deciding anything which
was necessary for disposing of the summons before him, but that, having
heard cross-examination on this part of the story, he ought to state his
view of the evidence and find the facts in anticipation of the trial, thus
discharging to that extent the function of the trial judge. In doing so he **H**
was, I think, making a decision which was wholly collateral to the proceeding
before him, and this is perhaps the more evidently so when the fact is
borne in mind that, although the proceeding before him was in form a step

**A** in this action, it was in substance a separate piece of litigation to which the plaintiff was not a party. The decision consequently, in my judgment, can found no claim of estoppel per rem judicatam.

The plaintiff has contended that Cross J. nevertheless obviously intended to decide this point once and for all, and that the court in the exercise of its inherent jurisdiction should not allow the matter to be re-opened. While, of course, I feel the force of this argument, I do not **B** think that I ought at this stage to strike the issue from the pleadings. It will, in my view, be a matter for the trial judge to decide whether he will admit any further evidence on this issue. If there is no further evidence upon it he may accept Cross J.'s finding. He may, however, be persuaded that Cross J. had not all the relevant material before him, in which case the trial judge may admit further evidence, with what result I cannot foresee, or he may be persuaded that, since the summons before Cross J. **C** was a proceeding to which the plaintiff was not a party, the judge's finding has no effect upon this action and the issue is at large.

Finally I must deal with an argument that the plaintiff cannot rely on an estoppel founded on the Pakistani and Indian decisions, or, indeed, on the English proceedings, if there be one, because, in proceedings in other jurisdictions, courts have come to contrary conclusions on the relevant **D** issues. The decisions relied upon are a judgment of District Judge Mansfield in an action in the United States District Court in the Southern District of New York between the present third defendant and a German subsidiary company of the third defendant, as plaintiffs, and the V.E.B. Carl Zeiss, Jena, and others, as defendants, and the judgments in certain proceedings in France to which the present plaintiff and the present third defendant were both parties.

**E** In the American action, which was for infringement of certain trade marks, the plaintiffs in that action succeeded on the infringement issues. The defendants in that action, however, raised counterclaims under the American anti-trust laws which have yet to be tried. The final order and formal judgment of the court on the infringement issues have been deferred until these counterclaims have been disposed of. If for no other reasons, **F** no counter-estoppel or any thing of that kind can, in my judgment, be founded upon these American proceedings, because (1) I am far from satisfied that the present plaintiff can be regarded as a privy to any of the defendants in those proceedings, and (2) it is not established that the judgment delivered by the District Judge, or any conclusion of his contained in it, is yet final in the sense referred to earlier.

**G** The French proceedings related to certain trade marks which, before the second world war, had been registered in France in the name of Carl Zeiss. In consequence of a French law enacted during the war relating to enemy property these trade marks had been sequestrated. Under a further French law of January 4, 1955, the release of such trade marks to their former German holders, or to persons claiming through those holders, was authorised. The dispute in the French court arose from the fact that **H** the present plaintiff and the V.E.B. Carl Zeiss, Jena, together claimed to have the marks released to them, while the present third defendant claimed to have the marks released to them. The question for decision, therefore, was who in contemplation of French law should be recognised as having

been the former German holder or as claiming under a former German
holder.   It was held—stating the matter quite shortly—that the present   A
plaintiff had not been the former owner but that the former owner had
been the " firm " Carl Zeiss, that is to say the optical business; that the
V.E.B. Carl Zeiss, Jena, was not a successor in title of the former owner,
because the French court would not recognise uncompensated confiscation
by a foreign government; that the firm Carl Zeiss had been effectively
established in West Germany by Bauersfeld, Henrichs and Kuppenbender,   B
who had not resigned from the board of management of the optical business;
and that accordingly the present third defendant should be recognised as
entitled to have the trade marks released to it.   The court expressly
abstained from investigating whether the original Stiftung continued in
existence.   This decision, which was itself an appellate decision of the
Paris Court of Appeal, was confirmed by the Court of Cassation.

In my judgment, these proceedings cannot be relied upon as affording   C
any basis for a plea of res judicata or counter-estoppel for the present purpose
(1) because the evidence does not establish that the decision is
incapable of review by the deciding court, (2) because it is not established
that any part of the court's decision would be treated as res judicata and
incapable of relitigation in another cause between the same parties in
France.   In the absence of evidence on this latter point, the French decision,   D
in my judgment, lacks the necessary degree of finality to afford a basis for
" issue estoppel ": see *per* Lord Reid, [1967] 1 A.C. 853, 919.   Moreover,
for present purposes, I am only concerned with whether the French
decision can afford a counter-estoppel in relation to the first sentence of
paragraph 7 of the defence, that is to say as to the existence of the plaintiff
as a Stiftung, and, as I have pointed out, the court in France did not
investigate this.   E

In these circumstances it is unnecessary for me to consider further
whether contradictory earlier decisions, each inherently capable of
establishing an estoppel per rem judicatam on the same issue, can operate
as counter-estoppels so that one, or maybe both of them, cease to be
available as an estoppel in later litigation involving the same issue.   It is
also unnecessary for me to consider further whether I have enough of   F
the documentation of the proceedings in either America or France before
me to justify me in reaching any conclusion about the effect of the decisions
in those proceedings on the issues in the present action.

In the outcome, I order that the first sentence of paragraph 7 of the
defence be struck out, but I make no further order on the summons, except
as to costs, about which I will hear submissions.
G

MR. ARNOLD: My Lord, I am not quite sure how your Lordship was
dealing with the question raised by the notice of motion as to whether
the allegations in paragraphs 9 and 10 dealing with the resignation
should be struck out on the basis of Indian or Pakistani res judicata, which
is not dealt with in your Lordship's judgment.   Is that still to be tried?

H

BUCKLEY J.   I am not proposing to strike out any part of that.

ARNOLD Q.C.   Your Lordship has not dealt with that aspect at all.

A   I do not know whether that is still alive or whether your Lordship is just not dealing with it, or quite how we stand on that.

BUCKLEY J.   On this ground I should not be prepared to strike it out, because it could not be res judicata against the first and second defendants.

ARNOLD Q.C.   They do not adopt that.   However, I do not want to re-open that.

B

BUCKLEY J.   I am extremely sorry if I have failed to cover some part of the ground.   I thought I had covered everything in my judgment.

After further argument Buckley J. stated as follows: —

C   The order for costs which I will make as a result of my judgment is that the plaintiffs will have one-quarter of their costs as costs in the cause and the defendants should have three-quarters of their costs as costs in the cause.

I think the justification for three counsel depends on the weight and complexity of the matter to be dealt with; not the number of speeches but

D   the amount of work that has to be done in preparing the case.   I think this is a suitable case for three counsel on both sides.

> *Order that the first sentence of para-graph 7 of the defence of the third defendant be struck out.*
>
> E   *Order that one-quarter of the plaintiff's costs be plaintiff's costs in cause and that three-quarters of the defendants' costs be defendants' costs in cause.*
>
> *Plaintiff's application for leave to appeal and defendants' application for leave to cross-appeal refused.*
>
> F   *Order that the time in which the plaintiff might lodge a reply be extended until the expiry of seven days after any application to the Court of Appeal for leave to appeal, if unsuccessful or until disposal of the appeal if successful.*

G

No application for leave to appeal was in fact made by either side.

Solicitors: —*Courts & Co.; Herbert Smith & Co.*

T. C. C. B.

H

————

# TAB 21

**Judgment 11/2012**                    **Carlyle Capital Corporation Limited et al v Conway et al – Court of Appeal**
**- Civil File No 435**
**- 23rd March 2012**

**Appeal of Royal Court judgment of 22 July 2011.  Companies (Guernsey) Law 1994 – company liquidation – jurisdiction – appeal allowed.  Leave to appeal to the Privy Council dismissed – application for stays pending leave to appeal dismissed.  (see 29/2011)**

## IN THE COURT OF APPEAL OF GUERNSEY

The 23rd day of March, 2012 before The Hon Michael Jacob Beloff QC, presiding, James Walker McNeill QC and Sir Hugh Bennett

Between

|     |     |
| --- | --- |
| (1) | CARLYLE CAPITAL CORPORATION LIMITED (IN LIQUIDATION) |
| (2) | ALAN JOHN ROBERTS, NEIL MATHER, CHRISTOPHER MORRIS, ADRIAN JOHN DENIS RABET, solely in their capacity as Joint Liquidators of Carlyle Capital Corporation Limited (In Liquidation) |

Plaintiffs/Appellants

and

|      |     |
| ---- | --- |
| (1)  | WILLIAM ELIAS CONWAY JR |
| (2)  | JAMES H. HANCE JR |
| (3)  | JOHN CRUMPTON STOMBER |
| (4)  | MICHAEL J. ZUPON |
| (5)  | ROBERT BARCLAY ALLARDICE III |
| (6)  | HARVEY JAY SARLES |
| (7)  | JOHN LEONARD LOVERIDGE |
| (8)  | CARLYLE INVESTMENT MANAGEMENT LLC |
| (9)  | TC GROUP LLC |
| (10) | TCG HOLDINGS LLC |

Defendants/Respondents

On the Plaintiffs'' application for leave to appeal the judgment given by the Royal Court (Ordinary Division) on 22 July 2011;

THE COURT, having on 30 to 31 January 2012 and 1 to 3 February 2012 heard from Advocates J M Wessels for the Plaintiffs, Advocate S H Davies for the First to Fourth and Eighth to Tenth Defendants and Advocate G K Bell for the Fifth to Seventh Defendants;

And whereas, on 23 February 2012 the Court handed down a draft reasoned judgment for the parties to correct any literal errors;

And whereas, on 5 March 2012 the Court formally handed down its Judgment ("the Forum Judgment"), THE COURT:-

(i)     GRANTED the Plaintiffs leave to appeal the judgment of 22 July 2011;

(ii)    ALLOWED the appeal;

(iii) DISMISSED the First to Fourth and Eighth to Tenth Defendants' cross- appeal by Respondents'' Notice dated 21 September 2011;

(iv) DISMISSED the Fifth to Seventh Defendants' cross- appeal by Respondents'' Notice dated 23 September 2011;

(v) DISMISSED the Exceptions Déclinatoire of the First to Fourth and Eighth to Tenth Defendants dated 28 February 2011;

(vi) DISMISSED the Exceptions Déclinatoire of the Fifth to Seventh Defendants dated 28 February 2011;

(vii) SET ASIDE the stay granted by the Deputy Bailiff on 22 July 2011;

(viii) GRANTED the Plaintiffs leave to file an Amended Cause in the terms set out in the Proposed Amended Cause dated 13 May 2011, exhibited at Tab 165 to the Affidavit of Alan John Roberts sworn 13 May 2011;

(ix) ORDERED that the Defendants pay the Plaintiffs'' costs of and incidental to the Defendants'' Exceptions Déclinatoire dated 28 February 2011 including all of the costs of the hearing before Deputy Bailiff Collas from 27 June to 1 July 2011 and all of the costs of and incidental to the appeal on the standard recoverable basis, to be taxed if not agreed; and

(x) ORDERED that the Defendants provide an address for service and that the Amended Cause be placed on the Rôle des Causes à Plaider.

THE COURT this day ISSUED JUDGMENT in the terms attached hereto.

And whereas, UPON THE UNDERTAKING of the Plaintiffs not to contend or otherwise rely on in any way, in the courts of Guernsey or elsewhere, that the filing and service of a Defence by the Defendants (or any other subsequent steps, directions, or applications made before the courts of Guernsey or the provision of an address for service) prior to the determination of any application for special leave to appeal to the Privy Council or (if leave is granted) any appeal to the Privy Council against the Forum Judgment of the Court of Appeal constitutes a submission by the First to Sixth and Eighth to Tenth Defendants to the jurisdiction of the courts of Guernsey.

On 6 March 2012, THE COURT:

(xi) DISMISSED the First to Fourth and Eighth to Tenth Defendants' application for leave to appeal to the Judicial Committee of the Privy Council;

(xii) DISMISSED the Fifth to Seventh Defendants' application for leave to appeal to the Judicial Committee of the Privy Council;

(xiii) DISMISSED the First to Fourth and Eighth to Tenth Defendants' application for a stay pending an application for leave to appeal to the Judicial Committee of the Privy Council; and

(xiv) DISMISSED the Fifth to Seventh Defendants' application for a stay pending an application for leave to appeal to the Judicial Committee of the Privy Council.

J TORODE
Registrar of the Court of Appeal

## IN THE COURT OF APPEAL OF GUERNSEY

**Before:**

**The Hon Michael Jacob Beloff QC**
**James Walker McNeill QC**
**Sir Hugh Peter Derwyn Bennett**

**Judges of Appeal**

**Between:**

**(1) CARLYLE CAPITAL**
**CORPORATION LIMITED**
**(IN LIQUIDATION)**

**(2) ALAN JOHN ROBERTS, NEIL MATHER, CHRISTOPHER MORRIS,**
**ADRIAN JOHN DENIS RABET,**
**SOLELY IN THEIR CAPACITY AS JOINT LIQUIDATORS OF**
**CARLYLE CAPITAL CORPORATION LIMITED (IN LIQUIDATION)**

**(Applicants Plaintiffs)**

**–v–**

**(1) WILLIAM ELIAS CONWAY Jr**
**(2) JAMES H HANCE Jr**
**(3) JOHN CRUMPTON STOMBER**
**(4) MICHAEL J ZUPON**
**(5) ROBERT BARCLAY ALLARDICE III**
**(6) HARVEY JAY SARLES**
**(7) JOHN LEONARD LOVERIDGE**
**(8) CARLYLE INVESTMENT MANAGEMENT L.L.C.**
**(9) TC GROUP L.L.C.**
**(10) TCG HOLDINGS L.L.C.**

**(Respondents Defendants)**

**Decision handed down 13 February 2012**
**Written Judgment handed down 5 March 2012**

**Advocate  J M Wessels appeared for the Appellants**
**Advocate   S H Davies (First to Fourth & Eighth to Tenth)  &**
**Advocate G K Bell (Fifth to Seventh) appeared for the Respondents**

The President,

1.     This is a judgment of the Court.

2.     Carlyle Capital Corporation Limited (in liquidation) ("CCC") and its joint Liquidators, Messrs Roberts, Mather, Morris and Rabet (the Plaintiffs in the Cause) apply for leave to appeal and, if leave is granted, appeal that part of the order of the Deputy Bailiff dated 22 July 2011 whereby he, having refused to set aside leave to the Plaintiffs to serve the Cause out of the jurisdiction upon the Defendants 1-6 and 8-10 granted by Lieutenant Bailiff Patrick Talbot Q.C. on 7 July 2010, nevertheless ordered that the claims in the Cause be stayed pending a trial of any action against all the Defendants by the Plaintiffs in the State of Delaware in the United States of

America.  The Defendants 1-7 and 8-10, if leave is granted, appeal by cross notice the Deputy Bailiff's order refusing to set aside leave to serve out of the jurisdiction granted by LB Talbot. The Plaintiffs also seek leave to amend the Cause by adding certain causes of action against the existing Defendants and to join another party to the Cause.  For convenience, without prejudice to the distinct identities indicated, we shall call the disputant parties, save where otherwise necessary, the Liquidators and the Directors respectively.

3.    On 13 February 2012 we gave leave to appeal and allowed the appeal.  We dismissed the Directors cross-notice.  We allowed the Liquidators application for leave to amend the Petition. We indicated, as we foreshadowed at the conclusion of the hearing that we would give our reasons for these several decisions later.  The following are our reasons.

4.    At this stage of this potentially complex and costly litigation the  dispute is not about the merits of the Liquidators" claim but where adjudication of those merits should take place - the choice being between Guernsey and Delaware, the former supported by the Liquidators, the latter by the Directors.  The Deputy Bailiff, as appears from his order, acceded to neither side"s proposal in full. The essential question before this Court is whether his via media (or compromise) was flawed.

5.    We must start by setting out the background taking advantage, with gratitude, of the lucid summary made by the Deputy Bailiff.

6.    On 29 August 2006 CCC was incorporated in Guernsey.   It was promoted by the Carlyle Group, one of the world"s largest private equity firms, to invest in residential mortgage backed securities ("RMBS"). By July 2007 CCC had raised capital totalling US$ 945 million through a series of private placements and an initial public offering.  It was listed on the Euronext Exchange in Amsterdam.  The substantive proceedings in this matter concern the events of the following eight months during which the global credit markets became increasingly volatile and during which period the entire capital of CCC was lost.

7.    On 17 March 2008 CCC was placed into compulsory liquidation in Guernsey pursuant to section 94(a) of The Companies (Guernsey) Law 1994, as amended ("the 1994 Law") on the application of the Directors of CCC.

8.    CCC financed its investments through short-term repurchase agreements giving extensive leverage.  Consequently when CCC collapsed not only was the capital lost but, it is alleged, there was a substantial deficit.

9.    There are ten Defendants in these proceedings.  The first seven Defendants were all Directors of CCC.  The first four Defendants held offices and/or were employees of other companies within the Carlyle Group.  The fifth to seventh Defendants were appointed as independent members of the board of CCC.  The eighth Defendant, Carlyle Investment Management LLC ("CIM") is a Delaware registered company and was appointed as the investment manager and advisor to CCC pursuant to an investment management agreement ("IMA") dated 20 September 2006.

10.    The ninth Defendant, TC Group LLC, ("TCG"), which owned 75% of CIM, and the tenth Defendant, TCG Holdings LLC, the sole managing member of TCG , are collectively referred to as "Carlyle", except where otherwise stated. Carlyle and CIM have been described collectively by the Liquidators as "the Corporate Defendants".  It is alleged that, by virtue of their control over CCC and by their conduct, the Corporate Defendants became de facto or shadow Directors of CCC and thereby owed the same duties to CCC as its de jure Directors.

11.    The procedural history in outline is as follows.   On 7 July 2010 the Liquidators issued proceedings in four separate jurisdictions, Guernsey, Delaware, District of Columbia, and in the State of New York, all claiming in similar form damages "*in a sum to be determined at trial exceeding $1 billion*" together with other relief.  The Liquidators alleged in the Cause and

submitted before the Deputy Bailiff and before us, that the nature of the action is one essentially concerned with the internal management, control and corporate governance of CCC.  The Directors submitted before the Deputy Bailiff and before us that the nature of the Liquidators" action essentially relates to the failures of the duties arising under and connected with the IMA.

12.    On 7 July 2010 the Liquidators applied for leave to serve the proceedings out of the jurisdiction on all the Directors (save for the seventh Director ("Mr Loveridge") who is resident in Guernsey),  pursuant to Rule 8 of The Royal Court Civil Rules, 2007.  The application was heard and granted by LB Talbot on an *ex parte* basis.

13.    By applications dated 28 February 2011, the non-resident Directors applied to set aside the leave granted to serve out of the jurisdiction or, alternatively, for an order that the proceedings be stayed pending the outcome of the proceedings in Delaware.  The Deputy Bailiff understood that the proceedings in New York and in the District of Columbia were not being seriously pursued, and that, as he said in para 10 of his judgment "*the argument before me centred upon the choice of jurisdiction between Delaware and Guernsey*".

14.    On 8 August 2011 the Liquidators sought the Deputy Bailiff's leave to appeal which on 18 August 2011 was refused.  On 19 August 2011, the Liquidators sought leave to appeal from the Court of Appeal pursuant to an interlocutory direction from the Bailiff, sitting as a single member.  On 15 September 2011 the application came before The Hon. Michael J. Beloff QC (President), Michael Jones QC and Clare Montgomery QC, JJA, when it was ordered that the Liquidators" application for leave to appeal, with appeal to be followed if granted, was to be heard on 30 January 2012 with a 5 day estimate.  On 21 September the First to Fourth and Eighth to Tenth Defendants served a Cross Notice seeking to overturn the Deputy Bailiff's refusal to set aside the leave to serve out or alternatively to uphold the order as to the stay.  On 23 September the Fifth to Seventh Defendants served a similar Cross-Notice.

15.    The hearing before us accordingly took place between 30 January and 3 February 2012 frustrating the hopes of Lord Templeman in *Spiliada* that in this area "*submissions will be measured in hours not days" (1987 1 AC 460 at p.465G)*.  Advocate Wessels represented the Appellants and Advocate Davies all the Respondents except for the independent Directors who were represented by Advocate Bell.  We are grateful to the advocates for submissions of high quality and to the substantial teams who provided legal and logistical support.

16.    By way of prologue we deal with the application to amend.  Although in correspondence prior to the hearing before him the Deputy Bailiff was invited to consider the proposed amendments on the basis that they were certain to be granted, for whatever reason, the Liquidators in fact made no formal application to amend (DB paragraphs 118 and 133).  The Deputy Bailiff's approach to the proposed amendments was in consequence explicably ambivalent.  He said that he would in principle ignore them by reference to considerations of the balance of prejudice (DB paragraphs 133-4) - but nonetheless did avert to them, it appears on a *de bene esse* basis, and concluded that they would not have affected his decision on forum in any event (DB paragraph 140).  It seems to us preferable, now the application to amend has been made, to determine whether the claim is to proceed on the original or on an amended basis before adjudicating on the substantive matters in issue before us.  There is no doubt that we have power to do so**.**

17.    It would moreover be productive of delay and expense were we not to consider the application ourselves and to direct that it be heard by a judge of first instance.  Furthermore, neither Advocates Davies nor Bell indeed submitted that it was not appropriate for us to consider the application for leave to amend. Their submissions were rather that leave to amend should be refused.

18.    The Cause, as it presently stands, is against all the Directors for damages, jointly and severally, in a sum to be determined at trial exceeding $1 billion together with interest.  We summarise the bases of the various claims as follows.  It is alleged at section C of the Cause that the Directors

owed CCC fiduciary duties to act in the best interests of CCC without regard to the interests of Carlyle and duties to act with skill and care in managing CCC"s business affairs. So far as Carlyle and CIM are concerned, it is alleged that each owed duties, including fiduciary duties, to CCC to act in CCC"s best interests; in addition each owed the same duties as shadow Directors. It is alleged between E.6 to E.14 of the Cause that breaches of the various duties began in about July 2007 and continued through to about February 2008. Each breach is said to be either reckless or grossly negligent or negligent and to have constituted wilful misconduct and been in breach of fiduciary duties and other obligations owed by all the Defendants to CCC. Para 34 of the Cause, part of Section A "Introduction", stated:-

> ―At every juncture, the Defendants breached their fiduciary duties and acted recklessly and/or grossly negligently, by giving priority to The Carlyle Group's interests over those of CCC. What is more, the Defendants well understood and publicly declared their intention to undertake the steps that needed to be taken to maintain CCC as a viable entity, while simultaneously and secretly deciding to do precisely the opposite of what they knew and believed was necessary to save CCC. But The Carlyle Group's relationship with CCC did not reward prudent management and reduction of risk; rather it encouraged the Defendants to continue to increase risk in volatile markets, rather than preserve CCC's capital. In a desire to reap the rewards of outsize returns, the Defendants maintained excessive leverage and low liquidity, and recklessly sent CCC into its inevitable demise. CCC was so unprotected from the known and sustained volatility of the financial markets that by mid 2007 the loss of CCC's entire capital and its collapse became the inevitable consequence."

Further, there is a claim against CIM for breach of the IMA.

19.    The claims for relief are set out under 18 "Claims for Relief" in the Cause. The First to the Eighth Claims and the Eleventh to the Thirteenth Claims are for damages for misfeasance, breach of fiduciary duty, gross negligence and/or negligence as against the Defendants in their capacities as Directors and/or in the case of CIM and Carlyle as shadow Directors. The Ninth Claim, which has now been abandoned, was against CIM for a declaration to set aside the IMA. The Tenth Claim is against CIM for damages for breach of contract.  The Fourteenth Claim is by the Liquidators against the Directors, pursuant to s.106 of the 1994 Law or s.422 of the Companies (Guernsey) Law 2008 ("the 2008 law"), for compensation in amounts to be determined at trial.  The Fifteenth and Sixteenth Claims are again claims by the Liquidators under s. 106 etc., but against CIM and Carlyle, respectively, alleging that each were "officers" of CCC. The Seventeenth Claim is a claim against CIM and Carlyle for the return of CCC"s books and records and other property, in that despite requests for the return of all CCC"s books etc, some but not all books have been returned, and the failure to return all books etc amounts to obstruction of the proper investigation of CCC by the Liquidators. The Eighteenth Claim is a claim against CIM and Carlyle for unjust enrichment.

20.    We summarise the proposed amendments to the Cause as follows.  The Sixth to Eighth Claims are substituted for the original claims thereunder by a claim by the Liquidators against CCC"s Directors for wrongful trading pursuant to s.67C of the Companies (Guernsey) Law 1994 or s.434 of the Companies (Guernsey) Law 2008, against CIM for wrongful trading under the same Laws, and against Carlyle for wrongful trading under the same Laws. Declarations are sought that both CIM and Carlyle were Directors of CCC, as defined by s.67C (7) of the 1994 Law or s.434 (7) of the 2008 Law, and that all Defendants are liable to make such contributions to CCC"s assets as the Royal Court thinks proper. Further, an additional head of relief is for a disqualification order in respect of each of CCC"s Directors, CIM and Carlyle pursuant to s.67A (1) of the 1994 Law or s.428 of the 2008 Law. The last proposed amendment is to add State Street (Guernsey) Ltd, a Guernsey registered company, which provided administration services to CCC under an agreement dated 6 October 2006. The proposed Nineteenth Claim is against State Street and CIM for return of books and records of CCC.

Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

21.     The test to be applied in considering the application for leave to amend is to be found in para 75 of the judgment of Lord Phillips in *NML Ltd v Republic of Argentina* [2011] UKSC 31, which the Deputy Bailiff set out at para 129 of his judgment:-

> —*Where an application is made to amend a pleading the normal approach is to grant permission where to do so will cause no prejudice to the other party that cannot be dealt with by an appropriate order for costs.  This accords with the overriding objective.  Where all that a refusal of permission will achieve is additional cost and delay, the case for permitting the amendment is even stronger."*

He added:
> —*I can see no reason in principle why similar considerations should not apply where an application is made for permission to serve process out of the jurisdiction."*

22.     As the Deputy Bailiff said at para 130 of his judgment, Lord Phillips" reasoning is entirely consistent with the overriding objective which Guernsey has adopted in Rule 1 of the Royal Court Civil Rules, 2007, and there is no reason why that reasoning should not be persuasive and followed in Guernsey.

23.     In respect of all proposed amendments the Directors submitted that leave should be denied because they were all sought for purely tactical reasons i.e. to support the Liquidators" case on forum conveniens.  It seems to us that as long as the proposed amendments were not demurrable and had an independent purpose, the mere fact that they also, if allowed, added weight to the Liquidators" forum arguments could not be a valid basis for objection.  Indeed if they had both substance and purpose, it would be very difficult, if not impossible, to find that they were advanced only for inappropriate tactical reasons.  In any event we are unpersuaded that the Directors" assault under this head had any force.  The issue of proceedings in four jurisdictions, all claiming essentially the same relief, seemed to us to be no more than a conventional exercise of keeping all options open.  Even if at one time the Liquidators might have been open to the notion of a Delaware forum, their later rejection of that possibility was, in our view, nothing other than the product of consideration of its full implications.  There are in the copious files before us instances of both sides emphasising one matter in Delaware and another in Guernsey.  We must concentrate on the objective facts.

