I think, clear that epithets like "wilful" or "gross" do not advance the inquiry and can well be avoided. "Wilful" is not a term of art and is often used as meaning no more than a high degree of carelessness or recklessness. It is not necessarily limited in its use to intentional or deliberate wrong-doing.

I do not attempt to ascribe to Lawrence J.'s formula the universality or literal sanctity which appertains to the provisions of a statute, but it is, in my opinion, not only a valuable guide, but is in accordance with the authorities which the learned judge considered. It also seems to me to minimize, if not to destroy, the practical importance of the question which was much debated whether the employers' defence in such cases is properly described as a plea of contributory negligence. That it is not properly so described was held by the High Court of Australia in *Bourke* v. *Butterfield and Lewis, Ld.* (1) But I find in the conclusion of the judgment of the majority of the Court delivered by Knox C.J. these words : "We think "that in English law the phrase contributory negligence is "appropriate only in an action for negligence and not in an "action founded on breach of a positive statutory duty ; but if "no more is meant than that in such an action the plaintiff "may be disentitled to succeed because of his own misconduct, "we agree that that is an accurate statement of the law" A little earlier in the judgment it is said : "Whether the "conduct of an employee goes beyond mere thoughtlessness "or want of care and amounts to misconduct is in every case "a question of fact." On the facts of that case I think that according to the formula of Lawrence J. the plaintiff would have succeeded, as in fact he did under the judgment of the High Court of Australia. But Lawrence J. would have held that there was no negligence, whereas the High Court held that there was no misconduct.

I do not think that an action for breach of a statutory duty such as that in question is completely or accurately described as an action in negligence. It is a common law action based on the purpose of the statute to protect the workman, and belongs

(1) 38 C. L. R. 354.

H. L. (E.)

1939

CASWELL
*v.*
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

Lord Wright.

N

H. L. (E.)
1939
CASWELL
*v.*
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

Lord Wright.

to the category often described as that of cases of strict or absolute liability. At the same time it resembles actions in negligence in that the claim is based on a breach of a duty to take care for the safety of the workman. The cause of action is sometimes described as statutory negligence and it is said that negligence is conclusively presumed. Thus in *Lochgelly Iron and Coal Co., Ld.* v. *M'Mullan* (1), it was held that a breach of the statutory duty constituted personal negligence or wilful act of the employer within s. 29, sub-s. 1, of the Workmen's Compensation Act, 1925. I am not prepared to agree that the defence of contributory negligence should be excluded in such cases simply on the technical ground that the cause of action is not negligence in the strict sense, whereas contributory negligence presupposes original negligence. I have, however, come to the conclusion on a consideration of the English cases, that English law has accepted contributory negligence as a defence in this class of case. If the matter had been free from authority, I should, I think, have thought it simpler to hold that a workman's claim for injury caused by breach of the employer's statutory duty to fence and like duties, is only barred by blameworthy conduct on the man's part of such gravity and so directly causing the accident as in the judgment of the judge or jury to be properly described as the substantial cause of the accident and to shift the responsibility to him. This view would have been in accord with the general intention of the statute and would have avoided the technicalities which have gathered round the doctrine of contributory negligence. But that path is closed by the line of decisions in England, and if contributory negligence is properly defined, I do not feel that the distinction is for practical purposes generally other than one of words. What is all-important is to adapt the standard of what is negligence to the facts, and to give due regard to the actual conditions under which men work in a factory or mine, to the long hours and the fatigue, to the slackening of attention which naturally comes from constant repetition of the same operation, to the noise and confusion in which the man works, to his pre-occupation in what he is

(1) [1934] A. C. 1.

**A. C.**          AND PRIVY COUNCIL.                    179

H. L. (E.)

1939

CASWELL
*v.*
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

Lord Wright.

actually doing at the cost perhaps of some inattention to his own safety. In *Dew* v. *United British Steamship Co.* (1) I question if this point of view was fully realized by Scrutton L.J., when he dissented from the view of MacKinnon J., the trial judge. The latter was of opinion, as appears from what he said to the jury, that the real effective cause of the accident was the breach of the statutory regulation, and that the man's act in slipping was not the proximate cause of the accident. Scrutton L.J. held that as the man slipped when going about his duty and thus fell into the open unfenced hatch, the slipping was negligence because he would not have slipped if he had been more careful and was a co-operating cause, and hence that the man was disentitled to recover. So far as I follow the facts, I should have thought that they did not show negligence on the part of the man even if he might have walked more warily, and further that slipping was not the proximate cause of the injury. The negligence to be contributory must also be, in Lord Campbell's words in *Senior* v. *Ward* (2), negligence " materially contributing " to the injury. The rules of contributory negligence have been mainly developed in connection with road accidents, but at least since *Davies* v. *Mann* (3), the law in discussing contributory negligence in such cases has disregarded as not materially contributing causes some acts of the plaintiff which might be regarded as negligence in a sense, and treated them as of subsidiary moment in ascertaining the causation of the injury and has fixed attention on what was judged to be the proximate or effective cause. Hence the question was stated as it was in *Swadling* v. *Cooper* (4) to be what was the substantial cause. Contributory negligence involves two elements, negligence and contributing negligence. The policy of the statutory protection would be nullified if a workman were held debarred from recovering because he was guilty of some carelessness or inattention to his own safety, which though trivial in itself threw him into the danger consequent on the breach by his employer of the statutory duty. It is the breach

(1) 98 L. J. (K. B.) 88.          (3) (1842) 10 M. & W. 546.
(2) 1 E. & E. 385.               (4) [1931] A. C. 1.

180                                **HOUSE OF LORDS**                    **[1940]**

H. L. (E.) of statute, not the act of inadvertence or carelessness, which is

1939 then the dominant or effective cause of the injury. This follows,

CASWELL I think, if the rules of contributory negligence in road accident

*v.* or collision cases are suitably adapted to deal with breaches

POWELL by an employer of his statutory duty.

DUFFRYN

ASSOCIATED  I have dwelt on these legal questions out of respect to the very

COLLIERIES, careful arguments of law with which Mr. Fyfe and Sir William

LD. Jowitt have assisted the House. On the footing that con-

Lord Wright. tributory negligence is the test, I repeat that the respondents

have not discharged the onus of establishing it, and further

that such evidence as there is goes to negative a case of con-

tributory negligence, and finally that the hypothetical recon-

struction of the facts propounded on behalf of the respondents.

even if accepted, would not show a case of contributory

negligence.

I am for allowing the appeal.


LORD PORTER (read by LORD MACMILLAN). My Lords, the
facts have already been fully set out and I need not repeat
them, but some short statement of the duties of and instructions
given to the deceased man is desirable. His death was caused
as a result of his hand and arm being drawn in between a belt
and roller which it was his duty to clean. At the time when
the accident occurred the machine driving the conveyor belt
was working and the guard covering the roller had been
removed. It was admittedly part of his duty to take off the
guard and to clean the roller set behind it. His only instruc-
tions were not to clean the roller whilst the machine was in
motion.

He does not appear to have been told not to clean the roller
whilst the railway trucks which had been filled by the con-
veyor belt were being removed and the empty journey was
being drawn into position. Indeed, as the manager stated in
evidence, that would have been the obvious and convenient
time to use for cleaning the roller, subject to the difficulty that
whilst the machine was at rest half only of the roller would be
exposed and the other half could not be cleaned unless it were
given a half turn by setting the engine in motion. But there

**A. C.**     AND PRIVY COUNCIL.     181

may have been times when the half turn would be unnecessary
because the removal of a lump or the cleaning of the half
would effect all that was required. To have removed the
guard at the time when the engine was stopped would in those
circumstances have been part of the deceased m n's duty and
in itself no evidence of negligence.

But it is said it was in any case negligent not to have
replaced the guard before the engine started again. By
consent of the parties and at the request of your Lordships
certain information which had not been ascertained in evidence
was supplied to your Lordships' House. From this evidence
it appeared that shortly before the engine was restarted the
journey of trucks would be moved into position alongside the
deceased man and it was said that this truck movement
would give him ample warning of the restarting of the engine.
But it has to be remembered that the trucks are being changed
many times a day; that the young man would be busy
cleaning or baling and that his attention being so distracted he
might well fail to notice the approach or presence of the trucks.
Their arrival and removal were constantly repeated and in
no sense intended to be a warning, though to one who was
not engaged on other matters they might incidentally act as
such. No doubt, however, once the engine was started again
the deceased man must have known that it was working, and,
if engaged in cleaning the roller, ought to have ceased to do so.
The respondents maintain that it was his duty thereupon not
only to cease cleaning, but also to replace the cover at once, and
that he was guilty of negligence or misconduct in not doing so.

I cannot take this view. The cover had to be replaced
from the top and must touch or nearly touch the moving belt
in the process.

If the machinery was dangerous to one working in the
vicinity when unfenced, I think it was at least equally
dangerous to anyone replacing the cover. Indeed, to fail to
replace it may have been a prudent rather than a negligent
act.

If this view be accepted, the fact that the accident did not
take place until the lapse of five or six minutes after the engine

3

H. L. (E.)

1939

CASWELL
*v.*
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

Lord Porter.

H. L. (E.)

1939.

CASWELL
*v.*
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

Lord Porter.

was restarted can make no difference. Once the belt had begun to revolve the cover might remain off without any negligence or misconduct on the part of the workman.

As to how the accident happened I think at best only a guess is possible. Since the scrapers had been taken from the place where they had been left, and one at least was found in the water immediately below the dead man's body, it seems to be established that he must have removed the cover for the purpose of cleaning the roller. That he continued to clean the roller after the engine started is improbable. Had he been doing so the scraper would have remained inside the fixed guard, not outside. The planks on which he stood were slippery and he was baling. He may have slipped, and where a slip might carry him it is impossible to say. On the other hand it is conceivable, though not very likely, that he was attempting to brush off some of the matter adhering to the belt either inside or outside the guard and that his hand was carried on and gripped between belt and roller. In these circumstances I think the true finding is that there was a breach of statutory duty on the part of the respondents since the guard was off at a time when the machine was working; but there is nothing to show that the workman was in any way implicated in that breach of duty. He could rightfully remove the guard whilst the engine was stopped, during the time the journey of trucks was being changed, and there is no evidence that he took it off at any other time.

Nor have the respondents shown either by positive evidence or necessary implication from the facts proved that the workman was guilty of any misconduct, negligence or any wrongful act causing or contributing to his own injury. On the other hand it has not been shown by the appellant that the deceased man was not guilty of misconduct or negligence, and if such evidence be necessary she must fail.

What is the result of this finding ? The respondents say that it is the duty of the appellant to show two things: (1.) that there was a breach of statutory duty; and (2.) that the breach was the cause of the accident, but admit that if these two facts be proved the onus is on them to show negligence

**A. C.**          AND PRIVY COUNCIL.          183

on the part of the workman causing or contributing to the
accident. They add, however, that in this as in any case,
the facts as proved by the plaintiff may establish without
further evidence either that the accident was not caused by
the breach of duty or that the person meeting with an accident
must have been guilty of negligence.

With the first contention the appellant does not quarrel.
She acknowledges that she must show a breach of statutory
duty and that it was at least a cause of the accident though
not that it was necessarily the sole cause. She also agrees
that the evidence called on her behalf might of itself establish
that the respondents' fault did not cause the accident or that
the deceased man was in whole or in part the cause of his own
misfortune.

The principle applicable is to be found in the well known
passage from Lord Watson's speech in *Wakelin* v. *London and
South Western Ry. Co.* (1) : " If the plaintiff's evidence were
"sufficient to show that the negligence of the defendants
"did materially contribute to the injury, and threw no light
"upon the question of the injured party's negligence, then I
"should be of opinion that, in the absence of any counter-
"evidence from the defendants, it ought to be presumed
"that, in point of fact, there was no such contributory
"negligence. Even if the plaintiff's evidence did disclose
"facts and circumstances bearing upon that question, which
"were neither sufficient per se to prove such contributory
"negligence, nor to cast the onus of disproving it on the
"plaintiff, I should remain of the same opinion."

If for the word " negligence " of the defendants, the words
"breach of statutory duty " be substituted, the opinion
is exactly applicable to the facts of the present case.
Undoubtedly the absence of the guard contributed to the
injury which caused the death of the workman. Had the
guard been in its place the accident would not have happened.

On the other hand the evidence, as I have indicated, throws
no light upon the deceased man's negligence nor casts the onus
of disproving contributory negligence upon the appellant.

H. L. (E.)

1939

CASWELL
*v.*
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

Lord Porter.

(1) 12 App. Cas. 41, 48.

3

H. L. (E.)
1939
CASWELL
v.
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

Lord Porter.

The most that can be said on behalf of the respondents is that their employee may or may not have been guilty of some wrong-doing—there is nothing to show that he was.

This finding would entitle the appellant to succeed, but the argument on behalf of the appellant has gone further and her representatives have maintained that once it is shown that the respondents have been guilty of a breach of statutory duty and that that breach materially contributed to the accident, the respondents cannot succeed unless it be shown that the work-man knowingly and wilfully incurred the risk.

For this contention they rely upon the judgment of Campbell C.J. in *Caswell* v. *Worth.* (1) The case itself is not, I think, an authority for the principle propounded. It happened that in that case there was not only a want of ordinary care, but wilful misconduct, and Campbell C.J. fastened on the fact ; but he does not assert that nothing less than wilful misconduct will constitute a defence, and Coleridge J. in the same case says : "The action, however, must be subject to the rules "of common law, and one of those is, that a want of ordinary "care *or* wilful misconduct, on the part of the plaintiff is an "answer to the action." The italics are mine.

The appellant, however, gets her chief support for the proposition from the Australian case, *Bourke* v. *Butterfield and Lewis, Ld.* (2), and in particular from the judgment of Isaacs J. in that case. Undoubtedly that judgment goes some way towards upholding the principle contended for, but such a contention was, I think, unnecessary for the decision, and is not supported to its full extent by the majority of the Court, whose judgment was delivered by Knox C.J. who said (3) : "But did Parliament intend to extend that protection to every "employee in every circumstance ? We think not. In our "opinion it would be unreasonable to attribute to Parliament "an intention to impose upon the employer responsibility for "an injury which the employee deliberately invites, whether "by adopting the means of inflicting it, or by rejecting the means "of avoiding it, or for an injury which has happened because

(1) 5 E. & B. 849.                    (3) 38 C. L. R. 360.
(2) 38 C. L. R. 354.

**A. C.**    AND PRIVY COUNCIL.    185

"the employee deliberately took an unnecessary risk, not in
"the interests of the employer, but for his own purposes.
":It is not easy to frame an exact formula ; but it may be said
"that the employer is responsible for the negligence, but not
"for the misconduct, of his employee. Whether the conduct
"of an employee goes beyond mere thoughtlessness or want of
"care and amounts to misconduct is in every case a question
"of fact."

The speech of Lord Wright in *Flower* v. *Ebbw Vale Steel,
Iron and Coal Co., Ld.* (1), is also prayed in aid of the appellant's
contention ; but I do not think it can be said to confirm
that view. In terms the noble and learned Lord said (2) :
"I shall assume, though the question is reserved for decision in
"this House if it should ever arise in the future, that con-
"tributory negligence, properly defined and properly established,
"is a defence in this action." He then goes on to a considera-
tion of what the proper definition of contributory negligence
in such a case should be.

As against the view that contributory negligence is not a
defence to a claim based on a breach of statutory duty there
are a number of dicta in cases, beginning with *Britton* v. *Great
Western Cotton Co.* (3), to the effect that it is. Perhaps the
best known is that contained in the judgment of Vaughan
Williams L. J. in *Groves* v. *Lord Wimborne.* (4) Moreover in three
recent cases the Court of Appeal have decided in terms that in
such a case the contributory negligence of the injured party is
a defence : see *Dew* v. *United British Steamship Co.* (5) ; *Craze*
v. *Meyer-Dumore Bottlers' Equipment Co.* (6) ; and *Lewis* v.
*Denye.* (7)

But the question though debated has never been determined
in your Lordships' House. Strictly speaking the phrase
"contributory negligence" is not a very happy method of
expressing an act of the employee which may relieve the
employer from liability. Probably the phrase "negligence

H. L. (E.)

1939

CASWELL
*v.*
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

Lord Porter.

(1) [1936] A. C. 206.              (5) 98 L. J. (K. B.) 88.
(2) Ibid. 212.                     (6) [1936] W. N. 217.
(3) L. R. 7 Ex. 130.               (7) [1939] 1 K. B. 540.
(4) [1898] 2 Q. B. 402, 418, 419.

H. L. (E.)
1939
CASWELL
*v*
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

Lord Porter.

"materially contributing to the injury" would be more accurate,
but if the word "contributory" be regarded as expressing
something which is a direct cause of the accident, either phrase
is accurate enough and the less accurate phrase is, I think,
sanctioned by long usage.

Whatever form of words be used I see no reason for differing
from the numerous dicta extending over many years, or from
the decision of the Court of Appeal. It was held in *Lochgelly
Iron and Coal Co., Ld.* v. *M'Mullan* (1) that a breach of statutory
duty is personal negligence on the part of the employer within
the meaning of that phrase in s. 29, sub-s. 1, of the Workmen's
Compensation Act, 1925, and it is suggested that an action
founded on breach of statutory duty is an action founded on
negligence. Whether this be so, or whether a breach of statutory
duty be regarded as a cause of action in itself, the question
is the same. Is the employer liable for all accidents caused
by a breach of statutory duty, and, if not, what is the limita-
tion? Is it a defence to prove such negligence as would
constitute contributory negligence in an action founded on a
breach of common law duty, or must the employer go further
and show that the workman knowingly and wilfully incurred
the risk? These last are the words of Campbell C.J.
Knox C.J. in the Australian case speaks of "misconduct"
simpliciter.

No doubt the Mines Act was intended to protect both careful
and careless workmen, but neither the appellant in the present
case nor the High Court in Australia were prepared to go the
length of saying that no action on the part of the workman would
relieve the employer, and the protection required may well be
given by making the failure to fence a criminal act.

I do not see why the ordinary common law rules should not
apply, leaving the careless workman to his remedy under the
Workmen's Compensation Acts and reserving the additional
protection for breach of statutory duty to those who exercise
such reasonable care as a reasonable man working in the
particular mine or factory would exercise.

It is the reasonable man who is to be considered, not the

(1) [1934] A. C. 1.

**A. C.**           AND PRIVY COUNCIL.                    . 187

particular individual, and therefore the degree of care will not     H. L. (E.)
vary from man to man but it will, I think, vary from mine to       1939
mine and factory to factory. The skill gained by a worker        CASWELL.
may enable him to take risks and do acts which in an unskilled     *v.*
man would be negligence, and on the other hand the fatiguing      POWELL
                                                                  DUFFRYN
repetition of the same work may make a man incapable of          ASSOCIATED
                                                                  COLLIERIES,
the same care and therefore not guilty of negligence in doing      LD.
or failing to do an act which a man less fatigued would do or     Lord Porter.
leave undone.

The question to be determined was thus put by Lawrence J.
in the Court of First Instance in *Flower* v. *Ebbw Vale Steel,
Iron and Coal Co., Ld.* (1) : " The question is then whether the
"plaintiff by the exercise of that degree of care which an ordinary
"prudent workman would have shown in the circumstances
"could have avoided the result of the defendant's breach
"of duty."

With this I agree, and I doubt if the speech of Lord Wright
in your Lordships' House in the same case did more than
express his views as to what was the standard required in that
case. The High Court in Australia in *Bourke's* case (2),
may have thought that it required misconduct and not lack
of the appropriate degree of care to prevent the plaintiff
from succeeding. If they did, I do not agree with them.

There remains only to be considered the defence under
s. 108, sub-s. 8, of the Coal Mines Act, 1911, a section which
exempts the employer from liability if it is not reasonably
practicable to avoid or prevent a breach of s. 55 of the Act.

In *Coltness Iron Co., Ld.* v. *Sharp* (3) it was held that s. 102,
sub-s. 8, applied because it was not reasonably practicable
to keep the gearing which caused the accident securely fenced
during the time at which it had to be observed whilst being
tested.

So I suppose in the present case it might be argued that it
was not reasonably practicable to prevent the guard from
being removed—indeed that it was necessary to do so in order
to clean the roller. In a sense this contention is true. But

(1) [1934] 2 K. B. 132, 139.            (3) [1938] A. C. 90.
(2) 38 C. L. R. 354.

H. L. (E.)
1939
CASWELL
*v.*
POWELL
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.

Lord Porter.

though the absence of the guard is an inchoate danger whilst the engine is not in motion, it is only an actual danger when it is working. It may be impracticable to avoid removing the guard whilst the machine is motionless, but it is not impracticable that it should be fenced whilst the machine is in motion, or at any rate to ensure that the workman shall have sufficient notice of the fact that the engine is about to be used again and ample opportunity of replacing the guard. The ringing of a bell or a warning shout and in either case a reply, should be sufficient to avoid any danger; and so would instructions that the cleaning must only take place whilst the engine is stopped for that purpose, and after the necessary stop and half turn has been started again at the request of the cleaner. This failure to give adequate warning is no doubt a fault of system. But it is not fault of system of which the workman primarily complains. His complaint is that the guard was off. The employer might have excused himself by proving it impracticable to have it on, but he cannot rely upon his own want of system for that purpose. It is not the workman who wishes to rely, as a cause of action, upon the system adopted. It is the employer who desires to use it as an excuse for failing to keep the machinery guarded.

I think then that the workman has proved a breach of statutory duty and that that breach was a cause of the accident, that the employer has proved neither that the removal of the guard was an act which the workman should not have done, nor that its absence or the accident was due in whole or in part to the negligence of the workman, much less to his misconduct.

I take the view that it would be a sufficient defence to the employer to prove that the accident was in part caused by the act of the workman in the sense that it was materially contributed to by his negligence and by negligence I mean a failure to exercise such a degree of care as an ordinary prudent workman in that mine would exercise.

But the onus of proving that defence is admittedly on the respondents and I do not think they have discharged it.

The appellant is therefore in my view entitled to recover and

**A. C.**               AND PRIVY COUNCIL.                    189

I would allow the appeal and order the respondents to pay   H. L. (E.)
the costs in your Lordships' House and below.

> *Appeal allowed, and cause remitted to the King's*
> *Bench Division for a new trial on question of*
> *damages only.*

1939
⁓
CASWELL.
*v.*
POWELL.
DUFFRYN
ASSOCIATED
COLLIERIES,
LD.
⸺

Solicitors for appellant : *Smith, Rundell, Dods & Bockett, for*
*Morgan, Bruce & Nicholas, Pontypridd.*

Solicitors for respondents : *Furniss & Co., for Arthur J.*
*Prosser, Cardiff.*

# TAB 24

**Mid Essex Hospital Services NHS Trust v. Compass Group UK and Ireland Ltd (Trading As Medirest)**
Case No: A2/2012/0883
Court of Appeal (Civil Division)
15 March 2013

**[2013] EWCA Civ 200**

**2013 WL 617577**

Before: Lord Justice Jackson Lord Justice Lewison and Lord Justice Beatson
Date: 15/03/2013

**Analysis**

On Appeal from the High Court, Queen's Bench Division

Mr Justice Cranston

HQ10X02821

Hearing dates: 19th & 20th February 2013

**Representation**

- Mr James Collins QC and Mr Siddharth Dhar (instructed by Berwin Leighton Paisner LLP ) for the Appellant.
- Mr Robert Howe QC and Mr James Willan (instructed by DLA Piper UK LLP ) for the Respondent.

**Judgment**
Lord Justice Jackson:

1  This judgment is in nine parts, namely:

- Part 1.  Introduction,
- Part 2.  The contract,
- Part 3.  The facts,
- Part 4.  The present proceedings,
- Part 5.  The appeal to the Court of Appeal,

- Part 6.  Did the contract contain the alleged implied term?
- Part 7.  Clause 3.5 of the conditions,
- Part 8.  Did Medirest effectively terminate the contract under clause 28.4 of the conditions?
- Part 9.  Conclusion

**Introduction**

2  This is an appeal against a judgment of Mr Justice Cranston ("the judge"), who held that both parties to a substantial commercial contract were entitled to terminate by reason of the conduct of the other party. The contract was for the provision of services to two hospitals. The main issues are (a) the effect of an express obligation to "co-operate … in good faith" and (b) whether there was an implied term that the employer would not act in an arbitrary, irrational or capricious manner in assessing the contractor's performance.

3  The contractor was Compass Group UK and Ireland Ltd. The division of that company which was involved in this project traded under the name "Medirest". I shall therefore refer to the contractor as "Medirest". Medirest is claimant in the action and respondent in the Court of Appeal.

4  The Mid Essex Hospital Services NHS Trust is the body which engaged Medirest. I shall refer to it as "the Trust". The Trust is defendant in the action and appellant in the Court of Appeal.

5  I shall mention three individuals in the course of this judgment. Mr Taylor was at the material time the operations director of Medirest. Mr Aitchison was the commercial director of the Trust. Mr Wright was responsible for hotel services at the Trust and he reported to Mr Aitchison.

6  When I come to set out the terms of the contract, I shall refer to the Centre of Effective Dispute Resolution as "CEDR". I shall also correct two obvious typographical errors. The first error is in clause 5.9 of the conditions, where the text says "warning notices", whereas clearly the phrase "service failure points" was intended. The second error comes in paragraph 1.3 of Part F of the Payment Mechanism. In the second line

there is a reference to paragraph 5 of part C, whereas
clearly the reference should be to paragraph 6 of part C.

7   The solicitors for both parties will feature in the
narrative of the events. The solicitors for the Trust
are Capsticks Solicitors LLP, to whom I shall refer as
"Capsticks". The solicitors for Medirest are DLA Piper
UK LLP, to whom I shall refer as "DLA".

8   After these introductory remarks, I must now turn to
the contract which is the subject of this litigation.

**The contract**

9   On 1st April 2008 the Trust and Medirest entered
into a somewhat complicated contract, under which
Medirest would provide catering and cleaning services
for St John's Hospital and Broomfield Hospital in Essex
over a period of seven years. It was envisaged that
during the seven year period both hospitals would be
replaced by new facilities, which were being constructed
on the Broomfield site.

10   The contract is contained in four separate
documents. Document one contains the overarching
agreement. This states that Medirest will provide the
services set out in document four and that the Trust
will make payment for those services. It also provides
that the Trust has an option to extend the contract for
a further three years.

11   Document two sets out background information
concerning the plans and requirements of the Trust.
Paragraph 5.1 of document two provides that while the
two separate hospitals are in operation "the Contractor
will be expected to provide and operate a helpdesk
system to process requests and queries from the Trust
regarding the Catering service."

12   Document three sets out the conditions of contract. I
shall refer to this document as "the conditions". Clause
1 of the conditions sets out a number of definitions.
These include the following:

"1.1.2 'Beneficiary' means any or all
of:

(a)   the Department of Health and
all agencies thereof (including NHS
PASA);

(b)   GPs;

(c)   health service bodies referred to
in Section 9 of the National Health
Service Act 2006 ;

(d)   the Medical Research Council;

(e)   the Secretary of State for Health;

(f)   any care trust as defined in
section 77 of the National Health
Service Act 2006 ;

(g)   any NHS foundation trust listed
in the register of NHS foundation
trusts maintained pursuant to
section 39 of the National Health
Service Act 2006 ;

(h)   any body replacing or providing
similar or equivalent services to the
above;

(i)   any statutory successor to any of
the above;

and 'Beneficiaries' shall be construed
accordingly.

….

1.1.5   'Contract' means the
agreement between the Trust and the
Contractor comprising the Order,
these terms and conditions and
the schedules hereto, and the
Specification, and for the avoidance
of doubt all other terms, conditions
or warranties other than any terms,
conditions or warranties implied
by law in favour of the Trust or
the Beneficiaries are excluded from
the agreement between the Trust

and the Contractor unless expressly accepted in writing by the Trust's Representative."

13  Clause 2 of the conditions provides:

**"Appointment**

2.1    The Trust appoints the Contractor to provide the Services:

2.1.1        promptly (and in any event within any time targets as may be set out in the Service Level Specification) and in a professional and courteous manner so as to reflect and promote the image of the Trust and any Beneficiary;

2.1.2 strictly in accordance with the Service Level Specification and all provisions of the Contract;

2.1.3 in accordance with all applicable UK and European laws and

regulations and Good Industry Practice; and

2.1.4 in accordance with the policies (including, when on any premises of the Trust or any Beneficiary or on any other premises where it works alongside the Trust's or any Beneficiary's staff, any racial discrimination and equal opportunities policies), rules, procedures and quality standards of the Trust and any Beneficiary as amended from time to time.

2.2    The Contractor accepts the terms of appointment as provided in Clause 2.1 in consideration of the Contract Price."

14  Clause 3 of the conditions provides:

**"Performance of the Services**

3.1   Subject to Clause 17.1, the Contractor shall provide at its own expense all staff, equipment, tools, appliances, materials or items required for the provision of the Services to the Contract Standard.

3.2   To the extent that the Service Level Specification includes the date, format and method of delivery of the Services and Deliverables and/or the applicable performance measures, performance due-by dates, minimum performance levels and methods of performance measurement in respect of the Services, the Contractor will abide by the same.

3.3   Time shall be of the essence with regard to the obligations of the Contractor under the Contract.

3.4   If the Specification provides for performance of the Services in stages, the Contractor undertakes to perform the Services in strict compliance with the timetable for stages as provided in the Service Level Specification.

3.5   The Trust and the Contractor will co-operate with each other in good faith and will take all reasonable action as is necessary for the efficient transmission of information and instructions and to enable the Trust or, as the case may be, any Beneficiary to derive the full benefit of the Contract. At all times in the performance of the Services, the Contractor will co-operate fully with any other contractors appointed by the Trust or any Beneficiary in connection with other services at the Location.

3.6  In addition to any more specific obligations imposed by the terms of the Contract, it shall be the duty of the Contractor to notify the Trust's Representative of all significant changes to staffing, rates of pay or conditions of employment, or hours of work or other technological changes at least one month prior to the implementation of any such revised arrangements.

3.7   The Contractor shall provide information in a format, medium and at times specified by the Trust, related to the performance of the Services as may be reasonably required."

15  Clause 5 of the conditions provides:

**"Performance Measurement**

5.1   In addition to any more specific obligations imposed by the terms of the Contract, it shall be the duty of the Contractor to provide the Services to the Contract Standard which in all respects shall be to the satisfaction of the Trust's Representative.

5.2   The Contractor shall institute and maintain a properly documented system of quality control as set out in the Service Level Specification and which is to the satisfaction of the Trust's

Representative to ensure that the Contract Standard is met.

5.3 In addition to any other rights of the Trust and any Beneficiary under the Contract, the Trust's Representative shall be entitled to inspect the Contractor's quality control system referred to in Clause 5.2 above.

5.4 During the Term, the Trust's Representative may inspect and examine the provision of the Services being carried out at the Location without notice at any time. The Contractor shall provide to the Trust all such facilities as the Trust may require for such inspection and examination.

5.5 The Contractor shall allow the Trust and any person, firm or organisation authorised by the Trust to have access to and to audit all records maintained by the Contractor in relation to the supply of the Services. The Contractor shall assist the Trust or any party authorised by the Trust (as the case may be) in the conduct of the audit.

5.6 If any part of any Service is found to be defective or different in any way from the Service Level Specification or otherwise has not been provided to the Contract Standard other than as a result of a default or negligence on the part of the Trust or any Beneficiary, the Contractor shall at its own expense re-perform the Services in question (without additional remuneration therefor) within such time as established by

the Service Level Specification or such as the Trust or any Beneficiary may reasonably specify ….

5.8 The Trust or any Beneficiary shall ascertain whether the Contractor's provision of the Services meets the performance criteria as specified in the Service Level Specification or, if the criteria are not so specified, meets the standards of a professional provider of the Services. Where such performance criteria or standards have not been met by the Contractor in the performance of the Services then the Trust shall be entitled to levy payment deductions against the monthly amount of the Contract Price payable to the Contractor in accordance with the terms of the Payment Mechanism. In addition, the Trust may by notice to the Contractor award Service Failure Points depending on the performance of the Services as measured in accordance with the Service Level Specification. Service Failure Points which are agreed or determined to have been awarded in circumstances where such award was not justified shall be deemed to have been cancelled.

5.9 Without prejudice to the Trust's rights under Clause 28 and any other express rights under this Agreement, if the Contractor has exceeded the number of service failure points contained in Appendix D of the Payment Mechanism in any Contract Month then the Trust may give a written notice (a "Warning Notice") to the Contractor setting out the matter or matters giving rise to such notice and containing a reminder to the Contractor of

the implications of such notice. Any such notice shall state on its face that it is a "Warning Notice".

5.10 Where the Contractor receives a Warning Notice from the Trust it shall arrange and attend a meeting with the Trust's Representative within ten (10) Business Days. By the end of the meeting the Contractor shall have produced an agreed action plan with the Trust's Representative. The Contractor shall implement the agreed action plan within the agreed timescales and shall undertake such monitoring and review as necessary to establish the effectiveness or otherwise of the action plan. The Contractor shall report back all findings to the Trust within the timescale identified within the action plan."

16 In relation to clause 5.9 it should be noted that Appendix D of the Payment Mechanism specifies 220 service failure points as the threshold above which the Trust is entitled to serve a warning notice.

17 Clause 6 of the conditions provides:

"6.2 The only sums payable by the Trust or any Beneficiary to the Contractor for the provision of the Services shall be the Contract Price as calculated in accordance with the Payment Mechanism. All other costs, charges, fees and expenses of whatever kind arising out of or in connection with the Contract shall be the responsibility of the Contractor.

6.3 In accordance with the Service Level Specification and the Payment Mechanism, where the Contractor is required to provide Deliverables, the Trust or any Beneficiary shall be entitled to deduct a relevant element of the Contract Price in the event of failure to provide the Deliverables in accordance with the Service Level Specification."

18 Clause 6.4 of the conditions provides for Medirest to render invoices following the end of each month. Clause 6.5 provides for the Trust to pay those invoices within thirty days.

19 Clause 26 of the conditions sets out a dispute resolution procedure. In the first instance there is to be a meeting between more senior representatives of both parties, who will attempt to resolve the matter in dispute. If that meeting does not achieve a resolution, then the dispute is to be referred to mediation under the auspices of CEDR. If the mediation does not result in resolution of the dispute, then either party can commence proceedings in court.

20 Clause 28.1 of the conditions sets out a number of different circumstances in which the Trust is entitled to terminate the contract. The only part of this clause which is relevant for present purposes is sub-clause 28.1.10, which provides:

"the Contractor has exceeded the number of Service Failure Points set out in Appendix D of the Payment Mechanism in any six (6) month rolling period."

21 Appendix D of the Payment Mechanism specifies 1,400 service failure points as the threshold above which the Trust is entitled to terminate pursuant to clause 28.1.

22 Clause 28.2 of the conditions provides:

"The Trust and any Beneficiary shall be entitled to recover from the Contractor the amount of any Loss resulting from termination under Clause 28.1. For the purpose of this Clause, Loss shall include reasonable cost to the Trust and any Beneficiary of the time spent by its officers in terminating the Contract and in making alternative arrangements for the provision of the Services."

28.4.3 the Trust or such Beneficiary has not corrected the said breach of Contract within a reasonable period of time."

23   Clause 28.3 entitles the Trust to terminate the contract by giving six months notice in writing. Termination under this clause, however, does not entitle the Trust to any of the financial benefits set out in clause 28.2.

24   Clause 28.4 provides:

"The Contractor may terminate the Contract in the following circumstance, by giving 1 month's written notice:

28.4.1   if the Trust or any Beneficiary has committed a material breach of the Contract; and

28.4.2   the Contractor has brought the breach of Contract to the attention of the Trust's Representative, and

25   The final document which makes up the contract pack is document four. Part one of document four is entitled "Service Level Specification" and I shall refer to it as "the specification". The specification is divided into sub-parts. The specification sets out numerous requirements with which the contractor must comply. Sub-part B of the specification sets out general requirements. Sub-part C of the specification sets out specific requirements.

26   I shall deal first with the general requirements. Clause 6.1 of sub-part B of the specification provides:

"The Contractor shall undertake sufficient performance monitoring to demonstrate that each Performance Parameter is achieved, and where not achieved the extent of any shortfall."

27   Clause 7 of sub-part B of the specification sets out sixty performance parameters in the form of a table. Each of these performance parameters is given a number ranging from "GP01" to "GP60". In respect of each parameter it is specified whether a performance failure is classified as "major", "medium" or "minor". A separate column sets out the remedial period which is allowed for a performance failure. The final column

sets out how the performance of each parameter will be monitored.

28  One of the performance parameters in clause 7 deals with monthly reporting. This is parameter GP11, which provides:

"**Monthly Reporting**

The Contractor shall prepare a Monitoring Report and deliver it to the Trust within 5 Business Days after the Contract Month end. The Monitoring Report shall contain the following information in respect of the Contract Month just ended:

a)  the monitoring which has been performed by the Contractor in accordance with the Performance Monitoring Programme with a summary of the findings:

b)  a summary of all incidents and Ad-Hoc Service Requests reported to the Contractor or to the Helpdesk during the Contract Month including all Attendance/Completion/Make safe and Rectification Times and those achieved;

c)  a summary of all Performance Failures including the duration of each Performance Failure not responded to or rectified on time, with the time and date it commenced and the time and date it ceased;

d)  the relevant volume related data;

e)  the volume related adjustments to be made to the Service Payment in accordance with the Payment Mechanism;

f)  the deductions to be made from the Service Payment in respect of Performance Failures in accordance with the Payment Mechanism; and

g)  the number of Service Failure Points (SFP's) to be awarded in respect of Performance Failures on a daily basis. This part of the report should also show the rolling total for the past six months and highlight any day in this period that the rolling six-month total breaches a SFP threshold.

The Trust shall notify the Contractor within 10 Business Days of receipt as to whether it accepts the contents of the Monitoring Report and shall provide full details of any matter which is not resolved. If the Monitoring Report is agreed by the Trust, the Contractor shall issue an invoice for the undisputed sum as described in the Payment Mechanism.

The outcome of any Dispute Resolution Procedures will be reflected in the first payment due after the resolution of the dispute."

29  I turn next to the specific requirements. Clause 6 of sub-part C of the specification sets out forty nine performance parameters in the form of a table. Each of these performance parameters is given a number ranging from "SP01" to "SP49". In respect of each parameter it is specified whether a performance failure is classified as "major", "medium" or "minor". A separate column sets out the remedial period which is allowed for a performance failure. The final column sets out how the performance of each parameter will be monitored.

30  Appendices A, B and C to sub-part C of the specification set out details of meals to be served, meal times and so forth.

31   Part three of document four is the Payment Mechanism, to which I have previously referred. The Payment Mechanism is divided into six parts and four appendices.

32   Part A of the Payment Mechanism contains four pages of definitions. These include the following:

> "Deduction: means a deduction made from a Service Payment in accordance with this Payment Mechanism;

> ….

> FM Service: means a facilities management service to be provided by the Contractor in accordance with this Agreement, being one of the services specified in the Service Level Specification;

> ….

> Service Failure Points: means points allocated to the Contractor in respect of the occurrence of Performance Failures which are determined by the provisions set out in Part F of this Payment Mechanism and Appendix A;"

33 Part B of the Payment Mechanism sets out a formula for calculating the monthly service payments. This formula provides that there shall be subtracted from the sums otherwise due the total amount of deductions for performance failures, calculated in accordance with part C of the Payment Mechanism.

34   Part C of the Payment Mechanism includes the following provisions:

**"Entitlement to Make Deductions**

1.1   If at any time during the Term a Performance Failure shall occur the Trust shall, subject to paragraph 1.2 below, be entitled to make Deductions from the Service Payment in respect of that Performance Failure.

….

3.1   Subject to paragraphs 1 and 2 of this Part C, the amount of the Deduction in respect of a performance Failure shall be as follows:

> 3.1.1   in the case of a Minor Performance Failure, the sum of £5, index-linked;

> 3.1.2   in the case of a Medium Performance Failure, the sum of £15, index-linked; and

> 3.1.3   in the case of a Major Performance Failure, the sum of £30, index-linked.

….

**Remedial Periods**

6.1    On the occurrence of a Performance Failure, a period shall apply, within which the Contractor shall demonstrate to the reasonable satisfaction of the Trust that it has either remedied the Performance Failure or, where the period is marked with an asterisk in the Service Level Specification, has taken appropriate steps to prevent the recurrence of the Performance Failure. This period is referred to below as the "Remedial Period". The lengths of the Remedial Periods shall be:

6.1.1    as stated in the Service Level Specification in respect of the relevant Performance Failure; or

6.1.2    where no Remedial Period is stated in the Service Level Specification in respect of a Fault that has a Rectification Time, the Remedial Period shall be of the same duration as the Rectification Time.

6.2    If before the expiry of the Remedial Period the Contractor demonstrated to the reasonable satisfaction of the Trust that it has remedied the Performance Failure or, as applicable, has taken appropriate steps to prevent the recurrence of the Performance Failure, no further Deduction shall be made in respect of the Performance Failure, otherwise a further Deduction shall be made of the appropriate amount (as described in paragraph 3 above) and a further Remedial Period or Periods of equal duration shall apply (and, if appropriate, Deductions shall continue to be made) until such time as:

6.2.1    the Contractor shall demonstrate to the reasonable satisfaction of the Trust that it has remedied the Performance Failure or, as applicable, taken appropriate steps to prevent the recurrence of the Performance Failure; or

6.2.2    the Trust notifies the Contractor that the Trust no longer requires the

**WESTLAW**   © 2017 Thomson Reuters.

relevant FM Service."

remedied prior to the expiry of the Remedial Period, the appropriate number of Service Failure Points shall be awarded in respect of each such Performance Failure, even though they arise from the same circumstances.

35 Part F of the Payment Mechanism provides:

**Service Failure Points**

1.1 Service Failure Points shall be awarded for every Performance Failure deemed or actual which occurs during the Term unless such matters are disregarded pursuant to paragraph 4 of Part C and further disregarding any Performance Failure which is attributable to the occurrence of an event of Force Majeure.

….

1.3 For the avoidance of doubt when awarding Service Failure Points, where a further Performance Failure is deemed to have occurred in accordance with paragraph 6 of Part C, because Rectification is not carried out or, in the case of Performance Failures to which a Remedial Period applies the Performance Failure has not been

**Service Failure Points and Performance Failures**

1.4.1 The number of Service Failure Points which shall be awarded in respect of each Performance Failure shall be the number of Service Failure Points attributable to the Performance Failure Category allocated to the Performance Failure as set out in Appendix A of this Payment Mechanism.

**Total Monthly Service Failure Points**

The contractor shall calculate the total number of Service Failure Points awarded in each Contract Month.

**Appendix A**

**Service Failure Points**

| Category | SPFs |
| --- | --- |
| **Minor Performance Failure** | **2** |
| **Medium Performance Failure** | **6** |
| **Major Performance Failure** | **20** |

Compass Group UK and Ireland Ltd (t/a Medirest) v Mid..., 2013 WL 617577 (2013)

36    The contract in the present case was derived from two different sources. The first source was a standard NHS contract. The second source was the procedure found in PFI contracts for service failures and deductions. The judge observed that the cobbled together nature of the contract did not assist its use by either party. I agree. The package of contract documents contains some puzzles and inconsistencies which gave rise to conflict between the parties.

37 Having identified the relevant contract terms, I must now turn to the facts.

**The facts**

38    Under the terms of the contract, the first three months were a "bedding-in" period. This meant that Medirest was protected against deductions or other penalties. During this period there were serious shortcomings in the service provided by Medirest. There were insufficient staff, in particular not enough team leaders. There was a drop in the standard of maintenance and cleanliness of ward kitchens.

39    Medirest's monitoring was also deficient during the initial period. Medirest did not record performance failures. Nor did Medirest prepare monthly monitoring reports as it was obliged to do under performance parameter GP11, set out in clause 7 of sub-part B of the specification.

40    The Trust responded to Medirest's failures by adopting a challenging and robust approach. There was a meeting in early July 2008 at which Mr Wright of the Trust suggested a format for Medirest's monitoring reports.

41    Medirest failed to produce any monitoring reports before the end of July. It produced the first monitoring report on 7th August. That report was inadequate in that it only covered July, not the three preceding months.

42    In accordance with the penultimate paragraph of performance parameter GP11 the Trust responded disputing the contents of Medirest's monitoring report. At a meeting on 13th August 2008 the Trust presented its own calculations in respect of July. This showed 3,264 service failure points and deductions of £3,570.

43    These calculations caused surprise to the management of Medirest, who referred the matter to their lawyers. The Trust for its part proceeded to carry out its own monitoring every month and to assess Medirest's performance on an extremely harsh basis. Relations between the parties rapidly deteriorated.

44 The monitoring reports which the Trust prepared for August and September 2008 were totally different from the monitoring reports prepared by Medirest for those months. The Trust's monitoring reports included some assessments which were absurd. I set out nine examples:

• i)   Chocolate Mousse was discovered on 20th August 2008 to have become out of date on 19th August. It was removed that day. For this matter the Trust awarded a total of 56,360 service failure points

• ii)   On the 4th August some out of date ketchup was found which ought to have been used by the end of May. This was not a brand used by Medirest. The Trust awarded 36,860 service failure points in respect of this.

• iii)   Some spoons were found which were unsatisfactory. They were removed on discovery. The Trust awarded 29,075 service failure points in respect of this.

• iv)   There were some cleaning issues in ward B3 discovered on 4th August. The Trust awarded 4,737 points in respect of this.

• v) The fridge temperature display in ward B4 was found to be on defrost on 5th August 2008. The Trust awarded 63,220 service failure points for this.

• vi)   Some individual butter sachets were found which were undated. The Trust awarded 63,220 service failure points for this.

• vii)   There were some bagels found which were out of date. These were not Medirest items. Nevertheless the Trust awarded 64,040 points in respect of this matter.

• viii) Four cleaning issues on ward B16: crumbs in toaster, microwave, windowsill, shelves in fridge. The Trust awarded 14,168 service failure points.

• ix)   Fluff inside the RCN Noticeboard. This was locked and the key was kept by the RCN. The Trust awarded 2,979 service failure points.

 It seems that these excessive awards of service failure points were caused by the Trust's misinterpretation and

misapplication of paragraph 6 of part C of the Payment Mechanism.

45   Medirest, on the other hand, was also producing deficient monthly monitoring reports. There were many respects in which Medirest's service was unsatisfactory, but Medirest did not trouble to include these performance failures in its monthly reports. Also Medirest failed to provide and operate a helpdesk system, as required by paragraph 5.1 of document 2.

46   On 27th November 2008 there was a meeting between the senior management on both sides. This meeting was not as productive as either party had hoped. One beneficial consequence, however, was that immediately after the meeting Medirest implemented the helpdesk facility.

47   On 10th December 2008 Medirest sent a conciliatory letter to the Trust. Medirest accepted that it had incurred more than 1,400 service failure points in the preceding six months. This would entitle the Trust, if it saw fit, to terminate the contract under clause 28.1. Medirest stated that it would work extremely hard to improve its performance over the coming months.

48   Although Medirest was incurring a high number of service failure points under the contract, the actual catering service was proceeding satisfactorily. A survey carried out for the period October to December 2008 indicated a high level of patient satisfaction with both the food and the service by Medirest staff.

49   On 12th December 2008 the Trust served a warning notice under clause 5.10 of the conditions. This triggered an obligation upon Medirest to attend a meeting with the Trust and also to produce an agreed action plan.

50   During December 2008 Medirest prepared and sent to the Trust a draft action plan. The parties met on 5th January 2009, as required by clause 5.10. As a result of discussions during and after that meeting, on 15th January 2009 Medirest issued the final version of the action plan. The Trust formally accepted the action plan by letter dated 27th January 2009.

51   By the end of January 2009 the contract was operating in a more satisfactory manner. Medirest was

delivering the required catering and cleaning services. It was also monitoring its own performance and preparing monthly reports as required by performance parameter GP11. Although there was an improvement, things were not perfect. Medirest obtained a report on its catering from a health and safety expert. This report revealed areas where improvement was required. Medirest sent a copy of that report to the Trust, but omitted the critical two pages which identified where improvements should be made.

52   During 2009 Medirest was duly monitoring its own performance and submitting monthly reports. The Trust was also monitoring Medirest's performance and preparing its own set of monthly assessments. In respect of the months January to August 2009, the parties' respective assessments of the number of service failure points incurred were far apart. Even on Medirest's assessment, however, the total number of service failure points in the preceding six month period exceeded the threshold figure of 1,400.

53   The shortcomings in performance which attracted service failure points also entitled the Trust to make deductions from its monthly payments to Medirest. There were heated negotiations between the parties as to the extent of the deductions which should be made. On 11th March 2009 Medirest proposed that the Trust should make four monthly on account deductions of £20,000 each, pending determination of the correct figure. On 26th March the Trust agreed to this course. The Trust duly made those deductions from the next four monthly payments.

54   Relations between the management on both sides steadily deteriorated. On 12th July the Trust proposed that deductions of £20,000 per month should continue to be made. Medirest rejected this proposal and suggested activating the dispute resolution procedure. On 23rd July the Trust unilaterally deducted £137,834 from its monthly payment to Medirest.

55   By this stage the Trust was maintaining that the total deductions which it was entitled to make amounted to £711,037. A large part of this sum was referable to the excessive assessments of minor breaches in August and September 2008. The total deductions claimed for the nine items set out in paragraph 44 above amounted to £584, 640.

56 On 27th July there was an acrimonious telephone conversation between Mr Aitchison of the Trust and Mr Taylor of Medirest. Immediately after that telephone call Mr Aitchison sent notice of termination to Medirest pursuant to clause 28.1 of the conditions. Mr Aitchison stated in the notice that Medirest had incurred 82,470 service points in the preceding six months. Mr Aitchison did not consult the Trust board before sending the notice, but nothing turns on this omission.

57 On 5th August there was a meeting between the parties to discuss the question of deductions. They did not reach agreement. On 10th August Mr Aitchison informed Medirest that the total outstanding deductions amounted to £716,197 and that the Trust would make deductions of £106,032 from its next five monthly payments to Medirest.

58 Mr Aitchison's threat was not an empty one. On 20th August the Trust deducted £106,032 from its monthly payment to Medirest.

59 Medirest took the view that the Trust's conduct over the last year had been utterly unreasonable and that this deduction was the last straw. On 28th August Medirest's solicitors, DLA, sent a letter to the Trust pursuant to clause 28.4.2 of the conditions. In this letter DLA alleged that the Trust had committed material breaches of contract by awarding excessive service failure points and making excessive deductions. In the final section of their letter, DLA required the Trust to do the following by 4th September 2009:

"1. to withdraw the existing monitoring information;

2. to produce amended monitoring information to reflect information supplied by Medirest and to calculate the amount the Trust genuinely believes to be due from Medirest at this juncture;

3. to pay to Medirest the unlawful deduction made in respect of the August 2009 invoice payment; and

4. to confirm that the Trust will make no further deductions pending the agreement of the items set out at point 2 referred to above. For the avoidance of doubt, Medirest confirms that in the event that the parties are not in the position to agree the level of deductions, the matters hold be addressed pursuant to clause 26 of the Conditions which set out the dispute resolution procedure."

60 The Trust was also taking legal advice during this period. The Trust rapidly appreciated the error of its ways. Its solicitors, Capsticks, sent a conciliatory letter on 4th September 2009 and sought an extension of time.

61 By letter dated 7th September 2009 DLA extended the deadline for compliance to 10th September. DLA also amended Medirest's third requirement so as to include repayment of the deduction made in July, as well as the August deduction.

62 On 9th September 2009 Capsticks sent a letter to DLA making substantial concessions. They stated the following:

• (i) The Trust was immediately repaying to Medirest the sums deducted from the July and August payments.
• (ii) The Trust was reviewing its monitoring information in advance of a meeting between the parties in the week commencing 21st September.
• (iii) The Trust would make no further deductions pending the outcome of that meeting.

63 On 10th September 2009 Medirest received the Trust's payment of £243,875.53 in respect of sums previously deducted. Unfortunately neither this payment nor the statements in Capstick's letter assuaged Medirest's wrath. By letter dated 10th September DLA gave notice to the Trust pursuant to

clause 28.4.3 of the conditions that the Trust had failed to withdraw its monitoring information or to produce corrected monitoring information by the extended deadline. Accordingly Medirest was terminating the contract on one month's notice. Medirest later extended its termination date to 27th October 2009.

64    On 21st September 2009 the Trust issued a spreadsheet containing its revised monitoring information. This substantially reduced the Trust's previous assessment of service failure points and deductions. The parties were still some way apart on these matters, but the gulf was much narrower than before. The Trust contended that as at the end of July Medirest had incurred 104,828 service failure points and deductions totalling £191,620.87. Medirest contended that it had only incurred 12,904 service failure points and deductions of £30,290. Despite these differences between the parties, one important matter was common ground. During the preceding six months Medirest had incurred more than 1,400 service failure points. Thus on any view the Trust was entitled to terminate under clause 24.1 of the conditions.

65    On 8th October 2009 the Trust withdrew its July notice of termination. At the same time it issued a new notice of termination under clause 28.1, which would take effect on 23rd October. The parties then agreed that termination would take effect on 23rd October, without prejudice to whose termination of the contract was effective.

66    Medirest's catering and cleaning services duly came to an end on 23rd October 2009. Both parties maintained that they had validly terminated the contract. Each party maintained that it had substantial financial claims against the other. In order to resolve these issues Medirest commenced the present proceedings.

**The present proceedings**

67    By a claim form issued on 23rd July 2010 Medirest claimed against the Trust substantial damages for breach of contract. This claim was based upon the premise that Medirest had validly terminated the contract pursuant to clause 28.4 of the conditions.

68    The Trust defended Medirest's claim and put forward a substantial counterclaim. The essence of the Trust's case was that Medirest's purported termination was ineffective. It was the Trust who had effectively terminated the contract. Accordingly the Trust was entitled to substantial sums under clause 28.2 of the conditions and also substantial damages.

69    The action was tried before Mr Justice Cranston over eight days during February 2012. The judge handed down his judgment on 28th March 2012. I would summarise the judge's conclusions in seven propositions as follows:

- i)    The Trust's conduct from January 2009 onwards constituted a breach of its obligation to "co-operate … in good faith" under clause 3.5 of the conditions (see paragraphs 82 to 87).
- ii)    The Trust had a power under clause 5.8 of the contract conditions and the Payment Mechanism to make deductions from monthly payments and to award service failure points. There was an implied term that, in exercising this power, the Trust would not act in an arbitrary, capricious or irrational manner (see paragraphs 12, 45 and 86).
- iii)    In breach of the implied term the Trust exercised its power under clause 5. 8 and the Payment Mechanism in an arbitrary, capricious and irrational manner.
- iv)    Medirest's termination notice under clause 28.4 was valid. This would, absent the Trust's notice of termination, have brought the contract to an end on 27th October 2009.
- v)    The Trust's termination notice under clause 28.1 was also valid. This was because Medirest had exceeded the threshold of 1,400 service failure points in the preceding six months. This notice brought the contract to an end on 23rd October 2009.
- vi)    The Trust was in repudiatory breach of contract until 21st September 2009. Medirest did not, however, terminate for repudiatory breach.
- vii)    Since both parties were entitled to terminate, neither could succeed in its substantial claims for post termination losses.

I will refer to these elements of the judgment as "proposition (i)", "proposition (ii)" and so forth.

Compass Group UK and Ireland Ltd (t/a Medirest) v Mid..., 2013 WL 617577 (2013)

70   The Trust was aggrieved by the rejection of its counter claim for substantial post termination losses. Accordingly the Trust has appealed to the Court of Appeal.

**The appeal to the Court of Appeal**

71   By an appellant's notice dated 17th April 2012 the Trust appealed against the judgment of Mr Justice Cranston on four grounds. These were:

• i)  The judge was wrong to find that the Trust was in breach of clause 3.5 of the conditions.
• ii)  The judge was wrong to find that the Trust was in breach of an implied term.
• iii)  The judge was wrong to find that on 10th September 2009 Medirest was entitled to terminate under clause 28.4 of the conditions.
• iv)  The judge was wrong to find that the Trust was in repudiatory breach of contract until 21st September 2009.

72   The fourth ground of appeal seems to me to be of purely academic interest. Nobody suggests that Medirest accepted the Trust's repudiatory breach, if such existed.

73   This appeal was heard on 19th and 20th February 2013. Mr James Collins QC leading Mr Siddharth Dhar, appeared for the Trust. Robert Howe QC, leading Mr James Willan, appeared for Medirest. I am most grateful to counsel for the excellence of their oral and written submissions.

74   The first three sentences of paragraph 86 of the judgment are a crucial part of the judge's reasoning. These sentences read as follows:

"The absurdity of such calculations [viz the Trust's calculations in August and September 2008] was a breach of clause 3.5. It also constituted an exercise of the Trust's contractual power under clause 5.8 and the Payment Mechanism in an arbitrary, capricious and irrational manner. The Trust's submissions

that all that was involved were calculations does not accord with the reality."

75   The judge's finding that the Trust had a discretion under clause 5.8 of the contract conditions led to his finding of an implied term and breach of that term (propositions (ii) and (iii)). These findings, in turn, played a crucial role in the judge's conclusion that the Trust had breached clause 3.5 (proposition (i)). Thus the judge's finding of an implied term is integral to his analysis of Medirest's breach of the express term contained in clause 3.5.

76   I have therefore come to the conclusion that the best way to tackle the issues in this appeal is to begin by considering whether the contract contained the alleged implied term.

**Part 6.Did the contract contain the alleged implied term?**

77   In relation to proposition (ii), the judge relied upon the following authorities: Abu Dhabi National Tanker Co v Product Star Shipping Ltd (The "Product Star") [1993] 1 Lloyd's LR 397 , Horkulak v Cantor Fitzgerald International [2004] EWCA Civ 1287, [2005] ICR 402 , Socimer International Bank Ltd v Standard Bank London Ltd [2008] EWCA Civ 116, [2008] 1 Lloyd's LR 558 and JML Direct Ltd v Freestat UK Ltd [2010] EWCA Civ 34 . I must therefore review these and any other relevant authorities.

78   In The "Product Star" the charter-party provided that the vessel should not be required to proceed to any port which the master or owners in their discretion considered dangerous. The charterers wished the vessel to proceed to the port of Ruwais, but the master and owners refused on account of war risks. Both the Commercial Court and the Court of Appeal held that this refusal was a breach of contract. Leggatt LJ, with whom Balcombe and Mann LJJ agreed stated the relevant principle as follows at page 404:

"Where A and B contract with each other to confer a discretion

on A, that does not render B subject to A's uninhibited whim. In my judgment, the authorities show that not only must the discretion be exercised honestly and in good faith, but, having regard to the provisions of the contract by which it is conferred, it must not be exercised arbitrarily, capriciously or unreasonably. That entails a proper consideration of the matter after making any necessary inquiries. To these principles, little is added by the concept of fairness: it does no more than describe the result achieved by their application."

79    In Horkulak the claimant recovered damages for breach of contract against his former employer, representing loss of earnings. Under his contract of employment he had been entitled to a discretionary bonus. The Court of Appeal held that the lost bonus should form part of the damages. It was an implied term, based on the common intention of the parties, that there would be a genuine and rational exercise of the discretion by the employer: see paragraph 30 of the judgment of the court.

80    In Socimer a contract for the sale of assets between banks entrusted the task of valuation to one party. The Court of Appeal noted that the contract conferred on one party a power to make decisions which would have an effect on both parties. Accordingly, the contract was subject to an implied term. Rix LJ (with whom Lloyd and Laws LJJ agreed) noted that the decision-maker's discretion was limited as a matter of necessary implication. He was obliged to act honestly. Also there was "need for the absence of arbitrariness, capriciousness, perversity and irrationality": see paragraph 66.

81    In JML Direct the defendant operated a satellite television service and the claimant was a provider of television shopping channels. It was agreed that the claimant should have two of its shopping channels on the defendant's platform and that the defendant would

have discretion in the allocation of logical channel numbers. Both the trial judge and the Court of Appeal held that, in exercising its discretion, the defendant was under an implied obligation not to act in an arbitrary, irrational or capricious manner. Moore-Bick LJ, with whom the Master of the Rolls and Toulson LJ agreed, added at paragraph 14:

> "Such an obligation is likely to be implicit in any commercial contract under which one party is given the right to make a decision on a matter which affects both parties whose interests are not the same."

82    In each of the above cases the implied term was intrinsic. The contract would not make sense without it. It would have been absurd in any of those cases to read the contract as permitting the party in question to exercise its discretion in an arbitrary, irrational or capricious manner. By reference to Baroness Hale's classification in Geys v Société Générale [2012] UKSC 63 at [55], [2013] ICR 117, that implied term falls into the first category.

83    An important feature of the above line of authorities is that in each case the discretion did not involve a simple decision whether or not to exercise an absolute contractual right. The discretion involved making an assessment or choosing from a range of options, taking into account the interests of both parties. In any contract under which one party is permitted to exercise such a discretion, there is an implied term. The precise formulation of that term has been variously expressed in the authorities. In essence, however, it is that the relevant party will not exercise its discretion in an arbitrary, capricious or irrational manner. Such a term is extremely difficult to exclude, although I would not say it is utterly impossible to do so. Certainly clause 1.1.5 of the conditions in the present case is not effective to exclude such a term, if it is otherwise to be implied.

84    The question therefore arises whether clause 5.8 of the conditions in the present case confers a discretion such as to give rise to that implied term. The judge held

that it did. The Trust contends that the judge was wrong to do so.

85  Mr Collins submits that the judge erred in holding that the Trust had a discretion in relation to the awarding of service failure points or the making of deductions. The contract contains precise rules as how service failure points and deductions should be calculated. This leaves no room for any discretion. Accordingly there can be no implied term requiring the Trust not to act in an arbitrary, irrational or capricious manner when assessing these matters.

86  Mr Howe resists this argument and seeks to support the judge's analysis. He submits that clause 5.8 confers a clear discretion on the Trust. Mr Howe points in particular to two parts of clause 5.8. First, there is the phrase "the Trust shall be entitled to levy payment deductions". Secondly, there is the phrase "the Trust may by notice to the contractor award service failure points".

87  As both counsel acknowledged, there is an inconsistency between the wording of clause 5.8 and the wording of document four. Clause 5.8 states that the Trust makes decisions about service failure points and deductions. It also appears to say that the Trust has a discretion in this regard. Document 4 on the other hand states precisely the opposite. The Payment Mechanism in conjunction with the specification sets out distinct rules for calculating service failure points. These rules leave no room for discretion. Furthermore performance parameter GP11 says that it is Medirest, not the Trust, which has to do these calculations.

88  The inconsistencies between document three and document four are at first sight confusing. Counsel have helpfully cited all the usual authorities governing the construction of contracts, starting with Investors Compensation Scheme Ltd v West Bromwich Building Society [1998] 1 WLR 896 . I hope that I shall be forgiven if I do not embark upon a lengthy recitation of those authorities, replete with quotations.

89  I have read and re-read the contractual provisions which are in issue, fully bearing in mind the other terms of the contract and, more generally, the commercial context. In my view there is only one sensible way to construe these provisions. This is as follows:

• i)  Medirest is under a duty to monitor its own performance and to record all instances where it falls short. See clause 5.2 of the conditions.
• ii)  The Trust is entitled to monitor Medirest's performance whenever it wishes, but the Trust is not obliged to do so. See clause 5.3 of the conditions.
• iii)  The specification in conjunction with the Payment Mechanism contains precise rules for determining how many service failure points Medirest has incurred and what deductions are due. This exercise is a matter of calculation to be carried out at the end of each month. It does not involve discretion and there is only one right answer.
• iv)  Medirest is under a duty to carry out that calculation and to set out the results in its monthly monitoring report. See clauses 6 and 7 of sub-part B of the specification and performance parameter GP11, sub-paragraphs (f) and (g).
• v)  Upon receipt of the contractor's monthly report, the Trust may challenge Medirest's calculations if it thinks they are wrong. If the parties are unable to agree, the issue between them may be resolved through the dispute resolution procedure contained in clause 26 of the conditions.
• vi)  Once the correct figures for service failure points and deductions have been established, the Trust has a discretion. The Trust may "award" the service failure points to Medirest or it may choose not to do so. Likewise the Trust may levy deductions against its monthly payment to Medirest or it may choose not to do so. See clause 5.8 of the conditions.

90  Against this background, the question arises whether there is an implied term that Trust would not act in an arbitrary, capricious or irrational manner in relation to awarding service failure points or making deductions.

91  The discretion which is entrusted to the Trust in relation to service failure points and deductions in the present case is very different from the discretion which existed in the authorities discussed above. The Trust is a public authority delivering a vital service to vulnerable members of the public. It rightly demands

high standards from all those with whom it contracts. There may, of course, be circumstances in which the Trust decides to award less than the full amount of service failure points or to deduct less than it is entitled to deduct from a monthly payment. Nevertheless the Trust could not be criticised if it awards the full number of service failure points or if it makes the full amount of any deduction which it is entitled to make. The discretion conferred by clause 5.8 simply permits the Trust to decide whether or not to exercise an absolute contractual right.

92  There is no justification for implying into clause 5.8 a term that the Trust will not act in an arbitrary, irrational or capricious manner. If the Trust awards more than the correct number of service failure points or deducts more than the correct amount from any monthly payment, then that is a breach of the express provisions of clause 5.8. There is no need for any implied term to regulate the operation of clause 5.8.

93  Mr Howe points out that clause 6.2.1 of part C of the Payment Mechanism requires Medirest to demonstrate certain matters "to the reasonable satisfaction of the Trust". He submits that this involves an element of discretion. It must be implied that the Trust will not exercise this discretion in an arbitrary, irrational or capricious manner.

94  I do not accept this submission for two reasons. First, the qualification of "satisfaction" by the word "reasonable" makes the test objective, rather than subjective. Secondly, clause 6.2.1 contains its own control mechanism, viz "the reasonable satisfaction of the Trust". There is no need for a further or different control mechanism, as set out in the suggested implied term.

95    Let me now draw the threads together. The interpretation of clause 5.8 and the Payment Mechanism is as set out in paragraph 89 above. The implied term which the judge found and which Mr Howe supports does not exist. Accordingly the judge's finding that the Trust was in breach of the implied term cannot stand. Reverting to my earlier summary of the judge's judgment, I would reject propositions (ii) and (iii).

96  I turn next to the express term contained in clause 3.5 of the conditions.

**Clause 3.5 of the conditions**

97  The first sentence of clause 3.5 contains a jumble of different statements, set out in an incoherent order. It has different possible meanings, depending upon where one places the caesuras and what imaginary punctuation one inserts. Medirest contends that the sentence should be read as if it had the following punctuation and numeration:

> "The Trust and the Contractor:
>
> (1)  will co-operate with each other in good faith; and
>
> (2) will take all reasonable action as necessary:
>
> (a)  for the efficient transmission of information and instructions; and
>
> (b) to enable the Trust or, as the case may be, any Beneficiary to derive the full benefit of the Contract."

98  The Trust contends that the sentence should be read as if it had the following punctuation and numeration:

> "The Trust and the Contractor will co-operate with each other in good faith and will take all reasonable action as it necessary:
>
> (1)  for the efficient transmission of information and instructions; and
>
> (2) to enable the Trust or, as the case may be, any Beneficiary to derive the full benefit of the Contract."

Compass Group UK and Ireland Ltd (t/a Medirest) v Mid..., 2013 WL 617577 (2013)

99   The judge preferred Medirest's reading of the first sentence of clause 3.5. He noted that the Trust and Medirest had entered into a long term contract for the delivery of food and other services within a hospital. The performance of this contract would require continuous and detailed co-operation. He considered that it accorded with commercial common sense for there to be a general obligation on both parties to co-operate in good faith.

100   The judge then turned to the content of this obligation. He concluded that this provision referred to how the parties should conduct themselves in the course of performance. He held that this term had an objective character. It qualified how the duty to co-operate was to occur. See paragraph 33 of the judgment.

101   The judge then went on to review the Trust's conduct in relation to awarding service failure points and levying deductions. He held that this conduct constituted a breach of the obligation to co-operate in good faith imposed by clause 3.5. That breach was "material" for the purposes of clause 28.4 of the contract conditions. It was also repudiatory.

102   Mr Howe supports the judge's interpretation of clause 3.5. He submits that this is highly likely to be the intention of the parties. He draws attention to a number of cases in which an obligation to co-operate in good faith has been implied by the courts. In this case there is an express term to that effect. The court should not read it down.

103   Mr Collins invites this court to take a different view. He submits that if the parties had intended to impose a general duty to co-operate with one another in good faith, they would have stated this in a stand alone sentence with a full stop at the end. They did the opposite of that in clause 3.5.

104  Mr Collins also points out that this is a very detailed contract, where the obligations of the parties and the consequences of any failings have been spelt out in great detail. Commercial common sense therefore does not favour a general overarching duty to co-operate in good faith.

105   In addressing this question, I start by reminding myself that there is no general doctrine of "good faith" in English contract law, although a duty of good faith is implied by law as an incident of certain categories of contract: see Horkulak at paragraph 30 and Yam Seng Pte Ltd v International Trade Corporation Ltd [2013] EWHC 111 (QB) at paragraphs 120-131. If the parties wish to impose such a duty they must do so expressly.

106   I turn now to the construction of clause 3.5 of the conditions in the present case. Both parties have advanced powerful arguments. Nevertheless, after weighing up the competing submissions of counsel, I have come to the conclusion that the Trust's reading of clause 3.5 is correct. The obligation to co-operate in good faith is not a general one which qualifies or reinforces all of the obligations on the parties in all situations where they interact. The obligation to co-operate in good faith is specifically focused upon the two purposes stated in the second half of that sentence.

107   Those purposes are:

   • i)  the efficient transmission of information and instructions;
   • ii)  enabling the Trust or any beneficiary to derive the full benefit of the contract.

108   The reference to "any beneficiary" in the second purpose adds little to clause 3.5, regardless of how that clause is construed. The term "beneficiary" is defined in clause 1.1.2 of the conditions. It includes the Department of Health, the Medical Research Council and other bodies. Significantly, the definition does not include patients. None of the identified beneficiaries derives any direct benefit from Medirest's catering or cleaning services. I have come to the conclusion that the words "or any beneficiary" add nothing of significance and do not assist in the construction of the clause. The second stated purpose really means that the Trust should receive the full benefit of the contract. The benefit of the contract is that the catering and cleaning services should be delivered to the patients and the wards, for which the Trust is responsible.

109   I turn next to the content of the duty to co-operate in good faith, limited as it is by the two stated purposes. It is clear from the authorities that the content of a duty

of good faith is heavily conditioned by its context. Manifest Shipping Co Ltd v Uni-Polaris Insurance Co Ltd [2001] UKHL 1, [2003] 1 AC 469 insurers alleged that shipowners had failed to observe "utmost good faith" (as required by s. 17 of the Marine Insurance Act 1906 ) in the presentation of a claim. The Commercial Court judge, the Court of Appeal and the House of Lords all rejected that defence. Lord Scott, with whom Lord Steyn and Lord Hoffmann agreed, held that in the particular context the duty of utmost good faith required no more than that the insured should act honestly and not in bad faith: see paragraph 111.

110    In Street v Derbyshire Unemployed Workers' Centre [2004] EWCA Civ 964, [2005] ICR 97 the appellant was dismissed for making allegations of misconduct against her senior manager. The allegations were unfounded, but the appellant relied upon s. 43G of the Employment Rights Act 1996 , which provided protection for whistleblowers. The employment tribunal rejected the claim for unfair dismissal, as did the Employment Appeal Tribunal and the Court of Appeal. It was held that, although the appellant reasonably believed in the substantial truth of her allegations, she had not acted "in good faith" as required by s. 43G (1) (a) . Auld LJ, with whom Jacob and Wall LJJ agreed, explained the meaning of "good faith" as follows at paragraph 41:

> "Shorn of context, the words "in good faith" have a core meaning of honesty. Introduce context, and it calls for further elaboration. Thus in the context of a claim or representation, the sole issue as to honesty may just turn on its truth. But even where the content of the statement is true or reasonably believed by its maker to be true, an issue of honesty may still creep in according to whether it made with sincerity of intention for which the Act provides protection or for an ulterior and, say, malicious, purpose. The term is to be found in many statutory and common-law contexts, and because they are necessarily conditioned by their context, it is dangerous to apply

judicial attempts at definition in one context to that of another. "

111    There is a helpful illustration of these principles in CPC Group Ltd v Qatari Diar Real Estate Investment Co [2010] EWHC 1535 (Ch). In that case the parties entered into a joint venture agreement to acquire Chelsea Barracks with a view to its development. A sale and purchase agreement between the parties imposed an obligation upon both of them to act "in utmost good faith". Vos J held at paragraph 246 that, having regard to the context, the content of this obligation was:

> "to adhere to the spirit of the contract, which was to seek to obtain planning consent for the maximum Developable Area in the shortest possible time, and to observe reasonable commercial standards of fair dealing, and to be faithful to the agreed common purpose, and to act consistently with the justified expectations of the parties. "

112    In the context of clause 3.5 of the conditions the obligation to co-operate in good faith in my view means the following. The parties will work together honestly endeavouring to achieve the two stated purposes.

113    I turn now to the question whether the Trust was in breach of clause 3.5 by awarding excessive service failure points or making excessive deductions from monthly payments. I shall deal first with deductions. The four £20,000 deductions which the Trust made between March and June 2009 were clearly not breaches of contract. Medirest agreed to those deductions.

114    The substantial deductions which the Trust made in July and August 2009 fall into a different category. They were not agreed by Medirest and they exceeded the true amount which the Trust was entitled to deduct. In making these deductions the Trust was acting in breach

of clauses 5.8, 6.3 and 6.5 of the conditions. The Trust was also acting contrary to the various provisions of the Payment Mechanism concerning deductions which I have set out in Part 2 above. On the other hand these unilateral deductions were not breaches of clause 3.5 of the conditions. I say this for two reasons:

    • i) There is no finding by the judge that the Trust was acting dishonestly, as opposed to mistakenly applying the provisions of a complicated contract.
    • ii) These deductions were irrelevant to the two stated purposes. They had nothing to do with the transmission of information or instructions between the parties. Nor were they relevant to the Trust or any beneficiary deriving the full benefit of the contract.

115   The Trust was, therefore, in breach of clauses 5.8, 6.3 and 6.5 (but not 3.5) of the conditions and of the relevant provisions of the Payment Mechanism between 23rd July and 10th September 2009. On the latter date the Trust repaid to Medirest all of the sums which it had wrongfully deducted. Therefore the Trust effectively cured these breaches of contract before Medirest served its notice of termination under clause 28.4 of the conditions.

116   I turn now to the Trust's conduct in awarding service failure points. On the facts as found by the judge the Trust persisted in awarding an excessive number of service failure points throughout the period August 2008 to September 2009. This was a breach of the express provisions of clause 5.8 of the conditions. It was not, however, a breach of clause 3.5 of the conditions. I say this for two reasons:

    • i) There is no finding by the judge that the Trust was acting dishonestly, as opposed to mistakenly applying the provisions of a complicated contract.
    • ii) These deductions were irrelevant to the two stated purposes. In particular, an award of service failure points under clause 5.8 of the conditions was not "the transmission of information and instructions" within clause 3.5. The two clauses are directed towards different matters. There is no need for clause 3.5 and 5.8 to cover the same ground twice over and, as I read those two clauses, they do not do so.

117   The judge held that the Trust's award of an excessive number of service failure points constituted a breach of the implied term. He relied upon this breach of the implied term as supporting his conclusion that the Trust was in breach of clause 3.5: see paragraphs 86 and 87 of the judgment. For the reasons set out in Part 6 above, I do not consider that there was such an implied term. Accordingly this basis for finding a breach of clause 3.5 falls away.

118   In reciting the history of the dealings between the parties the judge has identified some instances where the management of Medirest acted unreasonably and many more instances where the management of the Trust acted unreasonably. The Trust's managers were aggressive in meetings and intemperate in their correspondence. Nevertheless, as the judge found at paragraph 71 of his judgment, this did not affect the services which Medirest were providing. There were no significant problems with those services from late January 2009 onwards. The parties agreed to keep their dispute about service failure points and deductions separate from the delivery of services to the wards. In that respect the parties were successful.

119   It is clear from the findings of the judge that the parties did co-operate effectively on all matters concerning the delivery of services to the hospital patients. In so far as information needed to pass between the parties to facilitate the delivery of services to patients, that information was duly transmitted. The Trust received the full benefit of the contract in the sense that patients were given meals at the proper times and the wards were kept clean.

120   I therefore come to the conclusion that, despite the breakdown of personal relationships at management level, there was no breach of clause 3.5 on either side. With reference to my earlier summary of the judge's judgment, I therefore disagree with proposition (i).

121   The only continuing breach of contract by the Trust on 10th September 2009, when Medirest served its termination notice, was the Trust's award of an excessive number of service failure points, contrary to clause 5.8 of the conditions. I must now consider

Compass Group UK and Ireland Ltd (t/a Medirest) v Mid... 2013 WL 617577 (2013)

whether that continuing breach enabled Medirest to terminate the contract.

**Did Medirest effectively terminate the contract under clause 28.4 of the conditions?**

122  For the reasons set out in Parts 6 and 7 above, I conclude that on 10th September 2009 the Trust was not in breach of clause 3.5 of the conditions. Nor was the Trust in breach of any implied term. Furthermore by 10th September 2009 the Trust had repaid all sums wrongfully deducted.

123  On 10th September 2009, when Medirest served its notice of termination, there was only one continuing breach of contract which the Trust had failed to correct. This was the award of an excessive number of service failure points, contrary to clause 5.8 of the conditions. The question therefore arises as to whether this was a "material" breach of contract within clause 28.4.1.

124  Counsel have cited a number of authorities in relation to the meaning of "material breach". For present purposes I only need refer to two of those authorities. In Dalkia Utilities Services plc v Celltech International Ltd [2006] EWHC 63 (Comm), [2006] 1 Lloyd's Rep 599 the claimant agreed to provide electricity and steam to a large paper mill which the defendant was constructing. Clause 14 of the agreement provided that the claimant could terminate if the defendant was in material breach of its obligation to pay. The claimant successfully terminated pursuant to that provision. In commenting on the operation of that clause Christopher Clarke J observed at paragraph 102:

> "The sums involved were neither trivial nor minimal. Celtech's continued failure to pay them was serious. In assessing the materiality of any breach it is relevant to consider not only of what the breach consists but also the circumstances in which the breach arises, including any explanation given or apparent as to why it has occurred."

125  In Fitzroy House Epsworth Street (No. 1) Ltd v Financial Times Ltd [2006] EWCA Civ 329, [2006] 1 WLR 2207 a lease contained a break clause which the tenant could exercise if it had "materially complied" with its obligations. The tenant was in breach of its repairing obligations in certain respects, but the Court of Appeal upheld a decision that the tenant was still entitled to exercise its right under the break clause. Sir Andrew Morritt C, with whom Jacob and Moore-Bick LJJ agreed, stated at paragraph 24 that the test for "material compliance" was objective, not subjective. At paragraphs 35-36 the Chancellor elaborated on the meaning of "material" as follows:

> "35.  … But I see no justification for attributing to the parties an intention that the insertion of the word 'material' was intended to permit only breaches which were trivial or trifling. Those words are of uncertain meaning also and are not the words used by the parties.
>
> Nor is it, in my view, of any assistance to consider whether the word 'material' permits more or different breaches than the commonly used alternatives 'substantial' or 'reasonable'. The words 'substantial' and 'material', depending on the context, are interchangeable. The word 'reasonable' connotes a different test."

126  Reverting to the present case, I must consider what "material breach" means in the context of clause 28.4.1 of the conditions. In my view this phrase connotes a breach of contract which is more than trivial, but need not be repudiatory. Clause 28.4 has the drastic effect of allowing Medirest to cancel a long term contract on one month's notice. Having regard to the context of this provision, I think that "material breach" means a breach which is substantial. The breach must

be a serious matter, rather than a matter of little consequence.

127 Against this background, was the Trust's award of an excessive number of service failure points, contrary to clause 5.8 of the conditions, a "material breach" within clause 28.4.1? In this regard four matters should be noted. First, all service failure points awarded up to March 2009 were time expired. This included the nine excessive assessments made in July and August 2008, which I have identified in Part 3 above. Secondly, in relation to the most recent six month period, it was not disputed that Medirest had incurred more than 1,400 service failure points. Thus the Trust was entitled to terminate pursuant to clause 28.1. Thirdly, in so far as the Trust had awarded or purported to award points in excess of 1,400, these additional points had no contractual effect. Fourthly, the Trust had made it clear by 10th September that it would be reviewing its previous award of service failure points.

128 In my view, having regard to all those circumstances, as at 10th September 2009 the Trust's breach of clause 5.8 in awarding an excessive number of service failure points did not amount to a "material breach" within clause 28.4.1. In the result, therefore, Medirest was not entitled to terminate under clause 28.4 and its purported notice of termination was invalid. Reverting to my summary of the judge's judgment, I disagree with proposition (iv).

**Conclusion**

129 For the reasons set out in Part 6, 7 and 8 above, I would allow the Trust's appeal. The Trust is entitled to pursue its claim for financial relief on the basis that it has terminated the contract pursuant to clause 28.1 of the conditions and Medirest's purported termination is ineffective.

130 I would also set aside the judge's finding that the Trust had committed a repudiatory breach of contract (proposition (vi)). This is not a matter of any practical significance, but both parties have asked that it be dealt with.

131 If my Lords agree, the judge's order will have to be revised to reflect these findings. I leave it to counsel to agree an appropriate form of order.

Lord Justice Lewison:

132 I am grateful to Lord Justice Jackson for his comprehensive description of the facts and the issues on this appeal. I agree with both his conclusion and his reasoning. But since we are differing from the judge; and in tribute to the excellent submissions of Mr Howe QC, I would like to add a judgment of my own.

133 The ultimate issue on this appeal is whether Medirest was entitled to terminate the contract in reliance on an unremedied material breach of contract by the Trust. So the first question is whether there was a breach of contract at all. The judge found that there were two breaches of contract: a breach of the duty to co-operate in good faith under clause 3.5; and a breach of clause 5.8 as the result of an arbitrary or capricious exercise of contractual discretion.

134 Underpinning both these findings was the judge's finding that the manner in which the Trust calculated what it said it was entitled to award as Service Failure Points ("SFPs") and what it was entitled to levy by way of Deductions was absurd. I deal first with clause 5.8. It provides, so far as material, as follows:

> "The Trust or any Beneficiary shall ascertain whether the Contractor's provision of the Services meets the performance criteria as specified in the Service Level Specification… Where such performance criteria or standards have not been met by the Contractor in the performance of the Services then the Trust *shall be entitled* to levy payment deductions against the monthly amount of the Contract Price payable to the Contractor *in accordance with the terms of the Payment Mechanism*. In addition, the Trust *may* by notice to the Contractor award Service Failure Points depending on the performance of the Services *as measured in accordance with the Service Level Specification* . Service Failure Points which are agreed or

determined to have been awarded in circumstances where such award was not justified shall be deemed to have been cancelled." (Emphasis added)

135   Part C paragraph 1.1 provides that in the event of a Performance failure the Trust is "entitled to make Deductions from the Service Payment in respect of that Performance Failure".

136   Mr Collins QC accepted on behalf of the Trust that where one party to a contract has a discretion to exercise which will potentially impact upon the contractual rights and entitlements of another party to the contract the courts are more willing than heretofore to interpret the provisions conferring that discretion as being subject to implicit limits. Thus where one party to a contract has a discretionary power to decide whether a port is safe ( The Product Star (No 2) [1993] 1 Lloyd's Rep 397 ); or discretion to decide whether an employee should be paid a bonus, and if so how much ( Horkulak v Cantor Fitzgerald International [2005] ICR 402 ; Khatri v Cooperative Centrale [2010] EWCA Civ 397) ; or discretionary power to raise interest rates ( Paragon Finance plc v Nash [2002] 1 WLR 685 ) an arbitrary or capricious exercise of discretion will be invalid. Indeed in some cases a failure to exercise a discretion or an arbitrary or capricious exercise of discretion will amount to a free-standing breach of contract sounding in damages ( Horkulak v Cantor Fitzgerald International ). But the rationale for interpreting discretionary powers as subject to implicit limitations is that without such limitations the discretion would be unfettered; or, as Leggatt LJ put it in The Product Star (No 2) , the exercise of the power would be the decision maker's "uninhibited whim". It is, therefore, a necessary control mechanism.

137   By contrast, Mr Collins said that in our case there is no need for a control mechanism of this kind. Here, he said, the Trust had no discretion. He accepted that the language of this clause (unlike others) was expressed in terms of entitlement rather than obligation. But he said that there was no real discretion either in awarding SFPs or in the number of SFPs awarded. The language

used was no different from clause 6.1 which said that Medirest "may" charge the Trust the contract price. Clearly that was not a discretion in any real sense: the parties plainly expected Medirest to charge what it was entitled to charge. Moreover, as he pointed out, GP11 (which was part of the performance specification) required Medirest itself to calculate SFPs.

138   I see no reason to depart from the language of entitlement in which clause 5.8 and Part C paragraph 1.1 are expressed. Thus in my judgment it was up to the Trust to decide whether or not to levy payment deductions; and whether or not to award SFPs. But that was the extent of the Trust's decision making power under the contract. If the Trust decided to award SFPs, the contract itself, through the medium of the Payment Mechanism, provided for the number of SFPs to be awarded. Either the Trust was right or wrong in its application of the contract terms to the facts of the case. It had no discretion to exercise as regards the maximum number of SFPs to be awarded. The judge did not find that in deciding to award SFPs the Trust had made an arbitrary or capricious decision. Rather, he decided that the absurdity of the Trust's position was in the number of SFPs that it awarded. Likewise in the case of Deductions, the contract itself provided for their calculation.

139   Thus the contract provides by its express terms for the number of SFPs to be awarded. Equally it also provides by its express terms for the amount of a Deduction that the Trust is entitled to levy. Mr Howe QC relied on paragraph 6.1 which brought a performance failure to an end where the failure had been remedied "to the reasonable satisfaction" of the Trust. However, in my judgment this provision militates against the implied term rather than in favour of it. Where the contract itself expressly provides the control mechanism, especially where the control mechanism is an objective test, there is no warrant for implying a different one.

140   If the Trust misinterprets the express terms of the contract or if it is unreasonable in its non-satisfaction then it will not be entitled to award the SFPs it claims to be entitled to award, or to levy the Deductions that it claims to be entitled to levy. But that is because the express terms prevent it from doing so: not because of

any implicit limitation. The suggested term thus fails the test of necessity.

141  In effect the judge has implied a term that makes it a breach of contract to misinterpret the contract. In my judgment it is not generally a breach of contract merely to assert rights which the contract does not confer. In Kenny v Preen [1963] 1 QB 499 one of the questions was whether a landlord had committed a breach of the covenant for quiet enjoyment by asserting that the tenancy had come to an end. Pearson LJ said:

> "The judge accepted Mr. Sheridan's first contention that a mere challenge by the landlord to the tenant's title, a denial by him of her title, would be sufficient to constitute a breach of the covenant. I am not able to adopt the judge's view on that point. We are not concerned in this case with a denial of the tenant's initial title by virtue of the letting, and I am not considering whether or not that could be a breach of the covenant. In this case the landlord was asserting that the tenant's title, her right to possession of the premises, although initially valid, had been wholly determined by a notice to quit. In my judgment, a landlord by merely making that assertion, however wrong he may be, does not commit a breach of covenant. He is entitled to make that assertion, at any rate if he believes it to be true, frequently, emphatically and even rudely. He is entitled also to threaten proceedings in the courts for possession and damages."

142  In my judgment the judge was wrong in holding that there was an implied term in the manner that he formulated.

143  If action is taken on the basis of the assertions, then the actions themselves may well amount to a breach. But in the present case in so far as the Trust did act on its assertion that it was entitled to make Deductions, it repaid the amounts deducted following the "cure letter". The SFPs that the Trust awarded had no continuing consequences because, as Lord Justice Jackson has explained (a) they were, for the most part, time expired and (b) even on Medirest's own calculations sufficient SFPs had been incurred as to justify the Trust in terminating the contract. There was, therefore, no material breach still subsisting when Medirest purported to terminate the contract.

144  Clause 3.5 of the contract provides, so far as material:

> "The Trust and the Contractor will co-operate with each other in good faith and will take all reasonable action as is necessary for the efficient transmission of information and instructions and to enable the Trust or, as the case may be, any Beneficiary to derive the full benefit of the Contract."

145  It is common ground that a detailed syntactical analysis of the wording of the clause will not provide an answer to the point that divides the parties. The question is whether clause 3.5 imposes a general duty of co-operation in good faith or a more limited duty. Mr Howe stressed that this was a long-term contract for the supply of services in a hospital; and that it would require interaction between employees of Medirest and the Trust at all levels in the hierarchy. In such a contract there were bound to be things that went wrong from time to time; and co-operation would be necessary at a practical level to find solutions. As against that, Mr Collins pointed to the judge's finding that the dispute over SFPs and Deductions did not affect the day to day provision of services, which the parties had agree should be hived off from the financial dispute.

146  It seems to me to be clear that whatever the scope of the duty it can be no more than a duty to *co-operate* in good faith. My difficulty is to see in what sense the unilateral decision by the Trust to award SFPs or to

assert a right to levy Deductions (or even the actual levying of Deductions) is something that requires co-operation at all.

147  Mr Howe also argued that properly interpreted the second limb of clause 3.5 imposed on the Trust a duty not to act unreasonably in the exercise or purported exercise of its rights under the contract; and in particular imposed on the Trust an obligation not to make unreasonable claims. In my judgment, however, that is simply not what the clause says. First, it is concerned with taking action, not making claims. Second, the action concerned is action for limited purposes. Third, I do not consider that a positive obligation to take all reasonable action necessarily entails a negative obligation not to make unreasonable claims.

148  Accordingly, like Lord Justice Jackson I conclude that Medirest was not entitled to terminate the contract when it purported to do so. I, too, would allow the appeal.

Lord Justice Beatson:

149  I also agree that Medirest was not entitled to terminate the contract when it purported to do so, and would allow the appeal. Since we are differing from the judge's careful judgment, I wish to add some observations about clause 3.5.

150  The recent decision in Yam Seng Pte Ltd v International Trade Corporation Ltd [2013] EWHC 111 (QB), decided since the judge's decision, was relied on by Mr Howe QC. In that case, Leggatt J gave extensive consideration to the question of implying a duty of good faith into a contract. His discussion emphasised that "what good faith requires is sensitive to context", that the test of good faith is objective in the sense that it depends on whether, in the particular context, the conduct would be regarded as commercially unacceptable by reasonable and honest people, and that its content "is established through a process of construction of the contract": see paragraphs [141], [144] and [147]. See also paragraph [154]. Those considerations are also relevant to the interpretation of an express obligation to act in good faith.

151  The scope of the obligation to co-operate in good faith in clause 3.5 must be assessed in the light of the provisions of that clause, the other provisions of the contract, and its overall context. As to the first of these factors, I respectfully agree with Jackson LJ (at paragraphs [106] – [108]) that the content of the obligations to co-operate in good faith is to be determined by reference to the two purposes specified in the clause. Those purposes are the efficient transmission of information and instructions and enabling the Trust or any beneficiary to derive the full benefit of the contract. The judge had regard to those purposes, stated (see paragraph [27]) that the second one was "crucial", and (see paragraph [34]) regarded those purposes as "broad". He also had regard to the third of the factors and accepted (see paragraph [27]) that the scope of the duty to co-operate takes its content from "the circumstances and the nature of the contract concerned".

152  My observations concern the second factor. Jackson LJ, in paragraphs [114] – [116] of his judgment, recognised the role of the other provisions of the contract in ascertaining the meaning of clause 3.5. In the section of his judgment (paragraphs [23] – [35]) considering the meaning of clause 3.5 and whether it was breached, the judge did not refer to the other clauses of the contract. It was perhaps because of this that he regarded (see paragraph [34]) the stated purposes in clause 3.5 as "broad", and, in the light of that breadth, concluded that the Trust had breached clause 3.5 by awarding excess service failure points and making excessive deductions from the monthly payments. In my judgment, his approach meant that, in determining the scope of the obligations under clause 3.5, he gave insufficient weight to the other provisions of the contract and, to this extent did not take sufficient account of the context of clause 3.5.

153  As awarding excessive service failure points and making excessive deductions from the payments put the Trust in breach of clauses 5.8, 6.3 and 6.5 of the contract, it was not necessary to give clause 3.5 a wide meaning which meant that these matters also constituted a breach of that provision. Absent a wide meaning to clause 3.5 and a broad interpretation of the two stated purposes, awarding excessive service failure points and making excessive deductions from payments were not relevant to the two stated purposes for the

reasons given by Jackson LJ at paragraphs [114] and [116] of his judgment.

154   The contract in the present case is a detailed one which makes specific provision for a number of particular eventualities. The specific provisions include clauses 5.8, 6.3 and 6.5. In a situation where a contract makes such specific provision, in my judgment care must be taken not to construe a general and potentially open-ended obligation such as an obligation to "co-operate" or "to act in good faith" as covering the same ground as other, more specific, provisions, lest it cut across those more specific provisions and any limitations in them.

Crown copyright

© 2017 Sweet & Maxwell

2013 WL 617577

---

**End of Document**

© 2017 Thomson Reuters.

# TAB 25

3/13/2017    10-03635.jpg Dec 27 1 e 2 v. Brian Norman Dean as Liquidator of C B Sizzlers Limited (New Zealand) [1997] UKPC 57 (24th Nove…

1o-03635-jpm Doc 27-1 Filed 04/03/17 Entered 04/03/17 18:29:57 Exhibit A

Part 2    Pg 44 of 354



[Home] [Databases] [World Law] [Multidatabase Search] [Help] [Feedback]

# The Judicial Committee of the Privy Council Decisions

**You are here:** BAILII >> Databases >> The Judicial Committee of the Privy Council Decisions >> Countrywide Banking Corporation Limited v. Brian Norman Dean as Liquidator of C B Sizzlers Limited (New Zealand) [1997] UKPC 57 (24th November, 1997)
URL: *http://www.bailii.org/uk/cases/UKPC/1997/57.html*
Cite as: [1997] UKPC 57, [1998] 2 WLR 441, [1998] AC 338, [1998] BCC 105

[New search] [Buy ICLR report: [1998] AC 338] [Help]

# Countrywide Banking Corporation Limited v. Brian Norman Dean as Liquidator of C B Sizzlers Limited (New Zealand) [1997] UKPC 57 (24th November, 1997)

*Privy Council Appeal No. 41 of 1997*

**Countrywide Banking Corporation Limited** *Appellant*

*v.*

**Brian Norman Dean as Liquidator of C B Sizzlers**

**Limited (in liquidation)** *Respondent*

FROM

**THE COURT OF APPEAL OF NEW ZEALAND**

---------------

JUDGMENT OF THE LORDS OF THE JUDICIAL

COMMITTEE OF THE PRIVY COUNCIL,

Delivered the 24th November 1997

------------------

*Present at the hearing:-*

3/13/2017    Countrywide Banking Corporation Ltd v. Brian Rodney Dean (as Liquidator of C B Sizzlers Limited) (New Zealand) [1997] UKPC 57 (24th Nove…

Part 2 - Pg 45 of 354

Lord Browne-Wilkinson

Lord Slynn of Hadley

Lord Hoffmann

Lord Hutton

Mr. Justice Gault

·[Delivered by **Mr. Justice Gault**]

------------------------

1. This appeal raises the issue of the correct construction of the voidable preference provisions of the New Zealand Companies Acts.

2. At the time of the enactment of the new 1993 Act, the earlier 1955 Act, which continued to apply, was amended so that the same new provisions governing company liquidations were introduced in both Acts. In this case their Lordships are concerned with section 266 of the 1955 Act as amended which is in identical terms to those in section 292 of the 1993 Act.

3. The material facts can be stated briefly. The appellant ("Countrywide") was the lessor under a lease dated 4th May 1993 by which C B Sizzlers Limited ("the company") occupied retail space in the foodcourt complex in the Queen Street Countrywide Bank Centre at Auckland. In addition to the base rent, the lessee was required to pay as additional rent a percentage of the gross receipts of its business, a percentage of the foodcourt operating expenses and a promotion levy also based upon gross receipts.

4. The lease provided for payment of interest by the lessee on amounts in arrear and unpaid and for the lessor's costs of recovery. There was also provision for assignment of the lease by the lessee subject to the consent of the lessor. Before giving consent the lessor was entitled to require payment of all moneys due and payable under the lease.

5. The lessee company fell into arrears and in October 1994, by variation, the rent was reduced with retrospective effect from 1st September 1993. The rate of additional rent also was reduced. Still arrears increased and in March 1995 the amount outstanding was $18,766.86. Countrywide then instructed solicitors to recover that amount. Shortly after that instruction was issued Countrywide was made aware that the business of the company was subject to a sale and purchase agreement. The sale included the lease the assignment of which required the consent of Countrywide. At the request of the company's solicitors Countrywide agreed not to issue proceedings on the basis that all moneys due to it under the lease would be paid out of the proceeds of sale. On 5th May 1995 Countrywide received from the solicitors acting for the company a payment of $30,914.90 which is the subject of this appeal. That sum represented the total of the amounts payable under the lease and unpaid to that date.

6. In the meantime, unknown to Countrywide, another creditor had served on the company on 28th March 1995 a statutory demand for payment of other indebtedness and had applied on 4th May for an

order that the company be wound up.  Such an order was made in the High Court at Auckland on 1st June 1995.  Under the 1993 law the liquidation commenced on the appointment of the liquidator.

7. There were filed with the liquidator proof of debts totalling $63,715.43 in addition to which the National Bank was owed $15,375.00 under a debenture.  The balance of the proceeds of the sale of the business (there were no other assets) were such that other creditors were likely to receive nothing whereas Countrywide had been paid in full.

8. The relevant sections of the Companies Act 1955 are as follows:-

"266. **Transactions having preferential effect**

(1) In this section, `transaction', in relation to a company, means -

(a) A conveyance or transfer of property by the company:

(b) The giving of a security or charge over the property of the company:

(c) The incurring of an obligation by the company:

(d) The acceptance by the company of execution under a judicial proceeding:

(e) The payment of money by the company, including the payment of money under a judgment or order of a court.

(2) A transaction by a company is voidable on the application of the liquidator if the transaction -

(a) Was made -

(i) At a time when the company was unable to pay its due debts; and

(ii) Within the specified period; and

(b) Enabled another person to receive more towards satisfaction of a debt than the person would otherwise have received or be likely to have received in the liquidation -

unless the transaction took place in the ordinary course of business.

(3) Unless the contrary is proved, for the purposes of subsection (2) of this section, a transaction that took place within the restricted period is presumed to have been made -

(a) At a time when the company was unable to pay its debts; and

(b) Otherwise than in the ordinary course of business.

(4) For the purposes of this section, in determining whether a transaction took place in the ordinary course of business, no account is to be taken of any intent or purpose on the part of a company -

(a)To enable another person to receive more towards satisfaction of a debt than the person would otherwise receive or be likely to receive in the liquidation; or

(b)To reduce or cancel the liability, whether in whole or in part, of another person in respect of a debt incurred by the company; or

(c)To contribute towards the satisfaction of the liability, whether in whole or in part, of another person in respect of a debt incurred by the company -

unless that person knew that that was the intent or purpose of the company.


(5)For the purposes of subsection (2)(a)(ii) of this section, `specified period' means -

(a)The period of 2 years before the commencement of the liquidation; and

(b)In the case of a company that was put into liquidation by the Court, the period of 2 years before the making of the application to the Court together with the period commencing on the date of the making of that application and ending on the date on which the order was made.


(6)For the purposes of subsection (3) of this section, `restricted period' means -

(a)The period of 6 months before the commencement of the liquidation; and

(b)In the case of a company that was put into liquidation by the Court, the period of 6 months   before the   making  of  the

application to the Court together with the period commencing on the date of the making of that application and ending on the date on which the order of the Court was made.


**268.Procedure for setting aside voidable transactions and charges -**

(1)A liquidator who wishes to have a transaction that is voidable under section 266 of this Act or a charge that is voidable under section 267 of this Act set aside must -

(a)File in the Court a notice to that effect specifying the transaction or charge to be set aside and, in the case of a transaction, the property or value which the liquidator wishes to recover, and also the effect of subsections (2), (3), and (4) of this section; and

(b)Serve a copy of the notice on the other party to the transaction or the grantee of the charge and on every other person from whom the liquidator wishes to recover.

(2)A person -

(a)Who would be affected by the setting aside of the transaction or charge specified in the notice; and

(b)Who considers that the transaction or charge is not voidable -

may apply to the Court for an order that the transaction or charge not be set aside.

(3)Unless a person on whom the notice was served has applied to the Court under subsection (2) of this section, the transaction or charge is set aside 28 days after the date of service of the notice.

(4)If one or more persons have applied to the Court under subsection (2) of this section, the transaction or charge is set aside on the day on which the last application is finally determined, unless the Court orders

otherwise.

269.**Other orders** - If a transaction or charge is set aside under section 268 of this Act, the Court may make one or more of the following orders:

(a)An order requiring a person to pay to the liquidator, in respect of benefits received by that person as a result of the transaction or charge, such sums as fairly represent those benefits: ...


270....

(3)Recovery by the liquidator of property or its equivalent value, whether under section 269 of this Act or any other section of this Act, or under any other enactment, or in equity or otherwise, may be denied wholly or in part if -

(a)The person from whom recovery is sought received the property in good faith and has altered his or her position in the reasonably held belief that the transfer to that person was validly made and would not be set aside; and

(b)In the opinion of the Court, it is inequitable to order recovery or recovery in full. ..."


9. The liquidator gave notice under section 268 of his wish to set aside the payment by the company to Countrywide and called for repayment of the amount of $30,914.90.  Countrywide applied on 8th September 1995 to the High Court under section 268(2) for an order that the transaction not be set aside on the ground that it took place in the ordinary course of business.


10. It is common ground that at the time the payment was made the company was unable to pay its due debts, that the payment was made within the specified and restricted periods and that it enabled Countrywide to receive more towards the satisfaction of its debt than it would be likely to receive in the liquidation.  The sole question therefore was whether Countrywide had overcome the presumption in section 266(3) and established that the transaction took place in the ordinary course of business so as to fall within the exception provided in section 266(2).


11. In support of its application Countrywide filed an affidavit from an experienced conveyancing solicitor.  His unchallenged evidence was that it is virtually invariable practice for a landlord to require all outstanding rent and other payments under a lease to be paid as a condition of the landlord's consent to the assignment of a lease.  He said also that if a tenant of commercial premises has been unable to meet payments under a lease as they fall due and the sale of that tenant's business is about to occur it is entirely usual for a landlord to receive all lease payments due under the lease from the sale of that business.


12. The case for Countrywide was that a payment for which the company was liable under the terms of its lease made in circumstances which were entirely usual represented a transaction that took place in the ordinary course of business within the meaning of that expression in section 266(2).


13. In the High Court, in her judgment delivered on 5th December 1995, Cartwright J. referred to authorities to which further reference will be made.  She rightly noted the focus of section 266 as on the company which is about to be, or has been, placed in liquidation and its transactions.  She accepted that

3/13/2017    10.0.3635.jpg Corporation 271 Ltd v. Brian Codron (a Liquidated & others) [1997] UKPC 57 (24th Nove...

Part 2    Pg 49 of 354

the transactions are to be viewed against the circumstances of the company at the time.  She found that the payment to Countrywide was made when there was no possibility of the Company's business continuing, that Countrywide was aware of that and of the company's serious financial difficulties when it consented to the assignment of the lease.  In that context she held that the payment which was dependent upon the cessation of business could not be in the ordinary course of business.

14. Countrywide appealed to the Court of Appeal.  The judgment of that Court delivered by Keith J. on 12th December 1996, after brief reference to the principal authorities relied upon at first instance, noted that the parties were not understood as disagreeing on the law.  The Court said that the wording of the phrase "in the ordinary course of business" and its standard interpretation make it plain that the test is an objective and general one such that emphasis is not to be placed on the business of the particular parties to the transaction, whether jointly or singly.  The Court went on to consider the particular transaction in question.  It was held that while payments of debts as they become due, including payments under a lease, would be part of the ordinary course of business, as might adherence to invariable practice of meeting outstanding indebtedness as a condition of securing a lessor's consent to assignment of a lease, the payment in this case was of a quite different order.  This was a payment of long accrued arrears and, being the largest sum paid by the company to Countrywide at any one time, it could not be accepted as having been made in the ordinary course of business.  The appeal was dismissed.

15. Before their Lordships' Board Mr. Smith for Countrywide emphasised the importance of the case to lessors and the need, if the appeal should be dismissed, for lessors to change what on the evidence is an invariable practice of recovering arrears upon assignment by the lessee.  He said lessors will have to move on defaulting tenants before any substantial arrears accrue with consequent disruption to the lease market.

16. Mr. Smith submitted that certain factual findings of Cartwright J. were unsupported by evidence.  Their Lordships consider however that of those material to her decision the findings that Countrywide knew of the cessation of the business of the company and of its financial difficulties were reasonable inferences from the evidence of the request to withhold proceedings pending completion of the sale of the business.

17. Mr. Smith did not take issue with the Court of Appeal's description of the test of what is in the ordinary course of business as an objective and general one.  He submitted however that in its reasoning the Court did not apply that test but focused on the particular dealings between the lessor and the lessee in concluding that the transaction was not in the ordinary course of business between them.

18. He contended for a test of whether the transaction was one which a man might undertake without having any bankruptcy in view.  On that test, he argued, the payment of moneys due under a lease, in accordance with invariable practice where the lease is assigned, must be accepted as in the ordinary course of business.  This, he said, would reflect commercial reality.

19. Mr. Williams for the liquidator supported the judgment.  He submitted that whether the payment was made in the ordinary course of business is basically a question of fact and that there were concurrent findings in favour of the liquidator in the lower courts.

20. On the law Mr. Williams was able to rely upon a judgment of Fisher J. delivered only a few days before the hearing before their Lordships in *In re Modern Terrazzo Ltd. (In Liquidation), Bowden v. Macdonald* (unreported) 10th October 1997; High Court of New Zealand (Auckland Registry) No. M654 of 1995. In that judgment Fisher J. considered in some detail the interpretation of the phrase "in the ordinary course of business" in section 266 (and section 292 of the 1993 Act). In a careful analysis, drawing upon a perceptive article by Matthew D.J. Conaglen; *Voidable Preferences under the Companies Act 1993, A Change in Focus* [1996] N.Z. Law Review 197, Fisher J. reviewed the authorities and brought them into clearer perspective. Their Lordships have been considerably assisted by his judgment, as indeed was Mr. Williams.

21. The repeal of section 309 and the substitution of section 266 in 1993 effected a substantial change in the approach to voidable preferences in New Zealand. Section 309, which was based upon the English law, provided that payments made within two years before winding up commenced, if made by a company unable to pay its debts as they fell due, was voidable as against the liquidator if made "with a view to" giving one creditor a preference over other creditors. The enquiry was as to whether it was the dominant intention to prefer on the part of the debtor when the payment was made. A creditor so preferred was able to retain the payment by showing that it was received in good faith, that in reliance on the validity of the payment the creditor had altered his or her position and that retention would not be inequitable (section 311A(7)).

22. The change effected in 1993 by the new section 266 was to abandon as the sole ground for avoidability the intention of the debtor to prefer. The enquiry under section 266(2) is as to whether in the prescribed circumstances the effect of the transaction was to prefer - to enable a creditor to receive more than would be likely in the liquidation. That intention did not cease to be relevant in all circumstances is apparent from subsection (4) which reintroduces it as a factor for consideration of the ordinary course of business exception where the person preferred knew of any intent or purpose of the debtor to prefer. The alteration of position relief for creditors has been maintained in section 270. What then is a transaction in the ordinary course of business which has the effect of preferring a creditor, the identification of which may be influenced by knowledge of the other person that there was an intention or purpose on the part of the company to prefer? Good faith on the part of the creditor of itself cannot bring a transaction within the exception because that is an element of the change of position relief the creditor might seek where the exception does not apply.

23. In the course of argument references were made to a number of other contexts in which consideration has been given to the ordinary course of business. Under the former fraudulent preference provisions of bankruptcy (or insolvency) and company winding up laws the courts evolved a test for negating an intention to prefer where the preference was made in the ordinary course of business. It could be satisfied where the payment was one a person might make without having any bankruptcy in view. That was the approach contended for by the appellant relying on English authorities tracing back to *Rust v. Cooper* (1777) 2 Cowp 629 and *Tomkins v. Saffery* (1877) 3 App.Cas. 213. Those are the authorities that also recognised that the necessary intention to prefer could be negated by showing that the debtor paid under pressure from the creditor or in a desperate attempt to remain in business. They represent the approach jettisoned in New Zealand by the repeal of section 309. This is clear from the report of the Law Commission which recommended the comprehensive revision of the company law enacted in 1993 (New Zealand Law Commission, *Company Law Reform and Restatement* (1989) N.Z.L.C. Report 9) para. 649:-

"The focus at present, when a creditor receives payment in preference to others, is on the intention of the debtor company. This means that in circumstances were a creditor is preferred through no voluntary action by the debtor, for example, where a creditor is able to coerce the debtor, the transaction cannot be attacked. This leads to the unsatisfactory situation where creditors may be treated differently according to the quirks of their circumstances. The purpose of a voidable transaction regime is to avoid this, yet the present law

permits it.  Our proposals, which are drawn from both the Australian Law Reform Commission's Report and the submission of the New Zealand Society of Accountants, set out a test which is more straightforward to apply."

24. The view expressed at the end of this paragraph has not attracted unanimous agreement as appears from the poignant addendum to Fisher J.'s judgment in the *Modern Terrazzo Ltd.* case:-

"It was in 1993 that the Australians abandoned the phrase `in the ordinary course of business' as the key exception to their company voidable preference regime (formerly s565 of The Corporations Law (Cth) and its predecessors; see now ss588FA-588FG of The Corporations Law).  As one commentator put it (1994) 19 M.U.L.R. 545:-

`This abolition has occurred, principally, because of the judicial uncertainty in interpreting what was meant by the phrase.  It is undeniable that there has not only been uncertainty, but also confusion.'

25. New Zealand chose that moment to introduce into its own companies legislation the very phrase which Australia had just discarded.  One of us must have got it wrong.  Although in these situations right-thinking New Zealanders would normally assume it to be Australia, Barker J. conceded in *In re NZ Spraybooth Ltd.* [1996] 7 N.Z.C.L.C. 261,075 that in this instance `It is perhaps unfortunate that this phrase was included in the new companies legislation'.  He may be right."

26. The Australian experience revolved around a statutory provision having some similarity to section 266 but which cannot be said to have been adopted by the New Zealand Legislature.  The leading decision of the High Court of Australia in *Taylor v. White* (1964) 110 C.L.R. 129 dealt with the statutory exception in favour of a "payee in good faith and for valuable consideration and in the ordinary course of business".  The relevant section expressly negated the good faith component of the exception under circumstances leading to an inference of actual or constructive knowledge by the creditor of the debtor's inability to pay its debts and the preferential effect of the payment.  In their Lordships' view that represents a considerably different approach to that required by the New Zealand section.  The Australian cases therefore do not have direct application to the New Zealand provision though they may provide some guidance as to the meaning to be given to the phrase "in the ordinary course of business".

27. Another context in which the expression is to be found is in identifying the circumstances in which a company may dispose of assets the subject of a floating charge.  *Reynolds Bros. (Motors) Pty. Ltd. v. Esanda Ltd.* (1983) 8 A.C.L.R. 422 and *Julius Harper Ltd. v. F.W. Hagedorn & Sons Ltd.* [1991] 1 N.Z.L.R. 530 are cases in that field.  As was recognised by the Court of Appeal in the second of those cases (page 543) the focus of consideration in these situations the course of business of the particular company.  Dicta in this context are to be considered in that light.

28. In each of the judgments of the High Court and Court of Appeal in the present case reliance was placed on passages from two judgments in Australian cases.  The first is to be found in the judgment of Rich J. in *Downs Distributing Co. Pty. Ltd. v. Associated Blue Star Stores Pty. Ltd. (In Liquidation)* (1948) 76 C.L.R. 463,477.  That was a decision of the High Court of Australia on the question of whether a transaction which had the effect of converting an unpaid supplier into a secured creditor within the statutory period prior to liquidation was void or whether the creditor was protected by the exception in favour of a payee in good faith and for valuable consideration and in the ordinary course of business.  Citing the earlier decision of *Burns v. McFarlane* (1940) 64 C.L.R. 108,125, Rich J. said:-

"This last expression it was said `does not require an investigation of the course pursued in any particular trade or vocation and it does not refer to what is normal or usual in the business of the debtor or that of the creditor'.  It is an additional requirement and is cumulative upon good faith and valuable consideration.  It is, therefore, not so much a question of fairness and absence of symptoms of bankruptcy as of the everyday usual or normal character of the transaction.  The provision does not require that the transaction shall be in the course of any particular trade, vocation or business.  It speaks of the course of business in general.  But it does suppose that according to the ordinary and common flow of transactions in affairs of business there is a course, an ordinary course.  It means that the transaction must fall into place as part of the undistinguished common flow of business done, that it should form part of the ordinary course of business as carried on, calling for no remark and arising out of no special or particular situation."

29. Williams J. in the same case (page 480) said:-

"It seems to me, therefore, that the expression refers to a transaction into which it would be usual for a creditor and debtor to enter as a matter of business in the circumstances of the particular case uninfluenced by any belief on the part of the creditor that the debtor might be insolvent."

30. The New Zealand Court of Appeal in *Julius Harper Ltd. v. F.W. Hagedorn & Sons Ltd.* said (page 543) that the last part of the passage from the judgment of Rich J. expresses the usual meaning of the words "ordinary course of business" though it was there applied in a different context.

31. In his judgment in *Reynolds Bros. (Motors) Pty. Ltd. v. Esanda Ltd.*, Mahoney J.A., in considering whether a floating charge continued to attach to certain tractors disposed of by a company, addressed the question of whether it was done by the company in the ordinary course of business.  He said (page 428):-

"That transaction was, as Mr Grieve submitted, an extraordinary one.  But, within this principle, `ordinary' is not to be confined to what is in fact ordinarily done in the course of the particular business of the company.  Transactions will be within this principle even though they be, in relation to the company, exceptional or unprecedented."

Fisher J. in the *Modern Terrazzo Ltd.* case expressed the view that this dictum is inconsistent with that of Rich J. in the *Downs Distributing Co.* case and, because of its quite different context, is unhelpful.  He preferred the view of Rich J. expressed in the analogous context as more appropriate to reflect the purpose of the voidable preference provisions.

32. There are difficulties in drawing upon formulations in different words of statutory tests and treating them as applicable in all circumstances.  Such difficulties are increased where those formulations originate in different legal or factual contexts.  This is particularly so where the test is essentially one of fact in any event.  For these reasons, as presently informed by the argument in this case, their Lordships do not adopt any particular formulation.  Nor is it necessary for this case to make any comprehensive statement, suitable for all cases, of the criteria for determining when a transaction is to be held to have taken place in the ordinary course of business for the purpose of section 266 and the corresponding section in the 1993 Act.

33. Their Lordships do not accept, as submitted for the appellant, that the test is general in the sense that it would be satisfied so long as it can be said that the transaction is one which might reasonably take place in some business setting. To abstract the particular business setting and enquire (in effect) merely whether it is possible to envisage a setting in which the transaction would be an ordinary one is not what the statute requires. In that situation the intent and purpose of the company would never have relevance yet section 266(4) specifies circumstances in which they are to be taken into account.

34. Plainly the transaction must be examined in the actual setting in which it took place. That defines the circumstances in which it is to be determined whether it was in the ordinary course of business. The determination then is to be made objectively by reference to the standard of what amounts to the ordinary course of business. As was said by Fisher J. in the *Modern Terrazzo Ltd.* case, the transaction must be such that it would be viewed by an objective observer as having taken place in the ordinary course of business. While there is to be reference to business practices in the commercial world in general, the focus must still be the ordinary operational activities of businesses as going concerns, not responses to abnormal financial difficulties. Their Lordships respectfully agree with the judge's conclusion by reference to the policy of the section (page 17):-

"Whether a payment should be regarded as commercially routine at a day to day trading and operating level will turn at least in part upon a comparison with the practices of the commercial community in general. But equally, the way in which the particular company has acted in the past, and its dealings with the particular creditor, would seem pertinent. That the payment was simply a repetition of past patterns of behaviour would make it more difficult to argue that it represented special assistance to an insider or the result of special enforcement measures or a situation in which the subject creditor ought to have investigated before extending credit. So at a policy level there is something to be said for the view that relevant considerations should extend to the prior practices of the particular company."

35. The section therefore requires examination of the actual transaction in its factual setting (excluding the intent or purpose of the company save as required by subsection 4). Because the examination is undertaken objectively by reference to the standard of the ordinary course of business, there may be circumstances where a transaction, exceptional to a particular trader, will nonetheless be in the ordinary course of business - as for example its first transaction of a particular type. It may be that transactions undertaken in the past will, because of changed circumstances, no longer be considered as in the ordinary course of business. The payment of some accrued indebtedness may be within the ordinary course of business as may the payment of moneys owing under a lease to secure a lessor's consent to an assignment of the lessee's interest. The particular circumstances will require assessment in each case.

36. In the present case, on the finding of Cartwright J. at first instance, the payment was made when, to the knowledge of the lessor, it was part of the transaction by which the company was disposing of its business. Their Lordships consider it was entirely open to the judge to find that in the circumstances the payment was not in the ordinary course of business. Equally, the view was open to the Court of Appeal that the payment, made up as it was including long-standing arrears, when made was not in the ordinary course of business.

37. Mr. Smith's argument that to apply the section so narrowly as to exclude from the ordinary course of business payments of the kind here in issue will disrupt the ordinary conduct of the affairs of lessors is not accepted. Lessors, although contractually entitled to payments provided for in the lease, are not secured creditors. There is no warrant for more favourable treatment for them than other creditors. On the contrary, the policy of the voidable preference law is to secure the equal participation of creditors in such of the company's property as is available in the liquidation.

3/13/2017    10-03635-jpm Corp. Doc 2711-2 v. Brit... Filed 04/03/17 Liquidators 04/03/... Entered 04/03/17 18:29:57 (Ireland) [1997] Exhibit A (24th Nove...

Part 2    Pg 54 of 354

38. For the reasons given their Lordships will humbly advise Her Majesty that the appeal should be dismissed.  The appellant must pay the respondent's costs before their Lordships' Board.

© CROWN COPYRIGHT as at the date of judgment.

© 1997 Crown Copyright

**BAILII:** Copyright Policy | Disclaimers | Privacy Policy | Feedback | Donate to BAILII
URL: *http://www.bailii.org/uk/cases/UKPC/1997/57.html*

# TAB 26

700          **All England Law Reports**          [1992] 4 All ER

What then has the judge done in this case? He had before him a figure of £48,000 as being the full cost of a nanny until Danielle was 11 and half such cost *a* from 11 to 15. He then, without giving specific reasons concluded that an appropriate figure would be £20,000, apportioned £15,000 to date of trial and £5,000 thereafter. I do not consider that we have before us material to enable us to interfere with this award, which if I am right as to the approach, appears to me to be an entirely reasonable award and to do justice between the parties would therefore, like Sir David Croom-Johnson, dismiss both appeal and cross-appeal. *b*

I would add by way of postscript that, where the provider of the replacement services is the tortfeasor, arguments successfully advanced in earlier cases that it would be unjust if the tortfeasor were to benefit from the generosity of a third party cannot apply.

*c*

*Appeal dismissed. Cross-appeal dismissed. No order for costs.*

Wendy Shockett    Barrister.

*d*

# Cowan de Groot Properties Ltd v Eagle Trust plc

CHANCERY DIVISION
KNOX J
*e*
3-7, 10-14, 17-20 DECEMBER 1990, 11, 17-18, 21-25, 28-31 JANUARY, 1, 4-5 FEBRUARY, 11, 15-16 MARCH, 19 JULY 1991

*Trust and trustee – Constructive trust – Breach of fiduciary duty – Knowing receipt of trust property – Sale of company assets at undervalue – Directors of vendor company in breach of fiduciary duty in respect of sale of company assets – Whether purchaser* *f* *company liable as constructive trustee – Whether purchaser company having knowledge of directors' breach of duty – Proper test to be applied.*

In May 1989 the vendor company, E plc, agreed to sell to the purchaser company, P Ltd (a wholly-owned subsidiary of C plc), three properties for a total of £900,000 *g* and to grant an option to purchase two other properties at £350,000 and £250,000 respectively. Prior to completion E plc sought to rescind the whole agreement and shortly thereafter P Ltd purported to exercise its option over the fifth property. In various stages P Ltd sold on the three properties for a total of £1,777,500 and (by agreement between the parties) the fifth property for £408,000. The purchaser company subsequently brought an action against E plc, *h* seeking a declaration that the notice exercising the option over the fifth property was valid and effective according to its terms. E plc counterclaimed that C plc or P Ltd was liable as constructive trustee of the fourth property and of the proceeds of the sale of the other properties on the ground of knowing receipt of trust property and that both C plc and P Ltd were liable as constructive trustees on the basis of knowing assistance in a fraudulent breach of fiduciary duty. The principal *i* breach of fiduciary duty on which the constructive trust claims were based was that two directors of E plc, F and S, deliberately or recklessly brought about the sale of the five properties at a gross undervalue as part of a fraudulent scheme, the main element of which was identified as a purported joint venture agreement with another company, F Ltd, which was allegedly a sham set up to benefit F and

S. E plc contended that the managing director of C plc knew that F and S were in
*a* fraudulent breach of their duty to E plc, since (i) he knew of the undervalue, in
that he knew that the terms and manner in which the sale agreement was made
(eg the exceptional size of the required deposit, the speed of the exchange of
contracts and the lack of proper marketing) indicated a breach of fiduciary duty,
or (ii) he wilfully shut his eyes to the obvious or (iii) he wilfully and recklessly
failed to make the inquiries which an honest and reasonable man would have
*b* made, or, in the further alternative, that P Ltd or C plc had knowledge of
circumstances which would have indicated to an honest and reasonable man that
F and/or S were likely to have been acting fraudulently or in breach of their
fiduciary duties or had knowledge of facts which would have put an honest and
reasonable man on inquiry as to whether they were acting fraudulently or in
*c* breach of duty. E plc also counterclaimed, independently of the constructive trust
claims, that it was able to trace the proceeds of the sold properties into the hands
of P Ltd or C plc on the footing that they were not bona fide purchasers for value
without notice of E plc's equity, namely the right of recovery because of the
breach of fiduciary duty by F and S of which there was constructive if not actual
notice. C plc counterclaimed that S, acting on behalf of E plc, had fraudulently
*d* misrepresented to C plc that F Ltd was party to an agreement with E plc to
purchase the five properties and that C plc and subsequently P Ltd would have to
reach an accommodation with F Ltd in order to make the purchase free from any
claim by F Ltd and that in reliance on those misrepresentations it had paid out
£400,000 to F Ltd.

*e* **Held** – (1) In determining whether a purchaser company had knowledge of a
breach of duty arising out of the sale of another company's property at an
undervalue, the proper test to be applied was whether knowledge that the
directors of the vendor company were deliberately selling at a gross undervalue
could reasonably be imputed to the purchaser and, since the breach of fiduciary
duty arose out of a typical commercial transaction, the requirement of knowledge
*f* as the basis for liability as a constructive trustee would be met where it was
possible to show that the purchaser had (i) actual knowledge of the breach, (ii)
wilfully shut his eyes to the obvious or (iii) wilfully and recklessly failed to make
the type of inquiries that an honest and reasonable man would have made. In
such a situation it would not be appropriate for the court to be astute to find
*g* circumstances which could indicate knowledge by a purchaser of breach of
fiduciary duty on the part of directors of a vendor company. The duty of directors
of a purchasing company was to buy as cheaply as they could in the light of the
mode and terms of the proposed sale and it would be going too far to impose on
them a positive duty to make inquiries into the reasons for an offer being made
to their company at what appeared to be a bargain price. The line should be
*h* drawn at the point where the price in question was indicative of dishonesty on
the part of the directors of the vendor company, regard being had not only to the
open market value but also to the terms and mode of sale. Although C plc's
managing director knew that E plc was selling at less than the open market value
of the five properties, it was reasonable for him to think that E plc could not
afford to market the properties properly and was looking for a quick sale with an
*j* exceptionally large deposit which necessarily involved a drop in the price, and
consequently the conclusion that the asking price was indicative of dishonesty on
the part of E plc's directors could not properly be reached. The constructive trust
claim based on knowing receipt therefore failed. If, contrary to that conclusion,
it was right to have regard to knowledge of circumstances which would indicate
the facts to an honest and reasonable man or which would have put an honest and

reasonable man on inquiry in determining liability, then the underlying broad
principle in commercial transactions was that the court would impute knowledge *a*
to a person who was guilty of commercially disreputable conduct in the particular
context involved on the basis of what a reasonable person would have learnt. In
the circumstances C plc's managing director had not had knowledge on that basis
either. Moreover, since C plc's managing director had no relevant knowledge of
S's failure to disclose to E plc his interest in F Ltd, it was clear that the constructive
trust claim based on the fraudulent design involving F Ltd also failed. E plc's *b*
constructive trust claims would accordingly be dismissed (see p 759 g to 761 j,
p 766 b d e and p 767 b c, post).

(2) There was no independent right to trace property against a purchaser for
value under a contract for sale where the contract was not liable to be set aside
and there was no valid claim to impose a constructive trust, since a claim to trace *c*
property was not an independent cause of action. It followed that E plc's second
counterclaim would be dismissed, with the result that the declaration sought in
the statement of claim that the notice exercising the option over the fifth property
was valid and effective would therefore be granted (see p 767 f g, post).

(3) Although E plc's managing director, S, had had ostensible authority to make
the representation to C plc's managing director concerning F Ltd's pre-existing *d*
contractual interest in the five properties, he had not had actual authority to do
so, since the representation was to his knowledge incorrect. Having regard to the
fact that C plc had been entitled to believe and rely on the representation made
by S on behalf of E plc and in reliance on that fraudulent misrepresentation had
paid out £400,000 to F Ltd, it followed that C plc succeeded on its counterclaim
to E plc's counterclaims (see p 767 j to p 768 f, post). *e*

**Notes**

For constructive trusts, see 48 *Halsbury's Laws* (4th edn) paras 584–596, and for
cases on the subject, see 48 *Digest* (Reissue) 254–272, 687–690, *2213–2365, 6346–
6354.*

For the principle of following assets, see 16 *Halsbury's Laws* (4th edn reissue) *f*
paras 911–915 and 48 *Halsbury's Laws* (4th edn) para 941, and for cases on the
subject, see 20 *Digest* (Reissue) 900, 6706 and 48 *Digest* (Reissue) 728–738, 6687–
6751.

**Cases referred to in judgment**

*Agip (Africa) Ltd v Jackson* [1992] 4 All ER 385, [1990] Ch 265, [1989] 3 WLR *g*
1367; *affd* [1992] 4 All ER 451, [1991] Ch 547, [1991] 3 WLR 116, CA.
*Baden v Société Générale pour Favoriser le Développement du Commerce et de l'Industrie
en France SA* [1992] 4 All ER 161; *on appeal* (1985) [1992] 4 All ER 279n, [1985]
CA Transcript 65.
*Barclays Bank plc v Quincecare Ltd* (1988) [1992] 4 All ER 363. *h*
*Barnes v Addy* (1874) LR 9 Ch App 244, LC and LJJ.
*Belmont Finance Corp Ltd v Williams Furniture Ltd (No 2)* [1980] 1 All ER 393, CA.
*Carl-Zeiss-Stiftung v Herbert Smith & Co (a firm) (No 2)* [1969] 2 All ER 367, [1969]
2 Ch 276, [1969] 2 WLR 427, CA.
*Eagle Trust plc v SBC Securities Ltd* [1992] 4 All ER 488.
*Guinness plc v Saunders* [1990] 1 All ER 652, [1990] 2 AC 663, [1990] 2 WLR 324, *j*
HL.
*Hely-Hutchinson v Brayhead Ltd* [1967] 3 All ER 98, [1968] 1 QB 549, [1967] 3
WLR 1408, CA.
*International Sales and Agencies Ltd v Marcus* [1982] 3 All ER 551.
*Lands Allotment Co, Re* [1894] 1 Ch 616, [1891–4] All ER Rep 1032, CA.

*Lipkin Gorman (a firm) v Karpnale Ltd* [1992] 4 All ER 331, [1987] 1 WLR 987; *rvsd in part* [1992] 4 All ER 409, [1989] 1 WLR 1340, CA; *rvsd in part* [1992] 4 All ER 512, [1991] 2 AC 548, [1991] 3 WLR, HL.

*Manchester Trust v Furness* [1895] 2 QB 539, CA.

*Montagu's Settlement Trusts, Re, Duke of Manchester v National Westminster Bank Ltd* (1985) [1992] 4 All ER 308, [1987] Ch 264, [1987] 2 WLR 1192.

*Morris v Kanssen* [1946] 1 All ER 586, [1946] AC 459, HL.

*Nelson v Larholt* [1947] 2 All ER 751, [1948] 1 KB 339.

*Rolled Steel Products (Holdings) Ltd v British Steel Corp* [1985] 3 All ER 52, [1986] Ch 246, [1985] 2 WLR 908, CA.

*Royal British Bank v Turquand* (1856) 6 E & B 327, [1843–60] All ER Rep 435, 119 ER 886, Ex Ch.

*Russell v Wakefield Waterworks Co* (1875) LR 20 Eq 474, MR.

*Thomson v Clydesdale Bank Ltd* [1893] AC 282, [1891–4] All ER Rep 1169, HL.

*Transvaal Lands Co v New Belgium (Transvaal) Land and Development Co* [1914] 2 Ch 488, [1914–15] All ER Rep 987, CA.

*Westpac Banking Corp v Savin* [1985] 2 NZLR 41, NZ CA.

### Action and counterclaims

By writ the plaintiff, Cowan de Groot Properties Ltd (formerly known as Pinepad Ltd (Pinepad) a wholly-owned subsidiary of Cowan de Groot plc), brought an action against the defendant, Eagle Trust plc (Eagle), on an agreement dated 4 May 1989 between the plaintiff under its original name and Eagle whereby Eagle agreed to sell certain properties to Pinepad and to grant Pinepad the option to purchase two other properties, seeking a declaration that the notice exercising the option over one of the properties was valid and effective. Eagle counterclaimed that since the sale agreement was ineffective the actions taken under it were liable to be undone, and that in the premises Pinepad was liable as constructive trustee of one property and the proceeds of sale of others, and had knowingly assisted in fraudulent breach of fiduciary duty by two of its directors, and sought a tracing order. Pinepad and its parent company counterclaimed that they were not liable as constructive trustees. The facts are set out in the judgment.

*Robin Potts QC* and *David Chivers* (instructed by *Memery Crystal*) for Cowan de Groot.

*Trevor Philipson QC* and *Craig Orr* (instructed by *Berwin Leighton*) for Eagle.

*Cur adv vult*

19 July 1991. The following judgment was delivered.

**KNOX J.** Although the plaintiff in these proceedings is Cowan de Groot Properties Ltd, a company previously called Pinepad Ltd and which I shall refer to by its original name 'Pinepad', the onus of proof of the matters in dispute is accepted as lying upon the defendant, Eagle Trust plc (Eagle), which has counterclaimed against both Pinepad and its holding company Cowan de Groot plc (Cowan de Groot). Pinepad was at all material times the 100% subsidiary of Cowan de Groot.

The proceedings concern an agreement (the agreement) dated 4 May 1989 between Eagle and Pinepad whereby Eagle agreed to sell properties in three towns or cities to Pinepad and to grant an option to Pinepad to purchase two other properties, one in Bristol and the other in Newport and which I shall call 'the Bristol property' and 'the Newport property'. The properties agreed to be sold were in Wolverhampton, Nuneaton and Birmingham and I shall refer to them

individually as 'the Wolverhampton property', 'the Nuneaton property' and 'the Birmingham property'. The prices specified in the agreement for the latter were   *a* as follows: £300,000 for the Wolverhampton property; £50,000 for the Nuneaton property and £550,000 for the Birmingham property. The options were options to buy at the following prices: £350,000 for the Bristol property; and £250,000 for the Newport property. I shall refer to all five properties comprised in the agreement, both the three agreed to be sold and the two over which options were granted, as 'the five properties'.   *b*

The agreement was completed on 1 June 1989 by transfers in favour of Pinepad of the Wolverhampton property, the Nuneaton property and the Birmingham property. The option over the Newport property has been sought to be exercised by Pinepad by a notice dated 23 April 1990. The option over the Bristol property remains unexercised but Eagle claims that it was under no obligation to complete   *c* the option agreements over the Bristol and Newport properties and that it has rescinded the whole of the agreement by letters dated 30 March 1990 addressed to Cowan de Groot and Pinepad. The principal issue in the action shortly stated is whether or not the agreement and the actions taken pursuant to it are, in the events which have happened, effectual or whether, on the other hand, as Eagle claims, the agreement is ineffective and the actions taken under it, notably the   *d* transfers of the Wolverhampton, Nuneaton and Birmingham properties, liable to be undone.

Eagle acquired the five properties by purchase from CP Holdings Ltd (CP Holdings) on 9 December 1988 at a price of £1,200,000. In making this purchase Eagle was following up transactions which had earlier been negotiated in 1986 and 1987 between CP Holdings acting through its director, Mr B Schreier, and   *e* Midland City Partnership plc (MCP plc) acting through its directors, Mr J W Ferriday and Mr R Smith, who both figure largely in the events upon which this action depends. CP Holdings was engaged in business as builders' merchants and allied trades and there were in 1986 dealings, the details of which are immaterial to these proceedings, but the end result of which was that a company, MCP   *f* Building Supplies Ltd, a subsidiary of MCP plc, had vested in it builders' merchants businesses in East Anglia and the Midlands which had previously belonged to J H Sankey Ltd, a subsidiary of CP Holdings. There was included among those dealings an option granted by CP Holdings to MCP plc to acquire three of the latter premises, namely the Nuneaton, Wolverhampton and Birmingham properties, but the option expired by effluxion of time before it was   *g* exercised. Similarly in July 1987 MCP Building Supplies Ltd acquired further branches in the West Country of the businesses of J H Sankey Ltd and two of those branches operated on the Bristol property and the Newport property and options for 12 months were granted to MCP plc to acquire the freeholds of those premises at open market values but they too expired by effluxion of time.

Shortly before this last transaction Eagle Trust plc had been formed in March   *h* 1987 by a merger of various companies, of which the two largest were Mitchell Somers plc and MCP plc. The latter two companies became subsidiaries of a listed company, Audiotronic plc, which then changed its name to Eagle Trust plc. From then on MCP plc and thereby MCP Building Supplies Ltd became wholly-owned subsidiaries of Eagle. The board of Eagle after the merger in March 1987 consisted of the following nine persons. (1) Mr Thomas. He was chairman of Eagle, having   *i* previously been chairman of Mitchell Somers plc. He retired from the board of Eagle in October 1988 and played no significant part in the events with which these proceedings are concerned. (2) Mr Ferriday. He had been chairman of MCP plc and became group chief executive of Eagle. He succeeded Mr Thomas as chairman when he retired. Mr Ferriday in practical terms effectively controlled

Eagle at all material times in all major policy matters, more especially with regard
*a* to acquisitions and strategic financial matters. He kept in close touch with Mr
Smith. (3) Mr Smith. He had been managing director and in 1986 executive
chairman of MCP Building Supplies Ltd. He became group managing director of
Eagle. He was a friend and confidant of Mr Ferriday. They had between them
run MCP plc and MCP Building Supplies Ltd. Mr Smith was concerned principally
with the management of Eagle's subsidiaries and in particular the MCP side, of
*b* which MCP Building Supplies Ltd was the most important part. (4) Mr C P
Whiley was non-executive director of Eagle at first but became executive in July
1989. He was concerned principally with the financial and City side of Eagle's
affairs. (5) Mr Martin Baker had been finance director of Mitchell Somers plc and
became finance director of Eagle. (6) Mr Black was an executive director with
*c* principal responsibility for the management of the Mitchell Somers plc side of
Eagle.

There were also three non-executive directors, Mr Janson, Mr Saunders and Dr
Hardwicke.

Mr Ian Tromans gave evidence before me on behalf of Eagle. He was employed
from 1985 onwards by J H Sankey Ltd, originally as the East Anglia regional
*d* manager and he moved to MCP Building Supplies Ltd when that company
acquired the businesses in East Anglia. By June 1986 Mr Tromans had become
managing director of MCP Building Supplies Ltd. His executive chairman was
Mr R Smith. Mr Ferriday and Mr Smith were in effective control of MCP Building
Supplies Ltd and when Eagle was formed in March 1987 both Mr Ferriday and
Mr Smith became directors of Eagle whereas Mr Tromans did not but he became
*e* an employee of Eagle although still managing director of MCP Building Supplies
Ltd. The latter pursued an expansionist policy after Eagle was formed and became
a large business with a very substantial turnover, estimated by Mr Tromans at
some £52m in 1988. It was however a business which by its nature had to carry
large stocks and it was always undercapitalised so that profitability did not keep
*f* pace with growth. I shall return later to the state of its finances and those of Eagle
in the first half of 1989.


EAGLE'S ACQUISITION OF THE FIVE PROPERTIES

Mr Tromans, who had long known Mr Schreier of CP Holdings, was instructed
*g* by Mr Smith shortly before 4 August 1988 to try to negotiate with Mr Schreier a
purchase of the five properties. This was a project that Mr Tromans had for some
time been seeking to promote, partly because the rent which MCP Building
Supplies Ltd was paying was somewhat in excess of what at current rates of
interest it would, Mr Tromans reckoned, cost to borrow the amount likely to be
needed to buy the five properties and partly because the commercial property
*h* market was rising fast and the purchase seemed to him intrinsically attractive.
There was also a special reason in relation to the Birmingham property, which
unlike the others of the five properties, which were all freehold vested in CP
Holdings, was a long leasehold interest underlet in part to MCP Building Supplies
Ltd and in part to Servis Systems Ltd, so that MCP Building Supplies Ltd was only
in physical occupation of part of the Birmingham property. Mr Tromans had a
*j* project for getting possession of the remainder on the termination of the
underlease in favour of Servis Systems Ltd, which was due to expire in August
1989, on the ground that it was required for the occupation of MCP Building
Supplies Ltd and having done that to use the whole of the Birmingham property
as the headquarters for MCP Building Supplies Ltd. Mr Tromans had succeeded
in the summer of 1988 in persuading the board of Eagle to allow his proposed

purchase to go forward, hence his instructions from Mr Smith to approach Mr Schreier.                                                                                                          *a*

There was a meeting between Mr Tromans and Mr Schreier on 4 August 1988 upon which Mr Tromans reported to Mr Smith and Mr Duffy, financial controller of MCP Building Supplies Ltd, the next day. The report included the following:

'Following my meeting yesterday with Mr B. D. Schreier herewith details of our agreement                                                                                                    *b*

| Branch | Agreed value 4.8.88 |
|--------|---------------------|
| Birmingham | £505,000 (reduction from £550k for MCP improvements) |
| White Ladies Gate | £310,000 |
| Newport | £210,000 |
| Nuneaton | £45,000 |
| Wolverhampton | £130,000 |
| | £1,200,000 |

*c*

A deposit of 10% required by 11 August 1988 and the balance is to be paid *d* within three months . . . As you are aware Schreier is a difficult man to deal with and I think that when we settled on the figure he was immediately concerned that he had sold too cheap . . . We must move very quickly in particular as far as the Birmingham Branch is concerned the present tenants "Servis Systems" lease expires in August 1989 but they are entitled to a 12 months' notice period, obviously C.P. Holdings will not give them notice *e* and we cannot until we own the building. As you are aware, we all wish to make the Birmingham Branch our Head Office and we can save a considerable amount of time and money if we secure the property now . . .'

Mr Tromans had taken advice about current values from Messrs Alder King, surveyors and valuers of Bristol, as a check against the price asked for by Mr *f* Schreier. That valuation was not produced in evidence but Mr Tromans's evidence which I accept was that the Alder King valuation indicated that he was proposing on behalf of MCP Building Supplies Ltd about the right price. The transaction was on the basis that the sitting tenant was buying the reversion save with regard to the part of the Birmingham property which was occupied by and leased to Servis Systems.                                                                                        *g*

There was a hitch in the funding of the proposed purchase in that the board of Eagle at the last moment in August 1988 decided not to fund the purchase itself. However, an extension was obtained from Mr Schreier and on 4 October Mr Tromans sent him £120,000 by way of deposit and the rest of the price was produced by MCP Building Supplies Ltd in November 1988 although completion in the shape of the transfer of the properties to Eagle did not take place until 9 *h* December 1988.

Although Mr Tromans had obtained the approval of the Eagle board to the purchase of the five properties and had understood that Eagle would fund the transaction, he was told by Mr Baker, Eagle's finance director, in or about October 1988 that the money required could not be produced by Eagle. Mr Tromans negotiated loan facilities with Lloyds Bank plc, MCP Building Supplies Ltd's *j* bankers, and that was the source of the purchase price. However, MCP Building Supplies Ltd's indebtedness was part of the Eagle group's banking facilities and the advance was made by Lloyds Bank on that footing. This was done with the knowledge and approval of Mr Smith and Mr Baker but there is no record of any formal antecedent resolution by the Eagle board approving the making of an

*a* agreement for the purchase of the five properties from CP Holdings. The five properties were treated separately so far as conveyancing documents were concerned and indeed the Bristol property was divided into its two constituent parts. The six agreements for sale and six transfers were all dated 9 December 1988 and executed by Mr Baker and Mr Beaumont, Eagle's company secretary, the latter of whom gave evidence before me. He effectively did what he was told notwithstanding the absence of any board resolution until 26 January 1989, when

*b* there was an Eagle board resolution ratifying the affixing of the company seal to the documents in a schedule which included the six agreements and transfers mentioned above. The agreements were described in the schedule as:

'Six contracts for the acquisition of properties for M.C.P. (Building Supplies) Ltd from C.P. Holdings at £1·2 million.'

*c* This reflected the fact that MCP Building Supplies Ltd was the tenant of the five properties and in occupation of all save Nuneaton and Wolverhampton and that the purchase was embarked upon for reasons connected with MCP Building Supplies Ltd's long-term plans. In fact there had been uncertainty whether the transfers would be taken into Eagle's name or MCP Building Supplies Ltd's name

*d* until quite a late stage. The solicitor acting for Eagle and MCP Building Supplies Ltd on the instructions of Mr Smith and Mr Tromans was Mr Ranson, who gave evidence before me. He wrote to the solicitors acting for CP Holdings as late as 4 November 1988 saying he had not been able to identify from his clients which of the various companies would actually take the titles but anticipated that it would be MCP Building Supplies Ltd. In this he proved wrong because as already

*e* mentioned it was Eagle that was the purchaser. Mr Tromans did not protest at this because he recognised that MCP Building Supplies Ltd was heavily indebted to and dependent upon Eagle for its finances.

EAGLE'S ACQUISITION OF THE SAMUELSON GROUP

*f* Samuelson Group plc was a public company quoted on the Stock Exchange which traded very successfully in 1984 and 1985, when its share price rose steeply, but encountered some financial problems in 1986. It had originally been founded by Mr Sydney Samuelson and his three brothers and it remained in 1987 under family control. In September 1987 the board of Samuelson plc included Mr Sydney Samuelson, who was the chairman, and his son, Mr Jonathan Samuelson,

*g* who also figures very largely in these proceedings and whom I shall call 'Mr Samuelson', who was the managing director. Other substantial Samuelson family shareholders were Mr Samuelson's brothers Peter and Marc Samuelson and Mr Samuelson's uncle, that is Mr Sydney Samuelson's brother, Mr Michael Samuelson.

Mr Samuelson had trained as a chartered accountant. He joined the Samuelson Group at the age of 27 and became a director two years later and managing

*h* director one year after that, when he was still only 30. When financial problems were encountered in 1986 help was sought from an experienced industrialist, Sir John Mayhew-Sanders, who in early 1987 became chief executive, whereupon Mr Samuelson ceased to be managing director but remained on the board. A difference of opinion developed between Sir John Mayhew-Sanders and Mr Samuelson concerning the state of Samuelson Group plc's finances and what

*j* needed to be done. It is not relevant to the issues in these proceedings to determine the rights and wrongs of that difference of opinion. What is relevant is that acute disagreements broke out not only between Sir John Mayhew-Sanders and Mr Samuelson but also between Mr Samuelson and other members of his family. The audited accounts of Samuelson Group plc for the year ending April 1987 showed a loss of some £900,000 and there was a restatement by way of diminution

of £1·2m of profits for the previous year. Sir John Mayhew-Sanders's position was
that resignations from the board of members of the Samuelson family were *a*
needed to restore confidence among the bankers supporting Samuelson Group
plc, while Mr Samuelson did not accept that this was so. A proposal was mooted
for Mr Samuelson to resign or not offer himself for re-election and this was
supported by other members of the Samuelson family, notably Mr Samuelson's
father. At first Mr Samuelson was minded to agree but at an informal meeting of
Samuelson family directors on 30 September 1987 at the house of Mr Charles *b*
Corman, a partner in Messrs Titmuss Sainer & Webb, who had long advised
Samuelson Group plc, there was a considerable row when Mr Samuelson refused
at first to cease to be a director. He was supported in this by Mr Corman but other
members of the family thought he should go. Here again it is not necessary to go
into the rights and wrongs of that difference of opinion. It was resolved by Mr
Samuelson changing his mind and agreeing not to seek re-election at the *c*
forthcoming annual general meeting of the Samuelson Group plc, which would
in the normal course have been held early in December. This he did at that same
meeting after consulting Mr John Needleman on the telephone. Mr John
Needleman and Mr Samuelson are connected by marriage in that their wives are
sisters and at this stage Mr John Needleman, also a chartered accountant, was Mr *d*
Samuelson's friend and adviser. He gave evidence before me.

Mr Samuelson and Mr John Needleman had in view an alternative plan to Mr
Samuelson's quiet departure from Samuelson Group plc with the attendant risks
of damage to his reputation in relation to his stewardship as managing director
and the possible gradual erosion of his family's controlling position as shareholders
without their realising what he considered was its true overall value. That *e*
alternative was to find a bidder for a controlling interest at an acceptable price.
The search for such a bidder had already been set on foot by Mr Samuelson with
Mr John Needleman's help before 30 September but it was resumed with greater
urgency immediately after. One prospective bidder in the shape of Mr Robert
Maxwell was found but his offer was thought by Mr Samuelson not to be high *f*
enough and was not pursued.

On 5 October after sounding out three other possible bidders Mr Samuelson
attended a meeting at the offices of Mr Martin Boston, a solicitor with
entrepreneurial talents to which he appears to have given free rein. Mr Boston
did not give evidence before me. He was introduced to Mr Samuelson by Mr
John Needleman, whose accountancy firm did work for Mr Boston and his firm *g*
and for whom Mr Boston acted as solicitor. Mr John Needleman was on friendly
terms with Mr Boston.

Mr Boston had been present at the abortive negotiations with Mr Maxwell and
it was he who convened the meeting of 5 October in order to introduce Mr
Ferriday and Eagle Trust to the Samuelson family and to Mr Samuelson in
particular. This was the occasion when Mr Samuelson and Mr Ferriday first met. *h*
The object was to see if Eagle would make an acceptable bid for Samuelson Group
plc. The first meeting passed off well and a further meeting attended not only by
Mr Samuelson, Mr John Needleman, Mr Boston and Mr Ferriday but also by Mr
Samuelson's brothers Peter and Marc was held on 8 October 1987 at the offices at
Birmingham Airport of Paramount Airways Ltd (Paramount Airways), a company
which Mr Ferriday managed. On that occasion Mr Samuelson met other executive *j*
directors of Eagle, including Mr Smith and Mr Baker. This meeting was successful
and terms were agreed for Eagle to make a bid for shares in Samuelson Group plc.
The basic terms were an offer of six shares of Eagle for each share in Samuelson
Group plc with a cash alternative of £1·80 for each of the latter shares. At this
time the quoted price of Eagle shares was over 35p a share, significantly above the

**Ch D    Cowan de Groot Properties Ltd v Eagle Trust plc (Knox J)    709**

cash alternative. Simultaneously a rights issue to existing Eagle shareholders was
*a*  made on a basis of one new Eagle share for eight existing shares. Both the offer
and the rights issue were fully underwritten by SBCI Savory Milln and also sub-
underwritten. A public announcement regarding the offer and rights issue was
made on 12 October 1987 in which it was stated that members of the Samuelson
family intended to take the share alternative. It was during this take-over that Mr
Ferriday and Mr Samuelson first worked closely together. Mr Ferriday was the
*b*  dominant person on the Eagle board and Mr Samuelson was the spokesman for
the members of the Samuelson family who between them had a controlling
interest in Samuelson Group plc and whose attitude on the bid was therefore of
the first importance.

One week after the public announcement on 12 October the Black Monday
crash on the Stock Exchange occurred on 19 October. The price of Eagle shares
*c*  fell just below 30p on that day and fell further to around 26p by the end of that
week. It never came back up to 30p thereafter.

This substantial fall in the Eagle share price posed a considerable problem for
numerous sub-underwriters of the offer and rights issue. Notable amongst these
was Mr Martin Boston, who had taken on very substantial sub-underwriting
*d*  commitments in respect of 11 million shares in Eagle. The prospective loss on
this front seemed likely substantially to wipe out the £1·25m fee which he had
negotiated that a company which he controlled, Guardian Investments Ltd,
should receive as commission for the introduction of Eagle to Samuelson Group
plc. Other sub-underwriters of the offer were themselves shareholders in Eagle
and therefore in a position to vote at the forthcoming Eagle extraordinary general
*e*  meeting against the offer and, if successful in their opposition, thereby escape
liability on their sub-underwriting commitments. Mr Ferriday and Mr Samuelson
both had reason to fear that Mr Martin Boston if not relieved of his sub-
underwriting commitments might promote opposition amongst Eagle share-
holders. Mr Samuelson did not view that prospect with enthusiasm, because not
*f*  only his personal reputation as late managing director of Samuelson Group plc
but also his and his family's chances of securing a satisfactory price for their
Samuelson Group plc shares depended in his view upon the Eagle offer being
approved. Mr Ferriday for his part had no wish to see the take-over of Samuelson
Group plc which he had personally negotiated and promoted be voted down at
the Eagle extraordinary general meeting.

*g*  A meeting was held early in November 1987 between Messrs Ferriday,
Samuelson and Needleman to address these problems and a memorandum
prepared by Mr Needleman and corrected by Mr Samuelson was produced at the
trial. The details are not of direct significance to the issues in these proceedings
but reliance was placed upon the memorandum on behalf of Eagle as casting
Messrs Ferriday, Samuelson and Needleman in a very poor light. I accept that the
*h*  memorandum does indeed show that Mr Ferriday and Mr Needleman were quite
prepared to contemplate actions which would have been commercially
disreputable. Mr Ferriday stated his intention to leak price sensitive information
to keep or send up the price of Eagle shares and Mr John Needleman suggested
that preferential treatment should be given to Mr Martin Boston amongst the
sub-underwriters by members of the Samuelson family taking the cash alternative
*j*  and sub-sub-underwriting Mr Martin Boston's sub-underwriting, but Mr Ferriday
rejected that as defrauding the other 149 sub-underwriters. Mr Ferriday was
willing to take over Mr Boston's commitment but unable to deal because as a
director of Eagle he was in a closed period for dealing in Eagle shares under the
Stock Exchange Code. It was agreed that Mr John Needleman should put a
proposition, the details of which do not now matter, to Mr Martin Boston to

attempt to secure the latter's agreement. In fact that particular approach failed
but Mr Ferriday did reach terms with Mr Martin Boston on or about 13 November   *a*
1987 whereby the latter was relieved of his sub-underwriting commitments. The
Eagle extraordinary general meeting was held on 25 November 1987 and the
offer for Samuelson Group plc was approved.

    Mr Ferriday had very substantial commitments by way of sub-underwriting.
He had himself taken on some 15 million shares and had taken over from Mr
Martin Boston liability for another 11 million. This very extensive liability in the   *b*
context of the fall in the Eagle share price put him in financial difficulty and he
approached Mr Samuelson between 19 October 1987, when the Stock Exchange
crash occurred, and the Eagle extraordinary general meeting, when the Samuelson
Group plc acquisition was approved, for an assurance that Samuelson Group plc
directors would take the cash alternative notwithstanding their stated intention
to take a substantial part of their entitlement in the shape of Eagle shares and that   *c*
they would with that cash buy Eagle shares from Mr Ferriday at 30p a share if he
asked them to do so. There was a conflict of evidence between Mr Samuelson and
Mr Ferriday about the extent to which that request to enter into such an
agreement was accepted by the Samuelson family directors. Mr Samuelson's
evidence was that before the Eagle extraordinary general meeting all that was   *d*
agreed to was to elect to take cash and that it was only just before Christmas 1987
that the Eagle shares were bought from Mr Ferriday. There is no doubt that the
purchase from Mr Ferriday did go through just after Christmas 1987. 12,011,556,
and not 12,110,556 as is pleaded and admitted in the pleading, Eagle shares were
transferred by Anser General Investments SA (Anser) and Argonaut Global
Investments SA, both investment vehicles of Mr Ferriday, to five members of the   *e*
Samuelson family for a total price of £3,603,466·80, ie at 30p a share. Mr
Samuelson took 6m Eagle shares at a cost of £1·8m. On the market Eagle shares
then stood at roughly 18p. I prefer Mr Ferriday's evidence to the effect that there
was an antecedent understanding or gentleman's agreement that such a purchase
should be made. Whether there was or was not such an undertaking is not an   *f*
issue that is directly relevant to these proceedings. It was suggested for Eagle that
Mr Samuelson's evidence was deliberately untrue on this as on many other aspects
of the case. I am not satisfied that Mr Samuelson was deliberately seeking to
mislead the court on this matter. In my judgment what happened on this occasion
as on numerous other occasions when Mr Ferriday and Mr Samuelson did business
with each other was that there was a very loose understanding between them that   *g*
on this occasion Mr Samuelson would do what he could to see that Mr Ferriday
would get back 30p for Eagle shares to the extent that he wished and that Mr
Samuelson and his family's cash entitlement to the cash alternative permitted.
The end result was that Mr Samuelson and Mr Ferriday were mutually obligated
to each other. Mr Ferriday had done Mr Samuelson a very good turn in mounting
and putting through the Eagle take-over of Samuelson Group plc and Mr   *h*
Samuelson had done Mr Ferriday a very good turn in taking over 6m Eagle shares
at 30p a share when they stood below 20p in the market. The latter was not a
wholly disinterested step, although to those with the benefit of hindsight it now
looks extremely generous because Mr Samuelson and no doubt the other relevant
members of the Samuelson family took an optimistic view of the prospects of
Eagle and of the Samuelson Group within it and of the desirability of establishing   *j*
a good relationship with Mr Ferriday. A fortiori, when the understanding was
reached before the Eagle extraordinary general meeting there was the additional
incentive of seeing the Eagle acquisition going through.

    An additional disadvantage to the taking of the cash alternative was that it,
unlike the share alternative, attracted a liability to capital gains tax for someone

like Mr Samuelson ordinarily resident in this country. So far as Mr Samuelson
*a* was concerned the amount of tax involved was about £450,000.

As a result of the Eagle take-over of the Samuelson Group Mr Ferriday and Mr
Samuelson became close business associates and during 1988 they were involved
in a series of transactions and projected transactions the details of which are
irrelevant. It will suffice to list the more important ones.

*b* (1) Mr Samuelson continued to work with Eagle and its subsidiaries. Mr
Ferriday took steps to find Mr Samuelson positions which lessened the tensions
that predictably developed between Mr Samuelson as ex-managing director of
Samuelson Group plc and Eagle executives newly in charge of Samuelson Group.

(2) Mr Samuelson and Mr Ferriday made two visits to the West Coast of
America together, one in connection with a motor car project called in the United
*c* States 'Laforza' which was close to Mr Ferriday's heart and into which much of
Eagle's resources were poured, and the other in connection with a possible take-
over by Paramount Airways of an American airline.

(3) Mr Samuelson put Mr Ferriday in touch with possible sources of finance,
notably Coutts & Co, whose customer Mr Samuelson was. This involved Mr
Samuelson seeing details of Mr Ferriday's financial affairs, notably his sharehold-
*d* ings.

(4) Mr Samuelson lent Mr Ferriday £440,000, which was repaid with interest
by a transfer of 1,940,000 shares in Eagle.

(5) Mr Samuelson deposited £500,000 in February 1988 with Ferriday and
Smith Holdings Ltd (Fash) with a view to an investment in the above-mentioned
motor car project but that came to nothing and the money was returned with
*e* interest in June 1988.

As a result of these various negotiations and dealings Mr Ferriday and Mr
Samuelson were on close terms so far as business was concerned, saw each other
and spoke to each other spasmodically but overall not infrequently and, what is
more important, trusted each other so that transactions between them were
*f* conducted on a very informal basis.

MR SAMUELSON JOINS COWAN DE GROOT

Mr Samuelson was not particularly content in the Eagle organisation and left it
at the end of September 1988. Whether he jumped or as Mr Ferriday said was
pushed gently is of no great consequence. He was accordingly happy when Mr
*g* John Needleman told him of the possibility of buying a stake in Cowan de Groot
and getting a place on the board. The stake on offer was one of 20% of the issued
share capital, which at the then current price of about 60p per share was estimated
to cost £3·1m. The opportunity arose because the chief executive of Cowan de
Groot, Mr John Carr, was looking to retire and had instructed Mr John
Needleman's firm to find a purchaser for a 20% stake, which would have been
*h* just over 5 million shares.

Mr Samuelson did not have £3m readily available at this stage. What he had
in broad terms was 8 million shares in Eagle worth roughly £1·25m, some
£300,000 to £400,000 in other investments, and a half share in a house worth
roughly £1m. One obvious method of financing part of the acquisition would
have been to realise the shareholding in Eagle. Mr Samuelson suggested this to
*j* Mr Ferriday, who was strongly opposed to the idea because Eagle's financial
situation was becoming difficult and he wanted to avoid a sale of a large block of
shares held by a member of the Samuelson family, more especially as, where Mr
Samuelson had gone, other members of his family who still held Eagle shares
might well follow. There therefore ensued negotiations between Mr Ferriday and
Mr Samuelson for money to be lent by the former to the latter thus avoiding a

sale of Eagle shares. The negotiations also included Mr John Needleman because
he too had been looking for a place on the board of Cowan de Groot and it had
been agreed between Mr Samuelson and him that they should both go on the
board of Cowan de Groot once the share purchase had been made. Mr Ferriday
was not pleased about this because he had become deeply suspicious of Mr John
Needleman. Whether his suspicions, which related to activities of Mr John
Needleman as an umpire or arbitrator in an arbitration over the amount of the
commission payable to Mr Martin Boston on Eagle's acquisition of the Samuelson
Group, were justified is not relevant and was certainly not proved before me. The
significant fact is that Mr Ferriday was deeply suspicious of Mr John Needleman
and therefore insisted that if Mr John Needleman was to be involved in the
acquisition of Cowan de Groot shares he should carry some at least of the risk.

The Cowan de Groot proposal was brought to Mr Samuelson towards the end
of November 1988 and the consultations between Mr Ferriday, Mr Samuelson
and Mr John Needleman took place in the first half of December 1988. Mr
Samuelson wished to incorporate into the arrangements a discretionary settlement
which would enable capital gains tax on a sale of the Cowan de Groot shares at a
profit to be postponed until the gains were brought back within the jurisdiction
and this aspect of the plan was one which caused the most remarkable confusion
given that the drafting was handled by solicitors and the three trustees were
Messrs Samuelson, Ferriday and John Needleman, two of whom were chartered
accountants and therefore to be expected to have some appreciation of the effect
of a trust.

The proposals went through at least two versions. The first took the form of an
agreement (drafted by Mr John Needleman) by Mr Ferriday granting options to
each of Mr John Needleman and Mr Samuelson to acquire 25% of the amount of
ordinary shares in Cowan de Groot which it was anticipated Mr Ferriday would
acquire with £3m. That agreement although executed by Mr Ferriday was never
implemented because, inter alia, it obviously did not do what Mr Ferriday wanted
as a term of Mr John Needleman's involvement, namely subjecting him to part
of the risk if the Cowan de Groot shares fell in value.

There should also be mentioned at this stage, because it was a contemporaneous
transaction between Mr Samuelson and Mr Ferriday, a letter dated 3 December
1988 from the former to the latter. The executed terms were as follows:

> 'I am writing to formalise my long term "put" option arrangement relating
> to shares in Eagle Trust PLC ("the Company"). I am very grateful that you
> have allowed me to formalise our honorary arrangements. I know that you
> understand the reason for my doing so at this time.
>
> Shares
>
> 1. I shall have the right to require you to purchase, and you shall purchase
> up to five million Ordinary shares in the Company at a price of 20p per share
> at any time during the period 1st January 1989 to 31st December 1989 . . .
> 3. In the event that, by 31st March 1989, you have not acquired shares in the
> Company for a consideration of at least £445,000 from me, then you shall
> lend to me, interest free, repayable on one year's notice, the difference
> between the sum of £445,000 and the value of any shares acquired from me.'

Mr Ferriday duly confirmed his agreement by a letter in reply.

This was intended to provide Mr Samuelson with a means of discharging his
capital gains tax liability from the sale of the Samuelson Group plc shares to Eagle
when Mr Samuelson took the cash alternative and also repay a sum of £500,000
which he was proposing to borrow and did indeed borrow from his bankers

*a*    Coutts & Co to help finance the acquisition of shares in Cowan de Groot. It also contemplated the further transaction which occurred of Mr Ferriday advancing the further sums needed over and above the £500,000 to be borrowed from Coutts & Co in order to buy the stake in Cowan de Groot which Mr Samuelson intended to buy. In fact the put option in the letter of 3 December 1988 was never exercised.

*b*    The scheme that was in the event adopted was not notably more successful or indeed more comprehensible than its predecessors. The shares in Cowan de Groot were agreed to be vested in all three of Mr Samuelson, Mr Ferriday and Mr John Needleman as trustees of a discretionary settlement (the settlement).


*c*    THE SETTLEMENT OF COWAN DE GROOT SHARES
        The settlement was in a fairly common form of wide discretionary trust the essential features of which were as follows.
        'The beneficiaries' were defined as Mr Samuelson, his spouse and issue of any degree and their spouses and any charities added thereafter. There was an overriding power of appointment in favour of the beneficiaries exercisable by the
*d*    trustees with the consent of the settlor, Mr Samuelson, during an 80-year perpetuity period. Subject to that the income was payable to Mr Samuelson during his life and subject to that there was a discretionary trust of income during the perpetuity period in favour of the beneficiaries with a trust over capital in favour of the issue of Mr Samuelson per stirpes at the end of the period.
        Mr Samuelson had the power of appointing trustees during his life and of
*e*    nominating a protector who would have that power and the power to consent to exercises of the overriding power of appointment after his death.
        There was an express power to alter the proper law of the settlement and to appoint non-resident trustees.
        Overall it is clear that far and away the most important beneficiary was Mr
*f*    Samuelson himself. He was entitled to income and had a power of veto over any appointment of capital as well as the sole power of appointing new trustees, and he was an object of the power to appoint capital.


        THE COWAN DE GROOT SHARE PROFIT-SHARING AGREEMENT
*g*    Whether or not it was due to Mr Samuelson's preponderant position as a beneficiary is not clear but the solicitors responsible for drafting the settlement also prepared an agreement (the Cowan de Groot share profit-sharing agreement) which was designed to be and was executed contemporaneously with the settlement but whose terms are irreconcilable with the provisions of the settlement. The Cowan de Groot share profit-sharing agreement took the form of
*h*    a letter written by Mr Samuelson to Mr Ferriday and Mr John Needleman. It was drafted by the solicitors on Mr Samuelson's instructions at a stage when it was contemplated that the stake in Cowan de Groot shares to be purchased would be one of 20%. The draft was considered by Messrs Samuelson, Ferriday and John Needleman at a meeting at which it was altered by a number of deletions, which need not now be spelt out for present purposes, as well as the filling in of various
*j*    blanks. The end-product as executed on 14 December 1988 by all three persons at that meeting included the following:

            'To:    [J.W. Ferriday] (Mr "A")
                    [J. E. Needleman] (Mr "B")
            From:    [J. Samuelson] ("JS")

Dear Sirs,

*Cowan de Groot PLC*

I am writing to you in connection with the proposed arrangement between us relating to the acquisition of up to 20% of the issued ordinary share capital of Cowan de Groot plc ("the Company")

1. *Price*

1.1 It is anticipated that the price paid per share will be in the region of 60–65p and that the acquisition of such stake will be in the region of £3·1 million (such amount including all dealing, stamp duty, legal, accounting and other related costs) . . .

2. *Shares*

2.1 I shall endeavour on behalf of the parties to purchase initially 15% of the current Ordinary Share Capital of the Company at a price not exceeding 60p per share. It is intended that the share holding will be increased to around 20% of such share capital when further acquisition is permitted according to the relevant rules and guidelines of the Stock Exchange as laid down by the Rules Governing Substantial Acquisition of Shares ("SAR") or the Companies Act 1985 . . .

4. *Holding*

4.1 The Shares to be acquired or any part thereof will be held by Trustees in accordance with the terms of the Deed of Trust attached hereto

4.2 The Trustees shall not be permitted to sell or otherwise dispose of any Shares or any interest therein held on trust without the approval of all the parties hereto.

5. *Profit/Losses*

In the event of the disposal of all the shares or any part thereof the profit and/or losses will be dealt with as follows (if there is a part disposal any profit and loss being calculated on a proportionate basis):—

5.1 All or any loans and other charges (or [sic] any third party including any of the parties hereto) shall be repaid in full and any other liability in respect of the shares will also be paid in full.

5.2 Any profit shall be divided as follows:—

5.2.1 to Mr A—50%

5.2.2 to Mr B—25%

5.2.3 to JS—25%

5.3 Any losses shall be shared as follows proportionately:—

5.3.1 by Mr B up to 5% of such loss

5.3.2 by JS up to 13% of such loss

5.3.3 Mr A shall bear the rest of any loss but there shall be no upper limitation on the amount of liability hereunder . . .

8.1 This Letter Agreement shall constitute the entire understanding and agreement between the parties hereto in relation to the transactions contemplated by this letter and there are no other agreements or arrangements which are not contained in this Letter Agreement which shall give rise to any liability on the part of any party hereto.'

Both Mr Ferriday and Mr John Needleman signed confirmations that the letter from Mr Samuelson quoted above correctly set out the terms agreed between the three of them and agreed to be bound by all such provisions as affected them respectively.

Clause 8.1 to the effect that the letter contained the whole agreement between the parties was false to the knowledge of all three persons concerned, but Mr Samuelson and Mr John Needleman knew a great deal more than Mr Ferriday.

*a*  Mr Ferriday signed a side letter also dated 14 December 1988 to Mr Samuelson which stated, presumably with unconscious irony 'For the avoidance of doubt', and continued:

> 'I confirm that the circumstances regarding my loan to the Trustees of the J. W. Samuelson Settlement are as follows:—
*b*  1) The loan is repayable when the Cowan de Groot shares are sold. The interest on the loan is to be rolled up and is repayable along with the principal. 2) Any profit accruing to me under the attached Shareholder's Agreement over and above the accrued interest payable is to be held in trust for the children of J. W. Samuelson, namely Jane and Robert Samuelson at my discretion.'

*c*  Mr Ferriday intended, and Mr Samuelson knew that he intended, that this should be a secret transaction between them not known to Mr John Needleman. Nevertheless Mr Samuelson lost no time in telling Mr John Needleman. In addition Mr Samuelson and Mr John Needleman entered into their own secret arrangement, which they did keep secret from Mr Ferriday and did not record in writing until some six months later, whereby Mr Samuelson agreed to indemnify
*d*  Mr John Needleman against any losses while Mr John Needleman agreed to hold any profits in trust for Mr Samuelson. They both intended in entering into this agreement to frustrate Mr Ferriday's desire, fully appreciated by both Mr Samuelson and Mr John Needleman, that Mr John Needleman should be subject to 5% of the loss caused by a fall in the value of Cowan de Groot shares. Whether Mr Ferriday would have advanced the sums he did advance had he known what
*e*  Mr Samuelson and Mr John Needleman were doing behind his back must be doubtful. In a sense the question is wholly academic because I am satisfied that the Cowan de Groot share profit-sharing agreement was repugnant to the terms of the settlement and had no legal effect whatsoever. The conception of three persons holding property as trustees and simultaneously agreeing to divide up between themselves any profit made on a sale of the trust property is an impossible
*f*  one. Similarly it seems to me to follow logically that the provisions regarding the sharing of losses were of equally little effect since they were clearly intended to operate in conjunction with the profit sharing provisions. There is in principle no reason why trustees should not decide between themselves how any deficit suffered by them as a result of the liabilities of the trust exceeding its assets should
*g*  be borne, should they be made personally liable by creditors of the trust, but that need not be fully investigated because Mr Samuelson did in fact I find execute a document indemnifying his co-trustees against liability to Lloyds Bank which, together with Mr Ferriday and Mr Samuelson himself, advanced the moneys by which the property subject to the trusts of the settlement was acquired. Only a draft of that indemnity was produced in evidence but I accept Mr Samuelson's
*h*  evidence that he signed such an indemnity. That makes it unnecessary to investigate the question whether or not he would have been under a duty so to indemnify his co-trustees under the general law, more especially as it was not pleaded or argued before me.

That indemnity also renders the rather sordid little deception practised by Mr Samuelson and Mr John Needleman, whereby the former indemnified the latter
*j*  behind Mr Ferriday's back, irrelevant so far as practical consequences were concerned, at least so far as indebtedness to Lloyds Bank was involved.

PURCHASE OF COWAN DE GROOT SHARES
The settlement identified as 'the trust fund' a sum of £10 which appears to have been paid into the trustees' bank account at Lloyds Bank on 9 January 1989

and 3,652,743 ordinary shares of 10p each in Cowan de Groot. Those shares were
acquired as follows.                                                                     *a*

(1) 918,643 shares were bought on 14 December 1988 through Messrs Teather
& Greenwood, stockbrokers, at 60p a share for a total sum of £551,185·80 as a
separate transaction for cash settlement. That money was provided as to £500,000
by Mr Samuelson, who borrowed it from his bankers, Coutts & Co, and as to the
balance of £51,185·80 by Mr Ferriday from the account of Anser at Hambros
Bank (Jersey) Ltd. Anser was an offshore company controlled by Mr Ferriday and   *b*
used by him to deal with his funds. Its management was conducted in Jersey by
Ryco Trust Ltd. Mr Samuelson's borrowed £500,000 was channelled through
Ryco Trust Ltd, which paid to Teather & Greenwood's bank the global price of
£551,185·80 on 14 December 1988.

(2) 2,734,100 shares were also bought in the market through Teather &         *c*
Greenwood at 60p per share, ie allowing for £12,919·62 expenses of one sort or
another at a cost of £1,653,379·62 on 14 December 1988 for settlement, in the
usual way, on 9 January 1989. That sum was provided as to £1,103,379·62 by
way of overdraft on the trustees' bank account at Lloyds Bank and as to £550,000
by Mr Ferriday through the Anser account at Hambros Bank (Jersey) Ltd. Both
these latter figures require some qualification and explanation. The actual debit   *d*
entry in the trustees' bank account at Lloyds Bank was £1,657,514·38, which,
allowing for Mr Ferriday's contribution of £550,000, represents an advance of
£1,107,514·38. The difference between that figure and the above-mentioned
£1,103,379·62 was not satisfactorily explained in evidence but the discrepancy is
not significant and is probably attributable to costs or bank charges. The facility
which Lloyds Bank agreed to grant the trustees was one of £1,100,000, for which   *e*
it took security in the form of a mortgage over the 918,643 shares in Cowan de
Groot bought on 14 December. The loan was technically repayable on demand
but Lloyds Bank's expressed intention was to leave it outstanding until 30 June
1989. There was an agreement that Lloyds Bank should have 100% margin over
its loan by way of cover and that, if the Cowan de Groot shares fell so as to reduce
the bank's cover to 50% or less, there would be what the bank described as an   *f*
automatic trigger entitling it to sell or require additional security. The figure of
£550,000 advanced by Mr Ferriday is the product of three payments, one of
£125,000 from the Anser account at Hambros Bank (Jersey) to the trustees'
account at Lloyds Bank on 6 January 1989, the second a transfer out of the
trustees' account of £75,000 on the same day (of which more later) and the third   *g*
another payment from the Anser account at Hambros Bank (Jersey) to the
trustees' account at Lloyds Bank, this time of £500,000 on 10 January 1989. The
net result of those three payments was clearly an addition to the trustees' funds of
£550,000.

(3) On 18 January 1989 two parcels of 100,000 shares and 47,257 shares in
Cowan de Groot were bought by the settlement trustees through Teather &   *h*
Greenwood at prices of 60p and 59p respectively at a total cost of £88,574·59,
inclusive of costs, for settlement on 6 February 1989. The price for these shares
was provided by Mr Ferriday direct, that is to say without the money passing
through the trustees' bank account at Lloyds Bank.

(4) The aggregate of the above-mentioned shares is 3,800,000 and it was
common ground that they became subject to the trusts of the settlement. Another   *j*
400,000 shares in Cowan de Groot were also purchased in a similar unusual
manner. The seller was Mr Carr, the chairman of Cowan de Groot but soon to
retire and be replaced by Mr Samuelson. The 400,000 shares were agreed to be
purchased by Mr Samuelson through the market at 60p a share, giving a total
price inclusive of costs of £241,880. That sum was paid direct by Mr Ferriday
through Ryco Ltd to the brokers, again without passing through the trustees'

**Ch D    Cowan de Groot Properties Ltd v Eagle Trust plc (Knox J)    717**

*a*  bank account. There was however an arrangement entered into by Mr Samuelson for Mr Carr to be paid an additional 20p per share and this together with a small addition for interest because the payment was five days or so late amounted to £80,992·15 and was paid out of the trustees' account at Lloyds Bank on 18 January 1989. This sent the trustees' indebtedness well over their agreed facility and was only cleared on the strength of an assurance from Mr Samuelson that Mr Ferriday would pay in a sum to reduce the indebtedness. He did in fact cause £120,000 to

*b*  be paid into the trustees' account on 24 January 1989. Mr Samuelson agreed with Mr Ferriday that the latter would make these payments that enabled the 400,000 shares to be purchased on terms that Mr Ferriday would be repaid by the trustees with interest at a rate unspecified and that Mr Ferriday would be entitled to charge the 400,000 shares in favour of Hambros Bank (Jersey), which was to Mr Samuelson's knowledge advancing the funds. Neither Mr Ferriday nor Mr

*c*  Needleman nor Mr Samuelson gave any thought whatever to the question how far such a transaction was a permissible one for them to embark upon as trustees. Nevertheless, the result in my judgment was to vest the beneficial interest in the 400,000 shares in the trustees as trustees of the settlement subject to the rights both of Mr Ferriday to be repaid and of Hambros Bank (Jersey) to require the

*d*  shares to be sold to recoup the indebtedness of Anser, Mr Ferriday's investment vehicle, to it. The asset thus acquired by the settlement was in the nature of an equity of redemption, ie a beneficial interest in the share subject to lenders' rights.

Mr Samuelson caused to be reported to the Stock Exchange the acquisition by him of a beneficial interest in all the 4,200,000 shares in Cowan de Groot after they were agreed to be purchased and he was accordingly reported as being

*e*  beneficially interested in all those shares at all material times, ie down until after June 1989. Press releases on his behalf were issued on the same basis.

The legal ownership in the shares followed an equally if not more chequered course. The initial parcels of 918,643 and 2,734,100 shares were intended to be and should have been registered in the names of all three trustees, Messrs Samuelson, Needleman and Ferriday. In fact roughly 100,000 shares fewer, viz

*f*  3,552,850 shares were thus registered. The balance of the 3,800,000 shares, viz 247,150 were registered in Mr Samuelson's sole name. The reason for this was never satisfactorily explained. Nothing turns upon it, in that there is no doubt that Mr Samuelson held the shares as a trustee on the trusts of the settlement and not for his sole benefit. The 400,000 shares in the last parcel were registered in the name

*g*  of Hambros Bank's nominee company, reflecting and supporting the rights of that bank in respect of the advance to Anser. It will be convenient at this stage to record that in the latter part of March 1989 Hambros Bank realised its security and the 400,000 shares were sold and the proceeds credited to the Anser account at Hambros Bank (Jersey) Ltd. There was no profit realised and so the equity of redemption belonging to the settlement disappeared. Mr Ferriday, although he

*h*  knew that this had happened, kept the news from Mr Samuelson, who did not find out until well after the date of the agreement. I do not accept Mr Ferriday's evidence that he did not know about the sale.

In summary the Cowan de Groot shares were purchased with contributions by Mr Ferriday of the following sums:

*j*
| | |
|---|---|
| £51,185·80 | when the initial 918,643 shares were bought |
| £550,000·00 | when the 2,734,100 shares were bought |
| £88,574·59 | when the 147,757 shares were bought |
| £241,880·00 | when the 400,000 shares were bought |
| £80,000·00 | on 4 January 1989 (the additional £40,000 paid was to keep |
| £1,011,640·39 | interest charges down) |

**All England Law Reports**

Mr Samuelson contributed £500,000 borrowed from Coutts & Co and Lloyds Bank lent the rest of the moneys needed, initially £1,107,514·38.

*a*

So far as interest on these sums was concerned the position in summary was as follows. On the indebtedness to Lloyds Bank interest would be charged by the bank in the usual way. Dividends on the shares purchased would be credited to the trustees' bank account and then go towards defraying the interest. Subject to that Mr Ferriday agreed to feed the trustees' account sufficiently to keep the balance within permitted or tolerated limits and he was to be recouped when the *b* Cowan de Groot shares were sold. His status was that of a creditor of the trustees. The reamended defence of Eagle in paras 21 and 22 relied upon Mr Ferriday's legal title to the 3,552,850 shares registered in his name jointly with the other two trustees, and his contribution to the purchase price of the parcel of 147,500 (sic) shares. It is somewhat optimistically claimed that those two parcels of shares total 3·8 million shares. That is a trivial arithmetical error compounded by the *c* curious phenomenon that 247,150 and not 147,150 were registered in Mr Samuelson's sole name. I treat the pleading as relying on Mr Ferriday's contribution to the acquisition of the 3·8 million shares which it was common ground did indeed become subject to the trusts of the settlement. Reliance is also placed upon the Cowan de Groot share profit-sharing agreement and on Mr *d* Ferriday's contribution to the purchase of the 400,000 share parcel. No lien or other charge in favour of Mr Ferriday is pleaded. No doubt that was justified because the normal trustee's lien to be recouped all proper expenses in the execution of his trust would hardly extend to an advance of moneys for the initial purchase of trust property.

So far as interest on the £500,000 borrowed by Mr Samuelson from Coutts & *e* Co was concerned no express agreement was made between Mr Samuelson and his co-trustees. This was in line with the casual way in which they treated their duties and liabilities as trustees. The law implies a liability to pay interest on a loan of money and the probability is that Mr Samuelson would have been entitled in principle to be paid interest on his loan but since he was the beneficiary entitled to income under the settlement the point is not one of any materiality, save *f* conceivably for fiscal purposes, and it rightly was not addressed in argument, so I ignore it.

Mr Ferriday's contribution to the purchase of the trust property was agreed to be repayable to him with interest when the shares in Cowan de Groot were sold. The rate of interest was left undecided and I need not take time about that issue. Mr Ferriday's interest under this head was in my judgment the same as his *g* interest in being recouped in respect of interest charged by Lloyds Bank. I do not take time to debate whether Mr Ferriday was entitled to interest on sums paid by him to defray the bank's interest charges since nothing turns on it and the point was not argued.

Mr Samuelson and Mr John Needleman joined the board of Cowan de Groot *h* on 13 December 1988. Mr Carr, the chief executive whose shares were later bought as described above as assets of the settlement, remained a director and there was also another executive director, Mr Brian Riches, who gave evidence before me. Mr Riches is a chartered accountant and an experienced company director and his integrity was not questioned at any stage.

*j*

PERRANPORTH AIRFIELD

It will be convenient at this stage to deal with Mr Samuelson's and Mr Ferriday's activities concerning Perranporth airfield since although no relief is sought in relation thereto much reliance was placed on behalf of Eagle upon the way in which Mr Samuelson behaved and gave evidence regarding Perranporth airfield

*a* in support of the proposition that his evidence was not to be believed unless corroborated and that he was at a material time co-operating with Mr Ferriday in dishonest transactions from which it would be right to draw inferences with regard to their conduct in relation to the five properties.

At all material times Perranporth airfield, in Cornwall, was the property of Central Pacific Securities Ltd (CPS). Mr Ferriday was very substantially interested in CPS but the precise extent of his interest was not established. His interest *b* extended to give him the ability to give instructions on its behalf and make promises to his, Mr Ferriday's, creditors, notably Hambros Bank (Jersey), that proceeds of sale of CPS's property would be paid in reduction of Anser's indebtedness to Hambros Bank (Jersey), effectively in reduction of Mr Feriday's indebtedness. CPS was administered by Ryco Trust although registered in *c* Gibraltar. It banked with Hambros Bank (Jersey).

CPS on or about 18 October 1988 acquired Perranporth airfield using moneys belonging to Eagle to provide completion moneys. Mr Ferriday declined to answer questions about this (as he was entitled to do in exercise of his privilege against self-incrimination) and the documentary evidence tending to support this conclusion remains uncontroverted. It does not greatly signify for the purposes *d* of these proceedings whether or not the beneficial ownership of the moneys was vested in Eagle. Far more significant is the date, mid-October 1988, of the acquisition of Perranporth airfield. This makes it unlikely that Mr Ferriday was looking for a purchaser to whom CPS could resell before November and even more unlikely that he would have been trying to interest Mr Samuelson in the property at the end of September 1988, which is when Mr Samuelson left Eagle.

*e* Mr Ferriday was not alone in seeking to resell Perranporth airfield: other persons, notably a Mr Hughes, were involved. A third party purchaser was found by early December 1988.

I find that Mr Samuelson was told about Perranporth airfield at or very shortly before the time in early December when he was negotiating with Mr Ferriday *f* regarding the purchase of shares in Cowan de Groot. There may well have been a short period when he was approached about it before he joined the board of Cowan de Groot on 13 December 1988 but he did not express any firm interest until he was reasonably sure that he might be able to use Cowan de Groot moneys to finance the purchase if it went through. On 13 December when in the thick of negotiations with Mr Ferriday for the settlement he did express a lively interest *g* and Mr Ferriday reported by telephone to Mr Sampson of Ryco Trust that he had found a new purchaser 'this time around in sum of at least £1·25m subject to contract'. That was Mr Samuelson, prospectively wearing a Cowan de Groot hat. The earlier prospective purchaser was discarded. Mr Samuelson consulted Mr Stewart Russell of Russell Cash Ltd, commercial property consultants, with whom he was familiar, and obtained an informal appraisal by letter dated 20 December *h* 1988 which was sufficiently encouraging for Mr Samuelson to proceed with the negotiations with Mr Ferriday.

Mr Samuelson was in a difficulty regarding the involvement of Cowan de Groot in this proposed purchase in that he did not wish to inform Mr Carr of the prospective purchase. Mr Carr was supposed to be going to retire but he had not yet gone and might change his mind, particularly, said Mr Samuelson, if he heard *j* of advantageous transactions in the offing. Even assuming that to be true, it constituted no sort of excuse for what Mr Samuelson with Mr John Needleman's full knowledge and approval did ostensibly on Cowan de Groot's behalf, which was to instruct solicitors, Messrs Jerrard Saunders Donn, and contract to buy Perranporth airfield for £1·5m without consulting the other members of the Cowan de Groot board, Mr John Carr and Mr Riches. This was entirely improper conduct on the part of Mr Samuelson and Mr John Needleman.

There was a dearth of direct documentary evidence of the actual transaction effected by way of contract largely because the Cowan de Groot file was, it appears, *a* destroyed and singularly little evidence was obtained from the solicitors acting on either side, Jerrard Saunders Donn for Cowan de Groot and Mr Ranson who was acting for CPS. I find that a contract conditional upon planning permission being obtained by CPS was negotiated and agreed but not exchanged before the condition was at the last moment deleted and the contract made unconditional on 6 January 1989. Completion was delayed beyond normal to 6 July 1989 to *b* allow for the planning application to proceed. I do not accept the submission by Eagle that a conditional contract was exchanged on 4 January and an unconditional one on 6 January. The document relied upon in support of the submission that there was an exchange of a conditional contract on 4 January was a letter dated 6 January 1989 from Mr Ranson to CPS saying he had that day exchanged contracts *c* with completion scheduled for 7 July. Mr Ferriday was very anxious to be able to show as watertight a contract as possible to Hambros Bank (Jersey), which was looking to Perranporth airfield as comfort for the recovery of sums owing by Anser. For that purpose it was obviously preferable to have an unconditional contract rather than a conditional contract. On the other hand Mr Samuelson and Mr John Needleman were not at all anxious to expose Cowan de Groot to the risks *d* involved in a contract which was not subject to a condition cancelling it if planning permission for the sort of development Mr Samuelson had in mind of 50 dwelling houses was not obtained within a fairly short period. No contract or copy contract was produced. Mr Samuelson said in evidence that he had no recollection of signing one but he was constrained to admit in evidence what he had signally failed to admit in his witness statements prepared and exchanged *e* before trial, namely that there had indeed been an exchange of contracts. This is all the more obvious because £75,000 travelled round by way of deposit. It was provided initially in the £125,000 mentioned earlier which Mr Ferriday caused to be transferred from Anser's account to the trustees' bank account at Lloyds Bank. From thence £75,000 was transferred to Mr John Needleman's firm's client *f* account and from there to Jerrard Saunders Donn, who paid the same sum to Mr Ranson on behalf of CPS and he in turn remitted it to Hambros Bank (Jersey) for and on behalf of CPS. At the end of the day so far as Hambros Bank (Jersey) was concerned all that had happened was a transfer from Anser's account to that of CPS and thence back to Anser because CPS by letter dated 28 December 1988 to Hambros Bank (Jersey) authorised a debit of any such amount in favour of Anser's *g* account. Whether Hambros Bank (Jersey) was aware that it was itself the original source of the £75,000 paid into CPS's account for transfer to Anser's account may perhaps be doubted. On the way round the £75,000 was treated as a deposit on a contract for the purchase by Cowan de Groot of Perranporth and as between Cowan de Groot, Mr Ferriday, Mr Samuelson and Mr John Needleman it is plain enough that Mr Ferriday provided the money. Although it is clear *h* enough that the draft conditional contract was shown to Hambros Bank (Jersey), it is very remarkable that the evidence does not indicate that it was shown the unconditional one. Indeed the only evidence that an unconditional contract was ever executed is a letter dated 2 February 1989 signed by both Mr Ferriday and Mr Samuelson but addressed by CPS to Cowan de Groot, which read as follows:

*i*

'Dear Sirs,
*Perranporth Aerodrome*
    We refer to the contract dated 6th January 1989 for the purchase of Perranporth Aerodrome. This letter constitutes our formal agreement to the cancellation of the above mentioned contract in the event that planning consent for the construction of not less than 50 domestic residential units has

### Ch D    Cowan de Groot Properties Ltd v Eagle Trust plc (Knox J)    721

a    not been obtained (for any reason including the non-submission of a planning application) by 26th April 1989. In the event that the contract is cancelled in accordance with the provisions of this letter, the deposit of £75,000 together with all accrued interest will be immediately repaid to you. In addition, all liabilities and obligations arising out of provisions of the contract shall cease. Please sign the enclosed copy of this letter to signify your agreement to the above.'

b
All three of Mr Ferriday, Mr Samuelson and Mr John Needleman in effect stated in evidence and I accept that this letter was the result of what amounted to a bargain whereby in return for the reintroduction of a condition into the contract between CPS and Cowan de Groot Mr John Needleman gave up his aspiration to become chairman of Cowan de Groot. This was the fruit of Mr Ferriday's
c    continuing suspicion of and hostility towards Mr John Needleman and caused a considerable row between the two of them. It also contributed to the deterioration in the hitherto close relationship between Mr Samuelson and Mr John Needleman because the latter resented the fact that Mr Samuelson effectively did what Mr Ferriday wanted in relation to the chairmanship of Cowan de Groot.

    I do not accept that the contract for the sale of Perranporth airfield on 6 January
d    1989 was a sham to Mr Samuelson's knowledge and known by him to be only intended as a piece of paper to be shown to Hambros Bank (Jersey) in order to secure more acceptable conditions for loans to Anser. It is not necessary for me to make findings about Mr Ferriday's intentions in relation to this transaction but so far as Mr Samuelson is concerned I accept that he intended to make a contract for
e    Cowan de Groot's potential benefit. The fact that he consulted Mr Russell about the potential of the airfield, a step which can hardly have been intended as window-dressing, satisfies me that he did have a genuine interest in the property. On the other hand the way he went about dealing with the matter on Cowan de Groot's behalf was highly irregular and illustrates his willingness to cut corners and disregard legal requirements if he felt justified in doing so. I bear in mind
f    that even after Mr Carr had resigned in February 1989 Mr Samuelson never revealed the existence of the contract, which he had entered into on Cowan de Groot's behalf, to Mr Riches, the other member of the Cowan de Groot board besides Mr John Needleman who knew all about it. It follows that the alteration to the contract on 2 February 1989 making it conditional again was not revealed to Mr Riches.

g    Perranporth airfield also figured in dealings between Mr Ferriday and Mr Samuelson at a later stage after the date for the condition to be satisfied in the letter of 2 February 1989, viz 26 April 1989, had passed so that the Cowan de Groot contract had gone off. This is much later in the history of the matter, after the agreement had been completed as regards the Wolverhampton, Birmingham
h    and Nuneaton properties, but it will be convenient to deal with it here because it has the same relevance as the earlier transactions as regards Perranporth, that is to say it goes to Mr Samuelson's credit. On 5 June 1989 when Mr Ferriday's financial problems became desperately serious he attended a meeting in Jersey with Hambros Bank (Jersey) and Mr Rodger Young of Ryco at which he was pressed about the repayment of outstanding liabilities of Anser. The subject of Perranporth
j    airfield came up. Mr Ferriday is recorded in the note taken on behalf of Hambros Bank (Jersey) as having said that the agreement with Cowan de Groot was irrevocable at £1·5m for completion on 6 July but it is recorded that Mr Morris of Hambros Bank (Jersey) said that in his opinion it was not irrevocable, whereupon Mr Ferriday gave an undertaking to ensure that by 6 June a new contract would be exchanged giving the bank the necessary comfort for completion by 6 July. It is clear that Mr Morris understood this to be a contract

with Cowan de Groot because he adds that he already had the necessary evidence
that Cowan de Groot had the ability to complete. On the other hand that account *a*
conflicts with Mr Rodger Young's record of the same meeting, which was that a
contract would be exchanged within the next day or two by CPS with Cosh
Holdings Group plc another associated company of Mr Ferriday and Mr Smith.
That conflict of recollection in my judgment reflects the confusion in what Mr
Ferriday undertook to do. Mr Ferriday was frequently more categoric than clear
in his evidence and I have little doubt that this applied more especially to *b*
conversations where he was being pressed by creditors.

Whatever the explanation, Mr Ferriday did indeed get Mr Samuelson within
two days to sign two letters dated 7 June 1989 on Cowan de Groot notepaper. The
first was addressed to Mr Ferriday at Paramount Airways Ltd and read as follows:

'Perranporth Aerodrome                                                     *c*
    With reference to your proposed exchange of contract tomorrow for the
    purchase of Perranporth Aerodrome for £1,500,000 (with no further
    planning related uplift) we confirm our agreement to fund 50% of the costs
    of the project including the initial purchase cost.'

That was forthwith faxed to Mr Morris at Hambros Bank (Jersey). Mr *d*
Samuelson denied any knowledge that that was what Mr Ferriday wanted the
letter for. I do not accept that evidence. In my judgment at this stage Mr
Samuelson was asked by Mr Ferriday to write a letter of comfort on the basis that
it would not legally commit him or Cowan de Groot to anything and it was for
that reason that Mr Samuelson did not consult Mr Riches as he would have done
if he had intended to commit Cowan de Groot to an expenditure of upwards of *e*
£750,000. On the footing that Cowan de Groot was not legally committed there
is no explanation that I can see for such a letter other than to oblige Mr Ferriday
and I find that if Mr Samuelson did not know what Mr Ferriday wanted the letter
signed for it was because he deliberately shut his eyes to it.

The second letter of 7 June 1989 signed by Mr Samuelson was addressed to *f*
Jerrard Saunders Donn, the solicitors whom Mr Samuelson had instructed
ostensibly on Cowan de Groot's behalf to act for it in the proposed purchase. In
this letter Mr Samuelson instructed those solicitors as chairman and on behalf of
Cowan de Groot that the £75,000 deposit had not been paid by Cowan de Groot
but by Mr Samuelson personally and that Cowan de Groot now wished to
withdraw from the transaction. The solicitors were also told that they were at *g*
liberty to act for Paramount Airways as purchaser and treat the deposit as paid by
the latter company. This letter contained false statements, notably that Mr
Samuelson had paid the £75,000, and is yet another example of Mr Samuelson's
willingness to do and say what he thought desirable to achieve the immediate
object in view without any pernickety regard for the truth. On the other hand
the falsehoods were not designed to put money in his pocket and I have no doubt *h*
he regarded them as justifiable. The letter is of course consistent with a plan by
Mr Ferriday for a purchase by Paramount Airways. Whether or not such a
contract was made was not conclusively established before me but if contracts
were exchanged it was not completed before Paramount Airways went into
receivership.
                                                                          *j*

MR SAMUELSON
    Before I come to the facts leading directly up to the making of the agreement
it will be convenient to state my conclusions regarding Mr Samuelson's character
and reliability as a witness. In my view he can be described as a moral lightweight,
in that he takes a casual view of such matters as legal requirements be it of

company law or of the law of trusts where he considers it appropriate. Another
*a*  symptom of what I regard as his low moral standards and lack of scruples was his
willingness to practise a cheap deception on Mr Ferriday in relation to Mr John
Needleman's participation as a trustee of the settlement. On the other hand I do
not accept that Mr Samuelson would have willingly been party to any plan
designed to defraud Cowan de Groot, the company of which he was chairman, of
a major sum of money such as £400,000 or to one designed to put substantial
*b*  sums of money derived from the price paid by Cowan de Groot to Eagle for the
acquisition of any of the five properties into the pocket of a third party. I do
however accept that Mr Samuelson's evidence needs to be very carefully scrutinised
and as appears elsewhere in this judgment there is a significant amount of it
which I do not accept.

*c*
MR FERRIDAY
   The other central actor in this matter who gave evidence was Mr Ferriday and
it will be convenient to give my overall assessment of him. Mr Ferriday is an
imperious, voluble and vain man who conducted the affairs of Eagle in a highly
autocratic manner but who found himself well out of his depth when the
*d*  economic climate changed in October 1987. He is quite unscrupulous in the
means he adopts to achieve his commercial objectives and in my view only
observed the requirements of the law when he was practically compelled to do so
in order to achieve his aims. He was dismissive of the law's requirements which
he described as paperwork and left to others to attend to. He has been charged
with various offences in relation to his stewardship of Eagle and Paramount
*e*  Airways and for that reason was the subject of numerous rulings by me that
certain questions put to him need not be answered by him on the ground that the
answers might tend to incriminate him. Although not a party to the proceedings,
he had the benefit of advice from counsel who appeared for him and whom I
allowed to address me on the subject of self-incrimination and the pending
criminal proceedings and I am grateful to counsel for that help. For the purposes
*f*  of these proceedings I have to apply the civil burden of proof to the issues between
the parties. This not only involves the irrelevance of my findings to criminal
proceedings against Mr Ferriday but also requires me to approach the issues
between the parties without regard to the various safeguards to Mr Ferriday
which the criminal law affords him other than the warnings against self-
incrimination which were given. Generally, I treat Mr Ferriday's evidence with
*g*  very great reserve, since he is in my judgment much more unscrupulous than Mr
Samuelson. He was quite right in the view that he evidently held that he was a
much stronger character than Mr Samuelson.

FINANCIAL POSITION OF EAGLE IN EARLY 1989
*h*    By early 1989 both Eagle and its subsidiaries, notably MCP Building Supplies
Ltd, were experiencing cash flow difficulties which became increasingly serious
as 1989 went on. Until Eagle's bankers co-operated with each other in demanding
explanations from Eagle in May 1989, Mr Ferriday and Mr Baker, the finance
director, were able to secure enough cash by one means or another to keep Eagle's
and its subsidiaries' businesses trading. Thus on 3 May 1989, the day before the
*j*  agreement was exchanged, a letter was sent by a corporate banking executive of
National Westminster Bank plc to Mr Baker agreeing revised overdraft limits
which were described as representing an overall increase of £3·5m which it was
hoped would provide the group with sufficient funds to carry on normal trading
whilst its disposal programme continued. Some of the means used to obtain its
bankers' support would not have borne too close investigation. Thus the same

properties were held out to two of Eagle's bankers as available sources for raising cash. After Lloyds', National Westminster's and Standard Chartered Banks' *a* representatives met in mid-May 1989, a regional manager at Lloyds wrote to Mr Baker on 24 May 1989 saying, inter alia:

> '. . . the Bankers are unhappy with the conflict of information which they have received especially concerning asset disposal proceeds and the very substantial investment made in LAFORZA.' *b*

That unhappiness was amply justified because certain assets such as a large freehold property at Heathrow and a large holding of shares in Owners Abroad Group plc were mentioned to both Lloyds and National Westminster as possible sources of funds through sales without either bank apparently being told what was being said to the other. There had indeed been a realisation before 1989 on *c* the part of Mr Ferriday and the rest of the board of Eagle that cash flow was very tight and difficult and that sales of assets were needed in order to keep the businesses going. Attempts were made starting in 1988 to sell MCP Building Supplies Ltd or its businesses as a going concern. Sales of land within the group of which Eagle was the holding company were also contemplated. The minutes of an Eagle board meeting on 26 January 1989 include a statement that Mr Baker *d* believed that the short-term overdraft would be quite quickly cleared by asset sales but there is no record of any affirmative resolution for specific disposals on that occasion. That was the meeting when the execution of the contracts and transfers on the acquisition of the five properties was ratified. At an earlier board meeting on 8 December 1988 it was confirmed that the market would be properly tested in the normal manner in connection with the prospective sale of the *e* Samuelson Group properties in addition to considering offers from the Samuelson family. This was in response to a request from a non-executive director, Mr Janson, and shows that both Mr Ferriday and Mr Smith, who attended the meeting, were aware of their obligations in relation to asset disposals. Matters were taken further at a board meeting of Eagle on 22 March 1989. The minute *f* includes:

> 'Mr Ferriday . . . recommended that the asset disposals which had been under consideration for some time should be brought to fruition. It was believed that with the current high interest rates and the unease caused by the Press comment, it was no longer prudent to delay asset sales in the hope of obtaining higher prices. Mr Baker presented a schedule of the assets under *g* consideration and it was decided to proceed with a view to completing the sales and thereby substantially reducing the Group borrowings by the summer.'

That minute was prepared by Mr Beaumont, the company secretary of Eagle, who said in evidence, and I accept, that the schedule referred to as having been *h* presented by Mr Baker included the five properties. The schedule itself was not attached to the minutes but in line with the irregular way in which Eagle's affairs were conducted it was produced at the meeting and then taken back by the director who produced it and thus not preserved in the company's records. Mr Beaumont said he thought the schedule had prices against the various assets on it and on a balance of probabilities I accept that evidence. He did not say what the *j* price in respect of the five properties was. Again on a balance of probabilities I find it was £1·5m, the figure at which the five properties were, as appears below, already being attempted to be sold. No further Eagle board minute deals with any disposal of the five properties until on 13 June the completion of the sale of the Wolverhampton, Nuneaton and Birmingham properties by transfer to Pinepad was ratified, as usual, after the event.

*a*  Generally during the first five months of 1989 Eagle was up to or over its permitted overdraft limits but it did manage to persuade its bankers to continue to support it and I find that it was not at any time before the agreement was made on 4 May 1989 unable to meet its debts as they fell due or otherwise insolvent but it was in severe financial difficulty.

One particular attempted realisation of assets in February 1989 deserves specific mention. Mr Ferriday then approached Mr Samuelson with a view to selling to *b*  Cowan de Groot two Eagle subsidiaries, one called Swift Electrical and the other dealing in public address systems, but about whose name witnesses were uncertain. These companies were attractive to Cowan de Groot for reasons which do not matter for the purposes of this action and negotiations were embarked upon and some professional fees were incurred by Cowan de Groot. Neither *c*  purchase went forward because Eagle was demanding payment of a large returnable deposit before contract and this Cowan de Groot would only do upon having its repayment secured. Eagle proved unable to provide the requisite security because of a negative pledge to its bankers upon the property in question. There was therefore clear evidence given to Mr Samuelson in February 1989 that Eagle was short of cash and had its assets heavily charged to its bankers. Mr *d*  Corman of Titmuss Sainer & Webb was also involved and was also aware of Eagle's cash shortage.

THE ATTEMPTED SALE OF THE FIVE PROPERTIES TO FENWAY PROPERTIES LTD

On 22 February 1989 MCP Building Supplies Ltd had leases granted to it by Eagle over part of the Birmingham property and the whole of the Bristol and *e*  Newport properties. It no longer occupied the Wolverhampton and Nuneaton properties for the purposes of its business and the way was therefore open for all of the five properties to be sold by Eagle subject to the leases in favour of MCP Building Supplies Ltd and of the other tenant of the remainder of the Birmingham property, Servis Systems Ltd. During January 1989 Mr Ferriday told Mr Smith *f*  that the five properties would have to be disposed of as part of Eagle's asset disposal programme. Mr Smith did not put the five properties on the market by any process of advertisement or even of seeking to place them privately with the help of agents. Instead he looked around for someone or some company to whom they could be sold quickly and with a minimum of publicity. It was submitted to me that the requirement of confidentiality, or at least lack of publicity, was justified *g*  on the footing that any disclosure of the fact that the properties owned or occupied by MCP Building Supplies Ltd were up for sale was perceived as having the gravest risk of occasioning very serious damage to the remaining goodwill of MCP Building Supplies Ltd. I do not accept this. It was known in the trade that the business of MCP Building Supplies Ltd was up for sale and I do not accept that knowledge that the five properties were up for sale would have had any significant *h*  additional adverse effect, more especially as the sales of those properties which MCP Building Supplies Ltd was still occupying were subject to leases in its favour so that what it was doing was closely similar to a sale and lease-back transaction. Mr Tromans, the managing director of MCP Building Supplies Ltd, was aware of and concurred in the intention to sell the five properties. Indeed he said in evidence that he thought he initiated the idea of a sale with an option to *j*  repurchase. Although there was a need for dispatch in effecting the sale given the difficult financial position of Eagle and MCP Building Supplies Ltd there was no need in my judgment for secrecy or for a sale to be negotiated with a relatively impecunious friend of Mr Smith's. That however is what happened. The friend in question was Mr John Baines, who gave evidence before me. He was on friendly terms with Mr Smith, having had both business dealings, since Mr Baines ran a heating and plumbing business through a small limited company, Baines

Heating Ltd, and was a customer of MCP Building Supplies Ltd, and also social
contacts, which started in 1988 or thereabouts with promotional events connected  *a*
with business and went on to include playing football together. Mr Baines had
embarked upon various relatively small property transactions of a speculative
nature before he was approached by Mr Smith regarding the five properties in
February 1989 but he had never been involved in a project of anything
approaching the magnitude of the purchase of the five properties which Mr Smith
offered to him at £1·5m. Neither Mr Baines nor his plumbing company, Baines  *b*
Heating Ltd, had available cash resources to pay a 10% deposit on such a purchase,
nor indeed a 1% facility fee to a prospective mortgagee, let alone any substantial
part of the price. Mr Smith instructed Mr Ranson, a solicitor who habitually acted
for Eagle and MCP Building Supplies Ltd and who was familiar with Mr Ferriday
and Mr Smith, to act in the proposed sale to Mr Baines. Mr Ferriday also spoke to  *c*
Mr Ranson about the matter and asked him to hurry it through. Mr Baines
instructed his solicitor, Mr Flint of Messrs Pearson Rowe & Co, who also gave
evidence before me, and at an early stage a small limited company, Fenway
Properties Ltd (Fenway Properties), was acquired by Mr Baines and his wife from
company promoters recommended to Mr Baines by Mr Smith. Mr and Mrs
Baines were the sole directors and shareholders and Mrs Baines was the company  *d*
secretary. She had the custody of the company seal.

Mr Ranson, having had his instructions from Mr Smith, sent a draft contract
to Mr Tromans for approval on 6 February 1989. The draft contained the
following significant features.

It provided for sale of the five properties by Eagle to Fenway Properties at a
price of £1·5m subject to the leases mentioned above in favour of Servis Systems  *e*
Ltd and MCP Building Supplies Ltd over the Birmingham property and of the
latter over the Bristol and Newport properties. The price was I find chosen by Mr
Smith and apportioned among the five properties in the way stated in the
agreement at the outset of this judgment. Clause 3 of the draft read as follows:

'The Purchaser has paid a deposit of 10% to the Vendor's Solicitors as agents  *f*
for the Vendor prior to the date hereof and the balance of the purchase price
shall be paid on the completion date.'

No such payment of a deposit had been made to Mr Ranson. He was told by Mr
Smith shortly before 10 February 1989 that a 10% deposit had been paid directly
by Fenway Properties to Eagle. This too was untrue and was a deliberate lie by  *g*
Mr Smith at which Mr Baines connived in order to facilitate the loan from a
prospective mortgagee. Mr Ranson wrote to Mr Flint, Fenway Properties' solicitor,
on 10 February 1989 saying, inter alia:

'We are, in the interim, instructed to advise you that our clients instruct us
that they have received by way of 10% deposit on these purchases, pending  *h*
an early formal exchange of contracts and completion . . . We understand
your client requires this confirmation in order to produce the same to the
HFC Bank at Reading. You have our authority to disclose this letter
accordingly.'

It came as no great surprise to Mr Ranson at a later stage to find when the proposed
contract with Fenway Properties went off as it did in April 1989 that there was no  *j*
deposit to be repaid to Fenway Properties. Mr Ranson said in evidence that it was
not entirely unusual for him to receive instructions that a deposit had been paid
when it had not been. He described it in evidence as 'not necessarily orthodox'.
That was a euphemism to cover Mr Ranson's unease. In my view it was a
fraudulent misrepresentation made to the prospective mortgagee, HFC Bank, to

**Ch D    Cowan de Groot Properties Ltd v Eagle Trust plc (Knox J)    727**

a   induce it to make an advance to Fenway Properties. The misrepresentation was made on the express instructions of Mr Smith but Mr Baines was well aware that it was made and that it was false.

Mr Smith and Mr Baines had an informal agreement which they took good care not to reveal to their respective solicitors, Mr Ranson and Mr Flint, that the deposit should be treated as having been paid by Fenway Properties and found
b   after completion by a resale by the latter. To return to the draft contract submitted by Mr Ranson to Mr Tromans for approval on behalf of MCP Building Supplies Ltd, there was also included a clause which provided in a somewhat rough and ready form for Fenway Properties to offer to sell back to Eagle at the then current market value if the former wished thereafter to dispose of any of the properties transferred. This was Mr Ranson's attempt to give effect to a provision that Mr
c   Tromans had discussed with Mr Smith whereby Eagle would retain the right to repurchase should Fenway Properties wish to sell on. Mr Tromans had not originally envisaged a right to repurchase at the then current market price but rather at a fixed price but the matter was not of first priority and was not thought through by him so that he did not react to the draft contract which did not give effect to his original desire. I am in any event satisfied that Mr Smith would have
d   overridden any suggestion that there should have been included an option for repurchase at the price at which the five properties were proposed to be sold because that would have damped the sale generally and in particular would have been totally unacceptable to Mr Baines, who was a speculative buyer who was looking for a quick profit on a resale.

Another matter undertaken by Mr Tromans in order to help on the proposed
e   sale to Fenway Properties was to instruct the same valuers as had advised on the occasion of the acquisition of the five properties, Messrs Alder King, to produce as favourable a valuation as possible for submission to the proposed mortgagees, HFC Bank. This valuation was dated 13 February 1989 and stated the instructions upon which it was based as follows, namely:

f       '. . . instructions to inspect the premises and advise as to the current open market values of the freehold interests assuming vacant possession for book purposes.'

So far as a prospective mortgagee was concerned those were not likely to be very impressive instructions, not only because the Birmingham property was not in
g   fact freehold but leasehold, but also because there were leases subject to which it was proposed to transfer the five properties to Fenway Properties. The valuation given on these unrealistic instructions was as follows:

|  |  |
|---|---|
| The Wolverhampton property | £125,000 |
| The Birmingham property | £950,000 |
| The Nuneaton property | £60,000 |
| The Newport property | £400,000 |
| The Bristol property | £575,000 |
| Total | £2,110,000 |

j   It was duly sent on to HFC Bank as soon as it was received by Mr Flint.

HFC Bank sent a facility letter on 20 February 1989 to Fenway Properties offering to lend 90% of the proposed purchase price, ie £1,350,000, for a period of one year. This was subject to various terms, notably that the offer was subject to open market reports and valuations for mortgage purposes to be deemed satisfactory to HFC Bank and prepared by Messrs Stewart Newiss on all the five

properties with comments, inter alia, on vacant possession valuations and current
investment valuations. Coupled with this was a term that the loan would be
limited to the lowest of 90% of the purchase price, ie to £1,350,000, and 70% of
the investment valuation and 70% of the vacant possession valuation. There was
also a requirement of a non-returnable 1% flat fee on acceptance of the offer. This
latter request raised a problem because Mr Baines was not in a position to raise
the necessary £13,500 and told Mr Smith this. The latter lent the required sum
to Mr Baines in cash, a transaction that says a good deal about both the keenness
of Mr Smith to sell to Mr Baines or his company and the suitability of the latter as
purchaser. With this assistance Mr Baines on behalf of Fenway Properties accepted
the offer from HFC Bank on 22 February 1989.

Stewart Newiss made their valuation of the five properties dated 7 March 1989.
The relevant figures were as follows:

| Property | Vacant possession valuation | Investment valuation |
|---|---|---|
| The Bristol property | £400,000 | £400,000 |
| The Wolverhampton property | £150,000 | £150,000 |
| The Newport property | £385,000 | £360,000 |
| The Nuneaton property | £110,000 | £85,000 |
| The Birmingham property | £800,000 | £860,000 |
| Total | £1,845,000 | £1,855,000 |

Applying the formula in the facility letter HFC Bank expressed its willingness to
lend 70% of the vacant possession valuation, viz £1,291,500. This was £58,500
below the 90% figure of £1,350,000 that Mr Baines was looking for and even he
accepted on or about 10 March 1989 that the matter could not proceed on the
basis of the money which HFC Bank was willing to lend. HFC Bank returned the
balance of the facility fee of £13,500 after deducting their costs at £5,480. After
deduction of £3,890 in respect of Mr Flint's costs the balance of roughly £4,170
was returned to Mr Smith, who never recovered the rest of the £13,500 he
originally lent Mr Baines.

Mr Baines did not give up his attempts to buy through Fenway Properties
although he was, according to his solicitor Mr Flint, very disappointed. Mr Flint
tried on behalf of Fenway Properties to interest Co-operative Bank plc in lending
90% of the proposed purchase price but he was unsuccessful in this. Mr Baines
remained very keen on the proposed purchase and tried to find finance elsewhere.
His enthusiasm was primarily based on the belief that he could make a large
profit on the Wolverhampton property the buildings on which were old and of
very little value but the site was ripe for development. Mr Baines had received a
very optimistic report dated 13 February 1989 from an architect, Mr T P Bolton,
which stated that he could not overemphasise his recommendation to proceed
with a project which he recommended and which he estimated would yield
£3·5m to £4m. In early April 1989 a good deal of cold water was poured on this
project by another firm of surveyors assisted by quantity surveyors but they too
thought that there was a profit to be realised and Mr Baines remained eager to
embark upon it if he could. Mr Smith had introduced Mr Bolton to Mr Baines
and, I find, knew about his recommendations. An attractive offer of £560,000
subject to contract and subject to planning was made to Mr Baines for the
Wolverhampton property on 5 April 1989 by a development company which Mr
Smith introduced to him. The Wolverhampton property had development
potential but there was a long way to go in the shape of obtaining planning
permission and finance before any profit could be realised over the £300,000 at

**Ch D    Cowan de Groot Properties Ltd v Eagle Trust plc (Knox J)    729**

<span style="float:left">a</span> which it was being offered to Fenway Properties by Eagle. It will be recalled that Stewart Newiss valued it for HFC Bank at £150,000 so that it is very evident that it was a property about which very widely divergent views on value could be held. Interest had also been expressed in the shape of an offer subject to the usual legal formalities in the Nuneaton property at a figure of £102,500 by a building contractor and heating engineer on 31 January 1989 to agents for Eagle. This offer was passed on together with other inquiries for that property by Eagle to Mr
<span style="float:left">b</span> Baines. Accordingly Mr Baines also thought he could make a profit over the £50,000 at which the Nuneaton property was being offered to him by Eagle.

Mr Baines tried to interest Greyhound Bank in lending money on the security of the five properties and he did eventually succeed in getting a conditional offer from it on 3 May 1989 but that was too late because Eagle had by this time lost patience and gone elsewhere, viz to Cowan de Groot. In the meanwhile Mr Baines
<span style="float:left">c</span> had suggested to Mr Smith that a cousin of Mr Baines, a Mr Sylvester Adley, a builder in London, might be interested in buying. Mr Smith and Mr Baines put their heads together and Mr Smith wrote out in Mr Baines's office a series of laudatory comments about the virtues and values of all the five properties. I find that these were in the nature of puffs and no solid evidence at all of the values at
<span style="float:left">d</span> which the five properties could then be sold. Mr Baines in evidence was quite unable to substantiate much of what was said by Mr Smith in these notes, which suggested to Mr Adley that there was an estimated minimum total profit to be made of £2,167,000. Mr Adley was obviously sufficiently prudent not to place any reliance on these figures and refused to proceed. It is not in my judgment necessary to examine these figures in any detail since they constituted flights of
<span style="float:left">e</span> fancy on the part of Mr Smith and Mr Baines and are of no assistance as to evidence of value. I also pass over for a similar reason various valuation figures, which, unlike Mr Smith's figures sent to Mr Adley, in themselves may well have been genuine, and were obtained for insurance reinstatement purposes. They too bear no direct relation to the value of the property to a purchaser on the market and should be ignored.
<span style="float:left">f</span> Overall I consider that the conduct of the negotiations for a sale of the five properties to Fenway Properties did constitute a breach of the fiduciary duties of Mr Ferriday and Mr Smith as directors of Eagle in that they knowingly were seeking to sell valuable assets of Eagle to a personal friend of Mr Smith in a thoroughly unbusinesslike and in some respects dishonest way. Through Mr
<span style="float:left">g</span> Smith they knew that Mr Baines was in a relatively small way of business and unable to find even the prospective mortgagee's commitment fee let alone the deposit which they proposed to deal with in an irregular manner not to be revealed to either side's solicitor. Eagle's need for cash was pressing and it was in my judgment in the highest degree imprudent to ignore the rest of the world as potential purchasers in favour of a prospective purchaser such as Mr Baines. I
<span style="float:left">h</span> shall return later in this judgment to the question whether the proposed price of £1·5m was so low as of itself to constitute a breach of fiduciary duty on the part of Mr Ferriday and Mr Smith to negotiate to sell at that figure.

THE APPOINTMENT OF NEW TRUSTEES OF THE SETTLEMENT

<span style="float:left">i</span> During March 1989 steps were taken to implement the next stage in the capital gains tax avoidance scheme set in train by the settlement by the appointment of trustees resident in Jersey, namely Mr R C Young, Mr Michael Sampson and Ryco Trust Ltd. A deed of appointment dated 13 March 1989 was prepared by the same solicitors as prepared the settlement. It is not very happily drafted because the party of the first part is Mr Samuelson described as 'the Appointer', the parties

of the second part are Mr John Needleman and Mr Ferriday described as 'the Retiring Trustees', and the three new trustees named above, called 'the New *a* Trustees', are the parties of the third part. What was intended was that not only the retiring trustees but also Mr Samuelson, the appointor, should retire and be replaced by the new trustees but what the deed in terms provides is as follows:

> 'The Appointer appoints the New Trustees of the Settlement in place of the Retiring Trustees who are hereby discharged from the trusts hereof and *b* to act jointly for all the purposes of the trusts hereof.'

The draftsman either forgot or failed to notice that Mr Samuelson was also a trustee. On balance it seems to me likely that even as a matter of construction it would be right to treat Mr Samuelson as retiring because of the recital that the investments and cash in the settlement were intended to be forthwith transferred into the joint names of the new trustees as indicating that the new trustees and *c* no one else were intended thereafter to be trustees. Even if that view is incorrect, I have no doubt that the deed would be rectified if it had to be, because I accept the evidence of all three of Mr Samuelson, Mr Ferriday and Mr John Needleman that the common intention was for all three of them to retire and there is no evidence at all the other way. There was also a mix up with regard to the way in *d* which the schedule to the deed of appointment was completed. Initially there was typed in 4,200,000 ordinary shares in Cowan de Groot as assets of the settlement but that was amended in manuscript before execution to 3,800,000, a deletion of the 400,000 shares acquired in the name of Hambros Bank's nominee company. The other items in the schedule were also the subject of ink amendments initialled by all three of Mr Ferriday, Mr Samuelson, and Mr John *e* Needleman. Here again there was much untidiness. The recitals to the deed state that the schedule contains particulars of the investment and cash subject to the trusts of the settlement. What the schedule in fact contained was an inaccurate description of the assets and liabilities of the settlement. This was completed by Mr John Needleman and was a hasty and somewhat slipshod effort. It is not in *f* my judgment necessary to go into the minutiae of this because the deed of appointment of new trustees did not alter any obligations by describing them inaccurately. I am however satisfied that, however inartistically prepared, it was effective for its primary purpose of appointing the three Jersey resident trustees in place of the three original English resident ones. No less disorganised were the attempts to transfer the legal title to the 3,800,000 Cowan de Groot shares. *g* Various transfer forms were prepared for Mr Samuelson, Mr Ferriday and Mr John Needleman to execute and I find they did execute some but none was given effect to on the register so that the legal property in the Cowan de Groot shares remained as I have described it above until well after the date of the agreement. No useful purpose would be served by describing the various attempted share transfers and I refrain from doing so. *h*

THE FIVE PROPERTIES ARE OFFERED TO COWAN DE GROOT

The negotiations with Fenway Properties Ltd were broken off at the end of April 1989 when Mr Ferriday, who I find was kept broadly in the picture by Mr Smith regarding the negotiations with Fenway Properties, lost patience and took the negotiations out of Mr Smith's control and directed him to make a closely *i* similar offer to that which he had been making to Mr Baines and Fenway Properties to Cowan de Groot via Mr Samuelson, who was by now its chairman. There were various significant alterations or additions to the terms. The first was the omission of any right to repurchase by Eagle should the purchaser Cowan de

a Groot decide to sell on. The second was that the deposit, instead of the usual 10%, was to be one-third, ie £500,000 and the third was that contracts were to be exchanged within a very short period of time.

Mr Smith acted on those instructions and contacted Mr Samuelson during the week starting on Monday, 24 April to put the proposed transaction to him in its essential terms. I find that Mr Smith did also say to Mr Samuelson that he thought there was £200,000 in it for Cowan de Groot. Mr Ferriday I find sounded Mr
b Samuelson out in general terms about the proposed transaction but did not go into details. Mr Ferriday knew that Mr Samuelson had substantial funds at his disposal in Cowan de Groot and was keen to go into property transactions. Mr Ferriday was not concerned with details but only with getting £500,000 into Eagle's coffers. He had a particular reason for this in that the motor car project known as Laforza had to make a payment of some £400,000 to the Italian coach
c builders Pininfarina by 28 April if it was not to incur severe penalties which would in practice have put an end to the project as conceived by Mr Ferriday. There was a dispute whether or not the payment by Eagle of that sum was a proper application of Eagle funds. I was not satisfied on the evidence that it was established to be a proper payment authorised by the board of Eagle but I have no
d doubt that Mr Ferriday genuinely took the view that it would be for the benefit of Eagle for the payment to be made. So anxious was he for it to be made that so long as a sufficiently large deposit was secured to effect the payment by 28 April or very shortly thereafter he did not greatly care what the price was at which the five properties were sold. As he himself put it in evidence when asked why he did not consider seeking more than £1·5m:
e
> 'I wanted the money. There was a much more important task for it. £100,000 or £200,000 is neither here nor there in the context of what I wanted the money for.'

The more important task was keeping the Laforza project in existence by making the requisite payment to Pininfarina. Such an attitude regarding the price at
f which the five properties were to be sold was reckless, the recklessness of desperation in relation to the Laforza project.

Mr Smith also told Mr Samuelson during the week starting 24 April that contracts had been exchanged with another purchaser by Eagle, meaning Fenway Properties, that the latter could not complete for lack of necessary finance and that they would need to be allowed a piece of the action. This was of course not
g true as regards the exchange of contracts and was false to Mr Smith's knowledge. On a balance of probabilities I find that Mr Smith told Mr Ferriday that he had said this to Mr Samuelson. I also find that Mr Ferriday knew that contracts had not been exchanged with Fenway Properties. I reject the submission made on behalf of Cowan de Groot that Mr Smith deceived Mr Ferriday into thinking that
h there had been an exchange of contracts with Fenway Properties. All the witnesses who knew both Mr Smith and Mr Ferriday described them as very close business associates and I do not accept that Mr Smith would have deceived Mr Ferriday on such a question. I also find that neither Mr Smith nor Mr Ferriday told Mr Samuelson that in fact contracts had not been exchanged with Fenway Properties. Of the many disputed issues of fact this is perhaps the most important. My
j finding is not so much based on Mr Samuelson's and Mr Ferriday's evidence, both of which but particularly the latter I treat with great reserve, but on the sheer improbability of Mr Samuelson being told any such thing. In my judgment Mr Smith in telling Mr Samuelson that there was another purchaser who would need to be given a piece of the action was seeking to do his friend Mr Baines a favour.

No doubt Mr Smith felt sorry for Mr Baines in that he had tried hard to raise the requisite finance and then had had the deal taken away from him. Mr Smith, *a* who had lent Mr Baines the sum needed to pay HCF Bank's acceptance fee and had engaged in a deception about the payment of a deposit by Fenway Properties, had invested a good deal of personal effort into getting the transaction between Eagle and Fenway Properties through and I infer was reluctant to let it go for nothing. None of these considerations suggests that Mr Smith would have taken Mr Samuelson into his confidence regarding Fenway Properties' real position *b* being that of a prospective purchaser who had neither paid a deposit nor exchanged contracts. Any benefit that could be secured for Fenway Properties and thereby Mr Baines would be at Cowan de Groot's expense and Mr Smith was not going to point that out to Mr Samuelson. For similar reasons I find that Mr Smith told Mr Samuelson that the principal of Fenway Properties was a customer *c* of MCP Building Supplies and well known to Mr Smith but Mr Smith did not tell Mr Samuelson that that person, the principal of Fenway Properties, was a personal friend of Mr Smith's. I bear in mind that Mr John Needleman in evidence said he thought that Mr Baines—

> 'who is purported [sic] to be a friend of Mr Smith, I didn't think that Mr Smith wanted him to lose out.'      *d*

(I have inserted the word 'I' which is not in the transcript but in my judgment should plainly be added) and that it was in part because Eagle was being nice to Fenway Properties that Eagle, through Mr Smith, negotiated for a profit share for Fenway Properties. This is an aspect of the eventual negotiations for sale to Cowan de Groot to which I must later return but it is relevant to the issue of what Mr *e* Smith told Mr Samuelson. Just as Mr Smith was not in my judgment at all likely to tell Mr Samuelson that no deposit had in fact been paid by Fenway Properties, so it seems to me that it was highly improbable that he would have gone further than saying that the principal behind Fenway Properties was a customer and well known to Mr Smith.

Mr Smith asked Mr Baines to get his solicitor to write to Mr Ranson to say that *f* Fenway Properties was not proceeding with the proposed purchase and Mr Flint was duly asked by Mr Baines to do this and did so by a letter dated 3 May 1989. This process took a few days in that Mr Smith made his request to Mr Baines right at the outset when Mr Ferriday lost patience whereas Mr Flint's letter was only written in the following week.

Mr Samuelson told Mr John Needleman of the approach from Mr Smith during *g* the week starting 24 April. He also told Mr Riches that he was getting an offer from Eagle which looked like being attractive but he did not give him any details until the following week, which effectively started on Tuesday, 2 May, the previous day being a bank holiday. Mr Samuelson was much closer to Mr John Needleman than he was to Mr Riches, who was to Mr Samuelson's knowledge a *h* prudent and experienced director who would need to be convinced that it was sensible to embark upon a project before accepting it. During the week starting 24 April Mr Samuelson only had a verbal statement from Mr Smith of what and where the five properties were and it was clearly necessary for more details to be supplied to him so that the Cowan de Groot management could decide whether or not to enter into the proposed purchase. I reject the suggestion made to me *j* that Mr Samuelson deliberately delayed telling Mr Riches or Mr Downey about the transaction so as to be able more readily to get it approved quickly because he, Mr Samuelson, knew it was dishonest or at best suspect. It was arranged between Mr Samuelson and Mr Smith that there should be a meeting at the offices of Russell Cash early on Tuesday, 2 May at which Mr Ferriday, who was due to go to London that day anyway, would bring the relevant documentary material.

**Ch D    Cowan de Groot Properties Ltd v Eagle Trust plc (Knox J)    733**

THE MEETING AT RUSSELL CASH LTD ON 2 MAY 1989

*a*  On 2 May 1989 Mr Russell, of Russell Cash Ltd, was driven into his office in Welbeck Street by Mr Samuelson for a meeting there with Mr Ferriday. Mr Russell and Mr Samuelson had been at school together and were on friendly terms. It was due to this that Russell Cash had been advising the Samuelson Group regarding property matters and after the Samuelson Group was taken over by Eagle this had led to Russell Cash also giving property advice to Eagle. Mr
*b*  Russell was therefore acquainted with Mr Ferriday and he was aware of the need for cash of Eagle because he had been engaged shortly before May 1989 in the realisation of property interests of Eagle at Heathrow with a view to raising cash.

Mr Russell himself was heavily committed at this time with other work and he arranged for the main burden of advising Mr Samuelson to be taken by Mr
*c*  Andrew Finnamore, who was also present at the meeting on 2 May. Mr Samuelson had explained to Mr Russell before that meeting that Eagle was willing to sell to Cowan de Groot the five properties but that Eagle had entered into a contract of sale in favour of another company, Fenway Properties, but that company was having difficulty in completing the contract and was therefore prepared in principle to assign the benefit of its contract. Mr Samuelson wished to have
*d*  Russell Cash's opinion concerning the attractiveness of a contract to buy the five properties for £1·5m. It was known to Mr Russell that it was proposed that the transaction should be put through very swiftly.

Mr Ferriday produced to the meeting at Russell Cash a bundle of documents which I find included copies of the Stewart Newiss valuations of the Birmingham, Bristol and Newport properties but which did not include any indication of who
*e*  made the valuations or when. So far as Mr Russell and Mr Finnamore were concerned these valuations were of relatively minor importance in that they were being asked at very short notice to give their own opinion of value and copy valuations by an unidentified valuer at an unascertained date were not of real significance to them. Mr Samuelson strenuously denied having seen the Stewart Newiss valuation figures on 2 May or immediately thereafter. When Russell Cash
*f*  sent on to Cowan de Groot on 3 May Mr Finnamore's estimates of value (he and Mr Russell were at pains to emphasise that they could not be described as valuations) there were deleted from the supporting material the valuations placed on the Birmingham, Bristol and Newport properties. This was done deliberately, and quite properly by Russell Cash because it would merely have confused the
*g*  issue to include them. In fact Mr Finnamore's estimates of value contained in the letter which he wrote on 3 May 1989 to Mr Riches at Cowan de Groot were for all but one of the five properties either higher than or very close to the Stewart Newiss valuations. Mr Finnamore's figures, arrived at after making such inquiries as the very short time available allowed, were as follows:

*h*

| Wolverhampton | £550,000 |
|---|---|
| Nuneaton | £100,000 |
| Bristol | £570,000 |
| Newport | £450,000 |
| Birmingham | £750,000 |
| | £2,420,000 |

*j*

It was only on the Birmingham property that he placed a significantly lower figure than Stewart Newiss had done, viz £750,000 against the latter's £800,000 with vacant possession or £860,000 subject to tenancies. Mr Finnamore told Mr Samuelson in the course of the morning of 3 May 1989 what his figures were going to be. I also find that in a conversation with Mr Russell Mr Samuelson was told by Mr Russell that the five properties might eventually realise a value of

£3m to £3·5m but there was no question of that statement being an expression
of present value.

I find that Mr Samuelson did see the valuation figures in the bundle produced
by Mr Ferriday but that he did not place any significant weight upon them
because what he was proposing to rely on was Russell Cash's view as to values. Mr
Ferriday did not stay very long at Russell Cash's office, about 20 minutes, during
which time he mostly talked about the development potential of the
Wolverhampton property in relation to which the bundle of papers he brought
with him included the very enthusiastic approval by the architect Mr T P Bolton
mentioned above without of course any mention of the later cold water poured
on that enthusiasm by the other surveyors. Nor by the same token did he produce
the Stewart Newiss valuation of the Wolverhampton property which at £150,000
was a great deal lower than Mr Finnamore's estimate of value of £550,000 and
only half the figure at which it was being offered to Cowan de Groot, viz
£300,000. Everyone present at the meeting on 2 May 1989 at Russell Cash's
offices appreciated that Mr Ferriday was acting as a vendor in commending the
proposed sale to Cowan de Groot and accordingly prudently took what he said
and any opinion evidence he produced with a pinch of salt and as needing
verification.

It follows from the findings made above regarding Mr Samuelson's knowledge
of the Stewart Newiss valuations of the Birmingham, Newport and Bristol
properties that I reject his evidence that he did not see them on 2 May 1989. On
the other hand I do not accept that he deliberately lied to the court in his
explanations of the fact that Titmuss Sainer & Webb's conveyancing files contained
copies of those valuations, as in fact they did. How they got on to that file remains
a mystery. Mr Fryzer, the partner at Titmuss Sainer & Webb who actually
conducted the conveyancing transaction, was unable to say how those copies got
onto his files and they plainly had not made any great impression on him, no
doubt because they did not affect the title, which is what he was concerned with.
Mr Samuelson's explanation for the presence in the Titmuss Sainer & Webb
conveyancing file of these valuation documents was different in chief from what
he said in cross-examination. Which of the two accounts (if either) was correct is
not a question which directly impinges on any of the issues in this action, and I
do not take time with this question.

MR RANSON IS INSTRUCTED

Shortly after the meeting on 2 May Mr Ferriday and Mr Smith gave Mr Ranson
instructions that the sale to Cowan de Groot was going through and gave him
details of the essential terms, namely that the transaction was to be on the same
terms as proposed for the sale to Fenway Properties which had now fallen through
but without the option to repurchase and with a £500,000 deposit and an
exchange of contracts in the very near future. I find that Mr Ferriday gave these
instructions personally, and not through an assistant, because he was very anxious
to ensure that the deposit was used to make the payment due to Pininfarina as
quickly as possible. Mr Smith also gave the instructions because he was, under
Mr Ferriday's directions, in direct charge of the sale of the five properties. Mr
Ranson's evidence, which I accept, was that both Mr Smith and Mr Ferriday spoke
to him on the subject. It does not signify much in which order they spoke.

FENWAY PROPERTIES PROFIT-SHARING

Mr Samuelson shortly after leaving the meeting at Russell Cash on 2 May 1989
rang up Mr Smith and had a conversation regarding what might be done for

**Ch D    Cowan de Groot Properties Ltd v Eagle Trust plc (Knox J)    735**

*a*  Fenway Properties. Mr Samuelson was prepared to concede on behalf of Cowan de Groot a share of eventual profit but not to make a lump sum payment, more especially as he had not as yet had the benefit of Russell Cash's opinion on values. Mr Smith indicated that a half share of profit would be acceptable and he also made it clear that Eagle were looking for completion within 48 hours. The reason for this urgency he gave as a threat by Eagle's bankers not to meet a wages cheque.

*b*  It was submitted to me that Mr Samuelson's acceptance of the concept of Fenway Properties taking a share in profit without checking up to see how valid their claim to have a legally arguable if not enforceable interest in the transaction was indicative of Mr Samuelson's understanding that Fenway Properties in fact had no interest at all but that if the transaction was to go through Eagle would require Fenway Properties to be given a profit share. I do not accept this. It may be that

*c*  if Mr Samuelson had found out that Fenway Properties had neither exchanged contracts nor paid a deposit and if he had objected to paying any share of profit to them he would have been told that he could take it or leave it but that if Cowan de Groot was to buy at £1·5m it would have to enter into a profit-sharing agreement with Fenway Properties, but I do not accept that Mr Samuelson did find out what the contractual position regarding Fenway Properties was. With

*d*  the benefit of hindsight it is now easy to say that Mr Samuelson should have made at least some inquiries on the subject of the alleged existing contract with Fenway Properties. In fact he made none and at first sight that looks to be at least careless and perhaps explicable by dishonesty. But when one takes into account that an honest and diligent professional conveyancer such as Mr Fryzer also took no such step although he knew from an early stage of the intention to enter into a profit-

*e*  sharing agreement with Fenway Properties the failure of Mr Samuelson and the other members of the board of Cowan de Groot to make an effective investigation of Fenway Properties' contractual position in relation to Eagle becomes more comprehensible and a long way short of indicating dishonesty.

*f*  THE BOARD OF COWAN DE GROOT IS INFORMED
    In the afternoon or evening of 2 May Mr Samuelson told both Mr Riches and Mr Downey of the possibility of buying the five properties from Eagle at £1·5m and described the price as attractive. He said the reason was that Eagle were in a cash crisis, hence the need for speed. I prefer Mr Riches's evidence to that of Mr Samuelson on the question whether Mr Samuelson gave Mr Riches any details

*g*  about the prospective purchase at the usual management meeting of Cowan de Groot directors on Friday, 28 April to the effect that he did not. Mr Samuelson knew Mr Riches would need to be satisfied that the transaction was both worth pursuing and proper and he did not know enough to warrant giving Mr Riches any details on Friday, 28 April before receiving any documentary information himself.

*h*
    SOLICITORS ARE INSTRUCTED
    Quite early on 3 May 1989 Mr Samuelson gave to Titmuss Sainer & Webb a warning that there was a proposal on foot for a purchase transaction that would need great expedition and that Mr Ranson would be acting for the vendor. This was a normal and prudent step. His contact was Mr Corman, who told him that

*j*  the partner who would normally have dealt with such a matter was not available and that it would be handled by Mr Fryzer, who had lately been made a partner. Mr Fryzer gave evidence before me. No one challenged his honesty and his conveyancing expertise revealed two flaws in Eagle's title which had escaped Mr Ranson. He kept very full notes of most of his dealings. On the other hand it was

evident that he had given very long and anxious consideration to the events of May and June 1989 before giving evidence in late December 1990 and in some *a* respects he had persuaded himself that events not recorded in his notes had taken a particular course rather than having a direct recollection of them.

Mr Fryzer had two telephone conversations with Mr Ranson, who told him where the five properties were, their insurance values, the total proposed price of £1·5m and the deposit of £500,000 with exchange that very day, giving as the reason for Eagle's hurry the possibility of a take-over. Fenway Properties was not *b* mentioned save to record the fact that there were available replies to preliminary inquiries made to a previous purchaser. Mr Ranson knew perfectly well that there had been no exchange with Fenway Properties and he therefore said nothing at all about any rights or interest it might still have.

*c*

COWAN DE GROOT BOARD MEETING

At Cowan de Groot's offices there was a board meeting shortly after 2 pm with all the directors, Mr Samuelson, Mr John Needleman and Mr Riches present together with the company secretary, Mr Downey. The formal minute prepared by the latter recorded the meeting as having been held at 10 am that morning and that Mr John Needleman was not there. I find that Mr Downey was mistaken *d* about those two aspects and that Mr Samuelson, who signed the minutes, was careless in doing so. In my judgment Mr Downey confused the board meeting in the afternoon of 3 May with the informal notification that Mr Samuelson gave to Mr Riches and himself the previous afternoon. The formal minute in any event did not record much that was discussed and decided at the board meeting. It did record that Mr Samuelson reported he had learnt that Eagle was seeking to dispose *e* of five properties for £1·5m, that it would be necessary to act very quickly as the transaction would need to be completed by the close of business on 4 May 1989 and that it was agreed in principle that negotiations with Eagle should continue. What were omitted from that minute but were discussed at the board meeting were the following points, all of which were reported by Mr Samuelson to the meeting: (a) that a deposit of £500,000 was required to be paid on exchange; (b) *f* that there was a prior purchaser, Fenway Properties, who had signed and exchanged contracts and paid a deposit of £150,000 but had failed to complete and was currently unable to do so; (c) that it would be necessary to enter into some form of profit-sharing agreement with Fenway Properties to secure their withdrawal and that a fifty-fifty split was suggested; (d) that an estimate of value *g* of the five properties was going to be provided by Russell Cash in a figure of £2·4m and that an indication had been given by that firm that ultimately they could realise £3m to £3·5m after development.

Mr Riches was concerned at the unusual features of the proposed transactions, particularly the size of the deposit and the speed with which the exchange was to be made. Other features which worried him were the question of Eagle's possible *h* insolvency and the effect this might have on the deposit and the role that Fenway Properties was playing. Mr Riches did not altogether trust Mr John Needleman or Mr Samuelson and he wanted to be sure that neither of them nor anyone connected with Eagle had any connection with Fenway Properties. Mr Downey, who had experience of insolvency work, was concerned about the possibility of a sale by Eagle at an undervalue followed by Eagle's insolvency. At one stage in the *j* discussion when Mr Riches was expressing some reservations about allowing Cowan de Groot to embark upon the proposed transaction, Mr John Needleman suggested that, if Cowan de Groot did not engage in it, he and Mr Samuelson in their individual capacities might do so. Mr Samuelson demurred at this and it was not pursued because Mr Riches was sufficiently satisfied with Mr Samuelson's

explanation to agree to the transaction proceeding subject to the advice of Cowan
*a*  de Groot's solicitors and subject to conducting a company search on Fenway
Properties and getting a confirmation that Fenway Properties' interest in the
contract had terminated. In particular Mr Riches accepted Mr Samuelson's
explanation that Eagle was suffering from a cash crisis and was under pressure
from its bankers, who might not meet a wages cheque, as an explanation for the
speed of the proposed exchange. The concept of a 50% profit-sharing arrangement
*b*  with Fenway Properties was accepted subject to Cowan de Groot being in sole
control of the properties and subject to Cowan de Groot recovering all its outlay
and costs before any question of profit arose. A stepped distribution of profit was
suggested by Mr Samuelson and in principle agreed to whereby Cowan de Groot
would take the first £250,000 of profit, Fenway Properties the next £250,000 and
*c*  any additional profit would be divided equally. This has the obvious advantage
from Cowan de Groot's point of view that if there is a profit Cowan de Groot
would get at least half of it and if it was under £250,000 the whole of it. Overall
it was clear that in the light of Russell Cash's opinion on values the proposed
transaction had all the appearance of being likely to yield a substantial profit and
the apparent oddities such as speed and the size of deposit due to Eagle's cash
*d*  problems did not appear to present an insuperable objection so long as their
solicitors did not advise against the transaction. After the board meeting Mr
Downey went to Titmuss Sainer & Webb's offices to liaise with Mr Fryzer, Mr
Riches set about organising the loan of the £1·5m required from Cowan de
Groot's bankers and Mr Samuelson reported to Mr Smith that in principle the
transaction was approved by Cowan de Groot, which would agree the tiered
*e*  profit-sharing arrangement, and asked that confirmation be given to Cowan de
Groot's solicitors that Fenway Properties would withdraw from the transaction
and would accept the proposed profit-sharing arrangement. He did not ask for
further information regarding the principal behind Fenway Properties. Nor if it
be material do I find that Mr Smith and Mr Samuelson entered into an enforceable
*f*  agreement on behalf of Fenway properties and Cowan de Groot respectively
regarding a profit-sharing arrangement. All there was was an intention by Mr
Samuelson that the tiered arrangement mentioned above would be acceptable.

CONSULTATIONS AT THE SOLICITORS' OFFICES
    Mr Downey spent the late afternoon with Mr Fryzer. He passed on the concern
*g*  felt by Mr Riches regarding Mr Samuelson's past involvement with Eagle, the
speed of the transaction, the size of the deposit, the possibility of Eagle's insolvency
and Fenway's involvement. As regards the latter the possibility of there being a
side-deal between Fenway and Mr Ferriday was specifically raised. Mr Fryzer was
told of the discrepancy between the price being asked and Russell Cash's advice
regarding value and of Eagle's apparent cash crisis. He was aware of a
*h*  memorandum prepared by Professor Adams regarding the provisions of s 238 of
the Insolvency Act 1986 and having consulted it again he advised that there was a
risk if Eagle went into liquidation within two years that the transaction might be
open to attack as having been made at an undervalue for the purposes of the
section, that is to say a transaction entered into by a company for a consideration
*j*  the value of which in money or money's worth was significantly less than the
value in money or money's worth of the consideration provided by the company.
He also drew attention to the provisions of s 238(5), which provides as follows:

    'The court shall not make an order under this section in respect of a
    transaction at an undervalue if it is satisfied—(a) that the company which
    entered into the transaction did so in good faith and for the purpose of

carrying on its business, and (b) that at the time it did so there were reasonable grounds for believing that the transaction would benefit the company.'

Mr Fryzer accepted in cross-examination that the saving provision regarding transactions made in good faith would not have been applicable if the fact was that the directors of Eagle knew they were selling at such an undervalue. Mr Fryzer, who was a conveyancer rather than a company law specialist, decided to consult a partner senior to him, Mr Corman, who was such a specialist and moreover was well acquainted with Mr Samuelson, and had acted for Cowan de Groot in company and commercial matters since Mr Samuelson became its chairman. Notably Mr Corman had been involved in the abortive negotiations by Eagle to sell two of its subsidiaries to Cowan de Groot in February 1989.

MR CORMAN IS CONSULTED

Mr Corman saw Mr Fryzer and Mr Downey at about 6 pm on the same day, 3 May 1989, and having heard a summary of the proposed transaction from them decided that there were two matters upon which Mr Samuelson should be personally questioned. The first was whether Mr Samuelson had such a shareholding or had or had lately held such an office in Eagle as to cause the proposed transaction to need shareholder approval pursuant to the Stock Exchange 'Yellow Book'. The second concerned the possibility of the proposed transaction being set aside by a liquidator of Eagle and in that context Mr Corman wished to know whether Mr Samuelson was satisfied that Eagle was solvent and whether he considered that the directors of Eagle were aware that they were apparently entering into a transaction at an undervalue. So, in the presence of Mr Downey and Mr Fryzer, Mr Corman telephoned Mr Samuelson on a loudspeaker telephone so that the former two persons were able to hear what was said on either side. Although both Mr Downey and Mr Fryzer took notes only the former's survive and they are clearly abbreviated.

Mr Corman satisfied himself that because Mr Samuelson had only been a director of a subsidiary of Eagle, viz Samuelson Group, and was only a 1% shareholder in Eagle no shareholder consent would be required by the Stock Exchange rules. He asked Mr Samuelson whether Eagle was solvent and was told that it was. This was, I find, Mr Samuelson's genuine opinion on this point. It appears to have been correct at the time and I do not accept that Mr Samuelson was seeking to deceive Mr Corman into thinking that Eagle was solvent when he knew or suspected that it was not. Mr Samuelson did not tell Mr Corman that a threat had been made not to meet Eagle's wages bill. Both Mr Downey and Mr Fryzer were aware that the basis upon which Cowan de Groot was offered the five properties at £1·5m was that Eagle was in a cash flow crisis and that its existing purchaser, Fenway Properties, was not in a financial position to complete as quickly as Eagle wanted. This I find was conveyed to Mr Corman. Mr Corman also asked Mr Samuelson about Fenway Properties' position. Mr Downey's abbreviated note about this reads:

'(ii) share—Fenway can complete—under 21 days—they will walk away Fenway Properties Ltd—Eagle Trust are intermediaries—can only assume quick completion. Previous Eagle valuation was £1·7m. Do Eagle know of £2·4m? No—J.S.'

Although Mr Downey's note uses the words 'can complete', I do not accept that Mr Samuelson categorically stated that it was certain that Fenway Properties would complete within 21 days, since any such definite assertion would have

*a* been contrary to what he had said earlier to Mr Downey and the other Cowan de Groot directors, namely that Fenway Properties was not currently able to complete fast enough for Eagle. I find that Mr Samuelson was explaining the basis upon which the profit-sharing arrangement with Fenway Properties was founded, namely that the latter had the benefit of a contract and could well complete but with a profit-sharing agreement of the sort proposed with a tiered distribution of net profits would abandon its contract with Eagle. Mr Samuelson also said that he

*b* did not know anyone connected with Fenway, with whom he had no direct contact since Eagle was acting as intermediary. Mr Samuelson did not tell Mr Corman what he had told his fellow directors that the principal behind Fenway Properties was a customer of MCP Building Supplies Ltd. Mr Corman accepted what Mr Samuelson said without further investigation. No one suggests he was not acting honestly in doing so, although it was suggested that his inquiries were

*c* perfunctory. Here again it is easy to be wise after the event. I do not consider that Mr Corman was acting in any way negligently or improperly in taking his client's word at its face value. So far as valuation considerations are concerned I find that Mr Corman received a factually inadequate assurance from Mr Samuelson. The actual question asked by Mr Corman was whether or not Eagle were aware of the

*d* £2·4m opinion on value expressed by Russell Cash. The answer to that question was fairly obvious in that a prospective purchaser is not likely to tell a prospective vendor of a higher valuation than the current asking price. No doubt different considerations would apply to a lower valuation. However I am satisfied that Mr Samuelson knew what Mr Corman was intending to ask, namely whether the Eagle directors were aware that they were selling at an undervalue. His answer

*e* that Eagle's last valuation was £1·7m was inaccurate because there was no such valuation, as Mr Samuelson knew. I do however accept his evidence that he was not seeking to deceive Mr Corman but was stating compendiously (and inaccurately) the effect of Mr Smith telling him that there was £200,000 in the transaction for Cowan de Groot over and above the asking price of £1·5m. Mr Corman closed the interview by saying that there was no harm in making a

*f* profit. That is the sort of generalisation that does not bear close examination since it is self-evident that there are many ways of making a profit which are highly reprehensible and indeed illegal. I do not consider that it was intended or understood to mean more than the fact that a profit is highly probable is not of itself a valid reason for refraining from entering into a given transaction so long as there is no evidence of fraud, which on the evidence before Mr Corman there

*g* was not. It clearly was not intended to mean that if a profit was going to be made no other considerations mattered.

THE LETTER OF 3 MAY 1989
    Among several telephone conversations on 3 May 1989 between Mr Fryzer and
*h* Mr Samuelson there was one in which the former advised the latter of the need to ensure that Fenway Properties was effectively withdrawing from its contract (as they supposed it to be) with Eagle. The letter written by Pearson Rowe & Co on 3 May to Ransons saying that Fenway Properties no longer wished to proceed with the proposed purchase of the five properties was received by Mr Ranson at about 3.15 pm that day. He had previously been instructed by Mr Ferriday that
*j* it would be coming and to send it on to Cowan de Groot. This he did about an hour later and Mr Samuelson saw it shortly thereafter. I find on balance that Mr Samuelson dropped it in on Mr Fryzer that evening but not much turns on the precise time. Reliance was placed on behalf of Eagle on the inadequacy of the letter as a formal renunciation by Fenway Properties of its supposed contractual

rights. Mr Fryzer in evidence accepted that Mr Samuelson did not view the latter
as satisfactory. Mr Samuelson disagreed with that evidence and said he thought it    *a*
was. On this point I prefer Mr Samuelson's evidence. The letter from Pearson
Rowe & Co was not of course addressed to Cowan de Groot or its subsidiaries but
it would in my view have placed an immense obstacle in the path of any attempt
by Fenway Properties to seek specific performance as against Cowan de Groot had
there been a contract in existence between Eagle and Fenway Properties. Far more
important however to a conveyancer than any question of the adequacy of the    *b*
letter as a release by Fenway Properties was the fact that there was no entry on the
register or caution to protect Fenway Properties' contract so that Cowan de Groot
on getting a clear search, as it did, could safely contract with Eagle. Mr Fryzer was
a conveyancer and it is this consideration which explains the fact that he did not
feel it necessary further to explore the precise mechanics of the release or
renunciation by Fenway Properties of any contractual rights which it had.    *c*

THE LETTER OF 4 MAY 1989
    The fact that Mr Ferriday personally told Mr Ranson that the letter of 3 May
1989 would be coming from Fenway Properties' solicitor is an indication that Mr
Ferriday took an interest in smoothing the path for the contract with Cowan de    *d*
Groot to go forward. Mr Ferriday, I find, also took an active part in procuring the
sending of another letter by Pearson Rowe & Co, this time on 4 May. Mr Baines
at Mr Ferriday's specific request told Mr Flint of Pearson Rowe & Co early on 4
May to send a letter to Ransons reading:

    'Our client asks us to bring to your attention the fact that Fenway Properties    *e*
    Ltd are entering into a joint venture with Cowan de Groot plc in relation to
    this property transaction . . .'

Mr Flint did as he was asked. He inquired of Mr Baines what it was about and
particularly whether his firm Pearson Rowe & Co was to be involved in the joint
venture mentioned. He was told that it would not and at that point Mr Flint lost    *f*
interest and did not pursue the matter. It is very doubtful whether he would have
found much out from Mr Baines about the nature of the joint venture, for Mr
Baines was wholly unable to give any coherent account of what he understood
the joint venture referred to actually was to consist of. I find that he was effectively
thoroughly confused by Mr Ferriday, as the latter intended, and that he, Mr
Baines, had no clear idea at all of what was likely to be involved in the joint    *g*
venture or that it would confer significantly valuable rights in Fenway Properties.
I am far from able to accept all Mr Baines's evidence but on this aspect his evidence
is in tune with what was said by Mr Ranson and I prefer it to Mr Ferriday's
evidence. Mr Ranson again was warned of the imminent arrival of the letter by
Mr Ferriday. He too asked what the joint venture was about, but, as not    *h*
infrequently happened with Mr Ferriday, was quickly made aware that this was
not anything that he need or should concern himself with. In conformity with
his practice when acting for Mr Ferriday on occasions when there was no improper
act asked of him personally Mr Ranson did as he was told without asking any
further questions. The letter was received by Mr Ranson at 9.54 am or shortly
thereafter and although he intended to send it on to Titmuss Sainer & Webb    *j*
when he sent a fax to them at 3.25 pm he did not do so until 9.48 pm that same
evening. The letter had no effect upon the course of events and is only significant
in showing that Mr Ferriday was involved in paving the way for the profit-sharing
agreement between Fenway Properties and Cowan de Groot. He had no clear idea

at this stage what this might produce as an end product but I am satisfied that he
*a* recognised in Mr Baines someone whom he could manipulate quite easily.

The company search on Fenway Properties revealed that it was a £2 company
with two directors, Mr and Mrs Baines, and that Mr Baines's only other
directorship was in his heating company. This did not reveal any substantial
organisation but equally it did not reveal any evident connection with Mr
Samuelson, Mr John Needleman or Mr Ferriday or indeed Eagle or its subsidiaries.
*b* In effect the results of the search showed nothing.

There were two significant last minute changes in plan made on 4 May 1989.
The first was that because defects were discovered by Mr Fryzer in the title
deduced on behalf of Eagle to the Bristol and Newport properties the agreement
was altered from one of outright purchase and sale of the five properties to the
grant of an option to purchase the Bristol and Newport properties and a sale of
*c* the other properties. A positive obligation was placed upon Eagle to use its best
endeavours to obtain a marketable title to the Bristol and Newport properties.
The modification was devised by Mr Fryzer and did not involve any alteration of
the consideration for any of the five properties although it did make the deposit
of £500,000 an even larger proportion of the price to be paid on completion. Mr
*d* Samuelson consulted Mr Russell about the wisdom of going on with the
transaction in the light of the title difficulties regarding the Bristol and Newport
properties. Mr Russell advised against going on unless or until the conveyancing
problems were solved. He saw no objection to dealing with the problem by the
grant of an option. Mr Samuelson's consultation of Mr Russell provides some
indication that Mr Samuelson had a genuine concern to be as sure as possible that
*e* this was a prudent transaction for Cowan de Groot to embark upon, rather than
putting through a scheme which he knew to be fraudulent. Equally I do not
consider that the fact that Mr Samuelson was keen for the transaction to go
forward, rather than to wait for the conveyancing problems to be ironed out, is
indicative of any consciousness on his part of a dishonest scheme.

The other significant last minute change in the transaction was the introduction
*f* of Pinepad as the purchaser and grantee of options in place of Cowan de Groot.
This was a perfectly normal technique to adopt in acquiring a property for a
group of companies and was done for accounting and fiscal reasons. As mentioned
at the outset, Pinepad was a wholly-owned subsidiary of Cowan de Groot. Its sole
director was Mr Samuelson. Its sole function at this stage was to enter into the
transaction in place of Cowan de Groot, its holding company. Cowan de Groot
*g* funded the transaction through its own banking facilities. Pinepad was not a
nominee however in the strict legal sense of holding the benefit of the agreement
on trust for Cowan de Groot. On a resale at a profit it would have been Pinepad,
rather than Cowan de Groot, that would have been liable to corporation tax on
any chargeable gain. The relationship between Cowan de Groot and Pinepad was
*h* one of creditor and debtor rather than beneficiary under a bare trust and trustee
or nominee.

The agreement was exchanged at about 11.20 pm on 4 May despite a further
hitch in that both Mr Smith and Mr Ferriday, either of whom might have been
expected to sign on behalf of Eagle, were in the United States of America that day
and not available to sign. Mr Samuelson played an active part in finding a director
*j* of Eagle to sign. He first contacted Mr Smith by telephone in New York, who
said Mr Baker, the finance director, would sign and then, when Mr Baker proved
not to be obtainable, Mr Samuelson contacted Mr Whiley, who came and having
checked with Mr Ferriday that it was in order to sign and exchange did so on
behalf of Eagle. Here again, while I accept that Mr Samuelson was showing

himself keen, and indeed keener than Eagle for all their cash crisis, to proceed to exchange, it does not in my view follow from that that Mr Samuelson was *a* deliberately hastening on what he knew to be an improper transaction. He was satisfied he had a good bargain on Cowan de Groot's behalf and he was keen to conclude it.

Mr Ferriday's principal objective of securing a payment to Pininfarina for the benefit of the Laforza car project was realised in that Mr Ranson on Mr Ferriday's instructions paid £400,294·20 to Pininfarina on 8 May, having received the *b* £500,000 deposit on 4 May. The delay was caused by the fact that Ransons held the £500,000 deposit as stakeholders until clear local searches were obtained on the properties sold by 8 May, whereupon Cowan de Groot agreed to permit the deposit to be held by Ransons as agents for the vendor Eagle, thereby freeing it in Mr Ranson's hands to be dealt with as directed by Mr Ferriday.

Finally, as regards the events of 4 May there remains to be dealt with a *c* telephone call that Mr Fryzer had shortly after 3 pm with a person whom he thought to be Mr Flint. Mr Fryzer and Mr Downey both made notes recording that this conversation took place and it is clear that it did. The record kept by Mr Fryzer showed that he was told by the other party to the conversation, whom I shall call 'Flint', that he 'Flint' had written the fax-letter regarding the joint *d* venture mentioned above whereupon Mr Fryzer corrected this and said he understood it to be a profit-sharing agreement with Cowan de Groot in complete control and outlined the tiered profit distribution mentioned above. 'Flint' indicated that these terms were broadly in agreement with his instructions. Mr Flint, the partner in Pearson Rowe & Co, was very firm in his evidence that he had no such conversation with Mr Fryzer on that day and supported this assertion *e* by saying, inter alia, that he would certainly have noted it had it occurred because it would have been of great importance to Fenway Properties and Mr Baines. I accept this evidence from Mr Flint, whose bona fides is not challenged. It was submitted on behalf of Cowan de Groot that both the notes made by Mr Downey and Mr Fryzer referred to the fact that 'Flint' said he had sent the fax dated 4 May *f* about the joint venture and that is correct. As already stated it was sent at about 9.54 am on that day but the only people who would be at all likely to know of this were the parties to the fax, Mr Flint and Mr Ranson, and this indicates, it is submitted, that it was the real Mr Flint who had the telephone conversation with Mr Fryzer and that because his firm had dropped out of it as Mr Baines had told him early that morning Mr Flint paid no attention and made no note. It is indeed *g* puzzling to know what happened but on balance I consider that 'Flint' was an imposter put up by Mr Ferriday. I appreciate, as Mr Ferriday himself pointed out, that it would be a very risky thing to do to impersonate a solicitor to another solicitor. The risks of not getting the professional jargon right would be considerable and there is the point that Mr Ferriday was not sent a copy of the fax of 4 May concerning the joint venture. Nevertheless I am unable to accept that *h* Mr Flint would not have been interested to hear that the joint venture from which his firm had been excluded that very morning was perhaps going to produce £250,000 or more. Mr Flint had put a good deal of work into this matter and for it to go off in such a way was plainly disappointing. His disinterest would have been superhuman if he failed to react to or recall the news that his client might well be making a £250,000 or greater profit. In addition Mr Flint struck *i* me as not only an honest witness, no one doubts that, but also a competent and efficient solicitor and a reliable witness. On a balance of probabilities I accept his evidence.

The main practical effect of this conclusion is that it demonstrates that Mr

**Ch D    Cowan de Groot Properties Ltd v Eagle Trust plc (Knox J)    743**

*a* Ferriday was promoting a dishonest scheme right from the outset of the so-called joint venture in putting forward someone to agree the profit-sharing agreement purportedly on behalf of Fenway Properties. It is quite neutral on the question whether or not Mr Samuelson was privy to such a scheme. The second effect of my finding that 'Flint' was not Mr Flint is that there can be no question of the conversation between 'Flint' and Mr Fryzer having created any legally binding profit-sharing agreement between Fenway Properties and either Cowan de Groot

*b* or Pinepad. Nor do I find that any such agreement was created at any other time.

POST-EXCHANGE STEPS

The absence of any document containing the proposed profit-sharing agreement was appreciated and sought to be rectified shortly after the exchange of documents

*c* by Mr Samuelson asking Mr Fryzer to produce a draft of such a document. Mr Fryzer continued to be very busy with the conveyancing aspects of this and other transactions and not immediately available, so the first rough draft was in fact produced by Mr Samuelson. It set out the tiered profit shares already described. This approach was abandoned by Cowan de Groot and Pinepad in favour of an arrangement whereby Fenway Properties would be paid a lump sum. The reasons

*d* for that change were twofold. First, it became increasingly clear to the board of Cowan de Groot that Russell Cash's figure of £2·42m was on the conservative side. Mr Samuelson and Mr Finnamore visited four of the five properties on 11 and 12 May 1989 and Mr Finnamore thereafter on 24 May 1989 wrote a letter recommending how they should be marketed. His recommendations were so far

*e* as figures were concerned in summary as follows:

| | |
|---|---|
| The Newport property | £500,000 to be asked to achieve £450,000 to £500,000 |
| The Bristol property | £570,000 |
| The Nuneaton property | £80,000 to £100,000 perhaps more for a neighbouring owner |
| The Wolverhampton property | No figure was put on this but its development potential was noted |
| The Birmingham property | £1·2m to be asked to achieve £1·05 to £1·15m. |

*g* It is clear that he did not consider that any of the figures mentioned in the earlier report of 3 May totalling £2·42m was too high but rather the contrary.

THE LUMP SUM PAYMENT

It stood to reason that if the ultimate realisations were likely to be greater than

*h* at first anticipated a lump sum payment to Fenway Properties based on the original expectations would be likely to be more rewarding than a fifty-fifty split of net profits. The second reason for the change to a lump sum payment was that advice was taken from Touche Ross on the fiscal implications of the proposed profit-sharing agreement. Mr Riches wrote on 18 May seeking that advice and saying that the half share of profit to be realised was estimated at £500,000 to

*j* £1m. Touche Ross's advice was to the effect that a lump sum payment would have beneficial fiscal repercussions. It is not necessary to go into what the reasons given for this were. It suffices for my purposes to record that the change to a lump sum transaction was in my judgment made because it was recommended by the professional advisers of Cowan de Groot and Pinepad and adopted by the

board of Cowan de Groot for valid fiscal and commercial reasons and not because
it was promoted by Mr Samuelson for any sinister reason.

    The question whether or not Cowan de Groot or Pinepad was in fact bound to
give Fenway Properties a profit share was discussed by the Cowan de Groot board
internally and not with Mr Fryzer. Mr John Needleman, never a man to make
unnecessary financial concessions, questioned whether any payment need be
made. Mr Riches and Mr Samuelson both took the view that there was a moral
obligation on Cowan de Groot which it should honour, and in addition Mr
Samuelson, I find, quite genuinely considered there was probably a legal obligation
as well. Mr Fryzer, when asked, raised the question whether there was a legal
obligation but did not take the matter further, recognising the right of Cowan de
Groot to honour what the board regarded as their moral obligation.

    The board of Cowan de Groot agreed upon the principle of making a lump
sum offer to Fenway properties and left it to Mr Samuelson to implement. He
instructed Mr Fryzer to inquire of Fenway Properties' solicitors whether a lump
sum would be acceptable and if so what sum. Mr Fryzer left a message with Mr
Flint of Pearson Rowe & Co late in the afternoon of 22 May 1989 to ring back
but, before getting a response from Mr Flint, Mr Fryzer was instructed by Mr
Samuelson on 23 May to put an offer of £250,000. This figure had been agreed
by informal discussion in the board of Cowan de Groot and was taken from the
similar figure in the first stage of the proposed tiered profit-sharing arrangement.
In effect what was suggested was that Fenway Properties be guaranteed the share
they would have been entitled to if the profits were £500,000 but should forgo
any share of larger profits. There had to date been no movement from Fenway
Properties to seek the execution of a formal profit-sharing agreement, which with
the benefit of hindsight is a suspicious feature. But it did not arouse the suspicions
of either Mr Riches or Mr Fryzer at the time. In the circumstances it seems
unrealistic to regard Mr Samuelson's failure to take precautions based on Fenway
Properties' failure to react between 4 May when the agreement was exchanged
and 23 May when the offer of £250,000 was made as an indication of Mr
Samuelson's complicity in promoting a sham profit-sharing agreement.

    Mr Fryzer did make contact with Mr Flint on 23 May and made him a without
prejudice offer of £250,000 to leave the five properties in Mr Fryzer's clients'
hands alone. Mr Fryzer, who thought he had already spoken to Mr Flint on 4
May, also told Mr Flint of the late developments in the negotiations leading up to
the exchange of the agreement between Eagle and Pinepad, that is to say the
option agreement regarding the Bristol and Newport properties and the
substitution of Pinepad for Cowan de Groot. This is entirely consistent with Mr
Fryzer's evidence that he thought he spoke to Mr Flint on 4 May but does not
disprove Mr Flint's evidence that he was not a party to the conversation on that
day with Mr Fryzer. Mr Flint was extremely surprised at Mr Fryzer's offer but
maintained a non-committal silence and did not express his surprise to Mr Fryzer,
contenting himself with saying that he would take instructions. Mr Flint did
however record that perhaps Mr Fryzer had rung the wrong solicitor. That
contemporaneous note in my view does support Mr Flint's evidence that he knew
nothing previously of the tiered profit-sharing proposals and that if he had been
party to the conversation with Mr Fryzer on 4 May he would have recorded it.

    Mr Flint I find passed on the offer of £250,000 to Mr Baines, who initially was
as surprised as Mr Flint. Mr Baines then rang Mr Smith to find out what was
going on. Mr Smith told Mr Ferriday of Mr Baines's call and Mr Ferriday took
control of the situation by ringing Mr Baines and telling him that there had been
a mistake in that Cowan de Groot's solicitors had rung the wrong solicitors and

that he Ferriday would deal with the matter. Mr Baines on 25 May rang Mr Flint
*a* to say that he was dealing with the matter direct. This meant that Mr Flint need
no longer concern himself with the matter and he did not.

I find that Mr Ferriday learnt all he needed to know from the report from Mr
Smith that Mr Baines was being offered £250,000. This was a quite sufficient
indication to him that Cowan de Groot were likely to be anticipating a considerably
greater total profit than £500,000 out of the transaction. I reject Mr Ferriday's
*b* evidence that he elicited details about Cowan de Groot's likely profit from Mr
Russell of Russell Cash and accept the latter's evidence that he did not have any
contact with Mr Ferriday about the five properties after the meeting early on 2
May.

On 1 June 1989 completion duly took place of the contract in the agreement
for the sale of the Nuneaton, Wolverhampton and Birmingham properties and
*c* the balance of the purchase price of £900,000 after the £500,000 deposit, subject
to usual apportionments, was paid and transfers were executed in favour of
Pinepad.

The next relevant event with regard to Fenway Properties was that Mr
Samuelson was telephoned by someone unidentified in evidence pretending to be
*d* Mr Baines who told Mr Samuelson in blunt terms that £250,000 would not be
enough. I find this call was procured by Mr Ferriday and was not made by Mr
Baines, whom Mr Ferriday had successfully mystified as to what was going on.
Mr Samuelson said he would have to confer with his colleagues on the board of
Cowan de Groot and did indeed consult Mr Riches and Mr Downey. They
discussed various possibilities, including an immediate payment of £250,000
*e* with additional payments of £100,000 when the Bristol and Newport properties
were disposed of, but eventually decided on an offer of £400,000 which they
regarded as representing a refund of the deposit which they thought Fenway
Properties would have forfeited to Eagle (it matters not whether that belief was
justified) plus the original £250,000. When the false Mr Baines rang back on 5
*f* June that offer of £400,000 was made to him and accepted on the basis that it was
to be made to 'Mr Baines' and not Fenway Properties. Before that occurred Mr
Ferriday had paved the way for him to intercept this payment in various ways.

First he provided Mr Smith with the text of a letter which Mr Baines was to ask
Mr Flint of Pearson Rowe & Co to send to Cowan de Groot. It was written by Mr
Ferriday in block capitals and read:

*g*
'LETTER FROM X'S SOLICITORS

TO Y

WE CONFIRM WE HAVE DISPOSED OF AN INTEREST IN "UPLIFT" VALUE OF THE
PROPERTY PURCHASE TO A THIRD PARTY, WHO WE UNDERSTAND IS IN DIRECT
CONTACT WITH YOURSELVES. WE FURTHER CONFIRM WE HAVE NO FURTHER CLAIM
*h* AGAINST Y OF ANY NATURE.'

The letters X and Y were intended to refer as follows. X was Fenway Properties
and X's solicitors were Pearson Rowe & Co. Y was Cowan de Groot. Mr Ferriday
got Mr Smith to give the text written out by Mr Ferriday to Mr Baines at a cricket
match on Saturday, 3 June 1989 with instructions to give it to Pearson Rowe &
*j* Co to send to Cowan de Groot. This was Mr Ferriday's method, as he frankly
admitted in evidence, of getting rid of Fenway Properties' current legal advisers
and making it possible for Mr Ferriday to introduce another legal representative
for Fenway Properties through whom he, Mr Ferriday, could procure the lump
sum payment in prospect from Cowan de Groot without Mr Baines understanding

exactly what was going on. At that stage the probability is in my judgment that
Mr Ferriday had not settled in his own mind what the mechanics for diverting     *a*
the lump sum would be and I do not consider that he had an ascertained third
party in mind. Mr Baines did as he was told but Mr Flint was not willing to send
the letter off on his notepaper on Mr Baines's behalf without more ado. In
particular he was concerned at the possibility of adverse repercussions in relation
to capital gains from the use of the words 'we have disposed of an interest'. He
therefore advised taking an accountant's advice and the upshot of that was that at     *b*
the expense of grammar the text as sent by Mr Flint to Cowan de Groot on 5 June
shortly after 2 pm read under a heading 'Fenway Properties Limited':

> 'We are instructed to write to you to confirm that our client company
> referred to above has no interest in the up lift value of the property purchase
> in favour of a third party and we understand the third party is in direct     *c*
> contact with yourselves. We also confirm that our client company has no
> claim against your company of any nature whatsoever.'

The second step taken by Mr Ferriday, having got rid of Pearson Rowe & Co
was to instruct a substitute firm, Messrs Beller Needleman & Co, through its
partner Mr Beller, who gave evidence before me. Mr Ferriday saw Mr Beller very     *d*
early on Monday, 5 June in his office in London and instructed him that he, Mr
Ferriday, was owed £300,000 commission by Cowan de Groot, that he wanted to
collect the commission but that he wanted not to reveal his identity. He told Mr
Beller that he was to contact Mr Samuelson who was the managing director of
Cowan de Groot and that the form of the invoice to be sent would be sent later to
Mr Beller for him to send on. Mr Beller did not seek to inquire into this     *e*
transaction. He duly received by fax from Ryco Trust in Jersey later that day the
relevant text of an invoice to Cowan de Groot:

> 'Attn of Mr J. Samuelson Beller Needleman represent a UK resident client
> . . . to agreed commission recoverable for introduction of the portfolio of
> properties [and the Nuneaton, Wolverhampton and Birmingham properties     *f*
> are set out] £300,000. Please remit to Beller Needleman.'

Mr Beller on the same day signed a letter intended to go with an invoice in the
terms instructed and his evidence, based on his firm's practice, was that it was
sent off to Cowan de Groot, marked 'For the attention of Mr J Samuelson'. The
letter gave Beller Needleman's client account bank account number and sort code.     *g*
Mr Samuelson's evidence was that this letter did not reach him. I find that letter
was not sent because it was very quickly superseded by a further instruction from
Mr Ferriday on the telephone the same day that the client was a Mr N Baines and
that the figure was £400,000 and not £300,000. Mr Beller accepted the change
in his client without demur and sent off the revised invoice in Mr Baines's name
in the sum of £400,000. This did reach Cowan de Groot. Mr Samuelson saw this     *h*
and at 6.20 pm in the evening of June 5, having consulted Mr Merrison in the
absence of Mr Fryzer of Titmuss Sainer & Webb, with Mr Riches's approval,
replied, asking for Beller Needleman's bank details and specifying a form of
receipt by Mr Baines for £400,000 payment receipt from Pinepad. Mr Beller had
not previously heard of that company but he was prepared to act for it if asked to     *j*
do so. Mr Beller did however think it prudent to get written confirmation that
he was instructed as Mr Ferriday said and accordingly Mr Ferriday provided Mr
Beller with a sheet of Fenway Properties notepaper with:

> 'With reference to fee from Pinepad of £400,000 please take bearer's
> instructions. Many thanks.'

It bore the seal of Fenway Properties impressed upon it and a signature 'John

*a* Baines'. Mr Baines's evidence was that he did not sign this nor did he or his wife, who as company secretary of Fenway Properties had custody of its seal, affix the seal or part with it to enable Mr Ferriday to affix the seal to this sheet of paper. I do not accept part of that evidence of Mr Baines, who I find was not telling the truth about this. I find that Mr Baines provided Mr Ferriday at the latter's request with several sheets of Fenway Properties notepaper and the company seal and that

*b* Mr Ferriday then produced the document quoted above which Mr Ferriday handed to Mr Beller early on June 6. I do not accept that Mr Ferriday stole the seal and had another made. He did not have the time for that. Mr Ferriday also at the same time on 6 June 1989 gave Mr Beller several more sheets of Fenway Properties notepaper and told him that Fenway Properties was a company he was

*c* using for this transaction and that it belonged to a friend of his, Mr Baines. Mr Beller was content to accept instructions from Fenway Properties on the strength of this documentation and early on June 6 he sent a fax to Mr Samuelson at Cowan de Groot enclosing another revised invoice on Fenway Properties paper and a draft receipt for and on behalf of Fenway Properties and N Baines Esq for £400,000 from Pinepad in respect of the five properties and not mentioning

*d* commission or any other reason for the payment but containing a number of fairly trivial clerical errors. Mr Samuelson was away from Cowan de Groot that day and Mr Riches asked Mr Downey to take, and he duly took, the advice of Titmuss Sainer & Webb regarding the form of the receipt to be taken. Mr Merrison of that firm in consultation with a tax partner devised the ultimate form of receipt which corrected the clerical errors and provided for a receipt by

*e* Beller Needleman and a signature from Mr Baines plus execution under seal on behalf of Fenway Properties. This form was cleared by Mr Merrison with Mr Beller. It was suggested for Eagle that the introduction of a firm Beller Needleman with a name identical to that of Mr John Needleman was a suspicious circumstance which should have put Mr Samuelson on his guard. The name in the firm name

*f* is derived from a Mr Andrew Needleman, a cousin of Mr John Needleman. Relations between the two cousins were not cordial. Mr John Needleman had fallen out with him, as with others, over a question of money. Mr Ferriday's activities through Beller Needleman were indeed nefarious but the fact that he resorted to that firm had nothing to do with any Needleman connection but to the fact that Mr Ferriday was rightly confident that Mr Beller would act on his

*g* instructions. Therefore, although Mr Riches and Mr Downey were understandably surprised at the name Needleman cropping up, they were quite right to permit their suspicions to be allayed because that was not in fact the source of trouble. By the same token I do not find that Mr Samuelson was at fault, in not being suspicious at the emergence of a solicitor's firm named Beller Needleman apparently acting for Mr Baines. On this score I find that Mr John Needleman

*h* raised the question of Beller Needleman having acted for Mr Ferriday in the past with Mr Samuelson but this was after the payment had been made, by which time it was too late to recover it save by taking proceedings. I base this on Mr John Needleman's evidence, which I accept on this matter. Mr Downey put the conversation between Mr Riches and Mr Samuelson about Beller Needleman's involvement a little later than the original deals on 2 and 3 May but cannot

*j* possibly be right because Beller Needleman had no involvement before 5 June. In any event Mr Riches, unlike Mr John Needleman, had no knowledge of any involvement of Beller Needleman with Mr Ferriday and was only concerned about the coincidence regarding the name Needleman which I have already dealt with. Finally, I do not accept that the fact that Mr Samuelson did not tackle Mr Ferriday about whether Beller Needleman had been acting for him on 5 and 6

June when Mr Samuelson was told some time later that Beller Needleman had
previously acted for Mr Ferriday is indicative of Mr Samuelson's dishonesty or of   *a*
his knowledge of Mr Ferriday's dishonesty. When Mr Samuelson was told where
the £400,000 paid out of Cowan de Groot's bank account had in fact gone he did
take steps to tackle Mr Beller about this. There was a conflict of evidence between
Mr Samuelson and Mr Beller as to what happened. Mr Beller's account was that
Mr Samuelson did call without appointment at his firm's offices in the spring of
1990, that he met Mr Samuelson as he, Mr Beller, went down the stairs and that   *b*
all Mr Samuelson said to him was 'I'm Jonathan Samuelson' and that there was no
conversation between the two of them about anything. Mr Samuelson's account
was that he did see Mr Beller and asked whether Mr Ferriday was involved in the
payment to Fenway Properties, to which Mr Beller replied that his client was
Fenway Properties and Mr John Baines and that Mr Ferriday was nothing to do
with it. I regret to say that I cannot accept Mr Beller's evidence upon this. I find   *c*
his account implausible in the extreme, whereas Mr Samuelson's, which I accept,
is intrinsically probable. I am assisted in this conclusion by the opinion which I
hold that Mr Beller may not have had an entirely easy conscience about his ready
acceptance of kaleidoscopically variable instructions from Mr Ferriday on 5 and 6
June.   *d*

The £400,000 was paid over from Cowan de Groot's bank account to Beller
Needleman's client account on 6 June 1989 to be held to Titmuss Sainer & Webb's
order until the receipt in the form agreed between Mr Merrison and Mr Beller
was received by Titmuss Sainer & Webb. As already stated, that form provided
for execution by Mr Baines and execution under seal by Fenway Properties. Mr
Ferriday procured the forging of Mr Baines's signature and used or directed the   *e*
use of Fenway Properties' seal on the receipt which Mr Beller had passed to him
for execution. Mr Beller received that document back on 8 June and received a
verbal release on 9 June and a written confirmation of it dated 12 June 1989 from
Mr Merrison. On 9 June on the strength of the verbal release he transferred
£398,000, retaining £2,000 in respect of his costs as agreed with Mr Ferriday, to
Ryco Trust in Jersey. From thence Mr Ferriday procured its transfer to Mr Martin   *f*
Boston, the solicitor mentioned earlier, to constitute part of a deposit on an
intended purchase transaction by Paramount Airways of shares in Owners Abroad
Ltd belonging to Eagle. This transaction was never completed and was in all
probability in itself a dishonest transaction on the basis of the explanation given
by Mr Ferriday in evidence, but that aspect is not relevant to these proceedings.
The £398,000 went neither to Fenway Properties nor to Mr Baines but was   *g*
intercepted by Mr Ferriday for his own purposes. Mr Samuelson, I find, had no
knowledge of what Mr Ferriday did with the money until long after the event,
nor did he have any knowledge of what Mr Ferriday was intending to do with
the money. Mr Baines did not go empty-handed away because I find that Mr
Ferriday handed over to him a Jaguar motor car in return for his co-operation in   *h*
such matters as getting Mr Flint to send letters and providing Fenway Properties
notepaper and the company seal. I reject Mr Baines's evidence that the Jaguar car
was in return for his management of a company in the Eagle Group during the
summer of 1989. Mr Baines was duped by Mr Ferriday into lending his aid to the
latter's schemes but Mr Baines was, I find, prepared to do things such as provide
Fenway Properties' notepaper and the company seal, which he must have known   *i*
were being used improperly by Mr Ferriday for his own ends just as he was
prepared to mislead HCF Bank into thinking that a deposit had been paid by
Fenway Properties when he knew perfectly well it had not. On the view I take,
although a victim, he was hardly an innocent one.

**Ch D    Cowan de Groot Properties Ltd v Eagle Trust plc (Knox J)    749**

MR SAMUELSON'S GUARANTEE

*a*  Another transaction with which Mr Beller was involved is one in respect of which I should make findings although on the view I take of the matter it is not relevant to any issue which I have to determine in these proceedings. This is that one week later than 6 June, when the £400,000 payment was made, Mr Samuelson went to Beller Needleman's offices to sign a guarantee of £1m indebtedness of Mr Ferriday to Mr Albert Wade. The origins of this transaction go back to the loan
*b*  which Mr Ferriday had made to the trustees of the settlement. Mr Ferriday as well as Eagle was becoming increasingly beleaguered financially between May and June 1989 and one possible source of money was the settlement. He had discussions with Mr Samuelson about repayment by the trustees of the settlement. Mr Samuelson was unable to raise any funds sufficient to repay the settlement's indebtedness although he did think he would be in funds in August 1989 because
*c*  he received an offer on 22 May 1989 from an American firm of attorneys on behalf of Iroquois Brands Ltd to purchase his 7,940,000 shares in Eagle on 22 May 1989 at 17p per share. Mr Samuelson made a counter-offer to sell at 22p per share, viz for £1,746,800, which was accepted by the American attorneys on 30 May. Completion was to be on 21 August 1989 or earlier if the buyer wished. In the
*d*  event that transaction was not completed but that is not relevant for my purposes. What is relevant is that Mr Samuelson was closely engaged with Mr Ferriday about the proposed sale of Eagle shares on or about 22 May since Mr Ferriday was attempting to negotiate the sale of a substantial holding in Eagle of which Mr Samuelson's holding was part to Iroquois Brands. It is also relevant that although Mr Samuelson was not in a position to cause the trustees of the settlement to
*e*  repay its indebtedness to Mr Ferriday since that would have involved selling a very large part of the Cowan de Groot holding he did have as he thought the prospect of substantial liquidity in August 1989. Since Mr Ferriday's cash needs were much more urgent than that, other sources of finance were needed and were found in the shape of Mr Albert Wade, chairman of companies with a substantial holding both in Eagle and Cowan de Groot. Mr Wade met Mr Samuelson and Mr
*f*  Ferriday on 13 June 1989 and agreed to lend Mr Ferriday £1m against Mr Samuelson's guarantee, which the latter agreed to give as a temporary substitute for the repayment of the settlement's indebtedness to Mr Ferriday. The solicitor chosen to prepare the necessary documents was Mr Beller. Mr Ferriday instructed him to prepare documents evidencing a loan of £1m by Mr Wade to Mr Ferriday and a guarantee of repayment by Mr Samuelson. Mr Samuelson called by
*g*  appointment at Beller Needleman's offices on 14 June 1989 to sign the guarantee. Mr Ferriday was there too and Mr Samuelson signed the guarantee. Mr Beller was I find acting for Mr Ferriday. There was no discussion on that occasion of the transaction regarding the five properties or the £400,000 payment made by Cowan de Groot. The actual form of guarantee then signed by Mr Samuelson was
*h*  not acceptable to Mr Wade and a slightly altered form of guarantee was sent by Mr Beller to Mr Samuelson to sign and he duly signed it at Mr Beller's offices two or three days later. He also signed a promissory note in support of it at the same time. Both were expressed to be payable on 23 August 1989. There was no provision that Mr Samuelson was to be released if Mr Ferriday's indebtedness from the settlement was repaid by some other source. Mr Ferriday in consideration
*j*  of Mr Samuelson's guarantee signed a letter dated 13 June 1989 (but I find signed the following day) confirming that he had no claim against Mr Samuelson for any profit share arising out of the Cowan de Groot share profit-sharing agreement and releasing Mr Samuelson from all his obligations in that respect. Mr Ferriday thereby also confirmed that he had no claim financial or otherwise against the

trustees of the settlement. So far as the first provision, the release of the benefit
from the Cowan de Groot share profit-sharing agreement, is concerned that letter    *a*
was in my view of no effect because Mr Ferriday had no right to any share of
profit for reasons given earlier. Mr Ferriday's evidence was that he thought he
still had a beneficial interest but held it for Mr Samuelson's children. I accept that
that was his view although it was in law incorrect but the practical result on either
basis was that Mr Ferriday was not giving up any beneficial interest. The release
of the trustees on the other hand was a dealing with his personal right to be repaid    *b*
the moneys he had advanced to the trustees of the settlement. Here again, as so
often was the case in the documents executed in connection with the settlement,
the drafting was very defective in that it was only intended that Mr Ferriday
should give up his right to be reimbursed if and to the extent that Mr Samuelson's
guarantee was enforced against him.                                                  *c*

The intended acquisition by Iroquois Brands of shares in Eagle was accompanied
by changes on the board of Eagle. Mr Malcolm Stockdale, the chairman of
Iroquois Brands, was appointed acting chief executive of Eagle on 12 June 1989
by a resolution of the board of Eagle which at the same time accepted the
resignations of Mr Ferriday and Mr Baker, the finance director. Mr Ferriday had
been replaced as chairman of Eagle by Mr Stockdale on 24 or 26 May 1989 but    *d*
remained chief executive until he resigned as a director on 12 June 1989. The
affairs of Eagle were at this stage in a state of crisis. The share quotation had been
suspended at 18p a share on 19 May 1989. At a board meeting of Eagle on 13
June 1989, ie after Mr Ferriday's resignation as a director, the programme for
disposal of assets was reviewed and it was noted that three MCP Building Supplies
Ltd properties, viz the Birmingham, Wolverhampton and Nuneaton properties,    *e*
had recently been sold to Pinepad for £900,000 but that it was apparent that only
£385,869 had been remitted to MCP Building Supplies Ltd. Mr Beaumont, the
company secretary, was instructed to write to Ransons and Mr Ferriday for a full
and prompt explanation. Mr Whiley stated that he believed that Pinepad also
held options to purchase two other properties, as well he might since he himself    *f*
signed the relevant document on 4 May. At that meeting it was also resolved to
ratify the affixation of the Eagle company seal to the transfers to Pinepad of the
Birmingham, Wolverhampton and Nuneaton properties, an action which was
recorded as having been authorised at short notice on 31 May 1989 by Messrs
Stockdale, Smith, Black and Whiley.

                                                                                    *g*

POST-COMPLETION DEALINGS

The subsequent dealings by Pinepad with the properties transferred to it on
1 June 1989 were as follows.

(a) *The Nuneaton property*                                                          *h*

Contracts for sale at £102,500 were exchanged on 4 July and completion took
place on 11 July. This was a transaction which had been in negotiation by Russell
Cash on behalf of Cowan de Groot and Pinepad since shortly after the agreement
was exchanged on 4 May 1989 and perhaps more significantly there had been
offers made by the same purchaser for the Nuneaton property in the sum of
£102,500 as long ago as 31 January 1989 which were known of by Mr Smith.    *j*

(b) *The Wolverhampton property*

This was known to all concerned throughout to be a site ripe for development
but without planning permission. A considerable amount of work was done by

**Ch D    Cowan de Groot Properties Ltd v Eagle Trust plc (Knox J)    751**

*a* architects on the instructions of Cowan de Groot to put together a scheme for submission for planning permission to be obtained and by Russell Cash to find tenants for the new development if and when constructed. The development proposals generated a great deal of interest. Planning permission was eventually secured on 18 December 1989 and the property was ultimately sold in October 1990 for £425,000.

*b* (c) *The Birmingham property*
   This was subject to two leases, one in favour of MCP Building Supplies Ltd and the other in favour of Servis Systems. The former were bad tenants, their financial predicaments have been described earlier, and that situation did not improve, so that in August 1989 the company went into administrative receivership. This *c* gave Pinepad, which by this time had changed its name to De Groot Properties Ltd, the opportunity to forfeit the lease, which it did, and that in turn enabled a profitable sale to be effected to the holding company of Servis Systems, the other tenant, at £1,250,000. Completion took place on 30 October 1989 of a contract exchanged on 6 October 1989.
   The Newport and Bristol properties, which were the subject of options, were *d* not the subject of an exercise of the option before 30 March 1990 when Eagle, by letters addressed to Cowan de Groot and Pinepad, claimed to rescind the agreement. As mentioned at the outset of this judgment Pinepad served notice on Eagle on 20 April 1990 claiming to exercise the option to purchase the Newport property for £250,000, the figure in the agreement. Offers in the region of £410,000 had previously been received for it by Russell Cash. On 25 April *e* 1990 the writ in the action by Pinepad to enforce the options in the agreement or to have them declared valid was issued. After the date of the writ, the Newport property was sold in June 1990 for £408,000 by agreement between the parties and the net proceeds of sale over and above the £250,000 option price which was on any view payable to Eagle, just under £151,000, abide the result of this action. *f* The Bristol property remains unsold.

VALUATION EVIDENCE
   The expert valuers called on either side agree the open market and forced sale values of the five properties as at 4 May 1989 as follows:

*g*

|  | Open market | Forced sale |
| --- | --- | --- |
| The Birmingham property | £1,000,000 | £850,000 |
| The Wolverhampton property | £500,000 | £400,000 |
| The Nuneaton property | £100,000 | £85,000 |
| The Bristol property | £475,000 | £430,000 |
| The Newport property | £450,000 | £385,000 |
*h* | Total | £2,525,000 | £2,150,000 |

   They both use the expressions 'open market' and 'forced sale' in the sense in which they are defined by the Royal Institution of Chartered Surveyors. The former is the best price at which an interest in the property might reasonably be *j* expected to be sold at the date of the valuation assuming (a) a willing seller, (b) a reasonable period in which to negotiate the sale, taking into account the nature of the property and the state of the market, (c) that values will remain static in that period, (d) that the property will be fully exposed to the open market, (e) that no account will be taken of any additional bid by a purchaser with a special interest.

Forced sale is defined as the open market value as defined above with a proviso
that a time limit for completion has been imposed that cannot be regarded as a    *a*
reasonable period, and both valuers took the time thus abridged as within four
months from receiving instructions to achieve a sale.

Thus far the experts on either side were on solid ground with comparables and
other data upon which to base their opinion, which coincided and which I
naturally accept. They were also asked for their opinions on maximum prices for
the five properties to be offered to an already identified purchaser to the exclusion    *b*
of others to be as certain as possible of achieving a sale subject to conditions and
time constraints comparable to those imposed by Eagle in its approach to Cowan
de Groot in the week beginning 24 April 1989, viz an exchange of contracts
within 48 hours, a £500,000 deposit to be paid on exchange to agents for the
vendor and completion on 1 June 1989. In addition their views were sought on    *c*
the effect on the valuation of the assumed hypothesis that Eagle had entered into
a binding contract with a third party and required the purchaser to procure a
release from the contract by agreeing to share profits on resale equally with the
purchaser. On these matters the two experts differed and this was hardly
surprising because the sort of transaction they were asked to envisage does not in
fact occur in practice so that they had no comparables or other reliable data upon    *d*
which to underpin their valuation opinions. In effect therefore their views were
more in the nature of educated guesses than valuations properly so called and
were arrived at by applying what each took to be the appropriate discounts to be
applied to their agreed open market and forced sale valuations according to the
additional hypothetical facts they were asked to allow for. Their views were in
my judgment of limited value on these discounts. The valuation given by Mr    *e*
Bingham for Cowan de Groot on the footing of the stepped profit-sharing
agreement contained in Mr Samuelson's first draft of the proposed profit-sharing
agreement but assuming that that arrangement would not constrain Cowan de
Groot from dealing with the properties in accordance with good estate
management was £1,402,000. The comparable valuation given by Mr Macey for
Eagle was £1,860,000.    *f*

My conclusion on the issue of valuation of the five properties is that the mode
and terms of sale chosen by Eagle in the approach made by Mr Smith to Cowan
de Groot were grossly depreciatory of the price which could be expected and, as I
have already indicated, in my judgment Mr Ferriday and Mr Smith, who were
responsible for fixing that mode and those terms of sale, were recklessly negligent    *g*
and in breach of duty to Eagle in offering to sell and selling on those terms. On
the other hand I am firmly of opinion that given that mode of sale and those
terms of sale that were adopted the actual figure of £1,500,000 was not a figure
which was so far below what a purchaser on those terms could be expected to pay
as of itself to indicate to the prospective purchaser that dishonesty or even
negligence was involved. In other words the shortfall between what Eagle should    *h*
have realistically achieved as a price and what it did achieve was entirely
attributable to the mode and terms of sale and not to an undervalue in the sense
that the property was being offered for sale at a figure which did not reflect both
the open market value in the sense used by the expert valuers and the mode and
the terms of sale.    *j*

EAGLE'S CLAIMS

Eagle's claims against Cowan de Groot and Pinepad can be summarised as
follows.

(a) Cowan de Groot or Pinepad is claimed to be liable as a constructive trustee

*a*  of the Bristol property and of the proceeds of sale of the five properties other than the Bristol property both on the basis of knowing receipt of trust property and, as regards both Cowan de Groot and Pinepad, of knowing assistance in a fraudulent breach of fiduciary duty. The claim concerning knowing receipt involves identifying the recipient of the relevant property and Eagle's primary claim is that Cowan de Groot is the recipient on the alternative bases, first, that Pinepad acted as its agent and, secondly, that as a matter of law this is a case where it would

*b*  be proper to lift the corporate veil and attach the constructive trust to the holding company of Pinepad notwithstanding that the latter was the recipient of the relevant property.

(b) The breaches of fiduciary duty upon which the constructive trust claims are based are in summary as follows: (1) that Mr Ferriday and Mr Smith deliberately or recklessly brought about the sale of the five properties at a gross

*c*  undervalue; (2) that Mr Ferriday and Mr Smith deliberately procured the sale of the five properties at an undervalue as part of a fraudulent scheme to the detriment of Eagle, the principal element in that scheme being identified as the purported joint venture agreement with Fenway Properties, which Eagle claims was a sham intended to benefit Mr Smith and Mr Ferriday, and a second element

*d*  of the scheme being identified as the payment by Cowan de Groot of £400,000 to Beller Needleman and thence to Mr Ferriday's direction; (3) that Mr Ferriday had an interest in Cowan de Groot shares held or intended to be held on the trusts of the settlement and in the transaction consisting of the fraudulent scheme involving Fenway Properties and was under a duty both under general equitable principles and under s 317 of the Companies Act 1985 to disclose those interests

*e*  to Eagle or to the board of Eagle, which he failed to do.

(c) Eagle claims that Mr Samuelson knew that Mr Ferriday and Mr Smith were in fraudulent breach of their fiduciary duty to Eagle in that (1) Mr Samuelson knew of the undervalue and knew that Mr Ferriday and Mr Smith knew or believed the five properties were worth substantially more than £1·5m, (2) Mr

*f*  Samuelson knew that the terms upon which and the manner in which the agreement was made, notably the size of the deposit, the speed of the exchange of contracts and the lack of proper marketing, were such as to indicate breach of fiduciary duty, (3) Mr Samuelson was aware of suspicious circumstances surrounding the £400,000 payment and its negotiation, (4) Mr Samuelson knew that Mr Ferriday had failed to disclose his interest as mentioned in (b) (3) above to

*g*  Eagle and (5) Mr Samuelson failed to make obvious inquiries regarding Fenway Properties and its alleged contract with Eagle.

(d) In the alternative if Mr Samuelson did not have the knowledge claimed by Eagle of Mr Ferriday and Mr Smith's breaches of fiduciary duty it is claimed that he wilfully shut his eyes to the obvious or wilfully and recklessly failed to make the inquiries which an honest and reasonable man would have made.

*h*  (e) In the further alternative it is claimed that Pinepad or Cowan de Groot had knowledge of circumstances which would have indicated to an honest and reasonable man that Mr Smith or Mr Ferriday or both were likely to have been acting fraudulently and in breach of their fiduciary duties or had knowledge of facts which would have put an honest and reasonable man on inquiry as to whether Mr Smith or Mr Ferriday or both were acting fraudulently or in breach

*j*  of fiduciary duty.

(f) It is said that the agreement was in the circumstances voidable, so that the options are not exercisable since the agreement was rescinded so far as it remained executory when the letters of 30 March 1990 were sent claiming rescission.

(g) Finally Eagle advanced a claim, independently of the constructive trust

claims, to be able to trace the property of Eagle into the hands of Pinepad or
Cowan de Groot on the footing that neither of the latter was in the circumstances *a*
a bona fide purchaser for value without notice of breach of fiduciary duty by
directors of Eagle.

CONSTRUCTIVE TRUST

There was a substantial measure of agreement between the parties regarding *b*
the applicable law on constructive trusts, more especially concerning cases of
knowing assistance. It was submitted on behalf of Eagle, and accepted on behalf
of Cowan de Groot, that the ingredients for a constructive trust on the basis of
knowing assistance are as follows: (1) a trust or other fiduciary relationship, (2) a
dishonest design on the part of the trustee or fiduciary (3) relating to misapplication
of trust property, (4) actual knowledge of that design in categories (i), (ii) and (iii)  *c*
of the five mental states set out in the judgment of Peter Gibson J in *Baden v Société
Générale pour Favoriser le Développement du Commerce et de l'Industrie en France SA*
[1992] 4 All ER 161 at 235 as follows:

'. . . (i) actual knowledge; (ii) wilfully shutting one's eyes to the obvious;
(iii) wilfully and recklessly failing to make such inquiries as an honest and  *d*
reasonable man would make; (iv) knowledge of circumstances which would
indicate the facts to an honest and reasonable man; (v) knowledge of
circumstances which would have put an honest and reasonable man on
inquiry'

and (5) assistance in the implementation of the design.                            *e*

It is not necessary in view of the agreement between the parties on this point
to cite further authority beyond the textbooks, *Snell's Equity* (29th edn, 1980) pp
193–194 and *Underhill and Hayton on the Law Relating to Trusts and Trustees* (14th
edn, 1987) p 355 and the cases there cited.

In relation to knowing receipt there was not the same degree of unanimity
between the parties, save that they were both agreed that the subject of the type  *f*
of knowledge which is required was one of considerable academic and judicial
controversy and both parties accepted that it was not an essential that the breach
of trust or of fiduciary duty should be fraudulent. Upon the doubtful question of
the type of knowledge required, it was submitted for Eagle that the knowledge
required for the imposition of a constructive trust in the case of a purchaser for
value of trust property conveyed in breach of trust or of fiduciary duty was actual  *g*
or constructive knowledge of the breach of trust. For Cowan de Groot and
Pinepad it was submitted that want of probity on the part of the constructive
trustee was an essential element and that the elements of carelessness involved in
categories (iv) and (v) of the *Baden* classification were not sufficient for this
purpose. In particular it was submitted that unless it could be shown that Cowan  *h*
de Groot or Pinepad by their directors either knew or deliberately shut their eyes
to a relevant breach of fiduciary duty or wilfully and recklessly failed to make
such inquiries as an honest and reasonable man would have made there would be
no such requisite want of probity established. It was further submitted that for
there to be such a wilful and reckless failure to make such inquiries as an honest
and reasonable man would make it would need to be established that the directors  *j*
of Cowan de Groot or Pinepad believed that the relevant breach of fiduciary duty
was a probability rather than a possibility.

The authorities relied upon on behalf of Eagle in support of the proposition
that constructive notice without lack of good faith suffices for the purpose of
knowing receipt are as follows. In *Nelson v Larholt* [1947] 2 All ER 751, [1948]

1 KB 339 an express trustee in the shape of an executor of a will drew cheques on
*a* the executors' account signing 'G. A. Potts, Executor of William Burns, dec.' for
his own purposes in favour of a bookmaker whose good faith in receiving and
collecting on the cheques was not impugned nor was it suggested that the cheques
were received other than for value. Denning J held that the executor was
fraudulent (that was not in doubt) and that the bookmaker was liable to repay. It
is therefore authority for the proposition that the requisite notice in a knowing
*b* receipt case where a third party recipient gives value can be based on an honest
but negligent failure to make the inquiries which an honest and reasonable man
would have made. But it is to be observed that the notice of the trust could hardly
have been clearer and as Denning J said ([1947] 2 All ER 751 at 753, [1948] 1 KB
339 at 344): 'I am satisfied that the defendant had notice of the want of authority.'
*c* He applied an objective test of what a reasonable and honest man should also have
known and applying that test held that the defendant had the requisite notice.
    In *Belmont Finance Corp Ltd v Williams Furniture Ltd (No 2)* [1980] 1 All ER 393
the claim was that a company called City Industrial Finance Ltd (referred to as
'City') was a constructive trustee in a sum of money which it received in the
course of a transaction which was held to be illegal as infringing the prohibition
*d* against a company giving financial assistance for the purchase of its shares
contained in s 54 of the Companies Act 1948. Buckley LJ said (at 405):

    'I now come to the constructive trust point. If a stranger to a trust (a)
    receives and becomes chargeable with some part of the trust fund or (b) assists
    the trustees of a trust with knowledge of the facts in a dishonest design on
*e*    the part of the trustees to misapply some part of a trust fund, he is liable as a
    constructive trustee (*Barnes v Addy* (1874) LR 9 Ch App 244 at 251–252 per
    Lord Selborne LC). A limited company is of course not a trustee of its own
    funds: it is their beneficial owner; but in consequence of the fiduciary
    character of their duties the directors of a limited company are treated as if
    they were trustees of those funds of the company which are in their hands or
*f*    under their control, and if they misapply them they commit a breach of trust
    (*Re Lands Allotment Co* [1894] 1 Ch 616 at 631, 638, [1891–4] All ER Rep
    1032 at 1034, 1038, per Lindley and Kay LJJ). So, if the directors of a
    company in breach of their fiduciary duties misapply the funds of their
    company so that they come into the hands of some stranger to the trust who
    receives them with knowledge (actual or constructive) of the breach, he
*g*    cannot conscientiously retain those funds against the company unless he has
    some better equity. He becomes a constructive trustee for the company of
    the misapplied funds. This is stated very clearly by Jessel MR in *Russell v
    Wakefield Waterworks Co* (1875) LR 20 Eq 474 at 479, where he said: "In this
    Court the money of the company is a trust fund, because it is applicable only
    to the special purposes of the company in the hands of the agents of the
*h*    company, and it is in that sense a trust fund applicable by them to those
    special purposes; and a person taking it from them with notice that it is being
    applied to other purposes cannot in this Court say that he is not a constructive
    trustee." In the present case, the payment of the £500,000 by Belmont to Mr
    Grosscurth, being an unlawful contravention of s 54, was a misapplication of
*j*    Belmont's money and was in breach of the duties of the directors of Belmont.
    £489,000 of the £500,000 so misapplied found their way into the hands of
    City with City's knowledge of the whole circumstances of the transaction. It
    must follow, in my opinion, that City is accountable to Belmont as a
    constructive trustee of the £489,000 under the first of Lord Selborne LC's
    two heads.'

Goff LJ said (at 410):

> 'What Belmont has to show is that the payment of the £500,000 was a misfeasance, which for this purpose is equivalent to breach of trust, that City received all or part of this money, and that it did so knowing, or in circumstances in which it ought to know, that it was a breach of trust.'

His conclusion on the question whether it did is stated (at 412):

> 'In my judgment the answer to that question must plainly be Yes, for they are fixed with all the knowledge that Mr James had. Now, he had actual knowledge of all the facts which made the agreement illegal and his belief that the agreement was a good commercial proposition for Belmont can be no more a defence to City's liability as constructive trustees than in conspiracy. Apart from this, clearly, in my judgment, Mr James knew or ought to have known all the facts that I have rehearsed, showing that there was in any event a misfeasance apart from illegality.'

Illegality no doubt stands apart so far as notice of breach of trust is concerned but Goff LJ did expressly include knowledge that should have been acquired from known facts and that again supports an objective test.

Similarly in *Agip (Africa) Ltd v Jackson* [1992] 4 All ER 385 at 403, [1990] Ch 265 at 291 Millett J described the class of constructive trust where a person receives for his own benefit trust property transferred to him in breach of trust as follows:

> 'He is liable as a constructive trustee if he received it with notice, actual or constructive, that it was trust property and that the transfer to him was in breach of trust, or if he received it without such notice but subsequently discovered the facts.'

But that is a quite general statement and has to be read in the context of the passage where Millett J in terms declined to express an opinion on the question whether constructive notice was sufficient in a 'knowing receipt' case (see [1992] 4 All ER 385 at 405, [1990] Ch 265 at 293). I do not therefore derive much guidance on this particular issue from that decision, which was concerned with knowing assistance.

Lawson J in *International Sales and Agencies Ltd v Marcus* [1982] 3 All ER 551 at 558 adopted an objective test of what the recipient ought to know, saying:

> '. . . in my judgment, the knowing recipient of trust property for his own purposes will become a constructive trustee of what he receives if either he was in fact aware at the time that his receipt was affected by a breach of trust, or if he deliberately shut his eyes to the real nature of the transfer to him . . . or if an ordinary reasonable man in his position and with his attributes ought to have known of the relevant breach.'

In fact Lawson J found there was actual knowledge of the breach of trust, so the statement of principle was obiter.

Reliance was also placed on Lord Herschell LC's and Lord Shand's speeches in *Thomson v Clydesdale Bank Ltd* [1893] AC 282, [1891–4] All ER Rep 1169, where the House of Lords held that a bank was entitled to retain sums paid by a broker into his overdrawn account with the bank by cheque when the bank knew that the cheque was the proceeds of the sale of shares but did not know and made no inquiry whether the payment in was of moneys in the broker's hands as agent or as principal. That decision does not assist Eagle in my view. Lord Herschell LC said ([1893] AC 282 at 289, [1891–4] All ER Rep 1169 at 1171):

*a*
> 'It is obvious that the case of the appellants wholly fails unless they bring home to the respondents much more than has been attempted here, namely, a knowledge that in the particular case the person was not justified in paying over the particular amount.'

True it is that earlier in his speech he said ([1893] AC 282 at 287–288, [1891–4] All ER Rep 1169 at 1171):

*b*
> '. . . if the person receiving the money has reason to believe that the payment is being made in fraud of a third person, and that the person making the payment is handing over in discharge of his debt money which he has no right to hand over, then the person taking such payment would not be entitled to retain the money . . .'

*c* Even this statement while admitting of cases where an objective standard regarding knowledge is justified is not authority for the proposition that there is a duty to inquire. In similar vein Lord Shand said ([1893] AC 282 at 293, [1891–4] All ER Rep 1169 at 1173):

*d*
> '. . . liability for repayment of funds which can be traced or followed into the banker's hands, and which has been applied in payment of the agent's debt, shall arise only where it can be shewn that there was knowledge, on the banker's part, not merely that the fund was received from the broker's principal, but knowledge also that the payment was a misapplication of the fund, made in violation of the agent's duty and obligation.'

*e* Finally Lord Watson, alone of their Lordships, in terms required bad faith for a constructive trusteeship to be imposed, saying ([1893] AC 282 at 290, [1891–4] All ER Rep 1169 at 1172):

> '. . . the broker's fraud is of no relevancy in this case, unless it is coupled with bad faith on the part of the respondents . . . It is not enough for them to prove that the respondents acted negligently . . .'

*f*
Finally reliance was placed upon *Westpac Banking Corp v Savin* [1985] 2 NZLR 41, where a bank was held to have constructive notice that sums paid into the overdrawn trading account of a company, which the bank was aware was in the habit of selling boats as agents for third parties and paying the proceeds into its trading account, were thus paid in without authority, so that the bank was accountable as a constructive trustee. There was in that case actual knowledge found on the part of the bank that there was a three chances in four odds that the payment in was of a third party's, as opposed to the company's own, moneys and that a responsible officer was conscious that the moneys might not be freely dealt with by the company as its moneys. Putting it at its lowest that appears to be a case where there was a strong probability rather than a mere possibility that the payment in question was in breach of fiduciary duty. Richardson J, having set out the five categories of circumstances which can be treated as amounting to the requisite knowledge in the *Baden* classification, said (at 52–53):

*g*

*h*

*j*
> 'Earlier judicial debate had centred mainly on the fourth and particularly the fifth type of knowledge. Peter Gibson J concluded that there was sufficient authority to treat all five categories of knowledge as material but considered that only in exceptional circumstances should a Court impute type (5) knowledge to an agent such as a bank acting honestly on its "customer's" instructions. The Judge made it clear that he considered the five types of knowledge were the requisite knowledge for constructive trusteeship whether of the "knowing receipt" category, which up to now I have been

All England Law Reports          [1992] 4 All ER

discussing, or the "knowing assistance" category where the property has not
necessarily passed through the hands of the defendant and, as he pointed out,   *a*
the relevant knowledge must be of facts and not of mere claims or allegations
(*Carl Zeiss Stiftung v Herbert Smith & Co (No 2)* ([1969] 2 All ER 367, [1969] 2
Ch 276)). As will shortly become apparent, it is not necessary for the purpose
of this case to express a final view as to the ambit of constructive knowledge
in this class of case. In principle I cannot see any adequate justification for
excluding categories (4) and (5) at least in the "knowing receipt" class of case   *b*
and I tend to favour for that class of case the comprehensive approach adopted
by Peter Gibson J which now has the endorsement of *Halsbury* ((4th edn)
vol 48, para 592). Clearly Courts would not readily import a duty to inquire
in the case of commercial transactions where they must be conscious of the
seriously inhibiting effects of a wide application of the doctrine. Nevertheless   *c*
there must be cases where there is no justification on the known facts for
allowing a commercial man who has received funds paid to him in breach of
trust to plead the shelter of the exigencies of commercial life.'

Sir Clifford Richmond quoted with approval the passages cited above from
Buckley and Goff LJJ in *Belmont Finance Corp Ltd v Williams Furniture Ltd (No 2)*   *d*
[1980] 1 All ER 393 at 405, 410 and adopted the view that constructive as well as
actual notice of the relevant trust can suffice in a knowing receipt case (see [1985]
2 NZLR 41 at 69–70). His conclusion was stated as follows ([1985] 2 NZLR 41 at
71):

'In my view the actual knowledge of the bank was such as ought to have
led a reasonable man in the position of the bank manager to the belief that   *e*
Aqua Marine was dealing with the proceeds of boats sold "on behalf of" for
its own benefit in a manner not authorised by the owners of the boats. The
knowledge of the bank was of facts which went beyond merely putting the
bank on inquiry as it was unthinkable that the boat owners would have
agreed to what was going on if they had been made aware of the real position.'   *f*

From this he agreed in holding the bank liable as constructive trustee.
   There is therefore a substantial body of authority in favour of the proposition
that constructive notice based on what a reasonable man would have concluded
though falling short of want of probity on the part of the person charged as a
constructive trustee may suffice in a knowing receipt case.
   The other view is in my judgment most clearly expressed in Megarry V-C's   *g*
judgment in *Re Montagu's Settlement Trusts, Duke of Manchester v National
Westminster Bank Ltd* (1985) [1992] 4 All ER 308 at 329–330, [1987] Ch 264 at
285, where he said:

'(1) The equitable doctrine of tracing and the imposition of a constructive
trust by reason of the knowing receipt of trust property are governed by   *h*
different rules and must be kept distinct. Tracing is primarily a means of
determining the rights of property, whereas the imposition of a constructive
trust creates personal obligations that go beyond mere property rights. (2) In
considering whether a constructive trust has arisen in a case of the knowing
receipt of trust property, the basic question is whether the conscience of the
recipient is sufficiently affected to justify the imposition of such a trust. (3)   *j*
Whether a constructive trust arises in such a case primarily depends on the
knowledge of the recipient, and not on notice to him; and for clarity it is
desirable to use the word "knowledge" and avoid the word "notice" in such
cases. (4) For this purpose, knowledge is not confined to actual knowledge,
but includes at least types (ii) and (iii) of *Baden* knowledge [see [1992] 4 All

**Ch D    Cowan de Groot Properties Ltd v Eagle Trust plc (Knox J)    759**

*a*　ER 161 at 235], ie actual knowledge that would have been acquired but for shutting one's eyes to the obvious, or wilfully and recklessly failing to make such inquiries as a reasonable and honest man would make; for in such cases there is a want of probity which justifies imposing a constructive trust. (5) Whether knowledge of *Baden* types (iv) and (v) suffices for this purpose is doubtful; in my view, it does not, for I cannot see that the carelessness involved will normally amount to a want of probity.'

*b*
This was submitted on behalf of Cowan de Groot and Pinepad to be an accurate summary. It has been adopted by Steyn J in *Barclays Bank plc v Quincecare Ltd* (1988) [1992] 4 All ER 363 and by Alliott J in *Lipkin Gorman (a firm) v Karpnale Ltd* [1992] 4 All ER 331, [1987] 1 WLR 987, but not applied by Vinelott J, although on other grounds the claim to a constructive trust failed, in *Eagle Trust*

*c*　*plc v SBC Securities Ltd* [1992] 4 All ER 488. By that decision Vinelott J struck out as bound to fail an action by Eagle Trust against the underwriters of the cash alternative and the rights issue in connection with the take-over by Eagle of Samuelson Group mentioned earlier in this judgment. The particular facts are not directly relevant to this case, but the statement of principle is. It is ([1992] 4

*d*　All ER 488 at 509):

'. . . if, in the ordinary course of business, a payment is made in discharge of a liability to the defendant, the defendant cannot be made liable as a constructive trustee merely upon the ground that he knew or had reason to suspect that there had been a breach of trust disentitling the trustee to make the payment. It must be shown that the circumstances are such that

*e*　knowledge that the payment was improper can be imputed to him. In my judgment, therefore, in a case of this kind, in order to make a defendant liable as a constructive trustee, it must be shown that he knew, in one of the senses set out in categories (i), (ii) or (iii) of Peter Gibson J's analysis in *Baden*, that the moneys were trust moneys misapplied; or the circumstances must

*f*　be such that, in the absence of any evidence or explanation by the defendant, that knowledge can be inferred. And it may be inferred if the circumstances are such that an honest and reasonable man would have inferred that the moneys were probably trust moneys and were being misapplied, and would either not have accepted them or would have kept them separate until he had satisfied himself that the payer was entitled to use them in discharge of

*g*　the liability.'

In my judgment the position of a person dealing as purchaser with a vendor company's directors on a sale is as regards potential breaches of fiduciary duty by the directors of the vendor company in many ways similar to that of a person to whom a payment is made in discharge of an obligation in that they are typical

*h*　commercial transactions. As Vinelott J observed in *Eagle Trust plc v SBC Securities Ltd* [1992] 4 All ER 488 at 507:

'The doctrine of constructive notice was developed in the field of property transactions and at a time when full and careful investigation of title was called for before a purchaser could be satisfied that the vendor had legal title

*j*　to the property sold and that there were no legal or equitable encumbrances on it. Judges have frequently warned of the danger of extending the doctrine beyond these bounds.'

Vinelott J quoted Lindley LJ in *Manchester Trust v Furness* [1895] 2 QB 539 at 545 and *Thomson v Clydesdale Bank Ltd* [1893] AC 282, [1891–4] All ER Rep 1169 in support. Neither the fraudulent scheme that is relied upon by Eagle in the present

case nor the claimed sale at a gross undervalue in my judgment constitute the sort
of incumbrance with which conveyancing investigations of title are concerned. *a*
In relation to such dealings it would be inappropriate to introduce the doctrine of
constructive notice. I prefer in this context as the proper test to be applied the
question whether knowledge that the directors of Eagle were deliberately selling
at a gross undervalue can reasonably be imputed to Mr Samuelson; it follows
from this view that I do not accept the submission made to me that in the case of
a knowing receipt of trust property it is not necessary to establish at least in the *b*
case of a bona fide purchaser for value of trust property that the recipient had
actual knowledge in categories (i), (ii) or (iii) in the *Baden* case of the breach of
trust. I suspect that the inclusion of the words 'bona fide' in that submission was
not intended because their presence would seem to negative any possibility even
of constructive knowledge, but apart from that I consider that the relegation of a *c*
purchaser for value to a category more, rather than less, exposed to claims of
constructive trusteeship to be misconceived. The volunteer, such as the tenth
Duke of Manchester in the *Montagu* case, is not a person who is entering into an
arm's length contractual bargaining transaction and the courts applying equitable
doctrines would be more, rather than less, likely to impute knowledge to a
volunteer than to a contracting purchaser, more especially when the subject of *d*
inquiry on the latter's part, such as the question whether the sale to him is at a
deliberate undervalue, is a matter in which his commercial interest is diametrically
opposed to that of the vendor. On the other hand I do not accept what is implied
in the submissions on Cowan de Groot's behalf that all that was involved was
negligence on the part of Eagle's directors. Eagle's case is put squarely on the basis
of fraud in relation to the fraudulent design involving Fenway Properties and *e*
reckless and deliberate conduct in the sale at an undervalue. The latter can
constitute a breach of fiduciary duty and is in my judgment capable in law of
constituting such a breach as will ground a claim to a constructive trust if the
requisite knowledge in the third party is established.

So far as the fraudulent design involving Fenway Properties is concerned, I am *f*
satisfied that Mr Samuelson had no relevant knowledge of any of the five
categories in the *Baden* classification and I find the constructive trust claim on this
basis fails.

So far as the claim based on a reckless and deliberate sale at an undervalue is
concerned the position is not so clear-cut.

There is not a single figure at which one can say of any given property that that *g*
is its value so that a sale below that figure is a sale at an undervalue. A fortiori one
cannot postulate of all sales below the open market value of a property that
directors of a company making such a sale are guilty of a breach of fiduciary duty.
Account has to be taken of the terms and mode of sale in assessing the question
whether there was a breach of fiduciary duty in any given case where directors of
a company cause a company to sell its property. My conclusion has already been *h*
stated that there was a breach of fiduciary duty involved in the proposed sale of
the five properties in the way in which the negotiations for the sale of Cowan de
Groot were conducted and the switch to an option transaction at the same figure
in relation to two properties as was proposed for a sale makes no difference to that
conclusion. Mr Ferriday was guilty of a reckless disregard of his duties towards
Eagle in his single-minded concentration on laying Eagle's hands on £500,000 to *i*
the exclusion of all other considerations. Mr Smith was also guilty of breach of
fiduciary duty in his choice of Fenway Properties as sole potential purchasers and
in his dishonest activities in permitting that proposed sale.

So far as Mr Samuelson's knowledge of these matters is concerned, I accept that

he knew that Eagle was selling at less than the open market value of the five
*a* properties in the sense in which the expert witnesses use that expression and
indeed in a less refined sense of the figure which the properties might be expected
to fetch if properly marketed. He also thought that Eagle could not afford the
time to market the properties properly and were looking for a very quick sale
with a wholly exceptionally large deposit which necessarily involved a drop in
the price. In a situation such as that it is not in my view appropriate for the court
*b* to be astute to find circumstances which could indicate knowledge by a purchaser
of breach of fiduciary duty on the part of directors of a vendor company. The
duty of directors of a purchasing company is to buy as cheaply as they can in the
light of the mode and terms of the proposed sale and it would in my judgment
be a slippery slope upon which to embark to impose upon directors of a company
*c* a positive duty to make inquiries into the reasons for an offer being made to their
company at what appears to be a bargain price. The line should in my judgment
be drawn at the point where the figure in question, regard being had not only to
the open market value but also to the terms and mode of sale, is indicative of
dishonesty on the part of the directors of a vendor company. In my judgment
that conclusion cannot properly be reached here notwithstanding the fact that Mr
*d* Samuelson did have some material, notably in the shape of the valuation produced
at the meeting at Russell Cash, from which he could see that at least with regard
to some of the five properties Eagle had had a valuation which was significantly
higher than the figure which Eagle was asking Cowan de Groot to pay in respect
of that individual property. The figure at which the property was sold was only
part of the overall picture which it was necessary to have before concluding that
*e* there was breach of fiduciary duty. Had there been a genuine need for a sale on
the depreciatory terms on which the sale was affected there would have been no
breach of fiduciary duty. Mr Samuelson did not in my judgment have the
knowledge in any of the categories (i), (ii) or (iii) of the *Baden* classification of the
facts that constituted the breach of fiduciary duty in the sale at the figure and on
*f* the terms on which it was affected. That is fatal to Eagle's claim on the basis of a
sale at an undervalue on the view which I take of the test to be applied to a
purchase in a commercial transaction from a company vendor. If, contrary to my
view it is right to have regard to the categories (iv) and (v) of the *Baden*
classification, I would still conclude that Mr Samuelson should not be treated as
having the requisite knowledge. I have stated my conclusion in terms of the
*g* classification of circumstances in *Baden* principally because that is the way the case
was pleaded and argued by the parties. I share the reservations expressed by
Millett J in *Agip (Africa) Ltd v Jackson* [1992] 4 All ER 385 at 405, [1990] Ch 265
at 293 regarding over refinement in making the distinctions implicit in that
classification or a too ready assumption that categories (iv) and (v) are necessarily
cases of constructive notice only. In my judgment it may well be that the
*h* underlying broad principle which runs through the authorities regarding
commercial transactions is that the court will impute knowledge, on the basis of
what a reasonable person would have learnt, to a person who is guilty of
commercially unacceptable conduct in the particular context involved. The
banker in *Westpac Banking Corp v Savin* [1985] 2 NZLR 41 who took a three to
one chance regarding the source of the sums paid into the debtor's account was,
*j* but the banker in *Thomson v Clydesdale Bank Ltd* was not, guilty of such conduct.
Although I regard much of Mr Samuelson's conduct in matters which are
peripheral to this case such as Perranporth airfield as quite unacceptable, in
relation to the central issue regarding knowledge of a sale at a deliberate or
reckless undervalue I acquit him of it.

WHO WAS THE RECIPIENT?

The conclusion thus stated renders it unnecessary to identify the recipient of *a*
the Bristol property and of the proceeds of sale of the five properties other than
the Bristol property, but the point was fully argued and I will state my conclusions
shortly. In my view the recipient was Pinepad which was not acting as agent for
Cowan de Groot. Had dishonesty or want of probity been established there would
have been no difficulty in lifting the corporate veil but in the absence of dishonesty
or want of probity in the relevant transaction there is in my view no justification *b*
for regarding the legal nature of the transaction as different from what a strict
analysis produces.

CONFLICT OF INTEREST

The other head of breach of Mr Ferriday's duty as a director relied upon by *c*
Eagle is based on the claim that Mr Ferriday was interested in 3·8 million shares
in Cowan de Groot and in the further 400,000 shares registered in the name of
Hambros (Jersey Nominees) Ltd and that he had an interest in the transaction in
relation to the fraudulent scheme involving Fenway Properties. It is further
claimed that Mr Ferriday failed to disclose his interest to the board of Eagle and
that he placed himself in a position where his interest and his duty to Eagle *d*
conflicted.

The duties of disclosure relied upon are in part statutory and in part under
general equitable principles. The statutory provision is s 317 of the Companies
Act 1985, sub-ss (1) and (2) whereof read as follows:

'(1) It is the duty of a director of a company who is in any way, whether *e*
directly or indirectly, interested in a contract or proposed contract with the
company to declare the nature of his interest at a meeting of the directors of
the company.
(2) In the case of a proposed contract, the declaration shall be made—*(a)*
at the meeting of the directors at which the question of entering into the
contract is first taken into consideration; or *(b)* if the director was not at the *f*
date of that meeting interested in the proposed contract, at the next meeting
of the directors held after he became so interested; and, in a case where the
director becomes interested in a contract after it is made, the declaration shall
be made at the first meeting of the directors held after he becomes so
interested.' *g*

I omit s 317(3), which provides for a general notice of interest to be valid to satisfy
the section, because there is no suggestion that this was complied with. It is in
my judgment clear on the authority of *Hely-Hutchinson v Brayhead Ltd* [1967] 3 All
ER 98, [1968] 1 QB 549 as approved by Lord Goff in *Guinness plc v Saunders* [1990]
1 All ER 652 at 664, [1990] 2 AC 663 at 697 that the statutory duty of disclosure *h*
under s 317 of the Companies Act 1985 or under its predecessor, s 199 of the
Companies Act 1948, does not of itself affect the validity of a contract. That
however leaves the ordinary principles of law and equity which, unless excluded
by relevant articles of association, have the result that, if a director enters into or
is interested in a contract, the contract may be voidable at the instance of the
company (see per Lord Goff in *Guinness plc v Saunders* [1990] 1 All ER 652 at 664, *j*
[1990] 2 AC 663 at 697, and *Transvaal Lands Co v New Belgium (Transvaal) Land
and Development Co* [1914] 2 Ch 488, [1914–15] All ER Rep 987). It is a condition
of such relief that the parties can be restored to their original positions, which in
the present case would be possible as regards the options granted by the agreement
but not as regards the sales of the Wolverhampton, Birmingham and Nuneaton

properties, which were completed and the properties sold on. Eagle's claims
*a*  under this head are therefore limited to avoidance of the options over the Bristol
and Newport properties.

The relevant article in Eagle's articles of association is art 118 (a) and (b), which
reads as follows:

'(a) The provisions of Part X of the 1985 Act or any statutory re-enactment
*b*   thereof or modifications thereto applicable to the Company shall be complied
with in every respect.

(b) Subject as aforesaid, no Director or intending Director shall be
disqualified by his office from contracting with the Company, or any other
company in which the Company may be interested either with regard to his
tenure of any such other office or place of profit as is referred to in Article
*c*   117 of these Articles or as vendor, purchaser or otherwise. Further, subject,
if and as required by Section 320 of the 1985 Act, to the approval of the
Company in general meeting, and save as provided in Section 341 of the
1985 Act, no such contract nor any other contract, transaction or arrangement
(whether or not constituting a contract) entered into by or on behalf of the
Company or any other company in which the Company may be interested,
*d*   in which any Director is in any way directly or indirectly interested (whether
through persons connected with him as defined in Section 346(2) of the 1985
Act, or otherwise) shall be liable to be avoided, nor shall any Director so
contracting or being so interested be liable to account to the Company for
any profit realised by any such contract, transaction or arrangement by reason
of such Director holding that office or of the fiduciary relationship thereby
*e*   established; PROVIDED that the nature of his interest (if not declared in
accordance with the provisions of Article 120(c) of these Articles) has been or
is declared by him:—(i) at the meeting of the Board at which the question of
entering into that contract, transaction or arrangement is first taken into
consideration; or (ii) if the Director was not at the date of that meeting
*f*   interested in the proposed contract, transaction or arrangement, at the next
meeting of the Board after he became so interested; or (iii) if that contract,
transaction or arrangement or proposed contract, transaction or arrangement
is entered into or to be entered into not by the Company but by a company
in which the Company is interested as to one per cent or more of the equity
share capital of that company, at the next meeting of the Board after the
*g*   Director became aware of his interest or the Company's interest in such
contract, transaction or arrangement.'

In my judgment the proviso to art 118(b) only renders the provisions of the
general law mentioned above inoperative where there is a positive compliance
with the terms of that proviso, so that if there is in fact no meeting of the board
*h*  at which the question of entering into the contract is taken into consideration the
general law operates and the contract may be liable to be avoided. I reject the
argument advanced on behalf of Cowan de Groot that this article produces a
different result from the differently worded art 99 that was involved in *Hely-
Hutchinson v Brayhead Ltd* [1967] 3 All ER 98, [1968] 1 QB 549. That read as
follows:
*j*
'A director may contract with and be interested in any contract or proposed
contract with the company either as vendor, purchaser or otherwise, and
shall not be liable to account for any profit made by him by reason of any
such contract or proposed contract, provided that the nature of the interest
of the director in such contract or proposed contract be declared at a meeting

of the directors as required by and subject to the provisions of section 199 of the Act. No director shall vote as a director in respect of any contract or arrangement in which he shall be interested, and if he do so his vote shall not be counted . . .'

Of that article Lord Denning MR said ([1967] 3 All ER 98 at 103, [1968] 1 QB 549 at 585):

'On the wording it might be suggested that there is no contract unless the director discloses his interest. In other words, that disclosure is a condition precedent to the formation of a contract; but I do not think that that is correct. All that art. 99 does is to validate every contract when the director makes proper disclosure. If he discloses his interest, the contract is not voidable, nor is he accountable for profits. But if he does not disclose his interest, the effect of the non-disclosure is as before: the contract is voidable and he is accountable for secret profits.'

In art 118(b) of Eagle there is no explicit reference to the statutory requirement of s 317 but the scheme of the article is in my judgment similar in requiring affirmative compliance with the disclosure provisions before freeing the transaction from the general rules of law and equity.

The only board meetings of Eagle that can be relevant to these issues are those held on 22 March and 13 June 1989, about which I have made findings earlier. The former was before any question arose of a sale to Cowan de Groot and there can be no question of Mr Ferriday being under a duty at that stage to disclose any relevant interest in Cowan de Groot or a projected transaction with it. The latter was after completion of the sale of the three properties agreed to be sold by the agreement and even longer after the grant of the option over the Newport and Bristol properties. Reliance was placed on the earlier meeting on 22 March on behalf of Cowan de Groot and Pinepad in that it was argued that there was Eagle board approval for proceeding with various property sales which included the then projected sale to Fenway Properties at £1·5m of the five properties and that this amounted to an effective resolution for sale of the five properties at that price to anyone willing to buy, so that the identity of the purchaser became irrelevant so long as that purchaser was willing to pay £1·5m, thus effectively absolving any director of Eagle from his duty of disclosure if he or a company in which he was interested became such a purchaser. This point was not pleaded by Cowan de Groot and Pinepad in their amended defence to the counterclaim and I do not regard it as open to them. In any event I am not satisfied that Mr Ferriday was thereby absolved from his duty to declare an interest in the light of the highly abnormal transaction that was in fact entered into and which had a very significant impact on the price recoverable by Eagle. If and to the extent that there was an authorisation for a sale at £1·5m it was in my view implicit that it was for a sale on normal commercial terms and not on terms such as severely to depress the price commercially recoverable.

I turn therefore to the question whether Mr Ferriday did have in interest that required disclosure.

So far as the shares in Cowan de Groot are concerned the 400,000 share parcel can clearly be disregarded because it had been realised by a mortgagee well before the date of the agreement. So far as the 3·8 million shares are concerned Mr Ferriday was in my view a bare trustee of the legal interest therein without any duties to perform. Indeed it was only an accident that he remained the legal owner. Although it is clear on the authority of *Transvaal Lands Co v New Belgium*

*(Transvaal) Land and Development Co* [1914] 2 Ch 488, [1914–15] All ER Rep 987

a that a conflict between a duty as trustee for others on the one hand and a duty as a director on the other constitutes just as significant a conflict of interest as does a conflict between a personal interest and a duty as a director, that principle only applies where the trusteeship carries duties, which a bare trusteeship does not. The bare legal title which Mr Ferriday accidentally retained is not in my judgment relevant because it gave rise to no conflict. The second interest principally relied

b upon by Eagle was Mr Ferriday's interest in the fraudulent scheme connected with Fenway Properties. In my judgment Mr Potts QC for Cowan de Groot was correct in submitting that an intent to defraud a company does not constitute an interest such that the prospectively fraudulent director is under an obligation to disclose but the point is in my view academic because either the other contracting

c party has actual knowledge or is treated as having knowledge of the prospective fraud or it is not. If it is, then the transaction can be avoided as against it because of its knowledge of the fraud. If it is not, then the transaction cannot be avoided against it. On the view of the facts which I have taken, Cowan de Groot and Pinepad had no knowledge either through Mr Samuelson or otherwise of Mr Ferriday's fraudulent design through Fenway Properties and, even if Mr Ferriday

d was under an obligation to disclose his prospective fraudulent interest to the board of Eagle, his failure to do so cannot affect Cowan de Groot or Pinepad. There is finally, under the question whether Mr Ferriday had an interest that required disclosure, the claim by Eagle that he had such an interest in that transaction contained in the agreement in that he was personally interested in Cowan de Groot or its subsidiary Pinepad obtaining a beneficial bargain because

e his debtors', the trustees of the settlement's, only significant asset was their shareholding in Cowan de Groot and his right to be repaid was tied to the sale of that shareholding at a profit. Moreover his liability in respect of interest owing to Lloyds Bank would be reduced to the extent to which dividends were declared and paid by Cowan de Groot. In addition the Cowan de Groot share profit-sharing

f agreement was relied upon by Eagle as constituting a relevant interest of Mr Ferriday in Cowan de Groot. As regards the latter I have earlier expressed the view that it was of no legal effect and, even assuming, as seems likely, that Mr Ferriday did not appreciate this and thought he had rights under it, albeit on the basis that he held them for the benefit of Mr Samuelson's children, the only significant question is whether he did indeed have such an interest. A director

g who erroneously supposes he has an interest is under no duty to declare that erroneous supposition. I therefore disregard the Cowan de Groot share profit-sharing agreement.

On the other hand in my judgment Eagle is on firmer ground in identifying the transaction enshrined in the agreement as an agreement in which Mr Ferriday had an interest because of the several ways which I have mentioned in which it

h was to his interest that Cowan de Groot should prosper both on a capital and an income basis. It was submitted for Cowan de Groot that there is no authority suggesting that a director of a vendor company has a disclosable interest in a contract with a purchasing company because he is a creditor of that company and that the same conclusion follows a fortiori if the director is a creditor not of the purchasing company but of shareholders of the purchasing company. I would

j accept that in the great majority of cases there would be no disclosable interest in such a situation because the link between the director of the vendor company and the purchasing company would be too tenuous to justify its treatment as constituting an interest. But regard has to be had to the particular circumstances as well as to the correct categorisation of the nature of the director's legal

relationship. If that be right I consider that regard should be had to what in my judgment is the fact that Mr Ferriday had a greater practical interest in the *a* prosperity of Cowan de Groot than he would have had had he been, say, a 1% shareholder. His chances of recovering a very substantial sum of money was closely linked to the potential successful sale of the trustees' only settled asset of any significance, shares in Cowan de Groot. De facto he had every ground for wanting to see Cowan de Groot prosper.

However, I need not further pursue this issue because I have also reached the *b* conclusion that it would not be correct to treat Mr Samuelson as having notice of Mr Ferriday's failure to disclose his interest to the board of Eagle, assuming for this purpose that he had such a disclosable interest. In my view the rule in *Royal British Bank v Turquand* (1856) 6 E & B 327, [1843–60] All ER Rep 435 affords a defence to Cowan de Groot. The rule was stated with approval in the House of Lords in *Morris v Kanssen* [1946] 1 All ER 586 at 592, [1946] AC 459 at 474 by *c* Lord Simonds as follows:

'But persons contracting with a company and dealing in good faith may assume that acts within its constitution and powers have been properly and duly performed, and are not bound to inquire whether acts of internal *d* management have been regular.'

For present purposes I assume a duty on Mr Ferriday to disclose his interest at an Eagle board meeting. That he did not so disclose it and that Mr Samuelson knew of the interest are plain. Mr Samuelson is to be taken to know the contents of the articles of association of Eagle and a fortiori of the general law regarding the need for disclosure. He is therefore to be taken to be aware of the need for Mr Ferriday *e* to declare his interest. He did not in fact have any knowledge whether or not Mr Ferriday had thus declared his interest and the issue is whether he was put on inquiry as to this, because it is well settled that ignorance by itself does not entitle an outsider to rely on the rule in *Royal British Bank v Turquand*. As Slade LJ put it in *Rolled Steel Products (Holdings) Ltd v British Steel Corp* [1985] 3 All ER 52 at 77, *f* [1986] Ch 246 at 284:

'It is a rule which only applies in favour of persons dealing with the company in good faith. If such persons have notice of the relevant irregularity, they cannot rely on the rule.'

In the *Rolled Steel Products* case the Court of Appeal held that the defence based on *g* *Royal British Bank v Turquand* should not have been allowed to be pleaded at a very late stage because that prevented the plaintiffs showing by cross-examination that there was notice of the relevant irregularity. The latter was that the relevant meeting was attended by only two directors, one of whom had a personal interest which under the articles disqualified him from voting unless he had declared his personal interest, which he had not, and without his vote there was no quorum. *h* What the plaintiff was deprived of the opportunity of proving by the very late amendment was not that the director with an interest needed to declare it, but that the defendant knew he had not done so or was put on inquiry whether he had. This is clear from Slade LJ's reasoning where he said ([1985] 3 All ER 52 at 78–79, [1986] Ch 246 at 286): *j*

'Though, for obvious reasons, these matters were never ventilated in evidence, I suspect, for example, that cross-examination of Mr Edwards, as a well-trained lawyer, could well have elicited admissions sufficient to indicate that Colvilles and BSC [the defendant], through their legal advisers, were

*a*    sufficiently put on inquiry, in the relevant sense, whether Mr Shenkman [the director with the interest] had duly declared his interest.'

In my judgment Mr Samuelson and through him Cowan de Groot were not put on inquiry whether or not Mr Ferriday's interest had been disclosed. It was submitted for Eagle that Mr Samuelson knew as a fact that Mr Ferriday had not disclosed his interest to the board of Eagle. That plea fails on the facts. Mr

*b*    Samuelson in my judgment had no knowledge of what passed between Mr Ferriday and the board of Eagle. The fact that Mr Ferriday was not a person to trouble his head over-much by what he would have regarded as lawyers' technicalities and referred to as 'paperwork' and that Mr Samuelson knew a great deal about Mr Ferriday's character and habits, all of which I accept, is in my judgment not nearly enough to put Mr Samuelson or Cowan de Groot on inquiry.

*c*    Both sides were represented by separate solicitors and an inquiry by Titmuss Sainer & Webb as to disclosures to Eagle's board by directors of Eagle of their interest would in my view have been most unusual and very probably not replied to as not being matter for inquiry. It is to be borne in mind that in the *Rolled Steel Products* case the relevant resolution had actually been prepared by solicitors for the claimed outsider, potentially a most material factor.

*d*

TRACING

Finally so far as the action and counterclaim are concerned Eagle relies on a claim to trace the proceeds of the four properties which have now been sold, i e all the five properties save the Bristol property. This is put on the basis principally

*e*    of the claims to constructive trusts as a right exercisable against Pinepad or Cowan de Groot on the footing that they are not bona fide purchasers for value without notice of Eagle's equity, the equity in question being the right of recovery because of the breach of fiduciary duty by Eagle directors of which it is said there was constructive if not actual notice. In my judgment this fails on the facts, but even if it did not there can in my view be no independent right to trace against a

*f*    purchaser for value under a contract for sale where the contract is not liable to be set aside and there is no valid claim to impose a constructive trust. I accept Mr Potts's submission for Cowan de Groot that tracing is not an independent cause of action.

Accordingly in my judgment the counterclaim by Eagle falls to be dismissed and I propose to grant the declaration sought in the statement of claim that the

*g*    notice exercising the option over the Newport property was valid and effective according to its terms.

COUNTERCLAIM TO COUNTERCLAIM

Pinepad and Cowan de Groot counterclaim that Mr Smith acting on behalf of

*h*    Eagle fraudulently misrepresented to Cowan de Groot that Fenway Properties was party to an agreement with Eagle to purchase the five properties and that Cowan de Groot and subsequently Pinepad would have to reach an accommodation with Fenway Properties to be able to purchase the five properties free from any claim by Fenway Properties and that in reliance on those misrepresentations £400,000 was paid to Fenway Properties on 9 June 1989.

*j*    I have found that Mr Smith did indeed falsely represent to Mr Samuelson that Fenway Properties had exchanged contracts with Eagle and paid a deposit. It was submitted for Eagle that Mr Smith was not acting in the course of his employment with Eagle in so doing. In my view Mr Smith was acting within his ostensible authority as Eagle's managing director. It is of course clear that he did not have

actual authority to make a fraudulent misrepresentation. Mr Smith in approaching
Mr Samuelson on behalf of Cowan de Groot was seeking to put a sale proposition    *a*
on behalf of Eagle to Cowan de Groot. Had it been the case that Eagle had
exchanged contracts with Fenway Properties it would have been entirely proper
for Mr Smith to tell Mr Samuelson of the existence of the prior contract. Indeed
it would have been improper not to do so. I appreciate that Mr Smith also acted
as intermediary for Fenway Properties or pretended to do so and that in that
respect Cowan de Groot through Mr Samuelson was on notice that he was not    *b*
acting on Eagle's behalf, but that does not in my view detract from the fact that it
was as a director of Eagle that he made the offer to sell to Cowan de Groot and
stated that Eagle had already got a contract with Fenway Properties.

Eagle also claims that Cowan de Groot is not entitled to rely upon Mr Smith's
ostensible authority because Mr Samuelson knew Mr Smith's statement was    *c*
fraudulent (that fails on the facts) or because Cowan de Groot was put on inquiry
whether or not Fenway Properties had a legitimate claim to share profits with
Cowan de Groot. I have effectively rejected the latter submission on the facts in
that I do not consider that Cowan de Groot was under a positive duty to investigate
the veracity of Mr Smith's representation. In my judgment it does not lie in the
mouth of a party which has through its officer made a fraudulent misrepresentation    *d*
to say that a better investigation would have revealed the falsity of the
representation.

I find that Mr Samuelson did believe and rely on the representation. That he
passed it on to the other members of the board of Cowan de Groot is clear and
they plainly relied on Mr Smith's representation, which was passed on to them
without substantial distortion. Eagle's claim that Cowan de Groot is disentitled    *e*
from claiming reliance because of Mr Samuelson's actual or 'Nelsonian' knowledge
fails on the facts. Similarly the claim that the chain of causation was broken by
Mr Samuelson's breach of duty in failing to disclose to Cowan de Groot that he
knew or believed Smith and Ferriday were acting fraudulently fails on the facts.

In my judgment Cowan de Groot succeeds in its counterclaim to counterclaim    *f*
but I will hear counsel on the question of quantum, more especially as there
would appear to be an error in the interest claimed by Cowan de Groot.

*Order accordingly.*

Evelyn M C Budd    Barrister.

# TAB 27

[HOUSE OF LORDS.]

WILLIAM DERRY, J. C. WAKEFIELD,          H. L. (E.)
M. M. MOORE, J. PETHICK, AND S. J. } APPELLANTS;     1889
WILDE  .  .  .  .  .  .  .  .  .          July 1.

.AND

SIR HENRY WILLIAM PEEK, BARONET.     RESPONDENT.

*Action of Deceit—False Representation—Fraud—"Legal Fraud"—Company*
*—Misrepresentation in Prospectus.*

> In an action of deceit the plaintiff must prove actual fraud. Fraud is
> proved when it is shewn that a false representation has been made know-
> ingly, or without belief in its truth, or recklessly, without caring whether
> it be true or false.
>
> A false statement, made through carelessness and without reasonable
> ground for believing it to be true, may be evidence of fraud but does not
> necessarily amount to fraud. Such a statement, if made in the honest
> belief that it is true, is not fraudulent and does not render the person
> making it liable to an action of deceit.
>
> A special Act incorporating a tramway company provided that the
> carriages might be moved by animal power, and, with the consent of the
> Board of Trade, by steam power. The directors issued a prospectus con-
> taining a statement that by their special Act the company had the right to
> use steam power instead of horses. The plaintiff took shares on the faith
> of this statement. The Board of Trade afterwards refused their consent
> to the use of steam power and the company was wound up. The plaintiff
> having brought an action of deceit against the directors founded upon the
> false statement :—
>
> *Held*, reversing the decision of the Court of Appeal and restoring the
> decision of Stirling J. (37 Ch. D. 541), that the defendants were not liable,
> the statement as to steam power having been made by them in the honest
> belief that it was true.

APPEAL from a decision of the Court of Appeal. The facts
are set out at length in the report of the decisions below (1).
For the present report the following summary will suffice:—

By a special Act (45 & 46 Vict. c. clix.) the Plymouth, Devon-
port and District Tramways Company was authorized to make
certain tramways.

(1) 37 Ch. D. 541.

H. L. (E.)
1889
DERRY
v.
PEEK.

By sect. 35 the carriages used on the tramways might be moved by animal power and, with the consent of the Board of Trade, by steam or any mechanical power for fixed periods and subject to the regulations of the Board.

By sect. 34 of the Tramways Act 1870 (33 & 34 Vict. c. 78), which section was incorporated in the special Act, "all carriages used on any tramway shall be moved by the power prescribed by the special Act, and where no such power is prescribed, by animal power only."

In February 1883 the appellants as directors of the company issued a prospectus containing the following paragraph :—

"One great feature of this undertaking, to which considerable importance should be attached, is, that by the special Act of Parliament obtained, the company has the right to use steam or mechanical motive power, instead of horses, and it is fully expected that by means of this a considerable saving will result in the working expenses of the line as compared with other tramways worked by horses."

Soon after the issue of the prospectus the respondent, relying, as he alleged, upon the representations in this paragraph and believing that the company had an absolute right to use steam and other mechanical power, applied for and obtained shares in the company.

The company proceeded to make tramways, but the Board of Trade refused to consent to the use of steam or mechanical power except on certain portions of the tramways.

In the result the company was wound up, and the respondent in 1885 brought an action of deceit against the appellants claiming damages for the fraudulent misrepresentations of the defendants whereby the plaintiff was induced to take shares in the company.

At the trial before Stirling J. the plaintiff and defendants were called as witnesses. The effect given to their evidence in this House will appear from the judgments of noble and learned Lords.

Stirling J. dismissed the action; but that decision was reversed by the Court of Appeal (Cotton L.J., Sir J. Hannen, and Lopes L.J.) who held that the defendants were liable to make good to the plaintiff the loss sustained by his taking the shares,

and ordered an inquiry (1). Against this decision the defen-
dants appealed.

H. L. (E.)
1889

DERRY
*v.*
PEEK.

March 28, 29; April 5, 9, 11.  Sir *Horace Davey* Q.C. and
*Moulton* Q.C. (*M. Muir Mackenzie* with them) for the appellants :—

The law as laid down by the Court of Appeal goes much
further than any previous decision and is unsound.  To support
an action of deceit it always was necessary at common law and
still is both there and in Chancery to prove fraud, i.e., that the
thing was done fraudulently.  Fraud never has been and never
will be exhaustively defined, the forms which deceit may take
being so many and various.  There is a negative characteristic :
it must be something which an honest man would not do ; not
merely what a logical or clear-headed man would not do.  How-
ever unbusinesslike a man may be he is not fraudulent if he acts
honestly.  The natural consequences of words or acts must be
taken to have been intended, but not so as to impute fraud to
honesty.  No honest mistake, no mistake not prompted by a dis-
honest intention, is fraud.  The shape of the mistake does not
make it more or less a fraud if it is a mistake.  Once establish
that a man honestly intended to do his duty, the consequences
cannot turn his words or acts into a fraud.  There may be an
obligation to see that no untrue statement is made, but the failure
to meet that obligation is not fraud, if there is no dishonest
intention.  The statement may be inaccurate, yet if the defendants
honestly—though mistakenly—believed that it substantially
represented the truth, there is no fraud, and an action of deceit
will not lie.  The decision of the Court of Appeal is that to such
a statement the law attaches a meaning which makes it fraudulent.
A material misstatement may be a ground for rescinding the
contract, but the consequences of fraud and of breach of contract
are widely different.  In an action for breach of contract the
defendant must make good his words.  In an action founded on
fraud he must bear the whole of the consequences which have
been induced by the fraudulent statement, which may be very
extensive.  The essence of fraud is the tricking a person into
the bargain.  If the fact that the consent of the Board of Trade

(1) 37 Ch. D. 541, 591.

3        2 A 2

H. L. (E.)
1889
DERRY
*v.*
PEEK.

was necessary was suppressed by these defendants in order to make the bait more alluring there was fraud. The issue then is one of fact, was there an intention to make the bait more alluring? It is not the carelessness leading to an untrue statement which makes fraud; it is the carelessness whether the statement is untrue or not. It is in this sense that the authorities have held defendants liable for fraud when they have made untrue statements "recklessly." The above propositions are the result of the authorities. The law laid down in the earlier cases is well exemplified by *Taylor* v. *Ashton* (1), where, however, the head-note does not truly represent the effect of the decision, and *Joliffe* v. *Baker* (2). In *Polhill* v. *Walter* (3)—which may be relied on by the respondent—the Court considered that the misrepresentation was made by the defendant *knowing it to be untrue.* The idea that something less than fraud was necessary to found an action of deceit crept in first in Lord Chelmsford's observations in *Western Bank of Scotland* v. *Addie* (4), and was extended by Cotton L.J. in *Weir* v. *Bell* (5), where he treats "recklessly" as if it meant "negligently," whereas it means "indifferent whether the statement be true or false." This confusion has arisen mainly since the Judicature Act, actions of deceit being tried in Chancery by judges who, sitting without juries, have confounded issues of fact with issues of law. Here the Court of Appeal held that an action of deceit lies if the defendant makes an untrue statement, without reasonable ground for believing it to be true, though he did in fact honestly believe it to be true. If that be the law a negligent, improvident, or wrong-headed man is a fraudulent man. A want of reasonable ground may be evidence of fraud, but it is not the same thing as fraud.

As to the facts, Stirling J. found that the defendants believed the misstatement to be true, and that finding ought to be conclusive. The Court of Appeal do not contradict that finding.

The misstatement complained of really meant that the company had obtained the necessary statutory authority to use steam power, without which authority no consents could have given

---

(1) 11 M. & W. 401.   (3) 3 B. & Ad. 114.
(2) 11 Q. B. D. 255.   (4)·Law Rep. 1 H. L. (Sc.) 145, 162.
(5) 3 Ex. D. at p. 242.

authority, because by the Tramways Act 1870 (33 & 34 Vict. c. 78 s. 34) steam power is prohibited except where the special Act authorizes steam power. It may be that the defendants knew the statement was not strictly accurate, but if so they honestly thought that the statement conveyed a substantially accurate representation of the fact, either because they thought it not worth while to encumber the prospectus with the qualifications, or because those qualifications were not present to their minds when they made the statement. In the prospectus reference is made to the special Act, so that any one who consulted the Act could see for himself what the authority was.

Lastly, the plaintiff was no doubt in some degree influenced by the misstatement, but there was no evidence that he would not have taken the shares if the statement had contained the full truth as to the necessary consents being obtained.

*Bompas* Q.C., and *Byrne* Q.C. (*Patullo* with them) for the respondent :—

The decision of the Court of Appeal is right and for the reasons there given. Directors are liable not only for a false statement which they know to be false, but for a false statement which they ought to have known to be false. This proposition is supported by the obiter dictum of Lord Westbury in *New Brunswick &c. Co.* v. *Conybeare* (1), and by the obiter dicta of the Lords in *Peek* v. *Gurney* (2) as to what the liability of the defendants would have been to original shareholders, and by the judgment of Jessel M.R. in *Smith* v. *Chadwick* (3).

It is not necessary that there should be carelessness whether the statement is true or not: it is enough if there be carelessness or negligence in making the statement. Making an untrue statement without reasonable ground is negligence which will support an action of deceit. In support of the respondent's contention the following authorities are relied on: *Slim* v. *Croucher* (4); *Evans* v. *Bicknell* (5); *Brownlie* v. *Campbell* (6); *Polhill* v. *Walter* (7); *Milne* v. *Marwood* (8); *Denton* v. *Great*

(1) 9 H. L. C. 725, 726.
(2) Law Rep. 6 H. L. 377.
(3) 20 Ch. D. 44.
(4) 1 D. F. & J. 518, 523.
(5) 6 Ves. at p. 183.
(6) 5 App. Cas. 925, 935, 950.
(7) 3 B. & Ad. 114.
(8) 15 C. B. 778, 781.

H. L. (E.)

1889

DERRY
*v.*
PEEK.

*Northern Railway Company* (1) ; *Thorn* v. *Bigland* (2) ; *Smout* v. *Ilbery* (3) ; *Rawlins* v. *Wickham* (4) ; *Hallows* v. *Fernie* (5) ; *Mathias* v. *Yetts* (6) ; *Smith* v. *Chadwick* (7) ; *Pasley* v. *Freeman* (8) ; *Chandelor* v. *Lopus* (9). [LORD HALSBURY L.C. referred to *Haycraft* v. *Cressy* (10).]

But it is not necessary to go the full length of the propositions contended for. Even if the fourth proposition of Lopes L.J. is not law, the appellants are nevertheless liable ; for the evidence shews that the statements were made either with the knowledge that they were untrue or with no belief on the subject.

It was stated that it was fully expected that a considerable saving would be effected by the use of steam. In fact the directors had not considered the matter, and when they did so afterwards there was a majority of one only in favour of steam. The effect of the evidence is not the same as to all the directors. As to Derry, the inference is that he never took the trouble to consider whether the statement was true or false. Wakefield and Wilde had complete knowledge but made statements which they knew not to be true at the time, thinking the requisite consents would be given. Pethick's evidence is inconsistent with itself. At one moment he says that he thought the Board of Trade had no right to refuse consent if its reasonable requirements were met, at another that he thought they had an absolute right to refuse. Moore, it must be admitted, stands in a different position, and can only be held liable under the fourth proposition of Lopes L.J.

The respondents are entitled to judgment on the grounds accepted by Lord Cranworth in *Western Bank of Scotland* v. *Addie* (11) and by the Earl of Selborne in *Smith* v. *Chadwick* (12): The belief which would justify the appellants must be one founded on an exercise of judgment. Grounds which would be sufficient in some cases would not be so in others, where *uberrima fides* is required, *e.g.* in statements made to an intending partner. As

(1) 25 L. J. (Q.B.) 129.

(2) 8 Ex. 725.

(3) 10 M. & W. 1, 10.

(4) 3 D. & J. 304, 312.

(5) Law Rep. 3 Ch. 467.

(6) 46 L. T. (N.S.) 497, 502.

(7) 20 Ch. D. 27, 44.

(8) 2 Sm. L. C., 9th ed. p. 74.

(9) 1 Ibid. p. 186.

(10) 2 East, 92.

(11) Law Rep. 1 H. L. (Sc.) 145, 164.

(12) 9 App. Cas. 187, 190.

to the duty of a director to persons about to take shares in a company, see *New Brunswick and Canada Railway Company* v. *Muggeridge* (1) and *Henderson* v. *Lacon* (2).

H. L. (E.)

1889

DERRY
*v.*
PEEK.

The House took time for consideration, LORD HALSBURY L.C. saying that notice would be given to the appellants if their Lordships desired to hear a reply.

July 1.   LORD HALSBURY L.C. :—

My Lords, I have so recently expressed an opinion in the Court of Appeal on the subject of actions of this character that I do not think it necessary to do more than say that I adhere to what I there said (3). To quote the language now some centuries old in dealing with actions of this character, "fraud without damage or damage without fraud" does not give rise to such actions. I have had also the opportunity of reading the judgment of my noble and learned friend Lord Herschell, and I could desire to add nothing to his exhaustive and lucid treatment of the authorities.

My Lords, when I turn to the question of fact I confess I am not altogether satisfied. In the first place I think the statement in the prospectus was untrue,—untrue in fact, and to the minds of such persons as were likely to take shares I think well calculated to mislead. I think such persons would have no idea of the technical division between tramways that had rights to use mechanical means and tramways that had not. What I think they would understand would be that this particular tramway was in an exceptionably advantageous position,—that the statement was of a present existing fact, that it had at the time of the invited subscription for shares the right to use steam. And I think such a statement if wilfully made with the consciousness of its inaccuracy would give rise to an action for deceit, provided that damage had been sustained if a person had acted upon a belief induced by such a prospectus.

But upon the question whether these statements were made with a consciousness of their misleading character, I cannot but

(1) 1 Dr. & S. 363, 381.          (2) Law Rep. 5 Eq. 249.
(3) See *Arnison* v. *Smith*, 41 Ch. D. 348, 367.

H. L. (E.)
1889
DERBY
*v.*
PEEK.

Lord Halsbury,
L.C.

be influenced by the opinions entertained by so many of your Lordships that they are consistent with the directors' innocence of any intention to deceive.

The learned judge who saw and heard the witnesses acquitted the defendants of intentional deceit, and although the Court of Appeal held them liable, overruling the decision of the learned judge below, they appear to me to have justified their decision upon grounds which I do not think tenable, namely, that they, the directors, were liable because they had no reasonable ground for the belief which nevertheless it is assumed they sincerely entertained.

My Lords, I think it would have been satisfactory to have had a more minute and exact account of how this prospectus was framed, the actual evidence of the draftsman of it, and the discussions which took place upon the alteration in form; which alteration gave such marked and peculiar prominence to the special feature of this particular tramway, in respect of the possession of power to use steam. Nevertheless, if, as I have said, the facts are reconcilable with the innocence of the directors, and with the absence of the mens rea which I consider an essential condition of an action for deceit, the mere fact of the inaccuracy of the statement ought not to be pressed into constituting a liability which appears to me not to exist according to the law of England.

As to the question whether Sir Henry Peek was induced to take his shares by reliance on the misleading statement, I admit that I have very considerable doubt. On the one hand I do not believe that any one can so far analyse his mental impressions as to be able to say what particular fact in a prospectus induced him to subscribe. On the other hand the description of Sir Henry Peek, even now that the question has been pointedly raised and brought to his mind, of what did or did not induce him to take his shares is hardly reconcilable with his having been substantially induced by the statement in question to take them.

On the whole I acquiesce in the judgment which one of your Lordships is about to move, namely, that the judgment appealed from be reversed.

LORD WATSON :—

My Lords, I agree with Stirling J. that, as matter of fact, the appellants did honestly believe in the truth of the representation upon which this action of deceit is based. It is by no means clear that the learned judges of the Court of Appeal meant to differ from that conclusion; but they seem to have held that a man who makes a representation with the view of its being acted upon, in the honest belief that it is true, commits a fraud in the eye of the law, if the court or a jury shall be of opinion that he had not reasonable grounds for his belief. I have no hesitation in rejecting that doctrine, for which I can find no warrant in the law of England. But I shall not trouble your Lordships with any observations of mine, because I accept without reserve the opinion about to be delivered by my noble and learned friend upon my left (Lord Herschell).

LORD BRAMWELL :—

My Lords, I am of opinion that this judgment should be reversed. I am glad to come to this conclusion; for, as far as my judgment goes, it exonerates five men of good character and conduct from a charge of fraud, which, with all submission, I think wholly unfounded, a charge supported on such materials as to make all character precarious. I hope this will not be mis-understood; that promoters of companies will not suppose that they can safely make inaccurate statements with no responsi-bility. I should much regret any such notion; for the general public is so at the mercy of company promoters, sometimes dis-honest, sometimes over sanguine, that it requires all the protec-tion that the law can give it. Particularly should I regret if it was supposed that I did not entirely disapprove of the conduct of those directors who accepted their qualification from the con-tractor or intended contractor. It is wonderful to me that honest men of ordinary intelligence cannot see the impropriety of this. It is obvious that the contractor can only give this qualification because he means to get it back in the price given for the work he is to do. That price is to be fixed by the direc-tors who have taken his money. They are paid by him to give

H. L. (E.)

1889

DERBY
v.
PEEK.

H. L. (E.)
1889

DERRY
v.
PEEK.

Lord Bramwell.

him a good price, as high a price as they can, while their duty to their shareholders is to give him one as low as they can.

But there is another thing. The public, seeing these names, may well say, " These are respectable and intelligent men who think well enough of this scheme to adventure their money in it ; we will do the same," little knowing that those thus trusted had made themselves safe against loss if the thing turned out ill, while they might gain if it was successful. I am glad to think that Mr. Wilde, a member of my old profession, was not one of those so bribed. The only shade of doubt I have in the case is, that this safety from loss in the directors may have made them less careful in judging of the truth of any statements they have made.

There is another matter I wish to dispose of before going into the particular facts of the case. I think we need not trouble ourselves about " legal fraud," nor whether it is a good or bad expression ; because I hold that actual fraud must be proved in this case to make the defendants liable, and, as I understand, there is never any occasion to use the phrase " legal fraud " except when actual fraud cannot be established. " Legal fraud " is only used when some vague ground of action is to be resorted to, or, generally speaking, when the person using it will not take the trouble to find, or cannot find, what duty has been violated or right infringed, but thinks a claim is somehow made out. With the most sincere respect for Sir J. Hannen I cannot think the expression " convenient." I do not think it is " an explanation which very clearly conveys an idea ;" at least, I am certain it does not to my mind. I think it a mischievous phrase, and one which has contributed to what I must consider the erroneous decision in this case. But, with these remarks, I have done with it, and will proceed to consider whether the law is not that actual fraud must be proved, and whether that has been done.

Now, I really am reluctant to cite authorities to shew that actual fraud must be established in such a case as this. It is one of the first things one learned, and one has never heard it doubted until recently. I am very glad to think that my noble and learned friend (Lord Herschell) has taken the trouble to go into the authorities fully ; but to some extent I deprecate it,

because it seems to me somewhat to come within the principle
Qui s'excuse s'accuse.    When a man makes a contract with
another he is bound by it; and, in making it, he is bound not to
bring it about by fraud.    Warrantizando vendidit gives a cause
of action if the warranty is broken.    Knowingly and fraudulently
stating a material untruth which brings about, wholly or partly,
the contract, also gives a cause of action.    To this may now be
added the equitable rule (which is not in question here), that a
material misrepresentation, though not fraudulent, may give a
right to avoid or rescind a contract where capable of such rescis-
sion.    To found an action for damages there must be a contract
and breach, or fraud.    The statement of claim in this case states
fraud.    Of course that need not be proved merely because it is
stated.    But no one ever heard of or saw a statement of claim or
declaration for deceit without it.    There is not an authority at
common law, or by a common law lawyer, to the contrary; none
has been cited, though there may be some incautious, hesitating,
expressions which point that way.    Every case from the earliest
in Comyns' Digest to the present day alleges it.    Further, the
learned judges of the Court of Appeal hardly deny it.    There is
indeed an opinion to the contrary of the late Master of the
Rolls, but it must be remembered that his knowledge of actions
of deceit was small, if any.    I did not think, then, that it was
necessary to cite cases to shew that to maintain this action
fraud in the defendant must be shewn, though I am glad it has
been done.

Now, as to the evidence.    The plaintiff's case is that the
defendants made an untrue statement, which they knew to be
untrue, and likely to influence persons reading it; therefore they
were fraudulent.    It is not necessary to consider whether a
primâ facie case was made out by the plaintiff.    We have all
the evidence before us, and must judge on the whole.    The
alleged untrue statement is that, " The company has the right to
use steam or mechanical power instead of horses," and that a
saving would be thereby effected.    Now, this is certainly untrue,
because it is stated as an absolute right, when in truth it was
conditional on the approval of the Board of Trade, and the sanc-
tion or consent of two local boards; and a conditional right is

H. L. (E.)

1889

DERRY
v.
PEEK.

Lord Bramwell.

348                          HOUSE OF LORDS                    [VOL. XIV.

H. L. (E.)
1889
DERRY
v.
PEEK.

Lord Bramwell.

not the same as an absolute right. It is also certain that the
defendants knew what the truth was, and therefore knew that
what they said was untrue. But it does not follow that the
statement was fraudulently made. There are various kinds of
untruth. There is an absolute untruth, an untruth in itself,
that no addition or qualification can make true ; as, if a man says
a thing he saw was black, when it was white, as he remembers
and knows. So, as to *knowing* the truth. A man may know it,
and yet it may not be present to his mind at the moment of
speaking ; or, if the fact is present to his mind, it may not occur
to him to be of any use to mention it. For example, suppose a
man was asked whether a writing was necessary in a contract for
the making and purchase of goods, he might well say " Yes,"
without adding that payment on receipt of the goods, or part,
would suffice. He might well think that the question he was
asked was whether a contract for goods to be made required a
writing like a contract for goods in existence. If he was writing
on the subject he would, of course, state the exception or quali-
fication.

Now, consider the case here. These directors naturally trust
to their solicitors to prepare their prospectus. It is prepared and
laid before them. They find the statement of their power to use
steam without qualification. It does not occur to them to alter
it. They swear they had no fraudulent intention. At the very
last they cannot see the fraud. There is their oath, their previous
character unimpeached, and there is to my mind this further
consideration : the truth would have served their purpose as well.
" We have power to use steam, etc., of course with the usual con-
ditions of the approval of the Board of Trade and the consent
of the local authorities, but we may make sure of these being
granted, as the Board of Trade has already allowed the power to
be inserted in the Act, and the local authorities have expressed
their approbation of the scheme." (See plaintiff's answer, 313 (1),
which shews that he would have been content with that state-
ment.)

During the argument I said I am not sure that I should
not have passed the prospectus. I will not say so now, because

(1) The references are to the Appendix printed for the House.

certainly I would not pass it now after knowing the unfortunate
use made of the statement, and no one can tell what would have
been the state of his mind if one of the factors influencing it was
wanting.    But I firmly believe it might have been, and was,
honestly done by these defendants.    Stirling J. saw and heard
them, and was of that opinion.    It is difficult to say that the
plaintiff was not.    The report of the 6th of November 1884
shewed that the consent of the Board of Trade was necessary,
shewed also that the corporation of Devonport would not consent,
shewed therefore the " untruth " and the defendants' knowledge
of it, and yet the plaintiff " had every confidence in the direc-
tors; " and see his answers to questions 53 and 365.

I now proceed to consider the judgments that have been
delivered.    It is not necessary to declare my great respect for
those who have delivered them.    Stirling J. refuses to say
whether actual fraud must be shewn, and deals with the case on
the footing that the question is whether the defendants had
reasonable grounds for making the statement they did.    He holds,
as I do, that they thought the company had the right, as put in
the prospectus, to use steam.    Then he says he must " come to
the conclusion that they had reasonable grounds for their belief;
at all events, that their grounds were not so unreasonable as to
justify me in charging them with being guilty of fraud."    It is
singular that the learned judge seems to consider that unreason-
ableness must be proved to such an extent as to shew fraud.    He
then proceeds, for what seem to me unanswerable reasons, to shew
that they did every one believe that they had the right stated
in the prospectus.    He refers to what he saw of them in the box.
He says he cannot come to the conclusion that their belief was
so unreasonable and so unfounded, and their proceedings so
reckless or careless that they ought to be fixed with the con-
sequences of deceit.    He makes an excellent remark, that " mer-
cantile men dealing with matters of business would be the first
to cry out if I extended the notion of deceit into what is honestly
done in the belief that these things would come about, and when
they did not come about, make them liable in an action of fraud."
My only variation of this would be that it may be that the
objection did not, and naturally did not, occur to them.    It has

H. L. (E.)

1889

DERBY
*v.*
PEEK.

Lord Bramwell.

H. L. (E.)
1889
DERRY
v.
PEEK.

Lord Bramwell.

not been argued, and I will say no more on the question, whether had the plaintiff known the contents of the Act he would or would not have applied for the shares, than that I agree with Stirling J.

Cotton L.J. says the law is "that where a man makes a statement to be acted on by others which is false, and which is known by him to be false, or is made by him recklessly, or without care whether it is true or false, that is without any reasonable ground for believing it to be true," he is liable to an action for deceit. Well, I agree to all before the "that is" and I agree to what comes after if it is taken as equivalent to what goes before, viz., "recklessly or without care whether it is true or false," understanding "recklessly" as explained by "without care whether it is true or false." For a man who makes a statement without care and regard for its truth or falsity commits a fraud. He is a rogue. For every man who makes a statement says "the truth is so and so, and I know it or believe it." I say I agree to this as I understand it.

It seems to me, with great respect, that the learned Lord Justice lost sight of his own definition, and glided into a different opinion. He says (p. 451, F.), "There is a duty cast upon a director who makes that statement to take care that there are no statements in it which in fact are false; to take care that he has reasonable ground for the material statements which are contained in that document (prospectus), which he intends to be acted on by others. And although in my opinion it is not necessary there should be what I should call fraud, there must be a departure from duty, . . . and he has violated the right which those who receive the statement have to have true statements only made to them." This seems to be a most formidable matter. I agree there is some such duty. I agree that not only directors in prospectuses, but all persons in all dealings should tell the truth. If they do not they furnish evidence of fraud; they subject themselves to have the contract rescinded. But to say that there is "a right to have true statements only made," I cannot agree, and I think it would be much to be regretted if there was any such right. Mercantile men, as Stirling J. says, would indeed cry out. No qualification is stated.

If this is law the statement may be reasonably believed to be
true by him who makes it, but if untrue there is to be a cause of
action ; and that although he may have refused a warranty.   I
hope not.   There is a duty to tell the truth, or, rather, what is
believed to be the truth.   At page 452, B., his Lordship says :
" Where a man makes a false statement without reasonable ground
to suppose it to be true, and without taking care to ascertain if
it is true, he is liable civilly as much as a person who commits
what is usually called fraud."   I say I agree if that means
making a statement of which he knows or believes not the truth.
His Lordship proceeds to examine whether the defendants had
reasonable ground for believing what they said, and comes to
the conclusion that they had not, and so holds them liable, not
because they were dishonest, but because they were unreasonable.
I say they never undertook to be otherwise.   He says (461 G.) :
" It is not that I attribute to them any intention to commit fraud,
but they have made a statement without any sufficient reason for
believing it to be true."

Sir James Hannen says that he agrees with Cotton L.J.'s state-
ment of the law, and adds : " If a man takes upon himself to assert
a thing to be true, which he does not know to be true, and has no
reasonable ground to believe to be true," it is sufficient in an
action of deceit.   I agree, if he knows he has no such reasonable
ground and the knowledge is present to his mind ; otherwise,
with great respect, I differ.   He cites Lord Cairns (465 F.), that,
" if persons take upon themselves to make assertions as to which
they are ignorant whether they are true or untrue, they must in
a civil point of view be held as responsible as if they had asserted
that which they knew to be untrue."   So say I, but this does not
support Sir James's proposition.   Nor does he deal with what he
quotes from Lord Cranworth.   But further (466), he speaks of
legal fraud as meaning " that degree of moral culpability in the
statement of an untruth to induce another to alter his position,
to which the law attaches responsibility."   But if there is moral
culpability, I agree there is responsibility.   But to believe with-
out reasonable grounds is not moral culpability, but, (if there is
such a thing) mental culpability.   He says, " the word ' fraud ' is
in common parlance reserved for actions of great turpitude, but

H. L. (E.)

1889

DERRY
v.
PEEK.

Lord Bramwell.

H. L. (E.)
1889.
DERRY
*v.*
PEEK.
Lord Bramwell.
——

the law applies it to lesser breaches of moral duty." I agree the law applies it to all breaches of the moral duty to tell the truth in dealing with others; but that duty cannot be honestly broken. To be actionable, a breach of that duty must be dishonest. Nay, it is a man's duty sometimes to tell an untruth. For instance, when asked as to a servant's character, he must say what he believes is the truth, however he may have formed his opinion, and however wrong it may be. His Lordship says he cannot think the directors had any reasonable ground for believing the prospectus to be true. But had they the matter present to their minds? Even if this were the question I should decide in their favour.

As to the judgment of Lopes L.J., I quite agree with what he says : " I know of no fraud which will support an action of deceit to which some moral delinquency does not belong." I think that shews the meaning of what he says " fourthly," though that is made doubtful by what he says at 472 D.

I think, with all respect, that in all the judgments there is, I must say it, a confusion of unreasonableness of belief as evidence of dishonesty, and unreasonableness of belief as of itself a ground of action.

I have examined these judgments at this length owing to my sense of their importance and the importance of the question they deal with. I think it is most undesirable that actions should be maintainable in respect of statements, made unreasonably perhaps, but honestly. I think it would be disastrous if there was "a right to have true statements only made." This case is an example. I think that in this kind of case, as in some others, Courts of Equity have made the mistake of disregarding a valuable general principle in their desire to effect what is, or is thought to be, justice in a particular instance. It might, perhaps, be well to enact that in prospectuses of public companies there should be a warranty of the truth of all statements except where it was expressly said there was no warranty. The objection is to exceptional legislation, and to the danger of driving respectable and responsible men from being promoters, and of substituting for them those who are neither.

In this particular case I hold that unless fraud in the defendants could be shewn, the action is not maintainable. I am

VOL. XIV.]                    AND PRIVY COUNCIL.                    353

satisfied there was no fraud.   Further, if an unreasonable mis- | H. L. (E.)
statement were enough, I hold there was none.   Still further, I | 1889
do not believe that the plaintiff was influenced by the mis- | DERRY
statement, though I am entirely satisfied that he was an honest | *v.*
witness. | PEEK.

LORD FITZGERALD :—

My Lords, the pleadings and the facts have been already
referred to by the noble Lords who have addressed the House.
The action is for deceit.   The writ was sued out in February
1885, and originally claimed rescission of the contract with the
company.   It was subsequently amended by striking out the
company as defendants, and also the prayer for rescission, and it
assumed the character of an action for deceit against the present
appellants (five of the directors), and claimed "damages for the
fraudulent misrepresentations of the defendants."

The statement of claim, which is sufficient in form to raise the
real question, alleged the misrepresentation to exist in the pro-
spectus issued in February 1883, and to consist of the paragraph
so often read, that the company had a right to use steam or other
mechanical motive power; and it was further alleged "that the
defendants intended thereby to represent that the company had
an absolute right to use steam and other mechanical power," and
that such representation was made fraudulently, and with the
view to induce the plaintiff to take shares in the company.

So far, my Lords, the real issue seems to have been raised
fairly and clearly, and to depend on matters of fact.   There were
circumstances connected with the promotion of the company,
and the procuring of four of the defendants to act as directors,
which tended to create suspicion as to their statements and their
bona fides, and attracted directly the attention of the learned
judge before whom the case was tried.   The defendants, who
were severally produced as witnesses at the trial, were exposed
to a very lengthened and searching cross-examination by counsel
for the plaintiff, and were also carefully examined by the judge
as to these transactions, with the result apparently of freeing
them from any imputation therein of moral misconduct.

The question which I am about to examine in the first in-

354                           ¡HOUSE OF LORDS          [VOL. XIV.

H. L. (E.)
1889
Derry
*v.*
Peek.

Lord FitzGerald.

stance, and excluding for the present the element of fraud, is, whether the impugned statement in the prospectus was a false statement in the sense of being untrue. That it was inaccurate so far as it purported to give the legal effect of the special Act I do not doubt, but was it untrue as representing the position of the company in a popular and business sense? The General Tramways Act (33 & 34 Vict. c. 78), which regulates tramways generally, but subject to the provisions of the special Act, if any, of each company, places them under the supervision of the Board of Trade with a view to public safety, and for public protection generally, and by its 34th section it provides " that all carriages used on tramways shall be moved by the power prescribed by the special Act."

The special Act of this company became law on the 24th of July 1882, and by ss. 4 and 5 the company incorporated by the Act is empowered to make the seven tramways in question in all respects in accordance with the plans and sections. Sect. 15 provides minutely for their formation, subject to the orders of the Board of Trade, and by sect. 16 the tramway is not to be opened for public traffic until it shall have been inspected and certified by the Board of Trade to be fit for such traffic.

Before referring to the 35th section of the special Act we may glance at sect. 37 of that Act, which empowers the Board of Trade to make bye-laws as to any of the tramways on which steam may be used under the authority of the Act, and sect. 44, which provides that where the company intends to use steam they shall give two months' notice.

There are several other sections providing for the use of steam power if the company should elect to use it as the motor.

In the light of those sections of the special Act, and of sect. 34 of the general Act, let us now look at the particular paragraph of the prospectus, and sect. 35 of the special Act. By that section Parliament has done that which Parliament could do, and which the Board of Trade could not do. It has conferred on the company authority to use steam as its motive power. It has not imposed on the company the use of steam power, but it says that they may use it if they elect to do so. Before dealing with the consent of the Board of Trade I desire to call attention

to the proviso in the 35th section, "that the exercise of the powers hereby conferred with respect to the use of steam shall be subject to the regulations in Schedule 'A,' and to any regulations which may be added thereto or substituted therefor by the Board of Trade for securing to the public all reasonable protection against danger in the exercise of the powers by this Act conferred with respect to the use of steam."

H. L. (E.)

1889

DERBY
*v.*
PEEK.

Lord FitzGerald.

Schedule A., referred to in sect. 35, contains no less than ten regulations for the direction of the company in the exercise of the right so conferred to use steam power.

Now, turning back to the words "with the consent of the Board of Trade," in sect. 35 of the special Act, that consent could not confer, nor would its absence take away, the right conferred by the legislature to use steam as a motor. Its true character is that of a precaution imposed by the legislature to defer the actual exercise of the right conferred until the supervision of the Board of Trade secures to the public all reasonable protections against danger. To attain these objects the legislature provides that the powers it has conferred should not be actually exercised without the consent of the Board of Trade.

My Lords, I have, though with difficulty, arrived at the conclusion that the statement in the prospectus, that by the special Act the company had the right to use steam power, was not untrue in a popular or business sense.

Let us see for a moment in what way and with what meaning General Hutchinson used similar expressions. In his report of the 12th of July 1884 he says: "The Act of 1882 gives, however, the company authority to use mechanical power over all their system, and I think it would be most objectionable that this power should be exercised on parts of Tramway No. 1 on account of the narrowness of three of the roads."

The remainder of the incriminated paragraph of the prospectus is, "and it is fully expected that by means of this (i.e., the use of steam) a considerable saving will result in the working expenses of the line as compared with other tramways worked by horses." This was not untrue: there had been a division of opinion in the directory on the subject, which was finally and before the issue of the prospectus resolved in favour of steam.

H. L. E.)
1889
DERRY
*v.*
PEEK.

Lord FitzGerald.

The conclusion I have arrived at, my Lords, is that this paragraph of the prospectus, though inaccurate in point of law in one particular, seems on the whole to have been morally true.

If this view is correct it is an answer to the action, but assuming that it is not correct, or that your Lordships are not prepared to adopt it, I proceed to express my opinion on the remaining substance of the action. Cotton L.J. describes the action as "an action of deceit, a mere common law action." The description is accurate, and I proceed to deal with it as a mere common law action. It has not been in the least altered in its characteristics by having been instituted in the Chancery Division, or tried by a judge without the aid of a jury, nor are your Lordships necessarily driven to consider on the present appeal some of the subtle and refined distinctions which have been engrafted on the clear and simple principles of the common law. The action for deceit at common law is founded on fraud. It is essential to the action that moral fraud should be established, and since the case of *Collins* v. *Evans* (1), in the Exchequer Chamber, it has never been doubted that fraud must concur with the false statement to maintain the action. It would not be sufficient to shew that a false representation had been made. It must further be established that the defendant knew at the time of making it that the representation was untrue, or, to adopt the language of the learned editors of the Leading Cases, that "the defendant must be shewn to have been actually and fraudulently cognisant of the falsehood of his representation or to have made it fraudulently without belief that it was true." The leading counsel for the respondent met the argument fairly on the allegations of fact. He alleged "that the defendants were not honest; that they stated in the prospectus a definite lie, and knew that it was a lie." That is the very issue, in fact, in the case.

The whole law and all the cases on the subject will be found in the notes to *Chandelor* v. *Lopus* (2) and *Pasley* v. *Freeman* (3). There is also a clear and able summary of the decisions, both in law and in equity, brought down to the present time in the recent edition of Benjamin on Sales, by Pearson-Gee and Boyd.

(1) 5 Q. B. 804, 820.          (2) 1 Smith's L. C. 9th Ed. p. 186.
          (3) 2 Smith's L. C. 9th Ed. p. 74.

AND PRIVY COUNCIL.

I desire to make an observation on *Chandelor* v. *Lopus* (1). H. L. (E.)
The report in Cro. Jac. 4 would seem to have but little direct
bearing on the present case were it not for the opinion attributed
to Anderson J.; but there is a valuable note in 1 Dyer by
Vaillant (75a) which is as follows: Lopus brought an action
upon the case against Chandelor, and shewed that, whereas the
defendant was a goldsmith, and skilled in the nature of pre-
cious stones, and being possessed of a stone which the defendant
asserted and assured the said plaintiff to be a true and per-
fect stone called a bezoar stone &c., upon which the plaintiff
bought it &c. There the opinion of Popham C.J. was " that if I
have any commodities which are damaged (whether victuals or
otherwise), and I, *knowing them to be so,* sell them for good, and
affirm them to be so, an action upon the case lies for the deceit:
but although they be damaged, if I, *knowing not that,* affirm them
to be good, still no action lies, without I warrant them to be
good." The action seems originally to have been on a warranty
which failed in fact, as there had been no warranty, and it was
then sought to support it as an action for deceit ; but it was not
alleged in the count that the defendant knew the representation
to be untrue. It was in reference to that that the observation of
Popham C.J. was made. He had the reputation of being a
consummate lawyer.

The note in 1 Dyer (75a) was probably by Mr. Treby, after-
wards Chief Justice Treby. He edited an edition of Dyer
published in 1688. I have not had an opportunity of referring
to it, but it is said that he gave the public some highly authori-
tative notes in that edition. I have quoted from Mr. Vaillant's
edition, published in 1794.

The whole evidence given on this appeal has been laid before
your Lordships, and we have to deal with it as a whole. That
evidence has been already so fully stated and criticised that it
is not necessary for me to do more than to state the conclusions
of fact which in my opinion are reasonably to be deduced from
it, viz. that the several defendants did not know that the in-
criminated statement in the prospectus was untrue, and that, on
the contrary, they severally and in good faith believed it to be

H. L. (E.)

1889

DERRY
*v.*
PEEK.

Lord FitzGerald.

(1) 1 Smith's L. C. 9th Ed. p. 186.

358                        HOUSE OF LORDS                [VOL. XIV.

H. L. (E.)
1889
DERRY
v.
PEEK.

Lord FitzGerald.
true. The conclusions, in fact, at which I have arrived, render
it unnecessary for me to consider the long and rather bewildering
list of authorities to which your Lordships were referred, or to
criticise the reasons given in the Court of Appeal for their deci-
sion in the present case. I desire, however, to make a single
observation.

There is one characteristic which, as it seems to me, pervades
each of the several judgments in the Court of Appeal, viz. that
the bonâ fide belief of the defendants in the truth of the repre-
sentation was unavailing unless it was a reasonable belief resting
on reasonable grounds. If this is correct, it seems to me that in
an action for "deceit" it would be necessary to submit to the
jury (if tried before that tribunal) not only the existence of that
belief bonâ fide, but also the grounds on which it was arrived at,
and their reasonableness.

I am by no means satisfied that such is the law, and if now
driven to express an opinion on it, I would prefer following the
opinion of Lord Cranworth in *Western Bank of Scotland* v.
*Addie* (1), in which he said: " I confess that my opinion was
that in what his Lordship (the Lord President) thus stated, he
went beyond what principle warrants. If persons in the situa-
tion of directors of a bank make statements as to the condition
of its affairs, which they bonâ fide believe to be true, I cannot
think they can be guilty of fraud, because other persons think,
or the Court thinks, or your Lordships think, that there was no
sufficient ground to warrant the opinion which they had formed.
If a little more care and caution must have led the directors to a
conclusion different from that which they put forth, this may
afford strong evidence to shew that they did not really believe
in the truth of what they stated, and so that they were guilty of
fraud. But this would be the consequence, not of their having
stated as true what they had not reasonable ground to believe to
be true, but of their having stated as true what they did not
believe to be true."

A director is bound in all particulars to be careful and cir-
cumspect, and not, either in his statements to the public or in
the performance of the duties he has undertaken, to be careless

(1) Law Rep. 1 H. L., Sc. 145, 168.

or negligent, or rash. Want of care or circumspection, as well
as recklessness, may in such a case as the present be taken into
consideration in determining at every stage the question of
bona fides.

H. L. (E.)
1889
DERRY
v.
PEEK.

My Lords, I am of opinion that the decision of the Court of
Appeal should be reversed.

LORD HERSCHELL :—

My Lords, in the statement of claim in this action the respon-
dent, who is the plaintiff, alleges that the appellants made in
a prospectus issued by them certain statements which were
untrue, that they well knew that the facts were not as stated in
the prospectus, and made the representations fraudulently, and
with the view to induce the plaintiff to take shares in the
company.

"This action is one which is commonly called an action of
deceit, a mere common law action." This is the description of
it given by Cotton L.J. in delivering judgment. I think it
important that it should be borne in mind that such an action
differs essentially from one brought to obtain rescission of a
contract on the ground of misrepresentation of a material fact.
The principles which govern the two actions differ widely.
Where rescission is claimed it is only necessary to prove that
there was misrepresentation ; then, however honestly it may have
been made, however free from blame the person who made it,
the contract, having been obtained by misrepresentation, cannot
stand. In an action of deceit, on the contrary, it is not enough
to establish misrepresentation alone ; it is conceded on all hands
that something more must be proved to cast liability upon the
defendant, though it has been a matter of controversy what
additional elements are requisite. I lay stress upon this because
observations made by learned judges in actions for rescission
have been cited and much relied upon at the bar by counsel for
the respondent. Care must obviously be observed in applying
the language used in relation to such actions to an action of
deceit. Even if the scope of the language used extend beyond
the particular action which was being dealt with, it must be
remembered that the learned judges were not engaged in deter-

H. L. (E.)
1889

DERBY
*v.*
PEEK.

Lord Herschell.

mining what is necessary to support an action of deceit, or in discriminating with nicety the elements which enter into it.

There is another class of actions which I must refer to also for the purpose of putting it aside. I mean those cases where a person within whose special province it lay to know a particular fact, has given an erroneous answer to an inquiry made with regard to it by a person desirous of ascertaining the fact for the purpose of determining his course accordingly, and has been held bound to make good the assurance he has given. *Burrowes v. Lock* (1) may be cited as an example, where a trustee had been asked by an intended lender, upon the security of a trust fund, whether notice of any prior incumbrance upon the fund had been given to him. In cases like this it has been said that the circumstance that the answer was honestly made in the belief that it was true affords no defence to the action. Lord Selborne pointed out in *Brownlie v. Campbell* (2) that these cases were in an altogether different category from actions to recover damages for false representation, such as we are now dealing with.

One other observation I have to make before proceeding to consider the law which has been laid down by the learned judges in the Court of Appeal in the case before your Lordships. "An action of deceit is a common law action, and must be decided on the same principles, whether it be brought in the Chancery Division or any of the Common Law Divisions, there being, in my opinion, no such thing as an equitable action for deceit." This was the language of Cotton L.J. in *Arkwright v. Newbould* (3). It was adopted by Lord Blackburn in *Smith v. Chadwick* (4), and is not, I think, open to dispute.

In the Court below Cotton L.J. said : "What in my opinion is a correct statement of the law is this, that where a man makes a statement to be acted upon by others which is false, and which is known by him to be false, or is made by him recklessly, or without care whether it is true or false, that is, without any reasonable ground for believing it to be true, he is liable in an action of deceit at the suit of anyone to whom it was addressed or anyone of the class to whom it was addressed and who was

(1) 10 Ves. 470.                              (3) 17 Ch. D. 320.
(2) 5 App. Cas. at p. 935.                    (4) 9 App. Cas. 193.

VOL. XIV.]          AND PRIVY COUNCIL.                    361

materially induced by the misstatement to do an act to his pre-
judice." About much that is here stated there cannot, I think,
be two opinions. But when the learned Lord Justice speaks of
a statement made recklessly or without care whether it is true or
false, *that is* without any reasonable ground for believing it to be
true, I find myself, with all respect, unable to agree that these are
convertible expressions. To make a statement careless whether
it be true or false, and therefore without any real belief in its
truth, appears to me to be an essentially different thing from
making, through want of care, a false statement, which is never-
theless honestly believed to be true. And it is surely conceiv-
able that a man may believe that what he states is the fact,
though he has been so wanting in care that the Court may
think that there were no sufficient grounds to warrant his belief.
I shall have to consider hereafter whether the want of reasonable
ground for believing the statement made is sufficient to support
an action of deceit. I am only concerned for the moment to
point out that it does not follow that it is so, because there is
authority for saying that a statement made recklessly, without
caring whether it be true or false, affords sufficient foundation
for such an action.

That the learned Lord Justice thought that if a false statement
were made without reasonable ground for believing it to be true
an action of deceit would lie, is clear from a subsequent passage
in his judgment. He says that when statements are made in a
prospectus like the present, to be circulated amongst persons in
order to induce them to take shares, " there is a duty cast upon
the director or other person who makes those statements to take
care that there are no expressions in them which in fact are false ;
to take care that he has reasonable ground for the material state-
ments which are contained in that document which he prepares
and circulates for the very purpose of its being acted upon by
others."

The learned judge proceeds to say : " Although in my opinion
it is not necessary that there should be what I should call fraud,
yet in these actions, according to my view of the law, there must
be a departure from duty, that is to say, an untrue statement
made without any reasonable ground for believing that statement

H. L. (E.)

1889

DERRY
*v.*
PEEK.

Lord Herschell.

-03635-jpm   Doc 271-2   Filed 04/03/17   Entered 04/03/17 18:29:57   Exhibit
Part 2   Pg 151 of 354

H. L. (E.)  to be true; and in my opinion when a man makes an untrue state-
1889     ment with an intention that it shall be acted upon without any
DERRY    reasonable ground for believing that statement to be true he
v.       makes a default in a duty which was thrown upon him from the
PEEK.    position he has taken upon himself, and he violates the right
Lord Herschell. which those to whom he makes the statement have to have true
         statements only made to them."

Now I have first to remark on these observations that the alleged "right" must surely be here stated too widely, if it is intended to refer to a legal right, the violation of which may give rise to an action for damages. For if there be a right to have true statements only made, this will render liable to an action those who make untrue statements, however innocently. This cannot have been meant. I think it must have been intended to make the statement of the right correspond with that of the alleged duty, the departure from which is said to be making an untrue statement without any reasonable ground for believing it to be true. I have further to observe that the Lord Justice distinctly says that if there be such a departure from duty an action of deceit can be maintained, though there be not what he should call fraud. I shall have by-and-by to consider the discussions which have arisen as to the difference between the popular understanding of the word "fraud" and the interpretation given to it by lawyers, which have led to the use of such expressions as "legal fraud," or "fraud in law;" but I may state at once that, in my opinion, without proof of fraud no action of deceit is maintainable. When I examine the cases which have been decided upon this branch of the law, I shall endeavour to shew that there is abundant authority to warrant this proposition.

I return now to the judgments delivered in the Court of Appeal. Sir James Hannen says: " I take the law to be that if a man takes upon himself to assert a thing to be true which he does not know to be true, and has no reasonable ground to believe to be true, in order to induce another to act upon the assertion, who does so act and is thereby damnified, the person so damnified is entitled to maintain an action for deceit." Again, Lopes L.J. states what, in his opinion, is the result of the

cases.  I will not trouble your Lordships with quoting the first
three propositions which he lays down, although I do not feel
sure that the third is distinct from, and not rather an instance of,
the case dealt with by the second proposition.  But he says that
a person making a false statement, intended to be and in fact
relied on by the person to whom it is made, may be sued by the
person damaged thereby : " Fourthly, if it is untrue in fact, but
believed to be true, but without any reasonable grounds for such
belief."

H. L. (E.)

1889

DERBY
*v.*
PEEK.

Lord Herschell.

It will thus be seen that all the learned judges concurred in
thinking that it was sufficient to prove that the representations
made were not in accordance with fact, and that the person
making them had no reasonable ground for believing them.
They did not treat the absence of such reasonable ground as
evidence merely that the statements were made recklessly, care-
less whether they were true or false, and without belief that they
were true, but they adopted as the test of liability, not the exist-
ence of belief in the truth of the assertions made, but whether
the belief in them was founded upon any reasonable grounds.
It will be seen, further, that the Court did not purport to be
establishing any new doctrine.  They deemed that they were
only following the cases already decided, and that the proposi-
tion which they concurred in laying down was established by
prior authorities.  Indeed, Lopes L.J. expressly states the law in
this respect to be well settled.  This renders a close and critical
examination of the earlier authorities necessary.

I need go no further back than the leading case of *Pasley* v.
*Freeman* (1).  If it was not there for the first time held that an
action of deceit would lie in respect of fraudulent representations
against a person not a party to a contract induced by them, the
law was at all events not so well settled but that a distinguished
Judge, Grose J., differing from his brethren on the Bench,
held that such an action was not maintainable.  Buller J.,
who held that the action lay, adopted in relation to it the lan-
guage of Croke J., in 3 Bulstrode 95, who said : " Fraud without
damage, or damage without fraud, gives no cause of action, but
where these two concur an action lies."  In reviewing the case

(1) 2 Smith's L. C. 74.

364                          HOUSE OF LORDS              [VOL. XIV.

H. L. (E.)     of *Crosse* v. *Gardner* (1) he says: "Knowledge of the falsehood
1889         of the thing asserted is fraud and deceit;" and further, after
DERRY        pointing out that in *Risney* v. *Selby* (2) the judgment proceeded
*v.*         wholly on the ground that the defendant knew what he asserted
PEEK.        to be false, he adds: "The assertion alone will not maintain the
Lord Herschell, action, but the plaintiff must go on to prove that it was false,
             *and that the defendant knew it to be so,*" the latter words being
             specially emphasised. Kenyon C.J. said: "The plaintiffs applied
             to the defendant, telling him that they were going to deal with
             Falch, and desired to be informed of his credit, when the defen-
             dant fraudulently, and knowing it to be otherwise, and with a
             design to deceive the plaintiffs, made the false affirmation stated
             on the record, by which they sustained damage. Can a doubt be
             entertained for a' moment but that this is injurious to the
             plaintiffs?" In this case it was evidently considered that fraud
             was the basis of the action, and that such fraud might consist
             in making a statement known to be false.

                 *Haycraft* v. *Creasy* (3) was again an action in respect of a false
             affirmation made by the defendant to the plaintiff about the
             credit of a third party whom the plaintiff was about to trust.
             The words complained of were, " I can assure you of my own know-
             ledge that you may credit Miss R. to any amount with perfect
             safety." All the judges were agreed that fraud was of the essence
             of the action, but they differed in their view of the conclusion to
             be drawn from the facts. Lord Kenyon thought that fraud had
             been proved, because the defendant stated that to be true within
             his own knowledge which he did not know to be true. The other
             judges thinking that the defendant's words vouching his own
             knowledge were no more than a strong expression of opinion,
             inasmuch as a statement concerning the credit of another can be
             no more than a matter of opinion, and that he did believe the
             lady's credit to be what he represented, held that the action
             would not lie. It is beside the present purpose to inquire which
             view of the facts was the more sound. Upon the law there
             was no difference of opinion. It is a distinct decision that know-
             ledge of the falsity of the affirmation made is essential to the

             (1) Carth. 90.                    (2) 1 Salk. 211.
                            (3) 2 East, 92.

VOL. XIV.]        AND PRIVY COUNCIL.                    365

maintenance of the action, and that belief in its truth affords a
defence.

I may pass now to *Foster* v. *Charles* (1). It was there con-
tended that the defendant was not liable, even though the repre-
sentation he had made was false to his knowledge, because he
had no intention of defrauding or injuring the plaintiff. This
contention was not upheld by the Court, Tindal C.J. saying:
" It is fraud in law if a party makes representations which he
knows to be false, and injury ensues, although the motives from
which the representations proceeded may not have been bad."
This is the first of the cases in which I have met with the expres-
sion " fraud in law." It was manifestly used in relation to the
argument that the defendant was not actuated by a desire to
defraud or injure the person to whom the representation was
made. The popular use of the word " fraud " perhaps involves
generally the conception of such a motive as one of its elements.
But I do not think the Chief Justice intended to indicate any
doubt that the act which he characterised as a fraud in law was
in truth fraudulent as a matter of fact also. Wilfully to tell a
falsehood, intending that another shall be led to act upon it as if
it were the truth, may well be termed fraudulent, whatever the
motive which induces it, though it be neither gain to the person
making the assertion nor injury to the person to whom it is
made.

*Foster* v. *Charles* (1) was followed in *Corbett* v. *Brown* (2), and
shortly afterwards in *Polhill* v. *Walter* (3). The learned counsel
for the respondent placed great reliance on this case, because
although the jury had negatived the existence of fraud in fact the
defendant was nevertheless held liable. It is plain, however, that
all that was meant by this finding of the jury was, that the defen-
dant was not actuated by any corrupt or improper motive, for Lord
Tenterden says, " It was contended that . . . in order to maintain
this species of action it is not necessary to prove that the false
representation was made from a corrupt motive of gain to the
defendant or a wicked motive of injury to the plaintiff ; it was
said to be enough if a representation is made which the party

H. L. (E.)

1889

DERRY
*v.*
PEEK.

Lord Herschell.

(1) 7 Bing. 105.              (2) 8 Bing. 33.
(3) 3 B. & Ad. 114.

H. L. (E.)
1889
DERRY
*v.*
PEEK.

Lord Herschell.

making it knows to be untrue, and which is intended by him, or which from the mode in which it is made is calculated, to induce another to act on the faith of it in such a way as that he may incur damage, and that damage is actually incurred. A wilful falsehood of such a nature was contended to be in the legal sense of the word *a fraud*, and for this position was cited *Foster* v. *Charles* (1), to which may be added the recent case of *Corbett* v. *Brown* (2). The principle of these cases appears to us to be well founded, and to apply to the present."

In a later case of *Crawshay* v. *Thompson* (3) Maule J. explains *Polhill* v. *Walter* (4) thus : " If a wrong be done by a false representation of a party who knows such representation to be false, the law will infer an intention to injure. That is the effect of *Polhill* v. *Walter* " (4). In the same case, Cresswell J. defines " fraud in law," in terms which have been often quoted. " The cases," he says, " may be considered to establish the principle that fraud in law consists in knowingly asserting that which is false in fact to the injury of another."

In *Moens* v. *Heyworth* (5), which was decided in the same year as *Crawshay* v. *Thompson* (3), Lord Abinger having suggested that an action of fraud might be maintained where no moral blame was to be imputed, Parke B. said : " To support that count (viz., a count for fraudulent representation) it was essential to prove that the defendants *knowingly* " (and I observe that this word is emphasised), " by words or acts, made such a representation as is stated in the third count, relative to the invoice of these goods, as they knew to be untrue."

The next case in the series, *Taylor* v. *Ashton* (6), is one which strikes me as being of great importance. It was an action brought against directors of a bank for fraudulent representations as to its affairs, whereby the plaintiff was induced to take shares. The jury found the defendants not guilty of fraud, but expressed the opinion that they had been guilty of gross negligence. Exception was taken to the mode in which the case was left to the jury, and it was contended that their verdict was sufficient

| | |
|---|---|
| (1) 7 Bing. 105. | (4) 3 B. & Ad. 114. |
| (2) 8 Bing. 33. | (5) 10 M. & W. at p. 157. |
| (3) 4 M. & Gr. 357. | (6) 11 M. & W. 401. |

to render the defendants liable ; Parke B., however, in delivering
the opinion of the Court said : " It is insisted that even that (viz.,
the gross negligence which the jury had found), accompanied
with a damage to the plaintiff in consequence of that gross negli-
gence, would be sufficient to give him a right of action. From
this proposition we entirely dissent, because we are of opinion
that, independently of any contract between the parties, no one
can be made responsible for a representation of this kind unless
it be *fraudulently made*. . . . But then it was said that in order
to constitute that fraud, it was not necessary to shew that the
defendants *knew* the fact they stated to be untrue, that it was
enough that the fact *was* untrue if they communicated that fact
for a deceitful purpose, and to that proposition the Court is
prepared to assent. It is not necessary to shew that the defen-
dants knew the facts to be untrue ; if they stated a fact which
was untrue for a fraudulent purpose, they at the same time *not
believing* that fact to be true, in that case it would be both a legal
and moral fraud."

Now it is impossible to conceive a more emphatic declaration
than this, that to support an action of deceit fraud must be
proved, and that nothing less than fraud will do. I can find no
trace of the idea that it would suffice if it were shewn that the
defendants had not reasonable grounds for believing the state-
ments they made. It is difficult to understand how the defen-
dants could, in the case on which I am commenting, have been
guilty of gross negligence in making the statements they did, if
they had reasonable grounds for believing them to be true, or if
they had taken care that they had reasonable grounds for making
them.

All the cases I have hitherto referred to were in courts of
first instance. But in *Collins* v. *Evans* (1) they were reviewed
by the Exchequer Chamber. The judgment of the Court was
delivered by Tindal C.J. After stating the question at issue to
be " whether a statement or representation which is false in fact,
but not known to be so by the party making it, but, on the
contrary, made honestly and in the full belief that it is true,
affords a ground of action," he proceeds to say : " The current of

(1) 5 Q. B. 804, 820.

H. L. (E.)

1889

DERRY
*v.*
PEEK.

Lord Herschell.

H. L. (E.)
1889

DERRY
*v.*
PEEK.

Lord Herschell.

the authorities, from *Pasley* v. *Freeman* (1) downwards, has laid down the general rule of law to be, that fraud must concur with the false statement in order to give a ground of action." Is it not clear that the Court considered that fraud was absent if the statement was "made honestly, and in the full belief that it was true"?

In *Evans* v. *Edmonds* (2) Maule J. expressed an important opinion, often quoted, which has been thought to carry the law further than the previous authorities, though I do not think it really does so. He said: "If a man having no knowledge whatever on the subject takes upon himself to represent a certain state of facts to exist he does so at his peril, and if it be done either with a view to secure some benefit to himself or to deceive a third person he is in law guilty of a fraud, for he takes upon himself to warrant his own belief of the truth of that which he so asserts. Although the person making the representation may have no knowledge of its falsehood the representation may still have been fraudulently made." The foundation of this proposition manifestly is, that a person making any statement which he intends another to act upon must be taken to warrant his belief in its truth. Any person making such a statement must always be aware that the person to whom it is made will understand, if not that he who makes it *knows*, yet at least that he *believes* it to be true. And if he has no such belief he is as much guilty of fraud as if he had made any other representation which he knew to be false, or did not believe to be true.

I now arrive at the earliest case in which I find the suggestion that an untrue statement made without reasonable ground for believing it will support an action for deceit. In *Western Bank of Scotland* v. *Addie* (3) the Lord President told the jury "that if a case should occur of directors taking upon themselves to put forth in their report statements of importance in regard to the affairs of the bank false in themselves and which they did not believe, or had no reasonable ground to believe to be true, that would be a misrepresentation and deceit." Exception having been taken to this direction without avail in the Court of Session, Lord Chelmsford in this House said: "I agree in the propriety of this

(1) 2 Smith's L. C. 74.                    (2) 13 C. B. 777.
(3) Law Rep. 1 H. L., Sc. 145, 162.

interlocutor. In the argument upon this exception the case was put of an honest belief being entertained by the directors, of the reasonableness of which it was said the jury, upon this direction, would have to judge. But supposing a person makes an untrue statement which he asserts to be the result of a bonâ fide belief in its truth, how can the bona fides be tested except by considering the grounds of such belief? And if an untrue statement is made founded upon a belief which is destitute of all reasonable grounds, or which the least inquiry would immediately correct, I do not see that it is not fairly and correctly characterised as misrepresentation and deceit."

I think there is here some confusion between that which is evidence of fraud, and that which constitutes it. A consideration of the grounds of belief is no doubt an important aid in ascertaining whether the belief was really entertained. A man's mere assertion that he believed the statement he made to be true is not accepted as conclusive proof that he did so. There may be such an absence of reasonable ground for his belief as, in spite of his assertion, to carry conviction to the mind that he had not really the belief which he alleges. If the learned Lord intended to go further, as apparently he did, and to say that though the belief was really entertained, yet if there were no reasonable grounds for it, the person making the statement was guilty of fraud in the same way as if he had known what he stated to be false, I say, with all respect, that the previous authorities afford no warrant for the view that an action of deceit would lie under such circumstances. A man who forms his belief carelessly, or is unreasonably credulous, may be blameworthy when he makes a representation on which another is to act, but he is not, in my opinion, fraudulent in the sense in which that word was used in all the cases from *Pasley* v. *Freeman* (1) down to that with which I am now dealing. Even when the expression "fraud in law" has been employed, there has always been present, and regarded as an essential element, that the deception was wilful either because the untrue statement was known to be untrue, or because belief in it was asserted without such belief existing.

H. L. (E.)

1889

DERRY
*v.*
PEEK.

Lord Herschell.

(1) 2 Smith's L. C. 74.

H. L. (E.)
1889
DERRY
*v.*
PEEK.

Lord Herschell.

I have made these remarks with the more confidence because they appear to me to have the high sanction of Lord Cranworth. In delivering his opinion in the same case he said: "I confess that my opinion was that in what his Lordship (the Lord President) thus stated, he went beyond what principle warrants. If persons in the situation of directors of a bank make statements as to the condition of its affairs which they bonâ fide believe to be true, I cannot think they can be guilty of fraud because other persons think, or the Court thinks, or your Lordships think, that there was no sufficient ground to warrant the opinion which they had formed. If a little more care and caution must have led the directors to a conclusion different from that which they put forth, this may afford strong evidence to shew that they did not really believe in the truth of what they stated, and so that they were guilty of fraud. But this would be the consequence not of their having stated as true what they had not reasonable ground to believe to be true, but of their having stated as true what they did not believe to be true."

Sir James Hannen, in his judgment below, seeks to limit the application of what Lord Cranworth says to cases where the statement made is a matter of opinion only. With all deference I do not think it was intended to be or can be so limited. The direction which he was considering, and which he thought went beyond what true principle warranted, had relation to making false statements of importance in regard to the affairs of the bank. When this is borne in mind, and the words which follow those quoted by Sir James Hannen are looked at, it becomes to my mind obvious that Lord Cranworth did not use the words " the opinion which they had formed " as meaning anything different from " the belief which they entertained."

The opinions expressed by Lord Cairns in two well-known cases have been cited as though they supported the view that an action of deceit might be maintained without any fraud on the part of the person sued. I do not think they bear any such construction. In the case of *Reese Silver Mining Co.* v. *Smith* (1) he said: "If persons take upon themselves to make assertions as to which they are ignorant whether they are true or untrue

(1) Law Rep. 4 H. L. 64, 79.

they must, in a civil point of view, be held as responsible as if
they had asserted that which they knew to be untrue." This
must mean that the persons referred to were conscious when
making the assertion that they were ignorant whether it was
true or untrue. For if not it might be said of any one who
innocently makes a false statement. He must be ignorant that
it is untrue, for otherwise he would not make it innocently ; he
must be ignorant that it is true, for by the hypothesis it is false.
Construing the language of Lord Cairns in the sense I have
indicated, it is no more than an adoption of the opinion expressed
by Maule J. in *Evans* v. *Edmonds* (1). It is a case of the
representation of a person's belief in a fact when he is conscious
that he knows not whether it be true or false, and when he has
therefore no such belief. When Lord Cairns speaks of it as not
being fraud in the more invidious sense, he refers, I think, only
to the fact that there was no intention to cheat or injure.

In *Peek* v. *Gurney* (2) the same learned Lord, after alluding to
the circumstance that the defendants had been acquitted of fraud
upon a criminal charge, and that there was a great deal to shew
that they were labouring under the impression that the concern
had in it the elements of a profitable commercial undertaking,
proceeds to say : " They may be absolved from any charge of a
wilful design or motive to mislead or defraud the public. But
in a civil proceeding of this kind all that your Lordships have
to examine is the question, was there, or was there not, misrepre-
sentation in point of fact ? If there was, however innocent the
motive may have been, your Lordships will be obliged to arrive
at the consequences which properly would result from what was
done." In the case then under consideration it was clear that
if there had been a false statement of fact it had been knowingly
made. Lord Cairns certainly could not have meant that in an
action of deceit the only question to be considered was whether
or not there was misrepresentation in point of fact. All that he
there pointed out was that in such a case motive was immaterial :
that it mattered not that there was no design to mislead or
defraud the public if a false representation were knowingly made.
It was therefore but an affirmation of the law laid down in *Foster*

H. L. (E.)

1889

DERBY
*v.*
PEEK.

Lord Herschell.

(1) 13 C. B. 777.          (2) Law Rep. 6 H. L. 377, 409.

3        2 C 2

372                          HOUSE OF LORDS                    [VOL. XIV.

H. L. (E.)    v. *Charles* (1), *Polhill* v. *Walter* (2), and other cases I have already
1889          referred to.

DERRY              I come now to very recent cases. In *Weir* v. *Bell* (3) Lord
*v.*          Bramwell vigorously criticised the expression "legal fraud," and
PEEK.         indicated a very decided opinion that an action founded on
Lord Herschell.   fraud could not be sustained except by the proof of fraud in fact.
              I have already given my reasons for thinking that, until recent
              times at all events, the judges who spoke of fraud in law did not
              mean to exclude the existence of fraud in fact, but only of an
              intention to defraud or injure.

              In the same case Cotton L.J. stated the law in much the
              same way as he did in the present case, treating "recklessly" as
              equivalent to "without any reasonable ground for believing" the
              statements made.     But the same learned judge in *Arkwright* v.
              *Newbold* (4) laid down the law somewhat differently, for he said :
              "In an action of deceit the representation to found the action
              must not be innocent, that is to say, it must be made either with
              knowledge of its being false, or with a reckless disregard as to
              whether it is or is not true."     And his exposition of the law
              was substantially the same in *Edgington* v. *Fitzmaurice* (5).     In
              this latter case Bowen L.J. defined what the plaintiff must prove
              in addition to the falsity of the statement, as "secondly, that it
              was false to the knowledge of the defendants, or that they made
              it not caring whether it was true or false."

              It only remains to notice the case of *Smith* v. *Chadwick* (6).
              The late Master of the Rolls there said, "A man may issue a pro-
              spectus or make any other statement to induce another to enter
              into a contract, believing that his statement is true, and not in-
              tending to deceive ; but he may through carelessness have made
              statements which are not true, and which he ought to have known
              were not true, and if he does so he is liable in an action for
              deceit ; he cannot be allowed to escape merely because he had
              good intentions, and did not intend to defraud." This, like
              everything else that fell·from that learned judge, is worthy of
              respectful consideration.     With the last sentence I quite agree,

                    (1) 7 Bing. 105.              (4) 17 Ch. D. 301.
                    (2) 3 B. & Ad. 114.           (5) 29 Ch. D. 459.
                    (3) 3 Ex. D. 238.             (6) 20 Ch. D. 27, 44, 67.

but I cannot assent to the doctrine that a false statement made through carelessness, and which ought to have been known to be untrue, of itself renders the person who makes it liable to an action for deceit. This does not seem to me by any means necessarily to amount to fraud, without which the action will not, in my opinion, lie.

H. L. (E.)
1889
DERRY
*v.*
PEEK.
Lord Herschell.

It must be remembered that it was not requisite for Sir George Jessel in *Smith* v. *Chadwick* (1) to form an opinion whether a statement carelessly made, but honestly believed, could be the foundation of an action of deceit. The decision did not turn on any such point. The conclusion at which he arrived is expressed in these terms: " On the whole I have come to the conclusion that this, although in some respects inaccurate, and in some respects not altogether free from imputation of carelessness, was a fair, honest, and bonâ fide statement on the part of the defendants, and by no means exposes them to an action for deceit."

I may further note that in the same case, Lindley L.J. said : "The plaintiff has to prove, first, that the misrepresentation was made to him ; secondly, he must prove that it was false ; thirdly, that it was false to the knowledge of the defendants, or at all events that they did not believe the truth of it." This appears to be a different statement of the law to that which I have just criticised, and one much more in accord with the prior decisions.

The case of *Smith* v. *Chadwick* was carried to your Lordships' House (2). Lord Selborne thus laid down the law : " I conceive that in an action of deceit it is the duty of the plaintiff to establish two things: first, actual fraud, which is to be judged of by the nature and character of the representations made, considered with reference to the object for which they were made, the knowledge or means of knowledge of the person making them, and the intention which the law justly imputes to every man to produce those consequences which are the natural result of his acts ; and secondly, he must establish that this fraud was an inducing cause to the contract." It will be noticed that the noble and learned Lord regards the proof of actual fraud as essential, all the other matters to which he refers are elements to be considered in determining whether such fraud has been

(1) 20 Ch. D. 27, 44, 67.          (2) 9 App. Cas. 187, 190.

H. L. (E.)
1889
DERRY
*v.*
PEEK.

Lord Herschell.

established.   Lord Blackburn indicated that although he nearly agreed with the Master of the Rolls, that learned judge had not quite stated what he conceived to be the law.   He did not point out precisely how far he differed, but it is impossible to read his judgment in this case, or in that of *Brownlie* v. *Campbell* (1) without seeing that in his opinion proof of actual fraud or of a wilful deception was requisite.

Having now drawn attention, I believe, to all the cases having a material bearing upon the question under consideration, I proceed to state briefly the conclusions to which I have been led. I think the authorities establish the following propositions: First, in order to sustain an action of deceit, there must be proof of fraud, and nothing short of that will suffice.   Secondly, fraud is proved when it is shewn that a false representation has been made (1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless whether it be true or false.   Although I have treated the second and third as distinct cases, I think the third is but an instance of the second, for one who makes a statement under such circumstances can have no real belief in the truth of what he states.   To prevent a false statement being fraudulent, there must, I think, always be an honest belief in its truth.   And this probably covers the whole ground, for one who knowingly alleges that which is false, has obviously no such honest belief.   Thirdly, if fraud be proved, the motive of the person guilty of it is immaterial.   It matters not that there was no intention to cheat or injure the person to whom the statement was made.

I think these propositions embrace all that can be supported by decided cases from the time of *Pasley* v. *Freeman* (2) down to *Western Bank of Scotland* v. *Addie* (3) in 1867, when the first suggestion is to be found that belief in the truth of what he has stated will not suffice to absolve the defendant if his belief be based on no reasonable grounds.   I have shewn that this view was at once dissented from by Lord Cranworth, so that there was at the outset as much authority against it as for it.   And I have met with no further assertion of Lord Chelmsford's view until

(1) 5 App. Cas. 925.                (2) 2 Smith's L. C. 74.
(3) Law Rep. 1 H. L., Sc. 145.

the case of *Weir* v. *Bell* (1), where it seems to be involved in
Lord Justice Cotton's enunciation of the law of deceit. But no
reason is there given in support of the view, it is treated as
established law. The dictum of the late Master of the Rolls,
that a false statement made through carelessness, which the
person making it ought to have known to be untrue, would sustain
an action of deceit, carried the matter still further. But that
such an action could be maintained notwithstanding an honest
belief that the statement made was true, if there were no reason-
able grounds for the belief, was, I think, for the first time decided
in the case now under appeal.

In my opinion making a false statement through want of care
falls far short of, and is a very different thing from, fraud, and
the same may be said of a false representation honestly believed
though on insufficient grounds. Indeed Cotton L.J. himself
indicated, in the words I have already quoted, that he should
not call it fraud. But the whole current of authorities, with
which I have so long detained your Lordships, shews to my mind
conclusively that fraud is essential to found an action of deceit,
and that it cannot be maintained where the acts proved cannot
properly be so termed. And the case of *Taylor* v. *Ashton* (2)
appears to me to be in direct conflict with the dictum of Sir
George Jessel, and inconsistent with the view taken by the
learned judges in the Court below. I observe that Sir Frederick
Pollock, in his able work on Torts (p. 243, note), referring, I pre-
sume, to the dicta of Cotton L.J. and Sir George Jessel M.R.,
says that the actual decision in *Taylor* v. *Ashton* (2) is not con-
sistent with the modern cases on the duty of directors of com-
panies. I think he is right. But for the reasons I have given
I am unable to hold that anything less than fraud will render
directors or any other persons liable to an action of deceit.

At the same time I desire to say distinctly that when a false
statement has been made the questions whether there were reason-
able grounds for believing it, and what were the means of know-
ledge in the possession of the person making it, are most weighty
matters for consideration. The ground upon which an alleged
belief was founded is a most important test of its reality. I can
conceive many cases where the fact that an alleged belief was

H. L. (E.)

1889

DERRY
*v.*
PEEK.

Lord Herschell.

(1) 3 Ex. D. 238.                    (2) 11 M. & W. 401.

HOUSE OF LORDS [VOL. XIV.

H. L. (E.)
1889
DERRY
*v.*
PEEK.
Lord Herschell.

destitute of all reasonable foundation would suffice of itself to convince the Court that it was not really entertained, and that the representation was a fraudulent one. So, too, although means of knowledge are, as was pointed out by Lord Blackburn in *Brownlie* v. *Campbell* (1), a very different thing from knowledge, if I thought that a person making a false statement had shut his eyes to the facts, or purposely abstained from inquiring into them, I should hold that honest belief was absent, and that he was just as fraudulent as if he had knowingly stated that which was false.

I have arrived with some reluctance at the conclusion to which I have felt myself compelled, for I think those who put before the public a prospectus to induce them to embark their money in a commercial enterprise ought to be vigilant to see that it contains such representations only as are in strict accordance with fact, and I should be very unwilling to give any countenance to the contrary idea. I think there is much to be said for the view that this moral duty ought to some extent to be converted into a legal obligation, and that the want of reasonable care to see that statements, made under such circumstances, are true, should be made an actionable wrong. But this is not a matter fit for discussion on the present occasion. If it is to be done the legislature must intervene and expressly give a right of action in respect of such a departure from duty. It ought not, I think, to be done by straining the law, and holding that to be fraudulent which the tribunal feels cannot properly be so described. I think mischief is likely to result from blurring the distinction between carelessness and fraud, and equally holding a man fraudulent whether his acts can or cannot be justly so designated.

It now remains for me to apply what I believe to be the law to the facts of the present case. The charge against the defendants is that they fraudulently represented that by the special Act of Parliament which the company had obtained they had a right to use steam or other mechanical power instead of horses. The test which I purpose employing is to inquire whether the defendants knowingly made a false statement in this respect, or whether, on the contrary, they honestly believed what they stated to be a true and fair representation of the facts. Before considering whether the charge of fraud is proved, I may say that I

(1) 5 App. Cas. at p. 952.

approach the case of all the defendants, except Wilde, with the inclination to scrutinise their conduct with severity. They most improperly received sums of money from the promoters, and this unquestionably lays them open to the suspicion of being ready to put before the public whatever was desired by those who were promoting the undertaking. But I think this must not be unduly pressed, and when I find that the statement impeached was concurred in by one whose conduct in the respect I have mentioned was free from blame, and who was under no similar pressure, the case assumes, I think, a different complexion.

I must further remark that the learned judge who tried the cause, and who tells us that he carefully watched the demeanour of the witnesses and scanned their evidence, came without hesitation to the conclusion that they were witnesses of truth, and that their evidence, whatever may be its effect, might safely be relied on. An opinion so formed ought not to be differed from except on very clear grounds, and after carefully considering the evidence, I see no reason to dissent from Stirling J.'s conclusion. I shall therefore assume the truth of their testimony.

I agree with the Court below that the statement made did not accurately convey to the mind of a person reading it what the rights of the company were, but to judge whether it may nevertheless have been put forward without subjecting the defendants to the imputation of fraud, your Lordships must consider what were the circumstances. By the General Tramways Act of 1870 it is provided that all carriages used on any tramway shall be moved by the power prescribed by the special Act, and where no such power is prescribed, by animal power only (1). In order, therefore, to enable the company to use steam-power, an Act of Parliament had to be obtained empowering its use. This had been done, but the power was clogged with the condition that it was only to be used with the consent of the Board of Trade. It was therefore incorrect to say that the company had the right to use steam ; they would only have that right if they obtained the consent of the Board of Trade. But it is impossible not to see that the fact which would impress itself upon the minds of those connected with the company was that they had, after submitting

H. L. (E.)
1889
DERBY
*v.*
PEEK.

Lord Herschell.

(1) 33 & 34 Vict. c. 78, s. 34.

H L. (E.)
1889
DERRY
v.
PEEK.

Lord Herschell.

the plans to the Board of Trade, obtained a special Act empowering the use of steam. It might well be that the fact that the consent of the Board of Trade was necessary would not dwell in the same way upon their minds, if they thought that the consent of the Board would be obtained as a matter of course if its requirements were complied with, and that it was therefore a mere question of expenditure and care. The provision might seem to them analogous to that contained in the General Tramways Act, and I believe in the Railways Act also, prohibiting the line being opened until it had been inspected by the Board of Trade and certified fit for traffic, which no one would regard as a condition practically limiting the right to use the line for the purpose of a tramway or railway. I do not say that the two cases are strictly analogous in point of law, but they may well have been thought so by business men.

I turn now to the evidence of the defendants. I will take first that of Mr. Wilde, whose conduct in relation to the promotion of the company is free from suspicion. He is a member of the Bar and a director of one of the London tramway companies. He states that he was aware that the consent of the Board of Trade was necessary, but that he thought that such consent had been practically given, inasmuch as, pursuant to the Standing Orders, the plans had been laid before the Board of Trade with the statement that it was intended to use mechanical as well as horse-power, and no objection having been raised by the Board of Trade, and the Bill obtained, he took it for granted that no objection would be raised afterwards, provided the works were properly carried out. He considered, therefore, that, practically and substantially they had the right to use steam, and that the statement was perfectly true.

Mr. Pethick's evidence is to much the same effect. He thought the Board of Trade had no more right to refuse their consent than they would in the case of a railway; that they might have required additions or alterations, but that on any reasonable requirements being complied with they could not refuse their consent. It never entered his thoughts that after the Board had passed their plans, with the knowledge that it was proposed to use steam, they would refuse their consent.

Mr. Moore states that he was under the impression that the
passage in the prospectus represented the effect of sect. 35 of the
Act, inasmuch as he understood that the consent was obtained.
He so understood from the statements made at the board by the
solicitors to the company, to the general effect that everything
was in order for the use of steam, that the Act had been obtained
subject to the usual restrictions, and that they were starting as a
tramway company, with full power to use steam as other companies
were doing.

Mr. Wakefield, according to his evidence, believed that the
statement in the prospectus was fair; he never had a doubt about
it. It never occurred to him to say anything about the consent
of the Board of Trade, because as they had got the Act of Parlia-
ment for steam he presumed at once that they would get it.

Mr. Derry's evidence is somewhat confused, but I think the
fair effect of it is that though he was aware that under the Act
the consent of the Board of Trade was necessary, he thought that
the company having obtained their Act the Board's consent would
follow as a matter of course, and that the question of such consent
being necessary never crossed his mind at the time the prospectus
was issued. He believed at that time that it was correct to say
they had the right to use steam.

As I have said, Stirling J. gave credit to these witnesses, and I
see no reason to differ from him. What conclusion ought to be
drawn from their evidence? I think they were mistaken in sup-
posing that the consent of the Board of Trade would follow as a
matter of course because they had obtained their Act. It was
absolutely in the discretion of the Board whether such consent
should be given. The prospectus was therefore inaccurate. But
that is not the question. If they believed that the consent of the
Board of Trade was practically concluded by the passing of the
Act, has the plaintiff made out, which it was for him to do, that
they have been guilty of a fraudulent misrepresentation? I think
not. I cannot hold it proved as to any one of them that he
knowingly made a false statement, or one which he did not
believe to be true, or was careless whether what he stated was
true or false. In short, I think they honestly believed that what
they asserted was true, and I am of opinion that the charge of
fraud made against them has not been established.

H. L. (E.)

1889

DERBY
*v.*
PEEK.

Lord Herschell.

380                    HOUSE OF LORDS                [VOL. XIV.

H. L. (E.)    It is not unworthy of note that in his report to the Board of

1889    Trade, General Hutchinson, who was obviously aware of the pro-

DERBY    visions of the special Act, falls into the very same inaccuracy of

*v.*    language as is complained of in the defendants, for he says : " The

PEEK.    Act of 1882 gives the company authority to use mechanical

Lord Herschell.    power over all their system."

I quite admit that the statements of witnesses as to their belief
are by no means to be accepted blindfold. The probabilities
must be considered. Whenever it is necessary to arrive at a con-
clusion as to the state of mind of another person, and to deter-
mine whether his belief under given circumstances was such as
he alleges, we can only do so by applying the standard of conduct
which our own experience of the ways of men has enabled us to
form ; by asking ourselves whether a reasonable man would be
likely under the circumstances so to believe. I have applied this
test, with the result that I have a strong conviction that a reason-
able man situated as the defendants were, with their knowledge
and means of knowledge, might well believe what they state they
did believe, and consider that the representation made was sub-
stantially true.

Adopting the language of Jessel M.R. in *Smith* v. *Chad-
wick* (1), I conclude by saying that on the whole I have come to
the conclusion that the statement, " though in some respects in-
accurate and not altogether free from imputation of carelessness,
was a fair, honest and bonâ fide statement on the part of the
defendants, and by no means exposes them to an action for
deceit."

I think the judgment of the Court of Appeal should be
reversed.

> *Order of the Court of Appeal reversed ; order of*
> *Stirling J. restored ; the respondent to pay to*
> *the appellants their costs below and in this*
> *House : cause remitted to the Chancery Division.*

> *Lords Journals* 1st July 1889.

Solicitors for appellants : *Linklater, Hackwood, Addison &
Brown.*

Solicitors for respondent : *Tamplin, Tayler & Joseph.*

(1) 20 Ch. D. at p. 67.

# TAB 28

**Richard Anthony Fountayne
England v. Brian David Smith**
Case No: CHANI 99/0275/B3
Court of Appeal (Civil Division)
24 November 1999

**1999 WL 1048249**

Before: Lord Justice Morritt Lord Justice
Laws and Mr Justice Jonathan Parker
Wednesday, 24th November 1999

**Analysis**

On Appeal from the High Court of Justice Chancery
Division (HH Judge Weeks QC)

**Representation**

• Mr Leslie Kosmin QC (instructed by Withers ,
12 Gough Square, London EC4A 3SW, for the
Appellant).
• Mr Gabriel Moss QC and Miss S.Prevezer
(instructed Herbert Smith , Exchange House,
Primrose Street, London, EC2, for the Respondent).

**Judgment**
Wednesday, 24 November 1999
Lord Justice Morritt:

1  By a letter of request dated 18th August 1998 sent by
the Supreme Court, South Australia, on the application
of the appellant Mr England, the liquidator of Southern
Equities Corporation Ltd, to the Companies Court,
Royal Courts of Justice, the former asked the latter
to exercise its jurisdiction pursuant to the provisions
of s.426 Insolvency Act 1986 to assist it by making an
order for the examination of Mr Brian D.Smith. HH
Judge Weeks QC, sitting in the Companies Court as
a deputy High Court judge, determined that he had
jurisdiction to make the order sought by the combined
effect of s.596B Corporations Law (Aust) and s.426
Insolvency Act 1986 . He found, in the light of the expert

evidence before him, that a judge in South Australia
exercising the discretion conferred on him by s.596B
would make such an order. But he decided that the fact
that a comparable application made by the liquidator
of a company being wound up in England under s.236
Insolvency Act 1986 would be rejected was "a good
and sufficient ground for refusing the order sought".
This is the appeal of Mr England from the order of
HH Judge Weeks QC made on 1st March 1999 rejecting
his application for an order for the examination of
Mr Smith as requested by the Supreme Court, South
Australia.

2    The relevant facts may be shortly stated.
Southern Equities Corporation Ltd ("SECL") was
incorporated in 1969 in the state of Western Australia
in the Commonwealth of Australia. It is a public
company the shares of which were listed on the
Australian Stock Exchange. In its original name, Bond
Corporation Holdings Ltd, it carried on business
as a multinational conglomerate through about 800
subsidiaries incorporated in 25 jurisdictions. In August
1991 it changed its name and entered into a scheme of
arrangement, approved by the court, with its members
and creditors. On 23rd December 1993 it was wound up
by the court in South Australia and Mr England became
and is its liquidator. The deficiency with regard to its
creditors is about Aus$3bn, the largest yet recorded in
Australia.

3  Arthur Andersen (Australia) ("AAA") were the
statutory auditors of SECL for the years 1988 to 1992.
In each of those years the audit was carried out from the
offices of AAA and SECL in Perth, Western Australia.
Mr Brian Smith was at the material time a partner
in Arthur Andersen (UK) and the managing practice
partner of that firm with responsibilities for Arthur
Andersen in Europe. In relation to the audits of the
accounts of SECL for the years 1988 and 1989 he went
to Australia twice in 1988 and once in 1989.

4  The first visit was in March 1988. On that occasion Mr
Smith carried out in Perth, Western Australia, a review
of the decision of AAA to accept SECL as an audit
client. In August 1988, shortly before the provision of
final audit clearance of the accounts of SECL Group for
the year ended 30th June 1988, he attended meetings in
Perth with Messrs Underwood and Gardener of AAA
and with Mr Greene of Arthur Andersen (US). Mr

Gardener was the managing practice partner of AAA with responsibility for Australia. Mr Greene occupied a comparable position in the United States. At those meetings the participants discussed a number of issues which had been identified in the course the audit. In September 1989 Messrs Smith, Underwood, Gardener and Greene met again in Perth, prior to final audit clearance of the SECL Group accounts for the year ended 30th June 1989, to discuss issues identified in the course of the audit of those accounts.

5    In September 1994 the liquidator of SECL commenced proceedings against Arthur Andersen in the Supreme Court South Australia. He claims damages in excess of Aus$700m for negligence and breach of duty, contractual, statutory and fiduciary in the conduct of the audit of the accounts for 1988 in respect of 18 individual transactions. The claim is made against what the liquidator alleges to be the world wide firm called Arthur Andersen. Only the partners of AAA have appeared to defend the claims. Mr Smith, in common with the partners in Arthur Andersen firms in other jurisdictions, claims that he cannot be liable because there was no world wide firm and he was not a partner in AAA. We were told that the hearing was likely to start in 2000 and to last for two years.

6  S.596B Corporations Act , to which I shall refer in greater detail later, confers on the court in Australia the power, subject to certain limitations and conditions, to order the examination of a person concerning a company's affairs. It is similar to, but not the same as, the power conferred on the court in England by s.236 Insolvency Act 1986 . The liquidator has examined Mr Gardener and Mr Parkin, the senior manager on the audit of the 1988 accounts of SECL, amongst others, in Australia pursuant to s.596B . He has also, pursuant to the order of a District Court in Illinois, examined Mr Greene in Chicago. He has been unable to examine Mr Underwood. The audit working papers of AAA for the 1988 and 1989 accounts have also been produced. In his affidavit sworn on 10th November 1997 the liquidator commented that the only contemporaneous notes of the meetings attended by Mr Smith which he had been able to obtain were brief and cryptic handwritten notes of Mr Smith. Mr Smith has sworn an affidavit in answer to this application in which he states that he has no other documents. AAA have indicated that they intend to call Mr Smith as a witness at the trial but have declined to

give an undertaking to that effect. Under the Australian procedural rules there is no obligation on Mr Smith or AAA to provide to the liquidator in advance of the trial a witness statement of the evidence of Mr Smith.

7  On 15th August 1997 the liquidator obtained an order of the Supreme Court, South Australia for the examination of Mr Smith and for the issue of a letter of request for that purpose to the Companies Court in England. The letter of request was duly issued on 18th August 1997. On 17th September 1997 the liquidator applied to the Companies Court in England for an order as sought in the letter of request. The application was not immediately pursued because a comparable application in relation to J.N.Taylor Finance Pty Ltd was then pending. That application was refused by Evans-Lombe J on 22nd January 1998. see, Re J.N.Taylor Finance Pty Ltd [1999] 2 BCLC 256 . The refusal and the reasons for it were well known to the liquidator for he was also the liquidator of J.N.Taylor Finance Pty Ltd, a sub-subsidiary of SECL. The matter was referred back to the Supreme Court in South Australia. The letter of request was amended pursuant to an order of the Supreme Court, South Australia on 18th August 1998. The application to this court was then amended accordingly. The amended letter of request recites that the liquidator has shown to the satisfaction of the court that it is just and convenient that the letter of request should issue. It records that Mr Smith is resident in London and sets out a summary of the facts as I have recorded them. It then states

"The Liquidator's investigations into the financial affairs of the SECL group (including the audits) have led to the commencement of Action No. 1474 of 1994 in the Supreme Court of South Australia between SECL and Arthur Anderson & Co. An appearance to Action 1474 has been filed by the Australian partners of Arthur Anderson only.

Action No 1474 of 1994 relates only to the conduct of SECL's audit for the financial year ending 30 June 1988. SECL was placed in liquidation by the Supreme

WESTLAW   © 2017 Thomson Reuters.

Court of South Australia on 23 December 1993, by which time Arthur Anderson & Co had audited SECL's accounts for each of the financial years ended 30 June 1989, 5 October 1990, 30 June 1991 and 30 June 1992.

The Liquidator requires access to documents held by Mr. Smith and to examine Mr. Smith for the purpose of furthering his investigation of the audits of the SECL group for the years ended 30 June 1988 and 1989, 5 October 1990, 30 June 1991 and 30 June 1992 and his investigation of the financial affairs, transactions and collapse of the SECL group subsequently, including investigation of the causes of action the subject of 1474 of 1994. The Liquidator believes that the examination of Mr. Smith and these documents will provide a valuable source of information in furtherance of his investigation.

In addition, the Liquidator requires access to such documents and to examine Mr. Smith in order to fulfil his statutory obligations and in particular his reporting obligations under Section 533 of the Australian Corporations Law in circumstances where SECL will pay dividends to its creditors of an amount substantially less then $0.50 in the dollar.

It is necessary for the purposes of justice including the proper administration of the winding up of SECL in Supreme Court of South Australia Action No 92516 of 199 that Mr. Smith who is resident within your jurisdiction, be examined.

THIS COURT FURTHER REQUESTS that, for the reasons stated above and for the assistance of the said court you order the said witness to attend at such time and place as you shall appoint before the Master of the Supreme Court of South Australia responsible for the supervision of the winding up of SECL, the Honourable Judge Peter Bowen Pain or such other person as you may appoint to take the examination of the witness and that you cause the witness to be examined in the presence of the agents of the official Liquidator and the witness and in accordance with the Australian law and procedure, namely Division 1 of Part 5.9 of the Australian Corporations Law."

8  Thus the request is for an order for the examination of Mr Smith "in accordance with Australian law and procedure, namely Division 1 of Part 5.9 of the Australian Corporations Law". It is not disputed that s.426 Insolvency Act 1986 confers on the court in England the power to make the order requested by the Supreme Court in South Australia. The issue is whether it should exercise the discretion conferred on it by that section to grant or to refuse the request.

9  Division 1 of Part 5.9 of the Australian Corporations Law is concerned with the examination of officers and other persons about the affairs of a corporation. They are broadly comparable to the provisions of s.236 Insolvency Act 1986 ; indeed both derive ultimately from Companies Act 1862 . But the practice of the court in the exercise of their respective jurisdictions has diverged. The divergence was well described by Evans-Lombe J in Re J.N.Taylor [ibid] p.271

> "On their face the sections have no materially different effect as to the powers which they confer on the

court to which application is made. The difficulty arises because there is a sharp divergence in the practice of English and Australian courts in the exercise of the discretion in circumstances where it is being exercised after proceedings have been commenced by the relevant office holder, in this case liquidator, against the person or entity sought to be examined. This divergence is best illustrated by the fact that there is no reported Australian case where an order for examination under s 596B has been refused on the grounds that the individual or corporation to be examined is currently being proceeded against by the relevant office holder in respect of a claim forming part of the subject matter which it is the intention of the proposed examination to inquire into. By contrast with the possible exception of the decision of Hoffmann J in Re J T Rhodes Ltd [1987] BCLC 77 , a case arising from unusual facts, there is no reported case in the English courts where an examination has been allowed to proceed after the liquidator has commenced such proceedings against a proposed examinee."

10  In Re J.N.Taylor Evans-Lombe J refused to make the order sought by the letter of request. After an exhaustive review of the authorities as to the exercise of the discretion of the court in England to order an examination under s.236 Insolvency Act 1986 he concluded (p.281) that had the application before him been pursued by an English liquidator it would have been dismissed because the potential for oppression of the witness outweighed any perceived advantage to the liquidator. He added

"It seems to me that it is not without significance that, as I have already

pointed out, any oral examination cannot be other than an examination by this court under s 236, the powers conferred by which would be necessary to enforce answers. I find it difficult to accept that an examinee, resident in this country can be ordered, pursuant to s 426, to answer questions put by a foreign liquidator in an examination held in this country in circumstances where, had the liquidator been English he could not have been compelled to answer them."

11  The proposition that the oral examination could not be other than by the English Court under s.236 was derived from the observations of Robert Walker J in Bond v England (13th November 1996 unreported) to which the Full Court of the Supreme Court of South Australia demurred in Bond v England (26th March 1997 unreported) . For the reasons he gave HH Judge Weeks QC did not accept the proposition. He considered that

"in a case where the court finds it appropriate to apply foreign insolvency law under s.425(5) the court does have jurisdiction to order the witness to be examined by a foreign judge sitting in that capacity in the United Kingdom and applying foreign law. That I think is implicit in the authority in s.425(5) to apply the insolvency law which is applicable by either court in relation to comparable matters falling within its jurisdiction."

Though counsel for Mr Smith submitted that Evans-Lombe J rather than Judge Weeks was right on this issue, their principal contention was that the issue was irrelevant. In those circumstances it is unnecessary to pursue that matter further.

12  I have already referred, in broad terms, to the conclusion of Judge Weeks. I should now do so in more detail. After describing the material facts he set out the relevant provisions of Division 1 of Part 5.9 Corporations Law and ss.236 and 426 Insolvency Act 1986 . He then considered the decisions of courts in England on the application of the last mentioned provision, particularly Hughes v Hannover [1997] 1 BCLC 497 and Re J.N.Taylor [ibid]. His conclusion is expressed as a series of six steps. There is no dispute about the first four in which the judge concluded that he had jurisdiction under s.426 Insolvency Act 1986 to make the order sought and that if the application had been made to a judge sitting in South Australia such an order would have been made. With regard to the remaining two steps he said

> "Step 5: would I have made a similar order on an application by an English liquidator? The answer in my judgment is plainly "no" …

> Step 6: is the last finding a good or sufficient ground for refusing the order sought? I have reached the same premise as Evans-Lombe J. And I think that I ought to follow his judgment and reach the same conclusion. I would in any event respectfully agree with his conclusion, at least in a case where the reason for refusing the order in England is an assessment of what justice demands. I think the purpose of s. 426 (5) is to extend the jurisdiction of the English courts by enabling them to make orders which they otherwise could not have made. It would seem to me wrong to use the extended jurisdiction to make orders which the English court could have made, but would not have made, because it thought them unfair."

13  The liquidator submits that the judge was wrong for a number of reasons. He accepts that had the application been made under s.236 Insolvency Act 1986 by a liquidator of a company being wound up in England it is most unlikely that on the facts of this case the court would have acceded to his application. But he submits that that is an irrelevant consideration because the application is not being made by such a liquidator under that section. He contends that the judge failed to give effect to the clear terms or purpose of s.426 Insolvency Act 1986 . For Mr Smith it is submitted that the judge was right for substantially the reasons he gave. If, as is submitted, the reason why the court in England would refuse to make such an order under s.236 is because it would be oppressive of the witness then in exercise of the discretion conferred on it by s.426 Insolvency Act 1986 it cannot be right to make an order under s.596B which could be no less oppressive of the witness.

14  I propose to start with a brief consideration of the position in England regarding applications for an order for examination under s.236 Insolvency Act 1986 . That section provides:

> "(2)  The court may, on the application of the office-holder, summon to appear before it …

> (c)  any person whom the court thinks capable of giving information concerning the promotion, formation, business, dealings, affairs or property of the company."

By s.237(4) any person who appears before the court under s.236 may be examined on oath concerning the company or the matters specified in s.236(2)(c) . Apart from what may be implicit in the terms of s.236 itself there are no limitations on the scope or nature of the examination contained in either the Act or rules made thereunder. The fact that s. 236 is, and its statutory predecessors were, unlimited in their terms has given rise from time to time to suggested limitations on their exercise. But the Court of Appeal

in Re: Cloverbay [1991] Ch.90 and the House of Lords in British & Commonwealth Holdings v Spicer & Oppenheim [1993] AC 426 have emphasised that there are no such limitations. In the former Sir Nicolas Browne-Wilkinson, at page 102 said

> "The words of the Insolvency Act 1986 do not fetter the court's discretion in any way. Circumstances may vary infinitely. It is clear that in exercising the discretion the court has to balance the requirements of the liquidator against any possible oppression to the person to be examined. Such balancing depends on the relationship between the importance to the liquidator of obtaining the information on the one hand and the degree of oppression to the person sought to be examined on the other. If the information required is fundamental to any assessment of whether or not there is a cause of action and the degree of oppression is small (for example in the case or ordering premature discovery of documents) the balance will manifestly come down in favour of making the order. Conversely, if the liquidator is seeking merely to dot the i's and cross the t's of a fairly clear claim by examining the proposed defendant to discover his defence, the balance would come down against making the order. Of course, few cases will be so clear; it will be for the judge in each case to reach his own conclusion."

Later, at page 103, he added

> "But for myself I am unable to accept, in the absence of specific statutory authority, that it is not oppressive to require someone suspected of wrongdoing

to prove the case against himself on oath before any proceedings are brought. In the exercise of its discretion, the court may consider that the legitimate requirements of the liquidator outweigh such oppression: but it remains oppressive."

In British & Commonwealth Holdings v Spicer & Oppenheim Lord Slynn of Hadley (page 439) while pointing out that the power conferred by the section was in terms unlimited emphasised that

> "it is plain that this is an extraordinary power and that the discretion must be exercised after a careful balancing of the factors involved — on the one hand the reasonable requirements of the administrator to carry out his task, on the other the need to avoid making an order which is wholly unreasonable, unnecessary or "oppressive" to the person concerned."

15  It appears from the reported cases dealing with applications for orders under s.236 and its predecessors that the Court has prevented such oppression by refusing to make any order for examination. We were not referred to any reported case in which consideration has been given to the ability of the Registrar or Master before whom the examination takes place to prevent any abuse of the process of the court by the imposition of restrictions on the scope or nature of the examination. This is in marked contrast to the law and practice in Australia to which I now turn.

16  Division 1 of Part 5.9 Corporations Law is entitled "Examining a person about a corporation". It relates to "a corporation's examinable affairs" which is defined in the widest terms by ss. 9 and 53 of the Corporations Law. S.596A deals with the examination

of an examinable officer of the corporation. In that case the court is obliged to order the officer's examination. S.596 B deals with the examination of other persons. It provides

> (1) The Court may summon a person for examination about a corporation's examinable affairs if:
>
> (a) an eligible applicant applies for the summons; and
>
> (b) the Court is satisfied that the person:
>
> (i) has taken part or been concerned in examinable affairs of the corporation and has been or may have been guilty of misconduct in relation to the corporation; or
>
> (ii) may be able to give information about examinable affairs of the corporation."

It is in my view of some significance that the terms of subsection (1)(b)(i) expressly recognise that the examinee may be identified by the fact that he is or may be guilty of misconduct towards the company. Thus pending or contemplated proceedings are likely to cover the matters on which he will be examined. It is to be noted that in this respect the provisions of s.596B and s.236 differ and that Judge Weeks did not refer to that part of s.596B .

17 The subsequent sections in that Division contain detailed express provisions as to the procedure for obtaining such an order and how the examination is to be conducted. It is unnecessary to set them out in full. But I should draw attention to some of them. The person ordered to be examined must attend before the court and submit to an examination on oath and he may be required to produce specified books in his possession and relating to the corporation's examinable affairs ( s.596D ). By s.596F there is conferred on the court power at any time to give directions about the matters

to be enquired into and the procedure to be followed, including who may attend or have access to the records of the examination. S.597 deals with the conduct of the examination, including whether it should be held in private, who may take part, what questions may be put, the obligations of the examinee, the preservation of liens, the admissibility of the evidence including the use to which answers to incriminating questions may be put and representation.

18 The principles on which the courts of Australia act are clearly described in the judgment of Street J in Re: Hugh J.Roberts Ltd [1970] 2 NSWR 582 . Having referred to the wide terms of the statutory predecessor of s.596B and to the possibility of abuse he pointed out by reference to the decisions of this court in Re: Metropolitan Bank (1880) 15 Ch.D.139 and Re: North Australian Territory Co. (1890) 45 Ch.D. 87 that the liquidator's power to proceed by private examination was available to him notwithstanding that litigation to which the subject matter of the examination might be directed was already current. At page 585 he said

> "In my judgment it is immaterial in basic substance whether the private examination is sought to be used by a liquidator to gather information in connection with proceedings he believes he might be able to bring, proceedings he contemplates bringing, proceedings he has decided to bring, and proceedings he has already brought. There is no presently relevant distinction in substance between gathering information referable to commencing proceedings and gathering information referable to continuing proceedings. There may be more risk of or opportunity for the examination being vexatious or oppressive after proceedings have been commenced (cf. Re North Australian Territory Co. *supra* , and Heiron's Case , *supra.* ) Also an abuse of process may be more readily exposed once proceedings are already on foot. But this is surely not to the point, as vexation or

oppression will not be tolerated no matter when the examination is held.

A liquidator need not be diffident in using a private examination for its ordinary and legitimate purpose in the gathering of information. But he must not abuse this process. For instance an attempt, where litigation is either contemplated or commenced, to summon the prospective or existing defendant's probable witnesses and examine them simply for the purpose of destroying their credit would exceed the legitimate use of the process. Beyond stating this extreme instance, I consider it unsafe to generalise — very often the gathering of information quite properly involves testing the reliability or credit of the examinee from whom the information is being obtained.

It is not without significance that the Master or Deputy Master in Equity presides over the examinations. The type of examination which could be vexatious, oppressive or harassing will not be difficult to recognise. If counsel is appearing for the party being examined, he will no doubt take objection where necessary. And if the examinee is unrepresented, one can be confident that the Master himself would intervene were a situation to develop where the examination departed into a field which is abusive of the process of the Court. I reiterate that the mere fact the subject-matter of the examination is directly concerned with issues currently being litigated or matters incidental to such issues will not by itself render the proceedings abusive."

The practice referred to by Street J has been followed in Australia ever since. It was recently confirmed, with ample citation of supporting authority, by Debelle J in Re: Southern Equities Corporation Ltd, Bond v England (1997) 24 ACSR 472 at pp.486/7 and 489. It was in the light of that practice and procedure that the Supreme Court of South Australia made the orders for the examination of Mr Smith on 15th August 1997 and 18th August 1998 and issued the letters of request to which I have referred.

19   The source of the jurisdiction of the Companies Court in England to accede to the request is s.426 Insolvency Act 1986 . That section was enacted to give effect to the recommendation of the Review Committee on Insolvency Law and Practice (CMND 8558) chapter 49 that the provisions for mutual aid between "British courts" having jurisdiction in bankruptcy and insolvency matters should be both remodelled and extended. Ss.(1) to (3) deal with the position concerning the three jurisdictions within the United Kingdom. The relevant subsections, (4),(5), (10) and (11) , provide

**Co-operation   between   courts exercising jurisdiction in relation to insolvency**

…

(4) The Courts having jurisdiction in relation to insolvency law in any part of the United Kingdom shall assist the courts having the corresponding jurisdiction in any other part of the United Kingdom or any relevant country or territory.

(5)  For the purposes of subsection (4) a request made to court in any part of the United Kingdom by a court in any other part of the United Kingdom or in a relevant country or territory is authority for the court to which the request is made to apply, in relation to any matters specified

in the request, the insolvency law which is applicable by either court in relation to any matters specified in the request, the insolvency law which is applicable by either court in relation to comparable matters falling within its jurisdiction.

…

(10) In this section "insolvency law" means —

(a) in relation to England and Wales, provision made by or under this Act … and extending to England and Wales;

…

(d) in relation to any relevant country or territory, so much of the law of that country or territory as corresponds to provisions falling within any of the foregoing paragraphs;

(11) In this section "relevant country or territory" means —

(a) …

(b) any country or territory designated for the purposes of this section by the Secretary of State by order made by statutory instrument."

20 The Secretary of State has made three orders under subsection (11) designating 20 countries or territories for the purposes of s.426 . In each case the country or territory concerned has a legal system based on the Common Law and most, if not all, are members or former members of the Commonwealth. But some prominent common law countries, for example, the United States and some members or former members of the Commonwealth, for example India and Pakistan are not included; nor, apart from the Republic of Ireland, is any member of the European Union a designated country or territory. Thus all the designated countries or territories may be expected to have similar systems, principles, procedures and legal traditions.

21 The ambit of those subsections was considered by this court in Hughes v Hannover Ruchversicherungs AG [1997] 1 BCLC 497 . In my judgment, with which Roch and Thorpe LJJ agreed, I drew attention (pp. 515d–518h) to certain features of the section. For present purposes it is sufficient to reiterate some of them. First, "insolvency law" means, with regard to England, the Insolvency Act 1986 and with, regard to Australia, so much of the law of Australia as corresponds to the Insolvency Act 1986 . Accordingly s.596B Corporations Act is a provision of the insolvency law of Australia for the purposes of s.426(5) . Second, the letter of request sent by the Supreme Court of South Australia is authority for the Companies Court in England to apply either its own insolvency law or the insolvency law of Australia and, in either case, its own general jurisdiction and powers. Accordingly, and it was not disputed, the letters of request sent by the Supreme Court of South Australia authorised the Companies Court to apply s.596B Corporations Law. Third, notwithstanding the mandatory words in subsection (4) , the Companies Court was not bound to grant the order sought in the letter of request. In relation to both the nature of the discretion and impact of the request I said, at page 518g,

> "The assistance should be given if, in accordance with the law to be applied, the relief sought may properly be granted. In cases requiring the exercise of a discretion the fact of the request is a weighty matter to be taken into account but it cannot outweigh all others."

22 I have already referred to the relevant parts of the judgments of Evans-Lombe J in Re J.N.Taylor and of Judge Weeks in the instant case. In each case the

refusal to accede to the request of the Supreme Court of South Australia is founded on the propositions that (1) an order comparable to that sought would not be made pursuant to s.236 Insolvency Act 1986 because it would be regarded as oppressive, (2) in the exercise of its jurisdiction under s.426 the court in England will not make an order it considers to be oppressive, therefore (3) the court should not make the order sought pursuant to s.596B Corporations Act . In my view the reasoning is fallacious and the result unjustified by the terms of the section.

23    First, the relevance of s.236 Insolvency Act 1986 is limited. It is a provision of insolvency law within subsection (10)(a) because it is contained in the Insolvency Act 1986 . Consequently it serves, in accordance with subsection (10)(d) , to identify s.596B as a provision of the insolvency law of South Australia. Thus when faced with the request from the Supreme Court of South Australia the Companies Court had the choice, afforded by subsection (5) , whether to apply s.236 or s.596B . But once the choice to apply s.596B is made s.236 ceases to have any relevance.

24    Second, I do not consider that it is possible to divorce from a provision of insolvency law, as defined, which confers a jurisdiction on the court of the relevant country the principles and practice by which that jurisdiction is exercised by that court. Thus the insolvency law of South Australia identified as s.596B must include the principles in accordance with which the jurisdiction thereby conferred is exercised. In other words the Companies Court, having chosen to apply the law of Australia, should direct itself by reference to the principles to which Street and Debelle JJ referred in Re: Hugh J.Roberts Ltd [1970] 2 NSWR 582 and Re: Southern Equities Corporation Ltd, Bond v England (1997) 24 ACSR 472 respectively. Were it otherwise s.426 would be deprived of much of its effect for the choice of the law of the requesting court would be circumscribed by limitations to be found in the corresponding provisions of the insolvency law of England. It is clear beyond any doubt that the principles observed by the courts in Australia are as directed to avoiding oppression of the examinee as are the principles underlying s.236 . What is different is the method by which that goal is to be achieved; in Australia much emphasis is placed on the express powers of the Court contained in Division 1 of Part

5.9 and on the responsibility of the judicial officer before whom the examination takes place. In England there is no such emphasis, the Insolvency Act 1986 and the Insolvency Rules do not contain provisions comparable to ss.596C to 597 and orders are refused on the implicit assumption that there is no comparable responsibility of the judicial officer or if there is it will not be discharged.

25    Third and arising from the second, is the question of comity. It is plain that one object of the section is to provide for some form of reciprocal assistance for insolvencies with an international dimension. But this is to be confined to countries or territories with insolvency laws corresponding to the Insolvency Act 1986 which the Secretary of State has determined in his discretion to designate. It would be inconsistent with such a framework that the Companies Court, having elected to apply the insolvency law of the requesting court, should then stigmatise either the substantive law or the exercise by the requesting court of the jurisdiction thereby conferred as oppressive.

26    Fourth, if the request may properly be granted by the application of the law of the requesting country or territory how can the Companies Court in England refuse to accede to the request of the Supreme Court of South Australia? To do so must involve giving no weight to the fact of the request and ignoring the duty imposed by subsection (4) .

27    In short it appears to me that the decisions of Evans-Lombe J. in Re J.N.Taylor and of Judge Weeks in the instant case involve (1) restricting the expression "insolvency law" so as to exclude the principles and practice in accordance with which the requesting court exercises its statutory jurisdiction, (2) ignoring the need for comity evident in the framework provided for by the section and (3) giving no weight to the request. It follows that in my view Judge Weeks exercised his discretion on a wrong basis. But it does not follow from that conclusion that an order for the examination of Mr Smith should be made. That is to be determined by this court in the exercise of its discretion.

28    I start from the proposition that the provision to be applied is s.596B Corporations Law and that the jurisdiction is to be exercised in accordance with the principles to which Street and Debelle JJ referred. Thus

the existence of the proceedings in South Australia is not an obstacle. This court is entitled to have regard to the expertise, knowledge of both the issues in the action and the affairs of the SECL Group and judicial duty of Judge Bowen Pain before whom the examination would take place to avoid any oppression of Mr Smith. I also pay regard to the fact that, pursuant to s.596B , the Supreme Court of South Australia has itself made orders in August 1997 and 1998 for the examination of Mr Smith. Thus it is not a case merely of a request having been made pursuant to s.426(5) . The requesting court has exercised the discretion granted to it under the relevant jurisdiction so as to make the order sought. I do not think that ordinarily this court should perform that task again unless it is shown that the requesting court was ignorant of some material fact or that subsequent events have undermined the justification for the original order.

29   There is no suggestion that the Supreme Court was ignorant of some material fact. The only relevant subsequent event is the passage of time which makes the matters on which the liquidator wishes to examine Mr Smith more distant but the trial of the action more imminent. But in my view that is not an adequate reason to refuse the request. The trial is still months away. When it starts it is estimated that it will take two years. Counsel for Mr Smith did not demur from the suggestion that if Mr Smith was not examined in the immediate future he would not be examined at all. It was suggested that information obtained from Mr Smith might lead to some disruption of the timetable for the trial of the action. But that is not a reason for refusing to make the order sought. The objection assumes that the information so obtained is relevant. In that event it should be left to the trial judge to decide how it should be accommodated; it is not a reason to deny the liquidator the opportunity to obtain it.

30   It follows that in my view the order sought from the Companies Court by the Supreme Court of South Australia may, by virtue of s.426 Insolvency Act 1986 , properly be granted pursuant to s.596 Corporations Act and that there is no consideration of sufficient weight to justify not giving the assistance required by s.426(4) . For all these reasons I would allow the appeal and grant the relief sought by the liquidator's amended application.

Lord Justice Laws:

31   I agree.

Mr Justice Jonathan Parker:

32   I also agree that this appeal should be allowed, for the reasons which Lord Justice Morritt has given. I only add a few words of my own as I have reached a conclusion which differs from that reached by Judge Weeks QC.

33   Mr Moss QC (for Mr Smith) submits that if an English liquidator had applied for the examination of Mr Smith under section 236 of the Insolvency Act 1986 in circumstances where litigation similar to the Australian action was pending in England, the English court would have declined to make such an order on grounds of oppression (see Re Cloverbay [1991] Ch 90 CA ). It follows, he submits, that the English court is bound to refuse to order the examination of Mr Smith pursuant to section 596B of the Australian Corporations Law, since such an order would be similarly oppressive. As he put it in the course of his oral submissions: "If it is oppressive under English law, that is the end of the line: we do not accede to the request". I will refer to this approach as "the section 236 approach".

34   The section 236 approach was the approach adopted both by Mr Justice Evans-Lombe in Re J. N. Taylor Finance and by Judge Weeks QC in the instant case, and it provided the basis for their conclusions that assistance should not be given.

35   Let it be assumed for present purposes that Mr Moss's premise is correct, and that the English court, applying Re Cloverbay in the context of an English liquidation and with litigation pending in England, would have refused to make an order for the examination of Mr Smith under section 236 on grounds of oppression.

36   It goes without saying that the English court will not make an order which it regards as oppressive. The question, however, is whether the conclusion follows from the premise: that is to say, whether the fact

that an order under section 236 would be oppressive in an English context means that an order under section 426(4) and (5) for the examination of Mr Smith pursuant to section 596B of the Australian statute would similarly be oppressive under English law. In my judgment that conclusion does not follow.

37 Firstly, in considering whether the giving of assistance to a foreign court under section 426 would be oppressive under English law, account must in my judgment be taken of section 426 itself and in particular of the words "shall assist" in subsection (4) . Albeit the duty placed on the English courts by those words is not an absolute duty, in that the English court retains a discretion (a) whether to give assistance at all (see Hughes v. Hannover at p.518a) and (b) as to the form which any assistance may take (see *ibid.* at p.517g), there remains a duty on the English court to give assistance to a foreign court where assistance may properly be given (see *ibid.* p.518g). On the section 236 approach, however, no account at all is taken of the existence of this statutory duty, and of the public policy significance which it plainly has. The existence of this statutory duty is as clear an indication as one could hope to find that public policy favours comity, in the giving of assistance to foreign courts in insolvency matters.

38 Secondly, account must in my judgment be taken of the fact that the Secretary of State for Trade has power under section 426(11) to designate by statutory instrument those countries or territories which are to be a "relevant country or territory" for the purposes of the section. The inclusion of this power seems to me to be a further clear indication that public policy favours the giving of assistance to a country or territory so designated. Once again, the section 236 approach takes no account of this factor.

39 Thirdly, the section 236 approach is in my judgment inconsistent with the authority of the English court under section 426(5) to apply foreign insolvency law, and with the public policy considerations underlying the conferring of that authority, to which I have just referred. In my judgment section 426(5) allows no scope for restricting the operation of the insolvency law of a designated country or territory by subjecting it to considerations to which the English court might be expected to have regard had English insolvency law applied.

40 Fourthly, where (as here) the assistance sought is discretionary, the request for assistance is "a weighty factor to be taken into account" (see Hughes v. Hannover p.518c–d). Yet on the section 236 approach no weight is attached to the request. On the section 236 approach, the mere fact that an order would not be made under section 236 in corresponding circumstances is "the end of the line".

41 Fifthly, in considering whether the giving of assistance pursuant to a request from a foreign court would be oppressive under English law, account must in my judgment be taken of all the facts and circumstances of the case. This may sound trite, but the section 236 approach (as I understand it) does not allow for the intrusion of any factor beyond the attitude which the English court might be expected to take to a hypothetical application under section 236 , in an English context.

42 In the instant case, for example, account must in my judgment be taken of the following facts and circumstances in particular:

• (a) that Australian law recognises that an order for examination under section 596B of the Australian statute in circumstances where litigation is either pending or in the offing may operate in an oppressive way;
• (b) that Australian law affords specific protections to an examinee pursuant to section 596B , designed to prevent oppression in the conduct of the examination; and
• (c) that the Australian court has itself given judicial consideration (albeit on an *ex parte* basis) to the question whether assistance should be sought from the English court in the form of an order against Mr Smith under section 596B and has concluded that the giving of such assistance would be (to quote from the Letter of Request) "just and convenient".

43 For those reasons, I conclude that the section 236 approach is flawed in principle.

44 The question then arises whether, adopting the wider approach which I have just described, the giving of the

assistance sought would be oppressive under English law.

45 In my judgment the giving of the assistance sought would not be oppressive, even on the assumption that the English court would have refused to make an order under section 236 in corresponding circumstances in an English context on grounds of oppression. I reach that conclusion for the following reasons:

• (a) The existence of the statutory duty imposed by section 426(4) , and the public policy considerations which I have identified above as appearing from the terms of section 426 itself, must in my judgment carry significant weight in considering whether the giving of the requested assistance would be oppressive.

• (b) There is plainly a divergence of approach between English law and practice on the one hand and Australian law and practice on the other in seeking to prevent oppression by liquidators in the context of examinations sought under section 236 of the English statute and section 596B of the Australian statute. But the significance of that divergence should not be overstated. In both jurisdictions the courts are concerned to prevent oppression, but the methods adopted for that purpose are different. Whereas in England an order for examination would be refused where its operation is considered oppressive, in Australia the specific protections against oppression impact upon the conduct of the examination itself. But the aim in both jurisdictions is the same: to prevent oppression.

• (c) The fact that the Australian court has already given judicial consideration to the issuing of the Letter of Request, and concluded that it is "just and convenient" that it should issue, seems to me to be a further factor of considerable significance, and one which adds even greater weight to the mere fact that the request has been made.

• (d) Also of significance, in my judgment, is the fact that it is proposed that the examination (if ordered) be carried out in England by Judge Bowen Pain, who is a Master of the Supreme Court of South Australia and who is, on the evidence, both familiar with the affairs of the SECL Group and also very experienced in the supervision of examinations under the Australian Companies Code and subsequently the Corporation Law. He is also, as I understand it, familiar with the issues in the Australian litigation and has dealt with a number of interlocutory matters arising in that litigation.

46 In my judgment those factors lead to the clear conclusion that the giving of the requested assistance in this case would not be oppressive under English law, and that such assistance ought to be given.

Order: Appeal allowed. Minute of order to be agreed between the parties. Leave to appeal to the House of Lords refused.

Crown copyright

© 2017 Sweet & Maxwell
1999 WL 1048249

---

**End of Document**
© 2017 Thomson Reuters.

# TAB 29



[2014] UKPC 9
**Privy Council Appeal No 0061 of 2012
and Nos 0058, 0059, 0060 and 0061 of 2013**

# JUDGMENT

## Fairfield Sentry Limited (in Liquidation) (Appellant) v Migani and others (Respondents)

## Lombard, Odier & Cie and others (Appellants) *v* Fairfield Sentry Limited (in Liquidation) (Respondent)

## Credit Suisse London Nominees Limited and another (Appellants) v Fairfield Sentry Limited (in Liquidation) (Respondent)

## Quilvest Finance Limited and others (Appellants) v Fairfield Sentry Limited (in Liquidation) (Respondent)

## UBS AG New York and others (Appellants) v Fairfield Sentry Limited (in Liquidation) (Respondent)

## From the Court of Appeal of the British Virgin Islands

**before**

**Lord Neuberger**
**Lord Mance**
**Lord Clarke**
**Lord Sumption**
**Lord Toulson**

## JUDGMENT DELIVERED BY

### Lord Sumption

### ON

### 16 April 2014

**Heard on 18 and 19 March 2014**

*Lombard, Odier & Cie and others*
David Lord QC
Robert Christie

(Instructed by Blake Lapthorn)

*Credit Suisse London Nominees Ltd and another*
Laurence Rabinowitz QC
Arabella di Iorio
Maximilian Schlote
(Instructed by Herbert Smith Freehills LLP)

*UBS AG New York and others*
Lord Falconer QC
Paul Webster QC
(Instructed by Gibson Dunn & Crutcher LLP)

*Quilvest Finance Ltd and others*
Mark Hapgood QC
Phillip Kite
Alan Roxburgh
(Instructed by Latham & Watkins)

*Fairfield Sentry Ltd (in Liquidation)*
Jonathan Crow QC
Andrew Westwood
Stephen Midwinter
(Instructed by Macfarlanes LLP)

**LORD SUMPTION:**

*Introduction*

1.    Bernard L. Madoff and his company Bernard L. Madoff Investment Securities LLC ('BLMIS') ostensibly operated as fund managers, principally from New York. Over a period of at least seventeen years he operated what seems likely to be the largest Ponzi scheme in history, accepting sums variously estimated between US$17 billion and US$50 billion for investment. It appears that from at least the early 1990s there had been no trades and no investments. Returns to investors were fictitious and the corresponding documentation fabricated. As with any Ponzi scheme, net withdrawals from funds under management were paid from new money placed with BLMIS for investment. In December 2008 Madoff was arrested, and in March 2009 he pleaded guilty in a New York court to a number of counts of fraud. He was later sentenced to 150 years imprisonment.

2.    Fairfield Sentry Ltd is a company incorporated in the British Virgin Islands as a mutual fund. I shall, like most of the formal documentation, call it "the Fund". From 1997 to 2008, it was the largest of a number of feeder funds which placed money with BLMIS for investment. Over that period, about 95% of its assets, amounting to some US$7.2 billion was placed with BLMIS. Investors participated indirectly in these placements by subscribing for shares in the Fund at a price dependent on the Fund's net asset value per share ('NAV'), and were entitled to withdraw funds by redeeming their shares under the provisions of the Fund's Articles of Association. The net addition to or reduction of its funds arising from subscriptions or withdrawals over any month was reflected in corresponding additions or reductions of funds placed with BLMIS. The shares were also transferrable, subject to certain restrictions in the Articles, but we were told that there was no secondary market in them. On 18 December 2008, shortly after Madoff's frauds came to light, the Directors of the Fund suspended the determination of the Fund's NAV per share, thus effectively terminating the redemption of shares. On 21 July 2009, the High Court of the British Virgin Islands ordered the Fund to be wound up.

3.    It is inherent in a Ponzi scheme that those who withdraw their funds before the scheme collapses escape without loss, and quite possibly with substantial fictitious profits. The loss falls entirely on those investors whose funds are still invested when the money runs out and the scheme fails. Members of the Fund who redeemed their shares before 18 December 2008 recovered the NAV which the Directors determined to be attributable to their shares on the basis of fictitious reports from BLMIS. The loss will in principle be borne entirely by those who were still Members of the Fund at that date.

4.      These proceedings are brought by the Fund at the instance of its liquidators against a number of financial institutions who were Members of the Fund but redeemed some or all of their shares before December 2008. Their purpose is to recover from the Defendants the amounts paid out to them on redemption, on the footing that they were paid out in the mistaken belief that the assets were as stated by BLMIS, when there were in fact no such assets. Any recoveries made on this basis can then be distributed rateably between all Members, irrespective of when or whether they redeemed.

5.      Similar proceedings have been brought by the Fund in other jurisdictions against other Members and former Members to recover redemption payments. They include more than 300 actions in the United States, in which the Fund is claiming more than US$6 billion. The United States actions have been stayed pending the outcome of these proceedings.

6.      On 20 April 2011, Bannister J in the Commercial Division of the High Court of the British Virgin Islands ordered four preliminary issues to be tried. The first three issues have together been called the "Article 11" question.  These issues were all concerned with the question whether certain transaction documents issued to Members of the Fund recording the NAV per share or the redemption price upon redemption were binding on the Fund under Article 11 of its Articles, which deals with the effect of certain "certificates". It is now accepted, and rightly accepted, by the Fund that if they were binding the present claims must fail. The fourth issue was whether the Defendants have a defence on the ground that by their surrendering their shares they gave good consideration for the money that they received on redemption. This has been called the "Good Consideration" question. The two questions were argued separately below and before us. But for reasons which will be explained, they are closely related and have to be considered together.

7.      Bannister J decided the Article 11 question in favour of the Fund. He held that the documents relied upon by the Defendants as binding were not "certificates" for the purpose of Article 11. But he held in favour of the Defendants on the Good Consideration question, and on that basis summarily dismissed the action. He was affirmed on both points by the Eastern Caribbean Court of Appeal.

*The contractual documentation*

8.      Subscribers for shares in the Fund complete a Subscription Agreement, by which they subscribe for shares to be offered by the Fund at the NAV per share as the opening of business on the effective date of purchase "pursuant to the terms herein, the Memorandum, and the Fund's Memorandum of Association and Articles of Association (collectively 'the Fund Documents')": see clause 1.

9.      Of these three documents, the "Memorandum" means the Private Placement Memorandum by which the Fund offers a stated number of shares. Its main function is to convey information about how the Fund is managed and how its assets are invested, and to define certain expressions used in the Subscription Agreement. It describes the investment strategy of the Fund, and explains that it is implemented by BLMIS. A section headed "Transfers, Redemptions and Termination" describes the procedure for redemption.

10.     The Subscription Agreement binds the subscriber to his subscription and to the terms of the Fund Documents, but is otherwise concerned entirely with acknowledgements, representations and warranties as to his understanding of the investment and of associated procedures and risks, mostly for regulatory purposes. For present purposes, what matters is not the subscriber's acknowledgements, representations and warranties, nor the factual statements of the Fund, but the terms of the subscriber's membership of the Fund, which govern the redemption of its shares. These terms are to be found in the Articles of Association of the Fund. The relevant provisions are Articles 9, 10 and 11 and the associated definitions in Article 1. These operate by reference to the "Valuation Day" and the "Dealing Day". A Valuation Day is the last business day of any month (or such other date as the Directors may determine); and with respect to redemptions a Dealing Day is a Valuation Day.

11.     Article 9 deals with the issue and allotment of shares. Article 9(1) provides for shares to be issued to those applying for them on the Dealing Day following the application. Article 9(1)(b) provides:

          "The issue of Shares pursuant to this Article shall be effected at not less than the Subscription Price determined in accordance with paragraph (2) of this Article but in no event shall a Share be allotted or issued at a price less than its par value."

Article 9(2) provides that the Subscription Price per share is to be the

          "Net Asset Value of each Share (as determined in accordance with Article 11) as at the close of business in Amsterdam, The Netherlands, on the Valuation Day immediately preceding the Dealing Day on which such issue is made."

12.     Article 10 deals with redemptions. It is in some respects the mirror image of Article 9. Article 10(1) provides that

"Subject to the provisions of the Memorandum, these Articles and the Act and subject as hereinafter provided, the Company shall on receipt by it or its authorised agent of a request in writing (or in such other form as the Directors may determine) by a Member ('the Applicant') specifying the number and class of Shares to be redeemed redeem or purchase all or any portion of the Shares registered in the Applicant's name, PROVIDED THAT:

(a) subject as hereinafter provided, the redemption or purchase of Shares pursuant to this Article shall be made on the Dealing Day on which, or immediately following the day on which, the written request is received provided that the said request is received on or before the Dealing Time."

Article 10(1)(b) provides (so far as relevant) that

"the redemption or purchase of Shares pursuant to this article shall be effected at the Redemption Price determined in accordance with paragraph (2) of this article."

Article 10(1)(c) provides for the Redemption Price to be paid "as soon as practicable after the Dealing Day", being normally 30 days after the Dealing Day, subject to extension in certain special cases. Article 10(2) deals with the Redemption Price. It provides:

"(2)    The Redemption Price for each Share shall be the Net Asset Value per Share (as determined in accordance with Article 11) as at the close of business in Amsterdam, The Netherlands on the Dealing Day on which such redemption is effected less such sum (if any) as the Directors may consider represents the appropriate provision for fiscal and sale charges which would be incurred on the sale of assets of the Company, in each case rounded to the nearest minimum integral unit of the Base Currency."

13.    Article 11 deals with the determination of the NAV per share for the purpose of both subscriptions and redemptions. Article 11(1) provides:

"[a] The Net Asset Value per Share of each class shall be determined by the Directors as at the close of business on each Valuation Day (except when determination of the Net Asset Value per Share has been suspended under the provisions of paragraph

(4) of this Article), on such other occasions as may be required by these Articles and on such other occasions as the Directors may from time to time determine.

[b] The Net Asset Value per Share shall be calculated at the time of each determination by dividing the value of the net assets of the Fund by the number of Shares then in issue or deemed to be in issue and by adjusting for each class of Shares such resultant number to take into account any dividends, distributions, assets or liabilities attributable to such class of Shares pursuant to paragraph (2) of Article 4, all determined and calculated as hereinafter provided.

[c] Any certificate as to the Net Asset Value per Share or as to the Subscription Price or Redemption Price therefor given in good faith by or on behalf of the Directors shall be binding on all parties."

The sub-paragraph numbers [a], [b] and [c] have been added for ease of reference. Article 11(2) identifies the assets and liabilities to be included in the calculation of the NAV. In effect they are all the assets and liabilities of the Fund. Article 11(3) contains detailed supplementary provisions governing certain aspects of the valuation.

*Redemption procedure*

14.    Since 1999, the Fund's administrator has been Citco Fund Services (Europe) BV, a leading professional administrator of mutual funds based in the Netherlands. The Private Placement Memorandum records that under an administration agreement dated 20 February 2003, the Fund has appointed Citco as the administrator of the Fund under the overall direction of the Directors. Citco is described as having responsibility for day-to-day administrative services including "calculation of Net Asset Value" and "communications with shareholders".

15.    This summary description is borne out by the terms of the agreement of 20 February 2003. Clause 2.1 of the agreement provides for the Administrator (Citco) to provide "the Services", which are defined in Schedule 2 as including the "calculation of the Net Asset Value and the Net Asset Value per Share on a monthly basis in accordance with the Fund Documents", and "publishing the Net Asset Value per Share (of each class if appropriate) as requested by the Fund." Clause 3.4 provides that "the Administrator shall on behalf of the Fund redeem Shares in accordance with the provisions and procedures set out in the applicable Fund Documents", on receipt of the

Member's written request to redeem and the provision of sufficient moneys to satisfy the Redemption Price.

16.    The management of a mutual fund is bound to involve the communication to Members of a substantial volume of routine documentation, including transactional documentation generated upon redemption. It is common ground that in the Fund's case, this included the following documents:

i)    Citco calculated an estimated NAV weekly and a final NAV on each Valuation Day, i.e. on the last business day of each month. All of these figures were posted by Citco on a password-protected website which it maintained and which was accessible to Members.

ii)    The final NAV per share for the last business day of each month was communicated in about the middle of the following month by the Fairfield Group client desk at Citco by e-mail to all Members. The operative part of the representative e-mail before us reads:

"Please be advised that the final net asset value per share of Fairfield Sentry Limited, Class A, is USD 957.8430 as at December 2003.

Should you have any questions or require further information, please do not hesitate to contact us."

iii)    Upon each redemption, the redeeming Member received from Citco in about the middle of the month following the relevant Valuation Day a contract note recording the transaction. The operative part began:

"In accordance with your instructions, we confirm having REDEEMED the following voting shares from FAIRFIELD SENTRY LIMITED."

There followed the relevant Valuation Day, the number of shares redeemed, the Redemption price per share and the total net redemption proceeds.

iv)    Each Member received from Citco in about the middle of each month a monthly statement of his account. This recorded, among other things, the

opening and closing NAV per share for the previous calendar month, and a
summary of activity (if any) over the previous calendar month recording
subscriptions and redemptions in the month and the NAV per share
corresponding to each one.

Each of these documents is said by the Defendants to be a "certificate" for the purpose
of Article 11(1) [c] of the Fund's Articles.

*Restitution*

17.    The availability of a claim for restitution arising out of a transaction governed
by the Articles of the Fund is governed by the same law which governs the Articles
themselves, namely the law of the British Virgin Islands. In every relevant respect, the
principles of the law of the British Virgin Islands governing the construction of the
Articles and any associated common law right to restitution are the same as those of
English law.

18.    The basic principle is not in dispute. The payee of money "cannot be said to have
been unjustly enriched if he was entitled to receive the sum paid to him": *Kleinwort
Benson Ltd v Lincoln City Council* [1999] 2 AC 349 at 408B (Lord Hope). Or, as
Professor Burrows has put it in his *Restatement of the English Law of Unjust
Enrichment* (2012) at §3(6), "in general, an enrichment is not unjust if the benefit was
owed to the defendant by the claimant under a valid contractual, statutory or other legal
obligation." Therefore, to the extent that a payment made under a mistake discharges a
contractual debt of the payee, it cannot be recovered, unless (which is not suggested)
the mistake is such as to avoid the contract: *Barclays Bank Ltd v W.J. Simms Son &
Cooke (Southern) Ltd* [1980] QB 677, 695. So far as the payment exceeds the debt
properly due, then the payer is in principle entitled to recover the excess.

19.    It follows that the Fund's claim to recover the redemption payments depends on
whether it was bound by the redemption terms to make the payments which it did make.
That in turn depends on whether the effect of those terms is that the Fund was obliged
upon a redemption to pay (i) the true NAV per share, ascertained in the light of
information which subsequently became available about Madoff's frauds, or (ii) the
NAV per share which was determined by the Directors at the time of redemption. If (ii)
is correct then, the shares having been surrendered in exchange for the amount properly
due under the Articles, the redemption payments are irrecoverable.

*What was the Fund obliged to pay upon redemption*

20.    Mr Crow QC, who appeared for the Fund, invited us to stop at the general
principle, and not to answer this question. He submitted that the effect of the contractual

provisions governing redemption was not covered by the preliminary issues and ought to be referred back to the High Court. He also suggested that at a further hearing in the High Court, New York law, which is the proper law of the Subscription Agreement, might be relevant. The Board unhesitatingly rejects these submissions. Neither the Article 11 question nor the Good Consideration question, as formulated in the preliminary issues, can be resolved without deciding what is the effect of the Articles. Both courts below proceeded on that basis. The effect of the Articles is therefore properly before the Board. The Board notes that neither the Fund nor the Defendants have pleaded New York law. Nor can the Board discern any basis on which New York law could be relevant, since none of the questions raised by the preliminary issues depends on the terms of the Subscription Agreement. They depend wholly on the construction of the Articles, which is governed by the law of the British Virgin Islands.


21.    The starting point is the scheme of the Articles. Articles 9 and 10 determine the status of investors as Members of the Fund, a question which ought in principle to be capable of definitive resolution at any moment in the Fund's history. Both the Subscription Price under Article 9 and the Redemption Price under Article 10 depend on the NAV per share determined under Article 11. Article 9(1)(a) provides that the issue of shares "shall be made on the Dealing Day". Article 9(1)(b) provides for the Subscription Price to be determined in accordance with Article 9(2), which means that it is to be the NAV per share "determined in accordance with Article 11". Article 9(1)(c) provides for the Subscription Price to be payable at a time fixed by the Directors, failing which any allotment for which payment is due may be cancelled. There are corresponding provisions of Article 10 concerning redemptions. Article 10(1)(a) provides that the redemption of shares "shall be made on the Dealing Day". Article 10(1)(b) provides that the redemption is to be effected at the Redemption Price determined in accordance with Article 10(2), which means the "Redemption Price for each Share shall be the Net Asset Value per Share (as determined in accordance with Article 11)" on the Dealing Day. Under Article 10(1)(c), that price must be paid as soon as practicable after the Dealing Day, being normally thirty days thereafter subject to specified and limited extensions. These provisions determine the amount due and the time of payment. Moreover, once the NAV per share for a given monthly Valuation Day is ascertained, subscriptions and redemptions effected at the corresponding Subscription and Redemption Price will affect the determination of NAV per share on the following monthly Valuation Day. This is because the receipt of subscription moneys and the payment out of redemption moneys will affect the amount of the Fund's assets for the purpose of Article 11(2). It will be apparent from this summary that the whole of this scheme depends upon the price being definitively ascertained by the Dealing Day and known to the parties shortly thereafter. It is unworkable on any other basis.


22.    The Fund's case is that when Article 10(2) defines the Redemption Price as the NAV per share "determined in accordance with Article 11", it means the NAV correctly determined by dividing the NAV of the Fund by the number of shares in issue in accordance with Articles 11(1)[b], 11(2) and 11(3). If this is right, the same must be

true of Article 9(1)(c), which fixes the Subscription Price by reference to the same provisions of Article 11. The Directors' determination of the NAV per share as at the Valuation Day, under Article 11, was not definitive according to this analysis unless a certificate was issued pursuant to Article 11(1)[c], and that would happen only if the Directors chose to issue one.

23.    In the Board's opinion, this is an impossible construction. If it were correct, an essential term of both the subscription for shares and their redemption, namely the price, would not be definitively ascertained at the time when the transaction took effect, nor at the time when the price fell to be paid. Indeed, it would not be definitively ascertained for an indefinite period after the transaction had ostensibly been completed, because unless a certificate was issued it would always be possible to vary the determination of the NAV per share made by the Directors at the time and substitute a different one based on information acquired long afterwards about the existence or value of the assets. This would not only expose Members who had redeemed their shares to an open-ended liability to repay part of the price received if it subsequently appeared that the assets were worth less than was thought at the time. It would confer on them an open-ended right to recover more (at the expense of other Members) if it later appeared that they were worth more. Corresponding problems would arise out of the retrospective variation of the Subscription Price long after the shares had been allotted.  Indeed, it is difficult to see how the Directors could perform their duty under Article 9(1)(b) not to allot or issue a share at less than the Subscription Price if the latter might depend on information coming to light after the allotment had been made.

24.    If, as the Articles clearly envisage, the Subscription Price and the Redemption Price are to be definitively ascertained at the time of the subscription or redemption, then the NAV per share on which those prices are based must be the one determined by the Directors at the time, whether or not the determination was correctly carried out in accordance with Articles 11(2) and (3). That means either (i) that the Directors' determination at the time must be treated as conclusive whether or not there is a certificate under Article 11(1)[c]; or else (ii) that  Article 11(1)[c] must be read as referring to the ordinary transaction documents recording the NAV per share or the Subscription or Redemption Price which will necessarily be generated and communicated to the Member at the time, and not to some special document issued at the discretion of the Directors. The Board considers, for the reasons given below, that in a case where a provision for certification such as Article 11(1)[c] has been included as part of the mechanics of subscription and redemption, the correct approach is the second one.

*Certification*

25.    The Board has been referred to a number of authorities dealing with certification clauses, none of them analogous to Article 11(1)[c]. Their effect, broadly summarised, is that the word "certificate" has no standard meaning and that the question what

constitutes a certificate is dependent on the commercial or legal context in which the certification clause appears.


26.     The Board was invited by the Fund to read the opening words ("Any certificate") as if they said "A certificate, if any". This, it was argued, showed that there would not necessarily be one in every case. For that reason, and because there is nothing in the language of the Articles which obliged the Fund to issue a certificate, it was submitted that the issue of a certificate was wholly in the discretion of the Directors or their delegates and that it could be withheld for any rational and honest reason. A variant of this argument appears to have been accepted by the Court of Appeal. The Board, however, is unable to accept it. In the first place, it places more weight on the word "Any" than it will bear. It seems more likely that the word was used because the rest of the clause refers to a number of different things that may be certified, namely the NAV per share, the Subscription Price and the Redemption Price. Secondly, the problem about the suggestion that certification is a discretionary matter for the Directors, is that it is impossible to discern what purpose such a discretion could rationally be thought to serve. The sole object of certification is to produce finality, and the scheme of the Articles, as the Board has summarised it above, shows that finality is equally important for all determinations of the NAV per share and all Subscription and Redemption Prices. There is no rational ground for regarding finality as desirable in some cases but not in others, according to the discretionary decision of the Directors or their delegates. Such a discretion, if it existed, could only operate capriciously, and is therefore most unlikely to have been intended by the draftsman.


27.     As a matter of language, a "certificate" ordinarily means (i) a statement in writing, (ii) issued by an authoritative source, which (iii) is communicated by whatever method to a recipient or class of recipients intended to rely on it, and (iv) conveys information, (v) in a form or context which shows that it is intended to be definitive. There is no reason to think that a document must satisfy any further formal requirements, unless its purpose or legal context plainly requires them. There is nothing in the context of these Articles which does.


28.     The relevant categories of document generated in the ordinary course of the Fund's relations with Members are listed at paragraph 16. In the Board's opinion the monthly e-mail, the contract notes and the monthly statement of account are all "certificates". They communicate information in documentary form to Members. It follows that the critical questions in the present case are whether transaction documents in the three categories are (i) issued by an authoritative source and (ii) in a form or context which shows that they are intended to be definitive.


29.     The authoritative character of their source can be shortly dealt with. Documents in all three categories were issued by Citco under the authority of the Directors, conferred by the Administration Agreement. The calculation of the monthly NAV per

share was among the functions of Citco included in Schedule 2, Part 1 of the Agreement. Its publication was a function of Citco under Schedule 2, Part 2(e). The communication to Members seeking to redeem their shares of the monthly NAV per share and the Redemption Price is necessarily implicit in clause 3.4 of the Agreement, which delegates to Citco the duty of redeeming shares in accordance with the "provisions and procedures" set out in the Fund Documents. These authorities are general, and not specific to any particular transaction or category of transactions. If the issue of a "certificate" were an exceptional or discretionary step, something more specific by way of authority might have been required. But for the reasons which the Board has already given, the certification procedure under Article 11(1)[c] is neither exceptional nor discretionary.

30.    Turning to the question whether they were intended to be definitive, the context in which they are issued plainly demonstrates that they were. As the Board has already observed, the nature of a redemption transaction and the procedures set out in Article 10 make it essential that the Redemption Price should be definitively ascertained at the time of the transaction and as at the Valuation Day. In that context, any unqualified documentary statement of the Redemption Price or the NAV per share on which it is based must be intended to be definitive. The Articles could not otherwise operate as they are intended to.

31.    This conclusion is borne out by the language of the documents. The emails formally "advising" the monthly NAV per share to Members describe it in terms as the "final" figure. The contract notes formally "confirm" the redemption and record its terms. The monthly Members' statement constitutes a formal record of each transaction during the month and the NAV per share at which it went through. All of this information was plainly intended to be relied upon by Members as a definitive record of the transaction and the values on which it was based.

32.    The Board prefers to express no opinion on the question whether the statements posted on the Citco website are also "certificates". A statement on a website may well have all the characteristics of a "certificate", but that may depend on a variety of considerations on which the Board has little or no evidence, including the permanence of any statement posted on it and what Members are told about the kind of information which they will find there.

*Conclusion*

The Board will humbly advise Her Majesty that the appeals against the decision of Bannister J and the Court of Appeal on Preliminary Issues 1, 2 and 3 should be allowed, save as to information posted on the Citco website, and that the appeal against their decision on Issue 4 should be dismissed. The parties are invited to agree an appropriate form of declaration on all four issues.

# TAB 30

[HOUSE OF LORDS.]

H. L. (E.)    GALBRAITH . . . . . . . . . . .    APPELLANT ;

1910                          AND

*June* 23.    GRIMSHAW AND ANOTHER . . . . . . .    RESPONDENTS.

*Attachment of Debts—Scottish Judgment—Extension to England—Garnishee Order Nisi—Service on Garnishee—Subsequent Bankruptcy of Judgment Debtor in Scotland—Rights of Trustee in Bankruptcy—Bankruptcy Act, 1883 (46 & 47 Vict. c. 52), s. 117.*

A judgment for a sum of money which was obtained in an action in Scotland was extended to England under the Judgments Extension Act, 1868, and the judgment creditor served a garnishee order nisi on a firm who owed a debt in England to the judgment debtor.

After the service of the garnishee order nisi the whole estate of the judgment debtor was sequestrated under the Scottish bankruptcy law and transferred wherever situated to the appellant as trustee for the creditors with power to recover all estates, debts, or money due to the judgment debtor. In an interpleader issue in England between the trustee and the judgment creditor as to their respective claims to the garnished debt :—

*Held*, that the judgment creditor had by the service of the garnishee order nisi obtained an attachment in England before the date of the sequestration, and that the Scottish Court had no power to interfere with his claim.

Decision of the Court of Appeal, [1910] 1 K. B. 339, affirmed.

THE facts material to this appeal are stated in the head-note. The dates are as follows : October 23, 1908, judgment for 311*l.* and costs in an action in Scotland by Grimshaw and another against Merrens & Sons ; October 26, judgment extended to England ; October 27, garnishee order nisi in respect of 400*l.* owed to Merrens & Sons in England served upon the firm in England who owed the 400*l.* ; November 12, sequestration in Scotland of the estate of Merrens & Sons ; December 7, confirmation of the appellant as trustee of the sequestrated estate.

In the interpleader issue between the appellant and the respondents (Grimshaw and another) as to their respective claims to the garnished debt Ridley J. gave judgment for the appellant. This decision was reversed by the Court of Appeal

A. C.                    AND PRIVY COUNCIL.                    509

(Farwell, Buckley, and Kennedy L.JJ.), who entered judgment
for the respondents.   Hence this appeal.

June 22, 23.   *Radcliffe, K.C.*, and *Pringle*, for the appellant.
The garnishee order nisi did not transfer the property in the
sum garnished from the judgment debtor, nor did it create a
charge.   There is in our law no term which exactly defines the
right of a garnishor, which has been described as a lien or
security; it is something like a distringas on stock.   A receiver
in a debenture-holders' action is entitled to precedence over the
garnishor, although appointed after the garnishee order: *Norton*
v. *Yates*(1); *Geisse* v. *Taylor* (2); *Cairney* v. *Back*. (3)   A gar-
nishee is but a stakeholder.   In *Rogers* v. *Whiteley* (4) Lord
Watson said: "The effect of an order attaching all debts . . . .
is to make the garnishee custodier for the Court, of the whole
funds attached."   In *In re Combined Weighing and Advertising
Machine Co*. (5) it was held that a garnishee order does not create
between garnishor and garnishee any debt either at law or in
equity.   *Holmes* v. *Tutton* (6) was like the present case, and the
title of the assignees in bankruptcy prevailed.

The Court will recognize and give effect to a foreign bank-
ruptcy: *Sill* v. *Worswick*. (7)   In *Solomons* v. *Ross* (8) the title
of the administrator of "desolate" estates in Holland was
preferred to that of a person who had, like a garnishor, attached
moneys of the bankrupt.   A similar order with respect to Irish
property was made in *Neale* v. *Cottingham* (9), referred to in the
same note, and in *Jollet* v. *Deponthieu*. (10)   The question must
be decided according to Scottish and not English law.

*Rawlinson, K.C.*, and *H. Dobb*, for the respondents.   By the
order of the King's Bench Division the respondents acquired a
lien or charge for the money lodged in Court by the garnishees,
and that charge had priority to the rights of the appellant.   The
money was bound in the hands of the garnishees.   The garnishees
could not pay the money due to the bankrupt to any one else

(1) [1906] 1 K. B. 112.
(2) [1905] 2 K. B. 658.
(3) [1906] 2 K. B. 746.
(4) [1892] A. C. 118, at p. 122.
(5) (1889) 43 Ch. D. 99.

(6) (1855) 5 E. & B. 65.
(7) (1791) 1 H. Bl. 665.
(8) (1764) 1 H. Bl. 131, n.
(9) (1764) 1 H. Bl. 133, n.
(10) (1769) 1 H. Bl. 132, n.

510                           HOUSE OF LORDS                    [1910]

H. L. (E.)     than the respondents.  On the order's becoming absolute the
1910       money attached becomes the property of the creditors.  Sect. 117
GALBRAITH   of the Bankruptcy Act, 1883, is only machinery, and is no
v.        authority for introducing English law into a Scottish bankruptcy.
GRIMSHAW.
           When the garnishee order was obtained the rights of the Scottish
           creditors and of the appellant had not come into existence; they
           only arose on November 12, when the petition was presented.
           There is no authority for applying the provisions of s. 45 of the
           Bankruptcy Act, 1883, which require that an execution or attach-
           ment must be completed in order to prevail over the trustee's title,
           to Scotland.  The question must be decided by English and not
           Scottish law.  In the cases cited from Henry Blackstone time
           was the governing consideration and the title of the assignees in
           bankruptcy was prior to the garnishee order.  On the effect of
           an arrestment, which is the equivalent of a garnishee order,
           Lord Deas' judgment in *Goetze* v. *Aders* (1) supports the
           respondents.

             *Radcliffe*, K.C., in reply.

             LORD LOREBURN L.C.  My Lords, in this case I think that
           the conclusion arrived at by the Court of Appeal ought to be
           supported.

             To my mind your Lordships would be wise to apply the rule
           explained by Lord President Inglis in the case of *Goetze* v.
           *Aders*. (2)  I think that rule is applicable in England also.  The
           attachment in England will not prevail against a claim of a
           foreign trustee in bankruptcy which is prior in date, provided
           that the effect of the bankruptcy is to vest in the trustee the
           assets in question.  If the attachment is prior in date, then I do
           not think it will be affected by the title of the trustee in a foreign
           bankruptcy; and the reason is that a foreign law making
           the title of the trustee relate back to transactions which the
           debtor himself could not have disturbed has no operation in
           England, while the English law as to relation back applies only
           to cases of English bankruptcy, and therefore the trustee may
           find himself (as in this case) falling between two stools.

             I think, my Lords, in each case the question will be whether

                    (1) (1874) 2 R. 150, 155.            (2) 2 R. 150.

A. C.                AND PRIVY COUNCIL.                                511

H. L. (E.)

1910

GALBRAITH
v.
GRIMSHAW.

Lord Loreburn
L.C.

the bankrupt could have assigned to the trustee, at the date when the trustee's title accrued, the debt or assets in question situated in England. If any part of that which the bankrupt could have then assigned is situated in England, then the trustee may have it; but he could not have it unless the bankrupt could himself have assigned it. It follows that the trustee cannot have this debt free from the garnishee order, because the bankrupt could only have assigned it on November 12, subject to the garnishee order.

My Lords, with regard to s. 117 of the Bankruptcy Act, 1883, I think that affects procedure and does not enlarge the rule to which I have alluded. And I am not prepared to accept and act upon the case which is scantily reported in the volume of Blackstone's Reports to which we have been referred. (1) I am not prepared to accept that case as an authority against the rule which I have referred to.

I will not say, my Lords, that there may not be exceptions to that rule; as, for example, if the effect of the foreign bankruptcy were to transfer to the trustee only part of the assets of the bankrupt. Such points, to my mind, ought not to be settled or treated as settled except after consideration of the cases in which they actually arose. But I think it is enough to say in the present case I see nothing that should disturb the rule or the principle to which I have adverted.

LORD MACNAGHTEN. My Lords, this is rather a singular case. If the bankruptcy had been an English bankruptcy, the attachment, being uncompleted, would not have prevailed against the claim of the judicial factor or the trustee in bankruptcy. If the attachment, or the process in Scotland that corresponds more or less with attachment, had been pending there, the claim of the judicial factor or the trustee in bankruptcy must have succeeded. But, as it is, a creditor of the bankrupt having duly obtained an attachment in England before the date of the sequestration cannot, I think, be deprived of the fruits of his diligence.

It may have been intended by the Legislature that bankruptcy

(1) *Solomons* v. *Ross*, (1764) 1 H.Bl. 131, n.

H. L. (E.)
1910
GALBRAITH
v.
GRIMSHAW.

Lord
Macnaghten.

in one part of the United Kingdom should produce the same consequences throughout the whole kingdom.    But the Legislature has not said so.    The Act does not say that a Scotch sequestration shall have effect in England as if it were an English bankruptcy of the same date.    It only says that the Courts of the different parts of the United Kingdom shall severally act in aid of and be auxiliary to each other in all matters of bankruptcy. The English Court, no doubt, is bound to carry out the orders of the Scottish Court, but in the absence of special enactment the Scottish Court can only claim the free assets of the bankrupt. It has no right to interfere with any process of an English Court pending at the time of the Scotch sequestration. `It must take the assets of the bankrupt such as they were at that date and with all the liabilities to which they were then subject.    The debt attached by the order nisi was at the date of the sequestration earmarked for the purpose of answering a particular claim —a claim which in due course would have ripened into a right. With this inchoate right the Scottish Court had no power to interfere, nor has it even purported to do so.    Therefore I think the appeal fails.

LORD JAMES OF HEREFORD.    My Lords, I concur.

LORD DUNEDIN.    My Lords, I concur with the opinions which have been delivered.    I think that the general principle which underlies every bankruptcy system is that after bankruptcy the bankrupt is no longer really the owner of his own property, but holds his own property as trustee for the whole of his creditors for equal division.    That carries with it necessarily the idea that some of his creditors may already have got security or may have taken part of the property in execution.    And if the matter went no further than that it is quite clear that both of those positions would be good as against the bankrupt himself and consequently as against the rest of his creditors.    It is a very natural development of that in working out a bankruptcy system that you should introduce a law of relation back, and that within a certain period, which will always be an arbitrary period determined by positive enactment, you should hold that the

H. L. (E.)

1910

GALBRAITH
v.
GRIMSHAW.

Lord Dunedin.

security given or the execution effected should have no effect and that that property should be like the rest of the property of the bankrupt.

Now so far as the general principle is concerned it is quite consistent with the comity of nations that it should be a rule of international law that if the Court finds that there is already pending a process of universal distribution of a bankrupt's effects it should not allow steps to be taken in its territory which would interfere with that process of universal distribution ; and that I take to be the doctrine at the bottom of the cases of which *Goetze* v. *Aders* (1) is only one example. But if you wish to extend that not only to the question of recognizing a process of universal distribution but also of introducing the law of relation back, then it seems to me you at once get into rather great difficulties, because the question at once arises, according to which law will you apply the doctrine of relation back ? If you take the law of the country of the bankruptcy, then the execution or security in question may be and often is of a kind which is quite foreign to the system of law which you are administering in the Bankruptcy Court. If on the other hand you take the law of the country of the attachment, then you have to administer a law which is quite ignorant of the precise execution or security with which it has to deal. Accordingly, to say the least of it, there has been quoted to us no instance where as a question of international law a Court has applied the rule of relation back, and certainly there are dicta of Lord President Inglis which seem to point completely the other way. Of course that would not prevent the matter being dealt with in the United Kingdom by means of positive enactment. I entirely concur with what fell from the noble and learned Lord on the woolsack as to the true meaning of s. 117.

*Order of the Court of Appeal affirmed and appeal dismissed with costs.*

*Lords' Journals*, June 23, 1910.

Solicitors: *Heath & Hamilton ; Julius A. White.*

(1) 2 R. 150.

# TAB 31

Gleeson v J Wippell & Co Ltd, [1977] F.S.R. 301 (1977)

*301  **Gleeson v. J. Wippell & Co. Ltd.**
In the High Court of Justice—Chancery Division
17 January 1977

**[1977] F.S.R. 301**

Before: The Vice-Chancellor
17 January 1977

**Analysis**

Copyright—Infringement—Practice—Striking out—Res judicata—Issue estoppel—Whether defendants privy to previous action—Chain of causation in previous action—Defendant found to have been part of chain of causation—Whether proceedings frivolous, vexatious or otherwise abuse of process of court—Inherent jurisdiction to strike out—Observations on form and content of affidavits.

• R.S.C. Ord. 18, r. 19 (1) (b) and (d),
• Ord. 15, r. 6 (2) (b) (ii) and
• Ord. 41, rr. 1 (5) & 11 (1).

At W.'s request, D. manufactured copies of a clerical shirt which had been made by W. The plaintiff brought an action [1] against D. for infringement of copyright in her drawings of a clerical shirt, alleging that W, had copied the shirt from a shirt manufactured by the plaintiff from those drawings. The action failed. The trial judge, whose decision was affirmed by the Court of Appeal, having heard evidence from witnesses including employees of W. held that the designer of the W. shirt knew nothing of the plaintiff's shirt at the time of making his design. The plaintiff then brought proceedings against W. on the same facts, and W. applied to strike out the action under Ord. 18, r. 19 (1) (b) and (d), contending that the action was frivolous, vexatious or otherwise an abuse of the process of court. and, in the alternative, under the court's inherent jurisdiction, on the ground that the central issue as to whether W.'s shirt was a copy of the plaintiff's shirt had already been decided in the previous action.

Held, dismissing the application,

(1) that for the doctrine of issue estoppel to apply, there were three requirements, namely that the judgment relied upon must have been final, that there must be identity of subject matter and that there must be identity of parties or alternatively privity of interest between the parties;

Carl Zeiss Stiftung v. Rayner & Keeler Ltd. (No. 2) [1967] 1 A.C. 853 applied. Mercantile Investment and General Trust Co. v. River Plate Trust. Loan and Agency Co. (1894) 1 Ch. 578, Marginson v. Blackburn Borough Council (1939) 2 K.B. 426and Carl Zeiss Stiftung v. Rayner & Keeler Ltd. (No. 3) [1970] Ch. 506 considered: *302

(2) that in the circumstances there was no privity of interest between W. and D., in particular because the relationship between the parties could not be conditional on the character of the decision in the previous case, and that, since it would have been unjust had D. been found liable, not to allow W. to deny liability, no question of estopped could arise;

Carl Zeiss Stiftung v. Rayner & Keeler (No. 3) (Supra) applied;

(3) that the plaintiff should not be deprived of the right to do better against W. than she had against D., to have discovery against W. and to examine W.'s witnesses;

(4) that a plaintiff should not be forced under the doctrine of issue estoppel to choose which of a chain of possible defendants to sue and thereafter be deprived of the right to bring proceedings against any one of those not originally a party to those proceedings, thus making the decision binding on the latter and requiring them to apply to be joined if they did not wish to risk being condemned unheard;

Yat Tung Investment Co. Ltd. v. Dao Heng Bank Ltd. [1975] A.C. 581 distinguished.

(5) that the jurisdiction to strike out, whether inherent or under the rules, should be exercised only with great caution and only in plain and obvious cases where it was clear beyond doubt that the action would not succeed; and

(6) that the jurisdiction in each case was discretionary and that even if a matter had been or may have been res judicata it might be preferable to leave it to be resolved at the trial:

Carl Zeiss Stiftung v. Rayner & Keeler (No. 3) (supra) and Higgins v. Woodall (1889) 6 T.L.R. 1, applied.

*Observed in respect of the affidavits filed*:

(a) that Order 41, rule 1 (5) provides that both sides of the paper must be covered and rule 11 (1), that exhibits should not be annexed to affidavits;

(b) that an extract of an opinion of the Queen's Counsel was not evidence as to legal rights; and

(c) that the view said to have been taken by a Legal Aid Committee was not evidence and ought not to be reported in an attempt to sway the court [pp. 310–311].


•No further cases were referred to in the judgment.


This was an application by the defendants. J. Wippell & Co. Ltd., to strike out the Writ, Statement of Claim and Reply in an action for infringement of copyright brought by Miss J. C. Gleeson. All relevant facts appear from the judgment which follows.


**Representation**

Robin Jacob, instructed by Bristows, Cooke & Carpmael, appeared on behalf of the plaintiff. E. P. Skone James, instructed by Theodore Goddard & Co., appeared on behalf of the defendants.


THE VICE-CHANCELLOR:


This is litigation about a special type of collar-attached shirt, designed for use by the clergy. This shirt makes it necessary to wear a white clerical collar or a vestock. A vestock, I may say, is a **\*303** form of black bib with a stand-up collar that is worn over an ordinary shirt. The special shirt also has the advantage of a tidy appearance when the jacket is removed. Put briefly, the shirt is black, and buttons up centrally down the front, with a fly strip covering the buttons. The shirt has attached to it a special kind of collar consisting of a double thickness of material with a space called a "tunnel" running all round between the two thicknesses. At the centre of the front a rectangle is excised from the outer thickness, and a strip of white plastic is inserted in this rectangle, with the ends projecting each side into the tunnel to hold it in position. This gives the appearance of a white clerical collar which is visible only in the rectangle and is concealed elsewhere by a black vestock. I need not describe the shirt in any greater detail as this has already been done by Whitford J. and the Court

of Appeal in J. C. Gleeson v. H. R. Denne Ltd. [1975] R.P.C. 471. I shall call that action the Denne action: it lies at the heart of the present proceedings. I may add that the hearing before Whitford J. took place not on the dates in October 1972 stated by the report, nor on the dates in October 1973 stated by [1975] F.S.R. 250 (dates which, if right, would mean that the notice of appeal was given over six months before the hearing at first instance had begun: see p. 254), but on 11, 12, 13 and 14 December, 1972.


The claim in the Denne action was for breach of copyright. In 1959, the plaintiff, Miss Gleeson, had the idea of making the type of shirt in question, and made a number of drawings of it. In due course she had shirts manufactured to her design, and sold them. She had left it too late to obtain any protection from a patent or a registered design, but the effect of the Design Copyright Act 1968 was to enable her to sue for any infringement of copyright in her sketches, notwithstanding that they related to industrial designs.


I do not propose to set out the detailed facts; they will be found in the judgment of Whitford J., whose decision was affirmed by the Court of Appeal. I am concerned with two manufacturers who made shirts which the plaintiff claims were made in breach of her copyright. One manufacturer is the defendant in the present proceedings. J. Wippell and Co. Ltd., which I shall call "Wippell." The other is the defendant in the Denne Action, H. R. Denne Ltd., which I shall call "Denne." They are linked to each other by the fact that Denne, who I think manufacture on a larger scale than Wippell, began to manufacture shirts of this type at the request of Wippell, who supplied Denne with a shirt of theirs to copy. In the Denne action, the plaintiff sued not Wippell, but Denne. The essence of the claim was not that Wippell or Denne had directly copied the drawings, but that Denne had copied the Wippell shirt (which was not disputed), and that Wippell had indirectly copied the plaintiff's drawings by copying Gleeson shirts which were copies of the drawings. A central issue was thus whether the Wippell shirt infringed the plaintiff's copyright: and this fell to be decided in proceedings to which Wippell was not a party.


In those proceedings the plaintiff failed. The shirt-maker for Wippell **\*304** was Mr. E. J. Davies, and it was

he who designed the Wippell shirt it question. In the Denne action it was held that when he designed the Wippell shirt he knew nothing of the plaintiff's shirt, and so had not copied her drawings, either directly or indirectly. That was accordingly an end of the Denne action: for what Denne had copied was no infringement of the plaintiff's copyright. The Denne action, begun by writ on 16 November 1970, thus came to an end in the Court of Appeal on 20 December 1974.

Almost a year later, on 17 December 1975, the plaintiff issued a writ against Wippell, claiming an injunction, a declaration, damages and delivery up of offending copies. The claim is in large degree based on the same allegations as in the Denne case. The pleadings have reached the stage of the Reply, accompanied by bevies of Further and Better Particulars. What is before me is a summons by Wippell to strike out the endorsement on the Writ, the Statement of Claim, and the Reply. The application is made under the Rules of the Supreme Court, Ord. 18, r. 19 (1) (b) ("frivolous or vexatious") and (d) ("otherwise an abuse of the process of the court"), and under the inherent jurisdiction. The central core of the application is, of course, that as in the Denne action it had already been decided that the Wippell shirt did not infringe the plaintiff's copyright, it is frivolous, vexatious and an abuse of the process of the court for the plaintiff to seek to litigate all over again what has already been decided against her. This contention naturally led into territory entitled *res judicate*, expressed *per rem judicatam*, issue estoppel, and what, for want of a better name, was called *quasi res judicata*. This last expression, I should say, was treated during the argument as being a label, inelegant but of convenient brevity, for the wider sense in which the doctrine of *res judicata* can be appealed to, where although there is no mandatory bar to the proceedings on the footing of *res judicata* or issue estoppel, there is a discretionary bar under the jurisdiction to strike out the proceedings as being an abuse of a process of the court: see Yat Tung Investment Co. Ltd. v. Dao Heng Bank Ltd. [1975] A.C. 581 at 590.

The basic difficulty in the way of Mr. Skone James, who appeared for Wippell, is that Wippell was not a party to the Denne action. The decision in that case was thus a decision in which Wippell played no part. At one stage Mr. Skone James seemed disposed to contend that Wippell had played some part in that action, since evidence had been given by employees of Wippell: but I do not think that the discharge of the function of a witness by a servant or officer of a company can possibly be taken to mean that the company is taking a part in that action.

I propose first to consider the general head of *res judicata*. It was common ground that the only relevant form of this was issue estoppel. Mr. Skone James referred to the three requirements set out by Lord Reid in Carl Zeiss Stiftung v. Rayner & Keeler Ltd. (No. 2) [1967] 1 A.C. 853 at 909, 910; and see at p. 935, *per* Lord Guest. The first require- **\*305** ment, that of a final judgment in the earlier proceedings, is plainly satisfied. So is the second requirement, that of identity of subject matter, here the question whether or not the Wippell shirt is an indirect copy of the plaintiff's drawings. It is the third requirement, that there should be identity of parties in the two sets of proceedings, that creates the difficulty. There was identity of plaintiffs in the two proceedings; the presence of the plaintiff company as a co-plaintiff in the Denne action plainly makes no difference for this purpose. But for the doctrine of issue estoppel to apply there must also be identity of defendants (which there plainly is not) or else the existence of privity between Denne, the defendant in the earlier action, and Wippell, the defendant in the present action. Such privity, said Mr. Skone James, does exist in the present case, whereas, on behalf of the plaintiff, Mr. Jacob said it did not. The question, then, is the meaning of "privity" in this context.

The requisite privity is said to be a privity either of blood, of title, or of interest: see Zeiss No. 2, at p. 910, *per* Lord Reid. Plainly there is no question of blood or title in this case, and so only privity of interest can be in question. One difficulty about this is the protean nature of the word "interest," a term which at times seems almost capable of meaning all things to all men. Another difficulty is that, as Lord Guest pointed out in Zeiss No. 2 at p. 936, "there is a dearth of authorities in England upon the question of privities." From such authorities as there are, it is by no means easy to distil any principle. In Mercantile Investment and General Trust: Co. v. River Plate Trust, Loan and Agency Co. (1894) 1 Ch. 578, a plaintiff had sued an American company. Under an indemnity given to that company by an English company the English company assisted the American company in the litigation

and paid its costs. The plaintiff won, and then sued the English company, contending that the English company was really the defendant in the first action, and so was estopped from disputing the plaintiff's claim. Romer J., however, rejected this contention; and in Zeiss No. 2 Lord Reid's reference to this decision. at page 911, was certainly not in terms of disapproval. The fact that there would be an estopped as between the indemnifier and the indemnified does not produce an estoppel *quoad* third parties. In that respect, an agreement to indemnify creates no privity.

It has also been held that a judgment against A in one capacity does not bind him in another capacity. Thus a finding of negligence against him in proceedings in which he is concerned in his personal capacity does not bind him in proceedings in which he engages in his capacity as his wife's personal representative: Marginson v. Blackburn Borough Council (1939) 2 K.B. 426. Again, if A purports to act as agent for B, and the plaintiff then successfully sues A for breach of warranty of authority, B cannot be regarded as privy to A in those proceedings: Carl Zeiss Stiftung v. Rayner & Keeler Ltd. (No. 3) [1970] Ch. 506. In that case, at page 541, Buckley J. said that he had been referred to "no authority which indicates at all clearly what kind of interest in earlier **\*306** litigation relied upon as constituting a *res judicata* is sufficient to render someone, who was not a party and is not a successor in title to a party to that litigation, privy to a party for the purposes of the doctrine." Privity for this purpose is not established merely by having "some interest in the outcome of litigation." So far as they go, I think these authorities go some way towards supporting the contention of Mr. Jacob that the doctrine of privity for these purposes is somewhat narrow, and has to be considered in relation to the fundamental principle *nemo debet bis vexari pro eadem causa.*

I turn from the negative to the positive. In Zeiss No. 2, at pp. 911, 912, Lord Reid suggested that if a plaintiff sued X and established some right in that action, a servant or third party employed by X to infringe the right and so raise the whole question again should be regarded as being a privy of X's in subsequent proceedings, for it would be X who would be "the real defendant." Lord Reid agreed with a statement which applied the rules of *res judicata* to

subsequent proceedings brought or defended "by another on his account," that is, on X's account.

This is difficult territory: but I have to do the best I can in the absence of any clear statement of principle. First, I do not think that in the phrase "privity of interest" the word "interest" can be used in the sense of mere curiosity or concern. Many matters that are litigated are of concern to many other persons than the parties to the litigation, in that the result of a case will at least suggest that the position of others in like case is as good or as bad as, or better or worse than, they believed it to be. Furthermore, it is a commonplace for litigation to require decisions to be made about the propriety or otherwise of acts done by those who are not litigants. Many a witness feels aggrieved by a decision in a case to which he is no party without it being suggested that the decision is binding upon him.

Second, it seems to me that the substratum of the doctrine is that a man ought not to be allowed to litigate a second time what has already been decided between himself and the other party to the litigation. This is in the interest both of the successful party and of the public. But I cannot see that this provides any basis for a successful defendant to say that the successful defence is a bar to the plaintiff suing some third party, or for that third party to say that the successful defence prevents the plaintiff from suing him, unless there is a sufficient degree of identity between the successful defendant and the third party. I do not say that one must be the *alter ego* of the other: but it does seem to me that, having due regard to the subject-matter of the dispute, there must be a sufficient degree of identification between the two to make it just to hold that the decision to which one was party should be binding in proceedings to which the other is party. It is in that sense that I would regard the phrase "privity of interest." Thus in relation to trust property I think there will normally be a sufficient privity between the trustees and their beneficiaries to make a decision that is binding on the trustees also binding on the beneficiaries, and vice versa. **\*307**

Third, in the present case I think that the matter may be tested by a question that I put to Mr. Skone James in opening. Suppose that in the Denne action the plaintiff, Miss Gleeson, had succeeded, instead of failing. Would the decision in that action that Wippell had indirectly

copied the Gleeson drawings be binding on Wippell, so that if sued by Miss Gleeson, Wippell would be estopped by the Denne decision from denying liability? Mr. Skone James felt constrained to answer yes to that question. I say "constrained" because it appears that for privity with a party to the proceedings to take effect, it must take effect whether that party wins or loses. As was said by Buckley J. at page 541 of Zeiss No. 3 (where the question was rather different), "The relationship cannot be conditional upon the character of the decision." In such a case, Wippell would be unable to deny liability to Miss Gleeson by reason of a decision reached in a case to which Wippell was not a party, and in which Wippell had no voice. Such a result would clearly be most unjust. Any contention which leads to the conclusion that a person is liable to be condemned unheard is plainly open to the gravest of suspicions. A defendant ought to be able to put his own defence in his own way, and to call his own evidence. He ought not to be concluded by the failure of the defence and evidence adduced by another defendant in other proceedings unless his standing in those other proceedings justifies the conclusion that a decision against the defendant in them ought fairly and truly to be said to be in substance a decision against him. Even if one leaves on one side collusive proceedings and friendly defendants, it would be wrong to enable a plaintiff to select the frailest of a number of possible defendants, and then to use the victory against him not merely *in terrorem* of other and more stalwart possible defendants, but as a decisive weapon against them.

With those considerations in mind, I turn to the case before me. I cannot see any ground for holding that Wippell is in privity of interest with Denne, or that they are linked in such a way as to make any doctrine of *res judicata* applicable. There was a trade relationship between the two, in the course of which Denne, at Wippell's request, copied a Wippell shirt: but that is all. If the plaintiff had succeeded against Denne, there would, in my judgment, have been no ground whatever for saying that Wippell should be bound by the decision against Denne. On the footing that the relationship of privity operates whether the decision is for or against the party in question, that seems to me to be conclusive.

Let me, however, leave that on one side, and consider matters on the footing that, as in fact occurred, the plaintiff failed against Denne. No question can thus arise whether Wippell, conducting its own case, could do better than Denne did; for Denne won. What is uncertain is whether the plaintiff can do better against Wippell than she did against Denne; and the real question is not so much what will in fact happen, but whether, by reason of the Denne decision, the plaintiff ought to be deprived of the right to attempt to do better against Wippell than she did **\*308** against Denne. The result of the Denne action certainly suggests that the plaintiff has an uphill task in suing Wippell; but not every uphill task results in failure. It must also be considered whether the plaintiff ought to be precluded from having discovery against Wippell and the right to cross-examine the Wippell witnesses merely because after having discovery against Denne and cross-examining the Denne witnesses she failed to establish against Denne that Wippell had indirectly copied her drawings. I cannot see why she should.

In the result, it does not seem to me that Wippell is in any such privity with Denne as to make it possible to invoke the doctrine of issue estoppel against the plaintiff. I am conscious that I have been unable to state any clear principle as to what does and does not constitute privity of interest for this purpose; but this is merely a procedure summons, and the subject is indeed difficult. Whatever the test, and wherever the line will finally be drawn, the plaintiff seems to me to be on the right side of any reasonable line that could be drawn—right, that is, from the plaintiff's point of view. That contention of Mr. Skone James accordingly fails.

I turn to the other was in which Mr. Skone James put the matter. As this finally emerged, the intention centered on a combination of the Yat Tungcase and Ord. 15, r. 6 (2) (b) (ii). The rule in question confers a power on the court, either on application or of its own motion, to order any person to be added as a party to litigation if between him and any party to the proceedings there is some question or issue which arises out of any relief or remedy claimed in the proceedings, or relates to or is connected with it, and in the opinion of the court it is just and convenient to determine it as between that person and that party as well as the parties to the proceedings. Mr. Skone James contended that in the Denne proceedings it was so plain that Wippell was at the heart and core of the case that the plaintiff ought to have joined Wippell, and that as

Gleeson v J Wippell & Co Ltd, [1977] F.S.R. 301 (1977)

she failed to do so, she ought not now to be permitted to sue Wippell. In the Yat Tung case, the question was one not of failure to add a party, but of failure to advance a contention. There was a sufficient identity of parties in the two sets of proceedings, but the Judicial Committee held that the Statement of Claim in the second action should be struck out as being an abuse of a process of the court because it was founded on a contention which ought to have been advanced in the first action, but had not been. Mr. Skone James very properly accepted that he was seeking to extend the Yat Tung case, but urged that there was no great difference between adding contentions and adding parties.

It seems to me that the difference is very considerable. Where there is a chain of possible defendants, running perhaps from a designer to a manufacturer, and thence to a wholesaler, and then to a retailer, with some degree of dependence of one upon another, a plaintiff may be put in a position of some difficulty. Some defendants may be worth more powder and shot than others; but if Mr. Skone James is right, the failure to join a possible defendant in the chain may mean that, whatever **\*309** additional evidence or acquisition of riches subsequently emerges, that possible defendant cannot be sued in subsequent proceedings. At least for those in the chain, those not sued initially will be released. Furthermore, if the plaintiff succeeds against those whom he sues, then those in the chain who have not been sued may be told that they are bound by the decision. Mr. Skone James' riposte was that they could avoid being condemned unheard by applying to be joined as defendants; but this seems to me to be unrealistic. If this were the law, there would no doubt be what some would regard as bigger and better litigation, with a multiplication of parties.

I fully accept, of course, that it will often be desirable not to have a series of successive actions in place of one action with many parties; but circumstances vary greatly, and it is impossible to lay down rules for every case. Sometimes a multiplicity of parties would make litigation too cumbersome, protracted and expensive. The doctrine for which Mr. Skone James contends seems to me to be one that will put litigants into a position of some peril, requiring them to judge correctly whether or not the case is one in which under Ord. 15, r. 6 (2) (b) (ii) a court would or would not add parties. Mr Jacob realistically

accepted that with hindsight it would have been better to have joined Wippell in the Denne action, and Mr. Skone James very properly stressed that he was concerned not with long chains of possible defendants, but merely with a case in which it was plain that one additional party ought to have been joined in the Denne action. Nevertheless, one cannot decide cases in a vacuum, and without regard to other cases which differ in their facts but fall within the same principle. I can well see the justice of refusing to permit a plaintiff who has failed to take an obvious point against the defendant to have a second bite at the cherry by suing the defendant a second time in order to take that point. What I cannot see is the justice of refusing to permit a plaintiff to sue a person at all because the plaintiff failed to join him as a defendant in other proceedings against another person. Such a failure may provide material for cross-examination in the second proceedings, and it may also sound in costs, especially if the second proceedings have the same result as the first; but the drastic step of striking out the proceedings is quite another matter.

It will be seen that I regard with considerable suspicion the marriage between Order 15, r. 6 (2), and Order 18, r. 19, for which Mr. Skone James contends, and that I am apprehensive of the permissive provisions of the former rule being forged into a weapon which requires some parties to resort to it and correctly judge its effect at their peril. However, it seems to me that there are two other considerations that are decisive under this head. First, there is the well-settled requirement that the jurisdiction to strike out an endorsement or pleading, whether under the rules or under the inherent jurisdiction, should be exercised with great caution, and only in plain and obvious cases that are clear beyond doubt Second Zeiss No. 3 established that, as had previously been assumed, the jurisdiction under the rules is discretionary: even if the matter is or may **\*310** be res judicata, it may be better not to strike out the pleadings but to leave the matter to be resolved at the trial. In the present case, I may say, the defence duly pleads res judicata. The inherent jurisdiction, too, is discretionary: see Higgins v. Woodhall (1889) 6 T.L.R. 1, per Lord Halsbury, the Lord Chancellor.

In those circumstances, I feel no doubt. I certainly cannot say that it is in the least plain, obvious or clear beyond doubt that the action cannot succeed, or is an abuse of the process of the court. Nor, as a matter of discretion,

WESTLAW © 2017 Thomson Reuters.

do I consider that it would be right to strike out the writ or pleadings; indeed, I think it would be wrong to do so. That conclusion makes it unnecessary for me to explore a question of alleged inconsistency in the explanations put forward by Wippell as to the origin of the design of the Wippell shirt, and how far it could and should have been explored in the Denne action, and whether there was now a convincing explanation of the inconsistency. These are matters that can be explored at the trial. I also leave it as open as I can how far anything that I have decided or said in this judgment can or should affect anything that arises for decision by the trial judge. Accordingly, in my judgment, this application fails.

I must add a word about the affidavits. It is obviously desirable that it should be possible to file affidavits economically and with convenience. The rules accordingly provide that both sides of the paper must be used, and that exhibits, which of course are not filed, should not be annexed to the affidavits: see Order 41, rr. 1 (5), 11(1). All six of the defendant's affidavits before me are typed on one side of the paper only, and three of them have exhibits which are clamped to the affidavit by a pair of plastic strips about an eight of an inch thick which run the full length of the spine. These strips are also used on two more of the defendant's affidavits. I have no doubt that this was well-meant; but the use of such strips or of anything else which adds materially to the thickness of affidavits is undesirable as increasing the problems of filing. Further, I observe that none of the defendant's affidavits comply with the requirement of endorsement under Order 41, r. 9 (5). I shall accordingly hear what proposals the defendant has to put matters in order.

The plaintiff's affidavits avoid these defects of form, though only partially as to Ord. 41, r. 9 (5); but one of them displays undesirable features that I think ought not to be allowed to pass unchecked. In Mr. Brown's affidavit he quotes a passage from an opinion of a silk, and he exhibits an article in a journal concerned with patents. The object appears to be to demonstrate that the plaintiff has prospects of success against Wippell if her action is not halted. The main objection to the extracts from the article is that they do not appear to me to constitute any

evidence; and the purpose of affidavits is, or should be, to provide evidence. As I told Mr. Jacob, I would listen with pleasure to any submission upon the subject that the chose to put before me, whatever his source of inspiration, but I would not listen to the words of a Q.C. however eminent, or the author of an article, when proffered as evidence **\*311** of the legal rights and prospects of a litigant. A court does not hear expert evidence on what the law of England is, or what the rights of parties are under that law. In any case, extracts from counsel's opinion are usually valueless, or worse, without the rest of the opinion and the instructions on which it was based, to show what the opinion was founded on and what reservations and qualifications there are. The function of counsel's opinion in cases where litigation concerning an infant is being compromised, and so on, is, of course, quite different.

There is one other feature in Mr. Brown's affidavit that also seems to me to be undesirable. He states that where an action on similar facts has been lost, the Legal Aid Committee "would need to be well convinced that there was a genuine issue to be tried," and that the Committee in this case "based their decision to grant the plaintiff legal aid in these proceedings at least in part" on the opinion of the Q.C. that I have mentioned. Again, I cannot see how that constitutes any sort of evidence. Further, it seems to me to be most undesirable to attempt to sway the court by referring to the view that the Committee is said to have taken. If such views were admitted, then where both parties were legally aided the court would have to weigh the imperfectly known views of one committee, based on materials unknown to the court, against the corresponding views of the other committee; and a litigant who had no legal aid would lack one of the weapons of his legally aided opponent. I propose to hear what the plaintiff has to say about the costs of this affidavit.

Subject to these matters, this application fails, and the summons will be dismissed.

Defendants' summons dismissed. Plaintiff's costs in any event. Leave to appeal refused. **\*312**

## Footnotes

1    J. C. Gleeson v. H. R. Denne Ltd. [1975] R.P.C. 471, [1975] F.S.R. 250.

© 2017 Sweet & Maxwell                    [1977] F.S.R. 301

**End of Document**                                         © 2017 Thomson Reuters.

# TAB 32

**Greenclose Limited v. National Westminster Bank plc**
Case No: HC 12D02057
High Court of Justice Chancery Division
14 April 2014

**[2014] EWHC 1156 (Ch)**

**2014 WL 1219575**

Before: Mrs Justice Andrews DBE
Date: 14/04/2014

**Analysis**

Hearing dates: 25-27 March 2014

**Representation**

• Stephen Auld QC and Saul Lemer (instructed by Bryan Cave LLP , 88 Wood Street, London EC2V 7AJ) for the Claimant.
• Andrew Mitchell QC and James Cutress (instructed by Dentons UKMEA LLP , One Fleet Place, London EC4M 7WS) for the Defendant.

**Approved Judgment**
Mrs Justice Andrews:

1   The issue at the heart of this case is whether the Defendant ("the Bank") validly exercised its contractual right to extend the term of a 5 year interest rate collar transaction ("the Collar") for a further two years by giving notice to the Claimant ("Greenclose") before 11am on 30 December 2011. The Collar was an interest rate hedging transaction that was entered into as a prerequisite to the Bank affording Greenclose loan facilities of £15 million under a Loan Agreement dated 5 October 2006. Although the Loan Agreement pre-dates the Collar, drawdown was not permitted until the hedge was in place.

2   In simple terms, a Collar combines two products to generate a maximum (cap) and minimum (floor)

level of interest payable. The party seeking to hedge his exposure to the risk of interest rate movement simultaneously buys a cap from, and sells a floor to, the trading counterparty. If the base rate remains at or between those two levels the hedging party (in this case, the borrower) pays nothing to, and receives nothing from, the counterparty, (in this case, the lender). Thus if the Collar is entered into in order to hedge the interest payable under a variable rate loan, as it was in this case, the borrower continues to pay the lender that variable rate for so long as the base rate remains between the floor and the cap. If the base rate rises above the cap, the lender pays the borrower the difference. If the base rate falls below the floor, the borrower pays the lender the difference. The risk of the base rate dropping below the floor is the price the hedging party has to pay for the trade. It is an alternative to paying an upfront premium, which explains why these products are sometimes referred to as "zero coupon". Therefore, if the borrower is hedging at a time when interest rates are high, it is to his advantage to keep the floor level as low as possible.

3   In order to determine the notice issue, I must construe the provisions of Section 12 of the 1992 ISDA Master Agreement (Multi Currency-Cross Border Form) read in conjunction with the other contractual documents including the Schedule to the Master Agreement and the transaction Confirmation. ISDA (which stands for the International Swaps and Derivatives Association) is a not-for-profit corporation incorporated in the State of New York. In Lomas and others v JFB Firth Rixon Inc and others (ISDA intervening) [2010] EWHC 3372 (Ch), [2011] 2 BCLC 120 at [7] Briggs J. noted that:

"It has over 820 member institutions, including most of the world's major institutions that deal in OTC derivatives, as well as businesses, government entities and other end users that rely on derivatives to manage the risks inherent in their core economic activities. Its primary purpose is to encourage the prudent and efficient development of privately negotiated derivatives business. For that purpose it has developed standard contractual wording and

transaction architecture for market participants. This first occurred, historically, in relation to swaps. Since 1992 its standard terms have been used for numerous other types of derivatives, including pure contracts for differences, caps and floors. Thus, interest rate swaps are a sub-class of an original and still very important class of derivatives for which ISDA's standard forms, and the master agreement in particular, are routinely used".

4  As Briggs J. went on to explain, at [8]:

"The 1992 version of the Master Agreement was the first to be designed in a form applicable to derivatives other than just swaps, and to accommodate both financially and physically settled transactions. The 2002 version replicates many of the provisions of the 1992 version, but with adjustments based on lessons learnt since 1992, in particular from experience of periods of market turmoil in the late 1990s. Nevertheless the publication of the 2002 master agreement did not lead to its invariable use in preference to its predecessor."

In this case, the parties chose the 1992 form to govern the transaction, despite the fact that the effective date of the Collar was 4 January 2007.

5  Given that this is a version of a standard form which is still in regular use as a template throughout the world, the way in which I determine the issues of construction is bound to have ramifications beyond this case. In particular, I have to decide whether the different means of giving notice set out in s.12 are mandatory or permissive, and whether the phrase "electronic messaging system" used in the 1992 form embraces emails. Unfortunately, unlike Briggs J. (and the Court of Appeal) in Lomas v JFB Firth Rixon , I do not have the assistance of submissions from ISDA itself, and there has been no expert evidence on market practice.

6  If I conclude that the Bank did give notice which was effective to extend the term of the Collar, I then have to decide whether, as Greenclose alleges, there were any terms to be implied in the Collar that precluded the Bank from exercising its option in the circumstances in which it sought to do so. Greenclose submits that there were terms that:

• a)  The Bank would not extend the Collar if extending was not reasonably necessary to protect Greenclose against interest rate fluctuations or rises so as to protect the Bank against the risk of Greenclose being unable to service its repayments under the Loan Agreement ("the Protection Condition");
• b)  The Bank would not extend the Collar if doing so would materially increase the risk of Greenclose being unable to service the loan and defaulting ("the Risk of Default Condition");
• c)  The Bank would act in good faith and/or in accordance with the principles of fair dealing ("the Good Faith condition").

In the light of the argument that there were implied terms, it is necessary to set out the factual background to the transaction in more detail than might otherwise have been sufficient.

7  Greenclose is a family business which owns and operates three luxury hotels, two in the New Forest and one in Wales. It opened a Spa in one of the hotels, Careys Manor, in around August 2004, having spent around £5 million on the project. In large part due to the success of that venture, Greenclose has managed to cope with the adverse impact of the recession on the leisure industry. It currently employs around 350 people and has a turnover of around £12 million per annum. The majority shareholder and managing director is Mr John Leach. In practice he is the man in overall charge of running the business with the assistance of, among others, the finance director Mr David Reynolds. Greenclose's office is at Mr Leach's

home in Lymington, Hampshire, Pennington House.
Mr Leach is an astute and sophisticated businessman
who follows the market movement of base rates and
LIBOR. He was rightly described in one of the Bank's
internal emails as *"capable of making an educated and
informed decision on hedging"* .

8  In the late summer of 2005, Greenclose was looking to
refinance its facilities with Allied Irish Bank. Mr Leach
entered into discussions with the Bank, which seemed
keen to solicit his custom. However, the Bank had
concerns about Greenclose's ability to service the debt,
and initially turned down Greenclose's application.
Despite that initial setback, in January 2006 the Bank
did agree to lend £1.5 million to Mr Leach personally, to
be used to inject funds into Greenclose. It took a charge
over Pennington House as security.

9  Negotiations for a 15-year term loan to Greenclose,
coupled with an overdraft facility, continued through
much of 2006. In order to allay the Bank's
concerns about debt servicing, the Bank proposed that
Greenclose should enter into some form of interest rate
hedging product – a step referred to within the Bank
as "Interest Rate Management" ("IRM" for short). Mr
Leach was reluctant to commit Greenclose to an interest
rate swap, which would fix the rate of interest, because
he expected base rates would peak and then fall. He
did not want his business to be locked in to a high
interest rate. The Bank made it clear at an early stage
that some form of interest rate hedge was going to be a
precondition of any agreement to provide the facilities
to Greenclose. Nevertheless, the Bank was prepared
to allow Greenclose some flexibility in the choice of
products and time of the hedging.

10  On 24 May 2006, Mr Leach had a meeting
with Mr Michael Harrison, then the designated senior
commercial banking relationship manager, and Mr
Matthew Jones, then an associate in the Bank's UK
Treasury Solutions division of the RBS Global Banking
& Markets department, ("GBM") based in their Bristol
office. Mr Jones' role was to meet clients and discuss
interest rate risk management with them. He was also
the interface between the client and the Bank's trading
desk, and the person to whom Mr Leach spoke on the
telephone when he placed the order for the Collar and
two subsequent IRM transactions.

11  Mr Jones (who now works for one of the Bank's
competitors) gave evidence at the trial. He confirmed
the favourable impression of him that I had formed
on reading the documents, including the transcripts of
tapes of his telephone discussions with Mr Leach. He
is an intelligent, articulate, and highly conscientious
young man.

12  In May 2006 the base rate was 4.5% and seemed
likely to rise. Mr Leach thought it unlikely that rates
would move much in the short-term, though possibly
there would be one rise (to 4.75%). He said he felt that
Greenclose could cope relatively comfortably even in
what he considered to be the unlikely event that base
rates went up by 1%. He was concerned to secure the
ongoing operations of Greenclose, whilst at the same
time limiting the downside risk if base rates rose for a
sustained period of time, particularly if they went above
6%, which he described at the meeting on 24 May 2006
as an "Armageddon" scenario.

13  On 2 June 2006, Mr Jones sent Mr Leach by
email the first version of a paper he had prepared for
Greenclose entitled "Interest Rate Risk Management
Solutions". It contained a summary of their discussions
on 24 May and included full explanations of, and
indicative quotes for, 10 year and 15 year base rate
swaps, 10 year and 15 year base rate zero upfront
premium Collars, and a real rate lock-in, incorporating
a zero-upfront premium RPI Collar. Mr Jones stated
in the paper that this list was by no means exhaustive,
and further alternatives could be looked into if required.
Mr Jones also very properly and fairly pointed out
that any contract with RBS Global Markets would
be completely separate to the underlying loan, that
there would be breakage costs associated with early
termination, and that the levels quoted in his paper did
not include the banking margin.

14  Mr Jones assessed Mr Leach at the time as taking
a responsible attitude to managing his IR risk, and
thought that he demonstrated during the meeting a
broad understanding of a number of economic issues.
I agree with that assessment. I had the advantage of
seeing and hearing Mr Leach giving evidence for many
hours. Like Mr Jones, he was an impressive witness
who gave his evidence in a frank and straightforward
manner. It was plain that he had a good understanding
of the various IRM products that he was offered by the

Bank, (very fairly, he did not seek to suggest otherwise). Despite this, on every occasion when he was discussing them with Mr Leach, Mr Jones took considerable pains to spell out how those products worked.

15  On 5 June 2006 Mr Harrison sent Mr Leach a letter to say that the Bank's Credit Committee had given its approval for the proposed facilities, and enclosing a Schedule outlining the main terms and conditions on which the Bank was prepared to provide the funding, whilst stressing that these were subject to completion of the Bank's usual lending diligence procedures. The Schedule stated that *"Interest rate hedging, to the Bank's satisfaction, of minimum nominal amount of £10m for a minimum period of 10 years is a condition precedent of the facilities"* .

16  Mr Leach tried to persuade the Bank to remove the condition precedent, but he was unsuccessful. As he explained in his evidence: *"I was not unhappy about the hedging, I was unhappy about the fact that hedging was a condition of the loan"* . The reason for this was that although he saw it as being in Greenclose's and the Bank's mutual interest that Greenclose should hedge, Mr Leach wanted some flexibility as to how and when Greenclose should do so. The Bank did its best to accommodate Mr Leach in this regard. On 8 September 2006 Mr Harrison sent him a letter which stated that the Bank understood his stance on wanting some flexibility on interest rate hedging in order to manage his responsibility of ensuring the best financial advantage for Greenclose. Mr Harrison said he was happy to confirm that the following arrangement was acceptable to the Bank:

> " You will have full discretion to choose swaps, caps collars or other derivatives traded by our Financial Markets dealers
>
> • £5m of nominal debt hedging is entirely at your discretion
>
> • £5m of nominal debt is to be dealt on the day of first loan drawdown for a minimum 5 year period at a swap or cap rate of 6% or less

> • £5m is to be dealt at your discretion within three months from first drawdown or earlier if the 5 year LIBOR reaches 6%.
>
> ….
>
> We do need a signed ISDA in order to complete two or more interest hedging deals."

17  Although this was not expressed in the clearest of terms, Greenclose was still being required to hedge only £10 million of the £15 million nominal debt. The second of the bullet points was intended to signify that it was entirely up to Greenclose to decide whether it would also hedge the remaining £5 million. The Collar with which this case is concerned was entered into in order to satisfy the requirement in the third bullet point that £5 million of nominal debt be dealt on the first day of drawdown.

18  By the time that letter was sent, Virginia Lynn of the Bank's legal department had already sent a draft version of the 1992 ISDA Master Agreement by email to Mr Reynolds. She asked him to review the draft Schedule and let her know if he had any comments to make. Part 4 of the draft Schedule stated next to the heading "Addresses for notices or communications to Party B" in bold capital lettering and square brackets "PLEASE CONFIRM DETAILS". Underneath the heading appeared the following:

> **Address** : [there then followed the address of Pennington House]
>
> **Attention** : David Reynolds
>
> **Telephone** : [Greenclose's office phone number]

**Fax** : [left blank]

It appears that this information was derived from an ISDA request document filled in by Mr Harrison. The one piece of contact information that Ms Lynn did not transpose from the request document to the draft Schedule was Mr Reynolds' email address. I do not consider this to have been an oversight, for reasons which will appear later in this judgment.

19 The Loan Agreement, which was signed by the Bank on 2 October 2006 and by Greenclose on 5 October 2006, provided, by Clause 7.2:

> "The Bank shall furthermore not be obliged to make the Loan or any Tranche thereof available unless the following conditions are satisfied on the date on which the Loan is drawn:
>
> …
>
> (e) The Borrower has entered into an interest rate hedging instrument acceptable to the Bank at a level for a period and for a notional amount acceptable to the Bank".

20 After the Loan Agreement was signed, discussions continued between the parties as to the hedging instrument that Greenclose would enter into. On 25 October 2006, following a telephone conversation with Mr Leach, Mr Jones sent him an update of his paper on IRM solutions. This included indicative quotes for 5, 7 and 10 year base rate swaps and 5 and 10 year base rate collars. It also introduced a Bank extendable base rate collar, explaining that *"RBS holds the sole right to extend the collar on the 5th anniversary for a further 2 years at no cost. The collar then retains the same levels as for the first 5 years ."* The indicative quotes made it clear that the floor of the extendable collar was a lower rate than the floor of the "vanilla" zero upfront

premium collars. Mr Leach accepted in evidence that he understood at the time that the advantage of an extendable collar was that Greenclose got a lower floor than it would have done under a vanilla collar. He also understood that the *quid pro quo* for that lower floor was that the Bank would be given the power to extend the term of the transaction.

21 By this time, the upward trend in interest rates had gone further than Mr Leach anticipated in May 2006, and there was a consensus that base rates would rise to 5% in November (as indeed they did). Mr Leach was still optimistic that UK rates would not go beyond 5.25%. However, in that financial climate, it was not feasible for Greenclose simply to purchase a cap, because it would have been too expensive. Given Mr Leach's understandable antipathy towards fixed rate swaps, from his perspective the only realistic choice was between a vanilla collar and an extendable collar. This was not known to Mr Jones, who anticipated at the time that Mr Leach was most likely to choose a 5 year swap.

22 On 23 November 2006 Mr Leach told Mr Harrison that his lawyers had no issue with the ISDA form, and Mr Harrison gave Ms Lynn instructions to send Greenclose a formal copy for signature. Ms Lynn sent the execution copies to Greenclose under cover of a letter dated 29 November 2006 addressed to Mr Reynolds. The signed copy was returned by post to Ms Lynn under copy of a letter from Mr Leach's secretary. The ISDA Master Agreement and the Schedule to it are both dated "as of 29 November 2006". The relevant part of Part 4 of the executed Schedule dealing with notices and other communications from the Bank to Greenclose was in identical terms to the draft Schedule quoted in paragraph 18 above.

23 The scheduled date for drawdown under the Loan Agreement was Thursday 4 January 2007. At Mr Harrison's suggestion, Mr Jones emailed Mr Leach on 22 December 2006 giving him a quick market update, pointing out that the 5 year swap rate was moving upwards, and saying that he would pick up the phone to him in early January 2012. On the morning of 3 January 2007 at 9.52am Mr Jones emailed Mr Leach the third version of his paper on IRM solutions, with indicative quotes for 5 and 7 year base rate swaps, 5 and 7 year base rate collars and a 5 year + 2 year base rate Bank extendable collar, based on the market that morning.

As before, all the quotes for collars were capped at 6%. The floors were 5.35% for a vanilla 5 year collar, 5.25% for a vanilla 7 year collar and 5.10% for an extendable 5 year collar. As he had done in his previous paper, Mr Jones spelled out that the cost of the cap was reduced by accepting the floor, and that Greenclose could not take advantage of base rates below the floor.

24    Mr Jones telephoned Mr Leach at 2.20pm the same day. Mr Leach said that he had seen Mr Jones' email and had arranged a meeting to discuss it with Mr Reynolds in around half an hour. He asked if he could ring him back. Mr Jones asked if there were any matters Mr Leach wanted to discuss with him before he spoke to Mr Reynolds. Mr Leach observed that none of the products seemed hugely appealing. He thought that the market was near the top, that base rates were likely to go to 5.25% but he would be surprised if they went up again, and that his feelings about the market movements thus far had proved reasonably accurate. There was also some discussion about the floor rates. Mr Leach expressed surprise that they were so high.

25    The transcript shows that the conversation then continued as follows:

> MJ: Ok, if you think about it, if you do the swap you'd be at 5.48, if you did the 5 year collar you'd be at 5.35 on a 5 year basis, if you did a 7 year collar, you'd be at 5.25 with that floor, which means that if we did have a base rate increase to 5 and a quarter you wouldn't obviously pay an adjustment because you'd be at that 5 and a quarter, if you look at a hybrid between the two which was the extendable collar what that means is, um…

> JL it gives you an option to renew

> MJ it gives us a one off right to extend it at the same levels for a further 2 years. Now if you think about a 5 year collar with the floor at 5.35 and a 7 year at 5.25, if you have

a 5 year, but potentially 7 years, we can get it down to 5.1, so that would mean obviously at the moment, if in that example you'd be paying 10 basis points with base rates, because you would not benefit clearly from a funding rate below or base rate funding rate below 5.10, now if we went to 5 and a quarter we'd pay you 0.15, sorry, you would, I do beg your pardon, you would be at the 5 and a quarter level.

> JL …which is where I think rates are going to go anyway

> MJ Yep, yep

> JL You know, so, it's in a sense heads I lose and tails I lose

> MJ I mean the market I guess is where it is, if you, if you're looking at the collars, if you're looking at the extendable collar, just bear in mind obviously where that floor is if you give the bank, not yourself, but the bank, obviously, the one off right to extend for a further 2 years, you know you still get the cap protection at 6% and we keep that floor in place at 5.1, you know on the 5th anniversary for another 2 years, then obviously allows us to give you a better, you know, reflect that flexibility we have if you like, in giving you a better floor rate, so if you want to get that floor rate down, then obviously that's a way of doing that, but look at that in conjunction, you know, if you're comparing the vanilla collars you can see obviously 5 years you'd be at 5.35 on the floor, 7 years at 5.25.

JL No I do agree that the extendable one on the face of it, I mean it, you know, it um..

MJ I think the thing about that is you'd be then obviously in 5 years time, we come to the end of 5 years, one of two things can happen, we could say, we're not extending it

JL Base rates are 3% you say you're going to extend it [laughs]. Base rates are at 8% you say must be joking…

MJ Yeah exactly, kind of, but what that, then think about what it's giving you in the intervening 5 years, it means you've had you know a lower floor, like for like on that 5 year swap or even indeed on that 7 year swap.

JL No, no, I agree, I mean of the three on offer I think that's probably the best, the extendable, but um, it depends on where the cycle is doesn't it, you know, I mean if you and me and the City are right in saying that probably they won't go higher, I mean generally the market is seeing 5 and a quarter as top you know, it's not seeing any higher than that…"

26 It was clear that Mr Leach was still not keen on being forced to hedge to cover a scenario he did not expect to materialise, namely, base rates exceeding 6%, but he knew that he had no choice in the matter. It is equally clear that he understood that the price of obtaining the lowest floor rate was granting the Bank the power to extend the collar. The conversation concluded with Mr Leach saying he thought he would be able to call Mr Jones back before 4 pm.

27 When Mr Leach reverted a little later in the afternoon, the first thing he did was to query the floor rates he had been given. He said that he had obtained a lower quote (for the 5 year vanilla collar) from an alternative contact, of 5.25% instead of 5.35%. Mr Jones promised that he would double check the current market rates with his trader. He said he would do that once Mr Leach had made a decision on what he wanted to do. Mr Leach said he thought they might go with the extendable collar, because no one knew what would happen in 5 years' time, but he wanted as good a deal as the Bank could get for Greenclose. Mr Jones then ran through the features of the extendable collar again. He said:

> "And just to confirm as well obviously it's effectively could be a 7 year contract, so it runs for 5 years then on the 5th anniversary the Bank and not yourselves will look at it and decide whether or not we will extend it at exactly the same level so the same cap, same floor and same notional for a further 2 years that's how it works. Are you, are you comfortable with that?"

Mr Leach responded " *yes, yes* ".

28 Having spoken to the trader, Mr Jones rang back at 15.25pm and told Mr Leach that he was able to get the floor on the extendable collar down to 5.07%. Mr Leach said he would go with that. Mr Jones then ran through the trade yet again. He spelt out that on the fifth anniversary the Bank had the right but not the obligation to extend the trade on the same levels for a further two years. It was set against average quarterly base rates with a cap at 6% and a floor at 5.07%. This meant that Greenclose was giving up the right to benefit from any base rate below 5.07%. In response to that explanation, Mr Leach said "yes". Mr Jones then stressed that at all levels he was talking about base rates and not including the banking margin, and he reiterated the exposure to breakage costs on early termination. He

Greenclose Ltd v National Westminster Bank Plc, 2014 WL 12157512 (2014)

asked Mr Leach if he was happy with that and Mr Leach said that he was.

29 Mr Jones then asked Mr Leach for his fax number so that he could fax him the post trade confirmation to sign and fax back to the Bank's London office. Mr Leach gave him the fax number and Mr Jones said that a final confirmation would follow in the post, which would also require Mr Leach's signature. After confirming again that the trade was on a notional amount of £5 million across the term, Mr Jones then went away to execute the order.

30 It is evident from these exchanges that Mr Leach knew exactly what sort of product he was buying into and what the advantages and disadvantages were. Although his comment *"Base rates are 3% you say you're going to extend it… Base rates are at 8% you say must be joking"* was of a jocular nature, the comment demonstrates an appreciation by Mr Leach that the Bank was likely to exercise its right to extend if the market conditions were in its favour in five years' time, i.e. if base rates had moved below the floor. Of course, at the time of the transaction, neither party could have foreseen that base rates would have dropped anywhere near as low as they did.

31 It was obvious from the terms in which he reported the transaction to the rest of his team within Global Markets that Mr Jones thought he had done a deal which was good for the client and good for the Bank, which was what he had hoped to achieve. I reject any suggestion that Mr Jones was trying to persuade Mr Leach to favour the extendable collar, let alone that he was doing so in order to increase the Bank's commission. Mr Jones set out the three types of product, gave a fair explanation of each of them, and in their discussions he did no more than point out what Mr Leach was perfectly capable of working out for himself, namely, that the deal with the lowest floor, and thus the cheapest for Greenclose, was the extendable collar. When base rates went up only a few days later, Mr Jones' view that the deal was a good one for Greenclose was shared by Mr Leach and Mr Reynolds. Thus, for example, when Mr Jones spoke to Mr Reynolds on 6 February 2007 to find out when Greenclose planned to execute the next IRM hedge, Mr Reynolds commented that it was *"a shame we didn't do more on the last one"* .

32 The post-transaction acknowledgment arrived by fax at 16.34pm on 3 January 2007, and Mr Leach sent the signed copy back as directed at 17.12. The formal transaction Confirmation, which is dated 3 January 2007, was posted by the Bank to Greenclose's office on or after 8 January, at Mr Jones' direction, and marked for the attention of Mr Leach. He signed and returned the copy marked "File Copy" as requested.

33 The Confirmation, like the Schedule to the Master Agreement, expressly incorporated the definitions and provisions contained in the 2000 ISDA Definitions. It continued:

> "This Confirmation supplements, forms part of, and is subject to, the 1992 ISDA Master Agreement dated as of 29 November 2006, as amended and supplemented from time to time ("the Agreement") between yourselves and [the Bank]. All provisions contained in the Agreement govern this Confirmation except as expressly modified below."

34 The Termination Date was defined as *"04 January 2012, subject to adjustment in accordance with the Modified Following Business Day Convention"*. I need not consider the Modified Following Business Day Convention for the purposes of this judgment because, in the event, all relevant dates were business days. Under the heading "other provisions" the Confirmation stated, so far as is material:

> "[The Bank] have the right but not the obligation to amend the Termination Date of this Transaction to 04 January 2014 (the "Extended Termination Date") …..by giving notice to [Greenclose] by 11.00am London time on 30 December 2011….

If [the Bank] exercise such right, the Transaction shall be extended with effect from and including the Termination Date to and including the Extended Termination Date."

35  The Bank's ability to extend the term of the contract was described in the Confirmation as a *"right to amend the Termination Date of this Transaction"* . There was some debate at the trial as to whether it was correct to characterise this right as a contractual option, or whether it was an irrevocable unilateral offer by Greenclose to vary the Termination Date which was capable of acceptance by giving notice to Greenclose, or neither of the above. However, I doubt if the correct jurisprudential characterisation makes any significant difference to the way in which I should approach the notice issue. It is plain that, as a matter of contract, the Bank could only exercise its right to change the Termination Date to 4 January 2014 by giving notice to Greenclose by 11am on 30 December 2011.

36  It follows that if, on its true construction, the contract mandated the methods by which such a notice to extend was to be given, then the Bank would have to give notice by any prescribed method, and it would have to follow the contractual requirements strictly. Failure to do so would render the notice ineffective to extend the Collar. That appeared to be common ground, and there is ample authority to support that approach: see e.g. Lord Hoffmann's famous example in Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd [1997] AC 749 at 776:

> "If the clause had said that the notice had to be on blue paper, it would have been no good serving a notice on pink paper, however clear it might have been that the tenant wanted to terminate the lease."

37  On the other hand, if there was no contractual restriction on the methods of giving notice, Mr Mitchell

QC submitted that it was unnecessary for the notice to have actually come to the attention of anyone at Greenclose, so long as it was available to be read before 11am. Mr Auld QC submitted that if the notice provisions in the agreement are permissive, and a method was used that was outside the specified categories which deem notice to be effective even if the recipient does not see it (or in some cases, does not even receive it) it was necessary for the notice to have been actually communicated to Greenclose by 11am. For reasons that will appear later in this judgment I prefer Mr Auld's analysis of what these contracting parties intended.

38  The Bank's primary case is that it gave notice by sending an email to Mr Leach at 9.45am on 30 December 2011. The email was followed by a voicemail message left on Mr Leach's mobile phone by Mr Russell Tew (who had sent the email) at 9.59am. The Bank's fallback position is that the voicemail message was itself a notice, though it is clear from his evidence that Mr Tew did not intend it to be anything other than a courtesy call to inform the customer that a notice had been sent.

39  Although the Bank contends that it is unnecessary to prove that the email was read or the message was listened to before 11am, Mr Mitchell has invited me to find that as a matter of fact, Mr Leach listened to the message and read the email before the deadline. Mr Leach denies this. His evidence is that he was unaware of the email and did not listen to the message until the following day. Much of Mr Mitchell's extensive cross-examination of Mr Leach was directed towards undermining his credibility on that issue. In the light of this factual dispute, I will set out the material facts surrounding the Bank's purported exercise of its right to amend the termination date, before construing the notice provisions in the Collar.

40  In November 2011 Greenclose was asking the Bank for a renewal of its existing facilities, an increase in its overdraft, and/or deferral of the capital element of its loan repayments to assist its cashflow and to enable it to carry out some refurbishment over the winter months. In support of that application, Mr Reynolds provided the Bank with a budget for 2012. By then, base rates had plummeted to 0.5%, well below the floor of the Collar. The Collar was not serving the purpose for which it

Greenclose Ltd v National Westminster Bank Plc, 2014 WL 12155751 (2014)

had been put in place, namely, protecting Greenclose (and the Bank) against the risk that base rates would rise to 6% or above. It was costing Greenclose around £57,000 per quarter: that is the figure which appears in the quarterly "reset confirmation" sent by the Bank to Greenclose by fax on 9 December 2011 to inform it of the amount due for payment under the Collar.

41   On 18 November 2011 Mr Alan Bufton, who had taken over from Mr Harrison as the relationship manager, warned Mr Reynolds in an email that he should budget for the Collar to be extended and amend his cashflow forecast accordingly. Thereafter, Mr Leach sought to persuade the Bank not to extend the Collar. He argued that an extension of the existing instrument offered Greenclose no protection and was extremely expensive, for no benefit. Within the Bank, the decision was one for GBM, and specifically the traders, to take. In December 2011 Mr Bufton forewarned GBM that the customer was going to ask the Bank to set aside the extension. The two people with whom he corresponded were Mr Tew and his colleague Mr Rishin Patel, both of whom occupied similar positions to that of Mr Jones, though they were based in the London office.

42   Prior to November 2011, Mr Tew had not been involved in matters pertaining to Greenclose. However, since Mr Patel was due to be away on holiday at the end of December 2011, it was Mr Tew's responsibility to give the notice of extension if the trader on the GBM trading desk, Mr Bob Goodfellow, decided to exercise the Bank's contractual right to extend the Collar. This seemed virtually inevitable, given that internal documents indicate that the Bank was "out of the money" on its own book of business despite being heavily "in the money" vis a vis Greenclose on this individual Collar.

43   On 9 December 2011 Mr Tew sent an email to Mr Bufton in these terms:

> "Alan — on 30th December GBM will need to contact the customer to inform them of the intention to extend the collar. Under the terms of the agreement this will be done via fax. Can you please provide me with the clients:

Name:
Email address:
Phone
number:
Fax number:

so that we can get hold of the client in the Christmas week…"

44   Despite the impression given in that email, Mr Tew had not checked the terms of the ISDA Master Agreement or the Schedule. Indeed, he never checked it. Mr Tew always intended to give notice by fax; he decided to do so for no other reason than that it was a standard method of communication with the Bank's customer base. He had no idea that there was no fax number in the Schedule or that the only contact for Greenclose named in the Schedule was Mr Reynolds.

45   It appears that, despite a reminder, Mr Bufton did not respond to Mr Tew's request for contact details for the client. On 13 December 2011 Mr Tew sent an email to Mr Bufton stating: *"With regards the extension of the Greenclose collar we will contact the client (Catherine and John Leach) at…"* [he then set out Greenclose's office fax number and telephone number]. He asked Mr Bufton to let him know if the numbers were incorrect, failing which he would assume they were correct. Mr Bufton confirmed that they appeared correct. Mr Patel obtained Mr Leach's email address from someone in Mr Bufton's department on 23 December, and forwarded it to Mr Tew by email on 28 December.

46   Mr Leach's concerns about the renewal of the Collar were debated at the Bank's December Credit Forum, but the decision was left with GBM. On 20 December 2011, Mr Bufton wrote to Greenclose to communicate the decision of the Credit Forum to refuse both the request to increase the overdraft facility and the request for loan repayment relief, but to agree to the renewal of existing facilities. Mr Bufton said in the letter that Mr Leach's views on the extension had been shared with his colleagues in GBM who exercised the final decision but that he would *"strongly suggest that you work to the premise that the Collar in question will be extended and*

*that you will be notified as such on 30th December. Whilst nothing is certain, the extension looks highly likely"* .

47  That letter did not arrive until 28 December 2011, but its contents did not come as a surprise to Mr Leach, because in the intervening period Mr Leach had received, read and digested an email from Mr Patel which was sent to him at 12.38pm on 23 December. The material part of the email said:

> "Next week, we will be sending you written notice for the extension of the termination date of the current hedge (IRG 14654731) you have with us. I have attached a copy of the original trade confirmation for your reference. The notice will be sent to you on the 30th December 2011 no later than 11.00 am London time and the extension of the termination date execution will take place on the 4th January 2012." [emphasis added]

48  Greenclose's offices shut every year at around midday on the last working day before Christmas, and re-open on the first business day after New Year. The evidence of Mr Leach, supported by the evidence of Mr Reynolds, is that Mr Leach turned on his "out of office" automated response to emails on the morning of Friday 23 December 2011 just before midday, after which they had some pre-Christmas drinks and nibbles and the office then closed for the Christmas vacation at around 12.15pm. The "out of office" remained switched on throughout the vacation until the office opened again on 3 January 2012, although Mr Leach was in and out of the office in the intervening period. Thus when Mr Tew's email was sent to Mr Leach's email address on 30 December 2011 it would have generated an automatic "out of office" response.

49  The question whether the "out of office" message was switched on by Mr Leach on 23 December 2011 is of minor significance, given that Mr Leach accepts that he saw and read Mr Patel's email of 23 December 2011 shortly after it was received in his inbox. Indeed he forwarded it at 12.59 that day to two of his trusted

advisors, Mr Haycocks and Mr Marrow, under cover of an email expressing his frustration and disappointment at the absence of any response from the Bank to his requests for extension of the overdraft facilities and postponement of capital repayments, and stating that he was not prepared to accept the hedging without a fight because he found the Bank's action *"totally exploitative and unacceptable"* . However, the Bank contends that Mr Leach's evidence that the "out of office" response was operating on 30 December 2011 should not be accepted, and that it adversely affects the credibility of his evidence as to when he first saw Mr Tew's email and heard the voicemail message sent and left respectively on that date.

50  Mr Leach plainly had no independent recollection of switching the "out of office" message on. He candidly admitted that he did not habitually turn on his "out of office" whenever he was away from the office. The impression that I formed from his 3rd Witness Statement and his evidence in cross-examination was that Mr Leach was certain that his "out of office" message was turned on when the Bank purported to give notice by email on 30 December 2011, but his belief that he switched it on on 23 December 2011 was heavily reliant upon Mr Reynolds' recollection of events.

51  Mr Reynolds' evidence was that in the late morning of 23 December 2011, Mr Leach (who admitted he is not as computer literate as Mr Reynolds) contacted Mr Reynolds to ask him to check that his "out of office" message was working, and Mr Reynolds sent him a test email which generated the "out of office" response. Mr Reynolds thought it was most likely that this contact was by telephone from Mr Leach's office to Mr Reynolds in the downstairs office. The response read as follows: *"The office is closed untill [ sic ] Tuesday 3rd January 2012 . I will not be picking up emails during this holiday."* Mr Reynolds noted that, unlike his own standard "out of office" message, Mr Leach's automated response said that the office was closed. He decided that he would alter his own "out of office" message to mirror the wording of Mr Leach's message, and did so. Unlike Mr Leach, Mr Reynolds generally switched on his "out of office" message whenever he was going to be away. After the Christmas drinks, Mr Reynolds went off to meet his wife for further pre-Christmas celebrations at around 12.15. Thereafter they went off on holiday, as it happened, to one of

Greenclose's hotels. Mr Reynolds returned to supervise the accounting staff dealing with the payroll on the morning of 28 December 2011, but that was a quick visit, and he was not officially back from holiday until Tuesday 3 January 2012.

52  Mr Reynolds explained in cross-examination that this was his actual recollection of what happened when he was first asked about the matter two or three months after the event. He added that *"as of today, yes, it might be different"* . Neither the test message nor the "out of office" response to it has been disclosed by Greenclose. Mr Leach and Mr Reynolds both gave evidence that they assumed that they had been permanently deleted; Mr Reynolds gave evidence about the efforts made by Greenclose's IT advisers to find the messages without success.

53  Mr Leach forwarded Mr Patel's email of 23 December 2011 to Mr Reynolds on 28 December by email timed at 9.00am. That email was received by Mr Leach after Mr Reynolds had departed for his Christmas holiday, which explains why Mr Leach did not forward it to Mr Reynolds' email address immediately on 23 December. Mr Reynolds' mobile was not set up to receive such data, so there was no point in his doing so. Unless Mr Reynolds had already got in to the office, and switched his own automated "out of office" off before Mr Leach's message was sent to him on the morning of 28 December 2011, there should have been an automated response from him to Mr Leach's email if his recollection is correct. Again, no such response been disclosed by Greenclose.

54  The Bank's case is that Mr Leach's "out of office" auto response cannot have been switched on from 23 December 2011 until 3 January 2012 because if it had been, both Mr Patel and Mr Tew would have received "out of office" responses to their emails sent to Mr Leach's email address on 23 December 2011 and 30 December 2011, and these responses would have been captured and retained on the Bank's then recently-introduced journaling system even if they had been "double deleted", i.e. deleted from the recipient's inbox and then from the "deleted items" folder. Mr Patel was not called to give evidence that he received no "out of office" response. Mr Tew's evidence was that he did not recall receiving an out of office response to his email of 30 December 2011 and did not believe that he got one.

55  Mr Hood, a Messaging Services Manager within the Bank, gave evidence of searches carried out by two named employees of the technology services division that retrieved all the entries on the journaling system that captured and retained the emails sent to and received by Mr Patel on 23 December 2011 and the emails sent to and received by Mr Tew on 30 December 2011, which were then forwarded to the Bank's solicitors. Mr Hood said he was informed by the solicitors that they had been unable to find the "out of office" emails from Mr Leach on either date. However, the journaling system retrieved automated "out of office" responses that were received in Mr Patel's and Mr Tew's inboxes on 23 and 30 December 2011 respectively from the computer of Mr Bufton, to whom their emails to Mr Leach on those dates had been copied. It apparently failed to pick up any external "out of office" responses received in Mr Patel's inbox on 23 December 2011.

56  It is important to note that the Bank chose to call no expert evidence, and that Mr Hood was tendered as a witness of fact. Given that his evidence about the searches and their results was at best second-hand, it was of very limited assistance, and any opinions he expressed are inadmissible. The problem with Mr Hood's evidence is that the Court has no means of knowing how thorough the searches were, or how effective the journaling system was in capturing data. I find it significant that no "out of office" was disclosed by the Bank from Mr Patel, to whom Mr Tew's email of 30 December 2011 to Mr Leach was also copied, and whose absence from the office on 30 December 2011 had led to Mr Tew being responsible for giving the notice. It is inherently unlikely that a bank employee would go away on holiday without switching on his "out of office" message, and such a message should have appeared in Mr Tew's inbox along with Mr Bufton's. Yet the Bank produced no such message from the journaling system, and no evidence from Mr Patel. On the evidence before me, the only "out of office" response captured in Mr Tew's inbox on 30 December 2011 was Mr Bufton's.

57  If the automated responses had been sent from Mr Leach's computer to Mr Patel's and Mr Tew's computers, Mr Hood said he doubted that they would have been filtered out as "spam" because other emails

from Greenclose had got through without difficulty, but he accepted that they might have been held up in transmission for some reason. Another possible explanation for the alleged non-receipt of the "out of office" message, accepted by Mr Hood (though it was not explored in evidence with Mr Leach) is that in error his "out of office" email was set up to respond to internal emails only; but like Mr Hood's evidence about the "spam" filter, that is pure speculation. I mention it only by way of demonstrating that even if the "auto response" was not captured by the journaling system, or did not reach Mr Patel's or Mr Tew's inboxes, it does not necessarily follow that one can conclude on the balance of probabilities that it was not set up or sent. It would be dangerous to draw the conclusion merely from the failure of the Bank's searches to turn up the "out of office" responses from Mr Leach, coupled with their success in finding internal "out of office" responses from Mr Bufton, that Mr Leach's evidence is unreliable, particularly since the searches appear to have failed to turn up Mr Patel's "out of office" response. Moreover, it is odd that no external "out of office" emails were picked up in Mr Patel's inbox for the whole of 23 December 2011, which was the Friday before Christmas.

58   Whenever the Court has to resolve a conflict of this nature it is important to evaluate it against the inherent probabilities and the contemporaneous evidence (or lack of it). So far as the inherent probabilities are concerned, if an "out of office" response was turned on at any point during the Christmas holidays, it is far more likely to have been turned on before Christmas, or at least before New Year, than on 2 January, the day before the office was officially due to re-open. If 23 December was the last working day, that is the most likely date on which it would have been turned on.

59   Moreover, Mr Leach had become seriously ill with Norovirus at the beginning of December 2011; so ill that his planned open heart surgery had to be postponed from 9 December to late January 2012. Although the Greenclose offices are physically located within Mr Leach's home, his illness made it less likely that he would be doing much work or dropping in to the office on a regular basis during the vacation period. Thus there was a good reason for him to set up an "out of office" message warning people seeking to get in touch with him over the vacation period that the office was shut for

the duration and he would not be picking up emails; all the more so if Mr Reynolds was going to be physically absent for almost the whole of that time. That was one of the reasons given by Mr Reynolds for recalling that the "out of office" was set up on 23 December 2011 when he was first asked about it.

60   It is also inherently likely that documents of this nature, particularly test messages, would be permanently deleted from the computer system of the sender or recipient if there was no particular reason to keep them, so the absence of documents from Greenclose's computer records is not a particularly strong point in itself. There has been no expert evidence about Greenclose's or the Bank's computer systems and the ability or otherwise to retrieve such information from the metadata. Mr Reynolds was far from sure that the Greenclose backup system would have captured these emails, and in any event he said it was overwritten on a cyclical basis. On the other hand, it is less likely that the automated responses were sent if they do not appear on the Bank's journaling system – provided that it was working correctly. This particular Bank has had notorious problems with its IT in the past, though there was no evidence one way or the other about the operational effectiveness of the journaling system. One message may have got lost or delayed in transmission, but it seems improbable that both would have done, as they were supposedly sent a week apart, and to different recipients.

61   So far as the contemporaneous documents are concerned, two are of particular significance. One is the only automated "out of office" reply produced by Greenclose in disclosure from the whole of the Christmas and New Year period. It is a response to an untitled email sent to Mr Leach by his secretary, Sarah Boullier on the morning of the extra New Year Bank Holiday, Monday 2 January 2012. The automated reply was sent at 11.35 am, in the terms I have already quoted (including the typographical error). It was found by Mrs Boullier in her "deleted items" folder and forwarded by her to Mr Leach on 8 March 2012. The email of 2 January 2012 from Mrs Boullier to Mr Leach to which it responded has not been found. The subject matter was left blank.

62   If that document is genuine (and Mr Mitchell very properly did not contend otherwise) the latest that Mr

Leach could have set up the "out of office" automatic reply was on the morning of 2 January 2012. On the Bank's case it would have had to have been set up on that date, because it says there was no automated response to Mr Tew's email of 30 December 2011, and the period in between was the New Year weekend. Moreover, Mrs Boullier had sent Mr Leach at least two emails on 28 December 2011. If the "out of office" response had been switched on by then, her first email to Mr Leach should have generated the auto response, but the Bank's contention (again unsupported by expert evidence) is that subsequent emails from her to Mr Leach (including the 2 January 2012 email) would not have done, because the system assumes that the sender of the email will not need telling twice that the recipient is not there.

63  If that hypothesis is correct (though in the absence of expert evidence I cannot safely assume that it is), then if the auto response had been switched on before 28 December 2011, either (a) the auto response was switched off and on again in the intervening period, (which does not accord with Mr Leach's recollection, and seems inherently unlikely) or (b) the message from Mrs Boullier on 2 January 2012 that generated the response was sent from a different email address, (which does not appear to have been the case, even though she sent it from out of the office). Yet, if the 2 January 2012 "auto response" email is genuine, Mr Mitchell was unable to afford me any plausible explanation for why Mr Leach would have turned on his "out of office" response for the first time on the morning of 2 January. Even if Mrs Boullier was sending Mr Leach a test message, there was no reason for him to have wanted his secretary to send him a test message that morning to check that the "out of office" was working, unless he believed it was already switched on. Moreover, he is unlikely to have asked Mrs Boullier to check that it was working if, as Mr Reynolds attested, he had already checked that with him.

64  If the Bank's assertion about how "auto response" messages work is correct, the communications between Mrs Boullier and Mr Leach by email on the morning of 28 December 2011 would appear to demonstrate that Mr Leach cannot have set up his automated response on 23 December and kept it on throughout the holidays. However, that does not mean that his evidence about it being set up before 30 December 2011 and operative

on that date is mistaken. The conversation between Mr Leach and Mr Reynolds leading to the setting up and checking of the auto response could have taken place on the morning of 28 December 2011, when they were both in the office, and not on 23 December, as they now believe it did. Although Greenclose was officially closed for business, 28 December 2011 was the next business day after 23 December because 27 December was an extra bank holiday.

65  Mrs Boullier's time sheet indicates that she worked until 11.40am on 28 December 2011. Her last email sent to Mr Leach that morning is timed at 11.34. It is plausible that Mr Leach would want to set up an "auto response" before the New Year break, especially if he had overlooked it on the previous Friday; and it seems likely that Mr Leach would have asked Mr Reynolds, who was in the office, to check that he had set the message up correctly on his computer, especially if Mr Leach's PA had gone home. Mr Reynolds' recollection that this conversation occurred in the late morning also fits that scenario.

66  At the time that the "out of office" response of 2 January 2012 was sent to Mrs Boullier, no issue had yet been raised about the validity of the 30 December 2011 email notice of extension which, by this time, Mr Leach had read. It was not until after Mr Leach had complained to the Bank (in an email sent to a senior official, Mr Armbrister, on 3 January 2012) that he forwarded Mr Tew's email of 30 December 2011 to Mr Haycocks for his comments, on 4 January 2012. Mr Haycocks' first comment was *"interesting to know if legally they notified us on time"* . The response is the second of the significant documents. At 15.47pm the same day, Mr Leach emailed the relevant provisions of the ISDA Master Agreement (which had been forwarded to him by Mr Reynolds) to Mr Haycocks. He stated in that email *"My email was in "out of office" mode and it stated that the office was closed and I would not be picking up emails over the period. Interesting"!*

67  Mr Haycocks responded: *"Very interesting! Need a lawyer's interpretation!"* to which Mr Leach responded " *A bit "last resort* "!" – indicating that Mr Leach was privately far from convinced that the "out of office" message would assist Greenclose. Thus, within a week of the date on which the notice of 30 December 2011 was sent, (but some weeks before Mrs Boullier retrieved

the 2 January 2012 email from her "deleted" folder), Mr Leach was telling Mr Haycocks that his email was in "out of office" mode on 30 December 2011 – though unsurprisingly he did not tell him the date on which he switched it on. He had no reason to say that to Mr Haycocks if it was untrue; and if he had not switched the "out of office" response on until 2 January 2012, he could hardly have forgotten about that or got muddled about the dates only two days afterwards.

68  As Mr Mitchell went to great lengths to demonstrate with Mr Leach, it was not until much later, in a letter dated 29 March 2012, that Greenclose's solicitors formally raised any point on the validity of the notice. The fact that the validity of the notice was not yet in issue in January 2012 undermines any suggestion that Mr Leach made up a story about the "out of office" message being switched on prior to 30 December 2011, because he had no reason to make it up at a point when it was of no apparent significance to his dispute with the Bank. So the 4 January email to Mr Haycocks is powerful near-contemporaneous evidence that the "out of office" auto response was indeed switched on by Mr Leach some time before 30 December 2011.

69  Therefore, both the inherent probabilities and the contemporaneous documents emanating from Greenclose are consistent with the evidence of Mr Leach that on 30 December 2011, the "out of office" automated message was switched on and would have been sent out in response to emails received in Mr Leach's inbox, including Mr Tew's email, and I find as a fact that it was. The fact that for reasons unknown the Bank's journaling system appears to have failed to capture the message in Mr Tew's inbox is insufficient to rebut that evidence.

70  My impression of Mr Leach and Mr Reynolds in the witness box played no part in my conclusion, but it reinforces it. I have no doubt that both of them were doing their honest best to assist the Court. Neither was evasive in cross-examination, and Mr Leach readily conceded that he had no explanation for how it was that the automated responses apparently did not reach the Bank or for the fact that an automated response was sent to his secretary on 2 January 2012 when she had already emailed him on 28 December 2011. Although witnesses can be mistaken, especially with the passage of time, Mr Reynolds' account of checking Mr Leach's

auto response and then altering his own "out of office" message to include information about the office being shut was plainly a truthful account of something that had actually happened. As he first gave that account within around 3 months of the events in question he cannot have been mistaken about the year.

71  The only question that remains is when the automated message was switched on. In this regard, for the reasons I have stated, the evidence seems to point towards the conversation between Mr Leach and Mr Reynolds taking place on the morning of 28 December 2011, rather than on the morning of 23 December as they both now believe it did – but if, and only if, the Bank's assertion about the way in which "auto responses" work is correct. If the Bank is wrong about that, 23 December 2011 is inherently more likely, and it accords with the recollection of both the relevant witnesses in 2012. Fortunately, it is unnecessary for the purposes of this judgment for me to resolve that point.

72  On 23 December 2011, when he read Mr Patel's email, Mr Leach knew that the Bank intended to give notice in writing to extend the Collar the following week. He had no reason to suppose that notice would be given by email. Historically, important communications from the Bank were sent by letter and arrived in the post. The only communications of any significance relating to the Collar that were sent by fax after the post-transaction acknowledgment were the quarterly reset confirmations. Email was not a means of notice or communication set out in the Schedule to the Master Agreement. Nor, incidentally, was it a prescribed means of giving notice under the Loan Agreement. Mr Leach did not need to physically go into Greenclose's office to check the mail, as it would be delivered to his home in the normal way, and it appears from the events of 28 December 2011 (referred to below) that the post arrived before 10am.

73  Mr Leach's email sent to Mr Haycocks and Mr Marrow shortly after he read Mr Patel's email of 23 December 2011 demonstrates that he was very angry about the Bank's decision. On the morning of 28 December 2011, (which was the next day that Mr Leach went into the office) and shortly after he had forwarded Mr Patel's email to Mr Reynolds, Mr Leach sent a further email to Mr Haycocks and Mr Marrow at 9.24 am. Mr Leach's email indicates that he had calmed

Greenclose Ltd v National Westminster Bank Plc, 2014 WL 12157512 (2014)

down, but he was still very upset about the Bank's behaviour, and that he wanted to discuss what to do next with Mr Haycocks and Mr Marrow. He planned to call each of them for a separate discussion and then possibly to set up a tripartite conference call. At that time he had not received the Bank's letter of 20 December 2011. That letter arrived in the post around 20 minutes later. It was scanned by Mrs Boullier and sent to Mr Leach by email, and forwarded by him later that morning to Mr Haycocks and Mr Marrow. The letter was consistent with Mr Patel's indication that the notice would be given on 30 December 2011. Therefore, Mr Leach would have expected the notice from the Bank to have arrived in that morning's post, if not before.

74   On 29 December 2011, the trader, Mr Goodfellow, sent an email to GBM addressed, among others, to Mr Jones, confirming that the Bank would be exercising its right to extend the Collar. He said that " *the option expiry date is the 30th but this option is deep deep in the money so there is no chance of us not exercising. We may as well inform the client today*" . One of Mr Jones' colleagues forwarded the message to Mr Tew, who responded " *Bob – we have already given the client a heads up and I will fax/email him tomorrow morning as per the confo. Cheers.* "

75   Thus it was Mr Tew who took the decision to wait until the morning of 30 December 2011 to give the contractual notice, despite the fact that the senior trader who had decided to extend the Collar was content that Greenclose be given notice of extension on 29 December. Mr Mitchell submitted that it was possible to construe the Confirmation as requiring that notice be served on 30 December 2011, so that service on 29 December would not suffice. I disagree. The words "by 11am on 30 December 2011" set a deadline of 11am on 30 December 2011: they do not mean "on 30 December 2011 but before 11am." Of course, the Bank was entitled to wait until just before the deadline to give the notice; but by doing so it took the risk that if it made an error or if there was some other problem, there would be insufficient time to redress the situation.

76   On the morning of 30 December 2011 Mr Tew attempted to fax notice of the Bank's exercise of its right to extend the Collar to Greenclose's fax number, at 9.35am. The fax said:

"Dear John,

As per the Rishin Patel's email sent Friday 23 December 2011 please take this as written notice that the Bank is exercising its right to extend the termination date of the hedging contract IRG14654371 for a further two years. The contract extension will apply from 4 January 2012 and the new termination date will be 4 January 2014."

77   The attempt at transmission failed. The delivery report stated "NOAN" under "status" indicating to Mr Tew that there was no answer from the recipient's fax machine. The reason why there was no answer has not been established. I accept Mr Leach's evidence that he never turned the office fax machine on or off. Even if the fax machine had been switched off by someone, rather than (for example) running out of paper, or suffering a fault on the line, there was nothing sinister about that: it was holiday time and the office was unmanned, although Mr Leach was dropping in from time to time. There was no deliberate attempt by Greenclose to prevent the receipt of the notice. Mr Leach was expecting that notice to arrive in a letter, not by fax or email, and although he was unhappy about the Bank's decision, he was resigned to receiving it; his focus was on seeing if there was anything he could do to persuade the Bank to change its mind.

78   In any event, Mr Leach is plainly not someone who would resort to such underhand behaviour. In the course of the trial it was suggested to Mr Leach not only that he caused the fax machine to be switched off, but that his first witness statement created a deliberately misleading impression of his movements in and out of the office over the Christmas and New Year holidays and that there was deliberate prevarication by his solicitors in answering questions or disclosing material that might be regarded as unhelpful to him. I unhesitatingly reject all those criticisms, although in fairness to the Bank, it is easy to see why it was

suspicious. Mr Leach had ill-advisedly sent an email to Mr Armbrister on 3 January 2012, suggesting that he was unaware of the Bank's right to extend the Collar at the time when the transaction was entered into. It said " *At no time was this option discussed and if I had been made aware verbally of the bank's option, I would not have agreed to it* ".

79   It is to his credit that when he was faced with that document, Mr Leach did not seek to justify his behaviour. Although what he said was untrue, when the email is read in its entirety it is plain that Mr Leach was not seeking to argue that Greenclose was not bound by the terms of the Collar, but rather to persuade the Bank that it was unfair for it to act in a manner which was, as Mr Leach saw it, totally contrary to its customer's best interests. I cannot conclude from that lie, told in that context, that Mr Leach was prepared to perjure himself or that he was involved in any attempt to mislead the Court. When he made his first witness statement, Mr Leach did not have the benefit of all the disclosure, and as often happens when a person is trying to recollect what happened some years previously, some mistakes were made. There has been no attempt to suppress disclosable documentation; the stance taken by Greenclose's solicitors in the correspondence to which Mr Mitchell referred was a perfectly proper one.

80  At 9.45am Mr Tew sent an email to Mr Leach's email address which he ccd to Mr Bufton and Mr Patel. The subject matter was " *Notice to extend existing Base Rate Collar IRG14654371* " It said:

> "Dear John
>
> Below is a copy of a fax we tried to send to you this morning. We are informing you that the Bank is exercising its right to extend the hedging contract IRG 14654731".

It did not occur to Mr Tew to tick the box requiring a "read receipt" so that he would find out when Mr Leach had opened the email. I find on the balance of probabilities that Mr Tew did receive the "out of office" auto response to that email. It explains why he

then tried to get hold of Mr Leach by phone, using the office number, to draw his attention to the email. Of course Mr Tew would have been aware that the fact that an "out of office" response is generated does not necessarily mean that the person you are trying to contact is not physically in the office. Pennington House was Mr Leach's home.

81   At 9.58am Mr Tew rang the Greenclose office telephone number but got no response. As there is no answering machine, he was unable to leave a message. A transcript of that call recorded Mr Tew's background conversation with a lady in his office. As the phone rang, Mr Tew said " *perfect, he's not answering. But it's not I don't think it's going to go to voicemail either* " to which the lady said " *ah it's not your fault* ". That suggests that Mr Tew was becoming frustrated because his attempts to make contact with Greenclose thus far had failed, which is also consistent with his having received an "out of office" response to the email. He was obviously concerned that something may have gone wrong with the notice, and his colleague was trying to console him. Mr Tew then rang Mr Leach's mobile number. The call went straight through to the Vodafone voicemail service. He left a message as follows:

> "Hello there. This is a message for John Leach. It's Russell Tew calling at the Royal Bank of Scotland. I'm just calling to say that I sent you an email this morning and a fax although we couldn't get through on the fax number. Uh, giving the bank's intention to extend your existing base rate collar. The bank will exercise that right to extend it. The details are in the email. Any questions please give me a call." He then left his telephone number.

82   That message was not, nor did it purport to be, a notice exercising the Bank's contractual right to extend. It was drawing attention to the email and the fax purportedly containing the written notice that the Bank had told Mr Leach it was going to serve. Although Mr Leach's telephone records show that he accessed

his voicemail account for 20 seconds at 10.32am on 30 December 2011, and twice on the following day, he cannot recall what calls he received or from whom, but he believes that he did not hear Mr Tew's message until 31 December. Even if he were mistaken about that, the objective evidence establishes that he did not listen to his messages for long enough on 30 December to have heard anything more than Mr Tew telling him that he had sent him an email that morning. He would not have heard what the email related to.

83  Vodafone coverage, and thus the mobile reception at Pennington House is very bad. Mr Leach has to go outside into the grounds in order to try and find somewhere where he can make calls and listen to voicemail, and even then he said he often finds it difficult to make out what is being said because of interference on the line. The only logged access to voicemail that was long enough for Mr Leach to have heard all Mr Tew's message was on the following day, and that accords with his evidence that he did not listen to that message until after he had read the email. I accept that evidence.

84  Mr Mitchell pointed out that the email would also have been received on Mr Leach's mobile phone, to which it would have been sent automatically. There was no evidence of any difficulties in receiving emails at Pennington House. He submitted that when Mr Leach accessed his voicemail at 10.32am he was likely to have had some notification of the missed call from Mr Tew and of any new emails. However, Mr Leach was not expecting an email from the Bank. Mr Tew was unknown to Mr Leach, as they had had no previous dealings, and his telephone number, if it came up, would have meant nothing to him. Mr Leach said, and I accept, that he did not use his mobile (a Nokia) to access emails because the keyboard and screen were too small. Even if the email had been downloaded onto his mobile by the time he accessed his voicemail, I find it inherently improbable in the light of those facts that Mr Leach would have checked his mobile for emails on 30 December 2011, let alone opened and read, Mr Tew's email on his mobile.

85  Mr Leach's evidence is that he did not read the email before 11am on 30 December 2011. The first time he saw Mr Tew's email was when he next went into the office. I accept that evidence. At the time when he

made his 3rd witness statement Mr Leach believed that next visit to the office to have been on 31 December. As it happens, he was mistaken, because he did go in to the office on 30 December and made some phone calls from the office number, albeit after 11am. Looking at the inherent probabilities, and bearing in mind Mr Leach's evidence that he checked in the office on 28 and again on 29 December 2011 to see if the letter containing the notice had arrived from the Bank, it is likely that he would have done the same on 30 December, but he would not have found the notice in the post.

86  If he had switched on his computer, however, he would have seen the email from Mr Tew, and given that he was expecting to hear something from the Bank by 30 December 2011, it is probable that he would have opened and read it. Another indication that Mr Leach saw the notice on 30 December 2011 is the fact that when he told Mr Haycocks in the email of 4 January 2012 that the "out of office" had been switched on, he did not add " *and I did not see the notice myself until the following day* ", as one might have expected had that been the case. On the other hand, there was little or no point in Mr Leach telling Mr Haycocks about the "out of office" message, (and by implication, what it should have conveyed to the Bank) if, despite that message, he had actually been in the office and seen the message before 11am. The terms of the email to Mr Haycocks are consistent with Mr Leach's evidence that he did not see the email from Mr Tew until after the deadline expired.

87  Therefore I find Mr Leach did not see the email or hear the voicemail message left by Mr Tew until after 11am on 30 December 2011. This was not a case of deliberate evasion; Mr Leach had no knowledge that the Bank was attempting to serve notice by email until he subsequently saw and opened Mr Tew's email on his computer.

## Notice

88  The 1992 ISDA Master Agreement provides, so far as is relevant:

    **Notices**

    (a)  **Effectiveness** . Any notice or other communication in respect of

this Agreement may be given in any manner set forth (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i)  if in writing and delivered in person or by courier, on the date it is delivered;

(ii)  if sent by telex, on the date the recipient's answerback is received;

(iii) if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)  if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested) on the date that mail is delivered or its delivery is attempted; or

(v)  if sent by electronic messaging system, on the date that electronic message is received….

(b)  **Change of Addresses** . Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.”

89  Part 4 of the Schedule contains no fax number for Greenclose and no email address for Mr Reynolds (the named contact) or anyone else. Therefore, unless a notice of change was given under s.12(b), if s.12(a) of the Master Agreement (read together with the Schedule) is mandatory, the ways in which an effective notice could be given to Greenclose would be in writing (delivered in person or by courier) or by registered or certified mail. None of these methods was used by the Bank. Although some argument was addressed to me about whether the fax number provided by Mr Leach at Mr Jones' request for the purposes of transmitting the post-transaction acknowledgement, (and used thereafter for transmitting the quarterly position statements) was implicitly incorporated into the Schedule, I do not need to decide that point, since the attempt to send the notice by fax to Greenclose failed.

90  The notice clause was not a “tailor made” piece of drafting. It is part of a standard form which was described by Briggs J in Lomas v Firth Rixon at [53] as “ *probably the most important standard market agreement used in the financial world* .” He continued: “ *it is axiomatic that it should as far as possible be interpreted in a way that serves the objectives of clarity, certainty and predictability, so that the very large number of parties using it should know where they stand.* ” Although that judgment was appealed, the Court of Appeal said nothing to disapprove those observations, and I agree with them.

91  It is also important to bear in mind that, whilst the Master Agreement sets out standard provisions that should be interpreted uniformly, it is just a template which the parties are free to adopt in whole or in part or to change as they see fit. The Schedule to the Master Agreement is where the parties will usually adapt its terms to suit their own requirements. Thus, even if s.12(a) is mandatory, it would still be possible for additional or alternative means of notice or communication to be included in the Schedule (or, indeed, in the Confirmation) if the parties so wished.

92  The Bank's case is that s.12(a) deals purely with the deemed effectiveness of any notices given by the methods therein set out, and that it does not necessarily follow that no other types of notice can be effective.

It just means that if some other method of notice is adopted, the party giving the notice must prove that it was given to and received by the other contracting party. Mr Mitchell placed strong emphasis on the use of the word "may", which, by contrast with "shall" or "must", will normally be construed as permissive. He pointed to the fact that language used elsewhere in the Master Agreement is more obviously mandatory in character, for example Section 9(b), which provides that " *no amendment, modification or waiver in respect of this Agreement will be effective unless in writing… and executed by each of the parties…* " He submitted that s.12(a) could have been couched in similar terms so as to make it clear that no notice would be effective unless given in writing and by one of the prescribed methods, to the address or fax number or electronic messaging system details provided in the Schedule.

93   However, in a context where the word "may" is followed by a list of various methods of serving notice, the word can connote that the person serving the notice has a choice between those prescribed methods. In my judgment that is plainly the sense in which the word "may" is used in Section 12(a), and the natural meaning to be given to the phrase " *may be given in any manner set forth* " is that notice can be given in any manner that is listed, but in no other way. This construction is supported by the words in parenthesis which follow, stipulating that notices under Sections 5 and 6 "may not" be given by fax or electronic messaging system. "May not" in this context has to be understood as a prohibition. One would expect the draftsman to use "may" and "may not" in the same sense in the same sentence.

94   Therefore, the natural interpretation of s.12(a) is that there are a limited number of permitted means of giving notice, and that the party giving notice has a free choice between them, save insofar as notices under s.5 and s.6 are concerned, when the choice of methods becomes more restricted. The words " *to the address or number or in accordance with the electronic messaging system details provided* (see the Schedule)" also support a mandatory construction. Without them, the details appearing in Part 4 of the Schedule would have no greater significance than any contact details supplied outside the contract, and there would be little purpose in specifically providing that those details can only be altered by notice under s.12(b).

95   S.12(a) must not be construed in isolation, and the other terms of the Master Agreement support that interpretation. S.12(b) deals with how alterations are to be made to the address, telex or facsimile number or electronic messaging system details at which notices or other communications " *are to be given* " to each party. The phrase " *are to be given* " is used, instead of " *may be given* ". That phrase plainly indicates that the details provided by each party in the Schedule mandate the means of notification (unless and until changed by further notice pursuant to s.12(b)). As one might expect, those details mirror the methods of notification listed in s. 12(a), which specifically tells the reader to see the Schedule (in order to find out the address, etc. provided by each party for delivery or service of such notices). I accept Mr Auld's submission that the purpose of Part 4 of the Schedule, read in conjunction with s.12(a), was to set out a clear procedure under which notices could be unequivocally served by one party on the other. No useful purpose is served by s.12(b) unless that is the case.

96   Section 13(c) includes the phrase that " *the parties irrevocably consent to service of process given in the manner provided for notices in* Section 12". It goes on to state that nothing in the Agreement will affect the right of either party to serve process in any other manner permitted by law. That gives a degree of support for the mandatory construction, because the reference is to " *the manner provided for notices* " rather than " *the manner permitted for notices* ." It suggests that section 12 provides, i.e. sets out, the manner in which all notices are to be served.

97   It is significant that all the methods listed in s.12(a) envisage the notice being given in writing or some other permanent form. This is understandable in a context where contractual notices have such important ramifications for the contracting parties (and potentially impact upon positions they may have taken to hedge against their exposure under that contract), for example, by bringing the term of the contract to an end prematurely. Section 5, for example, enables one party to give notice to the other of a breach of the agreement which, if it is not remedied on or before the thirtieth day after notice of such failure is given, will constitute an Event of Default. An Event of Default enables the non-defaulting party to designate an Early Termination Date. It is just as important that the notice under s.5

spells out exactly what the other contracting party has allegedly done or failed to do, as it is that both parties know when the thirty days start to run, otherwise the recipient of the notice does not know what he needs to do to stop time running against him. Oral notice of alleged breaches would give rise to uncertainty, and would be a recipe for argument, which is precisely what the ISDA Master Agreement is designed to avoid. Certainty is of paramount importance.

98 The same considerations apply to Section 6, under which in certain specified circumstances, including an Event of Default, an Early Termination Date can be designated by giving at least 20 days' notice to the other contracting party. The Early Termination Date cannot be " *earlier than the day such notice is effective* ". Both parties need to know for certain when the Early Termination Date will be, because that is the date on which their positions will close out. Notices under ss.5 and 6 are generally regarded as the most important types of notice that can be given under the Master Agreement. If fax notices do not suffice for ss. 5 and 6, it would make little or no commercial sense to construe the Agreement as permitting oral notices to be given for those sections.

99 There is no inconsistency with Section 9(e)(ii), which specifically enables Transactions to be entered into "orally or otherwise". That reflects the common trade practice of orders being placed with traders over the telephone, but the way in which an agreement can be made on ISDA terms is something quite different from the way in which the parties to that agreement have agreed that notice under it is to be given. By their nature Transactions are often entered into at speed, and orally, but they are invariably confirmed in a document.

100 The Bank relied upon the decision of the Court of Appeal in Ener-G Holdings Plc v Hormell [2012] EWCA Civ 1059 . That was a very different case, which concerned a tailor-made contractual notice clause which had three sub-sections. Subsection (i) provided that " *any notice …. under this Agreement shall be in writing and signed by or on behalf of the party giving it* ". Subsection (ii) stated that " *any such notice may be served by delivering it personally or by sending it by pre-paid recorded delivery post…* " Subsection (iii) stated when notices served in the ways referred to in subsection (ii) " *shall be deemed to be received* ." [Emphasis added].

The majority of the Court of Appeal agreed with the trial judge that the word "may" in this context was permissive, although they admitted they did not find the point an easy one, and Longmore LJ delivered a powerful dissenting judgment.

101 I consider that case gives rise to no general rules, and turned on the language of the contract in question, which concerned the sale and purchase of a business. Quite apart from the fact that the draftsman had used "shall" and "may" in different sub-paragraphs of the very same clause (a point which clearly influenced the decision of the Master of the Rolls) it is understandable why the court felt reluctant to construe subsection (ii) narrowly. That construction would have meant that a claim for breach of a contractual warranty could be subject to a contractual time-bar even if the other contracting party had actual notice of it – something which, objectively, the parties were unlikely to have intended. The notice in question did not have an impact on the contract itself, either by bringing it to a premature end or by extending it, let alone a potential impact on the positions of the contracting parties under other contracts with third parties. When one is dealing with the exercise of a contractual right to extend the contract for another two years, there is less justification for adopting a permissive construction, because the circumstances are akin to the exercise of an option.

102 Moreover, the "deemed receipt" sub-clause in the contract in Ener-G Holdings v Hormell had the effect of treating the notice as being received at a particular time, regardless of when (or even if) it was actually received or seen. Thus adoption of either of the two permitted contractual methods of notice had the perceived advantage for the party giving notice of shifting the risk (of non-receipt or delayed receipt) to the recipient. The court held that if some other method of notice was adopted, the party giving the notice would have to prove that the recipient had received the notice (and when). In the case of personal delivery, it was held that the function of the clause was to obviate the necessity of proving that the notice was given to a director, rather than to an authorised employee, of a corporate recipient. Thus the function of sub-clause (ii) was one of risk allocation in terms of proof.

103 In my judgment, the arguments in favour of a mandatory construction in this case are far more

compelling than they were in Ener-G Holdings v Hormell . By contrast with the sub-clause in that case, s.12(a) of the Master Agreement is not about risk allocation, it is about validity. It is not concerned with deemed *receipt,* but with deemed *effectiveness* , (a concept which has particular significance for notices served under s.6). S.12(a) only obviates the necessity for proof of actual delivery or receipt in a minority of cases. Although a notice sent by certified or registered mail is deemed to be effective on the date when delivery is attempted , a notice given by fax is only deemed to be effective if and when it is " *received by a responsible employee of the recipient in legible form* ." Proof of transmission by the sender will not suffice. In most cases s.12(a) requires delivery or receipt to be proved by the person who seeks to rely upon the notice; in the case of a fax there are additional evidential requirements. Thus the function of s.12(a) cannot be to shift the risk of non-delivery or non-receipt to the intended recipient if any of the stipulated forms of notice are adopted.

104   In any event, s.12(a) does not say that "notice given by any of the following methods shall be deemed effective as indicated". It says that " *notice may be given in any manner set forth"* (it then refers to the Schedule) " *and* will be deemed effective as indicated". The " *and* " is important. It signifies that the section is not exclusively about when a notice is deemed effective; the first part of the section deals with the permitted means of giving notice, and the second deals with the date on which any notice given by each of those permitted methods will be deemed to be effective. All the indications are that it is intended to be comprehensive.

105   S.12(a) does not specifically address the hour of service but simply the date. Mr Mitchell submitted that this point favoured the Bank's construction, but it seems to me to be, at best for the Bank, neutral, and at worst, a further point favouring the view that this provision is not an evidential risk-shifting mechanism. Plainly, if the contracting parties stipulate that a certain type of notice has to be served by a specified time of day on a particular date, service before that deadline must be proved in the normal way.

106   I do not accept the Bank's submission that the words in parenthesis are mandatory, but the rest of the wording in Section 12(a) is not. If Section 12(a) performed a similar function to the clause in Ener-G Holdings Plc v Hormell it would simply be setting out the agreed consequences of service by one of the permitted methods, i.e. doing no more than signifying when such a notice would be deemed to be effective. There would be no place within a clause whose sole function is risk allocation, for an absolute prohibition on the service of certain types of notice by one of the permitted methods. Consistency would require any prohibition on service of notices under s.5 or s.6 by fax or electronic messaging system to be couched in terms precluding such notices from being " *deemed effective* ". Instead, there is an absolute prohibition which appears in a sentence said to set out some, but not all, of the permitted means of giving notice. At the very least one might have expected the draftsman to have dealt with that prohibition by means of a separate sub-section in order to avoid confusion. Moreover, that absolute prohibition arises in the part of section 12(a) that deals with the means of giving notice, and not in the part dealing with the effectiveness of notices served by those various means. In my judgment there is no justification for reading the rest of the part of the section in which it appears as permissive, rather than mandatory, and to do so makes no sense.

107   I am fortified in my interpretation by strong indications that ISDA itself regards s.12(a) as mandatory. As this is a standard form, it is permissible to take into account published explanatory notes such as the User's Guide to the Master Agreement, as for example Aikens J did in Australia & New Zealand Banking Group Ltd v Société Générale [2000] CLC 161 ; and see Lewison, The Interpretation of Contracts, 5th Ed, at 3.08. Section M (Section 12 – Notices) of the User's Guide to the ISDA 1992 Master Agreement (1993 ed.) states that section 12 " *sets forth the means by which any notice or other communication in connection with a 1992 Agreement may be given … this Section has been modified from the 1987 Master Agreement so as to contemplate notices or other communications by facsimile transmission or electronic messaging system for certain purposes* ". The notes then refer to " *permitted* " notices given by fax and " *permitted* " electronic messages and conclude " *Relevant addresses, numbers or electronic messaging details must be specified in* Part 4(a) of the Schedule *to the Multicurrency Master…* " The language of the guide is consistent with the provisions being mandatory. It refers to " *the means by which notices may be given* " not *"examples of ways in which*

*notices may be given."* It does not describe this section as an evidential or risk-distributing section. It also describes the information in Part 4(a) of the Schedule in mandatory terms.

108   The same section of the User's Guide to the ISDA 2002 Master Agreement states that "Section 12(a) *provides that notices or communications in respect of the 2002 agreement may be given in six different forms,"* which it then sets out. There are six different forms rather than five, because email was added in the new Section 12(a)(vi). The reference to the six different forms is couched in terms that suggest that they are the only methods by which notice can be given. Weight is added to that interpretation of the Guide by the next paragraph which begins "Section 12(a) *has been modified from the 1992 Agreement to permit email delivery* ". The use of the word " *permit* " indicates that this method of giving notice was not permitted under the 1992 form. As well as shedding some light on the interpretation of " *electronic messaging system* ", which I address below, this later guide lends further support to the view that the specified methods of giving notice under s.12(a) are (and always have been) mandatory and regarded as such by ISDA itself. There would be no need to modify them to add another method if they were merely permissive, since that method would always have been available.

109   The explanation given in the Guide is inconsistent with the notion that the section does no more than stipulate when a notice given by each of the identified methods is deemed to be effective. If that had been its purpose, the explanation would have said something to the effect that " *the new* section 12(a)(vi) *clarifies the position where a notice is served by email, by stipulating that such a notice is deemed effective on delivery, rather than at some other time, such as receipt* ".

110   Mr Mitchell submitted that it was impermissible for the Court to have regard to the modifications to the Master Agreement suggested by ISDA in 2001 and implemented in the 2002 ISDA Master Agreement, even though those modifications were made long before the Collar was entered into. He submitted that they were not part of the factual matrix, because Greenclose was not a market trader, and there was no evidence that it was aware of those changes, even though the Bank was. However, the way in which the ISDA Master

Agreement is to be construed cannot differ depending upon the identity of the parties to a specific contract made using those terms as a template. In my judgment, it would be wrong in principle for the Court to ignore any evidence that sheds light upon how ISDA (or the market) interpreted the 1992 Master Agreement at or before the time when the Collar was entered into, and the evidence about changes that were suggested by ISDA and eventually made to S.12(a) of the 1992 Agreement and the reasons for those changes is plainly helpful in that regard.

111   In Seadrill Management Services Ltd v OAO Gazprom [2004] 1 AC 715 , Moore-Bick LJ expressed doubts about the legitimacy of comparing earlier and later versions of a standard form contract on the assumption that the parties consciously intended to achieve a particular result by adopting the later version; but he contrasted that exercise with cases in which " *it is possible to identify with a degree of confidence the reason for a particular amendment to a standard form* " when he accepted that a comparison between them may be appropriate. Here, of course, the reasons for the amendments were publicised by ISDA at the time; and the purpose of the comparison is not to assume a conscious intention that the parties intended to achieve a particular result by adopting the later (or indeed the earlier) version; it is to ascertain whether anything said by the authors of the standard form at the time of the amendments sheds light on the correct interpretation of the earlier version. The Bank, of course, was the party which chose the 1992 version of the ISDA Master Agreement to govern these transactions, and put it before Greenclose for its agreement; it cannot claim to have been ignorant of the differences between that and the 2002 version.

112   In October 2001 ISDA published a document entitled "the Amendments to the ISDA Master" which, as its name suggests, contained a series of suggested amendments designed to address perceived areas of difficulty or deficiency in the 1992 Master Agreement. Among these was Attachment 6, which repeats the language of s.12(a) of the 1992 ISDA Master Agreement verbatim, save for removing the words in parenthesis and adding 12a (vi) which reads " *if sent by email, on the date that email is delivered* ". The Commentary on the Amendments explains that this suggested amendment:

"amends Section 12 (a) (Notices-Effectiveness) of the Master Agreement in two main respects. First, the parenthetical in the second and third lines of Section 12(a) is deleted in Attachment 6 so that notices under Section 5 or 6 of the Master Agreement may be given by any of the specified methods. The inability to give notices under Sections 5 or 6 via facsimile or electronic messaging systems proved to be unduly restrictive during the market turbulence experienced in 1998. Second, Attachment 6 adds a new clause (a)(vi) to permit giving notice via e-mail, the effectiveness of which is upon delivery of the email."

113  Thus in 2001 ISDA was saying that the effect of removing the prohibition on service of notices under ss 5 or 6 by fax or electronic messaging system was to enable such notices to be given " *by any of the specified methods* ". There was no suggestion that such notices could be given (or continue to be given) by unspecified methods. Moreover, the use of the word "permit" is significant; it suggests that notice by email was not previously allowed, and that the methods set out in section 12 are mandatory.

114  S.12(a) of the 2002 ISDA Master Agreement incorporates those two changes. S.12(a)(iv) states that a notice will be effective "if sent by email, on the date it is delivered". A notice sent by electronic messaging system, however, is still deemed effective on the date on which it is "received", just as it is in the 1992 ISDA Master Agreement. Part 4 of the Schedule to the 2002 ISDA Master Agreement specifically refers to email in addition to all the other methods of communication specified in the Schedule to the 1992 Master Agreement (but the words "Electronic Messaging System Details" remain in the Schedule).

115  My view that the specified methods of giving notice are mandatory is consistent with that of Justice Duffy

of the US District Court in New York in a very similar case, albeit that the form under consideration was a 1987 ISDA Master Agreement (which did not make provision for notices to be served by fax.) New York law and English law are the two systems that are usually chosen by the parties to ISDA Master Agreements to govern their transactions. The case was First National Bank of Chicago v Ackerley Communications Inc (2001) WL 15693 (SDNY). As in the present case, the bank, First Chicago, had a two year option to extend a derivative – in that case, an interest rate swap. It claimed to have given effective notice by fax of its election to extend the agreement. The Judge referred to the fact that the relevant 1987 ISDA Master Agreement did not provide for facsimile transmission as an acceptable means of notification between the parties. He quoted the notice clause, which is in similar, but slightly different terms to Section 12(a) of the 1992 Master Agreement:

> "Any notice or communication in respect of this Agreement will be sufficiently given to a party if in writing and delivered in person, sent by certified or registered mail (airmail, if overseas) or the equivalent (with return receipt requested) or by overnight courier or given by telex (with answerback received) at the address or telex number specified…"

He said there was no proof that First Chicago attempted notification of Ackerley by any of the means listed in the contract. Failure to give the required notice defeated First Chicago's entire claim. He added:

> "It is hornbook law that when the terms of a written contract are clear and unambiguous and those terms require written notification in a particular manner then such notification can be given only in that manner…"

116  Both parties have also referred me to the views of commentators. An article on the ISDA strategic documentation review and the forthcoming 2002 ISDA Master Agreement entitled "A New Master Agreement for the New Millenium: The Development of the 2002 ISDA Master Agreement" by Richard Tredgett and John Berry of Allen & Overy [2005] 5 JIBFL 197, 1 May 2002 , says this about the notice provisions:

"Under the 1992 Agreements, notices may generally be given in various ways, including by a facsimile or electronic messaging system. However, notices under ss 5 and 6 of the 1992 Agreements (which include default notices and notices designating Early Termination Dates) may not be given by a facsimile or electronic messaging system. Further, the 1992 Agreements do not provide for delivery of any notices, including notices under ss 5 and 6, by email. The prevailing view has been that e-mail is not an "electronic messaging system".

Experience in 1998 showed that giving notice to a counterparty (particularly one that is in financial difficulty) is not always easy or even possible. Stories circulated of ailing counterparties switching off fax machines, bolting doors or taking other evasive measures designed to prevent others from delivering notice to them. In the light of these experiences, it was felt that consideration should be given to ways of trying to improve the notice provisions in the 1992 Agreements, perhaps by expanding the permitted ways of giving effective notice."

117  By contrast, Simon James of Clifford Chance, in his book on the Law of Derivatives (1999) refers to the fact that notice provisions in agreements generally are of two types, those which require that notice must be given in accordance with the requirements set out in the agreement or provide that notice may be given in a particular way but it does not prevent notice being given in other ways. He takes the view that s.12(a) opts for the latter approach, but does prevent certain notices being given in one particular way. Mr James does not explain why he reaches that view, and makes no reference to the Guide. Moreover, he was writing before the changes to the standard form in 2001 and 2002 and therefore did not have the advantage of ISDA's own explanation of why it felt it desirable to alter the notice provisions.

118  Simon Firth, of Linklaters, in his more recent book, Derivatives Law and Practice (2013) takes a rather more considered view and explains his reasons for it. At paragraph 11.177 after quoting s.12(a) of the 1992 ISDA Master Agreement, he states that such provisions help to promote certainty by making it clear when a notice will be treated as having been duly given. He goes on to add " *what is less clear, however, is whether a notice will be valid if it is given in any other way ( for example by being sent to an address that is not specified in the Schedule or, unless it is given under s.5 or 6 of the 1992 Agreement, to a different fax number.)*" He then argues for a permissive construction, so as to permit service by ordinary post if the letter is received by someone with actual authority to act on behalf of the recipient, and cites Ener-G Holdings v Hormell as an example of a case in which " *the same conclusion was reached on the basis of a slightly differently worded provision* ". Mr Firth does not explain how the approach he advocates is consistent with the promotion of certainty, which he appears to regard as a laudable objective. Ordinary post can go astray; the whole purpose of identifying registered or certified post is that receipt can be proved. Moreover, he appears not to have considered the ISDA materials, since he makes no reference to them.

119  Mr Firth contends that if the notice is sent to a different address or fax number from the one referred to in the Schedule, but is received by someone with authority, it should be valid. The first point to make about that argument is that it presupposes that s.12(a) is mandatory. If it is not, then notice can be given in any way that the person giving it wishes, provided it comes

to the attention of the recipient. Mr Firth describes the words " *see* the Schedule" as a "simple injunction" and states that it does not *necessarily* mean that the only information that is relevant is that provided in the Schedule. However he fails to explain what else it is supposed to mean, or what function the Schedule is supposed to serve if not to mandate the address, fax number or electronic messaging system details at or to which notice is to be given.

120   The reason that Mr Firth gives for his view that the information in the Schedule should not be regarded as exclusive is that " *the opposite conclusion would mean that, if the recipient had moved offices or changed its fax number without notifying the sender, it would be impossible for a notice to be served* ." In those circumstances, however, the sender would be unlikely to have a different address or fax number to send the notice to, unless it made its own inquiries. Moreover, if the notice was sent to the specified address by certified or registered mail then it would be deemed served even if delivery was attempted and the recipient had moved out of that address. In any event, the article by Messrs Tredgett and Berry indicates that practical problems were indeed experienced in giving notice under the 1992 Master Agreement during the financial turmoil of the late 1990s because it was relatively easy for the receiving party to avoid delivery. The introduction of email as a specified method of giving notice was in part intended to overcome those problems.

121   Having had the advantage of seeing the materials to which I have referred and hearing full argument by leading counsel on the rival constructions, I disagree with the view of Mr James and reject Mr Firth's contentions as to how these provisions should be construed. Section 12(a) is mandatory and notice has to be given by the means it prescribes, by reference to and in accordance with the information provided in Part 4 of the Schedule, unless there has been an amendment of that information by a notice given by the party to whom that information relates to the other contracting party under Section 12(b). If the Schedule does not provide certain information necessary for service by a prescribed method, then the contract must be construed as limiting the prescribed methods to those expressly permitted by the Schedule unless and until the missing information is notified under Section 12(b) or the contract is formally amended.

122   The question whether the notice given under s.12(a) can be addressed to someone other than a person who is named in the Schedule is more difficult. Mr Auld submitted that s.12 should be construed as mandating that the notice be served on the person or persons named in the Schedule, as that would create greater certainty. He pointed out that in the Schedule to the ISDA Master Agreement in this case, the Bank had specified that s.5 or s.6 notices should be addressed to "Head of Legal, Global Banking and Markets", and all other notices should be marked for the attention of "Swaps Administration". If delivery to the named addressee is not mandatory, there would be no point in drawing that distinction and even s.5 or s.6 notices could be served on anyone at the Bank with authority to receive them. I see the force of that argument; however, they would still have to be served at the address specified in the Schedule for service of such notices, which lessens the chances of their going astray.

123   The provisions relating to fax messages specifically refer to receipt by " *a responsible employee of the recipient* ". Thus if a fax number had been provided by Greenclose in or for the purposes of the Schedule, and a fax had been received in the office at the designated number by Mr Leach, it would be impossible to argue that the notice was ineffective even if it was not addressed to Mr Reynolds. If that is so for faxes, then as a matter of consistency the same logic should apply to the other specified methods of notice. Moreover, s.12(a) refers to giving notice to the address, number or electronic messaging system details provided in the Schedule, and not to the persons or addressees specified in the Schedule. In my judgment, if the notice is addressed to the receiving party or to someone with authority to receive it on behalf of that party, and served on such a person, that will suffice, even if it is not addressed to or received by a person named in the Schedule.

124   I do not regard the fact that the office telephone number was set out in the Schedule as a reason for construing s.12(a) as permissive, or construing this contract as permitting oral notices to be given. The telephone number, like Mr Reynolds' name, was an additional piece of information not required by s.12(a). The fact that it appeared in the Schedule did no more than signify that this was the number to be used

for telephonic communication with Greenclose. One cannot properly infer an intention to vary the methods by which notice can be given simply from the presence of that telephone number. Matters would have been different if the Schedule or the Confirmation had said, in terms, that " *notices may also be given by telephone* ".

125  Given that the methods stipulated in s.12(a) are mandatory, the next issue is whether giving notice by email was permitted. The short answer to that is no, because regardless of whether the phrase " *electronic messaging system* " includes email, no email address was ever specified in the Schedule for the purposes of giving notice under this agreement. Thus the contracting parties did not intend notices to be served by email. After the signature of the Master Agreement and the Schedule, no notice was ever given by Greenclose to the Bank under s.12(b) changing the details in the Schedule.

126  Mr Mitchell sought to argue that Mr Leach's email address was "provided" by his signing the post-transaction acknowledgement combined with a course of dealing between the parties by which they communicated using Mr Leach's email address. That argument has no merit; the post-transaction acknowledgment was not a notice under s.12(b) and it did not emanate from Greenclose. It was the Bank that inserted Mr Leach's email address in that document in the first place. Mr Jones had asked Mr Leach for his fax number specifically for the purpose of sending him the post-transaction acknowledgment; he made no request of any kind in respect of an email address. Mr Leach accepted in evidence that he confirmed its accuracy by signing and returning the fax, but he was never asked to agree to service of notices by email either then or subsequently, and I cannot construe his actions as amounting to an objective agreement by Greenclose to the addition of email to the Schedule as a permitted method of serving notice or to the addition of an email address. The Bank obviously did not consider that to have been the case, since no file note or other document has been produced to indicate that anyone on the Bank's side annotated or amended the Schedule following receipt of the Post-Transaction acknowledgement. Moreover, nothing is said about it in the Confirmation, which would have been the obvious place for the matter to have been recorded as part of the agreed terms of this transaction.

127  It is nothing to the point that there have been a large number of email communications between the Bank and Mr Leach over the years. That does not signify that there was ever any agreement by Greenclose that formal notices or communications under the Collar could be given to it by email. With the exception of the post-transaction acknowledgment and the quarterly reset confirmations, all important communications were sent to Greenclose by post.

128  The fact that the original transaction was carried out over the telephone and the post-transaction acknowledgment appeared in a fax exchange does not affect the agreed position under s.12 or the Schedule. The post-transaction acknowledgment was interim confirmation of the trade before the final transaction Confirmation was sent (by post). The definition of " *Confirmation* " in the ISDA Definitions is: " *one or more documents or other confirming evidence exchanged between the parties (including by means of an electronic messaging system or email) which, taken together, confirm all of the terms of that Swap transaction.* " That makes it clear that the mandatory provisions of s12(a) do not extend to confirmations, any more than they do to transactions. The way in which a transaction is made or a confirmation is recorded has no bearing on the question of how a notice can be validly given.

129  In any event, the phrase " *Electronic Messaging System* " in the 1992 ISDA Master Agreement does not include email. In 1992, email was not in common use and thus the reference to "electronic messaging system" is unlikely to have been intended to include it. Nor is it possible to conclude that over time, with the developments in computer technology, the meaning of that expression altered or that the expression must necessarily be construed as including any types of electronic messaging system that became more prevalent or were developed after the form was originally drafted. The distinction expressly drawn in the ISDA definition of " *Confirmation* " (referred to above) between electronic messaging systems and email, the suggested amendment to section 12(a) in 2001, the changes to that section in the 2002 Master Agreement to include email for the first time, and the reasons given for this by ISDA itself, make it plain that the expression was never intended to embrace email, and that specific provision had to be made to include email after it became a common form of communication.

That view is supported by commentators. I have already referred to the article by Messrs Tredgett and Berry. As a further example, in his book "Mastering the ISDA Masters Agreements (1992 and 2002): A Practical guide for negotiation", Paul Harding states:

> "Section 12 states the means by which any notice or communication in connection with an Agreement may be made, including by fax or electronic messaging systems which does not include email."

130    Mr Mitchell was unable to point to any commentary expressing a different view. He referred instead to dictionary definitions of email. The Oxford English Dictionary defines email as " *messages distributed by electronic means from one computer user to another via a network"* and " *the system of sending messages by such electronic means* " and the definition in Chambers English Dictionary is to like effect. Whilst it is true that the expression "email" may be understood as a reference to the system of sending the messages, in the sense of the OED example: " *a contract communicated by email* ", that is not the sense in which "system" is being used in the Master Agreement.

131    The language of the Master Agreement also gives clear indications that email was not intended to be included in the expression " *electronic messaging system* ". The focus is on the "system", which in that context suggests a recognized system that was expressly set up for the purpose of transmitting electronic messages, which a computer is not. S.12(a) refers to the " *electronic messaging system details provided* " in the Schedule. It therefore envisages that what will be provided in the Schedule is not (or not just) an address but details of the particular messaging system that is going to be used to transmit the electronic messages. That is more consistent with the interpretation advocated by Greenclose; a banking counterparty could give its SWIFT details and number, for example.

132    A further clue to the meaning of the expression appears from the fact that notice given by electronic messaging system is deemed to have been given on

"receipt". The time at which an email is received is difficult to ascertain and is a recipe for argument – does one count receipt on the server, or receipt in the inbox? What if the recipient has a desktop computer and a handheld device such as a mobile phone to which emails are routed? Is the email received when it is loaded onto the first device or the second? What happens if the message is filtered out and never arrives but does not "bounce back"? The time when it is delivered is straightforward, which explains why ISDA adopted that as the point of effectiveness. By contrast, it is easy to ascertain when a SWIFT message is received because the time will be recorded on the message at the recipient's end of the system.

133    Mr Mitchell submitted that the distinction between email and electronic messaging system drawn in the 2002 ISDA Master Agreement lends support to the view that prior to that time the phrase "electronic messaging system" must have been taken to include email, and that the definition of "electronic messaging system" as excluding email suggests that it would otherwise be included. I cannot accept that submission. The definition is an express reflection of the situation as it was (and as it was understood) prior to the 2002 ISDA Master Agreement. The evidence before me shows that the distinction drawn by ISDA between "electronic messaging system" and "email" was designed to make it plain that email was not encompassed within the expression "electronic messaging system"; that its intention in 2001 and 2002 was to introduce email as a permitted method of serving notice, because it was not permitted under the 1992 Master Agreement; and the commentators suggest that the prevailing view in the market at all material times was that the 1992 Master Agreement does not permit notice to be given by email, whereas the 2002 Master Agreement does. That view of the 1992 Master Agreement is something of which the Bank and its legal department must have been aware; it explains why Mr Reynolds' email address was omitted from the Schedule both in the draft version sent by Ms Lynn to Greenclose and in the final version signed by the parties, despite being stated in the ISDA request document.

134    Thus the purported notice sent by email was not a valid and effective notice and it did not operate to extend the term of the Collar.

135  I should add that I would have reached the same conclusion even if I had accepted Mr Mitchell's submission that s.12(a) is permissive, because the email was not opened or seen by Mr Leach until after the deadline had passed. It is insufficient for the Bank to establish that it would have arrived in his inbox before 11am. The Confirmation makes it clear that the right is to be exercised by " *giving notice to Greenclose* ", not by serving a notice on Greenclose. "Giving notice to" can mean different things in different contexts, but as a matter of plain English it involves actual communication of the subject-matter of the notice to the person who receives it. It is important to bear in mind the specific function that this contractual notice was intended to serve. A valid notice would extend the duration of the contract by two years. Neither party expressly contemplated that notice would be given by email – so if that method is permitted, when are those parties to be taken as having implicitly agreed that notice would be "given" to Greenclose by using it?

136  In the context of determining when an offer has been accepted, Lord Wilberforce said in Brinkibon v Stahag Stahl GmbH [1983] 2 AC 34 , at 42D:

> "No universal rule can cover all such cases; they must be resolved by reference to the intentions of the parties, by sound business practice and in some cases by a judgment where the risks should lie."

In this particular case the task of the court is to ascertain the intention of the contracting parties by construing the notice provisions. Since this notice concerned the exercise of a contractual option or right of extension, or the acceptance by the Bank of a unilateral and irrevocable offer to extend the contract, it seems to me to be wholly uncommercial to suggest that on an objective construction of the Collar the parties can be taken to have agreed that notice would be given to Greenclose by a method neither party had specified, if it was not actually communicated to someone in authority at Greenclose.

137  Cases such as The Brimnes [1975] QB 929 are concerned with a very different type of scenario. They

have nothing to do with the interpretation of a specific contractual term. If the parties are in an ongoing trading relationship where notices are routinely served by a particular method, such as a telex or fax, it makes sense to conclude that such a notice will be served when it is available to be read or seen during normal office hours. There may be many contexts in which a court would have no hesitation in deciding that an email was "received" when it was received on the other party's computer within ordinary business hours, or "delivered" when it is transmitted and no "message undeliverable" bounce-back arrives in the sender's inbox. This is not one of them. These parties could have contracted on the terms of the 2002 ISDA Master Agreement, which would have had the effect for which the Bank contends if notice was given by email — but they chose not to. They cannot be treated as having made exactly the same bargain by choosing the 1992 form and not specifying email as a method of giving notice.

138  An email is not subject to the postal acceptance rule. It is a form of near-instantaneous communication. I do not accept that, on an objective analysis, the parties to this contract can be taken to have agreed at the time of entry into the Collar, that in five years' time, sending an email to the computer of someone who is not a named contact in the Schedule to the Master Agreement, and who would not be expecting notice to be given in that way, would suffice in and of itself to bring to Greenclose's attention the exercise of the Bank's unilateral right to extend the term by a further two years. If, as Mr Mitchell contended, notice could have been given orally, then leaving a voicemail message would not be good enough either. There would have to be actual communication (save, perhaps, were there was deliberate evasion by the recipient, which is not the case here). It is irrelevant that advance warning may have been given to the recipient to expect some form of written notice that morning.

139  If Mr Mitchell's analysis had been correct, and the function of s.12(a) was one of risk allocation, so that it would not be incumbent on the server to prove that the notice had actually come to the attention of the recipient if one of the prescribed methods (other than fax) was used, one would expect the corollary to be that such proof *would* be needed if another permitted method was used instead (and *a fortiori* if the parties expressly

agreed, as they did, that the sender had to prove that a fax was received by a responsible employee). If the sender had to prove the actual receipt of a fax by someone with authority to act on behalf of the recipient, that suggests that the parties were concerned that there should be proof that the notice actually came to the attention of Greenclose. If that is true for a fax message, the same reasoning should apply to an email.

140   The burden on the sender is not particularly onerous. Modern technology easily enables the sender to find out when the email has been opened by setting up the computer to generate the appropriate message. However, as I have said, Mr Tew did not ask for a "read receipt". The reason that he was so keen to get a message to Mr Leach to draw his attention to the email was that he had received the "out of office" auto reply and became worried that he had not seen it. Mr Tew's behaviour is consistent with the natural interpretation of the notice clause (although he was unaware of what it said) because if one party is extending the term of the contract it would expect to have to ensure that the other party knew about it.

141   There was nothing unbusiness-like about an "out of office" auto reply being set up on Mr Leach's computer in these circumstances; quite the reverse. The Bank knew full well that it was the Christmas holiday period and having dealt with Greenclose for five years, it would have been aware that it closed the office between Christmas and New Year. The very reason why Mr Tew had been so anxious to collate the various contact details for Greenclose on 9 December 2011 and thereafter was that he anticipated that there might be some problem in communication given that notice had to be given during the week after Christmas.

142   The Bank's unattractive contention that it was all the fault of Greenclose that it failed to deliver the notice by 11am and that this somehow creates an estoppel precluding Greenclose from raising any objection to it, was rightly not at the forefront of Mr Mitchell's submissions. The Bank took the risk of waiting to serve until the last minute and it made the mistake of assuming (a) that service by fax was permitted and (b) there would be no problems with the fax transmission. That is not to be laid at the door of Greenclose. Mr Leach was not expecting any communication from Mr Tew, with whom he had had no prior dealings; he was

not expecting any emails from the Bank and as he had been told that notice was going to be given in writing, he was not expecting a telephone call either. In my judgment Mr Leach is not to be criticised for the fact that he did not see the email until after 11am on 30 December 2011.

143   Accordingly, for all the above reasons, the Bank failed to give a valid notice of the exercise of its right to extend the termination date of the Collar and the contract came to an end on 4 January 2012. It follows that the Bank is liable to repay to Greenclose all the sums that Greenclose has paid it under the terms of the Collar since that date, with interest.

**Implied Terms**

144   In the light of my conclusions on the notice point, it is unnecessary for me to address Greenclose's alternative case. However in deference to the detailed submissions from both parties, and in case this matter goes further, I will deal with the case on implied terms as succinctly as possible. In my judgment none of the suggested terms meets the test for an implied term set out by Lord Hoffmann (delivering the judgment of the Privy Council) in Attorney General of Belize v Belize Telecom [2009] 1 WLER 1988 at [16]-[27] as endorsed and clarified by the Court of Appeal in The Reborn [2009] 2 Lloyd's Rep 639 . None of the suggested terms is necessary to give effect to the reasonable expectations of the parties to the Collar.

145   The Confirmation gives the Bank an unqualified right to extend the term of the Collar for a further two years. The Confirmation states that the Bank has a right, but not an obligation to extend. When a contract gives one of the parties an absolute right, a court will not usually imply any restrictions on it, even restrictions preventing the right from being exercised in an arbitrary, capricious or irrational manner: see e.g. the Court of Appeal decision in Lomas v JFB Firth Rixon [2012] EWCA Civ 419 at [46]; Mid Essex Hospital Services NHS Trust v Compass Group UK and Ireland Ltd [2013] EWCA Civ 200 at [77]-[95]. The restrictions suggested by Greenclose would prevent the Bank from extending the Collar in the very circumstances in which it would be in its economic interests to do so, namely, when at the time of the fifth anniversary, base rates had dropped below the floor.

They would also require the Bank to subordinate its own commercial and economic interests to those of its customer, even to the extent of potentially bearing a loss on its trader's book of business.

146  Although the original purpose of the Collar was to provide protection (for both parties) against the possibility of a rise in base rates above 6%, which would have made it more difficult for Greenclose to service the loan, no derivative product would have provided Greenclose with the envisaged protection unless interest rates remained high. The only way in which that protection could have been achieved without there being a potential downside for Greenclose if the market moved in the opposite direction would have been to purchase a cap, and that was prohibitively expensive and would have required a substantial up-front premium. The Collar was the cheapest and the "least worst" of the remaining three possibilities. If Mr Leach had chosen a fixed rate swap or a vanilla collar, Greenclose would have had to pay more money to the Bank than it did during the initial five year term of the Collar.

147  Mr Leach plainly understood the differences between those three products. He knew that the right to extend was the price Greenclose was paying for a low floor, and he expected that the Bank would extend the term of the Collar if the market moved in its favour. He never sought to bargain for any limitation on the exercise of the Bank's right. Implying a term like the "Protection Condition" is not only unnecessary to make the contract workable, it would fly in the face of the expectations of the contracting parties. An agreement that the Bank would not extend the term of the Collar if to do so was not reasonably necessary to afford Greenclose interest rate protection, is tantamount to an agreement that the Bank would (or would only) extend the term of the Collar in circumstances in which it *was* reasonably necessary to afford such protection to Greenclose. Once it is translated into those positive terms it becomes plain that the alleged implied term is unreasonable and that these contracting parties would not have agreed to it.

148  If the Collar could only be extended if, after five years, base rates were at or around the levels that they were in January 2007, the suggested implied term comes perilously close to requiring the Bank to extend the

Collar in such circumstances, even though the parties have expressly agreed that it is under no obligation to extend, but has an unfettered right to choose. If it does not mean that, then how could one evaluate whether the alleged implied term has been breached? To what point would the market have to have moved before it was said that it was no longer "reasonably necessary" for Greenclose to hedge? Over what period of time is the existence of a sufficient risk of an increase in rates over the cap to be evaluated? Moreover, the Bank would be getting nothing in return for its agreement to a lower floor if it were deprived of the right to exercise the option in circumstances in which it was "in the money". In essence it would be taken to having agreed to act against its own commercial and economic interests.

149  The Risk of Default condition is even more uncertain and again, it is unnecessary to imply it to make the contract effective. There is no objective yardstick by which the Bank can evaluate whether the exercise of its right is going to "materially increase" Greenclose's risk of default in repayment of the loan. Mr Leach was unable to say what criteria the Bank would be required to take into account in making that evaluation.

150  So far as the "Good Faith" condition is concerned, there is no general doctrine of good faith in English contract law and such a term is unlikely to arise by way of necessary implication in a contract between two sophisticated commercial parties negotiating at arms' length. Leggatt J's judgment in Yam Seng Pte Ltd International Trade Corporation Ltd [2011] EWHC 111 , on which Greenclose heavily relies, is not to be regarded as laying down any general principle applicable to all commercial contracts. As Leggatt J expressly recognized at [147] of that judgment, the implication of an obligation of good faith is heavily dependent on the context. Thus in some situations where a contracting party is given a discretion, the Court will more readily imply an obligation that the discretion should not be exercised in bad faith or in an arbitrary or capricious manner, but the context is vital. A discretion given to the board of directors of a company to award bonuses to its employees may be more readily susceptible to such implied restrictions on its exercise than a discretion given to a commercial party to act in its own commercial interests.

151  In TSG Building Services v South Anglia Housing Limited [2013] EWHC 1151 Akenhead J refused to imply a term that an unqualified right to serve notice to terminate the contract should be exercised in good faith, even though in that case there was an express clause in that contract requiring the parties to work together in a spirit of trust, fairness and mutual co-operation. He said, at [51]

> "Even if there was some implied term of good faith, it would not and could not circumscribe or restrict what the parties had expressly agreed in Clause 12.3, which was in effect that either of them for no, good or bad reason could terminate at any time before the term of four years was completed. That is the risk that each voluntarily undertook when it entered into the Contract…"

In my judgment precisely the same reasoning applies in the context of an unqualified option or right given to one party to extend the contract at the end of its initial five-year term. Greenclose took the risk that the Bank would extend the term, and in return for taking that risk, it received the lower floor.

152  In any event, exercising the option did not give rise to a material risk of default and the Bank did not act in bad faith in exercising it. If the person exercising the option were to take the pessimistic view that interest rates would remain at 0.5%, Greenclose's net payments under the Collar would be in the order of £230,000 per annum. It is clear from its financial statements that Greenclose's cashflow (and thus the question whether Greenclose was able to service the debt to the Bank) depended to a large extent on how much money was paid out in dividends and put back by way of directors' loans. Mr Leach was very supportive of his company and as and when he needed to, he injected money into it or reduced the dividends. Greenclose's management accounts to October 2011 showed a group trading profit of £400,000 in the year to date, even taking into account the costs of the Collar, and as Mr Leach accepted, it remained profitable throughout the recession.

153  The Bank took the view at the time, in the absence of a forecast balance sheet, that a covenant breach was a possibility but most likely to be avoided by Greenclose, even if the risk of such a breach was potentially increased by extending the Collar. Further, and significantly, although Mr Leach tried very hard to persuade the Bank not to exercise the option once he was alerted to its intention to do so, neither he nor Mr Reynolds once sought to suggest that if the option were exercised it would put Greenclose at risk of defaulting. Their arguments were exclusively focused upon the fact that the purpose for which the Bank had required the hedge would no longer be served, and that Greenclose would get no benefit from the extension.

154  It is understandable why Mr Leach felt aggrieved about the decision to extend; from his perspective the Bank was taking unfair advantage of the unprecedented economic situation to make money for itself when the circumstances were the polar opposite of those in which the Bank had insisted that Greenclose enter into a hedge. However, in deciding to exercise the right to extend the Collar Mr Goodfellow was entitled to have regard to the Bank's own economic interests and to the exposure on his overall book. This was not a case of naked greed or exploitation of a vulnerable customer, even though from the customer's perspective it might have had that appearance. The decision was taken honestly and Mr Goodfellow was under no obligation to put the interests of the customer above those of the Bank.

### Conclusion

155  As a result of unprecedented market movements following the financial crisis, Greenclose made what, in hindsight, turned out to be a bad bargain, though at the time it looked like a good one. The Bank had an absolute and unqualified right to extend the Collar, and it was free to choose to exercise that right in the circumstances in which it made that choice. However, the express terms of the 1992 ISDA Master Agreement and Part 4 of the Schedule mandated the ways in which the Bank could give notice to Greenclose. By leaving it to the last minute to give notice, and failing to check the terms of the contract, the Bank took a calculated risk, and it got it wrong. The notice it sent by email was ineffective; it was sent by a method that was not permitted, to an address that was not specified, and

Greenclose Ltd v National Westminster Bank Plc, 2014 WL 1219575 (2014)

it was not seen by Mr Leach prior to 11am on 30 December 2011 2011. The voicemail message left on Mr Leach's phone does not improve the Bank's position, since it was not a notice and did not even purport to be.

156  It follows that Greenclose is entitled to judgment. I shall make the declarations that it seeks in paragraph 16 (1)(1A) and (2) of the Amended Particulars of Claim and order repayment of the sums it paid to the Bank under the Collar over the period of the extension, together with interest. The Bank's Counterclaim is dismissed in its entirety. There is no useful purpose to be served in making the declarations sought in paragraphs 4-7 of the Counterclaim, which have no bearing on any of the issues that I have had to decide.

Crown copyright

© 2017 Sweet & Maxwell

2014 WL 1219575

**End of Document**                                      © 2017 Thomson Reuters.

# TAB 33

**\*313  Henderson v. Henderson**

 Image 1 within document in PDF format.

Ct of Chancery

20 July 1843

**(1843) 3 Hare 100**

**67 E.R. 313**

1843

**Analysis**

[100] *July* 4, 7, 11, 20, 1843.

[S. C. at law, 6 Q. B. 288; 11 Q. B. 1015. See *Mutrie* v. *Binney* , 1887, 35 Ch. D. 620; *In re Henderson* , 1887-89, 35 Ch. D. 716; 37 Ch. D. 244; and (sub nom. *Nouvion* v. *Freeman* ), 15 A. C. 1. Discussed, *Worman* v. *Worman* , 1889, 43 Ch. D. 296.]

The next of kin of an intestate filed their bill in equity in the Supreme Court of Newfoundland against A., the brother and deceased partner of the intestate, for an account of the estate of the father of A. and of the intestate possessed by A., and an account of the partnership transactions, and the dealings of A. with the estate since the death of the intestate. The bill was taken, *pro confesso* , against A. in the Colonial Court, and, on a reference, the Master reported that certain sums were due to the several next of kin on the account of the estate of the intestate's father possessed by A.; but that no account between A. and the intestate had been laid before him: the Supreme Court decreed that the sums found by the Master to be due to the next of kin and the costs should be paid to them by A. The next of kin brought their actions in this country against A. upon the decree. A. then filed his bill in this Court against the next of kin and personal representative of the intestate, stating that the intestate's estate was indebted to him on the partnership accounts and on private transactions; alleging various errors and irregularities in the proceedings in the Supreme Court, and that A. intended to appeal therefrom to the Privy Council; and praying that the estate of the intestate

might be administered, the partnership accounts taken, the amount of the debt due to A. ascertained and paid, and the next of kin restrained by injunction from proceeding in their actions.

Demurrer, for want of equity, allowed on the ground that the whole of the matters  **\*314**  were in question between the parties, and might properly have been the subject of adjudication in the suit before the Supreme Court of Newfoundland.

That, inasmuch as the Privy Council is the Court of Appeal from the Colonial Court, and has jurisdiction to stay the execution of the decree pending the appeal, the Court will not interfere by injunction, on the ground of error or irregularity in the decree of the Colonial Court.

Whether, in a case of error shewn in the judgment of the Court of a foreign country, from which there was no appeal to any of Her Majesty's Courts, the decision would be the same, *quære?*

The bill was filed in May 1843 by Bethel Henderson against Elizabeth Henderson, the widow of Jordan. Henderson, his deceased brother, and Charles Simms and Joanna, his wife, who was the daughter of Jordan; and also against J. Gadsden, the administrator of the estate of Jordan, in England; and it stated that William Henderson, a merchant in Bristol and Newfoundland, the father of the Plaintiff and Jordan Henderson, in 1808, admitted them into partnership with him, and in 1817 resigned all his interest in the trade to them: that the Plaintiff and Jordan carried on the business in partnership from 1817: that the share or interest in the partnership, which their father gave up to them, was worth £15,000 or thereabouts, and was continued in, and formed part of, the partnership of the Plaintiff and Jordan: that Jordan Henderson died in March 1830 intes- [101] -tate, leaving the Defendants, Elizabeth, his widow, Joanna (the wife of the Defendant, C. Simms), his daughter, and also leaving William, a son: that Elizabeth, the widow, obtained letters of administration of the estate of Jordan in Newfoundland, and, together with the Plaintiff, carried on the partnership business for the purpose of winding it up; but before that was done, a fire in the island in August 1832 destroyed the buildings and plant of the partnership, and all the books, except the ledgers; and that disputes then arose between the Plaintiff and Elizabeth, the widow.

The bill then set forth a petition presented in November 1832 by the Defendants, the widow and children of Jordan, to the Judges of the Supreme Court in Newfoundland, which alleged that William, the father, before his death, gave or bequeathed £1000 to or for the Petitioner, Joanna, and gave or bequeathed the rest of his estate between Bethel, the Plaintiff, and Jordan, his sons, equally: that Bethel was living with William, the father, at Bristol, and possessed himself of his estate: that Jordan died possessed of considerable real and personal estate in the partnership, both in England and Newfoundland: that Bethel had possessed himself of all such estate, as well as of the partnership books, and carried on trade therewith, and had drawn monies thereout: that he also refused to satisfy the Petitioners whether Jordan had left any will; and prayed that Bethel might be decreed by the Supreme Court to come to an account in respect of all and singular the premises; and that as well the estate of William, the father, as the estate of Jordan, might be applied in a course of administration.

The bill stated that no personal representative of William, the father, or of Jordan, was a party to the said proceeding in the Supreme Court: that Elizabeth, **[102]** the widow, presented another petition, dated the 8th of December 1832, not intituled in any cause to the said Judges, which alleged that, since administration of the estate of her husband had been granted to her, Bethel, the Plaintiff, had rendered her certain accounts of debts and assets in Newfoundland, but refused to account to her for the property of the deceased in England: that he was then about to leave the country, whereby the Petitioner would, in all probability, be prevented from bringing him to any account respecting the said estate, unless the Supreme Court should grant immediate process against him: that a brig, called "The Elizabeth," belonging to the intestate and Bethel equally, had, without the Petitioner's authority, been laden at Harbor Grace, by Bethel, principally on freight, under an engagement to sail on the 10th of December for Bristol: that the Petitioner had good reason to know that the monies of Jordan, in the possession of Bethel in England, amounted from £5000 to £8000: the Petitioner therefore prayed the writ of *ne exeat regno* , to restrain Bethel from departing out of the jurisdiction, and that he might be ordered to exhibit to the Court a full account of all the estate of Jordan come, to his

hands: that C. Simms, by **\*315** affidavit, intituled " *Elizabeth Henderson* v. *Bethel Henderson* ," deposed that Bethel was then justly indebted to Elizabeth, the widow, administratrix of the estate of Jordan, in the sum of £3100 sterling, exclusive of such further sum as he might be indebted to her on account of monies and property in England; and that he threatened to leave the island and go beyond sea, out of the jurisdiction of the Court, whereby the said debt would be lost or endangered, or the recovery thereof would be difficult.

The bill stated that an instrument purporting to be a writ of *ne exeat regno* , dated the 10th of December **[103]** 1832, was issued out of the Supreme Court, with a summons or *subpœna* , in the first-mentioned suit: that the Plaintiff, on the 22d of December, executed his bond, with two sureties, to the high sheriff of the island, in the sum of £6200, conditioned to be void if the Plaintiff should personally appear before the Court by the 10th of June then next, and render a full account of the estate of Jordan come to his hands, whether arising from the estate of William, the father, or otherwise; and also an account of the said partnership business, and answer and fulfil the orders and decrees of the Supreme Court touching the said estate, and also touching a certain bill, then filed, of Elizabeth Henderson and others, against the Plaintiff: that the Plaintiff then quitted the island and returned in 1834: that, on the 14th of June 1834, the Supreme Court ordered the bond to be put in suit, unless the Plaintiff should put in his answer to the first petition; and, in July 1834, the Plaintiff appeared in that suit by H. A. Emerson, Esq., Her Majesty's Solicitor-General in the island, who also prepared the Plaintiff's answer, which was sworn and filed on the 11th of July 1834, intituled in the first suit only.

The bill then stated the purport of the Plaintiff's answer: that exceptions were taken by the Petitioners, for that he had not set out an account of the partnership transactions, or of the estate of Jordan possessed by him; or whether William, the father, left any and what estate, for the use of Jordan or his family: that the Supreme Court ordered that the accounts prayed for in the first suit should be filed before the 25th of July, or that the bond should be assigned to the Petitioners to be put in suit: that the Plaintiff had, for several years, employed J. Fitzgerald, an accountant in the island, in keeping the accounts of the said business; and in order

that Fitzgerald might make out the accounts of the **[104]** partnership, the Plaintiff, on the 20th of July, delivered over to him the books and accounts of the business in England, and on the same day the Plaintiff quitted the island.

The bill then stated that Fitzgerald made out in distinct parts the accounts of the partnership from 1817 to the death of Jordan, and the subsequent accounts of the Plaintiff, and filed the same on the 4th of August 1834, and verified them by affidavit, as true extracts from the Plaintiff's books: the bill stated the balances appearing by the several accounts; the result of which was that £4500 and £883, 7s. 5d. were owing to the Plaintiff from the Newfoundland concern, and that a further sum of £2366, 15s. 4d. was owing to him from the estate of Jordan, in respect of transactions since his death; and a large sum was also owing to the Plaintiff as a private debt, in respect of advances he had made for the use of Jordan and his family.

The bill then set forth a letter received by the Plaintiff from his solicitor and counsel, H. A. Emerson, Esq., stating that delay had occurred in the report on the exceptions, owing to the answer having been mislaid by the Clerk of the Court, and adverting to what had been since done: that the Plaintiff received no further information respecting the suit, except that he had recently learnt that the Master, on the 26th of December 1835, reported the Plaintiff's answer to be sufficient, but that the accounts had been subsequently filed; and, upon the motion of the Plaintiff's counsel, the accounts were referred to the Master for his report: that the Petitioners excepted to the Master's report, and in January 1835 obtained an order discharging the order by which the accounts were referred to the Master: that no further proceedings were ever taken on the said peti- **[105]** -tion: that in 1836 the Plaintiff discharged H. A. Emerson, Esq., as his solicitor, and did not employ any other solicitor, and thenceforwards had no counsel or solicitor in the island, as all the Defendants and their solicitor well knew.

The bill then stated that in January 1837 the Defendants obtained a rule for leave to amend the first-mentioned petition or bill, no person being authorized by the Plaintiff, who was out of the jurisdiction, to oppose the same; that in May 1837 **\*316** the Defendants exhibited a bill in their own names (and in that of

William, the son, without his authority), addressed to the Judges of the Supreme Court. [The bill was then set forth: it charged the Plaintiff with having possessed the sum of £30,000 in respect of the estate of William, the father, impeached the partnership and other accounts put in by the Plaintiff in various specific points, and charged him with misappropriation and loss of the partnership property and estate since the death of Jordan, and calling for discovery on various subjects: and it prayed that the Plaintiff might account and pay to the Defendants their share of the alleged assets of William, the father, the partnership property which belonged to Jordan, the amount of the losses thereto by the carrying on of the trade since his death, and that they might be at liberty to inspect the original books of account of the Bristol trade.]

The bill stated that the summons or *subpœna* , requiring the Plaintiff to appear to the bill, was served on H. A. Emerson, Esq., on the pretence that as he had been the Plaintiff's solicitor and agent in the petitions, he was so in the said third suit: that a commission was issued by the Supreme Court to take the Plaintiff's answer, and that in October 1837 one of the persons named in the **[106]** commission communicated with the Plaintiff, then residing at Bristol, and required him to put in his answer, and lent the Plaintiff a copy of the bill, being the first intimation of the suit which he had received. The bill then stated that the pretended service and other proceedings were wholly irregular, contrary to the rules of the Supreme Court, which were set out, and also to the statute for the better administration of justice in Newfoundland (5 Geo. 4, c. 67): that the commission was returned with a declaration by the commissioners that the Plaintiff had not put in, and did not intend to put in, any answer.

The bill then stated that the Defendants (the Plaintiffs in the third suit) in December 1839 obtained a rule *nisi* to take their bill *pro confesso* against the Plaintiff, and served the same on H. A. Emerson, Esq., who, without authority, took upon himself to appear on the motion as the Plaintiff's counsel and solicitor, and on the 11th of February 1840 the Supreme Court ordered the last-mentioned bill to be taken *pro confesso* , and referred it to the Master to compute principal and interest due to the Defendants: that on the 18th of April 1840 the Master of the Supreme Court made a rule or order, addressed to H. A. Emerson, Esq., appointing the 23d

WESTLAW © 2017 Thomson Reuters.

of April to take the account: that the meeting was adjourned to the 30th of April, when the Defendants' solicitor put in an account, charging the Plaintiff with sums amounting to £17,054, 12s. 9d. in respect of the partnership transactions, and £15,000 in respect of the estate of William, the father, but allowing no credits whatever to the Plaintiff: that the Master made his report, dated the 6th of June 1840, and thereby, after stating that *he had not had any account between* Bethel and Jordan laid before him, he found that the **[107]** Defendant, Bethel, received from William, the father, some time previous to his death, which occurred in the year 1821, the sum of £30,000 sterling, in trust to pay one moiety thereof to Jordan; and that Jordan died intestate, in 1830, leaving the Plaintiff Elizabeth, his widow, and two children only, namely, Joanna (married to C. Simms) and William; and he found that of the said sum of £30,000 sterling, one moiety, or £15,000, together with interest thereupon, was then due to the widow and children of Jordan by the Defendant, Bethel, to be paid in the proportions thereinafter directed; and, upon the said sum of £15,000, he computed simple interest, from the 1st of January 1822, to the 1st of June 1840, at £4 per cent. per annum, which amounted to £11,650 sterling, making, with the principal, the sum of £26,650, which he thereby reported to be due and payable to the Plaintiffs by the Defendant, Bethel, in the following proportions, namely, the sum of £8883, 6s. 8d. to the Plaintiff, Elizabeth Henderson; a like sum to the Plaintiff, C. Simms and Joanna, his wife; and a like sum to the Plaintiff, William Henderson.

The bill stated that this report was filed on the 6th of June 1840: that an order *nisi* to confirm was served on H. A. Emerson, Esq., and that the same was confirmed absolutely on the 10th of June 1840: that the Defendants obtained an order for a final decree *nisi* , but the Judges of the Supreme Court directed that as H. A. Emerson, Esq., had withdrawn from the defence of the suit, the notice of motion for the final decree should be served on the Plaintiff personally: and that, if cause should not be shewn by the then next term, the final decree should be made: that no notice of such **\*317** motion was ever served upon the Plaintiff; but that in March 1841 the Plaintiff was served with a document purporting to be a *subpœna* to hear judgment; to which was **[108]** attached a notice, signed by the solicitor of the Defendants, "that the Master's report, filed on the 6th of June 1840," stood confirmed; that, on the affidavit of the service of the

said document, the Supreme Court, on the 6th of June 1841, made a decree. [The bill set forth the decree, which recited the various proceedings, as having been duly prosecuted; and ordered and decreed that Bethel, the Defendant therein named, should pay to Elizabeth, the widow, £8883, 6s. 8d. sterling; to C. Simms and Joanna, his wife, £8883, 6s. 8d., and to William, the son, £8883, 6s. 8d.; and that he should also pay to the Plaintiffs their costs of the suit.]

The bill then specified many of the statements recited in the decree, which it alleged were untrue; that the third bill was in fact an original, and not an amended, bill; and that there were various other irregularities in the proceedings; the bill alleged that in December 1841, before the Plaintiff had notice of the decree, the same was inrolled; that in August 1842 the Plaintiff was applied to, by the attorney of the Defendants, for payment of the said sum of £8883, 6s. 8d. to the Defendant Elizabeth, the widow, and the like sum to the Defendant, Simms, and Joanna, his wife, with £55 costs, which was the first notice he received of the final decree; and that the Defendants had lately brought two actions against the Plaintiff in the Queen's Bench to recover the said sums.

The bill charged that the decree was wholly irregular, and ought not to be enforced, and that the same ought to be reversed by Her Majesty in Council, on the Plaintiff's appealing against the said decree, which, notwithstanding the inrolment thereof, he intended to do; that there was no personal representative of Jordan Henderson, appointed in this country, party to any of the **[109]** proceedings; and that there was no personal representative whatever of William, the father, a party thereto; that none but a personal representative of Jordan Henderson was entitled to, or could give a discharge for, any part of his personal estate.

The bill alleged that the whole of the estate of William, the father, had consisted of the partnership property, given up by him to Jordan Henderson and the Plaintiff, his sons, and continued by them in the business, and that the Plaintiff was only accountable for the same with, and as part of, the other partnership assets; and, if the partnership accounts were properly taken, it would appear, and was the fact, that a very large sum of money was due and owing to the Plaintiff from the estate of Jordan, in respect of advances by the Plaintiff to

the concern, payments beyond his receipts, and money drawn out by Jordan, his widow and family; and that the estate of Jordan was also indebted to the Plaintiff in two sums of £547 and £538, in respect of monies which the Plaintiff had expended, at Jordan's request, in the education of his said children.

The bill prayed that an account might be taken of what was due to the Plaintiff from the estate of Jordan, and of the other debts of Jordan, and of his personal estate, and that the same might be applied in a due course of administration: that an account of the partnership transactions between the Plaintiff and Jordan might be also taken: that all necessary inquiries might be directed to ascertain the personal estate of William, the father; that so much, if any, of the said two sums of £8883, 6s. 8d. as might be found payable by the Plaintiff (he not admitting that any part thereof was so payable) might be applied and administered as part of the assets of Jordan: that the Defendants, Elizabeth, the widow, and Simms and **[110]** his wife, might be restrained by injunction from proceeding with the said or any other action to recover the said two sums of £8883, 6s. 8d.: and that a commission might be issued to examine witnesses in Newfoundland.

To this bill the Defendants, Elizabeth, the widow, and Simms and his wife, demurred for want of equity, want of parties and multifariousness..

Mr. Tinney, Mr. Burge and Mr. Rolt, for the demurrer.

Mr. Purvis and Mr. Bagshawe, for the bill.

The points submitted to the Court in argument will sufficiently appear from the judgment. The authorities cited were *Phillips* v. *Hunter* (2 H. Bl. 402), *Cottington's case* (2 Swans. 326, n.; Lord Nottingham's MS.), *White* v. *Hall* (12 Ves. 321), *Henley* v. *Soper* (8 B. & C. 16), *Fuller* v. *Willis* (1 Myl. & K. 292, n.), *Alivon* v. *Furnival* (1 *318 Cr. Mees. & Ros. 277), *Cowan* v. *Braidwood* (1 Man. & Grang. 882), *Becquet* v. *M'Carthy* (2 B. & Adol. 951), *Houlditch* v. *Marquis of Donegal* (8 Bligh (N. S.), 301), *Russell* v. *Smyth* (9 Mees. & W. 810), *Ferguson* v. *Mahon* (11 Ad. & Ell. 179), *Thompson* v. *Derham* (1 Hare, 358). Burge Com. Col. Law, vol. 3, p. 1058.

The Vice-Chancellor [Sir James Wigram]. The Plaintiff by his bill alleges that he and Jordan, his late brother,

were partners in business, one branch of which was carried on at Bristol and the other at Newfoundland: and that, in respect of that partnership, he is **[111]** a creditor to a large amount on the estate of Jordan; that part of the partnership property was derived from their father; and that all the property which they derived from their father formed part of the assets of the partnership. The Plaintiff also alleges that he is a creditor on the estate of Jordan, in respect of a private debt; and the bill prays such an account as would comprise all these matters which are in question between the Plaintiff and the estate of Jordan. Upon these facts a decree for an account against Gadsden, the personal representative of Jordan in England, would be of course, and perhaps also, if that had been the object of the suit, the decree for an account might have been extended to Elizabeth, the widow, as the personal representative of Jordan in Newfoundland. The widow of Jordan and Simms and his wife are, however, before the Court in the character of next of kin, and there is no pretence for making them parties in that character in a suit for the mere administration of the estate of Jordan. The relief sought against those parties is founded upon the proceedings which have taken place in the Court in Newfoundland, and the use which they are about to make of these proceedings in this country.

The Defendants, who have demurred, insist, in support of their demurrer, first, that all and every part of the matter in question on this bill was concluded by a final decree of the Supreme Court of Newfoundland, dated in June 1841, made in a suit wherein the Defendants and William, the son of Jordan, were Plaintiffs, and the present Plaintiff was Defendant, except in so far as that decree is subject to be reviewed in the Privy Council; secondly, that by that decree the amount recovered was decreed to be paid to the Plaintiffs in that suit as beneficial owners, and that the same thereby ceased to be part of the estate of Jordan, subject to his debts. They **[112]** insist, moreover, that the proceedings appear upon the bill with sufficient certainty to sustain the decree upon the grounds advanced; and that the only party against whom the Plaintiff can proceed to recover his claim, or any part of it, is the Defendant, Gadsden.

I have read the bill carefully, and, without going minutely through the facts of the case, it is sufficient to say, for the purpose of explaining the order I am about to make, that the original bill in the Supreme

Court of Newfoundland claimed an account of the same partnership dealings, of which accounts are prayed by the present bill; and also sought accounts in respect of the estate of William Henderson, the father, possessed by Bethel on account of Jordan; that the Defendant in that suit, who is the Plaintiff here, made claims by his answer to the original bill corresponding in substance with those which he makes by his bill in the present suit: that an amended bill, or a bill which the Court at least thought it right to term an amended bill, was afterwards filed by the same Plaintiffs against Bethel: that the amended bill stated and charged that Bethel was largely indebted to the estate of Jordan on the partnership accounts; but that such accounts could not be taken in consequence of Bethel absenting himself from the island and not producing the documents; and it further appears that, Bethel having absented himself from the jurisdiction, an order of the Supreme Court was made in February 1840 for taking the amended bill *pro confesso;* and that the amended bill was by the same order referred to the Master to compute principal and interest due to the Plaintiffs; and that the Master made his report in June 1840. [His Honor stated the report ( *supra* , pp. 106, 107).] It appears further that the Supreme Court pronounced its final **[113]** decree in June 1841, and thereby, after referring to all the antecedent proceedings in the cause, decreed that Bethel Henderson should pay to the widow and two children of Jordan, who were Plaintiffs, the sum of £8883, 6s. 8d. each, and costs of the suit.

This decree, explained by the report, has in effect severed William the father's estate from the bulk of the property in question, and the partnership accounts and **\*319** the private debt are not specifically the subject of adjudication. Upon this decree Elizabeth, the widow, and Joanna, the daughter of Jordan, and the husband of Joanna have brought their actions in this country.

The bill charges that the proceedings leading to this decree were irregular, that the decree itself was irregular, that a large balance was due to the Plaintiff, and that the decree ought not to be enforced, but ought to be reversed by Her Majesty in Council, on appeal, which the Plaintiff intends to bring. The bill specially alleges, as one ground of irregularity, that the report of the Master, of the 6th of June 1840, wholly omitted any notice of the account connected with the partnership, and is confined to the monies alleged to be due from the

Plaintiff, in respect of the estate of William Henderson, the father; and that a large sum of money is due to the Plaintiff on the partnership accounts, as would appear if they were properly taken. On behalf of the Defendants, it has been argued that the proceedings on the face of the bill shewed that the decree concluded the whole matter, that I could not rehear that decree, and that it was final and conclusive, unless reversed by the Privy Council, the proper appellate tribunal.

Without giving any opinion upon the question whether charges, shewing that the proceedings in a foreign **[114]** Court were altogether null and void, as being against natural justice, would or not, upon general demurrer, have been treated as null, and have sustained the bill as to the whole of the relief prayed, I have no doubt that mere irregularity in the proceedings is insufficient for that purpose, in a case in which an appeal lies from the Colonial Court to the mother country, and there is a tribunal competent to reform the errors of the Court below, and even to suspend the execution of the decree pending the appeal, if justice requires that it should be suspended. [1]

But as the Plaintiff in this case argued only that the whole question between the parties was not concluded by the decree, and did not contend that, upon the charges in the bill, I ought to disregard the decree, I assume, for the present purpose, that I must, upon this demurrer, consider the amount due from Bethel, in respect of William the father's estate, as concluded by the decree of the Supreme Court, subject only to the appeal to the Privy Council; and that the only question I have now to decide is whether I am to consider the partnership account and the claim of Bethel in respect of the private account as having been likewise the subject of adjudication by the Supreme Court in the island, or whether those items in the general account, which certainly might have been taken in that suit, are to be considered as excepted out of the operation of the decree, under the special circumstances appearing on the Master's report, and the other proceedings stated in the bill.

In trying this question I believe I state the rule of the **[115]** Court correctly when I say that, where a given matter becomes the subject of litigation in, and of adjudication by, a Court of competent jurisdiction, the Court requires the parties to that litigation to bring

forward their whole case, and will not (except under special circumstances) permit the same parties to open the same subject of litigation in respect of matter which might have been brought forward as part of the subject in contest, but which was not brought forward, only because they have, from negligence, inadvertence, or even accident, omitted part of their case. The plea of *res judicata* applies, except in special cases, not only to points upon which the Court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time. Those who have had occasion to investigate the subject of bills of review in this Court will not discover anything new in the proposition I have stated, so far as it may apply to proceedings in this country: and in an application to a Court of Equity in this country, for its aid against the effect of a proceeding by a Court of Equity in one of the colonies, I conceive it to be the duty of this Court to apply the same reasoning, at least in the absence of charges in the bill, shewing that a different principle ought to be applied. (See *Bentinck* v. *Willink* , 2 Hare, 1.) The observations of Lord Cottenham in the case of *The Marquis of Breadalbane* v. *The Marquis of Chandos* (2 Myl. & Cr. 732, 733) have **\*320** an important bearing upon this point. I may mention also the cases of *Farquharson* v. *Seton* (5 Russ. 45), *Partridge* v. *Usborne* ( *Id.* 195), and the judgment of Lord Eldon in *Chamley* v. *Lord Dunsany* (2 Sch. & Lef. 718), as shewing the general principle to which I have adverted. It is plain that litigation would be intermin- **[116]** -able if such a rule did not prevail. Now, undoubtedly the whole of the case made by this bill might have been adjudicated upon in the suit in Newfoundland, for it was of the very substance of the case there, and *primâ facie* , therefore, the whole is settled. The question then is whether the special circumstances appearing upon the face of this bill are sufficient to take the case out of the operation of the general rule.

Now, what are those circumstances? One circumstance relied upon was that, by the decree of the Colonial Court of the 11th of February 1840, the amended bill only was taken *pro confesso.* The amended bill, it appears, is not, as in this Court, the original bill amended and written upon, so that the amended bill

wholly supersedes and comes in the place of the original bill; but the amendments are upon a distinct record.

The bill in this cause charges that the last bill was in fact and substance an original bill, and addressed to different Judges, and that it was not an amended bill; this charge I might have been bound to take as a fact if the Plaintiff had not, by settling out the amended bill and the final decree, given me an opportunity of judging in what sense only the charge is true. I find that the amended bill proceeds upon and refers to the original bill, and to the answer of the Defendant thereto, and the final decree of the Court recites the whole of the proceedings anterior to the final decree, beginning with the original bill. It is impossible, therefore, to contend with effect that the amended bill, though in a sense distinct from the original bill, as being written upon other paper, leaving the first bill still on the record, was not a continuance of the pleadings in one and the same cause, and this, critically considered, is not inconsistent with the charge in the bill which I have just read.

**[117]** Another objection was the absence or the irregularity of service upon the Plaintiff. Although it is not necessary that I should go into the question respecting the notice, I ought not to disregard the fact that the Plaintiff represents that he had on different occasions actual notice of the suit, and of the relief which was sought against him by it, however irregularly that notice might have been communicated; and if the Plaintiff thought that he might safely disregard the proceedings, and abstain from interposing any defence, on the ground of their irregularity, I think I ought to consider him as having relied on the strength of his case for establishing that irregularity by a complaint in the same jurisdiction, or in the Court of Appeal, and not to have relied on being therefore able to set the decree of the Supreme Court at defiance, even while it remained unreversed.

I may here recur to the observation that the omission of the Master to take the partnership accounts is stated in the bill to be an error in the decree, forming one ground for appeal to the Privy Council.

The point upon which I have had most difficulty in satisfying myself is this: if the decree of the Supreme Court is conclusive upon one party it must, I conceive, be conclusive upon both; and, if not conclusive upon

both, it ought to be conclusive upon neither. Now the amended bill alleged that the Plaintiffs there were creditors upon the partnership account, but that the accounts of the partnership cannot be taken, owing to the manner in which the Defendant in that suit had acted. These allegations were established as facts, by the effect of the order for taking the bill *pro confesso;* and it appeared to me during the argument that the present Defendants (the Plaintiffs in Newfoundland) might have a **[118]** right to say that the accounts not taken by the Master were open for their benefit, by reason that it was the conduct of the Defendant alone which had prevented those accounts from being taken. But that, I think, is not a correct view of the case. The decree was to compute what was due to the Plaintiffs for principal and interest; that is, upon all the accounts in question in the pleadings, including the partnership and private account. The Plaintiffs were not compelled to take such a decree, but, having taken it, they are bound by the consequences, and must be taken to have waived any disadvantage to themselves which would result from it.

The conclusion to which I must come, in a case where relief is sought in this Court **\*321** in consequence of errors and irregularities in the decree of a Colonial Court, and an appeal lies from that decree to the appellate jurisdiction in this kingdom, is to allow the demurrer. I do not say that my conclusion would have been the same if the proceedings which were impeached had taken place in a foreign Court, from which there was no appeal to any superior jurisdiction which a Court of Equity in this country could regard as certain to administer justice in the case. I express no opinion on that point.

Demurrer allowed, with liberty to amend.

*Dec.* 18. The bill was not amended; and this day, on the motion of the Defendants, was ordered to be dismissed.

Footnotes

1  See stat. 3 & 4 Will. 4, c. 41, s. 21; and see also the Charter of Justice of Newfoundland, Clark's Summary of Colonial Law, pp. 433, 434.

67 E.R. 313

© 2017 Sweet & Maxwell

**End of Document**

© 2017 Thomson Reuters.

# TAB 34





# United Kingdom House of Lords Decisions



[New search] [Buy ICLR report: [1995] 2 AC 145] [Help]

JISCBAILII_CASE_CONTRACT
JISCBAILII_CASE_TORT

Parliamentary Archives,
HL/PO/JU/18/254

**Arbuthnott (and others) (Respondents) v. Fagan and Feltrim
Underwriting Agencies Limited (and others) (Appellants) and**

**two other actions (1st Appeal)**

**Arbuthnott (and others) (Respondents) v. Fagan and Feltrim
Underwriting Agencies Limited (and others) (Appellants) and**

**two other actions (2nd Appeal)**

**Deeny (and others) (Respondents) v. Gooda Walker Limited (In
Voluntary Liquidation) (and others) (Appellants)**

**(Conjoined Appeals)**

**Henderson (and others) (Respondents) v. Merrett Syndicates
Limited and others (Appellants) and two other actions**

JUDGMENT

Die Lunae 25° Julii 1994

Upon Report from the Appellate Committee to whom were
referred the Appeals Arbuthnott (and others) against Fagan and
Feltrim Underwriting Agencies Limited (and others) and two other
actions (two appeals), Deeny (and others) against Gooda Walker
Limited (and others) and Henderson (and others) against Merrett
Syndicates Limited and others and two other actions, That the
Committee had heard Counsel as well on Tuesday the 15th as on
Wednesday the 16th, Thursday the 17th, Tuesday the 22nd,
Wednesday the 23rd, Thursday the 24th and Monday the 28th days
of March last upon the Petitions and Appeals of the Defendants

listed in the Schedule to the Writs of Summons in Actions 1992
Folios 1856, 2423 and 3383; of Feltrim Underwriting Agencies
Limited of Friary Court, 65 Crutched Friars, London EC3N 2NP; of
the Defendant Members' Agents listed in Schedules 4 to 20, 22 to
48 and 50 to 69 of the re-amended Writ of Summons in Action 1993
Folio 335; and of Merrett Syndicates Limited and Merrett
Underwriting Agency Management Limited, both of Arthur Castle
House, 33 Creechurch Lane, London EC3A 5EB, praying that the
matter of the Orders set forth in the Schedules thereto, namely
Orders of Her Majesty's Court of Appeal of the 13th day of
December 1993, might be reviewed before Her Majesty the Queen
in Her Court of Parliament and that the said Orders might be
reversed, varied or altered or that the Petitioners might have
such other relief in the premises as to Her Majesty the Queen in
Her Court of Parliament might seem meet; as upon the cases of
Hugh Sinclair Arbuthnott and John Keithley Oxley Arbuthnott (and
the others listed in the first Schedules to the Writs of Summons
in Actions 1992 Folios 1856, 2423 and 3383); of Michael Eunan
McLarnon Deeny (and the others listed in Schedules 1 to 71 of the
Writ of Summons in Action 1993 Folio 335); and of Ian McIntosh
Henderson, William Hallam-Eames and Elise Heckman Hughes (and the
others listed in the Schedules to the Writs of Summons in Actions
1992 Folio 1496 and 1993 Folios 145 and 545) lodged in answer to
the said Appeals; and due consideration had this day of what was
offered on either side in this Cause:

Judgment: 25 July 1994

## HOUSE OF LORDS

*ARBUTHNOTT (AND OTHERS) (RESPONDENTS) v. PAGAN AND FELTRIM
UNDERWRITING AGENCIES LIMITED (AND OTHERS) (APPELLANTS)
AND TWO OTHER ACTIONS (1ST APPEAL)*

*ARBUTHNOTT (AND OTHERS) (RESPONDENTS) v. PAGAN AND FELTRIM
UNDERWRITING AGENCIES LIMITED (AND OTHERS) (APPELLANTS)
AND TWO OTHERS ACTIONS (2ND APPEAL)*

*DEENY (AND OTHERS) (RESPONDENTS) v. GOODA WALKER LIMITED
(IN VOLUNTARY LIQUIDATION) (AND OTHERS) (APPELLANTS)*

*(CONJOINED APPEALS)*

*HENDERSON (AND OTHERS) (RESPONDENTS) v. MERRETT SYNDICATES
LIMITED (AND OTHERS) (APPELLANTS) AND TWO OTHER ACTIONS*

Lord Keith of Kinkel
Lord Goff of Chieveley
Lord Browne-Wilkinson
Lord Mustill
Lord Nolan

## LORD KEITH OF KINKEL

My Lords.

For the reasons set out in the speech of my noble and learned friend Lord Goff of Chieveley. which I have read in draft and with which I agree, 1 would dismiss these appeals.

## LORD GOFF OF CHIEVELEY

My Lords.

<u>Introduction</u>

The appeals now before your Lordships' House arise out of a number
of actions brought by underwriting members (known as Names) of Lloyd's
against their underwriting agents, in an attempt to recoup at least part of the
great losses which they have suffered following upon recent catastrophic

- 1 -

events, mainly in the United States of America, which have led to
unprecedented claims being made upon Lloyd's underwriters.

The actions in question form part of a large number of actions of this
kind, which are now approaching trial in the Commercial Court. At the root
of many of these actions lie questions of law, upon the resolution of which
depends the nature of the legal responsibility which rested upon underwriting
agents towards the Names for whom they acted. Accordingly, with the co-
operation of the parties to the actions out of which the present appeals arise.
Saville J. ordered that certain issues of principle should be decided as
preliminary issues. Having heard argument upon these issues, he gave
judgment on 12 October 1993, his rulings being favourable to the contentions
advanced on behalf of the Names. On 13 December 1993, the Court of
Appeal unanimously affirmed the decision of Saville J., for the reasons given
by him. The matter now comes before your Lordships' House, with the leave
of the House; and the hearing of the appeals has been expedited, in the hope
that the fact that the appeals have come before the House will result in as little
disturbance as possible to the programme now established for the hearing of
the various Lloyd's actions in the Commercial Court.

It is necessary for me now to identify, and place in their context, the
various issues which fall for consideration on these appeals. But before I do
so, it is desirable that I should first set out certain basic facts about the

structure of Lloyd's, with special reference to the relationship between Names and their underwriting agents.

Every person who wishes to become a Name at Lloyd's and who is not himself or herself an underwriting agent must appoint an underwriting agent to act on his or her behalf, pursuant to an underwriting agency agreement. Underwriting agents may act in one of three different capacities.

1. They may be members' agents, who (broadly speaking) advise Names on their choice of Syndicates, place Names on the Syndicates chosen by them, and give general advice to them.

2. They may be managing agents, who underwrite contracts of insurance at Lloyd's on behalf of the Names who are members of the Syndicates under their management, and who reinsure contracts of insurance

and pay claims.

(3) They may be combined agents, who perform both the role of members' agents, and the role of managing agents in respect of the Syndicates under their management.

Until 1990, the practical position was as follows. Each Name entered into one or more underwriting agency agreements with an underwriting agent, which was either a members' agent or a combined agent. Each underwriting agency agreement governed the relationship between the Name and the

- 2 -

members' agent, or between the Name and the combined agent in so far as it acted as a members' agent. If however the Name became a member of a Syndicate which was managed by the combined agent, the agreement also governed the relationship between the Name and the combined agent acting in its capacity of managing agent. In such a case the Name was known as a direct Name. If however the Name became a member of a Syndicate which was managed by some other managing agent, the Name's underwriting agent (whether or not it was a combined agent) entered into a sub-agency Agreement under which it appointed the managing agent its sub-agent to act as such in relation to the Name. In such a case the Name was known as an Indirect Name.

Before 1 January 1987, no forms of underwriting agency or sub-agency agreements were prescribed at Lloyd's; but standard clauses were in common use, and forms of agreement used by underwriting agents were similar, if not identical. For the purposes of the first group of actions now under appeal (the Merrett actions), which were concerned with that period, specimen agreements were placed before Saville J. for use by him in respect of those actions. These are to be found annexed to his judgment. However, pursuant to the

Lloyd's Act 1982, Byelaw No. 4 of 1984 was made which prescribed forms of agency agreement and sub-agency agreement. These forms became compulsorily applicable as from 1 January 1987, and are the relevant forms in the other two groups of actions which are the subject of the present appeals, the Feltrim actions and the Gooda Walker actions. A subsequent Byelaw, No. 8 of 1988, prescribed new standard forms of agreement for use in 1990 and subsequent years of account. With these forms, which swept away the distinction between direct and indirect Names, your Lordships are not directly concerned in the present appeals.

I turn to the appeals now before your Lordships' House. These are (1) the Merrett Appeals, and (2) the conjoined Feltrim and Gooda Walker Appeals.

### (1) The Merrett Appeals.

The appellants in these appeals (referred to as "Merretts") are in fact Merrett Syndicates Ltd. ("MSL") and Merrett Underwriting Agency Management Ltd. ("MUAM"). Up to 1 January 1986, MSL was a combined agent. It was the Managing Agent of Syndicate 418/417, and was also a members' agent. From 1 January 1986, MUAM became the Managing Agent of Syndicate 418/417, and MSL operated solely as a members' agent. There are three groups of Merrett actions brought by Names who were members of Syndicate 418/417. In all three groups of actions, there are complaints of negligent closure of a year or years of account into subsequent years by reinsurance to close ("RITC"). In one of them, there is also a complaint as to the writing of certain contracts of insurance; and in this case there is also an issue of limitation.

- 3 -

### (2)(a) The Feltrim Appeals.

The appellants are (i) Feltrim Underwriting Agencies Ltd. ("Feltrim"), which acted as a managing agent only; and (ii) about 40 members' agents ("the Feltrim Members' Agents"), which are in fact unrelated to Feltrim. In the actions which are the subject of these appeals, Names who were members of Syndicates managed by Feltrim sue Feltrim as managing agents, and also sue the Feltrim members' agents as their members' agents. All the Names are indirect Names. The Names allege against Feltrim negligent underwriting during the years 1987-1989 arising out of their Syndicates' participation in the London Market Excess of Loss ("LMX") business, it being alleged that the underwriters assumed greatly excessive aggregate liabilities, and took out far too little reinsurance. The Feltrim members' agents are sued on the basis that they are contractually liable for the defaults of Feltrim as managing agents to whom the underwriting was delegated. There is no limitation issue.

### (2)(b) The Gooda Walker Appeals.

The appellants are 65 members' agents ("the Gooda Walker Members' Agents"), against which it is alleged by Names that they are contractually liable to the Names for failure by the managing agents of the Syndicates of which the Names were members, to which the Gooda Walker Members' Agents had delegated the function of underwriting, to exercise reasonable care and skill in relation to such underwriting.

It might have been expected that, in all three groups of appeals, there would be appeals by both the members' agents and the managing agents: and that in each case issues would arise whether there was liability on their part in contract, or in tort, or for breach of fiduciary duty. But that is not in fact the case. In the case of the Merrett Appeals, there is no issue before your Lordships between the Names and their members' agents acting as such. Except for one entirely distinct issue concerned with RITC, the appeals are concerned only with the issue of liability, either in tort or for breach of fiduciary duty, of Merretts as managing agents, whether to direct Names (where Merretts were combined agents) or to indirect Names. By way of contrast, in the Gooda Walker Appeals the Gooda Walker Managing Agents are not appealing to this House against the decision of the Court of Appeal, with the result that the ruling of the Court of Appeal that they owed a contractual duty to direct Names, and a duty of care in tort to indirect Names, will remain binding as between them and the Names in question. The only issue now before your Lordships on the Gooda Walker appeals arises in relation to the agency agreements entered into between Names and the Gooda Walker Members' Agents. So far as the Feltrim appeals are concerned, however, issues arise both as to Feltrim's liability as managing agents, viz. whether Feltrim owed a duty of care in tort, or as fiduciary, to the indirect Names who were members of the Feltrim Syndicates in the years 1987-1989, and as to the Feltrim Members' Agents' liability as such in relation to the

- 4 -

agency agreements entered into between them and Names, as in the Gooda Walker appeals.

In the result, the following issues have been identified as arising for the decision of your Lordships' House on these appeals:

Issue 1.

(A). Merrett Appeals. Liability of managing agents to Names under the forms of agreement in force before 1987.

(1) Duty of care - indirect Names. Did managing agents (who were not also members agents) owe indirect Names a duty under the pre-1985 Byelaw form of underwriting agency agreement to carry out their underwriting functions with reasonable care and skill for the 1979 to 1985 years of account

(a) Does the law of tort impose any duty upon managing agents not to cause purely economic loss to Names?

(b) Does the "absolute discretion" conferred upon managing agents under the pre-1985 Byelaw form of underwriting agency agreement preclude the implication of any duty other than duties to act honestly, rationally and

loyally?

(2) <u>Duty of care - direct Names.</u> Did Merretts as managing agents who were also members' agents owe direct Names a non-contractual duty under the pre-1985 Byelaw forms of underwriting agency agreement to carry put their underwriting functions with reasonable care and skill for the 1979 to 1985 years of account inclusive?

(3) <u>Fiduciary duty.</u> Did Merretts as managing agents (whether they were also members' agents or not) owe Names as fiduciary a duty to conduct the underwriting for the account of the Names with reasonable care and skill for the 1979 to 1985 years of account (inclusive) equivalent to the alleged duty of care in tort?

(B). <u>Feltrim Appeals. Liability of managing agents to names under the forms of agreement in force between 1987 and 1989.</u>

1. <u>Duty of care - indirect Names.</u> In tort Did Feltrim, a managing agent only, owe a duty of care in tort to the (indirect) Names on the Feltrim Syndicates to carry out the conduct and management of the underwriting business of the Feltrim Syndicates with reasonable care and skill at any material time between 1987 and 1989?

2. <u>Fiduciary duty.</u> As fiduciary Did Feltrim owe Names a fiduciary duty equivalent to a duty of care in tort as described above?

- 5 -

<u>Issue 2.</u>

<u>Feltrim and Gooda Walker Appeals. Liability of members' agents to Names under the forms of agreement in force during the period 1987 to 1989;-</u>

Whether, in relation to, and on the true construction of, agency agreements entered into between Names and members' agents in the standard form provided for by Lloyd's Byelaw No. 1 of 1985:

(1) It was a term of the said agency agreements that the actual underwriting would be carried on with reasonable care and skill, so that the members agents remained directly responsible to their Names for any failure

to exercise reasonable care and skill by the managing agents of any particular Syndicate to whom such underwriting had been delegated.

(2) There was a term of the said agreements that the members' agent was only required to exercise reasonable care and skill in relation to such activities and functions as members' agents by custom and practice actually perform for their Names personally.

(3) There was a direct contractual relationship of principal and agent between Names and the managing agents of Syndicates in which the Names participated.

Issue 3.

Merrett Appeals. Reinsurance to close.

Whether for Names who executed the new prescribed 1985 Byelaw form or underwriting agency agreement the contractual relationship between such Names for the 1985 underwriting year of account and their members' agents and between their members' agents and the managing agent in relation to the acceptance in about June 1987 by the Syndicate for the 1985 underwriting year of account of the reinsurance to close the 1984 underwriting year of account was governed by the 1985 Byelaw form of agreement or by the pre-1985 Byelaw form of agreement.

For the purpose of considering these various issues, I shall for convenience organise them a little differently, as will appear hereafter.

I Merrett and Feltrim Appeals.

A Duty of care - Liability of managing agents to Names (both direct and indirect Names) in tort.

(1) Introduction

- 6 -

I turn now to the tortious issues which arise in the Merrett and Feltrim appeals. The first issue, in the order in which they are stated, is concerned with the question whether managing agents, which were not also members' agents, owed to indirect Names a duty of care in tort to 'carry out their underwriting functions with .reasonable care and skill. The second issue is concerned with the question whether managing agents, which were also members' agents, owed such a duty to direct Names.

The first of these issues, relating to indirect Names, arises in both the Merrett appeals and the Feltrim appeals. However the issue in the Merrett

appeals arises in the context of the pre-1985 Byelaw forms of agency and sub-agency agreements, whereas that in the Feltrim appeals does so in the context of the forms of agreement prescribed under the 1985 byelaw. The second of these issues, relating to direct Names, arises only in the Merrett appeals, in the context of the pre-1985 Byelaw forms.

It is desirable that I should at once identify the reasons why Names in the Merrett and Feltrim actions are seeking to establish that there is a duty of care owed to them by managing agents in tort. First, the direct Names in the Merrett actions seek to hold the managing agents concurrently liable in contract and in tort. Where, as in the case of direct Names, the agents are combined agents, there can be no doubt that there is a contract between the Names and the agents, acting as managing agents, in respect of the underwriting carried out by the managing agents on behalf of the Names as members of the Syndicate or Syndicates under their management, the only question being as to the scope of the managing agents' contractual responsibility in this respect. Even so. in the Merrett actions. Names are concerned to establish the existence of a concurrent duty of care in tort, if only because there is a limitation issue in one of the actions, in which Names wish therefore to be able to take advantage of the more favourable date for the accrual of the cause of action in tort, as opposed to that in contract. Second, the indirect Names in both the Merrett and the Feltrim actions are seeking to establish the existence of a duty of care on the part of the managing agents in tort, no doubt primarily to establish a direct liability to them by the managing agents, but also, in the case of the Merrett actions, to take advantage of the more advantageous position on limitation. Your Lordships were informed that there is no limitation issue in the Feltrim actions.

I turn next to the forms of agreement which provide the contractual context for these issues. I have already recorded that, so far as the pre-1985 Byelaw forms are concerned, no form was prescribed, but those in use were substantially similar if not identical, and that specimen forms of agency and sub-agency agreement were agreed for the purposes of these preliminary issues and are scheduled to the judgment of Saville J. The most relevant provisions of the specimen forms are the following.

(1) <u>Agency Agreement</u>

- 7 -

" 1. The Agent shall act as the underwriting agent for the Name for the purposes of underwriting at Lloyd's for the account of the Name policies and contracts of insurance reinsurance and guarantee relating to all classes of insurance business which with the sanction of the Committee of Lloyd's may be transacted at Lloyd's by the Syndicate.

. . .

4. The Agent shall have full power and authority to appoint and
employ the Sub-Agent to carry on or manage the underwriting
and to delegate to or confer upon the Sub-Agent all or any of
the powers authorities discretions and rights given to the Agent
by this agreement.

. . .

6. (a) The Agent shall have the sole control and management
of the underwriting and absolute discretion as to the acceptance
of risks and settlement of claims whether such claims shall in
the opinion of the Agent be legally enforceable or not.

. . .

(d) The Name shall not in any way interfere with the exercise
of the aforesaid control or management or discretion.

        7. The following provisions shall apply concerning the
accounts of the underwriting:-

. . .

(e) The Syndicate account of any calendar year shall not be
closed before the expiration of the two calendar years next
following the calendar year in question and in order to close
the Syndicate account of any year the Agent may:-

        (i) re-insure all or any outstanding liabilities in such
        manner and by debiting such account with such sum as
        the Agent shall in the absolute discretion of the Agent
        think fit as a premium for reinsurance and crediting the
        reinsurance premium to the Syndicate account of the
        next succeeding year or

        (ii) re-insure all or any outstanding liabilities of such
        account into the account of any other year then
        remaining open or in any other manner which the Agent
        thinks fit or

        (iii) allow the whole or part of a Syndicate account of
        any year to remain open until its outstanding liabilities
        shall have run off

- 8 -

. . .

12.(a) The Agent may from time to time retain out of the profits of the underwriting which would otherwise be payable to the Name any moneys which the Agent may in the absolute discretion of the Agent (subject to any requirements prescribed by Lloyd's) think desirable to carry to reserve and such moneys may be placed on deposit at any bank or discount house of public or local authorities or building society or may be invested in such stocks funds shares or securities (including bearer securities) in any part of the world as the Agent may determine and the Agent shall not be responsible for any loss of principal or interest on such deposits or investments. Interest or dividends earned on any such deposits or investments shall be credited to the Name in respect to the Name's due proportion thereof."

(2) <u>Sub-Agency Agreement</u>

"2. The Sub-Agent agrees and is retained and authorised to act as Underwriting Sub-Agent for the Agent for the purpose of underwriting at Lloyd's in the Names and for the account of each of the Names policies and contracts of insurance reinsurance and guarantee relating to all classes of insurance business which with the sanction of the Committee of Lloyd's may be transacted as insurance business and of carrying on for each of the Names the business of Marine Underwriter at Lloyd's and the appointment of the Sub-Agent shall take effect in respect of each of the Names on and from the date specified in the second column of the Schedule hereto opposite the name of each of the Names.

. . .

5. The Agent delegates to the Sub-Agent the exercise of all such powers authorities discretions and rights conferred upon the Agent by the Underwriting Agency agreement as it may be in any way necessary for the Sub-Agent to have to enable the Sub-Agent or any underwriter or agent appointed by the Sub-Agent to carry on the underwriting for the Names and to close the accounts of the Names.

6. Subject to the provisions of clause 7 hereof the underwriting shall be conducted and the accounts thereof shall be kept and made up and the profits ascertained in such manner as the Sub-Agent may for the time being think fit and the Sub-Agent shall have the sole control and management of the

underwriting and sole discretion as to the acceptance of risks and the compromise or settlement of claims.

. . .

8. All questions relating to the investment of premiums and other monies not required for the current service of the underwriting and to the time and manner of paying over profits and the placing of sums to a reserve shall be decided by the Sub-Agent and subject as aforesaid the Sub-Agent shall pay over the profits of the underwriting to the Agent for distribution to the Names."

Turning to the forms of agency and sub-agency agreements prescribed by the 1985 Byelaw, I will set out the material provisions below when considering Issue 2, concerned with the liability of members' agents. These provisions will therefore be available for reference, and I do not propose to repeat them here.

In the result, in neither the specimen agreements nor the agreements prescribed by the 1985 Byelaw is there any express provision imposing on the agent a duty to exercise care and skill in the exercise of the relevant functions under the agreement: but I understand it not to be in dispute that a term to that effect must be implied into the agreements. It is against that background that the question falls to be considered whether a like obligation rested upon the managing agents in tort, so that the managing agents which were also members' agents owed such a duty of care in tort to direct Names, with the effect that the direct Names had alternative remedies, in contract and tort. against the managing agents; and whether managing agents which were not also members' agents owed such a duty of care in tort to indirect Names, so that the indirect Names had a remedy in tort against the managing agents, notwithstanding the existence of a contractual structure embracing indirect Names, members' agents and managing agents, under which such a duty was owed in contract by the managing agents to the members' agents, and by the members' agents to the indirect Names. Furthermore, the question also arises whether, under the pre-1985 forms of agreement, the absolute discretion as to the acceptance of risks (and settlement of claims) vested in agents under clause 6(a) of the agency agreement, and delegated by them to sub-agents (the managing agents) under clauses 5 and 6 of the sub-agency agreement, was effective to exclude any duty of care which might otherwise have been imposed upon the managing agents, either in contract or in tort.

Saville J. resolved all these issues in favour of the Names. He held that a duty of care was owed by managing agents in tort both to direct Names and to indirect Names, and that the existence of such a duty of care was not excluded by reason of the relevant contractual regime, whether under the pre-

1985 specimen agreements, or under the forms of agreement prescribed by the
1985 Byelaw. In particular, he held that the absolute discretion conferred on

- 10 -

the agent under clause 6(a) of the pre-1985 Byelaw specimen agency
agreement, and delegated to the managing agent under clauses 5 and 6 of the
related sub-agency agreement, did not exclude any such duty of care. On all
these points Saville J,'s decision was, as I have recorded, affirmed by the
Court of Appeal.

(2) The argument of the Managing Agents

        The main argument advanced by the managing agents against the
existence of a duty of care in tort was that the imposition of such a duty upon
them was inconsistent with the contractual relationship between the parties.
In the case of direct Names, where there was a direct contract between the
Names and the managing agents, the argument was that the contract legislated
exclusively for the relationship between the parties, and that a parallel duty of
care in tort was therefore excluded by the contract. In the case of indirect
Names, reliance was placed on the fact that there had been brought into
existence a contractual chain, between Name and members' agent, and
between members' agent and managing agent; and it was said that, by
structuring their contractual relationship in this way, the indirect Names and
the managing agents had deliberately excluded any direct responsibility,
including any tortious duty of care, to the indirect Names by the managing
agents. In particular, the argument ran. it was as a result not permissible for
the Names to pray in aid, for limitation purposes, the more favourable time
for accrual of a cause of action in tort. To do so, submitted the managing
agents, would deprive them of their contractual expectations, and would avoid
the policy of Parliament that there are different limitation regimes for contract
and tort.

        Such was the main argument advanced on behalf of the managing
agents. Moreover, as appears from my summary of it, the argument was not
precisely the same in the case of direct Names and indirect Names
respectively. However, in any event, I think it desirable first to consider the
principle upon which a duty of care in tort may in the present context be
imposed upon the managing agents, assuming that to impose such a duty
would not be inconsistent with the relevant contractual relationship. In
considering this principle, I bear in mind in particular the separate submission
of the managing agents that no such duty should be imposed, because the loss
claimed by the Names is purely economic loss. However the identification of
the principle is, in my opinion, relevant to the broader question of the impact
of the relevant contract or contracts.

(3) The governing principle

        Even so, I can take this fairly shortly. I turn immediately to the
decision of this House in *Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd.*

[1964] AC 465. There, as is of course well known, the question arose
whether bankers could be held liable in tort in respect of the gratuitous
provision of a negligently favourable reference for one of their customers,

- 11 -

when they knew or ought to have known that the plaintiff would rely on their
skill and judgment in furnishing the reference, and the plaintiff in fact relied
upon it and in consequence suffered financial loss. Your Lordships' House
held that, in principle, an action would lie in such circumstances in tort; but
that, in the particular case, a duty of care was negatived by a disclaimer of
responsibility under cover of which the reference was supplied.

The case has always been regarded as important in that it established
that, in certain circumstances, a duty of care may exist in respect of words as
well as deeds, and further that liability may arise in negligence in respect of
pure economic loss which is not parasitic upon physical damage. But, perhaps
more important for the future development of the law, and certainly more
relevant for the purposes of the present case, is the principle upon which the
decision was founded. The governing principles are perhaps now perceived
to be most clearly stated in the speeches of Lord Morris of Borth-y-Gest (with
whom Lord Hodson agreed) and of Lord Devlin. Lord Morris said, at
pp. 502-503):

> "My Lords, I consider that it follows and that it should now be
> regarded as settled that if someone possessed of a special skill
> undertakes, quite irrespective of contract, to apply that skill for the
> assistance of another person who relies upon such skill, a duty of care
> will arise. The fact that the service is to be given by means of or by
> the instrumentality of words can make no difference. Furthermore, if
> in a sphere in which a person is so placed that others could reasonably
> rely upon his judgment or his skill or upon his ability to make careful
> inquiry, a person takes it upon himself to give information or advice
> to, or allows his information or advice to be passed on to. another
> person who, as he knows or should know, will place reliance upon it.
> then a duty of care will arise.

Lord Devlin said, at p. 526:

> "The respondents in this case cannot deny that they were performing
> a service. Their sheet anchor is that they were performing it
> gratuitously and therefore no liability for its performance can arise.
> My Lords, in my opinion this is not the law. A promise given without
> consideration to perform a service cannot be enforced as a contract by
> the promisee; but if the service is in fact performed and done
> negligently, the promisee can recover in an action in tort."

He then cited a number of authorities, and continued, at pp. 528-529:

"I think, therefore, that there is ample authority to justify your Lordships in saying now that the categories of special relationships which may give rise to a duty to take care in word as well as in deed are not limited to contractual relationships or to relationships of fiduciary duty, but include also relationships which in the words of

- 12 -

Lord Shaw in *Norton v. Lord Ashburton* [1914] A.C. 932, 972 are 'equivalent to contract,' that is, where there is an assumption of responsibility in circumstances in which, but for the absence of consideration, there would be a contract. Where there is an express undertaking, an express warranty as distinct from mere representation, there can be little difficulty. The difficulty arises in discerning those cases in which the undertaking is to be implied. In this respect the absence of consideration is not irrelevant. Payment for information or advice is very good evidence that it is being relied upon and that the informer or adviser knows that it is. Where there is no consideration, it will be necessary to exercise greater care in distinguishing between social and professional relationships and between those which are of a contractual character and those which are not. It may often be material to consider whether the adviser is acting purely out of good nature or whether he is getting his reward in some indirect form. The service that a bank performs in giving a reference is not done simply out of a desire to assist commerce. It would discourage the customers of the bank if their deals fell through because the bank had refused to testify to their credit when it was good.

"I have had the advantage of reading all the opinions prepared by your Lordships and of studying the terms which your Lordships have framed by way of definition of the sort of relationship which gives rise to a responsibility towards those who act upon information or advice and so creates a duty "of care towards them. I do not understand any of your Lordships to hold that it is a responsibility imposed by law upon certain types of persons or in certain sons of situations. It is a responsibility that is voluntarily accepted or undertaken, either generally where a general relationship, such as that of solicitor and client or banker and customer, is created, or specifically in relation to a particular transaction."

He said, at pp. 531-532:

"Since the essence of the matter in the present case and in others of the same type is the acceptance of responsibility, I should like to guard against the imposition of restrictive terms notwithstanding that the essential condition is fulfilled. If a defendant says to a plaintiff: 'Let me do this for you: do not waste your money in employing a professional, I will do it for nothing and you can rely on me.' I do not think he could escape liability simply because he belonged to no

profession or calling, had no qualifications or special skill and did not hold himself out as having any. The relevance of these factors is to show the unlikelihood of a defendant in such circumstances assuming a legal responsibility, and as such they may often be decisive. But they are not theoretically conclusive and so cannot be the subject of definition. It would be unfortunate if they were. For it would mean that plaintiffs would seek to avoid the rigidity of the definition by

- 13 -

bringing the action in contract as in *De La Bere v. Pearson Ltd.* [1908] 1 K.B. 280 and setting up something that would do for consideration. That, to my mind, would be an undesirable development in the law; and the best way of avoiding it is to settle the law so that the presence'- or absence of consideration makes no difference."

From these statements, and from their application in *Hedley Byrne,* we can derive some understanding of the breadth of the principle underlying the case. We can see that it rests upon a relationship between the parties, which may be general or specific to the particular transaction, and which may or may not be contractual in nature. All of their Lordships spoke in terms of one party having assumed or undertaken a responsibility towards the other. On this point. Lord Devlin spoke in particularly clear terms in both passages from his speech which I have quoted above. Further, Lord Morris spoke of that party being possessed of a "special skill" which he undertakes to "apply for the assistance of another who relies upon such skill". But the facts of H*edley Byrne* itself, which was concerned with the liability of a banker to the recipient for negligence in the provision of a reference gratuitously supplied. show that the concept of a "special skill" must be understood broadly, certainly broadly enough to include special knowledge. Again, though *Hedley Byrne* was concerned with the provision of information and advice, the example given by Lord Devlin of the relationship between solicitor and client, and his and Lord Morris' statements of principle, show that the principle extends beyond the provision of information and advice to include the performance of other services. It follows, of course, that although, in the case of the provision of information and advice, reliance upon it by the other party will be necessary to establish a cause of action (because otherwise the negligence will have no causative effect), nevertheless there may be other circumstances in which there will be the necessary reliance to give rise to the application of the principle. In particular, as cases concerned with solicitor and client demonstrate, where the plaintiff entrusts the defendant with the conduct of his affairs, in general or in particular, he may be held to have relied on the defendant to exercise due skill and care in such conduct.

In subsequent cases concerned with liability under the *Hedley Byrne* principle in respect of negligent misstatements, the question has frequently arisen whether the plaintiff falls within the category of persons to whom the

maker of the statement owes a duty of care. In seeking to contain that category of persons within reasonable bounds, there has been some tendency on the part of the courts to criticise the concept of "assumption of responsibility" as being "unlikely to be a helpful or realistic test in most cases" (see *Smith v. Eric S. Bush* [1990] 1 AC 831, 864-865, *per* Lord Griffiths: and see also *Caparo Industries Plc v. Dickman* [1990] 2 AC 605, 628. *per* Lord Roskill). However, at least in cases such as the present, in which the same problem does not arise, there seems to be no reason why recourse should not be had to the concept, which appears after all to have been adopted, in one form or another, by all of their Lordships in *Medley*

- 14 -

*Byrne* [1964] AC 465 (see, e.g., Lord Reid at pp. 483, 486 and 487; Lord Morris (with whom Lord Hodson agreed) at p. 494; Lord Devlin at pp. 529 and 531; and Lord Pearce at p. 538). Furthermore, especially in a context concerned with a liability which may arise under a contract or in a situation "equivalent to contract", it must be expected that an objective test will be applied when asking the question whether, in a particular case, responsibility should be held to have been assumed by the defendant to the plaintiff: see *Caparo Industries Plc v. Dickman* [1990] 2 AC 605, 637, *per* Lord Oliver of Aylmerton. In addition, the concept provides its own explanation why there is no problem in cases of this kind about liability for pure economic loss; for if a person assumes responsibility to another in respect of certain services, there is no reason why he should not be liable in damages for that other in respect of economic loss which flows from the negligent performance of those services. It follows that, once the case is identified as falling within the *Hedley Byrne* principle, there should be no need to embark upon any further enquiry whether it is "fair, just and reasonable" to impose liability for economic loss - a point which is, I consider, of some importance in the present case. The concept indicates too that in some circumstances, for example where the undertaking to furnish the relevant service is given on an informal occasion, there may be no assumption of responsibility; and likewise that an assumption of responsibility may be negatived by an appropriate disclaimer. I wish to add in parenthesis that, as Oliver J. recognised in *Midland Bank Trust Co. Ltd. v. Hett, Stubbs & Kemp* [1979] Ch. 384, 416F-G. (a case concerned with concurrent liability of solicitors in tort and contract, to which I will have to refer in a moment) an assumption of responsibility by, for example, a professional man may give rise to liability in respect of negligent omissions as much as negligent acts of commission, as for example when a solicitor assumes responsibility for business on behalf of his client and omits to take a certain step, such as the service of a document, which falls within the responsibility so assumed by him.

(4) The application of the principle to managing agents at Lloyds

Since it has been submitted on behalf of the managing agents that no liability should attach to them in negligence in the present case because the only damage suffered by the Names consists of pure economic loss, the

question arises whether the principle in *Hedley Byrne* is capable of applying in the case of underwriting agents at Lloyds who are managing agents. Like Saville J. and the Court of Appeal, I have no difficulty in concluding that the principle is indeed capable of such application. The principle has been expressly applied to a number of different categories of person who perform services of a professional or quasi-professional nature, such as bankers (in *Hedley Byrne* itself); solicitors (as foreshadowed by Lord Devlin in *Hedley Byrne,* and as held in the leading case of *Midland Bank Trust Co. Ltd v. Hett, Stubbs & Kemp* [1979] Ch. 384, and other cases in which that authority has been followed); surveyors and valuers (as in *Smith v. Eric S. Bush* [1990] 1 A.C. 831); and accountants (as in *Caparo Industries Plc. v. Dickman* [1990]

- 15 -

2 A.C. 605). Another category of persons to whom the principle has been applied, and on which particular reliance was placed by the Names in the courts below and in argument before your Lordships, is insurance brokers. As Phillips J. pointed out in *Youell v. Bland Welch & Co. Ltd. (The-Superhulls Cover Case No.* 2) [1990] 2 Lloyd's Rep. 431, 459, it has been accepted, since before 1964, that an insurance broker owes a duty of care in negligence towards his client, whether the broker is bound by contract or not. Furthermore, in *Punjab National Bank v. DeBoinville* [1992] 1 Lloyd's Rep. 7 it was held by the Court of Appeal, affirming the decision of Hobhouse J., that a duty of care was owed by an insurance broker not only to his client but also to a specific person whom he knew was to become an assignee of the policy. For my part I can see no reason why a duty of care should not likewise be owed by managing agents at Lloyds to a Name who is a member of a Syndicate under the management of the agents. Indeed, as Saville J. and the Court of Appeal both thought, the relationship between Name and managing agent appears to provide a classic example of the type of relationship to which the principle in *Hedley Byrne* applies. In so saying, I put on one side the question of the impact, if any, upon the relationship of the contractual context in which it is set. But, that apart, there is in my opinion plainly an assumption of responsibility in the relevant sense by the managing agents towards the Names in their Syndicates. The managing agents have accepted the Names as members of a Syndicate under their management. They obviously hold themselves out as possessing a special expertise to advise the Names on the suitability of risks to be underwritten; and on the circumstances in which, and the extent to which, reinsurance should be taken out and claims should be settled. The Names, as the managing agents well knew, placed implicit reliance on that expertise, in that they gave authority to the managing agents to bind them to contracts of insurance and reinsurance and to the settlement of claims. I can see no escape from the conclusion that. in these circumstances, prima facie a duty of care is owed in tort by the managing agents to such Names. To me, it does not matter if one proceeds by way of analogy from the categories of relationship already recognised as falling within the principle in *Hedley Byrne* or by a straight application of the principle stated in the *Hedley Byrne* case [1964] AC 465 itself. On either

basis the conclusion is, in my opinion, clear. Furthermore, since the duty
rests on the principle in *Hedley Byrne,* no problem arises from the fact that
the loss suffered by the Names is pure economic loss.

This conclusion is, however, subject to the impact, if any, of the
contractual context. In argument before your Lordships this was regarded as
constituting the main basis for the managing agents' challenge to the
conclusion on this point of the courts below. To this point I must therefore
turn: but before I do so I propose to consider briefly, if only to put it on one
side, the question whether, under the pre-1985 forms of agreement, a duty of
care on the part of the managing agents was excluded by the absolute
discretion vested in them under their contract with the direct Names, or with
the members' agents in cases involving indirect Names.

- 16 -

(5) Absolute Discretion

I can deal with this point briefly because, like the Court of Appeal, I
agree with Saville J. that there is no substance in it. It was the submission of
the managing agents in the Merrett appeals before your Lordships, as it had
been before Saville J., that there was an unbroken line of authority supporting
the proposition that the expression "absolute discretion" in the context of a
private law agreement meant that the exercise of the power given by the
agreement to the recipient of the power cannot be challenged by the donor or
beneficiary of the power unless (a) the exercise of the power is in bad faith,
or (b) (arguably) the exercise of the power is totally unreasonable. It
followed, so the argument ran, that a duty to exercise due skill or care,
whether contractual or extra-contractual, was inconsistent with the bargain
and so must be excluded. However, it appears to me, as it did to the judge,
that in the present context the words used cannot have the effect of excluding
a duty of care, contractual or otherwise. Clear words are required to exclude
liability in negligence; and in the present case the words can, and in my
opinion should, be directed towards the scope of the agents' authority. No
doubt the result is that very wide authority has been vested in the agents; but
the suggestion that the agent should as a result be under no duty to exercise
due skill and care in the exercise of his function under the agreement is, in the
present context, most surprising. I am content to adopt the following passage
from the judgment of Saville J. as my own:

"As I have said in other cases, Lloyd's could not exist as an insurance
and reinsurance market unless the business is conducted by
professionals who must be given the widest possible powers to act on
behalf of the Names. Thus the underwriting agency agreement makes
absolutely clear that the Name must leave it exclusively to the
underwriting agents actually to run the business. The standard of
behaviour to be expected of the underwriting agents in carrying out
this task is an entirely different matter. The underwriting agency
agreement contains no express provisions in this regard, but I do not

find this in the least surprising, since it seems to me literally to go without saying that the underwriting agents must act with reasonable care and skill in exercising their authority and carrying on the underwriting business on behalf of the Name. The very fact that the agents are given the widest possible authority to act on behalf of the Name, together with the fact that the Name's potential liability for the actions of the agents is unlimited and the further fact that the agents receive remuneration for exercising their professional skills on behalf of the Name, seem to me to point irresistibly to the conclusion that in such a relationship the law does (as a matter of common sense it should) impose a duty of reasonable care and skill upon the underwriting agents of the kind alleged by the Names, which could only be modified or excluded by clear agreement between the parties. I can find nothing in the underwriting agency agreement which indicates that this duty (the ordinary one owed by any professional

- 17 -

person) is in any way modified or excluded in the present cases, nor to my mind is there anything of relevance in this context in the sub-agency agreement."

For these reasons I am, like both courts below, unable to accept the managing agents' argument on this point. With this point out of the way I can turn to the main argument on this part of the case, relating to the impact of the contractual context.

(6) <u>The impact of the contractual context.</u>

All systems of law which recognise a law of contract and a law of tort (or delict) have to solve the problem of the possibility of concurrent claims arising from breach of duty under the two rubrics of the law. Although there are variants, broadly speaking two possible solutions present themselves: either to insist that the claimant should pursue his remedy in contract alone. or to allow him to choose which remedy he prefers. As my noble and learned friend Lord Mustill and I have good reason to know (see *J. Bracconot et Cie v. Compagnie des Messageries Maritimes (The Sindh)* [1975] 1 Lloyd's Rep. 372). France has adopted the former solution in its doctrine of non cumul. under which the concurrence of claims in contract and tort is outlawed (see Tony Weir in XI Int. Encycl. Comp. L., ch. 12. paras. 47-72, at para. 52). The reasons given for this conclusion are (1) respect for the will of the legislator, and (2) respect for the will of the parties to the contract (see: para. 53). The former does not concern us; but the latter is of vital importance. It is however open to various interpretations. For such a policy does not necessarily require the total rejection of concurrence, but only so far" as a concurrent remedy in tort is inconsistent with the terms of the contract. It comes therefore as no surprise to learn that the French doctrine is not followed in all civil law jurisdictions, and that concurrent remedies in tort and contract are permitted in other civil law countries, notably Germany

(see: para. 58). I only pause to observe that it appears to be accepted that no perceptible harm has come to the German system from admitting concurrent claims.

The situation in common law countries, including of course England. is exceptional, in that the common law grew up within a procedural framework uninfluenced by Roman law. The law was categorised by reference to the forms of action, and it was not until the abolition of the forms of action by the Common Law Procedure Act 1852 that it became necessary to reclassify the law in substantive terms. The result was that common lawyers did at last segregate our law of obligations into contract and tort, though in so doing they relegated quasi-contractual claims to the status of an appendix to the law of contract, thereby postponing by a century or so the development of a law of restitution. Even then, there was no systematic reconsideration of the problem of concurrent claims in contract and tort. We can see the courts rather grappling with unpromising material drawn from the old cases in which liability in negligence derived largely from categories based

- 18 -

upon the status of the defendant. In a sense, we must not be surprised: for no significant law faculties were established at our universities until the late 19th century, and so until then there was no academic opinion available to guide or stimulate the judges. Even so, it is a remarkable fact-mat there was little consideration of the problem of concurrent remedies in our academic literature until the second half of the 20th century, though in recent years the subject has attracted considerable attention.

In the result, the courts in this country have until recently grappled with the problem very largely without the assistance of systematic academic study. At first, as is shown in particular by cases concerned with liability for solicitors' negligence, the courts adopted something very like the French solution, holding that a claim against a solicitor for negligence must be pursued in contract, and not in tort (see, e.g., *Bean v. Wade* (1885) 2 T.L.R. 157): and in *Groom v. Crocker* [1939] 1 K.B. 194, this approach was firmly adopted. It has to be said, however, that decisions such as these, though based on prior authority, were supported by only a slender citation of cases, none of great weight; and the jurisprudential basis of the doctrine so adopted cannot be said to have been explored in any depth. Furthermore when, in *Bagot v. Stevens Scanlan & Co. Ltd.* [1966] 1 Q.B. 197. Diplock L.J. adopted a similar approach in the case of a claim against a firm of architects, he felt compelled to recognise (pp. 204-205) that a different conclusion might be reached in cases "... where the law in the old days recognised either something in the nature of a status like a public calling (such as common carrier, common innkeeper, or a bailor and bailee) or the status of master and servant". To this list must be added cases concerned with claims against doctors and dentists. I must confess to finding it startling that, in the second half of the 20th century, a problem of considerable practical importance

should fall to be solved by reference to such an outmoded form of categorisation as this.

I think it is desirable to stress at this stage that the question of concurrent liability is by no means only of academic significance. Practical issues, which can be of great importance to the parties, are at stake. Foremost among these is perhaps the question of limitation of actions. If concurrent liability in tort is not recognised, a claimant may find his claim barred at a time when he is unaware of its existence. This must moreover be a real possibility in the case of claims against professional men. such as solicitors or architects, since the consequences of their negligence may well not come to light until long after the lapse of six years from the date when the relevant breach of contract occurred. Moreover the benefits of the Latent Damage Act 1986, under which the time of the accrual of the cause of action may be postponed until after the plaintiff has the relevant knowledge, are limited to actions in tortious negligence. This leads to the startling possibility that a client who has had the benefit of gratuitous advice from his solicitor may in this respect be better off than a client who has paid a fee. Other practical problems arise, for example, from the absence of a right to contribution between negligent contract-breakers; from the rules as to

- 19 -

remoteness of damage, which are less restricted in tort than they are in contract; and from the availability of the opportunity to obtain leave to serve proceedings out of the jurisdiction. It can of course be argued that the principle established in respect of concurrent liability in contract and tort should not be tailored to mitigate the adventitious effects of rules of law such

as these, and that one way of solving such problems would no doubt be 'to rephrase such incidental rules as have to remain in terms of the nature of the harm suffered rather than the nature of the liability asserted' (see Tony Weir, XI Int. Encycl. Comp. L. ch.12., para. 72). But this is perhaps crying for the moon; and with the law in its present form, practical considerations of this kind cannot sensibly be ignored.

Moreover I myself perceive at work in these decisions not only the influence of the dead hand of history, but also what I have elsewhere called the temptation of elegance. Mr. Tony Weir (XI Int. Encycl. Comp. L. ch. 12., para. 55) has extolled the French solution for its elegance; and we can discern the same impulse behind the much-quoted observation of Lord Scarman when delivering the judgment of the Judicial Committee of the Privy Council in *Tai Hing Cotton Mill Ltd. v. Liu Chong Hing Bank Ltd.* [1986] A. C. 90. 107 B-D:

Their Lordships do not believe that there is anything to the advantage of the law's development in searching for a liability in tort where the parties are in a contractual relationship. This is particularly so in a commercial relationship. Though it is possible as a matter of legal

semantics to conduct an analysis of the rights and duties inherent in some contractual relationships including that of banker and customer either as a matter of contract law when the question will be what, if any, terms are to be implied or as a matter of tort law when the task will be to identity a duty arising from the proximity and character of the relationship between the parties, their Lordships believe it to be correct in principle and necessary for the avoidance of confusion in the law to adhere to the contractual analysis: on principle because it is a relationship in which the parties have, subject to a few exceptions, the right to determine their obligations to each other, and for the avoidance of confusion because different consequences do follow according to whether liability arises from contract or tort, e.g. in the limitation of action."

It is however right to stress, as did Sir Thomas Bingham M.R. in the present case, that the issue in *Tai Hing* was whether a tortious duty of care could be established which was more extensive than that which was provided for under the relevant contract.

At all events, even before *Tai Hing* we can see the beginning of the redirection of the common law away from the contractual solution adopted in *Groom v. Crocker* [1939] 1 K.B. 194, towards the recognition of concurrent remedies in contract and tort. First, and most important, in 1963 came the

- 20 -

decision of your Lordships' House in *Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd.,* reported in [19641 A.C. 465. I have already expressed the opinion that the fundamental importance of this case rests in the establishment of the principle upon which liability may arise in tortious negligence in respect of services (including advice) which are rendered for another, gratuitously or otherwise, but are negligently performed - viz., an assumption of responsibility coupled with reliance by the plaintiff which, in all the circumstances, makes it appropriate that a remedy in law should be available for such negligence. For immediate purposes, the relevance of the principle lies in the fact that, as a matter of logic, it is capable of application not only where the services are rendered gratuitously, but also where they are rendered under a contract. Furthermore we can see in the principle an acceptable basis for liability in negligence in cases which in the past have been seen to rest upon the now outmoded concept of status. In this context, it is of particular relevance to refer to the opinion expressed both implicitly by Lord Morris of Borth-y-Gest (with whom Lord Hodson agreed) and expressly by Lord Devlin that the principle applies to the relationship of solicitor and client, which is nearly always contractual: see [1964] AC 465, 497-499 (where Lord Morris approved the reasoning of Chitty J. in *Cann v. Willson* (1888) 39 Ch.D. 39), and p. 529 (per Lord Devlin).

The decision in *Hedley Byrne,* and the statement of general principle in that case, provided the opportunity to reconsider the question of concurrent

liability in contract and tort afresh, untrammelled by the ancient learning based upon a classification of defendants in terms of status which drew distinctions difficult to accept in modern conditions. At first that opportunity was not taken. *Groom v. Crocker* [1939] 1 K.B. 194 "was followed by the Court of Appeal in *Cook v. Swinfen* [1967] 1 W.L.R. 457. and again in *Heywood v. Wellers* [1976] QB 446: though in the latter case Lord Denning M.R. (at p. 459) was beginning to show signs of dissatisfaction with the contractual test accepted in *Groom v. Crocker* a dissatisfaction which crystallised into a change of heart in *Esso Petroleum Co. Ltd. v. Mardon* [1976] QB 801. That case was concerned with statements made by employees of Esso in the course of pre-contractual negotiations with Mr. Mardon, the prospective tenant of a petrol station. The statements related to the potential throughput of the station. Mr. Mardon was persuaded by the statements to enter into the tenancy; but he suffered serious loss when the actual throughput proved to be much lower than had been predicted. The Court of Appeal held that Mr. Mardon was entitled to recover damages from Esso, on the basis of either breach of warranty or (on this point affirming the decision of the judge below) negligent misrepresentation. In rejecting an argument that Esso's liability could only be contractual. Lord Denning M.R. dismissed *Groom v. Crocker [* [1939] 1 K.B. 194 and *Bagot v. Stevens Scanlan Co. Ltd.* [1966] 1 Q.B. 197 as inconsistent with other decisions of high authority, viz. *Boorman v. Brown* (1842) 3 Q.B. 511. 525-526 per Tindal C.J., and (1844) 11 Cl. & Fin. 1, 44 per Lord Campbell: *Lister v. Romford Ice and Cold Storage Co. Ltd.* [1957] AC 555, 587 per Lord Radcliffe;

- 21 -

*Matthews v. Kuwait Bechtel Corporation* [1959] 2 Q.B. 57; and *Nocton v. Lord Ashbunon* [1914] A.C. 932, 956, per Viscount Haldane L.C. He then held that, in addition to its liability in contract, Esso was also liable in negligence. The other members of the Court of Appeal. Ormrod and Shaw L.JJ., agreed that Mr. Mardon was entitled to recover damages either for breach of warranty or for negligent misrepresentation, though neither expressed any view about the status of *Groom v. Crocker* [1939] 1 K.B. 194. It was however implicit in their decision that, as Lord Denning held, concurrent remedies were available to Mr. Mardon in contract and tort. For present purposes, I do not find it necessary to comment on the authorities relied upon by Lord Denning as relieving him from the obligation to follow *Groom v. Crocker,* though I feel driven to comment that the judgments in *Esso Petroleum Co. Ltd. v. Mardon* [1976] QB 801 reveal no analysis in depth of the basis upon which concurrent liability rests. That case was however followed by the Court of Appeal in *Batty v. Metropolitan Property Realisations Ltd.* [1978] Q.B. 554, in which concurrent remedies in contract and tort were again allowed.

The requisite analysis is however to be found in the judgment of Oliver J. in *Midland Bank Trust Co. Ltd. v. Hett, Stubbs & Kemp* [1979] Ch. 384. in which he held that a solicitor could be liable to his client for negligence either in contract or in tort, with the effect that in the case before him it was

open to the client to take advantage of the more favourable date of accrual of the cause of action for the purposes of limitation. In that case, Oliver J. was much concerned with the question whether it was open to him, as a judge of first instance, to depart from the decision of the Court of Appeal in *Groom v. Crocker* [1939] 1 K.B. 194. For that purpose, he carried out a most careful examination of the relevant authorities, both before and after *Groom r. Crocker,* and concluded that he was free to depart from the decision in that case, which he elected to do.

It is impossible for me to do justice to the reasoning of Oliver J.. for which I wish to express my respectful admiration, without unduly prolonging what is inevitably a very long opinion. I shall therefore confine myself to extracting certain salient features. First, from his study of the cases before *Groom v. Crocker,* he found no unanimity of view that the solicitor's liability was regarded as exclusively contractual. Some cases (such as *Howell v. Young* (1826) 5 B.& C. 259) he regarded as equivocal. In others, he understood the judges to regard contract and tort as providing alternative causes of action (see *In re Manby and Hawksford* (1856) 26 L.J.Ch. 313, 317, and *Sawyer v. Goodwin* (1867) 36 L.J.Ch. 578, 582, in both cases per Stuart V.-C., and most notably *Nocton v. Lord Ashburton* [1914] A.C. 932, 956. per Viscount Haldane L.C.). However *Bean v. Wade* (1885) 2 T.L.R. 157, briefly reported in the Times Law Reports and by no means extensively referred to, provided Court of Appeal authority that the remedy was exclusively contractual; and it was that case which was principally relied upon by the Court of Appeal in *Groom v. Crocker* [1939] 1 K.B. 194 when

- 22 -

reaching the same conclusion. Oliver J. put on one side those cases, decided for the purpose of section 11 of the County Courts Act 1915. under which a different statutory test had to be complied with, viz. whether the action was one "founded on a contract" or "founded on a tort".

It is evident that the early authorities did not play a very significant part in Oliver J.'s decision (see [1979] Ch. 384, 411 C-D). He loyally regarded *Groom v. Crocker* as prima facie binding upon him. His main concern was with the impact of the decision of this House in *Hedley Byrne* [1964] AC 465, and of subsequent cases in the Court of Appeal in which *Hedley Byrne* had been applied. As he read the speeches in *Hedley Byrne,* the principle there stated was not limited to circumstances in which the responsibility of the defendant had been gratuitously assumed. He referred in particular to the statement of principle by Lord Morris of Borth-y-Gest at pp. 502-503. which I have already quoted, and said, at p. 411 E-F:

> "The principle was stated by Lord Morris of Borth-y-Gest as a perfectly general one and it is difficult to see why it should be excluded by the fact that the relationship of dependence and reliance between the parties is a contractual one rather than one gratuitously

assumed, in the absence, of course, of contractual terms excluding or restricting the general duties which the law implies."

Oliver J. went on (p. 412) to quote from the dissenting judgment of Denning L.J. in *Candler v. Crane Christmas & Co.* [1951] 1 K.B. 164. 179-180 (a passage approved by Lord Pearce in *Hedley Byrne* [1964] AC 465. 538) and said, at p. 413 B-D:

> "Now, in that passage, I think that it is abundantly clear that Denning L.J. was seeking to enunciate a general principle of liability arising from the relationship created by the assumption of a particular work or responsibility, quite regardless of how the relationship arose

> . . .

> "The inquiry upon which the court is to embark is 'what is the relationship between the plaintiff and defendant?' not 'how did the relationship, if any, arise' That this is so appears. I think, with complete clarity from subsequent cases."

Later he said, at p. 415:

> "The matter becomes, in my judgment, even clearer when one looks at the speech of Lord Devlin in the *Hedley Byrne* case [1964] A.C. 465, for he treats the existence of a contractual relationship as very good evidence of the general tortious duty which he is there discussing. He said, at pp. 528-529:

- 23 -

> > 'I think, therefore, that there is ample authority to justify your Lordships in saying now that the categories of special relationships which may give rise to a duty to take care in word as well as in deed are not limited to contractual relationships or to relationships of fiduciary duty, but include also relationships which in the words of Lord Shaw in *Nocton v. Lord Ashburton* [1914] A.C. 932, 972, are 'equivalent to contract', that is, where there is an assumption of responsibility in circumstances in which, but for the absence of consideration, there would be a contract . . .'

He expressed his conclusion concerning the impact of *Hedley Byrne* on the case before him in the following words, at p. 417 A-C:

> The case of a layman consulting a solicitor for advice seems to me to be as typical a case as one could find of the sort of relationship in which the duty of care described in the *Hedley Byrne* case [1964] A.C. 465 exists: and if I am free to do so in the instant case. I would,

therefore, hold that the relationship of solicitor and client gave rise to
a duty in the defendants under the general law to exercise that care and
skill upon which they must have known perfectly well that their client
relied. To put it another way, their common law duty was not to
injure their client by failing to do that which they had undertaken to
do and which, at their invitation, he relied upon them to do. That duty
was broken, but no cause of action in tort arose until the damage
occurred; and none did occur until August 17. 1967. I would regard
it as wholly immaterial that their duty arose because they accepted a
retainer which entitled them, if they chose to do so. to send a bill to
their client."

I wish to express my respectful agreement with these passages in Oliver J.'s
judgment.

Thereafter, Oliver J. proceeded to consider the authorities since *Hedley
Byrne.* in which he found, notably in statements of the law by members of the
Appellate Committee in *Arenson v. Arenson* [1977] A.C. 405 and in the
decision of the Court of Appeal in *Esso Petroleum Co. Ltd. v. Mardon* [1976]
Q. B. 801, the authority which relieved him of his duty to follow *Groom v.
Crocker* [1939] 1 K.B. 194. But I wish to add that, in the course of
considering the later authorities, he rejected the idea that there is some general
principle of law that a plaintiff who has claims against a defendant for breach
of duty both in contract and in tort is bound to rely upon his contractual rights
alone. He said, at p. 420 A-B:

"There is not and never has been any rule of law that a person having
alternative claims must frame his action in one or the other. If I have
a contract with my dentist to extract a tooth, I am not thereby

- 24 -

precluded from suing him in tort if he negligently shatters my jaw:
*Edwards v. Mallan* [1908] 1 K.B. 1002."

The origin of concurrent remedies in this type of case may lie in history; but
in a modern context the point is a telling one. Indeed it is consistent with the
decision in *Donoghue v. Stevenson* [1932] AC 562 itself, and the rejection
in that case of the view, powerfully expressed in the speech of Lord
Buckmaster (see, in particular, pp. 577-578), that the manufacturer or repairer
of an article owes no duty of care apart from that implied from contract or
imposed by statute. That there might be co-existent remedies for negligence
in contract and in tort was expressly recognised by Lord Macmillan in
*Donoghue v. Stevenson,* at p. 610, and by Lord Wright in *Grant v. Australian
Knitting Mills Ltd.,* [1936] AC 85, 102-104. Attempts have been made to
explain how doctors and dentists may be concurrently liable in tort while other
professional men may not be so liable, on the basis that the former cause

physical damage whereas the latter cause pure economic loss (see the discussion by Christine French in (1983) 5 Otago L.R. 236, 280-1). But this explanation is not acceptable, if only because some professional men, such as architects, may also be responsible for physical damage. As a matter of principle, it is difficult to see why concurrent remedies in tort and contract, if available against the medical profession, should not also be available against members of other professions, whatever form the relevant damage may take.

The judgment of Oliver J. in the *Midland Bank Trust Co.* case [1979] Ch. 384 provided the first analysis in depth of the question of concurrent liability in tort and contract. Following upon *Esso Petroleum Co. Ltd. v. Mardon* [1976] QB 801, it also broke the mould, fn the sense that it undermined the view which was becoming settled that, where there is an alternative liability in tort, the claimant must pursue his remedy in contract alone. The development of the case law in other common law countries is very striking. In the same year as the *Midland Bank Trust Co.* case, the Irish Supreme Court held that solicitors owed to their clients concurrent duties in contract and tort: see *Finlay v. Murtagh* [1979] I.R. 249. Next, in *Central Trust Co. v. Rafuse* (1986) 31 D.L.R. 4th 481, Le Dain J., delivering the judgment of the Supreme Court of Canada, conducted a comprehensive and most impressive survey of the relevant English and Canadian authorities on the liability of solicitors to their clients for negligence, in contract and in tort, in the course of which he paid a generous tribute to the analysis of Oliver J. in the *Midland Bank Trust Co.* case. His conclusions are set out in a series of propositions at pp. 521-2 of the report: but his general conclusion was to the same effect as that reached by Oliver J. He said, at p. 522:

> ". . .A concurrent or alternative liability in tort will not be admitted if its effect would be to permit the plaintiff to circumvent or escape a contractual exclusion or limitation of liability for the act or omission that would constitute the tort. Subject to this qualification, where concurrent liability in tort

- 25 -

> and contract exists the plaintiff has the right to assert the cause of action that appears to be the most advantageous to him in respect of any particular legal consequence."

I respectfully agree.

Meanwhile in New Zealand the Court of Appeal had appeared at first, in *McLaren Maycroft & Co. v. Fletcher Development Co. Ltd.* [1973] 2 N.Z.L.R. 100. to require that, in cases where there are concurrent duties in contract and tort, the claimant must pursue his remedy in contract alone. There followed a period of some uncertainty, in which differing approaches were adopted by courts of first instance. In 1983 Miss Christine French published her Article on the Contract/Tort Dilemma in (1981-84) 5 Otago

L.R. 236. in which she examined the whole problem in great depth, with special reference to the situation in New Zealand, having regard to the "Rule" in *McLaren Maycroft*. Her Article, to which I wish to pay tribute, was of course published before the decision of the Supreme Court of Canada in the *Central Trust* case. Even so. she reached a conclusion which, on balance. favoured a freedom for the claimant to choose between concurrent remedies in contract and tort. Thereafter in *Rowlands v. Collow* [1992] 1 N.Z.L.R. 178 Thomas J., founding himself principally on the *Central Trust* case and on Miss French's Article, concluded that he was free to depart from the decision of the New Zealand Court of Appeal in *McLaren Maycroft* and to hold that a person performing professional services (in the case before him an engineer) may be sued for negligence by his client either in contract or in tort. He said. at p. 190:

> " The issue is now virtually incontestable; a person who has performed professional services may be held liable concurrently in contract and in negligence, unless the terms of the contract preclude the tortious liability."

In Australia, too, judicial opinion appears to be moving in the same direction. though not without dissent: see, in particular. *Aluminum Products (Qld.) Pty. Ltd. v. Hill* [1981] Qd.R. 33 (a decision of the Full Court of the Supreme Court of Queensland) and *Macpherson & Kelley v. Kevin J. Prunty & Associates* [1983] 1 V.R. 573 (a decision of the Full Court of the Supreme Court of Victoria). A different view has however been expressed by Deane J in *Hawkins v. Clayton* (1987-88) 164 C.L.P. 539. 585. to which I will return later. In principle, concurrent remedies appear to have been accepted for some time in the United States (see Prosser's Handbook on the Law of Torts. 5th ed. (1984) p. 666), though with some variation as to the application of the principle in particular cases. In these circumstances it comes as no surprise that Professor Fleming, writing in 1992, should state that "the last ten years have seen a decisive return to the 'concurrent' approach" (see his *Law of Torts,* 8th ed., p. 187).

- 26 -

I have dealt with the matter at some length because, before your Lordships, Mr. Temple Q.C., for the managing agents, boldly challenged the decision of Oliver J. in the *Midland Bank Trust Co.* case [1979] Ch. 384, seeking to persuade your Lordships that this House should now- hold that case to have been wrongly decided- This argument was apparently not advanced below, presumably because Oliver J.'s analysis had received a measure of approval in the Court of Appeal: see, e.g., *Forster v. Outred & Co.* [1982] 1 W.L.R. 86, 99, per Dunn L.J. Certainly there has been no sign of disapproval, even where the *Midland Bank Trust Co.* case has been distinguished: see *Bell v. Peter Browne & Co.* [1990] 2 Q.B. 495.

Mr. Temple adopted as part of his argument the reasoning of Mr. J.M. Kaye in an article *The Liability of Solicitors in Tort* (1984) 100 L.Q.R. 680. In his article, Mr. Kaye strongly criticised the reasoning of Oliver J. both on historical grounds and with regard to his interpretation of the speeches in *Hedley Byrne.* However, powerful though Mr. Kaye's article is, I am not persuaded by it to treat the *Midland Bank Trust Co.* case as wrongly decided. First, so far as the historical approach is concerned, this is no longer of direct relevance in a case such as the present, having regard to the development of the general principle in *Hedley Byrne.* No doubt it is correct that, in the 19th century, liability in tort depended upon the category of persons into which the defendant fell, with the result that in those days it did not necessarily follow that, because (for example) a surgeon owed an independent duty of care to his patient in tort irrespective of contract, other professional men were under a similar duty. Even so, as Mr. Boswood Q.C. for the Names stressed, if the existence of a contract between a surgeon and his patient did not preclude the existence of a tortious duty to the patient in negligence 'there is no reason in principle why a tortious duty should not co-exist with a contractual duty in the case of the broad duty of care now recognised following the generalisation of the tort of negligence in the 20th century.

So far as *Hedley Byrne* itself is concerned. Mr. Kaye reads the speeches as restricting the principle of assumption of responsibility there established to cases where there is no contract; indeed, on this he tolerates no dissent, stating (at p. 706) that "unless one reads *[Hedley Byrne\* with deliberate intent to find obscure or ambiguous passages" it will not bear the interpretation favoured by Oliver J. I must confess however that, having studied yet again the speeches in *Hedley Byrne* [1964] AC 465 in the light of Mr. Kaye's critique, I remain of the opinion that Oliver J.'s reading of them is justified. It is, I suspect, a matter of the angle of vision with which they are read. For here, I consider, Oliver J. was influenced not only by what he read in the speeches themselves, notably the passage from Lord Devlin's speech at pp. 528-529 (quoted above), but also by the internal logic reflected in that passage, which led inexorably to the conclusion which he drew Mr. Kaye's approach involves regarding the law of tort as supplementary to the law of contract, i.e. as providing for a tortious liability in cases where there is no contract. Yet the law of tort is the general law, out

- 27 -

of which the parties can, if they wish, contract: and, as Oliver J. demonstrated, the same assumption of responsibility may, and frequently does, occur in a contractual context. Approached as a matter of principle, therefore, it is right to attribute to that assumption of responsibility, together with its concomitant reliance, a tortious liability, and then to enquire whether or not that liability is excluded by the contract because the latter is inconsistent with it. This is the reasoning which Oliver J., as I understand it, found implicit, where not explicit, in the speeches in *Hedley Byrne.* With his conclusion I respectfully agree. But even if I am wrong in this, I am of the

opinion that this House should now, if necessary, develop the principle of assumption of responsibility as stated in *Hedley Byrne* to its logical conclusion so as to make it clear that a tortious duty of care may arise not only in cases where the relevant services are rendered gratuitously, but also where they are rendered under a contract. This indeed is the view expressed by my noble and learned friend Lord Keith of Kinkel in *Murphy v. Brentwood District Council* [1991] 1 AC 398, 466, in a speech with which all the other members or the Appellate Committee agreed.

An alternative approach, which also avoids the concurrence of tortious

and contractual remedies, is to be found in the judgment of Deane J. in *Hawkins v. Clayton* (1987-88) 164 C.L.R. 539. 582-586. in which he

included, at p. 585:

On balance, however, it seems to me to be preferable to accept that there is neither justification nor need for the implication of a contractual term which, in the absence of actual intention of the parties, imposes upon a solicitor a contractual duty (with consequential liability in damages for its breach) which is co-extensive in content and concurrent in operation with a duty (with consequential liability in damages for us breach) which already exists under the common law of negligence."

It is however my understanding that by the law in this country contracts for services do contain an implied promise to exercise reasonable care (and skill) in the performance of the relevant services; indeed, as Mr. Tony Weir has pointed out (XI Int. Encycl. Comp. L., ch. 12, para. 67), in the 19th century the field of concurrent liabilities was expanded "since it was impossible for the judges to deny that contracts contained an implied promise to take reasonable care, at the least, not to injure the other party". My own belief is that, in the present context, the common law is not antipathetic to concurrent liability, and that there is no sound basis for a rule which automatically restricts the claimant to either a tortious or a contractual remedy. The result may be untidy: but, given that the tortious duty is imposed by the general law, and the contractual duty is attributable to the will of the parties, I do not find it objectionable that the claimant may be entitled to take advantage of the remedy which is most advantageous to him, subject only to ascertaining whether the tortious duty is so inconsistent with the applicable contract that,

- 28 -

in accordance with ordinary principle, the parties must be taken to have agreed that the tortious remedy is to be limited or excluded.

In the circumstances of the present case, I have nor regarded it as necessary or appropriate to embark upon yet another detailed analysis of the

case law, choosing rather to concentrate on those authorities which appear to
me to be here most important. I have been most anxious not to overburden
an inevitably lengthy opinion with a discussion of an issue which is only one
(though an important one) of those which fall for decision; and, in the context
of the relationship of solicitor and client, the task of surveying the authorities
has already been admirably performed by both Oliver J. and Le Dain J. But,
for the present purposes more important, in the present case liability can, and
in my opinion should, be founded squarely on the principle established in
*Hedley Byrne* itself, from which it follows that an assumption of responsibility
coupled with the concomitant reliance may give rise to a tortious duty of care
irrespective of whether there is a contractual relationship between the parties,
and in consequence, unless his contract precludes him from doing so, the
plaintiff, who has available to him concurrent remedies in contract and tort,
may choose that remedy which appears to him to be the most advantageous.

(7) <u>Application of the above principles in the present case</u>

        I have already concluded that prima facie a duty of care was owed in
tort on the *Hedley Byrne* principle by managing agents both to direct Names
and indirect Names. So far as the direct Names are concerned, there is
plainly a contract between them and the managing agents, in the terms of the
pre-1985 Byelaw form of agency agreement, in which a term falls to be
implied that the agents will exercise due care and skill in the exercise of their
functions as managing agents under the agreement. That duty of care is no
different from the duty of care owed by them to the relevant Names in tort:
and, having regard to the principles already stated, the contract does not
operate to exclude the tortious duty, leaving it open to the Names to pursue
either remedy against the agents.

        I turn to the indirect Names. Here there is, as I see it, no material
distinction between the claims of the Names in the Merrett actions, and those
of the Names in the Feltrim actions. True, the former arise in the context of
the pre-1985 Byelaw forms of agency and sub-agency agreements, whereas the
latter arise in the context of the forms of agreement prescribed by the 1985
Byelaw. However in both cases there must be implied into the sub-agency
agreements a duty upon the managing agents to exercise due skill and care.
A similar responsibility must rest upon the members' agents under the 1985
Byelaw form of agency agreement, and I will assume that the same applies
under the pre-1985 Byelaw form (though the point does not arise for decision
by your Lordships). In neither case, however, is there any material difference
between the relevant contractual duty and any duty which is owed by the
managing agents to the relevant Names in tort. It is however submitted on
behalf of the managing agents that the indirect Names and the managing

- 29 -

agents, as parties to the chain of contracts contained in the relevant agency
and sub-agency agreements, must be taken to have thereby structured their

relationship so as to exclude any duty of care owed directly by the managing
agents to the indirect Names in tort.

In essence the argument must be that, because the managing agents
have, with the consent of the indirect Names, assumed responsibility in
respect of the relevant activities to another party, i.e. the members' agents,
under a sub-agency agreement, it would be inconsistent to hold that they have
also assumed responsibility in respect of the same activities to the indirect
Names. I for my part cannot see why in principle a party should not assume
responsibility to more than one person in respect of the same activity. Let it
be assumed (unlikely though it may be) that, in the present case, the managing
agents were in a contractual relationship not only with the members' agents
under a sub-agency agreement but also directly with the relevant Names,
under both of which they assumed responsibility for the same activities. I can
see no reason in principle why the two duties of care so arising should not be
capable of co-existing.

Of course I recognise that the present case presents the unusual feature
that claims against the managing agents, whether by the members' agents
under the sub-agency agreement or by the indirect Names in tort, will in both
cases have the purpose, immediate or ultimate, of obtaining compensation for
the indirect Names. In these circumstances, concurrent duties of care could,
in theory at least, give rise to problems, for example in the event of the
insolvency of the managing agents or the members' agents. Furthermore, as
Mr. Temple Q.C. suggested in the course of his submissions on behalf of the
managing agents, questions of contribution might, at least in theory, arise.
But your Lordships' task, like that of the courts below, is to answer the
questions of principle raised by the issues presented for decision: and in these
circumstances it would be quite wrong to embark upon the examination of
questions which do not arise on those issues, and indeed may never arise in
practice. For myself, I am all the more reluctant to do so since, because the
liability (if any) of the managing agents will in each case flow from claims by
the indirect Names, it may well be that practical problems such as these will,
it they arise, find a practical solution.

I wish however to add that I strongly suspect that the situation which
arises in the present case is most unusual; and that in many cases in which
a contractual chain comparable to that in the present case is constructed it may
well prove to be inconsistent with an assumption of responsibility which has
the effect of. so to speak, short circuiting the contractual structure so put in
place by the parties. It cannot therefore be inferred from the present case that
other sub-agents will be held directly liable to the agent's principal in tort.
Let me take the analogy of the common case of an ordinary building contract,
under which main contractors contract with the building owner for the
construction of the relevant building, and the main contractor sub-contracts
with sub-contractors or suppliers (often nominated by the building owner) for

- 30 -

the performance of work or the supply of materials in accordance with standards and subject to terms established in the sub-contract. I put on one side cases in which the sub-contractor causes physical damage to property of the building owner, where the claim does not depend on an -assumption of responsibility by the sub-contractor to the building owner; though the sub-contractor may be protected from liability by a contractual exemption clause authorised by the building owner. But if the sub-contracted work or materials do not in the result conform to the required standard, it will not ordinarily be open to the building owner to sue the sub-contractor or supplier direct under the *Medley Byrne* principle, claiming damages from him on the basis that he has been negligent in relation to the performance of his functions. For there is generally no assumption of responsibility by the sub-contractor or supplier direct to the building owner, the parties having so structured their relationship that it is inconsistent with any such assumption of responsibility. This was the conclusion of the Court of Appeal in *Simaan General Contracting Co. v. Pilkington Glass Ltd. (No. 2)* [1988] QB 758. As Bingham L.J. put it, at p. 781:

> "I do not, however, see any basis on which the defendants [the nominated suppliers] could be said to have assumed a direct responsibility for the quality of the goods to the plaintiffs [the building owners); such a responsibility is, I think, inconsistent with the structure of the contract the parties have chosen to make."

It is true that, in this connection, some difficulty has been created by the decision of your Lordships' House in *Junior Books Ltd. v. Veitchi Co. Ltd.* [1983] 1 AC 520. In my opinion, however, it is unnecessary for your Lordships to reconsider that decision for the purposes of the present appeal. Here however I can see no inconsistency between the assumption of responsibility by the managing agents to the indirect Names, and that which arises under the sub-agency agreement between the managing agents and the members' agents, whether viewed in isolation or as part of the contractual chain stretching back to and so including the indirect Names. For these reasons, I can see no reason why the indirect Names should not be free to pursue their remedy against the managing agents in tort under the *Medley Byrne* principle.

I Merrett and Feltrim Appeals

B. Fiduciary Duty

The question arising under this issue is whether Merretts acting as managing agents (whether or not they are also members' agents) owed the Names a fiduciary duty to conduct the underwriting for the account of the Names with reasonable skill for the 1979 to 1985 underwriting years of account (inclusive) equivalent to the alleged duty of care in tort.

Both Saville J. and the Court of Appeal declined to address this question since having regard to the manner in which they decided the issue on the tortious duty of care, the question did not arise. Having regard to the conclusion which I have reached on the tortious duty, I likewise do not think it necessary for your Lordships' House to address the question of fiduciary duty.

II. <u>Feltrim and Gooda Walker Appeals</u>

<u>Liability of members' agents to Names during the period 1987-1989</u>

Saville J. held that this issue should be decided against the members' agents, and his decision was affirmed by the Court of Appeal, for the same reasons. As a result it was held that, under agency agreements in the form prescribed by Lloyd's Byelaw No. 1 of 1985, members' agents are responsible to the Names for any failure to exercise reasonable skill and care on the part of managing agents to whom underwriting has been delegated by the members agents; and that the members agents are not required to exercise skill and care only in relation to those activities and functions which members' agents by custom and practice actually perform for the Names personally.

This issue raises a question of construction of the prescribed form of agency agreement. Since however the prescribed forms of agency and sub-agency agreements together constitute the contractual regime established by the Byelaw, it follows that the agency agreement should not be considered in isolation, but as forming, together with the sub-agency agreement, a coherent whole which, in a case concerned with indirect Names, regulates the contractual relationship between Name, members' agent and managing agent. Furthermore it is not to be forgotten that, in a case concerned with a combined agent, the agency agreement may fulfil the dual function of regulating the functions of the combined agent both in its role as members agent, and in its role as managing agent in respect of any Syndicate under its management of which the Name is a member.

In order to consider this question of construction I think it desirable that I should, like Sir Thomas Bingham M.R., first set out the terms of the most relevant provisions of the prescribed forms of agency and sub-agency agreements. These are as follows.

<u>AGENCY AGREEMENT</u>

1. DEFINITIONS:

In this agreement the under mentioned expressions shall where the context so requires or admits have the following meanings:-

(a) The expression 'the Syndicate' shall mean the syndicate or, if more than one, each of the respective syndicates of which the Name is for the time being a member under the provisions of this agreement, being the syndicate or syndicates specified in the Schedule(s) attached hereto ....

## 2. APPOINTMENT OF THE NAME'S AGENT AT LLOYD'S:

1. The agent shall act as the underwriting agent for the Name for the purpose of underwriting at Lloyd's for the account of the Name such classes and descriptions of insurance business, other than those prohibited by the Council, as may be transacted by the Syndicate (hereinafter referred to as 'the underwriting business').

2. In acting as underwriting agent for the Name the Agent shall at all times comply with the byelaws, regulations and requirements for the time being of the Council affecting the Name as an underwriting member of Lloyd's. Provided that if and to the extent that any provision of this Agreement shall be inconsistent with any such byelaw, regulation or requirement such inconsistent provision shall be deemed to be modified or cancelled so far as may be necessary or appropriate to the intent that the byelaw, regulation or requirement in question shall prevail and have full effect.


. . .


## 4 POWERS OF THE AGENT

(a) The agent is authorised .... to exercise such powers as the agent may consider to be necessary or desirable in connection with or arising out of the underwriting business, including without prejudice to the generality of the foregoing:

(i) the acceptance of risks and the effecting of reinsurance, including reinsurance for the purpose of clause 5(g) hereof;


. . . .


(b) Without prejudice to the generality of the provisions of sub-clause (a) of this clause, the agent shall have the

following customary and/or special powers in connection with the conduct and winding-up of the underwriting business:

. . . .

(G) Delegation of agent's powers:

- 33 -

Power, subject to any requirements of the Council, to appoint or employ any person, firm or body corporate to carry on or manage the underwriting business or any part thereof, and to delegate to or confer upon any person, firm or body corporate all or any of the powers, authorities and discretions given to the agent by this agreement including this power of delegation and the other powers contained in this paragraph.

5. CONTROL OF UNDERWRITING BUSINESS:

(a) The agent shall have the sole control and management of the underwriting business and the Name shall not in any way interfere with the exercise of such control or management.

. . . .

(g) In order to close the underwriting account of any year the agent may:

(i) reinsure all or any outstanding liabilities in such manner as the agent shall think fit, including the debiting of such account and the crediting of the underwriting account of the next succeeding year with such reinsurance premium as the Agent in its absolute discretion (subject to any requirements of the Council) thinks fair or

(ii) reinsure all or any outstanding liabilities into the underwriting account of any other year then remaining open or in any other manner which the agent (subject as aforesaid) thinks fair.

. . . .

8. REMUNERATION:

(a) The Name shall pay to the agent as remuneration for
the services of the agent a fee at the rate per annum specified in the
Syndicate Schedule.

. . . .

### 9. UNDERTAKING BY THE NAME TO PAY ALL
### LIABILITIES AND OUTGOINGS:

(a) The Name shall keep the agent at all times in
funds available for the payment of the liabilities, expenses and
outgoings of the underwriting business . . . ."

- 34 -

"SUB-AGENCY AGREEMENT

W H E R E A S the agent is the underwriting agent at
Lloyd's for certain underwriting members of Lloyd's and it has been
arranged between the agent and the sub-agent that the sub-agent shall
act as the sub-underwriting agent for one or more of such underwriting
members upon the terms hereinafter mentioned.

NOW IT IS HEREBY AGREED AND DECLARED between
the parties hereto as follows :-

. . . . .

2. The sub-agent shall act as sub-agent for the agent for the
   purpose of conducting in the names and for the account of each of the
   agent's Names that part of the underwriting business as defined in
   clause 2(a) of the agency agreement which is to be transacted by such
   Name as a member of the Syndicate (hereinafter called 'the Syndicate
   underwriting business'); ....

3. (a) The sub-agent shall underwrite for the agent's
   Names as part of the Syndicate ....

   (b) The individual premium income limit to be
allocated to the Syndicate in respect of each of the agent's Names shall
be agreed from time to time between the sub-agent and the agent . .

. .

5. (a) The agent delegates to the sub-agent the performance of all such duties and the exercise of all such powers, authorities and discretions imposed or conferred upon the agent by the agency agreement (including without prejudice to the generality of the foregoing the power of delegation contained in that agreement) as it may be appropriate or necessary for the sub-agent to perform or exercise for the purpose of carrying on the Syndicate underwriting business.

. . . .

7. (a) The sub-agent shall conduct the Syndicate underwriting business in such manner as to comply with the provisions of the agency agreement and Lloyd's byelaws and regulations and is to have regard for Lloyd's Codes of Conduct or similar forms of guidance for the Lloyd's market.

. . . .

- 35 -

12. (a) The agent undertakes to put and keep the sub-agent in funds to such extent as the sub-agent shall in its sole discretion determine for payment of all liabilities, expenses and outgoings from time to time payable in connection with the Syndicate underwriting business but (subject to any supplementary provision) only to the extent that the agent shall be able to enforce against a Name the provisions of the agency agreement.

. . . . "

The rival contentions of the parties centred upon the construction to be placed upon clause 2(a) of the agency agreement. For the Names in the Feltrim actions, it was submitted by Mr. Boswood Q.C. that clause 2(a) contains an express undertaking by the underwriting agent to act as the underwriting agent of the Name, with the effect that (except to the extent that, where the agent is a combined agent, it acts as managing agent of a Syndicate of which the Name is a member) members' agents are as such bound to

underwrite insurance business for the Name. It was conceded that, if that submission was correct, there was an implied term that such underwriting should be carried out with reasonable care and skill. Mr. Boswood's argument on this point was supported by Mr. Vos Q.C. for the Names in the Gooda Walker actions.

This argument was accepted by the courts below. But before the Appellate Committee it was subjected to a powerful attack by Mr. Eder Q C for the Gooda Walker members' agents, supported by Mr. Rowland for the Feltrim members agents. The argument ran as follows:

(1) Mr. Eder began with clause 2(a) of the agency agreement, under which it is provided that the agent shall act as 'underwriting agent' for the Name. He then drew upon the definitions of 'underwriting agent' in Byelaw No. 4 of 1984, and in paragraph l(c) of the Interpretation Byelaw No. 1 of 1983 (as amended), as showing that an underwriting agent may be either a member's agent or a managing agent, and submitted that appointment under clause 2(a) as underwriting agent' did not of itself indicate in which capacity the agent was agreeing to act.

(2) Next he turned to clause 2(b). Here again he invoked Byelaw No. 4 of 1984, and the definitions in Part A of both 'managing agent' and members agent' which show (1) that a managing agent performs for an underwriting member the function of (inter alia) underwriting contracts of insurance at Lloyd's and (2) that a members' agent does not perform any of the functions of a managing agent. Further, under paragraph 4(a) of Part B of the Byelaw, there is a prohibition against any person acting as a managing agent who is not registered as such under the Byelaw. Building on this prohibition, Mr. Eder developed an argument to the effect that, on a true construction of clause 2(a), members' agents could not as such have agreed

- 36 -

to do underwriting on behalf of the Names, when that was a prohibited activity under the relevant Lloyd's legislation.

(3) Turning to clause 4 of the agency agreement, he stressed that the clause is concerned not with duties but with powers conferred upon the agent, specifying powers the exercise of which the agent may consider to be 'necessary or desirable'. It followed from the fact that a member's agent is prohibited from acting as a managing agent that the exercise, in particular, of the power to accept risks and effect reinsurances could not properly be regarded as necessary or desirable for a members' agent. Furthermore, clause 4(b)(G) falls into two parts, the former being concerned with a power to appoint another person to carry on or manage the underwriting business, and the latter with a power to delegate or confer upon another the powers, etc., given to the agent. It was the submission of Mr. Eder that the effect of this

sub-clause was, first, that the members' agent can appoint a managing agent to carry on the actual underwriting for the Name, even though the members' agent has itself no power to do so; and that the delegation of the broad authority conferred by clause 4(a) on the members' agent would have the effect of authorising the managing agent to underwrite on the Name's behalf. In his submission, clause 4(b)(G) envisaged that the person so appointed would be acting directly on behalf of the Name.

(4) There was nothing in the agency agreement, and in particular nothing in clause 5, to indicate that the members' agents contracted to underwrite or to be responsible for the underwriting in the sense advanced by the Names.

Impressed though I was by Mr. Eder's argument, in the end I feel unable to accept it.

I start, like him, with clause 2(a). This is the central provision, which makes available to Names the opportunity of participating in underwriting at Lloyd's. Consistently with that evident object, it does not merely appoint the agent as "the underwriting agent" for the Name, but does so "for the purpose of underwriting at Lloyd's for the account of the Name such classes and descriptions of insurance business .... as may be transacted by the Syndicate (hereinafter referred to as 'the underwriting business')." Next. I have in the forefront of my mind the fact that, as I have already pointed out, the agency agreement is designed to enable it to perform a dual purpose so that it may apply not only to the functions of a members' agent as such, but also to the functions performed by a combined agent when it acts as managing agent in respect of a Syndicate of which the Name is a member. I have a feeling that this duality of function may lie at the root of the somewhat elliptical language in which clause 2(a) is expressed. However it follows in my opinion that appointment of the agent as underwriting agent under clause 2(a) must, in the case of a combined agent, impose upon it the duty of carrying out underwriting on behalf of the Name if entered as a member of a syndicate of which the agent is the managing agent. Furthermore, I find it very difficult to see how the same words in clause 2(a) can impose any different obligation

- 37 -

on the members' agent when the relevant Syndicate is not managed by it, either because it is a pure members' agent, or because the Syndicate in question is managed by some other managing agent. Here, I draw attention to the definition of 'the Syndicate' in clause l(a) of the agency agreement, under which no distinction is drawn in this context between Syndicates managed by a combined agent in its capacity as managing agent, and Syndicates managed by some other managing agent, in which the Name is entered as member pursuant to a sub-agency agreement with the members' agent.

That the same obligation is in such circumstances imposed on the members' agent is, in my opinion, made clear beyond doubt when we read the

agency agreement together with the sub-agency agreement, and discover from clause 2 of the latter that the managing agent acts as sub-agent for the members' agent in conducting the relevant part of the underwriting business as defined in clause 2(a) of the agency agreement. The position under clause 2(a) is therefore that the obligation imposed on the members' agent under the clause with regard to underwriting is the same, whether it is acting as members agent or is a combined agent acting as managing agent in respect of a Syndicate of which the Name is a member. The only difference is that in the former case it carries out the underwriting through the agency of a managing agent, under the terms of the prescribed form of sub-agency agreement, whereas in the latter case it carries it out itself.

Furthermore, like Saville J., I cannot see that such performance of its obligations by a members' agent can constitute any breach of the prohibition in paragraph 4 of Part B of the underwriting agents Byelaw, since in each case the function of managing agent will always be performed by a managing agent: indeed, on my understanding of the position, this is precisely what was intended by the draftsman of the agency and sub-agency agreements, who plainly intended that there should be no breach of the Byelaw.

There is another consideration which strongly supports the conclusion that clause 2(a) of the agency agreement must be read as imposing responsibility on the members' agent in respect of underwriting for the Name. It is plain from the two prescribed forms of agreement that, in a case involving an indirect Name, they create no contractual relationship between the Name and the managing agent. On the contrary, as I have already indicated, there is a clear structure by virtue of which, under clause 2(a) of the agency agreement, the members' agent is appointed the Name's underwriting agent for the purpose set out in the sub-clause; and, under clause 2 of the sub-agency agreement, it is provided (here mirroring the recital to that agreement) that the sub-agent (the managing agent) shall act as sub-agent for the agent (the members' agent). Consistently with these provisions, under clause 4 of the agency agreement all the necessary powers are vested in the underwriting agent (the members' agent), including the power to delegate contained in clause 4(b)(G); and clause 5(a) of the sub-agency agreement provides for the delegation by the agent (the members' agent) to the sub-agent

- 38 -

(the managing agent) of the performance of all duties and the exercise of all powers, authorities and discretions imposed or conferred upon the agent by the agency agreement as may be appropriate or necessary.

It was submitted by Mr. Eder on behalf of the members' agents before Saville J. and the Court of Appeal, and again before the Appellate Committee, that in cases involving indirect Names there was indeed a contractual relationship between the Names and the managing agents, under which the managing agents were contractually responsible for the proper performance

of the underwriting for the Names. In this connection, Mr. Eder relied in particular upon the fact that the recital to the sub-agency agreement recites that it has been arranged between the agent and the sub-agent that the sub-agent shall act as the sub-underwriting agent for the Names.

However, the substantive provisions of the sub-agency agreement (in particular, clauses 2, 3, and 5) make it perfectly clear that, although the sub-agent has power to underwrite for the agent's names, i.e. to bind the Names to contracts of insurance, nevertheless there is no contractual relationship between the sub-agent and the Names, the only relevant contractual relationship of the sub-agent being with the agent. In this connection the true position in law is, in my opinion, accurately stated by Professor F.M.B. Reynolds in Article 36(3) of the 15th edition (1985) of Bowstead on Agency, p. 131, as follows:

> "But there is no privity of contract between a principal and a sub-agent as such, merely because the delegation was effected with the authority of the principal; and in the absence of such privity the rights and duties arising out of any contracts between the principal and the agent, and between the agent and the sub-agent, respectively, are only enforceable by and against the immediate parties to those contracts. However, the sub-agent may be liable to the principal as a fiduciary, and possibly in other respects."

Of the three authorities cited by Mr. Eder in support of his submission on this point *De Bussche v. Alt* (1877) 8 Ch.D. 286, *Powell & Thomas v. Evan Jones & Co.* [1905] 1 K.B. 11 and *Tarn v. Scanlan* [1928] A.C. 34, the first two were concerned with the accountability of a sub-agent for secret profits, and the third with liability for income tax. Each was a decision on its own specific facts, and none provides Mr. Eder with assistance in the form of general guidance on the circumstances in which a contractual relationship may come into existence between a principal and a sub-agent. I am satisfied that no such relationship came into existence between the Names and their sub-agents in the present case.

In these circumstances, Mr. Eder's argument leads to the extraordinary conclusion that, under the prescribed forms of agency and sub-agency agreements, neither members' agents nor managing agents assumed any contractual responsibility to the Names for the underwriting which was the

- 39 -

principal purpose of these agreements. Such a conclusion is, in my opinion. so improbable that it adds considerable support for the view that Mr. Eder's argument cannot be right, and that the true position must be that, on a true construction of clause 2(a) of the agency agreement, members' agents did indeed undertake to carry out underwriting for the Names, as was held by both courts below.

I recognise, of course, that it might have been thought right to structure the agreements differently, so that the managing agents were put into a direct contractual relationship with indirect Names who are members of Syndicates under their management. This was what was in fact done under the new forms of agreement brought into force as from 1 January 1990. But it is plain that this was not the intention under the forms of agreement now under consideration under which, in cases involving indirect Names, the managing agent acts as sub-agent of the members' agent, and all the necessary powers, etc. are vested in the members' agent which then delegates the performance of them to the managing agent.

In truth, once it is appreciated that the obligation to underwrite under clause 2(a) of the agency agreement may be performed by the underwriting agent either by itself in a case involving direct Names, or otherwise through a managing agent under the terms of the sub-agency agreement, everything falls into place. This is particularly true of clause 4 of the agency agreement, when read in conjunction with clauses 2 and 5 of the sub-agency agreement. As far as clause 4(b)(G) of the agency agreement is concerned, on which Mr. Eder placed such reliance, this can be seen to reflect precisely the position under clauses 2(a) and 4(a); the effect of the sub-clause is, as obviously contemplated by the draftsman of the two agreements, that under the first part the members agent will appoint the managing agent to act as its sub-agent for the purpose of conducting the relevant part of the underwriting business, under clause 2 of the sub-agency agreement, and under the second part delegate to it under clause 5(a) the performance of the relevant powers, etc., which, significantly, are vested in the members' agent under clause 4(a) of the agency agreement. The vesting of these powers in the members' agent is, in my opinion, a strong pointer against the construction of the agreements for which Mr. Eder contends. Had that construction represented the draftsman's intention, he would surely, in this respect at least, have drafted the agreements differently.

For these reasons, which I understand to be the same as those given by Saville J., which were accepted by the Court of Appeal, I would on this issue accept the argument advanced on behalf of the Names, and reject that advanced on behalf of the members' agents.

III <u>Merrett Appeals</u>
Reinsurance to Close.

- 40 -

On this Issue, I can see no answer to the conclusion reached by Saville J. and the Court of Appeal. I agree with the submission advanced by Mr. Borwood Q.C. on behalf of the Names in the Merrett Appeals that when Names on the 1985 underwriting year reinsured Names on the 1984 year, although the 1984 Names were running off their business, the 1985 Names

were writing new insurance business which could only be done pursuant to the 1985 Byelaw form of agreement in force as from 1 January 1987, as held by the courts below.

Conclusion

For these reasons, I would answer all the questions in the same manner as Saville J. and the Court of Appeal, and I would dismiss the appeals of the members' agents and the managing agents with costs.

**LORD BROWNE-WILKINSON**

My Lords,

I have read the speech of my noble and learned friend Lord Goff of Chieveley, with which I am in complete agreement. I add a few words of my own on the relationship between the claim based on liability for negligence and the alternative claim advanced by the Names founded on breach of fiduciary duty.

The decision of this House in *Hedley Byrne & Co. Ltd. v. Heller and Partners Ltd.* [1964] AC 465, was, to a substantial extent, founded on the earlier decision of this House in *Nocton v. Lord Ashburton* [1914] A.C. 932. In that case, Lord Ashburton sought to be relieved from the consequences of having loaned money to, amongst others, his solicitor Nocton. Lord Ashburton's pleadings were based primarily on an allegation of fraud; in particular, there was no allegation on the pleadings either of breach of contract by Nocton or of negligence. The lower courts treated the case as being wholly dependent on proof of fraud. But in this House Nocton was held liable for breach of a fiduciary obligation owed by him as solicitor to his client. However, although the decision was based on breach of fiduciary duty, both Viscount Haldane L.C. and Lord Shaw expressed such fiduciary duty as being but one example of a wider general principle, viz., that a man who has voluntarily assumed to act on behalf of, or to advise, another in law assumes a duty to that other to act or to advise with care. Viscount Haldane said, at p. 948:

> "Although liability for negligence in word has in material respects been developed in our law differently from liability for negligence in act, it is nonetheless true that the man may come under a special duty to exercise care in giving information or advice. I should accordingly be sorry to be thought to lend countenance to the idea that recent

- 41 -

decisions have been intended to stereotype the cases in which people can be held to have assumed such a special duty. Whether such a duty has been assumed must depend on the relationship of the parties, and

it is at least certain that there are a good many cases in which that relationship may be properly treated as giving rise to a special duty of care in statement."

Viscount Haldane gave a further explanation of the decision in *Nocton v. Lord Ashburton* in *Robinson v. The National Bank of Scotland Ltd.* [1916] S.C. (H.L.) 154. 157:

> ". . .I wish emphatically to repeat what I said in advising this House in the case of *Nocton v. Lord Ashburton,* that it is a great mistake to suppose that, because the principle in *Derry v. Peek* clearly covers all cases of the class to which I have referred, therefore the freedom of action of the courts in recognising special duties arising out of other kinds of relationship which they find established by the evidence is in any way affected. I think, as I said in *Nocton's* case, that an exaggerated view was taken by a good many people of the scope of the decision in *Derry v. Peek.* The whole of the doctrine as to fiduciary relationships, as to the duty of care arising from implied as well as expressed contract, as to the duty of care arising from other special relationships which the courts may find to exist in particular cases, still remains, and I shall be very sorry if any word fell from me which suggests that the courts are in any way hampered in recognising that the duty of care may be established when such cases really occur."

It was these passages from the speeches of Viscount Haldane, and others. which this House in *Hedley Byrne* took up and developed into the general principle there enunciated as explained by my noble and learned friend, Lord Goff of Chieveley.

This derivation from fiduciary duties of care of the principle of liability in negligence where a defendant has by his action assumed responsibility is illuminating in a number of ways. First, it demonstrates that the alternative claim put forward by the Names based on breach of fiduciary duty, although understandable, was misconceived. The liability of a fiduciary for the negligent transaction of his duties is not a separate head of liability but the paradigm of the general duty to act with care imposed by law on those who take it upon themselves to act for or advise others. Although the historical development of the rules of law and equity have, in the past, caused different labels to be stuck on different manifestations of the duty, in truth the duty of care imposed on bailees, carriers, trustees, directors, agents and others is the same duty: it arises from the circumstances in which the defendants were acting, not from their status or description. It is the fact that they have all assumed responsibility for the property or affairs of others which renders them liable for the careless performance of what they have undertaken to do, not the description of the trade or position which they hold. In my judgment, the

- 42 -

duties which the managing agents have assumed to undertake in managing the
insurance business of the Names brings them clearly into the category of those
who are liable, whether fiduciaries or not, for any lack of care in the conduct
of that management.

Secondly, in my judgment, the derivation of the general principle from
fiduciary duties may be instructive as to the impact of any contractual
relationship between the parties on the general duty of care which would
otherwise apply. The phrase "fiduciary duties" is a dangerous one, giving rise
to a mistaken assumption that all fiduciaries owe the same duties in all
circumstances. That is not the case. Although, so far as I am aware, every
fiduciary is under a duty not to make a profit from his position (unless such
profit is authorised), the fiduciary duties owed, for example, by an express
trustee are not the same as those owed by an agent. Moreover, and more
relevantly, the extent and nature of the fiduciary duties owed in any particular
case fall to be determined by reference to any underlying contractual
relationship between the parties. Thus, in the case of an agent employed
under a contract, the scope of his fiduciary duties is determined by the terms
of the underlying contract. Although an agent is, in the absence of contractual
provision, in breach of his fiduciary duties if he acts for another who is in
competition with his principal, if the contract under which he is acting
authorise him so to do, the normal fiduciary duties are modified accordingly:
see *Kelly v. Cooper* [1993] A.C. 205, and the cases there cited. The
existence of a contract does not exclude the co-existence of concurrent
fiduciary duties (indeed, the contract may well be their source); but the
contract can and does modify the extent and nature of the general duty that
would otherwise arise.

In my judgment, this traditional approach of equity to fiduciary duties
is instructive when considering the relationship between a contract and any
duty of care arising under the *Hedley Byrne* principle (of which fiduciary
duties of care are merely an example). The existence of an underlying
contract (e.g. as between solicitor and client) does not automatically exclude
the general duty of care which the law imposes on those who voluntarily
assume to act for others. But the nature and terms of the contractual
relationship between the parties will be determinative of the scope of the
responsibility assumed and can, in some cases, exclude any assumption of
legal responsibility to the plaintiff for whom the defendant has assumed to act.
If the common law is not to become again manacled by "clanking chains" (this
time represented by causes, rather than forms, of action), it is in my judgment
important not to exclude concepts of concurrent liability which the courts of
equity have over the years handled without difficulty. I can see no good
reason for holding that the existence of a contractual right is in all
circumstances inconsistent with the co-existence of another tortious right,
provided that it is understood that the agreement of the parties evidenced by
the contract can modify and shape the tortious duties which, in the absence of
contract, would be applicable.

For these reasons, in addition to the much wider considerations addressed by Lord Goff of Chieveley, I would dismiss the appeals.


## LORD MUSTILL

My Lords.

I have had the advantage of reading in draft the speech prepared by my noble and learned friend Lord Goff of Chieveley, and for the reasons which he gives, I too would dismiss the appeals of the Members' Agents and the Managing Agents with costs.

## LORD NOLAN

My Lords.

I have had the advantage of reading in draft the speech prepared by my noble and learned friend Lord Goff of Chieveley, and for the reasons which he gives, I too would dismiss these appeals with costs.


- 44 -

**BAILII:** Copyright Policy | Disclaimers | Privacy Policy | Feedback | Donate to BAILII
URL: *http://www.bailii.org/uk/cases/UKHL/1994/5.html*

# TAB 35

Hill (As Trustee in Bankruptcy of Nurkowski)
v. Spread Trustee Company Ltd & Anor
Case No: A3/2005/1183
Court of Appeal (Civil Division)
12 May 2006

**[2006] EWCA Civ 542**

**2006 WL 1288358**

Before: Lord Justice Waller Lady
Justice Arden and Sir Martin Nourse
Friday 12th May, 2006

**Analysis**

On Appeal from HHJ Weeks QC Sitting as a Deputy
Judge of the High Court of Justice Chancery Division
Dated 16 May 2005

**Representation**

    • Catherine Newman QC and Timothy Evans
(instructed by Osborne Clarke ) for the Appellants.
    • Stephen Davies QC and Stefan Ramel (instructed
by Clarke Willmott ) for the Respondents.

**Judgment**
Lady Justice Arden:

1  The judgment under appeal in this case occupies
nearly eighty pages of the law reports ( [2005] BPIR 842
). It concerns claims made by the trustee in bankruptcy
of a Mr Nurkowski to obtain relief under section 423
of the Insolvency Act 1986 ("the 1986 Act") in respect
of a settlement made by Mr Nurkowski in favour of his
daughter, and in respect of certain charges given by him
to the trustees of that settlement. The appellant trustees
challenge a number of the judge's crucial findings of
fact. But this appeal also raises a number of important
issues of law about claims made under section 423
with which we must also deal. The relevant statutory
provisions are set out in the appendix to this judgment.

The essence of section 423 of the 1986 Act is that it
empowers the court to avoid transactions entered into
at any time if made by a person at an undervalue and
with the purpose of prejudicing his creditors. As we shall
see, section 423 is cast in very wide terms in order to
cover the vast range of transactions which might meet
the basic criteria which I have just mentioned. As I said
in IRC v Hashmi [2002] 2 BCLC 489 , 504:

> "Section 423 plays an important role
> in insolvency law. It can moreover
> apply even though the debtor is
> not in a formal insolvency …
> Section [423] is a carefully calibrated
> section forming part of a carefully
> calibrated group of sections."

2  I have dealt with all the issues that were argued, save
as stated in paras 118 and 138 below.

3  This then is an appeal by Spread Trustee Company
Limited and Mr David John Warr, the trustees of the
Henry Stanley Nurkowski Maintenance and Settlement
Trust ("the trustees"), against the order of HHJ Weeks
QC sitting as a deputy Judge of the High Court of
Justice, Chancery Division. By his order it was declared,
on the application of Mr Richard Hill, Mr Nurkowski's
trustee in bankruptcy, that the settlement dated 10
March 1989 ("the settlement"), of which the trustees
are trustees, two legal charges dated 17 April 1996 and
12 August 1996 (respectively "the second legal charge"
and "the third legal charge" and collectively "the
later charges") and an assignment dated 21 November
1997 in their favour of a loan account owed to Mr
Nurkowski by his company HS and KM Nurkowski
Ltd ("the company") constituted transactions within
section 423(3) of the 1986 Act. By way of relief in respect
of these transactions, the order provided (1) that the
trustees should indemnify the estate of Mr Nurkowski
in bankruptcy against any claim by HM Revenue &
Customs ("the Revenue") to set aside a compromise of
tax liabilities made with Mr Nurkowski on 30 March
1993 ("the compromise"); (2) that the first legal charge
and the second legal charge should be set aside; and
(3) that the trustees should repay the sum of £162,051
plus interest to Mr Nurkowski paid to them under the

assignment dated 21 November 1997, such sum to be recredited to the amounts owed by him to the trustees.

**The background**

4    The judge set out the background in detail in his judgment, and my summary, which follows, is based largely on his judgment. The paragraphs of the judgment of the judge are not numbered and accordingly I will use page references from the report in BPIR. My summary should be read with the report of the judge's judgment. The numbers in brackets are references to the pages of that report.

5    The events in issue occurred between 1988 and 2001. I will start with an overview of the facts. Mr Nurkowski, an ice-cream manufacturer and vendor with commercial interests also in building and property development, owned two fields, called respectively OS149 (3½ acres) ("the bottom field") and OS160 (4½ acres) (the bottom field), at Hilperton, near Trowbridge, Wiltshire. These fields abutted an area of some 200 acres ("the Paxcroft Mead development") for which Gallagher Limited ("Gallagher") made an application for planning permission. (Unless otherwise stated, when I refer to OS 149, I include a small parcel of land forming part of the top field which was known as OS 149A). The application for planning permission was made to West Wiltshire District Council and Mr Nurkowski was a member of the planning committee of that Council, though he did not vote on the grant of permission to Gallagher on 4 April 1989. About a month before that resolution, Mr Nurkowski had made a gift into settlement of OS160. The settlement was a newly formed accumulation and maintenance settlement for Mr Nurkowski's 2 7frac12; year old daughter, Anna. Those representing Mr Nurkowski advised subsequently the Revenue that OS 160 was worth only £35,000 on its settlement in March 1989. In fact, the judge found that Mr Nurkowski had already received an offer for this field of £700,000 from Gallagher and that Mr Nurkowski knew that £700,000 was the minimum value of OS160. OS149 and OS160 were sold some five months after the settlement for £2m, even though neither field was within the planning permission which had been given.

6   The Revenue did not accept the valuation of £35,000 for OS 160 put forward by Mr Nurkowski's advisers.

In due course, the Revenue agreed to compromise its claim against Mr Nurkowski in the sum of £160,000. The trustee in bankruptcy takes the view that that compromise was colourable and that the Revenue could now raise a new assessment under section 29 or section 36 of the Taxes Management Act 1970 .

7   Following the receipt of the sale consideration, the trustees made a number of loans to Mr Nurkowski. Between 1994 and 1997 Mr Nurkowski executed charges conferring additional security on the trustees for its loans to him. He also made an assignment to the trustees of the sums owed to him by the company on loan account. The first of these charges is not material for the purposes of this appeal.

8   We have been provided with a helpful chronology prepared by counsel. In reading the summary below, the following critical dates should be borne in mind:

- 14 March 1986 Mr Nurkowski acquires OS 149 and OS 160 for £21,000
- 10 March 1989 gift of OS 160 into settlement
- 4 April 1989 Gallagher's planning application granted for land abutting OS 149 and OS 160
- 1/2 August 1989 OS160 sold to Gallagher (£218,000 paid immediately and £518,000 deferred until 2 February 1991)
- 10 October 1989 Submission to the Revenue of a valuation of £35,000 for OS160
- 16 February 1993 No 1 Loan (£250,000) secured over the share certificates representing shares in the company
- 28 March 1993 No 2 Loan (£198,500) secured over the Lion & Fiddle public house
- 30 March 1993 compromise between Mr Nurkowski, the trustees and the Revenue
- 30 March 1993 No 3 Loan (£160,000) secured over land at Cockhill, Trowbridge
- 19 May 1993 No 4 Loan (£30,000) (no additional security)
- 29 June 1993 No 5 Loan (£70,000) secured over The Three Lions, Holt, Wiltshire
- 17 April 1996 the second legal charge. This was an all monies charge which gave the trustees security over Mr Nurkowski's home, a property called Enniswood
- 12 August 1996 a field adjoining Enniswood was charged to the trustees — the third legal charge

•27 September 1996 all monies charge executed in favour of the trustees ranking behind a charge over the property already given to Lloyds Bank plc (Lloyds)

•21 November 1997 assignment by way of charge by Mr Nurkowski in favour of the trustees of his loan account with the company

•7 January 1998 the Revenue assess capital gains tax on Mr Nurkowski in respect of the sale of OS 149 in the sum of £436,790.32

•28 January 1999 a bankruptcy order was made against Mr Nurkowski on the Revenue's petition

•4 December 2002 Notice of this application was issued by the trustee in bankruptcy

9  I will now amplify this summary of events. The judge deals with the planning history (846), and I do not consider that I need set it out. The process was a long and drawn out one, but the judge found that it was generally agreed between Gallagher and the planning officers that OS 160 should eventually be part of the comprehensive development of the area, and that OS 149 might either be developed as an independent site or as a means of access to adjacent land.

10  Mr Nurkowski's own accountant was a Mr Holdway. In late 1987 he approached the Revenue on behalf of Mr Nurkowski for their view of the income tax implications of a sale of the land. The Revenue replied that they could not give a tax clearance without more information. So the tax implications of a disposal were under consideration at this early stage.

11  Gallagher were in touch with Mr Nurkowski before permission was given. In May 1988 they made an offer to buy an option over OS 149 and 160 for £40,000. If the option was exercised, Gallagher would pay 80% of the market value following grant of planning permission. On 12 December 1988, Mr Cox of Gallagher and Miss Foster, representing the agents for Gallagher, met Mr Nurkowski. It was agreed that the negotiations should be put on hold so Mr Nurkowski "could put his own house in order". He said that he would revert to Gallagher in due course. There is an important issue as to whether in the course of these negotiations Gallagher offered Mr Nurkowski £700,000 for OS 160. Mr Nurkowski's evidence was that no such offer was made but the judge rejected his evidence on this point.

12  In January 1989, Mr Nurkowski went to take tax advice from Spicer & Oppenheim. On 9 January 1989, Mr Nurkowski met Miss Horrocks of that firm. The judge set out the material parts of the attendance note prepared by Ms Horrocks at 846G to 847G of the judge's judgment. In that attendance note, Mr Nurkowski is recorded as saying that he had received an offer of £700,000 for OS 160. The attendance note also stated that it was Mr Nurkowski's opinion that this sum represented neither the current value of the land nor the value of the land with planning permission. Miss Horrocks' attendance note states that the main concern of Mr Nurkowski was how to alleviate capital gains tax of about £1m. The issue on which he sought advice is recorded in the following terms:

> "He wondered if his offshore company could be used by transferring the land to that company which he realised would trigger off a capital gain by his sale into the company but he hoped [that this] would protect the final greater gain when planning permission was granted [and] the land was sold to the development company. [H]e considers this very urgent and would like action very very quickly …"

Miss Newsham, another representative of Spicer & Oppenheim, spoke to Mr Nurkowski the following day and ascertained his view as to the current market value which he said was in the region of £25,000 to £40,000. He said that he was expecting OS 149 and OS 160 to be worth at least £300,000 and more "if he obtained planning permission in his own right". He also told Miss Newsham that he expected the district council to grant planning permission in April 1989.

13 Mr Nurkowski is recorded as saying that the market value of his land was as agricultural land with possibly some hope value thrown in and that it was worth about £5,000 per acre when valued as agricultural land but that it would be worth considerably more in view of the development. On the basis of the offer that he had received the bottom field would be worth £1.5m. He

thought that the final offer from the developer would be worth some £2.4m once planning permission was obtained.

14  Spicer & Oppenheim consulted Reads, a firm of accountants in Guernsey. On 13 January 1989, Mr Donaldson, a partner in Reads, sent his advice by fax. The material parts of that advice are set out at 848G to 849H. The essence of the advice was that the best course would be to set up an accumulation and maintenance settlement for a child with UK trustees, gift into it one of the fields and then immediately appoint foreign trustees in their place (or "export" the settlement to Guernsey). This would enable Mr Nurkowski to argue that any sale of the land by the trustees was not subject to income tax. Mr Nurkowski could make an election to hold over the gain on making the gift into settlement, which could accumulate income and capital gains. There would, however, be a charge to capital gains tax when the settlement was exported, based on the then value of the land. The significant points about this advice for the purposes of this appeal are as follows. Firstly, it proceeded on the basis that there was a sporting chance that Mr Nurkowski would be able to defer capital gains tax or even avoid it altogether if he formed a settlement. But success was not guaranteed. Mr Nurkowski might find that he had incurred the expenses of setting up a settlement for no purpose. Secondly, the advice supports the inference that when Mr Nurkowski proceeded to make the gift into settlement of OS160 he was simply following the advice he had received from Spicer & Oppenheim. Thirdly, Mr Donaldson must have thought that the land even at that stage was worth more than its agricultural value since he talks of transferring "(say) £100,000 worth of the land" into a discretionary settlement (849C).

15  There was a further meeting on 16 January 1989 at the offices of Spicer & Oppenheim in Bristol. A note was taken by Miss Goillau. She recorded that Mr Nurkowski thought that the market value of the land, meaning the then current market value, was £700,000, the amount of Gallagher's offer for OS 160 plus a further £100,000/150,000 for OS 149 (850C). The meeting note also records that Mr Nurkowski had a meeting with his developers planned for the following Wednesday as "he has put a proposal to them for a joint venture whereby he provides" OS 160. There is therefore in this file note a further reference to the

£700,000 offer and to active negotiations for the sale of the land.

16  The deed setting up an accumulation and maintenance trust of Mr Nurkowski's daughter Anna then aged 2½ years was executed on 10 March 1989. The original trustees were UK residents. The deed contained a clause (clause 17) excluding the settlor and his spouse from any benefit from the capital or income of the settlement. In due course the trustees made substantial loans to Mr Nurkowski. It was suggested in argument that the loans did not involve a breach of clause 17. We expressed our surprise at that suggestion but we do not have to decide if it is right or not but note that the Revenue might reasonably have taken the view that as a result of this clause Mr Nurkowski could not as a result arrange a loan from the settlement. After execution of the deed, OS 160 (the bottom field) was simultaneously gifted into the settlement. On 13 March 1989, the appellants replaced the original trustees and the settlement was thereby "exported" to Guernsey (852A).

17  The planning committee of the West Wiltshire District Council approved Gallagher's planning application on 4 April 1989. Mr Nurkowski was not present when this business was taken. Within a few weeks Mr Nurkowski had re-opened negotiations with Gallaghers' agent, Mrs Foster, and received offers from other developers. There is a curious letter from Mrs Foster to Gallagher of 24 April 1989, set out at 852B to G, in which Mrs Foster states that Mr Nurkowski had been under the incorrect impression that his land had planning permission and that he was looking for an option arrangement with Gallagher, and she also ends the letter by stating that Mr Nurkowski had been "a good ally" and encouraging Gallagher to do a deal with him. The judge makes no findings as to what she meant by these last matters and indeed Mrs Foster was unable to enlighten the court what she meant when she was cross-examined. It seems unlikely that Mr Nurkowski, a member of the planning committee, would have been unaware of the fact that his fields were outside the permission that was granted. In April 1989 Mr Nurkowski also opened negotiations with other developers, such as Beazer Homes.

18  However that may be, Gallagher did not leave the matter in Mrs Foster's hands. Mr Cox took

over the negotiations and agreed with Mr Nurkowski that he would sell OS 149 and OS 160 for a total aggregate price of £2m. The purchase of the bottom field was not conditional on planning permission but the consideration was to be paid in part as a deposit and part was to be deferred for a maximum of two years. The purchase of the top field was however conditional on planning permission.

19  The original deal provided that the price for OS160 would be paid outright without any deferral (853C). In the course of negotiating the contract, Mr Boyd, Mr Nurkowski's solicitor, took tax advice on behalf of Mr Nurkowski and the settlement. At one stage, Mr Nurkowski considered an exchange of land between the settlement and himself as the bottom field was worth more and Gallaghers only wanted to enter into a conditional contract for the top field (856E). Further negotiations took place between Mr Nurkowski, Mr Boyd and Gallagher and a contract for the sale of the bottom field was prepared and signed by the trustees for £1.25m. in early June 1989. At that time OS 149 was agreed to be sold for £875,000. But the agreement was then renegotiated without the active participation of the trustees. The parties then executed contracts whereunder consideration (£2m) was apportioned as to £740,000 for the bottom field (the settlement's property) and £1,260,000 for Mr Nurkowski's property. The consideration for the sale of OS 160 was payable in two instalments, a deposit of £220,000 and the balance being due in February 1991. In the case of OS 149 the deal was structured as to one acre as an outright sale for £378,000 payable on completion and as to the balance as a put option exercisable by Mr Nurkowski at a price of £882,000 by 8 January 1993. In due course Mr Nurkowski exercised his option against Gallagher. Accordingly the contracts for the top field were not in the event conditional on planning permission. Completion took place on 2 August 1989. The price paid was wholly remarkable given the lack of development prospects for the land but that would of course not prevent the incurring of tax.

20  There was no explanation for why the price was reapportioned in the way described, other than that Mr Nurkowski decided that after all he want a larger slice of the profits than before. It is doubtful whether the trustees took separate advice before accepting the renegotiated contract. If, as seems likely, they did not

do so, that is evidence of their willingness to do Mr Nurkowski's bidding, rather than act as independent trustees. The renegotiation of the contract also shows Mr Nurkowski's intense interest in money matters. The judge's assessment of him was that he was an astute business man (914H).

21  Shortly before the renegotiated contracts were exchanged, Mr Boyd arranged for OS 160 to be valued by Mr Nicolson of Carter Jonas on the basis of sale of the freehold with vacant possession as at 16 March 1989. Mr Boyd did not disclose the negotiations with Gallagher: the judge held that neither Mr Boyd nor Mr Nicolson knew about the offer of £700,000 in December 1988. Mr Nicolson made enquiries as to whether there was any planning potential in OS 160 and the planning officer told him that this field had no planning hope at all. On 14 July 1989 Mr Nicolson provided a written valuation of OS 160 in the sum of £35,000 which was submitted to the Revenue. The transaction with Gallagher was in due course completed.

22  In November 1990 the district valuer asked for further information about the land.

23  At Mr Nurkowski's suggestion, the settlement bought Mr Nurkowski's land at Cockhill, Trowbridge in April 1990 for £130,000. In February 1991 the settlement agreed to lend £510,000 to Mr Nurkowski to help him settle his capital gains tax bill arising on the sale of that part of OS 149/149A which was sold outright. Interest was agreed at 1% over base rate, with six monthly rests. This was in due course secured by a loan agreement secured by an assignment by Mr Nurkowski of his rights against Gallaghers under his put option in respect of Field 149.

24  In December 1991 Mr Nurkowski was assessed for £30,000 tax in respect of the sale of the Cockhill land. Mr Nurkowski's accountant said that he was not in a position to pay.

25  In April 1992 the Revenue sought information about the sale of OS 160 from Gallagher.

26  On 26 May 1992, Mr Nurkowski made an offer to buy a public house called the Lion & Fiddle for £150,000. This did not in the event proceed at this stage

Hill v Spread Trustee Co Ltd, 2006 WL 12883581 (2006)

but the settlement lent £10,000 in cash to Mr Nurkowski on 8 July 1992.

27 In June 1992, the district valuer told the Revenue that he could not see why the value of OS160 in March 1989 should be less than the amount paid by Gallagher in August 1989.

28 According to a document prepared by Mr Gardner of the trustees, on 14 July 1992 Mr Nurkowski and Mr Gardner had a meeting at which Mr Nurkowski said that he was in dispute with the Revenue over valuation and that he therefore wanted to dispose of as many of his assets as he could to the settlement. He would not be able to repay the loan due to the settlement before January 1993 and he would then either transfer assets or repay in cash which could be used to buy assets from him.

29 On 12 November 1992, a new district valuer advised his colleagues in the Revenue that OS 160 was worth £650,000 as at 16 March 1989.

30 In December 1992, Mr Nurkowski (having exercised his put option) became liable to pay a further £352,000 tax in respect of the sale of the balance of OS 149 payable in December 1993. He also owed some £665,000 to the settlement. He and Mr Boyd agreed to offer to repay one half of the monies owed to the settlement. The trustees accepted this proposal and that the repayment should be made out of the proceeds of the consideration outstanding from the sale of OS149.

31 Shortly after this, Lloyds Bank plc, with which the company had a loan account, sought a reduction in the company's overdraft.

32 On 29 January 1993, Mr Boyd had a meeting with the Revenue in order to negotiate the value of the land sold to Gallagher. He told the Revenue that the sale to Gallagher had only been secured at the last minute (879H). Mr Boyd told the Revenue that no deal had been concluded before the settlement had taken place.

33 In a telephone conversation on 3 February 1993, as recorded by Mr Fuller of the Revenue, Mr Boyd told Mr Fuller that Mr Nurkowski was "very heavily in debt. He owed substantial amounts to two banks, particularly in respect of his company's account. The

£880,000 realised last month had wholly gone to settle the money owed to the bank." (881E). He said Mr Nurkowski "simply did not have the wherewithal to meet even the £143,000 and was relying on being able to raise this amount from the bank by way of loan". Mr Fuller asked for a statement of Mr Nurkowski's financial position. Mr Boyd said that he had drafted a balance sheet and it showed that Mr Nurkowski was "in the red by some £350,000". In answer to a question from Mr Fuller Mr Boyd said that "he understood that the funds to buy the investments held by the settlement had been financed by bank loans" (881–2).

34 In February 1993, Mr Nurkowski agreed to buy two public houses, the Three Lions and the Nettleton Arms for £52,000 plus VAT and £150,000 respectively. Mr Boyd told the trustees that Mr Nurkowski would be drawing down on his loan arrangements with them to make a number of acquisitions. The terms as agreed meant that Mr Nurkowski would not have to pay any interest to the trustees for five years.

35 In February 1993, Mr Nurkowski made a further offer to purchase the Lion & Fiddle public house.

36 On 15 February 1993, Mr Fuller telephoned Mr Boyd. Mr Fuller referred to the substantial assets of the settlement and raised the question whether the trustees would lend money to Mr Nurkowski to pay his tax. Mr Boyd said that he thought that the trustees would not make any loan to Mr Nurkowski except on commercial terms. Mr Boyd said that he would need instructions from Mr Nurkowski. Mr Nurkowski instructed him to continue to negotiate.

37 On 16 February 1993, the trustees lent £250,000 to Mr Nurkowski so that the company's overdraft with Lloyds Bank could be paid off. This loan carried interest at 1.5% above Lloyds Bank base rate, payable at six-monthly intervals, and was secured over the shares in the company. In fact the last audited accounts of the company, drawn up as at 31 March 1991, showed that the company was then insolvent but the trustees did not ask to see these accounts. The terms of the loan were set out in a loan agreement, which the judge called "Loan 1". Clauses 5 and 6 of Loan 1 provided for the making of further advances and the grant of further security as follows:

"5. It is intended that further sums may from time to time be advanced to the borrower. The parties acknowledge that all such further advances should be on the same terms and conditions as the principal loan and as are contained in this agreement.

6. … The Borrower will deposit such further security from time to time in connection with further advances as the trustees shall reasonably require …"

38 Meanwhile, Mr Boyd continued his negotiations with the Revenue and made an offer of compromise of £160,000. He reported the offer to Mr Nurkowski, who was proceeding to acquire three public houses.

39 On 24 February 1993, the Revenue accepted the offer of £160,000 made by Mr Boyd. On 26 February 1993, contracts were exchanged for the purchase for the Lion & Fiddle for £165,000 plus VAT.

40 On 1 March 1993, Mr Nurkowski instructed Mr Boyd to apply to the settlement for a further loan of £198,500 to complete the purchase of the Lion & Fiddle and also a loan of £160,000 to pay the Revenue. The trustees agreed to make both loans. The loan of £198,500 was recorded in an agreement which the judge called "Loan 2". It was dated 25 March 1993. The terms as to interest and other terms in Loan 1 applied. This loan was secured by a charge over the Lion & Fiddle public house.

41 The loan of £160,000 was recorded in a loan agreement dated 30 March 1993 which the judge called "Loan 3". This was not supplemental to Loan 1 and was interest free for up to twenty years as the terms of this loan provided that it was not repayable for 20 years or if earlier 28 days after the death of Mr Nurkowski. Mr Nurkowski was given a right to pre-pay the loan. The trustees asked for security against Enniswood House. Mr Nurkowski refused to offer Enniswood House as

security but gave security over the balance of the land at Cockhill not previously sold to the trustees. He gave an indemnity to the trustees against liabilities arising by reason of the trustees making the loan free of interest. Clause 5 of Loan 3 contained the following provision for further security:

"The Borrower will deposit such further security from time to time in connection with the Number 3 loan as the trustees shall reasonably require …"

42 On 30 March 1993, Mr Nurkowski signed an agreement of compromise with the Revenue. The Revenue agreed to accept the sum of £160,000 in full and final settlement of all tax liabilities of whatever description arising on the making of the settlement, on the sale of the land in August 1989 and on the disposal of the Cockhill land. That sum of £160,000 was duly paid.

43 In May 1993, Mr Nurkowski asked the trustees for yet more loans. On 19 May the trustees agreed to lend a further £30,000. This was recorded in a loan agreement which the judge called "Loan 4", which was supplemental to loan 1. There was no additional security for this loan (890G).

44 In June 1993, Mr Boyd asked the trustees for a loan of a further £90,000 to make a further property acquisition. The trustees indicated that they would be willing to lend their remaining cash (£40,000) and to liquidate their remaining investments. Mr Nurkowski through Mr Boyd asked the trustees to do this. Accordingly the trustees made a further loan of £70,000 to Mr Nurkowski, which was recorded in a loan agreement dated 29 June 1993 which the judge called "Loan 5". The security was the Three Lions public house which Mr Nurkowski had bought for £52,000 plus VAT. The terms were those applying to Loan 1.

45 On 23 November 1993, the trustees had to ask Mr Nurkowski to lend some small sums so that they could pay the tax due from them as trustees. Later they asked

for small sums to pay their own fees but none of these sums were paid.

46 Meanwhile Mr Nurkowski had received a further assessment for £372,457 in respect of the gain on OS 149. Mr Boyd told Mr Nurkowski's accountant that he had no sums to pay the tax. The balance sheet of the settlement as at 5 April 1994 showed that the debts then owed by Mr Nurkowski to the settlement amounted to £762,729.

47 On 16 June 1994, the trustees asked for the security for the loans made to Mr Nurkowski to be increased. On 4 November 1994, Mr Boyd made a number of proposals to the trustees, including a proposal for a second charge over Enniswood House. On 24 November 1994, Pritchard Englefield & Tobin, solicitors, wrote to Mr Boyd on behalf of the trustees asking for a reduction in the borrowings or an increase in the security offered. Their letter stated:

> "It would seem there is a serious shortfall and our clients have instructed us to press for either a reduction in the borrowings or a major increase in the security offered. It is important that a formal offer with valuations is made to the trustees at an early date."

48 Mr Boyd replied on 30 December 1994, stating that Mr Nurkowski was unlikely to be able to reduce the borrowings but was willing to offer further security. Mr Boyd stated that he intended to continue to negotiate with the trustees direct. Nothing further was heard from Pritchard Englefield & Tobin.

49 On 30 December 1994, Mr Nurkowski executed a legal charge over the Lion & Fiddle in favour of the trustees.

50 In May 1995, having taken advice from counsel, Mr Boyd told the trustees that he could no longer act for them. On 7 October 1995, Mr Nurkowski told the trustees that he was unable to pay their fees. The

Revenue continued to press both the trustees and Mr Nurkowski in respect of tax due.

51 In February 1996 the trustees asked Mr Nurkowski if the land at Cockhill could be sold "to provide some liquidity for the trust", although this was a trust asset. On 27 March 1996, Mr Nurkowski sold the Three Lions public house to the company and the trustees released the charge without requiring any repayment of the debts due from Mr Nurkowski. On 17 April 1996, Mr Nurkowski executed a second charge over Enniswood in favour of the trustees. In August 1996 and February 1997, Mr Nurkowski provided the trustees with further security over property he owned.

52 On 23 October 1997, the trustees wrote to Mr Nurkowski stating that they were only willing to allow the loans to Mr Nurkowski to remain outstanding if they were satisfied that the security was adequate. On 4 December 1997 the trustees wrote to Mr Boyd saying that the trustees would like to have the maximum security available and that they would be pleased if Mr Boyd would pursue that matter with Mr Nurkowski.

53 On 21 November 1997, Mr Nurkowski assigned to the trustees all the indebtedness of the company to himself. This was absolute in its terms but it was common ground that it was given by way of security only.

54 On 30 June 1998, the Revenue made an assessment on Mr Nurkowski in the sum of £437,147 tax plus interest on the gain on OS 149.

55 In August 1998, Mr Nurkowski was served with a statutory demand in respect of the unpaid tax. On 12 January 1999, Mr Nurkowski was served with a bankruptcy petition and on 28 January 1999 a bankruptcy order was made against him.

56 On 21 January 1999, the trustees made a demand for repayment of £548,500 being the amount outstanding of the monies lent by them, plus interest due thereon of £311,458, even though some of these monies could not be rendered due on demand.

57 Mr Hill was appointed trustee in bankruptcy. Mr Boyd told Mr Hill that he acted for the settlement and had not acted for Mr Nurkowski for some time.

Hill v Spread Trustee Co Ltd, 2006 WL 12883583 (2006)

**The judge's findings**

58  In his general observations about the witnesses, the judge said:

> "Mr Nurkowski was a dreadful witness. At times he did not even attempt to make plausible replies to questions and his evidence was at odds with the contemporary documents and the likely chain of events. I find that he was completely dishonest and I can place no reliance on anything he said."

59  The judge was also critical of Mr Boyd. He said that Mr Boyd was not prepared to tell a direct lie but was a master of what Kipling called the "truthful answer that tells the blacker lie" (906C). By way of example he held that he had wrongly misrepresented to the trustees that the reapportionment of the consideration for the sale of OS 149 and OS 160 was Gallagher's idea.

60  The judge then made his findings in respect of the argument that the settlement was a sham. There is no appeal against that part of his judgment so I need say no more about it. At 914B, the judge turned to the claim under section 423 of the 1986 Act. He held that Mr Nurkowski had three purposes in making the settlement, namely an understandable and proper intention to provide for his daughter, a proper intention to defer tax on the property and a purpose to evade tax by pretending that there was little difference between the current value of the land and the cost to him on acquisition in 1986. The judge held that this was so even if Mr Nurkowski had intended to elect to hold over the tax payable on the gift into settlement as there would have been at least a partial clawback when the settlement was exported. The judge continued:

> "Mr Nurkowski thought, until he was later corrected by Miss Foster, that OS 160 was going to get planning permission in April. He

> therefore decided to conceal the current value of the land and to endeavour to persuade the Inland Revenue that it had little or no hope value in March 1989 . He was aware that he should have taken action some time ago, but he hoped that by misrepresenting the current value he would be able to achieve the benefit he would have had if he had settled the land in 1987. I find that, as Miss Newsham recorded, he had an offer in 1988 of £700,000 for OS160 and he was aware that that was probably its minimum value at the time . I do not find Miss Foster's evidence to the contrary convincing she was not a party to Gallagher's negotiations." (914F) (Italics added)

61  The judge went on to hold that although Mr Nurkowski instructed Mr Boyd to give him tax advice he did not give him anything like the same information that he had given Spicer & Oppenheim in January. He held that Mr Nurkowski had deliberately concealed the offer he had received for the land from his advisers in the summer of 1989. He found that neither Mr Boyd nor Mr Nicolson knew of it: it is indeed the trustees' case that Mr Boyd did not know of the £700,000 offer (appellants' skeleton argument page 23, para. 64(iii)). He held that he could infer that it was Mr Nurkowski's intention in March 1989 not to reveal that offer or the extent of the interest shown by Gallagher in 1988 to the Revenue, and that one of his purposes in making the settlement was to prejudice the interests of the Revenue by inducing them to make a wrong assessment of capital gains tax. The judge held that he could not do this without the settlement because if he retained the land the capital gain would be the difference between the cost adjusted for indexation, and the sale price. The judge held that although this was not his sole or dominant purpose this was positively intended and a factor which substantially motivated him. The judge rejected the submission that it was the deception not the settlement which caused any prejudice.

"The settlement was an essential part of the purpose. If I buy petrol, I can say that I do so for the purpose of making a fire, although I cannot make the fire without buying matches." (915B)

62  The judge rejected a defence that the claim was statute barred. He held that the claim under section 423 was a specialty and that section 8(1) of the Limitation Act 1980 applied. He held that the action could not have arisen before the bankruptcy order was made. Since that order had been made on 28 January 1999 the application was not statute- barred.

63  The judge also rejected the argument that the Revenue was not a victim for the purpose of section 423(5) because it had entered into a compromise with Mr Nurkowski. He held that the question whether section 423(3) was satisfied had to be determined at the time the transaction was entered into. If his interests had not actually been prejudiced that might be a matter to be taken into account when the court gave relief.

64  The judge considered a number of the transactions under which Mr Nurkowski had given security over his assets in favour of the trustees. In particular he held that section 423 did not apply to the security given for the loans made in 1991 and 1993. The aggregate amount which Mr Nurkowski borrowed from the settlement was £1,228,500. The 1991 transaction had been repaid and the 1993 loans were not within section 423 . He held that the charge over the Lion & Fiddle on 30 December 1994 was outside section 423 because it was made pursuant to a contractual obligation to perfect security on demand from the trustees. However he held that the charges over Enniswood and the land at the rear of that property, in April and August 1996 respectfully, and the assignment of the loan account in November 1997 were transactions within section 423 . These transactions involved the grant of security for loans already made and although it might appear that the trustees had given consideration in the form of forbearance from enforcing their loans, in fact the trustees' pressure was "synthetic" and no consideration was given. The purpose was to put assets beyond the reach of the Revenue.

65  In the light of his findings the judge heard further argument as to the appropriate form of order and gave the relief described in para. 3 of this judgment and made orders for the payment of costs.

**The issues on this appeal**

66  The following are the issues which arise on the judge's findings of fact:

- a.  *The £700,000 offer issue:* Was the judge entitled to find that Gallagher had made an oral but unconditional offer of £700,000 to purchase OS 160 from Mr Nurkowski in 1988, and as at the date of the settlement dated 10 March 1989 Mr Nurkowski knew that such offer represented the minimum value of OS160?
- b.  *The purpose issue (fact)* : Was the judge entitled to find that one of Mr Nurkowski's purposes in making the settlement was, by concealing the £700,000 offer, to cause the Revenue to value the land at less than its true value as at the date of the settlement?
- c.  *The later charges and assignment issue* : was the judge entitled to conclude that the later charges and the assignment were given for no consideration for the purposes of section 423 of the 1986 Act?

67  The following are the issues of law which arise on this appeal:

- d.  *The limitation issue:* is the trustee in bankruptcy's application statute- barred?
- e.  *The purpose issue (law)* : was Mr Nurkowski's intention as found by the judge sufficient to constitute a purpose capable in law of being a purpose for the purposes of section 423(3)(b) ? i.e. was it prejudicial? was it sufficiently realistic? did it cause prejudice?
- f.  *The victim issue:* was the Revenue a victim for the purposes of section 423(5) ? i.e. did the applicant have to prove that the Revenue was a victim at the date of the trial?
- g.  *The charges and assignment issue* : if the later charges were outside section 423(1)(a) , should the judge have held that they were within section

423(1)(c) as they involved the disposition of the property of Mr Nurkowski at an undervalue?

68   In the course of the hearing of this appeal an application was made to amend the grounds of appeal to include new points of law as to the form of relief that the judge should have granted and in addition a point which was not investigated at trial as to whether the second and third charges were granted pursuant to clause 5 (the covenant to provide such further security as the trustees might reasonably require) in Loan 3. We granted the application to raise new points of law as to relief, which were not opposed. We refused permission to amend the grounds of appeal in respect of the remaining issue. It raised the issue of the reasonableness of any requirement by the trustees, and this was not investigated at the trial as it was not raised by the appellants until after all the witnesses other than Mr Boyd had by then given their evidence. Indeed we have not been shown any evidence that the trustees were seeking to invoke this clause in any event.

69   A number of issues arise on this appeal but have been stood over for hearing following the handing down of this judgment. Those further issues are therefore not dealt with in this judgment. They include issues as to costs and:

   • h.  *The relief issue (the settlement)* : did the judge err in the exercise of his discretion as to the form of relief in respect of the settlement?
   • i.  *The penalties issue* : should relief have extended to penalties and also to tax which Mr Nurkowski owed apart from the gift into settlement?
   • j.  *The relief issue (charges)* : should the judge have brought into account the release by the trustees of their charge over the shares in the company?

**Issues of fact**

70   The judge could not have concluded that the settlement was a transaction to which section 423 applied unless he had found that one of Mr Nurkowski's purposes in entering into it on 10 March 1989 was to prejudice the interests of the Revenue. If therefore Mr Nurkowski only formed that intention at a later date,

for example when he saw Mr Nicolson's valuation of OS 160, or if he had never formed anything that might be described in law as a "purpose", the settlement could not be avoided under section 423 .

71   An unusual feature of this case is that the settlement alone could not prejudice the Revenue. It was the failure to reveal the offer of £700,000 made in December 1988 (if made) for the purposes of valuing the land vested in the settlement that was capable of prejudicing the Revenue. It would indeed succeed in prejudicing the Revenue if it led to an incorrect valuation of the land and that valuation caused the Revenue to agree a lower value for it than it would otherwise have done. On the other hand if there had been no settlement there would have been no charge to tax and no valuation. Mr Nicolson's valuation was incomplete for the Revenue's purposes since at it took no account of any prior offer for OS 160. However, the position is further complicated by the fact that the Revenue did not rely on Mr Nicolson's valuation but on internal advice as to the value of OS 160. The position is yet further complicated by the fact that the Revenue proceeded to enter into a compromise with Mr Nurkowski and to relinquish its claim to assess tax arising out of the gift into settlement. However, the Revenue certainly was a form of future creditor by reason of the settlement. Moreover, its position is that in the events which have happened there are still claims to tax and interest of about £270,000 arising out of the gift into settlement, and that the compromise does not prevent these claims from being advanced. The Revenue also claims tax pursuant to section 739 of the Income and Corporation Taxes Act 1988 as a result of loans made by the trustees to Mr Nurkowski.

72   The judge did not decide whether the Revenue was correct about being able to reopen the compromise. Indeed he could not do so in a way that would bind the Revenue because the Revenue was not a party to the application. He did not, however, dismiss the application on the basis that it had not been shown that the Revenue was a victim who still had a claim at the date of the trial. He fashioned the relief in a way which he considered was appropriate to deal with the situation that the Revenue might or might not be shown later to be a victim in relation to the tax due as a result of the gift into settlement. Whether he gave appropriate relief is not in issue at this stage. The point to be made at this stage is

that this is a most unusual case; in the usual situation the bankrupt has entered into a transaction which removes assets from the reach of a creditor or creditors and has a direct effect on their ability to recover their debts, and that creditor or those creditors remain unpaid at the date of the trial. Here, as I have said the settlement did not as such prejudice the Revenue and indeed the Revenue received a sum which at the time it accepted in full discharge of the tax due in respect of the gift into settlement.

73  The appeal must be considered at two levels. First, the court must examine whether the judge's findings of fact can be successfully challenged. Then, the court must consider the questions of law. It should be borne in mind, however, that, while questions of fact have been separated out for ease of analysis, there are in some cases closely connected issues of law which are considered separately.

**The £700,000 offer issue**

74  This is an appeal against the judge's finding of fact. Accordingly, the only issue here is whether the judge was entitled to make a finding that Gallagher made an offer of £700,000 in December 1988. Mr Nurkowski's evidence was that no such offer was made. Mr Cox of Gallagher was not called to give evidence, but Miss Foster, who represented Gallagher's agents, was called and she denied that an offer of £700,000 had been made. Miss Newman submits that the existence of such an offer conflicted with Mr Cox's file note made in April 1992 in preparation for the inspection of his file by the Revenue. She also submits that it is more probable that Gallagher offered to buy merely an option over OS 160 and that Mr Nurkowski merely exaggerated the position when he had meetings with Spicer & Oppenheim in January 1989.

75  Miss Newman further submits that the question whether such an offer was made was irrelevant because the question at issue as between Mr Boyd and the Revenue was whether the £740,000 agreed to be paid by Gallagher in August 1989 was significantly more than market value. I do not accept this submission. If an offer of £700,000 was made in December 1988 it was clearly material to determining the market value at March 1989.

76  The three contemporaneous attendance notes prepared by Spicer & Oppenheim record statements by Mr Nurkowski that Gallagher had made an offer of £700,000 in December 1988. Mr Nurkowski's denials in evidence that such an offer had been made were partly based on the lack of a written offer.

77  Mr Nurkowski had clearly been interested in disposing of his land for some time, as the enquiry which Mr Holdway made of the Revenue in late 1987 demonstrates. Moreover, this is confirmed by the negotiations with other developers after the grant of planning permission in respect of the main development. In normal circumstances it would not be expected that developers would be keen to acquire sites on the periphery of the main development which did not have planning permission but that was not the case in respect of these two sites.

78  The judge took the view that there were negotiations between Gallagher and Mr Nurkowski to which Miss Foster was not a party. Her suggestion that Mr Nurkowski thought that his land had planning permission is difficult to accept having regard to Mr Nurkowski's involvement in the planning matter. It was therefore open to the judge to reject her evidence that no negotiations had taken place in December 1988. His conclusion was supported by contemporaneous documents.

79  In my judgment, particularly in the light of the Spicer & Oppenheim attendance notes, the judge was entitled to make the finding that Gallagher had made an offer to Mr Nurkowski to acquire OS 160 in December 1988. On no less than three occasions Mr Nurkowski is recorded as saying that such an offer had been made. Moreover, Mr Nurkowski said he wanted to proceed as quickly as he could and one of the reasons why he might have wished to do that was to make sure the December offer from Gallagher was not lost.

**The purpose issue (fact)**

80  Again this is an appeal against the judge's findings of fact. The judge inferred that one of the purposes in setting up the settlement was to evade tax by pretending that there was little difference between the cost of OS 160 to him and its value as at March 1989. To do this,

Hill v Spread Trustee Co Ltd, 2006 WL 1283580 (2006)

Mr Nurkowski had concealed the offer of £700,000 from his adviser, Mr Boyd, and from Mr Nicolson.

81    Miss Newman focuses on the judge's general assessment of Mr Nurkowski as a witness. She submits that the judge was not entitled to find that Mr Nurkowski was "completely dishonest" and that the judge should have given specific examples and reasons for finding that he was dishonest. The judge failed to make allowance for the fact that the cross-examination was conducted (by Mr Stephen Davies QC) in what she submitted was a bullying way. She submits that the judge should have made express allowance for this conduct. In addition, insufficient allowance was made for the fact that Mr Nurkowski was severely dyslexic: at the trial Miss Newman made an application that when he was to be cross-examined on a document it should first be read to him. The judge said he would make every allowance for Mr Nurkowski's disability. In my judgment he was right not to prescribe how Mr Davies should cross-examine from the outset. The judge intervened from time to time in the cross-examination so that Mr Nurkowski was given a proper opportunity to answer a question. Miss Newman submits that he did not do so sufficiently.

82    By way of further example, Miss Newman submits that the cross-examiner's approach to Mr Boyd was so aggressive that he was paralysed and unable to answer questions in a way which put his evidence in its best light: she described him as "a rabbit stuck in the headlights". She added that her objections to this approach were overruled by the judge or waved aside without reasons.

83    Miss Newman informed us that of the evidence of Miss Foster was interrupted because she broke into tears. She declined the judge's offer of a break. I do not see from the transcript that any improper pressure was brought to bear on this witness in the cross-examination which led up to that interruption.

84    In relation to Mr Nurkowski and Mr Boyd, Miss Newman's submission clearly raises serious issues. However, there is nothing in the grounds of appeal to support the way the submission is put. There is a general ground of appeal that the judge's findings on such matters as purpose were against the weight of the evidence, but that does not of itself cover a submission

that the judge gave too much weight to the evidence of particular witnesses because he failed to take into account that they had unfairly been pressurised into giving their answers. It does not give the respondent proper notice of the points to be made. Furthermore, the submission is not substantiated by the necessary evidence. This court only has the transcript of the evidence. Some aspects of the alleged bullying would not be recorded in the transcripts, such as tone of voice, rapid fire of questioning and so forth. I can see from the transcript that for instance there were comments by the cross-examiner in the course of the cross-examination which offended the rule that advocates should not express any personal opinion on the matters in issue. That should not have occurred. There were also instances in the extracts shown to the court where a number of comments made by the cross-examiner in the course of cross-examination were highly critical of the witness. These comments too should not have been made. The duty of the advocate is at all times to be courteous to witnesses and, if this does not occur, the judge should intervene. However, the responsibility does not rest only on the judge. If the judge does not intervene, counsel for the other side should consider whether to object. We do not see that that occurred very often in this case, and if counsel's objections are brushed aside counsel needs to make a general statement which is recorded in the transcript to explain why counsel will not be intervening on every occasion and reserving all the parties' rights. Needless to say, cross-examination of a witness that is excessive may also lead to any answers that are favourable to the cross-examiner being rejected in any event, and so even apart from being discourteous the technique may be self-defeating.

85    Miss Newman has prepared a file of extracts from transcripts with her comments interposed. I have used this file as the basis of making my criticisms of the cross-examination in the last paragraph. But some of the comments which she makes in those comments in my judgment are not fair criticisms of the cross-examiner. His role was to elicit answers from which the judge could draw some very serious inferences against Mr Nurkowski and Mr Boyd. In all the circumstances I would reject Miss Newman's submission that the judge's findings of fact against the appellants can be set aside because of the conduct of the cross-examination of these witnesses. This was a very experienced judge and

in making findings of fact he would be well practised at making all the allowances which need to be made for witnesses, particularly in the situation where their reputation is at stake. There is no evidence to suggest that the approach had a material adverse effect on the witnesses. It would not be fair to the respondents for this court to proceed on the basis that they were so affected unless there was evidence to that effect to which the respondents had had an opportunity to reply.

86   I now turn to the question whether the crucial finding of purpose was a finding which the judge was not entitled to make. The judge gave few clues as to how he reached his finding. The test whether Mr Nurkowski had the necessary intention is a subjective test: the judge had to be satisfied that he actually had the purpose, not that a reasonable person in his position would have such. On the other hand, the judge could infer that such a purpose existed even if Mr Nurkowski himself denied it.

87   It is incontrovertible that Mr Nurkowski had tax planning advice which suggested a gift into settlement. At first sight therefore this looks like a case where the lay client merely followed his advisers' advice, and left it to them to provide the necessary information to the Revenue. Section 423 does not prevent a person from acting on legitimate tax avoidance advice in this way. After all Mr Nurkowski's case is that he did not try to hide anything from Mr Boyd, to whom he gave Spicer & Oppenheim's contact details. Mr Boyd could if he had followed up those leads have found out what Mr Nurkowski had told Spicer & Oppenheim. The judge did not refer to this evidence. It was always possible that Mr Nurkowski had no intention of deceiving the Revenue. He simply found later that Mr Nicolson was prepared to give a valuation which just happened to give him a benefit in tax terms which he was not expecting. Mr Nicolson was not on the scene at 10 March 1989. There is a risk that the judge saw that the sale of OS 160 and OS 149 occurred within a short period after March 1989 and therefore assumed that Mr Nurkowski must have intended throughout to set up the settlement with a view to getting an incorrect valuation which would lead the Revenue to assess him with far less tax than he would otherwise have to pay. Did the judge work backwards from what happened in July and August 1989 and conclude that the purpose must have been to conceal the gain in March 1989? It can be said that the fact that the sale occurred so soon after

the grant of planning permission goes against the idea that Mr Nurkowski intended to conceal the existence of an earlier offer from Gallagher. It is said that he would have put more distance between the offer and the eventual deal if he really intended this.

88   The difficulty with these arguments is that, taking the judge's findings step by step, the judge's conclusion was that Mr Nurkowski had had an offer from Gallagher in December 1988, and that Mr Nurkowski's evidence to the contrary was untrue. His subsequent actions have to be viewed in the light of those findings. Moreover, it is common ground that Mr Boyd did not know of the offer and Mr Nurkowski did not expressly inform him of it. It was clearly a relevant matter to be mentioned to his solicitor and therefore the fact that it was not expressly disclosed was a factor for which there was no real explanation: it is hardly an answer to say that Mr Boyd could have found the information out for himself if he had contacted Spicer & Oppenheim. In addition, Mr Nurkowski wanted money in a hurry. He clearly regarded the settlement as a vehicle of his own and that is why he felt able to renegotiate the contract without the participation of the trustees in a way that disadvantaged the settlement. It must have been obvious to him the law did not actually allow him to do that. He was very familiar with the tax issues and with the importance of land values. These points are apparent from the Spicer & Oppenheim attendance notes. There is nothing in Mr Boyd's attendance notes which we have seen that suggests that Mr Nurkowski needed detailed advice on these issues. Mr Nurkowski was experienced in doing property deals. Moreover the chronology of events shows that Mr Nurkowski was unwilling to pay tax and regularly delayed paying it, all of which demonstrates a constant awareness in what he did of tax implications. The memo of 16 July 1992 referred to above is subsequent evidence of his desire to ensure that the Revenue recovered as little as possible.

89   As to the lie in relation to the £700,000, the judge could, as Charles J had done in Carman v Yates [2005] BPIR 476 , have reminded himself of the direction, known as the Lucas direction, used by judges when summing up to juries that a person may have several different reasons to lie and the fact that he lies on one occasion or about certain matters does not necessarily mean that he did so on other occasions or on other matters as well (see R v Lucas [1981] 1 QB 720 and R v

Middleton [2000] TLR 293 ). A tribunal must consider whether there were special circumstances which would help explain why he lied on past occasions. The need to do this, however, is well known to judges and there is no need for them to give themselves an express direction.

90  In my judgment, in the light of all the circumstances, the judge was entitled to take the view that, when Mr Nurkowski was in discussion with Mr Boyd, that it was unlikely that he just forgot about the offer in December 1988 and that he could be satisfied that the non-disclosure to Mr Boyd was deliberate. It is not enough for Miss Newman to say that the allegation was not pleaded. It was pleaded that there was concealment of the offer from the Revenue and it must have followed from that that concealment from Mr Boyd would also be alleged.

91  Having reached that point the judge was faced with the question why should Mr Nurkowski have dissembled on both these matters? The judge heard all the evidence and there were many different strands in the evidence. In my judgment it was open to him to conclude that Mr Nurkowski had the plan for making the gift into settlement and hiding information from the Revenue. I accept Miss Newman's submission that it would be unsatisfactory if the judge had merely relied on his impression of Mr Nurkowski as a witness but in my judgment there was plenty of other evidence from which he could draw the inference that he did, particularly the contemporaneous Spicer & Oppenheim attendance notes.

**The later charges and assignment issue**

92  The judge found that the later charges and the assignment were given for the purpose of putting assets beyond the reach of the Revenue. He took the view that there was no consideration for these transactions for the purposes of section 423(1)(a) . It has not been suggested that for a transaction to be "on terms that provide for … no consideration" within that paragraph the terms of the transaction must expressly provide for there to be no consideration. The claim as originally pleaded was under section 423(1)(c) , i.e. that the charges were transactions at an undervalue, but in the end the respondent succeeded on section 423(1)(a) .

93  Miss Newman submits that a transaction which grants security cannot be for no consideration because a charge does not deplete the debtor's assets. In my judgment this argument must be rejected. Miss Newman's argument relies on the holding of Millett J as he then was in Re M C Bacon Ltd [1990] BCLC 324 at 340c to 341d that the grant of security cannot constitute a transaction at an undervalue. It does not follow from this that a transaction involving the grant of security can never amount to a transaction for no consideration. In my judgment, it is no different from any other transaction in that respect. This in my judgment was also the view of Millett J who was careful to point out that the security in the case before him was not given without consideration because it was given in exchange for forbearance by the creditor (340f).

94  Clause 6 of Loan 1 provided for the grant of further security in connection with further advances. Since neither of the later charges nor the assignment was given for further advances, it cannot be said that the judge was in error in holding that this clause did not apply. Miss Newman submits that the judge should have interpreted the covenant for further security in clause 6 of Loan 1 as arising not simply when the trustees were making further advances to Mr Nurkowski but also by implication when he was in default of his covenants, for example to make repayment. The judge's interpretation meant that the trustees were unprotected. In my judgment, although Miss Newman's interpretation would have produced a more commercial result, it is not possible to reach that interpretation except by an impermissible rewriting of the terms of Loan 1.

95  The trustees also argued before the judge that they were entitled to take possession of the profits of the Three Lions and the Lion & Fiddle and that they took the later charges and assignment in lieu of enforcing such rights. However the question is then whether that argument is substantiated by the evidence and in particular whether the trustees in fact applied genuine pressure so that the later charges and the assignment can be said to have been given as consideration for their forbearance from enforcing such rights as they had. The forbearance which the trustees gave was to enable Mr Nurkowski to develop the Three Lions and the Lion & Fiddle and continued after 16 February

WESTLAW    © 2017 Thomson Reuters.

1998. Accordingly, on Miss Newman's submission, forbearance was given.

96  Miss Newman accepts that the question whether the later charges and the assignment were for no consideration can be determined on the documentary evidence, consisting mainly of correspondence. In my judgment the facts appearing from the documents summarised above show that the trustees were asking for repayment and for further security without applying pressure. They naturally wanted their fees paid and to be put in funds to pay tax due from them. However, subject to those matters, they were in reality otherwise content to let matters roll forward. The letter from Pritchard Englefield and Tobin was a contrived and artificial attempt to demonstrate the imposition of pressure. That firm's quick departure from the scene lends support to the argument that the trustees did not wish to apply any pressure at all. The fact that the trustees thought that the debts due to them were repayable before 16 February 1998, or that Mr Nurkowski also thought that they were in a position to enforce repayment of the sums due to them, does not mean that consideration in that form was in fact given. The test is objective and consideration was plainly not given in that circumstance. The grant of the security over Enniswood or the land at the rear was not to obtain the trustees' consent to the release of their charge over the Three Lions so that it could be developed; this was not the reason why those charges were granted. Those charges were granted so that the trustees could have as much security as possible even though they were in no position to demand repayment or exert any pressure or give forbearance. The fact that the development of the Three Lions continued after 16 February 1998 does not mean that there was consideration for the grant of security before that date, as Miss Newman submits. It is no answer that the trustees felt that they had to apply pressure gently as Mr Nurkowski was providing a home for the beneficiary of the settlement. The truth is that the trustees were prepared to act in accordance with Mr Nurkowski's wishes and that attitude did not significantly change when the trustees became short of money themselves. It was not the trustees who were pressing for payment of the amounts due to them. It was the Revenue.

97  Miss Newman submits that there was consideration for the assignment of the loan account because

Lloyds Bank were seeking to increase the amount for which they had priority over Enniswood from £75,000 to £120,000. There is a reference to that proposal before the assignment is signed. However the deed of postponement was not signed until 1998 and it is not suggested in the correspondence that the trustees were only prepared to execute the deed of postponement if they were given the further security in the form of the assignment of the loan account.

98  In my judgment the judge was entitled to conclude that the trustees were not pressing for repayment of the sums due to them and did not give any consideration in the form of forbearance for the grant of the later charges and the assignment. Loans 1, 2, 4 and 5 were not repayable until 16 February 1998. Loan 3 was not repayable until 30 March 2013 (unless Mr Nurkowski died in the meantime). Accordingly the trustees were in no position to demand repayment at the date of the later charges or the date of the assignment. The loans were one-sided in Mr Nurkowski's favour. The trustees were in law prospective creditors of Mr Nurkowski. However, they did not threaten to start proceedings to obtain a judgment or to bring bankruptcy proceedings against Mr Nurkowski. Moreover, the trustees were advised by Mr Boyd at most times, which makes it even more unlikely that they would apply any real pressure on Mr Nurkowski.

99  Accordingly in my judgment, the appeal against the judge's findings in respect of the later charges must be dismissed.

### Issues of law

100  Most of the issues of law which arise concern section 423 and therefore I start with some general observations about that section and sections 424 and 425 , which are connected with it. Sections 423 to 425 are drafted in wide terms. The sections apply to transactions defrauding creditors (using the terminology in the marginal note) whether or not the person effecting the transaction has become insolvent.

101  The scheme of section 423 is unusual. Subs (1) defines the circumstances in which section 423 applies: there must be a transaction at an undervalue as defined. Both gifts and transactions with a gratuitous element are covered. Subs (2) defines the objects for which the

court can grant relief and refers to "victims". Subs (2) does not set out the circumstances in which the court may grant that relief. Those circumstances appear from subs (3) . Subs (3) stipulates the purpose with which the transaction must have been entered into before relief can be granted. Subs (4) identifies the court which can hear a claim under section 423 . Subs (5) defines a "victim" of a transaction defrauding creditors, and it is to be noted that the definition is not restricted to creditors with present or actual debts: whether a person is a victim turns on actual or potential prejudice suffered. The definition of "victim" is employed in relation to the criteria for relief in subs (2) . It is not used in subs (3) , which defines the necessary purpose. The person or persons who fulfil the conditions in section 423(3) may thus be a narrower class of persons than those who at the date of the transaction are victims for the purpose of section 423(5) . For a person to be a "victim" there is no need to show that the person who effected the transaction intended to put assets beyond his reach or prejudice his interests. Put another way, a person may be a victim, and thus a person whose interests the court thinks fit to protect by making an order under section 423 , but he may not have been the person within the purpose of the person entering into the transaction. That person may indeed have been unaware of the victim's existence. That answers the question: what connection must there be between the purpose and the prejudice? Section 423(2) in conjunction with the definition of victim in 423(5) makes prejudice or potential prejudice a condition for obtaining relief. That prejudice does not have to be achieved by the purpose with which the transaction was entered into. Nor in my judgment does the purpose have to be one which by itself is capable of achieving prejudice. What subs (3) requires is that the purpose should be one which is to prejudice "the interests" of a claimant or prospective claimant. The "interests" of a person are wider than his rights. The expression the "interests" of a member in section 459of the Companies Acts 1985 (right of members of a company to apply for relief against unfair prejudice) have been similarly construed: see for example Re Sam Weller & Sons Ltd [1990] Ch.682 , 685. Likewise in Peter Buchanon Ltd v McVey [1955] AC 516n at 521, Kingsmill Moore J of the Supreme Court of Ireland spoke of having to consider the *interests* of creditors (which included in that case the tax authority in respect of a tax liability triggered by a sale of whiskey stocks), when a dividend is paid by a solvent company, even though those creditors have no right in law to stop a dividend being paid. I do not therefore consider that it is any answer to the application of section 423 in the present case that the settlement did not by itself prejudice the right of the Revenue to make an assessment of tax on the disposal of OS 160 to the settlement when it was exported to Guernsey. In my judgment, therefore, where as in this case the applicant relies on section 423(3)(b) , the crucial step is to identify the interests of the person which are said to be prejudiced.

102 The next question is whether a person can be said to have the necessary purpose if he is completely mistaken as to whether entry into the transaction can have the effect of prejudicing a person's interests. This question assumes a rather exceptional state of affairs where a person has the necessary purpose of putting assets beyond the reach of his creditors and wrongly thinks that if he enters into a transaction at an undervalue (e.g. gifts property to his wife) his creditor, B, will be prejudiced. If unbeknown to him his wife has agreed to pay the monies transferred to her to B, the purpose that he had in mind will not be achieved. If the creditor takes the benefit of the transaction solely for himself and refuses to share it out with other creditors, they will be persons who (arguably at least) are prejudiced by the transaction and can constitute victims within section 425(5) . Another situation that might occur is where the debtor enters into a transaction knowing that his entry into that transaction, together with the happening of some other event, will prejudice a creditor. I consider that the court does not have to consider the relative causal effect of the two matters. If the transaction is entered into with the requisite purpose, the fact that some other event needs to occur does not mean that the transaction cannot itself be within section 423(3) . I consider that this is what the judge meant by his test of whether the transaction was an essential part of the purpose (in which connection he applied his analogy with petrol and matches for a fire). I therefore do not accept Miss Newman's submission that it is necessary to approach section 423 as if a test of causation were to be applied. The right approach in my judgment is to apply the statutory wording. It is enough if the transaction sought to be impugned was entered into with the requisite purpose. It is entry into the transaction, not the transaction itself, which has to have the necessary purpose.

103  Miss Newman seeks to test her propositions by supposing that Mr Nurkowski had entered into the transaction with the requisite purpose but had then thought the better of it with the result that there was no concealment of the £700,000 offer from the Revenue. I infer that the Revenue would in this case have gone on to make a proper assessment of the tax. It is not necessary to express a final view on the application of section 423 to this example but if that example had happened and there was no reason why Mr Nurkowski should not make the gift to the settlement, it is doubtful whether there would have been any victims for the purpose of section 423 . However, the point does not arise in this case and I express no view on it.

104   Section 424 sets out who may apply for an order under section 423 . A victim may bring proceedings under section 424 as well as (say) a trustee in bankruptcy, but any application, by whomsoever brought must be brought on behalf of all the victims of the transaction.

105  Section 425 sets out a non-exhaustive list of the orders that may be made under section 423 . The 1986 Act does not specify any period of limitation in relation to a claim under section 423 . Although section 423 has been in statute in one form or another since 1571, there is no reported case that we have seen which decides whether any period of limitation applies to claims under the section and if so what that period is. I shall have to deal with that question and a number of detailed points that arise on the interpretation of sections 423 to 425 below.

**The limitation issue**

106  The argument on limitation has been conducted on the following basis. The questions that have been argued are:

> • a.  Is there a statutory period of limitation for claims under section 423 ?
> • b.  If the answer to a is yes, when did the period of limitation begin to run?

107  These proceedings were begun on 4 December 2002, that is over twelve years after the settlement was executed. Therefore this action must fail unless there is no period of limitation, or the period is six or twelve years and began within the period of six or twelve years (as the case may be) ending on 4 December 2002. That would be the case if the period begins on the date of the bankruptcy order, which was 28 January 1999.

108  If there is a statutory period of limitation, it is either twelve years or six years. The relevant statutory provisions of the 1980 Act are as follows:

> (1)  An action upon a specialty shall not be brought after the expiration of twelve years from the date on which the cause of action accrued.
>
> (2)  Subsection (1) above shall not affect any action for which a shorter period of limitation is prescribed by any other provision of this Act.
>
> (1)   An action to recover any sum recoverable by virtue of any enactment shall not be brought after the expiration of six years from the date on which the cause of action accrued …"

109  Before the judge Mr Davies submitted that the commencement of the period of limitation could be postponed under section 32 of the 1980 Act set out in para 120 below. Under that section, the commencement of a statutory limitation period can be postponed if there has been fraud, concealment or mistake. The judge did not find it necessary to reach a decision on section 32 but he observed that it raised a number of difficulties. The fraud or concealment must be the act of the defendant (as defined in section 32(1) ). Here any fraud or concealment was on the face of it that of Mr Nurkowski, not the appellant trustees. Mr Davies did not develop his submissions on section 32(1) at the hearing of this appeal.

110 We were shown no authority which decides the limitation point. In the recent case of Law Society v Southall [2002] BPIR 336 , this court proceeded on the basis that there was no applicable limitation period. (That case concerned gifts made by the debtor and it may be that the parties took the view that if there was any statutory period, its commencement would be postponed under section 32 of the 1980 Act). In the present case, the judge held that there was an applicable limitation period and considered that the claim was a specialty (915E to F). However he held that the limitation period (twelve years) ran from the date of the bankruptcy order so that the claim was brought in time.

111 Before I go to the authorities, attention should be drawn to the features of claims under section 423 which mean that, if such claims are subject to a statutory limitation period, there may be practical difficulties in bringing such claims. As noted above, there is no requirement that the transaction should have occurred in a specified "twilight" period before the bankruptcy. It is quite possible that it will have lain undiscovered for some time. It is one of the characteristics of transactions to which section 423 applies that they are entered into by a person when he is solvent just in case he becomes unable to pay his debts as they fall due later (as where a person is about to begin a new and risky business venture). In that situation he might well have entered into the transaction with the necessary purpose of prejudicing his creditors in those circumstances. Moreover, if the statutory limitation period runs, as Miss Newman submitted, from the date of the transaction, that period might well have expired before the appointment of the office holder who is entitled to bring a claim under section 424(1) (a) or (b) unless, of course, section 32 applies.

112 Under section 424(1)(c) a victim can bring an application under section 423 at any time. If he does so, he is deemed to bring the claim on behalf of every victim of the transaction ( section 424(2) ). If the judge is right, then there must be separate limitation periods for different applicants even though there can only be a single cause of action. On the face of it, that is anomalous. A victim who brings an application under section 423 is not enforcing a remedy for prejudice to himself alone because he, like the trustee to bankruptcy, is deemed to bring the proceedings on behalf of all the victims ( section 424(2) ). Moreover, once the court has

made an order on an application under section 423 , that must be the end of any claim by any other person under section 423 in respect of that transaction. If there is a statutory limitation period commencing on the date of the transaction, there may well be victims who only come into existence after its expiry, but it may be said that it is the inevitable consequence of any limitation period that it will give the defendant a good defence to claims brought after the expiry of the period. I would add that there is a question on which we have not heard argument as to who benefits from an order under section 423 . It may not be the general body of creditors in the bankruptcy (see for example Fidelis Oditah, *Legal Aspects of Receivables Financing* , 1991, para 7.6).

113 Notwithstanding the above, it is the policy of the statute of limitations that there should be an end to litigation and that this is in the public interest. On this basis, there is no reason why claims under this section should not be subject to some time limit. A trustee in bankruptcy is always liable to find himself in a position where claims that he might have made have become statute-barred before he can take steps to enforce them. The hardship is arguably not great here because the cause of action could always have been enforced by a victim of the transaction, even before the trustee was appointed. In any event, the trustee may be able to rely on section 32(1) of the 1980 Act. Section 424(1)(a) reflects the practice under earlier legislation: see for example Re Lane-Fox [1900] QB 508 . In Re Eichholz [1959] Ch 708 , Harman J left open the question whether, if the proceedings were brought by a trustee in bankruptcy, a representative creditor had to be joined. It may be that the purpose of providing in section 424(1)(a) that a trustee in bankruptcy could make the application was simply to resolve this question. It would be odd if by inserting section 424(1)(a) Parliament had made a radical change to the question when time starts to run for limitation purposes. If it runs from the appointment of a trustee in bankruptcy or the appointment of a supervisor of a voluntary arrangement within section 424(1) , time may start to run again many years after the transaction sought to be set aside, and indeed there may be successive bankruptcies or voluntary arrangements. It is, moreover, not clear whether a victim who makes an application with the permission of the court pursuant to section to 424(1)(a) or (b) would then be entitled to the benefit of the same limitation period.

114  With that introduction I turn to the first of the two questions set out in para 106 above.

**Is there a statutory period of limitation?**

115   In his notice of application, the trustee seeks declarations that the settlement, the later charges and the assignment were transactions defrauding creditors under the meaning of section 423 of the 1986 Act which should be set aside accordingly. The trustee also seeks an order vesting the assets of the settlements in him, but that is of little use now as nearly all the assets of the settlement have been applied in making loans to Mr Nurkowski. He also asks for further or other relief. By his respondent's notice, the trustee in bankruptcy seeks a "compendious money judgment" (as his skeleton argument puts it) to put the Revenue into the position that it would have been in if Mr Nurkowski had himself sold both OS 149 and OS 160 to Gallagher for the sum of £2m., and an order setting aside the later charges and the assignment. The judge's order does not set aside the settlement, and the trustee does not in his respondent's notice contend that the order should have done so. (It may be that the range of orders mentioned in section 425 was not available under earlier legislation). While the relief sought in respect of the later charges and the assignment is clearly not to recover a sum of money (though it may lead to a consequential order for the payment of money), the order sought in respect of the gift into settlement may be such an order. In those circumstances, section 9(1) may apply: see section 9(1) and section 8(2), above. However that may be, I do not see how it can be said that, in that case, the 1980 Act provides no limitation period. Of course, the court has jurisdiction to make some form of order other than the payment of money, but it is established by earlier decisions of this court that where statute enables the court to give relief in monetary or non-monetary form the court should look to see what is actually claimed: see West Riding of Yorkshire CC v Huddersfield Corp [1957] 1 QB 540, and Re Farmizer (Products) Ltd [1997] 1 BCLC 589.

116  Insofar as the relief sought is not for "the recovery of a sum recoverable by virtue of" an enactment, within section 9 of the 1980 Act, I agree with the judge that this is an action for a specialty. The essence of a specialty is a covenant under seal or an obligation imposed by statute: see Collin v Duke of Westminster [1985] 1 QB 581, at 601D to 603H per Oliver LJ with whom May LJ and Sir Roger Ormrod agreed, citing in particular Lord Hanworth MR in Aylott v West Ham Corporation [1927] 1 Ch 30, 50 and Lord Atkin in Pratt v Cook, Son & Co (St Paul's) Ltd [1940] AC 437, 446. In both the cases cited the claim was to recover a sum of money under a statute. The Collin case itself concerned a claim for a declaration as to entitlement to acquire the freehold of a property under the Leasehold Reform Act 1967. This court did not determine whether such a claim was a specialty but we have not been shown any authority which establishes that an obligation imposed by statute other than to pay money is not a specialty. On the contrary, section 8 seems to assume that it is as otherwise there would be little purpose in section 8 in relation to statutory obligations having regard to section 8(2) (see also Preston & Newsom, Limitation of Actions, 1989, para 8.9, page 59).

117  I note that the view is expressed in the Cork Report (Report of the Review Committee on Insolvency Law and Practice, 1982, Cmnd 8558) that there is no time limit in which proceedings must be brought to have a transaction set aside under section 172 of the Law of Property Act 1925 (paras 1203 and 1213), but no authority is cited for this opinion. It may be that the Cork Committee had in mind Re Maddever (1884) 27 Ch D 523 (not cited to us in argument) in which this court held that a specialty creditor who applied to set aside a conveyance as fraudulent under the statute 13 Eliz. c.5, the predecessor of section 172 of the Law of Property Act 1925, was not barred by laches and could be brought at any time before his own claim as a creditor became statute-barred. However, at this time there was no statutory limitation period for claims made pursuant to statute, other than debts (see section 3 of the Civil Procedure Act 1833). A statutory limitation period for non-monetary claims made pursuant to statute was introduced for the first time by section 2 of the Limitation Act 1939, pursuant to the recommendation of the Law Review Committee chaired by Lord Wright MR in its Fifth Interim Report (Statutes of Limitation) (Cmnd 5334,1936) (see in particular page 8 of the Report). Once there was a statutory limitation period for non-monetary claims based on a statute, that period must in my judgment apply. However it must follow from Re Maddever that a claim which is statute-barred as against the debtor cannot be the basis of a claim

to set aside a fraudulent conveyance. This principle is consistent with the principle that a statute-barred debt cannot be proved in bankruptcy (see, for example, Cotterill v Price [1960] 1 WLR 1907 ), and accordingly I would hold that the same principle applies to claims which may result in the distribution of the benefits of a judgment under section 423 .

118  My conclusion as to the application of a statutory limitation period is consistent with the decision of this court in the Farmizer case that a claim for a contribution to the assets of a company under section 214 of the 1986 Act in consequence of wrongful trading was subject to the limitation period in section 9(1) . It is also consistent with the decision of John Randall QC sitting as a deputy judge of the High Court of Justice, Chancery Division, in Re Priory Garage (Walthamstow) Limited [2001] BPIR 144 in relation to applications to set aside transactions as at an undervalue or as voidable preferences under section 238 to 241 of the 1986 Act. As we have not heard argument on the form of relief in respect of the settlement, I would leave open the question whether section 9(1) could apply to that part of the trustee's application in that respect.

**When did the period of limitation begin to run?**

119  I now turn to the question when the period begins. The argument that it begins on the appointment of the trustee where an application is made by a trustee in bankruptcy under section 424(1)(a) is that that section prevents any application being made under section 423 except by the persons mentioned in section 424(1) . Thus the requirements for making an application cannot be satisfied in the case of a trustee in bankruptcy until he has been appointed. The judge accepted this argument, citing para. 182 of the judgment of Charles J in Carman v Yates . The holding of Charles J was based on an opinion expressed in Muir Hunter on *Personal Insolvency* and a passage in Re Priory Garage , though I agree with the judge that the passage cited is not directed to this point.

120  I do not consider that the judge was correct on this point. The question is one of statutory interpretation. A period of limitation runs from the date on which the ingredients of the cause of action are complete: Coburn v Colledge [1897] 1 QB 702 , 706 (see also Letang v

Cooper [1967] 1 QB 232 at 242 to 243). A cause of action is complete when all the facts which it would be necessary to prove, if traversed, in support of the right to a judgment of the court, can be pleaded.

121  It must be uncontroversial that the matters contained in section 423(1) and (3) are ingredients of the cause of action under section 423 . The difficult question is whether section 424 also sets out ingredients of the cause of action. As the marginal note states, section 424 deals with the question of who can bring the application. Is this — in whole or part — purely a procedural question, or does section 424(1) set out ingredients of the cause of action?

122  In favour of the former view, it can be said that the appointment of the trustee is not a matter which has to be pleaded before any claim under section 423 can be pleaded. It is likely that there will be a victim prior to his appointment (if there are any victims at all). I have already observed that if the judge is right, the limitation period can begin many years after the transaction. It also means that there are separate limitation periods applying to different applicants. These considerations would tend to make it less likely that time began to run in this case for the purpose of the 1980 Act only when the trustee was appointed. Likewise, it would be very odd if a statutory limitation period began on the appointment of a trustee in bankruptcy if there were in fact no victims at that date.

123  It can also be said that, if the claim is brought outside a statutory period starting on the date of the conveyance, the application may be saved by section 32(1) . This provides:

> "(1)  Subject to subsections (3) and (4A) below, where in the case of any action for which a period of limitation is prescribed by this Act, either—
>
> (a)  the action is based upon the fraud of the defendant; or
>
> (b)  any fact relevant to the plaintiff's right of action has been deliberately concealed from him by the defendant; or

(c)  the action is for relief from the consequences of a mistake;

the period of limitation shall not begin to run until the plaintiff has discovered the fraud, concealment or mistake (as the case may be) or could with reasonable diligence have discovered it.

References in this subsection to the defendant include reference to the defendant's agent and to any person through whom the defendant claims and his agent."

124  This section could clearly be invoked where the defendant was party to the fraud or to any deliberate concealment. Here, however, there is no basis for saying that the appellants were party to any fraud or that they have deliberately concealed any relevant facts. It is possible that the fraud of Mr Nurkowski can be treated as that of the trustees as a result of the extended meaning given in section 32(1) to references to the defendant. However we have not heard any submissions on this point and it is thus inappropriate to express a view on the application of section 32 to this case as that matter has not been fully argued.

125  On the other hand, if it is correct that for the purposes of limitation time begins to run from the date of the transaction, there may be no person at all at the start of the period. It would be odd if Parliament enacted a provision for victims where time started to run before the person who wanted to enforce his rights as a victim had become a victim. In the present case, for instance, the Revenue did not become a victim before Mr Nurkowski made the gift into settlement and submitted the valuation of the land for £35,000. Likewise, a person who enters into (say) a voluntary settlement of all his assets in contemplation of entering into a risky trade may remain solvent for many years. In such a case, I doubt whether a person is "capable of being prejudiced" by the settlement for the purposes of

section 423(5) until the debtor becomes insolvent. Until that point in time, there may therefore be no person capable of applying for an order.

126  In these circumstances, in my judgment, the statutory limitation period cannot start to run until there is a victim within the statutory definition. It must be part of the cause of action that it can be shown that he is a victim. The limitation period must in my judgment then continue unless and until whichever first occurs of (a) the disposal of the possibility of any claim under section 423 by a binding judgment or settlement, or (b) the expiry of the period of limitation applicable to the section 423 claim.

127  The next issue is whether the period also begins when a trustee in bankruptcy is appointed. I do not consider that that is the effect of section 424 because the trustee's application is also made on behalf of the victims. This is an indication that he is to be in no better position than the victims themselves, and thus not able to bring a claim if their claims under section 423 or against the debtor are statute-barred. On the other hand he must be in a position to make an application so long as there is any victim whose claim is not statute barred. I note that in Re Maddever , the co-applicant was the nominee under letters of administration of the insolvent estate of the deceased but the judgment of this court does not suggest that his presence had any effect on the limitation question. I accept, of course, that that case was decided before section 424 was enacted. I have put forward in para. 113 above a possible explanation for including the trustee as a person who may make an application under section 423 .

128  The next issue is whether the limitation period begins each time a victim comes into existence. I would put my answer to this issue in this way. Section 424 establishes the collective nature of the remedy under section 423 : any victim can make the application but if he does so he represents all victims. Likewise, a trustee in bankruptcy can make an application. However, if the trustee makes an application under section 423 , his application is also on behalf of all victims. Section 423 is thus a collective remedy. It follows that the ingredients of the cause of action can be established by pointing to the existence of any one of the victims. It must follow logically from this that the limitation period applicable to the section 423 claim made on any

WESTLAW   © 2017 Thomson Reuters.

particular application cannot start before the victim for the purposes of that application (ie the applicant, or, if the applicant if not himself a victim, the person(s) on whose behalf the applicant makes the application) became a victim. The period then runs from this date or, if the commencement of that period is postponed under section 32 of the 1980 Act, from that postponed date. The length of the period is governed by section 8(1) of the 1980 Act, unless section 9 of that Act applies.

129  In this case, the claim which the Revenue now seeks to advance in respect of the capital gains tax liability apparently settled by the compromise did not come into existence until the compromise was made in 1993. This court has not heard argument on the form of relief and therefore this court must as I see it proceed on the basis that section 8 applies. Accordingly the trustee's claim cannot be struck out as statute barred at this stage.

### The purpose issue (law)

130  There can be no doubt but that section 423(3) requires the person entering into the transaction to have a particular purpose. It is not enough that the transaction has a particular result. The question which Miss Newman raises is: what must be shown in order for the court to be able to find that a purpose has been formed?

131  This is different from the question considered by this court in the recent case of IRC v Hashmi [2002] 2 BCLC 489 . In that case the question was whether when there was more than one purpose the proscribed purpose had to be dominant or not. This court held that it is not necessary for the proscribed purpose to be the dominant purpose; it was sufficient if it was a real substantial purpose.

132  Here it is said that Mr Nurkowski could not be confident that he would get any tax advantage. It was just a hope that he would save tax, rather than an intention. I would accept that there is a line to be drawn between mere hopes and settled aims. As Asquith LJ said in Cunliffe v Goodman [1950] 2 KB 237 , 253, a person cannot be said to have an intention merely because he contemplates something as a possibility or if his wishes are merely a minor factor in the achievement of a particular result.

133  The judge did not draw a distinction between hopes and purposes. However, in my judgment the strength of his finding makes the distinction irrelevant since he found that inducing the Revenue to make a wrong assessment of the capital gains was something that Mr Nurkowski positively intended and was a factor which "substantially motivated" him (915A). This in my judgment was enough to show that Mr Nurkowski acted with what was in law a purpose.

134  I have already dealt with the question whether the purpose was prejudicial or had to be causative of the prejudice to the Revenue.

### The victim issue

135  If I may be forgiven for saying so, this issue is a bit like the chicken and the egg. The appellants criticise the judge for not making a finding about the compromise. They say that he heard all the evidence that there was likely to be on that issue. The position as it existed before the settlement could not be restored and so court has no jurisdiction to make an order unless there was a victim as defined in section 423(5) .

136  In my judgment there is nothing in section 423 which mandates this result. I have already observed that it is a feature of sections 423 to 425 that they are drafted in wide terms, and this is another example of their inbuilt elasticity. It is correct that normally the court would consider that it was not proportionate to hear an application unless it could be shown at that date that there was a person who could benefit by a positive finding under section 423 . But there are bound to be cases where that cannot be shown, perhaps because the person who seems to have been prejudiced has to establish his claim in foreign proceedings, or because there are creditors whose claims have not yet matured into present debts. Here the Revenue has grounds for saying that they were deceived as to Mr Nurkowski's means and as to his ability to raise loans from the settlement. There is as it seems to me a deliberate avoidance of the term "victim" in section 423(1) and (3) , which set out the conditions which have to be satisfied before the court can make an order under section 425 . On the contrary, all that has to be shown is that the person is making or may at some time make a claim (see section 423(3)(a) and (b) ).

137 There is another perspective on the victim issue. The Revenue in the unusual circumstances of this case appeared to move out of the class of victims when it agreed to the compromise but to move back into the class when it resuscitated the claims thereby settled. The position is more apparent than real because it contends that it has had the right to set the compromise aside since the date of entry into the compromise. On that basis it did not move out of the class of victims when it agreed to the compromise. However I see no reason why a person cannot cease to be the person within section 423(3) but become a victim for the purposes of section 423(5) (perhaps by reason of some other indebtedness which the debtor owes to it) before the court makes its order so as to be a person whose interests may be protected by such order. Section 423 is sufficiently flexible to allow this.

**The charges and assignment issue**

138 The respondent initially relied on section 423(1)(c) as the basis for invoking section 423 in relation to the later charges and the assignment. The question of the application of section 423(1)( c) to these transactions does not arise in the light of my rejection of the appeal against the judge's finding that the trustees gave Mr Nurkowski no consideration for these transactions. It would be difficult on the judge's findings to consider the appeal on the alternative basis of section 423(1)(c) applies because that paragraph requires a comparison to be made between the consideration provided by the parties, for which there is no factual basis which could be reviewed on appeal. Miss Newman, however, sought to argue that as a matter of law the grant of security involved no diminution in the value of Mr Nurkowski's assets. Therefore the fact that the consideration provided by the trustees was negligible did not bring the transactions within this paragraph. As to that, I would observe that section 423(1)(c) did not refer to a diminution in assets and does not depend on the grant of proprietary rights. The grant of other rights can constitute consideration; this argument is supported by section 425 which refers to "obligations" and "benefits" as well as to property. If it had been necessary to find the grant of a proprietary right, I would provisionally not have accepted the argument that the grant of security in this case did not involve the disposition of any property right in favour of the trustees. Obviously there is no change in the physical

assets of the debtor when the security is given but there seems to be no reason why the value of the right to have recourse to the security and to take priority over other creditors, which the debtor creates by granting the security, should be left out of account. In the circumstances, I would respectfully doubt whether the holding in MC Bacon on which Miss Newman relied could apply to the later charges, which were in fact charges by way of legal mortgage, especially in the light of what was said by Lord Hoffmann and Lord Millett in Buchler v Talbot [2004] 2 AC 298 at [29] and [51] respectively. I would have the same doubts in relation to the assignment, under which (even though section 136 of the Law of Property Act 1925 was not satisfied) title to the debt was transferred to the trustees. The holding in MC Bacon was applied by this court in National Bank of Kuwait v Menzies [1994] 2 BCLC 306 , where a further assignment was made of a debt that had already been assigned by way of charge, and if this point had to be decided we would have to consider whether that case was distinguishable or was now binding on this point in the light of the Buchler case. However it is not necessary for me to express a final view on these points on this appeal.

**Disposition of this appeal**

139 For the reasons given above I would dismiss this appeal as respects the issues so far argued, and stand over the remaining issues in the appeal and on respondent's notice to a further hearing.

Sir Martin Nourse :

140 I have had the opportunity of reading in draft the judgment of Lady Justice Arden. I agree with her conclusions on all the questions we have to decide except the limitation issue (paras 106 to 129).

141 On that issue the first question is whether there is a period of limitation at all. It is not clear why in Law Society v Southall [2002] BPIR 336 the parties, and thus this court, proceeded on the basis that there was no period of limitation applicable to the claim under section 423 of the 1986 Act. What is clear is that the point was not argued, so that the decision is of no assistance in the present case.

142  Those who may apply for an order under section 423 are specified in section 424(1) . They include, in para (a):

> "in a case where the debtor has been adjudged bankrupt … the trustee of the bankrupt's estate … or (with the leave of the court) … a victim of the transaction. "

In the present case the action is brought by a trustee in bankruptcy and there is at least one victim of the transaction in the shape of the Inland Revenue.

143  There is no general rule that an action brought by a trustee in bankruptcy is not subject to the provisions of the Limitation Act 1980 , and I can see no justification for there to be an exception in the case of a claim brought under s.423 . That is confirmed by such authority as may be said to bear on the point; see in particular Re Priory Garage (Walthamstow) Ltd [2001] BPIR 144 , a case relating to the somewhat comparable provisions of section 238 to 241 of the 1986 Act.

144  The second question is whether the claims of the trustee in bankruptcy fall within section 8(1) or section 9(1) of the Limitation Act 1980 . My own view, like that of Judge Weeks QC (pp 915–916), is that, since the main claim was in origin and substance a claim to set aside the settlement, the action as a whole was "an action upon a specialty" within section 8(1) . But because the action was commenced on 4 December 2002, more than twelve years after the settlement was made on 10 March 1989 and less than six years after the bankruptcy order was made on 28 January 1999, the question whether the applicable period of limitation was twelve years under section 8(1) or six years under section 9(1) is academic.

145  So the third and decisive question is whether the period started on the date of the settlement, in which case the action is barred, or on 28 January 1999, in which case it was brought in due time. Following the view expressed by Charles J in para 182 of his judgment in Re Yates (A Bankrupt) [2004] All ER (D) 373 , Judge Weeks held that the cause of action could not have accrued before the bankruptcy order was made. Charles J said:

> "If there is a limitation period, the passages in Muir Hunter suggest that in the case of a claim by a trustee in bankruptcy begins to run from the date of the bankruptcy order. Counsel for the trustee made the same submission on the basis that that is the date when the cause of action accrued to the trustee. I agree …"

146  The principal objection to that view is that, because section 424(2) provides that an application made under any of the paragraphs of sub-section (1) is to be treated as made on behalf of every victim of the transaction there can only be a single cause of action, while if the view expressed by Charles J and Judge Weeks is right, there must be separate limitation periods for different applicants under section 423 .

147  In my respectful view the premise of this objection is incorrect. It may be difficult to know exactly what Parliament did or did not have in mind in enacting section 424(2) , but it seems that its main purpose must have been to ensure that a victim who had not applied under section 423 should gain the same advantage as one who had.

148  In any event, I do not think it is right to say that the effect of section 424(2) is that there can only be a single cause of action in respect of one transaction. In Letang v Cooper [1965] 1 QB 232 , 242, Diplock LJ said:

> "A cause of action is simply a factual situation the existence of which entitles one person to obtain from the court a remedy against another person."

That shows that the identity of the claimant or applicant is an ingredient of the cause of action and because two different persons may have the same or a similar cause

Hill v Spread Trustee Co Ltd, 2006 WL 1288358 (2006)

of action it does not follow that there is only a single
cause of action.

149    Further, I see no inherent objection to the
notion that there may be separate limitation periods
for different applicants under section 423 . While it has
always been the policy of the Limitation Acts to put
an end to stale claims, it has not been part of their
policy to provide that time shall run against a claimant
or applicant before he has been able to commence his
action; see in particular section 28 of the 1980 Act
(disability).

150    Three further points must be made. First, it is
not an objection to the judge's view that the limitation
period may begin many years after the transaction. That
state of affairs is perfectly capable of arising under
other sections of the 1980 Act, e.g. sections 28 and 32
. Secondly, I do not agree that the appointment of the
trustee in bankruptcy is not an ingredient of the cause of
action vested in *the trustee* . It is not until a bankruptcy
order is made that the trustee is identified as the person
entitled to sue. Thirdly, it is in my view immaterial that
when the bankruptcy order is made there may be other
victims of the transaction whose individual claims may
already be statute-barred but who may nevertheless be
able to claim as creditors in the bankruptcy.

151    For these reasons, differing from Lady Justice
Arden, I have come to the conclusion that the judge's
view of the limitation issue was correct. Like him, I
would decide it in favour of the trustee in bankruptcy
and dismiss the appeal accordingly.

Lord Justice Waller:

152    I too agree with conclusions reached by Lady
Justice Arden on all questions we have to decide except
the limitation issue. On that issue I agree with the
judgment of Sir Martin Nourse, and am fully persuaded
by his reasoning that the judge's conclusion on this issue
was correct.

153    It follows that the appeal on the issues which
were before us will be dismissed and (for the avoidance
of doubt) further argument on relief will not include
argument on the limitation issue.

**The Appendix**

**Sections 423 to 435 of the 1986 Act**

Sections 423 to 435 of the 1986 Act (as amended and
now in force) provide as follows:

> **Transactions defrauding creditors**
> (1)    This section relates to
> transactions entered into at an
> undervalue; and a person enters
> into such a transaction with another
> person if —
>
> (a)    he makes a gift to the other
> person or he otherwise enters into a
> transaction with the other on terms
> that provide for him to receive no
> consideration;
>
> (b)    he enters into a transaction
> with the other in consideration of
> marriage; or
>
> (c)    he enters into a transaction
> with the other for a consideration
> the value of which, in money or
> money's worth, is significantly less
> than the value, in money or money's
> worth, of the consideration provided
> by himself.
>
> (2)    Where a person has entered into
> such a transaction, the court may, if
> satisfied under the next subsection,
> make such order as it thinks fit for —
>
> (a)    restoring the position to what it
> would have been if the transaction
> had not been entered into, and
>
> (b)    protecting the interests of
> persons who are victims of the
> transaction.
>
> (3)    In the case of a person entering
> into such a transaction, an order
> shall only be made if the court is

satisfied that it was entered into by him for the purpose —

(a)  of putting assets beyond the reach of a person who is making, or may at some time make, a claim against him, or

(b)  of otherwise prejudicing the interests of such a person in relation to the claim which he is making or may make.

(4) In this section "the court" means the High Court or —

(a)  if the person entering into the transaction is an individual, any other court which would have jurisdiction in relation to a bankruptcy petition relating to him;

(b)  if that person is a body capable of being wound up under Part IV or V of this Act, any other court having jurisdiction to wind it up.

(5)  In relation to a transaction at an undervalue, references here and below to a victim of the transaction are to a person who is, or is capable of being, prejudiced by it; and in the following two sections the person entering into the transaction is referred to as "the debtor".

**Those who may apply for an order under s 423**

(1)  An application for an order under section 423 shall not be made in relation to a transaction except —

(a)  in a case where the debtor has been adjudged bankrupt or is a body corporate which is being wound up or is in administration, by the official receiver, by the trustee of the bankrupt's estate or the liquidator or

administrator of the body corporate or (with the leave of the court) by a victim of the transaction;

(b)  in a case where a victim of the transaction is bound by a voluntary arrangement approved under Part I or Part VIII of this Act, by the supervisor of the voluntary arrangement or by any person who (whether or not so bound) is such a victim; or

(c)  in any other case, by a victim of the transaction.

(2)  An application made under any of the paragraphs of subsection (1) is to be treated as made on behalf of every victim of the transaction.

**Provision which may be made by order under s 423**

(1)    Without prejudice to the generality of section 423, an order made under that section with respect to a transaction may (subject as follows)—

(a)  require any property transferred as part of the transaction to be vested in any person, either absolutely or for the benefit of all the persons on whose behalf the application for the order is treated as made;

(b)  require any property to be so vested if it represents, in any person's hands, the application either of the proceeds of sale of property so transferred or of money so transferred;

(c)  release or discharge (in whole or in part) any security given by the debtor;

WESTLAW   © 2017 Thomson Reuters.

(d) require any person to pay to any other person in respect of benefits received from the debtor such sums as the court may direct;

(e) provide for any surety or guarantor whose obligations to any person were released or discharged (in whole or in part) under the transaction to be under such new or revived obligations as the court thinks appropriate;

(f) provide for security to be provided for the discharge of any obligation imposed by or arising under the order, for such an obligation to be charged on any property and for such security or charge to have the same priority as a security or charge released or discharged (in whole or in part) under the transaction.

(2) An order under section 423 may affect the property of, or impose any obligation on, any person whether or not he is the person with whom the debtor entered into the transaction; but such an order —

(a) shall not prejudice any interest in property which was acquired from a person other than the debtor and was acquired in good faith, for value and without notice of the relevant circumstances, or prejudice any interest deriving from such an interest, and

(b) shall not require a person who received a benefit from the transaction in good faith, for value and without notice of the relevant circumstances to pay any sum unless he was a party to the transaction.

(3) For the purposes of this section the relevant circumstances in relation to a transaction are the circumstances by virtue of which an order under section 423 may be made in respect of the transaction.

(4) In this section "security" means any mortgage, charge, lien or other security."

Crown copyright

© 2017 Sweet & Maxwell
2006 WL 1288358

End of Document    © 2017 Thomson Reuters.

# TAB 36

*1120  Holman et Al' v. Johnson, alias Newland

Image 1 within document in PDF format.

5 July 1775

(1775) 1 Cowper 341

98 E.R. 1120

1775

### Analysis

Wednesday, July 5th, 1775. Action lies for goods sold abroad, which are prohibited here, if the delivery of them be complete abroad: tho' the vendor knows they are to be run into England.

[Distinguished, *Clugas* v. *Penaluna* , 1791, 4 T. R. 468. Doubted, *Bernard* v. *Reed* , 1794, 1 Esp. 92. Distinguished, *Waymell* v. *Reed* , 1794, 5 T. R. 600; see *Bristow* v. *De Sequeville* , 1850, 5 Ex. 278. Referred to, *Taylor* v. *Chester* , 1869, L. R. 4 Q. B. 314; *Scott* v. *Brown* [1892], 2 Q. B. 728; *In re Thomas* [1894], 1 Q. B. 750; *Burrows* v. *Rhodes* [1899], 1 Q. B. 823; *Gedge* v. *Royal Exchange Assurance Corporation* [1900], 2 Q. B. 220.]

Assumpsit for goods sold and delivered: plea non assumpsit and verdict for the plaintiff. Upon a rule to shew cause why a new trial should not be granted, Lord Mansfield reported the case, which was shortly this: the plaintiff who was resident at, and an inhabitant of, Dunkirk, together with his **[342]** partner, a native of that place, sold and delivered a quantity of tea, for the price of which the action was brought, to the order of the defendant, knowing it was intended to be smuggled by him into England: they had, however, no concern in the smuggling scheme itself, but merely sold this tea to him, as they would have done to any other person in the common and ordinary course of their trade.

Mr. Mansfield, in support of the rule, insisted, that the contract for the sale of this tea being founded upon an intention to make an illicit use of it, which intention and purpose was with the privity and knowledge of the plaintiff, he was not entitled to the assistance of the laws of this country to recover the value of it. He cited Huberus 2 vol. 538, 539, and *Robinson* v. *Bland* , [1] to shew that the contract must be judged of by the laws of this country, and consequently that an action for the price of the tea could not be supported here.

Mr. Dunning, Mr. Davenport, and Mr. Buller, contra, for the plaintiff, contended, that the contract being complete by the delivery of the goods at Dunkirk, where the plaintiff might lawfully sell, and the defendant lawfully buy, it could neither directly nor indirectly be said to be done in violation of the laws of this country; consequently it was a good and valid contract, and the plaintiff entitled to recover. It was of no moment or concern to the plaintiff what the defendant meant to do with the tea, nor had he any interest in the event. If he had, or if the contract had been that the plaintiff should deliver the tea in England, it would have been a different question; but there was no such undertaking on his part. They pressed the argument ab inconvenienti, and cited several cases. MSS. at Ni. Pri. before Lord Mansfield, sittings in London.—An action brought by the plaintiffs, who were lacemerchants in Paris, for laces (which were contraband in this country) sold and delivered to the defendant's order at Calais. The question made was, whether the vendor of contraband goods at Paris was not bound to run the risk of their being smuggled into this country? But Lord Mansfield held, that as the contract on the **\*1121** part of the plaintiff was complete by his delivering the laces at Calais, he was clearly entitled to recover, and the jury found a verdict accordingly.— *Faikney* v. *Reynous and Richardson* , East, 7 Geo. 3, B. R. since reported in 4 Bur. 2069, & 1 Black. 633, where one partner in a stock-jobbing contract lent the other 1500*l.* to pay his moiety of the differences on the rescounter day; and though this was pleaded **[343]** to the bond, the Court upon demurrer over-ruled the plea, and held the plaintiff was entitled to recover. *Bruston* v. *Clifford* , in Chan. before Lord Camden, 4th December, 1767. *Alsibrook* v. *Hall* in C. B. where money paid for the defendant for a gaming debt was held recoverable by the plaintiff.

Lord Mansfield.—There can be no doubt, but that every action tried here must be tried by the law of England; but the law of England says, that in a variety of circumstances, with regard to contracts legally made abroad, the laws of the country where the cause of

action arose shall govern.—There are a great many cases which every country says shall be determined by the laws of foreign countries where they arise. But I do not see how the principles on which that doctrine obtains are applicable to the present case. For no country ever takes notice of the revenue laws of another.

The objection, that a contract is immoral or illegal as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed; but it is founded in general principles of policy, which the defendant has the advantage of, contrary to the real justice, as between him and the plaintiff, by accident, if I may so say. The principle of public policy is this; ex dolo malo non oritur actio. No Court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act. If, from the plaintiff's own stating or otherwise, the cause of action appears to arise ex turpi causâ, or the transgression of a positive law of this country, there the Court says he has no right to be assisted. It is upon that ground the Court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff. So if the plaintiff and defendant were to change sides, and the defendant was to bring his action against the plaintiff, the latter would then have the advantage of it; for where both are equally in fault, potior est conditio defendentis.

The question therefore is, whether, in this case, the plaintiff's demand is founded upon the ground of any immoral act or contract, or upon the ground of his being guilty of any thing which is prohibited by a positive law of this country.—An immoral contract it certainly is not; for the revenue laws themselves, as well as the offences against them, are all positivi juris. What then is the contract of the plaintiff? It is this: being a resident and inhabitant of Dunkirk, together with his partner, who was born there, he sells a quantity of tea to the defendant, and delivers it at Dun- **[344]** -kirk to the defendant's order, to be paid for in ready money there, or by bills drawn personally upon him in England. This is an action brought merely for goods sold and delivered at Dunkirk. Where then, or in what respect is the plaintiff guilty of any crime? Is there any law of England transgressed by a person making a complete sale of a parcel of goods at Dunkirk, and giving credit for them? The contract is complete, and nothing is left to be done. The seller, indeed, knows what the buyer

is going to do with the goods, but has no concern in the transaction itself. It is not a bargain to be paid in case the vendee should succeed in landing the goods; but the interest of the vendor is totally at an end, and his contract complete by the delivery of the goods at Dunkirk.

To what a dangerous extent would this go if it were to be held a crime. If contraband clothes are bought in France, and brought home hither; or if glass bought abroad, which ought to pay a great duty, is run into England; shall the French taylor or the glass-manufacturer stand to the risk or loss attending their being run into England? Clearly not. Debt follows the person, and may be recovered in England, let the contract of debt be made where it will; and the law allows a fiction for the sake of expediting the remedy. Therefore, I am clearly of opinion, that the vendors of these goods are not guilty of any offence, nor have they transgressed against the provisions of any Act of Parliament.

I am very glad the old books have been looked into. The doctrine Huberus lays down, is founded in good sense, and upon general principles of justice. I entirely agree with him. He puts the general case in question, thus: tit. De Conflictu Legum, vol 2, pag. 539. "In certo loco merces quædam prohibitæ sunt. Si vendantur ibi, **\*1122** contractus est nullus. Verum, si merx eadem alibi sit vendita, ubi non erat interdicta, emptor condemnabitur, quia, contractus inde ab initio validus fuit." Translated, it might be rendered thus: In England, tea, which has not paid duty, is prohibited; and if sold there the contract is null and void. But if sold and delivered at a place where it is not prohibited, as at Dunkirk, and an action is brought for the price of it in England, the buyer shall be condemned to pay the price; because the original contract was good and valid.—He goes on thus: "Verum si merces venditæ in altero loco, ubi prohibitæ sunt essent tradendæ, jam non fieret condemnatio, quia repugnaret hoc juri et commodo reipublicæ quæ merces prohibuit." Apply this in the same manner.—But if the goods sold were to be delivered in England, where they are prohibited; the contract **[345]** is void, and the buyer shall not be liable in an action for the price, because it would be an inconvenience and prejudice to the State if such an action could be maintained.

The gist of the whole turns upon this; that the conclusive delivery was at Dunkirk. If the defendant had bespoke the tea at Dunkirk to be sent to England at a certain price; and the plaintiff had undertaken to send it into England, or had had any concern in the running it into England, he would have been an offender against the laws of this country. But upon the facts of the case, from the first to the last, he clearly has offended against no law of England. Therefore, let the rule for a new trial be discharged.

The three other Judges concurred.

The end of Trinity term.

Footnotes

1    2 Bur. 1077, since also reported in 1 Black. Rep. 234, 256.

98 E.R. 1120

© 2017 Sweet & Maxwell

---

**End of Document**                                                           © 2017 Thomson Reuters.

# TAB 37

VOL. V.]            AND PRIVY COUNCIL.                        317.

[HOUSE OF LORDS.]

HOULDSWORTH . . . . . . . . APPELLANT ;

CITY OF GLASGOW BANK AND LIQUI-
DATORS . . . . . . . . . . } RESPONDENTS.

H. L. (Sc.)

1880

March 12.

*Joint Stock Company—Action by Shareholder against the Company in Liqui-
dation for Damage caused by Fraudulent Misrepresentations of Directors
inducing him to purchase Shares.*

A person purchasing a chattel or goods, concerning which the vendor
makes a fraudulent misrepresentation, may on finding out the fraud elect to
retain the chattel or goods, and still have his action to recover any damage
he has sustained. But the same principle does not apply to shares or stock
in a joint stock company, for a person induced by the fraud of the agents of
a joint stock company to become a partner in that company can bring no
action for damages against the company whilst he remains in it: his *only*
remedy is *restitutio in integrum*, and rescission of the contract; and if that
becomes impossible—by the winding-up of the company or by any other
means—his action for damages is irrevelant, and cannot be maintained.

*H.* bought from the *City of Glasgow Bank*, a co-partnership registered
under the *Companies Act*, 1862, £4000 of its stock in February, 1877.

He was registered as a partner, received dividends and otherwise acted
as a partner ever since. The bank went into liquidation in October, 1878,
with immense liabilities: and *H.* was entered on the list of contributories,
and paid calls. In December, 1878, *H.* raised an action against the liqui-
dators, to recover damages in respect of the sum he had paid for the stock ;
the money he had already paid in calls ; and the estimated amount of future
calls. He founded his right to relief upon the ground of fraudulent misrepre-
sentations made by the directors and other bank officials to him. He ad-
mitted that after the winding-up had commenced it was too late for him to
have rescission of his contract, and *restitutio in integrum* :—

*Held*, affirming the decision of the Court below, that, even although the
fraudulent misrepresentations might, if the bank had been a going concern,
have entitled him to rescind his contract, rescission being now impossible, as
decided by *Oakes* v. *Turquand* (Law Rep. 2 H. L. 325), and *Tennent* v.
*City of Glasgow Bank* (4 App. Cas. 615), they afforded no ground for an
action against the liquidators ; therefore the action was irrelevant.

APPEAL against a judgment of the Court of Session in *Scotland.*

The *City of Glasgow Bank* was an unlimited company, incor-
porated and registered under the *Companies Act*, 1862, and had by
virtue of its articles of co-partnership power to deal in its own
shares.

H. L. (Sc.)
1880
Houlds-
worth
v.
City of
Glasgow
Bank.

In February, 1877, *Arthur Hooton Houldsworth*, the Appellant, purchased £4000 of the bank stock, from the bank itself, at the price of £9000. He was duly entered as a partner in the register of members; received dividends; and continued to be a partner ever since.

On the 2nd of October 1878, the bank stopped payment; and never resumed business. . And on the 22nd of the same month an extraordinary resolution to wind up the bank was passed; and liquidators were appointed. The Appellant was entered on the list of contributories, and paid calls.

On the 21st of December, 1878, he raised this action against the bank and its liquidators to recover damages in respect of (1.) £9046 5s. 3d., the price of stock and stamp duty; (2.) the sum of £20,000, being loss sustained by him through paying the amount of the first call; and (3.) the sum of £200,000, the estimated amount of future calls which may be made upon him. And he founded his claim on the ground that he was induced to buy the £4000 stock by means of the fraudulent misrepresentations and concealments of the manager, and directors. In his form of action he did not attempt to obtain rescission of the contract and restitution, even in a question *inter socios.*

The Lord Ordinary (1) assoilzied the Respondents from the conclusions of the summons; and stated in his note that he was of opinion that the case was ruled by the decision of this House in *Addie* v. *Western Bank* (2).

On a reclaiming note against the Lord Ordinary's interlocutor, the First Division of the Court of Session, on the 4th of July, 1879 (Lord *Shand* dissenting), dismissed the Appellant's action as irrelevant (3).

Feb. 16, 17. *The Lord Advocate* (Right Hon. *W. Watson*), and Mr. *Herschell*, Q.C. (with them Mr. *Romer*), contended, for the Appellant, that the principal was liable for the fraud of his agent acting within the sphere of his business; and that that was equally the case where the principal was an incorporated company

(1) Lord *Rutherfurd Clark.*         vol. vi. p. 1164; Scot. Law Rep. vol.
(2) Law Rep. 1 H. L., Sc. 145.       xvi. p. 700.
(3) Court of Sess. Cas. 4th Series,

acting through its directors, and, therefore, prior to liquidation the company here were liable, in respect of the fraud of the directors, to make reparation for the loss suffered by the Appellant. See *Barwick* v. *English Joint Stock Bank* (1); *Mackay* v. *Commercial Bank of New Brunswick* (2), approved in *Swire* v. *Francis* (3); see also *Denton* v. *Great Northern Railway Company* (4); *Swift* v. *Winterbotham* (5); *dictum* of Lord *Coleridge* in *Swift* v. *Jewsbury* (6); *Weir* v. *Bell* (7), affirming *Weir* v. *Barnett* (8); opinion of Lord *Cranworth* in *Reedie* v. *London and North Western Railway Company* (9); of *Holt*, J., in *Hern* v. *Nichols* (10); also of *Parke*, B., in *Cornfoot* v. *Fowke* (11); and also *Bell's* Com. (7th ed.), 1, 6, 14; *Clark* on Partnership, vol. i. p. 257; *Jardine* v. *Carron Company* (12); *National Exchange Company of Glasgow* v. *Drew and Dick* (13), which last case was distinguished from *Burnes* v. *Pennell* (14), affirming *Forth Main Insurance Company* v. *Burnes* (15); *Traill* v. *Smith's Trustees* (16); *Clyesdale Bank* v. *Paul* (17). The Respondents relied on *Addie* v. *Western Bank* (18), but the argument in that case before the House was chiefly on the question of rescission of the contract; see report (19), and one of the chief differences between that case and this was that there, subsequently to *Addie's* purchase, but before he had made any claim for either restitution or damages, the bank was changed from an ordinary joint stock company to an incorporation. And Lord *Cranworth* seemed to have rested his opinion on that peculiar circumstance, being of opinion that the new incorporation did not take over the liabilities for claims of damages against the former company founded on the fraud of its officials. The committee of the Privy Council in

H. L. (Sc.)

1880

HOULDS-
WORTH
*v.*
CITY OF
GLASGOW
BANK.

(1) Law Rep. 2 Ex. 259.
(2) Law Rep. 5 P. C. App. 394, and at pp. 410, 412.
(3) 3 App. Cas. 106, at p. 114.
(4) 5 E. & B. 860.
(5) Law Rep. 8 Q. B. 244.
(6) Law Rep. 9 Q. B. 301, at p. 312.
(7) 3 Ex. D. at p. 238.
(8) Ibid. p. 32.
(9) 4 Ex. 244, at p. 255.
(10) 1 Salk. 288.
(11) 6 M. & W. 358, at p. 373.

(12) Court of Sess. Cas. 3rd Series, vol. ii. p. 1101.
(13) 2 Macq. 103.
(14) 2 H. L. C. 497; 6 Bell's App. 541.
(15) Court of Sess. Cas. 2nd Series, vol. x. p. 689.
(16) Court of Sess. Cas. 4th Series, vol. iii. p. 770.
(17) Court of Sess. Cas. 4th Series, vol. iv. p. 626.
(18) Law Rep. 1 H. L., Sc. 145.
(19) Law Rep. 1 H. L., Sc. at p. 148.

H. L. (Sc.)
1880
HOULDS-
WORTH
*v.*
CITY OF
GLASGOW
BANK.
———

*Mackay* v. *Commercial Bank of New Brunswick* (1) held that *Addie* v. *Western Bank* (2) was decided upon that fact, which did not arise in the case before them or in *Barwick* v. *English Joint Stock Bank* (3); and, further, the Committee approved of Lord *Cranworth's* observation " that if by the fraud of the company's agent third parties have been defrauded, the corporation may be made responsible to the extent to which its funds have been benefited;" and here the bank had been largely benefited, for when the Appellant purchased the shares if the true state of the bank had been known they would have been worth less than nothing. Then Lord *Chelmsford*,—the only other Law Lord who decided *Addie's* case,— based his judgment exclusively on the right to rescind, and therefore did not take the same view of the case as Lord *Cranworth*. Also, though Lord *Chelmsford* remarked that an action of deceit does not lie against a company for the fraud of its directors, that remark was inconsistent with other parts of his judgment, where he concedes (*a*) that the fraudulent representations of the directors of such a company are imputable to the company, and (*b*) that the company can retain no benefit which it has derived from them. Those two points covered the whole contention and were sufficient for the Appellant's case.

They further maintained that the defrauded partner had his choice of reducing the contract, into which he was led by fraud; or of claiming damages without reducing the contract; for see *Amaan* v. *Handyside* (4); *Lindley* on Partnership [4th ed.], pp. 717, 923; *Sedgwick* on Damages [4th ed.], p. 339; Stair, Inst. 1, 9, 14. And dealing with a going company, was there any principle in law which would make the action for damages inapplicable?

[EARL CARNS, L.C.:—I quite understand why such an action should not be applicable: on your becoming a shareholder you must have divorce, or cannot have compensation.]

On general principle one can retain the shares, and yet get damages.

[EARL CAIRNS:—During the last quarter of a century the

(1) Law Rep. 5 P. C. App. 394, at p. 410, 413.

(2) Law Rep. 1 H. L., Sc. 145.

(3) Law Rep. 2 Ex. 259.

(4) Court of Sess. Cas. 3rd Series, vol. iii. p. 526.

VOL. V.]                    AND PRIVY COUNCIL.                    321

Courts have been inundated with cases of this kind; and yet <span>H. L. (Sc.)</span>
there is no case where such a contention has been put forward.]    1880

Because rescission is more appreciable, and more sought    HOULDS-
for.    .                                                           WORTH
                                                                     *v.*
Then having this alternate right before liquidation, they sub-    CITY OF
mitted liquidation did not extinguish the liability, but it was    GLASGOW
                                                                     BANK.
enforceable by an action against the liquidators. Liquidation was
not the repudiation of the debts and liabilities, but on the con-
trary was the ascertainment of the amount of such; see opinion
of Lord *Chelmsford* in *Waterhouse* v. *Jamieson* (1) ; and Lord *Cairns*
in *In re Duckworth* (2).

It could not be said that the liquidators had not sufficient means
of satisfying the Appellant's claim, for the old shareholders had
not yet been called upon. Therefore, it followed that though the
winding-up put an end to rescission and restitution, *Oakes* v.
*Turquand* (3), the right of an action for damages remained; see
*dictum* of *Lindley*, J., in *Stone and Collins* v. *City and County
Bank* (4), where he decided against the plaintiffs on the express
ground that they had not brought their action for damages; see
also the *dicta* of *Bramwell*, L.J., *Brett*, L.J., and *Cotton*, L.J., in
that case on appeal (5).

It was not inconsistent that the Appellant should have damages
against the company of which he was a member; nor that he
should have to pay a share towards his own damages. The Act of
1862, sects. 158, 131, expressly provided for the proof against the
company of the debts of all descriptions including damages; also
such a claim as the Appellant's was sanctioned, or at least not pre-
judiced by sect. 38, sub.-sect. 7. There was no limitation to a case
of fraud, therefore the Appellant's remedy was not limited to
rescission. He was entitled to claim in the liquidation, though
himself being a member he would be liable to pay calls *pro tanto*
with the other members; but he was in the claim for damages to
be regarded as an independent person, quite apart from his
character as a partner. See also, beside cases previously cited,

(1) Law Rep. 2 H. L., Sc., at p. 37.        (3) Law Rep. 2 H. L. 325.
(2) Law Rep. 2 Ch. App. at p. 580.          (4) 3 C. P. D. 282, at p. 299.
                        (5) Ibid. at p. 306.

322                           HOUSE OF LORDS                  [VOL. V.

H. L. (Sc.)     *New Brunswick Company* v. *Conybeare* (1); *Ranger* v. *Great*
                *Western Railway Company* (2); *Scholefield* v. *Templer* (3).
1880

Houlds-
worth          Mr. *E. E. Kay*, Q.C., Mr. *Benjamin*, Q.C., Mr. *Davey*, Q.C., and
   *v.*         Mr. *Balfour* appeared for the Respondents; but were not called
City of        upon to address the House.
Glasgow
Bank.

The Law Peers having considered their judgment, delivered
the following opinions:—

March 12.  EARL CAIRNS, L.C.:—

My Lords, in this case the Appellant bought from the *City of
Glasgow Bank* £4000 of its stock in February, 1877, paying
£9000 for it.  He was registered as a partner, received dividends,
and otherwise acted as a partner.  When the bank went into
liquidation in October, 1878, he was entered on the list of contri-
butories, and has since then paid very large sums for calls.  On
the 21st of December, 1878, he commenced the present action
against the liquidators to recover damages in respect of the sum
he had paid for shares and the moneys he has since paid for calls,
and he founds his right to relief upon the ground of fraudulent
misrepresentations made by the directors and others connected
with the bank, for whose representations he alleges the bank was
answerable.

As the question is one of relevancy, I will assume that the
allegations of fraudulent misrepresentations are such as that if
the bank had been a going concern the Appellant would have
been entitled to rescind his contract and to have recovered back
all sums paid in respect of his shares.  The Court of Session has
been of opinion that even although the averments amount to
what I have stated, still they afford no ground for an action
against the liquidators, and they have dismissed the action with
costs.  In my opinion the Court was right.

It was admitted before your Lordships, as indeed it could not
be denied, that after the winding-up of the company commenced
it was too late for the Appellant to repudiate his stock, and that

(1) 9 H. L. C. 711.                  (2) 5 H. L. C. 72.
          (3) Joh. 155; 28 L. J. (Ch.) 452.

he must remain, as the liquidation found him, a partner in the
bank and a contributory as such.  It also came to be admitted in
the course of the arguments at your Lordships' Bar that if the
Appellant, remaining a partner, had a right to raise an action for
damages against the liquidators after the winding-up, he must
also have had a right before the winding-up to have remained a
partner, and also then to have brought an action for damages.  It
appears to have been contended in the Court below that the
Appellant might be unable to maintain the present action as a
claim in the liquidation to be satisfied *pari passu* with other credi-
tors, and yet might be able to maintain it as a claim against the
company or against shareholders in the company after all other
creditors were satisfied.   In the argument at your Lordships' Bar
I think it was felt to be impossible to maintain this theory of a
deferred or secondary right of action against the company.  I am
satisfied there is no foundation for it.  The *Winding-up Act* has
no provisions for the payment of claims against the company
except the claims of creditors.   Creditors are supposed to be paid
*pari passu*, and there is no provision after they are paid for open-
ing up fresh claims by a contributory against the company.
There are, indeed, provisions which, after the debts are paid,
enable any inequalities in the contributions of the contributories
to be set right, but that is quite a different matter.

The question, therefore, mainly argued at your Lordships' Bar,
and upon which the decision of this case must, as I think, depend,
was this : Can a man, induced by the fraudulent misrepresenta-
tions of agents of a company to take shares in the company, after
he discovers the fraud, elect to retain the shares, and to sue the
company for damages ?

There is no doubt that according to the law of *England* a person
purchasing a chattel or goods, concerning which the vendor makes
a fraudulent misrepresentation, may, on finding out the fraud,
retain the chattel or the goods and have his action to recover any
damages he has sustained by reason of the fraud.  I will assume,
although no distinct authority has been produced, and I do not
wish to express a decided opinion upon it, that the law of *Scotland*
in the case of a chattel or of goods is the same as that of *England*.

But does the same rule apply to the case of shares or stock in a

H. L. (Sc.)

1880

HOULDS-
WORTH
*v.*
CITY OF
GLASGOW
BANK.

Earl Cairns, L.C.

3        Y 2

H. L. (Sc.)
1880

Houlds-
worth
*v.*
City of
Glasgow
Bank.

Earl Cairns, L.C.

partnership or company? We are accustomed to use language as to such a sale and purchase as if the thing bought or sold were goods or chattels, but this it certainly is not. The contract which is made is a contract by which the person called the buyer agrees to enter into a partnership already formed and going, taking his share of past liabilities, and his chance of future profits or losses. He has not bought any chattel or piece of property for himself; he has merged himself in a society, to the property of which he has agreed to contribute, and the property of which, including his own contributions, he has agreed shall be used and applied in a particular way and in no other way.

Does, then, the principle which in the case of a chattel admits of an action for damages, apply to the case of a partnership contract such as I have described?

It may go some way to answer this question to observe that, although during the last quarter of a century actions in every shape and form have been brought or attempted to be brought arising out of dealings in shares alleged to have been fraudulent, no case could be mentioned at the Bar in which an action for damages has been sustained, the Plaintiff retaining his position in the company. A few *dicta* were referred to, but they were of so vague and hypothetical a character that they are not deserving of further examination.

I will, however, ask your Lordships to look at the case on principle.

A man buys from a banking company shares or stock of such an amount as that he becomes, we will say, the proprietor of one hundredth part of the capital of the company. A representation is made to him on behalf of the company that the liabilities of the company are £100,000, and no more. His contract, as between himself and those with whom he becomes a partner, is that he will be entitled to one hundredth part of all the property of the company, and that the assets of the company shall be applied in meeting the liabilities of the company contracted up to the time of his joining them, whatever their amount may be, and those to be contracted afterwards, and that if those assets are deficient the deficiency shall be made good by the shareholders rateably in proportion to their shares in the capital of the company. This is

the contract, and the only contract, made between him and his
partners, and it is only through this contract, and through the
correlative contract of his partners with him, that any liability of
him or them can be enforced.

It is clear that among the debts and liabilities of the company
to which the assets of the company and the contributions of the
shareholders are thus dedicated by the contract of the partners,
a demand that the company, that is to say, those same assets and
contributions, shall pay the new partner damages for a fraud
committed on himself by the company, that is, by himself and
his co-partners, in inducing him to enter into the contract which
alone could make him liable for that fraud, cannot be intended to
be included. Any such application of the assets and contributions
would not be in accordance but at variance with the contract into
which the new partner has entered.

He finds out, however, after he joins the company, that the
liabilities were not £100,000 but £500,000. He is entitled there-
upon, as I will assume, to rescind his contract, to leave the com-
pany, and to recover any money he has paid or any damages he
has sustained; but he prefers to remain in the company and to
affirm his contract, that is to say, the contract by which he agreed
that the assets of the company should be applied in paying its
antecedent debts and liabilities. He then brings an action against
the company to recover out of its assets the sum, say £4000,
which it will fall upon his share to provide for the liabilities, over
and above what his share would have had to provide had the
liabilities been as they were represented to him. If he succeeds
in that action, this £4000 will be paid out of the assets and con-
tributions of the company. But he has contracted, and his con-
tract remains, that these assets and contributions shall be applied
in payment of the debts and liabilities of the company, among
which, as I have said, this £4000 could not be reckoned. The
result is, he is making a claim which is inconsistent with the con-
tract into which he has entered, and by which he wishes to abide;
in other words, he is in substance, *if not in form, taking the course
which is described as approbating and reprobating, a course which
is not allowed either in Scotch or English law.

My Lords, whatever differences may be pointed out between this

H. L. (Sc.)

1880

HOULDS-
WORTH
*v.*
CITY OF
GLASGOW
BANK.

Earl Cairns, L.C.

H. L. (Sc.)
1880

HOULDS-
WORTH
*v.*
CITY OF
GLASGOW
BANK.

case and the case of *Addie* v. *The Western Bank* (1) in this House, I think the *ratio decidendi* in that case would go far, if it did not go the whole way, to decide the present appeal. But I entertain no doubt, for the reasons I have stated, that on principle, irrespective of authority, the decision of the Court of Session was right. I will move your Lordships to dismiss the appeal with costs.

LORD SELBORNE :—

My Lords, the principle on which the cases of *Barwick* v. *The English Joint Stock Banking Company* (2), *Mackay* v. *Commercial Bank of New Brunswick* (3), and *Swire* v. *Francis* (4) (relied upon the Appellant), were decided, was thus stated by Mr. Justice *Willes* in the former of those cases, and repeated (from his judgment) by the Judicial Committee in the two latter : " The master is liable for every such wrong of his servant or agent as is committed in the course of his service, and for the master's benefit," because, although the master may not have authorized the particular act, " he has put the agent in his place to do that class of acts, and he must be answerable for the manner in which that agent has conducted himself in doing the business which it was the act of his master to place him in." To the principle so stated no exception can, in my opinion, be taken, though the manner in which the master is to be answerable, and the nature and extent of the remedies against him, may vary according to the nature and circumstances of particular cases.

That principle received full recognition from this House in *The National Exchange Company* v. *Drew* (5) and *New Brunswick Railway Company* v. *Conybeare* (6), and was certainly not meant to be called in question by either of the learned Lords who decided *Addie* v. *The Western Bank of Scotland* (1). It is a principle, not of the law of torts, or of fraud or deceit, but of the law of agency, equally applicable whether the agency is for a corporation (in a matter within the scope of the corporate powers) or for an individual ; and the decisions in all these cases proceeded, not on the

(1) Law Rep. 1 H. L., Sc. 145.          (4) 3 App. Cas. 106.
(2) Law Rep. 2 Ex. (Ch.) 259.          (5) 2 Macq. 103.
(3) Law Rep. 5 P. C. 394.              (6) 9 H. L. C. 711.

ground of any imputation of vicarious fraud to the principal, but because (as it was well put by Mr. Justice *Willes* in *Barwick's Case* (1) ), " with respect to the question whether a principal is answerable for the act of his agent in the course of his master's business, no sensible distinction can be drawn between the case of fraud and the case of any other wrong." It is of course assumed in all such cases that the third party who seeks the remedy has been dealing in good faith with the agent in reliance upon the credentials with which he has been entrusted by the principal, and had no notice either of any limitation (material to the question) of the agent's authority, or of any fraud or other wrongdoing on the agent's part at the time when the cause of action arose.

In the greater number, probably, of cases of this kind the question whether the fraud or other wrongful act of an agent could itself properly be imputed to his principal is not material; the liability of the principal to the third party, when properly measured by damages, being practically the same, whether he was privy to the wrongful act or not.

Sir *Montague Smith* in *Mackay* v. *Commercial Bank of New Brunswick* (2), criticised (perhaps justly) some expressions which fell from Lord *Cranworth* in this House in the two cases of *Conybeare* and *Addie*, particularly in the latter case, in which Lord *Cranworth* said that " an incorporated company cannot, in its corporate character, be called on to answer in an action for deceit." The sequel of Lord *Cranworth's* words appeared to me to shew that in using these expressions (perhaps technically inaccurate) he had substance, and not form, in view. In the old forms of common law pleading fictions were not seldom allowed, but not so as in the result to make the rights or remedies of the parties depend on the fiction rather than on the law applicable to the real facts which were allowed under those forms of pleading to be given in evidence. In *Barwick's Case* (1) a corporation was directly charged with fraud upon the pleadings (no mention being made of agency) and an objection taken on that ground was treated by Mr. Justice *Willes* as technical. " If " (he said) " a man is answerable for the wrong of another, whether it be fraud or other wrong, it may be described in pleading as the wrong of the person who is

(1) Law Rep. 2 Ex. (Ch.) 259.        (2) Law Rep. 5 P. C. at p. 410.

H. L. (Sc.)

1880

HOULDS-
WORTH
*v.*
CITY OF
GLASGOW
BANK.

Lord Selborne.

H. L. (Sc.)   sought to be made answerable in the action." And all that was
1880        laid down by Sir *Montague Smith* in *Mackay's Case* (1) itself was,
HOULDS-     that there might be cases in which to work out the appropriate
WORTH       remedy against a principal who had " profited by the fraud of his
*v.*        agent," the form of action, technically called " an action of deceit,"
CITY OF
GLASGOW     might be either necessary or convenient; that very learned Judge
BANK.       saying expressly that " the time had passed when much import-
Lord Selborne.  ance was attached to mere forms of actions;" and that " an action
——          of deceit might be maintainble in which the fraud of the agent
            might be treated, for purposes of pleading, as the fraud of the
            principal."

In Equity, one of the main heads of which has always been the
redress of fraud, the constructive imputation of fraud to persons
not really guilty of it has never been treated as the ground of
relief, though the law of agency was administered according to
the same rules in Equity as at Common Law, and though in
Equity, as well as at law, an innocent principal might suffer for
the fraud of an agent. Vice-Chancellors *Knight Bruce* and
*Parker,* and Lord Chancellor *Campbell* (all very eminent Judges)
said (as Lord *Cranworth* and Lord *Chelmsford* also said in this
House), that the law does not impute the fraud of directors to a
company; and the same proposition would, I apprehend, be equally
true, in the sense in which they intended it, if the principal
whose agent was guilty of fraud were not a corporation but an
individual. The real doctrine which Lord *Cranworth,* in *Addie's
Case* (2), meant (as I understand him) to affirm was one of sub-
stance and not of form: " An attentive consideration " (he said)
" of the cases has convinced me that the true principle is that
these corporate bodies, through whose agents so large a portion
of the business of the country is now carried on, may be made
responsible for the frauds of those agents to the extent to which
the companies have profited by those frauds; but that they
cannot be sued as wrongdoers by imputing to them the misconduct
of those whom they have employed. A person defrauded by
directors, if the subsequent acts and dealings of the parties have
been such as to leave him no remedy but an action for the fraud,
must seek his remedy against the directors personally."

(1) Law Rep. 5 P. C. 394.        (2) Law Rep. 1 H. L., Sc. 145.

The words in this passage "to the extent to which the companies have profited by those frauds" may perhaps require some enlargement or explanation; but, subject to that qualification, I am of opinion that this doctrine is in principle right, and that the present case is one in which (as in the case of *Addie*) there would be a miscarriage of justice if the distinction which it involves were not attended to. This is not a case of parties at arm's length with each other, one of whom has suffered a wrong of which damages are the simple and proper measure, and which may be redressed by damages without any unjust or inconsistent consequences. For many purposes a corporator with whom his own corporation has dealings, or on whom it may by its agents inflict some wrong, is in the same position towards it as a stranger; except that he may have to contribute, rateably with others, towards the payment of his own claim. But here it is impossible to separate the matter of the Pursuer's claim from his status as a corporator, unless that status can be put an end to by rescinding the contract which brought him into it. His complaint is, that by means of the fraud alleged he was induced to take upon himself the liabilities of a shareholder. The loss from which he seeks to be indemnified by damages is really neither more nor less than the whole aliquot share due from him in contribution of the whole debts and liabilities of the company; and if his claim is right in principle I fail to see how the remedy founded on that principle can stop short of going this length. But it is of the essence of the contract between the shareholders (as long as it remains unrescinded) that they should all contribute equally to the payment of all the company's debts and liabilities.

Such an action of damages as the present is really not against the corporation as an aggregate body, but is against all the members of it except one, viz., the Pursuer; it is to throw upon them the Pursuer's share of the corporate debts and liabilities. Many of those shareholders (as was observed by Lord *Cranworth* in *Addie's Case* (1)) may have come and probably did come into the company after the Pursuer had acquired his shares. They are all as innocent of the fraud as the Pursuer himself; if it were imputable to them it must, on the same principle, be imputable to

(1) Law Rep. 1 H. L., Sc. 145.

H. L. (*Sc.*)

1880

HOULDS-
WORTH
*v.*
CITY OF
GLASGOW
BANK.

Lord Selborne.

330                            HOUSE OF LORDS                    [VOL. V.

H. L. (Sc.)
1880
HOULDS-
WORTH
v.
CITY OF
GLASGOW
BANK.

Lord Selborne.

Pursuer himself as long as he remains a shareholder; and they are no more liable for any consequences of fraudulent or other wrongful acts of the company's agent than he is. Rescission of the contract in such a case is the only remedy for which there is any precedent, and it is in my opinion the only way in which the company could justly be made answerable for a fraud of this kind. But for rescission the Appellant is confessedly too late.

I will not enlarge further upon the reasons for this conclusion, which I know will be more fully explained by others of your Lordships. But I must add that I think the Court of Session was right in holding the present question concluded by *Addie's Case* (1). The only difference between *Addie's Case* and the present is this, that the *Western Bank of Scotland* was formed under 7 Geo. 4, c. 67, by which it was enabled to sue, and liable to be sued (upon all causes of action for which the shareholders for the time being were answerable) by its public officer; and it continued in that state till after the alleged frauds had been committed, so as to give a cause of action to the Pursuer, Mr. *Addie*. The subsequent registration, under 20 & 21 Vict. c. 49, s. 8, was in my judgment sufficient to transfer from the unregistered to the registered company all liabilities upon any cause of action whatever for which the unregistered company might have been sued by its public officer immediately before the registration. I do not understand that there was really any difference between Lord *Chelmsford* and Lord *Cranworth* in that case; both appear to me to have founded their judgments upon those views of the law of agency on the one hand, and of fraud on the other, to which I have already referred. One expression, indeed, of Lord *Cranworth*, in that part of his judgment which relates to the question of damages (" He comes too late "), might possibly, if it were not qualified by the subsequent context, have been taken to mean that even if the unregistered company had been liable to be sued for damages, by its public officer, down to the time of registration, that liability would not have been among the " debts and obligations " transferred by 20 & 21 Vict. c. 49, s. 8, to the registered company. Lord *Cranworth* was, I think, too good a lawyer and too accurate a thinker to have placed any such narrow (I had almost said unreasonable)

(1) Law Rep. 1 H. L., Sc. 145.