VOL. V.]                   AND PRIVY COUNCIL.                            331

construction upon such words in such a statute.  He made, to my
mind, his real meaning plain by what he went on to say ; from
which, it is apparent that if the *Western Bank* had been incor-
porated before, and not after, the frauds then in question, the
corporation would not, in his opinion, have been liable for those
frauds in an action of this kind for damages.  And that, my
Lords, is precisely the present case.

H. L. (Sc.)
1880
HOULDS-
WORTH
*v.*
CITY OF
GLASGOW
BANK.

Lord Selborne.

LORD HATHERLEY :—

My Lords, I agree in the conclusions that have been arrived at
by those of your Lordships who have addressed the House in this
case.

I think that the following points may be considered as con-
cluded by authority ; at all events I shall assume them so to be
for the purposes of the case before the House.  First, that an
agent acting within the scope of his authority, and making any
representation whereby the person with whom he deals on behalf
of his principal is induced to enter into a contract, binds his prin-
cipal by such representation to the extent of rendering the con-
tract voidable, if the representation be false, and the contracting
party take proper steps for avoiding it whilst a *restitutio in in-
tegrum* is possible.  Secondly, that a corporation is bound by the
wrongful act of its agent no less than an individual, and that such
misrepresentation by the agent being a wrongful act, the result of
such misrepresentation must take effect in the same manner
against a corporation as it would against an individual.  Thirdly,
that, if there cannot be a *restitutio in integrum*, the contract
cannot be rescinded, but must remain in force, whatever right
may exist in regard to damages for injury sustained by the party
deceived.

My Lords, in this case it may be assumed for the present
purpose that the contract is one which was obtained by fraudulent
misrepresentation on the part of an agent or agents of the *City of
Glasgow Bank*, whereby the Appellant was led to purchase shares
in that bank as though it were a profitable going concern, whereas
it was in fact hopelessly insolvent, purchasing the privilege of
becoming a shareholder, if it were a privilege, or, rather, as it
turned out, acquiring that unfortunate position, for the sum of

H. L. (Sc.)
1880

HOULDS-
WORTH
*v.*
CITY OF
GLASGOW
BANK.

Lord Hatherley.

£9000.   In about a year and a quarter after this purchase had been made the bank was in liquidation, and the Appellant alleges that he has already contributed £20,000 towards the debts of the company, and also that he is liable to an extent which he puts in his condescendence as being possibly about £200,000 more in respect of the debts of the concern.   He asks as a remedy to recover the sum that he paid for his shares, less certain small deductions mentioned in the case, and also to be indemnified as to the payment of the £20,000 and the possible future liability. This remedy he asks for as against the company, of which at the time of the bank going into liquidation he was a member or partner, and from which partnership he has never been discharged.

The main point in the case is whether he should be allowed to proceed further in such an action, that is to say, the question arises on relevancy in reference to the remedy which this gentleman seeks to obtain with regard to the injury which he says has been done to him.   The Lord Ordinary held that the case was concluded by *Addie's Case* (1), and the same view was entertained by three of the Judges in the Court of Session.   The principal difference between the present case and that of *Addie* is that in *Addie's Case* (1) the company was not incorporated at the time of the purchase, but became so before the liquidation, whereas in the present case the company was incorporated before the time when the purchase was made by the Appellant, and he became a shareholder.   In the view which I take of the case, I do not consider that difference to be one which should render relief possible in this case, if it was proper to withhold it in the case of *Addie.*   It appears to me to be fatal to the Appellant's right to the relief he asks that he is still, or was at the date of the liquidation, a shareholder in the company against which he asks it.   No case has been cited in which such a remedy as that sought by the Appellant in the present case has been allowed to take effect by any Court either in *Scotland* or in *England.*

What became the position of the Appellant when he had paid his money in respect of the transfer of shares into his name ?   He thereby became on the one hand entitled to any profits made by the employment of the capital of the company according to the

(1) Law Rep. 1 H. L., Sc. 145.

proportion which his shares bore to all the other shares in the company. And at the same time he undertook to bear a like aliquot share of all the debts and liabilities of the company incurred, or to be incurred, in respect of the business which the company was carrying on. Amongst the debts would be (if the Appellant be right) the debt due to himself in respect of the damage sustained by him through the wrongful act of the company in inducing him by misrepresentation to place himself on the list of shareholders. It appears that he did draw dividends (I think three) of alleged profits out of the concern.

Now suppose, and I fear from other cases that have come before your Lordships' House the supposition is by no means an improbable one, suppose I say that there should be some ten or twelve other shareholders in a like position with the Appellant with regard to purchasing shares under misrepresentation on the part of the company's agents, some of them having purchased shares before him and others after him; those ten or twelve shareholders would each of them have the same claim in respect of damages against the company (except in each case the party suing) as is now claimed by the present Appellant. The present Appellant would by his partnership contract have to bear his aliquot share of the damages that might be claimed by other misled shareholders who had been placed on the list by the same course of misrepresentation as himself. What end would there ever be to the interlacing claims on the part of misled shareholders *inter se* as to dividends received whereby the fund which might have been applied towards recouping and making good the debts of the company, including the damages claimed by the Appellant, was diminished? How could they be retained by the Appellant as against his fellow sufferers? He would clearly have to account for them as between himself and his fellow sufferers who would be claiming relief on the same grounds as himself.

In truth the Appellant is trying to reconcile two inconsistent positions, namely, that of shareholder and that of creditor of the whole body of shareholders including himself. As has been observed already by those of your Lordships who have preceded me, amongst the various cases which have been brought before the Courts in respect of dealings with joint stock companies, no case

H. L. (Sc.)

1880

HOULDS-
WORTH
*v.*
CITY OF
GLASGOW
BANK.

Lord Hatherley.

H. L. (Sc.)
1880
HOULDS-
WORTH
v.
CITY OF
GLASGOW
BANK.

Lord Hatherley.

can be adduced in which a person so claiming to be a shareholder has at the same time successfully asserted his claim against a company in liquidation for such a debt as this, namely one in which he is himself a co-debtor with all his fellow shareholders to himself, and is himself in common with them responsible again to them individually for like liabilities irrespective of represensations made by their common agent.

Some clauses in the *Companies Act* were cited in the course of the argument as shewing the rights *inter se* on the part of shareholders of a company by which they were all to be brought into equality one with another when the settlement took place and arrangements for winding up were made by the liquidators. Those provisions as to liquidation for the purpose of equalizing the contributions of contributories *inter se*, do not appear to me to authorize such a scheme or contrivance as would be necessary in this case to effect the object proposed by the Pursuer. Having omitted to obtain a rescission of the contract, he would have to make a complicated inquiry such as I have described as between himself and other shareholders who could put themselves in the same position as himself as regards misrepresentation by the common agent; and nothing has been pointed out in the Act which leads to the supposition that any such inquiry as that was contemplated. What has really happened is this—he has had the misfortune, together with others, as I have said, in all probability, though that is not in evidence in this case, of being misled by the representations of the agent of the company. If your Lordships were to establish a precedent in his case there would probably be other claimants also, each of whom would have a claim which, it appears to me, could not be dealt with after the time for the rescission of the contract had gone by. If the Appellant obtains the relief he has sought, every other shareholder in the same position as himself might come forward to claim a similar relief. What has really happened is that both he and those other shareholders in a like position, have suffered from the misfortune of having employed a dishonest agent. As between third parties to the company and the Appellant, he might well be entitled to rescission of the contract whereby he became a shareholder, but, if time and circumstances have prevented that remedy and he must remain a shareholder,

I do not see how he can escape the burden occasioned by the common misfortune of himself and many of the other shareholders in having employed dishonest agents. I therefore feel that whatever rights this gentleman may have acquired in the first instance, his case has been rendered hopeless by what has taken place since, by reason of which it has been placed beyond his power to put things in such a position that his name can be struck off the share list altogether, in which case he would, according to some of the authorities which have been cited, have stood in the position of a stranger with reference to misrepresentations made by agents of the company.

I agree with the order which has been proposed to your Lordships by my noble and learned friend.

H. L. (Sc.)

1880

HOULDS-
WORTH ,
v.
CITY OF
GLASGOW
BANK.

Lord Hatherley.

LORD BLACKBURN :—

My Lords, I also think that it is not necessary to hear the counsel for the Respondents, as after carefully considering the judgments below, and the arguments of the Appellant's counsel, I have come to the conclusion that the interlocutor appealed against was right, and that the appeal should be dismissed with costs.

The Lord Ordinary based his judgment on this short ground :—
"The Lord Ordinary thinks that this case is ruled by the decision of the House of Lords in *Addie* v. *The Western Bank* (1) ;" and that, if correct, was a sufficient ground for his decision. For when it appears that a case clearly falls within the *ratio decidendi* of the House of Lords, the highest Court of Appeal, I do not think it competent, for even this House, to say that the *ratio decidendi* was wrong. It must, however, in my opinion, always be open to a party to contend that the differences between the facts in the case then under discussion and those in the case on which the decision in the House of Lords proceeded are so material as to prevent his case from falling within the *ratio decidendi* of the House, even though the opinions of the learned and noble Lords who decided the case in the House are so worded as to seem to apply equally to the facts in the case then under discussion ; for unless those differences in fact did exist in the case in this House, or at least

(1) Law Rep. 1 H. L., Sc. 145.

H. L. (Sc.)
1880

Houlds-
worth
v.
City of
Glasgow
Bank.

Lord Blackburn.

the possibility of their existence was prominently brought forward, I think the House cannot be taken to have decided that such differences in fact might not make a material distinction in law.

1 think, therefore, that it is important to inquire what are the differences of fact between this case and that of *Addie* v. *The Western Bank* (1), and then to determine whether they do make a material distinction in law.

The *Western Bank* was a co-partnership carrying on the business of banking in *Scotland* under the provisions of 7 Geo. 4; c. 67. Whilst this was so, *Addie* entered into a contract with persons who were, though he did not know it, agents for the *Western Bank* to purchase shares in that bank. *Addie* paid to the agents of the bank the agreed consideration, and accepted shares, which in fact belonged to the bank, and in respect of them became a partner on the terms contained in the partnership deed of the *Western Bank*. Some time elapsed, and the *Western Bank* becoming insolvent stopped payment. Then advantage was taken of the provisions of the *Joint Stock Banking Companies Act*, 1857 (20 & 21 Vict. c. 49) s. 6, and it was resolved by a majority of the shareholders to register the *Western Bank* as a company, other than a limited company, under the provisions of the *Joint Stock Companies Act*, 1857. *Addie* was a party to this resolution. The *Western Bank* after registration was wound up. *Addie* was made a contributory, and he and such of the other contributories as were solvent paid calls, by means of which all the creditors were paid, and some surplus existing had to be returned to the contributories who had paid. Then, and not till then, *Addie* commenced his action in the Court of Session.

The interlocutor appealed against, which was reversed, was that of the 2nd of February, 1864: "That the Pursuer had stated matter relevant to go to trial."

The following appear to me to be the material statements in the case now before this House. The *City of Glasgow Bank* was originally, like the *Western Bank*, a co-partnership carrying on business in *Scotland* under the provisions of 7 Geo. 4, c. 67. The deed of co-partnery of this bank did not in any material respect

(1) Law Rep. 1 H. L., Sc. 145.

VOL. V.]                     AND PRIVY COUNCIL.                          337

differ from that of the *Western Bank*.  But whereas the *Western* ⁣H. L. (Sc.)
*Bank* was registered under the provisions of the *Joint Stock Bank-*          1880
*ing Companies Act*, 1857, after *Addie* had entered into the contract     Houlds-
in respect of which he raised his claim, the *City of Glasgow Bank*          worth
was registered under the *Companies Act*, 1862, on the 29th of             City of
November, 1862, several years before the date of the transactions          Glasgow
                                                                            Bank.
in respect of which the Pursuer raises his claim ; and the Pursuer     Lord Blackburn.
knew that he was purchasing shares the property of the bank, and            ———
dealing with the agents of the bank, whilst *Addie* was not aware
of these facts; and this action was commenced earlier than that
of *Addie*.  It was commenced after the liquidation had begun, but
before it was ascertained how much the solvent contributories
would have to pay, or who would be solvent contributories.

I do not observe any other differences between the statements
in the case now under discussion and the statements in the case of
*Addie* v. *The Western Bank* (1).    And as I think that those differ-
ences of fact make no distinction in law, and as the interlocutor ap-
pealed against in this case seems to me identical in effect with that
pronounced by this House, I agree with the Lord Ordinary that
this case is ruled by the decision of the House in *Addie* v. *The
Western Bank*.

But one very important question was raised by the judgments in
the Court of Session, and argued by the counsel at your Lordships'
Bar, which, if ever it becomes necessary to decide it, may require
much consideration.  The contract with a joint stock company
to take shares in that company is a very peculiar one.   Whether
the company be, as the *Western Bank* was, a banking co-partner-
ship in *Scotland* under the 7 Geo. 4, c. 27, having such a deed of
co-partnership as that bank had, or a joint stock company regis-
tered under the *Companies Act*, 1862, the contract equally is in
substance an agreement with the company to become a partner in
the company on the terms that the partner shall, in common with
all his co-partners for the time being, contribute to make good all
liabilities of the co-partnership as if this incoming partner had
been a member of the partnership from the beginning.   Further,
he consents that any one of his co-partners may, by procuring a
person to take his shares, get rid (at least *inter socios*) of his lia-

(1) Law Rep. 1 H. L., Sc. 145.

H. L. (Sc.)
1880
HOULDS-
WORTH
v.
CITY OF
GLASGOW
BANK.

Lord Blackburn.

bility, substituting that of the incoming shareholders. I know of no other contract which in these respects resembles this contract.

It was with this peculiar kind of contract that the House of Lords had to deal in *Addie* v. *The Western Bank* (1), and it is with this peculiar kind of contract that your Lordships have now to deal. I do not think the House is called on now to decide whether a difference in the kind of contract induced by the fraud would make a sufficient distinction in law to prevent the decision in *Addie's Case* (1) from governing such a case as that.

I do not think there is now any doubt that when a contract is, in the language of the English common lawyers, induced by fraudulent deceit of the other contracting party, or of one for whom he is responsible, or, in the language of the Civil Law, when there is *dolus dans locum contractui*, the contract is not void but only voidable. And it follows from this that though the deceived party may rescind the contract and demand restitution, he can only do so on the terms that he himself makes restitution. If either from his own act, or from misfortune, it is impossible to make such restitution, it is too late to rescind. But though he cannot rescind he may, at least in English law, as against the person actually guilty of the fraud, recover damages (*Clarke* v. *Dixon* (2) and *Cole* v. *Bishop*, mentioned in that case by Justice *Erle* (3)). The Lord President in this case says, that the deceived party may rescind if the fraud inducing the contract was that of an agent acting in the principal's business and within the scope of his authority, though the principal was ignorant of the fraud, and free from all moral guilt, or even, being an incorporation, was necessarily incapable of knowing anything except by its agents, and therefore free from all moral guilt (if such a phrase can be properly applied to an incorporated body), and so far I think the position is not disputed. But when he proceeds to say that "when the result of the fraud is the making of a contract between the party deceiving (not personally but through an agent) and the party deceived, I am not aware that any remedy is open to the latter, except a rescission of the contract, or at least without a

(1) Law Rep. 1 H. L., Sc. 145.          (2) E. & B. 148.
(3) E. & B. at p. 153.

rescission of the contract," he states a proposition which is much
controverted.

Lord *Shand* disputes it on principles and authorities of Scotch
law well worthy of consideration, and then says:—

The whole question has been very carefully considered in recent cases in *England*, in which it has been settled, on principles which I am satisfied are sound, that an incorporation will be answerable in damages for the fraudulent representations of its agents made in the course of the business intrusted to them: *Barwick* v. *The English Joint Stock Bank* (1); *Swift* v. *Winterbotham* (2); *Mackay* v. *The Commercial Bank of New Brunswick* (3); *Swire* v. *Francis* (4); *Stone and Collins* v. *The City and County Bank, Limited* (5); *Weir* v. *Bell* (6). I say nothing of *Udell* v. *Atherton* (7), except that it was the decision of a Court equally divided; that it was considered in most, if not all, of the subsequent cases just cited; and that I am not aware of any judgment since its date in which it was spoken of with approval, while it has been more than once referred to as a decision to be explained and accounted for on special grounds.

*Barwick* v. *English Joint Stock Bank* (1) was decided just before
the decision in *Addie* v. *The Western Bank* (8), and the noble and
learned Lords who advised the House were not aware of that
decision. I may here observe that one point there decided was
that, in the old forms of English pleading, the fraud of the agent
was described as the fraud of the principal, though innocent.
This, no doubt, was a very technical question. The substantial
point decided was, as I think, that an innocent principal was
civilly responsible for the fraud of his authorized agent, acting
within his authority, to the same extent as if it was his own fraud.
It is not necessary now to decide whether that was right or wrong
as the law stood before the decision in *Addie* v. *The Western
Bank* (8), nor, as I think, whether it is overruled by that decision.
*Mackay* v. *Commercial Bank* (3) was decided after *Addie* v. *The
Western Bank* (8), and was distinguished from it. I do not think
your Lordships need now inquire whether successfully or not.

But it seems to me that Lord *Chelmsford* did not lay down any
general position as to all contracts. He says: "The distinction to
be drawn from the authorities, and which is sanctioned by sound
principle, appears to be this—where a person has been drawn into

H. L. (Sc.)

1880

HOULDS-
WORTH
*v.*
CITY OF
GLASGOW
BANK.

Lord Blackburn.

(1) Law Rep. 2 Ex. 259.
(2) Law Rep. 9 Q. B. 301.
(3) Law Rep. 5 P. C. 394.
(4) 3 App. Cas. 106.
(5) 3 C. P. D. 283.
(6) 3 Ex. D. 238.
(7) 7 H. & N. 172.
(8) Law Rep. 1 H. L., Sc. 145.

H. L. (Sc.)
1880
HOULDS-
WORTH
*v.*
CITY OF
GLASGOW
BANK.

Lord Blackburn.

a contract to purchase shares belonging to a company by fraudulent misrepresentations of the directors, and the directors, in the name of the company, seek to enforce that contract, or the person who has been deceived institutes a suit against the company to rescind the contract on the ground of fraud, the misrepresentations are imputable to the company, and the purchaser cannot be held to his contract because a company cannot retain any benefit which they have obtained through the fraud of their agents. But if the person who has been *induced to purchase shares by the fraud of the directors*, instead of seeking to set aside the contract, prefers to bring an action of damages for the deceit, such an action cannot be maintained against the company, but only against the directors personally. The action of Mr. *Addie* is for the reduction of the deeds of transference of the shares, and alternatively for damages. But as it is brought against the company, it will follow from what has been said that he cannot recover unless he is entitled to rescind the contract."

I cannot say whether Lord *Chelmsford* meant to confine his observation to the particular kind of contract then before him, without deciding whether the same doctrine would apply to all kinds of contracts, or whether it was only by accident that he confined his language as he did. There are strong reasons given by the noble and learned Lords who have already spoken in this case for holding that when one has been induced by the fraud of the agents of a joint stock company to contract with that company to become a partner in that company he can bring no action of deceit against the company whilst he remains a partner in it. There are reasons which would not apply to every case in which a contract has been induced by fraud, as for example, if an incorporated company sold a ship, and their manager falsely and fraudulently represented that she had been thoroughly repaired and was quite seaworthy, and so induced the purchase, and the purchaser first became aware of the fraud after the ship was lost, and the underwriters proved that she had not been repaired and was in fact not seaworthy, and so that the insurance was void when it would be too late to rescind.

Lord *Cranworth* uses language applicable to all contracts; I cannot say whether he meant to apply the doctrine to all kinds of

contracts, however different from that with which he was dealing. I do not say that the difference of the contract from that to buy shares would distinguish the case. All that I say is, that if such a case arises, the consideration of the question whether it is decided by *Addie* v. *The Western Bank* (1) is not meant to be prejudiced by anything I now say.

H. L. (Sc.)

1880

HOULDS-
WORTH
*v.*
CITY OF
GLASGOW
BANK.

> *Interlocutors appealed from affirmed; and appeal dismissed with costs.*

*Lords' Journals,* 12th March, 1880.

Agents for Appellant: *Simson & Wakeford.*
Agents for Respondents: *Martin & Leslie.*

(1) Law Rep. 1 H. L., Sc. 145.

# TAB 38

**House of Spring Gardens Ltd v. Waite & Ors**

1985 H. No. 2355

In the Supreme Court of Judicature

Court of Appeal (Civil Division)

On Appeal from the High Court of Justice

Queen's Bench Division

11 April 1990

**1990 WL 754656**

Lord Justice Fox Lord Justice Stuart-Smith Lord Justice McCowan

Wednesday 11th April 1990.

**Analysis**

**Representation**

• MR LIONEL SWIFT Q.C. and MR M. HARRINGTON (instructed by Messrs. T. Cryan & Co., Solicitors, Harrow) appeared on behalf of the Appellants.

• MR GAVIN LIGHTMAN Q.C. and MR A. BOYLE (instructed by Messrs. Phillip Conn & Co., Solicitors, Manchester) appeared on behalf of the Respondents.

**JUDGMENT**

LORD JUSTICE STUART—SMITH:

This is an appeal by the third defendant (Mr McLeod) from a judgment given by Sir Peter Pain sitting as a Deputy High Court Judge, against all defendants on 2nd February 1989, pursuant to the Rules of the Supreme Court, Order 14 , in the sum of £3,179,673.52., plus interest. The first and second defendants (Mr Waite and Hr Seamus Waite respectively) have not appealed.

The plaintiffs obtained a judgment against all three defendants in the Republic of Ireland for £3,474,570 and interest of £78,337. That was a judgment given by Costello J. initially on 20th December 1982, when he determined

the question of liability in favour of the plaintiffs, and on 7th March and 27th April 1983, when he assessed damages in their favour.

An appeal by the three defendants to the Supreme Court of Ireland was dismissed with costs on 11th January 1985, save that the amount of interest was, to a small extent, reduced. No money has been paid by any of the defendants in satisfaction of the judgment, though sums totalling some £950,000 have been recovered from other sources.

The purpose of the present proceedings in this country is to enforce the judgment of Costello J. The Civil Jurisdiction and Judgments Act, 1982 , does not apply to that judgment. The answer put forward by the defendants in these proceedings is that the judgment of Costello J. was obtained by fraud, namely misrepresentation as to the plaintiff's entitlement to the confidential information and copyright in issue in the action. Each of the defendants in the present action pleaded that on 28th January 1985 Mr Waite and Mr Seamus Waite commenced an action in Ireland to set aside the judgment of Costello J. on this ground of fraud. At the time those defences were served that action had not been tried. in Ireland. However, on 9th October 1987, after a 21-day hearing on the merits, Egan J. dismissed the action. On 10th June 1988 the Supreme Court dismissed an appeal by Mr Waite and Mr Seamus Waite for default in setting down the appeal. It is the plaintiffs' case that having regard to the result of the action before Egan J., the defence of fraud is no longer available to the defendants.

**Background**

In the late 1970's the third plaintiff (Mr Sacks) invented a bullet-proof vest. According to Costello J., a great deal of expertise went into the design. Mr Sacks' information about the construction of the vest represented a valuable asset. In late 1978, Mr Sacks met Mr Waite and they discussed establishing a joint venture. The aim was that Mr Sacks would provide the techinical know-how, and

Mr Waite would provide the manufacturing capacity and the marketing skills and contacts. Mr Waite had connections in North Africa, particularly in Libya; and

Er Waite's son, Mr Seamus Waite, and his son-in-law Mr McLeod, were involved in Mr Waite's business. Mr Waite induced Mr Sacks to impart all the valuable information which he had developed as regards the bullet proof vests on the faith of an oral agreement by Mr Waite that he would enter into a joint venture for the supply of vests to Libya, and that the profits of the joint venture would be equally divided between them. From an early stage there was the prospect of a very substantial contract for the sale of 50,000 vests to the Libyan army at a price of some ? 0,000,000. Mr Sacks went out to Libya to demonstrate his product, and the Libyans were greatly impressed. But Mr Waite deceived the Libyans into thinking it was his own company, Molex Limited, which had developed the vest, and that it was already being manufactured by Molex. This was untrue.

On 11th August 1979 Mr Waite signed a contract for the sale of ?,000,000-worth of vests to the Libyan army, using an Isle of Man company called Emory Limited. But he deceived Mr Sacks into thinking that negotiations with the Libyans had broken down. Mr Waite secretly established a manufacturing plant at Cork, at which the vests were manufactured by a company known as Point Blank Limited, a subsidiary of Emory Limited. Production started in January 1980.

In February 1980 Er Waite told. Mr Sacks that the contract with the Libyans had collapsed. This was also a lie. However, Mr Sacks subsequently discovered the deception, and this led to the first of four rounds of litigation between the parties.

**The first round**

In June 1980 the plaintiffs launched actions in this country and the Republic of Ireland for damages for misuse of confidential information and breach of copyright. Those proceedings were settled by an agreement dated 10th September 1980 (the settlement agreement) The principal terns of that agreement were that Mr Waite and his companies would pay a royalty on the vests sold to the Libyans at a price of 11.53 per cent., and that Mr Waite and his companies would notify any further contract which might be entered into with the Libyans. Mr Waite and his companies paid the royalty on the first contract, but

they did not notify a further contract for £5,000,000-worth of vests. Instead, they engaged on a second round of deception. The second contract was entered into on 22nd January 1981; but it was effectively concealed from Mr Sacks until early 1982. When he did discover it, the defendants denied that it was a notifiable contract within the meaning of the settlement agreement. Manufacture of the vests to fulfil the second contract had begun in Cork in July 1981, and was still continuing at the time of the discovery by Mr Sacks of its existence. This discovery led to the second round of litigation.

**The second round**

In February 1982 the plaintiffs launched two main actions, one in the Republic of Ireland and one in this country. There were subsidiary proceedings in Guernsey, Jersey and the Isle of Lan. The proceedings in the Republic of Ireland proceeded to trial, which lasted for 16 days in October 1982. They culminated in the judgment of Costello J. in favour of the plaintiffs.

Costello. J. made the following findings, amongst others:

• (1)   That i.r Waite had tricked Mr Sacks into parting with valuable confidential information about the design of the vests.
• (2)   That Waite had deceived Mr Sacks about the existence of the first Libyan contract.
• (3)   That the second Libyan contract was clearly notifiable under the settlement agreement. He rejected the defendants' suggestion that the vest was sufficiently different from that supplied under the first contract as not to be notifiable under the settlement agreement. The contract was not notified because of a dishonest decision by Waite not to pay royalties on it.
• (4)   That Mr Waite had created a fictitious contract with a bogus company with a view to concealing the truth; that he had suppressed the original contract with the Libyans and the invoice and letter of credit because these would have shown that the vests supplied under it were the same as those supplied under the first contract.
• (5)   The Judge disbelieved Hr Waite's evidence that he had no financial benefit from the second contract, and he recorded that both Er Waite and Er Seamus

Waite had given evidence which they knew to be false in the course of the trial. On the other hand, he found Mr Sacks to be a truthful witnesses, blessed with a good and accurate memory.

• (6) He held that a deliberate decision had been taken not to call Er McLeod as a witness. He would have been able to explain the true circumstances of the second contract. The Judge held that he did not attend in order to avoid answering questions about it.

• (7) He held that the Waites were in breach of the settlement agreement and that all three defendants had wrongfully used confidential information imparted by Mr Sacks to make the vests, and that they had been in breach of copyright in respect of the cutting patterns for the vests.

After damages had been assessed at a later hearing the defendants appealed to the Supreme Court. The appeals were heard in November 1984, and after they were over the defendants made an application to adduce fresh evidence, and launched a motion for a new trial. The application was based on the evidence of a Er Parish and a Er Waldie, as well as on the evidence of Mr Waite. Affidavits from those two witnesses were placed before the Supreme Court. The defendants claimed, on the basis of their evidence, that Er Sacks had deceived Costello J. regarding the role which he played in developing the armoured vest.

The Supreme Court allowed the defendants' motion for a new trial on terms that £3,750,000 was paid into court, representing the amount of damages and costs. The Court took into account the fact that Costello J. had held that the defendants had had the money from the second contract, the gross proceeds of which amounted to some £5,000,000. The defendants did not bring the money into court, so the new trial did not take place. The appeal proceeded to judgment on the basis that there would be no new trial, and was dismissed on 11th January 1985.

So far as the proceedings launched in this country in February 1982 were concerned, apart from certain Mareva relief which was granted against Er Waite and his companies and consequential interlocutory proceedings dependent upon that, they proceeded no further.

**The third round**

This round did not directly involve the appellant, Er McLeod. On 28th January 1985 Mr Waite and Mr Seamus Waite launched proceedings in the Republic of Ireland against the three plaintiffs in, these proceedings, claiming that Er Sacks had obtained the judgment given by Costello J. in 1982 by fraud. This action was based on exactly the same allegations as those that had been put before the Supreme Court in connection with the motion for a new trial, and on the same allegations as have, at all times, constituted the defence in the present action.

That matter dame for trial between the 29th April and 24th July 1987. It lasted 22 days. Neither Er Waite nor Er Seamus Waite gave evidence. But both Er Parish and Er Waldie were called as witnesses. Egan J. rejected the Waites' case that the previous judgment had been obtained by fraud, and on 9th October 1987 he dismissed the action, with costs. He held that Er Parish had, in a number of respects, given evidence which he knew to be false. He found that Er Parish was giving evidence in circumstances in which he had been promised money by Mr Waite if the judgment of Costello J. was set aside. The amount which he stood to gain was ?00,000, plus a 50 per cent. royalty. He reached the same conclusion as Costello J. on the evidence, and he found that the Waites had failed to show any likelihood that Costello J. would have arrived at a different conclusion if all the additional evidence had been heard by him, and that the Waites had failed to prove that the judgment had been obtained by fraud. The Waites appealed against Egan J.'s judgment, but they failed to set the appeal down in time and it was dismissed on 10th June 1988.

**The fourth round**

On 21st March 1985 the plaintiffs issued the Writ in this action, seeking to enforce the judgment of Costello J. Defences were filed on behalf of all three defendants claiming that his judgment had been obtained by fraud. The matters relied upon were the allegations of Mr Parish. All three defences referred to the proceedings in Ireland to set aside Costello J.'s judgment.

Paragraph 7 of Mr McLeod's defence read as follows:

> "On 28th January 1985 the first
> and second defendants (the Waites)
> commenced an action in the
> Republic of Ireland to set aside
> the judgment on the ground that
> it was obtained by fraud as
> particularised in paragraph 1 of the
> first defendant's defence herein".

Whilst the Waites' action to set aside the judgment of
Costello J. proceeded in Ireland, the plaintiffs took no
further step in the English proceedings. But, following
Egan J.'s judgment, they issued a Summons under Order
14 for judgment. That Summons was issued on 27th
October 1987, but it was held in abeyance until after the
Waites' appeal was dismissed.

**The hearing before Sir Peter Pain**

The case made by the plaintiffs before Sir Peter Pain was
as follows:

• (1)  The judgment of Egan J. finally determined
the claim to set aside the judgment of Costello J. for
fraud. Accordingly, it was not now possible for any of
the defendants to re-open the matter. Each defendant
was estopped by cause of action or issue estoppel.
• (2) Alternatively, it would be an abuse of the process
of the Court for the defendants to re-run the same
claim of fraud which had already been determined by
Egan J.
• (3)  On the evidence, there was no reasonable
possibility of the alleged fraud being established.
Accordingly, there was no triable issue.
• (4)  If leave to defend were granted, it would only be
upon condition that the full amount of the judgment
debt should be brought into Court.

Mr Waite and Mr Seamus Waite appeared in person. Mr
McLeod appeared by Counsel, being legally aided. The
greater part of the submissions was made on behalf of

all the defendants by Counsel. His main points were as
follows:

• (1)  There should be leave to defend because there
was a triable issue whether the judgment of Costello
J. was obtained by fraud.
• (2) In considering whether a foreign judgment could
be impeached for fraud, it was well established that
special caution is required before summary judgment
is entered. Leave to defend should be given unless it
is obvious that the allegation of fraud is frivolous.
• (3)  The decision of Egan J. in October 1967, that
the judgment of Costello J. had not been obtained by
fraud was irrelevant, because the English Court must
itself consider whether there was fraud; that is so,
even if the relevant evidence was precisely the same
as that which has been rejected in the foreign court,
whether that evidence is in fact heard in the original
proceedings or (as here) is heard by another Judge in
subsequent proceedings.
• (4) That even if Egan J.'s decision was relevant to the
present proceedings, it could not affect the position
of Mr McLeod, as he was not a party to the action
tried by Egan J.

Sir Peter Pain held as follows:

• (1)  That Mr Waite and Er Seamus Waite were
estopped from alleging fraud on the basis of Mr
Parish's evidence by the judgment of Egan J.
• (2)  That it was very doubtful whether it was open
to ? McLeod to raise the allegation that the judgment
of E?an J. was obtained by fraud, having regard to
the documents and affidavits, and the absence of any
attempt to define the nature of the fraud practised
on Egan J. But even if the point was available to Er
McLeod, it did not stand up.
• (3)  That Mr McLeod, although in a different
position from the Waites because he was not party to
the proceedings before Egan J., he was, nevertheless,
bound by the estoppel because of privity of interest
between him and the Waites.
• (4) That in view of the foregoing it was unnecessary
for the Judge to consider the alternative argument put
forward by the plaintiffs, to the effect that it is an
abuse of the process of the court for the defendants
to seek to re-litigate the fraud allegation.

• (5) In any event, no triable issue had been shown.

**In the Court of Appeal**

In this Court the same submissions of law have been made on behalf of Hr McLeod as were made before the Judge. But whereas before the Judge the case was based on the evidence of Mr Parish, in the forefront of Mr Swift's argument on the appeal has been the evidence of Colonel Piper. This is indeed remarkable, because although the affidavit of Colonel Piper was read to the Judge, no submission whatever was made upon it by Hr Harrington, who appeared for Mr McLeod; and, not surprisingly, the Judge made no mention of it in his judgment. The matter does not stop there because there was no reference to this evidence in the Notice of Appeal. However, since it was referred to in the appellants' Skeleton Argument, we gave leave to amend the Notice of Appeal.

The amendment reads:

> "1(d) The learned Judge erred in failing to give any or any sufficient weight to the evidence of Colonel Richard Warren Piper, contained in his affidavit of 5th December 1988, and to the fact that Colonel Piper's evidence had not been before Mr Justice Egan or Mr Justice Costello".

The short answer to this ground of appeal is that the Judge could hardly be said to have erred, when he was never invited to attach any weight or significance to the evidence. However, since the matter has been argued before us on the basis that this evidence shows a triable defence, we must, in due course, deal with it.

I would only add at this stage that the circumstances in which this evidence is placed before the Court is highly

unsatisfactory, and raised very many questions to which no answer is provided by the appellant.

Three matters call for comment. First, although Colonel Piper's affidavit was sworn on 5th December 1988, it was not served on the plaintiffs until 27th January 1989 — two working days before the hearing before the Judge. No explanation for the delay was forthcoming. Secondly, it is a reasonable inference from the nature of the cross-examination of Mr Sacks before Costello J. that the present defendants had the substance of Colonel Piper's evidence available to them at that time. Thirdly, not the slightest attempt has been made to explain why, if it be the case that his evidence was available, it was not adduced in either of the Irish trials. And indeed, in the light of the second point which I have just made. I think the conclusion must be that it was available to them, but they chose not to use it.

We are told by Mr Lightman that one of the Mr Waites gave an oral explanation of his non-attendance before Costello J., this being that his then employers, Alcan/ Armourflex, would not agree to his doing so unless the Waites entered into a licensing agreement with them. It is difficult to see how this can be correct, since Colonel Piper, according to his own evidence, left his employment with Alcan in 1979.

I then turn to consider the issues that arise in this appeal.

Were the Waites estopped by the ,judgment of Egan J. from contending that the judgment of Costellor J. was obtained by fraud?

It is common ground that in proceedings in this country to enforce a foreign judgment as a debt at common law, the defendant can set up a defence that the judgment was obtained by fraud. If, on a summons under RSC Order 14 , the evidence of the defendant discloses a triable issue that the foreign judgment has been so obtained, leave to defend should be given. But a foreign judgment that is final and conclusive on its merits and is not impeachable on the grounds of fraud (or other grounds that are not material) is conclusive as to any matter thereby adjudicated upon

and cannot be impeached for any error of fact or law. See Dicey and Morris "Conflict of Laws", 11th Edition, Rule 42 at page 460, Volume 1.

But for the judgment of Egan J., Costello J.'s judgment could have been impeached on the grounds of fraud. But the respondents contend that the judgment of Egan J. is final and conclusive on the issue whether or not the prior judgment was obtained by fraud, and cannot itself be impeached. It established both cause of action, estoppel and issue estoppel. Not so, argues Er Swift, because of a rule perculiar to foreign judgments. This is because the foreign judgment can be impeached for fraud even though no newly discovered fraud is relied upon and the fraud might have been, and was, relied upon in the foreign proceedings. See Abouloff v. Oppenheimer (1882) 10 Q.B.D. 295 , and Vadala v. Lawes (1890) 25 Q.B.D. 310 . These cases have been considerably criticised over the years; they were decided at a time when our courts paid scant regard to the jurisprudence of other countries. Nevertheless, we are bound by them and they were recently followed in this Court in Jet Holdings v. Patel (1988) 3 W.L.R. 295 .

But in my judgment the scope of these decisions should not be extended, and they are clearly distinguishable. In none of these cases was the question whether the judgment sued. upon here was obtained by fraud litigated in a separate and second action in the foreign jurisdiction. Unless Egan J.'s decision is itself impeached for fraud, it is conclusive of the matters thereby adjudicated upon, namely whether Costello J.'s judgment was obtained by fraud. See Dicey, Rule 42 .

Some attempt was made before Sir Peter Pain to argue that Egan J.'s judgment was itself impeachable for fraud. This was not supported by any evidence, save a bare assertion in an affidavit sworn by Mr Waite on the second day of the hearing before the Judge. It does not warrant consider ation.

Mr Swift argued that if Mr Parish and Mr Waldie's evidence had been tendered before Costello J. and had been rejected, it would still have been open to the defendants, in enforcement proceedings in this country,

to set up an allegation based upon their evidence, to the effect that Mr Sacks had given perjured evidence and so procured his judgment by fraud. Why, then, should it make any difference that the evidence is adduced and the issue contested in a second action in Ireland? The answer is that no question of fraud on the part of Mr Sacks was in issue in the Costello action; it was in the Egan action.

I have no doubt that the Judge was correct to hold, on the material and argument before him, that the Waites were estopped from alleging that the judgment of Costello J. was obtained by fraud, based (as that allegation was) on the evidence of Mr Parish and Mr Waldie. I propose to consider later in this judgment the effect of Colonel Piper's evidence.

The Judge did not find it necessary to consider the question of abuse of process, and it is perhaps unnecessary for me to do so either. But I have no doubt whatever that, even if the judgment of Egan J. did not create an estoppel, it would be an abuse of process for the Waites to re—litigate the very same issue in the English courts upon which they failed in Ireland, not least because they themselves chose that forum, which was the natural forum in which to challenge the judgment of Costello J. They could, if they had wished, merely have waited for enforcement proceedings to be taken here, and then attempt to set up fraud. They did not do so. They cannot try again here to obtain a different verdict.

### decision?

He was not a party to the action; but an estoppel will bind those who are privy to the parties bound. Carl Zeiss Siftung v. Rayan and Keeler Ltd. No. 2 (1967) 1 A.C. 853 .

The requisite privity is said to be a privity of either blood, of title or of interest. Per Lord Reid in the Zeiss case at page 910. The only relevant one is privity of interest. It is not easy to detect from the authorities what amounts to a sufficient interest. It has been held that judgment against a defendant in one capacity does not bind him in another capacity. arginson v. Blackburn Borough Council (1939) 2 K.B. 426 , though I would wish to reserve my opinion as to whether on the facts of that case the plaintiff's

representative claim might not have been struck out as an abuse of the process. A mere interest in the outcome of the litigation is not sufficient.

In Gleeson v. J. Wippell & Co. Ltd. (1977) 1 W.L.R. 510 , where at page 515 Megarry V. —C. propounded this test:

> " …but it does seem to me that, having due regard to the subject matter of the dispute, there must be a sufficient degree of identification between the two to make it just to hold that the decision to which one was party should be binding in proceedings to which the other is party. It is in that sense that I would regard the phrase 'privity of interest";

At page 5160 he said:

> "A defendant ought to be able to put his own defence in his own way, and to call his own evidence. He ought not to be concluded by the failure of the defence and evidence adduced by another defendant in other proceedings unless his standing in those other proceedings justifies the conclusion that a decision against the defendant in them ought fairly and truly to be said to be in substance a decision against him. Even it one leaves on one side collusive proceedings and friendly defendants, it would be wrong to enable a plaintiff to select the frailest of a number of possible defendants, and then to use the victory against him not merely in terrorem of other and more stalwart possible defendants, but as a decisive weapon against them".

There is a further principle which in my judgment supplements what was said in that case by the Vice—Chancellor. It is to be found in the judgment of the Privy

Council in Nana Ofori Atta II v. Nana Abus Bonsra II (1958) A.C. 95 . At page 102 Lord Denning said:

> "Those instances do not however cover this case, which is not one of active participation in the previous proceedings or actual benefit from them, but of standing by and watching them fought out or at most giving evidence in support of one side or the other. In order to determine this question the West African Court of Appeal quoted from a principle stated by Lord Penzance in Wytcherley v. Andrews . The full passage is in these words:
>
> > 'There is a practice in this court, by which any person having an interest may make himself a party to the suit by intervening; and it was because of the existence of that practice that the judges of the Prerogative Court held, that if a person, knowing what was passing, was content to stand by and see his battle fought by somebody else in the same interest, he should be bound by the result, and not be allowed to re—open the case. That principle is founded on justice and common sense, and is acted upon in courts of equity, where, if the persons interested are too numerous to be all made parties to the suit,

one or two of the class are allowed to represent them; and if it appears to the court that everything has been done bona fide in the interests of the parties seeking to disturb the arrangement, it will not allow the matter to be re-opened'.

"Mr Phineas Quass argued before their Lordships that the principle stated by Lord Penzance was confined to wills and representative actions and has never been extended further. No decision, however, was cited to their Lordships which confines the principle to wills and representative actions. Their attention was indeed drawn to one case where a like principle was applied to mortgages in somewhat special circumstances: see Farquharson v. Seton . But assuming, without deciding, that the English decisions have hitherto been so confined, their Lordships would point out that there is nothing in the principle itself which compels it to be limited to wills and representative actions. The principle, as Lord Penzance said, is founded on justice and common sense".

It is true that in [Re Langton (1964) P. 163]{.underline} , both Dankwerts and Diplock L.JJ. suggested that this rule was peculiar to the Probate Division, but this was not necessary for the decision in the case, and the Nana case was not cited. The rule may have originated in the special

position in probate, but I cannot see that justice and common sense requires it to be so confined.

How are these principles to be applied in this case? All three defendants were joint tortfeasors, having acted in breach of the duty of confidence in relation to the confidential information imparted to them and in breach of the plaintiff's copyright in the cutting patterns for the vest. The judgment against them was joint and several. If the Waites' action to set aside Costello J.'s judgment had succeeded, that judgment would have been set aside in toto, not just against the Waites; it obviously could not stand. Even if (which I do not accept) the judgment against Hr McLeod did not automatically fall in the event of the Waites' succeeding, it is plain that in the English proceedings the plea of estoppel or abuse of process would have prevented the plaintiff pursuing the claim on Costello J.'s judgment against Mr McLeod.

Mr McLeod was well aware of those proceedings. He could have applied to be joined in them, and no-one could have opposed his application. He chose not to do so and he has vouchsafed no explanation as to why he did not. *Mr* Swift says he was not obliged to do so; he was not obliged to go to a foreign jurisdiction; he could wait till he was sued here. He speaks as if Mr McLeod was required to go half-way round the world to some primitive system of justice. That is not so. He had to go to Dublin whose court as the Judge said are perfectly compe ten t to deal with this matter; Moreover, it was a process that was good enough for the Waites. Instead, he was content to sit back and leave others to fight his battle, at no expense to himself. In my judgment that is sufficient to make him privy to the estoppel; it is just to hold that he is bound by the decision of Egan J.

But there is a further point upon which Lightman relies, and it is the pleading in the appellant's defence, to which I have already quoted, referring to the Waites' proceedings to set aside the judgment. Ir Lightman submits that this is a plea of estoppel by the appellant, and that since estoppels are mutual, it can be relied upon against the appellant. Mr Lightman cited the case of Re Defries, Nortan and Levy (1883) 48 L.J. 703 . Pollock B. at page 704 said:

"But the defendants cannot be said to have waived the estoppel by not

pleading this judgment, for it was not in existence when the pleadings closed. I think it will be found that there is an old decision that/is sufficient to plead pendency of another action in order to enable the party pleading to put the judgment in such action in evidence by way of estoppel".

It would, in my view, be most unwise if this House were to use this occasion to say anything that might be taken as limiting to fixed categories the kinds of circumstances in which the court has a duty (I disavow the word discretion) to exercise this salutary power".

In my judgment, the plea in the defence Was a plea of estoppel; and as I have already said, had the Waites succeeded it was a plea that would have availed the appellant. It is plain that he was asserting that although he was not a party to those proceedings, he was privy to them. He was right.

**Abuse of process**

The Judge did not find it necessary to deal with the question of abuse of process. In my opinion the same result can equally well be reached by this route, which is untrammelled by the technicalities of estoppel. The categories of abuse of process are not closed — see Hunter v. Chief Constableof West Midlands Police & Ors (1982) A.C. 529 .

At page 536 Lord Diplock said:

"My Lords, this is a case about abuse of the process of the High Court. It concerns the inherent power which any court of justice must possess to prevent misuse of its procedure in a way which, although not inconsistent with the literal application of its procedural rules, would nevertheless be manifestly unfair to a party to litigation before it, or would ,otherwise bring the administration of justice into disrepute among right-thinking people. The circumstances in which abuse of process can arise are very varied; those which give rise to the instant appeal must surely be unique.

That was a case where the Court would not permit a collateral attack on the decision of a court of competent jurisdiction. The principle has recently been applied in this Court to analogous cases, where issues of fact have been litigated exhaustively in sample cases; it is an abuse of the process for a litigant, who was not one of the sample cases, to re-litigate again all the issues of fact on the same, or substantially the same evidence. Bee Ashmore v. British Coal Corporation (unreported 27.2.90).

The question is whether it would be in the interests of justice and public policy to allow the issue of fraud to be litigated again in this Court, it having been tried and determined by Egan J. in Ireland. In my judgment it would not; indeed, I think it would be a travesty of justice. Not only would the plaintiffs be required to re-litigate matters which have twice been extensively investigated and decided in their favour in the natural forum, but it would run the risk of inconsistent verdicts being reached, not only as between the English and Irish courts, but as between the defendants themselves. The Waites have not appealed Sir Peter Pain's judgment, and they were quite right not to do so. The plaintiffs will no doubt proceed to execute their judgment against them. What could be a greater source of injustice, if in years to come, when the issue is finally decided, a different decision is in the appellant's case reached? Public policy requires that there should be an end of litigation, and that a litigant should not be vexed more than once in the same cause.

**Colonel Piper's evidence**

So far I have dealt with the case on the same basis as that which was presented to the Judge, namely, that it was from the evidence of Mr Parish and hr Waldie that the case

of fraud against Yr Sacks was constructed. But as have already indicated in the forefront of this appeal hr Swift has placed the evidence of Colonel Piper. He relies upon it, both to impugne the judgment of Costello J., and that of Egan J., and he submits that both on its own and in addition to that of Messrs. Parish and Waldie it raises a sufficiently arguable case of fraud.

An allegation of fraud is a most serious charge to make, not least by those who have themselves been found to have acted dishonestly. In my judgment before such a submission was made to this Court it required a careful analysis of the statements of representations to be found in the evidence of Mr Sacks in each trial that was said to be false, and the respects in which, in reliance on Colonel Piper's evidence, it can be said to be false. That is what was done in the defences in relation to Mr Parish's evidence. It was not done in relation to Colonel Piper's evidence. Mr Swift submitted that he need not do so because Colonel Piper's evidence was before the Court and under Order 14 proceedings the Court should not look too closely at it, provided it was in conflict with Mr Sack's evidence. That, he said, would be a matter for the trial Judge when leave to defend was given.

I cannot too strongly deprecate this approach. It is crucial that the Court be satisfied that the defence put forward is not a bogus one. That is all the more essential here where no submissions whatever were addressed to the Judge based upon this evidence.

Mr Boyle, to whom the Court is greatly indebted, did subject the submissions made and the evidence given at the trials, and that of Colonel Piper, to close analysis. In the result in my judgment the evidence of Colonel Piper does not come within a mile of establishing a prima facie case of fraud on the part of Mr Sacks. The essence of what Yr Sacks claimed, and the Judge held was confidential to him, was the combination of laminated Kevlar material coupled with ceramic tiles to provide protection against high velocity bullets, both ball and armour-piercing (AP) for personal protection. He never claimed to have invented the use of Kevlar for body armours, or ceramic tiles. It was the successful combination of the two in a vest to form body armour against high velocity bullets, overcoming the difficult problem of blunt trauma, that was the essence

of his claim. Nowhere in his affidavit does Colonel Piper expressly repudiate this. Indeed, at paragraph 11 he says:

> "I said (to Mr Sacks) we could provide high velocity ballistic panels (the ceramic tiles) which could defeat NATO 7.62 ball and lower levels or attack for a vest and that we could also stop NATO 7.62 mm AP but this had not yet been tested on body armour" . Even if by implication Colonel Piper was claiming they had successfully combined the ceramic HV pack with Kevlar to produce body armour effective against all HV bullets, this was contrary to the evidence of Mr Brown, who was entirely impartial and whose evidence much impressed Costello J.

In the course of his evidence before that Judge, Hr Brown had said:

> "412.   Q. Would you consider next the high velocity pack, do you think he made any contribution in that field? (A) In as much as he has taken a material which the relevant manufacturer thought would not work and turned it into what is, according to the Home Office, a highly efficient body armour, yes I do.

> "413.   Q. Who were the people? (A) Alcans, also an import agent for Armoflex at first. The gentleman promoting it, Warren Piper came to my range, the date I have there. I asked him to do a trial of the Armoflex against the plaster base and we did that and he said it was no good for body armour".

House of Spring Gardens Ltd v Waite (No.2), 1990 [V] 758456 (1990)

This evidence entirely corroborated Mr Sacks' claim. Mr Swift does not suggest that Yr Brown was committing perjury in giving this evidence. How it can be suggested that Mr Sacks is, when he says the same thing, I do not understand.

The only matter which Colonel Piper expressly contradicts in his evidence is to be found at paragraph 17 of his affidavit. He said:

> "I believe it was in 1983 that I was informed that a Judge in Ireland had concluded that Michael Sacks could properly claim that copyright existed in his favour in the design of the HV ballistic panel which was used in his vest. This is contrary to the facts as I know them".

Mr Sacks had never claimed anything of the sort. His claim to copyright related to the cutting patterns for the Kevlar making up the vest. The nature of the confidential information is as I have already described.

It is important to see for what purpose Colonel Piper's evidence was sought to be introduced and relied upon by Mr Waite. He claimed it was in support of an assertion he had made in an earlier affidavit. The actual reference is to cross-examination of Mr Sacks about discovery in the second trial, and I can see no relevance in this. I assume, in fact, he means to refer to a part of his affidavit where he says:

> "During the fraud trial other quite dramatic nondisclosures in the 1982 trial came to light. The name of Ed Elkins of Armorflex the supplier of the most important part of Mr Sacks vest was only dragged out of Mr Sacks under cross-examination. Mr Sacks gave evidence (pages 11 and 12 of the transcript extract for the 27th May 1987 which I exhibit hereto marked WW2) that having met the Libyan officer in my office the officer was only

interested in the high velocity pack which was capable of stopping 5.56 AP rounds. Mr Sacks relationship with Alcan who were Armorflex UK agents was kept very much a secret in the 1982 trial. lir Sacks continued to maintain he was the author of the vest without revealing his association with

Alcan". These last two sentences are quite false, as even a cursory examination of the evidence given by Mr Sacks at the fraud trial will reveal.

In my judgment there is no basis whatever in the evidence of Colonel Piper to suggest that hr Sacks had committed perjury in either trial. Mr Harrington was wise not to found any submission on this evidence before Sir Peter Pain.

I would dismiss the appeal.

LORD JUSTICE

McCOWAN: The sequence of events and the part (or absence of a part) played in them by the appellant to this appeal are of considerable significance in this case.

Ending on 20th December 1982, Costello J. tried an action in the Irish courts brought by the respondents to this appeal for damages for misuse of confidential information, breach of contract and infringement of copyright relating to a bullet-proof vest. The defendants to that action were the two Waits and the appellant Hr McLeod. The appellant did not give evidence in or even attend those proceedings.

In giving judgment for the respondents, Costello J. commented that the appellant, if the Waites, were right, was the one person who might have cleared up all the

mysteries in the case, and in particular explained where important missing documents were.

The Judge went on to say:

> "I can reach no other conclusion but that …. Mr McLeod did not attend court so as to avoid answering questions which would have resulted in damage to the case now advanced by the defendants …."

On 28th January 1985 the two Waites (but not the appellant) brought an action in Ireland against the respondents seeking to set aside the judgment of Costello J. on the ground that it had been procured by one of the respon dents, Mr Sacks, by falsely pretending that he was responsible for the design of the bullet-proof vest, when in truth it was a Mr Parish who deserved the credit for that.

On 31st March 1985 the respondents issued the Writ in the present English action seeking to enforce the judgment of Costello J. On 9th April 1985 Mr William Waite served a defence to that action claiming that the judgment had been obtained by fraud in the same respects as he was alleging in the action he had brought in Ireland. Mr Seamus Waite served a similar defence, and on 20th August 1985 the appellant served his defence relying on the fraud alleged by Mr William Waite in his defence, and adding this significate paragraph:

> "On 28th January 1985 the first and second defendants commenced an action in the Republic of Ireland to set aside the judgment on the ground it was obtained by fraud as particularised in paragraph 1 of the first defendant's defence herein".

As Sir Peter Pain was later to say: "… one must assume that this plea had some relevance to the proceedings" .

In my judgment the wording of that paragraph of the appellant's defence was tantamount to saying: "Let the Irish Courts decide the issue of whether the judgment was obtained by fraud, and until they have, let not this action proceed" . In taking that line the appellant was, I consider, not merely acquiescing in, but positively encouraging a decision of this issue by the Irish courts in an action to which he was not a party. That was a very clever tactic. If the judgment of Costello J. were set aside as against the Waites, he could certainly have benefitted because in practical terms it could never have been enforced against him. If, on the other hand, the Waites failed in their Irish action, he could do what he has in fact now done, which is to say that he is not bound by the decision in that action since he was not a party to it, and to have another bite at the cherry of alleging fraud against the respondents.

The hearing of the Irish action brought by the Waites lasted some 22 days, followed by a judgment on 9th October 1987. The appellant once again did not give evidence and this time the Waites did not either. However Mr Parish, the alleged true designer of the bullet—proof vest, did.

In giving judgment for the respondents to this appeal, Egan J. rejected the evidence of Mr Parish that he and not Yr Sacks was responsible for the design of the vest. Indeed, the Judge found that Mr Parish had given evidence before him which he knew to be false on the promise by Mr William Waite of financial reward if the judgment of Costello J. were set aside.

There followed, on 1st and 2nd February 1989, the hearing of the respondents' Order 14 Summons before Sir Peter Pain. The Waites appeared in person, and Mr William Waite read to the Court an affidavit from a Colonel Piper, sworn on 5th December 1988 but not served on the respondents until 27th January 1989. The appellant was represented by Mr Harrington (Junior Counsel before us) and it is not disputed that in his submissions on behalf of his client he placed not one word of reliance on the affidavit of Colonel Piper. The same is true of the grounds of appeal. It is right to say, however, that Colonel Piper figured prominently in Mr Swift's Skeleton Argument, and by the time he opened the appeal to us, Colonel Piper's affidavit had become the foundation of his case as

House of Spring Gardens Ltd v Waite (No.2), 1990 WL 754556 (1990)

providing the new evidence of fraud which was not before Egan J.

Challenged by Mr Lightman as to the absence of mention of Colonel Piper in the grounds of appeal, Mr Swift sought and obtained from this Court leave to amend them by adding a paragraph alleging that: "The learned Judge erred in failing to give any or any sufficient weight to the evidence of Colonel Richard Warren Piper, contained in his affidavit of 5th December 1988 ….

I am bound to say that I do not consider this amendment an appropriate method of putting Mr Swift's argument before this Court, since I fail to see how the Judge can be blamed for attaching no weight to a document to which the appellant's counsel plainly attached no weight either.

Should we attach any weight to it? Colonel Piper's name did indeed figure in the trial before Costello J. Mr Sacks, and his wholly independent witness Mr Brown, were cross-examined about him by Counsel for the Waites. This was in the context of asking whether Mr Sacks had not in fact used in the bullet-proof vest materials made by a company called Armoflex. He never denied this. His case was that his contribution had been to think of using Armoflex products as part of a bullet-proof vest. Colonel Piper, he said, had not believed that those products could usefully be employed in a bullet-proof vest, and Mr Brown gave supporting evidence that that was indeed Colonel Piper's attitude at the time. The nature of the cross-examination of those two witnesses suggests strongly that Counsel had a proof from Colonel Piper, but the Colonel was not called as a witness before Costello J.

In the proceedings before Egan J., Colonel Piper again did not give evidence. There was indeed no reason why he should, since it was not being suggested in those proceedings that he or Armoflex were the true designers of the vest, or that Mr Sacks had fraudently misled Costello J. in respect of them. The Waites' case then still was that Mr Parish was the real designer, and that Mr Sacks had deceived Costello J. in respect of him.

The important passages in Colonel Piper's affidavit are to be found in the final paragraph, namely:

> "I believe it was in 1983 that I was informed that a Judge in Ireland had concluded that Michael Sacks could properly claim that copyright existed in his favour in the design of the EV ballistic panel which was used in his vest. This is contrary to the facts as I know them … the design of the HV ballistic insert used by Sacks remains the property of Mr Elkins and Armoflex Inc."

If that was what Colonel Piper was informed about, at the trial before Costello J., he was misled. Mr Sacks was not claiming that he had copyright in Armoflex's BY ballistic panel, and the Judge never held that he had any such copyright. Accordingly, I have no hesitation in concluding that the material in Colonel Piper's affidavit is valueless in any attempt to establish that the respondents obtained judgment from Costello J. by fraud. No triable issue has, in my judgment, been shown on behalf of the appellant.

I am further of the view that the history of this whole matter, and not least the appellant's part in it, makes it plain that the attempt now being made on his behalf to defend this action in the manner indicated is an abuse of the process of the court.

I would therefore dismiss this appeal.

LORD JUSTICE FOX:

I have read in draft the judgments of Stuart-Smith and McCowan L.JJ. I agree with them and would dismiss this appeal accordingly.

ORDER: Appeal dismissed with costs on indemnity basis. Legal aid taxation of appellant's costs. Leave to appeal to the House of Lords refused.

© 2017 Sweet & Maxwell

Crown copyright                              1990 WL 754656

**End of Document**                                          © 2017 Thomson Reuters.

# TAB 39

**1 Ch.**                    CHANCERY DIVISION.                    599

*In re* HANDMAN AND WILCOX'S CONTRACT.

[1900 H. 3963.]

*Settled Land—Lease—Void or Voidable—" Best Rent "—Collusive Bargain for Reduction of Rent—Purchaser for Value without Notice—Doubtful Title— Settled Land Act*, 1882 (45 & 46 Vict. c. 38), s. 7, sub-s. 2; s. 54.

A tenant for life, purporting to act under the powers of the Settled Land Act, 1882, granted a building lease of some vacant land at less than the best rent that could reasonably be obtained, the rent having been reduced in consideration of the waiver by the lessee of a claim for damages against the lessor, and the lessee covenanted to lay out a certain sum in building. The lessee neglected to build, and the lease was sold by auction to the vendor at a large price. The vendor agreed to sell at an enhanced price to the purchaser, and the purchaser objected that, having regard to the amount of the price, it must be shewn that the rent reserved by the lease was the best that could reasonably be obtained within s. 7, sub-s. 2, of the Settled Land Act. The vendor had no knowledge of the arrangement between the lessor and the lessee as to the reduction of the rent, and he insisted that, as purchaser for value without notice, he could make a good title to the purchaser :—

*Held*, by Buckley J., that, inasmuch as the lease did not comply with the statutory requirements as to rent, and the lessee did not act in good faith within s. 54, it was bad, and could be set aside as against a purchaser for value without notice :

*Held*, by the Court of Appeal, on the authority of *Freer* v. *Hesse*, (1853) 4 D. M. & G. 495, that, assuming that the lease was voidable only and not void, the title was not such as ought to be forced upon the purchaser, since it depended on a doubtful question of fact, namely, whether his predecessor in title, the vendor, purchased without notice of the defect in the title.

THIS was a purchaser's summons under the Vendor and Purchaser Act, 1874.

In 1894 a building lease of some vacant land in the Western Road, Ealing, was granted by G. Haynes, as tenant for life under the powers of the Settled Land Act, 1882, to W. Nye for a term of ninety-nine years at a rent of 4*l.*, the lessee covenanting, within the space of six months from the date of the lease, to erect thereon a meeting-room at the cost of 200*l.* at least. The lessee did not perform the covenant to build, and eventually became bankrupt; and in October, 1900, his

C. A.

1901

BUCKLEY

J.

*Feb.* 8.

C. A.

1902

*Jan.* 24, 27,

28;

*Feb.* 17.

C. A.
1902

HANDMAN
AND
WILCOX'S
CONTRACT,
*In re.*

trustee in bankruptcy sold the lease by auction to C. Handman for 150*l.*

In July, 1900, Handman agreed to sell the property to G. J. Wilcox for 195*l.*, and Wilcox paid a deposit of 20*l.* Wilcox made the following requisition: "Having regard to the fact that the lease is now sold for 195*l.*, it must be shewn that the rent reserved was the best rent that could reasonably be obtained."

Handman failed to comply with this requisition, and this summons was then taken out by Wilcox, asking for a declaration that the requisitions had not been sufficiently answered, and that a good title to the premises had not been shewn in accordance with the contract, and for a return of the deposit.

It appeared from the evidence, which was conflicting, that the lease was granted at less than the best rent that could reasonably be obtained, the lessor having accepted the reduced rent of 4*l.* in consideration of the waiver by the lessee of a personal claim for damages against him. It further appeared from an affidavit filed by Handman, and this was not contradicted, that he had no knowledge of the above facts, and he set up the plea of purchaser for value without notice as an answer to the objection as to the inadequacy of the rent.

The summons was heard before Buckley J. on February 8, 1901.

*E. Clayton,* for the purchaser. The lease was granted by a tenant for life under the powers of the Settled Land Act, 1882, and the best rent that could reasonably be obtained was not reserved as directed by s. 7, sub-s. 2. A tenant for life is treated as a trustee for all parties (s. 53), and cannot take a premium. The lease is therefore void: *Chandler* v. *Bradley.* (1) This was not a fair dealing in good faith as between lessor and lessee, so as to be protected by s. 54 and be binding on the remaindermen; it is at least voidable, and may be set aside at the instance of the remaindermen: *Chandler* v. *Bradley.* (2) Such a title is too doubtful to be forced on a purchaser: *In re New Land Development Association and Gray.* (3)

(1) [1897] 1 Ch. 315.      (2) [1897] 1 Ch. 323.      (3) [1892] 2 Ch. 138.

*Stewart-Smith*, for the vendor.  We are purchasers for value without notice, and have the legal estate.

[BUCKLEY J.  It is a voidable transaction, and can be set aside at the instance of the beneficiaries.  How can they be estopped ?  It is on the face of it a statutory lease, and you bought with knowledge of the provisions under which it was made.]

We have got the legal estate without notice, and the fact that the lease may be set aside cannot affect us.  In order to affect us notice must be actual, not constructive : Farwell on Powers, 2nd ed. p. 429 ; *Green* v. *Pulsford* (1) ; *M'Queen* v. *Farquhar.* (2)

Under s. 54 of the Settled Land Act, 1882, the lease itself is good as between lessor and lessee and cannot be impugned ; it cannot be that a purchaser from the lessee is in a worse position than the lessee himself.

[BUCKLEY J.  The effect of s. 54 is that a lease is good if the parties bonâ fide agreed that the rent was a proper one.  That does not apply to make the lease good by a subsequent transfer where the rent was insufficient and the lease bad.]

The beneficiaries are protected by the notice which has to be given to the trustees.  The lease is not voidable as against the transferee.  Even if it is voidable, it is operative until set aside, and it passed the legal estate.  The evidence shews that the best rent was reserved within the rule laid down in *Doe* v. *Radcliffe.* (3)

BUCKLEY J. referred to the lease and to s. 7, sub-s. 2, of the Settled Land Act, 1882, and continued :—The purchaser says that in point of fact the best rent was not obtained.  If that was the case s. 54 has, in my opinion, no application to the present case.  [His Lordship read s. 54.]  The section applies only to the grant of a lease, and has no application to the time when a subsequent transfer is made.  The lease having been granted, it was put up for sale by auction ; Handman bought it, and the

C. A.
1902
HANDMAN
AND
WILCOX'S
CONTRACT,
*In re.*

(1) (1839) 2 Beav. 70 ; 50 R. R.          (2) (1805) 11 Ves. 467 ; 8 R. R.
102.                                                    212.
          (3) (1808) 10 East, 278 ; 10 R. R. 295.

602                              CHANCERY DIVISION.                      **[1902]**

C. A.
1902

HANDMAN
AND
WILCOX'S
CONTRACT,
*In re.*

Buckley J.

lessee's trustee in bankruptcy assigned it to Handman. Handman says he took it without any notice that it had been granted at a rent which was not the best rent. He now argues that that is a defence for him on this summons. In my opinion that is not a defence. The lease being a statutory lease under a power to grant leases at the best rent, if the fact was that it was not granted at the best rent, and the lessee was not acting in good faith within s. 54, the lease was bad; and that objection is open at the instance of the beneficiaries, not only against the original lessee, but also against his transferees who have acquired the lease without notice of the defect. If the lease was not granted for the best rent it is voidable, and the beneficiaries can say so against the transferees as well as against the original lessee. Otherwise the lease might go on during the life of the tenant for life, and when the remaindermen came into possession they would be told that although the tenant for life had granted a lease which was not for the best rent and was therefore bad, yet the property had so changed hands that they could not recover it. There remains only a question of fact.

[His Lordship dealt with the evidence, and came to the conclusion that the lease was not a good lease within the statute, and the purchaser was not bound by the contract.]

H. C. R.

C. A.

Handman appealed from this decision. The appeal came on for hearing on January 24, 1902.

*Vernon Smith*, K.C., and *Stewart-Smith*, for Handman. Handman purchased in the open market a term of ninety-nine years, apparently validly created by a tenant for life under the Settled Land Act, 1882. He thus got the legal estate in the term, and, being himself a bonâ fide purchaser without notice of any defect in the title, he could hand on that legal estate to a purchaser from him even though that purchaser had notice of the defect.

[COZENS-HARDY L.J. Under sub-s. 5 of s. 7, "a statement, contained in a lease or in an indorsement thereon, signed by the tenant for life, respecting any matter of fact or of calculation

under this Act in relation to the lease, shall, in favour of the
lessee and of those claiming under him, be sufficient evidence
of the matter stated." Was there any such statement in this
case as to this rent being the best rent?]

No. A tenant for life who grants a lease under the Act
does, in fact, thereby pass the legal estate whether he reserves
the best rent or not; just as, if he sells or makes an exchange
under ss. 3 and 4, he passes the legal estate whether he obtains
the "best price" or "best consideration" or not. It cannot,
therefore, be said that the lessee of the term gets nothing
merely because it may subsequently turn out, perhaps years
afterwards, that the rent reserved may not have been the "best
rent." The object of the Act is to protect the title of a lessee
dealing in good faith with the tenant for life: *Mogridge* v.
*Clapp*. (1) See also s. 45, sub-s. 3, and s. 54 of the Act.

[COZENS-HARDY L.J. *Dowager Duchess of Sutherland* v.
*Duke of Sutherland* (2) seems somewhat in point.]

In that case the leases were held to be invalid because they
were not made in good faith. But it is there distinctly stated (3)
that the Court would be reluctant to allow a lease to be
impeached merely on the ground of inadequacy of rent, where
the lease was granted in good faith; and there is no evidence
in the present case that the lease was not granted in good faith.

[STIRLING L.J. I had to consider this point in *Chandler* v.
*Bradley* (4), where I decided that a lease under the Act by a
tenant for life was void as against the trustees of the instrument
by which the property was settled on the ground that, having
regard to a bribe given by the lessee to the tenant for life as an
inducement to grant the lease, the "best rent" had not been
obtained, but the question whether the lease was void or
voidable was not argued.]

In that case the action was brought against the original
lessee, and there also bad faith was found as a fact. In *Mog-
ridge* v. *Clapp* (1) Lindley L.J. expressed an opinion to the
effect that, even if there had been a want of good faith on the
part of a person dealing with a tenant for life, still a purchaser

C. A.
1902
HANDMAN
AND
WILCOX'S
CONTRACT,
*In re.*

(1) [1892] 3 Ch. 382, 395.          (3) [1893] 3 Ch. 195.
(2) [1893] 3 Ch. 169.               (4) [1897] 1 Ch. 315.

CHANCERY DIVISION. [1902]

C. A.
1902

HANDMAN
AND
WILCOX'S
CONTRACT,
*In re.*

without notice from that person would be protected. Sect. 53, which provides that the tenant for life shall be deemed to be a trustee for the parties interested, does not impose a condition which affects the title, but relates to the personal liability of the tenant for life : *In re Marquis of Ailesbury's Settled Estates* (1), per Lindley and Fry L.JJ. Sect. 54 protects a bonâ fide purchaser or lessee, and at any rate a purchaser from the original purchaser or lessee is protected. The effect of those sections is that the tenant for life himself would be liable for his breach of trust, but a bonâ fide purchaser from him is protected. Assuming that the best rent was not obtained, there is no evidence of any want of good faith on the part of the lessee, for there is nothing to shew that he knew at the date of the bargain that the lessor was a limited owner. The mere fact that the lease was expressed to be made in exercise of the powers of the Settled Land Act is not conclusive upon this question. Good faith is a question of fact, and it is not negatived by proof of constructive notice.

[VAUGHAN WILLIAMS L.J. referred to *In re Chawner's Settled Estates* (2) as to what constitutes best rent.]

As to the meaning of good faith within s. 54, see *Mogridge v. Clapp* (3), per Kekewich J. Cases under the Settled Estates Act, 1877, do not apply, for by s. 4 of that Act, and probably also by s. 46, the requirements as to leases are made conditions precedent to the granting of a lease.

*Micklem, K.C.*, and *E. Clayton*, for Wilcox. Sub-ss. 1, 2, and 3 of s. 7 provide definitely what a lease by a tenant for life must contain. They are the conditions on which alone a lease can be granted, and no lease under the Act can be valid unless those conditions are fulfilled. This is a statutory power, and primâ facie, if the terms of the power are not complied with, the legal estate does not pass. Assuming the provisions of s. 7 were inserted in a settlement, it is clear that a lease which did not comply with those conditions would be void, and no estate would pass. This lease was granted at an under-value in pursuance of an arrangement between the lessor and

(1) [1892] 1 Ch. 506, 536, 545.    (2) [1892] 2 Ch. 192.
(3) [1892] 3 Ch. 382, 391.

1 Ch.                    CHANCERY DIVISION.                    605

lessee, and this is not a defect which the Court could have
remedied under the Leases Act, 1849 (12 & 13 Vict. c. 26) : see
Farwell on Powers, 2nd ed. pp. 343, 345; *Moffett* v. *Lord
Gough*. (1)

C. A.
1902
HANDMAN
AND
WILCOX'S
CONTRACT,
*In re.*

[COZENS-HARDY L.J. referred to s. 20, sub-s. 2, of the
Settled Land Act.]

That section does not apply to this case.

[STIRLING L.J. referred to s. 54.]

That section is limited to the case of parties acting in good
faith.  Where the parties on both sides agree for an extraneous
consideration that a reduced rent shall be accepted, that is not
acting in good faith within the section.

In *Mogridge* v. *Clapp* (2) Kay L.J. expressed his opinion
that a lease which did not comply with the requirements of s. 7
would be void, although there is no express enactment to that
effect, following the analogy of leases granted under powers in
a settlement; and see also his observations as to the meaning
of good faith under s. 54.

Assuming that the lease is voidable only and not void, we
say that Handman is not a bonâ fide purchaser for value
without notice.  By s. 3, sub-s. 1 (i.), of the Conveyancing
Act, 1882, the test of constructive notice is whether the fact in
respect of which it is sought to impute notice would have come
to the knowledge of the purchaser if such inquiries had been
made as ought reasonably to have been made.  In this case
Handman knew all that Wilcox knew, and the facts which
Wilcox knew, namely, that the price was excessive considering
the amount of the rent and that the land had not been built
on, were sufficient to lead him to discover the defect in
the title.

[STIRLING L.J. referred to *Bailey* v. *Barnes*. (3)]

That was a different case, because a mortgagee may sell at a
forced sale and at the best price to suit his own interest; but
a tenant for life who sells or lets in exercise of the powers of
the Settled Land Act, 1882, is a trustee for all the parties
interested.

(1) (1878) 1 L. R. Ir. 331.        (2) [1892] 3 Ch. 382, 398.
(3) [1894] 1 Ch. 25.

C. A.

1902

HANDMAN
AND
WILCOX'S
CONTRACT,
*In re.*

At any rate, this is not a title which ought to be forced upon a purchaser. This title depends upon a question of fact which may be controverted by persons who are not parties to these proceedings, and would not be bound by the judgment of the Court. If the remaindermen attacked Wilcox, he would have to prove that though he had notice of the defect in the title his predecessor had not. That is a doubt which does not turn upon the construction of an Act of Parliament, but upon a question of fact, and the Court will not force upon a purchaser a title depending upon a doubtful question of fact: *In re Briggs and Spicer.* (1)

[STIRLING L.J. That case was decided upon the view that the word ".void" in s. 47 of the Bankruptcy Act, 1883, meant void; but subsequently the Court of Appeal took a different view of the construction of that section in *In re Carter and Kenderdine's Contract.* (2)]

That does not affect the question for which it is now cited; and see *In re New Land Development Association and Gray.* (3)

*Vernon Smith*, K.C., in reply. The provisions of s. 7 are not in the nature of conditions essential to the validity of the lease, but the tenant for life is liable for the non-observance of them, and every one claiming through him with notice. The legal estate passes, notwithstanding this collusive bargain between the tenant for life and the lessee. It was at most a voidable transaction. To hold the contrary would be to defeat the policy of the Act, which was to make land more marketable.

[COZENS-HARDY L.J. referred to *Freer* v. *Hesse* (4) upon the question of doubtful title.]

That is hardly consistent with *Mogridge* v. *Clapp.* (5) Practically there is no real risk to the purchaser. There must be something like threatened or apprehended litigation, or a reasonable probability of litigation.

*Cur. adv. vult.*

(1) [1891] 2 Ch. 127.                    (3) [1892] 2 Ch. 138.
(2) [1897] 1 Ch. 776.                    (4) 4 D. M. & G. 495.
                    (5) [1892] 3 Ch. 382.

Feb. 17.  VAUGHAN WILLIAMS L.J.  This is an appeal from a decision of Buckley J.  The question is raised on a summons under the Vendor and Purchaser Act, 1874.  The question is whether the vendor has made such a title as can be forced upon the purchaser.  The material facts are that a tenant for life under the powers of the Settled Land Act, 1882, granted to a lessee a building lease for ninety-nine years at a rent less than the best rent that could reasonably be obtained, and this was done with the knowledge, as appears from the evidence, both of the tenant for life and of the lessee.  The lessee covenanted for the erection of a house at the cost of 200*l*., and he did not erect the house, but after a few years became bankrupt.  His trustee in bankruptcy sold the lease, and the present vendor purchased at the price of 150*l*.  That was a very substantial price when one considers that the rent reserved was only 4*l*.—a price which, to my mind, would have been a much more likely commercial price in case the rent reserved had been what it ought to have been.  It may very well be that the purchaser had no means of knowing this, and did not in fact know it, but we have not got really sufficient evidence to enable us to judge of that.  Now he has entered into a contract for the sale of this lease, and the present purchaser declines to accept the title.  The title is a doubtful title because there are really material facts which are in doubt.  Those facts are such that not only is it theoretically possible that they may be put in issue, as was the case in *Mogridge* v. *Clapp* (1), and as was pointed out by Lindley L.J., but it is extremely probable that the validity of this lease may be hereafter questioned by those who are entitled in remainder, and the success of that question may depend upon facts which are too much in doubt to make it right to force the title on the purchaser.  In these circumstances, we think that the decision of Buckley J. must be affirmed, and the appeal dismissed.

STIRLING L.J.  In this case I take the same view of the facts as Buckley J.  I think that on the evidence as it now stands it must be taken that the lease which is the subject-matter of

C. A.
1902
HANDMAN
AND
WILCOX'S
CONTRACT,
*In re.*

(1) [1892] 3 Ch. 382.

2 *U* 2                                1

C. A,
1902

HANDMAN
AND
WILCOX'
CONTRACT,
*In re.*

Stirling L.J.

the contract was granted, not merely in consideration of the annual rent of 4*l.* thereby reserved, but of the abandonment by the lessee of a money claim against the lessor personally. The lease was granted by the lessor under the powers conferred by the Settled Land Acts; and this, I think, the lessee must be taken to have known. In my opinion, therefore, the lessee did not reserve the best rent that could be obtained, and the lessee did not act in good faith within the meaning of s. 54 of the Settled Land Act, 1882. It follows that the lease was either void or voidable as against the parties entitled under the settlement other than the lessor. If the lease was void, as the purchaser contends, then the title of the vendor is bad. If the lease was voidable only, as is contended on behalf of the vendor, then the title might be supported on the ground that the vendor was a purchaser for value without notice. It was, however, decided by the Court of Appeal in Chancery in *Freer v. Hesse* (1) that a title the validity or invalidity of which depends on the question of fact whether a particular person had or had not notice ought not to be forced on a purchaser, and from that decision I do not see my way to depart. On these grounds I am of opinion that the appeal ought to be dismissed.

COZENS-HARDY L.J. This appeal raises questions of difficulty and importance as to the true effect of the Settled Land Act. [His Lordship stated the undisputed facts, and continued as follows:—]

It appears from the evidence, as Buckley J. has found, that the lease was granted by Haynes to Nye, not at the best rent, but at a reduced rent, in consideration of the waiver by Nye of a claim for damages against Haynes. I entirely adopt Buckley J.'s view of the evidence in this respect. But it is said that Handman was not aware of this arrangement, and that although the lease might not be good in the hands of Nye or of any one claiming through him with notice of the defect, it is good in favour of Handman as a purchaser for value without notice, and that he can pass it on to Wilcox.

(1) 4 D. M. & G. 495.

1 Ch.                    CHANCERY DIVISION.                         609

Now two points arise for consideration: (1.) Is the lease void or only voidable? (2.) Is the title such as ought to be forced upon a purchaser?

Having regard to the view which I take on the second question, it is not necessary—and perhaps not desirable—that I should state the conclusion at which I have arrived on the first point. Assuming in favour of the vendor that the lease is only voidable and not void, I do not think the title such as ought to be forced upon a purchaser. In that view everything would depend upon whether Handman had notice of the defect. In *Freer* v. *Hesse* (1) Knight Bruce L.J. says: "No doubt generally speaking, if not universally, a purchaser with notice from a vendor without notice is entitled to the same protection as the vendor was entitled to; but this is a question not between incumbrancers claiming rights against the estate: it is one arising in a suit for specific performance between the person in possession, who wishes to sell the estate, and the person to whom he wishes to sell it, and the safety of the title depends for this purpose on the point whether the vendor had notice of the incumbrance. The vendor says that he had not. His agents say they had not. This is, perhaps, true; but I am not aware of any instance, and counsel have not been able to supply any to the Court, of a title depending upon such a fact being forced on a purchaser." I think that is still good law. I should not hesitate to force upon a purchaser a title depending upon the construction and effect of a general statute, even though my view differed from that of the Court below. A striking instance of this is furnished by *In re Carter and Kenderdine's Contract* (2), where the Court of Appeal compelled a purchaser to take a title which depended upon the true construction of s. 47 of the Bankruptcy Act, 1883, although Stirling J. in *In re Briggs and Spicer* (3) had held a title bad which depended upon precisely the same point. But different considerations apply where the title depends upon the proof of a fact, such as notice or want of notice. The decision of the Court in such a case, based upon the evidence before it, would

C. A.

1902

HANDMAN
AND
WILCOX'S
CONTRACT,
*In re.*

Cozens-Hardy
L.J.

(1) 4 D. M. & G. 503.          (2) [1897] 1 Ch. 776.
(3) [1891] 2 Ch. 127.

**610**                          CHANCERY DIVISION.                    **[1902]**

C. A.        not be binding upon, or indeed in any way influence, the Court
1902         in a litigation between other parties where different evidence
HANDMAN      might be adduced. I am not satisfied that Handman might
AND          not be affected with notice of the defect. The result is that I
WILCOX's
CONTRACT,    think Buckley J.'s judgment is correct, and that the appeal
*In re.*     must be dismissed with costs.

Solicitors: *S. L. MacAndrew; James Morley.*

H. B. H.

---

C. A.        OLIVER *v.* GOVERNOR AND COMPANY OF THE
1902                          BANK OF ENGLAND.
*Feb.* 20, 21.
[1900 O. 933.]

*Principal and Agent—Bank of England—Transfer of Stock—Attorney—Inno-
cent Misrepresentation—Implied Warranty of Authority—Change of
Position — Forged Power — Attorney innocently acting under . Forged
Power—Liability of Agent—Third Party—Indemnity.*

S., a stockbroker, produced to the Bank of England a power of attorney
for the sale and transfer of Consols standing in the names of the plaintiff
and another person, a solicitor, the form of power having been obtained in
ordinary course from the bank by S. upon the instructions of the solicitor,
who professed to act on behalf of the plaintiff as well as himself; but
the plaintiff knew nothing of the matter. The power purported to be
signed by both stockholders, and at the foot was the usual "demand to
act" signed by S. Acting on that "demand," and in pursuance of their
statutory duty, the bank allowed S. to execute the transfer in the bank
books as "attorney" for the two stockholders. S. received the purchase-
money under the power and paid it to the solicitor, who applied it to his
own use. Subsequently it was discovered that the plaintiff's signature to
the power had been forged, whereupon, in an action by the plaintiff against
the bank, the latter were ordered to transfer to him the like sum of
Consols, and also to pay to him all back dividends, together with the costs
of the action. The bank then claimed indemnity as against S. under a
third-party notice.

No blame was attributable either to S. or to the bank for what had
happened :—

*Held,* that a warranty was to be implied as against S. of the authority
upon which he "demanded" of the bank the performance of their statu-
tory duty, and that this implied warranty rendered him liable to indemnify
the bank.

The principle laid down in *Collen* v. *Wright,* (1857) 8 E. & B. 647, 657,

# TAB 40

**[2010 (2) CILR 154]**
**IN THE MATTER OF FREERIDER LIMITED**

GRAND COURT, FINANCIAL SERVICES DIVISION (Foster, J.): September 16th, 2010

*Companies—compulsory winding up—dispositions and transfers during winding up—validation by court—grant of security over all company's assets may be within "ordinary course of company's business" for purpose of consent validation order but depends on context—relevant considerations include but not limited to (a) circumstances of case; (b) how objective observer would regard; and (c) prior practices, focusing on businesses in ordinary operation and not abnormal financial difficulties—not to qualify if for purpose of funding one shareholder's litigation against another or merely because non-fraudulent and within company's objects*

*Companies—compulsory winding up—dispositions and transfers during winding up—validation by court—grant of security over all company's assets usually to be prospectively validated by court, though may retrospectively validate—relevant considerations include but not limited to (a) within directors' powers; (b) directors believed it necessary; (c) in good faith; (d) backed by good reasons; and (e) irregularities in company's affairs—court to avoid prejudice to unsecured creditors*

The company was in official liquidation in the Grand Court.

The company was a part of a corporate structure for the exploitation of an invention of Mr. Heinen, and was a quasi-partnership between himself and Mr. Le Comte with each of them holding 50% of the voting shares. Its principal assets were intellectual property rights in the invention. Mr. Le Comte was of the view that the company's assets were highly valuable, and had good commercial prospects. They entered into a shareholder agreement, one of the terms of which was that "All votes [are] to be carried in favour of, and/or all actions to be taken and documents and instruments [are] to be executed in accordance with, the recommendation with regard thereto made by Mr. Le Comte in his sole discretion." Over time, the relationship between the two broke down, and the company experienced significant financial difficulties. Legal proceedings between them were commenced in New York and the Netherlands, and, in March 2009, Mr. Heinen applied to the Grand Court to wind up the company. Subsequently, in June 2009, Mr. Le Comte proposed that the company obtain a validation order to enable it to carry on its general business, notwithstanding the existence of the winding-up petition. Mr. Heinen

---

formally consented to the validation order, the terms of which permitted "payments and other dispositions of property made by the company in the ordinary course of its business for proper value," and requested details of the transactions that Mr. Le Comte sought to validate. No such details were ever provided. In August and December 2009, Mr. Le Comte, purporting to act on behalf of the company, entered into two promissory notes with 733 Properties, a company which was part of the Durst Organization in New York. One of the heads of the Durst Organization was Mr. Durst, a personal friend of Mr. Le Comte's. In entering into the notes, both 733 Properties and the Durst Organization relied on Mr. Le Comte's attorneys' opinion, some of the assumptions underlying which Mr. Durst knew to be under challenge. The notes, which were in substantially identical terms, each provided (a) for a credit line of up to US$1m., to be repaid with interest, to be made available to the company; (b) for the grant by the company of security over all of its assets; and (c) that the institution against the company of any liquidation proceeding, which remained undismissed for 90 days, would amount to default, rendering the note immediately due and payable and allowing 733 Properties to exercise its rights pursuant to the security. Correspondence between Mr. Durst and Mr. Le Comte indicated that they had previously discussed the proposal to grant the security, with the aim of preventing Mr. Heinen from gaining control over the company's assets, and that the proposal and subsequent grant had been concealed from Mr. Heinen. Nonetheless, Mr. Le Comte and his wife provided to the Durst Organization personal guarantees of the company's obligations under the notes. Mr. Le Comte and Mr. Heinen both agreed that the company was solvent on a balance sheet test at this time, although the reason Mr. Le Comte gave for entering into the notes was that the company was unable to pay its debts as they fell due.

The Grand Court (Foster, Ag. J.) directed (in proceedings reported at 2009 CILR 604) that, since the winding-up petition was in reality a dispute between Mr. Le Comte and Mr. Heinen, the petition be heard *inter partes* between them, with the company not able to participate. In May 2010, the Grand Court (Foster, J.) ordered the winding up of the company on the just and equitable ground (in proceedings reported at 2010 (1) CILR 486), finding that Mr. Le Comte had been guilty of a lack of probity in his management of the company's affairs. This had the effect, pursuant to s.99 of the Companies Law (2010 Revision), that any disposition of the company's

property made after the presentation of the winding-up petition in March 2009 would be void unless validated by the court. Liquidators were appointed in respect of the company. The company's bank statements showed that a significant amount of the sums drawn down under the notes were used by Mr. Le Comte to settle the accounts of the attorneys acting on his instructions in the winding-up proceedings. Shortly thereafter, 733 Properties gave notice that the winding-up order constituted a default, that all sums and obligations to it had become due, and that it intended to exercise its rights pursuant to the security. 733 Properties subsequently assigned its rights to its subsidiary, the GCF Group.

The liquidators applied for a declaration that the purported grant of the security over all the company's assets was void under s.99 of the Companies Law (2010 Revision). They submitted that the grant of the security was not within the terms of the validation order, since it (a) had been for the inappropriate purpose of funding Mr. Le Comte's litigation against Mr. Heinen; (b) was not part of the ordinary operation of the business, but rather a response to abnormal financial difficulties, with major consequences; (c) was not analogous to the loans that the company had previously taken from Mr. Le Comte himself or the proposed third-party financing he had discussed with Mr. Heinen; (d) was concealed from Mr. Heinen, when, under the terms of the shareholders' agreement between himself and Mr. Le Comte, he should have been consulted and the matter put to a vote; (e) was disproportionate to the amount of borrowing enabled by the notes, given Mr. Le Comte's high valuation of the company; (f) inappropriately provided for an immediate default upon the execution of the notes; (g) had the collateral purpose of giving the Durst Organization a priority claim over the assets and thereby preventing Mr. Heinen from gaining control; and (h) was therefore not in the ordinary course of the company's business. They further submitted that it should not now be retrospectively validated, since (i) granting the security was not in the interests of the company, nor could a reasonable and honest director have believed it to be; (j) there had been irregularities in the company's affairs in that Mr. Le Comte was guilty of a lack of probity; (k) retrospective validation at this time would frustrate the official liquidators' taking control of the assets; and (l) declaring the grant of the security void would not be unfair to 733 Properties or the Durst Organization, since it was their decision to rely on Mr. Le Comte's attorneys' opinion, some of the assumptions underlying which Mr. Durst knew to be under challenge.

The GCF Group submitted in reply that the grant of the security was within the terms of the validation order and should not be declared void under s.99 of the Companies Law, since (a) the company's articles of association provided that the company's objects were unrestricted; (b) the company had relied on loans from Mr. Le Comte in the past; (c) Mr. Heinen and Mr. Le Comte had previously discussed proposals to obtain third party financing; (d) meeting the costs of the ongoing litigation through borrowing money had become an existing practice of the company; (e) by virtue of the shareholders' agreement between them, Mr. Le Comte was not required to inform Mr. Heinen of the proposed grant; (f) the existence of the winding-up petition, of which the Durst Group was already aware, was not intended to qualify as a default; (g) the fact that Mr. Le Comte and his wife had provided personal guarantees of the company's obligations under the notes was inconsistent with the inference of a collateral purpose; and consequently (h) the grant of the security was in "the ordinary course of the company's business." In the alternative, GCF applied for an order retrospectively validating the grant of the security, submitting that (i) the court had an unfettered jurisdiction to validate dispositions, including retrospectively; (j) the company was

solvent at the relevant time, and therefore the validation of the grant of the security should not be seen as prejudicial to unsecured creditors; and (k) declaring the grant of the security void would be unfair to 733 Properties and the Durst Organization.

The court considered (a) the test for whether a company's actions came within "the ordinary course of business"; and (b) when it would exercise its discretion to validate a disposition of a company's property so that the disposition would not be void under s.99 of the Companies Law.

**Held,** declaring the purported grant of the security void:

(1) The court would declare the grant of the security to be void under s.99 of the Companies Law (2010 Revision). Since it was established law that a grant of security over a company's assets was a disposition of its property, in order to determine whether it was within the terms of the validation order the question was whether it was made in "the ordinary course of the company's business." In answering this, the relevant considerations included the circumstances in which the

grant occurred, whether an objective observer would consider it as having occurred in the ordinary course of business, and the prior practices of the company. The focus needed to be on the ordinary operational activities of businesses, and not responses to abnormal financial difficulties. However, not all these factors would be applicable in every case, no single factor would be conclusive, and the list was not exclusive. A disposition could be in the ordinary course of business despite being unprecedented, and conversely, a disposition would not automatically qualify simply because it was non-fraudulent and within the objects of the company's articles of association. A grant of security over all of a company's assets during winding up could fall within the ordinary course of a company's business, but the court needed to consider all the circumstances. Moreover, the grant of such security should usually be the subject of a prospective validation application to the court, in order that all the potential consequences could be properly analyzed (paras. 13–17).

(2) The grant of the security was outside the ordinary course of the company's business in a number of ways. First, the purpose of obtaining money in return for security was to finance Mr. Le Comte's litigation against Mr. Heinen, of which the company was merely the subject-matter, and it would not be in the ordinary course of any company's business to borrow money to fund litigation by one shareholder against another. Secondly, it was a response to abnormal financial difficulties, and not within the ordinary operational activities of the company. Neither the loans the company had previously taken from Mr. Le Comte himself nor the proposed third-party financing he had discussed with Mr. Heinen before their relationship broke down were analogous to granting security over all the company's assets, which was a highly unusual step with major consequences. Thirdly, Mr. Le Comte had deliberately concealed from Mr. Heinen the grant of the security, when the shareholders' agreement required Mr. Le Comte to consult with Mr. Heinen, and arguably to put the

---

matter to a vote. Fourthly, the extent of the security was disproportionate to the amount of borrowing enabled by the notes, given Mr. Le Comte's much higher valuation of the company. It was also surprising that—on a usual construction without reference to the parties' intentions, as required by Cayman law—the notes provided for an immediate default upon their execution. Fifthly, there was clear evidence that Mr. Le Comte's grant of the security had the collateral purpose of giving the Durst Organization a priority claim, thereby preventing Mr. Heinen from gaining control of the assets. In the circumstances, the grant of the security was clearly not in the ordinary course of the company's business and therefore fell outside the terms of the consent validation order (para. 31; paras. 42–49).

(3) Moreover, the court would not retrospectively validate the grant of security over all of the company's assets. The grant of such security should usually be the subject of a prospective validation application to the court, in order that all the potential consequences could be properly analyzed. Nonetheless, the court had an unfettered discretion whether to validate any particular disposition, including doing so retrospectively, so that it would not be void under s.99 of the Companies Law. In determining whether to exercise this discretion, the relevant considerations would be: whether the disposition was within the directors' powers; whether the directors believed it to be necessary or in the interests of the company; whether it was made in good faith; whether there were good reasons for it; and whether there had been irregularities in the affairs of the company. Not all of these factors would always be applicable, nor was it an exclusive list—every case would turn on its own circumstances. The court's principal concern would be to avoid prejudice to the body of unsecured creditors as a whole. If the company were solvent, the usual assumption would be that the disposition would not be prejudicial to the creditors as it should not affect their repayment, although even this would not be conclusive if, as here, the winding-up petition were based on grounds other than insolvency (para. 25; paras. 51–59).

(4) In these circumstances, it was unclear whether the company was solvent at the time of the grant of the security. It appeared that, although it was solvent on a balance sheet test, it was not solvent in that it was unable to pay its debts as they fell due. However, even if it were solvent when the grant of the security was proposed, the court would not have validated the grant of the security at that time. As the court had already concluded, the grant was not in the ordinary course of the company's business, and there was no evidence suggesting that the reasons for granting it were in the interests of the company or could have been held by a reasonable and honest director. Rather, it appeared to be purely in Mr. Le Comte's personal interests. Irregularities in the affairs of the company had also been shown, in that Mr. Le Comte had been guilty of a lack of probity and had granted the security to achieve a collateral purpose. Even if the court would have validated it at the time of its proposal, it would not now do so retrospectively, since, the company having entered official liquidation,

validation of the grant of the security would frustrate the official liquidators' taking control of the assets. Nor would this be unfair to 733 Properties or the Durst Organization, since it was their decision to rely on Mr. Le Comte's attorneys' opinion, some of the assumptions underlying which Mr. Durst knew to be under challenge. The grant of the security would therefore not be validated retrospectively, and would be void under s.99 of the Companies Law (paras. 61–67).

**Cases cited:**

(1)    *Ashborder BV* v. *Green Gas Power Ltd.*, [2005] 1 BCLC 623; [2005] BCC 634; [2004] EWHC 1517 (Ch), applied.

(2)    *Burton & Deakin Ltd., In re,* [1977] 1 W.L.R. 390; [1977] 1 All E.R. 631, referred to.

(3)    *Countrywide Banking Corp. Ltd.* v. *Dean,* [1998] A.C. 338; [1998] 2 W.L.R. 441; [1998] 3 LRC 107; [1998] 1 BCLC 306; [1998] BCC 105, applied.

(4)    *Crossmore Elec. & Civil Engr. Ltd., In re* (1988), 5 BCC 37; [1989] BCLC 137, referred to.

(5)    *Cybervest Fund, In re, 2006 CILR 80, dicta* of Smellie, C.J. applied.

(6)    *Denney* v. *John Hudson & Co. Ltd.,* [1992] BCLC 901; [1992] BCC 503, referred to.

(7)    *Fairway Graphics Ltd., Re,* [1991] BCLC 468, referred to.

(8)    *Fortuna Dev. Corp., In re, 2004–05 CILR 533, dicta* of Henderson, J. applied.

(9)    *Gray's Inn Constr. Co. Ltd., In re,* [1980] 1 W.L.R. 711; [1980] 1 All E.R. 814, *dictum* of Buckley, L.J. applied.

(10)    *Mal Bower's Macquarie Elec. Centre Pty. Ltd., Re,* [1974] 1 N.S.W.R. 254, referred to.

(11)    *Scotiabank (C.I.) Ltd. v. Treasure Island Resort (Cayman) Ltd., 2004–05 CILR 423,* referred to.

(12)    *Steane's (Bournemouth) Ltd., Re,* [1950] 1 All E.R. 21, applied.

(13)    *Tellsa Furniture Pty. Ltd., Re* (1985), 81 FLR 185; 9 ACLR 869, applied.

**Legislation construed:**

Companies Law (2010 Revision), s.99: The relevant terms of this section are set out at para. 4.

s.100(2): The relevant terms of this sub-section are set out at para. 4.

s.142(1): The relevant terms of this sub-section are set out at para. 37.

*A.A. Galatopoulos* and *Ms. R.A. Collins* for the liquidators;

*J.G. Manning* and *A.J. Walters* for the GCF Group;

*G. Halkerston* and *Ms. K. Brown* for Mr. Heinen;

*A. Turner* and *Ms. R. Lawrence* for Mr. Le Comte.

1    **FOSTER, J.:** This is the ruling on the application of the joint official liquidators ("the JOLs") of Freerider Ltd. ("the company," and in official

liquidation) by summons dated August 30th, 2010 seeking a declaration that the security over all the assets of the company purportedly granted under two convertible revolving secured promissory notes and security agreements, respectively dated August 17th, 2009 ("the first note") and December 3rd, 2009 ("the second note," and together, "the notes") in favour of 733 Properties Inc. and subsequently assigned to its subsidiary, GCF Group LLC, is not within the terms of a validation order made by consent on June 29th, 2009 ("the consent validation order"), not having been granted in the ordinary course of the company's business for proper value, and is therefore void under s.99 of the Companies Law (2010 Revision) ("the Law"). The ruling also relates to the summons of GCF, also dated August 30th, 2010, seeking an order that, if the court finds that the security is not within the terms of the consent validation order, the grant of the security should now be retrospectively validated and accordingly not be void pursuant to s.99 of the Law.

**General background**

2    The company was ordered to be wound up on just and equitable grounds on May 13th, 2010 on the petition of Mr. Heinen, who is one of the two voting shareholders, which was vigorously opposed by the only other voting shareholder, Mr. Le Comte. Mr. Le Comte subsequently appealed to the Court of Appeal against the winding-up order, but his appeal was refused on August 24th, 2010. In a previous ruling dated November 11th, 2009, the court had directed pursuant to O.3, r.11(2) of the Companies Winding Up Rules 2008 that the company itself should not be able to participate in the winding-up proceedings, as it was merely the subject-matter of the proceedings, which should be treated as *inter partes* proceedings between Mr. Heinen and Mr. Le Comte.

3   The background to the dispute between Mr. Heinen and Mr. Le Comte concerning the company is fully set out in the reasons for the winding-up order dated May 13th, 2010, and I do not consider it necessary to rehearse that background.

**The consent validation order**

4   Section 99 of the Law provides:

"When a winding up order has been made, any disposition of the company's property and any transfer of shares or alteration in the status of the company's members made after the commencement of the winding up is, unless the Court otherwise orders, void."

Section 100(2) of the Law provides:

"In any other circumstance not specified in subsection (1) [none of which are applicable here], the winding up of a company by the

Court is deemed to commence at the time of the presentation of the petition for winding up."

Both s.99 and s.100(2) are intended to protect the unsecured creditors of the company once winding-up proceedings have commenced. The companies law in the United Kingdom, Australia, Canada and most other Commonwealth common law jurisdictions has been to the same effect since the 19th century.

5   On June 22nd, 2009, the attorneys then representing the company on Mr. Le Comte's instructions, Turner & Roulstone, wrote to Mr. Heinen's attorneys, Appleby, proposing that the parties should agree to a validation order to enable the company to carry on its general business notwithstanding the presentation of the winding-up petition, thus avoiding the consequences of s.99 of the Law. Turner & Roulstone requested an urgent response. The following day, June 23rd, 2009, Appleby responded stating that they were taking instructions in relation to the proposed validation order and in the meantime requested details of the transactions which it was sought to validate. By reply email on June 24th, Turner & Roulstone responded, again requesting that Mr. Heinen's attorneys revert to them on the proposed orders without delay. Their email then said:

"*The company needs to have the ability to conduct its general business* and this type of order is given as of right where a just and equitable petition has been issued. There is no obligation on the company to provide specific details of the transactions which it wishes to conduct." [Emphasis supplied.]

6   By reply letter dated June 29th, 2009, Appleby confirmed that their client, Mr. Heinen, was prepared to agree to the terms of the "draft consent order validating payments and other dispositions of property made by the company in the ordinary course of its business for proper value pending the determination of the petition." Appleby went on to contend that their client was entitled to details of all such transactions and requested confirmation by return that such details would be provided. It seems that no response to that request was ever received.

7   The consent validation order, being a consent order, was dealt with administratively and signed by the clerk of court. There was no hearing by or involvement of the court. The consent validation order provided as follows:

"IT IS HEREBY ORDERED BY CONSENT THAT, notwithstanding the presentation of the petition against Freerider Ltd. ("the company"):

   (1) payments made into or out of the bank accounts of the company in the ordinary course of business of the company; and

   (2) dispositions of the property of the company made in the ordinary course of its business for proper value;

between the date of presentation of the petition and the date of judgment on the petition or further order in the meantime shall not be void by virtue of the provisions of s.99 of the Companies (Amendment) Law 2007 [now s.99 of the Law] in the event of an order for the winding up of the company being made on the said petition."

It is para. 2 of the consent validation order which is now in issue.

**Procedure**

8   I should note that Mr. Heinen had previously issued a summons, dated June 16th, 2010, subsequently amended on July 15th, 2010, by which he himself sought a declaration that the notes and the security were both void pursuant to s.99 of the Law. This summons as amended therefore predated the JOLs' summons, which is the subject of this ruling. Both counsel for GCF and counsel for Mr. Le Comte raised an issue as to Mr. Heinen's *locus* to make such an application, contending that the JOLs were the only appropriate parties to seek a declaration under s.99 of the

Law. As the JOLs have since done that (albeit that their application relates only to the grant of the security and not to the promissory notes as such), I declined to hear Mr. Heinen's amended summons or the related arguments on the question of Mr. Heinen's *locus* in the course of hearing the JOLs' summons. However, I indicated that I would deal with any issues arising out of Mr. Heinen's amended summons, if necessary, at some future date. Nonetheless, since Mr. Heinen and Mr. Le Comte are both contributories and were respectively the petitioner and the respondent in the winding-up proceedings, I did agree to hear and did hear submissions on behalf of Mr. Heinen in support of the JOLs' summons and in opposition to GCF's summons and submission on behalf of Mr. Le Comte in opposition to the JOLs' summons and in support of GCF's summons.

9   I should also note that counsel for Mr. Heinen indicated that he wished to argue that the grant of the security was not anyway a disposition of the property of the company because, he contended, Mr. Le Comte had no authority to enter into the notes and to grant the security on behalf of the company. Since, at a previous directions hearing on August 27th, 2010, I had already directed that the sole issue for determination at the hearing before me in the event that the JOLs issued a summons would be whether the grant of the security was made in the ordinary course of the company's business in terms of the consent validation order, I declined to allow Mr. Heinen's counsel to make his proposed argument at the hearing of the JOLs' summons. However, I accepted that Mr. Heinen's counsel was entitled to consider his position in light of this ruling and, if he considered

it necessary and appropriate, to make an application in that regard at some future date.

**The disposition in issue**

10   The affidavit evidence establishes that Mr. Le Comte, purporting to act on behalf of the company, as the borrower and 733 Properties as the lender entered into the first note on August 17th, 2009, approximately two months after the date of the consent validation order. 733 Properties is a company which is part of the Durst Organization of New York, which carries on business principally as an owner, builder and manager of commercial and residential real estate in New York. The Durst Organization is headed by Mr. Jonathan Durst and a cousin of his. Mr. Durst's wife is a close personal friend of Mr. Le Comte's wife. According to Mr. Durst's affidavit, he has been a friend of Mr. Le Comte and his family for almost 20 years, principally through the friendship of their respective wives and children. Mr. Le Comte's evidence confirms this.

11   The first note relates to a sum of up to US$1m. together with interest. The second note relates to a further sum of up to US$1m. together with interest. The notes are otherwise in substantially identical terms and by cl. 3 in each case provide for the grant by the company of security (referred to in the notes as "collateral") over all of the company's assets, wherever located, including all intellectual property rights and any claims against third parties. The notes also provide (cl. 2) *inter alia* that the institution against the company of any liquidation proceeding which remains undismissed for 90 days is an event of default as a result of which the note in each case becomes automatically and immediately due and payable and 733 Properties has the right to exercise its rights under the note with regard *inter alia* to the security.

12   On May 21st, 2010 (just over a week after the winding-up order of May 13th, 2010 was made), 733 Properties gave formal notice that the winding-up order constituted a default under the notes and that all sums and obligations under the notes were then due and payable and that 733 Properties intended to exercise its rights and remedies under the notes, including all its rights to proceed against the "collateral" (*i.e.* the security). Since then, there has been an ongoing disagreement between 733 Properties (and its subsequent assignee, GCF) and the JOLs and Mr. Heinen over the right of the JOLs or 733 Properties, now GCF, to possession and control of the assets of the company, including the right to control the litigation instigated by Mr. Le Comte in the name of the company in New York and the Netherlands. Subsequently, as I understand it, by consent of the parties, including the JOLs, the legal proceedings in New York were stayed by the court until November 30th, 2010 to enable determination of the validity of the purported grant of the security by the company, which is, of course, a matter of Cayman law, by this court.

**The relevant law on the ordinary course of business**

13   Section 99 of the Law applies when there is a disposition of a company's property after the commencement of a winding up and the court has not made an order that the disposition concerned is not thereby void. It was accepted by all parties that the expression "disposition of property" in this context encompasses encumbrances granted over a company's property, such as

the security in this case. That is clearly established by authority and not in doubt. Furthermore, as the petition for winding up the company was presented (*i.e.* filed with the court and initiated) on March 6th, 2009 and a winding-up order has since been made, the winding up of the company is deemed, pursuant to s.100(2) of the Law, to have commenced on March 6th, 2009. Accordingly, the security was clearly granted after the commencement of the winding up. There is again no doubt about that and there was no dispute in that regard either between the parties.

14   The court has not made any order specifically validating the granting of the security. The only validation order made is the consent validation order which validates dispositions made by the company "in the ordinary course of its business for proper value." The phrase "in the ordinary course of business" has been considered by various Commonwealth courts on a number of occasions and in a number of contexts, the circumstances of all of which are inevitably different. However, the opinion of the Privy Council in *Countrywide Banking Corp. Ltd.* v. *Dean* (3), which is of course binding on this court, is in my opinion the appropriate authority for determination of the meaning of that expression in Cayman law. The Privy Council made reference to several decisions in other courts, but ultimately declined to adopt any particular formulation of the phrase. It said ([1998] A.C. at 349):

"There are difficulties in drawing upon formulations in different words of statutory tests and treating them as applicable in all circumstances. Such difficulties are increased where those formulations originate in different legal or factual contexts. This is particularly so where the test is essentially one of fact in any event. For these reasons, as presently informed by the argument in this case, their Lordships do not adopt any particular formulation. Nor is it necessary for this case to make any comprehensive statement, suitable for all cases, of the criteria for determining when a transaction is to be held to have taken place in the ordinary course of business for the purpose of [the English legislation under consideration].

. . .

Plainly the transaction must be examined in the actual setting in which it took place. That defines the circumstances in which it is to

be determined whether it was in the ordinary course of business. The determination then is to be made objectively by reference to the standard of what amounts to the ordinary course of business. As was said by Fisher, J. in the *Modern Terrazzo Ltd.* case, 10 October 1997, the transaction must be such that it would be viewed by an objective observer as having taken place in the ordinary course of business. While there is to be reference to business practices in the commercial world in general, the focus must still be the ordinary operational activities of businesses as going concerns, not responses to abnormal financial difficulties. Their Lordships respectfully agree with the judge's conclusion by reference to the policy of the section:

'Whether a payment should be regarded as commercially routine at a day to day trading and operating level will turn at least in part upon a comparison with the practices of the commercial community in general. But equally, the way in which the particular company has acted in the past, and its dealings with the particular creditor, would seem pertinent. That the payment was simply a repetition of past patterns of behaviour would make it more difficult to argue that it represented special assistance to an insider or the result of special enforcement measures or a situation in which the subject creditor ought to have investigated before extending credit. So at a policy level there is something to be said for the view that relevant considerations should extend to the prior practices of the particular company.'"

15   It was submitted on behalf of the JOLs, in my opinion correctly, that the opinion of the Privy Council makes it clear that there are no comprehensive criteria for what constitutes "in the ordinary course of business." It is essentially a matter of fact in the light of the particular circumstances in each case. Nonetheless, certain key points were made clear, namely:

   (a) the transaction must be examined in the circumstances in which it occurred;

   (b) the transaction must be such that an objective observer would view it as having taken place in the ordinary course of business;

   (c) the focus of the enquiry must be on the ordinary operational activities of businesses, not responses to abnormal financial difficulties; and

   (d) prior practices of the company will be a relevant consideration.

16   Of course, the Privy Council made it clear that none of these points is necessarily applicable in every case, they are not conclusive and are not intended to be comprehensive or exclusive. They are simply guidelines.

There was no substantial disagreement between the parties about this analysis, although their respective interpretation of the circumstances of the granting of the security differed considerably, and consequently their proposed application of these guidelines to such circumstances also differed.

17   I also found assistance from the judgment in the English case of *Ashborder BV* v. *Green Gas Power Ltd*. (1), which was a case involving interpretation of the phrase "in the ordinary course of business" in the context of a floating charge over assets of a company which had borrowed funds from lenders in the Enron group. The judge (Etherton, J., now a judge of the English Court of Appeal), in concluding that certain agreements fell outside the scope of the ordinary course of the business of the company concerned, held that the words of the phrase were ordinary words of the English language which had to be given the meaning which ordinary business people would be expected to give them against the factual and commercial background in which the agreements concerned were made. He said that a transaction could be in the ordinary course of business even if it were exceptional or unprecedented, but that a transaction was not to be regarded as in the ordinary course of a company's business merely because it was not fraudulent and was within the company's objects in its memorandum of association. He said that meaning must be given to the word "ordinary" in the phrase. He then held that, in the circumstances of that case, the transactions were not in the ordinary course of the company's business by reason *inter alia* of the non-disclosure to all the directors of the material terms of the agreements and because of his concerns about concealment of the transactions. He also relied on the fact that the company was in abnormal financial difficulty at the time and the agreements were entered into as an exceptional abnormal response to that. These factors were, in the view of the judge, sufficiently unusual features to take the transactions out of the scope of the company's ordinary course of business.

**The circumstances of the grant of the security**

18   There was no contemporaneous documentary evidence before me to indicate when discussions between Mr. Le Comte and Mr. Durst concerning the proposed first note started. The first available email communication is dated April 6th, 2009. It is from Mr. Le Comte to Mr. Durst under the heading "Freerider—Durst Convertible Secured Promissory Note" and, among other matters (as to which I shall comment further below), attached a proposed agreement. In the email, Mr. Le Comte said he had "tried to capture the spirit of our conversations in order to protect your interests as best I could." Clearly therefore, there had been previous conversations between Mr. Le Comte and Mr. Durst about the proposed loan, as to which there was no evidence before me. Clearly, Mr. Le Comte

was also endeavouring to protect the interests of the Dursts. There then followed a series of email exchanges between Mr. Le Comte and Mr. Durst, which culminated with the execution of the first note dated August 17th, 2009.

19   It is clear from this correspondence that the proposed and subsequent grant of the security was intentionally concealed by Mr. Le Comte from his co-director and contributory, Mr. Heinen, and that Mr. Durst was expressly told that this would be the case. In fact Mr. Heinen was not made aware of the existence of either of the notes and the grant of the security until after 733 Properties told the JOLs of them subsequent to the winding-up order. Mr. Le Comte sought to justify this to Mr. Durst at the time, and again in his affidavit evidence produced at the hearing before me, on the basis that his purported grant of the security on behalf of the company fell within his exclusive domain and overriding authority pursuant to the first shareholder agreement dated July 19th, 2003 between him and Mr. Heinen ("the shareholder agreement"). I should add that it was also argued before me that Mr. Heinen would anyway have had a conflict of interest with regard to the grant of the security since the borrowing secured thereby was, it was contended, to be used to meet the company's past and ongoing legal costs of the various litigation against him. Mr. Le Comte's position was that significant sums were and would in future be owed to attorneys in New York, the Netherlands and the Cayman Islands by, on his case, the company, which the company urgently needed and would in future need to settle in order to progress the litigation, and that Mr. Heinen, as the principal opposing party in such litigation, would have had a conflict of interest in being involved in the decision as to whether the company should grant the security in respect of borrowing from the Dursts for such purposes.

20   It appears from the email correspondence between Mr. Le Comte and Mr. Durst that Mr. Le Comte's request was that the company should be given access to a credit line for sums up to US$1m. pursuant to each note, and this appears to be what in practice occurred. GCF claims that Mr. Le Comte, purportedly on behalf of the company, drew down a total principal sum of US$1,550,000 under the notes and that, as at May 31st, 2010, interest amounting to US$38,836.77 had accrued on that sum.

21  Mr. Le Comte provided no evidence as to how the various sums drawn down under the notes were in fact used. His affidavit evidence was that they were used to settle outstanding debts of the company due principally to the attorneys acting in the litigation in New York, the Netherlands and in this country, and to fund the ongoing costs of such litigation. However, no evidence to support that general assertion was produced. Evidence from certain of the company's bank statements showed that a significant portion of the sums drawn down was used by Mr.

Le Comte to settle the accounts of the Cayman attorneys, Turner & Roulstone, acting on his instructions in the winding-up proceedings.

**Analysis and comment**

22  It seems to me that, in order to determine whether the grant of the security was in the ordinary course of the company's business, I must first consider what the business of the company was. As explained in the reasons for the winding-up order dated May 13th, 2010, the company was established to enable payments generated by the commercial exploitation of the intellectual property in TheWheel and associated technology to be made to an entity in a tax-free jurisdiction and also so that the intellectual property rights concerned could be held outside the Dutch company, e-Traction Europe BV, which actually carries out the physical work on and development of TheWheel and associated technology (see 2010 (1) CILR 486, at paras. 14 and 69). Accordingly, the company's business essentially consists of the holding and control of the intellectual property rights in TheWheel and other related technology.

23  It was submitted on behalf of GCF that the company's memorandum of association provides that the company's objects are unrestricted and that, accordingly, the grant of the security was within the company's objects. I was also referred to art. 95 of the company's articles of association, which provides that—

"the directors may exercise all the powers of the company to borrow money or to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligations of the company or of any third party."

It was contended that, accordingly, the provision of the security pursuant to the notes was within the company's objects and within the powers of its directors.

24  It was further submitted that, since the company has been reliant from time to time in the past on loans from Mr. Le Comte to meet its day to day operating expenses, borrowing money was within the ordinary course of the company's business. It was said that the grant of security as a condition of borrowing is clearly a usual practice of the business community in general.

25  It is, of course, the grant of the security over all of the company's assets and rights which is in issue, not the borrowing of money. The grant of such security obviously impacts adversely upon the position of unsecured creditors and is clearly an important and significant transaction. The principal purpose of the statutory scheme applicable to winding up is

to protect unsecured creditors and their entitlement to eventual *pari passu* distribution in a winding up and to enable the winding up of the company in an orderly manner by officers of the court. This is the principal reason why, in my opinion, a proposal by the directors of a company to grant security over all of its assets and rights after winding-up proceedings have been initiated would and should normally be the subject of a prospective validation application to the court so that the benefit to the company, which the directors contend derives from such secured borrowing, may be properly and fully analyzed and fairly balanced against the rights and interests of unsecured creditors in advance of any such security being granted. No doubt the court, in doing so, would have regard to the views of unsecured creditors, but an overall approach, having regard to all the circumstances, will be taken.

26  In fact, the company has never previously granted security of any kind in respect of its borrowings, which have always been from Mr. Le Comte as a shareholder and investor in the company. Both he and Mr. Heinen are on record as having said on several occasions that they consider the intellectual property rights currently held by the company to be of very substantial value having regard to the considerable financial potential from exploitation of TheWheel and associated technology. Those rights are also the company's only asset of any significance. Mr. Le Comte also estimated the realizations from the litigation, particularly in New York, if successful, would be very significant. In such circumstances, to grant security over all of the company's assets and rights, including all of the intellectual property rights it holds, was, as I have said, clearly a

very significant and important step, particularly having regard to the fact that such security was granted pursuant to the first note in respect of a loan of up to US$1m., a relatively small amount in proportion to Mr. Le Comte's own opinion of the very high value of the company's assets and rights.

27   It was also contended on behalf of Mr. Le Comte that, since the company has been carrying on litigation over the past three years (albeit procured by him), meeting the costs of such litigation through borrowing has been a prior practice and become part of the ordinary course of the company's business. I shall comment on that suggestion later in this ruling.

28   As I have already mentioned, in deliberately not informing his co-director, Mr. Heinen, of the proposed grant of the security, Mr. Le Comte relied on the provisions of the shareholder agreement and in particular s.1, as he did in his unsuccessful opposition to the winding up of the company. In the present context, Mr. Le Comte contends that the effect of the shareholder agreement is that he has the sole right to determine all management issues of the company of a non-technical nature and that accordingly it was solely up to him whether or not the company should enter into the notes and grant the security. In his view, Mr. Heinen was not

entitled to any say in the matter. However, in my opinion, apart from the fact that, as Mr. Le Comte was well aware at the time, it is anyway contended by Mr. Heinen that the shareholder agreement is not valid, that is not quite what the shareholder agreement provides. Section 1(2) provides, with regard to business and other non-technical issues:

"All votes [are] to be carried in favour of, and/or all actions to be taken and documents and instruments [are] to be executed in accordance with, the recommendation with regard thereto made by Mr. Le Comte in his sole discretion."

29   This clearly, at the least, requires there to be a recommendation with regard to the proposed action by Mr. Le Comte provided to Mr. Heinen, and, arguably, also a vote. The section does not, in my view, simply entitle Mr. Le Comte to ignore Mr. Heinen entirely and to make decisions and take actions unilaterally in respect of the company without at least informing his co-director (described in the shareholders agreement, as he and Mr. Le Comte both are, as a "manager" of the business). Mr. Le Comte, of course, alleges that he had removed Mr. Heinen as a director of the company. However, he was well aware that that was strongly disputed and that Mr. Heinen had refused to resign. Mr. Le Comte was aware of all this when he claimed to Mr. Durst that he had the sole right to procure the company to grant the security and that he did not intend to inform Mr. Heinen of what he proposed. Nor do I consider that the fact that he considered Mr. Heinen would have had a conflict of interest meant that he was not required to inform Mr. Heinen of his proposed action on behalf of the company.

30   A further point which was the subject of argument before me related to the provisions regarding default in the notes. It was submitted by counsel for the JOLs and counsel for Mr. Heinen that the wording of cl. 2(a)(iii) of each of the notes meant that, upon execution, the notes would become automatically and immediately due and payable because liquidation proceedings against the company had at the date of execution been commenced and remained undismissed for 90 days. This would have brought about an immediate acceleration of liability under the notes and the obligation of the company to pay an increased interest rate and legal and other expenses. There was affidavit evidence from the New York attorney representing the Durst Group in which he commented on that submission. He stated that the language in cl. 2(a)(iii) of each note is merely *pro forma*, that it was not contemplated that the existence of the winding-up petition, of which he and the company's New York attorneys were well aware, would qualify as a default and that he did not believe the company would have executed the notes if it had believed there was already an existing default.

31   The notes are, of course, governed by New York law, although the

law in this country is that foreign law is presumed to be the same as Cayman law in the absence of expert evidence of the relevant foreign law. No such expert evidence on the law of New York relating to the construction and interpretation of legal documents such as the notes was made available to me. Under Cayman law, it is well established that such documents are to be construed and interpreted solely upon the basis of their wording and that evidence of preliminary negotiations, of the subjective intentions of the parties and those connected to them and of subsequent actions is not relevant or admissible as an aid to their construction. There is no evidence before me as to whether or not that also represents the law of New York, but, on a

construction of cl. 2(a)(iii) in accordance with Cayman law, the submissions on behalf of the JOLs and Mr. Heinen in this regard are, in my opinion, clearly correct. It seems to me, to put it at its lowest, that the construction and effect of documentation which the directors of a company subject to winding-up proceedings propose to enter into, allegedly in the best interests of the company, such as the notes and the associated security, should and would properly be the subject of scrutiny by the court in considering whether or not a disposition pursuant to such documentation should be validated.

32   I have already made passing reference to some of the email communications between Mr. Le Comte and Mr. Durst but in my view they warrant further analysis and comment. I should say that the general tone of this series of emails is informal and friendly and makes it clear that there is considerable family friendship between Mr. Le Comte and his family on the one hand and Mr. Durst and his family on the other. There do appear to me to be gaps in the correspondences produced to me. As I have said, it is also clear from the correspondence that there were meetings and discussions between Mr. Le Comte and Mr. Durst, the content of which were either not recorded or such records were not produced and which was not disclosed nor explained in the affidavit evidence.

33   The first email produced, dated April 6th, 2009, from Mr. Le Comte to Mr. Durst, to which I have already referred in part, commences as follows:

"All went according to plan in Luxembourg, though not without noteworthy incidents. [Mr. Heinen] has been set up for the next round without knowing and/or realizing it.

The 'pearls of wisdom' have meanwhile materialized. Please find attached a proposed agreement . . ."

I consider it reasonable to assume that Mr. Durst understood what Mr. Le Comte was talking about. There is no evidence or suggestion otherwise.

34   In a subsequent email, dated May 29th, 2009, Mr. Le Comte informed Mr. Durst that it was—

"imperative that a parallel research and development production facility be created in the United States. A successful participation in this project would represent an enormous economic opportunity for the combined companies.

[Mr. Le Comte then referred to a pilot program for a people-mover system at Frankfurt Airport.]

Let's talk about this at your leisure. Incidentally, I did speak with your friend Tedd and gave him my best advice based on my assessment of the financial feasibility of his project . . ."

Again, it is not entirely clear what Mr. Le Comte is referring to by "the combined companies," but Mr. Durst must have known.

35   The reference to Mr. Durst's friend Tedd is to a contact he had provided to Mr. Le Comte who was interested in the possibility of using the technology associated with TheWheel. Mr. Heinen emphatically denied in his affidavit evidence that he had ever agreed that there should be a research and development facility in the US and he gave various credible reasons why he would never have agreed to that. It was submitted that this email was indicative of Mr. Le Comte's alleged plan to take over the intellectual property rights in TheWheel and associated technology entirely. It also seems that he may have been discussing doing so jointly with the Dursts.

36   On June 5th, 2009, Mr. Le Comte emailed Mr. Marx at the Durst Organization, with a copy to Mr. Durst, attaching a copy of the original draft agreement. He said:

"I have since come to the conclusion that a specific lien on the intellectual property and/or certain rights thereto should be added to ensure the ability to have a priority claim in recovering the debt, which should also serve in signalling to the 'opposition' that the actions being contemplated by them at this time are unlikely to allow them to gain control over the principal company assets (e-Traction Europe BV and the intellectual property) . . ."

A subsequent email from Mr. Le Comte to Mr. Durst, dated June 15th, 2009, makes it clear that there was also a conversation between them the same day as Mr. Le Comte's June 5th email.

37   Section 142(1) of the Companies Law (2009 Revision) (now s.142(1) of the 2010 Revision) provides:

"Notwithstanding that a winding up order has been made, a creditor who has security over the whole or part of the assets of a company is

entitled to enforce his security without the leave of the Court and without reference to the liquidator."

The evidence shows that Mr. Le Comte, Mr. Durst and their respective New York lawyers were well aware of this provision.

38   In my view, the inference from the email correspondence between Mr. Le Comte and Mr. Durst to which I have referred above, taken with Mr. Le Comte's deliberate action in not informing Mr. Heinen of his proposal to grant the security and the other circumstances at the time, is that Mr. Le Comte's intention, at least in part, was that the priority claim effected by the grant of the security to his friends the Dursts' company would prevent Mr. Heinen, through an official liquidator appointed on a winding up pursuant to Mr. Heinen's petition, from taking control of the assets of the company, particularly the intellectual property rights.

39   It was argued on behalf of GCF that the fact that Mr. Le Comte provided the Dursts with joint personal guarantees by himself and his wife of the company's obligations under the notes is inconsistent with this inference. Having regard to the particular circumstances of this matter, I do not agree. As I have already said, Mr. Le Comte was clearly of the firm view that the assets of the company "make it a very valuable company" with "enormous commercial prospects and valuable assets," and is on record as emphasizing that view on several occasions, including to Mr. Durst (see for example the email dated July 20th, 2009). He said that it was "simply inconceivable that in three years, when the loan comes due, [the company] would be worth less than the maximum amount of the credit line." If, as Mr. Le Comte believed, it was inconceivable that the company would be unable to repay the sums drawn down under the notes, the risk to him in providing the unsecured joint guarantees was negligible. In my judgment, the provision of the joint guarantees does not detract from the inference from the email correspondence, and from the other circumstances which I have already mentioned, that Mr. Le Comte's offer to add the security to the proposed borrowing arrangements was intended, at least in part, to prevent a liquidator appointed by this court from taking possession and control of the company's assets. He wished to ensure that, in the event of a winding up, the company's assets would be under the possession and control of his friends the Dursts.

40   Mr. Le Comte's deliberate concealment of the proposed and actual grant of the security is, in my opinion, entirely consistent with this analysis. Although by the time of the consent validation order on June 29th, 2009, discussions and negotiations between Mr. Le Comte and Mr. Durst with regard to the proposed borrowing and the grant of the security were well underway, no mention of the proposed transaction, and particularly the grant of the security, was made by Mr. Le Comte's Cayman attorneys, Turner & Roulstone, in their correspondence proposing the

consent validation order to Mr. Heinen's Cayman attorneys, Appleby. The explanation of the proposed validation order in Turner & Roulstone's email dated June 24th, 2009 that "the company needs to have the ability to conduct its general business" was, in the circumstances, disingenuous to say the least. Despite requests from Appleby for details of the transactions in question, no such information was provided, and no indication of the proposed grant of the security was given. I am also concerned that no mention of the grant of the security was made to the court at any time prior to or during the hearing of the winding-up petition in April 2010. Given the extent and effect of the purported grant of the security, it was clearly likely to be a significant factor in the court's consideration of whether a winding-up order should be made and official liquidators appointed to take possession and control of the company's assets. In my opinion the existence of the security should have been disclosed.

**Conclusions on the "ordinary course of business" issue**

41   Etherton, J. pointed out in *Ashborder BV* v. *Green Gas Power Ltd.* (1) that there may be circumstances in which the grant of security over all the assets of a company may be held to fall within the scope of the ordinary course of that company's business. Equally, however, even if *prima facie* such a grant may be considered to fall within the scope of that phrase, there may nonetheless be such unusual features surrounding such a disposition that it will nonetheless fall outside the scope of the ordinary course of the company's business.

42   In the present case I do not consider the grant of the security, which extended to all of the assets of the company, which Mr. Le Comte himself expressly considered to be of enormous commercial value, to have been in the ordinary course of the company's business at all. I have already explained the nature of the company's business. In my opinion, the fact that Mr. Le Comte has procured the company to engage in litigation with his co-director and contributory in New York, the Netherlands and Luxembourg over the past three years or so in no sense means that litigation is a business of the company. Certainly, the litigation in this court leading up to the winding-up order was not properly litigation by the company anyway: it was litigation between Mr. Le Comte and Mr. Heinen personally. It was essentially and obviously a dispute between Mr. Le Comte and Mr. Heinen, as quasi-partners in the business, the subject of which was the company.

Furthermore, it was very clearly not the ordinary business of the company, or of any company, to borrow money to fund litigation by one shareholder against another. Even the litigation in New York and the Netherlands, in which Mr. Le Comte has procured the company to engage, is principally litigation against an equal shareholder/contributory of the company. In my opinion that does not fall within the realm of what an objective observer would consider to be within the

ordinary course of the company's business. Borrowing for that purpose, and the grant of security over the assets of the company to enable such borrowing, is no different.

43   The transaction between Mr. Le Comte and the Dursts was, on Mr. Le Comte's own case, a response to abnormal financial difficulties and not within the ordinary operational activities of the company. It was in no sense a routine or typical transaction for the company. I am not persuaded by the argument that the prior practices of the company in taking loans from Mr. Le Comte, a shareholder and investor in the company, were in any sense akin to the dispositions involving the grant of the security. Even if it is correct that in the past, before the deadlock between them arose, Mr. Le Comte and Mr. Heinen together made attempts to obtain third-party financing for the company and that such financing would probably have involved the company being required to give security for such financing, there is no evidence at all with regard to the type or extent of any borrowing or of any security which may have been discussed. Furthermore, there is no obvious evidence that at that time any such borrowing was proposed to be used for the purposes of litigation by the company, still less litigation between the two principals of the company, and clearly that was not the case. In my opinion the only prior practice of the company in this respect has been the unsecured funding of the company from time to time by Mr. Le Comte as a shareholder and investor. That is entirely different from the grant of security over all the assets of the company in support of limited borrowing from friends of Mr. Le Comte. It is not something the company ordinarily would do. It was clearly a highly significant and unusual step for the company, and one with major potential consequences. I am of the opinion that, quite apart from the unusual features surrounding the transaction, the grant of the security pursuant to the first note, repeated pursuant to the second note, was clearly not within the ordinary course of the company's business.

44   I am also of the opinion that the unusual circumstances surrounding the purported grant of the security by the company through Mr. Le Comte take the grant out of the scope of the ordinary course of the company's business in any event. Not only were the proposals and discussions concerning the grant of the security made without the knowledge of the only other director at a time when all involved with the transaction knew that the winding-up petition had been initiated, but there was also a deliberate decision to conceal the proposal. Furthermore, Mr. Durst had been expressly told that there was another director who had refused to resign and that he was not to be informed about the proposed notes. The actual grant of the security was also subsequently and deliberately concealed from Mr. Heinen, not only in his capacity as a director of the company but also as a contributory and as the petitioner for the winding

up, until after the winding-up order had been made. It was also concealed from this court.

45   I have already commented on the surprising terms of the notes, which on a usual construction meant that there was an immediate default as soon as they were executed. In the circumstances, such a provision was not clearly in the best interests of the company, notwithstanding that in the event and with hindsight notice of default was not given until after the winding-up order was made.

46   A further significant feature of the security which I consider takes it outside the scope of the ordinary business of the company is its extent, which seems to me disproportionate to the amount of borrowing, which, pursuant to the first note, was up to US$1m. There does not appear to have been any discussion about the appropriate security or its nature or extent, simply the offer of security over all the company's assets by Mr. Le Comte. This in itself seems surprising and unusual to me.

47   In my opinion, it is also relevant that the whole transaction involving the grant of the security was with longstanding friends of Mr. Le Comte and his wife. Even if the affidavit evidence of Mr. Durst that the Dursts "would certainly not have made the loans to Freerider without having the security which it obtained under the notes" is accepted, he does say that he does "not recall specifically when or how the question of security was raised in our discussions." The fact of the matter is that it was Mr. Le Comte who voluntarily proposed that the security should be added to the proposed agreement with the Dursts to ensure they had a priority claim in order that, from Mr.

Le Comte's perspective, the winding-up proceedings would not allow "the opposition" to gain control over the principal assets of the company.

48   Quite apart from the ostensible purpose of the borrowing in respect of which the security was purportedly granted by the company and the misuse by Mr. Le Comte, again purportedly on behalf of the company, of at least a portion of that borrowing for his own purposes (and this court has already ordered Mr. Le Comte to refund to the company those monies which he procured the company to pay to his Cayman attorneys for representing his interests in his dispute with Mr. Heinen about the winding up of the company on the grounds that such use was misfeasance by Mr. Le Comte as a director), there is, as I have already explained, clear evidence that there was a collateral purpose in Mr. Le Comte offering and purportedly granting the security on behalf of the company. In my opinion, that is a sufficiently unusual feature of this transaction of itself which takes the grant of the security out of the ordinary course of the company's business. However, there are anyway the other unusual features which I have discussed which also render the circumstances surrounding

grant of the security sufficiently extraordinary as to mean that it was clearly not in the ordinary course of the company's business.

49   In my judgment, when all the circumstances surrounding the purported grant of the security are considered, it cannot reasonably be said that it was in the ordinary course of the company's business. Accordingly, I make the declaration which the JOLs seek: that the grant of the security is not within the terms of the consent validation order dated June 29th, 2009.

**Retrospective validation**

50   In light of my conclusion that the grant of the security was not made in the ordinary course of the company's business, it is void pursuant to s.99 of the Law "unless the Court otherwise orders." In that case, GCF, by its summons dated August 30th, 2010, now seeks an order by way of retrospective validation of the grant of the security.

*The relevant law on validation*

51   Neither s.99 of the Law nor any other statutory provisions prescribe the circumstances in which the court may validate any particular disposition so that it is not void under the section. The court has an unfettered discretion whether to validate any disposition in its particular circumstances. The equivalent position in England was stated in *Re Steane's (Bournemouth) Ltd.* (12) ([1950] 1 All E.R. at 25):

"The legislature, by omitting to indicate any particular principles which should govern the exercise of the discretion vested in the court, must be deemed to have left it entirely at large, and controlled only by the general principles which apply to every kind of judicial discretion."

52   That was confirmed in the English Court of Appeal by Buckley, L.J. in *In re Gray's Inn Constr. Co. Ltd.* (9), who added ([1980] 1 W.L.R. at 717): ". . . [T]he discretion must, in my opinion, be exercised in the context of the liquidation provisions of the [UK companies legislation, which is generally equivalent to the Law]." Accordingly, the statutory scheme on winding up pursuant to the Law is clearly relevant. I have already summarized the purpose of s.99, which is part of that scheme, earlier in this ruling, as being to preserve the assets of a company in winding up for the protection of its creditors (see confirmation of this by Smellie, C.J. in *Scotiabank (C.I.) Ltd. v. Treasure Island Resort (Cayman) Ltd.* (11) (2004–05 CILR 423, at para. 11)).

53   Guidance on the matters to be taken into account by the court in considering validation was addressed by Henderson, J. in *In re Fortuna Dev. Corp.* (8), as approved by Smellie, C.J. in *In re Cybervest Fund* (5).

In the *Cybervest* case, Smellie, C.J. agreed with and adopted a summary of the guidelines set out in the *Fortuna* case, which in turn derived from statements of "broad guidelines" in an English case, *In re Burton & Deakin Ltd.* (2). In the *Fortuna* case, it was said (2004–05 CILR 533, at para. 5):

"Thus, there are four elements which must be established before an applicant is entitled to a validation order. First, the proposed disposition must appear to be within the powers of the directors . . . Secondly, the evidence must show that the directors believe the disposition is necessary or expedient in the interests of the company . . . Thirdly, it must appear that in reaching the decision the directors have acted in good faith. The burden of establishing bad faith is on the party opposing the application. Fourthly, the reasons for the disposition must be shown to be ones which an intelligent and honest director could reasonably hold."

54   Smellie, C.J. went on in the *Cybervest* case to add (2006 CILR 80, at para. 29):
"There is another consideration to add to this list, in light of the concerns raised in this matter, although arguably it is subsumed within the third and fourth elements. This would be whether irregularities in the conduct of the affairs of the company can be shown, even if the company is clearly solvent, as is alleged here."

55   Of course these guidelines are neither exclusive nor necessarily applicable to every case in which the court may or may not validate a disposition of a company's property when the company is subject to winding-up proceedings. Every case will turn on its own particular circumstances.

56   It also appears that different considerations may apply depending on whether the company concerned is solvent or insolvent. Solvency in this context has been said to mean that the court is satisfied by credible evidence that the company is able to pay its debts as they fall due (see *Re Fairway Graphics Ltd.* (7) ([1991] BCLC at 468–469)). As I will explain later, it does not appear to me that the company was solvent in that sense at the relevant time.

57   The usual assumption in a case where the company is solvent is that the particular disposition would not be prejudicial to the creditors as it should not affect their debts being repaid (see *Fortuna* (8)). However, even if a company is solvent, that is not necessarily conclusive where the winding-up petition is based on grounds other than insolvency, such as the just and equitable ground (see *Cybervest* (5)), as in the present case.

58   If it cannot be established that the company concerned is solvent, then the principal concern of the court in considering an application for a

validation order will be to seek to avoid prejudice to the interests of unsecured creditors of the company (see *Denney* v. *John Hudson & Co. Ltd.* (6)). Occasionally, in appropriate circumstances, the court has sanctioned the grant of a charge over a company's property as security for a loan to enable the company to continue its business as a going concern so that it can be can be sold as such, but in exercising its broad discretion the court must determine the question having regard to all the circumstances in each case. In the present case, I have, of course, already determined that the grant of security was not in the ordinary course of the company's business. It is, however, also clear that payments by a company (and by extension, security granted in respect of borrowing to fund such payments) in respect of disputes which are essentially between shareholders of the company would not be validated (see *In re Crossmore Elec. & Civil Engr. Ltd.* (4)).

59   It was submitted on behalf of GCF that it would be unfair to it (and the Dursts) if the grant of the security were not now validated. However, the purpose of s.99 of the Law is to minimize hardship to the general body of creditors as a whole: prejudice suffered by one particular creditor—in this case GCF/the Dursts—if the disposition is not validated is to be given relatively little weight (see *Re Tellsa Furniture Pty Ltd.* (13)). Of course, the nature and extent of any hardship suffered by the recipient of the disposition in issue will depend entirely on the facts and circumstances surrounding the disposition. As was said in the same case (*ibid.*), quoting from *Re Mal Bower's Macquarie Elec. Centre Pty. Ltd.* (10) (1 N.S.W.L.R. at 258)—
"the legislative intention, as disclosed by the terms of [the equivalent of s.99 of the Law] is such as to require an investigation of what happened to the property, that is to say, what was the disposition, and then to enable the liquidator to recover it upon the basis that the disposition was void. It is recovery from the disponee that forms the basic legislative purpose of [the equivalent section]."

### Analysis and comment on the retrospective validation application

60   It is clear that the onus is on GCF to establish that a retrospective validation order should now be made in all the circumstances. The first note, pursuant to which the security was purportedly granted (it was in practical terms re-affirmed pursuant to the second note) was signed as of August 17th, 2009, a year before GCF made its application for validation thereof.

61   It is unclear whether the company was solvent at the relevant time, which in my view is at the time of the purported grant of the security pursuant to the first note. As I have already mentioned, both Mr. Le Comte and Mr. Heinen are firmly of the view that the company was and is solvent

on a balance sheet test. However, the very reason why, according to Mr. Le Comte, he procured the company to borrow from the Dursts was because the company was unable to pay its debts as they fell due. The JOLs have certified that the company is of doubtful solvency but that seems to be because they have had little or no access to the company's records and have accordingly been unable to reach a conclusion either way. The position appears to be that, at the time of the grant

of security, the company may have been solvent on a balance sheet test but insolvent in being unable to pay its debts as they fell due.

62  However, assuming, in GCF's and Mr. Le Comte's favour for the sake of argument, that the company was solvent at the relevant time, then the test approved by Smellie, C.J. in *Cybervest* (5) should be applied to the circumstances surrounding the grant of the security, which I have already outlined in determining that the grant of the security was not within the ordinary course of the company's business. I do not think it necessary for me to repeat my summary of and comment on those circumstances.

63  There was no "body of evidence" presented to me to satisfy me that the reasons for the grant of the security were ones that an honest and intelligent director could reasonably have held. Indeed, apart from Mr. Le Comte's general comments in his affidavit evidence that the purpose of the borrowing, which was secured by the purported grant of the security, was largely to pay the legal costs of the litigation in New York, the Netherlands and this country, there was, as I have already mentioned, no detailed information provided by him as to precisely how the funds borrowed from the Dursts' company had been utilized, nor was there any evidence to justify the submission on his behalf that such borrowing was in the best interests of the company. For example, there was no expert opinion evidence as to the merits of the litigation in New York from the company's perspective in order to justify further expenditure on the litigation at that time, namely when the company was the subject of winding-up proceedings. The evidence, and the inference I have drawn from it, is that the money borrowed from 733 Properties/the Dursts was used not only to settle outstanding invoices but also in order to enable the litigation to progress. There was no explanation, still less professional opinion, as to why, for example, the legal proceedings in New York, and perhaps in the Netherlands, could not have been stayed on the company's application pending the determination of the winding-up proceedings, rather than the company spending more money on the litigation in such circumstances. There was no evidence, other than the bare assertions of Mr. Le Comte, that continuing to spend money on the litigation was in the best interests of the company at that time, rather than it being in his personal interests. The evidence, in my opinion, very much supported the latter interpretation.

64  I should also mention the consideration specifically referred to in

---

*Cybervest*, namely whether irregularities in the conduct of the affairs of the company can be shown. The court has already concluded that the members of the company have justifiably lost confidence in Mr. Le Comte based on a lack of probity in his conduct of the affairs of the business, including the company (see 2010 (1) CILR 486, at para. 72) and I have already explained why I infer a collateral purpose on the part of Mr. Le Comte in offering and then purporting to grant the security to his friends' company. No authority has been submitted to me to the effect that the court has ever made a validation order, still less a retrospective one, in such circumstances.

65  It seems to me, having regard to the circumstances surrounding the grant of the security, most improbable that it would have been validated at or about the time of its proposed grant a year ago. Even if I am wrong about that, it does not follow that the grant of the security should now be validated retrospectively. The circumstances are now clearly different in that a winding-up order has since been made and the JOLs, who are officers of this court subject to this court's supervision, have been appointed to fulfil their statutory duties under the Law. The uncertainty with regard to the outcome of the winding-up proceedings which may have existed at the time when the security was purportedly granted now no longer exists. The grant of the security, which at the time may have possibly frustrated any official liquidators who might have been appointed in taking possession and control of the company's assets, now would definitely have that effect.

66  As far as 733 Properties and the Dursts are concerned, it was their decision to rely on an opinion by Mr. Le Comte's own attorneys, Turner & Roulstone, several of whose important assumptions were under challenge by Mr. Heinen, of which, at least in some respects, Mr. Durst was aware. For example, Turner & Roulstone did not point out the risks involved in not informing Mr. Heinen of the proposed transaction in light of the fact that Mr. Heinen had refused to resign as a director of the company. They did not point out the risk of the grant of the security, once it became known, being challenged and the risk of it being held by a court that it had not been granted in the ordinary course of the business of the company. They did not point out the risk involved in relying on the shareholder agreement which was under challenge and anyway open to other possible interpretation, or indeed the risks generally arising from the fact that Mr. Le Comte was involved in hostile litigation with Mr. Heinen in several jurisdictions which he was not inevitably bound to win in all respects. Furthermore, as I have already said, it seems to me reasonable to infer that Mr. Durst understood that Mr. Le Comte had offered the security at least in part for tactical collateral reasons of his own relating to his dispute with Mr. Heinen and also

related to his suggestions concerning his future control and development of the company's intellectual property rights,

involving a proposal for a research and development facility in the US, perhaps even as a possible venture with the Dursts.

**Conclusion on the retrospective validation application**

67   Having regard to all the circumstances surrounding the grant of the security and in light of my analysis and comments above, in the exercise of my discretion I refuse the application of GCF for retrospective validation. I am satisfied that the grant of the security would probably not have been validated prospectively if an application for validation had been made prior to its grant, as in my opinion it should have been, and I do not consider that it should now be validated retrospectively. Indeed it seems to me that there are good additional reasons, as I have outlined above, why that should not be done. I therefore refuse the application by GCF by their summons dated August 30th, 2010 and declare the grant of the security to be void under s.99 of the Law. In the circumstances I will reserve the question of costs for further submissions from counsel in due course.

*Declaration accordingly.*

Attorneys: *Maples & Calder* for the liquidators; *Campbells* for the GCF Group; *Appleby* for Mr. Heinen; *Turner & Roulstone* for Mr. Le Comte.

# TAB 41

[2010 (2) CILR 194]

IN THE MATTER OF WYSER-PRATTE EUROVALUE FUND LIMITED

GRAND COURT, FINANCIAL SERVICES DIVISION (Jones, J.): October 26th, 2010

*Companies—compulsory winding up—grounds for winding up—"just and equitable"—winding up of open-ended mutual fund "just and equitable" on basis of loss of substratum if redemptions permanently suspended, not accepting new subscriptions and engaged in informal liquidation by investment manager beyond terms of offering document*

*Companies—compulsory winding up—stay of petition—may adjourn petition under Companies Law (2010 Revision), s.95(1)(b) if "overtaken by events" despite case for relief having being made out—petition in response to informal liquidation adjourned until after projected date of liquidation if so close that little purpose served by appointing official liquidators, winding-up order might reduce sale value of assets and petitioner's concerns now resolved by either revision of liquidation plan or court order*

*Companies—compulsory winding up—alternative orders—as alternative to winding up on "just and equitable" ground sought in response to concerns with informal liquidation by investment manager, court may make orders under Companies Law (2010 Revision), s.95(3) resolving concerns—may require, e.g. providing shareholders with accounts if not envisaged in liquidation plan; early distribution to shareholders to reduce fee payable to investment manager*

The petitioner sought the winding up of a Cayman company on the just and equitable ground.

The petitioner owned 0.5% of the voting share capital in the company, an open-ended mutual fund. The company's articles required that compulsory redemptions be made on a "quarter day," defined as the last business day of a calendar quarter. The petitioner sought a full redemption of its shares on the next quarter day. Some weeks later, the company's investment manager informed the petitioner that, in accordance with its offering document, all that quarter's redemptions would be subject to a 10% limit because the company had received redemption requests equal to almost 40% of its NAV. Later that year, when the company had received redemption requests equal to 90% of its shares in issue, the investment

---

manager informed all investors that the company's directors had suspended pending and future redemptions, pursuant to their alleged power to do so in the company's offering documents. The suspension remained in place without modification until more than a year later, at which point the company began making limited distributions to shareholders which had submitted redemption requests. Subsequently, the investment manager informed investors of the details of a "wind-down plan" as agreed with the directors, whereby each investor would receive a compulsory redemption of 10% of its investment on the next quarter day, with the intention that a further 10% would be distributed on each subsequent quarter day. This process was to be completed in December 2011.

Many of the investors were concerned that this informal winding-up process would be too slow. In response to this, the company's directors revised the plan, instructing the investment manager to accelerate the plan so that its projected end date would be December 2010 and waive its entitlement to any management fees arising after the new projected end date. Unaware of the revisions to the wind-down plan—which were only communicated to the shareholders later—the petitioner applied to the Grand Court to wind up the company. The wind-down plan was subsequently accelerated further to the extent that its projected end date was, by the time of the present hearing, only a few weeks away, and the petitioner was only made aware of this at a case management conference.

*The just and equitable ground*

The petitioner sought relief on the just and equitable ground pursuant to s.92(e) of the Companies Law (2009 Revision), submitting that (a) given that the company had permanently suspended redemptions and ceased to accept new subscriptions, it was no longer carrying on business as a viable open-ended mutual fund; (b) the informal liquidation in accordance with the wind-down plan was not a carrying-on of business, since the company's offering document did not give the directors or the investment manager the authority to carry out such a plan; (c) the wind-down plan was not a suitable alternative remedy available to the petitioner, since it had not been approved by an EGM nor was it within the company's ordinary course of business, being a response to the extraordinary circumstance of the serving of redemption notices in respect of 90% of the shares; and (d) requisitioning an EGM for the purpose of placing the company into voluntary liquidation was not a practical alternative open to the petitioner, given that an EGM could only be

requisitioned by shareholders holding a majority of the voting share capital, and the petitioner held only 0.5% and had no access to the register of shareholders.

The company submitted in reply that no case for relief on the just and equitable ground had been made out, since (a) the informal liquidation in accordance with the wind-down plan was a carrying-on of the business, since it was provided for by its offering document, which warned that, in certain circumstances, shareholders' rights to redeem could be limited or suspended and shares could be compulsorily redeemed; (b) the wind-down plan itself was a suitable alternative remedy open to the petitioner;

and (c) a further suitable alternative remedy open to the petitioner was to requisition an EGM for the purposes of resolving to place the company into voluntary liquidation.

*The order(s) to be made*

The petitioner submitted that a winding-up order should be made and official liquidators appointed in respect of the company, since (a) the wind-down plan was not expected to be completed in good time; (b) under the wind-down plan, the investment manager would have an incentive to delay the process in that it would continue to be paid according to an agreed percentage of NAV; (c) there was no requirement for providing reports and accounts to the shareholders; and (d) the investment manager's intended retention of the company's cash until the following quarter day would be detrimental to the shareholders, since the cash would be included in the company's NAV for the purpose of calculating the investment manager's fee.

The company submitted in reply that the court should adjourn the petition and allow the informal liquidation to continue, since (a) making a winding-up order at this stage would be detrimental to the company and its shareholders, since it would signal to the market that the company was attempting to offload its assets quickly and could result in a significant loss in the value of its assets, given that some of them were investments in small-cap companies whose shares were thinly traded; (b) the wind-down process would now be completed within a few weeks; and (c) the investment manager no longer had an incentive to delay the process, since it had agreed to waive any fee which would have become payable to it after the end of this year.

The court considered (a) whether, in the circumstances, it would be appropriate to appoint official liquidators now or to adjourn the petition and re-list it for hearing after the projected end date of the wind-down plan; and (b) whether to make orders alternative to winding up the company on the just and equitable ground in order to avoid the problems with the wind-down plan, pursuant to s.95(3) of the Companies Law (2010 Revision).

*Costs*

The petitioner submitted that its presentation of the petition had been reasonable and that it should therefore be entitled to its costs on the indemnity basis.

A part-owner of the company submitted that the petitioner should not be entitled to its costs as they arose after the case management conference, since at that point it ought to have agreed to adjourn the petition in the light of the revisions to the wind-down plan.

**Held,** adjourning the petition and making alternative orders:

**The just and equitable ground**

(1) The court would adjourn the petition until after the projected end date of the wind-down plan, and make alternative orders. The petitioner

had made out a case for relief on the just and equitable ground in s.92(e) of the Companies Law (2009 Revision). The company had ceased to be a viable open-ended mutual fund by the time the petition was presented, in that it had permanently suspended redemptions and ceased to accept new subscriptions and was therefore no longer carrying on business. Moreover, it could not be said that the informal liquidation in accordance with the investment manager's wind-down plan was a carrying-on of business. Although the company's offering document warned that, in certain circumstances, shareholders' rights to redeem could be limited or suspended and shares could be compulsorily redeemed, there was no suggestion that these measures might be used for the purposes of an informal liquidation by the investment manager. In fact, the offering document was wholly silent as to the steps to be taken in the event it became necessary to liquidate the company, and there was nothing in it to suggest that the shareholders should not expect to be able to invoke the statutory winding-up provisions in the Companies Law (para. 21; paras. 23–27).

(2) Nor did the petitioner have a satisfactory alternative remedy. The wind-down plan itself was not an acceptable alternative, since it had been neither approved by a special resolution passed at an EGM nor impliedly approved in the sense of being within the company's ordinary course of business—rather, it was a response to an extraordinary circumstance, *i.e.* the service of redemption notices in respect of 90% of the shares. In these circumstances, the petitioner's only alternative to a winding-up petition was requisitioning an EGM for the purpose of resolving to place the company into voluntary liquidation. This, however, was not practical: by the terms of the offering document, an EGM could only be requisitioned by shareholders holding a majority of the voting share capital, of which the petitioner only held 0.5%—and moreover, the petitioner had no right to view the register of shareholders. Since the company had ceased to be a viable open-ended mutual fund, and there was no satisfactory alternative remedy open to the petitioner, it would be just and equitable to wind up the company pursuant to s.92(e) of the Companies Law (2009 Revision) ([paras. 28–29](#)).

**The order(s) to be made**

(3) The court would not, however, make an immediate winding-up order, the petition having been somewhat "overtaken by events." One aspect of the wind-down plan which the petitioner and most other shareholders had found unacceptable was the lateness of the projected end date. Since this had now been brought forward to within a few weeks, the appointment of official liquidators at this stage would serve little useful purpose. A second unacceptable aspect of the wind-down plan was that the investment manager would continue to receive a percentage of NAV, with the effect that it had an interest in delaying the process. Since the investment manager had agreed to waive any fee which would have become payable after the end of this year, this concern had to some extent been addressed. Moreover, it was possible that appointing official liquidators would be detrimental to the

company and its shareholders, since it would signal to the market that the company was attempting to offload its assets quickly and could result in a significant loss in the value of its assets, given that some of them were investments in small-cap companies whose shares were thinly traded. Therefore, rather than making a winding-up order and appointing official liquidators, the court would adjourn the petition, pursuant to s.95(1)(b) of the Companies Law (2010 Revision). The petition would be re-listed for hearing on a date after the anticipated completion of the wind-down plan ([paras. 30–31](#)).

(4) The court would also make orders under s.95(3), which specified the orders available as an alternative to winding up on the just and equitable ground. An unsatisfactory aspect of the wind-down plan was that it did not require the shareholders to be provided with reports and accounts, whereas official liquidators would have a statutory obligation to do so. The court would therefore make an order under s.93(3)(a) and/or (b) to the effect that unaudited financial statements and NAV calculations be prepared and distributed to shareholders monthly. Further, the investment manager's proposed retention of the company's cash until after the next quarter day, on the basis that the company's articles required redemptions to be made on such a day, would be detrimental to the shareholders, since it would then be included in the company's NAV for the purpose of calculating the investment manager's fee. The court would therefore order under s.95(3)(b) that, two weeks before the next quarter day, the company make a distribution (by way of compulsory redemption of shares) of all available cash held by the company, as at a date one month before the next quarter day ([paras. 32–33](#)).

**Costs**

(5) The presentation of the petition was a justifiable response to the wind-down plan in its original form, and the petitioner would be entitled to its costs of doing so on the indemnity basis. However, in the light of the revisions to the plan, the petitioner ought to have agreed to adjourn its petition. Since it had an opportunity to reconsider its position at the case management conference, it would not be entitled to its costs as they arose after that point ([para. 34](#)).

**Cases cited:**

(1) *Belmont Asset Based Lending Ltd., In re*, [2010 (1) CILR 83](#), *dicta* of Jones, J. applied.

(2) *Citco Global Custody NV* v. *Y2K Fin. Inc.*, Eastern Caribbean Supreme Ct. (BVI High Ct.), Claim No. BVIHCV 2009/0020A, November 25th, 2009, unreported, distinguished.

**Legislation construed:**

Companies Law (2009 Revision), s.92(e):

"A company may be wound up by the Court if . . . the Court is of opinion that it is just and equitable that the company should be wound up."

Companies Law (2010 Revision), s.95(1)(b): "Upon hearing the winding up petition the Court may . . . adjourn the hearing conditionally or unconditionally."

s.95(3): "If the petition is presented by members of the company as contributories on the ground that it is just and equitable that the company should be wound up, the Court shall have jurisdiction to make the following orders, as an alternative to a winding-up order, namely—

(a)    an order regulating the conduct of the company's affairs in the future;

(b)    an order requiring the company to refrain from doing or continuing an act complained of by the petitioner or to do an act which the petitioner has complained it has omitted to do . . ."

*T. Lowe, Q.C., Ms. L. Hatfield* and *S.M.P. Dawson* for the petitioner;
*R. Hollington, Q.C., Ms. C. Wilkins* and *R. Bell* for the company;
*F. Hughes* for the part-owner.

1   **JONES, J.:** This is a petition for an order that Wyser-Pratte EuroValue Fund Ltd. ("the company") be compulsorily wound up by order of the court and that two qualified insolvency practitioners be appointed as joint official liquidators. The petitioner is UBS Fund Services (Cayman) Ltd. in its capacity as trustee as of the AIFAM Event Driven Fund Trust. It is not in dispute that the company is solvent, applying a balance sheet test, and that the petitioner has *locus standi* to present a petition on the just and equitable ground contained in s.92(e) of the Companies Law (2009 Revision). I concluded that the petitioner has made out a case for relief but determined, in the exercise of my discretion, that it would not be appropriate to make an immediate winding-up order. Instead, I adjourned the petition until the first available date for hearing after November 16th, 2010 and made alternative orders pursuant to the power contained in s.95(3)(b) of the Companies Law (2010 Revision). I now give my reasons for this ruling.

**General factual background**

2   The underlying factual background is not disputed in any material respect and can be stated shortly in the following way. The company was incorporated as an exempted company under the Companies Law (1999 Revision) on June 5th, 2000 to carry on business as an open-ended investment fund as part of a typical "master-feeder" structure. It was duly registered with the Cayman Islands Monetary Authority pursuant to s.4(3)(c) of the Mutual Funds Law. The company's management structure is typical of that of many thousands of corporate investment funds domiciled in the Cayman Islands. The investment management functions

are delegated to Wyser-Pratte Management Co. Inc. ("the investment manager") pursuant to an investment management agreement dated October 3rd, 2005. The company's administration, including the preparation of financial statements and determination of net asset values, is delegated to SEI Global Services Inc. ("the administrator") pursuant to the terms of an administration agreement. The investment manager carries on business in New York and the administrator carries on business in Dublin. They perform their contractual obligations under the overall supervision of the company's board of directors, comprising Mr. Jason Santamaria and Mr. Sebastian Freitag ("the directors"). It is relevant to bear in mind that Mr. Santamaria and Mr. Freitag are "independent directors" in that neither of them are employees or associates of either the investment manager or administrator. Mr. Santamaria is a principal of Santamaria and Martina LLC, a management consulting firm based in California. He was previously employed as a business analyst with McKenzie & Co. and as an investment banker with Morgan Stanley. Mr. Freitag is managing director of Freitag & Co., an investment bank carrying on business in Frankfurt, Germany. Earlier in his career he also worked as business analyst with McKenzie & Co.

3   The company was originally set up as a "feeder fund," the whole of whose assets were invested in Wyser-Pratte EuroValue Master Fund LP, a Cayman limited partnership formed on September 15th, 2005 for this purpose ("the master fund"). At some stage there were two feeder funds, but the audited financial statements reflect that the company was the master fund's only feeder after January 1st, 2008. In these circumstances, having concluded that the company was to be wound down and terminated by means of a compulsory redemption plan, the continuation of the master/feeder structure obviously served no useful purpose and it was terminated with effect from January 1st, 2010. As explained in the audited financial statements for the year ended December 31st, 2009, the company's directors resolved that it would redeem its entire investment in the master fund, which then transferred all its assets and liabilities to the company at fair value at the close of business on December 31st, 2009 in exchange for the company's interest in the master fund. The master fund was then dissolved.

4   The petitioner is also an investment fund domiciled in the Cayman Islands. Details of its legal and management structure have not been put in evidence, but it appears to be typical of that of many unit trusts established in this jurisdiction. Its trustee is UBS Fund Services (Cayman) Ltd. Its investment manager is AIFAM LLC, which is part of an investment management group based in New York. On or about April 23rd, 2007, the petitioner subscribed for shares in the company to the value of US$2m. and on May 1st was issued 1,500,075.113335 Class A participating shares at a net asset value of US$1,269.75 per share. There is no material

distinction between the company's two classes of shares, except that the Class A shares are denominated in US dollars and the Class B shares are denominated in Euros. I note that the minimum subscription was either US$2m. or €1m. The petitioner presently holds 879.73 Class A participating shares, representing approximately 0.85% of the economic value of the company. It is relevant to note that the shares carry the right to vote at general meetings of the company.

**Redemption of the petitioner's shares**

5   By letter dated March 26th, 2008, the petitioner sought a full redemption of all its shares on the next redemption day (defined to mean the last business day of each calendar quarter), which was June 30th, 2008. By an email transmitted two days later, the administrator acknowledged this request and impliedly accepted the petitioner's right to redeem its shares at the NAV ruling on that date. However, by an email transmitted on April 29th, 2008, the investment manager stated that "as per the offering memorandum 'Redemption of Shares,' your June 30th, 2008 request is being prorated in accordance with the 10% limit." During the course of the telephone conference which took place the same day, the investment manager advised that a 10% limit had been placed on all June 30th, 2008 redemptions because the company had received redemption requests for that date equal to almost 40% of its total NAV. As a result of this limitation, the petitioner was able to redeem only 395,833 shares at a total value of US$319,070.43 net of all fees. The redemption price represented an NAV of US$848.50 per share compared with the petitioner's original subscription price of US$1,269.75 per share (representing a 33% decline in value).

6   By a letter to investors dated September 25th, 2008, the investment manager stated that the directors had invoked the provisions of the company's articles of association to suspend pending and future redemptions as of September 30th, 2008. This letter did not specify the specific article upon which the directors had relied, but it is common ground that they must have acted in reliance upon art. 59(b), which states:

"The directors may declare a suspension of the determination of the net asset value, the subscription for shares, the redemption and repurchase of shares, including the right to receive the redemption price, for the whole or any part of a period:

. . .

   (b) [for any period] during which in the opinion of the board of directors, upon consultation with the investment manager, disposal of investments by the company would not be reasonable or practical or would be prejudicial to the non redeeming shareholders."

7   The letter to investors stated that—

"this decision was made in order to maintain an adequate voice in the fund's activist projects that are currently underway. Further redemptions from the fund will reduce the fund stakes in critical positions to the point of impairing the fund's ability to carry out existing activist agendas. It is important to note that the suspension is not a function of liquidity in the traditional sense as all assets in the portfolio are publicly-traded, exchange-listed securities. Rather, the cause of the suspension is a simple function of protecting the presence or voice that the fund needs to act effectively as a catalyst for corporate change in the fund's current activist initiatives. It is our firm belief that granting redemption requests and further disposing of a portion of the fund's assets would be seriously prejudicial to the non-redeeming shareholders of the fund and the fund's investment program."

8   This suspension of redemptions remained in force without any modification for more than a year. Then, by letter dated October 23rd, 2009, the investment manager gave notice of the company's proposal to commence distributions to redeeming shareholders (without regard to the timing of their request) at the rate of 2.5% of their investment in the company each quarter beginning with December 31st, 2009. This letter stated:

"The directors and investment manager are now satisfied that with the improvement in the fund's performance and the improving risk tolerance in the marketplace, action may now be taken. It is

their current intention to allow each investor that has submitted a redemption request to redeem 2.5% of their investment in the fund each quarter, beginning at the close of business on December 31st, 2009. The current plan is that all redeeming investors will receive a distribution in accordance with their interest in the fund, without the regard to the timing of any submitted redemption request. The distribution will be made in the form of compulsory redemption from the fund. The general suspension on redemptions will remain in place and the gate is not hereby being imposed."

Between January 22nd and 25th, 2010 the petitioner received a redemption payment totaling US$18,982.73, constituting 2.5% of the value of its shareholding as at December 31st, 2009.

9   On January 27th, 2010, a meeting took place between representatives of the petitioner and the company at the investment manager's office in New York. It was attended by Mr. Guy Wyser-Pratte (who is President and CEO of the investment manager) on behalf of the company and Mr. Sanjay Mitta and Ms. Mia-Margaret Laabs (who are employees of AIFAM group companies) on behalf of the petitioner. What happened at this meeting is described in para. 18 of Mr. Wyser-Pratte's first affidavit and

para. 6 of Ms. Laabs' affidavit. Mr. Wyser-Pratte describes having taken the petitioner's investment managers through the company's portfolio of assets in great detail. Because Mr. Mitta and Ms. Laabs apparently expressed no concern about the company's operations or the types of assets in which it was invested, Mr. Wyser-Pratte felt that it had been a very positive meeting. However, Ms. Laabs says in her affidavit that it was a result of this meeting that she lost confidence in Mr. Wyser-Pratte and the company's intended strategy, although she obviously did not express her concern to him because Mr. Wyser-Pratte came away from the meeting with the opposite impression. Since the company had suspended redemptions since September 2008, her concern was that its investment manager should be focused on realizing assets, whereas Mr. Wyser-Pratte had made it clear that he intended to make new investments (although there is no evidence before the court that any new investments were in fact made after September 2008).

**The wind-down/compulsory redemption plan**

10   On March 25th, 2010, the investment manager distributed an important letter to investors setting out what was subsequently described by Mr. Santamaria in his first affidavit as "the wind-down plan" and by Mr. Wyser-Pratte in his affidavit as a "compulsory redemption plan." These expressions are used interchangeably. This letter stated:

"We are writing to inform you that the general partner of Wyser-Pratte EuroValue LP and the Board of Directors of Wyser-Pratte EuroValue Fund Ltd. (collectively, the "funds") have decided to immediately begin the process of winding down the funds in an orderly fashion . . . Accordingly, the funds have further decided to compulsorily redeem 10% of each investor's investment in the funds as of March 31st, 2010 (regardless of whether or not such investor has submitted a redemption request). All investors will receive a distribution in accordance with their interest in the funds, without regard to the timing of any submitted redemption request. It is our goal that each quarter, the funds will distribute to every investor a minimum of 10% of their investment in the funds, and, where it is deemed feasible, a greater portion of the investors' investment will be returned."

11   I make the following observations about the wind-down/compulsory redemption plan. First, it appears to confirm a state of affairs which had existed since September 2008 when the directors suspended redemptions and subscriptions. What proportion of shareholders had submitted redemption requests as at September 30th, 2008 is not disclosed in the company's affidavit evidence, but I was told by counsel during the hearing that redemption notices had by then been received in respect of 90% of the shares in issue. I think that it is reasonable to infer that the remainder

would have served notices if they had thought it necessary to do so in order to participate in the compulsory redemption plan. Secondly, the decision to implement the wind-down/compulsory redemption plan was made without any formal consultation with the shareholders. The directors did not see fit to convene an EGM for the purpose of passing a special resolution authorizing them to implement the plan, either in the form set out in their letter or some variation of it.

12   I have no direct evidence from any of the shareholders about their response to the wind-down plan, but I can infer from what was said at the monthly management meeting held (by teleconference) on July 9th, 2010 that the investment manager's timetable was unacceptable to

many, if not most of them. The minutes of this meeting are exhibited to Mr. Santamaria's first affidavit. Mr. Louis Morin (an employee of the investment manager) is recorded as having said that—

"he had received enquiries from a number of shareholders that held shares which represented a significant amount of economic value of the company, being approximately 50–60%, enquiring as to why the process of realization could not occur sooner."

13   The minutes record that directors and Mr. Morin then reviewed the company's portfolio in detail and each position was discussed as to events, liquidity and market conditions. They discussed an appropriate timeframe in which the realization of the company's remaining assets could be feasibly achieved. Having regard to Mr. Morin's advice (which appears to have changed since the March 25th letter was written), the directors instructed the investment manager to accelerate the wind-down plan by a year and complete it by December 31st, 2010. Mr. Morin also proposed that the investment manager would waive its entitlement to any management fees falling due after December 31st, 2010.

**Acceleration of the wind-down/compulsory redemption plan**

14   In the meantime, the winding-up petition was presented to the court on July 6th and served on the company on July 12th, together with a summons for directions listed for hearing on July 21st, 2010. It is clear that the petition was presented before the petitioner became aware of the revised version of the wind-down/compulsory redemption plan formulated at the management meeting on July 9th. It is equally clear that the plan's timetable was accelerated initially in response to concerns expressed by shareholders generally and not in response to the winding-up petition, which did not come to the attention of the investment manager and directors until some days later.

15   The accelerated timetable for the wind-down/compulsory redemption plan was communicated to the shareholders by the investment manager's letter dated July 20th, 2010, which stated:

2010 (2) CILR 205

"Following consultation between the directors of the fund and the investment manager, the timetable for the wind down has now been accelerated such that the fund will be attempting to realize the remaining assets by December 31st, 2010.

In order to return cash to shareholders, we intend to make compulsory redemptions of a significant number of shares on September 30th, 2010 and December 31st, 2010. We do anticipate that some of the fund's securities may not be sold entirely by December 31st, 2010, due to the limited liquidity of some of the securities. These very few securities that remain will be sold as soon as possible in 2011. The investment manager will charge the fund no fees past December 31st, 2010. Following completion of this process, the fund will, in accordance with its offering memorandum, make any necessary payments to creditors of the fund (including the establishment of a reserve for liquidation expenses) and return any remaining proceeds of realization to shareholders by way of a final compulsory redemption). The fund will then be formally liquidated and dissolved after its final audit."

This letter did not disclose that a winding up petition had been presented against the company.

16   My order for directions made on July 21st, 2010 required that copies of the petition, the verifying affidavit (without its exhibits), the supporting affidavits sworn by the nominated insolvency practitioners and the order itself be distributed to all shareholders by the administrator. This was done on July 28th under cover of a letter signed by one of the directors. It stated that the directors considered it to be in the best interests of the company to resist the petition because, in their opinion, the appointment of official liquidators would have a two-fold adverse effect, namely to—

"(a) delay the realization of the remaining assets of the [company] and the distribution of proceeds . . . and

(b) increase the expense of realizing the [company's] remaining assets by adding a further layer of substantial additional costs that will be charged by the liquidators."

The directors' letter also stated that "the investment manager has informed the board that it expects the appointment of liquidators will likely result in severely reducing the value of certain assets held by the [company]."

17   The wind-down/compulsory redemption plan was accelerated further during the course of August. By a letter dated August 5th, 2010, the directors advised the shareholders that assets in the amount of US$30.2m. had been realized since July 1st (and therefore was not reflected in the June 30th management accounts which had been distributed with the previous letter) and that a further US$7.7m. was likely to be realized by

August 15th. Based on these numbers, the directors said that a further US$37.5m. (less expenses) would be distributed by means of a compulsory redemption as at September 30th, 2010. However, the directors also said that the remaining four investments were unlikely to be realized until the end of the year—a forecast which was revised by the investment manager immediately before the hearing of the petition.

18   By the time that Mr. <mark>Wyser-Pratte</mark> had sworn his second affidavit on September 6th, 2010, the timeframe for the wind-down plan had accelerated even further. By this time, the company had cash in hand of about US$42.7m. and investments in four listed securities, all of which are relatively illiquid, thinly-traded stocks. He said that the investment in one stock was being sold in the market in tranches and should be completed by the end of September. As regards the other three, Mr. <mark>Wyser-Pratte</mark>'s evidence is that he is currently negotiating "block trades" and anticipates that one will be concluded by early September, one by mid-to-late September, and the last one between September and October. In other words, by the time of the hearing, the company's position was that its wind-down plan could and should be concluded by the end of October or thereabouts. Less than six months earlier, the investment manager was saying that this process could not be done, or at least not in an "orderly manner," for another 15 months, until the end of 2011.

19   I conclude that the wind-down plan was accelerated as a result of shareholder pressure, including that exerted by the presentation of the winding-up petition. Left to its own devices, I think that the investment manager would have been content to perpetuate the exercise until the end of 2011.

**The petitioner's case: loss of substratum**

20   The petitioner's case is that the company is liable to be would up on the just and equitable ground because it has ceased to carry out any investment business as set out in its offering documents, or at all, such that the company's substratum has therefore wholly failed. In these circumstances, the petitioner contends that the company should be liquidated in accordance with the Companies Winding Up Rules under the direction of official liquidators, rather than informally by its directors and investment manager pursuant to the wind-down/compulsory redemption plan. The petitioner's counsel relies upon what I said in *In re Belmont Asset Based Lending Ltd.* (1) (2010 (1) CILR 83, at para. 12):

"A company was said to have 'lost its substratum' if the purpose for which it was formed can no longer be carried out (*In re Bristol Joint Stock Bank* (44 Ch. D. at 712, *per* Kekewich, J.)); if the company has practically ceased to carry on business because it has become impractical to do so (*In re Diamond Fuel Co.* (13 Ch. D. at 408, *per*

James, L.J.)); or if the company was formed to pursue a specific business opportunity which is no longer available to it (*In re Haven Gold Mining Co.*). To translate these statements into a modern context, it can be said that it is just and equitable to make a winding-up order in respect of an open-ended corporate mutual fund if the circumstances are such that it has become impractical, if not actually impossible, to carry on its investment business in accordance with the reasonable expectations of its participating shareholders, based upon representations contained in its offering document. If such a company, organized as an open-ended mutual fund, has ceased to be viable for whatever reason, the court will draw the inference that it is just and equitable for a winding-up order to be made."

21   In my judgment the company had certainly ceased to be a viable open-ended mutual fund by the time the winding-up petition was presented. Indeed, with the benefit of hindsight, I think that it had ceased to be viable in September 2008. By definition, a company cannot be said to be carrying on business as an open-ended mutual fund if its ability to redeem shareholders in cash and its ability to accept new subscriptions has been terminated permanently.

**The company's defence**

22   The company's case is that the undisputed factual circumstances do not lead to the conclusion that the company has "lost its substratum" or "ceased to be viable as a mutual fund." It is said that a company is only liable to be wound up on this basis if there exists a state of affairs entirely outside what can fairly be said as having been in the contemplation of the investors when they subscribed for their shares. Counsel goes on to argue that the wind-down/compulsory redemption plan is "at the heart of what each shareholder signed up to when it made its investment." In support of this proposition, counsel relies in particular upon the decision of the Eastern Caribbean Supreme Court in *Citco Global Custody NV* v. *Y2K Fin. Inc.* (2). Bannister, Ag. J. said (Cause No. BVIHCV 2009/0020A, November 25th, 2009, at para. [24]):

"In the present case, Y2K's proposal is, as I have said, not merely that it should be wound up, but that before that is put in train suspension of NAV should end and the shares of all requesting investors be redeemed out of the remaining available funds. Mr. Browne-Wilkinson, Q.C. and Mr. Jeffrey Chapman, who appeared together with Ms. Arabella di Lorio and Ms. Aisling Dwyer for Citco/Headstart characterised the proposed resumption of redemptions as 'a distribution of assets to be carried out by the directors,' as if they were proposing some sort of informal and extra-statutory liquidation of their own devising. Although he put the point very

---

persuasively I do not think that that is right. A redemption of the shares of those investors who wish to redeem is not a distribution by way of *ad hoc* liquidation, of the sort which Scott, J. (as he then was) so deplored in *Re Perfectair Holdings Ltd.* [[1990] BCLC 423]. It is wholly different from liquidation both in law and in fact. It is a carrying on, albeit for the last time, of the business of Y2K in accordance with the contractual rights of members under Y2K's Articles of Association. If, after that has been done, there remain investors who do not wish to be redeemed, then liquidation must follow, since the surplus cannot lawfully be distributed in those circumstances except in accordance with the statutory scheme. But while Y2K is solvent (that fact is not challenged), it seems to me that there is nothing in the authorities which suggests that it would be a proper exercise of discretion for the Court to step in and shut the company down while it remains in a position to carry out the last of its commercial functions for the benefit of those of its investors who have requested that it should do exactly that."

23   In my judgment, counsel's submission is highly artificial and ignores the commercial realties. There is nothing in the company's offering document which would lead its shareholders to anticipate that the suspension of redemptions and the imposition of a wind-down plan is something which may happen "in the ordinary course of business." Nor is there anything in the offering document which suggests that a liquidation of the company will necessarily be carried out under the supervision of its directors, rather than professional insolvency practitioners, or that it will be carried out pursuant to a plan devised by the investment manager without shareholder approval, or that the investment manager will continue to be paid a percentage of NAV during the liquidation process, or that there will be no formal mechanism whereby the shareholders can intervene and influence the process. In fact, the offering document is wholly silent about what will happen in the event that it becomes necessary to put the company into liquidation.

24   The company's offering document does warn shareholders that, in certain circumstances, their right to redeem may be limited or suspended altogether. It states, under the heading "Limited liquidity," that—

"an investment in the fund provides limited liquidity since the shares are not freely transferable and a shareholder generally may redeem shares only on the first anniversary of its admission to the fund and, thereafter, as of the end of each calendar quarter, upon at least 90 days' prior written notice to the administrator . . .

If redemption requests are received with respect of any redemption date (as defined below in 'redemption of shares') for more than 10% of the value of the fund's net assets, the board of directors may, in its

---

sole discretion, (i) satisfy all such redemption requests: or (ii) reduce all redemption requests *pro rata* so that only shares giving rise to aggregate redemption proceeds equal to 10% of the NAV of the fund as of the redemption date are redeemed . . .

In addition, the fund may limit or suspend redemption rights for any and all shareholders for any period during which, in the opinion of the Board of Directors, upon consultation with the investment manager, disposition of investments by the fund would not be reasonable or practicable or would be prejudicial to the shareholders."

25   However, the offering document does not explain that a suspension of redemptions may be left in place indefinitely whilst the investment manager realizes the assets and carries out a long-term liquidation plan, in this case for more than three years from September 2008 to December 2011. To the contrary, it seems to me that any shareholder who reads this section of the offering document would anticipate that its redemption rights will only be suspended temporarily in response to some exceptional event, such as a sudden influx of redemption notices, outside the control of the directors.

26   The offering document also warns shareholders that, in certain circumstances, their shares may be compulsorily redeemed. It states, under the heading "Compulsory redemption":

"The board of directors, in its sole and absolute determination, may compel redemption of all or any portion of a shareholder's shares at any time immediately upon notice if the fund or the shareholders as a whole could suffer any tax, fiscal, legal, regulatory, pecuniary or material administrative disadvantage, which it or they would not otherwise have suffered."

27  This statement does little more than re-state the terms of art. 57 of the company's articles of association. Counsel for the company argues that the power contained in art. 57 can properly be used (in combination with a suspension of redemptions under art. 59(b)) for the purpose of liquidating the company. Even if counsel's construction of art. 57 is right, which I very much doubt, the company's offering document gives shareholders no clue that it might be used for this purpose. Quite simply, the offering document does not address what will happen in the event that it becomes necessary or appropriate to liquidate the company. It does not say how or by whom a solvent liquidation will be conducted. In my judgment, there is no basis upon which it can be said that it should have been within the reasonable contemplation of shareholders, at the time they subscribed for shares, that any liquidation would be carried out informally by the investment manager and that they should not expect to be able to invoke the provisions of Part V of the Companies Law.

**Conclusions**

28  The company had probably ceased to be viable as an open-ended mutual fund from September 2008. It is agreed by all concerned that it must be liquidated and ultimately dissolved. The real issue is how, when and under whose supervision is this to be done. The investment manager's wind-down/compulsory redemption plan was presented to the shareholders as a *fait accompli*. In my judgment it cannot be characterized as something which the shareholders should have anticipated as likely to happen in the ordinary course of business. It is a response to an extraordinary circumstance, namely the service of redemption notice by an overwhelming number of shareholders. The details have not been put in evidence, but I was told by counsel for the company that redemption notices have been served in respect of 90% of the shares. The directors did not see fit to convene an EGM for the purpose of seeking shareholder approval. Therefore, in my judgment, the circumstances are such that it is just and equitable for the company to be wound up pursuant to the provisions of Part V of the Companies Law.

29  Counsel for the company argues that I should not come to this conclusion because the petitioner has an "alternative remedy." He submits that I should dismiss the petition because the wind-down/compulsory redemption plan is itself an alternative remedy. I reject this proposition for the reasons already explained. The wind-down/compulsory redemption plan has not been approved by a special resolution passed at an EGM. Nor does it have implied approval in the sense of being something which should be anticipated in the ordinary course of business. If the company is going to be liquidated, I see no basis for denying the shareholders' the right to have it done in accordance with the provisions of the Companies Law. The only alternative to presenting a winding-up petition is to requisition an EGM for the purpose of proposing a resolution that the company be put into voluntary liquidation. However, I do not regard this as a practical alternative. By art. 80, an EGM can only be requisitioned by a shareholder or shareholders holding "at least a majority of the paid up voting share capital." The petitioner holds only 0.5%. The largest single shareholder holds only 20%. Shareholders seeking to act in concert are faced with the problem that share registers of hedge funds are usually treated as confidential documents and the shareholders of the company have no express right under the articles to call for a copy. It was therefore practically impossible for the petitioner to requisition an EGM.

30  Having come to the conclusion that the petitioner has made out its case for relief, I have a wide range of discretionary powers under s.95 and I concluded that I should not make an immediate winding-up order for the following reasons. First, the petition has to some extent been overtaken by events. It was presented in response to the wind-down/compulsory redemption plan as originally formulated in the investment manager's letter of

March 25th, 2010. An important aspect of the plan, which was unacceptable both to the petitioner and most other shareholders, was the projected end date of December 31st, 2011. This projection was subsequently accelerated, first to December 31st, 2010, then to October 31st or thereabouts. By the time of the hearing, the projected end date was so close that the appointment of official liquidators would serve little useful purpose. Another unacceptable aspect of the plan was its assumption that the investment manager would continue to receive 0.5% of NAV, payable

quarterly in arrears. The effect of this fee structure is that the investment manager has a financial interest in delaying the company's liquidation. By the time of the hearing, this concern had also been addressed to some extent because the investment manager agreed to waive any fee which might otherwise have become payable after December 31st, 2010. Second, there is unchallenged evidence that the mere appointment of official liquidators will signal to the market that the company is engaged in a "fire sale" of its assets. Even though all its remaining assets are listed securities, they are in fact relatively large positions (in some cases more than 5%) in small-cap companies whose shares are thinly traded, and Mr. Wyser-Pratte's opinion is that the appointment of official liquidators could result in a significant loss in value.

31   For these reasons I decided to adjourn the petition pursuant to s.95(1)(b). Having accepted Mr. Wyser-Pratte's evidence that the remaining assets are likely to be realized during September and the first part of October, it is anticipated that the "liquidation" can be brought to a conclusion by the end of that month, whereupon a final redemption of shares and distribution of cash will be made and final accounts will be prepared. The petition will be re-listed for hearing on the first open day after November 16th. If the "liquidation" has been satisfactorily completed, it is anticipated that the company will then ask the court to make an order for dissolution.

32   I also decided to make an order under s.95(3)(b). As at the close of business on September 2nd, the company held approximately US$42.7m. in cash. It has no liabilities other than fees and expenses payable to its various professional service providers. The investment manager intended to retain this cash until after September 30th on the basis that the articles required that compulsory redemptions be done on a quarter day. However, delaying the distribution of this cash can have no possible benefit for the shareholders. Indeed, it would be detrimental to delay its distribution until after September 30th, because it would then be included in the NAV for the purpose of calculating the investment manager's fee. The additional fee (0.5% of US$40m) would far outweigh any interest which might be earned on this money during September. I therefore made an order that the company shall make a distribution, by way of compulsory redemption of shares of all available cash held by the company as at August 31st to all registered shareholders of the company on or before September 15th.

---

33   Another aspect of the directors' wind-down plan about which shareholders could legitimately complain is that it did not require the investment manager (or administrator) to provide them with reports and accounts on a regular basis, whereas official liquidators would have a statutory obligation to do so. I therefore made an order pursuant to s.95(3)(a) and/or (b) that unaudited financial statements and NAV calculations be prepared as at August 31st and monthly thereafter, and that they be distributed to the shareholders.

34   As regards costs, the general principle is that an order should be made in favour of the successful party. The petitioner can claim to have been partially successful in that it made out a case for relief, albeit not exactly the relief it was asking for. However, I think that there is merit in the submission made by counsel for the Russell Funds (which own about 20% of the company). He said that the presentation of the petition was a justifiable response to the wind-down/compulsory redemption plan in its original form, but suggested that the petitioner ought to have agreed to adjourn its petition in response to the directors' subsequent actions. The case management conference on September 1st provided the petitioner with an opportunity to reconsider its position. I conclude that the petitioner should have its costs on the indemnity basis up to that point. I also made an order for costs in favour of the Russell Funds.

*Order accordingly.*

Attorneys: *Solomon Harris* for the petitioner; *Walkers* for the company; *Conyers, Dill & Pearman* for the part-owner.

# TAB 42

**\*820  Johnson v. Gore Wood & Co (a firm)**

House of Lords

14 December 2000

**[2001] B.C.C. 820**

Lord Bingham of Cornhill , Lord Goff of Chieveley ,
Lord Cooke of Thorndon , Lord Hutton , Lord Millett

Judgment delivered 14 December 2000

### Analysis

Remedies—Damages—Professional negligence—Abuse of process—Solicitors retained by company and controller —Dispute concerning exercise by company of option to purchase land—Company entered litigation on solicitors' advice—Advised of quick and successful action—Action took years—Property market collapsed—Company incurred losses—Action by company against solicitors—Action settled—Further action by controller against solicitors on similar basis—Solicitors applied to strike out controller's action—Preliminary issues—Whether controller's action an abuse of process—Whether duty of care established—Whether damages recoverable by controller—Reflective loss—Appeal.

This was an appeal against a judgment of the Court of Appeal ([1999] BCC 474) allowing an appeal against a decision of Pumfrey J on a trial of preliminary issues refusing to strike out a personal action in negligence brought by the controller of a company against a firm of solicitors who had already settled a similar action by the company. The Court of Appeal decided that it was arguable that some of the heads of damages claimed should not be struck out as irrecoverable but dismissed the action as an abuse of process of the court. The controller appealed against the dismissal of the action and the company cross-appealed against the decision that certain heads of damage should not be struck out.

'J' was a businessman who carried on business through a number of companies. One of these companies was a property company, 'WWH', of which he was managing director and owned all but two of the issued

shares. WWH was J's alter ego. WWH instructed the defendant solicitors, 'GW', in connection with a proposed purchase of land. GW had acted for some time in relation to J's companies and were retained on his personal affairs. WWH had an option to purchase the land and instructed GW to serve a notice exercising the option. GW served notice on the vendor's solicitors. That gave rise to proceedings for specific performance against the vendor who claimed that personal service was required. GW advised J that the dispute would be settled successfully and quickly and so GW allowed the proceedings in WWH's name to go ahead. The proceedings were delayed and the land was eventually conveyed to WWH some four years after exercise of the option. In that time the property market had collapsed. The proceedings and delay left WWH out of pocket and it took proceedings against GW. The action was settled at trial by a payment by GW to WWH of £1.8m including a sum for costs. J alleged that GW owed a duty of care in relation to the exercise of the option to him personally as well as to WWH. The settlement agreement provided that the amount of any claim made by him personally against GW in respect of loss of income, dividends or capital distribution as a shareholder in WWH should not exceed £250,000. J issued a writ and preliminary issues were ordered as to whether any of the heads of damage claimed were irrecoverable as a matter of law. Pumfrey J held that GW were estopped from contending that J's personal action was an abuse of process, that it was arguable that GW owed duties to J in contract and tort, and that the heads of damage claimed by J were not irrecoverable. The Court of Appeal allowed an appeal on the basis that although liability on some of the heads of damage was arguable, the personal action was barred by the principle in Henderson v Henderson (1843) 3 Hare 100 that parties to a case must bring the whole case forward and not relitigate on the same matter. Further, any claim for the loss of value of J's shareholding in WWH was unsustainable in the light of Stein v Blake [1998] BCC 316 . J appealed and GW cross-appealed.

**\*821**

*Held* , allowing the appeal in part and dismissing the cross-appeal:

1  Because a matter could have been raised in earlier proceedings did not mean that it should have been nor that raising it in later proceedings was necessarily

abusive under the principle in Henderson v Henderson . Otherwise would be too dogmatic an approach to what should be a broad, merits-based judgment which took account of the public and private interests involved and all of the facts of the case, focusing attention on the crucial question whether in all the circumstances a party was misusing or abusing the process of the court by seeking to raise before it the issue which could have been raised before. Lack of funds would not ordinarily excuse a failure to raise an issue in earlier proceedings, but it was not necessarily irrelevant, particularly if the lack of funds appeared to have been caused by the party against whom the claim was sought.

2   The judge was right that the settlement of WWH's action proceeded on the common assumption that there would be further proceedings by J which would not be an abuse and that it would be wrong to allow GW to resile from that position. In any event J's action was not an abuse of process. The Court of Appeal gave too little weight to the considerations, such as lack of funds, which caused J not to pursue the personal action earlier, and to the fact that some four years elapsed before GW applied to strike out, which long period was potent evidence that the action had not been taken to have been abusive, and failed to weight the overall balance of justice.

3   Where a company suffered loss caused by breach of duty to it only the company could sue and a shareholder could not claim for diminution in the value of his shareholding ( Stein v Blake [1998] BCC 316 ). Where the company had no cause of action but a shareholder did, the shareholder could recover even if the loss was the diminution in value of his shareholding ( Lee v Sheard [1956] 1 KB 192 , George Fischer (GB) Ltd v Multi-Construction Ltd [1995] BCC 310 and Gerber Garment Technology Inc v Lectra Systems Ltd [1997] RPC 443 ). Where the company suffered loss and the shareholder suffered a separate and distinct loss caused by breach of duty owed independently to the shareholder, each could recover for its own loss but not for the loss of the other. Certain statements in Barings plc v Coopers & Lybrand [1997] BCC 498 and in Christensen v Scott [1996] 1 NZLR 273 were inconsistent with those principles.

4   Applying those principles, J's claimed losses were personal except for a claim relating to payments which

the company would have made into J's pension fund which was merely a reflection of the company's loss and should be struck out. An alternative claim on the basis that the value of J's shareholding would have been increased had the payments not been made was also a reflection of the company's loss and should be struck out. So far as the claim was for enhancement of the value of the pension if the payments had been made it was unobjectionable as personal to J and should be allowed to stand.

5   J was not entitled to damages for mental distress and anxiety ( Addis v Gramophone Co Ltd [1909] AC 488 applied ) nor was he entitled to aggravated damages. (Per Lord Cooke of Thorndon J should be permitted to claim damages for financial embarrassment and injury to family relationships).

**The following cases were referred to in the speeches:**

- Addis v Gramophone Co Ltd [1909] AC 488 .
- Amalgamated Investment and Property Co Ltd v Texas Commerce International Bank Ltd [1982] 1 QB 84 .
- Arnold v National Westminster Bank plc [1991] 2 AC 93 .
- Ashmore v British Coal Corp [1990] 2 QB 338 .
- Bailey v Bullock [1950] 2 All ER 1167 .
- Barings plc (in administration) v Coopers & Lybrand (a Firm) [1997] BCC 498 .
- Barrow v Bankside Agency Ltd [1996] 1 WLR 257 .
- Bradford & Bingley Building Society v Seddon (Hancock & Ors, t/a Hancocks (a Firm), third parties) [1999] 1 WLR 1482 .
- Bragg v Oceanus Mutual Underwriting Association (Bermuda) Ltd [1982] 2 L1 Rep 132 .
- Brisbane City Council v Attorney-General for Queensland [1979] AC 411 .
- Brown v Waterloo Regional Board of Commissioners of Police (1982) 136 DLR (3d) 49; (1983) 150 DLR (3rd) 729 .
- C (a minor) v Hackney London Borough Council [1996] 1 WLR 789 .
- Christensen v Scott [1996] 1 NZLR 273 .
- Clark Boyce v Mouat [1994] 1 AC 428 .
- Fischer (George) (Great Britain) Ltd v Multi-Construction Ltd Dexion Ltd (third party) [1995] BCC 310 .
- Foss v Harbottle (1843) 2 Hare 461 .

• Gerber Garment Technology Inc v Lectra Systems Ltd [1997] RPC 443 .
• Gleeson v J Wippell & Co Ltd [1977] 1 WLR 510 .
• Greenhalgh v Mallard [1947] 2 All ER 255 .
• Halliday v Shoesmith [1993] 1 WLR 1 .
• Hayes v James & Charles Dodd (a Firm) [1990] 2 All ER 815 .
• Henderson v Henderson (1843) 3 Hare 100 .
• Henderson v Merrett Syndicates Ltd [1994] CLC 918; [1995] 2 AC 145 .
• Heron International Ltd v Lord Grade [1983] BCLC 244 .
• Hobbs v London and South Western Railway Co (1875) LR 10 QB 111.
• Home and Colonial Insurance Co Ltd, Re [1930] 1 Ch 102 .
• House of Spring Gardens Ltd v Waite [1991] 1 QB 241 .
• Hunter v Chief Constable of the West Midlands Police [1982] AC 529 .
• Lee v Sheard [1956] 1 QB 192 .
• Lips Maritime Corp v President of India [1988] AC 395 .
• Mahmud v Bank of Credit and Commerce International SA [1998] AC 20 .
• Manson v Vooght [1999] BPIR 376 .
• Mouat v Clark Boyce [1992] 2 NZLR 559 .
• Prudential Assurance Co Ltd v Newman Industries Ltd (No. 2) [1982] Ch 204 .
• R P Howard Ltd v Woodman Matthews & Co (a firm) [1983] BCLC 117 .
• Ruxley Electronics and Construction Ltd v Forsyth [1996] AC 344 .
• Stein v Blake [1998] BCC 316 .
• Talbot v Berkshire County Council [1994] QB 290 .
• Taylors Fashions Ltd v Liverpool Victoria Trustees Co Ltd [1982] 1 QB 133 .
• Vervaeke v Smith [1983] 1 AC 145 .
• Walker v Stones [2001] B.C.C. 757 .
• Watson v Dutton Forshaw Motor Group Ltd (unreported, 22 July 1998, CA ).
• Watts v Morrow [1991] 1 WLR 1421 .
• Whelan v Waitaki Meats Ltd [1991] 2 NZLR 74 .
• Windsor Steam Coal Co (1901) Ltd, Re [1929] 1 Ch 151 .
• Yat Tung Investment Co Ltd v Dao Heng Bank Ltd [1975] AC 581 .

**Representation**

• Roger ter Haar QC and Simon Howarth (instructed by Shoosmith & Harrison ) for the appellant.
• Alan Steinfeld QC and Elizabeth Ovey (instructed by Beachcroft Wansbroughs ) for Gore Wood & Co.

**SPEECHES**

Lord Bingham of Cornhill:

There are two parties before the House. The first is Mr Johnson, the plaintiff in the action, who appeals against a decision of the Court of Appeal dismissing the action as an abuse of the process of the court. The other is Gore Wood & Co, a **\*823** firm of solicitors, who cross-appeal against a decision of the Court of Appeal ([1999] BCC 474) , on a preliminary issue of law, that certain heads of damage pleaded by Mr Johnson should not be struck out as irrecoverable. Both appeal and cross-appeal raise questions of legal principle which your Lordships' House has not, in recent years, had occasion to consider.

**The facts**

Mr Johnson is a business man who conducted his business affairs through a number of companies. One of his businesses was property development, which he carried on through a company, Westway Homes Limited ('WWH'), of which he was managing director and holder of all but two of the issued shares. For all practical purposes WWH was the corporate embodiment of Mr Johnson.

Acting on behalf of WWH, Mr Johnson instructed Gore Wood & Co ('GW'), through a partner in the firm named Robert Wood, to act as solicitors for WWH in connection with a proposed purchase of land at Burlesdon in Hampshire from a Mr Moores. WWH planned to develop the land, but the project was one of some complexity, since the title of Mr Moores was to some extent doubtful and access to the land was dependent on acquisition of a strip of land owned by a third party. WWH had an option to purchase Mr Moores' land, and WWH instructed GW to serve a notice exercising this option.

Mr Johnson contends that from early April 1987, even before GW was formally instructed to act as solicitor for WWH, Mr Johnson engaged the firm, usually acting through Mr Wood, to advise him personally and act on behalf of certain of his companies in addition to WWH, as a result of which GW and in particular Mr Wood gained a detailed knowledge of his financial affairs and those of the companies concerned. He further contends that GW through Mr Wood knew and intended that advice given to him in connection with any business matter would or might be acted upon by him in relation to the conduct of his business affairs generally, including his personal financial affairs. Since the present proceedings have not progressed beyond determination of the preliminary issues giving rise to this appeal and cross-appeal there has been no detailed investigation of the facts, some of which are in dispute between the parties. But GW accepts that from time to time the firm acted on behalf of Mr Johnson personally and some of his companies other than WWH.

In February 1988 GW served notice exercising WWH's option on Mr Moores' solicitors. Mr Moores and the solicitors acting for him asserted that the notice had not been validly served since it had not been served upon Mr Moores personally. Having obtained the advice of counsel WWH instructed GW to issue proceedings against Mr Moores for specific performance of the contract created by the exercise of the option. This was done in March 1988. An alternative claim was made against Mr Moores' solicitors alleging breach of warranty of authority. GW continued to act for WWH in those proceedings until the end of November 1989. The proceedings came on for trial in the Chancery Division in January 1990, when an order for specific performance was made against Mr Moores and an inquiry into damages ordered. The alternative claim against Mr Moores' solicitors was dismissed. Mr Moores had been legally aided from an early stage of the litigation and now, because of his mental condition, was acting through a guardian ad litem. He appealed against the judge's decision, but his appeal was dismissed by the Court of Appeal on 20 February 1991, although on different grounds.

For reasons outside the control of Mr Johnson or WWH there was further delay before the land was conveyed to WWH. It was April 1992, more than

four years after the exercise of the option, before the conveyance was completed. By this time WWH had suffered substantial loss because of the cost of the Chancery proceedings, the inability of WWH to recover damages and costs from Mr Moores, who had no assets save for the balance of the purchase price of the Burlesdon land, the collapse of the property market and the high interest charges borne by WWH. On 8 January 1991 WWH started proceedings for professional negligence against GW.  **\*824**  In those proceedings GW admitted that it owed WWH a duty to exercise reasonable care in connection with the exercise of the option, but denied that that duty had been broken or that the damages claimed were recoverable. WWH applied for summary judgment. This application succeeded at first instance but failed on appeal. WWH was now in serious financial difficulty.

WWH's action against GW came to trial before a deputy judge on 26 October 1992. The hearing was estimated to last 10–12 days. This estimate was greatly exceeded. In the sixth week of trial, the company's evidence on liability had been completed and Mr Wood was in the course of giving evidence for GW when the action was compromised upon payment by GW to WWH of £1,480,000, which represented a very substantial proportion of the sum claimed by WWH, and costs in the agreed sum of £320,000.

Mr Johnson claims that because he had retained GW to advise and act for him personally as well as for WWH, the firm owed him as well as WWH a duty of care in contract and tort in relation to the exercise of the option, the advice which Mr Johnson contends was given to him personally as well as to WWH concerning the prospects of success in and the likely duration of the Chancery proceedings and the conduct of the Chancery proceedings. He claims that GW breached that duty and so caused him substantial loss. Whether GW owed Mr Johnson personally such a duty and whether (if so) it breached that duty will be live issues in this action if it proceeds. But for purposes of the issues now before the House, GW accepts that the facts pleaded by Mr Johnson are capable of supporting his case on these issues if established at trial.

Mr Johnson did not initiate proceedings to enforce any personal claims against GW at the time when WWH began its action against the firm. In an affidavit sworn

on 6 March 1998 he deposed to his reasons for not doing so at that stage. His reasons were:

> • (1) that he was in no position to bring a personal claim against GW until he was granted full legal aid in October 1992, his previous certificate having been limited;
> • (2) that advancing his personal claims would have substantially delayed the progress and ultimate resolution of WWH's action against GW, which would have led to WWH going into liquidation before the trial of its action;
> • (3) that the financial resources of both Mr Johnson and WWH had been exhausted by this litigation, said to have been caused by GW's negligence;
> • (4) that joining the personal claim to WWH's claims would have led to an adjournment of the October 1992 trial date fixed for WWH's action;
> • (5) that the more complicated nature of Mr Johnson's personal claims would have had an adverse effect on the costly and time-consuming work required to prepare WWH's case for trial; and
> • (6) that the time which Mr Johnson could devote to the conduct of litigation was restricted by his need, from June 1991, to find new employment.

GW does not deny that these were the reasons which led Mr Johnson not to proceed personally at that time, but does not accept that they provided valid or reasonable grounds for not doing so.

On 17 January 1991, well before WWH's action came to trial, solicitors representing that company notified the solicitors for GW that Mr Johnson had a personal claim against the firm which he would pursue in due course. No details of the claim were given. On 6 December 1991 solicitors representing Mr Johnson informed GW that he had received a legal aid certificate to take proceedings against the firm for damages for negligence. The letter, couched in general terms, contended that GW had owed a duty to Mr Johnson personally as well as to WWH. While making no admission, GW's insurers in January 1992 invited Mr Johnson's solicitors to give full details of the quantum of his personal claim. Mr Johnson's solicitors replied in February 1992, outlining certain heads of claim and giving estimates in round figures of claims approaching

£2m. In October 1992, on the eve of trial of WWH's action against GW, Mr Johnson's solicitors wrote to GW's solicitors, referring to his legal aid certificate and **\*825** giving notice that his personal claim would be pursued whether the company's claim culminated in judgment or settlement. Since a substantial payment into court had been made on behalf of GW, Mr Johnson and WWH expected a favourable outcome of the company's action. On 19 November 1992, when trial of the company's action against GW was well advanced, Mr Pugh (a solicitor representing Mr Johnson) spoke to Mrs MacLennan (the solicitor representing GW) on the telephone and discussed Mr Johnson's personal claim: Mr Pugh said that it had been thought better to wait until the company's claim had been concluded before dealing with the personal claim; Mrs MacLennan asked whether Mr Pugh would object to an overall settlement of the company's claim and Mr Johnson's personal claim; he said that he would have to take instructions but could not himself see any objections 'provided the figures were all right'. He gave her a rough idea of the heads of claim and the figures. Mr Johnson instructed Mr Pugh that he would not be adverse to an overall settlement provided it was reasonably satisfactory. Mrs MacLennan indicated that GW (or its insurers) also were not adverse to an overall settlement if the figures could be agreed. On 1 December 1992 Mr Pugh met Mrs MacLennan at court to try to negotiate a settlement of his personal claim. His attendance note of this meeting read:

> 'She mentioned an overall cap and said that she could not settle for more. I said that John Johnson's claim was a separate one and she said that so far as it was not related to the actual company's claim it might well be different. After some discussion it was agreed that so far as his claim as a shareholder and only relating to a loss of dividends income and capital distribution there would be a cap at a figure to be agreed. This would not affect all the other claims on the list as previously discussed. Mrs McClenan [sic] reiterated her previous view but said it would be a separate claim and it would really be a matter for separate negotiation

in due course. A cap was agreed
at £250,000 excluding interest and
costs.'

The settlement agreement made between WWH and
GW on 2 December 1992 was signed by solicitors for
both sides; the solicitors representing WWH also, for
this purpose, represented Mr Johnson.

By the settlement agreement GW agreed to pay the sums
already mentioned with no admission of liability, in full
and final satisfaction of all claims of WWH against
GW and vice versa. The sum of £1m which GW had
paid into court was to be paid out to WWH's solicitors.
WWH undertook that any of its liabilities personally
guaranteed by Mr Johnson would be discharged out of
the sums received under the settlement agreement, the
object plainly being to limit the quantum of any claim
which Mr Johnson might thereafter make personally.
Clause 3 of the settlement agreement provided:

> 'Mr Johnson undertakes that the
> amount of any claim made by
> him personally in any action
> against [GW] in respect of any
> losses suffered by him by reason
> of loss of income, dividends or
> capital distribution in respect of
> his position as a shareholder of
> [WWH] will not exceed £250,000
> not including interest accruing in
> respect of any period after the
> date of this agreement nor costs.
> This undertaking does not limit any
> other of Mr Johnson's rights against
> [GW].'

A confidentiality clause in the agreement contained an
exception 'In connection with any action which Mr
Johnson may bring against [GW].'

Mr Johnson issued his writ in the present proceedings
against GW on 7 April 1993. Over the next four-and-
a-half years the parties pleaded and re-pleaded their

respective cases. A payment into court was made by
GW. Witness statements were exchanged. Mr Johnson
served his accountancy evidence. On 20 November 1997
the action was fixed for trial in January 1999. On 3
December 1997 GW's solicitors intimated, for the first
time, that it intended to apply to strike out the action
as an abuse of the process of the court. Notice was
also given that GW would seek the determination of
preliminary issues whether it had owed Mr Johnson
a duty of care and whether the damages which he
claimed were in principle recoverable on the facts **\*826**
pleaded. On 25 February 1998 it was ordered that
preliminary issues be tried, the second of which was:

> 'to what extent (if at all) on the
> basis of and assuming the truth of
> the facts pleaded as set out above
> are any of the heads of damage
> pleaded in paragraphs 23 and 24
> of the Re-Amended Statement of
> Claim irrecoverable as a matter of
> law by [Mr Johnson] by way of
> damages for the pleaded breaches of
> the duties owed to him.'

In para. 6 of his re-amended statement of claim Mr
Johnson pleaded an implied term of his personal
retainer of GW that it would exercise all due skill and
care in execution of that retainer, and a like duty of care
in tort. In para. 9 it was pleaded:

> 'Without prejudice to the generality
> of paragraph 6 above it was the
> duty of [GW], in carrying out its
> retainer on behalf of [Mr Johnson]
> in accordance with the implied term
> pleaded in the said paragraph, or
> alternatively in discharging its duty
> of care in tort owed to [Mr Johnson],
> to

> (a)  exercise all due skill and care
> in connection with the exercise of
> the said option to purchase land
> and/or any further steps which were

necessary to obtain possession of the land;

(b)    advise [Mr Johnson] fully and accurately of all developments in connection with the exercise of the said option which might affect the financial requirements and prospects of [WWH];

(c)    advise [Mr Johnson] of the implications of such developments for his personal financial situation and other business projects, including his existing liabilities and new financial commitments contemplated;

(d)    advise and/or warn [Mr Johnson] fully and accurately of any delay or difficulty in exercising the said option to purchase land, which might adversely affect [Mr Johnson's] personal financial situation and other business projects, including his existing liabilities and new financial commitments contemplated;

(e)    advise and/or warn [Mr Johnson] fully and accurately of the implications of any advice given or steps taken by [GW] on behalf of [WWH] which might adversely affect [Mr Johnson's] personal financial situation and other business projects.'

In para. 12 it was pleaded that GW had acted in breach of the terms pleaded in para. 6 and 9 in connection with the exercise of WWH's option to purchase the Burlesdon land, and in para. 16 it was pleaded that between February 1988 and November 1989 GW had acted negligently or in breach of the implied terms of its retainer pleaded in para. 6 and 9 in advising Mr Johnson from time to time as to the likely duration and

outcome of the earlier proceedings against Mr Moores. The claims for damages made by Mr Johnson in para. 23 and 24 of his re-amended statement of claim are the subject of detailed consideration below.

The preliminary issues came for hearing at first instance before Pumfrey J who, in a careful judgment delivered on 21 May 1998, resolved them in favour of Mr Johnson. On the abuse issue he found that GW was estopped by convention from contending that the action was an abuse. Applying Amalgamated Investment & Property Co Ltd v Texas Commerce International Bank Ltd [1982] QB 84 he concluded:

> 'that in reaching the settlement, [GW] and Mr Johnson did act on the common assumption that the personal claim would be made, and would be entertained by the court. I think that it is now unconscionable for [GW] to allege that the personal claim is an abuse of process in the light of Henderson v Henderson .'

He resolved the duty issue in favour of Mr Johnson. He concluded that the heads of damage claimed by Mr Johnson were not irrecoverable as a matter of law as damages for the breaches alleged by Mr Johnson.
**\*827**

GW appealed. In a judgment of the court (Nourse, Ward and Mantell L JJ) given on 12 November 1998 ([1999] BCC 474), the Court of Appeal agreed with the judge that on the facts pleaded a duty of care had arguably been owed by GW to Mr Johnson. The Court of Appeal shared the judge's view on the difficulty of the damage issue but agreed with his conclusion that the pleaded heads of damage were arguably recoverable, save as to one head of damage which it would have struck out.

The Court of Appeal held, differing from the judge, that there had been no estoppel by convention. But it also held that there had been an abuse under the rule in Henderson v Henderson (1843) 3 Hare 100 . It said ( [1999] BCC 474 at p. 502E):

'Mr ter Haar submits that the rule has no application because different issues arise in the two sets of proceedings. In this action there are entirely new questions about the extent of the duty owed to the plaintiff personally and the losses he has suffered. On the other hand, there was in our view a substantial similarity, particularly as to whether or not [GW's] conduct as solicitors fell below the required standard in connection with the exercise of the option and the conduct of the Chancery litigation [against Mr Moores] as well as the overlapping loss suffered by the company. This encompasses practically the whole of the ground traversed for six weeks in the company action. In our judgment, narrowly to circumscribe the application of the rule would defeat its purpose. Mr Johnson was the alter ego of the company: he controlled the company's decisions and through him the company's claim was brought. Within days after that writ was issued, he was intimating his personal claim. He could have brought it then. Although his legal aid was then limited in some way which is not clear to us, no explanation has been given for the delay in removing whatever limitations had been imposed and he had full cover by October, long before the trial. For reasons which appeared good to him, he preferred not to delay the company action but to pursue it vigorously before the company was forced into liquidation. That does not, in our judgment, excuse him from failing to launch his own claims. If he could have done so, he should have done so.'

### Abuse of process

The rule of law depends upon the existence and availability of courts and tribunals to which citizens may resort for the determination of differences between them which they cannot otherwise resolve. Litigants are not without scrupulous examination of all the circumstances to be denied the right to bring a genuine subject of litigation before the court ( Yat Tung Investment Co Ltd v Dao Heng Bank Ltd [1975] AC 581 at p. 590 per Lord Kilbrandon, giving the advice of the Judicial Committee; Brisbane City Council v Attorney-General for Queensland [1979] AC 411 at p. 425 per Lord Wilberforce, giving the advice of the Judicial Committee). This does not however mean that the court must hear in full and rule on the merits of any claim or defence which a party to litigation may choose to put forward. For there is, as Lord Diplock said at the outset of his speech in Hunter v Chief Constable of the West Midlands Police [1982] AC 529 at p. 536, an

'inherent power which any court of justice must possess to prevent misuse of its procedure in a way which, although not inconsistent with the literal application of its procedural rules, would nevertheless be manifestly unfair to a party to litigation before it, or would otherwise bring the administration of justice into disrepute among right-thinking people. The circumstances in which abuse of process can arise are very varied; those which give rise to the instant appeal must surely be unique. It would, in my view, be most unwise if this House were to use this occasion to say anything that might be taken as limiting to fixed categories the kinds of circumstances in which the court has a duty (I disavow the word discretion) to exercise this salutary power.'

One manifestation of this power was to be found in the Rules of the Supreme Court, O. 18, r. 19 which empowered the court, at any stage of the proceedings, to strike out any pleading which disclosed no reasonable cause of action or defence, or which was scandalous, frivolous or **828** vexatious, or which was otherwise an abuse of the process of the court. A similar power is now to be found in r. 3.4 of the Civil Procedure Rules 1998 (SI 1998/3132).

GW contends that Mr Johnson has abused the process of the court by bringing an action against it in his own name and for his own benefit when such an action could and should have been brought, if at all, as part of or at the same time as the action brought against the firm by WWH. The allegations of negligence and breach of duty made against the firm by WWH in that action were, it is argued, essentially those upon which Mr Johnson now relies. The oral and documentary evidence relating to each action is substantially the same. To litigate these matters in separate actions on different occasions is, GW contends, to duplicate the cost and use of court time involved, to prolong the time before the matter is finally resolved, to subject GW to avoidable harassment and to mount a collateral attack on the outcome of the earlier action, settled by GW on the basis that liability was not admitted.

This form of abuse of process has in recent years been taken to be that described by Sir James Wigram V-C in Henderson v Henderson (1843) 3 Hare 100 at p. 114 where he said:

'In trying this question, I believe I state the rule of the Court correctly, when I say that, where a given matter becomes the subject of litigation in, and of adjudication by, a court of competent jurisdiction, the Court requires the parties to that litigation to bring forward their whole case, and will not (except under special circumstances) permit the same parties to open the same subject of litigation in respect of matter which might have been brought forward as part of the subject in contest, but which was not

brought forward, only because they have, from negligence, inadvertence, or even accident, omitted part of their case. The plea of res judicata applies, except in special cases, not only to points upon which the Court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time.'

Thus the abuse in question need not involve the reopening of a matter already decided in proceedings between the same parties, as where a party is estopped in law from seeking to re-litigate a cause of action or an issue already decided in earlier proceedings, but (as Somervell LJ put it in Greenhalgh v Mallard [1947] 2 All ER 255 at p. 257) may cover:

'issues or facts which are so clearly part of the subject-matter of the litigation and so clearly could have been raised that it would be an abuse of the process of the court to allow a new proceeding to be started in respect of them.'

A series of cases, mostly in recent years, has explored this form of abuse. Reference need not be made to all of them. In the Yat Tung case abuse was found where a claimant who had unsuccessfully sued a bank on one ground brought a further action against the same bank and another party on a different ground shortly thereafter. Giving the advice of the Judicial Committee of the Privy Council, Lord Kilbrandon said ([1975] AC 581) at pp. 589–590:

'The second question depends on the application of a doctrine of estoppel, namely res judicata. Their Lordships

agree with the view expressed by McMullin J. that the true doctrine in its narrower sense cannot be discerned in the present series of actions, since there has not been, in the decision in no. 969, any formal repudiation of the pleas raised by the appellant in no. 534. Nor was Choi Kee, a party to no. 534, a party to no. 969. But there is a wider sense in which the doctrine may be appealed to, so that it becomes an abuse of process to raise in subsequent proceedings matters which could and therefore should have been litigated in earlier proceedings.'

In Brisbane City Council v Attorney-General for Queensland [1979] AC 411, the Privy Council expressly endorsed Somervell LJ's reference to abuse of process and observed, at p. 425: **\*829**

‘This is the true basis of the doctrine and it ought only to be applied when the facts are such as to amount to an abuse: otherwise there is a danger of a party being shut out from bringing forward a genuine subject of litigation.'

In Hunter's case, above, in which Henderson v Henderson was not cited, the plaintiff sought to challenge in civil proceedings a decision in a criminal case against which he had not appealed on the ground which he sought to raise in the civil proceedings. The proceedings were struck out.

In Vervaeke v Smith [1983] 1 AC 145 the appellant, who had failed in English proceedings to annul her marriage, had succeeded in doing so in Belgium on different grounds and sought recognition in England of the Belgian decree. Lord Hailsham of St Marylebone LC at p. 157 described the rule in Henderson v Henderson as ‘both a rule of public policy and an application of the law of res judicata' and said of it:

‘… whatever the limits of Henderson v Henderson (1843) 3 Hare 100 (which I regard as a sound rule in ordinary civil litigation) may ultimately turn out to be, I believe that it must apply to a case like the present, where the petitioner in the first proceedings not merely does not rely on the grounds then already in theory available to her, but deliberately conceals the real facts (on which she now relies) from the court in order to put forward a bogus case which is radically inconsistent with them.'

Ashmore v British Coal Corporation [1990] 2 QB 338 involved an attempt to reopen issues which had been decided adversely to the appellant's contentions in rulings which, although not formally binding on her, had been given in sample cases selected from a group of claims of which hers had been one. The Court of Appeal held that it was not in the interests of justice to allow her to pursue her claim. Reliance was placed on Bragg v Oceanus Mutual Underwriting Association (Bermuda) Ltd [1982] 2 L1 Rep 132 in which Kerr LJ at p. 137 said:

‘To take the authorities first, it is clear that an attempt to relitigate in another action issues which have been fully investigated and decided in a former action *may* constitute an abuse of process, quite apart from any question of res judicata or issue estoppel on the ground that the parties or their privies are the same. It would be wrong to attempt to categorize the situations in which such a conclusion would be appropriate.'

In House of Spring Gardens Ltd v Waite [1991] 1 QB 241 the plaintiffs sued three defendants in England to enforce a judgment which they had obtained against those defendants in Ireland. The defendants pleaded in defence that the Irish judgment had been obtained by fraud. That was a contention which two of the defendants, but not the third (a Mr McLeod) had raised in Irish proceedings to set aside the judgment, but the allegation had been dismissed by Egan J. Summary judgment was given against the three defendants in England but Mr McLeod appealed against that judgment. The Court of Appeal held that Mr McLeod, like the other defendants, was estopped from mounting what was in effect a collateral challenge to the decision of Egan J. It also held that Mr McLeod's defence was an abuse of process. At p. 255 Stuart-Smith LJ said:

> 'The question is whether it would be in the interests of justice and public policy to allow the issue of fraud to be litigated again in this court, it having been tried and determined by Egan J. in Ireland. In my judgment it would not; indeed, I think it would be a travesty of justice. Not only would the plaintiffs be required to re-litigate matters which have twice been extensively investigated and decided in their favour in the natural forum, but it would run the risk of inconsistent verdicts being reached, not only as between the English and Irish courts, but as between the defendants themselves. The Waites have not appealed Sir Peter Pain's judgment, and they were quite right not to do so. The plaintiffs will no doubt proceed to execute their judgment against them. What could be a greater source of injustice, if in years to come, when the issue is finally decided, a different decision is reached in Mr McLeod's case? Public policy requires that there should be an end of litigation and that a litigant should not be vexed more than once in the same cause.'

*830

Arnold v National Westminster Bank plc [1991] 2 AC 93 was a case of issue estoppel. Tenants invited the court to construe the terms of a rent review provision in the sub-underlease under which they held premises. The provision had been construed in a sense adverse to them in earlier proceedings before Walton J, but they had been unable to challenge his decision on appeal. Later cases threw doubt on his construction. The question was whether the rules governing issue estoppel were subject to exceptions which would permit the matter to be reopened. The House held that they were. At p. 109 Lord Keith of Kinkel said:

> 'In my opinion your Lordships should affirm it to be the law that there may an exception to issue estoppel in the special circumstance that there has become available to a party further material relevant to the correct determination of a point involved in the earlier proceedings, whether or not that point was specifically raised and decided, being material which could not by reasonable diligence have been adduced in those proceedings. One of the purposes of estoppel being to work justice between the parties, it is open to courts to recognise that in special circumstances inflexible application of it may have the opposite result, as was observed by Lord Upjohn in the passage which I have quoted above from his speech in the Carl-Zeiss case [1967] 1 A.C. 853 at 947.'

In the passage referred to Lord Upjohn had said:

> 'All estoppels are not odious but must be applied so as to work justice and not injustice, and I think the principle of issue estoppel must be applied to the circumstances of the

subsequent case with this overriding consideration in mind.'

Talbot v Berkshire County Council [1994] QB 290 arose out of a motor accident in which both the driver and his passenger were severely injured. The passenger sued the driver. The driver's insurers, without notice to the driver, made a third party claim against the Berkshire County Council, claiming contribution as between joint tortfeasors but including no claim for the driver's own injuries. Not until after the expiry of the limitation period for bringing a personal claim did the driver learn of the third-party claim against the county council. At trial, the passenger succeeded in full, damages being apportioned between the driver and the county council. The driver then sued the county council to recover damages for his own injuries. On the trial of preliminary issues, the judge held that the driver was prima facie estopped from bringing the action but that there were special circumstances which enabled the court to permit the action to be pursued. The county council successfully challenged that conclusion on appeal. At p. 298 Stuart-Smith LJ said:

'There can be no doubt that the [driver's] personal injury claim could have been brought at the time of [the passenger's] action. It could have been included in the original third party notice issued against the council ( RSC, Ord. 16, r. 1(b) and (c) ); it could have been started by a separate writ and consolidated with or ordered to be tried with [the passenger's] action: Ord. 4, r. 9 . The third party proceedings could have been amended at any time before trial and perhaps even during the trial to include such a claim, notwithstanding that it was statute-barred, since it arose out of the same or substantially the same facts as the cause of action in respect of which relief was already claimed, namely, contribution or indemnity in respect of [the passenger's] claim: Ord. 20,

r. 5 . In my opinion, if it was to be pursued, it should have been so brought.'

Stuart-Smith LJ considered that the insurers' solicitors appeared to have been negligent but that the claim against the county council should be struck out unless there were special circumstances, and concluded that there were not. With his conclusions Mann and Nourse LJJ agreed. Since the driver's claim against the county council was held by the judge to be statute-barred, a claim against the solicitors may have offered the driver his only hope of recovery.

The plaintiff in C (a Minor) v Hackney London Borough Council [1996] 1 WLR 789 lived in one of which her mother was tenant. She suffered from Down's Syndrome and claimed in this action to have suffered personal injury caused by the negligence and breach of statutory duty of the borough council as housing authority. Her mother had previously made a similar *831 claim which had been the subject of a consent order in the county court. The borough council applied to set aside a judgment entered in the plaintiff's favour in default of defence and to strike out the claim on the ground that the plaintiff's action was an abuse of the process of the court. Reliance was placed in particular on the Yat Tung case and Talbot v Berkshire County Council . This argument was accepted by the judge, who held that the plaintiff's action should have been advanced at the same time as her mother's, the more so as the plaintiff was dependent on her mother. The plaintiff's appeal against this decision succeeded. Simon Brown LJ said, at p. 794:

'I therefore reject entirely the submission that Yat Tung Investment Co Ltd v Dao Heng Bank Ltd [1975] AC 581 justifies extending the Talbot v Berkshire County Council [1994] QB 290 principle – that an unlitigated monetary claim is barred if it could have been advanced and established in earlier proceedings (itself to my mind an extended application of the

res judicata doctrine) – to those not themselves party to the earlier proceedings.

It follows from all this that in my judgment the doctrine of res judicata even in its widest sense has simply no application to the circumstances of the present case and that the judge erred in ruling to the contrary. One does not, therefore, reach the point of asking here whether special circumstances exist to exclude it; C's erstwhile solicitors' suggested negligence is, frankly, an irrelevance. Nor, in my judgment, does this case come within measurable distance of any other form of abuse of process based on public policy considerations analogous to those underlying the res judicata doctrine: see, for instance, the Court of Appeal's decision in Ashmore v British Coal Corporation [1990] 2 Q.B. 338 .

All that said, this judgment should not be taken as any encouragement to lawyers or their clients to follow the course in fact adopted here. As the judge rightly recognised, in circumstances such as these, it is plainly in the public interest to have a single action in which the claims of all the affected members of the household are included rather than a multiplicity of actions…'

Barrow v Bankside Agency Ltd [1996] 1 WLR 257 was one of the flood of cases which arose out of losses in the Lloyd's insurance market. Mr Barrow was a member of an action group which had successfully sued a number of members' agents for negligent underwriting. Having substantially succeeded, but recovered only a proportion of the damages he had claimed, Mr Barrow issued fresh proceedings against his members' agent on a different ground. It was clear that this claim, even if made earlier, would not have been tried at the same time as the earlier action, since the scheduling of cases was the subject of detailed management by the Commercial Court. The members' agent contended that to bring this further claim, not raised at the time of the earlier proceedings, was an abuse. In the Court of Appeal it was said, at p. 260:

> 'The rule in Henderson v Henderson (1843) 3 Hare 100 is very well known. It requires the parties, when a matter becomes the subject of litigation between them in a court of competent jurisdiction, to bring their whole case before the court so that all aspects of it may be finally decided (subject, of course, to any appeal) once and for all. In the absence of special circumstances, the parties cannot return to the court to advance arguments, claims or defences which they could have put forward for decision on the first occasion but failed to raise. The rule is not based on the doctrine of res judicata in a narrow sense, nor even on any strict doctrine of issue or cause of action estoppel. It is a rule of public policy based on the desirability, in the general interest as well as that of the parties themselves, that litigation should not drag on for ever and that a defendant should not be oppressed by successive suits when one would do. That is the abuse at which the rule is directed.'

At p. 263, the rule was described as a salutary one, and the court suggested that its application should not be circumscribed by unnecessarily restrictive rules. On the facts it was held that the **\*832** procedure adopted by Mr Barrow was not an abuse. The court also held that if, contrary to its opinion, the case did fall within the mischief at which Henderson v Henderson was directed,

there were special circumstances which justified non-application of the rule.

In Manson v Vooght [1999] BPIR 376 , the plaintiff had sued administrative receivers of a company of which he had been managing director and principal shareholder in a 1990 action which culminated in a judgment adverse to him in 1993. There were other proceedings leading to other judgments, also given in 1993, relating to certain of the same issues: proceedings to disqualify the plaintiff as a director, in which findings adverse to him were made; and summonses issued in the liquidation of the company, when the court refused to allow issues which had been decided in the disqualification proceedings to be re-litigated. In 1994 the plaintiff issued a further writ making claims against the administrative receivers and others. His proceedings against the administrative receivers were struck out on the ground that these claims should have been raised, if at all, in the 1990 action. This decision was upheld by the Court of Appeal. Giving the leading judgment May LJ said, at pp. 387–388:

'In my view, the use in this context of the phrase "res judicata" is perhaps unhelpful, and this not only because it is Latin. We are not concerned with cases where a court has decided the matter; but rather cases where the court has not decided the matter, but where in a (usually late) succeeding action someone wants to bring a claim which should have been brought, if at all, in earlier concluded proceedings. If in all the circumstances the bringing of the claim in the succeeding action is an abuse, the court will strike it out unless there are special circumstances. To find that there are special circumstances may, for practical purposes, be the same thing as deciding that there is no abuse, as Sir Thomas Bingham MR came close to holding on the facts in Barrow . The bringing of a claim which could have been brought in earlier proceedings may not be an abuse. It may in particular

cases be sensible to advance cases separately. It depends on all the circumstances of each case. Once the court's consideration is directed clearly towards the question of abuse, it will be seen that the passage from Sir James Wigram V-C's judgment in Henderson is a full modern statement of the law so long as it is not picked over semantically as if it were a tax statute.

The extent of any coincidence of causes of action, facts or even the capacities in which parties are sued, though relevant, will not necessarily determine the outcome…'

At pp. 388–389, May LJ continued:

'[Counsel for Mr Manson] submits that the kind of abuse of process relied on by the first defendant in this appeal is to be narrowly confined and precisely defined so that legitimate claims are not stifled and so that potential litigants know where they stand. Otherwise they may be driven to include in one proceedings related but distinct claims which might sensibly be left for later consideration. The law should not thus encourage premature litigation which may prove unnecessary. He further submits that delay is the subject of the law of limitation and should not feature additionally as an element of abuse.

It is of course axiomatic that the court will only strike out a claim as an abuse after most careful consideration. But the court has to balance a plaintiff's right to

bring before the court genuine and legitimate claims with a defendant's right to be protected from being harassed by multiple proceedings where one should have sufficed. Abuse of process is a concept which defies precise definition in the abstract. In particular cases, the court has to decide whether there is abuse sufficiently serious to justify preventing the offending litigant from proceeding. In cases such as the present, the abuse is sufficiently defined in Henderson which itself is encapsulated in the proposition that the litigant could and should have raised the matter in question in earlier concluded proceedings. Special circumstances may negative or excuse what would otherwise be an abuse. But there may in particular cases be elements of abuse additional to the mere fact that the matter could and should have been raised in the earlier proceedings.'

**\*833**  On p. 389 May LJ added:

'Mr Manson relies on special circumstances to negative or excuse the abuse. He says that the scope of the 1990 action was limited because he had legal expenses insurance for that action which only covered some of his claims and that the insurers were not prepared to support the claims which he now wants to bring. Although this may be an explanation, in my view it does not excuse the abuse nor does it amount to special circumstances. It is commonplace for litigants to have difficulties in affording the cost of litigation. But lack of means cannot stand as an excuse for abuse of process.'

Last in this series of cases comes Bradford & Bingley Building Society v Seddon (Hancock & Ors, t/a Hancocks (a Firm), third parties) [1999] 1 WLR 1482 , a decision later in time than the Court of Appeal's judgment in the present case but given by two of the same Lords Justices. Mr Seddon had made an investment on the advice of an accountant, Mr Hancock, which he had financed by taking a mortgage loan from the Bradford & Bingley Building Society. The investment failed. Mr Seddon claimed damages or an indemnity against Mr Hancock, who admitted liability to indemnify Mr Seddon to the extent of about 75 per cent of Mr Seddon's claim. Judgment was entered in Mr Seddon's favour for this admitted sum and Mr Hancock was given leave to defend as to the balance. Mr Seddon was unable to enforce his judgment as Mr Hancock had no money, and the residual claim was not pursued. The building society then proceeded against Mr Seddon to enforce the debt owed to it under the mortgage loan. Mr Seddon sought to join as third parties Mr Hancock, in order to pursue the residual claim, and two of his partners, Mr Seddon's contention being that the advice tended to him had been given by the firm to which Mr Hancock and his partners belonged. An application to strike out the third party claim was upheld by the judge and Mr Seddon appealed. In the course of a judgment with which Nourse and Ward L JJ agreed, Auld LJ said at p. 1490:

'In my judgment, it is important to distinguish clearly between res judicata and abuse of process not qualifying as res judicata, a distinction delayed by the blurring of the two in the courts' subsequent application of the above dictum [of Sir James Wigram V-C in Henderson v Henderson ]. The former, in its cause of action estoppel form, is an absolute bar to relitigation, and in its issue estoppel form also, save in "special cases" or "special circumstances": see Thoday v Thoday [1964] P 181 , 197–198 per Diplock LJ and Arnold v National Westminster Bank plc [1991] 2 AC

93 . The latter, which may arise where there is no cause of action or issue estoppel, is not subject to the same test, the task of the court being to draw the balance between the competing claims of one party to put his case before the court and of the other not to be unjustly hounded given the earlier history of the matter …

Thus, abuse of process may arise where there has been no earlier decision capable of amounting to res judicata (either or both because the parties or the issues are different) for example, where liability between new parties and/or determination of new issues should have been resolved in the earlier proceedings. It may also arise where there is such an inconsistency between the two that it would be unjust to permit the later one to continue…'

At p. 1492 Auld LJ continued:

'In my judgment mere "re"-litigation, in circumstances not giving rise to cause of action or issue estoppel, does not necessarily give rise to abuse of process. Equally, the maintenance of a second claim which could have been part of an earlier one, or which conflicts with an earlier one, should not, per se, be regarded as an abuse of process. Rules of such rigidity would be to deny its very concept and purpose. As Kerr LJ and Sir David Cairns emphasised in Bragg v Oceanus Mutual Underwriting Association (Bermuda) Ltd [1982] 2 Lloyd's Rep 132 , at 137 and 138–139 respectively, the courts should not attempt to define or categorise fully what may amount to an abuse of process; see also per Stuart-Smith LJ in Ashmore v British Coal Corporation [1992] QB 338 at 352. **834** Sir Thomas Bingham MR underlined this in Barrow v Bankside Agency Ltd [1996] 1 WLR 257 , stating, at p. 263B, that the doctrine should not be "circumscribed by unnecessarily restrictive rules" since its purpose was the prevention of abuse and it should not endanger the maintenance of genuine claims; see also per Saville LJ at p. 266D–E.

Some additional element is required, such as a collateral attack on a previous decision (see e.g. Hunter v Chief Constable of the West Midlands Police [1982] AC 529 ; Bragg's case [1982] 2 Lloyd's Rep 132, per Kerr LJ and Sir David Cairns, at pp. 137 and 139 respectively, and Ashmore's case [1990] 2 Q.B. 338), some dishonesty (see e.g. per Stephenson L.J. in Bragg's case, at p. 139, and Potter L.J. in Morris v Wentworth-Stanley [1999] 2 WLR 470 at p. 480 and 481; or successive actions amounting to unjust harassment (see e.g. Manson v Vooght …)).'

The Court of Appeal held that Mr Seddon's third-party proceedings were not an abuse of process, and the appeal succeeded.

It may very well be, as has been convincingly argued (Watt, 'The Danger and Deceit of the Rule in Henderson v Henderson : A new approach to successive civil actions arising from the same factual matter' 19 *Civil Justice Quarterly* (July 2000), p. 287), that what is now taken to be the rule in Henderson v Henderson , has diverged from the ruling which Wigram V-C made, which was addressed to res judicata. But Henderson

v Henderson abuse of process, as now understood, although separate and distinct from cause of action estoppel and issue estoppel, has much in common with them. The underlying public interest is the same: that there should be finality in litigation and that a party should not be twice vexed in the same matter. This public interest is reinforced by the current emphasis on efficiency and economy in the conduct of litigation, in the interests of the parties and the public as a whole. The bringing of a claim or the raising of a defence in later proceedings may, without more, amount to abuse if the court is satisfied (the onus being on the party alleging abuse) that the claim or defence should have been raised in the earlier proceedings if it was to be raised at all. I would not accept that it is necessary, before abuse may be found, to identify any additional element such as a collateral attack on a previous decision or some dishonesty, but where those elements are present the later proceedings will be much more obviously abusive, and there will rarely be a finding of abuse unless the later proceeding involves what the court regards as unjust harassment of a party. It is, however, wrong to hold that because a matter could have been raised in early proceedings it should have been, so as to render the raising of it in later proceedings necessarily abusive. That is to adopt too dogmatic an approach to what should in my opinion be a broad, merits-based judgment which takes account of the public and private interests involved and also takes account of all the facts of the case, focusing attention on the crucial question whether, in all the circumstances, a party is misusing or abusing the process of the court by seeking to raise before it the issue which could have been raised before. As one cannot comprehensively list all possible forms of abuse, so one cannot formulate any hard and fast rule to determine whether, on given facts, abuse is to be found or not. Thus while I would accept that lack of funds would not ordinarily excuse a failure to raise in earlier proceedings an issue which could and should have been raised then, I would not regard it as necessarily irrelevant, particularly if it appears that the lack of funds has been caused by the party against whom it is sought to claim. While the result may often be the same, it is in my view preferable to ask whether in all the circumstances a party's conduct is an abuse than to ask whether the conduct is an abuse and then, if it is, to ask whether the abuse is excused or justified by special circumstances. Properly applied, and whatever the legitimacy of its descent, the rule has in my view

a valuable part to play in protecting the interests of justice.

Mr ter Haar, for Mr Johnson, submitted (as the judge had held) that GW was estopped by convention from contending that the bringing of an action to enforce his personal claims was an abuse of process. In resisting GW's complaint of abuse, Mr ter Haar relied, as he did in the courts below, on three features of this case in particular. The first was the acute financial predicament in which Mr Johnson personally and WWH found themselves as a result, as **835** Mr Johnson alleges, of GW's negligence. The burden of financing the continuing operation of WWH, and of its very expensive litigation against GW, fell on him. His means was stretched to the utmost. The only hope of financial salvation lay in an early and favourable outcome to the company's claim against GW. Mr Johnson did not have a full legal aid certificate to pursue a personal claim. In any event, the addition of a personal claim would have complicated and delayed the trial of the company's claim, which might well have jeopardised the company's survival. Secondly, Mr ter Haar relied on the conduct of the parties after the settlement agreement was made (if, contrary to his earlier submission, there was no estoppel by convention). He pointed out that four-and-a-half years elapsed from the issue of Mr Johnson's writ in this action before GW first intimated their intention to apply to strike out the proceedings as an abuse of the court's process, during which period pleadings and evidence were exchanged, considerable costs were incurred, a substantial payment into court was made and a trial date fixed. This procedural history, he submitted, was evidence of the expectation of the parties at the time when the company's action was settled, and was in itself ground for rejecting GW's application; Halliday v Shoesmith [1993] 1 WLR 1 at p. 5. Thirdly, Mr ter Haar submitted that, to the extent that issues litigated in the company's action were to be re-litigated in this action, it was because GW had insisted on this and rejected the invitation of Mr Johnson to treat the evidence given in the earlier action as if given in this action.

Two subsidiary arguments were advanced by Mr ter Haar in the courts below and rejected by each. The first was that the rule in Henderson v Henderson did not apply to Mr Johnson since he had not been the plaintiff

in the first action against GW. In my judgment this argument was rightly rejected. A formulaic approach to application of the rule would be mistaken. WWH was the corporate embodiment of Mr Johnson. He made decisions and gave instructions on its behalf. If he had wished to include his personal claim in the company's action, or to issue proceedings in tandem with those of the company, he had power to do so. The correct approach is that formulated by Sir Robert Megarry V-C in Gleeson v J Wippell & Co Ltd [1977] 1 WLR 510 at p. 515 where he said:

> 'Second, it seems to me that the substratum of the doctrine is that a man ought not to be allowed to litigate a second time what has already been decided between himself and the other party to the litigation. This is in the interest both of the successful party and of the public. But I cannot see that this provides any basis for a successful defendant to say that the successful defence is a bar to the plaintiff suing some third party, or for that third party to say that the successful defence prevents the plaintiff from suing him, unless there is a sufficient degree of identity between the successful defendant and the third party. I do not say that one must be the alter ego of the other: but it does seem to me that, having due regard to the subject matter of the dispute, there must be a sufficient degree of identification between the two to make it just to hold that the decision to which one was party should be binding in proceedings to which the other is party. It is in that sense that I would regard the phrase "privity of interest" …'.

On the present facts that test was clearly satisfied.

The second subsidiary argument was that the rule in Henderson v Henderson did not apply to Mr Johnson since the first action against GW had culminated in a compromise and not a judgment. This argument also was rightly rejected. An important purpose of the rule is to protect a defendant against the harassment necessarily involved in repeated actions concerning the same subject matter. A second action is not the less harassing because the defendant has been driven or thought it prudent to settle the first; often, indeed, that outcome would make a second action the more harassing.

On the estoppel by convention issue, Mr Steinfeld QC for GW submitted that the Court of Appeal had been right and the judge wrong. There had been no common understanding between the parties on the issue of abuse, a topic which had never been raised. There was nothing to suggest that GW had tacitly agreed to forgo any defence properly open to it. Mr Steinfeld further submitted that the present proceedings did amount to an abuse, as the **\*836** Court of Appeal had rightly held. Mr Johnson could have advanced his personal claim at the same time as the company's claim and therefore should have done so. The consequence of his not doing so was to expose GW to the harassment of further proceedings canvassing many of the same issues as had been canvassed in the earlier action, with consequential waste of time and money and detriment to other court users. The facts relied on to excuse his earlier inaction were not accepted. He should have sought a full legal aid certificate earlier. He could not rely on lack of means. Any loss caused to Mr Johnson by GW's delay in applying to strike out could be compensated in costs.

Neither party challenged the correctness in principle of Lord Denning MR's statement in the Amalgamated Investment case [1982] QC 84 at p. 122 which, despite its familiarity, I quote:

> 'The doctrine of estoppel is one of the most flexible and useful in the armoury of the law. But it has become overloaded with cases. That is why I have not gone through them all in this judgment. It has evolved during the last 150 years in a sequence of separate developments: proprietary

WESTLAW    © 2017 Thomson Reuters.

estoppel, estoppel by representation of fact, estoppel by acquiescence, and promissory estoppel. At the same time it has been sought to be limited by a series of maxims: estoppel is only a rule of evidence, estoppel cannot give rise to a cause of action, estoppel cannot do away with the need for consideration, and so forth. All these can now be seen to merge into one general principle shorn of limitations. When the parties to a transaction proceed on the basis of an underlying assumption – either of fact or of law – whether due to misrepresentation or mistake makes no difference – on which they have conducted the dealings between them – neither of them will be allowed to go back on that assumption when it would be unfair or unjust to allow him to do so. If one of them does seek to go back on it, the courts will give the other such remedy as the equity of the case demands.'

The question is whether the parties to the settlement of WWH's action (relevantly, Mr Johnson and GW) proceeded on the basis of an underlying assumption that a further proceeding by Mr Johnson would not be an abuse of process and whether, if they did, it would be unfair or unjust to allow GW to go back on that assumption. In my judgment both these conditions were met on the present facts. Mr Johnson was willing in principle to try to negotiate an overall settlement of his and the company's claims but this was not possible in the time available and it was GW's solicitor who said that the personal claim 'would be a separate claim and it would really be a matter for separate negotiation in due course.' It is noteworthy that Mr Johnson personally was party to the settlement agreement, and that the agreement contained terms designed to preclude (in one instance) and limit (in another) personal claims by him. Those provisions only made sense on the assumption that Mr Johnson was likely to make a personal claim.

GW did not, of course, agree to forgo any defence the firm might have to Mr Johnson's claim if brought, and the documents show that GW's solicitor was alert to issues of remoteness and duplication. Had Mr Johnson delayed unduly before proceeding, a limitation defence would have become available. But an application to strike out for abuse of process is not a defence, it is an objection to an action being brought at all. The terms of the settlement agreement and the exchanges which preceded it in my view point strongly towards acceptance by both parties that it was open to Mr Johnson to issue proceedings to enforce a personal claim, which could then be tried or settled on its merits, and I consider that it would be unjust to permit GW to resile from that assumption.

If, contrary to my view, GW is not estopped by convention from seeking to strike out Mr Johnson's action, its failure to take action to strike out over a long period of time is potent evidence not only that the action was not seen as abusive at the time but also that, on the facts, it was not abusive. The indicia of true abuse are not so obscure that an experienced professional party, advised by leading counsel (not, at that stage, Mr Steinfeld), will fail to recognise them. It is accepted that Mr Johnson had reasons which he regarded as compelling to defer prosecution of his personal claim. If, as he contended, the urgency of obtaining an early and favourable decision in the company's action was itself a result of GW's breach of duty to the **\*837** company and to him, it would seem to me wrong to stigmatise as abusive what was, in practical terms, unavoidable. I agree with GW that it would certainly have been preferable if the judge who tried the company's action, and thereby became familiar with much of the relevant detail and evidence, had been able at the same time or shortly thereafter to rule on the personal claim. That would have been efficient and economical. But there were reasons accepted at least implicitly by both parties at the time for not proceeding in that way, and GW could, if it wishes, limit the extent to which issues extensively canvassed in the earlier action are to be reopened. It is far-fetched to suggest that this action involves a collateral attack on GW's non-admission of liability in the first action when that action was settled by insurers on terms quite inconsistent with any realistic expectation that GW would not be found liable.

WESTLAW    © 2017 Thomson Reuters.

In my opinion, based on the facts of this case, the bringing of this action was not an abuse of process. The Court of Appeal adopted too mechanical an approach, giving little or no weight to the considerations which led Mr Johnson to act as he did and failing to weigh the overall balance of justice. I would allow Mr Johnson's appeal.

**The recoverability of the damages claimed by Mr Johnson**

By its notice of cross-appeal GW challenged the Court of Appeal's ruling that all the heads of damage pleaded on behalf of Mr Johnson (with one exception) were or might be recoverable in principle if the pleaded facts were fully proved.

GW's first argument before the House, applicable to all save two of the pleaded heads of damage, was in principle very simple. It was that this damage, if suffered at all, had been suffered by WWH and Mr Johnson, being for this purpose no more than a shareholder in the company, could not sue to recover its loss. As the Court of Appeal pointed out in Prudential Assurance Co Ltd v Newman Industries Ltd (No. 2) [1982] Ch 204 at p. 210:

> 'A derivative action is an exception to the elementary principle that A cannot, as a general rule, bring an action against B to recover damages or secure other relief on behalf of C for an injury done by B to C. C is the proper plaintiff because C is the party injured, and, therefore, the person in whom the cause of action is vested.'

Here, it was argued, Mr Johnson was seeking to recover damage which had been suffered by WWH.

Mr Johnson's response was equally simple. It was accepted, for purposes of the application to strike out the damages claim, that GW owed a duty to him personally and was in breach of that duty. Therefore, subject to showing that the damage complained of was caused by GW's breach of duty and was not too remote, which depended on the facts established at trial

and could not be determined on the pleadings, he was entitled in principle to recover any damage which he had himself suffered as a personal loss separate and distinct from any loss suffered by the company.

On this issue we were referred to a number of authorities which included Lee v Sheard [1956] 1 QB 192 ; Prudential Assurance v Newman , above; Heron International Ltd v Lord Grade [1983] BCLC 244 ; R P Howard Ltd & Richard Alan Witchell v Woodman Matthews and Co (a Firm) [1983] BCLC 117 ; George Fischer (Great Britain) Ltd v Multi-Construction Ltd, Dexion Ltd (third party) [1995] BCC 310 ; Christensen v Scott [1996] 1 NZLR 273 ; Barings plc (in administration) v Coopers & Lybrand (a Firm) [1997] BCC 498 ; Gerber Garment Technology Inc v Lectra Systems Ltd [1997] RPC 443 ; Stein v Blake [1998] BCC 316 ; and Watson v Dutton Forshaw Motor Group Ltd (unreported, 22 July 1998, CA ).

These authorities support the following propositions:

• (1)  Where a company suffers loss caused by a breach of duty owed to it, only the company may sue in respect of that loss. No action lies at the suit of a shareholder suing in that capacity and no other to make good a diminution in the value of the shareholder's shareholding where that merely reflects the loss suffered by the company. A claim will **\*838** not lie by a shareholder to make good a loss which would be made good if the company's assets were replenished through action against the party responsible for the loss, even if the company, acting through its constitutional organs, has declined or failed to make good that loss. So much is clear from Prudential [1982] Ch 204 particularly at pp. 222–223, Heron International [1983] BCLC 244 particularly at pp. 261–262, George Fischer [1995] BCC 310 particularly at pp. 316 and 318, Gerber and Stein v Blake [1998] BCC 316 particularly at pp. 317–320.

• (2) Where a company suffers loss but has no cause of action to sue to recover that loss, the shareholder in the company may sue in respect of it (if the shareholder has a cause of action to do so), even though the loss is a diminution in the value of the shareholding. This is supported by Lee v Sheard [1956] 1 QB 192 at pp. 195–196, George Fischer and Gerber .

• (3) Where a company suffers loss caused by a breach of duty to it, and a shareholder suffers a loss separate and distinct from that suffered by the company caused by breach of a duty independently owed to the shareholder, each may sue to recover the loss caused to it by breach of the duty owed to it but neither may recover loss caused to the other by breach of the duty owed to that other. I take this to be the effect of Lee v Sheard [1956] 1 QB 192 at pp. 195–196, Heron International [1983] BCLC 244 particularly at p. 262, R P Howard [1983] BCLC 117 particularly at p. 123, Gerber and Stein v Blake [1998] BCC 310 particularly at p. 317. I do not think the observations of Leggatt LJ in Barings [1997] BCC 498 at p. 504H and of the Court of Appeal of New Zealand in Christensen v Scott [1996] 1 NZLR 273 at p. 280, lines 25–35, can be reconciled with this statement of principle.

These principles do not resolve the crucial decision which a court must make on a strike-out application, whether on the facts pleaded a shareholder's claim is sustainable in principle, nor the decision which the trial court must make, whether on the facts proved the shareholder's claim should be upheld. On the one hand the court must respect the principle of company autonomy, ensure that the company's creditors are not prejudiced by the action of individual shareholders and ensure that a party does not recover compensation for a loss which another party has suffered. On the other, the court must be astute to ensure that the party who has in fact suffered loss is not arbitrarily denied fair compensation. The problem can be resolved only by close scrutiny of the pleadings at the strike-out stage and all the proven facts at the trial stage: the object is to ascertain whether the loss claimed appears to be or is one which would be made good if the company had enforced its full rights against the party responsible, and whether (to use the language of Prudential [1982] Ch 204 at p. 223) the loss claimed is 'merely a reflection of the loss suffered by the company.' In some cases the answer will be clear, as where the shareholder claims the loss of dividend or a diminution in the value of a shareholding attributable solely to depletion of the company's assets, or a loss unrelated to the business of the company. In other cases, inevitably, a finer judgment will be called for. At the strike-out stage any

reasonable doubt must be resolved in favour of the claimant.

I turn to consider the heads of claim now pleaded by Mr Johnson.

• (1)   CPV and Adfocus. The claim is for sums which Mr Johnson, acting on GW's advice, invested in these companies and lost. This claim is unobjectionable in principle, as Mr Steinfeld came close to accepting.

•(2) Cost of personal borrowings: loan capital and interest. The claim is for sums which Mr Johnson claims he was obliged to borrow at punitive rates of interest to fund his personal outgoings and those of his businesses. Both the ingredients and the quantum of this claim will call for close examination, among other things to be sure that it is not a disguised claim for loss of dividend, but it cannot at this stage be struck out as bad on its face. The same is true of Mr Johnson's claims for bank interest and charges and mortgage charges and interest (which will raise obvious questions of remoteness).

• (3) Diminution in value of Mr Johnson's pension and majority shareholding in WWH. In part this claim relates to payments which the company would have made into a pension fund for Mr Johnson: I think it plain that this claim is merely a reflection of the company's loss and I would strike it out. In part the claim relates to enhancement of the value of Mr Johnson's pension if the payments had been duly made. I do not regard this part of the claim as objectionable in principle. An alternative claim, based on the supposition that the company would not have made the pension payments, that its assets would thereby have been increased and that the value of Mr Johnson's shareholding would thereby have been enhanced, is also a reflection of the company's loss and I would strike it out.

• (4)   Loss of 12.5 per cent of Mr Johnson's shareholding in WWH. Mr Johnson claims that he transferred these shares to a lender as security for a loan and that because of his lack of funds, caused by GW's breach of duty, he was unable to buy them back. This claim is not in my view objectionable in principle.

• (5)   Additional tax liability. If proved, this is a personal loss and I would not strike it out.

The second limb of GW's argument on the cross-appeal was directed to Mr Johnson's claim for damages for mental distress and anxiety. This is a claim for general damages for

> 'the mental distress and anxiety which he has suffered as a result of the protracted litigation process to which he has been subjected, the extreme financial embarrassment in which he and his family have found themselves, and the deterioration in his family relationships, particularly with his wife and son, as a result of the matters complained of in the Re-Amended Statement of Claim'.

Closely allied to this was a claim, pleaded at length, for aggravated damages 'by reason of the fact that the manner of the commission of [GW's] tort was such as to injure his pride and dignity'. GW contended that damages for mental distress and anxiety did not lie for breach of a commercial contract such as the present and that this was not a class of case in which aggravated damages were in principle recoverable. Mr ter Haar took issue with both these points.

The general rule laid down in Addis v Gramophone Co Ltd [1909] AC 488 was that damages for breach of contract could not include damages for mental distress. Cases decided over the last century established some inroads into that general rule (see, generally, McGregor on Damages (16th edn, 1997, Sweet & Maxwell), at para. 98–104). But the inroads have been limited and McGregor describes as a useful summary a passage in Watts v Morrow [1991] 1 WLR 1421 at p. 1445:

> 'A contract-breaker is not in general liable for any distress, frustration, anxiety, displeasure, vexation, tension or aggravation which his breach of contract may cause to the innocent party. This rule is not, I think, founded on the assumption that such reactions are

not foreseeable, which they surely are or may be, but on considerations of policy. But the rule is not absolute. Where the very object of a contract is to provide pleasure, relaxation, peace of mind or freedom from molestation, damages will be awarded if the fruit of the contract is not provided or if the contrary result is procured instead.'

Your Lordships' House had occasion to touch on this question in Ruxley Electronics and Construction Ltd v Forsyth [1996] AC 344 , an unusual case in which the issue concerned the measure of compensation recoverable by a building owner against a contractor who had built a swimming pool which was 18 inches shallower at the deep end than the contract specified. At p. 374, Lord Lloyd of Berwick said:

> ' Addis v Gramophone Co Ltd established the general rule that in claims for breach of contract, the plaintiff cannot recover damages for his injured feelings. But the rule, like most rules, is subject to exceptions. One of the well established exceptions is when the object of the contract is to afford pleasure, as, for example, where the plaintiff has booked a holiday with a tour operator. If the tour operator is in breach of contract by **840** failing to provide what the contract called for, the plaintiff may recover damages for his disappointment: see Jarvis v Swans Tours Ltd [1973] QB 233 and Jackson v Horizon Holidays Ltd [1975] 1 WLR 1468 .

This was, as I understand it, the principle which Judge Diamond applied in the present case. He took the view that the contract was one "for the provision of a pleasurable

amenity". In the event, Mr Forsyth's pleasure was not so great as it would have been if the swimming pool had been 7 feet 6 inches deep. This was a view which the judge was entitled to take. If it involves a further inroad on the rule in Addis v Gramophone Co Ltd [1909] AC 488 , then so be it. But I prefer to regard it as a logical application or adaptation of the existing exception to a new situation.'

I do not regard this observation as throwing doubt on the applicability of Addis in a case such as the present. It is undoubtedly true that many breaches of contract, cause intense frustration and anxiety to the innocent party. I am not, however, persuaded on the argument presented on this appeal that the general applicability of Addis should be further restricted.

I would strike out Mr Johnson's claim for damages for mental distress and anxiety. I would also strike out his claim for aggravated damages: I see nothing in the pleaded facts which would justify any award beyond the basic compensatory measure of damages.

**Conclusion**

For these reasons I would allow Mr Johnson's appeal and dismiss GW's cross-appeal, save that I would strike out his claims (identified in (3) above) for pension payments and the enhanced value of his shareholding, and for damages for mental distress and anxiety and aggravated damages. I would order GW to pay Mr Johnson's costs before the Court of Appeal and the judge, and the costs of the appeal and the cross-appeal to this House.

Lord Goff of Chieveley:

**The appeal**

**Abuse of process**

On the question whether there was an abuse of process on the part of the appellant, Lord Bingham of Cornhill has reviewed the facts and the relevant authorities in lucid detail. I find myself to be in complete agreement with his analysis of the authorities, and with his conclusion that on the facts there was no abuse of process on the part of the appellant; and I do not propose to burden this opinion with a repetition of his reasoning. I only wish to add a few words on the separate question of estoppel, with regard to the nature of the estoppel on which the appellant could, if necessary, have relied.

**Estoppel**

The conclusion of the judge, and the contention of Mr ter Haar for the appellant, was that the relevant estoppel was estoppel by convention. Reliance was placed in particular on a well-known passage in the judgment of Lord Denning MR in Amalgamated Investment & Property Co Ltd v Texas Commerce International Bank Ltd [1982] QB 84 at p. 122, where he said:

'The doctrine of estoppel is one of the most flexible and useful in the armoury of the law. But it has become overloaded with cases. That is why I have not gone through them all in this judgment. It has evolved during the last 150 years in a sequence of separate developments proprietary estoppel, estoppel by representation of fact, estoppel by acquiescence, and promissory estoppel. At the same time it has been sought to be limited by a series of maxims: estoppel is only a rule of evidence, estoppel cannot give rise to a cause of action, estoppel cannot do away with the need for consideration, and so forth. All these can now be seen to merge into one general principle shorn of limitations. When the parties to a transaction proceed on the basis of an underlying assumption – either of fact or of law – whether due to misrepresentation

or mistake makes no difference – on which they have conducted the dealings between them – neither of them will be allowed **\*841** to go back on that assumption when it would be unfair or unjust to allow him to do so. If one of them does seek to go back on it, the courts will give the other such remedy as the equity of the case demands.'

from a promise or assurance, not effective as a matter of contract, as to future conduct or as to a state of affairs not yet in existence. And there is no reason to suppose that the doctrine will ever develop so far. To allow such an estoppel would amount to the abandonment of the doctrine of consideration, and to accord contractual effect to assurances as to the future for which no consideration has been given.'

This broad statement of law is most appealing. I yield to nobody in my admiration for Lord Denning; but it has to be said that his attempt in this passage to identify a common criterion for the existence of various forms of estoppel – he refers in particular to proprietary estoppel, estoppel by representation of fact, estoppel by acquiescence, and promissory estoppel – is characteristically bold; and that the criterion which he chooses, viz. that the parties to a transaction should have proceeded on the basis of an underlying assumption, was previously thought to be relevant only in certain cases (for example, it was adopted by Oliver J in his important judgment in Taylors Fashions Ltd v Liverpool Victoria Trustees Co Ltd [1982] QB 133 ) and, in particular, in the case of estoppel by convention, a species of estoppel which Lord Denning does not mention. Furthermore, if he intended that his broad statement of principle should apply in the case of estoppel by convention, a further problem arises in that, in relation to that doctrine, it has been authoritatively stated in Spencer-Bower & Turner, *Law Relating to Estoppel by Representation* , in the scholarly and much admired third edition (1977) by Sir Alexander Turner, at pp. 168–169, that:

'Just as the representation which supports an estoppel *in pais* must be a representation of *fact* , the assumed state of affairs which is the necessary foundation of an estoppel by convention must be an assumed state of facts presently in existence … No case has gone so far as to support an estoppel by convention precluding a party from resiling

I myself suspect that this statement may be too categorical; but we cannot ignore the fact that it embodies a fundamental principle of our law of contract. The doctrine of consideration may not be very popular nowadays; but although its progeny, the doctrine of privity, has recently been abolished by statute, the doctrine of consideration still exists as part of our law.

I myself was the judge of first instance in the Amalgamated Property Co v Texas Bank case. I remember the doctrine of estoppel by convention being urged upon me; but the case was concerned with the scope of a guarantee, which was a matter of law, and, in the light of the passage in Spencer-Bower & Turner which I have just quoted, I hesitated to adopt the doctrine. Cautiously, and I still think wisely, I founded my conclusion on a broader basis of unconscionability. In the Court of Appeal, however, both Eveleigh LJ and Brandon LJ expressly founded the relevant parts of their judgments on the doctrine of estoppel by convention. They did so relying on the statement of principle from Spencer-Bower and Turner which I have already cited, which limits the doctrine to cases where there has been an agreed assumption as to *facts* , but nevertheless applied that statement to a case where the agreed assumption (as to the scope of the guarantee) was one of law. If Lord Denning's statement of principle is to be read as applying to the case of estoppel by convention, he implicitly rejected the statement of the law in Spencer-Bower & Turner, holding that there could be an estoppel whether the common underlying assumption was one of fact or of law.

WESTLAW    © 2017 Thomson Reuters.

I accept that in certain circumstances an estoppel may have the effect of enabling a party to enforce a cause of action which, without the estoppel, would not exist. Examples are given in my judgment in Amalgamated Property Co v Texas Bank [1982] QB 84 at pp. 105–107. But in my opinion it is not enough for that purpose that the estoppel may be characterised as an estoppel by convention, or that it can be said to be founded upon a common assumption by the parties.

**\*842**

Against this background I am, despite my great admiration for Lord Denning, reluctant to proceed on the basis of estoppel by convention in the present case. The function of the estoppel is here said to be to preclude the respondent firm from contending that Mr Johnson, by personally advancing a separate claim to damages against the respondent firm instead of doing so at the same time as pursuing his company's claim, was abusing the process of the court. That, as I see it, must relate to a matter of law. It could, however, be appropriate subject matter for an estoppel by representation, whether in the form of promissory estoppel or of acquiescence, on account of which the firm is, by reason of its prior conduct, precluded from enforcing its strict legal rights against Mr Johnson (to claim that his personal proceedings against the firm constituted an abuse of the process of the court). Such an estoppel is not, as I understand it, based on a common underlying assumption so much as on a representation by the representor that he does not intend to rely upon his strict legal rights against the representee which is so acted on by the representee that it is inequitable for the representor thereafter to enforce those rights against him. This approach, as I see it, is consistent with the conclusion of Lord Millett, who considers that the firm would be so precluded by virtue of its acquiescence in the manner in which Mr Johnson had conducted the litigation hitherto. In the context of the present case, moreover, I can see no material difference between invoking promissory estoppel or acquiescence as the ground on which the respondent firm should be precluded from asserting that the appellant had abused the process of the court. The truth of the matter is that the respondent firm, by its conduct and in particular by participating in negotiations for settlement of the company's claim against it on the basis that Mr Johnson would thereafter be free to pursue his own personal claim against it,

lulled Mr Johnson into a sense of security that he was free to pursue such a claim against the firm, without objection, in separate proceedings, with the effect that it became unconscionable for the firm to contend that his personal proceedings constituted an abuse of the process of the court. In the end, I am inclined to think that the many circumstances capable of giving rise to an estoppel cannot be accommodated within a single formula, and that it is unconscionability which provides the link between them.

For these reasons I would, like the remainder of your Lordships, allow the appeal; and I now turn to the cross-appeal of the respondent firm.

### The cross-appeal.

Here the question is whether certain heads of claim advanced by the appellant, Mr Johnson, against the respondent firm, should be struck out. The relevant heads of claim are usefully recorded in the opinion of Lord Bingham of Cornhill. I do not propose to repeat them in this opinion. The Court of Appeal held that each of the heads of damage pleaded in para. 23 and 24 of the re-amended statement of claim is recoverable as a matter of law by the appellant by way of damages for the breaches of duty pleaded by him, and so should not be struck out. It is against that decision that the respondent firm now cross-appeals to your Lordships' House.

The principal ground on which it is said by the respondent firm that some of these heads of claim should be struck out is derived from the well-known case of Prudential Assurance Co Ltd v Newman Industries Ltd [1982] Ch 204 . I agree with the analysis of that case, and of the other cases following upon it, set out in the opinion of Lord Millett (which I have had the opportunity of reading in draft). I accordingly agree with his conclusion that (at p. 863A below):

> 'On the assumption which we are bound to make for the purpose of this appeal, which is that the firm was in breach of a duty of care owed to Mr Johnson personally, he is in principle entitled to recover damages in respect of all heads

of non-reflective consequential loss
which are not too remote.'

On that basis I, like Lord Millett, agree with Lord
Bingham of Cornhill that the heads of damage specified
by him as items (1), (2), (4) and (5) are unobjectionable
and should not be struck out. Item (3) relates to the
diminution in value of the appellant's pension policy
set up by the company and accruing to the benefit of
the appellant as part of his remuneration in his **843**
capacity as director of the company. In so far as the
claim relates to payments which the company would
have made into a pension fund for the appellant, I agree
that the claim is merely a reflection of the company's
loss and should therefore be struck out. But in so far as
it relates to enhancement of the value of his pension if
the payments had been made, it is unobjectionable and
should be allowed to stand.

The second ground relates to the appellant's claims
for general damages for mental distress, and for
aggravated damages based on the fact that the manner
of commission of the respondent firm's wrong was
'such as to injure his pride and dignity'. I agree
with Lord Bingham of Cornhill that, as a matter of
principle, damages on these grounds are not generally
recoverable: see Addis v Gramophone Co [1909] AC
488 ; Watts v Morrow [1991] 1 WLR 1421 at p.
1445, per Bingham LJ; McGregor on Damages (16th
edn, 1997, Sweet & Maxwell), para. 98–104. It is
true that there has in recent years been a softening
of this principle in certain respects (see McGregor
on Damages and Mahmud v Bank of Credit and
Commerce International SA [1998] AC 20 ), but none of
these developments has, so far as I can see, gone so far
as to allow recovery on the broad grounds here pleaded.
I also would therefore strike out these two heads of
claim.

For these reasons, I agree with the order proposed by
Lord Bingham of Cornhill as to the disposal of both the
appeal and the cross-appeal. I also would agree with the order
proposed by him as to costs.

Lord Cooke of Thorndon:

Having had the advantage of reading in draft the
speech of Lord Bingham of Cornhill, I agree with
all that he says on the subject of abuse of process.
The course adopted by the parties of settling Westway
Homes Ltd's claim against Gore Wood & Co, but
leaving open any personal claim by Mr Johnson against
the same solicitors, subject to a cap on certain heads
of damages and an undertaking concerning personal
guarantees, strikes me as a sensible one: the personal
claim against the solicitors plainly involves different
and more difficult issues. The belated raising by the
defendants of the contention, more ingenious than
realistic, that the settlement had the effect of preventing
the personal claim seems to me closer to abuse of
process than the plaintiff's conduct in pursuing the
claim. The defendants are saved from that stigma by the
acceptance of their contention by the Court of Appeal,
but I agree that on this part of the case the appeal of the
plaintiff must be allowed.

On the recoverability of personal damages, I have much
more difficulty, for the following reasons. It will be
convenient to deal first with the claim for quantifiable
financial loss, secondly with the claim based on other
forms of suffering.

**Damages for quantifiable financial loss**

As the present is an action by one claiming to be a
personal client against solicitors, not an action by a
shareholder against a company and directors, the case
of Prudential Assurance Co Ltd v Newman Industries
Ltd (No. 2) [1982] Ch 204 , including the well-known
passage at pp. 222–223, has only a limited bearing.
The cash box illustration given by the Court of Appeal
(Cumming-Bruce, Templeman and Brightman LJJ) is
not helpful in this case because it does not envisage any
loss except of the company's £100,000. It is by no means
self-evident that, if the controlling shareholder had lost
a valuable business opportunity for want of prompt
access to the company's money, he would have been
unable to recover damages for that loss caused by the
defendant's deceit and theft of the cash box. The court
did give as a possible instance of a recoverable personal
loss the cost caused to the shareholder in consequence
of a fraudulent circular, such as the cost of attending
a meeting; but this single specific example is not fully
illuminating. Nothing that I am about to say involves
any criticism of the decision in the Prudential case or

anything said in it. My point is simply that it was not concerned with the kind of issue arising in the present case and contains no observations about this kind of issue. The same applies to Stein v Blake [1998] BCC 316 .

**\*844**

I respectfully agree that the three numbered propositions set out in the speech of Lord Bingham of Cornhill are supported by the English authorities cited by him. But these authorities and the propositions are not comprehensive. Nor, as my noble and learned friend also indicates, do they resolve the crucial question arising on a strike-out application in a case such as the present. This is a case about solicitors' negligence. The English authorities cited include only one relating to the not uncommon situation of a solicitor acting both for a client personally and for a company controlled by the latter. This is R P Howard Ltd and Richard Alan Witchell v Woodman, Matthews & Co (a Firm) [1983] BCLC 117 . In that case the solicitor was negligent in failing to initiate a timely application for statutory protection of the company's lease. The company negotiated with the landlord a new lease on terms less favourable than could have been obtained with the bargaining power of an extant application (loss A). The new lease also stipulated that the shareholder could not sell his shares without the landlord's consent (loss B). Against the solicitor Staughton J awarded the company loss A and the shareholder loss B. Although it flowed from the company's loss of bargaining power, loss B was not suffered by the company. So, too, in the present case Mr Johnson claims that at least the greater part of the losses for which he sues were not suffered by the company.

As the report of Christensen v Scott [1996] 1 NZLR 273 may not be readily available in England, it is as well to reproduce here the whole of the relevant passage in the judgment of the Court of Appeal delivered by Thomas J. I must not conceal that I was a member of the court of five on behalf of whom the judge spoke, although I confess to little independent recollection of the case. It was a case in which the defendants, firms of chartered accountants and solicitors, acted for the plaintiffs personally and in the course of doing so advised on channelling their assets into a company taking a lease of farm land. Naturally the defendants came to act for the company as well. By reason of alleged negligence on the part of the defendants

the consent of the landlord's mortgagees was not obtained, nor was a caveat registered against the title. Consequently the land was lost and the company failed. The company's claim against the defendants was settled by the liquidator for a sum alleged by the plaintiffs to be totally inadequate. The Court of Appeal held that the personal claims should not be struck out before trial. Thomas J said at pp. 280–281:

> 'We do not need to enter upon a close examination of the Newman Industries decision. It has attracted not insignificant and, at times, critical comment. See e.g. L C B Gower, *Gower's Principles of Modern Company Law* (5th edn, 1992) at pp. 647–653; L S Sealy, "Problems of Standing, Pleading and Proof in Corporate Litigation" in *Company Law in Change* (Ed, B G Pettet, 1987) at p. 1 especially at pp. 6–10; and M J Sterling, "The Theory and Policy of Shareholder Actions in Tort" (1987) 50 MLR 468 , especially at pp. 470–474. It may be accepted that the Court of Appeal was correct, however, in concluding that a member has no right to sue directly in respect of a breach of duty owed to the company or in respect of a tort committed against the company. Such claims can only be bought by the company itself or by a member in a derivative action under an exception to the rule in Foss v Harbottle (1843) 2 Hare 461; 67 ER 189 . But this is not necessarily to exclude a claim brought by a party, who may also be a member, to whom a separate duty is owed and who suffers a personal loss as a result of a breach of that duty. Where such a party, irrespective that he or she is a member, has personal rights and these rights are invaded, the rule in Foss v Harbottle is irrelevant. Nor would the claim necessarily have the calamitous consequences predicted by counsel in respect of the concept

of corporate personality and limited liability. The loss arises not from a breach of duty owed to the company but from a breach of duty owed to the individuals. The individual is simply suing to vindicate his own right or redress a wrong done to him or her giving rise to a personal loss.

We consider, therefore, that it is certainly arguable that, where there is an independent duty owed to the plaintiff and a breach of that duty occurs, the resulting loss may be recovered by the plaintiff. The fact that the loss may also be suffered by the company does not mean that it is not also a personal loss to the individual. Indeed, the diminution **\*845** in the value of Mr and Mrs Christensen's shares in the company is by definition a personal loss and not a corporate loss. The loss suffered by the company is the loss of the lease and the profit which would have been obtained from harvesting the potato crop. That loss is reflected in the diminution in the value of Mr and Mrs Christensen's shares. They can no longer realise their shares at the value they enjoyed prior to the alleged default of their accountants and solicitors. (For a discussion of the policy issues which arise in considering these questions, see Sterling (supra) at pp. 474–491.)

In circumstances of this kind the possibility that the company and the member may seek to hold the same party liable for the same loss may pose a difficulty. Double recovery, of course, cannot be permitted. The problem does not arise in this case, however, as the company has chosen to settle its claim. Peat Marwick and McCaw Lewis accepted a compromise in the knowledge that Mr and Mrs Christensen's claim was outstanding. It may well be, as was acknowledged by Mr Pidgeon in the course of argument, that an allowance will need to be made for the amount already paid to the liquidator in settlement of the company's claim.

It is to be acknowledged, however, that the problem of double recovery may well arise in other cases. No doubt, such a possibility is most likely with smaller private companies where the interrelationship between the company, the directors and the shareholders may give rise to independent duties on the part of the professional advisers involved. But the situation where one defendant owes a duty to two persons who suffer a common loss is not unknown in the law, and it will need to be examined in this context. It may be found that there is no necessary reason why the company's loss should take precedence over the loss of the individuals who are owed a separate duty of care. To meet the problem of double recovery in such circumstances it will be necessary to evolve principles to determine which party or parties will be able to seek or obtain recovery. A stay of one proceeding may be required. Judgment, with a stay of execution against one or other of the parties, may be in order. An obligation to account in whole or in part may be appropriate. The interest of creditors who may benefit if one party recovers and not the other may require consideration. As the problem of double recovery does not arise in this case, however, it is preferable to leave an examination

of these issues to a case where that problem is squarely in point.

Essentially, Mr and Mrs Christensen are alleging that as a result of Peat Marwick and McCaw Lewis's breach of duty owed to them personally they suffered a personal loss, that is, a reduction in the value of their assets. Their assets in this case had been channelled into their company. Thus, it is arguable that the diminution in the value of their shareholding is the measure of that loss. It may well be that when the evidence is heard it will be apparent that Mr and Mrs Christensen's claim is inflated, but that is a matter for the trial.

We are not prepared to hold at this stage that they do not have an arguable case to recover damages for the breach of an acknowledged duty.'

When that passage is read as a whole, two features will be noted. It will be seen not only that the whole passage is throughout guarded and provisional, but also that the court recognised both that double recovery cannot be permitted and that the interests of creditors may require consideration. In this field, if a client is suing his own solicitor, it would appear that only the problems of double recovery or prejudice to the company's creditors would justify denying or limiting the right to recover personal damages which, on ordinary principles of foreseeability, would otherwise arise. One other observation should be made about the passage in Thomas J's judgment. Although he did mention that Prudential had not gone without criticism, he did not find it necessary to examine that case closely. I would repeat that in no way am I criticising it. On the contrary I accept it to the full.

*846

The next closest of the English reported cases cited is Barings plc (in administration) v Coopers & Lybrand [1997] BCC 498 at p. 504. In that case (arising from the activities of Mr Leeson) a UK company was suing the auditors of its Singapore subsidiary; the auditors were also responsible for supplying audit information for the group accounts. On a pre-trial appeal, Leggatt LJ stated the law in terms which, albeit briefer, are much the same as those of Thomas J in Christensen v Scott , which case was cited by Leggatt LJ.

Gerber Garment Technology Inc. v Lectra Systems Ltd [1997] RPC 443 is more distant from the present case on the facts. It was a suit for infringement of patents in which some of the lost profits for which the plaintiff company claimed damages were suffered by subsidiary companies in which it held all the shares. The decision was that, when a shareholder has a cause of action but his company has none, he can recover damages measured by the reduction in value of his shareholding; but that the plaintiff must prove the amount of his own loss and that it cannot be assumed that this is the same as the loss suffered by the company. Such relevance as the case has lies in the reasoning of Hobhouse LJ in the Court of Appeal. At p. 474 he described Christensen v Scott as 'a good illustration of the application of the relevant principles'. After an extensive quotation from the judgment in that case, he added at p. 475:

'There is no reason to suppose that this case would have been differently decided in England. The decision helpfully illustrates that, provided that the plaintiff can establish a personal cause of action and can prove a personal loss caused by the defendant's actionable wrong, then the fact that the loss is felt by the plaintiff in the form of the loss of the value of the plaintiff's shares in a company is no answer to the plaintiff's claim. (In that case, as in the present case, no question of remoteness arose.)'

Thus Christensen v Scott does not appear to have caused problems for English judges hitherto, and I would hope that this position might continue. But it is necessary to add some further discussion of principle, as on the facts the present case is not on all fours with that case or any of the others cited in argument.

Assuming that this is a fairly typical case of a man carrying on business wholly or partly through a company or companies controlled by him, the first question at a trial will be whether Gore Wood & Co owed duties to Mr Johnson personally as well as to Westway Homes Ltd. Such personal duties could arise from a contract of retainer or in tort because of the closeness of relations ('proximity'), or from both sources concurrently. Henderson v Merrett Syndicates Ltd [1994] CLC 918; [1995] 2 AC 145 finally established in English law the legitimacy of recognising that professional advisers may owe to the same client a duty to exercise reasonable care and skill derived from both contract and tort law. Conceivably the rules as to remoteness or the measure of damages could produce different consequences; but in the interests of justice and the clarity of the law this should obviously be avoided unless forced upon the courts. The duty in such a case is most simply seen as a civil law obligation to conform to professional standards. In the argument it was not suggested that for the purposes of this appeal there is any material difference.

Although more elaborately pleaded here, the duty owed to the personal claimant would be to exercise reasonable care and professional skill in handling the legal side of his affairs and those of his relevant company. In this case it would include the elementary responsibility of exercising efficiently the company's option to purchase Mr Moores' land, on the basis that the risk of personal loss to Mr Johnson from a questionable exercise of the option was reasonably foreseeable by Gore Wood & Co. The duty was one of taking reasonable steps to safeguard his interests, not one of indemnity. Subject to that important qualification, there is some analogy with a contract of insurance When a solicitor is acting for both a shareholder personally and his company, the essence of the personal relationship is that the individual looks to the solicitor for care to provide personal financial protection.

That brings the discussion to what is perhaps the crucial point in this case. The required degree of personal protection will extend, I think, to protection against the operation of rules of **\*847** law that might foreseeably restrict the individual's right to recover damages if no duty were owed to him personally by the solicitor. In cases of the present class, two such rules may be relevant among other factors. One may be called the rule in Prudential v Newman Industries , using that as a shorthand to convey that a shareholder in a company has as such no right to recover from a third party damages for breach of the latter's duty to the company. The other may be called the rule in The Lips , using that as shorthand for the proposition in Lips Maritime Corp v President of India [1988] AC 395 at p. 425 per Lord Brandon of Oakbrook:

> 'There is no such thing as a cause of action in damages for late payment of damages. The only remedy which the law affords for delay in paying damages is the discretionary award of interest pursuant to statute.'

But for the solicitor's duty owed to the individual client, such restrictions could result in inability on the part of the latter to recover damages caused to him by the solicitor's negligence. Thus in the present case, whereas the option should have been exercised in a questionable manner in February 1988, it was not until more than four years later that the land was belatedly conveyed to Westway Homes Ltd, and not until a further period of about eight months had elapsed that the company obtained a monetary settlement of its claim against the solicitors.

Mr Johnson alleges (inter alia) that in the meantime the property market had collapsed, the development project had ceased to be financially advantageous, and he had incurred very high interest charges for personal borrowings. To the extent that he can establish at a trial that the delay in the obtaining by the company of the land or monetary compensation was caused or materially contributed to by negligence on the part of the defendant solicitors, there would appear to be no sound reason for denying him personal relief for

any damages foreseeably caused to him personally by the delay: provided always that double recovery is not sanctioned and the interests of the company's creditors are protected.

While double recovery has to be avoided, at this pre-trial stage I would not rule out the possibility that, on the close scrutiny at trial spoken of by Lord Bingham of Cornhill, it will be found that the ultimate agreed payment to the company was not intended to and did not in fact adequately compensate Mr Johnson for the company's want of title to the land in early 1988. It may be chiefly a matter of the timing. The rule in The Lips would not exclude the plaintiff's personal claim; he is not claiming damages for delay in paying damages to him. Rather he is claiming damages for the fact that his company did not have the land in 1988 – a claim outside the provenance and the purview of the rule in The Lips .

Thus the true scope of the settlement in 1992 is one of the matters requiring examination. In the instant case the settlement covered a very large part of the company's claim. It may well have been a reasonable settlement, reached after having due regard to the interests of the company's creditors, who could not successfully claim that more should have been recovered. There may nevertheless be some possibility that, in addition to any other right to personal damages that he may have against the solicitors, Mr Johnson could be heard to say against them that in any event he should be compensated for his company not having recovered fully. Such a possibility may be more significant in a case like Christensen v Scott where the shareholder has opposed and complains of the inadequacy of the company's settlement; but I do not think that it can be ignored in the present case at this stage.

In a company winding up the liquidator may be liable to the company for negligence on his part in making a compromise: see Re Windsor Steam Coal Co (1901) Ltd [1929] 1 Ch 151 ; Re Home & Colonial Insurance Co Ltd [1930] 1 Ch 102 . Accordingly I think that in cases within that principle the court should avoid sanctioning not only double recovery, but also any real prospect of double recovery. As this aspect was not explored in argument, it need not now be explored further.

Apart from the question of any shortfall in the company's recovery, I think that Mr Johnson could have a good personal claim against the solicitors for compensation on the basis already stated, that is to say on the basis that the damages claimed by him were not suffered by the company. Accordingly I agree with Lord Bingham that the claimed heads of damages **848 numbered in his speech (1), (2), (4) and (5) should not be struck out before trial, and that the same applies to the part of head (3) relating to the enhancement of the value of Mr Johnson's pension if the payments had been duly made. I am rather less clear that the remaining parts of head (3) should be struck out. Certainly, however, these claims relating to lost payments into a pension fund or retention of corresponding amounts in the company's assets look very much like claims for double recovery. As the other members of your Lordships' Appellate Committee are in no doubt that they should be struck out, I am content to concur in that conclusion.

In short, agreeing that at the strike-out stage any reasonable doubt must be resolved in favour of the claimant, I think it safer to avoid fine distinctions, especially before trial; and, with the very limited exceptions just mentioned, to leave all the extant claims in this case of complicated facts open for examination at trial. The open questions would include remoteness. And I would add one other cautionary remark. The trial judge would have to consider, not only issues of double recovery by Mr Johnson and the company, but also any issue of overlapping among Mr Johnson's claims themselves.

### Damages for general suffering

In Watts v Morrow [1991] 1 WLR 1421 at p. 1445, Bingham LJ said:

> 'A contract-breaker is not in general liable for any distress, frustration, anxiety, displeasure, vexation, tension or aggravation which his breach of contract may cause to the innocent party. This rule is not, I think, founded on the assumption that such reactions are not foreseeable, which they surely

are or may be, but on considerations of policy.

But the rule is not absolute. Where the very object of a contract is to provide pleasure, relaxation, peace of mind or freedom from molestation, damages will be awarded if the fruit of the contract is not provided or if the contrary result is procured instead. If the law did not cater for this exceptional category of case it would be defective. A contract to survey the condition of a house for a prospective purchaser does not, however, fall within this exceptional category. In cases not falling within this exceptional category, damages are in my view recoverable for physical inconvenience and discomfort caused by the breach and mental suffering directly related to that inconvenience and discomfort. If those effects are foreseeably suffered during a period when defects are repaired I am prepared to accept that they sound in damages even though the cost of the repairs is not recoverable as such. But I also agree that awards should be restrained, and that the awards in this case far exceeded a reasonable award for the injury shown to have been suffered. I agree with the figures which Ralph Gibson LJ proposes to substitute.'

I regard that as an authoritative statement of the present law of England regarding commercial contracts. The exceptional category is not confined, in my view, to contracts to provide pleasure and the like. For example, breaches of contracts for status such as membership of a trade union or a club may carry damages for injured feelings; but it is unnecessary to go into that area

further, as I accept that, if there was a contract between Mr Johnson and Gore Wood & Co, it is to be classified in English law as commercial in the sense that damages for mere distress are not available. Contract-breaking is treated as an incident of commercial life which players in the game are expected to meet with mental fortitude. For present purposes it may be assumed that the same principle applies in so far as the claim is grounded in tort: see Hayes v James & Charles Dodd (a Firm) [1990] 2 All ER 815 at pp. 826–827 per Purchas LJ. A fuller discussion of these various matters can be found in Mouat v Clark Boyce [1992] 2 NZLR 559 (a stage of the litigation not under consideration by the Privy Council in Clark Boyce v Mouat [1994] 1 AC 428 ).

But that does not quite dispose of Mr Johnson's claim for non-quantifiable damage. He alleges extreme financial embarrassment; it is said that from a state of some prosperity he was **\*849** reduced to subsistence on social security benefit. He also alleges deterioration in his family relationships, particularly with his wife and son. Although the pleader has treated them as mental distress, such consequences are in truth significantly more than mental distress. They are more akin to the physical inconvenience and discomfort referred to in Bingham LJ's third paragraph. In my opinion the common law would be defective and stray too far from reality, humanity and justice if it remorselessly shut out even a restrained award under these heads. Hence I would leave the claim in this part of the case standing also, although only on the footing that damages could not be awarded merely for injured feelings, nor could aggravated damages be awarded merely on that account.

English case law has fluctuated as to the recoverability of damages in contract for mental distress, as is detailed in McGregor on Damages (16th edn, 1997, Sweet & Maxwell), para. 98–106. See also Dr Harvey McGregor's preface at pp. vii to viii. But it has been established since Victorian times that, by contrast with mere mental distress, damages are recoverable for substantial inconvenience and discomfort. Thus in Hobbs v London and South Western Railway Co (1875) LR 10 QB 111 a court including Cockburn CJ and Blackburn and Mellor JJ upheld an award to a husband and wife for the inconvenience of having to walk home with young children four or five miles late on a drizzling night, although the wife's catching of a cold

was found too remote. That case was applied by Barry
J in Bailey v Bullock [1950] 2 All ER 1167 in awarding
damages against solicitors for the inconvenience to the
plaintiff of having to live in an overcrowded house. Such
authorities are treated in McGregor , para. 93–96, as
surviving the recent restriction of damages for mental
distress. The third paragraph already quoted from
Bingham LJ in Watts v Morrow is largely supported by
them. The line may not always be easy to draw, and it
is particularly difficult before trial to assess the weight
of the claims in the present case. But both a changed
way of life because of poverty and damaged family
relationships can be grievous forms of non-pecuniary
harm. I am respectfully unable to agree that they should
be ruled out of the law's purview.

Before parting with the case I would say something
about Addis v Gramophone Co [1909] AC 488 . In
severely confining damages for wrongful dismissal,
your Lordships' House of those days appears to have
seen the relationship of employer and employee as no
more than an ordinary commercial one. This is a world
away from the concept now, and in Mahmud v Bank of
Credit and Commerce International SA (in liq.) [1998]
AC 20 the House accepted that there is an implied
obligation of mutual trust and confidence, and that
an employer is under an implied obligation that he
will not, without reasonable and proper cause, conduct
his business in a manner likely to destroy or seriously
damage that relationship. Damages for financial loss,
including impaired employment prospects, caused by
harm to reputation could be recovered. It is true
that Addis was distinguished on the ground that it
related to injury to feelings caused by the manner of
termination of the relationship, which question did not
arise in Mahmud: see Lord Nicholls of Birkenhead at
p. 38 and Lord Steyn at p. 51. But the philosophy
is altogether different, as is the philosophy embodied
in modern employment legislation. Again, as Lord
Bingham has pointed out, Addis was not applied in
Ruxley Electronics and Construction Ltd v Forsyth
[1996] AC 344 . Addis has not uniformly been followed
in the Commonwealth: see Brown v Waterloo Regional
Board of Commissioners of Police (1982) 136 DLR (3d)
49 , a judgment of Linden J (the author of Canadian Tort
Law , now in its sixth edition). The decision was reversed
on other grounds, but Linden J's statements of principle
were substantially accepted: (1983) 150 DLR (3rd) 729 .
According to that authority, an employee wrongfully

dismissed may recover damages for mental distress in
some circumstances. To the same effect is Whelan v
Waitaki Meats Ltd [1991] 2 NZLR 74 , which contains
an instructive survey of the authorities by Gallen J. I
take leave to doubt the permanence of Addis in English
law. But it is not a question arising in the present case
either; I make these observations only to avoid being
identified with any approbation of Addis .

For the reasons already given, I would allow Mr
Johnson's appeal and would dismiss the cross-appeal
except as to the two claims identified by Lord Bingham
of Cornhill in his head (3)  *850  and as to aggravated
damages. In the result the one point on which I
differ concerns the claims for damages for financial
embarrassment and injury to family relationships: those
I would permit to go to trial. I concur in the order for
costs proposed by Lord Bingham of Cornhill.

Lord Hutton:

I have had the advantage of reading in draft the speech
of Lord Bingham of Cornhill. I am in full agreement
with his speech on the subject of abuse of process and
I wish to confine my observations to the issue whether
the damages claimed by Mr Johnson are recoverable as
a matter of law.

The case advanced by Mr Johnson is that he instructed
a firm of solicitors, Gore Wood & Co ('GW'), to advise
him personally as to the conduct of his businesses,
including the business of property development which
he carried on through a company Westway Homes
Ltd ('WWH') of which he was the managing director
and in which he held the entire shareholding with the
exception of two shares, and that acting on behalf of
WWH he also instructed GW to advise that company.
He contends that in advising him as to the business
affairs of the company, GW owed him a duty of care in
contract and tort and in breach of that duty caused him
very substantial financial loss. The question whether
the damages claimed are recoverable comes before the
House as a preliminary issue and is to be approached
on the basis that the facts pleaded by Mr Johnson are
capable of establishing a breach of a duty owed to him
which caused him loss.

I consider it to be clear that where a shareholder is personally owed a duty of care by a defendant and a breach of that duty causes him loss, he is not debarred from recovering damages because the defendant owed a separate and similar duty of care to the company, provided that the loss suffered by the shareholder is separate and distinct from the loss suffered by the company. This principle was recently stated in the judgment of the Court of Appeal delivered by Sir Christopher Slade in Walker v Stones [2001] B.C.C. 757 , the court stating (p. 778C–E) that a claimant is entitled to recover damages where:

'(a) the claimant can establish that the defendant's conduct has constituted a breach of some legal duty owed to him personally (whether under the law of contract, torts, trusts or any other branch of the law) AND

(b) on its assessment of the facts, the court is satisfied that such breach of duty has caused him personal loss, separate and distinct from any loss that may have been occasioned to any corporate body in which he may be financially interested.

I further conclude that, if these two conditions are satisfied, the mere fact that the defendant's conduct may also have given rise to a cause of action at the suit of a company in which the claimant is financially interested (whether directly as a shareholder or indirectly as, for example, a beneficiary under a trust) will not deprive the plaintiff of his cause of action; in such a case, a plea of double jeopardy will not avail the defendant.'

But a more difficult question arises where the shareholder claims a loss which is not separate and distinct from the loss suffered by the company but his loss flows from loss suffered by the company. In Prudential Assurance Co Ltd v Newman Industries Ltd (No. 2) [1982] Ch. 204 , the claimants sued the directors of the company alleging that they had issued a circular to the shareholders containing a fraudulent misrepresentation concerning the true value of certain assets, and the court stated at pp. 222h and 223a–b:

'But what [a shareholder] cannot do is to recover damages merely because the company in which he is interested has suffered damage. He cannot recover a sum equal to the diminution in the market value of his shares, or equal to the likely diminution in dividend, because such a "loss" is merely a reflection of the loss suffered by the company. The shareholder does not suffer any personal loss. His only "loss" is through the company, in the diminution in the value of the net assets of the company, in which he has (say) a 3 per cent shareholding. The plaintiff's shares are merely a right of participation in the company on the terms of the articles of association. The shares **851** themselves, his right of participation, are not directly affected by the wrongdoing. The plaintiff still holds all the shares as his own absolutely unencumbered property. The deceit practised upon the plaintiff does not affect the shares; it merely enables the defendant to rob the company.'

I shall call this statement 'the Prudential Assurance principle'.

In Christensen v Scott [1996] 1 NZLR 273 the Court of Appeal of New Zealand decided that where a plaintiff alleges a breach of duty owed to him personally by accountants and solicitors he is entitled to recover

WESTLAW  © 2017 Thomson Reuters.

damages notwithstanding that his loss flows from loss suffered by a company in which he is a shareholder through a similar breach of duty owed to the company. In that case two shareholders claimed damages for the diminution in the value of their shareholding in a company caused by the negligence of their accountants and solicitors. In delivering the judgment of the court, after setting out part of the above passage in the judgment in Prudential Assurance Thomas J stated at p. 280:

> 'It may be accepted that the Court of Appeal was correct, however, in concluding that a member has no right to sue directly in respect of a breach of duty owed to the company or in respect of a tort committed against the company. Such claims can only be bought by the company itself or by a member in a derivative action under an exception to the rule in Foss v Harbottle (1843) 2 Hare 461; 67 ER 189 . But this is not necessarily to exclude a claim brought by a party, who may also be a member, to whom a separate duty is owed and who suffers a personal loss as a result of a breach of that duty. Where such a party, irrespective that he or she is a member, has personal rights and these rights are invaded, the rule in Foss v Harbottle is irrelevant. Nor would the claim necessarily have the calamitous consequences predicted by counsel in respect of the concept of corporate personality and limited liability. The loss arises not from a breach of the duty owed to the company but from a breach of duty owed to the individuals. The individuals is simply suing to vindicate his own right or redress a wrong done to him or her giving rise to a personal loss.

> We consider, therefore, that it is certainly arguable that, where there

is an independent duty owed to the plaintiff and a breach of that duty occurs, the resulting loss may be recovered by the plaintiff. The fact that the loss may also be suffered by the company does not mean that it is not also a personal loss to the individual. Indeed, the diminution in the value of Mr and Mrs Christensen's shares in the company is by definition a personal loss and not a corporate loss.'

The approach taken by the Court of Appeal of New Zealand has been approved in a number of judgments of the Court of Appeal. In Barings plc v Coopers & Lybrand [1997] BCC 498 the plaintiff, a company holding shares in a subsidiary company, claimed damages against the defendants ('C&LS'), a firm of accountants, in respect of loss it suffered through loss sustained by its subsidiary, 'BFS', on the ground that the defendants were in breach of duties of care owed both to the plaintiff and to the subsidiary in carrying out an audit of the subsidiary's accounts. The defendants applied to set aside service of the writ in reliance on the Prudential Assurance principle. The defendants' application was rejected by the Court of Appeal and Leggatt LJ stated at p. 504G:

> 'The Prudential Assurance case decides that a shareholder in a company has no independent right of action based on an allegation of diminution in the value of his shares occasioned by damage to the company. Mr Kentridge seeks to rely on it as authority for the proposition that where a company may have a cause of action for damage caused to it by a tortfeasor, a person who enjoys an independent right of action against the tortfeasor cannot sue him at least in so far as his damages are measured by a diminution in the value of the company's shares. But in my

judgment that is a misapplication of the principle. If C&LS are in breach of a duty of care owed to Barings in respect of audit information supplied to them and the breach causes damage, Barings **\*852** cannot be disentitled from suing merely because the damages for which C&LS are said to be liable to Barings would or might include damages for which they are said to be liable to BFS. For C&LS are also in breach of a different duty, whether contractual or tortious, owed to BFS. Whereas complications might arise if these claims were made in separate actions, any risk of double jeopardy or of double recovery, such as were envisaged by the New Zealand Court of Appeal in Christensen v Scott [1996] 1 NZLR 273 at pp. 280–281, can be avoided if both claims are made in the same action. It may be, for instance, that C&LS are not liable to Barings for loss of the value of the shares in either BFS or any company which has a cause of action against C&LS for such loss.

The present case differs from the Prudential Assurance case because here the person in the position of shareholder, namely Barings, has a right of action independent of the company, BFS. On the other hand, unlike the situation in the George Fischer case, BFS does have a right of action itself. As that case shows, there is no legal principle that a holding company is unable to recover damages for loss in the value of its subsidiaries, resulting directly from a breach of duty owed to it, as distinct from a duty owed (or not owed as the case may be) to the subsidiaries.'

In Gerber Garment Technology Inc v Lectra Systems Ltd [1997] RPC 443 the plaintiff was entitled to damages for infringement of patent rights held by it and sought to recover damages for losses suffered by subsidiary companies in which it held all the shares, and which themselves had no cause of action, and the defendant contended that the claim was barred by the Prudential Assurance principle. That argument was rejected by the Court of Appeal and Hobhouse LJ cited the judgment of the Court of Appeal of New Zealand in Christensen v Scott and stated at p. 475:

> 'There is no reason to suppose that this case would have been differently decided in England. The decision helpfully illustrates that, provided that the plaintiff can establish a personal cause of action and can prove a personal loss caused by the defendant's actionable wrong, then the fact that the loss is felt by the plaintiff in the form of the loss of the value of the plaintiff's shares in a company is no answer to the plaintiff's claim. (In that case, as in the present case, no question of remoteness arose.)'

The judgments in Prudential Assurance and Christensen v Scott are difficult to reconcile, and it is also difficult to reconcile the judgment in Barings v Coopers & Lybrand with the judgment in the former case because the ground on which Leggatt LJ sought to distinguish it, namely, that in Prudential Assurance the shareholders did not have an individual right of action is invalid, the court in Prudential Assurance stating ([1982] Ch 204) at p. 222g that the defendants owed the shareholders a duty to give sound advice. Gerber Garment Technology can be distinguished from Prudential Assurance on the ground that the companies in which the plaintiff held shares did not themselves have a cause of action against the defendant. But I consider that the ruling in Prudential Assurance that

the shareholders could not recover damages cannot be explained on the ground of causation, which was the explanation advanced by Hobhouse LJ ( [1997] RPC 443 ) at p. 471; I think, in agreement with the Court of Appeal of New Zealand in Christensen v Scott , that the shareholders can be regarded as suffering a loss caused by breach of duty of the defendant notwithstanding that their loss is reflective of loss suffered by the company. Therefore I consider that the issue to be decided is whether this House should follow the reasoning set out in Prudential Assurance or the reasoning set out in Christensen v Scott .

I consider, with respect, that part of the reasoning in the Prudential Assurance case is open to criticism. In my opinion the view of the Court of Appeal of New Zealand that the loss suffered by a shareholder through the diminution in the value of his shareholding is a personal loss is a more realistic assessment than the view of the Court of Appeal in Prudential Assurance that the shareholder's loss is merely a reflection of the loss suffered by the company and that the **\*853** shareholder suffers no personal loss. This view has been criticised in an article by M J Sterling on 'The Theory and Policy of Shareholder Actions in Tort' (1987) 50 MLR 468 at pp. 470 and 471:

> 'The description of the Court of Appeal is not wrong, in that the value of a share is related to the present and expected future levels of dividend of the company and the right to receive dividends is a right of participation in the company, but it is suspiciously limited because a share is commonly treated as a piece of personal property. The fact that a share is valuable because it is a right of participation in a company does not preclude one as a matter of logic from regarding it as a piece of property …

> The Court of Appeal gave no reason for preferring their description of a share to one which includes its nature as an item of personal property but some good reason is

surely necessary to justify exclusion of this obvious characteristic. It is therefore suggested that, if necessary, a share can be regarded as a piece of personal property and a shareholder could be allowed to sue for injury to it.'

In my respectful opinion there is force in this criticism. However, even if this criticism be accepted, there remains the need to ensure that there is no double recovery and that creditors and the other shareholders of the company are protected. It was this need which was emphasised by Millett LJ in Stein v Blake [1998] BCC 316 at p. 320H, as the reason why the principle in Prudential Assurance should be followed:

> 'If this action were allowed to proceed and the plaintiff were to recover for the lost value of his shareholding from the first defendant, this would reduce his ability to meet any judgment which might thereafter be obtained by the liquidators, or by any of the old companies which were not in liquidation, to the prejudice of their creditors. The plaintiff would have obtained by a judgment of the court the very same extraction of value from the old companies at the expense of their creditors that the first defendant is alleged to have obtained by fraud and deceit.'

In Christensen v Scott the court considered that the problem of double recovery did not arise in that case as the defendants had settled the company's claim with the knowledge that the plaintiff's claim was outstanding. But the court recognised that double recovery cannot be permitted and that the interests of the creditors of a company must be protected. In my opinion the resolution of the conflict between Prudential Assurance

and Christensen v Scott narrows down to the issue whether, as held in the former case, the shareholder is debarred from bringing to trial an action claiming loss where such loss is merely reflective of loss suffered by the company, or whether the shareholder is entitled to proceed to trial on such a claim, it being a matter for the trial judge, if the plaintiff establishes his claim, to ensure that there is no double recovery and that creditors and other shareholders of the company do not suffer loss, which was the course which Pumfrey J held should be followed.

Whilst in a case such as Christensen v Scott there may be merit in permitting an individual shareholder to sue, the decision in Prudential Assurance has stood in England for almost 20 years and, whilst the decision has sometimes been distinguished on inadequate grounds, it has been regarded as establishing a clear principle which the Court of Appeal has followed in other cases. I further consider that the principle has the advantage that, rather than leaving the protection of creditors and other shareholders of the company to be given by the trial judge in the complexities of a trial to determine the validity of the claim made by the plaintiff against the defendant, where conflicts of interest may arise between directors and some shareholders, or between the liquidator and some shareholders, the principle ensures at the outset of proceedings that where the loss suffered by the plaintiff is sustained because of loss to the coffers of the company, there will be no double recovery at the expense of the defendant nor loss to creditors of the company and other shareholders. Therefore whilst I think that this House should uphold the Prudential Assurance principle, I also consider that it is important to emphasise that the principle does not apply where the loss suffered by the shareholder is separate and distinct from the loss suffered by the company.

**\*854**

The five heads of claim pleaded by Mr Johnson have been set out in the speech of Lord Bingham of Cornhill. I consider that the losses claimed in heads (1), (2), (4) and (5) are separate and distinct from loss sustained by WWH and that those heads of claim should not be struck out. In respect of head (3) I am also in agreement with the opinion of Lord Bingham that because it is not a separate and distinct loss, Mr Johnson cannot claim in respect of the moneys which WWH would have paid

into a pension fund for him if those moneys had been available to it, and that that part of the claim should be struck out, but that Mr Johnson can claim in respect of enhancement of the value of the pension if the payments had been made.

For the reasons given by Lord Bingham I would strike out Mr Johnson's claims for damages for mental distress and anxiety and for aggravated damages. Accordingly, I would allow Mr Johnson's appeal and dismiss GW's cross-appeal, save that I would strike out his claim in head (3) for pension payments (or, in the alternative, for the increase in the value of his shareholding if those pension payments had not been made), and for damages for mental distress and anxiety and for aggravated damages. I would concur in the order for costs proposed by Lord Bingham.

Lord Millett:

Lord Bingham of Cornhill has recounted the facts and I need not set them out again at any length. The appellant, Mr Johnson, is an entrepreneur who carried on business through a number of companies which he owned and controlled. One of them was Westway Homes Ltd ('the company'). Mr Johnson was its managing director and virtually only shareholder. The respondent firm ('the firm') is a firm of solicitors. Mr Johnson was in the habit of instructing the firm from time to time to act for him in connection with his personal affairs as well as for his various companies.

In 1988 the company held a valuable option to buy land for development. Mr Johnson instructed the firm to exercise the option on the company's behalf. The firm accepted his instructions and served the appropriate notice, but failed to do so in a manner which was incapable of challenge by the vendor. The vendor claimed that the option had not been validly exercised, and the company was obliged to bring proceedings for specific performance against him in the Chancery Division ('the Chancery proceedings'). These were not straightforward, and although the company was ultimately successful it was unable to obtain title to the land until April 1992, that is to say more than four years after it had exercised the option. It was awarded damages and costs against the vendor, but these proved to be irrecoverable.

The firm's failure to deal with the option in a manner which put its exercise beyond dispute caused the company substantial loss. As well as having to bear the costs of the Chancery proceedings, it sustained heavy financial loss as a result of the delay in obtaining title to the land. This loss was of two kinds. First, until the company established its title, it was unable to offer the land as security for its borrowings and so obtain a reduction in the very high interest charges it was paying. Secondly, delay in obtaining title to the land caused a corresponding delay in the commencement and completion of the development and thus in the time when the company could hope to realise any profit from the venture. As it happens, the delay frustrated the development altogether, for the collapse in the property market which took place during the currency of the Chancery proceedings made the venture unprofitable. But this was obviously not foreseeable in 1988, or Mr Johnson would not have caused the company to exercise the option and the vendor would not have resisted its claim to have done so.

In January 1991 the company brought proceedings against the firm for professional negligence. The firm admitted that it had been retained by the company to exercise the option and that it had owed the company a duty of care in doing so. But it denied both liability and quantum. The action came on for trial in October 1992 and was estimated to last 10–12 days. In December 1992, after the trial had already lasted for six weeks and evidence was still being given on behalf of the firm, the case was settled upon payment by the firm of £1,480,000 and £320,000 towards the company's costs. The sum of £1,480,000 represented the greater part of the damages claimed.

**\*855**

Mr Johnson has always claimed that the firm's negligence in the manner in which it exercised the option also caused substantial financial loss to him personally. In April 1993 he brought his own proceedings against the firm. This can have come as no surprise. Mr Johnson had made no secret of his intention to bring such a claim. He had indicated as much in January 1991, well before the company's action came to trial, and his solicitors had been in correspondence with the firm's insurers during 1991–1992. On the eve of the trial his solicitors told those representing the firm

that his personal claim would be pursued whether the current proceedings resulted in judgment or settlement. During the settlement negotiations in December 1992 the parties' respective solicitors discussed the possibility of an overall settlement of both Mr Johnson's personal claim and the company's claim, but the paucity of information to enable his personal claim to be quantified made this impossible. It was left that it was a separate claim which would be a matter for separate negotiation in due course. In agreeing the terms on which the company's claim was settled, Mr Johnson submitted to having most of his personal claim capped at £250,000 excluding interest and costs, and the company agreed to apply the settlement moneys in the discharge of liabilities of the company in respect of which Mr Johnson had given personal guarantees. This was designed to avoid the possibility of double recovery in respect of these liabilities if Mr Johnson brought his own proceedings and was successful.

For the next four-and-a-half years the proceedings brought by Mr Johnson followed the normal course. The parties served and amended their pleadings and exchanged witness statements. Mr Johnson served expert evidence. The firm made a payment into court. A trial date was obtained. But then came a sudden change of tack. The firm instructed fresh leading counsel. In December 1997 the firm's solicitors indicated, for the first time, that it intended to apply inter alia for an order to strike the action out as an abuse of the process of the court. In February 1998 the court ordered the trial of two preliminary issues: (i) whether the proceedings should be struck out as an abuse of the process of the court; and (ii) to what extent (if at all) and assuming the truth of the facts pleaded the heads of damages pleaded in para. 23 and 24 of the re-amended statement of claim were irrecoverable by Mr Johnson as a matter of law by way of damages for the pleaded breaches of duty owed to him.

Mr Johnson pleaded his claim in both contract and tort, and alleged that he had retained the firm to act for him personally as well as for the company in connection with the exercise of the company's option. He alleged that the firm had acted negligently in the manner in which it caused the option to be exercised, and that it had from time to time negligently and with unwarranted optimism advised him personally as

to the likely duration and outcome of the Chancery proceedings.

On the first question, the judge (Pumfrey J) found that the proceedings might well have been an abuse of the process of the court, but that in the light of the circumstances in which the company's action had been settled the firm was estopped by convention from contending that they were. Both parties had acted on the common assumption that Mr Johnson would bring his own proceedings and that these would be entertained by the court. On the second question he ruled that none of the heads of damage pleaded was irrecoverable in law.

The Court of Appeal (Nourse, Ward and Mantell L JJ) allowed the firm's appeal ( [1999] BCC 474 ). It held that there was no excuse for Mr Johnson's failure to launch his own claims when the company brought its action. 'If he could have done so', Mantell LJ said, 'he should have done so'. It held that there was no estoppel by convention; the parties shared a common assumption that Mr Johnson would bring his own proceedings, but they made no assumption one way or the other whether the court whether the court would entertain them; they never thought about the matter. On the second question the court differed from the judge on the authorities, which it agreed were in an unsatisfactory state, but held that, with only one exception, the pleaded heads of damage were arguably recoverable. Both parties now appeal to the House. Mr Johnson appeals on the first question; the firm cross-appeals on the second.
**\*856**

### Mr Johnson's appeal: abuse of process

In describing the proceedings brought by Mr Johnson as an abuse of the process of the court, the Court of Appeal was seeking to apply the well-known principle which Sir James Wigram V-C formulated in Henderson v Henderson (1843) 3 Hare 100 at p. 114 as follows:

> 'I believe I state the rule of the Court correctly when I say that, where a given matter becomes the subject of litigation in, *and of adjudication by* , a court of competent jurisdiction, the Court requires the parties to that litigation to bring forward

their whole case, and will not (except under special circumstances) permit the same parties to open the same subject of litigation in respect of matter which might have been brought forward as part of the subject in contest, but which was not brought forward, only because they have, from negligence, inadvertence, or even accident, omitted part of their case. *The plea of res judicata applies* , except in special cases, not only to points upon which the Court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time.' (My emphasis.)

As the passages which I have emphasised indicate, Sir James Wigram did not consider that he was laying down a new principle, but rather that he was explaining the true extent of the existing plea of res judicata. Thus he was careful to limit what he was saying to cases which had proceeded to judgment, and not, as in the present case, to an out of court settlement. Later decisions have doubted the correctness of treating the principle as an application of the doctrine of res judicata, while describing it as an extension of the doctrine or analogous to it. In Barrow v Bankside Members Agency Ltd [1996] 1 WLR 257 , Sir Thomas Bingham MR explained that it is not based on the doctrine in a narrow sense, nor on the strict doctrines of issue or cause of action estoppel. As May LJ observed in Manson v Vooght [1999] BPIR 376 at p. 387, it is not concerned with cases where a court has decided the matter, but rather cases where the court has not decided the matter. But these various defences are all designed to serve the same purpose: to bring finality to litigation and avoid the oppression of subjecting a defendant unnecessarily to successive actions. While the exact relationship between the principle expounded by Sir James Wigram

and the defences of res judicata and cause of action and issue estoppel may be obscure, I am inclined to regard it as primarily an ancillary and salutary principle necessary to protect the integrity of those defences and prevent them from being deliberately or inadvertently circumvented.

In one respect, however, the principle goes further than the strict doctrine of res judicata or the formulation adopted by Sir James Wigram V-C, for I agree that it is capable of applying even where the first action concluded in a settlement. Here it is necessary to protect the integrity of the settlement and to prevent the defendant from being misled into believing that he was achieving a complete settlement of the matter in dispute when an unsuspected part remained outstanding.

However this may be, the difference to which I have drawn attention is of critical importance. It is one thing to refuse to allow a party to relitigate a question which has already been decided; it is quite another to deny him the opportunity of litigating for the first time a question which has not previously been adjudicated upon. This latter (though not the former) is prima facie a denial of the citizen's right of access to the court conferred by the common law and guaranteed by art. 6 of the Convention for the Protection of Human Rights and Fundamental Freedoms (Rome, 4 November 1950) . While, therefore, the doctrine of res judicata in all its branches may properly be regarded as a rule of substantive law, applicable in all save exceptional circumstances, the doctrine now under consideration can be no more than a procedural rule based on the need to protect the process of the court from abuse and the defendant from oppression. In Brisbane City Council v A-G for Queensland [1979] AC 411 at p. 425 Lord Wilberforce, giving the advice of the Judicial Committee of the Privy Council, **857** explained that the true basis of the rule in Henderson v Henderson is abuse of process and observed that it:

> '… ought only to be applied when the facts are such as to amount to an abuse: otherwise there is a danger of a party being shut out from bringing forward a genuine subject of litigation.'

There is, therefore, only one question to be considered in the present case: whether it was oppressive or otherwise an abuse of the process of the court for Mr Johnson to bring his own proceedings against the firm when he could have brought them as part of or at the same time as the company's action. This question must be determined as at the time when Mr Johnson brought the present proceedings and in the light of everything that had then happened. There is, of course, no doubt that Mr Johnson *could* have brought his action as part of or at the same time as the company's action. But it does not at all follow that he *should* have done so or that his failure to do so renders the present action oppressive to the firm or an abuse of the process of the court. As May LJ observed in Manson v Vooght [1999] BPIR 376 at p. 387, it may in a particular case be sensible to advance claims separately. Insofar as the so-called rule in Henderson v Henderson suggests that there is a presumption against the bringing of successive actions, I consider that it is a distortion of the true position. The burden should always rest upon the defendant to establish that it is oppressive or an abuse of process for him to be subjected to the second action.

The rule in Henderson v Henderson cannot sensibly be extended to the case where the defendants are different. There is then no question of double vexation. It may be reasonable and sensible for a plaintiff to proceed against A first, if that is a relatively simple claim, in order to use the proceeds to finance a more complex claim against B. On the other hand, it would I think normally be regarded as oppressive or an abuse of process for a plaintiff to pursue his claims against a single defendant separately in order to use the proceeds of the first action to finance the second, at least where the issues largely overlap so as to form, in Sir James Wigram's words, 'the same subject of litigation'.

Particular care, however, needs to be taken where the plaintiff in the second action is not the same as the plaintiff in the first, but his privy. Such situations are many and various, and it would be unwise to lay down any general rule. The principle is, no doubt, capable in theory of applying to a privy; but it is likely in practice to be easier for him to rebut the charge that his proceedings are oppressive or constitute an abuse of process than it would be for the original plaintiff to do so.

Mr Johnson conceded that he and the company are privies. He was in a position to decide when to pursue the two claims and whether to pursue them together or separately, and that is enough for present purposes. But Mr Johnson and the company are different legal persons, each with its own creditors, and that is a fact of critical significance. Mr Johnson's personal claims raised difficult issues not present in the company's action: (i) did he retain the firm to act for him personally? (ii) should the firm have foreseen that failure to exercise the option properly would cause loss to Mr Johnson personally as well as to the company? (iii) which if any of his personal losses were recoverable (the issues in the cross-appeal)? (iv) quantum. It was not in the company's interest for his personal claims to be joined with its own much simpler claim, or for its case to be delayed until Mr Johnson's own case was ready for trial. Had the company been in liquidation and its action brought by the liquidator, he would have been well advised to insist on separate trials and to object to any delay in the trial of the company's action.

In these circumstances I am satisfied that Mr Johnson, who was bound to have regard to the interests of the company and its creditors, was entitled to defer the bringing of his own claims until after the company's claim had been resolved. Even if he had chosen to join the two claims in the same writ, it would have been both possible and appropriate for separate trials to be held of (i) liability; (ii) quantum (company); (iii) Mr Johnson's title to sue; and (iv) quantum **\*858** (Mr Johnson); and for (iii) and (iv) to be held over until after (i) and (ii) had been determined. Even as things are, there is no real question of double vexation. The firm was always liable to be sued by two different plaintiffs each with its own cause of action and its own heads of loss. The only area of overlap is in relation to the standard of care which the firm observed. Given that Mr Johnson and the company are privies, neither of them could re-open an adverse judgment on this, being bound by issue estoppel; while the parties could make their own arrangements in the event of a settlement.

Accordingly, I would reject the firm's contention that it was an abuse of process for Mr Johnson to bring his action after the company's claim had been resolved. Even if this were not the case, however, I agree with the trial judge that it would be unconscionable for the firm to raise the issue after the way in which it handled the

negotiations for the settlement of the company's action. I would not myself put it on the ground of estoppel by convention. Like the Court of Appeal, I have some difficulty in discerning a common assumption in regard to a matter about which neither party thought at all. This is not to say that estoppel has no part to play in this field. I would regard it as operating in the opposite way. Given that Mr Johnson was entitled to defer the bringing of his own proceedings until after the company's claims had been resolved, it would have been unconscionable for him to have stood by without disclosing his intentions and knowingly allowed the firm to settle the company's action in the belief that it was dealing finally with all liability arising from its alleged negligence in the exercise of the option. To bring his own claim in such circumstances would, in my opinion, amount to an abuse of the process of the court. But nothing like this took place.

This makes it unnecessary to deal with Mr Johnson's submission that it is too late for the firm to raise the issue. If necessary, however, I should have regarded the delay as fatal. Indeed, I should have regarded it as more than delay; I think it amounted to acquiescence. There is no proper analogy with the case which discloses no cause of action. Although it is obviously desirable to apply to strike out a claim which is doomed to fail at the earliest opportunity, there is no point in proceeding with a trial which serves no useful purpose. Even if the point is taken at the trial itself, it is a matter for the trial judge to decide whether to hear the evidence and adjudicate on the facts before deciding whether they give rise to liability, or to assume that the plaintiff will establish his allegations and decide whether, as a matter of law, they give rise to liability.

But the premise in the present case is that Mr Johnson has a good cause of action which he should have brought earlier if at all. I do not consider that a defendant should be permitted to raise such an objection as late as this. A defendant ought to know whether the proceedings against him are oppressive. It is not a question which calls for nice judgment. If he defends on the merits, this should be taken as acquiescence. It might well be otherwise if the ground on which the proceedings are alleged to be an abuse of process were different. But in a case of the present kind the court is not so much protecting its own process as the interests of the defendant.

Accordingly, I would allow Mr Johnson's appeal on the first question.

### The firm's cross-appeal: recoverable heads of damage

A company is a legal entity separate and distinct from its shareholders. It has its own assets and liabilities and its own creditors. The company's property belongs to the company and not to its shareholders. If the company has a cause of action, this represents a legal chose in action which represents part of its assets. Accordingly, where a company suffers loss as a result of an actionable wrong done to it, the cause of action is vested in the company and the company alone can sue. No action lies at the suit of a shareholder suing as such, though exceptionally he may be permitted to bring a derivative action in right of the company and recover damages on its behalf: see Prudential Assurance Co Ltd v Newman Industries Ltd (No. 2) [1982] Ch 204 at p. 210. Correspondingly, of course, a company's shares are the property of the shareholder and **\*859** not of the company, and if he suffers loss as a result of an actionable wrong done to him, then prima facie he alone can sue and the company cannot. On the other hand, although a share is an identifiable piece of property which belongs to the shareholder and has an ascertainable value, it also represents a proportionate part of the company's net assets, and if these are depleted the diminution in its assets will be reflected in the diminution in the value of the shares. The correspondence may not be exact, especially in the case of a company whose shares are publicly traded, since their value depends on market sentiment. But in the case of a small private company like this company, the correspondence is exact.

This causes no difficulty where the company has a cause of action and the shareholder has none; or where the shareholder has a cause of action and the company has none, as in Lee v Sheard [1956] 1 QB 192 , George Fischer (Great Britain) Ltd v Multi-Construction Ltd [1995] BCC 310 , and Gerber Garment Technology Inc v Lectra Systems Ltd [1997] RPC 443 . Where the company suffers loss as a result of a wrong to the shareholder but has no cause of action in respect of its loss, the shareholder can sue and recover damages for his own loss, whether of a capital or income nature, measured by the diminution in the value of his

shareholding. He must, of course, show that he has an independent cause of action of his own and that he has suffered personal loss caused by the defendant's actionable wrong. Since the company itself has no cause of action in respect of its loss, its assets are not depleted by the recovery of damages by the shareholder.

The position is, however, different where the company suffers loss caused by the breach of a duty owed both to the company and to the shareholder. In such a case the shareholder's loss, insofar as this is measured by the diminution in value of his shareholding or the loss of dividends, merely reflects the loss suffered by the company in respect of which the company has its own cause of action. If the shareholder is allowed to recover in respect of such loss, then either there will be double recovery at the expense of the defendant or the shareholder will recover at the expense of the company and its creditors and other shareholders. Neither course can be permitted. This is a matter of principle; there is no discretion involved. Justice to the defendant requires the exclusion of one claim or the other; protection of the interests of the company's creditors requires that it is the company which is allowed to recover to the exclusion of the shareholder. These principles have been established in a number of cases, though they have not always been faithfully observed. The position was explained in a well-known passage in Prudential Assurance Co Ltd v Newman Industries Ltd (No. 2) [1982] Ch 204 at p. 222:

> 'But what [the shareholder] cannot do is to recover damages merely because the company in which he is interested has suffered damage He cannot recover a sum equal to the diminution in the market value of his shares, or equal to the likely diminution in dividend, because such a "loss" is merely a reflection of the loss suffered by the company. The shareholder does not suffer any personal loss. His only "loss" is through the company, in the diminution of the value of the net assets of the company, in which he has (say) a 3 per cent shareholding. The plaintiff's shares are merely a right of participation in the company

on the terms of the articles of association. The shares themselves, his right of participation, are not directly affected by the wrongdoing. The plaintiff still holds all the shares as his own absolutely unencumbered property. The deceit practised upon the plaintiff does not affect the shares; it merely enables the defendant to rob the company. A simple illustration will prove the logic of this approach. Suppose that the sole asset of a company is a cash box containing £100,000. The company has an issued share capital of 100 shares, of which 99 are held by the plaintiff. The plaintiff holds the key of the cash box. The defendant by a fraudulent misrepresentation persuades the plaintiff to part with the key. The defendant then robs the company of all its money. The effect of the fraud and the subsequent robbery, assuming that the defendant successfully flees with his plunder, is (i) to denude the company of all its assets; and (ii) to reduce the sale value of the plaintiff's shares from a figure approaching £100,000 to nil. There are two wrongs, the deceit practised on the plaintiff and the robbery of the company. But the **\*860** deceit on the plaintiff causes the plaintiff no loss which is separate and distinct from the loss to the company. The deceit was merely a step in the robbery. The plaintiff obviously cannot recover personally some £100,000 damages in addition to the £100,000 damages recoverable by the company.'

It is indeed obvious that (on the given facts, where no consequential losses are stated to have arisen) the defendant cannot be made liable for more than £100,000 in total. It is equally obvious, however, that if the damages were recoverable by the shareholder instead of by the company, this would achieve the same extraction of the company's capital to the prejudice of the creditors of the company as the defendant's misappropriation had done.

It has sometimes been suggested (see, for example, George Fisher v Multi-Construction [1995] BCC 310 at p. 310E–G) that Prudential v Newman is authority only for the proposition that a shareholder cannot recover for the company's loss, and is confined to the case where the defendant is not in breach of any duty owed to the shareholder personally. That is not correct. The example of the safe-deposit box makes this clear. It is the whole point of the somewhat strained business of the key. The only reason for this is to demonstrate that the principle applies even where the loss is caused by a wrong actionable at the suit of the shareholder personally.

Prudential v Newman was followed in Stein v Blake [1998] BCC 316 , where the facts bore some resemblance to the illustration in the earlier case. The defendant was a 50 per cent shareholder and the sole director of a group of companies ('the old companies'). The plaintiff, who was the other 50 per cent shareholder, alleged that, in breach of fiduciary duty, the defendant had misappropriated the assets of the old companies by purchasing them at an undervalue and transferring them to other companies in his sole ownership. The plaintiff, who could have brought a derivative action on behalf of the old companies, chose instead to bring a personal action, claiming that he had been deprived of the opportunity to sell his shares in the old companies at their proper value and had suffered personal loss. The Court of Appeal set aside an earlier grant of leave to appeal from the judge's order striking out the plaintiff's action.

The plaintiff sought to distinguish Prudential v Newman by arguing that the defendant was in breach of a duty owed to him personally. But, as I pointed out, that was not the problem. The problem was that the only conduct relied upon as constituting a breach of that duty was the misappropriation of assets belonging to the old companies, so that the only loss suffered by the plaintiff consisted of the diminution in the value of his shareholding which reflected the depletion of the assets of the old companies. The old companies

WESTLAW    © 2017 Thomson Reuters.

had their own cause of action to recover their loss, and the plaintiff's own loss would be fully remedied by the restitution to the companies of the value of the misappropriated assets. It was not alleged that the plaintiff had been induced or compelled to dispose of his shares in the companies; he still had them. If he were allowed to recover for the diminution in their value, and the companies for the depletion of their assets, there would be double recovery. Moreover, if the action were allowed to proceed and the plaintiff were to recover for the lost value of his shares, the defendant's ability to meet any judgment which the old companies or their liquidators might obtain against him would be impaired to the prejudice of their creditors. The plaintiff would have obtained by a judgment of the court the very same extraction of value from the old companies at the expense of their creditors as the defendant was alleged to have obtained by fraud. Heron International Ltd v Lord Grade [1983] BCLC 244 was a case on the other side of the line. In the course of a contested take-over bid, the directors of the target company who owned a majority of the company's voting shares were alleged, in breach of their duties both to the company and to its shareholders, to have accepted proposals which would reduce the value of the company's assets and hence of its shares and induce the shareholders to accept the lower of two rival offers. The Court of Appeal granted the shareholders injunctive relief. It observed out that the decision of the directors, if implemented, would cause loss in two directions. First, the company would suffer loss to the extent that the value of its assets would be depreciated. That loss would be borne exclusively by the company. It was not a loss in respect of which the shareholders could recover, even if the market value of their shares fell in consequence. The **\*861** other loss would be to the pockets of the shareholders because they were deprived of the opportunity of accepting the higher offer. That loss would be suffered exclusively by the shareholders. It was not a loss to the coffers of the company, which would remain totally unaffected. That could readily be demonstrated. If, as a result of the decision of the board which was impugned, the take-over went through and the entire shareholding in the company became vested in one bidder at a lower price than was available from the other, the recovery of damages by the company would not compensate the former shareholders for their loss. Only a direct action by those shareholders in their own right, and not

in right of the company, could provide the necessary compensation.

In R P Howard Ltd & Richard Alan Witchell v Woodman Matthews and Co (a Firm) [1983] BCLC 117 a company and its principal shareholder brought an action in negligence against a firm of solicitors, alleging that, as a result of the firm's failure to advise an application for a new tenancy under the Landlord and Tenant Act 1954 , the company had been obliged to accept a new lease on terms less favourable than those it would have obtained under the Act. In addition, the principal shareholder was obliged to agree that he would not sell his controlling interest in the company without the landlord's consent. The judge (Staughton J) distinguished Prudential v Newman on the ground that the shareholder was not seeking to recover a sum which merely reflected the loss suffered by the company but his own independent loss because his shares were less easily saleable and therefore had a lesser market value. This is capable of being misunderstood, but was correct on the facts, since the shareholder's claim was rightly limited to the loss arising from the requirement to obtain the landlord's consent to any sale of the shares. This was additional to and did not reflect the loss suffered by the company as a result of the terms of the new lease. The shareholder made no claim on his own account in respect of the diminution in the value of his shares due to this.

In Barings plc v Coopers v Lybrand [1997] BCC 498 a parent company brought an action in negligence against the auditors of a wholly-owned subsidiary. Leggatt LJ correctly distinguished both Prudential v Newman , where the shareholder had no independent cause of action of his own, and George Fisher v Multi-Construction , where the company had none. Here each of them had its own cause of action. But he stated (at pp. 504H–505B) that if the shareholder suffered loss as a result of a breach of duty on the part of the defendant owed to it, it cannot be disentitled from suing merely because the damages claimed would or might include damages for which the defendant was liable to the company. There was, he said, no legal principle which debarred a holding company from recovering damages for loss in the value of its subsidiaries resulting directly from the breach of a duty owed to the holding company as distinct from a duty owed to the subsidiaries. I do not accept this as correct.

In Christensen v Scott [1996] 1 NZLR 273 the company carried on the business of potato farming on tenanted land. The landlord defaulted on a mortgage of the land and the mortgagee entered into possession and exercised its power of sale. Access to the standing crop was refused and the company was unable to harvest it, with disastrous financial consequences. The company went into liquidation and receivership, and the receiver and the liquidator brought proceedings for negligence against the company's professional advisers. The action was settled. The shareholders, who had guaranteed the company's debts, opposed the settlement, alleging that the sums offered by way of settlement were totally inadequate. In due course they brought their own proceedings, alleging that the defendants owed duties of care to them personally. They claimed damages representing the diminution in the value of their shareholdings arising from the defendants' negligence. The judge held that such damages reflected the company's loss and could not be recovered by the shareholders. The Court of Appeal of New Zealand allowed the shareholders' appeal.

In giving the judgment of the court, Thomas J distinguished Prudential v Newman on the ground that it did not necessarily exclude a claim brought by a shareholder to whom a separate duty was owed and who suffered his own personal loss as a result of that breach of duty. So far, of course, this is correct: Heron and Howard are just such cases. The judge observed that the **\*862** fact that the loss was also suffered by the company did not mean that it was not also a personal loss suffered by the shareholder. 'Indeed', he added (at p. 280):

> 'the diminution in the value of Mr and Mrs Christensen's shares in the company is by definition a personal loss and not a corporate loss. The loss suffered by the company is the loss of the lease and the profit which would have been obtained from harvesting the potato crop. That loss is reflected in the diminution in the value of Mr and Mrs Christensen's shares. They can no longer realise their shares at the value they enjoyed

prior to the alleged default of their accountants and solicitors.'

I cannot accept this reasoning as representing the position in English law. It is of course correct that the diminution in the value of the plaintiffs' shares was by definition a personal loss and not the company's loss, but that is not the point. The point is that it merely reflected the diminution of the company's assets. The test is not whether the company could have made a claim in respect of the loss in question; the question is whether, treating the company and the shareholder as one for this purpose, the shareholder's loss is franked by that of the company. If so, such reflected loss is recoverable by the company and not by the shareholders.

Thomas J acknowledged that double recovery could not be permitted, but thought that the problem did not arise where the company had settled its claim. He considered that it would be sufficient to make an allowance for the amount paid to the liquidator. With respect, I cannot accept this either. As Hobhouse LJ observed in Gerber ([1997] RPC 443 at p. 471), if the company chooses not to exercise its remedy, the loss to the shareholder is caused by the company's decision not to pursue its remedy and not by the defendant's wrongdoing. By a parity of reasoning, the same applies if the company settles for less than it might have done. Shareholders (and creditors) who are aggrieved by the liquidator's proposals are not without a remedy; they can have recourse to the Companies Court, or sue the liquidator for negligence.

But there is more to it than causation. The disallowance of the shareholder's claim in respect of reflective loss is driven by policy considerations. In my opinion, these preclude the shareholder from going behind the settlement of the company's claim. If he were allowed to do so then, if the company's action were brought by its directors, they would be placed in a position where their interest conflicted with their duty; while if it were brought by the liquidator, it would make it difficult for him to settle the action and would effectively take the conduct of the litigation out of his hands. The present case is a fortiori; Mr Johnson cannot be permitted to

challenge in one capacity the adequacy of the terms he agreed in another.

Reflective loss extends beyond the diminution of the value of the shares; it extends to the loss of dividends (specifically mentioned in Prudential ) and all other payments which the shareholder might have obtained from the company if it had not been deprived of its funds. All transactions or putative transactions between the company and its shareholders must be disregarded. Payment to the one diminishes the assets of the other. In economic terms, the shareholder has two pockets, and cannot hold the defendant liable for his inability to transfer money from one pocket to the other. In principle, the company and the shareholder cannot together recover more than the shareholder would have recovered if he had carried on business in his own name instead of through the medium of a company. On the other hand, he is entitled (subject to the rules on remoteness of damage) to recover in respect of a loss which he has sustained by reason of his inability to have recourse to the company's funds and which the company would not have sustained itself.

The same applies to other payments which the company would have made if it had had the necessary funds even if the plaintiff would have received them qua employee and not qua shareholder and even if he would have had a legal claim to be paid. His loss is still an indirect and reflective loss which is included in the company's claim. The plaintiff's primary claim is against the company, and the existence of the liability does not increase the total recoverable by the company, for this already includes the amount necessary to enable the company to meet it.

*863

On the assumption which we are bound to make for the purpose of this appeal, which is that the firm was in breach of a duty of care owed to Mr Johnson personally, he is in principle entitled to recover damages in respect of all heads of non-reflective consequential loss which are not too remote. Mr Johnson's principal complaint is that the firm negligently failed to exercise the company's option in a manner which would be incontestable. Even if this constituted the breach of a duty owed to Mr Johnson personally as well as to the company, there was a single breach which made it impossible for the company to establish that it had

exercised the option without litigation. In the event this delayed by four years the commencement of the development by the company and the time when the company could raise money at normal commercial rates of interest on the security of the land and commence the proposed development. Damages in respect of these heads of damage are recoverable by the company, and in so far as they are reflected in the diminution in the value of Mr Johnson's shares in the company are not recoverable by him.

There is a subsidiary complaint, that the firm represented both to the company and to Mr Johnson personally that the Chancery proceedings were certain of success and that judgment would be obtained within a relatively short time. These are separate representations which may be separately sued upon by each representee. In so far as Mr Johnson relied upon the representation made to him and suffered a separate and distinct loss qua representee and not merely qua shareholder or potential recipient of money from the company, he is entitled to recover.

Lord Bingham of Cornhill has identified the various heads of financial loss alleged in the statement of claim. I agree with his analysis and do not wish to add anything except in relation to Mr Johnson's pension. Mr Johnson claims that, but for its lack of funds resulting from the firm's failure to exercise the option properly, the company would have continued to make contributions to Mr Johnson's pension scheme. For the reasons I have endeavoured to state, Mr Johnson cannot recover the amount of the contributions which the company would have made if it had had the necessary funds; this merely reflects the company's loss and is included in its own claim. Nor can Mr Johnson claim interest in respect of the lost contributions for the same reason. But Mr Johnson's claim in respect of the enhancement of his pension is a different matter. The problem here is one of remoteness of damage, not reflective loss, for the loss (or strictly the net loss) is one which the company could not have sustained itself. Had Mr Johnson carried on business in his own name instead of through the medium of the company, then (subject only to the question of remoteness) he would have been entitled to recover a sum representing the lost increase in the value of his pension after giving credit for the amount saved in respect of the contributions and interest. Such loss is separate and distinct from the loss suffered by the

company, and while Mr Johnson's claim to recover it faces obvious difficulties it should not be struck out at this stage. But if he does establish his claim, he will have to give credit for the contributions which would have been required, whether by the company (reflective loss) or himself (which he has saved) together with interest thereon.

For the reasons given by Lord Bingham of Cornhill, I too would strike out Mr Johnson's claims to

damages for mental distress and anxiety and aggravated damages.

Accordingly, I would dismiss the cross-appeal while varying the order of the Court of Appeal in the manner proposed.

Appeal allowed in part. Cross-appeal dismissed **\*864**

© 2017 Sweet & Maxwell
[2001] B.C.C. 820

---

**End of Document**

© 2017 Thomson Reuters.

# TAB 43

**Dudley Joiner, Thelma Joiner v. Richard George,
Gary Robinson, Arnhem Technology Limited, The
International Technology Group Limited, Unigel Limited**

Case No: A3/2000/3294

Court of Appeal (Civil Division)

14 March 2002

**Neutral Citation Number: [2002] EWCA Civ 160**

**2002 WL 347143**

Before : Lord Justice Aldous Lord
Justice Keene and Sir Christopher Slade

Thursday 14th March 2002

## Analysis

On Appeal from Chancery Division Mr Justice Park

**Representation**

- Mr D. Joiner appeared in person.
- Peter Cranfield and Ian Wilson (instructed by DMH for the First and Second Respondents).

**JUDGMENT**

Sir Christopher Slade:

**Introduction**

1. On 31st January 2000 Park J delivered a judgment in which he held that the respondents to this appeal, Mr George and Mr Robinson, were in breach of contract by not causing a 51% shareholding in a company named Unigel Limited, but commonly known as "Unigel UK", to be transferred to the appellant claimants, Mr and Mrs Joiner, when the appellants exercised an option to purchase that shareholding on 23rd November 1994 ("the valuation date"). He declined to hold that they were entitled to specific performance, but held that they were entitled to damages.

2. The wording of the relevant part of the Order was:

"The first and second defendants do pay to the claimants damages equal to the value, expressed in money, which a 51% shareholding in the English company Unigel Limited would have had to the claimants on 23 November 1994, such value to be ascertained by an inquiry in accordance with the directions set out in Annex A hereto, together with interest at 8% per annum from 23 November 1994 until the date on which the value is determined by the court."

3. The inquiry directed by the Judge took place before him over six days spread between May and June 2000. As before, Mr Joiner represented himself and his wife, and Mr George represented himself and Mr Robinson. Mr Joiner and Mr George also gave evidence, and each called evidence from an expert witness: Mr Fisher of Bruce Sutherland & Partners on behalf of Mr and Mrs Joiner, and Mr Faull of Hilton Sharpe & Clarke on behalf of Mr George and Mr Robinson.

4. By his second judgment delivered on 28th July 2000, the Judge decided that the damages payable by the respondents to the appellants are £129,000, such damages to carry interest from 23rd November 1994 to 28th July 2000 at 8% per annum. He gave the appellants permission to appeal limited to the determination of the amount of damages.

5. The respondents sought permission to appeal out of time on liability and the amount of damages. On 29th March 2001 Lord Justice Aldous granted them permission to appeal solely on the issue of the amount of damages. At a time when the respondents were still acting in person, Mr George settled grounds of cross-appeal. But counsel recently instructed on their behalf, Mr Peter Cranfield, has informed us that, having considered the cross-appeal with

their legal advisers, the respondents have decided not to pursue it. Their case is that there was sufficient evidence to justify the Judge's findings on each of the matters as to which the appellants make complaint. Correspondingly, though they disagree with his findings referred to in grounds 1 to 3 of their grounds of appeal, they now accept that they were within the legitimate range of the exercise of his judicial discretion.

6.   As in the Court below, Mr Joiner has appeared in person, representing himself and his wife. He has presented their case with clarity and courtesy. Mr Cranfield, counsel for the respondents has also greatly assisted us with an excellent skeleton argument and his oral submissions.

**The Facts**

7.   The background facts which are material for present purposes can be summarised relatively shortly. I extract them principally from the Judge's two full and comprehensive judgments.

8.   Mr Joiner is a specialist in the technology of thixotropic gels. A thixotrope is a substance which forms a stable gel structure when it is at rest, but which becomes fluid when it is stirred or subjected to some other kind of force. A particular application of such gels is their use in connection with fibre-optic cables, and this has been Mr Joiner's field for about the last twenty years. He claims that he was originally involved in the invention of the concept. From the early 1980's he has been concerned as an entrepreneur in a number of business ventures to exploit it, supported throughout by his wife, the second appellant.

9.   In the mid to late 1980's, he and a few other persons owned and ran a company called Synthetic Technology Limited ("Syntec"). Its product was known as "rheogel". In 1989 it was placed in administration under Part II of the Insolvency Act 1986. The distributor of its rheogel was Astor Chemicals Limited ("Astor"), a large and financially strong company.

10.   In December 1989 the administrators of Syntec sold the business of Syntec to Astor. Syntec was subsequently dissolved. In view of certain alleged aspects of Mr Joiner's conduct while concerned with its management, the High Court, on 13 th April 1993, imposed on Mr Joiner a seven years disqualification from being a director pursuant to the Company Directors Disqualification Act 1986.

11.   After they had been deprived of Syntec's rheogel business, Mr and Mrs Joiner, in early 1990, acquired a new company, Gel Technology Limited ("Geltec") to establish a new gel business. They owned this company in equal proportions. It called its product "unigel". Like Syntec's rheogel, the business of which had been bought by Astor, unigel is a thixotropic gel designed for use in connection with fibre-optic cables.

12.   There was at least some degree of similarity between the two gels, rheogel and unigel. In February 1991 Astor began proceedings against Geltec, Mr Joiner and another director, Mr Bury, alleging that Geltec's unigel business involved infringements of intellectual property rights which Astor owned in consequence of its purchase of Syntec's business in 1989. Though Astor seems to have failed in an application for interlocutory relief, its action remained in existence and had some influence on the events which followed.

13.   The respondents, Mr George and Mr Robinson, have at all material times been close business colleagues. In the late 1980's, Mr Robinson was resident in Hong Kong, where he had established a company known as Arnhem Technology Limited ("Arnhem") in 1987 or 1988. By the time that is relevant for this case, Arnhem was owned by himself and Mr George. They saw great opportunities for the optical fibre industry in Asian markets, particularly China, Taiwan and India. They wanted to develop Arnhem's business so as to represent non-local manufacturers of various products used in the industry, such as thixotropic gels.

14.   The respondents first met Mr Joiner during the later part of the Syntec period. After Syntec had gone into administration and its business had been sold to Astor and Mr Joiner's new company, Geltec, started producing

WESTLAW   © 2017 Thomson Reuters.

unigel, Arnhem became the Far East distributor for Geltec. In general it did not act as an agent remunerated by commissions. The usual pattern was that it bought quantities of unigel from Geltec and resold it to customers in China. Arnhem and its network of customers in China were one of the major sale outlets enjoyed by Geltec.

15.    The respondents regarded unigel as an excellent product for exploitation within the fibre-optic cable market in China. In 1991 and 1992, there were a number of discussions between them and Mr Joiner about creating some more institutionalised relationship between them than the regular trading connection which had developed between Geltec and Arnhem. Meantime, however, the financial position of Geltec was deteriorating. A winding up petition was served on Geltec by a trade creditor in late 1991. Geltec was finally put into liquidation by an order of the Court on 29th July 1992.

16.    The more formal business connection between the appellants and the respondents began when, on 16th September 1992, they signed a document entitled "Heads of Agreement". It was for the most part drafted by Mr Joiner. The introductory paragraphs referred to Geltec and to Arnhem and recorded that the respondents were establishing a holding company named International Technology Group Limited ("ITG") registered in Hong Kong. They stated that the parties had agreed "to cooperate together to form a new UK registered company in order to acquire such assets of [Geltec] as are necessary to continue the manufacture and distribution of cable filling gels under the name Unigel". The stated terms of the Agreement included the following. The parties were to procure a shelf company which would have its name changed to "Unigel Ltd". The appellants would initially subscribe for 51 shares of £1 each in this company, which came to be commonly referred to as "Unigel UK". The opening directors would be the two respondents "on behalf of ITG". Mr Joiner would be offered a position on the board "when his personal position with regard to past litigation with Astor Chemicals Ltd is clarified". [The Judge found that the respondents were not at this time aware of Mr Joiner's disqualification as a director]. Unigel UK would negotiate a loan of £45,000 from National Westminster Bank. The respondents would "negotiate the purchase from the receivers of all of [Geltec's] manufacturing and laboratory equipment, all intellectual

property rights including the UNIGEL trade name and all goodwill attached to [Geltec's] business as per the attached Schedule 1". Conditionally on the loan from the Bank being obtained, Unigel UK would purchase the scheduled assets for £150,000 and certain further issues of shares would be made to the appellants and the respondents and/or ITG. If the loan was unobtainable, the provisions referred to in the last sentence were to be adjusted by "mutual agreement". Clause 18 recorded the parties intention to complete a "shareholders agreement", but they never did.

17.    On 7th November 1992 the appellants and respondents entered into the Agreement which has given rise to the present proceedings ("the Option Agreement"). Clause 1 varied the Heads of Agreement by providing that Mr George would be the sole director, "appointed on behalf of ITG". Clause 2 varied them by providing that all the shares in Unigel UK would be held by ITG, but that the appellants "will have the option to acquire ordinary shares in [Unigel UK] representing up to 51% of the equity …." The option was to be exercisable at any time and no monetary consideration was to be payable.

18.    The contemplated shelf company having been acquired, matters proceeded on the basis provided for by the Option Agreement. Mr George was the sole director of Unigel UK, and remained such throughout the years which are relevant to the case. Neither Mr Joiner nor Mrs Joiner ever became a director. Mr Joiner, however, in the capacity of a consultant to ITG, provided services to Unigel UK. He had an office at the factory. The two issued shares in Unigel UK were acquired by ITG, which in its turn was owned by the respondents. That remained the position for several years. The appellants had such rights, if any, as were conferred on them by the Option Agreement and by such provisions of the Heads of Agreement as survived the Option Agreement.

19.    Mr Joiner continued to be involved with Unigel UK and its business for about another two years. Over this period unigel was produced at the factory. By far the largest customer was Arnhem, for resales to customers in China. Arnhem did a good job in China. Unigel UK's turnover increased and for most of the time the factory was busy.

20.   Not later than 8th December 1993, ITG (which was wholly owned and controlled by the respondents) acquired a shelf company which, after about two months, changed its name to "Unigel Limited". I shall follow the Judge in referring to it as "Unigel HK", so as to distinguish it from Unigel UK, the corporate name of which was and is also Unigel Limited.

21.   On 7th February 1994, Unigel HK entered into an agreement with the liquidator of Geltec ("the Geltec Agreement") to purchase whatever interest the liquidator owned in the assets which had been used by Geltec in its thixotropic gels business. The Judge found that the business assets of Geltec thus sold consisted in effect of (i) the product name UNIGEL; (ii) any other intellectual property rights of the unigel business which Geltec may have had; and (iii) miscellaneous items of equipment of that business which had remained in the factory. The items thus sold to Unigel HK had in practice been used by Unigel UK with the acquiescence of the liquidator since the autumn of 1992. After they had been sold, Unigel UK continued to use them. Eventually, as will appear below, a royalty was introduced to be paid by Unigel UK to Unigel HK.

22.   Relationships between the appellants and the respondents, which had originally been good, began to deteriorate fairly early in 1993 and got progressively worse over the rest of the year and into 1994. The appellants disliked the shareholding and management structure of Unigel UK. They had no shares. Neither of them was a director; Mr George as the single director was in sole management control of the company's business. There were other matters which caused friction. Mr George and Mr Joiner were working in the same building and did not get on.

23.   In late 1993 and early 1994 there were exchanges about the possibility of the appellants being bought out. These culminated in two alternative offers made by the respondents on 1st March 1994. The Judge, in para 21 of his second judgment, described these offers as "US $220,000 if Mr Joiner was not locked in to Unigel UK

or otherwise precluded from competing, and US$540,000 (partly by instalments over five years) if Mr Joiner was locked in". Neither of these offers was accepted.

24.   As 1994 progressed, things got steadily worse. On 23rd November 1994 solicitors acting for the appellants gave formal notice of exercise by their clients of their rights under the Option Agreement to acquire a 51% shareholding in Unigel UK. On 2nd December 1994 ITG, in a letter signed by Mr Robinson, gave Mr Joiner one month's notice of termination of his consultancy agreement and instructed him no longer to attend at Unigel UK's premises. The locks in the building were changed.

25.   On 3rd September 1995 the appellants instituted proceedings against the respondents seeking specific performance of the Option Agreement. The outcome of those proceedings has been described in the Introduction to this judgment. It is now necessary to summarise the judgment which is under appeal.

### The Judgment on Damages

26.   The Judge began (paras 4–6) by explaining the origin and effect of the words from the Order: "the value, expressed in money, which a 51% shareholding in …. Unigel Limited would have had to the claimants on 23 November 1994". Those words merely reproduced the words in the judgment itself, as handed down. In the first draft of the judgment, circulated to the parties for minor corrections to be notified, the Judge had simply referred to "the market value" of a 51% shareholding on the valuation date. However, Mr Joiner represented to him that that form of wording might have precluded him from arguing that, if he and his wife had acquired 51% of the shares on that date, they would not have wanted to sell them, but would have wanted to keep them and to exercise the control which they would thereby have over the company's affairs. According to this argument, the real value to them of getting the shares would not have lain in their market value, but in the ability to take charge of the business themselves and to run it successfully and profitably in the future. In fairness to Mr Joiner, the Judge accordingly amended the wording of his judgment, so as to enable

him to advance this line of argument, to which the Judge aptly referred as the "lost opportunity" argument (though Mr Joiner himself preferred a different description) if he thought fit. The Judge further caused the essence of such wording to be reproduced in the consequential Order.

27.  Before the hearing began and at early stages in it, Mr Joiner had ambitions to develop the "lost opportunity" argument: (see para 7). In the end, however, while the Judge left it open to him to develop it, he did not press it: (see para 12). In any case, the Judge thought there were two specific factual points which effectively ruled it out: (see paras 8–11). First, Mr Joiner was subject to the director's disqualification order, which had the best part of six more years to run and restrained him from taking part in the promotion or management of the company. This would have precluded him, in the Judge's view, from exercising any control of the company in practice. Furthermore, in the Judge's view, while it would have been vital for Unigel UK to have access to borrowing facilities, no lending institution would have been likely to offer worthwhile facilities to a company whose controlling shareholder and moving spirit, even if not a director, was under a disqualification. Secondly, even apart from the disqualification order, Mr Joiner would not have been able to make a success of running Unigel UK, if he had obtained 51% control. For the minority shareholders controlled the distributor, Arnhem, through which the great majority of Unigel UK's sales were made.

28.  Having rejected the "lost opportunity" argument as the way to measure the damages, the Judge (para 12) said he had to fall back on the market value of the 51% shareholding. For this purpose, he thought it necessary to consider what would most probably have happened if the respondents, in accordance with their contractual obligations, had caused a 51% shareholding to be transferred to the appellants. His conclusion (para 13) was that the appellants would most probably have sold the shares. The Judge thus needed to determine a figure at which the appellants would have been able to sell them —a question which had to be answered, in his view, by considering what in the "real world", as opposed to the "hypothetical world", they would have done if they had got them on 23rd November 1994.

29.  The Judge's answer to this question was that the appellants would have sold them to the respondents or to ITG or to "some other George/Robinson vehicle". The Judge set out a number of reasons for reaching this finding of fact in paras 14 to 22 of his judgment, but since neither side has challenged it, these reasons need not be summarised in any detail. Essentially they were the following. On the one hand, the appellants would in practice have needed to sell their shareholding if they were going to get any value out of it, and the only realistic possible purchasers would have been the respondents or a company, like ITG, controlled by them. On the other hand, it was no less realistic to suppose that the respondents would have wanted to retrieve control of Unigel UK for themselves and would have recognised the necessity of paying a reasonable price to achieve that result.

30.  The Judge (para 20) pointed out that, if the appellants had obtained 51% of the shares in Unigel UK on the valuation date, the respondents would have had to come to some sort of terms with them or suffer a serious rupture in their supply arrangements for a significant item of the specialist goods which Arnhem held itself out as being able to supply to the Far East market. Furthermore, the offers which the respondents had made to the appellants to buy them out earlier in 1994 showed that they had been prepared to raise and pay quite substantial sums to be left in undisputed sole control of Unigel UK: (para 21).

31.  In the Judge's view, however, (paras 23 and 24), two factors in particular would have prevented the appellants from effectively holding the respondents to ransom and demanding an excessive price for their shares in Unigel UK. First, if pushed too hard, the respondents could have caused Arnhem to withdraw from selling gel for as long as it took to get a new manufacturing facility established and in production. Secondly, prospective lenders would not have been willing to lend them money if they had thought they were overpaying for what they were buying; and the respondents would have been dependent on borrowing facilities. The sale would thus have had to be at a "sensible" price: (para 25). The Judge (para 26) summarised his approach by saying that he proposed to form a view of "what the value of a 51% holding in Unigel UK would have been agreed to be in a sale where all personal antipathies were put aside and where both parties

recognised the reality that they would need to come to terms". Both experts agreed (para 27) that, in determining a value for the holding, it would first be necessary to determine what would have been the value of a 100% holding. The Judge rejected a submission by Mr Joiner that the purchasers would have been willing to pay a price above 51% of the value of the entirety. The 51% holding in his view fell to be valued at "a straight 51% of the value of 100%" (para 28).

32. In calculating the final figure which he reached, the Judge was guided by the valuation techniques explained by the experts (para 29). He identified three reasons for optimism as at the valuation date. First, Unigel UK was a supplier to the telecommunications industry which was then a high growth sector. Second, its principal product, unigel, was of a high quality. Third, the respondents believed that the market for it, particularly in the Far East, was promising and they wanted to have a major presence in it.

33. On the other hand there were reasons for caution (paras 30 to 33). Unigel UK was a young company which had been in business for only about two years and two of its predecessors, Syntec and then Geltec, had failed. Furthermore the purchasers would be constrained to quite some extent by the attitude of their prospective lenders. Any price paid at the valuation date would have to be based on hopes for the future, since the break-up value of the company was negligible. It had a share capital of £2 and its last published balance sheet showed a small deficit on shareholders' funds. After further observations on the prospects of the company as at the valuation date, the Judge concluded that "there would already be a worthwhile goodwill value in it but not an extravagant amount".

34. Before coming in detail to the expert evidence, the Judge directed his attention to one specific aspect of Unigel UK's position at the valuation date, namely the existence or otherwise of a liability, actual or potential, to pay licence fees to Unigel HK for the use of intellectual property. In this context the Judge (paras 34 to 36) expressed his findings of fact as follows:

"On 7 February 1994 the liquidator of Geltec had made an agreement with Unigel HK to sell to it various assets of Geltec's former business, including 'the intellectual property' as defined. The idea was for Unigel HK to license the IP rights to Unigel UK in return for licence fees. Mr Joiner was aware of this even if he was unenthusiastic about it. One of the meetings in September 1994 when Mr Robinson was in the country took place at the offices of Unigel UK's auditors. Mr Joiner was present. The principal subject matter of the meeting was to seek advice about the payment of licence fees from Unigel UK to Unigel HK, and the level at which they should be charged. However, at the valuation date there was no licence agreement in place, and in practice Unigel UK was using the product name 'unigel' without payment to Unigel HK or anyone else. This did not necessarily mean that it could go on doing that for ever, but it was the factual situation at the valuation date.

On the face of it there was also a UK trade mark application for 'unigel' in the name of Unigel HK. There is some doubt as to the validity of this, because Mr Joiner's diligent and impressive researches have shown that it was filed before the company which eventually became Unigel HK even existed, let alone before it changed its name to Unigel HK. However, if any point had been taken about this I assume that Unigel HK could always have made a new application which would not have been subject to the same possible challenge.

On 1 January 1995, after Mr Joiner had been excluded from the factory and from the affairs of Unigel UK

generally, a licence agreement was entered into between Unigel HK and Unigel UK. It purported to license Unigel UK to use a large range of rights or property which the agreement said were rights or property owned by Unigel HK, including even the right to use any future name used by Unigel UK. The licence fee was set at the high rate of 7½%. On 3 April 1995 it was replaced by a new licence agreement which was identical except that the licence fee was reduced to 5%."

35.   The Judge, however, expressed "major misgivings" about these agreements as follows (para 37):

"I am prepared to accept that Unigel HK may have had justification for charging a licence fee to Unigel UK for the use of the product name 'unigel', although even that might have been debatable given Mr Joiner's discovery about the date of the trade mark application and the fact that Unigel UK was only applying its own corporate name to the product. Apart from a fee for the use of the name I cannot see on what basis the licence fee could realistically be justified. There were no patents or other established forms of intellectual property in existence. The licence agreements said that they applied to 'formulations'. But if Unigel UK knew what the formulations were — and it certainly would have done if Mr Joiner had continued to be involved in it — I believe that it was entirely free to use them and did not need any licence from Unigel HK before it could use them. The licence agreements purported to give to Unigel UK the right to exploit the name 'Unifil', and presumably the associated right to market the Unifil

equipment. However, on the basis of the evidence which I have heard I believe that the Unifil equipment was developed by Unigel UK, in the persons of Mr Joiner and Mr Sohal, and not by or on behalf of Unigel HK."

36.   In the face of these problems, the Judge (para 38) indicated that, for the purpose of his valuation exercise, he proposed to deal with the question of licence fees as follows:

"I believe that the value of Unigel UK at the valuation date ought to be ascertained on the basis that, despite some uncertainties, it would have to concede a licence fee payment if it wanted to go on using the name 'unigel' for its product, or at least wanted to go on using the name without facing troublesome legal challenges. However the right to use the name was the limit of what it could plausibly be charged a licence fee for. As to the rate of fee, I think that, for the purpose of agreeing a share sale price in a transaction such as I postulated in paragraph 26 above (with vendors and purchasers both being prepared to give way to some extent in order to reach an agreement), a rate of 2½% would have been adopted."

37.   Then turning more specifically to the valuation process (para 39), the Judge indicated that he would "endeavour to arrive at a price by a structured approach, guided by the expert evidence, and not simply by some sort of intuition". It was common ground that the price should assume that Unigel UK was a going concern. "On that basis" he said "the core of the value lay in the expectation as at the valuation date of future profits from its business".

38.  Though there were differences between their detailed valuations, both the experts, Mr Fisher and Mr Faull, had accepted, as a norm, the basic concept of estimating a figure for "maintainable profit" and multiplying it by a price-earnings ratio. Mr Faull had described a valuation carried out simply by that process as a "capitalised earnings valuation". This was the sole method advocated by Mr Fisher. Mr Faull, however, referred to an alternative valuation method which he called "the adjusted net asset valuation" method. This differs from the capitalised earnings valuation method in that the maintainable profit times price-earnings formula is used to value not the company as a whole, but the goodwill of its business. The net book value, positive or negative, of the company's other assets and its liabilities is then added or deducted to arrive at a value of 100% of the shares. Mr Faull favoured the adjusted net asset method for Unigel UK, because he took the view that if a balance sheet had been drawn up at the valuation date it would have shown net liabilities rather than net assets (para 40).

39.  The Judge, however, (para 42) did not adopt Mr Faull's view on this point. It took into account a proportion of the licence fee of 7½% of payable by Unigel UK to Unigel HK. At the valuation date, no licence agreement existed and, even if one had existed, the highest fee which the Judge would have considered justifiable would have been 2½%. At that level of fee Unigel UK's balance sheet would have shown no or negligible net liabilities. In the circumstances the Judge thought it right to adopt the capital earnings valuation method.

40.  For this purpose (para 43) he had to begin by estimating the maintainable profit, which fell to be calculated in three stages:

• (1) Take an item for maintainable revenue, anticipated as at the valuation date.
• (2) Deduct the direct costs of sales, to arrive at the "gross profit".
• (3) Deduct an appropriate amount for overheads.

41.  The experts differed on some of these three components of the calculation. As to the first, Mr Fisher (using the "Discounted Future Earnings" method) had based his calculation of the level of maintainable revenue on a forecast of future revenues made by Mr Joiner in January 1994, (see para 54 below) so far as the forecast related to the three years ahead. He had then made deductions from those forecast revenues of three years ahead for direct costs and overheads, so as to produce a forecast of future profit. From that last figure, he had discounted back at 10% per annum to the valuation date, to give his figure of anticipated revenue. Mr Faull, on the other hand, had derived his figure of anticipated revenue from the actual trading figures of the accounting period which was current at that date, taking the period from the last accounting date (31st March 1994) back to the valuation date and then annualising the figure.

42.  The Judge (paras 44 and 45) preferred Mr Faull's approach to the calculation of revenue, saying this:

> "… He [Mr Faull] says that actual figures are better than forecasts, and in any case Mr Joiner had a poor past record as a forecaster. I do not want to go into this last point. It is something of a sore point with Mr Joiner, particularly because the forecasts of future sales which he made in 1994 turned out with hindsight to have been reasonably accurate. However, hindsight ought to be excluded. Further, as matters appeared at the valuation date a valuer then might well have thought that there was something in the assertion that Mr Joiner was a poor forecaster. In any case I accept Mr Faull's view that the actual figures should be preferred to a forecast.

> In terms of figures there turns out not to be much difference between the amounts which the two experts would take for the revenue, though as I have explained they get to their respective amounts by different routes. I prefer

Mr Faull's route on this aspect of the valuation. His figure for annual maintainable revenue, before direct costs and overheads, as perceived at the valuation date is £1m, and that is my figure also."

43.   The Judge then (para 46) considered the second element in the calculation of maintainable profit, namely the deduction of the direct costs of earning the revenue. This he treated as comprising three elements, of which only the third was controversial:

• (1) All direct costs other than elements (2) and (3). It was agreed that, in the trading period up to the valuation date, these direct costs were running at the rate of 60.93% of sales. So, on the Judge's assumed revenue of £1m, they would be £609,300.
• (2) Commissions, which Unigel UK paid on some of its sales. Scaling up the commissions on the actual sales down to the valuation date, so as to assume they would apply comparably to sales of £1m, gave assumed commissions of £57,524.
• (3) Licence fees. This was a disputed item. Mr Faull had deducted licence fees at 5% on sales. Mr Fisher had deducted nil. In accordance with his previous conclusions, the Judge considered a deduction of 2½ % appropriate, producing a figure of £25,000. After deduction of these three sums representing direct costs from the assumed annual revenue of £1m there was left a gross maintainable profit before overheads of £308,176.

44.   As to the deduction for overheads, the third element in the calculation of maintainable profit, the Judge (para 48) recorded that there was a marked difference between Mr Faull and Mr Fisher. Mr Fisher based his provision for the overheads required to run the business on the evidence of Mr Bury, a friend and former colleague of Mr Joiner. Mr Faull had taken the actual overheads in the accounts for the accounting period current at the valuation date, with certain adjustments. Mr Fisher and Mr Joiner suggested that a number of the expenses envisaged by Mr Faull

were too high, in particular for remuneration for directors and employees and for travel and subsistence. The Judge, however, (paras 48–51) ultimately accepted Mr Faull's figure for overheads which was £256,327.

45.   Deduction of that sum of £256,327 from the gross profit of £308,176 gave a maintainable pre-tax profit of £51,849. Allowing for tax at the small companies rate of 25% applicable at the valuation date produced a post-tax maintainable profit of £38,887: (para 51).

46.   The Judge said (para 52) that the next major stage in the valuation exercise was to select a price-earnings ratio by which to multiply the post-tax maintainable profit. It was more or less common ground that for this purpose the basic approach was to take an average price-earnings ratio from the price-earnings ratios applicable to comparable quoted companies and then to discount it to reflect the differences between such quoted companies and a company like Unigel UK. However, the two experts differed as to the kinds of quoted companies to take as comparables and also as the extent to which the average of quoted price-earning ratios should be discounted.

47.   The Judge (paras 53 and 54) agreed with Mr Fisher's view that, having regard to the nature of the business of Unigel UK, quoted companies in the general manufacturing and chemicals sectors should be taken as comparables, in preference to Mr Faull's view that the comparables should be taken from the chemicals and telecommunications sectors. Mr Fisher took the average price-earnings ratios of companies in his chosen sectors at the valuation date and then took the average of those two averages — a process which gave him a ratio of 25.05. The Judge accepted and applied this figure of 25.05. However he thought that the appropriate discount to apply to it was 75%, as suggested by Mr Faull, rather than 60% as suggested by Mr Fisher, to reflect the unquoted status of Unigel UK and all the other factors which would tend towards caution for the company as it existed at the valuation date.

48.   Accordingly, the Judge concluded (para 56) that if the applicable price-earnings ratio was to be derived from the average of two quoted sectors less a discount, he would

take 25.05 less a discount of 75%. This, rounded up to the nearest half produced a figure of 6.5%, which he adopted.

49.   The conclusion of the Judge's exercise involved a simple calculation which (at para 61) he summarised as follows:

"The post-tax maintainable profit must be multiplied by the selected price-earnings ratio to give a value for 100% of the shares in the company. So £38,887 is multiplied by 6.5 producing £252,766 for 100%. I have already said

that, to scale this down to a value for Mr and Mrs Joiner's 51% interest, I will simply take 51% of it … Therefore I value their interest at £128,910, which I round up to £129,000."

50.   In an Appendix to his judgment, the Judge set out the stages of his calculation in summary form. For ease of reference, I repeat this summary:

|  |  |  | £ | £ |
|---|---|---|---:|---:|
| 1. | Estimate of annual revenue |  |  | 1,000,000 |
| 2. | Deduct direct costs of earning revenue |  |  |  |
|  | (i) | Costs other than (ii) and (iii) below (60.93%) |  |  |
|  | (ii) | Commissions on revenue of £1m |  |  |
|  | (iii) | Licence fees at 2½% | 609,300 |  |
|  |  |  | 57,524 |  |
|  |  |  | 25,000 |  |
|  |  |  |  | (691,824) |
| 3. | Gross profit before overheads |  |  | 308,176 |
| 4. | Deduct estimate of annual overheads |  | (256,327) |  |
| 5. | Pre-tax maintainable profit |  |  | 51,849 |
| 6. | Deduct tax at 25% |  |  | (12,962) |
| 7. | Post-tax maintainable profit |  |  | 38,887 |
| 8. | Select appropriate price earnings ratio: 6.5 |  |  |  |
| 9. | Multiply post-tax maintainable profit (line 7) by price earnings ratio of 6.5 (line 8) to give value of 100% |  |  | 252,766 |
| 10. | Multiply by 51% to give value of a 51% holding |  |  | 128,910 |
|  |  |  | SAY | 129,000 |

51.   The Judge (para 64) compared his valuation with the two offers which had been made to the appellants in early

1994 and were not accepted (see para 23 above). He said this:

> "As I said in paragraph 21 above there were two of them. Mr Joiner has understandably concentrated on the offer which aggregated to US $540,000. But that was the offer on the basis that Mr Joiner would be tied in for 5 years in such a way that he could not compete with Unigel UK. The other offer was on the basis that Mr Joiner would not be tied in, so that he would have been free to compete or work for a competitor. That is the offer which should be compared with my valuation, because in the events that happened, once Mr Joiner had been dismissed by ITG and excluded from Unigel UK's factory on 4 December 1994, he was free to compete and to work for competitors. Indeed he established his own consultancy, and I believe that he has acted as a consultant to at least one competitor, an Indian company called Savita. The offer which was made and not accepted was US$220,000, which at the exchange rate at the time was equivalent to £148,048."

## The Grounds of Appeal

52. In his notice of appeal Mr Joiner relies on five grounds:

- (1) "The Judge was wrong not to take into account the forecast growth potential of the company."
- (2) "The Judge was wrong to exclude all hindsight."
- (3) "In light of the unchallenged evidence of Mr Bury the Judge was wrong to follow the principles on which Mr Faull calculated overheads."
- (4) "The Judge was wrong to allow licence fees as it was contrary to the heads of agreement."
- (5) "The Judge gives no reason for assessing the value as at 11/94 lower that defendants open offer of 3/94."

53. I shall begin by considering the fifth ground of appeal since that was the ground with which Mr Joiner himself, after some introductory observations, began his address to us.

## The Respondents' Offers of March 1994

54. Mr Joiner referred us to some of the background to the offers. On 16th January 1994, he had sent a telefax to Mr Robinson indicating that "if you make me the right offer for shares with a suitable consultancy contract and it can be done quickly", he would accept. For this purpose, he supplied his own share valuation, his method being to value the company in five years time, based on forecasts and the current business plan, and then (by the Discounted Future Earnings method) to discount it back to give a current value. For this exercise he assumed that the average selling price of gel was £3,500 per MT at a gross profit on raw material cost of 40%. His figures were as follows:

**"Forecast**

|  | MT | £ REVENUE | G/PROFIT | OVERHEAD | NET PROFIT |
|---|---|---|---|---|---|
| Year 1 | 300 | 1,050,000 | 420,000 | 200,000 | 220,000 |
| Year 2 | 400 | 1,200,000 | 480,000 | 350,000 | 130,000 |
| Year 3 | 500 | 1,750,000 | 700,000 | 360,000 | 340,000 |
| Year 4 | 600 | 2,100,000 | 840,000 | 380,000 | 460,000 |
| Year 5 | 700 | 2,450,000 | 980,000 | 400,000 | 580,000 |

Note: The overhead increases in year 2 to take account of additional production facilities. (Either expansion of UK or new plant in China for example)."

[As Mr Joiner pointed out to us, the figures of £1,200,000 and £480,000 relating to Year 2 were an obvious arithmetical error. They should have read £1,400,000 and £560,000].

55. The next stage in the negotiation was a Memo dated 25th February 1994 sent to Mr Joiner by Mr George, setting out, "only as an initial guideline for general discussion and understanding" some suggested terms that might be required in any proposed agreement for the sale by the appellants of their shares in Unigel UK. Clause 1 of these proposed terms embodied a restrictive covenant which would in effect have precluded the appellants from competing in the relevant market for five years. Clause 2 would have tied Mr Joiner into a contract of employment for five years.

56. Mr Joiner responded in a Memo dated 27th February 1994. In the last two paragraphs on page 1 and the first paragraph on page 2 of that Memo, he suggested that as a matter of law an effective restraint could not be imposed on him, "locking him out" of the gel market, but that the best protection for the respondents would be to "lock him in" to Unigel by providing sufficient incentive in a consultancy agreement.

57. There followed a Memo dated 1/3/94 sent by the respondents "for and behalf of ITG [sic]" and addressed to Mr Joiner which contained the two offers which the respondents said their backers had authorised them to make. It was not drafted by the respondents' legal advisers. It contemplated that the parties' respective legal advisers would be instructed if matters proceeded. Some of its provisions showed a certain lack of clarity. "Offer No 1" contained seven paragraphs. The first two paragraphs offered a purchase price of US$220,000 payable in two instalments. Offer No 1 continued:

"The agreement would limit your ability to compete in any manner in the best possible way and in the best interests of ITG/UNIGEL. However, everyone does recognise what you have said on this matter.

[This is the third paragraph of the offer, referred to in para 61 below]

There would also be a consultancy agreement that specified an agreed schedule of payments on a $ x / hour / day / week basis geared to the actual amount of work undertaken in response to specific work requests from UNIGEL / ITG.

We realise that perhaps the price in this offer may not be acceptable to you but this is all our backers / bankers would be willing to risk given your requests to be free to pursue other business interests and other statements."

58. The remaining paragraphs of Offer No 1 introduced Offer No 2 as follows:

"They have said that a far better option for both parties is one whereby you are more firmly locked into ourselves and locked out of competing by a more financially rewarding consultancy contract.

Unfortunately, this is more along the lines of the type of offer that you said

in the past you would prefer not to take. However, it does tend to meet the requirements you mention in the first paragraph of page 2 of your memo of 27/02/94 so it may well be acceptable to you."

"Offer No 2 offered a purchase price of US$540,000 payable by instalments and, so far as material, continued as follows:

> "There would be a term consultancy of 5 years with annual payments of $52,000.00 in return for 4% of the shares such that by the end of the consultancy ITG holds 100% of the shares.

> The consultancy agreement would also specify an agreed schedule of payments on a $ x / hour / day / week basis geared to the actual amount of work undertaken in response to specific work requests from UNIGEL / ITG.

> This amounts to a total of $540,000.00 payable to you plus the payments from the actual work performed under the consultancy agreement."

59.  The last page of the Memo dated 1/3/94 included the following paragraph:

> "The above offers are dependent upon us supplying the bank with a detailed sales forecast by geographical area with justifications and a breakdown of what working capital is required and how it is to be spent and being accepted as reasonable."

60.  The Judge (see para 51 above), having reached his final valuation figure, simply referred to the two offers by way of a comparative test. He regarded the lower Offer No 1 as the relevant one because it had been made on the basis that Mr Joiner would not be "tied in so that he would have been free to compete or work for a competitor". In para 21 of his judgment he had similarly described Offer No 1 as having been one of US$220,000 "if Mr Joiner was not locked in to Unigel UK or otherwise precluded from competing".

61.  Mr Joiner, who appeared to attach some importance to this point, suggested that these descriptions of Offer No 1 were wrong. The third paragraph of Offer No 1 in his submission demonstrated that Offer No 1, as well as Offer No 2, was made on the footing that Mr Joiner would be precluded from competing with Unigel UK, and that correspondingly, if the Judge was to approach his valuation on the realistic basis which he postulated, he should have done so on the hypothesis that Mr Joiner would be "locked into" the company, because that was what the parties had contemplated in March 1992.

62.  I am unable to accept this submission, which picks the rather vague wording of the third paragraph of Offer No 1 out of its context and attaches undue weight to it. When the last five paragraphs of Offer No 1 are read as a whole and in conjunction with the last two paragraphs of page 1 and the first paragraph of page 2 of the Memo dated 27th February 1994, it is in my judgment reasonably clear that the Judge was right in saying that the first offer, unlike the second, was made on the basis that Mr Joiner would not be locked into the company (either by a full-time consultancy agreement or otherwise).

63.  Having made this submission in regard to Offer No 1, Mr Joiner went on to submit that the Judge, in effecting his valuation, was wrong to disregard Offer No 2, as being immaterial. On the contrary, he submitted, that offer, being a bona fide offer made by the respondents only a few months before the valuation date, should have been taken as the basis or yardstick for the price which

the respondents would have been willing to pay for the appellants' shareholding as at the valuation date.

64.   There are in my judgment a number of reasons why this submission must be rejected. I need refer to only two of them, given by Mr Cranfield on behalf of the respondents. First, Offer No 2 was clearly no more than a tentative offer intended as a mere prelude to later negotiations and dependant on the respondents' bank being satisfied as to a large number of matters, set out on the last page of the Memo. Secondly, and conclusively, whatever may be the true construction of Offer No 1, Offer No 2 was made on the basis that Mr Joiner would be locked into Unigel UK. However, in paras 28 to 30 of his judgment on liability, the Judge described the rapidly deteriorating relationship between the parties. Indeed in para 30, he went so far as to describe the relationship between Mr Joiner and Mr George during the weeks immediately preceding the valuation as having become "poisonous". In those circumstances it is fanciful to suggest that, as at the valuation date, the parties would have come to an arrangement which locked Mr Joiner into Unigel UK. The clean break which in the event occurred was bound to happen.

65.   I would therefore reject Mr Joiner's submissions based on the two offers of March 1994.

**Hindsight**

66.   Mr Joiner's complaint concerning hindsight relates to the Judge's calculation of future revenue. Mr Fisher, in para 6.6 of his Report, reproduced (without correction of the arithmetical error) the forecasts (set out in para 54 above) made by Mr Joiner in January 1994, when negotiating for the sale of his shares. In para 6.21 of his Report, he expressed the opinion that "the profits forecast by Mr Joiner in 1994 could at November 1994 be regarded as sustainable." He therefore adopted the forecast pre-tax profit for the year to 31st March 1997 of £340,000 as maintainable and discounted this at a rate of 10% to arrive at a net present value. (He did not go beyond 1997 because he said that the actual trade figures were distorted due to the establishment of manufacturing facilities in China).

67.   The manner in which the Judge dealt with this matter of forecasts is summarised in paras 41 and 42 above. Mr Joiner submitted that he was wrong in rejecting Mr Fisher's approach to the estimate of revenue. He pointed out, as had Mr Fisher, that the sales revenue forecasts which had been made by Mr Joiner in 1994 had in the event proved very accurate. Taking into account the arithmetical error referred to in para 54 above, the three years sales forecast by Mr Joiner amounted to £4,200,000. The actual sales figures were £4,022,000. He submitted that Mr Faull, in basing his valuation on actual trading figures as at November 1994, had taken a "blinkered" view. Mr Fisher, he submitted, had been right in thinking it appropriate to test the reasonableness and reliability of Mr Joiner's forecasts against the actual trading results for the company for the years ending March 1995, 1996 and 1997 and, having done so, to adopt those figures.

68.   Mr Joiner, while accepting that the basic rule in valuing shares in a company is to reject evidence of events which occurred after the valuation date (see Re Holt [1953] 2 A.E.R. 1499), relied on certain cases in which the courts have held that it was legitimate to look at later events for the purpose of the particular valuation exercises they were called on to perform. He placed particular reliance on the decision of the House of Lords in Bwllfa and Merthyr Dane Steam Collieries v The Pontypridd Waterworks Company [1903] A.C. 431.

69.   In that case owners of coal mines under and near waterworks had given the undertakers notice under s.22 of the Waterworks Clauses Act 1847 that they intended to work the coal. The undertakers replied by a counter-notice requiring the mine owners not to work. Questions arose as to the amount of the compensation properly payable to the mine owners. There were long delays before the arbitration was completed. The House of Lords held that the statutory compensation was to be assessed not by reference to a fixed date, the date of the counter-notice, but by reference to what the coal owners would have made out of the coal during the whole time it would have taken them to get it, so that evidence was admissible before the arbitrator showing that coal rose in value after the date of the counter-notice. In a passage particularly relied on by Mr Joiner and Mr Fisher, Lord Macraghten (at p 431) said:

"Why should he listen to conjecture on a matter which has become an accomplished fact? Why should he guess when he can calculate? With the light before him, why should he shut his eyes and grope in the dark?"

However, by way of contrast, in the present case the damages do fall to be assessed by reference to a fixed date, namely 23 rd November 1994. The Bwllfa decision is therefore of no assistance to the appellants.

70.  A very recent decision, also relied on by Mr Joiner, was that of the House of Lords in Phillips v Brewin Dolphin Bell Lawrie Ltd [2001] 1 WLR 143. This concerned the valuation of a covenant to make four annual payments in a sublease of equipment for the purpose of identifying the "consideration" for a transaction within section 238(4)(b) of the Insolvency Act 1986. Lord Scott of Foscote said at p 153:

"Mr Mitchell submitted that these ex post facto events ought not to be taken into account in valuing PCG's sublease covenant as at 10 November 1989. I do not agree. In valuing the covenant as at that date, the critical uncertainty is whether the sublease would survive for the four years necessary to enable all the four £312,500 payments to fall due, or would survive long enough to enable some of them to fall due, or would come to an end before any had fallen due. Where the events, or some of them, on which the uncertainties depend have actually happened, it seems to me unsatisfactory and unnecessary for the court to wear blinkers and pretend that it does not know what has happened. Problems of a comparable sort may arise for judicial determination in many different areas of the law. The answers may not be uniform but may

depend upon the particular context in which the problem arises. For the purposes of section 238(4) however, and the valuation of the consideration for which a company has entered into a transaction, reality should, in my opinion, be given precedence over speculation."

71.  The particular context in which Lord Scott had regard to events which occurred after the date of the sublease was for the purpose of confirming that the covenant, which could already be seen as "precarious" from the outset, in fact had a nil value. He recognised that the approach which he adopted might not be applicable in other areas of the law. He was not stating any general principle with regard to valuation, still less with regard to the valuation of shares in a company.

72.  In Buckingham v Francis [1986] 2 A.E.R. 738, Staughton J, in valuing the shares in a company at a fixed date, (at p 740a) reiterated the basic rule in saying "The company must be valued in the light of the facts that existed at 24 March 1981", but added "regard may be had to later events for the purpose only of deciding what forecasts for the future could reasonably have been made on 24 March 1981". This addition was perhaps the judicial dictum most helpful to Mr Joiner. He relied on it in support of his submission that regard might be had to the post-November 1994 sales figures for the purpose of demonstrating that his forecasts of sales figures made in January 1994 had been fairly accurate.

73.  The latter case, however, is certainly not authority for the proposition that forecasts of future trading made before the valuation date should be preferred to the actual trading results of the company for its most recent period of trading merely because, in the event, such forecasts happen to tally reasonably well with the company's subsequent trading results. None of the authorities on which Mr Joiner relies support the proposition that, for the purpose of valuing shares in a company at a fixed date, its trading results after the valuation date should

be preferred to its trading results actually known at the valuation date.

74.   In all the circumstances, I accept Mr Cranfield's submission that the Judge was fully entitled to conclude that a valuer instructed on behalf of the respondent purchasers in November 1994 would in the real world have preferred Mr Faull's approach, which, in accordance with the standing practices of valuation, was tied to the most recent actual trading results, to Mr Fisher's approach which was based simply on Mr Joiner's best guess as to how Unigel UK was likely to perform in the future. Mr Joiner criticised the Judge's short statement in para 44 of his judgment that "hindsight ought to be excluded", because the Judge did not support it by reference to reasons or decided cases. The Judge, however, can in my opinion readily be excused for failing to spell out reasons for what he regarded as a statement of the general legal principles of share valuation so well established as to require no amplification.

75.  I would therefore reject Mr Joiner's submissions based on hindsight.

**Growth Potential**

76.   Before selecting his choice of method of valuation, the Judge had said (para 39): "Both sides agree (and so do I) that the price should assume that Unigel UK was a going concern. On that basis the core of the value lay in the present expectation (as at the valuation date) of future profits from the company's business." Both experts agreed that the company had growth prospects. Mr Faull himself had observed (para 6.8(i) of his Report) that "the company was engaged in a business that had significant potential for future growth". Mr Joiner again criticised the Judge for following Mr Faull's approach in basing his estimate of the future profits of the company on its actual recent trading results. The Judge in adopting this course, Mr Joiner suggested, entirely overlooked the growth potential of the company. The right course to follow in his submission would have been to adopt Mr Fisher's approach of using a forecast of the profit figures for three years forward (1997), based on Mr Joiner's forecast in January 1994 that the company's revenues would increase year on year from £1,050,000 in "year 1" to £1,750,000 in "year 3".

77.   Under the previous heading "Hindsight", I have already given reasons for concluding that the Judge was entitled to decline to base his valuation on Mr Joiner's forecasts. However, I do not think it correct to say that the Judge overlooked the growth potential of Unigel UK in reaching his ultimate figure for the valuation of the shares. In para 29 of his judgment, as a ground for optimism, he specifically referred to the fact that the company was a supplier to the telecommunications industry "which was very much a growth sector at the time". In para 32, however, he pointed out that while business sales had been on an upward trend over the two years that the company had been in business, "orders appeared to be erratic" and "there certainly was not a steady and consistent flow"; he there gave a number of reasons for caution in estimating future profits.

78.   The observation made by Mr Faull quoted in para 76 above was made by him in the part of his Report where he was considering what was the appropriate price-earnings multiple to be applied to his figure for maintainable profit. But, as Mr Cranfield submitted in his skeleton argument, Mr Faull specifically took the growth potential of Unigel UK into account in giving his opinion as to where the price-earnings multiple to be applied to the company should fall within the range which he considered suitable for a company such as Unigel UK with a high turnover and low profit: (see paras 6.7–6.10 of his Report). For the reasons given in paras 52–53 of his judgment, the Judge considered that Mr Faull's multiplier of 5 was too low and increased his figure to 6.5. Paras 53 and 54 of his judgment, while not referring in terms to the company's growth potential, in my opinion show clearly that he had such potential in mind, (as well as the reasons for approaching it with caution), in reaching his figure of 6.5. The appellants do not challenge this particular exercise of his discretion: (see para 24 of their skeleton argument). However, as Staughton J observed in Buckingham v Francis (supra at p 741i):

> "What one must guard against is making allowance for the same risks twice over i.e. in the assessment of future profits and also in the choice of a price/earnings ratio."

It is in my judgment no less necessary to avoid making allowance twice over for the same growth potential. This the Judge in the present case rightly avoided.

79. In my judgment therefore the judgment cannot be faulted by reference to Mr Joiner's submissions under the heading of growth potential.

**Licence Fees**

80. The manner in which the Judge dealt with the question of the existence or otherwise of a liability on the part of Unigel UK as at the valuation date to pay licence fees to Unigel HK for the use of intellectual property rights has been fully set out in paras 34 to 36 above. As will have appeared, his conclusion was that, for the purpose of agreeing a share sale price in a transaction such as he postulated, a rate of 2½% would have been adopted. He made a corresponding deduction from his estimate of Unigel UK's revenue, as a direct cost of earning that revenue.

81. Mr Joiner submitted that this conclusion was wrong because the charging of any licence fee to Unigel UK would have been contrary to the Heads of Agreement dated 16th September 1992. The provisions in the Heads of Agreement, summarised in para 16 above, had appeared to contemplate that (conditionally on the loan from National Westminster Bank being obtained) Unigel UK rather than Unigel HK would be the ultimate purchaser from Geltec's liquidator of its intellectual property rights and the UNIGEL trade name. Mr Joiner submitted that the Heads of Agreement were still in force at the valuation date and would have precluded the respondents through Unigel HK, of which they had control, charging Unigel UK with any licence fee for intellectual property rights.

82. This submission, however, attaches no weight to the Geltec Agreement, made before the valuation date on 7th February 1994 by which Geltec's liquidator agreed to sell to Unigel HK various assets of Geltec's former business, including the "intellectual property" as defined. Though the appellants at the trial on liability attempted to argue that, without their prior consent, Unigel HK should not have been set up at all or at least should not have been a party to the Geltec Agreement, this argument met with no success: (see pages 30 et seq. of the judgment on liability). There has been no appeal on this point. For present purposes therefore it has to be assumed that the Geltec Agreement, so far as it extended, was a valid agreement which did not infringe the appellants' rights.

83. In regard to the Geltec Agreement, the Judge found as facts (para 34 of his judgment in damages) that the idea was for Unigel HK to license the intellectual property rights to Unigel UK in return for licence fees, that Mr Joiner was aware of this idea, and that in September 1994 he attended a meeting at which the principal subject matter was to seek advice about the payment of licence fees by Unigel UK to Unigel HK and the level at which they should be charged. True it is that at the valuation date no licence agreement was yet in place and in practice Unigel UK was using the product name UNIGEL without payment to Unigel HK or anyone else. True it also is that the legal right of Unigel HK to charge a licence fee for the use of this product name was debatable for the reasons given in para 37 of the Judge's judgment. But, as the Judge pointed out, the mere fact that at the valuation date Unigel UK was using the product name without payment did not mean that it could go on doing so for ever. The whole legal situation was complex and problematic.

84. Taking all the circumstances into account, the Judge was in my opinion amply justified in concluding that the value of Unigel UK at the valuation date should be ascertained on the basis that, despite some uncertainties, it would have to concede a licence fee payment if it wanted to continue using the name UNIGEL for its product, or at least wanted to do so without facing troublesome legal challenges. Nor do, I think, he can be said to have erred when, as a matter of judgment, he decided that for the purpose of agreeing a share sale price in a transaction such as he postulated, a rate of 2½% would, as a matter of compromise, have been adopted. Such figure, it will be noted, was far lower than the licence fees of 7½% and later 5% agreed between Unigel UK and Unigel HK, albeit in different circumstances, after the valuation date.

**Overheads**

85.  As will have appeared from paragraph 44 above, the
Judge accepted Mr Faull's ultimate figure for overheads at
£256,327. The sources of this figure appear for the greater
part from his original Report. Using his "capitalised
earnings" method he derived his figures for overheads
from Unigel UK's March 1995 accounts. In Appendix
2 he set out the trading and profit and loss account
of the company for the year ended 31st March 1995
(the accounting year in which the valuation date fell).
This included a particularised list of overheads totalling
£279,634. He used these figures in Appendix 3 to calculate
the annualised trading figures of the company, and in
Appendix 4 to calculate the "maintainable profit" at
the valuation date. In Appendix 4 he derived a final
figure of £313,851 as the appropriate figure for overheads.
Subsequently, Mr Faull deducted from this last figure
the figure of £50,073 for sales commissions shown in
Appendix 2 and the figure of £7,451 for additional
commission shown in Appendix 4, and added them as
costs of sale. These deductions left the sum of £256,327
adopted by the Judge.

86.  In contrast, Mr Fisher, for the purpose of carrying
out his calculations under his Discounted Future Earnings
method, had made his estimate of the potential level of
overheads required by the business primarily on the basis
of the figures given by Mr Bury. He was a chartered
chemist and former business colleague of Mr Joiner with
experience in gel manufacturing, who had been asked in
particular to give his opinion as to the resources required
to manufacture gels.

87.  In his witness statement, Mr Bury gave detailed
evidence about the production capacities and appropriate
staffing levels for gel production. He exhibited a schedule
setting out his estimate of the operating costs required to
manufacture unigel and operate Unigel UK. In it he used
the same line items as appeared in the audited profit and
loss account of the company for the year ended March
1997. He gave two estimates, one for up to 500 MT
per year, using a small reactor, and one for up to 1000
MT per year, using a larger reactor. For comparison he
included a column showing the actual operating expenses

incurred by the company during the year ended 31st
March 1997 (£666,609) which exceeded his estimate of
£385,400 by £281,209. Mr Bury concluded that this
excess represented excessive expenditure on overheads.
Mr Fisher in his report (para 6.16) accepted Mr Bury's
figures. In reliance on his estimate of £385,400, he then
produced his subsequent figures.

88.  Mr Joiner's first submission under this head was
that the Judge erred in preferring the figures produced by
Mr Faull to those produced by Mr Fisher, based on the
evidence of Mr Bury, on which Mr Bury had not been
cross-examined. There are in my judgment at least two
reasons why this submission must be rejected. First, the
Judge was not obliged to accept Mr Bury's opinion (which
was merely opinion) as to the costs of the future likely
overheads of Unigel UK in carrying on the business of
manufacturing and selling Unigel products, when there
was other evidence of opinion, namely that of Mr Faull,
which he preferred. Secondly, the Judge was entitled to
find that, looking at the matter realistically, a purchaser
in the position of the respondents (or their valuer) would
have preferred Mr Faull's overhead figures, which were
taken from Unigel UK's actual trading overhead figures
and were thus tied to reality, to Mr Fisher's approach,
which was based simply on Mr Bury's opinion as to the
future overheads of a company engaged in a business of
this nature.

89.  Mr Joiner, recognising the difficulties facing his
first submission referred to in para 88 above, while not
abandoning it, directed the greater part of his argument
before us under this head to the Judge's approach to the
matter of overheads, based, as it was, on that of Mr Faull.
That approach, he submitted, was inconsistent. On the
one hand, the Judge disclaimed the use of hindsight. On
the other hand, he invoked hindsight at least to the extent
that he took into the reckoning the overheads of Unigel
UK incurred during the period from the valuation date up
to 31st March 1995.

90.  I do not think there is any substance in this
point. Any splitting up of the overheads for the year to
March 1995 would inevitably have been a quite arbitrary
and artificial operation. Furthermore, looking at the
matter realistically, the appellants and the respondents, in

negotiating a sale and purchase as at the valuation date in November 1994 would not in practice have been likely to conclude their negotiations until the overheads for the whole year had been ascertainable.

91. A further criticism of the Judge's approach, relied on more strongly by Mr Joiner, related to his treatment of salaries, wages and directors' fees. He pointed out that Mr Faull in his Report (para 5.4) had proceeded on the assumption of projected annual sales for Unigel of £1m at the valuation date.

92. In para 5.8 of his report, after referring to his calculation of overheads as set out in Appendix 3, Mr Faull had said:

> "That figure includes commission and the appropriate adjustment in respect of commission on a higher level of sales is shown at appendix 4. Certain other overheads could also be higher on a projected level of sales of £1m, but, as orders had been received and accepted of over £500,000 in the first six months of that accounting year … it would have been reasonable to assume at that time that no other overheads would significantly increase to achieve annual sales of £1m."

93. That was the assumption on which Mr Faull said he would proceed. However, as Mr Joiner pointed out, as Appendices 1 and 2 to the Report had shown, while the salaries and wages paid by Unigel UK in the year ending 31st March 1994 had been £25,867, those paid in the subsequent year ending 31st March 1995 had been £60,300. On the assumption made by Mr Faull, the difference of £34,433 between these two figures must, it was submitted, have represented an excessive payment on overheads. To this latter sum had to be added a sum of £2,919 representing the difference between National

Insurance contributions paid in the first year (£2,510) and those paid in the second year (£5,429).

94. To that sum of £2,919, it was submitted, further sums should be added because Mr George's evidence showed that after the valuation date two of his associates, Mr Coates and Mr Booker, had joined the company as consultants. Mr Coates had been paid £5,990 (rounded up) in respect of the year to 31st March 1995, and Mr Booker had been paid £400.

95. All these above-mentioned sums of £34,433, £2,919, £5,990, and £400 (totalling £43,742) in Mr Joiner's submission represented excessive expenditure by Unigel UK during the period between the valuation date and 31st March 1995, and should be deducted from any estimate of overheads accordingly.

96. Before the Judge, Mr Joiner had further argued that the figure for overheads should be reduced so as to reflect travel and subsistence at a level sharply below that which Unigel UK was in fact incurring. This argument was rejected by the Judge and was not pursued before us. Ultimately too, Mr Joiner did not pursue his earlier argument that one director, rather than two, would have sufficed after his departure.

97. At the conclusion of his opening address, Mr Joiner handed up to us a helpful revised version of the Appendix to the judgment, which showed what in his submission would have been all the appropriate figures on the basis of the Judge's general approach to the question of valuation. This revised version showed simply a deduction of the above-mentioned figure of £43,742 from the Judge's estimate of overheads (£256,327). This represented his final response to the Judge's estimate.

98. Having summarised, I hope fairly, what became Mr Joiner's ultimate submissions on the question of overheads, which I recognise as being of great importance to the appellants, I hope that it will not seem discourteous if I deal with them quite shortly. It is quite clear from paras 48–49 of the judgment that the question of staff costs had been fully ventilated in argument before the

Judge and had been fully considered by him. In para 49, having said that he accepted the principles on which Mr Faull calculated his deduction of overheads, and that he accepted his figures, the Judge said:

> "It would be excessive for me to go through all the contested items one by one. However, by way of example, I accept Mr Faull's view that a company which was carrying on an export business with a turnover of £1m or more a year ought to have two directors. And I accept that his figure of £38,000 a year for each director is realistic. On staff costs more generally, I do not accept Mr Joiner's assertion that Mr George and Mr Robinson introduced a "jobs for the boys" culture and employed too many people at too high salaries."

99. Though Mr Joiner told us that his reference to the introduction of a "jobs for the boys" culture had been directed to a period after 31 st March 1995, it is in my judgment clear that, in the sentence last quoted, the Judge was finding as a fact that, contrary to Mr Joiner's claim, Unigel UK had not employed too many people at too high salaries at any relevant time. I can see no grounds on which we can properly interfere with that finding of fact. Nor do I think that it was incumbent on the Judge, having decided the issue of principle in favour of Mr Faull's approach, to go through each item of overheads and say why he preferred his figure to that of Mr Fisher (derived from Mr Bury).

100. In my judgment therefore the appellants' submissions under that head must also be rejected.

## Conclusion

101. In conclusion, I would make these general observations. The process of valuation of a shareholding in a case such as this cannot be an exact science. Though it ultimately involves a finding of fact, elements leading up to such finding may well involve points on which different minds, approaching the matter judicially, could quite properly take different views — in other words, points to which there cannot be said to be exclusively one correct answer. It could be that, on some of the conclusions of fact reached by the Judge in his judgment on valuation, other minds would have taken different views. A figure substantially higher or lower than £129,000 might have been the result. But the Judge considered all the issues with great care and his judgment seems to me to have been conspicuously clear, logical and fair. I can see no substance in the criticisms of it based on the decision of this court in Flannery v Halifax Estate Agencies Ltd [2000] 1 W.L.R. 377, relating to the duty of the court to give sufficient reasons. This is not a case in my judgment which would justify any interference with the Judge's decision.

102. For the reasons given, I would dismiss this appeal.

Lord Justice Keene:

103. I agree.

Lord Justice Aldous:

104. I also agree.

Order: Appellant's appeal against the judgment of Park J dated 28th July is dismissed with costs on the standard basis to be subject of a detailed assessment if not agreed; the respondent's cross-appeal is dismissed with costs on an indemnity basis, to be the subject of a detailed assessment if not agreed; application for permission to appeal to the House of Lords refused.

Crown copyright

© 2017 Sweet & Maxwell

2002 WL 347143

**End of Document**

© 2017 Thomson Reuters.

# TAB 44

2015] SC (Bda) 65 Com ( 25 September 2015)



# In The Supreme Court of Bermuda

**CIVIL JURISDICTION**
**COMMERCIAL LIST**
**2010: No. 454**

**BETWEEN:-**

 (1) **KINGATE GLOBAL FUND LIMITED (In Liquidation)**
 (2) **KINGATE EURO FUND LIMITED (In Liquidation)**

**Plaintiffs**

**-and-**

 (1) **KINGATE MANAGEMENT LIMITED**
 (2) **FIM LIMITED**
 (3) **FIM ADVISERS LLP**
 (4) **FIRST PENINSULA TRUSTEES LIMITED**
  **(as Trustee of the Ashby Trust)**
 (5) **PORT OF HERCULES TRUSTEES LIMITED**
  **(as Trustee of the El Prela Trust)**
 (6) **ASHBY HOLDING SERVICES LIMITED**
 (7) **EL PRELA GROUP HOLDING SERVICES LIMITED**
 (8) **MR CARLO GROSSO**
 (9) **MR FEDERICO CERETTI**
 (10) **ASHBY INVESTMENT SERVICES LIMITED**
 (11) **EL PRELA TRADING INVESTMENTS LIMITED**
 (12) **ALPINE TRUSTEES LIMITED**

**Defendants**

## JUDGMENT ON PRELIMINARY ISSUES

### (In Court)

Date of hearing: 11th – 15th and 18th – 19th May 2015[1]

Date of judgment:  25th September, 2015

Mr Adrian Beltrami QC and Mr Alex Potts, Sedgwick Chudleigh Ltd, for the Plaintiffs

Mr Saul Froomkin QC and Ms Venous Memari, Liberty Law Chambers Limited, for the First Defendant

Mr Thomas Lowe QC and Ms Sarah-Jane Hurrion, Hurrion & Associates Ltd, for the Second, Third, Eighth and Ninth Defendants

Mr Alan Boyle QC and Ms Katie Tornari, Marshall Diel & Myers Limited, for the Fourth to Seventh and Tenth to Twelfth Defendants

### Overview

1.    As this is quite a long judgment, it may assist the reader if I set out the different sections in a table of contents.  References in brackets are to paragraph numbers.  All the parties have met with some measure of success, albeit the Defendants more so than the Plaintiffs.

(1)    Introduction (2 – 3)

(2)    The parties (4 – 11)

(3)    The Funds' pleaded claims (12 – 21)

(4)    The preliminary issues (22 – 24)

(5)    The contractual framework (25 – 74)

---

[1] The Court invited supplemental written submissions, which were received on or before 28th August 2015, on two authorities about which it had not been addressed in the course of argument: Arnold v Britton [2015] 2 WLR 1593 and R (Al-Skeini) v Defence Secretary [2007] QB 140.

(i)  Articles of Association (30 – 42)

(ii)  Information Memoranda (43 – 52)

(iii) Administration Agreements (53 – 60)

(iv) Manager Agreements (61 – 74)

(6)    Issue (1)(b) (75 – 116)

(7)    Issue (1)(a) (117 – 126)

(8)    Issue (2) (127)

(9)    Issue (3) (128 – 134)

(10)   Issue (4) (135)

(11)   Issue (5) (136 – 142)

(12)   Issue (6) 143 – 152)

(13)   Issue (7) (153 – 175)

(14)   Summary (176 – 178).

## Introduction

2.     This is a ruling on the trial of a number of preliminary issues.  They are all concerned with whether management fees ("the Disputed Fees") paid to the First Defendant ("KML") by the Plaintiffs ("Kingate Global" and "Kingate Euro", together "the Funds") under various management agreements ("the Manager Agreements") were contractually due to KML and, if so, whether the Funds are precluded from asserting a claim in unjust enrichment against KML and the various Defendants to whom the fees received by KML or their proceeds have been distributed.

3.     Applications for the trial of these preliminary issues were prompted by the decision of the Privy Council in <u>Fairfield Sentry Ltd</u> v <u>Migani & Ors</u> [2014] 1 CLC 611; [2014] UKPC 9 ("<u>Fairfield</u>").  The applications have been brought by the Trust Defendants (as defined below) and KML respectively.

## The parties

4.     The Funds were investment companies incorporated in the British Virgin Islands ("BVI").  Kingate Global was incorporated on 11th February 1994

3

and Kingate Euro on 19th April 2000. They were established as open-ended investment funds issuing non-participating, redeemable shares offered for subscription by means of information memoranda. Over time, they became "feeder funds" to Bernard L Madoff Investment Securities LLC ("BLMIS"), an investment company established and operated by the notorious fraudster Bernard L Madoff which acted as the Funds' investment adviser. The vast majority of monies raised by the Funds were transferred to BLMIS for investment on the Funds' behalf. In fact Mr Madoff was running a Ponzi scheme and none of the monies were invested. Upon Mr Madoff's arrest in December 2008 the Funds collapsed and were placed in liquidation in the BVI and Bermuda.

5.    Kingate Global commenced operations on 1st March 1994. There was a single class of shares, called Common Shares. On 1st March 1995 Kingate Global was recapitalised. It renamed the Common Shares as Class A Common Shares ("Class A Shares") and introduced a new class of shares called Class B Common Shares ("Class B Shares"). On 1st December 1995 the Fund introduced a further class of shares called DM Class Common Shares ("DM Shares"). Kingate Global redeemed the Class A Shares in 1997 and cancelled that share class designation in 1998, although Class B Shares continued to be named as such. On 1st January 1999 the DM Shares were renamed as Euro Class Shares and from 1st May 2000 the Class B Shares were renamed as US Dollar Shares. In around 2000 the DM Shares were "hived down" into Kingate Euro, ie shareholders of Kingate Global were given equal numbers of shares in Kingate Euro and the assets allocated to the DM Shares were transferred to Kingate Euro.

6.    KML is a company incorporated in Bermuda which at all material times acted as Manager or Co-Manager of the Funds. Under the Manager Agreements, and unless it had been grossly negligent, KML was entitled to monthly management fees. Their amount was to be calculated by the relevant Fund's Administrator ("the Administrator") by reference to the month end net asset value ("NAV") of the Fund and class of shares to which the fees related. The successive Administrators were all independent

4

financial services companies.  These calculations served a dual purpose, as they were also used to determine the subscription and redemption prices paid to the Fund by incoming investors and by the Fund to outgoing investors. As appears below, in the absence of bad faith or manifest error the calculations carried out by the Administrator were final and binding as between the Funds and the investors.  An important issue for determination by the Court is whether they were also final and binding as between the Funds and KML.

7.    The Second and Third Defendants ("FIM Ltd" and "FIM Advisers", together "FIM") are respectively a company and a limited liability partnership, both incorporated in England and Wales.  The Plaintiff alleges that at all material times until July 2005 FIM Ltd acted as a consultant to KML and the Funds, and that FIM Advisers acted in that capacity at all material times since July 2005.  FIM dispute this.

8.    The Eighth and Ninth Defendants ("Mr Grosso" and "Mr Ceretti") were at all material times directors of FIM Ltd and principals of FIM Advisers.  In this judgment I shall refer to the Second, Third, Eighth and Ninth Defendants collectively as "the FIM Defendants".

9.    The Fourth Defendant ("Ashby") is trustee of the Ashby Trust, of which Mr Grosso is a discretionary beneficiary, and the owner of the Sixth Defendant ("Ashby Holding Services").  The Fifth Defendant ("El Prela") is trustee of the El Prela Trust, of which Mr Ceretti is a discretionary beneficiary, and the owner of the Seventh Defendant ("El Prela Group Holding").

10.   The Twelfth Defendant ("Alpine Trustees") is a former trustee of the El Prela Trust.   The Tenth and Eleventh Defendants ("Ashby Investment Services" and "El Prela Trading Investments") are investment companies wholly owned by Ashby and El Prela respectively.

11.   KML has at all material times been owned beneficially by Ashby and El Prela.  At present, Ashby holds half of the issued share capital in KML indirectly through Ashby Holding Services and El Prela holds the other half

5

indirectly through El Prela Group Holding.  In this judgment I shall refer to the Fourth to Seventh and Tenth to Twelfth Defendants collectively as "the Trust Defendants".

### The Funds' pleaded claims

12.    The Funds have brought various non-fault based claims against the Defendants.  It is with these that this Ruling is directly concerned.  In the "Summary" section at the start of their Statement of Claim[2] they are summarised as follows:

"*16   In addition, from their establishment until November 2008, the Funds paid [KML] hundreds of millions of US dollars in fees.  The fees were calculated by reference to the Funds' net asset values.  Because of Mr Madoff's fraud, at all material times, the Funds' only significant asset was their money at the bank.  Accordingly, the Funds' net asset values were massively overstated, and the fees mistakenly overpaid.*

*17   The Funds' claim is:*

*17.1   in unjust enrichment on the ground of mistake, for the recovery of the overpaid fees from [KML] and/or [various of the Trust Defendants], as ultimate recipients of the fees, and/or Mr Grosso and Mr Ceretti, as ultimate recipients of the fees and/or ultimate beneficial owners of the shares in [KML];*

*17.2   alternatively, for orders based on the Funds' retention of legal title to the overpaid fees and/or their traceable proceeds;*

*17.3   alternatively, for declarations that [KML] and/or [various of the Trust Defendants] and/or Mr Grosso and Mr Ceretti hold the overpaid fees, together with their traceable proceeds, on trust for the Funds; ...*"

13.    The Trust Defendants, supported by the other Defendants, say that they have a complete defence to these claims, namely that KML was contractually entitled to all the management fees that it was paid as those fees were calculated by the Administrator.

---

[2] Or more accurately, the Re-Re-Re-Amended Statement of Claim, but that is a bit of a mouthful.

14.    The Funds have addressed this defence in their Reply[3] to the Trust Defendants' Defence.  Eg, they plead at para 15 that the Administrator made a manifest error in the calculation of the NAV in that:

"*15.1   it failed to verify the figures provided by BLMIS for the purpose of calculating the NAV; and/or*

*15.2   it ignored inconsistencies in the figures provided by BLMIS; and/or*

*15.3   it failed to consider and address inconsistencies in the figures provided by BLMIS adequately; and/or*

*15.4   it relied on [KML] and/or Mr Ceretti and/or Mr Grosso and/or FIM to verify the figures provided by BLMIS and/or to check the calculations of the NAV, and/or it permitted [KML] and/or Mr Ceretti and/or Mr Grosso and/or FIM to vary the calculations of the NAV, as pleaded in paragraph 18 below;*

*such that, in the premises, those determinations were not binding on the shareholders in the Funds ...*"

The Funds' case is that in those circumstances the NAV calculations are not binding as between the Funds and KML, even if, which is denied, they would have been otherwise.

15.    The Funds also plead that the NAV calculations that were carried out were not carried out by the Administrator:

"*18   Further and in any event ... the Funds' Administrator sought as a matter of settled practice [KML's] and/or FIM's and/or Mr Ceretti's and/or Mr Grosso's approval of and comments on calculations of the NAV before finalising the calculations and sending them to shareholders.  By way of example:*

*18.1   The Funds' Administrator's recorded 'MONTH END PROCEDURE' for Kingate Global provides, under the heading 'FINAL PROCEDURES':*

*'Send the final NAV to Federico [Ceretti] for approval before sending out faxes to Shareholders'.*

---

[3] As Re-Re-Re-Amended.

7

18.2   By fax dated 1 August 1995, Mr Ceretti indicated to Dan Voth of the Funds' Administrator that he believed the NAV for June to be wrong, and asked Mr Voth to amend the NAV accordingly.

18.3   By fax dated 4 January 1996, Dan Voth sought Mr Ceretti's approval of the 'FINAL NAV FOR CLASS A BEFORE PRICE IS PUBLISHED' on behalf of [KML].  Mr Ceretti responded on 5 January 1996, 'O.K.!!'

18.4   By fax dated 14 April 1997 addressed to Dan Voth, Mr Ceretti confirmed that the 'FINAL NAVS FOR KGF B AND DM ARE FINE'.

18.5   A memo dated 18 November 1997 prepared by Dan Voth notes that the NAV for the Class DM shares in Kingate Global had been restated for September 1997 and October 1997 due to a change in the method used for valuing forward contracts, and that Mr Ceretti had insisted that the NAV and share allocation for September subscriptions should be changed 'because it goes against his credibility as a "Hedge" fund manager'.

18.6   By email dated 1 November 2002 from the Funds' Administrator to KML, FIM's approval of the estimated NAV for the Funds was required 'before distribution to shareholders'.  By email dated 4 November 2002 to KML, Mr Grosso responded that the estimates looked 'OK'.

18.7   By email dated 13 February 2008, the Funds' Administrator advised FIM of the NAV of both Funds for January 2008.  Mr Ceretti responded by email dated 14 February 2008 querying the 'performance differential between the two funds', and asking the Funds' Administrator to check that forward contracts had been priced correctly.

19   In the premises, [KML] and/or FIM and/or Mr Ceretti and/or Mr Grosso had input as to and/or control over the calculations of the NAV, and accordingly those calculations were not calculations performed by the Funds' Administrator and were therefore not binding as between the Funds and Kingate Management."

16.   The Funds have supplied Voluntary Further and Better particulars of their Reply to the Trust Defendants in which they give a number of further examples of instances in which the Funds' Administrator sought KML's and/or FIM's and/or Mr Ceretti's and/or Mr Grosso's approval of and comments on calculations of the NAV before finalising the calculations and sending them to shareholders.

8

17.   In a Response to Request for Further and Better Particulars requested by the FIM Defendants, the Funds further clarified their case on control:

"*It is the Plaintiffs' case that [KML] (at least) exercised 'control over the NAV calculations' in that the Funds' Administrator sought their comments on and express approval of the NAV determinations before these were finalised and sent to the Funds' shareholders.  In such circumstances, the Plaintiffs aver that, as a matter of settled practice:*

*a.   The approval of [KML] was an absolute precondition to the finalisation of the NAV determinations and their publication.*

*b.   No NAV determination would have been finalised or published without the approval of [KML].*

*c.   KML had the power to influence the content of the NAV determinations, should it be dissatisfied with them, or to withhold its approval if it was not satisfied.*

*d.   [KML] held the power of sanction or veto over the finalisation and publication of the NAV determinations.*"

18.   The Funds have also brought various fault based claims against the Defendants. Although the Court is not presently concerned with the merits of those claims they are relevant to the determination of two of the preliminary issues.

19.   The Funds plead at para 106 of the Statement of Claim that KML, in performing and/or delegating the performance of its services under the Manager Agreements, breached its contractual and tortious duties to the Funds.  The alleged breaches, which are pleaded in some detail, focus on allegations that KML failed adequately or at all to carry out due diligence with respect to BLMIS; to monitor the investment advisory functions which it had delegated to BLMIS; or, insofar as it delegated responsibility for these tasks to FIM, to provide supervision to FIM.

20.   The Funds plead at para 107 of the Statement of Claim:

"*For the avoidance of doubt, and if necessary, the Funds aver that these breaches of duty, individually or collectively, amounted to 'gross negligence' by [KML], within the terms of the purported exclusionary provisions in the Manager Agreements.*"

21.    The Funds plead at para 12.3.2 of the Reply to KML's Defence:[4]

"*By reason of [KML's] breaches of duty detailed in paragraphs 106 to 107 of the Amended Statement of Claim, [KML] induced the mistake which resulted in the Funds making overpayments of management fees.*"


**The preliminary issues**

22.    By an order dated 14th November 2014, the Court directed that there be a trial of the following preliminary issues.  The various paragraphs in the Statement of Claim and the Reply mentioned in the preliminary issues are all set out or summarised above.

(1)    (a)    Whether the NAVs were determined from time to time by the Administrator on the assumption (made for the purposes only of the Trust Defendants' and KML's Preliminary Issues Summonses) that KML, and/or FIM, and/or Mr Grosso and/or Mr Ceretti had input over the calculation of the NAV to the extent of control, on the basis pleaded at paragraphs 18 and 19 of the Reply[5];

(b)    If the answer to (a) is yes, were the Administrator's determinations of the NAV binding on the Funds for the purpose of calculating the fees due to KML pursuant to the Manager Agreements in force between the Funds and KML, in the absence of bad faith or manifest error;

[It will be more convenient to address 1(b) before considering 1(a) and that is what I propose to do.]

---

[4] As Amended.

[5] Re-Re-Re Amended Reply to the Trust Defendants' Defence

10

(2)     If the answer to issue (1)(b) is yes, whether the fees paid by the Funds to KML on the basis of those NAV figures, ie the Disputed Fees, were, in the absence of bad faith or manifest error, properly due to KML under the terms of the Manager Agreements;

(3)     If the answer to (2) is yes, and subject to issues (5) to (7), whether in consequence the Funds are precluded from asserting that the Disputed Fees, or any payments alleged by the Funds to originate from the Disputed Fees, are recoverable from: (a) KML; (b) the FIM Defendants; and (c) the Trust Defendants;

(4)     If the answer to any of issues (1) to (3) is no, whether the Defendants have a defence to the claim in unjust enrichment insofar as this defence derives from alleged contractual entitlement on the part of KML;

(5)     Whether the bad faith and/or manifest error of BLMIS constitutes bad faith and/or manifest error in relation to the calculation of the NAV, such that any determination of NAV made by the Administrator was not for this reason binding on the Funds and KML;

(6)     If the facts are as pleaded by the Funds at paragraph 15 of the Reply, whether the conduct of the Administrator constituted bad faith and/or manifest error for the purpose of the NAV calculations, such that any determination of NAV made by it was not for this reason binding on the Funds and KML;

(7)     If the breaches of duty pleaded at paragraphs 106 and 107 of the Statement of Claim are established, whether the Defendants are precluded from asserting a defence to the claim in unjust enrichment insofar as this defence derives from alleged contractual entitlement on the part of KML by reason of its inducement of the Funds' mistake.

23.    I propose to address each issue irrespective of the answers to the previous issues.  Whereas I am indebted to counsel for their detailed and careful submissions, I do not propose to address each and every point made by

them. However I shall address what appear to me to be their main lines of argument.

24.    In approaching these issues I am not required to determine any issues of fact, save for inferences about the terms of the Administration Agreements and Manager Agreements in force during periods in which there are no extant executed copies. I anticipate that any such inferences will prove non-controversial.

**The contractual framework**

25.    In order to understand the competing submissions on the Manager Agreements it is necessary to consider those Agreements in the context of other contractual documents relating to the Funds, namely the Articles of Association, the Information Memoranda published to potential investors, and the Administration Agreements.

26.    Alan Boyle QC, counsel for the Trust Defendants, with whom the other Defendants agreed on this point, submitted that these documents were the component parts of an interlocking whole, and that the Articles of Association, the Information Memoranda and the Administration Agreements formed part of the essential commercial background and matrix against which the Manager Agreements fell to be construed ("the Contractual Scheme").

27.    Adrian Beltrami QC, counsel for the Funds, while acknowledging that these documents formed part of the commercial background to the Manager Agreements, emphasised that the Manager Agreements must be construed in their own terms, and submitted that the background documents were of limited assistance in this task.

28.    The Articles of Association for both Funds were amended and restated. Each class of shares had its own Information Memorandum, which was amended and restated on a number of occasions – there were 23 different versions altogether. Each class of shares also had its own Administration

Agreement and Manager Agreement, as amended from time to time.  With respect to any period for which an executed copy of either or both of these Agreements for a particular class of shares has not been found, I draw the reasonable inference that during that period those shares were administered or managed on the terms *mutatis mutandis* of an Administration Agreement or Manager Agreement that was in force at the time with respect to another class of shares.

29.    When describing the contractual framework it will be helpful to start with the Articles of Association, then go on to the Information Memoranda and the Administration Agreements, and conclude with the Manager Agreements.  This approach should not be taken to imply a preference for the approach of one party to the construction of these documents over that of another.

### *Articles of Association*

30.    The Articles of Association of Kingate Global were a contract between the Fund and its members.  They provided for the issue (Regulations 11 – 13) and redemption (Regulations 44 – 54) of shares in the Funds at a price equal to the NAV per share.  The issue price fell to be determined at the Valuation Day immediately preceding the applicable Dealing Day and the Redemption Price at the Valuation Day on which the shares were redeemed.  The Dealing Day was the first Business Day of each month following the initial issuance of shares in each month, or such other day as the directors might determine by resolution.  The Valuation Day was the last Business Day of each month following the initial issuance of shares in each month, or such other day as the directors might determine by resolution.   The definitions of these capitalised terms were set out in Regulation 1.  However no shares were to be issued (Regulation 14) or redeemed (Regulation 47) when the determination of NAV was suspended pursuant to Regulation 62.  The latter Regulation provided that the directors might at any time suspend the determination of NAV, and the issue and redemption of any of the Fund's shares, during various specified extraordinary events.

13

31.   The NAV was to be determined by or under the direction of the Administrator as at each applicable Valuation Day under Regulations 55 – 64. It was to be the fair market value at that date of all the assets of the Fund less all its liabilities (Regulation 55). The liabilities included the fees of the Investment Adviser, the Manager and the Administrator earned but not yet paid (Regulations 55 and 56). NAVs were to be determined by the Administrator in large part utilizing information supplied by the various advisers and managers of the Fund (Regulation 56 [1][6]).

32.   The Administrator was defined as Hemisphere Management Limited ("Hemisphere"), and any successor with whom the Fund entered into an administration agreement. The Manager was defined as KML and any successor with whom the Fund entered into a management agreement (Regulation 1).

33.   Regulation 55 was amended in the Amended and Restated Articles of Association filed on 27th October 1995, which provided that the NAV of a class of shares, for the purpose of issuing and redeeming shares, shall be determined by or under the direction of the Administrator with the concurrence of the Directors at each applicable Valuation Day. The definition of Class A Shares Manager remained *mutatis mutandis* the same as the definition of the Common Shares Manager, and the Class B Shares Manager was defined as KML and Tremont (Bermuda) Limited and any successor with whom the Fund entered into a management agreement (Regulation 1).

34.   If market quotations for the Fund's assets were not available or if the Administrator, in consultation with the Manager and the Investment Adviser, concluded that they were not indicative of fair value, those assets would be valued at their fair value as determined in good faith by the Administrator in consultation with the Manager and the Investment Adviser. The Administrator could conclusively rely on fair value valuations provided by

---

[6] The numbers in square brackets do not occur in the Articles but have been included in this judgment for ease of reference.

the Manager and the Investment Adviser, and independent appraisals generally would not be obtained in these situations (Regulation 56 [2]). The point was repeated but in broader terms and without qualification at Regulation 58: no independent appraisals in respect of the NAVs would be required. Regulation 58 also provided that the NAVs would be binding on all persons, ie investors and the Funds, absent bad faith or manifest error.

35. Regulation 56 was amended in the Amended and Restated Articles of Association filed on 6th June 2000 so as to provide that where the Administrator determined that market prices or quotations did not fairly represent the value of particular assets it was authorized to assign a different value to them. There was no longer any reference to consultation with a Manager or Investment Adviser, but there was a reference to the cost of appraisers or pricing services employed by the Fund, presumably to assist the Administrator in this task. The statement at Regulation 58 (now Regulation 57) that there was no need for independent appraisals was dropped. The Class B Shares Manager was renamed USD Class Manager. Manager was defined to mean the Class A Manager, the USD Class Manager, or any other person with whom the Fund entered into a Management Agreement. Eg in relation to the DM Shares (Regulation 1).

36. Returning to the unamended Articles, NAV was defined as the NAV of the Fund determined pursuant to the Articles (Regulation 1). For purposes of calculation of the NAV: (i) the price of shares in the Fund for which applications had been made (net of commission etc) was deemed to be an asset of the Fund as of the time at which such shares were first deemed to be in issue (Regulation 60 (a)); and (ii) the price of shares in the Fund to be redeemed was, from the close of business on the Valuation Day on which they were redeemed until the Redemption Price was paid, deemed to be a liability of the Fund (Regulation 60(b)). Thus the receipt of subscription monies and the payment out of redemption monies affected the calculation of NAV because they affected the amount of the Fund's assets.

37. The NAV per share was to be an amount equal to the NAV of the Fund divided by the number of shares outstanding (Regulation 61). For the

15

purpose of calculating such shares: (i) shares for which applications had been made under the Articles would be deemed to be in issue (ie outstanding) at the commencement of business on the relevant Dealing Day, ie the day on which they were allotted; and (ii) shares to be redeemed in accordance with the Articles would be deemed to remain in issue through the close of business on the Valuation Day on which they were actually redeemed (Regulation 64).

38.    The Articles of Association of Kingate Euro were in substantially the same terms.  The Administrator was defined as Hemisphere, and any successor with whom the Fund entered into an administration agreement.  The Manager was defined as KML and any successor with whom the Fund entered into a management agreement.  NAV was defined as the NAV of the assets belonging to the Fund or a class and/or series of shares and determined pursuant to the Articles (Regulation 1).

39.    There were provisions regarding the issue (Regulation 13) and redemption (Regulation 45) of shares for a consideration equal to the NAV at the applicable Valuation Date, and for the determination of the NAV of the shares (Regulations 55 – 60).

40.    The NAV of the shares, for the purpose of issuing and redeeming shares, was to be determined by or under the direction of the Administrator with the concurrence of the directors as at each applicable Valuation Date or such other occasion as the directors might determine.  It was the value at such date of all the assets belonging to the Fund less all its accrued debts and liabilities as calculated under the Regulations (Regulation 55).  Regulation 56 gave guidance as to how the value of all the assets and liabilities of the Fund might be determined at the discretion of the Administrator.  Eg the value of assets was to be recorded at their fair value as determined in good faith by the Administrator in the absence of current quotations or where the Administrator concluded that such quotations were not indicative of fair value (Regulation 56 (d)).  The liabilities of the Fund were to include the fees of the Manager and the Administrator earned or accrued but not yet paid (Regulation 56 (e)).

41.   The NAV of a share on any Valuation Date was to be calculated by dividing the NAV on that date by the total number of shares outstanding at the close of business on that date.  Shares called for redemption on a Valuation Date were to be deemed outstanding on that date whereas shares subscribed for on a Valuation Date were not to be deemed outstanding on that date (Regulation 57(b)).

42.   Any valuations made pursuant the Articles were to be binding on all persons in the absence of bad faith or manifest error (Regulation 58).  The directors might suspend the determination of the NAV of the Fund, and consequently the right of members to require the Fund to issue or redeem shares of that class, in certain specified extraordinary circumstances (Regulation 59).

### *Information Memoranda*

43.   The Information Memorandum formed part of the contract between the investor and the Fund, whether Kingate Global or Kingate Euro, because the Subscription Agreement for shares in the Fund provided that the subscription was on the terms of the relevant Information Memorandum and subject to the provisions of the Memorandum and Articles of Association of the Fund.  Thus, in the event of a discrepancy between the Information Memorandum and the Articles, the Articles would prevail.

44.   The purpose of the Memorandum was to inform potential investors about the Fund to help them decide whether they wanted to invest in it.  Taking the February 1994 Information Memorandum for the Common Shares as an example ("the February 1994 Memorandum"), it contained a Summary of key terms and concepts, and sections on the Fund, Investment Objectives, Investment Policy, Risk Factors, Management, Fees and Expenses, Shares of the Fund, Determination of NAV, Taxation and Additional Information.

45.   The section on Management explained that the Manager performed services pursuant to the Manager Agreement and summarised what they were.  It stated that the Manger received a monthly fee from the Fund calculated at an annual rate equal to 1.5% of the month-end NAV of the Fund, which was

17

generally payable as of the last Business Day of each month.  Under the Information Memoranda for Class B Shares and DM Shares, the monthly 1.5% management fee was to be divided between the Co-Managers.

46.    The section on Management also explained that pursuant to the Administration Agreement the Administrator was responsible *inter alia* for calculating, publishing or furnishing the subscription price of the shares in the Fund.

47.    The section on the Determination of NAV contained a fairly full summary of Regulations 55, 56, 58 and 61 of the Articles of Association, which dealt with this topic.  The following passages from that summary, including the guidelines to which they refer but which I have not set out, are repeated word for word in the 1994 Administration Agreements and Manager Agreements:

"*Net Asset Valuations are determined by the Administrator, in large part based upon information regarding the value of the Fund's portfolio assets provided by the Investment Advisors, as of the close of business on the last Business Day of each calendar month. The Fund generally seeks to have portfolio securities valued in accordance with the following guidelines.*

*Portfolio securities are valued at the last sale price reported on the principal securities exchange or market on which the securities are traded. In the absence of reported sales prices on the valuation date, portfolio positions generally are valued at the last reported bid quotation in the case of securities held long and at the last reported offer quotation in the case of securities sold short. In special circumstances in which the Administrator determines that market prices or quotations do not fairly represent the value of particular assets based on information provided by the applicable Investment Advisor, the Administrator is authorized to assign a value to such assets which differs from the market prices or quotations based on information provided by the applicable Investment Advisor.*

*Securities or other assets which are not generally marketable, including illiquid direct investments of the Fund, generally are valued at the lesser of cost or market price, and may be subject to an additional discount upon the recommendation of the Administrator. If appraisals are available, references can be made to such appraisals. Shares of other investment funds will generally be valued at the Net Asset Value supplied by such funds, less any applicable redemption charges customarily imposed by such funds and less any*

18

*provision for non-accrued management and performance fees. The value of assets are recorded at their fair value as determined in good faith by the Administrator in the absence of current quotations or if the Administrator concludes that such quotations are not indicative of fair value by reason of illiquidity of a particular security or other factors.*

*In addition to special valuation calculations relating to illiquid securities, other special situations affecting the measurement of Net Asset Values may arise from time to time. Prospective investors should be aware that situations involving uncertainties as to the valuation of portfolio positions could have an adverse effect on the Fund's net assets if judgments regarding appropriate valuations made by the Administrator should prove incorrect. In the absence of bad faith or manifest error, the Net Asset Value calculations made by the Administrator are conclusive and binding on all shareholders.*"

48.   The section on Additional Information stated that the Information Memorandum was not intended to provide a complete description of the Fund's Memorandum or Articles of Association or the Agreements with the Manager and Administrator which the memorandum had summarised. It stated that copies of all such documents were available for inspection by shareholders and prospective investors during normal business hours at the Administrator's office in Bermuda. The 1st March 1995 version of the Information Memorandum relating to Class A Shares emphasised the point by stating that the information in the Memorandum was qualified in its entirety by the Memorandum of Association and Articles.

49.   The Information Memoranda for the other classes of shares were in substantially similar terms. They were amended and restated from time to time, eg to correspond with changes to the Articles. Presciently, under the heading "*Certain Risk Factors*" they included the warning that when the Fund invested with an Investment Adviser, the Fund did not have actual custody of the assets, and that there was therefore a risk that the assets with the Investment Advisor could be misappropriated. Subsequent versions of the Information Memoranda also warned that the information supplied by the Investment Adviser might be inaccurate or even fraudulent. See, eg, the Information Memorandum dated 1st May 2004 for Kingate Global:

19

"*Possibility of Fraud or Misappropriation*

*Neither the Fund nor the Custodian has actual custody of the assets. Such actual custody rests with the Investment Adviser and its affiliated broker-dealer. Therefore, there is the risk that the custodian could abscond with those assets. There is always the risk that the assets with the Investment Advisor could be misappropriated. In addition, information supplied by the Investment Advisor may be inaccurate or even fraudulent. The Co-Managers are entitled to rely on such information (provided they do so in good faith) and are not required to undertake any due diligence to confirm the accuracy thereof.*"

50. As to the calculation of NAV, on 1st May 2000 an Information Memorandum was issued for the US Dollar Shares. The relevant part of the section headed "*Determination of Net Asset Value*" appears below and was the same or substantially the same in all subsequent Information Memoranda for US Dollar Shares.

"*Net Asset Value of the USD Shares is the market value of the Fund's total assets calculated as described below, less all accrued debts and liabilities, including (i) fees of the Co-Managers, the Administrator and the Bank earned or accrued but not yet paid, ...*

*The Administrator will determine the net asset value of the Fund's Portfolio assets attributable to the USD Shares at the close of business on the last Business Day of each calendar month. See 'CERTAIN RISK FACTORS'. The Administrator will verify the prices attributed to the securities held by the USD Shares of the Fund by reference to pricing sources independent of the Investment Advisor whenever reasonably possible.*

. . . . .

*The value of assets are recorded at their fair value as determined in good faith by the Administrator in the absence of current quotations or if the Administrator ...determines that market prices or quotations do not fairly represent the value of particular assets, the Administrator is authorized to assign a value to such assets which differs from the market prices or quotations. The cost of appraisers or pricing services employed [by] the Fund is an expense of the Fund and as such a charge against Net Asset Value of the USD Shares.*

*Prospective Investors should be aware that situations involving uncertainties as to the valuation of portfolio positions could have an adverse effect on the Fund's net assets if judgments regarding appropriate valuations made by the Administrator should prove incorrect. See 'CERTAIN RISK FACTORS'. In the absence of bad faith or manifest error, the Net Asset Value calculations of the USD Shares made by the Administrator are conclusive and binding on all shareholders.*

20

*The Net Asset Value per USD Share shall equal the Net Asset Value of the assets of the Fund attributable to the USD Shares divided by the number of outstanding USD Shares on the relevant valuation date.*"

51.  On 1ˢᵗ May 2000 an Information Memorandum was also issued for the Euro Shares.  The section headed "*Determination of Net Asset Value*" was in very similar terms.

"*Net Asset Value of the Shares is equal to the market value of the Fund's total assets calculated as described below, less all accrued debts and liabilities, including (i) fees of the Manager and the Administrator earned or accrued but not yet paid, ...*

*Net asset valuations attributable to the Shares are determined by the Administrator having regard to the value of the Fund's portfolio assets attributable to [the] Shares as of the close of business on the last Business Day of each calendar month.  See 'CERTAIN RISK FACTORS'.*

. . . . .

*The value of assets are recorded at their fair value as determined in good faith by the Administrator in the absence of current quotations or if the Administrator concludes that such quotations are not indicative of fair value by reason of illiquidity of a particular security or other factors.  In special circumstances in which the Administrator determines that market prices or quotations do not fairly represent the value of particular assets, the Administrator is authorized to assign a value to such assets which differs from the market prices or quotations.  The cost of appraisers or pricing services employed [by] the Fund is an expense of the Fund and as such a charge against Net Asset Value of the USD Shares.*

*Prospective investors should be aware that situations involving uncertainties as to the valuation of portfolio positions could have an adverse effect on the Fund's net assets if judgments regarding appropriate valuations made by the Administrator should prove incorrect.  See 'CERTAIN RISK FACTORS'.  In the absence of bad faith or manifest error, the Net Asset Value calculations of the Shares made by the Administrator are conclusive and binding on all shareholders.*

*The Net Asset Value per Share is equal to the Net Asset Value attributable to the Shares divided by the number of outstanding Shares on the relevant valuation date.*"

52.  By an Information Memorandum issued on 1ˢᵗ May 2004 for the Euro Shares the paragraph above beginning "*Net asset valuations attributable to the*

21

*Shares* ...” was amended to follow *mutatis mutandis* the paragraph beginning “*The Administrator will determine* …” in the Information Memoranda for the US Dollar Shares.

### Administration Agreements

53. The Administration Agreements were contracts between the relevant Fund, KML and the Administrator. The first such Agreement was made in 1994 in relation to the Common Shares. The Fund was Kingate Global and the Administrator was Hemisphere. The Interpretation clause defined NAV as meaning the NAV of all the shares calculated in accordance with Clause 4 of the Agreement as of the close of business on the last Business Day of each month. It also provided that unless the context otherwise required, words and expressions in the Agreement should bear the same meaning as in the Articles of the Fund. However any alteration or amendment of the Articles would not affect the Agreement without the affected party's consent. (Clause 1.5).

54. The Administrator was to act upon the terms contained in the Agreement and in accordance *inter alia* with the Articles of the Fund (Clause 2), and to observe and comply with the Articles and with the applicable provisions of any prospectus, explanatory memorandum or other such document relating to, and distributed by or on behalf of, the Fund (Clause 3.8). The Information Memorandum would have fallen within the rubric of “*explanatory memorandum*”. The Administrator's duties included the calculation of the NAV pursuant to Clause 4, the calculation of the subscription and redemption prices of the shares at each subscription and redemption date, and the calculation of the fees of the Manager (Clauses 3.4.4 – 3.4.6).

55. Clause 4 of the Administration Agreement dealt with the calculation of NAV. Clauses 4.1 to 4.4 repeated verbatim the passages cited above from the February 1994 Memorandum, save that Clause 4.1 provided that NAVs were to be determined by the Manager or the Administrator. The reference

22

to the Manager is anomalous and would appear to be a drafting error. There was a Clause 4.5 which is not found in the February 1994 Memorandum and which appears to be modelled on Regulation 56 [4] of the Articles of Association.

*"There will be deducted from the total value of the Fund's assets all accrued debts and liabilities, including (i) fees of the Investment Advisors, the Manager, the Consultant and the Administrator earned or accrued but not yet paid, (ii) a provision for the annual performance fees of the Manager and the Investment Advisors managed as of the valuation date, (iii) monthly amortization of organization costs, (iv) an allowance for the Fund's estimated annual audit and legal fees, and (v) any contingencies for which reserves are determined to be required. Net Asset Valuations will be expressed in U.S. Dollars, and any items denominated in other currencies will be translated at prevailing exchange rates as determined by the Administrator."*

56.  The Administration Agreement was restated and amended on 1st March 1995 so as to provide for the administration of both Class A and Class B Shares. It was further restated and amended on 1st May 2000 in relation to the Common Shares, which by now included the Class A Shares, Class B Shares and DM Class Shares. Although no Administration Agreement prior to that date has been found for the DM Shares, I draw the reasonable inference that the Administrator would have administered them on the same basis, *mutatis mutandis*, as the Class A and Class B Shares.

57.  Under the 1st May 2000 Administration Agreement, the Administrator's calculation of the NAV was expressly required to be carried out pursuant to the Information Memorandum, and the Administrator was required to co-ordinate with consultants and agents of the Fund and with the Co-Manager with regard to the Fund's currency hedging activities and obtaining price quotes in a manner consistent with the Information Memorandum (Clause 3.4.4). The fees to be calculated were the fees of the Co-Manager (Clause 3.4.6). Clause 4 of the Agreement was simplified so as to provide:

*"4.1    The Net Asset Value of the [Fund] and of each Share shall be calculated and computed in accordance with the [Information] Memorandum, as the same shall exist from time to time. An accurate copy of the definition of Net Asset Value as set forth in the Memorandum is attached hereto as an exhibit.*

23

*4.2   In the absence of bad faith or manifest error, the Net Asset Calculations made by the Administrator shall be conclusive and binding on all shareholders."*

58.    On 1st June 2007 Kingate Global and KML entered into an amended and restated Administration Agreement in relation to the Common Shares with a new Administrator, BISYS Hedge Fund Services Limited ("BISYS").

59.    Clause 4.1 provided that the duties of the Administrator in relation to the calculation of NAV were to:

*"4.1.1   calculate and publish the net asset value per share for each class of shares issued by the [Fund] and the subscription and redemption prices per Share for each class of Shares issued by the [Fund] in accordance with the methodology contained in the Articles, the Offering memorandum or as directed by the Directors from time to time utilising, whenever reasonably practicable, such independent pricing services as chosen by the Administrator from time to time;*

*4.1.2      oversee and review the calculation and payment of fees payable to the Administrator, the Manager and other service providers to the [Fund]; ..."*

60.    On 1st May 2000 Kingate Euro entered into an Administration Agreement with KML and Hemisphere.  On 1st June 2007 Kingate Euro and KML entered into an amended and restated Administration Agreement with BISYS.  Those agreements, which were in relation to the administration of the Euro Shares, were *mutatis mutandis* on the same terms as the agreements into which KML entered on those dates with Kingate Global.

### Manager Agreements

61.    The Manager Agreements were contracts between the relevant Fund and KML.  They can usefully be regarded as falling into three blocks.

### 1994 – 2004 ("the First Global Period")

62.    The first such agreement was concluded between Kingate Global and KML in relation to the Common Shares in 1994.  The Interpretation clause was identical to the Interpretation clause in the first Administration Agreement.

24

63.    The Manager was to act upon the terms contained in the Agreement and in accordance *inter alia* with the Articles (Clause 2) and to observe and comply *inter alia* with the Articles and with the applicable provisions of any prospectus, explanatory memorandum or other such document relating to the Fund and distributed by or on behalf of the Fund (Clause 3.3).    The Manager was authorised, subject to the overall policy and supervision of the directors, to exercise the functions, duties, powers and discretions exercisable by the directors under the Articles, either itself or wholly or in part through its authorised agents or delegates, on behalf of the Fund.  These included arranging for the performance of all accounting and administrative services which might be required by the Fund's operations (Clauses 3.1 and 3.4).

64.    The Manager was to be paid a management fee calculated at an annual rate equal to 1.5% of the month-end NAV of the Fund before any current accrual for a Performance Fee.  The management fee was generally payable as of the last Business Day of each month (Clause 6.1.1).  As no Performance Fees were ever paid I need not concern myself with the terms of the Manager Agreement relating to them.  Any dispute arising as to the amount of the Management and/or Performance Fee was to be referred to the Fund's auditors for settlement, who were entitled to make such further or other adjustments as might in the circumstances appear to them to be appropriate and whose decision was to be regarded as the decision of an expert and not of an arbitrator and was to be binding and final upon the parties (Clause 6.4). The dispute resolution provision was not included in any of the Manager Agreements under the Second Global Period or the Euro Period.

65.    Clause 4, which dealt with the calculation of NAV, was identical to clause 4 of the first Administration Agreement, save that Clause 4.1 did not contain any reference to the determination of NAV by the Manager.  Thus the Clause provided that "*Net Asset Valuations are determined by the Administrator ...*".

66.    The Manager Agreement was amended on 1st March 1995 so as only to provide for the administration of Class A Shares.  There is an unexecuted

25

copy of a Co-Manager Agreement dated 1995 in relation to the Class B Shares. The intended signatories were Kingate Global, KML, and Tremont (Bermuda) Limited ("Tremont"). The terms were *mutatis mutandis* the same as the terms for the Manager Agreement in relation to the Class A Shares. The Co-Managers were to be paid a Co-management fee calculated at an annual rate equal to 1.5% of the month-end NAV of the Fund attributable to Class B Shares. The Co-management fee was generally payable as of the last Business Day of each month. Appropriate adjustments would be made to account for capital contributions and withdrawals.

67.    There is no extant copy of any Manager or Co-Manager Agreement relating to the DM Shares. However a Termination Agreement and Release ("TAR") dated 31st March 1997 between Kingate Global, KML and Tremont noted that all three were parties to a Co-Manager Agreement dated 1st January 1996 with respect to the DM Shares, which was terminated by the TAR, and a Co-Manager Agreement dated 1st March 1995 with respect to the Class B Shares, which remained in force unaffected by the TAR.

68.    I draw the reasonable inferences that from 1st March 1995 the Class B shares were co-managed on the terms of the unexecuted copy of the Co-Manager Agreement; and that from or about 1st January 1996 the DM Shares were managed *mutatis mutandis* on the same terms until the TAR was executed, and thereafter *mutatis mutandis* on the same terms as the Class A Shares.

2004 – 2008 ("the Second Global Period")

69.    Subsequently, KML and Tremont entered into separate Co-Manager Agreements with Kingate Global. These were undated, but referred to the Restated Information Memorandum dated 1st May 2004. The Agreement between Kingate Global and KML set out the various administrative services for which the Co-Manager was responsible. These included, under the ultimate supervision of the directors, reviewing the calculation of the Fund's shares on the part of the Administrator and verifying the calculation of the management fees charged to the Fund (Clause 3.1 (e) and (f)).

26

70.     Clause 5.1 provided that as used in the Agreement, the NAV of the Fund and of the shares should have the meaning assigned to it in the Information Memorandum and should be calculated as described in the Information Memorandum.  Clause 5.2 provided that the Co-Managers should receive a monthly management fee at an annual rate of 1.5% of the NAV of the Fund determined as of each Valuation Date (as defined in the Information Memorandum) of each calendar month.  The fee was to be divided between them as they should from time to time agree by separate agreement.  It was to be payable as of the last Business Day of each calendar month.

71.     KML entered into a sole (rather than co-) Manager Agreement with Kingate Global on 1st January 2006.  As to Administrative Services, it provided that in accordance with the provisions of the Memorandum and Articles of Association of the Fund, and under the ultimate supervision of the directors, the Manager should assist the Fund (in a manner consistent with existing practice) in the performance of certain of its administrative duties as might be agreed between the parties from time to time (Clause 3.1).   The provisions for the calculation of NAV and *mutatis mutandis* the monthly management fee remained unchanged from the previous Agreement.

2000 – 2008 ("the Euro Period")

72.     On 1st May 2000 KML entered into a Manager Agreement with Kingate Euro.  The Definitions section in Part 1 provided that all capitalized terms used in the Agreement and not otherwise defined therein should have the meaning set forth in the Information Memorandum.  The Manager was entitled to a fixed monthly asset based management fee as such fee was described in the Information Memorandum (Clause 4.1(a)).   Under the ultimate supervision of the directors, the Manger was responsible for performing or procuring the performance of, *inter alia*, all aspects relating to the Fund's administration and accounting matters (Clause 3.1(f)).

73.     Clause 4.3 defined the scope of the Manager's liability to the Fund:

27

> "*The Manager (and any officer or director of the Manager) shall not be liable to the Fund or its Security holders for any error of judgment or for any loss suffered by the Fund or its security holders in connection with its services in the absence of gross negligence, wilful default, fraud, or dishonesty in the performance or non-performance of their obligations or duties.*"

74.    All the Manager Agreements in all three periods included a clause in similar terms, although the Manager Agreements prior to 1st May 2000 referred to "*negligence*" rather than "*gross negligence*".

**(1)(b)  If the answer to (a) is yes [as to which, see below], were the Administrator's determinations of the NAV binding on the Funds for the purpose of calculating the fees due to KML pursuant to the Manager Agreements in force between the Funds and KML, in the absence of bad faith or manifest error?**

75.    The Defendants submit that the Court should answer this question in the affirmative and that absent bad faith or manifest error KML was entitled to be paid 1.5% of the NAV as determined at the time by the Administrator. The Funds submit that the Court should answer this question in the negative and that KML was entitled to be paid 1.5% of the "true" NAV, adjusted to take into account the fact of the Madoff fraud when this was discovered.

76.    The Defendants place great reliance on <u>Fairfield</u>.  The case concerned a mutual fund ("Fairfield") which was incorporated in the BVI and was closely analogous to the Funds.  Like them, it was a feeder fund for BLMIS, with which it placed about 95% of its assets.  The subscription and redemption prices for its shares were calculated monthly in accordance with the articles of association based on the NAV per share.  The calculation was carried out by the directors rather than an administrator, and any certificate as to the NAV per share or the subscription or redemption price was expressed in the articles to be binding on all persons.  Apart from these immaterial differences, the provisions in Fairfield's articles of association for the calculation of NAV were indistinguishable from the equivalent provisions in the Articles of Association of the Funds.

28

77.   Fairfield, like the Funds, was a victim of Mr Madoff's Ponzi scheme. As a result, in December 2008 its directors suspended calculation of the NAV, thus effectively terminating the redemption of shares. Fairfield was subsequently placed in liquidation in the BVI.

78.   The liquidators brought proceedings against a number of the members which had redeemed some or all of their shares before the calculation of NAV was suspended. They sought to recover from the defendants the amounts paid out to them on redemption, on the footing that they were paid out in the mistaken belief that the assets were as stated by BLMIS, when there were in fact no such assets. Any recoveries made on this basis could then be distributed rateably between all members, irrespective of when or whether they redeemed.

79.   Lord Sumption, giving the judgment of the Board, held at paras 18 and 19 that whether the defendants were unjustly enriched depended upon whether they were contractually entitled to receive the payments. I shall consider unjust enrichment later in this judgment. For now, I shall focus on the issue of contractual entitlement, which Lord Sumption framed thus at para 19:

" ... *the Fund's claim to recover the redemption payments depends on whether it was bound by the redemption terms to make the payments which it did make. That in turn depends on whether the effect of those terms is that the Fund was obliged upon a redemption to pay (i) the true NAV per share, ascertained in the light of information which subsequently became available about Madoff's frauds, or (ii) the NAV per share which was determined by the directors at the time of redemption. If (ii) is correct then, the shares having been surrendered in exchange for the amount properly due under the articles, the redemption payments are irrecoverable.*"

80.   Lord Sumption held at paras 21 – 24 that (ii) was correct and that the redemption payments were therefore irrecoverable.

"*21 The starting point is the scheme of the articles. Articles 9 and 10 determine the status of investors as members of the Fund, a question which ought in principle to be capable of definitive resolution at any moment in the Fund's history. Both the subscription price under article 9 and the redemption price under article 10 depend on the NAV per share determined under article 11. Article 9(1)(a) provides that the issue of shares 'shall be made on the Dealing Day'. Article 9(1)(b) provides for the*

*subscription price to be determined in accordance with article 9(2), which means that it is to be the NAV per share 'determined in accordance with Article 11'. Article 9(1)(c) provides for the subscription price to be payable at a time fixed by the directors, failing which any allotment for which payment is due may be cancelled. There are corresponding provisions of article 10 concerning redemptions. Article 10(1)(a) provides that the redemption of shares 'shall be made on the Dealing Day'. Article 10(1)(b) provides that the redemption is to be effected at the redemption price determined in accordance with article 10(2), which means the 'Redemption Price for each Share shall be the Net Asset Value per Share (as determined in accordance with Article 11)' on the dealing day. Under article 10(1)(c), that price must be paid as soon as practicable after the dealing day, being normally 30 days thereafter subject to specified and limited extensions. These provisions determine the amount due and the time of payment. Moreover, once the NAV per share for a given monthly valuation day is ascertained, subscriptions and redemptions effected at the corresponding subscription and redemption price will affect the determination of NAV per share on the following monthly valuation day. This is because the receipt of subscription moneys and the payment out of redemption moneys will affect the amount of the Fund's assets for the purpose of article 11(2). It will be apparent from this summary that the whole of this scheme depends upon the price being definitively ascertained by the dealing day and known to the parties shortly thereafter. It is unworkable on any other basis.*

*22 The Fund's case is that when article 10(2) defines the redemption price as the NAV per share 'determined in accordance with Article 11', it means the NAV correctly determined by dividing the NAV of the Fund by the number of shares in issue in accordance with articles 11(1)[b], 11(2) and 11(3). If this is right, the same must be true of article 9(1)(c), which fixes the subscription price by reference to the same provisions of article 11. The directors' determination of the NAV per share as at the valuation day, under article 11, was not definitive according to this analysis unless a certificate was issued pursuant to article 11(1)[c], and that would happen only if the directors chose to issue one.*

*23 In the Board's opinion, this is an impossible construction. If it were correct, an essential term of both the subscription for shares and their redemption, namely the price, would not be definitively ascertained at the time when the transaction took effect, nor at the time when the price fell to be paid. Indeed, it would not be definitively ascertained for an indefinite period after the transaction had ostensibly been completed, because unless a certificate was issued it would always be possible to vary the determination of the NAV per share made by the directors at the time and substitute a different one based on information acquired long afterwards about the existence or*

30

*value of the assets. This would not only expose members who had redeemed their shares to an open-ended liability to repay part of the price received if it subsequently appeared that the assets were worth less than was thought at the time. It would confer on them an open-ended right to recover more (at the expense of other members) if it later appeared that they were worth more. Corresponding problems would arise out of the retrospective variation of the subscription price long after the shares had been allotted. Indeed, it is difficult to see how the directors could perform their duty under article 9(1)(b) not to allot or issue a share at less than the subscription price if the latter might depend on information coming to light after the allotment had been made.*

*24 If, as the articles clearly envisage, the subscription price and the redemption price are to be definitively ascertained at the time of the subscription or redemption, then the NAV per share on which those prices are based must be the one determined by the directors at the time, whether or not the determination was correctly carried out in accordance with articles 11(2) and (3).*"

81.     I accept Mr Boyle's submission, with which the other counsel for the Defendants agreed, that, with respect to the calculation of NAV, the articles of association in <u>Fairfield</u> are materially indistinguishable from the Articles of Association of the Funds.  It follows that Lord Sumption's analysis of the articles in <u>Fairfield</u> is of binding effect with respect to the Funds' Articles. Even if it were not binding, I would find it wholly persuasive.  I am therefore satisfied that in the absence of bad faith or manifest error the monthly NAV determinations by the Administrator were final and binding upon the Funds and their members for the purposes of calculating the subscription and redemption prices of shares.

82.     That does not answer the question of whether in the absence of bad faith or manifest error the monthly NAV determinations were also final and binding upon the Funds for the purpose of calculating the monthly management fees due to KML.  This is really two questions.  First, whether the monthly NAV determinations by the Administrator for the purposes of the subscription and redemption of shares were to be used to calculate the monthly management fees due to KML.  Second, if they were to be used for that purpose, whether absent bad faith or manifest error they were final and binding or alternatively merely provisional and therefore open to correction if found to be incorrect.

31

83.   The answers will depend on the construction of the various Manager Agreements, which Mr Beltrami characterised as long term service agreements between the Funds and their managers.  I was referred to a number of authorities to assist me with this task.  They included ICS Ltd v West Bromwich BS [1998] 1 WLR 896, HL; Attorney General of Belize v Belize Telecom Ltd [2009] 1 WLR 1988; Re Sigma Finance Corp (in administrative receivership) [2010] BCC 40; Sebastian Holdings v Deutsche Bank [2010] 2 CLC 300, EWCA;  Rainy Sky SA v Kookmin Bank [2011] 1 WLR 2900, UKSC; BMA Special Opportunity Hub Fund Ltd v African Minerals Finance Ltd [2013] EWCA Civ 416; and Marley v Rawlings [2015] AC 129, UKSC.  In supplemental written submissions I was also addressed on two judgments which were not handed down until after the hearing before me: Arnold v Britton [2015] 2 WLR 1593, UKSC; and Wood v Sureterm Direct Ltd [2015] EWCA Civ 839.

84.   Lord Neuberger, with whose judgment Lord Sumption and Lord Hughes agreed, helpfully summarised the applicable principles in Arnold v Britton at para 15.  Although directed to the interpretation of a particular clause in a number of leases, his summary is *mutatis mutandis* of general application.

"*When interpreting a written contract, the court is concerned to identify the intention of the parties by reference to 'what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean', to quote Lord Hoffmann in Chartbrook Ltd v Persimmon Homes Ltd [2009] AC 1101, para 14.*

85.   Thus the task of the court is to construe the parties' implied intention, ie the intention which is reasonably to be inferred from the contract read in the context of the relevant background knowledge, even though this may not correspond with the parties' actual, subjective intention.  As Lord Hoffmann, giving the judgment of the Board in Attorney General of Belize v Belize Telecom Ltd, stated at para 16, that meaning is not necessarily or always what the authors or parties to the document would have intended.  However there is no evidence of any such disparity in the present case.

86.   Lord Neuberger continued:

32

*And it does so by focussing on the meaning of the relevant words, in this case clause 3(2) of each of the 25 leases, in their documentary, factual and commercial context. That meaning has to be assessed in the light of (i) the natural and ordinary meaning of the clause, (ii) any other relevant provisions of the lease, (iii) the overall purpose of the clause and the lease, (iv) the facts and circumstances known or assumed by the parties at the time that the document was executed, and (v) commercial common sense, but (vi) disregarding subjective evidence of any party's intentions. In this connection, see <u>Prenn</u> [1971] 1 WLR 1381, 1384-1386; <u>Reardon Smith Line Ltd</u> v <u>Yngvar Hansen-Tangen (trading as HE Hansen-Tangen)</u> [1976] 1 WLR 989, 995-997 per Lord Wilberforce; <u>Bank of Credit and Commerce International SA</u> v <u>Ali</u> [2002] 1 AC 251, para 8, per Lord Bingham of Cornhill; and the survey of more recent authorities in <u>Rainy Sky</u> [2011] 1 WLR 2900 , paras 21-30, per Lord Clarke of Stone-cum-Ebony JSC.*"

87.   As to the documentary context mentioned by Lord Neuberger, Thomas Lowe QC, counsel for the FIM Defendants, referred me to para 40 of the judgment of the Court given by Thomas LJ (as he then was) in <u>Sebastian Holdings</u> v <u>Deutsche Bank</u>:

"*The Supreme Court emphasised in <u>Re Sigma Finance Corp</u> [2009] UKSC 2 the need, when looking at a complex series of agreements, to construe an agreement which was part of a series of agreements by taking into account the overall scheme of the agreements and reading sentences and phrases in the context of that overall scheme.*"

That is a principle which assumes particular significance in the context of this case.

88.   There is sometimes a tension between two of the factors mentioned by Lord Neuberger, namely the language of the contract and business common sense. In <u>Rainy Sky</u>, giving the judgment of the Court, Lord Clarke stated at para 30 that:

"*... where a term of a contract is open to more than one interpretation, it is generally appropriate to adopt the interpretation which is most consistent with business common sense.*"

89.   In similar vein, in <u>Re Sigma Finance Corp (in administrative receivership)</u> Lord Collins, with whom Lords Hope and Mance agreed, warned at para 35 against an overly literal approach to construction:

> "*In complex documents of the kind in issue there are bound to be ambiguities, infelicities and inconsistencies. An over-literal interpretation of one provision without regard to the whole may distort or frustrate the commercial purpose. This is one of those too frequent cases where a document has been subjected to the type of textual analysis more appropriate to the interpretation of tax legislation which has been the subject of detailed scrutiny at all committee stages than to an instrument securing commercial obligations: cf. Satyam Computer Services Ltd v Upaid Systems Ltd [2008] EWCA Civ 487, [2008] 2 C.L.C. 864, at [2].*"

90.    On the other hand, in <u>Arnold</u> v <u>Britton</u> Lord Neuberger cautioned that commercial common sense, while a very important factor to take into account when interpreting a contract:

    (1)    should not be invoked to undervalue the importance of the language of the provision which is to be construed (para 17);

    (2)    should not be invoked retrospectively (para 19):

> "*The mere fact that a contractual arrangement, if interpreted according to its natural language, has worked out badly, or even disastrously, for one of the parties is not a reason for departing from the natural language*";

    and that

    (3)    a court should be slow to reject the natural meaning of a provision as correct simply because it appears to have been a very imprudent one for the parties to have agreed, even ignoring the benefit of hindsight (para 20).

91.    I am satisfied that a reasonable person, having all the background knowledge of the parties, which would have included the terms of the Articles of Association, Information Memoranda and Administration Agreements, would have understood the parties to the Manager Agreements to intend that the monthly NAV determinations by the Administrator for the purposes of the subscription and redemption of shares were to be used to calculate the monthly management fee due to KML. I am therefore satisfied that this was an express contractual term. There is no suggestion in any of the contractual documents that any other calculations were to be used for this purpose.

34

92.    As to the First Global Period:

(1)    The Manager Agreements in force during this period provided that (i) the management fee was calculated at an annual rate equal to 1.5% of the month end NAV of the Fund; and (ii) the NAVs were determined by the Administrator as of the close of business on the last Business Day of each calendar month.

(2)    The Administration Agreements in force during this period provided that: (i) the Administrator's duties included the calculation of the NAV; the calculation of the Subscription Price and the Redemption Price of the shares at each Subscription and Redemption Date; and the calculation of the fees of the Manager or Co-Manager; and (ii) NAVs were determined by the Administrator or Manager as of the close of business on the last Business Day of each calendar month.

93.    The Manager Agreements stated in express terms that the monthly management or co-management fee was to be calculated based upon the month end NAV for the Fund and that the NAV was determined by the Administrator. From which I conclude that the monthly management fee was based upon the monthly NAV as determined by the Administrator. The Administration Agreements, to which KML was also a party, provide contextual support for this construction although it is not dependent upon them.

94.    As to the Second Global Period:

(1)    The Co-Manager and Manager Agreements in force during this period provided that: (i) the Co-Managers shall be entitled, in the aggregate, to receive from the Fund a monthly management fee at an annual rate of 1.5% of the NAV of the Fund determined as of each valuation date of each calendar month; and (ii) the NAV of the Fund and of the US Dollar shares should have the meaning assigned to it in the Information Memorandum and should be calculated as described in the Information Memorandum.

35

(2)    The Information Memoranda in force during this period provided that: (i) the Administrator would determine the NAV of the Fund's Portfolio assets attributable to the US Dollar shares at the close of business on the last Business Day of each month; (ii) the Manager or Co-Managers received a monthly fee from the Fund calculated at an annual rate equal to 1.5% of the month end NAV of the Fund attributable to the US Dollar Shares; and (iii) the subscription and redemption prices for the shares were equal to the NAV per share at the Valuation or Redemption Date.

95.    The Co-Manager and Manager Agreements stated that the monthly co-management or management fee was to be calculated based upon the month end NAV for the Fund calculated as described in the Information Memoranda.  The Information Memoranda stated that the Administrator would determine the NAV.  From which I conclude that the monthly management fee was based upon the monthly NAV as determined by the Administrator.

96.    As to the Euro Period:

(1)    The Manager Agreements in force during this period provided that the Manager shall be entitled to a fixed, asset based monthly management fee as defined and described in the Information Memorandum.

(2)    The Information Memoranda in force during this period provided that: (i) NAVs attributable to the Euro Shares were determined by the Administrator having regard to the value of the Fund's portfolio assets attributable to Euro Shares as of the close of business on the last Business Day of each calendar month; (ii) the Manager or Co-Managers received a monthly fee from the Fund calculated at an annual rate equal to 1.5% of the month end NAV of the Fund attributable to the Euro Shares; and (iii) the subscription and redemption prices for the shares were equal to the NAV per share at the Valuation or Redemption Date.

36

97.    The Manager Agreements stated that the monthly management fee was to be calculated based upon the month end NAV for the Fund calculated as described in the Information Memoranda.  The Information Memoranda stated that the Administrator would determine the NAV.  From which I conclude that the monthly management fee was based upon the monthly NAV as determined by the Administrator.

98.    I therefore reject Mr Beltrami's submission, based on a detailed textual analysis, that all that the Manager Agreements provided was a methodology for the calculation of the management fee, and not that any given calculation carried out by the Administrator pursuant to that methodology was contractually binding.

99.    I also reject Mr Beltrami's submission that the power of the directors to suspend the calculation of NAV is indicative that such calculations were not intended to be a condition precedent for entitlement to payment of a management fee, and hence that there was no contractual requirement that they should be used for its determination.  The calculation of NAVs was only ever likely to be suspended in extraordinary circumstances – as happened in this case when the Madoff fraud was uncovered.  Uncertainty over whether and on what basis the manager would be paid in such circumstances, assuming that the Funds had sufficient assets to make such payments, is not sufficient to undermine what I am satisfied is the clear and obvious construction of the Manager Agreements as set out in the preceding paragraphs.

100.    The more difficult question is whether absent bad faith or manifest error the Administrator's monthly NAV calculations were final and binding on the Funds with respect to the calculation of management fees.

101.    I accept that, whereas the scheme for the subscription and redemption of shares would have been unworkable unless the monthly NAV calculations were final and binding, the contractual arrangements for the payment of management fees would have been workable if they were merely provisional and subject to correction.  Though in my judgment the finality and certainty

37

of a final and binding determination makes better commercial sense than an arrangement whereby at some indeterminate date, maybe many years later, the management fees might fall to be recalculated.

102. Further, considering the Manager Agreements in the context of the overall scheme of the Funds, it would be anomalous if the management fees calculated by the Administrator were final and binding as regards the NAV used to determine the monthly subscription and redemption fees but not as regards the monies owing to KML. Particularly as management fees earned or accrued but not yet paid were one of the components of the calculation of NAV.

103. The Manager Agreements did not expressly provide for what was to happen if it transpired that the monthly NAV determinations by the Administrator did not represent the "true" NAV of the Funds. The question arises as to whether they did so by implication. The principles applicable to implying a contractual term were authoritatively stated by Lord Hoffmann in <u>Attorney General of Belize</u> v <u>Belize Telecom Ltd</u> [2009] 1 WLR 1988:

"*17   The question of implication arises when the instrument does not expressly provide for what is to happen when some event occurs. The most usual inference in such a case is that nothing is to happen. If the parties had intended something to happen, the instrument would have said so. Otherwise, the express provisions of the instrument are to continue to operate undisturbed. If the event has caused loss to one or other of the parties, the loss lies where it falls.*

*18 In some cases, however, the reasonable addressee would understand the instrument to mean something else. He would consider that the only meaning consistent with the other provisions of the instrument, read against the relevant background, is that something is to happen. The event in question is to affect the rights of the parties. The instrument may not have expressly said so, but this is what it must mean. In such a case, it is said that the court implies a term as to what will happen if the event in question occurs. But the implication of the term is not an addition to the instrument. It only spells out what the instrument means.*

. . . . .

*21   It follows that in every case in which it is said that some provision ought to be implied in an instrument, the question for the court is whether such a provision would*

38

*spell out in express words what the instrument, read against the relevant background, would reasonably be understood to mean. It will be noticed from Lord Pearson's speech [in Trollope & Colls Ltd v North West Metropolitan Regional Hospital Board [1973] 1 WLR 601] that this question can be reformulated in various ways which a court may find helpful in providing an answer—the implied term must 'go without saying', it must be 'necessary to give business efficacy to the contract' and so on—but these are not in the Board's opinion to be treated as different or additional tests. There is only one question: is that what the instrument, read as a whole against the relevant background, would reasonably be understood to mean?"*

104.  Thus if it transpired that the monthly NAV determinations by the Administrator did not represent the "true" NAV of the Funds, then for the purpose of calculating management fees, and absent bad faith or manifest error, those NAV determinations would stand unless there was an implied term to the contrary.  This is because the parties had expressly agreed that it was on the basis of the NAV determinations that the management fees were to be calculated.

105.  Mr Beltrami submitted that, by analogy with conclusive evidence clause cases such as London and Regional Properties v Ministry of Defence [2008] EWCA Civ 1212, it would take the clearest possible terms to make the Administrator's determination final and binding.  If by that he meant that something more was required than an agreement that such determination was to be used to calculate the monthly management fee then I reject his submission.  The agreement was final and binding absent an implied term that it was not.

106.  Although Mr Beltrami did not accept that the Plaintiffs' construction required the implication of any terms, he did rely on several express terms of the Manager Agreements and, with respect to the Second Global Period and the Euro Period, the Information Memoranda, to support the construction for which he contended.  He would no doubt submit that they supported the implication of a term if in order to make good his case one needed to be implied.

39

107.  First, Mr Beltrami noted the recurring provision that in the absence of bad
      faith or manifest error the NAV calculations made by the Administrator
      were conclusive and binding on all shareholders but that there was no
      equivalent provision that they were conclusive and binding on managers.
      This was, he submitted, indicative that the NAV calculations were not
      intended to be so.

108.  Mr Boyle submitted in reply that the clause referred to shareholders because
      it had been taken from the Information Memorandum which was a document
      addressed to shareholders.  Had the clause been intended to provide that the
      NAV calculations were not binding on managers, he submitted, it would
      have said so in express terms.  In fact, Mr Boyle submitted, the clause did
      not make valuations binding which would otherwise not be binding – as was
      clear from <u>Fairfield</u> they were binding upon the shareholders in any event –
      but defined the only circumstances in which they would not be binding,
      namely bad faith and manifest error.  I accept Mr Boyle's submissions on
      this point.

109.  To the extent necessary, Mr Beltrami relied on the principle of interpretation
      "*expressio unius est exclusio alterius*".[7]  Both counsel referred me to various
      cases cited in the Fifth Edition of <u>Lewison on the Interpretation of Contracts</u>.
      As Jenkins LJ said in <u>Dean</u> v <u>Wiesengrund</u> [1955] 2 QB 120, EWCA, at 130
      – 131, albeit in the context of a case of statutory construction:

      "*... this principle is ... no more than an aid to construction, and has little, if any, weight
      where it is possible ... to account for the expressio unius on grounds other than an
      intention to effect the exclusio alterius.*"

110.  In my judgment the *expressio unius* principle is of little assistance in
      construing the "*conclusive and binding on all shareholders*" provision as it
      raises rather than answers the question of whether it is possible to account
      for the fact that the shareholders but not the manager are mentioned on
      grounds other than an intention to exclude the manager.

---

[7] The expression of one thing is the exclusion of another.

111. Mr Beltrami also relied on Clause 6.4 of the Manager Agreements during the First Global Period which provided that any dispute arising as to the amount of the management fee was to be referred to the Fund's auditors for settlement. He submitted that it was difficult to understand the purpose of this provision in relation to management fees if any dispute related only to the arithmetic of the Administrator's calculation. But, he submitted, the provision made perfect sense if the auditors were able to recalculate the "true" NAV for the purpose of adjusting management fees calculated on the basis of erroneous information.

112. Mr Boyle replied that the real purpose of the provision was the resolution of disputes regarding the performance fee, the calculation of which was quite complicated. The inclusion of the management fee in the clause was subsidiary to this purpose. Thus, he submitted, its inclusion was not a reliable indicator of the potential ambit of the disputes over the management fee which the auditors might have been called upon to decide. Tellingly, neither performance fees nor a dispute resolution mechanism featured in the Manager Agreements for the Second Global Period or the Euro Period.

113. Even if the auditors were able to determine the "true" NAV for purposes of adjusting the management fee, it is not clear how that would assist Mr Beltrami. The contractual position would then be that, absent an implied term to the contrary, the calculation of NAV by the Administrator was final and binding for purposes of determining the management fee unless and until it was varied by the auditors, at which point the auditors' calculation would become final and binding. Insofar as relevant, the same would apply, *mutatis mutandis* to the calculation of the performance fee, which was not based on NAV.

114. Although Mr Beltrami referred me to various agreements with other service providers, I was not taken through them in detail and find them of little assistance.

115. Having found that it was an express term of the Manager Agreements that the monthly NAV determinations by the Administrator for the purposes of

the subscription and redemption of shares were to be used to calculate the monthly management fee due to KML, I am satisfied that there was no express contractual term that these determinations were merely provisional and open to correction if later found to be inaccurate.  Neither was there any implied term to that effect as that is not what the instrument, read as a whole against the relevant background, would reasonably have been understood to mean.

116.    Accordingly, I find that the Administrator's determinations of the NAV were binding on the Funds for the purpose of calculating the fees due to KML pursuant to the Manager Agreements in force between the Funds and KML, in the absence of bad faith or manifest error.

**(1)(a)   Whether the NAVs were determined from time to time by the Administrator on the assumption (made for the purposes only of the Trust Defendants' and KML's Preliminary Issues Summonses) that KML, and/or FIM, and/or Mr Grosso and/or Mr Ceretti had input over the calculation of the NAV to the extent of control, on the basis pleaded at paragraphs 18 and 19 of the Reply**

117.    The Administrator compiled the components of the NAV calculation, which was based largely on figures supplied by BLMIS, carried out the NAV calculation based on those components, and then sent it out to the shareholders.  However Mr Beltrami submitted that in spite of all this the Administrator did not determine the NAV within the meaning of the Manager Agreements because KML et al had the power to give or withhold approval of the NAV calculations, and hence to influence them.  That is what was meant by "*control*" in the Funds' pleaded case.

118.    I agree with Mr Lowe that the existence of "*control*" in the sense alleged did not mean that it was someone other than the Administrator who carried out the NAV determination.  In other words, I am satisfied that a reasonable person having all the background knowledge which would have been available to the parties would have understood that, assuming "*control*" in

42

the sense alleged, the NAVs were determined from time to time by the Administrator within the meaning of "*determined*" and its cognates as they were used in the Manager Agreements and other documents within the Contractual Scheme.

119. This construction accords with the natural and ordinary meaning of "*determined*". It also makes good commercial sense. As I have found that the monthly NAV determinations by the Administrator for the purposes of the subscription and redemption of shares were to be used to calculate the monthly management fee due to KML, if the determinations were only purported for the one purpose they would only be purported for the other. This would undermine the certainty needed to make the scheme for the subscription and redemption of shares workable.

120. Moreover, I accept Mr Lowe's submission that absent bad faith or manifest error the Court should not look behind the ostensible NAV determination to enquire whether that determination was actual or merely purported. He relied on Lord Sumption's observations about the finality of the calculation of NAV for the purposes of subscription and redemption prices at para 24 of <u>Fairfield</u>, which is set out above. If it is final for that purpose then it is final for the purpose of calculating management fees.

121. I shall deal briefly with the authorities to which I was referred, although my finding on this issue is not dependent upon them. Mr Beltrami submitted that, by analogy with conclusive certification cases, the requirement that the NAV was to be determined by the Administrator was to be strictly construed and the Administrator was required to act independently. See <u>North Shore Ventures Ltd</u> v <u>Anstead Holdings Inc</u> ("<u>North Shore</u>") [2012] Ch 31, EWCA, per Sir Andrew Morritt C at para 46 (strictly construed) and <u>Scheldebouw BV</u> v <u>St James Homes (Grosvenor Dock) Ltd</u> [2006] EWHC 89 (TCC) *per* Jackson J (as he then was) at paras 36 – 36 (requirement to act independently).

122. The former case concerned the construction of a guarantee and the latter case the construction of a building contract, so the factual circumstances of

the certifications were somewhat different to the facts of the instant case. However Mr Beltrami submitted that the requirements of strict construction and independence were of general application where two parties appointed a third to make a determination binding upon them.

123. Assuming that this is correct, these authorities do not take the matter much further. I am satisfied that, assuming control in the sense alleged, the exercise undertaken by the Administrator counted as a determination within the meaning of the Manager Agreements and other documents within the Contractual Scheme when they are properly construed.

124. Mr Lowe submitted that as a matter of common law all that was required of the Administrator was that it carried out the NAV calculation rationally (in a public law sense) and in good faith. See, eg, the judgment of the Court given by Rix LJ in WestLB AG v Nomura Bank International Plc [2012] EWCA Civ 495 at para 30. This requirement is very similar to the express provision in the Contractual Scheme that in the absence of bad faith or manifest error the Administrator's determination would be final and binding on all shareholders. I accept that the Administrator was required to act rationally and in good faith, but this does not preclude a requirement that the Administrator was also required to act independently.

125. I am not required to determine whether control by KML et al was consistent with the Manager Agreements. Mr Beltrami submitted that the parties could not reasonably be taken to have intended that KML was in effect the arbiter of its fees. But as Mr Boyle submitted, the express terms of the Manager Agreements provided that the Manager should supervise the performance of the Funds' administrative and accounting functions.

(1) During the First Global Period, the Manager Agreement provided that, subject to the supervision of the directors, KML should have power to arrange for the performance of all accounting and administrative services which might be required by the Fund's operations (Clause 3.1).

44

(2)     During the Second Global Period, the Manager Agreements provided that under the ultimate supervision of the directors KML was responsible for performing or procuring the performance of *inter alia* reviewing the calculation of the Fund's shares on the part of the Administrator and verifying the calculation of the management fees charged to the Fund (Clause 3.1 (e) and (f)).

(3)     During the Euro Period, under the 1st May 2000 Manager Agreement, and under the ultimate supervision of the directors, the Manager was responsible for performing or procuring the performance of, *inter alia*, all aspects relating to the Fund's administration and accounting matters (Clause 3.1(f)).

126.  Be that as it may, for the reasons given above I am satisfied that the NAVs were determined from time to time by the Administrator on the assumption that KML et al had input over the calculation of the NAV to the extent of control, on the basis pleaded at paragraphs 18 and 19 of the Reply.

**(2)  If the answer to (1)(b) is yes, whether the fees paid by the Funds to KML on the basis of those NAV figures, ie the Disputed Fees, were, in the absence of bad faith or manifest error, properly due to KML under the terms of the Manager Agreements**

127.  In light of the answer to issue 1(b), I am satisfied that the Disputed Fees, were, in the absence of bad faith or manifest error, properly due to KML under the terms of the Manager Agreements.

**(3)  If the answer to (2) is yes, and subject to issues (5) to (7), whether in consequence the Funds are precluded from asserting that the Disputed Fees, or any payments alleged by the Funds to originate from the Disputed Fees, are recoverable from: (a) KML; (b) the FIM Defendants; and (c) the Trust Defendants**

45

128. The issue here is whether KML's contractual entitlement to payment of the management fees which it received defeats the Funds' claim for unjust enrichment. Consideration of this issue proceeds on the assumption that, subject to the contractual entitlement point, the unjust enrichment claim is properly arguable.

129. The Funds' case, as summarised in their written submissions, is that they made a mistake on each occasion on which they paid fees to KML, as these were calculated and paid by reference to the stated NAVs of the Funds and on the assumption that the monthly determinations were accurate. By reason of the fraud being perpetrated by Mr Madoff and BLMIS, the stated NAVs were in fact grossly overstated because they were based on assets which did not exist (because they had been misappropriated by BLMIS and used in order to maintain the Ponzi scheme). The true position was that at all material times the Funds were insolvent or nearly insolvent and that the "correct" NAVs were very different to those which were stated. Had the true position been known, the Funds would have paid no, or very substantially reduced, fees, and KML could not have claimed anything more.

130. The Funds have brought restitutionary claims against both KML, as the direct recipient of the fees, and the FIM Defendants and the Trust Defendants, as their indirect recipients. They accept that, should the defence of contractual entitlement defeat the claim in restitution against KML, it would also preclude the claim in restitution against the indirect recipients.

131. As Saul Froomkin QC, counsel for KML, submitted, the applicable legal principles are to be found at para 18 of Lord Sumption's judgment in Fairfield:

"*18    The basic principle is not in dispute. The payee of money 'cannot be said to have been unjustly enriched if he was entitled to receive the sum paid to him':* Kleinwort Benson Ltd *v* Lincoln City Council *[1999] 2 AC 349 at 408B (Lord Hope). Or, as Professor Burrows has put it in his* Restatement of the English Law of Unjust Enrichment *(2012) at §3(6), 'in general, an enrichment is not unjust if the benefit was owed to the defendant by the claimant under a valid contractual, statutory or other legal obligation.' Therefore, to the extent that a payment made under a mistake discharges a contractual*

46

*debt of the payee, it cannot be recovered, unless (which is not suggested) the mistake is such as to avoid the contract: <u>Barclays Bank Ltd</u> v <u>W.J. Simms Son & Cooke (Southern) Ltd</u> [1980] QB 67 , 695. So far as the payment exceeds the debt properly due, then the payer is in principle entitled to recover the excess.*

*19    It follows that the Fund's claim to recover the redemption payments depends on whether it was bound by the redemption terms to make the payments which it did make."*

132.    The passage was part of the *ratio* of the case in that, notwithstanding Mr Beltrami's submission to the contrary, it was a necessary link in the chain of reasoning which led the judge to his conclusion.  This is clear from the first sentence in para 19:  "*It follows that ...*".   In order to arrive at the conclusion that the Fund's claim to recover the redemption payments depended on whether it was bound by the redemption terms to make the payments which it did make, Lord Sumption first considered and rejected the possibility that the Fund had a restitutionary claim to the redemption payments.  As stated by Brooke LJ in <u>R (Al-Skeini)</u> v <u>Defence Secretary</u> [2007] QB 140, EWCA, at para 145:

"*The ratio decidendi of a case has been defined as any rule of law expressly or impliedly treated by the judge as a necessary step in reaching his conclusion, having regard to the reasoning adopted by him: <u>Cross & Harris, Precedent in English Law</u>, 4th ed (1991), p 72; and see <u>Dunnachie</u> v <u>Kingston upon Hull City Council [2004] ICR 481</u>, para 82.*"

133.    Lord Sumption's reasoning is therefore binding upon me.  I would find it strongly persuasive even if it were not.  I need not assess the merits of Mr Beltrami's bold submission that it was not in fact correct, or go behind the judgment to consider the authorities on which it was based.  (Although I shall have something to say about them when considering issue 7.)  For purposes of unjust enrichment, the facts of the present case are materially indistinguishable from the facts in <u>Fairfield</u>.  The Funds made payments which discharged the contractual debts which they owed to KML. Subject to issues (5) to (7) those payments cannot be recovered if mistaken as it was neither submitted, nor was it seriously arguable, that the mistake was such as to avoid the Manager Agreements.

47

134. I conclude that subject to issues (5) to (7), the Funds are in consequence precluded from asserting that the Disputed Fees, or any payments alleged by the Funds to originate from the Disputed Fees, are recoverable from any of the Defendants.

**(4)  If the answer to any of issues (1) to (3) is no, whether the Defendants have a defence to the claim in unjust enrichment insofar as this defence derives from alleged contractual entitlement on the part of KML**

135. If, however, the answer to any of issues (1) to (3) is no, the Defendants do not have a defence to the claim in unjust enrichment insofar as this defence derives from alleged contractual entitlement on the part of KML.

**(5)  Whether the bad faith and/or manifest error of BLMIS constitutes bad faith and/or manifest error in relation to the calculation of the NAV, such that any determination of NAV made by the Administrator was not for this reason binding on the Funds and KML**

136. This issue is straightforward.  Turning first to the linguistic context, the references to bad faith and manifest error in the Manager Agreements and the other documents in the Contractual Scheme are all in substantially the same terms as the reference in the Manager Agreement for the First Global Period (at clause 4.4):

"*In the absence of bad faith or manifest error, the Net Asset Value Calculations made by the Administrator are conclusive and binding on all shareholders.*"

137. The reference needs to be considered in context:

"*In addition to special valuation calculations relating to illiquid securities, other special situations affecting the measurement of Net Asset Values may arise from time to time. Prospective investors should be aware that situations involving uncertainties as to the valuation of portfolio positions could have an adverse effect on the Fund's net assets if judgments regarding appropriate valuations made by the Administrator should prove incorrect.  In the absence of bad faith or manifest error, the Net Asset Value calculations*"

48

*made by the Administrator are conclusive and binding on all shareholders.*" [Emphasis added.]

138.  What the clause is saying is that judgments by the Administrator as to the calculation of NAV may prove incorrect but that unless the Administrator has acted in bad faith or made a manifest error those calculations will nonetheless be final and binding on all shareholders.  This construction finds contextual support in that it occurs within clause 4, headed "*Net Asset Value*", which deals with the calculation of NAV by the Administrator.

139.  The Manager Agreements fall to be construed in the context of the other documents in the contractual scheme.   As summarised earlier in this judgment, Kingate Global's Articles of Association provided at Regulation 58 that the NAVs would be binding on all persons absent bad faith or manifest error [Regulation 58].  This is in substance the same provision as appeared in the Manager Agreements.  Regulation 56[2] provided that the Administrator could conclusively rely on fair value valuations provided by the Manager and the Investment Adviser, and that no independent appraisals in respect of the NAVs would be required.  Their conclusiveness was not qualified by that Regulation.   Doubtless that is why independent valuations were not required.   As any valuations provided by the Manager or the Investment Adviser were conclusive, they could not be impugned on grounds of bad faith or manifest error.

140.  During the Second Global Period and the Euro Period, the Manager Agreements provided that the Manager was entitled to a fixed monthly based management fee as described in the Information Memoranda.   The Information Memoranda included the standard provision that in the absence of bad faith or manifest error the NAV calculations made by the Administrator were conclusive and binding on all shareholders and referred to "*CERTAIN RISK FACTORS*".  These included the possibility of fraud or misappropriation by the Investment Adviser or other third party.   The reference to these risk factors emphasised the point made in the Manager Agreement for the First Global Period.  Notwithstanding third party fraud or misappropriation, the NAV calculations made by the Administrator would

49

be conclusive and binding on all shareholders absent bad faith or manifest error by the Administrator.

141. The commercial context supports this construction. It was an express term of the Manager Agreements that the monthly management fee due to KML was to be calculated based on the monthly NAV determinations by the Administrator for the purposes of the subscription and redemption of shares. Given the need for those calculations to be certain, it would make little commercial sense to expose the Funds to the risk that they could potentially be set aside on the basis of unknown and unknowable factors that were beyond the Administrator's control.

142. I conclude that the bad faith and/or manifest error of BLMIS does not constitute bad faith and/or manifest error in relation to the calculation of the NAV, such that any determination of NAV made by the Administrator was not for this reason binding on the Funds and KML.

**(6)   If the facts are as pleaded by the Funds at paragraph 15 of the Reply, whether the conduct of the Administrator constituted bad faith and/or manifest error for the purpose of the NAV calculations, such that any determination of NAV made by it was not for this reason binding on the Funds and KML**

143. On the alleged facts, this issue is concerned not with bad faith but with manifest error. A "*manifest error*" was defined by Lewison J (as he then was) in IIG Capital v Van Der Merwe [2008] 1 All ER (Comm) 435, Ch D, at para 52 as: "*one that is obvious or easily demonstrable without extensive investigation.*" This definition was approved by the Court of Appeal of England and Wales in that case as reported at [2008] 2 All ER (Comm) 1185 at para 35.

144. The error need not be apparent on the face of the determination: it is permissible to examine the process by which the determination was arrived at and to show that the determination was obviously wrong by reference to an error in that process. See eg Axa Sun Life Services v Campbell Martin

[2011] 1 CLC 312, EWCA, *per* Stanley Burnton LJ at paras 72 – 74 and Rix LJ at para 108; and <u>IG Index Plc</u> v <u>Colley</u> [2013] EWHC 478, QB, *per* Stadlen J at para 813.

145. On the facts of this case, therefore, it would be permissible to go behind the NAVs and examine the calculations which gave rise to them. If the Administrator made an obvious error in the calculations then that error would count as manifest. But the calculations would have to be wrong on the basis of the material before the Administrator, rather than wrong on the basis of the true state of affairs as known to BLMIS and Mr Madoff. Any irregularities in the process by which the Administrator calculated those figures would be relevant only insofar as they went to demonstrate that the figures were wrong.

146. The error need not be detected at the time. In <u>IG Index Plc</u> v <u>Colley</u> due to the fraud of one of the defendants it went undetected for years. See the judgment of Stadlen J at 826. In <u>North Shore</u> the existence of a manifest error in the amount of debt certified as owing under a guarantee depended upon the Court of Appeal finding that a purported variation of a loan agreement had contractual effect. As Smith LJ stated at para 61, the guarantors could see immediately that the certificate was incorrect, but they could not demonstrate that conclusively until the court had determined the issue of variation. It is in that context that Sir Andrew Morritt's statement at para 53 that he could "*see no reason why the error must be manifest at the time of the certificate*" should be understood.

147. In the present case there was no error detected at the time. But, as Mr Boyle submitted, any error should, to count as manifest, have been reasonably *capable* of detection by the Administrator at or near the time when it was made. The possibility of prompt detection was important given the importance of the monthly NAV determinations for the redemption and calculation of shares. In practical terms, therefore, the question is whether any error is something which the Administrator should have spotted. The fact that no such error was in fact spotted by the Administrator is beside the point.

148.   Turning to para 15 of the Reply, it will be recalled that the Administrator
allegedly:

(1)    failed to verify the figures provided by BLMIS for the purpose of
calculating the NAV; and/or

(2)    ignored inconsistencies in the figures provided by BLMIS; and/or

(3)    failed to consider and address inconsistencies in the figures provided
by BLMIS adequately; and/or

(4)    relied on KML and/or Mr Ceretti and/or Mr Grosso and/or FIM to
verify the figures provided by BLMIS and/or to check the calculations
of the NAV, and/or it permitted KML and/or Mr Ceretti and/or Mr
Grosso and/or FIM to vary the calculations of the NAV, as pleaded in
paragraph 18 of the Reply.

149.   These allegations are merely bare bones.  The affidavit of Jeremy Scott filed
on behalf of the Funds' Joint Liquidators put some flesh on them:

*"205.   From about January 2000, the Administrator started to carry out its own price
checking of the securities bought and sold according to the Madoff monthly statements, in
that it consulted publicly available sources (such as Bloomberg) in order to see whether
the prices at which Madoff said (in the statements) the securities had been bought and/or
sold corresponded with information published elsewhere.  ...*

*206.   ... on at least one occasion, the price checking process generated inconsistencies
which could not be verified by the Administrator. On that occasion, FIM (through Mr
Grosso) advised the Funds to accept the figures provided by Madoff, notwithstanding the
inconsistencies identified by the Administrator."*

150.   Mr Scott then went on to give details of that one occasion.    The
Administrator contacted KML to draw to its attention valuation differences
between BLMIS and Bloomberg.  The upshot was that one Mr Wetherhill,
who was a director of the Funds and also of KML, and the Administrator
took steps to convene Board Meetings of the Funds for the purpose of
obtaining resolutions that following the advice of FIM they would utilise the
prices provided by BLMIS, which resolutions were duly signed by the

directors.    It would therefore appear that the four allegations are all interrelated.

151.    Mr Boyle argued persuasively that on the strength of Mr Scott's affidavit the Administrator did not ignore or fail to address the inconsistency, but acted together with the Funds and KML to address it.  There is considerable force in his submission that Mr Scott's affidavit would not support a finding of manifest error by the Administrator.  However Mr Beltrami fairly pointed out that the purpose of the parties putting in evidence was to enable the Court to determine the construction issues based on a factual platform, and not to make good the pleaded allegations.

152.    I therefore conclude that if the facts are as pleaded by the Funds at paragraph 15 of the Reply, then the conduct of the Administrator *may* have constituted manifest error (but not bad faith) for the purpose of the NAV calculations, such that any determination of NAV made by it was not for this reason binding on the Funds and KML.  The facts are not pleaded with sufficient particularity for me to make a finding one way or the other.

**(7)  If the breaches of duty pleaded at paragraphs 106 and 107 of the Statement of Claim are established, whether the Defendants are precluded from asserting a defence to the claim in unjust enrichment insofar as this defence derives from alleged contractual entitlement on the part of KML by reason of its inducement of the Funds' mistake**

153.    Although the wording of this question was agreed by all parties prior to the hearing, there were two aspects of it that proved controversial.  First, although the question is premised on a mistake by the Funds, Mr Lowe submitted that there was in fact no such mistake as the Funds were contractually obliged to pay the NAV as determined by the Administrator. Any mistake in the calculation of the NAV was therefore attributable, he submitted, to the Administrator and not the Funds.

154.    The answer to this point is, as Mr Beltrami submitted, that the Funds' mistake was to believe that the information supplied by BLMIS was correct.

Had the Funds known the true state of affairs there is in my judgment an irresistible inference that they would have suspended the determination of NAV, as they did when the Madoff fraud was uncovered.  Had they done so, the management fees to which KML was entitled – or at any rate those which fell to be calculated after the suspension – would have been substantially less.

155.    Second, there was a lively debate as to whether for purposes of answering this question the Court should assume that the pleaded facts were sufficient to establish that KML induced the Funds' mistake.  I read the question as requiring the Court to make that assumption.  I am in any case unable to say from the pleadings whether or not the alleged breaches of duty induced the Funds' mistake:  I can properly conclude only that they may have done.

156.    On the assumption, which I make for the purposes of this question, that KML did induce the Funds' mistake, Mr Beltrami put his case in two ways.  First, he submitted that such inducement negatived KML's contractual entitlement to the payment of management fees, at least insofar as such payment exceeded the "true" NAV of the Funds, whatever that might have been from time to time.

157.    Mr Beltrami relied upon the principle that a party will not generally be entitled to take advantage of his own breach of contract as against the other party.  This principle applies as much to a party seeking to obtain a benefit under a continuing contract as it does to a party who relies on his breach to avoid a contract and thereby escape his obligations.   See the leading judgment of Lord Jauncey, with whom the other members of the House of Lords agreed, in Alghussein Establishment v Eton College [1988] 1 WLR 587 at 591 D – E and 594 C – D.

158.    There are two further aspects of the principle which are material to the instant case.  First, it is necessary to show that the contractual rights or benefits which the party in question is seeking to assert or claim arise as a direct consequence of that party's prior breach.  See the leading judgment of Mr Justice Ribeiro PJ, with whom the other members of the Court of Final

54

Appeal of the Hong Kong Special Administrative Region agreed, in
<u>Kensland Realty Limited</u> v <u>Whale View Investment Limited</u> [2001] HKCFA
57 at para 95.

159.  On the Funds' case, the overpayment of management fees arose as a direct
consequence of KML's breach of duty.  It is true that, as Mr Boyle
submitted, KML does not need to rely on a breach of duty to establish its
right to payment: it performed services under the Manager Agreements for
which it was contractually entitled to be paid.  But were it not for that breach
of duty then on the Funds' case the amount to which KML was entitled
would have been substantially less.

160.  Secondly, the principle is one not of law but of construction.   See
<u>Alghussein Establishment</u> v <u>Eton College</u> *per* Lord Jauncey at 595 G – H.  It
is a presumption which will be rebutted if the agreement contains clear
express provisions to the contrary.  See the speech of Lord Jauncey at 595 C
– D, citing with approval the speech of Lord Diplock in <u>Cheall</u> v <u>Association
of Professional Executive Clerical and Computer Staff</u> [1983] 2 AC 180,
HL, at 189.

161.  Mr Boyle submitted that as the Manager Agreements defined the scope of
KML's liabilities to the Funds there was no room for the application of the
presumption.  For ease of reference I shall repeat the specimen clause from
the Manager Agreement dated 1st May 2000 with Kingate Euro which is set
out earlier in this judgment.

*"The Manager (and any officer or director of the Manager) shall not be liable to the
Fund or its Security holders for any error of judgment or for any loss suffered by the
Fund or its security holders in connection with its services in the absence of gross
negligence, wilful default, fraud, or dishonesty in the performance or non-performance of
their obligations or duties."*

162.  In my judgment this clause, like the similar clauses in the other Manager
Agreements, limits the circumstances in which KML may be liable to the
relevant Fund but does not limit the nature of that liability.  Thus the clause
contains a clear, express provision that the presumption will not apply in the

absence of gross negligence, wilful default, fraud, or dishonesty in the performance or non-performance by KML of its obligations or duties: it does not provide that the presumption will not apply if any one of those circumstances is present.

163.    The upshot is that I accept Mr Beltrami's submission that, on the assumption that KML induced the Funds' mistake, such inducement negatived KML's contractual entitlement to the payment of management fees insofar as such payment exceeded the "true" NAV of the Funds. It follows that in those circumstances contractual entitlement cannot give rise to a defence to the Funds' claim in unjust enrichment.

164.    The alternative way in which Mr Beltrami put his case was that, assuming that KML was contractually entitled to the management fees which it received, the Funds should be permitted to recover the mistaken payments as the mistake was induced by KML's breach of duty. He relied principally on two cases: Barclays Bank v Simms [1980] QB 677, HC, and Sybron v Rochem [1984] Ch 112, EWCA.

165.    In Barclays Bank v Simms, Goff J (as he then was) stated:

"*From this formidable line of authority certain simple principles can, in my judgment, be deduced: (1) If a person pays money to another under a mistake of fact which causes him to make the payment, he is prima facie entitled to recover it as money paid under a mistake of fact. (2) His claim may however fail if ... (b) the payment is made for good consideration, in particular if the money is paid to discharge, and does discharge, a debt owed to the payee (or a principal on whose behalf he is authorised to receive the payment) by the payer or by a third party by whom he is authorised to discharge the debt; ...*

· · · · ·

*To these simple propositions, I append the following footnotes:*

*(a) Proposition 1. This is founded upon the speeches in the three cases in the House of Lords, to which I have referred. It is also consistent with the opinion expressed by Turner J. in Thomas v. Houston Corbett & Co. [1969] N.Z.L.R. 151, 167. Of course, if the money was due under a contract between the payer and the payee, there can be no recovery on this ground unless the contract itself is held void for mistake (as in Norwich Union Fire*

56

*Insurance Society Ltd.* v. *Wm. H. Price Ltd.* [1934] A.C. 455) or is rescinded by the plaintiff. ...

(c) *Proposition 2 (b). This is founded upon the decision In Aiken v. Short,1 H. & N. 210, and upon dicta in Kerrison v. Glyn, Mills, Currie & Co.,81 L.J.K.B. 465. However, even if the payee has given consideration for the payment, for example by accepting the payment in discharge of a debt owed to him by a third party on whose behalf the payer is authorised to discharge it, that transaction may itself be set aside (and so provide no defence to the claim) if the payer's mistake was induced by the payee, or possibly even where the payee, being aware of the payer's mistake, did not receive the money in good faith: cf. Ward & Co. v. Wallis [1900] 1 Q.B. 675, 678-679, per Kennedy J.*"

[Paragraph breaks added for ease of reference.]

166.    The footnote to Proposition 1 was evidently what Lord Sumption relied upon as authority for the proposition cited earlier in this judgment from <u>Fairfield</u> that:

"*to the extent that a payment made under a mistake discharges a contractual debt of the payee, it cannot be recovered, unless (which is not suggested) the mistake is such as to avoid the contract: ...*"

167.    Mr Beltrami relied upon the footnote to Proposition 2(b). However the footnote was directed to three party cases where A paid B to discharge a debt owed to B by C rather than two party cases where A paid B to discharge a debt owed to B by A. The present case, like <u>Fairfield</u>, involves the latter situation. Insofar as the footnote to Proposition 2(b) is applicable to two party cases, it does not – and does not purport – to override the requirement in the footnote to Proposition 1 that there can be no recovery of money paid under a mistake of fact unless the contract itself is held void for mistake. As noted above, there is not and could not credibly be any suggestion that the Manager Agreements fall into this category. In the premises, <u>Barclays Bank</u> v <u>Simms</u> does not assist Mr Beltrami.

168.    In <u>Sybron</u> v <u>Rochem</u> the relevant defendant ("the Defendant") was employed by the relevant plaintiff ("the Plaintiff") in a senior management position. During the period of the Defendant's employment they both made payments for the benefit of the Defendant to a pension and life assurance

scheme administered by the Plaintiff.  Upon the Defendant's early retirement and pursuant to the scheme the Plaintiff paid him a lump sum.

169.  It was a term of the scheme that if the Defendant was dismissed for fraud or serious misconduct the Plaintiff did not have to make any payment to the Defendant insofar as that payment was funded by the Plaintiff's contributions to the scheme.

170.  Unbeknown to the Plaintiff, the Defendant while still in its employ was engaged in a conspiracy with other employees of the Plaintiff and its affiliates to set up a business in direct competition with the Plaintiff and its affiliates.

171.  When the Plaintiff learned of the Defendant's activities it brought proceedings against him to recover the lump sum payment, less the contributions made by the Defendant, on the ground that the payment was made on a mistake of fact.  Had the Plaintiff known of the Defendant's misconduct it would have dismissed him and would not have made the payment.

172.  The Plaintiff succeeded both at first instance and on appeal.  The Court of Appeal held that the Defendant was under a duty to disclose the misconduct of the other employees to the Plaintiff notwithstanding that such disclosure would inevitably have disclosed his own misconduct.  His failure to do so was a fraudulent breach of his duty to the Plaintiff and one which induced the Plaintiff's mistake.

173.  The facts of <u>Sybron</u> v <u>Rochem</u> are far removed from the facts of the instant case.  In <u>Sybron</u> the Plaintiff was mistaken about a fact which would have entitled it to terminate the contract, which brings the case within Goff J's footnote to Proposition 1.  Moreover, the mistake was induced by the Defendant's fraudulent conduct.  In the instant case, the Funds' mistake would not have entitled them to terminate the Manager Agreements, and it was allegedly induced by KML performing its contractual duties

inadequately but not dishonestly.  Consequently <u>Sybron</u> v <u>Rochem</u> does not assist Mr Beltrami either.

174.    Assuming that KML was contractually entitled to the management fees paid, therefore, the Defendants are not precluded from asserting a contractual entitlement defence to the claim in unjust enrichment by reason of KML's inducement of the Funds' mistake.

175.    Nonetheless, I conclude that if the breaches of duty pleaded at paragraphs 106 and 107 of the Statement of Claim are established, the Defendants are precluded from asserting a defence to the claim in unjust enrichment insofar as this defence derives from alleged contractual entitlement on the part of KML by reason of its inducement of the Funds' mistake.  As stated above, this is because such inducement negatived KML's contractual entitlement to the payment of management fees insofar as such payment exceeded the "true" NAV of the Funds.

**Summary**

176.    The preliminary issues are therefore resolved as follows:

(1)    (a)    Whether the NAVs were determined from time to time by the Administrator on the assumption (made for the purposes only of the Trust Defendants' and KML's Preliminary Issues Summonses) that KML, and/or FIM, and/or Mr Grosso and/or Mr Ceretti had input over the calculation of the NAV to the extent of control, on the basis pleaded at paragraphs 18 and 19 of the Reply;

*Yes, the NAVs were determined from time to time by the Administrator.*

(b)    If the answer to (a) is yes, were the Administrator's determinations of the NAV binding on the Funds for the purpose of calculating the fees due to KML pursuant to the Manager Agreements in force between the Funds and KML, in the absence of bad faith or manifest error;

59

*Yes, the Administrator's determinations were binding on the Funds for that purpose.*

(2)    If the answer to issue (1)(b) is yes, whether the fees paid by the Funds to KML on the basis of those NAV figures, ie the Disputed Fees, were, in the absence of bad faith or manifest error, properly due to KML under the terms of the Manager Agreements;

*Yes, in the absence of bad faith or manifest error, the fees were properly due to KML.*

(3)    If the answer to (2) is yes, and subject to issues (5) to (7), whether in consequence the Funds are precluded from asserting that the Disputed Fees, or any payments alleged by the Funds to originate from the Disputed Fees, are recoverable from: (a) KML; (b) the FIM Defendants; and (c) the Trust Defendants;

*Yes, subject to issues (5) to (7), the Funds are so precluded.*

(4)    If the answer to any of issues (1) to (3) is no, whether the Defendants have a defence to the claim in unjust enrichment insofar as this defence derives from alleged contractual entitlement on the part of KML;

*No, in those circumstances they do not.*

(5)    Whether the bad faith and/or manifest error of BLMIS constitutes bad faith and/or manifest error in relation to the calculation of the NAV, such that any determination of NAV made by the Administrator was not for this reason binding on the Funds and KML;

*No, it does not.*

(6)    If the facts are as pleaded by the Funds at paragraph 15 of the Reply, whether the conduct of the Administrator constituted bad faith and/or manifest error for the purpose of the NAV calculations, such that any determination of NAV made by it was not for this reason binding on the Funds and KML;

60

> *It may have constituted manifest error, such that any determination of NAV made by the Administrator was not binding on the Funds or KML.*

(7)    If the breaches of duty pleaded at paragraphs 106 and 107 of the Statement of Claim are established, whether the Defendants are precluded from asserting a defence to the claim in unjust enrichment insofar as this defence derives from alleged contractual entitlement on the part of KML by reason of its inducement of the Funds' mistake.

> *Yes, in that event the Defendants are precluded on the basis that KML's inducement of the Funds' mistake negatived its contractual entitlement.*

177.    Thus in order to succeed on a mistake based claim the Plaintiffs must first establish fault on the part of the Administrator or KML.

178.    I shall hear the parties as to costs.

Dated this 25th day of September, 2015

_____

Hellman J

61

# TAB 45

**Lilly Icos LLC and Another, Pfizer Enterprises
SARL and Others, Merck & Co Inc and Others,
AstraZeneca AB and Others v. 8PM Chemists
Limited, Vinesh Aggarwal, RDA Kollektif Sirketi**

Case Nos: HC07C02877

HC07C02930

HC07C02940

HC07C02986

High Court of Justice Chancery Division

31 July 2009

**[2009] EWHC 1905 (Ch)**

**2009 WL 2392200**

Before: The Hon Mr Justice Arnold

Date: 31 July 2009

Hearing dates: 11-12, 15-19, 24-26 June 2009 Further
written submissions: 30 June, 1, 2, 3 July 2009

**Representation**

• Simon Thorley Q.C. and Giles Fernando (instructed
by Baker & McKenzie ) for Lilly, Pfizer and
AstraZeneca.
• Simon Salzedo (instructed by Lovells LLP ) for
Merck.
• Richard Miller Q.C. and Justin Turner Q.C.
(instructed by Fasken Martineau LLP ) for the
Defendants.

**Approved Judgment**

The Hon Mr Justice Arnold

*Analysis*

Contents

| Topic | Paragraphs |
|---|---|
| Introduction | 1-5 |
| The cross-undertakings | 6-7 |
| Principles applicable on an inquiry under a cross-undertaking | 8-43 |
| General principles | 8-21 |
| Causation | 22-37 |
| Date of assessment | 38-41 |
| Remoteness | 42 |
| Mitigation | 43 |
| The facts | 44-206 |
| The witnesses | 44-46 |
| 8PM | 47 |
| The US healthcare market | 48-50 |
| Canadian internet pharmacies | 51-57 |
| 8PM's fulfilment business | 58-59 |
| Initial contact with CanadaDrugs | 60-61 |
| The Turkish fulfilment business | 62-70 |
| Development of the relationship with CanadaDrugs | 71 |
| RxNorth | 72 |
| CanadaDrugs's Barbados facility | 73-81 |
| RDA's business in the Claimants' products | 82 |
| The Heathrow detention | 83-84 |
| The Birmingham detention | 85-93 |
| Lilly's without notice application | 94-111 |
| Pfizer's without notice application | 112-117 |
| Merck's without notice application | 118-123 |
| AstraZeneca's without notice application | 124-126 |
| Lilly's with notice application | 127-135 |
| The search warrant | 136 |
| The Merck Injunction | 137-142 |

| The Pfizer and AstraZeneca Injunctions | 143-146 |
| The appeal | 147-150 |
| Discharge of the other Injunctions | 151-152 |
| The effect of the Injunctions | 153-192 |
| The state of the Defendants' Turkish fulfilment business prior to the Birmingham detention | 154-162 |
| The effect of the Birmingham detention | 163-166 |
| The effect of the without notice injunctions and with notice applications | 167-169 |
| The redundancies | 170-180 |
| Events following the Lilly Injunction | 182-188 |
| Events following the decision of the Court of Appeal | 189-190 |
| Conclusion | 191-192 |
| What would have happened if there had been no Injunctions? | 193-205 |
| Overall conclusion on causation | 206 |
| Quantum | 207-249 |
| The expert evidence | 208-215 |
| The Combined Database | 216-221 |
| Base period | 222-228 |
| Profit margins | 229-233 |
| Growth rate | 234-236 |
| Risk factor for the future | 236-240 |
| Risk factor for the period from 23 November 2007 to date | 241-244 |
| Discount rate | 245 |
| Conclusion on lost profits | 246 |
| Other losses claimed | 247-248 |
| Interest | 249 |
| Public policy | 250- |
| US law, policy and practice | 251-259 |
| English law | 260-292 |
| Contract | 261-266 |
| Tort | 267-272 |
| A broader principle? | 273-281 |
| Recover under a cross-undertaking | 282-286 |
| Conclusion on the law | 287 |
| Application to the present case | 288-292 |
| Election, estoppel etc | 293-307 |
| Liability of the various Claimants | 308-310 |
| Conclusion | 311 |
| Postscript | 312 |

## Introduction

1   This is my judgment on four inquiries as to the losses which the First Defendant ("8PM") and the Third Defendant ("RDA", which was referred to during earlier stages of the proceedings as "the Turkish Supplier"), who I shall refer to collectively as "the Defendants", have suffered as a result of interim injunctions obtained by the Claimants in four actions for trade mark infringement and in respect of which the Claimants gave cross-undertakings to compensate the Defendants. The parties are poles apart. The Defendants claim that they have suffered losses running into millions of pounds as a result of the injunctions. The Claimants dispute that the Defendants have suffered any loss at all. The Claimants also contend that, even if the Defendants have suffered any loss, it is irrecoverable as a matter of law.

2   I shall have to examine the facts in more detail below, but in outline they are as follows. The litigation concerns the Defendants' business of supplying branded pharmaceutical products sourced in Turkey to patients in the USA. Orders for products were placed by

US patients holding a US doctor's prescription with so-called Canadian internet pharmacies, who in turn contracted with the Defendants for the fulfilment of these orders. RDA, which purchased the products from Turkish wholesalers, dispensed and packaged products in response to each order and sent them in bulk to the UK where 8PM posted each package to the patient. The passage of the goods through the UK occurred under a customs procedure called "inward processing relief". The Claimants alleged that the import and/or export of the goods infringed their registered trade marks. The lead action was brought by Lilly Icos LLC and Eli Lilly & Co (collectively, "Lilly"). On 19 October 2007 Lilly obtained a without notice interim injunction from Kitchin J. Subsequently Pfizer Enterprises SARL and six associated companies (collectively, "Pfizer"), Merck & Co Inc and three associated companies (collectively, "Merck") and AstraZeneca AB and two associated companies (collectively, "AstraZeneca") also obtained without notice injunctions. On 23 November 2007 Mann J granted an interim injunction until trial in the Lilly action. Subsequently the Defendants consented to interim injunctions in favour of Pfizer, Merck and AstraZeneca. (I shall refer to the four with notice injunctions as "the Injunctions".) On 24 January 2008 the Court of Appeal discharged the Injunction granted by Mann J in favour of Lilly for reasons given on 5 February 2008. In short, the Court of Appeal held that Lilly had no cause of action for trade mark infringement. Its reasoning was equally applicable to the other Claimants. Subsequently the parties agreed that the other Injunctions should also be discharged (or, in one case, it expired). The Defendants contend that by the time the Injunctions were lifted their fulfilment business had been destroyed because their principal customer had gone elsewhere.

3  The Court of Appeal directed an inquiry under the cross-undertakings in the orders in the Lilly action. Subsequently it was agreed that there should be inquiries in the other three actions, and that all four inquiries should be heard together. On 26 March 2009 Warren J ordered that the inquiries be heard in two parts. This judgment is only concerned with the first part. The second part is due to be tried in December 2009.

4  The Defendants put their case in two main ways. Their primary case is that the losses which they claim were caused by the Injunction in the Lilly action. In the alternative, they say that the losses which they claim were caused by all four Injunctions. Although inquiries were directed under the cross-undertakings contained in the without notice injunctions, the Defendants do not contend that the losses which they claim were caused by those injunctions.

5  Lilly dispute that they are solely liable for the losses claimed by the Defendants if those losses are recoverable, while the other Claimants say that Lilly is solely liable. Lilly claim a contribution from the other Claimants in the event they are held solely liable for the losses claimed by the Defendants, but that claim is not presently before me. Nor is any question of apportionment if the Claimants are held jointly liable.

### The cross-undertakings

6  At the date of Mann J's order, RDA was not a defendant to Lilly's claim, although it was joined later. The cross-undertaking given to the Court by Lilly was in the following terms:

> "If the Court later finds that this Order or carrying it out has caused loss to the Defendant or the Turkish Supplier (as defined in the confidential schedule to the statement of Mr Aggarwal) and decides that the Defendant or the Turkish Supplier should be compensated for that loss, the Claimants will comply with any Order the Court may make."

7  The cross-undertakings given by Pfizer, Merck and AstraZeneca are in similar terms. There are small differences in wording, but it is not suggested that these are material.

### Principles applicable on an inquiry under a cross-undertaking

### General principles

Lilly Icos LLC v 8PM Chemists Ltd, 2009 WL 2392200 (2009)

8 A cross-undertaking in damages is normally required as a condition for the grant of an interim injunction. Its purpose is to ensure that the parties affected by the injunction are compensated if it later turns out that the injunction was wrongly granted. This purpose is fundamental to the courts' approach to the grant or refusal of interim injunctions, particularly since American Cyanamid Co v Ethicon Ltd [1975] AC 396 . It follows that the cross-undertaking is a very important means of ensuring that justice is done.

9 The basic principle applicable to an inquiry under a cross-undertaking is that the cross-undertaking should be enforced in accordance with its terms. In the case of a cross-undertaking expressed in terms such as those set out above, this involves two questions. First, has the order or carrying it out caused loss to the beneficiaries of the cross-undertaking, here 8PM and RDA? Secondly, if so, should the beneficiaries be compensated for that loss?

10  It follows that the court's primary task is to compensate the beneficiaries, not to punish the parties that obtained the injunction or to require those parties to make restitution of any benefits that they may have gained as a result of the injunction. It has been held that aggravated damages may be awarded on a cross-undertaking ( Columbia Picture Industries Inc v Robinson [1987] Ch 38 ) and it has been suggested that exemplary damages may be available (see Smith v Day (1882) 21 Ch D 421 at 428 and Digital Equipment Corp v Darkcrest Ltd [1984] Ch 512 at 516), but no such claim is raised in the present cases.

11  It is well established that the Court has a discretion to refuse to order an inquiry under a cross-undertaking even if the injunction in question is discharged: see Balkanbank v Taher [1995] 1 WLR 1056 and the earlier authorities discussed therein. In the present cases inquiries have been ordered, and the Claimants do not contend that an order for the payment of compensation should be refused on purely discretionary grounds. Nevertheless, for reasons that will appear, I shall have to return to this point below.

12  Until recently, the correct approach to the assessment of compensation under a cross-undertaking has generally been regarded as that set out in the *obiter*

*dictum* of Lord Diplock in Hoffman-La Roche & Co AG v Secretary of State for Trade and Industry [1975] AC 295 at 361:

> "The undertaking is not given to the defendant but to the court itself. Non-performance of it is contempt of court, not breach of contract, and attracts the remedies available for contempts, but the court exacts the undertaking for the defendant's benefit. It retains a discretion not to enforce the undertaking if it considers that the conduct of the defendant in relation to the obtaining or continuing of the injunction or the enforcement of the undertaking makes it inequitable to do so, but if the undertaking is enforced the measure of the damages payable under it is not discretionary. It is assessed on an inquiry into damages at which principles to be applied are fixed and clear. The assessment is made upon the same basis as that upon which damages for breach of contract would be assessed if the undertaking had been a contract between the plaintiff and the defendant that the plaintiff would not prevent the defendant from doing that which he was restrained from doing by the terms of the injunction: see Smith v. Day (1882) 21 Ch.D. 421 , *per* Brett L.J., at p. 427."

13  In recent years, however, there have been a number of cases in which judges of this Division have expressed doubts about the correctness of the approach articulated by Lord Diplock. Before turning to those cases, I would like to make three points.

14 First, the issue before the Court of Appeal in Smith v Day was whether Bacon V-C had correctly exercised his discretion to refuse to order an inquiry. The principal

ground on which the Court of Appeal held that he had was that the application for an inquiry had not been made sufficiently promptly after the injunction was discharged. A secondary ground was that the defendant's claim for damages rested upon an alleged agreement for a lease, but the Court held that there had been no such agreement. Thus Brett LJ's remarks about the approach to assessment were *obiter* . Furthermore, what he actually said was this:

> "Now in the present case there is no undertaking with the opposite party, but only with the Court. There is no contract on which the opposite party could sue, and let us examine the case by analogy to cases where there is a contract with, or an obligation to the other party. If damages were granted at all, I think the Court would never go beyond what would be given if there an analogous contract with or duty to the opposite party."

It is true that he went on to consider the claim by reference to Hadley v Baxendale (1854) 9 Ex 341 , but the passage quoted leaves open the possibility of assessment by reference to a non-contractual duty, such as a fiduciary duty.

15  Secondly, counsel for the Defendants pointed out that the conventional form of the cross-undertaking has changed since Hoffman-La Roche . At that time, the undertaking was "to abide by any order the court may make as to *damages* in case the court shall hereafter be of opinion that the defendant shall have sustained any *damages* by reason of this order [emphasis added]". The same form of undertaking was in use at the time of Smith v Day . Counsel suggested that the reference to damages had been influential in the adoption of the contractual approach, and that the contemporary form of cross-undertaking meant that the court was not constrained to follow that approach. The form of the cross-undertaking used at the time of Smith v Day appears to have originated with Knight-Bruce V-C. At that time the Court of Chancery could not award common law damages, but did award equitable

compensation. It seems unlikely that Brett LJ could have been misled by the label, but on the other hand it also seems unlikely that Knight-Bruce V-C would have contemplated assessing compensation applying a common law approach. Whatever the correct resolution of that conundrum, I would agree with counsel for the Defendants at least to this extent, that the contemporary form of undertaking is not only clearer as a matter of language, but also focuses attention more clearly on the correct questions to be considered.

16  Thirdly, counsel for the Defendants submitted that the contractual approach to assessment was conceptually difficult to apply in certain circumstances. The two examples he gave were without notice injunctions and cross-undertakings the beneficiaries of which are not parties to the proceedings. I think the latter example has more force than the former, but I am not convinced that either poses insuperable problems. As it happens, I think that a better illustration of the problems with the contractual approach is provided by the issue over the date of assessment discussed below.

17  In R v Medicines Control Agency ex p. Smith & Nephew Pharmaceuticals Ltd [1999] RPC 705 712-714 Jacob J (as he then was) reviewed Smith v Day and a number of later authorities, including the decision of the High Court of Australia in Air Express Ltd v Ansett Transport Industries (Operations) Pty Ltd (1981) 146 CLR 249 , and stated:

> "I have much sympathy with the view that the contract basis for assessment is or may be too narrow in some cases. After all, even if the injunctor is no wrongdoer, as compared with the wholly wrongly assailed injunctee, he stands a notch down. It was he who (as it turned out) wrongly assailed the injunctee. He was the 'voluntary litigant' as James LJ put it [in Graham v Campbell (1878) 7 Ch D 490] . There is a lot to be said for the view that the paying party should pay for all the damage directly caused to the injunctee by the wrongful injunction – that he must take his victim as he finds him. Of course, if,

once he knows of the injunction, the injunctee does not spell out to the injunctor any special circumstances causing direct but, to the injunctor, unforeseeable damages, he may not be allowed to recover for that damage. Equity would be apt to blame an injunctee who stood by, letting the injunctor build up a liability on the cross-undertaking of which he had no knowledge.

I think that in an appropriate case the courts will have to examine the principles more closely. I do not think it is necessary for me to do so here."

18  In Apex Frozen Foods v Ali [2007] EWHC 469 (Ch), [2007] All ER (D) 156 (Mar) Warren J referred to what Jacob J had said in the MCA case and continued:

"15.    I should, however, say that even if the contract basis of assessment is correct, I doubt that it would be right to incorporate all the principles which apply in relation to an assessment of damages. The starting point must surely be the true construction of the particular undertaking in question. That is to be judged against the background and purpose of the undertaking which is required by the court to be given in order to ensure that a mechanism is available to make good any detriment suffered by a defendant against whom injunctive relief is obtained when it is subsequently established that there should not be an injunction. …

16.    However, I do not need to decide, any more than Jacob J,

whether the contract approach is too narrow…"

19  In Les Laboratoires Servier v Apotex Inc [2008] EWHC 2347 (Pat), [2009] FSR 3 Norris J said at [7]:

"First, I am following the obiter guidance contained in the opinion of Lord Diplock in Hoffman-La Roche because, on the evidence and argument presented at trial, it is sufficient to enable me to determine the issues that arise. For my own part, I think it should be recognised that the award is of equitable compensation (not of damages strictly so called) and that there may be occasion to examine whether such equitable compensation should be fettered by rigid adherence to common law rules; and further, that if common law rules are to be applied, whether those relating to contract are more appropriate than those relating to tort or some other breach of duty (in which connection it will be noted that the judgment of Brett L.J. upon which Lord Diplock founded his view referred to '[a] contract with or duty to the opposite party')."

20  Counsel for the Claimants acknowledged the force of the observations of Jacob, Warren and Norris JJ, and accepted that the law appeared to be moving away from a rigidly contractual approach to assessment. For my part, I agree with Norris J that the remedy awarded under a cross-undertaking in damages is properly to be regarded as equitable compensation and not common law damages.

21  Two separate points were made by Norris J in Servier at [9]:

Lilly Icos LLC v 8PM Chemists Ltd, 2009 WL 2922400 (2009)

"Third, whilst it is for Apotex to establish its loss by adducing the relevant evidence, I do not think I should be over eager in my scrutiny of that evidence or too ready to subject Apotex' methodology to minute criticism. That is so for two reasons, quite apart from an acceptance of the proposition that the very nature of the exercise renders precision impossible. (a) Whilst, in order to obtain interlocutory relief, Servier will not have had to persuade Mann J. that it was *easy* to calculate Apotex' loss in the event of the injunction being wrongly granted, it will have had to persuade him that that task was easier than the calculation of its own loss in the event that the injunction was withheld. The passages I have cited from its skeleton argument and evidence show that it did so. Having obtained the injunction on that footing it does not now lie in Servier's mouth to say that the task is one of extreme complexity and that the court should adopt a cautious approach. Having emphasised at the interlocutory stage the relative ease of the process, it should not at the final stage emphasise the difficulty. (b) In the analogous context of the assessment of damages for patent infringement, in General Tire and Rubber Co v Firestone Tyre and Rubber Co Ltd (No.2) [1976] R.P.C. 197 at 212 Lord Wilberforce said:

'There are two essential principles in valuing the claim: first, that the plaintiffs have the burden of proving their loss; second, that the defendants being wrongdoers, damages should be liberally assessed but that the object is to compensate the plaintiffs and not to punish the defendants.'

The principle of 'liberal assessment' seems to me equally applicable in the present context. Although a party who is granted interim relief but fails to establish it at trial is not strictly a 'wrongdoer', but rather one who has obtained an advantage upon consideration of a necessarily incomplete picture, he is to be treated as if he had made a promise not to prevent that which the injunction in fact prevents. There should as a matter of principle be a degree of symmetry between the process by which he obtained his relief (an approximate answer involving a limited consideration of the detailed merits) and that by which he compensates the subject of the injunction for having done so without legal right (especially where, as here, the paying party has declined to provide the fullest details of the sales and profits which it made during the period for which the injunction was in force)."

## Causation

22  Causation is a familiar problem in many branches of the law. The basic, although not universal, test for causation both in contract and in tort is the "but for" test i.e. it must shown that the claimant would not have suffered the damage but for the defendant's act. This is determined as a matter of common sense. The test can be difficult to apply, however, where there are multiple causes. In such a case, the application of the but for test depends on the circumstances. This can lead to different emphases in contract and tort. In contract, the claimant may recover damages for a loss only where the breach of contract was the "effective" or "dominant" cause of the loss, but it need not be the only cause: see *Chitty on Contracts* (30th ed) at 26-032. If a breach of contract is one of two causes, both of which are effective to cause loss, the contract breaker is liable for the loss. It is sufficient that the breach is an effective cause, it does not have to be the more effective cause: *Chitty* at 26-041. In tort, the position is more complex. In general, however, it is sufficient to show that the tort was a cause of the loss, and not necessarily the sole or dominant cause: see Halsbury's Laws (4th ed reissue) vol. 12(1) at 854.

23  The approach of equity differs depending on the nature of the duty. In Bristol & West Building Society v Mothewt [1998] Ch 1 at 17 Millett LJ (as he then was) described the position with regard to the duty of a trustee or other fiduciary to use proper skill and care in the discharge of his duties as follows:

> "Although the remedy which equity makes available for breach of the equitable duty of skill and care is equitable compensation rather than damages, this is merely the product of history and in this context is in my opinion a distinction without a difference. Equitable compensation for breach of the duty of skill and care resembles common law damages in that it is awarded by way of compensation to the plaintiff for his loss. There is no reason in principle why the common law rules

of causation, remoteness of damage and measure of damages should not be applied by analogy in such a case. It should not be confused with equitable compensation for breach of fiduciary duty, which may be awarded in lieu of rescission or specific restitution."

24  In Target Holdings Ltd v Redferns [1995] 1 AC 421 at 434 Lord Browne-Wilkinson described the position with regard to duties which are peculiar to trustees:

> "The equitable rules of compensation for breach of trust have been largely developed in relation to such traditional trusts, where the only way in which all the beneficiaries' rights can be protected is to restore to the trust fund what ought to be there. In such a case the basic rule is that a trustee in breach of trust must restore or pay to the trust estate either the assets which have been lost to the estate by reason of the breach or compensation for such loss. Courts of Equity did not award damages but, acting in personam, ordered the defaulting trustee to restore the trust estate: see Nocton v. Lord Ashburton [1914] A.C. 932 , 952, 958, *per* Viscount Haldane L.C. If specific restitution of the trust property is not possible, then the liability of the trustee is to pay sufficient compensation to the trust estate to put it back to what it would have been had the breach not been committed: Caffrey v. Darby (1801) 6 Ves. 488 ; Clough v. Bond (1838) 3 M. & C. 490 . Even if the immediate cause of the loss is the dishonesty or failure of a third party, the trustee is liable to make good that loss to the trust estate if, but for the breach, such loss would not have

occurred: see Underhill and Hayton, Law of Trusts & Trustees 14th ed. (1987), pp. 734-736; In re Dawson, decd.; Union Fidelity Trustee Co. Ltd. v. Perpetual Trustee Co. Ltd. [1966] 2 N.S.W.R. 211 ; Bartlett v. Barclays Bank Trust Co. Ltd. (Nos. 1 and 2) [1980] Ch. 515 . Thus the common law rules of remoteness of damage and causation do not apply. However there does have to be some causal connection between the breach of trust and the loss to the trust estate for which compensation is recoverable, viz. the fact that the loss would not have occurred but for the breach: see also In re Miller's Deed Trusts (1978) 75 L.S.G. 454 ; Nestle v. National Westminster Bank Plc. [1993] 1 W.L.R. 1260 ."

control, so equitable compensation must be limited to loss flowing from the trustee's acts in relation to the interest he undertook to protect. Thus, Davidson states ["The Equitable Remedy of Compensation" (1982) 3 Melbourne U.L. Rev. 349] "It is imperative to ascertain the loss *resulting from breach of the relevant equitable duty*" (at p. 354, emphasis added).'

25 He went on at 438-439 to cite three passages from the judgment of McLachlin J in Canson Enterprises Ltd v Boughton & Co (1991) 85 DLR (4th) 129 and to approve them:

"At p. 160:

'While foreseeability of loss does not enter into the calculation of compensation for breach of fiduciary duty, liability is not unlimited. Just as restitution in specie is limited to the property under the trustee's

At p. 162:

'A related question which must be addressed is the time of assessment of the loss. In this area tort and contract law are of little help... The basis of compensation at equity, by

contrast, is the restoration of the actual value of the thing lost through the breach. The foreseeable value of the items is not in issue. As a result, the losses are to be assessed as at the time of trial, *using the full benefit of hindsight*.' (Emphasis added.)

consequence of the breach is to be assessed with the full benefit of hindsight. Foreseeability is not a concern in assessing compensation, but it is essential that the losses made good are only those which, *on a common sense view of causation*, were caused by the breach(Emphasis added.)

At p. 163:

'In summary, compensation is an equitable monetary remedy which is available when the equitable remedies of restitution and account are not appropriate. By analogy with restitution, it attempts to restore to the plaintiff what has been lost as a result of the breach, i.e., the plaintiff's loss of opportunity. The plaintiff's actual loss as a

In my view this is good law. Equitable compensation for breach of trust is designed to achieve exactly what the word compensation suggests: to make good a loss in fact suffered by the beneficiaries and which, using hindsight and common sense, can be seen to have been caused by the breach."

26 Thus equity's approach to causation, as distinct from remoteness, is little different to that of the common law. On the other hand, where distinctly equitable duties are engaged, equity does adopt a more flexible approach to questions such as the date of assessment. I shall return to this point below.

27 In the context of cross-undertakings, it can be important to consider whether the loss claimed was caused by the injunction or merely by the existence of the litigation. In Air Express the High Court were unanimous in holding that it was only damage caused

by the injunction that was recoverable under a cross-undertaking and not damage caused by the fact of the litigation itself. In that case Air Express claimed for damage caused by an injunction which restrained the Secretary of the Department of Transport from issuing a permission under customs regulations to import aircraft into Australia. The majority of the High Court agreed with the judge, however, that on the balance of probabilities the Secretary would not have issued the permission once the litigation had been commenced anyway, and thus the injunction made no difference. Accordingly, Air Express was not entitled to recover its loss.

28  Barwick CJ did not address the correct approach to causation in his judgment. Gibbs J said at 312-313 (emphasis added):

> "If the pendency of the litigation, rather than the making of the order, was the cause of the plaintiff's loss, the terms of the undertaking have no application, since the plaintiff has not sustained loss by reason of the order. Moreover, except in certain cases analogous to malicious prosecution, a defendant is not entitled to recover damages for loss resulting from legal proceedings brought against him - the only liability of the unsuccessful plaintiff is to pay costs. The court should no doubt scrutinize with care an assertion by a plaintiff that loss which has been suffered by a defendant has resulted from the litigation rather than from the making of the interlocutory order, since a plaintiff should not be allowed to evade payment of the price which he has agreed to pay for the grant of the injunction. In the end however the question becomes one of fact: did the making of the order cause the loss? The onus of proof must, in accordance with general principles, lie on the defendant who asserts that he

sustained damage by reason of the order.

It was submitted on behalf of the appellant that it is enough that the making of the order should have been a cause of the damage, so that if both the making of the order and the continuance of the litigation are concurrent causes the undertaking will be applicable. However, in almost every case in which an injunction is granted the injunction will play some part in causing the party bound by it to act in accordance with its terms. To order a plaintiff to pay damages where it appears that the party bound by the injunction would have acted as he did even if the injunction had not been granted, would be to give the undertaking an effect obviously not intended. *The party seeking to enforce the undertaking must show that the making of the order was a cause without which the damage would not have been suffered*. It was further submitted that the onus lies on the plaintiff, against whom the undertaking is sought to be enforced, to disentangle any damage arising from the litigation from that which was caused by the making of the order. However, the onus of proof does not shift in this way; the defendant, who seeks to enforce the undertaking, must prove that the damage he has sustained was caused by the making of the order.

The present case is in a number of respects exceptional. …"

29  Stephen J said at 319-320 (emphasis added):

"It is appropriate enough, in claims under such undertakings, to rely upon analogies drawn from the common law in matters of remoteness of damages, the concern of Brett L.J. in Smith v. Day , as Lindley L.J. points out in Schlesinger v. Bedford (1893) 9 TLR 370 . It is quite a different thing to seek to apply common law rules of causation to a claim made under such undertakings; there is no such analogy as Lord Reid in Baker v. Willoughby (1970) AC 467 , at p 492 found to exist in the case of workers' compensation. The reason for this is plain enough. In both contract and tort it is enough that the breach of contract or of duty is one direct cause of whatever damage a plaintiff has suffered - McGregor on Damages , 13th ed. (1972), pp. 69, 118. The breach is a wrongful act on the defendant's part and the common law visits him with liability for the consequences to the plaintiff, subject always to rules as to remoteness. But a plaintiff who sues for an injunction and obtains interlocutory relief, giving an undertaking to the court as the price of that relief, commits no wrongful act, no breach of contract or of duty when, at the trial, he fails to obtain any perpetual injunction. If, as a result of the grant of interlocutory relief, the defendant has been harmed there will, however, have been injustice and, an undertaking having been given, the court will thereby have been armed with jurisdiction, otherwise lacking, to right that injustice and compensate the defendant for the harm done to him.

From this it can be seen that it will only be if damage is suffered because of the grant of the injunction, and would not have been suffered but for it, that the court should compensate a defendant who claims damages under the undertaking. Its grant must be shown to be the causa sine qua non of the damage complained of before the defendant can be entitled to be compensated for what turns out to be the erroneous grant by the court of the injunction against it. Only then will the defendant have suffered, from the grant of the injunction, such 'real harm' as Cussen J. spoke of in Finnigan's Case what North J., in Attorney-General v. Albany Hotel Co. (1896) 2 Ch, at p 699 described as 'the damages which were really sustained'.

It follows that it is for the claimant under an undertaking to establish by evidence, or by inference from evidence, a prima facie case both that the grant of the injunction was a cause of his damage and that but for it he would not have suffered that damage."

30  Mason J said at 324-325:

"English law has not adopted a uniform approach to causation. Instead, it has tended to take refuge in the notion that causation is very largely a question of fact. But the many statements to this effect which are to be found in the decided cases do not attempt to deny the fact that the common law has applied a variety of theories and standards of

causation, in each instance applying that which is in point of policy the most apt or appropriate to the question which arises for decision.

For this reason little is to be gained in the present case from an examination of the myriad authorities which deal with causation of damage in contract, tort and other situations many of which were pressed upon us in argument. We are better advised to look to the purpose which the undertaking as to damages is designed to serve and to identify that causal connexion or standard of causal connexion which is most appropriate to that purpose. The object of the undertaking is to protect a party, normally the defendant, in respect of such damage as he may sustain by reason of the grant of the interim injunction in the event that it emerges that the plaintiff is not entitled to relief. It is no part of the purpose of the undertaking to protect the defendant against loss or damage which he would have sustained otherwise, as for example, detriment which flows from the commencement of the litigation itself. That is loss or damage which the defendant must bear himself, as he does when no interim injunction is sought or granted. Consequently, it is for the party seeking to enforce the undertaking to show that the damage he has sustained would not have been sustained but for the injunction."

31   He returned to the point at 332:

"Air Express bears the onus of showing the necessary causal connexion in the sense already explained between the damage and the injunction, that is, that the damage would not have been sustained but for the injunction. The crucial question is whether by establishing the sequence of events it has done enough to discharge that onus by making out a prima facie case.

Unless the circumstances indicate otherwise, when it appears that damage flows from the non-performance of an act and the performance of that act has been restrained by an interim injunction, the inference will generally be drawn that the damage has been occasioned by the injunction."

32   It can be seen that their Honours were agreed that the correct test is the but for test: the defendant must show the damage claimed would not have been sustained but for the injunction. It also appears, however, that the defendant need only show that the injunction was a cause of the loss, not the sole cause. On the other hand, if the loss was caused as much by the existence of the litigation as by the injunction, then the defendant cannot satisfy the "but for" test.

33   That the defendant need not show that the injunction was the sole cause is supported by the decision of the Court of Appeal of New Zealand in Bonz (Pty) Ltd v Cooke [2000] NZCA 44 . In that case the plaintiffs obtained an *Anton Piller* order and *ex parte* injunction in a claim for infringement of copyright. The injunction was subsequently varied in certain respects. At trial the plaintiffs' claims were dismissed. The defendant claimed damages on the cross-undertaking for the collapse of her business. Two of the issues on the inquiry were whether the injunction had caused the loss and, if so, whether that was reasonably foreseeable.

Blanchard J delivering the judgment of the Court of
Appeal summarised the judge's finding on the first of
these issues as follows at [11]:

> "Hansen J noted a submission on
> behalf of Bonz that Mrs Cooke
> had closed her business down to
> prepare for trial. He accepted that
> that was 'part of the motivation',
> but was satisfied, on the balance
> of probabilities, that it was the effect
> of the interim injunction that caused
> the business to close. 'Although the
> variation of the order was intended
> to assist Mrs Cooke to continue
> running her business, that proved to
> be impossible.'"

Blanchard J went on to endorse this conclusion at [29]
and [31]:

> "In part, the decision to close the
> business may have been motivated
> by the need to devote time and
> money to the litigation, which was
> complex and expensive. But we are
> of the view that Hansen J was
> right to conclude that a significant
> determinant of that decision was the
> injunction.
>
> …
>
> Hansen J made allowance for the
> impact of the litigation generally -
> apart from the injunction - on Mrs
> Cooke's finances but it was on the
> evidence open to him to conclude
> that the existence of the injunction
> was an operating cause of the closure
> of the business"

34  I was referred to six first instance decisions in
this country in which the issue of causation has been
considered. For the most part, I consider that these
represent decisions on the facts and do not assist in
ascertaining the correct approach as a matter of law. I
must, however, deal with the statement of Lightman J
in Triodos Bank NV v Dobbs [2005] EWHC 108 (Ch),
[2005] All ER (D) 121 at [37]:

> "The Receivers must not only
> establish causation on a "but for"
> basis; they must show that, prima
> facie, the giving of the undertaking
> was the exclusive cause of the
> loss. This does not mean, however,
> that they must deal with every
> conceivable or theoretical cause of
> the damage ( Tharros Shipping v.
> Bias [1994] 1 Lloyds Rep 577 )."

35  With respect to Lightman J, in my judgment this is
not a correct statement of the law. It does not appear
that either Air Express or Bonz v Cooke was cited to
Lightman J and the point may not have been argued
before him. It appears that the basis for Lightman J's
statement is a passage in the judgment of Saville J (as
he then was) at first instance in Financiera Avenida SA
v Shiblaq (The Times, 21 November 1988) commenting
on a passage from the judgment of Mason J in Air
Express which was quoted by Waller J (as he then was)
in Tharros v Bias . What Saville J actually said was this:

> "I find [the reasoning of Mason
> J] convincing. However, in my
> view this approach does not mean
> that a party seeking to enforce an
> undertaking must deal with every
> conceivable or theoretical cause
> of the damage claimed, however
> unlikely this may be. Once a party
> has established a prima facie case
> that the damage was exclusively
> caused by the relevant Order, then
> in the absence of other material
> to displace that prima facie case,
> the Court can, and generally would,

draw the inference that the damage would not have been sustained but for the order. In other words, the Court seeks to approach and deal with this question of causation in a commonsense way."

36  As Waller J pointed out at 581, that case went to the Court of Appeal on another point, and the Court of Appeal remitted the case to Saville J without either approving or disapproving his approach to causation. Waller J went on to say at 582 that:

"In my view, it is right to approach the undertaking in damages question as it was approached by the Australian Judge and by Saville J, but one must take care in so doing. …

In my judgment, a party must be able to show that he would not have suffered the damage 'but for' the injunction …"

37  In my judgment, neither Saville J nor Waller J was intending to apply a different test to that laid down in Air Express , nor did they mean that the claimant on the cross-undertaking had to go further than satisfying the but for test and show that the injunction was the exclusive cause of the loss.

**Date of assessment**

38  In contract, the general rule is that damages are to be assessed as at the date of the breach, but this is not an inflexible rule. In Golden Strait Corp v Nippon Yusen Kubishika Kaisha [2007] UKHL 12, [2007] 2 AC 353 the charterers repudiated a charterparty in December 2001 and the shipowners accepted the repudiation. The earliest contractual date for re-delivery of the vessel was December 2005, but the charterparty provided that both parties had the right to cancel the charter if war broke out between certain countries. In December 2001 war was possible, but not probable. In March 2003 the Second Gulf War broke out, which would have entitled the charterers to terminate. The majority of the House of Lords held that the shipowners were only entitled to damages to March 2003, and not to December 2005. The principle applied by the majority was that a victim of a breach of contract was entitled to damages representing the value of the contractual benefit of which he had been deprived, no less and no more, and that this might require assessment at a date other than the date of breach.

39  As Lord Scott of Foscote stated at [36]:

"The same would, in my opinion, be true of any anticipatory breach the acceptance of which had terminated an executory contract. The contractual benefit for the loss of which the victim of the breach can seek compensation cannot escape the uncertainties of the future. If, at the time the assessment of damages takes place, there were nothing to suggest that the expected benefit of the executory contract would not, if the contract had remained on foot, have duly accrued, then the quantum of damages would be unaffected by uncertainties that would be no more than conceptual. If there were a real possibility that an event would happen terminating the contract, or in some way reducing the contractual benefit to which the damages claimant would, if the contract had remained on foot, have become entitled, then the quantum of damages might need, in order to reflect the extent of the chance that that possibility might materialise, to be reduced proportionately. The lodestar is that the damages should represent the value of the contractual benefits of which the claimant had been

deprived by the breach of contract, no less but also no more. But if a terminating event had happened, speculation would not be needed, an estimate of the extent of the chance of such a happening would no longer be necessary and, in relation to the period during which the contract would have remained executory had it not been for the terminating event, it would be apparent that the earlier anticipatory breach of contract had deprived the victim of the breach of nothing. In Bwllfa and Merthyr Dare Steam Collieries (1891) Ltd v Pontypridd Waterworks Co [1903] AC 426 , the Earl of Halsbury LC, at p 429, rejected the proposition that 'because you could not arrive at the true sum when the notice was given, you should shut your eyes to the true sum now you do know it, because you could not have guessed it then' and Lord Robertson said, at p 432, that 'estimate and conjecture are superseded by facts as the proper media concludendi' and, at p 433, that 'as in this instance facts are available, they are not to be shut out'. Their Lordships were not dealing with a contractual, or tortious, damages issue but with the quantum of compensation to be paid under the Waterworks Clauses Act 1847 (10 & 11 Vict c 17). Their approach, however, is to my mind as apt for our purposes on this appeal as to theirs on that appeal."

40   In my judgment, the general contractual rule is not applicable to the case of a claim under a cross-undertaking. The defendant will usually (although not always, as discussed below) sustain the loss claimed after the date of the notional breach of contract, i.e. the date of the injunction. Often, the loss will be a continuing one down to the date of discharge of the

injunction. Furthermore, it would be artificial to regard the assessment as valuing the loss of a contractual benefit of which the defendant has been deprived. Rather, the defendant is being compensated for being prevented from carrying on its business in the way in which it normally would have done. Accordingly, I consider that the correct approach is that adopted by equity when awarding compensation for breach of fiduciary duty, namely to consider the position with the benefit of hindsight.

41   As counsel for the Claimants argued, however, even if compensation is to be assessed as at the date of judgment, it does not follow that all uncertainties or risks which existed as at the date of the injunction should be disregarded. I shall return to this point below.

### Remoteness

42   In his closing submissions counsel for the Claimants accepted that none of the losses claimed by the Defendants were too remote. Accordingly, it is not necessary to consider whether, and if so in what circumstances, the beneficiary of a cross-undertaking may be refused compensation on the ground that its loss is too remote.

### Mitigation

43   Although the Claimants pleaded that the Defendants had failed to mitigate their loss, in the light of the evidence counsel for the Claimants did not press this point. Accordingly, it is not necessary to consider whether, and if so to what extent, the beneficiary of a cross-undertaking is under a duty to mitigate its loss.

### The facts

### The witnesses

44   The principal factual witness was Vinesh Aggarwal, the Second Defendant. He is the managing director of 8PM and the majority owner of RDA. I found Mr Aggarwal to be an excellent witness: he was clear, precise and careful. I have no hesitation in accepting his evidence. Counsel for the Claimants accepted that Mr Aggarwal was an honest witness, but submitted

that in certain respects the documentary record showed that he had persuaded himself of a different version of events to what had actually happened or at least had misremembered things. I am not persuaded of this. When the documents were put to Mr Aggarwal, I found his explanations persuasive.

45  I also heard from Steven Allen, who is the Director of the EMEA branch of Pfizer's Global Security Group. He was a straightforward witness, but his evidence is not central to the issues I have to decide.

46  In addition I received a certain amount of written evidence from witnesses whose evidence was not challenged. Again, this is not central to the issues.

**8PM**

47  8PM was founded in 1992. Its principal business is that of retail pharmacy in the UK. It was acquired by Mr Aggarwal's parents in 1996 and they are still the majority shareholders. Mr Aggarwal and his brother Mukesh became directors of the company in 1996. Mr Aggarwal is a chartered accountant. He had no involvement in pharmacy before starting to work at 8PM, but since then his main role in the company has been in product procurement. As a result, he has become very knowledgeable about the way in which the pharmaceutical market operates in Europe and in various other countries, including Turkey, the USA and Canada. It is clear that he is an intelligent and able businessman.

**The US healthcare market**

48  The US healthcare market is the largest in the world, with combined sales of prescription and over-the-counter drugs of approximately US$308 billion in 2007. The prices of patented prices in the USA are amongst the highest in the world. Prices can be as much as 80% lower in Canada. A major reason for this price discrepancy is that in Canada the Patent Medicine Prices Review Board regulates prices for patented medicines so that they cannot increase by more than the Consumer Price Index. In contrast, in the USA there is no price control of patented drugs.

49  Healthcare in the USA is primarily funded by employers, who provide health insurance to 60% of the population. The US Federal government provides health insurance assistance, primarily to people aged 65 or over, through the Medicare scheme. Individual states also administer their own schemes to provide coverage for those with low incomes through the Medicaid scheme. In January 2006, Medicare Part D was introduced in order to subsidise the cost of prescription drugs for Medicare beneficiaries. A key feature of Medicare Part D is its banded structure. Between US$295 and $2,700 (2009 figures), patients only have to pay 25% of the cost of their medication. Between US$2,700 and $6,154 patients have to pay 100% of the cost. This referred to as the "coverage gap" or "donut hole". Above US$6,154 the required contribution falls to 5%.

50  The "coverage gap" is not the only problem with Medicare Part D. Others are that: (a) it does not cover everyone in the USA, so that there around 47 million people with no insurance coverage for drug costs; (b) Part D is complex and so patients do not make full use of it; (c) the premiums are increasing year on year; (d) the list of excluded drugs is also increasing year on year; and (e) there is an increasing need for medication in the population aged 45-65, but these people are not covered by Medicare unless they are chronically ill.

**Canadian internet pharmacies**

51  For the reasons given above, in the late 1990s US patients, especially those in neighbouring states, began travelling to Canada to buy prescription medicines to take home with them. This developed into a mail order trade, and from about 2000 into an internet trade. It appears that the trade started in Manitoba with some enterprising retail pharmacists who recognised that, with the then relatively weak Canadian dollar and low drug prices, they could offer drugs to US citizens at considerably lower prices than those persons could get locally. Through aggressive marketing, the industry took off and a large number of Canadian internet pharmacies ("CIPs") appeared in the years immediately after 2000. These included CanadaDrugs.com ("CanadaDrugs") in 2001.

52  In about 2003, it became clear to pharmaceutical companies that sales in the US were dropping while

sales in Canada were increasing rapidly. They reacted by putting pressure on Canadian wholesalers not to supply CIPs. In addition, from early 2004 to late 2007, the Canadian dollar was strengthening against the US dollar. These pressures caused both a consolidation of the CIP industry through acquisitions and a move by CIPs to set up fulfilment operations off-shore to avoid the supply restrictions in Canada and to gain access to cheaper sources of drugs.

53   Initially, fulfilment moved to jurisdictions such as Australia, New Zealand, the UK and other European countries. As US patients became accustomed to non-Canadian drugs, fulfilment started from other countries such as Turkey and Israel.

54   By 2004-2005 the size of the CIP trade was very substantial. An approximate estimate of its value during this period is C$2 billion or US$1.5 billion.

55   The CIP industry faced additional pressure in 2006 with the introduction of Medicare Part D and with the continued strengthening of the Canadian dollar. This caused further consolidation in the industry. This was mainly amongst the smaller CIPs that did not have the resources to set up off-shore operations in order to obtain cheaper drugs to be able to compete more effectively. By the end of this process, about 10 or so major CIPs emerged and they remain dominant today. Although the Canadian dollar has fallen against the US dollar more recently, this is unlikely to result in fulfilment operations returning to Canada because of the supply restrictions there and products still being more attractively priced overseas.

56   The CIP trade is subject to two seasonal effects. The first is that a substantial proportion of people on Medicare Part D reach the coverage gap in July and August. This produces an autumn spike in orders placed with CIPs. There is a dispute as to whether the Defendants' businesses experienced an autumn spike as a result and I shall return to that point below. The second seasonal effect is a New Year spike due to patients ordering drugs for the Christmas and New Year period.

57   Patient safety and satisfaction are very important to the CIPs. They want to ensure so far as possible that the products supplied are not counterfeits. They are also conscious of the need to offer a good service through call centres and to be responsive to customer queries and complaints. This has the effect that the US customers of CIPs tend to be loyal, which is illustrated by the fact that around 80% of the prescriptions handled by RDA were repeat prescriptions.

**8PM's fulfilment business**

58   In 2004 Mr Aggarwal was contacted by an executive from CanadaPharmacy.com, the trading name and website name used by Pivotal Partners Inc. At this time, 8PM was a successful business owning several pharmacies around Wolverhampton, but it was not involved in the CIP industry. The executive explained to Mr Aggarwal the CIP industry and the possibilities that it offered, and asked whether 8PM was interested in fulfilling orders for US patients. 8PM was subsequently chosen as CanadaPharmacy.com's fulfilment partner, supplying UK products and parallel imports of European origin. Beginning in September 2004, 8PM's fulfilment business took off very quickly.

59   Once the business was underway, Mr Aggarwal approached around 20 CIPs offering to supply them. To begin with, this led to JanDrugs Inc., PolarMeds Inc. and Nexus becoming customers of 8PM. Subsequently other CIPs also became customers.

**Initial contact with Canadadrugs**

60   In June 2005, Hamza Musaphir, the then President of CanadaDrugs telephoned Mr Aggarwal. By that time CanadaDrugs was the largest CIP. Mr Musaphir was looking for a European fulfilment partner. He knew that 8PM was already undertaking fulfilment for CIPs such as CanadaPharmacy.com and he had spoken to other CIPs, such as JanDrugs, about and obtained references from them concerning 8PM. During the course of several meetings, Mr Musaphir gave Mr Aggarwal a set of 18 orders to fulfil as a test, which 8PM passed by fulfilling them promptly. 8PM started fulfilling orders for CanadaDrugs shortly afterwards. Shortly after that, Mr Aggarwal was told by CanadaDrugs's Chief Financial Officer, Ron Sigurdson, that Mr Musaphir had left the company, but that CanadaDrugs remained keen to develop the relationship. This was borne out by events over the

next few months. As CanadaDrugs became increasingly comfortable with 8PM, and gained confidence in the reliability of its service, more products were allocated to it.

61   No written contract was entered between 8PM (or later LNA or RDA) and CanadaDrugs at any stage. Mr Aggarwal agreed the prices and fees that 8PM would charge orally with Mr Musaphir during their meetings, and later with Mr Sigurdson by telephone. There was never any dispute between 8PM, LNA or RDA and CanadaDrugs over fees or payment of invoices.

**The Turkish fulfilment business**

62   Soon after entering the CIP trade, 8PM realised that there was a call for cheaper branded drugs. CanadaPharmacy.com told Mr Aggarwal that, for that reason, it sourced products from the Turkish market. He therefore started investigations into setting up a Turkish fulfilment operation. Gaining the CanadaDrugs account gave him the confidence to set up a company called LNA Ecza Deposu Sirketi ("LNA") in Turkey in about August 2005. Mr Aggarwal owned 99% of shares in LNA. It started fulfilment operations in October 2005.

63   A few months later Mr Aggarwal realised that there would be various advantages to moving the business into a free trade zone. Such free trade zones have been in operation for over 20 years and were established to attract businesses transacting in hard currencies with the intention of attracting foreign currency revenues to Turkey to bolster the country's foreign exchange reserves. This had a number of benefits: it enabled pharmaceuticals to be sourced from outside Turkey so reducing reliance on the Turkish market; the import/export procedures on purchases and consignments to 8PM were much more streamlined; purchases and consignments were free of KDV, the Turkish equivalent to VAT; there was no need to apply for licences on a product by product basis for imports; and no pharmaceutical wholesale licence would be needed in order to carry out the fulfilment service.

64   Mr Aggarwal therefore purchased RDA, which was then a shell entity based in the Istanbul free trade zone. RDA is a form of limited partnership, and Mr Aggarwal became the major partner with a 99% share.

RDA took over the business of LNA without any formal purchase or other agreement being entered into. RDA began trading at the start of the third quarter of 2006, and by August 2006 it had taken over all of the fulfilment business of LNA. During September 2006 the remainder of LNA's inventory was transferred to RDA. Mr Aggarwal continued to use LNA for the procurement of drugs from the Turkish market to sell on to RDA for a short period. LNA became dormant in February 2007 and remained so until Mr Aggarwal sold it in May 2008.

65   It is important to appreciate that 8PM's UK fulfilment business continued once the Turkish fulfilment business was up and running. CanadaDrugs became a customer of LNA and then RDA, but it remained a customer of 8PM's UK fulfilment business. The same was true of two other CIPs, BBG and JanDrugs. 8PM claims that its UK fulfilment business also suffered loss as a result of the Injunctions, but I am not concerned with that claim which is scheduled for trial in December 2009. The UK fulfilment business and the Turkish fulfilment business were distinct even though 8PM was involved in both. 8PM invoiced CanadaDrugs for all supplies on one invoice, however.

66   It is also important to understand precisely how the Turkish fulfilment business operated. For convenience I shall concentrate on the business with CanadaDrugs, although I do not think there was much difference in the case of the other customers. US patients ordered drugs from CanadaDrugs over the internet or by telephone. Most of the drugs were prescription drugs, although some were over-the-counter drugs. In the case of the prescription drugs, the prescription was sometimes sent to CanadaDrugs by the patient and sometimes it was sent directly by the prescribing physician. CanadaDrugs outsourced fulfilment of these orders to *inter alia* 8PM and RDA. 8PM and RDA supplied CanadaDrugs with information as to availability, price, pack size and so on. It was CanadaDrugs's decision as to whether to allocate the order to 8PM or to RDA or elsewhere. Orders were placed and tracked by means of CanadaDrugs's IT system called Pharmacywire, which 8PM and RDA had access to via the internet and a log-in password. 8PM and RDA had different accounts and different passwords.

67  In the case of orders allocated to RDA, a copy of the patient prescription was made available to RDA. The relevant products for a particular patient were dispensed and put in a plain brown box addressed to that patient in the USA. The dispensing label bore a pharmacy name and toll free telephone number in the USA operated by CanadaDrugs for the patient to ring in the event of queries or complaints. 8PM and RDA used different pharmacy names, namely "Nucare Pharmacy" and "Complete Care Pharmacy", both of which were assigned to them by CanadaDrugs. As the order was processed, details were entered by RDA directly onto Pharmacywire. The packaged products were then air freighted in bulk consignments to 8PM in the UK. Two consignments of up to about 700 packages each were sent each week.

68  In the UK the consignments were handled under a suspensive customs procedure known as "inward processing relief" (IPR). This is a procedure which enables products to be imported into the UK, processed and exported without duty or VAT being payable. 8PM's role in the Turkish fulfilment business was to fulfil the logistical function of opening up the consignments and sending the individual packages to the patients in the US by Royal Mail.

69  Some of the products supplied by RDA were generic products, but the Defendants make no claim under the cross-undertakings in respect of those. RDA also had a wholesale business which is not the subject of any claim.

70  The Defendants usually invoiced CanadaDrugs weekly, although occasionally an invoice was rendered covering a longer period. For each order, the Defendants charged CanadaDrugs a price for the product(s) supplied, a shipping fee and a dispensing fee. The Turkish fulfilment business became extremely profitable. According to the Defendants' expert's calculations, in the year from 1 August 2006 to 31 July 2007 it generated average monthly profits of about US $150,000.

**Development of the relationship with Canadadrugs**

71  Before long, CanadaDrugs became the Defendants' biggest customer. During the year from August 2006 to July 2007, CanadaDrugs's orders formed about 56% and 88% of 8PM's and RDA's fulfilment businesses

respectively. During this period RDA supplied over a hundred different drugs to CanadaDrugs.

**RxNorth**

72  RxNorth was a competitor to CanadaDrugs which CanadaDrugs acquired in October 2006. As part of the acquisition CanadaDrugs acquired RxNorth's stock. This included some stock which CanadaDrugs did not want. CanadaDrugs sold this to RDA. The stock was shipped from CanadaDrugs Barbados to RDA to Turkey. As related below, it was detained en route by HMRC at Heathrow airport.

**CanadaDrugs's Barbados facility**

73  Some time in or before late October 2006 CanadaDrugs set up a fulfilment facility in Barbados. CanadaDrugs had always had an in-house fulfilment capability. There is no direct evidence as to why the Barbados facility was established, but it seems likely that it was for tax reasons. Obviously CanadaDrugs was not able to source product from Barbados itself. Instead, Barbados was mainly used as a fulfilment centre for product sourced from Australia and New Zealand, although it seems that some quantities were sourced from elsewhere. In particular, Barbados began operations using stock acquired by CanadaDrugs from RxNorth.

74  Mr Aggarwal learnt about the Barbados operation at the end of October 2006 when he was contacted by the President of CanadaDrug.com (Barbados) Ltd, Tom Haughton. Mr Haughton told Mr Aggarwal that he wanted to air freight consignments from Barbados to 8PM in the UK to be broken down for posting of the individual packages of medicines to US patients (referred to as "bag and burst"). The reason Mr Haughton gave for wanting to use 8PM and the Royal Mail rather than posting from Barbados was that the Barbados mail system was "extremely challenged". 8PM did not take up this offer, however.

75  The Claimants contend that, once CanadaDrugs's Barbados fulfilment operation was established, it became CanadaDrugs's primary supply centre with the Defendants' businesses being relegated to a secondary source. I do not accept this, for a number of reasons.

WESTLAW   © 2017 Thomson Reuters.

76  First, although there is no evidence as to the scale on which the Barbados facility operated, given the absence of a local source of product and given the approach to 8PM, and the reason for that approach, it seems unlikely that it operated on a large scale.

77  Secondly, Turkish product was cheap. Although there is little comparative data, it seems clear that it tended to be cheaper than Australian or New Zealand product.

78  Thirdly, the Defendants' Turkish fulfilment business continued to grow from October 2006 until September 2007. During this period CanadaDrugs's orders represented the bulk of RDA's business.

79  Fourthly, Mr Aggarwal gave evidence that there was a co-operative relationship between the Defendants and CanadaDrugs which extended to the Barbados operation. Thus the Barbados operation was not perceived by the Defendants as a competitive threat.

80  Fifthly, Mr Haughton visited 8PM in June 2007. Mr Aggarwal gave evidence, which I accept, that he discussed CanadaDrugs's intentions with regard to 8PM and RDA with Mr Haughton during this visit. Mr Haughton's answer was that CanadaDrugs wanted to maintain its relationship with 8PM and RDA, which was important to it. This was for a number of reasons. Strategically, it reduced the risks associated with orders being processed from one location only. The Turkish business was itself important to CanadaDrugs because of the prices it could offer. CanadaDrugs had researched the Turkish market and had been concerned about product authenticity, whereas Mr Haughton had confidence in RDA's vigilance against counterfeits. He described the consequences of counterfeit drugs being sent to CanadaDrugs's US patients as at best embarrassing and at worst "terrible". The prices that CanadaDrugs had been quoted were higher than those at which RDA was supplying them. Lastly, Turkish wholesalers insisted on being paid in advance but CanadaDrugs had no relationship with them and no one on the ground to look after its interests. All told, the risks of trying to enter the Turkish market itself were too great for CanadaDrugs.

81  The Claimants rely upon an email from Ron Sigurdson of CanadaDrugs to Mr Aggarwal dated 3 October 2007 following the Birmingham detention (as to which see below), listing drugs that CanadaDrugs needed RDA to re-ship "as these products are either not available elsewhere or not available profitably elsewhere". The Claimants point out that this list only consists of six out of 103 products detained. I am not persuaded by this. Mr Sigurdson did not say, and the evidence does not establish, that the other products were available equally profitably elsewhere. Furthermore, many of the products were sourced from 8PM's own UK fulfilment business, not Barbados.

### RDA's business in the Claimants' products

82  About 3% of RDA's business was in Lilly products, about 10% in AstraZeneca products, about 19% in Merck products and about 25% in Pfizer products. Thus a total of about 57% of its business was in the Claimants' products.

### The Heathrow detention

83  On 12 November 2006 Her Majesty's Revenue and Customs ("HMRC") detained a consignment of pharmaceuticals at Heathrow Airport en route from CanadaDrugs Barbados in Barbados to RDA in Turkey. This consignment consisted of the RxNorth stock which RDA had purchased from CanadaDrugs following CanadaDrugs's acquisition of RxNorth. The consignment included seven AstraZeneca brands including Crestor and Seroquel. On 21 November 2006 HMRC sent samples of the detained products to AstraZeneca. Initially, AstraZeneca informed HRMC that the packaging of the Crestor and Seroquel products was counterfeit, while everything else was authentic. Subsequently, AstraZeneca discovered that AstraZeneca Turkey had arranged for the repackaging of Crestor locally in 2006 for regulatory reasons. Accordingly, AstraZeneca accepted that the Crestor products were authentic. In the meantime CanadaDrugs had challenged the detention and HMRC had commenced condemnation proceedings. On 17 August 2007 there was a joint inspection of the Seroquel products by CanadaDrugs and AstraZeneca. On about 19 September 2007 the dispute was resolved on the basis that CanadaDrugs accepted that the

Seroquel packaging was counterfeit and there was no order for the costs of the proceedings.

84  Although the Seroquel was of Turkish origin, Mr Aggarwal gave unchallenged evidence that it had not been supplied to RxNorth by RDA but by one of RxNorth's other suppliers.

### The Birmingham detention

85  The background to the events which led to the present proceedings remains somewhat murky in certain respects.

86  At some point Pfizer started routinely making test purchases of products from CIPs. The earliest such purchase in evidence is one from RxNorth on 4 April 2007. The package bore a label with the name "Complete Care Pharmacy" together with a PO Box address in Slough. Two further purchases from RxNorth on 24 June 2007 were similarly labelled, as were two purchases from CanadaDrugs on 25 June 2007. By late September 2007 Pfizer had made nine further purchases from RxNorth and CanadaDrugs of products labelled in the same way. As Mr Allen accepted, it would have been apparent to those at Pfizer dealing with these products that they were of Turkish origin.

87  Mr Allen accepted that Pfizer shared intelligence with other pharmaceutical companies as well as with HMRC. It is not clear, however, whether Pfizer shared the information it had obtained about these test purchases with any of the other Claimants.

88  On or shortly before 26 September 2007 HMRC at Birmingham Airport detained a consignment of pharmaceuticals en route from RDA to 8PM ("the Consignment") pursuant to Council Regulation 1383/2003/EC of 22 July concerning customs action against goods suspected of infringing certain intellectual property rights and the measures to be taken against goods found to have infringed such rights ("the Customs Regulation"). The Consignment included Lilly, Pfizer, AstraZeneca and Merck brands.

89  On 26 September 2007 Kevin Moore, who is Lilly's Investigation Manager EMEA, attended a meeting with representatives of United States Customs and if

the Medicines and Healthcare Products Regulatory Authority ("MHRA") to discuss ongoing cases. The meeting was also attended by representatives from Pfizer, AstraZeneca, Sanofi-Aventis and Abbott. While at the meeting Mr Moore received a message from an officer of HMRC at Birmingham airport notifying him of the detention of the Consignment. On the same day the same officer telephoned Mr Allen of Pfizer and Simeon Wilson of AstraZeneca with a similar message. Chris Merchant of Merck was also notified by HMRC on the same day.

90  HMRC detained the Consignment on suspicion that some or all of the goods were counterfeit. It is not clear why HMRC suspected this. The Defendants believe that it is likely that one of the Claimants tipped HMRC off. Mr Allen was unable to shed any light on this, and the Claimants have not called any witness who could. In the circumstances, the Defendants' belief is an understandable one, but I am unable to say whether or not it is correct.

91  HMRC subsequently provided samples from the Consignment to each of Lilly, Pfizer, Merck and AstraZeneca. Mr Allen accepted that, when he received the samples, he appreciated that they were part of the CIP trade.

92  In due course all of the Claimants confirmed that the products bearing their respective trade marks were genuine and not counterfeit. The consequence of this was that HMRC could no longer detain the goods pursuant to the Customs Regulation. Accordingly, the Claimants set about commencing proceedings for trade mark infringement and applying for injunctions to stop the goods being released to 8PM.

93  On 12 October 2007 Mr Moore sent an email to representatives of Pfizer, Merck, Abbott, Sanofi-Aventis and GlaxoSmithKline, which was copied to two representatives of Lilly's solicitors Baker & McKenzie, in which Mr Moore wrote:

> "Following on from our conversations either yesterday or today regarding the recent UK customs seizure of 150kg medicines at Birmingham airport in which all our products are involved.

Our lawyers are considering action
to prevent the action from being
released. If your lawyers are willing
to consider similar action I hope to
bring them all together to maximise
out efforts, avoid duplication and
reduce costs. Please liaise with your
lawyers to establish whether they are
considering similar action, advise
them to liaise with Wendy Pang at
Baker and McKenzie in London."

in the United States, including: 24
packages of EVISTA, 42 of CIALIS,
three of HUMALOG, and six of
HUMULIN."

Later he said:

"… these products appear to
have originated from Turkey, been
imported into the UK and then some
at least are apparently intended to be
posted the United States."

**Lilly's without notice application**

94   On 19 October 2007 Lilly applied without notice
to Kitchin J for an interim injunction requiring
8PM to direct HMRC to deliver up, and HMRC
to deliver up, to Lilly's solicitors any goods bearing
five Lilly trade marks within the Consignment except
any goods identified by Lilly as being counterfeit
(referred to as "the Infringing Goods") and restraining
8PM from taking possession or custody of or dealing
with the Infringing Goods. Kitchin J granted the
order sought. 8PM was referred to in the application
and order as "a person unknown being the importer
of [the Consignment]", although Lilly were aware
of its identity, since Lilly was not permitted to
use that information under the Customs Regulation.
Accordingly, the order also required HMRC to disclose
the identity of the importer to Lilly for the purposes of
the proceedings.

95    The application was supported by witness
statements made by Mr Moore and by Bruce
Longbottom, Lilly's Associate General Counsel,
Trademarks and Copyright. In his witness statement
Mr Moore stated, after referring to the message he
received on 26 September 2007:

"I have now been informed that
the Consignment contains over 1000
packages addressed to individual
patients some of which appear to be

96   Mr Moore went on to deal with communications
he had had since 26 September 2006 with both HMRC
and the MHRA about the Consignment. In particular,
he related that he had contacted the MHRA on 11
October 2007 asking whether the MHRA was taking
any action to ensure the destruction of the Consignment
and referred to a telephone conversation he had had on
the evening of 11 October 2007 with Mick Deats, the
MHRA's Head of Enforcement.

97   In his witness statement Mr Longbottom said:

"I am informed by Mr Moore
and verily believe that Customs
indicated to Mr Moore that the
shipment was imported into the
United Kingdom with a view
to the individual packages within
the Consignment being sent to
individual patients many of whom
appear to be located in the United
States."

98   It is not apparent on the face of either statement
that Lilly had any evidence that any of packages were
to be sent anywhere other than to patients located in
the United States. Nor is that apparent now. Be that as

Lilly Icos LLC v 8PM Chemists Ltd, 2009 WL 2932200 (2009)

it may, what is most striking about Mr Moore and Mr Longbottom's statements when read now is that they contain no mention *at all* of the CIP trade.

99  In Lilly's counsel's skeleton argument in support of the application he stated:

> "The main argument between the parties will be as to consent. Although Lilly only need satisfy the court of an arguable case, it can be seen that the Respondents are unlikely to make out a defence of consent…

> Anticipating a further defence which the First Respondent may seek to run, parties sometimes seek to argue the goods will be exported outside the EEA and therefore that no infringing act will be committed in the relevant jurisdiction. In fact this is a non-runner. First, although some of the drugs were clearly destined for North America, this may not be true of the entire consignment. In any event, section 10(4)(c) provides that it is an infringement of trade mark to export goods under the sign…"

100  No reference was made either in the skeleton argument or in counsel's oral submissions to either of the decisions of the Court of Justice of the European Communities in Case C-405/03 Class International BV v Unilever NV [2005] ECR I-8735 and Case C-281/05 Montex Holdings Ltd v Diesel SpA [2006] ECR I-10881 . Nor was any reference made to IPR, since counsel was unaware that the goods were being processed under that regime.

101  During the course of these inquiries Lilly has disclosed the email which Mr Moore sent to Mr Deats and two others at the MHRA on 11 October 2007. In this email Mr Moore stated:

> "It would appear that the consignment was import for export and contained addressed packages for posting in the UK on behalf of 'Canadian' internet pharmacies."

102  The Defendants submitted that:

> • i)   this email demonstrates that Mr Moore appreciated that the consignment was "import for export" and contained packages for posting on behalf of CIPs;
> • ii)  all of the Claimants, including Lilly, must have been familiar with the CIP trade by then;
> • iii)  by failing to reveal to Kitchin J that the consignment was "import for export" on behalf of CIPs, Lilly failed to disclose all material facts of which they were aware.

103  8PM contended unsuccessfully before Mann J that the injunction granted by Kitchin J should be discharged for non-disclosure by Lilly, but at that time 8PM did not have the email of 11 October 2007 and so was not in a position to rely upon it. The Defendants requested Lilly to make Mr Moore and Mr Longbottom available for cross-examination before me, in part so they could be asked about this matter, but Lilly refused to make them available.

104  Lilly submitted that this matter is irrelevant to any issue in these inquiries. I accept that. Furthermore, because it is not relevant, it has not been fully investigated. It would therefore be wrong for me to come to any conclusion about it. All I will say is that I can understand why the Defendants are concerned.

105  A separate point is that Kitchin J's order contained a cross-undertaking in favour of 8PM and HMRC, but not in favour of RDA. (The same was true of the without notice injunctions obtained by Pfizer, AstraZeneca and Merck.) The Practice Direction – Interim Injunctions which supplements CPR Part 25 states at paragraph 5.1A:

"When the court makes an order for an injunction, it should consider whether to require an undertaking by the applicant to pay any damages sustained by a person other the respondent, including another party to the proceedings or any other person who may suffer loss as a consequence of the order."

This provision was introduced following the decision of the Court of Appeal in SmithKline Beecham plc v Apotex Europe Ltd [2006] EWCA Civ 658, [2007] Ch 71 (although it is arguable that the need for it had been apparent since at least Berkeley Administration Inc v McClelland [1996] ILPr 772 and ex p. Smith & Nephew). In that case it was held that the Canadian manufacturers of a pharmaceutical intended to be marketed in the United Kingdom could not recover for loss sustained as a result of an interim injunction against an associated English company and two other companies restraining them from importing and selling the product because the cross-undertaking was only expressed to be in favour of the defendants.

106 Kitchin J was not reminded by counsel for Lilly about paragraph 5.1A, nor was he invited to consider the ambit of the cross-undertaking at all. In my view it is important that advocates applying for without notice interim injunctions, and judges hearing them, should give specific consideration to this point. In cases such as these, where the owner of an intellectual property right is applying for an injunction in respect of a consignment of goods which have been detained by HMRC under the Customs Regulation, particular consideration should be given to extending the benefit of the cross-undertaking to the consignor of the goods as well as the consignee.

107 Kitchin J's order was served on 8PM on 23 October 2007 together with an application notice seeking an interim injunction to restrain 8PM from importing or dealing in goods under various Lilly trade marks (i.e. a wider injunction than that granted by Kitchin J) until trial.

108 On the same day Mr Moore sent an email to Mr Allen, Mr Wilson and Mr Merchant, copied to Ashley How of Pharmaceutical Security International ("PSI"), in which he said:

"Following on from the phone calls.

The official version of what I have written below will be circulated at 4pm. Please do not forward this email on and wait for the official version which will come from PSI at 4pm today. This is just to give you a heads up.

Last Friday in the High Court in the Strand our lawyers obtained an interim injunction against the customs not to release our products. They also obtained an interim injunction against the consignee (not named) and an order against the customs to name the consignee.

The injunction has been served on the customs and they have supplied the consignee's details in a way that we can now name them in any future court hearing.

Our lawyers are serving a claim against the consignee to inform them that we are applying for a full injunction against them.

We are hoping to be back in court on Friday of this week.

Our lawyers are using the Trade marks Act 1994 Sec 10 sub sec 1 and Counsel [sic] Regulation 40/94 Article 9(1) sub sec 1 sub sec a .

Lilly Icos LLC v 8PM Chemists Ltd, 2009 WL 2922400 (2009)

The above may not be correct legal terminology but it gives you the gist of what is happening.

Our lawyers are Baker & MacKenzie [sic]. The lawyer dealing is Wendy Pang. …

If you need anything else please call me."

109  The role of Mr How was described by Mr Moore in passing in his statement as follows:

"Ashley How of the Pharmaceutical Security Institute ('PSI') co-ordinates training to Customs on brands owned by a significant number of pharmaceutical companies. This has enabled him to develop good relations with Customs, such that various UK customs authorities use him as the unofficial central point of contact for all the pharmaceutical companies. In practice, when a UK Customs authority intercepts a consignment of pharmaceutical products, it will usually notify Ashley How first on an informal basis who would in turn informally notify the relevant pharmaceutical companies."

110  Mr Allen confirmed that, as the email dated 23 October 2007 suggests, Mr How played a coordinating role in relation to the present matter.

111 On 26 October 2007 Blackburne J made an order by consent in which 8PM gave an undertaking in lieu of an injunction which continued the relief granted by Kitchin J until 31 October 2007. On 31 October 2007 Kitchin J made an order continuing the injunction until an effective hearing of the application and gave directions for evidence in the meantime.

**Pfizer's without notice application**

112  On 26 October 2007 Pfizer applied without notice to Norris J for an injunction in similar form to that granted by Kitchin J on 19 October 2007. Norris J granted the order sought. Pfizer instructed the same solicitors and counsel. The application was supported by draft witness statements made by Mr Allen and by Julian Mount, Pfizer's Vice-President of European Trade and Mature Brands. The content and format of these statements were broadly similar to those previously made by Mr Moore and Mr Longbottom. In particular, they contained very similar statements to those quoted above. Again there was no mention of the CIP trade. Nor was there any reference to Pfizer's test purchases from CIPs.

113   On this occasion counsel's skeleton argument stated:

"The main argument between the parties will be as to consent. Although Pfizer only need satisfy the court of an arguable case, it can be seen that the Respondents are unlikely to make out a defence of consent…

Anticipating a further defence which the First Respondent may seek to run, parties sometimes seek to argue the goods will be exported outside the EEA and therefore that no infringing act will be committed in the relevant jurisdiction. There are a number of reasons why Pfizer say that this is a non-runner.

(1) First, although some of the drugs were clearly destined for North America, this may not be true of

the entire consignment. We will not know where the individual packages were to be sent until each of them is inspected or the First Respondent explains what its intentions were.

(2) Secondly, this does not appear to be a transit zone case where the goods are simply in customs warehouses. Although on the basis of the information which Pfizer are permitted to use under the Regulation, this is not something that can be investigated in any detail.

(3) Thirdly, this does not appear to be case where a consignment is simply in transit. … The consignment was, it appears to be broken down in the United Kingdom and the individual packages were to be re-posted to other countries. There are acts in the United Kingdom which Pfizer will say amounts to export. Section 10(4)(c) provides that it is an infringement of trade mark to export goods under the sign…

(4) Fourthly, … Pfizer asks why the importer is going to the lengths of the cost and delay in importing pharmaceuticals into the United Kingdom, breaking them down into individual packages, and re-sending them elsewhere, rather than simply sending the packages from Turkey which would be quicker and cheaper … what Pfizer believe (although they have no evidence, is that, in the case of pharmaceuticals not destined for the UK or elsewhere in the EEA but destined for North America, the purpose of entry into the UK of the pharmaceuticals, the separating of the consignment and the re-export from the UK in individual packages is that the goods are less likely to be searched by US customs…"

114   Again, there was no reference to Class International or Montex in the skeleton argument. Pfizer's solicitors' note of the hearing states, however:

> "Anticipating a further defence which the First Respondent may seek to run, parties sometimes seek to argue the goods will be exported outside the EEA and therefore that no infringing act will be committed in the relevant jurisdiction. In the ECJ in Colgate v Palmolive qualification it was held that as the products were in transit they were not imported into the EEA. There are a number of reasons why Pfizer say that this is a non-runner…"

115   Colgate v Palmolive is a reference to Class International . It does not appear that Norris J was actually shown the authority, however.

116   Norris J's order was served on 8PM on 29 October 2007. On 30 October 2007 Pfizer served on 8PM an application notice seeking an interim injunction restraining 8PM from importing or dealing in goods under certain Pfizer trade marks until trial.

117   On 6 November 2007 Warren J made an order by consent continuing the injunction granted by Norris J until not less than two days after judgment on the pending interim injunction application by Lilly.

### Merck's without notice application

118   On 29 October 2007 Merck applied without notice (save that informal notice was given that day) to Warren J for an injunction in similar form to those granted by Kitchin J on 19 October 2007 and by Norris J on 26 October 2007. Warren J granted the order sought. Merck instructed the same counsel, but

different solicitors. The application was supported by witness statements made by Henry Parkinson, a Legal Officer employed by Merck, and by David Latham, a partner of Lovells LLP, Merck's solicitors.

119  Mr Parkinson said in his statement:

> "The label [on a sample packet] refers to the Complete Care Pharmacy and gives an address at a PO Box in Slough and a 1-800 number. I understand from a Google search that this is a telephone number for an online pharmacy website called www.canadadrugs.com. Below the Complete Care Pharmacy text appears an Rx number (i.e. Rx: 14749018). Rx is a commonly used abbreviation for 'prescription'. A name also appears, presumably this is the name of the patient. Below this is a price in dollars and a date and immediately below this is a description of the product, in this case '8 tablets Fosamax 70mg'. Below this is the generic name of the product, a 'DIN number', the manufacturer (which is said to be MSD) and the dosing instructions, which in this case instruct the patient to 'take half a tablet weekly'. I am informed that DIN is an acronym used by Canadia [sic] pharmacies and the Canadian regulatory agency as the Drug Identification Number…

> Based on the information which appears on the over-stickered label, namely the 1-800 number which appears on the www.canadadrugs.com website … it seems likely that at least some of these drugs may be headed to final destinations in the USA or Canada.

> … A price in dollars does appear on the labels and on this basis we suspect that the Merck Drugs may go to the USA or Canada, however there is no guarantee that they have not been paid for in dollars via a website but are to be delivered to patients within the EEA. I do not know whether any of the Turkish Drugs or Malaysian Drugs are destined for end users in the UK market. I do not know why the unnamed consignee has decided to arrange for these products to be imported into the UK, unless the intention is to supply the Merck Drugs in the UK.

> It is my understanding that Merck have been told by HMRC that at least some of the products were contained in small 'boxes' or 'packs' … which … had the patient name and postal address labels applied. They were ready to be either franked or stamped for posting or to be put in express courier envelopes for onwards mail. HMRC have not told Merck which country or country these addresses are in…

> For those packages which appear to be destined to the USA, it may be that US Customs would look less stringently at packages arriving from the UK than from other countries. Unless there is such an advantage in shipping via the UK, it would appear to me that it would make more commercial sense to ship the Merck Drugs direct from Turkey or Malaysia to the their final destination."

WESTLAW   © 2017 Thomson Reuters.

120  This evidence goes further than that adduced by Lilly and Pfizer in putting the court into the picture with regard to the likely destination of the drugs in the USA and the Canadian connection, but it does not put it into context by explaining the nature of the CIP trade.

121  Counsel's skeleton argument was in similar terms to his skeleton argument in support of the Pfizer application. Again, Class International was not mentioned in the skeleton argument, but is recorded in Merck's solicitors' note of the hearing as having been cited in argument.

122  Warren J's order was served on 8PM on 31 October 2007. On 2 November 2007 Merck served an application notice seeking an interim injunction to prevent 8PM from importing or dealing in goods bearing certain Merck trade marks until trial.

123  On 12 November 2007 Lightman J made an order by consent continuing the injunction granted by Warren J until a hearing on or after 27 November 2007 or 14 days after judgment on the interim injunction application by Lilly, whichever was the later, with directions for evidence in the meantime.

### AstraZeneca's without notice application

124  On 1 November 2007 AstraZeneca applied without notice (save that AstraZeneca asked HMRC to notify 8PM of the application and HMRC did so on 31 October 2007) to Warren J for an injunction in similar form to those granted by Kitchin J on 19 October 2007, by Norris J on 26 October 2007 and by Warren J on 29 October 2007. Warren J granted the order sought. AstraZeneca instructed the same solicitors and counsel as Lilly and Pfizer. The application was supported by draft witness statements made by Mr Wilson and by Martin Broden, AstraZeneca's Legal Counsel. The content and format of these statements were broadly similar to those previously made by Mr Moore and Mr Longbottom. In particular, they contained very similar statements to those quoted above. Again there was no mention of the CIP trade.

125  Warren J's order was served on 8PM on 2 November 2007. On 6 November 2007 AstraZeneca served an application notice seeking an interim injunction to prevent 8PM from importing or dealing

in goods under certain AstraZeneca trade marks until trial.

126  On 6 November 2007 Briggs J made an order by consent continuing the injunction granted by Warren J until not less than 10 days after judgment on the pending interim injunction application by Lilly.

### Lilly's with notice application

127  8PM served evidence in opposition to Lilly's application for an interim injunction consisting of witness statements made by Mr Aggarwal, Ralph Cox of 8PM's solicitors Fasken Martineau Stringer Saul LLP and Donald Macarthur, a pharmacist, on 6 November 2007. This evidence was also relied upon in support of an application for summary judgment which was served by 8PM at around the same time.

128  In his statement Mr Aggarwal touched on the legal position regarding importation of foreign drugs into the USA, saying that it was not permitted although there had been pressure for a change in law. With regard to the damage which an injunction would cause, he said this:

> "36.  If 8PM is unable to handle Lilly Products, in effect this means that we lose all of the business which includes, amongst the products ordered, any Lilly Products. In any event I understand other pharmaceutical companies are seeking injunctive relief similar to that being sought by Lilly and are being represented by the same solicitors.
>
> 37.  If 8PM is unable to handle Lilly and other Products, the Turkish Supplier will be in an extremely difficult position. All of the products it supplies are shipped through the UK. As mentioned above, there are good shipping and insurance routes as regards the UK. It is not reliable to ship directly from

Turkey to the US, and insurance is difficult to obtain. I believe that to maximise commercial success, the Turkish Supplier would have to ship via a first world country. I know of no other country which would be acceptable to both the Turkish Supplier and US patients. Possibly some exist — I just do not know. I do not believe that, if the Turkish Supplier were to lose the ability to ship via the UK, it would be able to organise transport through any other country fast enough to insure that its business survived.

38.  If interim relief were granted there is a serious risk that at least in the short to medium term the Turkish Supplier would not be able to deliver product promptly to the US. In such circumstances I would expect the Canadian Pharmacies would seek other sources of supply. I would expect such damage to commercial relations to occur in one to two months. This would cause unquantifiable loss to the Turkish Supplier and 8PM…

39.  If we are stopped from handling Lilly products other companies operating in this sector will take our business. If we stop operating, even for a short period, there will be a knock-on effect for our future business which will be unquantifiable.

…

42.  In the event that 8PM was injuncted for more than one or two months, I believe the Turkish Supplier would have to close, for the

reason given above. I do not think that the Turkish Supplier would be able to arrange suitable alternative transport and insurance routes…

43.  Turkish Supplier has around $1 million of stock. If it was unable to supply goods, that stock, which has a limited shelf life, would begin to deteriorate."

129    Lilly served evidence in reply consisting of second witness statements of Mr Moore and Mr Longbottom and a witness statement of William Harris, a Lilly research scientist, on 14 November 2007. Mr Longbottom dealt at some length with the position under US law, saying in short that importation of foreign versions of pharmaceuticals into the USA was generally illegal. With regard to the damage which an injunction would cause to the Defendants, he said this:

"47.  I should like to comment on paragraphs 34-44 of Mr Aggarwal's statement regarding the harm which the Defendant might suffer in the events that an injunction was granted until the trial of this action.

48.  I have not seen the confidential annex to which Mr Aggarwal refers in paragraph 34. However, he confirms that the number of products of the Claimants in which the Defendant deals is 'very small'. I believe this makes it quite easy to calculate the loss that the Defendant might suffer as a result of an injunction being granted as, equally, small and, I would submit, quantifiable…

50.    Mr Aggarwal refers to the fact that there are related

actions pending of which I am also aware. However, I also understand there are a large number of pharmaceutical companies' products involved in this Consignment. I believe that this Court is only concerned with the impact of an injunction on the parties to this action but, even if there is a wider concern of the impact of more than one injunction, I believe that the potential harm in terms of loss of sales is quantifiable…

56. I should like to refer to paragraphs 48-52 of my First Witness Statement referring to the damage to the Claimants and, I reiterate, the damage that might be suffered by the Defendant and my undertaking on behalf of the Claimants of an undertaking in damages."

"54. This is [a] case where the balance of convenience heavily favours the grant of an injunction: Longbottom 2nd, paras 47 to 59.

55. … There is no question that Lilly are good for the money and any damage that 8PM may suffer (should it turn out the injunction was wrongly granted) can readily be quantified.

…

58. Mr Aggarwal has raised in his statement the possible damage to the Turkish supplier. However, there is no application made on behalf of the Turkish supplier, and it is a stranger at present to the proceedings. What seems clear is that any losses that it suffers are likely to be quantifiable in financial terms…"

130   8PM served evidence in rejoinder consisting of second witness statements of Mr Aggarwal and Mr Cox and witness statements of Anna McKay, an intellectual property consultant, and Barbara Scott, a customs consultant, on 19 November 2007. Lilly served further evidence consisting of witness statements of David Allen, Lilly's Director of Manufacturing Science and Technology, Global Parenteral Products, and Paul Rawlinson of Baker & McKenzie on 20 November 2007.

131   Lilly's application for an interim injunction until trial and 8PM's cross-application for summary judgment were heard by Mann J between 21 and 23 November 2007. The other Claimants had representatives in court during the hearing. In his skeleton argument for the application, counsel for Lilly submitted:

132   On 23 November 2007 Mann J granted the injunction sought by Lilly. In his judgment ( [2007] EWHC 2829 (Ch), [2008] FSR 11 ) Mann J concluded that Lilly had an arguable case of trade mark infringement and that the balance of convenience favoured the grant of an injunction. He also held that Lilly was guilty of non-disclosure on the application before Kitchin J in one out of three respects alleged by 8PM, but that that did not justify either discharge of Kitchin J's order or refusal of further relief.

133   I must quote three passages from Mann J's judgment which are relevant to the issues before me. The first concerns the position of the other Claimants at [16]:

"I should also observe that I have been informed that three other drug companies or groups are

interested in the overall consignment which was originally treated as suspicious by HMRC. Those other three companies, or perhaps there are four, have launched their own proceedings. Those proceedings are stayed pursuant to some form of agreement or pattern of agreements and they await the result of these proceedings."

134   The second concerns the question of illegality at [44]:

"Although it is something of a movable feast at present, there are some restrictions on the importation of drugs into the United States. The US Food and Drug Administration (FDA) has the function of policing this or supervising it. The strict requirements are probably in the course of being formally relaxed and there are a number of de facto informal concessions made in favour of individual customers who import for their own purpose. The extent of all this is a matter of dispute in this action. However, it appears that the position is as follows. Strictly speaking, the importation of all or most of these drugs would be illegal. However, US Customs announced that from October 2006 they would not confiscate drugs mailed from Canada. Nevertheless, the position about drugs mailed from other countries is more fluid. [8PM]'s evidence is that the strict legal position is in the course of likely modification as a result of legislation, subject only to presidential veto, which no one has any reason to suppose will be forthcoming."

135   The third concerns the question of whether the Defendants could be adequately compensated in damages if an injunction were to be wrongly granted:

"73.   … I next need to consider whether if I stop this trade in this particular manner, pending a trial, and it turns out that I should not have done so which is definitely arguable in this case, then the defendant and the Turkish supplier can be adequately compensated in damages. So far as 8 PM is concerned, I consider that it can. The damage will be quantifiable. Lost trade can be calculated by reference to past trade and I see no great problem about that. The level of trade in terms of 8 PM's business is undetermined because 8 PM has decided not to disclose the profitability to it of this trade. It is not apparent there will be any loss but if there is a loss I am satisfied it can be adequately compensated on the [cross] undertaking in damages and Eli Lilly are plainly good for that.

74.   The Turkish supplier is slightly different. I consider it right to take the position of the Turkish supplier into account because it is the Turkish supplier who will be the person mainly affected by this. Whether or not the transit of the goods through this jurisdiction is technically importation for the purposes of the Act, nevertheless the goods are effectively merely sent in transit through this jurisdiction and the business is really that of the supply of these drugs by the Turkish supplier either to Canadadrug or to the US end users. It matters

not which view one takes for these particular purposes.

75.   Accordingly, since the grant of an injunction will shut off this particular route available to the Turkish supplier, it seems to me to be right and inevitable that I should take the position of the Turkish supplier into account. The Turkish supplier is more financially at risk because it is the person with the commercial risk in the sales. Whether it will lose sales or not depends on whether it can find a substitute route. Various routes were suggested in the evidence. It is not clear to me that no such route is available and it is possible that another route will be found at least temporarily.

76.   However, even if that is wrong, the loss which the Turkish supplier will sustain in this respect is not apparently the whole of its business and even if it is it will be only a relatively short-term because I propose to make an order for a speedy trial. Since the parties have told me that they think they can be ready for trial in three months, that is an objective for achieving a speedy trial. One is, therefore, only looking at a three month disruption of business.

77.   I bear in mind that it has been submitted to me that one is not talking about the mere loss of three months of business. It may be that business lost is not entirely business that can be regained if the tap is turned back on. I accept that may be the case but to the extent that is the

case again that is something which sounds in damages."

## The search warrant

136   On 27 November 2007 an enforcement officer of the MHRA applied to a district judge sitting in Wolverhampton Magistrates Court for a warrant under section 111(5)(b) of the Medicines Act 1968 to enter and inspect 8PM's premises. The district judge duly granted the warrant. It was executed by MHRA officers accompanied by representatives of the Royal Pharmaceutical Society of Great Britain and the police not only at 8PM's premises, but also at Mr Aggarwal's home. This is apparently on the basis that Mr Aggarwal's home constituted "a place associated with [8PM's] premises", which I find surprising. Understandably, Mr Aggarwal believes that this action was prompted by Lilly and that its timing is explained by the grant of the Lilly Injunction, even though Lilly had already acknowledged by then that no counterfeits had been found in the Consignment. The search party did not find any counterfeit products or unlicensed products, and to date no action has been taken against 8PM or Mr Aggarwal as a result of the search.

## The Merck Injunction

137   At the time that the hearing before Mann J started the hearing of Merck's with notice application was floating from 27 November 2007. During the course of the hearing before Mann J, it was agreed that this should be put back to 3 December 2007.

138   On 27 November 2007 Merck's solicitors wrote to the Defendants' solicitors in the following terms:

> "We refer to the telephone conversations between us yesterday…

In those conversations you stated that at your client had agreed in principle to stay the above action and accept undertakings, in a form essentially following the injunction to trial granted in the Lilly action, to restrain it from importing products bearing the marks belonging to our clients which are the subject of this action until the trial of the Lilly action. Our client is also in principle agreeable to this approach and we therefore enclose a draft consent order for your consideration.

We should be grateful if you would discuss this with your client as a matter of urgency and indicate that your clients are agreeable to its terms…"

139   On 28 November 2007 there was a telephone conversation between the solicitors in which it appears that the Defendants' solicitors requested that the cross-undertaking in the draft consent order be extended to the Turkish Supplier (i.e. RDA) and Merck's solicitors said that they would take instructions. On the same day Merck's solicitors emailed a revised draft consent order which had been amended in another respect. On 29 November 2007 the Defendants' solicitors replied stating that it was essential that the Turkish Supplier was protected by the cross-undertaking and that this was the case with the order in the Lilly action.

140   After some further correspondence, Merck's solicitors wrote to the Defendants' solicitors on 4 December 2007 agreeing that the cross-undertaking should extend to the Turkish Supplier and enclosing a further draft of the consent order. On 5 December 2007 the Defendants' solicitors replied that in principle 8PM was prepared to agree to an order in similar terms to that in the Lilly action, and accordingly Merck's solicitors' draft was broadly acceptable, but requesting some minor amendments. Merck's solicitors responded on 6 December 2007 agreeing to most of the amendments and enclosing a further draft. On 10 December 2007 Merck's solicitors sent a further draft following a telephone conversation that day.

141   On 14 December 2007 the Defendants' solicitors wrote to Merck's solicitors raising a concern over the wording of the draft order. After further correspondence, revised wording was agreed on 18 December 2007. Merck's solicitors sent the Defendants' solicitors the final version of the draft consent on 19 December 2007, and the Defendants' solicitors signed and returned it the same day. The consent order was duly made by Master Bragge as of that date and sealed on 22 January 2008.

142   The Merck Injunction expressly provided that it took effect from the date of signature, namely 19 December 2007. Merck do not dispute that they became potentially liable under the cross-undertaking as from that date.

**The Pfizer and AstraZeneca Injunctions**

143   On 7 and 10 December 2007 Baker & McKenzie wrote on behalf of AstraZeneca and Pfizer respectively virtually identical letters to the Defendants' solicitors in the following terms:

"Following the judgement in the claim number HC 07C02877 Lilly Icos LLC and Eli Lilly and Company v 8PM Chemist (the 'Eli Lilly Case'), we assume that your client would be amenable to consenting to an order with our clients on the same lines as the Order entered on 30 November 2007 in that case (the 'Eli Lilly Order') pending the Eli Lilly trial decision.

We therefore enclose for your review a draft consent order that the return date be adjourned to a date after the trial in the Eli Lilly Case and that the above proceedings be stayed in the meantime.

As we are not aware of the identity of the Turkish Supplier, our clients are unable to give a cross undertaking in damages in relation to the Turkish Supplier.

If your client consents to the terms the draft consent order, we would be grateful if you would to sign this letter and the draft consent order and send copies to us by fax or e-mail."

144    The Defendants' solicitors replied to both letters on 13 December 2007 saying that the cross-undertakings should extend to the Turkish Supplier and disclosing its identity upon a confidential basis. On 18 and 21 December 2007 Baker & McKenzie replied enclosing revised draft consent orders which included the Turkish Supplier in the cross-undertakings. On 23 December 2007 the Defendants' solicitors replied enclosing countersigned copies of the draft order. The letters included a statement to the effect that they had countersigned upon a certain understanding as to the meaning of the order. On 9 and 10 January 2008 Baker & McKenzie replied with their understanding, and said that they assumed the Defendants agreed and would lodge the signed orders unless the Defendants indicated otherwise. On 10 January 2008 the Defendants wrote agreeing to this.

145    On 16 January 2008 Baker & McKenzie wrote to the Defendants' solicitors purporting to enclose the consent orders in both cases "entered on 15 January 2008". In fact, through an administrative error by the Court, the documents in question were copies of the draft consent orders stamped "Chancery Division Received 15 January 2008" rather than sealed orders. As I understand it, the AstraZeneca order was subsequently made by Master Price on 7 March 2008 and entered, but it was later noticed that it accidentally omitted the words "and the Defendant's Turkish supplier" before the words "should be compensated" in the cross-undertaking. This was corrected under CPR

r. 40.12 . The Pfizer order contained the same mistake, but to this day it has never been sealed. It is common ground, however, that nothing turns on this.

146    Mr Aggarwal gave unchallenged evidence that he understood that 8PM and Pfizer and AstraZeneca were bound by the consent orders on the date they were countersigned, namely 23 December 2007. In my judgment it was entirely reasonable for him to act on that understanding.

**The appeal**

147    Mann J refused 8PM permission to appeal against his order. 8PM applied to the Court of Appeal for permission to appeal and for expedition of the appeal. Jacob LJ granted permission to appeal limited to the question of whether Lilly had an arguable case of trade mark infringement and expedited the hearing of the appeal.

148    The appeal was heard on 24 January 2008. At the conclusion of the hearing the Court of Appeal announced that it had concluded that Lilly did not have an arguable case of trade mark infringement for reasons which would be given in writing later, and discharged the Injunction granted by Mann J.

149    The Court of Appeal's judgments ([2008] EWCA Civ 24 , [2008] FSR 12) were handed down on 5 February 2008 . In his judgment, with which Rix LJ and Sir William Aldous agreed, Jacob LJ held that it was *acte clair* in the light of Class International that a trade mark owner's goods which were not released for free circulation under the Customs Code , and thus were non-Community goods, were not imported into or exported from the Community for trade mark infringement purposes, and that this applied to goods processed under IPR just as much as it did to goods processed under the Customs procedure which featured in Class International .

150    The Court of Appeal invited the parties to agree an order or in the absence of agreement to make written submissions. No agreement was reached and the parties duly filed submissions. On 11 March 2008 the Court of Appeal made an order allowing the appeal, granting summary judgment in favour of 8PM (subject to one point which as I understand it was not in the

end pursued by Lilly) and discharging the Injunction granted by Mann J. Paragraph 4 of the order provided:

> "there be an enquiry as to damages under the cross undertakings recorded in schedule 1 of the order of 19th October 2007 and in the subsequent interim orders, including the orders of 26th and 31st October 2007 and 23 November 2007."

**Discharge of the other Injunctions**

151   On 28 January 2008 the Defendants' solicitors wrote to Pfizer's and AstraZeneca's solicitors, and on 30 January 2008 the Defendants' solicitors wrote to Merck's solicitors, requesting their respective clients' immediate consent to the release of 8PM from the principal injunctions granted against it. Each of Pfizer, AstraZeneca and Merck sought to agree terms for the release. Terms were agreed in the Pfizer and AstraZeneca actions on 26 February 2008. The Injunction in the Merck Action was limited in time to 1 March 2008 and expired on that date before terms for its release were agreed.

152   On 30 September 2008 Norris J made an order by consent in the Pfizer action for inquiries under the cross-undertakings in each of the orders dated 26 October 2007, 6 November 2007 and 15 January 2008. Patten J made a similar order in the AstraZeneca action on 1 October 2008. Master Bragge made a similar order in the Merck action on 12 December 2008.

**The effect of the Injunctions**

153   I must now go back in time and address the first of the two principal factual dispute between the parties before me, which is as to what effect, if any, the Injunctions had on the Defendants' Turkish fulfilment business. The Defendants' case is that the Injunctions caused them to lose their Turkish fulfilment business since the customers went elsewhere. The Claimants' case is that the Injunctions, as opposed to the Birmingham

detention and/or the existence of the litigation and/or the without notice injunctions, caused the Defendants no loss because Mr Aggarwal had decided either to close the Turkish fulfilment business or to put it on hold pending the outcome of the litigation prior to the hearing before Mann J.

**154 The state of the Defendants' Turkish fulfilment business prior to the Birmingham detention**

The Claimants contend that the Defendants' Turkish business was in decline even before the Birmingham detention. At one stage the Claimants were contending that it was in decline even before August 2007, but I did not understand that suggestion to be pursued in the Claimants' closing submissions. In any event, I consider that it is clear that the business was growing rather than declining up to that point.

155   The Claimants maintain that the business was in decline in September 2007. It is true that, if one looks at the value of the invoices to CanadaDrugs for the Complete Care business from number 106 dated 26 August 2007 to number 111 dated 30 September 2007, one can see a reduction in the figures from £83,331.43 to £52,845.94 (including shipping and dispensing fees). I do not accept that this shows that the business was in decline, however, for a number of reasons.

156   First, the period in question is only 5 weeks, so it is not a large sample of invoices from which to attempt to draw a conclusion. As one would expect, the invoice totals show a fair amount of weekly variation in any event.

157   Secondly, the figures include generic sales (which are not part of the claim) as well as branded products. Mr Aggarwal explained that the generic sales tended to be erratic because of delays in getting product from India. The Claimants say that the drop in generic sales is less than the drop in branded sales, but even if that is right it means that the drop in branded sales is lower than the figures quoted above suggests.

158   Thirdly, there was no significant decline in the number of branded products being sold by RDA to CanadaDrugs in September 2007.

159   Fourthly, the figure for the invoice dated 26 August 2007 was unusually high: although the Defendants had

had one or two better weeks (for example, £84,680.91 in the invoice dated 14 January 2007), that week was one of their best. One possible explanation of this is that, if there was an autumn spike (as to which, see below), it arrived a little early that year; but it does not matter whether that is correct or not. The point remains the same whatever the explanation.

160 Fifthly, although the figure for the invoices dated 23 and 30 September 2007 were on the low side, the Defendants had previously had a number of worse weeks than those (for example, several invoices in February and March 2007).

161 Sixthly, as I shall explain in more detail below, after Mr Aggarwal was notified of the Birmingham detention, he temporarily delayed shipments from RDA. Thus there were fewer consignments in September 2007 than in a normal month. This is likely to have affected at least the invoice dated 30 September 2007.

162 Seventhly, no plausible reason has been identified as to why the business should have suddenly started to decline in September 2007. In their closing submissions the Claimants sought to avoid this point by saying that it was not necessary for the Court to determine why the decline occurred. In my view, however, the absence of any explanation for a decline having occurred suggests that the correct analysis is that there was no decline, merely a combination of an unusually high peak, normal weekly variation and the effect of the Birmingham detention.

### 163 The effect of the Birmingham detention

It is common ground that in the short term the Birmingham detention had a significant adverse effect on the Defendants' Turkish fulfilment business. Thus the Complete Care invoice values dropped to £17,042.85 on 7 October 2007 and only £847.07 on 14 October 2007.

164 The reasons for this decline were not confined to the detention of the Consignment itself. Initially, Mr Aggarwal did not know that the Consignment had been detained by HMRC, just that it had not cleared. While trying to establish what had happened, he temporarily delayed further consignments being sent by RDA. By 1 October 2007 it was clear to him that it was a

detention on suspicion that the consignment contained counterfeits, and so he contacted CanadaDrugs to inform them. Over the next few days, two consignments of replacement orders were sent. One was sent by the usual UK route, in part to test whether it would be detained or not, and the other by a non-UK route (via Amsterdam to Neopost, in the Caribbean island of St Maarten, to post on to the US patients). The UK consignment cleared customs after a few days' delay, which gave Mr Aggarwal the confidence to re-start regular consignments.

165 It took longer for CanadaDrugs to recover confidence, however. When Mr Aggarwal informed CanadaDrugs of the detention, it switched orders to other fulfilment centres (its own centres in Barbados and Canada and to 8PM's UK fulfilment business). But from mid-October 2007, the volume of orders from CanadaDrugs rose again. Indeed, on 22 October 2007 Ron Sigurdson sent Mr Aggarwal an email saying "The following products have already been moved back to CCP [i.e. Complete Care Pharmacy]. Some are very good movers". He then listed 37 drugs. The effect of this can be seen in the figures: the Complete Care invoice dated 28 October 2007 was for £19,420.06.

166 It was suggested by the Claimants that the Birmingham detention was a defining event in that it demonstrated to CanadaDrugs that it could, or at least should, fulfil its orders by means other than the Defendants' Turkish fulfilment business. In my judgment this suggestion is not supported by the evidence. On the contrary, the evidence shows that, once CanadaDrugs had started to regain confidence, it moved orders back to the Defendants in significant quantities.

### 167 The effect of the without notice injunctions and with notice applications

As noted above, the Lilly without notice injunction and application for a wider injunction were served on 8PM on 23 October 2007 and the Pfizer without notice injunction and application were served on 29 October 2007 and 30 October 2007 respectively. The Merck without notice injunction was served on 31 October 2007. Also on 31 October 2007 8PM was informed by HMRC of AstraZeneca's application the following day. By 31 October 2007, therefore, Mr Aggarwal was aware that three groups of pharmaceutical companies

had obtained without notice injunctions in respect of goods in the Consignment, of whom two were applying for wider injunctions, and that a fourth was applying for an injunction in respect of the Consignment. As he appreciated, the injunctions in respect of the Consignment were of limited effect, but the wider injunctions sought had the potential to prevent the Defendants from fulfilling orders from CanadaDrugs via the United Kingdom.

168  Mr Aggarwal informed CanadaDrugs about the without notice injunctions and the applications for wider injunction shortly after these were served. Mr Aggarwal accepted that, as a result, CanadaDrugs would have considered RDA as being "at risk" from 23 October 2007.

169  Nevertheless, it was Mr Aggarwal's evidence that the Defendants' Turkish fulfilment business continued to recover from the effect of the Birmingham detention in the following month. I accept this evidence, which is supported by the figures. Although the Complete Care invoices dated 5, 12 and 19 November 2007 were down from that dated 28 October 2007, the invoice dated 26 November 2007 was up at £22,113.55.

**170 The redundancies**

The reason for highlighting the position as at 31 October 2007 above is that at the end of October 2007 Mr Aggarwal gave four employees of RDA notice of redundancy with effect from the end of November 2007. In addition, he decided to give a fifth employee notice of redundancy at the end of November 2007 effective at the end of December 2007. (RDA had already made one employee redundant with effect from 31 October 2007 for reasons which Mr Aggarwal said, and I accept, were unconnected with this dispute.) Mr Aggarwal's evidence as to the reason why he did this was as follows:

> "I took the decision in order to hedge my bets against one or more of what were to be the 23 November injunction and Additional Injunctions being granted. If they were, so that the business would be stopped while an alternative shipping route was found, the Employees would have

worked at least some of their notice periods by that time. If not, the Employees could be asked if they would like to stay on. … The date of the redundancies just reflects the precautionary measure I took to reduce staff costs quickly should the injunctions be granted."

Mr Aggarwal explained that there was a high unemployment rate in Istanbul and so it was easy to recruit new workers if and when needed.

171  Mr Aggarwal was cross-examined on two emails from Tacettin Dolek (the manager of RDA) to him dated 26 and 31 October 2007 and an email from himself to Prateek Gupta (the minority partner in RDA) dated 2 November 2007 in which the redundancies were discussed. In my view the emails from Mr Dolek are not particularly significant: they are not easy to interpret due to the quality of the author's English and Mr Aggarwal explained that Mr Dolek did not have the full picture anyway. The most that these emails show is that Mr Aggarwal was thinking about making staff redundant as early as 26 October 2007. More important is the email from Mr Aggarwal to Mr Gupta, in which he said:

> "As you are now aware that we will sadly be loosing all of the workers (except Urgas) at the end of November and also Idil at the end of December. This situation was unavoidable due to difficulties in BHX [i.e. Birmingham airport] and the resulting decrease in order volumes in Turkey."

172  Counsel for the Claimants submitted that the three emails, and in particular the one from Mr Aggarwal, demonstrated that Mr Aggarwal's explanation for the decision to make the employees redundant which I have quoted above was false. When cross-examined about his email, Mr Aggarwal said that the second sentence I have

*Lilly Icos LLC v 8PM Chemists Ltd, 2009 WL 2932007 (2009)*

quoted was shorthand for the effects of the litigation. The key passage of cross-examination is as follows:

"Q. You say you took the decision in order to hedge your bets against one or more of what were to be the 23rd November and additional injunctions being granted. I have to suggest to you that, having looked at the e-mails that passed between you and your operatives in Turkey, that it is quite plain that decision to make those employees redundant was because of the incident in Birmingham and the commencement of the litigation?

A. No. I do not agree with that, because by 31st October we can see that order volumes which had declined as a result of the detentions had already started creeping back up again and Mr. Sigurdson was moving a significant number of products back to CCP.

Q. That is not what you say in the e-mails?

A. I have already commented that Mr. Dolek was probably getting confused between the facts of the detention and the litigation. It may not be clear to him that two things are distinct.

Q. Mr. Dolek may be getting confused but on page 436 you wrote at the bottom, that you will be losing all of the workers at the end of November and Idil at the end of December. This situation was 'unavoidable due to difficulties in Birmingham and the resulting decrease in orders.'

A. I already qualified that reference to BHX was shorthand to the litigation.

Q. Exactly. Therefore, you were asking the people to leave because of firstly the detention and secondly the existence of the litigation?

A. I think by 2nd November or 31st October I had gotten over the detention, if I can put it that way, because I knew that there was nothing wrong, HMRC were simply doing their job. Having done their job the business had resumed to normality or some form of normality. Obviously the orders volumes were still not where they should be but I was confident they were going to get there.

Q. If they were going to get there why did you need to dispense with these people's services?

A. Because of the threat of litigation.

Q. The last time you were thinking of making someone redundant in April/May time you did not tell the operative and you were able to countermand the instruction before he had been told?

A. Correct.

Q. On this occasion the employees were told and you put a transfer

of responsibility into place with
immediate effect?

A. Umm hmm.

Q. So those people were going to be
made redundant come what may?

A. No, because we knew what date
the Lilly hearing injunction was for
so we knew that had things turned
in our favour we could still get those
workers to not leave at the end of
November."

173   Mr Aggarwal went on to say that RDA had
retained the managers in the organisation and so
retained the necessary skills for effective operation and
that the high rate of youth unemployment in Istanbul
meant that it would be easy to replace the workers who
had been made redundant if need be.

174   I accept that Mr Aggarwal was not intending
in his short email to give a full statement of all his
reasons for making the employees redundant. In my
view the effect of the Birmingham detention was a factor
in his thinking, but that was not the only factor. As
I have said, I accept that by the date of this email
sales were recovering from the effect of the Birmingham
detention. Indeed, sales had risen to £19,420.66. I
therefore consider that it is plausible that Mr Aggarwal
had the litigation in mind as well.

175   As I have pointed out above, by 31 October 2007
the status of the litigation was that three without notice
injunctions and two applications for wider applications
had been served on 8PM and it had been informed
by HMRC that a fourth application for a without
notice injunction was to be made the following day. Mr
Aggarwal rightly anticipated that further applications
for wider injunctions would follow. The effect of the
without notice injunctions on the Defendants' business
was limited, but the effect of the wider injunctions if

granted would be much more serious. Mr Aggarwal
knew that the hearing of Lilly's application would take
place in about three weeks' time, and he appreciated
that the decision on that application would effectively
determine all of the with notice applications.

176   In the circumstances, and taking into account Mr
Aggarwal's unchallenged evidence about the state of the
employment market in Istanbul, I consider it plausible
that Mr Aggarwal was hedging his bets as he said.
Accordingly, I accept his evidence on this point.

177   Counsel for the Claimants also submitted that
certain passages in Mr Aggarwal's witness statements,
and in particular paragraph 66 of his third statement
which is quoted below, together with this passage
of cross-examination, demonstrated that it was the
existence of the litigation, as opposed to the Injunctions,
which caused any loss which the Defendants had
suffered. I do not accept this submission, for the
following reasons.

178   First, the basis for this submission was the assertion
that Mr Aggarwal had decided to close the Turkish
fulfilment business, or at least put it on hold, prior to the
Lilly Injunction. I do not accept that Mr Aggarwal had
made any such decision, however. The only evidence
to support the assertion is the fact that Mr Aggarwal
decided to make the five employees redundant at the
end of October 2007. As I have said, I accept Mr
Aggarwal's explanation for that. All the other evidence
is the other way. Mr Aggarwal pointed out that RDA
had retained its skilled staff, in particular Mr Dolek.
As I have already pointed out, sales in the last week
before the Lilly Injunction rose to £22,113.55. That
amounts to between a quarter and a third of the
pre-detention level. Furthermore, RDA continued to
purchase stock in October and November. Counsel for
the Claimants suggested that that might have been for
the wholesale business, but that suggestion was not put
to Mr Aggarwal. In any event, I consider it unlikely that
all stock purchased was the wholesale business.

179   Secondly, the submission depends upon a selective
approach to Mr Aggarwal's evidence. If his evidence
is considered as a whole, I consider that it was clearly
to the effect that the cause of the loss of the Turkish
fulfilment business was the Injunctions.

180  Thirdly, it was not put to Mr Aggarwal in cross-examination that it was the existence of the litigation *per se* , as distinct from the Injunctions, which made him decide to make the employees redundant. Counsel for the Claimants submitted that this did not need to be put in view of Mr Aggarwal's answer in the passage quoted above "Because of the threat of the litigation". I do not agree. That answer has to be read in context. Read in context, I do not think that Mr Aggarwal was intending to distinguish between the threat of the litigation *per se* and the threat of the Injunctions. If the distinction was to be relied upon, the point needed to be squarely put to Mr Aggarwal, and it was not.

181  Fourthly, it was not put to Mr Aggarwal in cross-examination that it was the existence of the litigation *per se* , as distinct from the Injunctions, which caused the CIPs to take their custom elsewhere following the grant of the Lilly Injunction. In any event, the evidence points the other way. I do not doubt that the Defendants and the CIPs were concerned about the effect of the litigation, and in particular in the case of the Defendants the possibility of paying damages if they were to lose at trial, but this did not deter either the Defendants or the CIPs from continuing to do business on a significant scale right up to the Lilly Injunction.

**182 Events following the Lilly Injunction**
When Mann J granted the Lilly Injunction on 23 November 2007, Mr Aggarwal anticipated that the other Claimants would demand similar injunctions as well, and could see no reason for refusing to agree to such demands as they came. As can be seen from the account above, in the event such demands were not long in coming: Merck, AstraZeneca and Pfizer wrote requesting 8PM to consent to injunctions on 27 November 2007 (following a telephone call on 26 November 2007), 7 and 10 December 2007 respectively.

183  Over the weekend of 24-25 November 2007 Mr Aggarwal considered the implications of the Injunction, and in particular the possibility of using an alternative route. The Defendants had no alternative route in place and none had been investigated. Setting up an alternative route would require legal advice and potentially regulatory licences, and it would need to be tested. Mr Aggarwal estimated that this would take about 3-6 months.

184  In his third witness statement (his first on the inquiries), Mr Aggarwal gave the following account of conversations he had had with each of the Defendants' three customers following the Lilly Injunction:

> "66.      …      during      the week commencing 26 November 2007, I telephoned the CEO of CanadaDrugs.com, Kris Thorkelson, to inform him of the 23 November injunction. I telephoned him first because CanadaDrugs.com was the Turkish Supplier's major supplier accounting for about 88% of the orders being fulfilled. He asked what our next steps were and I said that we were thinking about appealing the decision but were not sure yet. In terms of order processing, I told him that the 23 November injunction affected products of the Lilly group but that it was highly likely that the Additional Injunctions would follow affecting products of the Pfizer, Merck and AstraZeneca groups as well as potentially Novartis and Schering-Plough. He commented that this was quite a list. I explained my understanding that, technically, we could still dispense and ship non-Lilly products, at least for the time being in respect of Pfizer, Merck and AstraZeneca products, but that it was something we would be reluctant to do in respect of these 3 companies in case it turned out that shipping their products through the UK did amount to trade mark infringement.
>
> 67.   The CEO agreed with me that continuing to supply products from other manufacturers was risky and suggested that anyway the majority of the orders from CanadaDrugs.com would relate to products of the companies that

had sought injunctions against 8PM and it would be difficult for CanadaDrugs.com to carry on using the Turkish Supplier for dispensing a minority of the products … This also affected orders from single patients that consisted of products of both the Claimants and other companies because CanadaDrugs.com was not keen at all to split orders between two suppliers (i.e. for 'partial fulfilment' by each). It is only where there is no option at all to consolidate orders that internet pharmacies will split them or agree to partial fulfilment. This is because it increases costs, is administratively more complex and also customers do not like receiving part of their order only - often when they get the first part they believe there has been a mistake over the rest of it and ring up the CIP to complain. It was for this reason that, as I said in paragraph 35 of my first Witness Statement, the Turkish Supplier if it could not 'satisfy one element of a particular prescription, it does not seek to satisfy any element' but would notify the CIP so the patient could be asked if he or she wanted partial fulfilment. That procedure was feasible for occasional occurrences but not long-term or where there is an inability to supply any of a given company's products and so, in paragraph 36, I anticipated that, because of knock-on effects it would have, 'If 8PM is unable to handle Lilly products, in effect this means that we lose all of the business'. I was therefore not surprised by the CEO's position on partial fulfilment. The conversation then ended by the CEO wishing me luck with the litigation and requesting that I keep him informed. I thanked him for

his understanding and apologised for the inconvenience this would inevitably cause to his business. I added that we would also investigate alternative shipping routes which would avoid the UK and keep him informed of progress on this front too. I will discuss the alternative shipping routes investigated below.

68. In the same week that I spoke to CanadaDrugs.com I also spoke to the president of BBG, Dr Simon Barclay. I informed him of the 23 November injunction, the likely Additional Injunctions and those companies' products concerned (the same companies as I had mentioned to CanadaDrugs.com). The president's reaction was that we should keep in touch and let him know if we became able to supply again. He was sympathetic but did not ask that we carry on with partial fulfilment only. BBG had fulfilment facilities other than the Turkish Supplier, for example in Singapore, and so I assume it would have channelled all of its orders through them. It could also have fulfilled orders with drugs from the New Zealand market although that would have had costs implications as that market is more expensive than, for example, Turkey.

69. Still in this same week, I spoke to the owner of JanDrugs, David Janeson, to give him the same information about the 23 November injunction and Additional Injunctions and their implications as I had given to CanadaDrugs.com and BBG. He replied that JanDrugs was not currently using the Turkish Supplier much anyway and that he would

WESTLAW  © 2017 Thomson Reuters.

switch what business had been
coming to the Turkish Supplier to
Canada or New Zealand with other
pharmacy partners. The reason he
was not using the Turkish Supplier
much was that he preferred non-
Turkish drugs but he would switch
from other suppliers to the Turkish
Supplier depending on how he
wanted to position his website
(balancing the source of a particular
drug against its cost) or when other
suppliers could not fulfil JanDrugs'
orders. However, he asked me to
keep him informed as he wished
to keep the Turkish Supplier as
an option and also factors such as
price and availability of drugs could
change in the future which would
make Turkey more favourable as
place for the fulfilment of JanDrugs'
orders."

185  I accept this account. It follows that the Defendants
lost the business of the three CIPs, and in particular
CanadaDrugs, as a result of Mr Aggarwal informing
them in these conversations of the Lilly Injunction and
of the likelihood of the other Injunctions being granted.

186  The effect on the Defendants' Turkish fulfilment
business was dramatic. The Defendants' invoice to
CanadaDrugs dated 3 December 2007 was for only
£675.68. Thereafter the Defendants made no sales to
CanadaDrugs (other than sales of stock on a wholesale
basis as discussed below).

187  Mr Aggarwal's evidence was that the business
was not irretrievably lost at that point in time: if he
could have gone back to the CIPs sufficiently quickly
either to say that the Injunction had been discharged
or that he had found a viable alternative route, then
he could have got the business back. This is, of course,
speculation on Mr Aggarwal's part, but it is clear that
was what Mr Aggarwal thought at the time, because he
spent a certain amount of time, effort and money after
these conversations in continuing to explore alternative

routes (he started exploring this question before 23
November 2007). Since mitigation is no longer an issue,
it is not necessary to go into the details of this. It suffices
to say that among the alternatives he considered were
Germany (using DHL and Deutsche Post), Switzerland
and Norway, and that the Defendants retained the
services of Ms Scott to investigate the latter two options.
These investigations continued until very shortly before
the hearing in the Court of Appeal. In addition, that this
was Mr Aggarwal's state of mind is supported by the
fact that the Defendants applied to expedite the hearing
in the Court of Appeal.

188  I consider that it is plausible that the Defendants
could have rescued the business within a certain period
of informing the CIPs about the Lilly Injunction and
the likelihood of the other Injunctions being granted
if the Lilly Injunction had been discharged sufficiently
quickly. It is impossible to say precisely when matters
reached the point of no return, but doing the best I
can I estimate that it was about one month after these
conversations i.e. in the last week of December 2007. By
that point in time, the other Injunctions had been agreed
or effectively agreed.

**189 Events following the decision of the Court of Appeal**
In his third witness statement, Mr Aggarwal gave
the following account of conversations he had had
following the decision of the Court of Appeal:

"98.  On 5 February 2008, the day
that the Court of Appeal's judgment
in the Lilly Action was delivered,
I received an email from Mr
Thorkelson of CanadaDrugs.com
congratulating me on the outcome.
The email showed that he had been
told by CanadaDrugs.com's legal
counsel who, I think, must have
found the judgment on the internet
as I had not by that stage notified
CanadaDrugs.com of it.

99.  But that afternoon, I spoke
to the CFO at CanadaDrugs.com
first to inform him of the Court
of Appeal decision (which he

already knew) and secondly to ask whether, in light of the decision, CanadaDrugs.com would resume the fulfilment business with the Turkish Supplier. His reply was that the alternative arrangements were going well, but he would keep us in mind if the need arose. However I had the impression that he was just being polite and that there was no intention to resume business with the Turkish Supplier. The conversation then moved on to discuss the possibility of selling a batch of the Turkish Supplier's stock to CanadaDrugs.com. He requested a list of the remaining stock to review. I will discuss the sales of stocks to CanadaDrugs.com below.

100.    During the same week, I also spoke to the owner of JanDrugs and the president of BBG to tell them of the lifting of the 23 November injunction and our ability to resume trade. I also informed them that the scale on which we could recommence business would depend on whether or not CanadaDrugs.com would go back to using the Turkish Supplier and the extent of any resumed business. This was because the Turkish Supplier could not offer the same level of service as it had prior to the Injunctions without the large volume of orders CanadaDrugs.com had been assigning to the Turkish Supplier. In particular, without the volume of orders from CanadaDrugs.com it would not be financially justifiable to send 2 consignments per week. I knew that only offering 1 consignment per week would not be attractive to JanDrugs or BBG as it would mean delays in the US patients receiving their

pharmaceuticals. Also, although I did not mention it to BBG or JanDrugs, there would not be the same economies of scale and so the Turkish Supplier would have to charge increased fees and drugs costs. This is because of the reduced bargaining power with wholesalers due to lower purchase volumes and also because of the various fixed costs of the business, such as premises expenses. I ended the conversations by saying that I would keep JanDrugs and BBG informed of discussions with CanadaDrugs.com."

"94.    I spoke to Mr Sigurdson, the CFO of CanadaDrugs.com, by telephone in the week commencing 25 February 2008 to find out how things were going with the alternative fulfilment arrangements and the possibility of doing business again with the Turkish Supplier. He replied that things were going well and therefore CanadaDrugs.com did not want to start re-using the Turkish Supplier. He then went on to say that CanadaDrugs.com had decided to stop using 8PM as well. I asked the reasons for these decisions. He replied that CanadaDrugs.com had been left with no choice but to set up alternative arrangements because, when the 23 November injunction was first granted, we could not say for certain if the Turkish Supplier would be able to operate again and in what time-frame. He also observed that the Additional Injunctions had been obtained and that 8PM was looking at the prospect of a full blown trial in May 2008. He added regarding 8PM that the decision was nothing to do with its performance or the service that

it was providing but was an internal decision."

190  Mr Aggarwal went on to recount a number of later contacts he had with the CIPs, each of which had proved equally fruitless. I accept Mr Aggarwal's account. It follows that, by the time the Court of Appeal discharged the Lilly Injunction, it was too late for the Defendants to rescue the business. This is precisely in accordance with what Mr Aggarwal had predicted in paragraph 42 of his first witness statement prior to the Lilly Injunction, namely that if 8PM was injuncted for more than a month or two, then RDA would have to close.

**191 Conclusion**

Accordingly, I conclude that the Injunctions caused the Defendants' Turkish fulfilment business customers to go elsewhere. In my judgment, all four Injunctions caused this, for the following reasons. First, the Lilly Injunction only affected 3% of the Defendant's business, whereas the four Injunctions together affected 57%. Secondly, although only the Lilly Injunction had been granted at the time of Mr Aggarwal's conversations with the Cips, the other Injunctions had been applied for and it was rightly anticipated that they would follow. Thirdly, by the time the window of opportunity for regaining the Cips' custom closed, the other Injunctions had been agreed or effectively agreed.

192  Counsel for Pfizer, AstraZeneca and Merck argued that the Injunctions in those actions could not have caused loss before they were granted or at least finally agreed. I do not agree. As counsel for Lilly rightly accepted, an injunction may cause loss before it is actually granted. In particular, steps may be taken by a defendant in anticipation of an injunction being granted which result in loss being suffered by the defendant after the injunction is granted. An obvious example is where an injunction is applied for, and between the date of the application and the date of the hearing the defendant concludes that it cannot resist the injunction and therefore will consent to it, and having taken that decision it takes steps to comply with the forthcoming injunction which later result in it suffering loss. Taking a common-sense approach to causation, the injunction causes that loss. Of course, if a defendant takes steps in anticipation of an injunction which in the event is not granted, then loss suffered by the defendant as a result is not caused by the non-existent injunction, but that does not disprove the proposition I have just stated.

**What would have happened if there had been no Injunctions?**

193  I now turn to the second major factual dispute, which is as to what would have happened if there had been no Injunctions. The Defendants' case is that the Turkish fulfilment business would have recovered to the levels it achieved prior to the Birmingham detention and would have continued to generate the same profits. The Claimants' case is that, even if there had been no Injunctions (and indeed no litigation), CanadaDrugs would have ceased to place orders with the Turkish fulfilment business by the end of December 2007, or at the latest around February or March 2008, in any event.

194  The Defendants' case is supported by the evidence to which I have already referred about CanadaDrugs moving orders back to RDA and by the rise in the level of sales between the invoices dated 14 October 2007 and 26 November 2007. On the other hand, the levels of sales had not completely recovered by 26 November 2007, and it is not inevitable that they would ever have done.

195  I have already dealt with most of the matters relied upon by the Claimants in support of their case, but one remains. This relates to a company called River East Supplies Ltd ("River East"). There is very little evidence about this company, as opposed to speculation. The facts established by the evidence are follows.

196  River East was incorporated on 13 September 2007. Mr Haughton was appointed as a director on 10 October 2007. Cheryl Haughton, presumably his wife, was appointed as a director on 19 October 2007. Both gave an address in Barbados. As at 13 September 2008 Mr Haughton owned the sole issued share in the company.

197  In February 2008 River East was granted a wholesalers' licence with parallel import rights by the MHRA. It typically takes up to 90 days for such a licence to be granted. The address given on the licence is an address in Nottingham.

198    Between 26 February 2008 and 20 June 2008 19 test purchases made by Pfizer from CanadaDrug's websites resulted in deliveries of packages displaying the names UK Services and UK Pharmacy Services and the Nottingham address. None of these products were of Turkish origin.

199    Mr Aggarwal found out about River East, although not its precise connection with CanadaDrugs, in January 2008. At some point between then and March 2008 CanadaDrugs informed Mr Aggarwal that they were no longer going to use 8PM for UK fulfilment, and it became apparent to Mr Aggarwal that CanadaDrugs was wholly or partially transferring the UK fulfilment business to another operation i.e. River East. In early March 2008 8PM sold some stock to River East.

200    Although there have been no test purchases by Pfizer delivered from this source since 20 June 2008, in an email to Mr Aggarwal dated 3 February 2009 Mr Haughton said that "our operation[s] in Barbados and the UK have been working out fine", which suggests that River East was continuing to perform that role.

201    Mr Aggarwal pointed out that, as at 10 October 2007, there were a number of reason why CanadaDrugs (or to be more precise, Mr Haughton) might have wanted a UK company other than 8PM to carry out fulfilment business. For example, it might have been to carry out the "bag and burst" operation for CanadaDrugs Barbados that 8PM declined to do. He also observed that, once the Injunctions were granted, it would have made sense for CanadaDrugs to use River East for fulfilment whatever the original plan was.

202    For their part the Claimants suggest that CanadaDrugs had decided even prior to the Birmingham detention, and certainly prior to the commencement of the Lilly action, to set up its own UK fulfilment business in place of 8PM. In my judgment the available evidence does not permit any such conclusion to be drawn. I accept Mr Aggarwal's evidence that there were a number of other reasons why River East could have been established. On the balance of probabilities, I consider that it was not for the reason suggested by the Claimants, since it is unlikely that CanadaDrugs would switch the UK fulfilment business at a time when the

evidence suggests it was planning to continue placing Turkish fulfilment business with the Defendants.

203    This leads to a separate point made by the Claimants. This is that the evidence indicates that, in the events that happened, CanadaDrugs moved all its fulfilment business from the Defendants to its own Barbados and UK operations. The Claimants contend that it is likely that the same thing would have happened even in the absence of the Injunctions. To my mind this is the Claimants' best point on causation. Why, it may be asked, did CanadaDrugs continue with the Barbados and UK operations rather than go back to the Defendants once the Injunctions had been lifted? It seems clear that CanadaDrugs found that it could operate satisfactorily and profitably without the Defendants. Would it not have reached that conclusion anyway?

204    I have deliberated over this point for some time. In the end I am not persuaded by it. The reason why I am not persuaded is that during the period from 14 October 2007 to 26 November 2007 CanadaDrugs placed an increasing amount of orders with the Defendants. It was only following the Lilly Injunction that it took its custom elsewhere. The Claimants argue that the effects of the Birmingham detention made CanadaDrugs appreciate, if it did not appreciate already, that it could do without the Defendants. If so, why did it move orders back to the Defendants, and do so increasingly, prior to the Lilly Injunction? On the evidence, it seems to me that the more likely explanation is that CanadaDrugs wished to continue trading with the Defendants until the Lilly Injunction, and the likelihood of the other Injunctions being granted shortly thereafter, forced it to go elsewhere. Once it established new arrangements, it did not want to undergo the further disruption of going back to the previous arrangements with the Defendants and found that it could operate satisfactorily without doing so.

205    On the other hand, this does serve to emphasise the fragility of the Defendants' trading relationship with CanadaDrugs. I shall return to this point below.

**Overall conclusion on causation**

206    My overall conclusion is that the Defendants have satisfied the but for test in respect of all the Injunctions.

I find that, but for the Injunctions, the Defendants would have continued to trade with CanadaDrugs and their other two customers and to generate profits after 23 November 2007.

**Quantum**

207   Having reached that conclusion, I must now quantify the loss which the Defendants have sustained. The principal head of loss claimed is the lost profits of the Turkish fulfilment business after 23 November 2007, but there are two additional heads of loss which I will consider separately below.

**The expert evidence**

208   Expert evidence as to quantum was given by three experienced forensic accountants. The Defendants called Mark Bezant, now a senior managing director of FTI Consulting. Lilly, Pfizer and AstraZeneca called Elizabeth Gutteridge of Deloitte. Merck called William Davies of Grant Thornton. All three experts were knowledgeable, articulate and fair in their evidence. I am concerned, however, about the costs implications of the Claimants having called two experts with the same expertise to deal with the same issues. I must therefore set out how that came about.

209   On 22 July 2008 Floyd J made an order by consent giving directions for the conduct of the inquiry under the cross-undertaking in the Lilly action. That order provided that Lilly and the Defendants could each call up to two experts witnesses. The names of the names of the experts were to be supplied on before 24 October 2008, the Defendants' experts' reports were to be served on or before 5 December 2008 and Lilly's experts' reports were to be served on or before 16 February 2009.

210   I was informed that Ms Gutteridge was instructed by Lilly in September 2008. She was duly nominated as an expert on 24 October 2008, as was Erika Lietzan (as to whom, see below). On the same day Merck's solicitors wrote to the Defendants' solicitors suggesting that, on the assumption that all the Claimants consented to the four inquiries being heard together, the disclosure and evidence be shared between the actions. This led to discussions between the Claimants with a view to agreeing common experts. Agreement was indeed

reached that Ms Lietzan would act for all four Claimants, but on about 11 November 2008 it was discovered that Ms Gutteridge had a conflict of interest that prevented her from acting for Merck even though the issues upon which her expert evidence was sought all concerned the Defendants' business and not any business of Merck. (Indeed, neither Ms Gutteridge nor Mr Davies said a word about their respective clients' businesses in any of their reports.)

211   The reason for the conflict of interest was that the US member firm of Deloitte Touche Tohmatsu provides audit services to The Merck/Schering Plough Cholesterol Partnership, a joint venture between Merck & Co Inc and Schering Plough. Under rules promulgated by the US Securities and Exchange Commission, auditors are prohibited from providing an expert opinion or other expert service for an audit client, or an audit client's legal representative, for the purpose of advocating an audit client's interests in litigation or in a regulatory or administrative proceeding or investigation. This prohibition extends to affiliates of the audit client, and Merck & Co Inc falls within the definition of an affiliate. The policy rationale for this prohibition is obvious, and I accept it without reservation. Nevertheless, I wonder whether the rule was intended to apply to a situation such as the present where the expert is a member of a different (albeit connected) firm in a different country giving independent expert evidence on the joint instructions of a number of parties, most of whom the rule does not apply to, about the business of other parties to whom the rule does not apply either.

212   Be that as it may, the upshot was that Lilly continued to instruct Ms Gutteridge, as did AstraZeneca and Pfizer, while Merck instructed Mr Davies. Counsel for the Claimants submitted that Lilly was constrained to act in that way because of the time constraints under Floyd J's order of 22 July 2008. I do not accept this. First, while I accept that Ms Gutteridge had carried out preparatory work by 11 November 2008, the main part of her work only started upon receipt of Mr Bezant's report. As at 11 November 2008, Mr Bezant's report had not been served and was not even due to be served until 5 December 2008. Secondly, at that date Lilly's expert's report was due on 16 February 2009. Thus there was ample time in which to instruct a new expert even on the existing

timetable. Thirdly, if Lilly had revealed the problem to the Defendants and the Court at that stage (which they did not), there can be no doubt that any extension of time for service of the expert's report that was needed would have been granted. Fourthly, just two days later on 13 November 2008 Floyd J made an order by consent in the Lilly case in almost identical terms to the 22 July 2008 order save that certain of the dates were changed. These included the dates for experts' reports which were changed to 14 January 2009 and 1 April 2009. This meant that there was even less time pressure on Lilly to produce its expert's report. (In the event, directions were subsequently agreed in the Merck action on 19 December 2008 which provided for experts' reports to be served on 7 April 2009 and 8 May 2009, and both Ms Gutteridge's and Mr Davies' reports were served on the latter date.)

213   The result of the Claimants' decision to instruct two different experts was predictable, namely that Ms Gutteridge and Mr Davies each served lengthy reports addressing the same issues. While there were certain differences between the points taken by them, and different emphases in relation to common points, there was a good deal of duplication. When I expressed concern about this on the first day of trial, counsel for the Claimants informed me that he had already indicated to counsel for the Defendants that he accepted that counsel for the Defendants should not have to cross-examine both witnesses on the same points. While saving cross-examination time, that course is not a satisfactory answer to duplication, because it means that one expert's report on those points is a waste of time and money. Subsequently, counsel for the Claimants identified a selection of paragraphs from each expert's reports which he said that counsel for the Defendants should cross-examine to, but accepted that the remainder need not be. While this procedure enabled the Claimants to cherry-pick the most favourable parts of the two experts' reports, it still meant that the other parts of the reports were wasted.

214   In my judgment, what should have happened is that, when the conflict issue regarding Ms Gutteridge arose, the Claimants should have found an expert forensic accountant who was able to act for all of them. As Aldous J (as he then was) pointed out in *Gerber Garment Technology Inc v Lectra Systems Ltd [1994] FSR 471* at 489:

"If they have the same expertise, then I only need one expert on each topic. It is contrary to the good administration of justice that there should be duplication. … There is no need to have two accountants, one is enough."

The principle that duplication of experts should be avoided is one that has subsequently been strongly reinforced by Lord Woolf MR's Access to Justice reports, and by *CPR Part 35* and the case law thereunder. As frequently been pointed out, expert evidence is a major contributor to the expense of English litigation. It is vital that parties and their advisors take appropriate steps to ensure that expert evidence is not duplicated.

215   I will hear further argument on the costs consequences of the Claimants' failure to take the correct course when this judgment is handed down.

### The Combined Database

216   Mr Bezant based his calculation of lost profits upon a database referred to as the "Combined Database". The Combined Database was compiled from two sources.

217   The first source was a set of databases recording the trading history of the Turkish fulfilment business ("the underlying databases"). The underlying databases were provided by way of disclosure and were the Defendants' Excel spreadsheets used for invoicing the CIPs. There is one underlying database for each of the three customers. They record in detail every individual patient order fulfilled by LNA and RDA. Much of the information in the underlying databases was originally downloaded from each CIP's website, but the prices actually charged to the CIPs were added by Mr Aggarwal on a weekly or monthly basis as and when he dealt with invoicing of the CIP in question. There can be no doubt that the prices charged to the CIPs are accurate: invoices to the CIPs and bank statements have also been disclosed and it is possible to follow through

individual patient orders and see that the prices shown as charged to the CIP were indeed paid.

218   The second source is a costs spreadsheet. This is an Excel spreadsheet containing details of all RDA's purchases of drugs, from which an average price per product has been calculated. All of the underlying invoices were disclosed.

219   The Combined Database combines information from the three underlying databases (but with the generic pharmaceuticals stripped out for which no claim is made) with information from the costs spreadsheet. The Combined Database contains details of just under 100,000 patient orders. The Claimants were given the opportunity, which they accepted, of verifying the Combined Database by choosing entries at random and receiving all the supporting documents that existed in the Defendants' control on each chosen entry. Nevertheless, the Claimants were not satisfied, and sought and obtained further disclosure of various categories of documents from the Defendants' business records.

220   It is fair to say that some confusion was caused by the Defendants' initial failure to reveal that they had operated a system of transfer pricing between 8PM and RDA. Once this was explained by Mr Aggarwal, however, it answered many of the queries which the Claimants and their experts had raised about the financial information upon which the claim is based.

221   By the time she came to give evidence at trial, Ms Gutteridge was largely satisfied by the disclosure that had been given and as to the accuracy of the financial information. Mr Davies was still not satisfied, but it was clear from his evidence that he would have not have been completely satisfied by anything less than full disclosure of the Defendants' entire business records for the period in question. In my view, such a level of disclosure was not necessary or proportionate to test the Defendants' claim.

**Base period**

222   It was common ground between the experts that, in order to calculate the Defendants' lost future profits, it was necessary to identity a base period which was as representative as possible of the business prior to

the Lilly Injunction. Ms Gutteridge considered that the correct base period was the year before the Injunction i.e. 24 November 2006 to 23 November 2007. Mr Bezant chose the period 1 August 2006 to 31 July 2007. He did so for two reasons. First, in order to exclude the effect of the Birmingham detention which he had been instructed was an exceptional event. Secondly, so as to include the whole of one autumn spike in sales within the year, rather than parts of two different autumn spikes.

223   The Claimants dispute that the Birmingham detention was an exceptional event or that there was an autumn spike in sales, and therefore contend that Ms Gutteridge's approach is to be preferred.

224   I find that the Birmingham detention was an exceptional event so far as the Turkish fulfilment business is considered. First, it only happened to one out of more than 120 consignments. (The Heathrow detention was different for various reasons, not least that it was of a consignment from Barbados to Turkey.) Secondly, the Claimants have adduced no evidence at all as to how frequent such detentions are with regard to pharmaceutical products even in general terms, let alone specifically with regard to goods being processed under inward processing relief and/or imported from Turkey and/or exported to the USA in fulfilment of CIP business. The absence of such evidence is significant given the Claimants' involvement with, and collective experience of, HMRC's operations in this field. In the absence of such evidence, I infer that detentions are infrequent.

225   Looking forward in time from the Birmingham detention, the detention occurred because HMRC suspected the presence of counterfeit goods. Given that none were found, HMRC would have been unlikely to detain another consignment absent evidence of the presence of counterfeits. This is particularly so given that nothing was found when the search warrant was executed (in saying this, I am not overlooking the fact that HMRC was not itself party to the obtaining of the search warrant). Furthermore, in January 2008 HMRC changed its policy. Since then, HMRC has ceased to detain goods suspected of infringing trade marks which are in transit through, or being transhipped within, the UK en route from one third country to another unless there is evidence of likely diversion onto the UK

or wider EU market (as to which, see Nokia Corp v HMRC [2009] EWHC 1903 (Ch)).

226  As to the autumn spike, there is some evidence of an autumn spike, although it is not compelling. More importantly, to my mind, the evidence suggests that, to the extent that there was an autumn spike, it was less pronounced and occurred earlier in 2007 than 2006. I find that, to the extent that there was an autumn spike, it had come to end before 23 September 2007. Thus it is not necessary to go as far back as the year ending 31 July 2007 to capture a whole spike. Furthermore, doing so has the effect of capturing the 2006 spike rather than the 2007 spike, which is less representative of the business as it existed at the time of the injunction. It also has the effect of including a period when exchange rates were rather favourable to the Defendants.

227  The Claimants suggested that, if the Birmingham detention was exceptional, the base period should taken as 1 October 2006 to 30 September 2007 on the basis that the effects of the detention were not felt until the beginning of October 2007. I am not convinced that this is correct, however. As noted above, the effects began to manifest themselves towards the end of September 2007.

228  Accordingly, I conclude that the base period should be the year to 23 September 2007.

**Profit margins**

229  Mr Bezant calculated the lost profits of the Defendants' Turkish fulfilment business by comparing the projected incremental revenues and costs extrapolated from the information in the Combined Database together with information as to overheads provided by Mr Aggarwal. A number of points arise in relation to the profit margins calculated by Mr Bezant.

230  The first is that the sales information in the Combined Database shows sales of the products over time, whereas the cost information for each product is a simple average over the entire period of RDA's trading. Mr Davies was of the view that using an average cost figure to calculate the profits in this way was not appropriate. Despite the length of time spent on this point during the trial, I can express my conclusion shortly. I was left in no doubt by the evidence of all the experts that, while using an average cost is undeniably a slightly crude approach, to attempt to calculate the cost of product for each sale, or even each month's sales, would take a great deal of time and effort which would be quite disproportionate to the likely effect on the profit calculation.

231  The second is that the Claimants contend that, if the figures are scrutinised, they demonstrate that the gross profit margin of the Turkish fulfilment business was declining during August and September 2007 due to significant increases in the cost of a number of the biggest selling products. I am not persuaded that Mr Bezant's profit figures should be adjusted for this reason. While I think the evidence does shows an increase in the Defendants' costs during this period, I consider that it is likely that, if such increases had continued, the Defendants would have compensated by increasing their prices to CanadaDrugs. On the other hand, I accept that this illustrates that one of the risks to the Defendants' business in the period after 23 November 2009 was the risk that their gross profit margin would be reduced. I have taken this into account when assessing the risk factor (as to which, see below).

232  The third is that the Claimants contend that there are certain credits which ought to have been included, but have not been, in particular for stock obsolescence. I do not accept this. As counsel for the Defendants submitted, the Claimants' contention depends on matters which were not put to Mr Aggarwal or are speculation unsupported by evidence.

233  The fourth is that the Claimants contend that the profit margins claimed are generally suspect, and probably inflated, for various other reasons. I do not intend to go through these individually. Again, I agree with the submission of counsel for the Defendants that the matters relied on were either not put to Mr Aggarwal, contradicted by his evidence or that of Mr Bezant or speculation unsupported by evidence. Again, however, I have borne in mind when assessing the risk factor that there is no guarantee that the Defendants' business would have continued to be as profitable in the future as in the past.

**Growth rate**

234  In order to calculate the future profits of the Turkish fulfilment business, Mr Bezant applied a growth rate of 4% for 2008 to 2012 and 1.9% thereafter. The figure of 4% was the lowest figure for this period given by Business Monitor International Inc in a report entitled *United States Pharmaceuticals & Healthcare Report Q3 2008* . According to the report, IMS Health forecasts pharmaceutical sales growth of 3-6% for the same period. It appears that both figures are in real terms i.e. excluding inflation. The figure of 1.9% is the forecast year-on-year change in consumer prices. The Defendants contend that these figures are, if anything, underestimated, since a report on Prescription Drug Trends published by the Kaiser Family Foundation in September 2008 states that the US Department of Health and Human Services projects an average annual increase of 8.2% over the period from 2006 to 2017.

235  Ms Gutteridge did not take issue with Mr Bezant's growth rates. Mr Davies suggested a growth rate of 1.8% for 2008 and nil thereafter. In cross-examination his only real justification for this was caution. He also referred to the current recession, but did not appear to have taken into account the possibility that this might benefit the Turkish fulfilment business.

236  Accordingly, I accept Mr Bezant's figures for the growth rate.

**Risk factor for the future**

237  In projecting the lost profits which the Defendants' Turkish fulfilment business would have made but for the Injunctions, it is necessary to take account of the risks to which that business was subject. These include the risk of the Defendants' customers going out of business, the risk that one or more of those customers might transfer their business elsewhere and so on. It is common ground that it is appropriate to allow for this by applying an annual percentage risk factor to the calculation of future profits, representing the risk that the business would come to an end within that year.

238  Mr Bezant considered that the appropriate risk factor to be applied for the future was 10% per annum. He explained in cross-examination that this was not arrived at as a matter of accountancy practice, but through the exercise of professional judgment. He

accepted that a higher risk factor might be appropriate, but not as high as 20% per annum.

239  Ms Gutteridge suggested that a risk factor of 20-25% was appropriate based on a list of risks set out in her first report. She was cross-examined at some length both on the individual risks she had taken into account and on the headline figure. In my judgment, the cross-examination demonstrated that she had over-estimated a number of the risks. By way of example, I consider that she overestimated the risks due to the absence of a written contract, illegality under US law (as to which see below) and competition in Turkey. She also looked at the matter from the perspective of a buyer of the business, whereas the Defendants were not intending to sell it.

240  Nevertheless, considering the evidence as a whole, I think that considerable caution as to the future of the business is required. This is not a business which had been established for a long period of time. Moreover, it was not operating in a well-established market sector. On the contrary, it had been established for a relatively short period of time and was operating in a fairly young and dynamic sector. Furthermore, the business was dependent on one customer for 88% of its business, and as noted above the relationship with that customer was a fragile one in the sense that the customer could decide to go elsewhere at any time. As stated above, I think it is also appropriate to take into account the risk that, even if the business continued, its profitability would decline. Accordingly, I consider that the appropriate risk factor for the future is 20% per annum.

**Risk factor for the period from 23 November 2007 to date**

241  Mr Bezant was instructed to assume that the Defendants business would have continued down to the date of his report. In his first report, he took this to be 31 December 2008 for convenience. In his second and third reports, he took it to be 31 March 2009. He therefore did not apply any risk factor for the period from 23 November 2007 until then. Mr Bezant was cross-examined on this assumption, and it was evident that he was uncomfortable with it. As counsel for the Claimants pointed out, it amounts to treating the risk that the business would have ceased prior to the trial as a question of fact to be evaluated on the balance of probabilities (i.e. applying the approach laid down in

Hotson v East Berkshire Area Health Authority [1987] 1 AC 750 ); but treating the risk that the business would cease in the future as a contingency to be reflected in the quantum of compensation. This is inconsistent and over-compensates the Defendants.

242    Ms Gutteridge's approach was to take 23 November 2007 as the date of assessment and then apply the same risk factor both to the period from then until trial and to the period from trial onwards. As counsel for the Defendants pointed out, this involves shutting one's eyes to what has happened since 23 November 2007. There are also other problems with this approach: it involves applying a discount rate to this period and then adding interest back, and it has the effect of imposing exchange rate movement losses on the Defendants.

243    In my judgment neither approach is correct. As set out above, I consider that the correct approach is to assess the compensation with the benefit of hindsight. Hindsight is not available looking forward, and it is appropriate to reflect the contingencies to which the Defendants' business was subject by the application of a risk factor. With regard to the period from 23 November 2007 to date, however, the Court does have the advantage of hindsight. As a result, it is now known that some of the contingencies did not materialise during that period. In particular, CanadaDrugs did not itself go out of business. On other hand, it is not known whether other contingencies would have materialised or not.

244    Accordingly, I conclude that a lower risk factor should be applied to the period from 23 November 2007 to date. In my judgment a risk factor of 10% is appropriate for this period.

## Discount rate

245    In addition to applying a risk factor, it is necessary to calculate the net present value of the future income stream so as to make allowance for the advantage of accelerated receipt. It was common ground between the experts that it was appropriate to do this by means of a discounted cash flow (DCF) analysis. Mr Bezant used a discount rate of 15% in his DCF analysis. The Claimants did not in the end dispute the appropriateness of this rate.

## Conclusion on lost profits

246    For the reasons given above, I conclude that the quantum of the Defendants' loss is represented by the sterling equivalent of a figure which is to be calculated by taking the profit calculated using Mr Bezant's figures for the profit margin for the base period of the year to 23 September 2007, applying growth rates of 4% and 1.9%, a discount rate of 15% and risk factors of 10% for the period from 23 November 2007 to the date of this judgment and 20% thereafter. I invite the parties to try to agree this calculation.

## Other losses claimed

247    The principal other head of loss claimed is for the losses on RDA's stock at the time of the Injunctions. RDA has subsequently been able to sell some of this stock wholesale, but has been left with a considerable proportion which it has been unable to sell. The Defendants claim the sterling equivalent of US$455,159.87. Apart from the matters I have already considered, the only real challenge to this claim by the Claimants is that to allow it in addition to the lost profits claim would amount to double recovery. I disagree: this head of loss arises out of the fact that the Defendants' Turkish fulfilment business was stopped dead in its tracks by the Injunctions rather than being wound down in an orderly manner. I find this loss proved.

248    Finally, the Defendants claim the sum of £4,000 for making RDA's employees redundant. Again I find this loss proved.

## Interest

249    The Defendants claim interest on any sums awarded. I do not understand there to be any dispute that in principle the Defendants are entitled to interest. I invite the parties to try to agree the calculation of interest.

## Public policy

250  The Claimants contend that any loss suffered by the Defendants is irrecoverable as a matter of law on public policy grounds. The basis for this contention is that the importation of pharmaceutical products such as those traded in by the Defendants into the USA is illegal under US law.

**US law, policy and practice**

251  I received expert evidence as to US law from Erika Lietzan, a partner in the Washington DC office of Covington & Burling LLP. The Defendants served a report from Robert Pinco, senior counsel at Buchanan Ingersoll & Rooney PC, but did not in the end call Mr Pinco to give evidence. I do not intend any personal criticism of either expert, but I have to say that in my view the cost of this evidence must have been grossly disproportionate. Both experts served substantial reports. Ms Lietzan's first report ran to 151 paragraphs with 267 footnotes and was accompanied by four schedules containing a further 114 paragraphs and 85 exhibits. Even though his differences from Ms Lietzan were only on certain points of detail and emphasis, Mr Pinco's report ran to 58 paragraphs with 55 footnotes accompanied by 17 exhibits. Mr Lietzan's second report in reply to Mr Pinco ran to 42 paragraphs with 54 footnotes and was accompanied by a further 24 exhibits. Yet the key point, which I have set out in the preceding paragraphs, has at all times been common ground between the parties. For a time the Claimants contended that the Defendants themselves were guilty of an offence under US law, but it appears that this was due to a misunderstanding as to the nature of the Defendants' contractual arrangements with CanadaDrugs: as she explained in cross-examination, Ms Lietzan had not researched, or considered in her reports, the question of the extra-territorial effect of US law. As I understand it, the Claimants did not in the end pursue this contention; [1] but it was not necessary to their case on public policy anyway. The principal difference between the parties was with regard to enforcement policy and practice; but this difference was not important to the Claimants' case either. In the circumstances, I shall deal with the relevant US law quite shortly. I shall concentrate on the position under Federal law, although Ms Lietzan explained that State law was relevant as well.

252  Before doing so, however, I should deal with the submission of counsel for the Defendants that Ms Lietzan's evidence should be treated with caution. The bases for this submission was that she had worked for PhRMA, a lobbying organisation for pharmaceutical companies, from 2003 to 2005 and that she was personally opposed to the importation of pharmaceuticals into the US. I am satisfied that she did not allow either of these factors to affect the discharge of her duty to the court as an expert witness.

253  The principal relevant statute is the Federal Food, Drug and Cosmetic Act ("FFDCA"), Chapter 9 of Title 21 of the United States Code . The US Food and Drug Administration ("the FDA") has primary responsibility for implementing and enforcing the FFDCA, although the bringing of proceedings is the province of the Department of Justice. US Customs and Border Protection ("CBP") has primary responsibility for administering federal laws relating to import, export and duties. The FDA is responsible for determining whether a drug offered for importation into the USA complies with the FFDCA. CBP is responsible for examining all imported merchandise, including merchandise imported by mail. The FDA and CBP have a co-operative relationship.

254  Under the FFDCA, no new drug may be marketed in the USA unless it has been approved by the FDA under either a New Drug Application ("NDA") or an Abbreviated New Drug Application ("ANDA"). The USA does not recognise drug approvals by any other country as an equivalent to, or an acceptable substitute for, approval by the FDA. FDA approval only permits the marketing of a product which is manufactured according to the specifications, under the controls and in the facilities specified in the NDA and which is labelled and packaged in accordance with the NDA. Even if it is manufactured by the same manufacturer, a drug which has been approved by a foreign regulator is highly unlikely to conform in all respects to the terms of the NDA. In general, therefore, the importation of a drug into the USA will contravene the FFDCA either because it qualifies as a "new drug" and has not been approved for marketing in the USA or because it does not bear FDA-approved labelling. It is immaterial for these purposes that the drug is imported into the USA for personal use or that it is sent to the USA by mail. Accordingly, it is the FDA's consistent position that

Lilly Icos LLC v 8PM Chemists Ltd, 2009 WL 2392200 (2009)

the importation into the USA of drugs purchased from CIPs for personal use violates the FFDCA even if the patient has a valid US prescription.

255   The FDA does have a policy not to enforce the FFDCA with regard to personal importation in certain limited circumstances. The FDA's Regulatory Procedures Manual states in Chapter 9 Import Operations and Actions:

> **"General Guidance**
>
> The statements in this chapter are intended only to provide operating guidance for FDA personnel and are not intended to create or confer any rights, privileges, or benefits on or for any private person.
>
> FDA personnel may use their discretion to allow entry of shipments of violative FDA regulated products when the quantity and purpose are clearly for personal use, and the product does not present an unreasonable risk to the user. Even though all products that appear to be in violation of statutes administered by FDA are subject to refusal, FDA personnel may use their discretion to examine the background, risk and purpose of the product before making a final decision. Although FDA may use discretion to allow admission of certain violative items, this should *not* be interpreted as a license to individuals to bring in such shipments.
>
> …
>
> **Drugs, Biologics and Devices**
>
> When personal shipments of drugs and devices that appear violative are brought to FDA's attention by CBP. FDA personnel will use their discretion to decide on a case by case basis whether to detain, refuse or allow entry of the product. Generally, drugs and devices subject to Import Alerts are not amenable to this procedure. Devices to be used by practitioners for treating patients should not be viewed as personal importations subject to this chapter. Drugs subject to Drug Enforcement Agency (DEA) jurisdiction should be returned to CBP for handling.
>
> In deciding whether to exercise discretion to allow personal shipments of drugs or devices, FDA personnel may consider a more permissive policy in the following situations:
>
> • 1.    when the intended use is appropriately identified, such use is not for treatment of a serious conditions, and the product is not known to represent a significant health risk; and
> • 2.    when a) the intended use is unapproved and for a serious condition for which effective treatment may not be available domestically either through commercial or clinical means;   b) there is no known commercialization or promotion to persons residing in the U.S. by those involved in the distribution of the product at issue; c) the product is considered not to represent an unreasonable risk; and d) the individual seeking to import the product affirms in writing that it is for the patient's own use (generally not more than 3 month supply) and

provides the name and address of the doctor licensed in the U.S. responsible for his or her treatment with the product, or provides evidence that the product is for the continuation of treatment begun in a foreign country."

256   Ms Lietzan's evidence was that importation of drugs such as those in issue in the present proceedings would not be covered by this policy. It is clear, however, that both the FDA and CBP have to decide how to allocate their resources. Furthermore, they are also subject to political pressures. The practical effects of these factors can be clearly seen from what happened during the period from November 2005 to October 2006. Starting in November 2005, CBP began systematically seizing foreign drugs that were being shipped to the USA by international mail. This led to CBP seizing some 40,000 packages. This policy was hugely unpopular. As a result, the Senate Committee on Homeland Security and Government Affairs investigated the matter and Senators Bill Nelson (Democrat, Florida) and David Vitter (Republican, Louisiana) sponsored legislation to stop CBP's seizures. Their Bill passed the Senate, but did not become law. In addition, however, they put direct political pressure on CBP. As a result, CBP stopped seizing small packages of drugs sent by mail. CBP's change of practice was announced by a press spokeswoman, but CBP did not formally change its policy with regard to the importation of drugs. In addition, the FDA was reported as having assured Senator Nelson that the FDA would not take action over such shipments, although again the FDA did not formally change its policy.

257   The upshot is the importation of drugs into the USA is generally illegal, and the responsible US agencies do not have a formal policy not to enforce the law in respect of personal importation by mail of drugs purchased from CIPs, but nevertheless in practice they choose to allocate their resources to other priorities.

258   It is neither necessary nor profitable to speculate as what legislative changes, if any, may be enacted by the US Congress in the future.

259   Finally, there is no evidence that the high price of branded pharmaceuticals in the USA is due to the relevant provisions of the FFDCA, as opposed to other factors, and in particular the fact that the products are generally protected by patents.

**English law**

260   The Latin maxim *ex turpi causa non oritur actio* (no action can arise from an illegal or immoral act) encapsulates a public policy which English law gives effect to in different ways in different situations. Since there is no over-arching principle of universal validity in all contexts, it is necessary to identify the principle or principles applicable to the situation at hand.

**261 Contract**

The effect of illegality under English law on the enforceability of a contract was stated by Devlin Lj (as he then was) in Archbolds (Freightage) Ltd v S Spanglett Ltd [1961] 1 Qb 374 at 388 as follows:

"The effect of illegality on a contract may be threefold. If at the time of making the contract there is an intent to perform it in an unlawful way, the contract, although it remains alive, is unenforceable at the suit of the party having that intent; if the intent is held in common, it is not enforceable at all. Another effect of illegality is to prevent a plaintiff from recovering under a contract if in order to prove his rights under it he has to rely on his own illegal act; he may not do that even though he can show that at the time of making the contract he had no intent to break the law and that at the time of performance he did not know that what he was doing was illegal. The third effect of illegality is to avoid the contract ab initio, and that arises if the making of the contract

is expressly or impliedly prohibited by statute or is otherwise contrary to public policy."

262    The effect of illegality under foreign law on the enforceability of a contract was stated by Robert Walker LJ (as then was) in Ispahani v Bank Melli Iran [1998] Lloyd's Rep Bank 133 at 136-137 as follows:

> "There are two associated principles. One is that where a contract is to be performed in a country where its performance is unlawful by the law of that country ( *lex loci solutionis* ), it will not be enforced by the English court. This principle is often identified with the well-known decision of this court in Ralli Brothers v Compania Naviera [1920] 2 KB 287 , which was a case of supervening illegality. But the same (or a closely similar) principle applies to existing illegality: see Robert Goff J. in Toprak Mahsulleri v Finagrain [1979] 2 Lloyd's Rep 98, 107, approved by the Court of Appeal [1979] 2 Lloyd's Rep 112 , 117. In this context 'performance' does not mean any activity required or contemplated by the contract; it has a relatively narrow and technical meaning (see Dicey & Morris, *Conflict of Laws* , 12th ed, pp. 357-363).

The other principle was stated as follows by Sankey LJ in Foster v Driscoll [1929] 1 KB 470 , 521-522:

> 'An English contract should and will be held invalid on account of illegality if the real object and intention of the parties necessitates them joining in an endeavour to perform in a foreign and friendly country some act which is illegal by the law of such country notwithstanding the fact that there may be, in a certain event, alternative modes or places of performing which permit the contract to be performed legally.'

Foster v Driscoll was the 'bootlegging' case in which, during prohibition, a group of persons in England and Scotland planned to ship 7,500 cases of whisky to North America, and hoped to make extraordinary profits. But they fell out and resorted to litigation between themselves.

In Toprak Robert Goff J. set out the above passage from Sankey LJ's judgment and analysed how it has been accepted as the relevant principle by the Court of Appeal and the majority of the House of

Lords in another very well-known case, Regazzoni v Sethia [1958] AC 301 . That case concerned a contract governed by English law for the sale of jute bags which were to be manufactured in India (although that was not a term of the contract). Both the seller and the buyer knew that the bags, although shipped c.i.f. Genoa, were intended to be resold to the Union of South Africa, contrary to an embargo which had the force of law in India. There was no evidence that the Indian shipper knew the intended ultimate destination."

263   As counsel for the Claimants emphasised, both the principles discussed by Robert Walker LJ are underpinned by the principle of international comity, that is to say, respect for the laws and courts of other nations. Thus in Ralli Brothers v Compañia Naviera sota y Aznar [1920] 2 KB 287 at 304 Scrutton LJ said:

"This country should not in my opinion assist or sanction the breach of the laws of other independent States."

In Foster v Driscoll [1929] 1KB 470 at 510 Lawrence LJ said:

"The ground upon which I rest my judgment that [a partnership formed for the main purpose of deriving profit from the commission of a criminal offence in a foreign and friendly country] is illegal is that its recognition by our Courts would furnish a just cause for complaint by the United States Government against our government (of which the partners are subjects)", and would be contrary to our obligation

of international comity as now understood and recognised, and therefore would offend against our notions of public morality."

In Regazzoni v K.C. Sethia (1944) Ltd [1958] AC 301 at 318-319 Viscount Simonds said:

"It is … nothing else than comity which has influenced our courts to refuse as a matter of public policy to enforce, or to award damage for the breach of, a contract which involves the violation of foreign law on foreign soil, and it is the limits of this principle that we have to examine.

…

Just as public policy avoids contracts which offend against our own law, so it will avoid at least some contracts which violate the laws of a foreign state, and it will do so because public policy demands that deference to international comity."

Similarly Lord Keith of Avonholm said at 327:

"In the present case I see no escape from the view that to recognise the contract between the appellant and the respondent as enforceable contract would give a just cause for complaint by the Government of India and should be regarded as contrary to conceptions of international comity."

264  It should be noted that, despite being underpinned by considerations of international comity, both principles have a limit which was stated by Robert Walker LJ in Ispahani at 139-140 as follows:

> "However, the absence of a reported decision clearly demonstrating the point ought not in my view to deter this court from affirming that the carrying out of prohibited acts within the territory in question is an essential and necessary element of the principle stated by Sankey LJ in Foster v Driscoll [1929] 1 KB 470 , 521, and approved by the House of Lords in Regazzoni v Sethia [1958] A.C. 301 . Apart from the formidable weight of judicial opinion behind that formulation of the principle, there are to my mind two compelling reasons against regarding as irrelevant the place where the prohibited acts are carried out. One reason is that international comity is naturally much readier to accept that a country's laws ought to be obeyed within its own territory, than to recognise them as having extraterritorial effect. The other reason is that the Ralli Brothers principle, although now regarded as a distinct principle, grows from the same rootstock. In the Ralli Brothers line of authority it is clear beyond argument that it must be the law of the place of performance that prohibits the act of performance. For that I need refer only to Kleinwort Brothers v Ungarische Baumwolle Industrie [1939] 2 KB 678 , in which MacKinnon LJ (at p.694) regarded the alternative as leading to preposterous results."

265  This limit in itself would not be an answer to the Claimants' case, since as noted above the Claimants do not rely upon any extra-territorial effect of US law. Instead, the Claimants rely upon the fact that the Defendants' knowledge that (i) the object of the Turkish fulfilment business was to supply drugs to patients in the USA and (ii) importation of pharmaceuticals into the USA is generally illegal under US law. Nevertheless, the existence of this limit demonstrates that international comity cannot be pressed too far.

266  A more fundamental limit of both the Ralli Brothers principle and the Foster principle is that they only apply to claims to enforce a contract. Since the Defendants are not seeking to enforce any contract, bur rather an undertaking to the court enforceable in equity, it follows that neither principle applies to the present case. Counsel for the Claimants accepted this.

### 267 Tort

There is no doubt that a defence of *ex turpi causa* can apply to a claim in tort in appropriate circumstances. Thus in the recent case of Gray v Thames Trains Ltd [2009] UKHL 33, [2009] 3 WLR 167 the claimant had killed, and been convicted of the manslaughter of, another person while suffering from post-traumatic stress disorder as a result of the defendants' negligence. The House of Lords held that the claimant's claim for loss of earnings would be precluded on the narrow basis that a person cannot recover for damage which is the consequence of a sentence imposed on him for a criminal act, but went on to hold that, not only the claim for loss of earnings, but also claims for general damages and for an indemnity against claims by the deceased's dependents were precluded by a wider rule that a person cannot recover for damage which is the consequence of his own criminal act.

268  Lord Hoffmann, with whom Lord Phillips of Worth Matravers and Lord Scott of Foscote agreed, analysed the wider rule as follows:

> "52. The wider principle was applied by the Court of Appeal in Vellino v Chief Constable of the Greater Manchester Police [2002] 1 WLR 218 . The claimant was injured in consequence of jumping from a

second-floor window to escape from the custody of the police. He sued the police for damages, claiming that they had not taken reasonable care to prevent him from escaping. Attempting to escape from lawful custody is a criminal offence. The Court of Appeal (Schiemann LJ and Sir Murray Stuart-Smith; Sedley LJ dissenting) held that, assuming the police to have been negligent, recovery was precluded because the injury was the consequence of the plaintiff's unlawful act.

53. This decision seems to me based upon sound common sense. The question, as suggested in the dissenting judgment of Sedley LJ, is how the case should be distinguished from one in which the injury is a consequence of the plaintiff's unlawful act only in the sense that it would not have happened if he had not been committing an unlawful act. An extreme example would be the car which is damaged while unlawfully parked. Sir Murray Stuart-Smith, at para 70, described the distinction:

'The operation of the principle arises where the claimant's claim is founded upon his own criminal or immoral act. The facts which give rise to the claim must be inextricably linked with the criminal activity. It is

not sufficient if the criminal activity merely gives occasion for tortious conduct of the defendant.'

54. This distinction, between causing something and merely providing the occasion for someone else to cause something, is one with which we are very familiar in the law of torts. It is the same principle by which the law normally holds that even though damage would not have occurred but for a tortious act, the defendant is not liable if the immediate cause was the deliberate act of another individual. Examples of cases falling on one side of the line or the other are given in the judgment of Judge LJ in Cross v Kirkby [2000] CA Transcript No 321 . It was Judge LJ, at para 103, who formulated the test of "inextricably linked" which was afterwards adopted by Sir Murray Stuart-Smith LJ in Vellino v Chief Constable of the Greater Manchester Police [2002] 1 WLR 218 . Other expressions which he approved, at paras 100 and 104, were 'an integral part or a necessarily direct consequence' of the unlawful act (Rougier J: see Revill v Newbery [1996] QB 567 , 571) and 'arises directly *ex turpi causa* ' (Bingham LJ in Saunders v Edwards [1987] 1 WLR 1116 , 1134.) It might be better to avoid metaphors like 'inextricably linked' or 'integral part' and to treat the question as simply one of causation. Can one say that, although the damage would not have happened

but for the tortious conduct of the defendant, it was caused by the criminal act of the claimant? ( Vellino v Chief Constable of the Greater Manchester Police [2002] 1 WLR 218 ). Or is the position that although the damage would not have happened without the criminal act of the claimant, it was caused by the tortious act of the defendant? ( Revill v Newbery [1996] QB 567 ).”

269   In Hewison v Meridian Shipping Services PTE Ltd [2002] EWCA 1821, [2003] ICR 766 the claimant was employed by the defendants as a merchant seaman even though he suffered from epilepsy and regularly took anti-convulsive drugs. He knew that his condition debarred him from employment as a seaman, and repeatedly falsely denied suffering from fits and failed to disclose his medication when answering medical questionnaires. He was seriously injured as a result of the defendants' negligence and breach of statutory duty. Although he returned to work, he suffered a fit which led to the defendants discovering his condition and dismissing him. The majority of the Court of Appeal held that his claim for loss of earnings calculated on the basis that he would have worked as a seaman until the normal retiring age, although not other heads of damage claimed, was precluded by public policy since the claimant could only have earned the sums claimed by continuing to deceive his employer and thereby committing the offence of obtaining a pecuniary advantage by deception contrary to section 16 of the Theft Act 1968 .

270  Clarke LJ, with whom Tuckey LJ agreed, stated the relevant principles as follows:

> “28.   … It is common ground that there are cases in which public policy will prevent a claimant from recovering the whole of the damages which, but for the rule of public policy, he would otherwise have recovered. The principle can perhaps be stated as a variation

of the maxim so that it reads *ex turpi causa non oritur damnum* , where the *damnum* is the loss which would have been recovered but for the relevant illegal or immoral act. A classic example is the principle that a person who makes his living from burglary cannot have damages assessed on the basis of what he would have earned from burglary but for the defendant's negligence.

29.   To my mind the authorities support that approach. They seem to me to support the proposition that where a claimant has to rely upon his or her own unlawful act in order to establish the whole or part of his or her claim the claim will fail either wholly or in part. In the present context the principle can be seen from the decision of this court in Hunter v Butler [1996] RTR 396 , although it has to be said that the case does give rise to some difficulties of interpretation.

…

33.   … The principle applied by Hobhouse LJ is, as I see it, that stated at p 405B, namely: ‘If a plaintiff comes to court and asserts as part of her case that she would have committed criminal acts and bases her claim on such an assertion she cannot recover in a court of law on that basis.’ That appears to me to be substantially the same test as that adopted in the *ex turpi causa non oritur actio* cases, as stated in the passage from the judgment of Beldam LJ in the Clunis case [1998] QB 978 , 986–987 quoted above.

34. I am not sure whether it is quite the same principle as that applied by Waite LJ but it does not seem to me necessary to consider that question further because, since Hirst LJ agreed with the judgment of Hobhouse LJ and since the principle just stated is part of the ratio decidendi of Hunter v Butler , we are bound to follow it

…

36. … In my opinion Hobhouse LJ must have had in mind a case where the claimant bases his or her claim upon his or her unlawful act in a substantial way. It is not, however, in my opinion sufficient that he or she has been party to some collateral or insignificant illegality or unlawful act. Thus, as Kemp & Kemp (2000) put it in para 13–080, a claimant is entitled to be compensated for his loss of earnings even though he had in the past failed to disclose them to the Inland Revenue: see Duller v South East Lincs Engineers [1981] CLY 577, a decision of Mr Edwin Jowett QC on 2 May 1980 ."

271  It is not clear whether the principles applied in Gray v Thames and in Hewison v Meridian apply where the acts in question are unlawful because they are criminal offences under foreign law, but the principle of international comity suggests that they should.

272  Counsel for the Claimants accepted that the principles applied by the House of Lords in Gray v Thames were not applicable to the present case. He submitted that the principle applied by the majority of the Court of Appeal in Hewison v Meridian was applicable even though the Defendants are not claiming that the Claimants are liable for any tort.

Before expressing a conclusion on this submission, it is convenient first to deal with two other points.

**273 A broader principle?**

Counsel for the Claimants argued that the principles applied in the contract and tort cases were merely instances of a broader principle, namely that the Court will not order a defendant to compensate a claimant for loss, or a head of loss, which arises out of the claimant's own involvement in an illegal activity whether under English law or foreign law. In my judgment, there is no such broader principle. My reasons are as follows.

274  First, as counsel for the Claimants accepted in argument and as the decision in Hewison v Meridian confirms, recovery is not precluded where the illegal activity is "incidental" (to use counsel's word) or "collateral or insignificant" (to use the language of Clarke LJ) to the claim or the head of loss. In my view, this concession undermines the very existence of the broader principle, since it shows that it is not enough that the loss "arises out of" the claimant's "involvement" in illegal activity. More is required.

275  Secondly, the existence of the broader principle is contradicted by the limits of the narrower principles applied in the cases discussed above. In the realm of contract, the three principles identified by Devlin LJ in Archbolds each have clear limits. Thus in an earlier decision in St John Shipping Corp v Joseph [1957] 1 QB 267 Devlin J (as he then was) held that the defendant cargo-owners were liable for freight due to the plaintiff shipowners even though the shipowners had been convicted of an offence under sections 44 and 57 of the Merchant Shipping Act 1932 as result of the ship being overloaded on the voyage in question. The cargo-owners' arguments that the contract was illegal because it was performed in an illegal manner, that the shipowners could not rely upon their own illegal act and that the shipowners could not enforce rights which resulted from their crime were all rejected. In Archbolds itself, the Court of Appeal held that the plaintiffs were entitled to recover damages for the loss of 200 cases of whisky stolen due to the negligence of the defendants' van driver notwithstanding that, unbeknownst to the plaintiffs, the defendants' carriage of the goods was illegal since the defendants did not have the requisite licence under the Road and Rail Traffic Act 1933 .

WESTLAW    © 2017 Thomson Reuters.

Similarly, the Foster principle is limited in the way identified by Robert Walker LJ.

276    Thirdly and perhaps most importantly, the existence of the broader principle is contradicted by the decision of the House of Lords in Tinsley v Milligan [1994] 1 AC 340 . In that case the majority held that a claimant to a interest in property, whether based on a legal or equitable title, was entitled to recover if he was not forced to plead or rely on an illegality, even though it transpired that the title on which he relied was acquired in the course of an illegal transaction or for an illegal purpose.

277  The leading speech for the majority view was given by Lord Browne-Wilkinson. He set out the position with regard to legal rights at 369-370:

> "The position at law is well illustrated by the decision in Bowmakers Ltd. v. Barnet Instruments Ltd. [1945] K.B. 65 . In that case Barnet acquired three parcels of machine tools which had previously belonged to Smith. The transaction was carried through by three hire-purchase agreements under which Smith sold the goods to Bowmakers who then hired them to Barnet. All three agreements were unlawful as being in breach of Defence Regulations : it is important to note that in the case of at least two of the parcels the illegality lay in the contract under which Bowmakers acquired the machine tools from Smith: see p. 69. Bowmakers succeeded in an action for conversion against Barnet. Even though it appeared from the pleadings and the evidence that the contract under which Bowmakers acquired the goods was illegal, such contract was effective to pass the property in the goods to Bowmakers who could therefore found their claim on the property right so acquired.

The position at law is further illustrated by Ferret v. Hill (1854) 15 C.B. 207 where A, with intent to use premises as a brothel, took a lease from B. B, having discovered that the premises were being used as a brothel, ejected A. A was held entitled to maintain ejectment against B notwithstanding that A entered into the lease for an illegal purpose.

In Taylor v. Chester, L.R. 4 Q.B. 309 the plaintiff had deposited with the defendant half a £50 note as security for payment due under an illegal contract with the defendant. The plaintiff was held unable to recover the half note as a special property in it (i.e. the security interest) had passed to the defendant.

In Alexander v. Rayson [1936] 1 K.B. 169 the plaintiff had leased a property to the defendant. For the purpose of defrauding the rating authorities, the plaintiff had carried through the transaction by two documents, one a lease which expressed a low rent the other a service agreement providing for additional payments sufficient to bring up the annual payment to the actual rent agreed. The plaintiff failed in an action to recover rent due under the agreements but the Court of Appeal, at p. 186, said that if the plaintiff had let the flat to be used for an illegal purpose, the leasehold interest in the flat would have vested in the defendant who would have been entitled to remain in possession of the flat until and unless the plaintiff could eject her without relying on the unlawful agreement.

From these authorities the following
propositions emerge: (1) property
in chattels and land can pass
under a contract which is illegal
and therefore would have been
unenforceable as a contract; (2) a
plaintiff can at law enforce property
rights so acquired provided that he
does not need to rely on the illegal
contract for any purpose other than
providing the basis of his claim to
a property right; (3) it is irrelevant
that the illegality of the underlying
agreement was either pleaded or
emerged in evidence: if the plaintiff
has acquired legal title under the
illegal contract that is enough."

278    Lord Browne-Wilkinson then proceeded to
consider the position in equity. At 372-373 he noted
that early authorities, notably certain decisions by Lord
Eldon, supported the proposition that equity would not
aid a plaintiff who had transferred property to another
for an illegal purpose. At 373-375 he considered later
authorities which departed from Lord Eldon's rule. At
375-376 he concluded:

"In my judgment, the explanation
for this departure from Lord Eldon's
absolute rule is that the fusion of
law and equity has led the courts
to adopt a single rule (applicable
both at law and in equity) as
to the circumstances in which the
court will enforce property interests
acquired in pursuance of an illegal
transaction, viz., the Bowmakers
rule [1945] K.B. 65 . A party to
an illegality can recover by virtue
of a legal or equitable property
interest if, but only if, he can
establish his title without relying on
his own illegality. In cases where
the presumption of advancement

applies, the plaintiff is faced with the
presumption of gift and therefore
cannot claim under a resulting trust
unless and until he has rebutted
that presumption of gift: for those
purposes the plaintiff does have to
rely on the underlying illegality and
therefore fails.

The position is well illustrated by
two decisions in the Privy Council.
In the first, Singh v. Ali [1960] A.C.
167 a plaintiff who had acquired
legal title to a lorry under an
illegal transaction was held entitled
to succeed against the other party
to the illegality in detinue and
trespass. The Board approved the
Bowmakers test. Two years later in
Palaniappa Chettiar v. Arunasalam
Chettiar [1962] A.C. 294 the Board
had to consider the case where a
father, who had transferred land to
his son for an illegal purpose, sought
to recover it under a resulting trust.
It was held that he could not, since
he had to rely on his illegal purpose
in order to rebut the presumption of
advancement.

…

In my judgment these two cases
show that the Privy Council was
applying exactly the same principle
in both cases although in one case
the plaintiff's claim rested on a
legal title and in the other on an
equitable title. The claim based on
the equitable title did not fail simply
because the plaintiff was a party to
the illegal transaction; it only failed
because the plaintiff was bound to
disclose and rely upon his own
illegal purpose in order to rebut the
presumption of advancement. The

Privy Council was plainly treating the principle applicable both at law and in equity as being that a man can recover property provided that he is not forced to rely on his own illegality."

279 At 376-377 Lord Browne-Wilkinson added a final point which is of some importance (emphasis added):

"Finally, I should mention a further point which is relied on by Miss Tinsley. It is said that once the illegality of the transaction emerges, the court must refuse to enforce the transaction and all claims under it whether pleaded or not: see Scott v. Brown, Doering, McNab & Co. [1892] 2 Q.B. 724 . Therefore, it is said, it does not matter whether a plaintiff relies on or gives evidence of the illegality: the court will not enforce the plaintiff's rights. In my judgment, this submission is plainly ill founded. There are many cases where a plaintiff has succeeded, notwithstanding that the illegality of the transaction under which she acquired the property has emerged: see, for example, Bowmakers Ltd. v. Barnet Instruments Ltd. [1945] K.B. 65 and Singh v. Ali [1960] A.C. 167 . In my judgment the court is only entitled and bound to dismiss a claim on the basis that it is founded on an illegality in those cases where the illegality is of a kind which would have provided a good defence if raised by the defendant. *In a case where the plaintiff is not seeking to enforce an unlawful contract but founds his case on collateral rights acquired under the contract ( such as a right of property ) the court is neither bound nor entitled to reject the claim*

*unless the illegality of necessity forms part of the plaintiff's case ."*

280 Counsel for the Claimants submitted that the basis for the decision in Tinsley v Milligan was that legal or equitable property rights passing under illegal contracts lie where they fall. I am not convinced by this reading of the case, since it fails to explain why the courts enforce such property rights, but not an illegal contract. In my view the explanation is that the property rights are not themselves illegal. Accordingly, the courts will enforce them. As the last sentence I have quoted from Lord Browne-Wilkinson's speech shows, the same applies to other collateral rights under an illegal contract. The position is different if the claimant has to rely upon his own illegality in order to establish his title to the property or other collateral right in the first place, just as it is different if the claimant is seeking to enforce an illegal contract or a contract which is to be performed illegally.

281 The principle applied by the majority of the Court of Appeal in Hewison v Meridian seems to me to be broadly consistent with this reading of Tinsley v Milligan : a claimant cannot recover a head of loss where he has to rely in a substantial way upon his own unlawful act to establish that loss. The essential difference between the majority and Ward LJ, who dissented, in that case was on the question of whether the claimant did have to rely upon his own unlawful act in order to establish his loss of earnings: compare the reasoning of Clarke LJ at [45](i)-(iii), (x)-(xi) and Tuckey LJ at [52] with that of Ward LJ at [83] and [88].

**282 Recovery under a cross-undertaking**

So far as counsel's researches went, the question of the impact of illegality on a claim under a cross-undertaking has only arisen for consideration in one case, namely Columbia v Robinson . In that case Scott J (as he then was) found that the defendants had infringed the plaintiffs' copyrights by reproducing pirate video tapes of films (and had committed passing off and trade mark infringement). He nevertheless held that the plaintiffs had seriously failed to comply with their duty of full and frank disclosure when obtaining a combined

*Anton Piller* order and *Mareva* injunction, and that the *Anton Piller* order had been executed in an oppressive manner.

283  On the defendants' application for an inquiry as to damages under the cross-undertaking, Scott J held as follows:

> "The defendants seek damages under the cross-undertaking given by the plaintiffs. In view of my findings as to the manner in which the order was obtained and executed, the defendants are, in my judgment, prima facie entitled to damages. The problem is quantum.

> Damages for breach of a cross-undertaking ought, in my judgment, to be primarily compensatory. But I do not think, in the present case, that is the whole of the basis on which damages can be granted. It is well settled that an increased level of damages, sometimes described as aggravated damages, can be awarded where trespass to land or trespass to goods has been accompanied by circumstances of contumely or affront: see *McGregor on Damages*, 14th ed. (1980), paras. 1082 and 1127. That has been so in the present case by reason, in my judgment, of the excessive and oppressive manner in which the *Anton Piller* order was executed. …

> I have given thought to whether I should order an inquiry as to damages in order that the damage done by the order to the defendants' businesses at 8, Frederick Street and at the Mill Street shop may be properly assessed. I have concluded that I ought not to order an inquiry as to damages for the following reasons.

First, the compensatory element of any damages should compensate the defendants for damage to their legitimate interests. They cannot expect to be compensated for damage to the illicit part of the businesses carried on at the Mill Street shop and at 8, Frederick Street.

The stock of video tapes at the Mill Street shop was, as I have concluded from the evidence in this case, composed largely of pirate tapes. It is true that a substantial number of the tapes were not copies of films in which any of the plaintiffs is entitled to copyright or an exclusive licence. Nonetheless, to the extent that the tapes were pirate tapes, they belonged, under section 18 of the Copyright Act 1956 , to the owners of the copyright. Further, every sale of every video tape from the Mill Street shop of which evidence has been given in this case seems to have been the sale of a pirate tape. The prospect of an inquiry as to the damage caused by the *Anton Piller* order to such a business brings to my mind the application by the highwayman against his partner for an account. The court would not countenance that application and I do not think I should countenance an inquiry into the damage caused by the order to the business of the Mill Street shop. Mr. Robinson will not of course suffer the fate of the highwayman, nor will Mr. Beveridge suffer the fate of his counsel.

As to the business carried on from 8, Frederick Street, I find it easy to accept that the business was,

WESTLAW  © 2017 Thomson Reuters.

in part, legitimate although, as I have found, in part concerned with the reproduction of tapes in flagrant breach of copyright. But so far as the legitimate side of the business is concerned, it was, in my view, for a time carried on by Mr. Wickenden. I was presented in evidence by Mr. Robinson with a series of falsehoods regarding the business allegedly carried on by Mr. Wickenden. He was I think, no more than a front for Mr. Robinson. The business carried on at 8, Frederick Street after the execution of the *Anton Piller* order terminated in July 1983 or thereabouts on account of, first, the collapse of Centre Video Ltd. and, secondly, the floods which damaged the majority of the video machines. The cesser of that continued business was not attributable, directly at least, to the *Anton Piller* order or its aftermath. In view of these circumstances, and particularly in view of the false evidence given me by Mr. Robinson, I am not prepared to order an inquiry into the damage caused to the 8, Frederick Street business by the *Anton Piller* order.

I propose, therefore, to make an assessment here and now of the sum that the plaintiffs ought to pay the defendants under the cross-undertakings in damages. In spite of what I have said, there must be some compensatory element in the damages to be awarded. The combination of *Anton Piller* order and Mareva injunction made it impossible for the defendants to obtain credit. The retention by Hamlins of all the documents of the businesses made any continuity of business very difficult. There was a legitimate part, both of the

8, Frederick Street business and, perhaps to a very small extent, of the Mill Street shop business. The defendants' chance to continue on a small scale a legitimate business was impaired by the ex parte order being obtained and executed. In addition, this is, in my judgment, a case in which aggravated damages are justified.

I propose to order that damages of £10,000 be paid by the plaintiffs to the defendants under the cross-undertakings in damages. If it is relevant to split the sum between the defendants, I would allow £2,500 to the company and £7,500 to Mr. Robinson. This split recognises that contumely and affront affect individuals, not inanimate corporations. The damages are awarded against the plaintiffs jointly."

284 Counsel for the Claimants submitted that this decision demonstrated that the court would not order compensation for the loss of an illegal business under a cross-undertaking, and that by virtue of international comity it could not matter whether the illegality was in England or overseas. Counsel for the Defendants submitted that the decision was merely an exercise of the court's discretion not to enforce the cross-undertaking. To that counsel for the Claimants replied that, even if that was so, the result could not be different on an inquiry since the objection based on public policy was not a matter of discretion.

285 In my judgment counsel for the Defendants is correct that Scott J was exercising his discretion not to enforce the cross-undertaking by ordering an inquiry as to damages, but instead by making a summary award essentially to compensate the defendants for the wrongful obtaining and execution of the *Anton Piller* order. This can be seen particularly clearly

from his reasons in relation to the 8 Frederick Street business, which included the false evidence given by Mr Robinson.

286    Nevertheless, it remains necessary to analyse the basis on which Scott J exercised his discretion, particularly so far as the Mill Street business was concerned. In my view, the basis of the decision was that virtually the entire business at Mill Street was unlawful in that it consisted of the sale or rental of video tapes which were pirate tapes, that is, infringing copies of films the copyrights in which were owned either by the plaintiffs or by other copyright owners. As counsel for the Defendants pointed out, Scott J clearly regarded it as significant that, by virtue of section 18 of the 1956 Act, the pirate tapes belonged to the copyright owner and hence the defendants were guilty of conversion. It is difficult to believe that Scott J would have taken a different view of this had the *Anton Piller* order been set aside for material non-disclosure prior to trial and he had been hearing an inquiry under the cross-undertaking. This reading is supported by Scott J's reference to the notorious case of Everet v Williams (1725) 2 Pothier on Obligations, p. 3 (see *Lindley & Banks on* Partnership (18th ed) at 8-07 footnote 22), which was also referred to by Lawrence LJ in Foster v Driscoll at 511.

**287 Conclusion on the law**

Columbia v Robinson was, of course, decided before either Tinsley v Milligan or Hewison v Meridian . In my view, however, the three cases are consistent with each other if read in the manner suggested above. I therefore conclude that the court will not award compensation under a cross-undertaking for the loss sustained by an unlawful business or where the beneficiary of the cross-undertaking has to rely to a substantial extent upon his own illegality in order to establish the loss. As a matter of international comity, it does not matter for this purpose whether the acts in question are unlawful under English law or under foreign law.

**288 Application to the present case**

In my judgment the principle set out in the preceding paragraph does not apply to the Defendants' claim in the present case for the following reasons.

289    First, I do not regard the Defendants' business as an unlawful one. It is beyond dispute that it was lawful so far as English law is concerned. As to US law, as already stated the Claimants do not now contend that US law has extra-territorial effect so as to make the Defendants' acts in this country illegal. In my view, the fact that the Defendants' business resulted in illegal acts being committed by others in the USA is not sufficient to make that business itself unlawful.

290    Secondly, in my judgment the Defendants do not have to rely upon their own illegality in order to establish their loss, and certainly not in a substantial way. They simply rely upon (i) the purchase of pharmaceuticals in Turkey, (ii) importation of those products into the United Kingdom, transhipment and export under IPR and (iii) sale of the drugs to CanadaDrugs upon terms that title and risk passed at the point where Royal Mail collected the goods from 8PM. None of these acts were illegal. It is the Claimants who seek to rely upon the illegal acts of importation into the USA by others as an answer to the claim.

291    Thirdly, even if the Defendants' business is regarded as having depended upon the commission of illegal acts by others in the USA, by the date of the injunction it was an established business with a valuable goodwill. That business, and in particular the goodwill, was property which could have been sold to a third party. (Indeed, as already noted, Ms Gutteridge's approach to valuing the lost business was essentially to consider what would be paid for it by a purchaser.) The Defendants' claim is for the loss of that business, and thus may be viewed as a claim for the loss of that property. It is difficult to see why, following Tinsley v Milligan , that loss should be irrecoverable.

292    Finally, I should deal with the consequences of my findings that (i) since October 2006 the practice, if not the policy, of the FDA and CBP has not been to try to enforce the FFDCA against personal imports, and (ii) it has not been proved that the higher prices prevailing in the USA of which the Defendants were indirectly taking advantage are attributable to the relevant provisions of the FFDCA. In my judgment, neither of these findings would defeat the Claimants' public policy argument if it were otherwise applicable. If I had a discretion in the matter, I would exercise it in favour of the Defendants

for these reasons; but neither side contends that I do not have a discretion.

**Election, estoppel etc**

293  The Defendants also advance a series of affirmative defences to the Claimants' public policy argument. In view of my conclusion above, I shall deal with these relatively briefly.

294  First, the Defendants contend that the argument is precluded by the cross-undertaking when construed against the background matrix of fact in the present case. In my judgment, it is impossible to construe the cross-undertaking as precluding the Claimants' argument. In reality, the Defendants' contention is not that the argument is precluded by the wording of the undertaking, but that the surrounding circumstances preclude the Claimants from taking the point by virtue of election or estoppel etc.

295  Secondly, the Defendants contend that the Claimants elected not to argue before Mann J that there was no requirement for them to compensate the Defendants for any loss caused by the injunction and are bound by that election. I do not recognise that as an election either at common law or in equity, however.

296  Thirdly, the Defendants contend that the Claimants are estopped from raising illegality as a bar to the recovery of loss under the cross-undertaking. This is said to be an estoppel by convention, but I am not persuaded that there was any relevant common assumption at the hearing before Mann J. On the other hand, the Defendants' case under this head can be analysed as one of estoppel by representation.

297  In short, the Defendants say that:

• i)  Lilly expressly contended through the evidence of its witness Mr Longbottom and through the submissions of counsel that the importation of pharmaceuticals into the USA was illegal;
• ii)  Nevertheless, Lilly also expressly represented through the evidence of its witness Mr Longbottom and through the submissions of counsel that the Defendants could be adequately compensated by an award of damages under the cross-undertaking

if the injunction sought by Lilly was wrongly granted;
• iii)  Lilly did not suggest that recovery under the cross-undertaking would be barred as a consequence of the illegality, and accordingly impliedly represented that it would not be barred;
• iv)  The Defendants relied upon that implied representation by not arguing that a bar on recovery under cross-undertaking showed that the balance of convenience favoured refusal of the injunction;
• v)  Mann J relied upon that implied representation by holding, in particular at [77], that, to the extent that the Defendants' business was lost, "that is something that sounds in damages"; and
• vi)  By seeking similar injunctions following Mann J's judgment, having been present at the hearing, the other Claimants adopted the same position.

298  In my view, this argument has force. If necessary, I would accede to it. Nevertheless, it seems to me that the argument fits more comfortably under the next heading rather than attempting to shoehorn it into a case of estoppel by representation.

299  Fourthly, the Defendants rely upon the principle articulated by Sir Nicholas Browne-Wilkinson V-C (as he then was) in Express Newspapers plc v News (UK) Ltd [1990] 1 WLR 1320 at 1329:

> "There is a principle of law of general application that it is not possible to approbate and reprobate. That means you are not allowed to blow hot and cold in the attitude that you adopt. A man cannot adopt two inconsistent attitudes towards another: he must elect between them and, having elected to adopt one stance, cannot thereafter be permitted to go back and adopt and inconsistent stance."

In that case he applied this principle by holding that it was not open to the plaintiff to advance inconsistent

cases on the claim and counterclaim which to all intents and purposes were mirror images of each other.

300   In my judgment this principle is applicable to the present situation. Lilly persuaded Mann J to grant an interim injunction on the basis that the damage to the Defendants' business could be adequately compensated by an award under the cross-undertaking even though Lilly was contending that importation into the USA was illegal. The other Claimants subsequently adopted the same stance in obtaining piggy-back injunctions. It is quite inconsistent with that stance for the Claimants to turn around after the injunctions have been discharged and say such compensation is irrecoverable as a matter of law by virtue of that illegality.

301   The Claimants rely upon the fact that the extent of the illegality was in dispute before Mann J, as shown by his judgment at [44], and will only finally be resolved by this judgment. In my view that is immaterial, since it does not affect the inconsistency in the stances adopted by the Claimants.

302   The Claimants also say that Mann J would have been bound to follow the same course even if he had known that the Claimants were going to rely on illegality as a bar to recovery. In my view this cannot be assumed. In those circumstances Mann J would have been faced with quite a different balance to weigh, and might well have reached a different conclusion. I do not go so far as to say that he would inevitably have refused the injunction. Conceivably, he might still have granted it. But it would certainly have affected his reasoning. Moreover, the possibility that Mann J might still have granted the injunction does not excuse the inconsistency in the stances adopted by the Claimants.

303   Fifthly, the Defendants contend that the issue is now *res judicata* as a result of Mann J's judgment. In my judgment this argument is a complete non-starter. There can be no issue estoppel in relation to a point which Mann J did not decide because it was not raised before him.

304   Sixthly, the Defendants contend that this point is not open to the Claimants because the Court of Appeal ordered an inquiry on the cross-undertaking in the Lilly action, and subsequently inquiries were ordered by consent in the other actions. Unlike in Balkanbank v

Taher , the respective orders were not in a form which preserved the court's discretion as to whether to enforce the undertaking. Accordingly, the Defendants say that the position is as stated by Neill LJ in Cheltenham & Gloucester Building Society v Ricketts [1993] 1 WLR 1545 at 1552:

> "A decision that the undertaking should be enforced is a precondition for the making of an order of an inquiry as to damages."

305   Even if this is correct, I do not see that it assists the Defendants. As noted above, the Claimants do not contend that the Defendants' claim should be refused in the exercise of the court's discretion, but rather that the loss is irrecoverable as a matter of law. That is clearly not a point which either the Court of Appeal's order or the subsequent consent orders determined.

306   The Claimants contend that none of these points can trump the public policy objection in any event, on the basis articulated by Schiemann LJ in Awwad v Geraghty & Co [2001] 1 QB 570 at 596:

> "Points on illegality are taken by the court of its own motion, not because of any consideration of fairness as between the two parties to the dispute but on wider considerations."

307   While I acknowledge the force of this point, I am not persuaded that it is an answer to the Claimant's third or fourth arguments. This is not a case like Awwad where a party is trying to enforce an illegal contract and is relying upon an estoppel to prevent the illegality being raised. One can well see why an estoppel should be not be countenanced in such circumstances. In this case, however, the court is enforcing an undertaking given to the court as the price of an interim injunction wrongly granted by the court. That undertaking was given by the Claimants on the implicit basis that such illegality

Lilly Icos LLC v 8PM Chemists Ltd, 2009 WL 2392200 (2009)

as there was would not be a bar to recovery under the cross-undertaking. The Defendants' argument is simply that the undertaking should be enforced on the same basis. If one looks outside considerations of fairness to the parties, in such circumstances it is also necessary for the court to protect the integrity of its own process.

### Liability of the various Claimants

308  Since I have found that the Defendants' losses were caused by all four Injunctions, *prima facie* all the Claimants are jointly liable for those losses.

309  Counsel for Pfizer, AstraZeneca and Merck argued that, even if the Injunctions in those Actions were found to have caused loss, on the true construction of the cross-undertakings such loss was not covered by the cross- undertakings because the loss of the Turkish fulfilment business preceded the Injunctions. I disagree. In my judgment the cross-undertakings cover all losses caused by the Injunctions (subject, possibly, to questions of mitigation and remoteness which do not arise here).

310  Finally, I should note that a dispute arose during the parties' closing submissions as to whether or not it was open to the Defendants to contend that the Claimants had acted in concert in applying for obtaining the Injunctions. In view of my finding as to causation, it is not necessary for me to resolve this dispute or to make any finding one way or the other.

### Conclusion

311  I conclude that the Claimants are jointly liable to compensate the Defendants for (i) lost profits in a figure to be calculated in the manner set out above, (ii) loss on unsold stock in the sum of the sterling equivalent of US$455,159.97 and (iii) redundancy costs in the sum of £4,000. The Defendants are also entitled to interest.

### Postscript

312  Shortly before I handed down this judgment, my attention was drawn to yesterday's decision of the House of Lords in Moore Stephens v Stone Rolls Ltd [2009] UKHL 39 . I have only had a brief opportunity to consider this, but it does not appear to contradict my decision on the public policy issue.

Footnotes

1    See transcript day 10 pages 1361 line 20 – 1361 line 4, 1381 lines 20-23, 1385 line 19- 1386 line 11.

Crown copyright

© 2017 Sweet & Maxwell
2009 WL 2392200

**End of Document**

© 2017 Thomson Reuters.

# TAB 46

Sun Life Assurance Company of Canada, American
Phoenix Life and Reassurance Company, Phoenix
Home Life Mutual Insurance Company v. The
Lincoln National Life Insurance Company

Case No: 2004 0545 A3

2004 0547 A3

Court of Appeal (Civil Division)

10 December 2004

**Neutral Citation Number: [2004] EWCA Civ 1660**

**2004 WL 2945745**

Before : The Right Honourable Lord Justice
Mance The Right Honourable Lord Justice
Longmore The Right Honourable Lord Justice Jacob

Friday, 10 December 2004

**Analysis**

On Appeal from Hon Mr Justice Toulson

Lower Court Reference 2003 Folio 575.

**Representation**

• Jonathan Sumption QC , Dominic Kendrick
QC , and Jawdat Khurshid (instructed by Clifford
Chance ) for the First Appellants and (instructed by
Barlow Lyde & Gilbert ) for the Second and Third
Appellants.
• Ian Hunter QC and Ms Juliet May (instructed by
CMS Cameron McKenna ) for the Respondent.

**JUDGMENT**

Lord Justice Mance:

**Introduction**

1.   This appeal concerns the correct analysis of an
arbitration award relating to a dispute between X and
Y, and its relevance in a subsequent, separate arbitration
between X and Z in which the legal position between

X and Y is an issue. X represents the three appellants
to this court, Sun Life Assurance Company of Canada,
American Phoenix Life and Reassurance Company and
Phoenix Home Life Mutual Insurance Company ("Sun/
Phoenix"), Y represents Cigna Reinsurance Company
of Europe SANV ("Cigna"), and Z represents the
respondents in this court, The Lincoln National Life
Insurance Company ("Lincoln"). Because arbitration
awards are generally confidential, it is worth mentioning
that the award between Sun/Phoenix and Cigna was
made available to Lincoln with, it seems, Cigna's consent
(and certainly to Cigna's knowledge and without Cigna
applying to prevent it occurring) following an order made
by the arbitrators in the arbitration between Sun/Phoenix
and Lincoln.

2.   Sun/Phoenix commenced an arbitration against
Cigna, claiming that Cigna had reinsured them
under Occupational Accident ("Occ/Acc") reinsurances
(covering 50% of losses of (a) $32,500 excess of $17,500
and (b) $200,000 excess of $50,000). These reinsurances
were allegedly concluded in August/September 1998
in respect of incoming business underwritten on Sun/
Phoenix's behalf by Centaur Underwriting Management
Limited of Bermuda ("Centaur"). Sun/Phoenix alleged
that the Occ/Acc business so reinsured included seven
whole account reinsurances accepted by Centaur to run
for three years from 1 $^{st}$ December 1997 to protect a
personal accident pool underwritten and managed by
Unicover Managers Inc. of New Jersey ("Unicover").
The arbitrators were Mr Nicholas Legh-Jones QC, Mr
Gordon Cornish and Mr Brian Kellett. Sun/Phoenix lost
this arbitration, since the tribunal by its award dated 14
$^{th}$ March 2002 declared that the whole Cigna reinsurance
had been validly avoided for misrepresentation and
non-disclosure by the brokers, Stirling Cooke Brown
Reinsurance Brokers Limited ("SCB"), by whom it had
been placed.

3.   A second arbitration was commenced by Lincoln
against Sun/Phoenix. In it, after losing the Cigna
arbitration, Sun/Phoenix contended by amendment to
their counterclaim that the Occ/Acc reinsurances had
never covered their exposure on the Unicover book
of insurances, and that such exposure was recoverable
accordingly from Lincoln under the terms of a reinsurance
covering loss of US$90,000 excess of $10,000 any one loss

in respect of risks attaching during the period 1 <sup>st</sup> October 1996 to 31 <sup>st</sup> December 1997. It is common ground that whether such exposure was recoverable from Lincoln depended upon whether the Occ/Acc reinsurances with Cigna would, apart from their avoidance, have covered it. This is because the Lincoln reinsurance incorporated a Net Retained Lines ("NRL") clause, signifying the following terms:

> "This Agreement applies only to that part of the Original Policies which the Reinsured retain net for their own account and in computing the Ultimate Net Loss, only loss or losses in respect of such Net Retained part of the Original Policies shall be included.

> The amount of Reinsurers' liability in respect of loss or losses shall not be increased by reason of the inability of the Reinsured to collect from any other reinsurers whether specific or general, any amounts which may have become due from them whether such inability arises from the insolvency of such other reinsurers or due to the cancellation of such other reinsurance by the Reinsured or by such other reinsurers for whatever reason or for any reason whatsoever."

It is not, and was not below, in issue that this clause applies to risks covered under a reinsurance which is later successfully avoided *ab initio* — even a reinsurance (like the Cigna reinsurance in fact) effected after the Lincoln reinsurance. Nothing in this judgment should therefore be taken as commenting on any argument that might have been raised to the contrary in a case like the present where the Occ/Acc reinsurances were not placed until after the Lincoln reinsurance.

4.   The issue before us arises because Lincoln contend that, in addition to or in the course of holding that the Cigna reinsurance had been validly avoided, the

Cigna arbitrators also determined that, apart from such avoidance, the Unicover book would have been covered by the Cigna reinsurances. That, Lincoln submits, was and is a binding determination as to the position as between Sun/Phoenix and Cigna, on which Sun/Phoenix cannot go back as against Lincoln in the present arbitration.

5.   The Lincoln tribunal (composed of Mr John Rowland QC, Mr Brian Wood and Mr Anthony Robertson) considered by its award dated 27 <sup>th</sup> May 2003 that it was "bound by the decision of the Cigna tribunal", but it went on to conclude that the Cigna tribunal were "not focusing on the issues that [had] arisen in [the Lincoln] arbitration" and "were not analysing the evidence before them with a view to providing any insight into the issues that [had] to be decided" in the Lincoln arbitration. Accordingly the Lincoln tribunal concluded that it was necessary for it to "reach its own view as to whether or not Cigna could ever have been bound to indemnify [Sun/Phoenix] in respect of losses arising from the Unicover whole account reinsurances". Its own factual conclusion — based on the witness statements, transcripts of evidence and submissions from the Cigna arbitration, albeit subject to redaction of parts identified by Sun/Phoenix as immaterial — was that "Cigna never agreed to cover the Unicover reinsurances and could never have been required to pay losses arising from the Unicover reinsurances".

6.   Lincoln obtained permission to appeal from Tomlinson J who certified two questions of law as being of general public importance. Only one remains relevant:

> "Whether the [Lincoln] Tribunal was free to depart from a binding obligation by an earlier tribunal of rights and obligations arising between Sun/Phoenix and Cigna set out in the Award of [the Cigna Tribunal] dated 14 March 2002."

7.   The appeal came before Toulson J who treated this question as requiring "analysis (a) of the findings of the

Cigna arbitrators and (b) of their relevance in the Lincoln arbitration". He concluded in his judgment dated 26 th February 2004 (a) that, contrary to the conclusion of the Lincoln tribunal, the Cigna tribunal had addressed the issue whether losses on the Unicover book would have been recoverable under the Cigna reinsurances but for Cigna's avoidance thereof, and had "reached an unambiguous decision" to the effect that "the Unicover whole account reinsurances were reinsured by Cigna, but that the Cigna reinsurance[s] had been validly avoided"; and (b) that, that point having been raised before and decided after hearing full evidence by the Cigna tribunal, the Cigna tribunal's "award determined the position between Sun/Phoenix and Cigna, on which the liability of Lincoln depended" and could be relied upon by Lincoln against Sun/Phoenix. This was so, he said, even though (if the Cigna award had been to opposite effect) Sun/Phoenix could "not necessarily" have relied on it against Lincoln.

8.  Toulson J gave permission to appeal to this court on both (a) "the [Lincoln] Tribunal's analysis of the findings in the Cigna Award; and (b) the relevance of the findings in the Cigna Award in the Lincoln Arbitration". Mr Jonathan Sumption QC representing Sun/Phoenix has presented submissions, and Mr Ian Hunter QC representing Lincoln, has responded under four main heads, which I recapitulate as follows:

• (1) The correctness of the Lincoln tribunal's analysis of what the Cigna tribunal did or did not decide.
• (2) Whether the Lincoln tribunal's analysis of what the Cigna tribunal decided was open to review in court as one of law.
• (3) Whether, if the Cigna tribunal decided that the Unicover book was covered by the Cigna reinsurances and the Lincoln tribunal erred in law in reaching a contrary view, the Cigna tribunal's decision in this respect created an issue estoppel or was by way of *obiter dictum* or collateral rather than fundamental to its award.
• (4) Whether Sun/Phoenix was bound in the Lincoln arbitration by any decision by the Cigna arbitration tribunal that the Unicover book was covered by the Cigna reinsurances.

  I shall consider the parties' submissions under these four heads. However, it is convenient to start with issue (2).

**Whether the Lincoln Tribunal's Analysis of What the Cigna Tribunal Decided was Open to Review in Court as one of Law**

9.  This is a curious point. Mr Sumption acknowledges that the exercise of analysis, of the effect of the Cigna award, in which the Lincoln tribunal engaged required the Lincoln tribunal to direct itself correctly on at least three points of law, viz. that the Cigna award should be examined as a whole, that any particular part(s) of it should be interpreted in the light of the particular issue(s) to which those part(s) were directed, and that any decision extracted from the Cigna award had to be sufficiently clear if it was to have even potential relevance to the Lincoln arbitration. However, he went on to submit that there were "both elements of fact and elements of law involved" in the exercise undertaken by the Lincoln tribunal. The tribunal was not, he submitted, simply construing the language of the award. It had to examine the background to determine to what issues words in the award were directed; and that might involve looking at the pleadings, the argument and the evidence "or at least [at] what, judging by the award, the arbitrators in the earlier case thought was the effect of the pleadings, the argument and the evidence". There was, he submitted, "an exercise of judgment involved" on the part of the Lincoln tribunal. Further, at times in his submissions, he suggested that, although it was agreed that Toulson J should look at the Cigna award itself (and not just at the account of it contained in the Lincoln award), this was done in effect *de bene esse* or without prejudice to the principle that at the end of the day the Cigna award itself was inadmissible, since no evidence or material outside the award is admissible on an appeal to the court: see Arbitration Act 1996, s.69(1) .

10.  Under s.69(1) , it was only open to Tomlinson J to give Lincoln leave to appeal to the Commercial Court "on a question of law arising out of an award". The issue about the correctness of the Lincoln tribunal's analysis of the Cigna award was treated by Toulson J as one of law. Toulson J raised with counsel on 3 rd December 2003 the question whether he should look at the Cigna award. After referring Toulson J to his power under s.70(4) of the 1996 Act to order arbitrators to state the reasons for their award in further detail, if an award "does not set out the tribunal's reasons in sufficient detail to enable the court

10-03635-jpm    Doc 271-3    Filed 04/03/17    Entered 04/03/17 18:29:57    Exhibit A -
Part 3    Pg 278 of 839

Lincoln National Life Insurance Co v Sun Life Assurance Co., 2004 WL 2365749...

properly to consider the … appeal", Mr Kendrick agreed that this could be short-circuited by, as the judge put it, "the bundle being put in front of me which has got the Lincoln contract, the Cigna contract and the award".

11.  However, Mr Kendrick QC, then leading for Sun/Phoenix evidently continued to submit that the Lincoln tribunal's analysis of the Cigna award in some way involved questions of fact or mixed fact and law. Toulson J records in his judgment (para. 44):

> "Mr Kendrick also submitted that if, as I conclude, the Lincoln arbitrators misinterpreted the Cigna award (in finding that the Cigna arbitrators had not directed themselves to the question whether the Unicover whole account reinsurances were within the Cigna reinsurance, subject to Cigna's avoidance), this was a purely factual error. I do not accept that submission. The interpretation of the Cigna award involved legal analysis."

….

I wanted to show that I was not afraid in a forensic way of dealing with the other matters. My Lord, you yourself said in the judgment that there is a question of analysis of the findings of the arbitrators and their relevance in the Lincoln Arbitration.

….

…. I would say that the two are so closely bound up that you are not really asking them to go any further. I certainly make it quite clear that I would not be suggesting for a moment that the court should be looking at the pleadings or whatever. I would have to take my stand or fall by the Cigna award, para. 84, recitals I and L etcetera."

12.  S.69(8) enabled Sun/Phoenix to appeal from Toulson J's decision on any question of law which Toulson J had determined under s.69(1) provided that he gave leave. That in turn depended upon him concluding that "the question is one of general importance or is one which for some other special reason should be considered by the Court of Appeal". When, after Toulson J's judgment had been given against his clients, Mr Kendrick sought permission to appeal to this court under s.69(8), the transcript shows that the judge was initially reluctant to give leave in relation to the correct analysis of the findings of the Cigna arbitrators. Mr Kendrick then said:

> "My Lord, I should make it clear that it has never really been my case that the court should be looking at the pleadings [i.e. in the Cigna arbitration]. My position is that you should just look at the Award and construe it.

13.  Toulson J was then persuaded to give permission to appeal both on the correct analysis and on the relevance of the Cigna award in the Lincoln arbitration. No suggestion was made at that stage of any challenge to the correctness of the judge's conclusion in paragraph 44 of his judgment (set out in paragraph 11 above) or to the permissibility of Toulson J looking at the Cigna award. As I see it, no permission was sought or granted in respect of any such challenge. On the contrary, Mr Kendrick seems to me to have used the judge's conclusion at paragraph 44 as the basis for now submitting that there was an easily identifiable question of legal interpretation of the document constituting the Cigna award which should go to the Court of Appeal, along with the issue of the relevance of any conclusion which that award did on analysis contain to the Lincoln arbitration.

WESTLAW   © 2017 Thomson Reuters.

14. In circumstances where Sun/Phoenix obtained leave to appeal from Toulson J on the simple ground that the effect of the Cigna award is one of straightforward legal analysis, I do not find it easy to see how they can now argue the opposite or suggest that the correctness of the Lincoln tribunal's analysis of the Cigna award may depend on unstated facts not reflected in the Lincoln award or not put before Toulson J by consent. Be that as it may, I am in any event satisfied that the question before us is, as Toulson J considered, one of law.

15. In Woodhouse A.C. Israel Cocoa Ltd. S.A. v. Nigerian Produce Marketing Co. Ltd. [1972] AC 741, the House of Lords held that the meaning of a letter was a question of construction in the surrounding circumstances as stated in the award, which it was for the court to determine, rather than a question of fact. Lord Hailsham added:

> "It might conceivably have been different if all the circumstances had not been made part of the award, or if all the relevant circumstances had not been fully exposed. But, on the course which the umpire rightly decided to pursue, the meaning of the letter … is a matter of construction in the light of the surrounding circumstances and not a matter of fact."

Here, so far as appears all the circumstances necessary to reach a conclusion on the correctness of the Lincoln tribunal's interpretation of the Cigna award were before the judge, either in the award or by consent. Further, if there had been any suggestion of further relevant circumstances, which either party was not willing to put before the judge by consent, there seems little doubt that he would, under s.70(4) , have ordered the Lincoln arbitrators to amplify their reasons accordingly.

16. It follows that I would reject Mr Sumption's first submission, and consider that it is for us to analyse the Cigna award for ourselves and, in the light of the construction that we put upon it, to determine the answers to the first and third issues before us, to which I next turn.

## The Correctness of the Lincoln Tribunal's Analysis of What the Cigna Tribunal Decided

17. It is necessary to set out more detail which can be derived from the Cigna and Lincoln awards. The predecessors to the Occ/Acc reinsurances placed with Cigna were more limited Occ/Acc reinsurances placed on Centaur's behalf by SCB with Odyssey Re (London) Ltd. as to 50% of each layer with effect from 1 st October 1996, the other 50% of each layer being placed with John Hancock Mutual Life Insurance Co. of Boston ("JEH"). These predecessor Occ/Acc reinsurances were however intended only to protect incoming business placed with Centaur by SCB, that being stated in the placing information; and the premium income estimate for such business was accordingly only US$17 million to $24 million. The Unicover book was in contrast placed with Centaur through Rattner Mackenzie Limited; and, by April 1998, Mr Cackett of Centaur was aware that the premium income on the Unicover book was very substantial (apparently, well over US$100 million), and further that it involved a large number of "buffer layer" (or fronting) contracts on which Unicover earned no overrider.

18. Mr Cackett was never happy with Odyssey as security, and had prior to March 1998 asked Mr Jeff Butler of SCB to get Odyssey replaced by security acceptable to Mr Sun/Phoenix. Contrary to the fact, Mr Butler of SCB had told Mr Cackett that JEH was taking over Odyssey's line. After Mr Cackett became concerned about the Unicover book, he formed the idea that the SCB Occ/Acc might be expanded to cover this and any other non-SCB business and so to take a total premium income of some $160 million (before specific facultative reinsurance). He wrote to Mr Butler by fax letter of 26 th June 1998, saying that he understood that SCB had the addenda replacing Odyssey by JEH and asking Mr Butler to arrange now to broaden the Occ/Acc reinsurance cover to include non-SCB business, giving a total premium in the order of $160 million. Mr Billyard of John Hancock agreed orally in late June 1998 to include non-SCB business, and indeed signed unqualified two endorsements (endorsements no. 2) to that effect in favour of Sun (though not Phoenix). However, the Cigna tribunal inferred that Mr Billyard

Lincoln National Life Insurance Co v Sun Life Assurance..., 2004 WL 4895745...

only gave this agreement because he was told that the purpose was to allow non-SCB business to bring the income up to the original estimate of US $17–24 million. Mr Butler nevertheless told Mr Cackett both that JEH had signed an endorsement protecting all Centaur's Occ/Acc business and (contrary to the fact) that JEH had agreed to replace Odyssey. Then, as his next step, he approached Odyssey, who had not in fact been replaced by JEH. Odyssey flatly refused to accept a revised premium income of $160 million. In late August 1998 Mr Butler approached Mr Billyard to take over Odyssey's 50% lines, including the additional premium to be generated by the inclusion of the Unicover book, but he too refused. He refused even when Mr Butler (without telling him that Odyssey had declined the additional income that would result from the Unicover book) offered JEH a retrocession of any additional 50% line back to Odyssey.

19.  Against this background, first Mr Riding of SCB and then on 28 [th] August 1998 his superior Mr Butler went to see Mr Minter of Cigna. The reasons incorporated in the Cigna award describe this meeting as "at the very core of the parties' dispute in this arbitration" and set the scene in their opening paragraph as follows:

> "1. On 28 August 1998 Mr Jeff Butler, a director of the brokers Stirling Cooke Brown Reinsurance Brokers Limited (SCB), asked Mr Paul Minter, the senior underwriter of the respondent (Cigna), to do him a favour by agreeing to reinsure the claimants (Phoenix/Sun) in respect of certain occupational accident business. Mr Minter agreed orally to do so, later describing the transaction as a "big oblig. (favour) for SCB". The dispute at the heart of this arbitration concerns the scale of the favour which Mr Minter granted. Issues have arisen concerning the satisfaction of conditions precedent to the agreement becoming binding on Cigna, the right of Cigna to avoid the transaction for misrepresentation and non-disclosure and the scope of the business actually covered by the agreement to reinsure, assuming it to be valid and binding upon Cigna. …."

20.  Then, after going through the history leading up to the meeting, the Cigna award said:

> "29—  Certain things are clear about this meeting. Mr Butler did not broke the risk as an attractive proposition on its merits. He said that SCB needed a favour from Cigna and he would not take no for an answer. He wanted Cigna to take over Odyssey Re's lines on certain low-level protections of Centaur's principals, one of whom, Sun Life, could not accept Odyssey as security. Mr Minter refused. Mr Butler then asked him to consider a variation to his proposal, namely, that Cigna should replace Odyssey's lines and front them for Odyssey, to whom the risk would be ceded on a 100% facultative retrocession. One or other of them mentioned Unicover, and Mr Minter was not happy about the prospects of reinsuring Unicover business. A sister company of Cigna, Connecticut General Life, was a member of the Personal Accident Unicover Pool, and Mr Minter knew enough about Unicover to be aware that Unicover's premium income was growing, and that Centaur had underwritten three year whole account reinsurance protections for Unicover as of December 1997 at what he believed to be a cheap rate. There was a discussion about Unicover …. The meeting ended with Mr Minter's oral agreement to write the Centaur reinsurances subject to a 100% facultative retrocession of the risk to Odyssey …

> "30—  Doubts and disagreements remain concerning what, if anything,

was said about Centaur's EPI, and what was said concerning exposure to Unicover whole account protection …"

21. In September 1998 Mr Minter initialled four off-slips to reinsure Sun/Phoenix in respect of its 50% of losses on its Occ/Acc business, without any exclusion of Unicover business. He did so on the understanding that SCB would be arranging a retrocession to Odyssey, without Cigna receiving any overrider. Odyssey initialled corresponding slips at about the same time, purporting to convert its previous line into a retrocession. It appears that Odyssey has subsequently claimed that these slips were voidable, but we are not concerned with that.

22. The Cigna award recites that:

> • "J)   Cigna sought declarations that:
>
>> • 1)  [Cigna] never became bound to the Occ/Acc Covers;
>> • 2)  In the alternative to (1), that [Cigna] was entitled to, and did properly, avoid the four reinsurance contracts by which it participated in the Occ/Acc programme, on grounds of misrepresentation and non-disclosure;
>> • 3)  In the alternative to (1) and (2), that [Cigna] was not liable to indemnify the claimants against losses in respect of their reinsurances of the Unicover Personal Accident Pool Whole Account Protections;
>> • 4)  In the alternative, that, at the least, [Cigna] was not liable to indemnify the

claimants against losses in respect of their reinsurance of the said Unicover Pool's "burning cost policies".

> • K)  At the hearing the respondent also submitted that the following risks, over and above the Unicover risks, had never been validly ceded by Centaur to the Occ/Acc Covers, so that no claims lay in respect of them:—
>
>> •Risks numbered by Centaur as 121, 124–125, 132, 191–192, 199–210 and 216–218"

The "burning cost policies" referred to in the third declaration sought were policies placed with Sun/Phoenix to protect Unicover against the risk of having to pay extra premium under excess of loss policies which constituted the bulk of the Unicover book reinsured with Sun/Phoenix. The Unicover book consisted as a whole of risks which were numbered 158–164 by Centaur.

23. The Cigna award was in two parts, a dispositive part and accompanying reasons. The dispositive part includes the following:

> "1.  WE DIRECT that our REASONS for this Award are set out in the document annexed hereto and shall be considered as part of this Award.
>
> 2.  WE HOLD that in August/September 1998 [Cigna] became bound to the Occ/Acc Covers by becoming a party to four contracts of reinsurance, two with the Phoenix Claimants and two with the Sun Claimant.

3.    WE HOLD and DECLARE that [Cigna] has validly and properly avoided the contracts of reinsurance by which it participated in the Occ/Acc programme on the grounds of misrepresentation and non-disclosure in the placement of these Occ/Acc covers by SCB on behalf of the claimants.

4.    WE HOLD that, subject to our decision in (3) above, all the numbered risks in respect of which the claimants sought an indemnity under the Occ/Acc covers were reinsured by [Cigna] with the exceptions of risks numbered 132 and 191–192."

24.  In their reasons, the Cigna tribunal further describe the issues before it:

Against this factual background the broad issues which arose for decision were as follows: —

• 1)  Was the fronting agreement concluded between [Sun/Phoenix] and [Cigna] through SCB voidable for misrepresentation or for non-disclosure?
• 2)  If not, was the condition precedent to Cigna's participation fulfilled, namely that there should be a 100% facultative retrocession on back-to-back terms concluded between Cigna and Odyssey?
• 3)  If so, what business written by Centaur on behalf of Phoenix and Sun was reinsured by Cigna under the occ/acc covers?"

25.  The Cigna tribunal then considered those issues under paragraphs headed (1) Avoidance (paras. 40–49), (2) Subjectivity (paras. 50–75) and (3) "Allocation" (paras. 76–84). As to avoidance, the tribunal found this with respect to the meeting of 28 [th] August 1998:

"44—  Mr Butler could not, however, avoid all mention of Unicover. Mr Minter had performed a review of the reinsurance protections of the Unicover pool in which Cigna's sister company was involved. He knew that the Unicover whole account protections had been placed with Centaur under a three year programme w.e.f. 1 December 1997. He believed that it was on advantageous terms for Unicover and he knew that Unicover were writing a lot of business. It was inevitable that he would want to know whether the occ/acc covers were exposed to Unicover business. Consistent with his "one step at a time" approach, Mr Butler was able to tell him that the occ/accs did not include Unicover business, because at that stage neither John Hancock nor Odyssey had accepted the expansion of the occ/accs to take the extra income (and potential exposure) generated by it. He assured Mr Minter that they did not reinsure Unicover protection. Mr Minter most probably did request an exclusion of Unicover business, but Mr Butler could not accept this as it would then have to be noted on the slip, and would therefore direct Centaur's attention to the delicate question of JEH Re's supposed agreement to cover it. He then had to find a reason for rejecting an exclusion, and must have come up with a response on the lines that Centaur wished to retain the option to cede the odd Unicover facultative declaration to the occ/accs, adding that Mr Cackett was obtaining specific protections for his exposure to Unicover business.

10-03635-jpm    Doc 271-3    Filed 04/03/17    Entered 04/03/17 18:29:57    Exhibit A -
Part 3    Pg 283 of 839

Lincoln National Life Insurance Co v Sun Life Assurance..., 2004 WL 1985745...

45— We also find that, consistent with his general approach, Mr Butler did tell Mr Minter that Odyssey were keen to stay on the risk and would therefore be willing to be fronted by Cigna. In a sense this was true, because EIU [Odyssey's underwriting agents] were content to stay on the Occ/Accs without any additional premium and were unaware that they should have been removed.

….

47— To front for Odyssey on the basis broked to Mr Minter was not so big a favour as to agree to front them on a greatly increased premium income. Nonetheless it was still a favour, in Mr Minter's eyes. It was unusual for Cigna to front and to write retrocessional business, Mr Minter disliked the idea of reinsuring Cigna's leading competitors and especially Mr Cackett who had cost him money in the past. In waiving an overrider he had made it easier for SCB to put the front in place. He had trusted Mr Butler's assurance that only one or two facultative Unicover cessions might be ceded to the Occ/Accs"

26.  While these paragraphs themselves contain a number of findings of fact, the Cigna award continues with the following paragraph 48 headed in bold type:

**Findings concerning the meeting of 28 August 1998**

• (1)— Income. Mr Butler had misrepresented the reinsured's estimate of the premium income on the underlying business which the reinsured intended to be reinsured under the Occ/Acc covers. The true figure given by the reinsured was in the order of $160m.

• (2)— Conversely, the estimate given by Centaur was not disclosed.

• (3)— Unicover. Mr Butler had misrepresented the extent to which the Occ/Acc covers were intended by Centaur to protect Unicover derived business. The intention of Centaur was to use the Occ/Accs to reinsure the programme by which Centaur's principals reinsured Unicover's whole account. It was not just a question of the odd possible facultative reinsurance. In short, the business was misdescribed. No specific fac. reinsurance was later placed to cover Centaur's exposure to Unicover.

• (4)— Odyssey. Mr Butler had stated that Odyssey were keen to remain on the Occ/Accs. This was true if the business ceded to the Occ/Accs remained at the same volume, but untrue if EIU were asked to reinsure the additional volume of business which the reinsured intended to cede. Odyssey had not yet been asked if they would accept to be fronted by Cigna.

•(5)— A prudent reinsurer would wish to take these matters into account when deciding whether to reinsure the risk broked to him as a front for Odyssey. They were relevant to the potential levels of income and loss exposure of the business intended to be reinsured.

• (6)— Mr Minter was induced to front for Odyssey by what Mr Butler said concerning estimated premium income, by his statement that the Occ/Acc covers did not involve exposure to Unicover at all (bar possibly one or two facultative reinsurances), and by his statement that Odyssey were keen to remain on the business. Had he known the true facts concerning Mr Cackett's intended use of the Occ/Acc covers and Odyssey's inability to accept further income on the business, he would have regarded the proposed business as too uncertain and risky to write. At the very least he would have insisted on a clear exclusion of all Unicover business or a maximum limit of premium.

• (7)— It follows that Cigna were entitled to avoid the agreement to front for Odyssey on the Occ/Acc covers."

27. Having concluded that Cigna was entitled to avoid its agreement to front for Odyssey on the Occ/Acc covers, the tribunal said in paragraph 49 that issues (2) and (3) listed in paragraph 39 of their reasons (cf paragraphs 22 and 23 above) did not arise, but that they would "record their decisions on them in deference to the detailed submissions presented". The tribunal did this in paragraphs 50 to 84 of its reasons. It referred to designation in the slips initialled by Mr Minter of the business covered as:

"All business written by the reinsured and allocated to their Personal Accident Account in respect of Workers' Compensation and Occupational Accident business only."

It considered and rejected an argument by Cigna that, in order for the defendants to be able to claim losses arising on a risk reinsured by the Occ/Accs, some act of allocation of that risk to the Occ/Acc covers was required. It held that prima facie it was sufficient that the defendants had internally coded a risk as part of their Occ/Acc business. However, it continued:

"80— We say "prima facie" because the coding cannot be conclusive. First, it must be a valid coding. A risk which was really wider than occupational accident or workers compensation would not qualify for protection, however coded. Secondly, good faith errors could be corrected under the generous E & O clause in the occ/acc contracts … Thirdly, it would be open to Centaur to agree with reinsurers on the Occ/Acc programme that a particular risk was not to be protected by the Occ/Acc or that business of a particular type falling within the general definition above was not to be protected under the covers. An example of the latter was the exclusion of Occ/Acc risks placed with Centaur by brokers other than SCB before Endorsement No. 2 was agreed. In other words, a qualifying risk coded PO or PW could be taken off cover by a specific decision of Centaur pursuant to the agreement of reinsurers."

28. Applying that analysis, the Cigna tribunal concluded that two risks in respect of which Sun/Phoenix had claimed indemnity were not protected by the Cigna Occ/Acc covers, viz. risk No. 132 (a whole account protection of JEH's personal accident account not restricted to workers' compensation and occupational accident business) and risks Nos. 191–2 (in respect of which Centaur had by fax dated 8 th September 1998 agreed with Odyssey that they should not be reinsured under the Occ/Acc covers, an agreement of which the tribunal considered that Cigna would have the benefit).

But the tribunal rejected an argument by Cigna that the Unicover burning cost protection policies were outside the scope of the Occ/Acc covers. It said:

> "It was argued by CIGNA that the burning cost protection policies described in paragraph 13 above were also outside the scope of the covers. The question turns neither upon whether these contacts are insurances or reinsurances, nor upon whether they are personal accident policies, which clearly they are not. It turns rather upon whether in this instance these additional premium protection policies can be described as business allocated by Centaur to their Personal accident Account" in respect of Workers' Compensation/Occupational accident business only". We think that it can. These were policies protecting Unicover against the contingency of having to pay additional premiums under their swing-rated excess of loss policies, which admittedly came within the definition. They were part and parcel of Centaur's Worker' Comp/ Occ/Acc. Book of business."

29.  Having thus identified those few risks which they found fell outside the scope of the Occ/Acc covers, the tribunal continued:

> "84—  Apart from the above risks we hold that all the risks listed in paragraphs 132–133 of [Cigna's] outline final written submissions were protected by the Occ/Acc covers subject to the earlier issues decided in this arbitration. If we had found that Cigna were bound to the Occ/ Acc covers subject to an exclusion of Unicover whole account protections, then we should have regarded that as constituting an agreement to

exclude that particular business from protection from under them."

When setting out this passage in his judgment, Toulson J recorded, correctly, that the risks listed in paragraphs 132–133 of Cigna's outline final submissions included the Unicover whole account book of reinsurances.

30.  Toulson J expressed as follows his conclusion on the question whether the Cigna tribunal had decided whether the Cigna reinsurances would, apart from their avoidance, have covered the Unicover book:

> "On my reading of their award, the Cigna arbitrators addressed that issue and reached an unambiguous decision on it. They concluded that the Unicover whole account reinsurances were reinsured by Cigna but that the Cigna reinsurance had been validly avoided."

He explained this conclusion as follows:

> "39—  The Lincoln arbitrators referred to recital K as supporting an argument that the Cigna arbitrators may not have considered whether the Unicover whole account reinsurances fell within the Cigna reinsurance, but for Cigna's successful avoidance. They did not refer to recital J (the recitals at J and K being a summary of submissions which had been advanced by Cigna in its pleadings and at the hearing) or more significantly to paragraph 84 of the Cigna arbitrators' reasons. Paragraph 84 shows that in arriving at their holding in paragraph (4) of their award the Cigna arbitrators had considered but rejected the conclusion that there had been an agreement to exclude Unicover whole account risks

Lincoln National Life Insurance Co v Sun Life Assurance, 2017 WL 4365745...

from the scope of cover written by Cigna.

….

40— Mr Kendrick submitted that the sentence in paragraph 84

> "If we had found that Cigna were bound to the occ/ acc covers subject to an exclusion of Unicover whole account protections, then we should have regarded that as constituting an agreement to exclude that particular business from protection under them"

should be read as meaning that if the Cigna arbitrators had not found that the Cigna reinsurance had been properly avoided, they would have found that there was an agreement to exclude Unicover whole account protections from the scope of cover. He also pointed out that in paragraph 80, where the Cigna arbitrators referred to the possibility of Centaur and Cigna agreeing that a particular risk was not to be covered by the occ/ acc covers, they were considering an allocation argument in relation to risks other than Unicover whole account risks. That observation is correct, but it is not in my view a persuasive reason for reading paragraph 84 in the way that Mr Kendrick suggests. If the experienced Cigna arbitrators had intended paragraph 84 to mean

what Mr Kendrick suggests, I am sure that it would have been worded very differently and that paragraph (4) of the award would have identified the Unicover whole account reinsurances among the risks excepted.

41— Paragraph 4 of their award and paragraph 84 of their reasons are also consistent with the Cigna arbitrators' findings about the meeting on 28 August 1998. As I read their reasons, they found that Mr Minter agreed to front for Odyssey on the occ/acc covers, amended to include business from all sources, without there being any exclusion of Unicover (which Mr Minter probably requested), because Mr Minter accepted Mr Butler's false representations about Centaur's intended use of the covers. Mr Kendrick made the point that in their reasons the Cigna arbitrators at times referred to this as an assurance (for example, in paragraph 47). The word "assurance" could mean either an assurance of intention (that is, a statement of intent) or a contractual promise. However, there would have been problems reconciling a contractual promise with a refusal to agree to an exclusion from cover, and paragraph 84 shows that the Cigna arbitrators had clearly in mind the question whether there was an agreement to exclude Unicover whole account risks from the cover.

42— I was referred to underlying documents, including extracts from the pleadings and submissions in the Cigna arbitration. In my view they do nothing to weaken the natural reading of the award. They tend, if anything, to confirm it. For they show that Mr Kendrick in his closing submissions canvassed with the arbitrators the

possibility of a finding that there was an agreement between Mr Minter and Mr Butler to exclude the Unicover whole account reinsurances from the occ/acc covers, and so it was a live issue for the arbitrators to decide.

43— As to the alternative argument that there was a gap in the Cigna arbitrators' findings, Mr Kendrick put forward various forms of argument, which he says were not considered by the Cigna arbitrators, for holding that the Cigna reinsurance would not have protected Sun/Phoenix against losses under the Unicover whole account reinsurances; but they had the common element that there was an oral agreement between Mr Minter and Mr Butler that the Unicover whole account reinsurances were not to be covered by the Cigna reinsurance. Whether such an agreement, if there was one, was properly to be described as giving rise to an agreement to exclude or a collateral agreement or an estoppel by convention is a matter of legal labelling, about which there was discussion between Mr Kendrick and the Cigna arbitrators during his closing submissions. They considered whether there was an agreement to exclude the Unicover whole account reinsurances and, on my reading of their award, they concluded that there was not."

31. Mr Sumption's primary submission before us was that the Cigna award was simply silent on the question whether the Unicover book would have been reinsured under the Cigna Occ/Acc reinsurances, but for their avoidance. The conclusion that the Cigna reinsurances were avoided made it unnecessary to consider their scope in that respect. Alternatively, he submitted that the most that might be inferred is that the arbitrators held an opinion on a point

which they did not decide in terms, and that that could not be good enough to found an issue estoppel even between the same parties. At this point, the argument on issue (1) tends to merge into the argument under issue (3) before us.

32. Much of the argument before us was directed to identifying the proper scope and effect of paragraph (4) of the dispositive part of the award. Mr Hunter argues that this paragraph was intended to respond to recitals J(3) and (4) as well as K, whereas Mr Sumption argues that it only responded to recitals J(4) and K. Mr Sumption cross-referred paragraph (4) to paragraphs 76–84 headed "Allocation", and drew attention to the absence in those paragraphs of any express reasoning addressing the Unicover book as a whole (as opposed to the Unicover burning cost policies in particular). The brief reference to the Unicover book in the second sentence of paragraph 84 should, he submitted, be understood as a neutral statement that the tribunal had not had to decide whether or not there was any such exclusion.

33. Mr Sumption's submission does not appear to me to meet the fact that the first sentence of paragraph 84 refers to "all the risks listed in paragraphs 132 to 133 of [Cigna's] outline final written submissions". These included the Unicover risks Nos. 158–164, i.e. the whole Unicover book. Further, the Cigna tribunal had in paragraph 79 made clear its view that the application of the Cigna reinsurances did not depend on any particular act of allocation to those reinsurances. Rather (subject to any specific agreement that particular risks would not be covered thereby) the Cigna reinsurances applied to all Occ/Acc business properly falling within the designation in the Cigna slips (that is business allocated to Cigna's Personal Accident Account as a sub-species of that general class of business called Workers Compensation/Occupational Accident business). Nevertheless, Mr Sumption is justified in drawing attention to the absence from paragraphs 76–84 of any reasoning explicitly addressing the Unicover book as a whole, in circumstances where it had been Cigna's alternative case that, if the Occ/Acc reinsurances were not avoided, the Unicover book fell outside or were excluded from their scope.

Lincoln National Life Insurance Co V Sun Life Assurance..., 2004 WL 4955749...

34.   However, the reason for this omission seems to me to have been that the Cigna tribunal had *already*, in the course of making its findings regarding avoidance, expressed its view that the Cigna reinsurances would, but for their avoidance, have covered the Unicover book. The last sentences of paragraphs 44 and 47 are I consider particularly relevant in this regard. That still raises the question why the point was not more clearly addressed. The probable answer is that it had been in neither party's particular interest in the Cigna arbitration to tie their case too closely to a proposition that the Unicover book was not reinsured. The major losses suffered by Sun/Phoenix related to the Unicover book. Sun/Phoenix, relying on the slips procured by Mr Butler, were contending that the Cigna reinsurances covered their Occ/Acc business on an unlimited basis, and were attempting in this way to recover such losses from Cigna. Cigna's primary case was on the other hand that the Cigna reinsurances had been validly avoided for misrepresentation or non-disclosure relating primarily to the Unicover book; and the most obvious — although, as I shall demonstrate, not the only — way of running such a case, was on the basis that the Unicover book fell within the terms of the reinsurances, so that matters material to it should have been fully and accurately represented and disclosed. However, if for any reason their claim to avoid had failed, then it would have been in Cigna's interest to pursue an opposite analysis, namely that the Unicover book fell outside the scope of the Cigna reinsurances.

35.   Consistent with this ambivalent approach, recital J(3) in the Cigna award records that Cigna's claim to a declaration that the Unicover book fell outside the Cigna reinsurances was as an alternative to their claim to a declaration establishing avoidance. Sun/Phoenix's position was also, or became also, ambivalent. The judge in paragraph 42 of his judgment refers to, and we were also shown, a transcript of Mr Kendrick's very last submissions before the Cigna tribunal. Mr Kendrick there sought to raise, from what may well by then have appeared to be impending shipwreck, an alternative case to the effect that, if Mr Butler misrepresented to Mr Minter that the Unicover whole account book (as opposed to a few other possible though as yet unspecified Unicover risks) was not intended to be and would not be reinsured under the Cigna reinsurances, the effect would be that the Unicover book was excluded from the scope of the Unicover risks. But the tribunal cannot be blamed if it did not treat this

unpleaded, last minute alternative seriously. The same transcript shows that Mr Legh-Jones QC's immediate reaction was that a conclusion that the Unicover book fell outside the scope of the Cigna reinsurances would not help Sun/Phoenix. Mr Butler would still have been placing the risk on a wholly different basis to that intended by Sun/ Phoenix (and indeed by Mr Butler) — since both of them intended to treat the Unicover book as reinsured.

36.   In this connection, the Cigna tribunal's formulation of paragraph 48 of its reasons, under the bold heading "**Findings concerning the meeting of 28 August 1998**", is in my view significant. These findings (set out in paragraph 26 above) focus on Mr Butler's misrepresentations and non-disclosure regarding the business *intended* by Sun/ Phoenix to be reinsured (and intended by him in his dealings with Sun/Phoenix as well as, presumably, Cigna to be *treated* as reinsured) under the Cigna reinsurances. There is no express finding in paragraph 48 that the Unicover book would actually have been within the scope of the Cigna reinsurances. The last sentences of paragraph 48(6) are worth repetition:

> "Had he [i.e. Mr Minter] known the true facts concerning Mr Cackett's intended use of the Occ/Acc covers and Odyssey's inability to accept further income on the business, he would have regarded the proposed business as too uncertain and risky to write. At the very least he would have insisted on a clear exclusion of all Unicover business or a maximum limit of premium."

That, it seems to me, is the common sense of the position. Regardless whether or not the Unicover book was within the scope of the Cigna reinsurances, Mr Butler's disingenuous intentions, and Sun/Phoenix's more innocent intentions arising as a result of their having also been misled by Mr Butler, were calculated to lead to major problems — indeed to precisely the dispute and arbitration that did arise between Sun/Phoenix and Cigna. No-one would sensibly write a reinsurance on that basis — and this is, as I see it, the gist of the last two sentences of paragraph 48(6) of the Cigna award (paragraph 26 above).

37. That said, I would agree that the Cigna tribunal was, when it came to express its views on points unnecessary for its decision, prepared itself to accept and treat the Unicover book as within the scope of the Cigna reinsurances. The tribunal could otherwise hardly have dealt with the question whether the Unicover burning cost policies were within such reinsurances in the terms it did. Nor do I think that it would otherwise have expressed itself as it did in the first and second sentences of paragraph 84 of its reasons. I would accordingly construe paragraph (4) of its dispositive award as embracing the Unicover book. But whether this paragraph should in these circumstances be treated as giving rise to any issue estoppel even between the parties is a different matter to which I next turn.

**Whether, if the Unicover Book was Covered by the Cigna Reinsurances, the Cigna Tribunal's Decision to that Effect Created an Issue Estoppel or was by Way of Obiter Dictum or Collateral Rather than Fundamental to its Award**

38. Mr Hunter's first submission is that the answer to this question is to be found in s.58(1) of the Arbitration Act 1996 , which provides that:

> "Unless otherwise agreed, an award made by the tribunal pursuant to an arbitration agreement is final and binding both on the parties and on any persons claiming through or under them."

However, I do not regard this as affecting the general principles by reference to which courts determine the extent to which judgments or awards are to be treated as final and binding in the instant or any future dispute. S.58(1) repeats in effect s.16 of the Arbitration Act 1950 :

> "Unless a contrary intention is expressed therein, every arbitration agreement shall, where such a provision is applicable to the reference, be deemed to contain a provision that the award to be made by the arbitrator

or umpire shall be final and binding on the parties and the persons claiming under them respectively."

That was the provision in force in 1965, when in Fidelitas Shipping Co. Ltd. v. V/O Exportleb [1966] 1 QB 630 a Court of Appeal consisting of Lord Denning MR, Danckwerts LJ and Diplock LJ stated the principles governing issue estoppel, in considering whether an interim arbitration award issued in London in 1961 barred shipowners from subsequently relying on a new point in order to try to avoid the impact of a cesser clause on their claim against charterers.

39. Lord Denning stated the relevant principles as follows (p.640):

> "The law, as I understand it, is this: if one party brings an action against another for a particular cause and judgment is given upon it, there is a strict rule of law that he cannot bring another action against the same party for the same cause. Transit in rem judicatam: see King v. Hoare (1844) 13 M & W 494 , 504. But within one cause of action, there may be several issues raised which are necessary for the determination of the whole case. The rule then is that, once an issue has been raised and distinctly determined between the parties, then, as a general rule, neither party can be allowed to fight that issue all over again. The same issue cannot be raised by either of them again in the same or subsequent proceedings except in special circumstances, see Badar Bee v. Habib Merican Noordin [1909] AC 615 , 623 per Lord Macnaghten."

He went on to consider the principle in Henderson v. Henderson (1843) 3 Hare 100 (with which we are not

Lincoln National Life Insurance Co v Sun Life Assurance..., 2004 WL 4865745...

concerned on this appeal), and to say that "Like principles apply in arbitration". Diplock LJ said (p.643):

> "Issue estoppel applies to arbitration as it does to litigation. The parties having chosen the tribunal to determine the disputes between them as to their legal rights and duties are bound by the determination by that tribunal of any issue which is relevant to the decision of any dispute referred to that tribunal. An arbitrator today has power to make an interim award determining particular issues separately from other issues in the arbitration."

40. Mr Sumption submits that it was not "necessary" or "relevant" for the determination of the dispute between Sun/Phoenix and Cigna for the Cigna tribunal to determine whether the Unicover book of business would or would not have been reinsured by the Cigna reinsurances, if these had not been avoided. He points out that the tribunal itself stated at the end of the section in its reasons dealing with avoidance that issues (2) and (3) before it "do not arise in view of our conclusion" on avoidance, and submits that paragraph (4) of the dispositive reasons was in the circumstances purely obiter. Further, in so far as it can be suggested that the Cigna tribunal, in the course of the reasoning leading to its conclusion that there had been a valid avoidance, expressed any view that the Unicover book would have been within the scope of the Cigna reinsurances, that was a passing and inessential view in the light of the considerations which I have mentioned in paragraphs 34 to 36 above.

41. Mr Sumption referred to Spencer Bower, Turner and Handley on *The Doctrine of Res Judicata* (3 rd Ed.) (1996), paragraph 201 of which states:

> "Even where the court has expressly determined the same issue in the earlier

proceeding an issue estoppel will not necessarily arise. Only determinations necessary to the decision, and fundamental to it, will found an issue estoppel. Other determinations, however positive, cannot."

An equivalent though slightly differently worded passage in the second edition of Spencer Bower was endorsed in dicta of May LJ and Balcombe LJ in In re Norway's Application (No.2) [1990] 1 AC 723 , 743 and 751–2. The requirement that the prior determination should have been "necessary", rather than "merely collateral or obiter" was emphasised in the recent Court of Appeal decision in Good Challenger Navegante SA v. Metalexportimport SA (The Good Challenger) [2004] 1 Ll.R. 67 . In a passage from Blair v. Curran (1939) 62 CLR 464 , 533, cited in Spencer Bower, Dixon J said:

> "The difficulty in the actual application of these principles is to distinguish the matters fundamental or cardinal to the prior decision or judgment, decree or order or necessarily involved in it as its legal justification or foundation from matters which even though actually raised and decided as being in the circumstances of the case the determining considerations, yet are not in point of law the essential foundation or groundwork of the decision, decree or order."

Spencer Bower at paragraph 201 also cites Fullagar J's observation in Brewer v. Brewer (1953) 88 CLR 1 , 15 that:

> "Issue estoppel only applies to issues. There is no estoppel as to evidentiary facts found in the course of determining the affirmative or negative of an issue."

WESTLAW  © 2017 Thomson Reuters.

42.  In In re State of Norway's Application (No.2) May and Balcombe LJJ indicated that the distinction between fundamental and collateral matters is not mechanical but flexible, and that it is to be drawn according to the circumstances and justice of the particular case. May LJ cited Lord Denning's statement in Fidelitas that the rule was not inflexible, as well as Lord Upjohn's statement in Carl Zeiss Stiftung v. Rayner & Keeler Ltd. (No.2) [1967] 1 AC 858 , 947 that:

> "All estoppels are not odious but must be applied so as to work justice and not injustice and I think the principle of issue estoppel must be applied to the circumstances of the subsequent case with this overriding consideration in mind".

43.  One test, but not a conclusive test, sometimes applied to determine whether a determination on an issue can have been fundamental is whether there could have been an appeal from that determination. Spencer Bower puts the matter as follows at paragraph 205:

> "A decision of fact against the party who succeeded will not found an estoppel because it cannot be fundamental to the decision. It would be unjust to make such a decision the foundation of an estoppel, for no appeal is available to the person against whom it was given."

44.  A similar passage was approved by Balcombe LJ in In re State of Norway's Application (No.2) at p.752. Woolf LJ at p.772–3 also regarded the absence of any realistic prospect of an appeal as inconsistent in that case with any issue estoppel. In The Good Challenger the Court

of Appeal left open, in relation to decisions with two separate ratios leading to the same result, the correctness of the immediately following passage from paragraph 205 in Spencer Bower:

> "A similar argument applies where several factual grounds are advanced as alternative bases for a cause of action and the court finds more than one in favour of the party who succeeds. No estoppel can be founded on any of the separate findings, for the party failing on such issues cannot appeal against any of them separately. To succeed on appeal he must succeed on all the issues, and if the finding on one is good, this will be fatal. There will be a cause of action estoppel, but the separate issues will not ground issue estoppel because none was fundamental to the decision."

45.  Applying these principles to this case, paragraph (4) of the dispositive part of the award was not necessary for the Cigna tribunal's decision. It was directed to an issue which the Cigna tribunal correctly stated in paragraph 49 of its reasons did not arise in view of its decision on avoidance. Although expressed as part of the dispositive award, it was in fact obiter. Cigna, which won on avoidance, had no basis for appealing against it. If Sun/Phoenix had been able to appeal on the issue of avoidance, then the scope of the Cigna reinsurances might have become a necessary issue for determination, but there was no such appeal.

46.  I have already considered the alternative way of looking at the Cigna tribunal's treatment of the question whether the Unicover book would have been covered under the Cigna reinsurances, but for their avoidance. In the light of what I have said in paragraphs 34–37 above, while I consider that the Cigna tribunal did hold and express the view that the Unicover book would have been covered by the Cigna reinsurances, I cannot regard its expression of that view as having been fundamental

to its decision on avoidance, or as anything other than collateral. It is, I consider, clear that the Cigna tribunal would have arrived at precisely the same conclusion as it did regarding avoidance, in the light of the way it expressed its central findings of fact in paragraph 48 of its award, even if it had formed an opposite view to the effect that the Unicover book fell outside or was excluded from the scope of the Cigna reinsurances.

47.  As will appear when considering issue (4) below, Mr Hunter's submissions in support of Toulson J's decision start from and depend upon a proposition that the Cigna award gave rise to an issue estoppel as between Sun/Phoenix and Cigna on the issue whether the Unicover book was covered under the Cigna reinsurances. It follows from this and my conclusions on issue (4) that Sun/Phoenix's appeal to this court succeeds.

**Whether Sun/Phoenix Were Bound in the Lincoln Arbitration by Any Decision by the Cigna Arbitration Tribunal that the Unicover Book was Covered by the Cigna Reinsurances**

48.  Mr Hunter submits that, if, on a proper reading, the Cigna award determined that the Unicover book was covered by the Cigna reinsurances in a manner giving rise to an issue estoppel in any subsequent dispute between Sun/Phoenix and Cigna, then Lincoln, whose rights or liabilities depend upon the legal position as between Sun/Phoenix and Cigna, were entitled to rely against Sun/Phoenix upon that determination to establish that position.

49.  The inspiration for Mr Hunter's submission is an obiter dicta passage in the judgment of Saville J in George Moundreas & Co. SA v. Navimpex Centrala Navala [1985] 2 Ll.R. 515 . The relevant claim was by Moundreas for breach by Navimpex of a commission agreement relating to a separate shipbuilding contract between Navimpex as builders and Solway Maritime Ltd as buyers of hull 730. Saville J held that it was an implied term of the commission agreement that Navimpex would not break the shipbuilding contract, so as to deprive Moundreas of commission as and when future instalments of the price became payable. The issue thus arose whether Navimpex had broken the shipbuilding contract. Moundreas pointed

to a finding to that effect in an arbitration between Navimpex and Solway. But they also called evidence and proved the breach independently. The second paragraph in the following passage from Saville J's judgment (p.520) is in these circumstances expressed provisionally and in obiter terms:

> "The plaintiffs urged me to treat the award of establishing that the sellers were in breach of the shipbuilding's contract to a degree justifying the cancellation of the buyers. The defendants objected on the grounds that the award only represented the opinion of the arbitrators and was thus inadmissible as evidence: they relied upon Hollington v. Hewthorn, [1943] 1 K.B. 587 .

> It seems to me that where the rights or obligations of the parties to a contract are determined by the contractual machinery of arbitration under that contract there is something to be said for the view that the result that the arbitrators reach can (in the absence of special circumstances) be treated in effect as part of the contract and thus established by third parties in the same way as any contract can be proved. Thus in the present case the arbitrators have concluded that the sellers [ *sic* ] had a right to cancel the contract and to claim damages as the result of the failure of the buyers [ *sic* ] to perform their obligations under the contract. As between the parties that is now the contractual position as determined by the contractual machinery of arbitration — and it is difficult to see why a stranger to the contract cannot prove that contractual position by simply producing the award as he can prove other contractual rights and obligations by simply producing the contract.

Be that as it may, the plaintiffs took the precaution of calling much the same evidence on the buyers' major complaint as was presented to the arbitrators and on the basis of the evidence I have heard I am satisfied that the hatch covers and coamings of this vessel were not constructed in accordance with the standards stipulated in art. 1.4. of the shipbuilding contract and that the defects were so serious that the buyers were fully justified in refusing to accept delivery of the vessel and in eventually cancelling the contract for breach by the sellers."

50. Saville J's dicta give rise to some immediate questions. First, although Saville J spoke of a stranger to the contract proving the contractual position by producing the award (without addressing the problem that such documents are usually private), his expressed rationale was that the award crystallised or created what "is now the contractual position" between the contractual parties. This rationale would suggest that it should not matter in whose favour the award was; and that Navimpex as much as Moudreas should have been able to "prove the contractual position" by producing the award. Mr Hunter's case is different. He submits that a third party has a one-way entitlement to rely on such an award, to the extent that it favours him. He submits that a third party would not be bound by a determination unfavourable to him; he could controvert it by any means or argument, factual or legal, available to him in the absence of any award. The rationale Mr Hunter advances is that the principle in *Moudreas* should itself be subject to the overriding principle that a stranger cannot be bound by a judgment or award to which he was not party or privy. Toulson J in the present case accepted this approach. He suggested that "the real considerations of fairness should be what is most fair to the parties and will avoid bringing the administration of justice in disrepute". Second, the situations in which Saville J contemplated that his suggested principle might apply are not defined. He suggested that it might be

subject to "special circumstances". It is not clear how far he intended only to embrace situations where the evidential position was effectively identical in the two cases, or what the position would be in the case of a prior award or judgment which had gone effectively by default or by agreement. It can, however, be said in response to this uncertainty that a similar problem arises in relation to issue estoppel, where the courts have emphasised a need for flexibility and caution. Toulson J thus considered that it could make "a difference in terms of justice whether the earlier decision was the product of an informal arbitration, in which the arbitrator had not properly addressed the arguments", or whether "the issues had been fully and properly investigated and addressed in a reasoned decision", and that "the confidentiality of the arbitration proceedings could also be a relevant factor". One is, however, entitled both to question the basis for invoking in relation to arbitration the broad considerations of justice on which Toulson J relied, and to question how feasible and satisfactory such an approach would be. This is particularly so in the context of prior arbitration proceedings, which will have taken place separately from the proceedings in which a stranger later seeks to invoke their outcome, and in relation to which problems of privacy and confidentiality would be highly likely to arise.

51. The application of the principle suggested by Saville J seems to me particularly difficult in the context of the present case. The reasons are connected with the nature of the Cigna award and with what I have already said on issue (3) above. Had we been concerned with an award determining simply that the Unicover book was covered by the Cigna reinsurances (and therefore entitling Sun/Phoenix to claim their losses on that book from Cigna), Sun/Phoenix would never ordinarily have claimed to be reinsured by Lincoln in respect of such losses at all. Perhaps, if Cigna had become insolvent, Sun/Phoenix might have been tempted to assert that the Cigna award was wrong, and to claim against Lincoln. Had they done so, Lincoln might have argued with some force that, whatever the scope of the Cigna reinsurances apart from the Cigna award, after the award the Unicover losses could not constitute "retained" losses within the meaning of the Net Retained Lines clause. But that would not mean that Sun/Phoenix was bound by the Cigna award as against Lincoln. It is more that the Cigna award — and the effective reinsurance to which it gave rise — would

itself have brought about a factual state of affairs to which the Net Retained Lines clause would apply. Had we, on the other hand, been concerned with an award declaring simply that Sun/Phoenix's had no right to be indemnified by Cigna in respect of losses on the Unicover book, because that book was outside the scope of the Cigna reinsurances, I would have seen force of Mr Hunter's submission that a stranger to the award in Lincoln's position should not be bound. The underlying reasons are identified in cases such as In ex p. Young, in re Kitchin (1881) 17 Ch.D. 668 and Bruns v. Colocotronis (The Vasso) [1979] 2 Ll.R. 412 to which I will come (paragraph 55 below). The argument that the award declaring that there was no liability was a relevant "fact" would not assist, if it was open to Lincoln to look back at the position prior to and apart from the award, and to show that that involved a reinsurance by Cigna of the Unicover book. Accordingly, it may be that, if this case had concerned a simple award declaring that Cigna was or was not liable in respect of the Unicover book, the result would have been a legal position broadly to the effect advocated by Mr Hunter. But this result would not flow from any principle such as that suggested by Saville J.

52. The difficulty about issue (4) is that it arises on the basis of an award which was not a simple determination of the question of liability, but which is said to have determined that question either unnecessarily or when deciding the issue of avoidance on which it did focus. For most purposes it is I think possible to cut the Gordian knot. If it was unnecessary for the Cigna tribunal to determine the question whether the Unicover book was protected, or if it only did so collaterally, then issue (4) simply cannot arise. Issue (4) could only arise (a) if the Cigna tribunal were (contrary to my view) to be regarded as having determined the question as a necessary part of its reasoning in relation to avoidance, *and* (b) if, as a result, it could be said that an issue estoppel would exist as between Sun/Phoenix and Cigna, in any subsequent proceedings in which the same question in some way arose as between them. Only in this remote situation, could the further question arise in this case whether there exists any principle along the lines mooted by Saville J.

53. With this introduction, I start with some basic propositions. The principles of res judicata and issue estoppel apply between parties to the original proceedings

or their privies. It is not, and could not be, suggested here that either principle has any direct application as between Sun/Phoenix and Lincoln. In Hollington v. Hewthorn [1943] KB 587 the Court of Appeal held that not even a criminal conviction for careless driving was admissible evidence to prove negligence in a subsequent civil action. The decision has been criticised, and has been qualified (for present purposes immaterially) by statute but otherwise remains law: cf Secretary of State for Trade and Industry v. Bairstow [2003] EWCA 321; 3 WLR 841 . It is also relevant to bear in mind that the submission by Mr Denning KC in Hollington v. Hewthorn was not that the criminal conviction should be regarded as conclusive evidence, but that it should be admissible as *prima facie* evidence of negligence (cf p.589). S.11 of the Civil Evidence Act 1968 now achieves that result generally in civil proceedings (apart from for defamation proceedings, in which s.13 makes the conviction conclusive). But there is nothing to give a civil judgment, still less an arbitral award, evidential value in establishing facts needing to be proved in separate proceedings against a stranger to the original proceedings.

54. Further, Mr Hunter does not suggest that there is on this appeal any relevance in the principle commonly taken to have been established in Henderson v. Henderson (1843) 3 Hare 100 , 114, that a party is normally expected to bring forward every point which would assist him in pursuing or defending a particular claim, and will be debarred from doing so later. That is a principle which applies between parties to proceedings. It has recently been explained as "separate and distinct from cause of action and issue estoppel" (although based on the same underlying public interest) and as depending upon the court's power to prevent misuse or abuse of its process: Johnson v. Gore Wood [2002] 2 AC 1 . It is not suggested that the Lincoln tribunal relied or could have been relied upon any such principle when saying that it was bound by whatever the Cigna tribunal had decided.

55. There are a number of situations in which courts have considered attempts by A to rely as against B upon rights or liabilities established in separate proceedings between A and C. One familiar context is that of principal and surety. In In re Kitchin (above), the Court of Appeal held that, in the absence of explicit words, a judgment or award obtained by a creditor against the principal

debtor does not bind, and is not evidence against, a surety, who is entitled to have the liability proved as against him in the same way as against the principal debtor. The court pointed out that the judgment or award might have resulted from the principal debtor's neglect to defend or admission. The principle was applied in the context of an arbitration award in The Vasso (above), where a guarantee had been given of the due performance and payment of all liabilities and obligations of shipowners arising under or out of certain written agreements which included an arbitration clause. Robert Goff J applied In re Kitchin , holding that the guarantee did not extend to the obligation to honour an award. He pointed out that an arbitration clause has special characteristics distinguishing it from the main obligations of the contract, as established by Heyman v. Darwins [1942] AC 356 — and confirmed, I would add, by subsequent cases. The distinction thus drawn, when considering the position of third parties, between on the one hand the main obligations of a contract and on the other hand an arbitration contrasts with, and in my view throws doubt upon, Saville J's assimilation of the two in Moudreas . The general principle in In re Kitchin and in The Vasso was further applied in Hayter v. Nelson [1990] 2 LL.R. 265 , where a reinsurer, who had been held liable to original insurers under an arbitration award, claimed to recover the amount of such liability from his retrocessionaires. Saville J there said, citing In re Kitchin , that just as a surety could not be bound by such an award or judgment, absent agreement, so a retrocessionaire was not.

56.   In Stargas SpA v. Petredec Ltd. (The Sargasso) [1994] 1 Ll.R. 412 , it had been determined by arbitration award that charterers were liable to sub-charterers under a voyage charter for contamination of the cargo. Charterers claimed from disponent owners an indemnity by way of damages under the head time charter. Clarke J held that it was for charterers to prove both the breach of the head charter and that it put them in breach of the voyage charter, but that, once they had done this, the arbitrators' award (based on their conclusion that there had been a similar breach) could be regarded as caused by the disponent owners' breach and so as quantifying the damages flowing from that breach, unless it could be shown that the charterers had failed to mitigate their loss or that the award was perverse or unreasonable. Clarke

J considered Moudreas as well as The Vasso and Hayter v. Nelson in the course of his judgment, but his decision appears to me to have turned on a relatively limited point of causation and not to bear on the issue that we have to decide.

57.   In Hollington v. Hewthorn Goddard LJ, after giving his reasons for considering that a judgment was neither conclusive nor of evidential weight in subsequent proceedings, went on:

> "A judgment, however, is conclusive as against all persons of the existence of a state of things which it actually affects when that state of things is a fact in issue. Thus, if A sues B, alleging that owing to B's negligence he has been held liable to pay £x to C, the judgment obtained by C is conclusive as to the amount of damages that A has had to pay C, but is it not evidence that B was negligent … and B can show, if he can, that the amount recovered was not the true measure of damage."

That reasoning appears to me consistent with that of Clarke J in The Sargasso . The fact of the judgment for £x can be relied upon as the causative result of B's breach of duty, although it is open to B to try to show that (as between himself and A) his liability to A should give rise to damages measured on some other basis. Where the breaches of duty are effectively the same, as in The Sargasso , this may involve showing either that A failed to mitigate, by taking some obvious point in answer to C's claim, or that the amount awarded was for some other reason so erroneous as to break the chain of causation, or of course that the contract between A and B itself stipulated for some other measure or contained relevant limitations or exceptions.

58.   In Sacor Maritima SA v. Repsol Petroleo SA [1998] 1 Ll.R. 518 , shipowners had settled cargo-receivers' claim under bills of lading and then successfully pursued time charterers for an indemnity in arbitration. The award proceeded on the basis that the cargo contamination

had occurred as a result of the acts or omissions of a surveyor appointed by voyage sub-charterers. Charterers then sought an indemnity from voyage sub-charterers in arbitration but failed because the arbitrators appointed under the sub-charter held (after hearing different evidence) that the contamination was due to the charterers' own fault in failing to instruct the master properly. I held on an appeal to the Commercial Court that the sub-charterers and the sub-charter arbitrators were in no way bound by the findings of the time charter arbitrator. As in The Sargasso , it was for the charterers to prove breach by the sub-charterers (and that it led to shipowners being entitled to claim an indemnity from charterers) before they could hope to rely on the time charter award to quantify their damages. I referred to Saville J's words in Moundreas . I said that, assuming that they represented the law, they did not assist the charterers. I added on the same basis that it made sense to treat the award in Moundreas as determining that the shipbuilders had been in breach of the shipbuilding contract with their buyers, but that in Sacor it was not sought to look to the time charter award to establish charterers' liability to owners, but to transpose findings of fact and conclusions of causation from it wholesale into the voyage charter arbitration. Since this was a passage based on an assumption that the dicta in *Moudreas* represented the law, it does not assist to resolve the issue whether and what validity and application Saville J's dicta may actually have.

59.    As examples of a situation in which B and C commonly agree by contract to be bound by the determination by judgment or award of the legal position as between A and B, Mr Sumption referred us to third party liability insurance, and to the decisions in Post Office v. Norwich Union Fire Insurance Society Ltd. [1967] 2 QB 363 and Bradley v. Eagle Star Insurance Co. Ltd. [1989] AC 957 . For a parallel, non-contractual, situation, he referred to Executor Trustee and Agency Company of South Australia Ltd. v. The Deputy Federal Commissioner (South Australia) (1939) 62 CLR 545 . In that case the question arose as to the basis on which the Commissioner should tax trustees, whose rights and duties under a will had been determined in the Full Court in proceedings to which the trustees, beneficiaries and representatives of next of kin were party. The High Court of Australia held that the Commissioner was bound to tax on the basis of the Court's determination, not because the Commissioner could be said to be bound on any principle

of estoppel by judicial decision, but because he was bound to take the rights of those involved "as they in fact actually exist between the parties", as Latham CJ put it at p.562.

60.    We were also referred to the recent decision in Drake Insurance plc v. Provident Insurance plc [2004] 1 Ll.R. 268 . Mrs Kaur in that case had two insurances potentially available to cover her in respect of an accident: she had her husband's insurance with Provident taken out in respect of the car she was driving and her own with Drake covering any car she was driving with its owner's consent. Provident obtained an award declaring that it was entitled to avoid her husband's insurance. So she looked exclusively to Drake, which indemnified her in full and sought 50% contribution from Provident on the ground that Provident had not in reality been entitled to avoid. Among the points taken by Provident was that, if this was so, then Drake had paid as to 50% as a volunteer, because of a rateable proportion clause in Drake's policy. The Court of Appeal held that Provident had not in reality been entitled to avoid, but rejected the suggestion that Drake had paid as a volunteer. Rix LJ spoke of the award between Mrs Kaur and the Provident as "a fact in the world, binding as between her and Provident, to which, had Drake sought to enforce the [rateable proportion] clause against her, she would have been in a position to point on the issue whether there was another existing insurance". In other words, in the context of a suggestion that Drake had acted as a volunteer in paying Mrs Kaur 100% of her claim under her policy, the award was a powerful factual tool in Mrs Kaur's hands, both because of the legal arguments which it made possible (whatever their ultimate merit) and because of the business pressure under which it put Drake, not to act "contrary to business ethics and the good name of the industry" by seeking to enforce the clause. Pill LJ agreed with Rix LJ on this part of the case.

61.    Clarke LJ put the matter somewhat differently. He thought that Mrs Kaur could in law have defeated any reliance on the rateable proportion clause:

"153.    In such postulated proceedings between Mrs. Kaur and Drake, Drake would have said that there was existing insurance covering the same liability between her and Provident, whereas Mrs. Kaur would have replied that

10-03635-jpm   Doc 271-3   Filed 04/03/17   Entered 04/03/17 18:29:57   Exhibit A - Part 3   Pg 297 of 839

Lincoln National Life Insurance Co v Sun Life Assurance..., 2004 WL 4955745...

there was no such existing insurance because Provident had avoided the policy and had been held to be entitled to do so. As I see it that defence would have succeeded. It would have been no defence for Drake to say that, as between it and Provident or indeed, as between it and Mrs. Kaur, it was entitled to say that the policy had not been validly avoided because, in my opinion (as already stated), the question for decision was whether there was existing cover as between Mrs. Kaur and Provident and Provident had persuaded an arbitrator that there was not."

These sentences accept that it would have been open to Drake to show as against both Provident and Mrs Kaur that the Provident award was wrong. But they proceed, as I see it, on the basis that this would have been irrelevant, because, for the purposes of the rateable proportion clause, what governed was the position as it actually existed and had been determined as between Mrs Kaur and Provident. If this is right, then Clarke LJ's reasoning parallels that applicable under third party indemnity insurance or adopted by the High Court in Executor Trustee , as described in paragraph 59 above.

62.   In the present case, there is nothing in the Lincoln reinsurance constituting an agreement that the operation and application of the Net Retained Lines clause should depend upon or follow any arbitral award or judgment as between Sun/Phoenix and any other potential reinsurer about the scope of any such other reinsurance. The only qualification that may have to be made to this proposition is that indicated in paragraph 51 above. If there had been an award between Sun/Phoenix and Cigna determining simply that losses on the Unicover book were recoverable under the Cigna reinsurances, their recoverability could be regarded as a relevant fact, which would mean that they were not being "retained" by Sun/Phoenix within the meaning of the Net Retained Lines clause.

63.   The cases considered in paragraphs 53–58 above all concern the situation of a party to the judgment or award seeking to rely upon it as against a stranger. In the present case, Lincoln, the stranger, is seeking to rely on the Cigna award as against a party to it. Such attraction as there is in Mr Hunter's suggested principle derives from this distinction. The judge was clearly influenced by the feeling that Sun-Phoenix had had a full opportunity to argue the issue and lost, and that justice is not generally served by permitting re-litigation of previously decided issues. Such considerations underlie conventional principles of res judicata and issue estoppel. Even where those conventional principles do not apply, such considerations may have direct force in court, in the context of arguments based on abuse of process: cf Hunter v. Chief Constable [1982] AC 529 and Secretary of State for Trade and Industry v. Bairstow (above). In the latter case the Court of Appeal analysed the previous case-law in this area and concluded that

> "it will only be an abuse of process of the court to challenge the factual findings and conclusions of the judge or jury in the earlier action if (i) it would be manifestly unfair to a party to the later proceedings that the same issues should be relitigated or (ii) to permit such relitigation would bring the administration of justice into disrepute" (cf per Sir Andrew Morritt V-C at para. 38).

But Mr Hunter did not, in the present private and arbitral context, make any submission to the effect that the Lincoln tribunal either had or exercised any similar jurisdiction to refuse to entertain any case by Sun/Phoenix contrary to the Cigna award on grounds of "abuse of process". I would add that, even if one were to assume that an arbitration tribunal could ever have any jurisdiction of this nature, its exercise on the facts of this case would in my view be excluded by the third, fourth and fifth considerations identified in paragraphs 66–68 below. The new principle which Mr Hunter seeks to develop from Saville J's dicta must, therefore, seek some foundation in legal principle other than the simple considerations of abuse of process which may apply in relation to the administration of justice in court.

64. However, as I see it, there is no foundation in legal principle for Mr Hunter's suggested new principle. First, as I have observed, Saville J's dicta are open to criticism for failing to distinguish between the relevance in relation to third parties of (on the one hand) the main obligations of a contract and (on the other hand) a judgment or arbitration award regarding such obligations.

65. Second, Mr Hunter's attempt to qualify Saville J's dicta so as to make them operate only one-way is contrary to ordinary principle. The principles of res judicata and issue estoppel commonly operate mutually. Saville J's dicta in Moundreas were themselves couched in terms suggesting an extended mutual principle. Spencer Bower puts the position in relation to estoppel arising from a judgment as follows at para. 213:

> "Estoppels by *res judicata* in civil cases "must be mutual" ( Petrie v. Nuttall (1856) 11 Exch. 569 , 575). .... The established requirement is that *res judicata* estoppels in civil cases are mutual, and a party is only bound in favour of another if a contrary decision would have bound him. This is important when determining whether a person is a privy."

Spencer Bower points out, however, that Lord Denning disagreed with this, and purported to overrule Petrie v. Nuttall in McIlkenny v. Chief Constable of the West Midlands Police [1980] QB 283 , 321, but that George Baker LJ expressed no view on the point while Goff LJ held that mutuality was basic. The House of Lords did not as I see it express any view on this point, although it agreed with Goff LJ on the different issue of abuse of process: see Hunter v. Chief Constable . However, the importance of finality, as a condition for issue estoppel, was emphasised in the speeches in the House of Lords in Carl Zeiss Stiftung : see pp. 909–910, 928, 935, 942–3 and 968–9; and the Court of Appeal's decision in Secretary of State for Trade and Industry v. Bairstow (above) has recently underlined the existence of a clear distinction

between (on the one hand) the finality or evidential admissibility of a prior decision as between parties or privies to that decision and (on the other hand) the wider jurisdiction that courts have in litigation to exclude or control collateral challenges to an earlier decision by one party to that decision as an abuse of process.

66. Thirdly, I do not consider that the arguments based on general justice have the force in the present context which Mr Hunter suggests and which Toulson J accepted. I do not think that it is obviously just, or even convenient, to allow a stranger to enjoy a one-sided entitlement to hold a party to the award or judgment to its terms, with a concomitant right to challenge its correctness whenever it appeared favourable to do so. In the context of arbitration, the limitation of appeals to points of law in addition to the need for leave for appeal (cf. Arbitration Act 1996, s.72 ) suggests a general need for caution, quite apart from the specific difficulty facing any attempt by Sun/Phoenix to appeal on an unpleaded alternative that they had not raised until the last minute (cf paragraph 35 above). Further, although there is no doubt in this case that it suits Lincoln to hold Sun/Phoenix to what it submits was determined by the award, it is not difficult to think of qualified scenarios. It could depend on potentially changing or developing facts whether the implications of an award between A and B were favourable to C at a particular time, or even from time to time. There could also be awards with both favourable and unfavourable aspects (for example a determination that certain risks were reinsured by A with B, but subject only to certain qualifications or monetary limits, with which C might wish to take issue). There would thus appear to be no guaranteed way of knowing when and how far an award would be binding. It would depend upon what suited the stranger to the award at any particular time.

67. Fourthly, and linked with the third point, there is a strong element of fortuity about the one-sided benefit for which Mr Hunter contends. Why should Lincoln gain any benefit from an award to which they were not party, particularly in the present context? Sun/Phoenix could not be said to have gained any benefit against anyone — let alone as against Lincoln — from any conclusion by the Cigna tribunal that, but for the avoidance, the Unicover book was protected. Further, if Sun/Phoenix had realised the hopelessness of their case on avoidance

and had conceded avoidance or compromised their claim, without any award ever being issued by the Cigna tribunal, Lincoln would have had to arbitrate the scope of the Cigna reinsurances in relation to the Unicover book with Sun/Phoenix without the benefit of any of the present submissions based on the Cigna award. Toulson J was impressed by the supposed difficulty that Lincoln would face: if Sun/Phoenix were permitted to engage in the *volte face* of calling Mr Minter to prove the existence of an exclusion against which they had previously argued before the Cigna tribunal, then Lincoln would have to call Mr Butler of SCB to try to prove that there was no exclusion, when his evidence before the Cigna tribunal had been that there was not even a misrepresentation or non-disclosure. But I do not see why that would create any special difficulty, let alone one requiring a departure from basic principles. Each witness would be expected to repeat his previous evidence. The Lincoln tribunal would be likely to be given access to transcripts of their previous evidence. It would have to make up its mind about the proper factual findings to make after hearing their further oral evidence. However unlikely it might be, Mr Butler might even convince the Lincoln tribunal that there was not only no exclusion but also no misrepresentation or non-disclosure — which would be to Lincoln's advantage.

68. Fifthly, and more fundamentally, the solution for which Mr Hunter contends appears to me to overlook or obscure important differences between arbitration and litigation. In the context of litigation, problems of potentially conflicting judgments arrived at between different parties to the same overall complex of disputes are met by provisions for joinder of parties or proceedings or for trial together, if necessary on a mandatory basis using the courts' compulsive powers. Even in circumstances in which there has been no such joinder, and where neither res judicata nor issue estoppel has any application, the court may intervene to prevent abuse of its process, as stated in paragraphs 63 and 65 above. All this is facilitated by the public nature of litigation, the public interest in the efficient administration of justice and the courts' coercive powers. Considerations of general justice of the sort to which Toulson J referred thus have relevance and can be given effect in the context of litigation. Arbitration is in contrast a consensual, private affair between the particular parties to a particular arbitration agreement. The resulting inability to enforce the solutions of joinder of parties or proceedings in arbitration, or to

try connected arbitrations together other than by consent, is well-recognised — though the popularity of arbitration may indicate that this inability is not often inconvenient or that perceived advantages of arbitration, including confidentiality and privacy are seen as outweighing any inconvenience. Different arbitrations on closely inter-linked issues may as a result lead to different results, even where, as in the present case, the evidence before one tribunal is very largely the same as that before the other. The arbitrators in each arbitration are appointed to decide the disputes in that arbitration between the particular parties to that arbitration. The privacy and confidentiality attaching to arbitration underline this; and, even if they do not lead to non- parties remaining ignorant of an earlier arbitration award, they are calculated to lead to difficulties in obtaining access, and about the scope of any access, to material relating to that award.

69. The conclusion that I would reach is that Mr Hunter's suggested principle has no sound basis, and that the dicta of Saville J in *Moudreas* cannot be regarded as reflecting or as based on any general principle of law in the arbitral context to which they were directed.

**Conclusion**

70. I would therefore allow this appeal and restore paragraph (4) of the dispositive part of the Lincoln award to the form in which it was made by the Lincoln tribunal.

Lord Justice Longmore:

71. I entirely agree with the judgment of Mance LJ on the first three issues to which the appeal gives rise. That means that the ratio of our decision is contained in his judgment on issue (3) to the effect that the Cigna arbitrators' conclusion (that the Unicover book was, apart from Cigna's successful avoidance, reinsured by Cigna) was not a necessary part of their decision, was collateral to it and thus not sufficient to constitute an issue estoppel in subsequent litigation. I add a few words on issue (4) not because I disagree in any way with Mance LJ's reasoning or conclusion but because we are differing from a considered dictum of Saville J and the judgment of Toulson J in the present case.

72.  In the Moundreas case [1985] 2 Lloyds Rep. 515 the claim was made by a shipbroker for his commission against the builders/sellers of the ship. The commission was payable on the happening of various stages of the shipbuilding contract which had not occurred because, as the arbitrators decided, the buyers were entitled to terminate the shipbuilding contract by reason of breach of contract on the part of the builders/sellers. The broker contended that it was a breach of the agency contract for the builders/sellers to deprive him of the opportunity of earning his commission at the relevant stages of the shipbuilding contract. He had, therefore, to prove that the builders/sellers had so deprived him which they would have done if (as the arbitrators had held) they were guilty of a repudiatory breach which the buyers were entitled to (and did) accept as terminating the contract. It was in these circumstances that Saville J said (page 520):—

> "As between the parties that is now the contractual position as determined by the contractual machinery of arbitration — and it is difficult to see why a stranger to the contract cannot prove that contractual position by simply producing the award as he can prove other contractual rights and obligations by simply producing the contract."

73.  There are, as it seems to me, four difficulties about this passage, which was not essential to his decision since the shipbroker in fact proved, by satisfactory evidence, that the builders/sellers were in repudiatory breach. The first (and purely formal) difficulty is that a stranger to a contract with an arbitration clause will often be in considerable difficulty in "simply producing the award". Arbitrations are usually private and awards can normally be referred to in other proceedings only if the parties to the award consent that it should be so referred to. I do not, however, wish to engage with possible exceptions to that general principle since Mr Ian Hunter QC for Lincoln asserted (and Mr Sumption QC for Sun/Phoenix appeared to accept) that Saville J was not confining his observations

to cases of arbitrators' awards. On this basis, Saville J's observations, if correct, would apply equally to a stranger producing a judgment, as to which there is no difficulty because it is a public document.

74.  It is, of course, possible that Saville J was intending to confine his remarks to cases of arbitration awards on the basis that it is an implied term of every contract containing an arbitration clause that the parties will honour an award. But even if that were to have been the basis of Saville J's observation, there would still be the difficulty (more acute in 1985 than now) that a third party cannot normally rely upon or otherwise take advantage of a term in a contract to which he is not a party. No argument was addressed to us on the Contracts (Rights of Third Parties) Act 1999 and I leave that matter there.

75.  The second difficulty, on the assumption that the observations were intended to be general in character, is that while it makes sense to say, in an appropriate case, that a stranger to a contract can prove the existence of "contractual rights and obligation by simply producing the contract" that is not sufficient for the purpose of the stranger. He needs to prove not the existence of "contractual rights and obligations" but that the person whom he is suing is in breach of the relevant obligations. He cannot do that merely by producing an award or a judgment, unless he has a contract with the person whom he is suing to the effect that he agrees that that question can be regarded as determined by a prior award or judgment. This has long been held to be the law in cases of contracts of guarantee, see Ex parte Young, Re Kitchin (1881) 17 ChD 668 (prior judgment) and The Vasso [1979] 2 Lloyds Rep. 412 (prior award). It has also been held to be the case for reinsurance, see Hayter v Nelson [1990] 2 Lloyds Rep. 265 . If the pre-1985 authorities had been cited to Saville J in Moundreas I doubt if he would have expressed himself in such general terms.

76.  It can, of course, be said that these two pre-1985 authorities are cases where a claimant who was successful in previous proceedings is seeking to rely on that success to preclude a stranger to those proceedings from putting forward the defence that the original defendant was not liable in a second set of proceedings to which the erstwhile stranger is now the defendant. That would obviously be

unjust. Mr Hunter argued that it was different where it was the now defendant who had been party to the previous proceedings; then, he said, it would be eminently just and reasonable that the now defendant, who has raised in previous proceedings the very same issue as arises in the current proceedings and has had that issue decided against him, should not be allowed to re-argue the very same matter in the new proceedings. He submitted that Moundreas was an example of just such a case and should be followed. This submission gives rise to the third and fourth difficulties with the observations of Saville J which is that they seem to me to be contrary to both principle and authority.

77.   The long-established principle is that estoppels are mutual. The principle for which Mr Hunter contends is curiously one-sided in that it is the now defendant who is bound by a decision against him but the now plaintiff would not be bound by a decision in the now defendant's favour. That is contrary to principle, see for example Spencer Bower *Res Judicata* 3rd ed para. 213. It is because of this requirement of mutuality that the further requirement of issue estoppel has evolved, that the estoppel is only effective as between the same parties or their privies. But if it would be unfair to bind someone who is not a party, the principle of mutuality requires that someone not a party cannot take advantage of a decision in proceedings made when he was not there.

78.   Fourthly there is the matter of authority. It is true to say that the majority of the Court of Appeal in the Birmingham bombing case McIlkenny v Chief Constable of the West Midlands [1980] QB. 283 supported the reasoning for which Mr Hunter was contending. In that case, the alleged bombers (they have now had their convictions quashed) had argued at trial that they had been assaulted by the police and that their confessions were not, therefore, admissible in evidence. On a voir dire Bridge J had stated that he was satisfied beyond reasonable doubt that the police had not assaulted the defendants; the result was that their confessions were held admissible. The same evidence was then deployed before the jury who nevertheless convicted the defendants and must, on any view of the matter, have likewise been convinced beyond reasonable doubt that they had not been assaulted by the police. The alleged bombers then sued the police for assault; both the Court of Appeal

and the House of Lords held that it was an abuse of process for them to claim damages in civil proceedings for assaults which a criminal court had concluded beyond reasonable doubt had not taken place. In the Court of Appeal, however, both Lord Denning MR and Sir George Baker concluded that the claimants were prevented by issue estoppel from raising the same points as had been concluded against them in the criminal proceedings despite the fact that the defendant chief constable in the civil proceedings was not the same party as the Crown in the criminal proceedings. They relied on the advice of the judges to the House of Lords in the Duchess of Kingston's case (1776) 2 Smith LC (13th Edn) 644, 647–8:—

> "But in all these cases, the parties to the suits, or at least the parties against whom the evidence was received , were parties to the sentence, and had acquiesced under it."

From these words, the principle was derived that a party, against whom an issue had been decided, could not raise the self-same issue in subsequent proceedings.

79.   As Goff LJ pointed out, this was contrary to more recent authority, particularly the Court of Appeal case of Mills v Cooper [1967] 2 QB 459 which had decided that the assertion which a party to new proceedings was in law estopped from asserting had to be the same assertion as was made

> "in his previous cause of action or defence in previous civil proceedings between the same parties or their predecessors in title."

80.   When the Birmingham case went to the House of Lords, sub nom Hunter v Chief Constable of the West Midlands Police [1982] AC 529 , the House decided that the institution of the civil proceedings was indeed an abuse of process of the court and that

10-03635-jpm    Doc 271-3    Filed 04/03/17    Entered 04/03/17 18:29:57    Exhibit A -
Part 3    Pg 302 of 839

Lincoln National Life Insurance Co v Sun Life Assurance..., 2004 WL 2985745...

"the question whether it also qualifies to bear the label "issue estoppel" is a matter not of substance but of semantics".

The House declined to engage in that matter of semantics but Lord Diplock said at page 540:—

"Nevertheless it is my own view, which I understand is shared by all your Lordships, that it would be best, in order to avoid confusion, if the use of the description "issue estoppel" in English law, at any rate … were restricted to that species of estoppel *per rem judicatam* that may arise in civil actions between the same parties or their privies, of which the characteristics are stated in a judgment of my own in Mills v Cooper [1967] 2 QB 459 that was adopted and approved by this House in DPP v. Humphrys [1977] AC 1 …."

81.  In these circumstances it seems to me too clear for argument that in this court we remain bound by Mills v Cooper and cannot be seduced along the path proposed by Mr Hunter and adopted by the majority of the Court of Appeal in the Birmingham bombing case. Toulson J was not told that this court had come to the same conclusion in Secretary of State for Trade and Industry v Bairstow [2004] Ch 1 by which, in my view, we are now bound.

82.  I would add that even if it were a principle of English law that a party against whom an issue had been decided in earlier proceedings could not reopen that issue in subsequent proceedings, it could only doubtfully apply in the present case. The earlier proceedings decided the issue of cover in favour of Sun/Phoenix; it can only be said to have been decided against them in the sense that for the purpose of the subsequent proceedings Sun/Phoenix

would prefer that the decision had gone the other way. But I doubt if the principle on which Mr Hunter relied (if it exists) was intended to cover such a case.

83.  The sad truth is that in the absence of any third-party or consolidation procedure in arbitration, parties may be put into the position of making inconsistent cases in different proceedings. In litigation it is possible to make inconsistent cases in the same proceedings; doing so later, in different proceedings, may come under the head of abuse of process. But that is no reason to extend the law of issue estoppel in arbitration proceedings beyond its proper sphere.

84.  All the above is not to deny that there may be cases in which an award can be evidence in subsequent proceedings even though it will not necessarily be conclusive evidence. It may, to use Rix LJ's expression in Drake Insurance Plc v Provident Insurance Plc [2003] EWCA Civ 1834 , be a "fact in the world". A good example of this is to be found in The Sargasso [1994] 1 Lloyds Rep. 412 where a charterer had been held liable by an award in favour of a sub-charterer who had sued to recover damages for damage to cargo. The charterer then sued the shipowner and proved breach of contract; the measure of damages to which he was entitled was governed by the award pursuant to which he had been held liable to the sub-charterer. It quantified the loss which he had actually suffered; he was entitled to put it in evidence for that purpose and say he should be able to recover not less than the amount of the award; the shipowner would also be entitled to say that the charterer should not recover more than the amount of award. That would not have prevented the shipowner from arguing that the charterer had not taken the right points and that he had thus failed to mitigate his damages or, indeed, that the award against him had been made by reason of some fact which was not a breach of contract on the owners' part.

85.  In The Sargasso Clarke J referred to the observations of Saville J in the Moundreas case and in that context they are uncontroversial. But I do not consider that they form a safe basis on which to found any extension of the existing law of issue estoppel, and they should not be followed in future for that purpose.

Lord Justice Jacob:

86.  I agree with both judgments. It is worth standing back from the detail. What Lincoln seek to do is to rely upon a non-operative (in the sense that no actual consequences flow from it), opinion expressed by the Cigna arbitrators. The opinion is in its nature private. Moreover it was unappealable. Lincoln seek more than just to rely upon the opinion — they say it is conclusive for all purposes and so conclusive in the later arbitration.

87.  I think such a result would be obviously wrong for the following reasons:

> • (a)  An arbitration is an essentially private matter between the parties to it. Only some consequence of an award (e.g. that A should pay B money) can go further and extend beyond the privacy of the arbitration itself — so as to become a "fact in the world." (Rix LJ's phrase).
> • (b)  Because the determination of arbitrators is itself a private matter it is in its nature not intended to be available to third parties for any purpose. A third party's rights against one of the parties to an earlier arbitration cannot depend on the happenstance of

the availability of the details of that arbitration in a later arbitration involving that third party. In this connection I note that the position may be different if the earlier decision is that of a court. In particular a decision of a court as to the construction of a contract is a matter of law — with the consequence that the further principle of judicial precedent on such a question may come into play.

88.   Where a party seeks to re-litigate in subsequent proceedings against Y a point he fought fully in earlier proceedings against X, it may be that, notwithstanding a lack of mutuality, he can be prevented from doing so on the grounds of abuse of process. As to that I express no concluded opinion for, for the reasons given by Mance LJ, there is no question of abuse of process here.

ORDER: Appeal allowed, respondents to pay appellant's costs of the appeal and below; Application to appeal to the House of Lords refused.

Crown copyright

© 2017 Sweet & Maxwell

2004 WL 2945745

---

**End of Document**                                   © 2017 Thomson Reuters.

# TAB 47



[Home] [Databases] [World Law] [Multidatabase Search] [Help]
[Feedback]





# United Kingdom House of Lords Decisions

**You are here:** BAILII >> Databases >> United Kingdom House of Lords Decisions >> Lipkin Gorman v Karpnale [1988] UKHL 12 (06 June 1991)
URL: *http://www.bailii.org/uk/cases/UKHL/1988/12.html*
Cite as: [1991] 2 AC 548, [1988] UKHL 12, [1991] 3 WLR 10

[New search] [Buy ICLR report: [1991] 2 AC 548] [Buy ICLR report: [1991] 3 WLR 10] [Help]

JISCBAILII_CASE_TRUSTS

Parliamentary Archives,
HL/PO/JU/18/251

Judgment: 6.6.91

## HOUSE OF LORDS

LIPKIN GORMAN (A FIRM)
(ORIGINAL APPELLANTS AND CROSS-RESPONDENTS)

v.

KARPNALE LIMITED

(FORMERLY PLAYBOY CLUB OF LONDON LIMITED)
(ORIGINAL RESPONDENTS AND CROSS-APPELLANTS)
AND OTHERS

Lord Bridge of Harwich
Lord Templeman
Lord Griffiths
Lord Ackner
Lord Goff of Chieveley

LORD BRIDGE OF HARWICH

My Lords,

I have had the advantage of reading in draft the speeches of my noble and learned friends Lord Templeman and Lord Goff of Chieveley. I agree with their conclusion that the appeal should be

allowed and the cross-appeal dismissed with the consequence that the appellants become entitled to judgment for the principal sum of £154,695 inclusive of the sum to which the cross-appeal relates. All questions with respect to the amount of interest to be awarded on this principal sum and with respect to the costs of the proceedings must, unless the parties are able to agree, be deferred to enable counsel to make further submissions.

With respect to the view that prevailed in the Court of Appeal I cannot see that the respondents are in any better position to resist the appellants' claim to recover the money which Mr. Cass stole from them and gambled away in the casino by reason of the fact that cash was exchanged for gaming chips before being wagered at the gaming tables. The respondents were nevertheless mere volunteers who gave no consideration for the stolen money. This was the common sense view expressed in the dissenting judgment of Nicholls L.J. Both my noble and learned friends have thoroughly analysed this issue and I agree with the reasoning in both their speeches.

I agree with my noble and learned friend Lord Goff of Chieveley that it is right for English law to recognise that a claim to restitution, based on the unjust enrichment of the defendant, may be met by the defence that the defendant has changed his position in good faith. I equally agree that in expressly acknowledging the availability of this defence for the first time it would be unwise to attempt to define its scope in abstract terms, but better to allow the law on the subject to develop on a case by case basis. In the circumstances of this case I would adopt the reasoning of my noble and learned friend Lord Templeman for the conclusion that the respondents can only rely on the defence to

- 1 -

the extent that it limits their liability to the appellants to the amount of their net winnings from Mr. Cass which must have been derived from the stolen money.

The respondents submitted that the appellants' claims failed on the ground that they had no title to the money which was the subject of the appeal or to the banker's draft which was the subject of the cross-appeal. The arguments in support of this submission are examined in the speech of my noble and learned friend Lord Goff of Chieveley. I agree with his reasons for rejecting them.

## LORD TEMPLEMAN

My Lords,

Cass was a partner in the appellant firm of solicitors, Lipkin Gorman ("the solicitors"). Cass withdrew £323,222.14 from the solicitors' bank account. The sum of £100,313.16 was

replaced, recovered or accounted for, but the balance of £222,908.48 was money which Cass stole from the solicitors and proved to be irrecoverable from him. Cass staked £561,014.06 at the gaming tables of the Playboy Club, a licensed casino owned and operated by the respondent, Karpnale Ltd. ("the club"). Cass won £378,294.06. After making adjustments for certain cheques, the club agreed that the club won and Cass lost overall, in a matter of months, the sum of £174,745. The parties also agreed that the maximum gross personal resources of Cass amounted to £20,050 and that at least the sum of £154,695 won by the club and lost by Cass was derived from money stolen from the solicitors. The club acted innocently throughout and was not aware that the club had received £154,695 derived from the solicitors until the solicitors claimed restitution. Conversion does not lie for money, taken and received as currency: see Orton v. Butler (1822) 5 B. & Ald. 652 and Foster v. Green (1862) 7 H. & N. 881. But the law imposes an obligation on the recipient of stolen money to pay an equivalent sum to the victim if the recipient has been "unjustly enriched" at the expense of the true owner. In Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour Ltd. [1943] AC 32, 61, Lord Wright said:

> "It is clear that any civilised system of law is bound to provide remedies for cases of what has been called unjust enrichment or unjust benefit, that is to prevent a man from retaining the money of or some benefit derived from another which it is against conscience that he should keep."

The club was enriched as and when Cass staked and lost to the club money stolen from the solicitors amounting in the aggregate to £300,000 or more. But the club paid Cass when he won and in the final reckoning the club only retained £154,695 which was admittedly derived from the solicitors' money. The solicitors can recover the sum of £154,695 which was retained by the club if they show that in the circumstances the club was unjustly enriched at the expense of the solicitors.

- 2 -

In the course of argument there was a good deal of discussion concerning tracing in law and in equity. In my opinion in a claim for money had and received by a thief, the plaintiff victim must show that money belonging to him was paid by the thief to the defendant and that the defendant was unjustly enriched and remained unjustly enriched. An innocent recipient of stolen money may not be enriched at all; if Cass had paid £20,000 derived from the solicitors to a car dealer for a motor car priced at £20,000, the car dealer would not have been enriched. The car dealer would have received £20,000 for a car worth £20,000. But an innocent recipient of stolen money will be enriched if the recipient has not given full consideration. If Cass had given £20,000 of the solicitors' money to a friend as a gift, the friend would have been enriched and unjustly enriched because a donee of stolen money cannot in good conscience rely on the bounty of the

thief to deny restitution to the victim of the theft. Complications arise if the donee innocently expends the stolen money in reliance on the validity of the gift before the donee receives notice of the victim's claim for restitution. Thus if the donee spent £20,000 in the purchase of a motor car which he would not have purchased but for the gift, it seems to me that the donee has altered his position on the faith of the gift and has only been unjustly enriched to the extent of the secondhand value of the motor car at the date when the victim of the theft seeks restitution. If the donee spends the £20,000 in a trip round the world, which he would not have undertaken without the gift, it seems to me that the donee has altered his position on the faith of the gift and that he is not unjustly enriched when the victim of the theft seeks restitution. In the present case Cass stole and the club received £229,908.48 of the solicitors' money. If the club was in the same position as a donee, the club nevertheless in good faith allowed Cass to gamble with the solicitors' money and paid his winnings from time to time so that when the solicitors' sought restitution, the club only retained £154,695 derived from the solicitors. The question is whether the club which was enriched by £154,695 at the date when the solicitors sought restitution was unjustly enriched.

The club claims that the club gave consideration for the sum of £154,695 by allowing Cass to gamble and agreeing to pay his winnings and therefore the club was not enriched or, alternatively, was not unjustly enriched. The solicitors claim that the club acquired £154,695 under void contracts and that as between the club and the solicitors from whom the money was derived, the club is in no better position than an innocent donee from the thief, Cass. The resolution of this dispute depends on the true construction of section 18 of the Gaming Act 1845, an analysis of the relationship between the club and Cass and the consideration of the authorities dealing with gaming and the authorities dealing with unjust enrichment.

Section 18 of the Gaming Act 1845, so far as material, provides:

> "all contracts or agreements, whether by parole or in writing, by way of gaming or wagering, shall be null and void; and that no suit shall be brought or maintained in any court of law or equity for recovering any sum of money or valuable thing alleged to be won upon any wager, or which

- 3 -

> shall have been deposited in the hands of any person to abide the event on which any wager shall have been made .
> . ."

The club contends that the club received money from Cass
under a contract with him which was not a contract "by way of
gaming or wagering" and is not rendered null and void by section
18 of the Act of 1845. Alternatively, even if the club received
the money under a contract by way of gaming nevertheless, it is
argued, the club was not unjustly enriched because, in the belief
that the money tendered by Cass was his own personal money, the
club accepted the money and altered the position of the club to
the detriment of the club by allowing Cass to gamble and by
paying his winnings when he won; the club, it is said, was
enriched, but not unjustly enriched, and may retain the money
which the club fairly and lawfully won. It is well settled that
section 18 of the Act of 1845 does not enable a gambler to
recover money which he has lost and paid.

The club was a proprietary club and Cass was a member.
Cass was not bound to gamble but if he contemplated doing so he
was bound to advance cash. Cass could pay cash to the club
cashier. In return for cash the cashier issued credit vouchers with
a face value equal to the money received. If Cass tendered a
credit voucher to a croupier at a gaming table, Cass would be
issued by the croupier with plastic chips amounting to the face
value of the voucher. Cass could, if he wished, instead of
tendering a voucher to a croupier, pay cash to a croupier and
receive plastic chips for cash. Gaming on the table was conducted
with chips. Cass was not bound to gamble and the croupier was
not bound to allow Cass to stake a chip at the table. If Cass
staked and lost, the croupier kept the chip which had been staked.
If Cass staked and won. the croupier paid out the winnings with
chips. If Cass paid cash for a credit voucher which he did not
exchange for chips, he could cash the credit voucher with the
cashier. If Cass changed a credit voucher for chips or if Cass
paid a croupier for chips, then the cashier would cash any chips
which Cass did not stake. If Cass acquired chips by winning at a
table or acquired chips from a fellow member, the cashier would
cash the chips for Cass. If Cass ordered refreshments at the club,
he could pay in chips. Thus within the club chips were treated as
currency and on leaving the club Cass could exchange chips for
money whenever he chose to do so. The chips themselves were
worthless and at all times remained the property of the club but
the club would redeem them for cash.

The club argues that when Cass paid, for example, £5,000 in
cash to the cashier or to the croupier, there came into existence
a contract which was not a gaming contract. In consideration for
£5,000 paid by Cass, the club agreed to cash any chips retained,
won or otherwise acquired and at any time presented for payment.
This was a contract, so it was said, in contemplation of gaming
and not a contract by way of gaming. If Cass staked a chip and
the croupier accepted the stake and played the game, there came
into existence a second contract. For example, if the game were
roulette, in consideration of the club promising to pay Cass if the
ball fell into a red pocket, Cass promised to pay the club if the
ball did not fall into a red pocket. When Cass lost he forfeited
his staked chip and forfeited the right to the money represented

by that chip. When Cass won he was entitled to the return of his staked chip and to his winnings in chips. But there were, according to the club, two separate contracts. By the first contract, Cass exchanged cash for chips and that was not a contract by way of gaming.

My Lords, when Cass paid money to the cashier, he was issued with a receipt in the form of a credit voucher and then in the form of a chip. The chip did not oblige Cass to avail himself of the facilities of the club and did not oblige the club to allow Cass to gamble or take advantage of any other facilities of the club. If a thief deposits stolen money in a building society, the victim is entitled to recover the money from the building society without producing the pass book issued to the thief. As against the victim, the building society cannot pretend that the building society gave good consideration for the acceptance of the deposit. The building society has been unjustly enriched at the expense of the victim. Of course the building society has a defence if the building society innocently pays out the deposit before the building society realises that the deposit was stolen money. But in the present case the club retained some of the stolen money. The club cannot as against the solicitors retain the stolen money save by relying on the gaming contracts which, as between the club and Cass, entitled the club to retain the solicitors' money which Cass lost at the gaming table. Those gaming contracts were void. The club remains unjustly enriched to the extent of £154,695.

If Cass had been gambling with his own money, the gaming system operated by the club would have ensured that Cass paid his gambling losses contemporaneously and that the club paid their gambling losses in arrears. The gaming contracts were void but section 18 of the Act of 1845 does not, as between gamblers, prevent a gambling loss from being paid contemporaneously or in arrears. A gambling loss, whenever paid, is a completed voluntary gift from the loser to the winner. But Cass was gambling with the money of the solicitors who have never gambled and never made a voluntary gift to the club.

Another way of analysing the situation is this. When Cass entered the club as a member, the club made to him a revocable offer to gamble with him in the manner and upon the terms dictated by the club. Those terms required Cass to pay his gambling stakes in advance and to allow the club to pay their gambling losses in arrears. The revocable offer by the club was accepted by Cass when he staked a chip and became irrevocable when the croupier accepted the chip as a stake. There was only one contract and that was a gaming contract.

The club claims that even if the only consideration given by the club was a gambling consideration, nevertheless the club altered its position to its detriment because the club allowed Cass to gamble and the club paid his winnings. This is another way of relying on a void gaming contract justifying the retention of the solicitors' money. The club has not suffered any detriment. If

the club pays £154,695 to the solicitors as a result of this appeal, the club will be in exactly the same position which would have obtained if Cass had not gambled away the solicitors' money. It is true that the club would have been in a better position if Cass had been gambling away his own money, but that plaintive

- 5 -

observation does not entitle the club to retain the solicitors' money by which the club remains unjustly enriched to the extent of £154,695.

Cass staked with the club money which he had stolen from the solicitors. The solicitors have been content to assume that in addition Cass staked £20,050 of his own money. Cass also staked money which from time to time he won from the club during the course of his doomed gambling. At the date when the solicitors claimed restitution the club had recovered all its own money and were left with £174,745 net winnings. The club is entitled to assert and the solicitors cannot disprove that £20,050 of the net winnings was money which had belonged to Cass. There remained £154,695 which must have been money stolen from the solicitors. My conclusion is that the club has no right to retain stolen money received by the club from the thief. Repayment by the club to the victim, limited to the net amount of stolen money which the club retains, will not inflict a net loss on the club as a result of the transactions between the club and the thief. In the present case money stolen from the solicitors by Cass has been paid to and is now retained by the club and ought to be repaid to the solicitors. The solicitors will recover part of their stolen money and the club will only lose the winnings the club was not entitled to make out of the solicitors' money.

Counsel produced a number of relevant authorities which must be considered. In Miller v. Race (1758) 1 Burr. 452, a bank note made out to bearer and payable on demand was treated as currency. Conversion did not lie because there is no property in currency. Lord Mansfield said, at pp. 457-458:

> "So, in the case of money stolen, the true owner cannot recover it, after it has been paid away fairly and honestly upon a valuable and bona fide consideration: but before money has passed in currency, an action may be brought for the money itself."

In the present case the money was received by the club fairly and honestly but not upon a valuable and bona fide consideration.

In Clarke v. Shee and Johnson (1774) 1 Cowp. 197 a servant stole money from his master and bought lottery tickets. Lotteries were illegal and void under the Lottery Act 1772. The master recovered from the defendants who were the holders of the lottery and had innocently received the stolen money. The defendants

unsuccessfully argued that there was no contract between the master and the defendants and that the defendants had given consideration for the receipt of the money. It was argued that though the defendants were fortunate in that the lottery tickets issued for the stolen money were not winning tickets, the defendants ran the risk "and therefore performed their part of the agreement: consequently, there is no foundation for an action to recover back the money paid." Lord Mansfield said, at p. 200:

> "Here the plaintiff sues for his identified property, which has come to the hands of the defendants iniquitously and illegally in breach of the Act of Parliament. Therefore they have no right to retain it; and consequently the plaintiff is well entitled to recover."

- 6 -

Mr. Lightman, who appeared on behalf of the club, sought to distinguish this authority on the ground that the Lottery Act 1772 made the contract between the servant and the defendants illegal and not merely void and imposed a criminal penalty for breach of the statute. For present purposes, however, it does not seem to me to matter whether the contract upon which the defendant relies as affording consideration for receipt of stolen money is illegal as provided by the Lottery Act 1772 or void as provided by the Gaming Act 1845. In each case the contract cannot be relied upon to support the retention by the defendant of stolen money derived from the plaintiff.

In Aubert v. Walsh (1810) 3 Taunt. 277 there was a wager on 15 September 1808 that the war with France would end before 1 July 1810. One party to the wager withdrew in October 1808 and was held entitled to recover his stake from the other party. Lord Mansfield said, at p. 283:

> "why should not a man say, you and I have agreed so and so, but the agreement is good for nothing; I cannot bind you, and you cannot bind me, therefore I desire, before the event happens, that you will pay me back my money:"

In the present case Cass could not bind the solicitors so both before and after the event, they can recover their money to the extent that as between the club and the solicitors, the stakes unjustly enriched the club and were retained by the club.

In Hudson v. Robinson (1816) 4 M. & S. 475, a partner fraudulently contracted in the names of the partnership to sell goods to the plaintiff. The fraud received the purchase price from the plaintiff and defaulted in delivery of the goods. It was held that the plaintiff could recover the purchase price from the fraud as money had and received. Lord Ellenborough C.J. said, at p. 478:

> "It is said that an action for money had and received is not maintainable in this case. But an action for money had and

received is maintainable whenever the money of one man
has, without consideration, got into the pocket of another.
Here the money of the plaintiffs has got into the pocket of
the defendant; and the question is whether this has been
without any consideration. The consideration was the
supposed right of the defendant to dispose of the goods as
partnership property, which was the inducement to the
plaintiffs to give this bill, under which they have been
obliged to pay the money. The defendant had no such right;
therefore the absence of any consideration entitles the
plaintiffs to maintain this action, and still more so where
the money has got into the defendant's pocket through the
medium of a fraud."

Here the money of the solicitors got into the pocket of the
club without any consideration.

In Bainbrigge v. Browne (1881) 18 Ch.D. 188, the plaintiff
children, under the influence of their father, charged by deed their
reversionary interest under a settlement as security for advances

- 7 -

made by the defendants to the father. Fry J. held, at p. 197,
that undue influence:

"operates against the person who is able to exercise the
influence (in this case it was the father) and in my
judgment, it would operate against every volunteer who
claimed under him, and also against every person who
claimed under him with notice of the equity thereby created
or with notice of the circumstances from which the court
infers the equity."

On the facts the defendants who were not volunteers did
not have the requisite notice and were entitled to enforce their
security. In the present case the club is in the same position as a
volunteer.

In Shoolbred v. Roberts [1899] 2 Q.B. 560, an undischarged
bankrupt played a match at billiards for £100 a side, the money
being deposited with stakeholders. The bankrupt was the winner.
It was held that the trustee in bankruptcy of the winner was
entitled to recover from the stakeholder the bankrupt's stake of
£100 but not the stake of the loser. Phillimore J. held, at p. 564,
that on the authorities:

" ... I am bound now to hold . . . that where people
embark in a perfectly lawful game and contest of skill, not
trusting to fortune but to skill, to ascertain the comparative
eminence of the two persons, the sums which they deposit
to make a joint award are to be considered by the law as
sums deposited by way of wagering, the contract is null and
void, and the winner cannot recover the fund."

        A fortiori, the club, as against the solicitors, is not entitled
to retain the solicitors' money on the grounds that the club might
have lost and paid its wager with Cass.


        Phillimore J. also held in <u>Shoolbred v. Roberts,</u> at pp. 564-
565, that the £100 staked by the bankrupt was his money and was
part of his property which his trustee in bankruptcy had a right to
recover from the stakeholder. If the bankrupt at any time
received from the stakeholder the stake of £100 which had been
deposited by the loser, that receipt "must be in the eye of the
law a voluntary gift by the stakeholders" or by the loser or
possibly by both to the bankrupt; and if the loser should receive it
of the bounty of the winner or of the bounty of the stakeholders
or at the bounty of both, so far it would not go to the trustee in
bankruptcy.


        When Cass lost and paid £154,695 to the club as a result of
gaming contracts, he made to the club a completed gift of
£154,695. The club received stolen money by way of gift from
the thief; the club, being a volunteer, has been unjustly enriched
at the expense of the solicitors from whom the money had been
stolen and the club must reimburse the solicitors.

        In <u>Black v. S. Freeman & Co.</u> (1910) 12 C.L.R. 105, the
High Court of Australia held that money stolen by a husband and
handed over to his wife by way of gift to her could be recovered
by the victim. O'Connor J. said, at p. 110:


                                    - 8 -


        "Where money has been stolen, it is trust money in the
        hands of the thief, and he cannot divest it of that
        character. If he pays it over to another person, then it
        may be followed into that other person's hands. If, of
        course, that other person shows that it has come to him
        bona fide for valuable consideration, and without notice, it
        then may lose its character as trust money and cannot be
        recovered. But if it is handed over merely as a gift, it
        does not matter whether there is notice or not."


        Although the decision in this case went on the grounds of
trust, the reasoning applies equally to a claim for money had and
received.


        In <u>Banque Beige pour l'Etranger v. Hambrouck</u> [1921] 1 K.B.
321, money stolen by a thief was paid, by way of gift, into the
bank account of a woman with whom he was living. When the
victim made a claim against the woman and her bankers, there
stood to her credit the sum of £315 representing part of the
money stolen from the victim. The victim was held entitled to
the £315. In that case the woman, as a donee, had become
unjustly enriched by the receipt of money stolen from the victim
and retained £315, part of that money. She was bound to
reimburse the victim. It was argued in favour of the woman, who
had no notice of the theft, that she obtained a good title to the

money because it was a gift to her from the thief and the fact
that she had paid the money into her banking account prevented
any following of the money and that an action for money received
would therefore not lie. Bankes L.J. said, at p. 327:

> "To accept either of the two contentions with which I have
> been so far dealing would be to assent to the proposition
> that a thief who has stolen money, and who from fear of
> detection hands that money to a beggar who happens to
> pass, gives a title to the money to the beggar as against
> the true owner - a proposition which is obviously impossible
> of acceptance."

The judgments deal with the case on the basis of following trust
assets but Atkin L.J. said, at p. 335:

> "as the money paid into the bank can be identified as the
> product of the original money, the plaintiffs have the
> common law right to claim it, and can sue for money had
> and received."

In my opinion the club in the present case are in no better
position than the donee in the Banque Beige case.

In Transvaal & Delagoa Bay Investment Co. Ltd. v. Atkinson
[1944] 1 All E.R. 579, money stolen from a company was paid by
the thief into a bank account of his wife. All the money was
expended, mostly by being returned to the husband. The difficult
questions which arise when a donee innocently disposes of stolen
money do not arise in the present case where the stolen money
has been retained by the club.

In the instant case Alliott J. declined to extend the
categories of quasi contract so as to enable the owner of stolen

- 9 -

property to recover the stolen money from the person to whom
the thief has lost it gambling: see [1987] 1 W.L.R. 987, 992-993.
But the contracts under which the club received the stolen money
were void under section 18 of the Act of 1845 and the club was
in no better position than a donee. On principle and on authority
a donee is bound to reimburse the victim for stolen money
received and retained by the donee and, in the circumstances, the
club was unjustly enriched to the extent that the solicitors' money
was retained by the club. The decision of Alliott J. was upheld
by the Court of Appeal (May and Parker L.JJ., Nicholls L.J.
dissenting) [1989] 1 W.L.R. 1340. May L.J. held that the club
gave valuable consideration for the stolen money when the club
issued Cass with chips which enabled him to gamble and when the
club undertook to cash the chips. Parker L.J. considered that a
contract by the club to pay cash for gaming chips was
consideration for the payment by Cass of cash for the use of
gaming chips. The judgments of the majority appeared also to

rely on the power of Cass to purchase refreshments with chips. But neither the power to purchase refreshments nor the exercise of that power could constitute consideration for the receipt of £154,695. In my opinion the chips transaction was part of a single contract by virtue of which Cass gambled away money stolen from the solicitors. If there was a separate chips contract it was a contract which was designed and effective to enable money to be gambled, won, lost and paid and as such it was a contract by way of gaming. Nicholls L.J. said, at p. 1383:

> "the chips were not money or money's-worth; they were mere counters or symbols used for the convenience of all concerned in the gaming. As tokens, the chips indicated that the holder had lodged cash with the club or, when a cheque had been used, had been given credit by the club, to the extent indicated by the tokens. It is as though the customer had been given a series of receipts in respect of the money handed over by him prior to beginning to play. The money was to go to the winners, or be returned to the customer if not spent on gaming. When the customer played at the table he was playing with the money he had brought with him to the casino, just as much as if he had used the banknotes themselves rather than the chips for which he had exchanged the banknotes preparatory to the start of play. I do not believe that this internal, preliminary, preparatory step, of issuing chips for cash, adopted for considerations of practical convenience, can have the effect in law that the club gave valuable consideration for the money it received, when the position in law under the statute is that if money rather than tokens had been used at the table, the club would not have given valuable consideration. I find such a conclusion repugnant to common sense."

> I agree and would allow the appeal.

Included in the sum of £154,695 is £3,735 representing a banker's draft made out to the solicitors and indorsed by Cass to the club for chips which Cass then gambled and lost. The Court of Appeal held that the club had not become holders of the draft in due course and gave judgment for the solicitors. In this House the club cross-appealed. In my opinion the draft represented

- 10 -

money derived from the solicitors which has unjustly enriched the club. There is no difference between the cash and the draft received by the club and the cross-appeal must be dismissed.

In the result I would order judgment to be entered for the solicitors for the sum of £154,695.

## LORD GRIFFITHS

My Lords,

I have had the advantage of reading the speeches of your Lordships. I agree that for the reasons given by Lord Templeman and Lord Goff of Chieveley the appellate solicitors can recover the sum of £150,960 from the respondent club as representing money stolen from the solicitors and the proceeds of the banker's draft lost by Cass in gaming at the respondent club.

I agree that for the reasons given by Lord Goff of Chieveley, the club converted the banker's draft made out to the solicitors' and that the cross-appeal fails.

## LORD ACKNER

My Lords,

I have had the advantage of reading in draft the speeches of my noble and learned friends. Lord Templeman and Lord Goff of Chieveley. I agree that the appeal should be allowed for the reasons set out in both these speeches. I have also had the advantage of reading in draft the speech of my noble and learned friend, Lord Bridge of Harwich. I agree with the views which he expresses as to the availability of the defence of change of position to a claim for restitution based on unjust enrichment as developed by my noble and learned friend, Lord Goff of Chieveley in his speech.

I also agree that for the reasons given by my noble and learned friend, Lord Goff of Chieveley the cross-appeal should be dismissed.

## LORD GOFF OF CHIEVELEY

My Lords,

The appellants, Lipkin Gorman ("the solicitors"), are a firm of solicitors. Norman Barry Cass was a partner in the firm from 1978 to 1980. He had the authority of his partners to draw upon the solicitors' client account, on his signature alone. The account was held at the branch of Lloyds Bank ("the bank") at 62 Brook Street, London W.1.

- 11 -

Cass proved to be a compulsive gambler. He gambled regularly at the casino at the Playboy Club ("the club") which was owned by the respondents, though he also gambled elsewhere.

Such was his addiction to gambling that he found his own resources insufficient; and so he helped himself to money in the client account. Without his partners' knowledge, between March and November 1980 he misappropriated large sums of money from the client account.

Cass used various methods to lay his hands on the money in the client account. His principal method was to have a cheque made out by the solicitors' cashier (a man named Chapman who, as the judge found, had been suborned by Cass), drawn on the client account and made payable to cash; Cass would then sign the cheque and Chapman would cash it at the bank and hand the cash to Cass. In addition, Cass caused building society accounts opened by him in the name of the solicitors to be credited with cash drawn from the client account by means of cheques made payable to various building societies; a total of £40,000 was credited to building societies in this way, during the relevant period. Cass then drew cash from the building society accounts. When Cass finally absconded, there was only £600 left in the building society accounts (excluding interest). Lastly, on one occasion Cass procured the issue of a banker's draft for £3,735 ("the banker's draft") drawn on the bank in favour of the solicitors; this he did by issuing a cheque in favour of the bank drawn on the client account. Chapman took delivery of the draft and passed it to Cass. By these means Cass dishonestly acquired a total of £323,222.14 from the client account. From time to time, however, he paid back into the client account various sums, totalling £100,313.16, to cover up shortfalls caused by his withdrawals, leaving a net shortfall of £222,908.98. It is accepted that a substantial part of the money so misappropriated by Cass, or of sums derived from it, was exchanged by Cass for gaming chips at the club, as was the banker's draft. In other words, these sums were gambled away by Cass. Indeed the total sum staked by Cass at the gaming tables of the club was no less than £561,014.06. This sum included some money of his own; but it was no doubt so large because of his restaking sums which he won from time to time, his total winnings amounting to £378,294.06. It has been agreed by the club that the net sum won by the club and lost by Cass over a period of about 10 months was £174,745. Over that period, the maximum resources of Cass were £20,050. On the basis that credit is given for the whole of that sum, it has been agreed that at least £154,695 won by the club and lost by Cass was derived from money obtained by Cass from the solicitors' client account.

At the club, Cass would present cash either at the cash desk or at the gaming tables. At the cash desk, he would be given a so-called "cheque credit slip" in exchange for cash: he would then exchange the slip for plastic chips of various denominations. If he presented cash at a gaming table, he would be given chips in exchange for the cash. These chips at all times remained the property of the club. Bets were normally made by putting down chips at the gaming table, but cash could be put down at the gaming table and if so would be accepted for bets, without any chips being used. Chips could also be accepted in lieu of cash for refreshments at the club; but their actual use for this

purpose at the club appears to have been very rare, and there was
no evidence that Cass ever used them for that purpose. Any
unused chips, together with chips representing sums won in gaming,
could be exchanged either for cash or a "winnings cheque" drawn
on the club's bank. Cass however returned to the club all the
winnings cheques he received, receiving in their place fresh cheque
credit slips which he then exchanged for chips for the purposes of
gaming.

Cass absconded to Israel. In due course he was extradited
from Israel; and on 8 June 1984 he was convicted at the Central
Criminal Court on 21 counts of theft of money from the solicitors'
client account and sentenced to three years imprisonment.

The solicitors commenced proceedings against both the
respondents and the bank. Their claim against the respondents was
for the recovery, on various grounds, of the money taken by Cass
from the current account and gambled away at the club. They
also claimed damages for conversion of the banker's draft. Their
claim against the bank was for damages for conversion or for
breach of contract, or alternatively as constructive trustees.
Before Alliott J., the solicitors' claim against the respondents
failed, except for the claim for damages for conversion of the
banker's draft [1987] 1 W.L.R. 987. Their claim against the bank
succeeded in part. In the Court of Appeal the solicitors' appeal
from the judge's decision dismissing their claim against the
respondents in respect of the money was dismissed by a majority
(May and Parker L.JJ., Nicholls L.J. dissenting) [1989] 1 W.L.R.
1340. I shall refer in due course to the grounds for this decision;
though I wish to record at this stage that Nicholls L.J. would have
held the respondents liable in damages for conversion of the
money. The respondents' cross-appeal in respect of the banker's
draft was also dismissed, but the cross-appeal of the bank
succeeded. Your Lordships' House has been concerned only with
the appeal of the solicitors from the dismissal of their claim
against the respondents, and the respondents' cross-appeal in
respect of the banker's draft. The solicitors' claim against the
bank has no longer been pursued.

Before the Court of Appeal, and again before your
Lordships' House, the solicitors' claim against the respondents was
for the full sum of £222,908.98 as money had and received. It
was not a claim for conversion of the money; and, despite the
view expressed by Nicholls L.J. in his dissenting judgment, I do not
consider that such an alternative claim was open to the solicitors.
Before the Court of Appeal, though not before the judge, the
solicitors relied strongly on Clarke v. Shee and Johnson (1774) 1
Cowp. 197, Lofft. 756, in support of their claim. The majority of
the Court of Appeal however distinguished that case and rejected
the solicitors' claim on the ground that the respondents received
the money in good faith and for valuable consideration, such
consideration arising first (per May and Parker L.JJ.) from the
fact that the club supplied chips in exchange for the money, the
contract under which the chips were supplied not being avoided as
a contract by way of gaming or wagering under section 18 of the

Gaming Act 1845; and second (per Parker L.J.) from the fact that, although the actual gaming contracts under which Cass gambled away the money were void under the Act, nevertheless he obtained in exchange for the money the chance of winning and of then

- 13 -

being paid and so received valuable consideration from the club. So far as the solicitors' claim for conversion of the banker's draft was concerned, the Court of Appeal rejected a contention by the club that they could escape liability on the ground that they were holders in due course of the draft. I shall consider first the solicitors' appeal in respect of the money, and then the respondents' cross-appeal in respect of the draft; though, as will appear, the appeal and cross-appeal share certain common features.

The solicitors' appeal

I turn then to the solicitors' appeal in respect of the money, which they claim from the respondents as money had and received by the respondents to their use. To consider this aspect of the case it is, in my opinion, necessary to analyse with some care the nature of the claim so made.

The solicitors' claim is, in substance, as follows. They say, first, that the cash handed over by the bank to Chapman in exchange for the cheques drawn on the solicitors' client account by Cass was in law the property of the solicitors. That is disputed by the respondents who say that, since the cheques were drawn on the bank by Cass without the authority of his partners, the legal property in the money immediately vested in Cass; that argument was however rejected by the Court of Appeal. If that argument is rejected, the respondents concede for present purposes that the cash so obtained by Cass from the client account was paid by him to the club, but they nevertheless resist the solicitors' claim on two grounds: first, that they gave valuable consideration for the money in good faith, as held by a majority of the Court of Appeal; and second that, in any event, having received the money in good faith and having given Cass the opportunity of winning bets and, in some cases, recovering substantial sums by way of winnings, it would be inequitable to allow the solicitors' claim.

At the heart of the solicitors' claim lies <u>Clarke v. Shee and Johnson</u> (1774) 1 Cowp. 197, Lofft. 756. In that case the plaintiff's clerk received money and negotiable notes from the plaintiff's customers, in the ordinary course of the plaintiff's trade as a brewer, for the use of the plaintiff. From the sums so received by him, the clerk paid several sums, amounting to nearly £460, to the defendant "upon the chances of the coming up of tickets in the State Lottery of 1772," contrary to the Lottery Act 1772. The Court of Queen's Bench held that the plaintiff was entitled to recover the sum of £460 from the defendant as money had and received by him for the use of the plaintiff. The

judgment of the court was delivered by Lord Mansfield. He said,
1 Cowp. 197, 199-201:

> "This is a liberal action in the nature of a bill in equity;
> and if, under the circumstances of the case, it appears that
> the defendant cannot in conscience retain what is the
> subject matter of it, the plaintiff may well support this
> action . . . the plaintiff does not sue as standing in the
> place of Wood his clerk: for the money and notes which
> Wood paid to the defendants, are the identical notes and
> money of the plaintiff. Where money or notes are paid
> bona fide, and upon a valuable consideration, they never

- 14 -

> shall be brought back by the true owner; but where they
> come mala fide into a person's hands, they are in the
> nature of specific property; and if their identity can be
> traced and ascertained, the party has a right to recover. It
> is of public benefit and example that it should; but
> otherwise, if they cannot be followed and identified, because
> there it might be inconvenient and open a door to fraud.
> Miller v. Race, 1 Burr. 452: and in Golightly v. Reynolds
> (1772) Lofft. 88 the identity was traced through different
> hands and shops. Here the plaintiff sues for his identified
> property, which has come to the hands of the defendant
> iniquitously and illegally, in breach of the Act of
> Parliament, therefore they have no right to retain it: and
> consequently the plaintiff is well entitled to recover."

It is the solicitors' case that the present case is indistinguishable
from Clarke v. Shee and Johnson. In each case, the plaintiff's
money was stolen - in that case by his servant, and in the present
case by a partner - and then gambled away by the thief; and the
plaintiff was or should be entitled to recover his money from the
recipient in an action for money had and received. It is the
respondents' case that the present case is distinguishable on one or
more of the three grounds I have mentioned. I shall consider
those three grounds in turn.

Title to the money

The first ground is concerned with the solicitors' title to
the money received by Cass (through Chapman) from the bank. It
is to be observed that the present action, like the action in Clarke
v. Shee and Johnson, is concerned with a common law claim to
money, where the money in question has not been paid by the
appellant directly to the respondents - as is usually the case where
money is, for example, recoverable as having been paid under a
mistake of fact, or for a consideration which has failed. On the
contrary, here the money had been paid to the respondents by a
third party, Cass; and in such a case the appellant has to establish
a basis on which he is entitled to the money. This (at least, as a

http://www.bailii.org/uk/cases/UKHL/1988/12.html

general rule) he does by showing that the money is his legal property, as appears from Lord Mansfield's judgment in <u>Clarke v. Shee and Johnson.</u> If he can do so, he may be entitled to succeed in a claim against the third party for money had and received to his use, though not if the third party has received the money in good faith and for a valuable consideration. The cases in which such a claim has succeeded are, I believe, very rare (see the cases, including <u>Clarke v. Shee and Johnson,</u> collected in G<u>off and Jones,</u> The Law of Restitution, 3rd ed. (1986), p. 64, note 29). This is probably because, at common law, property in money, like other fungibles, is lost as such when it is mixed with other money. Furthermore, it appears that in these cases the action for money had and received is not usually founded upon any wrong by the third party, such as conversion; nor is it said to be a case of waiver of tort. It is founded simply on the fact that, as Lord Mansfield said, the third party cannot in conscience retain the money - or, as we say nowadays, for the third party to retain the money would result in his unjust enrichment at the expense of the owner of the money.

- 15 -

So, in the present case, the solicitors seek to show that the money in question was their property at common law. But their claim in the present case for money had and received is nevertheless a personal claim; it is not a proprietary claim, advanced on the basis that money remaining in the hands of the respondents is their property. Of course there is no doubt that, even if legal title to the money did vest in Cass immediately on receipt, nevertheless he would have held it on trust for his partners, who would accordingly have been entitled to trace it in equity into the hands of the respondents. However, your Lordships are not concerned with an equitable tracing claim in the present case, since no such case is advanced by the solicitors, who have been content to proceed at common law by a personal action, viz. an action for money had and received. I should add that, in the present case, we are not concerned with the fact that money drawn by Cass from the solicitors' client account at the bank may have become mixed by Cass with his own money before he gambled it away at the club. For the respondents have conceded that, if the solicitors can establish legal title to the money in the hands of Cass, that title was not defeated by mixing of the money with other money of Cass while in his hands. On this aspect of the case, therefore, the only question is whether the solicitors can establish legal title to the money when received by Cass from the bank by drawing cheques on the client account without authority.

Before your Lordships, and no doubt before the courts below, elaborate argument was advanced by counsel upon this issue. The respondents relied in particular upon two decisions of the Privy Council as showing that where a partner obtains money by drawing on a partnership bank account without authority, he alone and not the partnership obtains legal title to the money so obtained. These cases. <u>Union Bank of Australia Ltd. v. McClintock</u>

[1922] 1 A.C, 240 and Commercial Banking Co. of Sydney Ltd, v. Mann [1961] AC 1, were in fact concerned with bankers' cheques: but for the respondents it was submitted that the same principle was applicable in the case of cash. The solicitors argued that these cases were wrongly decided, or alternatively sought to distinguish them on a number of grounds. I shall have to examine these cases in some detail when I come to consider the respondents' cross-appeal in respect of the banker's draft; and, as will then appear, I am not prepared to depart from decisions of such high authority as these. They show that, where a banker's cheque payable to a third party or bearer is obtained by a partner from a bank which has received the authority of the partnership to pay the partner in question who has, however, unknown to the bank, acted beyond the authority of his partners in so operating the account, the legal property in the banker's cheque thereupon vests in the partner. The same must a fortiori be true when it is not such a banker's cheque but cash which is so drawn from the bank by the partner in question. Even so, I am satisfied that the solicitors are able to surmount this difficulty, as follows.

It is well established that a legal owner is entitled to trace his property into its product, provided that the latter is indeed identifiable as the product of his property. Thus, in Taylor v. Plumer (1815) 3 M. & S. 562, where Sir Thomas Plumer gave a draft to a stockbroker for the purpose of buying exchequer bills, and the stockbroker instead used the draft for buying American securities and doubloons for his own purposes, Sir Thomas was able

- 16 -

to trace his property into the securities and doubloons in the hands of the stockbroker, and so defeat a claim made to them by the stockbroker's assignees in bankruptcy. Of course, "tracing" or "following" property into its product involves a decision by the owner of the original property to assert his title to the product in place of his original property. This is sometimes referred to as ratification. I myself would not so describe it; but it has, in my opinion, at least one feature in common with ratification, that it cannot be relied upon so as to render an innocent recipient a wrongdoer (cf. Bolton Partners v. Lambert (1889) 41 Ch.D. 295, 307, per Cotton L.J. - "an act lawful at the time of its performance [cannot] be rendered unlawful, by the application of the doctrine of ratification.")

I return to the present case. Before Cass drew upon the solicitors' client account at the bank, there was of course no question of the solicitors having any legal property in any cash lying at the bank. The relationship of the bank with the solicitors was essentially that of debtor and creditor; and since the client account was at ail material times in credit, the bank was the debtor and the solicitors were its creditors. Such a debt constitutes a chose in action, which is a species of property; and since the debt was enforceable at common law, the chose in

action was legal property belonging to the solicitors at common law.

There is in my opinion no reason why the solicitors should not be able to trace their property at common law in that chose in action, or in any part of it, into its product, i.e. cash drawn by Cass from their client account at the bank. Such a claim is consistent with their assertion that the money so obtained by Cass was their property at common law. Further, in claiming the money as money had and received, the solicitors have not sought to make the respondents liable on the basis of any wrong, a point which will be of relevance at a later stage, when I come to consider the defence of change of position.

Authority for the solicitors' right to trace their property in this way is to be found in the decision of your Lordships' House in Marsh v. Keating (1834) 1 Bing. (N.C.) 198. Mrs. Keating was the proprietor of £12,000 interest or share in joint stock reduced 3 per cent. annuities, standing to her credit in the books of the Bank of England, where the accounts were entered in the form of debtor and creditor accounts in the ledgers of the bank. Under what purported to be a power of attorney given by Mrs. Keating to the firm of Marsh, Sibbard & Co., on which Mrs. Keating's signature was in fact forged by Henry Fauntleroy, a partner in Marsh, Sibbard & Co., an entry was made in the books of the Bank of England purporting to transfer £9,000 of Mrs. Keating's interest or share in the stock to William Tarbutt, to whom, on the instructions of Henry Fauntleroy, the stock had been sold for the sum of £6,018 15s. In due course, the broker who conducted the sale accounted for £6,013 2s.6d. (being the sale price less commission) by a cheque payable to Marsh & Co. Upon the discovery of the forgery, Mrs. Keating made a claim upon the Bank of England; and the bank requested Mrs. Keating to prove in the bankruptcy of the partners in Marsh & Co. in respect of the sum so received by them. Mrs. Keating then commenced an action, pursuant to an order of the Lord Chancellor, for the

- 17 -

purpose of trying the question whether the partners in Marsh & Co. were indebted to her, in which she claimed the sum so received by Marsh & Co. as money had and received to her use. The opinion of the judges was taken, and their opinion was to the effect that Mrs. Keating was entitled to succeed in her claim. Your Lordships' House ruled accordingly. It must follow a fortiori that the solicitors, as owners of the chose in action constituted by the indebtedness of the bank to them in respect of the sums paid into the client account, could trace their property in that chose in action into its direct product, the money drawn from the account by Cass. It further follows, from the concession made by the respondents, that the solicitors can follow their property into the hands of the respondents when it was paid to them at the club.

Whether the respondents gave consideration for the money

There is no doubt that the respondents received the money in good faith; but, as I have already recorded, there was an acute difference of opinion among the members of the Court of Appeal whether the respondents gave consideration for it. Parker L.J. was of opinion that they did so, for two reasons:

(1) The club supplied chips in exchange for the money. The contract under which the chips were supplied was a separate contract, independent of the contracts under which bets were placed at the club; and the contract for the chips was not avoided as a contract by way of gaming and wagering under section 18 of the Gaming Act 1845.

(2) Although the actual gaming contracts were void under the Act, nevertheless Cass in fact obtained in exchange for the money the chance of winning and of then being paid and so received valuable consideration from the club.

May L.J. agreed with the first of these two reasons. Nicholls L.J. disagreed with both.

I have to say at once that I am unable to accept the alternative basis upon which Parker L.J. held that consideration was given for the money, viz. that each time Cass placed a bet at the casino, he obtained in exchange the chance of winning and thus of being paid. In my opinion, when Cass placed a bet, he received nothing in return which constituted valuable consideration. The contract of gaming was void; in other words, it was binding in honour only. Cass knew, of course, that, if he won his bet, the club would pay him his winnings. But he had no legal right to claim them. He simply had a confident expectation that, in fact, the club would pay; indeed, if the club did not fulfil its obligations binding in honour upon it, it would very soon go out of business. But it does not follow that, when Cass placed the bet, he received anything that the law recognises as valuable consideration. In my opinion he did not do so. Indeed, to hold that consideration had been given for the money on this basis would, in my opinion, be inconsistent with Clarke v. Shee and Johnson (1774) 1 Cowp. 197, Lofft 756. Even when a winning bet has been paid, the gambler does not receive valuable consideration for his money. All that he receives is, in law, a gift from the club.

- 18 -

However, the first basis upon which Parker and May L.JJ. decided the point is more difficult. To that I now turn.

In common sense terms, those who gambled at the club were not gambling for chips: they were gambling for money. As Davies L.J. said in C.H.T. Ltd. v. Ward [1965] 2 Q.B. 63, 79:

"People do not game in order to win chips; they game in order to win money. The chips are not money or

money's worth; they are mere counters or symbols used for
the convenience of all concerned in the gaming."

The convenience is manifest, especially from the point of view of
the club. The club has the gambler's money up front, and large
sums of cash are not floating around at the gaming tables. The
chips are simply a convenient mechanism for facilitating gambling
with money. The property in the chips as such remains in the
club, so that there is no question of a gambler buying the chips
from the club when he obtains them for cash.

But this broad approach does not solve the problem, which

is essentially one of analysis. I think it best to approach the

problem by taking a situation unaffected by the impact of the
Gaming Acts.

Suppose that a large department store decides, for reasons
of security, that all transactions in the store are to be effected
by the customers using chips instead of money. On entering the
store, or later, the customer goes to the cash desk and obtains
chips to the amount he needs in exchange for cash or a cheque.
When he buys goods, he presents chips for his purchase. Before he
leaves the store, he presents his remaining chips, and receives cash
in return. The example may be unrealistic, but in legal terms it
is reasonably straightforward. A contract is made when the
customer obtains his chips under which the store agrees that, if
goods are purchased by the customer, the store will accept chips
to the equivalent value of the price, and further that it will
redeem for cash any chips returned to it before the customer
leaves the store. If a customer offers to buy a certain item of
goods at the store, and the girl behind the counter accepts his
offer but then refuses to accept the customer's chips, the store
will be in breach of the contract for chips. Likewise if, before he
leaves the store, the customer hands in some or all of his chips
at the cash desk, and the girl at the cash desk refuses to redeem
them, the store will be in breach of the contract for chips.

Each time that a customer buys goods, he enters into a
contract of sale, under which the customer purchases goods at the
store. This is a contract for the sale of goods; it is not a
contract of exchange, under which goods are exchanged for chips,
but a contract of sale, under which goods are bought for a price,
i.e. for a money consideration. This is because, when the
customer surrenders chips of the appropriate denomination, the
store appropriates part of the money deposited with it towards the
purchase. This does not however alter the fact that an
independent contract is made for the chips when the customer
originally obtains them at the cash desk. Indeed that contract is
not dependent upon any contract of sale being entered into; the
customer could walk around the store and buy nothing, and then be

- 19 -

entitled to redeem his chips in full under the terms of his contract with the store.

But the question remains: when the customer hands over his cash at the cash desk, and receives his chips, does the store give valuable consideration for the money so received by it? In common sense terms, the answer is no. For, in substance and in reality, there is simply a gratuitous deposit of the money with the store, with liberty to the customer to draw upon that deposit to pay for any goods he buys at the store. The chips are no more than the mechanism by which that result is achieved without any cash being handed over at the sales counter, and by which the customer can claim repayment of any balance remaining of his deposit. If a technical approach is adopted, it might be said that, since the property in the money passes to the store as depositee, it then gives consideration for the money in the form of a chose in action created by its promise to repay a like sum, subject to draw-down in respect of goods purchased at the store. I however prefer the common sense approach. Nobody would say that the store has purchased the money by promising to repay it: the promise to repay is simply the means of giving effect to the gratuitous deposit of the money with the store. It follows that, by receiving the money in these circumstances, the store does not for present purposes give valuable consideration for it. Otherwise a bank with which money was deposited by an innocent donee from a thief could claim to be a bona fide purchaser of the money simply by virtue of the fact of the deposit.

Let me next take the case of gambling at a casino. Of course, if gaming contracts were not void under English law by virtue of section 18 of the Gaming Act 1845, the result would be exactly the same. There would be a contract in respect of the chips, under which the money was deposited with the casino; and then separate contracts would be made when each bet was placed, at which point of time part or all of the money so deposited would be appropriated to the bets.

However, contracts by way of gaming or wagering are void in English law. What is the effect of this? It is obvious that each time a bet is placed by the gambler, the agreement under which the bet is placed is an agreement by way of gaming or wagering, and so is rendered null and void. It follows, as I have said, that the casino, by accepting the bet, does not thereby give valuable consideration for the money which has been wagered by the gambler, because the casino is under no legal obligation to honour the bet. Of course, the gambler cannot recover the money from the casino on the ground of failure of consideration; for he has relied upon the casino to honour the wager - he has in law given the money to the casino, trusting that the casino will fulfil the obligation binding in honour upon it and pay him if he wins his bet - though if the casino does so its payment to the gambler will likewise be in law a gift. But suppose it is not the gambler but the true owner of the money (from whom the gambler has perhaps, as in the present case, stolen the money) who is claiming it from the casino. What then? In those circumstances the casino cannot, in my opinion, say that it has given valuable consideration for the money, whether or not the gambler's bet is successful. It has

given no consideration if the bet is unsuccessful, because its
promise to pay on a successful bet is void; nor has it done so if

- 20 -

the gambler's bet is successful and the casino has paid him his
winnings, because that payment is in law a gift to the gambler by
the casino.

For these reasons I conclude, in agreement with Nicholls
L.J., that the respondents did not give valuable consideration for
the money. But the matter does not stop there; because there
remains the question whether the respondents can rely upon the
defence of change of position.

<u>Change of position</u>

I turn then to the last point on which the respondents relied
to defeat the solicitors' claim for the money. This was that the
claim advanced by the solicitors was in the form of an action for
money had and received, and that such a claim should only
succeed where the defendant was unjustly enriched at the expense
of the plaintiff. If it would be unjust or unfair to order
restitution, the claim should fail. It was for the court to consider
the question of injustice or unfairness, on broad grounds. If the
court thought that it would be unjust or unfair to hold the
respondents liable to the solicitors, it should deny the solicitors
recovery. Mr. Lightman, for the club, listed a number of reasons
why, in his submission, it would be unfair to hold the respondents
liable. These were (1) the club acted throughout in good faith,
ignorant of the fact that the money had been stolen by Cass; (2)
although the gaming contracts entered into by the club with Cass
were ail void, nevertheless the club honoured all those contracts;
(3) Cass was allowed to keep his winnings (to the extent that he
did not gamble them away); (4) the gaming contracts were merely
void not illegal; and (5) the solicitors' claim was no different in
principle from a claim to recover against an innocent third party
to whom the money was given and who no longer retained it.

I accept that the solicitors' claim in the present case is
founded upon the unjust enrichment of the club, and can only
succeed if, in accordance with the principles of the law of
restitution, the club was indeed unjustly enriched at the expense of
the solicitors. The claim for money had and received is not, as I
have previously mentioned, founded upon any wrong committed by
the club against the solicitors. But it does not, in my opinion,
follow that the court has carte blanche to reject the solicitors'
claim simply because it thinks it unfair or unjust in the
circumstances to grant recovery. The recovery of money in
restitution is not, as a general rule, a matter of discretion for the
court. A claim to recover money at common law is made as a
matter of right; and even though the underlying principle of
recovery is the principle of unjust enrichment, nevertheless, where
recovery is denied, it is denied on the basis of legal principle.

It is therefore necessary to consider whether Mr. Lightman's submission can be upheld on the basis of legal principle. In my opinion it is plain, from the nature of his submission, that he is in fact seeking to invoke a principle of change of position, asserting that recovery should be denied because of the change in position of the respondents, who acted in good faith throughout.

Whether change of position is, or should be, recognised as a defence to claims in restitution is a subject which has been much

- 21 -

debated in the books. It is however a matter on which there is a remarkable unanimity of view, the consensus being to the effect that such a defence should be recognised in English law. I myself am under no doubt that this is right.

Historically, despite broad statements of Lord Mansfield to the effect that an action for money had and received will only lie where it is inequitable for the defendant to retain the money (see in particular Moses v. Macferlan (1760) 2 Burr. 1005), the defence has received at most only partial recognition in English law. I refer to two groups of cases which can arguably be said to rest upon change of position: (1) where an agent can defeat a claim to restitution on the ground that, before learning of the plaintiff's claim, he has paid the money over to his principal or otherwise altered his position in relation to his principal on the faith of the payment; and (2) certain cases concerned with bills of exchange, in which money paid under forged bills has been held irrecoverable on grounds which may, on one possible view, be rationalised in terms of change of position: see, e.g. Price v. Neal (1762) 3 Burr. 1354, and London and River Plate Bank Ltd. v. Bank of Liverpool [1896] 1 Q.B. 7. There has however been no general recognition of any defence of change of position as such; indeed any such defence is inconsistent with the decisions of the Exchequer Division in Currant v. Ecclesiastical Commissioners for England and Wales (1880) 6 Q.B.D. 234, and of the Court of Appeal in Baylis v. Bishop of London [1913] 1 Ch. 127. Instead, where change of position has been relied upon by the defendant, it has been usual to approach the problem as one of estoppel: see, e.g. R. E. Jones Ltd. v. Waring and Gillow Ltd. [1926] A.C. 670, and Avon County Council v. Hewlett [1983] 1 W.L.R. 605. But it is difficult to see the justification for such a rationalisation. First, estoppel normally depends upon the existence of a representation by one party, in reliance upon which the representee has so changed his position that it is inequitable for the representor to go back upon his representation. But, in cases of restitution, the requirement of a representation appears to be unnecessary. It is true that, in cases where the plaintiff has paid money directly to the defendant, it has been argued (though with difficulty) that the plaintiff has represented to the defendant that he is entitled to the money; but in a case such as the present, in which the money is paid to an innocent donee by a thief, the true owner has made no representation whatever to the defendant. Again, it was held by

the Court of Appeal in Avon County Council v. Howlett that
estoppel cannot operate pro tanto, with the effect that if, for
example, the defendant has innocently changed his position by
disposing of part of the money, a defence of estoppel would
provide him with a defence to the whole of the claim.
Considerations such as these provide a strong indication that, in
many cases, estoppel is not an appropriate concept to deal with
the problem.

　　　　In these circumstances, it is right that we should ask
ourselves: why do we feel that it would be unjust to allow
restitution in cases such as these? The answer must be that,
where an innocent defendant's position is so changed that he will
suffer an injustice if called upon to repay or to repay in full, the
injustice of requiring him so to repay outweighs the injustice of
denying the plaintiff restitution. If the plaintiff pays money to
the defendant under a mistake of fact, and the defendant then,

- 22 -

acting in good faith, pays the money or part of it to charity, it is
unjust to require the defendant to make restitution to the extent
that he has so changed his position. Likewise, on facts such as
those in the present case, if a thief steals my money and pays it
to a third party who gives it away to charity, that third party
should have a good defence to an action for money had and
received. In other words, bona fide change of position should of
itself be a good defence in such cases as these. The principle is
widely recognised throughout the common law world. It is
recognised in the United States of America (see Restatement of
Restitution, para. 142, and Palmer on Restitution, vol. III, para.
16.8); it has been judicially recognised by the Supreme Court of
Canada (see Rural Municipality of Storthoaks v. Mobil Oil Canada
Ltd. (1975) 55 D.L.R. (3d) 1); it has been introduced by statute in
New Zealand (Judicature Act 1908, section 94B (as amended)), and
in Western Australia (see Western Australia Law Reform (Property,
Perpetuities and Succession) Act 1962, section 24, and Western
Australia Trustee Act 1962, section 65(8)), and it has been
judicially recognised by the Supreme Court of Victoria (see Bank
of New South Wales v. Murphett [1983] 1 V.R. 489). In the
important case of Australia and New Zealand Banking Group Ltd.
v. Westpac Banking Corporation (1988) 78 A.L.R. 187, there are
strong indications that the High Court of Australia may be moving
towards the same destination (see especially at pp. 162 and 168,
per curiam). The time for its recognition in this country is, in my
opinion, long overdue.

　　　　I am most anxious that, in recognising this defence to
actions of restitution, nothing should be said at this stage to
inhibit the development of the defence on a case by case basis, in
the usual way. It is, of course, plain that the defence is not open
to one who has changed his position in bad faith, as where the
defendant has paid away the money with knowledge of the facts

entitling the plaintiff to restitution; and it is commonly accepted that the defence should not be open to a wrongdoer. These are matters which can, in due course, be considered in depth in cases where they arise for consideration. They do not arise in the present case. Here there is no doubt that the respondents have acted in good faith throughout, and the action is not founded upon any wrongdoing of the respondents. It is not however appropriate in the present case to attempt to identify all those actions in restitution to which change of position may be a defence. A prominent example will, no doubt, be found in those cases where the plaintiff is seeking repayment of money paid under a mistake of fact; but I can see no reason why the defence should not also be available in principle in a case such as the present, where the plaintiff's money has been paid by a thief to an innocent donee, and the plaintiff then seeks repayment from the donee in an action for money had and received. At present I do not wish to state the principle any less broadly than this: that the defence is available to a person whose position has so changed that it would be inequitable in all the circumstances to require him to make restitution, or alternatively to make restitution in full. I wish to stress however that the mere fact that the defendant has spent the money, in whole or in part, does not of itself render it inequitable that he should be called upon to repay, because the expenditure might in any event have been incurred by him in the ordinary course of things. I fear that the mistaken assumption that mere expenditure of money may be regarded as amounting to

- 23 -

a change of position for present purposes has led in the past to opposition by some to recognition of a defence which in fact is likely to be available only on comparatively rare occasions. In this connection I have particularly in mind the speech of Lord Simonds in <u>Ministry of Health v. Simpson</u> [1951] A.C. 251, 276.

I wish to add two further footnotes. The defence of change of position is akin to the defence of bona fide purchase; but we cannot simply say that bona fide purchase is a species of change of position. This is because change of position will only avail a defendant to the extent that his position has been changed; whereas, where bona fide purchase is invoked, no inquiry is made (in most cases) into the adequacy of the consideration. Even so, the recognition of change of position as a defence should be doubly beneficial. It will enable a more generous approach to be taken to the recognition of the right to restitution, in the knowledge that the defence is, in appropriate cases, available; and while recognising the different functions of property at law and in equity, there may also in due course develop a more consistent approach to tracing claims, in which common defences are recognised as available to such claims, whether advanced at law or in equity.

I turn to the application of this principle to the present case. In doing so, I think it right to stress at the outset that the respondents, by running a casino at the club, were conducting a perfectly lawful business. There is nothing unlawful about accepting bets at a casino; the only relevant consequence of the transactions being gambling transactions is that they are void. In other words, the transactions as such give rise to no legal obligations. Neither the gambler, nor the casino, can go to court to enforce a gaming transaction. That is the legal position. But the practical or business position is that, if a casino does not pay winnings when they are due, it will simply go out of business. So the obligation in honour to pay winnings is an obligation which, in business terms, the casino has to comply with. It is also relevant to bear in mind that, in the present case, there is no question of Cass having gambled on credit. In each case, the money was put up front, not paid to discharge the balance of an account kept for gambling debts. It was because the money was paid over, that the casino accepted the bets at all.

In the course of argument before your Lordships, attention was focused upon the overall position of the respondents. From this it emerged, that, on the basis I have indicated (but excluding the banker's draft) at least £150,960 derived from money stolen by Cass from the solicitors was won by the club and lost by Cass. On this approach, the possibility arose that the effect of change of position should be to limit the amount recoverable by the solicitors to that sum. But there are difficulties in the way of this approach. Let us suppose that a gambler places two bets with a casino, using money stolen from a third party. The gambler wins the first bet and loses the second. So far as the winning bet is concerned, it is readily understandable that the casino should be able to say that it is not liable to the true owner for money had and received, on the ground that it has changed its position in good faith. But at first sight it is not easy to see how it can aggregate the two bets together and say that, by paying winnings on the first bet in excess of both, it should be able to

- 24 -

deny liability in respect of the money received in respect of the second.

There are other ways in which the problem might be approached, the first narrower and the second broader than that which I have just described. The narrower approach is to limit the impact of the winnings to the winning bet itself, so that the amount of all other bets placed with the plantiff's money would be reoverable by him regardless of the substantial winnings paid by the casino to the gambler on the winning bet. On the broader approach, it could be said that, each time a bet is accepted by the casino, with the money up front, the casino, by accepting the bet, so changes its position in good faith that it would inequitable to require it to pay the money back to the true owner. This would be because, by accepting the bet, the casino has committed

itself, in business terms, to pay the gambler his winnings if
successful. In such circumstances, the bookmaker could say that,
acting in good faith, he had changed his position, by incurring the
risk of having to pay a sum of money substantially larger than the
amount of the stake. On this basis, it would be irrelevant
whether the gambler won the bet or not, or, if he did win the
bet, how much he won.

        I must confess that I have not found the point an easy one.
But in the end I have come to the conclusion that on the facts of
the present case the first of these three solutions is appropriate.
Let us suppose that only one bet was placed by a gambler at a
casino with the plaintiff's money, and that he lost it. In that
simple case, although it is true that the casino will have changed
its position to the extent that it has incurred the risk, it will in
the result have paid out nothing to the gambler, and so prima
facie it would not be inequitable to require it to repay the amount
of the bet to the plaintiff. The same would, of course, be equally
true if the gambler placed a hundred bets with the plaintiff's
money and lost them all; the plaintiff should be entitled to
recover the amount of all the bets. This conclusion has the merit
of consistency with the decision of the Court of King's Bench in
Clarke v. Shee and Johnson (1774) 1 Cowp. 197, Lofft. 756. But
then, let us suppose that the gambler has won one or more out of
one hundred bets placed by him with the plaintiff's money at the
casino over a certain period of time, and that the casino has paid
him a substantial sum in winnings, equal, let us assume, to one
half of the amount of all the bets. Given that it is not
inequitable to require the casino to repay to the plaintiff the
amount of the bets in full where no winnings have been paid, it
would, in the circumstances I have just described, be inequitable,
in my opinion, to require the casino to repay to the plaintiff more
than one half of his money. The inequity, as I perceive it, arises
from the nature of gambling itself. In gambling only an occasional
bet is won, but when the gambler wins he will receive much more
than the stake placed for his winning bet. True, there may be no
immediate connection between the bets. They may be placed on
different occasions, and each one is a separate gaming contract.
But the point is that there has been a series of transactions under
which all the bets have been placed by paying the plaintiff's
money to the casino, and on each occasion the casino has incurred
the risk that the gambler will win. It is the totality of the bets
which yields, by the laws of chance, the occasional winning bet;
and the occasional winning bet is therefore, in practical terms, the

- 25 -

result of the casino changing its position by incurring the risk of
losing on each occasion when a bet is placed with it by the
gambler. So, when in such circumstances the plaintiff seeks to
recover from the casino the amount of several bets placed with it
by a gambler with his money, it would be inequitable to require
the casino to repay in full without bringing into account winnings
paid by it to the gambler on any one or more of the bets so

placed with it. The result may not be entirely logical, but it is surely just.

    For these reasons, I would allow the solicitors' appeal in respect of the money, limited however to the sum of £150,960.

<u>The respondents' cross-appeal in respect of the banker's draft</u>

    The Court of Appeal unanimously affirmed the decision of the judge that the respondents were liable in damages for the conversion of the banker's draft. Two main issues arose on this aspect of the case. The first issue was whether the legal title to the draft was vested in the solicitors so as to enable them to claim that the draft was converted by the respondents, or that they were alternatively liable, on the basis of waiver of the tort of conversion, to pay to the solicitors the amount of the draft received by them from the bank as money had and received for the use of the solicitors. The second issue was whether, if such legal title was vested in the solicitors, the respondents could then defeat their claim on the ground that they were holders in due course and so protected by section 38(2) of the Bills of Exchange Act 1882. The judge held that the banker's draft, having been originally obtained for a lawful purpose and then improperly indorsed by Cass, was at all material times the property of the solicitors. He further held that, on the facts of the case, the respondents did not become holders in due course. He therefore held the respondents liable in damages for conversion [1987] 1 W.L.R. 987, 994-995. In the Court of Appeal, May L.J. upheld the judge's decision, expressly affirming his conclusion that on the facts the respondents were not holders in due course [1989] 1 W.L.R. 1340, 1360; and Parker L.J. likewise upheld the judge's decision, expressly affirming his conclusion that the solicitors obtained a good title to the draft. Nicholls L.J. agreed with Parker L.J., at p. 1387 that, for the reasons given by him, the solicitors obtained a good title to the draft; and he further held that, since (as with the cash exchanged for chips) the respondents did not give value for the draft, they could not become holders in due course under the Act.

    I wish to say at once, in agreement with Nicholls L.J. and for the reasons I have already given, that the respondents never gave value for the draft, any more than they gave valuable consideration for the solicitors' money paid to them by Cass. It follows that the respondents were never holders in due course of the draft. The only question remaining is whether the solicitors obtained title to the draft.

    On this aspect of the case, the respondents relied strongly on the decision of the Judicial Committee of the Privy Council in <u>Commercial Banking Co. of Sydney v. Mann</u> [1961] AC 1, in which the Board consisted of Viscount Simonds, Lord Reid, Lord Radcliffe, Lord Tucker and Lord Morris of Borth-y-Gest, the

- 26 -

advice of the Board being given by Viscount Simonds. In that
case, the respondent Mann carried on his profession as a solicitor
in Sydney in partnership with a man called Richardson. Mann and
Richardson maintained a "trust account" in the name of the
partnership with a branch of the Australian and New Zealand Bank
in Sydney ("the A.N.Z. bank"). Under the partnership agreement,
all the assets of the partnership were the property of Mann, but
cheques might be drawn on the partnership bank account by either
partner, Mann having given the necessary authority to the A.N.Z.
bank to enable Richardson to draw on the partnership account with
it. Richardson, in purported exercise of that authority, drew a
number of cheques on that account, in each case there being
inserted, after the word "Pay" in the printed form of cheque, the
words "Bank cheque favour H. Ward" or "Bank cheque H. Ward;" he
also filed application forms for bank cheques in favour of H. Ward
to a like amount, purporting to sign them on behalf of the firm.
He took the documents to the A.N.Z. bank, which in each case
debited the firm's account and issued a bank draft of an equal
amount in the form "Pay H. Ward or bearer." Each cheque was
then taken by Ward to a branch of the appellant bank, and cashed
over the counter. In due course, each of the cheques was paid by
the A.N.Z. bank to the appellant bank. From first to last the
part played by Richardson was fraudulent; Ward was not a client
of the partnership, nor had any client authorised the payment to
him of any money held in the trust account. Mann then sued the
appellant bank for conversion of the bank cheques, or alternatively
to recover the sums received by it from the A.N.Z. bank as money
had and received to his use. He succeeded in his claim before the
trial judge, whose decision was affirmed by the Court of Appeal of
New South Wales. The Privy Council however allowed the appeal,
holding (1) that Mann never obtained any title to the cheques, and
(2) that he could not obtain title by ratifying the conduct of
Richardson in obtaining the cheques from the A.N.Z. bank, without
at the same time ratifying the dealings in the cheques by Ward
and the appellant bank (a conclusion which could, in my opinion,
have been reached on the alternative basis that Mann could not,
by ratifying the conduct of Richardson in obtaining the cheques,
thereby render the innocent appellant bank a wrongdoer). It
followed that Mann's claim for damages for conversion failed, and
that his alternative claim for money had and received also failed.
In so holding, the Board applied the previous decision of the Privy
Council in Union Bank of Australia Ltd. v. McClintock [1922] 1
A.C. 240, which they held to be indistinguishable on both points
from the case before them.

It was the submission of the respondents in the present
appeal that both cases are indistinguishable from the present case,
and accordingly that in the present case the solicitors never had
sufficient title to the banker's draft to found an action for
damages for conversion against the respondents (or a claim for
money had and received), and further that they could not make
good their title by ratification of Cass's action in obtaining the
money from the solicitors' client account at the bank without also
ratifying his action in using the money for gambling at the club.

It is of some interest to record the process of reasoning by
which the Board in Mann's case reached their conclusion on the
issue of title. Viscount Simonds said [1961] AC 1, 8:

> "It is important to distinguish between what was Richardson's authority in relation on the one hand to the A.N.Z. bank and on the other to Mann. No question arises in these proceedings between Mann and the A.N.Z. bank. It is clear that Mann could not as between himself and the bank question Richardson's authority to draw cheques on the trust account. The position as between Mann and Richardson was different. Richardson had no authority, express or implied, from Mann either to draw cheques on the trust account or to obtain bank cheques in exchange for them except for the proper purposes of the partnership. If he exceeded those purposes, his act was unauthorised and open to challenge by Mann. It is in these circumstances that the question must be asked whether, as the judge held, the bank cheques were throughout the property of Mann. It is irrelevant to this question what was the relation between Richardson and Ward and whether the latter gave any consideration for the bank cheques that he received and at what stage Mann learned of the fraud that had been practised upon him. The proposition upon which the respondent founds his claim is simple enough: Richardson was his partner and in that capacity was able to draw upon the trust account and so to obtain from the bank its promissory notes: therefore the notes were the property of the partnership and belonged to Mann, and Richardson could not give a better title to a third party than he himself had."

He then referred to the previous decision of the Privy Council in McClintock's case [1922] 1 AC 240 and continued, [1961] AC 1,

10-11:

> "This is a direct decision that, if the acts of McClintock were unauthorised in the relevant sense of that word, the bank cheques did not when issued become the property of the plaintiffs. It appears to their Lordships that the majority of the full court in McClintock's case erred in regarding as decisive the fact that as between the plaintiffs and the bank McClintock was authorised to obtain bank cheques, whereas the relevant question was whether McClintock was as between the plaintiffs and himself authorised to obtain the particular cheques that were converted. Upon the verdict of the jury that he was not so authorised, they should have come to the opposite conclusion. In the same way in the present case the judge, having found that Richardson obtained the bank cheques in question in fraud of Mann and without his authority, should have gone on to hold that they did not become the property of Mann. Whether they became his by his subsequent ratification of the acts of Richardson is another question, which their Lordships will examine just as it was examined in McClintock's case. Upon what has been called the main question they observe that they could not hold that the respondent acquired a property in the bank cheques without directly contradicting a decision which has in 40 years been

the subject of no adverse comment. And they would add
that it appears to be in accordance with principle. They
agree with the analysis of the transaction which was
submitted by counsel for the appellant. In effect

- 28 -

Richardson, by means of unauthorised cheques,
misappropriated moneys in the trust account and used them
to acquire bank cheques from the A.N.Z. bank which bound
that bank to pay Ward or bearer out of its own money the
amounts specified in the cheques. Their Lordships were not
referred to any case in which in such circumstances
property so acquired has been held to belong automatically
to the party defrauded. In the present case, as in
McClintock's case, counsel sought to rely on such cases as
Cundy v. Lindsay [(1878) 3 App. Cas. 459, H.L.], but it
appears to their Lordships as it must have done to the
Board in McClintock's case, that the principle that the
purchaser of a chattel takes it, as a general rule, subject to
what may turn out to be informalities of title has no
application to a case of misappropriation of funds by an
agent and their subsequent application for his own purposes.
That there is a remedy, perhaps more than one, available to
the person defrauded is obvious, but that is not to say that
the property so acquired at once belongs to him so that he
can sue in conversion a third party into whose hands it has

come."

In the Court of Appeal, Parker L.J. stated that he had great
difficulty in following the reasoning in the two cases [1989] 1
W.L.R. 1340, 1371 F-G. I feel bound to say that I find the
reasoning in the passage I have quoted completely clear. Before
your Lordships, Mr. O'Brien for the solicitors was bold enough to
suggest that your Lordships should hold that these cases were
wrongly decided. It would take a great deal to persuade me to do
so, having regard to the distinction of the judges involved; and I
have heard no argument that persuades me to do so. In my
opinion, the crucial question is whether, on the facts of the
present case, the solicitors have succeeded in distinguishing Mann's
case [1961] AC 1 on acceptable grounds.

The judge distinguished the case as follows. He held that
the draft was originally obtained by Cass for a lawful purpose; he
therefore received the draft with the authority of his partners, and
the draft then became the property of the solicitors. This finding
was strongly challenged by the respondents, both before the Court
of Appeal and before your Lordships, on the ground that the point
was never pleaded, and that there was in any event no evidence to
support the judge's conclusion. Parker L.J. simply rejected the
respondents' argument on this point without reasons; but having
heard full argument upon it, I am satisfied that the respondents
are justified in their complaint. It is plain that the point was

never pleaded; indeed the solicitors' pleaded case was that the draft was obtained by Cass as part of his fraudulent design to loot money from the solicitors' client account for his own purposes. If the point had been pleaded, it would have been a matter for investigation at the trial whether the draft had indeed been obtained for a proper purpose, for example for the purpose of completion of a conveyancing transaction. As it was, there was no investigation of this point, and there was no evidence to support the judge's finding.

Parker L.J. sought to distinguish Mann's case [1961] AC 1 on another ground, viz. that the draft had been obtained from the bank by Chapman and then handed by him to Cass; and that when

- 29 -

Chapman received the draft, it was his duty to hand it to the solicitors and the property therefore passed to the solicitors when he obtained possession of it. The difficulty with this approach is that it appears to proceed on the assumption that Chapman was acting innocently in obtaining the banker's draft from the bank and handing it to Cass; whereas the judge held that he had been suborned by Cass: see [1987] 1 W.L.R. 987, 1018. In my opinion, the receipt by Chapman of the banker's draft was no different than the receipt by Cass himself, and the introduction of Chapman into the picture makes no difference.

However, before your Lordships Mr. O'Brien for the solicitors submitted that Mann's case could be distinguished from the present case because the banker's cheques in that case were made payable to a third party (Ward) or bearer, whereas in the present case the banker's draft was made payable to the solicitors. Now it is true that, in Mann's case, it cannot have been the intention of the A.N.Z. bank that the property in the banker's cheques should, on delivery to Richardson, immediately pass to Ward. Even so, the point seems to me to be of crucial importance. For the effect of the banker's draft in the present case having been made payable to the solicitors is, in my opinion, that the solicitors had the immediate right to possession of the draft against any other person, including, of course, Cass. On this basis, as it seems to me, the solicitors had vested in them, as from the moment when the banker's draft was delivered to Cass (through Chapman) by the bank, sufficient title to enable them to bring an action for damages for conversion of the draft. Authority for this proposition is to be found in Bute (Marquess) v. Barclays Bank Ltd. [1955] 1 Q.B. 202. In that case one McGaw, the manager of three farms belonging to the plaintiff, applied to the Department of Agriculture for Scotland for certain subsidies in respect of the farms. After McGaw had left the plaintiff's employment, the department sent to him, in satisfaction of the application, three warrants in respect of the subsidies. The warrants were made payable to McGaw, but elsewhere on them appeared the words "for the Marquess of Bute." McGaw paid the warrants into his own personal account at a branch of defendant

bank, which forwarded them for collection and paid the proceeds into his account, upon which he then drew. It was held by McNair J. that the plaintiff was entitled to succeed in an action against the defendant bank for damages for conversion. McNair J. held that the words "for the Marquess of Bute" had the effect that, in the circumstances, the warrants were payable to the Marquess of Bute through McGaw. He further held that, in order to succeed in an action for conversion, it was enough that the plaintiff could prove that, at the time of the alleged conversion, he was entitled to immediate possession; and that, as McGaw's employment had terminated before he received the warrants, the plaintiff would have been entitled to require McGaw to deliver the warrants to him when they were received. So also in the present case, as soon as the bank handed over the banker's draft, the solicitors were entitled to require its delivery to them, the draft being made payable to them and neither Chapman nor Cass having any right to retain it against them. It is of some interest to observe that, consistent with this approach, the banker's draft could not be transferred without indorsement by or on behalf of the solicitors; and that when Cass used the draft at the casino, he purported to indorse it on behalf of the solicitors, although of course he did so without authority.

- 30 -

For this reason, which constitutes another ground upon which Parker L.J. relied in the Court of Appeal, I am of the opinion that the solicitors had sufficient title to enable them to proceed in an action of conversion against Cass, or, in due course, against the respondents. It follows that since, for the reasons I have already given, the respondents cannot claim to have been holders in due course of the banker's draft, their cross-appeal must fail.

I understand that (failing agreement between them) counsel for the parties will make submissions to your Lordships on interest and costs after judgment has been delivered.

- 31 -

**BAILII:** Copyright Policy | Disclaimers | Privacy Policy | Feedback | Donate to BAILII
URL: *http://www.bailii.org/uk/cases/UKHL/1988/12.html*

# TAB 48

**Marks and Spencer plc v. BNP Paribas Securities
Services Trust Company (Jersey) Limited and another**

On appeal from: [2014] EWCA Civ 603

SC

2 December 2015

**[2015] UKSC 72**

**2015 WL 7692966**

before Lord Neuberger , President Lord Clarke
Lord Sumption Lord Carnwath Lord Hodge
Judgment Given on 2 December 2015

**Analysis**

Heard on 7 October 2015

**Representation**

    • Appellant Guy Fetherstonhaugh QC Kester Lees
(Instructed by King & Wood Mallesons LLP ).
    • Respondents Nicholas Dowding QC Mark Sefton
(Instructed by Allen & Overy ).

**Judgment**

Lord Neuberger: (with whom Lord Sumption and Lord
Hodge agree)

**Introductory**

This appeal concerns a tenant's break clause in a lease.
The lease had been granted for a term expiring on 2
February 2018, and, in the normal way, the rent was
payable in advance on the usual quarter days. The
tenant exercised its right under the break clause to
determine the lease on 24 January 2012, after it had
paid the full quarter's rent due on 25 December 2011.
The issue is whether it can recover from the landlords
the apportioned rent in respect of the period from 24
January to 24 March 2012. The resolution of that issue
turns on the interpretation of the lease, and it requires

the court to consider the principles by reference to which
a term is to be implied into a contract.

**The Contractual documentation**

The defendants were the landlords and the claimant was
the tenant under four sub-underleases of different floors
in a building known as The Point ("the Building") in
Paddington Basin, London W2. Each sub-underlease
was set out in a Schedule to a deed made on 15 January
2010, which varied or "restated" the provisions of a
previous sub-underlease which had been granted to the
claimant in 2006. The origin of most of the provisions
of each of the four sub-underleases granted in 2010
is to be found in the four sub-underleases granted in
2006. In this judgment, it is only necessary to refer
to one of the four deeds ("the Deed"), the sub-underlease
it granted ("the Lease") and the sub-underlease ("the
earlier Lease") it replaced, as any differences between
the four Deeds, the four 2010 sub-underleases and the
four 2006 sub-underleases are irrelevant for present
purposes.

The Lease demised the third floor of the Building ("the
Premises") together with the use of two car parking
spaces to the claimant "for a term of years starting
on 25 January 2006 and ending on 2 February 2018".
The reddendum reserved a rent consisting of (a) "the
Basic Rent" and (b) "the Car Park Licence Fee".
The Basic Rent was "£919,800 plus VAT per annum",
which was to be "reviewed in accordance with Schedule
4 ", which provided for reviews on certain specified
"review dates". The Basic Rent was to be "paid yearly
and proportionately for any part of a year by equal
quarterly instalments in advance on the [usual] quarter
days". As at 25 December 2011, the Basic Rent was
£1,236,689 per annum plus VAT. The Car Park Licence
Fee was £6,000 per annum, which was to "be paid by
equal quarterly instalments in advance on the [usual]
quarter days". The Lease was validly excluded from the
ambit of sections 24-28 of the Landlord and Tenant
Act 1954 , which meant that, if not determined before 2
February 2018, the Lease would end on that date.

Clause 8.1 of the Lease entitled the claimant (so long
as it remained the tenant) to determine the Lease, by
giving the landlords six months' prior written notice (a
"break notice") to take effect on the "first break date",
namely 24 January 2012, and clause 8.2 provided for

Marks & Spencer Plc v BNP Paribas Securities Services, 2015 WL 7889660...

a "second break date" of 24 January 2016. Clause 8.3 stipulated that a break notice would only have effect "if on the break date there are no arrears of Basic Rent or VAT on Basic Rent". Clause 8.4 provided that a break notice would only take effect on the first break date "if on or prior to the first break date the tenant pays to the landlord the sum of £919,800 plus VAT". Clause 8.5 was concerned with consequential conveyancing machinery. Clause 8.6 entitled the landlords to "waive compliance with all or any of the conditions … set out in clause 8.3". Clause 8.7 stated that if "the provisions of this clause are complied with" the Lease should end on the break date "without prejudice to the rights of either party in respect of any previous breach by the other". A very similar clause to clause 8 was contained in the earlier Lease: hence the choice of break dates, which were on anniversaries of the date of grant of the earlier Lease.

Schedule 5 to the Lease dealt with insurance. In brief, the landlords covenanted to insure the Building against specified risks, and the tenant was obliged to "pay to the landlord … a fair proportion [assessed by reference to the ratio of the floor area of the Premises to that of the Building] of every premium payable by the landlord … for insuring the Building …". These payments were "reserved as rent".

Schedule 7 to the Lease was concerned with the services which the landlord covenanted to provide to the occupiers of the Building, and the service charge which the tenant was to pay in return. The service charge, which was reserved as rent, was to be "a fair proportion" (assessed in a similar way to the insurance rent) of the cost to the landlords of providing the services. This was initially to be based on an annual estimate, which was to be paid "on account" in advance by equal instalments on the usual quarter days. Paragraph 4.5 of the Schedule provided for payment by the tenant of a balancing sum in ten working days if the actual expenditure was greater than the payment on account, and paragraph 4.6 entitled the tenant to be credited with any "overpayment … against the next … payment on account", if the expenditure was less than the payment on account.

As is almost invariably the case with modern commercial leases, the Lease was a very full and detailed document. It ran to some 70 pages, including 15 pages

of tenant's covenants and nine pages of landlords' covenants, and it included, in clause 5, a right for the landlords to forfeit the Lease for non-payment of rent or other breach of covenant by the tenant. The provisions for review of the Basic Rent in Schedule 4 ran to four pages, and required a periodic review of the rent to the then-current market rental value of the Premises as at certain specified "review dates". Paragraph 8 of Schedule 4 stated that if the reviewed rent was not determined by a review date, rent at the preceding rate is to be payable and, once the reviewed rent is determined, a balancing figure is payable by the tenant to the landlords.

It is not necessary to say much about the Deed, save that clause 4 provided that, if the tenant did not exercise its right to break the Lease (and the other three sub-underleases) on 24 January 2012, the landlords would pay the tenant £150,000 by crediting it against the tenant's liability for the rent due on the following quarter day, 25 March 2012.

**The factual background**

On 7 July 2011, pursuant to clause 8.1, the claimant tenant served a break notice on the defendant landlords to determine the Lease on 24 January 2012. On 19 July 2011, the defendants invoiced the claimant for its share of the insurance rent premium under Schedule 5 ("the insurance rent") in respect of the year from 1 July 2011, in the sum of £14,972.85 plus VAT, which the claimant paid two weeks later.

Shortly before 25 December 2011, the claimant paid the defendants the rent due on that date in respect of the quarter from that date up to and including 24 March 2012, the day before the next quarter day, thereby ensuring that clause 8.3 of the Lease was satisfied. This rent consisted of the Basic Rent (as reviewed) of £309,172.25 plus VAT, and the Car Park Licence Fee of £1,500. On or about 18 January 2012, the claimant paid the defendants £919,800 plus VAT, pursuant to clause 8.4 of the Lease. As a result of these payments, the break notice served on 7 July 2011 was effective, and the Lease determined on 24 January 2012.

On 3 September 2012, more than eight months after the expiry of the Lease, the defendants served on the claimant a service charge certificate in respect of

the services provided in the calendar year 2011. This showed that the cost of the services had been less than the estimate, and the defendants credited the claimant with its excess payment.

Although there were similar issues about the Car Park Licence Fee, the insurance rent and the service charge, the principal issue between the parties at trial was whether the claimant was entitled to be refunded a sum equal to the apportioned Basic Rent in respect of the period 24 January 2012 (when the Lease expired) and 25 March 2012, given that the claimant had paid the Basic Rent (in the sum of £309,172.25 plus VAT) on 25 December 2011 in respect of that period even though the Lease had expired on 24 January 2012. In a carefully reasoned judgment, Morgan J held that the claimant was so entitled — [2013] EWHC 1279 (Ch). For reasons given by Arden LJ (with whom Jackson and Fulford LJJ agreed), the Court of Appeal allowed the defendants' appeal — [2014] EWCA Civ 603.

The claimant now appeals to this court, contending, as it did in the courts below, that there should be implied into the Lease a term that, if the tenant exercises the right to break under clause 8 and the Lease consequently determines on 24 January, the landlords ought to pay back a proportion of the Basic Rent paid by the tenant due on the immediately preceding 25 December ("the apportioned sum"), being apportioned in respect of the period 24 January up to and including the ensuing 24 March 2012. A similar issue arises in relation to the Car Park Licence Fee and the insurance rent, which I shall deal with at the end of this judgment.

**Implied terms in contracts**

It is rightly accepted on behalf of the claimant that there is no provision in the Lease which expressly obliges the landlords to pay the apportioned sum to the tenant. Accordingly, it follows that in order to succeed the claimant has to establish that such an obligation must be implied into the Lease.

As Lady Hale pointed out in Geys v Société Générale [2013] 1 AC 523 , para 55, there are two types of contractual implied term. The first, with which this case is concerned, is a term which is implied into a particular contract, in the light of the express terms, commercial common sense, and the facts known to

both parties at the time the contract was made. The second type of implied terms arises because, unless such a term is expressly excluded, the law (sometimes by statute, sometimes through the common law) effectively imposes certain terms into certain classes of relationship.

There have, of course, been many judicial observations as to the nature of the requirements which have to be satisfied before a term can be implied into a detailed commercial contract. They include three classic statements, which have been frequently quoted in law books and judgments. In The Moorcock (1889) 14 PD 64 , 68, Bowen LJ observed that in all the cases where a term has been implied, "it will be found that … the law is raising an implication from the presumed intention of the parties with the object of giving the transaction such efficacy as both parties must have intended that at all events it should have". In Reigate v Union Manufacturing Co (Ramsbottom) Ltd [1918] 1 KB 592 , 605, Scrutton LJ said that "[a] term can only be implied if it is necessary in the business sense to give efficacy to the contract". He added that a term would only be implied if "it is such a term that it can confidently be said that if at the time the contract was being negotiated" the parties had been asked what would happen in a certain event, they would both have replied "'Of course, so and so will happen; we did not trouble to say that; it is too clear'". And in Shirlaw v Southern Foundries (1926) Ltd [1939] 2 KB 206 , 227, MacKinnon LJ observed that, "[p]rima facie that which in any contract is left to be implied and need not be expressed is something so obvious that it goes without saying". Reflecting what Scrutton LJ had said 20 years earlier, MacKinnon LJ also famously added that a term would only be implied "if, while the parties were making their bargain, an officious bystander were to suggest some express provision for it in their agreement, they would testily suppress him with a common 'Oh, of course!'".

Support for the notion that a term will only be implied if it satisfies the test of business necessity is to be found in a number of observations made in the House of Lords. Notable examples included Lord Pearson (with whom Lord Guest and Lord Diplock agreed) in Trollope & Colls Ltd v North West Metropolitan Regional Hospital Board [1973] 1 WLR 601 , 609, and Lord Wilberforce, Lord Cross, Lord Salmon and

Marks & Spencer Plc v BNP Paribas Securities Services..., 2015 WL 7862966...

Lord Edmund-Davies in Liverpool City Council v Irwin [1977] AC 239 , 254, 258, 262 and 266 respectively. More recently, the test of "necessary to give business efficacy" to the contract in issue was mentioned by Lady Hale in Geys at para 55 and by Lord Carnwath in Arnold v Britton [2015] 2 WLR 1593 , para 112.

In the Privy Council case of BP Refinery (Westernport) Pty Ltd v President, Councillors and Ratepayers of the Shire of Hastings (1977) 52 ALJR 20 , 26, Lord Simon (speaking for the majority, which included Viscount Dilhorne and Lord Keith) said that:

> "[F]or a term to be implied, the following conditions (which may overlap) must be satisfied: (1) it must be reasonable and equitable; (2) it must be necessary to give business efficacy to the contract, so that no term will be implied if the contract is effective without it; (3) it must be so obvious that 'it goes without saying'; (4) it must be capable of clear expression; (5) it must not contradict any express term of the contract."

In Philips Electronique Grand Public SA v British Sky Broadcasting Ltd [1995] EMLR 472 , 481, Sir Thomas Bingham MR set out Lord Simon's formulation, and described it as a summary which "distil[led] the essence of much learning on implied terms" but whose "simplicity could be almost misleading". Sir Thomas then explained that it was "difficult to infer with confidence what the parties must have intended when they have entered into a lengthy and carefully-drafted contract but have omitted to make provision for the matter in issue", because "it may well be doubtful whether the omission was the result of the parties' oversight or of their deliberate decision", or indeed the parties might suspect that "they are unlikely to agree on what is to happen in a certain … eventuality" and "may well choose to leave the matter uncovered in their contract in the hope that the eventuality will not occur". Sir Thomas went on to say this at p 482:

"The question of whether a term should be implied, and if so what, almost inevitably arises after a crisis has been reached in the performance of the contract. So the court comes to the task of implication with the benefit of hindsight, and it is tempting for the court then to fashion a term which will reflect the merits of the situation as they then appear. Tempting, but wrong. [He then quoted the observations of Scrutton LJ in Reigate , and continued] [I]t is not enough to show that had the parties foreseen the eventuality which in fact occurred they would have wished to make provision for it, unless it can also be shown either that there was only one contractual solution or that one of several possible solutions would without doubt have been preferred …"

Sir Thomas's approach in Philips was consistent with his reasoning, as Bingham LJ in the earlier case The APJ Priti [1987] 2 Lloyd's Rep 37 , 42, where he rejected the argument that a warranty, to the effect that the port declared was prospectively safe, could be implied into a voyage charter-party. His reasons for rejecting the implication were "because the omission of an express warranty may well have been deliberate, because such an implied term is not necessary for the business efficacy of the charter and because such an implied term would at best lie uneasily beside the express terms of the charter".

In my judgment, the judicial observations so far considered represent a clear, consistent and principled approach. It could be dangerous to reformulate the principles, but I would add six comments on the summary given by Lord Simon in BP Refinery as extended by Sir Thomas Bingham in Philips and exemplified in The APJ Priti . First, in Equitable Life Assurance Society v Hyman [2002] 1 AC 408 , 459, Lord Steyn rightly observed that the implication of a

Marks & Spencer Plc v BNP Paribas Securities Services, ... 2015 WL 7822866...

term was "not critically dependent on proof of an actual intention of the parties" when negotiating the contract. If one approaches the question by reference to what the parties would have agreed, one is not strictly concerned with the hypothetical answer of the actual parties, but with that of notional reasonable people in the position of the parties at the time at which they were contracting. Secondly, a term should not be implied into a detailed commercial contract merely because it appears fair or merely because one considers that the parties would have agreed it if it had been suggested to them. Those are necessary but not sufficient grounds for including a term. However, and thirdly, it is questionable whether Lord Simon's first requirement, reasonableness and equitableness, will usually, if ever, add anything: if a term satisfies the other requirements, it is hard to think that it would not be reasonable and equitable. Fourthly, as Lord Hoffmann I think suggested in Attorney General of Belize v Belize Telecom Ltd [2009] 1 WLR 1988 , para 27, although Lord Simon's requirements are otherwise cumulative, I would accept that business necessity and obviousness, his second and third requirements, can be alternatives in the sense that only one of them needs to be satisfied, although I suspect that in practice it would be a rare case where only one of those two requirements would be satisfied. Fifthly, if one approaches the issue by reference to the officious bystander, it is "vital to formulate the question to be posed by [him] with the utmost care", to quote from Lewison, *The Interpretation of Contracts* 5th ed (2011), para 6.09. Sixthly, necessity for business efficacy involves a value judgment. It is rightly common ground on this appeal that the test is not one of "absolute necessity", not least because the necessity is judged by reference to business efficacy. It may well be that a more helpful way of putting Lord Simon's second requirement is, as suggested by Lord Sumption in argument, that a term can only be implied if, without the term, the contract would lack commercial or practical coherence.

Before leaving this issue of general principle, it is appropriate to refer a little further to Belize Telecom , where Lord Hoffmann suggested that the process of implying terms into a contract was part of the exercise of the construction, or interpretation, of the contract. In summary, he said at para 21 that "[t]here is only one question: is that what the instrument, read as a whole against the relevant background, would reasonably be

understood to mean?". There are two points to be made about that observation.

First, the notion that a term will be implied if a reasonable reader of the contract, knowing all its provisions and the surrounding circumstances, would understand it to be implied is quite acceptable, provided that (i) the reasonable reader is treated as reading the contract at the time it was made and (ii) he would consider the term to be so obvious as to go without saying or to be necessary for business efficacy. (The difference between what the reasonable reader would understand and what the parties, acting reasonably, would agree, appears to me to be a notional distinction without a practical difference.) The first proviso emphasises that the question whether a term is implied is to be judged at the date the contract is made. The second proviso is important because otherwise Lord Hoffmann's formulation may be interpreted as suggesting that reasonableness is a sufficient ground for implying a term. (For the same reason, it would be wrong to treat Lord Steyn's statement in Equitable Life Assurance Society v Hyman [2002] 1 AC 408 , 459 that a term will be implied if it is "essential to give effect to the reasonable expectations of the parties" as diluting the test of necessity. That is clear from what Lord Steyn said earlier on the same page, namely that "[t]he legal test for the implication of … a term is … strict necessity", which he described as a "stringent test".)

It is necessary to emphasise that there has been no dilution of the requirements which have to be satisfied before a term will be implied, because it is apparent that Belize Telecom has been interpreted by both academic lawyers and judges as having changed the law. Examples of academic articles include C Peters The implication of terms in fact [2009] CLJ 513 , P Davies, Recent developments in the Law of Implied Terms [2010] LMCLQ 140 , J McCaughran Implied terms: the journey of the man on the Clapham Omnibus [2011] CLJ 607 , and JW Carter and W Courtney, Belize Telecom: a reply to Professor McLauchlan [2015] LMCLQ 245 ). And in Foo Jong Peng v Phua Kiah Mai [2012] 4 SLR 1267 , paras 34-36, the Singapore Court of Appeal refused to follow the reasoning in Belize at least in so far as "it suggest[ed] that the traditional 'business efficacy' and 'officious bystander' tests are not central to the implication of terms" (reasoning which was followed in Sembcorp Marine Ltd v PPL Holdings

Pte Ltd [2013] SGCA 43 ). The Singapore Court of
Appeal were in my view right to hold that the law
governing the circumstances in which a term will be
implied into a contract remains unchanged following
Belize Telecom .

The second point to be made about what was said
in Belize Telecom concerns the suggestion that the
process of implying a term is part of the exercise of
interpretation. Although some support may arguably
be found for such a view in Trollope at p 609, the
first clear expression of that view to which we were
referred was in Banque Bruxelles Lambert SA v Eagle
Star Insurance Co Ltd [1997] AC 191 , 212, where Lord
Hoffmann suggested that the issue of whether to imply
a term into a contract was "one of construction of the
agreement as a whole in its commercial setting". Lord
Steyn quoted this passage with approval in Equitable
Life at p 459, and, as just mentioned, Lord Hoffmann
took this proposition further in Belize Telecom , paras
17-27. Thus, at para 18, he said that "the implication
of the term is not an addition to the instrument. It
only spells out what the instrument means"; and at
para 23, he referred to "The danger … in detaching
the phrase 'necessary to give business efficacy' from
the basic process of construction". Whether or not one
agrees with that approach as a matter of principle must
depend on what precisely one understands by the word
"construction".

I accept that both (i) construing the words which
the parties have used in their contract and (ii)
implying terms into the contract, involve determining
the scope and meaning of the contract. However, Lord
Hoffmann's analysis in Belize Telecom could obscure
the fact that construing the words used and implying
additional words are different processes governed by
different rules.

Of course, it is fair to say that the factors to be taken into
account on an issue of construction, namely the words
used in the contract, the surrounding circumstances
known to both parties at the time of the contract,
commercial common sense, and the reasonable reader
or reasonable parties, are also taken into account on
an issue of implication. However, that does not mean
that the exercise of implication should be properly
classified as part of the exercise of interpretation, let
alone that it should be carried out at the same time as

interpretation. When one is implying a term or a phrase,
one is not construing words, as the words to be implied
are ex hypothesi not there to be construed; and to speak
of construing the contract as a whole, including the
implied terms, is not helpful, not least because it begs
the question as to what construction actually means in
this context.

In most, possibly all, disputes about whether a term
should be implied into a contract, it is only after the
process of construing the express words is complete that
the issue of an implied term falls to be considered. Until
one has decided what the parties have expressly agreed,
it is difficult to see how one can set about deciding
whether a term should be implied and if so what term.
This appeal is just such a case. Further, given that it
is a cardinal rule that no term can be implied into a
contract if it contradicts an express term, it would seem
logically to follow that, until the express terms of a
contract have been construed, it is, at least normally,
not sensibly possible to decide whether a further term
should be implied. Having said that, I accept Lord
Carnwath's point in para 71 to the extent that in some
cases it could conceivably be appropriate to reconsider
the interpretation of the express terms of a contract once
one has decided whether to imply a term, but, even if
that is right, it does not alter the fact that the express
terms of a contract must be interpreted before one can
consider any question of implication.

In any event, the process of implication involves a
rather different exercise from that of construction. As
Sir Thomas Bingham trenchantly explained in Philips
at p 481:

> "The courts' usual role in
> contractual interpretation is, by
> resolving ambiguities or reconciling
> apparent inconsistencies, to
> attribute the true meaning to
> the language in which the
> parties themselves have expressed
> their contract. The implication of
> contract terms involves a different
> and altogether more ambitious
> undertaking: the interpolation of
> terms to deal with matters for
> which, ex hypothesi , the parties
> themselves have made no provision.

> It is because the implication of terms is so potentially intrusive that the law imposes strict constraints on the exercise of this extraordinary power."

It is of some interest to see how implication was dealt with in the recent case in this court of Aberdeen City Council v Stewart Milne Group Ltd 2012 SLT 205 . At para 20, Lord Hope described the implication of a term into the contract in that case as "the product of the way I would interpret this contract". And at para 33, Lord Clarke said that the point at issue should be resolved "by holding that such a term should be implied rather than by a process of interpretation". He added that "[t]he result is of course the same".

It is true that Belize Telecom was a unanimous decision of the Judicial Committee of the Privy Council and that the judgment was given by Lord Hoffmann, whose contributions in so many areas of law have been outstanding. However, it is apparent that Lord Hoffmann's observations in Belize Telecom , paras 17-27 are open to more than one interpretation on the two points identified in paras 23-24 and 25-30 above, and that some of those interpretations are wrong in law. In those circumstances, the right course for us to take is to say that those observations should henceforth be treated as a characteristically inspired discussion rather than authoritative guidance on the law of implied terms.

Having made those general remarks about implied terms, I turn to consider the specific issue on this appeal, namely the claimant's contention that it is entitled to claim the apportioned sum from the defendants by virtue of an implied term to that effect in the Lease. I shall start by focussing on the terms of the Lease and the Deed, and then turn to the broader picture.

**The arguments based on the provisions of the Lease and the Deed**

Each quarter's rent paid in advance under a modern commercial lease, such as the Lease in this case, can fairly be said to be referable to the tenant's use and enjoyment of the demised premises for the forthcoming quarter. Accordingly, the sum of £309,172.25 plus VAT due on 25 December 2011, and paid shortly before that date, can fairly be said, at least in general terms, to have been envisaged as being the tenant's *quid pro quo* for being able to occupy and enjoy the Premises up to 25 March 2012. There is therefore real force in the contention that, if the defendants can retain the apportioned sum, it would be unfairly prejudicial to the claimant and a pure windfall for the defendants. A provision that the defendant landlords should reimburse the claimant tenant the apportioned sum would thus seem to be reasonable and equitable.

The claimant's case is reinforced by the fact that, as explained in para 4 above, the two break dates of 24 January 2012 and 2016 owe their origin to the date of grant of the earlier Lease, and that date was dependent on the date on which the head-landlord gave its consent to the grant of the earlier Lease. Thus, it can fairly be said that the parties had agreed the terms of the break clause, not knowing whether the break dates would be shortly after, shortly before or even on, a quarter day. This supports the notion that they are unlikely to have intended that the apportioned rent was intended to be retained by the landlords as part of the compensation for the tenant's operation of the break clause. This point is mildly weakened by the fact that the parties could have varied the break dates, or the terms of clause 8, when they came to renegotiate in 2010 the terms originally agreed in the 2006 Lease, but it still has force.

A further point on which the claimant relies arises from the fact that the Basic Rent is stipulated in the Lease to be "paid yearly *and proportionately for any part of a year* by equal quarterly instalments in advance" (emphasis added). It is common ground that the effect of the italicised words is that, if the Lease had run its full course to 2 February 2018, the tenant would only have had to pay an apportioned part of the Basic Rent due on 25 December 2017, because, as at that date, the parties would have known that the Lease would expire before the next quarter day, 25 March 2018. In the present case, it is common ground that, because the claimant had not paid the sum of £919,800 plus VAT due under clause 8.4 before 25 December 2011, it would not have been known as at that date whether the Lease would come to an end before 25 March 2012, and the tenant therefore had to pay the quarter's rent in full: it only

became clear that the Lease would determine on 24 January 2012 when the claimant paid the £919,800 plus VAT on 18 January. However, if the claimant had paid the £919,800 plus VAT before 25 December 2011, the claimant argues (rightly in my view) that it would have been clear on 25 December 2011 that the Lease would end on 24 January 2012, so that the claimant would only have had to pay an appropriate proportion of the Basic Rent on 25 December 2011. The claimant accordingly contends that commercial common sense mandates that it should be in the same financial position whether it pays the £919,800 plus VAT before 25 December 2011 or chooses to wait, as it is entitled to, until after 25 December 2011 to pay that sum. (I might add that this point is somewhat reinforced when one considers what would have happened if the tenant had waited till the second break date to determine the Lease: because clause 8.4 only applies to the first break date, the tenant would have been entitled to pay only an apportioned part of the quarter's Basic Rent on 25 December 2015.)

The claimant raised other points which, to my mind, had less force. Thus, the fact that the Basic Rent was payable "yearly *and proportionately for any part of a year*" was said of itself to support the implied term for which the claimant contends. Given that the italicised words did not justify the claimant paying only an apportioned part of the rent due on 25 December 2011 on the facts of this case, those words appear if anything to undermine the claimant's case: the fact that the Lease expressly provided that only part of a quarter's rent was to be paid in some circumstances could fairly be said to undermine the notion that one should imply a term which has a similar effect in other circumstances.

There is considerable force in the points discussed in paras 33-35 above, and between them they help make out a powerful case for contending that it is necessary for business efficacy that the term contended for by the claimant should be implied into the Lease. However, it is necessary to consider the countervailing arguments.

The defendants rely on the fact that the Lease is a very detailed document, which had been entered into between two substantial and experienced parties, and had been negotiated and drafted by expert solicitors. In particular, the Lease makes provision for a large number of contingencies. Accordingly, it is said, with obvious justification, that the observations of Sir

Thomas Bingham in Philips Electronique quoted in para 19 above are particularly in point.

More specifically, the defendants refer to the express provisions relating to the payment of money in connection with clause 8. First, there is the payment of £919,800 plus VAT under clause 8.4. It is said that, while it involves no logical inconsistency, it is somewhat peculiar to imply into the Lease a term requiring the landlords to pay the tenant around £200,000 plus VAT on 25 January 2012, when the Lease has an express term requiring the tenant to pay the landlords around £900,000 plus VAT by 24 January 2012: the implied term "lie[s] uneasily" with the express terms to use Bingham LJ's expression in The APJ Priti . Secondly, there is the condition in clause 8.3 which required the tenant to have paid all rent due on 25 March 2012 if it wished to exercise the right to break. Given that the effect of that provision is that the tenant must have paid rent for the whole quarter ending on 25 March 2012, it can again be said to be somewhat peculiar to imply a term requiring the landlord to repay the tenant most of that sum.

Clauses 8.3 and 8.4 of the Lease, together with clause 4 of the Deed, which provided that the tenant would be paid £150,000 if it did not exercise its right to break, show how carefully and fully the parties considered and identified their rights against each other in relation to clause 8 of the Lease. There is force in the argument that these three provisions show that the parties had directed their minds to the specific question of what payments were to be made between them in connection with clause 8, and in particular what sums were to be paid if the right to break either was implemented or was not implemented, and that this renders it inappropriate for the court to step in and fill in what is no more than an arguable lacuna.

There is, in my view, less force in the defendants' reliance on paragraph 8 of Schedule 4 to the Lease (discussed in para 7 above). I see the logic of the argument that the fact that the rent review provisions expressly dealt with a similar point is an indication that the parties must have intentionally excluded any reference to such a point in clause 8. However, the rent review provisions were no doubt taken from a previous precedent, and, while careful thought would have been given to their precise terms, a provision such

as paragraph 8 of Schedule 4 would have been in any
sophisticated modern rent review clause. Having said
that, I suppose that it might be said that the defendants
could make something of the fact that such a provision
is not normally included in a standard break clause, but
I think that is too remote from the issue in this case to
be of any help, and it is, sensibly, not a point which was
developed, or even raised, in argument.

**The general law on apportionment of rent payable in
advance**

The arguments discussed so far have focussed on the
terms of the Lease (and the Deed) and their commercial
effect. However, it is also necessary to consider the
established legal background against which the Lease
was entered into, and in particular the general attitude
of the law to the apportionability of rent payable in
advance.

It has long been well established that rent, whether
payable in arrear or advance, is not apportionable in
time in common law. Accordingly, if a lease under
which the rent is payable in arrear was forfeited or
came to an end prematurely for some other reason,
the landlord loses the right to recover the rent due
on the rent day following that determination, at least
according to the common law – see eg William Clun's
Case (1613) 10 Co Rep 127a . Parliament sought to
remedy this initially in a limited way through the
now repealed section 15 of the Distress for Rent Act
1737 and the Apportionment Act 1834 , and then
more comprehensively through the Apportionment Act
1870 , which is still in force. Section 2 of the 1870
Act prospectively provides that "All rents, annuities,
dividends, and other periodical payments in the nature
of income" should "like interest on money lent, be
considered as accruing from day to day, and shall be
apportionable in respect of time accordingly".

There is no doubt that section 2 applies to rent payable
in arrear, as was held by Malins V-C in Capron v
Capron (1874) LR 17 Eq 288 . In Ellis v Rowbotham
[1900] 1 QB 740 , the Court of Appeal held that the
1870 Act did not apply to rent payable in advance and,
ever since then, it has been assumed that this was the
law. At the invitation of the court, it was argued on
behalf of the claimant that Ellis should be overruled. I
am satisfied that it should be approved. In their brief

reasoned judgments, both AL Smith and Romer LJJ
explained that (i) the mischief that the 1870 Act was
concerned to correct related solely to rent in arrear,
and (ii) rent paid in advance could not be said to be
"accruing from day to day", unlike rent in arrear. There
is no reason to doubt the first reason. As to the second
reason, it has obvious force if one treats the statutory
reference to a sum "accruing" as a liability to pay the
sum accruing. The conclusion reached in Ellis is also
supported by the reference to "interest on money lent",
because interest has virtually invariably been payable in
arrear. In addition, sections 3 and 4 of the 1870 Act,
which are consequential provisions expressed to apply
to "The apportioned part of *any such* rent, annuity,
dividend, or other payment" (emphasis added), can
only apply to rent or other payments payable in arrear,
and not in advance, as they deal with the date when
such rent or other payments are to be treated as having
become due after the relevant event (ie, in the case of
rent, determination of the lease).

Even if we were considering the effect of section 2 in
the absence of the longstanding decision in Ellis , I
would have concluded that the section did not apply
to rent paid in advance, essentially for the reasons
summarised in para 44 above. However, like Collins
LJ who concurred in the conclusion reached in Ellis ,
I would not have regarded the issue as "altogether
free from doubt", in the light of the very wide words
of the section (" *All* rents, annuities" etc). As it is,
the conclusion is reinforced by the fact that Ellis has
stood for well over 100 years, and has been followed
and applied in a number of first instance and Court
of Appeal decisions without any expressions of doubt
as to its correctness — see eg Hildebrand v Lewis
[1941] 2 KB 135 , where at p 139 the Court of Appeal,
citing Ellis in support, described it as "well settled that
where rent is payable in advance the Apportionment
Act does not apply". I find it difficult to accept that this
court could properly rule that a statute had a meaning
which we thought was simply wrong, however long that
meaning had been assumed to be correct. Nonetheless,
I consider that, in a case where we had real doubt as to
the correct meaning of a statute, we should favour the
meaning which has been generally assumed to be correct
for a long period, especially when the basis of that
assumption is a judicial decision. In this case, however,
it is not necessary to go even that far, because, as just

10-03635-jpm    Doc 271-3    Filed 04/03/17    Entered 04/03/17 18:29:57    Exhibit A -
Part 3    Pg 350 of 839

Marks & Spencer Plc v BNP Paribas Securities Services, 2015 WL 7822966...

explained, I consider that the conclusion reached by the Court of Appeal 115 years ago in Ellis was correct.

It follows from this conclusion that neither the common law nor statute apportions rent in advance on a time basis. And this was, correctly, generally understood to be the position when the Deed and the Lease were negotiated and executed. The claimant's argument, by contrast, is that a term should be implied into the Lease that the Basic Rent payable in advance on 25 December 2011 should effectively be apportioned on a time basis. The fact that the Lease was negotiated against the background of a clear, general (and correct) understanding that rent payable in advance was not apportionable in time, raises a real problem for the argument that a term can be implied into the Lease that it should be effectively apportionable if the Lease is prematurely determined in accordance with its terms.

The point can be taken a little further. It is a very well established rule that a landlord who forfeits a lease under which the rent is payable in advance is entitled to payment of the whole of the rent which fell due on the quarter day preceding the forfeiture. The rule was well described by Lord Denning MR in Canas Property Co Ltd v KL Television Services Ltd [1970] 2 QB 433 , 442, where he addressed a case where the rent was payable in advance on the usual quarter days and the landlord forfeited the lease by serving a writ (now a claim form) "for instance on 25 April". He said, citing Ellis , that, given that "the rent is payable in advance, the writ should claim for the whole quarter's rent due *in advance* on March 25 … and mesne profits from June 24 … to the date of delivery of possession". (It may well be that the mesne profits should run from the date of service of the writ, but nothing hangs on that for present purposes.) Lord Denning contrasted the position where the landlord forfeited a lease under which the rent was payable in arrear, where, he said, the landlord should claim "rent at the rate of … from March 25 … to the date of service of the writ and mesne profits" thereafter. Lord Denning's approach was followed and applied by the Court of Appeal in Capital and City Holdings Ltd v Dean Warburg Ltd (1988) 58 P & CR 346 .

Thus, it is clear that, where a lease provides for payment of rent in advance on the usual quarter days, and the landlord forfeits the lease during the currency of a quarter, he is entitled to retain the whole of the rent due

on the quarter day immediately before the forfeiture if it has been paid, and, if it has not been paid, he is entitled to recover and retain the whole of that rent.

### Conclusions

If one concentrates on the factors identified in paras 33-35 above, there appears to be a strong case for the implied term for which Mr Fetherstonhaugh QC powerfully argued on behalf of the claimant. The point made in para 33 supports the contention that, not merely would an implied term be fair, but that clause 8 could be said to work rather unfairly without the implied term. The point made in para 35, supported by what is said in para 34, provides real support for the proposition that, without the implied term, clause 8 would operate in a rather capricious way. On the other hand, as Mr Dowding QC rightly said on behalf of the defendants, the factors identified in paras 38-40 above chime with the warnings given by Sir Thomas Bingham in Philips and his reasons for rejecting an implied warranty in APJ Priti . The Lease is a very full and carefully considered contract, which includes express obligations of the same nature as the proposed implied term, namely financial liabilities in connection with the tenant's right to break, and that term would lie somewhat uneasily with some of those provisions.

There is little point in resolving the hypothetical question whether, in the absence of the points discussed in paras 43-49 above, I would have concluded that a term should be implied as the claimant contends. Even if I would have reached that conclusion, I consider that it could not have stood once one faced up to the clear and consistent line of judicial decisions which formed the backcloth against which the terms of the Lease, and in particular the provisions of clause 8, were agreed. Save in a very clear case indeed, it would be wrong to attribute to a landlord and a tenant, particularly when they have entered into a full and professionally drafted lease, an intention that the tenant should receive an apportioned part of the rent payable and paid in advance, when the non-apportionability of such rent has been so long and clearly established. Given that it is so clear that the effect of the case-law is that rent payable and paid in advance can be retained by the landlord, save in very exceptional circumstances (eg where the contract could not work or would lead to

an absurdity) express words would be needed before it would be right to imply a term to the contrary.

I accept that refusing to accede to the proposed implied term in this case can lead to the operation of clause 8 having the somewhat curious effect discussed in para 35 above. However, while the difference in result between the tenant paying the £919,800 plus VAT before or after 25 December 2011 can fairly be said to be capricious or anomalous, it does not begin to justify a suggestion that the contract is unworkable. Indeed, the result cannot be said to be commercially or otherwise absurd, particularly as it is entirely up to the tenant as to when that sum is paid. Further, the fact that rent payable in advance is not apportionable can always lead to potential unfairness. For instance, a landlord with a right to forfeit on 23 March for a continuing breach of covenant could wait for three days to re-enter, in order to be able to receive the whole of the rent due in respect of the quarter to 24 June.

It is instructive to see how Morgan J, who accepted the claimant's case that there was an implied term, approached the question of apportionment of rent in the event of a forfeiture. At para 38 of his judgment, after referring to Ellis , he said that he "consider[ed] that the parties are to be taken to have contracted against the background of the established law", and he would not have been "prepared to imply such a term in a forfeiture". However, he held that such a term could be implied where the Lease determined under clause 8, but not where it determined as a result of a forfeiture, because (i) "at the date of the Lease …, there was no established law to the contrary in the case of a tenant's break clause", whereas there was in relation to forfeiture, and (ii) "it is significant that the parties agreed that the lessee could only break the Lease if it paid a sum equivalent to one year's rent to compensate the lessor for the fact that it is losing its income stream from the break date".

I am unconvinced by either of those reasons. The first reason effectively ignores the point that the reasoning in Ellis , Canas and Capital and City applies equally to a case where a lease determines by forfeiture as it does to a case where it determines by exercise of a right to break. The second distinction appears rather to point the opposite way, as explained in para 39 above. The fact that the tenant has to make a payment of over

£900,000 plus VAT by 24 January 2012 in order to exercise the right to break, lies uneasily with the notion that one should imply a term that the tenant should be paid around £200,000 plus VAT the following day, but no such problem exists with implying such a term on a forfeiture. Another reason was advanced before us, namely that forfeiture normally arises because of some failure on the part of the tenant. I agree that it does, but not always; more importantly, I do not see that as a justification for rejecting an implied term in relation to a forfeiture if such a term is to be implied in relation to the exercise of a break clause. Further, given that the exercise of the break clause is in the hands of the tenant, and the exercise of a right to forfeit is in the hands of the landlords, any argument for an implied term based on fairness is stronger in relation to forfeiture than in relation to clause 8.

Once one discards the two reasons given by the judge for reaching a different conclusion as to an implied term on the exercise of the break clause from that which would apply on a forfeiture, it seems to me that the logic of the analysis of Morgan J, who has considerable experience in this field, is that the claimant's case should fail in relation to the Basic Rent, as the Court of Appeal concluded.

Finally, I turn to the Car Park Licence Fee and the insurance rent. The reasons for rejecting the appellant's argument in relation to the Basic Rent apply equally to the Car Park Licence Fee: indeed, the position is *a fortiori* as the reservation of the Car Park Licence Fee includes no words such as "and proportionately for any part of a year", and the sum involved is very small in relative terms. So far as the insurance rent is concerned, the position is less clear. It is in a sense a payment for a service, and, as Morgan J rightly concluded, the service charge should be apportioned. However, that conclusion is based on the provisions of para 4.6 of Schedule 7 to the Lease, summarised in para 6 above, which enables the service charge to be apportioned, through the medium of a payment to the tenant: the reference to a credit plainly extends to giving effect to the credit, through payment, once the landlord and tenant relationship has come to an end. I do not consider the service charge to be a good analogy, because the service charge is paid for various ongoing services rather than a one-off contribution to a single payment, and because there is no such

provision in Schedule 5 , summarised in para 5 above, in relation to the insurance rent. The appellant argues that the reference to a "fair proportion" in Schedule 5 coupled with fact that there is no reference to the period for which the landlords should take out the insurance renders it easy to imply the term for which the appellant contends. In my view, however, unless it could be shown to have been unreasonable for the respondents to have insured the Building for the whole of the ensuing year when they did so, the reasons for dismissing this appeal in relation to the Basic Rent and the Car Park Licence Fee apply equally to the insurance rent. After all, the insurance rent is a single annual sum, specifically reserved as rent, with no provision for apportionment, and it became payable in full in July 2011; further, the money involved is, relatively speaking, small. It is almost invariable for a landlord, indeed for any property owner, to insure its property on an annual basis, unless there is a specific reason not to do so, and that was clearly the established practice in the present case. It may be that the landlords could not have recovered the insurance rent for a full year in a case where it would have been unreasonable for them to have expected the tenant to pay for a full year's cover. However, no such argument was advanced in this case, and it was probably too late to do so in any event, as the insurance rent had been paid for the year in question.

Accordingly, I would dismiss this appeal.

Lord Carnwath:

I agree that the appeal should be dismissed for the reasons given by Lord Neuberger so far as addressed to the issues between the parties. I add some brief comments only on the issue of implied terms, and in particular Lord Neuberger's comments on the status of the Privy Council judgment in the Belize case.

Unlike him, I would have been content to take my starting point not in the 19th century cases (such as The Moorcock ), but in the most modern treatment at the highest level. That is undoubtedly to be found in the judgment of the Privy Council in the Belize case ( Attorney General of Belize v Belize Telecom Ltd [2009] 1 WLR 1988 ). It is important to remember that this was not an expression of the views of Lord Hoffmann alone, as is implied in some commentaries, but was the considered and unanimous judgment of the Board as a whole (including Lady Hale, and Lord Rodger, Lord Carswell, Lord Brown, none of them known for lack of independent thought). In the leading textbook on the subject (Lewison, *Interpretation of Contracts* 5th ed (2014)), the judgment is realistically taken to "represent the current state of the law of England and Wales" (p 284, para 6.03). The rest of that chapter contains an illuminating discussion of the working out of the principles stated by Lord Hoffmann, as applied by the courts in different contractual contexts and different factual situations. We would need very good reasons for treating the judgment as less than authoritative, and we have not been asked by the parties to do so.

In the present case, there has been no dispute as to the authority of the Belize judgment, only as to its interpretation. The appellants seek to interpret it as supporting a more liberal approach than the traditional "necessity" test (in the words of their printed case):

> "those courts which purport to follow Belize , but in so doing apply the tests of business efficacy, absolute necessity and the officious bystander, are departing from the test decided by the Privy Council. The issue, therefore, is whether the type of necessity that is required for the implication of a term is what may be termed (a) absolute necessity (ie the contract simply will not operate without the term); or (b) reasonable necessity (ie the contract will not operate as it must reasonably have been intended by the parties to operate)." (para 59)

The respondents by contrast submit that, properly understood, the judgment should not be read as involving any watering down of the traditional tests.

To my mind there is no doubt that the respondents' interpretation is correct. This is so, whether one looks to the words of Lord Hoffmann alone, or to subsequent authority in the higher courts of this country. The appellants have sought to support their submission by

Marks & Spencer Plc v BNP Paribas Securities Services, 2015 WL 7882666...

a commendably thorough review of the many cases in which Belize has been cited, in this country and in other common law jurisdictions. In my view, with the possible exception of the Singapore case referred to by Lord Neuberger to which I will come, such support is lacking.

Very soon after it was given, the Belize judgment was subject to detailed consideration by Lord Clarke MR in the Court of Appeal in Mediterranean Salvage & Towage Ltd v Seamar Trading & Commerce Inc [2009] EWCA Civ 531 (10 June 2009); [2010] 1 All ER (Comm) 1 . The judgment was "adopted" also by Rix LJ (para 48). As the third member of the court, I was more cautious at that early stage, deciding the appeal on the narrow basis that the implied term had not been shown by the owners to be "necessary", and their case was not improved by substituting "any of the other formulations of the test discussed in the cases" (para 63).

Lord Clarke began by predicting (accurately as it has turned out) that Lord Hoffmann's analysis "will soon be as much referred to as his approach to the construction of contracts in Investors Compensation Scheme [1998] 1 WLR 896 , 912-913" (para 8). He observed that "the implication of a term is an exercise in the construction of the contract as a whole" (para 9, citing the two House of Lords authorities referred to by Lord Hoffmann). He then quoted extensively from the judgment, including its citation of Lord Simon's summary of the tests for implication of a term (see Lord Neuberger para 18). He did not see the judgment as involving a loosening of the traditional tests:

> "It is thus clear that the various formulations of the test identified by Lord Simon are to be treated as different ways of saying much the same thing. Moreover, as I read Lord Hoffmann's analysis, although he is emphasising that the process of implication is part of the process of construction of the contract, he is not in any way resiling from the often stated proposition that it must be necessary to imply the proposed term. It is never sufficient that it should be reasonable." (para 15)

In support he cited also the speech of Lord Wilberforce in Liverpool City Council v Irwin [1977] AC 239 , 253-254, rejecting the more flexible approach proposed in the Court of Appeal by Lord Denning MR. Lord Clarke also noted (para 17) the contrast drawn by Sir Thomas Bingham MR in Philips Electronique (a passage cited by Lord Neuberger at para 29) between the court's "usual role" in contractual interpretation of finding the "true meaning" of the words actually used by the parties, and the "more ambitious undertaking" involved in "the interpolation of terms to deal with matters for which … [they] have made no provision". Lord Clarke concluded this passage by noting the "stress" laid by the authorities on "the importance of the test of necessity. Is the proposed implied term necessary to make the contract work?" (para 18).

The appellants cite a number of later cases in the Court of Appeal in which the Belize judgment has been discussed in some detail (notably Crema v Cenkos Securities plc [2011] 1 WLR 2066 , para 42ff per Aikens LJ; Stena Line Ltd v Merchant Navy Ratings Pension Fund Trustees Ltd [2011] Pens LR 223 , para 36ff per Arden LJ; Jackson v Dear [2014] 1 BCLC 186 , para 15ff per McCombe LJ, adopting the summary of the cases by Briggs J at first instance). None of these involves any material departure from Lord Clarke's analysis. More significantly it gains direct support from the succinct observation by Lady Hale (herself a party to the Belize judgment) in Geys v Société Générale [2013] 1 AC 523 , para 55 (paraphrased by Lord Neuberger at para 15), where she referred to:

> "those terms which are implied into a particular contract because, on its proper construction, the parties must have intended to include them: see Attorney General of Belize v Belize Telecom Ltd [2009] 1 WLR 1988 . Such terms are only implied where it is necessary to give business efficacy to the particular contract in question."

The appellants refer also to the treatment of the Belize judgment in other common law countries, including Canada, Australia, New Zealand and Hong Kong. None of these citations raises any doubt as to the authority of the Belize judgment, nor any reason to question Lord Clarke's interpretation of it. The one exception appears to be the Singapore Court of Appeal, in which (as Lord Neuberger points out: para 24) the judgment has been subject to detailed and critical analysis in Foo Jong Peng v Phua Kiah Mai [2012] 4 SLR 1267 (followed in Sembcorp Marine Ltd v PPL Holdings Pte Ltd [2013] SGCA 43 ). Their analysis draws, *inter alia* , on criticisms made by Paul Davies, Recent developments in the law of implied terms [2010] LMCLQ 140 . I note that there is no criticism in that article of Lord Clarke's judgment as such. Rather it is cited as a supposed example of the less than "wholly enthusiastic" reception which the Belize judgment is thought to have received in later cases.

That and other academic articles, as well as the judgment of the Singapore Court of Appeal, have themselves been subject to critical examination in a recent article by Professor Richard Hooley, Implied terms after Belize Telecom [2014] CLJ 315 , in which he welcomes the "doctrinal coherence to interpretation and implication" brought by the Belize judgment. Other academic views, before and since, are cited by Lord Neuberger (para 24).

I see no purpose in reviewing the respective academic contributions in any detail, given the weight of judicial authority for the proposition (with which I understand we all agree) that the judgment is not to be read as involving any relaxation of the traditional, highly restrictive approach to implication of terms. Once that point is established, then I am not convinced with respect that the other points made by the Singapore court are sufficient to justify undermining the authority of the Board's reasoning. The passage from the court's conclusion quoted by Lord Neuberger (para 24) needs to be read in its full context:

> "In summary, although the process of the implication of terms does involve the concept of interpretation, it entails *a specific form or conception of interpretation which is separate and distinct*

*from the more general process of interpretation* (in particular, interpretation of the express terms of a particular document). Indeed, the process of the implication of terms necessarily involves a situation where it is precisely because the express term(s) are missing that the court is compelled to ascertain the presumed intention of the parties via the 'business efficacy' and the 'officious bystander' tests (both of which are premised on the concept of necessity). In this context, terms will not be implied easily or lightly. Neither does the court imply terms based on its idea of what it thinks ought to be the contractual relationship between the contracting parties. The court is *concerned only with the presumed intention of the contracting parties because it can ascertain the subjective intention of the contracting parties only through the objective evidence* which is available before it in the case concerned. In our view, therefore, although the Belize test is helpful in reminding us of the importance of the general concept of interpretation (and its accompanying emphasis on the need for objective evidence), we would respectfully *reject that test in so far as it suggests that the traditional 'business efficacy' and 'officious bystander' tests are not central to the implication of terms* . On the contrary, both these tests (premised as they are on the concept of necessity) are an integral as well as indispensable part of the law relating to implied terms in Singapore. …" (emphasis added)

This summary is useful because it draws together in short form the threads of an elaborate and carefully

considered judgment. As I read it the key points come down to three:

> • i) Although the implication of terms is one aspect of "the concept of interpretation", it should be treated as "separate and distinct from the more general process of interpretation";
> • ii) The court is concerned not with "what it thinks ought to be the contractual relationship between the contracting parties", but rather with their "presumed intention" as ascertained through "objective evidence";
> • iii) The central place of the "business efficacy" and "officious bystander" tests should be affirmed as "an integral as well as indispensable part" of the law of Singapore.

The first point is an interesting debating point, but to my mind of little practical significance. It is not a point addressed by the parties before us – understandably, if they regarded it (as I would) as settled, if not by the Belize judgment itself, then by the authorities relied on by Lord Hoffmann (noted by Lord Neuberger at para 25). Lord Neuberger (para 28) prefers a sequential approach: first interpretation, then implication. However, as he accepts (para 26) both processes are parts of the exercise of "determining the scope and meaning of the contract".

On this point also I see no reason to depart from what was said in Belize . While I accept that more stringent rules apply to the process of implication, it can be a useful discipline to remind oneself that the object remains to discover what the parties have agreed or (in Lady Hale's words) "must have intended" to agree. In that respect it remains, and must be justified as, a process internal to the relationship between the parties, rather than one imposed from outside by statute or the common law (see the distinction noted by Lord Neuberger: para 15).

Nor do I agree that support for such a division can be found in the judgments referred to by Lord Neuberger: that is, the judgments of the Master of the Rolls in the Philips case (already cited), and of this court in Aberdeen City Council . The passage from the former is useful as emphasising the narrow constraints on implication. But I do not read the Master of the Rolls as

treating it as a notionally separate exercise from that of interpretation. (Nor did Lord Clarke MR when quoting the same passage in Mediterranean Salvage : see above.) The contrast rather is between two aspects of the court's task in respect of "contractual interpretation": the "usual role" involving the resolution of ambiguities in the language used by the parties, and the "extraordinary power" involving interpolation of terms that they have not used.

In the same way the passages cited from Aberdeen City Council do not appear to support a sharp distinction between interpretation and implication, still less for the necessity of a sequential approach. No one thought it necessary to refer to Belize . Lord Clarke preferred implication, but acknowledged that the two processes achieved the same result. There is no indication that he had changed his view since Mediterranean Salvage . He seems to have treated them as two sides of the same coin. Lord Hope who gave the lead speech (which also had majority support) clearly saw them as part of a single exercise: the implied term was the "product" of interpretation. The case seems if anything to illustrate an "iterative", rather than sequential, process (see Lord Grabiner, The iterative process of contractual interpretation (2012) 128 LQR 41 ). The results of different interpretative techniques were considered and compared, in the light of the language used and its business context, to achieve a result which best represented the assumed intentions of the parties.

On the second point, in so far as there is a difference from the Singapore court, I prefer the approach of Lord Neuberger which seems to me entirely consistent with Belize . As he says (para 21), one is concerned not with "the hypothetical answer of the actual parties", but with that of "notional reasonable people in the position of the parties at the time at which they were contracting", or in other words of Lord Hoffmann's "reasonable addressee" ( Belize , para 18).

On the third point, there is no doubt as to the continuing significance of the traditional tests, as summarised by Lord Simon. If however the Singapore court intended thereby to prescribe a more rigid application of those tests, whether individually or cumulatively, I prefer the approach of the Board in Belize (para 27):

10-03635-jpm    Doc 271-3    Filed 04/03/17    Entered 04/03/17 18:29:57    Exhibit A -
Part 3    Pg 356 of 839

Marks & Spencer Plc v BNP Paribas Securities Services..., 2015 WL 7692966...

"The Board considers that this list is best regarded, not as [a] series of independent tests which must each be surmounted, but rather as a collection of different ways in which judges have tried to express the central idea that the proposed implied term must spell out what the contract actually means, or in which they have explained why they did not think that it did so."

This passage is also cited, albeit with only qualified approval, by Lord Neuberger (para 21).

In conclusion, while I accept that Lord Hoffmann's judgment has stimulated more than usual academic controversy, I would not myself regard that as a sufficient reason to question its continuing authority. On the contrary, properly understood, I regard it as a valuable and illuminating synthesis of the factors which should guide the court. Applying that approach to the present case leaves me in no doubt that the appeal should be dismissed.

Lord Clarke:

I agree that the appeal should be dismissed for the reasons given by Lord Neuberger. I only add a few words of my own because of the debate between Lord Neuberger and Lord Carnwath on Lord Hoffmann's view on the relationship between the approach to construction and the approach to the implication of a term which he expressed on behalf of the Judicial Committee of the Privy Council in Attorney General of Belize v Belize Telecom Ltd [2009] 1 WLR 1988 . I do so in part in order to clarify what I said in the cases referred to by Lord Carnwath, especially Mediterranean Salvage & Towage Ltd v Seamar Trading & Commerce Inc [2009] EWCA Civ 531, [2010] 1 All ER (Comm) 1 and

Aberdeen City Council v Stewart Milne Group Ltd [2012] SLT 240 .

As Lord Carnwath says at para 62, I did not doubt Lord Hoffmann's observation that "the implication of a term is an exercise in the construction of the contract as a whole". I recognise, however, in the light of Lord Neuberger's judgment, especially at paras 22 to 31, that Lord Hoffmann's view involves giving a wide meaning to "construction" because, as Lord Neuberger says at para 27, when one is implying a word or phrase, one is not construing words in the contract because the words to be implied are *ex hypothesi* and not there to be construed. However, like Lord Neuberger (at para 26) I accept that both (i) construing the words which the parties have used in their contract and (ii) implying terms into the contract, involve determining the scope and meaning of the contract. On that basis it can properly be said that both processes are part of construction of the contract in a broad sense.

I agree with Lord Neuberger and Lord Carnwath that the critical point is that in Belize the Judicial Committee was not watering down the traditional test of necessity. I adhere to the view I expressed at para 15 of my judgment in the Mediterranean Salvage & Towage case (which is quoted by Lord Carnwath at para 62) that in Belize , although Lord Hoffmann emphasised that the process of implication was part of the process of construction of the contract, he was not resiling from the often stated proposition that it must be necessary to imply the term and that it is not sufficient that it would be reasonable to do so. Another way of putting the test of necessity is to ask whether it is necessary to do so in order to make the contract work: see the detailed discussion by Lord Wilberforce in Liverpool City Council v Irwin [1977] AC 239 , 253-254.

Crown copyright

© 2017 Sweet & Maxwell

2015 WL 7692966

---

                                            © 2017 Thomson Reuters.

# TAB 49

Medcalf v. Weatherill and Another
House of Lords
27 June 2002

**2002 WL 1310751**

Before: Lord Bingham of Cornhill, Lord
Steyn Lord Hoffmann , Lord Hobhouse of
Wood-Borough, Lord Rodger of Earlsferry
Thursday 27th June, 2002

Analysis

Opinions of the Lords of Appeal in the Cause

**JUDGMENT**

My Lords,

1.   In this appeal two barristers (Mr Bernard Weatherill
QC and Ms Josephine Hayes) challenge a wasted costs
order made against them by the Court of Appeal. They
do so on two grounds: first, that the court had no
jurisdiction to make the order; and second, that such
an order should not have been made when they were
precluded by legal professional privilege from answering
the complaints made against them. The appeal requires
the House, for the first time, to consider the wasted
costs order regime introduced by section 4 of the Courts and
Legal Services Act 1990 and expressed in section 51(6)(7)
and (13) of the Supreme Court Act 1981 .

**The proceedings**

2.   The proceedings in which the wasted costs order was
made against the barristers concerned a snooker-based
television quiz game, originally conceived by Mr Michael
Kemp in about 1984 and developed in its early stages
in 1987, first by Mr Kemp and Mr Roger Medcalf and
then by these two with the addition of Mr Mardell, who
had professional experience of developing and exploiting
television game shows and was involved both personally

and through his company, originally named Createl Ltd
and then the Terry Mardell Organisation Ltd ("the
TMO"). The plans for this new game show went through
various different versions and were the subject of much
discussion and refinement. Presentations were made on
several occasions to the BBC, which was slow to respond.
In the end, however, the BBC did respond. It bought the
new game show and programmes were transmitted. They
have proved to be a continuing success. But from about
the end of 1987 Mr Medcalf was excluded from any part
in the development and exploitation of the project, which
were handled by Mr Mardell and his company and Mr
Kemp.

3.   In July 1993 Mr Medcalf issued proceedings against
Mr Mardell, Mr Kemp, the BBC (which settled before
the action came to trial and played no further part)
and the TMO. Mr Medcalf's claim at that stage was
based on alleged infringement of copyright and breach of
confidence. The action came on for trial before Lightman
J in January 1997 but was aborted on the third day of
trial to enable Mr Medcalf's advisers to re-plead his case
so as to include an additional claim in partnership. A
stringent order in costs was made against Mr Medcalf as
a condition of the postponement. Mr Medcalf's case was
then re-pleaded and a second trial took place before Lloyd
J in May 1998. At this trial the judge preferred the evidence
of Mr Medcalf to that of Mr Mardell and Mr Kemp. He
found that there had been a partnership between the
three men to be inferred from their conduct and that there
had also been a breach of confidence. The defendants
were ordered to provide an account of the profits of the
partnership and to make an interim payment of £100,000
into court.

4.   Mr Mardell and the TMO (but not Mr Kemp) at
once appealed against the judge's decision and there was a
second appeal against certain orders made by the judge in
a later decision on the taking of the partnership accounts.
No satisfactory account was provided in compliance with
the judge's order and in July 1999 Mr Medcalf applied
to strike out the defendants' third attempt to provide
the account ordered. In response the defendants served
witness statements making, for the first time, serious
allegations of fraud against Mr Medcalf and his solicitors
in connection with the conduct of the action before Lloyd
J. It was alleged that Mr Medcalf or his solicitors had

tampered with the transcripts of evidence given at the trial, that Mr Medcalf's solicitors had attempted to pervert the course of justice during without prejudice discussions with Mr Kemp and that Mr Medcalf's signature on his witness statement had been forged. No transcripts of evidence had been available to the judge when he had given judgment and Mr Medcalf in evidence had vouched the proof of his witness statement, but these points were relied on as impugning the credibility of Mr Medcalf, and the reliability of his evidence had been an important issue at the trial. The master referred the striking out application to Lloyd J, who was to have heard it on 26 November 1999 but who was in the event unable to hear it until 2 December 1999.

5.  Neither of the appellant barristers had up to then represented Mr Mardell or the TMO. Ms Hayes was instructed shortly before 24 November. On 25 November she informed leading counsel for Mr Medcalf (Mr Romie Tager QC) of an application she intended to make (and shortly thereafter did make) to the judge, that he should direct the police to investigate the allegations made concerning the transcripts and the perversion of the course of justice and that Mr Medcalf's application to strike out the account should meanwhile be stayed. Mr Medcalf's solicitors intimated an intention to apply for a wasted costs order against the defendants' solicitors, although this was not pursued. In her skeleton argument for the hearing before Lloyd J on 2 December Ms Hayes included the allegations of misconduct already mentioned but with the addition of certain serious allegations of a similar character. An amended notice of appeal was drafted, although not formally served, including these and additional allegations of impropriety.

6.  On 6 December 1999 Lloyd J rejected the defendants' application and refused permission to appeal. He went on to hear Mr Medcalf's application to strike out the defendants' third partnership account. Mr Weatherill, appeared before the judge with Ms Hayes on 8 December 1999 (having been instructed on that date or shortly before) when application was made that the judge should defer giving judgment on the striking out application pending receipt of evidence from the United States Department of Justice which might substantiate one of the allegations of fraud made against Mr Medcalf. This application was refused. On Mr Medcalf's application to

strike out the judge refused to make the order sought, but held that the third account which the defendants had given did not comply with his order and that they should have a last opportunity to comply.

7.  There was intense interlocutory activity on the part of Mr Medcalf and the defendants over the next two months. Relevantly for present purposes, the defendants' appeal against the judge's substantive decision in favour of Mr Medcalf, coupled with an application by the defendants to amend their notice of appeal so as to include the allegations of impropriety against Mr Medcalf already referred to, were due to be heard by the Court of Appeal on 14 February 2000. At a hearing on 28 January 2000 Clarke LJ gave directions to ensure that that date would be effective: among other things he ordered that evidence in the defendants' possession relevant to matters raised in the draft amended notice of appeal be served that day, with an indication in writing of any further evidence the defendants might wish to put before the court, and that the defendants should by 4 February 2000 issue and serve an application to amend their notice of appeal and to introduce fresh evidence, serve and file a bundle comprising all witness statements and evidence intended to be relied on, and serve and file a draft amended notice of appeal and supporting skeleton arguments covering those of the existing grounds of appeal still advanced and identifying any which were abandoned.

8.  In response to that order of Clarke LJ, the defendants served certain reports and listed evidence which was not in their possession but which they hoped would follow. A draft amended notice of appeal dated 3 February 2000, bearing the names of both barristers, was served on the following day. Skeleton arguments dated 4 February 2000, including a supplementary skeleton argument in support of the application to amend the notice of appeal signed by both the barristers, were also served on 4 February. The supplementary skeleton argument advanced submissions in support of each of the new allegations of fraud, forgery and other impropriety. Two additional bundles of evidence were served on Mr Medcalf. In the course of Friday 4 February 2000, for reasons which have not been disclosed, instructions were withdrawn from the defendants' solicitors. The barristers ceased to be instructed and the solicitors came off the record on Monday 7 February. During the following week Mr

WESTLAW   © 2017 Thomson Reuters.

Medcalf's advisers prepared and filed evidence to rebut the allegations of fraud and impropriety raised in the draft amended notice of appeal. This evidence was not served on the barristers, who were no longer acting, but they were again instructed at about midday on Friday 11 February and the evidence was then made available to them.

9.  At the hearing before the Court of Appeal (Peter Gibson and Schiemann LJJ and Wilson J) on Monday 14 February, Mr Weatherill and Ms Hayes, acting (as it is accepted that they did throughout) on instructions, opened the defendants' application to amend the notice of appeal and to adduce new evidence. The application to amend failed in respect of the allegations of impropriety. In the course of argument Mr Weatherill abandoned some of the allegations in the face of judicial hostility. In relation to the remaining allegations, the Court of Appeal rejected the application to amend (although other parts of the application to amend were conceded or were successful). This application occupied about one and a half days of court time, although no oral answer on behalf of Mr Medcalf was called for. A further two and a half days were devoted to argument on the substantive appeal. On 2 March 2000 the Court of Appeal handed down a unanimous reserved judgment, giving its reasons for rejecting the application to amend in respect of the defendants' allegations of fraud and impropriety and dismissing the substantive appeal. Counsel for Mr Medcalf indicated that he would be seeking a wasted costs order against the barristers. This matter was adjourned to enable Mr Medcalf to state his case and to enable the barristers to respond. At a hearing on 2 July 2000 the Court of Appeal ordered that this application proceed to a second stage.

10.  Before that application was resolved, Mr Medcalf compromised his action against Mr Mardell, Mr Kemp and the TMO. The terms of the compromise are not material, save to note that it expressly preserved and excluded Mr Medcalf's claim for wasted costs against the barristers. The principal basis upon which counsel for Mr Medcalf advanced the application for wasted costs against the barristers was that it had been improper of them as counsel for the defendants to have advanced allegations of fraud and other improprieties in the draft amended notice of appeal, in the supplementary skeleton argument and at the hearing of the appeal when, in contravention

of paragraph 606 of the Code of Conduct of the Bar of England and Wales, they could not have had before them reasonably credible material establishing a prima facie case of fraud. Mr Medcalf sought to recover as wasted costs the costs said to have been incurred in investigating and rebutting the allegations made, both by way of written evidence and oral argument at the hearing.

**Paragraph 606 of the Code of Conduct**

11.  Paragraph 606 of the Code of Conduct, headed "Drafting pleadings and other documents", at the relevant time provided:

> "A practising barrister must not devise facts which will assist in advancing his lay client's case and must not draft any originating process pleading affidavit witness statement or notice of appeal containing:
>
> • …
> • (c) any allegation of fraud unless he has clear instructions to make such allegation and has before him reasonably credible material which as it stands establishes a prima facie case of fraud;
> • …
>
> provided that nothing in this paragraph shall prevent a barrister drafting a pleading affidavit or witness statement containing specific facts matters or contentions included by the barrister subject to the lay client's confirmation as to their accuracy."

**Section 51 of the Supreme Court Act 1981**

12.  So far as relevant to this appeal, section 51 of the Supreme Court Act 1981 , as substituted by section 4 of the Courts and Legal Services Act 1990 , provides:

"(1) Subject to the provisions of this or any other enactment and to rules of court, the costs of and incidental to all proceedings in —

(a) the civil division of the Court of Appeal;

(b) the High Court; and

(c) any county court,

shall be in the discretion of the court ….

(3.) The court shall have full power to determine by whom and to what extent the costs are to be paid ….

(6.) In any proceedings mentioned in subsection (1), the court may disallow, or (as the case may be) order the legal or other representative concerned to meet, the whole of any wasted costs or such part of them as may be determined in accordance with rules of court.

(7.) In subsection (6), 'wasted costs' means any costs incurred by a party —

(a) as a result of any improper, unreasonable or negligent act or omission on the part of any legal or other representative or any employee of such a representative; or

(b) which, in the light of any such act or omission occurring after they were incurred, the court considers it is unreasonable to expect that party to pay ….

(13.) In this section 'legal or any other representative', in relation to a party to proceedings, means any person exercising a right of audience or right to conduct litigation on his behalf."

Sections 111 and 112 of the 1990 Act make provision for wasted costs to be awarded in criminal proceedings and civil proceedings in the magistrates' court.

### The wasted costs jurisdiction

13. In Ridealgh v Horsefield [1994] Ch 205 the Court of Appeal heard a composite group of six test appeals. Both the Bar and the Law Society were represented by leading counsel. At the invitation of the court, the Attorney General nominated two counsel to represent the general public interest. In a reserved judgment of the court, the Court of Appeal (Sir Thomas Bingham MR, Rose and Waite LJJ) reviewed at some length the history of the court's jurisdiction to order payment of costs by legal practitioners whose conduct had led to the incurring of unnecessary costs, made detailed reference to the rules and legislation governing the exercise of this jurisdiction, drew attention to certain obvious dangers to which the jurisdiction was subject and gave guidance on the future handling of such applications. Save that this judgment must now be read subject to the decision of the House in Hall (Arthur) JS v Simons [2000] 3 WLR 543 , and subject to what is said in paragraph 23 below, I would endorse and need not repeat what the Court of Appeal said in Ridealgh. It does however appear, from material laid before the House, that the clear warnings given in that case have not proved sufficient to deter parties from incurring large and disproportionate sums of costs in pursuing protracted claims for wasted costs, many of which have proved unsuccessful. The House is grateful for the perceptive commentary on the weaknesses of this jurisdiction made by Hugh Evans, "The Wasted Costs Jurisdiction" 64 MLR 51 (January 2001).

### The decision under appeal

14. The decision of the Court of Appeal now under appeal is reported at [2001] Lloyd's Rep PN 146 . Opinion was divided. Peter Gibson and Schiemann LJJ (for reasons given by Peter Gibson LJ on behalf of both) held that a wasted costs order should be made against the barristers. Wilson J dissented.

15. In paragraph 25 of the majority judgment, Peter Gibson LJ recorded that there was no dispute as to the jurisdiction to make a wasted costs order nor as to the principles to be applied. Full reference was made to Ridealgh. The crux of Mr Tager's case (for Mr Medcalf) was that the barristers had acted improperly,

in breach of paragraph 606 of the Code of Conduct, in making allegations of fraud unsupported by any reasonably credible material establishing a prima facie case: see paragraph 35 of the judgment. The defence advanced by Mr Davidson QC on behalf of the barristers was summarised in paragraph 39 of the judgment:

> "He says that the fundamental point was that this was a case in which it appeared that the court had been deceived at the trial and that it was right and in the public interest for advocates to bring that point forward for adjudication. His main line of defence, however, was based on the fact that, despite the best efforts of the solicitors acting for the barristers, the defendants have not responded to requests that they waive privilege so as to enable the barristers to refer to privileged material in defending the wasted costs claim. The barristers have put in evidence that they were fully aware of their duties under the Code of Conduct and believed that they complied with those duties. They say that they would like to put before the court full details of what material was available, their own consideration of it and their reasoning but are prevented by the law of privilege and confidentiality from doing so. They believe that if they could do so, no wasted costs order would be made. Mr Davidson submits that it is impossible for this court to know on what material the barristers acted, that it is unfair to the barristers, who are unable to give evidence on privileged and confidential matters, for us to draw inferences as to the available material or to exercise our discretion as to whether an order should be made. He and his junior, Miss Mulcahy, have drawn our attention to Article 6 of the European Convention on Human Rights and to the cases decided thereunder. They submit that it would be a contravention of that Article to

decide this case in circumstances where the barristers cannot give evidence on material matters whereas Mr Medcalf is able to bring forward all the evidence in his possession on what they call 'the key issue of fact'."

16.  The majority began by considering the allegations of fraud in the draft amended notice of appeal in order to assess whether there was a possibility that the barristers had had other material. This review was prefaced by certain preliminary observations. First, the majority emphasised the importance of paragraph 606, which gave litigating parties a measure of redress against potentially very damaging allegations for which (because of the law of absolute privilege) they could obtain no redress. Thus a barrister must be instructed to make the allegation in question, and should have reasonably credible material establishing a prima facie case before drafting such an allegation. The judgment continued (paragraph 40):

> "The material must be evidence which can be put before the court to make good the allegation. If there is material before counsel which cannot be used in court, the existence of that material cannot justify the actions of counsel in putting their names to the allegation."

Secondly, it was said that paragraph 606 applied not only to allegations of fraud but also to other allegations of dishonest or dishonourable conduct. Thirdly, the majority made plain that counsel must maintain his independence and not compromise his professional standards in order to please the client. In its review of 10 allegations made by the defendants, the majority held that no reasonably credible material had been produced to the court to justify seven, while concluding that there was some evidence to support the remaining three. In considering whether, on the material put before the court, the conduct of the barristers had been shown to be improper, unreasonable or negligent, the majority commented on the peripheral character of these allegations in relation to the main issues

in the action (paragraph 54) and based its finding against the barristers primarily on the failure to produce evidence to the court to support the allegations made. In paragraph 58 of its judgment the majority said:

> "Second, the barristers could not have allowed the draft amended notice of appeal to go out under their names to Mr Medcalf containing allegations of impropriety reliant on the expected contents of the witness statements without the barristers satisfying themselves of the existence of that evidence in a form to be put before the court. We emphasise that the duty under section 606 is one personal to counsel and cannot be delegated to his solicitors. He has to satisfy himself that he has reasonable credible material before him which as it stands establishes a prima facie case of fraud when he drafts the notice of appeal."

In paragraph 59 the majority held that the propriety of the pleading had to be assessed in the light of the material put before the court. It was not persuaded (paragraph 60) that the inability of the barristers to reveal privileged or confidential material made the hearing of the application unfair or contrary to article 6 of the European Convention. While acknowledging the high professional standing of the barristers, the majority found no reasons why, in the exercise of the court's discretion, it should deny Mr Medcalf the order he sought (paragraph 64).

17.  In his dissenting judgment Wilson J compressed into six the seven allegations on which the majority had found against the barristers. He agreed that, at the hearing, no reasonably credible evidence had been placed before the court which prima facie established the validity of those six allegations made against Mr Medcalf (paragraph 72). But in his opinion that was not the point. The point was whether the barristers had had such material before them. Wilson J first considered the barristers' position on 3–4 February when the draft amended notice of appeal had

been finalised and the skeleton arguments delivered. He said (in paragraphs 78–80):

> "78.    I harbour doubts whether on 3 and 4 February the barristers had before them the material which justified their making the six allegations. All six of them had figured in drafts of Ms Hayes dating back to early December 1999 so there had already been two months in which to collect the evidence to justify them. In the drafting of the jointly signed notice dated 3 February it is hard to discern selection, as opposed to blanket repetition, of (to use Mr Weatherill's own description at the hearing) the gallimaufry of allegations which on instructions had been assembled in the drafts of Ms Hayes.
>
> 79.    But, in the complete absence of evidence as to what the barristers actually had before them on 3 and 4 February, I have insufficient confidence in the fertility of my imagination to come to a positive conclusion that they could not have had before them whatever paragraph 606 required.
>
> 80.    There is an initial question as to what paragraph 606 did require to be before them. The words refer to 'reasonably credible material which as it stands establishes a prima facie case of fraud'. In paragraph 58 above my Lords so construe those words as to require the barristers to have before them reasonably credible evidence, in a form to be put before the court, which establishes the prima facie case. My view is that the word 'material' goes wider than evidence in proper form; that the phrase 'as it stands' just means 'at face value'; and that to construe

the word 'establishes' as something which can be achieved only by evidence admissible in court is, in this context, arguably to read too much into it. My own preference would be not to adopt any such paraphrase."

Wilson J raised a series of questions relating to the material which might have been before the barristers on 3–4 February and concluded:

> "84.  Answers to such questions might well have enabled me to concur in the conclusion of my Lords. Or they might have had the reverse effect. Lacking the answers, I remain in doubt as to whether on 3 and 4 February the barristers were guilty of professional impropriety. It is doubt of which, pursuant to the same passage in Ridehalgh v Horsefield , they must have the benefit. It is better that in certain circumstances the wasted costs jurisdiction should be emasculated by the principle of legal professional privilege than vice versa."

Of the hearing on 14–15 February he said (in paragraph 85) that "There was therefore an element of professional impropriety in articulation of these serious allegations at the hearing" in the absence of evidence to support them. In the exercise of his discretion, however, Wilson J would have declined to make an order against the barristers on this limited ground. In reaching this conclusion he was impressed by the extremely difficult circumstances in which both barristers, but particularly Mr Weatherill, had been called upon to act in this complex and highly contentious matter.

**Jurisdiction**

18.  The barristers' argument on jurisdiction was first raised in the House. It was said, first, that section 51

conferred no right on a party to seek a wasted costs order against any legal representative other than his own. Thus the court had no power to make an order against the legal representative of any opposing party. This submission was based on the wording of section 51(13) quoted above, and in particular the words "on his behalf": it was argued that a party could only seek a wasted costs order against a person exercising a right of audience or a right to conduct litigation on his behalf or any employee of such a person.

19.  There are in my opinion very compelling reasons why this construction cannot reflect the intention of Parliament. It is clear that in the exercise of its inherent jurisdiction the court could order a solicitor to compensate a party who was not the client of that solicitor, as it did in Myers v Elman [1940] AC 282 . In Orchard v South Eastern Electricity Board [1987] QB 565, 571, 581, the Court of Appeal expressly dissented from the view, advanced obiter by Lord Denning MR in Kelly v London Transport Executive [1982] 1 WLR 1055 , 1065, that this jurisdiction could be exercised against counsel also. In the context of the 1990 Act, which among other things provided for a substantial extension of solicitors' rights of audience in the higher courts, this inequality of treatment as between advocates performing the same professional function was plainly indefensible, and the object of section 51(6) and (7) was to put barristers and solicitors, for this purpose, effectively in the same position. Section 51 only applies in civil proceedings, but (as was accepted on behalf of the barristers) it is quite clear from section 111 of the 1990 Act (amending the Prosecution of Offences Act 1985) and section 112 of the 1990 Act (amending the Magistrates' Courts Act 1980) that in criminal proceedings in the Court of Appeal, the Crown Court or a magistrates' court and civil proceedings in a magistrates' court a wasted costs order may be made in favour of a party to the proceedings against the legal representative of any other party. No reason has been advanced why Parliament should have wished to lay down a different rule governing barristers in civil proceedings in the High Court, and it is to my mind inconceivable in the context of the 1990 Act that Parliament should have wished to afford to barristers in civil proceedings (otherwise than in a magistrates' court) a ground of exemption not enjoyed by solicitors. Against arguments of this weight, any submission based on the wording of subsection (13) would have to be irresistible. The barristers' argument is not. The subsection is intended to make plain that no liability can attach to

any practitioner not involved in the litigation giving rise to the claim. I note without surprise that a similar conclusion was reached by Neuberger J in Brown v Bennett (No 2) [2002] 1 WLR 713 .

20.  The barristers' second argument on jurisdiction was also based on the language of subsection (13) . It was to the effect that any order made against them could only relate to their conduct when exercising a right of audience in court. This was because they had no right to conduct litigation, as defined in sections 28 and 119(1) of the 1990 Act. Thus (it was said) they could not be liable in wasted costs for anything done when settling the draft amended notice of appeal or the skeleton arguments, the activities which had in fact given rise to most of the wasted costs claimed against them. A similar argument was advanced to and rejected by Leveson J in Worsley v Tambrands Ltd (unreported, 8 November 2000) and also by Neuberger J in Brown v Bennett (No 2) . Both judges were right to reject it. Section 4 of the 1990 Act substituted a new section 51 in the 1981 Act. Once inserted that section was to be read as part of the 1981 Act. Its interpretation was to be governed by its own terms and any other terms of the 1981 Act. I would question whether it would be permissible in principle to construe subsection (13) in the light of definitions imported into the 1990 Act for quite different purposes: see Bennion, Statutory Interpretation 3rd ed, (1997), p 213. The section was intended, as already stated, simply to make plain that no liability could attach to any practitioner not involved in the litigation giving rise to the claim. For the reasons convincingly given by Leveson J it would stultify the section if a barrister were not potentially liable for conduct immediately relevant to the exercise of a right of audience but not involving advocacy in open court. If one might have thought subsection (13) to be unnecessary, the facts of Byrne v Sefton Health Authority [2002] 1 WLR 775 show that it was not.

**The construction of paragraph 606 of the Code of Conduct**

21.  As is evident from the quotations from the judgments of the majority and the minority in the Court of Appeal set out in paragraphs 16 and 17 above, there was a difference of opinion on the interpretation of paragraph 606. The majority held that, when putting his signature to an allegation of fraud or dishonesty, counsel must have before him evidence in a form to be put before the court

to make good the allegation. Wilson J held that counsel must have "material" but that it need not be evidence in admissible form.

22.  Paragraph 606(c) lays down an important and salutary principle. The parties to contested actions are often at daggers drawn, and the litigious process serves to exacerbate the hostility between them. Such clients are only too ready to make allegations of the most damaging kind against each other. While counsel should never lend his name to such allegations unless instructed to do so, the receipt of instructions is not of itself enough. Counsel is bound to exercise an objective professional judgment whether it is in all the circumstances proper to lend his name to the allegation. As the rule recognises, counsel could not properly judge it proper to make such an allegation unless he had material before him which he judged to be reasonably credible and which appeared to justify the allegation. At the hearing stage, counsel cannot properly make or persist in an allegation which is unsupported by admissible evidence, since if there is not admissible evidence to support the allegation the court cannot be invited to find that it has been proved, and if the court cannot be invited to find that the allegation has been proved the allegation should not be made or should be withdrawn. I would however agree with Wilson J that at the preparatory stage the requirement is not that counsel should necessarily have before him evidence in admissible form but that he should have material of such a character as to lead responsible counsel to conclude that serious allegations could properly be based upon it. I could not think, for example, that it would be professionally improper for counsel to plead allegations, however serious, based on the documented conclusions of a DTI inspector or a public inquiry, even though counsel had no access to the documents referred to and the findings in question were inadmissible hearsay. On this point I would accept the judgment of Wilson J.

**Legal professional privilege**

23.  In Ridehalgh v Horsefield [1994] Ch 205 the Court of Appeal addressed the issue of legal professional privilege which may arise where an applicant seeks a wasted costs order against lawyers acting for an opposing party and at page 237B–D of its judgment it said:

"The respondent lawyers are in a different position. The privilege is not theirs to waive. In the usual case where a waiver would not benefit their client they will be slow to advise the client to waive his privilege, and they may well feel bound to advise that the client should take independent advice before doing so. The client may be unwilling to do that, and may be unwilling to waive if he does. So the respondent lawyers may find themselves at a grave disadvantage in defending their conduct of proceedings, unable to reveal what advice and warnings they gave, what instructions they received. In some cases this potential source of injustice may be mitigated by reference to the taxing master, where different rules apply, but only in a small minority of cases can this procedure be appropriate. Judges who are invited to make or contemplate making a wasted costs order must make full allowance for the inability of the respondent lawyers to tell the whole story. Where there is room for doubt, the respondent lawyers are entitled to the benefit of it. It is again only when, with all allowances made, a lawyer's conduct of proceedings is quite plainly unjustifiable that it can be appropriate to make a wasted costs order."

I do not for my part consider this passage to be inaccurate or misleading, and counsel did not criticise it. Read literally and applied with extreme care, it ought to offer appropriate protection to a practitioner against whom a wasted costs order is sought in these circumstances. But with the benefit of experience over the intervening years it seems clear that the passage should be strengthened by emphasising two matters in particular. First, in a situation in which the practitioner is of necessity precluded (in the absence of a waiver by the client) from giving his account of the instructions he received and the material before him at the time of settling the impugned document, the court

must be very slow to conclude that a practitioner could have had no sufficient material. Speculation is one thing, the drawing of inferences sufficiently strong to support orders potentially very damaging to the practitioner concerned is another. The point was well put by Mr George Laurence QC sitting as a deputy High Court judge in Drums and Packaging Ltd v Freeman (unreported, 6 August 1999) when he said, at paragraph 43:

"As it happens, privilege having been waived, the whole story has been told. I cannot help wondering whether I would have arrived at the same conclusion had privilege not been waived. It would not have been particularly easy, in that event, to make the necessary full allowance for the firm's inability to tell the whole story. On the facts known to D3 at the time it launched this application, D3 might very well have concluded that the firm would not be able to avoid a wasted costs order, even on the 'every allowance' basis recommended by: [Sir Thomas Bingham MR]."

Only rarely will the court be able to make "full allowance" for the inability of the practitioner to tell the whole story or to conclude that there is no room for doubt in a situation in which, of necessity, the court is deprived of access to the full facts on which, in the ordinary way, any sound judicial decision must be based. The second qualification is no less important. The court should not make an order against a practitioner precluded by legal professional privilege from advancing his full answer to the complaint made against him without satisfying itself that it is in all the circumstances fair to do so. This reflects the old rule, applicable in civil and criminal proceedings alike, that a party should not be condemned without an adequate opportunity to be heard. Even if the court were able properly to be sure that the practitioner could have no answer to the substantive complaint, it could not fairly make an order unless satisfied that nothing could be said to influence the exercise of its discretion. Only exceptionally could these exacting conditions be satisfied. Where a wasted costs order is sought against a practitioner precluded by legal professional privilege from giving his

full answer to the application, the court should not make an order unless, proceeding with extreme care, it is (a) satisfied that there is nothing the practitioner could say, if unconstrained, to resist the order and (b) that it is in all the circumstances fair to make the order.

24.  It was not submitted to the House that a relaxation of the existing rules on legal professional privilege could or should be permitted in a case such as the present: the decision of the House in R v Derby Magistrates' Court, Ex parte B [1996] AC 487 gave no encouragement to such a submission, and subordinate legislation introduced to modify that decision for purposes of the wasted costs jurisdiction was held to be ultra vires in General Mediterranean Holdings SA v Patel [2000] 1 WLR 272 and was revoked. No attempt has been made to modify the rule by primary legislation. The result no doubt is that in a context such as the present the scope for making wasted costs orders is very limited. This is not necessarily to be regretted. In Ridehalgh v Horsefield [1994] Ch 205, 238–239 the Court of Appeal considered that wasted costs hearings should be measured in hours and urged the courts to be astute to control what threatened to become a new and costly form of satellite litigation. In Harley v McDonald [2001] 2 AC 678 , reviewing the exercise by the New Zealand courts of the inherent jurisdiction to order barristers and solicitors to pay costs unnecessarily incurred, the Judicial Committee of the Privy Council observed (at p 703, para 50):

> "As a general rule allegations of breach of duty relating to the conduct of the case by a barrister or solicitor with a view to the making of a costs order should be confined strictly to questions which are apt for summary disposal by the court. Failures to appear, conduct which leads to an otherwise avoidable step in the proceedings or the prolongation of a hearing by gross repetition or extreme slowness in the presentation of evidence or argument are typical examples. The factual basis for the exercise of the jurisdiction in such circumstances is likely to be found in facts which are within judicial knowledge because the relevant events took place in court or are facts that

can easily be verified. Wasting the time of the court or an abuse of its processes which results in excessive or unnecessary cost to litigants can thus be dealt with summarily on agreed facts or after a brief inquiry if the facts are not all agreed."

Save in the clearest case, applications against the lawyers acting for an opposing party are unlikely to be apt for summary determination, since any hearing to investigate the conduct of a complex action is itself likely to be expensive and time-consuming. The desirability of compensating litigating parties who have been put to unnecessary expense by the unjustified conduct of their opponents' lawyers is, without doubt, an important public interest, but it is, as the Court of Appeal pointed out in Ridehalgh at page 226, only one of the public interests which have to be considered.

**The present appeal**

25.  Proceeding from the undoubted fact (with which Wilson J agreed) that at the hearing on 14–15 February there was no reasonably credible admissible evidence before the court to substantiate the seven allegations held to be improperly made, the majority of the Court of Appeal concluded that the barristers could have had no such admissible evidence before them when signing the draft amended notice of appeal and the skeleton arguments. It would seem likely that they did not. But this was to apply too stringent a test. The question is whether, at that stage, the barristers had material of any kind before them which justified the making of the allegations. This is something which the court does not know and cannot be told. Hunch and suspicion are not enough. Like Wilson J, and for the reasons given in his persuasive judgment, I remain in doubt, and the barristers must have the benefit of that doubt. In a case of this complexity, I would moreover think it unfair and contrary to the appearance of justice to condemn them unheard. While the Strasbourg jurisprudence to which the House was referred fortifies that conclusion (see, for example, De Haes and Gijsels v Belgium (1997) 25 EHRR 1 at p 48, paras 80–81) I do not think it relies on any principle not recognised by the

common law. Again like Wilson J, I would not think it right to base even a partial order on the barristers' failure to abandon the objectionable allegations at the outset of the proceedings on 14 February. They do not appear to have clung to these allegations with undue tenacity, and the matters relied on by Wilson J as influencing the exercise of discretion cannot be lightly discounted.

26.  I am in full agreement with the reasons given by my noble and learned friends Lord Steyn and Lord Rodger of Earlsferry. Save in relation to the transcript allegation, I am also in full agreement with the opinion of my noble and learned friend Lord Hobhouse of Woodborough: on that matter I differ from him because the transcript allegation, although weaker on its face than the other allegations, was not different in kind; and also because I share the view expressed by Lord Rodger in paragraph 76 below.

27.  Despite the highly regrettable outcome for Mr Medcalf, whose successful proceedings have had severe financial consequences for him, I would allow the barristers' appeal, quash the wasted costs order made by the Court of Appeal and award the barristers the costs of and occasioned by the wasted costs application both in the Court of Appeal and before the House (such order not to be enforced without leave of the Court of Appeal in relation to any period when Mr Medcalf was legally-aided).

28.  Well after the conclusion of argument, at a stage when the opinions of the committee were in final draft, material was received from the barristers suggesting that Mr Mardell and the TMO were or might be willing after all to waive their entitlement to legal professional privilege. The committee met informally (without reviewing this material in detail) to consider whether it should explore this material further or remit the matter to the Court of Appeal. It was unanimously resolved that the appeal should be decided on the basis upon which it had been argued both in the Court of Appeal and before the House. It would be inconsistent with the clear objectives of the wasted costs regime to permit this issue to be the subject of yet further litigation.

LORD STEYN

My Lords,

29.  I limit my remarks to the question whether the two barristers against whom wasted costs orders were made by a majority in the Court of Appeal had a fair opportunity to deploy their side of the case: Medcalf v Mardell [2001] Lloyd's Rep PN 146 .

30.  The legislation empowering the making of wasted costs orders did not expressly address the problem which arises where a barrister is prevented by legal professional privilege from explaining what instructions and material he received from his client: section 51 of the Supreme Court Act 1981 . Subsequently, the decision of the House of Lords in R v Derby Magistrates Court, Ex p B [1996] 1 AC 487 , 507D, ascribed to legal professional privilege an absolute character. It appears to pre-empt the creation of exceptions in the interests of justice. Doubts have been expressed about a perceived rigidity of the law: A A S Zuckerman, "Legal Professional Privilege — the Cost of Absolutism" (1996) 112 LQR 535 ; Colin Tapper, "Prosecution and Privilege" (1997) 1(1) International Journal of Evidence and Proof 5 ; Colin Passmore, "The Legal Professional Privilege" (1999) 3(2) International Journal of Evidence and Proof, 71 .

31.  It was common ground before the House that in the wasted costs jurisdiction under section 51 , the court had no power to relax the privilege so as to enable a barrister to defend himself against allegations of improper conduct. Where a client seeks a wasted costs order against his barrister, a waiver of privilege in relation to all relevant matters will be implied by law: Lillicrap v Nalder & Son [1993] 1 WLR 94 ; Matthews and Malek, Disclosure, 2nd ed, (2001) p 297. Sometimes the jurisdiction will be invoked against a barrister by the opposite party in the proceedings. In that situation the barrister's client will usually have no incentive to waive privilege and will refuse to do so. Here lies the root of a systemic problem.

32.  The jurisdiction provides compensation for an aggrieved litigant. It has, however, a penal effect on the practitioner against whom it is exercised: see Myers v

Medcalf v Mardell (Wasted Costs Order), 2002 WL 1310751 (2002)

Elman [1940] AC 282 , 319; Harley v McDonald [2001] 2 AC 678 , 703, para 49. In wasted costs proceedings a barrister is therefore entitled to defend himself by placing before the court, without restriction, all logically relevant material about his side of the story.

33. The wasted costs jurisdiction is available in respect of costs incurred by a party "as a result of any improper, unreasonable or negligent act or omission": s. 51(7) . An allegation of "improper" conduct is the most serious charge. The case against the barristers was throughout advanced and considered by the Court of Appeal on the basis that they had committed improper conduct.

34. The substance of the case against the barristers was that, contrary to paragraph 606 of the Code of Conduct, they made allegations of dishonesty against a litigant without having before them "reasonably credible material which as it stands establishes a prima facie case of [dishonesty]".

35. This particular professional duty sometimes poses difficult problems for practitioners. Making allegations of dishonesty without adequate grounds for doing so may be improper conduct. Not making allegation of dishonesty where it is proper to make such allegations may amount to dereliction of duty. The barrister must promote and protect fearlessly and by all proper and lawful means his lay clients interests: para 203 of the Code of Conduct. Often the decision will depend on circumstantial evidence. It may sometimes be finely balanced. What the decision should be may be a difficult matter of judgment on which reasonable minds may differ.

36. In the case before the House evidence is that the barristers were aware of the need for caution.

37. By their signatures to documents submitted to the court they vouched for the fact that they had before them material justifying the making of allegations of dishonesty.

38. Improper conduct under section 51(7) does not require proof of bad faith. Nevertheless, it is a highly material circumstance that the Court of Appeal accepted that the barristers believed in good faith that they had material which justified the making of the allegations: [2001] Lloyd's Rep PN 146 , 158 para 60.

39. Furthermore, it is relevant that both barristers were acknowledged to be competent and experienced practitioners. Their bona fide views that there were materials before them justifying the allegations they made are therefore entitled to some weight. But, despite their best endeavours they failed to obtain a waiver of privilege from their client, and they were therefore unable to explain the grounds for their beliefs.

40. In these circumstances the question is whether the barristers' beliefs that they had material which objectively justified the allegations unquestionably fell outside the range of views which could reasonably be entertained. The burden of proof is on the party applying for the wasted costs order. In Ridehalgh v Horsfield [1994] Ch 205 , at 239C, Sir Thomas Bingham MR observed that the wasted cost jurisdiction "recognises a shift in the evidential burden". This observation was plainly not intended to have any application where barristers are prevented by professional privilege from telling their side of the story.

41. The point narrows down to the question whether it has been proved that the materials on which the barristers in fact relied did not objectively justify their decision. The majority in the Court of Appeal (Peter Gibson and Schiemann LLJ), disagreeing with a strong dissenting judgment of Wilson J, answered this question in the affirmative. In doing so the Court of Appeal made a value judgment, based on inference, as to the nature and contents of the materials before the barristers. What exactly those materials included was and is unknown. Nevertheless, the majority in the Court of Appeal decided that even if the barristers had been permitted to tell their side of the story about the materials, which were before them, it would not have availed them in any way.

42. I cannot accept the view of the majority. The law reports are replete with cases which were thought to be

hopeless before investigation but were decided the other way after the court allowed the matter to be tried. Without knowing the barristers' side of the story, I am unwilling to speculate about the nature of the documents before them. In these circumstances it is unnecessary to examine the particulars of the allegations against the barristers which they had no opportunity to answer. Lawyers are also entitled to procedural justice. Due process enhances the possibility of arriving at a just decision. Where due process cannot be observed it places in jeopardy the substantive justice of the outcome. In my view the analysis of Wilson J was realistic and correct.

43.   It was impossible to determine the issue fairly. It follows that the wasted costs orders must be quashed.

44.   This conclusion has relevance for other cases involving the wasted costs procedure where the privilege prevents barristers from explaining their conduct. I am in full agreement with the guidance given by my noble and learned friend, Lord Bingham of Cornhill, in paragraph 23 of his reasons.

45.   For the reasons given by Lord Bingham of Cornhill and Lord Rodger of Earlsferry, as well as the reasons contained in this opinion, I would allow the appeals.

### LORD HOFFMANN

My Lords,

46.   I have had the advantage of reading in draft the speeches of my noble and learned friends Lord Bingham of Cornhill and Lord Steyn. For the reasons they have given I too would also allow the appeals.

### LORD HOBHOUSE OF WOODBOROUGH

My Lords,

47.   This appeal has raised for consideration the wasted costs jurisdiction of civil courts under s.51 of the Supreme Court Act 1981 as amended by the Courts and Legal Services Act 1990 . The 1990 Act restructured the legal professions and the interrelation between the roles of solicitors and barristers. It recognised that advocacy functions could be carried out by both branches and extended the power to make orders for costs not only against solicitors exercising the right to conduct litigation on behalf of a party but also against any advocate exercising a right of audience: s.51(13) . Section 51 is a provision dealing generally with the jurisdiction to make orders as to costs including a general power to determine by whom and to what extent costs of the proceedings are to be paid: s.51(3) . The 'wasted costs' jurisdiction is supplementary and subsection (6) empowers the court both to disallow costs which have been wasted by a legal representative as between the lawyer and his own client and to order that the legal representative meet the whole or part of any wasted costs.

48.   The present appeal is concerned only with the problems arising from the second limb of this power. The order in the present case was an order made on the application of the claimant in the action, Mr Medcalf, against the two barristers who had acted as the advocates for the defendant, Mr Mardell, and his company on their unsuccessful appeal to the Court of Appeal from a judgment given by Lloyd J in favour of Mr Medcalf. The complaint against the barristers made by Mr Medcalf and substantially upheld by the majority of the Court of Appeal (Peter Gibson and Schiemann LJJ, Wilson J dissenting) was that the barristers had caused him, Mr Medcalf, to incur wasted costs which the barristers ought to be ordered to meet.

49.   "Wasted costs" is a defined expression. Subsection (7) provides that it means —

> "any costs incurred by a party —
>
> (a)   as a result of any improper, unreasonable or negligent act or omission on the part of any legal or other representative or any employee of such a representative; or (b) which, in the light of any

such act or omission occurring after they were incurred, the court considers it is unreasonable to expect that party to pay."

The phrase "legal or other representative" is that to which I have already referred; it is defined as covering those who, in respect to a party, are exercising either a right of audience or a right to conduct litigation on the party's behalf. The aspect of these provisions with which this appeal is concerned is therefore alleged improper, unreasonable or negligent conduct by someone exercising rights of audience (ie acting as an advocate) on behalf of one party which the opposing party says should lead the court to make an order that the advocate should bear part of the costs incurred by that opposing party.

50. At first sight, this power to make costs orders against such advocates seems sensible and straight forward. However this simplicity is deceptive as the subsequent history of the exercise of this jurisdiction has shown. These complications and pitfalls were discussed in the judgment of the Court of Appeal in the group of cases reported as Ridehalgh v Horsefield [1994] Ch 205 (a judgment to which my noble and learned friend Lord Bingham of Cornhill was, as the then Master of the Rolls, a party) and principled and authoritative solutions provided. It is apparent from what your lordships have been told from the bar that, notwithstanding that judgment, many of the adverse consequences have persisted. The same message is given in the valuable article by Mr H Evans published at (2001) 64 MLR 51 . In the present case the Court of Appeal, both the majority and the minority, were following the Ridehalgh judgment although this led them to different conclusions. For myself, I would wish to take this opportunity to endorse and reaffirm what was said in that judgment. But it is clearly necessary to emphasise again some of its features.

**The Constitutional Aspect:**

51. The starting point must be a recognition of the role of the advocate in our system of justice. It is fundamental to a just and fair judicial system that there be available to a litigant (criminal or civil), in substantial cases, competent

and independent legal representation. The duty of the advocate is with proper competence to represent his lay client and promote and protect fearlessly and by all proper and lawful means his lay client's best interests. This is a duty which the advocate owes to his client but it is also in the public interest that the duty should be performed. The judicial system exists to administer justice and it is integral to such a system that it provide within a society a means by which rights, obligations and liabilities can be recognised and given effect to in accordance with the law and disputes be justly (and efficiently) resolved. The role of the independent professional advocate is central to achieving this outcome, particularly where the judicial system uses adversarial procedures.

52. It follows that the willingness of professional advocates to represent litigants should not be undermined either by creating conflicts of interest or by exposing the advocates to pressures which will tend to deter them from representing certain clients or from doing so effectively. In England the professional rule that a barrister must be prepared to represent any client within his field of practice and competence and the principles of professional independence underwrite in a manner too often taken for granted this constitutional safeguard. Unpopular and seemingly unmeritorious litigants must be capable of being represented without the advocate being penalised or harassed whether by the Executive, the Judiciary or by anyone else. Similarly, situations must be avoided where the advocate's conduct of a case is influenced not by his duty to his client but by concerns about his own self-interest.

53. Thus the advocate owes no duty to his client's opponent; inevitably, the proper discharge by the advocate of his duty to his own client will more often than not be disadvantageous to the interests of his client's opponent. ( Orchard v S E Electricity Bd [1987] QB 565 , 571) At times, the proper discharge by the advocate of his duties to his client will be liable to bring him into conflict with the court. This does not alter the duty of the advocate. It may require more courage to represent a client in the face of a hostile court but the advocate must still be prepared to act fearlessly. It is part of the duty of an advocate, where necessary, appropriately to protect his client from the court as well as from the opposing party. Similarly, the advocate acting in good faith is entitled to

protection from outside pressures for what he does as an advocate. Thus, what the advocate says in the course of the legal proceedings is privileged and he cannot be sued for defamation. For similar reasons the others involved in the proceedings (eg the judge, the witness) have a similar immunity.

54.  The professional advocate is in a privileged position. He is granted rights of audience. He enjoys certain immunities. In return he owes certain duties to the court and is bound by certain standards of professional conduct in accordance with the code of conduct of his profession. This again reflects the public interest in the proper administration of justice; public interest, covering the litigants themselves as well, is now also expressed in Part I of the Civil Procedure Rules . (See also Practice Direction 16 §9.) The advocate must respect and uphold the authority of the court. He must not be a knowing party to an abuse of process or a deceit of the court. He must conduct himself with reasonable competence. He must take reasonable and practicable steps to avoid unnecessary expense or waste of the court's time. The codes of conduct of the advocate's profession spell out the detailed provisions to be derived from the general principles. These include the provisions relevant to barristers which preclude them from making allegations, whether orally or in writing, of fraud or criminal guilt unless he has a proper basis for so doing. Paragraph 606(c), which has already been quoted by my noble and learned friend, requires express instructions and reasonably credible material which as it stands establishes a prima facie case of fraud. All this fits in well with an appropriate constitutional structure for a judicial system for the administration of justice.

55.  The introduction of a wasted costs jurisdiction makes an inroad into this structure. It creates a risk of a conflict of interest for the advocate. It is intended and designed to affect the conduct of the advocate and to do so by penalising him economically. Ideally a conflict should not arise. The advocate's duty to his own client is subject to his duty to the court: the advocate's proper discharge of his duty to his client should not cause him to be accused of being in breach of his duty to the court. ( Arthur Hall v Simons [2000] 3 WLR 543 ) But the situation in which the advocate finds himself may not be so clear cut. Difficult tactical decisions may have to be made,

maybe in difficult circumstances. Opinions can differ, particularly in the heated and stressed arena of litigation. Once an opposing party is entitled to apply for an order against the other party's legal representatives, the situation becomes much more unpredictable and hazardous for the advocate. Adversarial perceptions are introduced. This is a feature of what happened in the present case. The factors which may motivate a hostile application by an opponent are liable to be very different from those which would properly motivate a court.

56.  In my judgment, the jurisdiction must be approached with considerable caution and the relevant provisions of s.51 construed and applied so as not to impinge upon the constitutional position of the advocate and the contribution he is required to make on behalf of his client in the administration of civil justice. The judgment in Ridehalgh referred to most of the relevant points.

First, from the point of view of the advocate the jurisdiction is penal. It involves making a finding of fault against the advocate and visiting upon him a financial sanction. Unlike the position between the advocate and his own client where the potential for liability will encourage the performance of the advocate's duty to his client (see Arthur Hall v Simons , sup) and the order would be truly compensatory, the jurisdiction to make orders at the instance of and in favour of the opposing party gives rise to wholly different considerations for the advocate. The risk of such an application can, at best, only provide a distraction in the proper representation of his own client and, at worst, may cause him to put his own interests above those of his client. The construction of the section and the application of the jurisdiction should accordingly be no wider than is clearly required by the statute.

Secondly, the fault must, in the present context, relate clearly to a fault in relation to the advocate's duty to the court not in relation to the opposing party, to whom he owes no duty.

Thirdly, the terms used in subsection (7) should receive an appropriately restrictive interpretation in relation to advocates. The judgment in Ridehalgh spelled this out at p.232 of the report. The use of the first two terms, improper and unreasonable, call for no further explanation. The word negligent raises additional problems of interpretation which are not material to

the present appeal since the respondents' allegation against the appellants is impropriety not negligence. But it would appear that the inclusion of the word negligent in substitution for "reasonable competence", is directed primarily to the jurisdiction as between a legal representative and his own client. It is possible to visualise situations where the negligence of an advocate might justify the making of a wasted costs order which included both parties, such as where an advocate fails to turn up on an adjourned hearing so that a hearing date is lost. The breach of the advocate's duty to the court will be clear and if the breach was not deliberate, the term negligent would best describe it. For a person exercising a right to conduct litigation (ie a litigation agent) it is less difficult to think of apt examples affecting the other side as was the situation in Myers v Elman [1940] AC 282 . The use of the same language in subsection (7) in relation to both categories of legal representative does not mean that it will have the same breadth of application for both categories.

Fourthly, it is the duty of the advocate to present his client's case even though he may think that it is hopeless and even though he may have advised his client that it is. (Ridehalgh pp.233–4) So it is not enough that the court considers that the advocate has been arguing a hopeless case. The litigant is entitled to be heard; to penalise the advocate for presenting his client's case to the court would be contrary to the constitutional principles to which I have referred. The position is different if the court concludes that there has been improper time-wasting by the advocate or the advocate has knowingly lent himself to an abuse of process. However it is relevant to bear in mind that, if a party is raising issues or is taking steps which have no reasonable prospect of success or are scandalous or an abuse of process, both the aggrieved party and the court have powers to remedy the situation by invoking summary remedies — striking out — summary judgment — peremptory orders etc. The making of a wasted costs order should not be the primary remedy; by definition it only arises once the damage has been done. It is a last resort.

**Practical Consequences:**

57.  The practical consequences of the wider use of the jurisdiction, particularly where the client's opponent is the applicant, were also commented upon in Ridehalgh. The first and most striking is that it creates satellite litigation which too easily gets out of proportion to the litigation which has spawned it. The present case provides an educational but far from extreme illustration. The principal trial was not wholly straightforward, involving successive amendments of the pleadings, questions of legal analysis and bitterly contradictory oral evidence but the trial judge was able to deliver his judgment at the end of the trial without having to reserve it. He held in favour of the existence of a partnership and ordered an account of profits. After various contested interlocutory applications both to the judge and to the Court of Appeal, the Court of Appeal, in March 2000, unanimously dismissed Mr Mardell's appeal, dismissing also his application to amend the notice of appeal and adduce fresh evidence. A month later the main action was settled. The wasted costs application has occupied the following two years with a further full hearing in the Court of Appeal and an appeal to your Lordships' House. If the policy of the wasted costs jurisdiction is to reduce the costs of litigation and to save court time, it too often fails to achieve this objective (as is confirmed by the Modern Law Review article already referred to). The jurisdiction is discretionary and should be reserved for those cases where the unjustifiable conduct can be demonstrated without recourse to disproportionate procedures. (See also Harley v McDonald [2001] 2 AC 678 .) The jurisdiction does not exist as an end in itself; it is distinct from the professional disciplinary structures. The procedures appropriate for wasted costs applications were discussed in Ridehalgh at pp.238–9.

58.  Once the power to initiate wasted costs procedures is extended to the opposite party in the litigation, that party is provided with a weapon which it is too much to expect he will not on occasions attempt to use to his own advantage in unacceptable ways. It must not be used as a threat to intimidate the lawyers on the other side. (Ridehalgh at p.237, citing Orchard v S E Electricity Bd [1987] QB 565 ) It should not be motivated simply by resentment at an inability to obtain an effective order for costs against an assisted or impecunious litigant. (Ridehalgh at p.231, citing Symphony v Hodgson [1994] QB 179 ) Nor should it be used as a means of continuing contentious litigation by other means or to obtain from a party's lawyers what cannot be obtained from the party himself. The legitimate interest of an applicant for a wasted costs order is financial, a reduction in the costs he has to bear, but the application must be merits based and

clearly made out; it must not raise a suspicion of being itself abusive.

59. A further consequence of exercising the jurisdiction on the application of an opposite party is that it raises questions of the legal professional privilege of the lawyer's client. The client very probably will have no interest in waiving the privilege. Indeed the client may stand to gain if his opponent can look to the client's lawyer for an indemnity rather than to the client himself. This situation creates a serious problem which may lead to the emasculation of the wasted costs jurisdiction as between the opposing party and the advocate. The appellants argue that in cases such as the present it should do so: fairness requires that the privileged material should be before the court; if it cannot be, the application for wasted costs should fail. They submit that this argument must be conclusive.

**Legal Professional Privilege:**

60. As already observed by my noble and learned friend Lord Steyn, the nature and extent of legal professional privilege has not been in question on this appeal nor has it been the subject of any argument. Its absolute and paramount character has been accepted by the respondents, citing R v Derby Magistrates' Court, ex parte 'B' [1996] AC 487 and General Mediterranean Holdings v Patel [2000] 1 WLR 272 . However, the need of a lawyer to be able to ask a court to look at privileged material when a lawyer's conduct is in question may not be so intractable. The material in question may be confidential rather than absolutely privileged. ( Parry-Jones v The Law Society [1969] 1 Ch 1 ) It may be possible to restrict the use which can be made of the disclosed material so as to reduce or remove the infringement of the client's privilege. (See per Glidewell LJ in R v Commissioners of Inland Revenue ex parte Taylor (No.2) 62 TC 578 at p.588.) It may be that partially inquisitorial procedures can be adopted, as in the inter partes taxation of costs. It should be remembered that the subject matter of the wasted costs application is an alleged breach of the lawyer's duty to the court and it is not unique that a lawyer may have to refer to privileged material in the context of explaining himself to the court and defining his relationship to the court as, for example, when a litigation agent is applying to come off the record or a barrister is ceasing to represent

an assisted defendant during the course of a criminal trial. It may be that, as in the context of Articles 6 and 8 of the European Convention on Human Rights , the privilege may not always be absolute and a balancing exercise may sometimes be necessary. ( Campbell v UK (13590/88 ) 15 EHRR 137 and Foxley v UK (33274/96) 31 EHRR 25 ) But on the present appeal it must be taken that the material which the appellants say is relevant may not directly or indirectly be made available to the court with the result that it is open to the appellants to argue that the Court of Appeal must have acted unfairly in making a wasted costs order against them.

61. The point was specifically considered in Ridehalgh at pp.236–7:

> "The privilege is not theirs to waive. … So the respondent lawyers may find themselves at a grave disadvantage in defending their conduct of proceedings, unable to reveal what advice and warnings they gave, what instructions they received. In some cases this potential source of injustice may be mitigated by reference to the taxing master, where different rules apply, but only in a small minority of cases can this procedure be appropriate. Judges who are invited to make or contemplate making a wasted costs order must make full allowance for the inability of respondent lawyers to tell the whole story. Where there is room for doubt, the respondent lawyers are entitled to the benefit of it. It is again only when, with all allowances made, a lawyer's conduct of proceedings is quite plainly unjustifiable that it can be appropriate to make a wasted costs order." (emphasis supplied)

The answer given therefore was not to treat the existence of privileged material as an absolute bar to any claim by an opposite party for a wasted costs order but to require the

court to take into account the possibility of the existence of such material and to give the lawyers the benefit of every reasonably conceivable doubt that it might raise. So, all that the lawyer has to do is to raise a doubt in the mind of the court whether there might not be privileged material which could affect its decision whether or not to make a wasted costs order and, if so, in what terms and the court must give the lawyer the benefit of that doubt in reaching its decision, including the exercise of its statutory discretion. I see nothing unfair about this approach. Further, if the use of the jurisdiction on the application of an opposite party is kept within the proper bounds, the frequency with which the problem arises of taking into account the existence of possibly relevant but unseen privileged material should be much reduced.

62.   The contrary submission of the appellants on this appeal treats the existence of privileged material as a kind of trump card which will always preclude the making of a wasted costs order on the application of an opposite party. They ask how can a court evaluate whether privileged material which, ex hypothesi, it has not seen would affect its decision without first seeing that material. But this argument does not reflect what was said in Ridehalgh. Once the lawyer is given the benefit of any doubt, any element of unfairness is removed. It must depend upon the circumstances of each particular case. For example, a lawyer who has to ask for an extension of time or an adjournment because, say, he has forgotten about a time-limit or has accidentally left his papers at home, would not be able to say that any privileged material could possibly excuse his incompetent mistake. To make a wasted costs order against him would not (absent some additional factor) be inappropriate or unfair. In other situations privileged material may have a possible relevance and therefore require assumptions favourable to the lawyer to be made. Thus, in the present case it is assumed that in all respects the appellant barristers were acting on the express instructions of their lay clients although a finding of fact to that effect could only be made after the consideration of privileged material. The assumption removes the unfairness which might otherwise, in this respect, exist.

63.   Therefore, for myself, I would not qualify what was said in Ridehalgh. But I agree that it may be salutary to remind parties that each case must depend upon

its own facts and that the power to make an order is discretionary and material which could affect the exercise of that discretion is also relevant. I agree with my noble and learned friend Lord Bingham of Cornhill that the court must be satisfied before it makes the wasted costs order that there is nothing that the lawyer could say, if unconstrained, to resist the order and that it is in all the circumstances fair to make the order.

**The Present Case:**

64.   The facts leading up to the making by the Court of Appeal of the wasted costs order against the barristers are fully set out in the Court of Appeal judgments and have been summarised in the Opinion of my noble and learned friend. The difference between the majority and the minority in the Court of Appeal was not in the test to be applied. All agreed that the barristers should be given the benefit of any doubt: see Peter Gibson LJ, [2001] Lloyd's Rep 146 , at pp.153 and 157. The difference lay in the outcome of applying the test. Thus Peter Gibson LJ said at p.158 on behalf of himself and Schiemann LJ:

> "Try though we might, we have not found it possible to conceive of any circumstances in which the barristers in putting their names to the particular allegations of impropriety in the draft amended notice of appeal and supporting them in their skeleton and at the hearing had relevant privileged or confidential material which justified their conduct as compliant with section 606 but had been withheld from the court."

On the other hand, Wilson J said (at p.162):

> "I remain in doubt whether on 3 and 4 February the barristers were guilty of professional impropriety. It is doubt of which, pursuant to the same passage in Ridehalgh v Horsefield , they must have the benefit. It is better that in certain circumstances

the wasted costs jurisdiction should be emasculated by the principle of legal professional privilege than vice versa."

65. With the one exception of the transcripts allegation, I agree that the preferable view is that the wasted costs order should not have been made. The complaint made on behalf of Mr Medcalf was that an application had been made to the Court of Appeal to allow the amendment of the notice of appeal and for the admission of fresh evidence which included allegations which could not properly be made. The application for a wasted costs order was based upon the draft amended notice and the accompanying skeleton argument. These documents were effectively simultaneous although dated one day apart (3 and 4 February 2000) and they were signed by the barristers. It was a consequence of these documents that additional time was taken up on the first two days (14 and 15 February) at the hearing of the appeal but there was not any additional waste of time caused by counsel taking excessive time to argue Mr Mardell's case. All the relevant points upon which the applications to amend and admit fresh evidence were based were hopeless and were roundly rejected by the Court of Appeal both at the time and in their unanimous written judgment dismissing the appeal. With the one exception already mentioned, I would put these points into the category of arguing a hopeless case. How they would ever persuade the Court of Appeal to allow the appeal and reverse the judge's judgment escapes me. They related to peripheral matters and, although the credibility of Mr Medcalf was central to the judge's decision and the attempt to upset it on appeal, they could not be thought sufficient, nor were they all novel. Speaking for myself, I would put these points into the category, not of impropriety, but of counsel discharging their duty to present even a hopeless case if instructed to do so, in which case no question of making a wasted costs order against them should have arisen. It must be remembered that the good faith of the barristers and their consciousness of the rules of their profession are not challenged nor is their statement that they acted upon their clients' express instructions. If it is considered that the barristers' inclusion of these points was improper, I would not arrive at that conclusion without feeling doubts which I would not wish to resolve without knowledge of

the surrounding circumstances and the privileged material covering the relationship between the advocates and their client. I do not believe that in these circumstances it would be fair to exercise the discretion against the appellants.

**The Transcripts Allegation:**

66. This allegation was included in Ground 45 of the proposed amendments to the notice of appeal. It was in the following terms:

> "The First and Fourth Defendants have fresh evidence that since the trial there has been interference with the official transcript of the trial. The First and Fourth Defendants have caused a second set of transcripts to be prepared by different transcribers. The first set of transcripts contain alterations, deletions, interpolations, and false certifications tending to the detriment of the First and Fourth Defendants' already disclosed grounds of appeal and attempting to buttress the learned Judge's Judgment, obscure perjured testimony and prevent the discovery of additional substantive grounds of appeal. The said interference casts such fundamental doubt upon the integrity of the plaintiff and the process of the court in this case that a new trial should be ordered ex debito justitiae."

This is an allegation of serious fraud and conspiracy involving not only Mr Medcalf but also the official court transcribers and, presumably, the plaintiffs' solicitors. The accompanying skeleton argument in 12 paragraphs identified the evidential material relied on, going back to the previous summer.

67. There are three important features which are essential to the proper evaluation of the allegation made in the proposed Ground 45. The appellants' argument failed to

have any regard to them and the same could fairly be said of the dissenting judgment of Wilson J.

68. The first and most important is that the allegation was made as part of and was dependant upon a Ladd v Marshall (see [1954] 1 WLR 1489) application to admit fresh evidence in the Court of Appeal on appeal from a final judgment. The applicant has to identify and place before the Court of Appeal in documentary form the fresh evidence the subject of the application. The fresh evidence to support the relevant ground of appeal has thus to be fully disclosed. There is no room for the applicant to say that if you grant my application to adduce the fresh evidence then there is other evidence not adduced at the trial and not included in my application upon which I will also want to rely. The application is exhaustive of the opportunity to adduce fresh evidence in the Court of Appeal. In any event, the position was put beyond argument by an order of Clarke LJ on 28th January directing that any evidence to be relied on should be served by 4th February. The evidence placed before the Court of Appeal on behalf of Mr Mardell was the only evidence upon which Mr Mardell could rely in support of Ground 45 and upon which the advocates could rely as justifying the allegation in Ground 45 in compliance with Paragraph 606 of the Code of Conduct.

69. There has been a discussion whether Paragraph 606 is satisfied by an expectation of obtaining admissible evidence which has not yet been obtained. I do not wish to enter upon this discussion save to say that it is misconceived: the emphasis should be upon whether the existing material discloses a prima facie case, which is a concept well understood in many areas of procedural law, not least in the criminal law. The question which the advocate must ask is: is there a prima facie case of the fraud which I am going to allege? It is important not in any way to devalue the important principle encapsulated in Paragraph 606. But, in any event the 'expectation' excuse cannot, and could not on any hypothesis, assist the appellants here. At the early stages of litigation, before the close of pleadings, some of the relevant evidence supporting an allegation may not yet have been put into a form which can actually be used at the trial; discovery may yet have to take place but a party may know what documents will have to be produced on discovery. At the stage of trial, evidence which has not been given and the

advocate cannot adduce cannot be relied upon to justify an allegation. After trial and judgment, the situation is even more clear cut. Only evidence already adduced in the action or for which leave to adduce is given by the Court of Appeal under Ladd v Marshall can be relied upon as justification. This was the position here in relation to Ground 45. Ground 45 and the accompanying skeleton argument made allegations which came within the scope of Paragraph 606 and clearly should have been (and the barristers say it was) seen as engaging the professional responsibility of an advocate to the court. Since the allegations related to matters occurring after trial and judgment, the principle in Ladd v Marshall was inevitably critical to the ability to sustain the allegation. A specific application to admit fresh evidence had to be made. The allegation had to be made on the evidence which Mr Mardell as the appellant was asking the Court of Appeal to admit. If that evidence did not disclose even a prima facie case against Mr Medcalf, it follows that a breach of Paragraph 606 and the advocates' duty to the court occurred.

70. The second feature is partly a consequence of the first. It is not possible to make a Ladd v Marshall application without waiving any privilege in the material which is the subject of the application. Ground 45 starts with the words — "the … Defendants have fresh evidence that since the trial there has been interference with the official transcripts of the trial". They cannot at the same time claim any privilege against disclosing what that evidence is. The suggestion that there was material capable of justifying the allegation which Mr Mardell could rely on without waiving any privilege and disclosing the material to the opposite side and the court is patently unsustainable.

71. The third feature is peculiar to the present case. The allegation of fraudulent interference with the transcript had been unsuccessfully relied upon by junior counsel for Mr Mardell on previous occasions using the same material. In particular, on 2nd December, she applied to Lloyd J for an order that proceedings on the account should be stayed and the police should be directed to investigate the transcript question as an attempt to pervert the course of justice. The judge dismissed the applications and refused leave to appeal. The reaction of the Court of Appeal on the hearing of the substantive appeal should

have come as no surprise to the barristers. It was entirely in line with what had been said by the judge earlier. There was no evidence whatever that Mr Medcalf or anyone acting for him had anything to do with the defective transcripts. The evidence disclosed regrettably familiar deficiencies in the system whereby mechanical recordings and transcripts are made in the Royal Court of Justice in London. The primary tape is in the court-room where the trial is taking place and depends upon a court official each day keeping a log of the proceedings and switching the tape on and off at the right times. The tape recording should be of a reasonably good quality but the transcriber, who has no independent knowledge of the proceedings, is entirely dependant upon what the court officials have done. (The court officials may indeed have had to look after several courts at the same time.) What happened in the present case was that the court officials did not keep a complete log and did not always switch on or off the tape recorder at the times they should. Also, at times the voice on the tape was not clear. All this was confirmed by the investigations carried out and the statements and affidavits lodged. In the Royal Courts of Justice there is also a back-up multitrack tape which runs throughout the working day covering all courts. Inevitably its quality is not as good as the primary tape. A transcript is not made unless asked for. The transcript will normally be made by one of the Lord Chancellor's Department contractors from the daily court-room tapes if available. This was what was done initially in the present case. When the defects in the first transcript and, hence, in the tapes from the court room were discovered and the solicitors complained, the senior contractors were called in and a further complete transcript was made using both types of tape. This is the second transcript to which Ground 45 refers and which those representing Mr Mardell consider to be satisfactory.

72.  It was an unhappy incident but it was fully explored and explained in the evidence which was put before the Court of Appeal. In my judgment no competent and reasonably experienced advocate or litigator should have seen anything remotely sinister about it let alone treat it as evidence of a conspiracy to pervert the course of justice. As previously stated, there was nothing to implicate Mr Medcalf or any one acting for him in any wrong doing in this connection whatever. It disclosed no prima facie case against him. Yet the advocates put their signature to Ground 45 and to the supporting skeleton argument.

73.  In my judgment this was just the type of situation Paragraph 606 was designed to prevent. Unjustifiable allegations of fraud have been made. Like Peter Gibson LJ and Schiemann LJ, I cannot conceive of any privileged material which could possibly make any difference to the culpability of making this irresponsible allegation or justify it. The allegation is on its face implausible and suggests an abandonment of the objectivity and sense of proportion which a court is entitled to require of an advocate. Further it was the duty of the advocate to put before the court on the Ladd v Marshall application the material which was said to justify the allegation. If the material was not reasonably capable of justifying it, even on a prima facie basis, the allegation should not have been made.

74.  Therefore I would for myself only allow the appeal in part. But your Lordships consider otherwise and would allow the appeal wholly. Since matters of discretion are involved and since I do not feel confident that, if the transcript allegation had stood alone, the Court of Appeal would still have thought that a wasted costs order was appropriate, or at least felt no doubt about it, I will with reluctance concur in the order proposed. Subject to what I have said in this Opinion, I agree with what has been said by my noble and learned friends Lord Bingham of Cornhill and Lord Steyn; I also agree with what the former has said in paragraph 28 of his Opinion.

LORD RODGER OF EARLSFERRY

My Lords,

75.  I have had the advantage of considering the speeches of my noble and learned friends, Lord Bingham of Cornhill and Lord Steyn, in draft. I agree with them and, for the reasons they give, I too would allow the appeal.

76.  Like my noble and learned friend, Lord Hobhouse of Woodborough, I was much troubled by the allegation, in ground 45 of the proposed amendments to the notice of appeal, of fraudulent interference with the transcript.

None the less, the appellants have not been able to tell their side of the story. A court making a wasted costs order under section 51 of the Supreme Court Act 1981 exercises a discretion. All kinds of mitigatory circumstances may be relevant to the exercise of that discretion. In my view, therefore, it was wrong for the Court of Appeal to make an order against the appellants in a situation where the full facts about the circumstances in which the appellants had been instructed and had prepared the relevant documents were not known and where the appellants were prevented from putting them before the court.

77.  The majority of the Court of Appeal held that the appellants' conduct, in drafting the amended notice of appeal on 3 February 2000 and in preparing the skeleton arguments the following day, had been "improper" in terms of section 51(7)(a) . That decision was based on the view that their conduct on those dates was governed by paragraph 606 of the Code of Conduct of the Bar of England and Wales (7th ed (2000)). Paragraph 606 provides that, before making any allegation of fraud, counsel should have before him "reasonably credible material which as it stands establishes a prima facie case of fraud". The majority held that, in terms of the rule, the "material" had to be "evidence which can be put before the court to make good the allegation": [2001] Lloyd's Rep (PN) 146 , 154, para 40 per Peter Gibson LJ. Since it was clear from what happened subsequently that no such evidence had been available to counsel on 3 and 4 February, the majority held that counsel had breached the rule in paragraph 606.

78.  The interpretation of the paragraph 606 that the majority adopted is, perhaps, not surprising since the rule of professional conduct was formerly understood to be to that effect. For instance, in Associated Leisure Ltd (Phonographic Equipment Co Ltd) v Associate Newspapers Ltd [1970] 2 QB 450 , 456E–F Lord Denning MR indicated his understanding that the duty of counsel

was not to put a charge of fraud on the record "unless he has clear and sufficient evidence to support it." The passage is cited in Bullen & Leake & Jacob's Precedents of Pleadings 13th ed (1990), p 428. The same approach is to be found in the extrajudicial remark of Lord Macmillan that, where a person's reputation is at stake, the pleader should not "trespass … a hair's breadth beyond what the facts as laid before him and duly vouched and tested, will justify": "The Ethics of Advocacy" in Law and Other Things (1937), p 192, approved in Oldfield v Keogh (1941) 41 SR (NSW) 206 , 211 per Jordan CJ.

79.  But the current rule is that stated in paragraph 606. Wilson J held that the term "material" in paragraph 606 went wider than evidence in proper form: [2001] Lloyd's Rep (PN) 146 , 161 para 80. The paragraph states a rule of professional conduct rather than a rule of law, but I agree with his interpretation of it. The current rule of conduct is slightly less strict than the rule as at one time understood. While, usually, the material before counsel will comprise evidence in an admissible form, something less can satisfy the requirements of the current rule, provided that it establishes a prima facie case of fraud. A report of an official inquiry, or accurate reports of evidence given in a civil or criminal trial, are examples that come to mind. A professional rule that permits counsel to draft pleadings on such a basis, before the actual evidence is to hand, achieves a sensible balance: it gives due protection to defendants, while not putting unnecessary obstacles in the way of claimants and their counsel raising proceedings promptly. So interpreting the rule, I am unable to infer from the circumstances that the appellants were necessarily in breach of it on 3 or 4 February 2000.

Crown copyright

© 2017 Sweet & Maxwell

2002 WL 1310751

---

**End of Document**    © 2017 Thomson Reuters.

# TAB 50

**Michael Wilson & Partners Limited v.
Thomas Ian Sinclair, Sokol Holdings
Incorporated, John Forster Emmott**
Case Number: A3/2012/2616
Court of Appeal (Civil Division)
13 January 2017

**[2017] EWCA Civ 3**

**2017 WL 11804**

Before: Lord Justice Patten The Senior
President of Tribunals and Lord Justice Simon
Date: 13.1.2017

**Analysis**

On Appeal from the Commercial Court

The Hon Mr Justice Teare

Hearing dates: 1 and 2 November 2016

**Representation**

• Charles Samek QC , David Holland QC and
Adam Solomon (instructed by Direct access ) for the
Appellant.
•Mr Sinclair (in person and on behalf of the 2nd
Respondent).
• Philip Shepherd QC (instructed by Kerman & Co
LLP ) for Mr Emmott.

**Approved Judgment**
Lord Justice Simon:

**Introduction**

1  The facts underlying this claim arose over 10 years
ago. Since then the legal issues have involved the parties
in litigation in three continents, a protracted arbitration
and many hearings before the Commercial Court in
London.

2  The present proceedings were begun on 12 October
2010. On 21 September 2012 they were struck out, save
for a claim in debt, as an abuse of the court's process
by Teare J, see Michael Wilson & Partners Limited v.
Sinclair and others [2012] EWHC 2560 (Comm) . The
Judge gave permission to appeal and the explanation
for the delayed hearing is set out in an earlier judgment
of this court, see Michael Wilson & Partners Limited v.
Sinclair and others [2015] EWCA Civ 774 .

**The nature of the claim and the issues on the appeal**

3  In brief summary, the claimant ('MWP'), a company
providing legal and consultancy services, claims against
four defendants: Thomas Sinclair ('Mr Sinclair') and
Sokol Holdings Incorporated ('Sokol'), who are the
respondents to the appeal, and Eagle Point Investments
Limited ('EPIL') and Butterfield Bank (Bahamas)
Limited ('Butterfield') who are not.

4  MWP claims in respect of shares ('the Max shares')
and cash ('the Max funds) which EPIL received from
an AIM listed company ('Max'). It asserts that EPIL
received the Max shares and Max funds on behalf of
Mr John Emmott, a director and employee of MWP;
and that Mr Emmott had acquired them in breach
of contractual obligations and fiduciary duties which
he owed to MWP as a partner. The claim against
Mr Sinclair and Sokol ('the Sinclair defendants') is
brought on the basis that Mr Emmott acquired these
benefits with the knowing assistance of the Sinclair
defendants; or alternatively, that the transfer of the
benefits constituted the payment of a bribe or secret
commission for which the Sinclair defendants are liable.

5  By their defence the Sinclair defendants contend
that the Max shares and Max funds were received by
EPIL on behalf of Mr Sinclair and not on behalf of Mr
Emmott; and there was no breach of obligation owed to
MWP by Mr Emmott for which they are liable.

6  The defendants joined Mr Emmott as a party to the
litigation under CPR Part 20 , and at the hearing before
Teare J, he was an active participant, supporting the
Sinclair defendants' application to strike out the claim
against them. In the lengthy period since the judgment
under appeal the Part 20 claim has been discontinued
against Mr Emmott, although submissions were made

WESTLAW   © 2017 Thomson Reuters.

on his behalf by Mr Shepherd QC without objection from Mr Samek QC, who appeared for MWP.

7 In order to understand the basis of the strike out application it is necessary to consider events which took place in 2006.

8 On 14 August 2006 (more than 4 years before the commencement of the Commercial Court action) MWP began arbitration proceedings against Mr Emmott, claiming that he received the Max shares and Max funds as a bribe or secret profit from the Sinclair defendants. By an award dated 6 April 2010, the arbitration tribunal (Lord Millett, Christopher Berry and Valerie Davies) rejected that claim, concluding that Mr Emmott had received the shares on behalf of Mr Sinclair and had no control over or a beneficial interest in them.

9 As the Judge expressed it at [2] of his judgment:

> It is a remarkable feature of the claim brought by MWP that the central allegations made in it have already been determined against MWP in an arbitration in which MWP, Mr. Emmott and Mr. Sinclair have been involved, for the past 6 years. I use the word *involved* deliberately. MWP and Mr. Emmott were party to that arbitration. Mr. Sinclair was not. He did however give evidence to the arbitral tribunal. His interest in the arbitration was such that he funded Mr. Emmott's defence of the claim brought in the arbitration by MWP against Mr. Emmott. The arbitrators … held that there was no relevant breach of fiduciary duty by Mr. Emmott and that the Max shares were beneficially held by Mr. Sinclair. Notwithstanding that award (which was unsuccessfully challenged by MWP under sections 68 and 69 of the Arbitration Act 1996 , see MWP v Emmott [2011] EWHC 1441 (Comm) , MWP now seeks to raise the same issues in this … action. The application to

strike out therefore raises interesting questions regarding the interplay between arbitration and litigation.

10 To put it another way, MWP's claim in the Commercial Court action is entirely inconsistent with, and contrary to the findings made in, the award to which MWP had been a party. It was on this basis that the Sinclair defendants, supported by Mr Emmott, applied to strike out the claim under CPR Part 3.4(2) or to obtain a summary disposal of the claim under CPR Part 24.2 .

11 Although the application was advanced on a number of grounds, they succeeded on only one. The Judge concluded that to permit MWP to make the same factual allegations which it had made in the arbitration and which had been rejected by the arbitrators was an abuse of the court's process.

12 It is against that decision that MWP appeals.

13 At its most simple, the issue can be expressed as follows: whether it is an abuse of the Court's process for A to claim in legal proceedings against C, on a basis which has been decided against A in arbitration proceedings between A and B?

14 The circumstances in which that question is to be answered are, however, important; and there are further questions which arise on this appeal that it will be necessary to address in the course of this judgment:

- (1) whether, and to what extent, the award (a) was admissible on the application before Teare J and on this appeal, and (b) would be admissible at a trial;
- (2) the extent to which the abuse of process jurisdiction on which the Sinclair defendants rely applies when the prior determination is an arbitration award rather than the judgment of a court;
- (3) whether the Judge was wrong, on the particular facts of this case, to conclude that the proceedings were an abuse of process; and finally,

• (4) whether, if MWP were unsuccessful on the appeal, it would be entitled to an abatement of an adverse costs order made by the Judge to the extent that the costs of the Sinclair defendants included those of Mr Emmott against whom they subsequently discontinued?

**The facts in more detail**

15  The facts which are material to the appeal are set out fully in the judgment of Teare J, and can be summarised more briefly for present purposes.

16  MWP provided legal and business consultancy services in Kazakhstan; and until June 2006 Mr Emmott was a director and employee of the company.

17  Mr Sinclair is the Managing Director and a major shareholder of Sokol, a US company with interests in Kazakhstan. Sokol was a client of MWP and engaged the firm in connection with natural resource transactions in Kazakhstan, including the transaction with which the present action is principally concerned (the 'Max 1 Transaction'). Since August 2006, Butterfield has been the trustee of a trust in which Mr Emmott is interested. It is understood to own EPIL, a Bahamian company.

18  The Max 1 Transaction involved the purchase and on-sale by Sokol of interests in Kazakhstan oilfields; and Mr Emmott acted in connection with the transaction and played a significant role in its success.

19  Shortly before the conclusion of the transaction, some of those involved in the deal were rewarded by the issue of shares. In early August 2005, 134.1 million shares in Max were issued to 25 allottees (including Sokol), in accordance with instructions given by Mr Sinclair.

20  14.75 million of those shares (the Max shares) were issued to EPIL; and it is MWP's case that these were issued for the benefit of Mr Emmott as his reward for his involvement in the Max 1 Transaction. It contends that, since Mr Emmott was involved in the transaction as its agent and employee, the Max shares should have been accounted for, in addition to the fees paid or due under its letter of engagement with Sokol. It is MWP's

case that in breach of his contractual and fiduciary obligations to MWP, he connived with the Sinclair defendants to divert the Max shares to himself (through EPIL), rather than ensuring that they were allotted to MWP.

21  In addition to the Max shares EPIL also received US$950,000 (the Max funds), which MWP contends also ought to have been accounted for; and that, again wrongfully and in breach of obligation, Mr Emmott diverted the Max funds to himself.

22  In June 2006, Mr Emmott left MWP to work for a competitor business known as 'Temujin'. MWP alleges that he conspired with two other former employees of MWP, Mr Nicholls and Mr Slater, from late 2005 to form Temujin and to take advantage of work and opportunities belonging or available to MWP. The work and opportunities included projects in which the Sinclair defendants were concerned; and the role of the Sinclair defendants in this alleged conspiracy, and their assistance and procurement of alleged breaches of contract and fiduciary duty which it involved, are the subject of another action, the Temujin action.

23  As noted above, in August 2006, shortly after Mr Emmott's departure, MWP commenced arbitration proceedings against him under an arbitration clause in his contract, bringing claims for breach of contract and fiduciary duty in connection with a wide range of matters, including the undisclosed profit represented by the Max shares and Max funds, and his participation in the conspiracy to form and divert work to Temujin. It was Mr Emmott's case in the arbitration that the Max shares were in fact intended for Mr Sinclair's benefit and that they were simply warehoused by EPIL because Mr Sinclair had not been able to make his own offshore holding arrangements in time. In support of its claims in the arbitration MWP obtained a number of freezing, disclosure and receivership orders from the Commercial Court.

24  There are two further matters of history to which it is convenient to refer at this point.

25  First, MWP invited Mr Sinclair to join the arbitration in order that the claims in respect of the Max shares could be determined conclusively as between all the relevant parties concerned. He refused to do so.

26  Secondly, on 19 October 2006, Mr Sinclair issued proceedings in the Bahamas seeking a declaration that the Max shares belonged to him. EPIL was a defendant to that action. MWP was also joined as a defendant and successfully challenged the jurisdiction of the Bahamian Court. In the course of submissions, counsel for MWP informed the Bahamian Court of Appeal that if MWP's claims to beneficial ownership of the Max shares failed in the arbitration, 'then it will abandon its claim to the shares, and that is the end of the matter.'

27  Mr Sinclair's refusal to join in the arbitration was relied on by MWP, and MWP's statement to the Bahamian Court of Appeal was relied on by the Sinclair defendants both before Teare J and on this appeal.

28  The arbitration tribunal issued a second interim award adjudicating on the liability aspects of MWP's claims on 22 February 2010 (re-issued on 6 April 2010 with typographical and other corrections). Among other findings, it found that (1) Mr Sinclair had not given Mr Emmott any shares in Max and had been under no legal obligation to do so, and (2) Mr Emmott had no interest in any of the Max shares and had not made any profit, secret or otherwise, for which he was liable to account to MWP. However, the tribunal also held, as Mr Emmott had admitted, that he was liable to account for US$250,000 of the Max funds, although not the balance. The tribunal concluded that MWP had:

> …no claim to any of the 14.75 million shares in Max held by the trustee of Mr Emmott's Bahamian trusts and that they are held to the order of Mr Sinclair. We shall authorise and direct each of the parties to inform the relevant trustees and the Supreme Court of the Bahamas of this finding but not of the reasons on which it is based.

29  By §5 of its seventeenth procedural order dated 24 March 2010, the arbitrators stated that the parties were 'authorized and instructed to inform the relevant

Bahamian Court and the EPIL trustees of the dismissal of MWP's claim to any interest in the Max shares.'

30  On 6 April 2010 the tribunal issued a 'clarification' of its award, stating that it had not granted declaratory relief because it was considered sufficient to dismiss MWP's claim and to give the direction in §5 of its seventeenth procedural order. The tribunal added that if this were to prove insufficient to dispose of the proceedings in the Bahamas and to enable the trustees to transfer the shares to Mr Sinclair they would reconsider their decision not to grant a declaration.

31  In a letter of 22 April 2010 the tribunal authorized and directed Mr Emmott's solicitor to release to Mr Sinclair, the EPIL Trustees and the Bahamian Court section 5 and paragraph 27 of section 8 of the award. This explains how Mr Sinclair, although not a party to the arbitration, has a redacted copy of the award. By the eighteenth procedural order dated 22 February 2012 the tribunal recorded that it was common ground that the whole of the award had been and would be before the Commercial Court.

32  The present action was commenced on 12 October 2010. Proceedings were served on the Sinclair defendants in the jurisdiction and, by 22 February 2011 the pleadings were closed with the Sinclair defendants' Reply to the Defence to Counterclaim.

33  MWP makes no claim in the action against Mr Emmott. It does, however, seek various forms of relief against the Sinclair defendants (declarations, equitable compensation, damages and accounts) on the basis that the Max shares and Max funds were held by EPIL on a constructive trust for MWP, and that the Sinclair defendants were in breach of their contract with MWP and/or gave dishonest assistance to Mr Emmott in breaches of his fiduciary duty. MWP also sues Sokol for a number of unpaid invoices.

34  By its defence, the Sinclair defendants contend (consistently with the findings of the arbitrators) that the Max Shares were issued to EPIL for the sole benefit of Mr Sinclair, and that EPIL was used as an offshore vehicle to receive the shares because the offshore trust structure which Mr Sinclair had asked Mr Emmott to set up had not been completed in time. The defence case is that the Max shares were held by EPIL on a

bare trust for Mr Sinclair. They do not admit the Max funds payment and deny that they made or procured it. A set-off and counterclaim was also asserted in respect of alleged negligence on the part of MWP (acting by Mr Emmott) in making arrangements for the receipt of the Max shares, although this was subsequently discontinued by Sokol and Mr Sinclair.

35  MWP applied to challenge the award under sections 68 and 69 of the Arbitration Act 1996 ; and on 8 June 2011 Andrew Smith J dismissed the applications. I shall return later in this judgment to an observation he made in the course of his judgment refusing the applications.

36  In September 2011 EPIL transferred the Max shares to Mr Sinclair; and on 2 May 2012 Mr Emmott was joined as a Part 20 defendant by the Sinclair defendants with the leave of the court.

**The Judge's decision in summary**

37  The Judge found that the abuse of process doctrine could apply where the decision under collateral attack was an arbitration award, see his judgment at [49]-[54], and concluded that the action constituted a collateral challenge to the award. He noted that Mr Sinclair had not been a party to the arbitration and had refused to become a party [59], and that if there was nothing more, the action would not have been an abuse [60]. However, there were 'special circumstances' which, taken with other factors which he identified at [61]-[68], rendered the proceedings an abuse of the court's process.

38  It will be necessary to consider this part of the judgment in more detail later. At this point it is convenient to summarise the law under two headings: (1) abuse of process, and (2) reliance by a party advancing an argument on abuse of process on a prior arbitral award.

**The law: (1) abuse of process**

39  The citation of authority began with the House of Lords decision in Hunter v. Chief Constable of the West Midlands [1982] AC 529 , and a passage from the speech of Lord Diplock at 536 C-D.

…this is a case about abuse of the process of the High Court. It concerns the inherent power which any court of justice must possess to prevent misuse of its procedure in a way which, although not inconsistent with the literal application of its procedural rules, would nevertheless be manifestly unfair to a party to litigation before it, or would otherwise bring the administration of justice into disrepute among right-thinking people. The circumstances in which abuse of process can arise are very varied; those which give rise to the instant appeal must surely be unique. It would, in my view, be most unwise if this House were to use this occasion to say anything that might be taken as limiting to fixed categories the kinds of circumstances in which the court has a duty (I disavow the word discretion) to exercise this salutary power.

At p.541B-C, he continued:

The abuse of process which the instant case exemplifies is the initiation of proceedings in a court of justice for the purpose of mounting a collateral attack upon a final decision against the intending plaintiff which has been made by another court of competent jurisdiction in previous proceedings in which the intending plaintiff had a full opportunity of contesting the decision in the court by which it was made.

Michael Wilson & Partners Ltd v Sinclair, 2012 WL 13804 (2012)

40  In Bragg v. Oceanus Mutual [1982] 2 Lloyds Rep 132 , the Court of Appeal identified some of the limits of the abuse jurisdiction. Kerr LJ at p.137*l*:

> To take the authorities first, it is clear that an attempt to relitigate in another action issues which have been fully investigated and decided in a former action *may* constitute an abuse of process, quite apart from any question of res judicata or issue estoppel on the ground that the parties or their privies are the same. It would be wrong to attempt to categorize the situations in which such a conclusion would be appropriate;

and at 138l:

> …where, as here, consolidation was in fact sought by the party in question, I cannot begin to see how any question of abuse of the process of the Court could be said to arise.

At 183r and 139l, Sir David Cairns added:

> I do not accept the proposition advanced by Counsel for the appellant … that when an issue has already been decided in proceedings between A and B it is prima facie an abuse of the process of the Court for B to seek to have the issue decided afresh in proceedings between himself and C and that in such circumstances there is an onus on B to show some special reason why he should be allowed to raise the issue against C.

> …

> It would in my judgment be a most exceptional course to strike out the whole or part of a defence in a commercial action, or to refuse leave to amend a defence in such an action, simply because the issue raised or sought to be raised had been decided in another commercial action brought against the same defendant by a different plaintiff. The facts that the first action had been fairly conducted and that the issue had been the subject of lengthy evidence and argument could not, in my view, be sufficient in themselves to deprive the defendant of his normal right to raise any issue which he is not estopped from raising.

41  In Arthur J S Hall & Co (a firm) v. Simons [2002] 1 AC 615 , Lord Hoffmann at 701 A-C described the two policies which underlie discouragement of relitigation.

> The law discourages relitigation of the same issues except by means of an appeal. The Latin maxims often quoted are *nemo debet bis vexari pro una et eadem causa* and *interest rei publicae ut finis sit litium* . They are usually mentioned in tandem but it is important to notice that the policies they state are not quite the same. The first is concerned with the interests of the defendant: a person should not be troubled twice for the same reason. This policy has generated the rules which prevent relitigation when the parties are the same: autrefois acquit, res judicata and issue estoppel. The second policy is wider: it is concerned with the interests of the state. There is a general public interest in the same issue not being litigated over again.

The second policy can be used to justify the extension of the rules of issue estoppel to cases in which the parties are not the same but the circumstances are such as to bring the case within the spirit of the rules.

42 One example given by Lord Hoffman of a case which was within the 'spirit' of the rules was the earlier Privy Council decision in Reichel v. Magrath (1889) 14 App Cas 665 . In that case, a new vicar of Sparsholt, Dr Magrath, was able to rely on the abuse of process even though he had not been party to earlier proceedings between Reichel and the Bishop of Oxford and the Queen's College and so was not bound by any issue estoppel arising out of those proceedings. As Lord Hoffman observed:

> Although the parties were different, the case was within the spirit of the issue estoppel rule. Dr Magrath was claiming though the college, which had been a party to the earlier litigation.

At p.702E, he added:

> …the courts have a power to strike out attempts to relitigate issues between different parties as an abuse of process of the court. But the power is used only in cases in which justice and public policy demand it.

At p.751D-E, Lord Hobhouse said:

> To challenge in later litigation an earlier non-binding decision between different parties is not itself abusive, provided there are good reasons for doing so. So far as

questions of law are concerned, the doctrine of precedent contemplates this. So far as questions of fact are concerned, each court had to try and decide questions of fact on the evidence adduced before it. Judicial comity and common sense take care of most situations in practice but the law does tolerate the possibility of apparently inconsistent decisions. The element of vexation is an aspect of abuse, the use of litigation for an improper purpose, trying to have repeated bites at the same cherry. The objectionable element is not the risk of inconsistency.

43  In Johnson v. Gore Wood & Co [2002] 2 AC 1 , at p.31A-E, Lord Bingham of Cornhill, in a speech with which the other members of the appellate committee agreed, identified the nature of the enquiry when considering an abuse application where the Court was considering the type of abuse described in Henderson v. Henderson (1843) 3 Hare 100 .

> But Henderson v Henderson abuse of process, as now understood, although separate and distinct from cause of action estoppel and issue estoppel, has much in common with them. The underlying public interest is the same: that there should be finality in litigation and that a party should not be twice vexed in the same matter. This public interest is reinforced by the current emphasis on efficiency and economy in the conduct of litigation, in the interests of parties and the public as a whole. The bringing of a claim or the raising of a defence in later proceedings may, without more, amount to abuse if the court is satisfied (the onus being on the party alleging abuse) that the claim or defence should have been raised

in the earlier proceedings if it was to be raised at all. I would not accept that it is necessary, before abuse may be found, to identify any additional element such as a collateral attack on a previous decision or some dishonesty, but where those elements are present the later proceedings will be much more obviously abusive, and there will rarely be a finding of abuse unless the later proceeding involves what the court regards as unjust harassment of a party. It is, however, wrong to hold that because a matter could have been raised in earlier proceedings it should have been so as to render the raising of it in later proceedings necessarily abusive. That is to adopt too dogmatic an approach to what should in my opinion be a broad, merits-based judgment which takes account of the public and private interests involved and also takes account of all the facts of the case, focusing attention on the crucial question whether, in all the circumstances, a party is misusing or abusing the process of the court by seeking to raise before it the issue which could have been raised before. As one cannot comprehensively list all possible forms of abuse, so one cannot formulate any hard and fast rule to determine whether, on given facts, abuse is to be found or not.

44 In re Norris [2001] 1 WLR 1388 was a case in which it was argued that a prior confiscation order made by a Crown Court against a husband was determinative of the wife's interest in the property. The Customs and Excise Commissioners argued that the wife's attempt to reopen the issue was an abuse of the Court's process. At [26] Lord Hobhouse of Woodborough referred to some of the cases, including Hunter v. Chief Constable .

These are illustrations of the principle of abuse of process. Any such abuse must involve something which amounts to a misuse of the litigational process. Clear cases of litigating without any honest belief in any basis for doing so or litigating without having any legitimate interest in the litigation are simple cases of abuse. Attempts to relitigate issues which have already been the subject of judicial decision may or may not amount to an abuse of process. Ordinarily such situations fall to be governed by the principle of estoppel *per rem judicatam* or of issue estoppel (admitted not to be applicable in the present case). It will be a rare case where the litigation of an issue which has not previously been decided between the same parties or their privies will amount to an abuse.

45 Sir Andrew Morritt V-C in Secretary of State for Trade and Industry v. Bairstow [2004] Ch 1 , having reviewed many of the cases referred to above, set out his conclusions at [38].

In my view these cases establish the following propositions. (a) A collateral attack on an earlier decision of a court of competent jurisdiction may be but is not necessarily an abuse of the process of the court. … (d) If the parties to the later civil proceedings were not parties to or privies of those who were parties to the earlier proceedings then it will only be an abuse of the process of the court to challenge the factual findings and conclusions of the judge or jury in the earlier action if (i) it would be manifestly unfair to a party to

the later proceedings that the same issues should be relitigated or (ii) to permit such relitigation would bring the administration of justice into disrepute.

46 The nature of the enquiry was further considered again in the judgment of Buxton LJ in Taylor Walton (a firm) v. Laing [2007] EWCA Civ 1146 [2008] PNLR 11 , at [12–13].

> 12. The court … has to consider, by an intense focus on the facts of the particular case, whether in broad terms the proceedings that it is sought to strike out can be characterised as falling under one or other, or both, of the broad rubrics of unfairness or the bringing of the administration of justice into disrepute. Attempts to draw narrower rules applicable to particular categories of case (in the present instance, negligence claims against solicitors when an original action has been lost) are not likely to be helpful.

> 13. As to the proper approach of this court, TW sought to draw from Lord Diplock's disavowal of the word discretion the conclusion that, since the issue was not one for the discretion of the judge, in any appeal this court should start again, and simply decide whether the trial judge had been right or wrong. I do not think that the matter is so straightforward. In the passage relied, on Lord Diplock was indicating that to strike out a case brought without infraction of the rules of procedure was a serious step, not to be taken unless the circumstances were sufficiently

extreme as to demonstrate that the judge had a duty to act. That is a much more stringent test than simply to say that the circumstances must fall within a category that entitles the judge to decide for himself whether or not to take action. It is therefore correct that this court, in reviewing the judge's decision, is not limited to considering whether the facts fell within a wide ambit of discretion. At the same time, however, the issue although not one of discretion is one of judgment in determining whether the duty referred to by Lord Diplock arises. In reviewing such an exercise of judgment this court will always give considerable weight to the opinion of the judge, and particularly so when that opinion has been formed by a commercial judge of many years' experience.

47 More recently, in Kotonou v. National Westminster Bank Plc [2015] EWCA Civ 1106 at [45], Gloster LJ, commented on Buxton LJ's observations in the Taylor Walton case .

> Thus, in my view, what is required in the present case is 'an intense focus on the facts of this case', to determine whether in broad terms Mr Kotonou's new proceedings can be characterised as falling under one or other, or both, of the broad rubrics of unfairness or the bringing of the administration of justice into disrepute. That approach involves not merely concentrating on the effect of the findings of fact made by the deputy judge (as the master and Morgan J did), but also addressing the much wider question as to whether this is a case which, in all the circumstances,

Michael Wilson & Partners Ltd v Sinclair, 2017 WL 1368412017)

engages the Henderson v Henderson principle. That holistic approach is to be preferred to the artificial exercise of attempting to decide whether, in circumstances not giving rise to cause of action or issue estoppel, there is, or is not a rule, that some additional element or 'special factor' is required, what such 'special factor' might be and whether it is present in the particular circumstances of the present case.

48  The following themes emerge from these cases that are relevant to the present appeal.

• (1)   In cases where there is no *res judicata* or issue estoppel, the power to strike out a claim for abuse of process is founded on two interests: the private interest of a party not to be vexed twice for the same reason and the public interest of the state in not having issues repeatedly litigated; see Lord Diplock in Hunter v. Chief Constable , Lord Hoffmann in the Arthur Hall case and Lord Bingham in Johnson v. Gore Wood . These interests reflect unfairness to a party on the one hand, and the risk of the administration of public justice being brought into disrepute on the other, see again Lord Diplock in Hunter v. Chief Constable . Both or either interest may be engaged.
• (2) An abuse may occur where it is sought to bring new proceedings in relation to issues that have been decided in prior proceedings. However, there is no prima facie assumption that such proceedings amount to an abuse, see Bragg v. Oceanus ; and the court's power is only used where justice and public policy demand it, see Lord Hoffmann in the Arthur Hall case.
• (3)   To determine whether proceedings are abusive the Court must engage in a close 'merits based' analysis of the facts. This will take into account the private and public interests involved, and will focus on the crucial question: whether in all the circumstances a party is abusing or misusing the court's process, see Lord Bingham in Johnson

v. Gore Wood and Buxton LJ in Taylor Walton v. Laing .
• (4)   In carrying out this analysis, it will be necessary to have in mind that: (a) the fact that the parties may not have been the same in the two proceedings is not dispositive, since the circumstances may be such as to bring the case within 'the spirit of the rules', see Lord Hoffmann in the Arthur Hall case; thus (b) it may be an abuse of process, where the parties in the later civil proceedings were neither parties nor their privies in the earlier proceedings, if it would be manifestly unfair to a party in the later proceedings that the same issues should be relitigated, see Sir Andrew Morritt V-C in the Bairstow case; or, as Lord Hobhouse put it in the Arthur Hall case, if there is an element of vexation in the use of litigation for an improper purpose.
• (5)   It will be a rare case where the litigation of an issue which has not previously been decided between the same parties or their privies will amount to an abuse of process, see Lord Hobhouse in In re Norris .
•To which one further point may be added.
• (6)   An appeal against a decision to strike out on the grounds of abuse, described by Lord Sumption JSC in Virgin Atlantic Airways Ltd v. Zodiac Seats UK Ltd [2014] AC 160 at [17] as the application of a procedural rule against abusive proceedings, is a challenge to the judgment of the court below and not to the exercise of a discretion. Nevertheless, in reviewing the decision the Court of Appeal will give considerable weight to the views of the judge, see Buxton LJ in the Taylor Walton case, at [13].

49  Although these points were not substantially in issue between the parties, their application to the facts was hotly contested.

### The law: (2) the application of abuse of process to prior arbitral awards

50  Mr Samek relied on the observations of this Court in Sun Life Assurance Company of Canada and others v. Lincoln National Life Insurance Company [2005] 1 Lloyd's Law Rep 606 to support a broad submission that a prior arbitration award cannot form the basis of an abuse of process.

51  The issue on appeal in the Sun Life case, as explained by Mance LJ at [1], has a superficial similarity to the present case.

> This appeal concerns the correct analysis of an arbitration award relating to a dispute between X and Y, and its relevance in a subsequent, separate arbitration between X and Z in which the legal position between X and Y is in issue. X represents the appellants in this court, Sun Life … Y represents, Cigna … and Z represents … the respondents in this court … ('Lincoln')

52  One of the points considered by the Court of Appeal was whether, where there were two arbitral tribunals, an award in one arbitration could give rise to an estoppel *per rem judicatam* in another. The question arose in the context of insurance and reinsurance. It was not suggested that the principles of *res judicata* and issue estoppel could have any direct application, see Mance LJ at [53]. The submission was that if, on a proper reading of the first award, an issue had been determined in a manner giving rise to an issue estoppel as between the parties to that arbitration, a reinsurer, whose rights or liabilities depended upon the legal position between the parties to the first award was entitled to rely on that determination against an insurer, who was one of those parties, see Mance LJ at [48]. In fact, no issue estoppel was created by the first arbitration award and so the observations of the court on the point were not a necessary part of the reasoning, see Mance LJ at [8] and [48] and Longmore LJ at [71]. It is equally clear that no argument was advanced on the basis of abuse of process, see Mance LJ at [63].

53  The observations of Mance LJ on which MWP relied were directed to whether, if an arbitral tribunal had power to prevent its process from being abused, there were considerations which would have excluded its use on the facts of the case. In rejecting that argument Mance LJ identified the important differences between arbitration and litigation.

[68]  … more fundamentally, the solution for which (counsel for Lincoln) contends appears to me to overlook or obscure important differences between arbitration and litigation. In the context of litigation, problems of potentially conflicting judgments arrived at between different parties to the same overall complex of disputes are met by provisions for joinder of parties or proceedings or for trial together, if necessary on a mandatory basis using the courts' compulsive powers. Even in circumstances in which there has been no such joinder, and where neither *res judicata* nor issue estoppel has any application, the court may intervene to prevent abuse of its process, as stated in paragraphs 63 and 65 above. All this is facilitated by the public nature of litigation, the public interest in the efficient administration of justice and the courts' coercive powers. Considerations of general justice of the sort to which Toulson J referred thus have relevance and can be given effect in the context of litigation. Arbitration is in contrast a consensual, private affair between the particular parties to a particular arbitration agreement. The resulting inability to enforce the solutions of joinder of parties or proceedings in arbitration, or to try connected arbitrations together other than by consent, is well-recognised — though the popularity of arbitration may indicate that this inability is not often inconvenient or that perceived advantages of arbitration, including confidentiality and privacy are seen as outweighing any inconvenience. Different arbitrations on closely inter-linked issues may as a result lead to different results, even where, as in the present case, the evidence

Michael Wilson & Partners Ltd v Sinclair, 2017 WL 13604 (2017)

before one tribunal is very largely the same as that before the other. The arbitrators in each arbitration are appointed to decide the disputes in that arbitration between the particular parties to that arbitration. The privacy and confidentiality attaching to arbitration underline this; and, even if they do not lead to non-parties remaining ignorant of an earlier arbitration award, they are calculated to lead to difficulties in obtaining access, and about the scope of any access, to material relating to that award.

See also Jacob LJ at [87].

54  Although I accept these points as far as they go, I do not consider that they support Mr Samek's broad proposition. What is clear is that there are good reasons why a court should be cautious before accepting that later court proceedings are an abuse of its process because it involves a collateral attack on an earlier arbitration award.

55  Mr Shepherd referred to a decision of Reyes J in the High Court of Hong Kong in which a broad submission similar to Mr Samek's was considered, see Parakou Shipping Pte Ltd v. Jinhui Shipping and Transportation Ltd (2010) HCAJ 184/2009 . In that case, there had been a London arbitration to determine whether Parakou had entered into an agreement to charter a vessel from Galsworthy Ltd. Galsworthy contended that they had and Parakou contended that they had not. In an arbitration award made in August 2010 the tribunal concluded that there had been a prima facie binding fixture which had been ratified by Parakou, and that no relevant misrepresentations had been made for which Galsworthy was responsible. Prior to the date of this award, in August 2009, Parakou had begun proceedings in Hong Kong alleging against the defendant that they had made misrepresentations which had induced the contract, if such had been concluded.

56  Reyes J held that the Hong Kong claim raised the same misrepresentation issues that had been decided

by the arbitrators, albeit in an arbitration between different parties to those sued in the Hong Kong action, and struck out Parakou's claim. The Judge identified what he described as the second aspect of the Court's jurisdiction to strike out collateral attacks on adverse final decisions as an abuse of process: namely, where the doctrine of *res judicata* did not strictly apply.

> 96.  Where a collateral challenge is alleged to be an abuse of process under the second aspect, the Court scrutinises the relevant facts carefully. This is because it is a serious matter to strike out a claim and prevent a plaintiff litigating a matter. It is not every collateral attack that will be held to be an abuse of process by the Court a collateral attack will typically only be an abuse where the Court finds that there will be 'manifest unfairness' or 'the bringing of justice into disrepute' if a plaintiff is allowed to continue with subsequent proceedings …

57  In the course of his judgment, Reyes J recited a number of arguments advanced by Parakou which were similar to those advanced by Mr Samek on behalf of MWP. First, that the London arbitration award was not binding otherwise than as between the immediate parties (Galsworthy and Parakou), and on that basis it could not be an abuse for Parakou to litigate issues which featured in the arbitration. Secondly, in relation to issues which arose in the arbitration and litigation, the Hong Kong court might make different findings. Thirdly, there was nothing unusual or objectionable about different forums coming to different conclusions.

58  Reyes J considered the judgment of the Court of Appeal in the Sun Life case on which Parakou had relied, and concluded that it did not assist Parakou's argument in answer to the strike out application. First, as already noted, it was not an abuse of process case (see the Parakou judgment at §152). Secondly, and pertinently, an analysis of what was said in the Sun Life

case did not support the proposition that the abuse of process jurisdiction was not available where the court was faced with an attempt to re-litigate issues decided in an arbitration (see the Parakou judgment §§155–157). Thirdly, where the doctrine of *res judicata* did not strictly apply and the parties to the subsequent proceedings were not the same parties or their privies in the earlier proceedings, the Court was bound to engage in a fact sensitive enquiry to see whether there is manifest unfairness or conduct which brings 'justice into disrepute', (see the Parakou judgment §§92–95). Reyes J concluded:

> 171. I do not read Mance LJ as having in mind (or extending his remarks to) the situation here, where in effect Parakou is seeking by litigation in Court to re-open matters decided in an Arbitration to which the Defendants were privies. In contrast to Lincoln's argument in Sun Life , the Defendants here advance a more modest application. This is not a case of two arbitrations …

> 172. In the present circumstances, regardless of the availability of joinder or consolidation in arbitration proceedings, the Court must undoubtedly have jurisdiction in the interests of justice to prevent its own process from being abused.

> 173. Where arbitration is concerned, of course the Court must exercise caution given the differences between arbitration and ordinary litigation identified by Mance LJ. But caution does not mean that the Court should not strike out in an appropriate situation. In light of the similarity of issues and of the alter ego relationship between the Defendants and Galsworthy, it seems to me that the proper and efficient

administration of justice imposed a duty (Lord Diplock's expression) to refuse to allow the Hong Kong action to proceed.

59  After further consideration of the facts of the case with which he was concerned, Reyes J added:

> 184. Closely read, I do not think that Sun Life supports Parakou's case. The abuse of process jurisdiction may be invoked in appropriate cases even where arbitration in involved.

60  In the present case Teare J adopted a similar approach to the question whether the abuse of process doctrine could apply where the previous decision was that of an arbitral tribunal.

> 50. In answering this question it is necessary to bear in mind that the question is whether the process of this court is being abused by a claim being brought before it. The nature of the court or tribunal which has given the decision said to be under collateral attack will or may be important in deciding whether the proceedings in this court are an abuse of its process. For example, where the decision under collateral attack is the decision of a jury in a criminal trial, there may be particularly cogent reasons for saying that the collateral attack is an abuse of the process of this court; see Arthur JS Hall v Simons [2002] 1 AC 615 at p.702 per Lord Hoffmann. But there is high authority for saying that it is unwise to limit to fixed categories the circumstances in which it is the court's duty to prevent its processes from being abused; see

Michael Wilson & Partners Ltd v Sinclair, 2017 WL 1384421 (2017)

Hunter v Chief Constable [1982] AC 529 at p.536 per Lord Diplock and Arthur JS Hall v Simons [2002] 1 AC 615 at p.702 per Lord Hoffmann. I have therefore concluded that there can be no rule that the court can have no such duty merely because the tribunal whose decision is under attack is an arbitral tribunal. However, it will probably be a rare case where an action in this court against a non-party to an arbitration can be said to be an abuse of the process of this court. Where a claimant has a claim against two or more persons and is obliged to bring one such claim in arbitration the defeat of that claim in arbitration will not usually prevent the claimant from pursuing his claim against the other persons in litigation. Arbitrations are private and consensual and non-parties cannot, in the absence of consent, be joined or be affected by the decisions of the arbitral tribunal.

61  At [52] Teare J considered MWP's arguments based on the Sun Life case, noting, as had Reyes J, that the observations of Mance LJ were *obiter* and that abuse of process had not been relied on. Having referred to the considerations set out by Mance LJ, Teare J continued:

54.  I accept that these are relevant considerations to bear in mind when deciding whether, on the facts of any particular case, there has been an abuse of the process of this court. It seems to me that they will often cause this court to conclude that it is not an abuse for A to make allegations against B which are contrary to the findings in an arbitration between A and C to which B was not party. However, in the light of the clear guidance

from the House of Lords to which I have referred I am unable to accept that the doctrine of abuse of process cannot apply merely because the decision under collateral attack is that of an arbitral tribunal. Further, the court in Lincoln National Life v Sun Life Assurance Co. of Canada was not considering the case of an arbitration followed by litigation but of successive arbitrations.

62  A similar approach was adopted by Hamblen J in Arts & Antiques Ltd v Richards and others [2014] Lloyd's Law Rep (Ins and Reins) 21 .

20.  It is apparent that abuse of process may be relied upon by a non-party to the earlier litigation said to give rise to the abuse. This is illustrated by the case of Taylor Walton (a firm) v David Eric Laing [2007] EWCA Civ 1146 . That case concerned a negligence claim brought by Mr Laing against his solicitors. The claim made depended on Mr Laing proving that the agreements, about the drafting of which complaint was made, were in the terms alleged by Mr Laing. That issue had been decided against Mr Laing in proceedings between him and the other party to the agreement. That decision had not been appealed and the Court of Appeal held that it was an abuse of process to seek to relitigate that decision in the further proceedings brought.

63  Having cited [49] and [50] of Teare J's judgment in the present case, Hamblen J continued.

23. It is also apparent that abuse of process may be relied upon where the earlier decision was that of an arbitral tribunal rather than a court and that arbitration involved a different party.

24 In the circumstances of that case Teare J decided that it would be an abuse of process to allow a collateral attack on the decision of the arbitral tribunal to be made, even though the court proceedings were brought against a non-party to the arbitration.

64 On the facts of the Arts & Antiques case, Hamblen J set out his conclusion at [46].

I agree that the Taylor Walton v Laing decision supports a finding of abuse of process in this case. Aside from the fact that the earlier decision was in arbitration, the two cases are analogous. There is in this case no new evidence which casts doubt on the arbitrator's decision. Indeed, for reasons set out below, such further evidence as there is confirms the correctness of his decision. That decision has sought to be challenged by appeal but the application has been dismissed on the basis that the decision is 'not open to serious doubt'. For the issue to be relitigated in this court involves a collateral attack on the arbitrator's final and binding decision. Further, that decision relates to the terms of the contract as between A&A and Zurich, which have been determined in accordance with the agreed contractual machinery, namely by arbitration. In all the circumstances, I conclude that it would bring

the administration of justice into disrepute, and would be oppressive and unfair on Towergate and Mr Richards, for A&A to be allowed to fight the issue of whether or not the contract contained CP2 all over again. It would accordingly be an abuse of process.

65 In OMV Petrom SA v. Glencore International AG [2014] 2 Lloyd's Law Rep 308 , Blair J followed the approach of Teare J and Hamblen J in the earlier cases.

23. The question whether abuse of process may be relied upon where the earlier decision is that of an arbitral tribunal, rather than that of a court, arose directly in Michael Wilson & Partners Limited v Sinclair [2013] 1 All ER (Comm) 476 . At [50], Teare J pointed out that the question is whether the process of the court is being abused by a claim being brought before it. He accepted that the nature of the tribunal which has given the prior decision may be important in deciding whether the subsequent court proceedings are an abuse of process. This (it is to be noted) takes account of the principle that arbitration proceedings are confidential to the parties of the arbitration. But in deciding whether it is the court's duty to prevent its processes from being abused, he concluded that '… there can be no rule that the court can have no such duty merely because the tribunal whose decision is under attack is an arbitral tribunal': see also Art & Antiques Limited v Richards [2013] EWHC 3361 (Comm) at [23], Hamblen J.

24. In this case, Petrom of course was not a party to the arbitration. As regards non-parties, Teare J goes on to say that '… it will probably be a rare case where an action in this court against a non-party to an arbitration can be said to be an abuse of the process of this court'. As he pointed out, where a claimant has a claim against two persons and is obliged to bring one claim in arbitration, the defeat of the claim in arbitration will not usually prevent him from pursuing his claim against the other person in litigation. On the facts of that case, however, he decided that it *would* be an abuse of process to allow a collateral attack on the prior decision of the arbitral tribunal to be made, even though the court proceedings were brought against a non-party to the arbitration. I would accept also, that it can be an abuse of the process of the court to seek to relitigate in court proceedings issues which have been the subject of prior proceedings before an arbitral tribunal if the tests set out in the authorities are otherwise satisfied.

66 Mr Samek was critical of the decisions in these cases, going so far as to contend that the Art & Antiques case was wrongly decided. I reject his criticism.

67 In my view Teare J correctly stated the law in [50] of his judgment in the present case. There is no 'hard edged' rule that a prior arbitration award cannot found an argument that subsequent litigation is an abuse of process. The Court is concerned with an abuse of its own process; and there are abundant references in the authorities to the dangers of setting limits and fixing categories of circumstances in which the court has a duty to act so as to prevent an abuse of process.

68 I agree with Reyes J's observation in the Parakou case that, although a Court will be cautious in circumstances where the strike out application is founded on a prior arbitration award, that caution should not inhibit the duty to act in appropriate circumstances. I would also add my agreement with Teare J's observation at [50] of his judgment that it will probably be a rare case, and perhaps a very rare case, where court proceedings against a non-party to an arbitration can be said to be an abuse of process.

69 In my judgment the real argument is whether the present case is one of those rare cases; but before turning to that issue it is necessary to consider a logically prior question.

### The admissibility of the award.

70 The issue is whether the award is admissible for the purposes of the application and the appeal, see [14] above at subparagraph (1) (a).

71 Although the arbitrators authorised the release of the award to Mr Sinclair, the EPIL trustees and the Bahamian Court, Mr Samek submitted that it was not open to the Sinclair defendants to use the award for the purposes of its strike out application. He relied on the principle that factual findings made in one case are inadmissible in subsequent proceedings (unless the party against whom it is sought to deploy the finding is bound by decision by reason of an estoppel *per rem judicatam*). In support of this proposition, he relied on the decision of this Court in Rogers v. Hoyle, Secretary of State for Transport and another intervening [2014] EWCA Civ 257, [2015] QB 265 at [32]. In that case an action was brought by executors against the pilot of an aircraft in which the deceased had died following a crash. The pilot applied for a declaration that a report of the Department of Transport Air Accident Investigation Branch was inadmissible because, among other reasons, its admission was precluded under the rule in Hollington v. Hewthorn , see Hollington v. F. Hewthorn & Co Ltd [1943] KB 587 .

72 In the course of his judgment dismissing the appeal, Christopher Clarke LJ (with whom Arden and Treacy LJJ agreed) reviewed the authorities and reaffirmed the rule in Hollington v. Hewthorn , adding, by reference to the decision of Hoffmann J in Land Securities plc

v. Westminster City Council [1993] 1 WLR 286 , that the rule also applied to the findings of fact made by arbitrators, see [34]. At [39–40] he referred to the foundation on which the rule rested:

> 39.  As the judge rightly recognised the foundation on which the rule must now rest is that findings of fact made by another decision maker are not to be admitted in a subsequent trial because the decision at that trial is to be made by the judge appointed to hear it ('the trial judge'), and not another. The trial judge must decide the case for himself on the evidence that he receives, and in the light of the submissions on that evidence made to him. To admit evidence of the findings of fact of another person, however distinguished, and however thorough and competent his examination of the issues may have been, risks the decision being made, at least in part, on evidence other than that which the trial judge has heard and in reliance on the opinion of someone who is neither the relevant decision maker nor an expert in any relevant discipline, of which decision making is not one. The opinion of someone who is not the trial judge is, therefore, as a matter of law, irrelevant and not one to which he ought to have regard.

> 40.  In essence, as the judge rightly said, the foundation of the rule must now be the preservation of the fairness of the trial in which the decision is entrusted to the trial judge alone.

73  These observations are uncontroversial. However, they do not have the consequence that a court is not permitted to consider the contents of either an earlier

judgment or an earlier arbitration award in order to see whether a later claim amounts to an abuse of its process. In cases where it is said that a current claim is an abuse of process because it amounts to an impermissible collateral challenge to an earlier decision it is plainly necessary to look at the earlier decision; and the suggestion that it is inadmissible for such a purpose is wrong.

74  Of course, this still leaves open a question as to the use to which the earlier judgment or award may be put in the later proceedings, but that is a different question to which I will return later.

75  I turn then to what is now the central question on the appeal: whether the Judge was right to conclude that MWP's claim against the Sinclair defendants was an abuse of the court's process?

**Abuse of process and the present claim**

76  The Judge's starting point was to identify that the burden of demonstrating abuse of process was on the Sinclair defendants and that the test that they had to meet was an exacting one.

77  He noted that, although the factual allegations against Mr Emmott mirrored the failed allegations made against him in the arbitration and that the claim amounted to a collateral challenge to the findings of the arbitrators, it could be said to be justified because Mr Sinclair had not been a party to the arbitration and the action was the only means by which MWP could bring its claim against the Sinclair defendants, see his judgment at [59].

78  The Judge continued:

> 60.  If those had been the only material circumstances I would not have been persuaded that the proceedings in this court were being abused. However, there are, it seems to me, special circumstances in this case which must, in my judgment, be taken into account. First, Mr. Sinclair was a witness in the arbitration and was cross-

examined. Second, Mr. Sinclair, no doubt because of his interest in the outcome of the arbitration, funded Mr. Emmott's defence in the arbitration. Third, the arbitration tribunal concluded that the Max shares were held to the order of Mr. Sinclair. Fourth, the arbitration tribunal intended and expected that the effect of its award would be that EPIL would transfer the Max shares to Mr. Sinclair. To that end it authorised disclosure of the relevant section of its award to Mr. Sinclair, the EPIL Trustees and the Bahamian Court. That explains how Mr. Sinclair, a non-party to the arbitration, has a copy of the award and reasons which would ordinarily be private and confidential to the parties.

79  At [61] the Judge considered whether MWP had been labouring under a disadvantage in the arbitration from which it would be free in the litigation, and concluded that it had not.

80  In the following paragraphs of his judgment at [62]-[67] the Judge set out the 'special circumstances' which in his view made it an abuse of process to permit MWP to make the same factual allegations which had been made and rejected in the arbitration.

81  There was the fact that, whereas most arbitrations have, and are intended to have, effect only between the parties, this arbitration was different. The issue of whether the Max shares were held by EPIL to the order of Mr Sinclair or of MWP was at the heart of the arbitration. The Judge noted that the tribunal envisaged that EPIL would dispose of the Max shares in accordance with the instructions of Mr Sinclair pursuant to the tribunal's award. This was clear from the terms of the seventeenth procedural order referred to above.

82  MWP would need to prove in its claim against the Sinclair defendants that the Max shares had been received by EPIL on behalf of Mr Emmott in breach of his fiduciary duty to MWP. However, that was an allegation that the arbitrators had rejected when made by MWP against Mr Emmott in the arbitration. In the light of MWP's acceptance that it was estopped as against Mr Emmott from alleging that EPIL had received the Max shares on behalf of Mr Emmott in breach of his fiduciary duty, it was difficult to see how MWP could challenge any evidence which Mr Emmott might give at trial on the issue. The Judge noted Mr Samek's submission that he could put MWP's central allegation to Mr Emmott in cross-examination at trial, but found it difficult to see how that could be allowed in the light of the admitted estoppel between MWP and Mr Emmott. The Judge considered that this was a further illustration of the abusive nature of MWP's claim.

83  While the Judge recognised that striking out the court proceedings would prevent MWP from advancing its claim against the Sinclair defendants, save for the claim in debt which it is accepted would not be stayed, MWP had been able to put its entire case on the facts when cross-examining Mr Emmott and Mr Sinclair in the arbitration. In these circumstances, he did not consider that the fact that Mr Sinclair refused to be a party to the arbitration and that the Commercial Court action was therefore the only forum in which MWP could advance its claim against him was sufficient to prevent the claim amounting to an abuse of process, particularly since a breach of fiduciary duty alleged against Mr Emmott was a necessary pre-condition of MWP's claim against Mr Sinclair.

84  The Judge accepted that mutuality was absent and that, if the arbitrators had decided in MWP's favour, Mr Sinclair would have been able to say that he was not bound by the tribunal findings, but concluded that this was not a complete answer. He referred to a passage in the Sun Life case at [88] in which Jacob LJ said that where a party seeks to re-litigate in subsequent proceedings against Y a point that he fought fully in earlier proceedings against X, it might be that, notwithstanding a lack of mutuality, he could be prevented from doing so on the grounds of abuse of process. That tentative view was reinforced by the decision in Reichel v Magrath (1889), where

Dr Magrath (the new vicar) was able to rely on the abuse of process even though he had not been party to the earlier proceedings between Reichel (on the one hand), and the Bishop and the College (on the other) and so was not bound by any issue estoppel arising out of those proceedings. It was, in the words of Lord Hoffmann in the Arthur Hall case, within the spirit of the issue estoppel rule. The Judge recognised that lack of mutuality was a factor to be taken into account but considered that in the circumstances it did not prevent MWP's claim from being an abuse of process. Mr Sinclair had not been a party to the arbitration but his involvement in the arbitration and the fact that he had received the shares from EPIL pursuant to the award brought the case 'within the spirit' of the issue estoppel rule.

85  Finally, the Judge took into account the issue of whether it would be fair to allow the action to proceed. Mr Sinclair and Mr Emmott had both been involved in the lengthy arbitration and had given evidence. The Judge did not accept that it would be manifestly unfair to permit MWP to advance its allegations a second time against Mr Sinclair, since he had always maintained that the result of the arbitration would not bind him and must have been aware of the risk that further proceedings would be brought against him. However, Mr Emmott was in a different position. He had defended himself against the allegations in the arbitration and the tribunal had rejected MWP's suggestion that he had been the intended recipient of the Max shares. The arbitrators had found that he expected to receive about 250,000 shares in Max and that if MWP had not obtained a freezing order against the shares Mr Sinclair might well have given Mr Emmott shares in Max for which he would have had to account to MWP as a secret profit. On this basis it could not be said that his reputation had survived the arbitration intact. Nevertheless, in the Judge's view, when allegations have been fully and carefully considered it is usually unfair to permit the accuser to have a second opportunity to make the same allegations. Circumstances might exist which would justify a second opportunity but they do not exist in this case. Although MWP had not made Mr Emmott a party to the Commercial Court litigation, he had been made a party by Mr Sinclair late in the day giving rise to the suspicion that the joinder was only done to strengthen the abuse of process argument; but whether or not that was so, the Judge considered

that Mr Emmott would necessarily have been a witness in the action and MWP would have wanted to put its allegations to him a second time, and this would be manifestly unfair to him.

86  Mr Shepherd (supported by Mr Sinclair) commended this reasoning and the conclusion that the claim was an abuse of process. He submitted that MWP's claim in the legal proceedings was entirely predicated on showing that Mr Emmott had acted in breach of his fiduciary duties to MWP. After a lengthy and expensive investigation of the issues the arbitrators concluded that he had not. On this basis they argued that the Judge's analysis was entirely correct. Unless there was a clearly discernible justification for it, what was a collateral attack on the arbitrators' decision was an abuse of the court's process.

87  Despite these arguments and the Judge's careful reasoning, I am clear that his conclusion was wrong and that the high threshold which engages the Court's duty to act to prevent abuse of its process was not met.

88  There were a number of material considerations which weighed heavily against the conclusion that the claim was an abuse of process.

89  The prior proceedings relied on to support the application to strike out were arbitration proceedings to which Mr Sinclair was not a party. Not only had he not been a party, he had been invited by MWP to join as a party to the arbitration and agree to be bound by an award so that the issue of beneficial ownership of the Max shares could be conclusively determined in a way that would bind each of MWP, Mr Emmott and Mr Sinclair, giving rise to *res judicata* or creating estoppels on which each could subsequently rely. He had refused to join in the arbitration; and had adopted the position in the Bahamian proceedings that the outcome of the arbitration was 'totally irrelevant to the dispute' between MWP and him.

90  Despite this, he now relied on the arbitration proceedings and award to characterise MWP's claim against him as an abuse of process, seeking to take the benefit of an arbitration award by which the Sinclair defendants would not have been bound had it been decided differently. This was the point about lack of mutuality which plainly troubled the Judge; and it was

a highly material, if not dispositive, factor. As Kerr LJ said in Bragg v. Oceanus :

> …where, as here, consolidation was in fact sought by the party in question, I cannot begin to see how any question of abuse of the process of the Court could be said to arise.

91  It is necessary therefore to consider the steps which led the Judge to conclude that the Sinclair defendants had satisfied the 'especially', 'exacting' test which Teare J had recognised had to be satisfied.

92  Although he identified 'special circumstances' which he considered satisfied this test, in doing so he placed too much emphasis on the arbitration and award to which the Sinclair defendants were not a party and gave too much weight to the position of Mr Emmott in the litigation despite the fact that he had not been sued by MWP.

93  This was not a case in which there had been a prior claim by MWP against the Sinclair defendants; and it follows that the application to strike out could not be founded on the private interest of a party not to be vexed twice for the same reason. MWP's only means of pursuing its clams against them was by means of the present action. Nor was Mr Emmott being vexed twice, since he was only a party in the litigation at the suit of the Sinclair defendants, by whom he was subsequently released. The Judge's suspicion that his late joinder by the Sinclair defendants was only done to strengthen the abuse argument appears to be justified.

94  It also seems to me that the Judge placed too much weight on his view that, because MWP was inviting the Court to come to a different view to the arbitrators in relation to the nature and discharge of Mr Emmott's obligations, it was mounting an illegitimate collateral attack on the award. However, as Lord Hobhouse expressed it in the Arthur Hall case at p.743 C:

> There is no general rule preventing a party inviting a court to arrive at a decision inconsistent with that arrived in another case.

95  In the course of dismissing MWP's challenge to the award under ss.68 and 69 of the Arbitration Act 1996 , see Michael Wilson & Partners Ltd v. Emmott [2011] EWHC 1441 (Comm) , Andrew Smith J set out an unchallengeable view of the matter at [63]:

> Mr. Sinclair was not party to the reference or the Award. The Tribunal's findings and directions do not determine any dispute other than between MWP and Mr. Emmott. They confer no rights upon Mr. Sinclair. I am unable to see how the finding that the Tribunal made can result in substantial injustice to MWP: as MWP acknowledges, in proceedings to which Mr. Sinclair is party the courts are free to reach a different conclusion from that of the Tribunal. This possibility might, as MWP submits, lead to conclusions which MWP characterises as 'irreconcilable'…

96  As noted above, the Judge's conclusion that the legal proceedings were an abuse was based on four 'special circumstances … which must be taken into account', see [60] of the judgment: (1) Mr Sinclair was a witness in the arbitration, (2) Mr Sinclair funded Mr Emmott's defence in the arbitration, (3) the tribunal found that the Max Shares were held to the order of Mr Sinclair, and (4) the tribunal intended and expected that the effect of the award would be that EPIL would transfer the Max shares to Mr Sinclair.

97  Taking these in turn, I do not agree that the fact that (1) Mr Sinclair was a witness in the arbitration, and (2) funded the defence, bore any material weight in the light of his equivocal approach to the arbitration. I accept that the arbitrators (3) found that, as between

MWP and Mr Emmott, the Max shares were held to the order of Mr Sinclair, and (4) that they intended that EPIL would transfer the Max shares to Mr Sinclair in consequence of the award. However, the tribunal did not have jurisdiction to adjudicate on the claims in a way that bound MWP in relation to a non-party; and the fact that the arbitrators gave limited permission for parts of the award to be published to Mr Sinclair is not material. The tribunal did not and could not grant any relief as between MWP and Mr Sinclair or Sokol.

98   Nor am I persuaded that the application was to be resolved by reference to the 'spirit' of the issue estoppel rule, see the Judge's citation from Reichel v. Magrath . In that case the party who sought to strike out the claim (Dr Magrath) was claiming through the College, which had previously succeeded in litigation against Reichel. This is not what occurred in the present case. Mr Sinclair claims that he always had the beneficial interest in the Max shares and did not derive that interest from or through Mr Emmott, as the Judge held when dismissing the argument that he was Mr Emmott's privy. Moreover, and again as the Judge rightly held, there was no mutuality in Mr Sinclair being allowed to rely on the findings favourable to him in the arbitration, since his participation and interest would not have been sufficient to bind him to the arbitrators' findings if they had been adverse. On this basis it is difficult to see how the case fell 'within the spirit' of the issue estoppel rule.

99   Although Teare J considered that it would be manifestly unfair to Mr Emmott for him to have to face MWP's allegations for a second time, it is important to bear in mind that MWP did not sue him and has not sought any relief against him. He is not being vexed twice by MWP. He was joined as a Part 20 defendant at the suit of the Sinclair defendants and is now no longer a party. So far as MWP's claim is concerned, Mr Emmott is no more than a potential witness. I say 'potential' because it was not agreed between the parties to the appeal that Mr Emmott would be called as a witness, what he might say if he were called or how he would respond to questions that he might be asked. These are matters to which I will return later. The Judge appears to have regarded it as material that Mr Emmott 'would, in any event, have been a witness in the proceedings.' Whether or not that is so, the abuse jurisdiction as expressed in Bairstow is concerned with manifest unfairness to a party, not a witness.

100   Finally, Mr Samek is entitled to submit that in saying:

> Circumstances may exist which justify a second opportunity [to make allegations against Mr Emmott] but I am persuaded that they do not exist in this case;

the Judge appears to have reversed the burden of proof. It was not for MWP to identify circumstances which justified bringing the claim but for the Sinclair defendants to identify reasons why doing so was manifestly unfair on a party to the action. The justification for making the allegations again (and against the Sinclair defendants, not Mr Emmott) was that MWP had properly triable claims against the Sinclair defendants in respect of the Max shares and Max funds which it would not otherwise be able to prosecute.

101   In forming this view, I have not overlooked a further argument raised by MWP: a criticism of the Judge's view, expressed at [61], that this was not a case in which MWP was labouring under a disadvantage in the arbitration from which it would be free in the litigation. Mr Samek submitted that there was evidence before the Judge which demonstrated (or raised a serious argument) that there were gaps in the disclosure to MWP in the arbitration which MWP could reasonably expect would be filled in the litigation. This may or may not be so, but, in the light of my conclusions set out above, it is not necessary to express any view about this.

### The admissibility of the award in the litigation

102   This is the question identified in [14] above at (1) (b). Mr Samek submitted that the rule in Hollington v. Hewthorn (see above) would preclude the admission of the award in the present litigation; whilst the Judge considered that Mr Emmott could not be cross-examined by MWP in a way which was inconsistent with the award, on the basis of an issue estoppel. Since this point does not strictly arise at this stage, I would be hesitant to express even a provisional view on these

matters. Much will depend on the shape of the case as it develops, for example, who seeks to rely on the award and for what purpose. It will be for the Commercial Court to determine in due course the issues that arise in relation to the award and how they should be dealt with.

### MWP's costs appeal

103   Finally, I should say something about MWP's cross-appeal. Again, in the light of my view that MWP's appeal on the substantive issue should be allowed and that the case should proceed to trial, it is unnecessary to deal with the point at length.

104   Mr Solomon submitted that because the Sinclair defendants had discontinued their Part 20 claim against Mr Emmott in July 2014, the costs order made by Teare J on 21 September 2012 should be set aside. He relied on the terms of CPR Part 38.6(1) :

> Unless the Court orders otherwise, a claimant who discontinues is liable for the costs which a defendant against whom the claimant discontinued incurred on or before the date on which notice of discontinuance was served on the defendant.

105   He submitted that the effect of this provision is that a default order came into existence by which the Sinclair defendants became liable for all Mr Emmott's costs. He relied on the observations of Pill LJ in Safeway Stores Ltd v. Twigger [2010] EWCA Civ 1472, [2011] 2 All ER 841 at [58], that a discontinuance in such circumstances has the effect of automatically reversing the orders of the court below; and argued that this meant that the Sinclair defendants were disentitled from recovering from MWP any costs for which they were liable to Mr Emmott.

106   There are three problems with this submission. First, the observations of Pill LJ did not arise for decision on the Safeway case, see, for example, Lloyd LJ at [41].

107   Secondly, if it had arisen for decision, it is clear that, although Longmore and Lloyd LJJ acknowledged that discontinuance might have the effect that Pill LJ suggested:

> The formal position must, in my view, be that orders for costs in favour of a claimant before discontinuance remain in effect. They will not be unwound merely because the claimant discontinues.

See, Longmore LJ [33] and Lloyd LJ in agreement at [35].

108   Thirdly, in Dar Al Arkan Real Estate Company v. Al Refai [2015] EWCA 1793 (Comm) Andrew Smith J set out some of the difficulties that would arise if Pill LJ's approach were adopted in the usual case. The reasoning is compelling.

109   Since it is unnecessary to express a concluded view on the matter it is sufficient that I express my strong doubts that MWP would have been entitled as of right to secure the reversing of the order for costs against the Sinclair defendants following a discontinuance of their Part 20 proceedings against Mr Emmott two years after the date of the judgment under appeal and at a time when the appeal appeared not to be proceeding to a hearing.

### Conclusion

110   For the reasons set out above, I would allow MWP's appeal.

The Senior President of Tribunals

111   I agree.

Lord Justice Patten

112   I also agree.

© 2017 Sweet & Maxwell

Crown copyright

2017 WL 11804

**End of Document**                                              © 2017 Thomson Reuters.

# TAB 51

1891
*Jan. 15.*

MONTGOMERIE AND OTHERS *v.* UNITED KINGDOM MUTUAL STEAM-
SHIP ASSOCIATION, LIMITED.

*Insurance—Marine Insurance—Mutual Marine Insurance Association—Action
against Association by Person not a Member.*

The defendants, a mutual insurance association, by a policy of marine insur-
ance in the form of a deed-poll, covenanted with a firm described therein as " a
member," to pay losses upon a steamship. By the terms of the policy, the
members having ships entered were to make good losses on the ship according
to the provisions of the articles of association and the rules, one of which was
an arbitration clause, by which the sum to be paid by the association in respect
of any claim was to be settled by the committee ; and the member, if he agreed
to accept the amount so settled, was to be entitled to payment according to the
mode of payment customary in the association ; and, in case of difference, the
matter in dispute was to be decided by arbitrators to be appointed by the com-
mittee and the member, the obtaining of a decision from whom was to be a
condition precedent to the right of the member to maintain an action on the
policy. The memorandum of association stated that the association was estab-
lished for the "insurance of ships of members, and of ships which the members
may be authorized to insure in their own names." The articles of association
provided that " every person who, on behalf of himself or any other person or
persons, insures or enters for protection any ship . . . shall as from the date of
the commencement of such insurance or protection be deemed to have become
a member of the association ;" and that " all claims in respect of insurance or
protection shall be made and enforced against the association only, and not
against any member thereof ; but the association shall not be liable to any
member or other person for the amount of any loss, claim, or demand except to
the extent to which the association is able to recover from the members or
persons liable for the same." The plaintiffs, who were part-owners of the
steamship insured, brought an action on the policy in their own names against
the defendants to recover a loss on the vessel :—

*Held,* by Wright, J., that the action was not maintainable, as the terms of
the policy expressly excluded liability on the part of the defendants to any
person other than the firm therein described as " a member."

*United Kingdom Mutual Steamship Assurance Association, Limited* v.
*Nevill* (19 Q. B. D. 110) considered.

CASE tried before Wright, J., without a jury. The action was
brought by the plaintiffs, each of whom was owner of a one-
sixty-fourth share in the steamship *William Hartmann,* to recover
an alleged loss under a policy of insurance granted by the
defendants. The facts and arguments sufficiently appear in the
judgment.

1 Q. B.          QUEEN'S BENCH DIVISION.                    371

*Sir C. Russell, Q.C., Barnes, Q.C.,* and *Joseph Walton,* for the
plaintiffs.

*Cohen, Q.C.,* and *James Fox,* for the defendants.

WRIGHT, J.  The action is brought on a policy in the form of
a deed-poll, by which the United Kingdom Mutual Steamship
Assurance Association, Limited, covenant with Perry, Raines &
Co. to pay losses in certain events.  Perry, Raines & Co. are
described as having become a member of the association, and as
having entered for insurance, in Class 1, a steamship, the *William
Hartmann,* and the covenant is in consideration of the premises
and of the observance by the insured of the rules and regula-
tions.  The agreement is, that the members having ships entered
in the class shall, according to the provisions of the articles of
association and the rules endorsed on the policy, and subject to a
proviso, be liable to make good losses upon the ship which may
attach to the policy.  The proviso is: " In accordance with the
articles of association and the rules of the class this policy, and
the other policies of the association and class, are granted on this
condition ; and it is hereby specially agreed that the association
under all their policies of insurance of the said class shall be
liable in the whole only to the extent of so much of the said funds
as the said association is able to recover from the members of the
said class."  The question is, whether the plaintiff Montgomerie
and the other plaintiffs who are not named in the policy as
covenantees are entitled to maintain an action in their own
names against the United Kingdom Mutual Steamship Associa-
tion for the amount of the loss which happened to the *William
Hartmann* in the year 1883.

There is no doubt whatever as to the general rule as regards
an agent, that where a person contracts as agent for a principal
the contract is the contract of the principal, and not that of the
agent; and, primâ facie, at common law the only person who
may sue is the principal, and the only person who can be sued is
the principal.  To that rule there are, of course, many exceptions.
First, the agent may be added as the party to the contract if he
has so contracted, and is appointed as the party to be sued.
Secondly, the principal may be excluded in several other cases.

1891

MONTGOMERIE
*v.*
UNITED
KINGDOM
MUTUAL
STEAMSHIP
ASSOCIATION.

QUEEN'S BENCH DIVISION.                [1891]

1891

MONTGOMERIE
*v.*
UNITED
KINGDOM
MUTUAL
STEAMSHIP
ASSOCIATION.

Wright, J.

He may be excluded if the contract is made by a deed inter partes, to which the principal is no party. In that case, by ancient rule of common law, it does not matter whether the person made a party is or is not an agent. This, however, does not apply here, as this instrument is a deed-poll. Another exception is as regards bills and notes. If a person who is an agent makes himself a party in writing to a bill or note, by the law merchant a principal cannot be added. Another exception is that by usage, which is treated as forming part of the contract or of the law merchant, where there is a foreign principal, generally speaking the agent in England is the party to the contract, and not the foreign principal; but this is subject to certain limitations. Then a principal's liability may be limited, though not excluded. If the other party elects to sue the agent, he cannot afterwards sue the principal. Again, where the principal is an undisclosed principal, he must, if he sues, accept the facts as he finds them at the date of his disclosure, so far as those facts are consistent with reasonable and proper conduct on the part of the other party. Again, if the principal is sued, he is entitled to an allowance for payments which he may have made to his agent if the other party gave credit originally to that agent. Also, and this is very important, in all cases the parties can by their express contract provide that the agent shall be the person liable either concurrently with or to the exclusion of the principal, or that the agent shall be the party to sue either concurrently with or to the exclusion of the principal.

These principles apply to marine insurance with very little modification, the chief modification of which I am aware being with reference to ratification. In matters of insurance, apparently in the interests of the assured, a person may become a principal by ratification although the agent did not insure and did not purport to insure on his behalf expressly or by name, if the agent, in fact, insured on behalf of those who might be interested, though the party was not at that moment ascertained; and a principal on whose behalf an insurance was actually made can ratify the insurance, even though at the time of ratification he knows that the subject of insurance, the vessel, or whatever it may have been, has been lost. I do not know of any other

1 Q. B.          QUEEN'S BENCH DIVISION.                    373

exception; unless it be that a deed-poll in the case of an
insurance can be sued upon not merely by the covenantee or
other person who is named in it, but by the person interested on
whose behalf the insurance was made. Primâ facie, therefore, the
plaintiffs are entitled to sue in this case; but they may be
excluded by the terms of the contract, and the real question is
whether that is the case here.

1891
MONTGOMERIE
<i>v.</i>
UNITED
KINGDOM
MUTUAL
STEAMSHIP
ASSOCIATION.

Wright, J.

Now, it was held in *United Kingdom Mutual Steamship Assur-
ance Association* v. *Nevill* (1), on this very form of contract,
that the principal in this case, the plaintiff Montgomerie, is
excluded from being sued for the premiums, and there appears
to be a presumption that rules of that kind are what may be
shortly described as correlative. If the plaintiff Montgomerie
could not have been sued for the premium, or what is equivalent
to the premium, namely, his contribution to the funds of the
association, there appears to be a presumption that he and his
co-plaintiffs would not be entitled to sue for that which is the
consideration for the contribution, namely, the moneys insured.
As Lord Blackburn said, in the case of the *Elbinger Actien-
Gesellschaft* v. *Claye* (2) : " The right to sue and liability to be
sued upon a contract are reciprocal." He points out certain
exceptions, and afterwards says: " I must say I think that the
two things are correlative. A man cannot make a contract in
such a way as to take the benefit unless also he take the respon-
sibility of it." The question, then, is, Have the parties so con-
tracted that Montgomerie and his co-plaintiffs cannot sue, the
alternative being that the action should have been brought in
the name of Perry, Raines & Co. ? I have come to the conclusion
that the parties have so contracted. I think that the rules an-
nexed to the policy and the articles of association which are incor-
porated with the policy shew plainly that it was the intention of
the parties that the association should look to the member only
for contribution, and should have to deal with and be entitled to
say that they would deal with the member only in respect of the
settlements of losses. Now the member here is, I think, clearly
Perry, Raines & Co. ; and with respect to this particular contract
which was that sued on in *United Kingdom Mutual Steamship*

(1) 19 Q. B. D. 110.          (2) Law Rep. 8 Q. B. 313, at pp. 316, 317.

1891

Montgomerie
*v.*
United
Kingdom
Mutual
Steamship
Association.

·Wright, J.

*Assurance Co.* v. *Nevill* (1), as distinguishable from that discussed in *Great Britain* 100 *A* 1 *Steamship Insurance Association* v. *Wyllie* (2), the rule on which I place particular reliance is the arbitration clause. It was plainly in the contemplation of the parties that all settlements under these policies should be made by arbitration, and when you have to consider who it is that the parties intended should be entitled to sue, it is natural to look to the clause which provides the machinery under which the proceedings against the company are to be taken. The arbitration clause commences as follows: "The sum, if any, to be paid by this club in satisfaction of any claim shall in the first instance be settled by the committee, and the member"—not the party entitled—" if he agree to accept such sum (if any) as may be allowed by the committee in full satisfaction of his claim shall be entitled to demand payment so soon as the amount to be paid has been so ascertained and settled, but not before; and payment shall only be claimed according to the customary mode of payment in use in this club." It then provides that in case of difference the matter in dispute is to be decided by two arbitrators, one appointed by the committee, and the other by the member making the claim; and these words follow: "Provided always, and it is hereby expressly agreed, that no action shall be commenced, or other proceedings taken in any court or tribunal for recovery of any claim or demand under or by virtue of a ·policy in this club, unless and until the amount thereof in dispute has been decided by arbitration; and the obtaining such decision is hereby declared to be a condition precedent to the right of any member to maintain any such action or other proceeding." The clause has not been insisted upon as an answer to the action. I refer to it as shewing who it is that the parties thought was the proper person to deal with the association.

I now turn to the articles of association which are incorporated into the contract. But it may not be altogether immaterial to observe that the memorandum of association speaks only of "insurance of the ships of members and of ships which members may be authorized to insure in their own names." This leads to the

(1) 19 Q. B. D. 110.                        (2) 22 Q. B. D. 710.

1 Q. B.          QUEEN'S BENCH DIVISION.          375

inference that the distinction was present to the mind of the
framer of that document. Though a member may insure on behalf
of some one else it is the member, and not the person on whose
behalf he insures, that is intended to be insured by the association.
As regards the articles of association, by the interpretation clause
" member " means member of the association. By the 3rd
article of association " the association shall consist of the several
persons who shall for the time being be insured or protected or
shall have entered or agreed to enter ships for insurance or pro-
tection." Primâ facie that would seem to provide that everyone
who had his interest protected by a policy should be in some
sense a member of the association. But this is followed by
the 4th article, " Definition of members. Every person who on
behalf of himself or any other person or persons insures or enters
for protection any ship or ships, or share or shares of a ship in
the association, shall as from the date of the commencement of
such insurance or protection be deemed to have become a
member of the association." It appears to me that this is an
express provision that those persons only are to be deemed to be
members who have on behalf of themselves or any one else in-
sured or entered for protection any ship or ships. By the 40th
article : " Every engagement or liability of a member of the
association in respect of any insurance or protection shall for all
the purposes relative to enforcing such engagement or liability
be deemed to be an engagement or liability by or on the part
of such member to the association and not to any other member
or members, and all moneys payable thereunder shall be paid to
the association." By the 41st article : " All claims in respect of
insurance or protection shall be made and enforced against the
association only and not against any members thereof ; but "—
now come the words which at first sight appear to me to suggest
a different construction—" the association shall not be liable to
any member or other person for the amount of any loss, claim,
or demand except to the extent of the funds which the associa-
tion is able to recover from the members or persons liable for the
same, and which are applicable to that purpose." But although
primâ facie " member or other person " would mean member or
other person interested, it appears to me to be consistent with

1891

MONTGOMERIE
*v.*
UNITED
KINGDOM
MUTUAL
STEAMSHIP
ASSOCIATION.

Wright, J.

1891

MONTGOMERIE
*v.*
UNITED
KINGDOM
MUTUAL
STEAMSHIP
ASSOCIATION.

Wright, J.

the clause that the words "liable to any member or other per-
son" point to liability to the "other person" through the hands
of the member; and it is material to observe that in *United
Kingdom Mutual Steamship Association* v. *Nevill* (1), Fry, L.J.,
expressly deals with these words, and, after considering the terms
of the policy, points out that in his judgment the words "mem-
ber or other person" mean member or person succeeding to or
representing a member in the same way as personal representa-
tives or a trustee in bankruptcy.

I need only now refer briefly to the judgments in that case.
Lord Esher, M.R., says (2): "I think that in the case of such a
contract as this under seal it is not allowable to go behind the
instrument to make undisclosed principals responsible because
they are not parties and have not attached their seals to the
contract under seal." I do not think, however, that this con-
sideration is the ground of his decision. In this case if there
had been a deed inter partes it would have been an answer at
once that Montgomerie and his co-plaintiffs were not parties to
the deed. Lord Esher, M.R., also says (3): "The association
can only sue the member as an assured for what is equivalent to
the premium. It seems to follow that if they cannot sue him as
an insurer, neither can they sue the person alleged to be his un-
disclosed principal as an insurer. If such person can be sued at
all it must be as an assured for what is equivalent to the pre-
mium. But can he be so sued?" He goes on to give judgment
to the effect that the principal corresponding to Montgomerie
and the other co-plaintiffs in this case could not be sued for con-
tributions, and then he says: "I do not think that he is a party
to the contract as an undisclosed principal, although he may be
a cestui que trust in respect of the proceeds the member may
receive. Not being a party, he cannot sue or be sued on the
contract." The only point for decision in that case was whether
he could be sued; but the Master of the Rolls does in terms say
that he cannot sue. Fry, L.J., appears to take the same view,
though I cannot find that either he or Lopes, L.J., actually
express an opinion on that particular point. But Fry, L.J., does

(1) 19 Q. B. D. 110, at p. 119.         (2) At pp. 115, 116.
(3) At p. 116.

1 Q. B.                QUEEN'S BENCH DIVISION.                    377

deal expressly with the words, "member or other person," in
article 41 in the manner which I have mentioned.

In the case of *Great Britain A 1 Steamship Insurance Association*
v. *Wyllie* (1), and in the case before Mathew, J., of *Ocean Iron
Steamship Assurance Association* v. *Leslie*, which is reported in the
note to that case, the question arose upon a Lloyd's policy, which
is a totally different form of policy to the deed in this case, and
a different conclusion was arrived at.   In these cases the decision
in *United Kingdom Mutual Steamship Assurance Association, Limited*
v. *Nevill* (2), was expressly stated to be entirely consistent with
the decision in *Great Britain A 1 Steamship Insurance Association* v.
*Wyllie* (1), and the decision in the former case was put by the
Court of Appeal in the latter case, and by Mathew, J., in *Ocean
Iron Steamship Assurance Association* v. *Leslie* (1), on the ground
that the association had contracted themselves out of the right
to sue Nevill, who, but for the express contract, would have
been liable to be sued for his contribution under the general
rule of law, as it was held in these cases that Wyllie and Leslie
could be sued for theirs.

For these reasons I think that the action cannot be maintained
by Montgomerie and the co-plaintiffs against the defendants, and
that the defendants are therefore entitled to judgment.

*Judgment for the defendants.*

Solicitors for plaintiffs: *Stokes, Saunders, & Stokes.*
Solicitors for defendants: *Parker, Garrett, & Parker.*

1891
<br>
MONTGOMERIE
*v.*
UNITED
KINGDOM
MUTUAL
STEAMSHIP
ASSOCIATION.

Wright, J.

(1) 22 Q. B. D. 710.          (2) 19 Q. B. D. 110.

H. D. W.

# TAB 52

**Moore Stephens (a firm) v. Stone
Rolls Limited (in liquidation**
House of Lords
30 July 2009

**SESSION 2008-09 [2009] UKHL 39,
on appeal from:[2008] EWCA Civ 644**

**2009 WL 2207450**

Appellate Committee Lord Phillips of Worth Matravers
Lord Scott of Foscote Lord Walker of Gestingthorpe
Lord Brown of Eaton-under-Heywood Lord Mance
Thursday 30 July 2009

**Analysis**

Opinions of the Lords of Appeal for Judgment in the
Cause

Hearing dates: 10-12 February 2009

**Representation**

•Appellant: Michael Brindle QC Mark Simpson QC
David Murray (Instructed by Norton Rose LLP ).
•Respondent: QC Jonathan Sumption QC Tom
Adam QC (Instructed by Barlow Lyde & Gilbert
LLP ).

**Judgment**
Lord Phillips of Worth Matravers

My Lords,

**Introduction**

1   Mr Stojevic is a fraudster. He used the appellant
company, ("S&R") as a vehicle for defrauding banks.
The fraud was discovered and both S&R and Mr
Stojevic were successfully sued for deceit by the
principal victim, Komercni Bank SA ("the Bank").

The respondent, Moore Stephens, were S&R's auditors.
Moore Stephens accept that they owed S&R a duty
to exercise reasonable skill and care in carrying out
their duties as auditors. For purposes of the present
argument they also accept that they were in breach
of that duty and that, but for their breach, the fraud
that Mr Stojevic was perpetrating through S&R would
have ended earlier. In this action S&R seek to recover
losses caused to them in consequence of the extension
of the period of their fraudulent activity that they
submit was caused by Moore Stephens' breach of duty.
Moore Stephens contend that this claim cannot succeed
because it is founded on S&R's fraud and is met by
the defence commonly described by the Latin maxim
" *ex turpi causa non oritur actio* " (" *ex turpi causa* ").
Whether *ex turpi causa* provides a defence to the claim
advanced by S&R is the preliminary issue raised by this
appeal.

2   Although he was a 'shadow director' acting under
power of attorney and the shares in S&R are held in the
name of a family trust it has been common ground that
Mr Stojevic was the sole directing mind and will and the
beneficial owner of S&R.

3   I have had the benefit of reading in draft the opinion
of each of your Lordships. Each has summarised the
nature of the fraud perpetrated by Mr Stojevic through
S&R. It involved S&R obtaining payments under letters
of credit by presenting to banks false documents in
relation to fictitious commodity trading. My noble and
learned friend Lord Mance has explained in a little
more detail how the fraud worked. When the fraud was
ultimately discovered, the monies fraudulently obtained
by S&R had all been paid away to other participants in
the fraud. The damages awarded to the Bank against
S&R and Mr Stojevic exceed $94 million. Neither
defendant could satisfy the judgment. The liquidators
have started the present action in the name of S&R in
an attempt to recover damages for the benefit of S&R's
creditors, who are the banks defrauded by S&R. The
claim for breach of Moore Stephens duty of care is
brought in both contract and tort.

4   Mr Stojevic had planned to use S&R to perpetrate
this fraud before Moore Stephens were engaged, indeed
the engagement of Moore Stephens was part of his
plot. S&R, which was not at the material time carrying
on any significant business, had an auditor who was

WESTLAW   © 2017 Thomson Reuters.                                                          1

a sole practitioner based in Rotherhithe. Mr Stojevic decided to replace him with Moore Stephens as part of a strategy to make S&R appear respectable in the eyes of European Banks. In persuading Moore Stephens to become S&R's auditors, Mr Stojevic gave a fictitious account of the business that S&R had been doing and of the business whose accounts Moore Stephens would be auditing.

5   My initial reaction to S&R's claim was that, as a matter of common sense, it could not succeed. There were three reasons for this reaction. The first was that S&R are seeking to put themselves forward as the victims of fraud when they were, in fact, the perpetrators of the fraud. The true victims of the fraud were the banks. True it is that S&R are now subject to a paper liability to the Komercni Bank of over $94m, but common sense would suggest that this is not really a loss that they have suffered. They started with nothing and their alleged losses are sums that they acquired by fraud and then paid away as part of the same fraudulent transaction. If a person starts with nothing and never legitimately acquires anything he cannot realistically be said to have suffered any loss. This was the reasoning of Mummery LJ who, in a short judgment in the Court of Appeal, agreed with Rimer LJ that the claim of S&R should be struck out. Keene LJ agreed with both judgments. Mummery LJ concluded his judgment:

> "119.  Does common sense matter? Yes. It is contrary to all common sense to uphold a claim that would confer direct or indirect benefits on the corporate vehicle, which was used to commit the fraud and was not the victim of it, and the fraudulent driver of the fraudulent vehicle".

The second reason why common sense led me, initially, to consider that S&R's claim should not succeed was that Moore Stephens were also the victims of S&R's fraud. They were induced to agree to act as S&R's auditors by a fictitious and fraudulent account of S&R's business, given to them on behalf of the company by Mr Stojevic, and they were deceived in carrying out their audits by accounts fraudulently prepared on behalf of

the company, albeit that it is for present purposes to be assumed that they were negligent in not detecting the fraud. It does not seem just that, in these circumstances, S&R should be able to bring a claim in respect of the very conduct that S&R had set about inducing. The final reason of common sense that predisposed me against this claim was one which would not, unlike the other two, occur to the man in the street but might occur to a student with knowledge of the principles of the law of negligence. Looking at the realities, this claim is brought for the benefit of banks defrauded by S&R on the ground that Moore Stephens should have prevented S&R from perpetrating the frauds. Why, if this is a legitimate objective, should the banks not have a direct cause of action in negligence against Moore Stephens? One answer, I would suggest, is that a duty of care in negligence will only arise where this is fair, just and reasonable. It would not be considered fair, just and reasonable for auditors of a company to owe a duty of care to an indeterminate class of potential victims in respect of unlimited losses that they might sustain as a result of the fraud of the company. If it would not be fair, just and reasonable for the banks to have a direct claim, then it would not seem fair just and reasonable that they should achieve the same result through a claim brought by the company's liquidators for their benefit. In a lecture to the Chancery Bar Association entitled "Common Sense and Causing Loss" given on 15 June 1999 Lord Hoffmann commented adversely on the practice of those judges who justify their decisions by reference to "common sense". He suggested that this was far too often an unsatisfactory alternative to the identification of the relevant principles. The differences of opinion between the members of the committee underline the need to identify the relevant principles that apply in this case. It also underlines the difficulty of that task. The first step is to identify the issues raised by the parties.

### The issues raised by the parties

6   This appeal arises out of a strike-out application in which only one of a number of possible defences to the claim is advanced. Mr Sumption QC for Moore Stephens has admitted that his clients owed S&R a duty to exercise reasonable care in relation to the auditing of S&R's accounts and, for the purpose of these proceedings, that they were in breach of that duty. He submits, however, that S&R are precluded from

Stone & Rolls Ltd (In Liquidation) v Moore Stephens (A Firm), 2009 WL 2207450 (2009)

claiming a remedy for that breach of duty by a defence of public policy, namely *ex turpi causa* . He submits that the nature and extent of this defence has been definitively determined by the decision of this House in [Tinsley v Milligan [1994] 1 AC 340](#) . It involves the application of what he has described as a " *reliance* " test. A claimant cannot succeed if, in order to make good his claim, he has to aver and rely upon his own illegal conduct. This principle, so he submits, is not based as it was once thought to be upon a disinclination by the courts to award a remedy in circumstances where this would be "an affront to the public conscience". It is simply a principle that the court will not allow its process to be used to further an object which is, on its face, illegal. The principle applies automatically and inflexibly. The "effect of illegality is not substantive but procedural" - Tinsley v Milligan at p. 374. To apply the test you have to do no more than consider the essential averments of the particulars of claim. Mr Sumption submits that in Tinsley v Milligan this House reduced *ex turpi causa* to "the narrowest possible test for the public policy defence short of actually discarding it".

7 Mr Sumption submits that the best explanation of the reason for the *ex turpi causa* defence is that suggested by McLachlin J in Hall v Hebert (1993) 101 DLR (4th) 129 , at p.165:

> "…to allow recovery in these cases would be to allow recovery for what is illegal. It would put the courts in the position of saying that the same conduct is both legal, in the sense of being capable of rectification by the court, and illegal. It would, in short, introduce an inconsistency in the law. It is particularly important in this context that we bear in mind that the law must aspire to be a unified institution, the parts of which - contract, tort, the criminal law - must be in essential harmony. For the courts to punish conduct with the one hand while rewarding it with the other, would be to 'create an intolerable fissure in the law's conceptually seamless web': Weinrib - "Illegality as a Tort Defence" (1976) 26 U.T.L.J.28 at p.

42. We thus see that the concern, put at its most fundamental, is with the integrity of the legal system".

8 Mr Sumption has accepted that the "reliance" test is subject to one important qualification. The unlawful conduct relied on must be that of the claimant himself, not conduct for which he is vicariously liable or which is otherwise attributed to him under principles of the law of agency.

9 The first answer to Mr Sumption's case advanced on behalf of S&R by Mr Brindle QC founds on that qualification. He submits that S&R's liability to the banks for Mr Stojevic's fraud is vicarious. The second answer is that, whether the first answer is right or wrong, for the purposes of the application of *ex turpi causa* , Mr Stojevic's fraud cannot be attributed to S&R. In support of this submission Mr Brindle relies (i) on a principle of the law of agency known as the Hampshire Land principle after the decision in [In re Hampshire Land Company [1896] 2 Ch 743](#) , and (ii) on the principles governing the attribution of actions and states of mind to companies identified in the speech of Lord Hoffmann in [Meridian Global Funds Management Asia Ltd v Securities Commission [1995] 2 AC 500](#) .

10 Both Mr Brindle's first and second answers proceed on the premise that Mr Sumption's "reliance" test is correctly formulated. They accept that the reliance test applies to the facts of this case and that, in applying it, a company has to be treated in the same way as a natural person. He has, however, an alternative and more fundamental answer to Mr Sumption. He submits that *ex turpi causa* does not provide a defence where the claimant's illegal conduct was *the very thing* that the defendant was under a duty to prevent. Here again he founds his argument on jurisprudence that relates to natural persons.

11 Finally, and very much as a fall-back position, Mr Brindle submits that *ex turpi causa* applies only where this is "fair, just and reasonable" and that it is not fair, just and reasonable that the defence should apply in the circumstances that have given rise to this appeal.

12  The debate between the parties has largely centred on the nature and effect of the Hampshire Land principle. Mr Sumption summarised this principle as follows in oral argument:

> "There is not to be imputed to a company a fraud which is being practised against it even if it is being practised by someone whose acts and state of mind in the ordinary way are attributed to the company."

Mr Sumption submits that this principle does not prevent attribution to S&R of Mr Stojevic's fraud which was directed not against S&R but against the banks.

13 Mr Brindle does not accept that the Hampshire Land principle is as narrow as this. He submits that it also applies in respect of fraud on the part of an agent of the company that is directed against a third party in as much as the fraud is likely ultimately to come home to roost with consequent detriment to the company. Thus the company is a secondary victim of the fraud. That is precisely what has happened in this case, for S&R has been held liable for Mr Stojevic's fraud.

14  Mr Sumption has a fall back position that meets this argument. It turns on the fact that Mr Stojevic was, in effect, the sole shareholder in S&R and also solely responsible for S&R's activities. Mr Sumption submits that where there is no human embodiment of the company other than the fraudster, attribution of the fraud to the company is inevitable.

**The decisions of the Courts below**

15  Both Langley J at first instance and the Court of Appeal accepted that the relevant issues were those that I have just described. Langley J rejected the first two answers advanced by Mr Brindle to *ex turpi causa* . He held that S&R were primarily, and not just vicariously, responsible for the fraudulent conduct and that the Hampshire Land principle did not apply. Mr Stojevic's fraud was properly attributed to S&R. He accepted, however, Mr Brindle's third answer. He held that *ex*

*turpi causa* could not prevent a claim founded on fraud that would not have occurred had Moore Stephens properly complied with their "very duty" as auditors of the company.

16  Rimer LJ, in giving the leading judgment in the Court of Appeal, agreed that Hampshire Land did not apply, but for a different reason. He held that the critical question was whether it was right to treat S&R as the villain or the victim. In the former case the fraud would be attributed to S&R; in the latter case it would not. He held that S&R was the villain and not the victim, Hampshire Land did not apply and *ex turpi causa* was a defence to S&R's claim. Thus he accepted Mr Sumption's definition of Hampshire Land and rejected Mr Brindle's wider definition.

17  Rimer LJ rejected Mr Brindle's argument based on the principle that he described as "the very thing". He accepted Mr Sumption's submission that this was a principle that related to causation and that it did not displace the operation of the defence of *ex turpi causa* .

**A Summary of my conclusions**

18  In order to assist in following this lengthy opinion I propose at this stage to summarise my conclusions:

- • 1) Under the principle of *ex turpi causa* the court will not assist a claimant to recover compensation for the consequences of his own illegal conduct.
- • 2) This appeal raises the question of whether, and if so how, that principle applies to a claim by a company against those whose breach of duty has caused or permitted the company to commit fraud that has resulted in detriment to the company.
- • 3) The answer to this question is not to be found by the application of Hampshire Land or any similar principle of attribution. The essential issue is whether, in applying *ex turpi causa* in such circumstances, one should look behind the company at those whose interests the relevant duty is intended to protect.
- • 4) While in principle it would be attractive to adopt such a course, there are difficulties in the way of doing so to which no clear resolution has been demonstrated.
- • 5) On the extreme facts of this case it is not necessary to attempt to resolve those difficulties.

Those for whose benefit the claim is brought fall outside the scope of any duty owed by Moore Stephens. The sole person for whose benefit such duty was owed, being Mr Stojevic who owned and ran the company, was responsible for the fraud.

• 6) In these circumstances *ex turpi causa* provides a defence to the claim.

## The duties of auditors

19   I agree with my noble and learned friend Lord Mance that the starting point for considering the issues raised by this appeal is the duties undertaken by Moore Stephens as auditors. I am grateful for his detailed and helpful analysis. I would summarise the position as follows. The leading authority is Caparo Industries Plc v Dickman [1990] 2 AC 603 . The duties of an auditor are founded in contract and the extent of the duties undertaken by contract must be interpreted in the light of the relevant statutory provisions and the relevant Auditing Standards. The duties are duties of reasonable care in carrying out the audit of the company's accounts. They are owed to the company in the interests of its shareholders. No duty is owed directly to the individual shareholders. This is because the shareholders' interests are protected by the duty owed to the company. No duty is owed to creditors - Al Saudi Banque v Clarke Pixley [1990] Ch 313 . The Auditing Standards require auditors who have reason to suspect that the directors of a company are behaving fraudulently to draw this to the attention of the proper authority. The scope of the duty of care owed by auditors is a matter to which I shall return later in this opinion. For present purposes it suffices to note that the duty is unquestionably imposed in the interests of, at least, the shareholders of the company.

## Ex turpi causa

20   *Ex turpi causa* is a principle that prevents a claimant from using the court to obtain benefits from his own illegal conduct. In the years immediately before the decision in Tinsley v Milligan the courts had developed a flexible approach to the defence of illegality, applying the test of whether, having regard to the illegality involved in the case, it would "shock the public conscience" to afford the claimant the relief

sought. This test has been said to have originated from the judgment of Hutchison J in Thackwell v Barclays Bank plc [1986] 1 All ER 676 although reference to shocking the public conscience can be traced back at least to the judgment of Salmon LJ in Gray v Barr [1971] 2 QB 554 at p. 581. Tinsley v Milligan involved a dispute between two single women as to title to a house. The house had been purchased with their joint funds, but put into the sole name of the appellant. The reason for this was to facilitate fraudulent claims by the respondent on the Department of Social Services. The respondent claimed that, as the property had been bought with joint funds it was held on a resulting trust under which she had an equitable interest. The appellant contended that the respondent was precluded from asserting her claim because of the illegal purpose of the arrangement. The Court of Appeal, by a majority, had found in favour of the respondent, applying a test of whether, having regard to the illegality, it would be "an affront to the public conscience" to grant the relief sought. This House was in agreement that this was not the correct test. There was not, however, unanimity as to the correct approach to illegality. Lord Keith of Kinkel and Lord Goff of Chieveley would have allowed the appeal on the basis that the respondent was not entitled to equitable relief because the effect of the illegality was that she did not come to the court with "clean hands". The reasoning of the majority appears from the following passages of the speech of Lord Browne-Wilkinson at pp. 369, 375 and 377:

> "… it is now clearly established that at law (as opposed to in equity), property in goods or land can pass under, or pursuant to, such a contract. If so, the rights of the owner of the legal title thereby acquired will be enforced, provided that the plaintiff can establish such title without pleading or leading evidence of the illegality…

> … A party to an illegality can recover by virtue of a legal or equitable property interest if, but only if, he can establish his title without relying on his own illegality.

…

…In a case where the plaintiff is not seeking to enforce an unlawful contract but founds his case on collateral rights acquired under the contract (such as a right of property) the court is neither bound nor entitled to reject the claim unless the illegality of necessity forms part of the plaintiff's case."

21  The House in Tinsley v Milligan did not lay down a universal test of *ex turpi causa* . It was dealing with the effect of illegality on title to property. It established the general principle that, once title has passed, it cannot be attacked on the basis that it passed pursuant to an illegal transaction. If the title can be asserted without reliance on the illegality, the defendant cannot rely on the illegality to defeat the title. This principle had been applied in the case of personalty in Bowmakers Ltd v Barnet Instruments Ltd [1945] KB 65 . The House held that it also applied in the case of both legal and equitable title to realty. The House did not hold that illegality will never bar a claim if the claim can be advanced without reliance on it. On the contrary, the House made it plain that where the claim is to enforce a contract the claim will be defeated if the defendant shows that the contract was for an illegal purpose, even though the claimant does not assert the illegal purpose in making the claim - see Alexander v Rayson [1936] 1 KB 169 , approved by Lord Browne-Wilkinson at p. 370.

22    Hewison v Meridian Shipping Services Pte Ltd [2002] EWCA Civ 1821; [2003] PIQR P252 illustrates another situation in which *ex turpi causa* defeated a claim albeit that the illegality was not asserted by the claimant.

23    In Cross v Kirkby (CA 18.2.2000) Beldam LJ remarked:

"I do not believe that there is any general principle that the claimant

must either plead, give evidence of or rely on his own illegality for the principle to apply. Such a technical approach is entirely absent from Lord Mansfield's exposition of the principle"

I agree with that observation.

24   In Tinsley v Milligan the *ex turpi causa* defence failed because the respondent did not need to plead the illegal agreement in order to establish her equitable title. Mr Sumption relies on the decision as establishing a general principle that is the converse of that applied by the majority of the House. This is that if the claimant has to rely on his own illegality to establish his claim the courts will *never* entertain the claim ("the reliance test"). I have already noted that Mr Sumption advanced one qualification to this rule - it only applies where the illegality is personal to the claimant, not vicarious. In the course of argument when dealing with United Project Consultants Pte Ltd. v Leong Kwok Onn [2005] SGCA 38; [2005] 4 SLR 214 he accepted another qualification. The illegality must involve turpitude. The defence may not apply where the claimant's illegality consists of an offence of strict liability of which he is unaware. Those, as I shall shortly show, are valid qualifications to the defence of *ex turpi causa* in the context in which it is raised on this appeal. They are not, however, of general application to the defence of *ex turpi causa* .

25    Although Tinsley v Milligan does not establish a general rule that if a claimant founds his claim on his own illegal conduct, the defence of *ex turpi causa* will apply, earlier cases support this principle: Marles v Philip Trant & Sons Ltd [1954] 1 QB 29 ; Archbolds (Freightage) Ltd v S. Spanglett Ltd [1961] 1 QB 374 . I do not believe, however, that it is right to proceed on the basis that the reliance test can automatically be applied as a rule of thumb. It is necessary to give consideration to the policy underlying *ex turpi causa* in order to decide whether this defence is bound to defeat S&R's claim. As Lord Hoffmann recently remarked in Gray v Thames Trains Ltd [2009] UKHL 33; [2009] 3 WLR 167 at para 30:

"The maxim *ex turpi causa* expresses not so much a principle as a policy. Furthermore, that policy is not based upon a single justification but on a group of reasons, which vary in different situations".

### The underlying policy

26  The policy underlying *ex turpi causa* was explained by Lord Mansfield in 1775 in Holman v Johnson 1 Cowp. 341, 343; 98 ER 1120 , 1121:

"The objection, that a contract is immoral or illegal as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed; but it is founded in general principles of policy, which the defendant has the advantage of, contrary to the real justice as between him and the plaintiff, by accident, if I may so say. The principle of public policy is this; ex dolo malo non oritur actio. No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act. If, from the plaintiff's own stating or otherwise, the cause of action appears to arise ex turpi causâ, or the transgression of a positive law of this country, there the court says he has no right to be assisted. It is upon that ground the court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff. So if the plaintiff and defendant were to change sides, and the defendant was to bring his action against the plaintiff, the latter would then have the advantage of it;

for where both are equally in fault, potior est conditio defendentis.

The policy can be subdivided into two principles in relation to contractual obligations:

(i)  The court will not enforce a contract which is expressly or impliedly forbidden by statute or that is entered into with the intention of committing an illegal act.

(ii)  The court will not assist a claimant to recover a benefit from his own wrongdoing. This extends to claims for compensation or an indemnity in respect of the adverse consequences of the wrongdoing - see Beresford v Royal Insurance Co Ltd [1938] AC 586 .

It is the second principle that is in play on this appeal.

### Qualifications to the second principle

27  The two qualifications recognised by Mr Sumption apply in respect of the second, but not the first principle. Thus they apply to the type of claim with which your Lordships are concerned. S&R are not seeking to enforce an illegal agreement. They are seeking compensation for the adverse consequences of having engaged in unlawful conduct. A number of authorities to which we have been referred support Mr Sumption's acceptance that in these circumstances the defence of *ex turpi causa* will only apply where the claimant was personally at fault and thus where his responsibility for wrongdoing was primary rather than vicarious: Burrows v Rhodes and Jameson [1899] 1 QB 816 ; Hardy v Motor Insurers' Bureau [1964] 2 QB 745 at p.760; Lancashire County Council v Municipal Mutual Insurance Ltd [1997] QB 897 at p. 908; United Project Consultants Pte Ltd v Leong Kwok Onn [2005] 4 SLR 214 . Furthermore, there has never been any suggestion that it is contrary to public policy for a company to

insure against liabilities that it may vicariously incur as a consequence of the wrongdoings of its agents. Arab Bank plc v Zurich Insurance Co [1999] 1 Lloyd's Rep 262 was such a case.

28  Thus Mr Sumption is correct to accept that, in the context of a claim for compensation for the adverse consequences of wrong-doing, *ex turpi causa* applies where the wrongdoing is personal, or primary, but not where it is vicarious.

### The Consequences of Moore Stephens' primary case

29  The consequences of Moore Stephens' primary case are best considered in a case where the facts are not as extreme as those with which your Lordships are concerned. Assume that a company carries on legitimate business, owns legitimate assets and has shareholders who are not complicit in the conduct of the man who runs the company, "the directing mind and will" of the company. Assume that the directing mind and will, in breach of his duties to the company, involves the company in fraudulent trading and that this causes the company to sustain losses. On Moore Stephens' primary case, as Mr Sumption accepted, a claim for damages for misfeasance against the directing mind and will would be defeated by the defence of *ex turpi causa* on the ground that the directing mind and will's turpitude was attributed to the company.

30  Assume that the auditors of the company had negligently failed to identify the fact that the directing mind and will was acting fraudulently, with the consequence that his fraud was permitted to continue. The company's claim against the auditors for the benefit of its shareholders, whose interests the auditors should have protected, would be barred by the very wrongdoing that the auditors' negligence had permitted to occur.

31  Mr Brindle would avoid these consequences in one of two ways. First he says that the fraud of the directing mind and will does not fall to be treated as the fraud of the company for the purposes of *ex turpi causa* . This is because where the company becomes a victim of the fraud, although the fraud is directed at a third party, the Hampshire Land principle prevents the fraud from being attributed to the company. Alternatively he argues that where the fraud is "the very thing" that the

defendant was under a duty to prevent, *ex turpi causa* does not apply at all.

### The opinions of the Committee

32  My noble and learned friends Lord Walker of Gestingthorpe and Lord Brown of Eaton-under-Heywood have not adopted the reasoning of Rimer LJ in finding in favour of Moore Stephens. They have based their decisions on Mr Sumption's fall back position. Each has held that Hampshire Land does not apply, that Mr Stojevic's fraudulent conduct is to be treated as the conduct of S&R and that *ex turpi causa* defeats S&R's claim. In doing so, however, their Lordships have restricted their reasoning to the situation where the directing mind and will of the company is also its owner. This leaves open the question of whether *ex turpi causa* will bar a claim by a company with independent shareholders where those shareholders have been unaware that the directing mind and will of the company has been involving the company in fraud.

33  My noble and learned friend Lord Scott of Foscote considers that Mr Stojevic's fraud would not be attributed to S&R so as to bar a claim by S&R against Mr Stojevic. This is because his fraud constituted a breach of the duty that he owed to S&R as an officer of the company. Lord Scott applies the same reasoning to the claim that is brought against Moore Stephens. They too, as auditors, owed duties as officers of S&R and the claim brought by S&R is for breach of those duties. In these circumstances, Mr Stojevic's fraud should not be attributed to S&R. This result is not reached by the application of Hampshire Land on the facts of this case. Rather, so it seems to me, Lord Scott accepts the force of "the very thing" argument, at least where the very thing relates to a duty imposed on the defendant as an officer of the claimant company.

34  Lord Mance starts by considering what the position would have been as between S&R and Mr Stojevic if the latter had not been the sole shareholder in S&R. He concludes that if S&R had sued Mr Stojevic *ex turpi causa* would not have applied as there would be no question of Mr Stojevic benefiting from his own wrong and it would be nonsensical to attribute his wrong to the company in such circumstances. He also considers that Hampshire Land would apply in that situation, because

S&R had to be considered as a separate legal entity from Mr Stojevic and Mr Stojevic's conduct could properly be characterised as a fraud on S&R.

35  Lord Mance next turns to consider whether the position is affected by the fact that Mr Stojevic was sole shareholder in S&R. He concludes that had S&R been solvent there might have been difficulty in establishing any claim against Mr Stojevic. As, however, it was insolvent, Mr Stojevic was in breach of duty in failing to have regard to the interests of the creditors. S&R would have been able to sue him for breach of this duty and *ex turpi causa* could not be relied upon as a defence.

36  Lord Mance then considers whether S&R could have claimed against Moore Stephens if S&R had had independent shareholders rather than Mr Stojevic. Applying similar reasoning Lord Mance concludes that *ex turpi causa* could not defeat a claim against Moore Stephens for failing to detect the very fraud that was asserted by way of that defence.

37  Does it make a difference that Mr Stojevic was the sole shareholder in the company? Had S&R been solvent Moore Stephens would not have committed any actionable breach of duty in failing to draw the attention of the owner of the company to his own fraud. Lord Mance concludes that the critical factor is that S&R was insolvent. Just as Mr Stojevic was in breach of his duty to have regard to the interests of the creditors, so the auditors' duty to the company extended beyond the interests of the shareholders to the interests of the creditors. *Ex turpi causa* affords no defence to breach of this duty.

38  Having summarised the conclusions reached by your Lordships I turn to consider the topic that has formed the central bone of contention between the parties, namely the application of the Hampshire Land principle.

### Attribution and Hampshire Land

### Attribution

39  The principles governing the attribution of conduct and states of mind to companies have been helpfully analysed by Lord Hoffmann in Meridian Global Funds Management Asia Ltd v Securities Commission [1995] 2 AC 500, an appeal to the Privy Council from New Zealand . The appellant company, Meridian, was an investment management company. Its chief investment manager and senior portfolio manager had acquired shares for the company without the knowledge of the managing director or the board of the company. The company was under a statutory obligation to give notice of this acquisition, but failed to do so. It appears to have been common ground that the company was only in breach of this obligation if it had knowledge of the acquisition in question. The issue was whether the company had the requisite knowledge.

40  At p. 506 Lord Hoffmann first dealt with what he described as the "primary rules of attribution" of acts of a company, namely those set out in the articles of association of the company or implied by company law. He then referred to the application to a company of the "general rules of attribution" that apply equally in the case of natural persons, such as principles of agency, estoppel, ostensible authority in contract or vicarious liability in tort.

41  At p. 507 Lord Hoffmann commented:

> "The company's primary rules of attribution together with the general principles of agency, vicarious liability and so forth are usually sufficient to enable one to determine its rights and obligations. In exceptional cases, however, they will not provide an answer. This will be the case when a rule of law, either expressly or by implication, excludes attribution on the basis of the general principles of agency or vicarious liability. For example, a rule may be stated in language primarily applicable to a natural person and require some act or state of mind on the part of that person 'himself', as opposed to his servants or agents. This is generally true of rules of the criminal law, which ordinarily impose liability only for the actus reus and mens rea of the defendant himself. How is such a rule to be applied to a company?

Stone & Rolls Ltd (in Liquidation) V Moore Stephens (A Firm), 2009 WL 2207450 (2009)

One possibility is that the court may come to the conclusion that the rule was not intended to apply to companies at all; for example, a law which created an offence for which the only penalty was community service. Another possibility is that the court might interpret the law as meaning that it could apply to a company only on the basis of its primary rules of attribution, i.e. if the act giving rise to liability was specifically authorised by a resolution of the board or an unanimous agreement of the shareholders. But there will be many cases in which neither of these solutions is satisfactory; in which the court considers that the law was intended to apply to companies and that, although it excluded ordinary vicarious liability, insistence on the primary rules of attribution would in practice defeat that intention. In such a case, the court must fashion a special rule of attribution for the particular substantive rule. This is always a matter of interpretation: given that it was intended to apply to a company, how was it intended to apply? Whose act (or knowledge, or state of mind) was *for this purpose* intended to count as the act etc of the company? One finds the answer to this question by applying the usual canons of interpretation, taking into account the language of the rule (if it is a statute) and its content and policy.”

42   While initially Lord Hoffmann had spoken of attribution of *acts* here he spoke of attribution of an *act or knowledge or a state of mind* . Normally the attribution of an act will carry with it the attribution of

knowledge of the act, but this is not necessarily the case as Lord Hoffmann made plain at p. 511:

> “But their Lordships would wish to guard themselves against being understood to mean that whenever a servant of a company has authority to do an act on its behalf, knowledge of that act will for all purposes be attributed to the company. It is a question of construction in each case as to whether the particular rule requires that the knowledge that an act has been done, or the state of mind with which it was done, should be attributed to the company.”

**Hampshire Land**

43   Lord Walker has summarised the relevant authorities where the Hampshire Land principle has been applied. The important point to note is that Hampshire Land is an exception to the normal rules for the attribution of an agent's *knowledge* to his principal. It is not a rule about the attribution of *conduct* . Hampshire Land applies where an agent has knowledge which his principal does not in fact share but which under normal principles of attribution would be deemed to be the knowledge of the principal. The effect of Hampshire Land is that knowledge of the agent will not be attributed to the principal when the knowledge relates to the agent's own breach of duty to his principal. The rationale for Hampshire Land has been said to be that it is contrary to common sense and justice to attribute to a principal knowledge of something that his agent would be anxious to conceal from him.

44   The cases demonstrate some confusion as to the precise nature and scope of the Hampshire Land principle and doubt has even been expressed as to whether it exists - see *Bowstead & Reynolds on* Agency 18th ed (2006, at 8-188 and 8-213 and Watts, “Imputed Knowledge in Agency Law - Excising the Fraud Exception” (2001) 117 LQR 300 at pp. 319-320. There is a tendency to confuse the Hampshire Land principle

Stone & Rolls Ltd (in Liquidation) V Moore Stephens (A Firm) 2009 WL 2207450 (2009)

with a similar principle developed by the courts of the United States, referred to as "the adverse interest exception to imputation".

45  The nature of what I shall call "the adverse interest rule" varies from state to state. It is an exception to the imputation principle under which both the *knowledge* and the *conduct* of an employee or agent are attributed to his principal where that person is acting in the course of his employment or within his apparent authority. Under the adverse interest rule the *knowledge* and *conduct* of an agent will not be attributed to the principal where the agent's actions are adverse to the interests of his principal. In some States the agent's conduct must be targeted against the principal if the rule is to apply. In others, the rule applies more widely, in circumstances where the agent's conduct is done for his personal benefit and is adverse to the interests of his principal, but is not aimed against his principal. A helpful overview of United States law on this topic has been provided by Amelia T Rudolph and Elizabeth V Tanis in a paper entitled "Invoking *In Pari Delicto* to Bar Accountant Liability Actions Brought by Trustees and Receivers" (2008) ALI-ABA Study Materials.

46  The adverse interest rule would, so it seems to me, operate at least in some circumstances as a normal rule of attribution under established principles of the English law of agency, rather than as an exception to the norm. Under it an English court would not attribute to a company the act of its managing director in dishonestly transferring the company's funds into his own account.

47  The operation of a similar principle in the context of the criminal liability of a company for the acts of its directing will and mind is to be found in the decision of the Canadian Supreme Court in Canadian Dredge & Dock Co Ltd v The Queen (1985) 19 DLR (4th) 314 . In the course of giving the judgment of the court Estey J put the position as follows at p. 351:

> "Where the directing mind conceives and designs a plan and then executes it whereby the corporation is intentionally defrauded, and when this is the substantial part of the regular activities of the directing mind in his office, then it is unrealistic in the extreme to consider

that the manager is the directing mind of the company…Where the criminal act is totally in fraud of the corporate employer and where the act is intended to and does result in benefit exclusively to the employee-manager, the employee-directing mind, from the outset of the design and execution of the criminal plan, ceases to be a directing mind of the corporation and consequently his acts could not be attributed to the company under the identification doctrine".

This statement was made in relation to criminal charges brought *against* the company. It describes a principle of attribution that I would accept as applicable under English common law.

48  I believe that Mr Sumption's definition of the Hampshire Land principle that I have quoted in paragraph 12 above more accurately describes the adverse interest rule. Confusion between the two principles has tended to obfuscate what, at the end of the day, is a question of attribution that is not difficult to answer on the facts of this case.

**Attribution in this case**

49  Mr Brindle submits that this case involves two questions of attribution. The first is whether S&R's liability to the banks was primary or vicarious. The second is whether, for the purpose of *ex turpi causa* , Mr Stojevic's fraudulent conduct falls to be attributed to S&R. These are two different ways of posing the same question. The purpose for which the question of attribution has to be answered is in order to decide whether the defence of *ex turpi causa* applies. If Mr Sumption's reliance test is applied, the question that has to be answered is whether S&R is relying upon its own fraud, rather than fraud for which it is only vicariously liable, in order to found its claim. If the underlying principle of public policy is applied, the question that has to be answered is whether S&R is seeking to obtain compensation for the consequences of its own fraud

rather than for the consequences of fraud for which it is only vicariously liable. To answer the question it is necessary to decide whether the fraud of Mr Stojevic falls to be treated as the fraud of S&R itself.

50   As between a company that has committed fraud and the victim of the fraud, the question of whether the company's liability is primary or vicarious seldom, if ever, arises. As Estey J remarked in Canadian Dredge & Dock Co Ltd v The Queen , at pp 324-325:

> "At common law there was no difficulty in finding liability in a corporation in the law of torts, even though the state of mind of the corporation was established by imputing to that corporation the intentions and the conduct of its servants and agents. Thus, in the law of torts, the courts from the earliest times found vicarious liability in the corporation on the principles of agency."

In this case, however, it is necessary to distinguish between vicarious and primary liability for the purpose of considering the application of *ex turpi causa* . There is no way of doing this other than by applying the same approach as applies in other circumstances where this exercise is necessary. Indeed *Bowstead & Reynolds* at 8-188 identifies "the supposed fraud exception to the rules as to imputation of the agent's knowledge to the principal" as one of the situations where it may be necessary to consider whether conduct ranks as the act of the corporation itself. The words of Lord Reid in Tesco Supermarkets Ltd v Nattrass [1972] AC 153 at 170 are directly in point:

> "A living person has a mind which can have knowledge or intention or be negligent and he has hands to carry out his intentions. A corporation has none of these: it must act through living persons, though not always one or the same person. Then the person who acts is not speaking or acting

for the company. He is acting as the company and his mind which directs his acts is the mind of the company. There is no question of the company being vicariously liable. He is not acting as a servant, representative, agent or delegate. He is an embodiment of the company or, one could say, he hears and speaks through the persona of the company, within his appropriate sphere, and his mind is the mind of the company. If it is a guilty mind then that is the guilt of the company. It must be a question of law whether, once the facts have been ascertained, a person in doing particular things is to be regarded as the company or merely as the company's servant or agent. In that case any liability of the company can only be a statutory or vicarious liability."

51   Where those managing the company are using it as a vehicle for fraud, or where there is only one person who is managing all aspects of the company's activities, there is no difficulty in identifying the fraud as the fraud of the company. Thus in Royal Brunei Airlines Sdn Bhd v Tan [1995] 2 AC 378 , a case concerning a company, BLT, that was owned and managed by one man, Lord Nicholls of Birkenhead, when giving the advice of the Privy Council, observed at p. 393:

> "Set out in these bald terms, the defendant's conduct was dishonest. By the same token, and for good measure, B.L.T. also acted dishonestly. The defendant was the company, and his state of mind is to be imputed to the company."

52  Lord Nicholls returned to this theme in Mahmud v BCCI [1998] AC 20 at p. 34 where he said this about BCCI:

> "The bank operated its business dishonestly and corruptly. On the assumed facts, this was not a case where one or two individuals, however senior, were behaving dishonestly. Matters had gone beyond this. They had reached the point where the bank itself could properly be identified with the dishonesty. This was a dishonest business, a corrupt business."

53  A similar issue of attribution arose in KR v Royal & Sun Alliance plc [2006] EWCA Civ 1454; [2007] 1 All ER (Comm) 161 in relation to a clause in a policy of liability insurance. The clause excluded the insurers' liability in respect of: "Injury damage or financial loss which results from any deliberate act or omission of the insured…" The insured was a company that operated children's homes. The issue was whether the clause exempted the insurers from liability in respect of the company's liability for physical abuse perpetrated by the managing director and major shareholder in the company. The Court of Appeal held at paragraph 65 that the intention of the clause was to exclude liability for damage or injury caused by the deliberate acts of the person who was to be regarded as, in effect, the company, as opposed to the acts of those who were mere employees. As such it excluded liability in respect of the acts of the managing director:

> "It is not just the case that he was managing director and majority shareholder of the company; he was [the company]. He treated the company as his own and nothing of consequence happened without his say so."

54  In this case it might be said that S&R was not a business being carried on corruptly but rather that there was no business at all. Mr Stojevic, in the name of the company, was pretending to carry on a fictitious business. With false pretences and fabricated documents he was fraudulently inducing Komercni Bank and other banks to pay large sums to S&R. It might be argued that the adverse interest rule, as formulated by Estey J in Canadian Dredge & Dock Co Ltd v The Queen , applies, in that Mr Stojevic was, from the outset, acting pursuant to a criminal plan that was exclusively for his own benefit. Such an argument would, however, be fallacious. Mr Stojevic was using S&R for his own dishonest purposes, but in a manner that resulted in substantial payments being made to S&R. It has never been suggested that Mr Stojevic's conduct did not fall to be attributed to S&R so as to render S&R liable in deceit. That S&R was properly held liable is the basis of S&R's claim. The fraudulent business must be treated as the business of S&R carried on, in the first instance, to benefit S&R.

55  Mr Brindle submits that the Hampshire Land principle applies so as to prevent attribution in this case. For the reasons that I have given I do not consider that that principle has any application. Nor does the adverse inference rule apply so as to prevent the attribution of Mr Stojevic's fraudulent conduct to the company. Mr Brindle has not suggested that the banks are not to be treated as the primary victims of the fraud that Mr Stojevic has caused S&R to commit. He submits, however, that the fraud should not be attributed to S&R because it has come home to roost, making S&R a secondary victim. Neither authority nor common sense supports this proposition. As Mr Sumption points out, a company that commits fraud is always liable to find itself a secondary victim in this way. Mr Brindle's submission amounts, on analysis, to an argument that ex turpi causa should never prevent a company from recovering compensation for the consequences of fraud which those managing the company have caused it to commit. That submission falls to be considered in the context of the alternative way that Mr Brindle advances his case.

56  For the reasons that I have given I find that neither the Hampshire Land principle nor the adverse interest rule prevents the attribution of Mr Stojevic's fraud to S&R.

## The very thing

57   This argument is founded upon the fact that Mr Sumption has conceded that Moore Stephens owed a duty of care to S&R and that it is to be assumed for the purposes of the *ex turpi causa* issue that the duty of care has been broken. Mr Brindle's argument is, in essence, that if a duty exists to take action that will prevent a claimant from committing an illegal act, the claimant must have a remedy for breach of that duty, otherwise the duty will be rendered nugatory. Mr Brindle relies on reasoning of Buxton LJ to this effect in Reeves v Commissioner of Police of the Metropolis [1999] QB 169 . The relevant issue under consideration was whether, on the premise that suicide was to be treated as illegal conduct, *ex turpi causa* would bar a claim against the police for negligently permitting a prisoner to commit suicide. In holding that it would not Buxton LJ observed at p. 185:

> "Here, the alleged turpitudinous act is the very thing that the defendant had a duty to try to prevent, imposed by a law of negligence which itself appeals to public conscience or at least public notions of reasonableness"

58   Mr Brindle's argument is that fraud by S&R was one of the very things that Moore Stephens owed a duty of care to prevent. It follows that *ex turpi causa* should not defeat a claim for breach of that duty. I propose, when approaching Mr Brindle's alternative argument, to consider it initially in relation to a solvent company with independent and innocent shareholders which suffers damage because its directing mind and will involves it in fraud.

## Claim by the company against the directing will and mind

59   Lord Scott and Lord Mance consider that a company must be able to bring a claim against a director who, in breach of duty, causes the company damage by

involving it in fraud. I sympathise with their reaction. Imagine a group of investors who float a company to own and operate a yacht commercially. They engage a skipper to whom they entrust the management of the business. In breach of duty he charters the yacht to drug smugglers, with the consequence that the vessel is seized and confiscated. It would seem contrary to justice if the company could not bring an action against the skipper for misfeasance for the benefit of the shareholders. Why should the skipper be entitled to pray in aide the very thing that his breach of duty had brought about? On what principled basis can one avoid the application of *ex turpi causa* in such circumstances?

60   Lord Mance considers that Hampshire Land can be pressed into service. For the reasons that I have given I do not agree. It makes no sense to say that the fraud should not be attributed to the company. The fact that fraud has been attributed to the company is the very thing about which the company is complaining. The company's complaint is that its directing will and mind has infected it with turpitude. If *ex turpi causa* is not to apply in such circumstances, the reason should simply be that the public policy underlying it does not require its application.

61   One can readily reach that conclusion where all the shareholders are innocent. Recovery from the directing mind and will does not result in any individual recovering compensation for his own wrong. The position becomes unclear, however, if some of the shareholders were complicit in the directing mind and will's misconduct. Lord Mance states that in such circumstances some process designed to achieve the ends of justice would "without doubt" prevent the fraudulent shareholders from profiting from their dishonesty. Lord Mance may well be right, but it is not apparent to me that the law provides a mechanism for achieving this. What would seem to be involved would be a lifting of the veil of incorporation in order to ensure that shareholders who were complicit in the illegal manner of operating the company would not be able to share in the recovery from the directing mind and will. This would, I believe, be without precedent.

62   The situation becomes more complicated when one considers a claim against auditors, such as that with which this appeal is concerned, by a company that has independent shareholders. Here the argument

is that auditors should not be entitled to pray in aid the very illegality that their breach of duty has permitted to occur. The same problem arises where some of the shareholders are complicit in the fraud being perpetrated on the banks by the directing mind and will. But more intractable is the problem of contributory negligence. The duty owed by the auditors to the company is a duty of care. It would not seem just for a company to make a full recovery of damages against auditors for the benefit of banks which have themselves negligently failed to carry out appropriate "due diligence" before advancing monies to the company. Mr Brindle recognised this, for he opened his case by submitting that any apparent unfairness in holding Moore Stephens liable to S&R would be met by contribution under the Law Reform (Contributory Negligence) Act 1945 . But it is not easy to see how the Act would apply. Moore Stephens' liabilities would reflect S&R's liabilities to the banks and the damages paid by Moore Stephens would be paid, indirectly to the banks. Lack of care on the part of the banks in their dealings with S&R ought to be taken into account for the purposes of contributory negligence. Yet such lack of care could not be prayed in aid by S&R in answer to claims framed by the banks in deceit - Standard Chartered Bank v Pakistan National Shipping Corpn (Nos 2 and 4) [2002] UKHL 43; [2003] 1 AC 959 . Nor is there any obvious mechanism by which such lack of care could be relied upon by Moore Stephens in answer to the claim brought by S&R.

63   My Lords, I would not think it right to hold as a matter of general principle that *ex turpi causa* does not apply to a claim by a company against its auditors for failing to detect that the company has been operating fraudulently unless it were demonstrated how the difficulties to which I have referred could be resolved. There has been no such demonstration in this case. Thus I am not able to join Lord Scott and Lord Mance in concluding, for the reasons that they have given, that *ex turpi causa* does not apply to S&R's claim. At the same time, I have not been persuaded by Mr Sumption's primary case that the reliance test, or the principle of public policy that underlies it, would necessarily defeat S&R's claim if S&R were a company with independent shareholders that had been "high-jacked" by Mr Stojevic. In that, at least, I believe that I share common ground with all your Lordships.

**The significance of the fact that S&R was a "one man company"**

64   I turn to consider Mr Sumption's fall back position. This applies to what, by way of shorthand, is described as a "one man company", that is a company where the sole shareholder is also the person who runs the company or, if there is more than one shareholder, where the shareholders together run the company. Mr Sumption argued that where all who have ownership and control of a company are complicit in a fraud carried out by the company there is no room for the application of the Hampshire Land principle. In support of this argument he drew attention to United States jurisprudence that establishes a "sole actor" exception to the adverse interest rule.

65   Lord Brown and Lord Walker have based their decision on Mr Sumption's fall back position. Lord Walker identifies the reason for the Hampshire Land principle to be that it would be "unjust to its innocent participators (honest directors who were deceived, and shareholders who were cheated)" to fix a company with its directors' fraudulent intention. Where there are no honest directors or shareholders there is " *ex hypothesi* no innocent participator". It follows that there is no room for the application of Hampshire Land .

66   Lord Scott and Lord Mance do not accept this analysis. They would include among the "innocent participators" the creditors of a company in circumstances where the company is insolvent or is threatened with insolvency. They postulate that the duty owed by auditors is owed for the benefit of these participators also, and that *ex turpi causa* should not defeat a claim brought for their benefit.

67   For the reasons that I have already given, I consider that the real issue is not whether the fraud should be attributed to the company but whether *ex turpi causa* should defeat the company's claim for breach of the auditor's duty. That in turn depends, or may depend, critically on whether the scope of the auditor's duty extends to protecting those for whose benefit the claim is brought.

68   One fundamental proposition appears to me to underlie the reasoning of Lord Walker and Lord Brown. It is that the duty owed by an auditor to

a company is owed for the benefit of the interests of the shareholders of the company but not of the interests of its creditors. It seems to me that here lies the critical difference of opinion between Lord Walker and Lord Brown on the one hand and Lord Mance on the other. Lord Mance considers that the interests that the auditors of a company undertake to protect include the interests of the creditors.

69   I was initially doubtful as to whether it would be right to decide this strike out application on the basis that the interests of creditors fall outside the scope of the duty of care that auditors owe to a company. I was concerned that such an approach was precluded by Mr Sumption's concession of the existence both of a duty and, for the purposes of argument, a breach. In oral submission however, Mr Sumption made it plain that his concession in respect of the duty owed by Moore Stephens was a limited one.

70   Mr Sumption conceded that Moore Stephens owed a duty to S&R to ensure, so far as reasonable care permitted, that S&R's accounts showed a true and fair view of its affairs. He conceded that, for the purpose of the strike out application, it should be assumed that Moore Stephens was in breach of this duty. He further conceded that, had they performed this duty, they would have discovered the fraud that was taking place. Finally he conceded that Moore Stephens would then have reported the fraud to the authorities, which would have brought S&R's operations to a halt. Thus, as a matter of causation, the assumed breach of duty resulted in the losses sustained by S&R as a result of the continuing fraud. What Mr Sumption did not accept, however, was that reporting the fraud to the authorities formed any part of the duty owed to S&R.

71   Mr Sumption submitted that the duty owed to a company by its auditors was exclusively for the benefit of its shareholders. No duty was owed to creditors. The duty of the auditors to exercise due care when reporting on the accounts enabled the shareholders to hold the management of a company to account. Accounting standards and duty to the public went beyond the auditor's duty to the company. Indeed it overrode the duty of confidentiality that would otherwise be owed to the company. It was this public duty that might require an auditor to "shop" a company if there was reason to think that it was involved in crime. Mr

Sumption submitted that "against that background it is very difficult to see how the law can rationally hold an auditor liable when the entire shareholder body and the entire management is embodied in a single individual who knows everything because he has done everything".

72   Those submissions were largely founded on the decision of this House in Caparo . While the plaintiff in that case was a company, its primary claim was in its capacity as purchaser of the shares in a public company ("Fidelity") of which the defendants were the statutory auditors. The claim was in the tort of negligence. The plaintiff alleged that the defendants had been negligent in auditing Fidelity in that they had approved accounts which, inter alia, overvalued the assets of the company. The plaintiff alleged that, foreseeably, reliance on the audited accounts had led it to pay an excessive amount for the shares of Fidelity in a successful take-over bid. The question of whether the defendants owed a duty of care to the plaintiff was tried as a preliminary issue.

73   After lengthy consideration of authorities dealing with the duty of care in relation to negligent misstatements Lord Bridge of Harwich remarked at p. 623:

> "These considerations amply justify the conclusion that auditors of a public company's accounts owe no duty of care to members of the public at large who rely upon the accounts in deciding to buy shares in the company. If a duty of care were owed so widely, it is difficult to see any reason why it should not equally extend to all who rely on the accounts in relation to other dealings with a company as lenders or merchants extending credit to the company. A claim that such a duty was owed by auditors to a bank lending to a company was emphatically and convincingly rejected by Millett J. in Al Saudi Banque v. Clarke Pixley …"

74   At p. 626, after considering the provisions in the Companies Act 1985 that relate to auditors, Lord Bridge added:

> "No doubt these provisions establish a relationship between the auditors and the shareholders of a company on which the shareholder is entitled to rely for the protection of his interest. But the crucial question concerns the extent of the shareholder's interest which the auditor has a duty to protect. The shareholders of a company have a collective interest in the company's proper management and in so far as a negligent failure of the auditor to report accurately on the state of the company's finances deprives the shareholders of the opportunity to exercise their powers in general meeting to call the directors to book and to ensure that errors in management are corrected, the shareholders ought to be entitled to a remedy. But in practice no problem arises in this regard since the interest of the shareholders in the proper management of the company's affairs is indistinguishable from the interest of the company itself and any loss suffered by the shareholders, e.g. by the negligent failure of the auditor to discover and expose a misappropriation of funds by a director of the company, will be recouped by a claim against the auditors in the name of the company, not by individual shareholders.

> I find it difficult to visualise a situation arising in the real world in which the individual shareholder could claim to have sustained a loss in respect of his existing shareholding referable to the negligence of the auditor which could not be recouped by the company."

75   Lord Oliver of Aylmerton also gave detailed consideration to the role of auditors in the light of the relevant statutory provisions. The following passages from his opinion at pp. 630 and 631 are of particular relevance:

> "It is the auditors' function to ensure, so far as possible, that the financial information as to the company's affairs prepared by the directors accurately reflects the company's position in order, first, to protect the company itself from the consequences of undetected errors or, possibly, wrongdoing (by, for instance, declaring dividends out of capital) and, secondly, to provide shareholders with reliable intelligence for the purpose of enabling them to scrutinise the conduct of the company's affairs and to exercise their collective powers to regard or control or remove those to whom that conduct has been confided….

> Thus the history of the legislation is one of an increasing availability of information regarding the financial affairs of the company to those having an interest in its progress and stability. It cannot fairly be said that the purpose of making such information available is solely to assist those interested in attending general meetings of the company to an informed supervision and appraisal of the stewardship of the company's directors, for the requirement to supply audited accounts to, for instance, preference

Stone & Rolls Ltd (in Liquidation) v Moore Stephens (A Firm) 2009 WL 2207450 (2009)

shareholders having no right to vote at general meetings and to debenture holders cannot easily be attributed to any such purpose. Nevertheless, I do not, for my part, discern in the legislation any departure from what appears to me to be the original, central and primary purpose of these provisions, that is to say, the informed exercise by those interested in the property of the company, whether as proprietors of shares in the company or as the holders of rights secured by a debenture trust deed, of such powers as are vested in them by virtue of their respective proprietary interests."

76   Both Lord Bridge and Lord Oliver cited with approval the decision of Millett J in Al Saudi Banque v Clarke Pixley [1990] Ch 313 . That was an action brought in negligence against the auditors of a company by a number of banks. They alleged that they had relied upon favourable auditors' reports, negligently given, in advancing money to the company. Some of the banks were already creditors of the company at the time that the reports were made. The question of whether the auditors owed a duty to the banks was tried as a preliminary issue. Millett J held that no duty was owed, relying in part on the reasoning of the majority in the Court of Appeal in Caparo [1989] QB 653 . He held that the necessary proximity between the banks and the auditors was not established. He went on, however, to hold that it would not be just and reasonable to impose such a duty on the auditors. This was because breach of the duty would expose the auditors to liability for sums advanced by the banks to the company of an indeterminate amount, which would be unknown to the auditors and unforeseeable by them.

77   Mr Sumption also relied upon the decision of Hobhouse J. in Berg, Sons & Co Ltd v Mervyn Hampton Adams and Others [2002] Lloyd's Rep PN 41 . The relevant claim in that case was brought by a company in liquidation ("Berg") against its auditors

("Dearden Farrow") for negligently failing to qualify the accounts of the company, as a consequence of which the company incurred further liabilities. The company had only one active director, a Mr Golechha, who was also the ultimate beneficial owner of all the shares in the company. At p. 44 Hobhouse J outlined the nature of Berg's case:

> "The essence of the claim made by the first Plaintiffs, Berg, against Dearden Farrow is that Mr Surrey ought not to have accepted the statements made, and the assurances given, to him by Mr Golechha. It is no part of the Plaintiffs' case that Mr Golechha, nor any director or shareholder of Berg, was in any way misled by anything which Dearden Farrow said or did; nor is it alleged that Mr Golechha, or any member of the company, in any way relied upon anything Dearden Farrow said or did. It further is not alleged that Mr Golechha was not fully aware of all relevant facts and considerations. Under these circumstances, it will be appreciated that there are serious further difficulties in the way of formulating and substantiating the claim of Berg against the Defendants. The existence of a contractual duty to exercise proper skill and care in and about the audit owed by the Defendants to Berg is not in dispute. But whether, assuming that there has been some breach, there is on any view a right to recover anything more that nominal damages is very definitely in dispute. The Defendants submit that the first Plaintiffs' claim is misconceived and cannot succeed even if some breach of contract is established."

78  Hobhouse J considered the implications of the decision in Caparo on the duty of care owed by auditors and reached the following conclusion:

> "It also follows that the purpose of the statutory audit is to provide a mechanism to enable those having a proprietary interest in the company or being concerned with its management or control to have access to accurate financial information about the company. Provided that those persons have that information, the statutory purpose is exhausted. What those persons do with the information is a matter for them and falls outside the scope of the statutory purpose. In the present case the first Plaintiffs have based their case not upon any lack of information on the part of Mr Golechha but rather upon the opportunity that the possession of the auditor's certificate is said to have given for the company to continue to carry on business and to borrow money from third parties. Such matters do not fall within the scope of the duty of the statutory auditor."

79  At p. 53 Hobhouse J referred to an accurate statement of the Hampshire Land principle in *Bowstead on* Agency (15th edition, 1985), Art 102:

> "Where an agent is party or privy to the commission of a fraud upon or misfeasance against his principal, his knowledge of such fraud or misfeasance, and of the facts and circumstances connected therewith, is not imputed to the principal."

He commented, at p 54:

> "In the present case it has not been proved that there was any fraud by Mr Golechha in relation to the 1981 audit, still less that at that time Mr Golechha was practising any fraud upon his principal, Berg. There was no entity which it can be said he misled or in relation to which it can be said that he was acting fraudulently in relation to the audit in October 1982. However one identifies the company, whether it is the head management, or the company in general meeting, it was not misled and no fraud was practised upon it. This is a simple and unsurprising consequence of the fact that every physical manifestation of the company Berg was Mr Golechha himself. Any company must in the last resort, if it is to allege that it was fraudulently misled, be able to point to some natural person who was misled by the fraud. That the Plaintiffs cannot do."

80  This comment demonstrates that Hampshire Land had no application to the facts of that case, but it has wider implications. Taken with the other passages in the judgment to which I have referred, it supports Mr Sumption's proposition that it is very difficult to see how the law can rationally hold an auditor liable when the entire shareholder body and the entire management is embodied in a single individual who knows everything because he has done everything. If that proposition is correct, it follows that any breach of duty on the part of Moore Stephens will not sound in damages because it has caused no loss.

81  I have had difficulty in this case in distinguishing between questions of duty, breach and actionable damage and, indeed, it is questionable whether it is sensible to attempt to distinguish between them. In Caparo at p. 627 Lord Bridge stated:

Stone & Rolls Ltd (In Liquidation) v Moore Stephens (A Firm), 2009 WL 2207450 (2009)

"It is never sufficient to ask simply whether A owes B a duty of care. It is always necessary to determine the scope of the duty by reference to the kind of damage from which A must take care to save B harmless. 'The question is always whether the defendant was under a duty to avoid or prevent that damage, but the actual nature of the damage suffered is relevant to the existence and extent of any duty to avoid or prevent it:' see Sutherland Shire Council v. Heyman, 60 A.L.R. 1 , 48, *per* Brennan J. Assuming for the purpose of the argument that the relationship between the auditor of a company and individual shareholders is of sufficient proximity to give rise to a duty of care, I do not understand how the scope of that duty can possibly extend beyond the protection of any individual shareholder from losses in the value of the shares which he holds."

Lord Oliver made a similar comment at p. 651:

"It has to be borne in mind that the duty of care is inseparable from the damage which the plaintiff claims to have suffered from its breach. It is not a duty to take care in the abstract but a duty to avoid causing to the particular plaintiff damage of the particular kind which he has in fact sustained."

82   These comments were made in relation to duty of care in tort. In Banque Bruxelles Lambert SA v Eagle Star Insurance Co Ltd (sub nom South Australia Asset Management Corpn v York Montague Ltd) [1997]

AC 191 Lord Hoffmann held that precisely the same reasoning applied to a duty of care in contract. He said at p. 211:

"A duty of care such as the valuer owes does not however exist in the abstract. A plaintiff who sues for breach of a duty imposed by the law (whether in contract or tort or under statute) must do more than prove that the defendant has failed to comply. He must show that the duty was owed to him and that it was a duty in respect of the kind of loss which he has suffered. Both of these requirements are illustrated by Caparo Industries plc. v. Dickman [1990] 2 A.C. 605 . The auditors' failure to use reasonable care in auditing the company's statutory accounts was a breach of their duty of care. But they were not liable to an outside take-over bidder because the duty was not owed to him. Nor were they liable to shareholders who had bought more shares in reliance on the accounts because, although they were owed a duty of care, it was in their capacity as members of the company and not in the capacity (which they shared with everyone else) of potential buyers of its shares. Accordingly, the duty which they were owed was not in respect of loss which they might suffer by buying its shares."

83   Mummery LJ held that Moore Stephens owed no duty of care to S&R, "a fraudster in the total grip of another fraudster". Although Mr Sumption has renounced any reliance on this holding, it is one with which I have sympathy. Moore Stephens were retained by Mr Stojevic by deception and with the object of enhancing the apparent respectability of S&R for the purposes of his proposed fraud. The details of the business that he retained Moore Stephens to audit were

wholly fictitious. If these motives and this dishonesty are to be attributed to S&R, as it seems to me they must be, then it is at least arguable that the illegal purpose of the contract under which Moore Stephens were retained rendered it unenforceable at the suit of Moore Stephens by reason of the application of the principle in Alexander v Rayson [1936] 1 KB 169 . More fundamentally, if party A, by deceit, induces party B to agree to play a part in a venture that is wholly fictitious, I find it hard to see how this can give rise to any duty on the part of party B.

84 If I put those reservations on one side and assume that Moore Stephens undertook a contractual duty to S&R to exercise due care in relation to the auditing of S&R's accounts, the question arises of whether that duty extended further than the exercise of reasonable care in the provision of information to the directors and those who had a proprietary interest in the company. The authorities relied upon by Mr Sumption lead to the conclusion that it did not.

85 The exercise of an auditor's duties to a company will, in some situations, have the effect of preserving the assets of the company. Such preservation will, whenever there is a risk that the company's assets may prove inadequate to meet its liabilities, protect not merely the interests of the shareholders but those of the creditors. It is arguable that the scope of the duty undertaken by the auditors of a company should extend to protecting the interest that the creditors have in the preservation of the assets of the company. So to hold would involve departing from, or at least extending, the reasoning of this House in Caparo . Such an extension would not, however, assist S&R in this case. To recover damages in this case S&R would have to establish that the scope of the duty undertaken by Moore Stephens extended to taking reasonable care to ensure that the company was not used as a vehicle for fraud and that this duty was owed for the benefit of those that the company might defraud. I see no prospect that such a duty could be established.

86 The scope of Moore Stephens' duty is not directly in issue on this appeal. What is in issue is whether *ex turpi causa* provides a defence to S&R's claim that Moore Stephens was in breach of duty. That is not, however, a question that I have been able to consider in isolation from the question of the scope of Moore

Stephens's duty. I have reached the conclusion that all whose interests formed the subject of any duty of care owed by Moore Stephens to S&R, namely the company's sole will and mind and beneficial owner Mr Stojevic, were party to the illegal conduct that forms the basis of the company's claim. In these circumstances I join with Lord Walker and Lord Brown in concluding that *ex turpi causa* provides a defence.

87 For these reasons I would dismiss this appeal.

Lord Scott of Foscote

My Lords,

**Introduction**

88 I have found this a very difficult case. Three of my noble and learned friends, Lord Phillips of Worth Matravers, Lord Walker of Gestingthorpe and Lord Mance have prepared and circulated lengthy opinions, totalling very nearly 200 paragraphs but reaching differing conclusions. Lord Phillips and Lord Walker have concluded that the *ex turpi causa* principle provides a complete defence to this action and that the appeal by Stone & Rolls Ltd (in liquidation) ("S & R") against the striking out of its action should therefore be dismissed. Both take the view that the fraud and dishonesty of Mr Stojevic is properly to be attributed to S & R. Lord Mance, however, has concluded that this action, brought by S & R against its auditors, Moore Stephens, for contractual and tortious negligence, cannot be defeated, at least at the present strike-out stage, by that attribution. My Lords I have come to the same conclusion as Lord Mance and without, as I hope, adding unnecessarily to the length of the opinions of your Lordships, I must explain why.

89 It is of critical importance, in my opinion, to notice that the case comes before your Lordships as a final appeal on a strike-out application. The application was made by Moore Stephens, defendants in the action but respondents before the House, on the ground that the claim by S&R had no real prospect of success. Many of the facts pleaded by S&R in their Amended Particulars of Claim are admitted by Moore Stephens in their Defence. It is not contended that any of the pleaded facts that are not admitted in the Defence can at this

stage be regarded as incapable of proof. It follows that for present striking-out purposes those facts must be assumed to be true.

**The facts**

90   S&R is a company incorporated in England and Wales. At all material times until its provisional liquidation in November 2002, S&R was controlled by Mr Stojevic. The shares in S&R are, or were, held by an Isle of Man company, Law Investments Ltd, the shares in which are, or were, held by trustees of what has been described as Mr Stojevic's family trust. S&R had directors but they took no part in the running of S&R's business and, it appears, exercised no control over its finances. Mr Stojevic, via a power of attorney granted to him by S&R's faceless directors, was in complete managerial control of every aspect of S&R.

91   Moore Stephens were, for the years 1996, 1997 and 1998, the auditors of S&R and signed unqualified audit reports for those three financial years. During this period, therefore, Moore Stephens were officers of S&R for the purposes, for example, of section 212 of the Insolvency Act 1986 and had a contractual relationship with S&R for the purpose, at least, of the preparation of the annual audit reports.

92   Mr Stojevic, throughout the period that Moore Stephens were S&R's auditors but unknown to Moore Stephens, used S&R as a vehicle of fraud. He used S&R as a vehicle through which funds, fraudulently extracted from banks which believed they were financing *bona fide* commodity trades, were then paid away to third parties under the influence or control of (or in league with) Mr Stojevic. The moneys paid by the defrauded banks to S&R and paid away by S&R to the third parties were the proceeds of the frauds. The most substantial of the frauds was committed against a Czech bank, Komercni Banka AS ("KB") which eventually, and inevitably, brought proceedings against S&R and Mr Stojevic for fraud. The proceedings led to Toulson J on 15 November 2002, giving judgment against both defendants for over US$94 million. The result of the judgment was that S&R went into provisional liquidation on 15 November 2002 and on 15 January 2003 the provisional liquidators were appointed liquidators of S&R. There were other defrauded banks and companies as well as KB and S&R

was hopelessly insolvent. Mr Stojevic has, apparently, no assets worth pursuing or at any rate none that the liquidators have been able to discover.

93   The appointment of the provisional liquidators brought to an end Mr Stojevic's control over S&R and on 22 December 2006 S&R, under the control of the liquidators, commenced the action against Moore Stephens that is the target of the striking-out application that has now reached your Lordships' House.

**The issue**

94   S&R's action against Moore Stephens seeks damages for negligence. The pleaded case is, in very brief summary, that Moore Stephens, when carrying out their audit and preparing their audit report in each of the three audit years, were negligent in not detecting "(a) Mr Stojevic's dishonesty; and (b) a pattern of fraud involving numerous fraudulent and/or irregular payments out by S&R to entities controlled by Mr Stojevic and his associates" (see para.12 of the Amended Particulars of Claim). It is pleaded that if this alleged negligence had not occurred Mr Stojevic would have been unable to procure the continuance of the fraudulent and irregular payments made out of S&R. In short, the fraudulent scheme would have come to an end.

95   Moore Stephens, in their Defence, deny any negligence or other breach of duty owed to S&R but plead that, in any event, "the claim advanced is inextricably linked with [S&R's] own dishonest acts" (para.3(1)) and that the claim is barred by the *ex turpi causa* rule.

96   The issue - an easy one to state but, at any rate for me, a difficult one to decide - is whether S&R's claim as pleaded must inevitably founder on the *ex turpi causa* rule.

**The *ex turpi causa* rule**

97   Both Langley J at first instance and Rimer LJ in the Court of Appeal commenced their consideration of the *ex turpi causa* rule by citing the well known statement

made by Lord Mansfield in Holman v Johnson 1(1775) Cowp.341 at 343 :

> "No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act. If, from the plaintiff's own stating or otherwise, the cause of action appears to arise ex turpi causa … there the court says he has no right to be assisted."

The *ex turpi causa* rule was the subject of careful consideration in Tinsley v Milligan [1994] 1 AC 340 where this House unanimously rejected the proposition that the application of the rule depended "on such an imponderable factor as the extent to which the public conscience would be affronted by recognising rights created by illegal transactions" (per Lord Browne-Wilkinson at 369). It is necessary, therefore, to put firmly to one side any question of whether, or to what extent, public conscience would be affronted by the spectacle of Moore Stephens being held liable to pay negligence damages to S&R, thus enabling the liquidators to pay dividends to the defrauded creditors of S&R, and to concentrate on whether S&R is founding its action on its "own dishonest acts" (para.3(1) of the Defence).

98 For that purpose it is desirable to be clear about what cause of action one is talking about. S&R has pleaded its case as one based both on contractual negligence and on tortious negligence. I doubt whether at the end of the day the point makes any difference but, for my part, I regard a case based on contractual negligence as the more apt approach. The complaint is a complaint of negligent auditing and Moore Stephens' duty to conduct the audit with due professional skill and care was a duty owed to S&R pursuant to the contract between them. There was no relationship between them other than the contractual one. It was that relationship that imposed the duty of care and, although it is now common to regard such a duty not only as contractual but also as tortious, it seems to me more logical to speak of it as a contractual duty. It is to be noted, moreover, that the Amended Particulars of Claim, in describing the scope of the duty of care relied on

(paras.51 and 52), relies on "an implied term of Moore Stephens' retainer" and that para.53 simply says that "Moore Stephens owed the claimants tortious duties co-extensive with the contractual duties set out above." I propose, therefore, to address myself to the question whether S&R's contractual cause of action is founded upon its "own dishonest acts."

### S&R's contractual cause of action

99 A cause of action for breach of contract requires no more than a valid contract and a breach of that contract. If the complaint is one of professional negligence made against a professional, such as an auditor who has been retained by the complaining client, no more need be pleaded and proved than that in the performance of his contractual duties the professional failed to exercise the standard of professional care that was owing to the client under their contract. For an action in tort, on the other hand, recoverable damage must be alleged and proved, for without such damage the tortious cause of action is not complete. Not so for an action based on breach of contract. If the breach is proved the complainant is entitled to judgment and to nominal damages at least.

100 The retainer of Moore Stephens by S&R to act as S&R's auditors for the years 1996, 1997 and 1998 is admitted in Moore Stephens' Defence (see paras.15 and 16). The implied term alleged in para.51 of the Amended Particulars of Claim is admitted, and so, too, is the bulk of the alleged requirements of a duty of "reasonable skill and care" (para.17). What is, of course, denied is that Moore Stephens failed to meet the requisite standard of reasonable skill and care (para.18). But their contractual duty to exercise that care is not in issue. And their failure to meet that standard is, for present striking-out purposes, to be assumed.

101 So, as it appears to me, S&R can found a cause of action against Moore Stephens without reliance on the fraudulent nature of Mr Stojevic's scheme.

102 But, of course, this action is not being brought in order to recover merely nominal damages. It is being brought in order to recover substantial damages, namely, damages representing the losses incurred by S&R in having paid out large sums to the third parties and thereby having denuded itself of funds which could

have been set against the liabilities it has incurred to those who were defrauded. Prominent among them, of course, is KB with its $94 million odd judgment debt.

103   Whether, even if the *ex turpi causa* rule did not stand in the way, S & R could recover as damages anything like the full amount of its losses, or indeed anything at all, will, I do not doubt, raise all sorts of issues of causation. These causation issues are for later, to be addressed at trial if S&R can surmount the *ex turpi causa* hurdle. For present purposes, however, it must be assumed that some amount of substantial loss could be shown to have been caused by Morre Stephens' breaches of duty and would, subject to the *ex turpi causa* rule, be recoverable as damages. But it has to be accepted that in order to succeed in recovering more than nominal damages S&R has had to plead the dishonest scheme under which the money extracted from the banks went via S&R to the third parties. So although, in my opinion, S&R does not have to found its cause of action on the dishonesty of the scheme, it cannot recover substantial damages without pleading the details that show the scheme to have been dishonest. Does this involve S&R in relying "on its own dishonest acts"? The answer depends on whether the dishonesty of Mr Stojevic should be attributed to S&R for the purposes of S&R's claim against Moore Stephens. This is, in my opinion, the short but determinative issue in the case.

**Attribution**

104   An incorporated company is a statutory legal person. It has corporate personality but can act only by agents and, as Lord Haldane LC memorably said in Lennard's Carrying Co.Ltd v Asiastic Petroleum Co.Ltd [1915] AC 705 at 713,

> "It has no mind of its own any more than it has a body of its own; its active and directing will must consequently be sought in the person of somebody who for some purposes may be called an agent, but who is really the directing mind and will of the corporation, the very ego and centre of the personality of the corporation."

Lord Haldane's remarks were examined by Lord Hoffmann in giving the judgment of the Board in Meridian Global Funds Management Asia Ltd v Securities Commission [1995] 2 AC 500, on an appeal from the Court of Appeal of New Zealand . Lord Hoffmann, at 506, noted that any proposition about a company's directing mind and will necessarily involved a reference to a set of rules of attribution. The company's primary rules would, he said, generally be found in the company's constitution, typically its articles of association, but would include also rules implied by company law, such as, for example, the rule that the unanimous decision of all the shareholders in a solvent company to do something that the company had power to do under its memorandum of association would be the decision of the company. He went on to say this:

> "These primary rules of attribution are obviously not enough to enable a company to go out into the world and do business. Not every act on behalf of the company could be expected to be the subject of a resolution of the board or a unanimous decision of the shareholders. The company therefore builds upon the primary rules of attribution by using general rules of attribution which are equally available to natural persons, namely, the principles of agency. It will appoint servants and agents whose acts, by a combination of the general principles of agency and the company's primary rules of attribution, count as the acts of the company."

105   These remarks of Lord Hoffmann have, as it seems to me, a particular resonance in the present case. Your Lordships have not been shown the Memorandum of Association or the articles of association of S&R nor

the power of attorney granted to Mr Stojevic. It may reasonably be assumed, I think, that the articles gave the directors power to grant a power of attorney to Mr Stojevic to enable Mr Stojevic to take management decisions on behalf of S&R. But it may confidently be asserted also that the directors' power could not have extended so as lawfully to authorise Mr Stojevic to treat the company as a vehicle for defrauding the banks and others in the way that he did or, indeed, in any other way to cause S&R to engage in fraudulent trading. Either the power of attorney would have been on its face unlawful and devoid of effect or, much more likely, Mr Stojevic's actions in using S&R as a vehicle for implementing the fraudulent scheme he had devised would have been outside the powers conferred on him by the power of attorney. This feature of the relationship between Mr Stojevic and S&R has no relevance whatever so far as dealings between S&R and those defrauded by the scheme are concerned. They were entitled to hold S&R liable for the frauds in which S&R had participated. But it does have relevance, in my opinion, to the question whether S&R was itself a victim of Mr Stojevic's fraudulent scheme and, thus, to the critical question whether, for the purposes of S&R's action against Moore Stephens, Mr Stojevic's dishonesty should be attributed to S&R.

106   In re Hampshire Land Company [1896] 2 Ch.743 established the rule that the knowledge of an officer of a company of his own fraud or breach of trust directed at third parties will not necessarily be imputed to that company (see the statement of the rule by Rimer LJ in paragraph 39 of his judgment in the Court of Appeal). Where the knowledge in question was the officer's knowledge of his own fraud or breach of duty, Vaughan Williams J declined in In re Hampshire Land Company to hold that the knowledge was to be attributed to the company (see pp 749-750). In particular, if the director in breach of duty has an adverse interest to that of the company, the knowledge of the breach of duty will not be imputed to the company: see J.C.Houghton and Co. v Nothard, Lowe and Wills Ltd [1928] AC 1 where Lord Sumner said that it would be

"… contrary to justice and common sense to treat the knowledge of such persons as that of their company, as if one were to assume that they

would make a clean breast of their delinquency" (p.19)

107   There are, however, cases, sometimes referred to as "sole actor" cases, where the company has no human embodiment other than the fraudster and where, therefore, there is no one in the company for the fraudster to deceive, no one in the company to whom "a clean breast of … delinquency" could be made. In these "one actor" cases, it is said, the Hampshire Land Company rule can have no sensible application. The knowledge of the fraudster simply *is* the knowledge of the company. An example of this proposition in action is Royal Brunei Airlines Sdn Bhd v Tan [1995] 2 AC 328 . This was a case in which the issue was whether the company, BLT, had been guilty of fraud or dishonesty in relation to money it held in trust for the plaintiff airline. The company had become insolvent and the airline sued its controlling director, Mr Tan, on the ground that he had knowingly assisted in the dissipation by BLT of the money. Lord Nicholls of Birkenhead, at 393, said this:

"The defendant accepted that he knowingly assisted in that breach of trust. In other words, he caused or permitted his company to apply the money in a way he knew was not authorised by the trust of which the company was trustee. Set out in these bald terms, the defendant's conduct was dishonest. By the same token, and for good measure, BLT also acted dishonestly. The defendant was the company, and his state of mind is to be imputed to the company."

108  But the attribution to BLT of Mr Tan's dishonesty for the purposes of the airline's claim against, in effect, BLT and Mr Tan, could not be taken to bar misfeasance proceedings by the liquidator of BLT against Mr Tan or against any other officer of BLT who, in relation to

the trust money, "has… been guilty of any misfeasance or breach of any … other duty in relation to …" BLT ( s.212(1), Insolvency Act 1986 - assuming, of course, that s.212 or some similar statutory provision were applicable to BLT's insolvent liquidation.

109  It is noteworthy that there appears to be no case in which the "sole actor" exception to the Hampshire Land Company rule has been applied so as to bar an action brought by a company against an officer for breaches of duty that have caused, or contributed to, loss to the company as a result of the company engaging in illegal activities. I can easily accept that, for the purposes of an action against the company by an innocent third party, with no notice of any illegality or impropriety by the company in the conduct of its affairs, the state of mind of a "sole actor" could and should be attributed to the company if it were relevant to the cause of action asserted against the company to do so. But it does not follow that that attribution should take place where the action is being brought by the company against an officer or manager who has been in breach of duty to the company.

110  It appears that the liquidators of S&R know of no assets of Mr Stojevic that could become the fruits of successful proceedings against him for breach of duty. But suppose that were not so. There can surely be no doubt that the liquidators could issue a misfeasance summons against him under section 212(1)(c) of the Insolvency Act 1986 . Could Mr Stojevic, on such a summons, contend that his dishonesty should be attributed to the company that, in breach of his fiduciary duties under the power of attorney, he had turned into his vehicle for fraud? It is long established that section 212 , like its statutory predecessors, is procedural and does not create a cause of action where none previously existed - although it is to be noted that section 212(3)(b) confers on the court a judgmental discretion as to the quantum of compensation that would not in an ordinary damages action be applicable. But Mr Stojevic could not, in my opinion, reduce his liability for breach of duty to S&R by attributing to S&R his own dishonesty, praying in aid the "sole actor" exception and the application of the ex turpi causa rule.

**The liability of Moore Stephens**

111  It is not clear to me why Moore Stephens, or any other officer of S&R whose breach of duty had contributed to the liabilities to which S&R is now subject, should be in any different position, so far as attribution to S&R of Mr Stojevic's dishonesty is concerned, to that of Mr Stojevic himself. Moore Stephens were not, as Lord Walker in para. 190 of his opinion has pointed out, directors or managers of the company's business. But they, too, as officers of the company (see s. 212(1)(a) ) could have been, and could still be, the recipients of a section 212 misfeasance summons. The damages claimed in this action could have been claimed as compensation under section 212(3) . Indeed this action is, to my mind, indistinguishable in substance from a section 212 misfeasance application and, if necessary, a simple amendment to the pleadings could make that clear. The same causation problems as lie beneath the surface in the present action would apply equally to a section 212 misfeasance application. No doubt the same ex turpi causa objection would have been taken but the nature of the claim, as one being brought for the benefit of S&R's creditors, would have been more openly apparent and not in the least a matter of objection.

112  So I return to what I regard as the determinative issue, short but difficult. Why should the dishonesty of Mr Stojevic be attributed to S&R for the purposes of an action by S&R against its auditors, officers of the company who, on the assumed facts, had committed breaches of contractual duty that had a causative role in producing the liabilities to which S&R is subject? There are, in my opinion, two reasons why that attribution should not be made, the first is a procedural reason, the second is substantive.

**The procedural reason**

113  This is a strike-out application. There has been no trial and no factual findings but, nonetheless, the argument has proceeded on the footing that Mr Stojevic was the beneficial owner of the S&R shareholding. This derives, I think, from paragraph 2 of the Agreed Statement of Facts and Issues, which says that "Mr Stojevic was, indirectly through his family trust and a company incorporated in the Isle of Man, [S&R's] ultimate beneficial owner". It is not clear to me what was meant in this context by "ultimate" or whether an "ultimate beneficial owner" is the same as an owner who

is absolutely beneficially entitled. There is nothing in the pleadings that says Mr Stojevic was the absolute beneficial owner of the S&R shares. Paragraph 2 of S&R's Amended Particulars of Claim says that he was a "shadow director" of S&R and held a power of attorney on behalf of S&R and paragraph 14 says that

> "S&R was controlled by Mr Stojevic and owned by Law Investments Limited …, an Isle of Man company which was in turn owned by Mr Stojevic's family trust …"

None of this justifies the assumption that Mr Stojevic was absolutely beneficially entitled to the S&R shares.

114  In the action in the Commercial Court brought by KB against S&R and Mr Stojevic, evidence was given about the relationship between Mr Stojevic and S&R. In paragraph 7 of his judgment, [2003] 1 Lloyd's Rep 383 at 384, Toulson J described Mr Stojevic as S&R's chief executive officer and continued:

> "SR's ultimate ownership is obscure, but Mr Stojevic was in command of its dealings with BCL and the bank"

He returned to the point in paragraph 25:

> "The shares in SR are held by an Isle of Man company called Law Investments Ltd, whose shareholders are nominee companies operating under an Isle of Man trust known as the Lucia trust. Mr Stojevic acknowledged that he was one of the beneficiaries of the trust. Objection was taken to his being asked to identify the other beneficiaries or the extent of his own beneficial interest, and the matter was not ultimately pressed by Mr Doctor QC on behalf of [KB]"

None of this justifies the assumption that Mr Stojevic was the absolute beneficial owner of the shares in S&R.

115  Langley J, in his judgment on the striking out application, referred to paragraphs 2 and 14 of S&R's pleading (cited in para 113 above) and said, in paragraph 21, that it was part of S&R's case that Mr Stojevic was "the controlling mind and will of S&R". He went on "There was no one else. In a real sense he was the company." The judge could not have meant that Mr Stojevic was the absolute beneficial owner of the S&R shares. There was nothing in the pleadings to justify such an assumption. In the Court of Appeal, on the other hand, Rimer LJ did say, in paragraph 5 that Mr Stojevic "owned, controlled and managed [S&R]" and in paragraph 9, that

> "In a real sense the company was [Mr Stojevic's] company. It was, for practical purposes, a 'one man company'."

And Mummery LJ, at paragraph 114, referred to S&R as "the one-man company owned and controlled by Mr Stojevic".

116  These references to S&R as being wholly controlled by Mr Stojevic were fully justified on S&R's own pleading; but references to S&R as "owned" by Mr Stojevic were not. A trial, if there is one, may establish that Mr Stojevic was indeed the absolute beneficial owner of the S&R shares but a conclusion to that effect cannot be reached at the present stage and I do not regard the single sentence in paragraph 2 of the Agreed Statement as justifying the description of S&R as a "one-man company" otherwise than for the purpose of emphasising that he was in complete managerial control.

117  This point bears on the status of S&R as a victim of Mr Stojevic's dishonesty. Mr Stojevic derived his powers of control of S&R not from the status of director, for he was not one, but from the power of attorney that he had been granted by, presumably, Law Investments Ltd or nominees of theirs. That power of

attorney had been used by Mr Stojevic to turn S&R into, so to speak, a corporate automaton. The power of attorney, if valid, could not have authorised the frauds in which S&R at Mr Stojevic's direction participated. Everything done by S&R at the direction of Mr Stojevic and in pursuance of his scheme of fraud must have been *ultra vires* his powers under the power of attorney. This feature could not enable S&R to resist the claims made by the defrauded third parties such as KB but, in my opinion, establishes S&R as a victim of the fraudulent scheme. In causing S&R to pay away to third parties the money fraudulently extracted from KB and the other victims of the frauds Mr Stojevic was abusing his powers under the power of attorney. That abuse was an essential feature of Mr Stojevic's fraudulent scheme and, as it seems to me, S&R was a victim of that abuse.

118   The emphasis placed by my noble and learned friends Lord Walker and Lord Phillips, and also by my noble and learned friend Lord Brown of Eaton-under-Heywood, on the assumed absolute beneficial ownership by Mr Stojevic of the S&R shareholding, coupled with his undoubted absolute managerial control, indicates, I suggest, that they are, in effect, lifting the corporate veil and treating S&R as if it were Mr Stojevic himself who was seeking to repel the *ex turpi causa* defence. But if the corporate veil cannot be lifted, and it cannot, in my opinion, if Mr Stojevic was not the absolute beneficial owner of the shares, the attribution of Mr Stojevic's dishonesty to S&R for the purpose of defeating an admitted breach of duty by S&R's officers, a breach of duty that had caused S&R to incur liabilities that it would not otherwise have incurred, cannot, in my opinion, be justified either in principle or on authority. S&R is a *legal persona* in its own right.

**The substantive reason**

119   Caparo Industries plc v Dickman [1990] 2 AC 605 established that auditors who prepare and submit to the company of which they are auditors negligently prepared accounts and reports may be in breach of the duty they owe to the company but are not in breach of any duty they owe to the shareholders. The company can recover in damages any loss caused by the breach of duty and the shareholders have no independent cause of action. Where a company is insolvent, loss caused to the company by a similar breach of duty by its

auditors can similarly be remedied by an action in damages brought by the company. Its creditors, like the shareholders of a solvent company, are owed no duty of care by the auditors and can have no independent cause of action. None of this is in doubt. There is, however, a difference between a cause of action in negligence brought by a solvent company and a similar cause of action brought by an insolvent company. In the former case any damages recovered will benefit the shareholders; in the latter case the damages will benefit the creditors.

120   The *ex turpi causa* rule is a procedural rule based on public policy. The perpetrators of illegality, *a fortiori* of dishonest illegality, ought not to be allowed to benefit from their reprehensible conduct. If S&R had remained a solvent company an action against Moore Stephens that would have enabled Mr Stojevic to benefit from any damages that were recovered would have offended the *ex turpi causa* rule. Take the case of a solvent company that under the direction of its managing director engages in an unlawful and, in the event, loss making activity that could and should have been prevented by a timely report made by its auditors. Let it be supposed the managing director is also a shareholder and that he and the auditors are together sued for negligent breach of duty. I know of no authority that would bar such an action on *ex turpi causa* grounds. The action, assuming it succeeded against both defendants, could be expected, via contribution proceedings, to leave the delinquent managing director with no benefit from any damages recovered from the auditors. And why, if that were so, should public policy require the auditors to be relieved of liability for their breach of duty?

121   In a case, such as the present, where the company is insolvent and will stay so whatever damages are recoverable from the auditors, the need to ensure that the delinquent director does not benefit from the damages does not present a problem. There is no possibility of Mr Stojevic benefiting from any damages recoverable from Moore Stephens. So, I repeat, why should the *ex turpi causa* rule, a rule based on public policy, bar an action against the auditors based on their breach of duty?

122   The wielding of a rule of public policy in circumstances where public policy is not

engaged constitutes, in my respectful opinion, bad jurisprudence.

123 For all these reasons, and in general agreement with the reasons given by Lord Mance, I would allow this appeal and allow this action to proceed to trial.

Lord Walker of Gestingthorpe

My Lords,

### Introduction

124 This is an appeal by Stone & Rolls Ltd (in liquidation) ("S&R") against an order of the Court of Appeal made on 18 June 2008, [2008] EWCA Civ 644 , [2008] 3 WLR 1146 . The Court of Appeal (Mummery, Keene and Rimer LJJ) allowed an appeal by Moore Stephens, a firm of chartered accountants, from an order of Langley J made on 11 September 2007, [2007] EWHC 1826 (Comm), [2008] Bus LR 304 , [2008] 1 BCLC 697 , and struck out S & R's claim against Moore Stephens (who had been its auditors) as barred by the *ex turpi causa* principle of public policy.

125 The fullest account of the facts is to be found in the judgment of Toulson J in Komercni Banka AS v Stone and Rolls Ltd [2002] EWHC 2263 (Comm), [2003] 1 Lloyd's Rep 383 . There is also a full statement of the facts which must be assumed (for the purposes of Moore Stephens' strike-out application) in the lengthy amended statement of claim (running to 398 paragraphs, with supporting schedules) setting out S & R's case against Moore Stephens. The brief summary that follows is based on these sources as well as the judgments below.

126 S & R, a company registered in England, was dormant when in 1995 it came under the control of Mr Stojevic, the second defendant in the action brought by Komercni Banka AS ("KB"), a Czech bank. Mr Stojevic, a Croatian, was at all material times in sole control of S & R and (through artificial arrangements set up in the Isle of Man) effectively the beneficial owner of its share capital. He was described by Toulson J as having a very quick mind, but as having been evasive and untruthful. He was in fact the mastermind behind a fraudulent scheme which eventually resulted in KB

obtaining judgment against S & R and Mr Stojevic for a sum in excess of $94m. Provisional liquidators of S & R were appointed on 15 November 2002 followed by a full winding-up order on 15 January 2003. The consequential claim against Moore Stephens is for about $94m together with several years' accrued interest.

127 The frauds were effected by means of letters of credit issued by KB in favour of S & R at the request of an Austrian company named BCL Trading GmbH ("BCL"). BCL was controlled by Mr Barak Alon, who appears to have been an accomplice of Mr Stojevic. Payment under the letters of credit was obtained by the presentation of false documents certifying the existence in distant warehouses of non-existent stocks of agricultural produce. These payments were promptly passed on to BCL, which initially met its liabilities to KB, so building up its confidence (KB was also found to have been negligent, but that was immaterial in a claim for deceit). Eventually however there were 30 letters of credit (totalling $94m) for which KB was not reimbursed. About $80m of this was promptly passed on to BCL, or companies connected with it, and it has never been traced.

### The illegality defence

128 No one can found a cause of action on his own criminal conduct. This is not a technical rule, but a fundamental principle of public policy. In the well-known words of Lord Mansfield CJ in Holman v Johnson (1775) 1 Cowp 341 , 343:

> "No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act. If, from the plaintiff's own stating or otherwise, the cause of action appears to arise *ex turpi causa*, or the transgression of a positive law of this country, there the court says he has no right to be assisted. It is upon that ground the court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff."

The same principle has been described by McLachlin J in the Supreme Court of Canada, writing for the majority, as based on the need to preserve the integrity of the legal system: Hall v Hebert (1993) 101 DLR (4th) 129 ,160, 165.

129  The leading modern English authority on the scope of the principle is the decision of this House in Tinsley v Milligan [1994] 1 AC 340 . In that case the House was unanimous in disapproving the "public conscience" test applied by the Court of Appeal (in reliance on the earlier decisions of Court of Appeal in Saunders v Edwards [1987] 1 WLR 1116 , Euro-Diam Ltd v Bathurst [1990] 1 QB 1 and Howard v Shirlstar Container Transport Ltd [1990] 1 WLR 1292 ). But the House was divided over the correct test. The majority identified the test as whether the claimant had to plead or rely on his own illegality (see Lord Browne-Wilkinson at p 376). The minority favoured a broader test of whether the claim was tainted by illegality (see Lord Goff of Chieveley at p 363).

130  Tinsley v Milligan is in some ways a difficult and controversial decision. It raised issues as to equitable interests in property, and the equitable "clean hands" doctrine, which do not arise here. The Law Commission is well advanced, after lengthy deliberation and consultation, with proposals for the reform of this area of the law (Consultation Paper No. 160, The Illegality Defence in Tort (2001) and Consultation Paper No. 189, The Illegality Defence (2009)). These proposals, if enacted by Parliament, would introduce more flexibility into this area of the law (although without reintroducing a general "public conscience" discretion).

131  It is not necessary to go further into the Law Commission's proposals. The present state of the law is as laid down by the majority of the House in Tinsley v Milligan . Any legislative change is likely to widen the test, not to narrow it. It is common ground that if Mr Stojevic had carried out his frauds on his own, and not through a corporate vehicle, neither he nor his trustee in bankruptcy would have had a claim against the auditors, since the illegality defence would have been unanswerable. The main area of dispute is as to the imputation to S & R of Mr Stojevic's criminal acts and intentions.

### Primary or vicarious liability?

132  The first issue, within this main area of dispute, is whether S & R was primarily (or directly, the term used by Rimer LJ) liable for the fraud practised on KB, or was merely vicariously liable for the fraud of Mr Stojevic. In the Court of Appeal and before your Lordships Mr Brindle QC contended that S & R's liability was vicarious only, while also contending (rather more vigorously) that the point was in any case of no real significance. Even if S & R's liability was more than merely vicarious, he submitted, the principle in Re Hampshire Land Co. [1896] 2 Ch 743 was still capable of applying in the context of a claim by S & R against its auditors. He criticised Rimer LJ for failing to distinguish between the attribution exercise called for in two different situations, that is (i) KB's claim for fraud against S & R, and (ii) S & R's claim for negligence against the auditors.

133  In my opinion Rimer LJ (with whom Mummery and Keene LJJ agreed) was clearly right in holding that S & R was primarily (or directly) liable for the frauds. He recognised that Citizens' Life Assurance Co Ltd v Brown [1904] AC 423 (a case of malicious libel on appeal to the Judicial Committee from New South Wales) was decided on the basis of vicarious liability. But its historical importance is as a decisive rejection of Lord Bramwell's view (in Abrath v North Eastern Railway Co. (1886) 11 App Cas 247 ) that a company could never have a dishonest motive attributed to it. The present law was clearly explained by Lord Reid in a passage which Rimer LJ cited from Tesco Supermarkets Ltd v Nattrass [1972] AC 153 , 170:

"I must start by considering the nature of the personality which by a fiction the law attributes to a corporation. A living person has a mind which can have knowledge or intention or be negligent and he has hands to carry out his intentions. A corporation has none of these: it must act through living persons, though not always one or

the same person. Then the person who acts is not speaking or acting for the company. He is acting as the company and his mind which directs his acts is the mind of the company. There is no question of the company being vicariously liable. He is not acting as a servant, representative, agent or delegate. He is an embodiment of the company or, one could say, he hears and speaks through the persona of the company, within his appropriate sphere, and his mind is the mind of the company. If it is a guilty mind then that guilt is the guilt of the company."

134  In this case there is no doubt that Mr Stojevic was the persona of S & R. He was "really the directing mind and will of the corporation, the very ego and centre of the personality of the corporation" (Viscount Haldane LC in Lennard's Carrying Co. Ltd v Asiatic Petroleum Co. Ltd [1915] AC 705 , 713). In his written case Mr Brindle criticised Rimer LJ for a meaningless inquiry for a single directing mind and will. He drew attention to a leading textbook suggesting that Lord Hoffmann has castigated that approach as a misleading "general metaphysic of companies" (Gower and Davies, The Principles of Modern Company Law, 8th edition, 2008, para 7-29, commenting on Meridian Global Funds Management Asia Ltd v Securities Commission [1995] 2 AC 500 , 509). That comment is, I think, overstated. In Meridian Lord Hoffmann approved Viscount Haldane's search for the person who was, within Lennard's Carrying Company, the equivalent of an individual ship-owner. He then pointed out that as the company seemed to have no business other than ship-owning, the functions of general management and responsibility for ship-owning coincided; and (p 509):

"It was this coincidence which left Viscount Haldane LC's speech open to the interpretation that he was expounding a general metaphysic of companies."

In short not every company has a single directing mind and will, but some companies do.

135  The criticism is therefore quite inapposite in relation to S & R, because it is common ground that Mr Stojevic really was the embodiment of S & R for all purposes. As Rimer LJ put it (in para 9 of his judgment):

"It is the essence of [S & R's] claim that Mr Stojevic was its controlling mind and will. Nobody else was in a like position. In a real sense the company was his company. It was, for practical purposes, a 'one man company'. It is a further part of the claim that the company was throughout used by Mr Stojevic as a vehicle for fraud, by extracting money from KB so that it could then be paid away to the fraudsters."

136  I conclude that S & R was primarily liable for the frauds and on that basis I go on to the Hampshire Land principle, bearing in mind that I have not yet fully addressed Mr Brindle's submissions about the importance of context—that is, the type of claim, by or against the company, in which the question of attribution arises.

**The Hampshire Land principle**

137  In Re Hampshire Land Company [1896] 2 Ch 743 Mr Wills was secretary of a trading company, Hampshire Land, and of a building society, Portsea Island. The company borrowed £30,000 from the building society. This was irregular because it was done without the authority of the company given at a properly-convened general meeting. The company then went into liquidation, and the building society claimed to be a creditor for £30,000. The claim depended on whether the building society was to be imputed, through Mr Wills, with knowledge of the irregularity. It was

accepted that if Mr Wills had been fraudulent, his knowledge would not have been imputed to the building society; and Vaughan Williams J applied the same principle to a breach of duty (even if it did not amount to fraud) since Mr Wills could not be expected to disclose something to his own detriment.

138   That principle (which is a general principle of agency) was applied by this House in J C Houghton and Co v Nothard, Lowe and Wills Ltd [1928] AC 1 . Two brothers, the Lowes, owed duties to two different trading companies, NLFP (an old-established company) and NLW (a new joint venture company partly owned by a competitor). The Lowes committed NLW to commercial arrangements that were against its best interests, and favourable to NLFP. The issue was whether the Lowes' guilty knowledge estopped NLW from obtaining relief. This House held that there was no estoppel. Viscount Dunedin observed (at p 14):

> "My Lords, there can obviously be no acquiescence without knowledge of the fact as to which acquiescence is said to have taken place. The person who is sought to be estopped is here a company, an abstract conception, not a being who has eyes and ears. The knowledge of the company can only be the knowledge of persons who are entitled to represent the company. It may be assumed that the knowledge of directors is in ordinary circumstances the knowledge of the company. The knowledge of a mere official like the secretary would only be the knowledge of the company if the thing of which knowledge is predicated was a thing within the ordinary domain of the secretary's duties. But what if the knowledge of the director is the knowledge of a director who is himself particeps criminis, that is, if the knowledge of an infringement of the right of the company is only brought home to the man who himself was the artificer of such infringement?

Common sense suggests the answer, but authority is not wanting."

He then referred to Hampshire Land . Similarly Viscount Sumner said of the Lowes (at p19):

> "Their silence was accordingly a notable breach of duty. It has long been recognised that it would be contrary to justice and common sense to treat the knowledge of such persons as that of their company, as if one were to assume that they would make a clean breast of their delinquency. Hence, for the purpose of estopping the company, some knowledge other than theirs has to be brought home to other directors, who can be presumed not to be concerned to suppress it. This was laid down, following earlier cases, in Re Hampshire Land Co , and was even then treated as incontestable."

139   The same principle was applied by the Court of Appeal in Belmont Finance Corporation Ltd v Williams Furniture Ltd [1979] Ch 250 . It was an appeal against the summary dismissal of Belmont's claim on the ground that Belmont was a party to the fraudulent conspiracy, and so shut out by the ex turpi causa rule. Belmont's directors (apparently in collusion with the shareholders in a company that I shall call Maximum) agreed to buy Maximum for £500,000, although it was said to be worth little more than £60,000. Maximum's ex-shareholders then bought all the shares in Belmont from the Williams Furniture group for £489,000, so committing an offence under section 54 of the Companies Act 1948 . Later Belmont, in liquidation, brought proceedings for misfeasance against its former holding companies and various individuals. The Court of Appeal allowed the appeal and directed that the claim should go to trial. The leading judgment was given by Buckley LJ, who did not refer to Hampshire Land or J C Houghton and Co

v Nothard, Lowe and Wills Ltd , but stated the same principle (at pp 261-262):

> "It may emerge at a trial that the facts are not as alleged in the statement of claim, but if the allegations in the statement of claim are made good, the directors of the plaintiff company must then have known that the transaction was an illegal transaction.

> But in my view such knowledge should not be imputed to the company, for the essence of the arrangement was to deprive the company improperly of a large part of its assets. As I have said, the company was a victim of the conspiracy. I think it would be irrational to treat the directors, who were allegedly parties to the conspiracy, notionally as having transmitted this knowledge to the company; and indeed it is a well-recognised exception from the general rule that a principal is affected by notice received by his agent that, if the agent is acting in fraud of his principal and the matter of which he has notice is relevant to the fraud, that knowledge is not to be imputed to the principal.

> So in my opinion the plaintiff company should not be regarded as a party to the conspiracy, on the ground of lack of the necessary guilty knowledge."

It should be noted that Belmont was not, on any view, a one-man company; and it was, as Buckley LJ observed, the victim of a conspiracy.

140    The decision in Belmont was not entirely straightforward, but in my view it was correct. The case can be understood only by reference to the fuller statement of its facts in the judgments in the second appeal to the Court of Appeal, Belmont Finance Corporation v Williams Furniture Ltd (No 2) [1980] 1 All ER 393 . The first appeal was from Foster J's order striking out Belmont's claim on the ground that it was seeking to rely on its own illegality. The second appeal, paradoxically, was from the same judge's dismissal of the claim at trial, on the ground that what had taken place was a bona fide commercial transaction involving no illegality.

141  The alleged illegality was in the company providing financial assistance for the purchase of its shares, contrary to what was then section 54 of the Companies Act 1948 . That provision is one reflection of the basic principle of company law requiring a limited company to maintain its capital: see the explanation by Lord Watson in the leading case of Trevor v Whitworth (1887) 12 Ch App 409 , 423-424. The general prohibitions on a limited company purchasing its own shares, or providing financial assistance for their purchase by another person (both now subject to carefully limited exceptions) have the purpose of preserving the limited company's capital for the protection of those who trade with it.

142    For present purposes there are two essential points to note in regard to the complicated manoeuvres undertaken in Belmont . First, there was a purchase (of the shares in Maximum) at a gross overvalue, and this (quite apart from section 54 of the Companies Act 1948 ) was a breach of fiduciary duty by those of Belmont's directors who were complicit (see especially the judgment of Goff LJ in Belmont (No 2) at p 411). Secondly, as part of the same prearranged plan the £0.5m extracted from Belmont was then recycled by purchasing the shares in Belmont, so infringing section 54 . The former shareholders in Belmont did not suffer under the prearranged scheme, since they wanted to sell the company and were no worse off through the purchase of Maximum at an overvalue (but they were held accountable as constructive trustees). The real victims, after predictions as to Maximum's profit-earning capacity proved mistaken, were Belmont's creditors (and especially its depositors, who apparently took priority to the debenture-holders).

143  Looking at the earlier Belmont decision again in the light of the fuller facts in Belmont (No 2) I think that Buckley LJ was right to say that Belmont was a victim. It lost over £0.4m in assets (though its former shareholders did not suffer that loss until the court made them accountable) and, on the Hampshire Land principle, the guilty knowledge of some of the directors was not to be attributed to Belmont. Section 54 was certainly enacted to protect company funds and the interests of shareholders as well as creditors, as Scarman LJ said in Wallersteiner v Moir [1974] 1 WLR 991 , 1032-1033 but I do not see that this undermines the reasoning of Buckley LJ (who referred to Wallersteiner v Moir at p 261).

144  In all these cases there was a company which was the victim of a fraud or serious breach of duty, and the court held that it was not to be prejudiced by the guilty knowledge of an individual officer who could not be expected to disclose his own fault. (The fact that duties were owed to two different companies in Hampshire Land and Houghton is, I think, an irrelevant coincidence). This principle is sometimes referred to in the United States of America as the "adverse interest" exception to the usual rule of imputation (see for instance Rudolph and Tanis, "Invoking *In Pari Delicto* to Bar Accountant Liability Actions Brought by Trustees and Receivers" (2008) ALI-ABA Study Materials). It is applied, typically, in cases in which the corporate victim is the claimant and the defence seeks to rely on the corporate victim's notice, knowledge or complicity. It will be necessary to consider some recent English cases which do not fit so neatly into the same mould.

145  In reviewing some of the recent cases Rimer LJ expressed surprise (in para 71 of his judgment) at the Hampshire Land principle being referred to in the context of fixing liability on a party. He saw the principle as "primarily concerned not with a company's *liabilities* to others but rather with its *claims* against others." Most of the early cases do fall into that category (though in Houghton NLW's claim was a counterclaim against a third party which was seeking delivery of bills of lading). But I can see no reason why the principle should be limited to claims. It is, as I have said, a general principle of agency which can apply to any issue as to a company's notice, knowledge or complicity, whether that issue arises as a matter of claim or defence.

## Sole actors and secondary victims

146  Mr Brindle has relied on the Hampshire Land principle to insulate S & R, for the purposes of the *ex turpi causa* rule, from Mr Stojevic's fraudulent conduct. Mr Sumption QC, for Moore Stephens, has in the Court of Appeal and before the House deployed two lines of argument against that. The first is that the principle has no application in a case where the person or persons with ownership and control of the company are entirely complicit in the fraud, so that there is no single individual connected with the company who can be regarded as an innocent party deceived and prejudiced by the fraud. This is, in the terminology used in the United States, the "sole actor" exception to the "adverse interest" rule—which is itself an exception to the ordinary rules of imputation. In England the phrase "one-man company" is sometimes used, but it is an imprecise expression which calls for explanation. The other line of argument is that the Hampshire Land principle does not apply to cases where the victim of the fraud is not the company itself, but a third party. This leads on to arguments as to whether the company in question, although not a primary victim, should be regarded as a secondary victim (and so within the principle).

147  In the Court of Appeal Rimer LJ (with the concurrence of the other members of the Court) rejected the first line of argument (paras 45 and 46) but acceded to the second (paras 65 to 73). I would add, however, that Rimer LJ's summary of his reasoning, (in para 73 of his judgment, quoted in para 169 below) begins with a couple of sentences which suggest to me that his discussion on the "victim" issue may have begun to raise some degree of doubt about his conclusion on the "sole actor" issue. I shall discuss these issues in turn. But as some of the modern cases touch on both issues it is convenient to summarise them first, in chronological order.

## The modern cases

148  Both sides relied on the decision of the Court of Appeal in Attorney General's Reference (No. 2 of 1982)

[1984] QB 624 . This was concerned with a point of criminal law:

> "Whether a man in total control of a limited liability company (by reason of his shareholding and directorship) is capable of stealing the property of the company; and whether two men in total control of a limited liability company (by reason of their shareholdings and directorships) are (while acting in concert) capable of jointly stealing the property of the company."

Two men, who were between them in total control of a company, had plundered its assets in extravagant living and it was insolvent to the extent of about £2.5m. The case was largely concerned with the application to that situation of the language of section 2(1)(a) and (b) of the Theft Act 1968 . For my part I do not think that the decision assists either side. It is really concerned with the correct construction of a criminal statute and its application to a situation which Parliament may not have contemplated when the Theft Act 1968 was being enacted.

149   Brink's-Mat Ltd v Noye [1991] 1 Bank LR 68 was not cited to the Court of Appeal (indeed Mr Sumption told us that it seems never to have been cited in any reported case before). Brink's-Mat was bailee of very valuable gold bullion stolen in a notorious armed robbery which took place in 1983. Two of the conspirators, Chappell and Palmer, smelted and recast some of the bullion and used a company, Scadlynn Ltd, to sell the recast gold (some was sold to its true owner, Johnson Matthey). Scadlynn had a small issued capital owned by Chappell and Palmer. Between September 1984 and the end of January 1985 over £10m was withdrawn in cash from Scadlynn's account with Barclays Bank. Brink's-Mat sued Chappell, Palmer, Scadlynn and Barclays Bank. The issue before the Court of Appeal was a proposed re-amendment of the statement of claim to add new claims against Barclays Bank. These were claims for wrongs to Scadlynn which Brink's-Mat claimed to be able to enforce as beneficiary

under a constructive trust. That was the very unusual context in which Mustill LJ said (at p 72):

> "Here the corporate entity named Scadlynn was, however odd the notion may seem at first sight, the victim of wrongful arrangements to deprive it improperly of a large part of its assets: see Belmont Finance Corporation Ltd v Williams Furniture Ltd [1979] Ch 250 , at pp 261-262. If the facts were such that the bank should have recognised the possibility of such an impropriety, and if the scope of the bank's duty of care was wide enough to impose an obligation to take steps to forestall it, I see no reason why the cause of action should not be enforced by Scadlynn for the ultimate benefit of the creditors who would look to those assets for satisfaction of their debts."

Similarly Nicholls LJ said (at 73):

> "On the facts alleged in the proposed amendments, Scadlynn was at all material times being used by Chappell and Palmer and others for a fraudulent purpose, viz, to realise the proceeds of sale of the robbery. But the plaintiff was not implicated in any such fraudulent purpose. On the contrary, along with the owners of the gold, the plaintiff was the intended victim of the scheme. Likewise, Scadlynn itself was an intended victim, in that Scadlynn was being used as a vehicle for committing a fraud on its creditors and a fraud on those beneficially interested in property held by Scadlynn. In those circumstances the fraudulent purposes of those controlling Scadlynn are not to be imputed to the company itself:

see Belmont Finance Corpn Ltd v Williams Furniture Ltd [1979] Ch 250 , per Buckley LJ at pp 261-262."

150 In Berg, Sons & Co Ltd v Mervyn Hampton Adams (1992) [2002] Lloyd's Rep PN 41 , Berg was, on any view, a one-man company. Mr Golechha was the only active director and sole beneficial owner of its shares. Berg became insolvent (without fraud being proved or, so far as I can see, alleged) and its liquidator sued some former partners in the auditors, Dearden Farrow. Hobhouse J held that the auditors had negligently treated certain bad debts as recoverable, but that only nominal damages could be recovered. The reason was explained by Hobhouse J, at p 54:

> "In the present case it has not been proved that there was any fraud by Mr Golechha in relation to the 1981 audit, still less that at that time Mr Golechha was practising any fraud on his principal, Berg. There was no entity which it can be said he misled or in relation to which it can be said that he was acting fraudulently in relation to the audit in October 1982. However one identifies the company, whether it is the head management, or the company in general meeting, it was not misled and no fraud was practised upon it. This is a simple and unsurprising consequence of the fact that every physical manifestation of the company Berg was Mr Golechha himself. Any company must in the last resort, if it is to allege that it was fraudulently misled, be able to point to some natural person who was misled by the fraud. That the plaintiffs cannot do."

Hobhouse J distinguished Belmont because there was no conspiracy to defraud Berg. He referred to Attorney General's Reference (No 2 of 1982) as "nearer to the point" but only, as I understand it, because in that case also there was no individual victim. But again the case was distinguishable because it involved fraud, and there was no fraud against Berg.

151 Group Josi Re v Walbrook Insurance Co Ltd [1996] 1 WLR 1152 was concerned with contracts of reinsurance which (lacking statutory authorisation) were void for illegality. It is of interest as being the first of the modern cases decided after Meridian . After referring to Meridian Saville LJ said (at p 1170):

> "In the present case the reinsurers rely upon cases where knowledge has been attributed, while the reinsured rely upon cases dealing with what has been called 'the fraud exception' or the rule in Re Hampshire Land Co [1896] 2 Ch 743 , i.e. cases where knowledge of the fraudsters of a fraud on a corporation has been unsuccessfully sought to be attributed to the corporation.

> Mr Bartlett [for the reinsurers] accepted that there were circumstances in which the 'fraud exception' meant that knowledge was not attributed. In his submission, the essence of the relevant principle is that the court will not infer that a company has knowledge of a fact known to an agent or director of the company where, because of the agent's or director's fraud or other breach of duty to the company, *it would be contrary to justice and common sense to draw such inference* .

> For the purposes of this case at least, I am prepared to proceed on the basis of this proposition."

152   Arab Bank plc v Zurich Insurance Co [1999] 1 Lloyd's Rep 262 involved a fraudulent valuation made by a managing director, Mr Browne (who was not however the directing mind and will of his company, JDW). Both JDW and Mr Browne were separately covered by a fidelity policy, subject to a proviso excluding from indemnity "any person knowingly committing, making or condoning [a dishonest or fraudulent] act." This context had an important bearing on the way in which Rix J approached the issue of attribution (see at p 279, where he said that the position might have been different with a "one man company"). But Rix J also discussed the "victim" issue. He observed at pp 282-283:

> "There remains the question, … whether the Hampshire Land doctrine is confined to cases of fraud where the principal is himself the victim of the fraud, or whether, as Mr Justice Vaughan Williams put it in Hampshire Land itself, the doctrine extends to other breaches of duty where common sense would destroy the inference of transfer of knowledge. In the typical case in which the doctrine has been applied, Houghton , Belmont , PCW and Group Josi Re , fraud has been found or assumed. In the present case, fraud is also assumed, but the primary victim of the fraud has been the lending institution which has relied on the valuation. I would accept, however, the plaintiffs' submission that JDW was also a victim, even if only a secondary victim, of the assumed fraud. One consequence of that assumed fraud has been JDW's liability to the plaintiffs, albeit in negligence. Moreover, even if it could be said that JDW, unlike the plaintiffs, was *not* the victim of Mr Browne's fraud, Mr Browne has, on the assumed facts, been guilty of dishonesty, and one can hardly visualise a graver dereliction of his duty to his company. Although the cases often involve fraud, Hampshire Land itself did not necessarily do so, and I note that in Group Josi Re , Lord Justice Saville was prepared to accept as a working definition of the scope of the principle the cases of 'the agent's or director's fraud or other breach of duty to the company' (at p 367). In my judgment, Mr Browne's fault comes within the concept of an agent's fraud on his principal, but, even if it does not, his fault is such a breach of duty to JDW as in justice and common sense must entail that it is impossible to infer that his knowledge of his own dishonesty was transferred to JDW."

153   McNicholas Construction Co Ltd v Customs & Excise Commissioners [2000] STC 553 is the first of the cases in which Rimer LJ was surprised to find Hampshire Land being used in the context of a claim against a company. McNicholas was a civil contractor and often had contracts to dig trenches for cable ducts. It had some employed staff but also used gangs of self-employed labourers. Customs & Excise suspected that McNicholas was paying fraudulent invoices for VAT on services which had never been provided, and was then claiming to deduct this as input tax. Customs & Excise raised assessments to recover lost tax and (so far as the assessments went back more than three years) had to establish dishonesty on the part of McNicholas. The Tribunal found that some of its site managers were complicit in the fraud, and that their dishonesty was to be attributed to McNicholas for the purposes of the VAT legislation.

154   Dyson J dismissed McNicholas's appeal. He approved the Tribunal's reliance on the context of the VAT legislation as calling for a special rule of attribution. He also made some interesting observations touching on the "victim" issue (para 55):

"In my judgment, the tribunal correctly concluded that there should be attribution in the present case, since the company could not sensibly be regarded as a victim of the fraud. They were right to hold that the fraud was 'neutral' from the company's point of view. The circumstances in which the exception to the general rule of attribution will apply are where the person whose acts it is sought to impute to the company knows or believes that his acts are detrimental to the interests of the company in a material respect. This explains, for example, the reference by Viscount Sumner in J C Houghton and Co v Nothard, Lowe and Wills Ltd [1928] AC 1 at p19 to making 'a clean breast of their delinquency'. It follows that, in judging whether a company is to be regarded as the victim of the acts of a person, one should consider the effect of the acts themselves, and not what the position would be if those acts eventually prove to be ineffective."

I have to say that I find it difficult to understand, as a matter of fact, why the fraud was "neutral" from the point of view of McNicholas. But the important point is Dyson J's view that in principle "in judging whether a company is to be regarded as the victim of the acts of a person, one should consider the effect of the acts themselves, and not what the position would be if those acts eventually prove to be ineffective."

155   The last of the recent cases is the decision of the Court of Appeal in Bank of India v Morris [2005] BCC 739 , one of the many cases concerned with the fallout from the collapse of BCCI. Mr Samant, a senior manager (but not a director) of the Bank of India, committed it to a series of transactions which amounted to assisting BCCI to defraud its creditors. The Court of Appeal upheld Patten J, who had held Bank of India liable under section 213 of the Insolvency Act

1986 . Again, the statutory context guided the court's approach to the appropriate rule of attribution. Patten J had been right to follow McNicholas (para 118):

"As in McNicholas , the acts of Mr Samant were not in fact targeted at BoI. He was acting for, and in what he apparently believed to be the interests of, BoI in seeking to gross up the balance sheet for the purposes of the year end accounts. The potential liability of BoI under s213 is irrelevant in deciding whether BoI was a victim of Mr Samant and whether his knowledge should be attributed to it for the purposes of s 213."

156   The Court of Appeal also commented on Arab Bank (para 124):

"In our judgment, the facts and the contractual context make Arab Bank a different case. It did not lay down a general principle of attribution of knowledge which governs this case of statutory liability to make compensation to victims of fraudulent trading. Arab Bank is not, as Mr Moss contended, authority for the proposition that knowledge of fraud can only be attributed to a company if the individual with the relevant knowledge was a director or directing mind of the company, or where it can be inferred from all the circumstances that the individual transferred his knowledge to the company or to its directing mind and will; nor is it authority for the proposition that there can be no attribution of knowledge where the company is a 'secondary victim' of the individual's wrongdoing or breach of duty."

**Discussion of the 'sole actor' exception**

157  The 'sole actor' exception was applied (although not by that name) by the Privy Council (on appeal from Brunei) in Royal Brunei Airlines Sdn Bhd v Tan [1995] 2 AC 378 . The airline had been defrauded by Mr Tan who was the principal director and shareholder in a travel agency company called Borneo Leisure Travel ("BLT"). The only other director and shareholder was Mr Tan's wife. BLT owed fiduciary duties to the airline for money which it received, but misappropriated it for its own purposes. Lord Nicholls of Birkenhead formulated the issue (at p.384) as "whether the breach of trust which is a prerequisite to accessory liability must itself be a dishonest and fraudulent breach of trust by the trustee." He answered that question in the negative, adding (at p 392) "although this will usually be so where the third party who is assisting him is acting dishonestly" (as Mr Tan was). But as BLT was a one-man company it was itself dishonest (at p 393):

> "Set out in these bald terms, [Mr Tan's] conduct was dishonest. By the same token, and for good measure, BLT also acted dishonestly. [Mr Tan] was the company, and his state of mind is to be imputed to the company."

Belmont was referred to in the Judicial Committee's judgment, but only on the issue of the degree of improbity required for accessory liability.

158  Berg was another clear case of a one-man company. It was not a case involving fraud, but Hobhouse J's judgment explains why it can be seen as a sort of mirror-image of the Hampshire Land situation. In Hampshire Land the company secretary had been guilty of a serious breach of duty which he could be expected to keep quiet about, and not disclose to the directors and members of the building society. His guilty knowledge was not therefore attributed to the building society. In Berg , by contrast, Mr Golechha knew all about the irrecoverable loans, and there was no other individual concerned in the management or ownership of his company from whom his knowledge could be concealed, because there simply was no such individual—"a simple and unsurprising consequence," as Hobhouse J put it, "of the fact that every physical manifestation of the company Berg was Mr Golechha himself."

159  In situations like those in Royal Brunei and Berg denial of attribution on "adverse interest" grounds would not serve the ends of justice. It would on the contrary operate as a reversion to the views of Lord Bramwell in Abrath v North Eastern Railway Company , reducing a one-man company to a mindless creature in the eyes of the law. Instead it has the mind of its human embodiment, though that is not treated as a *separate* mind for the purposes of the crime of conspiracy ( R v McDonnell [1966] 1 QB 233 , 245).

160  As I have said, the concept of a one-man company calls for some explanation. It was severely criticized by Lord Macnaghten in the leading case of Salomon v Salomon & Co Ltd [1897] AC 22 , 53:

> "It has become the fashion to call companies of this class 'one man companies.' That is a taking nickname, but it does not help one much in the way of argument. If it is intended to convey the meaning that a company which is under absolute control of one person is not a company legally incorporated, although the requirements of the Act of 1862 may have been complied with, it is inaccurate and misleading: if it merely means that there is a predominant partner possessing an overwhelming influence and entitled practically to the whole of the profits, there is nothing in that that I can see is contrary to the true intention of the Act of 1862, or against public policy, or detrimental to the interests of creditors."

161  But Salomon's case was not concerned with the attribution of any state of mind to Mr Aron Salomon's company. On the contrary, it was argued (successfully at first instance and in the Court of Appeal: Broderip v Salomon [1895] 2 Ch 323 ) that the company was a sham, a mindless mask for Mr Salomon as the real owner of the business. In this appeal, by contrast, the issue is the attribution to S & R of a dishonest state of mind. Where that is the issue the notion of a one-man company does become meaningful, as Royal Brunei demonstrates. In this context I would treat the expression as covering cases where there is one single dominant director and shareholder (such as Mr Tan in Royal Brunei , Mr Golechha in Berg , or Mr Stojevic in the present case) even if there are other directors or shareholders who are subservient to the dominant personality (such as Mr Tan's wife in Royal Brunei , the inactive solicitor-director in Berg , or S & R's nominee directors). I would also treat it as covering cases where there are two or more individual directors and shareholders acting closely in concert, such as the anonymised directors in Attorney General's Reference (No 2 of 1982) or Mr Chappell and Mr Palmer in Brink's-Mat . It may be simplest to propose a test in negative terms, on the lines of what Hobhouse J said in Berg , that is a company which has no individual concerned in its management and ownership other than those who are, or must (because of their reckless indifference) be taken to be, aware of the fraud or breach of duty with which the court is concerned.

162  The principle of the "sole actor" is more fully developed in United States case law. In his printed case Mr Sumption referred to a number of United States authorities (not cited to the Court of Appeal) while accepting that they have to be treated with caution, both because of variations between state laws and because of the rather different basis of the public policy defence in the United States (which inclines to *in pari delicto potior est conditio defendentis* as the guiding principle). I accept that caution is needed, but I find the general reasoning in these cases persuasive and in line with the English authorities just mentioned.

163  In The Mediators Inc v Manney 105 F 3d 822 (1997) , a decision of the Second Circuit of the United States Court of Appeals, applying the law of New York, the court upheld the rejection (on grounds of illegality) of a claim on behalf of a company's unsecured creditors against bankers, lawyers and accountants said to have assisted Mr Manny, the company's president and sole shareholder, in breach of fiduciary duties to the company. The court stated the principle as follows (at p 827, omitting references):

> "Second, the adverse interest exception does not apply to cases in which the principal is a corporation and the agent is its sole shareholder. As noted, the adverse interest exception is to a presumption that an agent has discharged the duty of disclosing material facts to the principal. Under New York law, where the agent is defrauding the principal, such disclosure cannot be presumed because it would defeat —or have defeated—the fraud. However, where the principal and agent are one and the same, the adverse interest exception is itself subject to an exception styled the 'sole actor' rule. This rule imputes the agent's knowledge to the principal notwithstanding the agent's self-dealing because the party that should have been informed was the agent itself albeit in its capacity as principal. Where, as here, a sole shareholder is alleged to have stripped the corporation of assets, the adverse interest exception to the presumption of knowledge cannot apply."

164  In Official Committee of Unsecured Creditors v R F Lafferty & Co Inc 267 F 3d 340 (2001) the Third Circuit of the United States Court of Appeals, applying the law of Pennsylvania, reached a similar conclusion. Two companies, Walnut and its wholly-owned subsidiary ELCOA, were run and owned by Mr William Shapiro and other members of the Shapiro family, assisted by various professionals. The two

companies ran a fraudulent Ponzi scheme. The court decided (at p357) that it must evaluate the *in pari delicto* defence without regard to whether the Committee was an innocent successor. On that basis the court applied the sole actor exception (treating the Shapiro family as a single entity) and held the companies to be *in pari delicto* (at p 359, references omitted):

> "The second part of the imputation test—whether fraudulent conduct was perpetrated for the benefit of the debtor corporation—is often analysed under the 'adverse interest exception.' Under this exception, fraudulent conduct will not be imputed if the officer's interests were adverse to the corporation and 'not for the benefit of the corporation.'

The Committee argues that the Shapiro family's fraud was adverse to the interests of the Debtors, and indeed, caused damage to them through 'deepening insolvency.' Thus, the Committee maintains that the Shapiros did not act for the benefit of the Debtors and their fraudulent conduct cannot be imputed to those corporations. However, even assuming that the Shapiros' interests were adverse to the Debtors' interests, the Committee cannot prevail because the 'adverse interest exception' is itself subject to an exception—the 'sole actor' exception. The general principle of the 'sole actor' exception provides that, if an agent is the sole representative of a principal, then that agent's fraudulent conduct is imputable to the principal regardless of whether the agent's conduct was adverse to the principal's interests. The rationale for this rule is that the sole agent has no one to whom he can impart his knowledge, or from whom he can conceal it, and that the corporation must bear the responsibility for allowing an agent to act without accountability."

165  There is also a very interesting discussion of these problems in the judgment of the Supreme Court of Canada in *Canadian Dredge & Dock Co Ltd v The Queen* (1985) 19 DLR (4th) 314 . It was the final appeal in a major criminal trial of both corporate and individual defendants for bid-rigging of tenders in the dredging industry. Top executives had conspired together and companies which had won contracts by illegal means divided their ill-gotten gains, some of which ended up in the hands of individual executives. The whole judgment (given by Estey J) deserves study. Its general conclusion (at the end of the headnote on p316) is this:

> "The corporation could not be said to have been defrauded in any relevant sense when the only thing of which it was deprived was part or indeed all of the product of the crime with which it was charged. It was no defence that some of the illegal compensation was diverted to the individuals."

166  Rimer LJ did not accept Mr Sumption's submissions on this point (and did not, as I have noted, have the United States and Canadian authorities cited to him). He did so primarily in reliance on the statement in Attorney General's Reference (No 2 of 1982) that the principle in Belmont can apply even though it was true of the two controlling directors (p 642) "that their acts are necessarily the company's acts; that their will, knowledge and belief are those of the company, and that their consent necessarily implies consent by the company." But the Court of Appeal rejected that reasoning, as I see it, only because it could not be reconciled with the words "the other" in section 2(1)(b) of the Theft Act 1968 . The Court of Appeal felt itself compelled by the wording of the statute to look for a *separate* will as it had in R v McDonnell , the case about conspiracy.

167  There is no special statutory context of that sort here. On this point I respectfully disagree with Rimer LJ and the other members of the Court of Appeal. In the case of a one-man company (in the sense indicated above) which has deliberately engaged in serious fraud, I would follow Royal Brunei (and the strong line of United States and Canadian authority) in imputing awareness of the fraud to the company, applying what is referred to in the United States as the "sole actor" exception to the "adverse interest" principle.

168   In particular I would apply the "sole actor" principle to a claim made against its former auditors by a company in liquidation, where the company was a one-man company engaged in fraud, and the auditors are accused of negligence in failing to call a halt to that fraud. Here I return to Mr Brindle's point (para 132 above) about the need to decide any question of attribution by reference to its context. Looking at the context, I cannot accept his submission that a claim against auditors is a context in which S & R should not be treated as primarily (or directly) liable for its fraud against KB, and so disabled by the *ex turpi causa* principle. Mr Sumption conceded, in line with the pleadings, that the auditors did owe a duty of care to S & R, although Mummery LJ (with whom, as with Rimer LJ, Keene LJ agreed) considered (para 115) that

> "the firm did not owe a duty of care to the company, which was a fraudster in the total grip of another fraudster."

On the assumption that the auditors did owe a duty of care to S & R, it was a duty owed to that company as a whole, not to individual shareholders, or potential shareholders, or current or prospective creditors, as this House decided in Caparo Industries plc v Dickman [1990] 2 AC 605 . If the only human embodiment of the company already knew all about its fraudulent activities, there was realistically no protection that its auditors could give it. In Caparo this House approved the decision of Millett J in Al Saudi Banque v Clarke Pixley [1990] Ch 313 , the facts of which were comparable to those of the present case.

**Discussion of secondary victims**

169   In para 73 of his judgment Rimer LJ set out his conclusions on what he called the Hampshire Land issue:

> "In these circumstances I am of the opinion that this is not a case in which the Hampshire Land principle has any application. The essence of the case is that it is one in which the

sole directing mind and will of the company procured it to enter into fraudulent transactions with banks. It was the company that dealt with the banks and, so it seems to me, clear that, as between the company and the banks, the principles of attribution require the dishonesty of the company's sole human agent to be imputed to the company. Mr Sumption's submissions satisfied me that this is a case in which such an imputation should be made and that the company should therefore *itself* be liable for the frauds. Whilst, as I have said, Mr Brindle did not accept that this is the correct analysis, he did not argue against it and he was prepared to accept it for the purposes of the present debate. It is not therefore a case in which the company was the target, or the victim, of its agent's dishonesty. It was itself the fraudster, and it was not the target of the fraud, and in my view it can make no difference that its frauds were likely, when and if found out, to result in the incurring of liabilities by the company itself."

170   As I have mentioned (para 147 above), at the beginning of this passage Rimer LJ seems to be showing some sympathy for the one-man company approach which he had earlier rejected. In the latter part of the passage he draws a clear distinction between a company as victim and a company as villain. Where a company has carried out large-scale frauds it is likely to end up in insolvent liquidation, and facing claims from those whom it has defrauded. It can therefore be regarded as a sort of secondary victim. But in the last sentence of the passage quoted Rimer LJ (without using that term) discounts the "secondary victim" theory as not material to the rules of attribution which he has been considering.

171  The expression "secondary victim" seems to have originated (at any rate in this context) in Brink's-Mat . That case was concerned with large-scale, flagrant, organised crime. From beginning to end legal title in the stolen bullion was shared between Brink's-Mat as bailee and Johnson Matthey as owner. But if it is necessary to construct a sort of parallel universe in which the conspirators' activities are supposed to have been lawful, I can see no reason to suppose that Scadlynn would have been the owner of the bullion. The bullion would surely have belonged to the conspirators as a sort of partnership. Scadlynn (with a small capital and only two of the conspirators as shareholders) would have been a bailee for reward, entrusted with the task of recasting the bullion and selling it as an agent. The directors of Scadlynn would have expected remuneration for their services. In short I can see no basis for the assumption by Mustill LJ that Scadlynn was "the victim of wrongful arrangements to deprive it improperly of a large part of its assets." I do not think that the decision can be given much weight; as my noble and learned friend Lord Phillips of Worth Matravers observes in para 5 of his opinion, "if a person starts with nothing and never legitimately acquires anything he cannot realistically be said to have suffered any loss."

172  A similar point may arise in the present case, since it is pleaded that money fraudulently obtained by S & R became the subject of "numerous fraudulent and/or irregular payments out by S & R to entities controlled by Mr Stojevic and his associates." Any contractual arrangements between S & R and BCL (or similar companies) for division of the fruits of their fraud would of course have been void for illegality. To describe such arrangements as fraudulent and/or irregular does not to my mind turn S & R into a victim in any ordinary sense. Mr Sumption's submissions on this point, which I am inclined to accept, are recorded in para 49 of Rimer LJ's judgment.

173  However it is unnecessary to speculate further about the commercial terms on which gangs of robbers or fraudsters might be expected to organize their criminal activities. There is in my opinion a clearer and firmer basis on which to determine what (if any) significance to give to the notion of a company being the secondary victim of the fraud (aimed at a third party) of one or more of its directors. It is necessary to keep well in mind why the law makes an exception (the adverse

interest rule) for a company which is a primary victim (like the Belmont company, which was manipulated into buying Maximum at a gross overvaluation). The company is not fixed with its directors' fraudulent intentions because that would be unjust to its innocent participators (honest directors who were deceived, and shareholders who were cheated); the guilty are presumed not to pass on their guilty knowledge to the innocent. But if the company is itself primarily (or directly) liable because of the "sole actor" rule, there is *ex hypothesi* no innocent participator, and no one who does not already share (or must by his reckless indifference be taken as sharing) the guilty knowledge. That is consistent with the analysis by Rix J in Arab Bank . In that case Mr Browne was not the directing mind of JDW, which was not a one-man company; Rix J accepted that the position might have been different if it had been.

174  I would therefore limit my ground of decision in this appeal to the proposition that one or more individuals who for fraudulent purposes run a one-man company (in the sense described above) cannot obtain an advantage by claiming that the company is not a fraudster, but a secondary victim. McNicholas and Bank of India may be best analysed as depending on a special rule of attribution required by the scheme of the legislation relating to VAT or fraudulent trading (as the case may be). It is not necessary to the disposal of this appeal, or prudent, to address every situation that may be described as involving a secondary victim.

### Three cases relied on by S & R

175  Mr Brindle argued that if an *ex turpi causa* defence is available in this case, it must have been overlooked in other well-known cases conducted by skilled and experienced counsel and solicitors. In particular, he referred to three pieces of litigation which he had cited to the Court of Appeal, but which had not been mentioned in the judgment of Rimer LJ: Barings , BCCI and Sasea . The actual decisions cited to the Court of Appeal are listed as Bank of Credit and Commerce International (Overseas) Ltd v Price Waterhouse 24 March 1998 , Laddie J, Barings plc v Coopers & Lybrand [2003] 1 Lloyd's Rep IR 566 and Sasea Finance Ltd (in liquidation) v KPMG [2000] 1 All ER 676 , but there were some other strands in the litigation about Barings , and many other strands in the BCCI

litigation (Mr Brindle's printed case refers in particular to the judgment of Lightman J in Bank of Credit and Commerce International SA (in liquidation) v Ali (No 2)[2000] ICR 1354, [1999] 4 All ER 83 and to Bank of Credit and Commerce International (Overseas) Ltd v Price Waterhouse [1998] BCC 617, the judgment of the Court of Appeal reversing Laddie J).

176  In an earlier draft I commented on these cases at some length. I have omitted that passage because it is not necessary, I think, or helpful, to try to reach any firm conclusion about these other litigious struggles. Mr Brindle is right to say that S & R's public policy defence is novel (at least in England). Mr Sumption's comments on Barings , BCCI and Sasea do suggest that there may have been good reasons why skilled and experienced counsel and solicitors did not attempt to deploy the public policy defence in those cases. But however novel the issues in this appeal, they must be decided on their merits, and not by reference to other cases in which (for whatever reason) they were not raised.

**The 'very thing' issue**

177  In the context of 'the very thing that the defendant was under a duty to take care to prevent' the phrase the 'very thing' may first have been used over sixty years ago by the unnamed County Court judge whose judgment was upheld by the Court of Appeal in Stansbie v Troman [1948] 2 KB 48 . That was the case of the decorator who left the door of his client's house unlocked when he went out to buy more wallpaper, with the result that some of the client's jewellery was stolen by an opportunistic thief. What the County Court judge actually said (see at p 51) was that the decorator failed to take reasonable care "to guard against the very thing that happened" and the decorator's counsel argued (unsuccessfully) that his job was to decorate his client's house, and not to look after its security. But the phrase has come to be used as a convenient label for the principle that if there is a duty (in contract or tort) to prevent harm caused by a third party, the person under that duty may be liable for the loss, and cannot excuse himself by saying that it was caused by the third party (though the third party will normally be concurrently liable). Reeves v Commissioner of Police of the Metropolis [1999] QB 169, [2000] 1 AC 360 and Corr v IBC Vehicles Ltd [2008] AC 884 (both concerned with suicide, though in a context of different duties of care) are extreme illustrations of this principle, where the (self-) harm was caused not by a third party but by the person to whom the duty was owed.

178  The principle is therefore a principle of causation. Mr Brindle accepts that, but submits that it is also a wider principle (he calls it a principle of logic) capable of excluding the public policy defence in a case where fraud on the part of a company is the very thing that it is the auditors' duty to detect (and so prevent for the future). He submits that a point made by Lord Hoffmann in Reeves (at p 372) applies to all defences, and not just causation defences:

> "[W]hatever views one may have about suicide in general, a 100 per cent apportionment of liability to Mr Lynch gives no weight at all to the policy of the law in imposing a duty of care upon the police. It is another different way of saying that the police should not have owed Mr Lynch a duty of care."

In Reeves illegality was run as a defence in the Court of Appeal, but not in this House. On the other hand *volenti non fit injuria* was run in this House, and was rejected. Mr Brindle submits (on the strength of Smith v Baker & Sons [1891] AC 325 , 360) that that is not a principle of causation. The *volenti* principle is far from precise and it may sometimes operate not as a principle of causation, but to negative any duty (or any breach). But in this context it operates as an element in causation. As Lord Hoffmann said in Reeves [2000] 1 AC 360 , 367:

> "In the present case, volenti non fit injuria can only mean that Mr Lynch voluntarily caused his own death to the exclusion of any causal effect on the part of what was done by the police. So I think it all comes to the same thing: was the breach of duty by the police a cause of the death?"

179  Checking for fraud is part of an auditor's task, but it is not his sole or primary task (for a reputable auditor to discover that the client company's business is wholly fraudulent and criminal must be quite unusual). But suppose for the sake of argument that a trader engages an accountant for the primary and express purpose of preparing financial statements that comply with all the requirements of company law and tax law, so that the lawfulness of the financial statements is the very thing that the accountant undertakes to do; and suppose that the accountant negligently fails to perform this task, and the trader is in consequence liable to some penalty or criminal sanction. Could the accountant meet a claim for professional negligence by pleading the *ex turpi causa* defence? It is obviously impossible to answer that question without knowing more about the facts. If the trader had honestly supplied information which he believed to be correct and complete, and the accountant had negligently failed to notice that the information could not be correct and complete, it seems unlikely that such a regulatory breach, not involving dishonesty, would bring the *ex turpi causa* principle into play.

180  That seems to have been the principle of the decision of the Court of Appeal of Singapore in United Project Consultants Pte Ltd v Leong Kwok Onn [2005] SLR 214 (paras 55 to 57), where the claimant trading company had been fined for incorrect tax returns prepared by the defendant. The court went on (paras 58 to 62) to express the view that the "very thing" principle would have excluded the *ex turpi causa* defence even if the facts had been serious enough to be capable of attracting it (para 60):

> "The respondent, however, alleged that the commission by the appellant of a statutory offence constituted an illegal act that disentitled the latter from pursuing its claim in tort. This argument placed the proverbial cart before the horse. On a proper appreciation of the facts, the appellant's running afoul of the Act could be attributed solely to the fact that the respondent had failed in his duty to warn. To allow the respondent to rely upon a consequence that was directly caused by his own failings and to

absolve him from liability, would be to reward the wrongdoer and punish the innocent party."

In my opinion that shows confusion of thought, since if the trader had been convicted of the more serious offence under section 96 of the Singapore it would have been guilty of deliberate and dishonest tax evasion and could not have been described as an innocent party.

181  In that situation the law would not permit the trader to claim against the accountant, not because there was no fault on the part of the accountant, but because public policy requires the dishonest trader to be denied a remedy. It is not a matter of rewarding a wrongdoer. To repeat the words of Lord Mansfield CJ in Holman v Johnson (1775) 1 Cowp. 341 , 343 "It is upon that ground the court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff."

182  In United Project Consultants the Singapore Court of Appeal referred to the decision of the Court of Appeal in Reeves [1999] QB 169 as supporting their view on the "very thing" point. But as I read that case only Buxton LJ (at para 185) relied on that point as one of his reasons for rejecting *ex turpi causa* . Lord Bingham of Cornhill CJ and Morritt LJ relied on the simple ground that suicide is no longer a crime. As already note, illegality was not an issue when Reeves came on further appeal to this House.

183  Rimer LJ considered this point at length (paras 75 to 105) and rejected it (paras 106 to 110). In my opinion he was right to do so. His reasoning was, I think, essentially the same as mine. The essential point is that a principle of causation cannot, as Rimer LJ put it, trump *ex turpi causa* where the latter principle applies, however short of merits the defendant may be.

### The effect of liquidation

184  It was argued for the appellants that the public policy defence should not bar claims brought by a company in insolvent liquidation, where the creditors were innocent parties who had been defrauded by Mr

Stojevic. If that were right, it would create a very large gap in the public policy defence, since most fraudsters (individual and corporate) become insolvent sooner or later and have liabilities to those whom they have defrauded. Mr Brindle conceded that if Mr Stojevic had carried out his frauds directly (and not through a one-man company) neither he nor his trustee in bankruptcy could have resisted the public policy defence. That conclusion was reached by Langley J. (para 65(2)) and is clearly correct (see Fry LJ in Cleaver v Mutual Reserve Fund Life Association [1892] 1 QB 147 , 156). There is no good reason to apply a different rule to a company in liquidation. Apart from special statutory claims in respect of misfeasance, wrong trading and so on, it cannot assert any cause of action which it could not have asserted before the commencement of its liquidation, as Mr Brindle concedes. That is especially true in the context of the duties of an auditor, which are not owed to a company's creditors.

### Contributory negligence

185   Mr Brindle put in the forefront of his case the general submission that *ex turpi causa* is a blunt instrument, and that a more satisfactory tool for doing justice would be the doctrine of contributory negligence. The *ex turpi causa* principle is indeed a blunt instrument. Rimer LJ referred to it, quoting Langley J at first instance, as "unforgiving and uncompromising." That is its nature. But I am far from convinced that (if the public policy defence were not available) contributory negligence would provide a more sensitive or effective tool, any more than it does in the suicide cases: see Reeves , especially Lord Hoffmann at pp 371-372. A company's fraud and its auditors' negligence are incommensurable in terms of blameworthiness and causal potency, just as lethal self-harm and negligent custody are incommensurable in those terms.

### The opinions of the minority

186   My Lords, after trying to analyse the intricacies of a complex and difficult case it is often helpful to stand back, as we say, and try to identify the essentials. Had Mr Stojevic acted alone in his fraud (for instance, had S & R been a completely fictitious company, never properly incorporated) it is perfectly clear that he would have had no cause of action against Moore Stephens because of (among other reasons) the *ex turpi causa* rule. That would have been the case even if the action had been taken by his trustee in bankruptcy acting solely for the benefit of the defrauded bank and other innocent creditors. That was the clear view of Langley J (in his conclusions at para 65(2)) and it has not been challenged. The *ex turpi causa* rule is distinct from the general principle that a claimant should not obtain a personal profit from his own wrong, although the two often overlap.

187 The same results would follow if Mr Stojevic had an individual partner in crime (as Mr Alon may have been, although his participation has not formed part of the argument). Two highwaymen may be partners in crime but neither can sue the other for an account: Everet v Williams (1725), a case which was once thought to be apocryphal, is verified by a note in (1893) 9 LQR 197 (see also Sir George Jessel MR in Sykes v Beadon (1877) 11 Ch D 170 , 195-196). The bill in equity for a partnership account would also have been dismissed out of hand if it had been brought, not by Everet himself but by the administrator of his insolvent estate, after Everet had been hanged at Tyburn, even though the administrator might have been suing exclusively for the benefit of those whom the pair had robbed.

188   Why then does it make a difference that S & R, Mr Stojevic's partner in crime, was not an individual but a corporation? For present purposes there is an obvious parallel between an action by a company in insolvent liquidation, and an action by the trustee in bankruptcy of an individual, or the administrator of the estate of an individual who has died insolvent. In each case the action is being brought by or under the control of a fiduciary for the benefit of innocent creditors. But in each case the fiduciary can have no better cause of action than the insolvent company or individual, since the *ex turpi causa* rule is "unforgiving and uncompromising". I can see no reason why the corporate status of S & R should alter the analysis. Once it is accepted (first) that a company can have a guilty mind ( Tesco Supermarkets Ltd v Natrass; Royal Brunei Airlines v Tan ) and (second) that S & R was directly (and not merely vicariously) liable for the frauds, then it seems to me to be in just the same position as one of the highwaymen.

189  My noble and learned friend Lord Scott of Foscote considers that the position is different because S & R was itself a victim. It had been turned, in his view, into a corporate automaton. That view contradicts not only the Court of Appeal but also the judge. Langley J observed (para 65(6)):

> "The primary victims of the fraud were KB and the other losers. The fraud undoubtedly exposed S & R to liabilities to KB and the other losers, which it could not meet once, as was intended, the moneys fraudulently obtained were paid away as they were to those responsible for the fraud. On the other hand S & R lost nothing to which it was ever entitled. S & R was in a real sense the perpetrator of the fraud on KB and the banks and the liability to which it was thereby exposed was not just the product of that fraud but the essence of it. In the particular circumstances of this case in my judgment it would be artificial not to fix S & R with the knowledge and wrongdoing of Mr Stojevic and also artificial to describe S & R even as a secondary victim of the fraud."

That puts the point very clearly. Lord Scott's view seems to me to treat the most obvious and extreme situation of a company which has a guilty mind (a one-man company engaged in wholly fraudulent activities) as amounting to a situation in which the company has no mind at all. That view, with great respect, seems to me to be inconsistent with Royal Brunei Airlines v Tan (which is generally regarded as a decision of high authority) and to put the clock back to Abrath v North Eastern Railway Co.

190  Some of the reasoning in Lord Scott's opinion proceeds on the basis that Moore Stephens, as auditors, were officers of S & R. There is long-standing authority that an auditor is an officer for the purpose of a misfeasance summons under what is now section 212 of the Insolvency Act 1986 : Re London and General Bank

[1895] 2 Ch 166, a decision of the Court of Appeal which was followed by another constitution of that Court (though with Lord Herschell expressly withholding his opinion) in Re Kingston Mill Cotton Company [1896] 1 Ch 6 . In the leading case of Re City Equitable Fire Insurance Co. Ltd [1925] Ch 407 counsel for the auditors reserved this point (see at p 422) but the case did not reach this House. The law may now be taken as settled that for the purposes of a misfeasance summons under section 212 —a procedural provision—an auditor is an officer of a company. But he is in a quite different position from a director or manager, as Bingham LJ pointed out in Caparo [1989] QB 653 , 681, cited by Lord Bridge of Harwich in this House [1990] 2 AC 605 , 625-626:

> "In carrying out his investigation and in forming his opinion the auditor necessarily works very closely with the directors and officers of the company. He receives his remuneration from the company. He naturally, and rightly, regards the company as his client. But he is employed by the company to exercise his professional skill and judgment for the purpose of giving the shareholders an independent report on the reliability of the company's accounts and thus on their investment. 'No doubt he is acting antagonistically to the directors in the sense that he is appointed by the shareholders to be a check upon them': In Re Kingston Cotton Mill Co [1896] 1 Ch 6 , 11, per Vaughan Williams J".

His part is, and must be, independent ( section 27(1) of the Companies Act 1989 provides that a person is ineligible for appointment as company auditor of a company if he is an officer or employee of the company). In short, even if an auditor is for some purposes an officer of the company for which he acts, he is in a totally different position from that of the directors and managers who are running its business.

In my respectful opinion it does not assist the task of analysis to equate them.

191 Someone who had been robbed by the highwaymen would have had a direct civil claim against both as joint tortfeasors, just as in this case KB had a claim (which it pursued to judgment) against S & R and Mr Stojevic. But KB had no possibility of a direct claim against Moore Stephens. That is clear from the judgment of Millett J in Al Saudi Banque v Clarke Pixley [1990] Ch 313 (decided after the decision of the Court of Appeal but before the decision of this House in Caparo Industries plc v Dickman ) and by the decision of this House in the latter case, approving the decision in Al Saudi Banque . Much of the opinion of my noble and learned friend Lord Mance seems to me, with great respect, to be seeking to attenuate by indirect means the House's decision in Caparo , although we are not invited to depart from it.

192 Lord Mance is rightly concerned at the difficulty of pinning down the concept of a one-man company. What if there are innocent minority shareholders who have no say in the management of the company? What if majority shareholders, even, have been "hijacked" by a fraudulent but dominant managing director? These are difficult questions but what can be said with confidence is that cases of that sort would plainly not be suitable for a strike-out (compare the unreported case of Marlwood Commercial Inc v Kozeny [2006] EWHC 872 (Comm) mentioned in paras 48-51 of the judgment of Langley J). In a case of that sort the court would have to enquire closely into the facts in order to see (as Saville LJ put it in Group Josi ) whether it would be contrary to justice and common sense to treat the company as complicit. But here it was the claimant's own case that the position was clear. As Rimer LJ said (to repeat para 9 of his judgment),

> "It is the essence of the company's claim that Mr Stojevic was its controlling mind and will. Nobody else was in a like position. In a real sense the company was his company. It was, for practical purposes, a 'one-man company'. It is a further part of the claim that the company was throughout used by Mr Stojevic as a vehicle for fraud, by extracting

> money from KB so that it could then be paid away to the fraudsters."

Some observations in Lord Scott's opinion appear to overlook this point.

193 I add a final comment on the "very thing" argument. It is nonsensical, the argument goes, to assert that there is a duty (for an auditor to detect fraud, or for the police to protect a man in custody from self-harm) but at the same time to empty that duty of content, either on grounds of causation or by applying the ex turpi causa rule. I see the force of that argument, but the analysis seems to me to rely on a good deal of hindsight. When the police hold a man in custody they owe him a variety of duties, including the duty to keep him safe from harm (whether from the police themselves, or from other detained persons, or from self-harm). The duty to take precautions against suicide is part of this duty. If a man in a good state of mental health deliberately kills himself while in police custody, his estate may be unable to recover damages, but that does not to my mind drain the police duty of care of all content. In Reeves only Buxton LJ seems to have been troubled by this point. Similarly with auditors. The detection of fraud is only a small part of the total statutory and common law duties owed by auditors, and the discovery that an apparently respectable and prosperous company is carrying on activities that are wholly fraudulent must be a very rare occurrence. This case is, as Mr Sumption emphasised in his written and oral submissions, a rare and extreme case, so extreme that it is in my opinion appropriate for summary disposal.

### Conclusion

194 For these reasons I would dismiss this appeal.

Lord Brown of Eaton-under-Heywood

My Lords,

195 Suppose as a solicitor practising on my own account I engage an accountant to complete my annual tax return. I have earned fees of £200,000 but, with a

view to defrauding the Revenue, I tell him that my fees were only £100,000 and provide him with my fee book for only six months of the year. He neglects to query this despite being provided with documents showing travelling expenses incurred over the full twelve month period. The Revenue are not so stupid and eventually my fraud is uncovered, I am charged the shortfall and heavily fined into the bargain. Can I sue my accountant in negligence or for breach of his contractual duty of care towards me? Plainly not. There could hardly be a more obvious application of the *ex turpi causa* principle to bar my claim. Luscombe v Roberts (1962) 106 SJ 373 illustrates the point. Suppose then I am bankrupted. Can my trustee in bankruptcy bring the claim for the benefit of my creditors? Equally plainly not. He enjoys no better claim than I had.

196   Suppose then essentially the same scenarios but this time I have incorporated my practice and carry it on as a one-man company. Would that bring about a different result? Would the accountant in those circumstances become liable for whatever losses the fraud ultimately occasioned the company? It would be odd were it so and in my opinion it is not so and could not be so ever since the rejection, over a century ago, of Lord Bramwell's view expressed in Abrath v North Eastern Railway Co. (1886) 11 App. Cas. 247 , 251 that a company, as a fictitious person, is "incapable of malice or of motive". Once it is recognised that a company can itself be fraudulent there could be no clearer instance of it than that suggested above, unless perhaps it is this very case.

197   The facts of this case are fully set out in the opinions of others of your Lordships and need not be repeated. Here, as my noble and learned friend Lord Walker of Gestingthorpe makes plain, not merely was Mr Stojevic "the directing mind and will of the corporation, the very ego and centre of the personality of the corporation" (Viscount Haldane LC in Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd [1915] AC 705 , 713), but Stone & Rolls Ltd (S & R) was, even on the most exacting definition of the term, a one-man company. As Mr Sumption QC put it, uncontentiously, at the beginning of his printed case:

> "[Mr Stojevic] was as completely identified with the company as it is possible for a human agent to be. He

had sole control over the company's every act. He was the company's sole beneficial owner. There were no independent or innocent directors whom Mr Stojevic had to deceive to make the fraud happen. There were no innocent shareholders relying upon the auditors to monitor the management. There were no employees."

198   How in these circumstances there is any room for the application of the Hampshire Land principle—see In re Hampshire Land Company [1896] 2 Ch 743 —I cannot for the life of me see. That principle, otherwise described as the adverse interest rule, operates as an exception to the ordinary rule of attribution, itself a general principle of agency, that ordinarily one imputes to the company (the principal) the knowledge of a director (the agent) on the basis that the agent may be presumed to have discharged his duty to disclose all material facts to his principal. The Hampshire Land exception recognises that in reality agents will not disclose to their principals the fact that they are committing fraud, least of all when they are defrauding the principals themselves, and that it would be contrary to common sense and justice for the law to presume otherwise. Indeed, the Hampshire Land principle may well go wider than this and extend also to breaches of duty by the agent short of fraud—consider, for example, Vaughan Williams J's judgment in Hampshire Land itself and Rix J's judgment in Arab Bank plc v Zurich Insurance Co. [1999] 1 Lloyd's Rep 262 —and to agents' frauds even if committed against others than their principals, and perhaps irrespective of whether the principal is to be regarded as "a secondary victim"—see again Rix J's judgment in Arab Bank . For the purposes of the present appeal, however, it is quite unnecessary to explore, let alone decide, any of this.

199   In the present case Mr Stojevic and S & R were in effect one and the same person. It is absurd to describe Mr Stojevic as the agent and S & R as the principal for all the world as if, but for the Hampshire Land principle, the law would presume that Mr Stojevic had been disclosing to S & R his fraudulent conduct

towards the Czech Bank. As Lord Reid said in Tesco Supermarkets Ltd v Nattrass [1972] AC 153 , 170:

> "He is not acting as a servant, representative, agent or delegate. He is an embodiment of the company or, one could say, he hears and speaks through the persona of the company, within his appropriate sphere, and his mind is the mind of the company. If it is a guilty mind then that guilt is the guilt of the company."

200  For this reason I find the concept of the "sole actor" exception to the adverse interest exception (the Hampshire Land principle) a somewhat puzzling one. Why is it necessary to except from an exception a category of case which cannot logically fall into the exception in the first place? Assuming, however, that there is scope for such an exception to the Hampshire Land principle, then the need for it seems to me compelling and as good a statement of it as any is to be found in The Mediators Inc v Manney 105 F 3d 822 (1997) already fully set out at para 163 of Lord Walker's opinion.

201  It is on this basis and this basis alone—the one-man company or sole actor basis—that I would uphold the Court of Appeal's judgment that S & R is in no different or better position than Mr Stojevic himself to resist the ex turpi causa defence (and the liquidator of S & R in no better position than either of them).

202  Lord Mance, as I understand his opinion, would find liability here in respect of all such losses as were occasioned by the fraud from the time when the auditors should have uncovered it. But what is this if not "liability in an indeterminate amount for an indeterminate time to an indeterminate class" of claimants—whoever came to be defrauded by the company in the trading period after the fraud should have been ended to whatever was the extent of their loss. (The quoted phrase comes, of course, from Cardozo CJ's judgment in Ultramares Corporation v Touche (1931) 174 N.E. 441 , adopted by Millett J in Al Saudi

Banque v Clarke Pixley [1990] Ch 313 , a judgment approved by the House in Caparo Industries plc v Dickman [1990 ] 2 AC 605 .) The company, through its liquidator, would be suing to recover on behalf of all those whom it had defrauded. That, indeed, is precisely the nature of this claim. Such an approach seems to me to run diametrically counter to the principles established in Caparo . I also find it difficult to reconcile with Hobhouse J's decision in Berg, Sons & Co Ltd v Mervyn Hampton Adams [2002] Lloyd's Rep PN 41 , an authority which Lord Mance prays in aid. Applying Caparo and rejecting a liquidator's claim against the company's former auditors, Hobhouse J said that the company "had based their case not upon any lack of information on the part of Mr Golechha [the company's directing mind] but rather upon the opportunity that the possession of the auditor's certificate is said to have given for the company to continue to carry on business and borrow money from third parties. Such matters do not fall within the scope of the duty of the statutory auditor". Here too, by the assumed negligence on the part of the auditors, the company was able to continue to carry on business, in this case stealing rather than borrowing money from third parties.

203  I recognise, of course, that confining the ex turpi causa defence, as I would, to one man company frauds means that, where any innocent shareholders are involved, a claim against the auditors may well lie (through the company) at their suit. This, however, would not be an open-ended claim, wholly indeterminate as to its potential scope and extent at the time of the audit, such as that presently brought. Quite how it would fall to be confined is no doubt open to argument. But on one view it might be limited to the innocent shareholders' own loss suffered through the continuing fraud from the time when, following a diligent audit, it should have been uncovered and brought to an end. A claim of that nature would seem to me to accord altogether more readily with the policies and principles generally understood to apply in this context.

204  With regard to the "very thing" argument, I agree entirely with what Lord Walker says and wish to add nothing on the point.

205 For these reasons, which really do no more than echo those of Lord Walker, I too would dismiss this appeal.

Lord Mance

My Lords,

## Introduction

206 The world has sufficient experience of Ponzi schemes operated by individuals owning "one man" companies for it to be questionable policy to relieve from all responsibility auditors negligently failing in their duty to check and report on such companies' activities. The speeches of my noble and learned friends in the majority have that effect. In my opinion, English law does not require it. I consider that the key to a proper resolution of this appeal is to bear firmly in mind: (a) the separate legal identities of a company and its shareholders; (b) the common law and contractual duties which it is common ground that auditors owe and which included in this case an express undertaking to comply with Auditing Standard SAS 110 on fraud and error of the Auditing Practices Board; (c) the rights that a company has as a result as against those who, whether as officer or auditor, commit wrongs against it; (d) the distinction between on the one hand a company's claim for its own net losses, for which it is entirely consistent with Caparo Industries plc v. Dickman [1990] 2 AC 605 that it should be able to sue auditors whose negligence led to such losses, and on the other hand its creditors' losses, for which under Caparo its creditors cannot sue negligent auditors; (e) the basic company law principle that the interests and powers of shareholders yield to those of creditors in a company which is actually or potentially insolvent. I differ from the majority speeches in this case because they fail in my respectful opinion to take these points duly into account.

207 Within the majority speeches, although their reasoning differs, there can be found (i) an inversion of the decision in Caparo - whereby the denial to creditors in that case of recovery against auditors because the company would have its own claim is deployed to deny the company's claim against auditors because this would indirectly benefit the company's creditors; (ii) a suggestion never pleaded or raised by the auditors

that the auditors' contractual engagements might be unenforceable *ab initio* ; (iii) a suggestion that the company did not suffer any loss at all - a surprising proposition, when its assets were over years steadily abstracted from it leaving it with a large deficit out of which it was unable to meet its liabilities to the banks; (iv) a suggestion that a company might be unable to recover against auditors, if some or apparently even one of its shareholders were complicit in fraud committed by the company's directing mind and will causing the company to suffer loss - a suggestion which if good would have provided auditors with immunity in a large number of auditors' negligence claims. I will explain my disagreement with each of points (i) to (iv) in the course of this speech. However, it is points (d), (e) and (i) together which ultimately divide the House and are, or ought to be, central to this appeal. I address them in paras. 265 to 273 and 275 to 277 below.

208 The appeal - against an order of the Court of Appeal expressed to be "for summary judgment on, or to strike out, the whole" of a company's claim against its auditor - raises for the first time in this jurisdiction the issue whether the maxim *ex turpi causa non oritur actio* can apply to a claim in contract and/or tort by a company against its auditors for professional negligence. Moreover, the issue is raised in an acute form by the auditor's primary submission, that there are only three pre-conditions to the application of the maxim: (a) fraud should have been committed by a person counting as the company's directing mind and will; (b) it should have been committed by the company, not against it; and (c) the company should also have to rely on the fraud in order to plead its case against the auditor. Only in the alternative does the auditor submit that, if those conditions do not alone engage the maxim, then the fact that the fraud was committed by the sole beneficial owner of the company delivers the *coup de grace* . In response, the company submits, inter alia, that the auditor's submissions undermine the purpose of an audit, and that, at least in circumstances where the company was insolvent at the relevant audit date, the company's interests can no longer be equated with those of its shareholders and the company can recover for loss it sustained by a scheme of fraud, which would have been detected and stopped by a careful audit.

## Facts

209  The essential facts to be assumed for the purposes of this appeal can be shortly stated. The appellant company, Stone & Rolls Ltd. ("S & R" - incorporated in England and Wales and in liquidation since November 2002), was at all material times under the complete control and effective ownership of a Mr Stojevic. (Mr Stojevic was not formally a director - the only such director was a resident of Sark - and the beneficial ownership which Mr Stojevic is admitted in the agreed statement of facts to have had of S & R's shares was indirect and covert, through an Isle of Man company the shares of which were held by a trust.) The respondent acted as S & R's auditors for periods ending 31st December in the years 1996 to 1999, in each case under a separate contractual engagement. Mr Stojevic was throughout those years using S & R as a vehicle for fraud. The fraud involved the extraction from various banks, principally it appears Komercni Banka A.S (the former State Bank of Czechoslovakia), of increasingly large amounts under letters of credit providing for deferred payment at maturity dates as long as 180 or even 360 days. The banks believed they were financing bona fide commodity trades, but the documents presented were false and did not relate to actual goods. S & R obtained funds without waiting for the expiry of the deferred periods by assigning or forfeiting the letters of credit. The funds were then paid away to third parties under the influence or control of Mr Stojevic, and used, in part only, to reimburse the banks in respect of previous maturing letters of credit (and so secure the issue of further larger letters of credit). The sums outstanding under these circular transactions grew steadily until eventually reimbursement of the banks ceased, and the banks were left with unsecured and very substantial losses. In proceedings before Toulson J in 2002, Komercni Banka A.S. exposed the fraud and obtained judgment in deceit against S & R for US$94,470,382.28: [2002] EWHC 2263 (Comm); [2003] 1 Lloyd's Rep 383 . S & R, having been stripped of its assets by Mr Stojevic and his associates, has nothing with which to meet this or any other liability or indebtedness, and is in liquidation.

210  S & R's claim against Moore Stephens is also capable of quite brief summary. It is agreed for present purposes that it is to be considered a claim in negligence only (though there is in relation to the 1998 audit a strongly denied and presently irrelevant allegation that Moore Stephens shut a Nelsonian eye to the fraud). The alleged negligence, put as a breach both of contract and of a duty of care, consists of failure on Moore Stephens's part to detect various aspects of the scheme of fraud. In this respect S & R accepts that no distinction can be drawn between the obtaining of monies under the letters of credit and their payment out. The two were integral parts of Mr Stojevic's scheme, and much of the negligence alleged against Moore Stephens consists of failure to react to clear signs that the goods purportedly being sold and represented by documents presented to the banks did not exist. The causation alleged is that, if Moore Stephens had discovered the fraud, they would have had to resign and report the matter to regulatory authorities. The loss claimed consists in the amounts paid out of S & R after the end of each of the audits upon which it is alleged the fraud should have been discovered.

**The audit role**

211  The proper starting point for consideration of this appeal is the nature of an audit and the duties which Moore Stephens as an auditor undertook each year. Both the statutory context and the terms of the particular engagement are important. But the existence of Moore Stephens's contractual engagement in each year is common ground, and it was neither pleaded (see Defence, paragraph 3) nor suggested in oral submissions that it was invalid or unenforceable as such; had any such point had any validity, one may be confident that those advising Moore Stephens would not have overlooked it, particularly bearing in mind the novelty and nature of some points which have been argued. The existence of a duty on the part of Moore Stephens to the company and its general scope are for present purposes also common ground. As the company's case puts it, Moore Stephens "owed the company a duty to take care to detect … the fraud; and … breached that duty" or, as Moore Stephens' own case puts it, they "owed the company a duty to report whether its accounts showed a true and fair view of its financial affairs. One of the things that they had to do to perform that duty was take such steps as were reasonable in the circumstances to discover that the company's business was fraudulent". The audits were undertaken under the Companies Act 1985 , and the cases of Caparo Industries plc v. Dickman [1990] 2 AC 605 and Al Saudi Banque v. Clarke Pixley [1990] Ch 313 (Millett J), approved in Caparo , therefore

contain relevant further guidance as to Moore Stephens' role and duties. In so far as these are prescribed by statute, such role and duties are necessarily inflexible - they cannot be changed or waived by the company, its management or its shareholders.

212    An auditor's primary duty is to report to shareholders on the annual accounts and report to be prepared by the directors: ss.226(1), 227(1), 233(1) and (3) and 234(1) of the 1985 Act, as inserted by the Companies Act 1989 . S.235 , as so inserted, states the duty:

> (1)    A company's auditors shall make a report *to the company's members* on all annual accounts of the company of which copies are to be laid *before the company in general meeting* during their tenure of office.
>
> (2)  The auditors' report shall state whether in the auditors' opinion the annual accounts have been properly prepared in accordance with this Act, and in particular whether a true and fair view is given ….
>
> (3)    The auditors shall consider whether the information given in the directors' report for the financial year … is consistent with those accounts; and if they are of opinion that it is not they shall state that fact in their report." (Emphasis added).

213    In Caparo at pp. 625D-616C Lord Bridge of Harwich approved the following summary by Bingham LJ [1989] QB 653 , 680 of the position of auditors in relation to shareholders:

> "The members, or shareholders, of the company are its owners. But they are too numerous, and in most cases too unskilled, to undertake the day to day management of that

which they own. So responsibility for day to day management of the company is delegated to directors. The shareholders, despite their overall powers of control, are in most companies for most of the time investors and little more. But it would of course be unsatisfactory and open to abuse if the shareholders received no report on the financial stewardship of their investment save from those to whom the stewardship had been entrusted. So provision is made for the company in general meeting to appoint an auditor ( section 384 of the Companies Act 1985 ), whose duty is to investigate and form an opinion on the adequacy of the company's accounting records and returns and the correspondence between the company's accounting records and returns and its accounts: section 237 . The auditor has then to report to the company's members (among other things) whether in his opinion the company's accounts give a true and fair view of the company's financial position: section 236 [sic]. In carrying out his investigation and in forming his opinion the auditor necessarily works very closely with the directors and officers of the company. He receives his remuneration from the company. He naturally, and rightly, regards the company as his client. But he is employed by the company to exercise his professional skill and judgment for the purpose of giving the shareholders an independent report on the reliability of the company's accounts and thus on their investment.

'No    doubt    he    is    acting antagonistically to the directors in the sense that he is appointed by

the shareholders to be a check upon them:' In re Kingston Cotton Mill Co. [1896] 1 Ch. 6 , 11, *per* Vaughan Williams J.

The auditor's report must be read before the company in general meeting and must be open to inspection by any member of the company: section 241 . It is attached to and forms part of the company's accounts: sections 238(3) and 239 . A copy of the company's accounts, including the auditor's report, must be sent to every member: section 240 . Any member of the company, even if not entitled to have a copy of the accounts sent to him, is entitled to be furnished with a copy of the company's last accounts on demand and without charge: section 246 ."

214 Caparo establishes that the auditor's statutory duty is not to any individual shareholder as a purchaser or potential shareholder of shares in the company, but to the shareholders collectively, and that their remedy for any breach lies through the company. As Lord Bridge put it at p.626D-E:

"… in practice no problem arises in this regard since the interest of the shareholders in the proper management of the company's affairs is indistinguishable from the interest of the company itself and any loss suffered by the shareholders, e.g. by the negligent failure of the auditor to discover and expose a misappropriation of funds by a director of the company, will be recouped by a claim against the auditors in the name of the company, not by individual shareholders."

Consistently with this, Lord Oliver of Aylmerton at p.630F-G described the auditor's function as being

"to protect the company itself from the consequences of undetected errors or, possibly, wrongdoing (by, for instance, declaring dividends out of capital) and, secondly, to provide shareholders with reliable intelligence for the purpose of enabling them to scrutinise the conduct of the company's affairs and to exercise their collective powers to reward or control or remove those to whom that conduct has been confided."

At p.653H, he quoted with approval the statement by O'Connor LJ in the Court of Appeal (at p.714) to the effect that loss by "fraudulent abstraction of assets by directors or servants …is recoverable by the company".

215 In addition to the auditor's primary responsibility to the shareholders as a whole, the legislation recognises certain obligations in respect of others. At p.631D-F Lord Oliver noted that:

"… the history of the legislation is one of an increasing availability of information regarding the financial affairs of the company to those having an interest in its progress and stability. It cannot fairly be said that the purpose of making such information available is solely to assist those interested in attending general meetings of the company to an informed supervision and appraisal of the stewardship of the company's directors, for the requirement to supply audited accounts to, for instance, preference shareholders having no right to vote at general meetings and to debenture

holders cannot easily be attributed to any such purpose."

Further, s.394 provides that:

> (1) Where an auditor ceases for any reason to hold office, he shall deposit at the company's registered office a statement of any circumstances connected with his ceasing to hold office which he considers should be brought to the attention of *the members or creditors* of the company or, if he considers that there are no such circumstances, a statement that there are none." (Emphasis added)

S.394(3) provides that the company must either send a copy of any statement identifying any such circumstances to every member, debenture-holder and person entitled to notice of general meetings or apply to the court.

216 Moore Stephens's statutory duties were reinforced by the contractual terms of their engagement letter dated 19 December 1996 and signed by Mr Stojevic for S & R on 14 January 1997. This letter acknowledged their statutory duties and identified their "professional responsibility to report if the financial statements do not comply in any material respect with applicable accounting standards, unless in our opinion the non-compliance is justified in the circumstances". The audit was to be "conducted in accordance with the Auditing Standards issued by the Auditing Practices Board", and the letter stated that

> "(11) The responsibility for safeguarding the assets of the company and for the prevention and detection of fraud, error and non-compliance with law or regulations rests with yourselves. However, we shall endeavour to plan our audit

so that we have a reasonable expectation of detecting material misstatements in the financial statements or accounting records (including those resulting from fraud, error or non-compliance with law or regulations) but our examination should not be relied upon to disclose all such material misstatements or frauds, errors or instances of non-compliance as may exist …"

217 Auditing Standard SAS 110 (issued January 1995) deals with fraud and error. It contains statements of auditing standards (SAS) and explanatory text in numbered paragraphs. SAS 110.1 states: "Auditors should plan and perform their audit procedures and evaluate and report the results thereof, recognising that fraud or error may materially affect the financial statements". SAS 110.10 (para. 50) states that, on becoming aware of a suspected or actual instance of fraud, auditors

> "should (a) consider whether the matter may be one that ought to be reported to a proper authority in the public interest; and where this is the case (b) except in the circumstances covered in SAS 110.12, discuss the matter with the board of directors, including any audit committee".

SAS 110.12 (para. 52) provides that

> "When a suspected or actual instance of fraud casts doubt on the integrity of the directors auditors should make a report direct to a proper authority in the public interest without delay and without informing the directors in advance."

The text at paragraph 56 explains that matters to be taken into account when considering whether disclosure is justified in the public interest may include "the extent to which the suspected or actual fraud is likely to affect members of the public". Plainly, one situation in which members of the public would be affected is where the fraud conceals or risks bringing about the company's insolvency. The viability of a company as a going concern is always a matter of audit importance.

218 The relationship of company and auditor is not therefore a simple two-party relationship. The company cannot in the audit context be equated with its board of directors or management. The company's shareholders are - at least while the company is solvent - the main focus of an auditor's activity and duties. The auditor, in undertaking the statutory role and contractual and tortious duties, is "acting antagonistically to the directors" (see para. 213 above).

**Analysis**

219 Moore Stephens's case, accepted by the Court of Appeal, is that the company, S & R, in order to show negligence on the part of Moore Stephens, has to plead and so rely on a scheme, to which it was through Mr Stojevic party and one aspect of which was fraud on S & R's banks; Mr Stojevic was S & R's directing mind; and the claim therefore falls within the core principle in Tinsley v Milligan [1994] 1 AC 340, which, it is submitted, precludes a party from pursuing a contractual or tortious claim if, in order to do so, it has to plead and rely on its own iniquity. Mr Sumption accepts that whether there is iniquity sufficient to trigger the maxim may sometimes require careful examination of the facts: see e.g. Burrows v. Rhodes [1899] 1 QB 816; United Project Consultants Pte Ltd v. Leong Kwok Onn [2005] SGCA 38; [2005] 4 SLR 214, but Mr Stojevic's iniquity is not here in doubt. The Court of Appeal accepted Moore Stephens' analysis, without drawing any distinction between cases where the directing mind of a company was and was not sole shareholder. S & R in resisting it draws on the nature and purpose of an audit (summarised above) as well as on two general principles of law: the first, that fraud *on* a company by even its most senior officer(s)

constituting its directing mind is not to be attributed to the company: In re Hampshire Land Company [1896] 2 Ch 743, Belmont Finance Corp. Ltd. v Williams Furniture Ltd. [1979] Ch 250 and Attorney General's Reference (No 2 of 1982) [1984] QB 624; and the second, that a person should not be entitled to deny liability for a breach of contract or duty consisting in failure to do the "very thing" (here, it is said, to check for and detect fraud) which it was his duty to do, reliance in this connection being placed on Reeves v Commissioner of Police of the Metropolis [2000] 1 AC 360.

220 A company, once legally incorporated, "must be treated like any other independent person with its rights and liabilities appropriate to itself": Salomon v. Salomon & Co Ltd [1897] AC 22, 30 per Lord Halsbury LC. But a company "has no mind of its own any more than it has a body of its own": Lennard's Carrying Co. Ltd. v. Asiatic Petroleum Co. Ltd. [1915] AC 705, 713. For some purposes it is necessary to attribute or impute to a company the mind, knowledge or intentions of one or more human beings. In a criminal law context, where the company stands accused, the law is likely to look at the acts and state of mind of a person who can be regarded as the embodiment of the company - its alter ego or directing mind - rather than at those of a person acting merely as servant, agent or delegate, for whom the company might in a civil law context be vicariously liable: Tesco Supermarkets Ltd. v Nattrass [1972] AC 153, 170E-G per Lord Reid. When and how far a company will be attributed with the state of mind of individuals who have acted for it depends on the circumstances and context. My noble and learned friend Lord Brown of Eaton-under-Heywood refers to the rejection of Lord Bramwell's view in Abrath v. North Eastern Railway Co. (1886) 11 App. Cas. 247, 251 that a company, as a fictitious person, is "incapable of malice or of motive". But the corollary of that rejection is not that the company is always to be attributed with the malice or motive of anyone acting for it or even of its top management (or indeed that it is always necessary to attribute to a company itself any state of mind at all).

221 The *locus classicus* in this area is now the advice of the Privy Council given by Lord Hoffmann in Meridian Global Funds Management Asia Ltd. v Securities Commission [1995] 2 AC 500. Lord Hoffmann identified the provisions of a company's constitution as

its primary rules of attribution. He instanced provisions making decisions of the majority of its board decisions of the company and the common law rule that the unanimous decision of all the shareholders in a *solvent* company about anything which the company under its memorandum of association has power to do are also decisions of the company. He cited in the latter connection Multinational Gas and Petrochemical Co. v. Multinational Gas and Petrochemical Services Ltd. [1983] Ch 258 . A company's primary rules of attribution are supplemented by general principles of agency and vicarious liability.

222   At p.507B, Lord Hoffmann went on to say that these together "are usually sufficient to enable one to determine its rights and obligations. In exceptional cases, however, they will not provide an answer. This will be the case when a rule of law, either expressly or by implication, excludes attribution on the basis of the general principles of agency or vicarious liability". He gave as examples situations where the law requires some act or state of mind of a person "himself" as opposed to his servants or agents, and the rule of the criminal law "which ordinarily imposes liability only for the actus reus and mens rea of the defendant himself". The court might then find that the rule of law was not intended to apply to companies at all, or that it could apply only on the basis of the company's primary rules of attribution or that neither of these solutions was satisfactory. In that case:

> "the court must fashion a special rule of attribution for the particular substantive rule. This is always a matter of interpretation: given that it was intended to apply to a company, how was it intended to apply? Whose act (or knowledge, or state of mind) was *for this purpose* intended to count as the act etc. of the company? One finds the answer to this question by applying the usual canons of interpretation, taking into account the language of the rule (if it is a statute) and its content and policy." (p.507D-F)

223   Although Lord Hoffmann in these passages focused on situations in which the primary rules of attribution might not alone suffice, he was not excluding the possibility of cases in which not even the primary rules of attribution should apply; and Mr Sumption QC for Moore Stephens rightly did not suggest that he was, though submitting that such cases would be "very rare indeed". One issue before your Lordships is whether the audit context may be such a case.

**Mr Stojevic's position as the company's directing mind**

224   I start with the company's position vis-à-vis Mr Stojevic. Moore Stephens's case has changed at each instance. But before the House Mr Sumption submitted was that S & R could only claim against Mr Stojevic on a narrow basis for abstraction of its monies (a proprietary claim like that mentioned by O'Connor LJ in Caparo : see paragraph 214 above); and that any claim against him for damages for breach of duty as an officer would be barred by the maxim *ex turpi causa* because it would involve pleading S & R's fraud on the banks. I do not accept this submission. It would mean that, if one element of Mr Stojevic's fraud on the banks had involved persuading the banks to pay the funds direct into an account represented as being S & R's but in fact Mr Stojevic's, S & R could not sue Mr Stojevic. Mr Stojevic's common law duty as a director to S & R was to conduct its affairs honestly and properly. S.172(1) of the Companies Act 2006 now states the duty, in terms expressly based on common law rules and equitable principles (see s.170(3) ), as being to "act in the way he considers, in good faith, would be most likely to promote the success of the company for the benefit of its members as a whole" - a duty made expressly "subject to any enactment or rule of law requiring directors, in certain circumstances, to consider or act in the interests of creditors of the company" (see s.172(3) ). S.212 of the Insolvency Act 1986 provides a summary remedy available in the course of winding up against anyone who is or has been an officer of the company in respect of, inter alia, "any misfeasance or breach of any fiduciary or other duty in relation to the company". (This is in addition to the specific remedies that apply in circumstances of fraudulent or wrongful trading under ss.213 and 214 .)

Stone & Rolls Ltd (In Liquidation) V Moore Stephens (A Firm), 2009 WL 2207450 (2009)

225 As between S & R and Mr Stojevic, Mr Stojevic's fraud on the banks was and is just as objectionable as the later abstraction of monies to which it was designed to lead. In holding a director responsible in such a case, a company is as a separate legal entity enforcing duties owed to it by the director. It is not acting inconsistently, or asking the court to act inconsistently, with the law. It is a remarkable proposition, that the directing mind of a company can commit the company to a scheme of fraud and then avoid liability in damages if the company would have to plead and rely on this scheme to establish such liability. It is even more remarkable, indeed paradoxical, when it is, I conceive, clear beyond doubt that the company has a remedy against its auditor for negligent failure to detect and report fraud by a company's directing mind where (at the very least) the company has innocent shareholders: see paragraphs 241 to 245 below.

**Ex turpi causa as between S & R and Mr Stojevic**

226 It follows that one would not expect the maxim *ex turpi causa* , however mechanistic it may be, to have any operation in a context such as the present. Mr Sumption stressed that "the true rationale for the defence of illegality associated with the maxim *ex turpi causa non oritur actio* ," is "the preservation of the integrity of the justice system" - meaning the need to avoid permitting a claimant "to indirectly profit from his or her crime, in the sense of obtaining remuneration for it" or in the sense of evading "a penalty prescribed by criminal law", to avoid putting "the courts in the position of saying that the same conduct is both legal, in the sense of being capable of rectification by the court, and illegal": Hall v. Hebert (1993) 101 DLR (4th) 129 , 160-165, 167 and 168 per McLachlin J (as she was). In Hall v. Hebert two drunken men had set off home by car. The defendant initially drove but stalled the car and lost the ignition key, and both then decided to try to push-start the car, with the plaintiff now as driver. The car turned over injuring the plaintiff. The defence of *ex turpi causa* failed, because the plaintiff was not seeking to make a profit from his wrongful act, but merely to claim damages for personal injury. The integrity of the legal system was not affected. No more do I think that it is here. On the contrary, S & R would be enforcing, and not seeking to profit from but to obtain compensation for, breach of the duties which Mr Stojevic owed to it. The law must enable that.

**The Hampshire Land principle**

227 Though not essential to my reasoning, I also consider that the principle established in In re Hampshire Land Company , Belmont Finance and Attorney General's Reference (No 2 of 1982) points towards the same result It prevents a company being treated as party to a fraud committed by its officers "on" or "against" the company, at least in the context of claims by the company for redress for offences committed *against* the company: Belmont Finance , 261D-H, per Buckley LJ, and 271F-G, per Goff LJ, and Attorney General's Reference (No 2 of 1982) , p.640A-B, per Kerr LJ; and see Edwards Karwacki Smith & Co. Pty. Ltd. v Jacka Nominees Pty. Ltd. (1994) 15 ACSR 502 , 515-517. Thus, in Belmont Finance the company's directors were party to an illegal conspiracy, "part and parcel" of which was that the company bought shares at an inflated price (p.264A), but their knowledge of this illegality was not imputed to the company and did not bar the company suing them for the conspiracy. The principle has also been applied in the context of a claim or allegation of estoppel against a company, seeking to hold the company responsible for a transaction in fraud of the company, by attributing to it knowledge of the fraud possessed by directors or agents who did not represent or act for the company in the transaction but had knowledge of it which they withheld from the company: J C Houghton and Co. v. Nothard, Lowe and Wills Ltd. [1928] AC 1 ; Kwei Tek Chao v. British Traders and Shippers Ld. [1954] 2 QB 459 , 471- 472.

228 Mr Sumption submits that the principle has no present relevance for two reasons. The first is based on its original rationale: that, since an agent deceiving a company will not disclose his own fraud to the company, the company cannot be imputed with knowledge of or treated as party to the fraud. This rationale, Mr Sumption submits, postulates a company with an "innocent constituency" (other officers and/ or shareholders) to whom Mr Stojevic could have disclosed, but from whom he would and did actually conceal, his misdeeds. If the suggestion is that the Hampshire Land principle or the thinking behind it can only apply where a company alleges loss through being deceived, I see no reason why it should be so confined. Whether knowledge should be attributed to a company is irrelevant in contexts like the present, where S & R's

claim is not that there were others within the company who relied on misleading statements by Mr Stojevic, but rather that Mr Stojevic's actions were in breach of his duties to S & R and that, had Moore Stephens detected them, no further breaches of duty would have been possible.

229    Neither in Belmont Finance nor in Attorney General's Reference (No 2 of 1982) is there any suggestion that the application of the principle in Hampshire Land depends upon there being some innocent constituency within the company to whom knowledge could have been communicated. Moreover, Attorney General's Reference (No 2 of 1982) is direct authority to the contrary. The two defendants were charged with theft, consisting of the abstraction of the assets of companies, of which they were "the sole shareholders and directors" and "the sole will and directing mind" (pp.635D-F and 638F-G). They contended that the companies were bound by and had consented to the abstractions precisely because they were its sole shareholders, directors and directing mind and will (pp. 634E-F and 638F-H). The Court of Appeal acknowledged the rule of attribution attributing to a solvent company the unanimous decision of all its shareholders (p.640A-D), but roundly rejected its application to circumstances where the sole shareholders, directors and directing minds were acting illegally or dishonestly in relation to the company. The court cited Belmont Finance as "directly contradict[ing] the basis of the defendants' argument" (p. 641B-C). The defendants' acts and knowledge were thus not to be attributed to the companies - although there was no other innocent constituency within the companies. Another justification for this conclusion may be that the effect of the limitations recognised by Lord Hoffmann in Meridian (paragraph 221 above) is that in such situations there *is* another innocent constituency with interests in S & R, since it is not open even to a directing mind owning all a company's shares to run riot with the company's assets and affairs in a way which renders or would render a company insolvent to the detriment of its creditors.

230    The second reason advanced by Mr Sumption is that, if the Hampshire Land principle could otherwise apply, the fraud here was committed on the banks, not on S & R. The Court of Appeal agreed with this submission. The company's exposure when it was left

"holding the baby" was merely a "secondary exposure" which was not enough to engage the principle: see paras. 72-73. In so reasoning, Rimer LJ was influenced by the fact that Mr Stojevic's fraud would be (and was by Toulson J) attributed to S & R itself in the context of any claims by the banks against S & R. This distinction between personal and vicarious liability towards third parties could have been relevant if, for example, S & R had been prosecuted for fraud (see e.g. Attorney General's Reference (No 2 of 1982) at p.640A-B) or if (more fancifully) there had been a general banking facility between Komercni Banka and S & R under which the latter's liability depended upon whether it was personally as opposed to vicariously liable for the deception of Komercni Banka. But it is irrelevant in the present context where S & R is seeking recourse from persons who, whatever their status vis-à-vis the company in the eyes of the outside world, owe duties and have committed wrongs towards S & R. The truth behind the Hampshire Land principle as explained in Belmont Finance and Attorney General's Reference (No 2 of 1982) is that such situations are different. They compel by their nature a separation of the interests and states of mind of the company and those owing it duties.

231    In the present case, the focus is on the separate interests of S & R on the one hand and Mr Stojevic (and the auditors, though I consider their position more fully later) on the other. In this context, there is no difficulty about characterising the whole scheme as one of fraud on the company. The scheme treated the company as a mere tool or conduit and left it at the end with a large deficit, in complete disregard of Mr Stojevic's duty to respect its separate identity and property. This is in no way to suggest that S & R did not incur liability to the banks. On the contrary, it is because Mr Stojevic quite wrongly involved it in a scheme of fraud of which this was one aspect that S & R is entitled to claim against him. (In fact of course, the liability which S & R incurred to its banks in deceit did not lead to S & R incurring the loss, or anything like the loss, it claims against Mr Stojevic - Mr Stojevic's abstraction of the monies from S & R did that. I note that, in a passage (para. 5) with a biblical echo (I Timothy 6, 7), my noble and learned friend, Lord Phillips of Worth Matravers suggests that S & R started life with nothing, never legitimately acquired anything and cannot realistically be said to have suffered any loss. This either ignores the

abstraction of S & R's assets or wrongly assumes that a deficit rendering a company insolvent is not a loss.

232  The same conclusion is indicated by authorities concerning schemes of fraud directly parallel to the present - that is, first, the defrauding of third parties and then the stripping from the company of its resulting assets for the benefit of its directing minds and beneficial owners: see RBG Resources plc v Rastogi , Brink's- Mat Ltd. v. Noye and, from Ontario, Oger v. Chiefscope Inc. et. al. (1996) 29 OR (3d) 215; upheld (1998) 113 OAC 373 . In RBG Resources plc v Rastogi Laddie J held, in trenchant terms, that the company had an arguable claim against directors for trial in a claim involving a parallel scheme of fraud to the present (raising funds from financiers in respect of bogus trades and paying them over to fraudulent counter-parties): and, when the case went to trial before Hart J, the directors in question did not pursue any defence to the contrary and judgment was given against them: [2004] EWHC 1089 (Ch). The case was moreover similar to the present in that one of the fraudulent directors was regarded as the sole ultimate controlling shareholder: see [2002] EWHC 2782 (Ch), paras. 3 and 51. In support of his conclusion, Laddie J referred both to Belmont and Attorney General's Reference (No. 2 of 1982) and to the company's "fall-back position" (to which I return below) that "in the case of an insolvent company, the directors are not at liberty to ignore the interests of the creditors": Kinsela v. Russell Kinsela Pty Ltd. (In Liquidation) (1986) 4 NSWL 722 , per Street CJ, cited with approval in West Mercia Safetywear Ltd. (in liq) v Dodd [1988] BCLC 250, 4 BCC 30 (CA) . The fall-back position to which Laddie J referred is likely to have been made with particular reference to the fraudulent director's position as sole controlling shareholder, to which I shall return.

233  The fraud in Oger involved procuring the owners of a Mercedes car to hand over the car to the company on terms that the company would within 90 days either sell it or purchase it for $55,000, whereas the company's principals and owners always intended to and did decamp with it or its proceeds (as well as it appears other cars or their proceeds). At first instance, Molloy J said bluntly that:

> "… the fraudulent actions of Barry and Vithoulkas [the principals] were

for their own financial gain. The corporation was merely a tool or vehicle which they implemented as an instrument of their fraud and to give the scheme a veneer of respectability. There was no benefit to the company from their actions. Rather, they stripped from the company all of its assets, both in terms of cash and consigned vehicles, and then absconded with them, leaving the corporation an empty shell with nothing but liabilities. In my view, it cannot be said that Barry and Vithoulkas have in these circumstances acted as the ego of the company itself and for the benefit of the company so as to bring the identification principles into play."

On appeal, the Court of Appeal dealt summarily with a submission that it could not be said that the actions constituted a fraud on the company, when, it was submitted, the corporation was set up for the very purpose of effecting their fraudulent scheme. The court said:

> "There was no admissible evidence before the trial judge which would allow her to conclude that the corporation was set up with a view to perpetrating the frauds. Further, we do not read these comments of the trial judge as meaning anything other than Vithoulkas and Barry perpetrated a fraud on the corporation as a means of achieving personal gain. It does not detract from the main thrust of the judge's finding that Barry and Vithoulkas were acting for their own benefit only."

I agree with the last two sentences, and add that it cannot sensibly make any difference whether or not the corporation there or S & R here was originally incorporated with a view to perpetrating the relevant fraud. Whatever the motives with which it was incorporated, it was not a sham. Once incorporated as a separate legal entity, it was entitled to be respected as such - even (indeed especially) by those who created and became its directing minds, wills and beneficial owners - and was not to be treated as their puppet.

234  In Arab Bank plc v. Zurich Insurance Co. [1999] 1 Lloyd's Rep 262 , 282-3 Rix LJ, and in Brink's-Mat Ltd. v. Noye [1991] 1 Bank L R 68 (a case involving a scheme of fraud with analogies to the present) the Court of Appeal, considered that a company exposed to third party liability by fraud could be regarded as a victim of the fraud for the purposes of a claim against other persons allegedly in breach of duty to it. In distinguishing between primary and secondary victims, the Court of Appeal in the present case was, however, influenced by reasoning in McNicholas Construction Co. Ltd. v Customs and Excise Comrs [2000] STC 553 (Dyson J) and in Bank of India v. Morris [2005] 2 BCLC 328 (Court of Appeal) . Both those cases were (as Rimer LJ noted) concerned with claims against the company by injured third parties, rather than claims by the company against others in breach of duty to it. So it is not clear why the Hampshire Land issue arose at all, and in my view the statements in them are of no assistance in resolving any issue of attribution in the present context.

**Directing minds and will who are also sole shareholders**

235  Does it make any difference to the result if the company's directing mind(s) also own all its shares? Here it is necessary to return to the common law rule of attribution to which Lord Hoffmann referred in Meridian , that the unanimous decision of all the shareholders in a solvent company about anything that the company has power to do under its memorandum of association counts as a decision of the company. Lord Hoffmann cited Dillon LJ's statement in Multinational Gas , p.288G-H, that "so long as the company is solvent the shareholders are in substance the company". In consequence, Kerr LJ said in Attorney General's Reference (No 2 of 1982) , p.640C-E, "the decisions alleged to have been taken negligently and breach of duty [in Multinational Gas ] were the decisions of the company itself and - the transactions being intra vires the company's memorandum - there was no basis for any claim by the liquidator".

236  However, the limitations mentioned by Lord Hoffmann are important. The transactions must be within the company's power under its memorandum of association; and it is only the unanimous decision of all the shareholders in a solvent company that can authorise or ratify an act that would otherwise constitute a breach of duty to the company, and make it the company's. No argument was addressed to the House on the former limitation, which in the present context probably overlaps with the latter. Transactions entered into by directors amounting in substance to no more than the fraudulent abstraction of increasingly large sums from an increasingly insolvent company with no other assets are unlikely to be within the scope of the company's powers; and the breach of duty involved in entering into such transactions cannot be answered by pointing to the directing mind's ownership of all the company's shares. This, as I have noted (para. 229 above), is what was decided by the Court of Appeal in Attorney General's Reference (No 2 of 1982) , a decision which was clearly right. In summary, at latest once directors know that a company is or would be insolvent, a disposition of the company's assets in disregard of the general creditors of the insolvent company will be actionable by the company, whatever the shareholders may wish or approve: see also per Dillon LJ in West Mercia Safetywear Ltd. (in liq) v Dodd [1988] BCLC 250 , 252, distinguishing the situation in Multinational Gas as one where the company was "amply solvent, and what the directors had done at the bidding of the shareholders had merely been to make a business decision in good faith, and act on that decision"; and also per Kerr LJ in Attorney General's Reference (No 2 of 1982) , p.640D-641C distinguishing Multinational Gas as not "concerned with allegations that the shareholders and directors had acted illegally or dishonestly in relation to the company".

237  The current edition (2007) of Palmer's Company Law Annotated Guide to the Companies Act 2006 states the position, at p 169:

"The scope of the common law duty requiring directors to consider the interests of creditors is more controversial. Cases support a variety of propositions, but the better accepted view is that a duty is owed by directors to the company (and not to the creditors themselves: Kuwait Asia Bank EC v National Mutual Life Nominees Ltd. [1991] 1 AC 187 at 217 PC; Yukong Line Ltd. v. Rendsburg Investments Corp (No 2) [1998] 1 WLR 294 [Toulson J]), and this duty requires directors of insolvent or borderline insolvent companies to have regard to the interests of the company's creditors ( West Mercia Safetywear Ltd. v Dodd [1988] BCLC 250 CA )."

238   I agree with this analysis. The Court of Appeal was therefore also correct in West Mercia to hold that directors who know the company to be insolvent owe to the company an enforceable duty to have regard to the interests of the company's creditors. In Yukong Line Toulson J was likewise right to consider that that would be so (p.314F-G). There, as in West Mercia , the directing mind and owner of a company who had incurred a large liability sought to put the company's assets out of the reach of its creditor by transferring them to another of his companies. A claim by the creditor against the director failed on the basis that the director owed no direct fiduciary or other duty towards creditors. His liability was, as in West Mercia , to the company for disregard of the interests of its creditors. Far from undermining the integrity of the common law if such a liability were recognised and enforced, it would undermine the concept of separate corporate identity and the protection for creditors in insolvent situations at which company law aims, if a company were not entitled to claim against its directing mind and sole controlling shareholder in such a situation. The English cases of RBG Resources plc v Rastogi and others and Brink's- Mat Ltd. v. Noye and the Canadian case of Oger v. Chiefscope Inc. et al. (cited above), in all of

which the directing minds of the relevant companies were the only shareholders, reach the same conclusion.

239   In In re The Mediators, Inc. 105 F.3d 822 (USAC, 2nd Cir. 1997), the Court held inadmissible a claim by a creditors' committee standing in the company's shoes brought against the company's sole shareholder, chief executive officer and chairman together with its bankers, lawyers and accountants for deliberately devising a scheme, which stripped the company of its assets in order to shield them from liquidation and from the company's creditors, while rendering the company liable for the cost of so doing. The reasoning was that, in a case of a sole shareholder and decision maker, "whatever decisions he made were, by definition, authorised by, and made on behalf of, the corporation" (p.827) and that the company had "no standing to assert aiding-and-abetting claims against third parties for cooperating in the very misconduct that it had initiated" (p.826). This is not English law. But an important element to understanding this rule is that in American law "Where third parties aid and abet a fiduciary's breach of duty to creditors - as is claimed here - the creditors may bring an action in their own right against such parties." (p.825).

240   In summary, it is no answer in English law to a claim by S & R against Mr Stojevic that Mr Stojevic had, as S & R's sole directing mind and sole shareholder, authorised the scheme of fraud which to his knowledge made the company increasingly insolvent to the detriment of its existing and future creditors. For present purposes it is to be assumed (and in fact it seems clear) that Mr Stojevic must have known that, as a result of his scheme of fraud, S & R was (increasingly) insolvent at each audit date.

**The auditors' liability where the company's directing mind is fraudulent**

241   I turn against this background to the auditor's position. Leaving aside situations in which the directing mind(s) is or are the sole beneficial shareholder(s), it is obvious - although the Court of Appeal's judgment is surprisingly silent on the point - that an auditor cannot, by reference to the maxim *ex turpi causa* , defeat a claim for breach of duty in failing to detect managerial fraud at the company's highest level by attributing to the company the very fraud which the auditor should have

detected. It would lame the very concept of an audit - a check on management for the benefit of shareholders - if the higher the level of managerial fraud, the lower the auditor's responsibility. When Lord Bridge noted in Caparo that shareholders' remedy in the case of negligent failure by an auditor to discover and expose misappropriation of funds by a director consisted in a claim against the auditors in the name of the company (p.626E), he cannot conceivably have had in mind that it would make all the difference to the availability of such a claim whether the director was or was not the company's directing mind. The fact that a "very thing" that an auditor undertakes is the exercise of reasonable care in relation to the possibility of financial impropriety at the highest level makes it impossible for the auditor to treat the company itself as personally involved in such fraud, or to invoke the maxim *ex turpi causa* in such a case. Context is once again all, as Kerr LJ recognised in Attorney General's Reference (No. 2 of 1982) at pp.640D-642H (see especially at p.642D). (I interpose that I do not read the discussion starting there at p.641E as proceeding on a basis inconsistent with that preceding it - I understand Kerr LJ there to have been addressing the factual question whether a jury would be bound to conclude that there was no dishonesty, which would arise if he were wrong in his legal analysis at pp.640A-641E.) Deception of auditors is the necessary stock-in-trade of fraudulent top management, as auditors and those responsible for auditing standards are and have long been very well aware. Lord Phillips's statement (para.5) that "common sense" might suggest that S & R's claim should fail because Moore Stephens were victims of deceitfully prepared company accounts must be categorically rejected. It would emasculate audit responsibility and the auditor's well-recognised duty to approach their audit role if not as bloodhounds, then certainly as watchdogs - planning and performing their audit with the "attitude of professional scepticism" required by paragraphs 27 and 28 of Auditing Standard SAS 110 in relation to the possibility of fraud as well as of error in management representations and company records and documents.

242    Auditing standards and procedures have changed significantly over the years. But the potential responsibility of auditors for negligent failure to detect accounting deficiencies or managerial fraud - leading the company to sustain further loss connected with such

deficiencies or the continuation of such fraud - dates back to the early days of auditing: see e.g. In re London and General Bank (No 2) [1895] 2 Ch 673 (CA) (liability for a dividend voted by shareholders on the basis of misleading accounts on which the auditors failed adequately to report) and In re Thomas Gerrard & Son Ltd. [1968] Ch 455 (liability for dividends voted and tax liabilities incurred on the basis of accounts containing fraudulent inflation of the company's profits by Mr Croston, its managing director and holder of 18,000 of its shares, which the auditors negligently failed to discover and report on). In the latter case, the auditors argued (somewhat faintly), that Mr Croston knew and was not misled about the true position and that the payment of the dividends and tax flowed from his or the directors' actions (pp.469D-E and 471C-D). Pennycuick J gave short shrift to the argument (pp.477G-478G)

243    In Galoo Ltd. v. Bright Grahame Murray [1994] 1 WLR 1360 auditors were allegedly negligent in failing to detect fraudulent overvaluation of Galoo Ltd.'s stock by Mr Sanders, who was clearly the directing mind of Galoo Ltd. and its 100% parent. The claim was that, but for such negligence, both companies would have been wound up in 1986 instead of in 1993 and would have avoided losses made in subsequent adverse trading in that eight year period. The claim was rejected on grounds of causation (the losses were caused by the subsequent adverse trading, and the "but for" link to the auditors' negligence was insufficient). There was no suggestion that Mr Sanders' knowledge of or involvement in the fraud could defeat it.

244    More recently, in Sasea Finance Ltd (in liquidation) v KPMG (formerly KPMG Peat Marwick McLintock [2000] 1 All ER 676 , the auditors were alleged to have failed to report promptly during the audit evidence of impropriety by two dominant figures in the group (neither however then a director). The auditors argued that it would have been no use to report to senior management consisting of the two dominant figures. In response, the Court of Appeal noted that there were six directors of whom no criticism was made and, in any event, that the Auditing Guidelines of the Institute of Chartered Accountants (Feb 1990 ed.)

"acknowledge that there may be occasions when it is necessary for an auditor to report directly to a

third party without the knowledge or consent of the management. Such would be the case if the auditor suspects that management may be involved in, or is condoning, fraud or other irregularities and such would be occasions when the duty to report overrides the duty of confidentiality".

The Court of Appeal cannot have thought such a duty in shareholders' interests would only exist if senior management *below* the level of the company's directing mind or board were complicit in the fraud.

245  It is in principle therefore no answer to an auditor who has failed to discover fraud to point to involvement or knowledge on the part of the company's directing mind. This conclusion is justified on grounds paralleling those applicable between the company and its directing mind (see paras. 224-232 above). That is not surprising, since both senior management and auditors owe duties to the company intended to protect shareholders' interests, and such duties must be enforceable. The two sets of relationship are essentially complementary, although the duty is in one case primary and in the other confirmatory. However the present scheme of fraud is categorised, it cannot in the context of the audit engagement be attributed to the company itself, so as to relieve the auditors from their duty or prevent the company complaining of its breach. Again, this is so as a matter of general principle having regard to the nature of the roles and duties undertaken. Again, however, it can be supported by reference to the Hampshire Land principle, which, in this context also, means that the interests and activities of S & R and of Mr Stojevic must be distinguished, precisely because it was among Moore Stephens's functions as auditor to ensure to the former a degree of protection against the latter.

246  In view of some observations made by my noble and learned friend, Lord Brown of Eaton-under-Heywood (in paras. 202-203) I add a word on the nature of an auditor's potential liability for negligent failure to detect, report and so stop a continuing course of management fraud. This was one of a number of topics on which the House did not hear argument, and some

authorities relevant to it were not therefore cited. But in principle, the auditor is potentially liable for further frauds committed in the same course of management fraud. An auditor may argue that loss suffered by a continuing scheme of fraud which the auditor ought to have detected was outside the scope of the auditor's duty or too remote or that there was a break in the chain of causation, but success in such an argument may be unlikely in circumstances where, ex hypothesi, the auditor was negligent in failing to detect the same continuing scheme. The relevant considerations were canvassed by Evans-Lombe J in Barings Plc v Coopers & Lybrand [2003] EWHC 1319 (Ch) at paragraphs 816-838. Hobhouse J's comments in Berg (discussed below) and the case of Galoo (paragraph 243 above) have nothing to do with this question. In both those cases, the losses and insolvency were caused by subsequent adverse trading decisions unconnected with the fraud. ( Galoo is no doubt the case to which Lord Hoffmann referred extra-judicially on this point in his Chancery Bar lecture *Common Sense and Causing Loss* of 15 June 1999.)

247  Examples of cases where auditors have been held liable for further losses in a continuing scheme of fraud include Pacific Acceptance Corpn. Ltd. v Forsyth (1970) 92 WN (NSW) 29 (see at p.41E-F - quantum was ultimately compromised: see p.133D-E), Dairy Containers Ltd. v NZI Bank Ltd. and Auditor-General [1995] 2 NZLR 30 (see at pp.52 lines 15-20 and 73 lines 23-29) and Barings Plc v Coopers & Lybrand itself (subject in that case to a finding of a break in the chain of causation occurring some 18 months after the negligent audit as a result of the fault of management not involved in the fraud (paras. 839-878). The position in such cases parallels that where auditors failed to detect a continuing negligent course of foreign exchange dealings: Daniels (formerly practising as Deloitte Haskins and Sells) v Anderson (1995) 16 ACSR 607 (see at pp. 703 line 48 to 705 line 3, 717 line 27 to 718 line 3 and 720 lines 34-43). It is auditors' exposure in such respects which has led them over the years to press for some mitigation of liability over and above any offered under s.727 of the Companies Act 1985 , now s.1157 of the Companies Act 2006 . One suggestion was that their liability should be made proportionate. This suggestion was rejected by the Law Commission in a Feasibility Investigation of Joint and Several Liability for the Department of

Trade and Industry (1996). More recently, auditors have however obtained a statutory right to limit their liability contractually under ss.534-536 of the 2006 Act.

**Overseas authority on attribution**

248   The House was shown a range of common law authority, particularly from Canada, Australia and the United States. It amply illustrates the variety of ideas and solutions current in this field. Ultimately, I derive no more than an increasing reluctance in recent case-law to hold that top management fraud provides a defence to a negligent auditor. While this corresponds with my own conclusion as to the right direction in principle for English law, I have relegated detailed examination of the overseas authorities to an annex.

**The auditor's position where some of the shareholders have engaged in fraud**

249   Fraud of the company's directing mind is as such, therefore, no bar to a claim by the company against its auditor for loss sustained by the company due to negligent failure to detect such fraud (paras 241 to 247 above). It cannot in principle make any difference if (as will very commonly be the case) the same person owns some shares in the company. As a matter of basic company law, the company's separate legal personality entitles it to claim, and the situation mentioned by Lord Hoffmann in Meridian (paras 221 to 235 above) in which it is legitimate to look behind the veil at the shareholders, applies only when *all* the shareholders in a solvent company concur in committing the company to some decision within its memorandum of association.

250   Lord Phillips expresses the view (para. 61) that the position "becomes unclear … if some of the shareholders were complicit in the directing mind and will's misconduct" because of the possibility of "the fraudulent … shareholders profiting from their dishonesty". Self-evidently this focuses only on the presently irrelevant situation of a solvent company. But even in a situation of solvency, I consider that the doubt expressed by Lord Phillips about the company's right of recovery conflicts with the principle precluding the lifting of the corporate veil. In reality, it would, if accepted, transform the law regarding

auditors' responsibility, since in many cases fraudulent management own some shares.

251   The concern behind the doubt is that auditors might be liable to the company in amounts which would then enure to the benefit of guilty shareholders. This is however an insubstantial spectre, whether or not the company is insolvent. In cases of insolvency (such as In re London and General Bank and In re Thomas Gerrard and the present), there is commonly no conceivable prospect of any shareholder benefiting by any recovery, however large, made against a negligent auditor. A claim against auditors will not in practice reimburse the company for all its loss, because the very basis of the claim will be that future loss was caused by failure on one or more audits to detect a continuing scheme of fraud which will *already* have caused past loss. This is quite apart from the fact that auditors' negligence cases are commonly compromised before trial. Further, if a guilty shareholder is identifiable and has current assets, the company will often look first to them and any recovery from the auditor will be reduced accordingly (as apparently happened in In re Thomas Gerrard ). And, if this does not happen, auditors commonly join fraudulent directors and others as third party defendants, and take steps to freeze any assets that they may have.

252   Nevertheless, it is appropriate to give some further consideration to the position of a solvent company (or a company which would be rendered solvent if it recovered damages from its auditors), on the remote hypothesis that, if it were to recover in full, then shareholders who had already benefited by or were involved in the wrongdoing might benefit by an increase in value of the company. A similar spectre of double recovery may be summoned in respect of the recovery from negligent auditors of dividends which a company has wrongly paid out to shareholders on the faith of fraudulent accounts. In that situation, the shareholders may either be entirely innocent or may include shareholders aware of the accounts' falsity. The spectre of double recovery was thus raised, briefly and unsuccessfully, as an objection to the recovery of damages against negligent auditors in In re Thomas Gerrard . Counsel submitted that it would be "monstrous for the shareholders to receive again what they had already received in excess dividends" (p.469F). Pennycuick J's response

Stone & Rolls Ltd (In Liquidation) V Moore Stephens (A Firm), 2009 WL 2207450 (2009)

was simply that the auditors were "of course entitled to credit for the account [sic] recovered from Mr Croston" (p.478G). As stated above, Mr Croston was not only the managing director, but also a significant shareholder. However, the company was in liquidation, so that the factual basis for counsel's submission that the shareholders might "receive again what they had already received in excess dividends" is also unclear.

253  The whole topic was however comprehensively revisited by Giles J in the Supreme Court of New South Wales in Segenhoe v Atkins (1990) 1 ACSR 697 where he held that it did not matter whether the company paying the dividend was solvent rather than insolvent. In either case the company as a separate entity was out of pocket to the extent of the money paid away. To prevent recovery by the company because the money was paid to shareholders rather than to a third party "would negate the company's status as a legal entity separate from its shareholders" and in any event, even if the shareholders remained the same, they would not necessarily be paid twice over. Giles J's full reasoning at pp.701-702 repays reading. The only contrary suggestion in any authority appears to consist of a single dictum of Cotton LJ in In re Exchange Banking Co (Flitcroft's case) (1882) 21 Ch D 519 . This was another case where dividends were over a period of years wrongly paid out of capital on the basis of accounts showing false profits prepared by directors who as shareholders received some of such dividends. The company, by now in liquidation, sued the directors for the totality of the dividends wrongly paid out. Sir George Jessel MR and Brett LJ held unequivocally that the dividends were recoverable in full, and would have been even had the company remained solvent. However Cotton LJ drew a distinction, saying, at p 536:

"The corporation is not the mere aggregate of shareholders. If the corporation was suing for the purpose of paying over again to the shareholders what the shareholders had already received the Court would not allow it. But that is not the case here, the company is insolvent, and there is no objection to allowing it to get back its funds for the purpose of paying debts. The case of the liquidator is stronger,

for in some respects he, as *a quasi* trustee for creditors as well as shareholders, stands in a different position from the company. But I rely on this, that the money was not paid to the corporation, but was paid improperly to individuals, and the corporation can sue the directors to get it back that it may be applied in payment of the debts of the corporation."

As Giles J observed in Segenhoe v Atkins , Cotton LJ's "reference to 'the shareholders' was probably to the particular shareholders who had received the dividends, rather than to the shareholders as a fluctuating body", and later case-law has tended to explain Cotton LJ's dictum as a reference to the court's power to give directions in a liquidation as to the proceedings which a liquidator may pursue. However, the dictum is on any view irrelevant in the present case where the company is irredeemably insolvent. If a case ever arose of a solvent company, the English courts would have the opportunity, as Giles J did, of reconsidering the dictum, and of either taking the same view as Giles J or fashioning the dictum into a rule preventing any possible double recovery (perhaps building on the VGM principle: see below).

254  I turn now to situations where the loss consists not of dividends paid out to shareholders, but of other payments fraudulently extracted from the company. In these situations, by definition, the only shareholders, who might conceivably benefit twice over if a company were able to recover such losses from wrongdoers such as its directors or auditor, would be shareholders participating in the fraud. Again, the issue would only arise in a case where (unlike the present) the company was solvent or (improbably) would be made so by recovery from its directors or auditor. In my view, English law would find, as some American courts have found, a way of addressing this issue, even though it may be a different way. First, if the point ever arose where a company, which had still not received full compensation for injury done to it by management fraud, were due to make a distribution to a manager shareholder, the company

could impound the defaulting manager/shareholder's share of the distribution under the principle identified in In re VGM Holdings Ltd. [1942] Ch 235 and Selangor United Rubber Estates Ltd. v. Cradock (No 4) [1969] 1 WLR 1773 . That principle not only enables the impounding, as in VGM , of a defaulting director's entitlement to satisfy his own liability, but also enables the impounding of the amounts due to a defaulting director in his capacity as shareholder to satisfy the liability of other defaulting directors liable jointly and severally with him. In Brink's-Mat Ltd. v Noye and others [1991] 1 Bank LR 68 , 72 Nicholls LJ suggested and Mustill LJ in his judgment accepted that this "or some other process designed to achieve the ends of justice" would "without doubt" prevent the fraudulent shareholders from profiting by their dishonesty. I also believe that would be so. The common law is not so barren as to be unable to achieve in this area what Lord Goff of Chieveley once described in another context as "practical justice".

255 One approach that could not, with respect, be adopted is that suggested by my noble and learned friend, Lord Brown, in his judgment at para. 203. That paragraph ignores separate corporate personality when it refers to "a claim against the auditors [which] may well lie (through the company) at their [i.e. innocent shareholders'] suit". A company (all the more so when in insolvent liquidation) sues in its own right, not for or at the suit of its shareholders. I am also aware of no "policies and principles", generally understood or not, which might limit a company's recovery for a wrong done to it by reference to whatever loss its innocent shareholders might, if the corporate veil were lifted, be said themselves to have suffered. The suggestion that this could be the measure of a company's recovery again ignores the company's separate legal identity and interests. Suppose senior management own 50% of the shares, and are operating a scheme of fraud which the auditor should have detected at the end of year 1, and that the fraud costs the company £1m in year 2. Why should it matter whether, but for the £1m abstraction in year 2, shareholders' equity would or would not have increased in value? What if the £1m abstraction imperils the company or renders it insolvent? The company has suffered a loss of £1m., and is entitled to recover this for its own purposes including payment of its debts. The only qualification on full recovery that might, theoretically, exist in a solvent situation (other than

those inherent in conventional contractual and tortious principles of causation and remoteness) is one tailored to ensuring that no guilty shareholder actually benefits, and this could be achieved, if it were ever to be a real concern, under or by development of the VGM principle in a manner respecting corporate identity (see para. 254 above). Further, as Cotton LJ recognised in In re Exchange Banking Co (Flitcroft's case) , whatever view one may take about the position where a company is solvent, "there can be no objection to allowing it to get back its funds for the purpose of paying debts". In an insolvent situation like the present, Lord Brown's suggestion is also in conflict with the decision in In re Thomas Gerrard , where Mr Croston's shareholding and its value were, rightly, treated as irrelevant to the company's recovery against its negligent auditors.

**The auditor's position where all the shareholders have engaged in fraud**

256 The issue which is, or should be, critical to this appeal arises where the person(s) responsible for the scheme of fraud own *all* the company's shares. The auditor is there to check on management and report to shareholders. But the shareholders know the true position. In a situation of solvency, the straightforward analysis is that there is nothing to report, no-one to complain and no loss. It might also be questioned whether there is any breach of duty, at least in tort and perhaps also in contract, in failing to report to persons who already know; however, this may overlook the fact that the negligent auditor will by definition not know that the shareholders do know, and it also needs to be considered in the light of the auditor's statutory role and the duties, here largely express, which an auditor undertakes. More pertinently, "so long as the company is solvent, the shareholders are in substance the company" (para. 235), and the company cannot therefore say that it was ignorant or misled or suffered loss.

257 Two cases illustrate the application of this straightforward analysis to companies solvent at the audit date. In Pendleburys Ltd. v. Ellis Green and Co. (1936) 181 LT 410 , a company claimed against its auditor loss caused by its cashier's defalcations. It sought to attribute such loss to the auditor's failure, when reporting on the accounts, to disclose weaknesses in the company's book-keeping systems arising from

the absence of certain books and internal checks. The company's only three directors were its sole shareholders and debenture-holders, and the auditor had reported the weaknesses to them from time to time. Swift J in dismissing the claim observed that the defendants had made their reports to the three men who had "every pecuniary interest in the company", and that, "although they, as auditors, were there to protect the shareholders it could not seriously be said that the shareholders did not receive the information and protection which the law desired should be secured to them" (p 411). The reference to the directors as having "every pecuniary interest in the company" and the absence in the report of any contrary suggestion indicate that the company remained solvent at all times.

258   The second case is Hobhouse J's decision in Berg . Berg & Co. was solvent at the date of the relevant 1982 audit. (It became insolvent some years later by reason of a trading debt incurred in 1984.) The negligence it alleged against its former auditors related to a receivable of £2.39m shown in the 1982 accounts as due from a company called Gimco, in respect of which the auditors had simply accepted the uncorroborated and unsupported assurances of Gimco and Mr Golechha, Berg & Co's sole active director and ultimate beneficial owner. At p.44 Hobhouse J pointed out that, although Berg & Co was a separate and distinct legal entity, Mr Golechha was its directing mind, his knowledge was the company's and "There was never any general body of shareholders nor any minority shareholders. In addressing their certificate to 'the Members' of Berg, [the auditors] were for all practical purposes addressing it to Mr Golechha alone". Applying Caparo he said (p.53) that

> "the purpose of the statutory audit
> is to provide a mechanism to enable
> those having a proprietary interest
> in the company or being concerned
> with its management or control to
> have access to accurate financial
> information about the company.
> Provided that those persons have
> that information, the statutory
> purpose is exhausted. What those
> persons do with that information is
> a matter for them and falls outside
> the scope of the statutory purpose.

In the present case the first plaintiffs [the company] have based their case not upon any lack of information on the part of Mr Golechha but rather upon the opportunity that the possession of the auditor's certificate is said to have given for the company to continue to carry on business and to borrow money from third parties. Such matters do not fall within the scope of the duty of the statutory auditor."

259   In this passage, Hobhouse J was identifying a situation analogous to that applying where a person (A) undertakes to report to a professional body on the affairs of a third person (B) to enable B to continue to engage in professional practice. If B procures A to issue the relevant certificate by deceiving A about matters which A, had he been careful, should anyway have observed, B cannot then turn round and blame A: Luscombe v. Roberts and Pascho (1962) 106 SJ 373 . But the professional body, if it incurs loss through allowing B to continue in practice, can in such a situation claim against A: Law Society v. KPMG Peat Marwick [2000] 1 All ER 515; [2000] 1 WLR 1921(CA) . In a case like Berg , once it is established that all relevant persons within a company know the true position, the company falls to be treated as a single person (B) in relation to its auditor (A).

260   The company argued in Berg that the Hampshire Land principle precluded the attribution to it of Mr Golechha's knowledge. The argument failed *in limine* (because it was not shown that Mr Golechha was guilty of any fraud on the audit or towards the company), but Hobhouse J (at p.54) also addressed the position as it would have been had there been any fraud:

> "However one identifies the
> company, whether it is the head
> management, or the company in
> general meeting, it was not misled
> and no fraud was practised upon it.
> This is a simple and unsurprising
> consequence of the fact that

Stone & Rolls Ltd (In Liquidation) V Moore Stephens (A Firm), 2009 WL 2207450 (2009)

every physical manifestation of the company Berg was Mr Golechha himself. Any company must in the last resort, if it is to allege that it was fraudulently misled, be able to point to some natural person who was misled by the fraud. That the Plaintiffs cannot do."

In the result, the company was entitled only to nominal damages for the technical breach of contract involved in the failure to qualify the audit report. Hobhouse J's words must be taken in context. The company was solvent at the relevant dates. There was no-one but Mr Golechha to think or act for or be interested in it.

261  American case-law supports a conclusion barring recovery from a auditor who has negligently failed to detect that the company's sole shareholder and controller (a "sole actor") has been engaging in fraud, e.g. by falsifying the company's accounts and conducting its business fraudulently to his own benefit and the injury of depositors and creditors ( Federal Deposit Insurance Corpn. v. Ernst & Young 967 F.2d 166 (1992) ) or by operating a Ponzi scheme leading the company into ever deeper insolvency ( Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc. 267 F.3d 340 (3rd Cir. 2001)). In the former case (decided under Texas law), the court left open the possibility that the creditors or the liquidator on their behalf might have a cause of action against the auditors. In the latter case, decided under Pennsylvania law, the court said that the nature of the claim (for the company's loss through "deepening insolvency" - a problematic head of loss in English law in any event) made it one which could only be pursued by the company, and that s.541 of the US Bankruptcy Code meant that the liquidator in pursuing it could be in no better position than the company had been before its liquidation.

262  Moore Stephens argue, and I understand the majority of your Lordships to consider, that this appeal is covered by the same analysis. In short, Mr Stojevic was S & R's sole directing mind and its sole beneficial owner; and the company cannot in consequence complain that it succeeded in deceiving

Moore Stephens and was in consequence not stopped by others (regulatory or investigating authorities) from pursuing its scheme of fraud. Such a conclusion could be explained in various ways: the auditor's duty did not extend to supplying information which all persons who can represent the company already have; or whistle-blowing on S & R was and is outside the statutory purpose of the audit as between the company and the auditor; or the principle *ex turpi causa* applies. Which way was adopted would be presently immaterial.

263  In my opinion, Moore Stephens's argument and the majority conclusion overlook a critical distinction between a company which is solvent and a company which is insolvent at the audit date. Let me, however, first consider two other reasons suggested by S & R for rejecting Moore Stephens's argument. They are: (a) the "very thing" principle and (b) the fact that S & R is currently insolvent and in liquidation. The first, that the maxim *ex turpi causa* is incapable of defeating a claim against Moore Stephens for failure to discover and report the very continuing fraud which is the basis of the claim to rely on the maxim, makes no sense if and so long as S & R and its directing mind and sole shareholder are to be identified with each other. An auditor or reporting accountant (A) cannot be in breach of duty, to a person (B) committing a fraud, by failing to report to a third person (C) B's own fraud about which B well knows (and which B could perfectly well have reported himself, had that not been the opposite of what he wished). This is so, even if such a report would have led to B being unable to continue the fraud. These points are demonstrated by both Luscombe and Berg . The case of Reeves v Commissioner of Police of the Metropolis [1999] QB 169 has in my opinion no real relevance. It stands for a principle of causation which does not sensibly extend to situations of fraud and could not override the maxim *ex turpi causa* if otherwise applicable.

264  The second reason, that S & R's current insolvency and liquidation should make a difference since any recoveries will be held on the statutory trust for creditors, is touched on in the American case-law considered in the annex to this speech. Mr Brindle accepts that S & R cannot in liquidation have a claim which it did not have pre-liquidation. But he submits that the defence *ex turpi causa* may cease to apply to a one-man company which goes into liquidation, because

Stone & Rolls Ltd (In Liquidation) V Moore Stephens (A Firm), 2009 WL 2207450 (2009)

in liquidation its assets are held and will be distributed under the statutory scheme for the benefit of creditors. I cannot however accept the argument. Under English law, the company in liquidation cannot in this respect be in a better position than it was pre-liquidation, merely by virtue of the fact that it has become insolvent and gone into liquidation: see also Berg (para. 258 to 260 above).

### The significance of insolvency at the audit date

265   The fact that S & R was insolvent at each audit date is, in contrast, in my opinion critical. The powers of directors and shareholders in circumstances of insolvency or potential insolvency are qualified (as described in paras 235 to 240 above). The issue as between the company and its auditors is whether the auditors' duty to the company extends, like the directors', beyond the protection of the interests of shareholders in a situation where the auditors ought to have detected that the company was (in fact, as a result of the fraud which the auditors ought to have discovered) insolvent. Despite the immense and highly skilled attention that the appeal has had generally, both prior to and during its presentation before the House, I fear that the centrality of this point may have been a little obscured by the spread of argument over other issues. Hobhouse J touched on it in Berg (at pp.54 to 55). But in Berg the problem did not arise because the insolvency arose *after* the 1982 audit certificate from Berg's subsequent unconnected trading misfortune and also because the auditor could not be said to have been "implicated in a breach of the company's duties to its creditors" in any way paralleling the way in which the directors in West Mercia were ( Berg , p.55). On the latter possibility, Hobhouse J added ( Berg , p.55):

> "The West Mercia case was a clear case of a director abusing his position for his own advantage but the same principle applies wherever it can be shown that those in charge of the affairs of a company or in control of it are acting contrary to the principles governing insolvency. It is only in this sense that it can be said that once a company is insolvent the

interests of the company become those of its creditors. The duty of the company and its directors is then to preserve the assets of the company. The present case does not involve any such situation at any material time. The company may have been trading imprudently; but there is no evidence that in 1982 it was trading in fraud of its creditors. There is no allegation that Dearden Farrow were a party to any breach by Mr Golechha of any of his fiduciary duties."

This passage shows that the earlier passage in Hobhouse J's judgment (at p.54) quoted in para 260 above must be read in context. It does not mean that a company's only claim against its officers (including in this term its auditor) lies in deceit. It does not mean that a company is always to be equated with its directing mind. It does not address the context of insolvency.

266   None of the previous cases, Pendleburys , Galoo and Berg , deals with the position of a company insolvent at the date of the audit due to past fraud, where the loss claimed consists in the continuation of the scheme of fraud to the further detriment of the company and its creditors, existing or future. In West Mercia and Yukong the directors knew of the company's potential insolvency and their actions constituted breaches of fiduciary duty designed to defeat creditor rights in insolvency. A director may now also incur responsibility to the company for wrongful trading under the Insolvency Act 1986, s.214 ; and the common law duty discussed in paragraphs 235 to 240 above covers some of the same ground. Here, however, there is no doubt that Mr Stojevic was in deliberate breach of fiduciary duty. If Moore Stephens had known about or shut a Nelsonian eye to Mr Stojevic's breach of duty, there could be little doubt about their liability (see Hobhouse J's dicta in Berg , p.55 (quoted in para 265 above). But the present appeal proceeds on the basis that they negligently failed to detect the scheme of fraud and the company's insolvency and so allowed the scheme to continue to the company's further detriment.

Stone & Rolls Ltd (In Liquidation) V Moore Stephens (A Firm), 2009 WL 2207450 (2009)

267 The decisions in Caparo and Al Saudi Banque establish that auditors' duties are normally limited to the protection of the company's interests for the benefit of its shareholders. There was no question of any insolvency on the facts of Caparo . The facts in Al Saudi Banque were closer, and the scheme of fraud remarkably similar, to the present. But the claimants were the banks, and their claim was dismissed on the basis that the auditors had not been appointed by them and "were under no statutory obligation to report to them" (p.336E). In both Caparo and Al Saudi Banque , the concern was about the uncertain and unknown exposure in respect of third party investment or lending which would follow from permitting third party claims.

268 Other than in special situations, therefore, auditors owe no direct duties towards third parties. But none of the above cases addresses the present situation of a claim by the *company* against its auditors for failure to pick up a fraudulent scheme rendering it increasingly insolvent. But in Caparo , both Lord Bridge and Lord Oliver recognised the company's standing to bring claims for loss which it has suffered by its officers' fraud (see para 214 above); and, further, Lord Oliver described an auditor's duty as being, first of all, "to protect the company itself from the consequences of undetected errors, or, possibly, wrongdoing", before identifying a second duty "to provide shareholders with reliable intelligence" (para 214 above).

269 In my opinion it is in no way inconsistent with Caparo or Clarke Pixley to hold auditors responsible to the company they audit in the present circumstances. I underline four points in this connection. First, the concern about indefinite exposure to third parties does not exist in the context of a claim by the company. S & R's claim is to recover its own (not its creditors') loss by reason of the continuing scheme of fraud. Loss to the company is not the same as loss to its creditors, although there may or may not be an overlap. An insolvent company may by fraud raise £1m from bank A which it uses in a Ponzi type scheme to pay off a borrowing from bank B. Bank A is £1m worse off, and bank B £1m better off. But the company itself is no worse off from the continuing fraud. It is liable to pay bank A £1m, but it has benefited by £1m by paying off bank B using bank A's £1m. Of course if (as here) it raises £1m by fraud and pays only £500,000 to bank B and if its directing mind makes off with the other

£500,000, then the company is £500,000 worse off due to the continuation of the fraud, but that is and remains its own loss. Secondly, S & R's claim is for precisely the same loss as a company with some shareholders innocent of involvement in top management's fraud would be entitled to claim from negligent auditors who had failed to detect and report the fraud (paras 249 to 255 above). Thirdly, it cannot be suggested that the care to be expected of Moore Stephens as auditors varied according to whether all of S & R's shares happened to be owned and/or controlled by Mr Stojevic. Their express contractual duty was under Auditing Standard SAS 110.10 and 110.12 to report to a proper authority without delay where suspected or actual fraud cast doubt on the integrity of directors. This duty in fact exists under SAS 110 irrespective of whether there are or are not independent shareholders of integrity. Auditors would not in any event necessarily have any idea whether any such shareholders exist.

270 Fourthly, quite apart from the express provisions of Auditing Standard SAS 110, a situation of insolvency introduces new considerations for reasons previously explained. The identity of interest which normally exists between a company and its shareholders ceases, and the duties of auditors, like those of directors, must recognise this. The company as a legal personality continues and the auditors' duty continues to be, in Lord Oliver's words in Caparo , "to protect the company itself from the consequences of undetected errors or, possibly, wrongdoing". If, in Hobhouse J's words in Berg , "those in charge of the affairs of a company or in control of it are acting contrary to the principles governing insolvency", then the auditors can no longer treat them as representing the company, and must take other action - according to SAS 110 "without informing the directors in advance". In reality, a public report to shareholders (however many of them were involved in the fraud) would itself bring matters to an end. Resignation - and it is part of S & R's pleaded case that Moore Stephens should, after detecting the fraud, have resigned as well as reported it to the authorities - would by statute have involved an express duty on the part of Moore Stephens to report to creditors: s.394(1) of the Companies Act (para 215 above). I believe that it would in any event probably be auditors' professional and common law duty to report suspicions of fraud to the proper authorities. But Auditing Standard SAS 110 puts this beyond doubt. Even if Moore Stephens

had been aware that directors known or suspected to be acting fraudulently were the beneficial owners of all the company's shares, they would under SAS 110 still have been obliged to report the circumstances to regulators or other authorities, without informing management in advance, in order to protect the interests of the company. In fact, as I have said, auditors may often not know whether or not all such directors own all the shares. It would be a strange policy and law that exempts auditors from all responsibility to the company, according to the chance that the directors on whose integrity they undertake to report prove to be the sole "beneficial owners" of all the company's shares.

271  It follows that in my opinion Moore Stephens cannot invoke the maxim *ex turpi causa* or deny causation by reference to the knowledge of and involvement in the fraud of Mr Stojevic, if Moore Stephens ought with proper skill and care to have detected that S & R was subject to a continuing scheme of fraud in circumstances in which S & R was insolvent and being rendered increasingly so. Under English law, S & R is thus in my opinion entitled to pursue its present claim against Moore Stephens.

272  American cases appear to have taken a different view on this particular point under Texan and Pennsylvanian state law: Federal Deposit Insurance Corpn. v. Ernst & Young and Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc. 267 F.3d 340 (3rd Cir. 2001): see para 261 above. They come from a different legal background, one where creditors may at least in some States have direct remedies, and their reasoning does not answer the considerations which lead me to a different conclusion. For the reasons I have given, I do not consider that they represent English law.

**Contributory fault**

273  The last matter on which I wish to comment - though not to reach any conclusions - is the question of contributory fault. Mr Brindle opened his oral submissions by accepting that it would be open to the court to apportion fault between the company and its auditor if recovery against the auditor were permitted in respect of fraud by the company's directing mind. It suited Mr Brindle's case to present Moore Stephens' defence of *ex turpi causa* as an extreme and novel

response to the present situation, and to proffer at the outset the more balanced discretionary possibility of a reduction of the claim on account of the company's contributory fault. However, I regret that, as part of the whole picture, the House has not heard full argument on this aspect. (Indeed, I consider that the House's resulting inability on this appeal to review the complete picture is a further reason for not determining the whole claim against Moore Stephens at this stage. If contributory negligence is available as a defence, it would cater for or assuage concerns about the general appropriateness of allowing recovery expressed in some of the majority judgments.) The starting point would be to consider the extent to which contributory fault is available in respect of non-fraudulent management failings, either the very failings which the auditors ought with care to have identified or different management failings which nonetheless contributed to the same loss as that which the auditor's negligence allowed to occur. The House's decision in Reeves makes clear that, in a simple two-party situation, it is possible for recovery, for breach of a duty to prevent the very thing complained of happening, to be reduced on a broad brush basis on account of the claimant's conduct in bringing about the thing. In *Professional Negligence* by Jackson & Powell (6th Ed. 2007), chap 17, a number of authorities are cited in which contributory fault has also been recognised as a ground for reduction of liability in auditor's negligence claims.

274  However, the obvious conundrum, if the fraud of top management is not attributed to the company for the purpose of the maxim *ex turpi causa* , is why it should be attributed to the company for the purpose of contributory fault under the Law Reform (Contributory Negligence) Act 1945 . Mr Brindle's justification for doing this is that, when considering the allocation of fault to the company under the Act, the court is in effect considering a claim against the company. But, even if a "fault" is in this way equated with a claim, the question arises in the context of an audit of a solvent company, how management fraud may be balanced against an auditor's negligence, when an auditor's primary responsibility is in respect of innocent shareholders, whose conduct will not usually be susceptible to criticism. And a similar difficulty arises about weighing the significance of fraud by a directing mind who is also sole beneficial shareholder, if, as I consider, the auditor may be answerable to

the company for negligent failure to detect and report on such a fraud. Despite such problems, contributory fault, including Leeson's fraud which the judge had held (rightly or wrongly, I need not consider) to be attributable to the company, was recognised as a ground for a substantial reduction in recovery against the auditors in Barings Plc v. Coopers & Lybrand [2003] EWHC 1319 (Ch). The subject was also discussed by the Full Court of South Australia in Duke Group Ltd. v Pilmer 73 SASR 180 (1999) (reversed in part on a different point at [2001] BCLC 773 ). The court there concluded that, while the company's directors' knowledge of their own fraud on the company would not be attributed to the company, the company could and would nonetheless be liable vicariously for such directors' misconduct and treated as at fault on the same basis, for the purposes of enabling negligent auditors to reduce their liability in tort. (This was a Pyrrhic victory, since at the time contributory negligence was not available in Australia in relation to the concurrent contractual claim against the auditors.) The Full Court's reasoning was avowedly pragmatic and it relied as it said on its "view that this is the fairer and more appropriate outcome". There is obvious attraction in such pragmatism in the present context. Not having heard argument on any such aspects, I say no more.

**Conclusion**

275   For the reasons I have given, I consider that this appeal should be allowed on the ground that Moore Stephens's duty was to the company, that it is not sufficient for Moore Stephens to argue that every relevant emanation of the company consisted of Mr Stojevic as its directing mind and sole shareholder, if Moore Stephens failed in breach of duty to the company to detect the continuing scheme of fraud being pursued by Mr Stojevic and to detect that the company was (in fact, due to such scheme of fraud) insolvent or potentially so. In that context, Moore Stephens cannot attribute to the company itself, for the purpose of invoking against it the maxim ex turpi causa, the knowledge of and involvement in the fraud of Mr Stojevic which (it is for present purposes to be assumed) they ought to have detected and reported to regulators or other proper authorities in the company's interests. What would have happened upon such detection and report is simply a matter of causation.

276   The company's ability to recover its own loss in such circumstances is in my view not only also right in principle, but also desirable. It means that recovery does not depend on the happenstance of whether or not all the company's shareholders were involved in the fraud. Whether a company is a one-person company or not may itself also be unclear, until one has penetrated a web of nominee or trust shareholdings. The result I reach reflects the various categories of person interested in the company, with whom in mind the auditors ought to plan and conduct their work. The contrary result espoused by the majority of your Lordships will weaken the value of an audit and diminish auditors' exposure in relation to precisely those companies most vulnerable to management fraud. The (too topical) lesson for creditors or depositors might be said to be that they should not expose themselves to one-person companies, at least without extensive due diligence. That is neither attractive nor realistic as an answer, when one-person companies can be large financial enterprises offering banking facilities to or inviting deposits or investments from many ordinary members of the public. It is in relation to exactly such companies that auditors ought to be encouraged to exercise the skill and care anyway due, rather than to feel that the risks of incurring liability to the company for a negligent audit are reduced. For completeness and not because it in any way influences my conclusion, I note that auditors are now also able to enter into fair and reasonable liability limitation agreements under ss.534-538 of the Companies Act 2006 , though how far this is proving acceptable to their client companies or others I am unaware.

277   I would therefore allow this appeal, and restore the judge's order dated 11 September 2007 dismissing Moore Stephens's application for summary judgment on, or to strike out, the claim against them and giving directions for the further conduct of the proceedings. The critical issue dividing the House is ultimately whether auditors, who should, in the performance of their contractual and tortious duties towards a company, have detected and (under the express terms of their engagement) then have reported to the appropriate authorities a scheme of fraud by top management rendering the company as a separate legal person increasingly insolvent, owe any enforceable duty towards the company to do this, so avoiding further loss to the company. In my opinion, they do.

## Overseas authority on attribution

(para 248)

• i.    Canadian Dredge & Dock Co. Ltd. v The Queen (1985) 19 DLR (4th) 314 was decided by the Canadian Supreme Court , after reference to English case-law including Tesco Supermarkets Ltd. v Nattrass . It concerned a criminal prosecution. Not surprisingly in this context, the Supreme Court took a limited view of the circumstances in which the company could disclaim the acts and state of mind of its directing mind. Estey J described these as being "when the directing mind ceases completely to act, in fact or in substance, in the interests of the corporation", or "where all of the activities of the directing mind are directed against the interests of the corporation with a view to damaging that corporation, whether or not the result is beneficial economically to the directing mind". Only then, might there "be said to be fraud on the corporation" or an act "totally in fraud of the corporate employer" (p.351). Two comments may be made. First, the language of fraud on a company was being used in the unfamiliar context of a charge *against* the company. In such a context, as I have said, the hurdle for disclaimer of responsibility was, not surprisingly, set high. Second, the phraseology developed in the judgment and used in subsequent Canadian cases (and some other common law cases: see e.g. In re The Mediators, Inc. , paras. 6-7, discussed in paragraph 239 above, and Duke Group Ltd. v Pilmer 73 SASR 180 (1999) , para.632. indicates a test which is both more rigid and more extreme than that which English law would adopt, particularly since the Privy Council's decision in Meridian .

• ii.    Despite the first point, the reasoning in Canadian Dredge has been transposed in Canada to the context of an auditor's negligence claim in a first instance decision. Hart Building Supplies Ltd. v. Deloitte & Touche [2004] BCSC 55 was a case where Mr Larson, a director and the directing mind and a 15% shareholder, had falsified Hart's inventory records and inflated its profits by false invoices "to try to help Hart's business", and so misled the auditors. The company's claim

was brought at the instance of its innocent 85% shareholder against the auditors for negligence. The judge in applying "the law as set out in Canadian Dredge " took principles which may be appropriate when determining a company's liability to the third party and applied them, without question, to the different situation of a company seeking redress from a third party on the face of it in breach of duty to the company. For reasons I have given, this does not represent English law, and it has also been subjected to trenchant Canadian critique: Emaciating the statutory audit - a comment on Hart Building Supplies Ltd. v. Deloitte & Touche by Ass. Prof. Darcy MacPherson, University of Manitoba: (2005) 41 Can Bus LJ 471.

• iii.    Australian authority has adopted a more sceptical attitude to the scope and appropriateness of application of Canadian Dredge in the audit context: Edwards Karwacki Smith & Co. Pty. Ltd. v Jacka Nominees Pty. Ltd. (1994) 15 ACSR 502, where the Supreme Court of West Australia , after reviewing inter alia Canadian Dredge , refused summary disposal of a claim against auditors for negligently failing to discover that the directing mind of a "one-man company" had been fraudulently concealing the true state of the business and so fraudulently inducing investors in it.

• iv.    American authority is copious and less easy to digest (as well appears from the May 2008 continuing legal education study paper of the American Law Institute and Bar Association which the House was shown). Various broad approaches emerge. One takes the general law's theory of attribution or "imputation" and subjects it to an "adverse interest" exception (itself stated in differing terms, some resembling the Canadian Dredge test, others considerably more nuanced), which is then in turn subject to a "sole actor" exception. Another suggests that, in the context of a professional duty to check upon and report fraud such as the audit duty, either the general theory of imputation or the *ex turpi causa* doctrine (known in the United States as the *in pari delicto defense* ) itself requires modification.

• v.    The early case of Cenco Inc. v. Seidman & Seidman 686 F 2d 449 (1982) (USCA, 7th Circ.) concerned a claim by a still solvent company to

recover damages from auditors who had failed to discover a fraud at top management and board level, consisting of inflating the value of inventory, and so of stock which was used to buy up other companies. Speaking for the court and applying the common law of Illinois, Judge Posner upheld the trial judge's directions to a jury which had led the jury to dismiss Cenco's claim. He differentiated fraud by top management involving theft from the company from the actual fraud which involved "turning the company into an engine of theft against outsiders". The case is therefore distinguishable from the present, which I would, for reasons indicated in paras 230 to 234, place in the former category for the purposes of the company's claim against Mr Stojevic or its auditors. Judge Posner went on to say that, even in deciding how to treat the latter category, the Illinois courts would be guided by "the underlying objectives of tort liability". Holding that these justified the judge's directions, he adopted a two-pronged "cost-benefit" analysis. To allow recovery would, first, benefit stockholders without differentiating between innocent and guilty stockholders and, second, shift the loss to all stockholders (who the court said were "slipshod in their oversight [of their chosen board] and so share responsibility for the fraud"), thus, in the court's view, reducing the incentive for stockholders to hire and monitor honest stockholders (pp.455-456).

• vi.  In Schacht v. Brown 711 F 2d 1343 (1983) (also USCA, 7th Circ.), top management had fraudulently continued an insurance company in business past its point of insolvency and systematically looted it of its most profitable and least risky business and income, aggravating its insolvency. Cenco was distinguished on various grounds: first, as decided under Illinois law, whereas the issue in Schacht arose under federal law and the court could say that "we therefore write on a clean slate and may bring to bear federal policies in deciding the estoppel question"; second, on the ground that the fraud in Schacht , including the "Pyrrhic 'benefit'" of its artificially prolonged life, was not sufficient to engage the Cenco analysis of a company operating as the engine of fraud on others; and, third, on the ground that the two-pronged analysis adopted

in Cenco led in Schacht to a different answer, because in Schacht the company was insolvent, there was no indication that the fraudulent top management would benefit from any recovery and "no evidence here of the existence of large corporate shareholders capable of conducting an independent audit, as in Cenco , and whose lack of investigatory zeal would be rewarded by a decision favourable to the [liquidator]" (p.1349).

• vii.  Similar thinking appears in (a) In re Jack Greenberg Inc. (Larry Waslow, Trustee v. Grant Thornton LLP) (U.S. Bankruptcy Court, E.D. Penn., Phil. Div.) 240 BR 486 (1999) , where the court emphasised that "while the imputation doctrine may be applied in auditor liability cases, the doctrine was not crafted with that purpose in mind" and should be allowed "to be invoked only where the objectives of tort liability dictate" (p.508); (b) NCP Litigation Trust v. KPMG LLP 901 A.2d 871 (N.J. 2006), where the Supreme Court of New Jersey differentiated between shareholders engaged in a fraud involving inflation of profits and other innocent shareholders, holding that imputation could only be asserted to preclude recovery by the former, disagreed with the suggestion in Cenco that "imputation must be applied to shareholder suits to deter future such wrongdoing", noted differences between Illinois and New Jersey law, and, referring to Schacht , also concluded that the management's fraud "inflating a corporation's revenues and enabling a corporation to continue in business 'past the point of insolvency' cannot be considered a benefit to the corporation", but that, even if it could, "any benefit would not be a complete bar to liability, but only a factor in apportioning damages" (p.888); and (c) In re Sunpoint Securities, Inc. (U.S. Bankruptcy Court, E.D. Texas, Tyler Div.) (377 BR 513 (2007) .

• viii.  One, though by no means the only, strand of the reasoning in Schacht and Jack Greenberg , involves a possible distinction between situations of solvency and insolvency. This is controversial in American law, particularly in the light of s.541 of the Federal Bankruptcy Code (according to which the bankruptcy estate "is comprised of … all legal or equitable interests of the debtor in property as of the commencement of the case"), and there is authority rejecting such a distinction

in cases covered by s.541 : Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc. 267 F.3d 340 (3rd Cir. 2001). Earlier authorities had rejected the defence of *in pari delicto* as an answer to claims by *receivers* against negligent auditors: Federal Deposit Insurance Corpn v. O'Melveny & Myers 61 F.3d 17 , 19, (1995) and Scholes v. Lehmann 56 F. 3d 750 , 754, (1995). The court in Lafferty distinguished these authorities on the ground that receivers are not within s.541 ( Lafferty , p.358). However, in a still more recent decision, Knauer v. Jonathon Roberts Financial Group, Inc. 348 F.3d 230 , (2003) the Court of Appeals for the Seventh Circuit has taken the view that receivers do stand in the shoes of the company in relation to entities deriving no benefit from the fraud, as opposed to direct beneficiaries of the fraud.

• ix. The "cost-benefit" analysis and other techniques deployed in American case-law do not find any easy match in English law. Case-law in some states permitting direct claims against auditors by injured third parties (including creditors) also complicates any appreciation of the practical significance of American authority: see e.g. Bily v. Arthur Young & Co. 3 Cal.4th 370 (1992) . However, the general message in the recent case-law that I have examined is one of increasing reluctance to hold that top management fraud provides a defence to a negligent auditor, and this at least corresponds with my conclusions as to the right approach in principle in English law.

Crown copyright

© 2017 Sweet & Maxwell

2009 WL 2207450

---

End of Document                                    © 2017 Thomson Reuters.

# TAB 53

L. C.

1865
~~~
*Nov.* 16, 17;
*Dec.* 9.
___

## MOSS *v.* ANGLO-EGYPTIAN NAVIGATION COMPANY.

*Pleading—Demurrer—Cross Bill—Res Judicata.*

Demurrer will lie to a bill, though called a cross bill, if it is not really a cross bill.

Demurrer will not lie to a bill on the ground of *res judicata*, unless it avers that everything in controversy as the foundation of relief was also in controversy in the former suit.

Order of STUART, V.C., overruling demurrer affirmed.

DEMURRER. This bill was filed by *W. M. Moss* against *The Anglo-Egyptian Navigation Company Limited, Frederick Chapple, J. J. Bibby, F. R. Leyland, J. T. Cross, J. Cater,* and *J. W. Larking,* and contained the following statements :—

That the Plaintiff was a shipowner, and had for several years carried on the business of a shipowner under the style of *James Moss & Co.,* and was engaged in carrying passengers and merchandise by steamers from *Liverpool* to *Egypt* and the *East,* and was ships' husband to several of the steamers engaged in the trade, and owner of shares in them. That the Defendant *Chapple,* and the Defendants *Bibby* and *Leyland,* the last two trading under the firm of *Bibby & Co.,* and the Defendant *Cross,* were engaged in the same trade in opposition to the Plaintiff. That in order to put a stop to the opposition, an agreement was made on the 25th of June, 1861, between the Plaintiff and the Defendants *Bibby, Leyland, Chapple,* and *Cross,* called the Italian Agreement, whereby they agreed not to compete in the outward steam trade to *Malta, Syria,* and *Egypt,* for five years; that *Bibby & Co.* should act as ships' husbands, and made many other stipulations as to the mode of carrying on the trade. That the Plaintiff and the Defendants *Bibby, Leyland,* and *Cross,* performed their parts of the stipulations contained in the Italian Agreement. That on the 13th of November, *Chapple* sent to the Plaintiff's firm a letter as follows :—

" GENTLEMEN,—I think it right to inform you that it is my in-

tention, immediately, to employ a steamship in the *Egyptian* trade
outwards from *Liverpool*. The loss of the *Pactolus* entitled me to
do this, and by it I shall endeavour, to some extent, to make good
the injury that loss would otherwise cause me, and to reduce the
damages I shall at the proper time have to demand of you on
account of my interest in the ship lost through your breach of
our agreement."

<div align="right">
L. C.

1865

Moss
*v.*
Anglo-
Egyptian
Navigation
Company.
</div>

That, in 1863, *Chapple* sent steamers to *Malta, Egypt,* and *Syria,*
and made large profits thereby, and that such employment of
steamers was in breach of the Italian Agreement. That *Chapple*
alleged that he was released from the agreement by reason of
breaches of the same agreement by the Plaintiff. That, in
1863, the Plaintiff filed a bill of complaint in this Court against
*Chapple, Bibby, Leyland,* and *Cross,* and such bill *stated the afore-
said facts,* and prayed an injunction against *Chapple,* to restrain
him from employing any steamship or vessel in the trade outwards
from *Liverpool* to *Malta, Egypt,* or *Syria,* and from competing in any
manner, either directly or indirectly, in such last-mentioned trade,
and otherwise from violating the said Italian Agreement, and that
if necessary, such agreement might be decreed to be specifically
performed, or for damages for the breach thereof, and for further
relief. That the Defendant *Chapple* duly appeared to the said
bill, and opposed the relief thereby sought. That the cause came
on to be heard before the Master of the Rolls, and on the 8th of
December, 1864, was dismissed with costs against *Chapple,* and
without costs against the other Defendants. That the decree
was enrolled, and the Plaintiff had appealed to the House of
Lords against the decree. That in September, 1864, and after
the evidence in *Moss* v. *Chapple* was closed, *Chapple* filed a
bill, in a suit called *Chapple* v. *Bibby,* against *Bibby, Moss,* and
others, charging that there were errors in the accounts fur-
nished, and that commission had been improperly charged by
*Bibby & Co.;* and praying an account against them, and
that they might be removed from being ships' husbands. That
the existence of the suit of *Chapple* v. *Bibby* was not and
could not be put in evidence in the suit of *Moss* v. *Chapple.*
That the Defendants, the *Company* and *Chapple,* pretended that
the Italian Agreement was invalid; but the Plaintiff charged

L. C.

1865

Moss
*v.*
Anglo-
Egyptian
Navigation
Company.

the contrary, and that the suit of *Chapple* v. *Bibby* was pending, and was founded on that agreement, and that *Chapple* intended to prosecute it.    That if *Chapple* had ever any ground for disputing the validity of the Italian Agreement, he became bound by it by filing the bill in *Chapple* v. *Bibby*.    That *Chapple* recently concerted with *Cater, Larking,* and others to form the *Anglo-Egyptian Navigation Company,* to carry on the same trade.    And the bill prayed that, if necessary, this bill *might be taken as a cross bill* to the suit of *Chapple* v. *Bibby,* and that the Defendants, the *Company* and *Chapple,* might be restrained from employing any steamship in the trade outwards from *Liverpool* to *Malta, Egypt,* or *Syria;* and that, if necessary, the Italian Agreement might be decreed to be specifically performed; and that the Defendants might be decreed to make compensation for damage; and that, if necessary, this suit might be taken as supplemental to the suit of *Moss* v. *Chapple,* and that the Plaintiff might have discovery from the Defendants, *Cater* and *Larking,* and relief and discovery from the other Defendants.

To this bill the Defendants, the *Company* and *Chapple,* put in separate general demurrers for want of equity.

The demurrer of *Chapple* was heard before Vice-Chancellor *Stuart,* who overruled it; and the *Company's* demurrer was also overruled.

The Defendants both appealed.

*The Attorney-General* (Sir *R. Palmer*), Mr. *Malins,* Q.C., and Mr. *Surrage,* for the Defendant *Chapple* :—

This bill is, in fact, a bill of review filed without leave, for it is on precisely the same ground, and asks the same relief as the bill in *Moss* v. *Chapple,* which has been dismissed; *Mitf. Pl.* (1); *Bainbrigge* v. *Baddeley* (2).    It is not really a cross bill either, though called so.    It is apparent, on the face of the bill, that the subject matter is *res judicata.*

Mr. *W. M. James,* Q.C., and Mr. *J. Pearson,* for the company :—

If the bill is a defence to *Chapple's* claim, and so a cross bill,

(1) 4th ed. 91.                    (2) 2 Ph. 705.

that cannot enable the Plaintiff to make the company a party.
You cannot have a supplemental bill against new Defendants
upon the speculation that the Plaintiff may succeed in his appeal
to the House of Lords.

Sir *H. Cairns*, Q.C., and Mr. *Kay*, in support of the bill :—

As far as regards *Chapple*, it is a cross bill and cannot be
demurred to for want of equity; but must wait till the hearing of
both suits; *Mitf. Pl.* (1). As to both Defendants, the bill raises
issues of law and of fact, which were not and could not be deter-
mined in the former suit. Suppose that the bill had not stated
the proceedings in the former suit, would it be an answer to plead
that there had been a former bill ? This bill applied to a different
state of circumstances, for breaches of the agreement have hap-
pened whilst the former suit was in existence, such as the institution
of the other suit and of the company. Such a suit cannot be met
by a plea of *res judicata; Toulmin* v. *Copland* (2); *Hunter* v.
*Stewart* (3).

*The Attorney-General*, in reply :—

What Lord *Redesdale* means is, that a cross bill requires no
equity, and need ask for no relief; but it must be a real cross bill,
otherwise, any unscrupulous Plaintiff, by calling his bill a cross
bill, might make it impossible to demur. The Plaintiff says,
first, this is not a bill *ad idem ;* and, secondly, that it contains
allegations of facts which have occurred since the first bill was
filed. The intendment is against the pleader, and he has not
averred that the former bill was not for the same matter as this
bill; on the contrary, he avers that everything pleaded in the
former suit was true, and he founds his claim to relief on the same
matter, and he must be taken to have proved it in the former
suit. The subsequent matter alleged is only as to the filing of
the bill in *Chapple* v. *Bibby*, and of the formation of the company,
and their intention to use these steamers in the *Levant* trade.
The issue raised in both suits is the same. Mr. *Chapple* says he
has a right to depart from the agreement, and means to do so;
and Mr. *Moss* denies that right. There is no question of facts.

<div style="text-align: right">

L.C.

1865

*Moss*
*v.*
ANGLO-
EGYPTIAN
NAVIGATION
COMPANY.

</div>

(1) 4th ed. p. 263.        (2) 2 Ph. 711.        (3) 10 W. R. 176.

L. C.

1865

Moss
v.
Anglo-
Egyptian
Navigation
Company.

As to the cases, the second bill in *Toulmin* v. *Copland* (U. S.), was quite different from the first; so also in *Hunter* v. *Stewart* (U. S.).

Mr. *James*, for the company, in reply.

As to the company not being able to avail itself of the defence of *res judicata*, not having been a party to the former suit, if it is *res judicata* as to *Chapple*, the suit fails as to the company also. The bill is multifarious if it is a cross bill as to *Chapple*, and an original bill as to the company. If the Plaintiff says that it is not *res judicata*, because he did not adduce all his evidence, then it is a clear bill of review.

The LORD CHANCELLOR, at the conclusion of the replies, expressed his opinion that the demurrers ought to have been allowed. If the bill was to be treated as a bill of review, of course it was demurrable; because there had been no permission given to file such a bill, as there should have been if the facts were newly come to the knowledge of the parties; but his Lordship did not look at it in that point of view; for the real questions were, first, whether this could be treated as a cross bill, and if it could be so treated, whether the demurrer was therefore bad; and if it could not be treated as a cross bill, whether the demurrer could be sustained upon the ground that it was only a re-opening or an endeavouring to re-open that which has been already adjudicated upon.

Upon the subject of a cross bill, there were, undoubtedly, authorities quoted which said that you could not demur to a cross bill; that a cross bill is a defence which must come on at the same time as the original bill, and be disposed of as if it were a sort of adjunct to the answer to be taken into consideration with the original bill. That, to a certain extent no doubt, was accurately stated; but then it must be a real cross bill; it would not do merely to say the bill was a cross bill, and therefore could not be demurred to; otherwise a bill might be filed for the specific performance of a sale of an estate with an allegation that it was to be treated as a cross bill to something else totally different. It must be a bill in its nature a cross bill. Then was this a cross bill? It did not appear to his Lordship that anything decided on this bill could be

of the least assistance to anything to be decided upon the bill to which it was said to be a cross bill.

Then as to the pleadings. The suit of *Moss* v. *Chapple* came on to be heard before the Master of the Rolls, and was dismissed with costs against some of the parties, and without costs as to others. His Lordship then expressed his opinion, that if upon the allegations in this bill there could be no doubt that the bill in *Moss* v. *Chapple* was dismissed for want of equity, on the ground that there was no valid agreement between the parties in restraint of the trading, this bill must be demurrable, and added that he thought the averments did go to that extent.

———

In the course of the next day, his Lordship expressed doubts whether the view taken by him at the close of the argument was correct, and gave leave to the counsel for the Defendants to offer further arguments on the question. This offer was declined by the *Attorney-General* for the Defendants, who left the matter to be decided as it stood.

———

Dec. 9.   LORD CRANWORTH, L.C. :—

In this case the Plaintiff is a *Liverpool* merchant, trading to the *Levant ;* the Defendant, Mr. *Chapple,* is also a *Liverpool* merchant, trading to the *Levant.* The other Defendants, for whom Mr. *James* appears, are a company that has been formed, deriving title under Mr. *Chapple.* The Plaintiff was in the habit of sending goods to the *Levant* almost entirely in ships belonging to a *Liverpool* firm of *Bibby & Company.* It appears that there was, previously to the year 1861, a great opposition between the *Liverpool* merchants in this trade to the *Mediterranean.* Several firms were engaged besides those I have mentioned, and they felt that it would be to their interest to stop this opposition if possible ; and with that view all or most of them became part owners of all or most of the ships engaged in the trade. I presume that was done with the view of giving validity, or with a hope of giving validity to an arrangement about the trade which might be otherwise void with reference to the law with respect to the restraints

L. C.

1865

MOSS
*v.*
ANGLO-
EGYPTIAN
NAVIGATION
COMPANY.

114                         CHANCERY APPEALS.                    [L. R.

L. C.        upon trade. I do not know whether that was the reason; but
1865         that possibly might be the reason. In point of fact, most of the
Moss         firms, or all of the firms became interested in all, or the greater
v.           number of the ships which were engaged in this trade. That
Anglo-
Egyptian     being so, on the 25th of June, 1861, the agreement was entered
Navigation   into which gives rise to the present question, and which is called
Company.     the Italian Agreement, the effect of which was that Mr. *Chapple*
             and Mr. *Cross* were not to compete with the Plaintiff, Mr. *Moss*, in
             the outward trade to *Malta*, *Syria*, and *Egypt*. In 1863, Mr.
             *Chapple* contended that circumstances had occurred releasing him
             from this agreement, and on the 13th of November, 1863, he gave
             formal notice to the Plaintiff that he intended to trade to the
             *Levant, non obstante* the agreement, and he thenceforth did so.
             Mr. *Moss*, the Plaintiff, thereupon filed his bill against Mr. *Chapple*
             and others, praying an injunction to restrain him from competing
             in the *Levant* trade, as being a course of conduct contrary to his
             agreement. That cause was heard at the Rolls, on the 8th of
             December, 1864, and the bill was then dismissed with costs against
             Mr. *Chapple*, and that dismissal has been enrolled, with a view, as
             I understand it, to an appeal to the House of Lords. The present
             bill was filed on the 13th of April, 1865, by Mr. *Moss* against Mr.
             *Chapple* and others, praying against them the very same relief,
             exactly as in the former suit, and to this bill there was a general
             demurrer on the ground of the former decree.

             Now there is no doubt that a question once adjudicated upon
             cannot be again brought in question except by a bill of review
             in the same Court, or by appeal to a higher Court. At the
             hearing before me when this case was argued some two or three
             weeks ago, I thought that principle would warrant the demurrer,
             but further consideration has satisfied me that I was wrong. If
             the decree *must* have proceeded on the ground that there was no
             right to restrain the Defendant, then the demurrer was good.
             But that is not so; it might have proceeded upon a want of proof
             of some material fact in the case. The test will be to see how it
             would have been if the former suit and decree had not been
             stated on the face of this bill but had been pleaded. It would not
             have been sufficient in such a case to plead the former suit and
             the decree of dismissal, it would have been necessary to couple

with that an averment of facts sufficient to show that the question
raised in the second suit had been adjudicated upon in the first.
That is not only conformable to principle, but to authority, and it
was the occurring of that to my mind when I left the Court that
led me to see that I had come to an erroneous conclusion. This
is not, it must be understood, a technical rule at all, but it is one of
substance, and unless it is strictly adhered to, Plaintiffs who have
a clear title to relief on account of the breach of an agreement,
may, by failing to prove a breach, lose all right to complain of
future breaches; as, for instance in this case, if the Plaintiff failed
to prove the trading or intention to trade to the *Levant*, as was
suggested by Sir *Hugh Cairns*. In short, I confess that the im-
pression on my mind was, that there was not only an averment that
all these matters were true which were stated in the former suit,
which of course is so, so far as there is a re-averment of them, but
also an averment that they had been established, which is some-
thing more than an averment of their truth. If there had been an
averment that all these facts averred in the bill were true, and also
that they had been averred in the former suit and proved, then I
am inclined to think the demurrer would have been good. But I
could not find, upon looking at all the authorities to which I had
recourse, an instance of a demurrer to a bill upon such a ground
as a former dismissal. I take it to be so for this reason, that it
never can happen without averments, which are not likely to be
introduced, that everything that was in controversy in the second
suit as the foundation for the relief sought was also in contro-
versy in the first. That is a very clear principle, and upon that
principle I think the demurrer must be overruled.

I will just call attention to one very imperfect authority on the
subject, the case of *Brandlyn* v. *Ord* (1), which is reported very
shortly. With regard to the substance of the case, that is imma-
terial; but Lord *Hardwicke* laid it down as a rule, "that where the
Defendants plead a former suit, that the Court implied that there
was no title, when they dismissed the bill, is not sufficient, they
must shew it was *res judicata*, an absolute determination in the
Court that the Plaintiff had no title." That is very awkwardly
worded, but the meaning of it is, that in pleading a former suit as

L. C.

1865

Moss
*v.*
Anglo-
Egyptian
Navigation
Company.

(1) 1 Atk. 571.

L. C.
1865

Moss
*v.*
Anglo-
Egyptian
Navigation
Company.

a bar, it is not sufficient to shew that the bill was dismissed, but you must plead, further, that which will shew that the same matter in dispute in the subsequent suit was *res judicata* in the first. The same thing was determined in *Peterborough* v. *Germaine* (1). That is a very complicated case, and the facts are very difficult to be collected; but the result was this, that the question whether the decree in a former suit was properly pleaded in bar to the relief sought in the second suit depended, in the opinion of the House of Lords, upon whether or not it appeared upon the plea that the same matters that were in dispute in the new suit had also been adjudicated upon in the first suit, and they desired one counsel on each side to argue that single question, and then the entry in the journal of the House is that, that having been done, the House was of opinion that the two matters were the same, and that what had been adjudicated upon in the first suit was completely the same as that which was sought to be adjudicated upon in the second, and thereupon they allowed the plea. Under those circumstances, I think I am bound to say, that this does not appear upon the face of this bill, and therefore the demurrers must be overruled, and must be overruled with costs.

His Lordship said, in answer to a question by the *Attorney-General,* that he adhered to what he had said as to a demurrer to a cross bill.

(1) 6 Bro. P. C. 1.

# TAB 54

**\*1104 Between William Mountford v. Robert Scott, James Blake, and Charles Warner**

Image 1 within document in PDF format.

Ct of Chancery

23 July 1823

**(1823) Turner & Russell 274**

**37 E.R. 1105**

1823

**Analysis**

**\*1105** *July* 23, [1823].

Where deeds are deposited for the purpose of obtaining credit, the person with whom they are deposited has no lien upon them for what is due to him in respect of monies previously advanced.

By indenture of lease, dated the 3rd of *March* 1809, a piece of ground was demised by *William Stapp* to the defendant *Robert Scott* , for the term of 78 years and a quarter from the 25th of *June* then instant at the yearly rent of £18, 2 *s.* , and on the 18th of *April* 1809, the lease was placed by *Scott* in the hands of the plaintiff, to **[275]** whom he was at that time indebted; at the time of the deposit of the lease one house had been erected upon the ground demised, and four others were afterwards built, and an underlease of those four houses was, by indenture dated the 16th of *February* 1810, granted by the defendant *Scott* to the defendant *Blake* for the term of 77 years and a half wanting 10 days from the 25th of *December* then last at a pepper corn rent. The underlease was expressed to be made in consideration of £200 paid by *Blake* to *Scott* ; but it was in fact made in part satisfaction of a debt due from *Scott* to *Blake* for timber and materials used in building the houses. It contained a covenant on the part of *Scott* to indemnify *Blake* against the rent of £18, 2 *s.* reserved by the original lease, and a power was given to *Blake* to enter and distrain upon the remainder of the premises comprised in such original lease in case he should be called upon to pay such rent, and *Scott* covenanted that

in the event of there not being sufficient distress upon the premises he would assign over the original lease to *Blake.* The defendant *Blake* afterwards sold the four houses to the defendant *Warner* for £285, and assigned them to him by a deed-poll indorsed on the underlease, and dated the 28th of *March* 1810. The underlease and the deed-poll were prepared by the same solicitor.

The bill stated the foregoing facts, and alleged, that the original lease was deposited with the plaintiff as a security for the debt then due to him, and that the defendant *Blake* , at the time of the underlease being granted, and the defendant *Warner* , at the time of the assignment to him, respectively had notice of the deposit having been made for the above-mentioned purpose. The bill prayed, that an account might be taken of what was due to the plaintiff on the security of the lease of the 3rd of *March* 1809, and that the defendants might be decreed to pay to the plaintiff what upon taking such account should appear to be due to him, or in default of payment, that the de- **[276]** -fendants might be decreed to assign and convey to the plaintiff all their estate and interest in the lease deposited with the plaintiff, and also in the lease of *Feb.* 1810, and that such of the defendants as should appear to have the lease of *Feb.* 1810, and the deed-poll indorsed thereon, in their possession or power, might be decreed to deliver up the same to the plaintiff; and if it should appear that *Warner* had not, before the execution of the assignment to him, and the payment of the purchase money for the same, any notice or reason to believe that the lease of the 3rd *March* 1809 had been deposited with the plaintiff, then that the defendants *Scott and Blake* , or one of them, might be decreed to pay to the plaintiff, what should appear to be due to him for principal and interest, on the security of the said lease.

By the joint several answer of the defendants *Scott* and *Blake* , the defendant *Blake* admitted, that before the underlease was granted to him, lie had been informed of the original lease having been deposited with the plaintiff as a security for a sum of money due to him from the defendant *Scott* , but insisted, that such lease, so deposited, could be considered only as affecting the one house which was erected on the piece of ground in question at the time of the deposit of such lease with the plaintiff, if the deposit could be considered as having effect at all.

The defendant *Warner* , in a passage of his answer which was read as evidence, admitted, that *Gyles* , the solicitor who prepared the underlease, was his solicitor at the date of the assignment to him, and was employed by him to prepare, and did prepare the deed-poll of the 28th of *March* 1810, and perused and approved of the same on his behalf, and as his solicitor, but he denied, that at the time of the execution of the deed-poll, or of paying his purchase money for the underlease, he had any notice of the original lease having been deposited with **[277]** the plaintiff for the purpose of securing the payment of any sum of money, or for any other purpose.

*1106 *Gyles* , the solicitor who prepared the underlease and assignment, was examined both on the part of the plaintiff, and of the defendants, and deposed, that upon the occasion of his being instructed to prepare the underlease, he asked the defendant *Scott* for the original lease, and that the defendant *Scott* informed him, that he had left it in the hands of the plaintiff for the purpose of obtaining credit thereon, and that the plaintiff, after it had been so left with him, had viewed the premises thereby demised, and had declared, that the messuage erected thereon, was not, in the shape of security, worth one shilling, the same being subject to a yearly ground rent of £18, 2 *s.* , and that he would not give him the defendant *Scott* any credit whatever upon the said lease, or the premises thereby demised. *Gyles* further deposed, that the defendant *Scott* at the same time declared to him, that he never had any timber or other goods or articles whatever from the plaintiff, by way of credit or otherwise, after he had left the said lease with him, and that he had not at any time given or executed any instrument to the plaintiff for any debt due or owing by him to the plaintiff, whereby the said lease was declared or understood to be deposited with the plaintiff as or by way of security, and that he had not ever given any security whatever to the plaintiff for the debt due from him, save and except a promissory note or bill of exchange for the sum of £130, or thereabout, for goods sold and delivered some time previous to the time of his leaving the lease with the plaintiff, and that the occasion of his having left the said lease with the plaintiff was, in consequence of his having sometime after he had given the aforesaid promissory note or bill of exchange applied to the plaintiff for some timber on credit to carry on and complete some buildings, and the plaintiff having requested to know

whether he would **[278]** deposit any lease or deed as a security for such further credit. *Gyles* further deposed, that he prepared the underlease of the 16th of *February* 1810 as the solicitor of the defendants *Scott* and *Blake* , and that he was before, and at the time of the date or execution of the said indenture of underlease, informed by the defendant *Scott* , that the original lease was then deposited with the plaintiff. The defendant *Scott* was also examined by the plaintiff.

After several witnesses had been examined, the defendant *Blake* became bankrupt, and the defendant *Scott* took the benefit of the insolvent debtor's act, and a supplemental bill was filed against their assignees.

The cause was heard before the *Vice-Chancellor* on the 24th of *January* 1818, and his Honour ordered the bill to be dismissed. (3 Madd. Rep. 34.)

The plaintiff appealed from the decree of the *Vice-Chancellor* , and the appeal now came on.

In the course of the argument an objection was made by the defendants to the evidence of *Scott* being read for the plaintiffs, upon the ground that a decree was prayed against him. In answer to the objection it was argued, that *Scott* having taken the benefit of the insolvent debtor's act, his provisional assignee would alone be liable.

The *Lord Chancellor* observed, that in the lease to *Blake, Scott* covenanted, in the event of there not being a sufficient distress upon the premises, to assign over the original lease; that *Warner* as the assignee of *Blake* would be entitled to the benefit of that covenant; and that *Scott* therefore was interested, because there might be a demand upon the covenant, on which he might be **[279]** sued, and to which, if he was sued (the demand being after the proceedings under the insolvent debtor's act), both his person and estate would be liable.

Mr. *Agar* and Mr. *Parker* for the appellant. It is quite clear that the equitable title of the plaintiff must prevail against the legal estate of the defendant, if he is affected with notice; *Hiern* v. *Mill* (13 Ves. 114). The possession of the original lease by the plaintiff was sufficient to put the defendant upon enquiry, and therefore to affect him with notice. *Smith* v. *Low* (1 Atk. 489). Where a purchaser cannot make out his title except through

a deed which leads to a fact, he is to be considered as having knowledge of that fact. *Mertins* v. *Jolliffe* (Ambler, 311). It has been often decided that notice to an agent is notice to the principal. *Maddox* v. *Maddox* (1 Ves. Sen. 61), *Le Neve* v. *Le Neve* (Ambl. 436), *Sheldon* v. *Cox* (Ambl. 624). In this case *Gyles* had notice of the deposit with the plaintiff, and it is admitted that lie was the solicitor of *Warner.*

Mr. *Hart* and Mr. *Willis* for the defendants.

The *Lord Chancellor* [Eldon]. I am clearly of opinion that there is in this case **\*1107** no ground for determining that the plaintiff is entitled to relief. It is true that it is established that a deposit of deeds is to be taken as a fact of evidence that the deposit is made for the purpose of securing money; that was laid down by Lord *Thurlow* , upon the notion that the deposit could be made for no other purpose; but the whole tenor of all the cases is, that doctrine is not to be carried further. The *Vice-Chancellor* in this case appears to have proceeded **[280]** upon the notion that notice to a man in one transaction is not to be taken as notice to him in another transaction; in that view of the case it might fall to be considered, whether one transaction might not follow so close upon the other, as to render it impossible to give a man credit for having forgotten it. I should be unwilling to go so far as to say, that if

an attorney has notice of a transaction in the morning, he shall be held in a Court of Equity to have forgotten it in the evening; it must in all cases depend upon the circumstances. Supposing that when *Warner* took this assignment, he was affected with notice of what was known to *Gyles* in the transaction with *Blake* , it is a clear fact in proof in this cause that the lease was not deposited for money advanced at the time; if it was put into the hands of the plaintiff as a security at all, it must have been for an antecedent debt; but the account which *Gyles* gives of the transaction is, that the lease was carried to the plaintiff, not for the purpose of being applied as a security for money already advanced, but for the purpose of obtaining future credit; I apprehend it has never been held, that if deeds are carried to a man for the purpose of obtaining credit from him, he has a lien upon them for what is due to him in respect of monies theretofore advanced. Such a decision would carry the doctrine upon mortgages by deposit of deeds, further than it has ever yet been carried. This decree therefore must be affirmed.

Decree affirmed.

© 2017 Sweet & Maxwell

37 E.R. 1105

---

© 2017 Thomson Reuters.

 © 2017 Thomson Reuters.

# TAB 55

**Dennis Edward Myers, Patricia Ann Myers v.
Kestrel Acquisitions Limited, Kestrel Holdings
Limited, Indigo Capital Partners Limited,
Indigo Capital IV SARL, Indigo Capital IV LP,
Alchemy Partners Nominees Limited, Alchemy
Partners (Guernsey) Limited, Swift Advances plc**

**Dennis Edward Myers, Patricia Ann
Myers v. Kestrel Acquisitions Limited**

Case No: HC13D03475, Case No: HC14A01554

High Court of Justice Chancery Division

31 March 2015

**[2015] EWHC 916 (Ch)**

**2015 WL 1403189**

Before: Sir William Blackburne

Date: 31/03/2015

**Analysis**

Hearing dates: 2, 3, 4 and 5 December 2014

**Representation**

• Paul Downes QC and Stewart Chirnside (instructed
by Bristows LLP ) for the Claimants.
• Guy Morpuss QC and Patricia Edwards (instructed
by Macfarlanes LLP ) for the Defendants.

**Judgment**

Sir William Blackburne:

**Introduction**

1  This is the trial of two closely related Part 8 claims.
The first was issued on 12 August 2013, the second
on 9 April 2014. It is not necessary to distinguish
between them. They arise out of the issue on 12 May
2004 to the claimants, Dennis and Patricia Myers,
by the first defendant ("Kestrel") of £5,264,798 Fixed
Rate Unsecured Loan Notes 2010 ("the Vendor Loan

Notes" or, more simply, "the VLNs"). The VLNs were
issued as part of the consideration for the sale by the
Myers of their sub-prime lending business which they
conducted through a company called Swift Advances
plc ("Swift"). The Myers hold the VLNs as trustees
of a family settlement. Claiming to exercise powers
contained in the terms of the VLNs, Kestrel has
purported to make unilateral amendments to those
terms. The amendments are of two kinds. The first
relates to amendments designed to subordinate the
VLNs to further loan notes which Kestrel has issued.
This has happened on 2 November 2007, 15 July 2008
and 6 July 2009. In all the VLNs have been subordinated
to £102m of further loans, together with the interest that
those further loans have earned and continue to earn.
The second relates to amendments designed to postpone
the redemption date of the VLNs. This has happened
on 15 July 2008, 1 September 2010, 21 December
2011 and 26 March 2014. If the postponements are
valid the VLNs now mature for payment, failing an
earlier event of default, on 31 March 2018. The original
maturity date was 12 May 2010. The subordinations
and postponements were effected to enable Kestrel to
raise the further funding it needed so that it could
weather the global recession.

2  By these claims the Myers, who appear by Paul
Downes QC and Stewart Chirnside, seek relief intended
to establish the invalidity of the amendments. They
contend that, without their consent (which was not
forthcoming), Kestrel had no power to subordinate
the VLNs to the further loans. They contend that all
of the postponements were likewise invalid although
they accept that the first of them (made on 15 July
2008 whereby redemption was postponed from 12 May
2010 to 30 September 2012) was arguably valid. I call
this "the invalidity issue". They say that as a result
of the subordinations and postponements the VLNs
are now worthless. They seek declaratory relief to
reflect these contentions. They also contend that in
the events that have happened Kestrel and the second
defendant ("Kestrel Holdings"), which is Kestrel's
parent company, are unable to pay their debts within
the meaning of section 123 of the Insolvency Act 1986
(" section 123 ") and that accordingly there has been an
event of default under the terms of the VLNs. They seek
a declaration to that effect. I call this "the insolvency
issue."

3  The defendants, appearing by Guy Morpuss QC and Patricia Edwards, deny that Mr and Mrs Myers are entitled to any of the relief they seek. They contend that the amendments were validly made and that, in any event, the Myers are estopped from contending otherwise. They also contend that Kestrel and its parent are not insolvent within the meaning of section 123 .

4  The Myers have also issued a Part 7 claim. It arises out of the same facts. Whether it proceeds to any extent will depend on the outcome of this hearing. It has been stayed by consent in the meantime.

5  I should add that one of the two issues raised by the later of the Part 8 claims (the so-called "lapse" issue) was abandoned by the Myers in late October by the service of a notice of discontinuance. I will mention it in more detail a little later.

**The facts**

6  Although these are Part 8 proceedings and therefore the Myers are obliged to assert, and do assert, that the resolution of the issues raised is unlikely to involve any substantial dispute of fact, to which end there was an agreed statements of facts, a great deal of evidence has been filed and neither side has quite been able to resist the temptation to refer to matters which do give rise to disputes of fact. That has been done either to describe the "wider picture" or in the hope that I will take the view that the factual position is so overwhelmingly in that side's favour on some issue that I should not hesitate to find accordingly. Or it has been to show that what at first sight looks to be unchallengeable factually, in truth conceals complex issues fit only for trial under Part 7 . Nevertheless, both sides have been anxious that so far as possible I should determine the issues raised by the two Part 8 claims.

7  The agreed statement of facts and the undisputed evidence disclose that the Myers built up a highly successful business in the field of non-conforming sub-prime secured lending. They did so through the medium of Swift. Swift is the eighth defendant. All of the shares in Swift were held on Myers family trusts. Among them was the P Myers Interest in Possession Settlement. The Myers bring these proceedings as trustees of that settlement. Nothing turns on its provisions.

8  On 8 May 2004 the Myers entered into an agreement ("the Sale and Purchase Agreement") with Kestrel and Kestrel Holdings for the sale of the whole of Swift's issued share capital to Kestrel. That company had been specially incorporated for the purpose. The sale was effectively to a private equity firm called Alchemy Partners LLP. The purchase consideration amounted in the event to £85m. Of that sum £4,661,173 was paid on (but as to £1m within six months of) completion. The balance of £80,338,827 was satisfied by the issue by Kestrel to the Myers on completion of (i) guaranteed loan notes in the sum of £75m, (ii) 74,029 shares in Kestrel, and (iii) the Vendor Loan Notes in the sum of £5,264,798. Completion was on 12 May 2004. (There was also a provision whereby up to a further £5m would become payable in certain events but those events did not and cannot now occur.) Effectively, as I understood it, the Myers received £79.67m in cash, 74,000 odd shares in Kestrel Holdings and the VLNs. It is with the latter, and only with the latter, that this hearing is concerned.

9  The VLNs were created by an instrument dated 12 May 2004 ("the Vendor Loan Note Instrument" or, more simply, "the VLNI"). They carry interest at 12% compounded annually, with the interest so earned being paid on the loan redemption date, i.e. initially 12 May 2010 and, if they were validly extended, the postponed dates and not before. Kestrel has the right in defined circumstances to redeem all of the Notes prior to that date with interest accrued up to the date of redemption. It can also purchase any of the Notes at any time and there is provision for the holders of the Notes to call for earlier repayment (together with accrued interest) upon the occurrence of specified events of default.

10  The consideration for the shares in Swift was funded in large part by Kestrel issuing unsecured discounted loan notes ("the Discounted Loan Notes" or more simply "the DLNs") with a nominal value of £103,086,443 to the sixth defendant ("Alchemy") and the fifth defendant ("Indigo"). The DLNs were created by Kestrel by an instrument dated 12 May 2004 ("the Discounted Loan Note Instrument" or, more simply, "the DLNI"). The discounted price paid was £55,185,201. Of that amount Alchemy agreed to subscribe £52,226,800 and Indigo the £2,958,401 balance. In addition, Alchemy subscribed for 734,272 ordinary shares in Kestrel Holdings and Indigo for

41,599 further such shares. The shares were issued at par.

11   Those loan notes, like the VLNs, had the same maturity date (12 May 2010). They were issued at a discount but this, I was told, was on the footing that, once interest up to redemption is included, the amount repayable on redemption would be their nominal amount, namely £108,925,803. I understood, but have not done the calculation, that this was on the footing that interest was also at the rate of 12% compounded annually. The DLNs provided for earlier redemption at Kestrel's option and, for this purpose, set out how interest was to be calculated up to the date of such earlier redemption. It was also open to Kestrel to purchase any of the Notes and there was provision for earlier redemption in various defined circumstances.

12   It is convenient at this point to return to the abandoned lapse issue. It arose from the fact that on 31 March 2008 the DLNs were replaced by fresh notes ("the Replacement Notes") constituting £85,766,963 Fixed Rate Unsecured Loan Notes 2010. They were issued to Alchemy and Indigo in the sums of £81,169,116 and £4,597,847 respectively and were in all material respects the same as the DLNs which they replaced. (Rather than refer to them in what follows it is simpler to continue to refer to the DLNs as if they had continued in being.) The gist of the lapse issue (which was one of the two issues raised by the later of the two Part 8 claims) was that, as a matter of construction, after 31 March 2008 when the DLNs were replaced by Replacement Notes, Kestrel's right unilaterally to modify the VLNI lapsed. For a time this was the Myers's only and later their primary contention. However, by notice dated 29 October 2014, they abandoned the point. They sought to discontinue that claim when the matter came on for hearing before me. There remained a dispute on the costs arising out of it. At the end of the hearing I determined that dispute. It resulted in my ordering the Myers to make of payment of £30,000 on account of the defendants' costs of the issue.

13   Alchemy is a nominee for the seventh defendant ("Alchemy Guernsey"). These two companies are, together with Alchemy Partners LLP, part of a wider group of companies ("the Alchemy Group"). It was Alchemy Partners LLP which had initially offered to buy the entire issued share capital of Swift. It caused

Kestrel to be incorporated as a wholly owned subsidiary of Kestrel Holdings for the purpose of the acquisition. As a result of the acquisition Alchemy now holds a majority of the shares in Kestrel Holdings. It does so for investors in what was described as the Alchemy Investment Plan. This in turn is managed by Alchemy Guernsey.

14   Indigo is part of a group of companies ("the Indigo Group") which carries on business, I was told, as providers of mezzanine finance and venture capital. The Indigo Group includes the third defendant ("Indigo Capital") and the fourth defendant ("Indigo SARL"). The latter, which is a Luxembourg entity, is a wholly-owned subsidiary of Indigo. Up to the beginning of July 2007 Indigo Capital managed Indigo. There was then, it seems, a transfer of Indigo Capital's business to Indigo Capital LLP. I do not think that the details of this matter although, according to the evidence filed on behalf of the third defendant, the point is made (and it features in a submission made by Mr Downes in connection with the insolvency issue) that Indigo SARL has its own board of directors based in Luxembourg and it is they who are ultimately responsible for making its investment and divestment decisions.

15   A shareholders' agreement, dated 8 May 2004, to which, among others, the relevant Alchemy and Indigo companies, together with Kestrel and Kestrel Holdings were parties set out the terms on which the Alchemy and Indigo parties were willing to invest in Kestrel and its parent company. I do not need to refer to any of its terms. They have not featured in counsels' submissions. But it is necessary to set out some of the terms of the VLNI. Of particular importance to the current dispute are the following terms of that instrument (in which the expressions "Notes" and "Loan Notes" refer to the VLNs):

> "2.3   The Notes shall rank equally with the Discounted Loan Notes so as to provide the same pre-tax return to the respective holders thereof and the Company undertakes to treat the Discounted Loan Notes in the same manner as if they constituted a single class of securities.

2.4 Without prejudice to the generality of Clause 2.3 above, the Company undertakes:–

2.4.1 not to redeem, repay or purchase any of the Discounted Loan Notes unless at the same time the Company redeems, repays or purchases a proportionate amount of the Loan Notes based on the respective total amounts of Discounted Loan Notes and the Loan Notes outstanding prior to such event; and

2.4.2 not to amend the Discounted Loan Note Instrument or the terms and conditions of the Discounted Loan Notes unless at the same time it makes appropriate amendments to this Instrument and the terms and conditions

of the Loan Notes in order to give effect to clause 2.3 above."

16 Clause 6.1 deals with events of default and their consequences. Among the events of default is, by clause 6.1.4, if "any Group Company shall be unable to pay its debts within the meaning of Section 123 of the Insolvency Act 1986 ". The clause goes on to state that if an event of default occurs and in the case of, among others, clause 6.1.4, the event is continuing, the note holder is entitled by written notice to the Company to declare its holding of VLNs to be immediately due and payable whereupon they become immediately due and payable on the note holder's demand. Clause 6.2 goes on to state that where, pursuant to clause 6.1, a note holder has validly declared the VLNs to be due and payable "then, provided that the holders of Discounted Loan Notes have declared their notes to be due and payable, the Noteholder may by written notice to the Company call for repayment of its holding of Notes on such date as it may specify in such notice…" It is only therefore if the holders of the DLNs (or now the Replacement Notes) have declared their notes to be due and payable that the holders of the VLNs can actually demand payment of what is due to them.

17 Clause 9, headed "Modification" is as follows:

"9.1 The Company may make any modification to this instrument (including, for the avoidance of doubt, to the Conditions) either:–

9.1.1 with the sanction of an Extraordinary Resolution of the Noteholders; or

9.1.2 without
the sanction of
an
Extraordinary
Resolution but
unilaterally if
the
modification is
consistent in
all material
respects with
any
modification
being made to
the
Discounted
Loan Note
Instrument."

18 It is not necessary to refer to the Conditions or to any other provision in the VLNI.

19 On completion of the sale to the Alchemy and Indigo parties, the Myers, Kestrel, Swift and others entered into an intercreditor agreement ("the ICA"). Its aims included regulating the ranking of various debts owed by Kestrel. Having regard to the submissions made to me it is material to refer to just one of its terms and some of the definitions set out in it. The material term is clause 3, headed "Ranking of Debt", which so far as material is as follows:

"3.1 The Debt will rank for all purposes and at all times in the following order: 3.1.1 first the Lender Debt; 3.1.2 second the Investor Debt; and 3.1.3 third the Intra-Group Debt.

3.2 This Intercreditor Agreement does not purport to rank: 3.2.1 any of the Investor Debt as between the Investors; and 3.2.2 any of the Intra-

Group Debt as between the Intra-Group Creditors."

20 "Debt" is defined as the Lender, Investor and Intra-Group Debts. "Lender Debt" is what was owed or incurred by any Obligor to the Investors under certain finance documents. This dispute is not concerned with "Lender Debt" or "Intra-Group Debt" but, so far as the argument went, simply with "Investor Debt". That is defined by clause 1.1 to mean "the aggregate amount from time to time outstanding of all monies, obligations and liabilities (whether actual or contingent) due owing or incurred by any Obligor to the Investors under the terms of the Investment Documents (or any of them)". Kestrel was the material Obligor. The Investors were the Myers and the fifth, sixth and seventh defendants who were all parties to the ICA. At the time the ICA was entered into the Investor Documents were, so far as material, the VLNI and the DLNI. I was not referred to any other provision in the ICA.

21 This brings me to the further advances made to Kestrel, each secured by separate loan notes (referred to as Follow On Notes or "FONs" for short), and the steps taken by Kestrel to subordinate the VLNs to those further advances and also to postpone their maturity date.

22 On 2 November 2007 Kestrel issued £15m of Fixed Rate Unsecured Loan Notes 2011 ("the 2007 FONs"). They were issued to Alchemy as to £13.5m and to Indigo SARL as to the remaining £1.5m. According to the evidence (an Alchemy Guernsey so-called final investment recommendation paper) this borrowing was "to meet Swift's lending and growth targets, to manage a period of tight cash headroom and to preserve Swift's optionality." I was also told that the persons who supplied the cash under the so-called Alchemy Investment Plan to enable this further investment to be made by Alchemy were not the same as those who had supplied the £52,226,800 to enable Alchemy to purchase its share of the DLNs in May 2004. I was given to understand that this was also the case in relation to Alchemy's participation in the various FONs.

23  On the same date, 2 November 2007, Kestrel, by a deed of variation executed in purported exercise of the power conferred by clause 9.1.2 of the VLNI, sought to vary the terms of the VLNs so as to insert a new clause (clause 11). This new clause subordinated the rights of the holders of the VLNs to the rights of the holders of the 2007 FONs. The Myers challenge the validity of that deed. At the same time a similar amendment was made to the DLNI.

24  On 15 July 2008 Kestrel purported by deed executed on that date to amend the terms of the VLNs so as to (i) postpone their redemption date from 12 May 2010 to 30 September 2012 and (ii) subordinate the rights of the holders of the VLNs to the rights of the holders of (a) the 2007 FONS and (b) the (as yet to be issued) 2008 FONS. At the same time (and by separate instruments) similar amendments were made to the Replacement Notes and the redemption date of the 2007 FONs was postponed to 30 September 2012.

25  On 25 July 2008 Kestrel issued £64 million Fixed Rate Unsecured Loan Notes 2012 ("the 2008 FONS"). Of this amount £60 million was issued to Alchemy and £4 million to another company, Ares Capital Europe Limited ("Ares").

26  On 6 July 2009 Kestrel issued £23 million Fixed Rate Unsecured Loan Notes 2013 ("the 2009 FONs"). These were issued to Alchemy alone and were expressed to rank pari passu with the 2008 FONS issued to Ares but in priority to the remaining 2008 FONS and the 2007 FONS. The 2008 FONS and the 2009 FONS were expressed to be issued "to preserve Swift's optionality by paying off the debts of the banks in an orderly exit". By a deed executed on the same date Kestrel purported to amend the VLNs so as to subordinate the rights of the holders of them to the rights of the holders of (i) the 2007 FONs the 2008 FONs and (iii) the 2009 FONs and to make similar amendments to the Replacement Notes. At the same time the 2007 FONs and the 2008 FONs were amended so as to be subordinated to the 2009 FONs.

27  By a deed dated 1 September 2010 Kestrel purported to amend the VLNs so as once again to postpone the redemption date, this time from 30 September 2012 to 31 October 2013. A similar amendment was made to the Replacement Notes. At the same time the

redemption dates of the 2007, 2008 and 2009 FONs were rescheduled to the same date.

28  By a deed dated 21 December 2011 Kestrel purported to amend the VLNs a yet further time by postponing the redemption date from 31 October 2013 to 31 March 2015. Once more, similar amendments were made to the Replacement Notes and to the redemption dates of the 2007, 2008 and 2009 FONs.

29  Finally, on 26 March 2014, which was shortly after the first Part 8 claim had been issued, Kestrel purported to amend the redemption date of the VLNs once more, this time from 31 March 2015 to 31 March 2018. I was told that similar amendments were made to the redemption date of the Replacement Notes and the various FONs.

30  Some play was made before me by Mr Downes of the circumstances in which this final postponement occurred, coming as it did after a first hearing of the first Part 8 claim. Nothing turns on this, or at least nothing which I can deal with on the hearing of Part 8 claims.

31  The effect, said Mr Downes, of subordinating the VLNs and the Replacement Notes to the further loans and postponing their (and the FONs') redemption dates, coupled with the high rates of interest that the FONs carried and the return that Swift was making on its trading, was that by July 2008, when the 2008 FONs were issued, this further borrowing could at best be no more than a short term measure. He submitted that if the further £64 million was not repaid by the end of 2011 at the latest (the 2008 FONs had a redemption date at that time of 30 September 2012) there was no real prospect of the Myers (as holders of the VLNs) receiving any repayment if the subordinations and redemption postponements purportedly effected at that time took effect according to their terms. Effectively, he submitted, the VLNs were thereby being made irredeemable and insolvency rendered inevitable. He described this as Kestrel's financial tipping point. The further loan secured by the 2009 FONs, the subordination of the VLNs to this further borrowing and the further postponements of the redemption dates, coupled with the continuing high interest rates and lack of an improvement in Swift's level of trading meant, he said, that the position for the Myers as holders of

the VLNs could only get worse, indeed exponentially worse.

32  It is against that background of steadily mounting indebtedness and the lack of any prospect of repaying it, at least from late 2008, that Mr Downes invited me to consider the validity of the deeds purporting to subordinate the VLNs and postpone their redemption, and the issue of Kestrel's (and Kestrel Holdings') insolvency.

### The invalidity issue

33  Mr Downes advanced two separate arguments. The first was that the power to modify the terms of the VLNI was subject to an implied term. This was that the modification had to be in good faith and for the benefit of the holders of the DLNs and VLNs as a whole, viewing them for this purpose as a single class. Good faith meant something broader than simply the absence of dishonesty. I refer to this as the good faith term. He submitted that this result is reached in one or other of three ways. First, such a term is always implied into what Mr Downes described as "these sorts of arrangements." On analysis this meant that either by clause 2.3 or by clause 9.1.2 (or by a combination of the two) Kestrel is obliged to treat the Myers (as holders of the VLNs) as a minority within a larger single class of noteholders comprising the VLNs and the DLNs and that, for their protection, it was appropriate to imply the good faith term which is commonly implied where a majority has the right to bind a minority. Second, he submitted, there is a gap in the VLNI since, read literally (i.e. without implying some additional term), there is nothing in that instrument to prevent Kestrel from amending it in a way that amounts to a fraud on the holders of the VLNs such that, on accepted principles for implying terms into a contract, it is appropriate to place a curb on that possibility. This is achieved by implying the good faith term. Third, the VLNI gives to Kestrel a discretion whether or not to modify the terms of those two instruments such that, in accordance with well established authority, when exercising the discretion Kestrel must act in good faith and rationally. The second argument was that the changes made (on the occasions and in the manner set out above) to the terms of the VLNI so as to subordinate the VLNs to other indebtedness and to postpone their redemption date went beyond the

scope of modification allowed by clause 9.1. No change which altered the essential nature of the VLNs was permissible. In particular, he submitted that to be within the scope of what was permissible under clause 9.1.2 the modification must, viewing the position objectively at the time that it is to be made, improve the VLNs' prospect of repayment. A change which, so viewed, had the effect of diminishing that prospect, and necessarily one which eliminated that prospect altogether, was therefore beyond the scope of what was permissible and for that reason invalid. I refer to this as the threshold requirement. Additionally, and quite separately, Mr Downes submitted that, having regard to the terms of clause 3.1 of the ICA, subordination is simply not available as a permissible modification.

34  Mr Morpuss submitted that there was no basis for implying the good faith term. He submitted that, giving the power to modify its proper construction, all of the subordinations and postponements were permissible and validly effected and there was no justification for importing any kind of threshold requirement. He submitted that if, contrary to his submission, the power to modify was subject to the good faith term or must satisfy the threshold requirement then whether on any occasion the amendment to effect the subordination or postponement in question was valid involved an issue of fact which was not appropriate for determination on a Part 8 claim. He submitted that the ICA is irrelevant to the question of subordination or to any question of good faith.

### The Law

35  It is appropriate to refer, briefly, to the relevant legal principles. I was taken to a great many cases. It is sufficient to mention only a very few of them.

36  Dealing first with the power in the court to imply a term into a contract or other instrument, the most recent authoritative statements of the permissible limits of the power are to be found in the following two decisions. In Attorney General of Belize v Belize Telecom Ltd [2009] UKSC 10; [2009] 1 WLR 1988 Lord Hoffmann, delivering the judgment of the Privy Council, set out (at [16] to [18] and [21]) some general observations (equally applicable to this country) about what he described as the "process of implication":

Myers v Kestrel Acquisitions Ltd, 2015 WL 1403189 (2015)

"16 …The court has no power to improve upon the instrument which it is called upon to construe, whether it be a contract, a statute or articles of association. It cannot introduce terms to make it fairer or more reasonable. It is concerned only to discover what the instrument means. However, that meaning is not necessarily or always what the authors or parties to the document would have intended. It is the meaning which the instrument would convey to a reasonable person having all the background knowledge which would reasonably be available to the audience to whom the instrument is addressed: see Investors Compensation Scheme Ltd v West Bromwich Building Society [1998] 1 WLR 896 , 912-913. It is this objective meaning which is conventionally called the intention of the parties, or the intention of Parliament, or the intention of whatever person or body was or is deemed to have been the author of the instrument.

17 The question of implication arises when the instrument does not expressly provide for what is to happen when some event occurs. The most usual inference in such a case is that nothing is to happen. If the parties had intended something to happen, the instrument would have said so. Otherwise, the express provisions of the instrument are to continue to operate undisturbed. If the event has caused loss to one or the other of the parties, the loss lies where it falls.

18 In some cases, however, the reasonable addressee would understand the instrument to mean something else. He would consider that the only meaning consistent with the other provisions of the instrument, read against the relevant background, is that something is to happen. The event in question is to affect the rights of the parties. The instrument may not have expressly said so, but this is what it must mean. In such a case, it is said that the court implies a term as to what will happen if the event in question occurs. But the implication of the term is not an addition to the instrument. It only spells out what the instrument means.

21 …in every case in which it is said that some provision ought to be implied in an instrument, the question for the court is whether such a provision would spell out in express words what the instrument, read against the relevant background, would reasonably be understood to mean…There is only one question: is that what the instrument, read as a whole against the relevant background, would reasonably be understood to mean?"

37 In the subsequent case of Geys v Societe Generale, London Branch [2012] UKSC 63; [2013] 1 AC 523 Baroness Hale JSC provided (at [55]) a succinct summary of the circumstances in which a term might be implied into a contract:

"…it is important to distinguish between two different kinds of implied terms. First, there are those terms which are implied into a particular contract because, on its proper construction, the parties must have intended to include them:

see Attorney General of Belize v Belize Telecom Ltd [2009] 1 WLR 1988 . Such terms are only implied where it is necessary to give business efficacy to the particular contract in question. Second, there are those terms which are implied into a class of contractual relationship, such as between landlord and tenant or between employer and employee, where the parties may have left a good deal unsaid, but the courts have implied the term as a necessary incident of the relationship concerned, unless the parties have expressly excluded it: see Lister v Romford Ice and Cold Storage Co Ltd [1957] AC 555 , Liverpool City Council v Irwin [1977] AC 239 ."

38  On the obligation of a majority to act bona fide and for the benefit of the class as a whole, the classic exposition of the principle is to be found in the judgment of Sir Nathaniel Lindley MR in Allen v Gold Reefs of West Africa [1900] 1 Ch 656 at 671:

> "Wide, however, as the language is of s.50 [Companies Act 1862 : the power to alter a company's articles by special resolution], the power conferred must, like all other powers, be exercised subject to those general principles of law and equity which are applicable to all powers conferred on majorities and enabling them to bind minorities. It must be exercised, not only in the manner required by law, but also bona fide for the benefit of the company as a whole, and it must not be exceeded. These conditions are always implied, and are seldom, if ever, expressed."

39  See also British America Nickel Corporation v M J O'Brien Ltd [1923] AC 369 , concerned with a power contained in a trust deed securing an issue of mortgage bonds where a majority of the bond holders had the power to modify the bondholders' rights. Viscount Haldane, delivering the judgment of the Privy Council, said (at p 371) that:

> "To give a power to modify the terms on which debentures in a company are secured is not uncommon in practice. The business interests of the company may render such a power expedient, even in the interests of the class of debenture holders as a whole. The provision is usually made in the form of a power, conferred by the instrument constituting the debenture security, upon the majority of the class of holders. It often enables them to modify, by resolution properly passed, the security itself. The provisions of such a power to a majority bears some analogy to such a power as that conferred by s.13 of the English Companies Act of 1908 , which enables a majority of the shareholders by special resolution to alter the articles of association. There is, however, a restriction of such powers, when conferred on a majority of a special class in order to enable that majority to bind a minority. They must be exercised subject to a general principle, which is applicable to all authorities conferred on majorities to bind minorities; namely, that the power given must be exercised for the purpose of benefiting the class as a whole, and not merely individual members only."

40 As to good faith more generally, it was common ground that there is no general duty of good faith in commercial contracts but such a duty may be implied where it is in accordance with the presumed intention of the parties. I was referred in this context to the decision of Leggatt J in Yam Seng Pte Ltd v International Trade Corporation [2013] EWHC 111 (QB); (2013) 146 Con LR 39 . Particularly illuminating in this context was the following passage from the judgment of Andrews J in Greenclose Ltd v National Westminster Bank plc [2014] EWHC 1156 (Ch) at [150]:

> "So far as the "Good Faith" condition is concerned, there is no general doctrine of good faith in English contract law and such a term is unlikely to arise by way of necessary implication in a contract between two sophisticated commercial parties negotiating at arms' length. Leggatt J's judgment in Yam Seng Pte Ltd v International Trade Corporation Ltd …, on which Greenclose heavily relies, is not to be regarded as laying down any general principle applicable to all commercial contracts. As Leggatt J expressly recognized at [147] of that judgment, the implication of an obligation of good faith is heavily dependent on the context. Thus in some situations where a contracting party is given a discretion, the Court will more readily imply an obligation that the discretion should not be exercised in bad faith or in an arbitrary or capricious manner, but the context is vital. A discretion given to the board of directors of a company to award bonuses to its employees may be more readily susceptible to such implied restrictions on its exercise than a discretion given to a commercial party to act in its own commercial interests."

41 This brings me conveniently to the line of cases which culminated in Socimer International Bank v Standard Bank London [2008] EWCH Civ 116; [2008] 1 Lloyd's Rep 558 concerned with the exercise of a contractual discretion where the contract gives to one side a power to make decisions under the contract which might have an effect on both parties. In that case Rix LJ, after reviewing a number of authorities, said this (at [66]):

> "It is plain from these authorities that a decision-maker's discretion will be limited, as a matter of necessary implication, by concepts of honesty, good faith, and genuineness, and the need for the absence of arbitrariness, capriciousness, perversity and irrationality. The concern is that the discretion should not be abused. Reasonableness and unreasonableness are also concepts deployed in this context, but only in a sense analogous to Wednesbury unreasonableness, not in the sense in which that expression is used when speaking of the duty to take reasonable care, or when otherwise deploying entirely objective criteria: as for instance when there might be an implication of a term requiring the fixing of a reasonable price, or a reasonable time."

42 None of this was a matter of dispute between the parties.

**The Myers' contentions**

43 Accepting that, as the cases made clear, there was no general duty of good faith in commercial contracts Mr Downes nevertheless submitted that, in the instant case, given the nature of the contract constituted by the VLNI and the discretion given to Alchemy (under the

DLNI) and to Kestrel (both in the DLNI and in the VLNI) to vary those instruments, there had to be some limitation on the power to amend or modify the VLNI. The key to this was clause 2.3 which in terms states that the DLNs and the VLNs are to treated as a single class. He submitted that the reasonable expectation of any lender under the terms of the VLNI in May 2004 was that his rights would not be eroded by the majority loan note holders other than where the majority were acting in their own self interest as loan note holders and in good faith. Such a loan note holder would not reasonably have expected that the majority should be free to commit an act of economic self-harm to further what Mr Downes described as "some other conflicting agenda".

44   This potential for abuse was to be avoided, he submitted, by the implication of the good faith term, either because, given the position of Alchemy (and Indigo) as holders of the DLNs (numerically far greater in number and value than the VLNs) and the terms of clause 2.3 of the VLNI, it was appropriate to imply such an obligation so that any modification of the VLNI had to be in good faith and for the benefit of the loan note holders as a whole, or because without such an implied term there would exist a "gap" in the contract which would expose the holders of the VLNs to the risk that the majority could take steps to deprive them of their rights. The same result, he submitted, was to be reached by applying the Socimer line of cases and making Kestrel's unilateral power under clause 9.1.2 to modify the VLNI subject to the good faith requirement. He submitted as clear beyond argument that if the DLN and VLN notes had been constituted as a single class with the result that the majority could bind the minority, the VLNs could not have been changed unless the amendment was effected bona fide and for the benefit of the loan notes as a class. He submitted that it is against that background that clause 2.3 falls to be construed. It was to be understood as limiting the ability of Kestrel to make variations under clause 9.1.2 to reflect a modification being made to the DLNI to those which were being in good faith and for the benefit of the class as a whole. It mattered not that the amendment was being imposed by Kestrel rather than by Alchemy as the majority note holder in the enlarged class. Kestrel, when so acting, was seeking to match an equivalent modification made to the DLNI. In effect, it was acting for the holders of the DLNs.

45   I hope I have accurately captured the essence of what Mr Downes submitted to me on this part of the case.

46   Moving next to the scope of the modifications that clause 9.1.2 permits, Mr Downes submitted that the expression, as used in clause 9.1.2, should be given its natural and ordinary meaning, namely a change which does not alter the essential nature and characteristics of the VLNs. He supported this reference to the Oxford English Dictionary definition of "modification", namely "the act of making changes in an object without altering its essential nature or character; the state of being thus changed…" He submitted that the purported amendments to the VLNI amounted, either individually or collectively, to fundamental changes to the essential characteristics of the VLNs which could not be considered "modifications" on a true construction of the VLNI. He drew a distinction between a redeemable and an irredeemable (or perpetual) debenture. He drew my attention to the decision in Southern Brazilian Rio Grande Do Sul Railway Company Limited [1905] 2 Ch 78 where Buckley J held that the grant by the company of irredeemable debenture stock was unauthorised by the company's memorandum in that, although the company had power to borrow by the issue of debenture stock, borrowing necessarily implied the obligation at some time to repay whereas the irredeemable stock was equivalent to a perpetual annuity which was beyond the scope of the power. Drawing on those remarks, Mr Downes submitted that the various amendments, if valid, effectively meant that the VLNs ceased to be debts to be paid by a specified date (originally 8 March 2010) but instead would only be repayable if and when Kestrel chose. That, he said, was a change to their essential nature. He submitted that the fact that it may not be possible to identify at what precise point, and with which amendment to the VLNI, this became so did not matter. He summarised the figures, comparing Kestrel's aggregate loan note indebtedness with its available assets, at or about the time of each amendment and, as I have mentioned, identified July 2008 or thereabouts as the approximate date when, unless repaid reasonably promptly, the additional indebtedness represented by the 2007 (and subsequent) FONs and the interest that they were earning, taken together with the repeated postponements of their redemption date, meant that (if the amendments

were valid) the VLNs became effectively irredeemable. He accepted that a postponement *per se* would not necessarily be outside the scope of the clause if it improved the prospect of repayment but submitted that at the point where that ceased to be the case any further postponement would be beyond the scope of the clause. He submitted that that was very likely to be so in the case of any subordination of the VLNs to another category of debt. From all of this he derived what I have referred to as the threshold requirement, namely that implicit in the power to modify was that it was exercisable only if, objectively viewed, it improved the prospect of repayment.

47 Mr Downes sought to support this result by recourse to an alternative route. He referred to what he described as the "general purview" of the clause. He cited Trade Indemnity Company Limited v Workington Harbour and Dock Board [1927] AC 1 . In that case there was a power in a performance bond (procured in relation to a contract to enlarge a dock in Workington) to make alterations to the contract works without thereby releasing the performance guarantors. Lord Atkin (at page 15) stated that the words allowing alterations "would have to be cut down so as not to include such changes as have been suggested as substituting a cathedral for a dock, or the construction of a dock elsewhere, or possibly such an enlargement of the works as would double the financial liability…" Lord Atkin later referred (at page 21) to *Rowlatt on Principal and Surety* (1926 edition) to the effect that such words only relate to alterations "'within the general purview of the original guarantee.'" Mr Downes also referred to Triodosbank NV v Dobbs [2005] 2 Lloyd's Rep 588 where, again in the context of a guarantor's liability, the Court of Appeal stated that a variation to the contract between the creditor and the principal debtor in that case, permitted by the contract of guarantee, had to be within the 'purview' of the guarantee. In the course of his judgment Longmore LJ stated (at paragraph 16) that "…it is important to distinguish between a true variation of an existing obligation and the entering of what is in fact a different obligation even though it may purport to be no more than a variation. In that sense it is perfectly possible (and, indeed, right) to put a 'limit on the power to vary'…" In the instant case, said Mr Downes, the effect of the amendments (if valid), whether looked at individually or cumulatively, is such that the VLNI (as purportedly amended) falls

outside the general purview of the original instrument so rendering the amended version an entirely different and new instrument which has effectively replaced the original instrument.

48 Coming to an authority in a context much closer to the present case, Mr Downes referred me to the decision of the Court of Appeal in Mercantile Investment and General Trust Company v International Company of Mexico , decided in 1891 and reported as a footnote to Sneath v Valley Gold Limited [1893] 1 Ch 477 at 484 and following. In that case a group of debenture-holders challenged a resolution (and its subsequent implementation) of the defendant company (the issuer of the debentures in question) to exchange the debentures for paid-up preference shares in another company which had taken over the assets and liabilities of the defendant company. The complainants had voted against. One of the grounds of challenge was that the transaction embodied in the resolution was beyond the power of the clause in the debenture trust deed pursuant to which it was purportedly authorised. The clause in question was a power to "sanction any modification or compromise of the rights of the debenture-holders against the company or against its property…" The objects of the defendant company, which had been incorporated in Connecticut, were to buy and sell land in Mexico. The objects of the other company (a UK company), for whose preference shares in exchange for the debentures the resolution provided, were enough to encompass just about any kind of business. The Court of Appeal allowed an appeal from an order holding that the resolution was binding on the dissenting debenture-holders. In his judgment Lindley LJ stated that "the power to modify the rights of the debenture-holders against the defendant company does not include the power to relinquish all their rights." He said that a power to compromise their rights presupposed some dispute about them or difficulty in enforcing them and did not include a power to exchange their debentures for shares in another company where there was no such dispute or difficulty. Fry LJ, after stating that the debenture-holders were entitled under the debenture to the personal obligation of the defendant company to pay the principal and interest and to the benefit of a mortgage of certain land in Mexico, said this:

> "The result of the resolution in
> question, if valid, is to extinguish

both these rights, and in fact all rights against the American company and its property, and to substitute for them the rights of a preference shareholder in an English company which had been formed. The holders of the debentures would cease to have any security or any right to recover principal or interest, and would in exchange become entitled to share in the divisible profits of the new company. That new company had acquired, not only the property subjected to the mortgage of the American company, but other properties of that company not charged to the debenture-holders; and the right of the preference shareholders would be confined to share in the profits of the entire company and to an interest, in case of dissolution, in its surplus assets.

…

In my opinion, the transaction embodied in the resolution is not a modification of the rights of the debenture-holders against the defendant company or their property; it is the extinction of all their rights against the company or its property. A right to share in profits produced by a business in which the mortgaged property may be used as a part, and part only, of the profit-producing undertaking, is not a right against that property."

49 From this Mr Downes extracted the proposition that a modification of rights cannot extend to an extinction of those rights. Coming to the facts of the instant case he submitted that the repeated postponement of the redemption date and subrogation of the VLNs to the various FONs, if valid, were equivalent to an extinction of the rights under the VLNI and their replacement with entirely new rights which amounted effectively to a form of preference share. Such a substitution of rights was, he submitted, beyond the scope of clause 9.1.12.

**Conclusions on the invalidity issue**

50 In assessing whether to imply the good faith term I remind myself that, as Lord Hoffmann said in Belize (at [16]), the court has no power to introduce terms to make the instrument it is asked to construe fairer or more reasonable and that the most usual inference, if the instrument does not expressly provide for what is to happen when some event occurs, is that nothing is to happen and that where the event causes loss, the loss lies where it falls. I remind myself also that the overall documentation entered into when the Myers sold control of Swift to Alchemy and Indigo is extensive and detailed. In inviting me to imply the good faith requirement for the protection of the Myers (as holders of the VLNs) I am being asked to conclude that the parties omitted to insert an important term. The omission is all the more striking given that the authors of the documentation gave attention to the protection of the Myers' interests: any changes to the terms of the VLNs which Kestrel wishes unilaterally to make have to be within the scope of clause 9.1.2 of the VLNI; clause 2.3 requires that the VLNS are to rank equally with the DLNs as regards pre-tax returns; and clause 2.4 prohibits Kestrel from redeeming or repaying the DLNs or making any amendments to their terms without securing for the VLNs equivalent returns, redemptions and amendments.

51 It is important also to bear in mind that the impetus for the implied term has been Kestrel's need for additional borrowing and that the terms upon which such additional borrowing was likely to be available were likely to impact on the rights of the holders of the DLNs and VLNs. One may be forgiven for thinking that this is precisely the sort of issue that would have been in the minds of those asked to agree the terms of the VLNI. To an extent it was: the Myers as holders of the VLNs had the right under clause 15.1.3 of the Sale and Purchase Agreement to invest further when Kestrel was looking for further financial support. That clause ("the co-investment clause") provides that when in the

future Kestrel proposes to issue any shares, securities or further loan notes to Alchemy, it will offer to the Myers (for so long as they hold shares in Kestrel or VLNs) the opportunity to make a further investment pro rata to Alchemy's and their own existing respective investments in Kestrel. This opportunity was offered to them in 2007 but they declined to take it up. It is difficult, to put it no higher, to see why there is a need to imply an additional term into the VLNI to give them further protection merely because, as the co-investment clause plainly envisaged, they declined to invest further resources while others were willing to do so. If they had decided to exercise their co-investment right on each occasion that Kestrel looked for further financial support it is hard to suppose that the Myers would be looking for further protection; it is difficult therefore to see why, having decided not to exercise that right, it is appropriate, in order to mitigate the consequences of that decision, to imply some term into their agreement with Kestrel which constrains the circumstances in which Kestrel should be able to obtain further investment from another source, whether it is by subjecting Kestrel (or indirectly) Alchemy to the suggested good faith term, or by preventing Kestrel from giving priority to the new lending or by postponing the redemption date of the loan notes.

52    I mention these matters because they are the context for considering whether it is right to imply any additional term into the VLNI or to construe the power to modify given by clause 9.1.2 as if it were subject to the threshold requirement. For, as all the authorities make clear – I do not need to refer to them by name – the temptation to imply an additional term or to add a gloss to the meaning of a straightforward word like "modification" must yield to any contrary intention demonstrated by the existing terms of the instrument in question and to the relevant background.

**The good faith term**

53    With those considerations in mind I come to the three ways in which Mr Downes suggested that it was appropriate to imply any additional term into the VLNI. The first concerns the power of a majority to bind a minority, a circumstance which carries with it, either as a matter of implication (whether because it satisfies the requirements set out in Belize or because it is a term generally implied by the law in an instrument

of this nature) or by imposition of equity, a requirement that the majority should exercise its power bona fide for the benefit of the class as a whole. I have referred already to the relevant authorities.

54    I do not accept that it is permissible to imply such a term into the VLNI, much less, as Mr Downes suggested by way of a further possibility, into the ICA. There are several reasons why I reach this conclusion.

55    First, the assumption which underlies implying such a term into the VLNI is that the DLNs (now the Replacement Notes) and the VLNs constitute a single class. They do not. The DLNs are a class separate from the VLNs. They are created by different instruments. The DLNI makes no reference to the VLNI. There is nothing in the former to suggest that the DLNs form part of some wider class. The Myers, as holders of the VLNs are not parties to it and Alchemy and Indigo (as holders of the DLNs) are not parties to the VLNI. Schedule 3 of the DLNI sets out detailed provisions for the summoning and conduct of meetings of note holders. There is nothing in those provisions entitling the holders of the VLNs to be invited or heard or stating that their interests are to be considered in any way. The same is true in the case of the equivalent provisions in the VLNI in respect of the summoning and conduct of meetings of holders of the VLNs as regards the interests of holders of the DLNs. The importance of this is that if, as Mr Downes suggested, clause 9.1.2 is to be read as if it contained the good faith term it is difficult to see how it can assist the Myers. As non-parties to the VLNI there is nothing to require Alchemy or Indigo to have regard to the interests of holders of the VLNs when exercising their powers under the DLNI.

56    In any event, clause 2.3 of the VLNI proceeds on the footing that the DLNs and the VLNs are not one class. It requires Kestrel to treat the DLNs "in the same manner as if they constituted a single class". Two things are to be noted. First, the clause is directed at Kestrel's conduct, not that of the holders of the DLNs. Second, the clause does not say that the DLNs and the VLNs are a single class, merely that Kestrel is required to treat the DLNs in the same manner as if they constituted a single class. I read that to mean that Kestrel is to treat the DLNs as if they constituted a single class for the purposes set out in it, namely with regard to pre-tax returns and, to that end (as further explained in

clause 2.4), with regard to redemption, repayment and purchase of the DLNs (being matters which all pertain to the return to the holders) and the making of any amendments to the DLNI (without doing the same to the VLNI) "in order to give effect to clause 2.3…" Mr Downes submitted that if that had been the purpose of the clause, it could easily have ended after the word "manner". The fact, he said, that the words "as if they constituted a single class of securities" are added can only mean that the two sets of notes (the DLNs and VLNs) are indeed to form a single class and that they do so for all purposes and, in so doing, import the requirement that the majority must act bona fide and in the interests of the whole class. I do not agree. If it was intended that they were a single class for all purposes clauses 2.3 and 2.4 would not be needed. Instead, there would have been a clause in each instrument making clear that the loan notes created by that instrument formed part of a larger class which included the notes created by the other instrument. Neither does so.

57   Next, it is to be noted that by clause 4 of the DLNI the DLNs (like the VLNs) are freely transferable. The condition of any transfer is that the transferee shall have complied with any provisions relating to the transfer of the DLNs set out in the ICA. The only requirement in the ICA is that a transferee becomes a party to the ICA: see clauses 21.2 and 21.3 of the ICA. (The transferee is required to enter into a so-called Intercreditor Novation Deed making that person a party to the ICA.) There is nothing in either the DLNI or the ICA to indicate to the transferee that his rights under the DLNI are constrained by any duty to have regard to the interests of those holding VLNs, as part of some larger class which includes the DLNs. Mr Downes had no real answer to this point. He submitted that the duty is a "low" one. He submitted that an assignee of the DLNs who only became aware of the VLNs after he had paid his money and taken his assignment would have no problem in fulfilling the duty. But this did not answer the point.

58   Nor does the ICA itself assist in identifying the existence of a wider class comprising the DLNs and the VLNs. Mr Downes submitted that the good faith term was to be implied into it but was unable to identify any provision of that agreement, other I suppose than clause 3, where it would be appropriate to do so. If in truth the ICA was intended to be understood as if it contained

the good faith term it would surely have said so. It does not do so. Significantly, it is the only one of the many agreements and other documents executed at the time of the sale by the Myers of their sub-prime lending business to which Alchemy, Indigo and the Myers are parties. This surely would have been the agreement in which to set out the duties of good faith to be owed by those entities ("the Investors" as they are described in it) to one another if it had been intended that such duties were to exist. It does not.

59   In short, it is impossible to see by what process, contractual or otherwise, the freedom of the holders of the DLNs to exercise their powers under the DLNI is constrained by any obligation to have regard to the interests of the holders of the VLNs.

60   If Alchemy and Indigo as the holders of the DLNs are not subject to any duties to the Myers as holders of the VLNs, it would, as Mr Morpuss submitted, be extremely odd if Kestrel were somehow bound by an obligation of good faith. On the contrary, Kestrel's contractual obligation is to ensure that the VLNs are treated no differently (as regards the matters mentioned in clauses 2.3 and 2.4.1 of the VLNI) from the DLNs and, by clause 2.4.2, that no amendment is made to the DLNI or to the terms and conditions of the DLNs without at the same time making appropriate amendments to the VLNI and to the terms and conditions of the VLNs. The only limitation is that the amendments must be within the scope of clause 9.1.2 which is the only power to amend conferred on Kestrel if the VLNI is to be amended without the approval of the holders of the VLNs.

61   Once the holders of the DLNs have resolved to amend the DLNI, Kestrel has no choice: under clauses 2.3 and 2.4 it is obliged to modify the DLNI. It does so, if the holders of the VLNs do not themselves agree to make an equivalent amendment pursuant to clause 9.1.1, under clause 9.1.2. Although clause 9.1 is drafted as a power to modify ("the Company [ie Kestrel] may make any modification …") the power under 9.1.2 is not a discretion which involves a choice from a range of options. It is the exercise of a contractual right whether or not to modify the VLNI without the consent of the holders of the VLNs. It is constrained by the requirement that it should be a modification and that the modification in question should be consistent in

all respects with any modification being made to the DLNI. It harks back to clause 2.4.2. The power is akin to the discretion vested in the claimant Trust in Mid Essex Hospital Services NHS Trust v Compass Group UK and Ireland Ltd (t/a Medirest) [2013] EWCA Civ 200 . In that case Medirest was under a duty to monitor monthly its own performance and record instances where it fell short. A formula existed for calculating how many so-called "failure points" Medirest had incurred and what deductions fell to be made to the Trust's monthly payments to Medirest as a result. Once the correct figure for the failure points and deductions had been established the Trust had a contractual discretion: it was empowered to "award" Medirest the failure points or it might choose not to do so. Likewise, it might levy a deduction against its monthly payment to Medirest or it might choose not to do so. Jackson LJ (with whom Lewison and Beatson LJJ agreed) noted (at [91]) that the discretion entrusted to the Trust in relation to service failure points and deductions was very different from those cases where the discretion did not involve a simple decision whether or not to exercise an absolute contractual right but where the discretion involved making an assessment or choosing from a range of options taking into account various interests. He observed that the discretion in that case permitted the Trust to decide whether or not to exercise an absolute contractual right. Mr Morpuss described this as a binary choice. He submitted that under clause 9.1.2 Kestrel has a similar choice provided only that the amendment to be made to the VLNI, if it is to be imposed by Kestrel, is a modification in the sense discussed above. In my judgment, he is right in that analysis. The fact that Kestrel had that contractual choice does not justify subjecting it to some kind of good faith obligation. The decision in Socimer upon which Mr Downes relied is not in point.

62  What then of Kestrel's obligations under clauses 2.3 and 2.4? Mr Downes submitted that clause 2.4.2 (at the least) should be read as if it were subject to a duty to have regard to the interests of holders of the VLNs at the point where Kestrel and the holders of the DLNs are contemplating an amendment to the DLNI. It is to be noted that although by clause 8 of the DLNI Kestrel has the power with the sanction of an extraordinary resolution of the holders of the DLNs to make any modification to the DLNI (see also condition 6 of the conditions endorsed on each DLN) so that Kestrel has

the power to initiate the modification, under clause 19.4 of the second schedule to the DLNI, holders of DLNs have the power themselves to initiate and sanction any modification of their rights against Kestrel. The power is exercisable by the holders of the DLNs without Kestrel's agreement. Given those terms and the fact (if I am right) that the holders of the DLNs owe no duty of any kind to the holders of the VLNs when exercising their rights and powers under the DLNI, I find it very difficult indeed to see why Kestrel should itself be subject to any implied good faith (or similar) obligation towards the holders of the VLNs when deciding whether to initiate or agree to an amendment of the DLNI. Not the least of the reasons why, in my judgment, Kestrel should not be under any such obligation is that, at the end of the day, Kestrel and the holders of the VLNs are at arms' length with one another. Where a commercial party (here Kestrel) has a discretion which impinges directly on its own commercial and economic interests, exceptional circumstances are needed to imply a term requiring that party to subject those interests to those with whom it is dealing, not least when the instrument in which the term is to be implied is one where, as here, the terms are to be found in a detailed and professionally prepared commercial document.

63  For these reasons, which largely followed the submissions made to me by Mr Morpuss, I am not willing to imply the good faith (or any like) term.

**The threshold requirement**

64  I come next to the supposed threshold requirement. There was some debate between Mr Downes and the court before Mr Downes settled upon the formulation for which he now contends. Material to this is that although the good faith condition featured in the first of the Myers' two Part 8 claims there is no reference to the threshold requirement in either claim form, notwithstanding that the later claim pleads how the word "modification" in clause 9.1.2 should be construed. The first appearance that the revised formulation makes is in paragraph 59 of Mr Downes's and Mr Chirnside's skeleton argument. Mr Morpuss drew my attention to this delayed appearance. It is not entirely without significance in that if it had not occurred to those propounding it until so late in the day, the case for saying that that is what the clause must obviously mean is made more difficult.

65  That point aside, I am not persuaded that the meaning of the VLNI, as it would be reasonably understood by anyone with the relevant background knowledge who was invited to invest in the VLNs, is that clause 9.1.2 operates as if it contains a condition precedent that it can only be exercised if the modification in question improves the prospect of repayment of the VLNs. For that is the effect of the threshold requirement. I say that for three reasons. First, this is a carefully drawn instrument and it is very unlikely that so important a requirement would have been omitted on the footing that, although the instrument does not say so, this is what it must mean. Second, the requirement is silent on how one is to assess, at the time that the modification is proposed, whether it would improve the prospect of repayment and who it is who is to undertake the assessment. It seems scarcely likely that Kestrel and those investing in the VLNs, if they had intended to make the power of modification subject to this important qualification would have omitted this important aspect of its operation. Third, what is or is not a modification would probably change from time to time depending on what Mr Morpuss described as the "vagaries" of Kestrel's performance and what could be predicted for its future. This would give rise to uncertainty and, not least, to an uncommercial result which Kestrel and those investing in the VLNs are very unlikely to have intended.

**Were the amendments "modifications" within the scope of clause 9.1.2?**

66  It only remains to consider whether the amendments to the VLNI providing for the redemption date to be postponed and for the subordination of the VLNs to later indebtedness were "modifications" within the scope of clause 9.1.2.

67  Reference to the dictionary definition of "modification" and to statements on general purview are all very well at a high level of abstraction but of little assistance in determining where the line is to be drawn between what is and is not a modification and therefore on which side of the line the various amendments are which Kestrel has purported to make. No-one would quarrel with the proposition that a right under a contract for the delivery of an enlarged dock to modify the terms of that contract would not enable the supplier

to substitute a cathedral. But that scarcely assists. Much closer to the challenged amendments is the assistance to be derived from the clutch of authorities dating to the end of the 19th century and early years of the 20th century to which I was referred. Principal among them was Mercantile Investment upon which, as I have mentioned, Mr Downes placed considerable reliance. But that was a case where an attempt was made to subject the debenture-holders to a wholly different risk from the risk which they assumed when they invested in the debenture. Their rights against the company in which they had invested were to be replaced by rights, and then only as shareholders, in a quite different company with different objects and incorporated in a different jurisdiction. That involved, as Mr Downes submitted, an extinction of rights and their replacement by wholly new rights.

68  In Follitt v Eddystone Granite Quarries [1892] 3 Ch 75 the debenture trust deed which constituted a first charge over the undertaking and property of the company (the issuer of the debentures) contained the same power to sanction modifications and compromises as in Mercantile Investment . Resolutions of the debenture-holders and the shareholders were passed sanctioning a further loan to the company when it fell into financial difficulty. The further loan was to have priority over the debentures and be a first charge on the company's properties. The further charge was entered into and the trustees postponed the security given to the debenture-holders in favour of the further charge. Some of the debenture-holders challenged the validity of the steps taken to sanction and give effect to these matters. Stirling J held that the debenture-holders' resolution and the subordination of their security to the further charge were valid. In so doing he referred to and followed the decision in 1886 of Chitty J in Re Dominion of Canada Freehold Estate and Timber Company (reported only at 55 LT (NS) 347). There one of the questions was the validity of a resolution passed by the requisite majority at a duly-convened meeting of debenture-holders which authorised the company (the issuer of the debentures) to allow persons, willing to advance money, to receive security standing in priority to the debentures. Chitty J was of the view that the postponement of the debenture-holders' security to the new security was within the scope of a power in the debenture trust deed authorising the debenture-holders by a stated majority at a meeting duly convened to

"assent to any modification" of its provisions. Mr Downes sought to distinguish the decision in Follitt (and, I think, the decision of Chitty J) on the basis that they concerned the placing of new security ahead of existing security. I do not consider that this is a relevant distinction. The fact is that in both cases the debenture-holders were losing priority to a new class of creditor.

69   In Northern Assurance Company Limited v Farnham United Breweries Limited [1912] 2 Ch 125 the debenture trust deed conferred upon a general meeting of the debenture-holders a power similar to the power to sanction compromises and modifications contained in the trust deed considered in Mercantile Investment . The question which arose was whether resolutions passed by the requisite majority at a duly-convened meeting of the debenture-holders could validly sanction the conversion of redeemable debentures into irredeemable or perpetual debentures under a power in the debenture trust deed to sanction any modification or compromise of the rights of the debenture-holders against the company (the issuer of the debentures) or its property (the same power as in Mercantile Investment ). The debenture trust deed was entered into in 1890 and provided for payment of the principal thereby secured on 30 September 1909 with interest payable half-yearly at just over 4% per annum in the meantime. By a supplemental trust deed dated 1 May 1907, executed in pursuance of a resolution of the debenture-holders at a duly convened meeting and with the requisite majority the redemption date was put back ten years to 30 September 1919. In December 1910 a duly-convened meeting of the debenture-holders resolved (by the required majority) to convert the debentures into perpetual debentures and authorised the trustees to concur with the company in giving effect to the change. A small number of debenture-holders challenged the validity of the resolution. It was argued that the alteration sanctioned did not amount to a modification of the rights of the debenture-holders but to something much more extensive. Joyce J rejected this, holding that the alteration in question did not amount to anything more than the modification of the rights of the debenture-holders against the company and its property (i.e. was within the sanctioning power). Interestingly, it was also argued by the plaintiffs that the power to modify or compromise pursuant to which the resolution had been passed was subject to an implied condition precedent that it could not be exercised until

some serious occasion should arise which rendered it necessary or plainly expedient that the power in question should be exercised. Joyce J rejected this too, saying that he was unable to find any such condition expressed or necessarily implied anywhere in the deed.

70   It would appear, because the case is referred to in the judgment, that Joyce J was influenced in reaching this decision by what Eve J had said in October 1909 in a case reported as a footnote to the decision in Northern Assurance (and otherwise referred to briefly only at 54 Sol J 31), namely Re Joseph Stocks & Co Limited, Willey v Joseph Stocks & Co Limited . In that case too there was, for all practical purposes, the same power to modify or compromise contained in a debenture trust deed as there was in Mercantile Investment and also in Northern Assurance . The principal secured by the debentures was repayable at the latest on 1 October 1907. The company (the issuer of the debentures) found itself in debt to its bankers and, with a view to meeting the bankers' requirements if the overdraft was not to be called, passed a resolution passed by the requisite majority at a duly-convened meeting of the debenture-holders to do away altogether with the date of repayment of the principal secured by the debentures. The plaintiffs who had voted against the resolution challenged its validity, arguing, among other points, that it was not within the scope of that power. In dismissing that contention Eve J, adopting the approach taken by Fry LJ in Mercantile Investment , held that it was competent for the debenture-holders at a properly convened meeting and by the required majority to modify the rights of the holders by releasing the right to repayment on 1 October 1907. In so doing he reasoned as follows:

> "The right of the stockholder…was to receive his principal moneys if the company went into liquidation or if the company committed any breach of the covenants on its part contained in the deed, and the right, whatever happened, on October 1, 1907, to be paid off. Those three rights the stockholders enjoyed down to September 6, 1904, and the effect of this resolution was so far to modify their rights against the company as to eliminate from

those three rights the absolute right
to repayment on October 1, 1907."

71  Although those cases do not bind me in any way
– each is inevitably a decision on its own facts and
none seeks to lay down any hard and fast principle
– they show how the courts have approached the
issue of a "modification" to the terms of corporate
loan stock deeds, in particular amendments postponing
redemption or, as the case may be, subordinating the
issue to other indebtedness, and help point the way.
Mr Downes submitted that some of them, Northern
Assurance in particular, took too generous a view of
a modification and demonstrated a judicial reaction
against the ability of a small minority of stockholders
to block, or to seek to block, an amendment to the
governing trust deed. He referred to the remarks of
Joyce J in Northern Assurance (at page 133) quoting
Mellish LJ in another case describing such a minority as
a few "cantankerous" debenture-holders. He submitted
that Northern Assurance was wrongly decided as
being inconsistent with what was said in Mercantile
Investment , or at least that it would be decided
differently today, and that I should ignore it. Time has
moved on, he said; the courts should look with more
circumspection at what is claimed to be a modification
and, at the very least, be wary of attaching much, if any,
weight to those authorities.

72  I do not agree that those early decisions take
too generous a view of what is a modification. I do
not consider that the decision in Northern Assurance
was wrong and very much doubt that it would be
decided differently today. I am unaware of any appeals
from those decisions or adverse criticism of them in
later cases or in academic writings. Equally, however,
I do not consider that they are determinative of
the questions which I have to decide. But they do
illustrate how in the past the courts have approached
amendments to a debenture trust deed postponing
redemption or, as the case may be, subordinating the
issue to other indebtedness. In each case amendments
providing for a subordination of the indebtedness
to other indebtedness (secured or unsecured) or a
postponement of its redemption have been held to be a
permissible modification of rights.

73  How then should I view the amendments in the
present case? Each postponement of the redemption
date, of which there have been four, has been for a
relatively short period (the shortest was for no more
than eleven months, the longest for forty-eight months).
The cumulative effect of them, if all are valid, has
been to extend the redemption date from 12 May 2010
to 31 March 2018. As for the amendments made to
the VLNI subordinating the VLNs to the 2007, 2008
and 2009 FONs, it was rightly not contended that the
VLNI imposed any restriction on further borrowings
by Kestrel and the interest that might be charged
for them, notwithstanding that further borrowings, if
at a higher rate of interest than was being charged
under the VLNI, might well have the effect of reducing
the return achievable by the VLNs on redemption.
Relevant to this is that the VLNs have at all times been
unsecured: subject to the terms of the ICA, holders of
the VLNs rank *pari passu* with Kestrel's other creditors.
Subordination puts them in an inferior position as
regards higher-ranked indebtedness.

74  The conclusion I have reached is that, subject only
to an argument based on the ICA (which relates only
to subordination), each amendment made postponing
redemption and each amendment made subordinating
the VLNs to some other class of creditor was a
modification of rights within the scope of clause 9.1.2.
In reaching this conclusion it is to be noted that all
of the other detailed rights and obligations, set out
in what was clearly a carefully worded instrument,
have remained unchanged. In particular, Kestrel's right
at any time to redeem or repurchase the VLNs has
remained unaltered. Also unchanged are the many
events of default, the power to declare the VLNs
repayable on the occurrence of an event of default and
the circumstances in which the right to call for their
repayment arises. The VLNs have continued to rank
equally with the Replacement Notes. There was no
suggestion that the various postponements should for
some reason be viewed as if they had been made on the
same occasion, rather than when each was made. In my
judgment it is right to view each amendment separately
at the time it was made. But, even if it were appropriate
to consider the matter as if there had been one single
postponement, from 12 May 2010 to 31 March 2018,
I reach the same conclusion: the postponement was
within the scope of clause 9.1.2. I should add, for what

it is worth, that the amendments made are far removed in effect from the situation in Mercantile Investment . There is no extinction of rights of the scale and nature considered in that case.

**The ICA argument on subordinations**

75   That brings me finally to Mr Downes' submission based on the ICA concerning the validity of the subordination amendments. I understood him to submit that clause 3.1 of the ICA has the effect of preventing any alteration in priorities as between various classes of Kestrel's creditors which might operate to the detriment of the VLNs. In my judgment the ranking of the three types of debt mentioned in clause 3.1 is confined to those three. Clause 3.2 makes clear that the ICA does not seek even to rank any of its Investor Debt or Intra-Group Debt as between the Investors and Intra-Group creditors. The ranking dealt with by the clause is limited in its effect and is irrelevant to other debt. It does not prevent other debt from enjoying priority over the three classes of debt referred to in it. I cannot therefore see that it prevents Kestrel from specifying by appropriate amendment to the VLNI that the VLNs should be subordinated to it. It is not as though the parties to the ICA did not contemplate the possibility of further investment by Alchemy. This, in my judgment, is because there was never any intention that such further debt would be affected by clause 3 (or any other clause) of the ICA. I have also drawn attention to the co-investment right (clause 15.1.3 of the Sale and Purchase Agreement). Its significance in the present context is that if the intention had been that any further investment by Alchemy (or anyone else) should be ranked with the other Investor Debt, or at any rate not given priority, it could and presumably would have said so. It does not.

76   For these reasons I conclude that each of the challenged amendments to the VLNI was a "modification" within the scope of clause 9.1.2.

**The insolvency issue**

77   One of the events of default under the VLNI is, as I have earlier mentioned, if "any Group Company" (an expression which includes Kestrel and Kestrel Holdings) shall be unable to pay its debts within

the meaning of Section 123 of the Insolvency Act 1986 ": see clause 6.1.4. The Myers contend that Kestrel (and therefore Kestrel Holdings which depends entirely on the solvency and continued trading of its group subsidiaries, in particular Kestrel, to remain afloat) is insolvent within the meaning of that section. They contend (and if necessary will do so in their Part 7 claim) that the practical consequence of establishing a default is, as I understood it, that they will be entitled to call for the immediate repayment of the VLNs.

78   A lot of evidence, much of it contested, was filed which related to whether Kestrel was insolvent and, if so, by what date. I do not need to consider that evidence, and on a Part 8 claim it would not be appropriate to do so, because the defendants accept that from 2012 onwards, while there may be argument over the detailed numbers, Kestrel's liabilities have far exceeded its assets and that some form of restructuring of Kestrel's debt will be necessary to ensure that its liabilities do not exceed the funds available to meet them when the VLNs (and other notes) mature for payment, assuming that their redemption date has been validly postponed from time to time. (The Myers, as I have made clear earlier, allege that Kestrel has been insolvent since appreciably before 2012 but I do not need to explore whether they are right about that.)

79   The material provisions of section 123 of the Insolvency Act 1986 are to be found in sections 123(1) (e) and 123(2) . Section 123(1)(e) provides that "[a] company is deemed unable to pay its debts…(e) if it is proved to the satisfaction of the court that the company is unable to pay its debts as they fall due." And section 123(2) provides that "[a] company is also deemed unable to pay its debts if it is proved to the satisfaction of the court that the value of the company's assets is less than the amount of its liabilities, taking into account its contingent and prospective liabilities." Those are well known to practitioners as the cash-flow and assets (or balance-sheet) bases of insolvency respectively.

80   It was not, however, until the decision of the Supreme Court in BNY Corporate Trustee Services Ltd v Eurosail-UK 2007-3BL plc [2013] UKSC 28; [2013] 1 BCLC 613 (" Eurosail ") that there was discussion of the expression "debts as they fall due" (critical to an understanding of the cash-flow basis) and the precise relationship between the two bases was explored.

Lord Walker SCJ, in whose judgment Lords Mance, Sumption and Carnwath SCJJ concurred and with whom Lord Hope, who delivered a separate judgment on the so-called PECO agreement, also agreed, said this (at [37]) on those issues:

> "…the 'cash-flow' test is concerned, not simply with the petitioner's own presently-due debt, nor only with other presently-due debt owed by the company, but also with debts falling due from time to time in the reasonably near future. What is the reasonably near future, for this purpose, will depend on all the circumstances, but especially the nature of the company's business… The express reference to assets and liabilities is in my view a practical recognition that once the court has to move beyond the reasonably near future (the length of which depends, again, on all the circumstances) any attempt to apply a cash-flow test will become completely speculative, and a comparison of present assets with present and future liabilities (discounted for contingencies and deferment) becomes the only sensible test. But it is still very far from an exact test, and the burden of proof must be on the party which asserts balance-sheet insolvency…"

81  I am satisfied that, provided (as I have found them to be) the postponements of redemption were validly effected, the Myers have not shown that Kestrel was at any material time and is now cash-flow insolvent. There was no evidence that Kestrel has been unable to pay its presently-due debts at any time or is likely to be unable to pay debts falling due within the reasonably near future. Amanda Brooks, finance director since May 2007 of Kestrel, Holdings and Swift, asserted in evidence that Kestrel and Kestrel Holdings had always met their liabilities as they had fallen due. This was

not really disputed. The question rather was whether the Myers demonstrate – the burden of proof being on them to do so — that Kestrel is balance-sheet insolvent (and Kestrel Holdings too). This in turn focused on the position when the VLNs (and other notes) mature for payment. Currently, that will be 31 March 2018. The defendants contend, and their evidence sought to suggest, that in the light of the increasing deficiency going forward Kestrel and Kestrel Holdings will, if necessary, effect a reconstruction to ensure that their liabilities do not exceed the funds available to them when they mature in 2018. I will come to their evidence on this a little later.

82  In the event, therefore, the only issue in relation to balance sheet solvency, and thus in relation to the issue of insolvency as a whole, is whether and in what manner the court may take account of a future restructuring of Kestrel's liabilities. For without it there can be no doubt, as the evidence showed, that Kestrel is balance-sheet insolvent and so too is Kestrel Holdings.

83  It is convenient to consider first the decision in Eurosail to which Mr Downes referred me. In that case there were, so far as material, two classes of debt (represented by differently-denoted interest-bearing notes of the issuing company). One of the specified events of default under the notes was whether the issuer was "unable to pay its debts as and when due" or "was deemed unable to pay its debts" within the meaning of section 123(2) because "the value of the company's assets is less than the amount of its liabilities, taking into account its contingent and prospective liabilities". In order to bring about the practical impossibility of the issuer being subjected to an insolvency process and thus to attract a higher credit rating the trustee of the noteholders' rights entered into a so-called post-enforcement call option agreement (or "PECO") on behalf of the noteholders which limited the issuer's liability to creditors to the value of the assets backing the notes. The PECO gave an associate company of the issuer a call option to acquire all the notes at a nominal price together with the noteholders' claims if the security for the notes was found to be insufficient to pay all of the amounts due in the event of the security being enforced. The two classes of debt were not repayable until 2045 at the latest. The issue for decision by the court was whether the issuer was unable to pay its debts within the meaning of section

123(2) and, if so, whether the PECO had the effect that the issuer was nevertheless deemed able to pay its debts in the event of the call option under the PECO being exercised on the ground that the assignment of the noteholders' claims to the option holder would in practice extinguish their claims and they would have no further claim against the issuer. The Chancellor held that the value of the issuer's assets exceeded its liabilities so that the effect of the PECO did not arise but that, if it had, it would not have affected the issuer's liabilities since they would remain the same whether or not there was a PECO and whether or not the call option under it was called. He considered that while a PECO might affect the practical possibility of the issuer being subjected to an insolvency process it was irrelevant to the issuer's liabilities. The Court of Appeal dismissed an appeal against the solvency finding by affected noteholders. It also dismissed a cross-appeal by the issuer against the PECO ruling and did so for essentially the same reasons that the Chancellor had given. The matter went to the Supreme Court which dismissed the noteholders' appeal on the solvency issue, although for reasons which differed from those given in the Court of Appeal. I have already referred to what Lord Walker said on the correct approach to the operation of section 123(1) and (2) . I do not need to deal further with that aspect of the appeal. The Court also dismissed the issuer's cross-appeal. They did so (at [50] and [51]) by stating that they agreed with the reasons for doing so that had been given by the Chancellor and the Court of Appeal.

84  It was what Lord Hope went on to say about the relevance to balance-sheet solvency of the PECO agreement that was the subject of debate before me. It was argued on behalf of the issuer that, although as a matter of contract its liabilities were unlimited in recourse, the commercial reality was that liabilities which it would be unable to pay were liabilities which, by the operation of the PECO, it would never have to pay. Lord Hope did not accept that it was possible to distinguish the intended commercial effect of the PECO from their legal effect in this way. At [63] he said that:

> "...It [the PECO] has no effect...
> on the amount of the issuer's
> liabilities. To limit those liabilities
> as the issuer contends would
> contradict the parties' clearly

expressed commercial intention as found in the contractual documents. The fact that the economic result of the PECO may be the same as if the noteholders' right of recourse had been limited to the issuer's assets is beside the point."

85  I agree with Mr Morpuss that Eurosail is not really of any assistance in the instant case. There is no PECO or equivalent provision in the VLNI or, so far as I am aware, in any of the other loan note instruments. Either the contractual liability of Kestrel under the various loan notes continues to subsist when the time comes to assess what its liabilities are and whether they exceed the assets available to meet them so that it is possible to determine whether at that time Kestrel is balance-sheet insolvent or it does not. The question therefore is whether, although Kestrel's liabilities currently far exceed its assets and are likely to increase in amount and the gap between them and available assets likely to widen as time passes, it is permissible for the court to take into account Kestrel's intention to effect a restructuring when the liabilities fall due for payment (currently at the end of March 2018) either by recourse to a modification of the rights of the holders of the various classes of loan notes (including therefore the Myers as holders of the VLNs if they so remain by that date) pursuant to the right of modification (where it exists) under the various classes of loan note (clause 9.1.2 in the case of the VLNs) or, failing that, by recourse to a statutory scheme of arrangement under Part 26 of the Companies Act 2006 . He submitted that it was so open to the court. He submitted that this was essentially a matter of evidence and that on a balance of probabilities the evidence justified the conclusion that such a restructuring would occur such that when its liabilities fall due for payment the available assets will suffice in value to discharge them in full.

86  Mr Downes advanced three points. First, the evidence relied upon to say that the necessary restructuring will occur falls far short of what is needed if the court is to be persuaded that it will happen and that Kestrel will not be balance-sheet insolvent when the VLNs fall due for payment. He submitted that, so

far from being a commercial certainty, in truth there are good commercial reasons why a restructuring will not happen. He submitted that the evidence relied upon by the defendants to say that it will happen is carefully qualified. Second, he submitted that any attempt to achieve a restructuring by recourse to a contractual right to do so under clause 9.1.2 is not open to Kestrel since the power of modification of the VLNs under that clause does not permit the sort of restructuring that Ms Brooks envisages. Third, he submitted that a statutory scheme of arrangement will require the court's sanction and this will hardly be granted if the Part 7 claim is unresolved when the need for the scheme arises.

87   As to the first of those points, the evidence in question was to be found in the witness statements of Amanda Brooks for Kestrel and Kestrel Holdings, Kevin Murphy for Indigo and Dominic Slade for Alchemy. In paragraph 76 of her statement Ms Brooks said that "I consider that some form of restructuring will ultimately be required to ensure that each of [Kestrel's] and [Kestrel Holdings'] liabilities do not exceed the funds available to meet them as and when they mature." She enlarged on this, emphasising the support that the business had had from Alchemy and Indigo and how such support could be expected in the event of a restructuring. She explained the kind of restructuring that might be possible. They were of two types. One of them, she said, could be a contractual restructuring pursuant to clause 9.1.2 of the VLNI and its equivalent in the Replacement Notes, for example by amending the notes to give the holders the right to receive shares for their debt and, as a default position to be exercised only to the extent that any of the note holders chose not to take up this right, to make the debt redeemable by Kestrel at a sum which represented an appropriate percentage of the debt then outstanding under the notes in question. The other possibility canvassed by Ms Brooks was a statutory scheme of arrangement under Part 26 , for example one whereby the loan terms of the VLNs and the Replacement Notes would be altered so that they would be redeemable by Kestrel at a sum which represented "an appropriate percentage of the debt then outstanding under those notes." Her evidence also explored how Holdings too might be restructured to ensure balance sheet solvency. I understood that the restructuring which Ms Brooks has in mind would be not be effected until at or near to the time for payment of the liabilities as until then it

would not be known quite how much of the liabilities would need to be written down to ensure that they did not exceed the then available funds. She concluded that "By reason of their ability, with the support of sufficient of their stakeholders, to restructure their respective liabilities before those liabilities fall due for payment, and by reason of the fact that those stakeholders have unequivocally confirmed the availability of that support, neither [Kestrel] nor [Kestrel Holdings] is balance sheet insolvent."

88   Mr Slade is the managing partner of Alchemy Partners LLP ("Alchemy Partners") and is a director of Kestrel Holdings. He stated that Alchemy Partners is the investment adviser to the seventh defendant and that the sixth defendant, which is under the control of the seventh defendant, holds the Replacement Notes as nominee on behalf of the groups of investors who together make up the so-called Alchemy Investment Plan ("the Plan") of which the seventh defendant is the manager and general partner. His evidence was to the effect that Alchemy Partners makes recommendations to the seventh defendant which has full discretionary management in relation to the Plan's investments. Nonetheless, he said, the seventh defendant will consider those recommendations as part of its decision-making process "and, if it thinks fit, follow those recommendations." He stated that, in relation to each of the decisions needed in respect of its investment in the Kestrel Group, the sixth defendant had so far carried out the seventh defendant's recommendations. He went on to say that he believed that "any further recommendations by Alchemy in connection with the Plan's investment in the Kestrel Group would also be followed." Against that background he stated that "as investment adviser, Alchemy [i.e. Alchemy Partners] can envisage no benefit to the Plan in maintaining a higher level of loan note debt than [Kestrel] would be able to repay on maturity. At an appropriate point in time, but prior to the ultimate maturity date of the loan notes, Alchemy will recommend to [the seventh defendant] that the loan note debt is restructured in a manner which will ensure that [Kestrel's] liabilities do not exceed the cash or other assets available to meet those liabilities…Ideally…any restructuring would take place only when there was some degree of certainty as to the level of debt that needed to be restructured." He expressed a similar view in relation to Kestrel Holdings regarding the need to reduce the level of intercompany

debt owed by it to Kestrel so that its cash and assets are sufficient to meet its liabilities. He concluded by saying that the fact that Alchemy had not yet recommended a specific restructuring should not be taken as calling into question Alchemy's commitments in this regard and that at the relevant time, once approved by Alchemy's investment committee, Alchemy will recommend the Plan to compromise Kestrel's debt "in accordance with the most appropriate restructuring option outlined in the first witness statement of Amanda Brooks [i.e. as summarised above] in order to ensure that the liabilities of [Kestrel] do not exceed the value of [Kestrel's] assets as at the time those liabilities ultimately fall to be repaid." He said that a similar recommendation would be made with respect to Kestrel Holdings' liabilities.

89   Mr Murphy is one of the managing partners of Indigo Capital LLP. That entity, according to Mr Murphy, is able to make investment decisions directly in relation to the various assets held by the fifth defendant, including the Replacement Notes. He stated that the fourth defendant holds and has full discretionary management in relation to the 2007 FONs but that in practice that entity has chosen to follow each of the recommendations made to it by Indigo Capital LLP in relation to the Kestrel Group. He said that he believed that it would follow any further such recommendations. He then repeated, almost word for word but with suitable alterations to refer to Indigo and not Alchemy, what Mr Slade had stated with regard to Alchemy's support for restructuring the debt owed by Kestrel.

90   Mr Downes criticised these statements as not going far enough. All there was, he said, were recommendations to approve a restructuring. There were no undertakings to do so. Moreover, he submitted, the restructuring proposals, in so far as both Alchemy and Indigo held debt which had priority over the VLNs, made little or no commercial sense: they might be better advised to take what was available towards discharge of the debts which had priority and ignore the claims of those like the VLNs which were lower down the repayment scale.

91   I have no reason to doubt the willingness of both Alchemy and Indigo to assist Kestrel and Kestrel Holdings to effect whatever restructuring is eventually proposed with a view to ensuring that the cash and other

assts available are sufficient to meet their liabilities at the time the loan notes mature for payment. My difficulty is slightly different. It is that the nature of any scheme of arrangement, if one is needed, is at best no more than an aspiration. The most that Ms Brooks could say about it was that Kestrel "might propose to amend the terms of both the Investor Loan Notes and the Vendor Loan Notes to make these redeemable by [Kestrel] at a sum which…represented an appropriate percentage of the debt then outstanding under those notes." She could scarcely have been more tentative. She is really saying no more than that a scheme will be proposed to restore Kestrel to solvency and that it will command the requisite support of the principal creditors. How the scheme will actually provide for each class of creditor (as there will almost certainly be more than one), what those classes will be and how in other respects the scheme will operate are all matters which have yet to be worked out. In effect I am asked to accept on trust that a scheme will be promulgated which the necessary classes of creditor will vote to support by the required majorities and that it will receive the court's sanction. In Eurosail Lord Walker approved (at [42]) what Toulson LJ (as he then was) had stated when the case was before the Court of Appeal as the appropriate approach to balance-sheet insolvency:

> "Essentially, s 123(2) requires the court to make a judgment whether it has been established that, looking at the company's assets and making proper allowances for its prospective and contingent liabilities, it cannot reasonably be expected to be able to meet those liabilities. If so, it will be deemed insolvent although it is currently able to pay its debts as they fall due. The more distant the liabilities, the harder this will be to establish."

92  Kestrel's liabilities currently greatly exceed its assets. On the evidence the likelihood is that the deficiency will increase as each month passes up to the maturity date of the VLNs. It is conceded that a restructuring of some kind will be needed to restore Kestrel to solvency. The

form and details of the restructuring are unknown. All that seems likely is the readiness of the main creditors to support it. I am not willing on that evidence to say that Kestrel is solvent. Similarly with Kestrel Holdings. In my judgment the Myers have discharged the onus which is upon them to demonstrate balance-sheet insolvency.

93  In view of my conclusions on his first and second points Mr Downes' third point does not arise. This was to the effect that in any event the Part 7 claim will not have been concluded by the time the VLNs mature for payment and that it is scarcely likely that any court would exercise its power to sanction a scheme of arrangement if this were then the position. The Part 7 claim is concerned, among other issues, with claims in damages against the defendants for breach of contract, procuring breach of contract, negligence, breach of duty and injunctive relief against the fourth and fifth defendants. It is currently stayed pending determination of the two Part 8 claims. I have no idea whether the Part 7 claim will have been tried or otherwise resolved by the time that Kestrel has need for a scheme under Part 26 . I have no means of saying that it will not. There is certainly much time for it to be disposed of between now and March 2018. Nor is it apparent whether even if it has not been disposed of by then what remains for trial would be relevant to the sanctioning of a scheme under Part 26 . All I need say is that if this had remained a live point I would have felt unable to attach any weight to it.

94  Is this conclusion affected by the power to make modifications to the terms of the VLNs under clause 9.1.2? Even if I cannot assume that an acceptable scheme will be proposed which will receive the necessary creditor support and the court's sanction when the time for it comes, might it be open to Kestrel to have recourse to clause 9.1.2 so as to ensure that the VLNs are paid in full on maturity. And if it is open to Kestrel to have recourse to its power under clause 9.1.2 when the time is ripe to do so, is it any more appropriate for me now to assume that it will be effected in the future at or shortly before the VLNs are due to be repaid? Mr Downes submitted that the restructuring described by Ms Brooks (already summarised above) would be beyond the permissible scope of that clause. This is because in so far as it involved a reduction in the nominal value of the VLNs it would involve an extinction of rights and that would offend what was said in Mercantile Investment , namely that an extinction

of rights is not a modification of rights. For the same reason, he submitted, any restructuring that involves the substitution of shares in Kestrel in place of the VLNs would involve an extinction of rights. In reply, Mr Morpuss submitted that by the time the need for a contractual restructuring arises the VLNs would be so far without value in view of the debts having priority over them and the inadequacy of Kestrel's assets to meet even those prior claims that whether the nominal value of the VLNs is written down to any extent or the VLNs are exchanged for shares the position of the holders of the VLNs can only be improved. In short, the restructuring would be giving the holders of the VLNs some value (at a time when they would otherwise have none) and would therefore be improving their position. This, as I understood the submission, would not be an extinction of rights but a conferment of rights where immediately prior to restructuring none existed or none which had any value.

95  In my judgment Mr Morpuss' argument must be rejected. I have discussed earlier in this judgment the scope of a permissible modification under clause 9.1.2. I am of the view that a writing-down of the nominal value of the notes from say £1 to say 10p or their replacement by shares constituting a very small minority holding, carrying no right to redemption by any given date and carrying no entitlement to any particular income rights (Ms Brooks does not say what species of share would be offered and therefore what rights it would carry) is not a 'modification' within the scope of clause 9.1.2. I do not consider that the answer to this question would be affected by postulating that at the time of the alteration of rights the VLNs have no value. Moreover even if the power to modify were arguably wide enough I would need stronger evidence than I have been shown setting out what precisely the restructuring is that Kestrel intends, in particular the degree of write-down. This is because there must come a point, even giving clause 9.1.2 a wide and generous interpretation, when the proposed write-down in rights goes beyond what is permissible.

96  Mr Morpuss had a final string to his bow. He submitted that even if the Myers could establish that Kestrel or Kestrel Holdings was insolvent within the meaning of section 123 it would not be of any practical assistance to them. This was because, pursuant to an order earlier in these proceedings, they are now

WESTLAW    © 2017 Thomson Reuters.

fully secured by reason of a deposit of £14.5m in a trust account and also because any petition to wind up Kestrel or Holdings would probably be opposed by Alchemy and Indigo who are the only significant creditors and who have both indicated that they support the companies. Moreover, he submitted, under clause 6.2 of the VLNI, the Myers are only entitled to demand payment of what is due to them on the occurrence of an event of a default if the holders of the DLNs (now the Replacement Notes) have declared their notes to be due and payable. Alchemy and Indigo have not done so. (There is, I should mention, a claim by the Myers in their Part 7 claim that a term is to be implied in the ICA that, in the event of the insolvency (within the meaning of section 123 ) of Kestrel or of Kestrel Holdings or a declaration to that effect, Alchemy and Indigo would declare their Replacement Notes to be immediately due and payable and would not do anything to prevent the Myers from being entitled to call for the immediate payment of the VLNs.)

97  I am not minded to deny the declaratory relief which the Myers seek simply because, without more, they would appear unable presently to demand payment or pursue winding up proceedings. I consider that they are entitled to a declaration to reflect my finding that insolvency is established. It will be for decision in the Part 7 claim whether, insolvency having been established, Alchemy and Indigo are obliged to declare their Replacement Notes to be immediately due and payable. The fact that the precise extent of the balance-sheet deficiency is or may be a matter of dispute does not matter.

**Estoppel**

98  The defendants have advanced two estoppels. The first was in defence to the lapse claim (see paragraph 12 above). That claim has now been abandoned and there is no longer any need to pursue the defence to it. The second was in defence to the modification claim. This was to the effect that if each of the six amendments to the VLNI, providing for the successive postponements of the redemption date of the VLNs and for their subordination to the various FONs, was beyond the scope of the power to modify given by clause 9.1.2, the Myers are, by reason of their conduct, estopped from so contending. The species of estoppel relied upon is either estoppel by convention or estoppel by acquiescence.

As I am of the view that these six amendments are all within the scope of clause 9.1.2 the point does not arise. I should nevertheless make it clear that if I had to any extent been of a contrary view regarding the amendments I would not have thought it right to reach a decision on the estoppel defence on a Part 8 claim on the limited material before the court.

99  I do not need to refer to the authorities to which I was taken where the relevant principles relating to these estoppels are set out. It is sufficient to say that the defendants focus on an email sent by Kestrel's solicitor to Mr Myers and his solicitor in late October 2007 setting out the resolution which was to be passed by Kestrel to amend the terms of the Vendor Loan Note Instrument to subordinate the VLNs to the 2007 FONs, an email from Mr Myers to Mr Slade in March 2008 in connection with the replacement of the DLNs by the Replacement Notes and email exchanges which took place in July 2008 in connection with amendments needed to the VLNI to cater for the postponement of the redemption date of the VLNs from May 2010 to September 2012 and their subordination to the 2008 FONs. The gist of the contention was that the Myers' conduct on those occasions was consistent only with an acceptance that the modifications were permissible under clause 9.1.2 and that it would be unconscionable of them subsequently (in the current proceedings) to seek to say that they were not. I was persuaded that despite the contents of those emails there are serious arguments to suggest that the necessary requirements of an estoppel (whether it is by convention or by acquiescence) are not satisfied to enable the defences to each of the six amendments to run. Over and above that I am alive to the warning by Stanley Burnton LJ (at [77]) in ING Bank NV v Ros Roca SA [2011] EWCA Civ 353; [2012] 1 WLR 472 (and to which Mr Morpuss very properly referred me) that "[i]n general Part 8 proceedings are wholly unsuitable for the trial of an issue of estoppel. Once such a claim is disputed, save in exceptional cases, the proceedings will cease to comply with CPR r 8.1(2)(a) , since they will cease to be proceedings in which the parties do not seek the court's decision only on questions which are 'unlikely to involve a substantial dispute of fact'. A disputed claim of estoppel should be carefully pleaded." The estoppel claim is disputed. There are disputes of fact. Those disputes are ones of substance as regards the availability of the estoppel defence. There is nothing exceptional

Myers v Kestrel Acquisitions Ltd, 2015 WL 1403189 (2015)

in the case to justify their determination as part of the current Part 8 claims.

100   I am willing to make declarations reflecting my conclusions on the matters that were argued before me.

**Result**

Crown copyright

© 2017 Sweet & Maxwell

2015 WL 1403189

**End of Document**                                                                    © 2017 Thomson Reuters.

# TAB 56

**\*119  Menzies v. National Bank of Kuwait SAK**

Court of Appeal (Civil Division)

9 November 1993

**[1994] B.C.C. 119**

Balcombe Butler-Sloss L JJ and Sir Christopher Slade

Judgment delivered 9 November 1993

**Analysis**

Transactions defrauding creditors—Whether transaction was at undervalue— Insolvency Act 1986, s. 423(1)(c) .

This was an appeal by a bank against a judge's refusal to strike out a claim by a creditor of a company in liquidation for leave to bring proceedings under s. 423 of the Insolvency Act 1986 as a victim of an alleged transaction at an undervalue between the company and the bank.

The company in 1985 entered into a contract with the Kuwait Ministry of Public Works for the fitting out and furnishing of the Kuwaiti Conference Centre. The company employed a Kuwaiti company, 'AJ', as its local agent. AJ arranged the financing of the contract through the National Bank of Kuwait. The bank required the company to execute an assignment of all moneys to become due to the company from the ministry under the contract and a recourse agreement under which those moneys would be paid direct by the ministry to the company's account with the bank. In 1987, after the contract was substantially completed, the company gave a letter of instructions to the bank to allocate moneys received under the contract first to AJ, then to pay off the company's overdraft to the bank, then any further moneys to AJ. The company was then in financial difficulties. The bank applied moneys received by it from the ministry in respect of the contract in accordance with the letter of instructions.

A substantial UK creditor of the company, 'M', attempted to challenge payments of KD 381,266 (about £840,000) under s. 423 of the Insolvency Act 1986 .

Although there was an argument that if AJ had no entitlement to the moneys concerned the payments themselves could be 'transactions' challengeable under s. 423 , the court proceeded on the basis that it was the giving of the letter of instructions which was under attack as the relevant transaction for the purpose of s. 423 . It was common ground that M could properly be regarded as a victim of the relevant transaction within the definition in s. 423(5) .

*Held* , allowing the bank's appeal, striking out M's application and points of claim, and refusing leave to bring or continue proceedings for an order against the bank under s. 423 of the 1986 Act:

There was no realistic prospect of M satisfying the court under s. 423(1) that the transaction was 'entered into at an undervalue'. For the purposes of s. 423(1)(c) , the company did not provide any consideration in giving the letter of instructions. The letter did not create any security. AJ and the bank were already secured. The letter simply gave effect to an agreement providing for the future allocation, as between AJ and the bank, of sums to which they were already entitled as secured creditors. There was thus no basis on which M could persuade the court that the consideration obtained by the company was 'significantly less than the value, in money or money's worth, of the consideration provided by' the company, since the company provided no consideration whatever in money or money's worth for the transaction. M's proposed application under s. 423 failed in limine because this primary requirement of s. 423(1) could not be satisfied.

**The following cases were referred to in the judgments:**

- Ashmore v British Coal Corporation [1990] 2 QB 338 .
- M C Bacon Ltd, Re [1990] BCC 78 .

**Representation**

- Richard Hacker (instructed by Simmons & Simmons ) for the appellant.
- The respondent appeared in person.

National Bank of Kuwait SAK v Menzies, [1994] B.C.C. 119 (1993)

**JUDGMENT**
Sir Christopher Slade:

This is an appeal by the National Bank of Kuwait ('the bank'), brought with the leave of Dillon LJ given on 15 January 1993, from part of an order made by Chadwick J on 9 October 1992. The respondent to the appeal is Mr Rowan Menzies who is a substantial creditor in the liquidation of Ayala Holdings Ltd ('Ayala') and has appeared in person before this court. I can take the factual background largely from the summary contained in the judge's careful judgment.

Ayala was incorporated in this country in 1976. It was engaged in the business of fitting out and furnishing substantial and prestigious buildings outside the UK, and in particular in the Middle East. In December 1985 it entered into a contract with the Kuwait Ministry of Public Works ('the ministry') for the fitting out and furnishing of the Kuwaiti Conference Centre. The value of the contract was about KD 4.8m (approximately £11m at the rates of exchange then prevailing).

Ayala employed a Kuwaiti company, A1 Julaiah Trading and Contracting Co ('A1 Julaiah'), as its local agent or sponsor in connection with the contract. A1 Julaiah, on behalf of Ayala arranged the financing of the contract through the bank, which was its own banker, but thus became also the banker to Ayala.

The bank provided, among other facilities, the issue of a performance bond guaranteed by A1 Julaiah, an advance payment guarantee, a facility letter and the opening of letters of credit for the benefit of Ayala's suppliers. As a condition of so doing, the bank required and Ayala executed an assignment of all moneys to become due to Ayala from the ministry under the contract and a recourse agreement under which those moneys would be paid direct by the ministry to Ayala's account with the bank.

By or before April 1987 the work under the contract had been substantially completed, but moneys remained due from the ministry, and Ayala had a residual liability in respect of defects during a maintenance period. Settlement of the final account was held up pending the snagging work which had to be done in respect of defects. Ayala was in financial difficulties and indeed

Mr Menzies contends that it had already become insolvent. The judge found it reasonably clear that some arrangements had to be made in Kuwait to ensure that, notwithstanding these difficulties, the snagging works were done, so that settlement and final payment under the contract could be achieved.

In July 1987 Mr Mark Maley, the managing director of Ayala, visited the bank in Kuwait. He was accompanied by the managing partner of A1 Julaiah, Mr Hijazi. Following that visit – and, Mr Menzies alleges, as a result of it – Ayala, by a telex letter of 19 August 1987 sent by Mr Maley, gave instructions to the bank (expressed to be irrevocable) in the following form:

'Further to our recent telephone call and telex. As previously advised you Mr Hijazi and A1 Julaiah are giving assistance in finalising outstanding matters on this contract. In return for their assistance I would like to confirm and extend our instructions to you, that is that the allocation of funds received by National Bank of Kuwait for our work under the above contract should be allocated as follows:

1. The first KD 300,000 should be credited to the account of A1 Julaiah at National Bank with the exception of KD 5,000 which can be deducted from the next payment to be received and applied to our No. 1 account with you to cover interest to the end of June 1987.

2. Thereafter further funds should be applied to our No. 1 account at your bank until such time as the overdraft is closed.

3. Thereafter all further income from this source should be transmitted on receipt to the account of A1 Julaiah.
  **\*121**
Please note this is an irrevocable instruction for which we would be

grateful for your acceptance and I now hope that settlement of all our affairs on this contract will be sorted out in the near future.'

Pursuant to this letter of 19 August 1987 (which I will call 'the 1987 letter of instructions') the bank paid to A1 Julaiah KD 191,000 in February 1988 and a further KD 80,000 in February 1989.

Meantime on 19 January 1988, a petition had been presented for the winding up of Ayala. The petition was strenuously opposed during 1988 and for the greater part of 1989, Mr Menzies himself being an opposing creditor. As the judge observed, it may well be that if a final settlement of the account in respect of the Kuwaiti contract could have been achieved and payment made by the ministry, Ayala would have had sufficient funds to pay its debts in full.

In June 1989, however, a final settlement of the dispute between Ayala and the ministry was agreed in Kuwait. Under it a sum of KD 450,525 or thereabouts was to be paid by the ministry. Mr Menzies, on learning that this sum was to be paid in Kuwait to Kuwaiti creditors, thereby excluding English creditors from any benefit, applied to the English court and on 24 July 1989 obtained an undertaking restraining Ayala from signing the settlement agreement. On 13 September 1989 Millett J made an order by consent which released Ayala from that undertaking and directed that it should not make payments to A1 Julaiah unless certain conditions were satisfied.

Ayala's solicitors duly gave the bank the instructions required by Millett J's order. By a letter dated 27 September 1989, however, the bank expressed the view that it was bound by the law of Kuwait to give effect to the 1987 letter of instructions unless restrained by an order of the court. As a result Mr Menzies learned of the existence of that letter.

This disclosure to Mr Menzies seems to have caused a fundamental change in his attitude to the winding up of Ayala. He no longer opposed the petition but became a supporting creditor. He himself applied for

the appointment of a provisional liquidator in respect of Ayala, who was on 2 November 1989 duly appointed. On 21 November 1989 a compulsory winding-up order was made.

Nevertheless on 26 December 1989, pursuant to the 1987 letter of instructions, the bank applied moneys recovered by it from the ministry in respect of the Kuwaiti contract in transferring a sum of KD 110,266 to the account of A1 Julaiah with the bank and in discharging Ayala's liability on its current account with the bank in the amount of KD 277,967.

Section 168(3) of the Insolvency Act 1986 ('the 1986 Act') confers on the liquidator of a company which is being wound up by the court in England and Wales the right to apply to the court for directions in relation to any particular matter arising in the winding up. As the judge observed (particularly having regard to the provisions of s. 127 and 129 of the 1986 Act, relating to dispositions of a company's property after the commencement of its winding up), one would normally have expected the right of the bank to retain moneys and its obligations to make payments out of the proceeds of the Kuwaiti contract received by it from the ministry after the commencement of Ayala's winding up in January 1988 to have been investigated by the liquidator and if necessary resolved by the court on an application by the liquidator under s. 168 or in other proceedings brought by him in Ayala's name for that purpose. It appears, however, that the liquidator has never been in funds sufficient to enable him to take any such action.

Against this background Mr Menzies, as a substantial unpaid creditor of Ayala, has himself sought to pursue a number of remedies. He issued an application under s. 212 of the 1986 Act against Mr Maley, the former managing director of Ayala. After a hearing of more than three weeks, the application was dismissed by His Honour Judge Baker QC by a judgment of 13 November 1991, to which I will revert.

*122

Following that dismissal Mr Menzies on 27 November 1991 issued an application for relief against the bank, by which he sought in effect (inter alia):

• (1) a declaration that the failure to register the bank's security under the Companies Act 1985 made the security void against the liquidator under s. 395 of that Act;

• (2) an order that the bank pay the liquidator the sterling equivalent of the sums of KD 191,000, KD 80,000, KD 110,226 and KD 277,967 respectively mentioned above which had been paid or retained by it after the commencement of the winding up.

On 5 March 1992 Mr Menzies, with the leave of the registrar, amended the application to include relief set out in a document entitled 'Pleadings of the applicant', which Mr Menzies had delivered to the bank on or about 18 February 1992 and which was ordered to stand as his points of claim.

By notice dated 25 March 1992 the bank applied to strike out that application and the points of claim.

As the judge pointed out, prima facie the proper plaintiff in proceedings to recover property or obtain reimbursement for the benefit of a company in liquidation is the company itself acting through its liquidator; the circumstances in which such proceedings can properly be brought in a winding up by a person other than the company or its liquidator are to be regarded as exceptions to the general statutory principle. The judge, in my view rightly, considered that he had to approach the bank's striking out application on the basis that the application of March 1992 made by Mr Menzies as a creditor, and which purported to be made under the 1986 Act and Pt. 7 of the Insolvency Rules , could not be allowed to proceed unless he could bring himself within one or more identifiable provision or provisions in the 1986 Act or the rules which confer upon a creditor the right to proceed by way of application in the winding up.

The judge decided that there was nothing in the 1986 Act which enabled Mr Menzies as a creditor to seek in proceedings in this liquidation a declaration against the bank as chargee to the effect that a charge was void against the liquidator by reason of s. 395 of the Companies Act 1985 . He accordingly struck out that part of Mr Menzies' application which sought a declaration to this effect. There is no cross-appeal from this part of his order.

In the court below the payments of KD 277,967 and KD 110,266 referred to above were challenged by Mr Menzies both under s. 212 and under s. 423 of the 1986 Act. For the reasons given in his judgment (essentially on the grounds that the bank was not a person falling within s. 212(1) ), the judge struck out the claim based on s. 212 of the 1986 Act. There is again no cross-appeal from this part of his order.

However the payments of KD 191,000, KD 80,000 and KD 110,266 referred to above were further challenged under s. 423 of the 1986 Act, which so far as material provides:

'(1) This section relates to transactions entered into at an undervalue; and a person enters into such a transaction with another person if –

(a) he makes a gift to the other person or he otherwise enters into a transaction with the other on terms that provide for him to receive no consideration;

(b) … or

(c) he enters into a transaction with the other for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by himself.

(2) Where a person has entered into such a transaction, the court may, if satisfied under the next subsection, make such order as it thinks fit for –

(a) restoring the position to what it would have been if the transaction had not been entered into, and **\*123**

(b) protecting the interests of persons who are victims of the transaction.

(3) In the case of a person entering into such a transaction, an order shall only be made if the court is satisfied that it was entered into by him for the purpose –

(a) of putting assets beyond the reach of a person who is making, or may at some time make, a claim against him, or

(b) of otherwise prejudicing the interests of such a person in relation to the claim which he is making or may make.

…

(5) In relation to a transaction at an undervalue, references here and below to a victim of the transaction are to a person who is, or is capable of being, prejudiced by it; and in the following two sections the person entering into the transaction is referred to as "the debtor".'

Section 424 of the 1986 Act specifies the persons who may apply for an order under s. 423 . So far as material it provides:

'(1) An application for an order made under section 423 shall not be made in relation to a transaction except –

(a) in a case where the debtor … is a body corporate which is being wound up … by the official receiver…or the liquidator … of the body corporate or (with the leave

of the court) by a victim of the transaction …

(2) An application made under any of the paragraphs of subsection (1) is to be treated as made on behalf of every victim of the transaction.'

Section 425(2) of the 1986 Act provides:

'(2) An order under section 423 may affect the property of, or impose any obligation on, any person whether or not he is the person with whom the debtor entered into the transaction …'

In substance, though not in form, Mr Menzies' claim seeks reimbursement by the bank of the three sums last referred to above, totalling KD 381,266 (about £840,000 at current exchange rates).

In the court below and in this court, it was and is common ground that Mr Menzies could properly be regarded as a victim of the relevant transaction within the definition contained in s. 423(5) . Section 424(1) , however, authorises a victim of a transaction at an undervalue to make an application under s. 423 only with the leave of the court, and Mr Menzies had obtained no such leave when he made his application of 27 November 1991. Nevertheless in the court below, the bank was sensibly content that the judge should deal with the matter as though an application for such leave was before him. Logically the question of leave or no leave must come first, because if leave were refused, questions of striking out the s. 423 claim would not arise.

In considering an application or proposed application under s. 423 of the 1986 Act, the first task of the court is to identify the relevant 'transaction' which is under attack. In the course of argument in the court below, it

emerged that if the application proceeded, Mr Menzies would seek to allege that the moneys which were paid by the bank to A1 Julaiah pursuant to the 1987 letter of instructions were moneys to which A1 Julaiah had *no entitlement whatever* . On the basis of such an allegation, he might have been able to contend that the payments themselves were relevant 'transactions' for the purpose of s. 423 . However, his full and lengthy points of claim had contained no such allegation. Paragraph 11(iii) of that pleading, for example, had referred merely to payments made by the bank 'in respect against [Ayala] of which [A1 Julaiah] was unsecured'. In these circumstances, in my view clearly rightly, the judge declined to consider the proposed s. 423 application either on the basis that the moneys paid by the bank to A1 Julaiah **\*124** pursuant to the 1987 letter of instructions were moneys to which A1 Julaiah had no entitlement or that the payments of such moneys were themselves relevant transactions. As he put it:

> 'If that is the case which Mr Menzies wishes to make then it needs to be spelt out unambiguously and with particularity in his pleading. For the purpose of the application before me, I shall proceed on the basis that it is the letter of instruction alone which is said to be a transaction at an undervalue for the purposes of s. 423.'

In this court Mr Menzies sought to repeat the assertion that the moneys paid by the bank to A1 Julaiah pursuant to the 1987 letter of instructions were moneys which were not owed to A1 Julaiah. Since, however, he had lodged no respondent's notice nor given the bank any notice of his intention to resurrect this assertion (which could have given rise to important questions of evidence) nor produced any proposed amendment of his points of claim, we did not think it right to permit him to pursue it. We must proceed, as did the judge, on the basis that it is solely the giving of the 1987 letter of instructions which is under attack as the relevant 'transaction' for the purpose of s. 423 and that, as at that date, A1 Julaiah was a creditor of Ayala in a sum of at least KD 295,000 (i.e. KD 300,000 less KD 5,000).

(I note from Judge Baker's judgment in the Maley proceedings that Mr Menzies had originally made the same allegation that A1 Julaiah were not entitled to the KD 300,000 but had later withdrawn it, reducing it to an allegation that they were not secured creditors in respect of this sum.)

Having thus identified the 1987 letter of instructions as the relevant 'transaction', the next question for the court was and is whether that was a transaction 'entered into at an undervalue' within the meaning of s. 423(1) . This, as the judge described it, is a primary requirement of s. 423 . If this requirement is not satisfied, an application made under the section must inevitably fail in limine on that ground if no other.

The judge took the view that, in relation to the relevant transaction in the present case,

> 'the allegations in para. 16, and also in para. 18 of the points of claim, if established at a trial, would or might enable the court to reach the conclusion that the primary requirement of s. 423 was satisfied.'

I think I should quote the most material passages in para. 16 and 18 of the pleading, because they contain the substance of Mr Menzies' crucially important assertion that, by giving the instructions to the bank in the 1987 letter, Ayala entered into a 'transaction at an undervalue'. These passages read as follows:

### The attempts by NBK and AJ to become secured in the summer of 1987

Maley stated in his evidence [in the Maley proceedings] that he visited the NBK [the bank] with Hijazi in July 1987 … and that … both NBK and AJ [A1 Julaiah] at that time considered both NBK and AJ to be exposed and competing creditors for scarce funds. Therefore (according to Maley), he was persuaded by AJ and NBK to attempt to extend

AJ's security – and this led to AH's [Ayala's] fax containing the "irrevocable instruction" sent on 19 August 1987, purporting to give AJ further security against AH's creditors in the sum of KD 300,000. The purported consideration for this instruction was that AJ was making certain small payments to complete essential work in Kuwait, i.e. agreeing to fund the remedial work required on the contract and also to further fund the preparation of the final claim, and for doing all this AJ required further security.

The applicant contends that the reasons given by AH for this further additional security and the purported consideration for it were bogus in that AJ had only paid some KD 3,000 to advance the claim and pay creditors, and had paid nothing towards the remedial work all of which was carried out by a new company named Ayala Abbott & Butters Ltd.

*125

Accordingly the applicant contends that the giving of the irrevocable instruction of 19 August 1984 [sic] was a transaction at an undervalue ( IA 1986, s. 423 ) and he seeks leave of the court ( s. 424 ) to set this transaction aside as he is the victim of it. NBK subsequently acted in accordance with the irrevocable instruction and paid AJ on final settlement to the detriment of the applicant and other creditors, who received nothing.'

The most material parts of para. 18 of the points of claim read as follows:

'18. …

The applicant contends that the purported irrevocable instruction given on 19 August 1987 by AH to NBK authorising irrevocable payment of KD 300,000 from future contract receipts to AJ is voidable at the instance of the liquidator or creditors in that it was given for bogus or inadequate consideration at a time when AH was insolvent. The reason given in respect of the essential maintenance payments to be made by AJ was false. AJ paid nothing and had never agreed to pay anything. All the maintenance was carried out by Ayala Abbott & Butters ("AAB") and invoiced to Ayala Design & Build, another member of the Ayala group.

The reason given for the need to fund preparation of the claim was also false. Safco and Integrated Surveys had agreed to progress the claim for a contingency fee of five per cent of the final settlement award.'

On analysis, the allegations made in para. 16 and 18 as to the circumstances in which the irrevocable instructions came to be given on 19 August 1987 accordingly amount to this. As at that date, the bank and A1 Julaiah considered themselves to be exposed and competing creditors of Ayala for scarce funds. The purpose or a purpose of the giving of these instructions was therefore to grant A1 Julaiah additional security as against Ayala's creditors in a sum of KD 300,000. The consideration purportedly given by A1 Julaiah to Ayala for the grant of this additional security was (it is said): (1) the making of certain small payments by A1 Julaiah to complete essential work in Kuwait and (2) the

WESTLAW  © 2017 Thomson Reuters.

further funding of the preparation of Alaya's final claim under its contract with the ministry. In truth it is alleged, as to (1), A1 Julaiah neither had agreed to pay nor paid anything to complete the work in Kuwait, but all the maintenance was carried out by Ayala Abbott and Butters and invoiced to Ayala Design & Build, another member of the Ayala group; as to (2), save for a sum of about KD 3,000 paid by A1 Julaiah to advance the claim against the ministry and pay creditors, it was not A1 Julaiah, but a company called Safco and Integrated Surveys which had agreed to advance the claim (for a contingency fee and a share of the final settlement award).

Assuming in favour of Mr Menzies that the last-mentioned payment of KD 3,000 was the only consideration received by Ayala for the giving of the 1987 letter of instructions, that payment would still have prevented the relevant transaction from falling within s. 423(1)(a) of the 1986 Act. To satisfy the primary requirement of the section on an application made thereunder, Mr Menzies would therefore have to persuade the court that the transaction fell within 423(1)(c). To do so, he would have to establish that the consideration for which Ayala gave the 1987 letter of instructions was 'significantly less than the value, in money or money's worth, of the consideration provided by' Ayala.

I see no realistic prospect of Mr Menzies establishing that, in giving the 1987 letter of instructions, Ayala provided any consideration, even on the basis of the allegations made in his points of claim. In my judgment the facts set out in para. 6 of his pleading (which is headed 'Financing of contract SPF 85/8', coupled with the correspondence relating to financing which is contained in document 12 of his 'Bundle of documents in opposition to strike-out application of respondent', make it reasonably plain that as at 19 August 1987 A1 Julaiah and the bank were already secured. The letter of that date did not create **126 any security. Its purpose was simply to give effect to an agreement providing for the future allocation, as between A1 Julaiah and the bank, of sums to which they were already entitled as secured creditors.

The conclusion set out in the immediately preceding paragraph entirely accords with a finding of fact reached by Judge Baker in the Maley proceedings. We

were told that Mr Menzies has made three unsuccessful applications for a retrial of the claim against Mr Maley and that an appeal against Judge Baker's judgment was dismissed on 6 January 1993 because of Mr Menzies' failure to comply with an order for security of costs (though we were also told that an appeal against the order for security was pending). It is clear that before Judge Baker the question whether or not, as at 19 August 1987, A1 Julaiah was a secured creditor was a very live issue. In the course of a very full and careful judgment he concluded:

> 'I read these [instructions] simply as making an agreement between two parties – the debtor on the one hand and the creditors on the other as to priorities … It did not either lessen or add to the security which A1 Julaiah already had.'

Mr Hacker, on behalf of the bank, has submitted that in view of this finding, reached after a long trial with full evidence, it would be an abuse of the process of the court if Mr Menzies were to seek to relitigate this matter of fact on an application under s. 423 . In this context he referred us to (inter alia) the recent decision of this court in Ashmore v British Coal Corporation [1990] 2 QB 338 . I, for my part, do not find it necessary to rely on this line of authority. It will suffice to say that nothing in Mr Menzies' submissions or in the documentation before us has come near to persuading me that Judge Baker reached the wrong conclusion on this point. Mr Menzies referred us in this context to the provisions of s. 395 of the Companies Act 1985 (referred to above), but I cannot see how those provisions can lend any support to his submission that A1 Julaiah or the bank were not already secured creditors at the time when the 1987 letter of instructions was given.

Accordingly in my judgment we must approach this appeal on the basis that the 1987 letter of instructions conferred on A1 Julaiah or the bank no rights by way of security beyond those which they already possessed; it merely regulated the priorities as between the two creditors concerned. I therefore see no basis on which Mr Menzies could hope to persuade the court that the consideration obtained by Ayala was 'significantly

less than the value, in money or money's worth, of the consideration provided by' Ayala, so as to bring the case within s. 423(1)(c) . For, in my judgment, so far as his pleadings and the evidence show, *Ayala provided no consideration whatever in money's worth for the transaction* . It follows that in my judgment Mr Menzies' proposed application under s. 423 would fail in limine because the primary requirement of subs. (1) could not be satisfied.

Even if Mr Menzies could satisfy that primary requirement, he would still have to surmount further hurdles, some statutory and others relating to the exercise of the court's discretion, if he was to persuade the court that he should be given the leave sought. In the course of his judgment, the judge considered a number of such further hurdles and decided that none of them precluded the grant of leave sought by Mr Menzies. I do not think it necessary or helpful to express any view on these further matters, save to the extent below.

It must be noted that s. 423(3) of the Act imposes a second mandatory requirement which an applicant under the section must satisfy if he is to obtain relief. It precludes the court from making an order 'in the case of a person entering into such a transaction' unless it is satisfied that it was entered into by him for one or other of the purposes set out in subpara. (a) and (b) . As to this subsection, the judge expressed the view that the words which I have last quoted, **\*127**

> 'may have the effect of limiting the restriction in that subsection to cases where the order is made against the debtor as defined in subs.(5).'

He pointed out that s. 423 can be invoked in cases in which the debtor is not the subject of bankruptcy or winding-up proceedings. He observed:

> 'If the opening words of s. 423(3) do not have that effect, then it is difficult to see what purpose they do serve.'

I respectfully disagree with the judge on this point. Section 423(3) , as drafted, would not have made sense if the opening words, 'In the case of a person entering into such a transaction' had been omitted. They were, I think, clearly inserted by the draftsman for the simple, but necessary, purpose of defining the word 'him' in the subsequent phrase 'entered into by him'. Furthermore the construction placed by the judge on the subsection seems to me to ignore the mischief which s. 423 was intended to remedy, as explained in the *Report of the Review Committee on Insolvency Law and Practice* (Cmnd 8558) para. 1210 et seq. In my judgment therefore it would have been a further necessary condition precedent to a successful s. 423 application by Mr Menzies against the bank that he should establish that Ayala gave the 1987 letter of instructions for one or other of the purposes mentioned in s. 423(3) . The judge thought it arguable that the allegations in para. 16 of the points of claim, to the effect that Ayala's purpose in giving that letter was to give A1 Julaiah a security against the interests of other creditors, would, if established, suffice to satisfy this second requirement which is imposed by s. 423(3) , relating to the purpose of the person entering into the transaction. I do not think it necessary to decide whether the judge's opinion on this point was correct. However this point does prompt me to make some more general observations.

As Mr Menzies' argument proceeded, it became increasingly clear that the real substance of his complaint in regard to the 1987 letter of instructions is that it constituted and was intended as a *preference* of A1 Julaiah and the bank. Indeed he frequently used the phrase 'fraudulent preference' in the course of his submissions. Following the recommendations of the Cork Report (Cmnd 8558), the 1986 Act does not refer to a 'fraudulent' preference. It does however, contain a separate section ( s. 239 ) which gives 'the office-holder' the right to apply to the court for an order restoring the position to what it would have been if the company concerned had not at a 'relevant time' given a 'preference' as therein defined. For the purposes of that section (see subs. (4) ) a company gives a preference to a person if:

> '(a) that person is one of the company's creditors … and

(b) the company does anything …
which … has the effect of putting
that person into a position which,
in the event of the company going
into insolvent liquidation, will be
better than the position he would
have been in if that thing had not
been done.'

Section 239(5) precludes the court from making an
order under the section:

'unless the company which gave
the preference was influenced in
deciding to give it by a desire to
produce in relation to that person
the effect mentioned in subsection
(4)(b).'

Whether or not Ayala was so influenced, it may well be
that the 1987 letter of instructions at least constituted a
'preference', since it could be said that its practical effect
was, in the event, to leave A1 Julaiah and the bank more
or less fully protected as creditors of Ayala, while its
other creditors, of whom Mr Menzies is by far the most
substantial, are receiving nothing in the liquidation. On
this account, Mr Menzies and the other creditors of
Ayala deserve sympathy.

The liquidator of Ayala, as 'office-holder', would have
the right to bring proceedings under s. 239 , but as
I have already explained, it appears that he is more
or less without **128** funds with which to conduct
litigation. By a deed of assignment dated 10 February
1993 he assigned to Mr Menzies 'all rights to and choses
in action relating to or in any way arising out of or in
connection' with the proceedings. The deed recited
that it was intended that the liquidator be joined as a
party to the proceedings but he has taken no part in
them and an order dated 20 May 1993 (from which I
understand there has been no appeal) Knox J held that

the assignment did not assign to Mr Menzies any rights
to bring any proceedings, claims or causes of action
which the liquidator and/or Ayala may be entitled to
bring or assert against the bank.

Mr Menzies therefore has no right to make any claim
against the bank based on s. 239 and for present
purposes the possibility of the liquidator having any
such claim has to be disregarded. It must be stressed
that the claim which is under consideration on this
appeal is a claim not under s. 239 but under s. 423
, which is concerned not with wrongful preference
as such but with transactions 'entered into at an
undervalue'. For the reasons given above, I have come
to the clear conclusion that Mr Menzies has shown no
realistic prospect of establishing that the 1987 letter of
instructions constituted a transaction 'entered into at an
undervalue' in the relevant sense; his s. 423 claim would
therefore be bound to fail in limine.

I suspect that Chadwick J, who had many issues to
consider, did not have the benefit of so full an argument
on this point as we have had in this court from the
helpful submissions both of Mr Hacker for the bank
and Mr Menzies (who told us that he is a member of the
bar). On the short grounds which I have stated I would:
(1) allow this appeal; (2) strike out the whole of Mr
Menzies' notice of application dated 27 November 1991
as amended; (3) strike out the whole of the document
described as 'Pleadings of the applicant' served on the
bank and ordered by the registrar to stand as points
of claim; and (4) refuse leave to Mr Menzies to bring
or continue proceedings for an order against the bank
under s. 423 of the 1986 Act.

Since preparing this judgment, I have seen and
considered a copy of a letter dated 25 October 1993
written by Mr Menzies to the clerk to Balcombe LJ in
which he submits (rightly or wrongly) that the effect of
Chadwick J's order dated 9 October 1992, as varied by
an order made by him dated 30 October 1992, taken
together with (1) para. 4 of an order made by him dated
15 January 1993, (2) para. 2(c) of an order made by Sir
Mervyn Davies dated 3 March 1993; and (3) para. 1 of
the order made by Knox J dated 20 May 1993, is that Mr
Menzies has been granted leave to amend his points of
claim so as to contend that 'A1 Julaiah is not a creditor
at all', though 'currently such leave to amend is stayed'.
He states that 'should the liquidator withdraw from the

proceedings', he has every intention of amending his points of claim.

As already stated, however when this appeal came on for hearing, Mr Menzies had lodged no respondent's notice, nor given any notice of his intention to resurrect the assertion that A1 Julaiah was not a creditor, nor produced any proposed amendment of his points of claim. Furthermore we have been referred to no evidence, beyond his bare assertion, that the allegation has any foundation. In these circumstances I would not for my part think it right to include the grant or confirmation of any leave to amend Mr Menzies' points of claim in the order which this court makes on this appeal, so as to save the remaining parts of that pleading from being struck out.

Balcombe LJ:

I have had the advantage of reading in draft the judgment of Sir Christopher Slade. I would allow this appeal for the reasons which he gives; I also agree with the order he proposes. I add a few words of my own only because we are differing from the judgment of Chadwick J on the limited issues to which this appeal relates.

The principal issue on this appeal is whether the 1987 letter of instructions was a transaction entered into by Ayala at an undervalue within the meaning of s. 423(1) of the Insolvency Act 1986 . The definition of a 'transaction at an undervalue' in s. 423(1) is in **129** all relevant respects the same as the definition in s. 238(4) of the same Act. In M C Bacon Ltd [1990] BCC 78 , Millett J had to consider (inter alia) whether the granting of a debenture by a company was a transaction entered into by the company at an undervalue within s. 238(4)(b) (which corresponds to s. 423(1)(c) ). He said (at p. 92C):

> 'To come within that paragraph the transaction must be:
>
> (1)  entered into by the company;
>
> (2)  for a consideration;
>
> (3)  the value of which measured in money or money's worth;

(4)  is significantly less than the value;

(5)  also measured in money or money's worth;

(6) of the consideration provided by the company.

It requires a comparison to be made between the value obtained by the company for the transaction and the value of consideration provided by the company. Both values must be measurable in money or money's worth and both must be considered from the company's point of view.

In my judgment, the applicant's claim to characterise the granting of the bank's debenture as a transaction at an undervalue is misconceived. The mere creation of a security over a company's assets does not deplete them and does not come within the paragraph. By charging its assets the company appropriates them to meet the liabilities due to the secured creditor and adversely affects the rights of other creditors in the event of insolvency. But it does not deplete its assets or diminish their value. It retains the right to redeem and the right to sell or remortgage the charged assets. All it loses is the ability to apply the proceeds otherwise than in satisfaction of the secured debt. That is not something capable of valuation in monetary terms and is not customarily disposed of for value.

In the present case the company did not suffer that loss by reason of the grant of the debenture. Once

the bank had demanded a debenture the company could not have sold or charged its assets without applying the proceeds in reduction of the overdraft; had it attempted to do so, the bank would at once have called in the overdraft. By granting the debenture the company parted with nothing of value, and the value of the consideration which it received in return was incapable of being measured in money or money's worth.

Mr Vos submitted that the consideration which the company received was, with hindsight, of no value. It merely gained time and with it the opportunity to lose more money. But he could not and did not claim that the company ought to have received a fee or other capital sum in return for the debenture. That gives the game away. The applicant's real complaint is not that the company entered into the transaction at an undervalue but that it entered into it at all.'

In my judgment the reasoning of Millett J applies, mutatis mutandis, to the 1987 letter of instructions. It is unfortunate that Chadwick J was not referred to this case.

I add that I also agree with Sir Christopher Slade on the construction of s. 423(3) , that the sole purpose of the words 'In the case of a person entering into such a transaction' is to identify the 'him' in the succeeding phrase 'entered into by him'.

Mr Menzies' real complaint is that the 1987 letter of instructions constituted a preference of A1 Julaiah and the bank. His difficulty is that this can only be attacked by the liquidator of Ayala and Mr Menzies is either unable or unwilling to put the liquidator in funds for that purpose.

I add, finally, that I am in complete agreement with Sir Christopher Slade where he says, at the end of his judgment, that it is now far too late for Mr Menzies to seek to  *130  make a case before us, not based solely on the 1987 letter of instructions, but on the basis, which Chadwick J clearly rejected, that the payments by the bank to A1 Julaiah pursuant to the 1987 letter of instructions were of moneys to which A1 Julaiah had no title, and accordingly that the payments were themselves transactions entered into at an undervalue.

Butler-Sloss LJ:

I agree.

(Appeal allowed. Plaintiff's notice of motion struck out. Leave for the plaintiff to bring or continue proceedings against the bank refused. Leave to appeal to the House of Lords refused. Mr Menzies to pay the costs of the appeal, to include those reserved on 11 November 1993, and the costs of the application, to be taxed and paid forthwith)  *131

© 2017 Sweet & Maxwell

[1994] B.C.C. 119

WESTLAW   © 2017 Thomson Reuters.                                          12

# TAB 57

**Patel v. Mirza**

On appeal from: [2014] EWCA Civ 1047

SC

20 July 2016

**[2016] UKSC 42**

**2016 WL 03902311**

before Lord Neuberger , President Lady Hale , Deputy
President Lord Mance Lord Kerr Lord Clarke Lord
Wilson Lord Sumption Lord Toulson Lord Hodge
Judgment Given on 20 July 2016

*Analysis*

Heard on 16 and 17 February 2016

**Representation**

•Appellant Matthew Collings QC (Instructed by
Mischon de Reya ).
•Respondent Philip Shepherd QC Professor Graham
Virgo (Instructed by K A Arnold & Co ).

**Judgment**

Lord Toulson: (with whom Lady Hale, Lord Kerr, Lord
Wilson and Lord Hodge agree)

**Introduction**

1  "No court will lend its aid to a man who founds his
cause of action upon an immoral or an illegal act." So
spoke Lord Mansfield in Holman v Johnson (1775) 1
Cowp 341 , 343, ushering in two centuries and more of
case law about the extent and effect of this maxim. He
stated that the reason was one of public policy:

> "If, from the plaintiff's own stating
> or otherwise, the cause of action
> appears to arise ex turpi causa, or
> the transgression of a positive law
> of this country, there the court says

he has no right to be assisted. It is
upon that ground the court goes; not
for the sake of the defendant, but
because they will not lend their aid
to such a plaintiff. So if the plaintiff
and defendant were to change sides,
and the defendant was to bring his
action against the plaintiff, the latter
would then have the advantage of it;
for where both are equally in fault,
potior est conditio defendentis."

2  Illegality has the potential to provide a defence to
civil claims of all sorts, whether relating to contract,
property, tort or unjust enrichment, and in a wide
variety of circumstances.

3  Take the law of contract. A contract may be
prohibited by a statute; or it may be entered into for an
illegal or immoral purpose, which may be that of one
or both parties; or performance according to its terms
may involve the commission of an offence; or it may be
intended by one or both parties to be performed in a
way which will involve the commission of an offence;
or an unlawful act may be committed in the course
of its performance. The application of the doctrine of
illegality to each of these different situations has caused
a good deal of uncertainty, complexity and sometimes
inconsistency.

4  Holman v Johnson involved a claim for the price
of goods which the plaintiff sold to the defendant in
Dunkirk, knowing that the defendant's purpose was
to smuggle the goods into England. The plaintiff was
met with a defence of illegality. The defence failed.
Lord Mansfield held that knowledge on the part of
the plaintiff that the defendant intended to smuggle
the goods did not affect the plaintiff's entitlement to
recover the price of the goods, since he was not himself
involved in the smuggling. By contrast, in Pearce v
Brooks (1866) LR 1 Ex 213 a claim by a coachbuilder
against a prostitute for the hire of what was described
in the law report as an "ornamental brougham" was
held to be unenforceable for illegality after the jury
found that the defendant hired it for the purpose of
prostitution and that the plaintiff knew that this was

her purpose. It would seem that the difference between Holman v Johnson and Pearce v Brooks had to do with the type of goods supplied, because in both cases the plaintiff knew that the defendant was entering into the contract for an illegal or immoral purpose. In JM Allan (Merchandising) Ltd v Cloke [1963] 2 QB 340 , 348, Lord Denning MR endeavoured to rationalise the authorities by saying that "active participation debars, but knowledge by itself does not". However, the Law Commission commented in its discussion of the subject in its Consultation Paper on *Illegal Transactions: the Effect of Illegality on Contracts and Trusts* , LCCP 154 (1999) that the case law lacks clear guidance on what amounts to "participation" in this context.

5   It is unclear to what extent the doctrine of illegality applies to a contract whose object includes something which is in some respect unlawful, or the performance of which will involve some form of illegality, but not in a way which is central to the contract. In St John Shipping Corpn v Joseph Rank Ltd [1957] 1 QB 267 , 288, Devlin J said:

> "If a contract has as its whole object the doing of the very act which the statute prohibits, it can be argued that you can hardly make sense of a statute which forbids an act and yet permits to be made a contract to do it; that is a clear implication. But unless you get a clear implication of that sort, I think that a court ought to be very slow to hold that a statute intends to interfere with the rights and remedies given by the ordinary law of contract. Caution in this respect is, I think, especially necessary in these times when so much of commercial life is governed by regulations of one sort or another, which may easily be broken without wicked intent."

6   As to illegality in the manner of performance of a contract, Mance LJ observed in Hall v Woolston Hall Leisure Ltd [2001] 1 WLR 225 , 246, that the conceptual

basis on which a contract not illegal nor prohibited at the time of its formation may become unenforceable due to the manner of its performance is open to debate. In Anderson Ltd v Daniel [1924] 1 KB 138 a claim for the price of goods was held to be unenforceable because the seller had failed to give the buyer an invoice containing details which the seller was required to give him by statute. In the St John Shipping case Devlin J rejected the interpretation that the claim in Anderson Ltd v Daniel failed because in the course of performing a legal contract the plaintiff had done something illegal. The correct interpretation, he said, was that "the way in which the contract was performed turned it into the sort of contract that was prohibited by the statute": [1957] 1 QB 267, 284. In the St John Shipping case the claim was for freight under a charter party. In the course of taking on bunkers the vessel was overloaded and the master thereby committed an offence, for which he was prosecuted and fined £1,200. The extra freight earned by the overloading was £2,295 and to that extent the ship owners stood to profit from their wrong. The cargo owners refused to pay that part of the claim. Devlin J rejected their defence. He held that since the goods had been delivered safely, the ship owners had proved all that they needed. He was not prepared to construe the statute as having the effect of making the contract prohibited. If it had been otherwise, the ship owners would not have been entitled to any freight and would therefore have suffered an additional penalty, much greater than that provided for by Parliament, for conduct which might have been unintentional.

7   In Ashmore, Benson, Pease and Co Ltd v Dawson [1973] 1 WLR 828 the Court of Appeal adopted a different approach. Manufacturers of heavy engineering equipment entered into a contract of carriage with road hauliers. There was nothing illegal in the formation of the contract, but the hauliers overloaded the vehicles which were to transport the load, in breach of road traffic regulations, and one of the lorries toppled over during the journey as a result of the driver's negligence. The manufacturers' transport manager was present when the goods were loaded and was aware of the overloading. A claim by the manufacturers for the cost of repair of the damaged load was rejected on grounds of illegality. The Court of Appeal did not perform the same analysis as had Devlin J in the St John Shipping case. They held simply that the

WESTLAW   © 2017 Thomson Reuters.

manufacturers participated in the illegal performance of the contract and were therefore barred from suing on it.

8   These and other cases led the Law Commission to describe the effect that unlawful performance has on the parties' contractual rights as very unclear. (Consultative Report on the Illegality Defence, LCCP 189 (2009), para 3.27.)

9   In this case the issue is whether Lord Mansfield's maxim precludes a party to a contract tainted by illegality from recovering money paid under the contract from the other party under the law of unjust enrichment (to use the term now generally favoured by scholars for what used previously to be labelled restitution and, before that, quasi-contract). On one side it is argued that the maxim applies as much to such a claim as to a claim in contract, and that the court must give no assistance to a party which has engaged in any form of illegality. On the other side it is argued that such an approach would not advance the public policy which underlies Lord Mansfield's maxim, once the underlying policy is properly understood.

**Structure of this judgment**

10   With that introduction I turn to the facts of Mr Patel's claim and how it was decided in the courts below: see paras 11-16. A central part of their judgments, and of Mr Mirza's argument, concerns the doctrine of reliance applied by the House of Lords in Tinsley v Milligan [1994] 1 AC 340 : see paras 17-20. That decision led to the Law Commission conducting a comprehensive review of the law of illegality and making proposals for addressing what the Commission perceived to be its unsatisfactory features: see paras 21-49. Paras 33-39 concern European law and its potential impact on our domestic law. The approach adopted in Australia, Canada and the USA is considered at paras 50-66. Paras 67-81 address developments since the Law Commission's report, including three recent decisions of this court which laid bare a division of opinion about the framework for deciding issues of illegality. Paragraphs 82-94 contain a section entitled "The law at a crossroads". This leads to the critical part of the judgment, which considers the way forward and ends in a summary and proposal for the disposal of this appeal: paras 95-121. The reader who is more interested in what the judgment has to say

about the future than the past will no doubt wish to concentrate on the final section.

**Mr Patel's claim**

11   The essential facts can be shortly told. Mr Patel transferred sums totalling £620,000 to Mr Mirza for the purpose of betting on the price of RBS shares, using advance insider information which Mr Mirza expected to obtain from RBS contacts regarding an anticipated government announcement which would affect the price of the shares. Mr Mirza's expectation of a government announcement proved to be mistaken, and so the intended betting did not take place, but Mr Mirza failed to repay the money to Mr Patel despite promises to do so. Mr Patel thereupon brought this claim for the recovery of the sums which he had paid. The claim was put on various bases including contract and unjust enrichment. A fuller account of the facts is given in the judgments of the courts below and in the judgment of Lord Neuberger.

12   The agreement between Mr Patel and Mr Mirza amounted to a conspiracy to commit an offence of insider dealing under section 52 of the Criminal Justice Act 1993 . In order to establish his claim to the return of his money, it was necessary for Mr Patel to explain the nature of the agreement.

13   A defendant's enrichment is prima facie unjust if the claimant has enriched the defendant on the basis of a consideration which fails. The consideration may have been a promised counter-performance (whether under a valid contract or not), an event or a state of affairs, which failed to materialise. (See Professor Andrew Burrows' *A Restatement of the English Law of Unjust Enrichment* , 2012, p 86, para 15). In Sharma v Simposh Ltd [2013] Ch 23 , at para 24, the Court of Appeal cited with approval Professor Birks' summary of the meaning of failure of consideration in his revised edition of *An Introduction to the Law of Restitution* (1989), p 223:

> "Failure of the consideration for a payment … means that the state of affairs contemplated as the basis or reason for the payment has failed

to materialise or, if it did exist, has
failed to sustain itself."

For Mr Patel to show that there was a failure of
consideration for his payment of moneys to Mr Mirza,
he had to show what the consideration was, and that
required him to establish the nature of their agreement.

14  Applying the "reliance principle" stated in Tinsley
v Milligan [1994] 1 AC 340 , the judge held that Mr
Patel's claim to recover the sum paid was unenforceable
because he had to rely on his own illegality to establish
it, unless he could have brought himself within the
exception of the doctrine known, misleadingly, as locus
poenitentiae; and that he could not bring himself within
that exception since he had not voluntarily withdrawn
from the illegal scheme.

15  In the Court of Appeal the majority agreed with
the judge on the reliance issue, but disagreed with him
on the application of the locus poenitentiae exception.
They held that it was enough for the claim to succeed
that the scheme had not been executed. Gloster LJ
agreed with the majority that Mr Patel's claim should
succeed but she took a different approach to it. She
began her thoughtful analysis with a cri de coeur (para
47):

> "As any hapless law student
> attempting to grapple with the
> concept of illegality knows, it is
> almost impossible to ascertain or
> articulate principled rules from the
> authorities relating to the recovery
> of money or other assets paid or
> transferred under illegal contracts."

In summary, she rejected the view that Tinsley v
Milligan was to be taken as laying down a rule
of universal application that the defence of *ex turpi
causa* must apply in all circumstances where a claim
involves reliance on the claimant's own illegality. It was
necessary in her view to consider whether the policy
underlying the rule which made the contract illegal
would be stultified by allowing the claim. In addressing

that issue, relevant factors included the degree of
connection between the wrongful conduct and the claim
made, and the disproportionality of disallowing the
claim to the unlawfulness of the conduct. She identified
the mischief at which the offence of insider trading
was aimed as market abuse by the exploitation of
unpublished price-sensitive information obtained from
a privileged source. If no such activity occurred, Gloster
LJ said that it was hard to see on what basis public
policy should bar the return of money which had
previously been intended to be used for that purpose.
Mr Patel was not seeking to make a benefit from
wrongdoing, and she did not consider that such an
outcome would be just and proportionate.

16  On the issue of reliance, Gloster LJ did not consider
it necessary for Mr Patel to establish that the intended
betting on RBS shares was to be done with the benefit of
insider information; it would have been enough for him
to establish that the funds had been paid for the purpose
of a speculation on the price of the shares which never
took place. If, however, she were wrong on that issue,
she agreed with the other members of the court on the
locus poenitentiae issue.

### The reliance principle and Tinsley v Milligan

17  The facts of Tinsley v Milligan are well known.
Miss Tinsley and Miss Milligan each contributed to the
purchase of a home. It was vested in Miss Tinsley's sole
name, but on the mutual understanding that they were
joint beneficial owners. It was put in her sole name so
as to assist Miss Milligan to make false benefit claims
from the Department of Social Security (DSS), which
she did over a number of years with Miss Tinsley's
connivance. The money obtained from the DSS helped
them to pay their bills, but it played only a small
part in the acquisition of the equity in the house.
Eventually Miss Milligan confessed to the DSS what
she had done and made terms with it, but the parties
fell out. Miss Tinsley gave Miss Milligan notice to
quit and brought a claim against her for possession.
Miss Milligan counterclaimed for a declaration that
the property was held by Miss Tinsley on trust for the
parties in equal shares.

18  The Court of Appeal by a majority decided in
favour of Miss Milligan by applying the test whether
it would be "an affront to the public conscience"

to grant the relief claimed by her. The House of Lords unanimously rejected the "public conscience" test, but by a three to two majority upheld the Court of Appeal's decision. The leading speech was given by Lord Browne-Wilkinson. His starting point was that title to property can pass under an unlawful transaction; but he held that the court would not assist an owner to recover the property if he had to rely on his own illegality to prove his title. The Court of Appeal had recognised that distinction in Bowmakers Ltd v Barnet Instruments Ltd [1945] KB 65 in a case concerning personal property, referred to in more detail at para 111 below, and Lord Browne-Wilkinson held that the same applied to real property in which the claimant had a beneficial interest. Lord Browne-Wilkinson held that it was enough for Miss Milligan to show that she had contributed to the purchase of the property and that there was a common understanding that the parties were joint owners. She did not have to explain why the property had been put into Miss Tinsley's sole name. If the relationship between them had been that of daughter and mother, and each had contributed to the purchase of a property in the daughter's name, the result would have been different, because there would then have been a presumption of advancement in the daughter's favour. The mother would in those circumstances have had to rely on the illegal nature of the transaction to rebut the presumption, and her claim would therefore have been defeated by the doctrine of illegality. Lord Browne-Wilkinson acknowledged the procedural nature of this approach at [1994] 1 AC 340, 374:

> "The effect of illegality is not substantive but procedural. The question therefore is, 'In what circumstances will equity refuse to enforce equitable rights which undoubtedly exist.'"

19  Lord Goff, in the minority, held at p 356 that if A puts property in the name of B intending to conceal A's interest for a fraudulent or illegal purpose, neither law nor equity will allow A to recover the property, and equity will not assist him in asserting an equitable interest in it. It made no difference whether A's case

could be advanced without reference to the underlying purpose. He recognised, at p 363, the resulting hardship and said that he did not disguise his unhappiness at the result, but he did not regard it as appropriate for the courts to introduce a discretion. He considered, at p 364, that reform should be instituted only by the legislature, after a full inquiry by the Law Commission, which would embrace not only the advantages and disadvantages of the present system, but also the likely advantages and disadvantages of a discretionary system. He added that he would be more than happy if a new system could be evolved which was both satisfactory in its effect and capable of avoiding the kind of result which in his judgment flowed from the established rules in cases such as Tinsley v Milligan .

20  Tinsley v Milligan has been the subject of much criticism in this and other jurisdictions, for its reasoning rather than its result, but this is the first time in this jurisdiction that its reasoning has been directly called into question. Two decades have since passed since the decision and it is right to trace the developments which have occurred in that period.

### Law Commission

21  After the decision in Tinsley v Milligan the Law Commission included the illegality defence in its Sixth Programme of Law Reform (1995) (Law Com 234). It undertook a full inquiry of the kind which Lord Goff envisaged. It published its first consultation paper, *Illegal Transactions: The Effect of Illegality on Contracts and Trusts* (LCCP 154), in 1999. The responses, and developments in the case law, led the Commission to re-consider the problems and its proposals for reform. In 2009 it issued a further public consultation paper, *The Illegality Defence: A Consultative Report* (LCCP 189). In 2010 it issued its final confirmatory report, *The Illegality Defence* (Law Com 320). In relation to trust law, it proposed statutory reform and it produced a draft bill. In relation to the law of contract and unjust enrichment, the Commission considered that there were serious problems but that they were capable of being, and could best be, tackled by the process of judicial development. In 2012 the government announced that it did not intend to take forward the Commission's recommendation for statutory reform of the law relating to trusts, because it

did not consider reform of this area of the law to be a pressing priority for the government.

22    From its study of the case law and academic writing, the Commission identified the principal policy rationales for the illegality doctrine as 1) furthering the purpose of the rule infringed by the claimant's behaviour, 2) consistency, 3) prevention of profit from the claimant's wrongdoing, 4) deterrence and 5) maintaining the integrity of the legal system. It observed that these rationales were not mutually exclusive but overlapped to a greater or lesser degree. A sixth possible rationale, punishment, was controversial. The large majority of consultees considered that punishment was a matter for the criminal courts (to which one might add regulators) and should not be invoked in determining parties' civil disputes. (LCCP 189, paras 2.5-2.31.)

23    The conclusion that the illegality defence presented serious problems represented the overwhelming view of academic commentators and consultees generally. The Commission analysed the problems under four heads — complexity, uncertainty, arbitrariness and lack of transparency. It did not suggest that the problems resulted generally in unsatisfactory outcomes, but it was critical of the way in which they were reached. It said that, on the whole, the case law illustrated the judges threading a path through the various rules and exceptions in order to reach outcomes which for the most part would be regarded as fair between the parties involved, although there were instances of results which the Commission considered to be unduly harsh, for example in unlawful employment cases. Generally, the courts managed to avoid unnecessarily harsh decisions either by creating exceptions to the general rules or by straining the application of the relevant rules on the particular facts so as to meet the justice of the case. Seldom was there an open discussion in the judgments of the considerations which led the court to its decision. (LCCP 189, paras 3.50-3.60.)

24    The Commission considered that Tinsley v Milligan , and cases following it, exemplified the problems of arbitrariness, uncertainty and potential for injustice. The rule applied in that case was arbitrary in that the question whether the illegality affected the recognition or enforcement of the trust depended not on the merits of the parties, nor the policies underlying the illegality defence, but on a procedural issue. Moreover the effect of applying the reliance principle in cases involving the presumption of advancement gave that presumption an overriding importance which it was never intended to have. It led to uncertainty because there was much confusion over what exactly amounted to "reliance", particularly when the claimant was seeking to establish an equitable interest under a constructive trust. It had the potential to force the court into unjust decisions because, by focusing on procedural matters, the reliance principle precluded the court from paying attention to the policies that justified the existence of the defence, or taking into account such matters as the seriousness of the illegality and the value of the interest at stake. (Law Com 320, paras 2.13-2.15.)

25    The Commission examined the law in other jurisdictions, European law and European human rights law. In its first consultation paper in 1999 the Commission's proposed recommendation was to introduce statutory reform on the lines of the New Zealand model. The New Zealand Illegal Contracts Act 1970, section 7 , provides that the court may grant to any party to an illegal contract "such relief by way of restitution, compensation, variation of the contract, validation of the contract in whole or part or for any particular purpose, or otherwise howsoever as the court in its discretion thinks just". In its 2009 consultative report the Commission noted that the operation of this provision had been widely heralded as a success; that it had not created the deluge of litigation that was feared by some commentators; and that this model of reform, with slight variations, had been recommended by the law reform bodies of several other Commonwealth jurisdictions (LCCP 189, para 3.81). Nevertheless, in its 2009 consultative report and in its final report the Commission did not recommend statutory change (except in relation to trusts) for a combination of reasons. Although the proposal for statutory reform in the 1999 consultation paper had been supported by a majority of consultees, a minority had made critical comments which persuaded the Commission that judicial reform was a better way forward, and the Commission found difficulties in drafting a satisfactory statutory model. Most importantly, developments in the case law and the critical responses of consultees led the Commission to conclude that it was open to the courts to develop the law in ways that would render it considerably clearer, more certain and less arbitrary.

26    Among domestic authorities, the Commission referred to the decisions of the House of Lords in Bakewell Management Ltd v Brandwood [2004] 2 AC 519 and Gray v Thames Trains Ltd [2009] AC 1339 .

27    Bakewell bought an area of land registered as a common. Owners of neighbouring properties had for years driven across the land to reach the public highway. Bakewell brought an action to prevent them from continuing to do so. The defendants claimed to have acquired rights of way by prescription, but by driving across the land without the owner's consent they had committed offences under the Law of Property Act 1925 . So to establish their property rights the defendants had to rely on conduct which was criminal. This, Bakewell submitted, they were not entitled to do. Its argument was rejected. The House of Lords held that public policy did not prevent the defendants from acquiring an easement where the landowner could have made a grant which would have removed the criminality of the user. Lord Walker, with whom Lord Bingham and Lady Hale agreed, said at para 60:

> "I do not see this as reintroducing the 'public conscience' test which this House disapproved in Tinsley v Milligan [1994] 1 AC 340 . It is merely a recognition that the maxim ex turpi causa must be applied as an instrument of public policy, and not in circumstances where it does not serve any public interest: see for instance National Coal Board v England [1954] AC 403 , 419."

28    Gray v Thames Trains Ltd was a case in tort. Mr Gray developed post- traumatic stress disorder through being involved in a major railway accident, which caused him to suffer depression and a substantial personality change. He was previously of unblemished character but two years after the accident, and while under medical treatment, he pursued and stabbed to death a man who had stepped in front of his car. His plea of guilty to manslaughter on the ground of diminished responsibility was accepted and he was ordered to be detained in a mental hospital. He sued the train operator for negligence and liability was admitted. His claim for damages included compensation for his loss of liberty, damage to reputation and loss of earnings during his detention. The House of Lords held that public policy precluded him from recovering damages under those heads. The leading opinion was given by Lord Hoffmann, with whose reasoning Lord Phillips (subject to certain additional observations) and Lord Scott agreed.

29    Lord Hoffmann observed, at paras 30-32, that the maxim ex turpi causa expresses not so much a principle but a policy based on a group of reasons, which vary in different situations. The courts had therefore evolved varying rules to deal with different situations. Because questions of fairness and policy were different in different cases and led to different rules, one could not simply extrapolate rules applicable to one situation and apply them to another. It had to be assumed that the sentence was what the criminal court regarded as appropriate to reflect Mr Gray's personal responsibility for the crime he had committed. It was therefore right to apply the rule that he could not recover damages for the consequences of the sentence, reflecting an underlying policy based on the inconsistency of requiring someone to be compensated for a sentence imposed because of his personal responsibility for a criminal act. It was also to right to apply a wider rule that you cannot recover damage which is the consequence of your own criminal act, reflecting the idea that it is offensive to public notions of the fair distribution of resources that a claimant should be compensated (usually out of public funds) for the consequences of his own criminal conduct.

30    Lord Phillips said, at para 15, that he would reserve judgment as to whether the ex turpi causa maxim should apply if it were clear from the judge's sentencing remarks that the claimant's offending behaviour played no part in the decision to impose a hospital order, or, where the claimant's criminal act demonstrated a need to detain him both for his own treatment and for the protection of the public, if the judge made it clear that he did not believe that the claimant should bear significant personal responsibility for his crime. Lord Brown agreed with Lord Phillips' reservations.

31    Lord Rodger said, at paras 78-83, that the civil court must assume that the order made by the criminal

Patel v Mirza, 2016 WL 03902311 (2016)

court was appropriate to reflect Mr Gray's personal responsibility for the crime he had committed. The right approach on the facts of the case was that the court must "cleave to the same policy as the criminal court". However, he considered that the approach might well be different if the offence of which he had been convicted was trivial but revealed that he was suffering from a mental disorder, due to the defendant's fault, which made a hospital order appropriate.

32    The Law Commission drew from the various judgments a readiness on the part of the judges to examine the policy reasons which justified the application of the illegality defence and to explain why those policies applied to the facts of the case.

33    The Commission also considered the question how far illegal conduct may deprive claimants of rights under European Union law (LCCP 189, paras 3.82-3.89). Some contractual rights are now derived from EC directives. For example, the right to equal pay granted by the Equal Pay Directive ( directive 75/117/EEC ) is implied as a term into the employment contract. In other cases, such as the Sale of Consumer Goods Directive ( directive 99/44/EC ), EU law provides remedies that depend on the existence of a contract. The issue may therefore arise whether a national illegality doctrine which prevents a party from enforcing a contract is compatible with the EU law from which the contractual right arose.

34    In the 1990s various breweries let pubs to tenants on terms containing beer ties. These were found to be unenforceable because they breached article 81 (previously article 85) of the European Community Treaty . The issue then arose whether the fact that the tenant had been party to an illegal contract precluded him from claiming damages from the brewery. In Gibbs Mew plc v Gemmell [1999] 1 EGLR 43 , 49 the Court of Appeal held that this was so, because "English law does not allow a party to an illegal agreement to claim damages from the other party for loss caused to him by being a party to the illegal agreement" (per Peter Gibson LJ).

35    In Courage Ltd v Crehan (Case C-453/99) [2002] QB 507 , the Court of Appeal referred the question to the European Court of Justice, which took a different view. Advocate General Mischo expressed the view, at

paras 38-43, that although the individuals protected by article 81 were primarily third parties (consumers and competitors), a rule which automatically excluded a party to the agreement from the protection of article 81 was "too formalistic and does not take account of the particular facts of individual cases"; and that a party which was too small to resist the economic pressure imposed on it by the more powerful undertaking had more in common with a third party than with the author of the agreement. (The potential parallel with the relationship in some cases between an employer and an employee is obvious.)

36    The court agreed with the Advocate General. It held that where a contract was liable to restrict or distort competition, community law did not preclude a rule of national law from barring a contracting party from relying on his own illegal actions, if it was established that that party bore significant responsibility for the distortion of competition. In that context the matters to be taken into account by the national court included the respective bargaining power and the conduct of the parties to the agreement in the economic and legal context in which they found themselves. It was for the national court to ascertain whether the party who claimed to have suffered loss through concluding such a contract was in a markedly weaker position than the other party, such as seriously to compromise or even eliminate his freedom to negotiate the terms of the contract. An absolute bar to an action being brought by a party to a contract which violated the competition rules would not advance the full effectiveness of the prohibition contained in the Treaty, but rather the reverse.

37    The effect of the court's decision was not to treat article 81 as intended for the protection of parties who infringed it, as a class, but to treat it as a matter for the national court to determine whether on the facts of a particular case a party should be regarded as sinned against rather than sinning, and therefore entitled to damages for the consequences of the offending provision of the agreement.

38    The potential impact of European law was referred to, obiter, by Mance LJ in Hall v Woolston Hall Leisure Ltd [2001] 1 WLR 225 . The claimant was dismissed from her employment as a chef when her employer became aware that she was pregnant. She brought a

claim in the industrial tribunal for compensation under the Sex Discrimination Act 1975 . The Act pre-dated the Equal Treatment Directive (76/207/EEC) but gave effect to its provisions. Mrs Hall succeeded on liability, but it emerged during the remedies hearing that her employer was defrauding the Inland Revenue by falsely pretending that her net salary of £250 per week was her gross salary. She was aware of the fraud, because she was given pay slips which showed her gross pay as £250, deductions of £63.35 and net pay of £186.65. She knew that this was untrue, but when she raised the matter with her employer she was told that this was the way in which they did business. The tribunal held that the contract was tainted by illegality and that she had no right to compensation under the Act. Its decision was upheld by the appeal tribunal but reversed by the Court of Appeal, which held that her acquiescence in the employer's conduct was not causally linked with her sex discrimination claim and that public policy did not preclude her from enforcing her statutory claim. Mance LJ observed additionally that the Act should as far as possible be read as providing the same scope of protection as the Directive. Mrs Hall's position fell within the wording and purpose of the Directive despite the tribunal's finding of her knowledge of the fraud on the Inland Revenue.

39  That case did not involve the direct enforcement of a contractual obligation, but in cases where European Union rights depend on the existence of a contract (for example, in the consumer context), the Law Commission doubted whether the Court of Justice would be content with a system of domestic illegality rules which were formalistic and did not allow room for a proportionate balancing exercise to be carried out on the basis of clear principles of public policy (LCCP 189, para 3.89).

40  Where the terms or performance of a contract involve breach of a legislative provision, it is rare (as the Commission noted) for the statute to state expressly what are to be the consequences in terms of its enforceability. (For an example of an express statutory unenforceability provision, see section 127(3) of the Consumer Credit Act 1974 , which arose for consideration in Wilson v First County Trust Ltd (No 2) [2004] 1 AC 816 .) It is to be noted that in the present case, as Gloster LJ pointed out, section 63(2) of the Criminal Justice Act 1993 stipulated that "No contract

shall be void or unenforceable by reason only of section 52 ", presumably because of a concern that if a contract which involved insider dealing contrary to section 52 were void, there could be undesirable consequences for parties down the line. The question whether a statute has the implied effect of nullifying any contract which infringes it requires a purposive construction of the statute, as illustrated by the decision of the Court of Appeal in Hughes v Asset Managers plc [1995] 3 All ER 669 which the Commission commended.

41  If a contract involving prohibited conduct is not void as a matter of statutory construction, the Commission recommended that in deciding whether a claim arising from it should be disallowed by reason of illegality, the court should have regard to the policies that underlie the doctrine. It stressed that it was not advocating a general discretion, but a principled evaluation recognising (as Lord Walker put it in the Bakewell case, at para 60) that the maxim ex turpi causa must be applied as an instrument of public policy and not in circumstances where it would not serve the public interest. The Commission identified a number of potentially relevant factors: most importantly, whether allowing the claim would undermine the purpose of the rule which made the relevant conduct unlawful, and, linked to that question, the causal connection between the illegality and the claim (including how central the illegality was to the contract), the gravity of the conduct of the respective parties and the proportionality of denying the claim. (LCCP 189, para 3.142) The Commission recommended a broadly similar approach to the maxim ex turpi causa in cases of unjust enrichment, tort and enforcement of property rights.

42  The Commission considered that it was within the power of the courts to develop the law in that direction and that there were signs of willingness to do so. The underlying principles were already to be found in the case law and courts were in practice influenced by them in reaching their decisions, in some cases more openly than in others.

43  In relation to the application of the illegality defence to claims of unjust enrichment, the Commission carried out a detailed review in its 1999 consultation paper (LCCP 154, paras 2.32-2.56) and a further review in its 2009 consultative report (LCCP 189, paras 4.1-4.62). An unjust enrichment claim may simply be to unwind

the transaction by repayment of moneys paid and restoration of the parties to their original position, or it may take the form of a claim for recompense for benefits provided by one party to the other (a quantum meruit claim).

44   The Commission observed that one might have expected to find that illegality has little role to play as a defence to a claim for unjust enrichment, since the claimant is not seeking to execute the contract. However, after a more liberal start, the courts adopted a much tougher stance, applying the *ex turpi causa* maxim to such claims unless the claimant could bring himself within certain recognised exceptions. These were a) duress, b) possibly ignorance of a fact or law that rendered the contract illegal, c) possibly membership of a vulnerable class protected by statute and d) locus poenitentiae. The locus poenitentiae exception has given rise to difficult and conflicting case law, which was meticulously analysed in the judgments of the courts below in the present case with different conclusions. I do not propose to repeat their analysis because I do not consider it necessary to do so. The topic has only acquired importance because of the strictness of the basic rule which the courts have applied.

45   Not every case, however, has received such strict treatment. In Mohamed v Alaga & Co [2000] 1 WLR 1815 the Court of Appeal took a more flexible approach. The plaintiff, a Somali translator and interpreter, sued the defendant solicitors for breach of a contract by which he was to introduce Somali refugees to the firm, and assist in the preparation and presentation of their asylum claims, in consideration for a half share of the legal aid fees received by the firm. Alternatively, he claimed payment for his professional services as a translator and interpreter on a quantum meruit. His claim was struck out on the ground that the alleged fee sharing contract contravened rules which had statutory force under the Solicitors Act 1974 and that he was therefore precluded by the doctrine of illegality from claiming payment for services provided under the contract. The Court of Appeal restored the claim for payment on a quantum meruit.

46   Lord Bingham CJ (with whom the other members of the court agreed) differentiated between the claims for breach of contract and quantum meruit. As to the former, he held that the purpose of the prohibition in

the statutory rules was the protection of the public, and that it would defeat the purpose of the prohibition if a non-solicitor party to the agreement could invoke the court's aid to enforce the agreement. As to the quantum meruit claim, Lord Bingham acknowledged that on one view of the case the plaintiff was seeking to recover part of the consideration payable under an unenforceable contract. But he preferred to view it as a claim for a reasonable reward for professional services rendered. He considered it relevant (obviously to the question of the public interest in permitting or disallowing the claim) that the parties were not equal in blameworthiness. The firm could be assumed to know the rules and the likelihood was that it had acted in knowing disregard of them. By contrast, Lord Bingham had no difficulty in accepting that the plaintiff was unaware of any reason why the firm should not make the agreement, which was a common type of agreement in other commercial fields.

47   Mr Matthew Collings QC for Mr Mirza submitted in this case that Mohamed v Alaga & Co was a one off case and either represents an exception, peculiar to its particular facts, to the general rule that a party is not entitled to payment for services rendered under an illegal contract or was wrongly decided.

48   The Commission considered that the policies which underlie the illegality defence are less likely to come into play where parties are attempting to undo, rather than carry out, an illegal contract. As in the case of contractual enforcement, it recommended that a decision on disallowing a particular restitutionary claim for illegality should be based openly on the policies underlying the defence, taking into account the same sort of factors (such as the relative conduct of the parties and the proportionality of denying the claim).

49   I have said that the Commission examined the law of other jurisdictions. Before considering developments in domestic law since the Commission's final report, it is convenient at this stage to refer to the law in Australia, Canada and the USA.

### Australia

50   In Nelson v Nelson [1995] HCA 25; (1995) 184 CLR 538 , the High Court of Australia considered essentially the same issues as in Tinsley v Milligan , which it

declined to follow. As the widow of a mariner who had served in World War 1, Mrs Nelson was eligible under the Defence Service Homes Act 1918 to buy a house with the benefit of a subsidy from the Commonwealth of Australia, provided that she did not own or have a financial benefit in another house. She provided the money to buy a house in Bent Street, Sydney, but the transfer was taken in the names of her son and daughter. Their common intention was that Mrs Nelson should be the beneficial owner of the house. The reason for putting the Bent Street property in the names of her children was to enable her to buy another property with the benefit of a subsidy under the Act. This she did. One year later the Bent Street property was sold. By this time Mrs Nelson and her daughter had fallen out, and a dispute arose as to who was entitled to the sale proceeds. Mrs Nelson and her son brought proceedings against the daughter for a declaration that the proceeds were held by the son and daughter in trust for their mother. The daughter opposed the claim and sought a declaration that she had a beneficial interest. Under Tinsley v Milligan the daughter would have succeeded, because the illegal purpose of the parties in arranging for the property to be transferred into the names of the children would have prevented Mrs Nelson from rebutting the presumption of advancement in their favour.

51    The High Court unanimously rejected that approach. The majority (Deane, McHugh and Gummow JJ) held that the court should use its equitable jurisdiction to grant the declaration sought by Mrs Nelson, with the proviso that it should be subject to terms designed to ensure that the benefit wrongly obtained on the purchase of the second property should be repaid to the Commonwealth. The minority (Dawson and Toohey JJ) would have made the declaration without any such proviso, since the Commonwealth was not a party to the proceedings and should in their view be left to decide what action, if any, it wished to take.

52    Toohey J said at pp 595–597:

> "Once we are in the realm of public policy we are in a rather shadowy world. It is perhaps the more shadowy here because Mrs Nelson is not asking the court to

enforce a contract but rather to give effect to the resulting trust which would ordinarily arise once the presumption of advancement has been rebutted.

…

To allow the result in such a situation to be determined by the procedural aspects of a claim for relief is at odds with the broad considerations necessarily involved in questions of public policy.

…

Although the public policy in discouraging unlawful acts and refusing them judicial approval is important, it is not the only relevant policy consideration. There is also the consideration of preventing injustice and the enrichment of one party at the expense of the other ( St John Shipping Corpn v Joseph Rank Ltd [1957] 1 QB 267 , 288–289, per Devlin J)."

McHugh J, at p 609, described as unsatisfactory a doctrine of illegality that depended upon the state of the pleadings. He said at p 611:

> "The doctrine of illegality expounded in Holman was formulated in a society that was vastly different from that which exists today. It was a society that was much less regulated. With the rapid expansion of regulation, it is undeniable that the legal environment in which the doctrine of illegality operates has changed.

The underlying policy of Holman is still valid today — the courts must not condone or assist a breach of statute, nor must they help to frustrate the operation of a statute … However, the Holman rule, stated in the bald dictum: 'No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act' is too extreme and inflexible to represent sound legal policy in the late twentieth century even when account is taken of the recognised exceptions to this dictum."

53  McHugh J went on to suggest that except in a case where a statute made rights arising out of a particular type of transaction unenforceable in all circumstances, a court should not refuse to enforce legal or equitable rights on the ground of illegality if to do so would be disproportionate to the seriousness of the conduct or if it would not further the purpose of the statute. He said at 612–613:

"It is not in accord with contemporary notions of justice that the penalty for breaching a law or frustrating its policy should be disproportionate to the seriousness of the breach. The seriousness of the illegality must be judged by reference to the statute whose terms or policy is contravened. It cannot be assessed in a vacuum. The statute must always be the reference point for determining the seriousness of the illegality."

McHugh J's approach was cited with approval by a majority of the High Court in Fitzgerald v F J Leonhardt Pty Ltd [1997] HCA 17; (1997) 189 CLR 215 .

54  Noting the criminal sanctions which were available under the Act (imprisonment for up to two years) and the ability of the Commonwealth to recover any payments wrongly obtained by Mrs Nelson, the court did not consider that it should impose a further sanction by refusing to enforce her equitable rights, particularly when such a refusal would result in a penalty out of all proportion to the seriousness of her conduct (pp 570–571 per Deane and Gummow JJ, 590–591 per Toohey J and 616–617 per McHugh J).

**Canada**

55  In Hall v Hebert [1993] 2 SCR 159 the owner of a car allowed a passenger to drive it in the knowledge that he had drunk a large amount of beer during the course of the evening. The car overturned and the driver suffered head injuries. The Supreme Court held that the driver's claim against the owner in negligence was not barred by illegality, but that there should be a reduction in damages for contributory negligence. The judgment of the majority was given by McLachlin J.

56  She held that the courts should be allowed to bar recovery in tort on the ground of the plaintiff's illegal or immoral conduct only in very limited circumstances. The basis of the power lay in the duty of the courts to preserve the integrity of the legal system and it was exercisable only where that concern was in issue. It was in issue where a damage award in a civil suit would allow a person to profit from illegal or wrongful conduct, or would permit an evasion or rebate of a penalty prescribed by the criminal law. In such instances the law refused to give by its right hand what it took away by its left hand.

57  McLachlin J emphasised the importance of defining what was meant by profit when speaking of the plaintiff profiting from his or her own wrong. It meant profit in the narrow sense of a direct pecuniary award for an act of wrongdoing. Compensation for something other than wrongdoing, such as for personal injury, would not amount to profit in that sense. Compensation for the plaintiff's injuries arose not from the illegal character of his conduct, but from the damage caused to him by the negligent act of the owner in letting him drive. It represented only the value of, or substitute for, the injuries he had suffered by the fault of another. He would get nothing for being engaged in illegal conduct.

McLachlin J accepted that there might be cases where a claim should be barred from tort recovery which did not fall within the category of profit, in order to prevent stultification of the criminal law or the evasion of a criminal penalty, but the underlying principle was that the use of the power to deny recovery on the ground of illegality was justified only where the claim would introduce inconsistency into the fabric of the law.

58  In Still v Minister of National Revenue (1997) 154 DLR (4th) 229 an American citizen lawfully entered Canada and applied for permanent residence status. Pending consideration of her application, acting in good faith, she accepted employment but did so without obtaining a work permit as required by the Immigration Act 1985 . She was subsequently laid off and submitted a claim for benefits under the Unemployment Insurance Act 1985 . Her claim was rejected on the ground that the employment on which she relied in order to found her claim was prohibited under the Immigration Act . She appealed successfully to the Federal Court of Appeal.

59  The judgment of the court was given by Robertson JA. The court accepted that her employment without a work permit was expressly prohibited by the Immigration Act . It acknowledged that under what it described as the "classical model" of the illegality doctrine, the fact that the applicant acted in good faith was irrelevant; her employment under an illegal contract could not constitute insurable employment for the purposes of the Unemployment Insurance Act . However, it said at para 24 that in recognition of the rigidity and oft-times unfair application of the classical illegality doctrine, the courts had developed several ways in which a party may be relieved of the consequences of illegality where appropriate. The difficulty with those exceptions arose from "the legal manoeuvring that must take place to arrive at what is considered a just result". The court examined, at paras 25-36, a line of authorities that the Ontario courts which showed the courts turning from the classical model towards a modern approach. It expressed the view, at para 42, that the classical model had lost its persuasive force, and was now honoured more in the breach than in its observance through the proliferation of so-called judicial "exceptions" to the rule. The new approach involved an examination of the purpose underlying the relevant prohibition, and its rationale was explained by McLachlin J in Hall v Hebert .

60  After citing McLachlin J's judgment in Hall v Hebert , the court said at para 49:

> "As the doctrine of illegality rests on the understanding that it would be contrary to public policy to allow a person to maintain an action on a contract prohibited by statute, then it is only appropriate to identify those policy considerations which outweigh the applicant's prima facie right to unemployment insurance benefits. … While on the one hand we have to consider the policy behind the legislation being violated, the Immigration Act , we must also consider the policy behind the legislation which gives rise to the benefits that have been denied, the Unemployment Insurance Act ."

61  The court proceeded to consider the objectives underlying each of the two Acts. As to the policy consideration that a person should not benefit from his or her own wrong, the court regarded it as a critically significant fact that she had not deliberately broken the law but acted in good faith, and it noted that during her employment both the applicant and her employer had contributed to the unemployment insurance fund. Taking account of the objectives underlying each Act and the facts of the case, it concluded that denial of the application was not required in order to preserve the integrity of the legal system and would be disproportionate to the breach involved in failing to have obtained a work permit.

**USA**

62  The American Law Institute's Restatement (2nd) of Contracts (1981) states at para 178(1):

> "A promise or other term of an agreement is unenforceable on grounds of public policy if

legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement in such terms."

63   Nizamuddowlah v Bengal Cabaret Inc (1977) 399 NYS 2d 854 provides a practical example in the case of a devious and oppressive employer. The central defendant (the effective owner of the company named as first defendant) met the plaintiff in Bangladesh and offered to employ him at the defendant's restaurant in New York City. The plaintiff was to work for an initial period of three months without payment, after which he was to be paid a waiter's salary. The plaintiff accepted the offer. The defendant arranged for the plaintiff's travel and entry to the USA on a visitor's visa, and he also promised to obtain a resident visa or "green card" for him. The plaintiff worked for the defendant for 20 months, but he received no payment despite several demands. He also made repeated inquiries about his green card, but the defendant persistently stalled him. The plaintiff eventually managed to obtain a green card through his own efforts and sued the defendant to recover wages under the Minimum Wage Act . The defendant sought the dismissal of the action on the ground that the contract was illegal.

64   By working in the USA before he obtained a green card the plaintiff violated the immigration laws, and the judge was not prepared to accept his plea of ignorance, since he was warned in his application form for a visitor's visa that gainful employment would constitute a breach of his visa conditions. The judge concluded that he had willingly fallen in with the defendant's proposal because of his strong desire to emigrate to the USA. The judge identified the public harm liable to result from the type of conduct exposed by the case: employment of aliens such as the plaintiff in times of high unemployment deprived citizens and legally admitted aliens of jobs; their employment on substandard terms could depress wages and working conditions; and it could diminish the effectiveness of labour unions.

65   However, the judge found that the defendant was the main perpetrator, intent on evading and taking advantage of the immigration laws. He said that knowing about the immigration laws, and aware that a party to an illegal contract could not ask a court to help him to carry out his illegal objective, the defendant ran his enterprise without fairly compensating his employees. The judge concluded that the equitable course was that the plaintiff should be paid on the basis of unjust enrichment, and he calculated the amount of the award by reference to the statutory minimum wage.

66   The New York Supreme Court, Appellate Division, upheld the judgment at (1979) 415 NYS 2d 685. Observing that the Minimum Wage Act contained no indication of a legislative intent to protect only American workers, the court said:

> "Even illegal aliens have the right to pursue civil suits in our courts, and the practice of hiring such aliens, using their services and disclaiming any obligation to pay wages because the contract is illegal is to be condemned. The law provides penalties for aliens who obtain employment in breach of their visa obligations, but deprivation of compensation for labor is not warranted by any public policy consideration involving the immigration statutes."

**Developments since the report of the Law Commission**

67   The Court of Appeal supported and followed the approach of the Law Commission in Les Laboratoires Servier v Apotex Inc [2012] EWCA Civ 593, [2013] Bus LR 80 and ParkingEye Ltd v Somerfield Stores Ltd [2013] QB 840 . In the latter case ParkingEye contracted to provide a system of automated monitoring of car parking at Somerfield's supermarkets. The system recorded vehicle registration numbers and customers would be charged for staying beyond a set period. The contract was to be for an initial term of 15

months and ParkingEye's remuneration was to come from the charges levied over that period. Overstayers were to be sent letters of demand in a standard form agreed between the parties in advance of the conclusion of the contract. If the first demand did not result in payment, it was to be followed by a series of further demands in stronger terms. The third pro forma letter was deceptive because it falsely represented that ParkingEye had the authority and intention to issue proceedings against the customer if payment was not made within a stipulated period. Six months into the contract Somerfield repudiated it for reasons unconnected with the letters of demand. By that time the monitoring system had been installed at 17 of its stores. ParkingEye's claim for damages was met with a defence which included a plea of illegality based on the intended use of deception in the performance of the contract.

68  The trial judge rejected the defence and awarded ParkingEye damages of £350,000 for loss of profits caused by Somerfield's repudiatory breach. The Court of Appeal upheld his decision. The legally objectionable letter was only a small part of the intended performance of the contract and was not essential to it. The judge had found that ParkingEye did not appreciate that the letter would be legally objectionable when the parties agreed on its form, and that, if someone had pointed the matter out, the letter would have been changed. When its objectionable nature occurred to Somerfield, the proper and reasonable course would have been for Somerfield to raise the matter with ParkingEye and continue to honour the contract, so long as ParkingEye made the necessary alteration and performed the contract in a lawful manner, as it would have done. The court held that denial of ParkingEye's claim was not justified by the policies underlying the doctrine of illegality and would have led to a disproportionate result.

69  In that case I said at paras 52-53:

> "Rather than having over-complex rules which are indiscriminate in theory but less so in practice, it is better and more honest that the court should look openly at the underlying policy factors and reach a balanced judgment in each case for reasons articulated by it.

> 53.  This is not to suggest that a list of policy factors should become a complete substitute for the rules about illegality in the law of contract which the courts have developed, but rather that those rules are to be developed and applied with the degree of flexibility necessary to give proper effect to the underlying policy factors."

70  On the relevance of ParkingEye's state of mind, I referred at para 66 to Waugh v Morris (1873) LR 8 QB 202 . The case arose from a charter party under which a cargo of hay was to be shipped from Trouville to London. On arrival in London the master learned that a few months before the conclusion of the contract an order had been published under the Contagious Diseases (Animals) Act 1869 making it illegal to land hay brought from France. The master refrained from landing the cargo and, after some delay, the charterer transhipped and exported it. Meanwhile the contractual laydays had expired and the owner claimed for detention. The charterer resisted the claim on the ground that the contract was void for illegality, because its purpose was the delivery of the consignment to London, which was prohibited by law. The defence was rejected.

71  Giving the judgment of the court, Blackburn J said that all that the owner had bargained for was that on the ship's arrival in London the freight should be paid and the cargo unloaded. He contemplated that it would be landed and thought that this would be legal; but if he had thought of the possibility of the landing being prohibited, he would probably and rightly have expected that the charterer would not violate the law. Blackburn J said at 208:

> "We quite agree, that, where a contract is to do a thing which cannot be performed without a violation of the law it is void, whether the parties knew the law or

not. But we think, that in order to avoid a contract which can be legally performed, on the ground that there was an intention to perform it in an illegal manner, it is necessary to show that there was the wicked intention to break the law; and, if this be so, the knowledge of what the law is becomes of great importance."

72   Since the decisions of the Court of Appeal in Les Laboratoires Servier v Apotex Inc and the ParkingEye case, there have been three decisions by the Supreme Court involving the doctrine of illegality. The first was Hounga v Allen [2014] 1 WLR 2889 , a case with features similar to Nizamuddowlah v Bengal Cabaret Inc . Miss Hounga was a 14-year old Nigerian. Mr and Mrs Allen offered to employ her as a home help in the UK in return for schooling and £50 per month. With their help she entered the UK on false identity documents and obtained a six months' visitor's visa. The plan was masterminded by Mrs Allen's brother who lived in Lagos. He drafted an affidavit for Miss Hounga to swear, giving her surname as that of Mrs Allen's mother and a false date of birth. The affidavit led to the issue of a passport in that name. Mrs Allen's family then arranged for Miss Hounga to be taken to the British High Commission in Lagos, where she produced a document purporting to be an invitation from Mrs Allen's mother pretending to invite her granddaughter to visit her in the United Kingdom. The High Commission was duped into issuing her with entry clearance. Mrs Allen's brother then bought a ticket for Miss Hounga to travel to England. On arrival at Heathrow Miss Hounga confirmed to an immigration officer that the purpose of her visit was to stay with her grandmother. Subsequently a psychologist reported that Miss Hounga, who was illiterate, had low cognitive functioning, a learning disability and a developmental age much lower than her chronological age. Nevertheless she knew that she had entered the UK on false pretences, that it was illegal for her to remain beyond six months and that it was illegal for her to take employment in the UK.

73   After her arrival Miss Hounga lived at the Allens' home, looking after their children and doing housework. She was not enrolled in a school or paid any wages. She was told by Mrs Allen that if she were found by the police she would be sent to prison. This caused her extreme concern. Mrs Allen also subjected her to serious physical abuse. After 18 months an incident occurred in which Mrs Allen beat Miss Hounga, threw her out of the house and poured water over her. Miss Hounga slept that night in the Allens' garden in wet clothes. Next day they refused to let her back in, and she made her way to a supermarket car park, where she was found and taken to the social services department of the local authority.

74   Miss Hounga brought claims against the Allens in the employment tribunal for unfair dismissal, breach of contract and unpaid wages. They were dismissed on the ground that her contract of employment was unlawful. She appealed unsuccessfully to the appeal tribunal and she did not seek to appeal further. Neither the Court of Appeal nor the Supreme Court therefore had occasion to consider whether she was entitled to be paid for the services which she rendered on a quantum meruit (by analogy with cases such as Mohamed v Alaga & Co and Nizamuddowlah v Bengal Cabaret Inc et al ).

75   Miss Hounga also claimed to have been the victim of the statutory tort of unlawful discrimination under the Race Relations Act 1976, section 4(2)(c) , in relation to her dismissal. The tribunal found that she had been dismissed because of her vulnerability consequent upon her immigration status. She was therefore the victim of unlawful discrimination and she was awarded compensation for her resulting injury to feelings. The tribunal's order was set aside by the Court of Appeal, which held that the claim was tainted by the illegal nature of her employment and that for the court to uphold it would be to condone the illegality, but it was restored by the Supreme Court. The leading judgment was given by Lord Wilson, with whom Lady Hale and Lord Kerr agreed.

76   Lord Wilson did not consider that the solution of the case lay either in asking whether Miss Allen needed to rely on an illegal contract or in asking whether there was an inextricable link between the illegality to which she was a party and her claim. At the heart of the judgment Lord Wilson set out his approach in para 42:

"The defence of illegality rests on the foundation of public policy. 'The principle of public policy is this …' said Lord Mansfield by way of preface to his classic exposition of the defence in Holman v Johnson (1775) 1 Cowp 341 , 343. 'Rules which rest on the foundation of public policy, not being rules which belong to the fixed or customary law, are capable, on proper occasion, of expansion or modification': Maxim Nordenfelt Guns and Ammunition Co v Nordenfelt [1893] 1 Ch 630 , 661 (Bowen LJ). So it is necessary, first, to ask 'What is the aspect of public policy which founds the defence?' and, second, to ask 'But is there another aspect of public policy to which the application of the defence would run counter?'"

77  On the first question, drawing on the judgment of McLachlin J in Hall v Hebert , Lord Wilson addressed the policy consideration of preserving the integrity of the legal system and not allowing persons to profit from their illegal conduct. He concluded that an award of compensation for damage to Miss Hounga's feelings was not a form of profit from her employment; it did not permit evasion of a penalty prescribed by the criminal law; and it did not compromise the integrity of the legal system. Conversely, he said that application of the defence could encourage those in the situation of Mrs Allen to believe that they could discriminate against people like Miss Hounga with impunity and could thereby compromise the integrity of the legal system. On the second question, Lord Wilson said that the Court of Appeal's decision ran strikingly counter to the public policy against forms of people trafficking and in favour of the protection of its victims. Weighing the policy considerations, he concluded that insofar as any public policy existed in favour of applying the illegality defence, it should give way to the public policy to which its application would be an affront.

78  Hounga v Allen was a case in tort, but Lord Wilson's approach to the illegality defence was applied by the Court of Appeal in R (Best) v Chief Land Registrar [2016] QB 23 , where the issue was whether a claim to be registered under the Land Registration Act 2002 ("LRA") as the proprietor of a residential building by adverse possession was barred by illegality. The circumstances were that part of the relevant period of possession involved the commission of trespass which constituted a criminal offence under section 144 of the Legal Aid, Sentencing and Punishment of Offenders Act 2012 ("LASPOA").

79  Sales LJ (with whom McCombe LJ agreed) expressed the view, at para 51, that the best guidance on the relevant analytical framework was to be found in Lord Wilson's judgment (from which he quoted para 42 and the passage which followed it). Applying that guidance, he examined the public policy considerations underlying the provisions of the LRA governing acquisition of title to land and the public policy considerations underlying section 144 of LASPOA . He concluded that the mischief at which section 144 was aimed was far removed from the intended operation of the law of adverse possession and that public policy did not preclude the claim for registration.

80  After Hounga v Allen came the decision of the Supreme Court in Les Laboratoires Servier v Apotex Inc [2015] AC 430 . The issue of illegality arose in the context of a claim to enforce a cross-undertaking in damages given as a condition of an interlocutory injunction in proceedings which ultimately failed. The claim was therefore akin to a claim in contract. The facts were somewhat complicated but do not matter for present purposes. The court held unanimously that the Court of Appeal had reached the right result, but the majority of this court expressed the view, at para 21, that the Court of Appeal's decision could not possibly be justified by the considerations put forward by that court, which had in broad terms followed the approach commended by the Law Commission. I expressed a different view, at para 62, observing that the Court of Appeal had adopted a similar approach to that taken by this court in Hounga v Allen .

81  After Les Laboratoires Servier v Apotex Inc came Bilta (UK) Ltd v Nazir (No 2) [2016] AC 1 . There was a

sharp division of opinion about the proper approach to the defence illegality between, on the one hand, a strictly rule-based approach and, on the other hand, a more flexible approach by which the court would look at the policies underlying the doctrine and decide whether they militated in favour of the defence, taking into account a range of potentially relevant factors. The majority did not consider it necessary to resolve the difference in that case, since it did not affect the result, but Lord Neuberger said at para 15 that it needed to be addressed as soon as appropriately possible.

**The law at a crossroads**

82  In his *Restatement of the English Law of Contract* (Oxford University Press, 2016), pp 221–222, Professor Andrew Burrows explained the difficulty of attempting to state the law in relation to illegality:

> "Leaving aside the law on what one can loosely label 'statutory illegality' [cases where a statute makes a contract or a contract term unenforceable by either or one party] the law on the effect of illegality in contract (which one may loosely refer to as 'the common law of illegality') is in a state of flux …

> Traditionally, two Latin maxims have often been referred to without greatly illuminating the legal position: ex turpi causa non oritur actio ('no action arises from a disgraceful cause') and in pari delicto potior est conditio defendentis ('where both parties are equally in the wrong the position of the defendant is the stronger'). As previously understood, illegality in the law of contract — as developed from those Latin maxims — was governed by a series of rules which tended to distinguish, for example, between illegality in formation and illegality in performance. Unfortunately, commentators and courts have found it very difficult to state those rules with confidence and precision. Hence the textbook treatments not only differ from each other but are characterised by long-winded attempts to explain the law. Sharp propositions when offered by the courts or the books have to be qualified by reference to cases or hypothetical examples that do not fit those rules; and convincing justifications of those rules have proved elusive. More recently, therefore, and in line with a similar trend in respect of illegality as a defence in tort, some courts have favoured greater flexibility culminating in a 'range of factors' approach aimed at achieving a proportionate response to contractual illegality in preference to the traditional rule-based approach."

83  Since the law was at a crossroads, Professor Burrows set out alternative possible formulations of a "rule-based approach" and a "range of factors approach".

84  One possible version of a rule-based approach, at p 224, which Tinsley v Milligan and Les Laboratoires Servier v Apotex Inc could be interpreted as supporting, would be a single master rule based on reliance:

> "If the formation, purpose or performance of a contract involves conduct that is illegal (such as a crime) or contrary to public policy (such as a restraint of trade), a party cannot enforce the contract if it has to rely on that conduct to establish its claim."

85 An alternative rule-based formulation, at p 225, saw the reliance rule as only one of a number of rules and essentially confined to the creation of property rights. On this approach a formulation of the rules might be:

> "Rule 1. A contract which has as its purpose, or is intended to be performed in a manner that involves, conduct that is illegal (such as a crime) or contrary to public policy (such as a restraint of trade) is unenforceable (a) by either party if both parties knew of that purpose or intention; or (b) by one party if only that party knew of that purpose or intention.
>
> Rule 2. If rule 1 is inapplicable because it is only the performance of a contract that involves conduct that is illegal or contrary to public policy, the contract is unenforceable by the party who performed in that objectionable way but is enforceable by the other party unless that party knew of, and participated in, that objectionable performance.
>
> Rule 3. Proprietary rights created by a contract that involves conduct that is illegal or contrary to public policy will not be recognised unless the claimant can establish the proprietary rights without reliance on that conduct."

86 Professor Burrows identified six criticisms of those rules and, more generally, of a "rule-based" approach to illegality.

87 First, the difficulty with the Tinsley v Milligan reliance rule, whether as a master rule or as a rule restricted to cases involving the assertion of proprietary rights, was that it could produce different results according to procedural technicality which had nothing to do with the underlying policies. The decision of the Court of Appeal in Collier v Collier [2002] EWCA 1095; [2002] BPIR 1057 provides a good illustration. A father granted a lease of property to his daughter to hold on trust for him in order to deceive creditors. His claim to beneficial title was rejected on the ground of illegality, because it was held that he needed to rely on the illegal purpose in order to rebut the presumption of illegality which arose in favour of the daughter. Mance LJ considered at paras 105-106 what appeared to be the distinction introduced by Tinsley v Milligan between a beneficial interest which could be established by "some objectively provable and apparently neutral fact" and a beneficial interest arising only from an agreement made for an unlawful purpose. He described the effect as "little more than cosmetic" where the court was perfectly well aware of the close involvement of both parties in the illegality. Tempted as he was to adopt a severely limited view of the meaning of reliance (encouraged by the judgment of Dawson J in Nelson v Nelson ), he rightly did not consider that it was open to the Court of Appeal on the authorities to do so. He expressed strong sympathy with the criticisms of the law expressed by the Law Commission, and he concluded at para 113 that he had no liking for the result which the court was compelled to reach.

88 Second, the difficulties with rule 1 were illustrated by the ParkingEye case. The illegality in that case went to the contract as formed, because from the outset it was intended to send out to customers a form of letter of demand which contained some deliberate inaccuracies. The rule as stated did not permit differentiation between minor and serious illegality or between peripheral and central illegality. To have deprived ParkingEye of what would otherwise have been a contractual entitlement to damages of £350,000 would have been disproportionate. Moreover, as Sir Robin Jacob pointed out in that case, at paras 33-34, there was something odd about a rule which differentiated according to whether the intention was formed before or after the contract was made.

89 Third, as with the criticism of rule 1, the reference in rule 2 to performance that involved illegal conduct drew no distinction between serious criminality and relatively minor breach of a statutory regulation.

90  Fourth, although a purported advantage of firm rules is greater certainty, the cases do not always fit the rules because courts have often sought ways around them when they do not like the consequence. The flexible approach would not only produce more acceptable results, but would in practice be no less certain than the rule-based approach.

91  Fifth, although Lord Mansfield made it clear in Holman v Johnson that the illegality defence operates as a rule of public policy and is not designed to achieve justice between the parties, that does not mean that any result, however arbitrary, is acceptable. The law should strive for the most desirable policy outcome, and it may be that it is best achieved by taking into account a range of factors.

92  Sixth, although it may be argued that if there are deficiencies in the traditional rules, the way forward is to refine the rules to remove the deficiencies by appropriate exceptions, that task is one which has never been satisfactorily accomplished. The reason is that there are so many variables, for example, in seriousness of the illegality, the knowledge and intentions of the parties, the centrality of the illegality, the effect of denying the defence and the sanctions which the law already imposes. To reach the best result in terms of policy, the judges need to have the flexibility to consider and weigh a range of factors in the light of the facts of the particular case before them.

93  If a "range of factors" approach were preferred, Professor Burrows suggested, at pp 229–230, that a possible formulation would read as follows:

> "If the formation, purpose or performance of a contract involves conduct that is illegal (such as a crime) or contrary to public policy (such as a restraint of trade), the contract is unenforceable by one or either party if to deny enforcement would be an appropriate response to that conduct, taking into account where relevant –
>
> (a) how seriously illegal or contrary to public policy the conduct was;

> (b) whether the party seeking enforcement knew of, or intended, the conduct;
>
> (c) how central to the contract or its performance the conduct was;
>
> (d) how serious a sanction the denial of enforcement is for the party seeking enforcement;
>
> (e) whether denying enforcement will further the purpose of the rule which the conduct has infringed;
>
> (f) whether denying enforcement will act as a deterrent to conduct that is illegal or contrary to public policy;
>
> (g) whether denying enforcement will ensure that the party seeking enforcement does not profit from the conduct;
>
> (h) whether denying enforcement will avoid inconsistency in the law thereby maintaining the integrity of the legal system."

Professor Burrows noted that the final factor is capable of a wider or narrower approach, depending on what one understands by inconsistency.

94  The reference to what is an "appropriate response" brings to the surface the moral dimension underlying the doctrine of illegality, which inevitably influences the minds of judges and peeps out in their judgments from time to time. Tinsley v Milligan caused disquiet to Lord Goff and others precisely because its reasoning jarred with their sense of what was just and appropriate.

### The way forward

95  In Yarmouth v France (1887) 19 QBD 647 , 653, Lord Esher MR said:

"I detest the attempt to fetter the law by maxims. They are almost invariably misleading: they are for the most part so large and general in their language that they always include something which really is not intended to be included in them."

In Lissenden v C A v Bosch Ltd [1940] AC 412 , 435, Lord Wright quoted Lord Esher's words and added:

"Indeed these general formulae are found in experience often to distract the court's mind from the actual exigencies of the case, and to induce the court to quote them as offering a ready made solution."

96    The maxims *ex turpi causa* and in pari delicto are no exception. It is interesting that, according to Professor JK Grodecki, Lord Mansfield himself was "conscious that if the brocard in pari delicto was to be a beneficial rule of jurisprudence it should not be allowed to become rigid and inflexible": In pari delicto potior est conditio defendentis (1955) 71 LQR 254 , 258. Professor Grodecki gave examples including Smith v Bromley (1760) 2 Doug KB 696n; 99 ER 441 and Walker v Chapman (1773) Lofft 342, 98 ER 684 .

97    In Smith v Bromley (the earliest case in which the maxim in pari delicto appears to have been used) Lord Mansfield granted recovery to the plaintiff of money paid by the plaintiff to procure her brother's discharge from bankruptcy, which was an illegal consideration. As he explained, Lord Mansfield, at p 698, regarded it as in the public interest that the plaintiff should be repaid notwithstanding the illegal purpose of the payment:

"Upon the whole, I am persuaded it is necessary, for the better support and maintenance of the law, to allow this action; for no man will venture

to take, if he knows he is liable to refund."

98    In Walker v Chapman the defendant, who was a page to the King, offered to take a bribe of £50 from the plaintiff in return for securing him a place in the Customs. The bribe was paid but the plaintiff did not obtain the appointment and so he sued for the return of his money. It was argued for the defendant that no action would lie, the plaintiff being party to an iniquitous contract, and that the law would not suffer a party to "draw justice from a foul fountain". Lord Mansfield rejected the defence, distinguishing between a claim to overturn an illegal contract and a claim to obtain benefit from it. Later judges have taken a different and stricter approach.

99    Looking behind the maxims, there are two broad discernible policy reasons for the common law doctrine of illegality as a defence to a civil claim. One is that a person should not be allowed to profit from his own wrongdoing. The other, linked, consideration is that the law should be coherent and not self-defeating, condoning illegality by giving with the left hand what it takes with the right hand.

100    Lord Goff observed in the Spycatcher case, Attorney General v Guardian Newspapers Ltd (No 2) [1990] 1 AC 109 , 286, that the "statement that a man shall not be allowed to profit from his own wrong is in very general terms, and does not of itself provide any sure guidance to the solution of a problem in any particular case". In Hall v Hebert [1993] 2 SCR 159 McLachlin J favoured giving a narrow meaning to profit but, more fundamentally, she expressed the view (at 175–176) that, as a rationale, the statement that a plaintiff will not be allowed to profit from his or her own wrongdoing does not fully explain why particular claims have been rejected, and that it may have the undesirable effect of tempting judges to focus on whether the plaintiff is "getting something" out of the wrongdoing, rather than on the question whether allowing recovery for something which was illegal would produce inconsistency and disharmony in the law, and so cause damage to the integrity of the legal system.

101  That is a valuable insight, with which I agree. I agree also with Professor Burrows' observation that this expression leaves open what is meant by inconsistency (or disharmony) in a particular case, but I do not see this as a weakness. It is not a matter which can be determined mechanistically. So how is the court to determine the matter if not by some mechanistic process? In answer to that question I would say that one cannot judge whether allowing a claim which is in some way tainted by illegality would be contrary to the public interest, because it would be harmful to the integrity of the legal system, without a) considering the underlying purpose of the prohibition which has been transgressed, b) considering conversely any other relevant public policies which may be rendered ineffective or less effective by denial of the claim, and c) keeping in mind the possibility of overkill unless the law is applied with a due sense of proportionality. We are, after all, in the area of public policy. That trio of necessary considerations can be found in the case law.

102  The relevance of taking into account the purpose of the relevant prohibition is self-evident. The importance of taking account of the relevant statutory context is illustrated by Hardy v Motor Insurers' Bureau [1964] 2 QB 745 . The Road Traffic Act 1960 required a motorist to be insured against the risk of causing death or personal injury through the use of a vehicle on a road, but a line of authorities established that a contract to indemnify a person against the consequences of a deliberate criminal act is unenforceable. The plaintiff, a security officer at a factory, was injured when he was trying to question the driver of a van, who drove off at speed and dragged him along the road. The driver was convicted of unlawfully causing grievous bodily harm. The driver being uninsured, the plaintiff sued the defendant under an agreement between the defendant and the Minister of Transport, by which the defendant agreed to satisfy any judgment against a motorist for a liability required to be covered under a motor insurance policy. The defendant relied on the maxim *ex turpi causa* , arguing that a contract purporting to insure the driver against his own deliberate criminal conduct would have been unlawful. The defence was rejected. Diplock LJ said at p 767:

> "The rule of law on which the major premise is based — ex turpi causa

non oritur actio — is concerned not specifically with the lawfulness of contracts but generally with the enforcement of rights by the courts, whether or not such rights arise under contract. All that the rule means is that the courts will not enforce a right which would otherwise be enforceable if the right arises out of an act committed by the person asserting the right (or by someone who is regarded in law as his successor) which is regarded by the court as sufficiently anti-social to justify the court's refusing to enforce that right."

He observed that the purpose of the relevant statutory provision was the protection of persons who suffered injury on the road by the wrongful acts of motorists. This purpose would have been defeated if the common law doctrine of illegality had been applied so as to bar the plaintiff's claim.

103  Hounga v Allen and R (Best) v Chief Land Registrar are illustrations of cases in which there were countervailing public interest considerations, which needed to be balanced.

104  As to the dangers of overkill, Lord Wright gave a salutary warning in Vita Food Products Inc v Unus Shipping Co Ltd [1939] AC 277 , 293:

> "Nor must it be forgotten that the rule by which contracts not expressly forbidden by statute or declared to be void are in proper cases nullified for disobedience to a statute is a rule of public policy only, and public policy understood in a wider sense may at times be better served by refusing to nullify a bargain save on serious and sufficient grounds."

105  To similar effect Devlin J questioned "whether public policy is well served by driving from the seat of judgment everyone who has been guilty of a minor transgression" in St John Shipping Corpn v Joseph Rank Ltd [1957] 1 QB 267 , 288- 289.

106  In Saunders v Edwards [1987] 1 WLR 1116 , 1134, Bingham LJ said

> "Where issues of illegality are raised, the courts have (as it seems to me) to steer a middle course between two unacceptable positions. On the one hand it is unacceptable that any court of law should aid or lend its authority to a party seeking to pursue or enforce an object or agreement which the law prohibits. On the other hand, it is unacceptable that the court should, on the first indication of unlawfulness affecting any aspect of a transaction, draw up its skirts and refuse all assistance to the plaintiff, no matter how serious his loss nor how disproportionate his loss to the unlawfulness of his conduct."

107  In considering whether it would be disproportionate to refuse relief to which the claimant would otherwise be entitled, as a matter of public policy, various factors may be relevant. Professor Burrows' list is helpful but I would not attempt to lay down a prescriptive or definitive list because of the infinite possible variety of cases. Potentially relevant factors include the seriousness of the conduct, its centrality to the contract, whether it was intentional and whether there was marked disparity in the parties' respective culpability.

108  The integrity and harmony of the law permit — and I would say require — such flexibility. Part of the harmony of the law is its division of responsibility between the criminal and civil courts and tribunals. Punishment for wrongdoing is the responsibility of the criminal courts and, in some instances, statutory

regulators. It should also be noted that under the Proceeds of Crime Act 2002 the state has wide powers to confiscate proceeds of crime, whether on a conviction or without a conviction. Punishment is not generally the function of the civil courts, which are concerned with determining private rights and obligations. The broad principle is not in doubt that the public interest requires that the civil courts should not undermine the effectiveness of the criminal law; but nor should they impose what would amount in substance to an additional penalty disproportionate to the nature and seriousness of any wrongdoing. ParkingEye is a good example of a case where denial of claim would have been disproportionate. The claimant did not set out to break the law. If it had realised that the letters which it was proposing to send were legally objectionable, the text would have been changed. The illegality did not affect the main performance of the contract. Denial of the claim would have given the defendant a very substantial unjust reward. Respect for the integrity of the justice system is not enhanced if it appears to produce results which are arbitrary, unjust or disproportionate.

109  The courts must obviously abide by the terms of any statute, but I conclude that it is right for a court which is considering the application of the common law doctrine of illegality to have regard to the policy factors involved and to the nature and circumstances of the illegal conduct in determining whether the public interest in preserving the integrity of the justice system should result in denial of the relief claimed. I put it in that way rather than whether the contract should be regarded as tainted by illegality, because the question is whether the relief claimed should be granted.

110  I agree with the criticisms made in Nelson v Nelson and by academic commentators of the reliance rule as laid down in Bowmakers and Tinsley v Milligan , and I would hold that it should no longer be followed. Unless a statute provides otherwise (expressly or by necessary implication), property can pass under a transaction which is illegal as a contract: Singh v Ali [1960] AC 167 , 176, and Sharma v Simposh Ltd [2013] Ch 23 , paras 27-44. There may be circumstances in which a court will refuse to lend its assistance to an owner to enforce his title as, for example, where to do so would be to assist the claimant in a drug trafficking operation, but the outcome should not depend on a procedural question.

111    In Bowmakers [1945] 1 KB 65 the claim was for conversion of goods which had been obtained by the plaintiffs and supplied to the defendant under transactions which were assumed to be tainted by illegality. The Court of Appeal rightly said, at p 71, that "a man's right to possess his own chattels will as a general rule be enforced against one who, without any claim of right, is detaining them or has converted them to his own use, even though it may appear either from the pleadings, or in the course of the trial, that the chattels in question came into the defendant's possession by reason of an illegal contract between himself and the plaintiff", but it added the qualifying words "provided that the plaintiff does not seek, and is not forced, either to found his claim on the illegal contract or to plead its illegality in order to support his claim". The objections to the proviso have already been identified. It makes the question whether the court will refuse its assistance to the claimant to enforce his title to his property depend on a procedural question and it has led to uncertain case law about what constitutes reliance. The court ended its judgment, at p 72, by saying:

> "We are satisfied that no rule of law, and no considerations of public policy, compel the court to dismiss the plaintiffs' claim in the case before us, and to do so would be, in our opinion, a manifest injustice."

That conclusion, rather than the answer to a procedural question, should have been the end of the illegality defence, since it is based on public policy.

112    In Tinsley v Milligan , even if Miss Milligan had not owned up and come to terms with the DSS, it would have been disproportionate to have prevented her from enforcing her equitable interest in the property and conversely to have left Miss Tinsley unjustly enriched.

113    Critics of the "range of factors" approach say that it would create unacceptable uncertainty. I would make three points in reply. First, one of the principal criticisms of the law has been its uncertainty and unpredictability. Doctrinally it is riven with uncertainties: see, for example, paras 4-8 above. There

is also uncertainty how a court will in practice steer its way in order to reach what appears to be a just and reasonable result. Second, I am not aware of evidence that uncertainty has been a source of serious problems in those jurisdictions which have taken a relatively flexible approach. Third, there are areas in which certainty is particularly important. Ordinary citizens and businesses enter into all sorts of everyday lawful activities which are governed by well understood rules of law. Lord Mansfield said in Vallejo v Wheeler (1774) 1 Cowp 143 , 153:

> "In all mercantile transactions the great object should be certainty: and therefore, it is of more consequence that a rule should be certain, than whether the rule is established one way or the other. Because speculators in trade then know what ground to go upon."

The same considerations do not apply in the same way to people contemplating unlawful activity. When he came to decide cases involving illegality, Lord Mansfield acted in accordance with his judgment about where the public interest lay: see paras 96-98.

114    In Tinsley v Milligan Lord Goff considered that if the law was to move in a more flexible direction, to which he was not opposed in principle, there should be a full investigation by the Law Commission (which has happened) and that any reform should be through legislation. Realistically, the prospect of legislation can be ignored. The government declined to take forward the Commission's bill on trusts because it was not seen to be "a pressing priority for government" (a phrase familiar to the Commission), and there is no reason for optimism that it would take a different view if presented with a wider bill. In Clayton v The Queen (2006) 231 ALR 500 , para 119, Kirby J said that waiting for a modern Parliament to grapple with issues of law reform is like "waiting for the Greek Kalends. It will not happen" and that "Eventually courts must accept this and shoulder their own responsibility for the state of the common law". The responsibility of the courts for dealing with defects in the common law was recently emphasised by this court in R v Jogee [2016] 2 WLR

Patel v Mirza, 2016 WL 03902311 (2016)

681 , para 85, and Knauer v Ministry of Justice [2016] 2 WLR 672 , para 26. In each of those cases the court decided that it should depart from previous decisions of the House of Lords. That is never a step taken lightly. In departing from Tinsley v Milligan it is material that it has been widely criticised; that people cannot be said to have entered into lawful transactions in reliance on the law as then stated; and, most fundamentally, that the criticisms are well founded.

115  In the present case I would endorse the approach and conclusion of Gloster LJ. She correctly asked herself whether the policy underlying the rule which made the contract between Mr Patel and Mr Mirza illegal would be stultified if Mr Patel's claim in unjust enrichment were allowed. After examining the policy underlying the statutory provisions about insider dealing, she concluded that there was no logical basis why considerations of public policy should require Mr Patel to forfeit the moneys which he paid into Mr Mirza's account, and which were never used for the purpose for which they were paid. She said that such a result would not be a just and proportionate response to the illegality. I agree. It seems likely that Lord Mansfield would also have agreed: see Walker v Chapman . Mr Patel is seeking to unwind the arrangement, not to profit from it.

116  It is not necessary to discuss the question of locus poenitentiae which troubled the courts below, as it has troubled other courts, because it assumed importance only because of a wrong approach to the issue whether Mr Patel was prima facie entitled to the recovery of his money. In place of the basic rule and limited exceptions to which I referred at para 44 above, I would hold that a person who satisfies the ordinary requirements of a claim in unjust enrichment will not prima facie be debarred from recovering money paid or property transferred by reason of the fact that the consideration which has failed was an unlawful consideration. I do not exclude the possibility that there may be particular reason for the court to refuse its assistance to the claimant, applying the kind of exercise which Gloster LJ applied in this case, just as there may be a particular reason for the court to refuse to assist an owner to enforce his title to property, but such cases are likely to be rare. (At para 110 I gave the example of a drug trafficker.) In Tappenden v Randall (1801) 2 Bos & Pul 467, 471, 126 ER 1388 , 1390, a case of a successful claim

for the repayment of money paid for an unenforceable consideration which failed, Heath J said obiter that there might be "cases where the contract may be of a nature too grossly immoral for the court to enter into any discussion of it: as where one man has paid money by way of hire to another to murder a third person". The case was mentioned by the Law Commission (LCCP 189, para 4.53), but there is a dearth of later case law on the point. This is hardly surprising because a person who takes out a contract on the life of a third person is not likely to advertise his guilt by suing. But as a matter of legal analysis it is sufficient for present purposes to identify the framework within which such an issue may be decided. No particular reason has been advanced in this case to justify Mr Mirza's retention of the monies beyond the fact that it was paid to him for the unlawful purpose of placing an insider bet.

117  In support of his argument that this purpose was sufficient to disentitle Mr Patel from obtaining the return of his money, Mr Collings relied on cases such as Parkinson v College of Ambulance Ltd [1925] 2 KB 1 . In that case the plaintiff made a donation to a charity to secure a knighthood. When the honour failed to materialise he sued for the return of his money. The claim was rejected.

118  Bribes of all kinds are odious and corrupting, but it does not follow that it is in the public interest to prevent their repayment. There are two sides to the equation. If today it transpired that a bribe had been paid to a political party, a charity or a holder of public office, it might be regarded it as more repugnant to the public interest that the recipient should keep it than that it should be returned. We are not directly concerned with such a case but I refer to it because of the reliance placed on that line of authorities.

119  Since criticism was made of the Court of Appeal's decision in Mohamed v Alaga and Co , I would affirm its correctness and reject the view that it should somehow be confined to its own peculiar facts. With hindsight, it is perhaps unfortunate that this court did not have the opportunity of considering a claim by Miss Hounga for a quantum meruit.

**Summary and disposal**

120  The essential rationale of the illegality doctrine is that it would be contrary to the public interest to enforce a claim if to do so would be harmful to the integrity of the legal system (or, possibly, certain aspects of public morality, the boundaries of which have never been made entirely clear and which do not arise for consideration in this case). In assessing whether the public interest would be harmed in that way, it is necessary a) to consider the underlying purpose of the prohibition which has been transgressed and whether that purpose will be enhanced by denial of the claim, b) to consider any other relevant public policy on which the denial of the claim may have an impact and c) to consider whether denial of the claim would be a proportionate response to the illegality, bearing in mind that punishment is a matter for the criminal courts. Within that framework, various factors may be relevant, but it would be a mistake to suggest that the court is free to decide a case in an undisciplined way. The public interest is best served by a principled and transparent assessment of the considerations identified, rather by than the application of a formal approach capable of producing results which may appear arbitrary, unjust or disproportionate.

121  A claimant, such as Mr Patel, who satisfies the ordinary requirements of a claim for unjust enrichment, should not be debarred from enforcing his claim by reason only of the fact that the money which he seeks to recover was paid for an unlawful purpose. There may be rare cases where for some particular reason the enforcement of such a claim might be regarded as undermining the integrity of the justice system, but there are no such circumstances in this case. I would dismiss the appeal.

Lord Kerr: (agrees with Lord Toulson)

122  For the reasons given by Lord Toulson, with which I completely agree, I consider that this appeal should be dismissed.

123  The approach commended by Lord Toulson does not involve engaging with "an open and unsettled range of factors" — Lord Mance at para 192 of his judgment. On the contrary, as I see it, Lord Toulson's judgment outlines a structured approach to a hitherto intractable problem. It is an approach,

moreover, which, if properly applied, will promote, rather than detract from, consistency in the law. And it has the added advantage of avoiding the need to devise piecemeal and contrived exceptions to previous formulations of the illegality rule.

124  Central to Lord Toulson's analysis is the "trio of considerations" which he identified in para 101 of his judgment. The first of these involves an examination of the underlying purpose of the "prohibition which has been transgressed". By this, I understand Lord Toulson to mean the reasons that a claimant's conduct should operate to bar him or her from a remedy which would otherwise be available. That such reasons should be subject to scrutiny is surely unexceptionable. Whether in order to preserve "the integrity of the legal system" (*per* McLachlin J in Hall v Hebert [1993] 2 SCR 159 at 169) or to allow a proper understanding of the true nature of the public policy imperative for recognising a defence of illegality, the purpose of the denial of a remedy to which the claimant would otherwise be entitled should be clearly understood.

125  As it happens, McLachlin J disagreed with Cory J's suggestion that the doctrine of *ex turpi causa non oritur actio* should be replaced with a power vested in the courts to reject claims on "considerations of public policy" — p 168. But what is the preservation of the integrity of the legal system, if not a public policy consideration? Moreover, the underpinning of the preservation of that integrity (which McLachlin J said was that a person in a civil suit should not be permitted "to profit from illegal or wrongful conduct" or to benefit from "an evasion or rebate of a penalty prescribed by the criminal law") is *par excellence* a public policy consideration. And McLachlin J seemed to acknowledge as much when she said (at p 169) that the principle could be described "by an old-fashioned Latin name or by the currently fashionable concept of 'public policy'".

126  It is doubtful that a public policy consideration in the context of the defence of illegality could now be properly described as a "currently fashionable" concept. Indeed, in a number of cases that I will refer to briefly below, the maxim *ex turpi causa* has been recognised in this country as an *expression of policy*, rather than a principle. And in Canada it appears to be accepted that the weighing of public policies is the

proper approach to take in order to determine whether a defence of illegality should be allowed to prevail. In Still v Minister of National Revenue (1997) 154 DLR (4th) 229 (which is discussed by Lord Toulson in paras 58 *et seq* of his judgment) the Federal Court of Appeal considered that the doctrine of illegality now "rests on the understanding that it would be *contrary to public policy* to allow a person to maintain an action on a contract prohibited by statute" (emphasis supplied). On that basis, Robertson JA, who delivered the judgment of the court, said that it was necessary to identify the policy considerations which outweighed the applicant's right to a remedy. Although this was said in relation to competing policy goals in two items of legislation, there is no reason not to adopt the same approach in evaluating rival policy considerations in the non-statutory context.

127    To take this case as an example, why should Mr Mirza's wrongful retention of Mr Patel's money not be weighed against the undoubted illegality on the part of Mr Patel in entering an agreement to wrongly benefit from Mr Mirza's claimed ability to obtain access to insider information? If one concentrates on the illegal nature of the contract to the exclusion of other considerations, an incongruous result in legal and moral terms may be produced. This can be avoided by taking into account and giving due weight to the second and third of Lord Toulson's considerations *viz* countervailing public policies which would be wrongly discounted by denial of the claim and the proportionality of refusing to acknowledge its legitimacy.

128    It is, of course, possible to reach the same outcome that a weighing of the competing policy considerations produces by treating this case as one of unjust enrichment which warranted returning the parties to the position that they occupied before the transaction. This is on the basis that the court is not required to give effect to the illegal contract in order to find that Mr Mirza should not be allowed to retain Mr Patel's money. It would "simply return the parties to the status quo ante where they should always have been." — Lord Sumption at para 268. That seems to me, however, to be a much more adventitious and less satisfactory route to the proper disposal of the case than that represented by a rounded assessment of the various public policy considerations at stake.

129    Moreover, if the *ex turpi causa* axiom is itself no more than an expression of policy, the taking into account of countervailing policy considerations, in order to decide whether to give effect to it in a particular instance, is the only logical way to proceed. That is, in truth, a policy based rule has been clearly recognised. In Gray v Thames Trains Ltd [2009] UKHL 33; [2009] AC 1339 , para 30, Lord Hoffmann said that the maxim expressed, "not so much a principle as a policy" and that it did not have a single basis of justification but was rather based on "a group of reasons which vary in different situations". And in Stone and Rolls Ltd v Moore Stephens [2009] UKHL 39; [2009] AC 1391 , para 25 Lord Phillips expressly endorsed what Lord Hoffmann had said about the public policy nature of *ex turpi causa* , observing that it was necessary to consider the policy underlying it, in order to decide whether the defence of illegality was bound to defeat a claim.

130    Finally, in Les Laboratoires Servier v Apotex Inc [2012] EWCA Civ 593; [2013] Bus LR 80 , after referring (in para 66) to the Law Commission's recommendation in its 2010 Report (Law Com 320) to the effect that the illegality offence should be allowed where its application could be firmly justified by one or more of the rationales underlying it existence, Etherton LJ said, at para 73:

> "It is clear, then, that the illegality defence is not aimed at achieving a just result between the parties. On the other hand, the court is able to take into account a wide range of considerations in order to ensure that the defence only applies where it is a just and proportionate response to the illegality involved in the light of the policy considerations underlying it."

131    Lord Sumption has said in para 262(iii) of his judgment in this case that this court in Les Laboratoires Servier [2015] AC 430 had overruled the view expressed by the Court of Appeal that "an illegal act might nevertheless found a cause of action if it was not

as wicked as all that". That may be so, but I do not understand the judgment of this court in Les Laboratoires Servier to have expressly rejected the notion that whether the defence should be available depends on an examination of the policy considerations which underlie it in any particular instance and those which militate against it. At para 61 of his judgment in Les Laboratoires Servier Lord Toulson quoted with approval the statement of Lord Wilson in Hounga v Allen [2014] 1 WLR 2889 at para 42 to the effect that, in considering whether to allow a defence of illegality, "it is necessary, first, to ask 'What is the aspect of public policy which founds the defence?' and, second, to ask 'But is there another aspect of public policy to which application of the defence would run counter?'" The decision in Hounga was not mentioned in the judgment of the majority in Les Laboratoires Servier .

132  Lord Sumption did refer to Hounga , however, in the later case of Bilta (UK) Ltd v Nazir (No 2) [2016] AC 1 . He sought to explain the decision in Hounga on the basis that Ms Hounga did not rely, and did not need to rely, on the circumstances in which she had entered the United Kingdom (she had entered illegally). This is correct but she *did* need to rely on the fact of her employment in advancing a claim for unlawful discrimination in her dismissal from that employment. Since the employment was not legally sanctioned, she was therefore confronted with the illegality defence and, indeed, the Court of Appeal had held that the illegality of the contract of employment formed a material part of Ms Hounga's complaint and that to uphold it would be to condone the illegality. It was held in Hounga that the appellant's claim was not inextricably linked to her illegal conduct. On that account her action could not be defeated on the basis that her contract of employment was illegal. But Lord Wilson's discussion of the manner in which competing public policy considerations should be viewed, in calculating whether a defence of illegality should be permitted to defeat an otherwise viable claim, unquestionably forms part of the ratio of the decision.

133  The way is now open for this court to make its choice between, on the one hand, cleaving to the rule-based approach exemplified by Tinsley v Milligan [1994] 1 AC 340 and, arguably, the decision of the majority in Les Laboratoires Servier , and, on the other, a more flexible approach, taking into account the policy considerations that are said to favour recognising the

defence of illegality, those which militate against such recognition and the proportionality of allowing the defence to prevail. In Bilta (UK) Ltd Lord Neuberger said that the proper approach to the defence of illegality needed to be addressed by this court "as soon as appropriately possible" — para 15. This case unmistakably presents us with the opportunity to address the question and for the reasons given by Lord Toulson, I believe that the approach which he commends is plainly to be preferred.

134  A rule-based approach to the question of the effect of illegality on the availability of a remedy has failed to deliver on what some have claimed to be its principal virtues *viz* ease of application and predictability of outcome. This case exemplifies the point. There was a sharp but perfectly respectable difference of view in the judgments of the Court of Appeal as to whether the necessary ingredient of reliance on the illegal aspect of the agreement between Mr Mirza and Mr Patel was present. This is hardly surprising. In many situations in which transactions between parties are tainted by some form of illegality, it is not always easy to decide what it is that needs to be relied on when an unravelling of those transactions or some means of dealing with their failure is sought.

135  On the question of unravelling or unpicking an agreement, I do not consider that Tinsley is an example of the court conducting an unravelling exercise or of its returning the parties to the *status quo ante* . This much is clear from the speech of Lord Browne-Wilkinson at 376F of the report:

> "… Miss Milligan established a resulting trust by showing that she had contributed to the purchase price of the house and that there was common understanding between her and Miss Tinsley that they owned the house equally. She had no need to allege or prove *why* the house was conveyed into the name of Miss Tinsley alone, since that fact was irrelevant to her claim: it was enough to show that the house was in fact vested in Miss Tinsley alone. The illegality only emerged at all because Miss Tinsley sought to raise

it. Having proved these facts, Miss Milligan had raised a presumption of resulting trust. There was no evidence to rebut that presumption. Therefore, Miss Milligan should succeed." (original emphasis)

136   In effect, in Tinsley the majority *gave effect* to rather than unravelled the illegal agreement made between the parties. The agreement was that the ownership of the house should be shared equally between Miss Milligan and Miss Tinsley, and that they should represent to the Department of Social Security that it was owned solely by Miss Tinsley. It was because Miss Milligan did not need to rely on the illegal component of the agreement (that they make the false representation to the department) that she was able to succeed. This was not, therefore, a case of unravelling the agreement or restoring the parties to the *status quo ante* . To the contrary, it was an instance of segregating the illegal part of the agreement from that which, it was considered, could be enforced. Reference to or reliance on the objectionable part could thereby be avoided. To claim that such a contrivance produces a predictable, much less a certain, outcome, for such arrangements is, I believe, extremely far-fetched.

137   Even if the claim to predictability of outcome for the reliance test could be made good, however, it is questionable whether particular weight should be given to this consideration in circumstances where a claimant and defendant have been parties to an agreement which is plainly illegal. Certainty or predictability of outcome may be a laudable aim for those who seek the law's resolution of genuine, honest disputes. It is not a premium to which those engaged in disreputable conduct can claim automatic entitlement. For the reasons I have given, however, I do not believe that outcomes are easier to forecast on a rule-based approach.

138   Quite apart from the difficulty in predicting whether a claimant has to rely on the illegal dimension of an agreement in order to advance his claim, there is something unattractive and contrived about the means by which attempts have to be made in order to avoid the spectre of reliance. Professor Burrows in his *Restatement of the English Law of Contract* (Oxford University Press) outlined what he described as his single reliance master rule at p 224 in this way:

> "If the formation, purpose or performance of a contract involves conduct that is illegal (such as a crime) or contrary to public policy (such as a restraint of trade), a party cannot enforce the contract if it has to rely on that conduct to establish its claim."

139   In this case the formation of the contract, its purpose and its performance *all* involved illegality. Under the single reliance master rule, it is said that all of this can be ignored because it is not necessary to rely on the terms of the agreement, other than to demonstrate that there was no legal basis for the payment of the money to Mr Mirza. So, the looming presence of illegality does not require to be confronted at all. The issue is side-stepped and avoided. This cannot be the correct way in which to deal with the impact of illegality — in fact, under this approach, illegality is not addressed at all. It is surely better and more principled to examine why illegality should or should not operate to deny Mr Patel a remedy.

140   Returning the parties to the status quo ante likewise side-steps the issue of illegality. This approach proceeds on the basis that the transaction should simply never have taken place or that the parties should be returned to the condition that they ought always to have occupied. The contract is unpicked because it should not have been made. Mr Mirza is deprived of the money because it is unjust enrichment. No examination of the effect that the illegality has is warranted; recognition that there has been unjust enrichment is all that is required.

141   This is objectionable not only because it effectively ignores the illegality that surrounded the making of the contract but also because it produces an inconsistent result with that which is founded on a breach of contract claim. This leads to what Professor Peter Birks, in an

article entitled, "Recovering Value Transferred under an Illegal Contract" (2000) 1 TIL 155 , describes as self-stultification. Entitlement to restitution of money paid on foot of an illegal contract on the basis of unjust enrichment makes a nonsense, he says, of refusal to enforce the contract and, at p 160, it is "important that the law as stated in one area should not make nonsense of the law as stated in another".

142  Self-stultification can be avoided by adoption of the approach suggested by Lord Toulson. His mode of analysis requires examination of the justification for the defence of illegality in whatever context it arises, not a decision to circumvent the defence because of the type of remedy that is claimed. That appears to me to be a much more principled approach than one which avoids having to engage with the merits of the defence at all. Not having to engage with the merits on the basis that one does not have to rely on the illegality is a matter of fortuity. Because of that incidental circumstance an avenue to an equivalent outcome to that which would result from enforcement of the contract opens up. An examination of the impact of the illegality becomes irrelevant. That this should be a matter of happenstance is deeply unsatisfactory.

143  Lord Toulson's solution to this question also permits readier access to investigation of the traditional justifications for the *ex turpi causa* maxim — preservation of the integrity of the legal system and preventing profit from wrongdoing. If, on examination of the particular circumstances of the case, these can be shown to weigh heavily in the balance, it is more likely that the defence will be upheld. Carving out an exception to the application of the defence on the basis that it does not affect a claim for unjust enrichment where the illegality of the claimant does not require to be relied on does nothing to directly protect or uphold these values.

144  For these reasons and those given by Lord Toulson, I would dismiss the appeal.

Lord Neuberger:

145  The present appeal concerns a claim for the return of money paid by the claimant to the defendant pursuant to a contract to carry out an illegal activity, and the illegal activity is not in the event proceeded with owing to matters beyond the control of either party.

**The specific issue on this appeal**

146  In such a case, the general rule should in my view be that the claimant is entitled to the return of the money which he has paid. In the first place, such a rule ("the Rule") is consistent with the law as laid down in the 18th century by two eminent judges, one of whom is regarded as the founder of many aspects of the common law, including illegality; in addition it has support from some more modern cases. Secondly, the Rule appears to me to accord with policy, which is particularly important when illegality arises in the context of a civil claim. Thirdly, the Rule renders the outcome in cases in one area of a very difficult topic, that of contracts involving illegality, and the maxim *ex turpi causa non oritur actio* (ie that no claim can be based on an illegal or immoral arrangement), relatively clear and certain.

147  I turn first to the authorities. In Smith v Bromley (1760) 2 Doug KB 696n , the Court of King's Bench permitted a plaintiff to recover money she had paid to someone who had agreed to procure her brother's discharge from bankruptcy, which was an illegal consideration. Lord Mansfield CJ said at p 698 in the course of his judgment that, although the payment had been made for an illegal purpose:

> "Upon the whole, I am persuaded it is necessary, for the better support and maintenance of the law, to allow this action; for no man will venture to take, if he knows he is liable to refund."

Lord Mansfield subsequently followed this approach in Walker v Chapman (1773) Lofft 342 , where a bribe to the defendant to secure a job for the plaintiff in Government service was held recoverable, in circumstances where the job was not in fact obtained.

148  In Neville v Wilkinson (1782) 1 Bro CC 543 , 547 Lord Thurlow LC approved this approach, and "declared his opinion" that:

"[I]n all cases where money was paid for an unlawful purpose, the party, though *particeps criminis* , might recover at law; and that the reason was, that if courts of justice mean to prevent the perpetration of crimes, it must be not by allowing a man who has got possession to remain in possession, but by putting the parties back to the state in which they were before."

149   In the following century, the same approach was adopted in Taylor v Bowers (1876) 1 QBD 291 (which involved transfer of goods rather than of cash). Cockburn CJ said at first instance at p 295 that it was "well established" that "where money has been paid, or goods delivered, under an unlawful agreement, but there has been no further performance of it", then "the party paying the money or delivering the goods may repudiate the transaction, and recover back his money or goods". The Court of Appeal agreed, and at p 300 Mellish LJ, with whom Baggallay JA and Grove J agreed, said this:

"To hold that the plaintiff is enabled to recover does not carry out the illegal transaction, but the effect is to put everybody in the same situation as they were before the illegal transaction was determined upon, and before the parties took any steps to carry it out … "

It is true that the actual decision in that case can be justified on the ground that property in the goods concerned had never passed (which was the basis of James LJ's judgment), but it seems to me that the reasoning of Mellish LJ, like that of Cockburn CJ, reflects the proposition found in the 18th century judgments I have quoted.

150   It is also fair to say that Fry LJ doubted the correctness of Mellish LJ's dictum in Kearley v Thomson (1890) 24 QBD 742 , 746, and that in some subsequent cases the principle has not been applied. An obvious example is Parkinson v College of Ambulance [1925] 2 KB 1 , where a donor was held to be disentitled from recovering a gift to a charity obtained by the charity's illegal (and dishonest) promise to obtain an honour for the donor. I consider that that case was wrongly decided. It seems to me that the judgment in that case got close to representing what Bingham LJ described as the court "on the first indication of unlawfulness affecting any aspect of a transaction, draw[ing] up its skirts and refus[ing] all assistance to the plaintiff, no matter how serious his loss nor how disproportionate his loss to the unlawfulness of his conduct" (which he considered to be "unacceptable") — Saunders v Edwards [1987] 1 WLR 1116 , 1134. I agree with the view that the decision in Parkinson represented "a new and regrettable extension of the scope of the maxim" of *ex turpi causa* (to quote from Professor Grodecki's article (1955) 71 LQR 254, 263), and I consider that it should be overruled.

151   The Rule also derives some support from the Court of Appeal's decision in Tribe v Tribe [1996] Ch 107 , where the plaintiff was held to be entitled to recover shares which he had transferred to his son in order deceptively to improve his negotiating position in relation to an anticipated claim by his landlord, which in the event did not materialise. The question for the Court of Appeal was whether, following the controversial decision of the House of Lords in Tinsley v Milligan [1994] 1 AC 340 (the details of which are set out in paras 17-19 above), the father could "rebut the presumption of advancement by giving evidence of his illegal purpose", to quote from Millett LJ's judgment at pp 129H-130A. It was held that he could, on the basis that "[t]he transferor can lead evidence of the illegal purpose whenever it is necessary for him to do so provided that he has withdrawn from the transaction before the illegal purpose has been wholly or partly carried into effect" — per Millett LJ at pp 134G-H.

152   There is some support in the cases for the notion that different considerations should apply depending whether the claimant's claim for return of money or property paid pursuant to an unperformed illegal contract is based on a common law claim or a claim in

equity (compare the Privy Council decisions in Singh v Ali [1960] AC 167 and Chettiar v Chettiar [1962] AC 294 ). I do not consider that such a distinction is appropriate (and it may be that in that connection I differ from Millett LJ in Tribe at p 129G — although see at p 130E). I agree with Lord Browne- Wilkinson's observation in Tinsley at p 371, where he said that "[i]f the law is that a party is entitled to enforce a property right acquired under an illegal transaction, … the same rule ought to apply to any property right so acquired, whether such right is legal or equitable".

153   That proposition is supported, as I see it, by the second reason supporting the Rule, namely policy. As Millett LJ said in Tribe at p 133F, "the justification for this rule [which precludes the court from lending its assistance to a man who founds his cause of action on an illegal or immoral act] is not a principle of justice but a principle of policy", citing Lord Mansfield in Holman v Johnson (1775) 1 Cowp 341 , 343. That approach is also supported by Lord Hoffmann in Gray v Thames Trains Ltd [2009] AC 1339 , para 30, where he went on to say that the "policy is not based upon a single justification but on a group of reasons, which vary in different situations". Similarly, in Bakewell Management Ltd v Brandwood [2004] 2 AC 519 , para 60, Lord Walker said that "the maxim *ex turpi causa* must be applied as an instrument of public policy, and not in circumstances where it does not serve any public interest".

154   More broadly, it appears to me that policy supports the Rule, in part for the simple reasons given in the passages cited in para 147 above. Further, as Lord Mance points out, there is obvious attraction in the notion that, if all transfers made pursuant to an unexecuted illegal contract are re-transferred, then the parties are back in the position that they were, ie as if there had been no illegal contract, which again would seem to comply with policy.

155   It also appears to me that the Rule is consistent with the approach adopted in McLachlin J's analysis in the Canadian Supreme Court case Hall v Hebert [1993] 2 SCR 159 , 176. She explained that the basic justification for refusing relief to a plaintiff who relied on an illegal contract was that "to allow recovery … would be to allow recovery for what is illegal. It would put the courts in the position of saying that the same conduct is both legal, in the sense of being capable of rectification by

the court, and illegal. It would, in short, introduce an inconsistency in the law". Later at pp 179–180, she suggested that the court's "power" to refuse relief in a claim where illegality is involved "is a limited one" and that the use of the power "is justified where allowing the plaintiff's claim would introduce inconsistency into the fabric of the law, either by permitting the plaintiff to profit from an illegal or wrongful act, or to evade a penalty prescribed by criminal law". This approach (which is more fully analysed by Lord Mance) finds an echo in Lord Rodger's observation in Gray , para 82, that "the civil court should cleave to the same policy as the criminal court".

156   For some time, it was assumed that the Rule could be invoked not merely when the anticipated illegal purpose not been proceeded with at all, but with the super-added requirement that it had not done so because of the "repentance" of the plaintiff who was seeking to get his money back. Like Millett LJ in Tribe at p 135D- E, I would reject that notion. As he said, "[j]ustice is not a reward for merit", and in any event the notion that repentance is needed "could lead to bizarre results". Further, a claimant's repentance may be born of, or combined with, self-interest, in which case, if repentance is the essential factor, the court would face a real difficulty. In my opinion, the notion that the application of a rule should depend on whether or not the claimant has repented typifies the inappropriately moralistic approach of some courts when they have to deal with claims based in some way on illegality, which was rightly criticised by Bingham LJ in Saunders [1987] 1 WLR 1116 , 1134. Rather, the courts should adopt a more objective and analytical approach like that of McLachlin J in Hall .

157 Quite apart from principle, it appears to me that the Rule would establish, or maintain, a degree of clarity and certainty in relation to one aspect of the law on the vexed topic of the effect of illegality on contractual claims. One thing which is clear from reading only some of the large number of judgments on the law on that topic over the past 350 years is the inconsistency of reasoning and outcome in different cases. Those responsible for making and developing the law in any area must strive to achieve as much clarity and as much certainty as are consistent with principle and practicality.

158   There is, I acknowledge, some attraction in the point that the need for certainty in this area is diminished by the fact that parties to an arrangement which is illegal have less cause for complaint if the law is uncertain. However, criminals are entitled to certainty in the law just as much as anyone else. In any event, third parties are often affected by the enforceability of rights acquired or lost under contracts, and innocent third parties, it could be said with force, are in a particularly strong position to expect certainty and clarity from the law. Quite apart from this, there is a general public interest in certainty and clarity in all areas of law, not merely because it is a fundamental aspect of the rule of law, but also because the less clear and certain the law on any particular topic, the more demands there are on the services of the courts.

159   That leaves open two issues. First, the issue of what constitutes an illegal contract for the purpose of the Rule. In my view, as a general proposition, the rule would apply to any contract where the illegality would result in the court (if it could otherwise do so) not being able to order specific performance of the contract or damages for its breach. It would thus normally apply to any contract whose performance would inevitably involve the commission of a crime (i) because the whole purpose of the contract was the commission of a crime (eg a contract killing), or (ii) because it was a contract whose essential ingredient was the commission of a crime (the present case is an example), or (iii) because the contract could not be performed without the commission of a crime. In practice, of course, category (iii) would cover the other two categories, but setting out the three categories may help to illustrate the extent of the application of the rule.

160   As to category (iii), I have difficulties in seeing how a court could order specific performance of a contract which necessarily involved one or other of the parties committing a crime (even a minor crime). Requiring the contract to be performed would involve the court ordering a party to act illegally: that cannot be a course open to a court. For the same reason I have difficulties in seeing how a court could normally award damages for breach of such a contract. Conceptually, damages are a substitute for non-performance, and performance is not something the court can award; and it seems inconsistent with the court's function to penalise a defendant in damages for not doing something illegal or to compensate a claimant for not having a benefit which would have required either or both of the parties doing something illegal. For the court to make an order for specific performance or damages in such cases would seem to infringe the principle of consistency discussed in the judgment of McLachlin J in Hall .

161   The second issue is foreshadowed by the fact that I have described the Rule as being generally applicable. That is because the need for certainty must, particularly given the importance of policy, yield to the fact that, in this difficult and potentially multi-faceted area, there will inevitably be exceptions. Experience and common sense both suggest that any attempt to lay down a clear and inflexible rule on even one aspect of the topic of illegality in the context of contractual claims will lead to difficulties. (Both the majority and the minority reasoning in Tinsley are a good example of this). Indeed, the very fact that the approach of the courts in cases on this topic is based on policy suggests that strict immutable rules are inappropriate. Nonetheless, that does not negate any attempt to identify principles such as that suggested by McLachlin J and general rules such as that described in the cases mentioned in paras 147 and 148 above. The fact that the approach of the law to contracts with an illegal aspect is based on policy does not discharge judges from the normal duty of ensuring that the law on any topic is as clear and certain as it can be.

162   By way of example, I would mention two possible exceptions. First, where one of the parties, especially the defendant, is in a class which is intended to be protected by the criminal legislation involved, it may well be inappropriate to invoke the Rule. Secondly, there could well be no recovery (or only partial recovery) by a plaintiff where the defendant was unaware of the facts which gave rise to the illegality — especially if he had received the money and had altered his position so that it might be oppressive to expect him to repay it. There will no doubt be other exceptions, but I do not think that that undermines the usefulness of having the Rule as the prima facie or presumptive approach. (I discuss in paras 172-175 below with the test for determining whether it is appropriate to apply the Rule in any particular case).

163   In the present case, Mr Patel paid £620,000 to Mr Mirza pursuant to a contract, under which Mr Mirza

was to use the money to trade in RBS shares with the benefit of inside information for their common benefit. That was a contract whose agreed fundamental purpose was illegal. In fact, the anticipated inside information was not forthcoming and the contract effectively lapsed. I can see no good reason on these simple facts for not applying the Rule and accordingly I consider that Mr Patel is entitled to the return of the £620,000.

**Venturing further**

164  The majority, and indeed Lord Mance and Lord Sumption, would go wider in their judgments on this appeal, by laying down some wider and more general principles or rules relating to the effect of illegality on contracts. There is considerable attraction in doing so, not least because the law is in a state of uncertainty. The reasoning of the majority in the most recent decision of the House of Lords, Tinsley , is generally thought to be unsatisfactory: for a convincing analysis see the judgments in the decision of the High Court of Australia in Nelson v Nelson (1995) 184 CLR 538 (discussed more fully in paras 50-54 above). And the result arrived at by the minority in Tinsley is plainly unsatisfactory. I fear that the different approaches adopted by members of this court in the recent cases of Hounga v Allen [2014] 1 WLR 2889 , Les Laboratoires Servier v Apotex Inc [2015] AC 430 and Bilta (UK) Ltd v Nazir (No 2) [2016] AC 1 have left the law on the topic in some disarray. As I said in Bilta , para 15, "the proper approach to the defence of illegality needs to be addressed by this court (certainly with a panel of seven and conceivably with a panel of nine Justices) as soon as appropriately possible".

165  Nonetheless, there are arguments for not looking more widely at the issue of illegality in the contractual context. Thus, in all three recent Supreme Court cases (as in the present one), while there are some fairly sharp differences of opinion as to the proper approach, there is no real dispute as to the outcome. More broadly, the common law traditionally develops on a case by case basis, and there are self- evident dangers for a court to paint on an unnecessarily broad canvas, particularly bearing in mind that it is proceeding by reference to the facts of one particular case. And that can be said to be particularly true in the area of illegal contracts, where, as already mentioned, experience has shown that it is a topic fraught with difficulties, as is evidenced by

the fact that the reasoning and outcomes in a number of cases concerning contracts affected by illegality over the past 300 years are hard to reconcile. Reading those cases also shows that it would be impossible to envisage, and therefore to cater for, every type of problem which might arise in this field.

166  Nonetheless, it seems to me right to venture further in this case, essentially for the reasons summarised in para 164 above.

167  The first general point I should make is that, in my view, even where the contemplated illegal activity has been performed in part or in whole, it would be right to apply the Rule in appropriate cases. Thus, in the case of an illegal contract where money is paid by the claimant to the defendant, and the contract is then partly or wholly performed by the defendant paying a lesser sum to the claimant, I do not see why, at least in the absence of good reasons to the contrary, the court should not order that the claimant should recover the money that he paid the defendant, albeit reduced by the lesser sum which the claimant subsequently received from the defendant. Similarly, where the contract is wholly performed.

168  In effect, the reasons supporting the application of the Rule in cases where the illegal activity has not occurred, apply for the same reasons to contracts where the contemplated illegal activity has been wholly or partly performed. And there is the added reason of consistency with a case where the contract has not been performed. Thus, in my view, if the defendant in this case had only been able to purchase just a few shares on inside information and had accounted to the claimant for the proceeds of sale of those shares in the sum of, say £10,000, the contract would have been partly performed, but I consider that the claimant could have successfully sued to recover the £620,000 he had paid, less the £10,000 which he had received.

169  There are, I think, three arguments against such a conclusion. The first is that there are a number of judgments, including those in and Taylor v Bowers 1 QBD 291 , Kearley v Thomson 24 QBD 742 and Tribe v Tribe [1996] Ch 107 , where it has been expressly stated that the Rule only applies where the "illegal purpose has [not] been wholly or partly performed" to quote from Millett LJ in Tribe at p 124E. However,

perhaps particularly once one strips away the notion that repentance is irrelevant, I can see no good reason for not extending the rule to partly or even wholly performed contracts where *restitutio in integrum* can be achieved in practical terms and would be consistent with policy and proportionality. In the present case, for example, it would seem to be penal on the claimant that he could be deprived of £610,000 (and by the same token it would seem absurdly gratuitous that the defendant could benefit to the tune of £610,000) simply because the contract had been performed to a small extent.

170  Secondly, it may be argued that, once the contract has been partly performed, the basis for *restitutio in integrum* has gone. But that argument is only right if the basis of the Rule is total failure of consideration. In my view, that is not necessarily the correct analysis (unless the illegal consideration for which the money was paid is treated in law as no consideration, because it is illegal). Indeed, in the end, the correct analysis is not the centrally important issue, given that the question as to how the court deals with illegal contracts is ultimately based on policy. The ultimate function of the courts in common law and equity is to formulate and develop rules of a clear and practical nature. Now that the judiciary (rightly) pay more attention than we did to legal books and articles, we judges can look to legal academics not only to identify what they think are judicial inconsistencies and errors, but also to develop and modify their analyses of legal principles when we consider it necessary to change, develop or clarify the law.

171  Thirdly, it may be said that application of the Rule would result in the court sometimes getting precious close to enforcing an illegal contract — a course which the court most certainly cannot take, as already mentioned. I accept that application of the Rule would sometimes involve the court making an order whose effect in practice is similar to performance of the illegal contract. But there is nothing in that point. If a particular outcome is correct, then the mere fact that the same outcome could have been arrived at on a wrong basis does not make it the wrong outcome. Indeed, it is worth noting that the outcome in Tribe was precisely what it would have been if the contract in question had been enforced. The father had transferred the shares on the basis that it would help him avoid a threatened claim and that they would be transferred back when

the claim was no longer threatened; he sought an order for the retransfer after the threat had gone away, and application of the rule resulted in that order.

172  That, of course, leaves open what would constitute "an appropriate case" for the application of the Rule and "good reasons to the contrary" for these purposes. The exceptions which I have referred to in para 162 above would be examples of where it might not be appropriate to invoke the Rule. However, it seems to me to be clear that there could be many other circumstances where application of the Rule would not be appropriate in circumstances where the illegal activity has been wholly or partly put into effect.

173  In that connection, some assistance can be obtained from the guidance given by McLachlin J. Beyond that, it may be that some or all of the factors identified by Professor Burrows in the passage quoted by Lord Toulson in para 93 above could be relevant depending on the facts and issues in any particular case. However, I am not convinced that it is helpful to list all the potentially relevant factors and say that it is a matter for the court in each case to decide which of those factors apply in that case and what weight to give them. Once a judge is required to take into account a significant number of relevant factors, and the question of how much weight to give each of them is a matter for the judge, the difference between judgment and discretion is, I think, in practice pretty slight.

174  I have come to the conclusion that the approach suggested by Lord Toulson in para 101 above provides as reliable and helpful guidance as it is possible to give in this difficult field. When faced with a claim based on a contract which involves illegal activity (whether or not the illegal activity has been wholly, partly or not at all undertaken), the court should, when deciding how to take into account the impact of the illegality on the claim, bear in mind the need for integrity and consistency in the justice system, and in particular (a) the policy behind the illegality, (b) any other public policy issues, and (c) the need for proportionality.

175  I must admit that I was initially not attracted by this approach because it seemed close to giving a discretion to judges when it comes to deciding how to deal with a claim based on a contract with an illegal element. However, on further reflection, it appears to me

that, unlike the multi-factorial approach proposed by Professor Burrows, the structured approach proposed by Lord Toulson is not akin in practice to a discretion, and, in any event, it is the best guidance that can sensibly be offered at the moment. Experience shows that it is simply not possible to identify a more helpful or rigorous test. When considering whether it is possible to give more specific or firm guidance, I have considered some examples, which ultimately have helped to persuade me that greater clarity, strictness or specificity is simply not possible, at any rate at this stage, and they have served to conform the aptness of the approach set out in para 101 above.

176  A simple example is a case where the consideration for which the claimant paid or owed money was inherently illegal, rather than happening to involve an illegal act in order to be achieved. In such cases, it seems to me that considerations of certainty and policy indicate that the claimant should generally be able to refuse to pay any money which is due under the contract and, indeed, to recover the money he had paid. Thus, if the claimant paid a sum to the defendant to commit a crime, such as a murder or a robbery, it seems to me that the claimant should normally be able to recover the sum, irrespective of whether the defendant had committed, or even attempted to commit, the crime. If the defendant had not attempted the crime, the Rule would generally apply. If he had actually succeeded in carrying out the crime, he should not be better off than if he had not done so. I suppose one could justify that conclusion on the ground that the law should not regard an inherently criminal act as effective consideration.

177  That example might appear to suggest that more specific guidance could be given. However, even in relation to cases of the type described in para 176, there could be exceptions such as those mentioned in para 162 above. And, bearing in mind the enormous number of different crimes and different factual circumstances which could arise, it would be little short of foolhardy to imagine that there could not be other cases of this type where it would be inappropriate to apply the Rule.

178  Further, different considerations would often, I suspect very often, apply where the contract was not inherently illegal, but necessarily involved an illegal action. An extreme case might be where an employer employed a builder to carry out construction work

which they both knew would inevitably require the builder to park illegally — say on a double red line. As already explained in para 160 above, if the defendant refused to carry out the work, the contract could not be enforced prospectively by the employer, but he would be entitled to recover any money he had paid. However, if the builder carried out the work, the employer would not be able to avoid liability to pay in full: the fact that the defendant could not perform his obligations under the contract without committing a relatively technical and incidental crime would not deprive him of the right to payment in full for such performance.

179  However, greater problems and uncertainties could arise in other cases — eg where the nature of the criminal activity was more serious and/or more central to the activity involved, where the illegal activity was expressly included in the contract, or where one of the parties did not know or intend that the activity in question to be carried out was illegal but the other did, or where the proceedings arose out of the fact that such a contract had only been partly performed.

180  Further, where a claimant has performed his part of a contract which was inherently lawful but was unlawful for some other reason, there is real room for debate in any particular case whether he should be entitled to claim payment on a *quantum meruit* basis, even though he cannot enforce his right to contractual payment — compare Mohamed v Alaga & Co [2000] 1 WLR 1815 and Taylor v Bhail [1996] CLC 377 . While it would be possible to lay down a general rule as to whether or not a claimant could recover in such a case, it seems to me to be more satisfactory for the outcome to turn on the factors mentioned in para 174 above.

181  Similarly, it seems to me that the justification for the decision of the majority in Tinsley was, as Lord Toulson says, that it would have been disproportionate to have refused to enforce Miss Milligan's equitable interest in the relevant property on the grounds of her illegal activity, and the policy behind the law making the activity in question illegal was not infringed by acceding to her claim.

182  It is also worth referring back to the two examples set out in para 162 above. If the purpose of rendering an activity illegal is to protect a class of persons which includes only one of the parties to the contract,

then, absent any other argument based on policy or proportionality, it would seem appropriate that that party should not be disadvantaged by the illegality, and/or should be entitled to rely on the fact that the activity is illegal, as against the other party. And, if a claimant seeks recovery of money paid to a defendant under a contract which can only be performed illegally, and has not been performed, proportionality and policy may well justify the court refusing repayment if the defendant has spent the money and was unaware of the facts giving rise to the illegality at the time he spent it.

183  I would make three concluding points. First, quite apart from being persuaded by the reasons which justify the approach I have summarised in para 174 above, I consider that the fact that it is consistent with judgments of the courts in Australia and Canada, as explained by Lord Toulson in paras 50-61 above is a good reason for adopting the approach. When considering how to characterise, or whether to develop, any fundamental principle of the common law, it is normally sensible for a judge to consider how the principle has been approached in other common law jurisdictions, and it is desirable, if not always achievable, that all common law jurisdictions adopt the same approach.

184  Secondly, I should briefly address the fact that the criminal law and the Proceeds of Crime Act 2002 ("POCA") may inevitably have some impact on the rights and duties of parties who have entered into contracts with an illegal connection. The involvement of the criminal law played a very important part in the judgment of McLachlin J in Hall v Hebert . It seems to me to have two main components. First, it is for the criminal law, not the civil law, to penalise a party or parties for entering into and/or performing a contract with an illegal component. Secondly, in so far as the civil law is fashioned by judges in a particular case, they must ensure that it is not inconsistent with the criminal law.

185  So far as POCA is concerned, it enables the courts, through statutory powers, to do that which a common law judge cannot do, and which many might think was the best outcome in many of the more serious cases involving illegality, namely to ensure that the proceeds of crime are retained by neither party, but are paid over to the Government. This is not the occasion to discuss the effect of POCA , save to say that I would take some persuading that the common law should be influenced

by the fact that POCA is or is not being invoked in any particular case, although the civil courts should not make any order, or at least permit the enforcement of any order, if its effect would run counter to the provisions of POCA or to any step which was being contemplated under POCA by the relevant authorities.

186  Finally, I should say that, although my analysis may be slightly different from that of Lord Toulson, I do not think that there is any significant difference between us in practice. I agree with his framework for arriving at an outcome, but I also consider that there is a prima facie outcome, namely *restitution in integrum* .

Lord Mance:

187  That the law of illegality, particularly as it results from Tinsley v Milligan [1994] 1 AC 340 , merits at the highest level the consideration now being given to it, I would be among the first to accept. I indicated as much as a party to the unsatisfying decision which the Court of Appeal had to reach in Collier v Collier [2002] BPIR 1057 : see in particular para 106. Whether it is, however, appropriate to abandon basic principles going back nearly 250 years, resting on the sound appreciation of as a great a judge as Lord Mansfield CJ and approved and elucidated by the Supreme Court of Canada in an authoritatively reasoned judgment in 1993, is a different matter.

188  The basic problem, identified clearly and succinctly by Lord Mansfield in Holman v Johnson (1775) 1 Cowp 341 , is that there are at least three potential interests when questions of illegality arise for consideration: those of two parties and the public interest. It is, as he said, for reasons of public interest that an otherwise good cause of action may sometimes fail, where there has been illegality. In the absence of any relevant statutory power, the court has no direct power to mediate between these three interests, by for example requiring the public interest to be satisfied by a payment to the public purse. It does not even have the power, conferred by statute in New Zealand, to vary or validate an illegal contract in part "or otherwise howsoever" ( New Zealand Illegal Contracts Act 1970, section 7 ).

189   The application of the principle stated by Lord Mansfield was expanded in scope after his day (notably by Lord Eldon in Muckleston v Brown (1801) 6 Ves 52 as described by Lord Browne-Wilkinson in Tinsley v Milligan at p 372F. But, more recently it has diminished, Tinsley v Milligan being itself actually an example of this, in so far as it confirmed both that legal title to property could pass under an illegal contract and that equitable title was capable of recognition. The court's recognition of the equitable title was, however, made subject to the (problematic) pre-condition that the claimant could avoid reliance on illegality by relying on a procedural presumption. The court was able, in Tinsley v Milligan , to derive this presumption from the objectively demonstrable contribution made by Miss Milligan to the cost of acquiring the property. At the same time the court was prepared to ignore the fact, perfectly well-known to it, of the parties' illegal intentions.

190   In common with Lord Toulson (paras 100-101), I consider that valuable insight into the appropriate approach to the significance of illegality under today's conditions is found in the judgment of McLachlin J (as she was) writing for the majority the Supreme Court of Canada in Hall v Hebert [1993] 2 SCR 159 . The case concerned a claim in tort by a passenger against the owner of a car, who lost the keys when they fell out of the ignition when the car stalled and who decided in these circumstances that his passenger (who he knew to have drunk 11 or 12 bottles of beer) should drive while he tried to push-start the car. Unsurprisingly, the manoeuvre led to the passenger losing control, the car turning over and the passenger being injured. The Canadian Supreme Court upheld the passenger's claim, subject to contributory negligence.

191   The majority in the Canadian Supreme Court rightly regarded the case as one of "great importance". A number of points emerge with great clarity from McLachlin J's judgment:

• i)  First, rejecting Cory J's suggestion that "a power to reject claims on considerations of public policy" should replace the maxim *ex turpi causa non oritur action* , McLachlin J expressed her concern that public policy would provide no "clear guidance as to when judges could exercise this

draconian power and upon what grounds". She went on:

> "I fear that unless placed upon a firm doctrinal foundation and made subject to clear limits, this general power to invalidate actions on grounds of public policy might prove more problematic than has the troubled doctrine of ex turpi causa non oritur actio. We would be trading one label for another without coming to grips with the fundamental problem." (p 169)

• ii)  Second, she saw tort, not contract, as the real problem area in relation to illegality, expressing the view that:

> "The use of the doctrine of ex turpi causa to prevent abuse and misuse of the judicial process is well established in contract law and insurance law, where it provokes little controversy. The same cannot be said for tort." (p 171)

• iii)  Third, after examining authorities where the maxim applied to prevent claimants from profiting or obtaining exemplary damages in circumstances of illegality, she identified its rationale in today's world, in terms which have equal relevance to contract and tort:

> "The narrow principle illustrated by the foregoing examples of accepted application of the maxim of ex turpi causa non oritur actio in tort, is that a plaintiff will not be allowed to profit from his or her wrongdoing. This explanation, while accurate as

far as it goes, may not, however, explain fully why courts have rejected claims in these cases. Indeed, it may have the undesirable effect of tempting judges to focus on the issue of whether the plaintiff is 'getting something' out of the tort, thus carrying the maxim into the area of compensatory damages where its use has proved so controversial, and has defeated just claims for compensation. A more satisfactory explanation for these cases, I would venture, is that to allow recovery in these cases would be to allow recovery for what is illegal. It would put the courts in the position of saying that the same conduct is both legal, in the sense of being capable of rectification by the court, and illegal. It would, in short, introduce an inconsistency in the law. It is particularly important in this context that we bear in mind that the law must aspire to be a unified institution, the parts of which — contract, tort, the criminal law — must be in essential harmony. For the courts to punish conduct with the one hand while rewarding it with the other, would be to 'create an intolerable fissure in the law's conceptually seamless web': Weinrib ['Illegality as a Tort Defence' (1976) 26 UTLJ 28], at p 42. We thus see that the concern, put at its most fundamental, is with the integrity of the legal system." (pp 175–176)

• iv)    Fourth, McLachlin J said that such compensatory damages as were claimed in Hall v Hebert are

> "not properly awarded as compensation for an illegal act, but only as compensation for personal injury. Such damages accomplish nothing more than to put the plaintiff in the position he or she would have been in had the tort not occurred. No part of the award which compensates injury can be said to be the profit of, or the windfall from, an illegal act." (p 176)

In substance, McLachlin J can in this passage be said to have been applying a reliance test in tort. To establish a right to compensation, all that the plaintiff had to rely on was the tortious conduct, consisting of the causing of injury by negligent driving.

• v)   Finally, she concluded that:

> "there is a need in the law of tort for a principle which permits judges to deny recovery to a plaintiff on the ground that to do so would undermine the integrity of the justice system. The power is a limited one. Its use is justified where allowing the plaintiff's claim would introduce inconsistency into the fabric of the law, either by permitting the plaintiff to profit from an illegal or wrongful act, or to evade a penalty prescribed by criminal law. Its use is not justified where the plaintiff's claim is merely for compensation for personal injuries sustained as a consequence of the negligence of the defendant." (pp 179–180)

192   In my opinion, what is called for is a limited approach to the effect of illegality, focused on the need to avoid inconsistency in the law, without depriving claimants of the opportunity to obtain damages for wrongs or to put themselves in the position in which they should have been. This will offer the opportunity of resolving such problems as have, rightly, been identified in the present law, without replacing it wholesale with an open and unsettled range of factors. The latter might, in McLachlin J's words, "prove more problematic than has the troubled doctrine of ex turpi causa" itself.

193   McLachlin J's emphasis on the admissibility of compensatory claims leads me to the principle traditionally addressed under the head of *locus poenitentiae* . This principle in fact had a relevant role in the Tinsley v Milligan in so far as it was recognised as demonstrating that "the effect of illegality is not to prevent a proprietary interest in equity from arising or to produce a forfeiture of such right: the effect is to render the equitable interest unenforceable in certain circumstances": per Lord Browne-Wilkinson, p 374D. But its true significance is considerably greater. Where it applies, it fulfils a not dissimilar function to a claim for damages in tort. It puts the parties back in the position that they should have been in, in this case but for the entry into of the contract which was or became affected and unenforceable by reason of the illegality.

194   In early authorities the principle was put in wide terms. Smith v Bromley (1760) 2 Doug KB 696n was a case where the plaintiff was able to recover money she had paid to procure her brother's discharge from bankruptcy, which was an illegal payment. The primary reason was that the law making it illegal was for the protection of bankrupts and their families (so that the plaintiff and the defendant were *non in pari delictu* ). An editor's footnote (F7) on p 697 gives this as one of two exceptions to the principle that, in a case of illegality, matters are left to lie where they fall ( *potior est conditio defendentis* ). But Lord Mansfield CJ reinforced this reason by the more general consideration at p 698, that, although the payment had been made for an illegal purpose:

"Upon the whole, I am persuaded it is necessary, for the better support and maintenance of the law, to allow this action; for no man will venture to take, if he knows he is liable to refund."

The other exception identified in the footnote was that where the "contract is not executed, there is a *locus poenitentiae* , the *delictum* is incomplete, and the contract may be rescinded by either party".

195   In Neville v Wilkinson (1782) I Bro Ch 543 , 547, Lord Thurlow LC approved this approach, and "declared his opinion" that:

"[I]n all cases where money was paid for an unlawful purpose, the party, though particeps criminis, might recover at law; and that the reason was, that if courts of justice mean to prevent the perpetration of crimes, it must be not by allowing a man who has got possession to remain in possession, but by putting the parties back to the state in which they were before."

196   In Taylor v Bowers (1876) 1 QBD 291 possession of goods had been passed by the plaintiff, their owner, to A, in exchange for fictitious bills of exchange, in order to deceive creditors. But no compromise was achieved with creditors, "the illegal transaction was not carried out", and "it wholly came to an end" (p 300). In these circumstances, the plaintiff successfully sought recovery of the goods:

"To hold that the plaintiff is enabled to recover does not carry out the illegal transaction, but the effect is to put everybody in the same situation as they were before the illegal transaction was determined

upon, and before the parties took any steps to carry it out." (p 300)

The plaintiff was not seeking to enforce the illegal transaction, "but, on the contrary, setting it aside" and "not setting up his own fraud in order to make a title, but … repudiating the fraud and setting up his own prior rightful title as owner of the goods" (p 301).

197   Like Lord Sumption (paras 245-252), I see this principle of rescission as having become unduly limited with time, particularly in 20th century authority, and I consider that it should be restored to its former significance and generalised. Further, I consider that there is no reason why rescission should necessarily be restricted, as it was even in these earlier authorities, by reference to a test of execution or carrying out of the illegal purpose. The logic of the principle is that the illegal transaction should be disregarded, and the parties restored to the position in which they would have been, had they never entered into it. If and to the extent that the rescission on that basis remains possible, then prima facie it should be available.

198   In addition, as at present advised, I would not see any necessary objection to permitting rescission after part performance, by making, where possible, appropriate adjustments for benefits received. Equally, picking up points in Lord Neuberger's judgment (para 162) which I have read since writing the bulk of this judgment, I would not as at present advised see an imbalance or lack of parity of delict between the parties as a necessary or even probable bar to rescission, though I would agree that, in accordance with general principle, factors such as change of position could well preclude rescission. Complications may also arise in a context where a benefit received under an illegal transactions is capable of forfeiture under the Proceeds of Crime Act 2002 . We did not hear submissions on the position in such circumstances, and I express no opinion on it.

199   On the above basis, reliance on illegality remains significant as a bar to relief, but only in so far as it is reliance in order to profit from or otherwise enforce an illegal contract. Reliance in order to restore the status quo is unobjectionable. The result is, as I see it, not dissimilar to that which (leaving aside the potential

effects of section 7 ) results under section 6(1) of the New Zealand Illegal Contracts Act 1970 , providing that:

> "Notwithstanding any rule of law or equity to the contrary, but subject to the provisions of this Act and of any other enactment, every illegal contract shall be of no effect and no person shall become entitled to any property under a disposition made by or pursuant to any such contract …"

200   The approach I adopt avoids unsatisfactory results such as that reached in Collier v Collier , where it would have been entirely possible to achieve rescission even though the illegal scheme had been in some measure "executed" or "carried out". The father there could require the restoration of the property of which he had for an illegal purpose allowed his daughter to have the legal title. Similarly, in a situation like that in Tinsley v Milligan , it should be possible to avoid reliance on the artificial procedural concept of a presumption of a resulting trust. Such a presumption was available in that case to give effect to (though without necessarily referring to) the parties' actual intentions regarding equitable ownership or the reason (although the court was well aware of it) for structuring the transactions as they were. But, as Collier v Collier demonstrates, an artificial procedural presumption of this nature cannot be relied upon to be available in every case.

201   In future, Miss Milligan should simply be able to reverse the effect, as between herself and Miss Tinsley, of the property transactions which they arranged for the illegal purpose, which they carried out, of deceiving public authorities. Because the court would be reversing, rather than enforcing the illegal transactions, the court could take into account both the objective fact of joint contributions and the parties' actual and, by itself, legal purpose of joint ownership. Setting on one side the transactions by which they sought to achieve their illegal purpose, the underlying equitable interests, which they shared based on their contributions and intentions, would be enforceable as such. The court

could on that basis order the property to be registered in the joint names of Miss Tinsley and Miss Milligan.

202  It follows from what I have so far said that I cannot accept Lord Toulson's view (para 116) that it is unnecessary to consider the scope of *locus poenitentiae* . The underlying concept behind locus poenitentiae is restitutionary. It recognises that neither an admission of nor reliance on illegality is a bar to relief involving the reversal of an illegal transaction. In the full restitutionary sense I have discussed, the concept must be seen as an integral part of the overall principle governing illegality, and as the corollary of McLachlin J's limited rationalisation of that principle. Understood in that sense, free of early 20th century moralising, it restores the position to what it would and should have been, without any illegality. It avoids windfall benefits and disproportionate losses, without involving the positive enforcement of or the recovery of profits based on illegal bargains. No doubt, however, it would be desirable to avoid the moral undertones of the Latin brocard, and to encapsulate the full width of the modern principle, by referring in future simply to parties' normal entitlement to reverse the effects of an illegal transaction, where possible, even though the transaction may have been wholly or in part executed or carried into effect.

203  It also follows that in the present case I consider that no problem exists about recognising that Mr Patel is entitled to require Mr Mirza to return the stake which Mr Patel put up for the illegal purpose of use by Mr Mirza to make profits for their joint benefit by misuse of inside information. The claim does not seek to enforce or profit by the illegality. It seeks merely to put the position back to where it should have been, and would have been had no such illegal transaction ever been undertaken. I add that, having written the above and read Lord Neuberger's judgment in draft, it seems to me that, thus far, my analysis is essentially the same as that which Lord Neuberger describes in his judgment as "the Rule".

204  Before leaving the case, I must however return to the suggestion, unnecessary in my view for the resolution of this appeal, that the law of illegality should be generally rewritten. The new approach is advocated primarily by Lord Toulson, but Lord Neuberger appears, unless I have misunderstood him, to suggest

that it could serve both as a potential modification or qualification of the Rule and as an approach to be adopted to claims positively to enforce a contract, and to claims for damages for breach of contract or a quantum meruit for services rendered under an illegal contract (see his paras 174-175 and 178–180). The new approach is ostensibly based by Lord Toulson on Hall v Hebert , but it is transmuted by the statement (by Lord Toulson in para 101) that:

> "one cannot judge whether allowing a claim which is in some way tainted by illegality would be contrary to the public interest, because it would be harmful to the integrity of the legal system, without a) considering the underlying purpose of the prohibition which has been transgressed, b) considering conversely any other relevant public policies which may be rendered ineffective or less effective by denial of the claim, and c) keeping in mind the possibility of overkill unless the law is applied with a due sense of proportionality. We are, after all, in the area of public policy. That trio of necessary considerations can be found in the case law."

205  Under consideration c), it is then indicated (paras 107 and 108) that:

> "107.  In considering whether it would be disproportionate to refuse relief to which the claimant would otherwise be entitled, as a matter of public policy, various factors may be relevant. Professor Burrows' list is helpful but I would not attempt to lay down a prescriptive or definitive list because of the infinite possible variety of cases. Potentially relevant factors include the seriousness of the conduct, its centrality to the contract, whether it was intentional

and whether there was marked disparity in the parties' respective culpability.

108. The integrity and harmony of the law permit — and I would say require — such flexibility. …"

The reference to Professor Burrows' list is to the list which Lord Sumption sets out and analyses in his paras 259 and 260.

206  What is apparent is that this approach, would introduce not only a new era but entirely novel dimensions into any issue of illegality. Courts would be required to make a value judgment, by reference to a widely spread mélange of ingredients, about the overall "merits" or strengths, in a highly unspecific non-legal sense, of the respective claims of the public interest and of each of the parties. But courts could only do so, by either allowing or disallowing enforcement of the contract as between the two parties to it, unless they were able (if and when this was possible) to adopt the yet further novelty, pioneered by the majority of the Australian court in Nelson v Nelson [1995] HCA 25, (1995) 184 CLR 538 , of requiring the account to the public for any profit unjustifiably made at the public expense, as a condition of obtaining relief.

207  Although other jurisdictions are invoked, it is notable how slender the basis for doing so is. It comes down to the New Zealand statute and the Australian authorities of Nelson v Nelson and Fitzgerald v F J Leonhardt Pty Ltd [1997] HCA 17, (1997) 189 CLR 215 . We have no idea or information as to whether or not the approach there has proved unproblematic for the profession or the courts. What we do however have is an authoritative decision of the Canadian Supreme Court in Hall v Hebert , which does not in any way support the wholesale abandonment of a clear cut test, but rather explains and redefines the principle *ex turpi causa* in a manner which (consistently with the way in which the common law usually develops) offers every prospect of avoiding the evident anomalies which an over formalistic approach has in the past evidenced.

208  Lord Toulson also starts his judgment with a series of paragraphs (1 to 9) instancing what are supposed to be problems existing under the present law. I would only say as to Holman v Johnson (1775) 1 Cowp 341 and Pearce v Brooks (1866) LR 1 Ex 213 that the question what constitutes knowing participation sufficient to render a contract unenforceable is a discrete problem, which is unlikely to be resolved any more simply under the "range of factors" approach now advocated. Likewise, the St John Shipping case [1957] 1 QB 267 and Ashmore Benson Pease & Co Ltd v A v Dawson Ltd [1973] 1 WLR 828 arose in areas where the purpose and effect of statutory provisions were central to the decision (as it was in cases such as Hall v Woolston Hall Leisure Ltd [2001] 1 WLR 225 , Still v Minister of National Revenue (1997) 154 DLR (4th) 229 and Nizamuddowlah v Bengal Cabaret Inc (1977) 399 NYS 2d 854 , mentioned by Lord Toulson in paras 6, 58-61 and 63–66). Questions as to the effect of collateral or minor illegality (such as parking on a double red line, instanced by Lord Neuberger in para 178) on the enforceability of contractual rights have not, I believe, led to real difficulty in achieving just solutions under these and other authorities (compare also McLachlin J's view cited in para 191(ii) above) — and certainly not to such difficulty as to justify tearing up the existing law and starting again. Again, the new approach now advocated, with its wide range of additional factors, over and above statutory purpose and effect, would be unlikely to avoid similar analysis of statutory policy and similarly nice issues. More importantly, these are problems in areas far removed from the present, and do not to my mind throw any light on the issues we have to decide on this appeal.

209  For the reasons I have given, which correspond with those given by Lord Clarke and Lord Sumption, I would dismiss this appeal.

Lord Clarke:

210  As I see it, there is no disagreement between members of the court as to the correct disposal of this appeal. It is that the appeal must be dismissed because Mr Patel is entitled to restitution of the £620,000 that he paid to Mr Mirza on the basis that otherwise Mr Mirza would be unjustly enriched. As it seems to me, the application of orthodox principles of unjust

enrichment, rescission and *restitutio in integrum* leads to this conclusion. Those principles are consistently set out by Lord Mance and Lord Sumption. Although Lord Sumption sets out a broader statement of principle, he agrees with Lord Mance and *vice versa* . As it seems to me, there is no difference between their approach and the application by Lord Neuberger of what he calls "the Rule", which he defines in paras 145 and 146, as the right to return of money paid by the claimant to the defendant pursuant to a contract to carry out an illegal activity and the illegal activity is not in the event proceeded with owing to matters beyond the control of either party. Lord Sumption, at para 252, emphasises that the Rule arises automatically and by operation of law; a "right to restitution that in principle follows from the legal ineffectiveness of the contract …". I do not understand Lord Neuberger or Lord Mance to disagree with that. As Lord Neuberger says in para 146, the Rule is consistent with authority and with policy and renders the outcome in cases of contracts involving illegality and the maxim *ex turpi causa non oritur action* relatively clear and certain.

211  As Lord Neuberger says at para 154, in agreement with Lord Mance, there is obvious attraction in the notion that, if all transfers made pursuant to an unexecuted illegal contract are re-transferred, then the parties are back in the position they were, ie as if there had been no illegal contract, which would seem to comply with public policy.

212  This approach does not require any balancing of a series of different factors. It simply applies the principles derived from the authorities to the facts of the case. Lord Neuberger, Lord Mance and Lord Sumption have referred in detail, and (so far as I can see) consistently, to the authorities over very many years. None of them supports a balancing of the kind suggested by Lord Toulson. To my mind the most important sources are the judgments of Lord Mansfield CJ in Holman v Johnson (1775) 1 Cowp 341 and McLachlin J (now CJ) in Hall v Hebert [1993] 2 SCR 159 .

213  Lord Mance sets out in para 191 what he calls a number of points which emerge with great clarity from McLachlin J's judgment. I will not repeat those passages here. The critical point for present purposes is that she stressed the importance of having a firm doctrinal foundation for what she described as a

narrow principle. She was concerned, at p 169, that public policy would provide "no clear guidance as to when judges could exercise this draconian power and upon what grounds". The draconian power was "a power to reject claims on considerations of public policy". On the facts of Hall v Hebert she concluded that such compensatory damages as were claimed in that case were not properly to be regarded as awarded as compensation for an illegal act but only as compensation for personal injury. Then, as Lord Mance says, finally she concluded that:

> "there is a need in the law of tort
> for a principle which permits judges
> to deny recovery to a plaintiff on
> the ground that to do so would
> undermine the integrity of the justice
> system. The power is a limited one.
> Its use is justified where allowing
> the plaintiff's claim would introduce
> inconsistency into the fabric of
> the law, either by permitting the
> plaintiff to profit from an illegal or
> wrongful act, or to evade a penalty
> prescribed by criminal law. Its use
> is not justified where the plaintiff's
> claim is merely for compensation
> for personal injuries sustained as a
> consequence of the negligence of the
> defendant."

214  I entirely agree with that approach. I have always thought that the power of the court to deny recovery on the ground of illegality should be limited to well defined circumstances. I agree with Lord Mance in para 192 that, in the absence of such circumstances, claimants should not be deprived of the opportunity to obtain damages for wrongs or to put themselves in the position in which they should have been. As I see it, there is no need to replace that approach with what he calls an open and unsettled range of factors.

215  I agree with Lord Sumption's opinion in this regard. As he puts it at para 257, the search for principle which led McLachlin J to identify consistency as the foundation of this area of the law was a response to

Cory J, who had favoured a more flexible approach which would have depended upon whether the relevant public policy required that result on the facts of each case. The majority, including McLachlin J, did not agree. In para 258 Lord Sumption draws attention to the similar opinion of Lord Goff in Tinsley v Milligan [1994] 1 AC 340 at 358E-F, where he objected to the "public conscience test" adopted in the Court of Appeal, under which the court must "weigh, or balance, the adverse consequences of respectively granting or refusing relief". Lord Goff added that that was "little different, if at all, from stating that the court has a discretion whether to grant or refuse relief" and that it was very difficult to reconcile with the principle of policy stated by Lord Mansfield in Holman v Johnson . As Lord Sumption observes, on this point Lord Goff was supported by the whole of the Appellate Committee.

216   Between paras 259 and 265 Lord Sumption considers what he calls the "range of factors" approach and gives his reasons for rejecting it. I agree with him, and will not repeat his reasoning here, save for the following passage at para 262(iv):

> "The 'range of factors' test discards any requirement for an analytical connection between the illegality and the claim, by making the nature of the connection simply one factor in a broader evaluation of individual cases and offering no guidance as to what sort of connection might be relevant. I have already observed that the reliance test is the narrowest test available. If it is no longer to be decisive, the possibility is opened up of an altogether wider ambit for the illegality principle, extending to cases where the relevant connection was remote or non-existent but other factors not necessarily involving any connection at all, were thought to be compelling."

In short, such a test does not apply the principles laid down in the cases, and is inconsistent with the approach in Tinsley v Milligan and, in particular, the reliance test.

217   In para 265 Lord Sumption says that he cannot agree with the conclusion of Lord Toulson (at para 109) that the application of the illegality principle should depend on

> "the policy factors involved and … the nature and circumstances of the illegal conduct, in determining whether the public interest in preserving the integrity of the justice system should result in the denial of the relief claimed."

I agree with Lord Sumption that this is far too vague and potentially far too wide to serve as the basis on which a person may be denied his legal rights. As he says, it converts a legal principle into an exercise of judicial discretion, in the process exhibiting all the vices of "complexity, uncertainty, arbitrariness and lack of transparency" which Lord Toulson attributes to the present law. The illegality defence deprives claimants of their legal rights. The correct response for us is not to leave the problem to a case by case evaluation by the lower courts by reference to a potentially unlimited range of factors, but to address the problem by supplying a framework of principle which accommodates legitimate concerns about the present law.

218   Lord Mance expresses much the same conclusion in paras 204 to 207, with which I also agree. It is to my mind noteworthy that Lord Toulson puts his conclusion thus in para 109:

> "The courts must obviously abide by the terms of any statute, but I conclude that it is right for a court which is considering the application of the common law doctrine of illegality to have regard to the policy factors involved and to the nature and circumstances of the illegal conduct in determining whether the

public interest in preserving the integrity of the justice system should result in denial of the relief claimed. I put it in that way rather than whether the contract should be regarded as tainted by illegality, because the question is whether the relief claimed should be granted."

219   The striking feature of that approach is as I see it that it puts the question, not whether the contract should be regarded as tainted by illegality but whether the relief claimed should be granted. That seems to me to be essentially a question of discretion, or at least a consideration of all the relevant factors in order to decide where the balance should be struck. As I see it, there is no support in any of the authorities for that approach and it is directly contrary to many of the cases referred to by Lord Sumption and Lord Mance, in particular the reasoning of the majority in Hall v Hebert and of the House of Lords in Tinsley v Milligan , where it was expressly rejected by Lord Goff. It would be close to reviving the public conscience test. In my opinion the question posed in para 109 is the wrong question.

220   I recognise that common law principles develop from time to time. Two such developments are relevant here. The first is this. Lord Sumption and Lord Mance both focus on the scope of the principle of *restitutio in integrum* , as does Lord Neuberger. For example, Lord Neuberger first sets out the basis of the Rule, which seems to me to be consistent with the principles identified by Lord Sumption and Lord Mance. Thus in much of his judgment, notably in paras 145 to 160, Lord Neuberger stresses that the Rule supports the importance of certainty in the law. He then gives some examples of possible extensions of the Rule. So, for example, he says in paras 167 to 169 that the Rule may apply where the illegal contract is wholly or partly performed by the plaintiff paying a lesser sum to the defendant. I agree, but that is on the basis that it is essentially ordering restitution so far as appropriate in accordance with the underlying principle embodied in the Rule. As Lord Neuberger puts it in para 169, there is no good reason for not extending the Rule to partly or even wholly performed contracts where *restitutio in*

*integrum* can be achieved in practical terms and would be consistent with policy and proportionality. As I read his judgment, save at the very end his approach is orthodox and contemplates a development of the legal principles identified by Lord Sumption and Lord Mance.

221   The second relevant development is this. It is now recognised that some of the reasoning in Tinsley v Milligan can no longer stand: see in particular Lord Sumption at paras 236 to 239 and Lord Mance at paras 199 to 201. It is I think now accepted on all sides that, if Collier v Collier [2002] BPIR 1057 came before the courts today it would be decided differently. That is not however because the court will adopt the proposals of Lord Toulson but because the relevant legal principles have developed in a normal way.

222   Finally, I should note that it is not in dispute that the appeal should be dismissed on conventional principles.

223   I recognise that Lord Neuberger has expressed some support for the approach of Lord Toulson but I am not persuaded by his reasoning that it is appropriate.

Lord Sumption: (with whom Lord Clarke agrees)

224   Two questions arise on this appeal. The first is whether the contract between these parties is affected by the principle of public policy *ex turpi causa non oritur actio* (the illegality principle, as I shall call it). The second is whether, if so, Mr Patel is entitled to restitution of the £620,000 that he paid to Mr Mirza.

225   The first question has divided the courts below. The Deputy Judge (David Donaldson QC) and the majority of the Court of Appeal (Rimer LJ and Vos LJ) thought it plain that Mr Patel's claim was founded on an illegal agreement and could not be sustained unless he could invoke a special exception for executory agreements. They considered that there was such an exception. Gloster LJ on the other hand declined to see the problem in terms of rule and exception. At the risk of a rather crude summary of her thoughtful analysis, I would summarise her reasons as follows. Her first and main point (paras 67, 69-70, 72, 79–80) was that the rationale of the illegality rule did

not require Mr Patel to be denied restitutionary relief, because it did not involve enforcing his contract with Mr Mirza or enabling him to derive any benefit from it. Mr Patel's right to restitution was, she considered, "collateral". Second, that Mr Mirza and Mr Patel were not equally blameworthy because Mr Mirza was a finance professional while Mr Patel was not, and would not necessarily have known that insider dealing was illegal. Third, section 63(2) of the Criminal Justice Act 1993 provided that no contract should be void or unenforceable by reason of the prohibition of insider dealing in section 52 . The fourth was that Mr Patel did not need to rely on the illegal character of his agreement with Mr Mirza in order to recover the money. It was enough that he had paid it for a speculation that never occurred.

**The illegality principle and its rationale**

226   The present appeal exposes, not for the first time, a long-standing schism between those judges and writers who regard the law of illegality as calling for the application of clear rules, and those who would wish address the equities of each case as it arises. There are restatements of this court in support of both points of view: see Les Laboratoires Servier v Apotex Inc [2015] AC 340 and Houngo v Allen [2014] 1 WLR 2889 , paras 44-45. It also raises one of the most basic problems of a system of judge-made customary law such as the common law. The common law is not an uninhabited island on which judges are at liberty to plant whatever suits their personal tastes. It is a body of instincts and principles which, barring some radical change in the values of our society, is developed organically, building on what was there before. It has a greater inherent flexibility and capacity to develop independently of legislation than codified systems do. But there is a price to be paid for this advantage in terms of certainty and accessibility to those who are not professional lawyers. The equities of a particular case are important. But there are pragmatic limits to what law can achieve without becoming arbitrary, incoherent and unpredictable even to the best advised citizen, and without inviting unforeseen and undesirable collateral consequences.

227   Ancient as it is, the classic statement of the principle as it has traditionally been understood remains that of

Lord Mansfield CJ in Holman v Johnson (1775) 1 Cowp 341 :

> "The objection, that a contract is immoral or illegal as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed; but it is founded in general principles of policy, which the defendant has the advantage of, contrary to the real justice, as between him and the plaintiff, by accident if I may so say. The principle of public policy is this; *ex dolo malo non oritur actio* . No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act. If, from the plaintiff's own stating or otherwise, the cause of action appears to arise *ex turpi causa* , or the transgression of a positive law of this country, there the court says he has no right to be assisted."

228   There was a time when the courts approached the application of the illegality principle on the footing that a court should not be required to sully its hands by dealing with criminal ventures. In Everet v Williams (1725), noted at (1893) LQR 197 , the notorious case in which two highwaymen sought an account of the division of their profits, the court not only dismissed the action but fined the plaintiff's solicitors for the indignity visited upon it. There are periodic echoes of this attitude in later cases, notably Parkinson v College of Ambulance Ltd [1925] 2 KB 1 , 13, in which Lush J thought that no adjudication on a contract to procure an honour could be undertaken with "propriety or decency". This notion has sometimes been thought to derive support from Lord Mansfield's reference to the court withholding its aid. But the truth is that it has rarely risen above the level of indignant judicial asides. There are many purposes for which courts must necessarily inquire into the illegal acts of litigants. There

are principled exceptions to the illegality principle, which may entitle a party to base a claim on an illegal act. There are statutory schemes of apportionment which may require liability for dishonest acts to be distributed among the wrongdoers. The notion of judicial abstention could never be unqualified, nor has it been historically. The law, as Bingham LJ observed in Saunders v Edwards [1987] 1 WLR 1116 , 1134, must

> "steer a middle course between two unacceptable positions. On the one hand it is unacceptable that any court of law should aid or lend its authority to a party seeking to pursue or enforce an object or agreement which the law prohibits. On the other hand, it is unacceptable that the court should, on the first indication of unlawfulness affecting any aspect of a transaction, draw up its skirts and refuse all assistance to the plaintiff, no matter how serious his loss nor how disproportionate his loss to the unlawfulness of his conduct."

229   In its consultative report of 2009, *The Illegality Defence* (LCCP 189), at para 2.5, the Law Commission identified six policy rationales for the rule, which could be found in the case-law and the academic literature. They were: (1) furthering the purpose of the rule which the claimant's illegal behaviour has infringed; (2) consistency; (3) the need to prevent the claimant profiting from his or her own wrong; (4) deterrence; (5) maintaining the integrity of the legal system; and (6) punishment.

230   By "maintaining the integrity of the legal system" (rationale (5)), the Law Commission meant sparing the judiciary from involvement in serious wrongdoing: see para 2.24. I have given my reasons for rejecting this rationale. The Law Commission itself (paras 2.28-2.29) rejected rationale (6), punishment, on the ground that although rules of civil law might have a punitive effect, this was no part of their purpose. With very limited exceptions, such as certain rules

of causation in fraud cases or the rare occasions for awarding punitive damages, I think that this is correct. The other four rationales overlap. All of them to my mind are subsumed in no (2), the principle of consistency. The most influential statement of that principle is to be found in the much admired judgment of McLachlin J delivering the judgment of the majority of the Supreme Court of Canada in Hall v Hebert [1993] 2 SCR 159 , 169:

> "Whether we describe the principle under which judges are allowed to deny recovery to a plaintiff by an old-fashioned Latin name or by the currently fashionable concept of 'public policy', the underlying problem remains the same: under what circumstances should the immoral or criminal conduct of a plaintiff bar the plaintiff from recovering damages to which he or she would otherwise be entitled.

> My own view is that courts should be allowed to bar recovery in tort on the ground of the plaintiff's immoral or illegal conduct only in very limited circumstances. The basis of this power, as I see it, lies in duty of the courts to preserve the integrity of the legal system, and is exercisable only where this concern is in issue. This concern is in issue where a damage award in a civil suit would, in effect, allow a person to profit from illegal or wrongful conduct, or would permit an evasion or rebate of a penalty prescribed by the criminal law. The idea common to these instances is that the law refuses to give by its right hand what it takes away by its left hand."

After examining cases in which damages were refused when they represented a loss of benefits which would

WESTLAW   © 2017 Thomson Reuters.

have been derived from an illegal contract or activity, she observed, at p 176:

> "A more satisfactory explanation for these cases, I would venture, is that to allow recovery in these cases would be to allow recovery for what is illegal. It would put the courts in the position of saying that the same conduct is both legal, in the sense of being capable of rectification by the court, and illegal. It would, in short, introduce an inconsistency in the law. It is particularly important in this context that we bear in mind that the law must aspire to be a unified institution, the parts of which — contract, tort, the criminal law — must be in essential harmony. For the courts to punish conduct with the one hand while rewarding it with the other, would be to 'create an intolerable fissure in the law's conceptually seamless web'."

Her conclusion, at pp 179–180, was that:

> "… there is a need in the law of tort for a principle which permits judges to deny recovery to a plaintiff on the ground that to do so would undermine the integrity of the justice system. The power is a limited one. Its use is justified where allowing the plaintiff's claim would introduce inconsistency into the fabric of the law, either by permitting the plaintiff to profit from an illegal or wrongful act, or to evade a penalty prescribed by criminal law."

Hall v Hebert was a tort case, and the implications of illegality are not in all respects the same in the law of tort as in they are other branches of law. I shall return to this point below. But, as McLachlin J pointed out in the passage cited, the law is a unified institution. At the most fundamental level of policy, its internal coherence requires that contract, tort and criminal law should be in harmony.

231   In practice the illegality principle has almost invariably been raised as a defence to a civil claim based on a breach of the criminal law. In Les Laboratoires Servier v Apotex Inc [2015] AC 430 , this court held that with immaterial exceptions the defence is available only in such cases. This conclusion tends to reinforce the significance of the principle of consistency as a rationale. The civil courts of the state cannot coherently give effect to legal rights founded on criminal acts which are contrary to the state's public law. There is no reason to regard this as any less important according to whether the civil claim lies in contract or tort.

232   The English courts have taken a broader view than McLachlan J did of what constitutes "profiting" from an illegal act, but that is by the way. Her rationalisation of the illegality principle as being based on the consistency and internal coherence of the law has been consistently adopted in England in tort and contract cases alike by this court and by the Appellate Committee of the House of Lords before it: see R v Islam [2009] AC 1076 , para 38 (Lord Mance); Stone and Rolls Ltd v Moore Stephens [2009] 1 AC 1391 , paras 128 (Lord Walker), 226 (Lord Mance); Hounga v Allen [2014] 1 WLR 2889 , para 43 (Lord Wilson); Les Laboratoires Servier v Apotex Inc [2015] AC 430 , para 24 (Lord Sumption); Bilta (UK) Ltd v Nazir (No 2) [2016] AC 1 , para 172 (Lord Toulson and Lord Hodge). In Gray v Thames Trains [2009] 1 AC 1339 , Lord Hoffmann (with whom the rest of the Appellate Committee agreed) put forward the principle of consistency as the rationale of what he called the "narrower rule" precluding the recovery of damages representing loss directly arising from the sentence of a criminal court. He was inclined to think that the "wider rule" that a person cannot recover for damage which is the consequence of his own criminal act was based on a different principle concerned with "public notions of the fair distribution of resources": para 51, and cf Lord Rodger at para 84. Certainly, the inconsistency of awarding damages representing loss arising from a criminal sentence is more obvious and direct than it is when the claimant is claiming other damages causally flowing from his commission of a crime. But it seems

to me, as it did to McLachlan J and those who have adopted her approach more generally, that the internal coherence of the law is also the reason why it will not give effect in a civil court to a cause of action based on acts which it would punish in a criminal court. As Lord Hughes put it in Hounga v Allen (para 55), a dissenting judgment but not on this point, "the law must act consistently; it cannot give with one hand what it takes away with another, nor condone when facing right what it condemns when facing left."

**When is a civil claim "founded" on an illegal act?**

233  The starting point is that the courts exist to provide remedies in support of legal rights. It is fundamental that any departure from that concept should have a clear justification grounded in principle, and that it should be no more extensive than is required by that principle. The underlying principle is that for reasons of consistency the court will not give effect, at the suit of a person who committed an illegal act (or someone claiming through him), to a right derived from that act.

234  The test which has usually been adopted for determining whether this principle applies is the reliance test. The question is whether the person making the claim is obliged to rely in support of it on an illegal act on his part. The reliance test is implicit in Lord Mansfield's statement of principle, which assumes that the plaintiff's action is "founded on" his illegal act. But the modern origin of the test is the decision of the Court of Appeal in Bowmakers Ltd v Barnet Instruments Ltd [1945] 1 KB 65 , which concerned a hire purchase agreement illegal under wartime regulations. When the hirer disposed of the goods, the owner was held entitled to damages for conversion notwithstanding the illegality, because his right of action was based on his ownership. He could establish that without relying on the illegal hire purchase agreement. The reliance test was subsequently approved by the Privy Council in Singh v Ali [1960] AC 167 and Chettiar v Chettiar [1962] AC 294 and by the House of Lords in Tinsley v Milligan [1994] 1 AC 340 . All of these decisions, were about title to property, real or personal. But in Clunis v Camden and Islington Health Authority [1998] QB 978 the Court of Appeal applied it to a claim in tort. In St John Shipping Co Ltd v Joseph Rank Ltd [1957] 1 QB 267 , 291–292, Devlin J had applied it to a claim for freight under a contract of carriage. In Hewison v Meridian

Shipping Services PTE Ltd [2003] ICR 766 , the Court of Appeal applied it to a concurrent claim for damages in contract and tort in which the measure of damages depended on the terms of a contract. The claimant's action for damages against his employer for an injury at work failed because in order to prove his loss of earnings he had to show that he would have continued to deceive his employer about his fitness to operate machinery, as he had in the past.

235  There is, as these decisions suggest, nothing about the reliance test that limits its relevance to certain causes of action. But the test may apply in different ways, depending on what it is that the law regards as illegal. In a tort case or a property case it is generally enough to identify the illegal act and demonstrate the dependence of the cause of action upon the facts making it illegal. In a contract case, the position is less straightforward. A contract may be affected by illegality because terms lawful in themselves are intended to be performed in an illegal way or for an illegal purpose not apparent from the contract itself. This does not mean that contracts vitiated by this circumstance can be enforced simply by putting the case without reference to the illegal purpose or proposed mode of performance. It is enough to give rise to the defence that the claimant must rely on a contract which is in fact illegal, whether that is apparent from the terms or not.

236  The problem about the reliance test is not so much the test itself as the way in which it was applied in Tinsley v Milligan . The facts of that case are well known. Ms Tinsley and Ms Milligan contributed in approximately equal shares to the cost of buying a house in which both of them intended to live and run their lodging rooms business. They decided that it would be conveyed into the sole name of Ms Tinsley so as to enable Ms Milligan to defraud the Department of Social Security by pretending that she did not own her home and paid rent. Ms Tinsley claimed an order for possession on the footing that she was the sole owner. The Appellate Committee held by a majority that Ms Milligan was entitled to assert a 50% interest in the house notwithstanding the illegal purpose for which it had been conveyed into Ms Tinsley's sole name. There were two stages in the reasoning of Lord Browne- Wilkinson, who delivered the leading speech for the majority. The first was that where property is transferred for an illegal purpose, the transferee

nevertheless obtains a good title, notwithstanding that the transaction being illegal it would not have been specifically enforced. This is so whether the title in question is legal or equitable. The decision of the majority on this point settled a question on which there had been inconsistent authorities dating back to the beginning of the 19th century. It did so in a way which reflected the law's traditional reluctance to disturb settled titles. The result represents a notable difference between the law relating to the creation of legal or equitable titles and the law relating to contractual obligations generally. It means that although a contract may be vitiated by its illegal purpose or the illegal way in which it was intended to be performed, this is not true of title to property. It followed in that case that Ms Tinsley had a good title to the disputed property. The second stage of the reasoning was that an equitable interest in the property would also be recognised, provided that the person claiming it was not "forced to plead or rely on the illegality" (p 376E). In Ms Milligan's case, equity presumed a resulting trust in her favour by virtue only of her contribution to the purchase price. She did not therefore have to plead or prove the reasons why the property had been conveyed into Ms Tinsley's sole name. It followed that she could make good her claim to an interest.

237 The problem about this is that it makes the illegality principle depend on adventitious procedural matters, such as the rules of pleading, the incidence of the burden of proof and the various equitable presumptions. If Ms Tinsley had been a man and Ms Milligan had been his daughter, the decision would have gone the other way because the presumption of resulting trust would have been replaced by a presumption of advancement. She would have had to rebut it by reference to the actual facts. This is what the Privy Council decided in Chettiar v Chettiar [1962] AC 294 and the Court of Appeal in Collier v Collier [2002] BPIR 1057 , in both of which property was gratuitously transferred for an illegal purpose by a father to his son or daughter. The father was accordingly unable to establish his interest. Yet the distinction between these cases and Tinsley v Milligan is completely arbitrary. This is because the equitable presumptions operate wholly procedurally, and have nothing to do with the principle which the court is applying in illegality cases.

238 In Nelson v Nelson (1995) 184 CLR 538 , the majority's analysis in Tinsley v Milligan was criticised on this ground in the High Court of Australia: see pp 579- 580 (Dawson J), 592–593 (Toohey J), 609–610 (McHugh J). In my opinion, these criticisms are justified, although I would not go so far as McHugh did in Nelson v Nelson . He, alone among the judges of the High Court of Australia, would have jettisoned the reliance test altogether. What then is the true principle? In property cases, as the House held in Tinsley v Milligan , title is not vitiated by an antecedent illegal arrangement. An equitable interest in property may accordingly arise from a tainted scheme. Whether an equitable interest exists depends on the intentions of the parties. The true principle is that the application of the illegality principle depends on what facts the court must be satisfied about in order to find an intention giving rise to an equitable interest. It does not depend on how those facts are established. Ms Milligan was entitled to the interest which she claimed in the property because she paid half of the price and there was no intention to make a gift. That was all that the court needed to be satisfied about. Likewise, if Collier v Collier were to come before the courts today, the result should be the same notwithstanding that the equitable presumption went the other way. Mr Collier leased his property to his daughter for an illegal purpose, namely to deceive his creditors in the event that he became insolvent. He had an equitable interest in the property because the lease was gratuitous and there was no intention to make a gift. It would make no difference to the recognition of that interest that the purpose of the transaction was illegal. Why he chose to organise his affairs in that way would no doubt emerge in the course of the evidence, but would be irrelevant to the facts which founded his claim. The point was well made by Dawson J in Nelson v Nelson , at p 580:

> "There may be an illegal purpose for the transfer of the property and that may bear upon the question of intention, but it is the absence of any intention to make a gift upon which reliance must be placed to rebut the presumption of advancement. Intention is something different from a reason or motive. The illegal purpose may thus be evidentiary, but it is not the foundation of a

claim to rebut the presumption of advancement."

239  Shorn of the arbitrary refinements introduced by the equitable presumptions, which in any event apply only in property cases, the reliance test accords with principle. First, it gives effect to the basic principle that a person may not derive a legal right from his own illegal act. Second, it establishes a direct causal link between the illegality and the claim, distinguishing between those illegal acts which are collateral or matters of background only, and those from which the legal right asserted can be said to result. Third, it ensures that the illegality principle applies no more widely than is necessary to give effect to its purpose of preventing legal rights from being derived from illegal acts. The reliance test is the narrowest test of connection available. Every alternative test which has been proposed would widen the application of the defence as well as render its application more uncertain.

240  This last objection applies in particular to the main alternative test which has been proposed in the case law, namely that the facts relied upon should be "inextricably linked" with the illegal act. The difficulty about inextricable linkage as a test of connection is that it is far from clear what it means. On the face of it, the only link between the illegal act and the claim which is truly "inextricable", is a link based on causation and necessary reliance. So far as the test of inextricable linkage broadens the required connection more widely, it seems to me to be contrary to principle. Its vices may be illustrated by reference to the decision in Cross v Kirkby [2000] EWCA Civ 426, The Times 5 April 2000 , where it was first proposed by Beldam LJ. The facts were that a hunt saboteur started a fight with a hunt follower at a meet and came out of it worst. He ended up with a fractured skull, and sued the hunt follower for damages occasioned by his injuries. The main issue was whether the hunt follower had defended himself with excessive force. Beldam LJ held that he had not. But in case he was wrong about that, he held that the saboteur's injuries were inextricably linked with the fact that he had started the fight, so that his claim was barred by the illegality principle. Otton LJ agreed generally with Beldam LJ, but Judge LJ agreed only on the primary ground. To my mind, Beldam LJ's alternative ground was unprincipled. It only arose if the hunt follower responded to the attack with excessive force, and on that footing it was irrelevant who started the fight. The illegality principle served simply to deprive the plaintiff of a proper claim arising from the unlawful use of excessive force against him. The case illustrates the tendency of any test broader than the reliance test to degenerate into a question of instinctive judicial preference for one party over another.

### Exceptions

241  To the principle that a person may not rely on his own illegal act in support of his claim, there are significant exceptions, which are as old as the principle itself and generally inherent in it. These are broadly summed up in the proposition that the illegality principle is available only where the parties were *in pari delicto* in relation to the illegal act. This principle must not be misunderstood. It does not authorise a general enquiry into their relative blameworthiness. The question is whether they were legally on the same footing. The case law discloses two main categories of case where the law regards the parties as not being *in pari delicto* , but both are based on the same principle.

242  One comprises cases in which the claimant's participation in the illegal act is treated as involuntary: for example, it may have been brought about by fraud, undue influence or duress on the part of the defendant who seeks to invoke the defence. The best-known example is Burrows v Rhodes [1899] 1 QB 816 , where the illegality consisted in the plaintiff having enlisted in the defendant's private army for the Jameson raid, contrary to the Foreign Enlistment Act 1870 . The illegality principle was held not to arise because he had been induced to do so by the defendant's fraudulent misrepresentation that the raid had the sanction of the Crown, which if true would have made it legal. Cases in which the illegality consisted in the act of another for which the claimant is responsible only by virtue of a statute imposing strict liability, fall into the same category: see Osman v J Ralph Moss Ltd [1970] 1 Lloyd's Rep 313 ; Les Laboratoires Servier v Apotex [2015] AC 430 , para 29. In such cases, however, the construction and purpose of the statute in question will call for careful attention.

243   The other category comprises cases in which the application of the illegality principle would be inconsistent with the rule of law which makes the act illegal. The paradigm case is a rule of law intended to protect persons such as the plaintiff against exploitation by the likes of the defendant. Such a rule will commonly require the plaintiff to have a remedy notwithstanding that he participated in its breach. The exception generally arises in the context of acts made illegal by statute. In Browning v Morris (1778) 2 Cowp 790 , 792, Lord Mansfield expressed the point in this way:

> "Where contracts or transactions are prohibited by positive statutes for the sake of protecting one set of men from another set of men, the one, from their situation and condition being liable to be oppressed or imposed upon by the other, there the parties are not *in pari delicto* ; and in furtherance of these statutes, the person injured, after the transaction is finished and completed, may bring his action and defeat the contract."

The classic modern illustration is Kiriri Cotton Co Ltd v Dewani [1960] AC 192 , in which a tenant was held entitled to recover an illegal premium paid to the landlord, notwithstanding that his payment of it involved participating in a breach of an ordinance regulating tenancies. Lord Denning, delivering the advice of the Privy Council, observed at p 205 that: "The duty of observing the law is firmly placed on the Ordinance on the shoulders of the landlord for the protection of the tenant." Hounga v Allen [2014] 1 WLR 2889 on its facts illustrates the same principle. The claimant had been illegally trafficked into the United Kingdom by her employer. Her vulnerability on that account enabled her employer to exploit and ultimately to dismiss her. An attempt to bar her claim for unlawful discrimination on account of her participation in her own illegal trafficking failed. There was no claim under the employment contract itself, which was illegal, but it may well be that a claim for a *quantum meruit* for services performed would have succeeded on the same ground. There is New York authority for such a result:

see Nizamuddowlah v Bengal Cabaret Inc (1977) 399 NYS 2d 854 .

244   Protective statutes are the plainest examples of rules of law which implicitly exclude the operation of the illegality principle, but they are not the only ones. Some statutes, on their proper construction, are inconsistent with the application of the illegality principle even if they are in no sense protective. The statutory prohibitions against the overloading of ships are wholly directed to the operational safety of ships and their crews. On that ground, among others, Devlin J held in St John Shipping Corpn v Joseph Rank Ltd [1957] 1 QB 267 that a breach of the Merchant Shipping (Safety and Load Line Conventions) Act 1932 did not justify shippers and bill of lading holders in defending an action for freight. For the same reason, the illegality principle has been held to have no application to claims to contribution under the Civil Liability (Contribution) Act 1978 . The reason is that this would be inconsistent with the scheme of the Act: K v P [1993] Ch 140 . In Stone and Rolls Ltd v Moore Stephens [2009] AC 1391 , three members of the Appellate Committee, Lord Phillips, Lord Scott and Lord Mance, regarded the application of the illegality principle to an auditor's negligence as turning on the purpose of the auditor's statutory functions, although they reached different conclusions about what that purpose was.

**Restitution and loci poenitentiae**

245   The next question is whether the illegality principle bars an action for the recovery of the money which Mr Patel paid under the contract.

246   English law does not have a unified theory of restitution. Failure or absence of basis, which supplies such a theory in most civil law systems, was rejected as the overarching rationale of the law of restitution in Woolwich Equitable Building Society v Inland Revenue Comrs [1993] AC 70 , 172 (Lord Goff). For the moment, therefore, as Lord Hoffmann observed in Deutsche Morgan Grenfell Group plc v Inland Revenue Comrs [2007] 1 AC 558 , para 21, "the claimant has to prove that the circumstances in which the payment was made come within one of the categories which the law recognizes as sufficient to make retention by the recipient unjust."

247  It is nonetheless true that failure of basis is the reason (or at least a reason) why the retention of a benefit is treated in some categories of case as unjust. One of these is the category of case in which a money benefit is conferred on the recipient under or in anticipation of a contract and the basis for that transfer has failed, for example by frustration, total failure of consideration or want of contractual capacity or *vires* on the part of one of the parties. As a general rule, benefits transferred under a contract which is void or otherwise legally ineffective are recoverable: Westdeutsche Landesbank Girozentrale v Islington London Borough Council [1994] 4 All ER 890 (Hobhouse J), approved (obiter) on appeal to the House of Lords [1996] AC 669 , 681–682 (Lord Goff), 714 (Lord Browne-Wilkinson), 723 (Lord Woolf). In Guinness Mahon & Co Ltd v Kensington and Chelsea Royal London Borough Council [1999] QB 215 , the Court of Appeal held that the ineffectiveness of the transaction was a ground of restitution independent of total failure of consideration, and therefore available even if the contract had been partly performed. The reason, as Morritt LJ observed (p 230) is that: "The bank did not get in exchange for that performance all it expected, for it did not get the benefit of the contractual obligation."

248  One would expect the same reasoning to apply where the contract is unenforceable for illegality. In fact, however, the courts have not said this. The reason is that they have treated restitution as being available only where the payer was entitled to a *locus poenitentiae* in which to withdraw from the transaction. The breadth of this *locus* has varied with judicial fashion, but for much of the 20th century it was very narrowly interpreted indeed. This approach is not consistent with the recognition of a general right to the restitution of money paid under an illegal contract, in spite of the close analogy with other cases of ineffective contracts.

249  In one sense, the contract between these parties may be said to have been frustrated by the failure of the inside information to materialise, or to have resulted in a total failure of consideration because as a result the shares were never purchased. But that cannot be an adequate explanation of the reason why someone in Mr Patel's position may be entitled to restitution even on the limited basis which the concept of a *locus poenitentiae* allows. That concept permits the recovery

of money paid even before (indeed, especially before) the time for performance has arrived, and therefore in many cases before the contract was frustrated or the question of failure of consideration could arise. The ground of restitution in these circumstances can only be that the contract was illegal and that the basis for the payment had failed.

250  Of course, in order to demonstrate that the basis for the payment had failed, Mr Patel must say what that basis was, which would necessarily disclose its illegality. In my opinion, the reason why the law should nevertheless allow restitution in such a case is that it does not offend the principle applicable to illegal contracts. That principle, as I have suggested above, is that the courts will not give effect to an illegal transaction or to a right derived from it. But restitution does not do that. It merely recognises the ineffectiveness of the transaction and gives effect to the ordinary legal consequences of that state of affairs. The effect is to put the parties in the position in which they would have been if they had never entered into the illegal transaction, which in the eyes of the law is the position which they should always have been in.

251  The judges who first formulated the modern law of illegality at the end of the 18th century had no difficulty about this. In Smith v Bromley (1760) 2 Doug 696n , 697, one of Lord Mansfield's earliest statements on this area of law, he thought that restitution of an illegal consideration was "necessary for the better support and maintenance of the law". In Neville v Wilkinson (1782) Lord Chancellor Thurlow referred to this statement and "declared his opinion, that, in all cases where money was paid for an unlawful purpose, the party, though *particeps criminis* , might recover at law; and that the reason was, that if courts of justice mean to prevent the perpetration of crimes, it must be not by allowing a man who has got possession to remain in possession, but by putting the parties back to the state in which they were before". This was the basis on which relief was granted, at any rate by Mellish LJ and Bagallay LJ, in Taylor v Bowers (1876) 1 QBD 291 traditionally regarded as the leading case, and by Lord Atkinson delivering the advice of the Privy Council in Petherpermal Chetty v Muniandi Servai (1908) LR 35 Ind App 98 , 103.

252  In the course of the twentieth century, the law took a different and to my mind less satisfactory

turn. The courts began to treat the right of restitution as depending on the moral quality of the plaintiff's decision to withdraw. They reasoned that if the object of allowing restitution was to encourage withdrawal from an illegal venture, it ought to be withheld if the claimant had withdrawn involuntarily, for example because the other party withdrew first or the venture became impossible or failed for some reason other than his genuine regret. Although there are earlier traces of this notion, it is first overtly expressed in Parkinson v College of Ambulance [1925] 2 KB 1 , 16, where Lush J suggested that there was no *locus poenitentiae* if there was no penitence. It may be said to have reached its high point in the three decisions in Alexander v Rayson [1936] 1 KB 169 , Berg v Sadler & Moore [1937] 2 KB 158 and Bigos v Bousted [1951] 1 All ER 92 . The concept of penitential withdrawal leads to difficult distinctions and suggests an enquiry into a party's state of mind of a kind which the law rarely contemplates. It was rejected, rightly to my mind, by Millett LJ in Tribe v Tribe [1996] Ch 107 , 135 "Justice is not a reward for merit", he said: "restitution should not be confined to the penitent." I agree. But for the same reason I would reject the suggestion that Millett LJ went on to make that the right to restitution should still depend on the voluntary character of the plaintiff's withdrawal. As with the notion of penitence, this is to put a moral gloss on a principle that depends simply on the right to restitution that in principle follows from the legal ineffectiveness of the contract under or in anticipation of which the money was paid.

253 The courts' view about when the right of restitution ceases to be available has closely reflected the way in which they have analysed that right. At the outset, and throughout the 19th century, they held that the right of restitution ceased in contract cases once the contract had been executed at least in part. The reason for this was that they viewed the right of restitution as arising from a principle analogous to rescission for mistake or misrepresentation. They therefore applied to it the then current doctrine that an executed contract could not be rescinded at law except for fraud. In Lowry v Bourdieu (1780) 2 Doug 468 , 471, Buller J observed that in this context there was a "sound distinction between contracts executed and executory; and if an action is brought to rescind a contract, you must do it while the contract continues executory". Lord Mansfield, who sat in that case, presumably agreed, for he had expressed

the same view less expansively in Browning v Morris (1778) 2 Cowp 790 . Later, when the courts came to regard the *locus poenitentiae* as depending on the moral quality of the plaintiff's reason for resiling, they reframed the proposition so as to suggest that the right of restitution ceased to be available when the illegal purpose of the venture had been carried out. This might be the same as the point of time when the contract was executed. But it might be later, as in the numerous cases where a person nominally transferred his property to another with a view to defrauding his creditors. This test seems to me to be practically unworkable. Are we to distinguish between cases where the relevant representation was never made to the creditors and cases where it was but they did not believe it? More fundamentally, it proceeds from the same spurious moral gloss on the legal principle as the notion that the claimant's withdrawal must have been voluntary or penitent. The rule against rescinding executed contracts has now gone, and the limitation to cases in which the unlawful purpose has not been carried out never was sound. The rational rule, which I would hold to be the law, is that restitution is available for so long as mutual restitution of benefits remains possible. In most such cases, the same facts will give rise to a defence of change of position.

254 I would also reject the dicta, beginning with Tappenden v Randall (1801) 2 B&P 467 , 470 and Kearley v Thomson (1890) 24 QBD 742 , 747, to the effect that there may be some crimes so heinous that the courts will decline to award restitution in any circumstances. There are difficulties about distinguishing between degrees of illegality on what must inevitably be a purely subjective basis. But the suggestion is in any event contrary to principle. If I pay £10,000 to a hitman to kill my enemy, he should not kill my enemy and should not have £10,000. The fact that when it comes to the point he is unwilling or unable to kill my enemy does not give him any legal or moral entitlement to keep the £10,000. If he does kill him, the rational response is the same. He should be convicted of murder, but he should never have received the money for such a purpose and by the same token should not be allowed to retain it. Of course, in practice, this is all rather artificial. In a case involving heinous crimes, both parties would be exposed to confiscation orders under the Proceeds of Crime Act 2002 . St Thomas Aquinas thought the ideal solution to such a conundrum was

that neither party should have the money, which should be paid to charity: *Summa Theologica* II.2, Q 62, para 5. The courts have no power to order that, but statute has now intervened to produce something like the same result.

255  I say nothing about cases in which an order for restitution would be functionally indistinguishable from an order for enforcement, as in a case of an illegal loan or foreign exchange transaction. The traditional view is that if the law will not enforce an agreement it will not give the same financial relief under a different legal label: Boissevain v Weil [1950] AC 327 . I am inclined to think that the principle is sound, but I should prefer not to express a concluded view on the point. It is not the position here.

**The rule-based approach and the "range of factors" approach**

256  I can now return to the judicial schism to which I referred at the outset of this judgment.

257  A convenient starting point is the Supreme Court of Canada's decision in Hall v Hebert , to which I have already referred. It is important to remember that the search for principle which led McLachlin J to identify consistency as the foundation of this area of law was a response to the judgment of Cory J in the same case. He had favoured a more flexible test for applying the illegality principle, which would have depended on whether the relevant public policy required that result on the facts of each case: see p 205. That approach was not accepted by the rest of the court. Part of McLachlin J's concern about it arose from

> "the absence of clear guidance as to when judges could exercise this draconian power and upon what grounds. I fear that unless placed upon a firm doctrinal foundation and made subject to clear limits, this general power to invalidate actions on grounds of public policy might prove more problematic than has the troubled doctrine of *ex turpi causa non oritur actio* . We would be trading one label for another

without coming to grips with the fundamental problem." (p 169)

258  In Tinsley v Milligan [1994] 1 AC 340 , a similar view was taken by Lord Goff. I have cited extensively from this part of his speech in my judgment in Les Laboratoires Servier v Apotex Inc [2015] AC 430 , para 16, and the exercise need not be repeated here. In summary, Lord Goff objected to a test for applying the illegality principle which would require the court to "weigh, or balance, the adverse consequences of respectively granting or refusing relief" (p 358E-F). The adoption of such a test, he considered, at p 363, "would constitute a revolution in this branch of the law, under which what is in effect a discretion would become vested in the court to deal with the matter by the process of a balancing operation, in place of a system of rules, ultimately derived from the principle of public policy enunciated by Lord Mansfield CJ in Holman v Johnson ". On this point, Lord Goff was supported by the whole of the Appellate Committee.

259  For many years, the chief critic of this approach was the Law Commission, which at one stage proposed legislation along the lines of the New Zealand Illegal Contracts Act 1970 to make the application of the illegality principle subject to a broad judicial discretion. More recently, Professor Burrows has proposed that the same solution should be adopted by judicial decision, in his *Restatement of the Law of Contract* (2016). He would make the application of the illegality principle dependent, at any rate in contract cases, on a "range of factors" approach. This would require the judge to assess whether to deny a remedy would be an "appropriate response" to the claimant's conduct, taking account where relevant of eight factors. These factors are for the most part derived from the Law Commission's Consultative Report (paras 8.3, 8.11). They are: (a) how seriously illegal or contrary to public policy the conduct was; (b) whether the party seeking enforcement knew of, or intended, the conduct; (c) how central to the contract or its performance the conduct was; (d) how serious a sanction the denial of enforcement is for the party seeking enforcement; (e) whether denying enforcement will further the purpose of the rule which the conduct has infringed; (f) whether

denying enforcement will act as a deterrent to conduct that is illegal or contrary to public policy; (g) whether denying enforcement will ensure that the party seeking enforcement does not profit by the conduct; (h) whether denying enforcement will avoid inconsistency in the law, thereby maintaining the integrity of the legal system. Lord Toulson, in his judgment on the present appeal, supports this approach while suggesting that yet further factors may also be relevant.

260  With the arguable exception of (a) and (d) all of the considerations identified by Professor Burrows have been influential factors in the development of the rules of law comprised in the illegality principle as it stands today. Thus (b) is reflected in the requirement that, except where the making of the contract was itself illegal, there should have been some degree of participation by the claimant in the illegal act. It is also reflected in the exception for cases in which he was liable for the acts of another by virtue only of a rule imposing strict liability. As to (c), the purpose of the reliance test is to confine the illegality principle to cases in which the illegal act was truly central. Factor (e) is the basis of the exception discussed earlier in this judgment for cases in which the application of the illegality principle would be inconsistent with the legal rule which makes the act illegal, for example because its object is the protection of someone in the position of the claimant. It is also the basis on which claims are allowed for the restitution of money paid under an illegal contract. As to (f) and (g), there can be no doubt that historically the hope of deterring illegal conduct and depriving those responsible of any benefit arising from it have been important factors in the development of the illegality principle, although I personally doubt whether any but the best-advised litigants have enough knowledge of the law to be deterred by it. Factor (h), as I have suggested, is the most widely accepted rationale for the illegality principle in the modern law.

261  The real issue, as it seems to me, is whether the "range of factors" identified by the Law Commission and Professor Burrows are to be regarded (i) as part of the policy rationale of a legal rule and the various exceptions to that rule, or (ii) as matters to be taken into account by a judge deciding in each case whether to apply the legal rule at all. As matters stand, the former approach represents the law. The latter would require the courts to "weigh, or balance, the adverse

consequences of respectively granting or refusing relief" on a case by case basis, which was the very proposition that the House of Lords unanimously rejected in Tinsley v Milligan . We are entitled to change the law, but if we do that we should do it openly, acknowledging what we are doing and assessing the consequences, including the indirect consequences, so far as we can foresee them. In my opinion, it would be wrong to transform the policy factors which have gone into the development of the current rules, into factors influencing an essentially discretionary decision about whether those rules should be applied. Neither party contended for such a result, and their reticence was in my view entirely justified. It would be unprincipled and uncertain, and far from confining the ambit of the illegality principle to its essential minimum, it could only broaden it beyond its proper limits. Perhaps most important of all, justice can be achieved without taking this revolutionary step.

262  The reason why the application of the "range of factors" test on a case by case basis is unprincipled is that it loses sight of the reason why legal rights can ever be defeated on account of their illegal factual basis. It is I think right to make four points:

• i)  Whatever rationale one adopts for the illegality principle, it is manifestly designed to vindicate the public interest as against the interests and legal rights of the parties. That is why the judge is required to take the point of his own motion even if the parties have not raised it, as the deputy judge did in this case. The operation of the principle cannot therefore depend on an evaluation of the equities as between the parties or the proportionality of its impact upon the claimant.
• ii)  The "range of factors" test largely devalues the principle of consistency, by relegating it to the status of one of a number of evaluative factors, entitled to no more weight than the judge chooses to give it in the particular case. The criminal law, which is in almost every case the source of the relevant illegality, is a critical source of public policy. It is the prime example of the "positive law" (Lord Mansfield's phrase) which has always moulded the law of illegality in civil proceedings. The courts cannot consistently or coherently recognise legal consequences for an act which the law treats as punishable. Gloster LJ, for example, thought it relevant that there was no

finding that Mr Patel knew that insider dealing was illegal. Yet that would have been of no relevance in a criminal court, and it is difficult to see why it should be any more relevant in a civil one. Professor Burrows' factor (f) (whether denying enforcement will ensure that the party seeking enforcement does not profit by the conduct) is surely fundamental to the principle of consistency, and not just a factor to be weighed up against others.

• iii) The main justification for the "range of factors" test has always been that it enables the court to avoid inflicting loss on the claimant disproportionate to the measure of his badness. This was the instinct that led the Court of Appeal in Euro-Diam Ltd v Bathurst [1990] 1 QB 1 to propose that the illegality principle should be applied only where the alternative would be shocking to the public conscience. That concept was rejected in Tinsley v Milligan . Since then, it has been suggested that there may be cases at the opposite end of the spectrum of gravity, in which the offence was too trivial to engage the illegality principle: see Gray v Thames Trains Ltd , at para 83 (Lord Rodger). One would expect most if not all such offences to be covered by the exception for cases in which the application of the illegality principle would be inconsistent with the legal rule which makes the act illegal. But, extremes apart, it is difficult to reconcile with any kind of principle the notion that there may be degrees of illegality, as Professor Burrows' factor (a) seems to envisage. If the application of the illegality principle is to depend on the court's view of how illegal the illegality was or how much it matters, there would appear to be no principle whatever to guide the evaluation other than the judge's gut instinct. This was why this court recently rejected the view expressed by the Court of Appeal in Les Laboratoires Servier v Apotex Inc [2013] Bus LR 80 that an illegal act might nevertheless found a cause of action if it was not as wicked as all that.

• iv) The "range of factors" test discards any requirement for an analytical connection between the illegality and the claim, by making the nature of the connection simply one factor in a broader evaluation of individual cases and offering no guidance as to what sort of connection might be relevant. I have already observed that the reliance test is the narrowest test available. If it is no longer to be decisive, the possibility is opened up of an altogether wider ambit for the illegality principle, extending to cases where the relevant connection was remote or non-existent but other factors not necessarily involving any connection at all, were thought to be compelling.

263   The reason why the adoption of a "range of factors" test on a case by case basis would be uncertain is obvious in the light of these considerations. An evaluative test dependent on the perceived relevance and relative weight to be accorded in each individual case to a large number of incommensurate factors leaves a great deal to a judge's visceral reaction to particular facts. Questions such as how illegal is illegality would admit of no predictable answer, even if the responses of different judges were entirely uniform. In fact, it is an inescapable truth that some judges are more censorious than others. Far from resolving the uncertainties created by recent differences of judicial opinion, the range of factors test would open a new era in this part of the law. A new body of jurisprudence would be gradually built up to identify which of a large range of factors should be regarded as relevant and what considerations should determine the weight that they should receive. No one factor would ever be decisive as a matter of law, only in some cases on their particular facts. The size of the authorities bundles in this and other recent appeals to this court on the illegality principle is testimony to the volume of litigation which the principle has generated in every period of its history. I do not suppose that those who are about to enter into an illegal transaction are in the habit of studying the decisions of the courts on the point, but those who advise them after the event do, and the resultant uncertainty is likely to generate a great deal of wasteful and unnecessary litigation. I would readily accept that certainty is not the only value, or even necessarily the most important. But we are concerned in this case with the law of contract, an area in which the value of certainty is very great. It is one thing to say that a legal right may be overridden by a rule of law. It is another thing altogether to make a legal right, and particularly a contractual right, dependent on a judge's view about whether in all the circumstances it ought to be enforced.

264  Finally, I would point out that the adoption of such a revolutionary change in hitherto accepted legal principle is unnecessary to achieve substantial justice in the great majority of cases. The unsatisfactory features of the illegality principle as it has traditionally been understood have often been overstated, in part because of the way in which they were emphasised by Lord Goff in Tinsley v Milligan . It was, he said, "not a principle of justice; it is a principle of policy, whose application is indiscriminate and so can lead to unfair consequences as between the parties to litigation" (p 355B-C). That observation, however, reflected his view that no equitable interest in property could ever be claimed where the legal title had been vested in another for dishonest purposes. The law had been stated in this way by Lord Eldon at the beginning of the 19th century: see Muckleston v Brown (1801) 6 Ves 52 and Curtis v Perry (1802) 6 Ves 739 . But Lord Eldon's approach, although adopted by Lord Goff, was rejected by the majority of the Committee. When the law of illegality is looked at as a whole, it is apparent that although governed by rules of law, a considerable measure of flexibility is inherent in those rules. In particular, they are qualified by principled exceptions for (i) cases in which the parties to the illegal act are not on the same legal footing and (ii) cases in which an overriding statutory policy requires that the claimant should have a remedy notwithstanding his participation in the illegal act. Properly understood and applied, these exceptions substantially mitigate the arbitrary injustices which the illegality principle would otherwise produce. At the same time, the wider availability of restitutionary remedies which will result from the present decision will do much to mitigate the injustices which have hitherto resulted from the principle that the loss should lie where it falls.

265  For these reasons, I regret that I cannot agree with the conclusion of Lord Toulson (para 109) that that the application of the illegality principle should depend on

> "the policy factors involved and … the nature and circumstances of the illegal conduct, in determining whether the public interest in preserving the integrity of the justice system should result in the denial of the relief claimed."

In my opinion, this is far too vague and potentially far too wide to serve as the basis on which a person may be denied his legal rights. It converts a legal principle into an exercise of judicial discretion, in the process exhibiting all the vices of "complexity, uncertainty, arbitrariness and lack of transparency" which Lord Toulson attributes to the present law. I would not deny that in the past the law of illegality has been a mess. The proper response of this court is not to leave the problem to case by case evaluation by the lower courts by reference to a potentially unlimited range of factors, but to address the problem by supplying a framework of principle which accommodates legitimate concerns about the present law. We would be doing no service to the coherent development of the law if we simply substituted a new mess for the old one.

### Application to the present case

266  Against that background it is in my view entirely clear that the transaction into which these parties entered was affected by the illegality principle. The agreement pleaded, and found by the deputy judge to have been made, was not simply that Mr Mirza would place bets on movements of RBS shares for the joint account of himself and Mr Patel, but that he would do so with the benefit of inside information. Subject to immaterial exceptions, section 52 of the Criminal Justice Act 1993 makes it an offence for a person in possession of inside information to deal or encourage another person to deal in "securities", including contracts for differences. This was accordingly an agreement for Mr Mirza to commit a criminal offence. It was also a criminal conspiracy to that end.

267  Section 63(2) of the 1993 Act provides that: "No contract shall be void or unenforceable by reason only of section 52 ." The contracts affected by section 52 are contracts by way of dealing in securities. It follows that if Mr Mirza had placed the spread bets with IG Index, as he had conditionally promised to do, the contract would have been enforceable as between himself and IG Index. But Mr Patel could not have obtained specific performance of the distinct contract between himself and Mr Mirza or damages for breach of it. This is because, first, he would have had to rely

on the contract, which provided as one of its terms that the dealing should be carried out with the benefit of inside information. Mr Patel could not have avoided this result by simply characterising it as an agreement to speculate in RBS shares without referring to the basis on which it was agreed that that should happen. Secondly, none of the possible exceptions apply. The parties were on the same legal footing. Both would be liable to conviction for conspiracy in a criminal court, and any difference in the degree of their fault would be relevant only to the sentence. Section 52 of the Criminal Justice Act 1993 is not a statute designed to protect the interests of persons entering into an agreement to commit the offence of insider dealing, and there is no other overriding statutory policy which requires their participation in the offence to be overlooked when it comes to determining its civil consequences.

268  However, restitution still being possible, none of this is a bar to Mr Patel's recovery of the £620,000 which he paid to Mr Mirza. The reason is simply that although Mr Patel would have to rely on the illegal character of the transaction in order to demonstrate that there was no legal basis for the payment, an order for restitution would not give effect to the illegal act or to any right derived from it. It would simply return the parties to the status quo ante where they should always have been. The only ground on which that could be objectionable is that the court should not sully itself by attending to illegal acts at all, and that has not for many years been regarded as a reputable foundation for the law of illegality. This was Gloster LJ's main reason for upholding Mr Patel's right to recover the money. Although my analysis differs in a number of respects from hers, I think that the distinction which she drew between a claim to give effect to a right derived from an illegal act, and a claim to unpick the transaction by an award of restitution, was sound.

269  In the circumstances, Mr Mirza's only arguable defence was that he had paid the money to Mr Georgiou, the intermediary who had proposed the deal. But the judge declined to make a finding to this effect, and rejected a defence of change of position on the ground that even if it was true, Mr Mirza had had no reason to repay the money to anyone but Mr Patel from whom he had received it.

270  The Court of Appeal gave judgment for Mr Patel for £620,000 with interest. For the reasons which I have given, which correspond to those given by Lord Mance and Lord Clarke, I would dismiss the appeal against that order.

Crown copyright

© 2017 Sweet & Maxwell

2016 WL 03902311

**End of Document**                                                      © 2017 Thomson Reuters.

# TAB 58

PETRIE *v.* NUTTALL

passed to the defendants. [Alderson, B. It might be void as against creditors, but valid as a conveyance to the assignees under the bankrupt law.] If the assignment operated to pass [568] the property to the trustees, then the assignees have no title; if the assignment is void, the seizure of the goods by the plaintiff is a transaction with the bankrupt protected by the 133rd section of the 12 & 13 Vict. c. 106. They also referred to *Butler* v. *Hobson* (5 Scott, 798), *Goldschmidt* v. *Hamlet* (6 M. & Gr. 187), and *Graham* v. *Witherby* (7 Q. B. 491).

Kinglake, Serjt., and Barstow appeared in support of the rule, but were not called upon to argue.

ALDERSON, B. The rule must be absolute. The property in question would have passed to the plaintiff if he had seized it whilst it was the property of the bankrupt, and before he conveyed it to trustees for the benefit of his creditors. Then it is argued, that, because that conveyance was an act of bankruptcy, and void as against creditors, the plaintiff is remitted back to his original right. But the only effect of the assignment being an act of bankruptcy and void, is to transfer the title to the property from the trustees to the assignees.

PLATT, B. I am of the same opinion.

MARTIN, B. For the purpose of rendering an assignment by a trader of his property an act of bankruptcy, the deed must be invalid as against creditors, and consequently the law transfers the property to the assignees for the benefit of the creditors. The power of the plaintiff to seize future property was a license, and the conveyance by the bankrupt to the trustees operated as a revocation of that license.

Rule absolute.

[569] PETRIE *v.* NUTTALL. Jan. 16, 1856.—A verdict of guilty, and judgment thereon in an indictment for obstructing a public highway, cannot be pleaded as an estoppel in an action brought by the party convicted against a third person for using the way.

[S. C. 25 L. J. Ex. 200.]

Trespass for breaking and entering certain land of the plaintiff.

Plea—That, before and at the said times when &c., there was and of right ought to have been a certain common and public highway, into, through, over, and along the land of the plaintiff, for all persons to go, return, pass, and repass, on foot, and with horses, cattle, carts, and carriages, at all times of the year, at their free will and pleasure: wherefore the defendant, having occasion to use the said way, did, at the said times when &c., walk along the said way: quæ sunt eadem, &c.

Replication—The plaintiff joins issue on the said plea.

Rejoinder—That the plaintiff ought not to be admitted to take issue on the defendant's plea, and to deny, that, before and at the said several times when &c., there was and ought of right to have been a certain common and public highway into, through, over, and along the said land of the plaintiff, in which &c.; because the defendant says, that before any of the said times when &c., and before and at the time of the taking of the inquisition and of the finding the verdict hereinafter mentioned, John Petrie, William Petrie, James Petrie, and Joseph Petrie, some or one of them, were or was seised in their or his demesne as of fee of and in the said land in which &c., and were possessed of the said land; and that thereupon, on the 29th of August, A.D. 1853, at the general sessions of the peace of our lady the Queen, holden at Salford, in and for the county Palatine of Lancaster, it was by the oath of twelve jurors, good and lawful men, &c., then and there sworn and charged to inquire for our said lady the Queen and the body of the said county, presented that theretofore, and before the committing of [570] any of the offences in that indictment charged and stated, to wit, on the 1st of June, A.D. 1848, there was and thence hitherto has been and still was a certain common Queen's highway called, to wit, Rope-street, situate at the parish of Rochdale, in the county of Lancaster, for all the subjects of our said lady the Queen to go, return, pass, repass, ride, and labour, on foot and on horseback, and with cattle, carts, and carriages, at their free will and pleasure, without any impediment or obstruction whatsoever; that afterwards, and whilst the said common Queen's highway was such common Queen's highway as aforesaid, to wit, on &c., at the parish aforesaid &c., the said John Petrie, William Petrie, James Petrie, and Joseph Petrie

958                              PETRIE *v.* NUTTALL                              11 EX. 571.

unlawfully, wilfully, and injuriously did erect, build, put, and place, and cause to be erected, built, &c. in, upon, and across the said common Queen's highway, to wit, at the easterly end thereof, a certain wall and building made of, to wit, bricks, stone, and mortar, and being of great length and height, to wit, &c.: By means whereof the said common Queen's highway, then and during all the time aforesaid, was greatly obstructed, and the subjects of our lady the Queen then and during all the time aforesaid could not go, return, pass, repass, ride, and labour, on foot and on horseback &c., in, by, through, and over the said highway, as they were wont and accustomed and of right ought to do, to the great damage and common nuisance of all the subjects of our lady the Queen, in, by, and through the same highway, to wit, Rope-street, going, returning, passing, repassing, &c.: contra pacem, &c. The plea then stated that the indictment was removed into the Court of Queen's Bench; that the defendants pleaded not guilty, upon which issue was joined; that, on the 9th of August, 1854, at the Liverpool Assizes, the issue was tried by a jury, who found that the defendants were guilty of the matters contained in the indictment; that a day was given by the Court until the 7th of May, 1855, to hear judgment—At which day (the parties being present), **[571]** and it appearing and being proved to the Court that the nuisances charged in the indictment had been abated, it was considered and adjudged, and ordered by the Court, that the said John Petrie, William Petrie, James Petrie, and Joseph Petrie should, for the said nuisance so as aforesaid charged upon them by the said indictment, pay a fine to our lady the Queen of 1s. each, prout patet, &c. The plea then averred, that the highway in the indictment mentioned was the same highway as in the plea mentioned; and that the land of the plaintiff in the declaration mentioned was the same land as that on which the wall and building in the indictment mentioned were built. That after the giving of the said verdict, and before any of the said times when &c., the wall and building were removed, and the said highway was again opened to the plaintiff; and that this action was brought and is prosecuted by the plaintiff against the defendant on account of the defendant having, after the said verdict was given, and after the said wall and building had been removed as in the record of the judgment mentioned, and after the judgment had been given, walked along the said highway over the said land on which the said wall had been so erected and built as aforesaid, and for no other cause of action whatever. That, after the said verdict was given, the said John Petrie, William Petrie, James Petrie, and Joseph Petrie delivered the possession of the said land to the plaintiff, and the plaintiff took possession of the said land as a trustee for the said John Petrie, William Petrie, James Petrie, and Joseph Petrie, and that the plaintiff is, in respect of the said land, privy in estate to the said John Petrie, William Petrie, James Petrie and Joseph Petrie, some or one of them. The plea then stated, that the defendant was one of the prosecutors of the said indictment, and concluded with a prayer of judgment, if the plaintiff ought, contrary to the said verdict and judgment, to be admitted to take issue on the said plea, &c.

**[572]** Demurrer, and joinder therein.

Hugh Hill (Tindal Atkinson with him) in support of the demurrer. The question is, whether the verdict and judgment on an indictment can be pleaded as an estoppel in this action, and it is submitted that they cannot. It is a primary rule, that estoppels must be reciprocal. In Co. Litt. 352 a. it is said, "first, every estoppel ought to be reciprocal, that is, to bind both parties; and this is the reason that regularly a stranger shall neither take advantage nor be bound by the estoppel: privies in blood as the heir; privies in estate as the feoffee, lessee, &c.; privies in law as the lords by escheat, tenant by the curtesie, tenant in dower, the incumbent of a benefice, and others that come under by act of law, or in the post, shall be bound and take advantage of estoppels." Great injustice might ensue if a party who claimed a civil right, instead of trying that right by action, should proceed by indictment, and then set up the verdict and judgment as an estoppel. Treating the judgment in question as a judgment in personam, it would not be evidence either for or against strangers of the right of way. In Starkie on Evidence, p. 363, 4th ed., it is said: "As a general rule, a verdict or judgment in a criminal case is not evidence of the fact upon which the judgment was founded in a civil proceeding. . . . The main objection to the reception of such evidence is, that there would be no mutuality; for an acquittal of a party on a criminal proceeding would not be available in a civil action." The law is stated in similar terms in Taylor on Evidence, sect. 1505, 2nd ed., and Phillipps on

PETRIE *v.* NUTTALL     959

Evidence, p. 27, 10th ed. It is not denied that this verdict and judgment would be
admissible in evidence upon another indictment against the same or other parties;
but that proceeds on a different principle, viz. that there has been an adjudication by
a Court of competent jurisdiction upon a matter of a public nature: **[573]** *Regina* v.
*Haughton* (1 E. & B. 501). Such adjudications are regarded as a species of reputation,
and are admissible wherever reputation would have been evidence: *Reed* v. *Jackson*
(1 East, 355). An award is not evidence of a fact against the parties to be affected by
the proof of it in a criminal case: *Regina* v. *Fontaine Moreau* (11 Q. B. 1028); and yet
an award is in its nature as final as a judgment: *Dunn* v. *Murray* (9 B. & C. 780).
A conviction before justices is not evidence of the offence in a civil suit brought by
the party convicted: *Justice App. Gosling Resp.* (12 C. B. 39). The judgment in
question is not a judgment in rem. A judgment in rem has been defined as an
adjudication upon the status of some particular subject-matter by a tribunal having
competent authority for that purpose: 2 Smith's Lead. Cas. 439. Instances of such
judgments are collected in Taylor on Evidence, sect. 1488, 2nd ed. This judgment
does not declare the status of the road, but merely the status of a nuisance.
In an action for the price of rum, the defence being that the rum was adulterated,
Gibbs, C. J., ruled that the record of the condemnation of the rum was admissible,
being in rem; but he refused to admit the record of conviction for penalties,
on the ground that it was in personam, and therefore not evidence where the
parties were different: *Hart* v. *M'Namara* (4 Price, 154, note). An adjudication
in the Court of Admiralty, that a vessel is a lawful prize, is conclusive as to
the status of the vessel, but it is not evidence against another party whose vessel
was captured at the same time and under the same circumstances. In the case
of an indictment for a forcible entry involving a question of title, the judgment
of restitution would not be evidence of the prosecutor's title in a subsequent
action of ejectment. This is a mere judgment in personam, and not conclusive as
an estoppel.

**[574]** Mellish contrà. The question is, whether an owner of land, who has been
convicted of obstructing a public highway, may, after removal of the obstruction,
maintain an action against any person who uses the highway. The verdict and
judgment would be conclusive evidence in another indictment against the same parties;
and therefore, as they were owners of the land in fee simple, it would also be con-
clusive evidence against all persons claiming under them; so that the land must for
ever remain as a highway. Therefore, the argument for the plaintiff leads to this
absurdity, that, though the owners cannot build upon it, or use it in any manner
inconsistent with its being a public highway, they may nevertheless recover damages
against any person who does use it as a highway. [Alderson, B. It may have been,
that the only persons who could have proved that it was not a highway, were those
who were indicted. Suppose this action had been tried before the indictment, and
the jury had negatived the highway, would the verdict in that action have been
evidence on the indictment?] A record of conviction on an indictment against a
parish for not repairing a road, is conclusive evidence of the liability of that parish to
repair: *Rex* v. *St. Pancras* (1 Peak. N. P. 286). An acquittal on such an indictment
is not evidence, because the ground of acquittal does not appear; it may have been
that the highway was not out of repair. But a conviction of a former owner of lands
on an indictment for non-repair of a road ratione tenuræ is evidence of liability to
repair, as against a subsequent purchaser of the same lands: *Regina* v. *Blakemore*
(2 Den. C. C. 41: 21 L. J. M. C. 60). So a conviction on a presentment before
justices, that a road is out of repair, and that a particular township ought to repair it,
is evidence in a subsequent indictment against the township, that the road was
in that township: *Regina* v. *Haughton* (1 E. & B. 501). This is a judgment in rem.
The adjudication of the Court, that the **[575]** obstruction be removed, is an essential
part of the judgment; and if it be omitted when the indictment charges a continuing
nuisance, there would be error on the record: *Rex* v. *Stead* (8 T. R. 142); unless,
indeed, it be proved to the satisfaction of the Court that the obstruction has been
already removed: *Rex* v. *Incledon* (13 East, 164). All convictions are, to some
extent, judgments in rem. If a person has been convicted of felony by a Court of
competent jurisdiction, another Court cannot say that he is not a felon. [Alderson, B.
That is a judgment declaring the status of the party.] In this case, so far as regards
the removal of the obstruction, the judgment is binding on all persons. If the party

KINGSFORD *v.* MERRY

convicted had obstructed the highway by building a house, the judgment of removal would affect all persons who occupied it. The Court directs the obstruction to be removed, in order that the land may for ever be used as a highway; and it would prevent the judgment of the Court from being carried into effect, if the fact of its being a highway could be afterwards disputed. [Alderson, B. The case of *Rex* v. *Wilcox* (2 Salk. 458) shews that the judgment, that the obstruction be removed, is not a punishment of the party convicted, but an order for the removal of that which is a grievance to other people.] This is, in effect, a proceeding between the same parties, for the plaintiff claims under the persons who were convicted: *Blakemore* v. *The Glamorganshire Canal Company* (2 Cr. M. & R. 133). He also referred to *Lord Faversham* v. *Emerson* (ante, p. 385).

Hugh Hill was not called upon to reply.

ALDERSON, B. The plaintiff is entitled to judgment. It is essential to an estoppel that it be mutual, so that the same parties or privies may both be bound and take ad-[576]-vantage of it. The Crown and subject were the parties to the indictment; and therefore it was not between the two parties to this action. The distinction is shewn by the authority cited in Viner's Abridg. Estoppel (F.), 35, where it is said: "If a man, indicted of extortion or trespass, puts himself into the grace of the King, and makes fine, and after the party sues against him thereof by bill or writ, and he pleads not guilty, he shall have the plea, and the making of fine to the King shall not estop him." That is precisely this case, and we ought to follow the same rule. No doubt the judgment in the indictment may be given in evidence upon the trial of the issue as to whether the locus in quo is a public highway; but it cannot be pleaded as an estoppel. It has been ingeniously argued by Mr. Mellish, that to exclude the estoppel would lead to absurd consequences; but there is practically no real absurdity, for a verdict between two parties is not an estoppel as against other persons.

PLATT, B. I am of the same opinion. Viner's Abridg. Estoppel (F.), 33, citing Bro. Estoppel, pl. 159, is also an authority in the plaintiff's favour.

MARTIN, B. I also think that the plaintiff is entitled to judgment. I must, however, confess that I feel strongly the force of Mr. Mellish's argument, that, if the judgment in this indictment is conclusive against the party convicted and all persons claiming under him, it is absurd that those who are bound by that judgment should be able to bring an action against anyone who uses the highway. But it is impossible to get over the authorities from the time of Lord Coke to the present day, which shew that an estoppel must be mutual between the parties; and that, if by the rules of law it cannot be pleaded, the matter must be determined by a jury. This was pointed out in the late [577] case of *Lord Faversham v. Emerson* (ante, p. 385). If the judgment is offered in evidence at the trial, there will be an opportunity of taking the opinion of a Court of error as to whether it is conclusive; but it is sufficient at present to say, that it cannot be pleaded as an estoppel.

Judgment for the plaintiff.

KINGSFORD AND ANOTHER *v.* MERRY. Jan. 22, 1856.—Where a vendee obtains possession of a chattel, with the intention of the vendor to transfer both the property and possession; although the vendee has committed a false and fraudulent misrepresentation in order to effect the contract or obtain the possession, the property vests in the vendee until the vendor has done some act to disaffirm the transaction; and consequently, if, before the disaffirmance, the vendee has transferred either the whole or a partial interest in the chattel to an innocent transferee, the title of such transferee is good against the vendor.—Therefore, where A. falsely and fraudulently represented to the plaintiffs that he was authorised by and acting on behalf of V. N. & Co. in the purchase of certain goods, and the plaintiffs, in consequence of such false and fraudulent representation, delivered the goods to A. with intent to transfer to him the property in them, and A. pledged the goods with the defendant for a bonâ fide advance:— Held, that the plaintiffs could not maintain an action for the goods, until they had paid or tendered to the defendant his demand.

[S. C. 25 L. J. Ex. 166 : reversed, 1856, 1 H. & N. 503.]

Bovill moved (January 14) for a rule to shew cause why the verdict for the

# TAB 59

**Phillips (Liquidator of A.J. Bekhor & Company) and Another v. Brewin Dolphin Bell Lawrie (Formerly Brewin Dolphin & Company Limited) and Another**

House of Lords

18 January 2001

**2001 WL 14897**

Before: Lord Steyn Lord Hutton Lord Hobhouse of Wood -Borough Lord Millett Lord Scott of Foscote

Thursday 18th January, 2001

**Analysis**

Opinions of the Lords of Appeal for Judgment in the Cause

**JUDGMENT**

LORD STEYN

My Lords,

1.  For the reasons given by Lord Scott of Foscote in his opinion I would also make the order which he proposes.

LORD HUTTON

My Lords,

2.  I have had the advantage of reading in draft the speech prepared by my noble and learned friend Lord Scott of Foscote and for the reasons which he gives I would dismiss the appeal and make the order which he proposes.

LORD HOBHOUSE OF WOODBOROUGH

My Lords,

3.  I have had the advantage of reading in draft the speech to be delivered by my noble and learned friend Lord Scott of Foscote. I agree with the order which he is to propose and with the reasons which he will give.

LORD MILLETT

My Lords,

4.  I have had the advantage of reading in draft the speech prepared by my noble and learned friend, Lord Scott of Foscote.

I agree with it, and with the order he proposes.

LORD SCOTT OF FOSCOTE

My Lords,

5.  Section 238 of the Insolvency Act 1986 provides a remedy where a company goes into liquidation within two years after entering into a transaction at an undervalue. Where the section applies the liquidator may apply to the court for an order (subsection (2)) and the court:

> "shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not entered into that transaction" (subsection. (3)).

Subsection (4)(b) elucidates the meaning of a transaction at an undervalue:

> "… a company enters into a transaction with a person at an undervalue if — … the company

enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company."

The company in the present case is A. J. Bekhor & Co ("AJB"). On 10 November 1989 AJB entered into agreements with Brewin Dolphin & Co Ltd ("Brewin Dolphin") and into agreements with Private Capital Group Ltd. ("PCG"). PCG was the parent company of Brewin Dolphin. These agreements were linked. I will describe later the nature of the link and how it arose. The purpose of the agreements was the sale of AJB's stockbroking business to Brewin Dolphin. On 17 October 1989, in order to facilitate and set the stage for the sale, AJB sold its stockbroking business and business assets to Bekhor Securities Ltd ("BSL"), a wholly owned subsidiary, for a consideration of £1. The transfer of the business to Brewin Dolphin was to be brought about by a transfer of the BSL shares. Accordingly, under one of the 10 November 1989 agreements with Brewin Dolphin, AJB transferred to Brewin Dolphin its shares in BSL. Brewin Dolphin thus acquired AJB's business. AJB received in return (i) from Brewin Dolphin, the assumption by Brewin Dolphin of AJB's obligations to its employees, including, in particular, the obligation to make redundancy payments; and (ii) from PCG, under one of the 10 November 1989 agreements between AJB and PCG, a covenant by PCG to pay AJB £312,500 per annum for four years, the first payment to be made on 10 November 1990. This agreement was expressed to be a computer equipment leasing agreement and the payments were expressed to be rent payable for the right to use the computer equipment. The total "rent" to be paid over the four years was £1.25m. It was by no means a coincidence that £1.25m was the sum that it had been agreed would be paid for the stockbroking business. The computer equipment in question was not owned by AJB but had been leased from two lessors, Wirral Equipment Ltd and Asterrose Ltd. Each of the leases required the consent of the lessor to any subletting by AJB. Consent to the subletting of the equipment by AJB to PCG had neither been sought nor given. On account of default

by AJB in paying the rent due under these head leases, the head leases were terminated in early 1990 and the computer equipment was recovered by the head lessors. This took place before the date, 10 November 1990, on which the first payment of £312,500 was due to be paid to AJB under the 10 November 1989 sublease to PCG. So PCG treated the sublease as having been brought to an end by the termination of the head leases, and consequently made none of the £312,500 payments.

6.  In the negotiations between AJB and Brewin Dolphin that had led to the 10 November 1989 agreements, the value of AJB's stockbroking business, and the sum to be paid for it, had first been agreed at £2.5m but later negotiated down to the £1.25m. There were two reasons why, under the form the transaction finally took, the £1.25m was to be paid to AJB not by Brewin Dolphin, the purchaser of the business, but by PCG as rent for the computer equipment spread over four years. One reason was that PCG hoped to be able to deduct the "rent" from its taxable profits. The other reason was that the payment of £1.25m for the goodwill of the stockbroking business would have prompted requirements by the regulatory authority for additional capital funding for that business.

7.  AJB was, at the time of these agreements, in deep financial trouble. A winding up order was made against AJB on 25 April 1990. The petitioners were Wirral and Asterrose. On 4 May 1990 an administrative receiver was appointed by AJB's debenture holder. There is no dispute but that AJB is, and was when the winding up order was made, hopelessly insolvent.

8.  On 24 June 1994 Mr Phillips, the liquidator and administrative receiver of AJB, and AJB in liquidation commenced proceedings against Brewin Dolphin and PCG. It was contended that the transaction under which AJB had transferred its shares in BSL to Brewin Dolphin, thereby, in effect, transferring its stockbroking business to Brewin Dolphin, was a sale at an undervalue. An order against Brewin Dolphin under section 238 was sought. As against PCG, payment of the four annual sums of £312,500 was claimed. The payment of these was said to be the means by which "part of the value of the share capital of Bekhor Securities Limited was due to be paid to [AJB]" (para 10 of the amended statement of claim).

WESTLAW    © 2017 Thomson Reuters.    2

**The judgment of Evans-Lombe J.**

9. The trial took place before Evans-Lombe J: [1998] 1 BCLC 700 . An important issue at the trial was the extent to which the 10 November 1989 agreement under which the BSL shares were transferred to Brewin Dolphin and the 10 November 1989 agreement under which PCG was to make the four annual £312,500 payments should be treated as together providing the consideration for the transfer to Brewin Dolphin of the BSL shares. The judge held that the two agreements were linked "in the sense that it was never contemplated that one would not be entered into without the other". (There is an obviously unintentional double negative in this sentence). This finding of fact by the judge was not challenged in the Court of Appeal or before your Lordships. Brewin Dolphin and PCG were, said the judge, contending on the one hand that the 10 November 1989 sublease of the computer equipment was to be treated as a separate transaction, capable of being treated as at an end on the recovery of the equipment by the head lessors, but contending on the other hand that PCG's covenant in the sublease should be treated as part of the consideration for Brewin Dolphin's purchase of the BSL shares.

The judge said, at pp 723–724:

"It seems to me that it is not open to the defendants to put forward these two contentions simultaneously. If the payments made under the lease agreement were, in truth, part of the consideration for the purchase of the BSL shares under the share purchase agreement, then the lease agreement is not to be treated as a contract for the hire of goods within section 7 of the 1982 Act. Failure to ensure that PCG would be in position to enjoy possession of the leased equipment was not a breach going to the root of the share acquisition agreement nor did it constitute a repudiation of that agreement nor has the consideration for that agreement wholly failed, nor

does the doctrine of eviction by title paramount have the effect of terminating that agreement."

10. PCG and Brewin Dolphin were, he said, trying to "blow hot and cold". He held that it was not open to Brewin Dolphin and PCG to represent the four £312,500 payments as being part of the consideration for the shares, and, thus, of the stockbroking business. PCG's intention had been to set-off the four £312,500 payments against profit for the purposes of corporation tax. This could not be done if the payments were in truth part of the purchase price of the BSL shares. The judge concluded, therefore, that the covenant to make the payments under the computer equipment sublease had to be left out of account in considering whether, in selling the BSL shares to Brewin Dolphin, AJB had entered into a transaction at an undervalue. Leaving out of account the covenant to make the four annual payments of £312,500 the judge then set about the task of considering, on the one hand, what the value was of the shares, ie. in effect what the value was of AJB's stockbroking business, and, on the other hand, what the value was of the consideration that AJB had received.

11. As to the value of the consideration received by AJB, the judge took account of the obligation cast on Brewin Dolphin under the share-sale agreement to meet redundancy costs. These costs, he noted, were the reason why, in the negotiations, an initial valuation of the business of £2.5m was reduced by £500,000 in early September 1989. The redundancy obligations were in the event discharged by Brewin Dolphin at a net cost, after the gross cost had been taken into account for corporation tax purposes, of £325,000. The judge's calculation of this figure has not been challenged nor has his conclusion that the £325,000 should be treated as consideration given by Brewin Dolphin for the BSL shares. The £325,000 was, he held, the only consideration given for the shares that could be taken into account. I have already explained why he declined to allow the value of PCG's covenant to pay the four £312,500 payments to be taken into account, notwithstanding that the total, £1.25m, was the sum it had been agreed AJB should receive for the business.

12. On 9 November 1989 PCG had lent AJB £312,500 as a loan for a year intended to be repaid by set-off against the £312,500 payment that would become due on 10 November 1990. Consistently with his view about the "rent" to be paid by PCG under the sublease, the judge declined to allow that £312,500 to be treated as consideration for the transfer of the shares.

13. As to the value of the shares, the judge noted that Brewin Dolphin /PCG had treated £1.25m payable over a period of four years as the value of the stockbroking business. He discounted the £1.25 million to £875,000 in order to arrive at the value as at 10 November 1989. He took into account certain other business assets and put a total value of £1,050,000 on the value of the BSL shares as at 10 November 1989.

14. It had been argued for Brewin Dolphin that for section 238 purposes the value of the stockbroking business, and thus of the shares, was no more than nominal. Various pieces of evidence were referred to and various arguments were advanced in support of this contention but, at the end of the day, the judge declined "to depart from the prima facie value which results from what Brewin Dolphin were prepared to spend in acquiring the BSL shares". He deducted the £325,000 from the £1.05m and ordered Brewin Dolphin to pay £725,000 with interest. He dismissed the claim against PCG.

**The Court of Appeal**

15. Both Brewin Dolphin and PCG appealed. It is not clear to me why PCG did so. AJB cross-appealed, reviving the claim that PCG should be held liable to AJB in respect of the sums covenanted to be paid under the sublease notwithstanding that all the subleased equipment had been recovered by the head lessors. The Court of Appeal dismissed both the appeal and the cross-appeal. Their grounds, however, were rather different from those of the judge.

16. The judge had held that the 10 November 1989 share-sale agreement and the 10 November 1989 computer

equipment sublease were linked in that one would not have been entered into without the other and the four £312,500 payments under the sublease were the means by which the agreed consideration of £1.25m for the shares was to be paid to AJB. But he held that Brewin Dolphin and PCG were barred from relying on the £312,500 payments as part of the consideration for the shares. Morritt LJ, with whose judgment Laws LJ and Lord Woolf MR agreed, took a stricter approach to the identification for section 238 purposes of the "transaction." Morritt LJ said that unless the sublease agreement could be said to be a sham, or unless there had been an artificial division of the real transaction entered into by the parties, the form of the agreement into which the parties had entered would be determinative in identifying the transaction on which section 238 would bite. He identified the two issues before the court as being (1) the value of the shares in BSL to be taken into account for section 238 purposes and (2) the value of the consideration for those shares provided to AJB. And, at p 2060 of the report at [1999] 1 WLR 2052 , he said this:

> "The first two issues to which I referred earlier, particularly the second, depend on ascertaining, for the purposes of section 238 of the Insolvency Act 1986 , what was the transaction alleged to have been entered into by the company at an undervalue. The allegation of the liquidator is that the share sale agreement was the transaction so that only the consideration passing to and from the company thereunder is to be taken into account. This was disputed by Brewin Dolphin on the basis that the court must have regard to the whole transaction not just that part of it the liquidator seeks to challenge. This is a point of some importance on the true construction and application of section 238. It is true that the word 'transaction' is very widely defined. It is also true, as submitted by counsel for Brewin Dolphin, that, given the purposes of sections 238, 339 and 423 to which it applies, the court should not strain to narrow the definition by judicial decision. However, the word 'transaction' is to be construed and

WESTLAW © 2017 Thomson Reuters.

applied as part of section 238 as a whole … First, the transaction must be identified by reference to the person (or persons, for the singular must include the plural) with whom the company entered into it. Only the elements of the transaction between the company and that person may be taken into account. Thus, without more, a contract between the company, A, and B cannot be part of a transaction entered into by the company, A, with C. I introduce the caveat 'without more' to guard against cases where the transaction is artificially divided. The second limit appears to me to flow from the comparison the statute requires the court to make. In each case it is necessary to ascertain the consideration to be received by the company. In the case of section 238(4)(a) the transaction is either a gift or 'on terms that provide for the company to receive no consideration.' In other cases, as provided for in subsection (4)(b), the task is to ascertain the value of the consideration provided by the other person 'for' the consideration provided by the company. Whether or not the word 'consideration' in those contexts is confined to its legal meaning it clearly connotes the quid pro quo for that which is alleged the company disposed of at an undervalue."

Then, addressing himself to the facts of this case, Morritt LJ concluded that "the transaction" was the share sale agreement alone. He explained his conclusion in the following passage at p 2061:

"First, the parties acting at arm's length and for readily understandable commercial reasons chose so to structure the deal between them so that on the face of the documents the share

sale agreement and the lease agreement effected two separate, though linked, transactions. There is no indication that this different treatment was a sham or otherwise colourable. If parties in such circumstances choose so to structure their commercial dealings in my view the court should give full weight to their intentions. Second, for the reasons I have already given, the share sale agreement and the lease agreement cannot be the same transaction for the purposes of the section because, though the company was party to both of them, only Brewin Dolphin was party to the first and only PCG party to the second. Third, the parties to the lease agreement … unambiguously attributed the four annual payments of £312,500 to rent due thereunder for possession and use of the computer equipment to which it related. The promise to make those payments cannot be recharacterised as consideration from PCG or Brewin Dolphin 'for' the shares being sold by the company."

17.   For those reasons, different from those of the judge, Morritt LJ declined to allow the value of PCG's covenant to pay the £312,500 to be treated as part of the consideration for the shares.

18.   On the values to be attributed to the shares on the one hand and to the consideration given for the shares on the other, Morritt LJ agreed with the judge. So the appeal and cross-appeal were dismissed.

19.   This appeal by Brewin Dolphin and PCG is brought with the leave of your Lordships' House. There is no cross-appeal by AJB. So PCG stands excused from any liability to AJB under the 10 November 1989 sublease. The four payments of £312,500 each are not going to be made.

### The first issue

20. The first issue for your Lordships to decide is whether Evans-Lombe J and the Court of Appeal were right in declining to allow PCG's covenant in the sublease to be taken into account in assessing the value of the consideration for which AJB entered into the share sale agreement. Evans-Lombe J would, I think, have allowed it but for the view he took about Brewin Dolphin and PCG "blowing hot and cold". The Court of Appeal based its decision on the form of the agreements into which the parties had entered. In my respectful opinion, neither approach was right. One must, obviously, start with the share sale agreement. That was the agreement under which AJB agreed to divest itself of its allegedly valuable asset, namely, the shares in BSL. It is worth repeating the language of section 238(4)(b) : "… the company [AJB] enters into a transaction [the share sale agreement] with that person [Brewin Dolphin] for a consideration the value of which …" etc. The subsection does not stipulate by what person or persons the consideration is to be provided. It simply directs attention to the consideration for which the company has entered into the transaction. The identification of this "consideration" is in my opinion, a question of fact. It may also involve an issue of law, for example, as to the construction of some document. But if a company agrees to sell an asset to A on terms that B agrees to enter into some collateral agreement with the company, the consideration for the asset will, in my opinion, be the combination of the consideration, if any, expressed in the agreement with A and the value of the agreement with B. In short, the issue in the present case is not, in my opinion, to identify the section 238(4) "transaction"; the issue is to identify the section 238(4) "consideration".

21. On the facts of this case it is, in my opinion, plain that the consideration for the BSL shares was, apart from obligations assumed by Brewin Dolphin under the share sale agreement itself, the entry by PCG into the sublease agreement under which it covenanted to pay £312,500 per annum for four years. The facts are fully and clearly set out in Evans-Lombe J's judgment and are concisely and accurately summarised by Morritt LJ at pp 2056 — 2058 of the report in [1999] 1 WLR Both set out the relevant part of a memorandum prepared in September 1989 by

Brewin Dolphin's finance director. The memorandum described what had been agreed:

> "The basic concept is that Brewin Dolphin purchases the trade of [AJB] for a consideration of £1.25 million payable over four years … The detailed scheme is as follows (1) [AJB] forms [BSL] as a subsidiary. [AJB] sells its business excluding its computer and other fixed assets to [BSL] … [AJB] sells [BSL] to Brewin Dolphin. The purchase consideration would be £1 … (2) [AJB] enters into a finance lease for the computer and other assets with PCG. PCG enters into an operating lease with Brewin Dolphin for the computer, the lease payments to be yearly in arrears for four years at a rate of £312,500. This means that the purchase price will be tax allowable and there will be no goodwill."

So the purchase price of £1.25m was to be paid under the sublease in four annual payments of £312,500 each. No other conclusion is, in my opinion, possible but that on those facts the consideration for the BSL shares included the benefit of the covenant given by PCG under the sublease. In In re MC Bacon Ltd [1990] BCLC 324 , 340 my noble and learned friend, Lord Millett, then a Chancery judge, analysed the requirements of section 238(4)(b). He said:

> "To come within that paragraph the transaction must be (i) entered into by the company; (ii) for a consideration; (iii) the value of which measured in money or money's worth; (iv) is significantly less than the value; (v) also measured in money or money's worth; (vi) of the consideration provided by the company."

In my respectful opinion, that is a useful breakdown of the statutory requirements. In the present case the agreement for the sale of the shares was entered into for a consideration which included the benefit of the sublease agreement. So I now move on to the issues of value.

**What was the value, in money or money's worth, of PCG's covenant under the sublease?**

22.  This was not an issue which either Evans-Lombe J or the Court of Appeal had to consider. The approaches of each, different though they were, were alike in treating this issue as irrelevant. Naturally enough Mr Mitchell, counsel for Brewin Dolphin and PCG, contends that the value of the covenant was its face value. He points out that there is not, and never has been, any question as to PCG's ability to pay. I agree that there is no doubt as to PCG's ability to pay but the value of the covenant needs, in my opinion, to be investigated a little more deeply. The covenant was, according to the sublease, given in exchange for the right to use the computer equipment. But it appears that, by the end of September 1989, Brewin Dolphin had decided not to use the equipment in order to run the business it was negotiating to acquire but, instead, to update its own existing computer system. This decision did not, of course, affect the willingness of PCG to pay the £312,500 per annum for four years. The amount of those payments was attributable to the purchase, via the BSL shares, of AJB's business and was not attributable in the least to any value placed on the right to use the computer equipment. Nonetheless, the payments, according to the terms of the sublease, were for the right to use the computer equipment. The computer equipment, as Brewin Dolphin and PCG knew, was held by AJB under head leases from Wirral and Asterrose. Under each of these head leases, the lessee, AJB, was barred from assigning or subletting any of the equipment. The bar was expressed as an absolute one. It was not subject to the lessor's consent first being obtained or anything of that character. In each head lease the events on the occurrence of which the lessor would become entitled to terminate the lease include (i) failure by the lessee to pay the due rent, (ii) the appointment of an administrative receiver of the lessee's assets, and (iii) breach by the lessee of any of the terms of the lease. The right to terminate was expressed to be exercisable "at any time [after the event in question] notwithstanding any subsequent acceptance by the lessor of any rental …"

23.  The 10 November 1989 sublease, under which the four £312,500 payments were to be made, constituted, ipso facto, a breach by AJB of a term of the head leases. So the head leases became terminable at any time by the head lessors and the equipment comprised in the sublease could at any time have been repossessed by the head lessors. The re-possession of the computer equipment, which is what happened, would, and did, bring to an end the sublease and the payment obligations of PCG. So, what was the value, in money or money's worth, of a covenant by PCG that was so precarious?

24.  Mr. Mitchell suggested that the covenant was worth something, because the benefit of the sublease, and of PCG's obligation to pay the £312,500 sums, could have been assigned by AJB to the head lessors. There is, however, no evidence that the head lessors would have had any interest at all in such an assignment. If a covenant with the precarious character of PCG's covenant in the sublease is to have value attributed to it for section 238 purposes, the value must, in my opinion, be placed on a more firm footing than that of speculative suggestion. The actual events that took place in 1990, before any payment under the sublease had become due, are in my opinion, relevant. First, within a week of the date of the sublease agents for the head lessors wrote to AJB complaining about the sublease and threatening proceedings. In January 1990 AJB defaulted in payment of the rents due under the head leases and shortly thereafter the head lessors demanded the return of the equipment. On 5 February PCG confirmed that neither it nor Brewin Dolphin would obstruct the repossession of the equipment by the head lessors and on 23 February 1990 solicitors for PCG wrote to solicitors for AJB notifying them that "our client intends to accept your clients' repudiatory breach of the agreement between them. Alternatively there has been a total failure of consideration by your clients in relation to the lease of equipment dated 10 November 1989."

25.  PCG's covenant, which had been precarious at the outset, had become worthless by 23 February 1990 at the latest. To complete the point, AJB went into compulsory winding up in April 1990 and an administrative receiver was appointed in May. These events would inevitably have led the head lessors to terminate the head leases

and recover their equipment, if they had not done so
previously, thereby bringing the sublease to an end.

26. Mr Mitchell submitted that these ex post facto events
ought not to be taken into account in valuing PCG's
sublease covenant as at 10 November 1989. I do not
agree. In valuing the covenant as at that date, the critical
uncertainty is whether the sublease would survive for
the four years necessary to enable all the four £312,500
payments to fall due, or would survive long enough to
enable some of them to fall due, or would come to an
end before any had fallen due. Where the events, or some
of them, on which the uncertainties depend have actually
happened, it seems to me unsatisfactory and unnecessary
for the court to wear blinkers and pretend that it does
not know what has happened. Problems of a comparable
sort may arise for judicial determination in many different
areas of the law. The answers may not be uniform but may
depend upon the particular context in which the problem
arises. For the purposes of section 238(4) however, and the
valuation of the consideration for which a company has
entered into a transaction, reality should, in my opinion,
be given precedence over speculation. I would hold, taking
account of the events that took place in the early months
of 1990, that the value of PCG's covenant in the sublease
of 10 November 1989 was nil. After all, if, following the
signing of the sublease, AJB had taken the sublease to a
bank or finance house and had tried to raise money on
the security of the covenant, I do not believe that the bank
or finance house, with knowledge about the circumstances
surrounding the sublease, would have attributed any value
at all to the sublease covenant.

27. Where the value of the consideration for which
a company enters into a section 238 transaction is as
speculative as is the case here, it is, in my judgment, for
the party who relies on that consideration to establish its
value. PCG and Brewin Dolphin are, in the present case,
unable to do so.

28. For these reasons I, as did Evans-Lombe J and the
Court of Appeal for different reasons, would treat the
value of the consideration for which AJB entered into
the share sale agreement as being confined to the value
of the consideration under that agreement. The sublease
covenant, in my opinion, adds nothing.

**The value of the consideration given by the company**

29. On this issue, Mr Mitchell submitted that AJB's
business as at 10 November 1989 was worthless and that
the BSL shares were therefore valueless. This submission
was based on the fact that AJB appears to have been
hopelessly insolvent and by November 1989 was trading
at a substantial loss of £13,000 odd per day. The judge's
findings on the value of the BSL shares are conveniently
summarised at para 4.3 of AJB's case:

> "(1)  Bekhor's business assets were
> an attractive package to buyers such
> as Brewin Dolphin.
> (2)    It could not be inferred
> that Brewin Dolphin was the only
> potential purchaser.
> (3)    Brewin Dolphin was a
> reasonably well informed potential
> purchaser from the class of typical
> purchasers.
> (4)    The contemporary view of
> what a reasonably well-informed
> potential purchaser was prepared to
> pay was some evidence in assessing
> the market value of the BSL shares.
> (5)    Brewin Dolphin had been
> prepared to pay about £1,050,000
> for the BSL shares."

30. I respectfully agree with this approach. The value
of an asset that is being offered for sale is, prima facie,
not less than the amount that a reasonably well informed
purchaser is prepared, in arms' length negotiations, to pay
for it.

31. On this issue the judge reached his figure of £1,050,000
after hearing and assessing the evidence, including expert
evidence. It has not been demonstrated that in doing so
he misdirected himself. The Court of Appeal reviewed
the judge's conclusion. Morritt LJ at p 2063, described
his conclusion as "eminently sensible and evidently right"
and upheld it. Your Lordships have, in my opinion,

WESTLAW    © 2017 Thomson Reuters.

been provided with no reason to come to any different conclusion.


**The £312,500 loan**

32.   In my opinion, in agreement with the judge and the Court of Appeal, AJB succeeded in establishing that, for the purposes of section 238, it had entered into a transaction, namely the share sale agreement, at an undervalue and that the amount of the undervalue was £725,000, ie. £1,050,000 less £325,000. The order made by the judge and upheld by the Court of Appeal required Brewin Dolphin to pay that sum, with interest, to AJB. Neither before the judge nor before the Court of Appeal was any account taken of the £312,500 loan that had been made by PCG to AJB on 9 November 1989 and that had been intended to be repaid by set-off against the same amount due on 10 November 1990. In my opinion, however, that sum ought to be taken into account. It constituted an advance payment, as a loan, of a part of the consideration that had been given for the BSL shares. The receipt of that sum was an advantage that AJB would not have received but for its entry into the share sale agreement and the sublease agreement.

33.   PCG has proved for that sum in the liquidation of AJB, but what, if any, dividend will be received is not known. I imagine it will be negligible.


33.   Under section 238(3) , the court has a broad discretion to make "such order as it thinks fit for restoring the position to what it would have been if the company had not entered into that transaction". In my opinion, an order under the subsection that did not take account of AJB's receipt of the £312,500 would be unfair to Brewin Dolphin and PCG. I would, therefore, vary the order against Brewin Dolphin by allowing credit to be taken for the £312,500 and interest thereon. The interest should run from the same date and at the same rate as the interest on the sum payable by Brewin Dolphin. PCG will, of course, have to withdraw its proof for the £312,500 in the liquidation. With that variation to the order made by Evans-Lombe J, however, I would uphold the order and dismiss the appeal.


Crown copyright

© 2017 Sweet & Maxwell

2001 WL 14897

---

**End of Document**                                                 © 2017 Thomson Reuters.

# TAB 60

*664  **Portman Building Society**
**v. Hamlyn Taylor Neck (A Firm)**
Court of Appeal
22 April 1998

**[1998] P.N.L.R. 664**

( Millett , Morritt and Brooke L.JJ. )
April 22, 1998

### Analysis

Solicitor—mortgage transaction—breach of user condition—claim for restitution—mistake of fact

B bought a property in Torquay with the assistance of a mortgage advance of £93,000 from the plaintiff society. The defendant solicitors were instructed to act for both B and the plaintiff in connection with the purchase. It was an express condition of the mortgage advance that the property should be used solely for B's own occupation. In fact the property was an established guest house and, to the defendants' knowledge, B intended to continue to use it as such. The defendants did not tell the plaintiff that part of the purchase price had been apportioned to the goodwill of the business, or that only £87,250 had been apportioned to the property itself. Shortly before completion, the plaintiff paid to the defendants the sum of £92,100 which the defendants duly paid into their clients account and then to the vendor. B later defaulted in making his mortgage repayments. The plaintiff discovered that B was using the property as a guest house. The plaintiff recovered possession of the property and sold it at a substantial loss. The plaintiff sued the defendants for breach of contract, negligence, breach of trust, breach of fiduciary duty and restitution. The claim for restitution was pleaded as based on the society's alleged mistakes of fact (a) that the property was to be used for private occupation and (b) that the whole of the loan was going to be used to pay the purchase price. They reclaimed the whole loan from the defendant solicitors asserting that they had been unjustly enriched.

The master struck out the entire action on the grounds that (1) the claims for breach of contract, negligence and breach of trust were statute barred and that (2) the claims for breach of fiduciary duty and restitution disclosed no reasonable cause of action. On appeal against the master's decision in respect of the claim for restitution only Sir Richard Scott V-C upheld the master's decision. The plaintiff appealed.

Held, dismissing the appeal: a claim for restitution was designed to reverse unjust enrichment. Therefore in any such claim it was necessary to ask firstly, whether the defendant has been enriched, secondly, if so, whether such enrichment was unjust and, thirdly, whether such enrichment was at the expense of the plaintiff. A person could not be unjustly enriched if he had not been enriched at all. The money received by the *665 defendant was trust money, which belonged in equity to the plaintiff, and was properly paid by the defendant into its client account. The defendant never made any claim to the money but held the same to the order of the plaintiff. The defendant applied the same in accordance with the plaintiff's instructions and obtained a good discharge. Accordingly, the defendant was not enriched by the receipt of the £92,100.

The plaintiff's mistake did not render the money repayable or the transaction under which the money was paid invalid. The continuing validity of the transaction was fatal to the plaintiff's claim since the obligation to make restitution must flow from the ineffectiveness of the transaction under which the money was paid and not from any mistake or misrepresentation which induced it. It is fundamental that, where money is paid under a legally effective transaction neither misrepresentation nor mistake vitiates consent or gives rise by itself to an obligation to make restitution.

*Appeal dismissed* .

**Cases referred to in judgments:**

- (1)  Holland v. Russell (1861) 1 B & S 424 .
- (2)  Ex parte Edwards (1884) 13 Q.B.D. 747 .
- (3)  Barclays Bank v. W. J. Simms [1980] Q.B. 677 .

• (4) Bristol and West Building Society v. Mothew [1998] Ch. 1 .

**Appeal** from the Order of Sir Richard Scott V.-C, on appeal from a decision of the master to strike out the plaintiff's claim.

**Representation**

• Simon Berry, Q.C. and Mark West , instructed by Clarke Willmott & Clarke, Yeovil, Somerset, for the appellant.
• Jonathan Sumption, Q.C. and David Halpern , instructed by Bond Pearce, Exeter, for the respondent.

MILLETT L.J.:

This is yet another case in which a mortgagee, having advanced money on mortgage at the height of the property boom in the late 1980s and having realised its security during a serious recession in the early 1990s, has sought to recover its loss from the solicitor who acted for it in the transaction. Unwilling to plead fraud and unable to recover damages for breach of contract or tort, or equitable compensation for breach of fiduciary duty, it has had resort to an even less promising claim in restitution.

The appellant is the Portman Building Society ( "the Society" ). The respondent is a firm of solicitors, Hamlyn Taylor Neck ( "the firm" ). The case concerns a property in Torquay which was bought by a Mr Biggins with the assitance of a mortgage advance of £93,000 by the Society. In his mortgage application Mr Biggins stated that it was his intention to use the property exclusively for residential purposes. He repeated this in a letter **\*666** which he later wrote to the Society. The Society made it an express condition of its offer of a mortgage advance that the property should be used solely for Mr Biggins' own private occupation.

In accordance with the usual practice the firm acted for both Mr Biggins and the Society in the transaction.

In the proceedings the Society alleges that in fact the property was an established guest-house with some eight bedrooms and that to the firm's knowledge it was Mr Biggins' fixed intention throughout to continue to use it as a guest-house and not solely as a private residence for himself and his family. Before completion the firm negotiated with the vendor an apportionment of the purchase price of £98,000 between the property itself, the fixtures and fittings and the goodwill of the guest-house business. In due course the firm completed and returned the Society's standard form of report on title. This stated that the Society's conditions of advance had been complied with and that there were no other matters affecting the property about which the Society ought to be advised. The firm did not tell the Society that part of the purchase price had been apportioned to the goodwill of the business, or that only £87,250 of the purchase price had been apportioned to the property itself. In consequence, the Society alleges, it believed that the special condition regarding the residential use of the property had been complied with and that the full amount of the purchase price of £98,000 was attributable to the property which was to be the subject of the proposed mortgage. Although the Society pleads an actual representation of facts known to the representor to be untrue, it does not allege fraud or dishonesty and has disclaimed any intention of making such a claim.

Shortly before completion the Society paid the sum of £92,100 to the firm, and this was duly paid into the firm's client account. The difference between the sum of £392,100 received by the firm and the amount of the agreed mortgage advance of £93,000 is accounted for by the fact that £900 was applied by the Society in effecting a mortgage guarantee policy.

The transaction was completed in March 1989, when in accordance with its instructions the firm paid the sum of £92,100 to the vendor's solicitor and obtained a conveyance and mortgage of the property in favour of the Society in exchange.

Mr Biggins afterwards defaulted in making payments due under the mortgage. The Society became aware that Mr Biggins was using the property as a guest-house. It brought proceedings against Mr Biggins for possession,

WESTLAW    © 2017 Thomson Reuters.

recovered possession and sold the property, realising a substantial loss. It has not pursued Mr Biggins on his personal covenant for repayment, presumably on the ground that such an action would not be cost effective. Instead, in January 1996, it brought the present action against the firm.

By its writ the Society maintains a number of alternative causes of action. It claims damages for breach of contract, the tort of negligence or breach of trust; compensation for breach of fiduciary duty; or repayment of moneys had or received to the use of the Society. It is to be observed that, with the **\*667** exception of the last, all are claims to recover monetary compensation for loss in consequence of a wrong alleged to have been committed by the firm. The last claim, however, is a straightforward claim in quasi contract for money had and received or, as we would now call it, restitution. As counsel for the Society acknowledged, the remedy for such a claim is not damages but an account and payment.

On the firm's application the master struck out the entire action. He held that the claims for breach of contract, tort and breach of trust were statute-barred, more than six years having elapsed between the completion of the transaction in March 1989 and the issue of the writ in January 1996. He struck out the remaining claims for breach of fiduciary duty and restitution on the ground that they disclosed no reasonable cause of action.

The Society appealed to Sir Richard Scott V.-C. It did not pursue its appeal against the order striking out the claims for breach of contract, tort, breach of trust or fiduciary duty. It accepted that the claims for breach of contract, tort and breach of trust were statute-barred; and that the claim for breach of fiduciary duty was precluded by the decision of this court in Bristol and West Building Society v. Mothew [1998] Ch. 1 . This left only the restitutionary claim for an account.

The Society alleges that, in the events which happened, it paid the sum of £92,100 to the firm in the mistaken belief induced by the firm (i) that the special conditions contained in its offer of a mortgage advance that the property would be used solely as a private residence had

been complied with and (ii) that the whole of the purchase price of £98,000 was attributable to the property itself. The Society alleges that, if it had not been for those mistakes, it would not have been prepared to make the mortgage advance to Mr Biggins and would, therefore, not have paid the £92,100 to the firm in the first place.

Accordingly, the Society contends, it is entitled to maintain an action for the recovery of the £92,100 as money paid to the firm under a mistake of fact. It is conceded on behalf of the. firm that, if such an action is maintainable at all, it is arguably not statute-barred, on the ground that time will not have begun to run until the mistake which led to the payment being made was, or should with reasonable diligence have been, discovered. For its part the Society concedes that the firm duly applied the money in accordance with its mandate. It is implicit in that concession, and was confirmed by counsel in argument before us, that the firm's authority to make the payment had not been determined; and it is not alleged in the statement of claim that it was. It is to be observed that the Society has not sought to set the transaction aside whether for mistake, misrepresentation or otherwise; nor of course could it do so, at least against Mr Biggins, since with knowledge of the facts it has affirmed the transaction by enforcing the mortgage. In paying the £92,000 to the vendor's solicitor on completion and in exchange for an executed instrument of mortgage in favour of the Society, therefore, the firm must be taken to have been acting in accordance with the Society's unrevoked instructions.

**\*668**

The Vice-Chancellor struck out what remained of the action, and the Society appeals to this court. In my judgment the Vice-Chancellor was plainly right. The Society's claim for restitution is entirely misconceived. Whether the claim is for restitution for wrong or restitution for unjust enrichment by subtraction (as in the present case) such a claim is designed to reverse unjust enrichment. The first sentence of the first edition of Goff & Jones "The Law of Restitution" published in 1965 states:

> "The law of restitution is the law of all claims … which are founded on the principle of unjust enrichment."

That passage echoes section 1 of the Restatement of the Law of Restitution, published by the American Law Institute in 1937, in which the authors, Professors Warren Seavey and Austin Scott, made the epoch-making assertion:

> "A person who has been unjustly enriched at the expense of another is required to make restitution to that other."

This formulation explains why any claim to restitution raises the questions: (1) has the defendant been enriched? (2) If so, is his enrichment unjust? (3) Is his enrichment at the expense of the plaintiff? There are several factors which make it unjust for a defendant to retain the benefit of his enrichment; mistake is one of them. But a person cannot be justly enriched if he has not been enriched at all. That is why it is necessary to ask all three questions and why the fact that a payment may have been made, *e.g.* by mistake, is not by itself sufficient to justify a restitutionary remedy.

In the present case the firm was not enriched by the receipt of the £92,100. The money was trust money, which belonged in equity to the Society, and was properly paid by the firm into its client account. The firm never made any claim to the money. It acknowledged that it was the Society's money, held to the order of the Society and it was applied in accordance with the Society's instructions in exchange for a mortgage in favour of the Society. The firm did not receive the money for its own use and benefit, but to the Society's use. Given that the money was held to the order of the Society, the only question is whether the firm obtained a good discharge for the money. It is conceded that it did.

In its argument before us the Society relies on three lines of authority. The first is the line of cases which establish that an action lies to recover payments made under a mistake of fact; see for example Barclays Bank v. W. J. Simms [1980] Q.B. 677 , 695. So it does. In such cases the money is (mistakenly) paid to the defendant for his own use and benefit, or at least for the use and benefit of a third party and not for the use and benefit of the

plaintiff himself. But for the mistake, there would be no injustice in the defendant or the third party retaining the benefit of the payment, for that is the common intention of the parties. The effect of the plaintiff's mistake, **\*669** however, is to make it unjust for the defendant or the third party to retain the benefit of the payment. The action for restitution reverses the unjust enrichment.

But in the present case the Society paid the money to the firm to hold to the Society's order, that is to say for the Society's own use and benefit. The Society was entitled to give the firm directions as to the application of the money, and to revoke those directions and demand the repayment of the money if not previously applied in accordance with its unrevoked directions. The Society did not need to plead mistake or any other ground of restitution. The firm received the money on terms which made it an accounting party and has never denied its liability to account. The Society's difficulty is not in establishing the firm's liability to account, but in showing that anything is due from the firm after it applied the money in accordance with the Society's instructions.

Secondly, the Society relies on those cases which show that the cause of action for money had and received is complete when the plaintiff's money is received by the defendant. It does not depend on the continued retention of the money by the defendant. Save in strictly limited circumstances it is no defence that the defendant has parted with the money. All that is true. But it is, of course, a defence that he has parted with it by paying it *to the plaintiff or to the plaintiff's order* ; see Holland v. Russell (1861) 1 B & S 424; affd (1863) 4 B & S 14 . That is what the firm did in the present case.

Thirdly, the Society relies on the doctrine described in Article 113 of *Bowstead & Reynolds on Agency* , 16th ed., 1996, and Goff & Jones, *The Law of Restitution* (4th ed., 1993) at pages 750–51. The general rule is that money paid ( *e.g.* by mistake) to an agent who has accounted to his principal without notice of the claim cannot be recovered from the agent but only from the principal. The Society submits that the agent's defence in such a case is a particular species of the change of position defence and does not avail the agent who has notice, actual or

constructive, of the mistake which founds the plaintiff's claim.

I myself do not regard the agent's defence in such a case as a particular instance of the change of position defence, nor is it generally so regarded. At common law the agent recipient is regarded as a mere conduit for the money, which is treated as paid to the principal, not to the agent. The doctrine is therefore not so much a defence as a means of identifying the proper party to be sued. It does not, for example, avail the agent of an undisclosed principal; though today such an agent would be able to rely on a change of position defence.

The true rule is that where the plaintiff has paid money under (for example) a mistake to the agent of a third party, he may sue the principal whether or not the agent has accounted to him, for in contemplation of law the payment is made to the principal and not to his agent. If the agent still retains the money, however, the plaintiff may elect to sue either the principal or the agent, and the agent remains liable if he pays the money over to his principal after notice of the claim. If he wishes to protect himself, **\*670** he should interplead. But once the agent has paid the money to his principal or to his order without notice of the claim, the plaintiff must sue the principal.

But all this is by the way, because the doctrine is concerned with the receipt of money by an agent from a third party and his subsequent payment of the money to his own principal without the authority of the third party. Where the agent remains liable, it is not because a change of position defence is not available. It is because neither he nor his own principal was entitled to retain the money as against the third party who made the payment. The agent is liable to make restitution to the third party because he knew that his principal was no more entitled to the money than he was himself: see Ex parte Edwards (1884) 13 Q.B.D. 747 .

But in the present case, while the Society's mandate remained unrevoked, the firm was entitled and bound to deal with the money in accordance with the mandate. In the present case there is no third party plaintiff. The firm was the agent of the Society. It received the payment from its principal, held it to the order of its principal and applied it in accordance with its principal's instructions. The firm's defence is not that it has paid the money away to a third party but that it has dealt with it in accordance with the Society's instructions, and thereby obtained a good discharge.

In the course of argument counsel submitted that the Society's mistake, induced by the firm, rendered the money repayable and the mandate revocable. In fact, of course, the mandate was revocable in any case. The problem is that it was never revoked. The continuing validity of the transaction under which the money was paid to the firm is, in my judgment, fatal to the Society's claim. The obligation to make restitution must flow from the ineffectiveness of the transaction under which the money was paid and not from a mistake or misrepresentation which induced it. It is fundamental that, where money is paid under a legally effective transaction, neither misrepresentation nor mistake vitiates consent or gives rise by itself to an obligation to make restitution. The recipient obtains a defensible right to the money, which is divested if the payer rescinds or otherwise withdraws from the transaction. If the payer exercises his right of recission in time and before the recipient deals with the money in accordance with his instructions, the obligation to make restitution may follow.

This court explained the effect of a defensible payment in the recent case of Bristol and West Building Society v. Mothew [1998] Ch. 1 where I said at page 22:

> "… it would appear that the judge was of opinion that the defendant's authority to deal with the money was automatically vitiated by the fact that it (and the cheque itself) was obtained by misrepresentation. But that is contrary to principle. Misrepresentation makes a transaction voidable not void. It gives the representee the right to elect **\*671** whether to rescind or affirm the transaction. The representor cannot anticipate his decision. Unless and until the representee elects to rescind the representor remains fully bound.

"The defendant's misrepresentations merely gave the society the right to elect to withdraw from the transaction on discovering the truth. Since its instructions to the defendant were revocable in any case, this did not materially alter the position so far as he was concerned, though it may have strengthened the society's position in relation to the purchasers."

That, in my judgment, is the position in the present case.

The Society brings a claim for money had and received. The firm does not deny that it is an accounting party. It is an accounting party irrespective of the existence of any mistake on the part of the Society. But it has dealt with the whole of the money which it received from the Society in accordance with the Society's instructions, which have never been revoked. Accordingly, although the firm is accountable for the money it received, it is plain that there is nothing due to the Society on the taking of the account. The whole of the money has been expended on the Society's behalf. The court does not order an account to be taken where it is plain that there is nothing due.

In my judgment the action is entirely misconceived and the appeal must be dismissed.

MORRITT L.J.:

I agree.

BROOKE L.J.:

I agree. The writ in this action was issued on January 25, 1996, nearly seven years after the completion of the relevant transaction. The only reason why this expensive litigation has taken up so much time in the courts through three different levels is that the law of limitation has grown up piecemeal over the last 450 years before the modern remedy of restitution was properly developed. As a result the plaintiff sought to take adventitious advantage of section 32(1)(c) of the Limitation Act 1980 by advancing its alternative claim in restitution.

For the reasons given by Lord Justice Millett, with which I agree, this claim is hopeless. The time and cost devoted to this appeal illustrates, in my judgment, the need for Parliament to bring appropriate limitation rules relating to restitutionary remedies within a coherent, principled limitation statute as suggested by the Law Commission's recent Consultation Paper No. 151 "Limitation of Actions" (1998). Everybody would then be able to understand clearly where they stand and what the relevant rules are, and this sort of litigation could be avoided.

Order: Appeal dismissed with costs; application for leave to appeal to the House of Lords refused.  **\*672**

© 2017 Sweet & Maxwell
[1998] P.N.L.R. 664

---

End of Document                                                                    © 2017 Thomson Reuters.

# TAB 61

**\*571  Prest v. Petrodel Resources Ltd**

Supreme Court

12 June 2013

**[2013] UKSC 34**

**[2013] B.C.C. 571**

Lord Neuberger P. , Lord Walker ,
Lady Hale , Lord Mance , Lord Clarke ,
Lord Wilson and Lord Sumption :

June 12, 2013

**Analysis**

H1.  Corporate personality—Veil of incorporation —Piercing the veil of incorporation—Matrimonial proceedings—Ancillary relief order—Husband controlled several companies—Husband treated companies' assets as his own—Properties acquired by husband transferred to companies for nominal or questionable consideration or purposes—Divorce—Lump sum ordered against husband —Family court ordered husband to cause companies to convey certain properties to wife as husband entitled in possession or revision under statute—Court did not pierce the veil—On appeal held not appropriate to pierce the veil—Properties not held by husband in possession or reversion—Appeal—Whether doctrine of piercing the veil of incorporation existed—Circumstances in which courts might pierce the veil—Whether husband entitled to properties in possession or reversion—Whether companies should be ordered to convey properties to the wife—Matrimonial Causes Act 1973 s.24(1)(a).

H2.  This was an appeal from a decision of the Court of Appeal ([2012] EWCA Civ 1395) allowing an appeal against a decision of Moylan J. ([2011] EWHC 2956 (Fam)) in divorce proceedings that the former husband should procure the conveyance of the matrimonial home and, amongst other things, procure the transfer of seven UK properties legally owned by companies controlled by him to the former wife in partial satisfaction of a lump sum order awarded in her favour.

H3.  The former husband, "P", and his wife were married in 1993 and the matrimonial home was in London. P was not a party to the current appeal which concerned a number of companies called the Petrodel Group which was owned and controlled by P. The wife petitioned for divorce in March 2008 and a decree absolute was granted in November 2011. In the ancillary relief proceedings Moylan J. noted that P had failed to comply with disclosure obligations and to comply with orders of the court made during the course of the proceedings, so that the court could not assemble a conventional schedule of assets, but he found that P was the sole beneficial owner and the controller of the companies, and doing the best that he could on the material available assessed his net assets at £37.5 million. He ordered that P should procure the conveyance of the matrimonial home, which was legally owned by one of the Petrodel companies, and he should make a lump sum payment to her of £17.5 million plus other payments. In partial satisfaction of the lump sum order the judge ordered P to procure the transfer of seven properties owned by some companies in the group. The judge concluded that there was no general principle of law which entitled him to reach the companies' assets by piercing the corporate veil as the authorities showed that the separate legal personality of a company could not be disregarded unless it was being abused for a purpose that was in some relevant respect improper. He held that there was no relevant impropriety. He nevertheless concluded that in applications for financial relief ancillary to a divorce, a wider jurisdiction to pierce the corporate veil  **\*572**  was available under s.24 of the Matrimonial Causes Act 1973 . The judge found that the matrimonial home was held by PRL on trust for P, but he made no corresponding finding about the seven other properties and refused to make a declaration that P was their beneficial owner. He decided, having found that P simply treated the companies' cash balances and property as his own and drew on them as he saw fit, that he was specifically authorised to dispose of the companies' properties under s.24(1)(a) of the 1973 Act, under which the court could make on order in matrimonial proceedings in relation to property to which a party was "entitled, either in possession or reversion". In the Court of Appeal the respondent companies challenged the orders made against them on the ground that there was no jurisdiction to order

their property to be conveyed to the wife in satisfaction of the husband's judgment debt. The majority allowed the appeal and held that the practice of the Family Division, to treat the assets of companies substantially owned by one party to the marriage as available for distribution under s.24 of the Matrimonial Causes Act 1973 provided that the remaining assets of the company were sufficient to satisfy its creditors, was beyond the jurisdiction of the court unless (i) the corporate personality of the company was being abused for a purpose which was in some relevant respect improper, or (ii) on the particular facts of the case it could be shown that an asset legally owned by the company was held in trust for the husband. As the judge had rejected both of these possibilities on the facts he ought not therefore to have made the order he made. The former wife appealed to the Supreme Court.

H4. **Held,** allowing the appeal:

H5. 1. (Per Lord Sumption) The principle that the court may be justified in piercing the corporate veil if a company's separate legal personality was being abused for the purpose of some relevant wrongdoing was well established in the authorities. The recognition of a limited power to pierce the corporate veil in carefully defined circumstances was necessary if the law was not to be disarmed in the face of abuse. Provided limits were recognised and respected, it was consistent with the general approach of English law to the problems raised by the use of legal concepts to defeat mandatory rules of law.

H6. 2. The difficulty was to identify what was a relevant wrongdoing. References in the cases to a "façade" or "sham" begged too many questions to provide a satisfactory answer. Two distinct principles, the concealment principle and the evasion principle, lay behind those terms and much confusion had been caused by failing to distinguish between them. The concealment principle did not involve piercing the corporate veil at all but was that the interposition of a company or companies so as to conceal the identity of the real actors would not deter the courts from identifying them. In these cases the court was not disregarding the "façade", but only looking behind it to discover the facts which the corporate structure was concealing. The evasion principle was that the court may disregard the corporate veil if there was a legal

right against the person in control of it which existed independently of the company's involvement, and a company was interposed so that the separate legal personality of the company would defeat the right or frustrate its enforcement. ( Gilford Motor Co Ltd v Horne [1933] Ch. 935 , Jones v Lipman [1962] 1 W.L.R. 832 , Gencor ACP Ltd v Dalby [2000] 2 B.C.L.C. 734 and Trustor AB v Smallbone (No.2) [2001] 1 W.L.R. 1177; [2002] B.C.C. 795 considered .)

H7. 3. There was a limited principle of English law which applied when a person was under an existing legal obligation or liability or subject to an existing legal restriction which he deliberately evaded or whose enforcement he deliberately frustrated by interposing a company under his control. The court may then pierce the corporate veil for the purpose, and only for the purpose, of depriving the company or its controller of the advantage that they would otherwise have obtained by the company's separate  **\*573**  legal personality. The principle was a limited one because in almost every case where the test was satisfied the facts would in practice disclose a legal relationship between the company and its controller which would make it unnecessary to pierce the corporate veil. If it was not necessary to pierce the corporate veil, it was not appropriate to do so, because on that footing there was no public policy imperative which justified that course. But the recognition of a small residual category of cases where the abuse of the corporate veil to evade or frustrate the law could be addressed only by disregarding the legal personality of the company was consistent with authority and with long-standing principles of legal policy. ( Salomon v A Salomon & Co Ltd [1897] A.C. 22 , Ben Hashem v Ali Shayif [2008] EWHC 2380 (Fam); [2009] 1 F.L.R. 115 , and VTB Capital Plc v Nutritek International Corp [2012] EWCA Civ 808; [2012] 2 Lloyd's Rep. 313 considered .)

H8. 4. The judge at first instance was right to hold that he could not pierce the corporate veil under the general law without some relevant impropriety, and he declined to find that there was any. P had acted improperly in many ways and misapplied the assets of his companies for his own benefit, but in doing that he was neither concealing nor evading any legal obligation owed to his wife. Nor, more generally, was he concealing or evading the law relating to the distribution of assets of a marriage upon its dissolution. It could not follow that

the court should disregard the legal personality of the companies with the same insouciance as he did. The problem in the present case was that the legal interest in the properties was vested in the companies and not in P long before the marriage broke up. Whatever P's reasons for organising things in that way, there was no evidence that he was seeking to avoid any obligation which was relevant in these proceedings. It followed that the piercing of the corporate veil could not be justified in this case by reference to any general principle of law.

H9.   5. If there was no justification as a matter of general legal principle for piercing the corporate veil, it was impossible to say that a special and wider principle applied in matrimonial proceedings by virtue of s.24(1) (a) of the Matrimonial Causes Act 1973 . This provision clearly empowered the court to order one party to the marriage to transfer to the other property to which the first-mentioned party was entitled, either in possession or reversion. An "entitlement" was a legal right in respect of the property in question and "in possession or reversion" showed that the right in question was a proprietary right, legal or equitable. The section invoked concepts with an established legal meaning and recognised legal incidents under the general law. Courts exercising family jurisdiction did not occupy a desert island in which general legal concepts were suspended or meant something different. If a right of property existed, it existed in every division of the High Court and in every jurisdiction of the county courts; if it did not exist, it did not exist anywhere.

H10.   6. The judge was entitled to take account of the husband's ownership and control of the companies and his unrestricted access to the companies' assets in assessing what his resources were for the purpose of the 1973 Act, but he was not entitled to order the companies' assets to be transferred to the wife in satisfaction of the lump sum order simply by virtue of s.24(1)(a) . The construction of s.24(1)(a) of the Act was informed by its purpose and its social context, as well as by its language, and the object was to achieve a proper division of the assets of the marriage. But it did not follow that the courts would stop at nothing in their pursuit of that end. The recognition of a jurisdiction such as the judge sought to exercise in this case would cut across the statutory schemes of

company and insolvency law, which were essential for the protection of those dealing with companies.

H11.   7. It followed that the only basis on which the companies could be ordered to convey the seven disputed properties to the wife was if they belonged beneficially to P by virtue of the particular circumstances in which they came to be vested in him. Only then would they constitute property to which he was "entitled, either in possession or reversion." The judge found that P had deliberately sought to conceal facts, and he and the companies had failed to comply with court order **\*574** s for the disclosure of evidence, from which adverse influences could therefore be drawn. It was a fair inference, from all the facts, taken cumulatively, that the main, if not the only, reason for the companies' failure to co-operate was to protect the properties. That in turn suggested that proper disclosure of the facts would have revealed them to have been held beneficially by P, as the wife alleged. The most plausible inference from the known facts was that each of the properties was held on a trust by the companies for P, and accordingly the seven disputed properties should be required to be transferred to the wife.

H12.   8. (Per Lord Neuberger P.) It would be wrong to discard a doctrine of piercing the veil of incorporation which, while it has been criticised by judges and academics, has been generally assumed to exist in all common law jurisdictions, and represented a potentially valuable judicial tool to undo wrongdoing in some cases, where no other principle was available. A clear and limited doctrine would not fall foul of at least most of the strictures which have been made of the doctrine; in particular (i) it should be of value in the few cases where it could be properly invoked, (ii) it was sufficiently clear as to render it unlikely to be raised in inappropriate cases, and (iii) it did not cut across the rule in Salomon because it was consistent with conventional legal principles.

**H13. Cases referred to:**

- A v A [2007] EWHC 99 (Fam); [2007] 2 F.L.R. 467
- Adams v Cape Industries Plc [1990] Ch. 433; [1990] B.C.C. 786
- Alliance Bank JSC v Aquanta Corp [2012] EWCA Civ 1588; [2012] 2 C.L.C. 1027

• Allied Capital Corp v GC-Sun Holdings LP, 910 A.2d 1020 (2006)

• Atlas Maritime Co SA v Avalon Maritime Ltd (No.1) [1991] 4 All E.R. 769

• Attorney-General's Reference (No.2 of 1982) [1984] Q.B. 624; (1984) 1 B.C.C. 98973

• Attorney-General v Equiticorp Industries Group Ltd (In Statutory Management) [1996] 1 N.Z.L.R. 528

• Bank of Tokyo Ltd v Karoon [1987] A.C. 45

• Barcelona Traction, Light and Power Co Ltd, Re [1970] I.C.J. 3

• Belmont Finance Corp Ltd v Williams Furniture Ltd [1979] Ch. 250

• Ben Hashem v Al Shayif [2008] EWHC 2380 (Fam); [2009] 1 F.L.R. 115

• Berkey v Third Avenue Railway Co 155 NE 58 (1926)

• British Railways Board v Herrington [1972] A.C. 877

• Cape Pacific Ltd v Lubner Controlling Investments (Pty) Ltd 1995 (4) S.A. 790 (A)

• Constitution Insurance Co of Canada v Kosmopoulos [1987] 1 S.C.R. 2

• Darby, Re, ex p. Brougham [1911] 1 K.B. 95

• Director of Public Prosecutions v Gomez [1993] A.C. 442

• Duchess of Kingston's Case (1776) 2 Smith's L.C. (13th edn) 644

• Gencor ACP Ltd v Dalby [2000] 2 B.C.L.C. 734

• Générale des Carrières et des Mines (La) v FG Hemisphere Associates LLC [2012] UKPC 27; [2012] 2 C.L.C. 709

• Gilford Motor Co Ltd v Horne [1933] Ch. 935

• Green v Green [1993] 1 F.L.R. 326

• James Hardie & Co Pty Ltd (1989) 16 N.S.W.L.R. 549

• Jones v Lipman [1962] 1 W.L.R. 832

• Kremen v Agrest [2010] EWHC 3091 (Fam); [2011] 2 F.L.R. 490

• Lazarus Estates Ltd v Beasley [1956] 1 Q.B. 702

• Livesey (formerly Jenkins) v Jenkins [1985] A.C. 424

• Lonrho Ltd v Shell Petroleum Co Ltd [1980] 1 W.L.R. 627

• Macaura v Northern Assurance Co Ltd [1925] A.C. 619  *575

• Miller v Miller [2006] UKHL 24; [2006] 2 A.C. 618

• Mubarak v Mubarak [2001] 1 F.L.R. 673

• Multinational Gas & Petrochemical Co v Multinational Gas & Petrochemical Services Ltd [1983] Ch. 258

• Nicholas v Nicholas [1984] F.L.R. 285

• Nokes v Doncaster Amalgamated Collieries Ltd [1940] A.C. 1014

• R. v Inland Revenue Commissioners, ex p. TC Coombs & Co [1991] 2 A.C. 283

• R. v Secretary of State for the Home Department, ex p. Puttick [1981] Q.B. 767

• Salomon v A Salomon and Co Ltd [1895] 2 Ch. 323 (CA) ; [1897] A.C. 22

• Secon Service System Inc v St Joseph Bank & Trust Co ,855 F.2d 406 (7th Cir, 1988)

• Smith v Hancock [1894] 2 Ch. 377

• Stone & Rolls Ltd v Moore Stephens (a firm) [2009] UKHL 39; [2009] 1 A.C. 1391

• Tjaskemolen (The) [1997] 2 Lloyd's Rep. 465

• Trustor AB v Smallbone (No.2) [2001] 1 W.L.R. 1177; [2002] B.C.C. 795

• VTB Capital Plc v Nutritek International Corp [2012] EWCA Civ 808; [2012] 2 Lloyd's Rep. 313; [2013] UKSC 5; [2013] B.C.C. 514

• Wallersteiner v Moir [1974] 1 W.L.R. 991

• Welwyn Hatfield Borough Council v Secretary of State for Communities and Local Government [2011] 2 A.C. 304

• Wisniewski v Central Manchester Health Authority [1998] P.I.Q.R. 324

• Woolfson v Strathclyde Regional Council 1978 S.C. (HL) 90

• Wroth v Tyler [1974] Ch. 30

**H14 Representation**

• Richard Todd QC , Daniel Lightman and Stephen Trowell (instructed by Farrer & Co ) for the appellant.
• Tim Amos QC , Oliver Wise , Ben Shaw and Amy Kisser (instructed by Jeffrey Green Russell Ltd ) for the respondents.

**JUDGMENT**

LORD SUMPTION:

**Introduction**

1  This appeal arises out of proceedings for ancillary relief following a divorce. The principal parties before the judge, Moylan J, were Michael and Yasmin Prest. He was born in Nigeria and she in England. Both have dual Nigerian and British nationality. They were married in 1993, and during the marriage the matrimonial home was in England, although the husband was found by the judge to have been resident in Monaco from about 2001 to date. There was also a second home in Nevis. The wife petitioned for divorce in March 2008. A decree nisi was pronounced in December 2008, and a decree absolute in November 2011.

2  The husband is not party to the appeal in point of form, although he is present in spirit. The appeal concerns only the position of a number of companies belonging to the group known as the Petrodel Group which the judge found to be wholly owned and controlled (directly or through intermediate entities) by the husband. There were originally seven companies involved, all of which were joined as additional respondents to the wife's application for ancillary relief. They were Petrodel Res **576** ources Ltd ("PRL"), Petrodel Resources (Nigeria) Ltd ("PRL Nigeria"), Petrodel Upstream Ltd ("Upstream"), Vermont Petroleum Ltd ("Vermont"), Elysium Diem Ltd, Petrodel Resources (Nevis) Ltd ("PRL Nevis") and Elysium Diem Ltd ("Nevis"). Three of these companies, PRL, Upstream and Vermont, all incorporated in the Isle of Man, are the respondents in this court. PRL was the legal owner of the matrimonial home, which was bought in the name of the company in 2001 but was found by the judge to be held for the husband beneficially. There is no longer any issue about that property, which is apparently in the process of being transferred to the wife. In addition, PRL was the legal owner of five residential properties in the United Kingdom and Vermont is the legal owner of two more. The question on this appeal is whether the court has power to order the transfer of these seven properties to the wife given that they legally belong not to him but to his companies.

3  Part II of the Matrimonial Causes Act 1973 confers wide powers on the court to order ancillary relief in matrimonial proceedings. Section 23 provides for periodical and lump sum payments to a spouse or for the benefit of children of the marriage. Under s.24(1)(a)

, the court may order that "a party to the marriage shall transfer to the other party … such property as may be so specified, being property to which the first-mentioned party is entitled, either in possession or reversion". Section 25 provides for a number of matters to which the court must in particular have regard in making such orders, including, at s.25(2)(a) , the "income, earning capacity, property and other financial resources which each of the parties to the marriage has or is likely to have in the foreseeable future".

4  The proper exercise of these powers calls for a considerable measure of candour by the parties in disclosing their financial affairs, and extensive procedural powers are available to the court to compel disclosure if necessary. In this case, the husband's conduct of the proceedings has been characterised by persistent obstruction, obfuscation and deceit, and a contumelious refusal to comply with rules of court and specific orders. The judge, Moylan J., recited in his judgment ([2011] EWHC 2956 (Fam)) the long history of successive orders of the court which were either ignored or evaded, the various attempts of the husband to conceal the extent of his assets in the course of his evidence, and the collusive proceedings in Nigeria by which he sought declarations that certain of the companies were held in trust for his siblings. The only evidence on behalf of the respondent companies was an affidavit sworn by Mr Jack Murphy, a director of PRL and the corporate secretary of the three respondent companies, who failed to attend for cross-examination on it. The judge rejected his excuse that he was in bad health, and found that he was "unwilling rather than unable to attend court." His conclusion was that "as a result of the husband's abject failure to comply with his disclosure obligations and to comply with orders made by the court during the course of these proceedings, I do not have the evidence which would enable me to assemble a conventional schedule of assets." However, he found that the husband was the sole beneficial owner and the controller of the companies, and doing the best that he could on the material available assessed his net assets at £37.5 million.

5  By his order dated November 16, 2011, Moylan J. ordered that the husband should procure the conveyance of the matrimonial home at 16, Warwick Avenue, London W2 to the wife, free of incumbrances, and that he should make a lump sum payment to her

of £17.5 million and periodical payments at the rate of 2 per cent of that sum while it remained outstanding, together with £24,000 p.a. and the school fees for each of their four children. In addition he awarded costs in favour of the wife, with a payment of £600,000 on account. The judge ordered the husband to procure the transfer of the seven UK properties legally owned by PRL and Vermont to the wife in partial satisfaction of the lump sum order. He directed those companies to execute such documents as might be necessary to give effect to the transfer of the matrimonial home and the seven properties. Moreover, in awarding costs to the wife, the judge directed that PRL, Upstream and Vermont should be jointly and severally liable with the husband for 10 per cent of those costs. Corresponding orders were made against certain of the other corporate respondents to t **\*577** he original proceedings, but they did not appeal, either to the Court of Appeal or to this court, and are no longer relevant, save insofar as the facts relating to them throw light on the position of the three respondents. No order was made (or sought) for the transfer of any assets of Upstream, but that company is interested in the present appeal by virtue of its liability under the judge's order for part of the wife's costs.

6  The distinctive feature of the judge's approach was that he concluded that there was no general principle of law which entitled him to reach the companies' assets by piercing the corporate veil. This was because the authorities showed that the separate legal personality of the company could not be disregarded unless it was being abused for a purpose that was in some relevant respect improper. He held that there was no relevant impropriety. He nevertheless concluded that in applications for financial relief ancillary to a divorce, a wider jurisdiction to pierce the corporate veil was available under s.24 of the Matrimonial Causes Act . The judge found that the matrimonial home was held by PRL on trust for the husband, but he made no corresponding finding about the seven other properties and refused to make a declaration that the husband was their beneficial owner. It is tolerably clear from his supplementary judgment of November 16, 2011 (on the form of the order), that this was because having decided that he was specifically authorised to dispose of the companies' properties under s.24 , it was unnecessary for him to do so and undesirable because of "the potential tax consequences". It is not clear what

potential tax consequences he had in mind, but his observation suggests that without them he might well have made the declaration sought.

7  In the Court of Appeal ([2012] EWCA Civ 1395), the three respondent companies challenged the orders made against them on the ground that there was no jurisdiction to order their property to be conveyed to the wife in satisfaction of the husband's judgment debt. This contention, which has been repeated before us, raises a question of some importance. For some years it has been the practice of the Family Division to treat the assets of companies substantially owned by one party to the marriage as available for distribution under s.24 of the Matrimonial Causes Act , provided that the remaining assets of the company are sufficient to satisfy its creditors. In the Court of Appeal, the practice was supported by Thorpe L.J., but the majority disagreed. Rimer L.J., delivering the leading judgment for the majority, held that the practice developed by the Family Division was beyond the jurisdiction of the court unless (i) the corporate personality of the company was being abused for a purpose which was in some relevant respect improper, or (ii) on the particular facts of the case it could be shown that an asset legally owned by the company was held in trust for the husband. He considered that the judge had rejected both of these possibilities on the facts, and that he ought not therefore to have made the order. In a short concurring judgment, Patten L.J. said that the Family Division had developed "an approach to company owned assets in ancillary relief applications which amounts almost to a separate system of legal rules unaffected by the relevant principles of English property and company law." The practice, he concluded, "must now cease". This has significant practical implications. Unless the UK properties of the Petrodel Group are transferred to Mrs Prest, it is possible (she says likely) that the lump sum order in her favour will remain wholly unsatisfied. To date, the matrimonial home has been transferred to her but only subject to a pre-existing charge in favour of BNP Paribas to secure a debt of undisclosed amount. 10 per cent of the money ordered to be paid on account of costs has been paid by the three respondents, but only in order to satisfy a condition imposed on them upon their being granted leave to appeal to the Court of Appeal. Otherwise, apart from paying the children's school fees, the husband has not complied with any part of Moylan

J.'s order **\*578** and shows no intention of doing so if he can possibly avoid it.

## The issues

8   Subject to very limited exceptions, most of which are statutory, a company is a legal entity distinct from its shareholders. It has rights and liabilities of its own which are distinct from those of its shareholders. Its property is its own, and not that of its shareholders. In Salomon v A Salomon and Co Ltd [1897] A.C. 22 , the House of Lords held that these principles applied as much to a company that was wholly owned and controlled by one man as to any other company. In Macaura v Northern Assurance Co Ltd [1925] A.C. 619 , the House of Lords held that the sole owner and controller of a company did not even have an insurable interest in property of the company, although economically he was liable to suffer by its destruction. Lord Buckmaster, at 626–627 said:

> "no shareholder has any right to any item of property owned by the company, for he has no legal or equitable interest therein. He is entitled to a share in the profits while the company continues to carry on business and a share in the distribution of the surplus assets when the company is wound up."

In Lonrho Ltd v Shell Petroleum Co Ltd [1980] 1 W.L.R. 627 the House of Lords held that documents of a subsidiary were not in the "power" of its parent company for the purposes of disclosure in litigation, simply by virtue of the latter's ownership and control of the group. These principles are the starting point for the elaborate restrictions imposed by English law on a wide range of transactions which have the direct or indirect effect of distributing capital to shareholders. The separate personality and property of a company is sometimes described as a fiction, and in a sense it is. But the fiction is the whole foundation of English company and insolvency law. As Robert Goff L.J. once observed, in this domain "we are concerned not with economics but with law. The distinction between the two is, in law, fundamental": Bank of Tokyo Ltd v Karoon [1987] A.C. 45, 64 . He could justly have added that it is not just legally but economically fundamental, since limited companies have been the principal unit of commercial life for more than a century. Their separate personality and property are the basis on which third parties are entitled to deal with them and commonly do deal with them.

9   Against this background, there are three possible legal bases on which the assets of the Petrodel companies might be available to satisfy the lump sum order against the husband:

> • (1)   It might be said that this is a case in which, exceptionally, a court is at liberty to disregard the corporate veil in order to give effective relief.
> • (2)   Section 24 of the Matrimonial Causes Act might be regarded as conferring a distinct power to disregard the corporate veil in matrimonial cases.
> • (3)   The companies might be regarded as holding the properties on trust for the husband, not by virtue of his status as their sole shareholder and controller, but in the particular circumstances of this case.

## The judge's findings: the companies

10   Most of the judge's findings of fact were directed to two questions which are no longer in dispute, namely whether the husband owned the Petrodel Group and what was the value of his assets. For present purposes, it is enough to summarise those which bear on the position of the three corporate respondents.

11   At the time of the marriage, and throughout the 1990s, the husband was employed by a succession of major international oil tra **\*579** ding companies as a trader, but in 2001 he left his last employer, Marc Rich, and began to run his own companies. Initially, there were two principal companies involved, Aurora and the Petrodel companies. In 2004 Aurora was wound up and thereafter he operated mainly through the Petrodel companies. The principal operating company of this group was PRL, a company incorporated in the Isle of Man. Its financial statements record that it was incorporated on May 4, 1993, was dormant until 1996, and did not begin operations until April 25, 2002, i.e. after the husband had left Marc Rich and set up on his own. Between 1996 and 2002, it is described in its

financial statements as a property investment company. Its sole function in that period appears to have been to hold title to the matrimonial home at 16 Warwick Avenue in London and five residential investment properties in London, and to act as a channel for funding property purchases by other companies of the group. The husband's evidence was that the company had engaged in substantial agricultural and oil related business in the 1990s, in part in association with his then employer, Marc Rich. But this was inconsistent with the company's financial statements, and the judge rejected it. Mr Le Breton, a former business colleague of the husband, gave evidence at the hearing which the judge accepted as reliable. Mr Le Breton said that from about 2001 PRL was engaged in a limited way in oil trading and shipping, and from 2006 moved into oil exploration and production in Nigeria and West Africa. The latest disclosed accounts of PRL are draft accounts for 2008 and 2009. The judge declined to attach "any significant weight" to the financial data in the 2008 accounts, which he considered to have been manipulated. All the disclosed accounts are now very much out of date. For what they are worth, the accounts for both years show a substantial turnover and large balances. The husband's evidence was that PRL ceased trading in 2010, when it lost its major exploration contract. Given his evident determination to frustrate his wife's claims on him, it cannot be assumed that the assets of the company recorded in the disclosed accounts are still there.

12   Management control of PRL has always been in the hands of the husband, ostensibly as chief executive under a contract of employment conferring on him complete discretion in the management of its business. The judge found that none of the companies had ever had any independent directors. The husband is a director of PRL Nigeria, but otherwise the directors are all nominal or professional directors, generally his relatives, who accept directions from him. The directors of PRL are Mr Murphy (the principal of its corporate secretary) and a lady in Nevis who appears to have been the couple's cleaner there.

13   The ownership of the respondent companies proved to be more difficult to establish. The husband did not admit to having any personal interest in the shares of any company of the group, and declined to say who the ultimate shareholders were. Substantially all of the issued shares of PRL are owned by PRL Nigeria. Almost all the shares of that company are owned by PRL Nevis, a company about which very little is known, but whose accounts show substantial balances, apparently derived from trading. The husband's evidence was that the shares of PRL Nevis were owned by its own subsidiary PRL Nigeria. The judge described this as "puzzling" but made no finding as to whether it was true. More recently, it has been suggested that PRL Nevis is owned by a family trust about which, however, nothing has been disclosed. In the end, it did not matter, because the judge cut through the complexities of the corporate structure by accepting the evidence of the wife and Mr Le Breton that the husband was the true owner of the Petrodel Group, as he had always told them he was, even if the exact means by which he held it remained obscure. That accounted for PRL, PRL Nigeria and PRL Nevis.

14  It also accounted for Vermont, whose shares are held 49 per cent by PRL and 51 per cent by PRL Nigeria, and Upstream, which had a single issued share held by PRL Nevis. Vermont was and possibly st  **580**  ill is a trading company. The husband's evidence was that it began to ship crude oil in 2010. The exact nature of Upstream's business (if any) is unclear. It does not appear to trade.

15   The husband declined to answer the question whether he received any benefits from PRL other than his salary, saying that this was an "accounting question". The judge, however, made extensive findings about this. He found that his personal expenditure substantially exceeded his salary and bonuses as chief executive, and that the difference was funded entirely by the company. There was no formality involved. The husband simply treated the companies' cash balances and property as his own and drew on them as he saw fit. The judge found that the husband had "unrestricted access" to the companies' assets, unconfined by any board control or by any scruples about the legality of his drawings. He used PRL's assets to fund his and his family's personal expenditure, including the substantial legal costs incurred in these proceedings. The group was "effectively … the husband's money box which he uses at will."

### Piercing the corporate veil

16  I should first of all draw attention to the limited sense in which this issue arises at all. "Piercing the

corporate veil" is an expression rather indiscriminately used to describe a number of different things. Properly speaking, it means disregarding the separate personality of the company. There is a range of situations in which the law attributes the acts or property of a company to those who control it, without disregarding its separate legal personality. The controller may be personally liable, generally in addition to the company, for something that he has done as its agent or as a joint actor. Property legally vested in a company may belong beneficially to the controller, if the arrangements in relation to the property are such as to make the company its controller's nominee or trustee for that purpose. For specific statutory purposes, a company's legal responsibility may be engaged by the acts or business of an associated company. Examples are the provisions of the Companies Acts governing group accounts or the rules governing infringements of competition law by "firms", which may include groups of companies conducting the relevant business as an economic unit. Equitable remedies, such as an injunction or specific performance may be available to compel the controller whose personal legal responsibility is engaged to exercise his control in a particular way. But when we speak of piercing the corporate veil, we are not (or should not be) speaking of any of these situations, but only of those cases which are true exceptions to the rule in Salomon v A Salomon and Co Ltd [1897] A.C. 22 , i.e. where a person who owns and controls a company is said in certain circumstances to be identified with it in law by virtue of that ownership and control.

17  Most advanced legal systems recognise corporate legal personality while acknowledging some limits to its logical implications. In civil law jurisdictions, the juridical basis of the exceptions is generally the concept of abuse of rights, to which the International Court of Justice was referring in Re Barcelona Traction, Light and Power Co Ltd [1970] I.C.J. 3 when it derived from municipal law a limited principle permitting the piercing of the corporate veil in cases of misuse, fraud, malfeasance or evasion of legal obligations. These examples illustrate the breadth, at least as a matter of legal theory, of the concept of abuse of rights, which extends not just to the illegal and improper invocation of a right but to its use for some purpose collateral to that for which it exists.

18  English law has no general doctrine of this kind. But it has a variety of specific principles which achieve the same result in some cases. One of these principles is that the law defines the incidents of most legal relationships between persons (natural or artificial) on the fundamental assumption that their dealings are honest. The same legal i **\*581** ncidents will not necessarily apply if they are not. The principle was stated in its most absolute form by Denning L.J. in a famous dictum in Lazarus Estates Ltd v Beasley [1956] 1 Q.B. 702, 712 :

> "No court in this land will allow a person to keep an advantage which he has obtained by fraud. No judgment of a court, no order of a Minister, can be allowed to stand if it has been obtained by fraud. Fraud unravels everything. The court is careful not to find fraud unless it is distinctly pleaded and proved; but once it is proved, it vitiates judgments, contracts and all transactions whatsoever …"

The principle is mainly familiar in the context of contracts and other consensual arrangements, in which the effect of fraud is to vitiate consent so that the transaction becomes voidable ab initio. But it has been applied altogether more generally, in cases which can be rationalised only on grounds of public policy, for example to justify setting aside a public act such as a judgment, which is in no sense consensual, a jurisdiction which has existed since at least 1775: Duchess of Kingston's Case (1776) 2 Smith's L.C. (13th edn) 644, 646, 651 . Or to abrogate a right derived from a legal status, such as marriage: R. v Secretary of State for the Home Department, ex p. Puttick [1981] Q.B. 767 . Or to disapply a statutory time bar which on the face of the statute applies: Welwyn Hatfield Borough Council v Secretary of State for Communities and Local Government [2011] 2 A.C. 304 . These decisions (and there are others) illustrate a broader principle governing cases in which the benefit of some apparently absolute legal principle has been obtained by dishonesty. The authorities show that there are limited circumstances in which the law treats the use of a company as a means of evading the law as dishonest for this purpose.

19 The question is heavily burdened by authority, much of it characterised by incautious dicta and inadequate reasoning. I propose, first, to examine those cases which seek to rationalise the case law in terms of general principle, and then to look at a number of cases in which the court has been thought, rightly or wrongly, to have pierced the corporate veil in order to identify the critical features of these cases which enabled them to do so.

20 Almost all the modern analyses of the general principle have taken as their starting point the brief and obiter but influential statement of Lord Keith of Kinkel in Woolfson v Strathclyde Regional Council 1978 S.C. (HL) 90 . This was an appeal from Scotland in which the House of Lords declined to allow the principal shareholder of a company to recover compensation for the compulsory purchase of a property which the company occupied. The case was decided on its facts, but at 96, Lord Keith, delivering the leading speech, observed that "it is appropriate to pierce the corporate veil only where special circumstances exist indicating that it is a mere façade concealing the true facts."

21 The first systematic analysis of the large and disparate body of English case law was undertaken by a strong Court of Appeal in Adams v Cape Industries Plc [1990] Ch. 433; [1990] B.C.C. 786 (Slade, Mustill and Ralph Gibson L.JJ.). The question at issue in that case was whether the United Kingdom parent of an international mining group which was, at least arguably, managed as a "single economic unit" was present in the United States for the purpose of making a default judgment of a United States court enforceable against it in England. Among other arguments, it was suggested that it was present in the United States by virtue of the fact that a wholly-owned subsidiary was incorporated and carried on business there. Slade L.J., delivering the judgment of the court, rejected this contention: 532–544; 817–826. The court, adopting Lord Keith's dictum in Woolfson v Strathclyde (above), held that the corporate veil could be disregarded only in cases where it was being used for a deliberately dishonest purpose: 539, 540; 822, 823. Apart from that, and from cases turning on the wording of particular statutes, it held at 536; 820 that

"the court is not **\*582** free to disregard the principle of Salomon v A Salomon & Co Ltd [1897] AC 22 merely because it considers

that justice so requires. Our law, for better or worse, recognises the creation of subsidiary companies, which though in one sense the creatures of their parent companies, will nevertheless under the general law fall to be treated as separate legal entities with all the rights and liabilities which would normally attach to separate legal entities."

22 In Trustor AB v Smallbone (No.2) [2001] 1 W.L.R. 1177; [2002] B.C.C. 795 , Sir Andrew Morritt V.-C. reviewed many of the same authorities. Mr Smallbone, the former managing director of Trustor, had improperly procured large amounts of its money to be paid out of its account to a company called Intercom Ltd, incorporated in Gibraltar. Intercom was owned and controlled by a Liechtenstein trust of which Mr Smallbone was a beneficiary. Its directors acted on his instructions. At an earlier stage of the litigation, Trustor had obtained summary judgment on some of its claims against Intercom, on the footing that the payments were unauthorised and a breach of Mr Smallbone's duty as managing director, that the company was "simply a vehicle Mr Smallbone used for receiving money from Trustor", and that his knowledge could be imputed to the company. The Vice-Chancellor was dealing with a subsequent application by Trustor for summary judgment against Mr Smallbone himself. It was accepted that there was an arguable defence to the claims against him for damages or compensation for breach of his duties as a director of Trustor. Accordingly the sole basis of the application was that he was liable to account as a constructive trustee on the footing of knowing receipt. This depended on the proposition that he was to be identified with Intercom and so treated as having received the money himself. It was submitted that the authorities justified piercing the corporate veil in three, possibly overlapping, cases: (i) where the company was a "façade or sham"; (ii) where the company was involved in some form of impropriety; and (iii) where it was necessary to do so in the interests of justice. In each of these cases, the right of the court to pierce the corporate veil was said to be subject to there being no third-party interests engaged, such as unconnected minority shareholders or creditors.

The Vice-Chancellor concluded that the authorities supported the submission in case (i), and also in case (ii) provided that the impropriety was a relevant one, i.e. "linked to the use of the company structure to avoid or conceal liability for that impropriety". He followed Adams v Cape Industries (above) in rejecting the submission as applied to case (iii). In summary, the court was "entitled to 'pierce the corporate veil' and recognise the receipt of the company as that of the individual(s) in control of it if the company was used as a device or façade to conceal the true facts, thereby avoiding or concealing any liability of those individual(s)": see [23].

23   For years after it was decided, Cape Industries was regarded as having settled the general law on the subject. But for much of this period, the Family Division pursued an independent line, essentially for reasons of policy arising from its concern to make effective its statutory jurisdiction to distribute the property of the marriage upon a divorce. In Nicholas v Nicholas [1984] F.L.R. 285 , the Court of Appeal (Cumming-Bruce and Dillon L.JJ.) overturned the decision of the judge to order the husband to procure the transfer to the wife of a property belonging to a company in which he held a 71 per cent shareholding, the other 29 per cent being held by his business associates. However, both members of the court suggested, obiter, that the result might have been different had it not been for the position of the minority shareholders. Cumming-Bruce L.J. (at 287) thought that, in that situation, "the court does and will pierce the corporate veil and make an order which has the same effect as an order that would be made if the property was vested in the majority shareholder." Dillon L.J. said (at 292) that "if the company was a one-man company and the alter ego of the husband, I would have no difficulty in holding that there was power to order a transfer of the property." These dicta were subsequently applied by judges of the Famil **583** y Division dealing with claims for ancillary financial relief, who regularly made orders awarding to parties to the marriage assets vested in companies of which one of them was the sole shareholder. Connell J. made such an order in Green v Green [1993] 1 F.L.R. 326 . In Mubarak v Mubarak [2001] 1 F.L.R. 673 , 682C, Bodey J. held that for the purpose of claims to ancillary financial relief the Family Division would lift the corporate veil not only where the company was a sham but "when it is just

and necessary", the very proposition that the Court of Appeal had rejected as a statement of the general law in Adams v Cape Industries . And in Kremen v Agrest [2010] EWHC 3091 (Fam); [2011] 2 F.L.R. 490 , [46], Mostyn J. held that there was a "strong practical reason why the cloak should be penetrable even absent a finding of wrongdoing."

24   There were of course dissenting voices, even in decisions on ancillary relief. Much the most significant of them for present purposes was that of Munby J. In A v A [2007] EWHC 99 (Fam); [2007] 2 F.L.R. 467 , [18]–[19], he drew attention to the robust approach which had always been adopted by judges of the Family Division in seeing through sham arrangements designed to hide the ownership of assets of the marriage by vesting them in relatives or companies which were in reality holding them as their nominees. But he warned against departing from fundamental legal principle. At [21], he observed:

> "In this sense, and to this limited extent, the typical case in the Family Division may differ from the typical case in (say) the Chancery Division. But what it is important to appreciate (and too often, I fear, is not appreciated at least in this division) is that the relevant legal principles which have to be applied are precisely the same in this division as in the other two divisions. There is not one law of 'sham' in the Chancery Division and another law of 'sham' in the Family Division. There is only one law of 'sham', to be applied equally in all three Divisions of the High Court, just as there is but one set of principles, again equally applicable in all three divisions, determining whether or not it is appropriate to 'pierce the corporate veil'."

25   In Ben Hashem v Al Shayif [2008] EWHC 2380 (Fam); [2009] 1 F.L.R. 115 , another decision of Munby J., the difference between the approach taken in the Family Division and in other divisions of the High

Court arose in a particularly acute form, because he was hearing the claim for ancillary relief in conjunction with proceedings in the Chancery Division. In the Family Division, the wife was seeking an order transferring to her a property which she was occupying but which was owned by a company controlled by the husband, while in the Chancery proceedings the company was seeking a possession order in respect of the same property. After reminding himself of what he had said in A v A (above) and conducting a careful review of both family and non-family cases, Munby J. formulated six principles at [159]–[164] which he considered could be derived from them: (i) ownership and control of a company were not enough to justify piercing the corporate veil; (ii) the court cannot pierce the corporate veil, even in the absence of third-party interests in the company, merely because it is thought to be necessary in the interests of justice; (iii) the corporate veil can be pierced only if there is some impropriety; (iv) the impropriety in question must, as Sir Andrew Morritt had said in Trustor , be "linked to the use of the company structure to avoid or conceal liability"; (v) to justify piercing the corporate veil, there must be "both control of the company by the wrongdoer(s) and impropriety, that is (mis)use of the company by them as a device or façade to conceal their wrongdoing"; and (vi) the company may be a "façade" even though it was not originally incorporated with any deceptive intent, provided that it is being used for the purpose of deception at the time of the relevant transactions. The court would, however, pierce the corporate veil only so far as it was necessary in order to provide a remedy for the particular wrong which those controlling the company had done.

26 In VTB Capital Plc v Nutritek International Corp [2012] EWCA Civ 808; [2012] 2 Lloyd's Rep. 313 **\*584** , VTB Capital sought permission to serve proceedings out of the jurisdiction on the footing that the borrower under a facility agreement was to be identified with the persons who controlled it, so as to make the latter in law parties to the same agreement. The attempt failed in the Court of Appeal because the court was not satisfied that that would be the consequence of piercing the corporate veil even if it were legitimate to do so: see [90]–[91]. The decision is not, therefore, direct authority on the question whether the court was entitled to pierce the corporate veil. But the court considered all the principal authorities on that question and arrived at substantially the same conclusions as Sir Andrew Morritt V.-C.

and Munby J.. Munby J.'s statement of principle was adopted by the Court of Appeal subject to two qualifications. First, they said that it was not necessary in order to pierce the corporate veil that there should be no other remedy available against the wrongdoer, and so far as Munby J. suggested that it was, he had set the bar too high. Secondly, they said that it was not enough to show that there had been wrongdoing. "The relevant wrongdoing must be in the nature of an independent wrong that involves the fraudulent or dishonest misuse of the corporate personality of the company for the purpose of concealing the true facts": see [79]–[80]. On this point, the case took the same course in the Supreme Court [2013] UKSC 5; [2013] B.C.C. 514, which dismissed VTB Capital's appeal. So far as piercing the corporate veil is concerned, the court's reasons were given by Lord Neuberger. He noted the broad consensus among judges and text-book writers that there were circumstances in which separate legal personality of a company might be disregarded and the company identified with those who owned and controlled it. However, he declined to decide whether the consensus was right on an appeal from an interlocutory decision, given that, like the Court of Appeal, he considered that even if the veil were pierced the result would not be to make a company's controllers party to its contracts with third parties. But he adopted, as it seems to me, both the general reasoning of the Court of Appeal and the view of Munby J. that any doctrine permitting the court to pierce the corporate veil must be limited to cases where there was a relevant impropriety: see [128], [145].

27 In my view, the principle that the court may be justified in piercing the corporate veil if a company's separate legal personality is being abused for the purpose of some relevant wrongdoing is well established in the authorities. It is true that most of the statements of principle in the authorities are obiter, because the corporate veil was not pierced. It is also true that most cases in which the corporate veil was pierced could have been decided on other grounds. But the consensus that there are circumstances in which the court may pierce the corporate veil is impressive. I would not for my part be willing to explain that consensus out of existence. This is because I think that the recognition of a limited power to pierce the corporate veil in carefully defined circumstances is necessary if the law is not to be disarmed in the face of abuse. I also think that

provided the limits are recognised and respected, it is consistent with the general approach of English law to the problems raised by the use of legal concepts to defeat mandatory rules of law.

28   The difficulty is to identify what is a relevant wrongdoing. References to a "façade" or "sham" beg too many questions to provide a satisfactory answer. It seems to me that two distinct principles lie behind these protean terms, and that much confusion has been caused by failing to distinguish between them. They can conveniently be called the concealment principle and the evasion principle. The concealment principle is legally banal and does not involve piercing the corporate veil at all. It is that the interposition of a company or perhaps several companies so as to conceal the identity of the real actors will not deter the courts from identifying them, assuming that their identity is legally relevant. In these cases the court is not disregarding the "façade", but only looking behind it to discover the facts which the corporate structure is concealing. The evasion principle is different. It is that the court may disregard the corporate veil if there is a legal right against  **\*585**  the person in control of it which exists independently of the company's involvement, and a company is interposed so that the separate legal personality of the company will defeat the right or frustrate its enforcement. Many cases will fall into both categories, but in some circumstances the difference between them may be critical. This may be illustrated by reference to those cases in which the court has been thought, rightly or wrongly, to have pierced the corporate veil.

29   The first and most famous of them is Gilford Motor Co Ltd v Horne [1933] Ch. 935 . Mr EB Horne had been the managing director of the Gilford Motor Co Ltd. His contract of employment precluded him being engaged in any competing business in a specified geographical area for five years after the end of his employment "either solely or jointly with or as agent for any other person, firm or company." He left Gilford and carried on a competing business in the specified area, initially in his own name. He then formed a company, JM Horne & Co Ltd, named after his wife, in which she and a business associate were shareholders. The trial judge, Farwell J., found that the company had been set up in this way to enable the business to be carried on under his own control but without incurring liability for

breach of the covenant. However the reality, in his view, was that the company was being used as "the channel through which the defendant Horne was carrying on his business." In fact, he dismissed the claim on the ground that the restrictive covenant was void. But the Court of Appeal allowed the appeal on that point and granted an injunction against both Mr Horne and the company. As against Mr Horne, the injunction was granted on the concealment principle. Lord Hanworth M.R. said, at 961–962, that the company was a "mere cloak or sham" because the business was really being carried on by Mr Horne. Because the restrictive covenant prevented Mr Horne from competing with his former employers whether as principal or as agent for another, it did not matter whether the business belonged to him or to JM Horne & Co Ltd provided that he was carrying it on. The only relevance of the interposition of the company was to maintain the pretence that it was being carried on by others. Lord Hanworth did not explain why the injunction should issue against the company, but I think it is clear from the judgments of Lawrence and Romer L.JJ., at 965 and 969, that they were applying the evasion principle. Lawrence L.J., who gave the fullest consideration to the point, based his view entirely on Mr Horne's evasive motive for forming the company. This showed that it was "a mere channel used by the defendant Horne for the purpose of enabling him, for his own benefit, to obtain the advantage of the customers of the plaintiff company, and that therefore the defendant company ought to be restrained as well as the defendant Horne." In other words, the company was restrained in order to ensure that Horne was deprived of the benefit which he might otherwise have derived from the separate legal personality of the company. I agree with the view expressed by the Court of Appeal in VTB Capital (above), at [63], that this is properly to be regarded as a decision to pierce the corporate veil. It is fair to say that the point may have been conceded by counsel, although in rather guarded terms ("if the evidence admitted of the conclusion that what was being done was a mere cloak or sham"). It is also true that the court in Gilford Motor Co might have justified the injunction against the company on the ground that Mr Horne's knowledge was to be imputed to the company so as to make the latter's conduct unconscionable or tortious, thereby justifying the grant of an equitable remedy against it. But the case is authority for what it decided, not for what it might have decided, and in my view the principle which the

Court of Appeal applied was correct. It does not follow that JM Horne & Co Ltd was to be identified with Mr Horne for any other purpose. Mr Horne's personal creditors would not, for example, have been entitled simply by virtue of the facts found by Farwell J., to enforce their claims against the assets of the company.

30  Jones v Lipman [1962] 1 W.L.R. 832 was a case of very much the same kind. The facts were that Mr Lipman sold a property to the plaintiffs for £5,250 and then, t **\*586** hinking better of the deal, sold it to a company called Alamed Ltd for £3,000, in order to make it impossible for the plaintiffs to get specific performance. The judge, Russell J., found that company was wholly owned and controlled by Mr Lipman, who had bought it off the shelf and had procured the property to be conveyed to it "solely for the purpose of defeating the plaintiffs' rights to specific performance." About half of the purchase price payable by Alamed was funded by borrowing from a bank, and the rest was left outstanding. The judge decreed specific performance against both Mr Lipman and Alamed Ltd. As against Mr Lipman this was done on the concealment principle. Because Mr Lipman owned and controlled Alamed Ltd, he was in a position specifically to perform his obligation to the plaintiffs by exercising his powers over the company. This did not involve piercing the corporate veil, but only identifying Mr Lipman as the man in control of the company. The company, said Russell J. portentously at 836, was "a device and a sham, a mask which [Mr Lipman] holds before his face in an attempt to avoid recognition by the eye of equity." On the other hand, as against Alamed Ltd itself, the decision was justified on the evasion principle, by reference to the Court of Appeal's decision in Gilford Motor Co (above). The judge must have thought that in the circumstances the company should be treated as having the same obligation to convey the property to the plaintiff as Mr Lipman had, even though it was not party to the contract of sale. It should be noted that he decreed specific performance against the company notwithstanding that as a result of the transaction, the company's main creditor, namely the bank, was prejudiced by its loss of what appears from the report to have been its sole asset apart from a possible personal claim against Mr Lipman which he may or may not have been in a position to meet. This may be thought hard on the bank, but it is no harder than a finding that the company was not the beneficial owner at all. The bank could have protected itself by taking a charge or registering the contract of sale.

31  In Gencor ACP Ltd v Dalby [2000] 2 B.C.L.C. 734 , the plaintiff made a large number of claims against a former director, Mr Dalby, for misappropriating its funds. For present purposes the claim which matters is a claim for an account of a secret profit which Mr Dalby procured to be paid by a third party, Balfour Beatty, to a British Virgin Islands company under his control called Burnstead. Rimer J. held, at [26], that Mr Dalby was accountable for the money received by Burnstead, on the ground that the latter was "in substance little other than Mr Dalby's offshore bank account held in a nominee name", and "simply … the alter ego through which Mr Dalby enjoyed the profit which he earned in breach of his fiduciary duty to ACP." Rimer J. ordered an account against both Mr Dalby and Burnstead. He considered that he was piercing the corporate veil. But I do not think that he was. His findings about Mr Dalby's relationship with the company and his analysis of the legal consequences show that both Mr Dalby and Burnstead were independently liable to account to ACP, even on the footing that they were distinct legal persons. If, as the judge held, Burnstead was Mr Dalby's nominee for the purpose of receiving and holding the secret profit, it followed that Burnstead had no right to the money as against Mr Dalby, who had in law received it through Burnstead and could properly be required to account for it to ACP. Burnstead itself was liable to account to ACP because, as the judge went on to point out, Mr Dalby's knowledge of the prior equitable interest of ACP was to be imputed to it. As Rimer J. observed, "the introduction into the story of such a creature company is … insufficient to prevent equity's eye from identifying it with Mr Dalby." This is in reality the concealment principle. The correct analysis of the situation was that the court refused to be deterred by the legal personality of the company from finding the true facts about its legal relationship with Mr Dalby. It held that the nature of their dealings gave rise to ordinary equitable claims against both. The result would have been exactly the same if Burnstead, instead of being a company, had been a natural person, say Mr Dalby's uncle, about whose separate existence there could be no doubt.

32   The same confusion of concepts is, with respect, apparent in Sir Andrew **\*587**  Morritt V.-

C.'s analysis in Trustor AB v Smallbone (No.2) [2001] 1 W.L.R. 1177; [2002] B.C.C. 795 , which I have already considered. The Vice-Chancellor's statement of principle at [23] that the court was entitled to pierce the corporate veil if the company was used as a "device or façade to conceal the true facts thereby avoiding or concealing any liability of those individual(s)" elides the quite different concepts of concealment and avoidance. As I read his reasons for giving judgment against Mr Smallbone, at [24]–[25], he did so on the concealment principle. It had been found at the earlier stage of the litigation that Introcom was "simply a vehicle Mr Smallbone used for receiving money from Trustor", and that the company was a "device or façade" for concealing that fact. On that footing, the company received the money on Mr Smallbone's behalf. This conclusion did not involve piercing the corporate veil, and did not depend on any finding of impropriety. It was simply an application of the principle summarised by the Vice-Chancellor at [19] of his judgment, that receipt by a company will count as receipt by the shareholder if the company received it as his agent or nominee, but not if it received it in its own right. To decide that question, it was necessary to establish the facts which demonstrated the true legal relationship between Mr Smallbone and Introcom. Mr Smallbone's ownership and control of Introcom was only one of those facts, not in itself conclusive. Other factors included the circumstances and the source of the receipt, and the nature of the company's other transactions if any.

33  In Trustor , as in Gencor , the analysis would have been the same if Introcom had been a natural person instead of a company. The evasion principle was not engaged, and indeed could not have been engaged on the facts of either case. This is because neither Mr Dalby nor Mr Smallbone had used the company's separate legal personality to evade a liability that they would otherwise have had. They were liable to account only if the true facts were that the company had received the money as their agent or nominee. That was proved in both cases. If it had not been, there would have been no receipt, knowing or otherwise, and therefore no claim to be evaded. The situation was not the same as it had been in Gilford Motor Co v Horne and Jones v Lipman , for in these cases the real actors, Mr Horne and Mr Lipman, had a liability which arose independently of the involvement of the company.

34  These considerations reflect the broader principle that the corporate veil may be pierced only to prevent the abuse of corporate legal personality. It may be an abuse of the separate legal personality of a company to use it to evade the law or to frustrate its enforcement. It is not an abuse to cause a legal liability to be incurred by the company in the first place. It is not an abuse to rely upon the fact (if it is a fact) that a liability is not the controller's because it is the company's. On the contrary, that is what incorporation is all about. Thus in a case like VTB Capital , where the argument was that the corporate veil should be pierced so as to make the controllers of a company jointly and severally liable on the company's contract, the fundamental objection to the argument was that the principle was being invoked so as to create a new liability that would not otherwise exist. The objection to that argument is obvious in the case of a consensual liability under a contract, where the ostensible contracting parties never intended that any one else should be party to it. But the objection would have been just as strong if the liability in question had not been consensual.

35  I conclude that there is a limited principle of English law which applies when a person is under an existing legal obligation or liability or subject to an existing legal restriction which he deliberately evades or whose enforcement he deliberately frustrates by interposing a company under his control. The court may then pierce the corporate veil for the purpose, and only for the purpose, of depriving the company or its controller of the advantage that they would otherwise have obtained by the company's separate legal personality. The principle is properly described as a limited one, because in almost every case where the test is satisfied, the facts will in practice disclose a legal relationship between the company and  *588  its controller which will make it unnecessary to pierce the corporate veil. Like Munby J. in Ben Hashem , I consider that if it is not necessary to pierce the corporate veil, it is not appropriate to do so, because on that footing there is no public policy imperative which justifies that course. I therefore disagree with the Court of Appeal in VTB Capital who suggested otherwise at [79]. For all of these reasons, the principle has been recognised far more often than it has been applied. But the recognition of a small residual category of cases where the abuse of the corporate veil to evade or frustrate the law can be

addressed only by disregarding the legal personality of the company is, I believe, consistent with authority and with long-standing principles of legal policy.

36  In the present case, Moylan J. held that he could not pierce the corporate veil under the general law without some relevant impropriety, and declined to find that there was any. In my view he was right about this. The husband has acted improperly in many ways. In the first place, he has misapplied the assets of his companies for his own benefit, but in doing that he was neither concealing nor evading any legal obligation owed to his wife. Nor, more generally, was he concealing or evading the law relating to the distribution of assets of a marriage upon its dissolution. It cannot follow that the court should disregard the legal personality of the companies with the same insouciance as he did. Secondly, the husband has made use of the opacity of the Petrodel Group's corporate structure to deny being its owner. But that, as the judge pointed out at [219] "is simply [the] husband giving false evidence." It may engage what I have called the concealment principle, but that simply means that the court must ascertain the truth that he has concealed, as it has done. The problem in the present case is that the legal interest in the properties is vested in the companies and not in the husband. They were vested in the companies long before the marriage broke up. Whatever the husband's reasons for organising things in that way, there is no evidence that he was seeking to avoid any obligation which is relevant in these proceedings. The judge found that his purpose was "wealth protection and the avoidance of tax". It follows that the piercing of the corporate veil cannot be justified in this case by reference to any general principle of law.

**Section 24(1)(a) of the Matrimonial Causes Act 1973**

37  If there is no justification as a matter of general legal principle for piercing the corporate veil, I find it impossible to say that a special and wider principle applies in matrimonial proceedings by virtue of s.24(1)(a) of the Matrimonial Causes Act 1973 . The language of this provision is clear. It empowers the court to order one party to the marriage to transfer to the other "property to which the first-mentioned party is entitled, either in possession or reversion." An "entitlement" is a legal right in respect of the property in question. The words "in possession or reversion" show that the right

in question is a proprietary right, legal or equitable. This section is invoking concepts with an established legal meaning and recognised legal incidents under the general law. Courts exercising family jurisdiction do not occupy a desert island in which general legal concepts are suspended or mean something different. If a right of property exists, it exists in every division of the High Court and in every jurisdiction of the county courts. If it does not exist, it does not exist anywhere. It is right to add that even where courts exercising family jurisdiction have claimed a wider jurisdiction to pierce the corporate veil than would be recognised under the general law, they have not usually suggested that this can be founded on k. On the contrary, in Nicholas v Nicholas [1984] F.L.R. 285, 288 , Cumming-Bruce L.J. said that it could not.

38  This analysis is not affected by s.25(2)(a) of the Matrimonial Causes Act 1973 . Section 25(2)(a) requires the court when exercising the powers under s.24 , to have regard to "the income, earning capacity, property and other financial resources which each of the par **\*589** ties to the marriage has or is likely to have in the foreseeable future". The breadth and inclusiveness of this definition of the relevant resources of the parties to the marriage means that the relevant spouse's ownership and control of a company and practical ability to extract money or money's worth from it are unquestionably relevant to the court's assessment of what his resources really are. That may affect the amount of any lump sum or periodical payment orders, or the decision what transfers to order of other property which unquestionably belongs to the relevant spouse. But it does not follow from the fact that one spouse's worth may be boosted by his access to the company's assets that those assets are specifically transferrable to the other under s.24(1)(a) .

39  Moylan J. considered that it was enough to justify his order to transfer the properties that the husband should have the practical ability to procure their transfer, whether or not he was their beneficial owner. He found that this was established in the present case because of the power which the husband had over the companies by virtue of owning and controlling them. The judge did not make any finding about whether the properties of the corporate respondents were held in trust for the husband, except in the case of the matrimonial home in Warwick Avenue, which he found to be beneficially

his. What he held was that the assets of the companies were "effectively" the husband's property, because he treated them as such. He was "able to procure their disposal as he may direct, based again on his being the controller of the companies and the only beneficial owner." The judge accepted that as a matter of company law, the husband as shareholder had no more than a right of participation in accordance with the company's constitution, and that that did not confer any right to any particular property of the company. "But, what if the shareholder is, in fact, able to procure the transfer to them of a particular item of company property, such as a matrimonial home," the judge asked, "as a result of their control and ownership of the company and the absence of any third party interests." The judge's answer to that question was that the "purpose and intention" of the Matrimonial Causes Act 1973 was that the companies' assets should be treated as part of the marital wealth. "Effectively", he said, "the husband, in respect of the companies and their assets, is in the same position he would be in if he wa *s the beneficiary* of a bare trust or the companies were his nominees."

40  I do not accept this, any more than the Court of Appeal did. The judge was entitled to take account of the husband's ownership and control of the companies and his unrestricted access to the companies' assets in assessing what his resources were for the purpose of s.25(2)(a) . But he was not entitled to order the companies' assets to be transferred to the wife in satisfaction of the lump sum order simply by virtue of s.24(1)(a) . I do not doubt that the construction of s.24(1)(a) of the Act is informed by its purpose and its social context, as well as by its language. Nor do I doubt that the object is to achieve a proper division of the assets of the marriage. But it does not follow that the courts will stop at nothing in their pursuit of that end, and there are a number of principled reasons for declining to give the section the effect that the judge gave it. In the first place, it is axiomatic that general words in a statute are not to be read in a way which "would overthrow fundamental principles, infringe rights, or depart from the general system of law, without expressing its intention with irresistible clearness". The words are those of Lord Atkin in Nokes v Doncaster Amalgamated Collieries Ltd [1940] A.C. 1014, 1031 –1032, but the principle is very familiar and has been restated by the courts in many contexts and at every level. There is nothing in the Matrimonial Causes

Act and nothing in its purpose or broader social context to indicate that the legislature intended to authorise the transfer by one party to the marriage to the other of property which was not his to transfer. Secondly, a transfer of this kind will ordinarily be unnecessary for the purpose of achieving a fair distribution of the assets of the marriage. Where assets belong to a company owned by one party to the marriage, the proper claims of the other can ordinarily be satisfied by directing the transfer of the shares. It is true that this will **\*590** not always be possible, particularly in cases like this one where the shareholder and the company are both resident abroad in places which may not give direct effect to the orders of the English court. In an age of internationally mobile spouses and assets this is a more significant problem than it once was, but such cases remain the exception rather than the rule. Section 24 cannot be construed as if it were directed to that problem. Third, so far as a party to matrimonial proceedings deliberately attempts to frustrate the exercise of the court's ancillary powers by disposing of assets, s.37 provides for the setting aside of those dispositions in certain circumstances. Section 37 is a limited provision which is very far from being a complete answer to the problem, but it is as far as the legislature has been prepared to go.

41  The recognition of a jurisdiction such as the judge sought to exercise in this case would cut across the statutory schemes of company and insolvency law. These include elaborate provisions regulating the repayment of capital to shareholders and other forms of reduction of capital, and for the recovery in an insolvency of improper dispositions of the company's assets. These schemes are essential for the protection of those dealing with a company, particularly where it is a trading company like PRL and Vermont. The effect of the judge's order in this case was to make the wife a secured creditor. It is no answer to say, as occasionally has been said in cases about ancillary financial relief, that the court will allow for known creditors. The truth is that in the case of a trading company incurring and discharging large liabilities in the ordinary course of business, a court of family jurisdiction is not in a position to conduct the kind of notional liquidation attended by detailed internal investigation and wide publicity which would be necessary to establish what its liabilities are. In the present case, the difficulty is aggravated by the fact that the last financial statements,

which are not obviously unreliable, are more than five years old. To some extent that is the fault of the husband and his companies, but that is unlikely to be much comfort to unsatisfied creditors with no knowledge of the state of the shareholder's marriage or the proceedings in the Family Division. It is clear from the judge's findings of fact that this particular husband made free with the company's assets as if they were his own. That was within his power, in the sense that there was no one to stop him. But, as the judge observed, he never stopped to think whether he had any right to act in this way, and in law, he had none. The sole shareholder or the whole body of shareholders may approve a foolish or negligent decision in the ordinary course of business, at least where the company is solvent: Multinational Gas & Petrochemical Co v Multinational Gas & Petrochemical Services Ltd [1983] Ch. 258 . But not even they can validly consent to their own appropriation of the company's assets for purposes which are not the company's: Belmont Finance Corp Ltd v Williams Furniture Ltd [1979] Ch. 250, 261 (Buckley L.J.), Attorney-General's Reference (No.2 of 1982) [1984] Q.B. 624; (1984) 1 B.C.C. 98973 , Director of Public Prosecutions v Gomez [1993] A.C. 442, 496–497 (Lord Browne-Wilkinson). Mr Prest is of course not the first person to ignore the separate personality of his company and pillage its assets, and he will certainly not be the last. But for the court to deploy its authority to authorise the appropriation of the company's assets to satisfy a personal liability of its shareholder to his wife, in circumstances where the company has not only not consented to that course but vigorously opposed it, would, as it seems to me, be an even more remarkable break with principle.

42    It may be said, as the judge in effect did say, that the way in which the affairs of this company were conducted meant that the corporate veil had no reality. The problem about this is that if, as the judge thought, the property of a company is property to which its sole shareholder is "entitled, either in possession or reversion", then that will be so even in a case where the sole shareholder scrupulously respect **591 s the separate personality of the company and the requirements of the Companies Acts, and even in a case where none of the exceptional circumstances that may justify piercing the corporate veil applies. This is a proposition which can be justified only by asserting that the corporate veil does not matter where the husband is

in sole control of the company. But that is plainly not the law.

### Beneficial ownership of the properties

43    It follows from the above analysis that the only basis on which the companies can be ordered to convey the seven disputed properties to the wife is that they belong beneficially to the husband, by virtue of the particular circumstances in which the properties came to be vested in them. Only then will they constitute property to which the husband is "entitled, either in possession or reversion." This is the issue which the judge felt that he did not need to decide. But on the footing that he was wrong about the ambit of s.24(1)(a) , it does need to be decided now. The issue requires an examination of evidence which is incomplete and in critical respects obscure. A good deal therefore depends upon what presumptions may properly be made against the husband given that the defective character of the material is almost entirely due to his persistent obstruction and mendacity.

44    In British Railways Board v Herrington [1972] A.C. 877, 930–931 , Lord Diplock, dealing with the liability of a railway undertaking for injury suffered by trespassers on the line, said:

> "The appellants, who are a public corporation, elected to call no witnesses, thus depriving the court of any positive evidence as to whether the condition of the fence and the adjacent terrain had been noticed by any particular servant of theirs or as to what he or any other of their servants either thought or did about it. This is a legitimate tactical move under our adversarial system of litigation. But a defendant who adopts it cannot complain if the court draws from the facts which have been disclosed all reasonable inferences as to what are the facts which the defendant has chosen to withhold. A court may take judicial notice that railway lines are regularly patrolled by linesmen and Bangers. In the absence of evidence

to the contrary, it is entitled to infer that one or more of them in the course of several weeks noticed what was plain for all to see. Anyone of common sense would realise the danger that the state of the fence so close to the live rail created for little children coming to the meadow to play. As the appellants elected to call none of the persons who patrolled the line there is nothing to rebut the inference that they did not lack the common sense to realise the danger. A court is accordingly entitled to infer from the inaction of the appellants that one or more of their employees decided to allow the risk to continue of some child crossing the boundary and being injured or killed by the live rail rather than to incur the trivial trouble and expense of repairing the gap in the fence."

The courts have tended to recoil from some of the fiercer parts of this statement, which appear to convert open-ended speculation into findings of fact. There must be a reasonable basis for some hypothesis in the evidence or the inherent probabilities, before a court can draw useful inferences from a party's failure to rebut it. For my part I would adopt, with a modification which I shall come to, the more balanced view expressed by Lord Lowry with the support of the rest of the committee in R. v Inland Revenue Commissioners, ex p. TC Coombs & Co [1991] 2 A.C. 283, 300 :

"In our legal system generally, the silence of one party in face of the other party's evidence may convert that evidence into proof in relation to matters which are, or are likely to be, within the knowledge of the silent party and about which that party could be expected to give evidence. Thus, depending on the circumstances, a prima facie case may become a strong or *592 even an overwhelming case. But, if the silent party's failure to give evidence

(or to give the necessary evidence) can be credibly explained, even if not entirely justified, the effect of his silence in favour of the other party may be either reduced or nullified."

Cf. Wisniewski v Central Manchester Health Authority [1998] P.I.Q.R. 324, 340 .

45  The modification to which I have referred concerns the drawing of adverse inferences in claims for ancillary financial relief in matrimonial proceedings, which have some important distinctive features. There is a public interest in the proper maintenance of the wife by her former husband, especially (but not only) where the interests of the children are engaged. Partly for that reason, the proceedings although in form adversarial have a substantial inquisitorial element. The family finances will commonly have been the responsibility of the husband, so that although technically a claimant, the wife is in reality dependent on the disclosure and evidence of the husband to ascertain the extent of her proper claim. The concept of the burden of proof, which has always been one of the main factors inhibiting the drawing of adverse inferences from the absence of evidence or disclosure, cannot be applied in the same way to proceedings of this kind as it is in ordinary civil litigation. These considerations are not a licence to engage in pure speculation. But judges exercising family jurisdiction are entitled to draw on their experience and to take notice of the inherent probabilities when deciding what an uncommunicative husband is likely to be concealing. I refer to the husband because the husband is usually the economically dominant party, but of course the same applies to the economically dominant spouse whoever it is.

46  The facts, so far as the judge was able to make findings about them, are that the London properties were acquired as follows:

•December 1995

•Flat 4, 27 Abbey Road was transferred to PRL by the husband for £1. It had been bought by him in 1991, before the marriage and before the incorporation of PRL. There are two charges on the property, in favour

of Ahli United Bank and BNP Paribas, apparently to secure loans made to PRL. Neither the husband nor PRL has complied with orders to disclose the loan agreement and related documents.

•Flat 5, 27 Abbey Road was transferred to PRL on the same day, also for £1, by the husband's younger brother Michel. It had been bought in March of that year for £48,650 in Michel's name. The wife's evidence was that, at the time, Michel was a student in London with no substantial assets of his own who was being supported by her husband. She said that her husband had led her to believe that he had paid for it.

•March 1996

•Flat 2, 143 Ashmore Road, is a leasehold property transferred to PRL for £1 by the wife. It had originally been bought by the husband in November 1992 in the name of someone called Jimmy Lawrence. There is no information about Jimmy Lawrence or the reasons for his involvement. According to the husband's evidence, the purchase money came from PRL, but since PRL was not incorporated until six months after that, this cannot be correct. At some stage, it is unclear when or how, the lease was transferred into the name of the wife, and she must have signed the transfer when it was conveyed to PRL, but she had no recollection of being involved or of ever having owned it.

•1998

•The wife transferred her interest in the freehold of 143 **593** Ashmore Street to PRL. The freehold had originally been bought in 1996 in the name of the wife and one Esta Blechman, who was the leasehold owner of another flat in the building. There is no information about the consideration paid either in 1996 or in 1998. The husband's evidence was the funds to buy the wife's interest in 1996 came from PRL.

•August 2000

•Flat 6, 62-64 Beethoven Street was transferred to PRL by the husband for £85,000. He had originally bought it in 1988 (before the marriage) for £70,500. The property is charged to secure the loans made by Ahli United Bank and BNP Paribas.

•May 2001

•The matrimonial home, 16 Warwick Avenue, was bought in the name of PRL for £1.4 million and subsequently refurbished at a cost of about £1 million. The judge rejected the husband's evidence that the purchase price and refurbishment costs were funded by PRL, because at that stage the company had not commenced trading operations. He found that they were funded from bonuses earned by the husband, presumably, at this stage, from his last employer before he set up on his own. The judge found that PRL had always held this property on trust for the husband and that conclusion is not challenged on this appeal. The property is charged to secure the loans made by Ahli United Bank and BNP Paribas. In accordance with the judge's order PRL has now conveyed it to the wife, but subject to the charges.

•July 2001

•Flat 310, Pavilion Apartments was bought in the name of Vermont for £635,000. The judge found that the money was derived from PRL.

•January 2004

•11, South Lodge, Circus Road, was bought in the name of Vermont for £700,000. The judge found that the purchase price was also derived from PRL. The property is charged to secure the loans made to Ahli United Bank and BNP Paribas.

The judge recorded the wife's evidence that the husband had once advised her that if anything were to happen to him, she should sell all the properties, move

to Nevis and use the proceeds of sale to meet her living expenses there.

47 The starting point is that in her points of claim the wife expressly alleged, among other things, that the husband used the corporate defendants to hold legal title to properties that belonged beneficially to him. All seven of the properties in dispute on this appeal were identified in her pleading as having been held for him in this way. In her s.25 statement, she gives evidence of her belief that he was their beneficial owner, supported in some cases by admittedly inconclusive reasons for that belief. Neither the husband nor the companies have complied with orders for the production of the completion statements on the purchase of the properties and evidence of the source of the money used to pay the purchase price. The companies were joined to these proceedings only because they were alleged to be trustees for the husband of the shareholdings and the properties and because orders were being sought for their transfer to the wife. Yet the companies **\*594** failed to file a defence, or to comply with orders for disclosure. One of the few things that is clear from Mr Murphy's affidavit was that the companies' refusal to co-operate was deliberate, notwithstanding that they were conscious that the London properties (unlike the other assets) were within the jurisdiction of the court, which was in a position directly to enforce any order that it might make in respect of them. The only explanation proffered for their contumacy was that the information was confidential to the companies' shareholders or "commercial partners". It is difficult to imagine that any commercial partners could enjoy rights of confidence over information concerning residential investment properties in London, and on the judge's findings the only shareholder was the husband himself. The only directly relevant evidence given by Mr Murphy in his affidavit is a bald assertion that the companies are the sole beneficial owners of the shareholdings and the properties, but he declined to appear for cross-examination on it. The judge rejected his explanation that his health was not up to it. The judge's findings about the ownership and control of the companies mean that the companies' refusal to co-operate with these proceedings is a course ultimately adopted on the direction of the husband. It is a fair inference from all these facts, taken cumulatively, that the main, if not the only, reason for the companies' failure to co-operate is to protect the

London properties. That in turn suggests that proper disclosure of the facts would reveal them to have been held beneficially by the husband, as the wife has alleged.

48 Turning to what is known about the acquisition of the disputed properties, PRL acquired the legal interest in six London properties (including the matrimonial home) between 1995 and 2001. All of these properties were acquired by PRL before it began commercial operations and began to generate funds of its own. This was the main basis on which the judge found that the matrimonial home was held on trust for the husband from its acquisition in 2001. Since, as the judge found, no rent was paid to PRL for the family's occupation of the matrimonial home, this is a particularly clear case of the husband using PRL as a vehicle to hold legal title on trust for himself.

49 Of the other five properties owned by PRL, the first category comprises the three properties (Flats 4 and 5, 27 Abbey Road, and Flat 2, 143 Ashmore Road) acquired by the company in December 1995 and March 1996, in each case for a nominal consideration of £1. Since no explanation has been forthcoming for the gratuitous transfer of these properties to PRL, there is nothing to rebut the ordinary presumption of equity that PRL was not intended to acquire a beneficial interest in them. The only question is who did hold the beneficial interest. Flat 4, 27 Abbey Road was transferred by the husband, who had originally bought it in his own name in 1991, before PRL was incorporated. There is therefore an ordinary resulting trust back to the husband, which is held by him subject to the charges in favour of Ahli United Bank and BNP Paribas. Flat 5, 27 Abbey Road was transferred to PRL by the husband's younger brother Michel. He had acquired title shortly before at a time when he could not have paid for it himself. The wife's evidence was that the husband paid for it. Again, there is no evidence to rebut the ordinary inference that the husband was the beneficial owner of the property at the time of the transfer to PRL, and that the company held it on a resulting trust for him. The leasehold interest in Flat 2, 143 Ashmore Road was transferred to PRL by the wife. The rather curious chain of title before that is summarised above. The circumstances suggest that the husband must have provided the purchase money and was the beneficial owner when the legal estate was held by Jimmy Lawrence and also at the time of its

transfer from him to the wife. Either it then became the beneficial property of the wife (which is what equity would initially presume); or else it remained in the beneficial ownership of the husband, which is what I would on balance infer from the wife's evidence that the transfer was procured by the husband without her conscious involvement. In either case, the company as the legal owner can be required to transfer this property to the wife. I conclude that the husband was at all relevant times the beneficial owner of all three properties.

50  The freehold interest in 143  **595** Ashmore Road and Flat 6, 62–64 Beethoven Street come into a different category. Flat 6, 62–64 Beethoven Street is known to have been acquired by PRL from the husband in August 1998 for substantial consideration. Since PRL had not begun operations at that stage, I infer that the purchase money must have come from the husband. Virtually nothing is known about the terms of acquisition of the wife's interest in the freehold of 143 Ashmore Road, except that the husband says that the money came from PRL. I infer for the same reason that PRL was funded by the husband. In itself, that is consistent with PRL being the beneficial owner if, for example, the husband provided the money to the company by way of loan or capital subscription. But there is no evidence to that effect, and I would not be willing to presume it in the absence of any. I conclude that the husband was the beneficial owner of these two properties.

51  That leaves the two London properties (Flat 310, Pavilion Apartments and 11, South Lodge, Circus Road) which were acquired in the name of Vermont for substantial consideration, in July 2001 and January 2004 respectively. Vermont is an oil trading company which according to the husband started lifting oil in 2010. In the company's financial statements for 2008, the two properties are listed as its only assets and there were no liabilities apart from the bank loans charged on Flat 310, Pavilion Apartments. Flat 310, Pavilion Apartments was acquired with funds derived from PRL at a time when the company had not begun trading operations. I infer that the funds were provided to PRL by the husband. The position is the same in the case of 11, South Lodge, except that this was bought with money provided by PRL at a time when it was an active trading company and could therefore have funded the purchase itself. However, it is right to note (i) that the

ownership of residential investment property in London appears to have nothing to do with the oil trading business in which PRL was then engaged, and (ii) that at this stage of the history a consistent pattern can be discerned by which the husband causes properties to be acquired with funds provided by himself by companies under his control, nominally funded by PRL but in fact by himself. If 11, South Lodge was the exception, then it was a break with past practice. In the absence of any explanation of these transactions by the husband or his companies, I conclude that both of the properties acquired in the name of Vermont were beneficially owned by the husband.

52  Whether assets legally vested in a company are beneficially owned by its controller is a highly fact-specific issue. It is not possible to give general guidance going beyond the ordinary principles and presumptions of equity, especially those relating to gifts and resulting trusts. But I venture to suggest, however tentatively, that in the case of the matrimonial home, the facts are quite likely to justify the inference that the property was held on trust for a spouse who owned and controlled the company. In many, perhaps most cases, the occupation of the company's property as the matrimonial home of its controller will not be easily justified in the company's interest, especially if it is gratuitous. The intention will normally be that the spouse in control of the company intends to retain a degree of control over the matrimonial home which is not consistent with the company's beneficial ownership. Of course, structures can be devised which give a different impression, and some of them will be entirely genuine. But where, say, the terms of acquisition and occupation of the matrimonial home are arranged between the husband in his personal capacity and the husband in his capacity as the sole effective agent of the company (or someone else acting at his direction), judges exercising family jurisdiction are entitled to be sceptical about whether the terms of occupation are really what they ar  **596** e said to be, or are simply a sham to conceal the reality of the husband's beneficial ownership.

### Nuptial settlement

53  The wife sought special leave to argue that the companies constituted a nuptial settlement within the meaning of s.24(1)(c) of the Act. The court ruled in the course of the hearing that leave would be refused. The

point was not argued below and does not appear to be seriously arguable here.

### Terms for permission to appeal

54  Before parting with this case, I will only record my surprise that the companies were given permission to appeal on such undemanding terms. They were required to make a payment on account of costs, but they were not required to purge their contempt in failing to disclose documents or information, nor were they put on terms as to dealings with the properties. There may have been good reasons for not imposing such terms, but on the face of it the possibility was not even considered.

### Conclusion

55  I would accordingly declare that the seven disputed properties vested in PRL and Vermont are held on trust for the husband, and I would restore para.6 of the order of Moylan J. so far as it required those companies to transfer them to the wife.

56  Subject to any contrary submissions as to costs, I would also restore para.14 of the judge's order so far as it dealt with the costs payable by PRL and Vermont, and would order them to pay the costs of the appeal to the Court of Appeal and to this court. As at present advised, I would not require Upstream, against whom no relief has ever been sought, to pay any costs, but in the rather unusual circumstances of this case, I would not make any costs order in their favour either.

LORD NEUBERGER:

57  I agree that Mrs Prest's appeal succeeds. More particularly, I agree that her appeal should be (i) allowed on the basis that the properties were acquired and held by the respondents on trust for the husband, but (ii) dismissed in so far as it relies on piercing the veil of incorporation, or on s.24(1)(a) or (c) of the Matrimonial Causes Act 1973.

58  I agree with all that Lord Sumption says on (i) the construction of s.24(1)(a) of the 1973 Act, in [37]–[42], (ii) the trust issue, in his masterly analysis of the facts

and inferences to be drawn from them, in [43]–[52], (iii) the point sought to be raised under s.24(1)(c), in [53], and (iv) his conclusions in [55] and [56], and there is nothing I wish to add on those issues.

59  I wish, however, to add a little to what Lord Sumption says on the question of whether, and if so, in what circumstances, the court has power to pierce the corporate veil in the absence of specific statutory authority to do so.

60  I agree that there are two types of case where judges have described their decisions as being based on piercing the veil, namely those concerned with concealment and those concerned with evasion. It seems to me that Staughton L.J. had a similar classification in mind in Atlas Maritime Co SA v Avalon Maritime Ltd (No.1) [1991] 4 All E.R. 769, 779G (quoted in VTB Capital Plc v Nutritek International Corp [2013] UKSC 5; [2013] B.C.C. 514, [118]), where he sought to distinguish between "lifting" and "piercing" the corporate veil.

61  I also agree that cases concerned with concealment do not involve piercing the corporate veil at all. They simply involve the application of conventional legal principles to an arrangement which happens to include a company being interposed to disguise the true nature of that arrangement. Acc **\*597** ordingly, if piercing the corporate veil has any role to play, it is in connection with evasion.

62  Furthermore, I agree that, if the court has power to pierce the corporate veil, Munby J. was correct in Ben Hashem v Al Shayif [2009] 1 F.L.R. 115 to suggest that it could only do so in favour of a party when all other, more conventional, remedies have proved to be of no assistance (and therefore I disagree with the Court of Appeal in VTB [2012] 2 Lloyd's Rep. 313, [79], who suggested otherwise).

63  However, as in the recent decision of this court in VTB, it is not necessary to decide whether there is a principle that it is open to a court, without statutory authority (or, possibly, in the absence of the intention of contracting parties), to pierce the veil of incorporation ("the doctrine"), and, if it is, the scope, or boundaries, of the doctrine.

64 However, I can see considerable force in the view that it is appropriate for us to address those matters now. This is the second case in the space of a few months when the doctrine has been invoked before this court on what are, on any view, inappropriate grounds. It is also clear from the cases and academic articles that the law relating to the doctrine is unsatisfactory and confused. Those cases and articles appear to me to suggest that (i) there is not a single instance in this jurisdiction where the doctrine has been invoked properly and successfully, (ii) there is doubt as to whether the doctrine should exist, and (iii) it is impossible to discern any coherent approach, applicable principles, or defined limitations to the doctrine.

65 In these circumstances, there is obvious value in seeking to decide whether the doctrine exists, and if so, to identify some coherent, practical and principled basis for it, if we can do so in this case.

66 Any discussion about the doctrine must begin with the decision in Salomon v A Salomon and Co Ltd [1897] A.C. 22 , in which a unanimous House of Lords reached a clear and principled decision, which has stood unimpeached for over a century. The effect of the decision is encapsulated at 30–31, where Lord Halsbury L.C. said that a "legally incorporated" company "must be treated like any other independent person with its rights and liabilities appropriate to itself …, whatever may have been the ideas or schemes of those who brought it into existence". Whether that is characterised as a common law rule or a consequence of the companies legislation (or an amalgam of both), it is a very well-established principle of long standing and high authority. Writing extra-judicially, Lord Templeman referred to the principle in Salomon as the "unyielding rock" on which company law is constructed, and on which "complicated arguments" might ultimately become "shipwrecked": Forty Years On (1990) 11 Co. Law. 10 .

67 The decision in Salomon plainly represents a substantial obstacle in the way of an argument that the veil of incorporation can be pierced. Further, the importance of maintaining clarity and simplicity in this area of law means that, if the doctrine is to exist, the circumstances in which it can apply must be limited and as clear as possible.

68 Since the decision in Salomon , there have been a number of cases where the courts have considered "piercing" or "lifting" the corporate veil. The most important of those cases are discussed by Lord Sumption in [20]–[35] above. That discussion demonstrates, as I see it, the following:

• (i) The decision of the International Court of Justice in Re Barcelona Traction, Light and Power Co, Ltd [1970] I.C.J. 3 recognises the doctrine; however, that is in the context of a civil law system which includes the principle of abuse of rights, and begs the question whether, in a common law system, the doctrine should be applicable by the courts in the absence of specific legislative sanction.

• (ii) There are judgments in family cases based on obiter dicta in Nicholas v Nicholas [1984] F.L.R. 285 (e.g. the judgments of Thorpe L.J. in this case and of Mostyn J. in Kremen v Agrest (No.2) [2011] 2 F.L.R. 490 ), where the doctrine has been treated as valid and applicable; but the application **598 of the doctrine, even if it exists, in these cases is unsound, as Munby J. effectively (in both senses of the word) indicated in A v A [2007] 2 F.L.R. 467 and Ben Hashem [2009] 1 F.L.R. 115 .

• (iii) There are two cases outside the family law context which laid the ground for the establishment of the doctrine, namely the decisions of the Court of Appeal in Gilford Motor Co Ltd v Horne [1933] Ch. 935 , and of Russell J. in Jones v Lipman [1962] 1 W.L.R. 832 .

• (iv) There are two subsequent decisions, one of the House of Lords, Woolfson v Strathclyde Regional Council 1978 S.C. (HL) 90 , the other of the Court of Appeal, Adams v Cape Industries Plc [1990] Ch. 433; [1990] B.C.C. 786 , in which it was assumed or accepted that the doctrine existed, but they cannot amount to more than obiter observations, as in neither of them did the doctrine apply.

• (v) In subsequent cases in the Court of Appeal and High Court, it has been (unsurprisingly) assumed that the doctrine does apply, two recent examples being the Court of Appeal decisions in VTB [2012] 2 Lloyd's Rep. 313 and Alliance Bank JSC v Aquanta Corp [2012] EWCA Civ 1588; [2012] 2 C.L.C. 1027 .

• (vi) However, in only two of those subsequent cases (the first instance decisions in Gencor ACP Ltd v Dalby [2000] 2 B.C.L.C. 734 and Trustor AB v Smallbone (No.2) [2001] 1 W.L.R. 1177[ [2002] B.C.C. 795 ) has the doctrine actually been relied on, and they each could have been decided the same way without recourse to the doctrine, and therefore involved illegitimate applications of the doctrine on any view (see [62] above).

69  On closer analysis of cases mentioned in sub-para. (iii) above, it does not appear to me that the facts and outcomes in Gilford Motor and Jones provide much direct support for the doctrine. However, the decisions can fairly be said to have rested on the doctrine if one takes the language of the judgments at face value. Further, they indicate that, where a court is of the view (albeit that I think that it was mistaken in those cases) that there is no other method of achieving justice, the doctrine provides a valuable means of doing so.

70  In Gilford Motor , the legal argument at first instance and on appeal seems to have concentrated on the validity of the restrictive covenant (see at [1933] Ch. 935, 936–937 and 950–952). It is also clear from the judgment of Lord Hanworth M.R. at 961 that counsel for the company conceded that if, contrary to his contention, the company was a "mere cloak or sham" and that the business was actually being carried on by Horne in breach of the restrictive covenant, then the company should also be restrained. Further, in my view, as that passage indicates, the case was one of concealment, and therefore did not really involve the doctrine at all.

71  In any event, it seems to me that the decision in Gilford Motor that an injunction should be granted against the company was amply justified on the basis that the company was Horne's agent for the purpose of carrying on the business (just as his wife would have been, if he had used her as the "cloak"); therefore, if an injunction was justified against Horne, it was justified against the company. There is nothing in the judgments in Gilford Motor to suggest that any member of the Court of Appeal thought that he was making new law, let alone cutting into the well-established and simple principle laid down in Salomon .

72  It is by no means inconceivable that the three members of the Court of Appeal in Gilford Motor were using the expression "cloak or sham" to suggest, as a matter of legal analysis, a principal and agent relationship. Lord Hanworth relied on a passage in a judgment of Lindley L.J. in Smith v Hancock [1894] 2 Ch. 377, 385 (where the expression "cloak or sham" appear  *599  s to have originated), and in that passage, it seems to me that the cloak or sham is treated as amounting to the business being "carried on for the defendant". This view is supported by something Lord Denning M.R. said in Wallersteiner v Moir [1974] 1 W.L.R. 991, 1013 , namely it was "quite clear" that the companies in that case: "were just the puppets of Dr Wallersteiner. … Transformed into legal language, they were his agents to do as he commanded. He was the principal behind them. … At any rate, it was up to him to show that any one else had a say in their affairs and he never did so: cf Gilford ".

73  As for Jones , I am unconvinced that it was necessary for Russell J. to invoke the doctrine in order to justify an effective order for specific performance, as sought by the plaintiffs in that case. An order for specific performance would have required Lipman not merely to convey the property in question to the plaintiffs, but to do everything which was reasonably within his power to ensure that the property was so conveyed—see e.g. Wroth v Tyler [1974] Ch. 30, 47–51 . Lipman and an employee of his solicitors were the sole shareholders and directors of the company, and its sole liability appears to have been a loan of £1,500 to a bank (borrowed to meet half the £3,000 which it paid for the property). In those circumstances, it seems clear that Lipman could have compelled the company to convey the property to the plaintiffs (on the basis that he would have to account to the company for the purchase price, which would have ensured that the bank was in no way prejudiced). Indeed, I consider that the company could fairly have been described and treated as being Lipman's "creature", without in any way cutting into the principle established in Salomon .

74  The history of the doctrine over 80 years of its putative life (taking Gilford Motor as the starting point) is, therefore, at least as I see it, a series of decisions, each of which can be put into one of three categories, namely:

• (i) decisions in which it was assumed that the doctrine existed, but it was rightly concluded that it did not apply on the facts;
• ii) decisions in which it was assumed that the doctrine existed, and it was wrongly concluded that it applied on the facts;
• iii) decisions in which it was assumed that the doctrine existed and it was applied to the facts, but where the result could have been arrived at on some other, conventional, legal basis, and therefore it was wrongly concluded that it applied (see [62] above).

 (The doctrine has been invoked in cases not considered by Lord Sumption, but they take matters no further— see the decisions mentioned and briefly considered in VTB [2013] B.C.C. 514 , [125]–[127].)

75 The lack of any coherent principle in the application of the doctrine has been commented on judicially in many of the major common law jurisdictions. In this country, Clarke J. in The Tjaskemolen [1997] 2 Lloyd's Rep. 465, 471 said that "[t]he cases have not worked out what is meant by 'piercing the corporate veil'". In Australia, in Briggs v James Hardie & Co Pty Ltd (1989) 16 N.S.W.L.R. 549, 567 , Rogers A.J.A. in the New South Wales Court of Appeal observed that "there is no common, unifying principle, which underlies the occasional decision of courts to pierce the corporate veil", and that "there is no principled approach to be derived from the authorities". In Constitution Insurance Co of Canada v Kosmopoulos [1987] 1 S.C.R. 2, 10 , Justice Wilson in the Supreme Court of Canada said that "[t]he law on when a court may … 'lift' the corporate veil' … follows no consistent principle". The New Zealand Court of Appeal in Attorney-General v Equiticorp Industries Group Ltd (In Statutory Management) [1996] 1 N.Z.L.R. 528, 541 , said that "'to lift the corporate veil' … is not a principle. It describes the process, but provides no guidance as to when it can be used." In the South African Supreme Court decision, Cape Pacific Ltd v Lubner Controlling Investments (Pty) Ltd 1995 (4) S.A. 790 (A) , 802–803, Smalberger J.A. observed that "[t]he law is far from settled with regard to the circumstances in which it would be permissible to pierce the corporate veil".

76 Judges in t **600** he United States have also been critical, even though the doctrine has been invoked and developed to a much greater extent than in

this jurisdiction. In Secon Service System Inc v St Joseph Bank & Trust Co, 855 F.2d 406 (7th Cir, 1988), 414 , Judge Easterbrook in the US Court of Appeals described the doctrine as "quite difficult to apply, because it avoids formulating a real rule of decision. This keeps people in the dark about the legal consequences of their acts …". And in Allied Capital Corp v GC-Sun Holdings LP, 910 A.2d 1020 (2006) , 1042–1043, the Delaware Court of Chancery said that the doctrine has been "rightfully criticized for its ambiguity and randomness", and that its application "yield[s] few predictable results".

77 The doctrine has fared no better with academics. Easterbrook and Fischel, Limited Liability and the Corporation (1985) 52 Univ. Chicago L. Rev. 89 , pithily observe that "'[p]iercing' seems to happen freakishly. Like lightning, it is rare, severe, and unprincipled". The jurisprudence on the doctrine has been described as "incoherent and unprincipled" by Farrar, Fraud, Fairness and Piercing the Corporate Veil (1990) 16 Can. Bus L.J. 474, 478 . C Mitchell, in Lifting the Corporate Veil in the English Courts: An Empirical Study (1999) 3 Co. Fin . and Ins. L.R. 15, 16 observes that "courts have often used conclusory terms to express their decisions on the point, which for all their vividness tell us nothing about the reasoning which underpins these decisions". Neyers in Canadian Corporate Law, Veil-Piercing, and the Private Law Model Corporation (2000) 50 Univ. Toronto L.J. 173, 180 , asks rhetorically: "How can the 'legal person doctrine' that is so central to corporate law in one sentence be disregarded so casually in the next?" D Michael in To Know A Veil (2000) 26 J. Corp. Law. 41, 55 , refers to the doctrine as "a non-existent and false doctrine". Ramsay and Noakes, Piercing the Corporate Veil in Australia (2001) 19 C. & S.L.J. 250, 251 , note that the doctrine "is far from clear in the case law". Oh, Veil-Piercing (2010) 89 Texas Law Review 81, 84 says that "[t]he inherent imprecision in metaphors has resulted in a doctrinal mess".

78 This last view has some resonance with my remarks in VTB [2013] B.C.C. 514 , [124], about the use of pejorative expressions to mask the absence of rational analysis. It also chimes with Justice Cardozo's reference to the "mists of metaphor" in company law, which, "starting as devices to liberate thought, … end often by

enslaving it", in Berkey v Third Avenue Railway Co 155 NE 58 (1926), 61 .

79    In these circumstances, I was initially strongly attracted by the argument that we should decide that a supposed doctrine, which is controversial and uncertain, and which, on analysis, appears never to have been invoked successfully and appropriately in its 80 years of supposed existence, should be given its quietus. Such a decision would render the law much clearer than it is now, and in a number of cases it would reduce complications and costs: whenever the doctrine is really needed, it never seems to apply.

80    However, I have reached the conclusion that it would be wrong to discard a doctrine which, while it has been criticised by judges and academics, has been generally assumed to exist in all common law jurisdictions, and represents a potentially valuable judicial tool to undo wrongdoing in some cases, where no other principle is available. Accordingly, provided that it is possible to discern or identify an approach to piercing the corporate veil, which accords with normal legal principles, reflects previous judicial reasoning (so far as it can be discerned and reconciled), and represents a practical solution (which hopefully will avoid the problems summarised in [75] above), I believe that it would be right to adopt it as a definition of the doctrine.

81    Having read what Lord Sumption says in his judgment, especially in [17], [18], [27], [28], [34] and [35], I am persuaded by his formulation in [35], namely that the doctrine should only be invoked where "a person is under an existing legal obligation or liability or subject to an existing legal restriction which he deliberately evades or whose enforcement he deliberately frustrates by interposing a company un  *601  der his control".

82    It appears to me that such a clear and limited doctrine would not fall foul of at least most of the strictures which have been made of the doctrine. In particular, (i) it should be of value in the few cases where it can be properly invoked, (ii) it is, I believe and hope, sufficiently clear as to render it unlikely to be raised in inappropriate cases, and (iii) it does not cut across the rule in Salomon because it is consistent with conventional legal principles.

83    It is only right to acknowledge that this limited doctrine may not, on analysis, be limited to piercing the corporate veil. However, there are three points to be made about that formulation. In so far as it is based on "fraud unravels everything", as discussed by Lord Sumption in [18], the formulation simply involves the invocation of a well-established principle, which exists independently of the doctrine. In any event, the formulation is not, on analysis, a statement about piercing the corporate veil at all. Thus, it would presumably apply equally to a person who transfers assets to a spouse or civil partner, rather than to a company. Further, at least in some cases where it may be relied on, it could probably be analysed as being based on agency or trusteeship especially in the light of the words "under his control". However, if either or both those points were correct, it would not undermine Lord Sumption's characterisation of the doctrine: it would, if anything, serve to confirm the existence of the doctrine, albeit as an aspect of a more conventional principle. And if the formulation is intended to go wider than the application of "fraud unravels everything", it seems to me questionable whether it would be right for the court to take the course of arrogating to itself the right to step in and undo transactions, save where there is a well-established and principled ground for doing so. Such a course is, I would have thought, at least normally, a matter for the legislature. Indeed Parliament has decided to legislate to this effect in specified and limited circumstances with protection for third parties, in provisions such as s.37 of the Matrimonial Causes Act 1973 and s.423 of the Insolvency Act 1986 .

LADY HALE (with whom Lord Wilson agrees):

84    I agree that this appeal should succeed, on the basis that the properties in question were held by the respondent companies on trust for the husband. As he is beneficially entitled to them, they fall within the scope of the court's power to make transfer of property orders under s.24(1)(a) of the Matrimonial Causes Act 1973 . It also means that the court has power to order that the companies, as bare trustees, transfer these properties to the wife.

85    The reasons for holding that these properties were beneficially owned by the husband have been amply

explained by Lord Sumption. I would only emphasise the special nature of proceedings for financial relief and property adjustment under the Matrimonial Causes Act , which he explains in [45]. There is a public interest in spouses making proper provision for one another, both during and after their marriage, in particular when there are children to be cared for and educated, but also for all the other reasons explored in cases such as Miller v Miller [2006] UKHL 24; [2006] 2 A.C. 618 . This means that the court's role is an inquisitorial one. It also means that the parties have a duty, not only to one another but also to the court, to make full and frank disclosure of all the material facts which are relevant to the exercise of the court's powers, including of course their resources: see Livesey (formerly Jenkins) v Jenkins [1985] A.C. 424 . If they do not do so, the court is entitled to draw such inferences as can properly be drawn from all the available material, including what has been disclosed, judicial experience of what is likely to be being concealed and the inherent probabilities, in deciding what the facts are.

86 I also agree, for the reasons given by Lord Sumption, that s.24(1)(a) does not give the court power to order a spouse to transfer property to which he is not in law entitled. The words "entitled, either in possession or reversion" refer to a right recognised by the law of property. This is clear, not only from the statutory language, but also from the statutory h  **602** istory.

87 The words "entitled to any property either in possession or reversion" first appeared in the Matrimonial Causes Act 1857 , which introduced judicial divorce to the law of England and Wales. Section 45 gave the court power, when granting a decree of divorce on the ground of the wife's adultery, to settle such property for the benefit of the husband and/or the children of the marriage. The same words were used in s.3 of the Matrimonial Causes Act 1884 , when extending the same power to a husband's application for restitution of conjugal rights. They were carried through, respectively, into ss.191(1) and (2) of the Supreme Court of Judicature (Consolidation) Act 1925 , then into s.24(1) and (2) of the Matrimonial Causes Act 1950 , then into ss.17(2) and 21(3) of the Matrimonial Causes Act 1965 . The decree of restitution of conjugal rights was abolished in the comprehensive package of matrimonial law reforms which came into force on January 1, 1971. That package included, in

s.4(a) of the Matrimonial Proceedings and Property Act 1970 , the power to order either spouse to transfer to the other "property to which the first-mentioned party is entitled, either in possession or reversion". This was an expansion, for the benefit of either spouse and to outright transfer as well as settlement, of the earlier power to settle the wife's property. Section 4(a) later became s.24(1)(a) of the Matrimonial Causes Act 1973 .

88 There is nothing in the language, the history, or indeed the report of the Law Commission which led to the 1970 Act (Law Com No.25), to suggest that those words should be read to include "property over which the first-mentioned party has such control that he could cause himself to become entitled, either in possession or reversion". But of course such property can be taken into account when computing that party's resources for the purpose of s.25(2) of the 1973 Act, which lays down a non-exhaustive list of factors to be taken into account by the court when deciding how to exercise its various powers to make financial and property adjustment orders.

89 Nor is there anything in the language of s.24(1)(a) to suggest that it was Parliament's intention to grant the divorce courts an express power to "pierce the corporate veil" in such a way as to treat property belonging to a limited company as property belonging to the spouse who owns and/or controls the company. The question nevertheless arises as to whether, in a case such as this, the courts have power to prevent the statutes under which limited liability companies may be established as separate legal persons, whether in this or some other jurisdiction, being used as an engine of fraud. I agree with Lord Sumption that "piercing the corporate veil" is an example of that general principle, with which family lawyers are familiar from the case of R. v Secretary of State for the Home Department, ex p. Puttick [1981] Q.B. 767 .

90 Lord Sumption refers to the process compendiously as "disregarding the separate personality of the company" at [16]. When considering its scope, however, it may be helpful to consider what the purpose of doing this is. In Salomon v A Salomon and Co Ltd [1897] A.C. 22 the purpose was to go behind the separate legal personality of the company in order to sue Aron Salomon personally for a liability that was legally that of the company which he had set up (with himself

and members of his family as shareholders) to conduct his leather and boot-making business. This succeeded at first instance and in the Court of Appeal, Lindley L.J. going so far as to say that "Mr Aron Salomon's scheme is a device to defraud creditors": [1895] 2 Ch. 323, 339. They did not think that Parliament had legislated for the setting up of limited liability companies in order that sole traders should be able to conduct their businesses on limited liability terms. But the House of Lords disagreed: the company was a separate person from Mr Salomon and he could not be made liable for the company's debts. They did not think that there was any fraud involved simply in using a limited liability company as a vehicle for conducting a legitimate business. Thus was the legal str **\*603** ucture of modern business born.

91  But there are a few cases where the courts have apparently been prepared to disregard the separate personality of a company in order to grant a remedy, not only against the company, but also against the individual who owns and/or controls it. Both Gilford Motor Co Ltd v Horne [1933] Ch. 935 and Jones v Lipman [1962] 1 W.L.R. 832 are examples of this. In both those cases, it so happened that the controller had a pre-existing legal obligation which he was attempting to evade by setting up a company, in the one case a contractual obligation not to compete with his former employers, in the other case a contractual obligation to sell some land to the claimant. In Re Darby, ex p. Brougham [1911] 1 K.B. 95 , on the other hand, the liquidator of a creditor company was permitted to go behind the separate personality of a debtor company registered in Guernsey in order to obtain a remedy personally against its promoters who had fraudulently creamed off the profit from the sale by the Guernsey company to the creditor company of a worthless licence to run a slate quarry in Wales.

92  I am not sure whether it is possible to classify all of the cases in which the courts have been or should be prepared to disregard the separate legal personality of a company neatly into cases of either concealment or evasion. They may simply be examples of the principle that the individuals who operate limited companies should not be allowed to take unconscionable advantage of the people with whom they do business. But what the cases do have in common is that the separate legal personality is being disregarded

in order to obtain a remedy against someone other than the company in respect of a liability which would otherwise be that of the company alone (if it existed at all). In the converse case, where it is sought to convert the personal liability of the owner or controller into a liability of the company, it is usually more appropriate to rely upon the concepts of agency and of the "directing mind".

93  What we have in this case is a desire to disregard the separate legal personality of the companies in order to impose upon the companies a liability which can only be that of the husband personally. This is not a liability under the general law, for example for breach of contract. It is a very specific statutory power to order one spouse to transfer property to which he is legally entitled to the other spouse. The argument is that that is a power which can, because the husband owns and controls these companies, be exercised against the companies themselves. I find it difficult to understand how that can be done unless the company is a mere nominee holding the property on trust for the husband, as we have found to be the case with the properties in issue here. I would be surprised if that were not often the case.

94  There is a statutory power to set aside certain dispositions made with the intention of defeating a claim for financial provision or property adjustment in s.37 of the Matrimonial Causes Act 1973 . It is not suggested in this case that the expenditure involved in buying these properties, all of which were bought long before the marriage broke down, was made with that intention. If it had been, there might have been an argument that the exception for bona fide purchasers for value contained in s.37(4) did not apply to a company where the controlling mind was acting with that intention. But that is not this case.

95  Stone & Rolls Ltd v Moore Stephens (a firm) [2009] UKHL 39; [2009] 1 A.C. 1391 is an example of going behind the separate legal personality of the company in order to "get at" the person who owned and controlled it, not for the purpose of suing him, but in order to attribute his knowledge to the company so that its auditors could raise a defence of ex turpi causa to the company's allegation that they had neg **\*604** ligently failed to detect the fraudulent nature of its business.

96  For all those reasons, in addition to those given by Lord Sumption, I would dismiss this appeal on all but the issue of whether either party had a beneficial interest in the properties in question but allow it on that ground. I fervently hope that the wife will gain some benefit from the outcome of all this litigation, although in the light of the mortgages which apparently encumber the properties I am not optimistic that she will.

LORD MANCE:

97  I agree that the appeal should be allowed for the reasons given by Lord Sumption, supplemented in their essence by Lord Neuberger.

98  I agree with Lord Sumption's analysis of the domestic case-law to date in which the metaphor of "piercing the veil" has been deployed as part of the reasoning for a decision representing an exception to the basic principle in Salomon v A Salomon & Co Ltd [1897] A.C. 22 .

99  In the upshot, the only cases which Lord Sumption identifies in which a principle of "piercing the veil" can be said to have been critical to the reasoning can be rationalised as falling within what he describes as the evasion principle. In other cases, the corporate entity was simply being used to conceal the real actor, or some other analysis or relationship existed (such as principal and agent, nominee or trustee-beneficiary) to explain the decision.

100  It is however often dangerous to seek to foreclose all possible future situations which may arise and I would not wish to do so. What can be said with confidence is that the strength of the principle in Salomon's case and the number of other tools which the law has available mean that, if there are other situations in which piercing the veil may be relevant as a final fall-back, they are likely to be novel and very rare.

101  In this connection, I have however in mind that, in giving the recent Privy Council judgment in La Générale des Carrières et des Mines v FG Hemisphere Associates LLC [2012] UKPC 27; [2012] 2 C.L.C. 709 , I said at [77] (in a context where Gécamines was a state corporation, not susceptible of being wound up):

"The alternative way in which Hemisphere puts its case is to submit that, if Gécamines is otherwise accepted as a separate juridical entity, the facts found justify the lifting of the corporate veil to enable Hemisphere to pursue Gécamines as well as the state. In the Board's view, this involves a misapplication of any principles upon which the corporate veil may be lifted under domestic and international law. Assuming for the sake of argument that the 'unceremonious' subjecting of Gécamines to the controlling will of the state involved a breach by the State of its duty to respect Gécamines as a separate entity, that might conceivably justify an affected third party, possibly even an aggrieved general creditor of Gécamines, in suggesting that the corporate veil should be lifted to make the state, which had deprived Gécamines of assets, liable for Gécamines' debts. The Board need express no further view on that possibility. It represents the inverse of the present situation. There is no basis for treating the state's taking or Gécamines' use of Gécamines' assets for state purposes, at which Hemisphere directs vigorous criticism, as a justification for imposing on Gécamines yet further and far larger burdens in the form of responsibility for the whole of the debts of the Democratic Republic of the Congo. In international law as in domestic law, lifting the corporate veil must be a tailored remedy, fitted to the circumstances giving rise [to] it."

102  It may be that the possibility on which I touched in [77] would evaporate as a possible further exception to the principle in Salomon's case. It is certainly a different

situation to those which Lord Sumption discusses. But one would wish to hear further argument on this or any other suggested exception, in a case where it was directly relevant, before deciding thi **\*605** s. No-one should, however, be encouraged to think that any further exception, in addition to the evasion principle, will be easy to establish, if any exists at all. The evident absence, under the close scrutiny to which Lord Sumption has subjected the case-law, of authority for any further exception speaks for itself.

LORD CLARKE:

103  I agree with the other members of the court that the appeal should be allowed for the reasons given by Lord Sumption. I only wish to add a word on piercing the corporate veil. I agree that there is such a doctrine and that its limits are not clear. I also agree that Munby J. was correct in Ben Hashem v Al Shayif [2009] 1 F.L.R. 115 to suggest that the court only has power to pierce the corporate veil when all other more conventional remedies have proved to be of no assistance. It is thus likely to be deployed in a very rare case. Lord Sumption may be right to say that it will only be done in a case of evasion, as opposed to concealment, where it is not necessary. However, this was not a distinction that was discussed in the course of the argument and, to my mind, should not be definitively adopted unless and until the court has heard detailed submissions upon it. I agree with Lord Mance that it is often dangerous to seek to foreclose all possible future situations which may arise and, like him, I would not wish to do so. I expressed a similar view in VTB Capital Plc v Nutritek International Corp [2013] UKSC 5; [2013] B.C.C. 514 and adhere to it now. However, I also agree with Lord Mance and others that the situations in which piercing the corporate veil may be available as a fall-back are likely to be very rare and that no-one should be encouraged to think that any further exception, in addition to the evasion principle, will be easy to establish. It will not.

LORD WALKER:

104   Lord Sumption has comprehensively analysed the rather confused evidence relating to beneficial ownership of the London properties. His conclusion that they are all in the beneficial ownership of Mr Prest is in my view irresistible, based as it is on positive evidence of the sources from which the purchases were funded, as well as on inferences drawn from the failure of Mr Murphy, a director of PRL, to attend court for cross-examination. I also agree with all Lord Sumption's observations as to the construction and effect of the Matrimonial Causes Act 1973 , to which Lady Hale has added a full account of its legislative history. The appeal should be allowed in the terms proposed by Lord Sumption.

105  In these circumstances it is not strictly necessary for this court to add further general comments on the vexed question of piercing the corporate veil. But for my part I think it would be a lost opportunity—even perhaps a minor dereliction of duty—if we were to abstain from any further comment. I do therefore welcome the **\*606** full discussion in the judgments of Lord Neuberger, Lady Hale, Lord Mance and Lord Sumption.

106  I am reluctant to add to the discussion but for my part I consider that "piercing the corporate veil" is not a doctrine at all, in the sense of a coherent principle or rule of law. It is simply a label—often, as Lord Sumption observes, used indiscriminately—to describe the disparate occasions on which some rule of law produces apparent exceptions to the principle of the separate juristic personality of a body corporate reaffirmed by the House of Lords in Salomon v A Salomon and Co Ltd [1897] A.C. 22 . These may result from a statutory provision, or from joint liability in tort, or from the law of unjust enrichment, or from principles of equity and the law of trusts (but without any "false invocation of equity" in the phrase used by C Mitchell in the article mentioned by Lord Neuberger). They may result simply from the potency of an injunction or other court order in binding third parties who are aware of its terms. If there is a small residual category in which the metaphor operates independently no clear example has yet been identified, but Stone & Rolls Ltd v Moore Stephens (a firm) , mentioned in Lady Hale's judgment, is arguably an example.

(Appeal allowed)

© 2017 Sweet & Maxwell

**End of Document**                                              © 2017 Thomson Reuters.

# TAB 62

# HIGH COURT OF AUSTRALIA

Mason, Murphy, Aickin, Wilson and Brennan JJ.

*THE QUEEN v. MARKS; Ex parte AUSTRALIAN BUILDING CONSTRUCTION EMPLOYEES BUILDERS*
*LABOURERS' FEDERATION*
*(1981) 147 CLR 471*
*23 June 1981*

*Industrial Law (Cth)*

*Industrial Law (Cth)—Conciliation and arbitration—Registered organization—Rules—Eligibility for membership—Riggers erecting steel mast—Whether employed in building operations—Power for Commission to allow one organization to represent class of employees to exclusion of another—Whether judicial power of the Commonwealth—Natural justice—Application for order opposed on ground of inconsistency with agreement in previous proceedings before Commission—Consultation between Deputy President and Commissioner before whom agreement alleged to have been made—The Constitution (63 &64 Vict. c. 12), Ch. III—Conciliation and Arbitration Act 1904 (Cth), ss. 35, 142A (1).*

## Decisions

June 23.
The following written judgments were delivered: -
MASON J. This is an application by the applicant ("The B.L.F.") made pursuant to an order made by Aickin J. for a writ of prohibition directed to the first respondent, Marks J., a Deputy President of the Australian Conciliation and Arbitration Commission, and the second respondent ("the F.I.A."), prohibiting them from proceeding further with an application made by the F.I.A. under s. 142A of the Conciliation and Arbitration Act 1904 (Cth), as amended. (at p475)

2. The proceedings before Marks J. arose out of a demarcation dispute between the two unions concerning the right to represent employees of Electric Power Transmission Pty. Ltd. ("E.P.T.") at two construction sites in Victoria, one of which was the Omega Navigation Station at Darriman. The dispute at the second site, Mt Dandenong, is not presently relevant. The particular dispute in relation to the Omega Navigation Station is a manifestation of a long-standing and wide-ranging dispute between the two unions as to which of them should have the right to represent structural steel workers engaged in the construction of steel towers and other large projects. (at p476)

3. The F.I.A. made application to the Commission under s. 142A for an order giving it the right to represent the employees of E.P.T. at the two sites to the exclusion of the B.L.F. The B.L.F. opposed the application. Marks J. granted the application to the extent to which it related to the Omega site. The Full Bench of the Commission dismissed an appeal from this decision by the B.L.F., confirming the order made by Marks J. (at

4. The applicant's omission to join the members of the Full Bench as respondents to its application to this Court for prohibition creates a preliminary complication. Mr. Ryan for the applicant sought to justify the course which had been adopted by submitting that if the challenge to the decision of Marks J. succeeded on the footing that it was void, the confirmation of that decision by the Full Bench would have no operative effect. This submission does not meet the point that the Full Bench decision is conclusive while it stands. In Wishart v. Fraser (1941) 64 CLR 470 , it was held that an appeal as of right to the High Court from a decision of a magistrate exercising federal jurisdiction could not be maintained after it had been confirmed by a Court of Quarter Sessions. Dixon J. said (1941) 64 CLR, at p 483 : ". . . we cannot ignore the order of the Court of Quarter Sessions confirming the conviction and . . . unless we are satisfied that it was made without jurisdiction and is totally void, we must regard it as conclusive while it stands." By its decision the Full Bench confirmed the decision at first instance. Further steps to implement the decision will be steps taken pursuant to its confirmation of that decision. During the course of the hearing Mr. Ryan sought leave to amend by joining the members of the Full Bench. Leave should be granted and appropriate steps taken to amend the proceedings. (at p476)

5. The application to this Court is made on three grounds: (1) that a denial of natural justice was involved in the conduct of the proceedings by Marks J.; (2) that Marks J. had no jurisdiction under s. 142A to make an order in favour of the F.I.A. giving it the exclusive right to represent employees of E.P.T. working as riggers . the Omega site because they were engaged in a building operation and were therefore excluded from membership by the eligibility clause in the F.I.A. rules; and (3) that s. 142A does not confer jurisdiction on the Commission to make an order giving representation to an organization to the exclusion of another organization on the ground that the class or group of employees specified are not eligible for membership of the second organization because such an order would involve the exercise of the judicial power of the Commonwealth. (at p477)

6. The F.I.A. application related to: (1) approximately five men in the "Yard Gang" performing work in the yard and other work associated with the erection of the steel mast or tower at the Omega site, such as driving winches, vehicles, etc.; and (2) eight employees working on the mast itself, of whom six riggers are engaged in placing structural steel members in position and two labourers are engaged in assisting on the mast, tightening and tensioning bolts after the steel members are placed and secured. (at p477)

7. The Omega Navigation Station is an element in a world-wide navigation system. Its construction is being undertaken for the Commonwealth. E.P.T. is the contractor for the steelwork. The mast, which is the principal feature of the Station, will be a triangular (three-legged) lattice steel guyed mast some 427 metres 'n height, supported by eighteen radial guys anchored to anchor blocks on the ground. One feed radial from .ae mast is connected by a down feed aerial system to the Helix Building (a concrete building on the site) on top of which E.P.T. is to erect an insulator, and a protecting fabricated ice shell. The erection of the steel members comprising the steelwork in the mast is carried out by a team of eight which works in conjunction with a winch driver working on the ground. The six riggers who place the steel members in position on the mast and secure them safely operate the climbing jib crane on the mast which is used for lifting the steel members into position. Final bolting up and tensioning of bolts is performed by the two other labourers. (at p477)

8. Although the right to represent employees of E.P.T. in the Yard Gang was in contention before Marks J., the focal point of the dispute in this Court concerns the right to represent the six riggers in the second group, those working on the mast. However, if the applicant succeeds on its first and third grounds, prohibition would go in relation to the whole of the decision at first instance. If, however, the applicant succeeds on the second ground only, prohibition will go in relation to that part of the decision that confers a right to represent riggers in the second group only. (at p477)

9. Two of the grounds on which the B.L.F. opposed the F.I.A. application were: (1) that under cl. 3 (1) (d) of its rules the F.I.A. had no right to represent the employees in question because they were excluded from its membership; and (2) that an agreement had been reached between the two unions in proceedings before Commissioner Turbet, the effect of which was that the F.I.A. would have sole coverage of employees erecting towers carrying electricity wires in Victoria and that the B.L.F. would have sole coverage of employees erecting wireless communication masts in that State. The alleged denial of natural justice arises

out of the manner in which Marks J. dealt with this second defence to the F.I.A. application.
First Ground: Denial of Natural Justice. (at p478)

10. The B.L.F. contends that Marks J. consulted with Commissioner Turbet and ascertained from him that he considered that no such agreement as that alleged had been reached. According to the B.L.F., this conduct constituted a denial of natural justice and its effect was compounded by his Honour's refusal to issue summons to Commissioner Turbet, requiring him to give evidence as to the making of the alleged agreement. (at p478)

11. According to the B.L.F., at a hearing before Commissioner Turbet on 2 May 1980 in relation to the Mt Dandenong and Omega sites, Mr. Gallagher of the B.L.F. proposed an agreement in the terms alleged. The hearing was then adjourned into conference to discuss the proposed agreement as well as collateral issues. Around lunch time on 2 May Mr. Capogreco for the B.L.F. claimed that he received a telephone call from Commissioner Turbet asking him to ascertain whether Mr. Gallagher's proposal was still on foot and stating that the F.I.A. representatives would ascertain from their federal officers what their reaction was to the proposal. There was a subsequent telephone conversation between Mr. Capogreco and the Commissioner in which the proposed agreement was spelt out in some more detail. In a third telephone conversation, which took place later in the afternoon, Mr. Wallace, who was with Mr. Capogreco, informed the Commissioner that the agreement was acceptable to the B.L.F. Commissioner Turbet then told Mr. Wallace that he would speak to Mr. Reid of the F.I.A. who was then present at the Commission. The Commissioner left the telephone. When he returned he told Mr. Wallace that Mr. Reid had confirmed the agreement and that he, the Commissioner, would send a telegram setting out the basis of the settlement. It is common ground that at 3.56 p.m. in the afternoon Commissioner Turbet sent to each union a telegram in these terms:
"FOR YOUR INFORMATION BASIS FOR SETTLEMENT FIA/BLF DEMARCATION ISSUE - VICTORIA THAT THE ABCEBLF WILL MAKE NO CLAIM TO COVER PERSONS ENGAGED ON THE CONSTRUCTION OF ELECTRICITY TRANSMISSION TOWERS THAT THE FIA WILL MAKE NO CLAIM TO COVER PERSONS ENGAGED ON THE CONSTRUCTION OF TV AND RADIO TOWERS IN BOTH INSTANCES THESE ARRANGEMENTS WILL APPLY TO VICTORIA ONLY." (at p479)

12. The B.L.F. claim is that an oral agreement was made in the discussions between the Commissioner and the representatives of the two unions and that the sending of the telegrams evidences the terms of the agreement. (at p479)

13. In the course of making his submissions to Marks J., Mr. Capogreco said on 21 May 1980:
"The Federation invites the Commission firstly to acquaint itself with the making of this agreement, keeping in mind that a member of this commission has taken an active part in the making of it. Secondly, the Federation invites the Commission to refuse to hear this application on the grounds that it is an abuse of process in that it seeks the assistance of the Commission in bringing about a breach to an agreement to which the applicant is a party . . ."
Mr. Capogreco concluded his submission on this point by saying:
"Should the Commission be of the opinion that the existence of the agreement is in doubt or that its contents are not certain, the B.L.F. seeks an adjournment in order to call evidence from the participants to the making of the agreement." (at p479)

14. Following a short adjournment, Mr. Sweeney for the F.I.A. indicated that his organization rejected the suggestion that there was any agreement and referred to a telegram sent by the F.I.A. on 5 May 1980 to the Commissioner in which it rejected the proposed settlement. (at p479)

15. What then transpired is recorded in the transcript.
"HIS HONOUR: What do you have to say about that, Mr Capogreco?
MR CAPOGRECO: It appears beyond doubt that the existence and the terms of the agreement are a subject of doubt to say the least and, that being the situation, the Federation intends to call evidence to prove the existence of the agreement and its terms. We seek an opportunity from the Commission to enable us to call

the evidence.

HIS HONOUR: During the adjournment, Mr Capogreco, I had an opportunity to read the telegram which in itself seems to set out nearly the basis for settlement. It does not in its words suggest that an agreement was reached in the terms set out and perhaps I might say also I took the opportunity in the adjournment to speak to Mr Turbet. My understanding of the situation as it occurred was that this was put up as a proposition and a proposal for settlement and Mr Turbet never had any thought that agreement was reached. In fact he understood that the F.I.A. had to consider the matter and got instructions which culminated in a telegram, to which Mr Sweeney has referred. I only say that because I am entitled to inform myself in accordance with the act as to a situation such as this but I do it and say it now mainly to save what might be a considerable waste of time. I am not pre-judging the matter by any means but I would like to hear from you where and how you suggest the agreement was brought into fruition. Is there a document between the parties? Do you suggest there is a document between the parties that as I say brings to fruition such an agreement or is the only document which you know of that which the Commissioner sent? I am aware of what went on to some degree within the Commission but the parties themselves may have outside the Commission come to some agreement. Mr Sweeney says that is not so. I do not want the time of the Commission taken up unnecessarily if it is merely to bring forth a situation of argument which is not going to produce in the end the document which is an agreement.

MR CAPOGRECO: I have gone from the bar table as far as I can to recollect the circumstances and the events which created the agreement. All we are seeking now is to present to you evidence from witnesses as to the creation of the agreement.

.IS HONOUR: Can you give me the nature of the evidence that you have in mind?

MR CAPOGRECO: We intend to call all the witnesses, all the persons who have taken part in discussions which make up in the whole the agreement. That basically refers to discussions and telephone conversations which occurred on 2 May." (at p480)


16. In the course of the discussion that ensued, Mr. Capogreco said:

"We see that the Commission is in doubt as to whether the agreement exists and is in doubt as to what are its terms and that is why we seek to call evidence."

Mr. Capogreco made no claim at that stage that his Honour had acted improperly in consulting with Commissioner Turbet. The proceedings were then adjourned until 3 June 1980. In the meantime an application was made by the B.L.F. for the issue of a subpoena to Commissioner Turbet. That application was refused by Marks J. (at p480)


17. When the proceedings resumed on 3 June, Mr. Capogreco read a statement in which the B.L.F. complained that it had been refused the right to call evidence and asserted that it would withdraw from the ⌐roceedings and that it would not abide by any decision or order that might be made in the proceedings. (at ₚ480)


18. At this stage I should point out that the B.L.F. version of events is at variance with the transcript record of proceedings before Commissioner Turbet on 2 May 1980. First, there is no record of Mr. Gallagher having formulated any proposal for settlement before the proceedings were adjourned into private conference. Secondly, according to the Commissioner's summary of the private conference contained in the transcript, the accuracy of which was not contested by the parties, following a statement by Mr. Gallagher that the B.L.F. did not wish to cover persons engaged in the construction of electric transmission towers in Victoria, the Commissioner indicated that it would be desirable for the A.C.T.U. to convene a meeting of the two unions in the following week. It was then that the Commissioner put to Mr. Gallagher "a proposition" in terms of the alleged agreement. The Commissioner's summary of the private conference then continues in this way:

"The indication I have received from Mr Gallagher is that that arrangement would be satisfactory. It therefore seems to me that a proposal has emerged which could be placed before the meeting to be arranged by the ACTU for the consideration of the Federated Ironworkers Association and the Builders Labourers Federation. For my part, I will pass on to the ACTU the proposal I have just outlined.

Could I have an indication from the parties, as far as they are affected by what I have said, that the statement is a fair reflection of what occurred during the conference? When I say that, I accept that there are some parts of what I said which, clearly, you were not a party to and you could not indicate whether it was a fair reflection or not." (at p481)

19. Mr. Reid for the F.I.A. gave the following answer:
"For our part, Mr Commissioner, that is my understanding of what Gallagher said and that is what is being discussed here. That is all in the proposal. If the conference with the A.C.T.U. comes off from our federal people's point of view, that is a firm proposal they can be looking at for discussion at that conference." (at p481)

20. The Commissioner concluded at about 3 p.m. by saying:
"Also during the conference I stated that I would re-list this matter on 9 a.m., Thursday, 8 May. It seems to me that I should hold to that listing. That would give the parties an opportunity to report back to the commission and, hopefully, give the commission an opportunity to finalize the matter, if some agreement can be reached with the A.C.T.U."
It was at 3.56 p.m. that he sent the telegrams to the two unions. (at p481)

21. It was not suggested before us that the transcript record of proceedings before the Commissioner was otherwise than correct. (at p481)

22. From this account of the relevant events, brief though it is, two important matters emerge. First, Mr. Capogreco invited his Honour to make inquiry of Commissioner Turbet and asserted a right to call evidence ₁ the event that the inquiry revealed that there was doubt as to the making of the agreement. When his Honour disclosed that he had spoken to the Commissioner and what the latter had said, Mr. Capogreco made no complaint and expressed no surprise. His Honour did no more than respond to the invitation made to him by Mr. Capogreco. For this reason, apart from any other, what was done did not constitute a denial of natural justice. (at p482)

23. Secondly, the transcript record and the telegrams indicate that no binding agreement was reached by the two unions and that the "proposal" had not progressed beyond a proposal for settlement to be considered by the federal officers of the two unions and examined at a conference in the next week. The Commissioner's statement to Marks J. of his understanding of the position is in conformity with these materials. In his summary the Commissioner spoke of having formulated "a proposition" and of placing "a proposal" before a meeting to be arranged by the A.C.T.U. In the telegrams he spoke of "basis for settlement". He did not say that a settlement had been reached. What the telegrams did was to offer a basis of settlement to be considered by the federal organs of the two unions. Even if we assume the correctness of the account of the telephone conversations between 3 p.m. and 3.56 p.m. on 2 May 1980 given by Mr. Capogreco, there is nothing to indicate that Mr. Reid had authority from the federal officers of the F.I.A. to commit it to a binding ⁀greement. And on 5 May 1980 the F.I.A. rejected the proposal. (at p482)

24. I do not accept Mr. Handley's submission for the F.I.A. that no agreement could come into existence until a memorandum was notified in accordance with s. 28. A certified agreement has the same effect as, and is deemed to be, an award (s. 28 (3)). But this provision does not negate the existence of an agreement which, because it is not certified, lacks the effect of an award. Such an agreement may nevertheless be binding on the parties to it. (at p482)

25. However, as I see it, the B.L.F. had not shown a sufficient basis for the agreement which it alleged. Indeed, the B.L.F. made no attempt to call its own officers, Messrs. Capogreco and Wallace, to prove the conversations with Commissioner Turbet outlined by Mr. Capogreco in his submissions. Marks J. might have been better advised to defer his consideration of the application for a summons to Commissioner Turbet until the B.L.F. indicated more clearly whether it proposed to call other evidence. As events transpired, the B.L.F. denied themselves this opportunity by withdrawing from the proceedings. (at p483)

26. The power to issue a summons addressed to the Commissioner flows from s. 41 (1) (n). It provides:
"(1) The Commission may, in relation to an industrial dispute -
. . . .

(n) summon before it . . . witnesses . . ." Sub-section (2) provides that a reference to an industrial dispute shall be read as including a reference to any other proceedings before the Commission, unless a contrary intention appears. (at p483)

27. When application is made for the issue of a summons the Commission has a discretion to grant or refuse it. Generally speaking, the Commission will exercise its discretion in favour of the applicatn unless it appears that it would be vexatious or frivolous or otherwise an abuse of process to issue the summons. Special considerations apply to an application for a summons directed to a member of the Commission requiring him to give evidence of what he said and did in the performance of his duties. Then the summons should only issue when it appears that it is necessary for the purpose of doing justice between parties. In deciding whether such a case is shown to exist the Commission is entitled to consider whether there is a reasonable basis for concluding that the evidence of the member will assist the case of the parties seeking to call him. If no such basis is shown to exist the Commission will be justified in refusing to issue the summons. (at p483)

28. Marks J. relied on two matters to support his refusal to issue the summons: (a) that it was undersirable that a member of the Commission should be required to give evidence of things said and done by him in the performance of his duties; and (b) that there was no arguable basis for the contention that there was a binding agreement between the two unions. In my opinion, having regard to the view which I have formed as to the making of the agreement, his Honour was entitled to refuse the summons. (at p483)

29. Mr. Handley for the F.I.A. referred to s. 11A. He conceded that though it gives to a member of the Commission in the performance of his functions and duties the same protection and immunity as a judge of the Federal Court, it does not extend to confer an immunity from process or from giving evidence, at least in ιe circumstances of this case, where the evidence sought did not relate to the Commissioner's reasons for arriving at a decision. Consequently, the issue of a summons to the Commissioner would not have violated any rule of law. Nor would it have been a breach of any rule of law for the Commissioner to have given evidence in the proceedings before Marks J. of the conversations which he had with the representatives of the two unions. But, for the reasons which I have already given, Marks J. and the Full Bench were right to look closely at the question whether there was any reasonable basis on which the alleged agreement could be made out and whether Commissioner Turbet's evidence would assist the B.L.F. in making it out. In considering these questions both Marks J. and the Full Bench had the advantage of knowing what the Commissioner would say, if called as a witness. (at p484)

30. In any event, what happened before Marks J. cannot constitute a basis for prohibition on the ground that there was a denial of natural justice. The B.L.F. exercised its right of appeal to the Full Bench. On an appeal the Full Bench may admit further evidence and it may confirm, quash or vary the award or decision under appeal or make an award or decision dealing with the subject matter of the decision under appeal (s. 35 (9) (a), (c) and (d)). In Twist v. Randwick Municipal Council (1976) 136 CLR 106 , this Court held that the existence of a full statutory right of appeal on facts and law was indicative of a legislative intention that the citizen's only right of redress against the council's failure to give him an opportunity to be heard before .naking a demolition order was by way of appeal. I refer to my judgment in that case (1976) 136 CLR, at pp 113-117, esp at p 117 . See also Australian Workers' Union v. Bowen (No.2) (1948) 77 CLR 601 . (at p484)

31. The present case has some similarities to Twist. There is here a full appeal on fact and law under s. 35. Moreover, s. 35 (9) (a) enables the Full Bench to admit further evidence. Further, by reason of their very nature and their capacity to create unemployment, to dislocate industry and to disturb the life of the community including the essential services on which the community depends, industrial disputes call for speedy and final determination, an object which is best achieved by recognizing that the remedy of a party complaining that he has been denied natural justice at first instance is to exercise his right of appeal under s. 35 to the exclusion of pursuing relief by way of prerogative writ. (at p484)

32. There is a problem in saying that a member of the Commission is not under a duty to observe the rules of natural justice and there is a further problem in saying that the Parliament can oust the jurisdiction of this Court under s. 75 (v) of the Constitution to grant relief against an officer of the Commonwealth by way of prohibition for denial of natural justice. Even so, the B.L.F. exercised its right of appeal under s. 35 and the Full Bench examined the matter for itself. The B.L.F. does not suggest that there was any denial of natural justice in the appeal, except in so far as it submits that the Full Bench was wrong in upholding the decision not to issue the summons. In my opinion the B.L.F. received a full and fair hearing in the appeal and in those circumstances any denial of natural justice before Marks J. was irrelevant (Calvin v. Carr (1980) AC 574, at p 593 ). (at p485)

33. Second Ground: The F.I.A. Eligibility Clause. (at p485)

34. Clause 3 (1) of the F.I.A. rules provides that the union shall consist of an unlimited number of persons. There follows a number of paragraphs each setting out a category or categories of workers eligible for membership of the union. Paragraph (d) is in these terms:
"(d) Dressers, grinders, drillers on stationary machines, furnacemen (including forge furnacemen), pipe moulders, tool storemen, and all labourers, general or special, engaged in the iron, steel and metal industries, or engaged in the cast-iron, pipemaking industry, steel locking bar pipe industry, riggers and scaffolders (other than riggers on ships and riggers and scaffolders employed in shipyards, dockyards and in building operations), machinists (excepting operators of punching, shearing, rivetting, rolling, bending, angle or plate straightening, nipping and notching machines, and smith machines), and all assistants to mechanics, and labourers general or special, employed in constructional shops in industries in or in connection with which this Union is registered as an organisation." (at p485)

35. The B.L.F. submits that riggers engaged in structual steelwork fall within the exception "riggers . . . employed . . . in building operations" and are excluded from eligibility of membership of the F.I.A. Marks J. rejected this submission on the ground that the mast was not a "building". The Full Bench agreed with him. However, in this Court attention was rightly directed to the expression "building operations". (at p485)

36. The meaning of the word "building" depends very much on the context in which it is found. In some circumstances it means a building providing accommodation for people; in others it will include a structure accommodating something whether it be animals, materials, plant or machinery; at other times it signifies a mere structure or edifice e.g. a bridge, a tank or a tower. My inclination is to think that the word "building" is generally used in the widest of the three senses mentioned above, but the meaning which should be attributed to the word here, as always, depends on the particular context. (at p486)

37. Here the context is to be found in the critical expression "building operations". "Building" when used as an adjective in the expression "building operations" sometimes has a larger content than it has when used as a noun. "Building operations" is an expression more often used to describe the erection of a mere structure, for the very good reason that the words make no attempt to describe what it is that is being built. Thus the building of a bridge, an oil refinery, a petro-chemical plant or even a transmission tower is accurately described as a building operation, and the company carrying out the work is correctly described as being engaged in "building operations". (at p486)

38. Some support, albeit slight, for the view that that is the meaning which the expression has in cl. 3 (1) (d) is provided by the application made to the Registrar by the F.I.A. in 1924 when its constitution was amended so as to include "riggers" in the eligibility clause. Objections were made to this amendment by the Builders Labourers' Union and others. In the result the Registrar insisted that the amendment be qualified so as to exclude riggers "engaged in building operations". The transcript of the proceedings before the Registrar on 12 March 1924 reveals that after some discussion had taken place between the representatives of the two unions, the F.I.A. representative said: "We do not desire to take in men working in connection with building operations", and later, "We have never claimed any right to this work if it were done on buildings". After further discussion the Registrar made a number of comments. First he said:
"Bridges have been held to come within the definition of buildings whether concrete or iron. For instance, underground tanks have been held to be buildings in England. That is Stroud's definition."
Later he said:
"You see the times have changed and nowdays in building these structural buildings structural workers have come in and that same principle applies to bridges also; in the evolution of time all these things have been changed; for instance, if a portion of a bridge were being built and it were brick-work there is not doubt that the old custom was for the bricklayer to have his assistant with him and the carpenter would also have his assistant with him but on certain buildings nowdays those customs do not obtain, and the builders' labourere is now doing the work." (at p487)

39. The subsequent decision of the Registrar to insist on an amendment excluding riggers "engaged in building operations", seen in the light of this history, tends to indicate that the exception was designed to exclude riggers engaged in the erection of structures other than buildings stricto sensu, e.g. bridges. (at p487)

40. Another factor is that in a context in which the clause is designed to describe and define the class of persons eligible for membership there seems to be little point in distinguishing between riggers engaged in work on a building in the strict sense and those engaged in work on structures. A more rational and a more practical criterion would be to draw a line between riggers engaged in building operations in the wider sense and those who are not so engaged. (at p487)

41. The F.I.A. seeks to counter the effect of the history by relying on the judgments in Reg. v. Watson; Ex parte Australian Workers' Union (1972) 128 CLR 77 to demonstrate that "building operations" are in essence operations carried on in the building industry by persons described as "builders". Reg. v. Watson was a decision on the B.L.F.'S eligibility clause. The clause provided that the B.L.F. should consist of persons employed as builders' labourers on or about any building, or assisting specified tradesmen engaged in building operations, or employed in any "making or contracting job" of work, in (inter alia) concrete or other materials incidental to building construction. It was held that the clause did not apply to operators employed by ready-mixed concrete suppliers in producing concrete at batching plants. Barwick C.J. said (1972) 128 CLR at p 79 : "the eligibility clause properly understood is restricted to workers in the building industry itself either doing the building work or doing work which is properly described as incidental to the building operations, generally, but not necessarily in all cases, on the building site." Menzies J. said (1972) 128 CLR at p 85 ; "those who are employed at the batching plants are not employed by builders or their sub-contractors in building operations." Walsh and Gibbs JJ., who reached the same conclusion, expressed their reasons differently. The remarks of Barwick C.J. and Menzies J., though providing some support for the .I.A. point of view, went beyond what was necessary for the decision in the case. It was in any event a decision on the B.L.F. rules and it should not be taken as having a consequential application to the F.I.A. rules. (at p487)

42. The question here is a difficult one and the arguments are finely balanced. Although my initial inclination was to favour the narrower construction of "building operations", one which would confine the operations to buildings that are designed to house people or plant, on reflection I consider that the riggers on the mast are engaged in a "building operation". It is with reluctance that I depart from a unanimous decision of the Commission on a question of this kind. I do so because in my view the Commission did not address itself to the words "building operations". Instead, it directed its attention to the question whether the mast is a "building". (at p488)

43. Since writing what appears above, I have had the advantage of reading the judgments prepared by other members of the Court. They discuss the question, not raised by Mr. Handley for the F.I.A., whether to attribute the larger meaning to the expression "building operations" in the excluding words of cl. 3 (1) (d) of the F.I.A. rules - the meaning which I favour - would be to denude the words "riggers and scaffolders" in the main part of the clause of any significant content. With respect I agree with Murphy and Brennan JJ.'s reasons for answering this question in the negative. (at p488)

44. Third Ground: Construction of s. 142A (1). (at p488)

45. Section 142A (1) provides:
"The Commission may, on the application of an organization, an employer or the Minister or the Bureau, if it thinks it in the public interest to do so, make an order providing that an organization of employees shall have the right to represent, in respect of all or some industrial interests under this Act, a class or group of employees who are eligible for membership of the organization, either generally or subject to such limitations as it may specify, to the exclusion of another organization or organizations and may make such orders as it thinks necessary in consequence of such an order." (at p488)

46. The sub-section enables the Commission to make an order that an organization shall have the right to represent a class or group of employees who are eligible for membership in it to the exclusion of other organizations. To give full effect to the words of the sub-section involves no exercise of judicial power. In this respect three comments only are called for. First, the making of an order pursuant to the sub-section creates a new right in the organization; the order is not merely declaratory of an antecedent right. Secondly, the right thereby created operates only in respect of a class or group of employees who are in fact and law eligible for membership of the organization. Thirdly, the sub-section does not attempt in any way to hinge the new right on the Commission's opinion as to the eligibility of the class or group for membership or to

make the Commission's opinion on that question conclusive. Obviously the Commission has to decide for itself the question of eligibility for membership, but the status of its finding on that point is that of a finding as to a jurisdictional fact, one which is capable of review on prohibition under s. 75 (v) of the Constitution. (at p489)

47. In the result I would order that the proceedings be amended by joining the members of the Full Bench, and I would then grant prohibition directed to the existing respondents and the members of the Full Bench. (at p489)

MURPHY J. I agree with Mason J. In the Australian Conciliation and Arbitration Commission concentration on the question of whether there was a denial of natural justice distracted attention from the critical question of whether the Federated Ironworkers' Association (F.I.A.) "covered" the work in question. The F.I.A.'s eligibility rule includes "riggers and scaffolders (other than riggers on ships and riggers and scaffolders employed in shipyards, dockyards and in building operations)". (at p489)

2. The question directly in issue is the scope of "building operations" in the exclusion clause of the F.I.A.'s rules. Both the F.I.A. and the Australian Building Construction Employees' and Builders Labourers' Federation (B.L.F.) have submitted, correctly, in my opinion, that the term "building operations" means the same in the rules of both organisations. As Marks J. said "Taking into consideration the history of the amendment to the F.I.A. rules in 1924, I accept the submission of Mr Sweeney (counsel for the F.I.A.) that the term 'in building operations' in the rules of the B.L.F. and the F.I.A. should be given the same meaning." (at p489)

3. In the Commission, Marks J. at first instance, and on appeal the Full Bench (Williams and Robinson JJ. and Commissioner Neyland) assumed that the test of building operations was simply whether what was being erected was a building. Because of the absence of the B.L.F. the Commission was deprived of adequate argument on the issue. The Full Bench referred to the B.L.F.'s argument that it was not necessary for Marks J. to decide, as he did, that the work did not involve "building operations" within the B.L.F. rules, and stated "Nevertheless there appears to be no attack on His Honour's finding that the Omega mast was not a building and on the information before the Commission we have no reason to disagree with him as to this. However his comments regarding the application of the B.L.F. rules are not essential either to his decision under s. 142A or to this appeal." (at p490)

4. In my opinion the Commission was in error in accepting that there were no building operations unless what was being built was "a building". The phrase "building operations" does not mean operations of a building or buildings, it means operations of building. The adjective "building" is derived from the verb "to build" not from the noun "building". One builds bridges, towers and other structures as well as buildings. The composite expression "building operations" means the same as "building work" which appears in numerous safety codes. In any event, in Australian industrial relations, as in ordinary language, "building" is not confined to those structures which are to house people or goods or machines. (at p490)

5. The meaning of "building operations" has been the subject of much attention by industrial tribunals in Australia. It has been held, always as far as I am aware, to be a wide one. In Australian Builders Labourers' Federation v. Atkinson (1924) 19 CAR 419, at p 421 , Deputy President Quick said:
"In the term 'building operations' the adjective 'building' appears to have a wider meaning than the noun 'building' meaning an actual structure. Building operations might include such work as building a bridge; building a tower; building a silo; building an archway. The noun 'building' would primarily mean a house, a church, an edifice, a ship, or some structure having walls and a roof, or a wall without a roof, such as a tennis court, or a roof without a wall, such as a monument like a Greek temple, with a dome rising on pillars. As to what constitutes a building is always a question of degree and circumstance. I do not think that the term 'building' can be limited to a place for human habitation or storage."
He then applied the term building operations to the construction of various structures such as a large steel structure and loading platform which would fall outside the narrow meaning contended for by the respondent, but held that it did not apply to minor erections such as electric light poles. (at p490)

6. In Australian Builders Labourers' Federation v. Anderson (1926) 23 CAR 301, at p 305 Deputy President Quick held that the erection of a concrete pier and steel girder bridge over the Barwon River "comes within the meaning of the terms 'building' or 'building operations', without the necessity of deciding whether there is

3/17/2017    10-03635-jpm   Doc 271-3   Filed 04/03/17   Entered 04/03/17 18:29:57   Exhibit A
THE QUEEN v. MARKS; Ex parte AUSTRALIAN BUILDING CONSTRUCTION EMPLOYEES BUILDERS LABOURERS FEDERATION
Part 3   Pg 671 of 839

any distinction between the two expressions" but added "This finding, however, does not necessarily mean that an ordinary local drainage culvert which might be constructed in a particular situation under a road would come within the meaning of the term 'building'." (at p491)

7. In both those cases Deputy President Quick referred to an unreported case Taylor v. Monier Pipe and Reinforced Concrete Co. decided by the Supreme Court of Victoria on 4 December 1914. In that case it was held by Hodges and a'Beckett JJ., (Hood J. dissenting) "that a man employed by a concrete bridge building company doing concrete work in connexion with a kind of tower or elevated tank 60 feet high required for the purpose of holding water, was a builders' labourer within the meaning of the Commonwealth award . . . " (1924) 19 CAR 419, at p 421 . This conclusion depended on his being engaged either in building operations or in construction or repair of a building. (at p491)

8. In Australian Builders Labourers' Federation v. South Australia (1927) 25 CAR 279 , Drake-Brockman J. followed the 1924 decision of Deputy President Quick and held that large concrete water storage tanks were buildings. (at p491)

9. In Re Construction of Swimming Pool and Attendant Facilities at Prince Alfred Park, Sydney (1958) 57 NSWAR 486 the Industrial Commission of N.S.W. (De Baun, Cook and McKeon JJ.) applied the 1924 decision of Deputy President Quick and held that a large public in-ground swimming pool, its sewerage and drainage lines and an open skating rink and concrete concourse were buildings and that the construction of ꞇem came within the scope of the Builders Laborer's Union rules. These were the rules of the New South Wales trade union counterpart of the B.L.F. and the coverage depended on the work being on or about any building or in building operations or in the construction of buildings (which are the same as the words in the B.L.F. rules). (at p491)

10. These cases support the B.L.F.'s contention that the Omega mast is a building, and even if it were not, that the work is building work and "building operations". (at p491)

11. The respondent F.I.A. did not answer these cases. It submitted that they could be ignored because of the decision of this court in Reg. v. Watson; Ex parte Australian Workers' Union (1972) 128 CLR 77 . In my opinion that case throws no light at all on the question. It concerned whether the operation of a concrete batching plant came within the conditions of eligibility for membership of the B.L.F., and did not require any decision on the point in issue here. The respondent therefore presents no answer to the powerful argument that the consistent course of industrial decision over half a century has been in favour of the view that the riggers employed in construction of the Omega mast are engaged in building operations. (at p492)

¹2. To give this meaning to "building operations" does not denude of any operation the other words in the ₋xclusion clause. It may be assumed that many operations carried out by riggers on ships and riggers and scaffolders in shipyards and dockyards would also satisfy the description of "building operations" for which the B.L.F. contends (no doubt some such work would also fall within the meaning for which the F.I.A. contends); this only means that there is an overlap in the words of exclusion (which often occurs in such clauses). Only if all such operations satisfied the description "building operations" would the other words of exclusion be denuded of operation. This cannot be assumed, and not unexpectedly, there is no evidence to that effect. The respondent did not advance the argument. It would be persuasive only if it could be demonstrated that all possible work of riggers on ships and riggers and scaffolders in dockyards and shipyards would be covered by the meaning of "building operations" contended for by the applicant, but not by the meaning contended for by the respondent. (at p492)

13. It may not have been strictly necessary for Marks J. to decide on the meaning of "building operations" in the B.L.F. rules. However the history of the two organisations (and particularly the history of the exclusion clause) suggests that the phrase "building operations" appearing in the two rules should be given the same meaning. It would inject an element of artificiality and confusion if two different meanings, one narrow and one wide, were given to the phrase. If a narrow meaning were adopted the result would be to reduce the B.L.F.'s coverage and to exclude it from work which for many years has been regarded as within its industrial coverage. (at p492)

14. My conclusion is that the erection of the Omega mast is within the meaning of "building operations" in the exclusion clause of the F.I.A.'s rules. It follows that the F.I.A. is not entitled to enrol persons engaged as

riggers or scaffolders in that work, and that s. 142A of the Conciliation and Arbitration Act 1904 as amended was not applicable to enable an order to be made giving representation to the F.I.A. Section 142A does not purport to vest the Commission with judicial power. (at p492)

15. Prohibition should issue. (at p492)

AICKIN J. In this matter I have had the advantage of reading the reasons for judgment prepared by my brother Mason and those prepared by my brother Wilson. Like my brother Wilson I do not find it necessary to repeat the facts or the nature of the issues raised. (at p493)

2. I am in agreement with the conclusions and reasons of my brother Mason on two of the issues, namely, whether there was a failure to comply with the requirements of natural justice and whether s. 142A of the Conciliation and Arbitration Act 1904 requires or authorizes an exercise of judicial power. I also agree with his reasons for concluding that the members of the Full Bench of the Commission should have been joined as respondents to the application. I would grant the necessary leave to amend. (at p493)

3. I am however unable to share his view on the remaining issue, namely, whether the workers in question were eligible to be members of the Federated Ironworkers' Association of Australia as falling within its eligibility rule, the terms of which are set out in other judgments. Marks J. found that those workers were "riggers" and that finding was not challenged. (at p493)

4. I agree with Wilson J. in thinking that the question is what is the meaning of the exclusion of "riggers employed in building operations" in the eligibility rule of the Federated Ironworkers' Association and not whether the relevant employees would be eligible for membership of the Builders Labourers' Federation. The expression used in the Federated Ironworkers' Association rules must be read in its general and in its immediate context. The relevant part of the exception is "other than riggers on ships and riggers . . . employed in shipyards, dockyards and in building operations". In that context the words "building operations", if given the meaning contended for by the Builders Labourers' Federation, would make all the words quoted redundant except "other than riggers employed in building operations". That is an unlikely intention and is contrary to what seems to me to be the plain meaning of the whole phrase. I agree with Wilson J. that the history (which he recounts) of this clause in the proceedings before the Industrial Registrar in 1924 supports this construction. I would not regard such material as capable of overriding what would, viewed alone, be plain and unambiguous, but that question does not arise in the present case. (at p493)

5. In the result I agree that the expression "building operations" in cl. 3 (1) (d) means operations involving the construction of buildings. I can see no reason for differing from the view of Marks J. that the Omega mast is not a building. (at p494)

6. Accordingly I would dismiss the application for prohibition against Marks J. and the Full Bench of the Commission. (at p494)

WILSON J. I have had the advantage of reading the reasons for judgment prepared by Mason J., and it is unnecessary for me to recapitulate the facts of the case and the issues which have been debated. With respect, I agree with his Honour's conclusion on two of the three grounds on which the prosecutor seeks a writ of prohibition. In the circumstances of the case, I do not think that there was any breach by Marks J. of the principles of natural justice. Nor do I think that on its proper construction s. 142A of the Conciliation and Arbitration Act 1904 involves the exercise of judicial power. I do not wish to add anything to what his Honour has written on these matters. (at p494)

2. In my opinion, the difficult question requiring resolution is whether Marks J. was without jurisdiction to make an order in favour of the Federated Ironworkers' Association of Australia ("the F.I.A.") touching the six employees of Electric Power Transmission Pty. Ltd. ("E.P.T.") who were engaged in working aloft on the Omega mast, placing in position the structural steel members which formed it. In finding that these workers were properly described as "riggers", Marks J. cited the definition of that term in the Metal Industry Award as including "an adult employee who is responsible for, inter alia, the rigging involved in the erection, placing in position and dismantling of structural steel, and for the erection of tackle with wire, or ropes for lifting" (cl. 41 (45) (a)). That finding is not contested. The submission of the applicant ("the B.L.F.") is that the workers in question are not eligible to the members of the F.I.A. because they are riggers employed in

3/17/2017    10-03635-jpm   Doc 271-3   Filed 04/03/17   Entered 04/03/17 18:29:57   Exhibit A
THE QUEEN v. MARKS; Ex parte AUSTRALIAN BUILDING CONSTRUCTION EMPLOYEES BUILDERS LABOURERS FEDERATION
Part 3   Pg 673 of 839

building operations; an order giving that organisation the exclusive right to represent them is therefore beyond the jurisdiction of the Commission. (at p494)

3. The eligibility clause of the F.I.A. rules (cl. 3 (1)) describes a number of categories of workers eligible for membership of the organisation, including the following:

"(d) Dressers, grinders, drillers on stationary machines, furnacemen (including forge furnacemen), pipe moulders, tool storemen, and all labourers, general or special, engaged in the iron, steel and metal industries, or engaged in the cast-iron, pipemaking industry, steel locking bar pipe industry, riggers and scaffolders (other than riggers on ships and riggers and scaffolders employed in shipyards, dockyards and in building operations), machinists (excepting operators of punching, shearing, rivetting, rolling, bending, angle or plate straightening, nipping and notching machines, and smith machines), and all assistants to mechanics, and labourers general or special, employed in constructional shops in industries in or in connection with which this Union is registered as an organisation" (my emphasis).

Marks J. concentrated his attention on the question whether the Omega mast was a "building", and concluded that it was not. From that conclusion it was thought to follow as a matter of course that the riggers in question were therefore not involved in building operations and were eligible for membership of the F.I.A. It would have been preferable for the learned Deputy President in construing the scope of the eligibility clause to focus on the words "building operations", a term which may provide a broader frame of reference than the word "building". Viewed simply as a matter of language, the former term describes the nature of the activity rather than the resulting product. His Honour appears to have grounded his conclusion on the evidence of *vo* witnesses who expressed the opinion that the mast was not a building and to have made his own evaluation of "the essential nature of the structure itself as revealed on inspection, and the . . . evidence as to the method of its erection". With respect, I think his Honour's consideration of the problem was inadequate, although the reference to evidence of the method of its erection touches on an important criterion of the wider concept. He was denied the benefit of any submissions from the B.L.F., that organisation having chosen to refrain from continued participation in the proceedings. Again, when the appeal was before the Full Bench the focus of the complaint in this regard appears to have been that his Honour erred in finding that the riggers were not eligible for membership of the B.L.F. The only relevant passage in the reasons of the Full Bench is the following:

"Other points raised by the appellant were:

1. Whereas there was no dispute that the persons held to be riggers were in fact riggers it was not necessary for Justice Marks to decide, as he did, that the work did not involve 'building operations' within the BLF rules. Nevertheless there appears to be no attack on his Honour's finding that the Omega mast was not a building and on the information before the Commission we have no reason to disagree with him as to this. However his comments regarding the application of the BLF rules are not essential either to his decision under section 142A or to this appeal."

The question whether the work under consideration was capable of attracting the eligibility provisions of the ﹍les of the B.L.F. appears to have distracted attention from the central issue, namely, whether the workers so employed were eligible for membership of the F.I.A. It may be said that the construction of the term "building operations" holds the key to the understanding and application of the eligibility rules of both the B.L.F. and the F.I.A. because the same term is used, but such an approach could lead to error. The term is of variable content, and its meaning must be found in the context. The different context provided by the rules of the two organisations might well, in my opinion, yield different meanings of the term "building operations". In any event, the only relevant question is whether the exclusion of "riggers employed in building operations" from membership in the F.I.A. has application to the six riggers engaged on the mast. It is quite irrelevant to consider whether they are eligible to belong to the B.L.F. (at p496)

4. As I have said, the term "building operations" is a term of variable content. An indication of the elasticity of the term is afforded by some of the early interpretations of awards in this country. In Australian Builders Labourers' Federation v. Atkinson (1924) 19 CAR 419 at p 421 , Deputy President Quick said:

"In the term 'building operations' the adjective 'building' appears to have a wider meaning than the noun 'building' meaning an actual structure. Building operations might include such work as building a bridge; building a tower; building a silo; building an archway. The noun 'building' would primarily mean a house, a church, an edifice, a ship, or some structure having walls and a roof, or a wall without a roof such as a tennis court, or a roof without a wall such as a monument like a Greek Temple with a dome rising on pillars. As to what constitutes a building is always a question of degree and circumstance. I do not think that the term 'building' can be limited to a place for human habitation or storage."

but at p. 426 the learned Deputy President allowed some exclusions: "I do not think that erecting electrical

apparatus or switch-gear or masts or framework or poles to carry electric current wires is building or building operations within the award". See also Australian Builders Labourers' Federation v. Anderson (1926) 23 CAR 301, at pp 304-305 ; and Australian Builders Labourers' Federation v. South Australia (1927) 25 CAR 279 . (at p496)

5. The question is so much one of fact and degree that it would normally behove an appellate court to pay great regard to the judgment of the primary tribunal. However, in this case for the reasons I have mentioned the consideration of the issue was inadequate, and I feel obliged to approach the matter afresh. (at p497)

6. I have come to the conclusion that the riggers in question are elegible for membership of the F.I.A., for the reason that they are riggers within the meaning of that term in the Metal Industry Award and that while engaged in working aloft on the Omega mast assembling the steel members of it they are not engaged in "building operations" in the sense in which that term is used in cl. 3 (1) (d) of the F.I.A. rules. I find support for this conclusion in the following considerations:
(a) The words "building operations" are associated with words of exclusion or limitation, and cannot be construed so widely as to deny any meaningful operation to the primary proposition. If the term "building operations" was construed to include any process of construction, and the essential task of a rigger is the erection, placing in position and dismantling of structural steel then the primary reference to riggers in the eligibility clause would be denuded of any significant content:
(b) The association in the exclusion clause of "building operations" with "shipyards" and "dockyards" invites limited construction in that the clause identifies particular areas of work in which eligibility is denied. A wider construction would mean that the clause is repetitive, in that there must be many operations carried out by riggers in dockyards and shipyards which would also satisfy the description of "building operations":
(c) An examination of the record of the proceedings before the Industrial Registrar on 11 and 12 March 1924 on an application by the F.I.A. to amend its eligibility clause so as to include, inter alia, riggers and scaffolders, tends in my opinion to confirm that the reference to "building operations" in the exception is concerned with "buildings". The Builders Labourers' Union (the predecessor to the B.L.F.) objected to the inclusion of riggers and scaffolders, alleging an agreement between the two unions "that riggers and assistants to all artisans employed on all structural and steel work on purely building operations should belong to us" (that is, the B.L.U.). The Registrar pressed that objection on the F.I.A.'s representative saying: "Then with regard to the Builders Labourers' objection as to riggers and scaffolders on buildings: now, they are surely builders' labourers?" The representative of the F.I.A. answered: "I concede that when they are on the buildings". The parties were then sent away to seek agreement, and reported back to the Registrar on 12 March. The F.I.A. representative reported that, with respect to the B.L.U.: ". . . we agreed, as far as the riggers and scaffolders on buildings are concerned. We do not desire to take in men working in connection with building operations, and as a matter of fact we have never taken them in in all our lives and there need be no doubt on that score." Later in the discussion he again stressed that the F.I.A. did not want riggers "on ᴜ.ᴄe buildings". The Registrar nevertheless questioned the need for any reference to riggers at all, whereupon the B.L.U. representative intervened, saying: "Provided they add the words 'excepting riggers and scaffolders in building construction' . . . I do not see that it can do any harm." Of course, there is need for caution in using material of this kind to ensure that it does not divert attention away from the text requiring to be construed; nevertheless, I find it of assistance in confirming my resolution of the ambiguity in the clause. (at p498)

7. I would therefore construe "building operations" in cl. 3 (1) (d) as limited to operations involving the construction of buildings. This brings me back to a consideration of the conclusion reached by Marks J. based on the evidence and an inspection of the project. I see no reason to differ from him in that conclusion. The Omega mast is not a building. The riggers engaged in assembling it are eligible for membership of the F.I.A., and the challenge to jurisdiction on this ground fails. (at p498)

8. I would refuse the applications. (at p498)

BRENNAN J. A Full Bench of the Australian Conciliation and Arbitration Commission dismissed an appeal against an order made by Marks J., a Deputy President of the Commission, providing that from 22nd July, 1980 the Federated Ironworkers' Association of Australia ("the F.I.A.") should have the right to represent in respect of all industrial interests certain employees of Electric Power Transmission Pty. Ltd. to the exclusion of the Australian Building Construction Employees and Builders Labourers' Federation ("the B.L.F."). The order applied to all riggers, inter alios, employed by Electric Power Transmission Pty. Ltd. in or in connexion

with the construction of the Omega Navigational Aid Station at Darriman in Victoria. (at p498)

2. The order had been sought by the F.I.A. under s. 142A of the Conciliation and Arbitration Act 1904, which empowers a Presidential Member of the Commission to make such an order on the application of an organization in respect of a class or group of employees "who are eligible for membership of the organization". The application had been opposed by the B.L.F. When the Deputy President made the order, the B.L.F. appealed to the Full Bench pursuant to s. 35 (2) (d) of the Act. At the conclusion of the hearing, the Full Bench confirmed the order which the Deputy President had made (see s. 35 (9) (c)). (at p499)

3. The B.L.F. then sought and obtained an order nisi for a writ of prohibition directed to Marks J. alone, but it now seeks leave to amend its application so that the writ will be directed also to the Full Bench. That application should be granted. (at p499)

4. There are three grounds upon which the B.L.F. relies to found its application for a writ of prohibition. The first ground alleges a denial of natural justice in the proceedings before the Deputy President; the second asserts that the employees to which his order applies are ineligible to be members of the F.I.A.; and the third asserts that an order which gives to one organization a right to represent employees to the exclusion of another organization on the grounds that the relevant class or group of employees are not eligible for membership of the latter organization would require the exercise of judicial power. (at p499)

. If there were substance in the first ground, it would be necessary to consider whether and in what circumstances a hearing before and an order of confirmation made by the Full Bench might cure a denial of natural justice in proceedings before a Presidential Member, and to consider whether an order of confirmation supersedes an order made by a Presidential Member under s. 142A. But in my opinion those questions may be put aside, for I can find no denial of natural justice in the proceedings before the Deputy President. (at p499)

6. I need not repeat the facts which are set out in my brothers' judgments. When Marks J. consulted Commissioner Turbet in private, he acted in accordance with a request by the solicitor for the B.L.F. to do so, in order to ascertain from the Commissioner whether an agreement had been made by the B.L.F. and F.I.A. in settlement of their demarcation dispute. No complaint can be made about the consultation. No complaint was made about the consultation when Marks J. disclosed its result. The consultation with Commissioner Turbet did not bear out the B.L.F.'s suggestion that an agreement had been made. Before Marks J. the solicitor for the B.L.F. sought to draw some support for his suggestion that an agreement had been made by reference to a telegram sent by Commissioner Turbet. The Commissioner had sent the telegram to the B.L.F. and F.I.A. after they had conferred before him on their demarcation dispute. But that telegram did not support the suggestion that an agreement had been reached. It merely set out, to use its words, "for your information ⸗asis for settlement FIA/BLF demarcation dispute". The solicitor for the B.L.F., acknowledging that the agreement had not been proved, sought an adjournment "to call evidence to prove the existence of the agreement and its terms". The adjournment was granted, and dates for a resumed hearing were set. (at p500)

7. When the Deputy President next sat to hear that evidence, the B.L.F. withdrew saying that it had been "refused the calling of evidence from members of the public which was vital and appropriate". The B.L.F. was at liberty to tender evidence relevant to establish the existence of the agreement it had alleged. It was invited to do so. Nothing was offered to the Deputy President in support of its complaint, and nothing now appears to support it. It does appear, however, that during the adjournment an application by the B.L.F. for the issue of a witness summons to Commissioner Turbet had been refused, and the B.L.F. protested that members of the Commission are "not immune to summons". Was the Deputy President under an obligation to issue a witness summons to Commissioner Turbet? I think not. (at p500)

8. What was the purpose to be served at that stage of the proceedings by compelling the attendance of Commissioner Turbet as a witness to be called on behalf of the B.L.F. upon the issue of the alleged agreement? It may be surmised that the B.L.F. desired the Commissioner to be submitted to cross examination, but that furnished no ground for the issue of a summons to him prior to the tendering of any affirmative evidence of an agreement. Assuming for the purposes of the present case that Marks J. had power to issue a witness summons to Commissioner Turbet, at that stage of the proceedings he was right to refuse the summons at the request of a party which had not then attempted to show that an agreement had been made, and which had not then shown any ground for believing that its case might be advanced by the

Commissioner's testimony. It was not a case of refusing to allow a party to cross-examine his accuser; nor was it a case of the Commission resolving a conflict of evidence without allowing a party to test the evidence against him. There was then no conflict of evidence: the information was uniformly against the existence of an agreement. (at p500)

9. The B.L.F. had undertaken to prove that an agreement had been made, but it failed to offer any evidence of it. It had invited the consultation with Commissioner Turbet as a means of proving the agreement, but it failed to prove the agreement by that means. It declined to offer any other proof, though the B.L.F. representatives who allegedly made the agreement might have been called to give evidence if the B.L.F. wished to establish the agreement. A summons could have led only to the crossexamination of the Commissioner to whom the B.L.F. had unsuccessfully referred in support of its unsubstantiated allegation of an agreement. The refusal of a summons in these circumstances furnishes no ground for alleging a denial of natural justice. (at p501)

10. Once the B.L.F. withdrew from the proceedings, the Deputy President was left with the information given to him by Commissioner Turbet and the text of the telegram sent by the Commissioner. On this information, and without countervailing evidence, the Deputy President was entitled to proceed on the footing that no agreement had been reached between the B.L.F. and the F.I.A. There was no denial of natural justice affecting the order made by him on that footing. The first ground fails. (at p501)

1. The second ground turns upon the construction of par. (d) of cl. 3 (1) of the rules of the F.I.A. The relevant part of par. (d) relating to eligibility of riggers for membership reads:
" . . . riggers and scaffolders (other than riggers on ships and riggers and scaffolders employed in shipyards, dockyards and in building operations)".
Riggers generally are eligible for membership, but riggers employed in building operations are not eligible. How were the riggers in this case employed? They were employed in the operation of building the Omega tower. Both the Deputy President and the Full Bench of the Commission held that the tower is not a "building", and therefore they held that the riggers in question were not excluded from membership of the F.I.A. as "employed in building operations". I would agree that the Omega tower is not a building; but it does not follow that the riggers were not employed in building operations. The criterion of eligibility looks to the nature of the operation in which the rigger is employed, not to the nature of the structure upon which he is employed to work. A rigger who is engaged in the operation of building a structure which is not a building, may nonetheless be engaged in a building operation, and a rigger who is so employed is not eligible for membership of the F.I.A. Although the relevant distinction is between building operations and other operations, the nature of the operation in which riggers are employed necessarily reflects the object of the work in hand. When the object of work is the construction of a building or other structure such as a wall or ⁺ower built on and fixed to land, the riggers engaged in that construction may readily be held to be employed ₍n building operations. They are then employed in operations of a kind ordinarily involved in the construction of a building. (at p501)

12. But this is not the only kind of operation in which riggers may be employed; at all events, I do not apprehend that this understanding of the phrase "building operations" would bring into the categories of exclusion from eligibility all riggers howsoever employed. If that were the fact, the categories of eligibility and ineligibility could be given content only by limiting the category "riggers employed in building operations" to riggers employed in the construction of buildings. But rigging operations outside shipyards and dockyards which are not building operations can be envisaged, although it would not be desirable to discuss particular examples before concrete cases arise for determination. (at p502)

13. Suffice for the present to say that the operation of building the Omega tower, adding new components to bring the structure to its intended height, is a building operation. Accordingly, the riggers employed in that operation are not eligible for membership of the F.I.A. The condition of eligibility prescribed by s. 142A was not satisfied and neither the order made by the Deputy President nor the order of confirmation made by the Full Bench can be allowed to stand. It follows that a writ of prohibition must go to the Commission. (at p502)

14. As to the third ground relied on, I agree with the judgment of Mason J. that there is no substance in it. I agree also with the orders his Honour proposes. (at p502)

## Orders

Order that the proceedings be amended by adding as respondents Mr. Justice Williams and Mr. Justice Robinson, Deputy Presidents of the Australian Conciliation and Arbitration Commission, and Mr. Commissioner Neyland, a Commissioner of the said Commission.

Order that a writ of prohibition issue directed to the respondents prohibiting them from further proceeding in matter C. No. 3197 of 1980 in the Australian Conciliation and Arbitration Commission in so far as the proceedings relate to the riggers employed by Electric Power Transmission Pty. Ltd. engaged in the placing of structural steel on the mast at the Omega Navigation Station.

No order as to costs.

# TAB 63

**\*965  Morris & Ors v. Rayners Enterprises Inc & Anor**

**Morris & Ors v. Agrichemicals Ltd & Ors**

House of Lords

30 October 1997

**[1997] B.C.C. 965**

Lord Goff of Chieveley , Lord Nicholls
of Birkenhead , Lord Hoffmann , Lord
Hope of Craighead and Lord Hutton

Judgment delivered 30 October 1997

**Analysis**

Liquidation—Set-off—Depositors charged bank deposits
with repayment of loans by bank to principal debtors
—Bank went into liquidation—Liquidators sought
directions whether to recover loans in full leaving
depositors to prove or whether to set off deposits against
loans—Legal nature of charge-back of deposit—Whether
creditor could create charge over debt in favour of debtor
— Insolvency Rules 1986 (SI 1986/1925), r. 4.90 .

These were joined appeals in two test cases arising out of
an application for directions by the liquidators of Bank
of Credit and Commerce International SA ('B.C.C.I'),
where third party depositors in each had given charges
to B.C.C.I over deposits with it to secure loans to the
principal debtors (in each case the third party depositors
were the beneficial owners of the principal debtors). The
questions were whether B.C.C.I could claim repayment
from the borrowers without resorting to the security (in
which event B.C.C.I would be able to recover the loans
in full and leave the third party depositors to prove
in the liquidation), or whether B.C.C.I was obliged
to set off the loans against the deposits and treat the
borrowers as pro tanto discharged (in which event
B.C.C.I would recover only the excess, if any, of each
loan over the deposit).

The letters of lien/charge in the two cases were in similar
terms. Neither contained any express guarantee on the
part of the depositor or any personal covenant, whether

as surety or principal debtor, to repay the indebtedness
of the principal debtor. Each of the charges was
expressed to operate to secure the outstanding liabilities
of the principal debtor, not of the depositor.

The Court of Appeal ([1996] B.C.C. 204 ; [1996] Ch
245 ) held that set-off under r. 4.90 of the Insolvency
Rules 1986 was not triggered by an agreement for set-
off where the requirement for mutuality was absent,
nor did the fact that the agreements for set-off were
comprised in charge-backs supply the missing element
of mutuality. The principal debtors appealed.

*Held* , dismissing the appeals:

1  Set-off in English law was strictly limited under r. 4.90
to mutual claims existing at the bankruptcy date; there
could be no set-off of claims by third parties, even with
their consent, for to do so would be to allow parties by
agreement to subvert the fundamental principle of pari
passu distribution of an insolvent company's assets.

2  There was no mutuality, as required by r. 4.90 ,
as the depositors owed nothing to B.C.C.I. The only
contract between them and B.C.C.I, contained in the
letters of lien/charge, created no personal liability on
the depositors' part. ( M S Fashions Ltd v Bank of
Credit and Commerce International SA [1993] B.C.C.
70 ; [1993] Ch 425 distinguished .)

3  The law had regarded it as a conceptual impossibility
for a creditor to grant a charge over the debt in favour
of the debtor. A charge-back had been regarded as
incapable of vesting a proprietary interest in the chargee
on the basis that a person could not have a proprietary
interest in a debt or other obligation which he owed
another ( Re Charge Card Services Ltd (1986) 2 B.C.C.
99,373; [1987] Ch 150 ). However, the depositors' right
to claim payment of their deposit was a chose in action
which the law always regarded as property; there was
was no dispute that a charge over such a chose in
action could validly be granted to a third party. It was
conceptually possible for a charge to be created despite
the fact that  **\*966**  the beneficiary of the charge was the
debtor, for it could properly be said that the debtor had
a proprietary interest by way of charge over the debt.

4  There was no reason preventing banks and their
customers from creating charges over deposits if, for

reasons of their own, they wanted to. It was clear in practice that they did so and in a case in which there was no threat to consistency of the law or objection of public policy, the courts should be very slow to declare a practice of the commercial community to be conceptually impossible.

5  The letters were effective to do what they purported to do, namely to create a charge over the deposits in favour of B.C.C.I. (No view was expressed on whether a deposit charged was a 'book debt' and registrable under s. 395 of the Companies Act 1985 .)

6  The depositors were under no personal obligation to pay and r. 4.90 required at least the existence of the right to make a pecuniary demand; a right to appropriate property under one's control or to be discharged from a liability was not the same as a right to make a pecuniary demand upon the party in mutual dealings.

**The following cases were referred to in the speech of Lord Hoffmann:**

• Bank of Credit and Commerce International SA (in liq.), Re [1996] B.C.C. 980; [1997] Ch 213 .
• British Eagle International Airlines Ltd v Compagnie Nationale Air France [1975] 1 WLR 758 .
• Charge Card Services Ltd, Re (1986) 2 B.C.C. 99,373; [1987] Ch 150 .
• China and South Sea Bank Ltd v Tan Soon Gin (alias George Tan) [1990] 1 AC 536 .
• Debtor (No. 627 of 1936), Re a [1937] Ch 156 .
• Eberle's (The) Hotels and Restaurant Co Ltd v E Jonas & Brothers (1887) 18 QBD 459 .
• Ellis & Co's Trustee v Dixon-Johnson [1925] AC 489 .
• Foley v Hill (1848) 2 HL Cas 28 .
• Ford, ex parte; Re Chappell (1885) 16 QBD 305 .
• Gye v McIntyre (1991) 171 CLR 609 .
• Hiley v Peoples Prudential Assurance Co Ltd (1938) 60 CLR 468 .
• Mersey Steel and Iron Co v Naylor, Benzon & Co (1882) 9 QBD 648 .
• M S Fashions Ltd v Bank of Credit and Commerce International SA [1993] B.C.C. 70 ; [1993] Ch 425 .
• National Provincial and Union Bank of England v Charnley [1924] 1 KB 431 .

• National Westminster Bank Ltd v Halesowen Presswork & Assemblies Ltd [1971] 1 QB 1 ; [1972] AC 785 .
• Northern Bank Ltd v Ross [1990] B.C.C. 883 .
• Rye v Rye [1962] AC 496 .
• Stein v Blake [1995] B.C.C. 543; [1996] 1 AC 243 .
• Tam Wing Chuen v Bank of Credit & Commerce Hong Kong Ltd [1996] B.C.C. 388 .

**Representation**

• John McDonnell QC (instructed by Haring Ross Gagrat & Gardi ) for the first appellants.
• Christopher Carr QC and Michael Todd QC (instructed by Charles Russell ) for the second appellants.
• Michael Crystal QC and Robin Dicker (instructed by Lovell White Durrant ) for the respondents.

**SPEECHES**

Lord Goff of Chieveley:

I have had the advantage of reading in draft the speech of Lord Hoffmann. For the reasons he gives I would dismiss these appeals.
**\*967**

Lord Nicholls of Birkenhead:

I have had the advantage of reading in draft the speech of Lord Hoffmann. For the reasons he gives, and with which I agree, I would dismiss these appeals.

Lord Hoffmann:

**The issue**

These appeals arise out of an application for directions by the joint liquidators of Bank of Credit and Commerce International SA ('B.C.C.I'). It concerns cases in which B.C.C.I lent money on the security of a deposit which had been made with B.C.C.I by a third party. The question on which the liquidators seek the directions of the court is whether B.C.C.I can claim repayment from the borrower without resorting to the

security or whether it is obliged to set off the loan against the deposit and treat the borrower as pro tanto discharged. If the first answer is correct, B.C.C.I will be able to recover the loan in full and leave the third party depositor to prove in the liquidation. If the second answer is correct, B.C.C.I will be able to recover only the excess, if any, of the loan over the deposit.

## The facts

To put flesh on the abstract bones of this question, B.C.C.I have selected two test cases. In the first, B.C.C.I lent about $3.5m to a Panamanian company called Rayners Enterprises Inc ('Rayners') for the purpose of investing in property in England. Rayners granted legal charges over the properties to B.C.C.I to secure repayment of the loan. In addition, Mr Mohammed Jessa, who is the beneficial owner of Rayners, gave B.C.C.I additional security for part of the indebtedness in the form of charges over certain deposits with B.C.C.I to which he was beneficially entitled. These secured repayment of about £1.4m. On 15 September 1992 the liquidators sent a letter to Rayners demanding repayment. There is no dispute that, apart from the questions arising out of the existence of the security over the deposits, the loans are due and payable.

In the second case, B.C.C.I advanced about £4.4m and $4.2m to companies in what was called the Solai Group. A Panamanian company called Société Générale de Gestion et Services SA ('SGGS') made deposits with B.C.C.I in the sums of £3,037,741 and $8,018,000 respectively and executed documents charging the deposits to B.C.C.I to secure the repayment of the advances to the Solai Group. SGGS is beneficially owned by the controlling shareholders of the Solai Group. On 10 September 1991 the liquidators demanded repayment by the Solai Group companies and again it is accepted that the loans are due and payable.

There is one difference between the two cases on which some reliance was placed in argument. In the first case, Mr Jessa's deposits were already in existence for some time before he charged them to B.C.C.I to secure the indebtedness of Rayners. He says that he was (wrongly) advised by B.C.C.I that he would save tax if he borrowed money on the security of the deposit rather than simply using the deposited money to pay

for the properties. In the second case, SGGS made the deposits as a condition of the grant of facilities to the Solai Group and in fact executed the letter of charge before the deposits had even been made. So it is said that in the second case the security involved the deposit of 'new money' with the bank. I shall come back later to the way in which this distinction is said to be relevant.

## The security documents

The security documents executed by Mr Jessa and SGGS were not in precisely the same form but the differences are immaterial. The material provisions of the 'Letter of Lien/Charge' signed on behalf of Mr Jessa on 3 February 1989 (which I give by way of example) were as follows:

> 'In consideration of [B.C.C.I] at our request providing from time to time banking facilities to [Rayners] ("the borrower") from time to time, I … hereby give a lien/ **\*968** charge on the balances maintained by me in my accounts with you for all of the outstanding liabilities of the borrower in respect of the banking facilities and so that you shall have the power to withdraw and utilise the proceeds thereof … for the reduction or adjustment of the outstanding liabilities of the borrower with the bank without reference to me. I undertake to execute such deeds and instruments as the bank may require hereafter further to secure my accounts and I shall bear the cost thereof.

> I hereby declare that I have not encumbered, assigned or otherwise dealt with the accounts in any way and that they are free from all encumbrances and that I will not encumber, assign or deal with them or any renewal thereof.

It is understood that the balances held in the accounts under the lien/charge are not to be released to me, my heirs or assignees unless or until the entire outstanding liabilities of the borrower whether actual or contingent are fully repaid with interest, fees, commission etc. and the bank is under no obligation to provide or make available banking facilities to the borrower.'

The effect of the document may be summarised as follows. The first paragraph purports to grant the bank a proprietary interest, in the form of a lien or charge, over Mr Jessa's deposit. The second paragraph is a warranty that he has not previously encumbered his interest in the deposit and a covenant that he will not do so in the future. And the third paragraph is a contractual agreement that the deposit will be repayable only if all the liabilities of Rayners have been repaid. The document does not contain any promise by Mr Jessa to pay what may be due from Rayners to the bank.

### Rights of a secured creditor

The general rule is that a secured creditor is not obliged to resort to his security. He can claim repayment by the debtor personally and leave the security alone. In China and South Sea Bank Ltd v Tan Soon Gin (alias George Tan) [1990] 1 AC 536 at p. 545C, where the creditor's security consisted of a mortgage over shares and a personal guarantee from a surety, Lord Templeman said:

'The creditor had three sources of repayment. The creditor could sue the debtor, sell the mortgage securities or sue the surety. All these remedies could be exercised at any time or times simultaneously or contemporaneously or successively or not at all.'

If the creditor recovers judgment against the debtor and the debt is paid, the security is released. But B.C.C.I accepts that this will be the consequence of payment. The security created by the letter of lien/charge will be discharged and the deposit left unencumbered. Of course the depositor will only be entitled to a dividend in the winding up. But this would have been his position even if he had never granted the charge in the first place.

In the present case, however, Mr McDonnell (for Rayners) and Mr Carr (for the Solai Group) have advanced a number of arguments as to why B.C.C.I should not be entitled to sue them for money lent without first giving credit for the full amount of the sums deposited as security. I shall consider each in turn.

### Bankruptcy set-off

Rule 4.90 of the Insolvency Rules 1986 (SI 1986/1925) (reproducing earlier legislation) is headed 'Mutual credit and set-off' and provides:

'(1)  This Rule applies where, before the company goes into liquidation there have been mutual credits, mutual debts or other mutual dealings between the company and any creditor of the company proving or claiming to prove for a debt in the liquidation.

**\*969**

(2)  An account shall be taken of what is due from each party to the other in respect of the mutual dealings, and the sums due from one party shall be set off against the sums due from the other.

…

(4)  Only the balance (if any) of the account is provable in the liquidation. Alternatively (as the case may be) the amount shall be paid to the liquidator as part of the assets.'

WESTLAW   © 2017 Thomson Reuters.

When the conditions of the rule are satisfied, a set-off is treated as having taken place automatically on the bankruptcy date. The original claims are extinguished and only the net balance remains owing one way or the other: Stein v Blake [1995] B.C.C. 543; [1996] 1 AC 243 . The effect is to allow the debt which the insolvent company owes to the creditor to be used as security for its debt to him. The creditor is exposed to insolvency risk only for the net balance.

Not all jurisdictions recognise this kind of security in bankruptcy. The recent judgment of Sir Richard Scott V-C in Re Bank of Credit and Commerce International SA (in liq.) [1996] B.C.C. 980; [1997] Ch 213 illustrates the problems caused by the fact that English law, as the law of the ancillary liquidation, recognises such a set-off but the law of the principal liquidation (Luxembourg) does not. In English law, it is strictly limited to mutual claims existing at the bankruptcy date. There can be no set-off of claims by third parties, even with their consent. To do so would be to allow parties by agreement to subvert the fundamental principle of pari passu distribution of the insolvent company's assets: see British Eagle International Airlines Ltd v Compagnie National Air France [1975] 1 WLR 758 .

The sense of injustice which is undoubtedly felt by the depositors in this case arises, I think, not so much from the operation of r. 4.90 but from the principle that a company is a person separate from its controlling shareholders. If the depositors had been third parties in economic reality as well as in law, I imagine that it would not have been thought particularly unfair that the liquidators had chosen to exercise their undoubted choice of remedies and to proceed against the primary borrowers rather than resort to the third party security which they held. But the separate personality of depositor and borrower was an essential element in the structure which the parties chose to adopt for their borrowings and it cannot be ignored now that B.C.C.I has become insolvent.

The appellants nevertheless say that on the facts of this case there was mutuality between the depositor

and B.C.C.I and that automatic set-off under r. 4.90 therefore took place; the sum owed by B.C.C.I to the depositor (i.e. the amount of the deposit and interest) being set off against the amount owed by the depositor to B.C.C.I. The result was to extinguish the dept pro tanto for the benefit of both Mr Jessa and Rayners, both being liable for the same obligation.

**Construction of the security documents**

The difficulty about this argument is that the depositor did not owe anything to B.C.C.I. The only contract between him and B.C.C.I, contained in the letter of lien/charge, created no personal liability on his part. In Tam Wing Chuen v Bank of Credit & Commerce Hong Kong Ltd [1996] B.C.C. 388, the Privy Council had to construe a very similar document and held that no personal liability could be implied. Lord Mustill said at p. 393E:

> 'One thing is clear, that nowhere in these clauses does the instrument actually say that the depositor is to have a liability equal to the amount of the deposit, or, for that matter, equal to the indebtedness of the company. Thus, if the depositor is to succeed he must show that the transaction as formulated cannot be given any meaning unless he is personally liable.'

**\*970**  Mr McDonnell said that in the present case, the only way in which the transaction as formulated could be given a meaning would be if it were construed as creating a personal liability on the part of the depositor to pay the borrower's indebtedness. Although it did not expressly do so, but instead purported to create a charge over the deposit, it was, he submitted legally ineffective for this purpose. A charge in favour of B.C.C.I over a debt owed by B.C.C.I to the depositor was, as the Court of Appeal held ([1996] B.C.C. 204 ; [1996] Ch 245 ), conceptually impossible and created no proprietary interest in B.C.C.I. (In this respect, the present case was distinguishable from Tam Wing Chuen because in Hong Kong such charges had been legitimated by

statute: see s. 15A of the Law Amendment and Reform (Consolidation) Ordinance (c. 23) . The only way in which the letter in this case could operate as an effective security was contractually. Mr McDonnell submitted that to give effect to this intention, it should therefore be construed as imposing a personal obligation upon the depositor which B.C.C.I would be entitled to set off against his claim for the return of the deposit. On the winding up of B.C.C.I, the effect of r. 4.90 was to make such a set-off mandatory.

## M S Fashions Ltd

Mr McDonnell relied upon M S Fashions Ltd v Bank of Credit and Commerce International SA [1993] B.C.C. 70 , [1993] B.C.C. 360; [1993] Ch 425 as a case in which this kind of reasoning had been approved. I do not think that this is right. The case involved a very unusual security document in which, although no personal obligation was expressly created, references were made to the liability of the depositor being that of principal debtor. It was only to give effect to these words that the document was construed as creating a personal liability limited to the amount of the deposit. This was held to result in a set-off between depositor and B.C.C.I which, since depositor and principal debtor were jointly and severally and unconditionally liable for the same debt, discharged the principal debtor.

There is no doubt that the decision in M S Fashions produces a rather anomalous result to which the Court of Appeal ([1996] B.C.C. 204 at pp. 219, 222–223; [1996] Ch 245 at pp. 269, 273), drew attention. If the documents in that case had, as in this case, merely created a charge over the deposit or a contractual limitation on the right to withdraw the deposit (such as that in the third paragraph of the lien/charge letter which I have quoted), there would have been no cross-claim for the purposes of set-off. If the depositor had given a personal guarantee in the usual form and no demand had been made upon him before the bankruptcy date, his liability would have been merely contingent and would likewise have been incapable of set-off. But because the depositor was also personally liable jointly and severally with the borrower, an automatic set-off took place which discharged the borrower. The distinction is artificial because in no case would the bank wish to rely upon the depositor's personal liability, whether as principal or guarantor. It

will simply keep his money in accordance with the letter of charge. It could be said that, for a bank which is thinking of becoming insolvent, the M S Fashions case is a trap for the unwary.

The difficulty, as the Court of Appeal recognised, is to find a way of coming to a different answer which recognises the automatic and self-executing nature of set-off under r. 4.90 and the principle that joint and several debtors are liable for the same debt so that payment or deemed payment by the one discharges the other. In the case of a charged deposit, one possible answer is that the existence of the charge destroys mutuality: the bank's claim against the depositor is in its own right but the depositor's claim is subject to the equitable interest of the bank. This argument was somewhat cursorily rejected in M S Fashions at first instance and (advanced in a different form) at rather greater length in the Court of Appeal. In this case, the Court of Appeal suggested that reliance might be placed upon the retrospective effect of the collection and distribution of assets by the **971** liquidator, so that the recovery of the debt from the principal debtor could be deemed to take place immediately before the operation of r. 4.90 and, by discharging the debt, prevent set-off from taking place. I record the debate without comment; it is something which may have to be decided in the unlikely event of documentation such as that in M S Fashions appearing in another liquidation. (The B.C.C.I liquidators say that they have settled all their cases in which such documents were used.) But the point does not arise in this case because the letter of lien/charge simply cannot be construed as creating a personal joint and several obligation.

## Re Charge Card Services Ltd

The Court of Appeal rejected the argument that the letter was ineffective unless construed as imposing personal liability. They accepted Mr McDonnell's submission that, by reason of conceptual impossibility, it could not operate as a charge over the deposit. But they said that it could provide perfectly good security by virtue of the contractual provisions in the third paragraph which limited the right to repayment of the deposit and made it what is sometimes called a 'flawed asset.' I agree and could stop there without commenting on the question of whether a charge is conceptually

impossible or not. But the point has been very fully argued and should, I think, be dealt with.

The doctrine of conceptual impossibility doctrine was first propounded by Millett J in Re Charge Card Services Ltd (1986) 2 B.C.C. 99,373; [1987] Ch 150 and affirmed, after more extensive discussion, by the Court of Appeal in this case. It has excited a good deal of heat and controversy in banking circles; the Legal Risk Review Committee, set up in 1991 by the Bank of England to identify areas of obscurity and uncertainty in the law affecting financial markets and propose solutions, said that a very large number of submissions from interested parties expressed disquiet about this ruling. It seems clear that documents purporting to create such charges have been used by banks for many years. The point does not previously appear to have been expressly addressed by any court in this country. Supporters of the doctrine rely on the judgments of Buckley LJ (in the Court of Appeal) and Viscount Dilhorne and Lord Cross (in the House of Lords) in National Westminster Bank Ltd v Halesowen Presswork & Assemblies Ltd [1971] 1 QB 1 ; [1972] AC 785 . The passages in question certainly say that it is a misuse of language to speak of a bank having a lien over its own indebtedness to a customer. But I think that these observations were directed to the use of the word 'lien', which is a right to retain possession, rather than to the question of whether the bank could have any kind of proprietary interest. Opponents of the doctrine rely upon some nineteenth-century cases, of which it can at least be said that the possibility of a charge over a debt owed by the chargee caused no judicial surprise.

The reason given by the Court of Appeal ([1996] B.C.C. 204 at p. 211D; [1996] Ch 245 at p. 258) was that 'a man cannot have a proprietary interest in a debtor other obligation which he owes another.' In order to test this proposition, I think one needs to identify the normal characteristics of an equitable charge and then ask to what extent they would be inconsistent with a situation in which the property charged consisted of a debt owed by the beneficiary of the charge. There are several well-known descriptions of an equitable charge (see, for example, that of Atkin LJ in National Provincial and Union Bank of England v Charnley [1924] 1 KB 431 at pp. 449–450) but none of them purports to be exhaustive. Nor do I intend to provide one. An equitable charge is a species of charge, which

is a proprietary interest granted by way of security. Proprietary interests confer rights in rem which, subject to questions of registration and the equitable doctrine of purchaser for value without notice, will be binding upon third parties and unaffected by the insolvency of the owner of the property charged. A proprietary interest provided by way of security entitles the holder to resort to the property only for the purpose of satisfying some liability due to him (whether from the person providing the security or a **\*972** third party) and, whatever the form of the transaction, the owner of the property retains an equity of redemption to have the property restored to him when the liability has been discharged. The method by which the holder of the security will resort to the property will ordinarily involve its sale or, more rarely, the extinction of the equity of redemption by foreclosure. A charge is a security interest created without any transfer of title or possession to the beneficiary. An equitable charge can be created by an informal transaction for value (legal charges may require a deed or registration or both) and over any kind of property (equitable as well as legal) but is subject to the doctrine of purchaser for value without notice applicable to all equitable interests.

The depositor's right to claim payment of his deposit is a chose in action which the law has always recognised as property. There is no dispute that a charge over such a chose in action can validly be granted to a third party. In which respects would the fact that the beneficiary of the charge was the debtor himself be inconsistent with the transaction having some or all of the various features which I have enumerated? The method by which the property would be realised would differ slightly: instead of the beneficiary of the charge having to claim payment from the debtor, the realisation would take the form of a book entry. In no other respect, as it seems to me, would the transaction have any consequences different from those which would attach to a charge given to a third party. It would be a proprietary interest in the sense that, subject to questions of registration and purchaser for value without notice, it would be binding upon assignees and a liquidator or trustee in bankruptcy. The depositor would retain an equity of redemption and all the rights which that implies. There would be no merger of interests because the depositor would retain title to the deposit subject only to the bank's charge. The creation of the charge would be consensual and not require any formal assignment or vesting of title in the

bank. If all these features can exist despite the fact that the beneficiary of the charge is the debtor, I cannot see why it cannot properly be said that the debtor has a proprietary interest by way of charge over the debt.

The Court of Appeal said that the bank could obtain effective security in other ways. If the deposit was made by the principal debtor, it could rely upon contractual rights of set-off or combining accounts or rules of bankruptcy set-off under provisions such as r. 4.90 . If the deposit was made by a third party, it could enter into contractual arrangements such as the limitation on the right to withdraw the deposit in this case, thereby making the deposit a 'flawed asset'. All this is true. It may well be that the security provided in these ways will in most cases be just as good as that provided by a proprietary interest. But that seems to me no reason for preventing banks and their customers from creating charges over deposits if, for reasons of their own, they want to do so. The submissions to the Legal Risk Review Committee made it clear that they do.

If such charges are granted by companies over their 'book debts' they will be registrable under s. 395 and 396(1)(e) of the Companies Act 1985 . There is a suggestion in the judgment of the Court of Appeal that the banking community has been insufficiently grateful for being spared the necessity of registering such charges. In my view, this is a matter on which banks are entitled to make up their own minds and take their own advice on whether the deposit charged is a 'book debt' or not. I express no view on the point, but the judgment of my noble and learned friend Lord Hutton in Northern Bank Ltd v Ross [1990] B.C.C. 883 suggests that, in the case of deposits with banks, an obligation to register is unlikely to arise.

Since the decision in Re Charge Card Services Ltd (1986) 2 B.C.C. 99,373; [1987] Ch 150 statutes have been passed in several offshore banking jurisdictions to reverse its effect. A typical example is s. 15A of the Hong Kong Law Amendment and Reform (Consolidation) Ordinance (c. 23) , which I have already mentioned. It reads: **\*973**

> 'For the avoidance of doubt, it is hereby declared that a person ("the first person") is able to create, and always has been able to create,

in favour of another person ("the second person") a legal or equitable charge or mortgage over all or any of the first person's interest in a chose in action enforceable by the first person against the second person, and any charge or mortgage so created shall operate neither to merge the interest thereby created with, nor to extinguish or release, that chose in action.'

There is similar legislation in Singapore ( s. 9A of the Civil Law Act (c. 43) ); Bermuda (the Charge and Security (Special Provisions) Act 1990 ) and the Cayman Islands (the Property (Miscellaneous Provisions) Law 1994). The striking feature about all these provisions is that none of them amend or repeal any rule of common law which would be inconsistent with the existence of a charge over a debt owed by the chargee. They simply say that such a charge can be granted. If the trick can be done as easily as this, it is hard to see where the conceptual impossibility is to be found.

In a case in which there is no threat to the consistency of the law or objection of public policy, I think that the courts should be very slow to declare a practice of the commercial community to be conceptually impossible. Rules of law must obviously be consistent and not self-contradictory; thus in Rye v Rye [1962] AC 496 at p. 505, Viscount Simonds demonstrated that the notion of a person granting a lease to himself was inconsistent with every feature of a lease, both as a contract and as an estate in land. But the law is fashioned to suit the practicalities of life and legal concepts like 'proprietary interest' and 'charge' are no more than labels given to clusters of related and self-consistent rules of law. Such concepts do not have a life of their own from which the rules are inexorably derived. It follows that in my view the letter was effective to do what it purported to do, namely to create a charge over the deposit in favour of B.C.C.I. This means that the foundation for Mr McDonnell's argument for implying a personal obligation disappears.

### 'Due … in respect of … mutual dealings'

In the alternative, Mr McDonnell submitted that even if the depositor was under no personal obligation to pay, being liable to have the deposit applied in discharge of the principal's debt was for the purpose of r. 4.90 just as good. Indeed, from B.C.C.I's point of view, it was even better, since the bank was relieved from having to enforce the obligation and could repay itself by entries in its own books. Therefore the amount of the deposit should be treated as 'due' to B.C.C.I for the purposes of r. 4.90(2) . It is clear that for the purposes of the rule, the claim by the creditor against the insolvent company must be a provable debt. It speaks of a 'creditor of the company proving or claiming to prove for a debt in the liquidation.' It has long been held that this does not mean that the creditor must actually have lodged a proof ( Mersey Steel and Iron Co v Naylor, Benzon & Co (1882) 9 QBD 648 ) but the debt must be one which would have been provable if he had. The Court of Appeal held that the same was true of the claim by the company against the creditor: the debt must be one which would have been provable against Mr Jessa if he had been bankrupt. I am not sure that this is right and, as Mr McDonnell pointed out, the contrary was decided by the High Court of Australia in Gye v McIntyre (1991) 171 CLR 609 , a case which does not appear to have been cited to the Court of Appeal. In England, the extension of the definition of a provable debt by the Insolvency Rules 1986 probably means that the point is unlikely to arise in practice. It is not however necessary to decide it because in my view r. 4.90 requires at least the existence of a right to make a pecuniary demand: see The Eberle's Hotels and Restaurant Co Ltd v E Jonas & Brothers (1887) 18 QBD 459 and Dixon J in Hiley v Peoples Prudential Assurance Co Ltd (1938) 60 CLR 468 at p. 497. A right to appropriate property under one's control or to be discharged from a liability is not the same thing as a right to make a pecuniary demand upon the other party to mutual dealings. If there is any anomaly, it is that which I have **974** discussed in connection with M S Fashions and consists in the fact that there is a set-off when the depositor has undertaken personal liability. There is no anomaly in there being no set-off when he has not.

### Payment by the surety

Next the appellants say that the depositor, as surety, is entitled to pay off the debt himself and then claim indemnity from the principal debtor. This proposition is not disputed. But then the appellants say that the mode of payment they propose to employ is to appropriate their deposits for the purpose. In my view this cannot be done. For the reasons which I have already stated, there was no set-off between depositor and B.C.C.I at the bankruptcy date. Accordingly, all that the depositor can do is to prove in the liquidation. It cannot manufacture a set-off by directing that the deposit be applied to discharge someone else's debt, even though it may, as between itself and the debtor, have a right to do so. This is the very type of arrangement which the House declared ineffective in British Eagle International Airlines Ltd v Compagnie Nationale Air France [1975] 1 WLR 758 .

### Right of indemnity

Mr McDonnell next advanced an elaborate argument which he said produced a debt owing from B.C.C.I to Rayners which could be set off against its liability under r. 4.90 . It proceeded as follows. First, Rayners' request to Mr Jessa to charge his deposits to secure its liability to B.C.C.I gave rise to an implied promise to indemnify him against any loss which he might suffer thereby: see Ex parte Ford; Re Chappell (1885) 16 QBD 305 and Re a Debtor (No. 627 of 1936) [1937] Ch 156 . Secondly, the bankruptcy of B.C.C.I resulted in Mr Jessa suffering loss as a result of making the deposit for which he had a claim against Rayners. Thirdly, Rayners has a claim against B.C.C.I to be indemnified against Mr Jessa's claim because its obligation to pay Mr Jessa was a result of the breach by B.C.C.I of its obligation as a mortgagee to take proper care of the security and restore it unimpaired. B.C.C.I's bankruptcy converted the security from a claim to the deposit to a mere right to prove in the liquidation, with a fraction of the value of the original deposit. Fourthly, because Mr Jessa's claim arises out of the implied promise given when the deposit was made, Rayners' claim against B.C.C.I derives from a right which existed before the bankruptcy date and can be set off under r. 4.90 .

The first stage in the argument is indisputable. I make no comment on the second; Mr Crystal, for the liquidators, said that a principal debtor who requested a surety to charge a deposit as security for his debt did not

warrant the solvency of the institution with which the deposit was made. I will, however, assume in favour of the appellants that Mr Jessa would have been entitled, as against Rayners, to be indemnified for his loss. It is at the third stage that the argument breaks down. B.C.C.I's charge was not over the money which Mr Jessa deposited. That became the property of B.C.C.I: see Foley v Hill (1848) 2 HL Cas 28 . The charge was over Mr Jessa's chose in action, the debt owed to him by B.C.C.I. The insolvency involved no breach of duty by B.C.C.I in its capacity as chargee and did not change the nature of the debt which it owed. The reason why Mr Jessa lost his money was because the debt became subject to the statutory scheme of payment by pari passu distribution of the assets of B.C.C.I But this had no connection with the fact that he had given a charge. Rayners therefore had no claim against B.C.C.I which it could set off against its indebtedness.

The appellants said that to regard the giving of security as merely the creation of a charge over an existing debt was too narrow a view. The depositing of the money was an integral part of the creation of the security. Mr Carr, for the Solai Group, pointed out that SGGS had made the deposit purely for the purpose of providing security; as I **975** mentioned in part 2, above, the letter of lien/charge was actually executed before the money was deposited. The deposit was not an asset already in existence; it was new money provided as security. Mr McDonnell said that he was in a similar position because although Mr Jessa had made the deposits earlier, he had been advised by B.C.C.I to use them as security when he would otherwise have withdrawn them. But however one describes what was done to create the security, the fact is that the charge was over the debt and not over the money. The choses in action belonged to Mr Jessa and SGGS; the money belonged to the bank. The appellants may have been badly advised to create an asset for the purpose of giving a charge by depositing money with B.C.C.I, but they are not making a claim on the grounds of bad advice. There would be no point in doing so because it would not put them in a better position in the liquidation.

## Duty to restore the security

The appellants' next argument suffers from much the same defect as the last one. They say that B.C.C.I is not entitled to judgment against the debtor companies

unless it is able to restore the security which has been provided. The principle is undisputed, having been affirmed by this House in Ellis & Co's Trustee v Dixon-Johnson [1925] AC 489 , although Mr Crystal for B.C.C.I said that it was limited to restoration of security given by the debtor and did not apply to third parties. There seems to be no authority on this point but I am content to assume in favour of the appellants that it applies equally to security provided by a third party. Nevertheless, B.C.C.I is in a position to restore the security simply by releasing the charge over the deposit. The fact that it cannot restore the money in full is not relevant; the charge was not over the money and the winding up affects only B.C.C.I's role as a debtor, not its role as a chargee. In fact, in the case of an equitable charge, there is no formal act of release required. The charge simply ceases to exist when the debt it secured has been repaid.

## Marshalling

Finally, the appellants rely upon the equitable doctrine of marshalling. This is a principle for doing equity between two or more creditors, each of whom are owed debts by the same debtor, but one of whom can enforce his claim against more than one security or fund and the other can resort to only one. It gives the latter an equity to require that the first creditor satisfy himself (or be treated as having satisfied himself) so far as possible out of the security or fund to which the latter has no claim. I am at a loss to understand how this principle can have any application in the present case. There is only one debt and that is owed to B.C.C.I by the principal borrower. B.C.C.I has security to which it can resort as it chooses: see the citation from China and South Sea Bank Ltd v Tan Soon Gin [1990] 1 AC 536 in part 4, above. There is no basis upon which the depositors can assert an equity to require B.C.C.I to proceed against their deposits before claiming against the principal debtors.

For these reasons I would dismiss both appeals.

Lord Hope of Craighead:

I have had the benefit of reading in draft the speech which has been prepared by Lord Hoffmann. I agree

with it, and for the reasons which he has given I also would dismiss these appeals.

Lord Hutton:

I have had the advantage of reading in draft the speech of Lord Hoffmann. For the reasons he gives I, too, would dismiss these appeals.

(Appeals dismissed)  **\*976**

© 2017 Sweet & Maxwell
[1997] B.C.C. 965

**End of Document**                                    © 2017 Thomson Reuters.

# TAB 64

# Re Brabon

a

# Treharne v Brabon and others

CHANCERY DIVISION

JONATHAN PARKER J

b

25–28, 31 JANUARY, 1–4, 7 FEBRUARY, 3 MARCH 2000

*Winding up – Bankruptcy – Insolvency – Whether transactions at an undervalue – Transactions defrauding creditors – Sale of land by mortgagee not transaction entered into by bankrupt – Consideration provided on sale by mortgagor was value of land free from mortgage – No relief for trustee*

c

*in bankruptcy in relation to sale of land at undervalue in case of negative equity – Trustee failed to show that substantial purpose of transactions was to put assets out of reach of creditors – Insolvency Act 1986, ss 339, 423.*

In 1997 certain areas of land in East Sussex were together sold by NB, his wife, PB, and their son, BB, to a property development company (Silver) for

d

£670,000 for residential development. Between contract and completion NB was adjudged bankrupt. On completion, four areas of land in the sole ownership of PB, together with an access road, and one area of land in the joint ownership of PB and BB were transferred to Silver by a single transfer at a price of £566,000. Two other areas owned by NB before his bankruptcy

e

were transferred to Silver by PB by way of sale as mortgagee, in one case as second mortgagee under a charge granted to her by NB and in the other as transferee of a first charge granted by NB to a building society. The consideration for those sales was £29,000 and £75,000. In both cases the entire sale price was paid to the mortgagees in partial satisfaction of the indebtedness secured by the charges. NB's trustee in bankruptcy took

f

proceedings against NB, PB and BB alleging that a number of earlier transactions relating to one or more of the areas of land were shams and/or transactions defrauding creditors for the purposes of s 423 of the Insolvency Act 1986, and against Silver alleging that the conveyance to Silver by PB as mortgagee of the two areas of land held by NB before his bankruptcy constituted transactions at an undervalue under s 339 of the 1986 Act.

g

**Held** – (1)  The transfers of land by PB as mortgagee were not transactions 'entered into' by NB for the purposes of s 339. The relevant transaction for the purposes of s 339 was not the contract for sale but the actual disposal of those properties in favour of Silver and those disposals were made by PB as

h

mortgagee in exercise of her power of sale. The charges in favour of PB were valid and effective and were not shams. Even if the contract for sale was specifically enforceable against NB the contract was superseded by the actual transfers. A transfer by way of sale not by the bankrupt but by the bankrupt's mortgagee was not a transaction 'entered into' by the bankrupt. Therefore the trustee's claims against Silver under s 339 failed.

i

    (2)  There was negative equity in those two areas of land since the outstanding indebtedness secured on them exceeded the trustee's highest valuations. On a sale of mortgaged property by the mortgagor the value of

the consideration provided by the mortgagor for the purposes of s 339(3)(c) was not the value of the mortgagor's equity of redemption but the value of the land free from the mortgage. Therefore if the two areas of land had been transferred by the bankrupt there would have been a transaction at an undervalue for the purposes of s 339. However in the case of negative equity the court would not have granted the trustee in bankruptcy relief under s 339 since even if the mortgaged property had been sold at the price contended for by the trustee the entirety of the proceeds would have been applicable towards satisfaction of the secured debt, and no part of the proceeds would have been receivable by the bankrupt or trustee.

*Re MC Bacon Ltd* [1990] BCLC 324 applied.

(3)  The site was marketed by five firms of estate agents over more than two years before the sale to Silver. Therefore the sale to Silver was a sale on the open market conducted in a manner which had the effect of determining the actual market value of the site at the relevant time. Therefore the price paid by Silver was not an undervalue. However as a matter of the apportionment of the overall consideration to the two areas, the amount attributed to them was less than their true market value as part of the site and accordingly if relief had been otherwise available under s 339 against Silver the court would have granted relief in relation to those two transfers on the basis that they were transactions at undervalues.

(4)  A number of previous transactions within NB's family relating to the areas of land were transactions at an undervalue but the trustee failed to show that a substantial purpose of the transactions was to put assets out of the reach of the bankrupt's creditors. Therefore the trustee was not entitled to relief under s 423 and his claims failed.

**Cases referred to in judgment**

*Arbuthnot Leasing v Havelet Leasing (No 2)* [1990] BCC 637.

*Chohan v Saggar* [1992] BCC 306.

*Eichholz, Re* [1959] 1 All ER 166, [1959] Ch 708, [1959] 2 WLR 200.

*MC Bacon Ltd, Re* [1990] BCLC 324.

*Moon v Franklin* [1996] BPIR 196.

*Royscot Spa Leasing Ltd v Lovett* [1995] BCC 502, CA.

**Applications**

The trustee in bankruptcy of Neville Audley Brabon took proceedings against Mr Brabon, his wife, and their son, alleging that a number of earlier transactions within the Brabon family relating to one or more areas of land sold in 1997 to Silver (Building and Construction) Ltd were transactions defrauding creditors for the purposes of s 423 of the Insolvency Act 1986 and/or were ineffective to divest Mr Brabon of his beneficial interest and should be set aside. As against Silver the trustee further claimed that the transfer to Silver of two of the areas of land which were held by Mr Brabon immediately before his bankruptcy were transactions at an undervalue for the purposes of s 339 of the 1986 Act. The facts are set out in the judgment.

*a*

*Stephen Atherton* (instructed by *Wilde Sapte*) for the trustee.
*Charles Gratwicke* (instructed by *Harris Segal*) for the Brabons.
*David Marks* (instructed by *Russell-Cooke, Potter & Chapman*) for Silver (Building and Construction) Ltd.

*Cur adv vult*

*b*     3 March 2000. The following judgment was delivered.

**JONATHAN PARKER J.**

INTRODUCTION

*c*     Neville Audley Brabon, the third respondent in these consolidated proceedings, was adjudged bankrupt on 3 October 1997. The claimant in these proceedings, Stephen Treharne, is his trustee in bankruptcy. Mr Brabon formerly practised as a solicitor, but he was struck off the roll of solicitors in December 1994 and subsequently pleaded guilty to a number of charges of dishonesty arising out of the conduct of his solicitor's practice.

*d*     In the proceedings, which were commenced on 3 December 1997 in the Hastings County Court (and subsequently transferred to the High Court), the trustee seeks relief in respect of seven adjoining areas of freehold land lying to the north of North Trade Road in Battle, East Sussex, together with an access road leading from North Trade Road. I shall hereafter refer to the respective areas of land as 'Barbarossa', 'Hillcrest', 'Wendy', 'High Hedges', 'Little Meads', 'the ransom strips' and 'the open land'; and to the access road as 'the roadway'.

*e*     Immediately prior to 11 July 1997, the freehold in two of the seven areas (Barbarossa and Hillcrest) was vested in Mr Brabon; the freehold in a further four areas (Wendy, Little Meads, the ransom strips and the open land) was vested in Mr Brabon's wife, Mrs Penelope Brabon (the first respondent in the proceedings); and the freehold in the remaining area (High Hedges) was vested jointly in Mrs Brabon and their son Benjamin Brabon (the second respondent in the proceedings). Mrs Brabon also owned the roadway.

*f*

*g*     By a contract dated 11 July 1997, and exchanged on that date, Mr and Mrs Brabon and Benjamin Brabon agreed to sell the seven areas of land and the roadway to a developer, Silver (Building and Construction) Ltd (Silver), for £670,000. Silver is the fourth respondent in the proceedings. The contract also granted Silver an option to purchase an adjoining area of land ('the option land') for a further £60,000. The option land formed part of Mr and Mrs Brabon's adjoining property known as the Meads, and is also served by

*h*     the roadway. The contract was conditional on the grant of planning permission for the erection of 11 dwelling houses. In the event this condition was treated as fulfilled, in that although the determinative planning permission was not granted until a few days after completion, Silver had agreed in the meantime to treat the contract as unconditional.

*i*     As at the date of Mr Brabon's bankruptcy (3 October 1997), the contract remained uncompleted.

In December 1997 these proceedings were commenced, in anticipation of the contract being completed.

As against Mr and Mrs Brabon and Benjamin Brabon, the trustee alleges that a number of earlier transactions relating to one or more of the areas of land the subject of the contract entered into within the Brabon family, and involving one or more of Mr Brabon, Mrs Brabon, Benjamin Brabon, Mr Arthur Brabon (Mr Brabon's father, who was made bankrupt on 28 August 1997), and Chislelane Ltd (a company owned initially by Mr Brabon and Benjamin Brabon, and subsequently by Mrs Brabon and Benjamin Brabon: as to which see further below), were transactions defrauding creditors for the purposes of s 423 of the Insolvency Act 1986 (the 1986 Act), and/or were ineffective to divest Mr Brabon of his beneficial interest; and he seeks orders setting aside those transactions.

When the proceedings were commenced (ie before completion of the contract), the relief sought by the trustee against Silver was the setting aside of the entire contract as a transaction at an undervalue, for the purposes of s 339 of the 1986 Act; alternatively as a transaction defrauding Mr Brabon's creditors, for the purposes of s 423 of the 1986 Act.

The trustee applied for, and was granted, interlocutory injunctive relief restraining completion of the contract pending trial. On 31 January 1998 the injunction was discharged by consent, on terms that part of the proceeds of sale be held in the joint names of the solicitors for the trustee and for the Brabon family. The way was then clear for completion.

Completion took place on 13 March 1998. On completion, the four areas of land in the sole ownership of Mrs Brabon, together with the roadway, plus the one area of land in the joint ownership of Mrs Brabon and Mr Benjamin Brabon, were transferred to Silver by a single transfer at a price of £566,000. The two remaining areas formerly in the ownership of Mr Brabon (Barbarossa and Hillcrest) – Mr Brabon's title to those plots having vested in the trustee on his bankruptcy – were in each case transferred to Silver by Mrs Brabon by way of sale as mortgagee. In the case of Barbarossa Mrs Brabon sold as second mortgagee under a charge granted (or purportedly granted) to her by Mr Brabon dated 31 January 1994. In the case of Hillcrest Mrs Brabon sold in her capacity as transferee of a first charge granted by Mr Brabon to Nationwide Building Society dated 5 April 1982. The consideration for the sale of Barbarossa was £29,000; the consideration for the sale of Hillcrest was £75,000. Thus, the total consideration paid by Silver for the seven areas of land and the roadway was £670,000 (equal to the contract price).

Following completion, Silver exercised its option to acquire the option land for a further £60,000. I shall hereafter refer to the entirety of the land transferred to Silver on 13 March 1998 plus the option land as 'the site'. The total consideration paid by Silver for the site was thus £730,000.

On 28 October 1998 the trustee applied for permission to amend the relief sought against Silver in the light of the fact that, the site having been transferred to Silver, an order setting aside the contract was no longer appropriate. The application for permission to amend was heard by me, in the course of the pre-trial review on 22 January 1999. The application was unopposed, and I granted it. The amended relief sought by the trustee against Silver is a declaration in the following terms:

a

'… that the conveyance of the properties set out in the schedule hereto by [Mr Brabon] to [Silver] pursuant to [the contract] constituted transactions at an undervalue under s 339 of the [1986 Act] and/or constituted transactions defrauding creditors under s 423 of the Act.'

b

It is apparent from the terms of this amended relief that it is framed on the basis that Barbarossa and Hillcrest were transferred to Silver by Mr Brabon, whereas, as I have already noted, they were in fact sold and transferred to Silver by Mrs Brabon as mortgagee. It is not clear to me how the amendment came to be framed on an erroneous basis. The trustee plainly must have appreciated that, since he was not himself a party to the completion arrangements for the purpose of transferring Mr Brabon's title to Barbarossa and Hillcrest, those two areas of land would have to be dealt with in some

c

other way; and the evidence establishes that the trustee was informed that it was proposed that they would be transferred to Silver by way of mortgagee sale (although there is some doubt as to the extent to which the trustee was informed of the details of this proposal). At all event, the trustee was apparently content not to be a party to the sale of the site to Silver, presumably on the footing that his claims against Silver were effectively

d

secured by the deposit of part of the proceeds of sale in the joint names of the solicitors.

It is also apparent from the terms of the amended relief that the trustee is confining his claim against Silver to the sales of Barbarossa and Hillcrest. It was explained to me that he took this course in the light of the fact that the

e

sales of the remaining areas were not transactions entered into by Mr Brabon, and that in consequence relief under s 339 of the 1986 Act (transactions at an undervalue) would not be available in relation to the sales of those areas. On the face of it, the same consideration would appear to apply to the sales of Barbarossa and Hillcrest, which were in the event effected by Mrs Brabon as mortgagee. However, the trustee's case is that the

f

sales by Mrs Brabon as mortgagee are properly to be regarded as no more than conveyancing mechanics to give effect to the transaction into which Mr Brabon entered when he signed the contract.

In the event the trustee has not pursued any claim under s 423 as against Silver. Hence the only claims which the trustee makes against Silver are that

g

the sales of Barbarossa and Hillcrest were transactions entered into by Mr Brabon at an undervalue, for the purposes of s 339 of the 1986 Act.

The trustee appears by Mr Stephen Atherton of counsel; Mr Brabon, Mrs Brabon and Benjamin Brabon by Mr Charles Gratwicke of counsel; and Silver by Mr David Marks of counsel.

h

THE RELEVANT STATUTORY PROVISIONS

Section 339(1) of the 1986 Act provides that where a bankrupt has at any 'relevant time' (as defined in s 341) entered into a transaction with any person at an undervalue, the trustee in bankruptcy may apply for an order under the section. Section 339(2) provides that, on an application made

i

under sub-s (1), the court shall make such order as it thinks fit for restoring the position to what it would have been if the bankrupt had not entered into the transaction. Section 339(3)(c) provides that a bankrupt enters into a transaction with a person at an undervalue if he enters into a transaction

with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the bankrupt.

Section 341(1)(a) of the 1986 Act provides that, subject to sub-s (2), 'relevant time' means, in the case of a transaction at an undervalue, the period of five years ending with the date of presentation of the bankruptcy petition. Section 341(2) provides that where a bankrupt enters into a transaction at an undervalue at a time which is within that period, that time is not a relevant time for the purposes of ss 339 and 341 unless the bankrupt was insolvent at the time, or became insolvent in consequence of the transaction. However, s 341(2) is expressly disapplied where the transaction takes place within two years of the presentation of the bankruptcy petition. The transaction under challenge in the context of the trustee's claims against Silver (the transfers of Barbarossa and Hillcrest) took place only a month or so before the presentation of the bankruptcy petition against Mr Brabon. Accordingly in order to succeed on his claims under s 339 against Silver the trustee does not have to discharge the burden of establishing that Mr Brabon was insolvent at the time, or that he became insolvent in consequence of those transactions.

Section 423 applies to transactions entered into at an undervalue (including gifts and other transactions for no consideration) where the court is satisfied that the transaction was entered into by a person for the purpose of putting assets beyond the reach of his creditors or of otherwise prejudicing claims by creditors. Where the court is so satisfied, it may make such order as it thinks fit for restoring the position to what it would have been if the transaction had not been entered into and for protecting the interests of creditors prejudiced, or capable of being prejudiced, by the transaction. There is no time limit in respect of claims under this section.

Section 425(2)(a) provides that an order made under s 423 may affect the property of, or impose any obligations on, any person whether or not he is the person with whom the debtor entered into the transaction, save that such an order shall not prejudice any interest in property which was acquired from a person other than the debtor and was acquired in good faith, for value and without notice of the relevant circumstances.

A GENERAL DESCRIPTION OF THE SITE

The site lies to the north-west of North Trade Road, which runs approximately NE/SW. The only access to the site is via the roadway, which is an unmade-up track. The roadway leads from North Trade Road at right-angles in a north-westerly direction. The entrance to the roadway from North Trade Road lies between two houses fronting North Trade Road. To the left (if one faces the track from North Trade Road) is a house called 'High Hedges'. This is not to be confused with the area of land referred to as High Hedges. The house High Hedges, together with its garden, was carved out of a larger area by the Brabon family some time ago, and is not relevant to these proceedings. The land referred to as High Hedges consists of the remainder of this larger area, which was retained by the Brabon family when the site of the house High Hedges was conveyed away. The greater part of the land so retained lies to the rear (ie to the north-west) of the land conveyed away, but also included in the retained land is a small triangular piece of land

10-03635-jpm    Doc 271-3    Filed 04/03/17    Entered 04/03/17 18:29:57    Exhibit A -
Part 3    Pg 697 of 839

*a* in front of the house at the corner where the roadway meets North Trade Road (doubtless retained in order to facilitate the development of the site at some time in the future).

To the right of the entrance to the track is a house called 'Byways' which (like the house High Hedges) is not relevant to these proceedings. Byways formerly formed part of the property lying immediately to its rear, viz the Meads, where Mr and Mrs Brabon live. As in the case of the area referred to as High Hedges (and no doubt for the same reason) on conveying away *b* Byways the Brabon family retained, as part of the Meads, a triangular parcel of land at the corner where the roadway meets North Trade Road. This latter triangular parcel of land is larger than the equivalent parcel of land retained as part of the area referred to as High Hedges on the other side of the roadway (ie on the opposite corner), and it extends some distance down the *c* roadway. It is one of two relatively small areas of land which together form what I refer to as the ransom strips. Continuing down the roadway, passing (on the left) the house High Hedges and (on the right) Byways, one reaches (on the left) the area referred to as High Hedges and (on the right) the option land (which is part of the garden of the Meads). The Meads is the next property on the right, adjoining the option land. Thereafter, the roadway *d* turns at right-angles towards the north-east, and runs more or less parallel with North Trade Road. Adjoining the roadway to the right as one travels down it, and a few feet after rounding the corner, is another relatively small triangular-shaped piece of land. This is the other area which makes up what I refer to as the ransom strips. The ransom strips would require to be incorporated in any proposal to widen the roadway as part of any *e* development of the site (hence the appellation ransom strips).

Continuing along the roadway in a north-easterly direction, one passes (on the left-hand side – ie to the north-west) first Wendy then Barbarossa, before reaching Hillcrest, where the roadway ends.

Little Meads lies to the rear of the area referred to as High Hedges, *f* adjoining its north-western boundary. Little Meads has access to the roadway at the apex of the corner where the roadway turns north-eastward. To the rear of Little Meads, Wendy, Barbarossa and Hillcrest (ie to the north-west) lies a larger area which is the area referred to as the open land.

So far as the topography of the site is concerned, it is relevant to note that the rear of the site (including the rear gardens of Little Meads, Wendy, *g* Barbarossa and Hillcrest) slopes steeply downhill in a north-westerly direction, towards the open land.

THE CONVEYANCING HISTORY

Given the complexity (and, in a number of respects, the obscurity) of the conveyancing in relation to the site, for most of which Mr Brabon was *h* responsible in his capacity as solicitor acting for the Brabon family, it is convenient to deal separately with the various areas of land the subject of the trustee's claims in these proceedings.

*Barbarossa*

*i* Mr Brabon purchased Barbarossa in his own name in November 1984. He was registered as sole proprietor on 25 March 1985. Part of the purchase price was provided by way of loan from the Halifax Building Society, secured by a first charge.

According to Mr Brabon, in November 1988 he granted his father Mr Arthur Brabon (who was then living at Little Meads, of which he was registered proprietor) a right to live at Barbarossa for the rest of his life, in consideration of Mr Arthur Brabon transferring Little Meads to Mrs Brabon. It is at least common ground that in or about November 1988 Mr Arthur Brabon moved from Little Meads to Barbarossa, and that he continued to live there until shortly before the sale of Barbarossa to Silver. In evidence is a written agreement dated 1997 and made between Mr Arthur Brabon, Mr Brabon and Mrs Brabon, whereby Mr Arthur Brabon purports to surrender his right to occupy Barbarossa on completion of the sale of Barbarossa to Silver in consideration of Mr Brabon providing him with suitable alternative accommodation for the rest of his life. Further, there is in evidence a copy of a conveyance dated 24 November 1988 whereby Mr Arthur Brabon transferred Little Meads to Mrs Brabon. It is the trustee's case that Mr Brabon was at all material times the beneficial owner of Little Meads, and the trustee relies on the terms of the conveyance as supporting that contention. (I shall return to the terms of the conveyance when dealing with the conveyancing history of Little Meads.) The trustee also challenges the existence of a right for Mr Arthur Brabon to occupy Barbarossa for the rest of his life.

Also in evidence is a promissory note dated 31 January 1994, executed by Mr Brabon as a deed, whereby he purportedly charged Barbarossa with the repayment to Mrs Brabon of a sum of £70,000 'value received' with interest. The charge was not registered at the land registry until April 1997. The sale of Barbarossa to Silver was effected by Mrs Brabon in purported exercise of her power of sale under the charge contained in the promissory note, at the price of £29,000. It is the trustee's case as against the Brabon family (although it is not a case which the trustee seeks to make as against Silver) that the promissory note is a sham in that there was in reality no such debt owed by Mr Brabon to Mrs Brabon, and hence no valid charge in her favour.

Thus, the principal issues in relation to Barbarossa are:

(1) (as against Silver) whether the sale of Barbarossa to Silver for £29,000 was a transaction at an undervalue, for the purposes of s 339 of the 1986 Act;

(2) whether Mr Arthur Brabon acquired an enforceable right to occupy Barbarossa for the rest of his life; and

(3) whether the promissory note created a valid charge in favour of Mrs Brabon, and/or whether it can be impeached as a transaction defrauding creditors, for the purposes of s 423 of the 1986 Act.

*Hillcrest*

Hillcrest was purchased by Mr Brabon on or about 5 April 1982. Part of the purchase price was provided by way of loan by Nationwide Building Society, secured by a first charge on the property. Mr Brabon was registered as sole proprietor on 17 June 1982. On 21 February 1990 Mr Brabon granted a second charge over the property in favour of Lloyds Bank, to secure all moneys from time to time owing to the bank by Mr Brabon. The evidence is that at the date of the sale to Silver a sum of £300,000 or thereabouts was owing to the bank, secured by this second charge.

*a*
In evidence is a promissory note in Mr Brabon's handwriting dated 11 April 1996 in similar form to the promissory note relating to Barbarossa, to which I have already referred. The promissory note in relation to Hillcrest purports to charge Hillcrest with the repayment to Mrs Brabon of the sum of £3,920 'value received' with interest.

On 11 March 1998, Nationwide Building Society transferred its first charge to Mrs Brabon in consideration of a payment of £14,781.59. Two days later, on 13 March 1998, Mrs Brabon exercised the power of sale under

*b*
that charge in selling and transferring Hillcrest to Silver for £75,000.

As in the case of Barbarossa, it is the trustee's case as against the Brabon family that the promissory note is a sham in that there was no debt of £3,920 owed by Mr Brabon to Mrs Brabon, and hence no valid charge in favour of Mrs Brabon.

*c*
Thus, the principal issues in relation to Hillcrest are:

(1)  (as against Silver) whether the sale of Hillcrest to Silver at the price of £75,000 was a transaction at an undervalue, for the purposes of s 339 of the 1986 Act; and

(2)  (as against the Brabon family) whether the promissory note created a valid third charge in favour of Mrs Brabon, and/or whether it can be impeached as a transaction defrauding creditors, for the purposes of s 423 of

*d*
the 1986 Act.

*Wendy*
Wendy was purchased on 3 October 1984 by a company called Chislelane Ltd (Chislelane). Chislelane was formed by Mr Brabon for the purpose of

*e*
purchasing Wendy, and throughout Chislelane's existence (it was dissolved on 7 January 1997) Wendy remained its only asset. At all material times Mr Brabon was the only director of Chislelane. The issued share capital of Chislelane consisted of 100 ordinary shares of £1 each, of which (initially) 95 were registered in the name of Mr Brabon and five in the name of Benjamin Brabon.

*f*
Chislelane was registered as sole proprietor of Wendy on 28 November 1984. On 24 May 1985 Chislelane granted a first charge over Wendy in favour of Royal Bank of Scotland.

In evidence is a written agreement and assignment, drawn up by Mr Brabon and dated 1 March 1994, whereby Mr Brabon purports to sell to

*g*
Mrs Brabon for the price of £97,000 (receipt of which sum is expressed to be acknowledged) his 95 shares in Chislelane, together with certain other assets which are not the subject of these proceedings. The trustee contends (as against the Brabon family) that this document too is a sham, and that the expressed consideration of £97,000 was never paid.

*h*
On 31 July 1996 Chislelane transferred Wendy to Mrs Brabon for an expressed consideration of £60,000. The consideration is said by Mr and Mrs Brabon to consist of the assumption by Mrs Brabon of liability for £30,000 of the sum owing by Chislelane to Royal Bank of Scotland, coupled with a waiver by Mrs Brabon of £30,000 of the debt owed to her by Chislelane resulting from her having paid the interest on Chislelane's debt to

*i*
Royal Bank of Scotland. Once again, it is the trustee's case that this consideration is illusory and that in reality the transfer was gratuitous. The trustee accepts that £60,000 was the open market value of Wendy in July 1996, so no valuation issue arises in relation to Wendy.

On the same day, 31 July 1996, Mrs Brabon charged Wendy to Royal Bank of Scotland as security for Mr Brabon's indebtedness to the bank.

On 30 August 1996 Mrs Brabon was registered as sole proprietor of Wendy.

On 13 March 1997 Mrs Brabon transferred Wendy to Silver on completion of the sale of the site.

Thus, the principal issues in relation to Wendy are:

(1) whether Mrs Brabon provided consideration for the transfer of Wendy, and if so in what amount or value;

(2) whether the 1994 agreement and assignment was a 'sham'; and

(3) in any event, whether the transfer of Wendy was a transaction defrauding creditors, for the purposes of s 423 of the 1986 Act.

*High Hedges*

Although a copy of the relevant transfer is not in evidence, Mrs Brabon's evidence is that in 1979 High Hedges was purchased by herself, Mr Brabon, Mr Arthur Brabon and Mrs Olive Brabon (Mr Arthur Brabon's wife and Mr Brabon's mother), and that it was transferred into their joint names, as tenants in common in equal shares. This account is consistent with a transfer dated 27 April 1991 (a copy of which is in evidence). Mrs Olive Brabon died on 15 June 1987, and Mr Brabon was the sole beneficiary under her will. By the 1991 transfer, Mr Brabon assigned his beneficial share in High Hedges (which would appear to have increased to a half share on his mother's death) to Mr Arthur Brabon and Mrs Brabon, and he retired as a trustee.

It is asserted by Mr and Mrs Brabon that the assignment of Mr Brabon's beneficial share in High Hedges was made in consideration of a contribution of £4,000 made by Mrs Brabon towards the purchase of the Meads (Mr and Mrs Brabon's matrimonial home). According to Mr Brabon (and there is no evidence to contradict this) the Meads is owned jointly by Mr and Mrs Brabon. Mr Brabon asserts that there was further consideration for the assignment of his beneficial share in that Mrs Brabon agreed that he should have the entire benefit of a loan of £100,000 secured on the Meads.

On 16 January 1992, for no consideration, Mr Arthur Brabon and Mrs Brabon declared themselves trustees of High Hedges for Mrs Brabon and Benjamin Brabon. On 4 April 1997 Mr Arthur Brabon retired as a trustee and was replaced by Benjamin Brabon (who was by that time of full age). On 14 April 1997 Mrs Brabon and Benjamin Brabon were registered at the land registry as joint proprietors of High Hedges. Hence the need for Benjamin Brabon to be party to the contract, and to the transfer of High Hedges to Silver.

The trustee's case is that the assignment of Mr Brabon's beneficial share was not supported by consideration: ie that it was a voluntary assignment. He contends in the first place that the consideration referred to was never in fact provided by Mrs Brabon; in any event, he contends, Mrs Brabon's agreement to Mr Brabon having the entire benefit of a loan secured on property in their joint names cannot in law amount to consideration for the assignment of Mr Brabon's beneficial share. On that basis, he contends that Mr Brabon's beneficial share remained vested in him under a resulting or constructive trust. Alternatively, if the assignment was not a voluntary assignment, he contends that the transfer dated 4 April 1997 into the joint names of Mrs Brabon and Benjamin Brabon was a transaction defrauding

creditors for the purposes of s 423 of the 1986 Act, in respect of which he is
entitled to relief against Mrs Brabon and Benjamin pursuant to s 425 of the
1986 Act.

*a*

Thus, the principal issues in relation to High Hedges are:

(1) whether the assignment of Mr Brabon's beneficial share was a
voluntary assignment;

(2) if so, whether Mr Brabon's beneficial share remained vested in him
under a resulting or constructive trust; and

*b*

(3) if not, whether the subsequent transfer by Mrs Brabon and Mr Arthur
Brabon into the joint names of Mrs Brabon and Benjamin Brabon can be
impeached as a transaction defrauding creditors, for the purposes of s 423 of
the 1986 Act.

*c*

*Little Meads*

As noted earlier, in the section dealing with Barbarossa, by a conveyance
dated 24 November 1988 Mr Arthur Brabon transferred Little Meads to
Mrs Brabon. It is Mr and Mrs Brabon's case that this transfer was made in
consideration of Mr Brabon granting Mr Arthur Brabon the right to live at
Barbarossa for the rest of his life. The transfer itself refers to an 'agreement
to exchange', although no such written agreement has come to light.

*d*

Mr Brabon's evidence is that this is a reference to the arrangement for the
granting to Mr Arthur Brabon of a right to occupy Barbarossa for the rest of
his life in exchange for the transfer of Little Meads to Mrs Brabon.

Clause 1 in the operative part of the conveyance begins as follows:

*e*

'In consideration of the said agreement as to exchange the Vendor [i.e.
Mr Arthur Brabon] at the direction of the said NEVILLE AUDLEY
BRABON as Beneficial Owner hereby conveys …'

The trustee points to the words 'as beneficial owner' as evidence that at the
date of the conveyance Mr Brabon was the beneficial owner of Little Meads.
He further asserts that the conveyance to Mrs Brabon was for no
consideration, and that in consequence Mr Brabon remained the beneficial
owner; alternatively, he contends that the conveyance was a transaction
defrauding creditors for the purposes of s 423 of the 1986 Act.

*f*

Thus, the principal issues in relation to Little Meads are:

*g*

(1) whether at the date of the conveyance to Mrs Brabon (24 November
1988) Mr Brabon was the beneficial owner of Little Meads;

(2) whether any consideration was provided for the conveyance (and if so,
in what amount or value);

(3) if no consideration was provided, whether the beneficial interest in
Little Meads remained vested in Mr Brabon under a resulting or constructive
trust or on the basis of 'sham'; alternatively

*h*

(4) whether the conveyance was a transaction defrauding creditors, for
the purposes of s 423 of the 1986 Act.

*The ransom strips*

*i*

On 6 January 1992 the ransom strips were transferred by Mr Brabon to
Mr Arthur Brabon, and on the same day Mr Arthur Brabon declared that he
held them on trust for Mrs Brabon. The transfer to Mr Arthur Brabon was
expressed to be in consideration of the grant by Mr Arthur Brabon, as owner

of the roadway, of rights of way over the roadway in favour of the Meads. However, by a deed of gift dated 24 November 1988 Mr Arthur Brabon had already transferred the roadway to Mrs Brabon, with the consequence that as at 6 January 1992 Mrs Brabon already owned the roadway and Mr Arthur Brabon was not in a position to grant rights of way over it. In the light of the earlier transfer of the roadway, Mrs Brabon accepted in evidence that there was no consideration for the 1992 transfer of the ransom strips.

On 17 July 1996 Mr Arthur Brabon 'as nominee' transferred the ransom strips to Mrs Brabon for no consideration, purportedly pursuant to the 1992 declaration of trust. On 29 August 1996 Mrs Brabon was registered at the land registry as sole proprietor of the ransom strips.

The trustee attacks the 1992 transfer under s 423, and he seeks relief in relation to the 1996 transfer under s 425. Further he submits that the 1996 transfer was a transaction at an undervalue entered into by Mr Arthur Brabon, susceptible of challenge under s 339 by Mr Treharne in his capacity as trustee in bankruptcy of Mr Arthur Brabon. In that connection, Mr Atherton referred in the course of his submissions to the possibility of the proceedings being amended so as to enable Mr Treharne to pursue a claim under s 339 in his capacity as trustee in bankruptcy of Mr Arthur Brabon. Had an application for permission to amend the proceedings in that way been made, I would have been reluctant to grant it at such a late stage. In the event, however, no such application was made. Accordingly, I am not concerned with any claims in the bankruptcy of Mr Arthur Brabon.

Thus, the principal issues in relation to the ransom strips are:

(1) whether the 1992 transfer (which was admittedly gratuitous) is impeachable under s 423; and

(2) whether relief is available in relation to the 1996 transfer under s 425.

### The open land

On 1 February 1989 Mr Brabon transferred the open land to Mrs Brabon for an expressed consideration of £30,000. No application for the registration of Mrs Brabon as sole proprietor was made until 12 December 1991. Registration was effected on 16 December 1991.

The trustee contends that no consideration was in fact provided by Mrs Brabon, and that the transfer was executed for the purpose of defrauding Mr Brabon's creditors.

Thus, the principal issues in relation to the open land are:

(1) whether Mrs Brabon provided consideration for the transfer of the open land on 1 February 1989; and

(2) if not, whether the beneficial interest in the open land remained vested in Mr Brabon under a resulting or constructive trust or on the basis of 'sham'; alternatively

(3) whether the transfer of the open land was a transaction defrauding Mr Brabon's creditors, for the purposes of s 423 of the 1986 Act.

### The roadway

According to Mr Brabon, the roadway was originally owned by his maternal grandfather. Mr Brabon's evidence is that following the death of his grandfather, the roadway was vested in his mother the late Mrs Olive Brabon, who, in 1986, conveyed it into the joint names of herself and her

*a*  husband Mr Arthur Brabon. As noted earlier, in connection with the ransom strips, by a deed of gift dated 24 November 1988 Mr Arthur Brabon transferred the roadway to Mrs Brabon as donee.

The conveyancing in relation to the roadway is highly confusing, and it is the trustee's case that Mr Brabon deliberately made it so.

*b*  The trustee contends that at the date of the deed of gift the roadway (which, as is common ground, had a significant value) was beneficially owned by Mr Brabon. On that footing, the trustee's case is that the deed of gift is impeachable under s 423 of the 1986 Act.

Thus, the principal issues in relation to the roadway are:

(1) whether, as at 24 November 1988, Mr Brabon was the beneficial owner of the roadway;

*c*  (2) if so, whether the deed of gift is impeachable under s 423.

THE PROCEDURAL HISTORY

Initially, there were two applications by the trustee, both issued on 3 December 1997 in the Hastings County Court and served on the following day: one against Mr and Mrs Brabon and Benjamin Brabon (the Brabon respondents), seeking relief in relation to what I may call the 'intra-family' transactions, as described earlier in this judgment; the other against the Brabon respondents and Silver, seeking (at that stage) an order setting aside the contract.

*d*

The application against the Brabon respondents (which has not been subsequently amended) seeks relief in respect of Wendy and the ransom strips under ss 339 and 423 of the 1986 Act; in respect of High Hedges, Little Meads and the open land under s 423 of the 1986 Act; and in respect of Barbarossa and Hillcrest under ss 339, 340 (preferences) and 423 of the 1986 Act. However, as already noted, the trustee has not in the event mounted any claim under s 339 in respect of the intra-family transactions: his claims under s 339 relate only to the sales of Barbarossa and Hillcrest to Silver. Nor has he pursued any claim under s 340. His claims in relation to the intra-family transactions are brought under s 423 of the 1986 Act, further or alternatively on the basis that where assets have been transferred voluntarily by Mr Brabon the transferee holds such assets on a resulting or constructive trust for Mr Brabon and the beneficial interest in such assets accordingly forms part of his estate.

*e*

*f*

*g*  Given these changes in the way in which the trustee has put his case at trial, it is readily apparent, albeit with the benefit of hindsight, that the task facing the court in this complicated case would have been made immeasurably easier had there been a direction for pleadings. Equally, I have no doubt that it would have been of considerable assistance to the respondents and their advisers had the trustee been required to plead his case. However, so far as I am aware no direction for pleadings was sought at any stage by any party: at all events, no directions for pleadings was given.

*h*

Returning to the procedural history, on 3 December 1997 the trustee applied ex parte in the Hastings County Court for, and was granted, injunctive relief restraining completion of the contract, such injunctive relief to continue until 11 December 1997. On 4 December 1997 the trustee issued formal applications for a continuation of that injunctive relief, returnable on 11 December 1997.

*i*

The applications came before his Honour Judge Kennedy QC on 11 December 1997. The judge continued the injunctions and gave directions as to service of evidence and as to exchange of experts' reports as to the value of the site. He also gave liberty for the proceedings to be transferred to the High Court (as they subsequently were).

In relation to experts' reports, Judge Kennedy directed that such reports were to be exchanged not later than 7 February 1998, and were to be agreed so far as possible. He further directed that all experts were to meet and consult together to produce a joint statement of issues agreed or disputed, to be filed not later than 21 February 1998. Regrettably, I have to record that in the event the four expert valuers retained by the parties (one by the trustee, two by Silver and one by the Brabon respondents) have been unable to reach agreement on any relevant issue. The experts met twice (although the valuer retained by the Brabon respondents did not attend the second meeting), but neither meeting resulted in any useful progress. It is a sad commentary on the experts' collective failure in this respect that the 'Schedule of Unresolved Matters', lodged shortly before the trial (and almost two years out of time), lists no less than 24 unresolved issues, including such basic issues as 'Marketing of the Site', 'Build Costs', the application of parts of the 'Red Book' (a reference to the BICS practice statements and guidance notes), and 'Topography'. Although not included in the list of unresolved issues, it also became apparent in the course of the hearing that not even the acreage of the site had been agreed.

On 30 January 1998 the injunctions were discharged by his Honour Judge Rich, sitting as a judge of the High Court (to which the proceedings had by then been transferred). The order was made by consent, and, as I noted earlier, on terms that part of the proceeds of sale be deposited in the joint names of the solicitors for the trustee and for the Brabon family. It is also to be noted that the order provided that the trustee should, so far as necessary, consent to and join in the transfer and conveyance to Silver of the land the subject of the contract. As noted earlier, the trustee did not in the event participate in the arrangements for completion of the contract; in particular, he did not transfer Mr Brabon's freehold interest in Barbarossa or Hillcrest, leaving them to be transferred by way of sale by a mortgagee (in the event, Mrs Brabon).

I have already referred to the trustee's subsequent application to amend the application against Silver, and to the amended relief now sought against Silver.

The two applications were subsequently consolidated.

THE WITNESSES

*The witnesses of fact*

I heard the following witnesses of fact: Mr Treharne (the trustee); Mr Richard Silver (of Silver); Mr John Pilcher (senior partner of Wood & Pilcher, estate agents); Mr Benjamin Freeman (a partner in Freeman Forman, estate agents); Mr Nigel Coates (a partner in Russell-Cooke, Potter & Chapman, solicitors); Mr David White (a partner in Thomson Snell & Passmore, solicitors); Mr Ted Sear (a former employee of a company called Wilcon Homes Ltd); Mr Brabon; and Mrs Brabon.

a    As to the evidence of Mr Treharne, Mr Pilcher, Mr Freeman, Mr Coates and Mr White, suffice it to say that I am entirely satisfied that each of these witnesses was doing his best to assist the court to the best of his recollection, and I accept their evidence without qualification.

The same considerations apply to Mr Silver. He was subjected to a searching cross-examination by Mr Atherton, but I am fully satisfied that he too was a witness whose evidence can be relied upon.

b    Mr Ted Sear falls, I regret to say, into an entirely different category. In giving his evidence he was at times evasive; at other times self-contradictory. In the circumstances, save in one important respect to which I shall refer later, I am unable to place any significant reliance on his evidence on any disputed issue.

c    I turn next to Mr Brabon. In assessing the general reliability of Mr Brabon's evidence I naturally bear in mind that he has been convicted on a number of counts of dishonesty relating to the conduct of his solicitor's practice, to which he pleaded guilty. Plainly, therefore, I must approach his evidence with particular caution. At the same time, it does not follow from the fact of his convictions that he may not be telling the truth when giving evidence in this court. In that sense, I must take him as I find him.

d    I am satisfied that in giving evidence Mr Brabon was doing his best to give a true account of the various transactions which are in issue in these proceedings. At times his evidence was confused, but I am satisfied that he was not deliberately setting out to spread confusion. Rather, I gained the strong impression from seeing and hearing him give evidence that, notwithstanding a strong entrepreneurial instinct which (in earlier days) appeared to be yielding some success in commercial terms, he is (to put it charitably) not a man to whom paperwork and matters of administration come easily. On a number of occasions in the course of his evidence he frankly admitted that he had made mistakes in the conveyancing relating to intra-family transactions, and I am satisfied that they were genuine mistakes and not a guise for something more sinister. The conveyancing is on any footing sloppy and careless in a number of respects, but I do not regard that in itself as suggesting dishonesty or an improper purpose, particularly when one takes into account the family context. On the contrary, it might be said that a person who is setting out to achieve a dishonest or improper purpose will take particular care to avoid obvious mistakes in the documentation.

In cross-examination, Mr Atherton put it to Mr Brabon a number of times that he had deliberately misled his bankers (the NatWest Bank) as to the ownership of the various areas which make up the site, by representing that he was the owner of the entire site. Mr Brabon's evidence, however, was that the bank was at all material times fully aware of the position in relation to the ownership of the site, and was not concerned about it. I am satisfied that Mr Brabon did not set out deliberately to deceive the bank, and that he genuinely believed that the bank was aware of the position in relation to ownership of the site.

i    All in all, I am satisfied that in giving his evidence Mr Brabon was doing his best to give a truthful and accurate account of the various transactions about which he was asked questions, although the fact that his evidence

about these transactions was in some respects muddled and confused means that I must be cautious about accepting his evidence in the absence of corroboration from other sources.

That brings me to Mrs Brabon.

I found Mrs Brabon to be an impressive witness. I have no doubt that in giving her evidence she was trying to give a truthful and accurate account of events, to the best of her recollection. She is not a lawyer, still less is she an expert in conveyancing; nor was she privy to much of Mr Brabon's financial dealings, including his dealings with the NatWest Bank. On the other hand she is (if I may say so) plainly an intelligent woman, and she was able to explain in clear terms her own understanding of the various transactions in which she was involved, and of the intentions underlying those transactions. Moreover, she was open in acknowledging the limits of her recollection in relation to certain of the transactions in issue. I am satisfied that Mrs Brabon's evidence may be relied upon.

*The expert witnesses*

I heard valuation evidence from the following expert witnesses:

On behalf of the trustee: Mr Colin Jennings (of Edward Symmons & Partners);

On behalf of Silver: Mr Peter King (a sole practitioner); and

Mr John Pike (of General Accident Property Services); and

On behalf of the Brabon respondents: Mr John Turner (of Turner Morum).

I have already referred to the regrettable inability of the four experts to reach even a measure of agreement on any of the material issues to which their reports are directed. In the circumstances, suffice it to say that I am grateful for such assistance as they were able to give me.

THE CLAIMS AGAINST SILVER

It is convenient to address first the trustee's claims against Silver, since (as will, I hope, have become evident from the earlier section of the judgment dealing with the conveyancing history of the various areas of land the subject of the contract) the claims against Silver are different in quality from the claims against the Brabon respondents. The claims against Silver are limited to Barbarossa and Hillcrest, and they are based only on s 339 of the 1986 Act (transactions at an undervalue). The issues for decision in relation to Silver, therefore, are whether the transfers of Barbarossa and Hillcrest to Silver for a consideration of £29,000 and £75,000 respectively were transactions at an undervalue for the purposes of s 339: in other words, whether they were (a) transactions 'entered into' by Mr Brabon for the purposes of s 339 (the s 339 issue), and (b) transactions at an undervalue, in that the prices paid for the respective properties were significantly less than their then open market value ('the valuation issue').

I turn, therefore, to the facts material to the trustee's claims against Silver.

*The material facts*

In September 1994 Mr Brabon instructed Mr White of Thomson Snell & Passmore to act for the Brabon family on the sale of the site. Thereafter, five firms of estate agents were instructed to market the site, including Wood &

Pilcher and Freeman Forman. Mr Pilcher (of Wood & Pilcher) received his instructions from Thomson Snell & Passmore in November 1994, and

*a*

Mr Freeman (of Freeman Forman) was instructed at about the same time.

So far as Mr Pilcher was concerned, the procedure his firm adopted for marketing the site did not differ from the procedures customarily adopted by the firm when marketing development opportunities. He offered the site, on

*b*

a 'subject to planning' basis, to a wide selection of developers, from large national companies to small local developers operating in the Battle area. At the time, he was also marketing two other sites in the area (one some seven miles away and the other some ten miles away) and he found that these other sites aroused greater interest among developers than the site. By January 1995, however, he had received three offers for the site. Buxton Homes Ltd

*c*

had offered £670,000, subject to detailed planning permission for 11 detached houses; Priestmere Homes Ltd had offered £675,000, also subject to planning; and Berkeley Homes (Sussex) Ltd (Berkeley Homes) had offered £788,000 subject (inter alia) to planning permission for 12 detached houses and to a satisfactory soil test. Mr Pilcher was aware of the sloping

*d*

nature of the site, and of the fact that this would have an impact on the market value of the site should extra groundworks be required.

On 30 January 1995 Mr Pilcher was instructed by Mr Brabon to accept the Berkeley Homes offer. He accordingly wrote to Thomson Snell & Passmore with a view to a draft contract being prepared. However, he was

*e*

subsequently informed that Berkeley Homes had received a report from their soil specialists which suggested that a substantial additional sum would have to be spent on the construction of foundations. He passed this information on to Mr Brabon, who was concerned at this extra liability, as it would clearly have an effect on the sale value of the site. Mr Pilcher had a meeting with Berkeley Homes, who were in principle still interested in purchasing the

*f*

site, and it was arranged that further soil tests would be carried out.

In June 1995, following further soil tests and further discussions with Mr Pilcher, Berkeley Homes put in a revised offer of £500,000 subject to the same conditions and taking into account the ground conditions. However, Mr Brabon instructed Mr Pilcher not to accept this revised offer, and

*g*

Mr Pilcher accordingly proceeded to offer the site to numerous other developers.

In July 1995 Mr Pilcher received an offer from John Walker Homes Ltd in the sum of £465,000. He duly submitted this offer to Mr Brabon, who turned

*h*

it down. At this point Mr Pilcher went back to the companies who had made offers at the same time as Berkeley Homes, to see if they were willing to renew their offers. It appears that none did so. By this time, Mr Pilcher, who was speaking to developers on a daily basis, was finding it increasingly difficult to create interest in the site from prospective purchasers. He found that one of the major concerns of any prospective purchaser was the lack of

*i*

comparable sites within the immediate vicinity of the site. He was also aware that the value of development land in the area tended to decrease the nearer it was to the coast.

In August 1996 Mr Pilcher received an offer from Crofton Place Developments Ltd in the sum of £670,000, subject to planning permission for 11 houses and a number of other conditions. He discussed this offer with Mr and Mrs Brabon, and it was decided to accept it. Thomson Snell & Passmore were duly instructed. However, the offer did not proceed.

By this time, Mr and Mrs Brabon were pressing Mr Pilcher to try to achieve a sale at a price in excess of £650,000. Mr Pilcher's understanding from what they told him was that due to their current financial position it was essential that they achieved a figure in excess of £650,000. However, although Mr Pilcher managed to generate some interest from developers at figures below £650,000 he could not persuade them to go above that figure. Berkeley Homes were still interested, but not at a level which was acceptable to Mr and Mrs Brabon; and this despite Mr Pilcher's attempts to persuade them that Berkeley Homes, having spent a substantial sum investigating the site and preparing draft plans of a possible future development, would be prepared to offer a commercial price for the site.

In April 1997 Mr Pilcher received an offer from Wealden Homes Ltd in the sum of £680,000, subject to conditions. He was instructed to accept it, and once again contacted Thomson Snell & Passmore. However, Wealden Homes subsequently withdrew their offer, saying that they needed more time.

By June 1997 Mr Pilcher had been offering the site for sale for more than two years. He was also aware that other agents were also trying to sell the site. A number of developers whom he contacted told him that they had already received particulars of the site from other agents. He accordingly advised Mr and Mrs Brabon that any offer over £650,000 should be seriously considered, particularly bearing in mind the knowledge they had acquired from their dealings with Berkeley Homes of the potential cost of additional groundworks. In oral evidence, Mr Pilcher described Mr and Mrs Brabon's insistence on achieving as high a price as possible as one of his major problems in trying to find a purchaser for the site.

In June 1997 Millward Designer Homes Ltd offered £725,000 for the site, but the offer was not taken up in view of the higher offer made by Silver, through Freeman Forman.

In Mr Pilcher's opinion, the price eventually paid by Silver (£730,000) was a fair open market value, taking into account the need to carry out additional groundworks, as confirmed by the report obtained by Berkeley Homes.

In the meantime, Mr Freeman (of Freeman Forman) had also been trying to find a purchaser for the site, but with similar lack of success. He was aware of Mr Pilcher's dealings with Berkeley Homes, and of the fact that other estate agents had been retained. In November 1996 Mr Freeman received a conditional offer from Whiteoaks Developments Ltd in the sum of £625,000, and in March 1997 he received a conditional offer from Howard Developments Ltd for £690,000. However, both offers were subsequently withdrawn.

In March 1997 one of the other firms of estate agents retained by Mr Brabon, Atherton Joyes, received an offer for the site from Wilcon Homes (acting by Mr Ted Sear) in the sum of £700,000.

*a*

Mr Brabon decided to accept the Wilcon offer, and on 9 May 1997 Mr White of Thomson Snell & Passmore sent a draft contract to Wilcon's solicitors.

In the meantime, in April 1997 Mr Freeman was approached by Silver (acting by Mr Bob Sear, the brother of Mr Ted Sear of Wilcon). Mr Freeman sent Silver particulars of the site. The 'guide price' for the site was £690,000. Silver made an initial offer at that price.

*b*

Mr White imposed a deadline for Wilcon to exchange contracts which, in the event, Wilcon was unable to meet.  By this stage (June 1997) both Millward Designer Homes and Silver were offering £700,000 for the site. Mr Freeman was able to persuade them to bid against each other, and Millward Designer Homes bid £710,000.  Silver matched that offer.

*c*

Millward Designer Homes then offered £725,000. On learning of Millward Designer Homes' latest bid, however, Silver pulled out, saying that it did not wish to participate in an auction. Mr Freeman accordingly gave Millward Designer Homes the opportunity to exchange contracts within 14 days at a price of £725,000.  About ten minutes later, however, Mr Silver rang Mr Freeman back and said that Silver had reconsidered its position and was prepared to go higher. Mr Silver then offered £730,000 and subsequently £750,000 for the site. However, it was decided by Mr Brabon that Mr Freeman should not deal further with Silver at that stage, but that Millward Designer Homes should be allowed the agreed 14-day period to exchange at £725,000.

*d*

*e*

In the event, Millward Designer Homes failed to exchange within the 14-day period, and Mr Freeman was instructed by Mr Brabon to accept Silver's offer of £730,000. Mr Brabon did not consider the higher offer of £750,000 to be a genuine offer; rather, he regarded it as a tactical attempt to clear away the competition. As Mr Freeman put it in oral evidence:

*f*

'It was not regarded seriously, rightly or wrongly; the client was not happy it was a serious offer. He felt it was a spur of the moment "Well, try that and see what he says" sort of thing, just to rock the boat.'

*g*

On 30 June 1997 Mr Freeman faxed Silver's solicitors, Russell-Cooke, Potter & Chapman, with a sale advice form advising them of the acceptance of Silver's offer. Correspondence followed between Mr Coates of Russell-Cooke and Mr White of Thomson Snell, and in due course the contract was drawn up. There was no discussion between Mr Coates and Mr White as to apportionment of the purchase price of £670,000 for the site less the option land. Mr Coates took the view that apportionment of the price as between the various component parts of the land the subject of the contract was entirely a matter of the vendors.

*h*

On 1 July 1997 Lloyds Bank obtained a valuation of Hillcrest in the sum of £75,000. The valuation was on a 'stand-alone' basis (ie Hillcrest was not valued as part of the site as a whole).

*i*

On 11 July 1997 contracts were exchanged with Silver.

Following exchange of contracts, Mr Silver instructed architects to apply for planning permission for 12 houses on the site. Subsequently, following protracted negotiations with the highway authority concerning the entrance to the access road, Mr Silver instructed the architects to limit the initial application to eight houses.

At the time of exchange of contracts, Mr Silver was aware that some levelling of the site would be required. However, since the boundary of the local development zone lay only a few feet to the north-west of the proposed sites of the houses to be built on the land at the rear of the site, and since any levelling of the site would have to be contained within the development zone, the extent of the levelling which could be undertaken would be strictly limited. However, it subsequently became apparent to Silver, from discussions which took place between Mr Bob Sear and the planning authority, that the planning authority was willing to move the boundary of the development zone further away from the site of the proposed houses at the rear of the site. This had two consequences. In the first place, it allowed Silver to create rear gardens for the houses in question, and thereby make them more attractive to a purchaser. In the second place, and more importantly, it enabled Silver to carry out a much greater degree of levelling. Thus, whereas Berkeley Homes' plan had provided for split-level houses at the rear of the site in order to cater for the steep slope at that point, moving the boundary of the development zone enabled Silver to lower the proposed access road to the plots at the rear of the site (which was to follow the line of the roadway, incorporating the ransom strips) and to construct the houses themselves on a single level, thereby increasing their sale value. As Mr Silver put it in oral evidence:

'we have now started to look at a completely different scheme in essence, simply because … we are talking about a concept which had not been conceived, simply because the parameters which constrained it were more flexible than we had previously assumed.'

Following exchange, Mr Silver engaged Mr Freeman to advise Silver in relation to the marketing of the proposed development, and provided him with provisional plans. On 1 August 1997 Mr Freeman met Mr Bob Sear for a preliminary discussion as to the prices which might be achieved for completed houses. In the course of that meeting they discussed levelling the site so far as possible so as to avoid a split-level design for the houses. They both took the view that a split-level design would not be as attractive to purchasers as a single-level design.

On 5 August 1997, having considered the plans, Mr Freeman wrote to Mr Bob Sear setting out provisional sale prices for 11 houses on the land the subject of the contract (ie the site less the option land), on the basis that the site would be levelled so far as possible and that the houses would not be of a split-level design. The total of Mr Freeman's provisional selling prices for 11 houses amounted to £2,845,000. If one includes the option land (which is directly comparable to four of the plots in respect of each of which Mr Freeman gave a provisional selling price of between £175,000 and £190,000), the total gross sale value of the site, on Mr Freeman's figures, comes to approximately £3.1m.

*a*

On 14 August 1997 the NatWest Bank presented a bankruptcy petition against Mr Brabon.

On 3 October 1997 Mr Brabon was adjudged bankrupt.

On 9 October 1997 the local planning authority recommended that planning permission be granted for 8 houses, although formal planning permission was not at that stage granted.

*b*

On 10 October 1997 the trustee was appointed as Mr Brabon's trustee in bankruptcy.

On that day or shortly thereafter, the trustee's solicitors, Wilde Sapte, were informed by Mr Paul Smith of a firm called PTS Land, acting on behalf of Wilcon, that Wilcon had been competing with Silver to purchase the site and that Wilcon was prepared to pay a substantially higher price for it. In a letter

*c*

dated 3 November 1997 Mr Smith informed the trustee that Wilcon had asked him to submit an improved offer of £900,000. Asked about this offer in evidence, Mr Ted Sear accepted that it had been made, but went on to say that it did not follow that Wilcon would actually have paid that sum. He also stated in evidence that Wilcon would not have paid more than £700,000 for the site at the time. In re-examination, Mr Ted Sear said that the offer of

*d*

£900,000 had been made 'to cut out the opposition, hoping that we could possibly have another go at the scheme'. As he put it later in his re-examination: 'We would have offered anything really to have secured the site.' Having heard and seen Mr Ted Sear giving evidence, I have no doubt at all that he was fully capable of making a falsely inflated offer for that very purpose – as Mr Marks described it, a 'spoiling bid'. At the very least,

*e*

therefore, Wilcon's purported offer of £900,000 must be treated with the greatest scepticism. I go further, however. I am satisfied that the offer was no more than a tactical step by Wilcon, in the nature of a spoiling bid, with a view to preventing Silver from acquiring the site.

On 6 November 1997 Mr White (of Thomson Snell, for the Brabon

*f*

family) wrote to the trustee setting out the current position in relation to the sale of the site. In the course of his letter, he said:

*g*

'We appreciate that Mr Brabon's bankruptcy means that he can no longer be a party to the transfers. We have reported the position to the respective mortgagees and are at present waiting to hear from them with their comments. You will of course no doubt appreciate that in view of Mr Brabon's bankruptcy the mortgagees will themselves wish to complete the relevant transactions.'

*h*

Mr White explained in oral evidence that he made this comment on the footing (which he believed to be correct) that there was negative equity in relation to each of the two properties, Barbarossa and Hillcrest.

On 11 November 1997 Mr White wrote again to the trustee informing him that Nationwide Building Society proposed to join in the transfer of Hillcrest to transfer as mortgagees. The letter concluded:

*i*

'We are presently waiting to hear from the other mortgagees and will keep you advised.'

On 14 November 1997 Mr Freeman valued Barbarossa at £29,000, on the basis that Mr Arthur Brabon had a right to occupy it for the rest of his life.

On 27 November 1997 Wilde Sapte (for the trustee) wrote to Russell-Cooke (for Silver) inquiring whether any apportionment of the purchase price between the various plots had been agreed or discussed with Thomson Snell. Russell-Cooke responded that Wilde Sapte should take that matter up with Thomson Snell.

On 3 December 1997 these proceedings were commenced, and the trustee filed a witness statement contending that the contract price of £670,000 for the site less the option land was an undervalue. I have already related the ensuing procedural history, involving the grant of injunctive relief restraining completion, and the subsequent discharge of the injunction by consent, on terms.

On 4 December 1997 formal planning permission was granted for eight houses on the site.

On 9 December 1997 Silver formally waived the condition in the contract for the obtaining of planning permission for 11 houses on the site less the option land, and the contract thereupon became unconditional.

On 18 December 1997 Mr Ted Sear wrote to Wilde Sapte saying that in July 1997 Wilcon would have been prepared to offer £800,000–£900,000 to secure the site. In the circumstances, I am unable to attach any credence to that statement. It was, I am satisfied, no more than a further tactical move to try to prevent the sale to Silver.

On 3 February 1998 Mr White (of Thomson Snell) wrote to Mr Coates (of Russell-Cooke) saying:

> 'In view of the number of different titles and the interests of the respective mortgagees we believe that the simplest means of achieving completion will be for there to be three Transfers. One from the Nationwide Building Society in respect of Hillcrest; one from Halifax PLC in respect of Barbarossa; and one from [Mr and Mrs] Brabon in respect of the residue of the land.'

Although the trustee was well aware of the fact that the sale of the site was proceeding, he did not take any step to involve himself in the arrangements for completion. In particular, he raised no objection to Barbarossa and Hillcrest being the subject of sales by mortgagees.

In the event, as I related earlier, Mrs Brabon took a transfer of the Nationwide charge on Hillcrest and transferred Hillcrest to Silver as mortgagee under that charge. On completion of the sale of Hillcrest at the price of £75,000, some £15,000 of the proceeds was paid to Mrs Brabon in satisfaction of the first charge and the balance of some £60,000 was paid to Lloyds Bank as second chargee in partial satisfaction of the debt of some £300,000 secured by the second charge. In addition, Lloyds purported to transfer its second charge to Benjamin Brabon for an additional £10,000, although it is hard to see how that transfer could have operated to confer any security rights on Benjamin Brabon, since the property subject to the charge had been sold to Silver free from the charge.

*a*

So far as Barbarossa is concerned, the entirety of the sale price of £29,000 was paid to the Halifax Building Society in partial satisfaction of the indebtedness secured by its first charge (which stood at about £33,000).

Having set out the material facts, I can now turn to the first of the two issues identified earlier, viz the s 339 issue.

*The section 339 issue*

*b*

As noted earlier, s 339(1) provides that:

'… where an individual is adjudged bankrupt and he has at a relevant time … *entered into a transaction* with any person at an undervalue, the trustee of the bankrupt's estate may apply to the court for an order under [the] section.' (My emphasis.)

*c*

The short question is whether the transfers of Barbarossa and Hillcrest by Mrs Brabon as mortgagee (in the case of Hillcrest, as transferee of Nationwide's first charge) are, or fall to be treated as, transactions 'entered into' by Mr Brabon, for the purposes of the section.

*d*

In my judgment, the answer to that question is no.

Had the contract dated 11 July 1997 been completed prior to Mr Brabon's bankruptcy, with Mr Brabon executing transfers of Barbarossa and Hillcrest, then of course the position would have been otherwise. But, as I have related, that is not what happened.

*e*

In my judgment the relevant 'transaction' in relation to Barbarossa and Hillcrest, for the purposes of s 339, is not the contract but the actual disposals of those properties in favour of Silver; and as matters turned out those disposals were made not by the trustee but by Mrs Brabon as mortgagee, in exercise of her power of sale. In the case of Hillcrest, there can be no question as to the existence of the necessary power of sale under the

*f*

Nationwide mortgage: and in relation to Barbarossa, I have earlier found the charge in favour of Mrs Brabon to have been a valid and effective charge.

Nor, in my judgment, is it possible to dismiss the fact that Barbarossa and Hillcrest were transferred to Silver by way of sale by Mrs Brabon as mortgagee as mere 'conveyancing mechanics'. The matter can be tested in this way. Let it be assumed that Nationwide Building Society had elected to

*g*

sell to Silver as mortgagee, instead of transferring its charge to Mrs Brabon and thereby enabling her to do so. In such circumstances, it would (as it seems to me) have been impossible to equate that transaction with a transfer by Mr Brabon; and the same considerations must apply to Mrs Brabon as transferee of the Nationwide charge.

*h*

Mr Atherton sought to rely on the fact that the contract would have been specifically enforceable against Mr Brabon, and hence against the trustee. I accept that there is no reason to suppose that the contract was not specifically enforceable against Mr Brabon, and subsequently against the trustee, subject always to the trustee's right to resist completion of the sales of Barbarossa and Hillcrest on the ground that such sales were at an

*i*

undervalue. But in the event Silver was content to take transfers of those properties by way of sale from a mortgagee, and in my judgment those transfers effectively superseded the contract.

In the end, however, one comes back to the plain words of the subsection. In my judgment the words 'entered into' by the bankrupt do not extend to a transfer by way of sale not by the bankrupt but by the bankrupt's mortgagee. *a*

On that short ground, the trustee's claims against Silver must in my judgment fail.

In the light of that conclusion, it is strictly unnecessary to address the valuation issue. However, lest I be wrong on the s 339 issue, and so that relevant findings and conclusions may not be wanting, I now turn to the valuation issue. I do so on the footing that the sales of Barbarossa and Hillcrest to Silver were transactions entered into by Mr Brabon, within the meaning of s 339. *b*

*The valuation issue*

The trustee's case on the valuation issue is put in alternative ways. In the first place, the trustee contends that the sale price of £730,000 for the entire site (including the option land) was a significant undervalue (his expert witness, Mr Jennings, puts the value at £900,000); and that that undervalue must affect those parts of the overall sale price which were, in effect, apportioned to Barbarossa and Hillcrest, viz. £29,000 and £75,000 respectively. In the alternative, he submits that those apportioned sale prices were in themselves significant undervalues. *c*

*d*

The respondents join issue on the allegation of undervalue, but they also take what is in effect a preliminary point in the context of the valuation issue. Assuming for this purpose that (contrary to the conclusion reached above) the sales of Barbarossa and Hillcrest were transactions 'entered into' by Mr Brabon for the purposes of s 339, what has to be valued (they submit) is Mr Brabon's equity of redemption, since on any footing it is only the value of the equity of redemption which can be said to have been 'consideration provided by' him; and they go on to submit that even on Mr Jennings' valuations of Barbarossa and Hillcrest there was negative equity in each case (in relation to Barbarossa this submission assumes a finding that Mrs Brabon's second charge is a valid charge, securing an indebtedness of £70,000 with interest). *e*

*f*

I accordingly address this preliminary point; and I do so first in relation to Barbarossa.

So far as Mrs Brabon's charge over Barbarossa is concerned, her evidence is that in January 1994 she lent Mr Brabon a sum of £71,250, being the proceeds of a loan which she had obtained from Nationwide Building Society (and which was in turn secured on an area of land which has not been identified in evidence and which is described in the documentation only as 'Plot past The Meads'), and in return took a charge over Barbarossa to secure the repayment of £70,000 of that sum. The documentation establishes that she obtained a loan of £71,250 from Nationwide Building Society in January 1994, and that the proceeds of the loan were paid into Mr Brabon's solicitor's practice account. Mr Brabon explained in evidence that he needed a total of some £160,000 in order to, as he put it, 'try and correct the errors' (a reference to the deficiency in the practice's client account). Under cross-examination Mrs Brabon was adamant that, although she had not seen the promissory note at the time, she understood that in return for the loan she was to be granted a charge over Barbarossa and that that was the basis on which she made the loan. Asked in cross-examination whether she expected *i*

*g*

*h*

*a* Mr Brabon to repay the loan, she replied that she certainly would have hoped that he would have been able to. In fact, as I shall later relate, by January 1994 Mr Brabon was in very serious financial difficulties due to the downturn in the property market, quite apart from the need to make good the deficiency on his practice's client account, and there was a possibility that he might become bankrupt. In such circumstances it would have been highly imprudent of Mrs Brabon to provide him with funds otherwise than by way of loan, properly secured. In cross-examination Mr Atherton asked her why

*b* she did not simply give her husband the money, if he was in trouble. She replied:

*c* 'Certainly not. Why should I do that? I cannot see any reason why I should just give money or borrow money if I am not getting something in return, and I understood at the time that I would be getting a charge over Barbarossa, and fully expected to have the money returned to me.'

Mr Brabon gave evidence to similar effect.

*d* I accept Mr and Mrs Brabon's evidence on this issue, and I find that the £71,250 was paid to Mr Brabon by way of loan from Mrs Brabon and not as a gift; that the loan was made on the understanding that Mrs Brabon would be granted a charge over Barbarossa; and accordingly that the promissory note dated 31 January 1994 created a valid second charge over Barbarossa in favour of Mrs Brabon to secure the repayment of £70,000 with

*e* interest.

The trustee contends that the promissory note was never intended to have legal effect, but was to be kept for a 'rainy day', in case Mr Brabon should have need to produce it. I reject that contention. As set out below in the section of the judgment dealing with Mr Brabon's financial circumstances, as

*f* from February 1993 (when NatWest Bank revalued the property portfolio at substantially lower values than previously) it was appreciated by Mr Brabon (and no doubt by Mrs Brabon too) that Mr Brabon could not thereafter be supported with what I may call 'family funds', but that the various members of the family needed so far as possible to preserve their own assets. This is consistent with the funds provided to Mr Brabon by Mrs Brabon being

*g* provided by way of loan rather than by way of gift.

The trustee further contends that the ledger entry purporting to record receipt of the funds into Mr Brabon's practice account can be explained on the basis that Mr Brabon was acting as Mrs Brabon's solicitor in relation to the transaction in question. Further, he suggests that the fact that the charge

*h* is not for the full sum suggests that the promissory note may not be genuine. He also seeks to pray in aid the fact that one of the charges of dishonesty to which Mr Brabon pleaded guilty concerned the creation, between 8 and 12 January 1994, of a false ledger card purporting to evidence a transaction involving Mrs Brabon (not being a transaction relating to Barbarossa). However, as I have said, I accept the evidence of Mrs Brabon on this issue.

*i* Nor does the delay in registration, on which the trustee also relies, take the matter any further, in my judgment. I also reject Mr Atherton's assertion that the whole transaction is 'riddled with unreality', on the footing that one

would have expected a gift rather than a loan. As I have already concluded, as from February 1993 (if not earlier) Mrs Brabon was not disposed to make gifts to Mr Brabon, given his then financial position.

On the footing, therefore, that the promissory note created a valid charge over Barbarossa to secure repayment of £70,000 to Mrs Brabon, it follows that even if one takes Mr Jennings' highest valuation of Barbarossa (£97,500, on a vacant possession basis) there was negative equity in the property, given that some £33,000 was outstanding under the first charge in favour of the Halifax. Hence even if Barbarossa had been sold for £97,500, no part of the proceeds would have been receivable by Mr Brabon, or by the trustee.

The same applies to Hillcrest, which Mr Jennings values at £288,000. As noted earlier, some £300,000 was outstanding under the second charge in favour of Lloyds Bank, in addition to the £15,000 or thereabouts owing under the first charge granted, originally, to Nationwide Building Society. The fact that Lloyds Bank was content to release (or transfer) its charge for only £75,000 (£60,000 from the proceeds of sale and an additional £10,000 from Benjamin Brabon) does not mean that there was any value in the equity of redemption. No doubt it was a commercial decision on the part of Lloyds Bank to write off the balance of the indebtedness on the footing that it was irrecoverable. As in the case of Barbarossa, therefore, even if Hillcrest had been sold for £288,000 no part of the proceeds would have been receivable by Mr Brabon, or by the trustee.

The question therefore arises whether in these circumstances, even assuming in the trustee's favour that Mr Jennings' valuations are correct, the trustee is entitled to relief under s 339.

In *Re MC Bacon Ltd* [1990] BCLC 324 a liquidator applied to set aside a debenture granted by the company on the ground that it was a voidable preference, alternatively that it was a transaction at an undervalue for the purposes of s 238 of the 1986 Act. Section 238(4) defines a transaction at an undervalue in similar terms to the definition in s 339(3)(c). Millett J held that the liquidator's claim that the grant of the debenture was a transaction at an undervalue was misconceived, since by granting security rights over its assets the company had not depleted or diminished the value of its assets, and had not given away anything capable of valuation in monetary terms. Millett J said (at 340–341):

'The mere creation of a security over a company's assets does not deplete them and does not come within [the definition of a transaction at an undervalue]. By charging its assets the company appropriates them to meet the liabilities due to the secured creditor and adversely affects the rights of other creditors in the event of insolvency. But it does not deplete its assets or diminish their value. It retains the right to redeem and the right to sell or remortgage the charged assets. All it loses is the ability to apply the proceeds otherwise than in satisfaction of the secured debt. That is not something capable of valuation in monetary terms and is not customarily disposed of for value. In the present case the company did not suffer that loss by reason of the grant of the debenture. Once the bank had demanded a debenture the company could not have sold or charged its assets without applying the proceeds in reduction of the

*a*

> overdraft … By granting the debenture the company parted with nothing of value, and the value of the consideration which it received in return was incapable of being measured in money or money's worth.'

*b*

*c*

I respectfully agree with, and adopt, that reasoning. But the converse also applies. Just as the grant of security rights over an asset does not diminish the value of that asset in the hands of the grantor of those rights, with the consequence that in granting such rights the grantor has not parted with anything of value, so (in my judgment) on a sale of the asset the value of the consideration provided by the seller is the value of the asset free from the security rights. I therefore reject the respondents' submission that on a sale of mortgaged property by the mortgagor the value of the consideration provided by the mortgagor for the purposes of s 339(3)(c) is the value of the land subject to the mortgage, ie the value of the mortgagor's equity of redemption. The value of the consideration provided by the mortgagor in such circumstances is the value of the land free from the mortgage. If the value of the land free from the mortgage is significantly less than the price paid for it, then the transaction is a transaction at an undervalue for the purposes of s 339. However, the distinction between the value of the property free from the mortgage and the value of the equity of redemption will be of no practical significance where, on a sale at full value, some part of the proceeds would be receivable by the mortgagor (ie where there is an equity in the property), since on either basis any undervalue will impact in the first instance on the mortgagor.

*d*

*e*

The question which arises in the instant case, however, is what is the position where there is negative equity, ie where the equity of redemption in the mortgaged property is worth nil. In such circumstances the value of the consideration provided by the mortgagor on a sale is, for reasons given above, the value of the land free from the mortgage, with the result that there has been a transaction at an undervalue for the purposes of s 339. But at the same time even if the property had been sold for its full value no part of the proceeds of sale would have been receivable by the mortgagor, and in that sense the mortgagor has parted with nothing of value.

*f*

*g*

In my judgment the answer to this apparent conundrum is that once it is established (as it has been established in the instant case in relation to Barbarossa and Hillcrest) that even if the mortgaged property had been sold at the price contended for by the trustee in bankruptcy the entirety of the proceeds would have been applicable towards satisfaction of the secured debt, and no part of the proceeds would have been receivable by the bankrupt, the issue of undervalue becomes academic so far as the trustee in bankruptcy is concerned. That being so, I am for my part unable to conceive of any basis upon which the court would, in such circumstances grant the trustee in bankruptcy relief under s 339.

*h*

In the result, therefore, although I do not accept the respondents' analysis I concur in their conclusion that the fact that (as I have found) there was negative equity in the case of both Barbarossa and Hillcrest is fatal to the trustee's claims under s 339.

*i*

For completeness, however, I go on to consider the further questions which arise in the context of the valuation issue.

I turn first to the question whether the sale price of £730,000 for the entire site (including the option land) was a significant undervalue.

It should be made clear at this stage, if it is not already clear, that there is no suggestion that Silver was in any way connected with the Brabon family, or that it was anything other than a bona fide purchaser of the site without notice of any irregularities or improprieties. So far as Silver is concerned, it simply purchased the site on the open market, and paid open market value for it.

Plainly, where a property has been sold on the open market, after having been properly advertised and marketed, the sale price will in general represent the open market value of the land at the date of sale. This accords with the definition of market value in the Red Book (see Practice Statement 4) as:

> '[T]he estimated amount for which an asset should exchange on the date of valuation between willing buyer and a willing seller in an arm's length transaction after proper marketing wherein the parties had each acted knowledgeably, prudently and without compulsion.'

Where there has been an *actual* exchange of that nature, there will be no scope for estimating the open market value. The actual price paid will be the open market value.

In the instant case, the experts were faced with the somewhat unusual question whether the price paid on a sale of the site apparently on the open market, was in reality significantly less than the open market value of the site. The expert witnesses recognised that if in fact the site had been properly marketed, then a process of estimation of its 'true' market value would be an academic exercise. However, in the opinion of Mr Jennings (on behalf of the trustee) the site had not been properly marketed prior to the sale to Silver – an opinion with which Silver and its witnesses, principally Mr Pilcher and Mr Freeman, emphatically disagree. Mr Jennings having expressed that opinion, the respondents' three experts (Mr King and Mr Pike on behalf of Silver and Mr Turner on behalf of the Brabon respondents) were obliged to approach the valuation issue by testing the price actually paid against what in their opinion was the market value of the site, ignoring the actual sale to Silver. On that approach, Messrs King, Pike and Turner are all of opinion that the price of £730,000 was not an undervalue. It is accordingly necessary, before turning to the question of valuation, to address the question whether the site was properly marketed prior to the sale to Silver.

In the light of the facts set out earlier in this judgment, there can in my judgment be no substance in Mr Jennings' contention that the site was not properly marketed. Five firms of estate agents were marketing the property, over more than two years. However, Mr Jennings maintained in evidence that a multiple agency tends to lead to a sale at a price which is less than which could be achieved by a sole agent. The respondents' experts, together with Mr Pilcher and Mr Freeman, strongly disagreed with that proposition. I take the same view. With all respect to Mr Jennings, his proposition seems to me to defy reality. If it were true, no sensible vendor would retain more

than one agent; yet multiple agency is a commonplace. Indeed, it seems to me that, if anything, competition between agents is more likely to produce a better result for the vendor.

It was suggested to Mr Brabon in cross-examination that by July 1997 his financial situation was so parlous that he was desperate to achieve a quick sale, and to that end was prepared to accept less than the full value of the site. Mr Brabon denied that; and I accept his evidence in that respect. The notion that Mr Brabon was prepared to accept less than the full value of the site simply does not fit the facts, as I have set them out earlier in this judgment. Further, I have already concluded that the so-called Wilcon offer of £900,000, made in November 1997, was not a real offer.

In my judgment, therefore, the sale to Silver was a sale on the open market, conducted in a manner which had the effect of determining the *actual* market value of the site at the relevant time.

In the light of that conclusion, it is unnecessary to consider the expert evidence as to what was the open market value of the site, on the footing that the sale to Silver did not itself determine what was its market value. However, for completeness, I proceed to do so briefly.

Mr Jennings values the site as a whole, as at July 1997, at between £900,000 and £1,080,000; Mr Pike at £690,000; Mr King at £725,000– £745,000; and Mr Turner at £730,000.

Th experts are agreed that there are basically two methods of valuing development land. One is the direct comparison method, which (as its name implies) involves taking the prices paid for comparable sites as the basis for arriving at a market value of the subject site. The other is the residual method, which involves estimating the gross development value of the subject site, factoring in estimated construction costs (including an allowance for any abnormal costs due to the physical and/or topographical characteristics of the site) together with an allowance for development profit, and thereby arriving at a sum which a developer might reasonably be expected to be able to afford to pay for the site if he is to make a reasonable profit out of it.

Mr Jennings' preference is for the residual method; he regards the direct comparison method as 'relatively crude'. Messrs Pike, King and Turner take the opposite view; they regard the residual method as crude, and only to be adopted as a last resort if no comparables are available.

I prefer the views of Messrs Pike, King and Turner to those of Mr Jennings on this question. As I see it, if direct comparables are available, they will in general provide the most reliable basis for valuation. Applying the residual method to sites which in physical terms are not directly comparable may, as Mr Turner pointed out, be a useful method of achieving something approaching a true comparison with the subject site. But beyond that it seems to me that the residual method involves so many assumptions, and so many imponderables, that its results need to be treated with considerable caution. It also suffers, as I see it, from the weakness that the open market development value of a site is not necessarily equal to the maximum sum which a particular developer may be willing to pay for it. The successful bidder at an auction might not have reached his limit, but it does not follow that the price at which the land was knocked down to him was not the open market value of the land. So, apart from its other drawbacks, the residual

method is only of use, as it seems to me, as a rough guide to what developers *in general* could reasonably afford to pay for the land. I make this point because Mr Jennings' reports are based on calculations of what *Silver* could afford to pay for the site; calculations which are in turn based on post-contract material with which Silver has provided him. Mr Jennings seeks to work back from a gross development value of £3.1m, a figure which derives from Mr Freeman's advice in his letter dated 5 August 1997. Mr Jennings suggests that since, based on a gross development value of £3.1m, Silver stands to make a handsome profit from the development, ergo he must have paid less than market value for it. Mr Jennings even went so far, in oral evidence, as to state as a general proposition that where a developer makes what he terms a 'superprofit' from the development of a particular site, he must have paid less than market value for that site. With due respect to Mr Jennings, that reasoning seems to me to be plainly fallacious.

As already noted, in adopting the residual method Mr Jennings starts with the figure of £3.1m, that being the figure reached by Mr Freeman in August 1997 (extrapolating his figure for 11 houses to include the option land). But in so doing Mr Jennings is, as I understand him, relying on hindsight and ignoring the fact that (as I related earlier) by the time Mr Freeman gave his advice important developments had taken place since contract, in that by August 1997 it had become clear that the development could take the form of single-level, instead of split-level, houses and that its gross development value was correspondingly higher than originally thought. At the date of the contract, by contrast, all those who expressed interest in the site were proceeding on the basis of the plans prepared by Berkeley Homes, who were proposing to build split-level houses. I prefer the views of Mr King and Mr Turner that, without the benefit of hindsight, and based (therefore) on the Berkeley Homes plan, the gross development value of the site as at 11 July 1997 was substantially less than the £3.1m figure subsequently advised by Mr Freeman. Mr King values it at £2.95m and Mr Turner at £2.825m. I find that it fell within that range.

Further, Mr Jennings makes no allowance for the fact that (as Mr Pilcher and Mr Freeman testified, and as Messrs King, Pike and Turner also stressed) the site was a 'difficult' site, in that the Battle area had not proved popular in the market for new homes in East Sussex, and few developers had taken the risk of entering that market. Mr Jennings relied as a comparable on another development being carried out by Silver in the Battle area, known as the Highgrove development. That development consisted of six houses, two of which had been sold by 11 July 1997 and a further one was under offer. However, as Mr Silver said in evidence, the Highgrove scheme was a 'ground-breaking scheme', involving a degree of speculation. By 11 July 1997 it seemed to be going well, and no doubt that was one of the considerations which persuaded Mr Silver to offer £730,000 for the site; but at the same time there was plainly a speculative element – a significant commercial risk – in developing the site, and that element needs to be taken into account in assessing the market value of the site. In my judgment, Mr Jennings takes insufficient account of that factor in reaching his valuation of £900,000.

*a*    I further agree with Messrs King, Pike and Turner that other sites relied on as comparables by Mr Jennings – one in West Sussex, one in Oxfordshire and two in London – are not sufficiently comparable with the site to form a useful basis for valuing the site. It is clear from the evidence of Mr Pilcher and Mr Freeman, to which I have already referred, that the site was a particularly difficult one to market, given the apparent lack of attraction of the Battle area for new home buyers.

*b*    Mr Jennings also takes insufficient account, in my judgment, of the 'abnormal' development costs which are to be associated with a steeply sloping site. I agree with Messrs King, Pike and Turner that 'abnormals' are a significant factor in valuing the site.

*c*    A further criticism of Mr Jennings' reports, which in my judgment carries some weight, is that his figure of £900,000 as the open market value of the site as a whole is the same as the value which he reached when preparing a preliminary report for NatWest Bank in June 1997, notwithstanding that in that preliminary report he mistakenly included additional areas of land as part of the site, and he also assumed planning permission for 15 rather than 12 houses. Although he maintained in evidence that in preparing his subsequent reports, in which those errors were corrected, he was not influenced by his original (erroneous) valuation, I have no doubt that he was to some extent so influenced – albeit unwittingly – and that his original valuation has to some extent coloured his subsequent reasoning and conclusions.

*d*

*e*    All in all, therefore, I prefer the views of Messrs King, Pike and Turner as to the market value of the site as a whole as at 11 July 1997, and I agree with and accept their conclusion that the price of £730,000 paid by Silver for the site as a whole was not an undervalue.

    I now turn to the question of the market values of Barbarossa and Hillcrest, valued separately; and to the question whether the prices paid for those properties (£29,000 and £75,000 respectively) represented significant undervalues.

*f*    Mr Jennings values Barbarossa on a vacant possession basis at £97,500, and Hillcrest at £288,000. Mr King values Barbarossa on a vacant possession basis at £79,433 if one treats it as part of the site (£75,000 on a stand-alone basis), and Hillcrest at £228,523 if one treats it as part of the site (£100,000 on a stand-alone basis). Mr Turner values Barbarossa on a vacant possession basis at £89,177 and Hillcrest at £140,070, treating them as parts of the site.

*g*    If and in so far as it is appropriate to value Barbarossa subject to a right for Mr Arthur Brabon to occupy it for the rest of his life, Mr Jennings values it at £56,750; Mr King at £29,000 to £30,000; and Mr Turner at £40,000 to £45,000.

*h*    Mr Jennings' apportionment is based upon his figure of £900,000 as representing the market value of the site as a whole. Further, there is a difference of approach so far as the apportionment of the value of the entire site is concerned between Mr Jennings on the one hand and Mr King and Mr Turner on the other. Mr Jennings favours apportioning on a plot by plot basis, attributing a land value of 30% of the anticipated sales value for each plot (the 30% representing approximately the proportion which £900,000 bears to £3.1m). This process would, as I understand it, accord no apportioned value at all to the roadway, notwithstanding that the roadway,

*i*

at least at the point where it meets North Trade Road, is the key to any development of those plots which do not enjoy direct access onto North Trade Road. By contrast, Mr King and Mr Turner favour what Mr Turner termed a 'layered ransom approach' which involves taking account of the relative bargaining strengths of each of the component parts of the site inter se. On the layered ransom approach, a significant value is accorded to the roadway, and various other adjustments are required as between the various component parts of the site.

Quite apart from the fact that, given my earlier conclusions, Mr Jennings' base figure of £900,000 overstates the market value of the site in July 1997 by £160,000, I further take the view that the layered ransom approach to apportionment is the correct approach in the circumstances of this case. In my judgment, the fact that as at July 1997 all the component parts of the site happened to be owned by members of the Brabon family is immaterial to the question of apportionment, and I do not accept Mr Jennings' contrary view.

On that footing, I turn to the valuations of Mr King and Mr Turner.

In the first place, it is in my judgment plainly appropriate to value each component part of the site as part of the site, and not on a stand-alone basis. I can therefore ignore Mr King's valuations on a stand-alone basis.

As to the valuations of Mr King and Mr Turner on the footing that each component part is to be valued as part of the whole site, I have the following observations. Mr King was retained by Silver, and in consequence he has not carried out any separate valuations of any other parts of the site apart from Barbarossa and Hillcrest (those being the only two parts of the site which form the subject of the trustee's claims against Silver). Mr Turner, on the other hand, retained by the Brabon family, has conducted an apportionment in relation to every part of the site. Mr Turner's apportionment accords a value of 12.2% of the overall value of the site (£730,000) to Barbarossa and 19.2% to Hillcrest. The most valuable part of the site, on Mr Turner's apportionment, is High Hedges at £168,131 (23%). This is due to the pre-eminent position of High Hedges in relation to notional ransom payments – a position which derives mainly, as I understand the position, from the retention of the small triangle of land at the corner of the roadway and North Trade Road, to which I referred earlier. Mr Turner's apportionment is internally consistent and appears to me to be based on a correct approach. By contrast, Mr King's valuation of Hillcrest at £228,523 (31.3% of the overall value) appears difficult to justify, once it is accepted that (as Mr Turner has concluded, and in my view rightly concluded) the application of the layered ransom approach will result in High Hedges having a higher apportioned value than Hillcrest. If High Hedges is to be accorded a value in excess of Mr King's 31.3% for Hillcrest, it is difficult to see how (on Mr King's figures) the full apportionment process could work, since only some 33% at most of the overall value would remain to be apportioned amongst the other parts of the site, whereas on Mr Turner's figures the apportioned values of the remainder of the site total some 57.8% of the overall value.

Further, whereas Mr Turner has proceeded on the assumption that access to Hillcrest will be had over Barbarossa, and that an adjustment to their respective values is required in that respect, Mr King has not done so. An examination of the available plans (and in particular from app 6 to

Mr King's second report, entitled 'Overlay of Berkeley draft Layout')
certainly suggests that on the basis of the Berkeley Homes plan Mr Turner's
*a*   assumption that the only access to developed plots on Hillcrest would be via
Barbarossa is a correct assumption. On that footing, I consider that
Mr Turner was right to include an element of ransom in the valuation of
Barbarossa, at the expense of Hillcrest.

For those reasons, I prefer Mr Turner's valuations of Barbarossa (on a
vacant possession basis) and of Hillcrest to those of Mr King. Further, I
*b*   accept Mr Turner's apportionment in toto, in relation to the rest of the site,
in preference to the valuations of Mr Jennings. This will become relevant
when I come to consider the 'intra-family transactions'.

In so far as it is relevant to value Barbarossa on the basis that at the
relevant time Mr Arthur Brabon had a right to occupy it for the rest of his
*c*   life, Mr Jennings values Barbarossa at £56,650; Mr King at £29,000-
£30,000; and Mr Turner at £40,000-£45,000. Once again, I reject
Mr Jennings valuation, for the reasons already given. Mr King arrives at his
figure of £29,000-£30,000 by reference to a 20-year period at 7.5%.
Mr Turner arrives at his valuation of £40,000–£50,000 on the basis of a
development value of £89,000, which is in turn based on the 'layered ransom
*d*   approach'. As between Mr King and Mr Turner, Mr Turner's approach
seems to me to be more appropriate in the circumstances of this case, and I
accordingly accept his valuation of £40,000–£50,000. If it were necessary
to arrive at a precise figure, I would conclude that the value of Barbarossa in
July 1997 subject to a right for Mr Brabon to occupy it for the rest of his life
*e*   was £40,000.

As I see it, however, for the purposes of the trustee's claim against Silver,
Barbarossa falls to be valued on a vacant possession basis, and as part of the
site as a whole. The sale was not subject to any right of occupation (in any
event, so far as the evidence goes any such right of occupation would not
have been binding on the Halifax as first mortgagee). As to the price paid,
*f*   the fact that Mr Coates did not concern himself with apportionment of the
overall consideration of £730,000 does not alter the fact that the purchase
prices paid for Barbarossa and Hillcrest were £29,000 and £75,000
respectively.

Accordingly, had I concluded that relief was otherwise available under
*g*   s 339 against Silver, I would have granted relief in relation to the sale of
Barbarossa on the basis that it was a transaction at an undervalue for the
purposes of the section, the undervalue being the difference between £29,000
and £89,177, ie £60,177; and I would have granted relief in relation to
Hillcrest on the basis that it was a transaction at an undervalue for the
purposes of the section, the undervalue being the difference between £75,000
*h*   and £140,070, ie £65,070. For reasons given earlier, however, I have
concluded that the trustee's claims under s 339 must fail in any event,
regardless of the valuation issue.

In the result, therefore, for the reasons given above I conclude that the
trustee's claims against Silver fail.

*i*   In summary, those reasons are: (1) that the sales of Barbarossa and
Hillcrest were, in form and in substance, sales by Mrs Brabon as mortgagee;
and as such were not transactions 'entered into' by Mr Brabon, for the
purposes of s 339; and (2) that even if they were transactions 'entered into'

by Mr Brabon for the purposes of s 339, no relief is available to the trustee under that section since, on the facts, had the sales been at full value no part of the proceeds of sale would have been available for unsecured creditors.

*a*

THE CLAIMS AGAINST THE BRABON RESPONDENTS

*Section 423 of the 1986 Act*

In order to succeed in obtaining relief under s 423 of the 1986 Act in the instant case the trustee has to establish (1) a 'transaction at an undervalue' (defined in terms which are identical to those of the definition of the same expression in s 339), which is (2) entered into by Mr Brabon (3) for the purpose '(a) of putting assets beyond the reach of a person who is making, or may at some time make, a claim against him, or (b) of otherwise prejudicing the interests of such a person in relation to the claim which he is making or may make' (see s 423(3)). The trustee's claims in the instant case fall under (a), and I will hereafter refer to that purpose as 'the relevant purpose'.

*b*

*c*

Mr Atherton submits that it is enough for the trustee to establish that the relevant purpose was a 'substantial' purpose, and that he does not have to go further and establish that it was a 'dominant' purpose.

*d*

In *Chohan v Saggar* [1992] BCC 306 at 323 Mr Evans-Lombe QC, sitting as a deputy High Court judge, construed s 423(3) as requiring a claimant to demonstrate 'a dominant purpose to remove assets from the reach of actual or potential claimants or creditors, but as not excluding the possibility that there might also be other purposes behind the relevant transfer'. Similarly, in *Moon v Franklin* [1996] BPIR 196 (the judgment was delivered in June 1990) Mervyn Davies J considered that the correct test was 'predominant purpose'. In *Royscot Spa Leasing Ltd v Lovett* [1995] BCC 502, for the purposes of an interlocutory application the Court of Appeal was content (without deciding the point) to adopt a test of 'substantial' purpose, which it regarded as a lesser test, albeit in circumstances where it found that the applicant had failed that test (so that it would, a fortiori, have failed the stricter test of 'dominant' purpose).

*e*

*f*

On the other hand, it is not necessary for the trustee to establish a dishonest intent on the part of the debtor in carrying out the transaction in question. In *Arbuthnot Leasing v Havelet Leasing (No 2)* [1990] BCC 637 at 644, Scott J accepted that the debtor company had not acted with any dishonest intent in putting assets out of the reach of a prospective judgment creditor, yet he held that the relevant purpose was established. In that case the debtor company had received legal advice that the transaction in question could properly be carried out, and in carrying out the transaction it was motivated by a desire to protect the position of creditors generally. Nevertheless the relevant purpose was present. Scott J accepted that execution of the judgment which the creditor was likely to obtain would have done great damage to the debtor company's business, but he pointed out that by the transaction in question assets were deliberately put out of the reach of that creditor. See also *Re Eichholz* [1959] 1 All ER 166, [1959] Ch 708.

*g*

*h*

In addressing Mr Atherton's submission, I start with the words of s 423(3), set in the context of the mischief at which the section is directed. The subsection itself does not apply any epithet to the word 'purpose'. Still less does it indicate on its face that the relevant purpose must be the

*i*

transferor's only purpose. If such a limitation were to be implied, s 423 would, as Mr Evans-Lombe QC observed in *Chohan v Saggar* ([1992] BCC 306 at 321), be robbed of all practical effect, since the debtor could escape its application merely by establishing the existence of some other purpose in addition to the relevant purpose. So the fact that there may be an additional purpose or purposes cannot in itself serve to defeat a claim under the section. Once it is accepted, and given that, notwithstanding that s 423 is entitled 'Transactions defrauding creditors', it is not necessary for the trustee to establish dishonesty, I confess that I find some difficulty in distinguishing between a 'dominant' purpose and a 'substantial' purpose. On the basis that there is a difference, however, and that 'substantial purpose' is indeed a lesser test than 'dominant purpose', I am content to proceed in the instant case on the footing that 'substantial purpose' is the correct test. I emphasise, however, that I do so on the same basis as the Court of Appeal in *Royscot Spa Leasing Ltd v Lovett* [1995] BCC 502: that is to say, on the basis that if the trustee cannot meet the lesser test, a fortiori he could not meet the stricter one.

### Mr Brabon's financial circumstances

The trustee invites the court to infer from Mr Brabon's financial circumstances at the time of the various transactions under challenge that in each case a substantial purpose of the transaction was to put assets out of the reach of creditors. I therefore turn to the evidence as to Mr Brabon's financial circumstances.

The relevant evidence consists principally of the contemporary documentation, coupled with the oral evidence of Mr Brabon. As indicated earlier, Mrs Brabon played little part in Mr Brabon's dealings with NatWest Bank.

Although, as I commented earlier, Mr Brabon's evidence in relation to the conveyancing aspects of the various transactions under challenge in these proceedings was in many respects muddled and confused, his evidence about his dealings with NatWest Bank did not suffer from those defects. His recollection was as clear as one could reasonably expect, given the lapse of time, and in particular he was (as I noted earlier) adamant that he did not mislead the bank about the ownership of the various areas which together make up the site. I accept Mr Brabon's evidence as to his dealings with the NatWest Bank, and I find that he did not intend to mislead the bank on the question of ownership, and that at all material times the local branch manager of the bank (initially Mr Jacobs, who was replaced by Mr Nicholson) knew the true position in that respect.

On that footing, I turn to the facts relating to Mr Brabon's financial circumstances.

From about the early 1980s onwards Mr Brabon was carrying on the business of dealing in investment property on behalf of himself and his family, viz his parents, Mrs Brabon and Benjamin. Until March 1994 (when the Law Society intervened in his practice) Mr Brabon was responsible for all the conveyancing on behalf of the family. He explained in oral evidence that he was putting the site together for planning and resale, and that he divided up the ownership of the various parts of the site between different members of the family with a view to equalising their assets for tax purposes. I accept that evidence.

Through the 1980s the property market continued to rise, and Mr Brabon borrowed from his bank (the NatWest Bank) to finance the purchase of additional properties. The bank was content to lend for this purpose.

In 1989 Mr Brabon purchased two farms, Clover Hill Farm and Cripps Hall Farm. He put Clover Hill Farm on the market immediately for resale. As to Cripps Hall Farm, initially his plan was to develop it himself as a residence for some or all of the family. The bank provided finance for the purchase of the two farms, and it was agreed that interest on the loans should be rolled up.

At this stage, Mr Brabon was applying any spare cash towards the purchase of additional properties, and in consequence was finding it difficult to service his bank borrowings. However, his asset base (at then current valuations) was considerably in excess of his borrowings, by a ratio of approximately 3:1.

From about mid-1989 the property market went into decline, and the value of the Brabon family property portfolio began to fall. This led Mr Brabon to abandon his plan to develop Cripps Hall Farm himself, and he placed it on the market for resale, along with Clover Hill Farm. However, no buyers were forthcoming.

Notwithstanding this, the bank remained content at this stage for the interest on the farm loans to continue to be rolled up.

By October 1990 Mr Brabon's cash-flow difficulties had become more serious, but the bank was still content to support him. In an internal memorandum dated 15 October 1990, Mr Nicholson (who had by then taken over from Mr Jacobs) said:

'As you know, we are dealing with a highly reputable individual, possessed of substantial assets, but because of his various borrowings his liquid position remains far tighter than either he or we would wish. There is little more that he can do at the present time to generate sales or lettings and we are receiving his full co-operation in doing all he can to at least cover interest in the meantime …'

By March 1991 it had become apparent that there was little or no equity left in Clover Hill Farm, and the rolled up interest on the two farm loans amounted to more than £20,000. By this stage, the bank was becoming increasingly concerned at the level of its exposure. Mr Brabon, however, remained confident that he had a strong capital position, notwithstanding the difficulties he was experiencing in servicing his borrowings, and notwithstanding his continuing inability to sell the farms. Mr Brabon told me in evidence (and I accept) that he still did not feel under any pressure from the bank.

By mid-1992 the position had worsened. The farms were still unsold, and property values had dropped still further. Mr Brabon accepted that it was at about this time that, as he put it, the balance of power shifted, in the sense that he recognised that he was thereafter dependent on the bank's continued support if he was to survive financially. Under cross-examination, Mr Brabon described the downturn in his financial position in these terms:

*a*

'Perhaps wrongfully [sc wrongly], I was using cashflow to buy additional buildings, when with hindsight I should not have bought additional buildings and should have used it to service these funds. In other words, I was going forward, building up a property portfolio, using every penny to inject into buying more assets. That turned out to be wrong because of what happened in the recession. I accept that, yes.'

*b*

In the course of an internal memorandum dated 16 June 1992 Mr Nicholson said:

*c*

'Mr Brabon acknowledges our deep concern and recognises that the lack of tangible progress in the short term could bring serious consequences, i.e. borrowings being called in, security realised and possible bankruptcy.'

By September 1992 Mr Brabon's borrowings from the NatWest amounted to some £1.4m.

*d*

In February 1993 the bank obtained revaluations of the Brabon family property portfolio, which valued the properties at very substantially lower values than previously. Mr Brabon did not accept these valuations, regarding them as 'totally out of line with anything I had seen before'; but at the same time he realised that his financial position had by this stage become very serious. He told me that he was very concerned as to what the bank's attitude would be in the light of these valuations. He continued:

*e*

'the whole family idea had been to get through, to help each other to get through, but suddenly, when confronted with valuations which are in some cases a quarter of what had been obtained 18 months before had to consider what the Bank's real position was at that point of time in February 1993 … Obviously members of my family would not go on helping me beyond that point, because of my changed position, based on those suddenly new valuations. Previously I would have had the use of funds to help me through … The family were concerned about their own assets, because previously they had helped me, and if, in helping me, it meant using assets I could get through, then that is what would be done. But if the bank had adopted a different attitude in February 1993, based on those valuations, there was no point in my family providing for me, or the use of additional assets'.

*f*

*g*

I accept that evidence.

*h*

As noted earlier, in March 1994 Mr Brabon's solicitor's practice was taken over, following intervention by the Law Society.

On 24 August 1994 the bank demanded repayment, in the sum of £1.2m.

On 22 December 1994, following an investigation by the Law Society, Mr Brabon was struck off the roll of solicitors.

*i*

Subsequently, Mr Brabon pleaded guilty to a number of charges of dishonesty (none of which related to any of the transactions under challenge in these proceedings), and was sentenced to two and a half years' imprisonment.

*The various 'intra-family' transactions under challenge*

On 24 November 1988 the following relevant transactions took place.

(1) Mr Arthur Brabon conveyed Little Meads to Mrs Brabon, at the direction of Mr Brabon. The trustee seeks to construe the words 'as beneficial owner' as referring to Mr Brabon, and as demonstrating that Mr Brabon was the beneficial owner of Little Meads. I will refer to this conveyance as 'the Little Meads conveyance'.

(2) Mr Arthur Brabon ('as beneficial owner') conveyed the roadway to Mrs Brabon by way of gift. I will refer to this conveyance as 'the roadway conveyance'.

As noted earlier, it is contended by the Brabon respondents that at about the same time Mr Brabon granted Mr Arthur Brabon (who was then living at Little Meads) a right to occupy Barbarossa rent free for the rest of his life, in consideration of Mr Arthur Brabon transferring Little Meads to Mrs Brabon. This, it is said, explains the references in the Little Meads conveyance to 'an Agreement as to exchange made between [Mr Brabon] and [Mr Arthur Brabon] AND DATED THE 24th DAY OF NOVEMBER 1988', and to Mr Arthur Brabon conveying Little Meads to Mrs Brabon 'at the direction of [Mr Brabon]'. The trustee contends that no such 'Agreement as to exchange' ever existed, and that no right of occupation of Barbarossa was ever granted to Mr Arthur Brabon. The trustee further contends that even if such a right of occupation was granted, the Little Meads conveyance was a transaction at an undervalue since, on the footing that Mr Brabon was the beneficial owner of Little Meads immediately prior to the Little Meads conveyance, he received no consideration for the disposal of that beneficial interest. Conversely, if Mr Brabon was not the beneficial owner of Little Meads, any right of occupation granted to Mr Arthur Brabon was a transaction at an undervalue since Mr Brabon received nothing in return.

In support of his contention that no agreement for exchange existed, the trustee relies on the agreement (dated only '1997') whereby Mr Arthur Brabon purported to relinquish his right of occupation of Barbarossa in order to enable Barbarossa to be sold to Silver with vacant possession, in consideration of Mr Brabon providing him with suitable alternative accommodation. The agreement, which was drawn up by Thomson Snell & Passmore, recites that Mr Arthur Brabon 'is entitled to occupy [Barbarossa] during his lifetime rent free having previously agreed to give up all claim to any part of the estate of [the late Mrs Olive Brabon]'. This recital, the trustee points out, is wholly inconsistent with the existence of an agreement for exchange in the terms contended for by the Brabon respondents.

Mr Brabon told me in evidence that he could not understand to what the recital referred, and that in any event he was the sole executor and beneficiary under his mother's will. He said he cannot have read the agreement thoroughly, but that he was told that it was an agreement whereby his father would move out of Barbarossa to enable the sale to Silver to go through, on the basis that he (Mr Brabon) would provide him with somewhere else to live. As to the reference in the Little Meads conveyance to an 'Agreement as to exchange', Mr Brabon told me that it had been agreed between him and his father that in consideration of his father conveying Little Meads to Mrs Brabon he would allow his father to occupy Barbarossa

*a* rent free for the rest of his life, but that he did not think that a formal agreement to that effect had ever been drawn up and signed. He thought a formal agreement had been prepared, but he could not produce it.

Addressing first the trustee's contention as to the meaning and effect of the words 'as beneficial owner' in the Little Meads conveyance, it seems to me that this contention is unsustainable. As I read the deed, the expression 'as beneficial owner' is plainly being used in the conveyancing sense, in *b* connection with the incorporation of covenants as to title. I find that immediately prior to the Little Meads conveyance Mr Arthur Brabon was the beneficial owner of Little Meads. This is consistent with the terms of an earlier conveyance, dated 15 October 1986, whereby Mrs Olive Brabon conveyed Little Meads into the joint names of herself and her husband, Mr Arthur Brabon, as joint tenants. As noted earlier, Mrs Olive Brabon died *c* on 15 June 1987.

As to the grant to Mr Arthur Brabon of a right of occupation of Barbarossa, the recital in the 1997 agreement makes no sense on any basis, and only serves to illustrate the muddled treatment of the conveyancing in this case. I am satisfied, however, that agreement was reached in or about *d* November 1988 between Mr Brabon and Mr Arthur Brabon whereby Mr Arthur Brabon would give up his property Little Meads in favour of Mrs Brabon, in consideration of Mr Brabon granting him the right to occupy Barbarossa for the rest of his life. It is significant in this connection, as it seems to me, that in August 1984 Mr Brabon had informed Mr Jacobs at the NatWest Bank (according to Mr Jacobs' internal memorandum) that:
*e*

'[I]n due course his plans will be for parents to move from Little Meads into Barbarossa.'

*f* I find that a formal document was prepared to give effect to the agreement, but that the document was never completed and signed. However, the agreement was carried into effect in that Mr Arthur Brabon moved from Little Meads to Barbarossa.

As to undervalue, the Little Meads conveyance was clearly a transaction at an undervalue so far as Mr Arthur Brabon was concerned, in that he was *g* giving up the absolute ownership of one property in exchange for a right to occupy another property for the rest of his life. Equally, the Little Meads conveyance coupled with the grant of a right of occupation of Barbarossa was also a transaction at an undervalue so far as Mr Brabon was concerned, in that he received nothing in return for the grant of that right. But I am *h* satisfied that it was not a purpose (still less a substantial purpose) of the transaction to put assets out of the reach of Mr Brabon's creditors. In November 1988 the property market was still buoyant, and so far as Mr Brabon was concerned no cloud had as yet appeared on the horizon.

As to the gift of the roadway, the trustee submits that the beneficial owner *i* of the roadway was 'whoever suited [Mr Brabon] at the time', and that Mr Brabon was the true donor of the roadway. I am satisfied, however, that the donor was indeed Mr Arthur Brabon, and that at the date of the gift Mr Brabon had no beneficial interest in the roadway. Further, although by

definition the gift was a transaction at an undervalue for the purposes of s 423, I find that it was not a purpose of the gift to put assets out of the reach of Mr Brabon's creditors.

*a*

I conclude, therefore, that the trustee is not entitled to relief under s 423 in respect of the above transactions.

I turn next to the transfer dated 1 February 1989 whereby Mr Brabon transferred the open land to Mrs Brabon, for an expressed consideration of £30,000.

*b*

The first question which arises is whether the expressed consideration was in fact paid. Mr Brabon told me in evidence that Mrs Brabon would have paid the £30,000. He could not say how it had been paid but suggested that it might have been dealt with by way of set off in relation to other property transactions between himself and Mrs Brabon. He referred to the fact that Mrs Brabon herself owned a portfolio of properties. He could not produce any documentary record of the payment having been made, but pointed out that he was no longer in possession of documents relating to his solicitor's practice. Mrs Brabon told me that she had paid £30,000 for the open land, but she too was unable to produce any documentary evidence of the payment, despite a thorough search.

*c*

*d*

I accept Mrs Brabon's evidence that she provided consideration to the value of £30,000 for the transfer of the open land, although the consideration may have taken the form of an adjustment in relation to some other property deal between herself and Mr Brabon rather than a cheque for that sum. I bear in mind that a finding that the expressed consideration was not paid or provided would involve a finding of dishonesty on the part of Mr Brabon (who drew the transfer). However, I can see no reason why, in February 1989, Mr Brabon should have been tempted to act dishonestly in relation to the transfer by stating a fictitious consideration. Mrs Brabon had her own portfolio of properties and was in a financial position to provide the consideration, and the possibility of the future bankruptcy of Mr Brabon had not at that stage raised its head.

*e*

*f*

As to the value of the open land in February 1989, Mr Jennings and Mr Turner are agreed that £30,000 represented its then market value. Hence, the transfer of the open land in February 1989 was not a transaction at an undervalue.

*g*

I further find that it was not a purpose of the sale of the open land to put assets out of the reach of Mr Brabon's creditors; Mr Brabon's purpose in selling the open land was to provide himself with additional cash with which to service his borrowings.

I therefore conclude that the trustee is not entitled to relief under s 423 in relation to this transaction.

*h*

I turn next to the transfer dated 27 April 1991 whereby High Hedges was transferred out of the joint names of Mr Brabon, Mrs Brabon and Mr Arthur Brabon into the joint names of Mrs Brabon and Mr Arthur Brabon, who declared that they held it as tenants in common in equal shares. The effect of this transfer was to assign Mr Brabon's beneficial share in High Hedges to Mrs Brabon and Mr Arthur Brabon. (The case proceeded on the basis that it was a one-quarter share, although it would appear to have been a half share: see the section of this judgment dealing with the conveyancing history.)

*i*

*a*     There is nothing on the face of the transfer to suggest that it was other than a gift of Mr Brabon's beneficial share, and in his first affidavit in these proceedings Mr Brabon referred to it as such ('I decided to give my share to my wife'). In a later affidavit, however, Mr Brabon suggests that there was consideration for the transfer, in that Mrs Brabon had contributed £4,000 towards the construction costs on the Meads, and that she had allowed Mr Brabon the full use of a loan of £100,000 raised on the security of the Meads (which was owned by them jointly). The affidavit continues:

*b*

'It was agreed that I could use her £50,000 for my own purposes, and in return I gave her a quarter share in High Hedges.'

     When it was put to him in cross-examination that this was a different *c*     story, he replied: 'No, that just explains why I gave it to her'.
     In her affidavit, Mrs Brabon stated:

'The transfer of [Mr Brabon's] share to me was in consideration of a contribution I made of £4,500 towards the matrimonial home of The Meads which was to be put into joint names.'

*d*

     In a later affidavit, and in oral evidence, she corrected the figure to £4,000. She makes no mention in either affidavit of any loan raised on the security of the Meads, but in oral evidence she did refer to Mr Brabon wanting to borrow money on the security of the Meads.
*e*     I accept that Mrs Brabon contributed £4,000 towards the cost of refurbishing the Meads, but in relation to the assignment of Mr Brabon's beneficial share in High Hedges that was past consideration (the Meads was purchased in 1975). Further, although in 1979 a loan of £100,000 was raised on the security of the Meads, of which Mrs Brabon allowed Mr Brabon to enjoy the full benefit, I find that there was no agreement between Mr Brabon *f*     and Mrs Brabon that in consideration of her doing so Mr Brabon would assign his beneficial share in High Hedges to her and Mr Arthur Brabon. In any event, I accept Mr Atherton's submission that Mrs Brabon's conduct in allowing Mr Brabon to enjoy the full benefit of the loan raised on the security of the Meads (of which Mrs Brabon was a joint owner) cannot constitute *g*     consideration for this purpose.
     I therefore conclude that the assignment of Mr Brabon's beneficial share in High Hedges to Mrs Brabon and Mr Arthur Brabon was a voluntary assignment, not supported by consideration. It follows that it was a transaction at an undervalue for the purposes of s 423.
     Had it been necessary to address the question of valuation, I would have *h*     valued a one quarter beneficial share in High Hedges at £5,000 (based on Mr Turner's valuation), and a one half share at £10,000.
     I turn, then, to the question whether it was a transaction entered into by Mr Brabon for the purpose of putting assets out of the reach of his creditors.
     I find that it was not entered into by Mr Brabon for that purpose. *i*     Although, as related earlier in this judgment, by April 1991 Mr Brabon's financial circumstances had taken a turn for the worse and the NatWest Bank was becoming increasingly concerned at the level of its exposure, Mr Brabon remained confident that his difficulties would be overcome, and

he did not at that stage feel under pressure from the bank. I conclude that, in divesting himself of his interest in High Hedges in favour of Mrs Brabon and Mr Arthur Brabon, Mr Brabon's purpose was simply to compensate Mrs Brabon for the money which she had expended on the Meads and for allowing him to have the use of the entirety of the loan raised on the security of the Meads.

*a*

I turn next to the transfer dated 6 January 1992 whereby Mr Brabon transferred the ransom strips to Mr Arthur Brabon, who then declared that he stood possessed of them on trust for Mrs Brabon.

*b*

The form of transfer had been drafted for execution by Mr Arthur Brabon, and contained (presumably by way of intended consideration) a grant by him of rights over the roadway in favour of the Meads. However, as Mr Arthur Brabon had given the roadway to Mrs Brabon by the deed of gift dated 24 November 1988, he plainly could not have granted rights of way over it, even if he had executed the form of transfer. In the circumstances it is accepted by the Brabon respondents that the 1992 transfer was a voluntary transfer. Hence it was a transaction at an undervalue for the purposes of s 423.

*c*

Had it been necessary to address the question of valuation, I would have accepted Mr Jennings' valuation of the ransom strips at £5,000, as at January 1992 (Mr Turner did not value the ransom strips as at that date).

*d*

As to the purpose or purposes of the transaction from Mr Brabon's point of view, Mr Brabon described the purpose of the transaction in the following terms in the course of his cross-examination:

*e*

'In 1992 the family were in dispute with the neighbours at the end of the private roadway about the building and also about access on to our private roadway, the family private roadway. Originally [the ransom strips] were to be transferred to my wife, but at the last minute we decided not to transfer them to my wife because litigation looked imminent … At the last minute, after discussion with my wife, because my wife did not want to go into court and did not want disputes with the neighbours, I transferred it to my father.'

*f*

Mrs Brabon confirmed this account in her affidavit evidence, and was not cross-examined about it.

*g*

On the basis of the available evidence, I am not prepared to infer that one of Mr Brabon's purposes in divesting himself of the ransom strips was to put them out of the reach of his creditors. Although by January 1992 Mr Brabon's financial position had become more precarious, on his evidence (which I accept) he did not as yet regard the balance of power as having shifted to the NatWest Bank. I find that his only substantial purpose in so doing was to benefit other members of his family; initially his intention was to benefit Mrs Brabon, but as the transaction was carried out its purpose was to benefit Mr Arthur Brabon.

*h*

Chronologically, the next transaction which I have to consider is the charge over Barbarossa created in favour of Mrs Brabon by the promissory note dated 31 January 1994. However, I concluded earlier that this was a valid charge to secure repayment of £70,000 of a larger loan made by Mrs Brabon to Mr Brabon, and accordingly I need not consider it further.

*i*

*a*

I turn next to the third charge purportedly created over Hillcrest in favour of Mr Brabon by the promissory note dated 31 July 1996. I accept Mrs Brabon's evidence that she lent Mr Brabon £3,920, the funds coming from the current account of a caravan business called Castle View Statics which Mrs Brabon was carrying on at that time. Hence no question of a transaction at an undervalue arises. In any event, the charge could not amount to a transaction at an undervalue, for the reasons given by Millett J in *Re MC Bacon Ltd* [1990] BCLC 324. Accordingly the trustee's claim in respect of this transaction must fail.

*b*

Lastly, I turn to the sale of Wendy by Chislelane to Mrs Brabon on 31 July 1996, for an expressed consideration of £60,000 (a figure which, as is common ground, represented its current market value).

The trustee contends that the evidence shows that Wendy was originally purchased by Mr Brabon with his own funds. He submits that this is consistent with the fact that Chislelane did not register the Royal Bank of Scotland charge until some ten months after the purchase had been completed. In my judgment, however, the fact that there was a delay in registration is a thoroughly unsafe basis for a finding that Chislelane was not the purchaser of Wendy, or that Wendy was not purchased with Chislelane's funds. On the evidence, I am satisfied that Chislelane purchased Wendy with its own funds, with the aid of the loan from the Royal Bank of Scotland.

*c*

*d*

The trustee further contends that no consideration was provided for Mrs Brabon's purported purchase on 1 March 1994 of (among other things) Mr Brabon's shareholding in Chislelane. I find that that was not the case. Once again I accept Mrs Brabon's evidence that she paid Mr Brabon £97,000 as consideration for the sale of the assets the subject of the March 1994 agreement. The funds represented the proceeds of loans which Mrs Brabon had raised on the security of properties which she owned in Hastings, viz 1 Lower Park Road, and 9 Blomfield Road.

*e*

As to the sale of Wendy by Chislelane to Mrs Brabon on 31 July 1996, I accept Mrs Brabon's affidavit evidence that £30,000 of the consideration was provided by her assuming liability for the sum then outstanding under a first charge in favour of the Royal Bank of Scotland to secure the loan obtained by Chislelane to finance the purchase of Wendy (the sum then outstanding being approximately £30,000), and that the remaining £30,000 of the consideration was provided by Mrs Brabon forgiving £30,000 of a larger sum then owing to her by Chislelane in respect of interest on that loan which Mrs Brabon had paid out of her own resources.

*f*

*g*

Since, on those findings, Chislelane received full value for its disposal of Wendy, no question of a transaction at an undervalue can arise; still less a transaction entered into by Mr Brabon.

*h*

I accordingly conclude that the trustee's claim in respect of Wendy fails.

CONCLUSION

For the reasons set out above, I conclude that the trustee's claims fail, and that the action must be dismissed as against all the respondents.

*i*

*Order accordingly.*

Celia Fox    Barrister.

# TAB 65

a

# Re Casa Estates (UK) Ltd (in liquidation)

b

# Carman v Bucci

[2013] EWHC 2371 (Ch), [2014] EWCA Civ 383

c
CHANCERY DIVISION (COMPANIES COURT)

WARREN J

19 JUNE, 31 JULY 2013

d

COURT OF APPEAL, CIVIL DIVISION

SULLIVAN, MCFARLANE AND LEWISON LJJ

12, 13 MARCH, 3 APRIL 2014

e

*Transaction at undervalue – Relevant time – Connected person – Inability to pay debts – Tests for cash-flow and balance-sheet insolvency – Relationship between tests for inability to pay debts – Company's business introducing investors to property in Dubai – Dubai property market*
f
*crashing – Company going into insolvent liquidation – Liquidator challenging payments made to connected person – Whether payee rebutting presumption that company unable to pay debts at time of payments – Whether balance-sheet test excluded if company paying debts as they fell due – Insolvency Act 1986, ss 123(1)(e), (2), 238, 240(2).*

g
The appellant, Mrs Bucci, was the company secretary of Casa Estates (UK) Ltd, which was under the day-to-day management of her husband, Mr Bucci. The company's principal business was that of introducing investors to property in Dubai. It had an agent and intermediary in Dubai called Casa Dubai Real Estate Brokers LLC. Casa UK agreed to pay Casa
h
Dubai a monthly retainer and Casa Dubai agreed to pay Casa UK commission on sales at an average rate of 6%. Casa UK received money from investors who wanted to invest in property in Dubai. It transmitted the money to Casa Dubai for onward transmission to developers in Dubai. When Casa UK received customer deposits it had an obligation to account to the customer for those deposits, until such time as the deposits had been
i
applied towards the purchase of property in Dubai by payment to the developers. Casa UK did not maintain a client account, but mixed depositors' moneys with its own. In late 2008 the property market in Dubai collapsed, Casa Dubai failed and Casa UK went into insolvent liquidation. It was wound up compulsorily on its own petition with a net deficit as

regards creditors of £1,222,027. Its creditors included investors whose
payments to the company had not been paid to the vendor in Dubai.
Mr and Mrs Bucci were also the shareholders of another company (GUL)
which carried on a loss-making drinks business. It went into liquidation
owing about £474,000 to Casa UK. In the two years before its liquidation
Casa UK had made a number of payments to Mrs Bucci, totalling about
£104,000, which the respondent liquidator challenged under the Insolvency
Act 1986 ss 238 and 239. His Honour Judge Purle QC decided that the
payments sought to be recovered constituted transactions at an undervalue
within s 238. However, by virtue of s 240(2) the payments were not
recoverable because the company was not at the time unable to pay its
debts within the meaning of s 123. He found that there was no real
prospect of Casa UK ever recovering its loan from GUL. The expert
evidence was that if the GUL loan was eliminated as an asset of value, then
Casa UK was insolvent on a balance-sheet basis. However, he found that it
had been solvent on a cash-flow basis and had been paying its debts as they
fell due until the end of 2008. It had not reached 'the point of no return'
until that time. The liquidator appealed and when the appeal came before
Warren J the Supreme Court in *BNY Corporate Trustee Services Ltd v
Eurosail-UK-2007–3BL plc* [2013] UKSC 28, [2013] 1 BCLC 613, [2013]
1 WLR 1408 had disapproved the 'point of no return' test. Since Judge
Purle QC had applied the wrong test, Warren J reconsidered the matter and
concluded that Mrs Bucci had not rebutted the presumption that Casa UK
was insolvent at the times that it made the disputed payments to her.
Warren J found that Judge Purle QC had not dealt with some important
evidence relating to cash-flow solvency and had also not considered how it
was that debts continued to be paid. In Warren J's view the continued
payment of debts was only possible because new deposits from investors
were used to pay old debts. Warren J also concluded that, taking into
account loans from the directors as contingent liabilities and attributing no
significant value to the GUL loan, the company was balance-sheet insolvent
from the end of March 2007. Mrs Bucci appealed arguing that if a company
was cash-flow solvent under s 123(1)(e), there was no need to consider
whether it was also balance-sheet solvent under s 123(2), unless it had
contingent or prospective liabilities: the trial judge found that the company
was cash-flow solvent, and so there was no warrant for examining whether
it was balance-sheet insolvent.

**Held** – (1) The balance-sheet test in s 123(2) was not excluded merely
because a company was for the time being in fact paying its debts as they
fell due. The two tests stood side by side. They were part of a single
exercise, to determine whether a company was unable to pay its debts. In
addition, when applying the cash-flow test it was not enough merely to ask
whether the company was for the time being paying its debts as they fell
due. In an appropriate case the court had to consider how it was managing
to do so. Judge Purle had failed to consider that question and it was open to
Warren J to do so. He found that Casa UK was only able to continue to pay
its debts as they fell due by taking new deposits, and using them to pay off
old debts. He was entitled to make that finding and to conclude that
Mrs Bucci had not rebutted the presumption that Casa UK was cash-flow

*a*  insolvent at the time that it made the payments to her. *BNY Corporate Trustee Services Ltd v Eurosail-UK 2007–3BL plc* [2013] UKSC 28, [2013] 1 BCLC 613 applied.

(2) If the GUL loan had no significant value, then whatever value it did have could not have made any difference. The experts agreed that if the GUL loan was given no value then Casa UK was balance-sheet insolvent at
*b*  all relevant times. That was not, in itself, determinative of the issue under s 123(2), but it was difficult to see how it could not lead to the conclusion that Casa UK was insolvent on a balance-sheet basis. There was no credible evidence that the balance sheet would improve in the near future. Judge Purle QC recognised that when Casa UK took a deposit from an investor it incurred a liability to that investor. But he did not ask how those liabilities
*c*  were to be satisfied. After the Dubai crash it appeared that the amount owed to depositors exceeded the amount in the hands of Casa Dubai, giving rise to the inference that Casa UK had used depositors' moneys for its own purposes. Judge Purle QC applied the wrong test. Warren J was entitled to make findings for himself about balance-sheet insolvency and the appeal
*d*  court would not interfere with those findings.


**Cases referred to in judgment**

*Barclays Bank Ltd v Quistclose Investments Ltd* [1968] 3 All ER 651, [1970] AC 567, [1968] 3 WLR 1097, HL.
*e*  *BNY Corporate Trustee Services Ltd v Eurosail-UK 2007–3BL plc* [2011] EWCA Civ 227, [2011] 2 BCLC 1, [2011] 3 All ER 470, [2011] 1 WLR 2524, CA; *affd* [2013] UKSC 28, [2013] 1 BCLC 613, [2013] 3 All ER 271, [2013] 1 WLR 1408, SC.
*Byblos Bank SAL v Al-Khudhairy* [1987] BCLC 232, CA.
*Cheyne Finance plc, Re* [2007] EWHC 240 (Ch), [2008] 1 BCLC 741,
*f*  [2008] 2 All ER 987.
*Company (No 006794 of 1983), Re a* [1986] BCLC 261
*European Life Assurance Society, Re* (1869) LR 9 Eq 122.


**Appeal**

*g*  Russell John Carman, the liquidator of Casa Estates (UK) Ltd, appealed from the judgment of his Honour Judge Purle QC dated 17 December 2012 refusing the liquidator's application under the Insolvency Act 1986, ss 238 and 239 to recover payments made by the company to Joanne Marie Bucci, the respondent, as a connected person, and holding that the respondent had not rebutted the presumption in s 240(2) that the company was insolvent at
*h*  the times that it made the disputed payments to her. The facts are set out in the judgment.


*Hermann Boeddinghaus* (instructed by *Geldards LLP*) for the appellant.
*James Morgan* (instructed by *Shakespeares Legal LLP*) for the respondent.
*i*

*Judgment was reserved.*


31 July 2013. The following judgment was delivered.

**WARREN J.**                                                                    *a*

INTRODUCTION

[1] This is an appeal from the judgment of his Honour Judge Purle QC dated 17 December 2012 ('the Judge' and 'the Judgment'). The applicant in the proceedings is the appellant in this appeal ('Mr Carman') in his capacity as liquidator of Casa Estates (UK) Ltd ('the Company'). Mr Carman sought the recovery from the respondent in this appeal ('Mrs Bucci') of payments made to her or for her benefit under s 238, alternatively in relation to some of the payments under s 239, of the Insolvency Act 1986. References to section numbers in this judgment are to that Act unless otherwise indicated.

[2] The payments in question fall into two categories:

(i) The first category (totalling some £55,783) consists of remuneration and pension contributions made during the course of 2007 and 2008 in respect of services which Mrs Bucci claimed to have provided to the Company. Mr Carman sought to recover these payments, in whole or in part, as payments at undervalue pursuant to s 238. Of that amount £16,283.32 was paid in the years ending 5 April 2007 and 5 April 2008, £29,999 in the year ending 5 April 2009, with pension contributions totalling £9,500 paid over the same periods.

(ii) The second category (totalling some £48,205) consists of three payments of £4,000 each between January and July 2008 (described in the Company's accounts as 'dividends') and a payment to HMRC of £36,205 made in discharge of a tax liability of Mrs Bucci. She accepted that the three payments could not be justified as dividends but she claimed to have been a creditor of the Company and that the three payments and the payment to HMRC discharged the amount owing. Mr Carman disputed that Mrs Bucci was a creditor but advanced the alternative case (in case the Judge should have held that she was a creditor) that the payments were recoverable as preferences pursuant to s 239.

[3] In relation to the second category, the Judge rejected Mrs Bucci's case that the payments were made as repayment of loans owing to her. There is no appeal against that decision. Section 239 ceases to be of relevance. In relation to both categories, the Judge decided that all of the payments sought to be recovered by Mr Carman constituted transactions at undervalue within s 238.

[4] However, he also decided that the payments were not recoverable because the time of each payment was not a relevant time by virtue of s 240(2), on the basis that payment, the Company was not 'unable to pay its debts within the meaning of section 123 …' and did not become unable to do so as a result of the payment in question.

[5] Mr Carman now appeals on the basis that the Company was, contrary to the Judge's conclusion, unable to pay its debts within the meaning of s 123. He says that the Judge erred in law in the approach which he adopted to the issue whether the Company was unable to pay its debts and gave inappropriate weight to various factors which he identified. He also submits that certain payments received by the Company never became its own assets but were held on *Quistclose* trusts (*Barclays Bank Ltd v Quistclose Investments Ltd* [1968] 3 All ER 651, [1970] AC 567), a factor which Mr Boeddinghaus (who appears for Mr Carman) submits has a

Ch D　　　　　Re Casa Estates (UK) Ltd (Warren J)　　　　53

*a*　serious impact on the answer to the question of solvency. There is a dispute about whether this point was properly raised before the Judge and, if not, whether or not I should allow it to be raised for the first time on this appeal.

*b*　THE STATUTORY PROVISIONS

[6] I have found it helpful to set out parts of ss 123, 238 and 240 very early in this judgment. Section 123 provides so far as material:

*c*　'(1) A company is deemed unable to pay its debts—
(a) if a creditor (by assignment or otherwise) to whom the company is indebted in a sum exceeding £750 then due has served on the company, by leaving it at the company's registered office, a written demand (in the prescribed form) requiring the company to pay the sum so due and the company has for 3 weeks thereafter neglected to pay the sum or to secure or compound for it to the reasonable satisfaction of the creditor, or

*d*　(b) if, in England and Wales, execution or other process issued on a judgment, decree or order of any court in favour of a creditor of the company is returned unsatisfied in whole or in part, or
…
(e) if it is proved to the satisfaction of the court that the company is unable to pay its debts as they fall due.

*e*　(2) A company is also deemed unable to pay its debts if it is proved to the satisfaction of the court that the value of the company's assets is less than the amount of its liabilities, taking into account its contingent and prospective liabilities.'

[7] Section 238 provides so far as material:

*f*　'(1) This section applies in the case of a company where—
…
(b) the company goes into liquidation;
and 'the office-holder' means … the liquidator …

*g*　(2) Where the company has at a relevant time (defined in section 240) entered into a transaction with any person at an undervalue, the office-holder may apply to the court for an order under this section.
(3) Subject as follows, the court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not entered into that transaction.

*h*　(4) For the purposes of this section and section 241, a company enters into a transaction with a person at an undervalue if—
(a) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration, or

*i*　(b) the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company.
…'

[8] Section 240 provides so far as material:

'(1) Subject to the next subsection, the time at which a company *a*
enters into a transaction at an undervalue or gives a preference is a
relevant time if the transaction is entered into, or the preference given—

    (a) in the case of a transaction at an undervalue or of a preference
which is given to a person who is connected with the company
(otherwise than by reason only of being its employee), at a time in the
period of 2 years ending with the onset of insolvency (which expression *b*
is defined below),

    (b) in the case of a preference which is not such a transaction and is
not so given, at a time in the period of 6 months ending with the onset
of insolvency

    ...

    (2) Where a company enters into a transaction at an undervalue or *c*
gives a preference at a time mentioned in subsection (1)(a) or (b), that
time is not a relevant time for the purposes of section 238 or 239 unless
the company—

    (a) is at that time unable to pay its debts within the meaning of
section 123 in Chapter VI of Part IV, or *d*

    (b) becomes unable to pay its debts within the meaning of that section
in consequence of the transaction or preference;

    but the requirements of this subsection are presumed to be satisfied,
unless the contrary is shown, in relation to any transaction at an
undervalue which is entered into by a company with a person who is
connected with the company. *e*

    (3) For the purposes of subsection (1), the onset of insolvency is—

    ...

    (e) in a case where section 238 or 239 applies by reason of a company
going into liquidation at any other time, the date of the commencement
of the winding up.' *f*

    [9] It was common ground before the Judge (and this remains the position
before me) that Mrs Bucci was a person connected with the Company, so
that the relevant period within which a transaction is open to attack is two
years before the onset of insolvency and the statutory (rebuttable)
presumption of insolvency applies to transactions at an undervalue. *g*

THE FACTS

    [10] Paragraphs 4 to 11 of the Judgment contain a summary of certain
agreed facts and certain findings by the Judge. I do not need to repeat them *h*
in full. The following can be taken from those paragraphs and other parts
of the Judgment:

    (i) The Company was incorporated on 23 February 2005 and carried on
business as an introducer of investors to Dubai property. It received
payments from investors by way of deposits for properties and payment of
instalments towards the purchase price. It appears also to have operated as *i*
a dealer in its own right. It was under the day-to-day management of its
sole director, Franco Bucci ('Mr Bucci') who is Mrs Bucci's husband.
Mrs Bucci was company secretary. They were the owners of the company,
as equal shareholders. There were no other shareholders. Since it did not

a   broker sales of any UK properties, it was not required to, and did not in fact, keep a separate client account.

(ii) Casa Dubai Real Estate Brokers LLC ('Casa Dubai') was the Company's agent and intermediary in Dubai. It was incorporated in the UAE and was owned (as required under the local law) by two UAE nationals. Mr Bucci acted as general manager of Casa Dubai.

b   (iii) The Company ceased trading in December 2008 following the collapse of the Dubai property market. One of the developers with which the company dealt, Al Barakah, which promised investors a 50% return in six months, was unable to meet its obligations. Mr Bucci quickly reached the conclusion that the company could not survive in the light of Al Barakah's failure.

c   (iv) Mr and Mrs Bucci were also the sole shareholders of Gianluca (UK) Ltd ('GUL'). Initially, both Mr and Mrs Bucci appear to have provided consultancy services to third parties through GUL, at least down to June 2007. Mrs Bucci is an experienced businesswoman in her own right.

(v) In June 2007 GUL launched a drinks distribution business. It entered
d   into a loan agreement with the Company in June 2007 (resulting in a total of over £474,000 being lent by the Company to GUL by December 2008) which Mr Bucci signed for both parties. Advances were made between January 2007 and December 2008. GUL was loss-making from the start of its drinks business, though its turnover was on the increase until it ceased to trade, and Mr Bucci doubtless hoped that it would, with the company's
e   financial support, come good eventually. It entered into creditors' voluntary liquidation on 29 January 2009, following the Company ceasing to trade. Mr Bucci in its statement of affairs identified the Company as a creditor for £480,044, though the true figure was slightly less than this.

(vi) There is no doubt that moneys were in fact advanced to GUL, and that GUL was throughout its existence dependent on the company for its
f   viability. The Buccis, had the Company continued in business and been profitable, would probably have declared dividends so as to cover the outstanding loan, effectively treating it as repaid by their dividends. They saw the moneys taken out of the Company and put into GUL as surplus funds available to the shareholders.

(vii) The Company was wound up compulsorily on its own petition by an
g   order made on 4 March 2009. According to the statement of affairs provided by Mr Bucci, the Company had a net deficit as regards creditors of £1,222,027. Its creditors include investors who found that their payments to the Company had not been paid to the vendor in Dubai.

(viii) The petition had been presented on 15 January 2009. That therefore
h   became the date of the onset of insolvency for the purpose of the relevant statutory provisions to which I have referred. All the payments with which the Judge was concerned were made in the period of two years ending with the onset of insolvency. GUL had already been wound up with assets of under £15,000 and liabilities (mainly in the shape of unpaid loans from the Company) of over £500,000.

i   [11] Mr Boeddinghaus records in his skeleton argument – and there can be no doubt that this is right as a matter of fact – that the Company failed to keep adequate accounting records and that it has been difficult to state with accuracy the financial position of the Company at any time (and in particular to ascertain which of the funds controlled by the Company

represented investor payments which had not been paid to the Dubai *a*
vendors/developers). The Company filed no accounts for the years ended
31 December 2007 and 31 December 2008.

[12] It is also the case that the Company dealt with something around
750 customers from its introductions business, being paid a commission
averaging 6% by the developers/vendors concerned. The Company itself *b*
also acquired a number of properties which, according to Mr Bucci, were
financed out of the Company's profits. The Company also introduced a
number of investors to a scheme with a developer called Al Barakah which
promised a return of 50% over six months. After the collapse of Lehman
Brothers in September 2008, there was a slow-down of the Dubai property
market and developers stopped paying commissions. Mr Morgan says – this *c*
may not actually be in evidence but I do not think it is controversial – that
in particular Al Barakah itself became the subject of media attention in
early December and in early January 2009, creditors were notified that it
was insolvent. This left the Company with a liability under a guarantee to
Mr Lees, one of its customers, in the sum of some £280,000.

[13] There is one other piece of financial information which I would *d*
mention at this stage. Mr Bucci's evidence was that the Company was owed,
prior to the crash, some £745,000 by developers (to be paid through Casa
Dubai) but because of their financial difficulties, it was not realisable. It is
certainly the case that that money never reached the Company although
some of it may have reached Casa Dubai. By that time, the prospect of
recovery from Casa Dubai had vanished. *e*

[14] The Judge dealt with the two categories of payment (the first
category in paras 16–30 and the second in paras 31–42) reaching the
conclusion that all of the payments were payments at undervalue. There is
no appeal from those findings. In principle, therefore, s 238 was of
application but that was subject to the provisions of s 240(2).

[15] The Judge then addressed the question of solvency in the remainder *f*
of the Judgment. It is worth setting out what he said in para [44] in some
preliminary remarks directed at s 123:

> 'There is no suggestion in this case that any creditor served a
> statutory demand or obtained any judgment against the company at any
> time. In fact, there was no creditor pressure at any time, and the *g*
> company was in fact paying its debts as they fell due. The company had
> no cash-flow problem at the time of any of the payments. The question
> therefore is whether the company was at the material times deemed to
> be unable to pay its debts on the ground that the value of the company's
> assets was less than the amount of its liabilities, taking into account its
> contingent and prospective liabilities. This is what is sometimes called *h*
> the "balance-sheet test" as opposed to the "cash-flow test" otherwise
> applicable.'

[16] The Judge was therefore dismissive of the suggestion that there was a
cash-flow problem and that the Company was insolvent under the
cash-flow test. The focus of his decision was therefore on the balance-sheet *i*
test.

[17] Before I turn to the Judge's findings about the Company's solvency
and the way in which he applied the cash-flow test and the balance-sheet
test, I wish to say something about the authorities on s 123.

*a*

THE AUTHORITIES ON SECTION 123

[18] So far as s 123(1)(e) is concerned useful guidance is to be found in the decision of the Supreme Court in *BNY Corporate Trustee Services Ltd v Eurosail-UK 2007–3BL plc* [2013] UKSC 28, [2011] 2 BCLC 1, [2013] 1 WLR 1408, affirming the approach of Briggs J (as he then was) in *Re Cheyne Finance plc* [2007] EWHC 240 (Ch), [2008] 1 BCLC 741. The *b* discussions in both Lord Walker's speech in *Eurosail* and in the judgment of Briggs J in *Cheyne* include a review of the predecessor legislation. Until the Insolvency Act 1985, the words 'as they fall due' did not appear in the relevant insolvency legislation. Nor did express reference to the test of 'the value of the company's assets is less than the amount of its liabilities, taking into account its contingent and prospective liabilities'. Instead, one test of a *c* company being deemed to be unable to pay it debts was found in s 518(1)(e) of the Companies Act 1985, the test being 'if it is proved to the satisfaction of the court that the company is unable to pay its debts (and, in determining that question, the court shall take into account the company's contingent and prospective liabilities)'. That single test was replaced by the *d* two complementary provisions of what are now s 123(1)(e) and s 123(2). In that context, Lord Walker, at [34] of his speech approved of what Briggs J had said in [56] of his judgment:

'56. In my judgment, the effect of the alterations to the insolvency test made in 1985 and now found in s 123 of the 1986 Act was to replace in the commercial solvency test now found in s 123(1)(e), one futurity *e* requirement, namely to include contingent and prospective liabilities, with another more flexible and fact sensitive requirement encapsulated in the new phrase "as they fall due".'

[19] Briggs J went on, in [57] to note that,

*f*

'in the case of a company still trading, and where there is therefore a high degree of uncertainty as to the profits of its future cash flow, an appreciation that s 123(1)(e) permits a review of the future will often make little difference. In many, if not most, cases the alternative balance-sheet test will afford a petitioner for winding up a convenient *g* alternative means of proof of a deemed insolvency.'

[20] Briggs J did not address s 123(2) any further than that. He at least clearly saw s 123(2) as adding something of importance to s 123(1)(e). Before looking at what he said, I need to mention some of the authorities to which Lord Walker referred.

*h* [21] The first (see [28] of his speech) is *Re European Life Assurance Society* (1869) LR 9 Eq 122. In the course of his judgment, Sir James Wigram V-C said (at 128) that the court,

'… has nothing whatever to do with the question of the probability whether any business which the company may carry on tomorrow or *i* hereafter will be profitable or unprofitable. That is a matter for those who may choose to be the customers of the company and for the shareholders to consider.'

[22] The next case is *Re a Company* (*No 006794 of 1983*) [1986] BCLC

261 (also referred to as *Bond Jewellers*), decided by Nourse J on    *a*
21 December 1983. As Lord Walker described it (see at [30] of his speech),

'It concerned a tenant company with a propensity for postponing
payment of its debts until threatened with litigation. Nourse J felt
unable to make an order under s 223(d), and considered, but ultimately
did not make an order on, the "just and equitable" ground in s 222(f).    *b*
The case is of interest as illustrating (at p 263) that the phrase "as they
fall due", although not part of the statutory text, was understood to be
implicit in s 223(d). It is also of interest for the judge's observation on
the second point in s 223(d) (now embodied, in different words, in
s 123(2) of the 1986 Act):

"Counsel says that if I take into account the contingent and    *c*
prospective liabilities of the company, it is clearly insolvent in
balance-sheet terms. So indeed it is if I treat the loans made by the
associated companies [I remark in relation to this that these were loans
which the Judge had concluded had been used to prop up the company]
as loans which are currently repayable. However, what I am required to
do is to 'take into account' the contingent and prospective liabilities.    *d*
That cannot mean that I must simply add them up and strike a balance
against assets. In regard to prospective liabilities I must principally
consider whether, and if so when, they are likely to become present
liabilities." '

[23] That case was considered by Nicholls LJ in *Byblos Bank SAL v*    *e*
*Al-Khudhairy* [1987] BCLC 232, observing that the considerations leading
to Nourse J's conclusions did not appear from the report. Nicholls LJ did
not see anything inconsistent in what Nourse J had said with his own
conclusions (which I will come to in a moment).

[24] That brings me to *Byblos Bank*. The company was insolvent looking    *f*
at its balance sheet alone. But the company had a hope of receiving a
further capital injection. Nicholls LJ held that the focus of what was then
the relevant provision, s 223(d) of the Companies Act 1948, was on the
assets and liabilities of the company at the time when insolvency was
alleged and that account could not be taken of future assets. It is worth
repeating the citation from the judgment of Nicholls LJ in the speech of    *g*
Lord Walker:

'Construing this section first without reference to authority, it seems
to me plain that, in a case where none of the deeming paras (a), (b) or
(c) is applicable, what is contemplated is evidence of (and, if necessary,
an investigation into) the present capacity of a company to pay all its    *h*
debts. If a debt presently payable is not paid because of lack of means,
that will normally suffice to prove that the company is unable to pay its
debts. That will be so even if, on an assessment of all the assets and
liabilities of the company, there is a surplus of assets over liabilities.
That is trite law.

It is equally trite to observe that the fact that a company can meet all    *i*
its presently payable debts is not necessarily the end of the matter,
because para (d) requires account to be taken of contingent and
prospective liabilities. Take the simple, if extreme, case of a company
whose liabilities consist of an obligation to repay a loan of £100,000

a  one year hence, and whose only assets are worth £10,000. It is obvious that, taking into account its future liabilities, such a company does not have the present capacity to pay its debts and as such it 'is' unable to pay its debts. Even if all its assets were realised it would still be unable to pay its debts, viz, in this example, to meet its liabilities when they became due. It might be that, if the company continued to trade, during

b  the year it would acquire the means to discharge its liabilities before they became presently payable at the end of the year. But in my view paragraph (d) is focusing attention on the present position of a company. I can see no justification for importing into the paragraph, from the requirement to take into account prospective and future liabilities, any obligation or entitlement to treat the assets of the

c  company as being, at the material date, other than they truly are. Of course a company's prospects of acquiring further assets before it will be called upon to meet future liabilities will be very relevant when the court is exercising its discretion: for example, regarding the making of a winding-up order or the granting of short adjournments of a

d  winding-up petition.'

[25] What I think can be taken from the decisions of Nourse J and Nicholls LJ, read with the analysis of the law undertaken by Briggs J, is that the starting point under the pre-1985 legislation was to examine cash-flow insolvency – to see whether a company is commercially able to pay its debts

e  as they fall due – and then to examine whether future liabilities have any impact on the conclusion. Balance-sheet insolvency is not irrelevant to the ability to pay debts as they fall due.

[26] It is fair to say, however, that the precise relationship between the two limbs of the pre-1985 section was never clearly and fully analysed and did not, on the facts of the particular cases, need to be analysed. Further,

f  even in relation to cash-flow insolvency, the cases do not disclose factual situations where the company has put off paying debts which have fallen due and where the creditors have simply failed to complain or make demands for payment.

[27] Moreover, within the old section, there were two tests, albeit perhaps hidden away. On the face of the old section, there was only one question: is

g  the company unable to pay its debts? Implicit in that (see Lord Walker at [30]) was the phrase 'as they fall due'. But if it was clear that a company was balance sheet insolvent, it could nonetheless be wound up notwithstanding that it was cash-flow solvent. Even applying the discredited 'point of no return' test, a company might fail that test and yet be able to pay its debts as they fall due. A fortiori, following the decision of the

h  Supreme Court in Eurosail, it remains possible for a company to pass the s 123(1)(e) test but fail the s 123(2) test.

[28] Returning to Lord Walker's speech in Eurosail, after observing the difference as a matter of form between the current statutory test and the position under the Companies Act 1985, he noted that there is no

i  indication of how the two new provisions – s 123(1)(e) and s 123(2) – interact. He then went on at [37]:

'[37] Despite the difference of form, the provisions of s 123(1) and (2) should in my view be seen, as the Government spokesman in the House of Lords indicated, as making little significant change in the law. The

changes in form served, in my view, to underline that the "cash-flow"  *a*
test is concerned, not simply with the petitioner's own presently due
debt, nor only with other presently due debt owed by the company, but
also with debts falling due from time to time in the reasonably near
future. What is the reasonably near future, for this purpose, will depend
on all the circumstances, but especially on the nature of the company's
business. That is consistent with the *Bond Jewellers* case (*Re A*  *b*
*Company* (*No 006794 of 1983*)) [1986] BCLC 261, *Byblos Bank SAL*
*v Al-Khudhairy* [1987] BCLC 232 and *Re Cheyne Finance plc* [2008]
1 BCLC 741. The express reference to assets and liabilities is in my view
a practical recognition that once the court has to move beyond the
reasonably near future (the length of which depends, again, on all the
circumstances) any attempt to apply a cash-flow test will become  *c*
completely speculative, and a comparison of present assets with present
and future liabilities (discounted for contingencies and deferment)
becomes the only sensible test. But it is still very far from an exact test,
and the burden of proof must be on the party which asserts
balance-sheet insolvency …'  *d*

[29] One can see, therefore, that both under the old section and under
s 123 there were, and are, two different ways of showing that a company is
unable to pay its debts. The first is that the company is unable to pay its
debts as they fall due. As part of that exercise, account can be taken of
future and contingent debts falling due within the reasonably near future.  *e*
The second is whether liabilities exceed assets. Although the separation of
the old section into two separate subsections may not have been intended to
effect a significant change in the law, that separation is, I think, an
indication of how the draftsman saw the pre-existing law. As Lord Walker
noted, once the court has to move beyond the reasonably near future, any
attempt to apply the cash-flow test becomes speculative. A comparison of  *f*
assets and liabilities becomes the only sensible test. In applying that test, the
judgment of Nicholls LJ in *Byblos Bank* shows that account can only be
taken of existing assets: the logic of his reasoning means that expected
profits cannot be taken into account as an asset in assessing the cash-flow
test any more than the balance-sheet test. That is not to say that the  *g*
anticipated income and outgoings over the 'reasonably near future' cannot
be taken into account. If one is applying a cash-flow test then *ex hypothesi*
one is dealing with a situation which is not, in the view of the court,
speculative but is capable of rational prediction with some degree of
certainty.

[30] Further, in applying the balance-sheet test, future and contingent  *h*
liabilities only need to be taken into account: they do not have to be
brought into the balance at their face value or even a discounted value to
reflect the time to the date of payment. Instead, all the relevant
circumstances have to be considered and the result, as in *Eurosail* itself,
may be that the liabilities are of a nature such that they do not result in the
total assets being less than the total liabilities. There is, however, nothing in  *i*
that approach which mandates bringing in liabilities which are immediately
payable at anything less than their full value. Once one moves away from a
pure cash-flow assessment (taking into account prospective and contingent
liabilities in cases where the debts will be due in the reasonably near future),

Ch D          Re Casa Estates (UK) Ltd (Warren J)          61

a    it seems to me to follow, inevitably, that the solvency of a company with
contingent and prospective liabilities will properly be judged on a
balance-sheet test; if its current liabilities exceed its current assets, then it
will be insolvent even if it has managed (and is likely to be able to manage
in the reasonably near future ) to pay all of its debts from time to time, for
instance by a series of loans from its backers such as shareholders and
b    directors.

[31] The decision of the Court of Appeal in *Eurosail* (see [2011] 2 BCLC
1, [2011] 1 WLR 2524) had generated a considerable amount of discussion
in the light of certain things that Lord Neuberger MR had said. In his
discussion, Lord Neuberger adopted the approach of Professor Sir Roy
Goode in *Principles of Corporate Insolvency Law* (3rd edn, 2005) where
c    the professor had written:

'If the cash-flow test were the only relevant test [for insolvency] then
current and short-term creditors would in effect be paid at the expense
of creditors to whom liabilities were incurred after the company had
reached the point of no return because of an incurable deficiency in its
d    assets.'

[32] Lord Neuberger reasoned to the conclusion which adopted the 'point
of no return' as the test which the court is to apply in deciding upon
insolvency under s 123(2). The 'point of no return' was, however, expressly
e    rejected by Lord Walker as a paraphrase of the test in section 123(2) (see
[42] and [48] of his speech), albeit that it 'illuminates' the purpose of the
subsection as Toulson LJ had put it in his own judgment in the Court of
Appeal. Lord Walker at [42] of his speech explained his approach further
when agreeing with the following passage from Toulson LJ's judgment
at [119]:
f
'Essentially, s 123(2) requires the court to make a judgment whether it
has been established that, looking at the company's assets and making
proper allowance for its prospective and contingent liabilities, it cannot
reasonably be expected to be able to meet those liabilities. If so, it will
be deemed insolvent although it is currently able to pay its debts as they
g    fall due. The more distant the liabilities, the harder this will be to
establish.'

[33] The last sentence in that quotation puts the same point as was made
by Lord Neuberger in [62] of his own judgment when he said:

h    'Clearly, the closer in time a future liability is to mature, or the more
likely the contingency which would activate a contingent liability, and
the greater the size of the likely liability, the more probable it would be
that s 123(2) will apply.'

i    [34] Notwithstanding what Lord Walker said, the difference in form
between the old and the new provisions cannot be wholly ignored. What
the new form achieves is to throw into focus the distinction between
considerations of cash flow and considerations of assets and liabilities. It
requires the court to focus clearly on the debts which are due or will fall
due in the reasonably near future when applying s 123(1)(e) and which

debts are future debts to be brought into account under s 123(2). A given *a*
liability of a company, it seems to me, either is or is not a debt which is to
be taken into account in applying s 123(1)(e). If it is such a debt (because it
is due or will fall due within the reasonably near future) then it will be
taken into account in assessing whether the company is able to pay its debts
as they fall due. But if it is not such a debt, then the liability is necessarily *b*
a prospective or contingent liability. On this hypothesis, the debt is not
taken into account in assessing cash-flow solvency and it is necessary to go
on to consider s 123(2). In doing so, the court has to make a judgment
about whether the company can (adopting the approach of Toulson LJ
approved by Lord Walker) reasonably be expected to meet its liabilities –
not just the future liabilities but all of the company's liabilities. I do not, in *c*
any case, detect in what Lord Walker said (or indeed in Toulson LJ's
analysis in the section of his judgment dealing with the history of the
provision) a rigid demarcation between s 123(1)(e) and s 123(2). They
feature as part of a single exercise, namely to determine whether a company
is unable to pay its debts.

[35] Consider then a company which is balance-sheet insolvent on the *d*
basis of its current debts that is to say debts which have fallen due for
payment or will in the reasonably near future fall due for payment. Those
are precisely the debts which need to be taken into account in making an
assessment under the cash-flow test in accordance with s 123(1)(e). It is
difficult to see how the company could then be said, with nothing more, to
be cash-flow solvent. However, immediate cash-flow problems might be *e*
subject to amelioration; for instance, immediate debts could be covered by a
short term loan or by an overdraft facility, although that assumes the
creation of new liabilities on the part of the company which will either be
themselves liabilities which will fall due for payment within the reasonably
near future, in which case the cash-flow problem still arises, or one posits a
series of loans running past the reasonably near future, in which case the *f*
commercial reality is no different from that of a prospective liability to
which it would be appropriate to apply s 123(2), with liabilities exceeding
assets. The same would apply if a particular creditor (eg a shareholder or
director) agreed to postpone the calling-in of his debt. In contrast, if
immediate liabilities were to be financed by further long-term funding, then
that funding would give rise to a prospective or contingent liability which *g*
would not fall to be taken account of when applying the s 123(1)(e) test;
but that is just the sort of case where the test in s 123(2) would apply with
the result in this example, that liabilities exceed assets.

*h*

THE JUDGE'S APPROACH AND FINDINGS

[36] Reading the Judgment as a whole, there can be no doubt that the
Judge applied the 'point of no return' test in reaching his conclusion about
balance-sheet insolvency. He did not consider, or apply in the alternative, *i*
any other test. He was right to apply that test in the light of the law as was
when he delivered the Judgment.

[37] Mr Boeddinghaus submits that had the Judge applied the correct test
he would inevitably have come to the conclusion that the Company was

*a*  unable to pay its debts within the meaning of s 123 when each of the payments was made.

[38] Further, he says that the Judge was incorrect in what he said in para [47] of the Judgment:

*b*  '[47] Whilst those comments [ie of Lord Neuberger] primarily concerned the approach to be taken towards prospective and contingent liabilities, its effect is not so limited. Take, for example, the case of a company which is dependent upon the support of its directors. The directors' loan accounts may, in strict analysis, be current liabilities, but, if the directors have no immediate intention of calling the loans in, the company could not be said to have reached the point of no return, even *c* if the size of the directors' loan accounts meant that current liabilities exceeded current assets. The company would not in those circumstances be deemed to be unable to pay its debts under s 123(2).'

[39] He was wrong, Mr Boeddinghaus submits, not only because, once again, he was adopting the 'point of no return' test, but also because he was *d* inadmissibly treating a present liability as if it were simply a contingent or prospective liability. A present liability is precisely that – a liability which is due for immediate payment – and if the value of a company's assets are less than the amount of its liabilities due for immediate payment, it falls within s 123(2).

[40] In late 2008, there was a generally unanticipated collapse in the *e* Dubai property market, after the last of the payments was made to Mrs Bucci: see para [49] of the Judgment. It is on that basis and on the basis of the lack of creditor pressure referred to in para [44] (see para [15] above) that the Judge was able to make the finding, in that paragraph, that the Company was solvent on a cash-flow basis until the collapse. He did so, according to Mr Boeddinghaus, notwithstanding that Mrs Bucci's own *f* expert, Mr Vigar, gave no evidence at all on the question of cash-flow insolvency in his expert report nor in evidence in chief: his only evidence was in cross-examination and there was nothing unhelpful to Mr Carman's case in what he said.

[41] It is true that very little was said about cash-flow insolvency on *g* behalf of Mrs Bucci. However, her evidence and that of Mr Bucci was that the Company was profitable and had met all of its liabilities and in that the Judge appears to have agreed with them (although I have some observations to make later). Mr Vigar dealt with it only very briefly in his expert report. At section 2 he set out how his opinion on the questions raised in his instructions could be summarised. He stated in 2.1 that 'the cash-flow *h* position is considered in 2.5 below' and in 2.5 he stated that the Company remained solvent throughout 2008 until the cash deposits held in Dubai could not be recalled. His detailed reasons were stated to be contained in section 3. Most of the report is concerned with the balance sheet and not with cash flow. Cash flow is dealt with in a very short section, 3.5, of the report, incorporating appendix 5 to the report. Appendix 5 summarised the *i* Company's net assets month by month throughout 2008. Mr Vigar acknowledged that the figures for May and June looked 'highly suspect' so that it would be prudent to average the two months. He concluded that the Company was making profits up to and including July when it started to make losses. But the Company 'remained solvent throughout 2008 until the

*a*

cash funds held in Dubai could not be recalled'.

[42] Appendix 5 comprises a table setting out the reconstructed balance sheet for each month of 2008. It shows a positive balance each month increasing from just over £356,000 in January to £990,500 in August and then decreasing to £763,000 in December but with a sudden glitch in May when a deficit of nearly £610,000 is shown. The assets include the GUL loan, the amount of which is shown as increasing from nearly £299,000 in January to just over £474,000 in December.

*b*

[43] Mrs Bucci's then counsel (Mr David Berkley QC) included a single paragraph in his skeleton argument to the effect that the Company held large cash reserves; there was no evidence of any demands, pressing creditors, unsatisfied debts or anything else to suggest that until December 2008 the Company was not meeting its liabilities or paying its debts as they fell due. It operated its bank accounts without default and had a £50,000 overdraft facility. But for the Dubai crash, it would have continued to meet its obligations.

*c*

[44] His closing written submissions were also quite brief on the issue of cash flow comprising three material paragraphs, 12.3 to 12.5. In summary:

*d*

(i) The Company was not facing creditor claims. The evidence was of a cash-rich company.

(ii) The explanations given by Mr Bucci for not having forwarded deposits or instalments to developers was consistent with his attempting to safeguard and ringfence investors' money. He was able to show that moneys had been withheld because of poor performance or non-performance by developers.

*e*

(iii) Bank balances at June 2008 show healthy balances (something over £97,000 in total and the Company had the use of a £50,000 overdraft facility).

[45] I ought to record at this point that Mr Carman himself, in his first witness statement at para 47, explained that the Company was cash-flow solvent but this was because it took substantial deposits from investors wishing to purchase properties. He said that it was, at the time of his witness statement, unclear whether, through the set-off arrangements (as to which see para [47] below), these moneys were transferred in full to Casa Dubai or whether they were ever remitted to the Dubai developers.

*f*

[46] In paras [50]–[52] of the Judgment, the Judge set out very briefly some further factual aspects. It is worth setting them out in full:

*g*

'[50] The company's profit consisted primarily of its commission from sales. It did however receive customer deposits for ultimate onward transmission to the developer via Casa Dubai. To save on exchange control losses, the company retained some customer deposits. Some were passed on to Casa Dubai directly. Others were treated as remitted to Casa Dubai via a set-off arrangement against moneys due the other way. (The set-off operation is explained in the liquidator's letter to Mr Lees, an investor, dated 7 August 2009). The company did not set up a separate account for handling customer deposits. Technically, those arrangements gave rise to liabilities of the company towards its depositors until such time as the deposits were paid to the developer in satisfaction of the customers' contractual obligations. There were

*h*

*i*

a    corresponding amounts due from Casa Dubai in respect of moneys remitted to and still held by Casa Dubai or treated as remitted under the set-off arrangements.

[51] There was a rapid expansion of the business in 2007 and 2008. This increased the apparent profits of the company up to July 2008 (as ascertainable from its SAGE accounts system) but also resulted in

b    additional liabilities to customers whose deposits had not reached the developer, either because the development had not reached the appropriate stage justifying payment or because the developer could not hold deposits. The SAGE accounting system was operated in a way which was far from ideal. Nevertheless, the SAGE records gave a broadly accurate picture of the company's profitability, a point

c    confirmed by Mr Vigar.

[52] As a result of the sudden collapse of the property market in Dubai, which post-dated the September 2008 collapse of Lehman Brothers by over two months, Casa Dubai failed and the company's substantial liabilities to its customers crystallised, without the possibility of recovering any of those liabilities from Casa Dubai, or outstanding

d    commissions. However, until that point, the company's liabilities to customers were effectively contingent upon the failure of Casa Dubai or the developers. The company had no cash-flow difficulties until then, and had not reached the point of no return. When it did so, it reached the point of no return very suddenly, and ceased its business.'

e

[47] It is apparent from the way the Judge expressed himself in para [50] that he accepted the evidence about set-off. This was a set-off of commissions due against money due to developers. According to Mr Bucci, a client would pay the Company in the UK. The administrator would advise

f    the Dubai office (that is Casa Dubai) that payment had been received. Casa Dubai would pay the developer from commissions received from developers. If the commissions were not enough to pay the developer, a transfer would be requested from the company in the UK and sufficient funds would be transferred. It is not at all clear to me from what I have been shown how this would actually work in practice given that

g    commissions averaged at 6% but deposits were of a larger percentage than that. Further, it is not on every sale that a commission was immediately payable.

[48] Moreover, there ought ordinarily not to have been more than a very few days between receipt of moneys by the Company from a customer and its onward transmission, via Casa Dubai, to the developer. It is clear from

h    the evidence, however, that if all deposits and instalment payments had been paid to the developers in that time-scale, the Company would not have been able to build up funds with which to make the GUL loans and incur other expenditure in acquisition of its own properties nor would it have ended up with liabilities, by the time it went into liquidation, of over £640,000 to customers. In that context, even if the explanation given by Mr Bucci about

i    why certain deposits and instalments were retained, the expenditure of those moneys in other ways, such as loans to GUL or acquisition of illiquid assets, would have resulted in those assets being unavailable to meet the Company's cash-flow needs. Given that, ordinarily, a new deposit ought to have been passed across within a very few days, it would not have been

available to meet outstanding deposits or instalments. The whole edifice
depended, it seems to me, on a continuing flow of new business at the same
or even greater level than in the past.

[49] Mr James Morgan, who now appears for Mrs Bucci, asserts that the
Company was profitable even during 2008, a profit driven by average
monthly commissions of around £120,000, pointing out that the Judge
accepted that the SAGE reports from which this figure was derived gave a
broadly accurate picture of the Company's profitability. But a currently
profitable company is not necessarily either cash-flow solvent or
balance-sheet solvent, so the Judge's finding of fact does not lead inevitably
to a conclusion of cash-flow solvency.

[50] Mr Boeddinghaus does not accept that the Judge could properly have
decided that the Company was profitable. The SAGE reports were not
reliable (not a fault of SAGE but of the way it was operated). The
spreadsheet produced by Mr Vigar (his appendix 5 mentioned above) itself
relied on the SAGE reports. The spreadsheet contains a line at the bottom
showing the monthly increase (or in one case decrease) in assets throughout
the year. This is what was relied on by Mr Vigar as demonstrating the
profitability of the Company. However, if one takes appendix 5 at face
value, the balance sheet reveals a positive position even if one strips out of
assets the amount of the GUL loan from time to time, and attributes a nil
value to it. I do not understand how that factor is consistent with what was
recorded by the Judge namely that the experts were agreed that if the GUL
loan was valued at nil, the Company was balance-sheet insolvent at all
times after 31 December 2007. It is not possible, either, to see how the
monthly balance sheets are consistent with a starting point on 31 December
2007 of a net deficit (of £30,161 on Mr Minshall's figures). And even
Mr Vigar stated in his report that the figures for May and June looked
'highly suspect'.

[51] It is important to record what the Judge said in para [56] of the
Judgment namely that the experts were agreed that the Company was
marginally insolvent on a balance-sheet basis in March 2007. I am not sure
that is a totally correct summary: Mr Vigar had produced a balance sheet
which showed a position of net liabilities of £10,750 at March 2007. The
expert for Mr Carman, Mr Minshall, agreed that the Company was
insolvent on that date but did not, so far as I can see, ever commit himself
to that figure, being of the view that the data was unreliable. In any case,
this was not really of much relevance on the Judge's approach since he
concluded that the Company had not reached the 'point of no return' and
was not, therefore, insolvent.

[52] Moving ahead to December 2007, the Judge stated that the
Company was balance-sheet solvent taking into account the GUL loans at
face value but not if the loan was valued at nil. In his view (see para [57] of
the Judgment) it did not matter which:

'Either way, the company had not reached the point of no return, and
was trading profitably. Business was increasing, and there was no
likelihood of the company being called upon to refund the customer
deposits. The company continued to trade profitably overall in 2008.'

[53] This, unfortunately, seems to ignore why the company was not called
on to refund deposits, a matter about which the Judge made no finding. It

*a* might well have been because the depositors did not know that their deposits had not been paid,

[54] The Judge said that he was able to reach the conclusion which he did without needing to place any value on the GUL loan. He said in para [58] that he was inclined to the view, without deciding, that the GUL loan had no value. That, he acknowledged, weakened the balance sheet but did not

*b* 'point to the company having reached the point of no return'. The Company was able to make the payments it did to GUL and to Mrs Bucci 'precisely because it had not reached the point of no return, and had been trading profitably overall in 2007 and 2008'. However, in para [10], he had said that he did not consider that GUL was ever good for the money it owed to the Company or that it would be proper to regard the loans as

*c* having any significant value when considering the Company's solvency following the advances. It is not immediately obvious how the statements by the Judge in paras 10 and 58 are to be reconciled: I shall explain how I consider this can, and should be, done later in this judgment (see at para [99] below).

*d* [55] Both experts were, as the Judge said in para [58] of the Judgment, of the view that if the GUL loans were valued at nil, the Company was insolvent in December 2007 and at all times after that. That was not an end of the matter because, as he explained, neither expert was applying the test of 'point of no return'. Each expert,

*e* 'approached the matter as a mathematical exercise. This is a helpful starting point, but does not answer the question of when the point of no return was reached, which is a question I have to answer based on the evidence as a whole'

*f* [56] Carrying out that exercise, the Judge concluded that the 'point of no return' was reached in December 2008 and not before. He placed particular reliance on the explanations given by Mr Bucci of the business activities, both in the UK and in Dubai, with which he was involved. Even though Mr Bucci was subject to sometimes justified criticisms by Mr Boeddinghaus,

*g* for example in not segregating customers' moneys in a separate account and in keeping records that were at times shambolic, the Judge accepted Mr Bucci's explanations of the course the business was taking throughout 2007 and 2008. Mr Bucci had emphasised the suddenness of the Dubai property collapse, and that, until then, the business was viable and the Judge accepted that evidence.

*h* [57] The Judge saw the result of the Dubai crash in this way at para [60] of the Judgment:

'[60] The result of the Dubai crash is that the Company's liabilities towards depositors, which would but for the crash have been dealt with in the ordinary course of business, have come to fruition, without any

*i* possibility of recoupment from Casa Dubai. This itself excited the suspicion of Mr Boeddinghaus, but I do not consider this evaporation to be the responsibility of Mr Bucci, or a reason for rejecting his evidence concerning the company's trading activities. Any balance sheet prepared with hindsight can now show the gloomiest of pictures, with

customer balances in Dubai being written down to nil whilst the      *a*
liabilities remain. That was not the position until the end of 2008,
however.'

[58] I have already mentioned the absence of any express reference to a
trust claim or to authorities such as *Quistclose* in Mr Boeddinghaus'      *b*
submissions to the Judge. The matter did come up later, however. After
delivering the Judgment, the Judge heard two applications from
Mr Boeddinghaus one of which was an application for permission to
appeal. In the course of an oral judgment on that application the Judge said:

'In addition, it is said by Mr Boeddinghaus that the position is      *c*
transformed if, as Mr Vigar appeared to accept, the depositors' moneys
were treated as trust assets. I am not satisfied that that would have any
material impact upon whether or not the company was or was not able
to pay its debts at the material times. The fact is that the company,
rightly or wrongly, mixed up depositors' assets with its own assets, and
that gave rise to a liability which would have been discharged in the      *d*
ordinary course of business but for the Dubai property crash, because if
the property market had not crashed and the developers had not failed,
then the developments would have been completed, the payments
would have been made and the company would have been discharged
from all liability. It seems to me that, by not setting up a separate
account for customer deposits, the company increased its own      *e*
liabilities, which must be recognised, but, equally, what must be
recognised is that the assets available to it to match those liabilities were
also increased. The fact that there might have been created within the
accounting systems a notional trust account does not alter the fact that
the moneys were in fact treated as the company's and mixed up with its
own, and that its liabilities and assets must be looked at at any given      *f*
moment against the facts as they were and not in the light of the facts as
they should have been.'

[59] This reflects, I think, a passage in the cross-examination of Mr Vigar
where he accepted (i) that the Company should have had a client account      *g*
but never did have one; (ii) that the moneys belonged to the clients until it
was passed over to Dubai (by which was meant not Casa Dubai but the
developer); and (iii) that the moneys were in effect trust moneys (perhaps a
matter for the Judge rather than the witness). And it reflects what the Judge
himself said in the exchange with Mr Boeddinghaus when making the
application for permission to appeal: 'I was thinking more of the cases that      *h*
you get from time to time: "Has the company set up an effective trust
account to protect people currently putting in money?" and things like that.
You look at what the company did'.

[60] The possibility of a trust was mentioned in one of the documents in
the trial bundle, namely a proof of debt from Mr Rashid, a solicitor. He was      *i*
an intending purchaser of a property in Dubai and states in his proof of
debt form that he had paid 20% of the purchase price to the Company 'for
onward distribution to the developer but was unlawfully retained by [the
Company] … The money was subject to a purpose trust and should fall
back to myself as the payer since it falls outside [the Company's] insolvent

*a*  estate'. There was no evidence to suggest that the developer was in fact paid the 20%.

[**61**] Apart from that, there was no focus on the trust point. It was not addressed in the witness statements or skeleton arguments for trial; it was not a point which Mrs Bucci had addressed, since it had not been raised.

[**62**] Before turning to the grounds of appeal, I should make one further

*b*  comment about para [60] of the Judgment. The Judge stated that, but for the crash, the Company's liability to depositors would have been met in the ordinary course of business. The ordinary course of business, however, involved the continued receipt of deposits through new sales and the generation of commission. Although the Judge clearly considered that the liabilities of existing depositors would be met in this way, he made no

*c*  finding about the consequences of the further business which he envisaged or the longer-term position; indeed, he did not even mention this aspect. There was not a Ponzi scheme, as the Judge found, but he did not suggest that the existing liabilities (which related not only to deposits but also to instalment payments of the purchase price) would be met simply out of

*d*  commission rather than by utilisation of future deposits and instalment payments to generate cash flow. The way in which the liabilities would be met is clearly a factor which needs to be taken into account in assessing solvency, certainly once one moves away from the 'point of no return' test and possibly even applying such a test. If a liability can only be discharged by creating another liability (eg by borrowing from a bank or receiving

*e*  deposits or instalment payments which have to be applied contractually in a particular way) then the net asset position is not changed. The Company may not, on that basis, have been cash-flow insolvent but that is not to say that it was not balance-sheet insolvent.

*f*  THE GROUNDS OF APPEAL

[**63**] The grounds of appeal were as originally formulated as follows:

(i) The Judge erred in law in holding that the moneys paid to the Company by investors (which were moneys paid by them to meet their deposits or instalment payment obligations in respect of property purchases

*g*  in Dubai) became the property of the Company which it could use for its own commercial purposes.

(ii) Alternatively, the Judge erred in fact in so holding.

(iii) Of particular importance in that context are (i) the (incorrect) reliance by the Judge, in concluding that the moneys became assets of the Company, on the absence of a separate client account and (ii) the (correct) view of

*h*  Mrs Bucci's own expert that the Company ought to have kept a separate client account.

[**64**] Accordingly, the Judge should have held that the moneys were trust moneys, held on *Quistclose* trusts for the purpose of meeting deposit and instalment payment obligations on the part of investors. The practical consequence of that, it is said, is that if moneys advanced by investors and

*i*  held by the Company (or used for its own commercial purposes) were taken out of account when considering the Company's financial position, the Judge would have concluded that the Company was insolvent at all material times, not only on a balance-sheet basis but on a cash-flow basis.

[**65**] The grounds of appeal also allege that the Judge erred in fact in that

his conclusions on the question of insolvency were against the weight of the     *a*
evidence in that:

(i) He failed to attach any weight to the fact that the GUL loan had no
value.

(ii) He accepted (when he should not have done) the explanation put
forward by Mr Bucci that the Company had applied moneys paid by     *b*
investors by the operation of a set-off system when the explanation was not
credible nor would they account for the fact that commission payable by
developers to the Company cannot have matched in amount the sums paid
by investors.

(iii) He gave insufficient weight to the circumstances of the Company's
last 18 months of trading in concluding that the Company's point of no     *c*
return was not reached until December 2008.

[66] I can deal with those last three matters quite briefly.

(i) As to the first, he expressly stated that the judge reached his conclusion
without placing any value on the GUL loan. He therefore recognised that
the test which he was applying – the 'point of no return' test – would
operate in the context of an adjusted balance sheet which ignored the     *d*
amount of the loan as an asset. It is difficult to see what more weight he
could have given to the point. Mr Boeddinghaus' complaint is surely not
that the Judge attached no weight to the nil value of the loan but that,
having done so, he reached the wrong conclusion: but that is a different
point.

(ii) As to the second, I am wholly unconvinced by this. I do not     *e*
understand why Mr Bucci's explanation is said not to be credible. The Judge
accepted it and that is not a finding with which I should interfere. The
Judge did not suggest, I should add, that *all* of the deposits were paid in this
way and to have done so would have been contrary to Mr Bucci's own
explanation of how the set-off operated. In particular, his evidence was that
if Casa Dubai did not have enough money (representing commissions) in     *f*
hand, further funds would be remitted from the UK.

(iii) Since the 'point of no return' does not provide the right test, it
becomes irrelevant whether the Judge was right or wrong. The question
now is whether applying the correct test, I am in a position to be able to
decide whether the Company was unable to pay its debts giving due weight
to the factor which Mr Boeddinghaus identifies.     *g*

[67] In his skeleton argument (produced before the decision of the
Supreme Court in *Eurosail*), Mr Boeddinghaus submitted that, if the 'point
of no return' test was the correct test, it had no application in the present
case. He took issue with the Judge's statement at para [47] of the Judgment
to this effect: that although Lord Neuberger's comments primarily     *h*
concerned the approach to be taken towards prospective and contingent
liabilities, the effect of that approach is not so limited. Mr Boeddinghaus'
submission is that Lord Neuberger was addressing only the effect of
prospective and contingent liabilities in a case where the company is not
balance-sheet insolvent on the basis only of its current liabilities (and so
would be able, at least apparently, to continue trading). In the present case,     *i*
prospective and contingent liabilities were not in issue and there was no
need to invoke the 'point of no return' test at all. Had the Company not
made use of investor moneys, and on the correct assumption that the GUL
loan had no value, the Company could not have continued to pay its debts

*a*  because (as both experts believed) it was insolvent on a balance-sheet basis.

[68] Following the decision of the Supreme Court, Mr Boeddinghaus produced a further skeleton argument in which he submitted that it is now clear that Mr Carman's claim should succeed. The 'point of no return' test had been rejected and Mrs Bucci was unable to demonstrate, applying the correct test, that the Company had sufficient assets to be able to meet even
*b*  its present liabilities: the burden of proof falls on her under s 240(2) under which the requirement that a company is unable to pay its debts is presumed to be satisfied unless the contrary is shown by the company.

[69] At this stage, I should mention that Mr Morgan identifies what he describes as a complete change of emphasis in Mr Carman's case, with another change – the allegation of a *Quistclose* trust – being an entirely new
*c*  issue which he submitted Mr Carman should not be entitled to raise at this late stage. That change of emphasis is the reliance in this appeal on cash-flow insolvency which, according to him, hardly featured in the hearing below. Mr Carman's counsel, in opening, stated that balance-sheet insolvency was the key issue. Let me get that point out of the way now.
*d*  Cash-flow insolvency is not a new point raised for the first time in this appeal as is shown by the matters I have mentioned at para [41] above. The emphasis of a case frequently changes as it works its way up the court system. That does not mean to say that a particular cannot be given greater prominence on an appeal. Mr Boeddinghaus is perfectly entitled to make what he can of cash-flow insolvency on this appeal.
*e*

DISCUSSION

[70] The first question I wish to address is the one of legal dispute between the parties. The question can be asked this way: if a company has current liabilities the amount of which exceeds the value of its assets, is it
*f*  necessarily deemed unable to pay its debts under s 123(2)? By 'current' I intend to refer to liabilities which are currently due for payment or which will fall due for payment in the reasonably near future and which are therefore relevant to the cash-flow test. I deliberately do not insert the word 'current' before assets because, in the present case, it is not suggested that
*g*  there are any contingent or prospective assets (to use the mirror of contingent and prospective liabilities) the amount of which have to be brought into account. Of course, Mr Bucci's evidence was that he hoped that the Company would have a future income stream by way of commission, a hope which was dashed by the property collapse in Dubai. But it cannot sensibly be argued that that hope (before it was dashed) could
*h*  be brought into account as an asset in its own right.

[71] On a literal reading of s 123(2), Mr Boeddinghaus is correct. On the hypothesis underlying the question as I have formulated it, the value of the debts clearly is less than the amount of the liabilities and the difficulties which arise out of how prospective and contingent debts are to be taken account of simply do not arise.
*i*
[72] Mr Morgan submits that this literal reading is not the correct approach. Rather, the starting point is s 123(1)(e) and whether a company is able to pay its debts as they fall due. In answering this question, the court is to take account of the company's ability to pay its debts over the reasonably short period. He relies on the passage which I have cited from

*Cheyne* and the approval by Lord Walker of what Toulson LJ had said in    *a*
the Court of Appeal. In particular, he submits that what Lord Walker said
lends powerful support to the view that the short term, and indeed the
reasonably foreseeable future, is dealt with by s 123(1)(e) and that recourse
to s 123(2) is appropriate only once one has to move from the reasonably
near future, when application of the cash-flow test becomes speculative and    *b*
a comparison of present assets with present and future liabilities becomes
the only sensible test. And so, Mr Morgan submits, if the company *is* able
to pay its debts as they fall due, s 123(2) is a means of deeming the
company insolvent on the basis of its present, *prospective and contingent*
debts. But it is not concerned with deeming a company to be insolvent on    *c*
the basis of its present assets and liabilities alone when otherwise it can pay
its debts as they fall due. Recourse only needs to be had to s 123(2) where
there are in fact prospective or contingent debts. In any case, the court
should not apply a mechanistic test but should conduct a value judgment as
to whether in all the circumstances it is or was at the relevant time
reasonably likely that the company will be able to meet its liabilities.

[73] I have already considered *Eurosail* and other cases earlier in this    *d*
judgment. There are, however, some additional points to make in the light
of the submissions of both Mr Boeddinghaus and Mr Morgan.

[74] The first point to note is that neither Briggs J nor Lord Walker was
addressing the question which I have identified. Briggs J's focus was on the
way in which the cash-flow test was to apply and, in that context he
concluded that it involved an element of futurity, 'as they fall due' replacing    *e*
'taking into account its prospective and contingent liabilities' which had
appeared in the Companies Act 1985. He expressly recorded that in many
cases 'the alternative balance-sheet test will afford a petitioner a convenient
alternative means of proof of a deemed insolvency'.

[75] The second point to note arises from the example given by
Nicholls LJ in *Byblos Bank* contained in the passage of his judgment set out    *f*
at para [24] above. This was the extreme (to use Nicholls LJ's own word)
example of a company liable to repay a £100,000 loan one year hence and
whose only asset was worth £10,000. It was obvious that such a company
did not have the present capacity to pay its debts and as such was 'unable to
pay its debts'. If one alters Nicholls LJ's example a little, and posits that the    *g*
debt of £100,000 is immediately payable but is one which the creditor
(suppose a shareholder) has indicated he does not, for the moment, intend
to call in, then the company is, I suggest, as insolvent as the one in
Nicholls LJ's example. On Mr Morgan's approach, it would not be
insolvent because it can pay its debts as they fall due and the case is not one
of a prospective or contingent liability. Perhaps that is not fair to    *h*
Mr Morgan: he could say that a debt which has been postponed in this way
is properly to be seen as a prospective debt and is thus to be treated as such
in the application of the test adumbrated by Lord Walker (and Toulson LJ).

[76] Before moving away from *Byblos*, it seems to me that the passage of
the judgment of Nicholls LJ starting with the words 'It might be that, if the
company continued to trade ...' to the end of the extract set out at    *i*
para [24] above does lends some support to Mr Boeddinghaus' position. On
the basis, as stated by Lord Walker, that s 123 is not intended to represent
a significant change in the law, it remains the case that the future
profitability of a company cannot result in the assets of the company at any

*a*  time being treated as other than what they are.

[77] I do, nonetheless, accept that there is some force in Lord Neuberger's observations in [44] of his judgment in *Eurosail* in the Court of Appeal. In that paragraph, he said that in practical terms it would be rather extraordinary if s 123(2) was satisfied every time a company's liabilities exceeded its assets: many companies are solvent and successful, and many *b*  companies early on in their lives would be deemed unable to pay their debts if this was the meaning of s 123(2). He rejected Mr Sheldon's submission, made to meet that point, to the effect that the court had a discretion to refuse to make a winding-up order in such circumstances.

[78] I consider that one must treat with some circumspection Lord Neuberger's rejection of Mr Sheldon submission. Toulson LJ took the *c*  view (see [118]) that there may well be situations in which a company may be unable to pay its debts within the meaning of s 123(2) but for a particular reason the court does not consider that the best course would be to order that it should be wound up. And Nicholls LJ, albeit in a slightly different context, acknowledged that the prospect of a further injection of *d*  capital was something to be taken account of in the exercise of the discretion whether to wind up a company. Moreover, Lord Neuberger's practical concerns were an important element in driving him to the conclusion that the 'point of no return' was the correct test. With that test having been rejected, the consequence may be that what Lord Neuberger regarded as an extraordinary result will be commonplace.

*e*  [79] One can return, then, to the words of Toulson LJ, expressly approved by Lord Walker, and ask 'whether it [the company] cannot reasonably be expected to be able to meet those liabilities'. A reading of the passage from which those words are taken shows that 'those liabilities' are prospective and contingent liabilities but there can be no doubt, in my view, that the question raised by Toulson LJ subsumes the question whether the *f*  company is in fact not able to meet its current liabilities. This is a different question from cash-flow insolvency. A company may be able to pay its debts as they fall due by obtaining a loan from a bank or from a shareholder or director and, depending on the facts, this may mean that s 123(1)(e) does not apply. But such a loan would not improve its balance sheet and it would remain necessary, in my view, to consider s 123(2) as a *g*  separate matter. I therefore reject Mr Morgan's submission that it is necessarily only s 123(1)(e) which is engaged, and not s 123(2), in cases of immediate liabilities exceeding assets.

[80] I do, of course, accept that the deeming provision of s 123(2) may not apply even though the balance sheet shows a large deficit. That was the *h*  case in *Eurosail* itself because prospective and contingent liabilities were brought into the balance sheet on the basis of certain accounting conventions. On that basis, *Eurosail* was in the position of having net liabilities of £75m but was still held not to be insolvent. Those liabilities reflected, however, a large amount of long-term debt in relation to which the outcome was wholly speculative: see [49] of Lord Walker's speech. It *i*  was for that reason that Lord Walker considered that it had not been demonstrated that the company was unable to pay its debts.

[81] But I also reject Mr Boeddinghaus' submission that an excess of immediate liabilities over assets necessarily means that the company is insolvent, at least when it is expressed in that unqualified way. It still has to

be asked, I consider, whether the company cannot reasonably be expected to meet its liabilities. The answer to the question, when asked in the context of immediate liabilities exceeding assets, may be clear on the facts of a particular case and I accept that the court might be relatively easily satisfied that the company is insolvent. I would go this far with Mr Boeddinghaus, that is to say that I accept that the starting point must be that a company which has immediate liabilities which exceed assets is unable to pay its debts. Although, in the case of a winding-up petition, it is for the petitioner to establish to the satisfaction of the court that the case falls within s 123(2), the fact that a balance sheet shows a deficit is, by itself, enough to raise a prima facie case of insolvency; there is then an evidential burden on the company to show why it can, notwithstanding its balance sheet, reasonably be expected to meet its liabilities.

[82] That approach meets, in my view, the sort of example given by Lord Neuberger. If one asks why a successful company or a start-up company with such a balance-sheet deficit is not unable to pay its debts, the answer can only be given by looking at the facts of the particular case which show, for some reason, that the liability will be met. Start-up companies (those early in their lives as contemplated by Lord Neuberger at [44]) are solvent because those financing them have confidence in their eventual profitability and either provide term loans (so that one is looking at prospective debts and not immediate debts) or loans payable on demand but with the expectation that the loans will not be called on for some time. Although it is not for the court to speculate about the commercial success of a company, it can, and sometimes must, take a view, on the evidence, about the likelihood of loans being called in and of the likelihood of a company being able to meet them when called in. For example, if a company has a significant balance-sheet deficit all of which can be attributed to shareholder loans which, in practice, will not be called in so long as the company is profitable, it may be possible to reach the conclusion that the company is not unable to pay its debts. But if, to take an extreme example, there is no prospect at all of the company ever making sufficient profit to repay the loans, it would not be correct to describe the company as able to pay its debts when considering the application of s 123(2) even if it is able to meet its liabilities as they fall due in the short term and even though the expectation is that the company will continue to trade for the foreseeable future.

[83] From what I have already said, it can be seen that Mr Morgan's submission takes no account of the future beyond the reasonable period contemplated by Lord Walker's analysis in relation to the cash-flow basis. But as I have already observed, there is not a rigid division between s 123(1)(e) and s 123(2) and considerations relevant to one will inform the other. It is still necessary to look to the future in cases where it is suggested that a current liability such as a director's loan account can be ignored on the basis that it will not be called in. Lord Walker explained (see [37] of his speech) that a cash-flow test becomes completely speculative once a court has to move beyond the reasonably near future (a period depending on all the circumstances) and hence a comparison of present assets with present and future liabilities becomes the only sensible test. Similarly, if it is necessary to rely on the future state of the affairs of the company, and in particular its retained profits over a period of many months or even years,

*a* in order to justify a departure from a strict arithmetical comparison, the foundation for that future state of affairs must be firm; otherwise it is mere speculation and the balance-sheet test is no more sensible than the cash-flow test.

[84] In the present case, it is said that the loan accounts standing to the credit of Mr and Mrs Bucci were long term loans and would not be paid *b* out unless and until the Company could afford to do so. They accounted for a significant figure. If they were left out of account as liabilities, the balance sheet as of 31 December 2007 might have produced a positive figure rather than a deficit.

[85] They cannot, however, simply be left out of account in assessing whether liabilities exceed assets. It still remains pertinent to ask whether the *c* Company could be reasonably expected to meet the liability in respect of those accounts in due course. If the time for repayment is pushed beyond the reasonably near future, then the loan falls to be treated, I think, in the same was as any other prospective or contingent liability to which the balance-sheet test is applicable. If that liability can, for s 123(2) purposes, *d* be brought into account at some value less than its actual amount, then it may be difficult for a potential petitioner to satisfy the court that the value of the assets is less than the amount of its liabilities. But if that cannot be done, I see no reason why s 123(2) should not apply with the result that the Company is deemed unable to pay its debts.

[86] The present case is different. It is one where, for reasons I come to *e* next, the burden is on Mrs Bucci to demonstrate that the Company was able to pay its debts. That, in my judgment, requires her to show, on the balance of probabilities, that the loans would be repaid. Toulson LJ observed, in a situation where the burden is on the person asserting insolvency to prove it, that the more distant the prospective and contingent liabilities are, the harder it will be to establish that the company cannot *f* reasonably be expected to be able to meet its liabilities. In my view, the same applies in reverse: where the burden is on a person (Mrs Bucci in the present case) to rebut the presumption of insolvency, the further into the future one needs to go the harder it will be to prove that the company can reasonably be expected to be able to meet its liabilities.

[87] Turning to the burden of proof, it seems to me that the principal *g* function of s 123 (appearing as it does in the group of sections starting at s 122 under the heading 'Grounds and effect of winding-up petition') is to define the situations in which a company is, or is deemed to be, unable to pay its debts for the purposes of bringing winding-up proceedings under s 122 – see s 122(1)(f). But that is not its only purpose. Section 123 is also *h* invoked in relation to administration applications: see para 11(1) of Sch B1 where the court has to be satisfied that the company is or is likely to become unable to pay its debts, a phrase which has the same meaning as in s 123: see para 11. In these cases, it is clear that the court must be satisfied on a balance of probabilities that the company is unable to pay its debts. This burden is reflected in what Lord Walker said at [49], a burden to show *i* the court 'on the balance of probabilities, that a company has insufficient assets to be able to meet all its liabilities ...'. He said that the movements of currencies and interest rates prior to the final redemption dates were incapable of prediction with any confidence with the consequence that 'the court could not be satisfied that there will eventually be a deficiency'.

Because matters were speculative, it could not be said with confidence that the debts would not be satisfied so that the burden on the person alleging insolvency was not satisfied. It is relevant to note that the existence of the liabilities of the company was not in question: the issue was whether the assets were insufficient to meet those liabilities and, because of the need for speculation about the match of assets and liabilities in the future, it could not be said that the liabilities would not be met.

[88] It is not a corollary of those conclusions that the court would necessarily have been satisfied, had it needed to decide, on a balance of probabilities that the company did have sufficient assets to meet its liabilities. It is the nature of speculation that it is uncertain either way. The conclusion was not that, on the balance of probabilities, there would not be a deficiency. The conclusion was that the uncertainty and speculation about the outcome meant that the court could not be satisfied that there would be an *eventual* deficiency, and thus that its assets were less than its liabilities. In other words, there was a possibility that the company would in the long term be able to meet its liabilities at the time when they fell due for payment.

[89] Under s 240, the burden is the other way round in the case of persons connected with the company. Where there is an alleged transaction at undervalue, the time of the transaction is not a 'relevant time' unless one or both of the conditions of s 240(2) are fulfilled. Condition (a) is that 'at that time [the company] is unable to pay its debts within the meaning of section 123 …'. The subsection goes on to provide that the requirements of those conditions are presumed to be satisfied unless the contrary is shown in the case of a transaction with a person connected with the company, as in the present case. In the case of a transaction with a person who is not connected with the company, it is clear that the burden would be on the applicant (eg a liquidator) to show that the company was unable to pay its debts. The position would be no different from that which obtains in relation to the presentation of a petition for winding up.

[90] In the case of a transaction with a connected person, the position is different. The result of the presumption is that the burden is on the person seeking to uphold the validity of the transaction (Mrs Bucci in the present case) to show the contrary, that is to say to show that the requirements of s 240(2) are not satisfied. In other words, Mrs Bucci must show that the Company was able to pay its debts within the meaning of s 123.

[91] In my judgement, reading ss 123 and 240(2) together, it is necessary for Mrs Bucci to prove to the satisfaction of the court both (i) that the Company was at material times not unable to pay its debts as they fell due and (ii) that the value of the Company's assets equalled or exceeded the amount of its liabilities, taking into account its contingent and prospective liabilities (but note the argument dealt with in para [123] below). Adapting the analysis of Lord Walker and making necessary adjustments to the approach of Toulson LJ in [119] of his judgment, the court has to make a judgment about whether it has been established that, looking at the Company's assets and making proper allowance for its prospective and contingent liabilities, it can reasonably be expected to meet those liabilities. In the context of *Eurosail* itself, it would not have been possible, had there been a similar reversal of the burden of proof, to reach that conclusion any

*a*  more than it was possible to reach the conclusion actually arrived at when the burden was on the liquidator.

[92] There is one further point to make in the context of s 240. It relates to what Lord Neuberger regarded as 'rather extraordinary': see [44] of his judgment. In saying what he did, he did not address the different context of s 238. It is not at all extraordinary to my mind that a transfer at undervalue *b*  should be open to attack if it was made at a time when the amount of the company's immediate liabilities exceeded the value of its assets in the case of a transaction with a connected person. Thus if a company was to be put into winding up in reliance on a failure to meet a statutory demand pursuant to s 123(1)(a), I do not think that it would be extraordinary for the liquidator to be able to recover property transferred to a connected *c*  persons at an undervalue a few months before the date of the statutory demand, if it can be demonstrated that the company's balance sheet then showed liabilities immediately due exceeding assets. Some caution must be exercised in the weight to be attached to the 'extraordinary' result which Lord Neuberger perceived.

*d*  [93] There has been some debate about the nature of the Company's obligations in relation to the moneys received by investors and the extent of its liabilities as a result. Mr Boeddinghaus wishes to assert that these moneys never became assets of the Company but were held on *Quistclose* trusts, the purpose of the trusts being to pay to the developer/vendor of a property the relevant deposit or instalment payment received by the *e*  Company from its client. The application of moneys for any other purpose was a breach of trust and/or contract; the moneys were simply not properly available to meet other obligations so that, in assessing whether the Company was cash-flow solvent, reliance could not be placed on the availability of these funds other than for the payment of the actual deposit or instalment to which the relevant receipt related. Further, these funds were *f*  not assets when it came to assessing the ability of the Company to pay its debts for the purposes of s 123(2). I will deal with that aspect later.

[94] Assuming for the moment that the *Quistclose* argument is not available to Mr Carman, it remains the case that the Company had a liability matching each payment received by it. To the extent at any time that the moneys received by the Company by way of deposit and instalment *g*  payments exceeded payments to the vendors, the Company had a contractual liability to pay the developer or to return the money to the client for instance if the sale fell through for some reason. As the Judge said in para [50] of the Judgment, the arrangements gave rise to liabilities to clients until the deposits were paid to the developer in satisfaction of the *h*  client's obligation to the developer. So too in his *ex tempore* judgment refusing permission to appeal, he considered that, by not setting up a separate client account, it had to be recognised the Company increased its liabilities. One way or another, it seems to me, the Company had a liability, for the purposes of s 123(2), in respect of moneys received equal to the amount received and not applied in payment to developers.

*i*  [95] It is here that Mrs Bucci faces a dilemma. Either she accepts that all of the liabilities of the Company were ones giving rise to debts which were immediately due and payable or would become so within the reasonably near future or she does not accept that in which case the liabilities which she rejects as immediate are properly to be seen as prospective or contingent

liabilities. Under the first scenario, the Company fails the cash-flow test at a given time unless it can be shown that it had at that time the liquid resources necessary to meet those liabilities. If she maintains that certain liabilities are only future liabilities, then she may make it easier to satisfy the cash-flow test but she is left having to satisfy the balance-sheet test since the case would then be one of prospective and contingent liabilities.

[96] Before I address the components of that dilemma, there are some additional points to make. The first is that Mr Morgan makes play of the fact that the balance-sheet position indicating a deficiency at 31 December 2007 needed to place reliance on the directors' loan accounts. If those were taken out of the equation, then even on Mr Minshall's figures, assets exceeded liabilities. That is true, but there is no scope for the sort of speculation which arose in *Eurosail* about the value to be placed on those loan accounts. Those accounts would, one day, become payable. In contrast, in *Eurosail* it could not be said what, if anything, would be owing at maturity. Accordingly, if s 123(2) is in play, the argument which Mrs Bucci would need to deploy is that the loans are in effect prospective liabilities which might not be called in for a long time and that it is therefore not possible to say that the Company cannot reasonably be expected to be able to meet those liabilities.

[97] The next point is that it was common ground that if the value of the GUL loan was nil, then the Company was insolvent in December 2007 and thereafter. As the Judge put it at para [57] of the Judgment, the Company was balance-sheet solvent (having been in a position, I would add, of net liability as shown in the balance sheet in March 2007) if the GUL loan was taken into account at the amount outstanding as at 31 December 2007 but not if the loan was valued at nil. The Judge's conclusion at para [10] of the Judgment was that GUL was never good for the money. I suppose that could mean that part of the loan might be repaid but even if that is so, the Judge did not consider that it would be proper to regard the GUL loan as having any significant value when considering the company's solvency following the advances. I take that to mean that as at 31 December 2007, the advances made by that time were such that, if the value of the GUL loans was nil, the Company was insolvent. The Judge also stated that he did not consider that it would be proper to regard the loans as having any significant value when considering the Company's solvency following the advances. I take that, likewise, to mean that no significant value should be attached to the GUL loans as at 31 December 2007 in respect of advances which had been made by that time. But in para [58] the Judge appears to have left the matter more open, simply saying that he was *inclined* to accept the evidence of Mr Carman's expert that the value of the GUL loan was indeed nil.

[98] Mr Morgan submits to me (i) that the Judge did not make up his mind because it was unnecessary for him to do so and (ii) that it is difficult to see how the Judge could be seen as having made a final decision without resolving the points of difference between the experts. In any event, the Judge pointed out that this was not simply a mathematical exercise so that, according to Mr Morgan, neither expert adopted the right approach. But nor, I add, did the Judge adopt the correct approach since he adopted the wrong test – the 'point of no return' – as he was bound to do in the state of the law as it stood before the decision of the Supreme Court in *Eurosail*. On

*a* my view of the law, the experts were right to adopt the approach of comparing assets and liabilities, at least as their starting point.

[99] If Mr Morgan is right in the submission which I have just numbered (i) and (ii), then I cannot myself answer the question whether the Judge's inclination was in fact correct unless it is possible to do so by an examination of their reports and what they actually said in oral evidence. I

*b* have not been taken through their reports to see where they disagree and why, although I have read them both carefully, as well as their joint agreed statement. Still less have I had the advantage of hearing and seeing the two experts in order to resolve their differences. That was the function of the Judge but he, having adopted the 'point of no return' test, did not need to resolve the issue. However, it seems to me that the clear thrust of the Judge's

*c* actual decision was that the GUL loans were of no significant value at any time after any of the advances had been made. I take that as his finding of fact (or perhaps mixed fact and law) which is one I should not interfere with unless I am sure it was wrong (which I am not – indeed it seems to me likely to have been correct). If there is an apparent inconsistency between

*d* what he said in para [10] and para [58], it can be resolved by drawing a distinction between the GUL loans having no significant value and having no value at all. An insignificant value would not, on the figures, make any difference to the solvency or otherwise of the Company at any material time.

[100] Given the agreement between the experts that if a nil value is

*e* attributed to the GUL loans the Company was insolvent as at 31 December 2007 and at all times thereafter, Mrs Bucci obviously has a steep uphill task to persuade the court, the burden being on her if s 123(2) is in point at all, that the Company could reasonably expect to be able to repay the directors' loans when they were likely to be called in and thus to rebut the presumption of insolvency under s 240(2).

*f* [101] The position prior to 31 December 2007 is problematical. I do not understand Mr Vigar to have accepted that the Company was then insolvent in the sense required by s 123 even ignoring the amount of the GUL loan. However, the starting point even for Mr Vigar has to be that the liabilities did exceed the assets, albeit on one view only marginally, on that date since that much was common ground. The presumption under s 240(2)

*g* is that the Company was then unable to pay its debts by virtue of s 123(2) with the burden being on Mrs Bucci to show the contrary. A deficit on balance sheet is not an attractive launching pad for an argument by her that the Company was, in fact, solvent although it is at least a theoretical possibility.

*h* [102] I will consider that point further in a moment. But before I do, I should record that, according to Mr Carman's evidence which has not been challenged on this point, the only payment made to Mrs Bucci or to HMRC by way of pension contributions before 5 April 2007 was one small payment of £416.67. Accordingly, the position prior to that date was of little significance and no point was taken to distinguish the state of

*i* solvency of the Company on the making of that payment from the state of solvency on 31 March 2007. In practice, therefore, if the Company was deemed insolvent under s 123(2) on 31 March 2007, it can be taken to have

been insolvent on the occasion of that small payment too.

[103] Turning to the actual figures:

(i) It was and remains common ground that the Company was in a marginal net liability position of £10,751 on 31 March 2007 as shown in the balance sheet prepared by Mr Vigar. This deficit reflected a figure for long-term creditors of £12,486. There was no directors' loan. Indeed, the directors' accounts appeared to be overdrawn. I have not been told anything about the nature of the long-term creditors or about how long term the loans are. In the application of s 123(2) (if it applied in the first place) I can see no reason for bringing it into account at other than its face value when taking account of prospective and contingent liabilities.

(ii) As at 31 December 2007, Mr Minshall stated the deficit to be £30,116. This included a loan by the directors of the Company of £35,615. Although included under the heading 'Long Term Liabilities' I do not know anything about the terms of this loan. It may be that it is simply a loan payable on demand with an understanding that it would not in fact be called unless and until the Company could afford to pay it. There were also differences between the experts which the Judge left unresolved, although the figures concerned were modest – £3,256 in respect of depreciation and £2,833 in respect of the existence or otherwise of a debt owing to Let's Talk Marketing. Ignoring those items, if the directors loans are stripped out, the Company would not have been in deficit at all according to the balance sheet prepared by Mr Minshall.

(iii) However, Mr Minshall's balance sheet must be read subject to the substance of his report. The figure which he shows under Creditors short term is actually an asset of £58,456. That is a figure which results from figures extracted from SAGE (and adopted by Mr Vigar in his second reconstruction of the balance sheet): debtors at £10,788,369, creditors at £11,096,056 and Casa Dubai funds held in Dubai of £366,143 (a figure which matches the figure shown in Mr Carman's second reconstruction of the balance sheet). In relation to the SAGE figures for debtors and creditors, Mr Minshall stated (see para 21 of his report) that he did not accept either of those figures, although the difference between them was 'more credible'. He thought it entirely feasible, in the light of the factors related at paras 47 and 48 of his report, that the creditors figure is materially understated. The Judge did not deal with this aspect of the evidence.

[104] As I have already noted, the Judge referred to the Company as trading profitably. It seems that he placed reliance – indeed this may be the sum total of his reasoning – on appendix 5 to Mr Vigar's report. I have already explained that I do not understand how that appendix is consistent with the common ground that, if the GUL loan is valued at nil, the Company showed net liabilities on the balance sheet at all times from and after 31 December 2007. There is more to say about profit, however. In para 90 of his report, Mr Minshall expressed the view that there was no adequate information for Mr Vigar to reach the conclusion about profit which he did. Mr Minshall had earlier on given his analysis which justified that view. Mr Minshall commented that it was unclear whether, in making his statement about profit, Mr Vigar had considered the Company's position with specific reference to either its actual accounts or results. I have been shown no evidence that he did so. The Judge did not address Mr Minshall's criticism; indeed, his justification for his conclusion about

*a* profitability appears to me to be slightly circular. Thus, he expressed the view that the SAGE figures gave a broadly accurate picture of the Company's profitability 'a point confirmed by Mr Vigar'. But there was nothing, at least nothing I am aware of, which would have led the Judge to conclude that the SAGE reports did give a valid indication other than Mr Vigar's statement to that effect. So, it seems, the Judge accepted the

*b* picture presented by the SAGE reports simply because Mr Vigar says that they presented an accurate picture. The Judge did not refer to Mr Minshall's evidence about the unreliability of the SAGE reports or give any reasons why he preferred Mr Vigar to Mr Minshall on this topic. I have not been taken to those reports nor received any submissions about their reliability and can form no independent view of my own.

*c* [105] In addition, Mr Minshall was highly critical of appendix 5, which he dealt with in para 103 of his report. I do not set those criticisms out at length in this judgment. They appear to me to have considerable force. They were not addressed by the Judge.

[106] As already noted, not much was said about cash-flow insolvency on

*d* behalf of Mrs Bucci. More was said on behalf of Mr Carman although he acknowledged that the Company was cash-flow solvent but only on the basis that it was using deposits from later purchasers to pay the deposits of earlier purchasers. I have already set out the Judge's reasoning on this issue in para [40] above referring to paras 44 and 49 of the Judgment. Essentially, his conclusion was based on the fact that the Company had not in practice

*e* had any cash-flow difficulty until the collapse of the Dubai property market in late 2008.

[107] The asserted absence of creditor pressure is, however, only part of the picture. As a matter of fact, there were at least four creditors who did express concern about the non-transfer of their deposits to the developer. I say at least because they were four of a larger group where the details

*f* concerning payment or not as the case may be of deposits was not before the court. Those amounts relevant to those four creditors amounted to a modest sum, around £10,000 in total. The Judge did not mention them expressly in the Judgment: perhaps he considered them *de minimis* and not such as to affect the profitability of the Company and its ability to meet its liabilities. Mr Bucci gave an explanation in cross-examination of why the

*g* moneys had not been remitted although it is not clear whether that related to all four cases. It is not clear whether the Judge accepted that evidence. although there is perhaps an indication that he did in para [51] of the Judgment (see para [46] above).

[108] Perhaps more significant is what is contained in para 61 of Mr Minshall's report where, in addressing the four cases just referred to, he

*h* produced a table concerning the ageing of creditors. As he put it:

> 'I have also created an age-analysis of the creditors received and verified into the liquidation (*ie excluding the other creditors not yet verified*)
>
> The analysis reveals the following: ...'

*i* [109] There follows a table headed 'Ageing of creditors'. This lists against each month a figure for the debts incurred that month outstanding and still outstanding at the time of the liquidation. I do not propose to set out the table in this judgment, but it can be seen that for all months in 2008,

significant amounts of unpaid debts accrued. And for 2007, significant
amounts accrued in May, June, August and September and December. This
resulted in a total outstanding at the commencement of the liquidation of
over £648,000. Mr Minshall concluded that:

> 'As is seen, there are substantial creditors of considerable age
> implying that the Company was not remitting funds onwards to its
> developers, and/or [Casa Dubai] on a timely basis. This material
> supports the hypothesis that the Company was unable to pay this debts
> as they fell due.'

[110] It is also the case that Mr Bucci himself stated in his Preliminary
Information Questionnaire that there were 34 clients exposed to losses of
over £488,00 in relation to the failure, as the question is framed in the PIQ,
'to supply goods or services for which its customers have paid a deposit,
paid in part or paid in full'. Read in conjunction with the schedule of ageing
creditors, this is confirmation of a failure over a substantial period to pay
significant sums of money which were on any view due for payment. There
was also evidence in the form of an attendance note of a meeting between
Mr Carman and Mr Bucci on 8 October 2009 in which Mr Bucci is
recorded as saying that he compiled the list of creditors (that is to say, the
34 creditors referred to above) by collating complaints from investors who
had stated that their funds had not been invested. Mr Boeddinghaus
submits that the fact of such non-payment is of itself evidence of the
Company's inability to pay its debts as they fell due.

[111] The Judge did not address the evidence referred to in the preceding
four paragraphs in the Judgment. It does not seem to me that any of these
matters is a trivial matter. The evidence ought properly to have been
considered in assessing the cash-flow solvency of the Company.

[112] The Judge treated insolvency under s 123(1)(e) and s 123(2) as
discrete matters. It does not appear that counsel then acting for Mrs Bucci
addressed to the Judge the argument which Mr Morgan has addressed to
me to the effect that s 123(2) is concerned only with prospective and
contingent debts so that a company whose balance sheet shows a deficit on
the basis of current liabilities is not necessarily insolvent. Accordingly, the
Judge dealt with the issue of balance-sheet insolvency as a separate matter
and, applying the 'point of no return' test concluded that the Company was
not balance-sheet insolvent. Applying that test, he did not need to deal with
another argument which Mr Morgan makes namely that, if the directors'
loan accounts as at 31 December 2007 are ignored, the Company was not
balance-sheet insolvent. Since the loans would not in practice be called in, it
could reasonably be expected that the Company, given its profitability,
[would] be able to meet all of its liabilities.

[113] The problem which I face with that argument, however, is that I do
not have the material to enable me to make a fully-informed decision about
this. I have already dealt (see paras [104] and [105] above) with what the
evidence (including the expert evidence) revealed about profitability. I note
also the fairly generalised comments in a number of paragraphs in the
Judgment: examples can be found in paras 51, 57, 58 and 59 containing
references to profitability and viability.

[114] All in all, it does seem to me that there are reasons to doubt that the
Company was profitable and, given the absence of consideration by the

*a*  Judge to the matters raised by Mr Minshall, it must be open to question
when the directors' loan accounts could in practice be paid off if, indeed,
they could be paid off out of profit at all.

[**115**] There is a risk, it seems to me, in attaching too much weight to the
suggestion that the directors would not have called in their loans. That
clearly has an impact on cash-flow solvency because it may be possible to
*b*  leave out of account altogether a postponed loan in assessing what cash is
available to meet other immediate creditors. But the fact that the loan may
be postponed does not improve the balance-sheet position.

[**116**] Accordingly, if one is looking at the balance-sheet test rather than
the cash-flow test, the question (given that the burden of proof is on
Mrs Bucci under s 240(2)) is whether the Company can reasonably be
*c*  expected to meet its liability on directors' loan accounts in the context of its
liabilities overall. The further into the future one posits the need to repay
the account, the harder it is to satisfy that requirement – this is the converse
of what Toulson LJ said where the burden is the other way round: 'The
more distant the liabilities, the harder this will be to establish'.

*d*  [**117**] This is particularly so given that the making of profit in order to
meet the liability depends on the effectiveness of sales and the earning of
commission. The payment of outstanding liabilities depended on the
utilisation of deposits in respect of new sales (and possibly on instalment
payments in respect of previous and future sales). Those sales would,
themselves, have generated further liabilities in the form of an obligation to
*e*  make onward transmission of the new deposits to developers. This may not
have been a Ponzi scheme, but the onward payment of deposits from earlier
sales required, in the light of the way the Company was actually run, the
utilisation of deposits from future sales. It is not at all clear to me how it
can be said that the Company could reasonably expect to meet the liabilities
on directors' loan account at any time before the collapse of the Dubai
*f*  property market albeit that the Company could continue trading in the way
which it did.

[**118**] So far as the 31 March 2007 balance sheet is concerned, I have
addressed this at para [103](i) above. There is insufficient evidence – or if
there was evidence before the Judge, it has not been drawn to my attention
– to satisfy me on a balance of probabilities that the Company could
*g*  reasonably be expected to meet the long-term creditors of £12,486.
Accordingly, the Company was, in my judgment, balance-sheet insolvent as
at 31 March 2007. It follows from what I have said already that it was
therefore balance-sheet insolvent throughout the tax year 2006–07.

[**119**] For the period from 31 March 2007 to 31 December 2008, there is
*h*  no material which has been drawn to my attention to show that the
Company's balance sheet would have shown a positive net asset position
attributing a nil value to the amount outstanding on the GUL loan. Indeed,
by the time we get to the 31st December, the position is a deficit of over
£30,000 on Mr Minshall's figures. Mr Vigar's figures show a rather smaller
deficit – about £9,000 – if one strips out the GUL loan from the balance
*i*  sheet produced by him.

[**120**] I have addressed the 31 December 2007 balance sheet at
para [103](ii), (iii) above. Attributing a nil value to the GUL loan at all
times (which I do) the Company was balance-sheet insolvent at all material
times unless the directors' loans can be left out of account. For the reasons

given above, in particular in paras [115] to [117] above, I do not consider    *a*
that they can be left out of account.

[**121**] My conclusion, therefore, is that, subject to the matter identified in
para [123] below, Mrs Bucci is unable to rebut the presumption which
arises under s 240(2) in respect of balance-sheet insolvency. The Company
was at all material times in a position of net liabilities as disclosed by the
balance sheets prepared by both experts if the GUL loan is valued at nil.    *b*
Given the burden of proof, there is nothing, in my judgment, in the
argument that the directors' loan accounts would be left outstanding. I am
bound to say that, even if the burden had remained on Mr Carman rather
than Mrs Bucci, I would be satisfied, on the evidence before me, that the
assets were less than the liabilities. It seems to me that the loan accounts
cannot effectively be left out of account since, sooner or later, the    *c*
indebtedness would have to be paid.

[**122**] I therefore reach a different conclusion from the Judge. But he was
applying a different test – the 'point of no return'. He cannot be criticised
for doing that since that test represented the law at the time when he gave
his decision. But it does mean that the exercise which he carried out was    *d*
flawed and one which must be put right on appeal.

[**123**] The matter referred to in para [121] above is this. It is the argument
that if all of a company's liabilities are immediate or will be so within the
reasonably near future, s 123(2) does not come into play. In other words,
when applying the cash-flow test under s 123(1)(e), all of the company's
liabilities are taken into account and there is therefore no need to look    *e*
further to s 123(2). On the facts of the present case, I do not consider that
there is any scope for the application of this argument. It could not be
suggested that, had the Company stopped trading on any particular date
after 31 March 2007, that it would have been able to meet all of its
liabilities: its balance sheet shows (valuing the GUL loan at nil) an excess of
liabilities over assets. It would not then have been able to pay its debts as    *f*
they fell due. Its ability to do so depended on having sufficient cash flow
which in turn depended on receiving further deposits and/or instalment
payments. However, the further income received by the Company would
have given rise to a further immediate debt, or one due in a very few days,
so that, in my view, it could not be said that the Company was able to pay
its debts as they fell due. The new moneys received would not, properly,    *g*
have been available to pay the old debts at all.

[**124**] But even if that were not a problem, it remains the case that
cash-flow solvency could be established, even on Mr Morgan's argument,
only if the directors' loan account could be left out of account. It is my
view, in accordance with the analysis carried out earlier in this judgment,    *h*
that the regular postponement of the debt on directors' loan accounts will
result inevitably in a liability which is not due in the reasonably near future
and will become a postponed debt. If that happens, then s 123(2) must
come into play if it is not already in play. In that case, the position is as
discussed above.
    *i*

CONCLUSION

[**125**] My conclusion, therefore, is that Mrs Bucci is unable to rebut the
presumption which arises under s 240(2) with the result that each of the

*a*  payments in the first and second categories identified in para [2] above was made at a relevant time. Mr Carman's appeal therefore succeeds.

FURTHER ISSUES

*b*  [126] This conclusion makes it unnecessary to consider Mr Carman's submission based on the existence of a *Quistclose* trust. The points having been argued, I will express my views very briefly indeed.

[127] In the first place, I do not consider that this is a point which Mr Carman should be permitted to raise on this appeal. There was nothing in Mr Carman's witness statements which raised the point and nothing, so far as I am aware from what I have been told, in Mr Boeddinghaus' *c*  skeleton arguments before the Judge. The issue of trust was touched on in cross-examination but the only mention in Mr Boeddinghaus' written closing was a single reference to Mrs Bucci's expert's oral evidence where he referred to client money as trust moneys. No cases were referred to the Judge in support of the imposition of a trust although, no doubt, the Judge was familiar with the *Quistclose* concept. It was not until the application *d*  for permission to appeal that the matter took on any significance. The Judge plainly thought that it made no difference as one can see from the passage which I have set out at para [58] above. It was, in any case, too late for the matter to be raised so as to be considered as part of the trial process with relevant findings being made in a judgment. Had the point been clearly *e*  raised before the matter came to trial, one can imagine that some evidence addressing the point would have been adduced by each side – certainly by Mrs Bucci. She will have no opportunity to do so if I allow the point to be raised now. The existence of a trust of the nature alleged is not purely a matter of law; rather, it represents an application of the law to specific facts. In the present case, I cannot be sure that the relevant factual evidence was *f*  all put before the Judge and he was not, in any case, invited to make any findings. In my view, it is now far too late to raise the point.

[128] But in the second place, I incline to the view (but do not decide) on the evidence before me that the existence of such a trust is made out. The evidence such as it is supports the view that Company received investor's deposits and other payment on the basis of an obligation to apply those *g*  moneys only for the authorised purpose, namely the payment of the relevant deposit or making of the other payment, giving rise to a trust to apply the moneys for that purpose and no other.

[129] On that basis, the case for saying that the Company was cash-flow insolvent would be even stronger than it is. Although Mr Morgan has submitted that the Company was cash-flow solvent at all times, I consider *h*  that he would be in great difficulty in even maintaining an argument to that effect if there was a *Quistclose* trust.

A FINAL POINT

*i*  [130] It might be suggested that I should not have reached any conclusion about whether Mrs Bucci is able to rebut the presumption of insolvency in relation to the balance-sheet test on the basis that further findings of fact are required and perhaps the admission of further evidence. If that were right – obviously I do not think it is – the correct course would be to allow the appeal and remit the matter to the Judge. It would then be entirely for

him whether to allow any further evidence to be given and whether to allow       *a*
Mr Carman to raise the *Quistclose* point or any other point.


DISPOSITION

[**131**] Mr Carman's appeal is allowed. Each of the payments in the first
and second categories referred to in para [2] above is a transaction falling       *b*
within s 238 made at a relevant time within s 240.


*Appeal allowed.*
                                                                                 *c*

**Appeal**
Mrs Bucci appealed.


*Hermann Boeddinghaus* and *Alexander Cook* (instructed by *Geldards*) for       *d*
   the appellant.
*John Randall QC* and *James Morgan* (instructed by *Shakespeares*) for the
   respondent.


                                                  *Judgment was reserved.*       *e*


3 April 2014. The following judgments were delivered.


**LEWISON LJ.**                                                                  *f*


THE ISSUE

[1] The legal issue raised in this appeal is: when is a company deemed to
be unable to pay its debts, with the result that it is insolvent? The           *g*
procedural issue is whether the intermediate appeal court was entitled to
substitute its own evaluation of the facts upon which the answer to the legal
question depends.

[2] The issue arises in the context of an application by the liquidator of
Casa Estates (UK) Ltd ('Casa UK') to recover moneys paid out by the
company to Mrs Bucci under transactions which were transactions at an            *h*
undervalue. Since Mrs Bucci was a person connected with the company, she
had the burden of rebutting the statutory presumption that it was not
insolvent at the time when the payments were made. His Honour Judge
Purle QC decided that she had discharged that burden. But on appeal
Warren J disagreed with his Honour Judge Purle QC and held that she had
not. Warren J's judgment is at [2013] EWHC 2371 (Ch), and is available on        *i*
BAILII.

[3] Mrs Bucci, represented by Mr John Randall QC and Mr James
Morgan, appeals. The appeal is resisted by Mr Hermann Boeddinghaus and
Mr Alexander Cook, appearing on behalf of the liquidator.

*a*   THE LEGISLATION

[4] Section 123 of the Insolvency Act 1986 defines when a company is deemed to be unable to pay its debts. Section 123(1)(e) says that a company is deemed to be unable to pay its debts:

*b*       '… if it is proved to the satisfaction of the court that the company is unable to pay its debts as they fall due.'

[5] Section 123(2) says that:

*c*       'A company is also deemed unable to pay its debts if it is proved to the satisfaction of the court that the value of the company's assets is less than the amount of its liabilities, taking into account its contingent and prospective liabilities.'

[6] The test in s 123(1)(e) is usually known as the test of cash-flow solvency; and the test in s 123(2) as the test of balance-sheet solvency, although these are no more than convenient shorthands.

*d*   [7] Section 238 enables an office holder, such as a liquidator, to apply to the court for an order reversing a transaction made at a significant undervalue by an insolvent company. In the case of a transaction with a person connected with the company this potentially applies to a transaction made in the two years preceding the onset of insolvency: s 240(1). It will apply if, at the time of the transaction, the company is unable to pay its debts within the meaning of s 123. But in the case of a transaction made

*e*   with a person connected with the company, the company is presumed to be unable to pay its debts, unless the contrary is shown: s 240(2). Hence the burden lay on Mrs Bucci to rebut the presumption of insolvency.

*f*   HIS HONOUR JUDGE PURLE QC'S JUDGMENT

[8] Casa UK was incorporated on 23 February 2005. It was under the day-to-day management of Mr Bucci. His wife, Mrs Bucci, was the company secretary. The company's principal business was that of introducing investors to property in Dubai. It had an agent and

*g*   intermediary in Dubai called Casa Dubai Real Estate Brokers LLC ('Casa Dubai'). By a written agreement dated 1 January 2007 Casa UK agreed to pay Casa Dubai a monthly sum in the nature of a retainer equivalent to £10,000. Casa Dubai, in turn, agreed to pay Casa UK commission on sales at an average rate of 6%. That latter agreement does not appear to have been recorded in writing. In his first witness statement Mr Carman, Casa

*h*   UK's liquidator, said that the precise relationship between Casa UK and Casa Dubai was unclear. I do not believe that it has since been materially clarified.

[9] Thus the business model is, to some extent, obscure but in the main it seems to have worked as follows. Casa UK would receive moneys from an investor who wanted to invest in property in Dubai. In theory it would then

*i*   transmit the moneys to Casa Dubai in Dubai, for onward transmission to the developer. Arrangements between Casa UK and Casa Dubai were subject to a set-off arrangement. The details of the set-off are also obscure; and are also not contemporaneously recorded in writing. Casa UK was liable to pay the £10,000 a month retainer to Casa Dubai. Casa Dubai was,

on the other hand obliged to pay commission to Casa UK. It was also to *a* make payments to developers in Dubai on behalf of Casa UK's clients. The set-off apparently enabled Casa Dubai to withhold commission due to Casa UK by setting off those commissions against new client moneys received by Casa UK. Casa Dubai would then pay over the withheld moneys in its hands to the developers in Dubai. Casa UK would transmit to Casa Dubai *b* any shortfall in payments due to the developers. None of the accounts of the set-off arrangement expressly refer to the payment by Casa UK of the monthly retainer to which Casa Dubai was contractually entitled. The key point about the set-off system (whatever its details were) was that, as Mr Bucci confirmed in his cross-examination, the flow of money was always from the UK to Dubai. No profits were in fact remitted from Dubai *c* to the UK.

[10] Casa UK's filed accounts for the periods to December 2005 and December 2006 showed modest profits of £2,695 and £53,794 respectively. Although Casa UK's entitlement was an entitlement to commission only, these accounts recorded the gross sales price as part of its turnover. No further accounts were filed for later periods. *d*

[11] As his Honour Judge Purle QC pointed out, when Casa UK received customer deposits it had an obligation to account to the customer for those deposits, which was itself a liability to the customers until such time as the deposits had been correctly applied towards the purchase of property in Dubai by payment to the developers. Casa UK did not maintain a client account, but mixed depositors' moneys with its own. Nor did its accounting *e* systems enable depositors' moneys to be accurately identified with any confidence. The combination of the lack of a client account, and the fact that depositors' moneys were treated as part of Casa UK's own turnover led the liquidator's expert accountant, Mr Minshall, to comment in his report:

'The Company did not operate a client account. As a result, it *f* processed many millions of pounds that passed through its accounts and treated them as its own.'

[12] He adhered to that view in cross-examination.

[13] What is also puzzling is the existence of certain written agreements in the case papers. Casa UK introduced some investors (no more than four) to *g* a scheme with a developer in Dubai called Al Barakah. These investors included a Mr Lees. The scheme promised investors a return on their investment of 40% within six months. However, the case papers include a written agreement dated 25 September 2008. It is made between Casa UK itself and Mr Lees. Casa UK agreed to invest £200,000 'on behalf of' Mr Lees as part payment towards a property investment in Dubai. It also *h* agreed to pay Mr Lees within six months a guaranteed return of 40% on his investment and to repay the initial investment itself. Thus the overall effect of this agreement is that Casa UK had a liability to pay Mr Lees the equivalent of £280,000 (partly in sterling and partly in dirhams) within six months. Given that Casa UK's own entitlement to profit was its 6% *i* commission, it is wholly unclear where anyone thought that the money would come from to honour its commitment to Mr Lees; although Casa UK asserted that it would have had a matching claim against Al Barakah. In his first witness statement Mr Carman, Casa UK's liquidator, said that those investors whom Casa UK introduced to the Al Barakah scheme were

*a*    provided with post-dated cheques drawn in Casa UK's own bank accounts. This arrangement was sometimes referred to as a guarantee. But in fact it was not a guarantee at all. It was a primary liability on the part of Casa UK to make the promised payments to Mr Lees.

[14] In the course of 2007 and 2008 Casa UK made payments to Mrs Bucci amounting to £103,988 in aggregate. It is no longer contested *b*    that these payments were made in connection with transactions at an undervalue.

[15] His Honour Judge Purle QC recorded that the experts were agreed that Casa UK was 'marginally insolvent on a balance-sheet basis' in March 2007. During the same period covered by the payments made to Mrs Bucci, *c*    Casa UK also made loans amounting to £474,259 to another company called Gianluca (UK) Ltd ('GUL'). GUL was another company owned and controlled by Mr and Mrs Bucci. It was in the drinks distribution business, but it was loss-making from the start. His Honour Judge Purle QC found that there was no real prospect of Casa UK ever recovering its loan from GUL; and that it therefore had no significant value as part of Casa UK's *d*    assets. The experts called before his Honour Judge Purle QC agreed that if the GUL loan were eliminated as an asset of value, then Casa UK was 'balance sheet' insolvent at all material times from December 2007 onwards.

[16] His Honour Judge Purle QC said that there was a rapid expansion of Casa UK's business in 2007 and 2008. That, he said, 'increased the *e*    apparent profits of the company up to July 2008 … but also resulted in additional liabilities to customers whose deposits had not reached the developer, either because the development had not reached the appropriate stage or because the developer could not hold deposits.' He did not explain why he used the phrase 'apparent profits' rather than 'profits'. Mr Randall suggested that what the judge must have meant was that if the market *f*    crashed, Casa UK would not be able to survive.

[17] In late 2008 the property market in Dubai did indeed collapse. His Honour Judge Purle QC found that the collapse was 'sudden and not generally anticipated'. It was that collapse that pushed Casa UK into insolvent liquidation. As he put it at [52]:

*g*        'As a result of the sudden collapse of the property market in Dubai, which post-dated the September 2008 collapse of Lehman Brothers by over two months, Casa Dubai failed and [Casa UK's] substantial liabilities to its customers crystallised, without the possibility of recovering any of those liabilities from Casa Dubai, or outstanding *h*        commissions. However, until that point, [Casa UK's] liabilities to customers were effectively contingent upon the failure of Casa Dubai or the developers.'

[18] I do not understand the last sentence of that extract. The judge had already held at [50] that the receipt of money from customers created an *i*    obligation on the part of Casa UK towards the depositors. That is plainly correct, because Casa UK, as agent for the depositors, had an obligation to account. But that obligation was not contingent: it was an immediate liability. Nor could Casa UK's liability towards its depositors have been contingent on failure by the developers. If the money paid by depositors had actually reached the developers, Casa UK would have correctly applied the

depositors' money and its own obligation would have been discharged. *a*
Whether the developer subsequently failed was the client's risk: not Casa
UK's. Mr Randall accepted that this part of the judge's judgment was a
muddle.

[19] Until late December 2008 his Honour Judge Purle QC considered
that Casa UK had been cash-flow solvent. He explained his reasons for that
conclusion at [44]. They were as follows. There was no suggestion that any *b*
creditor had served a statutory demand or obtained a judgment against
Casa UK. There was no creditor pressure and Casa UK was in fact paying
its debts as they fell due. It had no cash-flow problem at the time of any of
the payments to Mrs Bucci. The cash-flow problems arose only after the
collapse of the Dubai property market in late 2008; and when the problems
materialised Casa UK reached the point of no return very suddenly and *c*
ceased business. At [57] the judge said that at the end of December 2007:

> 'Business was increasing, and there was no likelihood of [Casa UK]
> being called upon to refund the customer deposits.'

[20] This is a puzzling observation for two reasons. First, since the *d*
business consisted of paying customers' deposits to developers, the question
of refunding them would not normally arise. Second, the way the judge has
phrased his observation suggests that if there had been a likelihood of Casa
UK being called upon to refund deposits (ie to comply with its obligation to
account) it would not have been able to do so. That ties in with
Mr Randall's suggested explanation of the judge's use of the phrase *e*
'apparent profits' earlier in his judgment.

[21] Casa UK went into insolvent liquidation in March 2009 with a
deficiency as regards creditors of some £1.2m. The deficiency as regards
investors has been variously estimated. It is between £488,000 at its lowest,
and £1.05m at its highest. The liquidator and Mr Minshall arrived at *f*
figures of £630,000 and £648,000 respectively.

[22] As I have said his Honour Judge Purle QC held that Casa UK had
been paying its debts as they fell due up to the end of 2008 when the Dubai
property market collapsed suddenly. He held, therefore that at the time of
the payments to Mrs Bucci it was not cash-flow insolvent. He further held
that its liabilities to depositors were contingent and that, taking into *g*
account those contingent liabilities, Casa UK had not reached the point of
no return until the end of 2008.

[23] The phrase 'the point of no return' was one that had been coined by
Prof Sir Roy Goode QC and applied by the Court of Appeal in *BNY
Corporate Trustee Services Ltd v Eurosail-UK-2007–3BL plc* [2011] EWCA
Civ 227, [2011] 2 BCLC 1, [2011] 1 WLR 2524. It is abundantly clear that *h*
that was the test that his Honour Judge Purle QC applied: not least because
he used the phrase throughout his discussion of Casa UK's solvency: see
[47], [52], [56], [57], [58] and [59].

THE JUDGMENT OF WARREN J                                                  *i*

[24] By the time that the appeal in this case reached Warren J the Supreme
Court had considered the appeal in *Eurosail* and had said that the 'point of
no return' test was not the appropriate test: [2013] UKSC 28, [2013]
1 BCLC 613, [2013] 1 WLR 1408. It is not easy to distil Warren J's

*a*   judgment, but I think that the key points are these:

    (i) The test that his Honour Judge Purle QC applied, namely the 'point of no return' test, had been shown by the Supreme Court's decision in *Eurosail* not to be the right test: see [36], [66](iii) and [122].

    (ii) Thus the question for Warren J was whether, applying the right test, he was in a position to decide whether Casa UK was unable to pay its debts: *b*  see [66](iii).

    (iii) In reaching his conclusion on cash-flow solvency his Honour Judge Purle QC had not dealt with some of the important evidence. In particular (a) there were at least four creditors who had expressed concern about the non-transfer of their deposits to the developer; (b) there was a table of creditors which showed an increase in the amount of aged creditors, thus *c*  indicating that debts were accruing and not being paid; (c) Mr Bucci had himself stated that there were 34 clients exposed to losses of over £488,000 for goods and services that had not been supplied, and that that list of clients had been compiled by collating complaints from investors who had said that their funds had not been properly invested: see [107] to [110].

*d*     (iv) His Honour Judge Purle QC had also not considered how it was that debts continued to be paid. In Warren J's view the continued payment of debts was only possible because new deposits from investors were used to pay old debts: see [48], [62] and [117].

    (v) There was no material on which it could be said that, if no significant value was attributed to the GUL loan, Casa UK would ever be able to meet *e*  its liabilities, including contingent liabilities. Those liabilities included directors' loans, but they could not be excluded. Casa UK was balance-sheet insolvent as at 31 March 2007 and thereafter: see [118] to [120].

  **[25]** Warren J therefore concluded, contrary to his Honour Judge Purle QC's decision, that Mrs Bucci had not rebutted the presumption that Casa UK was insolvent at the times that it made the disputed payments to *f*  her. He reached this conclusion largely on the basis that Casa UK was unable to pay its debts as they fell due: see [123]. As he put it:

    'It could not be suggested that, had the Company stopped trading on any particular date after 31 March 2007, that it would have been able to meet all of its liabilities: its balance sheet shows (valuing the GUL *g*    loan at nil) an excess of liabilities over assets. It would not then have been able to pay its debts as they fell due. Its ability to do so depended on having sufficient cash flow which in turn depended on receiving further deposits and/or instalment payments. However, the further income received by the Company would have given rise to a further *h*    immediate debt, or one due in a very few days, so that, in my view, it could not be said that the Company was able to pay its debts as they fell due. The new moneys received would not, properly, have been available to pay the old debts at all.'

THE MAIN ARGUMENTS

*i*   **[26]** Mrs Bucci's argument is that if a company is cash-flow solvent, there is no need to consider whether it is also balance-sheet solvent, unless it has contingent or prospective liabilities. The trial judge found that the company was cash-flow solvent; and so there was no warrant for examining whether it was balance-sheet insolvent. If it is necessary to examine whether a

company is balance-sheet insolvent, then a judgment has to be made whether it really is balance-sheet insolvent. It is not simply a mechanical exercise of comparing assets and liabilities.

EUROSAIL

[27] In my judgment the following points emerge from the decision of the Supreme Court in *Eurosail* (and in particular the judgment of Lord Walker):

(i) The tests of insolvency in s 123(1)(e) and 123(2) were not intended to make a significant change in the law as it existed before the Insolvency Act 1986: para [37].

(ii) The cash-flow test looks to the future as well as to the present: para [25]. The future in question is the reasonably near future; and what is the reasonably near future will depend on all the circumstances, especially the nature of the company's business: para [37]. The test is flexible and fact-sensitive: para [34].

(iii) The cash-flow test and the balance-sheet test stand side by side: para [35]. The balance-sheet test, especially when applied to contingent and prospective liabilities is not a mechanical test: para [30]. The express reference to assets and liabilities is a practical recognition that once the court has to move beyond the reasonably near future any attempt to apply a cash-flow test will become completely speculative and a comparison of present assets with present and future liabilities (discounted for contingencies and deferment) becomes the only sensible test: para [37].

(iv) But it is very far from an exact test: para [37]. Whether the balance-sheet test is satisfied depends on the available evidence as to the circumstances of the particular case: para [38]. It requires the court to make a judgment whether it has been established that, looking at the company's assets and making proper allowance for its prospective and contingent liabilities, it cannot reasonably be expected to meet those liabilities. If so, it will be deemed insolvent even though it is currently able to pay its debts as they fall due: para [42].

[28] In the course of his judgment in *Eurosail* Lord Walker approved what he described as the 'perceptive judgment' of Briggs J in *Re Cheyne Finance plc* [2007] EWHC 2402 (Ch), [2008] 1 BCLC 741. Two of the points that Briggs J made bear on our case:

(i) Cash-flow solvency or insolvency is not to be ascertained by a blinkered focus on debts due at the relevant date. Such an approach will in some cases fail to see that a momentary inability to pay is only the result of temporary illiquidity. In other cases it will fail to see that an endemic shortage of working capital means that a company is on any commercial view insolvent, even though it may continue to pay its debts for the next few days, weeks, or even months: para [51].

(ii) Even if a company is not cash-flow insolvent, the alternative balance-sheet test will afford a petitioner for winding up a convenient alternative means of proof of a deemed insolvency: para [57].

DISCUSSION

[29] It is in my judgment clear from *Eurosail* and its approval of *Cheyne Finance* that the balance-sheet test in s 123(2) is not excluded merely because a company is for the time being in fact paying its debts as they fall

*a* due. In the case of *Eurosail* that is clear from Lord Walker's approval at [42] of what Toulson LJ had said in the Court of Appeal, and his description of the two tests as standing side by side. In the case of *Cheyne Finance* it is clear from Briggs J's description of the balance-sheet test as an alternative test. Thus I agree with Warren J at [34] that the two tests feature as part of a single exercise, namely to determine whether a company is *b* unable to pay its debts. In addition, even when applying the cash-flow test it is not enough merely to ask (as his Honour Judge Purle QC did) whether the company is for the time being paying its debts as they fall due. As Briggs J said in *Cheyne Finance* a realistic examination may reveal that a company is on any commercial view insolvent, even though it may continue to pay its debts for the time being.

*c*    [30] Warren J was at pains to point out that he was not (and we are not) dealing with a Ponzi scheme. But a hypothetical corporate Ponzi scheme will test the point. In the early stages of a Ponzi scheme money flows in from investors promised high returns. Money from new investors is used to pay the promised returns to existing investors. On the face of it therefore *d* the company is managing to pay its debts as they fall due. But the underlying reality is that, sooner or later, the whole house of cards will collapse. The accumulating liabilities to new investors cannot hope to be matched by any real investments: they are dependent on the continued inflow of new money. When that dries up, the game is up. In any commercial sense the company is insolvent from the beginning. What a *e* commercial approach requires the court to do is not to stop automatically at the answer to the question: is the company for the time being paying its debts as they fall due? In an appropriate case it must go on to inquire: how is it managing to do so?

   [31] It certainly seems counter-intuitive (to me at least) that a company that manages to stave off cash-flow insolvency by going deeper and deeper *f* into long-term debt is not insolvent. It may be able to trade its way out of insolvency, and thus avoid going into insolvent liquidation, but that is a different matter. Equally if (as Warren J held) Casa UK was only able to continue to pay its debts as they fell due by taking new deposits, and using them to pay off old debts, in any commercial sense the company was insolvent, whether on a cash-flow basis or a balance-sheet basis.

*g*    [32] So the question is twofold: was Warren J entitled to go behind his Honour Judge Purle QC's conclusion that Casa UK was cash-flow solvent up to December 2008; and, if he was, did he find (on a sustainable basis) that Casa UK was using new deposits to pay old debts?

*h* CASH-FLOW SOLVENCY

   [33] His Honour Judge Purle QC's conclusion was expressed at [44] and repeated at [49]. But that, in my judgment, is all it is: a conclusion.

   [34] It was not in dispute that Casa UK had been paying debts when creditors required to be paid. But the liquidator did not accept that that *i* meant that Casa UK was cash-flow solvent. In their letter of 16 March 2010 the liquidator's solicitors wrote:

       'The fact that the Company made its other payment obligations on time does not rebut the presumption that the company intended to prefer Mrs Bucci. On a cash-flow basis the Company was regularly

*a*

receiving substantial sums of money but those moneys belonged to investors: they were not sums that the Company was entitled to use to discharge its own liabilities. They should therefore be ignored when calculating whether or not the Company was cash-flow insolvent. If they are left in then it is unsurprising that the Company was able to meet cash-flow obligations at those points, through the misuse of investors' money.'

*b*

[35] In his first witness statement Mr Carman had said at [47] that the company 'was … able to remain cash-flow solvent by taking substantial deposits from investors wishing to purchase properties in [Dubai].' In the same witness statement he said at [52] that Casa UK's cash reserves were 'restricted largely to money received by investors which was meant to be remitted to [Casa Dubai]'. He amplified this in his third witness statement by referring to instances where the moneys had not been remitted to Casa Dubai. He repeated that evidence in cross-examination. His evidence was supported by that of Mr Minshall. Thus the liquidator's case was clear and consistent. Casa UK was able to meet its debts by the misuse of investors' money. The mere fact, therefore, that there were no statutory demands or judgments, and no creditor pressure proved nothing. Remarkably neither Mr nor Mrs Bucci, nor their expert witness Mr Vigar, answered the liquidator's case in their written material. That silence is eloquent. Mr Bucci, in cross-examination, denied the suggestion but he had no detailed figures to work with.

*c*

*d*

*e*

[36] His Honour Judge Purle QC did not comment on any of the liquidator's evidence on this part of the case. He simply failed to deal with the liquidator's case as put. Accordingly, in my judgment his Honour Judge Purle QC stopped his inquiry too early. Superficially Casa UK may have been managing to pay its debts as they fell due; but his Honour Judge Purle QC did not ask himself how it managed to do that.

*f*

[37] In my judgment, given that he did not pursue the inquiry as far as he should have done, it was open to Warren J to do so himself on the basis of the evidence before him. I do not accept Mr Randall's submission that Warren J was required to answer the question: what would his Honour Judge Purle QC have decided if he had applied the correct test? Nor do I accept his submission that if the answer to that question was unclear then the case should have been remitted to his Honour Judge Purle QC. In my judgment if an appeal court comes to the conclusion that the lower court has applied the wrong legal test, it is entitled to apply the correct legal test itself. I have already summarised Warren J's relevant findings of fact. In my judgment we should not interfere with those findings. Warren J was in my judgment entitled to find that Mrs Bucci had not rebutted the presumption that Casa UK was cash-flow insolvent at the time that it made the payments to her. He did not need to go any further.

*g*

*h*

BALANCE-SHEET SOLVENCY

*i*

[38] Warren J noted a tension between his Honour Judge Purle QC's finding that the GUL loan had no 'significant' value, and his inclination to find that it had 'no' value. I do not think that this matters. If the GUL loan had no significant value, then whatever value it did have cannot have made any difference. The experts agreed that if the GUL loan was given no value

a   then Casa UK was balance-sheet insolvent at all relevant times. While that, in itself, may not be a conclusive answer to the question whether Casa UK was insolvent within the meaning of s 123(2), it is difficult to see how it could not lead to that conclusion in the case of a trading company unless there was credible evidence that the balance sheet would improve in the near future. His Honour Judge Purle QC did not refer to any such evidence.

b   [39] His Honour Judge Purle QC recognised that every time that Casa UK took a deposit from an investor it incurred a liability to that investor. But I do not consider that he ever asked himself the question: how were those liabilities to be satisfied? His Honour Judge Purle QC said at [60]:

c     'The result of the Dubai crash is that [Casa UK's] liabilities towards depositors, which would but for the crash have been dealt with in the ordinary course of business, have come to fruition, without any possibility of recoupment from Casa Dubai, which seems to have evaporated.'

d   [40] Again, this is a puzzling observation. In the ordinary course of business depositors' money would have been paid over to developers, thus discharging Casa UK's obligation to account. If the amount that Casa UK owed depositors after the crash had been *matched* by moneys held by Casa Dubai under the set-off arrangement which became irrecoverable, then one might conclude that nothing had gone wrong with the accounting. But if the amount owed to depositors *exceeded* the amount in the hands of Casa Dubai, then the inference must be that Casa UK had used depositors'

e   moneys for its own purposes. The claims made by investors were of the order of £650,000. Although the moneys in the hands of Casa Dubai were said to be of the order of £1.6m, the experts agreed that there was no underlying material to substantiate that claim. His Honour Judge Purle QC

f   did not analyse the evidence about that.

   [41] Mr Randall fastened on a passage at [47] of his Honour Judge Purle QC's judgment in which he said that if a company was dependent on loans from its directors, then if the directors have no intention of calling in the loans, the company might not have reached the point of no return even if its current liabilities exceeded its current assets. I do not consider that this

g   passage supports the conclusion that Casa UK was not balance-sheet insolvent. In the first place, his Honour Judge Purle QC's observation was illustrative only. It was not accompanied by a finding of fact that Casa UK was such a company. Second, in fact Casa UK repaid all directors' loans (almost in full) very shortly before it went into insolvent liquidation. So this was not a case in which the directors left their money in the company.

h   Third, in the passage in question his Honour Judge Purle QC was applying the wrong test.

   [42] Again in my judgment Warren J was entitled to make the findings for himself. Again I do not consider that we should interfere with those findings.

i

THE PRESUMPTION

   [43] Finally, Mr Randall criticised Warren J for having said that he was not in a position to make findings of fact on some of the matters debated before him. But this overlooks the statutory presumption that the company

was insolvent when the payments were made. A presumption is a *a* provisional conclusion that must be displaced by contrary evidence. It is not the same as a trial at which the court starts, so to speak, with a blank sheet of paper. If the judge is not in a position to make a finding of solvency, the presumption prevails. Equally, if he is not in a position to make one or more findings about the building blocks in the case that the company was solvent, *b* then the presumption is not displaced. I do not, therefore, consider that this criticism undermines Warren J's overall conclusion.

RESULT

[44] I would dismiss the appeal.

*c*

**McFARLANE LJ.**

[45] I agree.

**SULLIVAN LJ.**

*d*

[46] I also agree.

*Appeal dismissed.*

Charlotte Hennessey    Solicitor (non-practising).

# TAB 66

**\*91  In the Matter of Charge Card Services Limited
and In the Matter of the Companies Act 1985**

Before the High Court of Justice,
Chancery Division (Companies Court)
12 June 1986

**[1987] E.C.C. 91**

(Mr. Justice Millett)

12 June 1986 [1]

### Analysis

Applications in the context of company winding-up proceedings.

Consumer credit. Charge cards. Contract. On the use of a charge card, three separate contracts come into operation. The first is a contract of supply between the supplier and the cardholder; the second is that between the supplier and the card-issuing company, the latter undertaking to honour the card by paying the supplier on receipt of the sales voucher; the third is the contract between the card-issuing company and the cardholder, by which the cardholder undertakes to reimburse the card-issuing company for payments made or liabilities incurred by the card-issuing company to the supplier as a result of his use of the card. There are thus three separate contracts and three parties, each being party to two of the contracts but none either party or privy to the third. [13]

Contract. Supply of petrol. Implied terms. It is an offence to obtain petrol with an intention to avoid paying for it. The contract between the garage and the motorist is therefore concluded when the motorist fills his car at the pump and not at the cash desk where the method of payment is decided. Garages invite motorists to pay by cash, cheque or recognised credit card *etc.*, but the primary obligation remains to pay in cash. If a motorist intends to pay by credit card, it is not a term of the contract concluded at the pump that payment *will* be made by credit card, but only that it *can* be. [29]

Richardson v. Worrall (Scott J.), [1985] S.T.C. 693 followed.

Contract. Supply of petrol. Credit card. The agreement which comes into existence by the cardholder's acceptance of the garage's standing offer to accept payment by credit card has  **\*92**  the same legal consequence whether it is made at the pump, and therefore before the contract of supply is entered into, or at the till, and therefore after the contract of supply has been concluded. The agreement to accept payment by means of the card is not an independent and free-standing contract in its own right, but merely an agreement on the method of payment under the contract of supply. This is so whether the contract of supply has already been concluded or is yet to be concluded. [32]

Contract. Consideration. Cheques. Credit cards. Production of a charge or credit card or signature of a cheque is not the consideration itself but merely the means of obtaining it. [33]

Contract. Sale of goods. Monetary consideration. Credit cards. Under section 2(1) of the Sale of Goods Act 1979, a sale of goods requires monetary consideration. When payment is made by means of a credit card, three separate bilateral contracts come into play, and the true consideration in such a contract of supply is the price, to be satisfied by the cardholder if he wishes by means of the card. [33]

Consumer credit. Credit card. Type of payment. Whether payment by charge or credit card is an absolute payment or, like payment by cheque, a conditional payment only is a question the answer to which must depend on the terms of the contract of supply. [35]

Consumer credit. Credit cards. Risk of non-payment. Conditional payment. There is no general principle of law that whenever a method of payment is adopted which involves a risk of non-payment there is a presumption, rebuttable by proof of special circumstances, that this is taken as a conditional payment only, so that the risk of non-payment falls on the paying party. [36]–[37]

Consumer credit. Credit cards. Credit and charge cards are used mainly to facilitate payment of small consumer debts resulting from transactions between parties who probably are not known to each other, the terms of which are not subject to negotiation. The identity of the card-issuing company is a matter for agreement. The machinery for payment does not require disclosure of the customer's address to the supplier, who may well have difficulty in

identifying the customer without the co-operation of the card-issuing company. The card as a method of payment has advantages for both parties— the customer obtains free credit for a period longer than the supplier is prepared to grant even to the card-issuing company or than he would obtain by use of a cheque, while the supplier obtains better security, one debtor in place of many and the **\*93** prospect of extra trade attracted to the credit facilities he can extend to the customer. The terms on which everyone is entitled to payment from everyone else are quite different in each case. If the customer is liable to pay the supplier on default of the card-issuing company, he must do so on the most onerous terms—immediate repayment of the full face value of the voucher, not the discounted payment the supplier would expect to receive from the card-issuing company. It is difficult to find any justification for imputing to the customer an intention to undertake such a liability. [46]

Consumer credit. Credit cards. Essence of the transaction. The essence of a transaction involving a credit card is that the supplier and the customer have for their mutual convenience each previously arranged to open an account with the same company and agree that any future account between themselves may, if the customer wishes, be settled by crediting the supplier's and debiting the customer's account with that company. That process does not depend on the company's solvency, and the customer must be discharged at the latest when the supplier's account with the company is credited, and not when the supplier is paid. Thus, there is no presumption that payment by means of a credit card is a conditional payment only, but in fact a presumption to the contrary. [47]–[48]

The Court, dealing with questions arising on the winding up of an insolvent credit card-issuing company, for the first time carefully analysed the various contractual relationships involved in a credit card transaction, in order to ascertain who—the guarantee company or the customers who had used their cards—were liable to pay the insolvent company's outstanding debts to the suppliers, in this case garages supplying fuel.

**Representation**

David Oliver Q.C. and Richard Hacker, instructed by Alsop Stevens, appeared for the liquidator of the company. Robin Potts Q.C. and Michael Todd, instructed

by Wragge & Co., appeared for Copes Service Station Ltd., one of the unpaid suppliers. John Chadwick Q.C. and Richard Gillis, instructed by Cameron Markby, appeared for Commercial Credit Services Ltd., the guarantee company.

The following cases were referred to in that part of the judgment here reported:

- 1. Richardson v. Worrall, [1985] S.T.C. 693 (Ch.D.).
- 2. In Re Romer & Haslam, [1893] 2 Q.B. 286 (Q.B.D.).
- 3. Bolt & Nut Co. (Tipton) Ltd. v. Rowlands Nicholls & Co. Ltd., [1964] 2 Q.B. 10 (Q.B.D.).
- 4. Allen v. Royal Bank of Canada, (1926) 134 L.T. 191.
- 5. W. J. Alan & Co. Ltd. v. El Nasr Export and Import Co., [1972] 2 Q.B. 189 (C.A.).
- 6. Maran Road SAW Mill v. Austin Taylor & Co. Ltd., [1975] 1 Lloyd's Rep. 156 (Q.B.D.).
- 7. E.D. & F. Man (Sugar) Ltd. v. Nigerian Sweets and Confectionery Co. Ltd., [1977] 2 Lloyd's Rep. 50 (Q.B.D.).

**JUDGMENT**
MILLETT J.:

[1] This case raises two questions. The first is one which can arise whenever goods or services are obtained by the use of a charge or credit card. The question is whether the supplier can call upon the customer to pay him direct if the company which issued the card becomes insolvent before paying him. It is a question upon which there is no reported decision and upon which academic writers have differed. It calls for a careful analysis of the complex legal relationships arising in a familiar and everyday transaction of deceptively simple appearance.

[2] Charge Card Services Ltd. (which I shall call `the Company') was incorporated in June 1982. It ceased to trade on 21 January 1985, and entered into creditors' voluntary liquidation on 4 February 1985. On the evidence presently available there is likely to be a deficiency as regards unsecured creditors of approximately £1,932,000.

[3]  The Company was promoted by the Motor Agents Association and the Scottish Motor Trades Association for the purpose of establishing and operating a charge card scheme known as the Motor Agents Association Fuel Card Scheme (which I shall call `the Scheme'). Under the Scheme the Company issued charge cards (called Fuel Cards) to individuals and companies which had submitted written applications for the use of such cards (I shall call them `Account Holders'). The cards were available for use by the Account Holder or by the person or persons whom the Account Holder had authorised to use the card (whom I shall call `Cardholders') at garages which were members of one or other of the two Associations and which had entered into a previous agreement with the Company.

[4]  The Company issued two types of charge card. The first could be used at any garage which had become a member of the Scheme. The second, commonly described as an `in-house card', could be used only at a particular garage or group of garages. For present purposes there is no relevant distinction between the two types of card. Immediately prior to the cessation of business by the Company there were some 4,666 garages which were members of the Scheme, of which 620 operated `in-house cards'; and there were in all some 33,500 Cardholders.

[5]  The Scheme was operated in a manner which would be familiar to anyone who has ever used a charge or credit card. Cardholders were entitled to use the Fuel Card to obtain petrol  **95**  and other designated products from garages which were members of the Scheme and which advertised their willingness to accept the card. If a Cardholder decided to use his card in connection with such a purchase, he would produce the card and sign a sales voucher completed by the garage. One copy of the voucher would be handed to the Cardholder; one copy would be retained by the garage; and one copy would be forwarded by the garage to the Company, which in due course would pay to the garage the face value of the sales voucher less an agreed commission. Weekly invoices showing the face value of the sales vouchers would be sent a by the Company to the Account Holder, who would also be sent a monthly statement showing the sums invoiced and payments by the Account Holder (and in certain circumstances interest). The Account Holder was obliged to pay the amount shown as owing to the Company within 14 days of receipt of the monthly statement.

[6]  The Company, of course, was in no position to invoice the Account Holder until it had received the sales vouchers from the garage; and it was to be expected that the Company would pay the garage before it received payment from the Account Holder. Normally, no doubt, it did so. There might, however, be cases— and during the last few weeks before the Company ceased trading there certainly were cases—in which the Account Holder was required to pay, and did pay, the Company before the Company paid the garage. For his part the Account Holder when required to pay the Company would have no means of knowing, and would be unlikely to inquire, whether the Company had paid the garage.

[7]  Because the Company would normally pay the garage before it obtained reimbursement from the Account Holder, it financed its activities by factoring its receivables. This was effected by an Invoice Discounting Agreement, dated 15 February 1983 and entered into between (1) the Company and (2) the First Respondents, Commercial Credit Services Limited (which I shall call `Commercial Credit'). By that Agreement all debts owing or to become owing from Account Holders to the Company were assigned to Commercial Credit. Notice of the assignment was given to Account Holders by a statement on each invoice sent to them.

[8]  At the date of liquidation the Company's books showed some £3,000,000 of receivables due from Account Holders for petrol and other products supplied to Cardholders against production of the Fuel Card. These receivables fell into two categories:

> • (i) cases where the garages had been paid by the Company, and
> • (ii) cases where the garage had not been paid by the Company.

Cases in the first of these categories cause no difficulty. It is agreed by all parties that these represented debts due to the Company and that, by virtue of the Invoice Discounting Agreement, they have been assigned to

Charge Card Services Ltd (No.2), Re, [1987] Ch.c. 81 (1986)

Commercial Credit. The present dispute is concerned solely with cases in the second category. In addition, for the reasons I have mentioned, there are cases where the Account **96** Holder has paid the Company, but the Company has not paid the garage. Such cases were not of course included in the Company's receivables at the date of liquidation and any questions which may arise in relation to them are not directly before me.

[9]  Shortly after the commencement of the liquidation it became apparent that difficulties were being caused and would continue to be caused by garages, which foresaw little prospect of a substantial dividend being received from the Company, or who were not prepared to wait, seeking to recover payment direct from the Account Holders and not from the Company. Among the garages which claimed to be entitled to take this course were the Second Respondents, who operated an in-house Scheme, and the Third Respondents, who operated the general Scheme. On 10 March 1986 the Third Respondents were appointed to represent all garages which were members of the Scheme. On the same date the Liquidator was directed to collect all sums due from Account Holders in respect of petrol and other products obtained by Cardholders by the use of Fuel Cards from garages which were members of the Scheme. The Liquidator was directed to pay the moneys so collected into a separate account, and was authorised to draw upon the account for the purpose of defraying the costs of collection. That Order was expressed to be without prejudice to any necessary accounting in the light of the determination of the questions now before the court and without prejudice to the question of the Liquidator's remuneration and the source from which it is to come. Pursuant to that Order, some £2,234,428 has been collected by the Liquidator, and after deduction of the costs of collection a net sum of £2,034,529 remains in the account.

**The first question**

[10]  The first question which is raised by the summons is whether the debts due from the Account Holders on 21 January 1985 (when the Company ceased to trade) or on 4 February 1985 (when it went into creditors' voluntary liquidation) in respect of petrol and other products obtained by Cardholders from garages which were members of the Scheme represented (a) debts due

to the Company, or (b) debts due to Commercial Credit, or (c) debts due to the garages from which the supplies were obtained, or (d) debts due to any other persons. As I have already mentioned, it is accepted that the garages have no claim to debts due from Account Holders in respect of petrol or other products for which the garages supplying them have been paid by the Company; and that by virtue of the Invoice Discounting Agreement the Company's receivables have been effectively assigned to Commercial Credit. In the absence of any representative Account Holder before the Court, the garages have also accepted that they can make no claim in these proceedings to moneys which were due from Account Holders on 21 January 1985 but were paid by them to the Company before the **97** commencement of the liquidation. Accordingly, the question which I have to decide is whether debts due from Account Holders at the commencement of the Company's liquidation on 4 February 1985 in respect of petrol and other products obtained by Cardholders from garages which were members of the Scheme and for which the garages supplying them have not been paid by the Company represented (a) debts due to Commercial Credit, or (b) debts due to the garages from which the supplies had been obtained.

[11]  The nature and consequence of the legal relationships created by the use of a credit or charge card for the purchase of goods or services have not been the subject of any reported decision.

[12]  It is clear that there are at least three parties involved: the supplier (in this case the garage), the purchaser (the Cardholder), and the company which issued the card (the Company). In the present case there are four, since cards were issued to Account Holders, who were entitled to authorise their employees or other authorised signatories (Cardholders) to make use of the cards. This is an added complication which can be ignored for present purposes, since in such a case the Account Holder is liable as principal, disclosed or undisclosed, to pay for the goods or services obtained by the use of the card, whether or not the Cardholder is also liable. The question is not who is liable to pay, but who is entitled to receive payment.

[13]  On the use of the card, three separate contracts come into operation. First, there is the contract of supply between the supplier and the Cardholder (either in his own right or as agent for the Account Holder); secondly, there is the contract between the supplier and the card-issuing company, which undertakes to honour the card by paying the supplier on presentation of the sales voucher; and, thirdly, there is the contract between the card-issuing company and the Account Holder by which the Account Holder undertakes to reimburse the card-issuing company for payments made or liabilities incurred by the card-issuing company to the supplier as a result of his or his Cardholder's use of the card. There are thus three separate contracts and three separate parties, each being party to two of the three contracts but neither party nor privy to the third. While the legal consequences of these arrangements must depend upon the terms of the particular contracts employed, one would expect each contract to be separate and independent and to be entered into between principals. In particular, one would expect the card-issuing company to enter into both its contract with the supplier and its contract with the Account Holder as a principal in its own right and not merely as agent for the Account Holder and the supplier respectively. One would also expect the supplier to be entitled to be paid whether or not the card-issuing company is able to obtain reimbursement from the Account Holder, and the card-issuing company to be entitled  **98**  to be paid whether or not the goods or services supplied by the supplier are satisfactory. The question which arises in the present case is: on whom does the risk of default by the card-issuing company fall? Does it fall on the supplier or (if the Account Holder has already paid the card-issuing company) on the Account Holder, so that he may be called upon to pay twice, and (if he has not already paid the card-issuing company) on the card-issuing company's receivables' financier?

[14]  In the present case, as must be common, the two contracts to which the card-issuing company was a party were in writing, while the contract of supply was not. The terms of the contract between each member garage and the Company are to be found on the reverse of a franchise application form, headed `Terms and Conditions relating to the grant and holding of a franchise'. By that Agreement the Company undertook to provide the equipment necessary to operate the Scheme, including an imprinter and sales vouchers, and a metal

double sided pole sign advertising the Scheme; and to reimburse the garage for `the cost' (*sic*) `of fuel and lubricants purchased, as shown by the relevant valid sales vouchers issued by the garage, less the appropriate commission due to the Company'. Two methods of claiming and receiving reimbursement were set out, and the differing rates applicable there to were specified. The Company also undertook to establish, for the benefit of all member garages, a guarantee of its obligation to reimburse them; regrettably it never did so. Finally, it undertook to maintain records of all transactions between itself and each member garage and to forward monthly statements to each such garage showing the amount of any indebtedness between them. For its part, each member garage under took (*inter alia*): `To honour all valid and current Motor Agents Association Fuel Cards presented by card holders by supplying petrol, diesel oil, liquified petroleum gas and lubricating oil (but no other products and no services) to the card holder at the same prices and on the same terms as for cash sales displayed at the point of sale'. Each garage also undertook to display signs indicating that the Fuel Card was accepted at relevant locations and to permit the Company to advertise or circulate the fact that a Fuel Card was accepted there. The Company reserved the right to reject any invalid sales voucher, and the circumstances in which a sales voucher should be invalid were specified. The Company also reserved the right to charge the garage with any over payment made in respect of sales vouchers and with the full amount of all payments made in respect of invalid sales vouchers.


[15]  The terms of the contract between the Company and the Account Holder are to be found in the Subscriber Agreement, by which each Account Holder agreed to be bound by the terms and conditions printed on the reverse of the Agreement relating to the issue of the card. So far as material these provided as follows.  **99**  First, the card was to become valid only when it had been signed either by the person to whom it had been issued (the Account Holder) or by the person whom the Account Holder had authorised to use the card (the Authorised Signatory). The signature and/or use by the Account Holder or his Authorised Signatory constituted agreement by the Account Holder to these terms and conditions. Condition 1 of the Terms and Conditions of Use provided: `Use of the Card will authorise [the Company] to pay for petrol, lpg, derv and oil (only) supplied to the Account Holder

or the Authorised Signatory by the various garages who are members of the Motor Agents Association or Scottish Motor Trade Association.' Use of the card was restricted to the Account Holder or the Authorised Signatory. The Agreement provided for monthly statements showing all accounts debited, less any credits or refunds, to be sent to the Account Holder by the Company; for the Account Holder to pay to the Company, within 14 days from the date to which the statement was made up, the whole of the amount shown to be owing by the statement; and for interest to be charged on any outstanding balance after expiry of the 14-day period. The Agreement contained provisions in case the card (which remained the property of the Company) should be lost or stolen; and provided that no claim by the Account Holder against any supplier should be the subject of any set-off or counter claim against or give rise to any liability on the part of the Company.

[16] Each supply contract between a member garage and a Cardholder will have taken place on the garage forecourt in a manner familiar to any motorist. I have been provided with an agreed Statement of Facts, from which the following can be extracted.

[17] By promotional literature issued by the Company in conjunction with the Motor Agents Association, retail garages were encouraged to apply to become members of the Scheme. High mileage fleet operators were similarly encouraged to apply to become Account Holders. Each garage accepted as a member of the Scheme was issued with a guide to the Scheme, an imprinter retail plate, sales vouchers, claim forms, promotional literature, and a metal double-sided pole sign advertising its membership of the Scheme. The garage would advertise its membership of the Scheme, and hence its willingness to accept the Company's Fuel Card, by its signs displayed on the garage forecourt and by the inclusion of the garage's name and address in a directory compiled by the Company and issued to all Account Holders. Garages operating an `in-house' Scheme would inform the customers for whom they previously operated credit accounts of the adoption of the `in-house card' by sending to each such customer a letter in a standard form suggested by the Company.

[18] The Company issued cards to an applicant only after credit references had been taken up. An upper limit was then placed **100** upon the value of the purchases that any given Account Holder could charge to his account. Upon issue of the cards, the Account Holder designated the identity of the Cardholders entitled to use them. Cards available for use at only one garage were sent to and held by that garage. Other cards, including `in-house cards' available for use at more than one garage were sent to the Account Holders.

[19] A Cardholder who required fuel would arrive on the garage forecourt and at a self-service garage would operate the fuel pump himself to put the required amount of fuel into the vehicle's fuel tank; at a service garage the fuel pump would be operated by an attendant acting on his instructions. The amount and price of the fuel provided would be recorded electronically on the pump. No prior discussion as to the method of payment would normally occur. Many petrol pumps display notices referring to the fact that it is an offence under the Theft Act 1968 to place fuel into a petrol tank without being able to pay with either cash, a cheque supported by a valid banker's card, or an approved credit card.

[20] A Cardholder who required lubricating oil would normally select the oil for himself from the garage's display or request an attendant to supply the lubricating oil for him.

[21] At the cashier's till the Cardholder (if he chose to take advantage of the Scheme) would proffer his card. Alternatively the Cardholder could pay by cash or cheque supported by a valid banker's card or by some other acceptable credit or charge card.

[22] In the case of an `in-house' scheme where the card was kept by the garage, the garage would produce the card upon being informed that the Cardholder wished to make use of the card in connection with the purchase.

[23] A sales voucher, as supplied by the Company, would be prepared with an imprint of the cardholder's card and sometimes the retailer's imprinter plate, giving the name

Charge Card Services Ltd (No.2), Re; [1987] E.C.C. 121 (1986)

(but not the address) of the Account Holder and the number of his account with the Company, after which particulars of the date, the vehicle registration number, the amount of fuel provided and the total cost would be entered on the sales voucher. The Cardholder would sign the sales voucher (with carbons underneath). The top copy of the sales voucher would then be handed to the Cardholder. Except in the case of `in-house' schemes where the card was kept at the garage, the card would then be returned to the Cardholder.

[24]  On behalf of the garages it was submitted that as soon as a Cardholder puts petrol in the tank of his car, or has petrol put in the tank by a garage attendant, he thereby contracts to purchase and pay for the petrol at the price displayed on the pump. (If the Cardholder is not the Account Holder, then the Account Holder also becomes liable at this stage as undisclosed principal, but this does not affect the nature or extent of the Cardholder's liability.) The Cardholder's liability to pay the garage for the petrol arises  **\*101**  when the petrol is put in his tank; and his obligation, in the absence of an acceptable alternative, is to pay in cash. Credit card advertisements outside the garage constitute a standing offer to Cardholders to settle their liability by means of the advertised card. The right to use his card is a right of which the Cardholder can avail himself if he wishes; he may, if he prefers, pay in cash. So far these submissions adopt the analysis of Scott J. in Richardson v. Worrall. [2] If the Cardholder chooses to pay by card (or for that matter, by cheque, whether or not supported by a bank card), the argument proceeded, he is not thereby unconditionally discharged from his liability to pay. Payment by card, it was submitted, like payment by cheque, operates as a conditional payment only. A supplier who accepts payment by credit or charge card must in the first instance look to the card-issuing Company for payment, and must present the sales vouchers with an appropriate claim form to the Company. But if for any reason the sales voucher is not honoured by the card-issuing Company, or the Company defaults or becomes insolvent, then the Cardholder's liability to pay the garage for the supplies he has received is not discharged. He is not discharged because, in the event, he has not paid.

[25]  The primary submission of counsel for Commercial Credit was to challenge this analysis of the forecourt

transaction. It was submitted that the Cardholder never becomes liable to the garage to pay for the petrol at all. His (and if he is not the Account Holder, the Account Holder's) only obligation is to pay the Company; while the garage never has any right to look to the Cardholder or Account Holder for payment, but must from the outset look to the Company. Counsel accepted the obvious fact that the Cardholder enters into a contract with the garage for a supply of petrol as soon as the petrol is put into the tank of his car. But, it was submitted, his obligation is not to pay for the petrol *simpliciter*: it is from the outset an obligation to pay or *to provide for payment by one of the methods which the garage holds itself out as willing to accept*. One of those methods in the present case was the Fuel Card; and the terms of the Agreement between the garage and the Company were that the garage would honour the card by supplying the petrol, and that the Company would pay the garage for the supply. The Cardholder was not bound to do so, but he was entitled from the outset to accept a supply of petrol on the terms that payment to the garage would be made by the Company, and that he or his Account Holder would not be required to pay the garage at all. There was, it was submitted, no reason to treat one method of payment, *viz.* payment in cash, as the primary or underlying obligation, when to the Cardholder's knowledge at the outset other methods, such as payment by card, were equally acceptable. The Account Holder and his Cardholders  **\*102**  were never at any stage under any obligation to pay the garage, it was submitted, because by arrangements made before the Cardholder drove on to the forecourt they were members of a favoured class to whom the garage would be obliged, if asked, to sell petrol and look for payment elsewhere.

[26]  By this means counsel for Commercial Credit sought to escape the conclusion that the acceptance of the card by the garage discharged any pre-existing obligation on the part of the Cardholder or his Account Holder to pay the garage, and thus, it was hoped, avoid altogether the question whether such discharge was absolute or conditional. For the reasons I shall explain, I do not consider that the question can be avoided by this route. First, however, I must examine the analysis of the transaction made by Scott J. in Richardson v. Worrall. [3].

[27] In that case the taxpayers, a Mr. Worrall and a Mr. Westall, were provided with credit cards by their employers which could be used to purchase petrol for both business and private motoring. The credit cards had been issued to the taxpayers' employers and the taxpayers were the authorised users. The taxpayers were assessed to income tax under Schedule E on the footing that the provision of the petrol used for private motoring constituted emoluments of their respective employments. Scott J. upheld the Crown's claim to tax on the ground that the credit card arrangements which the employers made available to the taxpayers enabled them to discharge their own liabilities to pay the garage for the petrol they had purchased.

[28] That decision is direct authority against the approach for which counsel for Commercial Credit contended. It is, however, necessary to examine the arguments which were advanced and rejected in that case, and the reasons for their rejection. The argument of Mr. Worrall's counsel is not material for present purposes. It was Mr. Westall's who submitted that, when Mr. and Mrs. Westall purchased petrol at garages which advertised that they accepted Barclaycard, they never incurred any liability at all to pay for the petrol. Counsel put his argument two ways. First, he submitted that the method of payment was an important part of the contract of sale, and that although the petrol had been put in the tank no contract for its purchase was concluded until, at the till, agreement was reached on the means of payment. Not surprisingly, Scott J. rejected that argument as complete nonsense.

[29] Counsel for Mr. Westall submitted, in the alternative, that if the contract for the purchase of petrol was made when the petrol was placed in the tank, it was a term of that contract, binding on both parties, that payment would be made by Barclaycard. Scott J. described this analysis as nearly as hopeless as the first. He rejected it in these words [4] : *103

> `Credit card advertisements outside a garage may well be regarded as a standing offer to motorists to settle their liability by means of the advertised credit cards. But a motorist whether or not he intends to use a particular credit card does

not put the petrol in his tank on the footing that he is obliged to use that card. The right to use the particular card, or to use any other advertised credit card, is a right of which he can avail himself if he wishes. He can, if he prefers, pay in cash. If an implied term of the contract regarding payment is to be spelled out it is, in my judgment, a term that payment will be made in cash but that if the motorist prefers he may settle his liability by a valid credit card of a sort displayed at the garage or by a cheque backed by an acceptable bank card. The underlying obligation, however, in lieu of an acceptable credit card or cheque and bank card is to make payment in cash.'

I respectfully agree with Scott J. that the taxpayer's contention, in the terms in which it was put, was quite untenable. It was not a term of the contract concluded at the pump that payment *would* be made by Barclaycard, but only that it *could* be. Right from the outset, however, and before incurring any liability at all, the taxpayer was entitled, if he chose, to make payment by means of the card. In that sense, he never had any obligation to pay the garage and, since he was not the Account Holder, he never had any obligation to pay anyone. He was from the outset entitled, if he chose, to a supply of petrol on terms that the garage would be paid by the card-issuing company, and the card-issuing company would be paid by the Account Holder.

[30] Accordingly, counsel for Commercial Credit criticised Scott J.'s conclusion that `the underlying obligation, in lieu of an acceptable credit card or cheque and bank card, is to make payment in cash'. But in my judgment this is plainly right. Scott J. was merely pointing out the obvious fact that the use of a credit or bank card is an alternative to payment in cash, and that if the Cardholder fails to avail himself of an acceptable alternative the obligation to pay in cash remains.

[31]  In Richardson v. Worrall Scott J. continued [5] :

> `As part of his argument counsel
> for Mr. Westall presented to me
> an analysis of a transaction settled
> by production of a credit card.
> His intention was to demonstrate
> that the card holder never becomes
> personally liable to pay the price of
> the goods or services. The liability
> to pay rests, he submitted, on the
> bank or finance company by whom
> the credit card was issued. The
> analysis depends, however, on the
> premise that no contract comes
> into existence until either the credit
> card is accepted by the supplier or
> the supplier becomes contractually
> bound to accept the credit card. In
> the case of purchases of motor fuel
> at garages and filling stations where
> the normal procedure, such as that
> followed by Mr. and Mrs. Westall
> and, for that matter, by Mr. Worrall,
> takes place, the premise fails.
> Whether the analysis of counsel for
> Mr. Westall is sound where, as in
> many department stores, the goods
> are not finally delivered until after
> the credit card has been offered and
> accepted, I need not decide.'

**\*104**

[32]  In my judgment, the agreement which comes into
existence by the Cardholder's acceptance of the garage's
standing offer to accept payment by means of the card has
the same legal consequence whether it is made at the pump
and before the contract of supply is entered into or at the
till and after the contract of supply has been concluded.
The agreement to accept payment by means of the card is
not an independent and free-standing contract in its own
right; it is merely an agreement on the method of payment
under the contrast of supply, and this is so whether the
contract of supply is already concluded or is yet to be
concluded.

[33]  This follows from an analysis of the true nature
of the consideration for the goods or services supplied
when payment is to be obtained by the supplier by the
use of a charge or credit card. Three possibilities have
been canvassed. The first is that the consideration for
the supply is not the price (which is to be paid by
the card-issuing company, a stranger to the contract
of supply) but production of the card and signature
of the voucher. I reject this analysis, which is quite
unrealistic. Production of the card and signature of a
cheque are not the consideration itself but the means
of obtaining it. Moreover, a sale of goods requires a
monetary consideration: see section 2(1) of the Sale of
Goods Act 1979. This analysis would thus lead to the
conclusion that, where payment is to be made by credit
or charge card, the contract of supply is not a sale
of goods, with the result that the statutory conditions
and warranties are not implied. The second possibility
which has been suggested is that there is a sale of goods,
but the contract is a tripartite contract under which the
consideration for the supply to the Cardholder is the
undertaking of the card-issuing company to pay the price
to the supplier. I reject this analysis, which confuses the
result of all the arrangements made with the legal means
employed to achieve it. On the use of the card, there
is no tripartite agreement, but three separate bilateral
contracts come into operation. In my judgment, the true
consideration in the contract of supply is the price, to be
satisfied by the Cardholder if he wishes by means of the
card.

[34]  If, however, the supplier's acceptance of the use of
a card is merely an agreement as to the means by which
the consideration under the contract of supply may be
satisfied, this must be so whether this agreement precedes
or follows or is simultaneous with and forms part of
the contract of supply itself. If the contract of supply
is entered into first, then the agreement that payment
thereunder shall be made by means of the card supersedes
and discharges a pre-existing obligation to pay in cash. If
not, it displaces at the outset what would, in the absence
of agreement, have been an obligation to pay in cash. In
either case, the question remains: what is the extent of the
obligation? Is it merely to provide a means of obtaining
payment from the card-issuing  **\*105**  company, so that
it is satisfied simply by producing the card and signing
the voucher? Or is it to provide a means of obtaining

payment from the card-issuing company which proves effective, so that it is satisfied only if the card-issuing company honours its obligation to pay the supplier? If the latter, then any pre-existing obligation to pay is not unconditionally discharged by the agreed substitute and, if there was no such pre-existing obligation, the underlying obligation to pay is not unconditionally displaced by the agreed alternative.

[35]  Accordingly, I turn to the real question, whether payment by charge or credit card is an absolute payment or, like payment by cheque, is a conditional payment only. That must depend upon the terms of the contract of supply, but in the circumstances of the present case these must be inferred. No doubt a provision in the franchise agreement that the Company's undertaking to honour the sales voucher should be taken in full exoneration of any obligation of the Cardholder or the Account Holder to the garage would be effective, as would a provision to the opposite effect in the subscriber's agreement, for neither party to the contract of supply should be taken to contract with the other on terms which were inconsistent with his own contract with the Company. It is sufficient to say that no such provisions are to be found in either agreement. In the course of argument it was faintly suggested that clause B2 of the franchise agreement was such a provision. This required the Company to honour all valid and current Fuel Cards by supplying petrol and other designated products to the Cardholder `at the same prices and on the same terms as for cash sales displayed at the point of sale'. It is, it was submitted, a term of a cash sale that on payment the customer obtains a good discharge. But that is not a term of a cash sale; it is simply the consequence of the performance by the customer of all his obligations under the contract. It is the extent of those obligations where payment is to be made by charge or credit card which is in question in the present case. Thus the clause is neutral on the question. In fact, the purpose of the requirement that the Cardholder is to be offered, not only the same price, but the same terms as the cash customer is quite different; if a cash customer is given a `free' glass or coin with each purchase, the Cardholder is to be given one too.

[36]  It was submitted on behalf of the garages that there is a general principle of law that, whenever a method of payment is adopted which involves a risk of non-

payment, there is a presumption, rebuttable by proof of special circumstances, that this is taken as conditional payment only, so that the risk of default is on the paying party. The principle, it is said, is that in the absence of agreement, express or implied, to the contrary, failure of the agreed method of payment leaves the liability to pay undischarged.

[37]  In my judgment, there is no such principle. As the cases cited to me demonstrate, the approach of the courts to this  *106  question has not been conceptual or based on any such supposed principle, but has been strictly pragmatic. As each new method of payment has fallen to be considered, its nature and the surrounding circumstances have been examined to see whether a presumption of conditional payment should be made. Indeed, only in this way is it possible to identify those special circumstances which may take an individual case out of the general rule applicable to payments by a particular method.

[38]  It is long settled that the giving of a cheque operates as a conditional payment only, unless the parties expressly or by implication otherwise agree: see In Re Romer & Haslam [6] and Bolt & Nut Co. (Tipton) Ltd. v. Rowlands Nicholls & Co. Ltd. [7] Although not strictly necessary for my decision, it is right, for reasons which will appear, that I should state my view that this presumption would not be displaced merely by the fact that the cheque was accompanied by a bank card. A cheque is a revocable mandate by the customer to his bank which authorises the bank, as his agent, to make payment out of moneys standing to the credit of his account or which the bank is willing to advance to him. The obligation undertaken by the bank to the supplier, which it enters into through the agency of its customer when he uses the bank card, is not to dishonour the cheque on presentation for want of funds in the account, so that it is obliged if necessary to advance moneys to the customer to meet it. If the cheque is met, the bank honours its own undertaking as principal to the supplier and, as agent for the customer, makes payment on its behalf out of his own moneys, whether or not these have been advanced to him for the purpose. The only risk is that of the default or insolvency of the bank; and this risk, though unlikely to be in the contemplation of the parties, is equally present whether or not the cheque is accompanied by a bank card. In either case, it is not

unreasonable to expect the customer to take responsibility for the default of his agent.

[39] A similar presumption has been applied to payment by bills of exchange and other negotiable instruments, whether given by the customer or a third party: see Allen v. Royal Bank of Canada. [8] This is a three-party situation, once the bill has been negotiated, for the acceptor is not the agent of a subsequent indorser, but on the contrary is liable to indemnify the indorser if he should be called upon to pay. Nevertheless, the identity of the acceptor is essentially the choice of the party who proffers the bill in payment, and it is unlikely that a supplier would be content to accept the liability of an unknown acceptor, selected by the customer, in complete exoneration of his own customer.

**\*107**

[40] The presumption has also been applied to irrevocable letters of credit. In such cases the choice of issuing bank is essentially a matter for the buyer, and it is not unreasonable to expect him to accept responsibility if the bank fails. In W. J. Alan & Co. Ltd. v. El Nasr Export and Import Co. [9] where the point did not strictly arise for decision, both Lord Denning M.R. and Stephenson L.J. expressed the view *obiter* that in the ordinary way a letter of credit operates as a conditional payment only. Lord Denning said [10] :

> `In my opinion a letter of credit is not to be regarded as absolute payment unless the seller stipulates, expressly or impliedly, that it should be so. He may do it impliedly if he stipulates for the credit to be issued by a particular banker in such circumstances that it is to be inferred that the seller looks to that particular banker to the exclusion of the buyer.'

[41] In Maran Road SAW Mill v. Austin Taylor & Co. Ltd., [11] where the issuing bank had defaulted so that the question arose directly for decision, Ackner J. followed

the *dicta* in W. J. Alan & Co. Ltd. v. El Nasr Export and Import Co. and applied the presumption. The defendants were, he said, obliged to employ a reliable and solvent paymaster and if they failed to do so, despite having put him in funds, they would have to pay twice over. In E. D. & F. Man (Sugar) Ltd. v. Nigerian Sweets & Confectionery Co. Ltd., [12] Ackner J. held that the fact that the seller had agreed on the identity of the issuing bank was only one of the factors to be taken into account when considering whether there were circumstances from which it could properly be inferred that the sellers looked to that particular bank to the exclusion of the buyers; that this fact was not conclusive; and that there were other circumstances present which supported the presumption that the letters of credit were given as conditional payment only.

[42] It was submitted to me that the structure of the relationship which is brought into operation when goods or services are obtained by the use of a credit or charge card is closely analogous to that established by the issue of an irrevocable letter of credit, that a similar presumption should be applied, and that there were no special features of the present case which would rebut that presumption.

[43] Before dealing with this contention I must consider an argument in favour of conditional payment suggested by Stephenson L.J. in W. J. Alan & Co. Ltd. v. El Nasr Export and Import Co., [13] and accepted by Ackner J. in Maran Road SAW Mill v. Austin Taylor & Co. Ltd., [14] that the buyers were not discharged because they had promised to pay by letter of credit, not to provide a **\*108** source of payment which did not pay. Whether or not that may be a possible ground for decision where the question turns on the true construction of the terms of payment in a written contract of supply, it cannot provide a solution in a case like the present, where the wording of the contract of supply is unknown, and indeed where the contract may have been concluded in complete silence, so that the terms of payment have to be inferred. In any case, I should respectfully have thought that the formulation begs the question, since it assumes that a promise to pay by a method which involves a risk of non-payment is satisfied only if the method results in actual payment, which is the very question to be decided. No doubt a person can be properly said to have `paid' only when he has discharged

all his obligations in regard to payment, but the extent of those obligations is the very question in issue. The fact is that the word `pay', like the word `payment', is ambiguous —it may refer to conditional or absolute payment—and its meaning in any given case cannot be determined merely by its use.

[44] In my view the structure of the relationship which is brought into operation when goods or services are obtained by credit or charge card bears only a superficial resemblance to that established by the issue of an irrevocable letter of credit. In both cases the supplier looks to a third party for payment, and the third party looks to the buyer for reimbursement, each of the three parties acting as principal. But in my judgment, there all resemblance ends, for, if the surrounding circumstances are considered, the two situations are not at all alike.

[45] Letters of credit are employed to finance international commercial transactions between traders who are normally known to each other, and the terms of which will have been the subject of negotiation. The contract will usually provided merely for payment to be made by letter of credit, the identity of the issuing bank being left to be nominated by the buyer after the contract has been concluded, and being a matter of indifference to the seller. Even where the identity of the issuing bank is agreed between the parties, there is no prior contract between the issuing bank and the seller; its obligations to the seller arise under the letter of credit itself. The sole purpose of the letter of credit is to provide security to the seller to replace that represented by the shipping documents which he gives up in exchange for the credit. Finally, the terms on which the seller is entitled to payment must be identical to those to which he is entitled under the contract with the buyer.

[46] By contrast, credit and charge cards are used mainly to facilitate payment of small consumer debts arising out of transactions between parties who may well not be known to each other, and the terms of which are usually not the subject of negotiation. The identity of the card-issuing company is necessarily a matter for agreement, since the card must be one which the customer is authorised to use and the supplier has the necessary equipment to **\*109** accept. The machinery of payment by charge or credit card does not require the disclosure of the customer's address to the supplier, and in the absence of special precautions which are seldom taken, at least in the case of small transactions, and which were not taken in the present case, the supplier might well have difficulty in identifying the customer without the co-operation of the card-issuing company. The availability of the card as a method of payment is advantageous to both parties: the customer obtains free credit for a period longer than that which the supplier is prepared to give even to the card-issuing company, or than he himself would obtain from the use of a cheque, with or without a bank card; while the supplier obtains not only better security (as he hopes) but the convenience of having a single debtor in place of many, and the prospect of extra trade by reason of the credit facilities which he is able to extend (without providing them himself) to the customer. Finally, the terms on which the supplier is entitled to payment from the card-issuing company are quite different from those on which the card-issuing company is entitled to payment from the customer; and both differ from those on which the supplier would be entitled to payment from the customer if he were subject to any residual liability not discharged by the use of the card. The card-issuing company is liable to pay the supplier very shortly after the receipt of the sales vouchers and claim form, but is entitled to deduct its commission; while the customer is liable to pay the full face value of the voucher, but is entitled to much longer credit. If the customer is liable to pay the supplier on the failure or default of the card-issuing company, it is on terms more onerous than either, for he must be liable to make immediate payment of the full face value of the voucher. It is difficult to find any justification for imputing to the customer an intention to undertake any such liability.

[47] The essence of the transaction, which in my view has no close analogy, is that the supplier and customer have for their mutual convenience each previously arranged to open an account with the same company, and agree that any account between themselves may, if the customer wishes, be settled by crediting the supplier's and debiting the customer's account with that company. That process does not depend on the company's solvency, and the customer must be discharged, at the latest, when the supplier's account with the company is credited, not when the supplier is paid. But once that point is reached, there is no logical place to stop short of the customer's signing the voucher.

[48]  The features I have described are normally present whenever payment is made by means of a credit or charge card, and they are all present in the case before me. In my judgment, they are sufficient not only to displace any presumption that payment by such means is a conditional payment only, but to support a presumption to the contrary.

**\*110**

[49]  I reach this conclusion with satisfaction, for two reasons. First, a supplier who is not content to accept the security of the card-issuing company alone, but who wishes to retain an additional right of recourse to the customer, has the means readily to hand; he can require payment by cheque accompanied by a bank card. Indeed, the Barclaycard may be used to serve either function. Secondly, it conforms to the general understanding of the public, that when a customer signs the voucher he has discharged his obligations to the supplier, and that he pays for the goods or services he has obtained when he pays the card-issuing company.

[50]  In the present case, there are no special features which support conditional payment, and one which supports the opposite view. This is the Company's undertaking in the franchise agreement to establish, for the benefit of all member garages, a guarantee of its obligation to reimburse them. While far from conclusive, this shows that the garages considered themselves to be giving credit to the Company rather than to the Account Holders.

[51]  Accordingly, I reject the submission that payment by the use of the Fuel Card operated as a conditional payment only. An alternative argument, however, was presented on behalf of the garages to the following effect. Although the subscriber's agreement merely authorised, and did not require, the Company to pay the garage for the fuel supplied to the Cardholder, nevertheless the Account Holder's liability to pay the Company did not arise until the Company paid the garage; the Company's right was a right of reimbursement only. Since the Company had not done so, it was not entitled to retain the money collected from the Account Holders. Of course, it could always become entitled to the money, simply by paying the garages. Accordingly, it was submitted, the liquidator

must either repay the money to the Account Holders, leaving the garages to prove in the liquidation, or pay the garages and extinguish their claims. Since he was under a duty to act in the interests of the general body of creditors, he was bound to take the latter course.

[52]  This argument turns on the true construction of the subscriber's agreement, the drafting of which is singularly inept. Its main provisions are contained in clauses 1 and 3. I have already read clause 1. That clause authorises the Company to pay for the fuel supplied, but it does not expressly authorise the Company to debit the Account Holder with the cost. Clause 3 is in the following terms: `A statement showing all amounts debited, less any credits or refunds, will be sent to the Account Holder by [the Company] each month. The Account Holder will pay to [the Company], within 14 days from the date to which such statement is made up, the whole of the amount shown to be owing by that statement. Interest will be charged at the rate of 3 per cent. (or such other rate as [the Company] may notify) per month or part of month on any balance outstanding after the expiry of such 14-day period  **\*111** until settlement is received. If any amount is outstanding for more than 5 weeks after the date of first issue of the statement showing that amount or exceeds the credit limit granted, ALL the Cards issued to the Account Holder may at the discretion of [the Company] be canceled forthwith and under no circumstances will the Account Holder be reinstated as a Cardholder.' That clause, which is the clause which actually imposes on the Account Holder the liability to pay the Company, presupposes but does not itself confer a right to debit the account with the cost of the fuel. There is, of course, no difficulty in inferring such a right; the question is whether it is a right to debit the account with liabilities incurred, or only with payments made.

[53]  Counsel for the garages relied on clauses 2 and 6. Clause 2 is concerned with the Cardholder's failure to sign the sales voucher or breach of any of the terms and conditions on which the card is issued, and provides that this should not relieve the Account Holder from liability `for the reimbursement of any payment made by' the Company in respect of fuel or oil supplied to the Account Holder or his Cardholder. Clause 6 is concerned with the theft or loss of the card, and requires this to be notified immediately and confirmed in writing within seven days.

It provides for the Account Holder to remain liable to the Company `for any payment made by it to its suppliers arising from the use of the card by any person before such confirmation is received'. Both clauses confer a right of reimbursement only.

[54]  Both clauses, however, deal with situations in which the Company incurs no liability to the garage, but is likely to make payments in discharge of a supposed liability. In both situations, an obligation on the part of the Account Holder to reimburse the Company for payments actually made is sufficient. Neither clause provides support for the wider proposition for which it was relied on.

[55]  In my judgment, the answer is to be found in clause 1, which expressly authorises the Company to pay for, and by implication to debit the Account Holder with the cost of, fuel and oil obtained by the use of the card. The authority to pay the garage must include authority to incur an obligation to pay it; and, if so, then the right to debit the Account Holder must be a right to debit him not only with payments made but also with liabilities incurred. I therefore reject the argument that the Account Holder's liability to pay the Company did not arise until the Company had paid the garage.

[56]  Accordingly, I answer Question 1 of the summons in favour of Commercial Credit.

**\*112**

Footnotes

1    The whole judgment is a very long one, most of which is concerned with insolvency law, so we have reported only the first part, which forms a complete whole.—Ed.
2    [1985] S.T.C. 693.
3    See above.
4    At p. 720E.
5    At p. 720G.
6    [1893] 2 Q.B.286.
7    [1964] 2 Q.B. 10.
8    (1926) 134 L.T. 191.
9    [1972] 2 Q.B. 189.
10    At p. 210.
11    [1975] 1 Lloyd's Rep. 156.
12    [1977] 2 Lloyd's Rep. 50.
13    At p. 220.
14    At p. 159.

[1987] E.C.C. 91

© 2017 Sweet & Maxwell

# TAB 67

In The Matter of Cheyne Finance Plc (in Receivership)

**In The Matter of the Insolvency Act 1986**
No.6745 of 2007
High Court of Justice Chancery
Division Companies Court
17 October 2007

**[2007] EWHC 2402 (CH)**

**2007 WL 4190562**

Before Mr. Justice Briggs
Wednesday, 17th October 2007

**Analysis**

**Representation**

• Mr. R. Sheldon QC and Mr. B. Isaacs (instructed by Lovells ) appeared on behalf of the Receivers.
• Mr. W. Trower QC and Mr. R. Fisher (instructed by Hunton & Williams ) appeared on behalf of Party A.
• Mr. S. Mortimore QC and Miss H. Stonefrost (instructed by Milbank Tweed, Hadley and McCloy LLP ) appeared on behalf of Party B.
• Mr. M. Pascoe QC and Mr. D. Allison (instructed by Ashurst and Kay Scholer LLP ) appeared on behalf of Party C.
• Mr. S. Isaacs QC and Mr. D. Bayfield (instructed by Jones Day, Herbert Smith and Sidley Austin ) appeared on behalf of Party D.

**Judgment**
Mr. Justice Briggs:

1   This is a second urgent application for directions by Receivers of the business and assets of Cheyne Finance Plc ("Cheyne"), appointed on 4th September 2007 pursuant to a Security Trust Deed ("the Trust Deed") dated 3rd August 2005 between Cheyne and the Bank of New York.

2  I heard and determined an earlier application in mid-September. The opening paragraphs of my judgment on that application are a sufficient general introduction to this application.

3   That application raised an issue as to how the Receivers should apply monies coming into their hands during the period between their appointment and the happening, if one should happen, of an Insolvency Event, asdefined. That issue turned on a question of construction of the Trust Deed. The only factual assumption then required was that at that time an Insolvency Event had not occurred.

4   My decision on that application, which has not been appealed, was that pending the happening of an Insolvency Event the Receivers should apply monies coming into their hands, first, in prompt payment of the debts of Senior Creditors and any prior debts as and when they fell due; secondly, in making provision for payment of the same classes of debt not yet due and, if that left any surplus — which then seemed unlikely, at least in the short term — in the manner provided for in the payment priority established in clause 12.1(c) and following of the Trust Deed.

5   I shall refer in this judgment to debts of Senior Creditors and those ranking in priority to them collectively as "Senior Debts". I use that phrase rather than "Senior Obligations", which is a defined term with a slightly narrower meaning in the Common Terms Agreement .

6   I preferred the "pay as you go" construction over a rival " *pari passu* " construction pursuant to which full provisioning for payment of all Senior Debts was to take precedence over payment on time and in full of such debts as and when they fell due. I was not asked by the Receivers on that occasion to construe the definition of "Insolvency Event" in the Common Terms Agreement , principally because, as at that time, the Receivers had not formed the view that Cheyne was insolvent on any arguable construction of that definition, or even that Cheyne was balance sheet insolvent, a concept apparently deliberately omitted from the Common Terms Agreement and Trust Deed by confining the incorporation of the Insolvency Act definition so as to exclude s.123(2) .

7  It appeared to be more or less assumed, both by the Receivers and the proponents of the rival arguments on that occasion, that for as long as the Receivers had the wherewithal to pay Senior Debts actually due and those falling due in the very near future then they could not make an Insolvency Event determination even though they regarded a default in payment of Senior Debts as inevitable in the middle or longer term future (see para.7 of my earlier judgment).

8  My determination of the issue of construction then raised did not depend upon that assumption about the meaning of Insolvency Event, and I then regarded it as one which might need to be tested if the Receivers' expectations as to Cheyne's longer term ability to pay its Senior Debts changed.

9  Intensive work which has since been carried out by and at the Receivers' direction into Cheyne's likely future cash flow has caused a change in the Receivers' expectations and has precipitated an urgent need for the meaning of the Insolvency Event definition to be determined.

10  The happening of an Insolvency Event depends upon a determination by the Receivers that Cheyne is, or is about to become, unable to pay its Senior Debts. The Receivers do not suggest that the courts should usurp their function by making that determination itself, a process which might involve factual issues being determined by an adversarial process. Rather they invite the court to decide whether, on certain assumed facts, Cheyne is or is about to become unable to pay its debts within the meaning of the Insolvency Event definition. They recognise that the fact-finding part of the task entrusted to them is to remain their responsibility and the invitation to the court to decide the insolvency question on assumed facts is in substance designed as a convenient vehicle for resolving all relevant issues of construction of the Insolvency Event definition.

**The Assumed Facts**

11  These are stated fully but concisely in the second witness statement of Neville Barry Kahn, one of the three Receivers. Since they are, by definition, not in dispute before me I need only summarise their consequences. They are derived from work done by the Receivers in defining the dates upon which the Senior Debts will all fall due and the amounts falling due on each relevant date, and from work done and opinions formulated by the Receivers' chosen valuers on the amounts of cash capable of being made available for payment on those dates on various hypotheses as to the manner in which the Receivers carry out the necessary asset realisation programme.

12  By way of introduction, first, it is plain that Cheyne could not pay its Senior Debts in full as they fall due merely by letting its own investments run to maturity and collecting the resulting cash. The investments must be sold in an uncertain market before maturity so that any estimation of Cheyne's incoming cash flow is critically dependent upon assumptions about the future market for Cheyne's assets, and in particular about the effect on that market, in which Cheyne is a substantial player, of any particular sales campaign.

13  Secondly, in advising as to Cheyne's likely incoming cash flow in the future, its advisors have, I suspect prudently and inevitably, taken and projected forward present market values and avoided subjective guesswork as to where the market may move hereafter.

14  Thirdly, the valuers have subjected to intense scrutiny the effect upon realisations of Cheyne's marketing programme driven, as it is, by the need to meet predictable and extremely large payment obligations in the near and medium term future. Their opinion is that sales at the volume and rate required to pay Senior Debts as and when they fall due will probably incur forced sale discounts in ranges lying between 0 and 7 per cent, depending upon the class of asset involved.

15  The results of this exercise may be stated as follows:

• (a)  If the Receivers were able to avoid incurring any discounts from open market value by reason of the size and timing of their sales programme, they would, by selling at present market values, just be able to pay all Senior Debts on time and in full. The prospect of avoiding incurring such discounts is regarded by the Receivers, on advice, as unlikely.
• (b)  If forced sale discounts are encountered at the mid-point of each of the ranges advised by the valuers as being the most likely, then Cheyne will

default in paying its Senior Debts as they fall due in February 2009, with a consequential shortfall as against debts falling due then or thereafter.

• (c)    If higher but still realistically possible discounts are incurred, default with a consequentially larger shortfall could occur as early as November 2008.

• (d) The Receivers have considered whether there is any method of realisation of Cheyne's investment portfolio which holds out the prospect of realising better value than forced sales at the rate necessary to pay all Senior Debts in full and on time. Following tentative negotiations their present view is that best value would be obtained by a sale of the whole portfolio to an investment bank in return for an underwritten note. This would, they think, hold out a better and indeed realistic prospect of paying all Senior Debts in full but not on time, i.e. not in accordance with the maturity dates of those debts. This is because the cash flow profile required, when aggregated with Cheyne's existing cash assets to match the maturity dates of the Senior Debts, would not be obtainable on an underwritten note received on a negotiated sale of the investment portfolio.

16  Mr. Kahn summarises the position in his second witness statement as follows:

> "As described above, the Receivers are currently in a position to continue with the 'pay as you go' approach to approximately 31 October 2007.

> The Receivers also have a substantial investment portfolio of assets in their hands. However, the best current assessment is that the high level of asset sales required to continue with the 'pay as you go' approach would involve Cheyne Finance selling assets for discounted prices which would in turn deplete its balance sheet and render it unable to pay some of its late-maturing Senior Obligations."

17  A recent further sale means that Cheyne can now pay due debts from liquid funds until 14th November, but it is agreed before me that I should assume, and the Receivers do not suggest otherwise, that the circumstances of that recent sale have no effect on the best current assessment which I have described, namely that default and a consequential shortfall will occur in relation to Senior Debts.

**The Questions Raised by this Application**

18  Having formed the view that the sales programme necessary to pay Senior Debts as they fall due is not the method likely to realise best value for Cheyne's Senior Creditors, the Receivers therefore ask for the following questions to be determined by the court:

• 1.  Whether, on the assumption that the facts stated in Mr. Kahn's second witness statement are true, Cheyne Finance Plc is unable or about to become unable to pay its debts as they fall due to Senior Creditors within the meaning of Insolvency Event.

• 2.  If the answer to question 1 is "No",

• (a)

• (i)  Are the Receivers obliged to sell assets of Cheyne Finance Plc to ensure that so far as is possible it pays its debts to Senior Creditors as they fall due?

• (ii)  If the answer to (i) is "Yes", are the Receivers nevertheless permitted to cause Cheyne Finance Plc to enter into a sale, the consequence of which is that the debt of any Senior Creditor which would be paid in full as it falls due absent the sale is not paid in full as it falls due? Would such a sale render Cheyne Finance unable, or about to become unable, to pay its debts as they fall due to Senior Creditors within the meaning of Insolvency Event?

• (b)  Are the Receivers permitted to cause Cheyne Finance Plc to enter into a sale, the consequence of which is that it continues to pay Senior Obligations in full as they fall due, but which renders it certain or most likely that not all Senior Obligations will be paid in full as they fell due? Would such a sale render Cheyne Finance unable or about to become unable to pay its debts as they fall due to Senior Creditors within the meaning of Insolvency Event?

19  That formulation of the questions is the subject of an agreed amendment made at the outset of the hearing, and differs in that respect from the form as it appears in the Application Notice.

20  I have heard submissions from four interested parties, and I will call them Parties A, B, C and D. All have appeared, as on the last occasion, on the basis that their anonymity is to be preserved. But this time all the parties also seek that the hearing be conducted, and judgment given (at least at this stage) in private, so as to avoid confidential information — for example, about the Receivers' expectations and advice as to the value of its portfolio — falling into the public domain. Maintaining anonymity of the parties will therefore, unlike on the last occasion, not have the compensating advantage that the hearing and judgment be conducted and given in public. I have therefore sought and obtained on a confidential basis from the Receivers the identity of all parties, which is not to be placed on the court file or otherwise made public.

21  Party A, as before, represents all Senior Creditors with short maturity dates for whom continuation of the pay as you go regime is preferable to an early declaration of an Insolvency Event. Party B, again as before, represents all Senior Creditors whose interests would be served by an early declaration of an Insolvency Event. Party C is a member of the class represented by Party B. Party D are a group of holders of subordinated debt, i.e. not Senior Creditors. The debt in question consists of Mezzanine Capital Notes ranking below the Senior Obligations in the payment priority established by clause 12 of the Trust Deed. On the assumed fact that continuing with pay as you go

is less likely than the determination of an immediate Insolvency Event to yield anything for them, they also support Party B on the issues before me.

22  Question 1 is the most important question and has occupied most of the court's time. Strictly, question 2 falls away if question 1 is answered in the affirmative, but I have been requested by all parties, other than Party D, to decide question 2 in any event, regardless of the outcome of question 1. To an extent, the analysis of the issues underlying question 2 sheds light on the answer to question 1, to which I now turn.

23  The definition of Insolvency Event in the Common Terms Agreement is as follows:

"  **Insolvency Event** means a determination by the Manager or any Receiver that the Issuer [ *Cheyne* ] is, or is about to become, unable to pay its debts as they fall due to Senior Creditors and any other persons whose claims against the Issuer are required to be paid in priority thereto, as contemplated by Section 123(1) of the United Kingdom Insolvency Act 1986 (such subsection being applied for this purpose only as if the Issuer's only liabilities were those to Senior Creditors and any other persons whose claims against the Issuer are required under the Security Trust Deed to be paid in priority thereto)."

24 The argument on question 1 has revealed two related issues as to the construction of the Insolvency Event definition in the Common Terms Agreement , namely:

• 1.  To what extent, if at all, is it permissible for the Receivers to have regard to Senior Debts falling due in the future when addressing Cheyne's commercial solvency ("the Future Debts question"); and,
• 2.  With what degree of confidence must the Receivers have formed the view that Cheyne is or

is about to become unable to pay its relevant debts as they fall due before they can properly make an Insolvency Event determination ("the Standard of Proof question"). Most of the debate has centred on the first of those two questions.

**The Future Debts Question**

25    For Party A, Mr. Trower QC and Mr. Fisher submitted that on the question whether Cheyne is unable to pay its debts as they fall due only those Senior Debts which are presently due are to be considered. On the question whether Cheyne is about to become so unable, then that admits in addition only those Senior Debts which are about to become — i.e. on the point of becoming — due, and excludes all Senior Debts with medium or longer term maturities.

26    Parties B, C and D all submit that, both in principle and because all Cheyne's Senior Debts have fixed maturity dates and amounts and because Cheyne is in run-off rather than a going concern, all Senior Debts can and must be considered whenever falling due.

27    In its essentials, Party A's submission was simple, and may be summarised as follows:

• 1. Leaving aside s.123(1)(a), (b), (c) and (d) , none of which apply on the assumed facts, the deliberate omission of subsection (2) shows that the parties agreed that the Receivers had to apply the English test of commercial or cash flow insolvency to be found in s.123(1)(e) .
• 2. When compared with s.123(2) , the language of s.123(1)(e) omits, and therefore requires to be ignored, all contingent and prospective liabilities.
• 3. The draftsmen of the insolvency legislation were perfectly capable of requiring reference to the future where it was intended (see, apart from s.123(2), ss.8 and 89 of the Insolvency Act , and ss.152, 173(3)(b), s.643(1)(b)(ii) and s.714(3)(b)(ii) of the Companies Act 1985 ).
• 4. Any doubt as to the admissibility of future events, including the falling due of future debts, is resolved in the Trust Deed by the phrase "is about to become".
• 5. There is nothing uncommercial in the parties to the Trust Deed adopting a clear and simple test

of insolvency which excludes the need to make difficult judgments about the value of Cheyne's assets in the future, even if, as Mr. Trower accepted, it introduces an element of priority in favour of short maturity as against long maturity Senior Debts, which is not found spelt out in terms in the Payment Priority in clause 12.

28    Attractively though those submissions were presented, I have come to the conclusion that they lead to the wrong result and must be rejected. My reasons follow.

29    Section 123(1)(e) dates only from the Insolvency Act 1985 . There is very little authority on its present form, and its previous form was rather different. Putting on one side the improbability that the draftsman of, still less the parties to, the Common Terms Agreement or the Trust Deed knew its history, that history may be summarised as follows.

30    Section 80 of the Companies Act 1862 provided to the extent relevant as follows:

> "A Company under this Act shall be deemed to be unable to pay its Debts …
>
> Whenever it is proved to the satisfaction of the Court that the Company is unable to pay its debts."

31    In re European Life Assurance Society (1869) 9 LR Eq 122 , it was held that 'debts' in s.80 meant only those actually due. Furthermore, prospective creditors had no *locus* to petition.

32    Section 28 of the Companies Act 1907 both permitted prospective creditors to petition and required the court to have regard to contingent and prospective liabilities when applying the 1862 Act. That new provision was consolidated in the Companies (Consolidation) Act 1908 in s.130 in the following form:

"A company shall be deemed to be unable to pay its debts — …

(iv)    if it is proved to the satisfaction of the court that the company is unable to pay its debts, and, in determining whether a company is unable to pay its debts, the court shall take into account the contingent and prospective liabilities of the company."

33  No substantive change occurred in 1929 in s.169(4) of that Act; or in 1948 in s.223(d) of that Act; nor indeed in the 1985 Companies Act in s.518(1)(e), despite slight changes in the language.

34  During the long period from 1907 to 1985 English courts addressed the questions posed by, for example, s.223(d) of the 1948 Act, without any rigid distinction between commercial and cash flow insolvency on the one hand and balance sheet insolvency on the other. The submission that commercial insolvency could not be established by reference to future debts could not have succeeded. This is reflected, for example, in the decision of the Court of Appeal in Byblos Bank SAL v. Al-Khudhairy [1987] BCLC 232, in which inability to pay debts within s.223 of the Companies Act 1948 was incorporated into a debenture as a trigger for the appointment of Receivers. At p.247 Nicholls L.J. said this:

"Construing this section first without reference to authority, it seems to me plain that, in a case where none of the deeming paras (a), (b) or (c) is applicable, what is contemplated is evidence of (and, if necessary, an investigation into) the present capacity of a company to pay all its debts. If a debt presently payable is not paid because of lack of means, that will normally be sufficient to prove that the company is unable to pay its debts. That will be so even if, on an assessment of

all the assets and liabilities of the company, there is a surplus of assets over liabilities. That is trite law.

It is equally trite to observe that the fact that a company can meet all its presently payable debts is not necessarily the end of the matter, because para.(d) requires account to be taken of contingent and prospective liabilities. Take the simple, if extreme, case of a company whose liabilities consist of an obligation to repay a loan of £100,000 one year hence, and whose only assets are worth £10,000. It is obvious that, taking into account its future liabilities, such a company does not have the present capacity to pay its debts and as such it 'is' unable to pay its debts. Even if all its assets were realised it would still be unable to pay its debts, viz, in this example, to meet its liabilities when they became due."

35  Mr. Trower described this as a case about balance sheet insolvency. I disagree. Nicholls L.J. is speaking about the ability of the company to meet its liabilities when they became due. What is striking, and for present purposes persuasive, is his explanation that the phrase "is unable to pay" is a reference to the company's present capacity, not to the date upon which relevant debts will fall due.

36  In the Insolvency Act 1985, repeated in s.123 of the 1986 Act, commercial and balance sheet insolvency are for the first time split apart. In place of the mandatory requirement to take account of contingent and prospective liabilities there has been added in s.123(1)(e) the phrase "as they fall due" after "debts". The mandatory requirement to consider contingent and prospective liabilities now only appears in s.123(2). There is no English authority on the question whether, as Mr. Trower submitted, those changes prevent

reference to prospective, i.e. future, debts under s.123(1)(e) .

37   To the limited extent that academic writers have addressed this point, they are divided. In their Annotated Guide to the Insolvency Legislation 2006/2007 (9th Ed) Messrs. Sealy and Millman say this at p. 149:

> "Paragraph (e) (as Companies Act 1985 s.518(1)(e) ) formerly read: "if it is proved to the satisfaction of the court that the company is unable to pay its debts (and, in determining that question, the court shall take into account the company's contingent and prospective liabilities)". This formula was unhelpful in that it ran together two issues: (1) the question of whether current debts could be met as they fell due, i.e. "commercial" solvency; and (2) the question whether the company would ultimately prove solvent if its future as well as present liabilities were brought into the reckoning. The confusion was resolved by the amendment made by [the Insolvency Act ] 1985: contingent and prospective liabilities are no longer to be taken into account for the purposes of para.(e), while insolvency calculated on a balance-sheet basis becomes a separate test under s.123(2)."

38   The English version of Professor Keay's **McPherson's Law of Company Liquidation** reaches the same conclusion.

39   Professor Goode in his **Principles of Corporate Insolvency Law** (3rd Ed) treats the developed Australian jurisprudence on this question as applicable to cash flow insolvency under s.123(1)(e) , and as permitting what he describe as "an element of futurity", at least by reference

to the near future. In fact, the Australian jurisprudence is not necessarily limited to considering debts falling due in the near future, although typical fact situations may often impose that restriction in practice.

40   The third edition of Professor Fletcher's **Law of Insolvency** assumes that contingent and prospective liabilities logically have no part to play in the cash flow evaluation of the company's affairs. For reasons which appear from the Australian jurisprudence, I doubt that supposed logic.

41   There is a wealth of Australian authority on the question of whether a cashflow or commercial insolvency test permits references to debts which will fall due in the future, i.e. in English terminology "prospective debts", rather than "prospective or contingent liabilities". The reason why this question has, unlike in England, been analysed in such detail in Australia is probably that neither the Australian courts nor legislature have developed a balance sheet test of the type found in s.123(2) .

42   Prior to 1992 the statutory test for insolvency in force in Australia was one based on inability to pay debts as they become due — see, for example, ss.107 to 109 of the Queensland Insolvency Act 1874 .

43   In Bank of Australasia v. Hall (1907) 4 CLR 1514 , Griffith C.J. said this at p.1527:

> "It was argued that only debts then actually payable and the amounts of which were then actually ascertained should be taken into consideration. One answer to this argument is that the matter for determination is the ability of the debtor, which is a state or condition that cannot be determined without having regard to all the facts. Another answer is that the debts referred to are not his debts 'then' payable, but his debts 'as they become due' — a phrase which looks to the future."

On p.1528 he said this:

"The words 'as they become due' require, as already pointed out, that some consideration shall be given to the immediate future; and, if it appears that the debtor will not be able to pay a debt which will certainly become due in, say, a month (such as the wages payable by Robertson for the month of July) by reason of an obligation already existing, and which may before that day exhaust all his available resources, how can it be said that he is able to pay his debts 'as they become due' out of his own moneys?"

The only dissenting judge, Higgins J., agreed on the meaning of the phrase "as they become due". At p.1554 he said this:

"The critical words are 'as they become due' so that, on the one hand, a debtor in making a payment or giving a security to a creditor, has to take into account, not only his debts immediately payable, but his debts which will become payable …"

44  In Sandell v. Porter (1966) 115 CLR 666 , construing s.95 of the Bankruptcy Acts 1924 to 1960 , Barwick CJ said this at p.670:

"The conclusion of insolvency ought to be clear from a consideration of the debtor's financial position in its entirety and generally speaking ought not to be drawn simply from evidence of a temporary lack of liquidity. It is the debtor's inability, utilizing such cash resources as he has or can command through the use

of his assets, to meet his debts as they fall due which indicates insolvency."

45  In Hymix Concrete Property Ltd. v. Garrity [1977] 13 ALR 321 , Jacobs J (with whom Barwick CJ and Gibbs J agreed) said at p.328 that an inability to pay debts as they become due was to be recognised as an endemic shortage of working capital rather than in a temporary lack of liquidity. Such an analysis requires some review of the future.

46  In Taylor v. Australia and New Zealand Banking Group Ltd. [1988] 6 ACLC 808 , McGarvie J. said at p.811 that the question of whether a company was able to pay its debts as they fell due was a question of fact to be decided as a matter of commercial reality in the light of all the circumstances. In that case the company had sold its main business asset and paid off its overdraft with part of the proceeds. In deciding whether it was then insolvent for the purposes of a preference claim against the bank the judge conducted a detailed review of the company's present and future debts before concluding that its finite assets were insufficient to enable it to pay them as they fell due.

47  From 1992 onwards the question of whether a company was solvent was to be decided pursuant to a formula now to be found in s.95A of the Corporations Act 2001 , which is as follows. Under the heading "Solvency and Insolvency":

"(1)   A person is solvent if, and only if, the person is able to pay all the person's debts, as and when they become due and payable.

(2)   A person who is not solvent is insolvent."

The familiar phrase "as and when they become due" has been supplemented by the words "and payable".

48  In Cuthbertson v. Thomas (1998) 28 ACSR 310 Einfeld J. said this at p.319:

> "Certain predicted events about which there is little uncertainty, such as the planned sale of a major asset or the falling due of a substantial loan, may influence whether the company is able to pay its debts as they become due and payable."

On p.320 he said this:

> "In essence the issue of a company's solvency should be viewed as it would by someone operating in a practical business environment."

49  In Southern Cross Interiors Pty. Ltd. v. The Deputy Commissioner for Taxation (1998) 29 ACSR 130 , Palmer J. held that the addition of the words "and payable" added nothing to the old formula based on "due". In his judgment, both in English and in Australian company legislation the word "due" had always meant "due and payable".

50  Finally, in Lewis v. Doran [2005] NSWCA 243 , at para.103 there is a helpful explanation of the question how far into the future the enquiry as to present insolvency may go. In short, it is a fact sensitive question depending upon the nature of the company's business and, if known, of its future liabilities.

51  It is clear from that brief review of the Australian decisions that in an environment shorn of any balance sheet test for insolvency, cash flow or commercial insolvency is not to be ascertained by a slavish focus only on debts due as at the relevant date. Such a blinkered review will, in some cases, fail to see that a momentary inability to pay is only the result of a temporary lack of liquidity soon to be remedied, and in other cases fail to see that due to an endemic shortage of working capital a company is on any commercial view insolvent, even though it may continue to pay its debts

for the next few days, weeks or even months before an inevitable failure.

52  Furthermore, the common sense requirement not to ignore the relevant future was found to be implicit in the Australian cases in the simple phrase "as they become due".

53  Returning to the English legislation, it is, in my view, critical to note that when separating out balance sheet insolvency from commercial insolvency in 1985 the legislature did not merely remove the requirement to include contingent and prospective liabilities in framing s.123(1)(e) out of its predecessor, but added what in Australia have always been regarded as the key words of futurity, namely the phrase "as they fall due". In that context "fall due" is, in my judgment, synonymous with "become due".

54  Mr. Trower submitted that the existence of the balance sheet test in s.123(2) makes an Australian type of approach to the commercial insolvency test unnecessary, because a company will always be balance sheet insolvent in circumstances where a review of future debts shows that it is commercially insolvent. I disagree. First, I can see no good reason why the developed understanding in Australia of the nature of the exercise required by the phrase "unable to pay debts as they become (or fall) due" should not be recognised when the same phrase is, for the first time, deliberately inserted into the English insolvency test. The Australian approach makes commercial sense, whereas the blinkered approach of ignoring the future does not.

55  Secondly, a company may not always be balance sheet insolvent where an Australian style test for commercial insolvency is satisfied, as in this example: The company has £1,000 ready cash and a very valuable but very illiquid asset worth £250,000 which cannot be sold for two years. It has present debts of £500, but a future debt of £100,000 due in six months. On any commercial view the company clearly cannot pay its debts as they fall due, but it is, or would be, balance sheet solvent.

56  In my judgment, the effect of the alterations to the insolvency test made in 1985 and now found in s.123 of the 1986 Act was to replace in the

commercial solvency test now in s.123(1)(e) , one futurity requirement, namely to include contingent and prospective liabilities, with another more flexible and fact sensitive requirement encapsulated in the new phrase "as they fall due".

57  In the case of a company which is still trading, and where there is therefore a high degree of uncertainty as to the profile of its future cash flow, an appreciation that s.123(1)(e) permits a review of the future will often make little difference. In many, if not most, cases the alternative balance sheet test will afford a petitioner for winding up a convenient alternative means of proof of a deemed insolvency.

58  The irony of the present case is that the Insolvency Event test, when applied by the Receivers appointed under the Trust Deed, will be in relation to a company in run-off, closed to future business, when its future cash flow profile is abnormally clear and when no balance sheet alternative test is available.

59  This leads me to my second main reason for rejecting Party A's case on the future debts issue. In my judgment, the presumed common intention to be derived from the parties' choice to define inability to pay debts by reference to s.123(1) rather than s.123(2) is simply that they wished Cheyne's solvency to be adjudicated on a commercial rather than balance sheet basis, and nothing more than that. The definition incorporates the whole of s.123(1) , not just s.123(1)(e) . The common feature of the lettered sub-sub-sections of s.123(1) is that they are indicia of commercial rather than balance sheet insolvency. Companies which fail to pay their judgment debts or, without good reason, to respond to statutory demands, are usually unable to pay their debts as they fall due regardless of the state of their balance sheets.

60  Even if my view as to the meaning and effect of s.123(1)(e) were wrong and a higher court concluded that it was to be interpreted as imposing the blinkers for which Mr. Trower contends, it would, in my judgment, be perverse to conclude that the parties to the Common Terms Agreement and Trust Deed intended that consequence, because of its potentially bizarre and uncommercial effects in the context of the affairs of Cheyne. In my last judgment I questioned whether, if the Receivers had sold all Cheyne's assets for cash,

and knew for sure that it would default in the distant rather than near future, it could not be determined to be insolvent until that distant event of default was about to occur. The Receivers would be obliged to go on paying early maturing Senior Debts in full, knowing that a failure to pay anything in respect of later maturing debts of identical seniority was a racing certainty. I cannot envisage any reason why the parties to the Common Terms Agreement and Trust Deed should have intended thereby to confer an absolute priority on the holders of early maturing Senior Debt. The manner in which that priority would impact on Senior Creditors would depend, not upon anything to be found in the Payment Priority, but upon the unpredictable outcome of a run-off which, at the time both of the framing of the contractual documents and the making of any investment in Cheyne pursuant to them, must have been regarded by the participants as an unpleasant but hopefully remote future risk.

61  Mr. Trower accepted that his construction had that consequence but submitted that it was commercially understandable because later maturing paper carried a slightly higher coupon and because investors with later maturity dates are always exposed to greater risks due to the longer time line in which those risks may occur.

62  In my judgment, the extra coupon on the longer notes does not begin to explain a deliberate choice of Mr. Trower's construction in preference to that advocated by Parties B to D. Furthermore, incurring a risk of future adverse events, such as is inherent in the pay as you go regime during a run-off while insolvency is merely a risk rather than a probability, is different in kind from a contractual choice absolutely to prefer earlier Senior Debt where insolvency is not merely a risk but a dead certainty.

63  Party A's construction also produces a conflict between the Insolvency Event definition and the Receivers' obligation under clause 10.2(a) of the Trust Deed, whereas the alternative construction does not. Clause 10.2(a), it will be recalled, is as follows:

> "It shall be a term of any appointment of a Receiver under subclause 10.1 that such Receiver shall, unless and until an Insolvency Event Notice is delivered by the

Security Trustee in accordance with Clause 9:

(a)   manage the Security Assets and the business of the Chargor with the objective of arranging for timely payment in full of the Chargor's obligations to the Senior Creditors and any creditors ranking in priority to the Senior Creditors in the Payment Priority and … in each case as and when they fall due for payment in accordance with Clause 12 below …"

64  In my judgment, the management objective thereby identified is to ensure, ifpossible, the timely payment in full of all Senior Debts as and when they falldue. It would be extraordinary if, during a run-off period when the Receivers knew that a medium or long term default was inevitable but could not determine an Insolvency Event until just before default occurred, they were to be saddled with an impossible objective, impossible because they knew that good management could not enable all Senior Debts to be paid in full.

65  Mr. Trower submitted that it was implicit in clause 10.2(a) that if a choice had to be made between payments of all debts in full or payment of early maturing debts on time, the Receivers had to choose a management method best calculated to secure the latter, even if it caused a greater failure to achieve the former. Again, I disagree because of the commercially bizarre results which this would produce. I put to Mr. Trower the example where Cheyne had liabilities of £1 billion falling due in one month and £6 billion falling due in six months. To raise the £1 billion would require a fire sale for £3 billion of a portfolio which, if sold in an orderly manner over six months, could raise £6 billion. Plainly, no commercially rational framers of the Trust Deed would impose upon the Receivers an obligation to effect that fire sale. Yet Mr. Trower submitted on that precise example that this is what clause 10.2(a) required.

66  On the alternative construction there is substantial harmony between the definition of Insolvency Event

and clause 10.2(a). For as long as, paying due regard to future debts, it appears that Cheyne can pay all its Senior Debts in full as they fall due, the obligation in clause 10.2(a) is attainable. Once it appears that Cheyne can no longer expect to pay all its Senior Debts in full as and when they fall due, the objective in 10.2(a) ceases to be attainable, but the Receivers can at exactly the same time determine that there has been an Insolvency Event. All debts are then accelerated and the 10.2(a) obligation ceases to apply.

67  Party A's best point, in my judgment, was the effect of the phrase "or is about to become" in the Insolvency Event definition. As a matter of language, the phrase does, on the face of it, point to a review only of the immediate future, and may suggest that the draftsman thought, so that the parties should be presumed to have intended, that "is unable" otherwise required the Receivers to wear the blinkers for which Mr. Trower contended, and then lifted the blinkers slightly so as to permit a very restricted look ahead at debts which will fall due imminently.

68  If the test whether Cheyne is unable to pay its debts when they fall due permits a review of all Cheyne's future Senior Debt then it is hard to envisage how, if Cheyne is about to fail that test, it is not already insolvent. Mr. Mortimore QC for Party B suggested that "is about to become" was designed to deal with a situation where the Receivers proposed a transaction which, once consummated, would cause Cheyne to fail the test, rather like a preference which renders a company insolvent under the Insolvency Act s.240(2)(b).

69  I cannot see how the discharge of the clause 10.2(a) duty while Cheyne is notinsolvent could lead to a situation where the proposed transaction makes it insolvent on Party B's approach to the future debts issue. As will appear, on Party A's approach the answer to that question may be different. It may be that, in truth, the phrase "or is about to become" is a piece of thoughtless drafting which adds little or nothing to "is". Though mindful that contracts should, if possible, be construed to avoid such a conclusion, the other factors which lead me to resolve the future debts question against Party A's construction easily outweigh this apparent contra-indication.

70 I therefore conclude that the definition of Insolvency Event does permit the Receivers to have regard to Cheyne's ability to pay Senior Debts falling due in the future.

**The Standard of Proof Question**

71 I turn, therefore, to the standard of proof question. Here the rival contentions range between Party C's Australian type submission that the Receivers should determine an Insolvency Event unless satisfied on the balance of probabilities that Cheyne will be able to pay all Senior Debts when they fall due, to Party A's submission that the Receivers should not determine an Insolvency Event unless satisfied that there is no reasonable prospect that Cheyne will be able to pay its debts when they fall due. In the middle lay Parties B and D's submission that the burden was on the Receivers to satisfy themselves of Cheyne's insolvency on the balance of probabilities.

72 Party A's approach would prevent an Insolvency Event where, as on the presently assumed facts, the prospect that Cheyne will pay its Senior Debts in full when they fall due is less than likely but more than fanciful. By contrast, all the other parties advocated the balance of probabilities which, regardless of the burden of proof which separated Party C's submission from that of Parties B and D, would require a determination of insolvency on the assumed facts.

73 In using the language of litigation, (standard and burden of proof, balance of probabilities, reasonable and fanciful prospects), both counsel and I have borne in mind throughout that the Trust Deed calls for experienced professionals working in the commercial world to make the determination, not the court at the end of a trial or a summary judgment application under CPR Part 24 . The language is, however, useful because it compresses well understood concepts into short phrases.

74 I have come to the conclusion that the level of confidence with which, before determining an Insolvency Event, the Receivers must consider that Cheyne is or is about to become unable to pay its Senior Debts as they fall due is better reflected in a balance of probabilities than in a view that the contrary prospect is so unlikely as to have become fanciful. They must be

satisfied, (a state of mind which calls for careful and thorough enquiry), that inability to pay is more likely than not. My reasons follow.

75 Parties B to D are entitled to take some comfort from the fact that the incorporation of s.123(1) as the relevant test of itself uses a definition which is framed to be used in court and resolved on a balance of probabilities, even though the test is, in fact, to be applied outside court and not by a judge. By contrast with a state of mind requisite for a finding of wrongful trading — that is, knowledge that there was no reasonable prospect that the company would avoid going into insolvent liquidation — which is used as a test for directors' personal liability, the Insolvency Event test is imposed upon the Receivers in the Trust Deed to determine the time at which run-off by fiduciaries with pay as you go is replaced by a *pari passu* distribution by the same fiduciaries in accordance with the Payment Priority. If that change is postponed for as long as there is more than a fanciful prospect of payment in full, its consequences may work grave prejudice to Senior Creditors with later maturing debts out of all proportion to the prejudice to early maturing creditors of becoming subject to *pari passu* distribution of assets realised to produce best value rather than early cash. The fact that the market for Cheyne's investment portfolio may go up as well as down may well make it hard to say that the prospect of payment in full is only fanciful, even though unlikely.

76 Being satisfied on the balance of probabilities is, in my judgment, typical of the standards on which commercial fiduciaries are accustomed to act when making important business decisions in the best interests of their beneficiaries. I can see no good reason in the present case to impose any higher hurdle.

77 The assumed facts are, as I have said, summarised by the passage in the second witness statement of Mr. Kahn at para.93, where he states that on the Receivers' best current assessment Cheyne is now unable to pay all its Senior Debts as they fall due. Accordingly, I answer question 1 in the affirmative.

**Question 2**

78 It follows that question 2 does not strictly arise on the assumed facts, since the Receivers will presumably make a determination of insolvency if those facts do not

change for the better. I am asked nonetheless to address question 2 in any event in case, on appeal, a different answer is given to question 1 than that which I have given. I shall do so briefly, reflecting the brevity of the submissions made on these further questions.

79  I do so, first, on the assumption that I am correct in my construction of Insolvency Event, but assuming that, perhaps because the assumed facts change or are found to differ from the true facts, the Receivers nonetheless do not make an Insolvency Event determination. A future default in paying Senior Debts is therefore assumed to be improbable, but there may still be a real risk of it.

80  Question 2(a)(i). In advance of an Insolvency Event clause 10.2(a) of the Trust Deed requires the Receivers to manage the assets so as to maximise the prospect (which, although probable, may be still subject to real risk), of a timely payment in full of all Senior Debts. If a proposed asset sale maximises that prospect, then the Receivers should sell. If not, they should not. The question as framed omits the words "all", "timely" and "in full", which should be added to any affirmative answer.

81  Question 2(a)(ii). On my construction of Insolvency Event, the answer must be no. Such a sale would convert Cheyne from a company probably able to pay all Senior Debts in full on time, and therefore solvent, into one that could not. No sensible interpretation of clause 10.2(a) could permit such a sale, not least because it would cause an Insolvency Event where it was otherwise improbable.

82  Question 2(b). On my construction of Insolvency Event the answer must again be no, because if there has been no Insolvency Event absent the sale Cheyne will probably be able to pay all its Senior Debts in full, and clause 10.2(a) requires the Receivers to maximise that prospect, whereas the sale would prevent it.

83  I turn now to question 2 on the alternative construction of Insolvency Event to that which I have preferred. On that construction it is, on the assumed facts, probable, but not necessarily certain, that Cheyne will fail to pay all Senior Debts in full as they fall due, but the Receivers are unable to declare an Insolvency

Event, so remain bound by clause 10.2(a) of the Trust Deed.

84  One of the reasons why I have rejected that construction of Insolvency Event is that, in my judgment, it gives rise to extraordinary difficulties in understanding how the clause 10.2(a) duty is to be performed, it being unlikely that the stated objective can be achieved in full. The same problems are magnified if future default is not merely probable, but certain.

85  Question 2(a)(i). Again, in my judgment, the answer must be yes, but with the addition of the words "all", "on time" and "in full". Where a proposed sale increases the prospects of achieving that objective from, for example, just better than fanciful to, for example, just less than even, then they should sell. If not, they should not sell.

86  Question 2(a)(ii). This question raises the problem that a proposed transaction may affect the prospects of achieving different parts of the clause 10.2(a) objective in different ways. For example, a proposed sale may substantially increase the prospects of payment of all Senior Debts in full, but at the price of making it certain that some will be paid late. The portfolio sale referred to in the assumed facts is just such a transaction.

87  Unsurprisingly, on my construction of Insolvency Event, clause 10.2(a) provides no answer to this conundrum. On the alternative construction of Insolvency Event no other provision of the Trust Deed does either. In my judgment, the Receivers would have to make that choice by applying their own judgment as to which course would best serve the interests of the Senior Creditors as a whole. I reject Party A's submission that clause 10.2(a) impliedly prefers prompt payment of early maturing debts over all other parts of the stated objective.

88  The consequence of such a decision may be to accelerate the date when, on the alternative construction of Insolvency Event, an actual or imminent default in payment of a Senior Debt on time triggers an Insolvency Event. If so, so be it. If the beneficial transaction made such a default imminent, then it would trigger an immediate Insolvency Event even prior to the sale. But to treat that consequence as meaning that therefore the Receivers should not

sell would be to allow the tail to wag the dog. It would almost, by definition, be a transaction which the Receivers would wish to pursue after an Insolvency Event, so the fact that a decision to sell would trigger an Insolvency Event would not, in my judgment, matter.

89    Question 2(b). This question presumably contemplates some kind of distressed sale which, although it fails to achieve best value, generates the early cash necessary to postpone an immediate or early Insolvency Event constituted by an actual or imminent default. On the alternative construction it would not trigger an Insolvency Event. Again, unsurprisingly, in my view, clause 10.2(a) provides no clear answer to this conundrum. I would answer it, like question 2(a)(ii), by reference to the Receivers' judgment as to the best interests of the Senior Creditors as a whole. From the evidence it seems most unlikely that the Receivers would think that such a transaction was in the best interests of Senior Creditors as a whole, unless perhaps the increased probability of a later default was marginal, whereas the proposed transaction secured major advantage in terms of earlier payment.

90  In my judgment, the Receivers would not be obliged slavishly to effect any sale which would postpone an early or imminent default regardless of the gravity of later defaults thereby caused by failing to obtain best value.

MR. SHELDON: My Lord, I am very much obliged. My Lord, I am not going to attempt, on my feet, to suggest a form of directions. I think we will have to have a look at transcript and then agree, because we have to incorporate various assumptions.

MR. JUSTICE BRIGGS: I think you do. I may have gone slightly beyond my brief in addressing question 2 on my construction.

MR. SHELDON: No, it has been very helpful, my Lord.

MR. JUSTICE BRIGGS: It seemed to me rather stupid not at least to try.

MR. SHELDON: No, it is extremely helpful. We will do that and we will circulate to respective counsel to agree it.

MR. JUSTICE BRIGGS: You may have to come back if you cannot agree it.

MR. SHELDON: Yes, if we cannot agree it we may have to come back to your Lordship.

That is the substantive part of the order. Could I just invite your Lordship to look at the application because there are one or two other consequentials. Your Lordship sees on p.2 of the application that we seek a sealing order under Rule 7.3(1)(v) . My Lord, can I suggest that we add words along the following lines — it is basically to ensure that two things happen — first of all, an application is made to a judge rather than to a registrar; and also to make sure that any such application is made on notice to the applicants' solicitors. What I would suggest is something along the following lines at the end of what appears, "Not to be made open to inspection without the court's permission, such permission to be made on application to the judge on 48 hours notice to the applicants' solicitors".

MR. JUSTICE BRIGGS: I would say "to a judge and to Mr. Justice Briggs, if available". It would save time, since I know the background, compared to it going, say, to the Queen's Bench applications judge, who might have other things on his mind.

MR. SHELDON: My Lord, that is very helpful. I do not suppose anybody here will object to that form of words.

My Lord, then there is the question of costs. On the last occasion your Lordship directed that that the costs of all parties be costs in the receivership. My Lord, the Receivers, subject to one caveat, would have no objection to a similar order here. My Lord, the caveat concerns interested Party D who has no less than three instructing solicitors. My Lord, I think it is agreed that only one set of solicitors' costs of Party D would be permitted.

MR. BAYFIELD: My Lord, that is right.

MR. JUSTICE BRIGGS: That seems eminently sensible to me, but otherwise you are amenable to that set being allowed?

MR. SHELDON: Yes.

MR. JUSTICE BRIGGS: Unless there is any objection, I would think it sensible to make that costs order.

MR. MORTIMORE: Yes, my Lord, and we strongly support the change to the confidentiality order suggested by my learned friend.

MR. JUSTICE BRIGGS: Yes, you want skeleton arguments.

MR. MORTIMORE: It should be all the evidence, because there has been an additional statement beyond Kahn 2, which was referred to.

MR. JUSTICE BRIGGS: It ought to be the statement, exhibits — you can re-draft it at leisure, but the statements, exhibits, what about the judgment?

MR. SHELDON: And the judgment?

MR. JUSTICE BRIGGS: The question does arise under article 6, which is not merely an *inter partes* question, but a public interest question, whether it is right that a judgment should be given on the basis that it is permanently in private.

MR. SHELDON: My Lord, I was going to come on to that. Clearly one would hope that when the dust settles this judgment could be made public. Whereas clause 12.1(b) was perhaps a peculiar, unique set of wording, the definition of Insolvency Event has been adopted I think in a number of similar transactions. So there will clearly be interest in the outcome.

MR. JUSTICE BRIGGS: It seems to be hallowed practice going right back to Byblos , albeit with an older definition. That was an older definition but it was still being incorporated into a party's document.

MR. SHELDON: Yes, it is the cash flow definition that is a slightly novel one. My Lord, what I would suggest is that we undertake to come back to your Lordship to release the judgment into public when the need for confidentiality has lapsed.

MR. JUSTICE BRIGGS: It would still be there, even if there was an insolvency determination because you want to do a deal in relation to the assets?

MR. SHELDON: Yes.

MR. JUSTICE BRIGGS: So it may lapse later than sooner. The only alternative I can think of is a sanitised judgment, but I find it quite difficult to see how that would be workable without treading on confidential matters.

MR. SHELDON: I think it would be difficult.

MR. JUSTICE BRIGGS: It cannot be workable just by anonymising the name of the company because there is reference back to my earlier decision which was given in public. It is difficult to see how, if you get rid of all the assumed facts, it makes sense.

MR. SHELDON: Yes, exactly. I think, just from having listened to it, it would look very odd. One cannot simply do a blue pencil test.

MR. JUSTICE BRIGGS: No, I do not think so. Yes, an undertaking to come back as and when the dust has settled is sensible, but I am not sure there ought not to be built in some automatic review, otherwise it might getforgotten, even in the best run offices.

MR. SHELDON: Yes, my Lord, perhaps we ought to undertake to bring the matter back before your Lordship at the end of a given period.

MR. JUSTICE BRIGGS: I suppose an alternative view is a kind of *Beddoe* application in relation to which there is some authority that article 6 is not engaged. You probably know the case I am thinking of. I am quite content to go down the route you propose. Indeed, I think it would be preferable.

MR. SHELDON: My Lord, yes. I do not know what an appropriate periodwould be.

MR. JUSTICE BRIGGS: Six months?

MR. SHELDON: Yes, that is what I had in mind, six months.

MR. JUSTICE BRIGGS: The obligation is to refer to me — that is a sensible course — in six months. It can be done on paper. If the paper says fine, then fine; if it says not fine, then probably not fine unless I am not satisfied with the explanation.

MR. SHELDON: In which case we will have to persuade your Lordship.

MR. JUSTICE BRIGGS: Yes, there might have to be a hearing. It does not seem to me that it need involve Parties A to D. This is really just protection of the commercial value of the assets in the hands of the Receivers.

MR. SHELDON: Yes.

MR. JUSTICE BRIGGS: Is that agreed?

MR. MORTIMORE: Yes, my Lord.

MR. SHELDON: My Lord, I think that is all I need to say now, although if there are further applications I may want to address your Lordship further.

MR. JUSTICE BRIGGS: I am anticipating there might well be!

MR. SHELDON: My Lord, yes.

MR. FISHER: My Lord, I am instructed to make an application for permission to appeal against your Lordship's judgment, my Lord, in short, on both the grounds that there is a real prospect of success or some other good reason why permission should be given.

My Lord, three short points: there is a point on construction on which reasonable parties could differ; it does involve within the drafting a point of law of significance, being the meaning of—

MR. JUSTICE BRIGGS: Section 123(1)(e) .

MR. FISHER: Yes, and Mr. Sheldon has made the point in terms of wider significance, the drafting in issue and the incorporation of 123 definition is something which has wide usage in the industry.

My Lord, for all those reasons we would ask that we do have permission to appeal against your Lordship's judgment.

I am aware that Mr. Sheldon may want to something about the timing. Your Lordship's order on the last occasion was to make an order that the appeal would be pursued with extreme diligence.

MR. JUSTICE BRIGGS: I think I suggested last time, did I not, that it was probably quicker to give you permission but attach some really nasty strings to it than to refuse it. I may have suggested that anyway, I have done on a number of occasions.

MR. FISHER: My Lord, I was not unfortunately there at the last hearing.

MR. JUSTICE BRIGGS: I can anticipate that there is urgency. There may be difficulty in it being dealt with in private in the Court of Appeal, but that is a separate problem.

MR. FISHER: There is both the *locus* point that your Lordship carved out in the last order, which was that you gave permission but without prejudice to the question of *locus standi* to appeal where we were not formally parties. My Lord, we can deal with that, we say, before the Court of Appeal.

MR. JUSTICE BRIGGS: Yes.

MR. FISHER: My Lord, in terms of the timing, perhaps I can get my shot in before Mr. Sheldon fires on this, we do need time to consider the judgment, we do need time certainly to analyse the commercial consequences of it for our client in the light of the notes it does hold and where its interests best lie. Advice needs to be given to the client and a decision is going to have to be made at a very high level in terms of whether or not an appeal is to be pursued. Whilst we would want, and anticipate trying to bring the appeal on next week, my position is that I can undertake that we will notify the other parties as to whether or not we do intend to take up the permission to appeal by close of business UK time on Monday, and lodge an application, an appellant's notice on Tuesday, and then take all steps to have the matter brought on as quickly as possible.

WESTLAW   © 2017 Thomson Reuters.

Cheyne Finance PLC (In Receivership), Re, 2007 WL 4190562 (2007)

MR. JUSTICE BRIGGS: So you would suggest undertaking to lodge by when?

MR. FISHER: To lodge the appellant's notice by 4.30 on Tuesday, my Lord, and we will give notice to all parties by—

MR. JUSTICE BRIGGS: That is the 23rd, is it not — yes.

MR. FISHER: — and give notice to all parties by 4.30 pm on Monday as to whether or not we do propose to move forward with your Lordship's permission for leave being granted.

My Lord, I appreciate there is urgency but, my Lord, realistically that is what I am in a position to offer your Lordship.

MR. JUSTICE BRIGGS: Right, who wants to respond to that?

MR. SHELDON: My Lord, the response in part may depend on whether there is going to be an application for some form of stay. In the light of your Lordship's judgment, and the clearly the Receivers will have to go away and check that there has been no change in the circumstances, but assuming there has been no change one would anticipate the determination of an Insolvency Event very soon.

MR. JUSTICE BRIGGS: Likewise, if a stay is not granted, an appeal would be nugatory, would it not?

MR. SHELDON: Exactly.

MR. JUSTICE BRIGGS: Bearing in mind the transaction which you hope to be able to negotiate.

MR. SHELDON: My Lord, once an Insolvency Event has been determined it would render an appeal nugatory because you cannot undo it really.

MR. JUSTICE BRIGGS: Until something is done pursuant to it it is a piece of paper.

MR. SHELDON: It is, but I think one would have anticipate that action would be taken pursuant to it and it could be very difficult to unravel.

My Lord, Mr. Fisher has not addressed that yet, but can I perhaps deal with the timing issue. We clearly need to know where we stand as soon as possible. There are these negotiations, refinancing negotiations, which are going on.

I must say, I am a little concerned that the timetable proposed by my learned friend is a little bit on the slack side. We really need to know whether or not there is going to be an appeal by the end of this week so that we can take steps — I do not know if your Lordship is in any position to assist on this — to have a hearing before the Court of Appeal next week. I think, on the timetable my friend suggests, that it is likely to push it back a week. What I would propose is that everyone be told by close of business on Friday. That should give my friend's clients enough time to think about it. Then we are in your Lordship's hands about when the notice of appeal is actually filed.

My Lord, I do not want to anticipate an application for a stay, my Lord, but it does raise issues about the holding the fort at the moment, but we do have certain ——

MR. JUSTICE BRIGGS: We had better deal with everything before we deal with any of it, I think. Logically, you deal with whether there is going to be an appeal first, but I take your point that a stay is closely bound up with it.

MR. SHELDON: Yes, as long as your Lordship is aware that there are suggestions that we have. I do not know if your Lordship wants to deal with that now.

MR. JUSTICE BRIGGS: Are those ones you have got, or just made?

MR. SHELDON: My Lord, there is another one, because the other issue is that if we do not, in the meantime, declare an Insolvency Event — if your Lordship were to direct us not to declare an Insolvency Event pending the outcome of an appeal — there is then the issue of the payments. There is $300 million which is due to be paid today.

Cheyne Finance PLC (In Receivership), Re, 2007 WL 4190562 (2007)

MR. JUSTICE BRIGGS: So you want a stay of any further current payments so as to freeze the position all ways?

MR. SHELDON: Indeed, absolutely. My Lord, the third element of it is that we would invite your Lordship to direct us not to make a determination that Insolvency Event has occurred by reason of us not making those payments. My Lord, I do not know if it is helpful, I do have a form of words.

MR. JUSTICE BRIGGS: I am just wondering if I can do that. Can I do that? I cannot amend the parties' contract without their consent. It is common ground that if today $300 million is not paid there is an Insolvency Event. I suppose you would say it is one of those events rather like a temporary cash flow crisis, there is not really a commercial insolvency because it is just that some judge has interfered and stopped you paying when you have the money?

MR. SHELDON: My Lord, that is right. My Lord, there does not seem to be any alternative.

MR. JUSTICE BRIGGS: Yes, I can see the point. Otherwise you say all the parties are prejudiced by the stay in a way that is unnecessary?

MR. SHELDON: Yes, and it means that Mr. Fisher's clients, they win even though they have lost!

MR. JUSTICE BRIGGS: I can see the force of your point. I am just hesitant that I can, as it were, declare here and now without hearing any argument that if you did not pay the $300 million due today there would be no insolvency consequences.

MR. SHELDON: My Lord, with respect, it is almost the same as the position on the first limb.

MR. JUSTICE BRIGGS: I suppose what I could do is not to prevent you from declaring an Insolvency Event which would let you off paying the $300 million, because there had been an Insolvency Event and then you do not have to pay anything immediately, in the sense that what you do is you do an orderly administration, but not let you do a transaction which would prevent you going back to the current pay as you go regime if the Court of Appeal took a different

view. I am just trying to think of a way of construing a stay in terms that would not involve the court magically varying the contract. I say that out of a desire to help, Mr. Sheldon.

MR. SHELDON: Yes, I do understand.

MR. MORTIMORE: My Lord, if I might assist. We have certainly come to the view that your Lordship was putting forward, namely that the consequences of your Lordship's decision on the first point are that the Receivers' are free to determine an Insolvency Event if they think fit.

MR. JUSTICE BRIGGS: And probably will.

MR. MORTIMORE: Consequent from that two things would follow. One is a payment, but the $300 million would not be paid today—

MR. JUSTICE BRIGGS: But is kept safe.

MR. MORTIMORE: — and there are further outflows over the next days certainly into next week, very serious outflows. The other matter is the potential sale which might render the appeal nugatory.

As regards the Insolvency Event and payments out, the position would be that if the Court of Appeal took a different view the determination by the Receivers on the basis of your Lordship's interpretation would simply be a nullity.

MR. JUSTICE BRIGGS: They would all be paid slightly late, and it would harder in those circumstances for anybody to say that that was because of the insolvency, it was because a judge got it all wrong.

MR. MORTIMORE: It comes entirely within the temporary blip in the Australian cases, so that no one would be the worse off. That is not a problem. The only problem one is left with then is the major sale, and that must be dealt with, as my learned friend says, by a highly urgent application to the Court of Appeal, so that we are definitely in the Court of Appeal next week.

MR. JUSTICE BRIGGS: Which is perfectly attainable, I know, because it has happened on other occasions.

Cheyne Finance PIc (In Receivership), Re, 2007 WL 4190562 (2007)

MR. MORTIMORE: My Lord, that is our position.

MR. JUSTICE BRIGGS: Yes, understood. Mr. Pascoe?

MR. PASCOE: My Lord, we would support the position Party B. There are very substantial funds to be paid out shortly which should not be paid out.

MR. JUSTICE BRIGGS: If they declare insolvency.

MR. PASCOE: My Lord, yes, but at the same time the appeal needs to be done very urgently. While it is obviously right that a transaction such as the proposal should not be entered into pending an appeal, but the *quid pro quo* for that, given that there must be a risk that —

MR. JUSTICE BRIGGS: Is that they get on with the appeal.

MR. PASCOE: Absolutely, my Lord, and the timescale that my learned friend

Mr. Fisher was suggesting—

MR. JUSTICE BRIGGS: The only slight downside is that if you put somebody under such a timetable to appeal, they spend all their living moments just doing it without thinking whether it is a good idea or not. It has happened before. I suspect that is what is behind Mr. Fisher's sensible observation that a moment for a cooling off period might be sensible.

MR. PASCOE: My Lord, plainly an opportunity has to be given to consider the application for leave, but that has got to be a compressed one. We do say that Mr. Fisher's timetable is too leisurely.

MR. JUSTICE BRIGGS: Yes, very well.

MR. BAYFIELD: My Lord, I do not think I can usefully add anything.

MR. JUSTICE BRIGGS: Well, Mr. Fisher? Do you want to say anything else before we go back to Mr. Fisher?

MR. SHELDON: My Lord, I am just a little bit concerned. If we do make a determination that an Insolvency Event has occurred we have to give notice, and there is, I think, a very real issue which I think we need to think about a little bit more about whether you can undo the Insolvency Event if the Court of Appeal were to disagree with your Lordship.

MR. JUSTICE BRIGGS: Tell me why you cannot. There may be an issue, but at the moment I have not seen it. It may be that Mr. Fisher should be telling me.

MR. SHELDON: Yes, I will see what he has to say.

MR. JUSTICE BRIGGS: At the moment my impression is that providing nothing is done which would prevent a return to the pay as you go regime if the determination and any notice is given pursuant to it were held to be invalid, then what is the problem? I may be wrong. You know this more deeply than, Mr. Sheldon.

MR. SHELDON: I think there is concern about the effect on the rating, for example.

MR. JUSTICE BRIGGS: On the what?

MR. SHELDON: On the rating of the—

MR. JUSTICE BRIGGS: I suppose there will be — with all that hindsight delivered by the Court of Appeal — a temporary blip in your ratings.

MR. SHELDON: That may be, although of course one does not know what knock- on effect it will have.

MR. JUSTICE BRIGGS: Let us hear from Mr. Fisher. I can rise while you take instructions if there are thought to be other problems you have not had a chance to formulate.

MR. FISHER: My Lord, I am grateful for that. My Lord, I had left the stay to one side simply because I could tell it was going to be most difficult, and I will not mention anything again on the permission to appeal point.

On the stay point, Mr. Pascoe set out timetable is somewhat leisurely, but we will not get the approved

judgment, or at least the transcript of the judgment until about 24 hours time from now and we have got to take instructions—

MR. JUSTICE BRIGGS: I am slightly surprised there has not been a shorthand writer in court if it is all that urgent. There has, good. Madam Shorthand Writer, when do we think, in practice, a judgment could be available?

SHORTHAND WRITER: Tomorrow morning.

MR. JUSTICE BRIGGS: Any rough idea of time, one for correction by parties and me.

SHORTHAND WRITER: Tomorrow morning.

MR. JUSTICE BRIGGS: There you are, Mr. Fisher.

MR. FISHER: My Lord, I am grateful for that. We do need to consider it, and, as your Lordship said, it is appropriate that my clients are given advice on the merits of proceeding with an appeal and whether or not it is in their best interests to do so and that there are grounds to do so before heading off to the Court of Appeal willy-nilly and just trying to get an appeal in because it suits everyone else in the circumstances. My Lord, that is what I say in terms of permission and the timing.

The only undertakings I am in a position to give to your Lordship are those which I set out when I was on my feet a few moments ago. If your Lordship puts a tighter timetable on it, then so be it, but we do need time to consider it carefully and those are the undertakings I am instructed to give.

My Lord, in terms of a stay, we would just make a couple of observations. The current position, assuming your Lordship is minded to give permission, is that the Receivers have a judgment, but it will be one in respect of which your Lordship has given permission, and therefore it is accepted that there is a real prospect that the Court of Appeal may go the other way.

MR. JUSTICE BRIGGS: Yes, real, in the sense of more than fanciful.

MR. FISHER: A real prospect of success, my Lord, yes.

My Lord, it is then a matters for the Receivers, in the light of that judgment, as to whether they feel confident enough in circumstances, where your Lordship has given a judgment which they say has one conclusion but permission has been given to appeal, to call an Insolvency Event.

My Lord, in terms of a stay, my clients would like the position to be preserved so that an appeal is not rendered nugatory. It does seem to us that a sensible solution to that would be that payments are not made on a pay as you go basis, but that a book sale is not effected so that there is no irreversible change of position. Then, were the Court of Appeal to say we disagree with your Lordship and give directions which therefore lead to the Receivers to reconsider whether or not an Insolvency Event had occurred, the position, albeit there would be some late payments, could be restored to that which

MR. JUSTICE BRIGGS: That is very helpful. The question is where does the determination of Insolvency Event fit into that. Which side of the dividing line does that come? At the moment I have some difficulty in seeing how the Receivers can stop payments unless they determine an Insolvency Event. I cannot rewrite the contract. Until then, how can they stop payments?

MR. FISHER: My Lord, there is a limited degree of comfort that my clients can give, and your Lordship can give to the Receivers in the circumstances. We would ask for a stay to the extent that it is necessary to protect the ability of the appeal to go forward. It will remain a question for the Receivers as to whether or not, in the light of the judgment, where leave to appeal has been given, whether they feel they should declare an Insolvency Event.

MR. JUSTICE BRIGGS: I see, leave it to the Receivers, not stay it. Thank you. That is helpful. I think everybody has had their say on the subject.

91   I must deal with the question of appeal. In my judgment, the issues which I have determined are issues where it is difficult to say there is no reasonable prospect of Party A persuading the Court of Appeal to a different view. Furthermore, they do involve a determination of the meaning and effect of s.123(1)(e) of the Insolvency

Cheyne Finance PLC (In Receivership), Re, 2007 WL 4190562 (2007)...

Act , about which there is no current authority, and which may affect other similarly drafted contractual structures, even if it does not affect petitioners to winding up to any great degree. Therefore, it is right that I, in principle, ought to give permission to appeal.

92 Nonetheless, it is apparent from the evidence, and indeed I think common ground, that the question of whether this judgment is to be the subject of an appeal, and a consequential appeal, needs to be conducted with the greatest possible urgency because there are very large payments due to be made by the Receivers if no Insolvency Event is determined, and because the Receivers wish to conduct a transaction in the very near future which they believe will secure better value than continuing with the present profile of asset disposals.

93 I have been offered undertakings by Party A to notify the other parties, including the Receivers, whether they intend to appeal by 4.30 on Monday, and to lodge a notice of appeal by 4.30 on Tuesday, and thereafter to prosecute the appeal with the utmost diligence. In my judgment, it is desirable, if possible, that this appeal should be got on next week, as has been possible before on similar appeals from this Division on matters of urgency.

94 In those circumstances, while I recognise that Party A, if only because it is in a representative capacity, needs to consider the judgment and obtain advice as to whether to pursue an appeal, nonetheless, I am of the view that it is appropriate to set a tighter timeframe for notice to appeal than that which has been proposed. The timeframe which I propose to set is that permission to appeal is given, but the time for lodging notice of appeal is abridged to 4.30 this Friday, 19th October 2007, and that the other parties all be notified of an intention so to do at the same time.

95 I also direct, in so far as it is possible for me to do so, that this matter is dealt with urgently, and I direct the parties — I do not think the Receivers need any direction — to prosecute the appeal with the utmost diligence. I anticipate that, those words having been said, the getting of an appeal quickly is likely to be best conducted directly between the parties and the Civil Appeals Office.

96 The question of stay then arises. It is common ground, whether or not the Receivers declare an Insolvency Event, if they were to complete the transaction to which I have already referred pending the hearing of an appeal, that would in all probability render the appeal nugatory, and for that reason there should be a stay to this extent, that no transaction of the type contemplated in the evidence and desired by the Receivers should be conducted pending the conclusion of the appeal unless the Court of Appeal otherwise directs.

97 I am not, however, minded, and indeed not invited by Mr. Fisher for Party A, to direct a complete stay of my judgment, such that, for example, the Receivers could not, on the basis of the judgment which I have given, determine that an Insolvency Event has occurred, and therefore so notify the Trustee with consequential service of notice as contemplated by the Trust Deed.

98 It seems to me, during the short time I have had to consider that question, that nothing irretrievable would take place as a result of that determination and the consequential sending of notice, except possibly a dip in the credit rating assigned to Cheyne Finance's securities.

99 If the Court of Appeal were to determine that I have got question 1 wrong such that the Receivers are unable at the moment to determine that there has been an Insolvency Event it would be open to the Court of Appeal to declare that their determination of insolvency and all notices connected with it was void, with the consequence, one supposes, that rating agencies would cease to take account of those notices in their assessment of the standing to be attributed to the company's securities.

100 Accordingly, I do propose to direct that pending the outcome of the appeal, or any other order in the meantime from the Court of Appeal, the Receivers do not carry out the transaction which they wish to carry out by way of a sale of the investment portfolio, but that they otherwise be at liberty to act as they think appropriate in the light of the judgment. As for getting this judgment perfected into a state when the Court of Appeal have it, it may be sensible at the moment the Shorthand Writer has obtained it in transcript form, for it to be immediately distributed in that form to the parties so that I can receive, as quickly as possible,

comments on it. For my part, it would be easiest if I could receive the comments of all the parties, as it were, collected on to one version of the judgment, rather than have to develop four eyes and look at four parallel sets of comments.

MR. SHELDON: My Lord, we will undertake to take charge of that and gather all the parties' comments.

MR. JUSTICE BRIGGS: What I would like to have is one draft back with all the comments on it. I do not really mind who the comments come from. They can all be in the same colour. Indeed, they can all be, if necessary, if it is an electronic document, in the form of proposed track changes. I do not mind how it is done. That seems to me the quickest way of getting an approved judgment to the Court of Appeal.

MR. SHELDON: My Lord, we will undertake to gather comments and then pass them to your Lordship.

MR. JUSTICE BRIGGS: Good, and I will simply do my best to get it out as quickly as I can.

MR. SHELDON: The only thing is, would your Lordship give liberty to apply?

MR. JUSTICE BRIGGS: What sort of liberty to apply? I have given you liberty to apply to the Court of Appeal. If it is something to do with the appeal, it seems to me they have got carriage of it rather than me once the appeal is under way.

What did you have in mind?

MR. SHELDON: My Lord, it is the unforeseen.

MR. JUSTICE BRIGGS: All right, but do not assume that if you apply to me I will not send you off to the Court of Appeal.

MR. SHELDON: We do understand that now that your Lordship has dealt with the matter. It is just that there may be something new that arises.

MR. JUSTICE BRIGGS: In particular, if, on reflection, you realise there is some irretrievable consequence of an Insolvency Event determination that nobody has yet thought of.

MR. SHELDON: Yes.

MR. JUSTICE BRIGGS: Very well. I will give all parties liberty to apply but I think they should do it on notice to the Receivers, if it is not the Receivers.

MR. SHELDON: I am obliged. Would your Lordship give me a minute. (After a pause) My Lord, I have assumed, and I am asked just to confirm this, that if we think it is a good deal we can continue to make piecemeal sales of assets. I think when your Lordship said—

MR. JUSTICE BRIGGS: I have said nothing to stop you.

MR. SHELDON: Absolutely, I did not think your Lordship had.

MR. JUSTICE BRIGGS: If someone comes and offers you something which you should bite their hands off for, I do not see why you should not sell it.

Insolvency does not seems to me to have fundamental consequence in terms of your power of sale, it just changes the objectives.

MR. SHELDON: It just changes the objectives, and the size of the body which we must principally have regard to. MR. JUSTICE BRIGGS: Very well. Thank you for all your assistance.

Crown copyright

© 2017 Sweet & Maxwell

2007 WL 4190562

© 2017 Thomson Reuters.

# TAB 68

**\*78  Re M C Bacon Ltd**

Chancery Division (Companies Court)
30 November 1989

**[1990] B.C.C. 78**

Millett J.
Judgment delivered 30 November 1989

### Analysis

Liquidation—Adjustment of prior transactions—Transactions at undervalue—Preferences—Company gave debenture to bank to secure overdraft when actually or virtually insolvent—Company went into creditors' voluntary liquidation three months later—Liquidator applied to have debenture set aside—Whether directors influenced in deciding to grant debenture by desire to improve bank's position in insolvent liquidation—Whether consideration for debenture was less in money than consideration provided by company—Whether consideration capable of valuation in monetary terms—Insolvency Act 1986, sec. 238(4)(b), (5), 239(4)(b), (5) .

This was an application by the liquidator of MC Bacon Ltd ("the company") to have a debenture set aside under sec. 239 of the Insolvency Act 1986 as a preference or under sec. 238 as a transaction at an undervalue.

The company traded profitably until 1986 when it lost its principal customer. The directors considered putting the company into immediate liquidation but, after taking legal advice, decided to continue trading. A substantial number of employees were made redundant, but the company made substantial losses and went into creditors' voluntary liquidation in August 1987, with an estimated deficiency for unsecured creditors of some £329,000.

The company's overdraft then stood at £235,530. It was secured by a debenture given in May 1987 when the company was actually or virtually insolvent and could not have continued without the bank's support.

The liquidator's case was that the directors were influenced, when they acceded to the bank's request for a debenture, by a desire to improve the bank's position in the event of the company's insolvent liquidation within sec. 239(4)(b) and (5) ; alternatively, that the granting of the debenture was a transaction at an undervalue within sec. 238(4)(b) .

*Held* , dismissing the liquidator's application:

1  A transaction would not be set aside under sec. 239 unless the company positively wished to improve the creditor's position in the event of insolvent liquidation. Desire was subjective, but its existence could be inferred from the circumstances of the case. The mere presence of the requisite desire would not be sufficient by itself. It must have influenced the decision to enter into the transaction. That requirement was satisfied if it was one of the factors which operated on the minds of those who made the decision, at the time when the decision was made.

2  In deciding to grant the debenture to the bank the directors were not motivated by any desire except the desire to avoid the calling in of the overdraft and to continue trading. They were not actuated by any desire to improve the bank's position as a creditor in the event of the company's liquidation.

3  Section 238(4)(b) required a comparison to be made between the value obtained by the company for the transaction and the value of consideration provided by the company. Both values had to be measurable in money or money's worth and had to be considered from the company's point of view.

4  The creation of security over the company's assets did not come within sec. 238(4)(b) . It did not deplete the assets or diminish their value. Loss of the ability to apply the proceeds of the assets otherwise than in satisfaction of the secured debt was not  **\*79** capable of valuation in monetary terms, nor was the consideration the company received in return.

### Representation

• Mr Geoffrey Vos and Mr David Lord (instructed by William Prior & Co ) for the liquidator.

• Mr John Lindsay QC and Mr Anthony Mann (instructed by Wilde Sapte ) for the respondents.

## JUDGMENT
Millett J:

M C Bacon Ltd ("the company") was formed in 1973 as part of a management buy-out by Mr Michael Creal ("Mr Creal"), Mr Sidney Glover ("Mr Glover") and Mr Alec Knight ("Mr Knight"). It carried on business as a bacon importer and wholesaler. Mr Creal and Mr Glover were executive directors and ran the business. Mr Knight was a non-executive director who had helped to finance the buy-out, and his shareholding was eventually bought in by the company.

Traditional bacon was the corner-stone of the business for the first ten years. In 1983, in response to the requirements of its principal customer, Dee Corporation, the company diversified into the supply of pre-packaged manufactured products such as gammon steaks, gammon joints and rashered bacon, and ran down the traditional side of the business. In December 1986 Dee Corporation, which by then was responsible for nearly 60 per cent of the company's turnover, abruptly withdrew its custom. Mr Creal and Mr Glover considered putting the company into immediate liquidation but, after taking legal advice, they decided to continue trading. A substantial number of employees were made redundant and the company attempted to regain sales volume with reduced overheads, but it made substantial losses as well as incurring liability to make redundancy payments in the process. It struggled on for some months but was unsuccessful. It eventually went into creditors' voluntary liquidation on 24 August 1987 with an estimated deficiency as regards unsecured creditors of £329,435.

At the date of liquidation the company's overdraft at the first respondent, National Westminster Bank ("the bank") stood at £235,530. The overdraft was secured by a debenture dated 20 May 1987 granted by the company. On 4 September 1987 the bank demanded payment and on the same day it appointed the second respondent as administrative receiver of the company. The applicant was appointed liquidator of the company at a meeting of creditors on 7 September 1987.

The applicant now claims to have the debenture set aside (1) under sec. 239 of the Insolvency Act 1986 ("the Act") as a voidable preference, or (2) under sec. 238 of the Act as a transaction at an undervalue. Originally the applicant also alleged that from 15 April 1987 onwards the bank was a shadow director of the company and claimed that it had thereby rendered itself responsible for what was alleged to have been the wrongful trading of the company on and after 15 May 1987. These last mentioned allegations were rightly abandoned by the applicant after six days of oral evidence. As a result, I can set out the facts at shorter length and in less detail than would otherwise have been the case.

## The facts

Up to 24 October 1986, when its financial year ended, the company traded profitably. It was able to keep within its overdraft limits and its account at the bank went into credit from time to time during the year. There was no "hard-core" borrowing. The company successfully resisted all attempts by the bank to obtain a debenture. In January 1986 the bank released the directors from their guarantees. In April 1986 it increased the company's overdraft facilities to £300,000 and offered to reduce the rate of interest if a debenture were provided. In May it conceded the reduction in the rate without requiring a debenture rather than risk the loss of the account to a competitor.

**\*80**

Mr Creal and Mr Glover were in their late fifties. They intended to retire when they were 60 and had originally expected to sell the company on their retirement. But Mr Creal's son, Mr Martin Creal (whom I shall call "Martin" in order to distinguish him from his father and without intending any disrespect thereby) joined the company in February 1982 when he was aged 24, and their intentions changed. Martin was appointed a director and was groomed for eventual succession. Mr Glover still intended to retire when he was 60 and sell his shares, but Mr Creal wanted Martin to take over the company when the time was right.

The loss of the company's main customer in December 1986 came as a severe blow. Thirty-six employees were immediately made redundant. Mr Creal was despondent and his first thought was to put the company into liquidation. Martin, however, was keen

to continue trading and to try to turn the company round. Mr Creal discussed the position with the company's solicitors and auditors and was advised that liquidation could be an over-reaction. Mr Creal told them that the loss of the Dee Corporation was "a set-back but not a disaster". He said that the company was very solvent, and was advised to monitor the figures carefully for a time to see whether significant trading losses were being incurred, to ensure that the company did not work its way through its reserves.

While Mr Creal and Mr Glover both thought that the company could be pulled round, the loss of the company's major customer and the need to reduce the size of the company hastened their decision to retire and hand the business over to Martin. Mr Creal no longer had the energy or inclination for the task. Mr Glover was 22.5 stone and suffered from arthritis. He was no longer prepared to do manual work, as full involvement in what had once again become a small company would require. They both had financial interests outside the company. Mr Glover in particular was engaged in small-scale property development through a company called Medallion Properties Ltd ("Medallion"), which he owned jointly with a small builder. He and Mr Creal were willing to provide Martin with advice and support but they brought forward the date of their retirement to coincide with the end of the current tax year. Martin for his part was keen to have the opportunity and the responsibility for returning the company to profit.

On 5 January 1987 Mr Glover called on Mr Hill, the manager of the Southwark branch of the bank where the company's account was maintained. He did not tell Mr Hill of the loss of the company's major customer, for he saw no advantage to the company in doing so. But he told Mr Hill that he and Mr Creal wanted to sell their shares to Martin and leave the company. He asked Mr Hill how the bank would react to a request to lend Martin £160,000 in order to buy out Mr Creal and himself. Mr Hill told him that it would not be an acceptable proposition. He also told Mr Glover that Martin had only been with the company for four years, that the bank would want to consider whether it would wish to continue the present facilities with him in charge, and that in those circumstances the bank would certainly be looking for a debenture.

Early in the new year Mr Glover resigned as joint managing director and it was formally agreed that effective management of the company should be transferred to Martin. This made no difference to the way in which the company's affairs were conducted in practice. Mr Glover remained a director and continued to be responsible for the company's financial administration and the production of monthly management accounts. Martin continued to spend virtually all his time in the factory and seldom visited the company's office at 192–194 Trundley's Road, Southwark, some 200 yards distant. On 19 January 1987 it was agreed that Mr Creal and Mr Glover would retire on 3 April, that Mr Creal would remain as non-executive unpaid chairman and that Mr Glover should sever his connection with the company.

During the next few weeks Mr Creal and Mr Glover were heavily engaged with the company's solicitors and accountants in arranging the terms on which they would retire. These were carried into effect on Friday 3 April 1987 when: **\*81**

> • (1) Mr Glover resigned as a director and secretary of the company and was paid a golden handshake of £50,000 of which £25,000 was paid immediately and £25,000 was prudently paid on the Monday following (the first day of the new tax year);
> • (2) Mr Creal resigned as an executive director and accepted the position of unpaid non-executive director and chairman;
> • (3) Martin, now the only executive director, was appointed secretary;
> • (4) Martin bought out Mr Glover's 20 per cent shareholding for £7,500;
> • (5) Mr Creal granted Martin an option to buy out his own shareholding at the same price per share exercisable at any time between 1 May 1990 and 30 April 1992.

It was also agreed that in lieu of the bonus payments to Mr Creal and Mr Glover for the year 1985–86 the company should pay a total of £80,000 into their self-administered joint pension fund, of which they were two of the three trustees. This sum represented pension contributions of £55,000 on behalf of Mr Creal and £25,000 on behalf of Mr Glover.

It has not been alleged that these payments were in any way improper. Mr Creal, Mr Glover and Martin knew

that the company was in a difficult financial position and that it needed time to pull it round, but they had no reason to think that it was technically insolvent or that it could not be pulled round. They knew that Martin might not succeed, and they agreed that if he failed they would reimburse him the cost of buying Mr Glover out.

The company's cash position was weak. Its overdraft remained at a low level throughout January, February and most of March but it rose strongly on 25 March to £248,569, still well within the limit of the facility but making it difficult to fund payments totalling £130,000. To ease the pressure on the overdraft, the pension fund made a temporary unsecured loan of £46,000, which was paid into the company's account on 26 March and repaid to the pension fund on 6 April, by which time other receipts had reduced the company's overdraft to £203,350:

To fund Mr Glover's golden handshake, it had already been agreed that Medallion would buy the company's office premises at 192–194 Trundley's Road for £40,000. Unfortunately it transpired that the title to the property was vested not in the company but in a wholly owned subsidiary which had been struck off the register, so that it would be necessary to have the subsidiary restored to the register and the property transferred to the company before Medallion could buy it. All this would take time and, in the event, was not completed when the company went into liquidation on 24 August. In the meantime and in order to assist the company's cash flow, Medallion paid the £40,000 to the company on account of the purchase price. This sum was received by the company on 6 April.

In order to fund the £80,000 which it paid to the pension fund, the company borrowed the money back from the pension fund on the security of a debenture dated 3 April 1987 which had been prepared by the company's solicitors for execution on that date and which was duly delivered to the registrar of companies for registration (just in time) on 23 April 1987.

On 14 April Mr Craig, the audit partner with the actual conduct of the company's audit, visited the company's offices to discuss the completion of the 1985–86 accounts with Mr Glover. Although Mr Glover had retired and no longer held any official position in the company, he was willing to make himself available

to discuss the figures. Mr Craig took the opportunity to review the latest management accounts for the 18 weeks to 27 February 1987 and discussed them with Mr Glover. They showed a loss of £91,000 for the four months, of which £61,000 had been incurred in January and February. **\*82** Mr Glover told Mr Craig that the directors, by which he meant Mr Creal and Martin, had discussed the figures and the possible courses of action available. He indicated that they would make a final decision on the future viability of the company based upon the six months' figures to 30 April, which Mr Craig was told should be available by 12 May. Mr Craig noted that the company would be saving some £80,000 a year in future by not having to pay remuneration to Mr Creal or Mr Glover.

Mr Craig did not attempt a trial balance but Mr Glover recalled his telling him that the company was at or near to insolvency. This was certainly the case. The company's net assets appearing in the draft accounts at 24 October 1986 were £261,000 (or £323,000 if provision for deferred taxation is written back as being no longer necessary) from which £91,000 losses since the year end to the end of February 1987, and £130,000 payments to Mr Creal and Mr Glover would fall to be deducted, leaving only £40,000 (or £102,000). But these figures include plant and machinery valued at over £200,000 on a going-concern basis and take no account of any further losses incurred since the end of February. Clearly the company's viability as a going concern depended on the continued support of the bank, while it would soon become technically insolvent (if it was not so already) if it was unable to stem its continuing trading losses in the relatively near future.

Mr Craig took the opportunity to explain to Mr Glover the provisions of the Act relating to trading while insolvent. I infer that he explained that directors could be made personally liable if they permitted the company to continue to trade when they knew or ought to have concluded that there was no reasonable prospect that the company would avoid going into insolvent liquidation.

The overdraft rose sharply after 9 April, reaching £299,379 on 14 April. Mr Hill asked Mr Glover to come and see him as a matter of urgency as the overdraft was right up to the limit. Mr Glover saw him on 15 April. In the course of the meeting he told Mr Hill for the first

WESTLAW   © 2017 Thomson Reuters.

time of the loss of the Dee Corporation's custom, of his own and Mr Creal's retirement, and of the sale of his own shareholding to Martin. He said that although he had resigned as a director he had returned to take control of the company's accounting procedures. He told Mr Hill that there was a meeting of the directors to be held on 21 April, and Mr Hill asked to be provided with a full report following that meeting together with a cash-flow forecast for 1987 and management accounts to 31 March. He also asked for the bank's form showing quick assets and liabilities to be completed and told Mr Glover that he should advise the directors that, with his own departure, and Mr Creal's intending to take a back seat and make Martin managing director, the bank would require a debenture.

Mr Glover told me that well before 3 April he had warned Mr Creal and Martin that:

> "The time is going to come when we are going to have to give the bank a debenture. They are going to demand a debenture and when they ask for it we are going to have to give it."

This is plausible evidence and I accept it. Mr Hill had already indicated as much in January when he had not known of the loss of the Dee Corporation or of the worsening financial position of the company.

Less plausibly, Mr Glover also told me that it was he himself who first raised the possibility of the bank taking a debenture by saying to Mr Hill: "I think it is time you had a debenture". I reject this evidence. It is not consistent with Mr Hill's note of the interview or his report to his regional office in which he said that he wished to take a mortgage debenture over the company "as a matter of urgency". Mr Glover was much given to reconstruction rather than recollection and was not always consistent. His very first reference to the bank's debenture was in terms of the bank having asked for a debenture, while his claim to have initiated the subject was progressively weakened as he admitted first that he may have been "prodded subconsciously" and later merely **\*83** "prodded". But Mr Hill had no need to "prod" Mr Glover into offering a debenture; he was in

a position to demand one, and I am sure that he did. I also doubt that Mr Glover actually said to Mr Hill: "It is time you had a debenture", though he may well have thought it. Mr Glover's evidence is chiefly valuable for the insights which it provides of his thought processes at the time. I accept it only to the extent of finding that, when Mr Hill demanded a debenture, Mr Glover recognised that the time had come when the demand was justified and could not reasonably be resisted.

On the same day (whether before or after the meeting with Mr Hill can no longer be determined) Mr Glover took steps to procure the company to repay the £40,000 which Medallion had paid in anticipation of a contract of purchase of Trundley's Road. In order to fund the repayment the company resolved to borrow the money from the only source of finance available to it, now the bank overdraft was at its limit, namely the pension fund. It borrowed the money on terms that the loan should be repayable on 15 January 1987 and be secured by a debenture. The debenture was dated 15 April. The £40,000 was borrowed from the pension fund and paid out to Medallion on the same day. It was repaid by the company to the pension fund on 30 April by which time the overdraft at the bank had been reduced to below £200,000.

Mr Glover returned to Mr Hill on 21 April with the bank's quick assets/liabilities form duly completed. This showed quick assets £389,000, quick liabilities £640,000 (including bank overdraft £270,000) and fixed assets £362,000. Mr Glover discussed these figures with Mr Hill and assured him that the company could trade within a maximum overdraft of £300,000. Mr Hill warned him that the limit must not be exceeded in any way. In the course either of this or of the previous conversation on 15 April, Mr Glover told him that the pension fund was also proposing to take a debenture, and Mr Hill told him that if there was any attempt by the pension fund to resist the bank having first priority with its debenture, the bank's continued support would not be forthcoming. Mr Glover accepted that. He told me, and I accept, that when he and Mr Creal had taken the pension fund debenture they had recognised that it would have to be subordinated to the debenture which they fully expected the bank would eventually demand.

On the same day (again whether before or after his discussion with Mr Hill can no longer be determined)

Mr Glover telephoned the auditors. He was unable to speak to an audit partner and was put through to Mr David Taylor, the taxation partner. There is a dispute as to what Mr Glover actually said. According to Mr Taylor's attendance note made immediately afterwards, Mr Glover "advised that it was now likely the company would go into liquidation". He also mentioned that "beforehand both the bank and the pension fund were executing debentures". Mr Taylor understood, though Mr Glover did not say, that this was "in the hope that their loans would be secured". In his letter to the company's solicitors written that same day, Mr Taylor said that he believed that they would by now have been advised by Mr Glover that "there is a possibility the company will be put into liquidation". In evidence to me Mr Glover denied that he ever said that the company "would" go into liquidation; he said only that it "could" go into liquidation. That is plainly right. Neither of Mr Taylor's versions suggests otherwise. The difference between them is not whether the company "would" or "could" go into liquidation, but as to the degree of likelihood that it could.

Both parties have invited me to resolve this conflict but I am unable to do so. I do not know what prompted Mr Glover's call. It is possible that he had just completed the management accounts for March and discovered that the company had continued to make heavy losses, but there is no evidence of this. Without knowing what prompted Mr Glover to make the call and whether he was referring to the possibility of the bank withdrawing support and forcing a liquidation or to the possibility of Mr Creal and Martin giving up the struggle, I find it impossible to reach a conclusion. But it is quite  *84 unnecessary to do so. It is sufficient to find, as I do, that Mr Glover was referring to an insolvent liquidation; that he recognised that there was a distinct possibility of the company going into insolvent liquidation in the near future; and that this was sufficiently likely to warrant putting the auditors on notice of the fact but not to warrant the taking of any further step, for Mr Glover took none. Mr Glover remembered that there was great urgency in getting the pension fund debenture to the registrar of companies and that it had to be biked there on 23 April, but this was due to the imminence of the 21-day deadline for delivery, not to the imminence of liquidation.

Another meeting took place between Mr Glover and Mr Hill on 27 April when Mr Hill suggested that the bank's financial services section should visit the company. Mr Glover welcomed this; he seems to have thought that the section would provide some kind of management consultancy service. In fact, of course, the bank's main object was to obtain advice whether the directors were likely to be able to pull the company round and restore it to profitable trading. On 30 April Mr Hill wrote confirming the date of the section's forthcoming visit and stated:

> "… the prime purpose of the section's involvement is to derive, from available data and discussion with key management, a reliable information base on which the bank can base its response to the future financing requirements of the business. A secondary, but complementary aim, is to highlight to management any areas emerging during the assessment that warrant attention, where appropriate suggesting possible courses of action."

On 5 May Mr Hill wrote again. His letter contained the following passages:

> "I write to confirm that subject to certain conditions given below the bank will continue to support your company to the extent of an overdraft maximum of £300,000 pending the outcome of that investigation. I must emphasise however that in view of the serious position in which the company now finds itself, the bank's support from here on is on a day-to-day basis with repayment on demand. The first essential of the bank's continuing support is the provision of a first mortgage debenture over the company's fixed and floating assets

including a specific charge over the freehold of 192–194 Trundley's Road. If that property remains in the name of the subsidiary, then it will be necessary for that company to give a charge and guarantee the account of the company",

and so on. Later in the letter:

"You will understand that there can be no question of the pension fund taking a debenture to protect its position on a pari passu basis with the bank and if such a move is contemplated it must be made clear that the bank's continued support as I have outlined is dependent upon its proposed debenture and fixed charge over the property having first priority."

Mr Glover and Martin took comfort from this development. They persuaded themselves that the bank had decided that the company was worth supporting at least for the time being and that they would obtain helpful advice from the section on how best to restore the company to profitability. If they had been contemplating the possibility of imminent liquidation on 21 April, that possibility had now receded in their minds.

The company's management accounts for the six months to 24 April 1987 were ready by 12 May. They showed a loss of £301,000 for the half year, and when account is taken of the payments totalling £130,000 made to Mr Glover and the pension fund, this means that the company had made a trading loss of £171,000 in the six months, that is to say a further trading loss of £80,000 during March and April. A trial balance as at 24 April showed net assets of £27,000, assuming that a provision for deferred taxation was not required. But the fixed assets included plant and machinery valued at

£232,000 on a going-concern basis. The company was almost certainly technically insolvent.

*85

Two members of the section attended the company's premises between 12 and 14 May. Mr Glover made himself available for questioning. At the end of their investigation Mr Glover naturally asked them: "How did we do?" He was told to wait for the report. He was, however, given to understand that the section would not be recommending an immediate withdrawal of support by the bank and he took comfort from this.

On 15 May one of the members of the section telephoned the bank's regional office and reported that the company appeared to be insolvent, that there were reasonable grounds for thinking that the company could recover, that there was an urgent need for changes and that each of the management had a different objective.

On 19 May Martin returned to the bank the debenture which had been sent to him by the bank a few days earlier. It was not properly executed for, in Mr Creal's absence on holiday, Martin was the only signatory. The defect was attended to and the document re-executed on 29 May. It was dated 20 May.

It is not necessary to rehearse later events at length. An edited copy of the section's report was forwarded to the company by Mr Hill on 12 June under cover of a letter which called for further information including a business plan and an integrated profit and loss and cash flow forecast and which continued:

"Whilst the bank awaits this information and the completion of its existing security, it will grant an overdraft facility of £250,000 until the middle of next month, and that should be adequate for the company's requirements, bearing in mind that Mr Glover has indicated that the account can work within a ceiling of £230,000. You will appreciate that £250,000 will, therefore, be regarded as a strict maximum from hereon. This facility is, of course, entirely dependent on

the bank satisfactorily concluding its present security, namely a first mortgage debenture over the company's fixed and floating assets, with the pension fund directors giving the deed of postponement to the necessary extent in respect of the debenture they have registered, and giving the deed of satisfaction in respect of the debenture that has been repaid."

"… our sanctioning authority … confirm that they are prepared to continue to allow the company an overdraft facility of *£250,000 maximum for a further two months*, during which period it is hoped that a sale of the company will be concluded. The bank's continued support is, however, subject to the opening of a *separate wages and salaries account* … Finally, it is considered strongly advisable that the directors should seek advice from their legal advisers *as to the provisions of the* Insolvency Act 1986, given the position portrayed in the recent report by our financial services section."

The bank's terms were accepted. A deed of postponement of the £80,000 debenture was executed by the trustees of the pension fund and a memorandum of satisfaction of the £40,000 debenture was filed. On 17 June Mr Glover, Mr Creal and Martin met to discuss the section's report. They were disappointed at the lack of practical advice in the report and considered the alternatives of liquidation or continuing to trade. They decided to continue trading. The section had recommended that Mr Glover should take over the role of managing director for a short period and that the company should consider recruiting an outsider. Mr Glover realised that there was no hope of attracting an outsider to be managing director and he was unwilling to accept the position himself, but he agreed to accept responsibility "without portfolio". It was agreed that Martin should continue "in the title of managing director but to in fact be directed by" Mr Glover.

By the end of June Mr Glover and Mr Creal realised that their best hope was to sell the company as a going concern. Mr Glover was prepared to sell it for £1. That way he would at least save the pension fund's £80,000. He had always assumed that if the company failed the pension fund's debenture would be worthless, ranking as it did behind that of the bank.

Mr Glover did not produce the information which Mr Hill had requested and eventually Mr Hill realised that there was no one in the company capable of producing it, but, if it were produced, it would not portray an acceptable situation. He had lost all confidence in the company's management. On 30 July his assistant wrote to Martin: **\*86**

The bank was no longer supporting an insolvent company to enable the directors to trade out of difficulty but to give them an opportunity to try to find a purchaser. Hence the advice contained in that last passage.

The company had continued to make losses throughout the period and its cash flow came under increasing strain. The auditors visited the company on 20 August and saw the management accounts for July. They recommended immediate liquidation. The company went into liquidation on 24 August.

I am satisfied that at all material times and in particular from 14 April onwards Mr Glover, Mr Creal and Martin knew (1) that the company was actually or virtually insolvent and (2) that if the bank withdrew its support at any time the company would be forced into immediate liquidation. Mr Glover was well aware of the danger that the company might go into insolvent liquidation. I have little doubt that the repayment of £40,000 to Medallion on 15 April was motivated by a desire to avoid the risk of losing it in that event.

Mr Glover assumed that if the company failed the pension fund debenture would be worthless because

WESTLAW   © 2017 Thomson Reuters.

10-03635-jpm    Doc 271-3    Filed 04/03/17    Entered 04/03/17 18:29:57    Exhibit A -
Part 3    Pg 830 of 839

it would rank behind the bank's debenture, and its existence provided no motive for him to encourage the company to continue to trade unless he believed that it could survive. He was, however, less sanguine than Martin. He was motivated primarily by a sense of loyalty and a desire that Martin should be given a chance to prove himself. But I am satisfied that, like the others, Mr Glover genuinely believed throughout that the company could be pulled round if it was given time. I express no opinion whether that was a reasonable belief for any of them to hold, for that is a question which may fall for decision in other proceedings and is unnecessary to decide in these.

I reject the allegation that Martin was merely a cat's-paw and that Mr Glover's was the controlling mind of the company. The decision to continue trading and not to liquidate, which was a continuing one, and the decision to grant the bank a debenture were made by all three men. Martin and, to a lesser extent, Mr Creal looked to Mr Glover for advice, particularly on financial matters and in relation to the bank, and his influence was very great indeed; but the decisions were the decisions of all of them.

**Voidable preference**

**The law**

Section 239 of the Act provides, so far as material:

> "(4)  For the purposes of this section and section 241, a company gives a preference to a person if–
>
> (a)  that person is one of the company's creditors or a surety or guarantor for any of the company's debts or other liabilities, and
>
> (b)  the company does anything or suffers anything to be done which (in either case) has the effect of putting that person into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if that thing had not been done.

*87

> (5)  The court shall not make an order under this section in respect of a preference given to any person unless the company which gave the preference was influenced in deciding to give it by a desire to produce in relation to that person the effect mentioned in subsection (4)(b)."

So far as I am aware, this is the first case under the section and its meaning has been the subject of some debate before me. I shall therefore attempt to provide some guidance.

The section replaces sec. 44(1) of the Bankruptcy Act 1914 , which in certain circumstances deemed fraudulent and avoided payments made and other transactions entered into in favour of a creditor "with a view of giving such creditor … a preference over the other creditors". Section 44(1) and its predecessors had been construed by the courts as requiring the person seeking to avoid the payment or other transaction to establish that it had been made "with the dominant intention to prefer" the creditor.

Section 44(1) has been replaced and its language has been entirely recast. Every single word of significance, whether in the form of statutory definition or in its judicial exposition, has been jettisoned. "View", "dominant", "intention" and even "to prefer" have all been discarded. These are replaced by "influenced", "desire", and "to produce in relation to that person the effect mentioned in subsec. (4)(b) ".

I therefore emphatically protest against the citation of cases decided under the old law. They cannot be of any assistance when the language of the statute has been so completely and deliberately changed. It may be that many of the cases which will come before the courts in future will be decided in the same way that they would have been decided under the old law. That may be so, but the grounds of decision will be different. What the court has to do is to interpret the language of the statute and apply it. It will no longer enquire whether there

was "a dominant intention to prefer" the creditor, but whether the company's decision was "influenced by a desire to produce … the effect mentioned in subsec. (4)(b) ".

This is a completely different test. It involves at least two radical departures from the old law. It is no longer necessary to establish a *dominant* intention to prefer. It is sufficient that the decision was *influenced* by the requisite desire. That is the first change. The second is that it is no longer sufficient to establish an *intention* to prefer. There must be a *desire* to produce the effect mentioned in the subsection.

This second change is made necessary by the first, for without it it would be virtually impossible to uphold the validity of a security taken in exchange for the injection of fresh funds into a company in financial difficulties. A man is taken to intend the necessary consequences of his actions, so that an intention to grant a security to a creditor necessarily involves an intention to prefer that creditor in the event of insolvency. The need to establish that such intention was dominant was essential under the old law to prevent perfectly proper transactions from being struck down. With the abolition of that requirement intention could not remain the relevant test. Desire has been substituted. That is a very different matter. Intention is objective, desire is subjective. A man can choose the lesser of two evils without desiring either.

It is not, however, sufficient to establish a desire to make the payment or grant the security which it is sought to avoid. There must have been a desire to produce the effect mentioned in the subsection, that is to say, to improve the creditor's position in the event of an insolvent liquidation. A man is not to be taken as *desiring* all the necessary consequences of his actions. Some consequences may be of advantage to him and be desired by him; others may not affect him and be matters of indifference to him; while still others may be positively disadvantageous to him and not be desired by him, but be regarded by him as the unavoidable price of obtaining the desired advantages. It will still be possible to provide assistance to a company in financial difficulties provided that the company is actuated only by proper commercial considerations. Under the new regime **88** a transaction will not be set aside as a voidable preference unless the company positively

wished to improve the creditor's position in the event of its own insolvent liquidation.

There is, of course, no need for there to be direct evidence of the requisite desire. Its existence may be inferred from the circumstances of the case just as the dominant intention could be inferred under the old law. But the mere presence of the requisite desire will not be sufficient by itself. It must have influenced the decision to enter into the transaction. It was submitted on behalf of the bank that it must have been the factor which "tipped the scales". I disagree. That is not what subsec. (5) says; it requires only that the desire should have influenced the decision. That requirement is satisfied if it was one of the factors which operated on the minds of those who made the decision. It need not have been the only factor or even the decisive one. In my judgment, it is not necessary to prove that, if the requisite desire had not been present, the company would not have entered into the transaction. That would be too high a test.

It was also submitted that the relevant time was the time when the debenture was created. That cannot be right. The relevant time was the time when the decision to grant it was made. In the present case that is not known with certainty. It was probably some time between 15 April and 20 May, although as early as 3 April Mr Glover and Mr Creal had resigned themselves to its inevitability. But it does not matter. If the requisite desire was operating at all, it was operating throughout.

### The evidence

Mr Glover and Martin both gave evidence; Mr Creal did not. I accept Martin as a reliable witness. Mr Glover was far from reliable, but I accept him as an honest witness who tried his garrulous best to help the court. His recollection was poor and much of his evidence consisted of inaccurate reconstruction. It was chiefly valuable for the insights it gave of his own and others' motives. He was defensive in relation to his own responsibility for permitting the company to continue to trade and insisted that after 3 April he had ceased to be a director. I am satisfied that he remained a de facto director and that he was a party to and greatly influenced all decisions of importance in relation to financial matters. In relation to the bank's debenture, however, he did not take sides but gave his evidence fairly and impartially. He had either not worked out

that it was in the interests of the pension fund, even if it were only an unsecured creditor, that the bank's debenture should be set aside, or, if he had, he did not allow it to affect his evidence.

I am satisfied that throughout the period from 15 April to 29 May Mr Glover, Mr Creal and Martin knew:

   • (1) that the company was probably insolvent and might not be able to avoid an insolvent liquidation;
   • (2) that its continuing to trade was entirely dependent on the continued support of the bank;
   • (3) that if the debenture which Mr Hill had asked for were not forthcoming the bank would withdraw its support; and
   • (4) that if the bank withdrew its support the company would be forced into immediate liquidation.

I am also satisfied that they had decided to continue trading in a genuine belief that the company could be pulled round. It follows that they had no choice but to accede to the bank's request for a debenture. I accept Martin's evidence:

   "It was viewed as a simple decision. Either we gave the bank a debenture or they called in the overdraft."

**\*89**

That sufficiently explains the decision to grant the debenture and there is no justification for inferring any other reason. There is no evidence that either Martin or Mr Creal wanted to improve the bank's position in the event of an insolvent liquidation and there is no reason why they should. I find as a fact that in deciding to grant the debenture to the bank neither of them was motivated by any desire except the desire to avoid the calling in of the overdraft and to continue trading. That, however, is not the end of the matter. They were greatly influenced by Mr Glover's recommendation that the debenture should be granted, and I turn to examine his evidence to see whether he was influenced by a desire to improve the bank's position in the event of a liquidation for, if he was, then, in my judgment,

the company's decision was similarly influenced, even though Mr Glover did not communicate any such desire to the others.

Mr Glover's evidence was to the same effect. He knew that if the company was to continue to trade it had no choice but to grant the debenture. He had a further reason for recommending it to the others. He believed that a debenture was not valid unless the company continued to trade for six months after it was given. Accordingly, he conceived the eccentric notion that if the bank took a debenture it would have to continue to support the company for a further six months. As he put it:

   "A. I viewed the bank, that the bank, having got the debenture, would then have to give us credit for a further six months …

   Q. What was the point in giving the bank a debenture, in your mind?

   A. In the first and foremost, to secure an overdraft of £250,000 for a guaranteed six months."

Mr Vos, who appeared for the applicant, accepted this evidence but claimed that there was another consideration which also operated on Mr Glover's mind, namely a desire to improve the bank's position in the event of the company's insolvent liquidation. He submitted that this was not as idiosyncratic as it might appear, for Mr Glover and Medallion as well as the pension fund all banked at the Southwark branch of the bank; Medallion had an overdraft and anticipated making a request for a further facility in the near future; and Mr Glover would have wanted to keep on the right side of Mr Hill. He even claimed that Mr Glover felt a sense of guilt for having allowed the overdraft to become so high (even though it never exceeded the permitted limit) and so morally responsible for the position in which the bank found itself. Either explanation would lend credence to the otherwise implausible, but as a reason for agreeing to

MC Bacon Ltd (No.1), Re, [1990] B.C.C. 78 (1989)

grant the debenture neither is supported by the evidence and neither was put to Mr Glover. I reject both.

I am satisfied that throughout the period Mr Glover's relationship with the bank was an arm's length one and that in dealing with the bank on the company's behalf he was not affected by personal financial considerations. It is noteworthy that:

> • (1) he did not tell Mr Hill of the loss of the Dee Corporation for some months because he saw no advantage to the company in doing so;
> • (2) he did not tell Mr Hill of his own or Mr Creal's actual retirement until afterwards, even though he knew that Mr Hill would be sufficiently concerned to demand a debenture in that event;
> • (3) although he learned of the company's probable insolvency on 14 April he would not have gone to see Mr Hill on 15 April if Mr Hill had not summoned him; and
> • (4) on or after 21 April he never warned Mr Hill of the imminence of liquidation or the urgency if a debenture was to be taken in time.

Mr Vos relied on several passages in Mr Glover's evidence in which he equated the bank's debenture with the pension fund debenture, and appeared to be saying that he **\*90** had been concerned to protect the bank's position in the event of the company's liquidation. When asked why he agreed to give the bank a debenture, for example, he replied:

> "Because the pension fund was having a – about to have a debenture, or was under way with a debenture. I believe the pension fund was under way with having a debenture. And it seemed logic that the bank should have a debenture too."

But here Mr Glover was looking at the request from the bank's point of view. He was saying no more than that he recognised that it was reasonable for the bank to ask for a debenture.

Mr Vos submitted that:

> • (1) Mr Glover obviously arranged for the pension fund to have a debenture because he desired to improve its position as a creditor in the event of the company's insolvency;
> • (2) he also desired to give the bank a first debenture even if only to avoid the calling in of the overdraft;
> • (3) it follows that he must have desired to put the bank ahead of the pension fund in the event of the company's insolvency;
> • (4) and it follows that he must have desired to put the bank ahead of the unsecured creditors in the event of the company's insolvency.

In fact, priority between the debenture holders was not a matter for the company but for the debenture holders themselves. The bank demanded priority and the pension fund conceded it. But, in any case, in my judgment, the syllogism confuses desire with intention and breaks down at (3). Mr Glover intended the bank to rank ahead of the pension fund but he obviously did not desire it. It was the price he had to pay for the bank's continued support.

Mr Vos strongly relied on the following passages in Mr Glover's evidence:

> "The debenture for the pension fund was tidied up. I felt it was right and proper that the debenture for the bank should have been tidied up.
>
> On the broad sense, I was worried that both the bank and the pension fund had not got a debenture because I considered them my responsibility …
>
> I was charged with protecting the pension fund and the bank. That is how I saw my charge. That was my side of the business.

I was in no way involved with the trading of the company or the suppliers. I was involved with the bank and, secondly, the pension fund. I would have deemed it my responsibility, since I dealt with the bank and the pension fund, to protect them … I never thought about the other creditors of the company … because they were Mike Creal's responsibility. It was not my side of the business."

Mr Vos placed the strongest reliance on the following answers by Mr Glover when he was dealing with the telephone call to Mr David Taylor on 21 April:

"Q. Who rang?

A. There is no question. I rang David Taylor. And I, for some unknown reason, would have been agitated. I was disturbed. And it is the one thing of all this I cannot – it is a statement to David Taylor where, in my agitation, I would have said to David: 'David, I must get this tidied up because this company could go into liquidation.'

Q. And what did you tell him you were going to get tidied up?

A. It was already in process: a debenture on the – a debenture on behalf of the bank and a debenture on behalf of the pension fund."

*91

This was reconstruction, not recollection, and in relation to the bank's debenture it was nonsense. There was a great deal of excitement on 21 or 22 April in delivering the pension fund debenture to the registrar before the deadline expired, but the bank did not send the form of debenture which it was seeking to the company until 14 May. Mr Glover cannot have been agitated about the need to deal with the bank's debenture as a matter of urgency on 21 April and, if he had been, he would have rung Mr Hill, not Mr Taylor. Nor is this merely an error of date. There was no time at which Mr Glover's answer can have been true, and he later corrected it by saying that in this conversation he had not been concerned about the bank's debenture.

Despite this, Mr Vos relied on it as betraying an anxiety on Mr Glover's part lest the company should go into liquidation before the bank had obtained a debenture. There could be no explanation for a desire to ensure that the bank had a debenture even though the company went into insolvent liquidation immediately afterwards, it was submitted, except a desire that the bank's position as a creditor should be improved in that event.

Normally, no doubt, that would be so. In the present case it would sit uneasily with Mr Glover's belief that a debenture was invalid unless the company continued to trade for six months, but then Mr Glover did not always think logically. However, the key to Mr Glover's evidence is to be found in another series of answers to questions from me:

"Q. You thought it was your responsibility to protect the bank, but you did not think it was your responsibility to get the debenture registered?

A. No. No, no.

Q. I do not entirely understand.

A. No, no. No, no. I think we will find that the bank's solicitors are responsible for registering their own charge or debenture."

He was wrong.

> "Q. I only want to understand what you mean by saying you thought you were responsible for protecting the bank, because the bank would not be protected if it was not registered?

> A. Ah, well, not to – forgive me. Not in the sense that I would protect the bank in – one would say in the wide legal sense. The bank was somebody I dealt with and therefore, having said that a debenture was given – was to be given – obviously I was going to follow it through to see that a debenture was given."

That, in my judgment, is all it came to. Mr Glover dealt with the bank, it was "his side of the business", and he saw it as his responsibility to ensure that the company did what he had told the bank it would do. He had promised Mr Hill that the company would give the bank a debenture and he would have been upset if the company had gone into liquidation before it had done so. But he was not concerned whether the bank registered the debenture, even though he knew that it would not be valid unless it was registered, because he did not regard that as his responsibility. He was not worried that the company might go into liquidation before the bank obtained a *valid* security. That was a matter of indifference to him. It follows, and I find, that he was not actuated by a desire to improve the bank's position as a creditor in the event of the company's liquidation.

## Conclusion

I dismiss the applicant's claim to set the debenture aside as a voidable preference.

## Transaction at an undervalue

Section 238 of the Act is concerned with the depletion of a company's assets by transactions at an undervalue. Section 238(4) of the Act defines a transaction at an undervalue as follows: **\*92**

> "For the purposes of this section and section 241, a company enters into a transaction with a person at an undervalue if–

> (a) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration, or

> (b) the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company."

The granting of the debenture was not a gift, nor was it without consideration. The consideration consisted of the bank's forbearance from calling in the overdraft and its honouring of cheques and making of fresh advances to the company during the continuance of the facility. The applicant relies therefore on paragraph (b).

To come within that paragraph the transaction must be:

- (1) entered into by the company;
- (2) for a consideration;
- (3) the value of which measured in money or money's worth;
- (4) is significantly less than the value;
- (5) also measured in money or money's worth;
- (6) of the consideration provided by the company.

It requires a comparison to be made between the value obtained by the company for the transaction and the value of consideration provided by the company. Both values must be measurable in money or money's worth and both must be considered from the company's point of view.

In my judgment, the applicant's claim to characterise the granting of the bank's debenture as a transaction at an undervalue is misconceived. The mere creation of a security over a company's assets does not deplete them and does not come within the paragraph. By charging its assets the company appropriates them to meet the liabilities due to the secured creditor and adversely affects the rights of other creditors in the event of insolvency. But it does not deplete its assets or diminish their value. It retains the right to redeem and the right to sell or remortgage the charged assets. All it loses is the ability to apply the proceeds otherwise than in satisfaction of the secured debt. That is not something capable of valuation in monetary terms and is not customarily disposed of for value.

In the present case the company did not suffer that loss by reason of the grant of the debenture. Once the bank had demanded a debenture the company could not have sold or charged its assets without applying the proceeds in reduction of the overdraft; had it attempted to do so, the bank would at once have called in the overdraft. By granting the debenture the company parted with nothing of value, and the value of the consideration which it received in return was incapable of being measured in money or money's worth.

Mr Vos submitted that the consideration which the company received was, with hindsight, of no value. It merely gained time and with it the opportunity to lose more money. But he could not and did not claim that the company ought to have received a fee or other capital sum in return for the debenture. That gives the game away. The applicant's real complaint is not that the company entered into the transaction at an undervalue but that it entered into it at all.

In my judgment, the transaction does not fall within subsec. (4), and it is unnecessary to consider the application of subsec. (5) which provides a defence to the claim in certain circumstances.
**\*93**

## Conclusion

In my judgment, the granting of the debenture to the bank was neither a voidable preference nor a transaction at an undervalue and I dismiss the application.

(Application dismissed)  **\*94**

© 2017 Sweet & Maxwell
[1990] B.C.C. 78

# TAB 69

Ch.                    Oldham B.C. v. Attorney-General (C.A.)                    Dillon L.J.

A    us in deciding the questions with which we have been concerned on this
appeal. Equally, however, we have not had to consider whether our
decision would have been different if all the provisions of the Act of
1992 had already come into force.

RUSSELL L.J.   I agree.

B    FARQUHARSON L.J.   I also agree.

Appeal allowed.
Declaration accordingly.
Order for costs to be agreed.

C    Solicitors: Sharpe Pritchard for Director of Legal and Secretarial
Services, Oldham Borough Council; Treasury Solicitor.

M. I. H.

D                                    ——————

[COURT OF APPEAL]

E    In re PARAMOUNT AIRWAYS LTD. (IN ADMINISTRATION)

1992   Feb. 11, 12, 13; 27                    Sir Donald Nicholls V.-C., Taylor and
Farquharson L.JJ.

Insolvency—Transaction at undervalue—Service out of jurisdiction—
Director transferring company's money to bank in Jersey—Bank
F    having no place of business in England—Company's administrators
seeking order for recovery of money from bank—Whether
jurisdiction to make order against foreign bank—Insolvency Act
1986 (c. 45), s. 238—Insolvency Rules 1986 (S.I. 1986 No. 1925),
r. 12.12

The administrators of a company issued an originating
application against a bank registered in Jersey seeking, inter
G    alia, declarations that the transfer to the bank of considerable
sums of money belonging to the company by one of its directors
constituted transactions at an undervalue within the meaning of
section 238 of the Insolvency Act 1986,[1] and also orders for
repayment. The bank carried on business in Jersey but not in
England and Wales. The administrators also commenced
proceedings by writ against the director and others in respect of
those transactions, claiming that the bank was liable to the
H    company as constructive trustee for those sums. The registrar
granted the administrators leave to serve the originating

[1] Insolvency Act 1986, s. 238(2)(3): see post, p. 233D–E.

224

application on the bank in Jersey pursuant to rule 12.12 of the     A
Insolvency Rules 1986.[2] Mervyn Davies J. granted the bank's
application to set aside the registrar's order, holding that section
238 of the Act of 1986 did not have extraterritorial effect so as
to include a foreigner resident abroad, and that "any person" in
the section could not apply to the bank.

On the administrators' appeal:—

*Held*, allowing the appeal, that it was not possible, in
construing the expression "any person" in section 238 of the     B
Insolvency Act 1986, to identify any particular limitation which
could be said to represent the presumed intention of Parliament
in enacting the legislation, and the words had to be given their
literal meaning, unrestricted as to persons or territory; and that
the court, therefore, had jurisdiction under section 238 to make
an order against a foreigner resident abroad; that, having regard
to the unambiguous terminology of rule 12.12(1) of the     C
Insolvency Rules 1986, the jurisdiction deriving from it to order
service out of the jurisdiction was not to be confined, by
analogy, to cases falling within R.S.C., Ord. 11, r. 1(1); and
that, accordingly, the judge's order would be set aside and the
registrar's order restored (post, pp. 239D–E, 241C–E, H–242A, C).

Dicta of Lord Scarman and Lord Wilberforce in *Clark v.
Oceanic Contractors Inc.* [1983] 2 A.C. 130, 145, 152, H.L.(E.)
applied.     D

*Ex parte Blain; In re Sawers* (1879) 12 Ch.D. 522, C.A.
distinguished.

*Per curiam.* By virtue of sections 423(2) and 238 of the Act
of 1986 the court has an overall discretion wide enough to
enable it, if justice so requires, to make no order against the
other party to the transaction. In particular, if a foreign element
is involved the court will need to be satisfied that, in respect of
the relief sought against him, the defendant is sufficiently     E
connected with England for it to be just and proper to make
the order against him despite the foreign element (post,
pp. 239G–240A, 242C).

Decision of Mervyn Davies J. [1992] Ch. 160; [1991]
3 W.L.R. 318; [1991] 4 All E.R. 267 reversed.

The following cases are referred to in the judgment of Sir Donald     F
Nicholls V.-C.:

*Blain, Ex parte; In re Sawers* (1879) 12 Ch.D. 522, C.A.
*Clark v. Oceanic Contractors Inc.* [1983] 2 A.C. 130; [1983] 2 W.L.R. 94;
     [1983] 1 All E.R. 133, H.L.(E.)
*Company (No. 00359 of 1987), In re A* [1988] Ch. 210; [1987] 3 W.L.R.
     339; [1987] 3 All E.R. 137
*Galbraith v. Grimshaw* [1910] A.C. 508, H.L.(E.)     G
*Jogia (A Bankrupt), In re* [1988] 1 W.L.R. 484; [1988] 2 All E.R. 328
*Ormiston, Ex parte; In re Distin* (1871) 24 L.T. 197
*Rousou's Trustee v. Rousou* [1955] 1 W.L.R. 545; [1955] 2 All E.R. 169;
     [1955] 3 All E.R. 486
*Sill v. Worswick* (1791) 1 H.Bl. 665
*Tucker (A Bankrupt), In re* [1988] 1 W.L.R. 497; [1988] 1 All E.R. 603
*Tucker (R. C.) (A Bankrupt), In re, Ex parte Tucker (K. R.)* [1990] Ch.     H
     148; [1988] 2 W.L.R. 748; [1988] 1 All E.R. 603, C.A.
*Vocalion (Foreign) Ltd., In re* [1932] 2 Ch. 196

[2] Insolvency Rules 1986, r. 12.12: see post, p. 241A–C.