24.     In respect of the proposed amendment to plead Wrongful Trading the Directors claimed that it was demurrable.  If this could be made good, it would of course be an irresistible ground for refusal of leave.  We remind ourselves, however, of the dangers of refusing leave in circumstances where the area of law is developing, and it would be preferable to have facts found rather than facts hypothetical before assessing the soundness of a plea.  See *X v Bedfordshire CC* 1995 2 AC 633 at p. 740-741 in a passage on striking out, in the speech of Lord Browne-Wilkinson but equally applicable, *mutatis mutandis*, to refusal of leave to amend:-

> —*In all these cases the defendants are seeking to strike out the claims at an early stage, before discovery has taken place and before the facts are known.  It is therefore necessary to proceed on the basis that the facts alleged in the various statements of claim are true.  It must be stressed that these allegations are not admitted by the defendants.*

> *Actions can only be struck out under* <u>*R.S.C., Ord. 18, r. 19*</u> *where it is clear and obvious that in law the claim cannot succeed.  Where the law is not settled but is in a state of development (as in the present cases) it is normally inappropriate to decide novel questions on hypothetical facts. ......*

> *Much more difficult is the question whether it is appropriate to decide the question whether there is a common law duty of care in these cases. There may be cases… where it is evident that, whatever the facts, no common law duty of care can exist.  But in other*

> *cases the relevant facts are not known at this stage. For example, in considering the question whether or not a discretionary decision is justiciable, the answer will often depend on the exact nature of the decision taken and the factors relevant to it. Evidence as to those matters can only come from the defendants and is not presently before the court...... if, on the facts alleged in the statement of claim, it is not possible to give a certain answer whether in law the claim is maintainable then it is not appropriate to strike out the claim at a preliminary stage but the matter must go to trial when the relevant facts will be discovered".*

25.  The concept of wrongful trading was introduced in the constituent parts of the United Kingdom pursuant to Cork Report of 1982.  The concept of fraudulent trading had required proof of dishonesty and to the criminal standard.  The Committee wished to allow compensation for those who had suffered foreseeable loss as a result of unreasonable behaviour, namely the objectively unreasonable continuation of the incurring of liabilities with no reasonable prospect of meeting them: see paragraphs 1776 – 1790 of the Report.  In Guernsey, section 67C of the 1994 Law (once amended) permits  a declaration of liability where a director, of a company which has gone into insolvent liquidation, at some time before the commencement of winding up knew or ought to have concluded that there was no reasonable prospect of avoiding going into insolvent liquidation.  The proposed amended pleading embraces this concept in the amended Sixth, Seventh and Eighth Claims and tracks exactly the statutory language.  The Directors" submission therefore has to be that the particulars said to give support to the general plea, even if established, did not support it.

26.  The debate between the parties can be epitomized in this way.  The Directors said that as long as insolvency could be avoided by the taking of some measures, the criterion of ,*no reasonable prospect of avoiding insolvent liquidation"* could not be satisfied.  The Liquidators say that for so long as the Directors had set their face against such measures, they could not deploy that hypothetical possibility in order to deny the existence of a mandatory element of the offence.  We need not pronounce on where the balance of arguments lies; it is sufficient to say that, at its lowest, the Liquidators" argument is not untenable.

27.  Two cases were relied on by the Directors for the contrary conclusion.  On a proper reading, neither do. *In re Continental Assurance* [2001] BPIR 733, at paragraph 106, Park J merely referred to typical cases where directors have:

> "*closed their eyes to the reality of the company's position, and carried on trading long after it should have been obvious to them that the company was insolvent and that there was no way out for it*."

In *In Re Marini Ltd* [2004] BCC 173 HH Judge Seymour QC, at paragraph 69 was considering a relatively ordinary trading company and the timing of the taking of radical measures.  The key sentence in that paragraph

> "*I should have been fairly readily persuaded on the totality of the evidence that each of the respondents ought to have appreciated by the time sales up to Christmas 1998 had not produced any improvement in the situation of the company that there was no reasonable prospect of insolvent liquidation being avoided in the absence of radical measures, but even at that stage the evidence did not indicate that insolvent liquidation was anything like inevitable."*

is both *obiter* and, on the issue under scrutiny, ambiguous.

28.  Neither passage enunciates a principle and both cases were determined after a trial.  It is worthy of note that the Cork Committee had in mind the inclusion of liability for those who shut their eyes to the obvious or refrained from asking obvious questions (paragraph 1788) and the test of what an honest reasonable businessman, with knowledge of all the facts, would have done

(paragraphs 1789 and 1790). There seems to us no reason in principle why the conclusion that there was no reasonable prospect of avoiding insolvent liquidation should not be available where it could be based upon the decisions which the Board itself had taken as to the way in which the company was to operate in its hour of difficulty. Assuming that a situation has developed which might be retrievable through radical measures but a Board decides on measures of a diametrically opposed nature, we are not persuaded that there is anything remarkable about a result that such conduct is wrongful. In other words, the relevant director knew or ought to have concluded that, assuming the Board did not depart from its policies, there was no reasonable prospect of avoiding going into insolvent liquidation.

29.    Another proposed amendment was designed to enable the Appellants to seek disqualification of the respondent Directors. The relevant statutory provisions are to be found in Section 67A(1)(7) and Schedule 3 of the 1994 Law. Unfitness of a character sufficient to entitle a court to make such an order is to be determined by reference to, among other matters, the individual‟s probity, competence, solvency, soundness of judgement, diligence and previous conduct. The Directors‟ bold argument that the Liquidators should not be permitted to bring such a claim flies, in our view, in the face of the statutory endowment of their power to do so. The supplementary and somewhat elusive argument that there is a perceptible conflict between the Liquidators‟ application for Directors‟ disqualification and their concurrent application for compensation from the self-same Directors under s.106 of the same law is again irreconcilable with the statutory recognition that they could do either (and, if saw fit, therefore both). The final argument that other bodies with power under the self-same statute to act had not done so leads nowhere. If a basis for a director‟s disqualification is arguably established, a liquidator is best placed to make an application in the context of proceedings where the director‟s conduct is already to be adjudicated upon.

30.    The Directors alleged a lack of particularity of the grounds in support of the application. Whilst there is no specified correlation of Conclusion 6 to particular parts of the preceding narrative, this is no basis for rejecting amendment as long as the general pleading contains material which could – and that is our view – support it. Any such imperfection can be cured later. So far as our experience goes, it is far from unusual for the early stages of such applications to be attended with calls for further and better particulars.

31.    The proposed addition of the eleventh defendant was not seriously contested.

32.    We will accordingly allow all the amendments and so clear the decks for the main (ie forum) issue before us.

33.    On the main issue we have borne in mind the established tests in this jurisdiction for (i) leave to appeal **and** (ii) where a discretionary decision is involved, the limits of powers of the appellate court to interfere.

34.    The general test for determining whether to grant leave to appeal is set out in *McNamara v Gauson* [2009-10] GLR 387, citing and adopting the English Practice Direction (Court of Appeal (Civil Division)) (8) of 1999. Thus (1) leave to appeal will be granted unless an appeal would have no real prospect of success; and (2) leave to appeal may also be granted in exceptional circumstances if there is an issue which, in the public interest, should be examined by the Court of Appeal, such as where a case raises questions of great public interest or questions of general policy.

35.    Where the discretionary decision of a lower court is involved, the limits of the appellate court are the correction of error of principle, of the taking into account of an irrelevant matter, the failure to take into account a relevant matter or the interference with a decision plainly wrong: e.g. *The Abidin Daver* [1984] AC 398, at 420.

36.     The established tests for service out of the jurisdiction are summarised in *Altimo Holdings Investments Ltd v Kyrgyz Mobile Telecom Limited* (2011) UKPC 7 para 71 (quoted by the Deputy Bailiff at paragraph 16).

> "*71.     On an application for permission to serve a foreign defendant (including an additional defendant to counterclaim) out of the jurisdiction, the claimant (or counterclaimant) has to satisfy three requirements: Seaconsar Far East Ltd v Bank Barkazi Jomhouri Islami Iran [1994] 1 AC 438, 453-457.  First, the claimant must satisfy the court that in relation to the foreign defendant there is a serious issue to be tried on the merits, i.e. a substantial question of fact or law, or both.  The current practice in England is that this is the same test as for summary judgment, namely whether there is a real (as opposed to a fanciful) prospect of success: e.g. Carvill America Inc v Camperdown UK Ltd [2005] EWCA Civ 645, [2005] 2 Lloyd's Rep 457, at [24].  Second, the claimant must satisfy the court that there is a good arguable case that the claim falls within one or more classes of case in which permission to serve out may be given.  In this context —good arguable case" connotes that one side has a much better argument than the other: see Canada Trust Co v Stolzenberg (No2) [1998] 1 WLR 547, 555-7 per Waller LJ, affd [2002] 1 AC 1; Bols Distilleries BV v Superior Yacht Services [2006] UKPC 45, [2007] 1 WLR 12, [26]-[28]. Third, the claimant must satisfy the court that in all the circumstances the Isle of Man is clearly or distinctly the appropriate forum for the trial of the dispute, and that in all the circumstances the court ought to exercise its discretion to permit service of the proceedings out of the jurisdiction."*

37.     Of the three key elements the satisfaction of the first two is not now in dispute.  There are serious issues to be tried (DB paragraph 17).  There is a good arguable case as to the gateways. (DB paragraph 66)

38.     As to the third test (ie that Guernsey is the "*clearly appropriate forum*") we start by observing that, although invited to do so, the Deputy Bailiff did not set aside the Lieutenant Bailiff's order serving the other Respondents out of the jurisdiction.

39.     The test for stay of proceedings instituted within the jurisdiction on grounds of forum non conveniens ("a forum test") is set out in the classic case of *Spiliada Maritime Corporation v Cansulex Limited* [1987] 1 AC 460 which has been applied in Guernsey on a number of cases including *Masood v Zahoor (*Royal Court, LB Southwell QC, 9th July 2007) and was referred to below by the Deputy Bailiff (DB paragraphs 20 and 67).  Lord Goff there stated (at p 476B – G):

> —In my opinion, having regard to the authorities (including in particular the Scottish authorities), the law can at present be summarised as follows.
>
> (a)     The basic principle is that a stay will only be granted on the ground of forum non conveniens where the court is satisfied that there is some other available forum, having competent jurisdiction, which is the appropriate forum for the trial of the action, i.e. in which the case may be tried more suitably for the interests of all the parties and the ends of justice.
>
> (b)     As Lord Kinnear's formulation of the principle indicates, in general the burden of proof rests on the defendant to persuade the court to exercise its discretion to grant a stay (see, e.g., the Société du Gaz case, 1926 S.C.(H.L.) 13 , 21, per Lord Sumner; and Anton, Private International Law (1967) p. 150). It is however of importance to remember that each party will seek to establish the existence of certain matters which will assist him in persuading the court to exercise its discretion in his favour, and that in respect of any such matter the evidential burden will rest on the party who asserts its existence. Furthermore, if the court is satisfied that there is another available forum which is prima facie the appropriate forum for the trial of the action, the burden will then shift to the

> *plaintiff to show that there are special circumstances by reason of which justice requires that the trial should nevertheless take place in this country (see (f), below).*

> (c)    *The question being whether there is some other forum which is the appropriate forum for the trial of the action, it is pertinent to ask whether the fact that the plaintiff has, ex hypothesi, founded jurisdiction as of right in accordance with the law of this country, of itself gives the plaintiff an advantage in the sense that the English court will not lightly disturb jurisdiction so established."*

40.    The criteria that govern stay on such grounds are the converse of those set out in the forum element of leave to serve out of the jurisdiction, as noted by the editors of the Supreme Court Practice 2012 at 6.37, 16 p.252.

41.    Since the power to stay proceedings is part of the general case management powers of the court, in exceptional circumstances it may be exercised where the interests of justice so require even where the case does not come within *Spiliada* principles; ie on grounds other than that another jurisdiction is forum conveniens. *Reichhold Norway v Goldman Sachs* 2000 1 WLR 173.

42.    There was some debate before us as to whether the stay ordered by the Deputy Bailiff was a forum stay or a case management stay; paradoxically the Directors argued that it was a forum stay though the reluctance of an appellate court to interfere with exercise of discretion would be particularly strong in respect of a case management decision.  In *Reichhold* Lord Bingham of Cornhill C.J., (at p. 186) cited with approbation the submissions of Counsel.

> _'He did, however, suggest that the court was well able to control its own business, and he accepted that the grant of stays such as this would be a rarity, account always being taken of the legitimate interests of plaintiffs and the requirement that there should be no prejudice to plaintiffs beyond that which the interests of justice were thought to justify."*

and added:

> "*stays are only granted in cases of this kind in rare and compelling circumstances."*

43.    The question of classification is in this instance difficult; the stay ordered by the Deputy Bailiff may most accurately be termed a quasi-forum stay since its basis was the apparent perception of the Deputy Bailiff that for most issues Delaware but, for a residual category Guernsey, was the appropriate forum.

44.    The case law in our view shows that the Court seized whether of an application for service out or an application for stay on forum grounds must identify what is the *forum conveniens* for resolution of ―the *trial of the dispute"* rather than of individual issues within the dispute (see passages from *Altimo Holdings* and *Spiliada* cited above).  Close scrutiny of the Deputy Bailiff's decision persuades us that in the end, for all his careful analysis, he never confronted that key question.   Two sentences which we highlight in the concluding parts of his judgment are significant.

> "*Conclusion*
> 151.    *Returning to the three limbed test laid down by the Privy Council in Altimo Holdings, the merits are not in issue.  I am satisfied that two of the jurisdiction gateways relied upon by the Plaintiffs are available.  I now have to decide whether Guernsey is clearly or distinctly the appropriate forum for the trial of the dispute.  As I have indicated, there are arguments for and against both Guernsey and Delaware.  **If the Plaintiffs had not pleaded any claims for statutory relief, I would be persuaded that Delaware is clearly or distinctly the appropriate forum.**  Having carefully considered the allegations in the*

*cause, I believe the importance to be attached to the exclusive  jurisdiction clause in the IMA outweighs any of the factors that would point in favour of Guernsey and I am not persuaded there is a strong cause to disregard the exclusive jurisdiction clause.*

152.    *All counsel approach the proceedings on the basis that it is preferable that all claims for relief are determined in the same set of proceedings.  I have accepted that the Delaware court will not have jurisdiction over the Section 106 claim, although the Defendants will submit to the jurisdiction of that court in respect of all heads of claim.  It would be unwise for me to assume that the Delaware court will ignore the limits on its jurisdiction and agree to deal with the Section 106 claim.  **Therefore, if the claims for relief all have to be determined in the same set of proceedings, Guernsey is not just clearly or distinctly the appropriate forum, it is the only available forum.**  The same applies to the proposed Section 67 claims in the proposed amended cause if I have to have regard to those claims which as I have explained, I do not believe is necessary.  Even though all the parties accepted the desirability of proceeding in a single jurisdiction, none of them have persuaded me that it is imperative to do so.  As I have endeavoured to explain, I am not persuaded that there is a real risk of conflicting legal or factual conclusions if the statutory claims are severed from the other claims for relief.  Similarly, I am not persuaded that any significant additional costs would be incurred if the statutory claims have to be determined in Guernsey after the other claims have been decided by the Delaware court.  Sending the case to Delaware will not therefore deprive the Plaintiffs of a juridical advantage because the statutory claims will still be available in Guernsey.*

45.    In each instance the Deputy Bailiff's choice is contingent.  Indeed had he concluded that Delaware was clearly the appropriate forum he should logically have set aside the order for service out, which had as its necessary premise that Guernsey was clearly the appropriate forum; but he did not.  This departure from principle by itself entitles us to revisit the exercise of discretion.

46.    There is a further point.  The Deputy Bailiff never at any juncture considered the consequences of his order. True it is that the Directors'' application for setting aside service out had as its alternative an application for a stay.  But neither in their written nor in their oral submissions did any party address this as a viable option; all were content to argue for (on the appellants'' side) Guernsey, or (on the respondents'') Delaware as the forum for resolution of the whole dispute, and for nothing in between, as indeed is reflected in the opening sentence of paragraph 152 of his Judgment quoted above.  We were taken carefully through the transcript of the hearing before him and, apart from a couple of allusive and speculative comments by the Deputy Bailiff, there was nothing at all to indicate that he had in mind the order he in fact made; and as he had invited the parties at the outset to not to deal with peripheral matters, both proceeded on the basis that it was an "*either/or*" case.  Whether or not the Deputy Bailiff's approach constituted (unwittingly) a breach of the *audi alteram partem* rule it is unnecessary to decide.  It is sufficient to note that he did not take into account a material consideration in the exercise of his discretion i.e. how his order would or could work and whether it would better deliver justice than the orders actually contended for by each side.

47.    This feeds into a third point on which the Deputy Bailiff, in our respectful view, erred. Stating (correctly) that all the parties accepted the desirability of proceedings in a single jurisdiction, he continued ―**none of them persuaded me that it is imperative to do so**" (DB paragraph 152).  This inverts the proper approach.  Presumptively all proceedings should be heard in a single jurisdiction; modern cases from *Spiliada* to *Altimo Holdings* require the court to choose which jurisdiction is *forum conveniens*.  It is for a party who contends for fragmentation to contend that (exceptionally) fragmentation is imperative, rather than vice versa.  So, in so far as the Directors sought to defend the Deputy Bailiffs order, the burden lay upon them to justify the split.  It was not for the Liquidators who assaulted it to show why a split could not be entertained.  The Deputy Bailiff relied on no authority for his statement; and we were not shown any which supports it.

Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

48.     On the premise, which we consider we have established, that it is for the above reasons at least proper for us to revisit the DBs exercise of discretion, it is useful to remind ourselves of certain matters which are indisputable.

     i.       The Cause, amended as it will be pursuant to our order raises *ex concessis* triable issues.

     ii.      The Directors have not put in their defence; in consequence it is impossible as of now to know what particular issues a court, where ever it sits, will have to decide.

     iii.     The Royal Court in Guernsey has jurisdiction to consider all the claims.

     iv.      The Chancery Court of Delaware does not have jurisdiction to consider all the claims. As far as wrongful trading is concerned, the Royal Court under the 1994 Law is the only Court which has jurisdiction: see the references to the Court in the 1994 Law, sections 67C and 117(1). As far as directors disqualification is concerned a Delaware court could not exercise a regulatory function conferred only on organs or officers in another jurisdiction. In our view the same must be true by parity of reasoning of the Section 106 claim brought under a Guernsey statute. No evidence submitted by experts in Delaware law by the Directors sought to suggest otherwise or sought to contradict similar evidence submitted by the Appellants experts consistent with this proposition.

     v.       Delaware law will govern the IMA breach of contract claims only. All claims of breach of duty by the Defendants whether as Directors *de jure, de facto* or shadow will be governed by Guernsey law.

     vi.      The Directors were responsible for the choice of Guernsey as the place of incorporation of CCC with the perceived advantages that such choice would bring. The Carlyle Group chose to incorporate CCC in Guernsey and the Director Defendants chose to be Directors of a Guernsey company. They opted, in short, to take advantage of the legal, fiscal and regulatory regimes applicable in Guernsey; furthermore prior to applying to place CCC in liquidation, the Directors considered which forum to adopt for that procedure and again chose Guernsey. All the Directors must have contemplated at the very least that they could be the subject of litigation in Guernsey. In emphasising the alleged primacy of the choice of forum clause (which we shall consider below) they could fairly be charged with blowing hot and cold, or, to mix the metaphor, having their cake and eating it.

49.     In our view factors (iii-vi) tell strongly in favour of Guernsey as the *forum conveniens*. Factors (iii) and (iv) engage the presumption against fragmentation. As to factor (v), where the principal issues are those of internal management of a corporation and correlative breach of duty, the place of incorporation will presumptively be the appropriate forum because of its ability to judge matters by its own standards of business conduct: see, for example, *Ceskoslovenska Obchodni Banka AS v Nomura International plc* 2003 I. L. Pr. 20 at paragraph 12(2) and (5).

50.     It is accepted that the Delaware Court, which, we are told, treats foreign law as law, not fact, could with the assistance of experts rule on matters of Guernsey law; but it is obvious beyond a peradventure that a Guernsey Court will be able to deal more directly, and shortly and cost effectively with such issues which are freighted by considerations of legal domestic policy, potentially particular to offshore jurisdictions. As to (vi) the place of incorporation is, under conflicts rules, the presumptive place for the resolution of disputes internal to a company, whose laws govern those issues: see *Konamaneni v Rolls Royce Industrial Power (India) Ltd* [2002] 1 WLR 1269 at paragraph 128 and *Base Metal Trading Ltd v Shamurin* [2005] 1 WLR 1157 at paragraph 67.

51.     The Directors submit that the Guernsey-specific claims outwith the reach of Delaware jurisdiction should be discounted. We need not repeat what we have said about wrongful trading and directors'' disqualification above. We should however emphasise that the provisions underlying those claims, and those under section 106, have a public interest dimension which gives them a particular importance. In *In re Pantmaenog Timber Co Ltd* [2004] 1 AC 158, the following views were expressed by Lords Millett and Walker of Gestingthorpe respectively:

> —*52.  From the earliest days of the joint stock company the liquidator has exercised functions which serve the public interest and not merely the financial interests of the creditors and contributories.....In consequence…'the community itself has always been recognized as having an important interest in [insolvency proceedings].'"*
>
> —*77.  ...winding up has…a dual purpose....The other is the investigation and the imposition of criminal or civil sanctions in respect of misconduct.....[This function] serves a wider public interest."*

52.   In respect of s106 claims the Directors say that, in fact if not in form, they add nothing to the common law claims. Of section 106 it is said by them (correctly) that it is procedural only; but it is incorrect to assert in consequence that it has no special role.

53.   We understand that this case involves the only application to the courts of this jurisdiction relying upon section 106 of the 1994 Law. It made provisions which apply during the course of a winding up of a company.  The section gives procedural rights to the liquidator, members and creditors.  But, whilst there are references to winding up and a liquidator, these do not, of course, identify that the provisions are a special part of an insolvency code but, as the title of the Part of the Law states, „Provisions of General Application in Winding Up‟.  The Liquidators plead that this company is being wound up because of a special resolution, on the application of the Directors, after the entire capital had been lost.  On taking office they stated that the company was unable to pay its debts and that there would be no distribution to shareholders.  The Liquidators being officers of the Court this court is entitled to proceed upon their statements on these fundamental matters.  The s. 106 claims in this litigation are being pled in the aftermath of and as part of the winding up of an insolvent company.

54.   The section, as the Deputy Bailiff stated (at paragraph 41 of his judgment), is in terms similar to, but not identical with, those of s. 212 of the Insolvency Act 1986 (as amended from time to time) in force in England and Wales.  This court is able to proceed, therefore, upon the basis of relevant judicial pronouncements from that other jurisdiction as to certain aspects of s.212 which are germane to the issues in this case.

55.   Put shortly, those indicate that, over many decades, the provision has been interpreted as providing a summary form of remedy to the specified persons who may rely upon it, but not innovating upon the nature of the obligations, breach of which will incur the potential intervention of the courts into the running of a company prior to its winding up: see, for example, *Revenue & Customs Commissioners v Holland* [2010] 1 WLR 2793, where. at paragraph 51 Lord Hope of Craighead DPSC said:

> —*Mr Knox submitted that the discretion under section 212 was wide enough to allow the court to reduce the award to nil even if it declined relief under section 727 of the 1985 Act. I agree with Rimer LJ that the discretion under section 212(3), which is essentially procedural in nature, is a discretion as to amount only once liability has been established. It is not so wide as to allow the judge, having determined that the section applies, to decline to make any order at all: see paras 108—110. The discretion which he is given by section 212(3) is as to the order that would be appropriate once liability has been established, not to grant relief against liability. It is a discretion as to how much the director should be ordered to pay, so as to do what is just in all the circumstances: see In re Loquitur Ltd [2003] 2 BCLC 442, para 245, per Etherton J."*

See also Lord Collins of Mapesbury JSC at paragraph 55:

> —*.....setion 212 is a procedural provision which does not create any substantive obligations, and consequently for a person to be made liable under section 212, that person must be guilty of breach of an independent duty: In re Canadian Land*

> *Reclaiming and Colonising Co (Coventry and Dixon's case) (1880) 14 ChD 660; In re City Equitable Fire Insurance Co Ltd [1925] Ch 407."*

56.     The provisions of s106 should, therefore be viewed as both summary and discretionary.  As such, and particularly remembering that the provisions apply during a winding up, the procedure which should accompany the provisions should be expeditious, and the case management very much under the direction of the court: for example as to timeframes and to the need for and modes of proof. Section 106, therefore, whilst being procedural in the sense of not establishing a new or independent liability, does establish a new discretionary remedy, available upon liquidation, to the liquidator and others.

57.     It is also to be borne in mind that in *In re B Johnson* [1955] 1 Ch 634, at 647, Evershed MR stated of the then equivalent English provisions:

> ―*Section 333, it has been many times said, is a purely procedural section. **I do not in the least seek, by so stating, to lessen its significance**: I mean (to restate it) that it does not create any new cause of action; it only provides a method of litigating particular claims; and, in providing a method, it is not exclusive. Prima facie (though, as will be later seen, there are difficulties in the plaintiff's way in this case), if the procedure of section 333 is not open against any person who is within the section, the claimant may proceed by ordinary action. But there is this procedural difference, which may, I think, indicate the kind of case to which it is intended to refer: whereas, in an ordinary action, it would be open to the person charged to bring in (if it were proper procedurally to do so) some third party whom that person might seek to make responsible; in a case under section 333, no such third-party procedure appears to be available."*
> *(*our underlining)

58.     The present case therefore is one in which the Liquidators" reliance on s. 106 is unlikely to provide a different remedy to that which they plead at common law.  But, hypothetically, had the Liquidators thought that a court might be reluctant to grant the remedy sought at common law, or had they been concerned as to delays in common law procedures, the very fact of liquidation would have permitted them access to the s. 106 remedy.

59.     As a result of the implementation of s. 6 of the Companies Amendment Guernsey Law 1996, (a section given the heading ‚Provisions relating to directors, fraudulent trading, etc.") section 67F of the Companies (Guernsey) Law, 1994 (as amended) provided, among others, that Company Articles exempting persons from liability pursuant to sections 67A-D or any other provision of the Law are void.  Upon an ordinary interpretation of this provision, as the Deputy Bailiff uses at paragraphs 54 to 62, it will embrace s. 106, which imposes a liability.  The fact that the same liability is imposed at common law and that the section does not create a new liability does not detract from the fact that the section imposes a liability if sought by certain persons, in certain circumstances and if deemed appropriate by the court in the exercise of its discretion.  Such a result is not inappropriate having regard to other considerations.  First it is to be noted that neither s. 67A (Disqualification Orders) nor s. 67B (Fraudulent trading orders) require that there be an insolvency.  Further, the new provisions were inserted in the general sector, Part XI: Directors, of the principal Law and not, for example in Part XVI: Compulsory Winding Up.

60.     For decades legislators have been astute continuingly to monitor the operation of limited liability companies and to protect the public from abuse of the protection from some liabilities which incorporation brings.  One of the protective mechanisms is that, upon winding up, the process of winding up is in the hands of an officer of the court, the liquidator.  That process brings with it, therefore, an independent appraisal of the manner in which the company has been operated, by a person not bound to the commitments of the company and those with whom it has contracted.  In a different context, that of a contractual agreement to arbitrate, the Court of Appeal in Singapore

expressed the following views in *Larsen Oil and Gas v Petropod* [2011] 3 SLR 414, at paragraph 48:

> "When a company becomes insolvent, its assets are impressed with a statutory trust that is administered by the liquidator for the benefit of the company's creditors (see Ng Wei Teck Michael v Oversea-Chinese Banking Corp Ltd [1998] 1 SLR(R) 778). That being so, the creditors of the insolvent company are the parties with the real interest in any dispute that involves the insolvent company, since they are the ones who stand to lose or gain from any diminution or augmentation of the company's assets. Since these creditors are not parties to the arbitration agreement between the insolvent company and its arbitral counterparties, it is very hard to justify why the liquidator (who represents the creditors) should be compelled to give up its rights to judicial remedies in favour of arbitration."

61.    Those views were expressed in the context of insolvency, which is not a qualifying factor chosen by the legislature in this jurisdiction for the operation of s. 67F, but the views appear equally applicable for a s. 106 scenario. A company would have had a claim against its Directors but does not pursue it (a) because it is controlled by its Directors and (b) because the (other) members, who might have sought a derivative action, did not do so because they were unaware of the salient circumstances giving rise to a claim. Had there been a derivative action it would have been met by the contractual defence of exemption from liability. Why, when the Directors have either chosen, or been forced by circumstances, to place the company in winding up and a liquidator has grounds for bringing a s.106 application against a court, otherwise entitled to make a discretionary order, be precluded from doing so by a pre-insolvency contract between the company and its Directors or third parties? The following points were discussed in argument.

62.    The parties both referred to a passage in a policy letter from the State Advisory and Finance Committee, dated 26 January 1996, on the proposed amendments to the 1994 Law. Whilst this may have lacked the interpretative significance of more formal *travaux preparatoires, i*t nonetheless indicated that some of those considering possible legislative amendments had in mind precluding the restriction on s. 106 remedies, but through the medium of what was permissible in company articles. S. 67F makes no reference to s.106, hence the present issue; but it may be worthy of some note that the terms of that section include restriction both through company articles as well as contract with the company. There appears to be no intervening statement on behalf of the promoters of the amendment. On any view therefore the letter gives no indication that the result of the ordinary interpretation is not to be relied upon.

63.    It was submitted for the Directors that, by cross-reference to ss 29 and 30 (which imposed liabilities) s. 106 could not properly be interpreted as resulting in the imposing or incurring of a liability. Such a contention cannot withstand the scrutiny of s. 106. Whilst the section does not create a new cause of action, it provides a procedure which, once properly instigated and duly accepted by the court, imposes a liability in such measure as the court determines. The ultimate liability might (or might not) be the same as might have been imposed through common law procedures based upon the same facts, but whilst the basis for the accrual of the cause of action would have been the same, the liability is determined upon through and imposed by means of the statute.

64.    The Directors also suggested, by reference to older English authority and to the new 2008 Guernsey Law, that the result of the ordinary interpretation would be surprising in that there would be no saving provisions in respect of a s. 106 matter. Again that submission does not withstand a proper scrutiny of s. 106. The structure of the section is that there be (under subsection 1) the basis for an application, and (under subsection 3) the possibility of an examination of conduct following which there may be a discretionary order ‚*as the Court thinks fit*'. Such a provision, in its simple and clear terms, allows for a discretionary approach which is

well capable to consider all issues as to consideration of conduct preparatory to determining upon an order.

65.    Speaking of ss 212 – 214 of the Insolvency Act 1986 in *Re Pantmaenog Timber Co Ltd* [2004] 1 AC 158, at paragraph 79, Lord Walker of Gestingthorpe said:

—Ever since the 1862 Act the court has made clear that these procedures exist for the protection of the general public, not in the interests of the creditors or shareholders of the particular company which is in liquidation. Indeed it may be contrary to the financial interests of the creditors and shareholders for these procedures to be invoked."

The foregoing conclusion as to the proper interpretation of s. 67F is consistent with that general aim.

66.    The s. 106 claims were pled at the outset of this action. Whilst, as indicated above, reliance on s. 106 is unlikely to provide a different remedy for the Liquidators to that which is pled on behalf of the company at common law, there may be procedural advantages to the Liquidators in seeking to rely on it and they are entitled to do so. The entitlement of a litigant to rely on maintaining broadly similar rights of action was recognised by Lord Goff of Chieveley in *Henderson v Merrett Syndicates Ltd* [1995] 2 AC 145, 193H-194D. As his lordship said there, *" I do not find it objectionable that the claimant may be entitled to take advantage of the remedy which is most advantageous to him".* Unless a claim is manifestly without possible foundation, this court cannot exclude from contemplation the right of the Liquidators to rely upon s. 106. The Cause, as it stands unamended, sets out claims based upon allegations of misfeasance and breach of fiduciary duty which cannot be said to be without any possible prospect of success.  They must be recognised, at this stage of proceedings, as proper parts of the whole case which is brought against the various defendants.

67.    The Directors further submit in the alternative that the findings made by a Delaware court on matters over which they have jurisdiction will dictate (or at least may fruitfully inform) the outcome of the Guernsey specific claims.  Putting it broadly, they contend that once the Delaware court has pronounced on what the Directors did or did not do, and whether by such acts or omissions they breached their duties as Directors, those findings can be relied on by the Guernsey court to determine whether they were guilty of Wrongful Trading, should pay compensation under section.106, or be disqualified.

68.    This ambitious submission ignores several key factors.  First unless and until the defences are served we cannot predict upon what issues the Delaware Court may be invited to pronounce. Secondly we cannot predict upon what issues the Delaware Court will in fact pronounce.  It is, for example, possible that the Directors will jointly or severally seek to rely upon the standard indemnity in article 157 of the Articles of CCC**,** or clause 6 of IMA as a preliminary issue. Thirdly it is by no means clear that the findings of the Delaware court will satisfy the criteria of issue estoppel, which are conveniently summarised in Spencer Bower and Handley (4th Edn) ("Spencer Bower" paragraph 1.02), and endorsed by the Supreme Court in *R (Coke-Wallis) v ICAEW* [2011] UKSC 1 at para 34.   Fourthly it is not inconceivable that at any rate the Liquidators might in any event be able to take advantage of an exception to issue estoppel where new evidence is discovered [Spencer Bower: para.8.31]. We have in mind the salutary warning of Dillon LJ in E I *du Pont de Nemours v Agnew* 1998 2 LLR 240 at p.245 where claims under product liability insurance were commenced in both England and in Illinois.

*"Other issues were also canvassed.  But in my judgment it is not proper for this Court to attempt to decide any of these issues at this stage.  As yet there has been no final judgment of the Illinois Court, and inevitably there has been no application by the insurers to amend their pleading in the English proceedings to rely on a final Illinois judgment as an estoppel.  The present application for a declaration that the insurers will not be entitled to rely on any such judgment as an estoppel is therefore necessarily premature: Re Clay, [1919] 1 Ch.66 and Re Barnato, [1949] Ch. 258.  In addition the*

*course of the argument on this appeal, and the cases cited where the Courts have had to consider issues of cause of action estoppel or issue estoppel, all show that to decide any such issue an analysis, and possibly a very close analysis, is necessary of what the decision, which is said to have given rise to the estoppel, decided and on what grounds. But that is not possible until after the decision has been made and its grounds are known. Again, until the decision of the Illinois Court is available, and the insurers have formulated their plea of estoppel in the English proceedings, it cannot really be known what estoppels are being set up and it may be possible that there are estoppels on some issues which ought to be recognised by the English Court: e.g. an issue estoppel precluding Du Pont from disputing that on the facts of their participation in the wrongful act they are under Illinois law – whatever its relevance to the English proceedings – precluded from claiming indemnity from the insurers against the punitive damages. To make either of the declarations claimed now would, in my judgment, be premature."*

[See also to like effect Neill LJ at p.249, Stocker LJ at p.250.]

We do not accept that *Texan Management v Pacific Electric* [2009] UKPC 46, upon which the Directors relied, provides a compelling precedent to contrary effect. In that case the issue was as to ownership of shares. Once the Hong Kong Court had pronounced on ownership, the BVI register would necessarily be amended, if necessary, to reflect its findings as a purely ministerial act.

69.    The Deputy Bailiff was clearly attracted by the idea that the Delaware Court would in fact, if not in form, solve any issues for the Guernsey Court. He said:

"*If the case, as presently pleaded, goes ahead in Delaware the facts and the causes of action will be proved or otherwise in that jurisdiction. Advocate Davies has acknowledged that will create an issue estoppel. The Plaintiffs could then pursue a separate action for the relief under statutory claims in Guernsey, relying upon the Delaware decision. I do not believe it would involve a lengthy hearing or be expensive.*" DB Paragraph para 136.

70.    It was, in this Court"s view, odd to suggest that the Directors ‚acknowledged" (sic) that there would be issue estoppels. Rather it was for them to aver the same. The Liquidators" certainly did <u>not</u> accept such estoppels would be created. This articulation of this throwaway line appears to this Court to be another consequence of the Deputy Bailiff going in a direction not signposted by any party and without the full benefit of their forensic analysis.

71.    The Deputy Bailiff also grappled with a question of what the dispute was in essence all about. At the hearing before the Deputy Bailiff the Advocates for each of the parties sought to persuade the Deputy Bailiff that their "*characterisation*" of the nature of the case being advanced by the Liquidators in the Cause was the correct one. The Deputy Bailiff considered the parties" submissions on this matter between paras 80 and 101 of his judgment. It is to be noted that he changed his mind, having initially been persuaded by Advocate Wessels" submission but in the end agreed with Advocate Davies" contentions – see paras 81 to 83 and 101 of DB judgment.

72.    The issue before us is whether the Deputy Bailiff fell into error by considering this issue at all, or if he was entitled to do so, whether he himself mischaracterised the nature of the Cause in that he accepted the submissions of Advocate Davies in preference to those of Advocate Wessels.

73.    We start by reminding ourselves of how the Deputy Bailiff considered the matter. At para 82 he said that when he first read the Cause his impression was that the main thrust was directed at all the Directors, whether *de jure* or *de facto* or shadow Directors, their duties and their alleged failures to act in CCC"s best interests. The main allegations were directed to the failure of the business model and failure to take strategic action to deal with the risk arising from market volatility and global economic crisis. It would be a matter for the trial court to decide precisely

where to draw the line between areas of responsibility delegated to CIM under the IMA and those areas where, either as a matter of contractual interpretation, or by Guernsey law, or by regulation, or otherwise, the board of Directors could not delegate but instead retained responsibility themselves.

74.    At para 83 the Deputy Bailiff said that, in order to understand whether one party has mischaracterised the nature of the claim, he must look at the substance of the case and decide whether the allegations were "the product of artful pleading", a phrase taken from para 59 of the affidavit of Allen Terrell, the Directors' expert on Delaware law.   Mr Terrell stated that Delaware courts have found that a forum selection clause was not to be defeated by artful pleading of claims **not** based on the contract containing the clause if those claims "grow out of" the contractual relationship or if the gist of the claims is a breach of that relationship.

75.    Between paras 86 and 95 the Deputy Bailiff concentrated his analysis on the terms of the appointment of CIM, which he describes as "*wide*", and the extent of the delegation thereunder to CIM.  He alluded to the fact that investors in CCC "were fully aware" that CIM was the investment manager, that one of the independent Directors (the Seventh Defendant) swore an affidavit to the effect that CIM implemented the investment guidelines of the board of Directors of CCC and that CIM carried out the every-day management and operations of CCC pursuant to the IMA. At para 94 the Deputy Bailiff said that looking at paras 57 to 59 of the Cause (which he set out) the Plaintiffs themselves understood the position to be that CIM was the investment manager and advisor to CCC with full discretionary investment management authority to implement the investment guidelines of CCC and to perform its day to day management and operations of its business subject to the oversight of CCC's directors, that CIM and TCG developed CCC's business model, and that in addition CIM provided investment management services to other affiliates within the Carlyle Group with similar or overlapping investment strategies.At para 95 he extracted various parts of the Cause as part of his analysis leading up to his conclusions in subsequent paragraphs.

76.    At para 98 the Deputy Bailiff stated that the alleged failures of the directors of CCC were "*essentially*" failures to act otherwise than in accordance with the advice of CIM or to adopt policies different from those recommended by CIM and Carlyle. At para 100 he said that it seemed to him that the "*starting point*" and "*a key factor*" in the trial court's analysis of the events that led to the collapse of CCC "*is going to be the steps taken, or not taken as the case may be, by CIM and Carlyle under the IMA.*"

77.    Thus it was that the Deputy Bailiff concluded at para 101, as we have already noted, that he had changed his view as to the character and nature of the allegations pleaded and of the case the Directors had to face. He agreed with the submission on behalf of all Directors that "*in substance the case is more concerned with failures of the investment advice, the investment policy, the investment guidelines and generally the duties of CIM under the IMA*". He went on to say that "*those issues need to be understood before considering the failures of the Directors whether they be de jure, de facto or shadow Directors.  In that sense, the breaches of the IMA are the primary issues and the allegations against the Directors are secondary*".

78.    Advocate Wessels submitted to us that this exercise ought not to have been undertaken at all. No authority had been produced by Advocate Davies that an evaluation of the "nature of the case" of a plaintiff was a necessary part of the court's reasoning in a *forum non conveniens* dispute. The Directors had conceded before the Deputy Bailiff that all the issues in the Cause were "serious issues to be tried on the merits i.e. a substantial question of fact or law, or both" – see para 71 of the judgment of Lord Collins in *AK Investment CJSC v Kyrgyz Mobil Tel Ltd [2011]* UKPC 7. It was not accordingly appropriate to conduct a mini-trial as to what was really the nature of the case was.

79.    Advocate Wessels submitted that he had specifically drawn to the attention of the Deputy Bailiff that it was not necessary for him to evaluate the nature of the case, in his written submissions in

reply below – see paras 44 and 48. Alternatively, Advocate Wessels submitted that, if *per contra* the Deputy Bailiff was entitled to consider the nature of the Liquidators" case, he had come to the wrong conclusion at para 101.  He took us painstakingly through the Cause, a very long document consisting of no less than 547 paragraphs plus sub-paragraphs.  He submitted that on any analysis the various causes of action against the Directors were independent of each other, and each was conceded to be "seriously arguable" by the Directors, and thus the court must work on the assumption that they will be made good.  He submitted that what was at the heart of the Liquidators" case as pleaded in the Cause was the setting of the strategy for CCC"s investments and the guidelines in relation thereto by its Directors and/or the failure of the Directors to adjust the strategy and guidelines in the light of changing economic conditions.  In the late summer or autumn of 2007 the guidelines set out by CCC as to investment policy were abandoned. He described that abandonment as the critical focus of the Liquidators" case.

The Directors recognised what they needed to do but did the exact opposite, namely in September 2007 they announced that fundamental revisions to CCC"s business model were required and would be implemented but did the reverse.  Leverage needed to be reduced and the minimum liquidity cushion raised to at least 40%. However what in fact happened, so it is alleged, is that the guidelines were suspended which included a minimum liquidity cushion of 20%, repo lines of a minimum equal to 125% of all outstanding borrowings, and a maximum of 85% of CCC"s capital be allocated to RMBS. All this, and continuing breaches of duty thereafter, were driven, so it is alleged, by a desire to give priority to the interests of Carlyle over those of CCC.

80.    Advocate Davies, supported by Advocate Bell who adopted the submissions of Advocate Davies, submitted to us that the exercise undertaken by the Deputy Bailiff was a necessary part of the evaluation of a court in a *forum non conveniens* dispute, particularly so in the instant case where the IMA contained an exclusive jurisdiction clause in favour of the courts of Delaware. If the nature of the case was indeed primarily about the alleged failures of CIM under the IMA, then the IMA and hence the exclusive jurisdiction clause was central to the dispute before the Deputy Bailiff. He referred us to the case of *Berliner Verkehrsbetriebe (BVG) Anstalt Des Offentlichen Rechts v JP Morgan Chase Bank NA & anor* [2010] EWCA Civ 390, [2010] 1 CLC 628 which involved whether the English court should have jurisdiction pursuant to the parties" contract or whether a German court should have jurisdiction pursuant to Article 22 (2) and Article 25 of Council Regulation (EC) No 44/2001, viz the Jurisdiction and Judgments Regulation.

81.    Advocate Davies referred to paras 22 and 23 of the judgment of Aikens LJ to the effect that the judge (Teare J) typified the questions that had to be asked under the Articles which we summarise broadly as what was the nature of the case or what were the principle issues.  Thus, Advocate Davies submitted that as the IMA brought in the exclusive jurisdiction clause, it was necessary for the court to undertake an evaluation of the nature of the Appellants" case.  The analogy between the authority of Berliner and the instant case was that, as in Berliner there was a competition between an exclusive jurisdiction clause in favour of the English courts and a regulation which favoured a German court, so in the instant case there was a competition between an exclusive jurisdiction clause favouring Delaware and claims in the Cause (and in the proposed amendments thereto) which only a Guernsey court could decide e.g. s.106 and s.67A and C.  He submitted that the Deputy Bailiff was correct to conclude that the role of CIM was at the centre of the Appellants" case and that the breach of duties of the Directors of CCC was secondary.  CCC had delegated to CIM very wide discretionary management authority, in particular as to its investments. The claim against the Directors is essentially that they failed to supervise CIM or to realise that what CIM had done was in breach of duty.  Thus, if CIM was not liable in the terms of the pleaded claims, it would be almost inconceivable that the de jure Directors of CCC would be held liable.

82.    Advocate Davies submitted to us that, whether the Liquidators" claim was characterised as one for breach of duty involving corporate governance and internal management or breach of duty arising under the IMA, the claim against CIM under the IMA was central to all the claims.

Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

Alternatively he submitted that if the Deputy Bailiff had mischaracterised the Liquidators" case, then their case cannot override the exclusive jurisdiction clause. It outweighs everything else.

83.    We are of the opinion that it was not part of a court"s function to undertake the sort of exercise undertaken by the Deputy Bailiff in the instant case. No authority has been produced in support of Advocate Davies" proposition that such an exercise should be undertaken in a forum non conveniens dispute. In our view the case of Berliner is plainly distinguishable in that the relevant Articles required the court to undertake such an exercise in the circumstances of that case. Furthermore, Advocate Davies conceded, rightly in our view, that if the Liquidators had chosen to claim against only the de jure Directors of CCC no evaluation of the nature of the case could have been undertaken.   Those claims, it has always been conceded by the Directors raise seriously arguable issues.

84.    Had only the de jure Directors been sued, it would not have been open to the Directors to submit that the true dispute was about CIM and the IMA, and hence bring in the exclusive jurisdiction clause. It would have been left to the Directors to plead, by way of defence, that the role of CIM was paramount in the light of the allegations (i.e by the Directors" delegation of the director"s duties to CIM under the IMA). Why then, we ask rhetorically, should the mere joinder of CIM alleging, *inter alia* against that entity, breaches of contract under the IMA, fundamentally alter the nature of the Liquidators pleaded case against the Directors  in such a way that the IMA takes centre stage? Surely it is for the trial court, having heard the evidence and submissions, to conclude what is the true position. Accordingly we conclude that the Deputy Bailiff erred in conducting such an exercise.

85.    If, however, we are wrong in concluding that the Deputy Bailiff ought not to have undertaken the exercise that he did, we nevertheless are of the opinion that he manifestly came to the wrong conclusion. We have carefully reread the Cause in the light of the submissions made to us by both Advocates, who took us through the Cause highlighting those of its parts which supported their contentions as to the nature of the Liquidators" case against the Directors. We do not consider that the Liquidators have indulged in "*artful pleading*".

86.    To us the nature of the case, as pleaded in the Cause, is as follows. The first four Directors were intimately connected to Carlyle, of which CIM, TC Group and TCG Holdings were associates controlled by Carlyle. Mr Conway, it is pleaded, was joint managing director of TCG Holdings, which was the sole managing member of TC Group.  He was also joint managing director of CIM, which was owned as to 75% by TC Group with power to direct and control CIM.  Mr Hance was an officer of CIM.  Mr Stomber was an officer of TC Group, joint managing director of TC Group, and managing director of CIM. Mr Zupon was a founding member of Carlyle and managing director of Carlyle.  Each of the above were Directors of CCC.  Mr Conway was a member of CCC"s investment committee.  Mr Hance was the non-executive chairman of CCC and a member of its investment committee. Mr Stomber was the President and Chief Executive Officer of CCC, and a member of its investment committee.  Mr Zupon was a member of CCC"s investment committee.  There were then of course the independent Directors of CCC, namely the Fifth, Sixth and Seventh Respondents.

87.    We consider that what is set out in the Introduction to the Cause, which might well have served as its conclusion, is an accurate summary of what is pleaded in detail thereafter. The Carlyle Group held all the voting shares of CCC. The Directors of CCC were as above, the first four intimately bound up with Carlyle. The Directors set the investment guidelines, details of which are set out in para 7 of the Cause.  It was the Directors" responsibility to set the investment managing guidelines and to alter them in the light of changing economic conditions. That critical function was not delegated by CCC to CIM under the IMA. The maintenance of an unencumbered minimum liquidity cushion was fundamental to the management of CCC"s leveraged investment portfolio.  By about the second quarter of 2007 the global credit markets were deteriorating and subprime mortgages defaults were increasing. This eroded the value of RMBS and other financial assets.  The Directors were aware of the escalating risks.  However, so

it is pleaded, far from selling RMBS and reducing CCC"s leverage, both of which, it is alleged, were in CCC"s interests, more RMBS were purchased and the leverage was not reduced.  The minimum liquidity cushion became inadequate.  Margin calls were at risk. In September 2007 fundamental revisions were decided upon i.e leverage was to be reduced and the minimum liquidity cushion raised from 20% to 40%.  It is pleaded that no steps were actually taken to implement those revisions; indeed it is pleaded that the investment guidelines were suspended. Thereafter it is pleaded that the Directors took no steps to preserve the assets of CCC but continued along the same path of a downward spiral. It seems to us that the nub of the Liquidators" case is to be found in paras 30 and 34 of the Cause, i.e. the Directors did not manage CCC"s investments prudently but put the interests of Carlyle above those of CCC. All these allegations are then expanded in very considerable detail in the Cause.

88.     Whilst we, of course, take into account those parts of the Cause highlighted by the Deputy Bailiff between paras 93 and 95 of his judgment, we cannot agree that looking at the Cause as a whole the core of the Liquidators case can be characterised as "*the alleged failures of the Directors of CCC are, essentially, failures to act otherwise than in accordance with the advice from CIM or adopt policies different from, and independent of, the recommendations being received from CIM and Carlyle*" (para 98).  Nor, with respect, can we agree with his conclusions at paras 100 and 101.  In arriving at his conclusions the Deputy Bailiff does not appear to have appreciated the part of the Cause which in essence pleads that the Directors of CCC were being advised <u>by</u> <u>themselves</u> in their capacity of being so intimately involved in Carlyle or that they allegedly breached their duties by putting the interests of Carlyle before that of CCC.

89.     What the Directors were doing before the Deputy Bailiff was in essence to extract from the Cause parts which might be said to foreshadow, even support they would say,  a defence in the future from the Directors (or at least of the de jure Directors of CCC), namely that they had delegated their responsibilities to CIM under the IMA. If such may be their defence, or one of them, then that is a matter for them to plead and for the trial court to decide having heard the evidence.

90.     Advocate Davies, in paras 222 to 228 of his submissions before us, contended that the allegations against the Directors are at bottom primarily allegations that arise out of the services performed under the IMA by CIM, the external manager of CCC"s business. Thus he contended that the authorities demonstrate that where the day to day operation of a company"s business is vested in an external manager, the Directors" duties are inevitably different from a situation where the director himself is managing the business. Advocate Davies drew our attention to *John v Price Waterhouse & anor* [2001] All E.R. 123, a decision of Ferris J, which he contended was similar to the instant case. This then led to the submission that in the instant case there was a confined residual role for the Directors of supervision more than a management role.

91.     The case of *John v Price Waterhouse & anor* involved a claim by Sir Elton John and various companies connected with him for damages for negligence against Price Waterhouse. A similar claim was made by the corporate claimants against Andrew Haydon.  Sir Elton placed his career in the hands of an individual called John Reid and a company formed by him, John Reid Enterprises Ltd ("JREL"), of which Mr Haydon, a chartered accountant, became a director and ultimately managing director.  Several management agreements were entered into between the claimants and Mr Reid and JREL. Mr Haydon was a director of two of the corporate claimants. Advocate Davies particularly relied on a passage at para 298 in the judgment of Ferris J where he said that the engagement of JREL left the Directors of the two corporate claimants with nothing to do except such formal acts as only the Directors personally could carry out. The judge found that Mr Haydon was running the companies but in his capacity as an executive of JREL. Advocate Davies submitted that that authority was analogous to the instant case.

92.     It is to be noted that the decision of Ferris J was one handed down <u>after</u> he had heard the evidence and submissions thereon.  All the claims against Mr Haydon were dismissed on the facts – see paras 270 to 300, and in particular para 300 (2). Para 298 was very much a finding of

Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

fact.  In the instant case it will be for the trial judge to decide, having heard the evidence, what was the true position.

93.     Furthermore, in the instant case the capacity in which Carlyle purported to act is a very live issue, particularly, so say the Liquidators, in circumstances in which they allege that there was a conflict of interest and where it is alleged the Directors subordinated the interests of CCC to their own.  As we have said, it has always been conceded by the Directors that all the allegations of breach of duty pleaded in the Cause are seriously triable issues. Accordingly, we do not consider the case of *John v Price Waterhouse & anor* to be of assistance at this stage of this litigation.

94.     The result of this effort at characterisation of the claims was to uplift the importance of the forum selection clause (the "FSC") – the jewel in the crown of the Directors" submissions.  Section 9 of the IMA provides [as quoted by the DB para 71].

> "*This Agreement shall be governed by, and construed in accordance with, the laws of Delaware, without giving effect to the choice of law principles thereof.  The federal or state courts sitting in Delaware shall have exclusive jurisdiction over any action, suit or proceeding with respect to this Agreement and each party hereto hereby irrevocably waives, to the fullest extent permitted by law, any objection that it may have, whether now or in the future, to the laying of venue in, or to the jurisdiction of, any and each of such courts for the purposes of any such suit, action, proceeding or judgment and further waives any claim that any such suit, action, proceeding or judgment has been brought in an inconvenient forum, and each party hereto hereby submits to such jurisdiction.  The parties hereby agree that no punitive or consequential damages shall be awarded in any such action, suit or proceeding.*"

*A*rguments will, we recognise, arise under Delaware Law as to the extent to which this binds persons other than the parties to the IMA itself i.e. CCC and CIM.

95.     The Directors directed the Deputy Bailiffs attention to *Donohue v Armco Inc* [2002] 1 Lloyd"s Rep. 425 [DB paras 73-74] where Lord Bingham of Cornhill said:

> ―*24.   If contracting parties agree to give a particular Court exclusive jurisdiction to rule on claims between those parties, and a claim falling within the scope of the agreement is made in proceedings in a forum other than that which the parties have agreed, the English Court will ordinarily exercise its discretion (whether by granting a stay of proceedings in England, or by restraining the prosecution of proceedings in the non-contractual forum abroad, or by such other procedural order as is appropriate in the circumstances) to secure compliance with the contractual bargain, unless the party suing in the non-contractual forum (the burden being on him) can show strong reasons for suing in that forum.  I use the word ―ordinarily" to recognise that where an exercise of discretion is called for there can be no absolute or inflexible rule governing that exercise, and also that a party may lose his claim to equitable relief by dilatoriness or other unconscionable conduct.  But the general rule is clear: where parties have bound themselves by an exclusive jurisdiction clause effect should ordinarily be given to that obligation in the absence of strong reasons for departing from it.  Whether a party can show strong reasons, sufficient to displace the other party's prima facie entitlement to enforce the contractual bargain, will depend on all the facts and circumstances of the particular case.  In the course of his judgment in The Eleftheria, [1969] 1 Lloyds Rep. 237 at p.242; [1970] P.94 at pp.99-100, Mr Justice Brandon helpfully listed some of the matters which might properly be regarded by the Court when exercising its discretion and his judgment has been repeatedly cited and applied.  Mr Justice Brandon did not intend his list to be comprehensive, but mentioned a number of matters, including the law governing the contract, which may in some cases be material.  (I am mindful that the principles governing the grant of injunctions and stays are not the same: see*

*Aérospatiale at p.896. Considerations of comity arise in the one case but not in the other. These differences need not, however, be explored in this case*

25. *Where the dispute is between two contracting parties, A and B, and A sues B in a non-contractual forum, and A's claims fall within the scope of the exclusive jurisdiction clause in their contract, and the interests of other parties are not involved, effect will in all probability be given to the clause. That was the result in Mackender v Feldia AG [1967] 2 QB 590; Unterweser Reederei GmbH v Zapata Off-Shore Co (_The Chaparral') [1968] 2 Lloyd's Rep 158; The Eleftheria, [1969] 1 Lloyd's Rep. 237; [1970] P 94; DSV Silo- und Verwaltungsgesellschaft mbH v Owners of the Sennar and 13 Other Ships (_The Sennar' (No. 2)) [1985] 1 WLR 490; British Aerospace Plc v Dee Howard Co [1993] 1 Lloyd's Rep 368; Continental Bank NA v Aeakos Compania Naviera SA and Others [1994] 1 WLR 588; Aggeliki Charis Compania Maritima SA v Pagnan SpA (_'The Angelic Grace'') [1995] 1 Lloyd's Rep 87; and Akai Pty Ltd v People's Insurance Co Ltd [1998] 1 Lloyd's Rep. 90. A similar approach has been followed by courts in the United States, Canada, Australia and New Zealand: see, for example, M/S Bremen v Zapata Off-Shore Co (1972) 407 US 1; Volkswagen Canada Inc v Auto Haus Frohlich Ltd [1986] 1 WWR 380; FAI General Insurance Co Ltd v Ocean Marine Mutual Protection and Indemnity Association (1997) 41 NSWLR 559; and Kidd v van Heeren [1998] 1 NZLR 324."*

96. Unfortunately the Deputy Bailiff's attention referred only to the passages about when an FSC should ordinarily be enforced and not to the paragraph where it would ordinarily not be. ie paragraph 27:

—27 *The authorities show that the English court may well decline to grant an injunction or a stay, as the case may be, where the interests of parties other than the parties bound by the exclusive jurisdiction clause are involved or grounds of claim not the subject of the clause are part of the relevant dispute so that there is a risk of parallel proceedings and inconsistent decisions. These decisions are instructive. In Evans Marshall and Co Ltd v Bertola SA and Another [1973] 1 WLR 349 there was a tripartite dispute but only two of the parties were bound by a clause conferring exclusive jurisdiction on the court in Barcelona. Kerr J at first instance was impressed by the undesirability of there being two actions, one in London and the other in Barcelona (pp 363–364). The Court of Appeal took a similar view (pp 377, 385). Sachs LJ thought separate trials particularly inappropriate where a conspiracy claim was in issue (p 377). In Aratra Potato Co Ltd v Egyptian Navigation Co (The El Amria) [1981] 2 Lloyd's Rep 119 the primary dispute was between cargo interests and the owner of the vessel, both parties being bound by a clause in the bill of lading conferring exclusive jurisdiction on the courts of Egypt. But the cargo interests had also issued proceedings against the Mersey Docks and Harbour Co, which was not bound by the clause. The Court of Appeal upheld the judge's decision refusing a stay. In the course of his leading judgment in the Court of Appeal Brandon LJ said, at p 128: —I agree entirely with the learned Judge's view on that matter, but would go rather further than he did in the passage from his judgment quoted above. By that I mean that I do not regard it merely as convenient that the two actions, in which many of the same issues fall to be determined, should be tried together; rather that I regard it as a potential disaster from a legal point of view if they were not, because of the risk inherent in separate trials, one in Egypt and the other in England, that the same issues might be determined differently in the two countries. See as to this Halifax Overseas Freighters Ltd v Rasno Export (The Pine Hill) [1958] 2 Lloyd's Rep 146 and Taunton-Collins v Cromie [1964] 1 WLR 633." Citi-March Ltd v Neptune Orient Lines Ltd [1996] 1 WLR 1367 also involved third party interests and raised the possibility of inconsistent decisions. Colman J regarded separate trials in England and Singapore as not only inconvenient but also a potential source of injustice and made an order intended to achieve a composite trial in London despite a Singaporean exclusive jurisdiction clause: see at pp 1375–1376. Mahavir Minerals Ltd v Cho Yang Shipping Co Ltd (The M C Pearl) [1997] 1 Lloyd's Rep 566 again involved third parties and raised the possibility*

*of inconsistent findings. Despite a clause conferring exclusive jurisdiction on the courts of Seoul, Rix J refused to stay proceedings in England. He regarded the case as on all fours with Citi-March (see p 575) and at p 569 observed: ―It seems to me that so far the plaintiffs have shown strong cause why the jurisdiction clause should not be enforced. This is indeed a paradigm case for the concentration of all the relevant parties' disputes in a single jurisdiction. If in such a case a host of different jurisdiction clauses were to be observed, the casualty at the root of the action would become virtually untriable. The action would fragment and reduplicate, at vast cost ...”  A similar approach is discernible in [Bouygues Offshore SA v Caspian Shipping Co \[1998\] 2 Lloyd's Rep 461,](#) in which the disputes involved four parties only two of whom were bound by an English exclusive jurisdiction clause. Although the effect of the clause was described by Evans LJ as ―near-conclusive” (p 467), an injunction to restrain proceedings in South Africa was refused. In paragraph 27 of his judgment (at p 466) Evans LJ said: ―In my judgment, two questions arise, one a matter of principle. First, should the Court, when deciding whether or not to enforce the exclusive jurisdiction clause by means of an injunction which prevents Bouygues from continuing with its proceedings against Ultisol in South Africa, take into account the effects of such an injunction on persons who are not parties or entitled to enforce the contract containing the jurisdiction clause, Portnet and Caspian here, but who are both necessary and proper parties to the litigation wherever it is held? In my judgment, the clear answer to this question is ‗yes'. Mr Justice Clarke did so in his judgment and the contrary has not been argued before us. The relevance of the potential effects on third parties has been recognised in other authorities ...” Sir John Knox also held that proceedings should be allowed to continue in South Africa because, among other reasons (see p 470), ―this is the only way in which to minimize, if not avoid altogether, the risk of inconsistent decisions in different jurisdictions.”*

The present is an example, in our view, of the type of cases where a FSC will not be enforced because the grounds of claim are outside it.  It is notable that the Directors‟ expert quoted by the Deputy Bailiff at para 84 said that Courts in Delaware will not allow forum selection clauses to be defeated by artful pleading of:

> *“claims not based on the contract containing the clause if those claims grow out of the contractual relationship .... or if the gist of those claims is a breach of that relationship”*

For reasons we have already discussed, in this case the Liquidators‟ claims are not based on contract: nor do they grow out of the contractual relationship, nor is the gist of those claims a breach of that relationship.

97   The Directors advanced sundry logistical considerations which the DB helpfully summarised paras 141-149.  (See generally Dicey, Morris, Collins: The Conflict of Laws: 16 ed p.476)

98   For the most part the DB was unimpressed by them.   He recognized that modern communications and modes of travel meant that international businessmen were or should be both available and able to litigate without difficult in a variety of fora and could not sensibly complain if the forum chosen was the place where they had incorporated a company, whose fate lay at the heart of the litigation (paras 142 and 147).  He discounted any notion that a Delaware trial would take significantly less time than one in Guernsey (para 143).  He accepted that Guernsey‟s case management tools were as effective as those in Delaware (para 144).   He rejected the notion that the Royal Court in Guernsey lacked the resources to cater for protracted trials (para 145); or that the Guernsey bar was too small to cope with substantial multi party commercial litigation (para 146). These are precisely the kind of matters involving fact sensitive evaluation in which an Appellate body would, *ceteris paribus*, not embark upon reconsideration of the rational assessment of the first instance tribunal even if it might itself have weighted them differently.

Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

99    The same arguments under this heading were redeployed before us, although we are in the present case free, indeed obliged, to reconsider all matters relevant to the disposal of the appeal for reasons deployed above.    We both can and do endorse the DB"s conclusions as summarised above.    In particular we can vouch from our collective experience as Appellate judges in this jurisdiction for all he has said about the capacity of the domestic Courts and local profession to cope with substantial commercial litigation with an international dimension, a growing phenomenon, reflective of Guernsey"s importance as a financial centre.

100    Why then did the DB finally conclude that the logistical factors to which he rightly attributed, consistently with the jurisprudence, little weight favoured Delaware (para 149)?    It was the consequence of his view that third parties might have to give evidence, and that the process of obtaining the same, if the witnesses were unwilling to come to Guernsey might be "*time consuming and more expensive*"" than if the trial took place in Delaware (para 148) (indeed before us this proposition was amplified into a submission that third parties might be joined in the proceedings).

101    We have three observations.    The first is that the number and identity of such involuntary witnesses is at present unknown; (and Advocate Wessels assured us that the Liquidators themselves had no present intention to join further parties).    The second is that, as the DB himself recognized, the procedures for taking evidence in foreign jurisdiction are indeed "*normal*""; the point has little more force than those referring to the incidents of  litigation with an international dimension that he had already rejected   (DB paras 142 and 147).    Thirdly a submission deployed before us, if not before the DB, that each potential witness would need his own local lawyer as guardian of his interests, reflected a practice, which may exist elsewhere but which we would not wish to encourage as a transplant  in this jurisdiction.

102    There was an an *terrorem* and a speculative element about some of the Directors" submissions under this rubric, elegantly presented though they were, and we are not persuaded to allow them to tilt the balance away from Guernsey.

103    The main points, as we see it, which favour this jurisdiction for disposal of these proceedings are those set out in paras 48 and 49 above, coupled with the need where possible to avoid fragmentation between jurisdictions; see, among a host of citations, *Donohue* cit sup para 36 where Lord Bingham said:

> 36    *In my opinion, and subject to an important qualification, the ends of justice would be best served by a single composite trial in the only forum in which a single composite trial can be procured, which is New York, and accordingly I find strong reasons for not giving effect to the exclusive jurisdiction clause in favour of Mr Donohue.*

The qualification in that case is not present in this [protection against liability under the RICO claims] and so the presumptive position is that fragmentation should be avoided (see Lord Scott at para 75).

104    While it is possible that the anti suit injunction, the subject of a forthcoming appeal, might be lifted and that the Delaware Court might then enjoin prosecution of some part of Guernsey proceedings, so as to create at any rate the possibility of fragmentation, we cannot allow this series of contingencies to divert our attention from the status quo.

105    The Deputy Bailiff himself rightly acknowledged the high desirability of having all heads of relief determined in the same set of proceedings in a single jurisdiction (DB para 137).    We would put it even higher.  Unless split hearings are required, they should be rejected as a *modus operandi*.

106    Advocate Wessels indulged in a final forensic flourish:

> "*Our basic position is: why should the entire trial of this action be split when it can take place in Guernsey?  What good reason has been put forward for that?  Why should these liquidators not be entitled to pursue their statutory insolvency claims in Guernsey?  Why should they be delayed in doing that?  What good reason is there for that?  Why should they not be entitled to proceed with their claims first in Guernsey because those are the claims which contain the valuable exclusions of the indemnities?  Why should anybody think it's a good idea to delay the prima facie stronger claims in favour of the prima facie weak claims?*
>
> *What arguments have the defendants been able to marshal to persuade you that this is not a case that triggers the internal management corporate governance principles that I've discussed?  Why is it not a case about what the governance of this case has done?  Why should this court not determine as a matter of its own law what the duties of directors are, what the duties of shadow and de facto directors are and in accordance with this jurisdiction's public policy work out whether those directors and these defendants are liable?*
>
> *On what basis have the defendants been able to counter the notion that lack of fragmentation is a good argument for breaking through and allowing this case to take place in one jurisdiction?  What have they demonstrated, sir, to suggest that all the other cases that have gone that way – those principles shouldn't be applied in this case?*
> *And the deputy bailiff , having concluded that this jurisdiction was the only place in which all the actions against all the defendants could take place, why shouldn't the action proceed in this court?  Why should the liquidators, as officers of this court, be put to the risk of substantial additional cost, delay and uncertainty of further satellite litigation for a split trial rather than being permitted to pursue all the claims in this jurisdiction in the manner that they have determined to be most efficient rather than allow the defendants to micromanage their case for them?"*

We cannot discern any compelling answer to this congerie of points.

107    Accordingly, we grant leave to amend the Cause as sought.  We give leave to the Appellants to appeal and allow the appeal. We dismiss the Cross-Notices. We set aside the stay granted by the Deputy Bailiff.

108    We add only a coda.  If there are circumstances in which a judge considers that a point on which he may wish to decide the case has not been fully argued, he should invite the parties to address the point in writing or orally as he sees fit.  If in circumstances where a draft judgment is handed down it appears to advocates to rest on an unargued point, they should before the Judge becomes functus seek an opportunity to address it.

# TAB 22

## COURT OF APPEAL OF THE ISLAND OF GUERNSEY

30 March; 27 April 2012

————

CARLYLE CAPITAL CORPORATION LTD
(IN LIQUIDATION) AND OTHERS

v

CONWAY AND OTHERS

Before The Hon Michael Jacob Beloff QC,
James Walker McNeill QC and
Sir Hugh Peter Derwyn Bennett, Judges of Appeal

**Practice — Anti-anti-suit injunction — Liquidators of Guernsey company bringing common law and statutory claims against former directors and managers — One defendant having benefit of exclusive Delaware jurisdiction clause — Whether non-statutory claims should be litigated in Delaware — Whether liquidators entitled to anti-anti-suit injunction restraining Delaware proceedings.**

The first plaintiff (CCC) was incorporated in Guernsey on 29 August 2006 to invest in residential mortgage-backed securities. After eight months of increasing volatility in the global credit markets, on 17 March 2008 CCC was placed into compulsory liquidation in Guernsey on the application of its directors. When CCC collapsed not only was the capital lost but there was a substantial deficit.

On 7 July 2010 CCC's liquidators issued proceedings in four separate jurisdictions, Guernsey, Delaware, Washington DC, and the State of New York, all claiming in similar form damages "in a sum to be determined at trial exceeding US$1 billion" together with other relief.

There were 10 defendants. The first seven were directors of CCC. The eighth defendant, Carlyle Investment Management LLC (CIM), was a Delaware-registered company and was appointed as the investment manager and advisor to CCC pursuant to an investment management agreement (IMA) dated 20 September 2006. The ninth defendant, TC Group LLC (TCG), owned 75 per cent of CIM, and the 10th defendant, TCG Holdings LLC, was the sole managing member of TCG. The eighth, ninth and 10th defendants were referred as "the Carlyle defendants". It was alleged that, by virtue of their control over CCC and by their conduct, the Carlyle defendants became de facto or shadow directors of CCC and thereby owed the same duties to CCC as its de jure directors.

The claim alleged that the defendants owed CCC fiduciary duties and duties to act with skill and care in managing CCC's business affairs, and were in breach of the various duties. There was also a claim against CIM for breach of the IMA. The liquidators claimed damages for misfeasance, breach of fiduciary duty, gross negligence and/or negligence as against the defendants in their capacities as directors and/or in the case of the Carlyle defendants as shadow directors. There was also a claim against CIM for damages for breach of contract. In addition, there was a claim against the directors, pursuant to section 106 of the Companies (Guernsey) Law 1994 or section 422 of the Companies (Guernsey) Law 2008 for compensation, claims under section 106 against the Carlyle defendants alleging that they were "officers" of CCC, a claim against the Carlyle defendants for the return of CCC's books and records and other property, and a claim against the Carlyle defendants for unjust enrichment.

On 7 July 2010 the liquidators applied for leave to serve proceedings out of the jurisdiction on all the defendants (save for the seventh defendant, who was resident in Guernsey). The application was heard and granted by Lieutenant Bailiff Talbot on an ex parte basis.

On 16 December 2010 the liquidators withdrew their proceedings in the Delaware court.

On 29 December 2010 the Carlyle defendants instituted proceedings in the Delaware court for an injunction ordering the liquidators not to pursue any litigation with respect to the IMA in any jurisdiction other than Delaware, for damages, and for a declaration that the exclusive jurisdiction clause in the IMA was a valid, binding and enforceable contractual agreement.

On 28 February 2011 all the defendants filed in Guernsey exceptions déclinatoire to set aside the leave to serve out of the jurisdiction granted by LB Talbot or, alternatively, for an order that the proceedings be stayed pending the outcome of proceedings in Delaware.

On 22 July 2011 Deputy Bailiff Collas declined to set aside service out of the jurisdiction but, relying on the exclusive Delaware jurisdiction clause in the IMA, he imposed a temporary stay on all the liquidators' claims, requiring them first to litigate their non-statutory claims in Delaware, followed by their statutory, insolvency type, claims in Guernsey once the Delaware proceedings had been concluded (the forum issue).

On 8 August 2011 the liquidators sought the Deputy Bailiff's leave to appeal on the forum issue which, on 18 August 2011, he refused.

On 17 August 2011 the Carlyle defendants filed a motion in the Delaware court for preliminary injunctive relief.

**Carlyle Capital Corporation Ltd v Conway**                    [Guernsey CA

On 18 August 2011 in the Delaware court the liquidators filed a motion to dismiss or stay the anti-suit proceedings.

On 19 August 2011 the liquidators in Guernsey submitted an application for leave to appeal to the Court of Appeal on the forum issue. On 15 September 2011 the Guernsey Court of Appeal ordered that the application, with the appeal to follow, if granted, should be heard as soon as possible.

On 21 September 2011 the first to fourth and eighth to 10th defendants served a cross-notice seeking to overturn the Deputy Bailiff's refusal to set aside the leave to serve out or alternatively to uphold the order as to the stay. On 23 September 2011 the fifth to seventh defendants served a similar cross-notice.

On 4 October 2011 the liquidators made an ex parte application in Guernsey for an anti-anti-suit injunction against the Carlyle defendants. The application was granted by Judge Finch on 7 October 2011.

On 17 November 2011 Judge Finch dismissed an application by the Carlyle defendants to set aside the ex parte order.

On 2 December 2011 Judge Finch in the course of a supplementary judgment recorded the Carlyle defendants' apparent intention to "advance the Delaware proceedings" and "to set up a trial in Delaware" and that would "cause serious issues before the Guernsey Court of Appeal to be pronounced upon in Delaware and is contrary to the sense of the judgment I handed down". He granted leave to appeal to the Carlyle defendants.

On 23 December 2011 the proceedings issued in the State of New York and in Washington DC by the liquidators were discontinued by consent.

Between 30 January and 3 February 2012 the Guernsey Court of Appeal heard the liquidators' appeal on the forum issue. In a judgment handed down on 5 March 2012 the Court of Appeal allowed the liquidators to amend the Cause so as to bring in additional statutory claims for wrongful trading and for disqualification orders. It allowed the liquidators' appeal on the forum issue and dismissed the defendants' cross-notice, on the basis that the Guernsey court had jurisdiction to consider all the claims whereas the Delaware court did not. The consequence of the Court of Appeal's decision was that all the liquidators' claims would proceed in a single jurisdiction, ie Guernsey.

On the hearing of the Carlyle defendants' appeal against Judge Finch's refusal to set aside the anti-anti-suit injunction, the Carlyle defendants submitted that the exclusive jurisdiction clause in the IMA gave them a contractual right to have all the issues decided by the Delaware court; it was therefore for the Delaware court and not for the Guernsey court to determine what effect should be given to the exclusive jurisdiction clause.

The liquidators contended that the Carlyle defendants were seeking to subvert the effect of the Court of Appeal's earlier judgment on the forum issue by seeking in Delaware that which they had already failed to obtain in Guernsey, ie an order compelling the liquidators' proceedings to be heard in Delaware.

———*Held* by Guernsey CA (BELOFF, McNEILL and BENNETT JJA) that the appeal would be dismissed.

(1) The principles governing the grant of an anti-anti-suit injunction were essentially the same as those which governed an anti-suit injunction. In considering whether to grant an anti-suit injunction the paramount objective was the ends of justice. Insofar as discrete categories of cases in the granting of such an injunction had been identified, they were not exhaustive. As long as the ends of justice were served by the grant of such injunction the absence of previous precedent should not inhibit the court to which an application was made (*see* paras 68, 71 and 72).

(2) Guernsey was the only jurisdiction in which all causes of action, common law and statutory, could be pursued and the statutory insolvency remedies were freighted with public interest considerations. To permit the Carlyle defendants to pursue their quest for anti-suit relief from the Delaware court might lead to multiplicity of proceedings and the possibility of inconsistent results. In the circumstances, the overall interests of justice favoured the grant of the anti-anti-suit injunction (*see* paras 78 to 85).

(3) Case law did not compel a contrary conclusion. An exclusive jurisdiction clause could be overridden in appropriate cases, not limited to the existence of vexation and oppression; for example, where it was necessary to avoid multiplicity of proceedings and the possibility of inconsistent judgments; where it was necessary to give effect to a statutory right in one forum even if the dispute was otherwise subject to a forum selection clause in favour of the foreign forum; where it was necessary for the protection of a court's legitimately conferred jurisdiction and the prevention of litigants' evasion of important public policies of the forum; and where it was necessary for the court to protect the integrity of its own judgments (*see* paras 86 to 108);

———*OT Africa Line Ltd v Magic Sportswear Corporation* [2005] 2 Lloyd's Rep 170, *Donohue v Armco Inc* [2002] 1 Lloyd's Rep 425; [2002] 1

LLOYD'S LAW REPORTS

Guernsey CA]                **Carlyle Capital Corporation Ltd v Conway**                [BELOFF JA

All ER 749, *Evans Marshall and Co Ltd v Bertola SA* [1973] 1 Lloyd's Rep 453; [1973] 1 WLR 349, *The El Amria* [1981] 2 Lloyd's Rep 119, *Samengo-Turner v J & H Marsh & McLennan (Services) Ltd* [2007] 2 CLC 104, *Qantas Airways Ltd v Rolls-Royce plc* [2010] FCA 1481, *Laker Airways Ltd v Sabena, Belgian World Airlines* 731 F.2d 909 (DC Cir 1984), *Masri v Consolidated Contractors International Co SAL* [2008] 2 Lloyd's Rep 301; [2009] QB 503 and *The Alkimos* [2004] FCA 698, considered.

(4) In any event, the Carlyle defendants' pursuit of the Delaware anti-suit proceedings, and of the present appeal, could be characterised as vexatious. It was calculated to prevent the liquidators from continuing to pursue the litigation in a single forum to a single trial; and to prevent the liquidators from ever pursuing their statutory insolvency remedies against the Carlyle defendants, which were available to the liquidators only in Guernsey (*see* para 112).

(5) There was a strong public policy in Guernsey against multiplicity of litigation and the fragmentation of proceedings that could and should be determined in a single action. The objectives and rationales underlying the policy included: (i) the saving of costs and waste of party and judicial resources; (ii) the avoidance of delay; (iii) the avoidance of the risk of inconsistent decisions and consequent injustice to parties; (iv) the prevention of loss to a complainant of the benefit of a single composite trial; (v) the avoidance of uncertainty and satellite disputes such as on questions of issue estoppel or res judicata; and (vi) the avoidance of potential injustice to third parties. In the present case the interests of justice were best served by the submission of the whole of the dispute to a single tribunal which was best fitted to give comprehensive judgment on all matters in issue in accordance with its own law which governed the vast majority of the claims (*see* para 116).

————

The following cases were referred to in the judgment:

*Aggeliki Charis Compania Maritima SA v Pagnan SpA (The Angelic Grace)* (CA) [1995] 1 Lloyd's Rep 87;

*Aratra Potato Co Ltd v Egyptian Navigation Co (The El Amria)* (CA) [1981] 2 Lloyd's Rep 119;

*Bouygues v Offshore SA v Caspian Shipping Co* (CA) [1998] 2 Lloyd's Rep 461;

*Citi-March Ltd v Neptune Orient Lines Ltd* [1997] 1 Lloyd's Rep 72; [1996] 1 WLR 1367;

*Donohue v Armco Inc* (HL) [2001] UKHL 64; [2002] 1 Lloyd's Rep 425; [2002] 1 All ER 749;

*Evans Marshall and Co Ltd v Bertola SA* (CA) [1973] 1 Lloyd's Rep 453; [1973] 1 WLR 349;

*Glencore International AG v Exter Shipping Ltd* (CA) [2002] EWCA Civ 524;

*Hadmor Productions Ltd v Hamilton* (HL) [1983] 1 AC 191;

*Incitec Ltd v Alkimos Shipping Corporation (The Alkimos)* [2004] FCA 698;

*Laker Airways Ltd v Sabena, Belgian World Airlines* 731 F.2d 909 (DC Cir 1984);

*Laugee v Laugee* [1990] JLR 236;

*Mahavir Minerals Ltd v Cho Yang Shipping Co Ltd (The MC Pearl)* [1997] 1 Lloyd's Rep 566;

*Masri v Consolidated Contractors International Co SAL* (CA) [2008] EWCA Civ 625; [2008] 2 Lloyd's Rep 301; [2009] QB 503;

*OT Africa Line Ltd v Magic Sportswear Corporation* (CA) [2005] EWCA Civ 710; [2005] 2 Lloyd's Rep 170;

*Qantas Airways Ltd v Rolls-Royce plc* [2010] FCA 1481;

*Samengo-Turner v J & H Marsh & McLennan (Services) Ltd* (CA) [2007] EWCA Civ 723; [2007] 2 CLC 104;

*Seismic Shipping Inc v Total E&P UK plc (The Western Regent)* (CA) [2005] EWCA Civ 985; [2005] 2 Lloyd's Rep 359;

*Société Nationale Industrielle Aérospatiale v Lee Kui Jak* (PC) [1987] AC 871;

*Star Reefers Pool Inc v JFC Group Co Ltd* (CA) [2012] EWCA Civ 14; [2012] 1 Lloyd's Rep 376;

*Turner v Grovit* (HL) [2001] UKHL 65; [2002] 1 WLR 107.

————

This was an appeal by the eighth to 10th defendants from the decision of Judge Finch dated 2 December 2011 refusing to set aside an anti-anti-suit injunction granted to the plaintiffs restraining the eighth to 10th defendants from pursuing proceedings in the Delaware courts.

Advocate S H Davies, instructed by Williams & Connolly, for the eighth to 10th defendants; Advocate J M Wessels, instructed by Lipman Karas, for the plaintiff liquidators.

The further facts are stated in the judgment of Beloff JA.

Judgment was reserved.

Friday, 27 April 2012

[Editor's note: on 10 July 2012 the Judicial Committee of the Privy Council refused the defendants' applications for permission to appeal.]

————

## JUDGMENT

**BELOFF JA:**

1. This is the judgment of the court in an appeal by the eighth, ninth and 10th defendants against an order of Judge Finch dated 2 December 2011 ("the Finch Decision").

2. The circumstances which generated the litigation, the backcloth to the Finch Decision, we take from our judgment in Civil Appeal No 435 handed down on 5 March 2012 to which we add the chronology of and relating to the litigation in the State of Delaware.

3. On 29 August 2006 the first plaintiff, Carlyle Capital Corporation Ltd ("CCC"), was incorporated in Guernsey. It was promoted by the Carlyle Group, one of the world's largest private equity firms, to invest in residential mortgage-backed securities.

4. By July 2007 CCC had raised capital totalling US$945 million through a series of private placements and an initial public offering. It was listed on the Euronext Exchange in Amsterdam.

5. The substantive proceedings in this matter arise out of the events of the following eight months during which the global credit markets became increasingly volatile and during which period the entire capital of CCC was lost.

6. On 17 March 2008 CCC was placed into compulsory liquidation in Guernsey pursuant to section 94(a) of the Companies (Guernsey) Law 1994 as amended ("the 1994 Law") on the application of the directors of CCC.

7. CCC financed its investments through short-term repurchase agreements giving extensive leverage. Consequently when CCC collapsed not only was the capital lost but, it is alleged, there was a substantial deficit.

8. On 7 July 2010 the liquidators (who for present purposes should be treated as CCC) issued proceedings in four separate jurisdictions, Guernsey, Delaware, Washington DC, and the State of New York, all claiming in similar form damages "in a sum to be determined at trial exceeding $1 billion" together with other relief. The liquidators allege in the Cause in this jurisdiction that the nature of the action is one essentially concerned with the internal management, control and corporate governance of CCC. The defendants, it appears, are likely to argue that the nature of the liquidators' action essentially relates to the failures of the duties arising under and connected with an investment management agreement ("IMA") dated 20 September 2006 between CCC and the eighth defendant.

9. There are 10 defendants in these proceedings. The first seven were all directors of CCC. The first four held offices and/or were employees of other companies within the Carlyle Group. The fifth to

seventh defendants were appointed as independent directors. The eighth defendant, Carlyle Investment Management LLC ("CIM"), is a Delaware-registered company and was appointed as the investment manager and advisor to CCC pursuant to the IMA.

10. The ninth defendant, TC Group LLC ("TCG"), owned 75 per cent of CIM, and the 10th defendant, TCG Holdings LLC, was the sole managing member of TCG. The eighth, ninth and 10th defendants refer to themselves as "the Carlyle defendants" and we shall do likewise. It is alleged that, by virtue of their control over CCC and by their conduct, the Carlyle defendants became de facto or shadow directors of CCC and thereby owed the same duties to CCC as its de jure directors.

11. The procedural history in outline is as follows.

12. On 7 July 2010 the liquidators applied for leave to serve proceedings out of the jurisdiction on all the defendants (save for the seventh defendant, Mr Loveridge, who is resident in Guernsey), pursuant to Rule 8 of the Royal Court Civil Rules 2007. The application was heard and granted by Lieutenant Bailiff Talbot on an ex parte basis.

13. On 16 December 2010 the liquidators withdrew their proceedings in the Delaware Chancery Court.

14. On 29 December 2010 the Carlyle defendants instituted proceedings by way of Verified Complaint in the Delaware Chancery Court ("the Complaint") against the liquidators for an injunction ordering the liquidators not to pursue any litigation with respect to the IMA in any jurisdiction other than Delaware, for damages, and for a declaration that the exclusive jurisdiction clause (the "EJC") in the IMA is a valid, binding and enforceable contractual agreement.

15. The EJC itself is set out in clause 9 of the IMA and reads:

"This Agreement shall be governed by, and construed in accordance with, the laws of Delaware, without giving effect to the choice of law principles thereof. The federal or state courts sitting in Delaware shall have exclusive jurisdiction over any action, suit or proceeding with respect to this Agreement and each party hereto hereby irrevocably waives, to the fullest extent permitted by law, any objection that it may have, whether now or in the future, to the laying of venue in, or to the jurisdiction of, any and each of such courts for the purposes of any such suit, action, proceeding or judgment and further waives any claim that any such suit, action, proceeding or judgment has been brought in an inconvenient forum, and each party hereto hereby submits to such jurisdiction."

16. The Complaint alleged, in broad terms, that the liquidators were in breach of the IMA, in particular the EJC, in bringing proceedings in Guernsey, the State of New York, and the District of Columbia. The Complaint made no distinction between the common law and equitable claims on the one hand and the statutory claims on the other in the liquidators' proceedings in Guernsey. Indeed, para 52 of the Complaint alleged that "any future litigation" by the liquidators in Guernsey (and elsewhere, other than Delaware) would cause the Carlyle defendants irreparable harm. On its face the injunction sought in the Complaint was wide enough to cover all existing and any future causes of action, whether pursuant to statute or otherwise, in Guernsey.

17. On 7 January 2011 the liquidators transferred the Carlyle defendants' Complaint proceedings (which we call "the anti-suit proceedings") to the Delaware Federal Court seeking to rely on US statutory provisions.

18. On 21 January 2011 the Carlyle defendants applied to transfer the anti-suit proceedings back to the Delaware Chancery Court.

19. On 10 February 2011, at a hearing in front of LB Talbot in Guernsey, Advocate Wessels for the liquidators told the court that the anti-suit proceedings in Delaware and the Guernsey proceedings would take their course, move at their own pace, and thus that neither case would affect the other. Advocate Davies for the Carlyle defendants, while careful to say before us that he was not alleging that the Carlyle defendants were deliberately lured into abstaining from accelerating their interim applications in Delaware by such statements made on behalf of the liquidators in Guernsey (and also in Delaware), nonetheless asserted that in point of fact such statements caused the Carlyle defendants to accept a more relaxed briefing schedule and to be content with a later hearing date in Delaware for their claim for interim relief than might otherwise have been the case.

20. On 16 February 2011 the Carlyle defendants requested the Delaware Federal Court to grant emergency relief, ie to resolve their expedited motion to remit the anti-suit proceedings to the Delaware Chancery Court so as to permit them to seek preliminary injunctive relief against the liquidators forbidding them to pursue proceedings in Guernsey.

21. On 25 February 2011 the liquidators filed their Reply Brief in Delaware and, at page 2 note 6 under "Introduction", drew attention to remarks made by the Royal Court on 10 February 2011 (when it set a five-day hearing of the Carlyle defendants' application to set aside leave to serve out of the jurisdiction for 6 June 2011) that applying the principles of international comity it did not wish to put any pressure, in terms of timing, on the Delaware court and expressed the hope that the US courts would approach the matter in an equally deliberative manner to make sure that the issues between the parties were fairly and properly heard.

22. On 28 February 2011 all the defendants filed in Guernsey exceptions déclinatoire to set aside the leave to serve out of the jurisdiction granted by LB Talbot or, alternatively, for an order that the proceedings be stayed pending the outcome of proceedings in Delaware.

23. On the same date the Carlyle defendants filed for preliminary injunctive relief in the Delaware Federal Court, to which, on 24 March 2011, the liquidators responded to the motion for preliminary injunctive relief, with the Carlyle defendants then filing their Reply Brief on 4 April 2011.

24. On 13 May 2011 Mr Roberts, one of the liquidators, swore his second affidavit in relation to the exceptions déclinatoire, and exhibited the proposed Amended Cause, details of which can be found in para 20 of our judgment in Civil Appeal No 435, and in respect of which we gave leave to amend – see para 32 thereof.

25. On 23 May 2011 the defendants applied for an adjournment of the hearing fixed for 6 June 2011, which the liquidators opposed.

26. On 2 June the Deputy Bailiff adjourned the hearing and ordered it to commence on 27 June 2011. The hearing duly took place between 27 June 2011 and 1 July 2011. The Deputy Bailiff understood that the proceedings in New York and in the District of Columbia were not being seriously pursued, and that, as he said in para 10 of his judgment "the argument before me centred upon the choice of jurisdiction between Delaware and Guernsey".

27. On 22 July 2011 the Deputy Bailiff declined to set aside service out of the jurisdiction but granted a stay of the proceedings in Guernsey on the basis that the liquidators should litigate their non-statutory claims in Delaware and only thereafter their statutory claims in Guernsey.

28. On 4 August 2011 the Delaware Federal Court transferred the anti-suit proceedings back to the Delaware Chancery Court and denied both the Carlyle defendants' motion for Preliminary Injunctive Relief and the liquidators' motion to dismiss or stay the proceedings as "moot".

29. On 8 August 2011 the liquidators sought the Deputy Bailiff's leave to appeal which, on 18 August 2011, he refused.

30. On 17 August 2011 the Carlyle defendants filed a motion in the Delaware Chancery Court for Preliminary Injunctive Relief. At para 13 thereof it is stated inter alia:

LLOYD'S LAW REPORTS

BELOFF JA]    **Carlyle Capital Corporation Ltd v Conway**    [Guernsey CA

"On 8 August 2011, the Liquidators sought leave to appeal the decision of the Royal Court of Guernsey to the Guernsey Court of Appeal. The Liquidators accordingly continue their efforts to avoid this Court and continue to violate the IMA's forum selection clause. In papers filed in this action prior to remand, the Liquidators indicated that they anticipate their appeal will be heard later this year."

31. On 18 August 2011 in the Delaware Chancery Court the liquidators filed a motion to dismiss or stay the anti-suit proceedings.

32. On 19 August 2011 the liquidators in Guernsey submitted an application for leave to appeal to a single judge of the Court of Appeal.

33. On 26 August 2011 the Carlyle defendants filed a motion for Summary Judgment in the Delaware Chancery Court. In the introduction it is stated that:

"this case seeks to end the flagrant forum shopping of [the Liquidators] in violation of their contractual obligations."

It recites that:

"On July 22, 2011, the Guernsey court enforced the IMA's forum selection clause, staying the Guernsey proceedings and directing the Liquidators to pursue their claims in Delaware . . . Nevertheless, the Liquidators persist in their efforts to avoid the jurisdiction of this Court by seeking leave to appeal the Guernsey court's judgment . . ."

34. The submission that by seeking leave to appeal the Deputy Bailiff's order the liquidators were persisting in their efforts to violate the IMA's exclusive Delaware EJC is repeated at page 17 of the motion. It is further submitted at page 29 that: "All of the claims that the Liquidators seek to bring against the Carlyle entities . . . are 'with respect to' the IMA and accordingly must be brought in Delaware". The conclusion of the motion makes it clear that the Carlyle defendants sought "summary judgment, permanently enjoin[ing] the Liquidators from further violating the IMA's exclusive Delaware forum selection clause, and . . . damages, subject to later quantification". In the alternative a preliminary injunction was sought prohibiting the liquidators from pursuing their claims outside of Delaware during the pendency of "this" action.

35. On 28 August 2011 the US counsel for the Carlyle defendants wrote to the liquidators' US counsel seeking to agree a combined briefing schedule, to which the latter replied on 6 September 2011 proposing a different schedule.

36. On 7 September 2011 the Bailiff directed the liquidators to present their application for leave to appeal to the full Court of Appeal during the following week for determination of the discrete question whether the liquidators' application for leave should be heard before or concurrently with the substantive appeal.

37. On 12 September 2011 [by which date no agreement for a briefing schedule had been reached], the Carlyle defendants filed a motion in Delaware seeking such a schedule. Under the proposed order all briefing was to be completed by 17 October 2011.

38. On 14 September 2011 the liquidators filed a response submitting that such motion sought to interfere with the Guernsey appellate process and that the various motions pending in Delaware should be stayed pending determination of the appeal in Guernsey.

39. On the same day the Court of Appeal heard the liquidators' application for leave to appeal. Mourant Ozannes for the liquidators wrote to Ogier for the Carlyle defendants seeking undertakings from the Carlyle defendants not to seek scheduling of the Delaware pending motions for anti-suit relief until after the determination of the liquidators' appeal in Guernsey.

40. On 15 September 2011, before the Court of Appeal sat to deliver its judgment, Advocate Davies informed Advocate Wessels for the liquidators that the Carlyle defendants would not give the undertakings sought. The Court of Appeal (Michael J Beloff QC (President), Michael Jones QC and Clare Montgomery QC JJA) ordered that the application for leave to appeal, with appeal to follow if granted, would be heard "as soon as possible preferably before a Court of Appeal in November . . ." with ". . . liberty to apply should it prove impossible to arrange for a Court of Appeal to sit in November 2011".

41. On the same day Strine C in the Delaware Chancery Court ordered the parties to reach agreement on a briefing schedule for the liquidators' motion to dismiss and the Carlyle defendants' motions for preliminary injunction and summary, ie final judgment.

42. Thereafter correspondence passed between the US lawyers for the parties, in which it is apparent that the Carlyle defendants were pressing for the motions to be heard and the liquidators were suggesting that the Delaware motions should await the hearing of the application which had been fixed for 30 January 2012, as the Carlyle defendants' motions were seeking to interfere with that process.

43. On 21 September 2011 the first to fourth and eighth to 10th defendants served a cross-notice seeking to overturn the Deputy Bailiff's refusal to set aside the leave to serve out or alternatively to uphold the order as to the stay.

44. On 23 September 2011 the fifth to seventh defendants served a similar cross-notice.

## LLOYD'S LAW REPORTS

**Carlyle Capital Corporation Ltd v Conway**

45. On 28 September 2011 the US counsel for the Carlyle defendants informed the liquidators' US counsel that they had spoken to Strine C who had scheduled a hearing for all the motions for 9 November 2011 but had said that 28 October 2011 might become available.

46. On 30 September 2011 the US counsel for the Carlyle defendants informed the liquidators' US counsel that they had spoken to Strine C who had set the hearing of all the motions for 28 October 2011 with all briefing to be completed by 21 October 2011.

47. On 4 October 2011 the liquidators filed in Guernsey their ex parte application for an anti-anti-suit injunction against the Carlyle defendants.

48. On 5 October 2011 the US counsel for the liquidators wrote to Strine C with a copy to the US counsel for the Carlyle defendants, at the bottom of page 2 and the top of page 3 it was stated:

"There is no urgency or prejudice to Carlyle here. All that is basically happening is an appeal; all of Carlyle's rights are preserved and Carlyle is protected on the question of costs and any damages . . ."

49. It was submitted by Advocate Davies that as an application for an ex parte order had been filed in Guernsey on 4 October 2011 those statements were untrue and may have been an attempt by the liquidators to mislead the Delaware court into granting a more generous timetable, whilst seeking draconian ex parte orders from the Royal Court preventing the Carlyle defendants from enforcing the EJC in the IMA. We consider that such a construction is not necessarily, reading the passage in context, the only one appropriate; but even were that so, we would not see this issue as decisive of the present appeal.

50. On 6 October 2011 Strine C made a scheduling order that all briefing be concluded by 21 October 2011.

51. On 7 October 2011 the ex parte application was granted by Judge Finch.

52. On the same day the Carlyle defendants, having been notified of Judge Finch's order, immediately filed in Delaware a Notice of Withdrawal of their motions for preliminary injunctive relief and for summary judgment without prejudice to their right to reinstate as soon as the ex parte order was lifted.

53. On 12 October 2011 Strine C issued an order vacating the scheduling order of 6 October 2011.

54. On 28 October 2011 Judge Finch conducted an inter partes hearing on the Carlyle defendants' application to set aside the ex parte order.

55. On 17 November 2011 Judge Finch dismissed the application.

56. On 2 December 2011 Judge Finch in the course of his supplementary judgment recorded the Carlyle defendants' apparent intention to "advance the Delaware proceedings" and "to set up a trial in Delaware" and that would "cause serious issues before the Guernsey Court of Appeal to be pronounced upon in Delaware and is contrary to the sense of the judgment I handed down". He granted leave to appeal to the Carlyle defendants.

57. On 9 December 2011 Ogier applied for an expedited hearing of the appeal against Judge Finch's order (and before the hearing fixed for 30 January 2012), and alternatively that both appeals be heard together. It was submitted by Advocate Davies that this request was driven by the fact that the effect of Judge Finch's order was to give the liquidators an unwarranted advantage in that it deprived the Carlyle defendants of an opportunity to obtain an order in Delaware restraining the continued breach of the EJC.

58. On 20 December 2011 the Court of Appeal delivered its ruling, gave reasons for declining to expedite the appeal against the Finch Decision, suspended further steps in that appeal until after the resolution of the appeal fixed for 30 January 2012 and provisionally fixed the hearing for the Finch Decision appeal for 5 and 6 March 2012.

59. On 23 December 2011 the proceedings issued in the State of New York and in Washington DC by the liquidators were discontinued by consent.

60. Between 30 January and 3 February 2012 the hearing of the appeal from the Deputy Bailiff duly took place before us. We allowed the liquidators to amend to bring in additional statutory claims. We gave the liquidators leave to appeal and allowed the appeal against the Deputy Bailiff's decision. We dismissed the Directors' cross-notices. In consequence of our order, if not otherwise displaced, all the liquidators' claims were to proceed in a single jurisdiction, ie Guernsey.

61. A threshold issue is whether we should consider whether to uphold or dismiss the appeal against the Finch Decision by reference to the position as it was before him, or as it is before us. Advocate Davies contended for the former position; Advocate Wessels for the latter.

62. It seemed to us in principle that it would be a sterile exercise to focus on the past, not the present. If Judge Finch was right to make the order when he did, non sequitur that it should be continued if circumstances had changed in a material way: if per contra he was wrong, then non sequitur that the order should be discontinued again if circumstances had indeed so changed. We remind ourselves of the locus classicus *Hadmor Productions Ltd v Hamilton* [1983] 1 AC 191 in which Lord Diplock at pages 220A to 221A set out the circumstances in

which an appellate body could review the exercise
of a discretionary power to grant an injunction.

"Before adverting to the evidence that was
before the learned judge and the additional
evidence that was before the Court of Appeal, it
is I think appropriate to remind your Lordships
of the limited function of an appellate court in an
appeal of this kind. An interlocutory injunction is
a discretionary relief and the discretion whether
or not to grant it is vested in the High Court
judge by whom the application for it is heard.
Upon an appeal from the judge's grant or refusal
of an interlocutory injunction the function of an
appellate court, whether it be the Court of Appeal
or your Lordships' House, is not to exercise an
independent discretion of its own. It must defer
to the judge's exercise of his discretion and must
not interfere with it merely upon the ground that
the members of the appellate court would have
exercised the discretion differently. *The function
of the appellate court is initially one of review
only. It may set aside the judge's exercise of his
discretion* on the ground that it was based upon a
misunderstanding of the law or of the evidence
before him or upon an inference that particular
facts existed or did not exist, which, although it
was one that might legitimately have been drawn
upon the evidence that was before the judge, can
be demonstrated to be wrong by further evidence
that has become available by the time of the
appeal; *or upon the ground that there has been
a change of circumstances after the judge made
his order that would have justified his acceding
to an application to vary it*. Since reasons given
by judges for granting or refusing interlocutory
injunctions may sometimes be sketchy, there
may also be occasional cases where even though
no erroneous assumption of law or fact can be
identified the judge's decision to grant or refuse
the injunction is so aberrant that it must be set
aside upon the ground that no reasonable judge
regardful of his duty to act judicially could have
reached it. It is only if and after the appellate
court has reached the conclusion that the judge's
exercise of his discretion must be set aside for one
or other of these reasons, that it becomes entitled
to exercise an original discretion of its own.

. . . The right approach by an appellate court
is to examine the fresh evidence in order to see
to what extent, if any, the facts disclosed by it
invalidate the reasons given by the judge for his
decision." (Our emphasis.)

63. This was followed by the Court of Appeal
in Jersey in *Laugee v Laugee* [1990] JLR 236 in a
manner germane to the present appeal, where it was
stated at page 248.

"Although this passage relates to interference
with discretion, it must follow equally that the

exercise of the discretion can be upheld on the
ground that subsequent evidence has appeared
which would further justify the original order."

64. By virtue of section 14 of the Court of
Appeal (Guernsey) Law 1961, this court has all
the power which vested in the Royal Court as a
"Cour des Jugements et Records". We consider
that we should exercise these powers rather than
remitting the matter to Judge Finch to take a fresh
view, which course would be a recipe for delay and
would engage other procedural problems. That said,
for reasons we shall explain later, we do not accept
that the judge made any real error in principle on a
fair reading of his several judgments such as would
have entitled us to review his discretion even had
we adopted a more conservative position.

65. The anti-suit injunction is a phe-
nomenon infrequently encountered in casebook
and commentary. Our researches found only 10
instances in which the concept is referred to by
that name in electronically available authorities.
Counsel between them referred to one case from
the United States of America, one from Australia,
and one from England; and it was only in the lat-
ter two that the injunction granted was given that
specific title. Initially Andrew S Bell, *Forum Shop-
ping and Venue in Transnational Litigation*, 2003,
OUP ("Bell") was the only academic work referred
to which dealt with such phenomenon discretely;
though under stimulus from the court, counsel's
researches produced a further more recent work by
Thomas Raphael: *The Anti-Suit Injunction*, 2008,
OUP ("Raphael") which contained subject-spe-
cific observations.

66. There was a brief discussion of the utility of
such a form of order. Since it was axiomatic that
it bound only the party to whom it was directed,
and not the court in which that party might seek
the conventional anti-suit injunction, what then, the
question was posed, was there to prevent that party
nonetheless making (successfully) an application to
that uninhibited court?

67. It seems to us that there is a threefold answer
to the question so posed. First, a breach of an anti-
anti-suit injunction would constitute a contempt of
court. True it is – to take the present case – that the
Carlyle defendants could, notwithstanding such an
order, seek anti-suit relief in Delaware; but they
would be, for example, in consequence unable to
come within the Guernsey jurisdiction, without risk
of committal. Secondly, it is to be assumed that in
societies governed by the rule of law a court order
(unless successfully appealed or avoided) will be
respected by those to whom it is directed, even
when outwith the jurisdiction of the court which
made it. Thirdly, the very premise for the seeking
of an anti-anti-suit injunction is that another court
(in this case the Delaware Chancery Court) might

LLOYD'S LAW REPORTS

Guernsey CA]    **Carlyle Capital Corporation Ltd v Conway**    [Beloff JA

itself grant an anti-suit injunction against a party proceeding in the court from which such injunction is sought (in this case the Royal Court) (see *Bell*, para 4.139). However, if reasons why the Guernsey Court grants the anti-anti-suit injunction are sufficient and seen to be sufficient, the Delaware court would (or could) in comity persuaded not to grant an anti-suit injunction even if one were subsequently sought from it.

68. Both parties proceeded on the basis that the principles governing the grant of an anti-anti-suit injunction were essentially the same as those which governed an anti-suit injunction. We are prepared to proceed on that premise given that the source of the jurisdiction (inherent or statutory) and the objects served by it are common. However it is well established that a court should exercise caution in the grant of an anti-suit injunction and we agree that, as Raphael puts it, "the particular sensitivity of this type of claim and the inherent risks of escalating conflicts between legal schemes should probably mean that anti-anti-suit injunctions should be granted with *particular* caution" (para 5.49).

69. The principles which govern classic anti-suit injunctions in the modern era were set out in the speech of Lord Goff in *Société Nationale Industrielle Aérospatiale v Lee Kui Jak* [1987] AC 871 at pages 892A to 897A, from which we derive the following principles (to some of which we have already alluded):

(1) First, the jurisdiction is to be exercised when the "ends of justice" require it.

(2) Where the court decides to grant an injunction restraining proceedings in a foreign court, its order is directed not against the foreign court but against the parties so proceeding or threatening to proceed.

(3) An injunction will only be issued restraining a party who is amenable to the jurisdiction of the court, against whom an injunction will be an effective remedy.

(4) As such an order indirectly affects the foreign court, the jurisdiction is one which must be exercised with caution.

(5) The decided cases show judges seeking to apply the fundamental principles in certain categories of case, while at the same time never asserting that the jurisdiction is to be confined to those categories.

(6) An injunction may be granted to restrain the pursuit of foreign proceedings on the grounds of vexation or oppression; but consistent with the basic principle of justice underlying the whole of this jurisdiction, the notions of vexation and oppression should not be restricted by definition; they vary with the circumstances of each case.

(7) While there is no presumption that a multiplicity of proceedings is vexatious, such multiplicity may, inter alia, make them vexatious.

(8) Since the court is concerned with the ends of justice, account must be taken not only of injustice to the defendant if the plaintiff is allowed to pursue the foreign proceedings, but also of injustice to the plaintiff if he is not allowed to do so. The court will not grant an injunction if, by doing so, it will deprive the plaintiff of advantages in the foreign forum of which it would be unjust to deprive him.

70. It was not suggested that those basic principles had themselves been altered in any of the subsequent cases, although naturally, given that later courts were confronted with a variety of different factual situations, they had to be adapted in their particular application.

71. Three matters in our view stand out from the jurisprudence viewed as a whole. First, the paramount objective is the ends of justice. [See too *Donohue v Armco Inc* [2002] 1 Lloyd's Rep 425 at page 431.] Secondly, insofar as discrete categories of cases in the granting of such an injunction have been identified, they are not exhaustive. Thirdly, even within the category to which the greatest attention was paid in the present case, that is to say the restraint of vexatious or oppressive conduct, that too was a flexible concept.

72. The case law does, of course, nonetheless provide guidelines. Examples are provided by it of when anti-suit injunctions may, and when they may not, be granted. As far as the latter is concerned, it is clear that the mere fact that a court has determined that a particular jurisdiction is forum conveniens, while it may be a necessary step, is not a sufficient basis for a grant of anti-suit relief: *Aérospatiale*, cit sup. But as long as the ends of justice are served by the grant of such injunction, the absence of previous precedent should not inhibit the court to which an application is made.

73. It is convenient before summarising the rival contentions to return to our earlier judgment so as to set the scene. At paras 48 and 49 we said:

"48. On the premise, which we consider we have established, that it is for the above reasons at least proper for us to revisit the DBs exercise of discretion, it is useful to remind ourselves of certain matters which are indisputable.

(i) The Cause, amended as it will be pursuant to our order raises ex concessis triable issues.

(ii) The Directors have not put in their defence; in consequence it is impossible as of now to know what particular issues a court, where ever it sits, will have to decide.

(iii) The Royal Court in Guernsey has jurisdiction to consider all the claims.

(iv) The Chancery Court of Delaware does not have jurisdiction to consider all the claims. As far as wrongful trading is concerned, the Royal Court under the 1994 Law is the only Court which has jurisdiction: see the references to the Court in the 1994 Law, sections 67C and 117(1). As far as directors disqualification is concerned a Delaware court could not exercise a regulatory function conferred only on organs or officers in another jurisdiction. In our view the same must be true by parity of reasoning of the Section 106 claim brought under a Guernsey statute. No evidence submitted by experts in Delaware law by the Directors sought to suggest otherwise or sought to contradict similar evidence submitted by the Appellants' experts consistent with this proposition.

(v) Delaware law will govern the IMA breach of contract claims only. All claims of breach of duty by the Defendants whether as Directors de jure, de facto or shadow will be governed by Guernsey law.

(vi) The Directors were responsible for the choice of Guernsey as the place of incorporation of CCC with the perceived advantages that such choice would bring. The Carlyle Group chose to incorporate CCC in Guernsey and the Director Defendants chose to be Directors of a Guernsey company. They opted, in short, to take advantage of the legal, fiscal and regulatory regimes applicable in Guernsey; furthermore prior to applying to place CCC in liquidation, the Directors considered which forum to adopt for that procedure and again chose Guernsey. All the Directors must have contemplated at the very least that they could be the subject of litigation in Guernsey. In emphasising the alleged primacy of the choice of forum clause (which we shall consider below) they could fairly be charged with blowing hot and cold, or, to mix the metaphor, having their cake and eating it.

49. In our view factors (iii)–(vi) tell strongly in favour of Guernsey as the forum conveniens. Factors (iii) and (iv) engage the presumption against fragmentation. As to factor (v), where the principal issues are those of internal management of a corporation and correlative breach of duty, the place of incorporation will presumptively be the appropriate forum because of its ability to judge matters by its own standards of business conduct: see, for example, *Ceskoslovenska Obchodni Banka AS v Nomura International plc* 2003 IL Pr 20 at paragraph 12(2) and (5)."

74. In the course of that judgment we particularly considered the impact of the EJC, which we described as the jewel in the crown of the Carlyle defendants' submission, and declined to enforce it relying on para 27 of *Donohue v Armco Inc*. Advocate Wessels therefore contended that the Carlyle defendants were seeking to subvert the effect of our judgment by seeking in Delaware that which they had already failed to obtain in Guernsey, ie an order which compelled the liquidators' proceedings quoad at any rate the Carlyle defendants to be heard in Delaware.

75. Advocate Davies contended to the contrary that the EJC was indeed compulsive to that end. He said that none of the cases relied upon by Advocate Wessels for general statements of principle addressed, still less permitted the overriding of an EJC. The lynchpin of his submissions was that the Carlyle defendants and CCC had agreed that any matters arising "with respect to the IMA" would be determined in the Court of Delaware. The meaning of that phrase and indeed of other aspects of the IMA, were for the Delaware courts only. If on its true construction the phrase embraced the statutory claims but the Delaware court concluded that it could not adjudicate upon them, that was the consequence of the EJC itself. CCC (and in its shoes the liquidators) could not therefore complain about its inability to pursue such claims since it was the product of the very bargain it had voluntarily struck.

76. Advocate Davies added that the Delaware court might decide that because of that limitation on their powers, ie an inability to adjudicate on the statutory claims, it would not grant the anti-suit relief sought. There were indeed a variety of possible outcomes if the Delaware court were left free to entertain the Carlyle defendants' application. Moreover the liquidators would have the full opportunity to make their case as to the proper outcome before that court. His main point was that the Carlyle defendants had a contractual right to have all such issues decided by the Delaware court, and CCC by signing the IMA was bound to respect that right. It was therefore for the Delaware court and not for us to determine what effect should be given to the EJC.

77. It was, of course, a necessary consequence of this submission that unless for whatever reason the Delaware court declined to grant the relief sought by the Carlyle defendants by way of anti-suit injunction, there would be fragmentation since it was not Advocate Davies' case that other persons not party to the IMA could make applications parasitic upon it. Advocate Davies suggested, however, that the Delaware court might be more tolerant of fragmentation than the courts of

Guernsey (or, indeed, of England and Wales); but in any event whether it could, should or would extend such tolerance was a matter for it.

78. We repeat that we accept that the mere fact that we have found Guernsey to be the forum conveniens is not of itself a sufficient basis to grant the anti-anti-suit injunction. However, we have gone significantly further than finding Guernsey to be forum conveniens. We have found that the Guernsey court is the only court in which all the causes of action, common law and statutory, can be pursued.

79. Looking at the matter in broad terms, there are three possible outcomes were we to allow the appeal and so permit the Carlyle defendants to pursue their quest for anti-suit relief from the Delaware court. First that the Delaware court would refuse it, in which case the Carlyle defendants would have lost nothing from the grant of anti-anti-suit relief. Secondly, that the Delaware court would grant relief without qualification. In which case, as we have already held, the liquidators' statutory claims, freighted with public interest considerations which we have already emphasised, might disappear into a jurisdictional black hole. Third that the Delaware court, recognising its own lack of power to adjudicate upon those statutory claims, would permit them to proceed in Guernsey, while itself adjudicating upon the so-called common law claims. In our view that would be the recipe for anarchy; multiplicity of proceedings and the possibility of inconsistent results, a fortiori if the benefits of the IMA and EJC only apply to the Carlyle defendants so that proceedings against the other directors, irrespective of the outcome in any putative anti-suit injunction in Delaware, would proceed in Guernsey. It seems counter-intuitive for us to countenance the risk of a situation in which the very same allegations against directors can be adjudicated upon in separate jurisdictions depending upon whether particular directors can (or cannot) enjoy the benefit of the IMA and the EJC, when precisely the same claims (other than the ones relating exclusively to breach of the IMA) are advanced against *all* of them.

80. Turning to the perceived advantages of litigation in Delaware, as we understood their submissions to us, the Carlyle defendants maintained that there were three. The first was logistical: nine of the 10 defendants (including for this purpose the individuals in charge of the Carlyle defendants) are American, with only the seventh defendant being resident in Guernsey. The second was that the courts of the jurisdiction specified in the EJC were best placed to apply the law by which the EJC is governed and, particularly whether it should be enforced, against whom, as to which claims, and

as to what relief should be available. The third was that without enforcement of the EJC it is rendered valueless since damages generally are regarded as an insufficient remedy for such breach (see Millett LJ in *Aggeliki Charis Compania Maritima SA v Pagnan SpA (The Angelic Grace)* [1995] 1 Lloyd's Rep 87 at page 96, col 2: "The justification for the grant of the injunction in either case is that without it the plaintiff will be deprived of its contractual rights in a situation in which damages are manifestly an inadequate remedy".

81. It seems to us that none carries compulsive weight. Clearly there are issues, upon which we touched in our earlier judgment at paras 87 to 90, as to whether or not the nub of the case against the defendants is properly to be characterised as one relating broadly to insolvency and the general duties of directors of Guernsey companies or one relating narrowly to the operation of the IMA. The key question is, however, where the interests of justice ought to be best served [and those, as we see it, are the interests of justice in the substantive proceedings as a whole] when the claims are pleaded as both but with the main emphasis on the former.

82. The claim here is by liquidators as part of the winding up of a Guernsey company. None of the American defendants claims to be so impoverished as to make litigation in Guernsey for him an unfair burden. We are therefore not persuaded that there would be a material benefit to the interests of justice for the litigation to be in Delaware merely because the majority of defendants are American.

83. As to the benefit of control of proceedings being in the hands of the (Delaware) courts of the EJC jurisdiction, we take the view that issues as to the ambit of the clause, albeit they may exist, are merely preliminary to the disposal of the full substantive issues as between the parties; and we are not persuaded that there is a particular and overriding need here to have that preliminary issue determined by one court rather than another. The meaning and scope of the IMA, in particular how it might avail the Carlyle defendants in respect of the claims advanced against them (on which to date they have kept their forensic powder dry) will be matters for Delaware law on which the Royal Court can form a view after receipt of expert evidence.

84. Nor can we unreservedly endorse the dictum of Millett LJ in *The Angelic Grace*, which we have cited in para 80 as being of universal application. In the present case the additional costs and expenses of being required to litigate in Guernsey as distinct from Delaware are surely capable of quantification.

85. So our preferred conclusion is that the overall interests of justice favour the grant of the anti-anti-suit injunction.

Beloff JA]                    **Carlyle Capital Corporation Ltd v Conway**                    [Guernsey CA

86. Does then the case law compel us to a contrary conclusion? Is an EJC always a trump card which overrides all other considerations?

87. We consider first the main authorities relied on by the Carlyle defendants. We accept as a starting point that not only would the Delaware court not be regarded as acting in breach of comity in granting anti-suit relief to enforce the EJC, but that such an injunction is not to be regarded as an interference with the jurisdiction of the Courts of Guernsey. As Lord Hobhouse said in *Turner v Grovit* [2002] 1 WLR 107 at para 23:

> "The present type of restraining order is commonly referred to as an 'anti-suit' injunction. This terminology is misleading since it fosters the impression that the order is addressed to and intended to bind another court. It suggests that the jurisdiction of the foreign court is in question and that the injunction is an order that the foreign court desist from exercising the jurisdiction given to it by its own domestic law. None of this is correct. When an English court makes a restraining order, it is making an order which is addressed only to a party which is before it. The order is not directed against the foreign court: Lord Goff of Chieveley, *Société Nationale Industrielle Aérospatiale v Lee Kui Jak* [1987] AC 871, 892. The order binds only that party, in personam, and is effective only in so far as that party is amenable to the jurisdiction of the English courts so that the order can be enforced against him: 'an injunction will only be issued restraining a party who is amenable to the jurisdiction of the court, against whom an injunction will be an effective remedy'."

and continued at para 26: "the making of a restraining order does not depend upon denying, or pre-empting, the jurisdiction of the foreign court". It does not, however, follow inexorably from that uncontroversial premise that an EJC must be enforced.

88. The Carlyle defendants cited a number of cases in which the courts had used the touchstone of vexation and oppression as determination of whether proceedings in a foreign court should be restrained and argued that the existence of either was a sine qua non of engagement of anti- or anti-anti-suit relief.

89. In *OT Africa Line Ltd v Magic Sportswear Corporation* [2005] 2 Lloyd's Rep 170 Longmore LJ in the English Court of Appeal said at para 31:

> "As a broad proposition of law, an anti-suit injunction may be granted where it is oppressive or vexatious for a defendant to bring proceedings in a foreign jurisdiction."

See too *Star Reefers Pool Inc v JFC Group Co Ltd* [2012] 1 Lloyd's Rep 376 per Rix LJ at para 25, *Seismic Shipping Inc v Total E&P UK plc (The Western Regent)* [2005] 2 Lloyd's Rep 359 per Clarke LJ at para 38 and *Glencore International AG v Exter Shipping Ltd* [2002] EWCA Civ 524 per Rix LJ at para 42. We remind ourselves, however, that such dicta cannot have been intended to, and indeed cannot, substitute more restrictive criteria for the wider test of interests of justice laid down in *Aérospatiale*.

90. *OT Africa* contained the strongest dictum in favour of the Carlyle defendants' position. There the Canadian legislature had introduced into Canadian law jurisdiction, through provisions in section 46 of the Canadian Marine Liability Act 2001, which, in appropriate circumstances, allowed plaintiffs to ignore EJCs in favour of foreign courts and bring proceedings in Canada. Despite that, the English Court of Appeal upheld an anti-suit injunction and enforced an EJC in favour of England because of the importance attached in English law to "the autonomy of the parties": per Longmore LJ paras 19 and 42.

91. Mutatis mutandis it would appear that the Delaware court would be entitled to apply its own policies to the question and not those of the non-EJC forum where proceedings in breach of the EJC had been brought. That analysis, however, does not of itself provide any direct guidance to this court in determining whether to issue the anti-anti-suit injunction sought.

92. We must nonetheless recognise that the Court of Appeal in *OT Africa*, having identified that the Canadian approach to anti-suit injunctions was similar to the English approach, was satisfied that the English proceedings, which were filed in compliance with the EJC, and in the forum selected by the EJC, would not be restrained by the Canadian Court notwithstanding the statutory regime permitting proceedings in Canada:

> "[A] Canadian court would *not grant an anti-suit injunction against proceedings in England founded on an exclusive jurisdiction clause in an English proper law contract, even in support of Canadian jurisdiction properly founded in Canadian law* under Section 46(1)." (Per Rix LJ at para 80.) [Our emphasis.]

93. It was therefore submitted by Advocate Davies that the *OT Africa* case is distinct English Court of Appeal authority for the proposition that a court ought not to grant an injunction to restrain the pursuit by a person in a foreign jurisdiction of relief seeking to enforce an EJC in favour of that jurisdiction contained in a contract governed by the law of that jurisdiction, even if the failure to grant such an injunction might prevent a party from pursuing a statutory remedy in the domestic jurisdiction.

94. While we accept that the part of the reasoning of Rix LJ in *OT Africa* which we have quoted in para 92 is persuasive in favour of the Carlyle defendants we make these observations. First it was dictum only. Secondly, the starting point of the analysis (ie, the search for oppressive and unconscionable conduct) seems, with respect, to be too restrictive. Thirdly, there is in any event no exact read-across from the situation in *OT Africa* to the situation which confronts us.

95. In *OT Africa*, the Canadian statute concerned merely provided that the Canadian court was entitled to assume jurisdiction in certain cases notwithstanding the existence of a foreign forum clause (see at para 5). Essentially, there were parallel substantive proceedings. By virtue of the Canadian legislation, the Canadian court was therefore free, pursuant to the relevant legislation, to disregard the English forum clause in adjudging itself the forum conveniens and to refuse to grant a stay. The English court was, of course, not bound by the Canadian legislation and was free to adjudge itself what was the forum conveniens on the basis of a forum clause, which ostensibly captured the entirety of the dispute between the parties: the mere fact that the Canadian court had jurisdiction to hear the proceedings instituted before it by virtue of the Canadian legislation did not provide sufficiently strong reasons for not enforcing in England the English jurisdiction clause.

96. The analogy between the circumstances leading to the views which we have quoted from the decision in *OT Africa* and those of the present case is weak. In the present case the relevant part of the domestic law is not merely a power to assume jurisdiction and thus provide an alternative forum; it is rather a unique code which, in contradistinction to the laws enforceable by the Delaware courts, will govern all claims for substantive relief arising out of allegations of breach of duty by the defendants whether as directors de jure, de facto or shadow. It therefore follows that it could not be added here, as Longmore LJ indicated at para 40 in *OT Africa* that there was a further consideration for the court of the EJC, namely, that "[i]t is only by granting an injunction that it will be possible to avoid duplicity of proceedings". This reference to the undesirability of duplicity resonates in this case in favour of the liquidators' stance.

97. It is, moreover, indisputable that EJCs can be overridden in appropriate cases. In *Donohue v Armco Inc* Lord Bingham (with whom the other members of the House of Lords agreed) said:

"29. . . . the first point to be made is that Mr Donohue has as against the first three Armco appellants a *strong prima facie right not to be the subject elsewhere than in England of claims by

*those companies falling within the scope of the clause*. Some of the claims made against him by those companies in New York do fall within the clause.

. . .

33. Thus Mr Donohue's strong prima facie right to be sued here on claims made by the other parties to the exclusive jurisdiction clause so far as the claims made fall within that clause is matched by the clear prima facie right of the Armco companies to pursue in New York the claims mentioned in the last three paragraphs. The crucial question is whether, on the facts of this case, the Armco companies can show strong reasons why the Court should displace Mr Donohue's clear prima facie entitlement. If strong reasons are to be found (and the need for strong reasons is underlined in this case by the potential injustice to Mr Donohue, already noted, if effect is not given to the exclusive jurisdiction clauses) they must lie in the prospect, if an injunction is granted, of litigation between the Armco companies on one side and Mr Donohue and the PCCs on the other continuing partly in England and partly in New York. What weight should be given to that consideration in the circumstances of this case?

34. I am driven to conclude that great weight should be given to it. The Armco companies contend that they were the victims of a fraudulent conspiracy perpetrated by Messrs Donohue, Atkins, Rossi and Stinson. Determination of the truth or falsity of that allegation lies at the heart of the dispute concerning the transfer agreements and the sale and purchase agreement. It will of course be necessary for any Court making that determination to consider any contemporary documentation and any undisputed evidence of what was said, done or known. But also, and crucially, it will be necessary for any such Court to form a judgment on the honesty and motives of the four alleged conspirators. It would not seem conceivable, on the Armco case, that some of the four were guilty of the nefarious conduct alleged against them and others not. It seems to me plain that in a situation of this kind the interests of justice are best served by the submission of the whole dispute to a single tribunal which is best fitted to make a reliable, comprehensive judgment on all the matters in issue. A procedure which permitted the possibility of different conclusions by different tribunals, perhaps made on different evidence, would in my view run directly counter to the interests of justice.

. . .

36. In my opinion, and subject to an important qualification, the ends of justice would be best

served by a single composite trial in the only forum in which a single composite trial can be procured, which is New York, and accordingly I find strong reasons for not giving effect to the exclusive jurisdiction clause in favour of Mr Donohue." (Emphasis added.)

(The important qualification, germane to that, is not replicated in this case.)

98. The same theme, the need to avoid multiplicity of proceedings and possibility of inconsistent judgments, as also alluded to by Longmore LJ in *OT Africa*, is reinforced by observations of such compelling authority.

99. Not only EJCs in favour of the jurisdiction which is invited to ignore them, but also EJCs in favour of another jurisdiction, may be overridden. In *Evans Marshall and Co Ltd v Bertola SA* [1973] 1 WLR 349 there was a tripartite dispute but only two of the parties were bound by a clause conferring exclusive jurisdiction on the court in Barcelona. Kerr J at first instance was impressed by the undesirability of there being two actions, one in London and the other in Barcelona (pages 363 and 364). The Court of Appeal took a similar view (pages 377 and 385). These views were included as part of the reasoning of the House of Lords in *Donohue v Armco* itself (para 27).

100. To like effect is the decision in *Aratra Potato Co Ltd v Egyptian Navigation Co (The El Amria)* [1981] 2 Lloyd's Rep 119 where the primary dispute was between cargo interests and the owner of the vessel, both parties being bound by a clause in the bill of lading conferring exclusive jurisdiction on the courts of Egypt. The cargo interests had also issued proceedings against the Mersey Docks and Harbour Co, which was not bound by the clause. The Court of Appeal upheld the judge's decision refusing a stay. In the course of his leading judgment in the Court of Appeal Brandon LJ said, at page 128 col 2:

"I agree entirely with the learned Judge's view on that matter, but would go rather further than he did in the passage from his judgment quoted above. By that I mean that I do not regard it merely as convenient that the two actions, in which many of the same issues fall to be determined, should be tried together; rather that I regard it as a potential disaster from a legal point of view if they were not, because of the risk inherent in separate trials, one in Egypt and the other in England, that the same issues might be determined differently in the two countries."

[See too in echo of the same theme *Citi-March Ltd v Neptune Orient Lines Ltd* [1996] 1 WLR 1367 per Colman J at pages 1375 and 1376, *Mahavir Minerals Ltd v Cho Yang Shipping Co Ltd (The MC Pearl)* [1997] 1 Lloyd's Rep 566, per Rix J

at pages 569 and 575, *Bouygues v Offshore SA v Caspian Shipping Co* [1998] 2 Lloyd's Rep 461, per Knox J at page 470.]

101. There are these additional considerations, beyond the need to avoid fragmentation and inconsistency, which can subvert the apparent paramountcy of an EJC.

102. First the existence of a statutory right in one forum is itself a reason for ignoring an EJC where a right could otherwise not be given effect. The (English) Court of Appeal held in *Samengo-Turner v J & H Marsh & McLennan (Services) Ltd* [2007] 2 CLC 104 that a statutory right to litigate in England will justify an anti-suit injunction against foreign proceedings, even if the dispute was otherwise subject to a forum selection clause in favour of the foreign forum. Tuckey LJ (with whom Longmore and Lloyd LJJ agreed) explained that in such circumstances the court was faced with a choice between granting an injunction to protect the plaintiff's statutory rights and doing nothing; and that it would not be just to do nothing: see at paras 38 to 39 and 41 to 43:

"So does it follow that we should grant an anti-suit injunction? Mr Dunning submits that we should because it is the only way to make the claimants' statutory right to be sued here effective. Damages would not be an effective remedy. Mr Rosen accepted that we could grant an anti-suit injunction if we found that section 5 was engaged but urges us not to do so as a matter of discretion and judicial restraint and in the interests of comity.

The position we are in is as follows. The New York court has rejected the challenge to its jurisdiction because of the clear and unambiguous terms of the exclusive New York jurisdiction clause in the bonus agreements. Had we not been concerned with the contracts of employment we should have upheld such a clause as well. *But, as it is, our law says that we cannot give effect to it. The claimants can only be sued here. What shall we do? The only choice it seems to me is between an anti-suit injunction or nothing.*

. . .

We were referred to various English cases which have dealt with these problems in the context of commercial disputes where injunctions have been claimed on the basis of an exclusive jurisdiction clause or forum conveniens. But no case was cited to us where the exclusive jurisdiction of the English court was mandated by statute. Mr Dunning submitted that where that was so, the case for an injunction was at least as strong as a case based on an exclusive jurisdiction clause. I do not necessarily accept this. In general, if parties agree an exclusive jurisdiction clause

LLOYD'S LAW REPORTS

Guernsey CA] **Carlyle Capital Corporation Ltd v Conway** [BELOFF JA

they should be kept to their bargain; if, as here, the exclusive jurisdiction of the English courts is imposed by statute it can be said that the case for an injunction is not so strong, particularly where the statute has provided that an agreed exclusive jurisdiction clause is of no effect.

The converse of this problem arose in *OT Africa Line v Magic Sportswear Corporation* [2005] 1 CLC 923 where a cargo claim under a bill of lading containing an English law and exclusive jurisdiction clause was made in Canada relying on Canadian legalisation which allowed such a claim to be made there in spite of the clause. This court granted an anti-suit injunction to restrain the Canadian proceedings on the ground that the parties should be kept to their English law bargain. This is an illustration of the court giving full effect to party autonomy which under Article 23 of the Regulation it is required to do, but under Articles 20 and 21 it cannot. We are in the latter position: we cannot give effect to the exclusive New York jurisdiction clause.

*Doing nothing is not an option in my judgment. The New York court cannot give effect to the Regulation and has already decided in accordance with New York law on conventional grounds that it has exclusive jurisdiction. The only way to give effect to the English claimants' statutory rights is to restrain those proceedings. A multinational business must expect to be subject to the employment laws applicable to those they employ in different jurisdictions.*" (Emphasis added.)

103. Likewise in *Qantas Airways Ltd v Rolls-Royce plc* [2010] FCA 1481 the Federal Court of Australia granted an anti-suit injunction to protect the plaintiff's rights under the Australian Trade Practices Act, notwithstanding that the plaintiff's claim was otherwise subject to an exclusive jurisdiction clause in favour of England. Whilst the decision granting the defensive anti-suit injunction is not available, the reasons of Rares J on a later application (at para 5) make plain the circumstances in which the defensive anti-suit injunction was granted. Importantly, there was evidence from Professor Adrian Briggs that an English court would likely grant an anti-suit injunction to enforce a forum selection clause to the exclusion of claims under the Trade Practices Act only available to the plaintiff in Australia.

104. This approach is not limited to English or Antipodean jurisprudence. In *Laker Airways Ltd v Sabena, Belgian World Airlines* (1984) 731 F.2d 909 (DC Cir 1984), Judge Wilkey of the United States Court of Appeals (District of Columbia Circuit) identified: (i) the protection of a court's legitimately conferred jurisdiction; and (ii) prevention of

litigants' evasion of important public policies of the forum as the two circumstances in which anti-suit injunctive relief is most often necessary. Judge Wilkey commenced his analysis of this justification for the grant of injunctive relief by observing (at page 927) that:

"Courts have a duty to protect their legitimately conferred jurisdiction to the extent necessary to provide full justice to litigants. Thus, when the action of a litigant in another forum threatens to paralyze the jurisdiction of the court, the court may consider the effectiveness and propriety of issuing an injunction against the litigant's participation in the foreign proceedings."

and continued at page 929 to say that:

"there must be circumstances in which an antisuit injunction is necessary to conserve the court's ability to reach a judgment. Just as the parallel proceeding rule counsels against interference with a foreign court's exercise of concurrent jurisdiction, it authorizes the domestic court to resist the attempts of a foreign court to interfere with an *in personam* action before the domestic court."

and at page 931 to say that:

"[a]nti-suit injunctions are also justified when necessary to prevent litigants' evasion of the forum's important public policies."

[In that case, the attempt to escape the application of United States anti-trust laws to their conduct of business in the United States.]

and concluded that there was nothing improper in the first instance decision in that case to "enjoin appellants from seeking to participate in the English proceedings solely designed to rob the court of its jurisdiction". The injunction granted by the United States court was purely defensive, rather than offensive (at page 938):

"The district court's antisuit injunction was purely *defensive* – it seeks only to preserve the district court's ability to arrive at a final judgment adjudicating Laker's claims under United States law. This judgment would neither make any statement nor imply any views about the wisdom of British antitrust policy. In contrast, the English injunction is purely *offensive* – it is not designed to protect English jurisdiction, or to allow English courts to proceed to a judgment on the defendant's potential liability under English anticompetitive law free of foreign interference. Rather, the English injunction seeks only to quash the practical power of the United States courts to adjudicate claims under United States law against defendants

LLOYD'S LAW REPORTS

**Carlyle Capital Corporation Ltd v Conway**

admittedly subject to the courts' adjudicatory jurisdiction." (Original emphasis in italics.)

105. As is not infrequently the case, one can identify inconsistent lines of authority in the US casebooks. But we find Judge Wilkey's reasoning impressive and highly germane to a case (such as is before us) where the 1994 Law assigns unique jurisdiction to the Royal Court.

106. The central allegation in this case after all is that each of the defendants recklessly breached their fiduciary and other duties to CCC, which are governed by Guernsey law and raise important questions of Guernsey company law and public policy. The joint liquidators claim (amongst other matters) insolvency remedies under the 1994 Law against each of the defendants, namely relief for wrongful trading (under section 67C) and misfeasance (under section 106) as well as orders for disqualification (under section 67A). Those statutory claims are justiciable only by this court and are inextricably linked with the liquidators' non-statutory claims governed by Guernsey law for breach of fiduciary duty and gross negligence against each of the defendants.

107. Secondly, a court has a right to protect the integrity of its own judgments. In *Masri v Consolidated Contractors International Co SAL* [2008] 2 Lloyd's Rep 301; [2009] QB 503, Lawrence Collins LJ (as he then was) observed that a court has power to make "ancillary orders in protection of its jurisdiction and its processes, including the integrity of its judgments" (at para 26).

108. All the cases, we acknowledge, involve an assessment of the weight to be attached to competing considerations as was acutely noted in *Incitec Ltd v Alkimos Shipping Corporation (The Alkimos)* [2004] FCA 698 by Allsop J who said:

"At this point, one has the intersection of two powerful considerations in international litigation: first, the desire of courts to hold commercial parties to their bargain in terms of exclusive jurisdiction clauses; secondly, the desire of courts to avoid disruption and multiplicity of litigation, in particular a desire to avoid parallel proceedings and the risk of inconsistent findings, and to avoid the causing of inconvenience to third parties . . .

At the outset, it should be recognised that the second competing consideration should not be expressed too broadly. To the extent that the operation of the exclusive jurisdiction clause causes financial or forensic inconvenience to the party which bound itself to the clause, that, of itself, is to be seen as only the direct consequence of the bargain entered and, generally, can be set to one side. What really are of importance in weighing against the operation of the exclusive

jurisdiction clause are: (a) the inconvenience, if any, whether financial or other, caused to third parties; (b) the effect, if any, upon the due administration of justice; and (c) any other appropriate public policy consideration that can be discerned in all the circumstances."

and concluded at page 509:

"The balance is a fine one, but overall in my view this Court should not promote competing and potentially conflicting litigation in circumstances where one venue can conveniently and promptly deal with the whole controversy."

We agree though the balance here is, in our judgment, less fine for reasons we now develop.

109. The Carlyle defendants made an informed tactical choice to litigate the question of forum and jurisdiction in Guernsey, with the alternative of a stay, knowing that it was only in this jurisdiction that they could obtain a stay of the entirety of the plaintiffs' claims. They sought a stay of all claims against all defendants on the basis of the forum clause in the IMA (notwithstanding that, even on the defendants' case, none of the seven director defendants is entitled to the benefit of the forum clause or to enforce the clause). At no time were the Carlyle defendants or any of the other defendants compelled to litigate the jurisdictional dispute in Guernsey. On the contrary, the defendants were content for the hearing to proceed before DB Collas in Guernsey on the basis that it was "agreed that all claims in this multi-jurisdictional matter should be tried in a single forum", and thus they could argue that all the liquidation claims should be determined in Delaware by reason of the fact that some fell within the scope of the forum clause. They pursued their exceptions déclinatoire to judgment. They did so without ever requesting the Royal Court to await the outcome of any application in the Delaware Court of Chancery before determining their exceptions, or submitting that it would be appropriate for the Royal Court to do so. Further, the revival in this chapter of proceedings of the reliance on the EJC, which we held ineffective in our first judgment, does savour strongly of an attempt to re-litigate a matter already decided against them. Interest reipublicae ut sit finis litium is a precept as applicable to interlocutory motions as to substantive trials.

110. In *Masri*, Lawrence Collins LJ (as he then was) observed that cases in which a party seeks to re-litigate abroad the subject matter of an English judgment are (at para 95) "classic case[s] of vexation and oppression, and of conduct which is designed to interfere with the process of the English court" and later reiterated this view, stating (at para 100):

"It is consistent with principle for an English court to restrain relitigation abroad of a claim

which has already been subject of an English judgment. There is long-established authority that protection of the jurisdiction of the English court, its process and its judgments by injunction is a legitimate ground for the grant of an anti-suit injunction."

111. Indeed the Carlyle defendants asked this court in the earlier appeal to determine its own jurisdiction and in so doing set in motion a process (including the exercise of rights of appeal) which has resulted in an appellate decision on the issues of forum and jurisdiction. They now seek to re-litigate the same issues in Delaware, with a necessary concomitant of depriving the Royal Court of its jurisdiction in the matter notwithstanding the fact that an appellate court has determined that Guernsey is clearly and distinctly the appropriate forum for the trial of the liquidators' claims (and the only available forum for the trial of all the liquidators' claims).

112. We would therefore, if necessary, characterise the purpose of the Carlyle defendants' pursuit of the Delaware anti-suit proceedings, and of this appeal, as vexatious. It is calculated: (1) to prevent the liquidators from continuing to pursue this litigation in a single forum to a single trial; and (2) to prevent the liquidators from ever pursuing their statutory insolvency remedies against the Carlyle defendants, which are available to the liquidators only in Guernsey.

113. Bell, at page 198 aptly observes that:

"The expedient of seeking an anti-anti-suit injunction will be especially important where there is a difference in the substantive law to be applied in the competing forums, whether by reason of the operation of a mandatory law of one forum that overrides any expressly chosen law, as was the case in Akai, or simply by dint of different choice of law rules . . ."

114. Turning, penultimately, to the decision of Judge Finch, his rationale on considering the arguments put before him appears from paras 56 to 58 of his judgment of 17 November 2011. He acknowledged that his starting point was the simple one of asking why – as he understood the likely result of acceding to the Carlyle defendants' arguments – the liquidators should be stopped from exercising their right of appeal. In addressing this conundrum he proceeded to emphasise the importance of the statutory insolvency claims over which the Delaware courts must be assumed to have no jurisdiction. As he then observed, he was not to be mesmerised by the EJC. Read fairly in context, and bearing in mind his earlier discussion of the EJC at paras 39 to 46, his reasoning appears to recognise that the EJC had to play a part in his process of deliberating on the arguments before him; but did not outweigh the importance to be accorded to the statutory claims and the interests of justice in trying to avoid the problems of fragmentation.

115. The arguments before this court had, as often, moved on from those before the court below into broader and deeper considerations; but we do not consider the judge's reasoning, as we have indicated our understanding of it, to be flawed.

116. In conclusion there is a strong public policy in Guernsey against multiplicity of litigation and the fragmentation of proceedings that can and should be determined in a single action. The objectives and rationales underlying the policy are clear, including: (i) the saving of costs and waste of party and judicial resources; (ii) the avoidance of delay; (iii) the avoidance of the risk of inconsistent decisions and consequent injustice to parties; (iv) the prevention of loss to a complainant of the benefit of a single composite trial; (v) the avoidance of uncertainty and satellite disputes such as on questions of issue estoppel or res judicata; and (vi) the avoidance of potential injustice to third parties. Plainly in this case the interests of justice are best served by the submission of the whole of the dispute to a single tribunal which is best fitted to give comprehensive judgment on all matters in issue in accordance with its own law which governs the vast majority of the claims. It is in reliance on the fundamental principle of the interests of justice, so explained, that we dismiss this appeal.

# TAB 23

[HOUSE OF LORDS.]

H. L. (E.)*  CASWELL  .  .  .  .  .  .  .  .  .  .  .  APPELLANT ;

1939                                    AND

May 4, 5, 8,  POWELL   DUFFRYN   ASSOCIATED ⎫
9, 15, 16 ;        COLLIERIES, LIMITED .  .  .  ⎬  RESPONDENTS.
July 25.                                          ⎭

*Mine—Unfenced machinery—Accident to workman—Failure of mine-owners to provide for notice of starting of machinery—Coal Mines Act, 1911 (1 & 2 Geo. 5, c. 50), ss. 55, 102, sub-s. 8.*

The respondents had in their colliery conveyor belts for transporting coal from the face to trams which by a rope haulage system conveyed it to the pit bottom. Sometimes portions of the coal, when damp, adhered to the surface of the belt and caked into hard obstructions, causing the belt to run out of alignment ; and to prevent this it was the duty of a workman, C. periodically to clean the upper roller by means of a scraper. In order to do this C. had to take off a movable plate from the machine operating the belts. This machine was put in motion and off again by a lever operated some distance away. C. had been told that he must not clean the roller while the machinery was in motion, and, further, he was instructed to replace the plate when he had finished cleaning. One day, after some journeys of the belt, the machine stopped, and the dead body of C. was found caught by the arm between the belt and the roller. The movable plate was found standing against the fixed plate below. No system of signalling or calling to the cleaner before starting or restarting the machine was in use in the mine, and it was therefore possible for it to be started while the cleaner was at work cleaning the roller.   In an action by the mother of C. claiming damages under the Fatal Accidents Acts and as his administratrix :—

*Held,* that the respondents were under a duty to see that the plate was replaced before the machine was restarted and had failed to comply with that obligation ; that a system which involved work being done at a machine which might be set in motion without any signal to the workman engaged in cleaning it was defective ; that the respondents had failed to show that it was not reasonably practicable to avoid or prevent the breach ; and therefore that they were liable in damages.

An action in respect of injuries caused by a breach of statutory duty does not differ from an action in respect of injuries caused by any other wrong. The defendant in such an action will succeed if he proves that the injury was caused wholly or in part by the omission of the workman to take the ordinary

―――――――――――――

* *Present :* LORD ATKIN, LORD THANKERTON, LORD MACMILLAN, LORD WRIGHT, and LORD PORTER.

care that would be expected of him in the circumstances ; but the
care to be expected of the workman may vary with the circum-
stances, and a different degree of care may well be expected from
a workman in a factory or mine from that which might be taken
by an ordinary man not exposed continually to the noise, strain and
manifold risks of the factory or mine.

Per Lord Wright. An action claiming damages for breach of
statutory duty is not completely or accurately described as an
action in negligence ; it is a common law action based on the purpose
of the statute to protect workmen, and it belongs to the category
often described as that of cases of strict or absolute liability.
At the same time, it resembles an action in negligence in that the
claim is based on breach of a duty to take care for the safety of
the workmen. English law has, however, accepted contributory
negligence as a defence in this class of action, but the policy
of the statutory protection would be nullified if a workman were
held debarred from recovering because he has been guilty of some
carelessness or inattention to his own safety which, though trivial
in itself, threw him into the danger consequent on the breach by
his employers of their statutory duty. It is the breach of the statute,
not the act of inadvertence or carelessness, which is then the
dominant or effective cause of the injury.

Statement of the law by Lawrence J. in *Flower* v. *Ebbw Vale Steel,
Iron and Coal Co., Ld.* [1934] 2 K. B. 132, at pp. 139, 140 approved.

Decision of the High Court of Australia in *Bourke* v. *Butterfield
and Lewis, Ld.* (1926) 38 C. L. R. 354 considered.

Decision of the Court of Appeal reversed.

APPEAL from a decision of the Court of Appeal.

The plaintiff, the mother of a young man who was killed
while working underground in a pit belonging to the
respondents, sued under the Fatal Accidents Acts, and as
administratrix of his estate, to recover damages on the ground
that her son's death was caused by a breach of the duty
imposed upon the respondents by s. 55 of the Coal Mines
Act, 1911, which provides that " every fly-wheel and all
" exposed and dangerous parts of the machinery used in or
" about the mine shall be kept securely fenced." Five days
before his death the appellant's son, Arthur Caswell, had
been given the work in the mine at which he was killed. The
respondents had installed a system of conveyor belts which
transported the coal, when gotten, from the face to trams in
which by a rope haulage system it was eventually conveyed
to the pit bottom. The conveyor belt which was rather less
than three feet wide, passed along the roadway, being supported

H. L. (E.)

1939

CASWELL
*v.*
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

H. L. (E.)

1939

CASWELL
v.
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

on trestles with rollers. The belt was driven by a compressed air turbine actuating three drums, this engine being at the side of the roadway. After the installation of this apparatus it was found that when the coal was damp, portions adhered to the surface of the belt and caked into hard obstructions, causing the belt to run out of alignment, and it was part of Caswell's duty to clean, when necessary, the upper roller when so obstructed, and to enable him to do this he was provided with iron scrapers. To clean the roller he had to remove the upper movable plate. He was told that he must not clean the roller while it was in motion, and, further, that he must replace the plate when he had finished cleaning. The machine in question was put in motion and stopped by a lever operated by a man some distance away, but there was no system of signalling or calling to Caswell, the cleaner, before the machine was started or restarted. A few days after he had been engaged in the work of cleaning the rollers his dead body was found close to the machine, he having been caught between the belt and the rollers, but how precisely this happened did not appear.

The action was tried by Humphreys J., who held that the plaintiff had failed to discharge the onus of proving either negligence or a breach of statutory duty on the part of the defendants and he gave judgment in their favour, and that judgment was affirmed by the Court of Appeal (Greer, Slesser and MacKinnon L.JJ. Slesser L.J. dissenting).

The plaintiff appealed to this House.

*D. P. Maxwell Fyfe* K.C. and *Joshua Davies* K.C. for the appellant. There having been a breach by the respondents of the duty imposed upon them by statute to have the dangerous machine securely fenced, and the deceased workman having met his death as a consequence of such breach, the respondents are liable in damages to the appellant. The mere fact that the deceased was caught and killed by the machine in the way he was, is evidence of a breach of the statute, calling upon the respondents to show, and they have failed to show, that it was impracticable to have the machine securely fenced or in such

**A. C.**        AND PRIVY COUNCIL.                    155

a condition as not to be a source of danger. In *Coltness Iron* <span style="float:right">H. L. (E.)</span>
*Co., Ld.* v. *Sharp* (1) this House held that, as it was not reason-
ably practicable to keep the machinery there in question
securely fenced, seeing that it had to be observed while being
tested, the appellant company were entitled to protection
from liability in respect of an accident to a workman who was
caught in the unprotected gearing. No such claim to exemption
from liability is possible in the present case. *Carey* v. *Ocean
Coal Co., Ld.* (2), decided that the duty to fence exposed
and dangerous parts of machinery imposed by s. 55 of the
Coal Mines Act, 1911, is even higher than that imposed by
s. 10 of the Factory and Workshop Act, 1910 : see also *Wing*
v. *Soar.* (3) As was said by Lord Wright in *Lochgelly Iron
and Coal Co., Ld.* v. *M'Mullan* (4), the provisions of the Coal
Mines Act, 1911, requiring that the roof of every working
place shall be made secure, "clearly belong to the class which
"impose a duty on the employer to take certain precautions
"for the protection of his workmen ; it is absolute in its terms,"
save where it is not reasonably practicable to avoid or prevent
a breach : see also *Flower* v. *Ebbw Vale Steel, Iron and Coal Co.,
Ld.* (5) So in this case the obligation on the respondents to fence
the machine was absolute. No contributory negligence by the
deceased was shown. In *Pringle* v. *Grosvenor* (6), the Court
of Session held that where a workman in a factory is injured
by an accident which would not have happened if the gearing
had been properly fenced as required by statute, the employer
cannot escape liability by the fact that the accident was partly
due to a mistake on the part of the workman : see also *Gibb* v.
*Crombie.* (7) In the Australian case of *Bourke* v. *Butterfield
and Lewis, Ld.* (8), it was held that contributory negligence is
not a defence to an action to recover damages for personal
injury caused by a breach of an absolute duty imposed for
the benefit of a class of persons, e.g. workmen ;  see also
*Groves* v. *Wimborne (Lord)* (9), where it was said that the

<div style="float:right; text-align:center">
1939<br>
CASWELL.<br>
<i>v.</i><br>
POWELL<br>
DUFFRYN<br>
ASSOCIATED<br>
COLLIERIES,<br>
LD.
</div>

(1) [1938] A. C. 90.                    (6) (1894) 21 R. 532.
(2) [1938] 1 K. B. 365.                 (7) (1875) 2 R. 886.
(3) [1938] 1 K. B. 379*n.*               (8) (1926) 38 C. L. R. 354.
(4) [1934] A. C. 1, 22.                 (9) [1898] 2 Q. B. 402.
(5) [1936] A. C. 206.

H. L. (E.)

1939

Caswell
*v.*
Powell
Duffryn
Associated
Collieries,
Ld.

defence of common employment is not applicable in a case where injury has been caused to a servant by a breach of the absolute duty imposed upon the master for the servant's protection: see also *Britton* v. *Great Western Cotton Co.* (1) ; and *Blenkinsop* v. *Ogden.* (2)   The duty of the respondents to fence the machine was absolute : see *Vincent* v. *Southern Ry. Co.* (3)   In *Senior* v. *Ward* (4) it was held that where a servant is killed or injured by accident resulting from the habitual negligence of a fellow workman acquiesced in by the employer, the latter is liable unless there has been contributory negligence by the servant.   In *Clarke* v. *Holmes* (5), Cockburn C.J. pointed out that even if the plaintiff in that case, who was injured by unfenced machinery, knew that it was unfenced, that was only a fact in the case, to be taken into consideration by the jury with all the other facts and circumstances, in determining whether the plaintiff had himself helped to bring about the accident in respect of which he sought to charge the defendant.   Here, the fact that this machine could be restarted without communication with the cleaner was clearly a dangerous method of working.

*Sir William Jowitt K.C., Trevor Hunter K.C.* and *Godfrey Parsons* for the respondents.   The machine in question was properly fenced on the morning of the accident and some one must have removed the protecting plate.   We submit that this must have been done by the deceased man himself.   That is the most likely explanation of how the accident occurred. With regard to the law, in such a case as this it is for the plaintiff to establish the breach of the statutory duty to fence machinery causing the accident : see *Grand Trunk Ry. Co.* v. *McAlpine* (6) ; and contributory negligence is an answer to such a claim : see per Lawrence J. in *Flower* v. *Ebbw Vale Steel, Iron and Coal Co. Ld.* (7), where he pointed out that the decision of the Australian Court in *Bourke* v. *Butterfield and Lewis, Ld.* (8), to the effect that contributory negligence is not a defence in such an action, is inconsistent with the English authorities.

(1) (1872) L. R. 7 Ex. 130.

(2) [1898] 1 Q. B. 783.

(3) [1927] A. C. 430.

(4) (1859) 1 E. & E. 385.

(5) (1862) 7 H. & N. 937, 945.

(6) [1913] A. C. 838.

(7) [1934] 2 K. B. 132.

(8) 38 C. L. R. 354.

**A. C.**          AND PRIVY COUNCIL.                    157

If, then, the deceased was the cause, or one of the main causes, of the injury which happened, his representative cannot recover, seeing that the deceased had the plainest possible warning that he must not clean the roller while the machine was in motion as it was highly dangerous to do so.

*D. P. Maxwell Fyfe K.C.* replied.

<div style="text-align:right">
H. L. (E.)

1939

CASWELL
*v.*
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.
</div>

The House took time for consideration.

1939. July 25. LORD ATKIN. My Lords, this is an appeal from a decision of the Court of Appeal who dismissed an appeal from a judgment of Travers Humphreys J. in favour of the defendants at the trial at the Cardiff Assizes in December, 1937. The appellant, the plaintiff in the action, is the mother of a young man, Arthur Caswell, who was killed while working underground at the Pandy Pit of the Naval Colliery, Penygraig, belonging to the respondents. She sues under the Fatal Accidents Acts, and also as administratrix of his estate to recover damages on the ground that his death was caused by a breach of a statutory duty imposed upon the defendants by s. 55 of the Coal Mines Act, 1911. That section prescribes " every fly-wheel and all exposed and dangerous "parts of the machinery used in or about the mine shall be kept "securely fenced." Caswell had been employed at the pit since he was fifteen. At the time of his death he was twenty-two. Five days before his death he had been given the work at which he was killed. The facts of the case as they emerged in this House are as follows. They were not fully ascertained in the Courts below, a circumstance which is especially unfortunate in view of the fact that the inquiry was into the conditions attending the death of a workman. The parties, however, gave every assistance to place the full facts before this House. It appears that about fifteen months before the date of the occurrence in question the defendants had installed a system of conveyor belts which transported the coal when gotten from the face to trams in which by a rope haulage system it was eventually conveyed to the pit bottom. The conveyor belt, which directly led the coal to the trams, is

H. L. (E.)
1939
CASWELL
*v.*
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

Lord Atkin.

the one with which this case is concerned : it was in fact
fed by two other conveyor belts communicating with the face.
The belt, which was rather less than 3 feet wide, passed
along the roadway, being supported on trestles with rollers
until it reached the chute, down which it deposited its load
into trams. The trams were made up in " journeys " of
fifteen trams, and unloaded were drawn in turn beneath the
chute which had a device to check the discharge during the
interval between one tram and the next. The belt itself
during the loading went on revolving. As the belt discharged
its load it passed round a roller or pulley and proceeded on
its return journey immediately below the full portion. It
was, of course, reversed so that the surface which had been
uppermost and in contact with the coal was now undermost.
The belt was driven by a compressed air turbine actuating
three drums, pulleys or rollers, as they have been called in
the case, each of 12 inches diameter and about 3 feet in width.
This engine was at the side of the roadway : the upper belt
with the coal passed over it : the lower belt passed into it
at the top of the engine and passing over the three rollers
received its motive force. It passed into the machine at the
height of about 6 feet. Originally the whole structure was
enclosed, but after a year's working it was found necessary
to have facilities for access to the top roller, the point met
by the belt, for the purpose of cleaning. It was found that
when the coal was damp, portions of coal and slimy stuff
adhering to the surface of the belt would cake into hard
obstructions on the surface of the roller, and cause the belt
to run out of alignment. For this purpose the upper portion
of the plate on the approach side of the engine was made
detachable. The machine remained enclosed up to the height
of about 4 feet 5 inches, and the remaining portion, about
1 foot 6 inches, was loose, and was fitted into a slot so as to be
removed and replaced without much difficulty. It was
about 3 feet wide, and to remove or replace it the operator
had to stand in front ; apparently it could not be placed in
the slot from the side. From the line of the plate to the
nearest portion of the roller was a distance of 2 feet. To

**A. C.**         AND PRIVY COUNCIL.         159

the bite of the roller and the belt was 2 feet 9 inches. Part
of Caswell's duty was to clean this upper roller when necessary.
For this purpose he was provided with two iron scrapers
which were produced at the hearing. They were heavy
implements about 4 feet in length, shaped like a hoe, the
scraper end was about 6 inches in width; at the other end
there was a rough handle in the shape of a ring. They were
sufficiently heavy to make it improbable that a man would
seek to handle them with only one hand. He could not, of
course, clean the roller without removing the movable plate.
The machine was about 12 yards away from the chute end
of the belt. It was put in motion and off again, not at the
machine itself, but by a lever at this chute which was in charge
of an assistant foreman, at this time Christopher Williams.
The remaining work of Caswell was to bale the water that
accumulated at this part of the roadway. The tramway
was laid on sleepers laid transversely in the usual way; but
sleepers were put down by the side of the tram lines and
parallel with them to afford a footing, and intervals were left
between these sleepers to afford a sump or sumps from which
the water could be withdrawn. For this purpose Caswell
was provided with a bucket with which he baled the water
either into a cask on one of the trams at the beginning of the
first shift and afterwards into any empty tram that might
be standing by. As far as his duties of cleaning the roller
were concerned, it was proved that he had received instruction
that he was not to clean while the machinery was in motion
and that he was to replace the plate when he had finished.
On the day in question four journeys had been completed.
The men were engaged in loading the fifth journey; they
had loaded three out of the fifteen trams, the fourth was
under the chute when the machinery stopped. They went
to the machine, and there they found the dead body of the
unfortunate Caswell; his right hand was outstretched, caught
between the belt and the roller and his head was drawn up
against the roller; his neck was broken. The body was drawn
up so that his feet were two feet from the ground, and beneath
his feet and lying in water beneath his feet was one of the iron

H. L. (E.)

1939

CASWELL
*v.*
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

Lord Atkin.

H. L. (E.)
1939

CASWELL
*v.*
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

Lord Atkin.

scrapers. The movable plate was standing up against the fixed plate below.

It is in these circumstances that this action was brought. It seems to me quite clear that this machinery when unfenced and in motion was dangerous ; that it was not fenced at the time and therefore was not left fenced ; and that the omission to keep the machine fenced " materially contributed to the "injury or death complained of," to use the text of Lord Watson in *Wakelin* v. *London and South Western Ry. Co.* (1) It would appear, therefore, that the defendants would be liable unless they proved—(a) under the terms of s. 102, sub-s. 8, of the Coal Mines Act that it was not reasonably practicable to avoid or prevent the breach, or (b) that a contributory cause of death was the negligence of the deceased workman. It will be convenient to deal with the second defence first, for the principal discussion in the case was on that topic.

There were four ways in which it was possible for Caswell to have cleaned the roller. The first, the forbidden way, was to scrape the dirt off the roller while it was in motion, i.e., while the conveyor belt was actually discharging into the trams. This was, as the assistant manager proved, forbidden. The plaintiff called three trustworthy trade union officials who deposed interviews with the manager in which he had said that this was the only way in which the roller could be cleaned. The manager deposed that he was misunderstood. He was referring to another method which is later to be described. The learned judge who saw the witness accepted the manager's explanation, and we cannot differ from his finding. The plaintiff also called a witness, Howells, who was at the time of the accident working at the mine. He not only spoke of this practice but said that no scrapers were provided—only a long rod ; that the movable plate was always absent, and that cleaning was constantly done by hand. The trial judge entirely disbelieved this witness with good reason. The defendants' witnesses made it plain that the dirt on the roller caked into hard excrescences which could not be flicked off by the hand but had to be hit off with the scraper. There is

(1) (1886) 12 App. Cas. 41, 47.

**A. C.**          AND PRIVY COUNCIL.          161

no evidence that Caswell ever cleaned the roller while in
motion, and it seems reasonably clear that at any rate at the
time of this accident he was not doing so. It would, according
to the defendants' own evidence, be very unlikely that he would
be doing such a futile thing as to use his hand alone, and if
he were using the scraper—(a) his hand would not have got into a
position to be caught, (b) the scraper would not have been
found in the position where it was, lying at his feet. The
second method was to clean the roller while the trams were
being loaded. It might happen that the belt would be out of
alignment or even stop because of obstruction on the roller.
In these circumstances, Williams, of his own accord or on a
hail from the cleaner, would stop the engine. The roller would
be cleaned and a half-turn given so as to expose and clean the
whole, and when finished, on another shout from the cleaner,
the conveyor would be started again. This involved, of course,
stopping the conveyance of coal throughout the entire part of
the mine served by the conveyors, and seems a course which
a boy of twenty-two would be disinclined to take on his own
initiative. On the day in question it had not been adopted, for
the machinery had never stopped except during the changing of
the journeys. The third method was that which the manager
said gave rise to the misunderstanding at the interviews.
While the machinery was stopped, during the changing of the
" journeys," a period of about fifteen minutes, the exposed
portion of the roller would be cleaned by the scraper ; the
cleaner would then call for another half-turn of the machine
and the other half of the roller would be so exposed and
cleaned. This would have been a simple method ; it seems
to have been assumed at the trial that it was the normal
method, and I think it clear that the trial judge so thought.
But on ascertaining the facts for this House it was made clear
that this was not how it was done. The system of working
required Christopher Williams, who was in charge of the lever
operating the machine, to leave the spot at the chute where the
lever was and attend the outgoing journey up to the spot about
80 yards away where there were double lines of tramway,
detach one end of the haulage rope from the outgoing journey,

H. L. (E.)

1939

CASWELL
v.
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

Lord Atkin.

H. L. (E.)
1939
CASWELL
v.
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

Lord Atkin.

attach it to the incoming journey of empty trams and accompany the latter to the chute. During this time, therefore, there was no one available to give the necessary half-turn, and this reasonably safe and effective system was not adopted. The fourth method was to wait until the machinery had stopped for the change of journeys and then clean the half of the roller which happened to be exposed, waiting to clean the remainder of the roller when it came into view at a subsequent stop. This was somewhat fortuitous for the cleaned portion might come up again at the next stop. I think, however, that it is almost demonstrable that this was the method adopted by Caswell on this morning. The first method, cleaning in motion is, I think, negatived by the evidence. The second and third were not used that morning as is shown by Williams's evidence as to the engine. As to the fourth, I think there must have been some occasion to clean. The manager said the roller required cleaning twice an hour; the movable plate had been taken off; and one scraper at least had been handled by Caswell, for it was lying at his feet and not at the side where it had been left by the night overman at the end of the night shift.

Is there then any evidence that Caswell had been guilty of negligence contributing to the accident ? If there is it must be in the fact that he had not replaced the movable plate. That he was authorized, indeed bound, to remove it from its closed position is manifest. The machine could not be cleaned unless he did. The facts seem to show that he had been using the scraper to clean the roller while at rest. Is it proved that he was negligent in not replacing the plate ? Now it is quite plain that there was no system of signalling or calling to the cleaner before starting the engine for the new journey. It was therefore perfectly possible for the machinery to start while the cleaner was at work at the roller. What was he then to do ? He would cease cleaning and put down his scraper. The plate could only be replaced while facing the moving machinery, and I cannot think that it was negligent on his part to incur this particular risk once the machinery started. The plate would have to be lifted to within about two or three inches at

**A. C.**          AND PRIVY COUNCIL.          163

the most from the moving belt. I think it would be fair to
conclude not only that it was not negligent to omit to replace
the plate in the circumstances but that caution required that
it should not be replaced. But if there was no negligence
proved in not replacing the plate what other careless act of
omission or commission is proved? Clearly none. What
precisely happened is not known. It is perfectly possible,
as pleaded in the alternative of the defendants themselves,
that the unfortunate man slipped and stumbled with his arm
through the opening and thereby was caught. Four or five
minutes probably elapsed from the time the machinery started.
I cannot see that he was doing anything careless in standing
near the orifice during that period or perhaps taking the
preliminary steps to resume his other job of baling. I should
add that I do not think he is shown to be careless by not
noticing either from the lapse of time or from the passing of
the journey of empty trams that the stop interval was coming
to an end. If closely engaged in cleaning he might well be
regardless of time. I come to the conclusion, therefore, that
the defendants have not established any contributory negli-
gence on the part of the deceased man. I propose, however,
later to say something on the interesting question whether any
and what contributory negligence affords a defence to such an
action as this.

I will, however, first discuss the other defence I mentioned
under s. 102, sub-s. 8, of the Act. As to this it is plain that the
defendants were entitled to entrust the cleaner with the duty
of removing this guard, for the roller could not otherwise be
cleaned. It was their duty, however, to see that the guard
was replaced; and though primarily that had to be done by
the cleaner, yet it was their duty to see that such a system of
working was adopted as made the performance of that duty
practicable with reasonable safety. A system which involved
work being done at a machine which might be set in motion
without any signal to the workman engaged in cleaning it
seems to me most defective. Any kind of signal could have
been employed which would give the cleaner time to stop
cleaning and close the fence. The defendants entirely fail, in

H. L. (E.)

1939

CASWELL
*v.*
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

Lord Atkin.

164                           HOUSE OF LORDS                    [1940]

H. L. (E.)   my judgment, to show that "it was not reasonably practicable
1939      "to avoid or prevent the breach."
CASWELL          Though I have come to the conclusion that in this case the
v.       defendants failed to prove negligence on the part of the
POWELL
DUFFRYN   deceased workman, I feel bound to say something on the topic
ASSOCIATED  which was much discussed in argument, whether contributory
COLLIERIES,  negligence is ever a defence to an action based upon a breach
LD.     of a statutory duty, or, more narrowly, based upon a breach of
Lord Atkin.  a statutory duty to protect workmen and others imposed by
such Acts as the Factory, Mining Acts, etc. Authority for the
proposition that contributory negligence in the ordinary sense
is not a defence to such an action is to be found in the judgment
of the High Court of Australia in *Bourke* v. *Butterfield and Lewis,
Ld.* (1) The argument is that safety obligations are placed
upon employers for the purpose of protecting not only work-
men who are careful but also those who are careless, and
that the object of the Legislature is defeated if the right to sue
for injuries caused by the breach of the safety regulations is
denied to the careless workman for whose benefit, amongst
others, the legislation was specially enacted. I venture to think
that this attractive theory does not give sufficient weight to
the true cause of action in such cases. The statute does not in
terms create a statutory cause of action. It does not, for
instance, make the employer an insurer. The person who is
injured, as in all cases where damage is the gist of the action,
must show not only a breach of duty but that his hurt was
due to the breach. If his damage is due entirely to his own
wilful act no cause of action arises; as, for instance, if out of
bravado he puts his hand into moving machinery or attempts
to leap over an unguarded cavity. The injury has not been
caused by the defendants' omission but by the plaintiff's own
act. But the injury may be the result of two causes operating
at the same time, a breach of duty by the defendant and the
omission on the part of the plaintiff to use the ordinary care
for the protection of himself or his property that is used by the
ordinary reasonable man in those circumstances. In that case
the plaintiff cannot recover because the injury is partly caused by

(1) 38 C. L. R. 354.

**A. C.**          AND PRIVY COUNCIL.                    165

what is imputed to him as his own default. On the other hand
if the plaintiff were negligent but his negligence was not a
cause operating to produce the damage there would be no
defence. I find it impossible to divorce any theory of contri-
butory negligence from the concept of causation. It is
negligence which " contributes to cause " the injury, a phrase
which I take from the opinion of Lord Penzance in *Radley* v.
*London and North Western Ry. Co.* (1) And whether you ask
whose negligence was responsible for the injury, or from whose
negligence did the injury result, or adopt any other phrase
you please, you must in the ultimate analysis be asking who
" caused " the injury ; and you must not be deterred because
the word " cause " has in philosophy given rise to embarrass-
ments which in this connection should not affect the judge.
Nor is this question of contributory negligence one that arises
only in cases where the defendant is charged with negligence,
as though the negligences belong to the same pack and one
trumps the other. In the leading case of *Butterfield* v. *Forrester*
(2) the action was a case for obstructing the highway whereby
the plaintiff was injured. No negligence appears to have been
alleged and the action appears to have been a simple action
for a nuisance on the highway. The authority cited in argu-
ment from Buller's Nisi Prius, 26.9. so describes the
action. I quote from the 7th ed., of 1817 ; "So if a man
"lay logs of wood cross a highway, though a person may
"with care ride safely by, yet if by means thereof my horse
"stumble and fling me I may bring an action : for wherever
"a man suffers a particular injury by a nuisance he may
"maintain an action." Yet it is in such an action that Lord
Ellenborough laid down the classic rule : " One person being
"in fault will not dispense with another's using ordinary care
"for himself." And the omission by the plaintiff to use ordinary
care may be the sole cause of the injury as was held in
*Butterfields'* case (2), or have contributed to cause the injury
as in the numerous cases which appear in the books. It may
be said finally that if contributory negligence is not regarded
from the point of view of causation it is difficult to see how

H. L. (E.)

1939

CASWELL
*v.*
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

Lord Atkin.

          (1) (1876) 1 App. Cas. 754.          (2) (1809) 11 East. 60.

166            **HOUSE OF LORDS**          **[1940]**

H. L. (E.)     damage comes to be divided under the Admiralty rule which is

1939     adopted in ordinary cases of injury in other systems of juris-

Caswell   prudence, and which persons of authority think should be

*v.*     adopted in ours.

Powell

Duffryn       I cannot therefore accept the view that the action for

Associated

Collieries,  injuries caused by breach of statutory duty differs from an

Ld.     action for injuries caused by any other wrong. I think that

Lord Atkin.   the defendant will succeed if he proves that the injury was

caused solely or in part by the omission of the plaintiff to take

the ordinary care that would be expected of him in the

circumstances.

But having come to that conclusion I am of opinion that the
care to be expected of the plaintiff in the circumstances will
vary with the circumstances ; and that a different degree of
care may well be expected from a workman in a factory or a
mine from that which might be taken by an ordinary man not
exposed continually to the noise, strain, and manifold risks of
factory or mine. I agree with the statement of Lawrence J. in
*Flower* v. *Ebbw Vale Steel, Iron and Coal Co., Ld.* (1), cited by my
noble and learned friend Lord Wright (2) : "I think of course
"that in considering whether an ordinary prudent workman
"would have taken more care than the injured man, the
"tribunal of fact has to take into account all the circumstances
"of work in a factory, and that it is not for every risky thing
"which a workman in a factory may do in his familiarity with
"the machinery that a plaintiff ought to be held guilty of
"contributory negligence." This seems to me a sensible
practical saying, and one which will afford all the protection
which is necessary to the workman. I cannot go further with
the High Court of Australia and limit contributory negligence
in this kind of case to wilful or serious misconduct. I have
already said that I see no ground for imputing any negligence
to the deceased man in the present case judged by any stand-
ard ; but in any case, judging the question of fact by the
standard suggested by Lawrence J., I think that the defence
of contributory negligence inevitably failed. This appeal
must be allowed ; and as the amount of damages has not been

(1) [1934] 2 K. B. 132, 139, 140.     (2) [1936] A. C. 206, 214.

**A. C.**      AND PRIVY COUNCIL.      167

determined, there must be a new trial on the question of damages only. Unless the parties otherwise agree the case will be reheard at the next Assizes for the County of Glamorgan. The appellant must have the costs so far incurred here and in the Courts below.

I am requested by my noble and learned friend Lord Thankerton to say that he agrees with the opinion which I have read.

<div style="text-align: right;">

H. L. (E.)

1939

CASWELL
*v.*
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

Lord Atkin.

</div>

LORD MACMILLAN. My Lords, this is an action of damages by the mother of a mine worker who met his death while at work in a colliery belonging to the respondents. Her case is that her son's death was due to the respondents' breach of their duty, under s. 55 of the Coal Mines Act, 1911, to keep securely fenced the exposed and dangerous machinery in the mine which the deceased was employed to tend.

It has to be borne in mind that the Coal Mines Act, while largely concerned with prescribing precautions to be taken for ensuring the safety of workmen in mines, does not confer any right of civil action for breach of its provisions. The statute enforces its requirements by imposing penalties of fine or imprisonment for their infringement. So far as I am aware, the only reference in the Act to civil proceedings is to be found in s. 102, sub-s. 8, which enacts that " the owner " of a mine shall not be liable to an action for damages as for " breach of statutory duty in respect of any contravention of or " non-compliance with any of the provisions of this Act if " it is shown that it was not reasonably practicable to avoid or " prevent the breach." Consequently a civil action for damages in respect of an accident to a miner alleged to be due to a breach of statutory duty on the part of his employers must, in my opinion, be based upon negligence and be subject to the general principles of law which govern actions of damages for negligence. Indeed, under s. 29, sub-s. 1, of the Workmen's Compensation Act, 1925, it is not permissible to take proceedings otherwise than under that Act in respect of an accident to a workman unless the injury is alleged to have been due to the personal negligence or wilful act of the

3

H. L. (E.)
1939

CASWELL
v.
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

Lord Macmillan.

employer or of some person for whose act or default the employer is responsible.

In such an action as that which is now before your Lordships it is therefore incumbent on the plaintiff to prove that the defendant owed a duty to the deceased workman, that the defendant failed to fulfil that duty and that the death of the workman was attributable to that failure of duty on the part of his employers. The Coal Mines Act does, however, materially assist the plaintiff in such a case. It absolves him from proving the existence and the nature of the employers' duty, for it imposes and defines the duty. If the plaintiff can show that there has been a breach of the statute he has established the existence of negligence. It remains for him only to prove that the accident was due to that negligence. On this latter issue the defendant is entitled to avail himself of the recognized pleas open to the defendant in an action based on negligence. He can either (1.) maintain that the plaintiff's evidence has failed to show that the defendant's negligence caused the accident or (2.) prove affirmatively that the accident was caused wholly or in part by the plaintiff's own negligence.

Now in the present case the appellant starts with the advantage that the duty which the respondents owed to her deceased son is defined and prescribed by the statute and that the respondents admit that they were in breach of that duty. The only remaining questions are whether it has been sufficiently shown that the deceased's death was due to that breach of duty on the part of the respondents and whether the respondents have proved that the deceased by his own negligence caused or materially contributed to the accident which befell him.

The mere fact that at the time of an accident to a miner his employers can be shown to have been in breach of a statutory duty is clearly not enough in itself to impose liability on the employers. It must be shown that the accident was causally associated with the breach of statutory duty.

I do not propose to rehearse the facts of the present accident. They have been fully set out by my noble and learned friend

Lord Atkin, with whose exposition, both of the facts and of
the law applicable thereto, I find myself in entire agreement.
While the precise manner in which the deceased met his death
remains unascertained because there was no eye-witness of the
accident, it has been proved to demonstration that if it had
not been for the respondents' breach of their statutory duty
the accident would not have happened. The respondents'
breach of duty was clearly a cause of the accident. Having
thus causally connected the accident with the respondents'
breach of duty, I do not think that it was incumbent on the
appellant to eliminate and disprove all conjectural possibilities
that the deceased may himself have been in some way careless
of his own safety. From the facts established by the appellant
it may be reasonably inferred that the respondents' breach
of duty was a substantial cause of the accident. It is then
for the respondents to show that the deceased himself was by
his own negligence wholly or partly responsible for the
accident. The respondents have been at pains to suggest
grounds for attributing possible negligence to the deceased.
These grounds have been largely conjectural. I agree with
all Your Lordships that the respondents have failed, as matter
of evidence, to establish any of them. They have also failed
to bring themselves within the statutory defence provided
by s. 102, sub-s. 8. That being so, the appellant is, in my
opinion, entitled to succeed, and I concur in the motion that
the appeal be allowed.

Lord Wright. My Lords, the precise manner in which
the accident occurred cannot be ascertained as the unfortunate
young man was alone when he was killed. The Court therefore
is left to inference or circumstantial evidence. Inference
must be carefully distinguished from conjecture or speculation.
There can be no inference unless there are objective facts
from which to infer the other facts which it is sought to
establish. In some cases the other facts can be inferred with
as much practical certainty as if they had been actually
observed. In other cases the inference does not go beyond
reasonable probability. But if there are no positive proved

*H. L. (E.)*
*1939*
CASWELL.
*v.*
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

Lord Macmillan.

H. L. (E.)
1939
CASWELL
v.
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

Lord Wright.

facts from which the inference can be made, the method of inference fails and what is left is mere speculation or conjecture.

In the present case there are, I think, certain known facts which enable some inferences to be drawn. Beyond that point the method of inference stops and what is suggested is conjecture. It is not necessary to recapitulate the facts which have been fully stated by my noble and learned friend, Lord Atkin. I shall be content to state what I regard as proved by the method of inference, and reject what appears to me to be matter merely of conjecture. I take it as proved by inference that the deceased had taken off the movable plate before the accident and had not replaced it. The evidence of the man whom he relieved at the job is clear that the plate was on when he left, and there was no one else at the place between 7 A.M., when Caswell's shift began, and the time of the accident, say 9.45 A.M. It is also matter of inference that the plate was off before the accident for about six minutes after the belt began to move to load the new journey, because there is nothing to justify the inference that Caswell took off the plate after the belt began to move, and that a certain number of trams must have passed along the lines for a few minutes before the belt began to move at the side of the place where Caswell stood. These facts, I think, can be properly inferred. But there is nothing to enable the Court to infer what Caswell was doing at the time of the accident. I accept the evidence that Caswell had been told not to put his hand into the space opened by removal of the plate in order to clean the roller; indeed, it is clear that the deposit was so hard caked as to make that operation not only dangerous but useless. I accept the evidence that the belt had not been stopped for cleaning operations since Caswell's shift began. I gather from the evidence that a proper, perhaps the best, opportunity to clean was when the machine was stopped in the ten minutes or so while a journey of trams was being changed. In order to clean the roller the plate must have been removed. It is a reasonable, though perhaps not a certain, inference from the evidence that Caswell had

**A. C.**         **AND PRIVY COUNCIL.**                              171

thought it necessary to clean the roller when the machine
stopped and had removed the plate to do so, but had been
caught unawares with the plate off when Christopher Williams
restarted the machine. I find it impossible to infer what
Caswell then did. His duty was to clean the roller when
necessary and to bale the water which collected in the sumps
close to the machine. I infer from the position of the movable
plate that at the time of the accident he was not trying to
replace it. That, it seems, would have been a dangerous
operation. The position in which one of the scrapers was
found justifies the inference that he had been using it that
morning, but not that he was using it at the time of the
accident. The suggestion that he may have slipped while
about to apply the scraper to the moving roll is, perhaps,
no more than a possibility. The suggestion that he may
have been reaching up to clear the belt of coal which threatened
to obstruct it, and that his hand had been drawn into the bite
is a mere conjecture, with, so far as I can see, no objective
fact to give it plausibility. There is no evidence where the
bucket or baler, which it is assumed there must have been
for him to bale with, was found. Hence it is not safe to
infer that he had slipped while baling, though that is perhaps
more probable than any other reconstruction. That he did
slip, for whatever reason, seems to be almost the only possible
inference from the evidence as a whole.

What is clear is that the absence of the movable plate,
rendering the machine unfenced, was, if not the sole cause, at
least a cause and a substantial cause, to adopt in this context
what was called in *Swadling* v. *Cooper* (1) the crucial question
in a road accident case, " whose negligence was it that
"substantially caused the injury ? " Indeed it seems to me
that the absence of the fence can properly be described as
the dominant, effective, or common sense cause. It is in my
opinion clear that if at the material time the machine had been
fenced, the man could not have been killed, or even come to
any serious harm. His death was caused by the absence of
fencing. Merely to slip, unless in proximity to the unfenced

(1) [1931] A. C. 1, 11.

H. L. (E.)

1939

CASWELL
*v.*
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

Lord Wright.

H. L. (E.)
1939
CASWELL
*v.*
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

Lord Wright.

machine, would have caused at most a bruising or, by very bad luck, perhaps a broken bone. The actual death was caused because the man was drawn into the open space ; that is, it was caused by the want of fencing. That there was a breach of s. 55 of the Coal Mines Act, 1911, is, I think, clear. It is true that the machine was not dangerous when stationary. The danger came when it was working. The mischief came because, owing to the defective system of working, the man who started the machine was twelve yards from the machine, and started it in practice, as he did in this case, without knowing whether the guard was on or not and without any warning to the man at the turbine. Hence the respondents could not rely on s. 102, sub-s. 8, of the Act, because they could not show that it was not reasonably practicable to avoid or prevent the breach. That could have been done if the system of working had provided that the machine should not be started unless the guard was on. I think that the breach of s. 55 caused, or at least substantially caused, the death.

It follows that the onus is shifted on to the respondents to prove that the deceased man was guilty of some misconduct or negligence which would have the effect of excluding his claim if the injury had not been fatal and which would therefore exclude the claim in this action, because the appellant has not a higher right than the man would have had if not killed. I think for this purpose in this connection the same rule applies as that stated by Lord Watson in *Wakelin* v. *London and South Western Ry. Co.* (2), applicable to an ordinary plea of contributory negligence.

If the defendants' negligence or breach of duty is established as causing the death, the onus is on the defendants to establish that the plaintiff's contributory negligence was a substantial or material co-operating cause. As Lord Watson said : " the " plaintiff is not bound to prove the negative in order to entitle " her to a verdict in her favour." Here the breach of the statutory duty on the part of the respondents is established, and there is, in my opinion, no evidence justifying the inference that Caswell was guilty of any conduct such as to bar

(1) 12 App. Cas. 41, 47.

**A. C.**    AND PRIVY COUNCIL.    173

the claim, whether or not the term contributory negligence is
used. But it is necessary to consider the arguments strenuously
advanced on behalf of the respondents to justify such an
inference. They may, I think, be fairly summarized as follows:
let it be conceded that the man was doing nothing wrong in
removing the plate to clean the roller when the machine was
stopped ; to assume that would be the view most favourable
to the man. But in that event his duty was to replace it in
due time. He should have done so the moment the machine
started, or if he had not time to replace it, stopped the machine
for that purpose by signalling to the man in charge of the
starting lever. Or still better he should have realized at
an earlier stage that the new journey of trams was coming
in as the trams passed him on their way to the point where
each in turn would come in under the chute and then he had
ample warning to replace the plate. As he failed to do so,
he was just as blameworthy as if he had taken off the plate
when the machine was working, a course which if taken
by him would have been negligence or misconduct sufficient
to bar the claim. Such are the contentions on behalf of the
respondents. The answers made on behalf of the appellant
are, first, that all this is mere conjecture and does not discharge
the onus which arises from the established fact of a breach
of the statute by the respondents ; and, secondly, that even
assuming the set of circumstances which the respondents put
forward as the reconstruction of the accident most favourable
to the appellant's claim, the failure of the man to replace the
plate was not contributory negligence or conduct such as to
bar the claim even on the assumptions postulated by the
respondents. It was pointed out that there was no evidence
that the man had been warned what he was to do if the machine
started when the plate, having been properly removed during
a stoppage, was off. To stop the machine after it had started
for a journey of trams was to stop the work of the colliery,
and the man might hesitate to do that and decide to wait
till the next stoppage. It was not his fault that the machine
started without his having an opportunity to replace it, and if
he kept away from the aperture he would be safe enough,

H. L. (E.)

1939

CASWELL
*v.*
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

Lord Wright.

H. L. (E.)
1939
CASWELL
v.
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

Lord Wright.

whereas the attempt to replace the plate while the machine
was in motion was obviously dangerous. It may be that,
if he so thought, he was guilty of an error of judgment, but
not one for which he was to be blamed in the particular
emergency. Nor was he to be blamed for not taking note
as the empty trams began to pass him, that the machine would
be starting as soon as the first tram of the journey reached
the chute. There was no evidence that he had been directed
to take note of that event, or that it had been recognized
as constituting a warning to replace the plate. Thus, I think
the answers on behalf of the appellant may be summarized.

In my opinion the appellant is right on both points. There
is, first, no sufficient evidence that Caswell was guilty of any
fault, so as to displace the onus imposed on the respondents
by reason of their breach of statutory duty which caused the
death, and secondly, the hypotheses relied on by the respondents,
if established, would not show that he was guilty of more than
an error of judgment or heedlessness or inadvertence in regard
to his own safety not amounting to contributory negligence
or misconduct such as to displace the claim. On this latter
point I adopt as an adequate criterion of what would bar the
man's claim the statement of Lawrence J. in *Flower* v. *Ebbw
Vale Steel, Iron and Coal Co., Ld.* (1) He accepted, as he was
required to do by the authorities binding him, that contributory
negligence was a valid defence to a claim for breach of a statutory
duty such as had been committed in that case, but he proceeded
to do what I think had not been done previously, i.e., to define
a standard to help a jury or a judge to decide whether or not a
man had been guilty of negligence in cases of this type. The
principle, he said, did not demand of "a workman in a factory a
"higher degree of care than an ordinary prudent workman in a
"factory would show." He proceeded: "The question is then
"whether the plaintiff by the exercise of that degree of care
"which an ordinary prudent workman would have shown in the
"circumstances could have avoided the result of the defendants'
"breach of duty. I find that he could and that the proximate
"cause of the accident was his own disobedience of orders. . . ."

(1) [1934] 2 K. B. 132, 139, 140.

**A. C.**   AND PRIVY COUNCIL.   175

I note the word "proximate" for the use of which there is
support in *Swadling* v. *Cooper*. (1) He added: "in considering
"whether an ordinary prudent workman would have taken
"more care than the injured man, the tribunal of fact has to
"take into account all the circumstances of work in a factory
"and that it is not for every risky thing which a workman in a
"factory may do in his familiarity with the machinery that a
"plaintiff ought to be held guilty of contributory negligence."
His judgment was affirmed by the Court of Appeal, but was
reversed unanimously in this House on the ground that there
was no evidence to justify the finding of disobedience to
orders and that the decision of Lawrence J. was based on this
finding, which he described as the proximate cause of the
accident, and not on the fact that the man was doing a risky
thing in putting his hand as he had done inside the machine.
In the opinion which I delivered in *Flower's* case (2) in this
House, I added, without considering whether such a plea was
properly described as one of contributory negligence, some
observations in explanation and support of the judge's definition
of what constituted contributory negligence in such cases,
which I regard as a valuable contribution to the law on this
subject.

The circumstances under which men working in a mine or a
factory are exposed to risk when machinery is unfenced in
breach of statutory duty have general characteristics of their
own. These have to be carefully considered when the question
is whether a man was negligent. I think the importance of the
ruling of Lawrence J. is that he drew attention to these general
conditions of work and thereby gave a good practical direction
and definition to help in deciding the issue of fact in any par-
ticular case. The learned judge did not mean that there are
grades or degrees of negligence or that the plaintiff is not
prevented from recovering by "mild" negligence but only by
"gross" negligence. Generally speaking in civil cases "gross"
negligence has no more effect that negligence without an
opprobrious epithet. Negligence is the breach of that duty to
take care, which the law requires, either in regard to another's

H. L. (E.)

1939

CASWELL
*v.*
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

Lord Wright.

(1) [1931] A. C. 1.   (2) [1936] A. C. 206, 210.

H. L. (E.)  person or his property, or where contributory negligence is in
1939        question, of the man's own person or property. The degree
Caswell     of want of care which constitutes negligence must vary with the
v.          circumstances. What that degree is, is a question for the jury
Powell      or the Court in lieu of a jury. It is not a matter of uniform
Duffryn     standard. It may vary according to the circumstances from
Associated  man to man, from place to place, from time to time. It may
Collieries  vary even in the case of the same man. Thus a surgeon doing
Ld.         an emergency operation on a cottage table with the light of a
Lord Wright. candle might not properly be held guilty of negligence in
respect of an act or omission which would be negligence if
he were performing the same operation with all the advantages
of the serene atmosphere of his operating theatre ; the same
holds good of the workman. It must be a question of degree.
The jury have to draw the line where mere thoughtlessness or
inadvertence or forgetfulness ceases and where negligence
begins.

What was the standard of negligence in such cases had been
left somewhat vague in the decisions before *Flower's* case. (1)
The word "wilful" has figured as affording some guide when
applied to negligence, as by Campbell C.J. and Wightman J.
in *Caswell* v. *Worth* (2), and many years later by Scrutton L.J.
in *Dew* v. *United British Steamship Co.* (3) ; but wilful in this
connection does not necessarily mean deliberate or intentional
wrong-doing. In *Senior* v. *Ward* (4) Campbell C.J. held that
the deceased man had been guilty of gross negligence which
materially contributed to his death. In *Pringle* v. *Grosvenor* (5)
the plaintiff, a woman, was employed to clean a revolving plate
while in motion. It was safe on three sides, though unfenced.
She was aware of the danger if she went on the other side but
did so and was injured. The Court of Session held that as she
did not go into danger wilfully or out of mere bravado, but
was committing a mistake by inadvertence, she was entitled
to recover because she could not have been injured if the
defendant had performed the statutory duty to fence. It is,

(1) [1936] A. C. 206, 210.          (4) 1 E. & E. 385.
(2) (1856) 5 E. & B. 849.           (5) 21 R. 532.
(3) (1928) 98 L. J. (K. B.) 88.